EXHIBIT 1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                    :      SUPERSEDING
UNITED STATES OF AMERICA            :      INFORMATION
                                    :
         - v. -                     :      S2 16 Cr. 467(AKH)
                                    :
MURRAY HUBERFELD,                   :
                                    :
                    Defendant.      :
                                    :
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: **MAY 2 5 2018**

**COUNT ONE**

(Conspiracy to Commit Wire Fraud)

The United States Attorney charges:

1.     In or around December 2014, in the Southern District
of New York and elsewhere, MURRAY HUBERFELD, the defendant, and
others known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit an offense against the United States, to wit, to violate
Title 18, United States Code, Section 1343.

2.     It was a part and an object of the conspiracy that
MURRAY HUBERFELD, the defendant, willfully and knowingly, having
devised and intending to devise a scheme and artifice to
defraud, and for obtaining money and property by false and
fraudulent pretenses, would and did transmit and cause to be
transmitted by means of wire communication in interstate and
foreign commerce, writings, signs, signals, pictures, and sounds
for the purpose of executing such scheme and artifice, in

violation of Title 18, United States Code, Section 1343, to wit, HUBERFELD and Jona Rechnitz, through the use of interstate wires, caused the management company of the Platinum Partners hedge fund ("Platinum"), with which HUBERFELD was affiliated, to pay $60,000 to Rechnitz's company by falsely representing, including through the use of a fraudulent invoice, that the money was to purchase courtside New York Knicks tickets, when in truth and in fact, and as HUBERFELD and Rechnitz knew, the actual purpose of the payment was to reimburse Rechnitz for having paid Norman Seabrook, the President of the Correction Officers Benevolent Association ("COBA"), for Seabrook's efforts to get COBA to invest millions of dollars in Platinum.

### Overt Acts

3.    In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere.

a.    On or about December 11, 2014, Jona Rechnitz e-mailed a fraudulent invoice to HUBERFELD, which on its face billed Platinum $60,000 for tickets to eight Knicks games at $7,500 per game.

2

      b. On or about December 15, 2014, HUBERFELD coordinated the delivery of a check from Platinum for $60,000 addressed to Rechnitz's company.

     (Title 18, United States Code, Section 371.)

          Geoffry S. Berman

        GEOFFREY S. BERMAN
        United States Attorney

3

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

MURRAY HUBERFELD,

Defendant.

**SUPERSEDING INFORMATION**

S2 16 Cr. 467 (AKH)

(Title 18, United States Code, Section 371.)

GEOFFREY S. BERMAN
United States Attorney.

*In Our*

5/25/18 Waiver and information filed.
Deft arraigned on S2 16 Cr 467 information;
Deft pres w/attys. Henry E. Mazurek + Alan Futerfas;
AUSAs Martin Bell + Kiara Pomerantz pres; Court
reporter Rebecca Forman pres; Deft enters a plea
of guilty to the S2 16 Cr 467 information; PSR
Ordered; Sentencing set for 9/14/18 @ 11:00 a.m.
Deft cont'd on bail.
                                        Hellerstein, J.

# EXHIBIT 2

# SECOND AMENDED AND RESTATED

## LIMITED PARTNERSHIP AGREEMENT

### OF

## PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P.

Dated

**July 1, 2008**

WD2000: NY 494369.5

## Table of Contents

Page #

**Article I General Provisions**..................................................................................... 1

Section 1.01.    Formation of Limited Partnership.......................................... 1
Section 1.02.    Partnership Name.................................................................. 2
Section 1.03.    Filing of Additional Statements. .......................................... 2
Section 1.04.    Registered Office. ................................................................ 2
Section 1.05.    Fiscal Year ........................................................................... 2
Section 1.06.    Purposes of Partnership........................................................ 2
Section 1.07.    Liability of Partners ............................................................. 4
Section 1.08.    Assignability of Interest ...................................................... 5
Section 1.09.    Business with the Public. ..................................................... 5

**Article II Management of Partnership** ....................................................... 5

Section 2.01.    General Partner. ................................................................... 5
Section 2.02.    Management Generally ........................................................ 5
Section 2.03.    Authority of General Partner ............................................... 5
Section 2.04.    Reliance by Third Parties..................................................... 6
Section 2.05.    Activity of the General Partner ............................................ 6
Section 2.06.    Exculpation .......................................................................... 6
Section 2.07.    Indemnification of General Partner ..................................... 7
Section 2.08.    Payment of Costs and Expenses .......................................... 7
Section 2.09.    Salaries or Other Payments.................................................. 8

**Article III Capital Accounts of Partners and Operation Thereof**........................... 8

Section 3.01.    Definitions............................................................................ 8
Section 3.02.    Capital Contributions........................................................... 9
Section 3.03.    Capital Accounts.................................................................. 9
Section 3.04.    Partnership Percentages .................................................... 10
Section 3.05.    Allocation of Net Capital Appreciation and Net Capital Depreciation ........ 10
Section 3.06.    Net Asset Value ................................................................. 11
Section 3.07.    Liabilities........................................................................... 13
Section 3.08.    Allocation for Tax Purposes .............................................. 13
Section 3.09.    Determination by General Partner of Certain Matters ....... 13
Section 3.10.    Adjustments to Take Account of Interim Year Events................. 13

**Article IV Withdrawals and Distributions of Capital** .............................................. 14

Section 4.01.    Withdrawals and Distributions in General.......................... 14
Section 4.02.    Withdrawals ....................................................................... 14
Section 4.03.    Limitation on Withdrawals ................................................ 15
Section 4.04.    Distributions....................................................................... 15

**Article V Admission of New Partners** ..................................................................... 16

Section 5.01.    New Partners ...................................................................... 16

**Article VI Death, Disability, Bankruptcy or Withdrawal of Partners**...................................**16**

| | | |
|---|---|---|
| Section 6.01. | Withdrawal, Death, etc. of General Partner | 16 |
| Section 6.02. | Withdrawal, Bankruptcy, etc. of Limited Partner | 17 |
| Section 6.03. | Effective Date of Withdrawal | 17 |
| Section 6.04. | Required Withdrawals | 17 |
| Section 6.05. | Limitations on Withdrawal of Capital Accounts | 17 |

**Article VII Duration and Dissolution of Partnership**.............................................**18**

| | | |
|---|---|---|
| Section 7.01. | Duration | 18 |
| Section 7.02. | Dissolution | 18 |
| Section 7.03. | Extension of Term | 19 |

**Article VIII Tax Returns; Reports to Partners**......................................................**19**

| | | |
|---|---|---|
| Section 8.01. | Auditors | 19 |
| Section 8.02. | Filing of Tax Returns | 19 |
| Section 8.03. | Reports to Partners | 20 |
| Section 8.04. | Reports to Partners and Former Partners | 20 |
| Section 8.05. | Tax Matters Partner | 20 |

**Article IX Miscellaneous**.........................................................................................**21**

| | | |
|---|---|---|
| Section 9.01. | General | 21 |
| Section 9.02. | Power of Attorney | 21 |
| Section 9.03. | Amendments to Partnership Agreement | 21 |
| Section 9.04. | Adjustment of Basis of Partnership Property | 22 |
| Section 9.05. | Choice of Law | 22 |
| Section 9.06. | Submission to Jurisdiction | 22 |
| Section 9.07. | Notices | 22 |
| Section 9.08. | Registers | 23 |
| Section 9.09. | Goodwill | 23 |
| Section 9.10. | Headings | 23 |
| Section 9.11. | Waiver of Rights | 23 |

WD2000: NY 494369.5

**SECOND AMENDED AND RESTATED**

**LIMITED PARTNERSHIP AGREEMENT**

**OF**

**PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P.**

**THIS SECOND AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT** (this "Agreement") of Platinum Partners Value Arbitrage Fund L.P., a Cayman Islands exempted limited partnership (the "Partnership") is entered into as of July 1, 2008 by and among Platinum Management (NY) LLC, a Delaware limited liability company and General Partner of the Partnership (the "General Partner"), Platinum Partners Value Arbitrage Fund (USA) L.P., a Delaware limited partnership ("Platinum USA"), and Platinum Partners Value Arbitrage Fund (International) Limited, a Cayman Islands exempted company ("Platinum International," and together with Platinum USA and all other parties who sign a limited partner signature page attached to this Agreement to become limited partners of the Partnership, the "Limited Partners"). The Limited Partners, the General Partner and any person hereafter admitted to the Partnership pursuant to Article V hereof, but excluding any person who ceases to be a Partner pursuant to Article VI hereof, are collectively referred to herein as the "Partners". The Partnership is and the terms of this Agreement are subject to the provisions of the Cayman Islands Exempted Limited Partnership Law (2001 Revision), as amended from time to time (the "Law").

# ARTICLE I

## GENERAL PROVISIONS

Section 1.01.  Formation of Limited Partnership.

(a) The General Partner and the Limited Partners have heretofore associated themselves and agreed to become partners and have formed the Partnership as an exempted limited partnership under the Law upon the filing with the Cayman Islands Registrar of Exempted Limited Partnerships of a statement pursuant to Section 9 of the Law.

(b) In connection with the formation of the Partnership, the General Partner and Harry Adler (the "Withdrawing Partner") entered into a limited partnership agreement dated December 13, 2002, that was amended and restated on December 31, 2002 (in connection with the Withdrawing Partner's withdrawal from the Partnership), which the parties now wish to further amend and restate in its entirety as set forth below.

(c) In furtherance thereof, the parties hereto do hereby confirm their agreement that the Partners do hereby associate themselves and agree to become partners of the Partnership.

(d) Throughout the Partnership's term, the General Partner shall take all reasonable steps necessary to keep the Partnership in good standing and in compliance with the Law.

Section 1.02.  Partnership Name.   The name of the Partnership is Platinum Partners Value Arbitrage Fund L.P.

Section 1.03.  Filing of Additional Statements.  The General Partner shall cause to be prepared and filed any additional statements, any fictitious name certificates, and any other documents required by, or desirable to comply with, the laws of the Cayman Islands and any other jurisdiction in which the Partnership shall carry on its business or otherwise be required to preserve the limited liability of the Limited Partners.

Section 1.04.  Registered Office.  The registered office of the Partnership in the Cayman Islands shall be at the offices of Walkers SPV Limited, Walker House, Mary Street, P.O. Box 908, George Town, Grand Cayman, Cayman Islands, or at such other address as the General Partner may from time to time determine.

Section 1.05.  Fiscal Year.  The fiscal year of the Partnership (herein called the "fiscal year") shall end on December 31 of each year or on such other date as the General Partner shall determine.

Section 1.06.  Purposes of Partnership.

(a) The Partnership is organized for the purposes of realizing capital appreciation by investing and trading in U.S. and non-U.S. Securities (as hereinafter defined) and to engage in all activities and transactions as the General Partner may deem necessary or advisable in connection therewith, including, without limitation:

(i)     to invest on margin, to engage in short sales and option writing, to enter into repurchase agreements and reverse repurchase agreements or to engage in such other investment techniques as the General Partner believes to be appropriate;

(ii)    to purchase, hold, sell, exchange, transfer and otherwise acquire and dispose of and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Securities and other property, funds or rights held or owned by the Partnership including, without limitation, such property, funds or rights which constitute non-traditional investment instruments;

(iii)   to allocate and invest discrete segments of the Partnership's assets to entities managed by others ("Portfolio Entities") and, pursuant to agreements granting trading authority over the segments of the Partnership's assets, to investment managers selected by the General Partner ("Managed Accounts"); provided, that the General Partner shall be responsible for monitoring the trading activities of the Partnership, the Portfolio Entities and the Managed Accounts;

(iv)    to borrow or raise moneys, and to issue, accept, endorse and execute promissory notes and other negotiable or non-negotiable instruments and evidences

of indebtedness, and to secure the payment of such or other obligations of the Partnership by hypothecation or pledge of all or part of the property of the Partnership, whether at the time owned or thereafter acquired;

      (v)    to engage personnel, including Affiliates (as defined in Section 2.05) of the General Partner, whether part-time or full-time, and do such other acts as the General Partner may deem necessary or advisable in connection with the maintenance and administration of the Partnership; and

      (vi)    to engage attorneys, independent accountants, consultants, investment managers, investment advisors, traders or such other persons as the General Partner may deem necessary or advisable.

(b) The Partnership's arrangements with each Portfolio Entity or Managed Account in which the Partnership has invested shall be subject to such terms and conditions as shall be set forth in an agreement between the Partnership and the Portfolio Entity or the portfolio manager of the Managed Account, which may authorize the Portfolio Entity or the portfolio manager of the Managed Account to invest on margin, to engage in short sales and option writing, to enter into repurchase agreements or reverse repurchase agreements or to engage in such other investment techniques as the General Partner believes to be appropriate.

(c) "Security" or "Securities" shall mean securities and other financial instruments of U.S. and non-U.S. entities, including, without limitation, capital stock; shares of beneficial interest; partnership interests and similar financial instruments; mortgage-backed securities; interests in real estate and real estate related assets; bonds, notes, debentures (whether subordinated, convertible, secured, unsecured or otherwise); currencies; commodities; interest rate, currency, commodity, equity and other derivative products, including, without limitation, (i) futures contracts (and options thereon) relating to stock indices, currencies, U.S. government securities and securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps, options, warrants, caps, collars, floors and forward rate agreements, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; equipment lease certificates; equipment trust certificates; loans; accounts and notes receivable and payable held by trade or other creditors; trade acceptances; contract and other claims; executory contracts; participations; mutual funds; money market funds; obligations of the U.S. or any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; banker's acceptances; trust receipts; and other obligations and instruments or evidences of indebtedness of whatever kind or nature; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable.

Section 1.07. Liability of Partners. The names and addresses of all of the Partners and the amounts of their respective contributions to the Partnership are set forth in the schedule of Capital Contributions and Partnership Percentages which shall be filed with the books and records of the Partnership and is hereby incorporated by reference and made a part of this Agreement (herein called the "Schedule").

The General Partner and all other Partners who are designated in the books and records of the Partnership as general partners of the Partnership (and former general partners) shall have unlimited liability for the repayment and discharge of all debts and obligations of the Partnership attributable to any fiscal year during which they are or were general partners.

The Limited Partners and all other Partners who are designated in the books and records of the Partnership as limited partners of the Partnership (and former limited partners) shall be liable for the repayment and discharge of all debts and obligations of the Partnership to the extent provided in the Law. In addition, the Limited Partners and former limited partners shall be liable for the repayment and discharge of all debts and obligations of the Partnership attributable to any fiscal year (or relevant portion thereof) during which they are or were limited partners of the Partnership to the extent of their respective interests in the Partnership in the fiscal year (or relevant portion thereof) to which any such debts and obligations are attributable.

The Partners and all former partners shall share all losses, liabilities or expenses suffered or incurred by virtue of the operation of the preceding paragraphs of this Section 1.07 in the proportions of their respective Partnership Percentages (determined as provided in Section 3.04) for the fiscal year (or relevant portion thereof) to which any debts or obligations of the Partnership are attributable. A Limited Partner's or former limited partner's share of all losses, liabilities or expenses shall not be greater than its respective interest in the Partnership for such fiscal year (or relevant portion thereof). The General Partner and all former general partners shall be liable for the losses, liabilities or expenses in excess of the interests of the Limited Partners and former limited partners in such proportion as the General Partner shall determine.

As used in this Agreement, the terms "interests in the Partnership," "interest in the Partnership," "Partnership interests" and "Partnership interest" shall mean with respect to any fiscal year (or relevant portion thereof) and with respect to each Partner or former partner, the amount of the Capital Account (as defined in Section 3.03) that such Partner (or former partner) would have received, or in fact did receive, pursuant to the terms and provisions of Article VI upon withdrawal from the Partnership as of the end of such fiscal year (or relevant portion thereof).

Notwithstanding any other provision in this Agreement, in no event shall any Limited Partner or former limited partner be obligated to make any additional contribution or payment whatsoever to the Partnership, or have any liability for the repayment and discharge of the debts and obligations of the Partnership (apart from its interest in the Partnership), except that a Limited Partner or former limited partner (i) may be required to repay a payment made to it by the Partnership in the circumstances specified in Section 14(2) of the Law and (ii) shall, in the discretion of the General Partner, be required, for purposes of meeting its obligations under this Section 1.07, to make additional contributions or payments, respectively, up to, but in no event in

excess of, the aggregate amount of returns of capital and other amounts actually received by it from the Partnership during or after the fiscal year to which any debt or obligation is attributable.

As used in this Agreement, the terms "former general partners," "former limited partners" and "former partners" refer to such persons or entities as hereafter from time to time cease to be General Partner, Limited Partners or Partners, respectively, pursuant to the terms and provisions of this Agreement.

Section 1.08.  Assignability of Interest.  Without the prior written consent of the General Partner, which may be withheld in its sole and absolute discretion, a Partner may not (i) pledge, transfer or assign its interest in the Partnership in whole or in part to any person except by operation of law or (ii) substitute for itself as a Partner any other person.  Any attempted pledge, assignment or substitution not made in accordance with the preceding sentence shall be void.

Section 1.09.  Business with the Public.  The Partnership shall not undertake any business with the public of the Cayman Islands other than so far as may be necessary for the carrying on of the business of the Partnership exterior to the Cayman Islands.

## ARTICLE II

## MANAGEMENT OF PARTNERSHIP

Section 2.01.  General Partner.  The Partnership shall at all times have at least one general partner registered or incorporated in the Cayman Islands.

Section 2.02.  Management Generally.  The management of the Partnership shall be vested exclusively in the General Partner.  The Limited Partners shall have no part in the management of the Partnership, and shall have no authority or right to act on behalf of the Partnership in connection with any matter.

Section 2.03.  Authority of General Partner.  The General Partner shall have the power by itself on behalf and in the name of the Partnership to carry out any and all of the objects and purposes of the Partnership set forth in Section 1.06, and to perform all acts and enter into and perform all contracts and other undertakings which it may deem necessary or advisable or incidental thereto, including, without limitation, the power to:

(a) open, maintain and close accounts with broker-dealers and other clearing organizations and issue all instructions and authorizations to broker-dealers and other clearing organizations regarding the Securities and/or money therein;

(b) open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(c) lend, with or without security, any of the Securities, funds or other properties of the Partnership, including by entering into reverse repurchase agreements and, from time to time without limit as to amount, borrow or raise funds, including by entering into

WD2000: NY 494369.5

repurchase agreements, and to secure the payment of obligations of the Partnership by mortgage upon, or pledge or hypothecation of, all or any part of the property of the Partnership;

(d) commit segments of the Partnership's assets from time to time for investment in Portfolio Entities and Managed Accounts and to enter into discretionary investment management agreements with portfolio managers relating to the Partnership's investments;

(e) do any and all acts on behalf of the Partnership, and exercise all rights of the Partnership, with respect to its interest in any person, firm, corporation or other entity, including, without limitation, the voting of Securities, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters;

(f) organize one or more corporations, partnerships or other subsidiary entities formed to hold record title, as nominee for the Partnership, of Securities or funds of the Partnership; and

(g) authorize any employee or other agent of the Partnership to act for and on behalf of the Partnership in all matters incidental to the foregoing.

Section 2.04. Reliance by Third Parties. Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

Section 2.05. Activity of the General Partner. The General Partner and its Affiliates (as defined below) shall devote so much of their time to the affairs of the Partnership as in the judgment of the General Partner the conduct of its business shall reasonably require, and none of the General Partner or Affiliates shall be obligated to do or perform any act or thing in connection with the business of the Partnership not expressly set forth herein. Nothing herein contained shall be deemed to preclude the General Partner or Affiliates from exercising investment responsibility, engaging directly or indirectly in any other business, or from directly or indirectly purchasing, selling, holding or otherwise dealing with any Securities for the account of any such other business, for its or their own accounts, for any family members or for other clients. No Limited Partner shall, by reason of being a Partner in the Partnership, have any right to participate in any manner in any profits or income earned or derived by or accruing to the General Partner or any Affiliate from the conduct of any business other than the business of the Partnership (to the extent provided herein) or from any transaction in Securities effected by the General Partner or such Affiliate for any account other than that of the Partnership.

As used herein, "Affiliate" shall mean any person, corporation, partnership, limited liability company, or other entity who: (1) directly or indirectly controls, is controlled by, or is under common control with, such person; (2) directly or indirectly owns or controls 10% or more of the outstanding voting securities of such person; or (3) is a member, manager, director, officer, employee, broker or agent of such person.

Section 2.06. Exculpation. None of the General Partner or its Affiliates shall be liable to any Limited Partner or the Partnership for mistakes of judgment or for action or inaction

which said person reasonably believed to be in the best interests of the Partnership, or for losses due to such mistakes, action or inaction or to the negligence, dishonesty or bad faith of any employee, broker or other agent of the Partnership, provided that such employee, broker or agent was selected, engaged or retained by the Partnership with reasonable care. Each of the General Partner and its Affiliates may consult with counsel and accountants in respect of Partnership affairs and be fully protected and justified in any action or inaction which is taken in accordance with the advice or opinion of such counsel and/or accountants, provided that they shall have been selected with reasonable care.

Notwithstanding any of the foregoing to the contrary, the provisions of this Section 2.06 shall not be construed so as to provide for the exculpation of the General Partner or any of its Affiliates for any liability (including liability under U.S. securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such exculpation would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 2.06 to the fullest extent permitted by law.

Section 2.07. <u>Indemnification of General Partner</u>. To the fullest extent permitted by law, the Partnership shall indemnify and hold harmless the General Partner, each Affiliate of the General Partner, each direct or indirect general or limited partner, director, officer, employee, agent, member and shareholder of the General Partner, or of any Affiliate of the General Partner and each person who otherwise serves as an advisor, consultant or legal representative to the General Partner in respect of the Partnership's affairs (each an "<u>Indemnified Party</u>") from and against any loss or expense suffered or sustained by an Indemnified Party by reason of the fact that it is or was an Indemnified Party, including, without limitation, any judgment, settlement, reasonable attorney's fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding, provided that such loss or expense resulted from a mistake of judgment on the part of an Indemnified Party, or from action or inaction that said Indemnified Party reasonably believed to be in the best interests of the Partnership. The Partnership shall, in the sole discretion of the General Partner, advance to any Indemnified Party, reasonable attorney's fees and other costs and expenses incurred in connection with the defense of any action or proceeding that arises out of such conduct. The Indemnified Parties shall agree that in the event an Indemnified Party receives any such advance, such Indemnified Party shall reimburse the Partnership for such fees, costs and expenses to the extent it shall be determined that it was not entitled to indemnification under this section. Notwithstanding any of the foregoing to the contrary, the provisions of this Section 2.07 shall not be construed so as to provide for the indemnification of the General Partner or its Affiliates for any liability (including liability under U.S. securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent (but only to the extent) that such indemnification would be in violation of applicable law, but shall be construed so as to effectuate the provisions of this Section 2.07 to the fullest extent permitted by law.

Section 2.08. <u>Payment of Costs and Expenses</u>. The Partnership shall bear all of its administrative, non-administrative, trading and operating expenses, including, but not limited to, rent, administrative services, Compensation (as defined below), all taxes, organizational and investment expenses (i.e., expenses which the General Partner reasonably determines to be directly or indirectly related to the investment of the Partnership's assets, such as brokerage

commissions and interest expense, etc.), legal expenses, compliance expenses, professional expenses (including, without limitation, expenses of consultants and experts), escrow expenses, internal and external accounting expenses, audit and tax preparation expenses and premiums for general partner liability insurance, custodial fees, costs incurred in forming the Partnership and any extraordinary expenses. On the date that the Limited Partners make their Initial Capital Contributions (as defined in Section 3.02(a)), the Partnership shall reimburse the General Partner for all expenses incurred by it or any of its Affiliates that are attributable to the organization of the Partnership. The Partnership may share office space, services and personnel with other businesses conducted by the General Partner or its Affiliates and, in such event, shall bear a proportionate share of the associated costs. If any of the above expenses are incurred jointly for the account of the Partnership and any other entity or business managed by the General Partner or its Affiliates, such expenses will be allocated among the Partnership and such other entities or businesses in such manner as the General Partner considers fair and reasonable. At the discretion of the General Partner, the organizational expenses of the Partnership shall be capitalized and amortized over a period of five years starting on the date of this Agreement.

Section 2.09. Salaries or Other Payments. The Partnership may pay a reasonable salary or other compensation to the General Partner or its members at an annual rate and in such installments as may be approved by the General Partner in its sole discretion and shall reimburse the General Partner for all expenses it incurs on behalf of the Partnership or the Master Partnership. The Partnership may also pay compensation, including fringe benefits, bonuses, fees, and incentive compensation to other persons who render services to the Partnership at an annual rate and in such installments as shall be approved by the General Partner. Any salary or compensation ("Compensation") paid pursuant to this Section 2.09 shall be treated as a Partnership expense.

## ARTICLE III

## CAPITAL ACCOUNTS OF PARTNERS AND OPERATION THEREOF

Section 3.01. Definitions. For the purposes of this Agreement, unless the context otherwise requires:

(a) The term "Accounting Period" shall mean the following periods: The initial Accounting Period shall commence upon the initial commencement of the Partnership. Each subsequent Accounting Period shall commence immediately after the close of the preceding Accounting Period. Each Accounting Period hereunder shall close at the close of business on the first to occur of (i) the last day of the fiscal year, (ii) the date immediately prior to the effective date of the admission of a new Partner pursuant to Section 5.01, (iii) the date immediately prior to the effective date of a Partner's Capital Contribution pursuant to Section 3.03, (iv) the effective date of any withdrawal by a Partner of capital pursuant to Article IV or Article VI hereof, or (v) the date when the Partnership shall dissolve;

(b) The term "Beginning Value" shall mean, with respect to any Accounting Period, the Net Asset Value of the Partnership's assets at the beginning of such Accounting Period;

-8-

(c) The term "Ending Value" shall mean, with respect to any Accounting Period, the Net Asset Value of the Partnership's assets at the end of such Accounting Period (before giving effect to withdrawals);

(d) The term "Net Asset Value" shall mean the dollar amount derived by subtracting (i) the liabilities of the Partnership as determined in accordance with Section 3.07 (including accrued expenses through the date thereof) from (ii) the value of the Partnership's assets, as determined in accordance with Section 3.06;

(e) The term "Net Capital Appreciation" shall mean, with respect to any Accounting Period, the excess, if any, of the Ending Value over the Beginning Value;

(f) The term "Net Capital Contributions" of any Limited Partner at any date shall mean (i) the sum of all Capital Contributions (as defined in Section 3.02) theretofore made to the Partnership by such Limited Partner less (ii) the total amount of any withdrawals by or distributions to such Limited Partner; and

(g) The term "Net Capital Depreciation" shall mean, with respect to any Accounting Period, the excess, if any, of the Beginning Value over the Ending Value.

Section 3.02.   Capital Contributions.

(a) Each Partner has paid or conveyed by way of contribution to the Partnership cash and/or Securities having an aggregate value (a "Capital Contribution") equal to the amount set forth in the books and records of the Partnership.   Additional Capital Contributions may be made by Partners only in accordance with the provisions of Section 3.03. Whether Securities shall be accepted as a contribution to the Partnership shall be determined in the sole discretion of the General Partner.   The contribution made by a Partner upon its admission to the Partnership is referred to herein as such Partner's "Initial Capital Contribution."

(b) If a Partner fails to contribute on the first day of an Accounting Period (the "Due Date") any portion (the "Unpaid Portion") of the Capital Contribution (whether such Capital Contribution is an Initial Capital Contribution or an additional Capital Contribution) that such Partner agreed to contribute, then the corresponding Capital Account of such Partner shall be debited in an amount equal to the amount of interest expense that would have been saved by the Partnership on the Unpaid Portion from the Due Date to the date the Unpaid Portion is contributed by such Partner. The amount so debited shall then be credited to the corresponding Capital Account of such Partner and the Capital Accounts of the other Partners pro rata in accordance with such Capital Accounts as of the Due Date. The Unpaid Portion shall be deemed to have been contributed by such Partner to the Partnership as of the first business day of the month during which such Partner agreed to make the related Capital Contribution. The General Partner will have the sole discretion whether to accept the Unpaid Portion.

Section 3.03.   Capital Accounts.   A capital account (herein called the "Capital Account") shall be established on the books of the Partnership for each Partner. The Capital Account of each Partner shall be in an amount equal to such Partner's Initial Capital Contribution, adjusted as hereinafter provided. At the beginning of each Accounting Period, the Capital Account of each Partner shall be increased by the amount of any Capital Contributions to

the Partnership made by such Partner as of the first day of such Accounting Period. At the end of each Accounting Period, the Capital Account of each Partner shall be (i) increased or decreased by the amount credited or debited to the Capital Account of such Partner pursuant to Section 3.05 and (ii) decreased by the amount of any withdrawals made by, or distributions made to, such Partner as of the end of such Accounting Period pursuant to Section 4.02 or Section 4.04. Additional Capital Contributions to the Partnership may be made by any Partner as of the first day of each quarter of a fiscal year, upon 10 days' prior written notice to the General Partner, subject to the sole discretion of the General Partner to determine a different date to accept additional Capital Contributions and to waive such notice period. The General Partner will have the sole discretion whether to accept such additional Capital Contributions, and may accept such additional Capital Contributions in whole or in part.

Section 3.04. _Partnership Percentages_. A "_Partnership Percentage_" shall be determined for each Partner for each Accounting Period by dividing the amount of each Partner's Capital Account at the beginning of such Accounting Period by the sum of all of the Capital Accounts at the beginning of such Accounting Period. The sum of all the Partnership Percentages shall equal 100 percent. The Partnership Percentages shall be set forth on the Schedule and in the books and records of the Partnership.

Section 3.05. _Allocation of Net Capital Appreciation and Net Capital Depreciation._

(a) Subject to Section 3.05(d), at the end of each Accounting Period, the Capital Account of each Partner for such Accounting Period shall be adjusted by crediting (in the case of Net Capital Appreciation) or debiting (in the case of Net Capital Depreciation) all Net Capital Appreciation or Net Capital Depreciation, as the case may be, to the Capital Accounts of all the Partners in proportion to their respective Partnership Percentages.

(b) In the event that the General Partner imposes a charge on the Capital Account of a Partner pursuant to Section 4.03(c) or Section 6.02, the amount of such charge shall be allocated as a credit, as of the date which the withdrawal giving rise to such charge is effective, to the Capital Accounts of each of the other Partners pro rata in proportion to the ratio that each Partner's Capital Account bears to the Capital Accounts of all of the Partners excluding the Capital Account of the Partner being so charged.

(c) All matters concerning any allocation pursuant to this Section 3.05 shall be determined by the General Partner, whose determination shall be final and conclusive as to all of the Partners.

(d) In the event the General Partner determines that, based upon tax or regulatory reasons, or any other reasons as to which the General Partner determines, a Partner should not participate in the Net Capital Appreciation or Net Capital Depreciation, if any, attributable to trading in any Security or type of Security or to any other transaction, the General Partner may allocate such Net Capital Appreciation or Net Capital Depreciation only to the Capital Accounts of Partners to whom such reasons do not apply. In addition, if for any of the reasons described above, the General Partner determines that a Partner should have no interest whatsoever in a particular Security, type of Security or transaction, the interests in such Security,

-10-

type of Security or transaction may be set forth in a separate memorandum account in which only the Partners having an interest in such Security, type of Security or transaction shall have an interest and the Net Capital Appreciation and Net Capital Depreciation for each such memorandum account shall be separately calculated.

Section 3.06.  Net Asset Value.

(a) The value of the Partnership's assets shall be determined as follows:

(i)      *Listed Securities*.  Freely marketable Securities listed or admitted to trading on any U.S. or non-U.S. stock exchange or the U.S. NASDAQ National Market System or comparable non-U.S. market system ("NMS") shall be valued (A) at the last reported sale price of the Security on the primary stock exchange or the NMS, as the case may be, on the date of determination, or in case there shall have been no sale of such security on such date, then (B) at the mean between representative "bid" and "asked" prices for such security on such exchange or the NMS at the close of business on the date of determination, or if no such "bid" and "asked" prices are reported on such date, then (C) at the last reported sale or mean between representative "bid and "asked" price within the five-day period preceding such date; or, if neither such last sale price nor "bid" and "asked" prices are reported during such period, then (D) at such price as the General Partner deems to be fair market value.

(ii)     *Unlisted Securities*.  Freely marketable Securities traded over-the-counter or on another dealer market shall be valued (A) at the "last sale" price as reported by the National Association of Securities Dealers Automated Quotation System ("NASDAQ") or other primary U.S. or non-U.S. quotation system as of the date of determination or, if no such price is reported for such date, then (B) at the mean between representative "bid" and "asked" prices at the close of business on the date of determination, as reported in NASDAQ or such other system (or, if not so reported, then as reported by a recognized quotation service); or, if no such price is reported on such date, then (C) at the "last sale" or mean between representative "bid" and "asked" prices so reported within the five-day period preceding such date; or, if neither such "last sale" price nor such "bid" and "asked" prices are reported during such period, then (D) at such price as the General Partner deems to be fair market value.

(iii)    *Restricted Securities*.  All Securities which are not freely marketable by reason of legal restrictions ("Restricted Securities"), if readily and immediately convertible into or exercisable for freely marketable Securities, shall be valued on the basis applicable to such underlying Securities, reduced by the applicable conversion or exercise price, as the case may be, and all other Restricted Securities will be valued at their fair value, on the basis of the last representative sale price of similarly restricted Securities, or if no such sale price is available, then at such price as the General Partner deems to be fair value.

(iv)     *Short Positions*.  Securities held short by the Partnership will be valued as respectively provided in (i), (ii) or (iii) hereof, as applicable.  The value of Securities held short by the Partnership shall be treated as a liability of the Partnership and, together with the amount of any margin or other loans on account thereof, shall be subtracted from the Partnership's assets in determining net assets of the Partnership.

-11-

(v)     *Options.*  Options for the purchase or sale of Securities will be valued as respectively provided in (i), (ii), (iii) or (iv) hereof, as applicable, except that options listed on an exchange will in any event be valued at the mean between the representative "bid" and "asked" prices at the close of business on the date of determination.  Premiums from the sale of options written by the Partnership shall be included in the assets of the Partnership and the market value of such options shall be included as a liability of the Partnership.

(vi)     *Dividends.*  Dividends declared but not yet received, and rights in respect of Securities which are quoted ex-dividend or ex-rights, shall be included at the fair value thereof, less any applicable taxes thereon, as determined by the General Partner, which may, but need not, be the fair market value so determined on the day the particular Securities are first quoted ex-dividend or ex-rights.

(vii)     *Commodity Interests.*     Positions in commodities, commodity futures contracts, options on such futures contracts or other interests in commodities traded on an exchange, through a clearing firm or a bank or other financial institution shall be valued at their most recent settlement price, or closing market quotation, as appropriate, on the applicable exchange or with such firm or institution on the applicable determination date.  If such contract cannot be liquidated, due to the operation of daily limits or otherwise, as of such determination date, the liquidating value on the first subsequent day on which the contract would be liquidated may be used or such other value as the General Partner may deem fair and reasonable.

(viii)     *Cash Items.*  Short-term money market instruments and bank deposits shall be valued at cost (together with accrued and unpaid interest) or market, depending on the type of investment, as the General Partner shall deem appropriate.

(ix)     *Assets Allocated to Portfolio Managers.*  All assets of the Partnership that are allocated to an independent portfolio manager (through a Portfolio Entity or Managed Account) for management shall be valued by the portfolio manager at their market value.

(x)     *Other Assets.*  The value of any other assets of the Partnership (or the value of the assets mentioned in this subsection (a) in situations not covered thereby, or in the event of any other happening determined by the General Partner in its discretion to make another method of valuation advisable) shall be their fair value, determined in such manner as may be selected from time to time by the General Partner in its discretion.  All values assigned to assets by the General Partner pursuant to this Article III shall be final and conclusive as to all of the Partners.

(b) The General Partner may suspend the calculation of the value of the Partnership's assets and Net Asset Value of the Partnership during the following circumstances: (i) one or more U.S. or non-U.S. stock exchanges or other markets on which a significant amount of the Partnership's investments are listed or quoted and which constitute the primary markets for such investments, are closed for any reason other than that of an ordinary holiday, or transactions at these exchanges are restricted or suspended; (ii) the existence of a war, natural catastrophe or any like state of affairs which constitutes an emergency as a result of which

-12-

disposal of Securities by the Partnership is not possible in an orderly manner; (iii) any means of communications necessary to determine the price or value of any of the Partnership's investments do not function; or (iv) the transfer of funds involved in the realization or acquisition of any investments is, in the judgment of the General Partner, not possible at normal rates of exchange.

(c) The foregoing notwithstanding, if the General Partner determines that the valuation of any Securities or other property in accordance with subsection (a) does not fairly represent market value, the General Partner shall value such Securities or other property as it reasonably determines and shall set forth the basis of such valuation in writing in the Partnership's records.

Section 3.07. Liabilities. Except as otherwise provided in this Agreement, liabilities shall be determined in accordance with generally accepted accounting principles in the U.S., applied on a consistent basis; provided, however, that the General Partner in its discretion may provide reserves for contingencies, including general reserves for unspecified contingencies, even if such reserves are not required by generally accepted accounting principles, which shall be reserved against each Partner's Capital Account in proportion to the respective Partnership Percentages of the Partners for the period(s) in respect of which the General Partner deems such contingencies to be attributable.

Section 3.08. Allocation for Tax Purposes. For each fiscal year, items of income, deduction, gain, loss or credit shall be allocated for income tax purposes among the Partners in such manner as to reflect equitably amounts credited or debited to each Partner's Capital Account for the current and prior fiscal years. Such allocations shall be made pursuant to the principles of Sections 704(b) and 704(c) of the U.S. Internal Revenue Code of 1986, as amended (the "Code"), and in conformity with Regulations §§ 1.704-1(b)(2)(iv)(f), 1.704-1(b)(4)(i) and 1.704-3(e) promulgated thereunder, or the successor provisions to such Section and Regulations. Notwithstanding anything to the contrary in this Agreement, there shall be allocated to the Partners such gains or income as shall be necessary to satisfy the "qualified income offset" requirements of Regulations § 1.704-1(b)(2)(ii)(d).

Section 3.09. Determination by General Partner of Certain Matters. All matters concerning the valuation of assets of the Partnership, the allocation of profits, gains and losses among the Partners including taxes thereon, and accounting procedures not expressly provided for by the terms of this Agreement shall be determined by the General Partner, whose determination shall be final and conclusive as to all of the Partners.

Section 3.10. Adjustments to Take Account of Interim Year Events. If a Partner shall make additional Capital Contributions to the Partnership, withdraw from the Partnership or make a withdrawal from its Capital Account as of a date other than the last day of a fiscal year, the General Partner shall make such adjustments in the determination and allocation among the Partners of Net Capital Appreciation, Net Capital Depreciation, Capital Accounts, Partnership Percentages, Incentive Allocation, items of income, deduction, gain, loss or credit for tax purposes and accounting procedures as shall equitably take into account such interim year event and applicable provisions of law, and the determination thereof by the General Partner shall be final and conclusive as to all of the Partners.

WD2000: NY 494369.5

## ARTICLE IV

## WITHDRAWALS AND DISTRIBUTIONS OF CAPITAL

Section 4.01.   Withdrawals and Distributions in General.   No Partner shall be entitled (i) to receive distributions from the Partnership, except as provided in Section 4.04 and Section 7.02, or (ii) to withdraw any amount from its Capital Account other than upon its withdrawal from the Partnership, except as provided in Section 4.02 and Section 6.01.

Section 4.02.   Withdrawals.

(a) A Limited Partner may withdraw amounts from its Capital Account, subject to the prior written consent of the General Partner, which may be withheld or granted in its absolute and sole discretion, and subject to the terms and conditions as may be established by the General Partner. No Limited Partner may request to withdraw amounts from its Capital Account before March 31, 2003.

(b) If the General Partner consents to a withdrawal of amounts from the Capital Account of a Limited Partner, the General Partner shall pay 90% of the requested amount (computed on the basis of unaudited data) to the Limited Partner within 30 days following the date of such consent. The unpaid balance on the amount requested to be withdrawn, subject to audit adjustments, shall be paid with interest at the end of the fiscal year at the average (calculated weekly) per annum short term (13 weeks) U.S. Treasury Bill rate.

(c) With respect to the Capital Account of any non-U.S. Limited Partner, and notwithstanding any provision of this Agreement to the contrary, the General Partner shall withhold and pay over to the Internal Revenue Service, pursuant to Sections 1441, 1442, 1445 or 1446 of the Code any successor provisions or any other provision as may be enacted into law, at such times as required by such provisions, such amounts as the Partnership is required to withhold under such provisions, as from time to time in effect, on account of such non-U.S. Limited Partner's distributive share of the Partnership's items of gross income, income or gain which are subject to withholding tax pursuant to such provisions. To the extent that a non-U.S. Limited Partner claims to be entitled to a reduced rate of, or exemption from, U.S. withholding tax pursuant to an applicable income tax treaty, or otherwise, the non-U.S. Limited Partner shall furnish the General Partner with such information and forms as it may require and are necessary to comply with the regulations governing the obligations of withholding tax agents. Each non-U.S. Limited Partner represents and warrants that any such information and forms furnished by it shall be true and accurate and agrees to indemnify the Partnership and each of the Partners from any and all damages, costs and expenses resulting from the filing of inaccurate or incomplete information or forms relating to such withholding taxes. Any amount of withholding taxes withheld and paid over by the General Partner with respect to a non-U.S. Limited Partner's distributive share of the Partnership's gross income shall be treated as a distribution to such non-U.S. Limited Partner and shall be charged against the Capital Account of such non-U.S. Limited Partner.

(d) Subject to Section 3.02(b), the General Partner may at any time withdraw any amount from its Capital Account.

-14-

Section 4.03.   Limitation on Withdrawals.

(a) The withdrawal by a Partner of any amount from its Capital Account pursuant to the provisions of Section 4.02 is subject to the provision by the General Partner for all Partnership liabilities in accordance with the Law and for reserves for contingencies, all in accordance with Section 3.07.

(b) If at any time the payment of any amount withdrawn pursuant to this Article IV would violate the rules or regulations of the U.S. Securities and Exchange Commission, any exchange or any self-regulatory agency, or would cause any affiliate of the Partnership to violate such rules or regulations, the payment of such amount shall be deferred until such time as such payment is permitted under such rules or regulations.

(c) If a withdrawal is permitted to be made in the discretion of the General Partner pursuant to Section 4.02, the Partnership, in the General Partner's discretion, may charge the withdrawing Partner's Capital Account an amount to offset the estimated cost of effecting such withdrawal, including any costs of selling securities in order to effect payment of such Partner's withdrawal amount, and such amount shall be reallocated pro rata among the Capital Accounts of the Partners excluding the Capital Account of the Partner being so charged.

(d) The General Partner shall not, on dissolution or otherwise, make a payment to a Partner which represents a return of any or all of its Capital Contribution to the Partnership unless, at the time of and immediately following such payment, the Partnership will be solvent.

(e) In the event of the Partnership becoming insolvent within a period of six months following the return of any or all of the Capital Contribution to a Partner, such Partner may be required to repay such amount in accordance with the Law together with interest of ten percent (10%) per annum to the Partnership to discharge a debt or obligation of the Partnership incurred during the period the contribution was an asset of the Partnership.

Section 4.04.   Distributions.

(a) The General Partner may, in its discretion, make distributions in cash or in kind (i) in connection with a withdrawal of funds from the Partnership by a Partner and (ii) at any time to all of the Partners on a pro rata basis in accordance with the Partners' Partnership Percentages.

(b) If a distribution is made in kind, immediately prior to such distribution, the General Partner shall determine the fair market value of the property distributed and adjust the Capital Account of all Partners upwards or downwards to reflect the difference between the book value and the fair market value thereof, as if such gain or loss had been recognized upon an actual sale of such property and allocated pursuant to Section 3.05. Each such distribution shall reduce the Capital Account of the distributee Partner by the fair market value thereof.

(c) The General Partner may withhold taxes from any distribution to any Partner to the extent required by the Code or any other applicable law. For purposes of this

Agreement, any taxes so withheld by the Partnership with respect to any amount distributed by the Partnership to any Partner shall be deemed to be a distribution or payment to such Partner, reduce the amount otherwise distributable to such Partner pursuant to this Agreement and reduce the Capital Account of such Partner.

## ARTICLE V

## ADMISSION OF NEW PARTNERS

Section 5.01. New Partners. The General Partner in its discretion may admit one or more new general or limited partners, subject only to the conditions that each such new Partner shall execute an appropriate supplement to this Agreement pursuant to which it agrees to be bound by the terms and provisions hereof. A new Partner may only be admitted to the Partnership with effect on the first day of each quarter of a fiscal year, subject to the discretion of the General Partner to determine a different date for the admission of a new Partner. Admission of a new Partner shall not be a cause for dissolution of the Partnership.

## ARTICLE VI

## DEATH, DISABILITY, BANKRUPTCY OR WITHDRAWAL OF PARTNERS

Section 6.01. Withdrawal, Death, etc. of General Partner.

(a) The General Partner may, upon 30 days' prior notice, withdraw from the Partnership at the end of any fiscal quarter of the Partnership, so long as at least one other general partner, incorporated or registered in the Cayman Islands, shall continue to act as general partner of the Partnership after such withdrawal. The withdrawal, death, disability, incompetency, bankruptcy, insolvency, termination or dissolution of the last remaining general partner, shall dissolve the Partnership unless within 90 days of such event the Limited Partners unanimously agree to continue the Partnership and appoint a successor general partner of the Partnership.

(b) In the event of the withdrawal, bankruptcy, insolvency, termination or dissolution of the General Partner, the General Partner or its legal representatives shall be entitled to receive, within 30 days of the end of such withdrawal date, 90% of the estimated Capital Account of the General Partner as of the date of such withdrawal (computed on the basis of unaudited data), subject to the provisions of Section 6.05. The Partnership shall pay the General Partner interest on the balance of its Capital Account at the average (calculated weekly) per annum short term (13 weeks) Treasury Bill rate and such balance, together with all interest earned thereon, shall be paid (subject to audit adjustments) within 30 days after completion of the audit of the Partnership's books for the year of determination pursuant to Section 8.01. Neither the General Partner nor its legal representatives shall have the right to take part in the management of the business of the Partnership upon the withdrawal, death, disability, incompetency, bankruptcy, insolvency, termination or dissolution of the General Partner, and the interest of the General Partner shall not be included in calculating the interests of the Partners required to take action under any provisions of this Agreement.

WD2000: NY 494369.5

Section 6.02.   Withdrawal, Bankruptcy, etc. of Limited Partner.

(a) No Limited Partner shall have the right to withdraw from the Partnership without the prior written consent of the General Partner, which may be withheld or granted in its sole discretion.  The withdrawal, bankruptcy, insolvency, termination or dissolution of a Limited Partner shall not dissolve the Partnership.

(b) In the event of the death, disability, incompetency, bankruptcy, insolvency, termination or dissolution of a Limited Partner or the consent by the General Partner to withdrawal by a Limited Partner in accordance with Section 6.02(a), the interest of such Limited Partner shall continue at the risk of the Partnership business until the last day of the fiscal year in which such event takes place (herein called the "Year of Determination") or earlier termination of the Partnership.  Such Limited Partner or its legal representatives shall be entitled to receive, within 30 days of the end of the Year of Determination, 90% of the estimated Capital Account of such Limited Partner as of the date of such withdrawal (computed on the basis of unaudited data), subject to the provisions of Section 6.05.  The Partnership shall pay such Limited Partner interest on the balance of its Capital Account at the average (calculated weekly) per annum short term (13 weeks) Treasury Bill rate and such balance, together with all interest earned thereon, shall be paid (subject to audit adjustments) within 30 days after completion of the audit of the Partnership's books for the Year of Determination pursuant to Section 8.01.  The General Partner may withhold from such balance an amount equal to the legal, accounting and administrative costs associated with the Limited Partner's withdrawal, and reserves for contingencies established pursuant to Section 3.07, if it determines that such costs should not be borne by the Partnership.  To the extent permitted by the Law, the interest of a Limited Partner who withdraws, dies, becomes disabled, incompetent, bankrupt, insolvent or is terminated or dissolved, or such Limited Partner's legal representatives, shall not be included in calculating the Partnership Percentages of the Limited Partners required to take any action under this Agreement.

Section 6.03.   Effective Date of Withdrawal.   The Capital Account of a withdrawing Partner shall be determined as of the effective date of its withdrawal.  For purposes of this Section 6.03, the effective date of a Partner's withdrawal shall mean (as the case may be): (i) the last day of the fiscal year in which such Partner shall cease to be a Partner pursuant to Section 6.01 or Section 6.02, or (ii) the date determined by the General Partner in connection with the withdrawal of a Limited Partner pursuant to Section 6.02.

Section 6.04.   Required Withdrawals.  The General Partner may at any time and for any reason compel the withdrawal of any Partner upon at least five days' prior written notice.  A notice of termination pursuant to this Section 6.04 shall have the same effect as the granting by the General Partner of its consent to a notice of withdrawal by such Partner pursuant to Section 6.02, and the Partner receiving such notice shall be treated for all purposes and in all respects as a Partner who has had its notice of withdrawal consented to by the General Partner.

Section 6.05.   Limitations on Withdrawal of Capital Accounts.

(a) The distribution to a withdrawn Partner or its legal representatives from its Capital Account pursuant to this Article VI is subject to the provision by the General

Partner for all Partnership liabilities in accordance with the Law and for reserves for contingencies pursuant to Section 3.07. The unused portion of any reserve shall be distributed, with interest at the prevailing Treasury Bill rate for short-term Treasury Bills from time to time in effect, as determined by the General Partner, after the General Partner shall have determined that the need therefor shall have ceased.

(b) If at any time the payment of any amount withdrawn pursuant to this Article VI would violate the rules or regulations of the U.S. Securities and Exchange Commission, any exchange or any self-regulatory agency, or would cause any affiliate of the Partnership to violate such rules or regulations, the payment of such amount shall be deferred until such time as such payment is permitted under such rules or regulations.

## ARTICLE VII

## DURATION AND DISSOLUTION OF PARTNERSHIP

Section 7.01. Duration. The Partnership shall continue until December 31, 2023, unless extended as provided in Section 7.03, until dissolved under the Law, or unless sooner dissolved pursuant to Section 6.01(a) or at any time by decision of the General Partner.

Section 7.02. Dissolution.

(a) On dissolution of the Partnership, no further business shall be done in the Partnership's name except the completion of incomplete transactions and the taking of such action as shall be necessary for the winding up of the affairs of the Partnership and the distribution of its assets. The maintenance of offices to effectuate or facilitate the winding up or liquidation of the Partnership's affairs shall not be construed to be a continuance of the Partnership. Upon the completion of the winding up and liquidation of the Partnership, a final statement with respect thereto shall be prepared and submitted to each Partner.

(b) Subject to the terms of the Law, the Partnership shall not be dissolved until a Notice of Dissolution signed by a General Partner has been filed with the Registrar.

(c) In the event of a dissolution of the Partnership, the General Partner may appoint one or more liquidators, including one or more general partners, who shall have full authority to wind up and liquidate the business of the Partnership and to make final distributions as provided in this Section. The appointment of any liquidator may be revoked, or a successor or additional liquidator or liquidators may be appointed, at any time by an instrument in writing signed by the General Partner. Any such liquidator may receive such compensation as shall be fixed, from time to time, by the General Partner.

(d) The liquidator shall, within no more than 30 days after completion of a final audit of the Partnership's books and records (which shall be performed within 90 days of such termination) and subject to the provisions of Section 7.02(e), make distributions out of Partnership assets, either in cash or in kind, in the following manner and order:

-18-

        (i)      to payment and discharge of the claims of all creditors of the Partnership who are not Partners;

        (ii)     to payment and discharge of the claims of all creditors of the Partnership who are Partners pro rata based on such Partners' Partnership Percentages; and

        (iii)    to the Partners in the proportion of their respective Capital Accounts.

(e) In connection with the dissolution of the Partnership, the General Partner or the liquidator (as applicable) may provide for liabilities in accordance with the Law and may establish reserves for contingencies pursuant to Section 3.07. Such reserves may be established, in the discretion of the General Partner or the liquidator (as applicable), for any contingency, including, but not limited to, costs and expenses which may or will be incurred in downsizing personnel or terminating advisory arrangements, contracts or leases. The unused portion of any reserves shall be distributed to the Partners after the General Partner or the liquidator (as applicable) shall have determined that the need therefor shall have ceased.

(f) In the event that the Partnership is dissolved on the date other than the last day of a fiscal year, the effective date of dissolution, as determined under the Law, shall be deemed to be the last day of a fiscal year for purposes of adjusting the Capital Accounts of the Partners pursuant to Section 3.05 and any expenses incurred in connection with such dissolution shall not affect such adjustment pursuant to Section 3.05. For purposes of distributing the assets of the Partnership upon termination, the General Partner shall be entitled to a return, on a pari passu basis with the Limited Partners, of the amount standing to its credit in its Capital Account.

Section 7.03. Extension of Term. It is contemplated by the Partners that the term of the Partnership shall terminate on December 31, 2023, unless sooner terminated pursuant to Section 6.01(a), until dissolved under the Law, or at any time by decision of the General Partner. Notwithstanding the foregoing, the term of the Partnership may be extended for up to two additional two-year periods by action of the General Partner with the consent of a majority in Partnership interest of the Limited Partners. Any such extension shall be subject to the rights of the Partners to dissolve the Partnership as provided in Section 6.01(a).

## ARTICLE VIII

### TAX RETURNS; REPORTS TO PARTNERS

Section 8.01. Auditors. The books and records of the Partnership shall be audited by an independent certified public accountant selected by decision of the General Partner, as of the end of each fiscal year of the Partnership and as of any date deemed appropriate by the General Partner.

Section 8.02. Filing of Tax Returns. The General Partner shall prepare and file, or cause the accountants of the Partnership to prepare and file a U.S. federal information tax return in compliance with Section 6031 of the Code and any required Cayman Islands or U.S. state or local income tax and information returns for each tax year of the Partnership.

Section 8.03.  Reports to Partners.

(a) Within 90 days after the end of each fiscal year, the Partnership shall prepare and mail to each Partner, together with the report thereon of the accountants selected by the General Partner, a financial report setting forth, as of the end of such fiscal year:

(i)  a balance sheet of the Partnership;

(ii)  a statement showing the Net Capital Appreciation or Net Capital Depreciation of the Partnership for such year; and

(iii)  such Partner's Capital Account as of the end of such fiscal year and the manner of its calculation.

(b) Within 60 days following the end of each of the first three fiscal quarters in each fiscal year, the Partnership shall prepare and mail to each Partner an unaudited report setting forth, as of the end of such fiscal quarter, the information described in subparagraphs (a)(i) and (a)(ii) above for such Accounting Period.

Section 8.04.  Reports to Partners and Former Partners.  Within 105 days after the end of each fiscal year, the Partnership shall cause its independent certified public accountants to prepare and mail, to each Partner and, to the extent necessary, to each former Partner (or its legal representatives), a report setting forth in sufficient detail such information as shall enable such Partner or former Partner (or its legal representatives) to prepare their respective U.S. federal income tax returns in accordance with the laws, rules and regulations then prevailing.

Section 8.05.  Tax Matters Partner.  The General Partner shall at all times constitute, and have full powers and responsibilities as, the "Tax Matters Partner" of the Partnership with respect to the annual U.S. federal income tax return for purposes of Section 6231(a)(7) of the Code.  Each person (herein called a "Pass-Through Partner") that holds or controls an interest as a Partner on behalf of, or for the benefit of another person or persons, or which Pass-Through Partner is beneficially owned (directly or indirectly) by another person or persons shall, within 30 days following receipt from the Tax Matters Partner of any notice, demand, request for information or administrative or similar document, convey such notice or other document in writing to all holders of beneficial interests in the Partnership holding such interests through such Pass-Through Partner.  In the event the Partnership shall be the subject of an income tax audit by any U.S. federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and its decision shall be final and binding upon, the Partnership and each Partner thereof.  All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership.

## ARTICLE IX

## MISCELLANEOUS

Section 9.01. General. This Agreement (i) shall be binding on the legal successors and representatives of the Partners, and (ii) may be executed, through the use of separate signature pages or in any number of counterparts with the same effect as if the parties executing such counterparts had all executed one counterpart; provided, however, that each such counterpart shall have been executed by the General Partner and that the counterparts, in the aggregate, shall have been signed by all of the Partners.

Section 9.02. Power of Attorney. Each of the Limited Partners hereby appoints the General Partner as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign, acknowledge, swear to and file:

(a) all amendments or modifications to the Partnership Agreement to the extent provided in the last paragraph of this Section 9.02;

(b) any and all instruments, certificates, and other documents which may be deemed necessary or desirable to effect the winding-up and termination of the Partnership; and

(c) any business certificate, amendment thereto, or other similar instrument or document of any kind necessary or desirable to accomplish the business purpose and objectives of the Partnership, or required by any applicable law.

The power of attorney hereby granted by each of the Limited Partners is coupled with an interest, is irrevocable, and shall survive, and shall not be affected by, the subsequent death, disability, incapacity, incompetency, termination, bankruptcy, insolvency or dissolution of such Limited Partner.

Such representative and attorney-in-fact shall not have any right, power or authority to amend or modify this Agreement when acting in such capacity, except in the case of an amendment or modification permitted without the approval of the Limited Partners pursuant to Section 9.03 or approved by the requisite Partnership Percentages of the Limited Partners.

Section 9.03. Amendments to Partnership Agreement. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the written approval of Limited Partners having in excess of 50% of the Partnership Percentages of the Limited Partners and the written approval of the General Partner, insofar as is consistent with the laws governing this Agreement; provided, however, that without the approval of the Partners the General Partner may amend the Agreement to (i) reflect changes validly made in the membership of the Partnership and the Capital Contributions and Partnership Percentages of the Partners; (ii) reflect a change in the name of the Partnership or the effective date of the Partnership; (iii) make a change that is necessary or, in the opinion of the General Partner, advisable to qualify the Partnership as a limited partnership or a partnership in which the Limited Partners have limited liability under the laws of any state, or ensure that the Partnership will not be treated as an association or publicly traded partnership taxable as a corporation for U.S.

-21-

federal income tax purposes; (iv) make a change that does not adversely affect the Limited Partners in any material respect; that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in this Agreement that would be inconsistent with any other provision in this Agreement, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with the provisions of this Agreement, in each case so long as such change does not adversely affect the Limited Partners; that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Cayman Islands or U.S. federal or state statute, so long as such change is made in a manner which minimizes any adverse effect on the Limited Partners; or that is required or contemplated by this Agreement; (v) make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the General Partner or the Partnership pursuant to the requirements of the Law if the provisions of the Law are amended, modified or revoked so that the taking of such action is no longer required; (vi) prevent the Partnership or the General Partner from in any manner being deemed an "Investment Company" subject to the provisions of the U.S. Investment Company Act of 1940, as amended; or (vii) make any other amendments similar to the foregoing. Each Partner, however, must approve of any amendment which would (a) reduce its Capital Account or rights of contribution or withdrawal, or (b) amend the provisions of this Agreement relating to amendments.

Section 9.04.   Adjustment of Basis of Partnership Property.   In the event of a distribution of Partnership property to a Partner or an assignment or other transfer (including by reason of death) of all or part of the interest of a Limited Partner in the Partnership, the General Partner, in its discretion, may cause the Partnership to elect, pursuant to Section 754 of the Code, or the corresponding provision of subsequent law, to adjust the basis of the Partnership property as provided by Sections 734 and 743 of the Code.

Section 9.05.   Choice of Law.   Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the Cayman Islands and, without limitation thereof, that the Law as amended from time to time shall govern the partnership aspects of this Agreement.

Section 9.06.   Submission to Jurisdiction.   Each party hereto hereby irrevocably submits to the non-exclusive jurisdiction of the courts of the Cayman Islands and the courts located in the State of New York with respect to any suit, action or proceeding relating to this Agreement and any or all transactions relating hereto and agrees and consents that service of process as provided by Cayman Islands law and New York law, as the case may be, may be made upon such party in any such suit, action or proceeding brought in any of said courts, and may not claim that any such suit, action or proceeding has been brought in an inconvenient forum. Each party hereby further irrevocably consents to the service of process out of any of the aforesaid courts, in any such suit, action or proceeding, by the mailing of copies thereof in the manner provided in Section 9.07 hereof.

Section 9.07.   Notices.   Each notice relating to this Agreement shall be in writing and delivered in person or by registered or certified mail. All notices to the Partnership shall be addressed to its registered office, with a copy addressed to the General Partner (or any other

person then serving as general partner). All notices addressed to a Partner shall be addressed to such Partner at the address set forth in the Schedule. Any Partner may designate a new address by notice to that effect given to the Partnership. Unless otherwise specifically provided in this Agreement, a notice shall be deemed to have been effectively given when mailed by registered or certified mail to the proper address or delivered in person.

Section 9.08.   Registers.   The General Partner shall keep or cause to be kept at the registered office of the Partnership a full and accurate register of Partnership interests and other books and records of the Partnership.

Section 9.09.   Goodwill.   No value shall be placed on the name or goodwill of the Partnership, which shall belong exclusively to the General Partner.

Section 9.10.   Headings.   The titles of the Articles and the headings of the Sections of this Agreement are for convenience of reference only, and are not to be considered in construing the terms and provisions of this Agreement.

Section 9.11.   Waiver of Rights.   One year from the date a Partner receives the report to which it is entitled pursuant to Section 8.03, such Partner shall be deemed to have irrevocably waived and released all rights, at law or in equity or by provision of any statute or otherwise, to challenge the contents of such report unless such challenge has previously been initiated.

*[Signature page follows]*

WD2000: NY 494369.5

**IN WITNESS WHEREOF,** the undersigned have executed this Agreement as a deed as of the date first set forth above.

PLATINUM MANAGEMENT (NY) LLC

By: _____

    Name:  Ari Glass
    Title:  Manager

Witness:

By: _____
    Name:  Greg  Zaffino

**LIMITED PARTNERS:**

Each person who shall sign a Limited Partner Signature attached hereto and who shall be accepted by the General Partner to the Partnership as a Limited Partner.

# EXHIBIT 3

# SECOND AMENDED AND RESTATED

# OPERATING AGREEMENT OF

# PLATINUM MANAGEMENT (NY) LLC

## Table of Contents

Page

| | | |
|---|---|---|
| ARTICLE I | Definitions............................................................................................ | 1 |
| ARTICLE II | General Provisions .............................................................................. | 6 |
| 2.1 | Formation and Foreign Qualification. ............................................... | 6 |
| 2.2 | Name. ................................................................................................. | 7 |
| 2.3 | Purpose. .............................................................................................. | 7 |
| 2.4 | Principal Business Office. .................................................................. | 7 |
| 2.5 | Registered Office and Registered Agent. ........................................... | 7 |
| 2.6 | Duration. ............................................................................................ | 7 |
| ARTICLE III | Members ............................................................................................... | 7 |
| 3.1 | Members. ............................................................................................ | 7 |
| 3.2 | Passive Members. .............................................................................. | 7 |
| 3.3 | Liability of Members. ........................................................................ | 8 |
| 3.4 | Additional Members. ......................................................................... | 8 |
| 3.5 | Meetings; Actions by Members. ........................................................ | 8 |
| ARTICLE IV | Management ......................................................................................... | 9 |
| 4.1 | Managers............................................................................................. | 9 |
| 4.2 | Limitations on the Authority of the Managers.................................... | 9 |
| 4.3 | Removal and Appointment of Managers. ........................................... | 10 |
| ARTICLE V | Capital Contributions; Capital Accounts ............................................ | 11 |
| 5.1 | Capital Contributions. ....................................................................... | 11 |
| 5.2 | Capital Accounts................................................................................ | 11 |
| 5.3 | Member Loans. .................................................................................. | 12 |
| 5.4 | Drag Along Right................................................................................ | 12 |
| ARTICLE VI | Allocations .......................................................................................... | 13 |
| 6.1 | Allocations of Net Profit and Net Loss.............................................. | 13 |
| 6.2 | Regulatory Allocations. ..................................................................... | 13 |
| 6.3 | Tax Allocations.................................................................................. | 14 |
| ARTICLE VII | Distributions ....................................................................................... | 14 |
| 7.1 | Withdrawals and Distributions in General......................................... | 14 |
| 7.2 | Member Draws. .................................................................................. | 14 |
| 7.3 | Tax Distributions. .............................................................................. | 15 |
| 7.4 | Ordinary Distributions. ...................................................................... | 15 |
| 7.5 | Distributions Upon Sale, Merger or Dissolution. .............................. | 15 |
| 7.6 | Limitation on Distributions................................................................ | 16 |
| 7.7 | Distributions In-Kind.......................................................................... | 16 |
| 7.8 | Withholding. ...................................................................................... | 16 |
| 7.9 | Distribution of Reserves. ................................................................... | 16 |
| 7.10 | Expenses. ........................................................................................... | 17 |
| ARTICLE VIII | Withdrawal, Removal, Death and Disability ....................................... | 17 |
| 8.1 | Removal. ............................................................................................ | 17 |
| 8.2 | Retirement, Permanent Disability or Death....................................... | 17 |
| 8.3 | Retirement Interests. ......................................................................... | 17 |
| 8.4 | Return of Confidential Information. ................................................... | 18 |

| | | |
|---|---|---|
| 8.5 | Vesting. | 18 |
| 8.6 | Buy-out. | 18 |
| ARTICLE IX | Transfers of Interests | 20 |
| 9.1 | Transfer Provisions. | 20 |
| 9.2 | Substituted Members. | 20 |
| ARTICLE X | Confidentiality, Non-Competition and Restrictive Covenants | 20 |
| 10.1 | Confidentiality. | 20 |
| 10.2 | Non-Competition and Non-Solicitation. | 21 |
| ARTICLE XI | Indemnification | 22 |
| 11.1 | Exculpation. | 22 |
| 11.2 | Indemnification. | 22 |
| ARTICLE XII | Records and Accounting, Fiscal Affairs | 23 |
| 12.1 | Records and Accounting. | 23 |
| 12.2 | Tax Status. | 23 |
| 12.3 | Tax Matters Partner. | 23 |
| 12.4 | Reports. | 24 |
| 12.5 | Member Representations and Warranties. | 24 |
| ARTICLE XIII | Company Property | 24 |
| 13.1 | Company Property. | 24 |
| 13.2 | Prohibition Against Partition. | 25 |
| ARTICLE XIV | Dissolution, Liquidation and Termination | 25 |
| 14.1 | Dissolution and Liquidation. | 25 |
| 14.2 | Cancellation of Certificate of Formation. | 25 |
| ARTICLE XV | Miscellaneous | 26 |
| 15.1 | Governing Law. | 26 |
| 15.2 | Notice. | 26 |
| 15.3 | Severability. | 26 |
| 15.4 | Headings. | 26 |
| 15.5 | Interpretation. | 27 |
| 15.6 | Entire Agreement. | 27 |
| 15.7 | Termination, Revocation, Waiver, Modification or Amendment. | 27 |
| 15.8 | Binding Effect. | 27 |
| 15.9 | Further Assurances. | 27 |
| 15.10 | Waiver | 27 |
| 15.11 | Additional Remedies. | 28 |
| 15.12 | No Reliance by Third Parties. | 28 |
| 15.13 | Arbitration. | 28 |
| 15.14 | Counterparts. | 28 |

EWAGNE\127314.8 - 3/30/11

## SECOND AMENDED AND RESTATED
## OPERATING AGREEMENT OF
## PLATINUM MANAGEMENT (NY) LLC

This Second Amended and Restated Operating Agreement (the "**Agreement**") of Platinum Management (NY) LLC (the "**Company**"), effective as of January 1, 2011, is entered into by and among URI LANDESMAN (the "**Manager**"), and MARK NORDLICHT and MARK NORDLICHT GRANTOR TRUST (each, a "**Passive Member**" and, collectively with Uri Landesman, in his individual capacity, the "**Members**").

**WHEREAS**, the Company was formed on August 22, 2001 as a limited liability company under the Delaware Limited Liability Company Act, 6 Del. C. § 18-101 et seq. (the "**Act**");

**WHEREAS**, the Company was governed by the terms of that certain Operating Agreement dated as of January 1, 2006, which was amended and restated as of November 1, 2008 (as amended, the "**Amended Agreement**");

**WHEREAS**, Ari Glass and A. Glass Management, LLC have withdrawn as Members and/or Managers of the Company, as applicable, and Uri Landesman has been admitted as a Member of the Company effective as of April 13, 2010 and has replaced Mark Nordlicht as the sole Manager of the Company effective as of January 1, 2011;

**WHEREAS**, the Members desire to further amend and restate the Amended Agreement to reflect such withdrawals, admission and change in Manager; and

**WHEREAS**, this Agreement completely restates, amends and supersedes the Amended Agreement.

**NOW, THEREFORE**, in consideration of the mutual covenants hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members hereby agree as follows

## ARTICLE I
### Definitions

The capitalized terms used in this Agreement shall have the meanings specified in this Article I.

"**1/1/10 Company Value**" has the meaning set forth in Section 7.5.2.

"**Act**" has the meaning set forth in the preamble.

"**Adjusted Capital Account Deficit**" has the meaning set forth in Section 6.2.1.

"**Affiliate**" means, with respect to any specified Person, any other Person that directly or indirectly, through one or more intermediaries, has control of, is controlled by, or is under common control with, such specified Person.  For these purposes, "control" means the

EWAGNE\127314.8 - 3/30/11

possession, directly or indirectly, of the power to direct or cause the direction of the management of any Person, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Allocable Incentive Fee Share**" means, in respect of any Former Member to whom a Withdrawal Amount has been paid, an amount equal to what would have been the amount of such Former Member's share of the actual incentive fees received by the Company in respect of the year of the relevant Retirement Date or Removal Date, as the case may be, had such Former Member been a Member for the entire year; provided, however, that the Allocable Incentive Fee Share in respect of Uri Landesman shall be determined without giving effect to Section 8.5 hereof (i.e., with all Interests of such Members being deemed vested).

"**Allocation Formula**" has the meaning set forth in Section 6.1.1.

"**Beneficiary**" means each natural person beneficiary of the Trust and each natural person who is a managing member or general partner of a beneficiary of the Trust that is a limited liability company or limited partnership.

"**Beneficiary Percentage Interest**" means, with respect to a Beneficiary, such Beneficiary's then-current percentage entitlement to Distributions received by the Trust from the Company.

"**Authorized Representative**" has the meaning set forth in Section 10.1.

"**Business Day**" means a day other than a Saturday or Sunday on which banks are open for business in New York City.

"**Buy-Out Amount**" has the meaning set forth in Section 8.6.3.

"**Capital Account**" has the meaning set forth in Section 5.2.1.

"**Capital Contribution**" means any contribution to the Company of property or services made by or on behalf of a Member.

"**Cause**" means, with respect to Uri Landesman, his:

(i)       conviction of a felony or a plea of guilty or nolo contendere to a charge of commission of a felony, in each case, that involves theft or embezzlement by him;

(ii)      willful malfeasance in the performance of his duties to the Company; or

(iii)     commission of any act or acts that results in a restriction on or the suspension of his activities by a governmental or regulatory authority or that results in a governmental or regulatory authority imposing other sanctions on him that involves a fine of at least $50,000, unless any other Member commits the same act.

2

"**Certificate of Formation**" means the Company's Certificate of Formation as filed with the Delaware Secretary of State, as it may be amended, supplemented or restated from time to time.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time, and any corresponding provisions of any succeeding law.

"**Company**" has the meaning set forth in the preamble.

"**Company Percentage**" means, at any time and with respect to any Member, including any Retired Member, such Member's interest in the Net Profit and Net Loss of the Company, as listed on the books and records of the Company at such time.   The aggregate amount of all Company Percentages (including both Voting Company Percentages and Non-Voting Company Percentages) shall always be equal (as nearly as possible) to 100%.

"**Confidential Information**" has the meaning set forth in Section 10.1.

"**Deferred Fees**" means any performance-based and/or asset-based fees earned by the Company the receipt of which has been deferred by the Company to a period beyond the year in which such fees were earned, as adjusted for any appreciation or depreciation at the conclusion of the applicable deferral period on account of any hypothetical investment of the deferred fees.

"**Family Interest**" has the meaning set forth in Section 9.1.

"**Family Member**" has the meaning set forth in Section 9.1.

"**Fiscal Period**" means a period commencing on the day immediately following the last day of the immediately preceding Fiscal Period and ending on the earliest of (a) December 31, (b) the date immediately preceding the date on which any Member's Company Percentage is adjusted pursuant to this Agreement, (c) the date immediately preceding the effective date of any distribution to any Member, (d) the date on which the Company is liquidated and wound-up, and (e) such other date as the Managers may determine.

"**Fiscal Quarter**" of the Company means the calendar quarter.

"**Fiscal Year**" means the period ending December 31 of each calendar year; provided, however, that the Company's final Fiscal Year shall end on the date on which the Company is liquidated and wound-up.

"**Former Member**" means any Retired Member and Uri Landesman if removed for Cause pursuant to Section 8.1.

"**Initial Members**" means, collectively, Mark Nordlicht, Uri Landesman and the Trust.

"**Interest**" means the rights in the Company afforded under this Agreement and the Act, whether of an economic or voting character or a combination thereof.

"**Losses**" has the meaning set forth in Section 11.2.

3

"**Manager**" means, at any time, any Person listed on the books and records of the Company as a manager at such time.

"**Member**" means a Passive Member or a Manager where no distinction is required and shall include a Retired Member unless otherwise provided or the context otherwise requires.

"**Member Deferred Fee Election**" means, with respect to each Member for any Fiscal Year, the deferral elections, if any, such Member has made pursuant to the Company's Deferred Income Allocation Plan (or similar plan), as the same may be amended from time to time, with respect to its prospective allocable share of Deferred Fees.  For the avoidance of doubt, (a) a Member Deferred Fee Election shall include any election made by a Member (at the same time as Member Deferred Fee Elections are made by other Members) not to defer payment of its allocable share of any Deferred Fees, (b) 40% of any Deferred Fees earned in respect of any Fiscal Year ending prior to January 1, 2010 shall be deemed to be the Member Deferred Fee Election of Mark Nordlicht or, upon his death, his heirs, and (c) 60% of any Deferred Fees earned in respect of any Fiscal Year ending prior to January 1, 2010 shall be deemed to be the Member Deferred Fee Election of the Trust, solely for the benefit of Mark Nordlicht, or his transferees and/or successors, as beneficiary.

"**Member Specific Deferred Fee Income**" means, with respect to each Member and for any Fiscal Period, that portion of the income recognized by the Company, if any, that is attributable to Deferred Fees and is covered by a Member Deferred Fee Election made by such Member.

"**Net Distributable Cash**" means all cash receipts of the Company, less the portion thereof used to pay or establish reserves for all Company expenses and contingencies, all as reasonably determined by the Managers in accordance with industry standard practices and to the extent applicable, consistent with prior Fiscal Periods.  Net Distributable Cash shall not be reduced by depreciation, amortization, cost recovery deductions or similar allowances, but shall be increased by any reductions in reserves previously established.

"**Net Profit**" and "**Net Loss**" mean, with respect to each Fiscal Period, an amount equal to the Company's Taxable Income or Tax Loss, as the case may be, for such Fiscal Period, together with the following adjustments:

(a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this definition shall be added to such Taxable Income or Tax Loss (but in no event shall any amount be included on account of Deferred Fees until such Deferred Fees are recognized by the Company as income for federal income tax purposes);

(b)    any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations §1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this definition shall be subtracted from such Taxable Income or Tax Loss;

(c)    upon a distribution of property (other than cash) to a Member, Net Profit or Net Loss for the Fiscal Period in which the distribution occurs shall be determined as if such property

4

were sold for its then fair market value, and the income, gain or loss from such deemed sale shall be allocated as provided in Section 6.1; and

(d)     where the book value of an asset is different than its tax basis, Net Profit or Net Loss will be determined based on the asset's book value.  Similarly, depreciation or amortization for this purpose shall be based on the asset's book value.

"**Net Residual Income or Loss**" means, for any fiscal period, the Company's Net Profit or Net Loss excluding all Member Specific Deferred Fee Income.

"**Non-Voting Company Percentage**" means the Company Percentage attributable to a Retirement Interest.

"**Paid Incentive Fee Share**" means, in respect of any Former Member to whom a Withdrawal Amount has been paid, an amount equal to that portion of the Withdrawal Amount paid to such Former Member that is attributable to any accrued incentive fees.

"**Passive Member**" means, at any time, any Person listed on the books and records of the Company as a passive member at such time.

"**Permanent Disability**" means, in respect of any Manager or Member, physical or mental illness or disease or impairment which renders such Manager or Member unable to perform the essential functions of his job with the Company for 180 consecutive days.

"**Person**" means any individual, partnership, corporation, limited liability company, unincorporated organization or association, trust or entity.

"**Regulations**" means the Treasury Regulations promulgated under the Code.

"**Removal Date**" has the meaning set forth in Section 8.1.

"**Retired Member**" means any retired, removed or Permanently Disabled Member, or the estate of any deceased Member, whose Interest has not been purchased by the Company pursuant to Section 8.6.

"**Retirement Date**" has the meaning set forth in Section 8.2.

"**Retirement Interest**" means the Interest held by a Retired Member, which Interest shall have no right to vote on any matter.

"**Tax Matters Partner**" has the meaning set forth in Section 12.3.

"**Taxable Income**" or "**Tax Loss**" means, with respect to each Fiscal Period, an amount equal to the Company's taxable income or loss for such year or period determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be separately stated pursuant to Code Section 703(a)(1) shall be included in such taxable income or loss).

5

"**Transfer**" means any sale, transfer, gift, assignment or pledge of, or grant of a security interest in an Interest, by operation of law or otherwise, excluding, however any grant of such a security interest in favor of the Company.

"**Transferring Member**" means a Member that makes a Transfer of all or any portion of its Interest to a Family Member pursuant to Section 9.1.

"**Trust**" means the Mark Nordlicht Grantor Trust.

"**Trust Agreement**" means the trust agreement of the Trust dated November 1, 2008.

"**Trustee**" means Mark Nordlicht solely in his capacity as trustee of the Trust and any successor trustee of the Trust.

"**Vested Interest**" has the meaning set forth in Section 8.5.

"**Voting Company Percentages**" means the aggregate of the Company Percentages of all Members other than Retired Members.

"**Withdrawal Amount**" means, in respect of any retired, removed, disabled or deceased Member (or, with respect to the Trust, the death or Permanent Disability of a Beneficiary), the book value of such Member's Capital Account (or, in the case of the death or Permanent Disability of a Beneficiary, a portion of the Trust's Capital Account equal to such Beneficiary's Beneficiary Percentage Interest) as of the Retirement Date or the Removal Date, as the case may be, increased by the aggregate of such Member's portion of management fee and incentive fee income which has accrued to such date but not yet been allocated to such Member, if any (or, in the case of the death or Permanent Disability of a Beneficiary, a portion of the Trust's portion of such management and incentive fee income equal to such Beneficiary's Beneficiary Percentage Interest), and, solely with respect to the removal of Uri Landesman for Cause pursuant to Section 8.1, reduced by any amounts reasonably reserved by the Company to defend any lawsuits reasonably relating to any acts or omissions of Uri Landesman that gave rise to such Cause. Any unused amounts so reserved shall be paid out to Uri Landesman upon the Company's reasonable determination that such reserve is no longer needed.

## ARTICLE II
### General Provisions

2.1    Formation and Foreign Qualification.

2.1.1    The Members (i) unanimously ratify, confirm and approve the continuance of a limited liability company pursuant to the provisions of the Act and this Agreement and (ii) acknowledge and agree that the Certificate of Formation for the Company, dated August 22, 2001, has heretofore been filed with the Delaware Secretary of State and that, effective as of the date hereof, this Agreement constitutes the Operating Agreement of the Company.

2.1.2    The Managers shall cause the Company to comply with any requirements necessary to qualify the Company as a foreign limited liability company in any

EWAGNE\127314.8 - 3/30/11

jurisdiction in which the Company shall be conducting business so as to require such compliance.

2.2     Name.

The name of the Company is "Platinum Management (NY) LLC." The business of the Company may be conducted under any other name deemed necessary or desirable by the Managers.

2.3     Purpose.

The Company is formed for the purpose of, and the nature of the business to be conducted and promoted by the Company is, engaging in (i) any lawful act or activity for which a limited liability company may be formed under the Act and (ii) any and all activities necessary or incidental to the foregoing, including, without limitation, investment management activities.

2.4     Principal Business Office.

The location of the principal office of the Company shall be 152 West 57th Street, 4th Floor, New York, New York or such other location as the Managers may from time to time designate.

2.5     Registered Office and Registered Agent.

The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. The Corporation Trust Company shall act as the Company's registered agent for the purpose of accepting service of process within the State of Delaware.

2.6     Duration.

The term of the Company commenced on the date that the Certificate of Formation was filed with the Delaware Secretary of State and shall continue in full force and effect until terminated in accordance with the provisions of this Agreement.

**ARTICLE III**
**Members**

3.1     Members.

The names, addresses, status as Manager, Passive Member or Retired Member, Capital Contributions and Company Percentage of the Members shall be maintained by the Managers with the records of the Company.

3.2     Passive Members.

No Passive Member shall have the right, authority or power to act for or on behalf of the Company or to take any action or do any thing that would be binding on the Company, or to

7

make any expenditures or incur any indebtedness in the name or on behalf of the Company solely by reason of being a Passive Member.  The Passive Members shall have only such voting rights and other rights of consent or approval as expressly set forth in this Agreement or in the Act.

3.3    Liability of Members.

All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability solely by reason of being a Member, except to the extent provided by the Act.

3.4    Additional Members.

3.4.1    The admission of a new Member to the Company requires the consent of 100% of the Voting Company Percentages.  Each new Member, as a condition precedent to admission to the Company as a Member, shall execute and acknowledge such instruments, in form and substance reasonable satisfactory to the Managers, as the Managers may deem necessary or desirable to effectuate such admission and to confirm that the Person to be admitted as a Member has agreed to be bound by the terms of this Agreement.

3.4.2    Unless otherwise consented to by 100% of the Company Percentages, the admission of a new Member to the Company shall reduce the Company Percentages of all Members, including Retired Members, on a pro rata basis.

3.5    Meetings; Actions by Members.

3.5.1    Meetings of Members (a) may be called by the Managers at any time and for any purpose(s), and (b) shall be called by the Managers upon the direction of 50% or more of the Voting Company Percentages.  Notice of any meeting shall be sent to all Members (other than Retired Members) at least three days prior to such meeting and shall specify the time, date, place and purpose(s) of such meeting.

3.5.2    Meetings of Members may take place in person or by telephone.  Any Member not present at a meeting in person by telephone or by proxy will be promptly informed by the Managers of any action(s) taken at such meeting.

3.5.3    Any action requiring the consent of 75% or 100%, as the case may be, of the Voting Company Percentages, may be taken either at a meeting where the holders of 75% or 100%, as applicable, of the Voting Company Percentages are present, or by the written consent of the holders of 75% or 100%, as applicable, of the Voting Company Percentages.

EWAGNE\127314.8 - 3/30/11

# ARTICLE IV
## Management

4.1    Managers.

    4.1.1   Except to the extent expressly limited by this Agreement or by the Act, the business and affairs of the Company shall be managed by the Managers who shall have the exclusive right and power to manage the business of the Company.  The Managers shall be authorized to do on behalf of the Company all things that are necessary or appropriate to carry out the Company's purposes and shall be responsible for policy setting, approving the overall direction of the Company and making all decisions affecting the business and affairs of the Company.  Effective as of January 1, 2011, Mark Nordlicht voluntarily resigned as a Manager and Uri Landesman became the Company's sole Manager.

    4.1.2   The Managers each shall have an equal say in all matters relating to the management of the Company and no Manager shall have the authority to bind the Company unless authorized by a vote of all Managers with each Manager having one vote; provided, however, that in the event of a deadlock with respect to any vote of the Managers, the right to break the tie vote shall alternate between the Managers with the first Manager to break a tie vote being decided by a coin toss.  Except to the extent expressly limited by this Agreement, all instruments, contracts, agreements and documents providing for the acquisition, mortgage or disposition of the property of the Company shall be valid and binding on the Company if properly authorized by a vote of the Managers and executed by any one of the Managers.

    4.1.3   Each of the Managers shall devote such time, resources and attention in order to carry out his duties hereunder as he shall determine to be necessary or appropriate.

    4.1.4   The Managers shall owe to the Company and the Members duties of care and loyalty equivalent to those owed by the officer of a Delaware corporation to such corporation and its stockholders.

    4.1.5   The Managers may appoint officers of the Company and may delegate any or all of their duties to one or more such officers and may revoke any such delegation at any time.  Mark Nordlicht is hereby appointed as the Company's Chief Investment Officer effective as of January 1, 2011, and he shall have such responsibilities as are customarily assigned to such office.

4.2    Limitations on the Authority of the Managers.

    4.2.1   Notwithstanding anything to the contrary herein, the following actions shall require the consent of not less than 75% of the Voting Company Percentages:

        (a)    the removal or replacement of a Manager.  Upon removal as Manager of a Manager who is also a Member, such Manager shall become a Passive Member;

9

(b)      the sale or merger of the Company;

(c)      the dissolution of the Company;

(d)      a voluntary bankruptcy filing with respect to the Company; and

(e)      issuing preferred Interests in the Company.

4.2.2    Notwithstanding anything to the contrary herein, the following actions shall require the consent of not less than 100% of the Voting Company Percentages:

(a)      admission of a new Member;

(b)      a non-pro-rata dilution of Members' Interests in connection with the admission of a Member;

(c)      transfer of all or any portion of any Member's Interest to any Person other than a Family Member;

(d)      incurrence of indebtedness for which the Company is liable in excess of 1% of the 1/1/10 Company Value;

(e)      guaranteeing the debt of a third party;

(f)      loaning money in excess of 1% of the 1/1/10 Company Value;

(g)      amending this Agreement or the Company's Certificate of Formation; and

(h)      any transaction between the Company and any Affiliate of the Company, any Manager or any Member that is not expressly contemplated by this Agreement.

4.3      <u>Removal and Appointment of Managers.</u>

4.3.1    Each Manager shall serve as Manager for so long as he is a Member or is a beneficiary of any trust that is a Member, unless removed as Manager as provided herein. With the exception of Uri Landesman, who may be removed as a Manager and as a Member, as applicable, pursuant to Section 8.1 below, a Manager may be removed as a Manager, but not as a Member, only with the consent of 75% of the Voting Company Percentages.  Upon such a removal, the removed Manager shall become a Passive Member.

4.3.2    If at any time, a Manager retires from the Company, is removed as Manager, dies or suffers a Permanent Disability and there is no other Manager, a new Manager shall promptly be selected by a vote of 75% of the Voting Company Percentages.  Notwithstanding the foregoing, in the event that Mark Nordlicht dies or suffers a Permanent Disability while he is a Manager, the Members agree to appoint and

10

select such individual, if any, who has been previously designated by Mark Nordlicht in writing to all of the Members to serve as a Manager in replacement of Mark Nordlicht; provided that such individual is reasonably acceptable to all of the other Managers. In the event that no such individual has been so designated or such individual is not reasonably acceptable to all of the other Managers, a replacement Manager shall promptly be selected by a vote of 75% of the Voting Company Percentages.

4.3.3   The Managers, without the consent of the Passive Members, may appoint any Member or non-Member to serve as an additional Manager.

**ARTICLE V**
**Capital Contributions; Capital Accounts**

5.1     Capital Contributions.

5.1.1   Prior to or concurrently with the execution of this Agreement, each Member has made, or is making, a Capital Contribution as set forth on Schedule 1 attached hereto. Any additional Capital Contributions by a Member from time to time shall be reflected on Schedule 1.

5.1.2   To the extent approved by the Managers from time to time, the Members may be permitted to make additional Capital Contributions if and to the extent they so desire. If the Managers determine that additional Capital Contributions are necessary or appropriate for the conduct of the Company's business, including, without limitation, the expansion or diversification of such business, the Members (other than Retired Members) shall be obligated to contribute such additional Capital Contributions on a pro rata basis; provided, however, that no Member shall be required to make Capital Contributions in excess of an aggregate of $25,000 during any rolling twelve-month period.

5.1.3   No Member shall be paid interest on any Capital Contribution.

5.2     Capital Accounts.

5.2.1   An individual capital account (a "**Capital Account**") shall be established on the books of the Company and maintained for each Member in compliance with this Agreement and in accordance with Regulation § 1.704-1(b)(2)(iv).

5.2.2   Each Member's Capital Account shall be increased by:

(a)     The amount of such Member's Capital Contributions to the Company;

(b)     The amount of Net Profit allocated to such Member pursuant to Article VI hereof; and

(c)     Any other increases required by Regulation § 1.704-1(b)(2)(iv).

5.2.3   Each Member's Capital Account shall be decreased by:

11

(a)     The amount of Net Loss allocated to such Member pursuant to Article VI hereof;

(b)     All amounts paid or distributed to the Member by the Company (other than any distribution in respect of repayment of principal or interest on any loan made by such Member to the Company pursuant to Section 5.3); and

(c)     Any other decreases required by Regulation § 1.704-1(b)(2)(iv).

5.2.4   The Members' Capital Accounts may (but are not required to) be adjusted in accordance with, and upon the occurrence of any event described in, Regulation § 1.704-1(b)(2)(iv)(f) and at such other times as may be determined by the Managers to reflect a revaluation of the Company's assets and liabilities and the Company's books.

5.2.5   All provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 704(b) of the Code and the Regulations promulgated thereunder and shall be interpreted in a manner consistent with such Regulations.   The Company shall make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations under Section 704(b) of the Code.

5.3     <u>Member Loans.</u>

Subject to Section 4.2.2 hereof, any capital that the Managers determine is required in connection with the operation of the Company may, at the election of the Managers, in whole or in part, be borrowed by the Company from third parties and/or one or more Members or any Affiliate of a Member; provided, however, that (i) any such loan(s) made to the Company by a Member and/or an Affiliate of a Member shall be on such terms as are agreed by the Managers and the Members and/or Affiliates making such loan(s); (ii) any such loan(s) must be evidenced in writing by a promissory note of the Company; and (iii) the Managers shall offer all Members the same opportunity to make any such loan(s) to the Company on a pro rata basis based on their respective Company Percentages.  No Member shall be required to loan money to the Company.

5.4     <u>Drag Along Right.</u>

If Members holding at least 75% of the Voting Company Percentages decide to sell all or substantially all of the Interests of the Company to a bona fide third party buyer in an arm's length transaction, each Member (including a Retired Member) agrees that he will sell a pro rata portion of his Interest in the Company to such buyer at the same time and on the same terms as the other Members; <u>provided</u>, that such Member receives his pro rata share of the entire purchase price.

12

# ARTICLE VI
## Allocations

6.1   Allocations of Net Profit and Net Loss.

6.1.1   Except as otherwise provided herein, Net Profit and Net Loss for each Fiscal Period, shall be allocated among the Members in the following manner (the "**Allocation Formula**"):

(a)   each Member's Member Specific Deferred Fee Income, if any, shall be allocated to such Member; and

(b)   Net Residual Income or Loss shall be allocated among the Members in accordance with their respective Company Percentages.

6.2   Regulatory Allocations.

6.2.1   Notwithstanding any other provision of this Agreement, Net Loss (or items of deduction as computed for book purposes) shall not be allocated to a Member to the extent that the Member has or would have, as a result of such allocation, an Adjusted Capital Account Deficit.   As used herein, a Member's "**Adjusted Capital Account Deficit**" means such Member's Capital Account has a deficit, after the Capital Account has been: increased by any amounts which such Member is obligated to restore pursuant to the terms of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations § 1.704-2(g)(1) and § 1.704-2(i)(5); and reduced by any adjustments, allocations or distributions described in Regulations § 1.704-1(b)(2)(ii)(d)(4), (5) or (6). Any Net Loss (or items of deduction as computed for book purposes) which otherwise would be allocated to a Member, but which cannot be allocated to such Member because of the application of the immediately preceding sentence, shall instead be allocated to the other Members, in accordance with their respective Company Percentages, subject to the limitation imposed by the immediately preceding sentence.

6.2.2   In order to comply with the "qualified income offset" requirement of the Regulations under Code Section 704(b), and notwithstanding any other provision of this Agreement to the contrary, if a Member for any reason (whether or not expected) has an Adjusted Capital Account Deficit, items of Net Profit (consisting of a pro-rata portion of the items thereof) shall be allocated to such Member in an amount and manner sufficient to eliminate as quickly as possible the Adjusted Capital Account Deficit.

6.2.3   If as a result of Section 6.2.1 or 6.2.2, any Member has been allocated at any time cumulative allocations of Net Profit or Net Loss in excess of the allocations such Member would have received but for such Sections, the Managers shall make offsetting allocations of the Net Profit and Net Loss to the Members to the extent allowable under the Code and the Regulations so that after giving effect to such offsetting allocations (or expected future allocations) each Member has been finally allocated amounts of Net Profit and Net Loss that such Member would have been allocated without Sections 6.2.1 and 6.2.2.

13

6.2.4   If the respective Company Percentages of the existing Members in the Company change or if an Interest is transferred to any other Person, all income, gains, losses, deductions, tax credits and other tax incidents resulting from the operations of the Company for the Fiscal Year of transfer shall be allocated, as between transferor and transferee, by taking into account their varying Company Percentages and by utilizing an interim closing of the Company's books in accordance with Section 706 of the Code and the Regulations thereunder.   A transferee of an Interest shall succeed to the Capital Account of the transferor Member to the extent it relates to the transferred Interest.

6.3      Tax Allocations.

6.3.1   Unless otherwise required by Section 704(c) of the Code and the Regulations thereunder, items of income, gain, loss and deduction of the Company for U.S. federal income tax purposes shall be allocated among the Company in the same manner as the related item was allocated under Section 6.1 hereof.   The required allocations of Section 704(c) of the Code or similar allocations under the Regulations are hereby incorporated.

6.3.2   Allocations pursuant to this Section 6.3 are made solely for income tax purposes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profit or Net Loss or distributions pursuant to any provision of this Agreement.

## ARTICLE VII
### Distributions

7.1      Withdrawals and Distributions in General.

No Member shall have any right to withdraw or demand distribution of any amount in its Capital Account except as expressly provided in this Article VII and Article VIII.

7.2      Member Draws.

In respect of any Fiscal Year, the Company, in the sole discretion of the Managers, may pay each Member who also provides services to the Company or any of its Affiliates an advance against its allocable share of the Net Profit for such Fiscal Year to the extent of available cash (the "**Draw**").   Each Member's annual Draw shall be payable in equal monthly installments on the first Business Day of each month.   The Managers shall determine each Member's Draw in respect of each Fiscal Year; provided, that Draws shall be made on a pro rata basis among eligible Members based on their respective Company Percentages, unless a Member consents in writing to receive less than his pro rata share.   Any draw payments made to the Trust pursuant to this Section 7.2 shall be solely for the benefit of Mark Nordlicht, or his transferees and/or successors, as beneficiary.   All payments made pursuant to this Section 7.2 shall be treated as "guaranteed payments" within the meaning of Section 707(c) of the Code.

14

7.3     Tax Distributions.

In the sole discretion of the Managers, no less frequently than quarterly and consistent with the Members' obligations to make quarterly estimated income tax payments, the Company may distribute to each Member a minimum cash distribution in an amount reasonably determined by the Managers to be necessary for such Member to pay any applicable taxes or estimated taxes attributable to allocations of Net Profit to such Member for the related Fiscal Period. The amounts to be distributed pursuant to this Section 7.3 shall be calculated by the Managers in their reasonable discretion taking into account the maximum combined United States federal, State of New York and City of New York tax rates applicable to individuals (or, if any Member is subject to higher combined United States federal, state and local tax rates and such Member so requests, such higher combined tax rates) on ordinary income and net short-term and long-term capital gain (as applicable), and otherwise based on such reasonable assumptions as the Managers determine in good faith to be appropriate. The highest distribution percentage applicable to any Member shall be applied equally to each Member regardless of its actual tax liability with respect to income of the Company.

7.4     Ordinary Distributions.

Subject to Section 7.5, as soon as practicable after the Net Profit for each Fiscal Year has been determined, the Company shall make distributions to the Members in an aggregate amount equal to the Company's Net Distributable Cash in respect of such Fiscal Year in excess of distributions made pursuant to Sections 7.2 and 7.3 during such Fiscal Year. In the sole discretion of the Managers, distributions may also be made during any Fiscal Year from the Company's Net Distributable Cash in respect of such Fiscal Year in excess of distributions made pursuant to Sections 7.2 and 7.3 during such Fiscal Year, at such times and in such amounts as may be determined by the Managers from time to time. All amounts distributed to the Members pursuant to this Section 7.4 shall be made in the same proportion as the related Net Profit was allocated under Section 6.1. Distributions with respect to realized Member Specific Deferred Fees shall be made to the applicable Members under Sections 7.3 and 7.4.

7.5     Distributions Upon Sale, Merger or Dissolution.

7.5.1     Notwithstanding anything else to the contrary in this Agreement, in the event of the sale, merger or dissolution of the Company, the Company shall make distributions in the following order and priority:

(a)     first, to the payment and discharge of all of the claims of all creditors of the Company that are not Members or Affiliates of any Member;

(b)     second, to the setting up of any reserves that the Managers deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company; provided that any reserves not necessary to satisfy such liabilities or obligations are distributed in accordance with this Section 7.5.1 as soon as practicable;

(c)     third, to the payment and discharge of all of the claims of all creditors of the Company that are Members or Affiliates of any Member;

15

(d)    fourth, pro rata to (i) Mark Nordlicht or, upon his death, his heirs until Mark Nordlicht or his heirs, as applicable, have received an amount equal to 40% of the 1/1/10 Company Value, and (ii) the Trust, solely for the benefit of Mark Nordlicht, or his transferees and/or successors, as beneficiary, until the Trust has received an amount equal to 60% of the 1/1/10 Company Value; and

(e)    fifth, to each of the Members (including, for the avoidance of doubt, the Trust and any Retired Members) in proportion to their Company Percentages.  Any Member Specific Deferred Fees shall be allocated and distributed to such Members, as applicable.

7.5.2   The Managers expressly agree to retain, at the expense of the Company, an independent third party appraiser to determine the fair value of the Company as of the opening of business on January 1, 2010, excluding any Member Specific Deferred Fees (the "**1/1/10 Company Value**").

7.6    <u>Limitation on Distributions</u>.

The right of any Member or the legal representatives of such Member to receive any distribution in respect of its Capital Account pursuant to this Article VII is subject to the provision by the Managers for all Company liabilities in accordance with Section 18-607(a) of the Act.  Furthermore, no distribution shall be made (a) if such distribution would violate any contract or agreement to which the Company is then a party, or any law, rule, regulation, order or directive of any governmental authority then applicable to the Company, (b) to the extent that the Managers, in their reasonable discretion, determine that any amount otherwise distributable should be retained by the Company to pay, or to establish reasonable reserves for the payment of, any liability or obligation of the Company, whether liquidated, fixed, contingent or otherwise, or (c) to the extent that the Managers, in their reasonable discretion, determine that cash available to the Company in insufficient to permit such distribution.

7.7    <u>Distributions In-Kind</u>.

The Managers may direct that any asset of the Company be distributed, pro rata, in-kind in accordance with the provisions of this Article VII.

7.8    <u>Withholding</u>.

The Managers may withhold from any amount allocable or payable to any Member any taxes required to be paid or withheld by the Company on behalf of or for the account of such Member.  Any such taxes shall be deemed to be a distribution or payment to such Member, reducing the amount otherwise distributable to such Member pursuant to this Agreement and reducing the Capital Account of such Member.

7.9    <u>Distribution of Reserves</u>.

Subject to Sections 7.5 and 7.6, the Managers, in their reasonable discretion, may determine that all or part of any amount previously retained by the Company to establish or fund a reserve should no longer be retained by the Company may distribute any such amounts to the

Members pro rata in proportion to their respective Capital Account balances as of the date any such determination is made.

    7.10    Expenses.

Except as otherwise provided in this Agreement or in any agreement to which the Company is a party, the Company will be responsible for all expenses incurred by the Company.

**ARTICLE VIII**
**Withdrawal, Removal, Death and Disability**

    8.1    Removal.

Uri Landesman may be removed by Mark Nordlicht as a Manager and as a Member at any time either (a) for Cause on not less than 10 days' prior written notice, or (b) without Cause on not less than 30 days prior written notice, in each case effective as of a date (the "**Removal Date**") specified in such notice, provided that Uri Landesman shall have 10 days from the date of his receipt of any notice purporting to remove him for Cause to cure the circumstances resulting in such Cause (if such circumstances are capable of being cured within such 10 days).

    8.2    Retirement, Permanent Disability or Death.

    8.2.1   Any Member may retire from the Company at any time on not less than 30 days' prior written notice to the Managers and the Members, as of a date (the "**Retirement Date**") specified in such notice.  In the event that Mark Nordlicht retires from the Company at a time when he is the trustee of the Trust, the Trust shall be deemed to have retired from the Company as of the same time.  From the day immediately following the Retirement Date, the retiring Member shall (i) have no further power or authority to perform any services for or on behalf of the Company, (ii) cease all activities on behalf of the Company, (iii) have no authority to act or on behalf of the Company, and (iv) cease to be a Manager (if applicable).

    8.2.2   In the event of the death or Permanent Disability of a Manager, Passive Member or Beneficiary, the date of death or Permanent Disability shall be the Retirement Date.

    8.3    Retirement Interests.

    8.3.1   Subject to Sections 8.5 and 8.6, as of any Retirement Date (or Removal Date, as the case may be), a removed, retired, Permanently Disabled or deceased Member's Interest (or, in the case of the death or Permanent Disability of a Beneficiary, a portion of the Trust's Membership Interest) equal to such Beneficiary's Beneficiary Percentage Interest) shall be exchanged for a Retirement Interest, which Retirement Interest shall grant to the Retired Member a Non-Voting Company Percentage in an amount equal to the retired, removed, Permanently Disabled or deceased Member's Company Percentage (or, in the case of the Trust, the applicable portion of the Trust's Company Percentage) as of the Retirement Date (or Removal Date, as the case may be).

17

8.3.2   Subject to Sections 8.5 and 8.6, upon the retirement, removal, Permanent Disability or death of any Member, and upon the death or Permanent Disability of a Beneficiary, the Company shall pay to the Retired Member (or the Trust in the case of the death or Permanent Disability of a Beneficiary), the Withdrawal Amount; provided, however, that such Retired Member shall remain liable to the Company for the amount by which its Paid Incentive Fee Share exceeds its Allocable Incentive Fee Share.  Except in extraordinary circumstances, 90% of the Withdrawal Amount (less such Retired Member's portion of any management fee and incentive fee income which has accrued to such date but not yet been allocated to him) shall be paid to such Retired Member within 60 days of the Retirement Date (or Removal Date, as the case may be), and the balance shall be paid within 30 days of the completion of the audits of the private investment funds managed by the Company for the Fiscal Year in which the Retirement Date (or Removal Date, as the case may be) occurs; provided, that to the extent Section 409A requires an earlier payout date, then such amount shall be paid by no later than such earlier date.

8.4   <u>Return of Confidential Information</u>.

Upon the removal, retirement, Permanent Disability or death of any Member, such Member, or the heirs of such Member, as the case may be, shall return, or cause to be returned, to the Company all Confidential Information (as defined in Section 10.1 hereof) that is or was in such Member's possession or control, and such Confidential Information shall remain in the possession and control of the Company.

8.5   <u>Vesting</u>.

Upon the retirement, removal for Cause or death of Uri Landesman, in each case, prior to January 1, 2015, Uri Landesman's Non-Voting Company Percentage shall be reduced by an amount, in respect of each Fiscal Quarter (or portion thereof) remaining between the applicable Retirement Date or Removal Date, as the case may be, and January 1, 2015, equal to 5% of Uri Landesman's Voting Company Percentage as of the applicable Retirement Date or Removal Date, as the case may be (each such resulting Non-Voting Company Percentage, a "**Vested Interest**"); provided, however, that each such Vested Interest shall not be less than 20% of Uri Landesman's Voting Company Percentage as of the applicable Retirement Date or Removal Date, as the case may be.  Upon the removal of Uri Landesman without Cause or the Permanent Disability of Uri Landesman, in each case prior to January 1, 2015, Uri Landesman's Vested Interest shall equal 100% of his Voting Company Percentage as of the applicable Removal Date or Retirement Date, as the case may be.

8.6   <u>Buy-out</u>.

8.6.1   No Member shall have the right to acquire any other Member's Interest.

8.6.2   In the event that Uri Landesman is removed for Cause pursuant to Section 8.1 prior to January 1, 2015, the Company shall have the right, in the sole discretion of Mark Nordlicht, to purchase all of Uri Landesman's Interest (including, for the avoidance of doubt, his Vested Interest) for the Withdrawal Amount in respect of such Interest;

18

provided, however, that Uri Landesman shall remain liable to the Company for the amount by which his Paid Incentive Fee Share exceeds his Allocable Incentive Fee Share.

Upon such a repurchase by the Company of Uri Landesman's Interest in the Company:

> (a)    beginning on the day immediately following the Removal Date, Uri Landesman shall no longer be a Member of the Company and the other Members of the Company shall participate in Uri Landesman's Company Percentage on a pro rata basis; and

> (b)    90% of the Withdrawal Amount (less such former Member's portion of any management fee and incentive fee income which has accrued to such date but not yet been allocated to him) in respect of Uri Landesman shall be paid to him within 60 days of the Removal Date, and the balance shall be paid within 30 days of the completion of the audits of the private investment funds managed by the Company for the Fiscal Year in which the Removal Date occurs; provided, that to the extent Section 409A requires an earlier payout date, then such amount shall be paid by no later than such earlier date.

8.6.3   In the event that Uri Landesman retires from the Company pursuant to Section 8.2 hereof prior to January 1, 2015, the Company shall have the right, in the sole discretion of Mark Nordlicht, to purchase all of Uri Landesman's Interest (including, for the avoidance of doubt, his Vested Interest) at the fair market value of such Vested Interest as of the Retirement Date (as determined by an independent valuation firm having a national reputation and having experience in valuing interests in entities like the Company, jointly selected by Mark Nordlicht and Uri Landesman, each acting reasonably.  In the event such individuals cannot agree upon such a valuation firm within 90 days of the Retirement Date, each individual shall choose a valuation firm meeting the above criteria, and such valuation firms shall jointly select a third valuation firm meeting the above criteria, and such third valuation firm shall determine such fair market value (the "**Buy-Out Amount**").

Upon such a repurchase by the Company of Uri Landesman's Interest in the Company:

> (a)    beginning on the day immediately following the applicable Retirement Date, Uri Landesman shall no longer be a Member of the Company in any capacity and the other Members of the Company shall participate in his Company Percentage on a pro rata basis; and

> (b)    the Buy-out Amount shall be paid to Uri Landesman by means of a three-year promissory note having, as principal terms, equal quarterly payments of principal and interest with interest calculated monthly at a rate equal to the one-month LIBOR rate as of the last day of the immediately preceding month plus 2%, compounded monthly.

EWAGNE\127314.8 - 3/30/11

## ARTICLE IX
### Transfers of Interests

9.1     <u>Transfer Provisions</u>.

No Member shall have the right to Transfer all or any portion of its Interest to any Person without the prior written consent of all of the Members (but not any Retired Member); provided, however, that a Member may Transfer all or a portion of its Interest in the Company (the "**Family Interest**") to his spouse, children, grandchildren or siblings, to a trust for the benefit of the Member or such family members and/or to an entity solely owned by such Member, such family members or such a trust and, in the case of the Trust, to another trust for the benefit of the same beneficiaries (collectively, "**Family Members**"), if such transferee complies with Section 9.2 below, in which case, (i) the Transferring Member shall be deemed to have voting control over all decisions to be made with respect to the Family Interest, (ii) the Transferring Member shall execute or shall cause to be executed all documents or instruments required to be executed by the Company evidencing such voting control, and (iii) the Family Interest shall be deemed to be owned by the Transferring Member for the purposes of Article VIII and this Article IX and shall be included in any permitted Transfer by such Transferring Member pursuant to this Article IX (other than to a Family Member).  Any Transfer made in violation of the provisions of this Article IX shall be null and void and shall not bind the Company or any Member.

9.2     <u>Substituted Members</u>.

The transferee of an Interest shall have the right to become a substituted Member of the Company only if (i) the consent referred to in Section 9.1 has been obtained, and (ii) the transferee executes and acknowledges such instruments, in form and substance reasonably satisfactory to the Managers, as the Managers may deem necessary or desirable to effectuate such Transfer and to confirm that the transferee has agreed to be bound by the terms of this Agreement.

## ARTICLE X
### Confidentiality, Non-Competition and Restrictive Covenants

10.1     <u>Confidentiality</u>.

Each Member acknowledges that he or it will from time to time have access to information of a confidential or proprietary nature, as commonly and generally understood, including, without limitation, confidential or proprietary investment methodologies, trade secrets, proprietary or confidential plans, client identities and information, client lists, business operations or techniques, records and data that are not matters of public record (other than through a breach by such Member of this Agreement or any confidentiality agreement with the Company or an Affiliate of the Company) (collectively, the "**Confidential Information**") owned or used in the Company and its Affiliates.  Each Member agrees to keep confidential and not ever disclose, publish, divulge, furnish, use or make accessible, nor permit any of representative or other Person acting on behalf of such Member (an "**Authorized Representative**") to disclose, publish, divulge, furnish, use or make accessible, to anyone any Confidential Information; provided, however, that a Member (or an Authorized Representative of a Member) may disclose

20

any such Confidential Information (a) that has become a matter of public record (other than through a breach by such Member of this Agreement or any confidentiality agreement with the Company or an Affiliate of the Company), (b) as may be required or appropriate in any report, statement or testimony submitted to any governmental authority having or claiming to have jurisdiction over such Member (or any Authorized Representative of such Member), but only that portion of the Confidential Information which, in the written opinion of counsel for the Member (or any Authorized Representative of such Member), is required or would be required to be furnished to avoid liability for contempt or the imposition of any other material judicial or governmental penalty or censure, (c) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, or (d) as to which the Managers have unanimously consented in writing. Each Member hereby further agrees that, upon the termination of such Member as a Manager or Passive Member, all data, memoranda, client lists, notes, programs and other papers, items and tangible media, and reproductions thereof, relating to the foregoing matter in such Member's possession or control shall be returned to the Company and remain in the possession of the Company. This Section 10.1 shall survive any termination of this Agreement, any Member's change of status to a Former Member and any Transfer by a Member.

10.2     Non-Competition and Non-Solicitation.

10.2.1     During the term of the Company, except with the prior written consent of the Initial Members, no Member (including, for the avoidance of doubt, any Retired Member) or any Affiliate of any of the foregoing shall:

(a)     engage in, or become a passive investor in, any investment manager to a hedge fund, private equity fund or other privately offered pooled investment vehicle, unless such Member or principal of any Member shares all his profits from such business with the other Members of the Company (including Retired Members) on a pro rata basis in accordance with their respective Company Percentages; or

(b)     solicit any employee of the Company or its Affiliates (other than any employees who at the time of such solicitation are also employees of any investment management company owned in full or in part by such soliciting Member in accordance with the terms of clause (a) above).

Notwithstanding the foregoing, if Uri Landesman is removed without Cause, the provisions in clauses (a) and (b) above shall not apply to him or his Affiliates.

10.2.2     Each Member agrees that the provisions of Section 10.2.1 are reasonable and necessary for the protection of the Company and its Affiliates, and that each provision, and the period or periods of time, geographic areas and types and scope of restrictions on the activities specified therein are, and are intended to be, divisible. Each Member further acknowledges that the goodwill, good name, and good standing of the Company in the investment industry are essential for the Company's day-to-day operation and existence. In the event that any provision of Section 10.2.1, including any one sentence, clause or part thereof, shall be deemed contrary to law or invalid or unenforceable in any respect by a court of competent jurisdiction, the remaining

21

provisions shall not be affected, but shall, to the full extent permitted by law, remain in full force and effect and any invalid and unenforceable provisions shall be deemed, without further action on the part of the parties hereto, modified, amended and limited to the extent necessary to render the same valid and enforceable, but in no event shall such provisions be modified, amended or limited to be more restrictive than the provisions contained herein.

10.2.3 This Section 10.2 shall survive any termination of this Agreement, any Member's change of status to a Former Member and any Transfer by a Member.

**ARTICLE XI**
**Indemnification**

11.1    Exculpation.

Notwithstanding any other provision of this Agreement, whether express or implied, or obligation or duty at law or in equity, no Member (including, with limitation, the Managers) shall be liable to the Company for any act or omission in relation to the Company, this Agreement, any related document or any transaction or investment contemplated hereby or thereby taken or omitted by a Member in the reasonable belief that such act or omission is in or is not contrary to the best interests of the Company and is within the scope of authority granted to such Member; provided that such act or omission does not constitute gross negligence, willful misconduct, bad faith or fraud.

11.2    Indemnification.

The Company shall indemnify and hold harmless each Member (including, without limitation, the Managers) and his or its Affiliates from and against any and all losses, claims, damages, liabilities, expenses (including, without limitation, legal fees and expenses), judgments, fines, settlements and other amounts relating to any and all acts, omissions, claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, which relate to the Member's relationship to, or status or activities with, the Company or which otherwise relate to or arise in connection with the property, business or affairs of the Company ("**Losses**"). The Member's expenses paid or incurred in defending itself against any Losses shall be reimbursed as paid or incurred. The indemnification provided pursuant to this Section 11.2 shall not apply with respect to a Member for that portion of any Losses determined by the final decision (from which an appeal cannot be taken or is not timely taken) of a court of competent jurisdiction to have been caused by such Member's gross negligence, willful misconduct, bad faith or fraud. Any payments made to or on behalf of a Member who is later determined not to be entitled to such payments shall be refunded to the Company promptly following such determination. This indemnity shall be provided out of Company assets only, and no Member shall have any personal liability with respect to this indemnity. The provisions of this Section 11.2 shall survive the termination of this Agreement with respect to all actions of a Member which occurred prior to such termination.

# ARTICLE XII
## Records and Accounting, Fiscal Affairs

12.1    Records and Accounting.

12.1.1 The Company shall maintain books and records which shall reflect all Company transactions and which shall be appropriate and adequate for the Company's business.  The Members shall have the right during normal business hours to request access to and copy such books and records, upon at least 1 Business Day's prior written notice to the Managers, in person or by their authorized attorney or agent, but only if (i) the request to access and/or copy:  (i) is for a purpose reasonably related to the Company's business and the Member's Interest in the Company, is not for any commercial purpose, is not detrimental to the best interest of the Company, is not damaging to the Company or its business and the Company is not required by law or by agreement with third parties to keep such books and records confidential (as reasonably determined by the Managers in good faith); (ii) the Member agrees (in form and substance satisfactory to the Manager) to use such information only for Company purposes and to maintain such information in strict confidence; and (iii) reasonable reproduction and distribution costs are paid by the Member.

12.1.2 The books and records of the Company shall be kept on the accrual basis in accordance with generally accepted accounting principles (except for revenues, which shall be accounted for on a cash basis).

12.2    Tax Status.

The Members intend that the Company will be treated as a partnership for U.S. federal, state and local income tax purposes and will be subject to all provisions of Subchapter K of the Code.

12.3    Tax Matters Partner.

Pursuant to Section 6231(a)(7)(A) of the Code, Mark Nordlicht is hereby designated as the "**Tax Matters Partner**" of the Company for all purposes of the Code and for the corresponding provision of any U.S. state or local statute.  All of the Members hereby consent to such designation and agree to take any such further action as may be required by the Regulations or otherwise to effectuate and maintain such designation.  In his capacity as the Tax Matters Partner, Mark Nordlicht shall have the exclusive right and authority to determine the accounting methods and conventions to be used in the preparation of the Company's tax returns and make such elections under the tax laws of the United States, the several states and other relevant jurisdictions as to the treatment of items of income, gain, loss, deduction and credit of the Company, or any other method or procedure related to the preparation of such returns; provided, that no such election under any such tax law shall be made which would have a negative impact on any Member not shared by the other Members in proportion to their respective interests hereunder.  Promptly after any filing is made by the Tax Matters Partner with the Internal Revenue Service or with any other taxing authority, the Tax Matters Partner will provide a copy of same to each of the other Members.

23

12.4   Reports.

The Company shall furnish to each Member detailed financial statements and information and documents (including Form K-1 or comparable information) necessary or desirable for the preparation or support of such Member's tax returns required in any jurisdiction, as soon as practicable after the end of each Fiscal Year.

12.5   Member Representations and Warranties.

12.5.1  Each Member represents and warrants that such Member has been advised to consult, and has consulted, independent counsel and tax counsel concerning the consequences of receiving such Member's Interest in the Company and becoming a Member, and such Member has neither received nor relied upon any investment, financial or tax advice from the Managers or counsel for the Company.

12.5.2  Each Member agrees, with respect to each Company income tax return that is prepared and filed in compliance with the provisions of this Agreement, that such Member shall not (a) treat, on such Member's income tax returns, any item of income, gain, loss, deduction or credit relating to such Member's interest in the Company in a manner inconsistent with the treatment of such item by the Company as reflected on Form K-1 or any other information statement furnished by the Company to such Member for use in preparing such Member's income tax returns, or (b) file any claim for refund relating to any such item based on, or which would result in, such inconsistent treatment.

12.5.3  In the event of a breach by any Member of the provisions of this Section 12.5, such Member shall be liable to the Company and the other Members for any costs, liabilities and damages (including, without limitation, consequential damages) incurred by any of them on account of such breach.

12.5.4  This Section 12.5 shall survive any termination of this Agreement, any Member's change of status to a Former Member and any Transfer by a Member.

**ARTICLE XIII**
**Company Property**

13.1   Company Property.

All property now or hereafter owned by the Company shall be deemed owned by the Company as an entity and no Member, individually, shall have any ownership of such property. Title to the assets and properties, real and personal, now or hereafter owned by or leased to the Company, shall be held in the name of the Company; provided, however, that if the Managers determine that title shall be held other than in the name of the Company, the Person or Persons who hold title shall certify by instrument duly executed and acknowledged, in form for recording or filing, that title is held as nominee and/or trustee for the sole benefit of the Company pursuant to the terms of this Agreement, and an executed copy of such instrument shall be delivered to each Member.

EWAGNE\127314.8 - 3/30/11

13.2   Prohibition Against Partition.

Each Member hereby permanently waives and relinquishes any and all rights it may have to cause all or any part of the property of the Company to be partitioned, it being the intention of the Members to prohibit any Member from bringing a suit for partition against the other Members, or any one of them.

## ARTICLE XIV
## Dissolution, Liquidation and Termination

14.1   Dissolution and Liquidation.

14.1.1  The Company shall dissolve upon, but not before, the first to occur of the following:

(a)      the holders of 75% of the Voting Company Percentages consent in writing to the dissolution of the Company;

(b)      the retirement, removal, death or Permanent Disability of the last remaining Manager unless the Members select a replacement Manager pursuant to Section 4.3.2 within 90 days of the relevant Retirement Date or Removal Date, as the case may be;

(c)      the bankruptcy or insolvency of the Company; or

(d)      operation of law.

14.1.2  Upon dissolution of the Company, but prior to the cancellation of the Certificate of Formation, the Company shall immediately commence to wind up its affairs, and the Managers shall proceed with reasonable promptness to liquidate the business of the Company.

14.1.3  During the period of the winding up of the affairs of the Company, the rights and obligations of the Members shall continue as provided herein.

14.1.4  The Company shall terminate after its affairs have been wound up and its assets fully distributed in accordance with Section 7.5.1.

14.1.5  No Member shall be obligated to repay any deficit in such Member's Capital Account to the Company or any other Member or have any right to demand property other than cash upon dissolution and termination of the Company.

14.2   Cancellation of Certificate of Formation.

Upon the completion of the liquidation of the Company's property, the Managers shall cause the cancellation of the Certificate of Formation and all qualifications of the Company as a foreign limited liability company in all foreign jurisdictions.

EWAGNE\127314.8 - 3/30/11

**ARTICLE XV**
**Miscellaneous**

15.1    Governing Law.

This Agreement shall be interpreted and construed exclusively in accordance with the laws of the State of Delaware without regard to its conflicts of laws rules.

15.2    Notice.

15.2.1  All communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if (i) delivered personally with receipt acknowledged; (ii) sent by registered or certified mail, return receipt requested; (iii) transmitted by facsimile (receipt of which shall be confirmed by telephone and by a writing sent by registered or certified mail on the Business Day that such facsimile is sent); or (iv) sent by recognized overnight courier for next Business Day delivery; to, in the case of notice to a Member, the address or facsimile number, as the case may be, set forth with respect to such Member in the books and records of the Company (or at such other address or facsimile number for a Member as such Member shall specify by notice to the Company, or, in the case of notice to the Company, to the attention of the Managers at the Company's principal business office.

15.2.2  Notice of change of address shall be deemed given when actually received or upon refusal to accept delivery thereof; all other communications shall be deemed to have been given, received and dated on the earliest of:  (i) when actually received or upon refusal to accept delivery thereof, (ii) the date when delivered personally, (iii) one Business Day after being sent by facsimile or overnight courier and (iv) four Business Days after registered or certified mailing.

15.3    Severability.

In case any one or more of the provisions contained in this Agreement shall be invalid or unenforceable in any respect, the validity and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby and the parties will attempt to agree upon a valid and enforceable provision which shall be a reasonable substitute for such invalid and unenforceable provision in light of the tenor of this Agreement and, upon so agreeing, shall incorporate such substitute provision in this Agreement.

15.4    Headings.

The headings in this Agreement have been inserted solely as a matter of convenience and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provisions hereof.

15.5    Interpretation.

All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular, or plural as the identity of the Person or Persons referred to may require

15.6    Entire Agreement.

This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes any and all prior agreements or understandings among the parties relating to the subject matter hereof, oral or written, all of which are hereby merged into this Agreement.  There are no promises, agreements, conditions, understandings, warranties, or representations, oral or written, express or implied, among the parties hereto, other than as set forth in this Agreement.

15.7    Termination, Revocation, Waiver, Modification or Amendment.

No termination, revocation, waiver, modification or amendment of this Agreement shall be binding unless agreed to in writing by the Members holding at least 75% of the Voting Company Percentages.  Without the written consent of each Member (including a Retired Member) adversely affected thereby, no amendment of this Agreement shall be made that (i) increases the obligations of any Member to make Capital Contributions, (ii) alters the allocation for tax purposes of any items of income, gain, loss, deduction or credit, (iii) alters the manner of computing the distributions of any Member, or (iv) allows the obligation of a Member to make a Capital Contribution to the Company to be compromised by the consent of less than all the Members.

15.8    Binding Effect.

This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors, permitted assigns, heirs, executors, administrators and legal representatives.

15.9    Further Assurances.

Each of the parties hereto agrees to execute, acknowledge, deliver, file, record and publish such further certificates, instruments, agreements and other documents, and to take all such further actions as may be required by law or deemed by the Managers to be necessary or useful in furtherance of the Company's purposes and the objectives and intentions underlying this Agreement and not inconsistent with the terms hereof.

15.10   Waiver

No consent or waiver, express or implied, by any Member to or of any breach or default by any other Member in the performance by any other Member of its obligations hereunder shall be deemed or construed to be a consent to or waiver of any other breach or default in the performance by such other Member of the same or any other obligation of such Member hereunder.  Failure on the part of a Member to declare such other Member in default, irrespective

27

of how long such failure continues, shall not constitute a waiver by such Member of its rights hereunder.

15.11   Additional Remedies.

The rights and remedies of any Member hereunder shall not be mutually exclusive. The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it limit or affect, any other rights in equity or any rights at law or by statute or otherwise of any party aggrieved as against the other for breach or threatened breach of any provision hereof, it being the intention of this paragraph to make clear the agreement of the parties hereto that their respective rights and obligations hereunder shall be enforceable in equity as well as at law or otherwise.

15.12   No Reliance by Third Parties.

Except as expressly provided herein, the provisions of this Agreement are not for the benefit of any creditor or other Person (including, without limitation, a Beneficiary) other than a Member, and no creditor or other Person shall obtain any rights under this Agreement or by reason of this Agreement. Beneficiaries shall in no event be considered Members of the Company, and the Managers, in their capacity as such, shall not have any fiduciary duties to the Beneficiaries.

15.13   Arbitration.

Any dispute arising out of, or relating to, this Agreement or the breach thereof (other than Article 10 hereof), or regarding the interpretation thereof, shall be finally settled by arbitration conducted in New York City in accordance with the rules of JAMS then in effect before a single arbitrator appointed in accordance with such rules. Judgment upon any award rendered therein may be entered and enforcement obtained thereon in any court having jurisdiction. The arbitrator shall have authority to grant any form of appropriate relief, whether legal or equitable in nature, including specific performance. For the purpose of any judicial proceeding to enforce such award or incidental to such arbitration or to compel arbitration and for purposes of Article 8 hereof, the parties hereby submit to the non-exclusive jurisdiction of the Supreme Court of the State of New York, New York County, or the United States District Court for the Southern District of New York, and agree that service of process in such arbitration or court proceedings shall be satisfactorily made upon it if sent by registered mail addressed to it at the address referred to in Section 15.2 above. The parties agree that money damages would be an inadequate remedy for any breach of any provisions of Article X and in the event of a breach or threatened breach of such provisions, the Managers or their successors or assigns may, in addition to other rights and remedies existing in their favor, apply for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, such provisions, without posting a bond or other security.

15.14   Counterparts.

This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which shall constitute one agreement. The signatures of any party

28

to a counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart.

**[Remainder of page intentionally left blank.]**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the date first written above.

**Manager:**

_____
URI LANDESMAN

**Passive Members:**

_____
MARK NORDLICHT

MARK NORDLICHT GRANTOR TRUST

By: _____
Mark Nordlicht,
solely in his capacity as Trustee

30

**Schedule I**

**Schedule of Members**

| Name | Address | Member Status | Company Percentage /Voting Status |
|------|---------|---------------|-----------------------------------|
| Mark Nordlicht | | Passive Member; Chief Investment Officer | 10% Voting Company Percentage |
| Uri Landesman | | Manager; Member | 25% Voting Company Percentage |
| Mark Nordlicht Grantor Trust | | Passive Member | 65% Voting Company Percentage |

EWAGNE\127314.8 - 3/30/11

# EXHIBIT 4

PLATINUM Partners

*March 2016*
*Offshore Fund*
*Class L*

VALUE ARBITRAGE FUND LP

## FUND OVERVIEW

**Platinum Partners Value Arbitrage Fund LP** ("PPVA") is a multi-strategy fund designed to achieve significant risk-adjusted returns irrespective of the direction of any broader market activity. PPVA deploys assets opportunistically across various strategies, including short term relative value, event driven, and asset based finance. The General Partner believes that consistent positive returns are a function of appropriately managing downside risk and seeks to invest in a mix of uncorrelated strategies.

## FIRM OVERVIEW

**Platinum Partners** (the "Firm") is a New York based investment management group with more than $1 Billion in assets under management. The Firm was founded in 2003 by Mark Nordlicht, an investor with over twenty years of experience in the asset management space. The Firm manages multiple funds, including Platinum Partners Credit Opportunities Master Fund L.P. ("PPCOMF"); Platinum Partners Value Arbitrage Fund L.P. ("PPVA"); Platinum Partners Liquid Opportunity Master Fund L.P. ("PPLO"); Marbridge Energy Finance Fund II LLC and Marbridge Energy Finance Fund International II Ltd. (collectively, "Marbridge II"). Although each of the aforementioned funds have separate investment advisors, Mr. Nordlicht is the CIO of the investment advisors of PPCOMF, PPVA, and PPLO . The CIO of the investment advisor of Marbridge II is a Portfolio Manager of the Firm.

## MANAGER BIOGRAPHY

**Mark Nordlicht** has over 20 years of experience in the investment industry and is responsible for oversight of all trading, asset allocation and risk management on behalf of the Platinum-managed funds. Mr. Nordlicht founded Platinum Energy Resources and Platinum Diversified Mining, publicly traded oil & natural gas and mining companies, respectively. Mr. Nordlicht is also the founder and served as non-executive Chairman of Optionable, Inc., a brokerage firm for energy options, until May 1, 2007. From 1997 to 2001, Mr. Nordlicht was a founder and managing partner of West End Capital, a New York-based money management firm. In 1991, Mr. Nordlicht founded Northern Lights Trading and was its general partner until 2000. Northern Lights Trading was a proprietary options firm based in New York which employed traders in the cotton, coffee, natural gas, crude oil, gold, and silver option trading pits. Mr. Nordlicht graduated from Yeshiva University with a B.A. in Philosophy.

**David Levy** serves as Co-Chief Investment Officer of Platinum Partners. Mr. Levy has spent his career as an investment specialist and portfolio manager. Mr. Levy oversees over $1 billion in total investments and has directly managed over $250 million in capital. The focus of Mr. Levy's investments is in asset-based lending in a variety of industries, and utilizing credit based strategies to generate returns with less risk than traditional strategies. Mr. Levy co-founded Crius Energy, a publicly listed national retail energy platform currently providing power to over 500,000 RCEs in the United States. Mr. Levy's prior experience also includes time spent in the New York City Mayor's office for Mayor Bloomberg and with the Chief Counsel's office of Senator Orrin Hatch. Mr. Levy also serves as a member of the International Crisis Group's Advisory Council. Mr. Levy holds a Bachelor of Science in Finance from Yeshiva University.

## FUND STATISTICS ±

| | | | | | |
|---|---|---|---|---|---|
| **Sharpe Ratio:** | 2.69 | **Downside Deviation:** | 0.69% | **Firm AUM:** | $1.27 Billion |
| **Annualized Standard Deviation:** | 5.43% | **Percentage of positive months:** | 84.28% | **PPVA Master Fund AUM:** | $690 Million |
| **Average Annualized Return** | 16.90% | **Largest Monthly Loss:** | 3.41% | **PPVA Offshore Fund AUM:** | $446 Million |

### PLATINUM PARTNERS VALUE ARBITRAGE (INTERNATIONAL), LTD. NET MONTHLY RETURNS

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD | Cum |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2003** | 1.41 | 0.63 | 0.47 | (0.08) | (0.82) | 1.91 | 1.07 | 2.55 | 3.22 | 2.11 | 1.67 | 2.02 | **17.33%** | **17.33%** |
| **2004** | 3.33 | 1.79 | 2.19 | 0.14 | 0.21 | (0.45) | (0.34) | 1.00 | (0.32) | 1.09 | 0.74 | 2.97 | **12.97%** | **32.55%** |
| **2005** | 1.63 | 0.97 | 0.29 | (0.29) | 0.78 | 1.39 | 1.54 | 2.04 | 1.46 | 3.13 | 0.51 | 2.34 | **16.93%** | **54.99%** |
| **2006** | 3.23 | 2.04 | 1.72 | 1.15 | 2.02 | 1.62 | 0.55 | 0.30 | 1.50 | 1.88 | 1.95 | 3.75 | **23.94%** | **92.10%** |
| **2007** | 2.48 | 3.81 | 4.33 | 2.99 | 4.35 | 5.44 | 2.22 | 3.39 | 1.56 | 4.96 | 1.95 | 6.09 | **53.25%** | **194.39%** |
| **2008** | (2.10) | 1.15 | (1.53) | 2.56 | 4.48 | 1.58 | 0.33 | 1.20 | (3.41) | (1.07) | 0.14 | 1.21 | **4.37%** | **207.26%** |
| **2009** | 3.29 | 0.42 | 2.01 | 1.35 | 2.57 | 1.69 | 1.82 | 1.53 | 1.80 | 0.64 | 0.54 | 1.47 | **20.86%** | **271.34%** |
| **2010** | 1.09 | 2.70 | 0.16 | 2.05 | (0.20) | 0.46 | 1.83 | 1.11 | 1.73 | 1.49 | 1.41 | 3.99 | **19.27%** | **342.89%** |
| **2011** | 2.10 | 4.41 | 2.18 | 1.83 | 1.37 | 2.87 | 0.77 | 0.56 | 0.98 | 1.31 | (0.49) | 1.43 | **21.03%** | **436.02%** |
| **2012** | 0.42 | 0.78 | 2.87 | (0.09) | 0.52 | 1.93 | 1.59 | 0.14 | 0.90 | 0.84 | (0.24) | 1.39 | **11.58%** | **498.08%** |
| **2013** | 1.75 | 0.79 | 1.36 | 0.18 | 0.85 | 1.13 | 0.95 | 1.29 | 0.23 | (1.78) | 1.41 | (1.21) | **7.11%** | **540.59%** |
| **2014** | 3.68* | 1.53 | 1.00 | 0.21 | 2.13 | 2.63 | 0.53 | 1.01 | (0.17) | (1.66) | (2.51) | 2.05 | **10.76%** | **609.50%** |
| **2015\*\*** | 0.10 | (0.89) | (0.83) | 7.83 | (0.22) | 1.28 | (0.07) | 0.02 | 1.05 | (1.43) | 0.24 | 1.65 | **±8.76%** | **±671.62%** |
| **2016\*\*** | (1.10) | 2.23 | +1.48 | | | | | | | | | | **±2.60%** | **±678.54%** |

*The January 2014 rate of return reflects a one time reversal of certain fees.
**Unaudited; ± Estimated and subject to change. The Master Fund AUM set forth above includes approximately 60.44% of the Special Investments.
The information herein is part of a two page packet which incorporates and is qualified by disclosures on page two.  Past performance is not necessarily indicative of future performance. No representation is made that the Fund will or is likely to achieve its objectives or that any investor will be able to avoid incurring losses.

PLATINUM Partners

VALUE ARBITRAGE FUND LP

*March 2016
Offshore Fund
Class L*

## INVESTMENT TERMS

| | |
|---|---|
| Minimum Investment: | $ 1,000,000 (USD) |
| New Capital: | Monthly |
| Lockup: | None |
| Withdrawals: | Quarterly, 60 days' notice required |
| Management Fee: | 2% |
| Incentive Allocation: | 20% |
| Other Fees: | Administrative and Investment Related |

## SERVICE PROVIDERS

| | |
|---|---|
| Administrator: | SS&C Technologies, Inc. |
| Auditor: | CohnReznick, LLP |
| Independent Valuation Agent: | Alvarez & Marsal Valuation Services, LLC |
| Legal Counsel: | Schulte Roth & Zabel LLP |
| Global Custodian: | BNY Mellon |
| Prime Broker: | Credit Suisse |

## STRATEGY PERFORMANCE

| Strategy | Net Return | Contribution to Fund |
|---|---|---|
| Long Short Fundamental | -5.71% | -0.29% |
| Quantitative | -0.35% | -0.01% |
| Opportunistic/Macro | -0.35% | -0.01% |
| Energy Related Arbitrage | 4.98% | 0.25% |
| Asia Based Arbitrage | 0.98% | 0.15% |
| Event Driven | 4.58% | 1.51% |
| Asset Based Finance General | -0.35% | -0.07% |
| Asset Based Finance Mining | -0.35% | -0.05% |
| **Total :** | | **1.48%** |

## TARGETED RISK ALLOCATION



## CONTACT

**Contact - Andrew Kaplan**   AKaplan@platinumlp.com   (212) 582-2222

Past performance is not necessarily indicative of future performance. This material is not an invitation to subscribe for shares or interests in any fund and is by way of information only. Sales of shares or interests are made on the basis of the relevant offering documents only and are not offered in any jurisdiction in which such offer or sale is not authorized. Investors will purchase limited partnership interests in Platinum Partners Value Arbitrage Fund (USA) L.P. ("Platinum USA") or preferred shares in Platinum Partners Value Arbitrage Fund (International) Limited ("Platinum International"), depending on the preference for an onshore or offshore feeder fund. Platinum USA and Platinum International will, in turn, invest all or substantially all of their assets in the Platinum Partners Value Arbitrage Fund L.P. (the "Master Fund"). Before any investment is made in either Platinum USA or Platinum International, investors should review carefully the Confidential Private Offering Memorandum for such fund (collectively, the "Memoranda"). The Memoranda describe in detail the risks associated with making an investment in either Platinum USA or Platinum International. Investors will have the right to redeem or withdraw their interests or shares, as the case may be, on a quarterly basis subject to certain restrictions described in the Memoranda. Investment in either feeder fund may not be suitable for all investors and prospective investors should consult their professional advisers as to suitability, legal, tax and economic consequences of an investment in either fund. Reference to the "Fund" means an investment in the Master Fund through the purchase of limited partnership interests in Platinum USA or preferred shares of Platinum International. 2015 and 2016 returns have not been audited. Most recent month is an estimate: Year-to-date and cumulative numbers and graphs include this estimate. Returns given are for non-restricted investors who were invested in Platinum (USA) or Platinum (International) at the beginning of the year. Returns shown for periods prior to May 2007 represent Class A returns; from June 2007 to September 2010 represent Class I returns; Class L thereafter. Actual returns for a particular investor may vary due to several factors including timing of investment and class. The Strategy Performance numbers are estimates and may vary. Certain estimations and simplifying assumptions were used to arrive at the targeted risk allocation. The numbers provided may not add up to the aggregate performance of the Fund. The Strategy Performance and Target Risk Allocation numbers may include leverage or implied leverage. Targeted Risk Allocation may change from time to time and relative to the above. Targeted Risk Allocation is updated as of March 31, 2016. Please note that all allocations are approximate, are calculated based on estimated risk exposure, are not intended to be an indication of actual fund notional exposure, and are subject to change without notice.

# EXHIBIT 5

# Due Diligence Questionnaire

## Platinum Management (NY) LLC

## September 2015

## CONFIDENTIAL

This document has been prepared by Platinum Management (NY) LLC (*Platinum*).  This document is not intended to replace the applicable Platinum Partners Value Arbitrage Fund LP Private Offering Memorandum and is general in nature and does not purport to be complete.

This document does not constitute an offer or solicitation of any investment.  The information contained herein may not be suitable for all investors.  Shares or interests are not offered in any jurisdiction in which such sale or offer is not authorized.

This document and any information contained herein speak only as of the date hereof and are subject to change without notice.  Platinum and its affiliated companies and employees shall have no obligation to update or amend any information contained herein.

This document is being furnished to you for informational purposes only and on the condition that it will not form a primary basis for any investment decision.  This document is not intended to provide, nor should it be construed or used as, tax, legal, financial or investment advice.  Past performance is not necessarily indicative of future results.

**Important Legal Information**

*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE PERFORMANCE. THIS MATERIAL IS NOT AN INVITATION TO SUBSCRIBE FOR SHARES OR INTERESTS IN ANY FUND AND IS BY WAY OF INFORMATION ONLY. SALES OF SHARES OR INTERESTS ARE MADE ON THE BASIS OF THE RELEVANT OFFERING DOCUMENTS ONLY AND ARE NOT OFFERED IN ANY JURISDICTION IN WHICH SUCH OFFER OR SALE IS NOT AUTHORIZED. INVESTORS WILL PURCHASE MEMBERSHIP INTERESTS OR SHARES IN THE RELEVANT FUND. BEFORE ANY INVESTMENT IS MADE IN SUCH FUND, INVESTORS SHOULD CAREFULLY REVIEW THE CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM FOR SUCH FUND (THE \*MEMORANDUM\*). THE MEMORANDUM DESCRIBES IN DETAIL THE RISKS ASSOCIATED WITH MAKING AN INVESTMENT IN THE APPLICABLE FUND. INVESTORS HAVE A RIGHT TO REDEEM OR WITHDRAW THEIR INTERESTS, ON A QUARTERLY BASIS, SUBJECT TO CERTAIN RESTRICTIONS DESCRIBED IN THE MEMORANDUM. INVESTMENT IN A FUND IS NOT SUITABLE FOR ALL INVESTORS. PROSPECTIVE INVESTORS SHOULD CONSULT THEIR PROFESSIONAL ADVISERS AS TO THE SUITABILITY AND THE LEGAL, TAX AND ECONOMIC CONSEQUENCES OF AN INVESTMENT IN A FUND.*

*THIS FUND DUE DILIGENCE QUESTIONNAIRE (\*DDQ\*) IS FOR ILLUSTRATION AND DISCUSSION PURPOSES ONLY AND IS NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED OR USED AS, FINANCIAL, LEGAL, TAX OR INVESTMENT ADVICE. THIS DDQ IS AS OF THE DATE INDICATED, IS NOT COMPLETE, AND DOES NOT CONTAIN CERTAIN MATERIAL INFORMATION ABOUT THE FUNDS, INCLUDING IMPORTANT DISCLOSURES AND RISK FACTORS ASSOCIATED WITH AN INVESTMENT IN THE FUNDS.*

*NO REPRESENTATION IS MADE THAT ANY FUND WILL OR IS LIKELY TO ACHIEVE ITS OBJECTIVES OR THAT ANY INVESTOR WILL BE ABLE TO AVOID INCURRING LOSSES. PORTFOLIO COMPOSITION AND RISK MANAGEMENT INFORMATION ARE SHOWN FOR ILLUSTRATION AND DISCUSSION PURPOSES ONLY AND ARE NOT A GUARANTEE OF THE PORTFOLIO COMPOSITION OF THE FUNDS AT ANY POINT IN TIME. CERTAIN NUMBERS ILLUSTRATED AND SHOWN IN THIS DDQ ARE UNAUDITED AND MAY NOT CONFORM WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES (\*GAAP\*). THIS DDQ DOES NOT TAKE INTO ACCOUNT THE PARTICULAR INVESTMENT OBJECTIVES OR FINANCIAL CIRCUMSTANCES OF ANY SPECIFIC PERSON WHO MAY RECEIVE IT. THIS DDQ IS SUBJECT TO REVISION, MODIFICATION AND UPDATING. THIS DDQ IS CONFIDENTIAL, IS INTENDED ONLY FOR THE PERSON TO WHOM IT HAS BEEN DELIVERED AND UNDER NO CIRCUMSTANCES MAY THIS DOCUMENT BE SHOWN, COPIED, TRANSMITTED, OR OTHERWISE GIVEN TO ANY PERSON OTHER THAN AN AUTHORIZED RECIPIENT.*

## 1.   Firm Overview

### 1.1.   Name of the Funds

The name of the master fund is:

**Platinum Partners Value Arbitrage Fund L.P.** (*PPVA*, the *Fund*, or the *Master Fund*).

The names of the feeder funds are:

**Platinum Partners Value Arbitrage Fund (USA) LP** (the *Onshore Fund*)

**Platinum Partners Value Arbitrage Fund (International) Ltd.** (the *Offshore Fund*)

**Platinum Partners Value Arbitrage Intermediate Fund Ltd.** (the *Intermediate Fund*)

For purposes of simplicity, the Offshore Feeder Fund and the Intermediate Fund may be referred to as the *Offshore Fund.*   The Master Fund, Onshore Fund and Offshore Fund are referred to collectively as the *Fund.*

### 1.2.   Name of the Management Company and General Partner

Platinum Management (NY) LLC (*Platinum*) is the Management Company for all of the funds.

### 1.3.   Address of the Manager

250 West 55th Street
14th Floor
New York, NY 10019
(212) 582-2222
InvestorRelations@platinumlp.com

### 1.4.   Provide a brief historical overview of the Firm.

Platinum Partners (the *Firm*) is a New York based investment management group with more than $1 Billion in assets under management. The Firm was founded in 2003 by Mark Nordlicht, an investor with over twenty years of experience in the asset management space. The Firm manages multiple funds, including Platinum Partners Credit Opportunities Master Fund L.P. (*PPCOMF*); Platinum Partners Value Arbitrage Fund L.P. (*PPVA*); Platinum Partners Liquid Opportunity Master Fund L.P. (*PPLO*); Bayberry Consumer Finance Fund LLC and Bayberry Consumer Finance Fund International Ltd. (collectively, *Bayberry*); Marbridge Energy Finance Fund II LLC and Marbridge Energy Finance Fund International II Ltd. (collectively, *Marbridge II*). Although each of the aforementioned funds have separate investment advisors, Mr. Nordlicht is the CIO of the investment advisors of PPCOMF, PPVA, and PPLO. The CIOs of the investment advisors of Marbridge II and Bayberry are Portfolio Managers of the Firm.

Platinum launched the Master Fund in January 2003 with an initial investment of $25 million in capital from founder Mark Nordlicht, his close family and friends.  Platinum began with a multi-strategy approach based on Mr. Nordlicht*s 20 years of industry experience.  The Fund*s investment strategies

1

have grown into a blend of nine low-correlated strategies focused on achieving consistent risk-adjusted returns and low volatility.

Headquartered in New York, the Fund is managed by a skilled team of investment professionals with broad experience in asset-based lending, capital allocation, risk management, investment sourcing, negotiation, due diligence, compliance, accounting, and investment operations.

**1.5. Describe the Manager's investment philosophy.**

Platinum believes that returns are a function of managing risk and investing in a diversified mix of uncorrelated strategies. Generally, strategies employed by the Fund begin by identifying downside risk. The Fund attempts to combine investments that generate consistent returns, with varying degrees of volatility, to provide a portfolio that is uncorrelated to global market indices and other Fund investments. Positions are managed continually with the goal of delivering non-directional investment results. It is the goal of Platinum that the Fund should have minimal exposure to broader market moves. Since inception, the Fund has had a correlation of 0.17 to the S&P 500 index.[1]  Strategies which exhibit potential exposure (i.e. beta) to select markets may utilize hedging techniques in order to minimize market correlation.

**1.6. Describe the Platinum Partners Value Arbitrage Fund L.P. fund structure**

The Master Fund is an exempted limited partnership formed under the laws of the Cayman Islands on December 17, 2002. The Master Fund, the Onshore Fund and the Offshore Funds are managed by Platinum Management (NY) LLC, a limited liability company domiciled in Delaware. Platinum Partners Value Arbitrage LP serves as the General Partner of the Master Fund. The Onshore Fund is a Delaware limited partnership formed on October 25, 2002. The Offshore Fund is a Cayman Islands exempted corporation formed on October 25, 2002. The Offshore Fund makes its investments in the Master Fund through the Intermediate Fund, a Cayman Islands exempted company formed on April 9, 2010. The Master Fund utilizes a series of majority-owned consolidated subsidiaries for energy trading and holding companies for certain privately-negotiated investments.[2]

Biographies of key personnel of the Fund:

*Mark Nordlicht*
*Principal, Chairman and Chief Investment Officer*

Mark Nordlicht is the Chairman and Chief Investment Officer of PPVA. He has acted in this capacity since January 2011. Mr. Nordlicht has twenty years of experience in the investment industry and is responsible for oversight of all trading, asset allocation and risk management on behalf of the Platinum-managed funds.. In 2003, Mr. Nordlicht founded and launched Platinum Partners Value Arbitrage Fund LP (*PPVA*), a multi-strategy hedge fund designed to achieve risk-adjusted returns irrespective of the direction of any broader market activity. PPVA deploys assets opportunistically across various strategies,

---

[1] Calculation based on the correlation of Platinum Partners Value Arbitrage Fund (International) Ltd. (the *Offshore Fund*) monthly returns to the S&P 500 Aggregate Index since inception of January 1, 2003 to September 30, 2015. You cannot invest directly in an index. This is the most relevant index to benchmark against given our strategy.

2

including long/short equity, energy arbitrage, convertible arbitrage, and asset based convertible debt. Mr. Nordlicht is currently the Chief Investment Officer of PPVA and Platinum Partners Liquid Opportunity Master Fund L.P. Additionally, Mr. Nordlicht launched Platinum Energy Resources (2005), a publicly traded oil & natural gas company and Platinum Diversified Mining (2007), a publicly traded mining company.  Mr. Nordlicht is also the founder and served as non-executive Chairman of Optionable, Inc., a brokerage firm for energy options, until May 1, 2007.  From 1997 to 2002, Mr. Nordlicht was a founder and the managing partner of West End Capital, a New York based money management firm that specialized in privately negotiated structured debt financings for small and mid-cap publically traded companies. In 1991, Mr. Nordlicht founded Northern Lights Trading, a proprietary options firm based in New York that employed traders in the cotton, coffee, natural gas, crude oil, gold, and silver option trading pits.  Mr. Nordlicht was the general partner of Northern Lights Trading until 2000. In 1990, Mr. Nordlicht graduated from Yeshiva University with a B.A. in Philosophy.


*David Levy*
*Co-Chief Investment Officer*

David Levy serves as Co-Chief Investment Officer of Platinum Partners and is responsible for overseeing more than $1 billion in total investments. Mr. Levy directly manages more than $250 million in capital, focusing on investments in asset-based lending and credit-based strategies, across a variety of industries, seeking to generate returns with less risk than traditional strategies.  Mr. Levy has spent his career as an investment specialist and portfolio manager. Prior to joining Platinum Partners, Mr. Levy co-founded Crius Energy, a publicly listed national retail energy platform, which currently provides power to over 500,000 residential consumer equivalents (RCEs) in the United States. He also previously worked in the office of New York City Mayor Michael Bloomberg, and prior to that, with the Chief Counsel to United States Senator Orrin Hatch. Mr. Levy serves as a member of the Advisory Council for the International Crisis Group.  He holds a Bachelor of Science in Finance from Yeshiva University.


*Naftali Manela*
*Chief Operating Officer*

Naftali Manela is the Chief Operating Officer of Platinum Partners and is responsible for overseeing operations for all funds under the firm's management. He also works closely with the firm's senior management and investment teams to supporting deal structuring. Mr. Manela previously served as the Chief Financial Officer of Platinum Credit Management LP, where he oversaw all accounting and reporting for Platinum Partners Credit Opportunities Master Fund LP, and its feeder funds, as well as several special purpose vehicles managed by Platinum Partners. Before joining Platinum Partners in 2008, Mr. Manela served as Vice President of Financial Reporting at S.A.C. Capital Management, LLC, where he was responsible for fund administration and financial reporting. Prior to that, Mr. Manela launched and managed a family office and fund of funds. Mr. Manela began his career at PricewaterhouseCoopers, where he worked as an auditor in the Capital Markets group focusing primarily on auditing hedge funds. Mr. Manela is a Certified Public Accountant in the State of New York and graduated *summa cum laude* from Touro College with a Bachelor of Science in Accounting.

3

*Joseph SanFilippo*
*Chief Financial Officer*

Joseph SanFilippo was senior auditor for BDO Seidman, LLP from August 2003 through January 2005, prior to joining Platinum. During his tenure at BDO, Mr. SanFilippo was a member of the financial services group and specialized in audits of Hedge Funds. From November 1999 until August 2003, Mr. SanFilippo was an auditor at Marks Paneth & Shron, LLP. Mr. SanFilippo is a Certified Public Accountant in the State of New York, a member of the American Institute of Certified Public Accountants and New York State Society of CPAs. He received his B.S. degree in Accounting from Brooklyn College.

*Suzanne Horowitz*
*Chief Legal Officer*

Suzanne Horowitz has over 15 years of legal and compliance experience, and is responsible for all legal matters relating to the Platinum-managed funds.  From 2013 to 2015, Ms. Horowitz was General Counsel and Chief Compliance Officer of Premium Point Investments LP which manages hedge funds and separate accounts, operates a mortgage conduit business and owns a majority interest in a residential property manager. From 2004 to 2012, Ms. Horowitz was Associate General Counsel and Senior Compliance Officer at Oak Hill Advisors, L.P. ("OHA"), an investment manager specializing in below investment grade credit markets (originally Ms. Horowitz performed legal and compliance functions for both Oak Hill Capital Partners and OHA). Prior to joining Oak Hill, Ms. Horowitz was an Associate at Reboul, MacMurray, Hewitt, Maynard & Kristol (subsequently merged with Ropes & Gray LLP) in the fund formation group.  Ms. Horowitz holds a J.D. from Benjamin N. Cardozo School of Law and a B.A from the University of Pennsylvania.

*David Ottensoser*
*Chief Compliance Officer*

David Ottensoser is Chief Compliance Officer of the Manager.  From 2002 to 2011, he was the General Counsel and Corporate Secretary of NICE Systems, Inc., the Americas* subsidiary of NICE Systems, Ltd., a public global technology company based in Israel, where he was responsible for all legal matters relating to NICE*s Americas* operations, including business transactions, corporate matters, intellectual property and commercial litigation. Prior to NICE, Mr. Ottensoser was General Counsel of Global Supplynet, a private e-commerce software development and consulting company. In addition, Mr. Ottensoser was an Associate at Moritt, Hock and Hamroff, LLP, where he focused on corporate law and litigation.  Mr. Ottensoser received his J.D. from Fordham Law School and a B.A. in English from Yeshiva University.

4



1.7. **Disclose the Fund's monthly performance since inception.**

| | PLATINUM PARTNERS VALUE ARBITRAGE (INTERNATIONAL), LTD. NET MONTHLY RETURNS | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Jan** | **Feb** | **Mar** | **Apr** | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **YTD** | **Cum** |
| **2003** | 1.41 | 0.63 | 0.47 | (0.08) | (0.82) | 1.91 | 1.07 | 2.55 | 3.22 | 2.11 | 1.67 | 2.02 | **17.33%** | **17.33%** |
| **2004** | 3.33 | 1.79 | 2.19 | 0.14 | 0.21 | (0.45) | (0.34) | 1.00 | (0.32) | 1.09 | 0.74 | 2.97 | **12.97%** | **32.55%** |
| **2005** | 1.63 | 0.97 | 0.29 | (0.29) | 0.78 | 1.39 | 1.54 | 2.04 | 1.46 | 3.13 | 0.51 | 2.34 | **16.93%** | **54.99%** |
| **2006** | 3.23 | 2.04 | 1.72 | 1.15 | 2.02 | 1.62 | 0.55 | 0.30 | 1.50 | 1.88 | 1.95 | 3.75 | **23.94%** | **92.10%** |
| **2007** | 2.48 | 3.81 | 4.33 | 2.99 | 4.35 | 5.44 | 2.22 | 3.39 | 1.56 | 4.96 | 1.95 | 6.09 | **53.25%** | **194.39%** |
| **2008** | (2.10) | 1.15 | (1.53) | 2.56 | 4.48 | 1.58 | 0.33 | 1.20 | (3.41) | (1.07) | 0.14 | 1.21 | **4.37%** | **207.26%** |
| **2009** | 3.29 | 0.42 | 2.01 | 1.35 | 2.57 | 1.69 | 1.82 | 1.53 | 1.80 | 0.64 | 0.54 | 1.47 | **20.86%** | **271.34%** |
| **2010** | 1.09 | 2.70 | 0.16 | 2.05 | (0.20) | 0.46 | 1.83 | 1.11 | 1.73 | 1.49 | 1.41 | 3.99 | **19.27%** | **342.89%** |
| **2011** | 2.10 | 4.41 | 2.18 | 1.83 | 1.37 | 2.87 | 0.77 | 0.56 | 0.98 | 1.31 | (0.49) | 1.43 | **21.03%** | **436.02%** |
| **2012** | 0.42 | 0.78 | 2.87 | (0.09) | 0.52 | 1.93 | 1.59 | 0.14 | 0.90 | 0.84 | (0.24) | 1.39 | **11.58%** | **498.08%** |
| **2013** | 1.75 | 0.79 | 1.36 | 0.18 | 0.85 | 1.13 | 0.95 | 1.29 | 0.23 | (1.78) | 1.41 | (1.21) | **7.11%** | **540.59%** |
| **2014** | 3.68* | 1.53 | 1.00 | 0.21 | 2.13 | 2.63 | 0.53 | 1.01 | (0.17) | (1.66) | (2.51) | 2.05 | **10.76%** | **609.50%** |
| **2015**** | 0.10 | (0.89) | (0.83) | 7.83 | (0.22) | 1.28 | (0.07) | 0.02 | ±0.94 | | | | **±8.16%** | **±667.43%** |

| | PLATINUM PARTNERS VALUE ARBITRAGE (USA), LP NET MONTHLY RETURNS | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Jan** | **Feb** | **Mar** | **Apr** | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** | **Nov** | **Dec** | **YTD** | **Cum** |
| **2003** | 1.39 | 0.63 | 0.45 | (0.09) | (0.83) | 1.89 | 1.06 | 2.54 | 3.21 | 2.10 | 1.66 | 2.00 | **17.17%** | **17.17%** |
| **2004** | 3.33 | 1.79 | 2.18 | 0.14 | 0.21 | (0.45) | (0.34) | 1.00 | (0.32) | 1.09 | 0.74 | 2.92 | **12.90%** | **32.28%** |
| **2005** | 1.62 | 0.96 | 0.29 | (0.29) | 0.77 | 1.38 | 1.54 | 2.04 | 1.46 | 3.12 | 0.51 | 2.35 | **16.88%** | **54.61%** |
| **2006** | 3.22 | 2.04 | 1.71 | 1.14 | 2.02 | 1.63 | 0.50 | 0.33 | 1.52 | 1.88 | 1.93 | 3.67 | **23.80%** | **91.41%** |
| **2007** | 2.49 | 3.83 | 4.34 | 2.90 | 4.32 | 5.42 | 2.22 | 3.38 | 1.56 | 4.91 | 1.93 | 6.10 | **53.00%** | **192.85%** |
| **2008** | (2.10) | 1.15 | (1.53) | 2.56 | 4.48 | 1.58 | 0.33 | 1.20 | (3.42) | (1.07) | 0.14 | 1.21 | **4.36%** | **205.61%** |
| **2009** | 3.29 | 0.42 | 2.01 | 1.35 | 2.57 | 1.68 | 1.80 | 1.51 | 1.79 | 0.64 | 0.54 | 1.47 | **20.78%** | **269.13%** |
| **2010** | 1.09 | 2.69 | 0.16 | 2.03 | (0.20) | 0.46 | 1.83 | 1.11 | 1.73 | 1.49 | 1.41 | 4.00 | **19.25%** | **340.17%** |
| **2011** | 2.10 | 4.41 | 2.18 | 1.83 | 1.38 | 2.87 | 0.77 | 0.56 | 0.98 | 1.31 | (0.48) | 1.43 | **21.05%** | **432.84%** |
| **2012** | 0.42 | 0.78 | 2.87 | (0.08) | 0.52 | 1.93 | 1.59 | 0.14 | 0.90 | 0.85 | (0.24) | 1.39 | **11.60%** | **494.65%** |
| **2013** | 1.75 | 0.79 | 1.36 | 0.18 | 0.85 | 1.14 | 0.96 | 1.29 | 0.23 | (1.77) | 1.41 | (1.20) | **7.15%** | **537.11%** |
| **2014** | 3.69* | 1.53 | 1.00 | 0.21 | 2.14 | 2.63 | 0.54 | 1.01 | (0.17) | (1.64) | (2.50) | 1.98 | **10.75%** | **605.58%** |
| **2015**** | 0.11 | (0.89) | (0.83) | 7.83 | (0.22) | 1.28 | (0.07) | 0.02 | ±0.94 | | | | **±8.17%** | **±663.26%** |

*The January 2014 rate of return reflects a one time reversal of certain fees.
**Unaudited; ± Estimated and subject to change
Past performance is not necessarily indicative of future performance. Net returns are net of all fees and expenses. Performance cited is believed to be correct as of the date prepared.  Performance cited is valid for Class I Shares in the Offshore Feeder Fund through 2009 and Class L since 2010.  For the returns of other previous fund share classes, please refer to audited financial statements and the Fund's monthly investor letters.  This document and any information contained herein speak only as of the date hereof and are subject to change without notice.  Platinum and its affiliated companies and employees shall have no obligation to update or amend any information contained herein. This document is being furnished to you for informational purposes only and on the condition that it will not form a primary basis for any investment decision.  This document is not intended to provide, nor should it be construed or used as, tax, legal, financial or investment advice. Note: For more detailed performance analytics, please see Section 8, Fund Performance Analytics.

6

**1.8.  Details of AUM of the Fund**

| Date | Total Assets Under Management |
|---|---|
| 10/1/15 | $789 million |
| 1/1/15 | $755 million |
| 1/1/14 | $761 million |
| 1/1/13 | $692  million |
| 1/1/12 | $688 million |
| 1/1/11 | $473 million |
| 1/1/10 | $435 million |
| 1/1/09 | $682 million |
| 1/1/08 | $567 million |
| 1/1/07 | $212 million |
| 1/1/06 | $102 million |
| 1/1/05 | $80 million |
| 1/1/04 | $59 million |

**1.9.  What are the Fund's Historical Returns[3]?**

| Platinum Partners Value Arbitrage Fund (USA) LP | |
|---|---|
| **Timeframe** | **Return** |
| Cumulative (Inception) | 663.26% |
| Average Annualized | 17.28% |
| 2015 (9 months) | 8.17% |
| 2014 | 10.75% |
| 2013 | 7.15% |
| 2012 | 11.60% |
| 2011 | 21.05% |
| 2010 | 19.25% |
| 2009 | 20.78% |
| 2008 | 4.36% |
| 2007 | 53.00% |
| 2006 | 23.80% |
| 2005 | 16.88% |
| 2004 | 12.90% |
| 2003 | 17.17% |

**1.10.  What is the percentage of months with a positive return?**

84.97% (130/153)

---

[3] All returns are calculated net of all fees and expenses. Returns are as of September 30, 2015. Past performance is not indicative of future results.

**1.11.** **What was the worst drawdown (continuous decline)?**

The worst continuous decline occurred over September and October 2008, when the fund lost an aggregate of 4.48%. This was followed by several months of positive results, resulting in a new high-water mark three months later in January 2009.

**1.12.** **Primary Fund Contact**

Andrew Kaplan, Chief Marketing Officer

(212) 582-2222

AKaplan@platinumlp.com

**1.13.** **External Service Provider Contacts**

**Administrator**
SS&C Technologies, Inc.
80 Lamberton Road,
Windsor, Connecticut 06095
Jessica Baker
sscinvestorservices@sscinc.com
Tel: (860) 298-4606
Fax: (860) 371-2503

**Auditor**
CohnReznick, LLP
1212 Avenue of the Americas
New York, NY 10036
Jay Levy, Audit
Jay.Levy@CohnReznick.com
(646) 254-7412

**Legal Counsel**
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
Russel Perkins
Russel.Perkins@srz.com
(212) 756-2000

**Offshore Fund Counsel**
Walkers
190 Elgin Avenue
George Town, Grand Cayman
KY1-9001Cayman Islands
Doreen Thomas
(345) 949-0100

**Global Custodian**
Bank of NY Mellon
1 Wall Street * 3rd Floor
New York, NY 10286
Kiley Sieffert
(407) 281-2991

**Prime Broker**
Credit Suisse Securities USA
Eleven Madison Avenue
New York, NY 10010
Allison Smith
(212) 325-4196

**Valuation Services**
Sterling Valuation Group, Inc.
590 Madison Avenue, 5th Floor
New York, NY 10022
Murray Grenville
(212) 207-6868

**Banking Services**
Sterling National Bank
425 Park Avenue
New York, NY 10022
Louis Cenname, Jr.
(212) 935-3847

8

## 2.   Fund Strategy

### 2.1.   What is the strategy of the fund?

The Fund is a multi-strategy, multi-manager hedge fund designed to achieve risk-adjusted returns irrespective of the direction of broader market activity[4]. The General Partner believes that returns are a function of appropriately managing downside risk and seeks to invest in a mix of uncorrelated strategies. Typically, the fund deploys capital opportunistically across multiple primary investment strategies.

The following are among the investment strategies expected to be employed, directly or indirectly, by the Master Fund.

*Equity Arbitrage.* The Master Fund may engage in various forms of equity arbitrage trading strategies, including, without limitation, long/short equity and event-driven. Long/short equity trading typically uses fundamental research to identify equity securities that either should perform well (in which case the securities will be held long) or poorly (in which case the equities will be sold short). Typically, the Portfolio Managers employing long/short equity techniques hold some combination of both long and short positions that will at least partly offset one another to minimize market risk. Event-driven trading may include investments in long and short positions of listed and unlisted equities, convertible debt, options, futures, debt and warrants that the Investment Manager or a Portfolio Manager expects to profit from the occurrence of certain issuer-specific events. These strategies may be fundamentally based or non-discretionary model driven. In employing these strategies, the Master Fund seeks to avoid exposure to the direction of the broader markets. The Master Fund may also engage in privately-negotiated equity transactions whereby the Master Fund will finance publicly traded companies through a private placement which typically consists of debt and/or equity. In addition, most negotiated financings will offer downside protection to the Master Fund while also providing upside exposure through warrants, equity or debt that converts into equity. The Master Fund may invest in special purpose acquisition companies when they are trading at a discount to the amount of cash per share they hold in escrow and a structural opportunity exists to realize the cash within a predetermined timeframe.

*Energy and Power Arbitrage.* The Master Fund may engage in various energy trading strategies, including, without limitation, location arbitrage and volatility arbitrage. These strategies may include investments in exchange-listed futures, options and options on futures contracts which are intended to profit from volatility spreads in the options markets of major world energy exchanges. Strategy risks include without limitation to volatility risks and position concentration risks. Risks are managed by stress testing market moves and volatility moves to ensure risks are within strategy risk limits. In addition, risks are controlled by generally being net long options, often including long wing options, thereby protecting against \*event risk.\* The Master Fund may take directional risk in the energy markets as deemed appropriate and timely by the Investment Manager. Furthermore, the Master Fund may engage in various trading strategies in the global carbon and financial transmission right (\*FTR\*) electricity markets. The Master Fund's carbon trading strategy often engages in opportunistic investments in which it obtains the rights to the commodity stream of carbon credits from clean energy projects such as wind farms, hydroelectric

---

4 No representation is made that the Fund will or is likely to achieve its objectives or that any investor will be able to avoid incurring losses.

power plants, coal mine methane power plants, and energy efficiency projects at cement factories. In exchange for advancing a limited amount of project development costs for each project, the Master Fund procures the right to purchase the resulting carbon credits at a discount to the then-current open market price, earning the corresponding spread (if any) upon a subsequent sale on the market. The electricity trading strategy involves fundamentally evaluating the FTR market, including analyzing historical congestions based on fundamental factors of transmission, generation and load and capturing aberrations in valuations of electricity congestion in the transmission market.

*Convertible Arbitrage.* The Master Fund may engage in various forms of convertible arbitrage trading strategies. Through these strategies, the Master Fund typically seeks to profit from fundamental research and exploit differences in the availability of capital including, without limitation, capital in emerging market economies. The success of the Master Fund's convertible arbitrage strategy depends upon the Investment Manager's ability to identify convertible securities that appear incorrectly valued relative to their theoretical value, purchase (or sell short) such a convertible security and sell short (or purchase) the underlying security for which the convertible security can be exchanged to exploit price differentials. There can be no assurance that the Investment Manager will be able to identify convertible arbitrage opportunities or that changes in price differentials will not cause losses. In addition, these strategies may utilize currency hedging techniques, including investment in futures and forward currency contracts which are intended to mitigate the Master Fund's exposure to foreign currency movements and country-specific political risk. Furthermore, the Master Fund may provide capital to well established non-U.S. companies seeking to raise capital for business purposes. These investments will be secured by shares of the publicly traded company. The Master Fund typically structures the financing in a manner that best secures the collateral in accordance with the laws of the local jurisdiction. It is anticipated that corporate executives or management of the non-U.S. company will sell their equity holdings to the Master Fund at an agreed upon discount (pursuant to a sale and repurchase agreement) whereby the counterparty agrees to repurchase the equity for a set price on a specified date in the future. If on any trading day the aggregate market value of equity holdings fall below a pre-agreed price, the counterparty is required to deliver sufficient additional shares to maintain the agreed upon purchase discount percentage. If the repurchase price is not paid to the Master Fund when due, or if additional shares are not received as described above, the Master Fund may elect to sell the shares into the open market to realize its investment and anticipated return.

*Asia-Based Arbitrage.* The Master Fund may engage in various forms of Asia-based investment strategies. The strategy includes investments in secured financing against publiclytraded Asian equities positions and/or convertible debt of exchange-listed, rapidly growing companies in emerging market countries. These investments typically seek to profit from fundamental research and exploit differences in the availability of capital in emerging market economies. Strategy risks include volatility, credit risk, and political risk. Risks are generally controlled via the use of position and concentration limits, extensive credit research and due diligence. In addition, this strategy may utilize currency hedging techniques including investments in futures and forward currency contracts which are intended to eliminate Fund exposure to foreign currency movements and to mitigate country specific political risk. Capital is also provided to well established foreign companies seeking to raise capital for business purposes, secured by shares of the publicly-traded company. The Master Fund seeks to structure investments in a manner that best secures the collateral in accordance with the laws of the local jurisdiction. Corporate executives or management of the foreign company may sell their equity holdings to the Master Fund at an agreed upon

10

discount (pursuant to a sale and repurchase agreement) whereby the counterparty agrees to repurchase the equity for a set price on a specified date in the future. If on any trading day the aggregate market value of equity holdings fall below a pre-agreed price, the counterparty is required to deliver sufficient additional shares to maintain the agreed upon purchase discount percentage. If the repurchase price is not paid to the Master Fund when due, or if additional shares are not received as described above, the Master Fund may elect to sell the shares into the open market to realize its investment and anticipated return.

*Quantitative Arbitrage.* The Master Fund may employ various non-discretionary quantitative arbitrage strategies that seek to exploit the occurrence of certain market phenomena in the equity, commodity, currency, and fixed income markets via the use of model-based investing strategies. Such strategies may be executed via investments in futures, options, equities, exchange-traded funds and other securities or instruments typically using computerized, algorithmic processes.

*Asset-Based Finance.* The Master Fund may employ various asset-based financing strategies that seek to profit from secured financing supported by assets in excess of the value of the debt, including, without limitation, asset-based convertible debt strategies, health care receivables strategies and legal finance strategies. These investments generally have strong opportunities to participate in equity appreciation through warrants, conversion features, or grants of stock that are part of the investment package. Asset-based convertible debt strategies may include privately negotiated investments in senior secured debt instruments convertible into underlying equity and/or collateral assets of public and private companies. Legal finance strategies may include investments in a pool of litigation being pursued by a single law firm, or investment in a single litigation, which may include the rights to participate in the proceeds received from the eventual outcome of the litigation(s) and/or a fixed return on the monies advanced. Asset-based investments in companies exploring for, or producing, natural resources, including but not limited to asset-based investments in the mining and energy sectors, may include privately negotiated investments in senior secured debt instruments typically secured via underlying collateral in excess of the value of the debt. These obligations are typically secured by the natural resource or rights to extract it owned by the companies and the collateral is evaluated based on the proven in-situ resource corresponding to the rights owned by such companies. The companies may or may not employ commodity hedging strategies to protect themselves from potential changes in the underlying resource.

*Private Equity Investments.* The Master Fund may employ various investment strategies that seek to profit from equity and debt investments in private or public companies. These investments include privately negotiated investments in debt instruments, preferred stock or units, membership interests and common stock of the companies. These investments generally have outsized opportunities to participate in equity appreciation relative to the investment at risk. Private equity investments include, but are not limited to, investments in the energy, natural resource, retail, medical and healthcare industries.

*Opportunistic/Macro.* The Master Fund may employ various investment strategies that seek to profit from investments that use macroeconomic principles and economic views to seek to identify global opportunities across various equity, fixed income, currency, and futures markets. The strategy generally seeks to exploit the occurrence of certain market phenomena via the use of model-based investing strategies. Certain risks are mitigated by using hedging techniques.

11

*Other.* The Master Fund is opportunistic and may also engage in other strategies and one-off opportunities in the sole discretion of the Investment Manager.

The consideration of any new strategy begins by exploring and identifying downside risk. Positions are managed continually to aim to ensure that the Fund's returns are uncorrelated to the direction of the broader markets.

The Fund seeks to deliver consistent monthly returns, with low volatility, and low beta exposure. Platinum identifies opportunities in which it believes it can readily create value in a predictable time frame and where it believes its competitive advantages translate into sustainable and attractive risk-adjusted returns. Platinum sources opportunities globally without limitation to geography. While Platinum believes that the current strategies have the potential for significant appreciation, Platinum continually evaluates a broad array of identifiable market opportunities.

### 2.2.  Is the strategy of the Fund directional or non-directional?

The Fund is non-directional and maintains minimal exposure to the broader market. Since inception, the Fund's correlation with the S&P 500 has been 0.17.[5] To reduce correlation, hedging techniques are utilized to minimize market exposure in higher beta investments.

### 2.3.  Describe the asset allocation policy between strategies.

Platinum deploys capital opportunistically across strategies that we expect to perform irrespective of the direction of the boarder market. We believe that the portfolio has the potential for significant asset appreciation and we allocate capital dynamically to those opportunities with the highest risk-adjusted return projections. Management pursues a portfolio of uncorrelated strategies, on a bottom-up basis, in order to reduce volatility of the Fund's returns.

The core of Platinum's investment strategy is a tested, rigorous investment selection and evaluation process. This process involves evaluating each strategy and investments within the Fund based upon risk and return characteristics, and allocating capital to those strategies that best enhance the Fund's overall risk-return profile.

Ultimately, the Managing Member of the General Partner will decide on allocations based upon what mix of strategies it believes will have the optimal risk-reward characteristics to produce risk-adjusted returns. In addition, management believes diversification is the cornerstone of risk management and seeks investment opportunities that are not only diversified in terms of performance, but in terms of volatility as well, thereby reducing the Fund's overall volatility. In determining whether to alter or adjust our exposure to an investment or strategy, consideration will be given to targeted investment goals, correlations to other existing Fund investments, and existing market trends. Platinum will continuously

---

5 Past performance does not gaurentee future results. Calculation based on the correlation of Platinum Partners Value Arbitrage Fund (International) Ltd. (the "Offshore Fund") monthly returns to the S&P 500 Aggregate Index since inception of January 1, 2003 to September 30, 2015. You cannot invest directly in an index. This is the most relevant index to benchmark against given our strategy.

evaluate these factors to determine the appropriate timing for the expansion or reduction of any particular investment strategy.

**2.4. What are the relative advantages of the Fund when applying the above-mentioned investment strategies?**

Historically, Platinum has demonstrated an advantage in selecting uncorrelated strategies that are differentiated and uncorrelated not only to broader market activity but also uncorrelated to other hedge funds and multi-strategy funds in particular.  In executing the Fund*s strategies, Platinum draws upon its ability to source and retain talent from a strong network of senior investment professionals and its reputation as an innovative fund manager.  One of Platinum*s competitive advantages is the depth and breadth of its investment team and network of industry professionals.  Platinum*s resources and experience provide optimal deal sourcing and also allow the firm to execute a cautious *prove the concept* approach to its investment opportunities.  Platinum*s depth and experience positions the firm to act rapidly to pursue investments in asset classes across the globe.  We believe our global presence and strategy of sourcing and retaining investment talent is a key competitive advantage and one that will hopefully enable the firm to continue achieving returns as each market in which it participates evolves and expands.

**2.5. List the market conditions in which the strategy is unsuitable.**

The Fund*s portfolio consists of a diversified mix of relative value investments and is designed to produce returns irrespective of any broader market environment or turmoil.  While on an overall basis, we do not believe any general market condition will be detrimental to the overall book, there are specific conditions relating to each strategy that could certainly negatively impact that particular strategy. These conditions may be related to the price of a commodity, or the occurrence of a specific company event. The crucial point for the Fund, however, is that when such a negative effect impacts a particular strategy, it is isolated to that strategy and does not affect the other strategies of the book.  Hence, the net result of running a book with a truly diversified mix of uncorrelated strategies is that positive performance in the majority of strategies can overcome a one-time negative event in a particular strategy.

**2.6. Give a list of relative risks and describe how these risks are managed.**

Platinum*s philosophy is to identify, measure, and control risk across all areas of our business. Risk management at Platinum has both qualitative and quantitative components.

A) Quantitative: Platinum believes that the quantitative components provide discipline and a framework for understanding and applying consistent risk adjusted performance assessments on many risk factors.  We target limits in a range of traditional areas, including position size, VAR, stop-losses, delta and duration, sector concentration, and diversification across and within strategies. Moreover, real-time P&L is monitored by the Chief Investment Officers and the individial Portfolio Managers.

B) Qualitative:  In addition to quantitative techniques, we believe that qualitative techniques are also critical, particularly due to the non-traditional investment types that our Fund trades. In other words, we feel strongly that there is no substitute for good judgment, that some risk factors

13

cannot be quantified, and quantitative models do not adequately address tail risk.  We constantly monitor and assess the various risks relating to each of our positions on an ongoing basis.

Platinum believes that there are two paramount risks in every loan or private equity transaction, in addition to the other risk factors as detailed in the relevant Memorandum[6]:

1.  <u>Counterparty fraud</u>. To mitigate counterparty fraud, Platinum employs detailed checks on its borrowers and the underlying transactions, including, but not limited to, full background checks, involved due diligence, frequent monitoring, use of controlled accounts and/or lockboxes, and verification of assets, inventory and/or other collateral, as necessary[7].

2.  <u>Errors in valuation of underlying collateral and volatility in collateral</u>.  To mitigate errors in valuing, Platinum actively monitors collateral, as required.  Platinum will employ outside valuation consultants when lending against an asset that Platinum believes it does not have sufficient expertise in valuing.

### 3.   Portfolio Strategy

**3.1.   Please describe the process of testing a new strategy.**

New liquid trading strategies are typically implemented with small initial allocations, in order for the firm to become comfortable with expected versus observed risk exposures, position concentrations and financial instrument usage.  New managers may have allocations increased after test periods, or may have allocations eliminated over time.

Financing strategies employ robust levels of due diligence testing.  The following items are taken into consideration[8]:

1)  Collateral
    a)  What is the underlying collateral?
    b)  Is the collateral able to be evaluated?
    c)  Is the collateral transferable?
    d)  What is the current market for the collateral?
    e)  Is the collateral monitorable?
    f)  Is the collateral legally distinct and can the Fund's interest be perfected?
    g)  Can the collateral be segregated?
    h)  Is the collateral volatile?

---

[6] For more detailed summary of risk factors, see the relevant Memorandum (as may be amended from time to time.)

[7] These represent fraud mitigation techniques. Not all items are applicable to each individual transaction and often many are not applied.

[8] The following represents a detailed list of due diligence items for a wide range of transactions.  Not all items are applicable to each individual transaction and often many are not applied in performing diligence for a transaction.

14

2) Return Analysis
   a) What are the profitability metrics of the underlying business?
   b) How has profitability changed over the past month, quarter, year?
   c) What is the Fund's expected return on the investment?
   d) What is the borrower's expected return on the investment?
   e) What are the alternative means of accessing capital for this borrower?
   f) Can the return be sustained over the life of the loan?
   g) Has the Fund extracted as much value as it can through all sources of cash flow?

3) Risks
   a) Has the Fund investigated the principals of its borrower?
   b) Are there any regulatory issues that are currently known?
   c) Is there pending regulation or legislation that may impact this business?
   d) Are there controls that can be imposed to control cash flow?
   e) Is there a structure that can be implemented to segregate pledged assets?
   f) Is there execution risk?
   g) Can the Fund insure any risks (e.g., counterparty, collateral value, currency or fraud)?
   h) Has the Fund fully analyzed its borrower's controls and procedures?
   i) Has the Fund controlled to the maximum extent possible cash management and movement?

4) Macro
   a) How is the business impacted by changes in the credit environment?
   b) How will the business be impacted by a change in inflation, GDP?
   c) Is there country-specific risk

5) Opportunity
   a) Can the transaction be scaled?
   b) Are there other companies that the Fund can target that employ a similar business model?

6) Loan Duration

7) Portfolio Concentration

8) Diligence
   a) Full legal diligence of key contracts, insurance, current banking relationships, financial relationships
   b) External accounting diligence, typically cash on cash audit of historical returns and balance sheet accounts
   c) Review of financials of business, transactions and related parties
   d) Background reports on principals, including credit checks, criminal searches and lien searches

15

   e) Industry reports, analyzing strengths, weaknesses, opportunities, and threats of industry and company
   f) Site visit
   g) Extensive management visits and interviews
   h) Escrow relationships
   i) Ongoing audit relationships

9) Banking relationships
   a) Establish controlled accounts
   b) Establish viewing rights to collateral accounts
   c) Create new entities, bankruptcy remote if necessary
   d) Approval of cash management process

10) Documentation
   a) Diligence should be recorded and organized
   b) Documents to be provided to fund management prior to funding

11) Maintenance
   a) Collateral monitored
   b) Bank accounts monitored
   c) Financial statements analyzed
   d) Risks updated
   e) Periodic updates with management
   f) Online access to corporate systems
   g) Provide all amended documents to fund management
   h) Site visits
   i) Discussions with the borrower's auditors where possible

**3.2. Describe the process of choosing new managers.**

In executing the Fund's strategies, Platinum draws upon its ability to source and retain talent from a strong network of senior investment professionals and its reputation as an innovative fund manager. This network is one of Platinum's key competitive advantages. Our goal is to evaluate potential portfolio managers, in order to evaluate different potential strategies and approaches.

There are many methods we use to evaluate new managers. We require that applicants provide all of their historical trading performance and allow us to independently verify its accuracy. We assess how distinctive the strategy is and its potential correlation to other Fund strategies. We typically perform testing on gross historical performance versus various benchmarks, and calculate a number of risks and return measurements, which may include $R^2$, correlation, covariance versus existing Fund strategies, alpha, beta, standard deviation and Sharpe ratio, and analyze risks and returns at different levels of leverage. In addition to quantitative analysis, we believe that qualitative analysis is equally important.

16

Our qualitative assessment of a potential manager includes reference checking, background investigation, and a detailed interview process.

**3.3.   How long does it take to exit the most liquid positions in the portfolio?**

The Fund's most liquid positions could, under normal market conditions, typically be liquidated in less than a week, including assets in the Energy and Power Arbitrage, Long/Short Fundamental Equity, Event Driven, Quantitative and Asia Based Arbitrage strategies.

**3.4.   Who are the participants in the process of selecting investments?**

Currently, all investments in the Fund are overseen by the Chief Investment Officers.  They also jointly manage the firm's allocation and risk management processes. At the strategy level, individual portfolio managers are selecting investments within parameters agreed upon by the manager.

**3.5.   Describe the Fund's use of leverage**

We make leverage decisions based upon actual risk exposures of each strategy, which can vary substantially. For example, Platinum does not typically apply leverage to its Asset Based Finance strategies. However, our Long/Short Fundamental, Event Driven, Opportunistic/Macro and Quantitative Equity strategies typically can employ up to 12.5 times leverage on certain positions, while limiting portfolio managers to no more than 20% net long or short exposure. The leverage on these strategies as a whole usually runs between 3 to 7 times. Commodities derivatives contracts utilized by the Energy Related Arbitrage strategy employs implied leverage based on prime brokerage cash collateral requirements. Platinum grosses up all equity exposure.

**3.6.   What is the level of Fund leverage employed over the last five years?**

| Leverage Employed Over the Last 5 years | |
|---|---|
| 2015 | 1.3 times capital |
| 2014 | 1.7 times capital |
| 2013 | 1.3 times capital |
| 2012 | 1.5 times capital |
| 2011 | 1.7 times capital |

**3.7.   What research materials do the investment managers use (internal research or outsourcing)?**

Investment managers at Platinum utilize internal research as well as outsourced buy-side and sell-side research, periodicals, and online news sources.  Use of external research depends upon strategy and sub-strategy trading needs, but may include: Bloomberg, Reuters, Financial Analysts Journal, The ARM Insider, Collection Advisor, CFA Institute Conference Proceedings Quarterly, The Economist, the Wall

17

Street Journal, Barron*s, and various daily sell-side morning research summaries including Deutsche Bank, Credit Suisse, JPMorgan, and Merrill Lynch.

**3.8.  Is short selling ever used?**

Short selling is used opportunistically as a method of creating alpha by allowing the Fund to profit from negative as well as positive market views, hedging market exposure by actively managing net long exposure of publicly traded markets, and leveraging alpha capture, such that fewer assets can produce greater returns investing in the same arbitrage opportunity.

**3.9.  What is the geographical distribution of your Investments?**

The majority of the Fund*s investments are located in North America.  The Fund also has investments in Europe, Asia, South America, Australia, and South Africa.  Platinum is agnostic about geography when selecting investments.  Investment opportunities pursued are those with the greatest risk-adjusted return potential, irrespective of location.

**4.   Valuation and Reporting**

**4.1.  Does the Fund have a formal Valuation Policy?**

Yes.  The Valuation Policy provides certain guidelines for the valuation of assets managed by Platinum in accordance with applicable Generally Accepted Accounting Principles (GAAP) as of the effective date of this policy. The Manager is responsible for administering the Valuation Policy.

The Manager has delegated to the Administrator the determination of the Net Asset Value of the Fund. In making such determination, the Administrator will follow the valuation policies and procedures adopted by the Fund as set out below.  If and to the extent that the Manager is responsible for or otherwise involved in the pricing of any of the Fund*s Loans or other assets, the Administrator may accept, use and rely on such prices in determining the Net Asset Value of the Fund and shall not be liable to the Fund, any investor in the Fund, the Manager or any other person in so doing.

The determination of the Net Asset Value, including the market value of all Loans and other assets, and liabilities, of the Fund (including reasonable reserves for contingencies) by the Manager will be final and conclusive.  Prospective investors should understand that these and other special situations involving uncertainties as to determinations of the market value of Loans and other assets of the Funds could have a material impact on the Net Asset Value of the Fund if the judgment regarding the appropriate determinations of their values should prove to be incorrect.

18

**4.2.**   **Discuss the Fund's valuation methodology.  State the types of financial assets which figure in the execution of the strategies and their method of valuation.**

The Valuation Policy ("the Policy") provides certain guidelines for the valuation of assets managed by Platinum Management (NY) LP (the "Manager") in accordance with applicable Generally Accepted Accounting Principles ("GAAP") as of the effective date of this policy.

The Policy's primary objective is to ensure compliance with *Fair Value of Financial Instruments*. Financial Accounting Standards Board ("**FASB**") Accounting Standards Codification ("**ASC**") Topic 820 ("**ASC 820**"), *Fair Value Measurements and Disclosures*, which defines fair value, establishes a fair value hierarchy based on the quality of inputs used to measure fair value, and provides disclosure requirements for fair value measurements. Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. In addition, the Policy is intended to assist in the identification of exceptions in the value of Account holdings, management of a diverse portfolio of investments, support of Risk Management analysis, risk mitigation, and facilitation of investor reporting.

## VALUATION METHODOLOGY

The valuation methodology generally followed is a fair valuation approach for each asset class and asset type. The methodology encompasses the use of the following: publicly available quotes for exchange-traded investments; valuations from a retained Independent Valuation Agent; solicited quotes from pricing service providers, brokers, or counterparties for traded and certain brokered market investments; market price less liquidity or restriction lockup discounts for certain non-marketable securities; mark-to-model, income method, market method, and risk-adjusted discounted cash flow analysis for certain direct investments; and proprietary valuation for complex asset structures.

*Asset Classes*

As of the effective date of the Policy, the Manager advises the following asset classes with the respective financial instruments:

| Asset Classes | Financial Instruments |
|---|---|
| Notes Receivable / Secured Lending | Secured/Collateralized Loans |
| Investment Companies | LP interest in other investment companies (Fund of Fund) |
| Private Equity | Common stock, preferred stock, LLC membership interest<br>Convertible notes and debentures<br>Warrants / options on private deals<br>Networking interests and profit sharing |
| Equities and Debt | Publicly traded common stock and bonds |
| Other Investments | Life settlement contracts |
| Derivatives | Forward contracts, options, warrants, swaps |

19

| Currencies | Future contracts, swaps |
|------------|-------------------------|
| Commodities | Forward contracts |

**FAIR VALUE HIERARCHY**

ASC 820 requires that financial holdings be classified according to three levels of fair value and disclosed to investors.  These levels are: quoted prices in active markets for identical investments (Level 1), prices modeled using observable market inputs (Level 2) and prices modeled using unobservable (proprietary) inputs (Level 3).

| Level | Definition |
|-------|------------|
| 1 | Quoted prices in active markets for identical assets and liabilities that the reporting entity has the ability to access at the measurement date; no blockage factors are allowed. The Account's external valuation and audit service providers rely on a combination of IDC, Bloomberg and other 3rd party service provider data for fair valuation of Level 1 financial instruments. |
| 2 | Inputs other than quoted prices included within Level 1 that are observable for the asset or liability, either directly or indirectly, including<br><br>A)  Quoted prices for similar assets and liabilities in active markets (adjusted); quoted prices for similar assets and liabilities in markets that are not active (e.g., some brokered markets, principal-to-principal markets);<br>B)  Inputs other than quoted prices that are observable for the asset or liability (for example, interest rates and yield curves observable at commonly quoted intervals, volatilities, prepayment speeds, loss severities, credit risks, and default rates)<br>C)  Inputs that are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs)<br><br>The Account's external valuation and audit service providers rely on a combination of market inputs, including interest rates, FX rates, comparable transaction prices, prepayment levels, accruals and pricing spreads in determining fair value estimates for Level 2 financial instruments. |
| 3 | Unobservable inputs. To the extent that observable inputs are not available, the entity may use its own assumptions about market participant assumptions, including assumptions about risk, developed based on the best information available (subject to cost-benefit constraint), which may include the entity's own data.  Asset types include, but are not limited to, notes receivable, private equity and.  Valuations of these assets generally utilize a mark-to-model methodology that may include discounted cash flow analysis.<br><br>The external valuation and audit service providers rely on a combination of market and non-market inputs, including comparable transaction prices, accruals, restriction |

| Level | Definition |
|---|---|
| | discounts and management discretion in determining fair value estimates for Level 3 financial instruments. <br><br> This category includes assets that primarily use internal analysis in the determination of fair value. The assets are either traded, but have no market price available or are complex structures and require management*s involvement to arrive at a fair value. |

**VALUATION APPROACHES**

| Financial Instrument Type | Affected Asset Classes | Valuation Method | ASC 820 Level |
|---|---|---|---|
| Publicly traded common stock and bonds (unrestricted), | Equities and Debt | Generally priced daily using an independent pricing source. | 1 & 2 |
| Membership or Limited Partnership interest | Investment Companies | Priced according to the most recent monthly net asset value provided by the Limited Partnership. A liquidity discount for redemption restriction may be used when appropriate. | 2 & 3 |
| Common and preferred stock, LLC membership interest, networking interest, profit sharing | Private Equity | *Income Approach* * Using a discounted cash flow (*DCF*) analysis to convert future cash flows of the Company to present value by applying an appropriate discount rate to reflect the risk of the cash flows including a hurdle rate of return or weighted average cost of capital (*WACC*). The measurement of value is based on market participant*s expectations about those future cash flows in the discrete and terminal year periods. | 3 |

21

| Financial Instrument Type | Affected Asset Classes | Valuation Method | ASC 820 Level |
|---|---|---|---|
| | | *Market Approach* * Using either/both (1) Guideline public Company method or (2) Guideline transaction method: Selecting similar guideline public comparable companies or comparable transactions, pulling the relevant market multiples from an independent pricing source, if applicable and determine the appropriate multiples based on differences between the subject Company and the comparable guideline companies and transactions.<br><br>Oil and Gas Investments:<br><br>*Market Approach* * Using either/both (1) Guideline public Company method or (2) Guideline transaction method:  In addition to the typical valuation multiples (i.e revenue, EBITDA), consideration will be given to the following acceptable valuation multiples in the Oil and Gas industry: Enterprise value to proven reserves, proven barrels, etc.  Selecting similar guideline public comparable companies or comparable transactions, pulling the relevant market multiples from an independent pricing source, | |

22

| Financial Instrument Type | Affected Asset Classes | Valuation Method | ASC 820 Level |
|---|---|---|---|
| | | if applicable and determining discounts/premiums to the comparable multiples based on differences (i.e. risk, performance, size) between the subject Company and the comparable guideline companies and transactions.<br><br>In addition, we will use best practices in industry to obtain independent third party Oil and Gas Reserve Reports that will demonstrate the Company's level of expected cash flows and category of proven reserves and barrels in the ground.<br><br>*Income Approach* \* See above for a description of this methodology, however, this methodology may not be used directly since the aforementioned reserve report is a form on an income approach as the report reflects future cash flows of the Company.<br>Market inputs for the Income and Market Approach will be pulled from CapitalIQ, an independent pricing source. | |
| Warrants / Options / Convertible Notes | Private Equity & Equities | Warrants of companies with market capitalizations are priced using Black-Scholes modeling.  Warrants of companies are valued at $0 when they are insignificant to | 2 & 3 |

23

| Financial Instrument Type | Affected Asset Classes | Valuation Method | ASC 820 Level |
|---|---|---|---|
| | | the holding and/or significantly out-of-money. Convertible Notes to publicly traded companies are valued based on the underlying stock price of the company or using an option pricing model. | |
| Forwards / Swaps / Futures | Derivatives, Commodities, Currency | Contracts are priced using a pricing model where price inputs are observed from actively quoted markets. | 2 |
| Life Settlement contracts | Other Investments | Fair value of a life insurance policy is determined by applying an investment discount rate based on the cost of funding the Company's life settlement contracts as compared to returns on investments in asset classes with comparable credit quality, to the expected cash flow generated by the policies in the Company's life settlement portfolio (death benefits less premium payments), net of policy specific adjustments and reserves. the following factors are consider in the fair value estimates: cost at date of purchase, recent purchases and sales of similar investments (if available and applicable), financial standing of the issuer, changes in economic conditions affecting the | 3 |

24

| Financial Instrument Type | Affected Asset Classes | Valuation Method | ASC 820 Level |
|---|---|---|---|
| | | issuer, maintenance cost, premiums, benefits, standard actuarially developed mortality tables and life expectancy reports prepared by nationally recognized and independent third party medical underwriters. | |
| Secured/Collateralized Loans | Notes Receivable / Secured Lending | Generally priced at principal loan amount outstanding unless the loan is impaired. The Investment Manager will generally consider a loan impaired when, based on current information and events, it is probable that the Company will be unable to collect the principal and/or interest and the value of the collateral doesn't support the loan.  The Investment Manager determines the significance of payment delays, payment shortfalls and the amount of payment on a case-by-case basis, taking into consideration the circumstances surrounding the loan and the strength of the borrower and the collateral (i.e. loan to value), including, but not limited to, the length and reason for the delay, the borrower's prior payment record and the amount of the shortfall in relation to the principal and interest owed. | 3 |

25

Valuation Considerations

Valuation inputs are assessed to ensure reasonableness and consistency.  These inputs include cash flow projections from counterparties, risk premium component of the discount rate, and reference market data.  Valuation methodologies utilized for new investments are also fully assessed and updated on a periodic basis.

Cash Flow Projections

Valuation methodologies using an Income approach will typically use cash flow projections in the discounted cash flows analysis.  These Company projections will be provided on an annual basis by the portfolio manager based on Management expectations of future cash flows.  When applicable, these cash flow projections will be updated on a quarterly basis based on changes to key assumptions.

Discount Rates

**WAAC** * Calculated taking into account the relative weights of each component of the underlying investee company's capital structure, the weighted average cost of capital is the average rate of return a company expects to compensate all its different investors. WAAC is used to discount present value of future earnings or cash flows.

**DLOM** * Marketability is defined as the ability to convert an investment into cash quickly at a known price and with minimal transaction costs. The DLOM is a downward adjustment to the value of an investment to reflect its reduced level of marketability. Primary factors in determining the size of the DLOM are as follows; Size of distributions or dividends, Size of revenues and/or earnings, Revenue and/or earnings growth and stability, Product risk and industry risk.

Broker Quotes

It is the Asset Manager's policy to take an average of all broker quotes received.  Broker quotes are generally provided by the broker from whom the asset or liability was originally purchased, the responsible prime broker and/or brokers holding other similar positions.  Where market liquidity allows, multiple quotes are received.  If trading activity is not sufficient to obtain multiple quotes, only one broker quote is required.

Valuation Exception Reporting

Exceptions include, but are not limited to: an override of Asset Manager cash flows, significant changes or a suspicious lack of changes to cash flow projections, changes between *SFAS 157 *Levels*, unavailability of external market data, and models or discounts applied to a Level 1 or 2 quote. Exceptions will be reported to the Committee who will assess all exceptions.
In the case of a discount applied to a Level 1 or 2 quote, the exception report will include documentation of the methodology used to arrive at the discount.

26

Independent Assessment

The Manager has retained an Independent Valuation Agent to provide an analysis of fair value on the majority of level 2 and level 3 securities on a quarterly basis.  The Independent Valuation Agent's analysis is reviewed and reconciled to internal fair value analysis by Manager.

**POLICY GOVERNANCE**

The Investment Manager is responsible for assessing and resolving any exceptions or revisions to the valuation methodology, policies and procedures as well as assessing the final portfolio Net Asset Value (NAV).

Development of Valuation Methodology and Policy

Valuation methodologies and the policy are developed by the Investment Manager. The methodology is reviewed by the Investment Manager on at least an annual basis or more frequently, at its sole discretion, based upon any recommended revisions to the methodology.

*Reporting*

Financial reports will be produced on a periodic basis.

| Frequency | Description |
|---|---|
| Monthly | 1.  Fair Value position Summary<br><br>2.  Sector Allocation and Holdings by Strategy |
| Quarterly | 3.  Quarterly valuations from 3rd party valuation service provider<br><br>4.  Investment purchase/sales rollforward |
| Annually | 5.  Audited GAAP Financial Statements, including footnotes (audited) |

27

**4.3.  Describe the Fund's governance of valuation policy for financial reports.**

The Valuation Committee is responsible for assessing and resolving any exceptions or revisions to the valuation methodology, policies and procedures, as well as assessing the final portfolio Net Asset Value ("NAV").

Development of Valuation Policy

The Valuation Committee develops the Valuation Policy and reviews it on at least an annual basis, or more frequently, at its discretion, in cases of significant methodology changes or organizational changes.

Handling of Exceptions & Escalations

Any exceptions in policy or methodology are reviewed and approved by one of the Chief Investment Officers.

**4.4.  What are the modes of reporting to investors (frequency of reporting, kind of reporting)?**

Platinum currently attempts to provide investor communications and reporting according to the following schedule:

| Report | Timeframe | Description |
|---|---|---|
| Monthly Fact Sheet | +10 business days after month end | Estimated net return % for previous month, strategy allocations, strategy returns, strategy contributions to Fund return, monthly performance since inception, cumulative performance |
| End of Month Net Asset Value | +15 business days after month end | Detailed statement of account, giving end of month NAV and monthly/YTD return % |
| Estimated Schedule K-1 | +100 calendar days after tax year end | Estimated Schedule K-1 |
| Audited Financial Statements | +120 calendar days after fiscal year end | GAAP financial statements, including footnotes (audited) |
| Final Schedule K-1 | +180 calendar days after tax year end | Final Schedule K-1 |

**5.  Legal and Organizational**

**5.1.  What is the form of incorporation of the Fund?**

Each legal entity associated with the master-feeder structure is as follows:

    Management Company: Limited Liability Company
    Master Fund: Exempted Limited Partnership

28

Onshore Feeder Fund: Limited Partnership
Offshore Feeder Fund: Corporation
Intermediate Fund: Corporation

**5.2.  What is the place of incorporation?**
Entity formation documents associated with the master-feeder structure were filed in the follow legal jurisdictions:

Management Company (*Platinum*): Delaware, USA
Master Fund: Grand Cayman, Cayman Islands
Onshore Fund: Delaware, USA
Offshore Fund: Grand Cayman, Cayman Islands
Intermediate Fund: Grand Cayman, Cayman Islands

**5.3.  What are the fees associated with the Fund?**
Management Fee: 2%
Incentive Allocation: 20%

Note: In addition to incentive fees, Sub-Advisors / Portfolio Managers are separately compensated for their services, and the Fund is responsible for such compensation and expenses payable to and incurred by each Sub-Advisor[9].

**5.4.  Is there any high water mark mechanism?**
All returns are subject to a high water mark mechanism, such that incentive fees are not charged on gross returns until the Fund has surpassed a previous high water mark.

**5.5.  Is there any hurdle rate mechanism?**
The only class that currently has a hurdle rate is Class P with an 8% preferred rate of return to the limited partners with the next 2% of performance distributed to the General Partner.  Thereafter, a typical 20% incentive allocation is charged. Generally, with respect to the Class P Interests, at the end of each fiscal year, any net capital appreciation (after deduction of Management Fees and other expenses), initially will be apportioned to the General Partner and the Class P Limited Partners pro rata in accordance with their respective beginning capital account balance for such fiscal year, as adjusted for any additional subscriptions and withdrawals made during the year. The amount initially apportioned to the General Partner for such fiscal year shall be allocated to the General Partner, and the amount initially apportioned to each Class P Limited Partner for such fiscal year shall be divided between such Limited Partner and the General Partner and allocated as follows:

(i) 8% Preferred Return: First, 100% to such Limited Partner, until such Limited Partner has been allocated an amount equal to a preferred return of 8% per annum on such Limited Partner*s beginning

---

[9] See relevant Memorandum for more details

29

capital account balance for such fiscal year, as adjusted for any additional subscriptions and withdrawals made during the year;

(ii) Catch-Up: Second, 100% to the General Partner until the cumulative allocations to the General Partner under this clause (ii) equals 20% of the total amounts allocated pursuant to clause (i) and this clause (ii); and

**5.6. What are the terms of liquidity for the customer?**

For all classes except for Class P, the liquidity terms are quarterly redemptions with a 60-day notification period. For Class P the liquidity terms are quarterly redemptions with a 12-month notification period. There is no initial lock up[10].

**5.7. What is the minimum investment for a customer?**

$1,000,000 USD (or equivalent).  The minimum investment amount may be waived by Platinum  and/or the Offshore Fund directors, as relevant.

**5.8. Side Pockets**

The Fund does not currently use side pockets.

**5.9.  Side Letters**

From time to time the Fund may enter into Side Letter Agreements with investors regarding, amongst other things, preferred liquidity terms and/or discounted fees.  For more information on the Fund's existing side letter(s), please contact the Manager.

**5.10. Managed Accounts**

The manager does not currently provide managed accounts.

**5.11. Is the Fund registered with any governmental body?**

The Master Fund and the Offshore Fund are registered with the Cayman Islands Monetary Authority.

**5.12. Is Platinum Management (NY) LLC a registered investment advisor?**

Platinum Management (NY) LLC is a registered investment advisor under the Investment Advisers Act of 1940.

---

[10] In accordance with the terms of the applicable Memorandum, subject to a 10% audit holdback.

The firm has structured and implemented a comprehensive Compliance Program, employs a Chief Compliance Officer and has a Compliance Manual and Code of Ethics.  The Fund has engaged SS&C (defined below) to conduct anti-money laundering reviews and to check insider trading policies.

Platinum is not registered as a commodity pool operator (*CPO*) with the U.S. Commodity Futures Trading Commission (*CFTC*) and operates under CFTC exemption, Regulation § 4.13(a)(3).

**5.13. What kinds of rights are conferred upon the purchasers?**
Subscribers to the Onshore Fund are issued limited liability membership interests. Subscribers to the Offshore Fund are issued redeemable, participating, voting shares of $0.01 par value per share in the capital of the Offshore Fund.  The shares may be subscribed for at an issue price of $1,000 per share.  For additional information on rights of the purchasers, please see the relevant Memorandum.

**6.   Operational Aspects**

**6.1.   How frequently are positions monitored?**
Positions are monitored actively, as required.

**6.2.   Please describe your process for executing, recording, confirming, settling and monitoring trades. What controls are in place to ensure trades are executed correctly and errors are resolved in a timely manner?**
Publicly traded equities are executed primarily via our portfolio managers and a dedicated execution trader. All verbal instructions between the trading desk and individual portfolio managers are confirmed in written format.  Trades are executed either via FIX or message-based electronic trade execution services.  Trade capture for these trades takes place automatically at the time of execution, either via our OMS Eze Castle or via automatic retention of all trade order messages sent through other trade execution services.  Executions flow into the system instantaneously if the order is executed via FIX, or manually if there is no FIX connection available to the executing broker. Tri-party reconciliation of these trading execution records is performed by our Operations staff between the prime broker, administrator and operations records.  Trade settlement and fail activity is monitored and recognized daily with our prime brokers.  Prime brokers generally display all unconfirmed trades on a T+1 basis on their websites, which we check daily.  Any amendments made by Platinum are saved in soft copy to our DTC Break folder.  All settlement and fail activity emails are sent to a shared Settlements email box which allows Operations personnel to monitor the process in real time and prevent any breaks prior to T+1 daily reconciliation and P&L calculation.  In addition, SS&C Technologies performs trade reconciliation on a daily basis.

Commodity trades are executed on electronic systems, or with one of our approved commodities brokers via trade order system or phone. Trade confirmations are sent back to the executing trader at the time of execution, and in a summary report at end of day. All commodities trades are either exchange products or OTC derivatives clearing on regulated exchange.  Trade confirms are received from exchange promptly and are automatically transferred into our risk system. Tri-party reconciliation of these trading

31

execution records is performed by our Operations staff between the prime broker, administrator and operations records.   Trade settlement and fail activity is monitored and recognized immediately via review by the responsible Portfolio Manager.   All settlement and fail activity emails are sent to a shared Settlements email box which allows Operations personnel to monitor the process in real time and prevent any breaks prior to T+1 daily P&L calculation.   In addition, SS&C Technologies performs trade reconciliation on a daily basis.

**6.3.   What is the target for the volume of assets under the management of the Fund?  Will the Fund stop raising new sums of money when it achieves this target?**
The Fund employs multiple investment strategies which have different capacity constraints.   In aggregate, we anticipate that current strategies can scale up to capital of at least $2.0 billion without material changes to the underlying strategies.   Additionally, we expect that the General Partner's expertise in identifying new strategies and talent shall increase the fund's capacity over time.   New money is only accepted in the event Platinum believes that opportunities exist to deliver risk adjusted returns.   Should the Fund grow to an amount whereby additional assets would dilute returns from existing opportunities, the Fund will be closed to new investors.

**6.4.   List insurance coverage maintained**
Key Man Insurance on Mark Nordlicht
Directors & Officers (*D&O*) Insurance

**7.   Fund Background**

**7.1.   What is the number of employees of the Firm?**
The firm has in excess of 35 employees spread across investment, legal, compliance, operations and marketing, of which approximately two thirds are investment professionals.

**7.2.   What is the volume of the managers* personal investments in the assets of the Fund?**
Entities related to Platinum and its employees own approximately 20% of the Fund*s AUM as of July 1, 2015.

**7.3.   Have there ever been any civil proceedings filed against any of the Fund*s principals pertaining to their fiduciary obligations?  Please describe in detail.**
Please refer to the latest copy of the audited financial statements for the Fund.

**7.4.   Have there ever been any criminal proceedings filed against any of the Fund*s principals?  Please describe in detail.**
No.

32

**7.5.  Have any of the Principals or affiliated entities ever (i) filed for bankruptcy or (ii) had any judgments entered against them involving fraud, willful misconduct, or material violation of the securities law?**

No.

**7.6.  Is there any pending litigation involving the Fund?**

Please refer to the latest copy of the audited financial statements for the Fund.

**7.7.  Does Platinum have a Business Continuity Plan?**

Platinum has prepared and maintains current Business Continuity Plan (*BCP*) outlining plans to continue business and meet existing obligations in the event of a Significant Business Disruption (*SBD*). A copy of the Business Continuity Plan is available upon request.

**8.   Risk Management and Control Mechanisms**

**8.1.  Who is in charge of risk control at the Fund?**

The Chief Investment Officers focus on managing the Fund*s overall investment risks, including risk/return analysis, asset allocation, investment due diligence, management of exposures, valuation, procedural and counterparty risks and other strategy considerations.

**8.2.  Describe the Fund*s risk management policy.**

A well-controlled risk profile is a critical part of Platinum*s investment methodology.  The Fund seeks to control risk in a number of ways, which may include: diversifying across investment strategies; adjusting the expected maturity or holding periods of positions; analyzing and monitoring risk-adjusted performance; and implementing operational controls.

Platinum utilizes various reports to monitor the risk profile of the Fund. These reports include, but are not limited to[11]:

> Margin requirements reporting
>
> Monitor trader*s stated trading strategy by reviewing trader*s net exposure, sector concentration, products traded, and other risk factors for any signification deviations
>
> Perform *what if* analysis, as requested, to determine the projected impact of certain trades upon various Fund risk measures, P&L effects, and broker margin requirements.
>
> Daily cash report, including short term expected liquidity
>
> Portfolio allocation among strategies
>
> Portfolio composition concentration

---

[11] The following represents a detailed list of risk management/monitoring tools. Not all tools are applicable or applied to each investment.

33

Ongoing legal and regulatory monitoring by internal and external legal sources

**8.3.   What tools are employed in risk management and in monitoring investments?**

Platinum employs 3rd party independent risk software, which provides risk management calculations on an application service provider (*ASP*) basis.  The Chief Investment Officers review these measurements on an ongoing basis.  In addition Platinum utilizes various reports to monitor the overall risk profile of the Fund. These reports include, but are not limited to:

> Daily cash report, including short term expected liquidity
> Portfolio allocation among strategies
> Portfolio composition concentration
> Monitoring of balancing requirements and/or collateral values
> Controlled account monitoring for balances and transactions
> Third party reports regarding underlying financial assets
> Ongoing legal and regulatory monitoring by internal and external legal sources
> Investment reporting requirements by the counterparties, including financial statements and tax returns
> Phone calls with counterparties

**8.4.   What is Platinum*s philosophy to limiting drawdowns?**

At the macro level, the Fund aims to reduce volatility of the Fund*s returns and limit steep losses by pursuing a portfolio of strategies uncorrelated to the broader markets.  In general, the Fund does not expect that market conditions will have a material effect upon its portfolio, but on a strategy level it may be correlated.

The Manager believes that diversification is the cornerstone of sound risk management.  When considering any new strategy, the Manager begins by exploring and identifying downside risk.  Additionally, the Manager actively focuses on identifying and hedging any structural risk in the portfolio.

Another important way the Manager attempts to limit draw downs is through frequent monitoring of investments.  Once an investment is made, portfolio managers will actively monitor the position on a daily, weekly or monthly basis, as applicable.  This practice enables the Manager to quickly identify potentially troubled investments, and in turn make informed decisions about reallocations or exit options.

**8.5.   Describe the Fund*s policy on the management of its level of liquidity.**

Platinum actively manages the Fund*s liquidity by monitoring the portfolio to anticipate cash flows, such that investments will generate enough income to provide the liquidity the Fund needs. As a result of the Fund*s use of leverage to finance certain strategies, we frequently adjust the Fund*s allocations to liquid and illiquid strategies in order to hedge liquidity risks.  The Fund makes policy decisions on liquidity management based upon daily P&L, margin and market value reporting; monthly subscriptions,

34

contributions, redemptions and withdrawals; and negotiations on lending facility terms and conditions. Platinum expends considerable energies negotiating excess capacity alternative lending agreements to manage Fund liquidity, counterparty and leverage risks associated with Fund investments and cash flows.

**8.6.   Please provide an investor reference for the Fund.**

Investor references are available upon request. Please inquire with the Manager.

EXHIBIT 6

# PLATINUM PARTNERS VALUE ARBITRAGE FUND (INTERNATIONAL) LIMITED

**A Cayman Islands Exempted Company**

**Private Offering of Voting, Participating and Redeemable Class L Shares**

**Minimum Subscription:  $1,000,000**

**CONFIDENTIAL PRIVATE OFFERING MEMORANDUM**

**PLATINUM PARTNERS VALUE ARBITRAGE FUND (INTERNATIONAL) LIMITED (THE "FUND") IS A CAYMAN ISLANDS EXEMPTED COMPANY AND ACCORDINGLY CERTAIN FILINGS HAVE BEEN MADE AND WILL IN THE FUTURE BE MADE IN RELATION TO THE FUND WITH THE CAYMAN ISLANDS MONETARY AUTHORITY.  HOWEVER, NO CAYMAN ISLANDS AUTHORITY AND NO OTHER AUTHORITY, INCLUDING THE U.S. SECURITIES AND EXCHANGE COMMISSION, HAS PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS CONFIDENTIAL PRIVATE OFFERING MEMORANDUM (THIS "MEMORANDUM").  THIS IS NOT A PUBLIC OFFERING.**

**THE CLASS L SHARES (THE "SHARES") ISSUED BY THE FUND ARE NOT FOR SALE TO U.S. PERSONS EXCEPT FOR CERTAIN TAX-EXEMPT U.S. INVESTORS. THIS MEMORANDUM IS NOT FOR USE IN THE UNITED STATES OR TO BE SENT TO TAX-EXEMPT U.S. INVESTORS UNLESS ACCOMPANIED BY THE SUPPLEMENT FOR TAX-EXEMPT U.S. INVESTORS.**

**SEE CFTC DISCLOSURES ON PAGE (ii).**

The date of this Confidential Private Offering Memorandum is November 2012

## CFTC DISCLOSURES

**REGISTRATION EXEMPTION.**  UNDER U.S. COMMODITY FUTURES TRADING COMMISSION ("CFTC") REGULATIONS, THE INVESTMENT MANAGER IS NOT REQUIRED TO REGISTER WITH THE CFTC AS A COMMODITY POOL OPERATOR ("CPO") OR A COMMODITY TRADING ADVISOR ("CTA").  AS A RESULT, UNLIKE A REGISTERED CPO OR CTA, THE INVESTMENT MANAGER WILL NOT BE REQUIRED TO DELIVER A DISCLOSURE DOCUMENT (CONTAINING CERTAIN CFTC PRESCRIBED DISCLOSURES) AND A CERTIFIED ANNUAL REPORT TO THE FUND'S INVESTORS.  A CLAIM OF EXEMPTION HAS BEEN FILED EFFECTUATING THIS EXEMPTION.

IN PARTICULAR, THE INVESTMENT MANAGER HAS CHOSEN TO AVAIL ITSELF OF A CPO EXEMPTION PROVIDED UNDER SECTION 4.13(a)(4) OF THE CFTC'S REGULATIONS WHICH REQUIRES THAT (I) THE OFFER AND SALE OF THE FUND'S SHARES ARE EXEMPT FROM REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED; AND (II) PARTICIPANTS IN THE FUND ARE LIMITED TO PERSONS THAT ARE "NON-U.S. PERSONS" OR "QUALIFIED PURCHASERS," ALL AS SET OUT IN THE FUND'S SUBSCRIPTION DOCUMENTS.

**NON-U.S. FUTURES.**  YOU SHOULD ALSO BE AWARE THAT THE FUND MAY TRADE NON-U.S. FUTURES OR OPTIONS CONTRACTS.  TRANSACTIONS ON MARKETS LOCATED OUTSIDE THE UNITED STATES, INCLUDING MARKETS FORMALLY LINKED TO A UNITED STATES MARKET, MAY BE SUBJECT TO REGULATIONS WHICH OFFER DIFFERENT OR DIMINISHED PROTECTION TO THE POOL AND ITS PARTICIPANTS.  FURTHER, UNITED STATES REGULATORY AUTHORITIES MAY BE UNABLE TO COMPEL THE ENFORCEMENT OF THE RULES OF REGULATORY AUTHORITIES OR MARKETS IN NON-UNITED STATES JURISDICTIONS WHERE TRANSACTIONS FOR THE POOL MAY BE EFFECTED.

DOC ID - 18830280.11

**GENERAL INFORMATION**

This Confidential Private Offering Memorandum (this "**Memorandum**") has been prepared in connection with the sale of voting, participating and redeemable Class L shares ("**Class L Shares**" or the "**Shares**") in Platinum Partners Value Arbitrage Fund (International) Limited, a Cayman Islands exempted company (the "**Fund**"). The Fund is a shareholder of, and invests substantially all of its capital in, Platinum Partners Value Arbitrage Intermediate Fund Ltd., a Cayman Islands exempted company (the "**Intermediate Fund**"). The Intermediate Fund and Platinum Partners Value Arbitrage Fund (USA) L.P. ("**Platinum USA**") are limited partners in Platinum Partners Value Arbitrage Fund L.P., a Cayman Islands exempted limited partnership (the "**Master Fund**"). The Master Fund serves as a vehicle for investing capital contributed by the Fund (through the Intermediate Fund) and Platinum USA for purposes of achieving the investment objectives of the Fund. (See "*Introduction — Investment Objective and Strategy*" herein.)

This Memorandum is being submitted for consideration by eligible investors who are interested in participating in the Fund and who are (i) not U.S. Persons, or (ii) if U.S. Persons, are Qualified Tax-Exempt U.S. Entities, Accredited Investors and Qualified Purchasers as such terms are described under "*The Offering — Eligible Investors*." (See "*The Offering — Eligible Investors*" herein for a more complete description of the requirements for investing in the Shares.) The use or retention of this Memorandum for any purpose other than the purpose set forth above is not authorized and no part of this Memorandum may be transmitted, reproduced or made available to any person other than the intended recipient or used for any other purpose without the express written consent of the Fund. Each prospective investor, by accepting delivery of this Memorandum, agrees to return the same and all related documents to the Fund in the event such investor does not purchase any of the Shares.

No person has been authorized to give any information or to make any representations other than those contained in this Memorandum in connection with the offering and sale of the Shares and, if given or made, such information and/or representations not contained herein must not be relied upon as having been authorized by or on behalf of the Fund, the Investment Manager or the Administrator (each as defined herein). The contents of this Memorandum should not be considered to constitute legal, tax, investment, accounting or other advice and each prospective investor should carefully review this Memorandum with its legal and financial advisers, and consult such advisers as to matters concerning legal, tax, regulatory, financial and accounting consequences of an investment in the Shares. Investors should inform themselves as to (i) the legal requirements within their jurisdiction and domicile for the purchase of the Shares, (ii) any foreign exchange restrictions that they might encounter, and (iii) the income and other tax consequences of a purchase of the Shares. No assurance can be given that existing laws will not be changed or interpreted adversely. The investor must rely on the investor's own evaluation of the investment and the terms of the offering, including the merits and risks involved in making an investment decision with respect to the Shares.

Certain information in this Memorandum has been obtained from sources believed to be reliable, although neither the Fund nor the Investment Manager guarantees its accuracy, completeness or fairness. Opinions and estimates may be changed without notice.

DOC ID - 18830280.11

This Memorandum contains forward-looking statements, including observations about markets, industry or regulatory trends, projections or other estimates (including estimates of return or performance). These forward-looking statements are based upon certain assumptions. Forward-looking statements may be identified by, among other things, the use of words like "intends," "expects," "anticipates," "believes," "seeks," "estimates," "should," or the negatives of these terms, and similar expressions. Other events that were not taken into account may occur and may significantly affect the analysis. Any assumptions should not be construed to be indicative of the actual events that will occur. Actual events are difficult to predict and may depend upon factors that are beyond the Fund's and the Investment Manager's control. Certain assumptions have been made to simplify the presentation and, accordingly, actual results may differ, perhaps materially, from those presented. Some important factors which could cause actual results to differ materially from those in any forward-looking statements include, among others, the following: foreign-exchange developments and financial, market, economic or legal conditions. Prospective investors are cautioned not to place undue reliance on such statements. None of the Fund, the Investment Manager or any affiliate thereof have an obligation to update any of the forward-looking statements in this Memorandum.

The Shares offered hereby have not been approved or disapproved by the U.S. Securities and Exchange Commission (the "**SEC**") or by the securities regulatory authority of any U.S. state, and neither the SEC nor any such authority has passed on the accuracy or adequacy of this Memorandum, nor is it intended that the SEC or any such authority will do so. Any representation to the contrary is a criminal offense.

Certain provisions of this Memorandum and the Memorandum and Articles of Association of the Fund and the Intermediate Fund, as amended from time to time (as applicable, the "**Articles**"), and other documents, are summarized in this Memorandum, but it should not be assumed that the summaries are complete and such summaries are qualified in their entirety by the contents of the documents which they purport to summarize.

The Investment Manager is registered as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended. Neither the Fund, the Intermediate Fund nor the Master Fund is registered as an investment company under the U.S. Investment Company Act of 1940, as amended.

This Memorandum has been prepared on behalf of the Fund and each recipient hereof acknowledges that no person or party other than the Fund will have any responsibility or liability for the accuracy and completeness of the contents hereof. The information in this Memorandum is as of the date hereof and is subject to change or amendment. The delivery of this Memorandum at any time does not imply that the information contained herein is correct at any time subsequent to the date hereof. The Shares are being offered subject to withdrawal, cancellation, or modification of the offering or of the terms and conditions pursuant to which the offering is made. The Fund reserves the right to accept or reject any application to purchase the Shares in whole or in part at any time for any reason prior to the termination of the offer.

*       *       *

THE SHARES ARE A SPECULATIVE INVESTMENT AND THIS OFFERING INVOLVES SUBSTANTIAL RISKS OF LOSS AS DESCRIBED HEREIN.  THE SHARES OFFERED HEREIN ARE SUITABLE FOR NON-U.S. PERSONS AND CERTAIN ELIGIBLE U.S. PERSONS AS DESCRIBED HEREIN, WHO DO NOT REQUIRE IMMEDIATE LIQUIDITY FOR THEIR INVESTMENTS, FOR WHOM AN INVESTMENT IN THE FUND DOES NOT CONSTITUTE A COMPLETE INVESTMENT PROGRAM AND WHO FULLY UNDERSTAND AND ARE WILLING TO ASSUME THE RISKS INVOLVED IN THE FUND'S INVESTMENT PROGRAM.   SUBSCRIBERS FOR THE SHARES MUST REPRESENT THAT THEY ARE ACQUIRING THE SHARES FOR INVESTMENT.  ANY TRANSFER OF THE SHARES IS SUBJECT TO LIMITATIONS AS DESCRIBED IN THIS MEMORANDUM AND THE ARTICLES.  NO OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY IS BEING MADE IN ANY JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL.

THE FUND IS A REGULATED MUTUAL FUND FOR THE PURPOSES OF THE MUTUAL FUNDS LAW (AS AMENDED) OF THE CAYMAN ISLANDS (THE "**CAYMAN ISLANDS MUTUAL FUNDS LAW**") AND ACCORDINGLY WILL BE REGULATED PURSUANT TO THE TERMS OF THAT LAW.  THE OBLIGATIONS OF THE FUND ARE (A) TO REGISTER THE FUND WITH THE CAYMAN ISLANDS MONETARY AUTHORITY (THE "**MONETARY AUTHORITY**") APPOINTED IN TERMS OF THE LAW, (B) TO FILE WITH THE MONETARY AUTHORITY PRESCRIBED DETAILS OF THIS MEMORANDUM AND ANY CHANGES TO IT, (C) TO FILE ANNUALLY WITH THE MONETARY AUTHORITY ACCOUNTS AUDITED BY AN APPROVED AUDITOR AND (D) TO PAY A PRESCRIBED ANNUAL REGISTRATION FEE.

PURSUANT TO THE MUTUAL FUNDS LAW, CERTAIN "MASTER FUNDS" (AS DEFINED THEREIN) ARE REQUIRED TO BE REGISTERED WITH, AND REGULATED BY, THE MONETARY AUTHORITY. THE MASTER FUND IS SO REGISTERED.  THE REGISTRATION PROCESS AND THE CONSEQUENCES OF REGULATION ARE SUBSTANTIALLY SIMILAR TO THAT DESCRIBED ABOVE IN RELATION TO THE FUND, SAVE THAT A "MASTER FUND" IS NOT REQUIRED TO ADOPT OR FILE A SEPARATE OFFERING DOCUMENT WITH THE MONETARY AUTHORITY.

THE SHARES OFFERED HEREBY HAVE NOT BEEN FILED WITH OR APPROVED OR DISAPPROVED BY ANY REGULATORY AUTHORITY OF ANY COUNTRY OR JURISDICTION, NOR HAS ANY SUCH REGULATORY AUTHORITY PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING OR THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM.   ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.  THE SHARES ARE NOT REGISTERED FOR SALE, AND THERE WILL BE NO PUBLIC OFFERING OF THE SHARES.

THIS MEMORANDUM HAS BEEN PREPARED AND DELIVERED BY OR ON BEHALF OF THE FUND FOR THE SOLE BENEFIT OF THE PERSON TO WHOM IT HAS BEEN DELIVERED AND SHOULD NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, EACH SHAREHOLDER (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF SUCH SHAREHOLDER, MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF (I) THE FUND AND (II) ANY OF ITS TRANSACTIONS, AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO THE SHAREHOLDER RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE, IT BEING UNDERSTOOD THAT "TAX TREATMENT" AND "TAX STRUCTURE" DO NOT INCLUDE THE NAME OR IDENTIFYING INFORMATION OF (I) THE FUND, THE INTERMEDIATE FUND OR THE MASTER FUND, OR (II) THE PARTIES TO A TRANSACTION.

THE FUND IS PROHIBITED FROM MAKING ANY INVITATION TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR ANY OF ITS SHARES UNLESS IT IS LISTED ON THE CAYMAN ISLANDS STOCK EXCHANGE.

THIS MEMORANDUM IS BASED ON THE LAW AND PRACTICE CURRENTLY IN FORCE IN THE CAYMAN ISLANDS AND IS SUBJECT TO CHANGES THEREIN.

.

## DIRECTORY

| FUND | ADMINISTRATOR |
|---|---|
| Platinum Partners Value Arbitrage Fund (International) Limited c/o Intertrust Corporate Services (Cayman) Limited Walkers 190 Elgin Avenue George Town, Grand Cayman KY1-9001 Cayman Islands | SS&C Technologies, Inc. 80 Lamberton Road Windsor, CT 06095 U.S.A. Tel:  +1 (860) 298-4599 Fax:  +1 (860) 371-2503 |

| INTERMEDIATE FUND | AUDITOR |
|---|---|
| Platinum Partners Value Arbitrage Intermediate Fund Ltd. c/o Intertrust Corporate Services (Cayman) Limited Walkers 190 Elgin Avenue George Town, Grand Cayman KY1-9001 Cayman Islands | BDO Tortuga P. O. Box 31118 SMB 5th Floor, Zephyr House Grand Cayman, Cayman Islands Tel: +1(345) 943-8800 Fax: +1(345) 943-8801 |

| MASTER FUND | U.S. LEGAL COUNSEL |
|---|---|
| Platinum Partners Value Arbitrage Fund L.P. c/o Intertrust Corporate Services (Cayman) Limited Walkers 190 Elgin Avenue George Town, Grand Cayman KY1-9001 Cayman Islands | Schulte Roth & Zabel LLP 919 Third Avenue New York, NY 10022 Tel:  +1(212) 756-2000 Fax:  +1(212) 593-5955 |

| INVESTMENT MANAGER | CAYMAN ISLANDS LEGAL COUNSEL |
|---|---|
| Platinum Management (NY) LLC 152 West 57th Street 4th Floor New York, NY  10019-3310 U.S.A. Tel:  +1 (212) 582-2222 Fax:  +1 (212) 582-2424 | Walkers 190 Elgin Avenue George Town, Grand Cayman KY1-9001 Cayman Islands Tel:  +1(345) 949-0100 Fax:  +1(345) 949-7886 |

| CLASS M SHAREHOLDER (INTERMEDIATE FUND) | GENERAL PARTNER OF THE CLASS M SHAREHOLDER |
|---|---|

Platinum Partners Value Arbitrage, LP
152 West 57th Street
4th Floor
New York, NY  10019-3310
U.S.A.
Tel:  +1 (212) 582-2222
Fax:  +1 (212) 582-2424

Platinum Partners Value Arbitrage (GP) Corp.
152 West 57th Street
4th Floor
New York, NY  10019-3310
U.S.A.
Tel:  +1 (212) 582-2222
Fax:  +1 (212) 582-2424

### DIRECTORS

David Bree
c/o dms Management Ltd.
PO Box 31910 SMB
Ansbacher House, 20 Genesis Close
Grand Cayman, Cayman Islands
Tel:  +1(345) 949-2777
Fax:  +1(345) 949-2877

Don Seymour
c/o dms Management Ltd.
PO Box 31910 SMB
Ansbacher House, 20 Genesis Close
Grand Cayman, Cayman Islands
Tel:  +1(345) 949-2777
Fax:  +1(345) 949-2877

Uri Landesman
152 West 57th Street, 4th Floor
New York, NY  10019-3330
U.S.A.
Tel:  +1(212) 582-2222
Fax:  +1(212) 582-2424

# TABLE OF CONTENTS

Page

DIRECTORY ..................................................................................................... vii

SUMMARY ........................................................................................................ 1

INTRODUCTION ............................................................................................... 16

INVESTMENT OBJECTIVE AND STRATEGIES ........................................... 16

THE INVESTMENT MANAGER, THE GENERAL PARTNER AND THE TEAM ............... 20

THE DIRECTORS ............................................................................................... 22

THE INVESTMENT MANAGEMENT AGREEMENT ..................................... 23

INCENTIVE ALLOCATION ............................................................................. 25

RISK FACTORS ................................................................................................. 26

CONFLICTS OF INTEREST ............................................................................. 44

EXPENSES ......................................................................................................... 48

THE OFFERING ................................................................................................. 49

REDEMPTIONS ................................................................................................. 52

NET ASSET VALUATION ................................................................................ 53

BROKERAGE AND TRANSACTIONAL PRACTICES ................................... 57

SUMMARY OF THE MATERIAL AGREEMENTS ......................................... 58

CERTAIN TAX CONSIDERATIONS ............................................................... 62

CAYMAN ISLANDS MUTUAL FUNDS LAW ............................................... 69

THE ADMINISTRATOR .................................................................................... 70

AUDITORS ......................................................................................................... 71

LEGAL COUNSEL ............................................................................................ 72

ADDITIONAL INFORMATION ........................................................................ 72

EXHIBIT A:  Form of Subscription Documents

DOCUMENTS SEPARATELY PROVIDED (IF APPLICABLE):

Supplemental Disclosure for Tax-Exempt U.S. Investors

## SUMMARY

The information set forth below is intended for quick reference only and is qualified in its entirety by reference to the more detailed information appearing under the applicable caption in the full text of this Memorandum or in other documents referred to herein.

### The Fund

**The Fund:**  Platinum Partners Value Arbitrage Fund (International) Limited (the "**Fund**") is an exempted company incorporated with limited liability under the laws of the Cayman Islands on October 25, 2002.

**The Intermediate Fund:**  The Fund is a shareholder of, and invests substantially all of its capital in, Platinum Partners Value Arbitrage Intermediate Fund Ltd. (the "**Intermediate Fund**"), an exempted company incorporated with limited liability under the laws of the Cayman Islands on April 9, 2010. Platinum Partners Value Arbitrage, LP, a Delaware limited partnership (the "**PPVA LP**"), is the manager of the Intermediate Fund. The general partner of PPVA LP is Platinum Partners Value Arbitrage (GP) Corp., a Delaware corporation. PPVA LP will be responsible for certain business affairs of the Intermediate Fund. The majority owner of PPVA LP is Mark Nordlicht.

The Intermediate Fund will issue shares to the Fund in classes and series that correspond to the classes and series of the Fund. In addition, the Intermediate Fund will issue Class M shares (the "**Class M Shares**") to PPVA LP. The Class M Shares are not subject to the Incentive Allocation or the Management Fee described below.

**The Master Fund:**  Platinum Partners Value Arbitrage Fund L.P. (the "**Master Fund**") is an exempted limited partnership formed under the laws of the Cayman Islands on December 17, 2002. The Intermediate Fund and Platinum Partners Value Arbitrage Fund (USA) L.P. ("**Platinum USA**"), a Delaware U.S.A. limited partnership, are currently the limited partners of the Master Fund. Other limited partners may be admitted to the Master Fund at future dates. In accordance with this "master-feeder" arrangement, the Master Fund serves as a vehicle for investing capital contributed by the Fund (through the Intermediate Fund) and Platinum USA for purposes of achieving the investment objectives of the Fund. The Intermediate Fund has invested substantially all of its capital in the Master Fund, but it may make investments outside the Master Fund when deemed appropriate for tax,

legal or regulatory reasons.

The Master Fund commenced operations as of January 1, 2003. The Master Fund's initial capital consisted of certain assets transferred from another investment fund managed by the General Partner (as defined herein) together with cash contributed by the Fund and Platinum USA.

**The Investment Manager:** The investment manager of the Fund, the Intermediate Fund, Platinum USA and the Master Fund is Platinum Management (NY) LLC, a Delaware U.S.A. limited liability company (the "**Investment Manager**"). The Investment Manager is responsible for managing, trading, investing and allocating the Fund's and the Master Fund's assets.

On January 1, 2011, Uri Landesman, the President of the Investment Manager, replaced Mark Nordlicht as the Manager of the Investment Manager. Mr. Landesman oversees all operations and risk management functions for the Investment Manager. Mr. Nordlicht remains the Chief Investment Officer and majority owner of the Investment Manager and will continue to be responsible for the day-to-day investment decisions regarding the Fund, the Intermediate Fund, Platinum USA and the Master Fund; provided that Mr. Landesman will have full veto power over any investment decisions.

**General Partner:** The Investment Manager also serves as the General Partner of the Master Fund (in its role as General Partner, the "**General Partner**").

**Directors:** The Fund's Board of Directors consists of David Bree, Don Seymour and Uri Landesman (the "**Directors**"). The Intermediate Fund's Board of Directors consists of the same individuals. Mr. Bree and Mr. Seymour are independent of the Investment Manager, and Mr. Landesman is the Manager of the Investment Manager.

**Administrator:** The Fund has retained SS&C Technologies, Inc. (acting through its business unit, SS&C Fund Services) (the "**Administrator**") to perform certain administrative, bookkeeping and registrar and transfer agency services.

**Investment Objective of the Fund:** The investment objective of the Fund is to achieve superior capital appreciation through its indirect investment in the Master Fund. The Master Fund is a multi-strategy hedge fund that seeks to achieve superior returns while attempting to minimize downside risk. The strategies that are employed by the Master Fund include,

but are not limited to, equity arbitrage, energy and power arbitrage, convertible arbitrage, long/short equity fundamental strategies, quantitative arbitrage, event-driven investing, receivables financing and asset-based lending strategies.

The General Partner may discontinue or limit the use of any of the foregoing strategies or pursue other strategies or employ other techniques it considers to be appropriate and in the Master Fund's best interest.  (See "*Investment Objective and Strategy*" herein.)   There can be no assurance that the investment objectives of the Fund, the Intermediate Fund or the Master Fund will be achieved, and investment results may vary substantially on a monthly and annual basis.  (See "*Risk Factors*" herein.)

To achieve its investment objectives, the Master Fund invests and trades in U.S. and non-U.S. equity and debt securities (both public and private); currencies, futures, forward contracts, and other commodity interests; options, swaps and other derivative instruments;  and other instruments and investments (collectively, "**Financial Instruments**").   Investments also may be made by the Master Fund in alternative investment funds that are managed by persons unrelated to the Investment Manager ("**Other Funds**").

The Investment Manager has granted trading authority over certain portions of the Master Fund's assets, and/or the assets of subsidiaries of the Master Fund that specialize in trading and/or investing in certain types of Financial Instruments, to individuals or entities who generally are independent contractors selected by the Investment Manager (the "**Portfolio Managers**") pursuant to written agreements.  The Investment Manager monitors the trading activities of the Portfolio Managers.   The Portfolio Managers chosen by the Investment Manager to trade the Master Fund's and/or the subsidiaries' assets generally are selected on the basis of their expertise in a particular style or area of investing.

Notwithstanding any of the foregoing, the Class L Shares (as defined below) will not participate in any profits or losses relating to the Master Fund's exposure to Banyon Investments LLC (the "**Banyon Investment**").  Please see "*Risk Factors – Banyon Investment*" for a description of the Banyon Investment.

**Certain Risks:**   An investment in the Fund is speculative and involves a high degree of risk, including the risk of loss of the entire

investment of a Shareholder (as defined below). These risks include, but are not limited to, the enhanced leverage inherent in the trading of commodities, the speculative nature of trading Financial Instruments, and the substantial charges which the Fund will incur, regardless of whether any profits are earned.

**Leverage:**   When deemed appropriate by the General Partner, the Master Fund will use leverage to effect its investment program. While leverage presents opportunities for increasing the total return on investments, it has the effect of potentially increasing losses as well. Accordingly, any event which adversely affects the value of an investment would be magnified to the extent that leverage is utilized. The cumulative effect of the use of leverage with respect to any investments in a market that moves adversely to such investments could result in a substantial loss which would be greater than if the investments were not leveraged. Leverage is inherent in the trading of commodities.

**Conflicts of Interest:**   Significant actual and potential conflicts of interest exist in the structure and operation of the Fund's business.

<u>Fees and Expenses</u>

**Management Fee:**   The Intermediate Fund pays the Investment Manager a monthly management fee equal to $1/12^{th}$ of 2.0% of the month-end net asset value of the Intermediate Fund (but not including the net asset value attributable to assets of the Class M Shares) before deduction of any Incentive Allocation (as defined below) and any distributions or redemptions made during the month (2% per annum), and after giving effect to other expenses as provided herein (including the Fund's expenses and the Intermediate Fund's pro rata share of the Master Fund's expenses) (the "**Management Fee**").

All or part of the Management Fee may be waived or reduced by the Investment Manager with respect to one or more Shareholders from time to time, in its sole discretion without notice to or the consent of the other Shareholders, including, in particular, during any wind-down of the Fund's business.

**Incentive Allocation:**   Under the Intermediate Fund's Memorandum and Articles of Association (together with the Fund's Memorandum and Articles of Association, as applicable and as amended from time to time, the "**Articles**"), an amount equal to, in the aggregate, 20% of the increase in Net Asset Value of each outstanding series within each class of the Intermediate Fund's shares (other than the Class M Shares and any other

classes of the Intermediate Fund's shares that are not subject to an Incentive Allocation) during each calendar year and any capital appreciation at the Fund level for such year, after taking into account any loss carryforwards applicable to each of such series and classes (i.e., after losses from all prior fiscal periods have been recouped), will be reallocated (the "**Incentive Allocation**") from the Net Asset Value of each series of each class of the Intermediate Fund's shares to the Net Asset Value of the Class M Shares (which are held by PPVA LP). The Net Asset Value of each corresponding series within each class of shares of the Fund will be reduced in turn as a result of the Incentive Allocation.

All or part of the Incentive Allocation may be waived by PPVA LP with respect to one or more Shareholders from time to time, in its sole discretion without notice to or the consent of the other Shareholders.

For purposes of calculating the Net Asset Value of the Intermediate Fund's shares in connection with the determination of the amount of the Incentive Allocation, the Intermediate Fund's pro rata share of the Master Fund's expenses and all expenses of the Fund will be taken into account.

An Incentive Allocation calculation will be made separately for each series of Shares purchased on each Offering Date (as defined below), even if purchased by the same Shareholder, as if such series were owned by different investors. Thus, any losses in respect of one series of Shares will not be netted against any gains in respect of another series of Shares.

No incentive allocation or asset-based fee will be allocated or paid to the General Partner by the Master Fund in its capacity as the general partner of the Master Fund.

**Organizational Expenses:**
Organizational expenses were borne by the Fund and were amortized over a period of 60 months. The Class L Shares will bear all of the organizational expenses attributable to the Class L Shares. Organizational expenses attributable to the Class L Shares are being amortized over a period not to exceed 60 months. While such amortization is not in accordance with U.S. generally accepted accounting principles ("**GAAP**"), which generally requires such expenses to be expensed when incurred, the Fund believes that amortizing these expenses is more equitable than requiring the initial Class L Shareholders to bear the entire cost of establishing the Class L Shares.

**Operating Expenses:** In addition to the Management Fee, the Class L Shares will bear their pro rata share of the Fund's ordinary and extraordinary expenses as well as their pro rata share of the Intermediate Fund's and the Master Fund's ordinary and extraordinary expenses. Such expenses may include, but are not limited to, fees for administrative services, entity-level taxes, investment expenses (e.g., brokerage commissions, interest expense and due diligence-related expenses including, without limitation, travel costs), legal expenses, compliance expenses, professional expenses (including, without limitation, consultants and experts), escrow expenses, insurance expenses (including, without limitation, director and officer liability insurance and error and omission liability insurance with respect to the activities of the Intermediate Fund, the Master Fund and the Investment Manager), accounting expenses, audit and tax preparation expenses, custodial fees, and any extraordinary expenses, such as indemnification of the Directors.

The Class L Shares of the Fund will also bear their pro rata share of the performance fees and/or allocations paid or allocated to Portfolio Managers and other persons who render services to the Master Fund or the Investment Manager.

A substantial portion of the compensation to Portfolio Managers will be in the form of fees and/or allocations based on the performance of their respective portfolios.

Notwithstanding any of the foregoing, the Class L Shares will not participate in any expenses related to the Banyon Investment, including, without limitation, the expenses of any litigations or other actions relating to the Banyon Investment. Please see "*Risk Factors – Banyon Investment*" for a description of the Banyon Investment.

The Offering

**Securities Offered:** The Fund is offering voting, participating and redeemable Class L shares, par value $0.01 per share ("**Class L Shares**" or the "**Shares**") to Eligible Investors (as defined below). Accepted subscribers for Class L Shares will become shareholders of the Fund (each, a "**Shareholder**" and collectively, the "**Shareholders**"). The Fund will also issue sub-classes of the Shares (each, a "**Sub-Class**") as described below.

In order to permit investments by the Master Fund in "new issues," as such term is defined by the Financial Industry Regulatory Authority ("**FINRA**"), the Fund is offering to

Eligible Investors different Sub-Classes of Shares. Restricted Persons, as defined in the Fund's Subscription Documents (as defined below), will receive a Sub-Class of Shares that participates in the aggregate (including all Restricted Persons) in only 10% of the profits, losses and costs associated with "new issues." Non-Restricted Persons will receive a separate Sub-Class of Shares.

The Fund may, as determined by the Directors, offer one or more new classes (each, a "**Class**") of Shares, having different terms with respect to the Management Fee, the Incentive Allocation, subscription and redemption provisions, voting and dividend rights, fees payable to service providers and in other respects from those offered hereby without notice to the existing Shareholders, unless the creation thereof would materially adversely affect the class rights of any such existing Shareholders, in which case consent will be required. Existing holders of Shares have no preemptive rights with respect to subsequent Classes or series of Shares.

Currently, the Fund has issued and outstanding Class A Shares, Class AN Shares, Class B Shares, Class I Shares, Class IN Shares, Class J Shares, Class J-E Shares, Class K Shares, Class KN Shares and Class O Shares (collectively, the "**Other Shares**"). Certain Classes of the Other Shares have no right to receive notice of, attend, speak or vote at general meetings of the Fund. The Other Shares are not the subject of this Memorandum.

**The Offering:** The Fund, generally, will offer Shares in series on the first Business Day (as defined below) of each calendar month, and at such other times as may be determined by the Directors (each, an "**Offering Date**"). A new series of Shares will be established by the Fund and issued on each Offering Date. Each series of Shares will be offered at the initial issue price of $1,000 per Share (the "**Offering Price**"). Shares will be issued in registered, book-entry form only.

The offering may be suspended or terminated at any time for any reason by the Directors. The issuance of Shares will be suspended for any period during which calculation of the Net Asset Value of the Fund has been suspended.

**Separate Series:** To facilitate equitable allocation of the Incentive Allocation by the Intermediate Fund to PPVA LP among investors purchasing Shares on different dates, the Fund will issue a different series of Shares at each Offering Date. The first series of Shares will be designated the

"**Initial Series**" and each subsequently issued series will be numbered sequentially.   As an internal accounting matter, the Directors will establish, in relation to each series, a "**Series Account**" to which the subscription monies received from the issue of Shares of that series will be allocated, together with investments and income, gains and losses derived therefrom.   Fund liabilities attributable to Class L Shares (except for any series-specific liabilities) will generally be allocated among the series of such Class L Shares proportionately and charged to the various Series Accounts.  The Articles permit the Fund to consolidate, by way of redemption, and reissue different series of Shares into a single series at the end of each fiscal year of the Fund; provided that the loss carryforward with respect to that series has been met.

| | |
|---|---|
| **Minimum Subscription:** | The minimum initial subscription for the Shares is $1,000,000 per subscriber, and existing Shareholders may subscribe for additional amounts with a minimum additional subscription of $100,000, or such lesser amounts as the Directors in their sole discretion may permit; provided that at no time shall a minimum initial investment of less than $50,000 be accepted. |
| **Subscription Procedure:** | In order to purchase Shares, a subscriber must (i) complete, execute and deliver to the Administrator the Subscription Documents in the form annexed hereto as Exhibit A (the "**Subscription Documents**") and (ii) pay the full amount of the subscription by arranging for a wire transfer pursuant to the instructions set forth in the Subscription Documents. |

In lieu of (i) above, existing Shareholders need only update any information in their original Subscription Documents that may have changed and deliver such information with a completed and signed Additional Subscription Request (which is attached to the Subscription Documents) to the Administrator.  Any subscriptions for Shares may be accepted or rejected, in whole or in part, in the discretion of the Fund or the Administrator on its behalf.   All subscriptions are irrevocable unless otherwise determined by the Directors in their sole discretion.  If a subscription request is not accepted, the subscription funds will be reimbursed to the subscriber.

All Subscription Documents must be received by the Administrator at least five Business Days before the requested Offering Date or such shorter period as the Administrator may determine.  Subscription funds must be

credited to the Fund's subscription account two Business Days before the requested Offering Date in order for a subscription to be accepted as of the requested Offering Date, unless the untimeliness is waived by the Directors, provided that no such waiver will occur after the fifth Business Day following the requested Offering Date. Pending acceptance of a subscription and issuance of Shares, subscription funds will be held in the Fund's subscription account at the Administrator. No interest will be paid on subscription amounts from the date of receipt until the subscription is accepted at an Offering Date.

**Placement of Shares:** The Shares are being offered directly by the Fund. There are no selling commissions payable from subscription amounts; however, with the consent of the Investment Manager and/or PPVA LP, as applicable, the Fund may elect to compensate one or more properly licensed persons with an amount equal to a portion of the Management Fee and/or the Incentive Allocation otherwise payable or allocable to the Investment Manager and PPVA LP, respectively.

**Suitability:** The Fund will accept subscriptions only from a limited number of sophisticated individuals and entities (collectively, "**Eligible Investors**") that are (i) Non-U.S. Persons, or (ii) U.S. Persons that are (a) exempt from U.S. income taxation (b) "accredited investors" within the meaning of Regulation D under the U.S. Securities Act of 1933, as amended, and (c) "qualified purchasers" under the U.S. Investment Company Act of 1940, as amended (the "**1940 Act**"). The Directors, in their sole discretion, may decline to admit any subscriber for any reason.

Liquidity

**Redemption of Shares:** Subject to certain restrictions described in this Memorandum, a Shareholder may redeem all or a portion of its Shares as of the last day of each fiscal quarter, and at such other times as the Directors will, in their sole discretion, permit (each, a "**Redemption Date**"), upon not less than sixty (60) days' prior written notice to the Administrator and the Investment Manager (subject to the discretion of the Directors to waive such notice). The redemption price for Shares will be based on the Net Asset Value per Share (as defined under "*Net Asset Valuation*" below) for the relevant series of Shares as of the relevant Redemption Date (which reflects accrued organizational and operational expenses of the Fund and the Fund's pro rata share of such expenses relating to the Intermediate Fund and the Master Fund, as well as any Incentive

Allocations allocable on redemption with respect to the redeemed Shares).

The Fund intends to pay at least ninety percent (90%) of the redemption price, and may pay more than ninety percent (90%) of the redemption price in the discretion of the Investment Manager in consultation with the Directors, within thirty (30) days after the applicable Redemption Date, with the balance thereof (subject to audit adjustments) being paid without interest within thirty (30) days after completion of the audit of the Fund's books for such fiscal year. Additionally, the right of any Shareholder to receive amounts upon a redemption of Shares may be subject to a holdback for the provision by the Directors for reserves for contingencies, including general reserves for unspecified contingencies (whether or not required by GAAP). Any amounts held back will be maintained with the general assets of the Fund and not segregated in a separate account.

Such payments may be made in cash and/or in kind. The Fund assets included in an in-kind distribution will be determined by the Investment Manager in its sole discretion and may not constitute a pro rata portion of either the Fund's entire portfolio or the Fund's illiquid positions. (See "*Net Asset Valuation*" herein.)

If a partial redemption would result in a Shareholder holding a number of Shares having an aggregate Net Asset Value of $250,000 or less (or such other minimum amount as may be determined by the Directors in their sole discretion), then the Fund will have the right either to (i) refuse to honor such request for a partial redemption or (ii) compel redemption of all such Shareholder's Shares.

After receiving notice of a redemption from a Shareholder, the Directors may, upon at least 24 hours' notice to the Shareholder (via email or otherwise), exercise their discretion pursuant to the Articles to determine the Redemption Date and redeem the relevant Shares at any time prior to the requested Redemption Date. For example, if a Shareholder gives notice on January 1 of its intention to redeem its Shares effective March 31, the Fund may give notice to the Shareholder that its Redemption Date will be brought forward to February 28 and pay redemption proceeds based on the Fund's Net Asset Value as of such date.

| | |
|---|---|
| **Suspension of Redemptions:** | The Fund will suspend redemption of its Shares during any period in which the calculation of the Net Asset Value of the Fund or the Net Asset Value per Share has been suspended.  (See "*Net Asset Valuation - Suspension of Calculation*" herein.) |
| **Mandatory Redemptions:** | The Fund may compulsorily redeem the Shares of any Shareholder at any time, for any reason or for no reason, in the sole discretion of the Directors.  (See "*Redemptions*" herein.)<br><br>This mandatory redemption right may be exercised by sending notice (including e-mail notice) to the Shareholder or any agent of the Shareholder listed in the Subscription Documents. |
| **Freezing Redemptions:** | If the Fund reasonably believes that a Shareholder is a "prohibited investor" as described in the Subscription Documents or has otherwise breached its representations and warranties to the Fund, the Fund may, following the redemption of Shares, freeze and segregate the redemption proceeds in accordance with applicable laws and regulations. |
| **Distributions:** | It is the present policy of the Fund to reinvest any dividends or other income it may receive through the Master Fund.  If the General Partner determines that the assets of the Master Fund exceed a size that can be effectively managed by the Master Fund in accordance with the Master Fund's investment strategies and objectives, the General Partner may elect to make distributions to the limited partners of the Master Fund, including to the Intermediate Fund.  Such distributions may be made in cash and/or in kind.  The Master Fund assets included in an in-kind distribution will be determined by the General Partner in its sole discretion and may not constitute a pro rata portion of either the Master Fund's entire portfolio or the Master Fund's illiquid positions.  It is anticipated that any such distributions to the Intermediate Fund from the Master Fund will in turn be distributed by the Intermediate Fund to the Fund by way of dividends and then distributed by the Fund by way of dividends to the Shareholders.  Except for such distributions, if any, Shareholders are not expected to receive current income on their Shares. |
| **Transfers:** | Shares are not transferable without the prior written consent of the Directors, which consent may be withheld in their sole discretion. |

| | |
|---|---|
| **Net Asset Valuation:** | The Net Asset Value of the Fund and the Net Asset Value of the Shares will be determined by the Administrator and calculated as of the close of business on the last Business Day of each month and on such other dates as may be determined by the Directors in their sole discretion. |
| **Regulatory Matters:** | The Investment Manager is registered with the U.S. Securities and Exchange Commission as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended, and accordingly has a chief compliance officer, a compliance manual and a code of ethics. |
| | The Investment Manager is not registered as a commodity pool operator with the U.S. Commodity Futures Trading Commission ("**CFTC**") pursuant to an exemption under CFTC Regulation § 4.13(a)(4) or as a commodity trading advisor. |
| | Neither the Fund, the Intermediate Fund nor the Master Fund is registered as an investment company under the 1940 Act. |
| **Brokerage and Custodial Arrangements:** | The Master Fund may execute and clear its transactions through a variety of brokers and clearing firms (together with all other brokers, the "**Brokers**"). |
| | Brokers will be selected by the Investment Manager on the basis of obtaining the best overall terms available, which the Investment Manager will evaluate based on a variety of factors, including the ability to achieve prompt and reliable executions at favorable prices, the operational efficiency with which transactions are effected, the quality of service, reputation, corporate access, the competitiveness of the commission rates, the securities lending arrangements available from the Broker, the Broker's ability to protect the Master Fund's trading patterns, positions and strategies from the broader market and the financial strength, integrity and stability of the Broker. |
| | The Investment Manager may receive "soft dollar" benefits that fall within the safe harbor of Section 28(e) of the U.S. Securities Exchange Act of 1934, as amended, as well as capital introduction benefits that may fall outside of Section 28(e). |
| **Tax Considerations:** | The Investment Manager intends to conduct the Fund's, the Intermediate Fund's and the Master Fund's businesses (including investments in loans, if any) in a manner such that none of the Fund, the Intermediate Fund and the Master Fund is engaged in a U.S. trade or business. There can be no assurance, however, that the U.S. Internal |

Revenue Service will agree that all of the Fund's, the Intermediate Fund's and the Master Fund's transactions will not constitute a U.S. trade or business, in which case the Fund would be subject to U.S. federal income and branch profits tax on its share of the income and gain from those activities and related activities, if any.  In addition, interest from U.S. sources earned on bank deposits and "portfolio interest" as defined under the U.S. Internal Revenue Code of 1986, as amended, are not subject to withholding for U.S. federal income tax.   However, dividend income and certain other interest from U.S. sources are subject to 30% withholding.

The Fund and the Intermediate Fund are exempted companies, and the Master Fund is an exempted limited partnership, under Cayman Islands law.  Each of the Fund and the Intermediate Fund has received an undertaking as to tax concessions pursuant to Section 6 of the Tax Concessions Law (Revised), and the Master Fund has received an equivalent undertaking pursuant to Section 17 of the Exempted Limited Partnership Law (Revised), which provides that, for a period of 20 years (or, in the case of the Master Fund, 50 years) from the date of issue of the undertaking, no law thereafter enacted in the Cayman Islands imposing any taxes or duty to be levied on income or capital assets, gains or appreciation will apply to any income or property of the Fund, the Intermediate Fund or the Master Fund.

There can be no assurance that the U.S. or Cayman Islands tax laws will not be changed adversely with respect to the Fund, the Intermediate Fund, the Master Fund or their investors, or that the Fund's, the Intermediate Fund's or the Master Fund's income tax status will not be successfully challenged by such authorities.

Potential shareholders should consult their own advisors regarding tax treatment by the jurisdiction applicable to them.  Shareholders should rely only upon advice received from their own tax advisors based upon their own individual circumstances and the laws applicable to them. (See "*Certain Tax Considerations*" herein.)

| | |
|---|---|
| **Reports to Shareholders:** | Shareholders will receive annual audited financial statements within 180 days of the fiscal year end or as soon as reasonably practicable thereafter. |
| **Fiscal Year:** | The fiscal year of the Fund ends on December 31. |

| | |
|---|---|
| **Business Day:** | Any day other than a day on which banking institutions or stock exchanges in New York, New York are authorized or obligated to close. |
| **Legal Counsel:** | Schulte Roth & Zabel LLP ("**SRZ**") serves as U.S. securities, commodities and tax counsel to the Fund, the Intermediate Fund, the Master Fund and the Investment Manager (collectively, the "**Platinum Parties**"). |
| | Walkers serves as Cayman Islands legal counsel to the Fund, the Intermediate Fund and the Master Fund. |
| | SRZ's representation of the Platinum Parties and their respective affiliates and Walkers' representation of the Fund, the Intermediate Fund, the Master Fund and their respective affiliates is limited to specific matters as to which they have been consulted by the Investment Manager.  There may exist other matters that could have a bearing on the Platinum Parties and their respective affiliates as to which they have not been consulted.  In addition, SRZ and Walkers do not undertake (nor do they intend) to monitor the compliance of the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth in this Memorandum, nor do they monitor compliance with applicable laws.  In their review of this Memorandum, SRZ and Walkers relied upon information furnished to them by the Investment Manager and its affiliates, and did not investigate or verify the accuracy and completeness of information set forth herein concerning the Platinum Parties and their respective affiliates and personnel. |
| | SRZ and Walkers do not represent any prospective investors in connection with the offering and will not be representing the Shareholders. |
| **Auditors:** | The Fund's independent auditor is BDO Tortuga, Cayman Islands. |
| **Additional Information:** | Requests for additional information should be directed to the Investment Manager or to the Administrator, whose respective contact information appears in the Directory. |
| **Use of this Memorandum:** | This Memorandum is important and should be read in its entirety before an investor decides whether to subscribe for any Shares in the Fund.  Each investor should consult with its financial, legal or tax advisers, as needed, before making an investment decision. |
| **Amendments:** | This Memorandum (including without limitation the investment strategy, Financial Instruments, risk factors, |

conflicts of interest, terms pursuant to which the Investment Manager provides its services, and terms of investment by Shareholders) may be amended or supplemented at any time and from time to time by the Directors in their sole discretion, subject either to the consent of the Shareholders or notice and an opportunity for such Shareholders to redeem their Shares without penalty, if applicable.

## INTRODUCTION

Platinum Partners Value Arbitrage Fund (International) Limited, a Cayman Islands exempted company (the "**Fund**"), has been organized to enable Eligible Investors (as defined below) to participate indirectly, through its ownership of shares of Platinum Partners Value Arbitrage Intermediate Fund Ltd., a Cayman Islands exempted company (the "**Intermediate Fund**"), and the Intermediate Fund's ownership of a limited partnership interest in Platinum Partners Value Arbitrage Fund L.P., a Cayman Islands exempted limited partnership (the "**Master Fund**"), in the investment objective of achieving capital appreciation by investing and trading in Financial Instruments (as defined below).  The investment manager of the Fund, Platinum Partners Value Arbitrage Fund (USA) L.P. ("**Platinum USA**"), the Intermediate Fund and the Master Fund is Platinum Management (NY) LLC, a Delaware U.S.A. limited liability company (the "**Investment Manager**").  The Investment Manager also serves as the general partner to the Master Fund (in such role, the "**General Partner**").  Platinum Partners Value Arbitrage, LP, a Delaware limited partnership ("**PPVA LP**"), is the manager of the Intermediate Fund.  The general partner of PPVA LP is Platinum Partners Value Arbitrage (GP) Corp., a Delaware corporation.  PPVA LP will be responsible for certain business affairs of the Intermediate Fund.

The Master Fund is a multi-strategy hedge fund that employs various investment strategies including but not limited to equity arbitrage, energy and power arbitrage, convertible arbitrage, long/short equity fundamental strategies, quantitative arbitrage, event-driven investing, receivables financing and asset-based lending strategies.

The Fund is a shareholder of the Intermediate Fund and invests substantially all of its capital in the Intermediate Fund.  The Intermediate Fund is a limited partner in the Master Fund and invests substantially all of its capital in the Master Fund.  The Master Fund pools the capital contributions of the Fund (through the Intermediate Fund) and Platinum USA, a Delaware U.S.A. limited partnership formed to permit participation by taxable U.S. investors, and invests such contributions in accordance with the investment objectives of the Master Fund.

## INVESTMENT OBJECTIVE AND STRATEGIES

### Investment Objective

The investment objective of the Fund is to achieve superior returns through its investment (through the Intermediate Fund) in the Master Fund.  The Master Fund is a multi-strategy hedge fund seeking to achieve superior returns while minimizing downside risk.  The strategies employed from time to time by the Master Fund include, without limitation, equity arbitrage, energy and power arbitrage, convertible arbitrage, long/short equity fundamental strategies, quantitative arbitrage, event-driven investing, receivables financing and asset-based lending strategies.

Every strategy employed by the Master Fund begins by identifying downside risk. Limiting downside exposure is an important objective of the Master Fund.  In this regard, the

Investment Manager employs a downside risk strategy that focuses on managing the Master Fund's portfolio with the goal of avoiding a significant net asset decline.

The Investment Manager believes that many of the Master Fund's strategies are unique in that it seeks to pursue niche strategies that are less commonly utilized by other market participants.

When employing strategies that may be considered widely used, such as quantitative and computerized arbitrage, the Investment Manager may do so in a proprietary manner such that, in the opinion of the Investment Manager, the Master Fund could have an advantage over other investors using similar strategies.  The Master Fund's Portfolio Managers (as defined below) have been selected on the basis of their experience in their respective trading strategies.  (See "*The Investment Manager, the General Partner and the Team*" herein.)

## Certain Investment Strategies

The following are among the investment strategies expected to be employed, directly or indirectly, by the Master Fund.

*Equity Arbitrage*.  The Master Fund may engage in various forms of equity arbitrage trading strategies, including, without limitation, long/short equity and event-driven.  Long/short equity trading typically uses fundamental research to identify equity securities that either should perform well (in which case the securities will be held long) or poorly (in which case the equities will be sold short).  Typically, the Portfolio Managers employing long/short equity techniques hold some combination of both long and short positions that will at least partly offset one another to minimize market risk.  Event-driven trading may include investments in long and short positions of listed and unlisted equities, convertible debt, options, futures, debt and warrants that the Investment Manager or a Portfolio Manager expects to profit from the occurrence of certain issuer-specific events.  These strategies may be fundamentally based or non-discretionary model driven.  In employing these strategies, the Master Fund seeks to avoid exposure to the direction of the broader markets.  The Master Fund may also engage in privately-negotiated equity transactions whereby the Master Fund will finance publicly traded companies through a private placement which typically consists of debt and/or equity.  In addition, most negotiated financings will offer downside protection to the Master Fund while also providing upside exposure through warrants, equity or debt that converts into equity.  The Master Fund may invest in special purpose acquisition companies when they are trading at a discount to the amount of cash per share they hold in escrow and a structural opportunity exists to realize the cash within a predetermined timeframe.

*Energy and Power Arbitrage*.  The Master Fund may engage in various energy trading strategies, including, without limitation, location arbitrage and volatility arbitrage.  These strategies may include investments in exchange-listed futures, options and options on futures contracts which are intended to profit from volatility spreads in the options markets of major world energy exchanges.  The Master Fund does not take large directional risk on movements in the energy markets but rather seeks to initiate various relative value strategies within these markets.  Strategy risks include volatility risks and position concentration risks.  Risks are managed by stress testing market moves and volatility moves to ensure risks are within strategy

risk limits.  In addition, risks are controlled by generally being net long options, often including long wing options thereby protecting against "event risk"

*Convertible Arbitrage*.  The Master Fund may engage in various forms of convertible arbitrage trading strategies.  Through these strategies, the Master Fund typically seeks to profit from fundamental research and exploit differences in the availability of capital in emerging market economies.   In addition, these strategies may utilize currency hedging techniques, including investment in futures and forward currency contracts which are intended to mitigate the Master Fund's exposure to foreign currency movements and country-specific political risk.  Furthermore, the Master Fund may provide capital to well established foreign companies seeking to raise capital for business purposes.  These investments will be secured by shares of the publicly-traded company.  The Master Fund typically structures the financing in a manner that best secures the collateral in accordance with the laws of the local jurisdiction.  It is anticipated that corporate executives or management of the foreign company will sell their equity holdings to the Master Fund at an agreed upon discount (pursuant to a sale and repurchase agreement) whereby the counterparty agrees to repurchase the equity for a set price on a specified date in the future.  If on any trading day the aggregate market value of equity holdings fall below a pre-agreed price, the counterparty is required to deliver sufficient additional shares to maintain the agreed upon purchase discount percentage.  If the repurchase price is not paid to the Master Fund when due, or if additional shares are not received as described above, the Master Fund may elect to sell the shares into the open market to realize its investment and anticipated return.

*Quantitative Arbitrage*.  The Master Fund may employ various non-discretionary quantitative arbitrage strategies that seek to exploit the occurrence of certain market phenomena in the equity, commodity, currency, and fixed income markets via the use of model-based investing strategies.   Such strategies may be executed via investments in futures, options, equities, exchange-traded funds and other securities or instruments.

*Asset-Based Lending*.  The Master Fund may employ various asset-based lending strategies that seek to profit from secured lending supported by assets in excess of the value of the debt, including, without limitation, asset-based convertible debt strategies, health care receivables strategies and legal finance strategies.  Asset-based convertible debt strategies may include privately negotiated investments in senior secured debt instruments convertible into underlying equity and/or collateral assets of public and private companies.  These investments generally have strong opportunities to participate in equity appreciation through warrants, conversion features, or free grants of stock that are part of the investment package. Health care receivables strategies may include investments in loans to companies acquiring professionally managed portfolios of medical accounts receivables. The portfolios may be enhanced through a proprietary methodology, to, in certain circumstances, collect upon the portfolios for a period of time, and then sell the enhanced portfolios at a profit.  Legal finance strategies may include investments in loans to companies acquiring pre-funded structured settlements secured by pre-funded cash in escrow.

*Other*.  The Master Fund is opportunistic and may also engage in other strategies and one-off opportunities in the sole discretion of the Investment Manager.

**Investment Techniques**

To achieve its investment objectives, the Master Fund invests and trades in U.S. and non-U.S. equity and debt securities (both public and private); currencies, futures, forward contracts, and other commodity interests; options, swaps and other derivative instruments; and other instruments and investments (collectively, "**Financial Instruments**").  Moreover, in order to implement the investment strategies of the Master Fund described above, the Investment Manager uses a variety of investment techniques.

The Master Fund may invest in options on stocks, bonds, currencies or market indices, thereby allowing the Master Fund to leverage its returns from specific Financial Instruments.  Options may also be used to hedge against, or profit from, sudden fluctuations in markets.  The level of cash and cash equivalents held by the Master Fund may vary from time to time and the Master Fund may also invest in longer-term debt instruments.  When deemed appropriate by the Investment Manager, the Master Fund may also invest in warrants, convertible securities, government securities, corporate bonds (both investment grade and high yield) and repurchase and reverse repurchase agreements.  The Master Fund is not limited in the types of Financial Instruments in which it may invest, the positions it may take (i.e., long or short), the use of leverage, or the concentration of its assets in particular investments.  Investments also may be made by the Master Fund in alternative investment funds that are managed by persons unrelated to the Investment Manager ("**Other Funds**").

The Investment Manager may also employ over-the-counter or forward contracts, or options on such contracts, in managing the investments of the Master Fund, which also involve the future purchase or sale of Financial Instruments, market indices or other commodities.  The Investment Manager may engage in short sales.  Such positions may be taken as part of a basic trading strategy or as hedging tools.  Such contracts may be traded on recognized futures exchanges or may be negotiated, or "over-the-counter," Financial Instruments.

The Master Fund may invest its excess funds in short-term investments, including U.S. Government securities, money market funds, commercial paper, certificates of deposit and bankers' acceptances.

The Investment Manager will have considerable flexibility in seeking the most profitable investment opportunities for the Master Fund.  Allocations of capital to Portfolio Managers and among investment strategies are subject to frequent change and there can be no assurances that the investment strategies described above will continue to be pursued by the Investment Manager.  Accordingly, the Master Fund may take advantage of opportunities in investment vehicles that are not presently contemplated for use by the Master Fund or that are not currently available to the extent such opportunities are both consistent with the Master Fund's investment objectives and legally permissible for the Master Fund.  This will allow the Master Fund to react to changes in the market and seek to capitalize on attractive opportunities that arise.

The investment objectives and policies summarized above represent the Investment Manager's current intentions.  Depending on conditions and trends in Financial Instruments markets and the economy generally, the Investment Manager may pursue other objectives or

employ other strategies and techniques it considers appropriate and in the best interest of the Master Fund.

The Master Fund's investment program is speculative and entails substantial risks. Because risks are inherent in all Financial Instrument investments to varying degrees, there can be no assurance that the investment objectives of the Master Fund will be achieved.  Some investment practices that may or will be employed by the Master Fund can, in certain circumstances, substantially increase the risks to which the Master Fund's investment portfolio is subject.  (See "*Risk Factors*" herein.)

## THE INVESTMENT MANAGER, THE GENERAL PARTNER AND THE TEAM

### The Investment Manager and the General Partner

Platinum Management (NY) LLC, a Delaware U.S.A. limited liability company, serves as the General Partner of the Master Fund and the Investment Manager of the Fund, the Intermediate Fund and the Master Fund.  The Investment Manager has full discretionary authority and responsibility to invest and re-invest the assets of the Fund, the Intermediate Fund and the Master Fund pursuant to an Investment Management Agreement among the Investment Manager, the Master Fund, Platinum USA, the Intermediate Fund and the Fund (the "**Investment Management Agreement**").  In addition, the Investment Manager is responsible for the selection of service providers in connection with the investment program of the Fund, Platinum USA, the Intermediate Fund and the Master Fund, and may also, from time to time, assist the Administrator in the calculation of the Net Asset Value per Share of the Fund (as defined below).

On January 1, 2011, Uri Landesman, the President of the Investment Manager, replaced Mark Nordlicht as the Manager of the Investment Manager.  Mr. Landesman oversees all operations and risk management functions for the Investment Manager.  Mr. Nordlicht remains the Chief Investment Officer and majority owner of the Investment Manager and will continue to be responsible for the day-to-day investment decisions regarding the Fund, the Intermediate Fund and the Master Fund; provided that Mr. Landesman will have full veto power over any investment decisions.

The Investment Manager is registered with the U.S. Securities and Exchange Commission ("**SEC**") as an investment adviser under the U.S. Investment Advisers Act of 1940, as amended (the "**Advisers Act**")**,** and accordingly has a chief compliance officer, a compliance manual and a code of ethics.

The Investment Manager is not registered with the U.S. Commodity Futures Trading Commission (the "**CFTC**") as a commodity pool operator pursuant to an exemption under CFTC Regulation § 4.13(a)(4) or as a commodity trading advisor.

Neither the Investment Management Agreement nor the Memorandum and Articles of Association of the Fund and the Intermediate Fund, as amended from time to time (as applicable, the "**Articles**"), restricts the Investment Manager or its members, principals, officers, employees

and affiliates (such members, principals, officers, employees and affiliates, collectively, the "**Affiliates**") from entering into other investment advisory relationships or engaging in other business activities with other investment funds (which may or may not have similar investment strategies and objectives and compensation arrangements as the Fund, the Intermediate Fund or the Master Fund) even though such activities may be in competition with the Fund, the Intermediate Fund or the Master Fund and/or may involve substantial amounts of the General Partner's, the Investment Manager's or their Affiliates' time and resources.  (See "*Risk Factors*" and "*Conflicts of Interest*" herein.)

## The Team

**Mark Nordlicht**
**Chief Investment Officer**

Mr. Nordlicht has over 20 years of experience in the investment industry and is responsible for oversight of all trading, asset allocation and risk management on behalf of the Platinum-managed funds.  Mr. Nordlicht founded Platinum Energy Resources and Platinum Diversified Mining, publicly traded oil & natural gas and mining companies, respectively.  Mr. Nordlicht is also the founder and served as non-executive Chairman of Optionable, Inc., a brokerage firm for energy options, until May 1, 2007.  From 1997 to 2001, Mr. Nordlicht was a founder and managing partner of West End Capital, a New York-based money management firm.  In 1991, Mr. Nordlicht founded Northern Lights Trading and was its general partner until 2000.  Northern Lights Trading was a proprietary options firm based in New York which employed traders in the cotton, coffee, natural gas, crude oil, gold, and silver option trading pits. Mr. Nordlicht graduated from Yeshiva University with a B.A. in Philosophy.

**Uri Landesman**
**President**

Uri Landesman has become the President of the Investment Manager effective as of April 2010 and the Manager of the Investment Manager effective as of January 1, 2011.

Mr. Landesman has over 26 years of experience in the investment industry and shares responsibility with Mr. Nordlicht for all trading, asset allocation and risk management on behalf of the Platinum-managed funds.  Most recently, Mr. Landesman spent 4 years at ING Investment Management, where he was Head of Global Growth and Chief Equity Strategist and managed and oversaw $3.5 billion in assets.  From 2000 to 2002, Mr. Landesman was Director of Global Research and Head of International Equities at Federated Investments.  Prior to working at Federated Investments, Mr. Landesman spent 2 years as a Partner at Arlington Capital, a Long/Short Equity hedge fund.  From 1993 to 1999, Mr. Landesman worked at JP Morgan Investment Management as a Senior Portfolio Manager in US large cap growth and as an Analyst in Technology Media Telecom.  From 1988 to 1992, Mr. Landesman was an Analyst at Great Lakes Capital, an Event Driven investment partnership.  He began his career at Sanford C. Bernstein & Company in 1985 as a materials and energy analyst.  Mr. Landesman graduated *summa cum laude* from Yeshiva University with a B.A. in Psychology.

*The Portfolio Managers.*  The Investment Manager has granted trading authority over certain portions of the Master Fund's assets, and/or the assets of subsidiaries of the Master Fund that specialize in trading and/or investing in certain types of Financial Instruments, to individuals or entities who generally are independent contractors selected by the Investment Manager (the "**Portfolio Managers**") pursuant to written agreements.  The Investment Manager monitors the trading activities of the Portfolio Managers.  The Portfolio Managers chosen by the Investment Manager to trade the Master Fund's and/or the subsidiaries' assets generally are selected on the basis of their expertise in a particular style or area of investing.  Each Portfolio Manager's compensation is linked to the performance of his or its respective trading portfolio, and certain Portfolio Managers may also receive a fixed draw or payment at the discretion of the Investment Manager.  Certain Portfolio Managers conduct their trading activities on the premises of the Investment Manager, while others operate independently outside of the Investment Manager's principal office.  Onsite Portfolio Managers are provided access to the Investment Manager's computers, research, software and other trading tools as necessary or desirable to implement their trading strategies.

## THE DIRECTORS

The Directors are responsible for the overall management and control of the Fund and the Intermediate Fund in accordance with the Articles, as applicable, and, subject to certain restrictions, may exercise all the powers of the Fund and the Intermediate Fund, including all borrowing powers.  The Directors are not responsible, however, for the day-to-day operations and administration of the Fund or the Intermediate Fund, nor are they responsible for making or approving any investment decisions, having delegated the investment responsibilities to the Investment Manager pursuant to the Investment Management Agreement and having delegated the day-to-day administrative functions to the Administrator pursuant to the Administration Agreement (each as defined below) in accordance with the powers of delegation as set out in the Articles.

The Directors of the Fund and the Intermediate Fund are David Bree, Don Seymour and Uri Landesman.  Messrs. Bree and Seymour are paid standard fees for their service as Directors, and they serve as Directors in a non-executive capacity.  Mr. Landesman does not receive a fee for serving as a Director.  Other Directors may also be hired and compensated in the future without the prior approval of the Shareholders (as defined below).  Biographical information concerning Mr. Bree and Mr. Seymour is set forth below.  Biographical information concerning Mr. Landesman is set forth above.

*David Bree*.  David Bree is a Managing Director of dms Management Ltd., a company management firm, licensed and regulated under the laws of the Cayman Islands, whose principals are focused on providing independent directors to investment companies.

Previously, he was the General Manager of Admiral Administration Ltd., an independent mutual fund administration firm in the Cayman Islands.

Prior to that, he was a Managing Director of International Fund Administration Ltd. in Bermuda.  His previous experience includes internal audit experience with a Fortune 500 company and public accounting experience with Coopers & Lybrand, New York.

He holds a BS degree in Accounting from New York University and is qualified as a Certified Public Accountant in the State of New York.

*Don Seymour*.   Don Seymour is a Managing Director of dms Management Ltd. a company management firm, licensed and regulated under the laws of the Cayman Islands, whose principals are focused on providing independent directors to investment companies.  He is a previous Director of the Cayman Islands Monetary Authority, an independent government agency responsible for the regulation of the financial services industry and of Cayman Airways Limited, the national airline of the Cayman Islands. He is a Notary Public and a previous member of the Trade & Business Licensing Board of the Cayman Islands.

Prior to founding dms Management Ltd., he was the Head of the Investment Services Division of the Cayman Islands Monetary Authority where he directed the authorization, supervision and enforcement of regulated mutual funds under the Mutual Funds Law and the supervision of company managers under the Companies Management Law of the Cayman Islands.

Prior to that, he was a Manager in Audit and Business Advisory Services with Price Waterhouse, where he was responsible for serving major investment management clients.

He holds a BBA degree in Accounting from the University of Texas at Austin and qualified as a Certified Public Accountant in the State of Illinois.

The Articles do not stipulate a retirement age for the Directors and do not provide for retirement of the Directors by rotation.  There is no shareholding qualification for the Directors.

Any Director may hold any other office in connection with the Fund or the Intermediate Fund in conjunction with his office of Director on such terms as to tenure of office and otherwise as the Directors may determine.  Any Director may also act in a professional capacity and he or its firm will be entitled to remuneration for such services as if he or it were not a Director.  A Director may contract with the Fund or the Intermediate Fund provided that the Director declares his or its interest or gives notice of his or its interest as soon as practicable after the Director obtains such interest.

The Articles contain provisions for the limitation of liability and the indemnification of each of the Directors and officers of the Fund and the Intermediate Fund by the Fund or the Intermediate Fund, as applicable, in the absence of willful default or gross negligence, against any loss or liability incurred by any Director or officer by reason of such Director or officer being or having been such a Director or officer.  Further provisions regarding the Directors are included in the Articles.

## THE INVESTMENT MANAGEMENT AGREEMENT

The Investment Management Agreement grants the Investment Manager full investment discretion and authority to manage, invest and re-invest the Master Fund's, Platinum USA's, the Intermediate Fund's and the Fund's assets.  The Investment Manager is responsible for the selection of service providers in connection with the investment program of the Master Fund,

Platinum USA, the Intermediate Fund and the Fund and may also, from time to time, assist the Administrator in the calculation of the Net Asset Value per Share (as defined below) of the Fund.

The Intermediate Fund pays the Investment Manager a monthly management fee equal to 1/12th of 2.0% of the month-end net asset value of the Intermediate Fund (but not including the net asset value attributable to assets of the Class M Shares) before deduction of any Incentive Allocation (as defined below) and any distributions or redemptions made during the month (2% per annum), and after giving effect to other expenses as provided herein (including the Fund's expenses and the Intermediate Fund's pro rata share of the Master Fund's expenses) (the "**Management Fee**").  All or part of the Management Fee may be waived or reduced by the Investment Manager with respect to one or more Shareholders from time to time, in its sole discretion without notice to or the consent of the other Shareholders, including, in particular, during any wind-down of the Fund's business.

The Investment Management Agreement may be terminated by any party thereto upon 30 days' written notice to the other parties.

The Investment Management Agreement contains exculpation and indemnification provisions that benefit the IMA Indemnified Persons (as defined below), but, under applicable law, the Shareholders have certain rights and causes of action that may not be waived.  Such non-waivable rights and causes of action may include, among others, claims for violations of the Advisers Act; claims for material misstatements and omissions in this Memorandum; claims under the anti-fraud provisions of the federal securities laws; and certain claims arising under state law.  The Investment Management Agreement provides that the Investment Manager and each of its Affiliates, consultants, independent contractors and agents (each, an "**IMA Indemnified Person**") who was or is made a party to, or is threatened to be made a party to, or is involved in, will not be liable for, and will be indemnified by each of the Fund, the Intermediate Fund and the Master Fund from and against any and all losses, claims, damages, liabilities (joint and/or several), expenses, judgments, fines, settlements and other amounts ("**Losses**") that relate to any threatened, pending or contemplated action, suit or proceeding, whether civil or criminal, administrative, arbitrative or investigative (each, a "**Proceeding**") or any appeal in or from any Proceeding, relating to such IMA Indemnified Person's performance or participation in the performance of duties or the rendering of advice or consultation with respect thereto, or that relate to, the Fund, the Intermediate Fund, the Master Fund, their business or their affairs except to the extent those Losses arise from actions or failures to have constituted gross negligence or a willful violation of law by the IMA Indemnified Person.  Notwithstanding the foregoing, as an additional level of protection for the Class L Shares, the Investment Manager has agreed to indemnify the Class L Shares with respect to any direct losses they may suffer as a result of the assets of the Participating Classes not being sufficient to satisfy any liabilities of the Fund and/or the Master Fund resulting from the Banyon Investment (each as defined below).

The Investment Management Agreement may not be assigned by the Fund, Platinum USA, the Intermediate Fund or the Master Fund, on the one hand, or the Investment Manager, on the other, without the consent of the other, except that the Investment Manager may, without consent, assign its rights under the Investment Management Agreement to and cause its obligations under that agreement to be assumed by, in whole or in part, one or more persons or entities who control, are controlled by, or are under common control with the Investment

Manager or the person or persons who control the Investment Manager immediately prior to such assignment so long as that transaction or act does not constitute an "assignment" within the meaning of the Advisers Act or other similar law applicable to the Investment Manager.

## INCENTIVE ALLOCATION

Under the Intermediate Fund's Articles, an amount equal to, in the aggregate, 20% of the increase in Net Asset Value of each outstanding series within each class of the Intermediate Fund's shares (other than its Class M Shares (the "**Class M Shares**")) and any other classes of the Intermediate Fund's shares that are not subject to an Incentive Allocation) during each calendar year and any capital appreciation at the Fund level for such year, after taking into account any loss carryforwards applicable to each of such series and classes (i.e., after losses from all prior fiscal periods have been recouped), will be reallocated (the "**Incentive Allocation**") from the Net Asset Value of each series of each class of the Intermediate Fund's shares to the Net Asset Value of the Class M Shares (which are held by PPVA LP).  The Net Asset Value of each corresponding series within each Class (as defined below) of Shares of the Fund will be reduced in turn as a result of the Incentive Allocation.  All or part of the Incentive Allocation may be waived by PPVA LP with respect to one or more Shareholders from time to time, in its sole discretion without notice to or the consent of the other Shareholders.  For purposes of calculating the Net Asset Value of the Intermediate Fund's shares in connection with the determination of the amount of the Incentive Allocation, the Intermediate Fund's pro rata share of the Master Fund's expenses and all expenses of the Fund will be taken into account.

An Incentive Allocation calculation will be made separately for each series of Shares purchased on the first Business Day of each calendar month, and such other times the Directors determine to offer a Class of shares, even if purchased by the same Shareholder, as if such series were owned by different investors.  Thus, any losses in respect of one series of Shares will not be netted against any gains in respect of another series of Shares.  Therefore, an Incentive Allocation may be allocable as to a series of Shares even though the investor may be in an overall loss position with respect to his aggregate investment in the Fund.  In addition, because losses in respect of one series of Shares are not offset against gains from any other series of Shares that may be held by the same investor, allocation of an Incentive Allocation in respect of any one series of Shares will not be affected by losses in respect of another series of Shares. Consequently, an investor may be subject to a greater Incentive Allocation than would otherwise be the case if losses incurred in respect of one series of Shares held by the investor were to be applied against the gains obtained by the investor in respect of one or more other series of Shares held by such investor.

No incentive allocation or asset-based fee will be paid or allocated to the General Partner by the Master Fund in its capacity as the general partner of the Master Fund.

With respect to periods prior to 2010, the Fund paid an incentive fee to the Investment Manager.  The Investment Manager elected to defer receipt of certain incentive fees owed to it. The Investment Manager will be paid such deferred amounts by the Fund at the end of the deferral period plus or minus an amount equal to the return that would be earned on such deferred amounts if they were invested in the Fund.

## RISK FACTORS

*There is a high degree of risk associated with the purchase of Shares of the Fund, and any such purchase should be made only after consultation with independent qualified sources of investment, legal and tax advice.  No investor should consider subscribing for more than such investor can comfortably afford to lose*.

The identification of attractive investment opportunities is difficult and involves a significant degree of uncertainty.  Returns generated from the Fund's investments may not adequately compensate Shareholders for the business and financial risks assumed.  The Fund will be subject to market risks common to investing in all types of Financial Instruments, including market volatility.  Subscribers should consider the following risks before subscribing for Shares.

### Investment Risks

#### Investment and Trading Risks in General

An investment in any type of Financial Instrument bears the risk of loss of capital.  As with any investment approach or strategy, no assurances can be given that the Investment Manager's strategy and methodology will be successful or that the Fund's or the Master Fund's investment objective will in fact be realized.  Any past success with any strategy or methodology cannot assure future results.

#### General Economic and Market Conditions

The success of the Master Fund's activities will be affected by general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws (including laws relating to taxation of the Master Fund's investments), trade barriers, currency exchange controls, and national and international political circumstances (including wars, terrorist acts or security operations).  These factors may affect the level and volatility of securities prices and the liquidity of the Master Fund's investments.  Volatility or illiquidity could impair the Master Fund's profitability or result in losses.  The Master Fund may maintain substantial trading positions that could be adversely affected by the level of volatility in the financial markets; the larger the positions, the greater the potential for loss.

#### Availability of Investments; No Assurance of Investment Return

The task of the Investment Manager of: (i) identifying and evaluating investment opportunities, including the best entry point to invest in an asset, (ii) managing such investments and (iii) realizing a return for investors, is difficult.   In addition to the volatility and unpredictability of the markets, certain markets in which the Master Fund may invest are very competitive for attractive investment opportunities and, as a result, there may be reduced investment returns.   Many firms competing with the Fund and the Master Fund have substantially greater financial resources and research staff.  A number of organizations operated by persons of competence and integrity have been unable to make, manage and realize such

investments successfully.  There is no assurance that the Master Fund will be able to invest its capital on attractive terms or generate the desired returns for the Shareholders.

## Availability and Accuracy of Public Information

The Investment Manager selects investments for the Master Fund, in part, on the basis of information and data filed by issuers with various government regulators or made available to the Investment Manager by the issuers or through sources other than the issuers.  Although the Investment Manager evaluates all such information and data and may seek independent corroboration when the Investment Manager considers it appropriate and when independent corroboration is reasonably available, the Investment Manager often will not be in a position to confirm the completeness, genuineness or accuracy of such information and data, and in some cases, complete and accurate information is not available.  Investments may not perform as expected if information is inaccurate.

## Misrepresentation

Of paramount concern with respect to certain types of investment activities is the possibility of material misrepresentation or omission on the part of a counterparty.  Such inaccuracy or incompleteness may adversely affect the valuation of an asset on behalf of the Master Fund.  The Master Fund relies upon the accuracy and completeness of representations made to counterparties to the extent reasonable, but cannot guarantee that such representations are accurate or complete.  Under certain circumstances, payments to the Master Fund may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment.

## Equity Risks

The Master Fund expects to invest in equity and equity derivative securities.  The value of these Financial Instruments generally will vary with the performance of the issuer and movements in the equity markets.  As a result, the Master Fund may suffer losses if it invests in equity securities of issuers whose performance diverges from the Investment Manager's expectations or if equity markets generally move in a single direction and the Master Fund has not hedged against such a general move.  In its equity derivatives and private placements businesses, the Master Fund is exposed to risks that issuers will not fulfill their contractual obligations to the Master Fund, such as delivering marketable common stock upon conversions of convertible securities and registering restricted securities for public resale.

## Private Placements and Unregistered Securities

The Master Fund may invest in equity, convertible securities and fixed income obligations, the disposition of which may be restricted under applicable U.S. securities laws. Whether or not so restricted, the market to resell such securities may be illiquid.  Therefore, such investments may be required to be held for a lengthy period of time or, if the Master Fund were forced to liquidate its position in such securities, such liquidation may be taken at a substantial discount to the underlying value or result in the entire loss of the value of such investment.

Certain private investments made by the Master Fund will share many of the same risk characteristics as venture capital investing, offering the opportunity for significant gains, but also involving a high degree of risk, including the complete loss of capital. Among these risks are the general risks associated with investing in companies operating at a loss or with substantial variations in operating results from period to period and investing in companies with the need for substantial additional capital to support expansion or to achieve or maintain a competitive position. Such companies may face intense competition, including competition from companies with greater financial resources, more expansive development, manufacturing, marketing and service capabilities, and a greater number of qualified managerial and technical personnel. The Master Fund may invest in the form of equity or "equity-linked" securities. As a result, the rights or claims of the Master Fund may be subordinate to those of other parties, including debt or senior equity holders, in the event of the failure of any portfolio company. Portfolio companies may be thinly traded and under-capitalized and therefore may be more sensitive to adverse business or financial developments. In the event that a portfolio company is unable to generate sufficient cash flow or raise additional equity capital to meet its projected cash needs, the value of the Master Fund's investment in such portfolio company could be significantly reduced or lost entirely.

## Trading in Financial Instruments May be Illiquid

Certain investment positions of the Master Fund may be highly illiquid. The investment strategies of the Investment Manager may require that the Master Fund invest in Financial Instruments for which no secondary markets exist and for which none are expected to develop. The Master Fund may invest in trade receivables, derivative contracts, bank debt, interests in legal claims, bonds and other securities, whether publicly traded or issued in a private placement, of financially troubled companies as well as illiquid over-the-counter securities, non-publicly traded securities, mortgage-backed securities and securities traded on foreign exchanges. Futures positions may be illiquid as described below under "*Risk Factors--Trading in Commodities, Futures and Options.*"

## Trading in Commodities, Futures and Options

The Master Fund may purchase futures or options contracts. Substantially all trading in commodities and futures has as its basis a contract to purchase or sell a specified quantity of a particular asset for delivery at a specified time, although certain Financial Instruments, such as market index futures contracts, may be settled only in cash based on the value of the underlying composite index. Futures trading involves trading in contracts for future delivery of standardized, rather than specific, lots of particular assets.

(i)     *Volatility*: Futures prices are highly volatile. Price movements for the futures contracts which the Master Fund may trade are influenced by, among other things, changing supply and demand relationships, government, trade, fiscal, and economic events, and changes in interest rates. Governments from time to time intervene, directly and by regulation, in certain markets, often with the intent to influence prices directly.

(ii)     *Position Limits*: The CFTC has jurisdiction to establish, or cause exchanges to establish, position limits with respect to all commodities traded on exchanges located in the U.S.

and may do so, and any exchange may impose limits on positions on that exchange. No such limits presently exist in the forward contract market or on certain non-U.S. exchanges. Insofar as such limits do exist, all commodity accounts (including the Master Fund's accounts) owned, held, controlled or managed by the Investment Manager may be combined (that is, aggregated) for position limit purposes. The existence of these limits may reduce the liquidity of the Master Fund's positions.

(iii)   *Price Limits*:   U.S. commodity exchanges may limit fluctuations in futures contracts prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits."   In addition, even if futures prices have not moved the daily limit, the Investment Manager may not be able to execute futures trades at favorable prices if little trading in such contracts is taking place (a "thin" market).

(iv)   *Margin*:   Futures are typically traded on "margin." The "margin" is the amount of escrow or performance bond deposit that the Master Fund will have to make and maintain with its futures commission merchants (futures brokers) to secure its future obligation to close out open positions. The initial margin requirements may be satisfied by the deposit of cash (or, in some U.S. markets, certain U.S. Government obligations). The open positions must be "marked to market" daily, requiring additional margin deposits if the position reflects a loss that reduces the Master Fund's equity below the level required to be maintained and permitting release of a portion of the deposit if the position reflects a gain that results in excess margin equity. The level of margin that must be maintained for a given position is sometimes subject to increase, requiring additional cash outlays. In the futures markets, margin deposits are typically low relative to the value of the futures contracts purchased or sold. Such low margin deposits are indicative of the fact that any futures contract trading typically is accompanied by a high degree of leverage. Because margin requirements normally range upward from as little as 2% or less of the total value of the contract, a comparatively small commitment of cash or its equivalent may permit trading in futures contracts of substantially great value. As a result, price fluctuations may result in a contract profit or loss that is disproportionate to the amount of funds deposited as margin. Such a profit or loss may materialize suddenly, since the prices of futures frequently fluctuate rapidly and over wide ranges, reflecting both supply and demand changes and changes in market sentiment.

(v)   *Size of the Fund's Account*:   Depending upon the size of the Master Fund's account, it may be difficult or impossible for the Investment Manager to take or liquidate a position in a particular commodity, method or strategy due to the size of the accounts which may be managed by the Investment Manager.

**Leverage; Interest Rates; Margin**

The Investment Manager intends to borrow funds on behalf of the Master Fund and expects that the Master Fund's investment portfolio will be highly leveraged in order to be able to increase the amount of capital available for marketable securities investments. The Investment Manager intends to also leverage the Master Fund's investment return with margin, options, commodity futures contracts, short sales, swaps, forwards and other derivative instruments. Certain over-the-counter ("**OTC**") securities require no margin to be deposited. In addition, in some cases, variation margin is not bilateral, whereby the Master Fund may, in a

leveraged transaction, be required to pay variation margin to one party but receive no variation margin from the other party. The amount of borrowings which the Master Fund may have outstanding at any time may be large in relation to its capital. Consequently, the level of interest rates, generally, and the rates at which the Master Fund can borrow, in particular, will affect the operating results of the Master Fund.

In general, the Master Fund's anticipated use of short-term margin borrowings results in certain additional risks to the Master Fund. For example, should the securities pledged to brokers to secure the Master Fund's margin accounts decline in value, the Master Fund could be subject to a "margin call," pursuant to which the Master Fund must either deposit additional funds with the broker, or suffer mandatory liquidation of the pledged securities to compensate for the decline in value. In the event of a sudden precipitous drop in the value of the Master Fund's assets, the Master Fund might not be able to liquidate assets quickly enough to pay off its margin debt.

The Master Fund may sell ("write") exchange-traded options on commodity futures contracts. The Master Fund is required to post margin with a clearing member of the appropriate clearing corporation. The amount of minimum margin is generally computed using a "SPAN" analysis to determine minimum requirements or is increased after being subjected to further risk analysis by the clearing member. The Master Fund may also trade OTC options. Whether any margin deposit will be required for OTC options will depend on the credit determinations and agreement of the parties to the transaction.

## Short Selling

The Investment Manager will engage in short selling for the Master Fund when deemed appropriate to its investment strategy. This practice may include situations where the Investment Manager believes, on the basis of its research and analysis, that the relevant security is overvalued, or that supply of such security is greater than that likely to be absorbed by current or future demand. The Investment Manager may also use short selling in an effort to limit the exposure of the Master Fund's portfolio or particular positions to price declines or fluctuations. Selling securities short involves selling securities that the Master Fund does not own. In order to make delivery to its purchaser, the Master Fund must borrow securities from a third-party lender. The Master Fund subsequently returns the borrowed securities to the lender by delivering to the lender securities purchased in the open market. Short selling inherently involves certain additional risks. Selling securities short creates the risk of losing an amount greater than the initial investment in a relatively short period of time and the theoretically unlimited risk of an increase in the market price of the securities sold short. Short selling can also involve significant borrowing and other costs, which can reduce the profit or create losses in particular positions.

## Hedging Transactions

The Master Fund may engage in short sales and utilize derivative instruments such as options, futures, forward contracts, interest rate swaps, caps and floors, both for investment purposes and to seek to hedge against fluctuations in the relative values of the Master Fund's portfolio positions. Hedging against a decline in the value of a portfolio position does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such

positions decline, but establishes other positions designed to gain from those same developments, thus potentially moderating the decline in the value of positions held in the portfolio. Such hedge transactions also limit the opportunity for gain if the value of a portfolio position should increase. Moreover, it may not be possible for the Master Fund to hedge against an exchange rate or interest rate fluctuation that is so generally anticipated that the Master Fund is not able to enter into a hedging transaction at a price sufficient to protect the Master Fund from the decline in value of the portfolio position anticipated as a result of such a fluctuation.

The success of the Master Fund's hedging transactions will be subject to the Investment Manager's ability to correctly assess the relationships between groupings of securities within the Master Fund's portfolio, as well as, in the case of hedges designed to address currency exchange rate and interest rate fluctuations, to correctly predict movements in the direction of such rates. Therefore, while the Master Fund may enter into such transactions to seek to reduce market currency exchange rate and interest rate risks, incorrect assessments of relationships between groupings of securities and unanticipated changes in currency or interest rates may result in less favorable overall performance for the Master Fund than if it had not engaged in any such hedging transactions. In addition, the degree of correlation between price movements of the instruments used in a hedging strategy and price movements in the portfolio position being hedged may vary. Moreover, for a variety of reasons, the Investment Manager may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged. Such imperfect correlation may prevent the Master Fund from achieving the intended hedge or expose the Master Fund to risk of loss. The successful utilization of hedging and risk management transactions requires skills complementary to those needed in the selection of the Master Fund's portfolio holdings.

## Speculative Positions Limits

The CFTC and certain commodity exchanges have established limits referred to as "speculative position limits" or "position limits" on the maximum net long or net short position which any person or group of persons may hold or control in particular futures and options. Limits on trading in options contracts also have been established by the various options exchanges and the U.S. Financial Industry Regulatory Authority ("**FINRA**"). The Investment Manager believes that established position limits will not adversely affect the Master Fund's contemplated trading. However, it is possible that the trading decisions of the Master Fund may have to be modified and that positions held by the Master Fund may have to be liquidated in order to avoid exceeding such limits. Such modification or liquidation, if required, could adversely affect the operations and profitability of the Master Fund.

## Non-U.S. Investments

The Master Fund may invest in non-U.S. or U.S. securities denominated in foreign currencies and/or traded outside of the U.S. Such investments require consideration of certain risks typically not associated with investing in U.S. securities or property. Such risks include, among other things, trade balances and imbalances and related economic policies, unfavorable currency exchange rate fluctuations, imposition of exchange control regulation by the U.S. or foreign governments, the imposition of withholding or other taxes on dividends, interest, capital gains, other income or gross sale or disposition proceeds, limitations on the removal of funds or

other assets, policies of governments with respect to possible nationalization of their industries, political difficulties, including expropriation of assets, confiscatory taxation and economic or political instability in foreign nations.

There may be less publicly available information about certain foreign companies than would be the case for comparable companies in the U.S., and certain foreign companies may not be subject to accounting, auditing and financial reporting standards and requirements comparable to or as uniform as those of U.S. companies.  Securities markets outside the U.S., while growing in volume, have, for the most part, substantially less volume than U.S. markets, and many securities traded on these foreign markets are less liquid and their prices more volatile than securities of comparable U.S. companies.  In addition, settlement of trades in some non-U.S. markets is much slower and more subject to failure than in U.S. markets.  There also may be less extensive regulation of the securities markets in particular countries than in the U.S.

Additional costs could be incurred in connection with the Master Fund's international investment activities.  Foreign brokerage commissions and trading costs are generally higher than in the U.S.  Expenses also may be incurred on currency exchanges when the Master Fund changes investments from one country to another.  Increased custodian costs as well as administrative difficulties (such as the applicability of foreign laws to foreign custodians in various circumstances, including bankruptcy, ability to recover lost assets, expropriation, nationalization and record access) may be associated with the maintenance of assets in foreign jurisdictions.

## **Forward Trading**

The Master Fund may trade forward contracts in the U.S. and in markets (including interbank markets) located outside the U.S.  Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis.  Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable.  In such a case, the Master Fund will be subject to the risk that a counterparty will be unable, or refuse, to perform with respect to such contracts.  The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration.  There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell.  Disruptions can occur in any market traded by the Master Fund due to unusually high trading volume, political intervention or other factors.  The imposition of controls by governmental authorities might also limit such forward trading to less than that which the Investment Manager or the Portfolio Managers would otherwise recommend, to the possible detriment of the Master Fund.  Market illiquidity or disruption could result in major losses to the Master Fund.

**Non-U.S. Currencies**

The Master Fund may invest a portion of its assets in Financial Instruments denominated in currencies other than the U.S. dollar and in other Financial Instruments, including futures, the price of which is determined with reference to currencies other than the U.S. dollar.  The Master Fund will, however, value its securities and other assets in U.S. dollars.  To the extent unhedged, the value of the Master Fund's assets will fluctuate with U.S. dollar exchange rates as well as with price changes of the Master Fund's investments in the various local markets and currencies.  Thus, a change in the value of the U.S. dollar compared to the other currencies in which the Master Fund makes its investments will affect the prices of the Master Fund's securities in their local markets.  The Master Fund also may utilize forward currency contracts, futures and options to hedge against currency fluctuations, but there can be no assurance that such hedging transactions will be implemented, or if implemented, will be effective.

**Options**

The Master Fund may purchase and sell ("write") options on Financial Instruments on national and international commodities and securities exchanges and in the domestic and international OTC market.  The seller ("writer") of a put option which is covered (e.g., the writer has a short position in the underlying security, currency or commodity) assumes the risk of an increase in the market price of the underlying security, currency or commodity above the sales price (in establishing the short position) of the underlying security, currency or commodity plus the premium received, and gives up the opportunity for gain on the underlying security, currency or commodity below the exercise price of the option.  If the seller of the put option owns a put option covering an equivalent number of shares with an exercise price equal to or greater than the exercise price of the put written, the position is "fully hedged" if the option owned expires at the same time or later than the option written.  The seller of an uncovered put option assumes the risk of a decline in the market price of the underlying security, currency or commodity below the exercise price of the option.  The buyer of a put option assumes the risk of losing its entire investment in the put option.  If the buyer of the put holds the underlying security, currency or commodity, the loss on the put will be offset in whole or in part by any gain on the underlying security, currency or commodity.

The writer of a call option which is covered (e.g., the writer holds the underlying security, currency or commodity) assumes the risk of a decline in the market price of the underlying security, currency or commodity below the purchase price of the underlying security, currency or commodity less the premium received, and gives up the opportunity for gain on the underlying security, currency or commodity above the exercise price of the option.  The seller of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying security, currency or commodity above the exercise price of the option.  The buyer of a call option assumes the risk of losing its entire investment in the call option.  If the buyer of the call sells short the underlying security, currency or commodity, the loss on the call will be offset, in whole or in part, by any gain on the short sale of the underlying security, currency or commodity.

Options may be cash settled, settled by physical delivery or by entering into a closing purchase transaction.  In entering into a closing purchase transaction, the Master Fund may be

subject to the risk of loss to the extent that the premium paid for entering into such closing purchase transaction exceeds the premium received when the option was written.

## Swap Agreements

The Master Fund may enter into swap agreements.  Swap agreements can be individually negotiated and structured to include exposure to a variety of different types of investments or market factors.  Depending on their structure, swap agreements may increase or decrease the Master Fund's exposure to long-term or short-term interest rates (in the U.S. or abroad), foreign currency values, mortgage securities, corporate borrowing rates, or other factors such as security prices, baskets of equity securities, or inflation rates.  Swap agreements can take many different forms and are known by a variety of names.  The Master Fund is not limited to any particular form of swap agreement if the Investment Manager determines it is consistent with the Master Fund's investment objective and policies.

Swap agreements tend to shift the Master Fund's investment exposure from one type of investment to another.  For example, if the Master Fund agrees to exchange payments in dollars for payments in foreign currency, the swap agreement would tend to change the Master Fund's exposure to U.S. interest rates and its exposure to foreign currency and interest rates.  Depending on how they are used, swap agreements may increase or decrease the overall volatility of the Master Fund's portfolio.  The most significant factor in the performance of swap agreements is the change in the specific interest rate, currency, individual equity values or other factors that determine the amounts of payments due to and from the Master Fund.  If a swap agreement calls for payments by the Master Fund, the Master Fund must be prepared to make such payments when due.  In addition, if a counterparty's creditworthiness declines, the value of swap agreements with such counterparty can be expected to decline, potentially resulting in losses by the Master Fund.

## Repurchase and Reverse-Repurchase Agreements

The Master Fund may use repurchase and reverse-repurchase agreements which involve certain risks.  For example, if the seller of securities under a repurchase agreement defaults on its obligation to repurchase the underlying securities, as a result of its bankruptcy or otherwise, the Master Fund will seek to dispose of such securities, which action could involve costs or delays.  If the seller becomes insolvent and subject to liquidation or reorganization under applicable bankruptcy or other laws, the Master Fund's ability to dispose of the underlying securities may be restricted.  Finally, it is possible that the Master Fund may not be able to substantiate its interest in the underlying securities.  If the seller fails to repurchase the securities, the Master Fund may suffer a loss to the extent that proceeds from the sale of the underlying securities are less than the repurchase price.  Similar elements of risk arise in the event of the bankruptcy or insolvency of the buyer.

## Risks of Early-Stage Companies

The Master Fund may invest in privately-placed securities of companies at an early stage of development, which involves a high degree of business and financial risk.  Early-stage companies with little or no operating history may require substantial additional capital to support

expansion or to achieve or maintain a competitive position, may produce substantial variations in operating results from period to period or may operate at a loss.  Such companies may face intense competition, including competition from companies with greater financial resources, more extensive development, better marketing and service capabilities and a larger number of qualified management and technical personnel.  Such risks may adversely affect the performance of such investments and result in substantial losses.

## Control Issues

Although the Master Fund may seek protective provisions, including, possibly, board representation, in connection with certain of its private equity investments, to the extent that the Master Fund takes minority positions in companies in which it invests, it may not be in a position to exercise control over the management of such companies, and, accordingly, may have a limited ability to protect its position in such companies.

## Highly-Leveraged Companies

Investments in private equity of highly-leveraged companies involve a high degree of risk.  Some of the Master Fund's investments in companies may involve leverage, which in turn will increase the exposure of such companies to adverse economic factors such as downturns in the economy or deterioration in the conditions of such companies or their respective industries. In the event any such company cannot generate adequate cash flow to meet debt service, the Master Fund may suffer a partial or total loss of capital invested in the company, which, depending on the size of the Master Fund's investments, could adversely affect the return on the capital of the Master Fund.

## Risks Associated with Investing in Other Funds

Although the Investment Manager carefully screens the third-party managers who manage the Other Funds, the Investment Manager has no ability to predict the investments the Other Funds may select or whether the managers will act in accordance with their investment objectives and strategies. Allocation by the Investment Manager to Other Funds, rather than investing the Fund's assets directly in Financial Instruments, significantly increases the fees, allocations and expenses payable by the Fund because the managers charge their own fees, allocations and expenses, which are in addition to the Incentive Allocation, Management Fee and expenses incurred directly and/or indirectly by the Fund.  There can be no assurance that such investments will be successful or will not result in substantial losses. In addition, the Fund will rely on the valuations provided by the Other Funds for the purposes of calculating the Net Asset Value of the Fund and preparing financial reports.  There is no assurance that such valuations will be correct or that such information will be received in a timely manner.

## Securities Lending

Some of the securities held by the Master Fund may be pledged as collateral for the margin accounts, which subjects the Master Fund to the risks associated with such pledging arrangements.  The Master Fund may also engage in additional programs of securities lending. To the extent the Master Fund engages in securities lending, there may be risks of delay and costs involved in the recovery of securities or even losses, should the borrower of the securities

have financial difficulty or otherwise fail to meet its obligations under the securities lending arrangement.

While the Master Fund expects to receive collateral in connection with the lending of securities, there is the risk that the price of the securities could increase while they are on loan and that the collateral will be inadequate to cover their value.  In general, it is expected that the Master Fund's securities lending agent will seek to consider all relevant facts and circumstances, including the creditworthiness of the broker, dealer or other borrower, in making decisions with respect to the lending of securities, although this cannot be assured.

**Banyon Investment**

On June 26, 2008, the Master Fund entered into a credit agreement (the "**Credit Agreement**") with Banyon Investments LLC, a Nevada limited liability company ("**Banyon**") (such transaction and the transactions related thereto are collectively referred to herein as the "**Banyon Investment**").  The Credit Agreement provided a credit facility to Banyon as borrower for purposes of acquiring interests in one or more third-party confidential structured settlement agreements arising out of claims or lawsuits.   George Levin, a principal of Banyon, and his wife, Gayla Sue Levin, executed personal guarantees of Banyon's obligations under the Credit Agreement.

Banyon is currently in default under the Credit Agreement due, in large part, to the fact that the structured settlement agreements in which it was acquiring interests were fabricated by attorney Scott Rothstein of the law firm Rothstein Rosenfeldt Adler, P.A. ("**RRA**"), the purported attorneys for the plaintiffs/claimants in such actions, as part of what has been reported to be a larger Ponzi scheme.

In December 2011, the Master Fund executed a settlement agreement with the Levins to resolve litigation the Master Fund commenced against the Levins in Nevada and Florida.  The settlement agreement requires Gayla Sue Levin to confess to judgment in an amount in excess of $170 million, and requires George Levin to consent to relief in a Chapter 7 bankruptcy case that the Master Fund is prosecuting against him.   The agreement is subject to approval of the bankruptcy court administering the Levins' Chapter 7 cases, and such approval is pending.

The Master Fund has also filed suit against third parties in connection with the Banyon Investment, including TD Bank, N.A., which served as the custodian of the attorney escrow accounts for RRA and provided the Investment Manager with incorrect confirmations of the balances in such accounts.  The Master Fund has asserted claims against Gibraltar Private Bank & Trust Co., a bank through which Rothstein operated his scheme.  The Master Fund has also filed suit in New York against Kroll Associates, Inc. in connection with due diligence services that Kroll provided for the benefit of the Master Fund in connection with the Banyon Investment.  While that suit was dismissed by the trial court, the Master Fund's appeal is pending.

In June 2012, the Master Fund entered a settlement agreement to resolve claims asserted against the Master Fund by the RRA trustee in a complaint filed in a Florida bankruptcy court.  The settlement, which remains subject to bankruptcy court approval, requires a payment to the RRA estate in the amount of $32 million in exchange for an allowed general unsecured claim

against the RRA estate in the amount of $28 million, plus an allowed "senior subordinated" claim against the RRA estate in the amount of $26 million.

Due to the uncertainty involving the Banyon Investment, the Class L Shares will not participate in any profits or losses relating to the Banyon Investment, including, without limitation, the expenses of the current and any future litigations or other actions relating to the Banyon Investment, any recoveries by the Master Fund in such litigations, and any damages awarded in connection with such litigations. These profits and losses will be allocated only to the other existing classes of the Master Fund's limited partnership interests (collectively, the "**Participating Classes**"). However, as further discussed in this Memorandum, in the event that the assets of the Participating Classes are not sufficient to satisfy any liabilities of the Fund and/or the Master Fund resulting from the Banyon Investment, the assets of the Class L Shares will be available to creditors to satisfy such liabilities, even though the Class L Shares are not entitled to any portion of the profits from the Banyon Investment. (See "*Risk Factors – Cross Class Liability*") In light of the foregoing, as an additional level of protection for the Class L Shares, the Investment Manager has agreed to indemnify the Class L Shares with respect to any direct losses they may suffer as a result of the assets of the Participating Classes not being sufficient to satisfy any liabilities of the Fund and/or the Master Fund resulting from the Banyon Investment.

## Portfolio Manager Compensation

The Portfolio Managers' incentive fees and allocations will be based on the individual performance of each Portfolio Manager, irrespective of the overall performance of the Fund. The fact that incentive fees and allocations are individually calculated exposes the Fund to the risk of paying a Portfolio Manager during periods when the Net Asset Value of the Fund decreases and of having its assets actually depleted by incentive fees and allocations.

## Offsetting Investments

The Portfolio Managers at times may hold economically offsetting positions. To the extent that the Portfolio Managers do, in fact, hold such positions, the Fund, considered as a whole, may not achieve any gain or loss despite incurring expenses.

## Possible Licensing Requirements

The Master Fund may be required to obtain various licenses in order to make, hold or dispose of certain investments. The Master Fund has not applied for these licenses and may not. The Investment Manager expects that if the Master Fund is required to obtain any such licenses, this process will be costly and may take several months. There is no assurance that the Master Fund will obtain all of the licenses that it desires or that the Master Fund would not experience significant delays in seeking these licenses. Furthermore, the Master Fund will be subject to various information and other requirements in order to maintain these licenses, and there is no assurance that the Master Fund will satisfy those requirements. The Master Fund's failure to obtain or maintain licenses might restrict its investment options and have other adverse consequences for the Master Fund.

## Fund Risks

### Operating History

The past investment performance of Platinum Partners Liquid Opportunity Fund (International) Ltd., Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid Opportunity Fund (USA) II L.P. (collectively, "**Platinum Liquid Opportunity**"), Mark Nordlicht, Uri Landesman and/or any of the entities with which they have been associated should not be construed as an indication of the future results of an investment in the Fund.

### No Participation in Management

Shareholders have no right or power to take part in the management or control of the business of the Fund, the Intermediate Fund or the Master Fund. Investment and trading decisions for the Master Fund are made by the Investment Manager. Shareholders must rely solely on the judgment of the Investment Manager in selecting investments and trades and should not invest in the Fund unless they are willing to entrust all aspects of the portfolio management of the Master Fund to the Investment Manager.

### Dependence Upon Investment Manager

Investment and trading decisions made by the Investment Manager ultimately are based on the judgment of Mark Nordlicht and Uri Landesman. No assurance can be given that the Master Fund's investment and trading methods and strategies will be successful under any market conditions. If Mr. Nordlicht or Mr. Landesman were to die or become disabled or otherwise terminate his relationship with the Investment Manager, any such event could have a material adverse effect on the Fund and its performance. The Fund has obtained a key man life insurance policy in the amount of $40 million on Mr. Nordlicht the proceeds of which are payable to the Master Fund and are intended to defray the costs of liquidation. Investors should note that although the Master Fund currently intends to maintain this life insurance policy, it may be cancelled in the future if the General Partner determines to do so, in its sole discretion.

### Substantial Fees and Expenses Payable Regardless of Profits

The Fund will incur obligations to pay its share of brokerage commissions, option premiums and other transaction costs to the Brokers. The Fund will incur its own operating costs, the Intermediate Fund's operating costs and the Intermediate Fund's pro rata share of the Master Fund's expenses, which includes compensation to and expenses of the Portfolio Managers. These expenses are payable, directly or indirectly, by the Fund regardless of whether the Fund realizes any profits as a whole.

### Incentive Allocations

The allocation to PPVA LP of twenty percent (20%) of the Fund's net capital appreciation may create an incentive for the Investment Manager, an affiliate of PPVA LP, to make investments that are riskier or more speculative than would be the case if this special allocation were not made. In addition, since the Incentive Allocation is calculated on a basis which includes unrealized appreciation of the Master Fund's assets, it may be greater than if such

allocation were based solely on realized gains.  The amount and terms of the Incentive Allocation were set by PPVA LP without negotiation with any third party.

The Portfolio Managers of the Master Fund generally will receive incentive compensation from the Master Fund based on the performance of their portfolios.  Therefore, it is possible that certain of the Portfolio Managers may receive incentive compensation even though the Fund, as a whole, does not have net capital appreciation.  Additionally, the incentive compensation to the Portfolio Managers may create an incentive for the Portfolio Managers to cause the Master Fund to make investments that are riskier or more speculative than would be the case if they were paid only a fixed compensation.  (See "*Incentive Allocation*" herein.)

## Layering of Fees, Allocations and Expenses

The Fund's direct fees and expenses, coupled with the Incentive Allocation and the Fund's pro rata share of the expenses of the Intermediate Fund and the Master Fund, including the incentive compensation paid to the Portfolio Managers, results in multiple levels of fees, expenses and allocations.  Accordingly, the Fund's expenses may constitute a higher percentage of net assets than expenses associated with other investment entities.

## Enhanced Transparency

One or more Shareholders may serve on the Investment Manager's internal risk committee and/or other of the Investment Manager's committees.  As a result, such Shareholders will have access to more frequent and/or more detailed information regarding the Master Fund's investments, performance and finances, and, thus, may be better able to assess the prospects and performance of the Fund than other Shareholders.  Subject to applicable law and any contractual provisions, the Fund does not intend to disclose the identities of the Shareholders that serve on such committee(s).

## Limited Liquidity

An investment in the Fund is suitable only for sophisticated investors who have no need for liquidity in this investment.  The ability to transfer Shares will be restricted in accordance with the terms of the Articles.  No Shareholder, directly or indirectly, may transfer its Shares without the prior written consent of the Directors, who may withhold such consent for any reason or for no reason.  Shareholders may redeem Shares only under very limited circumstances as described in this Memorandum, and such redemptions may be satisfied by the distribution of securities or other assets of the Fund selected by the Investment Manager rather than in cash.  Certain classes of the Fund's Shares also have redemption terms that are more favorable than the terms applicable to the Class L Shares.  (See "*Risk Factors--Trading in Financial Instruments May Be Illiquid" and "Redemptions*.")

## Substantial Redemptions

Shareholders may redeem Shares only in accordance with the terms of the Articles.  (See "*Redemptions*" herein.)  Substantial withdrawals of capital by the Fund (through the Intermediate Fund) from the Master Fund in connection with Shareholder redemptions could require the Master Fund to liquidate investments more rapidly than otherwise desirable which could

adversely affect the value of Shares and cause the Fund to make distributions in kind rather than in cash.  The Fund implemented a special redemption plan with respect to the Fund's December 31, 2008 redemption date due to significant and unexpected redemption requests for such redemption date.  Pursuant to such plan, the Fund paid approximately 28% of the redemption proceeds in cash, with the remainder satisfied in-kind either directly or indirectly via shares of a special purpose vehicle ("**SPV Shares**") to which the Master Fund had transferred its Illiquid Positions (the "**SPV**"), at the option of each redeeming shareholder.  As of December 31, 2010, all SPV Shares (other than those held by the Master Fund) were either (i) compulsorily redeemed or (ii) converted to Class K Shares of the Fund by way of contribution of such SPV Shares to the Fund in exchange for Class K Shares.  As a result, the Master Fund reacquired the remaining Illiquid Positions previously transferred by it to the SPV.

## Cross Class Liability

Each Class of shares represents a separate account and will be maintained with separate accounting records.  However, the Fund will be treated as one entity.  Thus, all of the assets of the Fund will be available to meet all of the liabilities of every Class regardless of the separate portfolio to which such assets or liabilities are attributable.  The same is true with respect to the Intermediate Fund.  In practice, cross class liability usually will arise only where a Class becomes insolvent.  (See also "*Risk Factors – Banyon Investment*")

## Additional Classes, Sub-Classes and Series of Shares

The Fund has the power to issue Shares in Classes, Sub-Classes or Series.  The Articles provide for the manner in which the liabilities are to be attributed across the various Classes, Sub-Classes or Series (liabilities are to be attributed to the specific Class, Sub-Class or Series in respect of which the liability was incurred).  However, the Fund is a single legal entity. Shareholders of one or more Classes, Sub-Classes or Series of Shares may be compelled to bear the liabilities incurred in respect of other Classes, Sub-Classes or Series of Shares that such Shareholders do not themselves own if there are insufficient assets in that other Class, Sub-Class or Series of Shares to satisfy those liabilities.  Accordingly, there is a risk that liabilities of one Class, Sub-Class or Series of Shares may not be limited to that particular Class, Sub-Class or Series of Shares and may be required to be paid out of one or more other Classes, Sub-Classes or Series of Shares.

## Other Currency Classes; Currency Hedging

The Fund will accept subscriptions in U.S. dollars with respect to certain Classes of shares, including the Class L Shares (the "**USD Classes**"), and Euros with respect to other Classes of shares, including the Class J-E Shares (the "**Euro Classes**"), all of which invest (through the Intermediate Fund) substantially all of their capital in the Master Fund.  From time to time, the Fund and the Master Fund will endeavor to mitigate the different foreign currency risks to which the Fund's different share Classes are subject by utilizing different currency hedging techniques with respect to the different share Classes.  Such hedging transactions may include a credit component, pursuant to which the Fund or the Master Fund may be required to grant to its hedging counterparty a security interest in certain of its assets.  Such security interest may include an undivided interest in all of the Fund's or Master Fund's assets, and may not be

limited solely to the assets that are attributable to the classes to which the hedge relates. Accordingly, in such a case, if the Fund or the Master Fund defaults with respect to a currency hedging transaction relating solely to one Class, then the hedging counterparty could lay claim to an interest in all of the Fund's or Master Fund's assets, as applicable, including those assets relating to the other Classes.  For example, if the Fund defaults with respect to a currency hedging transaction relating solely to the Class J-E Shares, then the hedging counterparty could lay claim to an interest in all of the Fund's assets, including those assets relating to the Class L Shares.  In such event, the Investment Manager, in its discretion, may cause the Euro Classes to compensate the USD Classes for assuming such risks, in amounts deemed reasonable by the Investment Manager.

## Brokerage Firms May Fail

Brokers and other financial institutions with which the Fund and the Master Fund conduct business or to which Financial Instruments have been entrusted for custodial purposes, may encounter financial difficulties and perhaps even file for bankruptcy.  Such an event could have a material adverse effect on the Fund.

## Limited Regulatory Oversight

While the Fund may be considered similar to an investment company, it is not registered, and does not intend to register, as such, under the U.S. Investment Company Act of 1940, as amended (the "**1940 Act**"), in reliance upon an exemption available to privately offered investment companies, and, accordingly, the provisions of that Act (which, among other matters, require investment companies to have a majority of disinterested directors, require securities held in custody to at all times be individually segregated from the securities of any other person and marked to clearly identify such securities as the property of such investment company and regulate the relationship between the advisor and the investment company) are not applicable to the Fund.   Neither the Master Fund nor the Intermediate Fund is registered or intends to register as an investment company under the 1940 Act.

The Investment Manager has availed itself of the exemption in CFTC Regulation § 4.13(a)(4) when operating the Fund, the Intermediate Fund and the Master Fund.  Consequently, some of the protections that would otherwise be available to investors if the Investment Manager were subject to more comprehensive regulatory oversight may not be available with respect to investments in the Fund.

## Legal, Tax and Regulatory Risks for Private Funds

Further legal, tax and regulatory changes could occur that may adversely affect the Master Fund, the Intermediate Fund and the Master Fund.  The regulatory environment for private funds is evolving, and changes in regulations that impact private funds may adversely affect the value of investments held by the Master Fund and may affect the Master Fund's ability to pursue its investment strategy.  In addition, the securities and futures markets are subject to comprehensive statutes, regulations and margin requirements.  The SEC, as well as other regulators, self-regulatory organizations and exchanges, have taken various extraordinary actions in connection with recent market events and may take additional actions.  The effect of any future regulatory

changes on the Master Fund, the Intermediate Fund and the Fund could be substantial and adverse.

**Tax Risks**

## U.S. Trade or Business

The Master Fund previously engaged in various activities, and may continue to engage in various activities, that could be treated as having been or being engaged in a U.S. trade or business, although the Master Fund does not believe it has engaged in such activities.  If the Master Fund were found to have been engaged or to be engaged in a U.S. trade or business, the Fund would be subject to U.S. federal (including branch profits), state and local tax (and possibly interest and penalties) on the income that was or is effectively connected to such trade or business.  Although Shareholders would not be subject to any tax, this would affect an investor's return, even if the investor was not an investor in the Fund at the time the Fund was treated as being engaged in a U.S. trade or business.  Prospective investors are urged to consult their own tax advisers with respect to the tax consequences of investing in the Fund.

The Master Fund invests in entities that may be engaged in a U.S. trade or business. Such entities may therefore be subject to U.S. taxation, thereby reducing the Fund's return on such investment to an after-tax return.  (See *Certain Tax Considerations.*")

## Withholding Tax

Generally, the Master Fund intends to enter into Financial Instrument transactions so that neither it nor its investors, including the Fund, is subject to U.S. income taxation or to taxation in the Cayman Islands.  However, U.S. source dividend (or dividend equivalents) and certain types of interest income allocated to the Fund may be subject to a U.S. 30% withholding tax. Prospective investors should consult their own tax advisers with respect to the tax consequences of investing in the Fund.

## Accounting for Uncertainty in Income Taxes

Pursuant to Financial Accounting Standards Board Accounting Standards Codification ("**ASC**") 740, formerly known as FIN 48 ("**ASC 740**") which provides guidance for how uncertain tax positions should be recognized, measured, presented and disclosed in financial statements, the Fund is required to determine whether a tax position, based on its technical merits, meets a more-likely-than-not recognition threshold that the position will be sustained upon examination.  As a result of such a determination, the Fund may be required to recognize a contingent tax liability in its net asset value calculation if the related tax position meets the recognition criterion in ASC 740 and, conversely, may be required to unrecognize a contingent tax liability in its net asset value calculation if the related tax position does not meet the recognition criterion in ASC 740.  In addition, the net asset value of the Fund may be adjusted if an uncertain tax position is settled.  Since ASC 740 has only recently been adopted, the Fund may be required to recognize in its financial statements contingent liabilities that under prior custom and practice in the industry would not have been recognized.  Such contingent liabilities may also relate to time periods that predate a Shareholder's investment in the Fund.  Recognition

and measurement of each tax position, including any tax position for which there is a lack of authority and audit experience, is determined by the Board of Directors, in its sole discretion, based on discussions with the Investment Manager, tax advisers and the auditor and based on the facts and circumstances known at the time.   There can be no assurance that any such determination will not change over time.  Adjustments made to the net asset value of the Fund in connection with the recognition or unrecognition of contingent tax liabilities may have a material positive or negative effect on certain Shareholders and prospective investors, depending on the circumstances.

## Identity of Beneficial Ownership and Withholding on Certain Payments

In order to avoid a U.S. withholding tax of 30% on certain payments (including payments of gross proceeds) made with respect to certain actual and deemed U.S. investments, the Fund, the Intermediate Fund, the Master Fund and relevant non-U.S. Other Funds will be required to enter into an agreement with the U.S. Internal Revenue Service (the "**Service**") by June 30, 2013 identifying certain direct and indirect U.S. account holders (including debtholders and equityholders).  A non-U.S. investor in the Fund will generally be required to provide to the Fund information which identifies its direct and indirect U.S. ownership.  Any such information provided to the Fund will be shared with the Service.  A non-U.S. investor that is a "foreign financial institution" within the meaning of Section 1471(d)(4) of the U.S. Internal Revenue Code of 1986, as amended (the "**IRC**"), will generally be required to enter into an agreement with the Service by June 30, 2013 identifying certain direct and indirect U.S. account holders (including debtholders and equityholders).  A non-U.S. investor who fails to provide such information to the Fund or enter into such an agreement with the Service, as applicable, would be subject to the 30% withholding tax with respect to its share of any such payments attributable to actual and deemed U.S. investments of the Fund, and the Board of Directors may take any action in relation to an investor's Shares or redemption proceeds to ensure that such withholding is economically borne by the relevant investor whose failure to provide the necessary information gave rise to the withholding.  Shareholders should consult their own tax advisers regarding the possible implications of these rules on their investments in the Fund.

*The foregoing list of risk factors does not purport to be a complete enumeration or explanation of the risks involved in an investment in the Fund.  Prospective investors should read this entire Memorandum, the Articles, and the Master Fund Agreement (as defined below) and consult with their own advisors before deciding whether to invest in the Fund.*

## CONFLICTS OF INTEREST

Conflicts exist and may arise between the interests of the Investment Manager (which is also the General Partner of the Master Fund) and those of the Shareholders. While the General Partner is accountable to the Master Fund as a fiduciary, the amended and restated limited partnership agreement of the Master Fund (the "**Master Fund Agreement**") grants the General Partner broad discretion as to many matters and limits the General Partner's fiduciary duties. By signing the Subscription Documents in the form annexed hereto as Exhibit A (the "**Subscription Documents**"), each investor acknowledges and consents to the General Partner's exercise of that discretion, including where the General Partner has a conflict of interest.

### Management Fee

There is a potential conflict of interest between the responsibility of the Investment Manager to maximize profits for Shareholders and the possible desire of the Investment Manager to avoid taking risks which could result in a reduction of the net assets of the Fund and, consequently, reduce the Management Fee payable to the Investment Manager.

### Incentive Allocation

The structure and allocation of the Incentive Allocation by the Intermediate Fund to PPVA LP may involve a conflict of interest and may create an incentive for the Investment Manager, an affiliate of PPVA LP, to make riskier or more speculative investments than it otherwise would. In some cases, the Incentive Allocation may be greater than fees and other charges charged by other investment advisers for similar services. Additionally, the incentive compensation to Portfolio Managers may create an incentive for Portfolio Managers to cause the Master Fund to make investments that are riskier or more speculative than would be the case if they were paid only a fixed compensation.

### Other Business Relationships of the Investment Manager

Each of the Investment Manager and its Affiliates devotes as much of its time and resources to the activities of the Fund, the Intermediate Fund and the Master Fund as it deems necessary and appropriate. The Investment Manager and its Affiliates are not restricted from entering into other investment advisory relationships or engaging in other business activities, even though such activities may be in competition with the Master Fund and/or may involve substantial amounts of the Investment Manager's time and resources. The principals of the Investment Manager may from time to time hold direct or indirect ownership interests in one or more other investment management companies, including those that share resources with the Investment Manager and/or co-invest with the Investment Manager. The Investment Manager and its Affiliates provide investment advisory services to other private investment funds and/or managed accounts ("**Other Accounts**"), including, without limitation, Bayberry Consumer Finance, Pro Player Advisors, Platinum Liquid Opportunity and the Platinum Partners Credit Opportunity funds, which may employ investment programs and strategies similar to the Fund and the Master Fund, and which may compete with the Fund and the Master Fund for investments. The Investment Manager and its Affiliates may also establish Other Accounts, and engage in other business activities, in the future. These activities could be viewed as creating a

conflict of interest in that neither the Investment Manager nor its Affiliates is exclusively devoting its resources to the business of the Fund, the Intermediate Fund and the Master Fund but must allocate such resources between that business and other activities.  Other Accounts could have compensation and profit sharing arrangements that differ from those provided in the Investment Management Agreement and the Intermediate Fund's Articles which may create incentives that could affect the Investment Manager's decisions as to how to allocate time, resources and investment opportunities.

Subject to applicable law, the Investment Manager and/or its principals and affiliates may engage in principal or agency cross transactions between or among the Funds if it determines the transaction to be in the best interests of the Company and the other entities comprising the Funds.  The Investment Manager's and/or its principals' and affiliates' duty to be unbiased and fair to its clients on both sides of a cross transaction may pose an inherent conflict of interest.  In an attempt to mitigate such conflict of interest and to ensure that it fulfills its duty to each client that is party to a cross transaction, the Investment Manager and/or its principals and affiliates seeks to ensure the appropriateness of the transaction for each client and that it is fair to both sides of the transaction.  Additionally, to the extent brokers and dealers are utilized to effect cross transactions, the Investment Manager and/or its principals and affiliates will utilize unaffiliated brokers and dealers at normal commission rates, and the Investment Manager and/or its principals and affiliates will receive no additional compensation as a result of the cross transactions.  Any fees or costs incurred as a result of a cross transaction will be allocated equitably in the sole discretion of the Investment Manager and/or its principals and affiliates, as applicable, between the transferor and transferee.  The Investment Manager and/or its principals and affiliates will not enter into principal transactions absent consent from the Members on a transaction by transaction basis before the completion of each such transaction.

The Investment Manager or its Affiliates may invest and trade for their own accounts, as well as the Other Accounts, in the same capacity as the Master Fund and in the same Financial Instruments as the Master Fund.  The Investment Manager or its Affiliates may also initiate transactions, trade more or less frequently for their own accounts or the Other Accounts, and trade and invest in certain Financial Instruments without doing the same for the Master Fund.  Although the Investment Manager or its Affiliates may engage in other activities which may, in some cases, provide an indirect benefit to the Fund and the Master Fund, in other cases such activities may create conflicts of interest with the Fund and the Master Fund.

In the event the Company requires additional funds on a short-term basis in order to make an investment, the Managing Member, the Investment Manager or their Affiliates and/or an affiliate fund, such as one of the Platinum-managed funds, may loan the Company any amounts to facilitate such investment. The Managing Member, the Investment Manager or their Affiliates and/or an affiliate fund, such as one of the Platinum-managed funds, may charge interest to the Company for such borrowed funds in an amount that the Managing Member or the Investment Manager determines, in its sole discretion, is fair and reasonable for the Company.  In addition, in the event that an affiliate fund, such as one of the Platinum-managed funds, requires additional funds on a short-term basis in order to make an investment, the Company may loan such affiliate fund any amounts to facilitate such investment.  The Company may charge interest to such affiliate fund for such borrowed funds in an amount that the Managing Member or the Investment Manager determines, in its sole discretion, is fair and reasonable for the Company.

As a result, conflicts of interest may arise between the Company and the Managing Member, the Investment Manager or their Affiliates, and/or an affiliate fund, such as one of the Platinum-managed funds, with respect to the repayment of any borrowed amounts.

## Other Business Relationships of the Portfolio Managers

Each of the Portfolio Managers devotes as much of its time and resources to the activities of the Master Fund as it deems necessary and appropriate and in accordance with the terms of its offering document, operating agreement or advisory agreement, as applicable.  Certain of the Portfolio Managers are not restricted from entering into other investment advisory relationships or engaging in other business activities, even though such activities may be in competition with the Master Fund and/or may involve substantial amounts of such Portfolio Manager's time and resources.  These activities could be viewed as creating a conflict of interest in that the Portfolio Manager is not exclusively devoting its resources to the business of the Master Fund but must allocate such resources between that business and other activities.  Other investment accounts managed by a Portfolio Manager could have compensation and profit sharing arrangements that differ from those provided in its agreement with the Master Fund which may create incentives that could affect the Portfolio Manager's decisions as to how to allocate time, resources and investment opportunities.

## Transaction Execution and Investment Opportunities

Conflicts of interest could also arise in connection with Financial Instruments transactions for the accounts of the Master Fund, other investment vehicles in which the Investment Manager or its Affiliates are involved, and any other advisory clients the Investment Manager may have.  These transactions could differ in substance, timing and amount, due to, among other things, differences in investment objectives or other factors affecting the appropriateness or suitability of particular investment activities to the Master Fund or other clients, or to limitations on the availability of particular investment or transactional opportunities. The Investment Manager will allocate transactions and opportunities among the Other Accounts in a manner it believes to be as equitable as possible, considering each account's objectives, programs, limitations and capital available for investment, but all accounts may not necessarily invest in the same Financial Instruments.  Furthermore, neither the Investment Manager nor its Affiliates has any obligation to provide the Master Fund or any other account with any particular investment opportunity or to refrain from taking advantage of an investment opportunity that could be beneficial to the Master Fund.

If the Master Fund and the Other Accounts seek to buy or sell the same Financial Instrument at the same time, the Investment Manager may combine purchase and sale orders on behalf of the Master Fund with orders for those other accounts, including its own or its principals' personal accounts, and to allocate the Financial Instruments or proceeds arising out of those transactions (and the related transaction expenses) on an average price basis among the various participants in the transactions.  While the Investment Manager believes combining transaction orders in this way is, over time, advantageous to all participants, in particular cases, the average price could be less advantageous to the Master Fund than if the Master Fund had been the only account effecting the transaction or had completed its transaction before the other participants.  Because of the Investment Manager's interest in the Master Fund, there could be

circumstances in which the Master Fund's transactions may not, under certain laws and regulations, be combined with those of some of the Other Accounts, and the Master Fund may obtain less advantageous execution than such other accounts.

## Asset Valuation

The Investment Manager has substantial discretion in determining the value of certain of the Master Fund's Financial Instruments.  While the value of most marketable Financial Instruments is based on prices reported in the public markets, at times, the size of a block of Financial Instruments held by the Master Fund or temporary restrictions on resale may justify imposing a discount on the market-determined value.  Whether and how much to reduce the value of Financial Instruments in any of these circumstances is subject to the Investment Manager's sole discretion.  In addition, a significant portion of the Master Fund's assets may be invested in restricted securities.  To the extent that the Master Fund makes such investments, the value of those investments will be determined in the Investment Manager's sole discretion.  The Investment Manager will face a conflict of interest in making any of these valuation decisions. Application of a discount to the value of marketable securities in the Master Fund's portfolio may reduce, or eliminate, any Incentive Allocation to which PPVA LP, an affiliate of the Investment Manager, would otherwise be entitled for the period ending on a Valuation Date (as defined below) or increase the amount of loss carryforward to be recovered before an Incentive Allocation would be allocable.  The Investment Manager will face similar conflicts of interest in assigning values to nonmarketable securities.

## Conflicts Inherent in a Master-Feeder Structure

Certain investments decisions made by the Investment Manager on behalf of the Master Fund could potentially have an adverse effect, either purposefully or inadvertently, on the Shareholders of the Fund, on the one hand, and the limited partners of Platinum USA, on the other hand.  This could occur for multiple reasons, including without limitation, tax reasons (i.e., non-corporate taxable U.S. investors would benefit generally from holding Financial Instruments long enough to achieve long-term capital gains tax treatment while non-U.S. persons or tax-exempt U.S. are tax treatment neutral).  While the Investment Manager reserves the right to make such trading and investment decisions, in general, it will endeavor to make investment decisions on behalf of the Master Fund that are fair to both Shareholders of the Fund and the limited partners of Platinum USA.

## Exculpation and Indemnification

The Master Fund Agreement provides that neither the Investment Manager nor its employees, agents or affiliates will be liable to the Master Fund for any act or omission based upon errors of judgment or other fault in connection with the business or affairs of the Master Fund as long as that person reasonably believed he or she acted in the best interests of the Fund and except for cases where the person's action is determined by a court to have constituted gross negligence or willful misconduct.  The foregoing liability standard is subject to applicable laws. In addition, the Master Fund Agreement provides the Investment Manager and its employees, agents and affiliates with broad indemnification rights for any act or omission as long as the indemnified person acted in good faith.

## Counsel

Schulte Roth & Zabel LLP ("**SRZ**") is U.S. securities, commodities and tax counsel to the Investment Manager, the Fund, the Intermediate Fund and the Master Fund, their principals and affiliates and other investment vehicles managed by the Investment Manager (collectively, the "**Platinum Parties**").  Accordingly, certain conflicts of interest exist and may arise.  The Fund has waived its conflict of interest with respect to potential and actual conflicts between the Fund and each of the Platinum Parties.  To the extent that an irreconcilable conflict were to develop between the Fund and any of the Platinum Parties, SRZ may represent the other Platinum Parties and may not represent the Fund.  SRZ is not representing any prospective investors in connection with the offering and will not be representing the Shareholders. Prospective investors are advised to consult their own independent counsel with respect to the legal and tax implications of an investment in the Shares.

## Directors

The Directors also act as directors for other companies and investment funds, which may create conflicts of interests.  The Directors owe a fiduciary duty to the Fund, as well as to such other companies for which they act as directors, and they will endeavor to ensure that all such conflicts are resolved fairly.

---

## EXPENSES

### Organizational Expenses

The Class L Shares of the Fund will reimburse the Investment Manager for all organizational and formation expenses of Class L Shares paid by the Investment Manager on behalf of the Class L Shareholders.  Although not consistent with GAAP, which generally requires such expenses to be expensed as incurred, the organizational expenses of the Fund were amortized over a 60-month period ending December 2, 2007, and the organizational expenses of the Class L Shares are being amortized over a period not to exceed 60 months so that early investors are not required to bear a disproportionate share of organizational expenses.

### Operating Expenses

In addition to the Management Fee, the Class L Shares will bear their pro rata share of the Fund's ordinary and extraordinary expenses as well as their pro rata share of the Intermediate Fund's and the Master Fund's ordinary and extraordinary expenses.  Such expenses may include, but are not limited to, fees for administrative services, entity-level taxes, investment expenses (e.g., brokerage commissions, interest expense and due diligence-related expenses including, without limitation, travel costs), legal expenses, compliance expenses, professional expenses (including, without limitation, consultants and experts), escrow expenses, insurance expenses (including, without limitation, director and officer liability insurance and error and omission liability insurance with respect to the activities of the Master Fund, the Intermediate Fund and the Investment Manager), accounting expenses, audit and tax preparation expenses, custodial fees, and any extraordinary expenses, such as indemnification of the Directors.

The Class L Shares of the Fund will also bear their pro rata share of the performance fees and/or allocations paid to Portfolio Managers and other persons who render services to the Master Fund or the Investment Manager.  A substantial portion of the compensation to Portfolio Managers will be in the form of fees and/or allocations based on the performance of their respective portfolios.

Notwithstanding any of the foregoing, the Class L Shares will not participate in any expenses related to the Banyon Investment, including, without limitation, the expenses of the current and any future litigations or other actions relating to the Banyon Investment.  (See "*Risk Factors – Banyon Investment*")

The Fund also bears the offering fees and expenses in connection with the private placement of Shares.  There are no selling commissions payable from subscription amounts; however, with the consent of the Investment Manager and/or PPVA LP, as applicable, the Fund may elect to compensate one or more properly licensed persons with a portion of the Management Fee and/or the Incentive Allocation otherwise due to the Investment Manager and PPVA LP, respectively.

## THE OFFERING

### Shares Offered

The Fund is offering Shares to a limited number of Eligible Investors as described below. Subscriptions for Shares will be accepted generally as of the first Business Day of a calendar month, or at such other times as determined by the Directors in their sole discretion (each, an "**Offering Date**").  The minimum initial investment is $1,000,000 and the minimum additional investment is $100,000.  The Directors of the Fund may, in their sole discretion, waive or reduce these requirements in particular cases or change them as to new investors in the future and may apply additional admission standards, provided always that at no time shall a minimum initial investment of less than $50,000 be accepted.  The offering may be suspended or terminated at any time for any reason by the Directors.

The Fund will offer Shares in different sub-classes of Shares (each, a "**Sub-Class**") in order to permit investments by the Master Fund in "new issues," as such term is defined by FINRA.  Restricted Persons, as defined in the Subscription Documents, will be issued a Sub-Class of Shares that will not share equally in profits, losses and costs attributable to any investment by the Fund in "new issues."  In order for the Fund to be eligible to invest, through the Master Fund, in "new issues," prospective investors will be required to provide certain information about themselves or their beneficial owners (including information related to their identities and occupations or those of their beneficial owners) as set forth in the Subscription Documents.

A new series of Shares will be established by the Fund and issued on each Offering Date. Each series of Shares will be offered at the initial issue price of $1,000 per Share.  Shares will be issued in registered, book-entry form only.

The Intermediate Fund will issue shares to the Fund in classes and series that correspond to the classes and series of the Fund.  In addition, the Intermediate Fund will issue Class M Shares to PPVA LP.

## Commencement of the Fund

The Fund and the Master Fund each commenced operations on January 1, 2003.  The Intermediate Fund commenced operations on July 1, 2010.  The Master Fund commenced operations with $25,000,000 in capital.

The business of the Fund and the Master Fund includes their management and administration and the realization and distribution of the Fund's assets to Shareholders, including in a wind-down of the Fund's operations.

## Eligible Investors

The offering of Shares will be made in accordance with Regulation S (with respect to non-U.S. Persons) and Regulation D (with respect to U.S. Persons) under the U.S. Securities Act of 1933, as amended (the "**Securities Act**").  Shares may be offered and sold only to investors who (i) are not U.S. Persons, or (ii) if U.S. Persons, are organizations exempt from U.S. income taxation ("**Qualified Tax-Exempt U.S. Entities**") under Section 501(a) of the U.S. Internal Revenue Code of 1986, as amended, "accredited investors" as defined in Regulation D of the Securities Act ("**Accredited Investors**") and "qualified purchasers" within the meaning of the 1940 Act ("**Qualified Purchasers**") (such persons being collectively referred to herein as "**Eligible Investors**").  These terms are described in the Fund's Subscription Documents.

The Fund reserves the right to determine conclusively whether any person is an Eligible Investor, a U.S. Person, a Qualified Tax-Exempt U.S. Entity, an Accredited Investor or a Qualified Purchaser.  The Fund may determine to limit or restrict ownership by a non-qualifying Shareholder after an investment in the Fund is made and to compulsorily redeem Shares held by such a Shareholder.

Any subscriptions for Shares may be accepted or rejected, in whole or in part, in the discretion of the Fund or the Administrator on its behalf.

## Suspension of Offering

The Fund reserves the right to suspend offerings entirely and to refuse to accept any subscription in whole or in part for any reason or for no reason.  In addition, the Fund will suspend offering of Shares for any period during which the calculation of the Net Asset Value of the Fund has been suspended.  (See "*Net Asset Valuation – Suspension of Calculation*" herein.)

## Subscription Documents

To subscribe to purchase Shares, an investor must complete the Subscription Documents as described in the *Summary*.

**Anti-Money Laundering Regulations**

As part of the Fund's responsibility for the prevention of money laundering, the Fund and the Administrator will require a detailed verification of the applicant's identity and the source of payment.  Depending on the circumstances of each application, a detailed verification might not be required where:

(a)      the applicant is a recognised financial institution which is regulated by a recognised regulatory authority and carries on business in a country listed in Schedule 3 of the Money Laundering Regulations of the Cayman Islands (as amended) (a "**Schedule 3 Country**");

(b)      the application is made through a recognized intermediary which is regulated by a recognized regulatory authority and carries on business in a Schedule 3 Country.  In this situation the Fund may rely on a written assurance from the intermediary that the requisite identification procedures on the applicant for business have been carried out; or

(c)      the subscription payment is remitted from an account (or joint account) held in the applicant's name at a bank in the Cayman Islands or a bank regulated in a Schedule 3 Country. In this situation the Fund may require evidence identifying the branch or office of the bank from which the monies have been transferred, verify that the account is in the name of the applicant and retain a written record of such details.

The Fund and the Administrator reserve the right to request such information as is necessary to verify the identity of an applicant.  In the event of delay or failure by the applicant to produce any information required for verification purposes, the Administrator will refuse to accept the application and the subscription monies relating thereto.

If any person who is resident in the Cayman Islands (including the Administrator) has a suspicion that a payment to the Fund (by way of subscription or otherwise) contains the proceeds of criminal conduct that person is required to report such suspicion pursuant to The Proceeds of Crime Law (as amended) of the Cayman Islands or any successor statute, rule or regulation.

By signing the Subscription Documents, applicants consent to the disclosure by the Fund and the Administrator of any information about them to regulators and others upon request in connection with money laundering and similar matters both in the Cayman Islands and in other jurisdictions.

**Other Jurisdictions**

The Fund will comply with applicable U.S. anti-money laundering regulations.   In addition, many jurisdictions are in the process of changing or creating anti-money laundering, embargo and trade sanctions, or similar laws, regulations, requirements (whether or not with force of law) or regulatory policies and many financial intermediaries are in the process of changing or creating responsive disclosure and compliance policies (collectively, "**Requirements**") and the Fund could be requested or required to obtain certain assurances from applicants subscribing for Shares, disclose information pertaining to them to governmental, regulatory or other authorities or to financial intermediaries or engage in due diligence or take other related actions in the future.  It is the Fund's policy to comply with Requirements to which

it is or may become subject and to interpret them broadly in favor of disclosure.  Each applicant will be required to agree in the Subscription Documents, and will be deemed to have agreed by reason of owning any Shares, that it will provide additional information or take such other actions as may be necessary or advisable for the Fund (in the sole judgment of the Fund and/or Administrator) to comply with any Requirements, related legal process or appropriate requests (whether formal or informal) or otherwise.  Each applicant, by executing the Subscription Documents and by owning Shares, is deemed to have consented, to disclosure by the Fund and its agents to relevant third parties of information pertaining to it in respect of Requirements of information requested related thereto.  Failure to honor any such request may result in redemption by the Fund or a forced sale to another investor of such applicant's Shares.

## REDEMPTIONS

A Shareholder may redeem all or a portion of its Shares as of the last day of each fiscal quarter, and at such other times as the Directors will, in their sole discretion, permit (each, a "**Redemption Date**"), upon not less than sixty (60) days' prior written notice to the Administrator and the Investment Manager (subject to the discretion of the Fund to waive such notice).  The redemption price for Shares will be based on the Net Asset Value per Share for the relevant series of Shares as of the relevant Redemption Date (which reflects accrued organizational and operational expenses of the Fund and the Fund's pro-rata share of such expenses relating to the Intermediate Fund and the Master Fund, as well as any Incentive Allocation allocable by the Intermediate Fund on redemption with respect to the series of Shares being redeemed).  The redemption price may be more or less than the offering price paid by the Shareholder, depending on the value of the assets of the Fund at the time of the redemption. Shares redeemed by the Fund shall not be considered outstanding after the actual date of redemption.

The Fund intends to pay at least ninety percent (90%) of the redemption price, and may pay more than ninety percent (90%) of the redemption price in the discretion of the Investment Manager in consultation with the Directors, within thirty (30) days after the applicable Redemption Date, with the balance thereof (subject to audit adjustments) being paid without interest  within thirty (30) days after completion of the audit of the Fund's books for such fiscal year.  Additionally, the right of any Shareholder to receive amounts upon a redemption of Shares may be subject to a hold back for the provision by the Directors for reserves for contingencies, including general reserves for unspecified contingencies (whether or not required by GAAP). Any amounts held back will be maintained with the general assets of the Fund and not segregated in a separate account.

Such payments may be made in cash and/or in kind.  The Fund assets included in an in-kind distribution will be determined by the Investment Manager in its sole discretion and may not constitute a pro rata portion of either the Fund's entire portfolio or the Fund's illiquid positions.

If a partial redemption would result in a Shareholder holding a number of Shares having an aggregate Net Asset Value of $250,000 or less (or such other minimum amount as may be determined by the Directors in their sole discretion), then the Fund will have the right either to (i)

refuse to honor such request for a partial redemption or (ii) compel redemption of all such Shareholder's Shares.

All redemption requests must be received by the Investment Manager and the Administrator in writing.  The Investment Manager will confirm by e-mail or by telephone and in writing all redemption requests which are received in good order.  Shareholders failing to receive e-mail or telephonic confirmations within five (5) days should contact the Investment Manager to confirm receipt.  Failure by the Shareholder to ensure the receipt of a redemption request may render such redemption request void.

After receiving notice of a redemption from a Shareholder, the Directors may, upon at least 24 hours notice to the Shareholder (via email or otherwise), exercise their discretion pursuant to the Articles to determine the Redemption Date and redeem the relevant Shares at any time prior to the requested Redemption Date.  For example, if a Shareholder gives notice on January 1 of its intention to redeem its Shares effective March 31, the Fund may give notice to the Shareholder that its Redemption Date will be brought forward to February 28 and pay redemption proceeds based on the Fund's Net Asset Value as of such date.

## Compulsory Redemptions

The Fund may compulsorily redeem the Shares of any Shareholder at any time for any reason or for no reason in the sole discretion of the Directors.  This mandatory redemption right may be exercised by sending notice (including e-mail notice) to the Shareholder or to any agent of the Shareholder listed in the Subscription Documents.

## Suspension of Redemptions

The Fund will suspend redemption of its Shares during any period in which the calculation of the Net Asset Value of the Fund or the Net Asset Value per Share has been suspended.  (See "*Net Asset Valuation - Suspension of Calculation*" herein.)

## NET ASSET VALUATION

## Method of Calculation

The Net Asset Value of each series of Shares will be determined by the Administrator in consultation with the Directors and the Investment Manager as at the close of business on the last Business Day of each month and on such other dates as are determined by the Directors in their sole discretion (collectively, "**Valuation Dates**").  The Net Asset Value of the Fund will be equivalent to the gross assets less the gross liabilities of the Fund as of any date of determination. To the extent feasible, expenses, fees and other liabilities will be accrued in accordance with GAAP.  However, reserves for estimated or accrued expenses, liabilities or contingencies, including general reserves for unspecified contingencies, need not be taken in accordance with GAAP.  In addition, although not consistent with GAAP, the organizational expenses of the Class L Shares are being amortized over a 60-month period, which may result in the audit opinion being qualified. The "**Net Asset Value of the Shares**" means the Net Asset Value of the Fund that is represented by each series of Class L Shares, in the aggregate.

Because the various series of Shares are issued at different dates, the Net Asset Value per Share of each such series is expected to differ.  The Net Asset Value per Share (prior to the determination of any Incentive Allocation) will be calculated at the time of each Valuation Date by, generally, first allocating any net capital appreciation or net capital depreciation in the Net Asset Value of the Fund for the period in question among each class of shares pro rata in accordance with the Net Asset Value of each class as of the immediately preceding Valuation Date (except for net capital appreciation and net capital depreciation in respect of (i) the Banyon Investment, which are allocated to the Participating Classes only and (ii) "new issues," which are allocated to the relevant Sub-Class of Shares only in accordance with FINRA rules), then, generally, allocating any net capital appreciation or net capital depreciation in the Net Asset Value of each class of shares among each series of shares within each class pro rata in accordance with the Net Asset Value of each such series as of such preceding Valuation Date and then dividing the Net Asset Value of such series of the Fund by the number of Shares of the series then in issue or deemed to be in issue.  Each Share within a series will have the same Net Asset Value.  An Incentive Allocation determined with respect to a particular series will be debited against the Net Asset Value of that series.

The Net Asset Value of the Master Fund is determined for all purposes (such as calculating profits and losses) by the Administrator, subject to the ultimate direction of the General Partner from time to time with respect to certain securities, as of the close of business on the last day of each period for which calculations are required in accordance with the Master Fund Agreement.  The Master Fund may also retain one or more independent valuation agents from time to time to assist in valuing certain of the Master Fund's assets.  Under the terms of the Master Fund Agreement, the value of the Master Fund's assets are determined as follows:

(a) *Listed Securities*.  Freely marketable securities listed or admitted to trading on any U.S. or non-U.S. stock exchange or the U.S. NASDAQ National Market or comparable non-U.S. market system ("**NMS**") will be valued (A) at the last reported sale price of the security on the primary stock exchange or the NMS, as the case may be, on the date of determination, or in case there will have been no sale of such security on such date, then (B) at the mean between representative "bid" and "asked" prices for such security on such exchange or the NMS at the close of business on the date of determination, or if no such "bid" and "asked" prices are reported on such date, then (C) at the last reported sale or mean between representative "bid" and "asked" price within the five-day period preceding such date; or, if neither such last sale price nor "bid" and "asked" prices are reported during such period, then (D) at such price as the General Partner deems to be fair market value.

(b) *Unlisted Securities*.  Freely marketable securities traded over-the-counter or on another dealer market will be valued (A) at the "last sale" price as reported by the National Association of Securities Dealers Automated Quotation System ("**NASDAQ**") or other primary U.S. or non-U.S. quotation system as of the date of determination or, if no such price is reported for such date, then (B) at the mean between representative "bid" and "asked" prices at the close of business on the date of determination, as reported in NASDAQ or such other system (or, if not so reported, then as reported by a recognized quotation service), or, if no such price is reported on such date, then (C) at the "last sale" or mean between representative "bid" and "asked" prices so reported within the five-day period preceding such date, or, if neither such "last sale" price nor such "bid" and "asked" prices are reported during such period.

(c)      *Restricted Securities*.  All securities which are not freely marketable by reason of legal restrictions ("**Restricted Securities**"), if readily and immediately convertible into or exercisable for freely marketable securities, will be valued on the basis applicable to such underlying securities, reduced by the applicable conversion or exercise price, as the case may be, and all other Restricted Securities will be valued at their fair value, on the basis of the last representative sale price of similarly restricted securities, or if no such sale price is available, then at such price as the General Partner deems to be fair value.

(d)      *Short Positions*.  Securities held short by the Master Fund will be valued as respectively provided in (a), (b) or (c) above, as applicable.  The value of securities held short by the Master Fund will be treated as a liability of the  Master Fund and, together with the amount of any margin or other loans on account thereof, will be subtracted from the Master Fund's assets in determining net assets of the Master Fund.

(e)      *Options*.  Options for the purchase or sale of securities will be valued as respectively provided in (a), (b), (c) or (d), as applicable, except that options listed on an exchange will in any event be valued at the mean between the representative "bid" and "asked" prices at the close of business on the date of determination.  Premiums from the sale of options written by the Master Fund will be included in the assets of the Master Fund and the market value of such options will be included as a liability of the Master Fund.

(f)      *Dividends*.  Dividends declared but not yet received, and rights in respect of securities which are quoted ex-dividend or ex-rights, will be included at the fair value thereof, less any applicable taxes thereon, as determined by the General Partner, which may, but need not, be the fair market value so determined on the day the particular securities are first quoted ex-dividend or ex-rights.

(g)      *Commodity Interests*.  Positions in commodities, commodity futures contracts, options on such futures contracts or other interests in commodities traded on an exchange, through a clearing firm, a bank or through another financial institution will be valued at their most recent settlement price, or closing market quotation, as appropriate, on the applicable exchange or with such firm or institution on the applicable determination date.  If such contract cannot be liquidated, due to the operation of daily limits or otherwise, as of such determination date, the liquidating value on the first subsequent day on which the contract would be liquidated may be used or such other value as the General Partner may deem fair and reasonable may be used.

(h)      *Cash Items*.  Short-term money market instruments and bank deposits will be valued at cost (together with accrued and unpaid interest) or market, depending on the type of investment, as the General Partner will deem appropriate.

(i)      *Other Funds*.  With respect to the Master Fund's ownership of interests in Other Funds, the value of such interest(s) shall mean the values reported to the Master Fund in the applicable net asset value statements sent by such Other Funds ("**Other Fund NAV**") to the Master Fund or, if such statements are not available, the most recent estimated net asset value of each of the Other Funds ("**Estimated Other Fund NAV**") based on preliminary returns reported by the Other Fund.  Once the Master Fund has finalized its Net Asset Value, whether or not

based on an Estimated Other Fund NAV, adjustments will be made only in subsequent periods and, except with respect to circumstances determined to be material in the discretion of the General Partner, no retroactive restatements will be made.  Therefore, in the event that there is a difference between an Estimated Other Fund NAV and the Other Fund NAV, any necessary adjustments will affect, and be reflected in, the Master Fund's Net Asset Value reported in subsequent periods.  Additionally, if there is a difference between the Estimated Other Fund NAV and the Other Fund NAV that results in an adjustment of the Master Fund's Net Asset Value after the Redemption Date or a Closing Date, the Master Fund will not make any adjustment to the Redemption Price or the subscription price, as the case may be.

(j)     *Other Assets*.  The value of any other assets of the Master Fund (or the value of the assets mentioned in (a) through (h) in situations not covered thereby, or in the event of any other happening determined by the General Partner in its discretion to make another method of valuation advisable) will be their fair value, determined in such manner as may be selected from time to time by the General Partner in its discretion.  All values assigned to assets by the General Partner will be final and conclusive as to all Shareholders.

## Suspension of Calculation

The Fund may suspend the calculation of the value of the Fund's assets and the Net Asset Value during the following circumstances:  (i) one or more U.S. or non-U.S. stock exchanges or other markets on which a significant amount of the Fund's investments are listed or quoted and which constitute the primary markets for such investments are closed for any reason other than that of an ordinary holiday, or transactions at these exchanges are restricted or suspended; (ii) the existence of a war, natural catastrophe or any like state of affairs which constitutes an emergency as a result of which disposal of securities by the Fund is not possible in an orderly manner; (iii) any means of communications necessary to determine the price or value of any of the Fund's investments do not function; (iv) the transfer of funds involved in the realization or acquisition of any investments is, in the judgment of the General Partner, not possible at normal rates of exchange; or (v) the Master Fund has suspended valuations, withdrawals and/or acceptance of capital contributions.

Notwithstanding the foregoing, if the General Partner determines that the valuation of any securities or other property in accordance with the above guidelines does not fairly represent market value, the General Partner may value such securities or other property as it reasonably determines and will set forth the basis of such valuation in writing in the Fund's records.

## BROKERAGE AND TRANSACTIONAL PRACTICES

The Master Fund may incur substantial brokerage commissions and other transaction expenses.  The Investment Manager has complete discretion in deciding which brokers and dealers to use and in negotiating rates of brokerage compensation.  In addition to using brokers as agents and paying commissions, the Master Fund may buy or sell Financial Instruments directly from or to dealers acting as principal (such as market-makers for over-the-counter derivatives) at prices that include markups or markdowns.  The following describes some noteworthy aspects of the Investment Manager's and the Master Fund's use of and relationships with brokers and dealers.

### Selection Criteria, Generally

In choosing brokers and dealers, the Investment Manager is not required to consider any particular criteria.  The Investment Manager seeks "best execution" of Master Fund transactions. What constitutes "best execution" and determining how to achieve it are inherently uncertain.  In evaluating whether a broker or dealer will provide best execution, the Investment Manager considers a range of factors.  These include, among others, historical net prices (after markups, markdowns or other transaction-related compensation) on other transactions; the execution, clearance and settlement and error correction capabilities of the broker or dealer generally and in connection with securities of the type and in the amounts to be bought or sold; the broker's or dealer's willingness to commit capital; the broker's or dealer's reliability and financial stability; the size of the transaction; research, corporate access, reputation, the availability of securities to borrow for short sales; the nature, quantity and quality of research provided by the broker or dealer; the broker's or dealer's ability to protect the Master Fund's trading patterns, positions and strategies from the broader market; and the market for the security.  As discussed below, the Investment Manager is not required to select the broker or dealer that charges the lowest transaction cost, even if that broker or dealer provides execution quality comparable to other brokers or dealers, and the Master Fund at times pays more than the lowest transaction cost available in order to obtain for itself and/or the Investment Manager services and products other than securities execution.

### "Soft Dollars"

The Investment Manager is authorized to determine different Brokers to be used for each Financial Instrument transaction for the Master Fund.  In selecting Brokers to execute transactions, the Investment Manager need not solicit competitive bids and does not have an obligation to seek the lowest available commission cost.  Brokers are selected generally on the basis of best execution, which will be determined by taking into account, among other things, commission rates (and other transactional charges), the Broker's financial strength, stability and responsibility, reputation, reliability, research capability, responsiveness to the Investment Manager and accuracy of recommendations on particular Financial Instruments, ability to execute trades, block trading and block positioning capabilities, nature and frequency of sales coverage, net price, depth of available services, arbitrage operations, bond capability and option operations, the availability of stocks to borrow for short trades, willingness to execute related or

unrelated difficult transactions in the future, order of call, back office, processing and special execution capabilities, efficiency of execution and error resolution.

In selecting Brokers, the Investment Manager may also take into account the value of referrals of prospective investors in the Fund, other investment funds investing in the Master Fund or other funds managed by the Investment Manager or its Affiliates and any related finder's fees.  Accordingly, the Master Fund may be deemed to be paying for such services with "soft" or commission dollars.  Although the Investment Manager believes that the Master Fund may benefit from the services obtained with such "soft" dollars, the Master Fund does not benefit from all of the "soft" dollar services.  The relationships with brokerage firms that provide "soft" dollar services to the Investment Manager may influence the Investment Manager's judgment in allocating brokerage business and create a conflict of interest in using the services of those broker-dealers to execute the Master Fund's brokerage transactions.

## Aggregation of Orders

In accordance with the terms of its compliance manual, the Investment Manager may combine orders on behalf of the Master Fund with orders for other accounts for which it or its principals have trading authority, or in which it or its principals have an economic interest; provided, however, that the Investment Manager may not combine orders on behalf of the Master Fund with orders for the personal accounts of the principals of the Investment Manager.  In such cases, the Investment Manager will allocate the securities or proceeds arising out of those transactions (and the related transaction expenses) on an average price basis among the various participants.  The Investment Manager believes combining orders in this way will, over time, be advantageous to all participants.  However, the average price could be less advantageous to the Master Fund than if the Master Fund had been the only account effecting the transaction or had completed its transaction before the other participants.  Because of the Investment Manager's interest in the Master Fund, there may be circumstances in which the Master Fund's transactions may not, under certain laws and regulations, be combined with those of some of the Investment Manager's and its Affiliates' other clients, and the Master Fund may obtain less advantageous execution than such other clients.

## Custody, Clearing and Settlement

The Master Fund has arrangements with a number of brokers and clears the Master Fund's transactions for securities, equities, bonds, options and futures through a number of brokerage firms.  Some securities of the Master Fund may be held by brokers as custodians for the Master Fund.  Other assets of the Master Fund may be held directly by the Master Fund and not through a custodial arrangement.

## SUMMARY OF THE MATERIAL AGREEMENTS

The following summarizes the material provisions of the Articles and the Master Fund Agreement.  It must not be assumed that such summaries are complete or accurate and such summaries are qualified in their entirety by the contents of the documents which they purport to summarize.  In the event of any conflict between the summaries contained herein and the contents of the actual agreements, the terms of the actual agreements will control.  Each

prospective investor is invited to meet with the Investment Manager to ask questions of and receive answers from the Investment Manager concerning any questions he or she may have with respect to the following agreements and to obtain any additional information, to the extent such information may be readily available.

## The Fund's Articles

The Fund has an authorized share capital of $50,000 divided into 5,000,000 ordinary shares with a nominal or par value of $0.01 each. Class L Shares ("**Class L Shares**" or the "**Shares**") are ordinary shares offered pursuant to this Memorandum. Accepted subscribers for Class L Shares will become shareholders of the Fund (each, a "**Shareholder**" and collectively, the "**Shareholders**"). Shares will be issued in registered, book-entry form only unless the Directors determine otherwise. Each Share will be issued as fully paid and non-assessable. No shares have preemptive, conversion, or exchange rights.

Each Share of a series represents an equal proportionate interest with each other Share of such series in the assets and liabilities of the Fund attributed in the books and records of the Fund to such series of Shares in accordance with the Articles.

The Directors may authorize the division of Shares into any number of Sub-Classes and series and the different Sub-Classes and series shall be established and designated (or redesignated as the case may be) and the variations in the relative rights (including voting and dividend rights), restrictions, preferences, privileges and payment obligations as between the different sub-Classes and series (if any) shall be fixed and determined by the Directors. The pro rata portion of the Fund's assets that may be attributed to each Sub-Class or series may be invested together with the pro rata portion of the Fund's assets that may be attributed to each other Sub-Class or series.

To facilitate equitable allocation of the Incentive Allocation by the Intermediate Fund to PPVA LP among investors purchasing Shares on different dates, Shares will be issued in a different series at each Offering Date, as described above. The first series of Shares will be designated the "**Initial Series**" and each subsequently issued series will be numbered sequentially. As an internal accounting matter, the Directors will establish in relation to each series a "**Series Account**" to which the subscription monies received from the issue of Shares of that series will be allocated, together with investments and income, gains and losses derived therefrom. Fund liabilities (save for any series-specific liabilities) will generally be allocated among the series proportionately and charged to the various Series Accounts.

The Articles permit the Fund to consolidate, by way of redemption and reissuance, different series of Shares into a single series at the end of each fiscal year of the Fund; provided that the loss carryforward with respect to that series has been met.

The Common Shares shall be issued at par value, fully paid, and shall carry the right to receive notice of and to attend, speak and to vote at general meetings of the Fund. Common Shares shall confer upon the holder thereof the right in a winding-up or repayment of the capital to receive a sum equal to the par value thereof but shall confer no other right to participate in the profits or assets of the Fund, including in respect of any dividends.

The holders of the Class L Shares are entitled to receive notice of, attend, speak or vote at general meetings of the Fund, in addition to (i) the right to receive notice of, to attend, speak and vote at general meetings of the Fund in connection with any matter concerning the dissolution of the Fund and any resolution in connection therewith, (ii) the "class rights" specified below and (iii) certain limited rights to vote in connection with certain amendments to the Articles. The holders of the Shares are entitled to vote with respect to any amendment to the Articles. Notwithstanding the foregoing, certain Classes of Shares have no right to receive notice of, attend, speak or vote at general meetings of the Fund.

The Articles may be amended or supplemented at any time and from time to time by the Directors in their sole discretion, subject either to the consent of the Shareholders or notice and an opportunity for such Shareholders to redeem their Shares, if applicable.

With respect to amendments to the Articles that require the consent of the Shareholders, the rights attaching to any Class or series of shares (unless otherwise provided by the terms of issue of the shares of that Class or series) may only be materially adversely varied or abrogated with the consent in writing of the holders of two-thirds of the issued shares of that Class or series, or with the sanction of a resolution passed by at least a two-thirds majority of the holders of shares of the Class or series present in person or by proxy at a separate general meeting of the holders of the shares of the Class or series. The rights conferred upon the holders of the shares of any Class or series issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that Class or series, be deemed to materially adversely varied or abrogated by the creation or issue of further shares (including any Class or series of Shares) ranking pari passu therewith or the redemption or purchase of shares of any Class or series by the Fund.

The Directors may refuse to approve the registration of any transfer of Shares in their sole discretion. No transfer of Shares shall be permitted unless (i) the transferor meets all fees and expenses of the Fund relating to the transfer and (ii) the transferor delivers to the Fund a legal opinion, in form and substance satisfactory to the Fund, in its sole discretion, to the effect that the proposed transfer is permitted under all applicable U.S. securities laws.

Every Director, secretary, assistant secretary, or other officer for the time being and from time to time of the Fund (but not including the auditors) and the personal representatives of the same (each, an "**Indemnified Person**") shall be indemnified and held harmless out of the assets and funds of the Fund against all actions, proceedings, costs, charges, expenses, losses, damages or liabilities incurred or sustained by him in or about the conduct of the Fund's business or affairs or in the execution or discharge of his duties, powers, authorities or discretions, including without prejudice to the generality of the foregoing, any costs, expenses, losses or liabilities incurred by him in defending (whether successfully or otherwise) any civil proceedings concerning the Fund or its affairs in any court whether in the Cayman Islands or elsewhere. No such Indemnified Person shall be liable (a) for the acts, receipts, neglects, defaults or omissions of any other such Director or officer or agent of the Fund or (b) for any loss on account of defect of title to any property of the Fund or (c) on account of the insufficiency of any security in or upon which any money of the Fund shall be invested or (d) for any loss incurred through any bank, broker or other similar person or (e) for any loss occasioned by any negligence, default, breach of duty, breach of trust, error of judgment or oversight on his part or (f) for any loss,

damage or misfortune whatsoever which may happen in or arise from the execution or discharge of the duties, powers authorities, or discretions of his office or in relation thereto, unless the same shall happen through his own dishonesty.

The Articles also provide that any disputes which may arise between the Fund and any of its Shareholders, their executors, administrators or assigns will be resolved through arbitration in accordance with the procedures contained therein.

The Intermediate Fund's Articles are substantially similar to the Fund's Articles.

## Master Fund Agreement

A limited partner in the Master Fund (a "**Limited Partner**") has no liability for the repayment and discharge of any obligations of the Master Fund save to the extent specified in the Exempted Limited Partnership Law (2012 Revision) of the Cayman Islands and to the extent of their respective interests in the Master Fund with respect to any debts and obligations of the Master Fund attributable to any fiscal year or part thereof during which such Limited Partner was a Limited Partner. The Master Fund will continue until December 31, 2023 unless sooner dissolved pursuant to the Master Fund Agreement. The Master Fund may also be extended for up to two (2) two-year periods by the General Partner, with the consent of the majority in interest of the Limited Partners of the Master Fund. A separate capital account will be established on the books of the Master Fund and a partnership percentage will be determined for each partner in the Master Fund (the General Partner and the Limited Partners together, the "**Partners**," each, a "**Partner**"). Each such capital account will reflect the net capital appreciation and net capital depreciation of each Partner's interest in the Master Fund. Additional contributions may be made by each Partner in accordance with the Master Fund Agreement. The management of the Master Fund is vested exclusively in the General Partner. The General Partner will be reimbursed for expenses incurred on behalf of the Master Fund. The Master Fund Agreement permits the Master Fund to pay a salary or other compensation to the General Partner. The Master Fund's assets will be valued in accordance with the terms of the Master Fund Agreement and the General Partner may make distributions to the Partners on a pro rata basis. No Limited Partner will be allowed to withdraw amounts from its capital account without the prior written consent of the General Partner, which may be withheld or granted in its absolute and sole discretion. Payment of ninety percent (90%) of any amount permitted to be withdrawn by a Limited Partner will be made within thirty (30) days following the withdrawal date and the unpaid balance, together with any interest earned thereon, will be paid (subject to audit adjustments) within thirty (30) days after the completion of the audit of the Fund's books for such fiscal year. Such payments may be made in cash and/or in the discretion of the Directors, in kind (in any manner or combination). The General Partner may, at any time, withdraw any amount from its capital account. A Limited Partner may not directly or indirectly transfer its interest in the Master Fund without the prior written approval of the General Partner, which may be withheld in its absolute and sole discretion for any reason or for no reason. A new Limited Partner may be admitted to the Master Fund at any time with the consent of the General Partner. The Master Fund Agreement may be modified or amended by the General Partner with the approval of more than fifty percent (50%) in partnership percentages of the Limited Partners. In certain cases the General Partner may amend the Master Fund Agreement without the approval of the Limited Partners. The Master Fund will provide to the Limited Partners (i) unaudited

financial reports of the Master Fund at the end of each quarter, and (ii) an audited financial report of the Master Fund at the end of each fiscal year. The General Partner is not liable to any Partner of the Master Fund and the Master Fund will indemnify and hold harmless the General Partner and the persons specified in the Master Fund Agreement subject to, and to the extent of, the terms of the Master Fund Agreement.

## CERTAIN TAX CONSIDERATIONS

**CIRCULAR 230 NOTICE. THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN, INCLUDING ANY OPINION OF COUNSEL REFERRED TO HEREIN, IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN (OR IN ANY SUCH OPINION OF COUNSEL); AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

THE DISCUSSION HEREIN IS FOR INFORMATIONAL PURPOSES ONLY AND IS A DISCUSSION PRIMARILY OF THE U.S. TAX CONSEQUENCES TO PROSPECTIVE INVESTORS. EACH PROSPECTIVE INVESTOR SHOULD CONSULT ITS PROFESSIONAL TAX ADVISOR WITH RESPECT TO THE TAX ASPECTS OF AN INVESTMENT IN THE FUND. TAX CONSEQUENCES MAY VARY DEPENDING UPON THE PARTICULAR STATUS OF A PROSPECTIVE INVESTOR. IN ADDITION, SPECIAL CONSIDERATIONS (NOT DISCUSSED HEREIN) MAY APPLY TO PERSONS WHO ARE NOT DIRECT SHAREHOLDERS IN THE FUND BUT WHO ARE DEEMED TO OWN SHARES AS A RESULT OF THE APPLICATION OF CERTAIN ATTRIBUTION RULES.

None of the Fund, the Intermediate and nor the Master Fund has sought a ruling from the Service or any other U.S. federal, state or local agency with respect to any of the tax issues affecting the Fund, the Intermediate Fund or the Master Fund, nor has any of them obtained an opinion of counsel with respect to any tax issues.

The following is a summary of certain potential U.S. federal tax consequences which may be relevant to prospective investors. The discussion contained herein is not a full description of the complex tax rules involved and is based upon existing laws, judicial decisions and administrative regulations, rulings and practices, all of which are subject to change, retroactively as well as prospectively. A decision to invest in the Fund should be based upon an evaluation of the merits of the trading program, and not upon any anticipated U.S. tax benefits.

U.S. Trade or Business

Section 864(b)(2) of the IRC provides a safe harbor (the "Safe Harbor") applicable to a non-U.S. corporation (other than a dealer in securities) that engages in the U.S. in trading securities (including contracts or options to buy or sell securities) for its own account pursuant to which such non-U.S. corporation will not be deemed to be engaged in a U.S. trade or business. The Safe Harbor also provides that a non-U.S. corporation (other than a dealer in commodities) that engages in the U.S. in trading commodities for its own account is not deemed to be engaged in a U.S. trade or business if "the commodities are of a kind customarily dealt in on an organized commodity exchange and if the transaction is of a kind customarily consummated at such place." Pursuant to proposed regulations, a non-U.S. taxpayer (other than a dealer in stocks, securities or derivatives) that effects transactions in the United States in derivatives (including (i) derivatives based upon stocks, securities, and certain commodities and currencies, and (ii) certain notional principal contracts based upon an interest rate, equity, or certain commodities and currencies) for its own account is not deemed to be engaged in a United States trade or business. Although the proposed regulations are not final, the Service has indicated in the preamble to the proposed regulations that for periods prior to the effective date of the proposed regulations, taxpayers may take any reasonable position with respect to the application of Section 864(b)(2) of the IRC to derivatives, and that a position consistent with the proposed regulations will be considered a reasonable position.

The Investment Manager intends to conduct the businesses of the Fund, the Intermediate Fund and the Master Fund (the latter two of which intend to operate as partnerships for U.S. tax purposes, in which case they would not in any event be subject to U.S. income tax) so as to meet the requirements of the Safe Harbor and believe that the transactions under their investment program (including investments in loans, if any) should qualify for the Safe Harbor. There can be no assurance, however, that the Service will agree that each of the transactions qualify for the Safe Harbor. If certain of the Fund's, the Intermediate Fund's or the Master Fund's activities were determined not to be of the type described in the Safe Harbor, the Fund's, the Intermediate Fund's or the Master Fund's activities may constitute a U.S. trade or business, in which case the Fund would be subject to U.S. income and branch profits tax on its allocable share of the income and gain from those activities and related activities, if any.

Even if the Fund's, the Intermediate Fund's or the Master Fund's securities trading activity does not constitute a U.S. trade or business, gains realized from the sale or disposition of stock or securities (other than debt instruments with no equity component) of U.S. Real Property Holding Corporations (as defined in Section 897 of the IRC) ("USRPHCs"), including stock or securities of certain Real Estate Investment Trusts ("REITs"), will be generally subject to U.S. income tax on a net basis. However, a principal exception to this rule of taxation may apply if such USRPHC has a class of stock which is regularly traded on an established securities market and the Fund generally did not hold (and was not deemed to hold under certain attribution rules) more than 5% of the value of a regularly traded class of stock or securities of such USRPHC at any time during the five year period ending on the date of disposition.[1]  Moreover, if the Fund,

---

[1]     The Fund will also be exempt from tax on direct or indirect dispositions of REIT shares, whether or not those shares are regularly traded, if less than 50% of the value of such shares is held, directly or indirectly, by non-U.S. persons at all times during the five-year period ending on the date of disposition.  However, even if the direct or indirect disposition of REIT shares would be exempt from tax on a net basis,

the Intermediate Fund or the Master Fund were deemed to be engaged in a U.S. trade or business as a result of owning a limited partnership interest in a U.S. business partnership or a similar ownership interest, income and gain realized from that investment would be subject to U.S. income and branch profits tax.

<u>Identity of Beneficial Ownership and Withholding on Certain Payments</u>

In order to avoid a U.S. withholding tax of 30% on certain payments (including payments of gross proceeds) made with respect to certain actual and deemed U.S. investments, the Fund, the Intermediate Fund, the Master Fund and relevant non-U.S. Other Funds will be required to enter into an agreement with the Service by June 30, 2013 identifying certain direct and indirect U.S. account holders (including debtholders and equityholders).  A non-U.S. investor in the Fund will generally be required to provide to the Fund information which identifies its direct and indirect U.S. ownership.  Any such information provided to the Fund will be shared with the Service.  A non-U.S. investor that is a "foreign financial institution" within the meaning of Section 1471(d)(4) of the IRC will generally be required to enter into an agreement with the Service by June 30, 2013 identifying certain direct and indirect U.S. account holders (including debtholders and equityholders).  A non-U.S. investor who fails to provide such information to the Fund or enter into such an agreement with the Service, as applicable, would be subject to the 30% withholding tax with respect to its share of any such payments attributable to actual and deemed U.S. investments of the Fund, and the Board of Directors may take any action in relation to an investor's Shares or redemption proceeds to ensure that such withholding is economically borne by the relevant investor whose failure to provide the necessary information gave rise to the withholding.  Shareholders should consult their own tax advisers regarding the possible implications of these rules on their investments in the Fund.

Non-U.S. shareholders may also be required to make certain certifications to the Fund as to the beneficial ownership of the Shares and the non-U.S. status of such beneficial owner, in order to be exempt from U.S. information reporting and backup withholding on a redemption of Shares.

<u>U.S. Withholding Tax</u>

In general, under Section 881 of the IRC, a non-U.S. corporation which does not conduct a U.S. trade or business is nonetheless subject to tax at a flat rate of 30% (or lower tax treaty rate) on the gross amount of certain U.S. source income which is not effectively connected with a U.S. trade or business, generally payable through withholding.  Income subject to such a flat tax rate is of a fixed or determinable annual or periodic nature, including dividends, certain "dividend equivalent payments" and certain interest income.  There is presently no  tax treaty between the U.S. and the Cayman Islands.

---

distributions from a REIT (whether or not such REIT is a USRPHC), to the extent attributable to the REIT's disposition of interests in U.S. real property, are subject to tax on a net basis when directly or indirectly received by the Fund and may be subject to the branch profits tax.  Distributions from certain publicly traded REITs to non-U.S. shareholders owning 5% or less of the shares are subject to a 30% gross withholding tax on those distributions and are not subject to tax on a net basis.

Certain types of income are specifically exempted from the 30% tax and thus withholding is not required on payments of such income to a non-U.S. corporation. The 30% tax does not apply to U.S. source capital gains (whether long or short-term) or to interest paid to a non-U.S. corporation on its deposits with U.S. banks. The 30% tax also does not apply to interest which qualifies as portfolio interest. The term "portfolio interest" generally includes interest (including original issue discount) on an obligation in registered form which has been issued after July 18, 1984 and with respect to which the person who would otherwise be required to deduct and withhold the 30% tax receives the required statement that the beneficial owner of the obligation is not a U.S. person within the meaning of the IRC.

Redemption of Shares

Gain realized by shareholders who are not U.S. persons within the meaning of the IRC ("non-U.S. shareholders") upon the sale, exchange or redemption of Shares held as a capital asset should generally not be subject to U.S. federal income tax provided that the gain is not effectively connected with the conduct of a trade or business in the U.S. However, in the case of nonresident alien individuals, such gain will be subject to the 30% (or lower tax treaty rate) U.S. tax if (i) such person is present in the U.S. for 183 days or more during the taxable year (on a calendar year basis unless the nonresident alien individual has previously established a different taxable year) and (ii) such gain is derived from U.S. sources.

Generally, the source of gain upon the sale, exchange or redemption of Shares is determined by the place of residence of the shareholder. For purposes of determining the source of gain, the IRC defines residency in a manner that may result in an individual who is otherwise a nonresident alien with respect to the U.S. being treated as a U.S. resident only for purposes of determining the source of income. Each potential individual shareholder who anticipates being present in the U.S. for 183 days or more (in any taxable year) should consult his tax advisor with respect to the possible application of this rule.

Gain realized by a non-U.S. shareholder engaged in the conduct of a U.S. trade or business will be subject to U.S. federal income tax upon the sale, exchange or redemption of Shares if such gain is effectively connected with its U.S. trade or business.

Tax-Exempt U.S. Persons

The term "Tax-Exempt U.S. Person" means a U.S. person within the meaning of the IRC that is exempt from payment of U.S. federal income tax. Generally, a Tax-Exempt U.S. Person is exempt from federal income tax on certain categories of income, such as dividends, interest, capital gains and similar income realized from securities investment or trading activity. This type of income is exempt even if it is realized from securities trading activity which constitutes a trade or business. This general exemption from tax does not apply to the "unrelated business taxable income" ("UBTI") of a Tax-Exempt U.S. Person. Generally, except as noted above with respect to certain categories of exempt trading activity, UBTI includes income or gain derived from a trade or business, the conduct of which is substantially unrelated to the exercise or performance of the Tax-Exempt U.S. Person's exempt purpose or function. UBTI also includes (i) income derived by a Tax-Exempt U.S. Person from debt-financed property and (ii) gains derived by a Tax-Exempt U.S. Person from the disposition of debt-financed property.

In 1996, Congress considered whether, under certain circumstances, income derived from the ownership of the shares of a non-U.S. corporation should be treated as UBTI to the extent that it would be so treated if earned directly by the shareholder.  Subject to a narrow exception for certain insurance company income, Congress declined to amend the IRC to require such treatment.  Accordingly, based on the principles of that legislation, a Tax-Exempt U.S. Person investing in a non-U.S. corporation such as the Fund is not expected to realize UBTI with respect to an unleveraged investment in Shares.  Tax-Exempt U.S. Persons are urged to consult their own tax advisors concerning the U.S. tax consequences of an investment in the Fund.

There are special considerations which should be taken into account by certain beneficiaries of charitable remainder trusts that invest in the Fund.  Charitable remainder trusts should consult their own tax advisors concerning the tax consequences of such an investment on their beneficiaries.

Reporting Requirements for U.S. Persons

The Fund is considered a passive foreign investment company ("PFIC") within the meaning of the IRC.  Any United States person within the meaning of the IRC who holds shares in a PFIC such as the Fund is required to report its investment in the PFIC on an annual basis.

Any U.S. person within the meaning of the IRC owning 10% or more (taking certain attribution rules into account) of either the total combined voting power or total value of all classes of the shares (the "10% Amount") of a non-U.S. corporation such as the Fund will likely be required to file an information return with the Service containing certain disclosure concerning the filing shareholder, other shareholders and the corporation.  Any U.S. person within the meaning of the IRC who within such U.S. person's tax year (A) acquires shares in a non-U.S. corporation such as the Fund, so that either (i) without regard to shares already owned, such U.S. person acquires the 10% Amount or (ii) when added to shares already owned by the U.S. person, such U.S. person's total holdings in the non-U.S. corporation reaches the 10% Amount or (B) disposes of shares in a non-U.S. corporation so that such U.S. person's total holdings in the non-U.S. corporation falls below the 10% Amount (in each such case, taking certain attribution rules into account), will likely be required to file an information return with the Service containing certain disclosure concerning the filing shareholder, other shareholders and the corporation.  The Fund has not committed to provide all of the information about the Fund or its shareholders needed to complete these returns.  In addition, a U.S. person within the meaning of the IRC that transfers cash to a non-U.S. corporation such as the Fund may be required to report the transfer to the Service if (i) immediately after the transfer, such person holds (directly, indirectly or by attribution) at least 10% of the total voting power or total value of such corporation or (ii) the amount of cash transferred by such person (or any related person) to such corporation during the twelve-month period ending on the date of the transfer exceeds $100,000.

Certain U.S. persons ("potential filers") who have an interest in a foreign financial account during a calendar year are generally required to file Form TD F 90-22.1 (an "FBAR") with respect to such account.  Failure to file a required FBAR may result in civil and criminal penalties.  Under existing regulatory guidance, potential filers who do not own (directly or indirectly) more than 50% of the voting power or total value of the shares of the Fund, generally

are not obligated to file an FBAR with respect to an investment in the Fund.  However, potential filers should consult their own advisors regarding the current status of this guidance.

Furthermore, certain U.S. persons within the meaning of the IRC may have to file Form 8886 ("Reportable Transaction Disclosure Statement") with their U.S. tax return, and submit a copy of Form 8886 with the Office of Tax Shelter Analysis of the Service if the Fund engages in certain "reportable transactions" within the meaning of U.S. Treasury Regulations.  If the Service designates a transaction as a reportable transaction after the filing of a reporting shareholder's tax return for the year in which the Fund or such reporting shareholder participated in the transaction, the reporting shareholder may have to file Form 8886 with respect to that transaction within 90 days after the Service makes the designation.  Shareholders required to file this report include a U.S. person within the meaning of the IRC if the Fund is treated as a "controlled foreign corporation" and such U.S. person owns a 10% voting interest.  In certain situations, there may also be a requirement that a list be maintained of persons participating in such reportable transactions, which could be made available to the Service at its request.  Moreover, if a U.S. person within the meaning of the IRC recognizes a loss upon a disposition of Shares, such loss could constitute a "reportable transaction" for such shareholder, and such shareholder would be required to file Form 8886.  A significant penalty is imposed on taxpayers who fail to make the required disclosure.  The maximum penalty is $10,000 for natural persons and $50,000 for other persons (increased to $100,000 and $200,000, respectively, if the reportable transaction is a "listed" transaction).   Shareholders who are U.S. persons within the meaning of the IRC (including Tax-Exempt U.S. Persons) are urged to consult their own tax advisors concerning the application of these reporting obligations to their specific situations and the penalty discussed above.

Estate and Gift Taxes

Individual holders of Shares who are neither present or former U.S. citizens nor U.S. residents (as determined for U.S. estate and gift tax purposes) are not subject to U.S. estate and gift taxes with respect to their ownership of such Shares.

Cayman Islands

There are no income, corporation, capital gains or other taxes in effect in the Cayman Islands on the basis of present legislation.  The Fund and the Intermediate Fund and the are exempted companies, and the Master Fund is an exempted limited partnership, under Cayman Islands law.  The Fund and the Intermediate Fund are exempted companies, and the Master Fund is an exempted limited partnership, under Cayman Islands law.  Each of the Fund and the Intermediate Fund has received an undertaking as to tax concessions pursuant to Section 6 of the Tax Concessions Law (Revised), and the Master Fund has received an equivalent undertaking pursuant to Section 17 of the Exempted Limited Partnership Law (Revised), which provides that, for a period of 20 years (or, in the case of the Master Fund, 50 years) from the date of issue of the undertaking, no law thereafter enacted in the Cayman Islands imposing any taxes or duty to be levied on income or capital assets, gains or appreciation will apply to any income or property of the Fund, the Intermediate Fund or the Master Fund.

European Union Savings Directive

Shareholders who are individuals resident in a Member State of the European Union or certain other jurisdictions referred to below should be aware of the provisions of the EU Council Directive 2003/48/EC of June 3, 2003 on taxation of savings income in the form of interest payments (the "**Directive**") pursuant to which income realized upon the sale or redemption of shares in undertakings for collective investment, as well as any income in the form of dividends or other distributions made by such undertakings for collective investment, may (depending upon the location, classification and investment portfolio of the undertaking) become subject to the reporting regime or withholding tax regime imposed by the Directive, if such payment is made by a paying agent established either in a Member State of the European Union or in certain other jurisdictions which have introduced an equivalent reporting or withholding tax regime in respect of such payments.

The provisions of the Directive apply to payments made on or after 1 July 2005. As a result of the classification by the Cayman Islands of funds such as the Fund established in its jurisdiction, it is unlikely that payments made directly by the Fund will be subject to the reporting (or withholding tax) regime. However, because these rules are complex and the precise extent of their application has not yet been confirmed by all Member States or other relevant jurisdictions which have agreed to introduce an equivalent reporting (or withholding tax) regime, application of the regime to payments emanating from the Fund cannot be excluded in all cases and shareholders who are individuals should consult their own tax advisers.

Shareholders to whom the Directive may be relevant should also be aware that the EU Commission is currently undertaking a review of the Directive, and that the proposals being considered as a part of that review include a possible extension of the types of funds or other undertakings for collective investment that are within the scope of the Directive. This extension, if implemented, might mean that in the future payments made by the Fund through any such payment agent as is described above to relevant Shareholders upon the redemption of Shares, or in the form of dividends or other distributions, could become subject to the reporting (or withholding tax) regime.

Other Jurisdictions

Interest, dividend and other income realized by the Fund, the Intermediate Fund or the Master Fund from non-U.S. sources, and capital gains realized, or gross sale or disposition proceeds received, on the sale of securities of non-U.S. issuers, may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced. It is impossible to predict the rate of foreign tax the Fund, the Intermediate Fund or the Master Fund will pay since the amount of the assets to be invested in various countries and the ability of the Fund, the Intermediate Fund or the Master Fund to reduce such taxes, are not known.

Future Changes in Applicable Law

The foregoing description of U.S. and Cayman Islands income tax consequences of an investment in and the operations of the Fund, the Intermediate Fund and the Master Fund is based on laws and regulations which are subject to change through legislative, judicial or

administrative action. Other legislation could be enacted that would subject the Fund, the Intermediate Fund or the Master Fund to income taxes or subject shareholders to increased income taxes.

<u>Other Taxes</u>

Prospective investors should consult their own counsel regarding tax laws and regulations of any other jurisdiction which may be applicable to them.

THE TAX AND OTHER MATTERS DESCRIBED IN THIS MEMORANDUM DO NOT CONSTITUTE, AND SHOULD NOT BE CONSIDERED AS, LEGAL OR TAX ADVICE TO PROSPECTIVE INVESTORS.

## CAYMAN ISLANDS MUTUAL FUNDS LAW

The Fund falls within the definition of a "Mutual Fund" in terms of the Mutual Funds Law of the Cayman Islands (as amended) (the "**Law**") and accordingly is regulated in terms of that Law. However, the Fund is not required to be licensed or employ a licensed mutual fund administrator since the minimum aggregate investment purchasable by a prospective investor in the Fund exceeds $50,000 or its equivalent in any other currency.

As a regulated mutual fund, the Fund is subject to the supervision of the Cayman Islands Monetary Authority (the "**Monetary Authority**"). The Fund must file this Memorandum and any changes that materially affect any information in this document with the Monetary Authority. The Monetary Authority may, at any time, instruct the Fund to have its accounts audited and to submit them to the Monetary Authority within such time as the Monetary Authority specifies. A prescribed fee must also be paid annually. The Monetary Authority may, at any time, instruct the Fund to have its accounts audited and to submit them to the Monetary Authority within such time as the Monetary Authority specifies. In addition, the Monetary Authority may ask the Directors to give the Monetary Authority such information or such explanation in respect of the Fund as the Monetary Authority may reasonable require to enable it to carry out its duty under the Law.

The Monetary Authority shall, whenever it considers it necessary, examine, including by way of on-site inspections or in such other manner as it may determine, the affairs or business of the Fund for the purpose of satisfying itself that the provisions of the Law and applicable anti-money laundering regulations are being complied with.

The Directors must give the Monetary Authority access to or provide at any reasonable time all records relating to the Fund and the Monetary Authority may copy or take an extract of a record it is given access to. Failure to comply with these requests by the Monetary Authority may result in substantial fines on the part of the Directors and may result in the Monetary Authority applying to a court to have the Fund wound up.

The Monetary Authority may take certain actions if it is satisfied that a regulated mutual fund:

(a)      is or is likely to become unable to meet its obligations as they fall due;

(b)      is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors;

(c)      is not being managed in a fit and proper manner; or

(d)      has any person appointed as Director, manager or officer that is not a fit and proper person to hold the respective position.

The powers of the Monetary Authority include *inter alia* the power to require the substitution of Directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund.  There are other remedies available to the Monetary Authority including the ability to apply to the court for approval of other actions.

The Intermediate Fund does not fall within the definitions of either "mutual fund" or "master fund" pursuant to the Mutual Funds Law and therefore is not expected to be registered with, or regulated by, the Monetary Authority.

Pursuant to the Mutual Funds Law, certain "master funds" (as defined therein) are required to be registered with, and regulated by, the Monetary Authority.  The Master Fund is so regulated. The registration process and the consequences of regulation are substantially similar to that described above in relation to the Fund, save that a "master fund" is not required to adopt or file a separate offering document with the Monetary Authority.

---

## THE ADMINISTRATOR

### The Administrator

The Fund, Platinum USA, the Intermediate Fund and the Master Fund (collectively, the "**Funds**") have entered into an administration agreement (the "**Administration Agreement**") with SS&C Technologies, Inc. (acting through its business unit, SS&C Fund Services) (the "**Administrator**") to perform day-to-day administrative, bookkeeping and registrar and transfer agency services.  The Administrator and its affiliates, under the ultimate supervision of the Directors, will be responsible for matters pertaining to the administration of the Fund, including, without limitation:  (i) calculating Net Asset Value; (ii) maintaining financial books and records so far as may be necessary to give a complete record of all transactions carried out by the Administrator on behalf of the Fund; (iii) providing registrar and transfer agent services in connection with the issuance, transfer and redemption of Shares; and (iv) observing and complying with applicable anti-money laundering laws and regulations.

The Fund has appointed the Administrator to act as registrar and transfer agent (the "**Registrar**") for the Fund.  The services provided by the Administrator, in the context of acting as Registrar, include the maintenance of a copy of the register of Share ownership (the "**Share**

**Register**") representing the Fund's records relating to Share ownership and the redemption of Shares; receipt of requests for redemption; authorization of redemption payments; authorization of disbursements of management fees and incentive fees and allocations, commissions and other charges; and other services as agreed on by the parties.

The fees payable to the Administrator are based on the aggregate net asset value of the Funds as detailed in the Administration Agreement.  The Fund may retain other service providers affiliated with the Administrator to perform the administrative services that would otherwise be performed by the Administrator.

The Administration Agreement may be renewed for two-year periods.  The Administration Agreement is subject to termination by the Administrator or by the Fund upon 90 days' written notice prior to the end of a given term or immediately in certain other circumstances specified therein.

In the absence of a material breach of the Administration Agreement by the Administrator due to gross negligence, bad faith, fraud or dishonesty in the performance of the Administrator's duties under the Administration Agreement, neither the Administrator nor any of its affiliates, officers, directors, employees, agents, successors and assigns (each, an "**Administrator Indemnified Person**") shall be liable to the Fund or any Shareholder or any other person on account of anything done, omitted or suffered by the Administrator or any other Administrator Indemnified Person in good faith pursuant to the Administration Agreement in the performance of the services described therein.

Under the Administration Agreement, the Fund agrees to indemnify and keep the Administrator and the Administrator Indemnified Persons indemnified from and against any liabilities, obligations, losses, damages, penalties, actions, judgments, claims, demands, suits, costs, expenses or disbursements that may be imposed on, incurred by or asserted against any of them arising (other than by reason of gross negligence, bad faith, fraud or dishonesty on the part of the Administrator or any other Administrator Indemnified Person or the material breach of the Administration Agreement by the Administrator) in connection with the provision of services under the Administration Agreement.

The Administrator is not responsible for any trading decisions of the Master Fund (all of which will be made by the Investment Manager and/or the Portfolio Managers).

THE ADMINISTRATOR WILL NOT PROVIDE ANY INVESTMENT ADVISORY OR MANAGEMENT SERVICES TO THE FUNDS AND THEREFORE WILL NOT BE IN ANY WAY RESPONSIBLE FOR THE FUNDS' PERFORMANCE.

## AUDITORS

The independent auditors for the Fund are BDO Tortuga, Cayman Islands, or such other firm as may be selected by the Directors from time to time.

## LEGAL COUNSEL

SRZ serves as U.S. securities, commodities and tax counsel to the Fund, the Intermediate Fund, the Master Fund and the Investment Manager (collectively, the "**Platinum Parties**").

Walkers serves as Cayman Islands legal counsel to the Fund, the Intermediate Fund and the Master Fund.

SRZ's representation of the Platinum Parties and their respective affiliates and Walkers' representation of the Fund, the Intermediate Fund, the Master Fund and their respective affiliates is limited to specific matters as to which they have been consulted by the Investment Manager. There may exist other matters that could have a bearing on the Platinum Parties and their respective affiliates as to which they have not been consulted.  In addition, SRZ and Walkers do not undertake (nor do they intend) to monitor the compliance of the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth in this Memorandum, nor do they monitor compliance with applicable laws.   In reviewing this Memorandum, SRZ and Walkers relied upon information furnished to them by the Investment Manager and its affiliates, and did not investigate or verify the accuracy and completeness of information set forth herein concerning the Platinum Parties and their respective affiliates and personnel.

SRZ and Walkers do not represent any prospective investors in connection with the offering and will not be representing the Shareholders.

## ADDITIONAL INFORMATION

The Investment Manager and the Administrator will answer all inquiries from prospective investors relative to the offering of the Shares and the intended operation of the Fund, the Intermediate Fund, and the Master Fund and will provide additional information (to the extent that they possesses such information or can acquire it without unreasonable effort or expense) necessary to verify the accuracy of any representations or information set forth in this Memorandum.

# EXHIBIT 7

# Platinum Partners
## VALUE ARBITRAGE FUND LP

**CONFIDENTIAL FOR DISCUSSION PURPOSES ONLY**
**PLATINUM MANAGEMENT (NY) LLC**

**DECEMBER 1, 2015**

www.platinumlp.com

PLATINUM PARTNERS
VALUE ARBITRAGE FUND | DISCLOSURES

**Disclosures**

Introduction

Strategies

Performance

Risk Management

Transparency

Compliance

Investor Base

Uncorrelated Returns

Awards & Recognition

Conclusion

Biographies

Fund Information

Past performance is not necessarily indicative of future performance. This material is not an invitation to subscribe for shares or interests in any fund and is by way of information only. Sales of shares or interests are made on the basis of the relevant offering documents only and are not offered in any jurisdiction in which such offer or sale is not authorized. Investors will purchase limited partnership interests in Platinum Partners Value Arbitrage Fund (USA) L.P. ("Platinum USA") or preferred shares in Platinum Partners Value Arbitrage Fund (International) Limited ("Platinum International"), depending on the preference for an onshore or offshore feeder fund. Platinum USA and Platinum International will, in turn, invest all or substantially all of their assets in the Platinum Partners Value Arbitrage Fund L.P. (the "Master Fund"). Before any investment is made in either Platinum USA or Platinum International, investors should review carefully the Confidential Private Offering Memorandum for such fund (collectively, the "Memoranda"). The Memoranda describe in detail the risks associated with making an investment in either Platinum USA or Platinum International. Investors will have the right to redeem or withdraw their interests or shares, as the case may be, on a quarterly basis subject to certain restrictions described in the Memoranda. Investment in either Platinum USA or Platinum International may not be suitable for all investors and prospective investors should consult their professional advisers as to suitability, legal, tax and economic consequences of an investment in either fund. Reference to the "Fund" means an investment in the Master Fund through the purchase of limited partnership interests in Platinum USA or preferred shares of Platinum International.

This presentation is provided for illustration and discussion purposes only and is not intended to be, nor should it be construed or used as investment, tax or legal advice, any recommendation, or an offer to sell, or a solicitation of any offer to buy, an interest in any security, including an interest in Platinum Partners Value Arbitrage Fund (International) Limited, which invests in Platinum Partners Value Arbitrage Fund LP (each, a "Fund" and together, the "Funds") advised by Platinum Management (NY) LLC ("Platinum"). Class J Shares in the Funds are subject to, among other provisions, a 2% management fee and 20% incentive fee, which differs from the fee structure applicable to the shares previously offered by the Funds. Returns presented for 2003 are presented net of a 20% incentive fee although no such fee was charged in 2003. Returns given are for non-restricted investors who were invested in Platinum (USA) or Platinum (International) at the beginning of the year. Returns shown for periods prior to May 2007 represent Class A returns. Any offer or solicitation of an investment in any Fund may be made only by delivery of the applicable Fund's confidential offering documents to qualified investors. Prospective investors should rely solely on such offering documents in making any investment decision. An investment in the Funds is not suitable for all investors. You cannot invest directly in an index. This is the most relevant index to benchmark against given our strategy.

This information is as of the date(s) indicated, is not complete, is subject to change, and does not contain material information regarding the Funds, including tax consequences and risk disclosures. Before making any investment, an investor should thoroughly review the applicable Fund's confidential offering documents with their professional advisor(s) to determine whether an investment is suitable for them. Periodic pricing or valuation information will be supplied to investors and there may be delays in receiving such information as well as important tax information. The Funds are unregistered private investment funds that are NOT subject to the same regulatory requirements as mutual funds, including mutual fund requirements to provide certain periodic and standardized pricing and valuation information to investors.

Future evidence and actual results (including actual composition and characteristics of existing and future Fund investments) could differ materially from those set forth in, contemplated by, or underlying these Statements. In light of these risks and uncertainties, there can be no assurance and no representation is given that these Statements are now or will prove to be accurate or complete in any way. Platinum undertakes no responsibility or obligation to revise or update such Statements.

Platinum Partners

**PLATINUM PARTNERS**
**VALUE ARBITRAGE FUND** | # DISCLOSURES

**Disclosures**

Introduction

Strategies

Performance

Risk Management

Transparency

Compliance

Investor Base

Uncorrelated Returns

Awards & Recognition

Conclusion

Biographies

Fund Information

Investment in the Funds may involve a high degree of risk and volatility and can be highly illiquid. Any assumptions, assessments, intended targets, statements or the like (collectively, "Statements") regarding future events or which are forward-looking constitute only subjective views, outlooks, estimations or intentions, are based upon Platinum's expectations, intentions or beliefs, should not be relied on, are subject to change due to a variety of factors, including without limitation to fluctuating market conditions and economic factors, and involve inherent risks and uncertainties, both general and specific, many of which cannot be predicted or quantified and are beyond Platinum's or the Funds' control.

Any financial indicators or benchmarks shown are for illustrative and/or comparative purposes only, may not be available for direct investment, are unmanaged, assume reinvestment of income, and have limitations when used for comparison or other purposes because they may have volatility, credit, or other material characteristics (such as number and types of securities or instruments) that are different from the Funds. The HFN Relative Value Aggregate Average is an equal weighted average of all single manager hedge funds and CTA/managed futures products in the hedgefund.net database.  Currently the database contains approximately 9,200 active funds in this index.  See http://www.hedgefund.net/marketing_index.cfm?template =realtime.html. The S&P (Standard & Poor) 500 is a capitalization-weighted index which tracks the performance of 500 widely held large-cap stocks in the industrial, transportation, utility and financial sectors. The Sharpe Ratio is calculated by subtracting a risk-free rate from the net return and dividing the result by the standard deviation of the net return. Certain information herein has been obtained from third party sources and, although believed to be reliable, has not been independently verified and its accuracy or completeness cannot be guaranteed.  This information is confidential, is intended only for intended recipients and their authorized agents or representatives and may not be distributed to any other person without Platinum's prior written consent.

Descriptions and examples involving investment process, risk management, investment and statistical analysis, and investment strategies and styles may contain underlying assumptions relating to investment theory or process, may not apply to all Fund positions or transactions, are provided for illustration purposes only and are not intended to reflect performance, and are subject to change. No representation is made that Platinum's or the Funds' risk management, investment process or investment objectives will or are likely to be achieved or successful or that the Funds or their investments in underlying managers will make any profit or will not sustain losses.

Performance shown is net of applicable fees and expenses and presumes reinvestment of income.  Any descriptions involving investment models, statistical analysis, investment process, and investment strategies and styles are provided for illustration purposes only and are not intended to reflect actual market conditions. Investments for the Funds are selected by, and will vary in the sole discretion of, Platinum and are subject to availability and market conditions, among other things.  Target allocations are for illustration purposes only and are subject to change at the discretion of Platinum. From time to time the Funds may be leveraged and may engage in other speculative investment practices that increase the risk of loss. Strategy Performance and Asset Allocation numbers contained herein may include leverage or implied leverage. Past performance is not indicative of future results. Performance may fluctuate, especially over short periods.

Platinum**Partners**

**PLATINUM PARTNERS**
**VALUE ARBITRAGE FUND**

# FUND OVERVIEW

Disclosures

**Introduction**

Strategies

Performance

Risk Management

Transparency

Compliance

Investor Base

Uncorrelated Returns

Awards & Recognition

Conclusion

Biographies

Fund Information

- Launched in January 2003, Platinum Partners Value Arbitrage Fund LP ("PPVA Fund") is a multi-strategy, multi-manager hedge fund that seeks significant risk-adjusted returns irrespective of any broader market direction.

- The firm and its affiliates manage approximately $1.37 billion across five products.[1]

| Platinum Partners Value Arbitrage Fund Intl L Shares | |
|---|---|
| Net Annualized Return Since Inception[2] | 16.99% |
| Standard Deviation | 5.45% |
| Sharpe Ratio | 2.68 |
| Percentage Positive Months[3] | 84.52% |
| Max Drawdown (Peak to Trough)[4] | (4.48%) |
| Correlation to S&P 500 Index[5] | 0.14 |

- The PPVA Fund allocates $771 million across nine distinct investment strategies that span various asset classes, geographies and liquidity profiles, targeting: 30% risk allocation to short term trading and relative value strategies, 30% to event driven strategies and 40% to asset based finance strategies.

- The Fund emphasizes qualitative, quantitative, operational, and structural risk management and utilizes third party administration and valuation services.

1  Note: Estimated firm AUM includes Platinum Partners Value Arbitrage Fund L.P. ("PPVA"), Platinum Partners Credit Opportunities Master Fund L.P. ("PPCOM"), Platinum Partners Liquid Opportunity Master Fund L.P. ("PPLO"), and Bayberry Consumer Finance Fund LLC and Bayberry Consumer Finance Fund Intl Ltd. (collectively, "Bayberry"), as of November 30, 2015
  Past performance does not guarantee future performance results.
2  Total months since inception: 155 months.  Total positive months since inception: 131 months. There is no guarantee that past performance will be indicative of future
3  performance. No representation is made that the Fund will or is likely to achieve its objectives or that any investor will be able to avoid incurring losses.
4  September 2008 – October 2008, Recovery period: three months.
5  Note: Correlation calculation based on Platinum Partners Value Arbitrage Fund International L Shares returns as of November 30, 2015. Please see additional disclosures in the disclaimer section of this presentation. All statistics include PPVA performance as of November 30, 2015. You cannot invest directly in an index.

Confidential for Discussion Purposes Only



PLATINUM PARTNERS
VALUE ARBITRAGE FUND

## COMPETITIVE EDGE

Disclosures

**Introduction**
Strategies
Performance
Risk Management
Transparency

Compliance
Investor Base
Uncorrelated Returns
Awards & Recognition

Conclusion
Biographies
Fund Information

**Strategy Mix:** Platinum's expertise in a broad array of diversified strategies allows for strong risk-adjusted returns uncorrelated not only to any broader market activity but also to other hedge funds and multi-strategy funds in particular

**Risk Management:** Risk is the primary focus of the fund managers, who utilize multiple third party risk systems and a focus on capital preservation in managing strategies.

**Opportunism:** Entrepreneurial culture and willingness to source outside the box investments

**Industry Network:** Extensive network of contacts provides atypical opportunities and first mover advantages

**Experience:** Ten year track record investing in a wide range of strategies[1]

[1] Past performance does not guarantee future performance results.

Please see additional disclosures in the disclaimer section of this presentation.

Confidential for Discussion Purposes Only



# TARGET ALLOCATION

PLATINUM PARTNERS
VALUE ARBITRAGE FUND

Disclosures

Introduction

**Strategies**

Performance

Risk Management

Transparency

Compliance

Investor Base

Uncorrelated Returns

Awards & Recognition

Conclusion

Biographies

Fund Information



**Short Term Trading / Relative Value Strategies**

Identifying and exploiting market pricing inefficiencies

**Event Driven Strategies**

Catalyst-driven investments based on in-depth company research designed to profit from the occurrence of selected developments

**Asset Based Finance Strategies**

Senior Secured risk profiles and equity-like upside

Pie chart labels:
- Asset Based Finance Mining 5%
- Long Short Fundamental, 10%
- Quantitative, 4%
- Opportunistic /Macro 4%
- Energy Related Arbitrage, 9%
- Asia Based Arbitrage, 9%
- Event Driven , 21%
- Asset Based Finance Energy, 28%
- Asset Based Finance General, 10%

As of November 30, 2015. Please note that all target allocations are approximate, are calculated based on estimated risk exposure, are not intended to be an indication of actual fund notional exposure, and are subject to change. Please see additional disclosures in the disclaimer section of this presentation.

Confidential for Discussion Purposes Only

Platinum Partners

PLATINUM PARTNERS
VALUE ARBITRAGE FUND

# FUND PERFORMANCE SINCE INCEPTION

Disclosures
Introduction
Strategies
**Performance**
Risk Management
Transparency
Compliance
Investor Base
Uncorrelated Returns
Awards & Recognition
Conclusion
Biographies
Fund Information



- PPVA (Offshore)
- HFN Relative Value Aggregate Average***
- S&P 500****

| Platinum Partners Value Arbitrage Fund (International) Limited Net Monthly Returns | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | YTD | Cumulative |
| 2003**** | 1.41 | 0.63 | 0.47 | (0.08) | (0.82) | 1.91 | 1.07 | 2.55 | 3.22 | 2.11 | 1.67 | 2.02 | 17.33% | 17.33% |
| 2004 | 3.33 | 1.79 | 2.19 | 0.14 | 0.21 | (0.45) | (0.34) | 1.00 | (0.32) | 1.09 | 0.74 | 2.97 | 12.97% | 32.55% |
| 2005 | 1.63 | 0.97 | 0.29 | (0.29) | 0.78 | 1.39 | 1.54 | 2.04 | 1.46 | 3.13 | 0.51 | 2.34 | 16.93% | 54.99% |
| 2006 | 3.23 | 2.04 | 1.72 | 1.15 | 2.02 | 1.62 | 0.55 | 0.30 | 1.50 | 1.88 | 1.95 | 3.75 | 23.94% | 92.10% |
| 2007 | 2.48 | 3.81 | 4.33 | 2.99 | 4.35 | 5.44 | 2.22 | 3.39 | 1.56 | 4.96 | 1.95 | 6.09 | 53.25% | 194.39% |
| 2008 | (2.10) | 1.15 | (1.53) | 2.56 | 4.48 | 1.58 | 0.33 | 1.20 | (3.41) | (1.07) | 0.14 | 1.21 | 4.37% | 207.26% |
| 2009 | 3.29 | 0.42 | 2.01 | 1.35 | 2.57 | 1.69 | 1.82 | 1.53 | 1.80 | 0.64 | 0.54 | 1.47 | 20.86% | 271.34% |
| 2010 | 1.09 | 2.70 | 0.16 | 2.05 | (0.20) | 0.46 | 1.83 | 1.11 | 1.73 | 1.49 | 1.41 | 3.99 | 19.27% | 342.89% |
| 2011 | 2.10 | 4.41 | 2.18 | 1.83 | 1.37 | 2.87 | 0.77 | 0.56 | 0.98 | 1.31 | (0.49) | 1.43 | 21.03% | 436.02% |
| 2012 | 0.42 | 0.78 | 2.87 | (0.09) | 0.52 | 1.93 | 1.59 | 0.14 | 0.90 | 0.84 | (0.24) | 1.39 | 11.58% | 498.08% |
| 2013 | 1.75 | 0.79 | 1.36 | 0.18 | 0.85 | 1.13 | 0.95 | 1.29 | 0.23 | (1.78) | 1.41 | (1.21) | 7.11% | 540.59% |
| 2014 | 3.68* | 1.53 | 1.00 | 0.21 | 2.13 | 2.63 | 0.53 | 1.01 | (0.17) | (1.66) | (2.51) | 2.05 | 10.76% | 609.50% |
| 2015** | 0.10 | (0.89) | (0.83) | 7.83 | (0.22) | 1.28 | (0.07) | 0.02 | 1.05 | (1.43) | ±0.20 | | ±6.95% | ±658.79% |

*The January 2014 rate of return reflects a one time reversal of certain fees.
± Estimated. * Unaudited   ***Sources: PPVA Audited Financials, HedgeFund.net and Yahoo! Finance.
**** Returns for 2003 reflect the imposition of a 20% incentive fee and applicable expenses although these fees were not charged in 2003.
All other returns are calculated net of all fees and expenses. Please see additional disclosures in the disclaimer section of this presentation.
Past performance is not indicative of future results. You cannot invest directly in an index. These are the most relevant indices to benchmark against given our strategy.

Confidential for Discussion Purposes Only

Platinum Partners

# RISK MANAGEMENT

PLATINUM PARTNERS
VALUE ARBITRAGE FUND

Risk management is the foundation of the Fund. The General Partner believes that risk must be addressed on several levels with multiple tools, as applicable.



Disclosures

Introduction

Strategies

Performance

**Risk Management**

Transparency

Compliance

Investor Base

Uncorrelated Returns

Awards & Recognition

Conclusion

Biographies

Fund Information

Confidential for Discussion Purposes Only

Platinum Partners

Disclosures
Introduction
Strategies
Performance
Risk Management
**Transparency**
Compliance
Investor Base
Uncorrelated Returns
Awards & Recognition
Conclusion
Biographies
Fund Information

# TRANSPARENCY

An integral part of our mission is to act as a fiduciary to our investors who entrust us with their capital.

- Commitment to providing portfolio insight
  - Monthly performance, capital allocation, performance contribution and risk metrics provided to all investors
  - Annual audit by CohnReznick, LLP, a firm with significant industry experience
  - Open-door policy for all investors regarding all the aspects of portfolio
  - In-depth Due Diligence Questionnaire available upon request

- Independent valuation and reporting
  - An independent third party valuation firm values PPVA's non-public investments on a quarterly basis
  - Formal policy outlining all fair valuation practices and methods
  - Internal team of experienced professionals with accounting and operations backgrounds
  - Compliance with federal and state reporting requirements

Please see additional disclosures in the disclaimer section of this presentation.

Confidential for Discussion Purposes Only

PLATINUM PARTNERS
VALUE ARBITRAGE FUND

Platinum Partners

PLATINUM PARTNERS
VALUE ARBITRAGE FUND

# COMPLIANCE

PPVA is committed to the highest legal and ethical standards in the industry:

- Registered Investment Advisor

- Code of Ethics

- Compliance Policies and Procedures

- Employee Personal Account restrictions and monitoring

- Anti-Money Laundering procedures and controls

Disclosures
Introduction
Strategies
Performance
Risk Management
Transparency
**Compliance**
Investor Base
Uncorrelated Returns
Awards & Recognition
Conclusion
Biographies
Fund Information

Please see additional disclosures in the disclaimer section of this presentation.

Confidential for Discussion Purposes Only

Platinum Partners



# INVESTOR BASE

PLATINUM PARTNERS
VALUE ARBITRAGE FUND

The PPVA Fund has a diversified global investor base with significant interests from all major investor types, including general partners' capital.



**Investor Geography**

- North America
- Asia
- Europe
- Middle East
- Latin America

57%
6%
27%
7%

**Investor Type**

- GP & Related
- Institutions & Trusts
- Family Offices
- HNW Individuals

25%
38%
20%

Disclosures
Introduction
Strategies
Performance
Risk Management
Transparency
Compliance
**Investor Base**
Uncorrelated Returns
Awards & Recognition
Conclusion
Biographies
Fund Information

Investor Type statistics and Investor Geography statistics estimated as of September 30, 2015.

Confidential for Discussion Purposes Only

Platinum Partners

# UNCORRELATED RETURNS

Since the inception of the PPVA Fund, the S&P 500 index has been down 53 out of 155 months. During these months, the Fund has had an average net return of +1.04%.

| Date | PPVA Intl L | S&P 500 | Date | PPVA Intl L | S&P 500 | Date | PPVA Intl L | S&P 500 |
|---|---|---|---|---|---|---|---|---|
| Jan '03 | 1.41% | -2.74% | Feb '08 | 1.15% | -3.48% | Jul '11 | 0.77% | -2.15% |
| Feb '03 | 0.63% | -1.70% | Mar '08 | -1.53% | -0.60% | Aug '11 | 0.56% | -5.68% |
| Sep '03 | 3.22% | -1.19% | Jun '08 | 1.58% | -8.60% | Sep '11 | 0.98% | -7.18% |
| Mar '04 | 2.19% | -1.64% | Jul '08 | 0.33% | -0.99% | Nov '11 | -0.49% | -0.51% |
| Apr '04 | 0.14% | -1.68% | Sep '08 | -3.41% | -9.08% | Apr '12 | -0.09% | -0.75% |
| Jul '04 | -0.34% | -3.34% | Oct '08 | -1.07% | -16.94% | May '12 | 0.52% | -6.27% |
| Jan '05 | 1.63% | -2.53% | Nov '08 | 0.14% | -7.48% | Oct '12 | 0.85% | -1.98% |
| Mar '05 | 0.29% | -1.91% | Jan '09 | 3.29% | -8.57% | Jun '13 | 1.13% | -1.50% |
| Apr '05 | -0.29% | -2.01% | Feb '09 | 0.42% | -10.99% | Aug '13 | 1.29% | -3.13% |
| Aug '05 | 2.04% | -1.12% | Oct '09 | 0.64% | -1.98% | Jan '14 | 3.68% | -3.56% |
| Oct '05 | 3.13% | -1.77% | Jan'10 | 1.09% | -3.70% | Jul '14 | 0.53% | -1.51% |
| May06 | 2.02% | -3.09% | May '10 | -0.20% | -8.20% | Sep '14 | -0.17% | -1.55% |
| Feb '07 | 3.81% | -2.18% | Jun '10 | 0.46% | -5.39% | Dec '14 | 2.05% | -0.42% |
| Jun '07 | 5.44% | -1.78% | Aug '10 | 1.11% | -4.74% | Jan '15 | 0.10% | -3.10% |
| Jul '07 | 2.22% | -3.20% | Nov '10 | 1.41% | -0.23% | Mar '15 | -0.83% | -1.74% |
| Nov '07 | 1.95% | -4.40% | Mar '11 | 2.18% | -0.10% | Jun '15 | 1.28% | -2.10% |
| Dec '07 | 6.09% | -0.86% | May '11 | 1.37% | -1.35% | Aug '15 | 0.02% | -6.26% |
| Jan '08 | -2.10% | -6.12% | Jun '11 | 2.87% | -1.83% | Sep '15 | 1.05% | -2.64% |
| | | | | | | Aggregate Return During S&P 500 Down Months | +71.66% | -85.91% |
| | | | | | | Average Return During S&P 500 Down Months | +1.04% | -3.64% |

Please see additional disclosures in the disclaimer section of this presentation. Past performance does not guarantee future results. You cannot invest directly in an index. This is the most relevant index to benchmark against given our strategy.

Confidential for Discussion Purposes Only

Disclosures
Introduction
Strategies
Performance
Risk Management
Transparency
Compliance
Investor Base
**Uncorrelated Returns**
Awards & Recognition
Conclusion
Biographies
Fund Information

PLATINUM PARTNERS
VALUE ARBITRAGE FUND


Platinum Partners

PLATINUM PARTNERS
VALUE ARBITRAGE FUND

# INDUSTRY AWARDS & RECOGNITION

The PPVA Fund has been honored with several awards from the industry due to its continued strong risk-adjusted returns:




- **Barclay Hedge's Ranking Awards**
  # 8 Multi-Strategy (September 2015)
  # 3 Multi-Strategy (April 2015)
  # 3 Multi-Strategy (June 2013)
  # 1 Multi-Strategy (February 2011)

- **Hedge Funds Review Americas Awards 2013**
  Best Non Directional Hedge Fund over 10 years

- **Hedge Funds Review Americas Awards 2012**
  Best Multi-Strategy Hedge Fund (July 2012)

- **HSBC Private Bank's Top 20 Hedge Funds of 2011**
  #5 (February 2012)

- **Bloomberg's 2011 Top 100 Richest Hedge Funds**
  #9 Mid-Sized Hedge Fund (February 2012)

- **Barron's 2011 Hedge Fund 100**   #56 (May 2011)
- **Barron's 2010 Hedge Fund 100**   #16 (May 2010)
- **Barron's 2009  Hedge Fund 100**   #15 (May 2009)
- **Barron's 2008 World's 75 Best Hedge Funds**   #26 (April 2008)

- **Absolute Return Awards 2008**
  Multi-Strategy Fund of the Year (November 2008)

- **Hedge Fund Manager / HFMWeek 2008 Performance Awards**
  Multi-Strategy Performance Award Winner (October 2008)

Disclosures

Introduction

Strategies

Performance

Risk Management

Transparency

Compliance

Investor Base

Uncorrelated Returns

Awards & Recognition

Conclusion

Biographies

Fund Information

All rights are reserved by the publishers.  Please see additional disclosures in the disclaimer section of this presentation.

Confidential for Discussion Purposes Only

Platinum Partners

**PLATINUM PARTNERS**
VALUE ARBITRAGE FUND

# CONCLUSION

- Thirteen consecutive years of absolute return since inception [1]

- Strong culture of risk management and transparency

- General Partner and related entities own over 20% of the Fund, creating incentive alignment with outside investors

- Uncorrelated results to both broader markets and other hedge funds

- Significant risk-adjusted returns

Disclosures
Introduction
Strategies
Performance
Risk Management
Transparency
Compliance
Investor Base
Uncorrelated Returns
Awards & Recognition
**Conclusion**
Biographies
Fund Information

[1] Past performance is not necessarily indicative of future results.
Please see additional disclosures in the disclaimer section of this presentation.
Confidential for Discussion Purposes Only

**Platinum Partners**

PLATINUM PARTNERS
VALUE ARBITRAGE FUND

# SELECTED BIOGRAPHIES

Disclosures

Introduction

Strategies

Performance

Risk Management

Transparency

Compliance

Investor Base

Uncorrelated Returns

Awards & Recognition

Conclusion

**Biographies**

Fund Information

**Mark Nordlicht - Chief Investment Officer**

Mr. Nordlicht has over 20 years of experience in the investment industry and is responsible for oversight of all trading, asset allocation and risk management on behalf of the Platinum-managed funds. Mr. Nordlicht founded Platinum Energy Resources and Platinum Diversified Mining, publicly traded oil & natural gas and mining companies, respectively. Mr. Nordlicht is also the founder and served as non-executive Chairman of Optionable, Inc., a brokerage firm for energy options, until May 1, 2007. From 1997 to 2001, Mr. Nordlicht was a founder and managing partner of West End Capital, a New York-based money management firm. In 1991, Mr. Nordlicht founded Northern Lights Trading and was its general partner until 2000. Northern Lights Trading was a proprietary options firm based in New York which employed traders in the cotton, coffee, natural gas, crude oil, gold, and silver option trading pits. Mr. Nordlicht graduated from Yeshiva University with a B.A. in Philosophy.

**David Levy – Co-Chief Investment Officer**

Mr. Levy serves as Co-Chief Investment Officer of Platinum Partners. Mr. Levy has spent his career as an investment specialist and portfolio manager. Mr. Levy oversees over $1 billion in total investments and has directly managed over $250 million in capital. The focus of Mr. Levy's investments is in asset-based lending in a variety of industries, and utilizing credit based strategies to generate returns with less risk than traditional strategies. Mr. Levy co-founded Crius Energy, a publicly listed national retail energy platform currently providing power to over 500,000 RCEs in the United States.  Mr. Levy's prior experience also includes time spent in the New York City Mayor's office for Mayor Bloomberg and with the Chief Counsel's office of Senator Orrin Hatch. Mr. Levy also serves as a member of the International Crisis Group's Advisory Council. Mr. Levy holds a Bachelor of Science in Finance from Yeshiva University.

Confidential for Discussion Purposes Only

Platinum Partners

**PLATINUM PARTNERS**
**VALUE ARBITRAGE FUND**

# FUND INFORMATION

| | |
|---|---|
| **Minimum Investment** | $1,000,000 |
| **Subscriptions** | Monthly |
| **Lock Up Period:** | None |
| **Redemptions** | Quarterly, 60 days' notice required |
| **Management Fee** | 2% |
| **Incentive Fee** | 20% |
| **High Watermark** | Yes |
| **Administrator** | SS&C Technologies, Inc. |
| **Auditors** | CohnReznick, LLP |
| **Investment Manager** | Platinum Management (NY) LLC |
| **Prime Brokers** | Credit Suisse, Cantor, Macquarie |
| **Independent Valuation Agent** | Sterling Valuation Group, Inc. |
| **Legal Counsel** | Schulte Roth & Zabel LLP |

Disclosures
Introduction
Strategies
Performance
Risk Management
Transparency
Compliance
Investor Base
Uncorrelated Returns
Awards & Recognition
Conclusion
Biographies
**Fund Information**

Please see Confidential Private Offering Memorandum for additional terms and conditions.

Confidential for Discussion Purposes Only

**Platinum Partners**

PLATINUM PARTNERS
VALUE ARBITRAGE FUND

# CONTACT INFORMATION

Disclosures

Introduction

Strategies

Performance

Risk Management

Transparency

Compliance

Investor Base

Uncorrelated Returns

Awards & Recognition

Conclusion

Biographies

**Fund Information**

**Andrew Kaplan**

Chief Marketing Officer

250 West 55th Street, 14th Floor

New York, NY 10019

Tel: (212) 271-7894

Fax: (212) 582-2424

Email: akaplan@platinumlp.com

Please see Confidential Private Offering Memorandum for additional terms and conditions.

Confidential for Discussion Purposes Only

Platinum Partners

EXHIBIT 8

**To:** dlevy@platinumlp.com[dlevy@platinumlp.com]; zweiner@platinumlp.com[zweiner@platinumlp.com]; marianne@odcnv.com[marianne@odcnv.com]
**From:** rickh@odcnv.com
**Sent:** Fri 1/8/2016 10:45:27 PM
**Subject:** Update

Another 8" of snow last nite- a real nightmare-  another 2 weeks of below freezing forecast

Somehow still making 4-5 oz/day.

Shipping gold Tuesday- 200-250 oz with payment about 1/19.

When we meet on Wednesday we need to get on the same page on a few things.

In October we gave you information to try to develop a plan.  Even with survivable weather it showed cash flow issues with the crusher re-start -at $1150 Au- not the $1060 we have been selling at.   The forecast did not envision the loss of the jaw crusher that was avoidable with timely funding.  The very best!!! long term solution was to let it go but the short term costs and issues it created are very very very serious..

The power point we presented as well as the cash flow model show limited cash flow in 2016 with a continued build-up of gold inventory on the pad.  That inventory build-up is possibly overstated but with the difficulty in raising new cash it is hard to plan on a different outcome.  Either way it is your gold - it is just your choice on how and when to cash it in.

While we have been brave troupers and understand the predicament you are apparently in- we continue to have the same two choices-

a) continue to operate and be capitalized to make that happen
b) stop and leach the inventory and try to find a way out in the future-- that will be a very bad long term decision- but

Our lives continue to be an absolute living hell by trying to do neither and/or both.  It is not possible to run, especially in this weather, without proper capitalization.  Just to make it have a chance to work I have been the unpaid general mine foreman living at the site for months and Marianne has continued to work unpaid for 30-50 hours a week while we juggle it all hourly.

Right now we have all things in place to proceed as if we have no sense. We will hit a wall about Feb 10- the size of that wall depends on the weather.

Due to your debt and equity position, I have no way to raise cash myself.  I have been trying through a possible deal with Newmont but that has now likely been pushed to the summer.

It is obviously your decision to look at the numbers and continue to feed this or give up-- but one or the other has to happen.   My best guess it will take another $200-$300K -- mostly weather dependent.

The numbers we will be bringing are no different than the numbers we presented in October.  At that time it looked like it would require about $600k-700k to continue- survivable weather which we did not get, $1150 gold which we did not get, and the use of the contractor's jaw which we lost due to bad timing.  The $300k certainly helped with the aid of free management.

If we shut down,  the project will require a big effort to re-start.  It is not a good idea but is mandatory with no new capitalization.

From 10,000 feet- it is a no brainer to continue on---- but we have run out of steam.  We cannot continue to abuse our own business.  In our absence we pay others to do a poor job of managing our own business while working for free to manage yours.  It does not make good sense and we have done it for a long time.  The $1100 gold that mostly created this mess was not our fault.

Meanwhile we have the project all set of to rock and roll- but still trying to assemble the new crushing electrical.  Not trivial

out there in this weather and with Jerry's kids.

We look forward to a discussion on how to form a plan to finish this job.

Rick

EXHIBIT 9

**To:** David Levy[dlevy@platinumlp.com]; Zach Weiner[zweiner@platinumlp.com]; Rick[rickh@odcnv.com]
**From:** Marianne
**Sent:** Thur 2/18/2016 5:40:08 AM
**Subject:** Re: Thaw

David,
I will send it to you tomorrow.
I am working on the audit which Is a huge job  - I was unwilling to dedicate a lot of my or the auditors time to the project until I could pay their past due bill and have confidence that I could pay for the audit. $30k.  So we are behind and will certainly have to use the available 5 day extension to file. It will be all we can do to complete it by then.
I submitted a draw request to Zach yesterday for funding next Tuesday.  And will be sending another one for funding on the 1st of March.  That is as far ahead as I can see right now.  Total for those three fundings will be $450k of the needed ? 625k ? I am not sure of the amount you and rick agreed on.  So, yes, this is an off week for funding. I think we were just looking for a response that the draw request was received and that funding remained on schedule.

You will hear from me tomorrow.

Marianne

Sent from my iPad

On Feb 17, 2016, at 8:41 PM, David Levy <dlevy@platinumlp.com> wrote:

> I was just kidding I know that gets lost in emails and I know how hard you guys have worked. Marianne I never got the equity backstory we discussed when you were in our office and really would like to get that sorted ASAP. I'm sorry for the ruff conditions but glad the weather and gold prices are on our side.  I was under the impression the funding schedule was every other week and this was an off week. Rick I do believe we are on the same page sorry for the bad humor on my part.

Sent from my iPhone

On Feb 17, 2016, at 11:34 PM, Rick Havenstrite <rickh@odcnv.com> wrote:

> David
>
> I think you are a good and funny guy-  There is occasionally  something lost in e-mail translation-  This is meant to be as light as this tired funny fat guy can be:)
>
> I would love to sell some gold (I know you know that- I know you know-- I know you know that).  The pad has been frozen down in record cold- the plant has been shut down for 3 weeks so we can sell no gold :) I wish I could rhyme another phrase
>
> I will defer to Marianne if next week will work to make payroll.  She has a week off ---fortunately still unpaid in Arizona:)-- we are cooked if it is not next week-- like a lobster- or ugly tourist on a beach in a lawn chair--- just saying
>
> At 57 years old I worked 14 hours today in 24" deep mud and ice to give your company a chance - I think that is also lost in the humorous  translation- that part not so funny- but no gym fees:)  Happy for good weather:) Trust me it still really really  sucked
>
> Neither Marianne or I will have a check in next weeks payroll. Nor in any payroll in the fore-seeable future- we love this job:) Next time we will ask if we will get paid?:) Darn the bad interview skills. Boss said just work harder.
>
> There will be no gold sold here for at least 3 weeks.  We are passengers-- or victims depending on how you

We are certainly on different pages.  I am glad I know you are just kidding.  This really seriously sucks :)!!!!

When you have an idea when the money might hit let us know so I can figure out exactly how to plan our day/week/month?  The matrix of variables is not funny and consumes an unbelievable!!!! amount of our time and money-  But that is why we get the big bucks:)!

If you need help raising the money let me know:)

Rick

PS

I will say it again- this time the company has zero room for error- with the plant shut down there is no stretch left in the string. The timing is much much much much more serious this time. This time we can really lose the company- no kidding

I do know you mean it all in humor--- e-mail sucks-- I think--or does it?:)

On Wed, Feb 17, 2016 at 6:22 PM, David Levy <dlevy@platinumlp.com> wrote:

Let's start selling some gold!

Sent from my iPhone

On Feb 17, 2016, at 7:10 PM, Rick Havenstrite <rickh@odcnv.com> wrote:

David and Zach

Just making sure you got this.

If there are going to be complications I need to make whatever adjustments are left.

The pad is thawing fast and we will have the plant running partially by noon tomorrow.

Rick

On Wed, Feb 17, 2016 at 7:00 AM, Rick H <rickh@odcnv.com> wrote:

With a hell of a lot of hard work in the freezing mud we will have some of the pad back under leach by the end of the week and a bunch more next week

The crusher was delayed until tomorrow and the goal is to crush next week- hopefully early in the week baring mechanical issues

I have called most of the people back from layoff- some start today

I need to make sure the money remains on schedule to avoid a mess

Rick

Sent from my iPhone

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

EXHIBIT 10

**To:**        Mark Nordlicht[mnordlicht@platinumlp.com]
**Cc:**        David Steinberg[DSteinberg@platinumlp.com]
**From:**     Dan Vickery
**Sent:**     Fri 4/1/2016 12:46:48 AM
**Subject:**  Re: Urigen Month End

Mark,

Around 200.

Regards,

Dan
Cell: 412-877-7944

> **From:** Mark Nordlicht
> **Sent:** Thursday, March 31, 2016 8:40 PM
> **To:** Dan Vickery
> **Cc:** David Steinberg
> **Subject:** Re: Urigen Month End

Remind me how many total patients we need.

Sent from my iPhone

On Apr 1, 2016, at 3:31 AM, Dan Vickery <dan.vickery@Urigen.com> wrote:

Mark,

Goal has always been 2016, but we need to average 20 patients a month from here on in, it's possible because both academic sites from our last trial, including Lowell, have yet to become effective. As I promised I will deliver a comprehensive assessment in mid April.

Regards,

Dan
Cell: 412-877-7944

> **From:** Mark Nordlicht
> **Sent:** Thursday, March 31, 2016 8:20 PM
> **To:** Dan Vickery
> **Cc:** David Steinberg
> **Subject:** Re: Urigen Month End

When do we think trial will be completed??

Sent from my iPhone

On Apr 1, 2016, at 2:41 AM, Dan Vickery <dan.vickery@Urigen.com> wrote:

Mark,

As per my update Tuesday, there are 27 patients, January was on track, but we didn't enroll as many patients in February and March. The condition is reduced in winter months and those were the cold

months. I am meeting with Lowell next week to make sure there aren't any systemic problems and the trial is on track. My goal is to report on this mid April. The independent committee needs to adjudicate whether we will get any data before completion of the trial. Not clear at this time.

Regards,

Dan
Cell: 412-877-7944

**From:** Mark Nordlicht
**Sent:** Thursday, March 31, 2016 7:31 PM
**To:** Dan Vickery
**Cc:** David Steinberg
**Subject:** Re: Urigen Month End

How is the trial
Progressing? When is the expectation on when we will get data?

Sent from my iPhone

On Apr 1, 2016, at 2:22 AM, Dan Vickery <dan.vickery@Urigen.com> wrote:

Mark,

Thank you I will order those payments tonight,

Regards,

Dan
Cell: 412-877-7944

**From:** Mark Nordlicht
**Sent:** Thursday, March 31, 2016 7:18 PM
**To:** Dan Vickery
**Cc:** David Steinberg
**Subject:** Re: Urigen Month End

Was planning on 350 k tomm
And more next week

Sent from my iPhone

On Apr 1, 2016, at 2:17 AM, Dan Vickery <dan.vickery@Urigen.com> wrote:

Mark,

Cato are shutting down the trial next week unless they get paid, and they need at least 100K, more like 200K, their payable is 400K. UCSD is owed over 100K and will close down Lowells site if they don't get a significant payment. We missed payroll (50K). Monthly expenses are 100K and we have missed 2 months of overhead, so that is 200K. Sorry to be so blunt but we need a significant amount of capital, as much as you can give us.

Regards,

Dan
Cell: 412-877-7944

**From:** Mark Nordlicht
**Sent:** Thursday, March 31, 2016 6:36 PM
**To:** Dan Vickery
**Cc:** David Steinberg
**Subject:** Re: Urigen Month End

What were u thinking??

Sent from my iPhone

On Apr 1, 2016, at 1:08 AM, Dan Vickery <dan.vickery@Urigen.com> wrote:

Mark,

Logistically, I need to order the checks tonight. Can you please give me a number to work with?

Regards,

Dan
Cell: 412-877-7944

**From:** Mark Nordlicht
**Sent:** Thursday, March 31, 2016 5:52 PM
**To:** Dan Vickery
**Cc:** David Steinberg
**Subject:** Re: Urigen Month End

Sorry, day got away from us. It is on tap for first thing in the morning, however.

Sent from my iPhone

On Apr 1, 2016, at 12:48 AM, Dan Vickery <dan.vickery@Urigen.com> wrote:

Mark/David,

I have not seen any sign that this funding is going through today, can you advise?

Regards,

Dan
Cell: 412-877-7944

**From:** Dan Vickery
**Sent:** Tuesday, March 29, 2016 12:21 PM
**To:** Mark Nordlicht
**Cc:** David Steinberg
**Subject:** RE: Urigen Month End

Mark and David,

Delays are OK, it is just helpful, inasmuch as possible, to have information we can work with and plan around. That being said is there an amount that has been earmarked?

Regards,

Dan
Cell: 412-877-7944

**From:** Mark Nordlicht [mailto:mnordlicht@platinumlp.com]
**Sent:** Tuesday, March 29, 2016 11:32 AM
**To:** Dan Vickery <dan.vickery@Urigen.com>
**Cc:** David Steinberg <DSteinberg@platinumlp.com>
**Subject:** Re: Urigen Month End

Ok, fundings going out thursday, sorry for the delay.

Sent from my iPhone

On Mar 29, 2016, at 6:28 PM, Dan Vickery <dan.vickery@Urigen.com> wrote:

David,

All I heard from Mark was that we were to be funded Friday, March 15, then you communicated it might happen the following Monday. I have heard nothing since. Indeed, in all of 2016, we have received only $150K in early February.

Regards,

Dan
Cell: 412-877-7944

**From:** David Steinberg [mailto:DSteinberg@platinumlp.com]
**Sent:** Tuesday, March 29, 2016 10:43 AM
**To:** Dan Vickery <dan.vickery@Urigen.com>
**Subject:** RE: Urigen Month End

What is Mark N telling you?

**From:** Dan Vickery [mailto:dan.vickery@Urigen.com]
**Sent:** Tuesday, March 29, 2016 9:54 AM
**To:** David Steinberg
**Subject:** Urigen Month End

David,

Can you provide me any information on the funding status. It is decision time again so If I can't get any firm information about the situation I am going to have to shut down the month end financial activities today.

Please tell me what you can so I can plan accordingly.

Regards,

Dan Vickery, President
Urigen Pharmaceuticals, Inc.
675 US Hwy 1, Ste. B206
North Brunswick, NJ 08902
O: 732-640-0160 x 204
M: 412-877-7944
F: 732-640-0163

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN

CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE

OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE

CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN

CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE

OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE

CONTACT THE SENDER BY REPLY E-MAIL AND

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED
RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY
UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT
THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY
ALL COPIES OF THE ORIGINAL E-MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED
RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED
REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED
RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES
OF THE ORIGINAL E-MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY
CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW,
USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED
RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE
ORIGINAL E-MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE,
DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-
MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.