EXHIBIT 11

**To:** zweiner@platinumlp.com[zweiner@platinumlp.com]
**From:** Land@goldengateoil.com
**Sent:** Wed 6/22/2016 5:18:25 PM
**Subject:** Re: Funding - Status of Platinum Partners

1:18-cv-10936-UA    Document 1-2    Filed 11/21/18    Page 2 of 103

I sent in the check requests in April and they were never paid. I can get them back. They are the 100 acre Ferrari leases

Sent from my iPhone

On Jun 22, 2016, at 10:15 AM, Zach Weiner <zweiner@platinumlp.com> wrote:

> I don't understand why we didn't pay those rentals? I asked numerous times to pay those leases. Are their cure rights? Are those leases that we were taking new leases for?

Sent from my iPhone

On Jun 22, 2016, at 1:13 PM, Bill LaFleur <Land@goldengateoil.com> wrote:

> We do have a few still in the primary term but we did not pay the delay rentals. The BOA lease that I took was a three paid up lease and it is still in effect

Sent from my iPhone

On Jun 22, 2016, at 10:10 AM, Zach Weiner <zweiner@platinumlp.com> wrote:

> Rich- I apologize I lost a family member yesterday and I am out of the office I will bring to resolution this week. All I can say is that we intend to bring the leases back into force per our plan and agreement with the landowners and to maintain those leases that have time on them. Do we have a current lease by lease status?

Sent from my iPhone

On Jun 22, 2016, at 1:01 PM, Richard Field <r.field@goldengateoil.com> wrote:

> Zach - it's now Wednesday and I've heard nothing regarding payroll.  I would really appreciate an update instead of relying on the NY Post.

We are running out of excuses to tell the Mineral Owners regarding the new leases.  Since the majority of leases are expired or in default is attracting a lot of outside interest from other oil and gas investors.

Please advise.

Sent from my Verizon Wireless 4G LTE smartphone


-------- Original message --------
From: Richard Field <r.field@goldengateoil.com>
Date: 6/21/2016 10:23 AM (GMT-08:00)
To: Zach Weiner <zweiner@platinumlp.com>, Bill LaFleur <Land@goldengateoil.com>
Cc: David Levy <dlevy@platinumlp.com>
Subject: RE: Funding - Status of Platinum Partners

Hello Zach - do you have any updates to share?

RF


Sent from my Verizon Wireless 4G LTE smartphone


-------- Original message --------
From: Richard Field <r.field@goldengateoil.com>
Date: 6/17/2016 5:12 PM (GMT-08:00)
To: Zach Weiner <zweiner@platinumlp.com>, Bill LaFleur <Land@goldengateoil.com>
Cc: David Levy <dlevy@platinumlp.com>
Subject: RE: Funding - Status of Platinum Partners

Thanks Zach.  I'm sure it's been a bt chaotic for you this last week.  Just a reminder, payroll happens on the last day of each month.  So if you're able to get funding for 2 pay cycles it would be for May & June.

Thanks

RF


Sent from my Verizon Wireless 4G LTE smartphone


-------- Original message --------
From: Zach Weiner <zweiner@platinumlp.com>
Date: 6/17/2016 11:23 AM (GMT-08:00)
To: Richard Field <r.field@goldengateoil.com>, Bill LaFleur <Land@goldengateoil.com>
Cc: David Levy <dlevy@platinumlp.com>
Subject: RE: Funding - Status of Platinum Partners

Rich- I apologize for being silent, and I apologize yet again for the payroll situation. For now we are business as usual. We will be taking care of you guys beginning of next week, and im trying to push for the next month to be paid in advance. We are also going to progress with the lease purchase, and I wanted you to keep the guys on your end attuned to that fact. Please let me know what the status of that is, and whether if we were to fund, we could still execute all the lease we would like to. Thanks.

**From:** Richard Field [mailto:r.field@goldengateoil.com]
**Sent:** Friday, June 17, 2016 3:29 AM
**To:** Zach Weiner
**Subject:** RE: Funding - Status of Platinum Partners

Zach - what is the status of funding for May's payroll?  My bills are piling up and my stress level is at all time high.  I would appreciate a response.

Rich

Sent from my Verizon Wireless 4G LTE smartphone

-------- Original message --------
From: Richard Field <r.field@goldengateoil.com>
Date: 6/15/2016 1:14 PM (GMT-08:00)
To: Zach Weiner <zweiner@platinumlp.com>
Subject: RE: Funding - Status of Platinum Partners

_____

**From:** Richard Field
**Sent:** Wednesday, June 15, 2016 12:42 PM
**To:** Zach Weiner <zweiner@platinumlp.com>
**Subject:** Funding - Status of Platinum Partners

Zach – With all of the disturbing news stories coming out of NYC regarding what is going on with Platinum can you shed some light on what this means for GGO?  I know we are the least of your worries but we need to know where we stand.  If Platinum is truly going to "unwind" its main hedge fund it looks to me like we are going to get the short end of the stick.

Personally I'm late on my mortgage and child support payments which does not bode well for me.  Should we file for unemployment?  I would really like to get a straight answer from you.  I've taken a calm stance on the funding issues this year having been in this business for over 20 years and living through its ups and downs.  I'm thankful for the job even with all of its headaches and uncertainty because of the huge potential going forward.  Like I've told you before I'm not one to bite the hand that feeds and have been trying to keep things together in light of the situation.  However, the issue at hand is looking like a death sentence from my prospective.

This is situation is more than just about money, it's about actual human beings and planning our next steps.

Please advise or call me at your earliest convenience.

http://www.wsj.com/articles/platinum-partners-to-unwind-main-hedge-fund-amid-kickback-probe-1465923509

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF
THE ORIGINAL E-MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE
ORIGINAL E-MAIL.

THIS E-MAIL IS INTENDED ONLY FOR THE DESIGNATED RECIPIENT(S). IT MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION. ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

# EXHIBIT 12

# Platinum Partners

**Platinum Partners Value Arbitrage Fund (USA), L.P.**
**c/o SS&C Technologies, Inc.**
**80 Lamberton Road**
**Windsor, CT 06095**

June 30, 2016

To:     The holders of all outstanding interests (the "Interests") of Platinum Partners Value
        Arbitrage Fund (USA), L.P. (the "Fund")

Dear Limited Partner,

The general partner of the Fund (the "General Partner") hereby provides notice that, based
upon recommendations of Platinum Management (NY) LLC and pursuant to the powers
conferred by the Third Amended and Restated Limited Partnership Agreement of the Fund
and the offering document of the Fund, the General Partner has resolved that the
determination of the Net Asset Value of the Interests and the withdrawal by limited partners
of the Interests be suspended with effect from June 30, 2016 primarily because Platinum
Partners Value Arbitrage Fund L.P. (the "Master Fund") has suspended withdrawals from
the Master Fund.

If you have any questions or require any additional information, please feel free to contact
us.

Yours faithfully,

*[signature]*

Platinum Partners Value Arbitrage, LP

# EXHIBIT 13

Message

| | |
|---|---|
| **From**: | Mark Nordlicht [Mark Nordlicht] |
| on behalf of | Mark Nordlicht |
| **Sent**: | 7/8/2016 12:51:02 PM |
| **To**: | mkimelman@platinumlp.com |
| **Subject**: | Re: 07.07.2016 PPVA/PPLO Margin Report |

Akj cdnt have gone up. Currency was in our favor amd indo was closed

Sent from my iPhone

On 8 Jul 2016, at 8:43 AM, Michael Kimelman <mkimelman@platinumlp.com> wrote:

| **PPVA Checking Activity 07/07/2016** | **Activity** | |
|---|---|---|
| (wire (out): PPVA to EDF Man | $ | (217,000.00) |
| (wire (out): PPVA to Maybank | $ | (27,000.00) |
| (wire (out): PPVA to Bermuda Prime | $ | (13,000.00) |
| wire in to: PPVA from Sherman Wells Sylvester | $ | 250,000.00 |
| wire in to: PPVA from PMNY (from PLOM) | $ | 7,000.00 |
| Net total | $ | - |
| Current Balance | $ | 87.86 |
| PMNY | $ | 1,946.00 |

PPLO: 4K
PLOM: 3K
PPCO: 33K
PCM: 10K
<Daily Cash Margin PPVA July 7, 2016.xlsx>
<Daily Cash Margin PPLO July 7, 2016.xlsx>

# EXHIBIT 14

WALKERS

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: FSD  131  OF 2016

IN THE MATTER OF THE COMPANIES LAW (2013 REVISION)

AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP LAW, 2014

AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P.

AUG 23 2016

## WINDING UP PETITION

TO THE GRAND COURT

1.    The humble petition of Platinum Partners Value Arbitrage Fund L.P. (the "**Master Fund**"), an exempted limited partnership registered under the Exempted Limited Partnership Law, 2014 and having its registered office at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, acting by Platinum Management (NY) LLC (the "**General Partner**") in its capacity as the general partner of the Master Fund shows that:

**Preamble**

2.    The Master Fund, acting by its General Partner, seeks a winding up order in respect of the Master Fund pursuant to section 92(d) of the Companies Law (2013 Revision) (the "**Companies Law**") (as that section is applied in respect of exempted limited partnerships by, and subject to the provisions of, section 36 of the Exempted Limited Partnership Law, 2014 (the "**ELP Law**")) on the ground that the Master Fund is unable to pay its debts and is therefore insolvent.

**The Master Fund**

3.    The Master Fund is presently constituted pursuant to a second amended and restated limited partnership agreement dated 1 July 2008 (the "**LPA**") made between the General Partner and each of the Onshore Feeder Fund and Platinum Partners Value Arbitrage Fund (International) Limited (the "**Offshore Feeder Fund**") in their capacities as the limited partners of the Master Fund. On or around 22 June 2010, the Offshore Feeder Fund ceased to be a limited partner of the Master Fund and Platinum Partners Value Arbitrage Intermediate

1

Fund Limited (the "**Intermediate Offshore Feeder Fund**") took its place as limited partner of the Master Fund.

4.     The Master Fund is registered with the Cayman Islands Registrar of Exempted Limited Partnerships with registration number 13869. The Master Fund is a mutual fund registered with the Cayman Islands Monetary Authority ("**CIMA**") pursuant to the Mutual Funds Law (as amended), with reference number 587506.

5.     The Offshore Feeder Fund, the Intermediate Offshore Feeder Fund, the Master Fund, together with the Onshore Feeder Fund, form a typical master/feeder investment fund structure within the Platinum group of funds (the "**Platinum Group**") whereby:

(a)     offshore and US tax-exempt investors invest their capital into the Offshore Feeder Fund, which in turn invests into the Intermediate Offshore Feeder Fund , which in turn invests into the Master Fund;

(b)     onshore investors invest into the Onshore Feeder Fund, which in turn invests into the Master Fund;

(c)     the investment activities of the Offshore Feeder Fund, the Onshore Feeder Fund and the Master Fund are managed by the General Partner in its separate capacity as an investment manager (the "**Investment Manager**") appointed pursuant to the terms of an amended and restated investment management agreement dated 27 April 2007; and

(d)     the Master Fund is a multi-strategy hedge fund that seeks to achieve significant returns while attempting to minimize downside risk; and

(e)     the Master Fund carries on its business, via the General Partner, primarily from New York City, New York, United States.

**Events leading up to the presentation of the petition**

6.     The Master Fund's financial position has recently deteriorated due to a combination of the following factors:

2

(a)     the shift in the concentration of the Master Fund's assets to illiquid private equity style investments which has caused an imbalance between liquid and illiquid assets;

(b)     a global decline in oil prices which has negatively affected the Master Fund's assets which operate in the oil and gas sector;

(c)     a delay in the availability of audited financial statements due to the esoteric nature of many of the investment assets of the Master Fund;

(d)     delayed monetisation events in relation to the Master Fund's investment assets which has delayed a rebalancing of the Master Fund's liquidity position;

(e)     a large amount of investor redemptions remaining unpaid past their due date, as noted below; and

(f)     the necessary borrowing of funds by the Master Fund to fund certain of its investment assets.

7.      Additionally, in recognition of its financial circumstances, on 30 June 2016 the Master Fund suspended withdrawals in accordance with its limited partnership agreement.

8.      The financial circumstances of the Master Fund have also been further negatively impacted by a number of regulatory issues and investigations ongoing in the United States. These events, particularly as reported in the press, have at the present juncture made it nearly impossible for the Master Fund to leverage its positions and monetise them to the benefit of the Master Fund and its ultimate investors.

9.      Most recently on 28 July 2016, Parris Investments Ltd ("**Parris**"), presented and served a petition to this Honourable Court for the winding up of the Offshore Feeder Fund on the basis that Parris is an unpaid redemption creditor of the Offshore Feeder Fund in the amount claimed of US$1,080,480.43 and that the Offshore Feeder Fund has, as at the petition date, failed to satisfy such liability to

3

Parris. That petition is due to heard by this Honourable Court on Tuesday 23 August 2016.

**The Master Fund's liabilities – bank and promissory notes**

10.    The Master Fund's principal financial liabilities to bank and promissory note creditors comprise:

(a)    Heartland Bank: the Master Fund owes liabilities to Heartland Bank (an Arkansas, United States, state bank) ("**Heartland**") in the original principal amount of US$7,000,000 plus interest pursuant to a credit agreement dated 31 August 2015 made between Heartland (as lender) and the Master Fund (as borrower) and a promissory note dated 31 August 2015 issued by the Master Fund to. The outstanding liability of the Master Fund to Heartland was US$7,069,684.03 as at 30 May 2016;

(b)    Kismetia: the Master Fund owes liabilities to Kismetia Ltd ("**Kismetia**") in the original principal amount of US$9,327,262.62 plus interest accruing at a rate of 1% per month (increasing to 3% per month following the occurrence of an event of default) pursuant to a promissory note and security agreement dated 31 December 2015 and as amended by a first amendment to promissory note and security agreement dated 14 June 2016, in each case made between the Master Fund and Kismetia. The outstanding liability of the Master Fund to Kismetia was US$9,803.046.75 as at 30 May 2016;

(c)    PPNE 16% lenders and PPNE 12% lenders: the Master Fund owes liabilities to a disparate group of lenders pursuant to:

(i)    a promissory note dated 11 May 2015 made between the Master Fund (as borrower) and such lenders in the aggregate principal amount of US$28,660,751.63 and incurring interest at a rate of 16% per annum. The outstanding liability of the Master Fund to such lenders was US$30,632,499.76 as at 30 May 2016; and

(ii)    a promissory note dated 12 August 2015 made between the Master Fund (as borrower) and such lenders in the aggregate

15197500.3 P0971.132468

principal amount of US$15,523,619.22 and incurring interest at a rate of 12% per annum. The outstanding liability of the aster Fund to such lenders was US$15,625,749.49 as at 30 May 2016;

(d)     Twosons:

    (i)     the Master Fund owes liabilities to Twosons in the principal amount of US$14,000,000 plus interest at a rate of 1.333% per month pursuant to a promissory note dated 18 September 2014 made between the Master Fund (as borrower) and Twosons. The outstanding liability of the Master Fund to Twosons was US$6,082,666.67 as at 30 May 2016;

(e)     Platinum Partners Credit Opportunities Master Fund LLC: the Master Fund owes liabilities to PPCO in the original principal amount of US$25,000,000 plus interest at a rate of 1.333% per month pursuant to a revolving promissory note dated 1 January 2015 issued by the Master Fund to PPCO. The outstanding liability of the Master Fund to PPCO was US$1,393,239.11 as at 30 May 2016;

(f)     Platinum Partners Liquid Opportunities Fund: the Master Fund owes liabilities to PPLO in the original principal amount of US$10,000 plus interest at a rate of 1% per month pursuant to an unsigned revolving line of credit promissory note stated to be dated 1 October 2015. The outstanding liability of the Master Fund to PPLO was US$1,930,498.95 as at 30 May 2016;

(g)     White Rock Properties: the Master Fund owes liabilities to White Rock Properties LLC ("**White Rock Properties**") in the original principal amount of US$8,500,000 pursuant to a promissory note dated 16 May 2016 made between the Master Fund (as borrower) and White Rock Properties (as lender). The outstanding liability of the Master Fund to White Rock Properties was US$8,908,088 as at 30 May 2016; and

(h)     Richard Stadtmauer, Marisa Stadtmauer and the National Society for Hebrew Day Schools: the Master Fund owes liabilities owed to:

5

(i)     Richard Stadtmauer in the original principal amount of US$6,390,043.79 plus interest at a rate of 7% per annum pursuant to a promissory note dated 27 May 2016 made between the Master Fund (as borrower), the Onshore Feeder Fund (as co-borrower) and Richard Stadtmauer (as lender). The outstanding liability of the Master Fund to Richard Stadtmauer was US$6,464,594.30 as at 30 May 2016;

(ii)    Marisa Stadtmauer in the original principal amount of US$4,115,052.52 plus interest at a rate of 7% per annum pursuant to a promissory note dated 27 May 2016 made between the Master Fund (as borrower), the Onshore Feeder Fund (as co-borrower) and Marisa Stadtmauer (as lender). The outstanding liability of the Master Fund to Marisa Stadtmauer was US$4,163,061.47 as at 30 May 2016;

(iii)   the National Society for Hebrew Day Schools (the "NSHDS") in the original principal amount of US$2,278,829.93 plus interest at a rate of 7% per annum pursuant to a promissory note dated 27 May 2016 made between the Master Fund (as borrower), the Offshore Feeder Fund (as co-borrower) and the NSHDS. The current outstanding liability of the Master Fund to the NSHDS is US$2,305,416.28 as at 30 May 2016;

(i)     Credit Suisse: a Uniform Commercial Code filing was made in the United States in respect of the Master by Credit Suisse on 8 July 2016 which likely relates to the Master Fund's entry into a prime brokerage relationship with Credit Suisse.

**The Master Fund's liabilities – New Mountain**

11.   The Master Fund has a potential liability to New Mountain in an amount claimed of US$33,246.158.50 (as at 18 May 2016 and subject to daily accruing interest claimed for the period thereafter) (the "New Mountain Claim"). The New Mountain Claim arises from a securities purchase and put agreement dated 7 November 2014 (the "New Mountain Put Agreement") which was originally

6

made between the Master Fund and New Mountain Finance Holdings LLC ("**NMFH**") and which NMFH subsequently assigned to New Mountain.

12. In summary terms (as alleged by New Mountain and in relation to which the Master Fund's position is reserved):

(a)     pursuant to the terms of the New Mountain Put Agreement, NMFH purchased from the Master Fund US$30,000,000 of 12% second priority senior secured notes issued by Northstar GOM Holdings Group LLC (one of the Master Fund's investments) (the "**Northstar Notes**"). The Master Fund was required to make payments to NMFH under the terms of the New Mountain Put Agreement and NMFH had an option to require the Master Fund to repurchase the Northstar Notes at a price equal to the principal amount. Pursuant to amendments to the New Mountain Put Agreement, the Master Fund agreed to pay four equal instalments of US$7,500,000 to New Mountain subject to the terms set out therein. Failure to pay such amounts would constitute an acceleration event under the New Mountain Put Agreement requiring the Master Fund to repurchase the balance of the Northstar Notes at a repurchase price calculated in accordance with the terms of that agreement;

(b)     New Mountain alleges that the Master Fund is in breach of its payment obligations to New Mountain under the New Mountain Put Agreement and a dispute between New Mountain and the Master Fund is being litigated before the Supreme Court of the State of New York, New York County (the "**New York Supreme Court**") (the "**New York Proceedings**");

(c)     on 18 May 2016, New Mountain served a statutory demand on the Master Fund and threatened to present a winding up petition against the Master Fund if the amount claimed was not paid within 21 days;

(d)     within the context of the New York Proceedings, New Mountain has sought summary judgment against the Master Fund. A verdict in respect of such summary judgment application may now be returned at any time; and

15197500.3 P0971.132468

(e)     on 15 June 2016, the Master Fund succeeded in obtaining a temporary restraining order and injunction from the New York Supreme Court which restrains New Mountain from presenting a petition to this Honourable Court for the winding up of the Master Fund. Such temporary restraining order and injunction remains in effect and New Mountain has not served a winding up petition on the Master Fund.

**The Master Fund's liabilities – redemption creditors**

13.     Prior to the Offshore Feeder Fund's and the Onshore Feeder Fund's suspension of the redemption of their shares or limited partner interests (as applicable) on 30 June 2016 a number of their investors had requested to redeem their shares or limited partner interests, either in full or in part.

14.     As at the date of this Petition:

(a)     the Offshore Feeder Fund owes approximately US$32,964,557 of unpaid redemptions and approximately US$6,935,186 in respect of audit holdback to its redemption creditors; and

(b)     the Onshore Feeder Fund owes approximately US$35,429,553 of unpaid redemptions and approximately US$2,974,843 in respect of audit holdback to its redemption creditors,

(such amounts together, the "**Redemption Creditor Claims**");

15.     The Offshore Feeder Fund (albeit via the Intermediate Offshore Feeder Fund which is interposed as a pass-through entity between the Master Fund and the Offshore Feeder Fund) and the Onshore Feeder Fund have corresponding back to back redemption creditor claims and/or withdrawal requests (as applicable) against the Master Fund in an aggregate amount equal to the Redemption Creditor Claims.

**The Master Fund's liabilities – other creditor liabilities**

16.     The Master Fund owes additional liabilities to the Offshore Feeder Fund (via the Intermediate Offshore Feeder Fund) and the Onshore Feeder Fund in respect of

8

audit holdback amounts in the sums of US$6,935,186.41 and US$2,974,843.15, respectively, and liabilities of US$4,716,731.82 to the Intermediate Offshore Feeder Fund in respect of amounts payable by the Intermediate Offshore Feeder Fund to the Investment Manager.

17.     The Master Fund is also subject to a number of other liabilities including but not limited to:

(a)     accrued expenses and other liabilities in the amount of US$6,449,468 in respect of, amongst other things, fees due to professional services providers and legal expenses incurred by legal counsel;

(b)     US$4,291,275 payable to the General Partner;

(c)     accrued but unpaid fees due to traders of US$13,073,209;

(d)     amounts due to the holders of minority interests in the Master Fund's subsidiary companies of US$1,813,251;

(e)     liabilities of approximately US$106,824,701 representing the amount the Master Fund expects to cover in respect of short sale contracts entered into by the Master Fund; and

(f)     unrealised depreciation on derivative contracts of approximately US$15,742,077.

**Insolvency**

18.     The most recently available un-audited financial statements of the Master Fund comprise a balance sheet prepared as at 30 May 2016 which showed that the Master Fund has access to only US$68,530 of cash assets as at that date. In addition, as at 16 August 2016, Master Fund's cash assets had increased, but only to US$881,976 which amount is insufficient to enable the Master Fund to discharge its liability in respect of the Redemption Creditor Claims.

19.     Accordingly:

(a)     the financial position of the Master Fund has deteriorated such that it does not have access to a sufficient amount of liquid assets in order to meet its present liabilities, including its present liabilities in respect of Redemption Creditor Claims;

(b)     it is unlikely that the Master Fund will be able to meet its liabilities to:

(i)     Kismetia; or

(ii)    White Rock Properties,

each which are stated to fall due on 31 August 2016; and

(c)     there exists a risk that summary judgment may be returned against the Master Fund in the New York Proceedings which may immediately and substantially increase the Master Fund's liabilities.

**Conclusion**

20.    The Master Fund is unable to pay its debts and is therefore liable to be wound up.

21.    The Limited Partners of the Master Fund have consented to the General Partner presenting this petition for the winding up of the Master Fund in its capacity as the general partner of the Master Fund.

**YOUR PETITIONER THEREFORE HUMBLY PRAYS:**

1.     That the Master Fund be wound up in accordance with section 92(d) of the Companies Law as applied by and subject to section 36 of the ELP Law.

2.     That Matthew James Wright and Christopher Barnett Kennedy both of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, West Bay Road, Grand Cayman, KY1-1103, Cayman Islands be appointed as Joint Official Liquidators of the Master Fund (the "**JOLs**").

3.     That the JOLs shall not be required to give security for their appointment.

10

4.     That the JOLs shall have the power to act jointly and severally in their capacity as liquidators of the Master Fund.

5.     The JOLs are hereby authorised jointly and severally to exercise any of the following powers without further sanction of the Court:

(a)     the power to bring or defend or continue any action or other legal proceeding in the name and on behalf of the Master Fund;

(b)     the power to carry on the business of the Master Fund so far as may be necessary for the presentation of a compromise or arrangement to its creditors and/or for its beneficial winding up;

(c)     the power to enter into discussions and negotiations for and on behalf of the Master Fund, for the purpose of, including but not limited to:

(i)     restructuring the Master Fund's business and operations;

(ii)    restructuring or rescheduling the Master Fund's indebtedness; and/or

(iii)   making any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Master Fund or for which the Master Fund may be rendered liable;

(d)     the power to compromise on such terms as may be agreed all debts and liabilities capable of resulting in debts, and all claims (present or future, certain or contingent, ascertained or sounding only in damages) subsisting, or supposed to subsist between the Master Fund and a limited partner or alleged limited partner or other debtor or person apprehending liability to the Master Fund;

(e)     the power to sell any of the Master Fund's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels;

15197500.3 P0971.132468

(f)     the power to raise or borrow money and grant securities therefor over the property of the Master Fund;

(g)     the power to engage staff (whether or not as employees of the Master Fund) to assist the JOLs in the performance of their functions;

(h)     the power to engage attorneys and other professionally qualified persons to assist the JOLs in the performance of their functions, whether in the Cayman Islands or elsewhere;

(i)     the power to:

   (i)     take control of the ownership interests of the Master Fund in its direct subsidiaries and/or joint ventures, investment, associated companies, business or other entities ("**Subsidiaries**") of the Master Fund in which the Master Fund holds an interest, in each case wherever located, as the JOLs shall think fit;

   (ii)    call or cause to be called such meetings of such Subsidiaries and/or to sign such resolutions (in each case in accordance with the provisions of any relevant constitutional or related documentation of such companies) and take such other steps, including applications to appropriate courts and/or regulators, as the JOLs shall consider necessary to appoint or remove directors, legal representatives, officers, and/or managers to or from such Subsidiaries, and in each case take such steps as are necessary to cause the registered agents (or other equivalent corporate administrators) of such Subsidiaries to give effect to the changes to the boards of directors, legal representatives, officers, and/or managers of such Subsidiaries, including (without limitation) effecting changes to the company registers of such Subsidiaries as may be deemed appropriate by the JOLs; and/or

   (iii)   to take such other action in relation to all such Subsidiaries as the JOLs shall think fit for the purpose of protecting the assets of the Master Fund and managing the affairs of the Master Fund;

12

(j)     the power to communicate with and carry out any necessary filings with regulatory bodies as appropriate, including, without limitation, the Cayman Islands Registrar of Exempted Limited Partnerships, the Cayman Islands Monetary Authority and the United States Securities and Exchange Commission in the name and on behalf of the Master Fund;

(k)     the power to enter into an amendment to the existing investment management agreement dated 27 April 2007 made between, amongst others, the Master Fund and Platinum Management (NY) LLC (the "**Investment Manager**") (the "**IMA**"). Payments made pursuant to the IMA should be regarded as an expense of the liquidation;

(l)     the power to enter into a protocol with Guidepost Solutions LLC ("**Guidepost**"), to regulate the manner in which the JOLs, Guidepost and Mr. Bart Schwartz may cooperate with each other on such matters as the JOLs may determine to be in the best interests of the creditors of the Master Fund; and

(m)     the power to do all acts and execute, in the name and on behalf of the Master Fund, all deeds, receipts and other documents in connection with the exercise of their powers notwithstanding that the JOLs are not the general partner of the Master Fund and, for that purpose, use the Master Fund's seal (if any) when necessary.

6.     There shall be constituted a liquidation committee ("**Liquidation Committee**") consisting of no more than five members who are creditors of the Master Fund.

7.     To the fullest extent permitted by law, the Liquidation Committee and its members shall have no duty, whether fiduciary or otherwise, to any other creditor, the Master Fund, the JOLs or any other person by reason of, or in connection with, their membership of or participation in the Liquidation Committee

8.     The JOLs be authorised, if they think fit, to:

(a)     take any such action as may be necessary or desirable to commence, or to cause the Master Fund to commence, proceedings under Chapter 11

13

of Title 11 of the United States Bankruptcy Code, and to take such steps arising in connection therewith that the JOLs may consider appropriate;

(b)     take any such action as may be necessary or desirable to obtain recognition of the appointment of the JOLs in any other relevant jurisdiction and to make applications to the courts of such jurisdictions for that purpose, including, without limitation as representatives of the Master Fund (as applicable) to seek relief under Chapter 15 of Title 11 of the United States Bankruptcy Code, and to take such steps arising in connection therewith that the JOLs may consider appropriate.

9.      Pursuant to Section 97 of the Companies Law, no suit, action or other proceedings, including criminal proceedings, shall be proceeded with or commenced against the Master Fund except with the leave of the Court and subject to such terms as the Court may impose.

10.     Pursuant to Section 99 of the Companies Law, no disposition of the Master Fund's property by or with the authority of the JOLs in either case in the carrying out of their duties and functions and the exercise of their powers pursuant to this Order shall be avoided and any payments made into or out of the bank accounts(s) of the Master Fund in the ordinary course of business of the Master Fund between the date of the presentation of the Petition herein and the date of the appointments of the JOLs shall not be avoided by virtue of the provisions of section 99 of the Companies Law in the event of an order for the winding up of the Master Fund being made on the Petition.

11.     Subject to section 109(2) of the Companies Law and the Insolvency Practitioner's Regulations 2008 (as amended), the JOLs be authorised to render and pay invoices out of the assets of the Master Fund for their own remuneration.

12.     The JOLs be at liberty to meet all disbursements reasonably incurred in connection with the performance of their duties and, for the avoidance of doubt, all such payments shall be made as and when they fall due out of the assets of the Master Fund as an expense of the liquidation.

13.     The JOLs be at liberty to apply generally.

14

14.     The costs of and incidental to the Petition be paid forthwith out of the assets of the Master Fund.

15.     Such further or other relief be granted as this Honourable Court deems appropriate.

AND your Petitioner will ever pray etc.

DATED the    23rd    day of August    2016.


_Walkers_
_____

WALKERS

Attorneys at Law for the Company

NOTE:       This Petition is intended to be served on:

(i)     all known creditors of the Company

(ii)    Platinum Partners Value Arbitrage Fund (International) Limited

(iii)   Platinum Partners Value Arbitrage Intermediate Fund Limited

(iv)    The Cayman Islands Monetary Authority

15

## NOTICE OF HEARING

TAKE NOTICE THAT the hearing of this Petition will take place at the Law Courts, George Town, Grand Cayman on            at 10.00 am.

Any correspondence or communication with the Court relating to the hearing of this Petition should be addressed to the Registrar of the Financial Services Division of the Grand Court at PO Box 495, Grand Cayman, KY1-1106, Telephone 345 949 4296

This **PETITION** is presented by Walkers, Attorneys at Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, for the Master Fund whose address for service is care of its said Attorneys at Law.

16

# EXHIBIT 15

**JUDICIAL ADMINISTRATION**

Date Received: _23 Aug 16_

Time Received: _1:49 pm_

WALKERS

1. Petitioner
2. M Nordlicht
3. Second Affidavit
4. Exhibit "MN-2"
5. _23_ August 2016

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: FSD ｜3｜ OF 2016

IN THE MATTER OF THE COMPANIES LAW (2013 REVISION)

AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP LAW, 2014

AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P.

### SECOND AFFIDAVIT OF MARK NORDLICHT

I, **MARK NORDLICHT**, of Platinum Management (NY) LLC, 250 West 55th Street, 14th Floor, New York, New York, 10019, United States being duly sworn **MAKE OATH AND SAY** as follows:

**INTRODUCTION**

1.  I am a director and the Chief Investment Officer of Platinum Management (NY) LLC (the **"General Partner"**) which is the general partner of Platinum Partners Value Arbitrage Fund L.P. (the **"Master Fund"**), an exempted limited partnership registered under the Exempted Limited Partnership Law, 2014 (the **"ELP Law"**) and having its registered office at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands.

2.  In my above noted capacity have been closely involved in this matter on behalf of the Master Fund at all material times and, save where the contrary is stated to be the case, the facts and matters to which I depose are within my own knowledge and are true. Where the facts and matters are not within my own knowledge, the source of my knowledge is stated and the facts and matters concerned are true to the best of my knowledge and belief. Nothing in this affidavit is intended to waive privilege in respect of the matters referred to, and privilege is not being waived.

1

3.     I am duly authorised by the General Partner to swear this affidavit in support of a summons filed herein seeking the appointment of Matthew Wright and Christopher Kennedy both of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, West Bay Road, Grand Cayman, KY1-1103, Cayman Islands, as joint provisional liquidators (the "**JPLs**") of the Master Fund pursuant to section 104(3) of the Companies Law (2013 Revision) (the "**Companies Law**") (as that section is applied in respect of exempted limited partnerships by, and subject to the provisions of, section 36 of the ELP Law) (the "**Summons**").

4.     There is now produced and shown to me and marked as exhibit "**MN-2**" a bundle of paginated copy documents which comprise the exhibit to this Affidavit: unless otherwise indicated, references to Tabs in this affidavit are to the consecutively numbered Tabs of **MN-2**.

5.     The Limited Partners (as defined below) of the Master Fund have consented to the presentation of a petition to this Honourable Court for the winding up of the Master Fund (the "**Petition**") and to the making of this application for the appointment of the JPLs. A copy of such consent is at **Tab 1**.

6.     I would note that for the purposes of this Affidavit, any assumptions, assessments, revenue expectations, cash flow statements or the like set forth below regarding future events or which are forward-looking constitute only subjective views, outlooks, estimations or intentions, are based upon the General Partner's expectations, intentions or beliefs, should not be relied on, are subject to change due to a variety of factors, including, without limitation, to fluctuating market conditions and economic factors, and involve inherent risks and uncertainties, both general and specific, many of which cannot be predicted or quantified and are beyond the control of the General Partner and/or the Master Fund.

## EX PARTE APPLICATION

7.     The Summons has been filed ex parte for the following reasons:

(a)     an ex parte application for the appointment of provisional liquidators is specifically permitted by section 104(3) of the Companies Law, as applied to exempted limited partnerships by section 36 of the ELP Law;

2

(b)   the joint official liquidators of the Offshore Feeder Fund have consented to the filing of this Summons and have consented to act as the JPLs of the Master Fund, as set out below;

(c)   publication of this Summons would, in the opinion of the General Partner, likely precipitate adverse creditor action which, for the reasons set out below, the General Partner thinks is in the best interests of all creditors to avoid at this stage; and

(d)   the JPLs will, should this Honourable Court be minded to appoint them as such, shortly engage with all creditors and look to present a compromise to relevant creditors in order to maximise returns to stakeholders.

**SUMMARY**

8.   The Master Fund is a regulated mutual fund in the Cayman Islands which forms part of a typical master/feeder investment structure within the group of funds (the **"Platinum Group"**) managed by Platinum Management (NY) LLC (which is also the General Partner of the Master Fund) in its capacity as the Platinum Group's investment manager (the **"Investment Manager"**).

9.   There follows a structure diagram showing the organisational structure of the part of the Platinum Group of which the Master Fund forms part:

3



10.    The Master Fund's liabilities principally comprise, as at 30 May 2016:

(a)    a number of structured financial liabilities in the approximate combined principal and interest amount of US$94,378,544 owed to:

(i)    one United States bank based out of Arkansas; and

(ii)    the holders of a series of promissory notes issued by the Master Fund, some of whom were former investors in certain of the Master Fund's feeder funds and who hold the promissory notes in settlement of historic redemption requests submitted to such feeder funds and, indirectly, to the Master Fund;

(b)    a potential liability to New Mountain Finance Corporation ("**New Mountain**") in the amount claimed by New Mountain of approximately US$31,800,000 (as at 18 May 2016 and subject to daily accruing interest claimed for the period thereafter) regarding payments which New Mountain claims are due from the

4

Master Fund in respect to a securities purchase and put agreement dated 7 November 2014 (the "**New Mountain Put Agreement**"), as further detailed at **[paragraph 37]** below;

(c)     indirect liabilities to certain of its ultimate redemption creditors in respect of:

    (i)     unpaid redemptions / withdrawals in the approximate amount of US$68,394,111; and

    (ii)    audit holdback amounts of US$9,910,029;

(d)     the following management fee liabilities to the Intermediate Offshore Feeder Fund and the Onshore Feeder Fund:

    (i)     US$4,716,731 due to the Intermediate Offshore Feeder Fund; and

    (ii)    US$2,683,160 due to the Onshore Feeder Fund;

(e)     accrued expenses and liabilities in the approximate amount of US$6,449,468;

(f)     an amount payable to the General Partner of US$4,291,275;

(g)     accrued trader fees of US$13,073,209;

(h)     amounts due to the holders of minority interests in the Master Fund's subsidiary companies of US$1,813,251;

(i)     liabilities of approximately US$106,824,701 representing the amount the Master Fund expects to cover in respect of short sale contracts entered into by the Master Fund; and

(j)     unrealised depreciation on derivative contracts of approximately US$15,742,077,

as explained in further detail at **[paragraphs 35 to 39]** below.

11.     Certain of the Master Fund's liabilities to its creditors are also secured and details of such security is set out at **[paragraph 35]** below. In addition, certain of the Master Fund's creditors are party to agreements which purport to restrict the ability of the

5

Master Fund to incur additional debt and/or to grant additional security over its assets.

12.   The Master Fund's financial position has recently significantly deteriorated to the extent that the General Partner (relying on information obtained in its capacity as both General Partner of the Master Fund and the Master Fund's Investment Manager) considers that the Master Fund is unable to pay its debts and is insolvent on a cash flow basis.

13.   The deterioration is, in the opinion of the General Partner, due to factors including:

(a)   a shift in the concentration of the Master Fund's investment assets away from a balanced portfolio of liquid and illiquid assets and more towards a portfolio that is more concentrated in private equity style illiquid assets. In addition, macro-economic factors, such as the recent fall in the price of oil have negatively affected the Master Fund because it holds significant investment assets in the oil and gas sector;

(b)   the effect that a number of investigations currently ongoing in United States in relation to the Investment Manager by (among others) the Securities and Exchange Commission (the "**SEC**"). These investigations have attracted media attention which has made it very difficult, if not impossible, for the Master Fund to further leverage its assets in order to provide a much needed liquidity and capital injection; and

(c)   that the offshore fund which indirectly feeds into the Master Fund, known as Platinum Partners Value Arbitrage Fund (International) Limited (the "**Offshore Feeder Fund**"), was the subject of a winding up petition from an unpaid redemption creditor. That petition is due to be heard by this Honourable Court on Tuesday 23 August 2016.

14.   Further detail regarding the financial deterioration of the Master Fund is set out at **[paragraphs 40 to 43]** below.

15.   However, whilst the General Partner considers that the Master Fund is insolvent on a cash flow basis, the General Partner believes that the Master Fund's assets, if realised properly and in accordance with the strategies detailed further in this

6

Affidavit, will be sufficient to discharge all of its liabilities for the benefit of its creditors and its investors, provided that steps are taken to avoid the enforcement of security or the potentially value-destructive process of an official liquidation. Further details regarding the Master Fund's assets are set out at **[paragraphs 32 to 34]** below.

16.     The General Partner's proposal is that a restructuring of the Master Fund's liabilities take place whereby: steps are taken to preserve the value of the Master Fund's assets; the realisation of some or all of the Master Fund's assets does not take place immediately but is instead delayed to the optimum point in the investment lifecycle of such assets; steps are taken to ensure that the Master Fund has sufficient working capital to allow such an orderly realisation to take place and safeguard assets from enforcement or potential value destruction; steps are taken to ensure that further capital investment may be made in certain of the Master Fund's assets in order to maximise creditor returns; and a compromise or arrangement is reached with some or all of the Master Fund's creditors in order to allow the above to take place (the **"Proposed Restructuring"**).

17.     A compromise or arrangement with creditors will be an essential part of such Proposed Restructuring because of the security over assets and rights held by certain creditors and because certain creditors are either currently owed, or very shortly may be owed, significant due and payable debts and because, in the General Partner's opinion, it is essential that a compromise or arrangement is reached in order to ensure that creditors do not take steps to enforce their security or seek to place the Master Fund into official liquidation which the General Partner believes would be overall detrimental to the Master Fund's creditors as a whole.

18.     Further details regarding the Proposed Restructuring are set out at **[paragraphs 58 to 67]**.

19.     The General Partner considers that such a Proposed Restructuring is likely to deliver a better outcome for creditors rather than what would potentially be the value-destructive process of an official liquidation or piecemeal security enforcement and without the benefit of an ability to pursue the above mentioned realisation strategies.

7

20.     The General Partner believes that the appointment of the JPLs, being officers of, and subject to the oversight and control of, this Honourable Court, will be essential in negotiating and consummating the Proposed Restructuring.

## THE MASTER FUND AND RELATED ENTITIES

21.     The Master Fund is presently constituted pursuant to a second amended and restated limited partnership agreement dated 1 July 2008 (the "**LPA**"), a copy of which is at **Tab 2**. The current limited partners of the Master Fund are Platinum Partners Value Arbitrage Fund (USA) L.P. (a Delaware limited partnership) (the "**Onshore Feeder Fund**") and Platinum Partners Value Arbitrage Intermediate Fund Limited (a Cayman Islands exempted company) (the "**Intermediate Offshore Feeder Fund**") (together, the "**Limited Partners**").

22.     The Master Fund is registered with the Cayman Islands Registrar of Exempted Limited Partnerships with registration number 13869. The Master Fund is a mutual fund registered with the Cayman Islands Monetary Authority ("**CIMA**") pursuant to the Mutual Funds Law (as amended), with reference number 587506.

23.     The General Partner is a limited liability company formed under the laws of the State of Delaware, United States on August 22, 2001. It serves as the general partner of the Master Fund and as the investment manager of Offshore Feeder Fund, the Onshore Feeder Fund and other Platinum Group entities, and its managing member is Mark Nordlicht. A copy of the operating agreement of the General Partner is at **Tab 2A**.

24.     The Intermediate Offshore Feeder Fund was incorporated in the Cayman Islands on 9 April 2010 as an exempted limited company and is registered with the Cayman Islands Registrar of Companies with registration number 239229. It serves as a tax-efficient "blocker" entity in the Platinum Group and its sole director is Mark Nordlicht. In turn, the shareholders of the Intermediate Offshore Feeder Fund are Platinum Partners Value Arbitrage L.P. (a Delaware limited partnership) which holds management shares in the Intermediate Offshore Feeder Fund and the Offshore Feeder Fund. Copies of the memorandum and articles of association of the Intermediate Offshore Feeder Fund are at **Tab 3**.

8

25.    The Offshore Feeder Fund was incorporated in the Cayman Islands on 25 October 2002 as an exempted limited company and is registered with the Cayman Islands Registrar of Companies with registration number 120736. The Offshore Feeder Fund's sole director is Mark Nordlicht. The shareholders of the Offshore Feeder Fund are the offshore investors who, through the Offshore Feeder Fund and the Intermediate Offshore Feeder Fund, have indirectly invested in the Master Fund. A copy of the memorandum and articles of association of the Offshore Feeder Fund are at **Tab 4**. The Offshore Feeder Fund is a mutual fund registered with CIMA pursuant to the Mutual Funds Law (as amended), with reference number 6785.

26.    CORIS searches dated 1 August 2016 in respect of the Master Fund, the Intermediate Offshore Feeder Fund and the Offshore Feeder Fund are at **Tab 5**.

**THE BUSINESS OF THE MASTER FUND**

27.    A structure chart setting out the current organisational structure of the Master Fund and the Limited Partners is set out at **[paragraph 9 above]**.

28.    The Offshore Feeder Fund, the Intermediate Offshore Feeder Fund, the Master Fund, together with the Onshore Feeder Fund, form a typical master/feeder investment fund structure whereby:

(a)    offshore and US tax-exempt investors invest their capital into the Offshore Feeder Fund, which in turn invests into the Intermediate Offshore Feeder Fund, which in turn invests into the Master Fund;

(b)    onshore investors invest into the Onshore Feeder Fund, which in turn invests into the Master Fund;

(c)    the investment activities of the Offshore Feeder Fund, the Onshore Feeder Fund and the Master Fund are managed by the Investment Manager under the terms of an amended and restated investment management agreement dated 27 April 2007 (the "**Investment Management Agreement**"), a copy of which is at **Tab 6**;

(d)    the administrator of the Offshore Feeder Fund, the Intermediate Offshore Feeder Fund, the Onshore Feeder Fund and the Master Fund is SS&C

9

Technologies, Inc., of 80 Lamberton Road, Windsor, CT 06095, United States (the **"Administrator"**) who provides certain administrative, bookkeeping and transfer agency services; and

(e) the auditor of the Offshore Feeder Fund, the Intermediate Offshore Feeder Fund and the Master Fund is CohnReznick (Cayman), P.O. Box 1748 GT, 27 Hospital Road, George Town, Grand Cayman, Cayman Islands.

29. The Master Fund is one of three fund structures managed by the Platinum Group: the other fund structures are Platinum Partners Credit Opportunities Fund L.P. (**"PPCO"**) and a further master/feeder structure comprising Platinum Partners Liquid Opportunity Fund (International) Ltd and Platinum Partners Liquid Opportunity Master Fund L.P. (together **"PPLO"**). The Master Fund, PPCO and PPLO are separate legal entities, but there is some commonality between each fund structure on the basis that the majority of the ultimate members of management are the same; the funds make intercompany loans to each other; certain back-office employees perform functions for both funds; certain investment professionals perform functions for both funds; and both funds operate from the same office space at 250 West 55th Street, 14th Floor, New York City, New York, United States.

30. The Master Fund is a multi-strategy hedge fund that seeks to achieve significant returns while attempting to minimize downside risk. The investment strategies employed by the Master Fund include:

(a) Equity arbitrage: the Master Fund may engage in various forms of equity arbitrage trading strategies including long/short equity trading, which uses research to identify equity securities that either should perform well (in which case the securities will be held long) or poorly (in which case the equities will be sold short), and event-driven trading may include investments in long and short positions of listed and unlisted equities, convertible debt, options, futures, debt and warrants that the Investment Manager or a portfolio manager expects to profit from the occurrence of certain issuer-specific events.

(b)     Energy and power arbitrage: the Master Fund may engage in various energy trading strategies, including, without limitation, location arbitrage and volatility arbitrage.

(c)     Convertible arbitrage: Through these strategies, the Master Fund typically seeks to profit from fundamental research and exploit differences in the availability of capital in emerging market economies. In addition, these strategies may utilize currency hedging techniques, including investment in futures and forward currency contracts which are intended to mitigate the Master Fund's exposure to foreign currency movements and country-specific political risk.

(d)     Asset-based lending: the Master Fund may employ various asset-based lending strategies that seek to profit from secured lending supported by assets in excess of the value of the debt, including, without limitation, asset-based convertible debt strategies, health care receivables strategies and legal finance strategies; and

(e)     Other: as an opportunistic investor, the Master Fund may also engage in other strategies and one-off opportunities in the sole discretion of the Investment Manager.

31.   Further details regarding the business of the Master Fund is set out in the confidential private offering memorandum of the Offshore Feeder Fund dated October 2015 as filed with CIMA, a copy of which is at **Tab 7**.

## ASSETS OF THE MASTER FUND

32.   The assets of the Master Fund comprise, as at 30 May 2016 and in summary:

(a)     investments in securities / investment assets of approximately US$915,000,000;

(b)     securities purchased under agreements to resell of approximately US$46,000,000;

(c)     unrealised appreciation on open derivative contracts of approximately US$6,900,000;

11

(d)     amounts due from brokers of approximately US$49,700,000;

(e)     a potential asset in respect of the purchase of notes under the New Mountain Put Agreement of US$30,000,000;

(f)     notes receivable of approximately US$16,000,000;

(g)     participation interest of approximately US$3,000,000;

(h)     claims receivable of approximately US$2,000,000;

(i)     cash in the approximate amount of US$68,500; and

(j)     prepayments of approximately US$1,000,000.

33.     It is notable that the approximate value of the Master Fund's assets is close to US$1,093,000,000. Such valuation is based upon a number of key assumptions, including, in many cases, the expectation that the portfolio investments forming a significant part of such assets will be given the time to mature through their natural lifecycle and receive additional capital investment where that is required. In addition, such valuations are confirmed by an independent third party valuation services provider on a quarterly basis and are further subject to annual audit review by the Master Fund's third party auditor.

34.     However, such assumptions may be undermined if the Proposed Restructuring is not implemented which will potentially lead to value destruction as regards such assets, as explained further below.

**LIABILITIES OF THE MASTER FUND**

35.     There follows a structure diagram which provides a summary of the financial liabilities of the Master Fund:

12



Platinum Partners Value Arbitrage Fund L.P.
Debt Structure Chart
(as at 30 May 2016)

Privileged & Confidential

*Guaranteed by Mark Nordlicht in his personal capacity
*NB: does not show security over assets

15167502.12 P0971.132468

36.    In further detail, the Master Fund's principal financial liabilities to bank and promissory note creditors comprise:

(a)    **Heartland Bank**:

(i)    the Master Fund owes liabilities to Heartland Bank (an Arkansas, United States, state bank) ("**Heartland**") in the original principal amount of US$7,000,000 plus interest pursuant to a credit agreement (the "**Heartland Credit Agreement**") dated 31 August 2015 made between Heartland (as lender) and the Master Fund (as borrower) and a promissory note dated 31 August 2015 issued by the Master Fund to Heartland (the "**Heartland Promissory Note**"). Copies of the Heartland Credit Agreement and the Heartland Promissory Note are at **Tabs 8 and 9**, respectively. The Heartland Credit Agreement is stated to be governed by the laws of the State of Arkansas and the United States of America. Liabilities due from the Master Fund to Heartland pursuant to the Heartland Credit Agreement are due for repayment on 31 August 2017. The outstanding liability of the Master Fund to Heartland was US$7,069,684.03 as at 30 May 2016. Notably, the Heartland Credit Agreement includes the following covenants:

(1)    a minimum assets under management covenant, pursuant to which the Master Fund is obliged to ensure that it maintains a specified ratio of assets under management to the outstanding balance of its liabilities to Heartland under the Heartland Credit Agreement;

(2)    a restriction on the borrowing by the Master Fund of additional debt if the aggregate amount of such additional debt would cause the Master Fund to be in breach of the minimum assets under management covenant; and

(3)    a restriction on the creation of additional security by way of liens (in United States legal terminology and as such term is defined in the Heartland Credit Agreement) if such liens would

14

cause the Master Fund to be in breach of the minimum assets under management covenant;

(ii)    as security for the Master Fund's obligations to Heartland pursuant to the Heartland Credit Agreement and the Heartland Promissory Note, the Master Fund has entered into a security agreement dated 31 August 2015 made between the Master Fund and Heartland (the "**Heartland Security Agreement**"). A copy of the Heartland Security Agreement is at **Tab 10**. The Heartland Security Agreement is stated to be governed by the internal laws of the State of Arkansas, but giving effect to federal laws applicable to national banks. Pursuant to the terms of the Heartland Security Agreement, the Master Fund has purportedly created a security interest in favour of Heartland over the "Collateral", (as such term is defined in the Heartland Security Agreement which is stated to include all "*Accounts, Chattel Paper, Documents, Equipment, Fixtures, General Intangibles, Investment Property, Instruments, Inventory, Pledged Deposits, Stock Rights and Other Collateral*" (in each case, as defined in the Heartland Security Agreement), wherever located, in which the Master Fund has any right or interest. I understand that Heartland has taken steps to perfect this security interest by filing a Uniform Commercial Code-1 financing statement in respect of it.

(b)    **Kismetia**:

(i)    the Master Fund owes liabilities to Kismetia Ltd ("**Kismetia**") in the original principal amount of US$9,327,262.62 plus interest accruing at a rate of 1% per month (increasing to 3% per month following the occurrence of an event of default) pursuant to a promissory note and security agreement dated 16 March 2016 (effective as of 31 December 2015) and as amended by a first amendment to promissory note and security agreement dated 14 June 2016 (together, the "**Kismetia Promissory Note Agreements**"), in each case made between the Master Fund and Kismetia. Copies of the Kismetia Promissory Note Agreements are at **Tab 11**. The Kismetia

15

Promissory Note Agreements are stated to be governed by the laws of the State of New York;

(ii) liabilities due from the Master Fund to Kismetia are stated to fall due on 31 August 2016, however, in any event, Kismetia may, at any time, accelerate the maturity date of such debt to a date no later than seven days from the date on which written notice to accelerate is provided to the Master Fund. The Master Fund is therefore currently at risk of immediate acceleration of the debt owed to Kismetia;

(iii) the outstanding liability of the Master Fund to Kismetia was US$9,803.046.75 as at 30 May 2016;

(iv) notably, the Kismetia Promissory Note Agreements include the following covenants:

 (1) a restriction on the Master Fund entering into a loan agreement with a lender which is in a "*position senior to*" Kismetia without receiving Kismetia's prior written consent; and

 (2) a restriction on the Master Fund creating additional security interests over its assets without the prior written consent of Kismetia;

(v) the Kismetia Promissory Note Agreements were issued to Kismetia as payment for the redemption of its shares in the Onshore Feeder Fund and a restructuring of such notes took place on 14 June 2016 to provide Kismetia with better terms, including accelerated enforcement rights;

(vi) as security for the Master Fund's obligations to Kismetia pursuant to the Kismetia Promissory Note Agreements, the Master Fund has thereunder purportedly created:

15167502.12 P0971.132468

(1)     a security interest in favour of Kismetia over all of the Master Fund's assets as at 31 December 2015, including over the proceeds of such assets; and

(2)     a pledge over Kismetia's "*redeemed equity interest Platinum Partners Value Arbitrage Fund International Ltd*" in favour of Kismetia;

(vii)   I understand that Kismetia has not taken steps to perfect such security interest by filing a Uniform Commercial Code-1 financing statement in respect of it.

(c)     **PPNE 16% lenders and PPNE 12% lenders**:

(i)     the Master Fund owes liabilities to a disparate group of lenders pursuant to:

(1)     a promissory note dated 11 May 2015 made between the Master Fund (as borrower) and such lenders in the aggregate principal amount of US$28,660,751.63 and incurring interest at a rate of 16% per annum (the "**PPNE 16% Promissory Note**"). A copy of the PPNE 16% Promissory Note is at **Tab 12** and a schedule of lenders under the same is at **Tab 13**. The PPNE 16% Promissory Note is stated to be governed by the laws of the State of New York. Liabilities due from the Master Fund to the lenders under the PPNE 16% Promissory Note are due for repayment on 11 May 2018. The outstanding liability of the Master Fund to such lenders is US$30,632,499.76 was at 30 May 2016; and

(2)     a promissory note dated 12 August 2015 made between the Master Fund (as borrower) and such lenders in the aggregate principal amount of US$15,523,619.22 and incurring interest at a rate of 12% per annum (the "**PPNE 12% Promissory Note**"). A copy of the PPNE 12% Promissory Note is at **Tab 14** and a schedule of lenders under the same is at **Tab 15**. The PPNE 12% Promissory Note is stated to be governed by

17

the laws of the State of New York. Liabilities due from the Master Fund to the lenders under the PPNE 12% Promissory Note are due for repayment 12 months from the date of each lenders payment is received pursuant to the PPNE 12% Promissory Note. The outstanding liability of the Master Fund to such lenders is US$15,625,749.49 was at 30 May 2016;

(ii)     certain of the lenders under such promissory notes were issued with such notes as payment for the redemption of shares they formerly held in the Onshore Feeder Fund and other funds within the Platinum Group; and

(iii)    as security for the Master Fund's obligations under the PPNE 16% Promissory Note and the PPNE 12% Promissory Note, the Master Fund is stated to have granted security over all of its assets held as at the date of the promissory notes. I understand that the lenders under such promissory notes have not taken steps to perfect such security interest by filing a Uniform Commercial Code-1 financing statement in respect of them.

(d)     **Twosons**:

(i)      the Master Fund owes liabilities to Twosons in the principal amount of US$14,000,000 plus interest at a rate of 1.333% per month pursuant to a promissory note dated 18 September 2014 made between the Master Fund (as borrower) and Twosons (as lender) (the "**Twosons Promissory Note**"). A copy of the Twosons Promissory Note is at **Tab 16**. The Twosons Promissory Note is stated to be governed by the laws of the State of New York. Liabilities due from the Master Fund to Twosons pursuant to the Twosons Promissory Note are due for repayment on 30 September 2017. The outstanding liability of the Master Fund to Twosons was US$6,082,666.67 as at 30 May 2016; and

(ii)     as security for the Master Fund's obligations to Twosons pursuant to the Twosons Promissory Note, the Master Fund has thereunder

18

purportedly created a security interest in favour of Twosons over all of the Master Fund's assets as at 18 September 2014, including over the proceeds of such assets. I understand that Twosons has not taken steps to perfect such security interest by filing a Uniform Commercial Code-1 financing statement in respect of it.

(e) **Platinum Partners Credit Opportunities Master Fund LLC**:

(i) the Master Fund owes liabilities to PPCO in the original principal amount of US$25,000,000 plus interest at a rate of 1.333% per month pursuant to a revolving promissory note dated 1 January 2015 issued by the Master Fund to PPCO (the "**PPCO Promissory Note**"). A copy of the PPCO Promissory Note is at **Tab 17**. The PPCO Promissory Note is stated to be governed by the laws of the State of New York. Liabilities due from the Master Fund to PPCO pursuant to the PPCO Promissory Note are due for repayment on 31 December 2017. The outstanding liability of the Master Fund to PPCO was US$1,393,239.11 as at 30 May 2016; and

(ii) as security for the Master Fund's obligations under the PPCO Promissory Note the Master Fund is stated to have granted security over all of its assets held as at the date of the PPCO Promissory Note. I understand that PPCO has not taken steps to perfect such security interest by filing a Uniform Commercial Code-1 financing statement in respect of it.

(f) **Platinum Partners Liquid Opportunities Fund**:

(i) the Master Fund owes liabilities to PPLO in the original principal amount of US$10,000 plus interest at a rate of 1% per month pursuant to an unsigned revolving line of credit promissory note stated to be dated 1 October 2015 (the "**PPLO Promissory Note**"). A copy of the PPLO Promissory Note is at **Tab 18**. I understand that whilst the PPLO Promissory Note has not been signed, the loan made and payable pursuant to it has nevertheless been operated, as between the Master Fund and PPLO, on the terms set out therein.

19

The PPLO Promissory Note is stated to be governed by the laws of the State of New York. Liabilities due from the Master Fund to PPLO pursuant to the PPLO Promissory Note are due for repayment on 31 December 2017. The outstanding liability of the Master Fund to PPLO was US$1,930,498.95 as at 30 May 2016; and

(ii)     as security for the Master Fund's obligations under the PPLO Promissory Note the Master Fund is stated to have granted security over all of its assets held as at the date of the PPLO Promissory Note. I understand that PPLO has not taken steps to perfect such security interest by filing a Uniform Commercial Code-1 financing statement in respect of it.

(g)     **White Rock Properties:**

(i)     the Master Fund owes liabilities to White Rock Properties LLC ("**White Rock Properties**") in the original principal amount of US$8,500,000 pursuant to a promissory note dated 16 May 2016 made between the Master Fund (as borrower) and White Rock Properties (as lender) (the "**White Rock Properties Promissory Note**"). A copy of the White Rock Properties Promissory Note is at **Tab 19**. The White Rock Properties Promissory Note is stated to be governed by the laws of the State of New York. Liabilities due from the Master Fund to White Rock Properties pursuant to the White Rock Properties Promissory Note are due for repayment on the earlier of 31 August 2016, three business days following the date on which the Master Fund or any of its subsidiaries receive the proceeds from the sale of all or substantially all of the Implant Sciences business (being a portfolio company of the Master Fund) or three business days following the date on which the Master Fund or any of its subsidiaries receives the proceeds from the sale of all or substantially all of the Agera Energy business (another portfolio company). The outstanding liability of the Master Fund to White Rock Properties was US$8,908,088 as at 30 May 2016. The White Rock Properties Promissory Note was issued to supersede a previous promissory note

20

dated 1 November 2015 in the principal amount of US$7,000,000. Notably, the terms of the White Rock Promissory Note restrict the ability of the Master Fund to grant any security interest in the Collateral (as such term is defined in the White Rock Properties Promissory Note) that ranks either senior to or pari passu with the security interest granted in the Collateral to White Rock Properties pursuant to the White Rock Properties Promissory Note;

(ii)     as security for the Master Fund's obligations to White Rock Properties pursuant to the White Rock Properties Promissory Note, the Master Fund has purportedly created a security interest in favour of White Rock Properties over the following:

(1)     all the Master Fund's right, title and interest in and to all the assets of the Master Fund held by the Master Fund as at 16 May 2016; and

(2)     the first US$8,500,000 payable under a credit agreement dated 4 September 2009 made between DMRJ Group, LLC (as lender) and Implant Sciences Corporation (as borrower, and being one of the Master Fund's portfolio investments);

(iii)    I understand that White Rock Properties has not taken steps to perfect such security interest by filing a Uniform Commercial Code-1 financing statement in respect of it.

(h)     **Richard Stadtmauer, Marisa Stadtmauer and the National Society for Hebrew Day Schools:**

(i)      the Master Fund owes liabilities owed to:

(1)     Richard Stadtmauer in the original principal amount of US$6,390,043.79 plus interest at a rate of 7% per annum pursuant to a promissory note dated 27 May 2016 made between the Master Fund (as borrower), the Onshore Feeder Fund (as co-borrower) and Richard Stadtmauer (as lender) (the "**Richard Stadtmauer Promissory Note**"). A copy of the

21

Richard Stadtmauer Promissory Note is at **Tab 20**. Liabilities due from the Master Fund to Richard Stadtmauer pursuant to the Richard Stadtmauer Promissory Note are due for repayment on 27 May 2018. The outstanding liability of the Master Fund to Richard Stadtmauer was US$6,464,594.30 as at 30 May 2016;

(2)　　Marisa Stadtmauer in the original principal amount of US$4,115,052.52 plus interest at a rate of 7% per annum pursuant to a promissory note dated 27 May 2016 made between the Master Fund (as borrower), the Onshore Feeder Fund (as co-borrower) and Marisa Stadtmauer (as lender) (the **"Marisa Stadtmauer Promissory Note"**). A copy of the Marisa Stadtmauer Promissory Note is at **Tab 21**. Liabilities due from the Master Fund to Marisa Stadtmauer pursuant to the Marisa Stadtmauer Promissory Note are due for repayment on 27 May 2018. The outstanding liability of the Master Fund to Marisa Stadtmauer was US$4,163,061.47 as at 30 May 2016; and

(3)　　the National Society for Hebrew Day Schools (the **"NSHDS"**) in the original principal amount of US$2,278,829.93 plus interest at a rate of 7% per annum pursuant to a promissory note dated 27 May 2016 made between the Master Fund (as borrower), the Offshore Feeder Fund (as co-borrower) and the NSHDS (as lender) (the **"NSHDS Promissory Note"**). A copy of the NSHDS Promissory Note is at **Tab 22**. Liabilities due from the Master Fund to the NSHDS pursuant to the NSHDS Promissory Note are due for repayment on 27 May 2018. The outstanding liability of the Master Fund to the NSHDS was US$2,305,416.28 as at 30 May 2016;

(ii)　　each of the Richard Stadtmauer Promissory Note, the Marisa Stadtmauer Promissory Note and the NSHDS Promissory Note (together, the **"Stadtmauer Notes"**) are stated to be governed by the

22

laws of the State of New York and notably include the following covenants:

(1)     a restriction on the borrowing of certain additional debt by the Master Fund without the prior written consent of Richard Stadtmauer, Marisa Stadtmauer and the NSHDS; and

(2)     a restriction on the creation of certain Liens (as such term is defined in the Stadtmauer Notes) over any of the Master Fund's assets and/or properties without the prior written consent of Richard Stadtmauer, Marisa Stadtmauer and the NSHDS;

(iii)     the Stadtmauer notes were entered into in connection with certain agreements entered separately between each of Richard Stadtmauer, Marisa Stadtmauer and the NSHDS, the Master Fund and others (the "**Stadtmauer Supplemental Agreements**"). Copies of the Stadtmauer Supplemental Agreements are at **Tab 23**. The Stadtmauer Supplemental Agreements record, amongst other things, that each of Richard Stadtmauer, Marisa Stadtmauer and the NSHDS were previously investors in the Offshore Feeder Fund and/or the Onshore Feeder Fund and that the promissory notes constituted pursuant to the Stadtmauer notes were issued to each of Richard Stadtmauer, Marisa Stadtmauer and the NSHDS following such investors' requests to withdraw funds from the Offshore Feeder Fund and/or the Onshore Feeder Fund and the failure of the Offshore Feeder Fund and/or the Onshore Feeder Fund to pay such withdrawal requests; and

(iv)     the obligations of the Master Fund and (as applicable) the Onshore Feeder Fund and the Offshore Feeder Fund under each of the Stadtmauer Notes are guaranteed by Mark Nordlicht (Platinum's founder) pursuant to the terms of a guaranty agreement dated 27 May 2016 made between Mark Nordlicht, Richard Stadtmauer, Marisa Stadtmauer and the NSHDS (the "**Stadtmauer Nordlicht Guarantee**

Agreement"), a copy of which is at **Tab 24**, on the terms set out therein.

37.    The Master Fund also has a potential liability to New Mountain in an amount claimed of US$33,246.158.50 (as at 18 May 2016 and subject to daily accruing interest claimed for the period thereafter) (the "**New Mountain Claim**"). The New Mountain Claim arises from the New Mountain Put Agreement which was originally made between the Master Fund and New Mountain Finance Holdings LLC ("**NMFH**") and which NMFH claims to have subsequently assigned to New Mountain. In summary terms, pursuant to the terms of the New Mountain Put Agreement, NMFH purchased from the Master Fund US$30,000,000 of 12% second priority senior secured notes issued by Northstar GOM Holdings Group LLC (one of the Master Fund's investments) (the "**Northstar Notes**"). The Master Fund was required to make payments to NMFH under the terms of the New Mountain Put Agreement and NMFH had an option to require the Master Fund to repurchase the Northstar Notes at a price equal to the principal amount. Pursuant to amendments to the New Mountain Put Agreement, the Master Fund agreed to pay four equal instalments of US$7,500,000 to New Mountain subject to the terms set out therein. Failure to pay such amounts would constitute an acceleration event under the New Mountain Put Agreement requiring the Master Fund to repurchase the balance of the Northstar Notes at a repurchase price calculated in accordance with the terms of that agreement:

(a)    New Mountain alleges that the Master Fund is in breach of its payment obligations to New Mountain under the New Mountain Put Agreement and a dispute between New Mountain and the Master Fund is being litigated before the Supreme Court of the State of New York, New York County (the "**New York Supreme Court**") (the "**New York Proceedings**");

(b)    within the context of the New York Proceedings, New Mountain has sought summary judgment against the Master Fund;

(c)    a verdict in respect of such summary judgment application may now be returned at any time;

(d)     on 18 May 2016, New Mountain served a statutory demand on the Master Fund and threatened to present a winding up petition against the Master Fund if the amount claimed was not paid within 21 days. A copy of the statutory demand is at **Tab 25**;

(e)     on 15 June 2016, the Master Fund succeeded in obtaining a temporary restraining order and injunction from the New York Supreme Court which restrains New Mountain from presenting a petition to this Honourable Court for the winding up of the Master Fund. Such temporary restraining order and injunction was granted on the basis that the New Mountain Put Agreement contains a forum selection clause which mandates that any legal action or proceeding with respect to the New Mountain Put Agreement or the transactions effected thereunder be brought in the courts of the State of New York or of the United States of America for the Southern District of New York, in each case sitting in New York City. To the best of my knowledge, such temporary restraining order and injunction remains in effect and New Mountain has not served a winding up petition on the Master Fund; and

(f)     if summary judgment in the New York Proceedings is given against the Master Fund, it is possible (though it is difficult to determine the probability of this) that the temporary restraining order may be lifted thereby enabling, to the extent the amount payable by the Master Fund to New Mountain is determined by the New York Supreme Court, New Mountain to present a winding up petition against the Master Fund in the Cayman Islands in short order. The Master Fund's position as to whether it will dispute this debt reserved.

38.   A Uniform Commercial Code filing was made in the United States in respect of the Master by Credit Suisse on 8 July 2016 which likely relates to the Master Fund's entry into a prime brokerage relationship with Credit Suisse.

39.   As regards the redemption liability owed to redeeming investors of the Offshore Feeder Fund and the Onshore Feeder Fund:

(a)     prior to the Offshore Feeder Fund's and the Onshore Feeder Fund's suspension of the redemption of their shares or limited partner interests (as

applicable) on 30 June 2016 (which is detailed at **[paragraph 41]** below) a number of their investors had requested to redeem their shares or limited partner interests, either in full or in part;

(b) as at the date of this Affidavit, I understand that:

    (i) the Offshore Feeder Fund owes approximately US$32,964,557 of unpaid redemptions and approximately US$6,935,186 in respect of audit holdback to its redemption creditors; and

    (ii) the Onshore Feeder Fund owes approximately US$35,429,553 of unpaid redemptions and approximately US$2,974,843 in respect of audit holdback to its redemption creditors,

    (such amounts together, the "**Redemption Creditor Claims**");

(c) the Offshore Feeder Fund (albeit via the Intermediate Offshore Feeder Fund which is interposed as a pass-through entity between the Master Fund and the Offshore Feeder Fund) and the Onshore Feeder Fund have corresponding back to back redemption creditor claims and/or withdrawal requests (as applicable) against the Master Fund in an aggregate amount equal to the Redemption Creditor Claims. In that regard, the Offshore Feeder Fund, the Onshore Feeder Fund, the Offshore Intermediate Fund and the Master Fund are party to a letter agreement 22 August 2016 (a copy of which is at **Tab 26**) pursuant to which they confirm that understanding;

(d) in addition the Master Fund owes additional liabilities to the Offshore Feeder Fund (via the Intermediate Offshore Feeder Fund) and the Onshore Feeder Fund in respect of audit holdback amounts in the sums of US$6,935,186.41 and US$2,974,843.15, respectively, and liabilities of US$4,716,731.82 to the Intermediate Offshore Feeder Fund in respect of amounts payable by the Intermediate Offshore Feeder Fund to the Investment Manager;

(e) certain liabilities incurred by the Master Fund comprise debt issued to redeeming investors of the Onshore Feeder Fund and the Offshore Feeder Fund, as noted above. In addition, the Master Fund has entered into, together with the Onshore Feeder Fund and Platinum Partners Liquid

26

Opportunity Fund (USA) L.P. ("**PPLO LP**"), a delay of payment penalty agreement dated 16 May 2016 with Ari Glass (the "**Ari Glass Penalty Agreement**"). A copy of the Ari Glass Penalty Agreement is at **Tab 27**. Ari Glass is a creditor of both the Onshore Feeder Fund and PPLO LP, having submitted redemption requests to both fund entities which were not paid. The Ari Glass Penalty Agreement provides, amongst other things:

(i)     for an increase in the amount of the payment obligations of the Onshore Feeder Fund and PPLO LP to Ari Glass that are set out therein in the event that the same are not discharged by 1 September 2016;

(ii)    that if the Master Fund pays White Rock Properties the amount due pursuant to the White Rock Properties Promissory Note then the Onshore Feeder Fund and PPLO LP shall promptly discharge their payment obligations to Ari Glass; and

(iii)   that if the Onshore Feeder Fund and PPLO LP do not satisfy their payment obligations to Ari Glass following the payment by the Master Fund to White Rock Properties of the amounts due pursuant to the White Rock Properties Promissory Note then the Master Fund shall owe Ari Glass an additional $1,000,000;

(f)     the Master Fund is also subject to a number of other liabilities recorded on its balance sheet as at 30 May 2016, including but not limited to the following:

(i)     accrued expenses and other liabilities in the amount of US$6,449,468 in respect of, amongst other things, fees due to professional services providers and legal expenses incurred by legal counsel;

(ii)    US$4,291,275 payable to the General Partner;

(iii)   a deposit of US$23,500,000 representing an advance in respect of the Master Fund's sale of its interests in Agera Energy. I understand that prior to the completion of the transaction this deposit may have been returnable but that the transaction has now closed subsequent

27

to 30 May 2016. Accordingly, I understand that this deposit is no longer a liability of the Master Fund;

(iv)    accrued but unpaid fees due to traders of US$13,073,209;

(v)     amounts due to the holders of minority interests in the Master Fund's subsidiary companies of US$1,813,251.76;

(vi)    liabilities of approximately US$106,824,701 representing the amount the Master Fund expects to cover in respect of short sale contracts entered into by the Master Fund; and

(vii)   unrealised depreciation on derivative contracts of approximately US$15,742,077.

## DETRIORATION IN THE MASTER FUND'S FINANCIAL POSITION

40.    The Master Fund's financial position has recently significantly deteriorated due to a combination of the following factors:

(a)     the shift in the concentration of the Master Fund's assets to illiquid private equity style investments which has caused an imbalance between liquid and illiquid assets. In that regard:

(i)     historically, the Master Fund's investment portfolio had been balanced between liquid and illiquid asset classes. However, in recent years the Master Fund has built up a large concentration of illiquid, private equity style investments which are mostly in the oil and gas sectors (which sector comprises approximately 40% of the Master Fund's investments). This has caused an imbalance in the Master Fund between liquid and private equity style investments which historically were balanced on an approximate 50/50 basis; and

(ii)    the shift in the constitution of the Master Fund's investment portfolio assets to a large holding of illiquid assets has been primarily due to the successful appreciation of assets that caused the private equity style illiquid investments to occupy a larger position in the Master Fund and volatility in the markets whereby the Master Fund drew

28

down its exposure in the liquid trading strategies and therefore was unable to restore such liquid trading strategies and delayed monetisation events;

(b)     a global decline in oil prices which has negatively affected the Master Fund's assets which operate in the oil and gas sector;

(c)     a delay in the availability of audited financial statements due to the esoteric nature of many of the investment assets of the Master Fund, the ongoing investigations summarised below and the fact that the Master Fund's Administrator has not been in a position to assist due to its remaining a creditor of the Master Fund in respect of unpaid professional services fees;

(d)     delayed monetisation events in relation to the Master Fund's investment assets which has delayed a rebalancing of the Master Fund's liquidity position;

(e)     a large amount of investor redemptions remaining unpaid past their due date, as noted above; and

(f)     the necessary borrowing of funds by the Master Fund to fund certain of its investment assets.

41.     Additionally, in recognition of the financial circumstances of the Master Fund and its limited access to liquid assets, on 30 June 2016 the Offshore Feeder Fund and the Intermediate Offshore Feeder Fund suspended determination of net asset value and the redemption of their shares by investors in accordance with its articles of association and the Onshore Feeder Fund also suspended the determination of net asset value and the withdrawal of limited partner interests pursuant to its limited partnership agreement. Such suspensions followed the suspension by the Master Fund of withdrawals on 30 June 2016 in accordance with its limited partnership agreement. A copy of notices sent to investors of both the Offshore Feeder Fund and the Onshore Feeder Fund are at **Tab 28**.

42.     The financial circumstances of the Master Fund have also been further negatively impacted by a number of regulatory issues and investigations ongoing in the United States. These events, particularly as reported in the press, have at the present

juncture made it nearly impossible for the Master Fund to leverage its positions and monetise them to the benefit of the Master Fund and its ultimate investors. Brief details of these regulatory issues and investigations as follows:

(a)     SEC investigation: the Platinum Group was served with a subpoena on 8 June 2016 from the SEC's Enforcement Division seeking documents relating to various transactions and business operational issues. The Platinum Group was in the process of responding to the subpoena when, on 22 June 2016, the United States Attorney's Office for the Eastern District of New York (the "**USAO-EDNY**") executed a search warrant of the Platinum Group's offices, seizing or copying many of the Platinum Group's files. Following that event, the SEC agreed to suspend the Platinum Group's response to the 8 June 2016 subpoena. The USAO-EDNY prosecutors were seeking, and had seized or copied, many of the same kinds of documents that the SEC Enforcement staff were seeking;

(b)     USAO-EDNY investigation: the Platinum Group was served with a subpoena on 8 June 2016 from the USAO-EDNY seeking documents relating to various transactions and business operational issues, a request that was largely similar to the SEC Enforcement subpoena. The Platinum Group was in the process of responding to the USAO-EDNY subpoena when USAO-EDNY prosecutors caused federal agents to execute a search warrant at the Platinum Group's offices on 22 June 2016. The USAO-EDNY thereafter agreed to suspend the Platinum Group's obligations to respond further to the subpoena pending the office's review of the materials seized and copied during the 22 June 2016 search;

(c)     SEC Office of Compliance Inspections and Examinations (the "**SEC-OCIE**"): on or about 28 June 2016, the Platinum Group was notified that the SEC-OCIE was commencing an examination of the Platinum Group's books and records pursuant to Rule 204 of the United States Investment Adviser's Act. The Platinum Group has been responding to multiple written requests for information from the SEC-OCIE Division on a rolling basis since 28 June 2016;

30

(d)    United States Attorney's Office for the Southern District of New York (the "**USAO-SDNY**"): in May 2015, the Platinum Group received a subpoena from the USAO-SDNY seeking various documents relating to investments by the Corrections Officers' Benevolent Association (the "**COBA**"). The Platinum Group complied with the subpoena and follow up requests in late 2015 and early 2016. On 8 June 2016, the USAO-SDNY filed a criminal complaint related to COBA against Murray Huberfeld, a founding partner of the Platinum Group and former investment officer at one of the funds managed by the Platinum Group. Mr. Huberfeld has not had management responsibility nor been employed at the Platinum Group since 2011 and the allegations against him relate to events that occurred in 2014. The complaint alleged that Mr. Huberfeld caused a bribe to be paid from the Platinum Group to Norman Seabrook, then head of the COBA union, in exchange for Mr. Seabrook's causing an investment to be made by COBA in the Platinum Group funds. The Platinum Group has not been charged in connection with the case; and

(e)    U.S. Commodities Futures Trading Commission (CFTC) Division of Enforcement: on 22 June 2016, the Platinum Group received a subpoena for documents from the U.S. Commodities Futures Trading Commission (CFTC) Division of Enforcement. The Platinum Group responded to the subpoena in early July 2016 and has not received any follow up or further request from the CFTC.

43.    Most recently on 28 July 2016, Parris Investments Ltd ("**Parris**"), presented and served a petition to this Honourable Court for the winding up of the Offshore Feeder Fund on the basis that Parris is an unpaid redemption creditor of the Offshore Feeder Fund in the amount claimed of US$1,080,480.43 and that the Offshore Feeder Fund has, as at the petition date, failed to satisfy such liability to Parris. That petition is due to be heard by this Honourable Court on Tuesday 23 August 2016.

## GUIDEPOST SOLUTIONS LLC

44.    In recognition of concerns regarding the solvency of the Master Fund and to address the SEC's concerns, on 18 July 2016, the Investment Manager, for itself and on behalf of, amongst others, the Offshore Feeder Fund and the Master Fund, engaged Guidepost Solutions LLC ("**Guidepost**") pursuant to the terms of an engagement

31

letter dated 18 July 2016 (the "**Guidepost Engagement Letter**"), a copy of which is at **Tab 29**.

45.     Guidepost's services are performed by Mr. Bart Schwartz and his team. Guidepost and Mr. Schwartz were engaged by the Investment Manager for itself and on behalf of a number of Platinum Group funds, including the Master Fund for the purposes of providing independent fiduciary oversight and to assist with the development and implementation of a plan for the orderly wind down of the funds under the management of the Platinum Group.

46.     Guidepost is actively monitoring the Master Fund's dealings with its investment portfolio and reports to the SEC at least monthly regarding the status of their engagement, the consummation of any sales of the Master Fund's assets, and the identification of any actual or potential violations of federal securities law, if any. In addition, Guidepost has various consultation rights under the Guidepost Engagement Letter regarding the Master Fund's dealing with its assets.

47.     A failure to appoint Guidepost and Mr. Schwartz would likely have substantially increased the risk that the SEC would have sought to place the Master Fund into receivership within the United States. The General Partner believes that the continued appointment of Guidepost and Mr. Schwartz and cooperation between Guidepost, Mr. Schwartz and the JPLs, should they be appointed as joint provisional liquidators by this Honourable Court, would be essential to mitigate any enforcement action which the SEC may take which, in the opinion of the General Partner, would be disastrous for creditors.

48.     However, notwithstanding the assistance provided by Guidepost, for the reasons set out below, it is now considered appropriate and in the best interests of the Master Fund's creditors and ultimate investors that the JPLs also be appointed to assist with the Proposed Restructuring of the Master Fund. The General Partner is hopeful that the JPL and Guidepost / Mr. Schwartz may agree a protocol regarding the terms on which they may cooperate and work together to achieve a better outcome for all stakeholders.

49.     CIMA has also been interested in recent developments. Most notably:

(a)     on 30 June 2016 CIMA sent an information request letter to the Master Fund requesting various information concerning the Offshore Feeder Fund, the Master Fund and other Platinum Group entities. A copy of the letter of 30 June 2016 is at **Tab 30**;

(b)     on 8 July 2016, the Master Fund's Cayman Islands counsel, Walkers, sent a reply to CIMA which responded to the document and information requests contained in CIMA's 30 June letter. A copy of Walkers' letter is at **Tab 31**;

(c)     on 22 July 2016, Walkers sent a further update letter to CIMA detailing the appointment of Guidepost / Mr. Schwartz and then proposal, as it was at that time, for the production of a plan for the orderly realisation of the assets of the Master Fund. A copy of this letter is at **Tab 32**;

(d)     on 16 August 2016, CIMA sent a further information request letter to the Master Fund. A copy of this letter is at **Tab 33**; and

(e)     on 22 August 2016, Walkers responded to CIMA. A copy of Walkers' letter is at **Tab 34**.

50.     A copy of the Petition and this provisional liquidation application will be served on CIMA.

**INSOLVENCY**

51.     The General Partner (in its capacity as such, or in its capacity as the Investment Manager) has not retained an independent financial or restructuring advisor and the audited financial statements of the Master Fund for the year ended 31 December 2015 are not yet available due to the effect of the ongoing investigations noted at **[paragraph 42 above]**

52.     The most recently available un-audited financial statements of the Master Fund comprise a balance sheet prepared as at 30 May 2016 (a copy of which is at **Tab 35**) (the "**May 2016 Balance Sheet**"). The May 2016 Balance Sheet is the most recently available balance sheet of the Master Fund. The production of the June and July balance sheets have been delayed because, in the normal course, they would be prepared with the assistance of the Master Fund's Administrator. However, due to

33

the solvency issues which are detailed in this Affidavit, the Administrator is a creditor in respect of unpaid fees and, as such, has not been in a position to assist with the preparation of the June and July balance sheets.

53.    Nevertheless, I understand that there has been no material change in the assets and liabilities of the Master Fund since 30 May 2016 save for the deposit liability of US$23,500,000 representing an advance in respect of the Master Fund's sale of its interests in Agera Energy. I understand that prior to the completion of the transaction this deposit may have been returnable but that the transaction has now closed subsequent to 30 May 2016. Accordingly, I understand that this deposit is no longer a liability of the Master Fund.

54.    The May 2016 Balance Sheet shows that the Master Fund had access to only US$68,530 of cash assets as at 30 May 2016. In addition, as at 16 August 2016, I understand that the Master Fund's cash assets have increased to US$881,976, but that increased amount is still clearly insufficient to enable the Master Fund to discharge its liability in respect of the Redemption Creditor Claims and it is not anticipated that the Master Fund will receive sufficient income in the short to medium term to allow it to discharge such liabilities.

55.    Accordingly:

(a)    the financial position of the Master Fund has deteriorated such that it does not have access to a sufficient amount of liquid assets in order to meet its present liabilities, including its present liabilities in respect of Redemption Creditor Claims, as noted at **[paragraph 39]** above;

(b)    it is unlikely that the Master Fund will be able to meet its liabilities to:

(i)    Kismetia; or

(ii)    White Rock Properties,

each which are stated to fall due on 31 August 2016; and

(c)    there exists a risk that summary judgment may be returned against the Master Fund in the New York Proceedings which may immediately and substantially increase the Master Fund's liabilities.

34

56.   Therefore, the General Partner believes, having made due enquiry and having taken appropriate advice from the Investment Manager, that the Master Fund is insolvent on a cash flow basis within the meaning of section 93 of the Companies Law and that its insolvency will only deepen over time as (and in the case of New Mountain, if) debts further crystallise and the assets further depreciate if they are not appropriately managed or if they suffer a shortage of required funding, or if there is an urgent and unstructured liquidation sale of the Master Fund's assets.

57.   The General Partner is also deeply concerned that if steps are not taken to secure the preliminary stages of the Proposed Restructuring as soon as possible then certain of the Master Fund's creditors may soon be in a position to petition for the winding up of the Master Fund which may instigate what would likely be a value-destructive process of liquidation process and security enforcement. The JPLs will require time and a moratorium to engage with creditors and to implement the Proposed Restructuring.

## PROPOSED RESTRUCTURING

58.   Whilst the Master Fund is presently unable to pay its debts due to a lack of sufficient liquid assets, the Master Fund's audited consolidated financial statements for the year ended 31 December 2014 (the "**2014 Annual Report**") (a copy of which are at **Tab 36**) show that as at 31 December 2014, the Master Fund's total consolidated assets were US$1,036,530,945 and total liabilities were US$267,141,193. In addition, the May 2016 Balance Sheet shows that the Master Fund's total assets as at 30 May 2016 amount to US$1,093,126,706.66 and its total liabilities amount to US$383,706,060.58.

59.   As such, whilst the General Partner believes that it is unable to pay its debts on a cash-flow basis, the General Partner believes that the value of the Master Fund's assets, if realised and in accordance with their present balance sheet valuations and if protected from deterioration in a sudden and unplanned official liquidation or security enforcement, will exceed the Master Fund's liabilities thereby enabling the Master Fund to discharge all of its liabilities in full.

60.   As regards the proper realisation of the Master Fund's assets, it is the opinion of the General Partner that certain of the Master Fund's investment assets are not yet at

15167502.12 P0971.132468

the optimum point in their investment lifecycle for the purposes of the Master Fund realising the maximum value from its investment in them. In addition, the General Partner believes that certain of such investment assets are also in need of further capital investment in order to maximise their value upon their ultimate realisation.

61.     In that regard, and by way of example:

(a)     one of the Master Fund's principal investment assets comprises an oil and gas drilling operation which requires funding to enable the company to drill its most attractive reserve and to re-work various legacy fields in the company's portfolio. Completion of such drilling will likely appreciate the value of the company and open up various options for the Master Fund to realise its investment via an accelerated liquidity event. In that regard, the Investment Manager has advised that:

(i)     pre-drilling, this company is capable of a daily production rate of 1,900 BOE/D (barrels of oil equivalent per day) and a monthly cash flow of up to US$500,000, whereas post-drilling, this company is capable of a daily production rate of 7,000 BOE/D and an increased monthly cash flow of between US$7,000,000 - 9,000,000; and

(ii)     between US$20,000,000 - 25,000,000 of additional funding, to be provided by the Master Fund on a senior secured basis, would be required the facilitate the completion of such drilling in the present circumstances where the company is able to take advantage of historically low drilling costs;

(b)     another of the Master Fund's investment assets comprises a gold mine which is facing operational difficulties due to a lack of funds available for capital expenditure on its infrastructure. If additional funds are made available to this company, the Investment Manager believes that the mine has the potential to produce increased quantities of gold which will unlock significant value in the company to the benefit of a future monetisation event. In that regard, the Investment Manager has advised that:

(i)      before additional capital investment, daily gold production is likely to be approximately 15 ounces per day with a break-even monthly cash flow; whereas

(ii)     after additional capital investment, daily gold production may increase to between 35 and 55 ounces per day with a positive monthly cash flow of $750,000 – 1,000,000;

(c)     the Master Fund has invested in a pharmaceutical company which has developed an asset which is in the midst of a 'phase 2' US Food and Drug Administration ("**FDA**") study. The Master Fund is this company's majority shareholder and the General Partner believes that additional funds in the region of US$8,000,000 (US$4,000,000 upfront and the balance to be self funded as progress is made) are needed to carry this company through to the end of the current 'phase 2' study which will lead to the highest possible valuation for this company upon its sale. The Investment Manager has advised that, based upon conservative market penetration assumptions, this company has projected first year revenue following completion of the phase 2 study to be in excess of US$200,000,000.

62.    However, if the Proposed Restructuring is not implemented, the General Partner believes that the alternative is the liquidation of the Master Fund's assets and concomitant potential destruction in the value of the Master Fund's assets to the detriment of its creditors and ultimate investors. In that regard:

(a)    approximately US$570,000,000 of the Master Fund's investment assets (representing just over half of the value of such assets as recorded on the May Balance Sheet) are investments in portfolio companies;

(b)    if there were to be an urgent liquidation sale of such assets, or if the assets are not properly serviced or protected, it is likely that such assets would attract a substantially lower value than their present valuations recoveries therefore resulting in a mere cents on the dollar return to the Master Fund; and

(c)    consequently, the General Partner believes that it is essential that steps are taken to secure the preliminary stages of the Proposed Restructuring in order

37

to avoid such significant potential value deterioration. Given the oil and gas assets and mining exposure, the General Partner is also cognisant of regulatory and environmental liabilities that may require cash and working capital to deal with.

63.    Accordingly, the General Partner is of the opinion that the appointment of the JPLs would be in the best interests of the Master Fund's creditors as a whole because it would enable to JPLs to:

(a)    bring about a restructuring of the Master Fund's existing liabilities that will enable the below to take place with a view to the maximisation of the future realisation of the Master Fund's assets for the ultimate benefit of all creditors and investors;

(b)    protect and insulate the Master Fund's assets from an immediate liquidation sale or security enforcement in order to preserve their value;

(c)    delay the realisation of some or all of the Master Fund's assets to a more optimum time in the lifecycle of such investment assets rather than complete an immediate and urgent liquidation sale of such assets;

(d)    ensure that the Master Fund has sufficient working capital resources for a sufficient period of time in order to enable a more beneficial realisation of the Master Fund's assets at a future appropriate date in the lifecycle of such investment assets; and

(e)    make a further capital investment in certain of the Master Fund's illiquid investments to aid those investments in moving through inflection points that will, in the opinion of the Investment Manager, yield better returns for investors.

64.    A restructuring of the Master Fund's liabilities is likely to be essential to facilitate the above strategy notably because:

(a)    certain of the Master Fund's creditors hold security over the assets of the Master Fund and, absent any forbearance agreed with such creditors or some other restructuring of their creditor rights, such creditors will be able to

38

enforce their security notwithstanding the statutory stay which will prevent any suit, action or other proceedings being proceeded with or commenced against the Master Fund upon its liquidation. The General Partner considers that actions taken by a secured creditor to enforce their security to further their own interests by realising some or all of the Master Fund's assets in satisfaction of their debt are unlikely to benefit all other creditors of the Master Fund because such actions will potentially destroy the value of the Master Fund's remaining assets;

(b)   the Master Fund has few liquid resources with which to fund any working capital required to implement the above strategy or to fund any capital investment to be made in the Master Fund's assets;

(c)   additional funds are therefore likely to be needed;

(d)   whilst there are a number of scheduled monetisation events over the forthcoming months, additional funds may be required and it may be more advantageous to seek to raise additional third party finance, including by way of bridge finance, to fund any immediate working capital and investment capital needs pending the receipt of proceeds from scheduled forthcoming monetisation events (**"New Money Funding"**);

(e)   having discussed with number of potential funders, the General Partner understands and anticipates that prospective finance providers would only be prepared to advance New Money Funding if the Master Fund is in a court-supervised process and that additional security be granted over some or all of the Master Fund's assets; and

(f)   those likely requirements for the New Money Funding present difficulties because, as noted above in this Affidavit, certain creditors of the Master Fund hold contractual rights which restrict the Master Fund from incurring additional debt and granting additional security over its assets. Accordingly, the General Partner believes that it will be necessary to either structure the New Money Funding around such rights and security or (more likely) to restructure the debt of such existing creditors and/or reach a compromise

39

with such creditors in order to permit the New Money Funding to be made on terms acceptable to the prospective funders;

65.     After a detailed consideration of the debt structure of the Master Fund and understanding the relevant creditors and their concerns, I understand that the Proposed Restructuring could potentially take place by way of (depending upon and subject the level and nature of engagement of the Master Fund's creditors and the discretion of the JPLs and ultimately this Honourable Court) one or more of the following methods:

(a)     a consensual restructuring whereby creditors may be persuaded (likely in return for additional debt and/or equity and/or other incentives) to (as applicable):

(i)      not enforce their security;

(ii)     to seek to place the Master Fund into official liquidation; and/or

(iii)    waive or vary their contractual rights and/or (if applicable) to subordinate their security in order to permit the Master Fund to raise New Money Funding,

in each case in order to facilitate an orderly realisation of the Master Fund's assets for their maximum value outside of the context of an urgent liquidation of the Master Fund and its assets with its potential attendant destruction of value and stigma;

(b)     a formal process such as a scheme of arrangement under the laws of the Cayman Islands (being the place of registration of the Master Fund and being the law governing the formation and constitution of the Master Fund) in order to facilitate the above outcomes;

(c)     a formal bankruptcy process under Chapter 11 of Title 11 of the United States Code (which I understand may permit New Money Funding within a statutory framework) in order to facilitate the above outcomes; and/or

(d)     the assistance of the United States Bankruptcy Court pursuant to Chapter 15 of Title 11 of the United States Code.

40

66.   Whilst no advanced negotiations have yet taken place with the creditors of the Master Fund regarding the Proposed Restructuring:

(a)   the Investment Manager has had confidential discussions with a number of redemption creditors and other stakeholders and it is clear from those conversations that such creditors and investors understand the Master Fund's illiquid asset constitution and consider that a "firesale" of such assets would not be in anyone's best interests

(b)   the General Partner is conscious that compromise and/or arrangement negotiations should take place urgently and that the appointment of the JPLs by this Honourable Court will be essential in assisting to safeguard the restructuring process in a controlled and efficient manner, notably given that the JPLs would be independent officers of this Honourable Court; and

(c)   in order for the Proposed Restructuring to be successful (or even have a chance of success) it is vital that the JPLs be allowed the opportunity to engage in discussions with creditors and lenders and to actively engage with the Investment Manager and interested stakeholders;

(d)   a clear plan will be formulated in short order and reports will be provided to this Honourable Court in due course;

(e)   given the disparate levels of debt and creditor claims, an orderly process is necessary and will ensure that value is preserved and maximised; and

(f)   at this stage, it is too early to tell the precise strategy for implementing the Proposed Restructuring. However, the General Partner is committed to seeking to facilitate the implementation of such of the above strategies as are likely to be successful for the benefit of all creditors and investors and, to that end, the General Partner intends to assist the JPLs to formulate a compromise or arrangement which can be presented to the Master Fund's creditors, either by way of a scheme or arrangement pursuant to section 86 of the Companies Law or otherwise.

67.   In summary therefore:

(a)     if the Proposed Restructuring were to be successful, the General Partner believes that it would likely facilitate the payment in full of all creditors and a return of capital to investors;

(b)     whereas, if the Proposed Restructuring were to fail, the General Partner contemplates that a potentially value destructive liquidation or security enforcement would ensue, to the comparative detriment to creditors and investors;

(c)     it is entirely possible that the Master Fund, having repaid its creditors or having compromised or restructured its debts, could return positive value to its investors once all liabilities have been discharged and may therefore avoid an insolvent liquidation (especially given that the Onshore Feeder Fund is not currently the subject to any current or threatened bankruptcy proceedings in the United States or elsewhere); and

(d)     consequently, having regarding to the duties owed by the General Partner to the Master Fund, the director of the General Partner has determined that it is in the best interests of the Master Fund, its creditors and its ultimate investors that restructuring professionals be appointed as JPLs of the Master Fund to assist with the Proposed Restructuring and to facilitate an orderly and structured method of maximising the proceeds of the future disposal of the Master Fund's assets.

**URGENCY**

68.     The General Partner is concerned that:

(a)     it has the following critical liabilities or potential liabilities falling due in the immediate term:

(i)     debt in the aggregate sum of US$18,711,134.75 (plus interest accrued from 30 May 2016 to date) owed to Kismetia and White Rock Properties which is due for repayment on 31 August 2016 (and, in the case of Kismetia, which may be accelerated at any time); and

42

(ii)     potential liabilities to New Mountain which are the subject to the verdict of the New York Supreme Court on the summary judgment application made by New Mountain in the New York Proceedings, which may be given at any time,

both of which could likely not be repaid or met;

(b)     such creditors are therefore likely to very soon be in a position to commence an involuntary official liquidation of the Master Fund which, for the reasons stated above, the General Partner believes would not be in the best interests of all creditors; and

(c)     it is possible that security could be enforced by secured creditors that would potentially lead to value destruction. A restructuring / compromise of such debt is therefore required.

69.     The General Partner therefore believes that it is essential that this Honourable Court appoints the JPLs as joint provisional liquidators of the Master Fund immediately to avoid the risk that such creditors could commence or precipitate action which would be detrimental to the Proposed Restructuring and, in the opinion of the General Partner, the interests of all creditors.

## PROPOSED PROVISIONAL LIQUIDATORS

70.     I have been informed by the JPLs, and I believe, that they have the necessary qualifications and experience to act as provisional liquidators of the Company and I have been informed by them that they are willing and able to do so if appointed by this Honourable Court.

71.     It is frequently considered advantageous for the same insolvency practitioners to be appointed as joint official liquidators and/or joint provisional liquidators over all entities within a fund structure, which would be facilitated should this Honourable Court be minded to appoint the JPLs over the Master Fund in addition to their appointment as joint official liquidators of the Offshore Feeder Fund.

72.     The debts due to the Intermediate Offshore Feeder Fund and the Offshore Feeder Fund are not disputed by the Master Fund and would likely be admitted to proof in the liquidation of the Master Fund.

73.     As noted above, this Honourable Court is due to hear a winding up petition in respect of the Offshore Feeder Fund on Tuesday 23 August 2016. It is anticipated that this Honourable Court will make an order winding up the Offshore Feeder Fund and appointing joint official liquidators ("**JOLs**") to the Offshore Feeder Fund. Should JOLs be appointed to the Offshore Feeder Fund, it is the General Partner's intention to provide a copy of this application to such JOLs in advance of the hearing of it and it is hoped that such JOLs will consent to it. I will ask Walkers to update the Honourable Court in that regard at the hearing of this application.

74.     In view of the aforesaid, I respectfully request that this Honourable Court make the orders sought in the Summons.

**SWORN** at                                       )
on the 23 day of August 2016              )
before me:                                          )
                                                          )
                                                          )
_Michael S. Kimel_                             )
**NOTARY PUBLIC**                           )

MICHAEL A KIMELMAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01KI6213031
Qualified In New York County
My Commission Expires November 02, 2017

_Mark Nordlicht_

**MARK NORDLICHT**

This Affidavit was filed by Walkers Attorneys-at-Law of 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands for the Company, whose address for service is that of its said Attorneys-at-Law.

44

15167502.12 P0971.132468

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD          OF 2016

IN THE MATTER OF THE COMPANIES LAW (2013 REVISION)

AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIPS LAW (2014 REVISION)

AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P.

THIS IS EXHIBIT "MN-2" TO THE SECOND AFFIDAVIT OF

**MARK NORDLICHT**

SWORN BEFORE ME THIS      23      DAY OF AUGUST 2016

_Michael C. Kimel_

NOTARY PUBLIC

MICHAEL A KIMELMAN
NOTARY PUBLIC-STATE OF NEW YORK
No. 01KI6213031
Qualified In New York County
My Commission Expires November 02, 2017

45

15167502.12 P0971.132468

# EXHIBIT 16

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 131 OF 2016 (AJJ)

IN THE MATTER OF THE COMPANIES LAW (2013 REVISION)

AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP LAW, 2014

AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P.

BEFORE THE HONOURABLE MR. JUSTICE ANDREW J. JONES QC
IN CHAMBERS
25 AUGUST 2016



### ORDER

**UPON** the application (this "**Application**") of Platinum Partners Value Arbitrage Fund L.P. (the "**Master Fund**") acting by Platinum Management (NY) LLC (the "**General Partner**") in its capacity as the general partner of the Master Fund pursuant its *ex parte* Summons issued on 23 August 2016 for the appointment of joint provisional liquidators pursuant to section 104(3) of the Companies Law (2013 Revision) (as amended) (the "**Companies Law**") (as applied by and subject to section 36 of the Exempted Limited Partnership Law, 2014);

**AND UPON** reading the winding up petition presented by the Master Fund acting by its General Partner on 23 August 2016 2016 (the "**Petition**"), the First Affidavit of Mark Nordlicht sworn on 23 August 2016, the Second Affidavit of Nordlicht sworn on 23 August 2016, the Third Affidavit of Mark Nordlicht sworn on 24 August 2016, the First Affidavit of Matthew Wright sworn on 19 August 2016, the First Affidavit of Christopher Kennedy sworn on 19 August 2016, the First Affidavit of Patrick McConvey sworn on 24 August 2016 and the respective exhibits thereto;

**AND UPON** hearing counsel for the Master Fund, acting by its General Partner

**IT IS ORDERED THAT**:

1.    Matthew Wright and Christopher Kennedy both of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, West Bay Road, Grand Cayman, KY1-1103,

Cayman Islands, be appointed as joint provisional liquidators (the "**JPLs**") of the Master Fund with the power to act jointly and severally and during the period of their appointment, any act required or authorised to be done by the JPLs may be done by any one or more of the JPLs.

2.   The JPLs shall not be required to give security for their appointment.

3.   The JPLs are hereby authorised jointly and severally to take such steps as, in their discretion, may be necessary or expedient for the purpose of presenting a compromise or arrangement to the creditors of the Master Fund in order to facilitate the maximisation of the value of the assets of the Master Fund upon their realisation.

4.   In addition to the powers prescribed in Part II of the Third Schedule to the Companies Law, the JPLs are hereby authorised jointly and severally to exercise any of the following powers without further sanction of the Court:

    (a)   the power to defend any action or other legal pending against the Master Fund;

    (b)   the power to enter into discussions and negotiations for and on behalf of the Master Fund for the purpose of, but not limited to -

        (i)   restructuring the Master Fund's business and operations;

        (ii)   restructuring or rescheduling the Master Fund's indebtedness; and/or

        (iii)   making any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Master Fund or for which the Master Fund may be rendered liable;

    (c)   the power to sell any of the Master Fund's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels, in each case subject to the prior consent of the liquidation committee constituted pursuant to paragraph 5 of this Order (the "**Liquidation Committee**") or, if such consent is not provided, subject to the prior sanction of the Court;



(d)     the power to raise or borrow money and grant securities therefor over the property of the Master Fund, in each case subject to the prior consent of the Liquidation Committee or, if such consent is not provided, subject to the prior sanction of the Court;

(e)     the power to engage staff (whether or not as employees of the Master Fund) to assist the JPLs in the performance of their functions;

(f)     the power to engage independent attorneys and other professionally qualified persons to assist the JPLs in the performance of their functions, whether in the Cayman Islands or elsewhere provided that the JPLs shall not engage Walkers, Schulte Roth & Zabel LLP or Dechert LLP as attorneys for the JPLs;

(g)     the power to:

        (i)     take control of the ownership interests of the Master Fund in its direct subsidiaries and/or joint ventures, investment, associated companies, business or other entities ("**Subsidiaries**") of the Master Fund in which the Master Fund holds an interest, in each case wherever located, as the JPLs shall think fit;

        (ii)    call or cause to be called such meetings of such Subsidiaries and/or to sign such resolutions (in each case in accordance with the provisions of any relevant constitutional or related documentation of such companies) and take such other steps, including applications to appropriate courts and/or regulators, as the JPLs shall consider necessary to appoint or remove directors, legal representatives, officers, and/or managers  to or from such Subsidiaries, and in each case take such steps as are necessary to cause the registered agents (or other equivalent corporate administrators) of such Subsidiaries to give effect to the changes to the boards of directors, legal representatives, officers, and/or managers of such Subsidiaries, including (without limitation) effecting changes to the company registers of such Subsidiaries as may be deemed appropriate by the JPLs; and/or

(iii)    to take such other action in relation to all such Subsidiaries as the JPLs shall think fit for the purpose of protecting the assets of the Master Fund and managing the affairs of the Master Fund;

(h)    the power to communicate with and carry out any necessary filings with regulatory bodies as appropriate, including, without limitation, the Cayman Islands Registrar of Exempted Limited Partnerships, the Cayman Islands Monetary Authority and the United States Securities and Exchange Commission in the name and on behalf of the Master Fund;

(i)    subject to the prior sanction of the Court following an application to be made upon not less than five days' notice to the Liquidation Committee, the power to engage either Platinum Management (NY) LLC, or another professional asset manager, to act as investment adviser;

(j)    subject to the prior sanction of the Court following an application to be made upon not less than five days' notice to the Liquidation Committee, the power to engage or re-engage the services of Guidepost Solutions LLC; and

(k)    the power to do all acts and execute, in the name and on behalf of the Master Fund, all deeds, receipts and other documents in connection with the exercise of their powers notwithstanding that the JPLs are not the general partner of the Master Fund and, for that purpose, use the Master Fund's seal (if any) when necessary.

5.    A Liquidation Committee shall be constituted consisting of -

(a)    not more than three creditors of the Master Fund;

(b)    an unredeemed shareholder of Platinum Partners Value Arbitrage Fund (International) Limited (the "**Offshore Feeder Fund**"); and

(c)    a limited partner of Platinum Partners Value Arbitrage Fund (USA) LP ("the **Onshore Feeder Fund**")

6.    To the fullest extent permitted by law, the Liquidation Committee and its members shall have no duty, whether fiduciary or otherwise, to any other creditor, the Master Fund, the

Offshore Feeder Fund, the Onshore Feeder Fund, the JPLs or any other person by reason of, or in connection with, their membership of or participation in the Liquidation Committee.

7.   The Liquidation Committee be authorised to engage Cayman Islands attorneys whose fees and expenses, reasonably and properly incurred on the instructions of the Liquidation Committee, shall be paid out of the assets of the Master Fund as an expense of the provisional liquidation.

8.   The JPLs be authorised, if they think fit, to take any such action as may be necessary or desirable to obtain recognition of the appointment of the JPLs in any other relevant jurisdiction and to make applications to the courts of such jurisdictions for that purpose, including, without limitation as representatives of the Master Fund (as applicable) to seek relief under Chapter 15 of Title 11 of the United States Bankruptcy Code, and to take such steps arising in connection therewith that the JPLs may consider appropriate.

9.   Pursuant to Section 97 of the Companies Law, no suit, action or other proceedings, including criminal proceedings, shall be proceeded with or commenced against the Master Fund except with the leave of the Court and subject to such terms as the Court may impose.

10.  Pursuant to Section 99 of the Companies Law, no disposition of the Master Fund's property by or with the authority of the JPLs in either case in the carrying out of their duties and functions and the exercise of their powers pursuant to this Order shall be avoided and any payments made into or out of the bank accounts(s) of the Master Fund in the ordinary course of business of the Master Fund between the date of the presentation of the Petition herein and the date of the appointments of the JPLs shall not be avoided by virtue of the provisions of section 99 of the Companies Law in the event of an order for the winding up of the Master Fund being made on the Petition.

11.  The costs of and incidental to the Application incurred by the Master Fund shall be agreed and paid by the JPLs out of the assets of the Master Fund.



**AND IT IS FURTHER DIRECTED THAT:**

12.     The hearing of the Petition shall be adjourned to 27 October 2016 at 10.00 am and any creditor of the Master Fund shall have liberty to apply, upon not less than 14 days' notice to the Master Fund and the JPLs, to –

      11.1 discharge or vary this order; and/or

      11.2 remove the JPLs and appoint alternative provisional liquidators.

13.     Any creditor or shareholder of the Offshore Feeder Fund and any creditor or limited partner of the Onshore Feeder Fund may be heard on the adjourned hearing of the Petition.

14.     The JPLs and/or the General Partner shall cause copies of the Petition and this Order to be served upon –

      14.1   all creditors of the Master Fund;

      14.2   all redemption creditors and shareholders of the Offshore Feeder Fund; and

      14.3   all creditors and limited partners of the Onshore Feeder Fund.

15.     The JPLs shall provide copies of all affidavits and exhibits thereto filed in support of the Petition and the Summons, upon request, to any creditor, shareholder and/or limited partner of the Master Fund, the Offshore Feeder Fund and the Onshore Feeder Fund.

16.     The JPLs shall file a report to the Court detailing the progress of the provisional liquidation and setting out their recommendations for any potential restructuring and shall make such report available to all creditors and limited partners of the Master Fund and all creditors and shareholders of the Offshore Feeder Fund and all creditors and limited partners of the Onshore Feeder Fund by no later than 13 October 2016.



17.   A transcript of the hearing of this Application shall be prepared and approved by the Judge and the JPLs shall provide copies, upon request, all creditors, shareholders and limited partners of the Master Fund, the Offshore Feeder Fund and the Onshore Feeder Fund.

DATED this 25th day of August 2016

FILED this 29th day of August 2016

_____

**The Honourable Mr. Justice Andrew J. Jones QC**

**JUDGE OF THE GRAND COURT**

This Order is filed by Walkers, Attorneys at Law for the Petitioner whose address for service is care of its said Attorneys at Law, Walkers, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9001, Cayman Islands.

# EXHIBIT 17

# IN THE GRAND COURT OF THE CAYMAN ISLANDS

## FINANCIAL SERVICES DIVISION

**CAUSE NO: FSD 131 of 2016 (AJJ)**

The Honourable Mr. Justice Andrew J. Jones QC
In Open Court, 27 October 2016

## IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)

## AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP LAW, 2014

## AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (IN PROVISIONAL LIQUIDATION)

---

### WINDING UP ORDER

---

**UPON** hearing counsel for Platinum Management (NY) LLC in its capacity as general partner of Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) (the "**Master Fund**") on the adjourned hearing of the winding up petition presented in respect of the Master Fund on 23 August 2016

**AND UPON** reading the First affidavit of Harris D. Kealey sworn on 19 October 2016, the Second Affidavit of Matthew Wright sworn on 24 October 2016, the First Affidavit of Claire Loebell sworn on 10 October 2016, the First Affidavit of Kieran Hutchison sworn on 12 October 2016, the Fourth Affidavit of Mark Nordlicht sworn on 26 October 2016, the Third Affidavit of Matthew Wright sworn on 26 October 2016, the First Affidavit of Richard Bernstein sworn on 26 October 2016 and the respective exhibits thereto

**AND UPON** hearing (a) counsel for Mr. Matthew Wright and Mr. Christopher Kennedy, both of RHSW (Cayman) Limited ("**Messrs. Wright and Kennedy**") in their capacity as joint provisional liquidators of the Master Fund, (b) counsel for New Mountain Finance Company, a creditor of the Master Fund, (c) counsel for BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, Senior Health Insurance Company of Pennsylvania and BBIL ULICO (referred to collectively as "the Beechwood Group"), Jules and Barbara Nordlicht, Parker Family Limited Partnership, Alaska Trust Company, Swedbank for Core Peak Hedge, Adela Kenner de Katz, Shumuel and Serena Fuchs Foundation, Paularene Management Inc. and Rivie Schewebel

Retirement Plan, creditors of the Master Fund and/or shareholders or creditors of Platinum Partners Value Arbitrage Fund (International) Limited (In Liquidation) (the "**Feeder Fund**")

**AND UPON** having determined that the same insolvency practitioners should not serve as official liquidators of both the Master Fund and the Feeder Fund

**AND UPON** Messrs Wright and Kennedy having given notice to the Court of their intention to resign as official liquidators of the Feeder Fund in the event that their interim appointment as official liquidators of the Master Fund is confirmed by the Court at a hearing to be held on 12 December 2016 in respect of both this cause and Cause FSD 118 of 2016 – AJJ) (the "**Combined Hearing**")

**AND UPON** the Court having determined that all matters relating to the appointment of official liquidators of the Master Fund and Feeder Fund should be heard and determined together at the Combined Hearing

**IT IS ORDERED THAT**

1.      The Master Fund be wound up in accordance with the provisions of the Companies Law (2016 Revision) as applied by section 36 of the Exempted Limited Partnership Law 2014.

2.      Messrs. Wright and Kennedy of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, PO Box 897, Grand Cayman, KY1-1103, be appointed as the joint official liquidators of the Master Fund on an interim basis until the end of the Combined Hearing or further order of the Court.

3.      The Official Liquidators shall have the power to act jointly and severally and any act required or authorised to be done by the official liquidators may be done by either or both of them.

4.      The Official Liquidators shall not be required to give security for their appointment.

5.      In addition to the powers prescribed in Part II of the Third Schedule to the Companies Law (2016 revision), the Official Liquidators may also exercise the following powers set

out in Part I of the Third Schedule without further sanction or intervention from the Grand Court:

a.      the power to defend or continue any action or legal proceedings pending against the Master Fund or previously commenced by the Master Fund, including but not limited to those actions and proceedings referred to in paragraphs 3.52 to 3.59 of the Abridged Report;

b.      the power, subject to the unanimous approval of the liquidation committee (failing which, the sanction of the court, to be sought on no less than 5 days' notice),  to sell any of the Master Fund's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels in order to be able to realise any of the Master Funds' assets;

c.      the power to engage Collas Crill as Cayman Islands legal counsel and Holland & Knight as United States legal counsel;  and

d.      power to continue the petition presented to the United States Bankruptcy Court, Southern District of New York (No.16-1295-scc) for recognition under Chapter 15 of the United States Bankruptcy Code.


6.      No suit, action or other proceedings, including criminal proceedings, shall be proceeded or commenced against the Master Fund except with leave of the Grand Court pursuant to section 97 of the Companies Law (2016 Revision).

7.      No disposition of the Master Fund property by or with the authority of the Official Liquidators in the carrying out of their duties and functions and the exercise of their powers shall be avoided by virtue of section 99 of the Companies Law.


**AND IT IS FURTHER DIRECTED THAT**

8.      The Official Liquidators shall prepare and file a report to the Court which shall deal with the following matters -

(a) A plan in respect of the work intended to be performed by or on behalf of the Official Liquidators in the six months ended 30 April 2017, including details of the staff who will be engaged;

(b) A budget in respect of the anticipated liquidation expenses for the period ended 30 April 2017;

(c) Details of any law firms other than Collas Crill and Holland & Knight which are proposed to be engaged by the Official Liquidators;

(d) Details of the professional portfolio manager(s) intended to be engaged or re-engaged by the Official Liquidators, including drafts of the proposed contracts of engagement;

(e) In the event that the Official Liquidators intend to engage Guidepost Solutions LLC, details of the proposed engagement including a draft of the proposed contract of engagement;

(f) Details of the "key professionals" intended to be engaged by the Official liquidators or employed by the Master Fund and/or any of its subsidiaries, including drafts of the proposed contracts engagement or employment; and

(g) Details of any other professional service providers intended to be engaged by the Official Liquidators or engaged or re-engaged to act on behalf of the Master Fund and/or any of its subsidiaries, including drafts of the proposed contracts of engagement

("**the Report**").

9.    The Report shall be filed by Monday 21 November 2016 and shall be served on or sent by e-mail to (a) the members of the Liquidation Committees of both the Master Fund and the Feeder Fund, (b) all known creditors of the Master Fund and (c) the shareholders and all known creditors of the Feeder Fund.

10.    The Liquidation Committee constituted following the meeting convened on 28 September 2016 (pursuant to paragraph 5 of the Order made on 25 August 2016) shall remain in place and retain its authority to act until further order of the Court.

11.    In the event that the Liquidation Committee (or any of its members acting individually) or any creditor of the Master Fund wishes to nominate a qualified insolvency practitioner(s) for appointment as official liquidator of the Master Fund in place of Messrs. Wright and Kennedy, notice of his intention together with supporting affidavits which shall comply

with the requirements of CWR Order 3, rule 4 and address, so far as possible, the matters referred to in the Report, shall be served on the Official Liquidators no later than Monday 5 December 2016

DATED this 27th day of October 2016

FILED this 2nd day of November 2016

The Honourable Mr. Justice Andrew J. Jones QC

This Order is filed by Collas Crill, Attorneys-at-Law for and on behalf of the Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (In Official Liquidation) herein, whose address for service is that of their said Attorneys, Floor 2, Willow House, Cricket Square, George Town, PO Box 709, Grand Cayman, KY1-1107, CAYMAN ISLANDS

# EXHIBIT 18

# IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

|  |  |
|---|---|
| In re: | Chapter 15 |
| PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (IN PROVISIONAL LIQUIDATION),[1] *et al.*, | Case No. 16-12925 (SCC) |
|  | (Jointly Administered) |
| Debtors in Foreign Proceedings. |  |

----------------------------------------------------------x

## ORDER GRANTING RECOGNITION AND RELIEF IN AID OF A FOREIGN MAIN PROCEEDING PURSUANT TO SECTIONS 1504, 1509, 1515, 1517, 1520 AND 1521 OF THE BANKRUPTCY CODE

Matthew James Wright and Christopher Barnett Kennedy, duly appointed joint official liquidators ("**Petitioners**" or "**Liquidators**") of Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) ("**Master Fund**") and the duly appointed joint official liquidators of Platinum Partners Value Arbitrage Fund (International) Ltd. (in Official Liquidation) ("**International Fund**" and together with Master Fund, the "**Funds**"), both Funds in liquidation by way of the Financial Services Division of the Grand Court of the Cayman Islands (the "**Grand Court**") (cause nos. FSD 131 of 2016 (AJJ) (Master Fund) and 118 of 2016 (AJJ) (International Fund)) as a result of the Grand Court's orders (the "**Liquidation Orders**") made pursuant to petitions for the winding up of the Funds under, as applicable, sections 92 and 104 of the Companies Law of the Cayman Islands (2016 Revision) (the "**Companies Law**") and section

---

[1] The last four digits of the United States Tax Identification Number, or similar foreign identification number, as applicable, follow in parentheses: Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) (1954) and Platinum Partners Value Arbitrage Fund (International) Ltd. (in Official Liquidation) (2356). The registered office of the International Fund is c/o The R&H Trust Co. Ltd., Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman KY1-1103, Cayman Islands. The Master Fund's registered address is c/o Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands.

36 of the Exempted Limited Partnership Law, 2014 ("**ELP Law**") (collectively, the "**Cayman Liquidations**"), by its United States counsel, Holland & Knight LLP, filed Official Form Petitions, the *Verified Petition for Recognition of Foreign Insolvency Proceedings and Application for Additional Relief, Pursuant to Sections 1504, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code* (the "**Verified Petition**,"[2] and, together with the Official Form Petitions, the "**Petition**"), and the accompanying Kennedy Declaration, Leontsinis Declaration, and Gluck Declaration, seeking relief pursuant to chapter 15 of the Bankruptcy Code; and upon due consideration of the Petition, Kennedy Declaration, Leontsinis Declaration and the Gluck Declaration, together with all exhibits thereto, in support of the Petition, and hearing no objections thereto, and a hearing having been held on November 21, 2016 the evidence put on the record at the Hearing; and appropriate and timely notice of the filing of the Petition and the Hearing thereon having been given by the Liquidators, pursuant to section 1514 of the Bankruptcy Code; and such notice having been adequate and sufficient for all purposes; and having been updated pursuant to Section 1518 of the Bankruptcy Code, and no other or further notice being necessary or required; and no objections or other responses having been filed that have not been overruled, withdrawn or otherwise resolved; and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefore, the Court makes the following findings of fact and conclusions of law:

A. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 109 and 1501 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York dated February 1, 2012.

---

[2] Capitalized terms used, but not otherwise defined herein shall have the meanings given to them in the Verified Petition.

B.     Venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1410 (2) because there is an action pending against the Funds within this judicial district, and the Court may enter a final order consistent with Article III of the United States Constitution.

C.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

D.     The Liquidators are the "foreign representatives" of the Funds pursuant to 11 U.S.C. § 101(24).

E.     The chapter 15 cases of the Funds were properly commenced pursuant to 11 U.S.C. §§ 1504, 1509 and 1515.

F.     The Liquidators have satisfied the requirements of 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

G.     The Cayman Liquidations are "foreign proceedings" pursuant to 11 U.S.C. § 101(23).

H.     The Cayman Liquidations are entitled to recognition by this Court pursuant to 11 U.S.C. § 1517.

I.     The Cayman Liquidations are pending in the Cayman Islands, the country where the Funds' center of main interests is located, and accordingly the Cayman Liquidations are foreign main proceedings pursuant to 11 U.S.C. § 1502(4), and are entitled to recognition as foreign main proceedings pursuant to 11 U.S.C. § 1517(b)(1).

J.     The Liquidators are entitled to all of the relief provided under 11 U.S.C. § 1520 and 1521 without limitation.

K.     The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted pursuant to 11 U.S.C. §§ 1507, 1517, 1520 and 1521.

**NOW, THEREFORE, IT IS HEREBY**

1.     **ORDERED**, that the Petition is granted as set forth herein;

2.     **ORDERED**, that the Cayman Liquidations are recognized as foreign main proceedings pursuant to 11 U.S.C. §§ 1517(a) and (b)(1);

3.     **ORDERED**, that all persons and entities (other than the Liquidators and their expressly authorized representatives and agents) are hereby enjoined, except as provided in 11 U.S.C. §§ 555 through 557, 559 through 562, 1520 and 1521 or as modified herein, from:

(1)     executing against the Funds' property or assets;

(2)     taking or continuing any act to obtain possession of, or exercise control over, the Liquidators (with respect to the Funds), the Funds, or any of the Funds' property or assets;

(3)     taking or continuing any act to create, perfect or enforce a lien or other security interest, set-off or other claim against the Liquidators (with respect to the Funds), the Funds or any of the Funds' property or assets as of the date of the filing of the Petition, or otherwise seeking the issuance of or issuing any restraining notice or other process or encumbrance with respect to the Funds or any of the Funds' property or assets; and

(4)     transferring, relinquishing or disposing of any property of the Funds to any person or entity other than the Liquidators;

and it is further

4.     **ORDERED**, that 11 U.S.C. § 1520(a) shall be effective with respect to the Cayman Liquidations; and it is further

5.     **ORDERED**, that 11 U.S.C. § 1521(a)(1-3) shall be effective with respect to the Cayman Liquidations and/or the stay, as provided for by Section 97(1) of the Companies Law, shall be effective in the United States of America pursuant to 11 U.S.C. § 1507; and it is further

6.     **ORDERED**, that the Liquidators or any third person acting pursuant to the Liquidators' instructions or agreement may transfer funds or property belonging to the Funds

into or out of the United States of America in accordance with their respective obligations to the Funds or under the Cayman Liquidations; and it is further

7. **ORDERED**, that the Liquidators are hereby authorized to examine witnesses, take evidence, and seek the production of documents within the territorial jurisdiction of the United States concerning the assets, affairs, rights, obligations or liabilities of the Funds, the Funds affiliates and the Funds' subsidiaries by:

    a. issuing discovery requests to intermediary banks that process U.S. dollar-denominated wire transfers and maintain records of such transfers;

    b. upon written request, obtaining turnover of any and all documents, records, filings, or other information, however stored, including but not limited to emails that are property of, concern or were made or issued on behalf of the Funds, from any person or entity subject to this Court's jurisdiction; and

    c. upon service of this order, prohibiting all persons and entities subject to the jurisdiction of this Court from destroying, secreting, altering, deleting or otherwise disposing of any electronic data, documents, records, filings, or other information, however stored, concerning or relating to the assets, affairs, rights, obligations or liabilities of the Funds; and it is further

8. **ORDERED**, that the Liquidators are authorized to operate the business of the Funds that is the subject of Cayman Liquidations and may exercise the powers of a trustee under and to the extent provided by 11 U.S.C. §§ 1520 and 1521; and it is further

9. **ORDERED**, that the Liquidators are hereby granted authority to assert claims of the Funds against parties that are subject to jurisdiction in the United States of America; and it is further

10. **ORDERED**, that the administration or realization of all or part of the assets of the Funds within the territorial jurisdiction of the United States of America is hereby entrusted to the Liquidators and the Liquidators are hereby established as the exclusive representatives of the Funds in the United States of America; and it is further

11.      **ORDERED**, that this Court retains jurisdiction with respect to the enforcement,
amendment or modification of this Order, any requests for additional relief or any adversary
proceeding brought in and through these chapter 15 cases, and any request by an entity for relief
from the provisions of this Order, for cause shown, that is properly commenced and within the
jurisdiction of this Court; and it is further

12.      **ORDERED**, that, notwithstanding Bankruptcy Rule 7062, made applicable to
these chapter 15 cases by Bankruptcy Rule 1018, the terms and conditions of this Order shall be
immediately effective and enforceable upon its entry, and upon its entry, this Order shall become
final and appealable.

Dated:

November 22, 2016
New York, New York

<div align="right">

/S/ Shelley C. Chapman
Honorable Shelley C. Chapman
United States Bankruptcy Judge

</div>

# EXHIBIT 19

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 131 of 2016 (AJJ)

The Honourable Mr. Justice Andrew J. Jones QC
In Open Court, 12 and 16 December 2016

IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)

AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP LAW, 2014

AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (IN OFFICIAL LIQUIDATION)

---

**FINAL ORDER**
**FOR APPPOINTMENT OF OFFICIAL LIQUIDATORS**

---

**UPON** hearing leading counsel for Messrs. Matthew Wright and Christopher Kennedy of RHSW (Cayman) Limited (the **"Official Liquidators"**) in their capacity as official liquidators of the Platinum Partners Value Arbitrage Fund L.P. (the "**Master Fund**") having been so appointed on an interim basis

**AND UPON** hearing counsel for (a) the Master Fund's liquidation committee and (b) New Mountain Finance Corporation ("**New Mountain**"), a creditor of the Master Fund

**AND UPON** reading the Official Liquidators' Second Report dated 21 November 2016 (the **"Second Report"**) and the Second, Third, Fourth and Fifth Affidavits of Matthew Wright sworn on 24 and 26 October and 8 and 12 December 2016 and filed on behalf of the Official Liquidators

**AND UPON** reading the First Affidavit of Harris D. Kealey sworn on 19 October 2016 and filed on behalf of New Mountain and the Second Affidavit of Harris D. Kealey sworn on 5 December 2016 and filed on behalf of New Mountain

**AND UPON** reading the Fourth Affidavit of Mark Nordlicht sworn on 26 October 2016 and filed on behalf of the individual members of the Liquidation Committee other than New Mountain

**AND UPON** reading the Affidavit of Jeffrey Parker both sworn on 9 December 2016 and filed on behalf of the Liquidation Committee

**IT IS ORDERED AND DIRECTED THAT**

1.      The appointment of Messrs. Wright and Kennedy of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, PO Box 897, Grand Cayman, KY1-1103, as joint official liquidators of the Master Fund is confirmed.

2.      In addition to the powers contained in paragraph 5 of the Winding Up Order made on 27 October 2016, the Official Liquidators shall have the following powers –

   (a) The power to take control of the ownership interests of the Master Fund in the direct subsidiaries, joint ventures, limited partnerships, associated companies and other entities ("the Subsidiaries"), wherever located, in which the Master Fund holds an interest;

   (b) The power to call or cause to be called such meetings and/or to sign such written resolutions (in each case in accordance with the provisions of the applicable constitutional documents) and to take such other steps, in applications to appropriate courts and/or regulators, as may be necessary or appropriate to appoint or remove directors, legal representatives, officers, managers, and/or contracted service providers to or from the Subsidiaries and in each case, where necessary, to cause the registered agents (or other equivalent corporate administrators) of such Subsidiaries to give effect to the changes to the boards of directors, legal representatives, officers, managers and/or contracted service providers of such Subsidiaries, including (without limitation) effecting changes to the company registers of such Subsidiaries;

   (c) Without prejudice to the generality of sub-paragraph (b), the power to appoint themselves as directors of the Subsidiaries;

(d) The power to take such other action in relation to any of the Subsidiaries as the Official Liquidators think fit for the purpose of protecting their assets and, indirectly, the assets of the Master Fund; and

(e) The power to re-engage, on terms complying with CWR Order 25, all or any of those foreign lawyers currently acting for the Master Fund itself (either alone or jointly with one or more Subsidiaries) in connection with any proceedings or arbitrations to which the Master Fund is a party.

3.      The Official Liquidators are authorised to engage -
(a) GLC Advisors & Co as portfolio managers and advisers on substantially the same terms as the letter agreement contained in Appendix III to the Second Report;
(b) LDM Global as IT consultants on substantially the same terms as those set out in the proposal and terms of engagement contained in Appendix IV to the Second Report;
(c) The Singapore law firm of DLA Piper on terms compliant with CWR Order 25.

4.      The Official Liquidators' costs of this application, including the cost of the Second Report and the hearing on 27 October 2016 shall be paid out of the assets of the Master Fund as an expense of the liquidation (except that the added cost of engaging leading counsel shall be disallowed).

5.      The Liquidation Committee's costs of this hearing (limited to the fees charged by Priestleys) shall be paid out of the assets of the Master Fund as an expense of the liquidation.

DATED this 16ᵗʰ day of December 2016

FILED this 20ᵗʰ day of December 2016

The Honourable Mr. Justice Andrew J. Jones QC

This Order is filed by Collas Crill, Attorneys-at-Law for and on behalf of the Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (In Official Liquidation) herein, whose address for service is that of their said Attorneys, Floor 2, Willow House, Cricket Square, George Town, PO Box 709, Grand Cayman, KY1-1107, CAYMAN ISLANDS

# EXHIBIT 20

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 131 of 2016 (AJJ)**

**IN CHAMBERS**
**29 SEPTEMBER 2017**

**BEFORE THE HONOURABLE MR. JUSTICE ANDREW J. JONES QC**

**IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)**

**AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2014 REVISION)**

**AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (IN OFFICIAL LIQUIDATION)**

---

**ORDER**

---

**UPON** reading the application of Mr. Matthew Wright and Mr. Christopher Kennedy both of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands, the joint official liquidators (the "**JOLs**") of Platinum Partners Value Arbitrage Fund L.P. (the "**Master Fund**") made by letter dated 15 September 2017 (the "**Application**")

**AND UPON** reading the Application and its enclosures

**AND UPON** the Liquidation Committee of the Master Fund consenting to the Application

**AND UPON** the JOLs having engaged Rehmann Robson as US tax advisors

**AND UPON** the JOLs having negotiated the terms of a proposed Settlement and Assignment Agreement and General Release (the "**Airdye Settlement**") made by and among the Master Fund; Platinum Partners Credit Opportunities Master Fund LP ("**PPCO**"); and Meserole LLC; Airdye Holdings LLC; Saviva FS I LP; Saviva FS I GP LLP; Fuller Smith Capital Management LLC; Daniel Fuller; Debs Corporation; Hiroshi Hayashi; Soubhi Debs; Hani Debs; and Mystic Bay Holdings Ltd

1

**AND UPON** the Court being satisfied that the resignation of Mr Matthew Wright as a joint official liquidator of the Master Fund should take effect from 30 September 2017 and that Mr Martin Nicholas John Trott should be appointed as successor liquidator

**IT IS ORDERED THAT:**

1.      The JOLs shall have the power to engage Rehmann Robson as tax advisors on the terms pursuant to the engagement letter executed on behalf of the Master Fund on 12 September 2017.

2.      The JOLs shall have the power to enter into the Airdye Settlement on substantially the same terms as the version enclosed with the Application and executed on behalf of PPCO.

3.      Mr Matthew Wright be released from the performance of any further duties as joint official liquidator of the Master Fund with effect from 30 September 2017 without the need to prepare a report and accounts in accordance with Order 10, rule 2 of the Companies Winding Up Rules 2008 (as amended) ("**CWR**").

4.      Mr Martin Nicholas John Trott of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands, be hereby appointed as successor liquidator to Matthew Wright with effect from 30 September 2017 pursuant to Order 5, rule 6 of CWR.

5.      The Application and the supporting documents enclosed with it shall be sealed for a period of six months.

6.      The costs of and incidental to this application insofar as they relate to paragraphs 1 and 2 of this Order shall be paid out of the assets under the JOLs' control as an expense of the administration of the PSC Trust (as defined in the Summons dated 22 August 2017) and/or as an expense of the liquidation.

7.      The additional costs of this application insofar as they relate to paragraphs 3 and 4 of this Order are not recoverable as an expense of the administration of the

2

This Draft Order is filed by Collas Crill, Attorneys-at-Law for and on behalf of the Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (In Official Liquidation) herein, whose address for service is that of their said Attorneys, 2nd Floor , Willow House, Cricket Square, PO Box 709, Grand Cayman, KY1-1107, Cayman Islands

PSC Trust (as defined in the Summons dated 22 August 2017) and/or as an expense of the liquidation.

**DATED** this 29th day of September 2017

**FILED** this 2nd day of October 2017

**The Honourable Mr. Justice Andrew J. Jones QC**
**Judge of the Grand Court**

This Draft Order is filed by Collas Crill, Attorneys-at-Law for and on behalf of the Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (In Official Liquidation) herein, whose address for service is that of their said Attorneys, 2nd Floor , Willow House, Cricket Square, PO Box 709, Grand Cayman, KY1-1107, Cayman Islands

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

**CAUSE NO: FSD 131 of 2016 (NAS)**

IN CHAMBERS

BEFORE THE HONOURABLE MR. JUSTICE NICHOLAS A. SEGAL

IN THE MATTER OF THE COMPANIES LAW (2018 REVISION)

AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (IN OFFICIAL LIQUIDATION)

---

### ORDER

---

**UPON** reading the application of Mr. Martin Trott and Mr Christopher Kennedy both of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands, the joint official liquidators (the "**JOLs**") of Platinum Partners Value Arbitrage Fund L.P. (the "**Master Fund**") made by letter from Collas Crill dated 26 June 2018 (the "**Application**")

**AND UPON** reading the Application and its enclosures

**AND UPON** the Court being satisfied that the resignation of Mr. Christopher Kennedy as a joint official liquidator of the Master Fund should take effect from 8 June 2018 and that Mr. Christopher Smith should be appointed as successor liquidator

**AND UPON** the application having been dealt with on the papers

**IT IS ORDERED THAT:**

1.    Mr. Christopher Kennedy be released from the performance of any further duties as joint official liquidator of the Master Fund with effect from 8 June 2018 without the need to prepare a report and accounts in accordance with Order 10, rule 2 of the Companies Winding Up Rules, 2018 ("**CWR**").

1

2.     Mr. Christopher Smith of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands, be hereby appointed as successor liquidator to Mr. Christopher Kennedy with effect from 8 June 2018 pursuant to Order 5, rule 4(6) of the CWR.

3.     The costs of the Application are not recoverable as an expense of the liquidation.

**DATED** this 6th day of July 2018

**FILED** this 9th day of July 2018

**The Honourable  Mr. Nicholas Segal**
Judge of the Grand Court

2