# EXHIBIT 21

Andrew M. Calamari
Sanjay Wadhwa
Adam Grace
Kevin P. McGrath
Neal Jacobson
Danielle Sallah
Jess Velona
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0180 (Velona)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　　v.<br><br>PLATINUM MANAGEMENT (NY) LLC;<br>PLATINUM CREDIT MANAGEMENT, L.P.;<br>MARK NORDLICHT;<br>DAVID LEVY;<br>DANIEL SMALL;<br>URI LANDESMAN;<br>JOSEPH MANN;<br>JOSEPH SANFILIPPO; and<br>JEFFREY SHULSE;<br><br>　　　　Defendants. | Civil Case No.<br><br><br>Complaint<br><br><br>Jury Trial Demanded |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against Defendants Platinum Management (NY) LLC ("Platinum Management"), Platinum

Credit Management, L.P. ("Platinum Credit"), Mark Nordlicht ("Nordlicht"), David Levy

("Levy"), Daniel Small ("Small"), Uri Landesman ("Landesman"), Joseph Mann ("Mann"),

Joseph SanFilippo ("SanFilippo") (collectively the "Platinum Defendants"), and Jeffrey Shulse

("Shulse") (all collectively "Defendants"), alleges as follows:

## SUMMARY

1.      This case involves a multi-pronged fraudulent scheme by Platinum Management

and Platinum Credit, the managers of hedge funds Platinum Partners Value Arbitrage Fund

L.P.(together with its feeder funds, "PPVA") and Platinum Credit Opportunities Master Fund

L.P. (together with its feeder funds, "PPCO"), respectively, led by Nordlicht, the co-Chief

Investment Officer ("CIO") of PPVA and PPCO.

2.      To existing and prospective investors, Platinum Management projected stability

and confidence, reporting steady, positive returns every year that averaged 17% annually from

2003-15. It also guaranteed its investors liquidity, as they were permitted to redeem on 60 or 90

days' notice (depending on when they invested) and receive payment of 90% of their redemption

request within 30 days thereafter. Marketing materials likewise stressed the fund's ready

capacity to liquidate positions.

3.      Behind the scenes, however, PPVA faced a growing liquidity crisis, which

Platinum Management, Nordlicht, Landesman, Mann and SanFilippo in various ways concealed

from existing and prospective investors for years. In fact, PPVA's growing concentration in

illiquid positions made it ever-more difficult for Platinum Management to pay investor

redemptions on time each quarter. Internal documents discussing redemptions are replete with

references such as "Hail Mary time," and of hoping that new subscriptions would prove

sufficient to pay current redemptions. As early as November 2012, Nordlicht and Landesman

complained that redemptions were "daunting " and "relentless," and in June 2014 Nordlicht

wrote Landesman that "It can't go on like this or practically we will need to wind down. . . . this

2

is code red . . . We can't pay out 25 million in reds [redemptions] per quarter and have 5 come in." Nonetheless, existing and prospective investors were kept in the dark for years about PPVA's liquidity crisis; to the contrary, Platinum Management continued to market the fund's flexible redemption terms even as it struggled to pay redemptions.

4.     Platinum Management also deceived investors by vastly overvaluing its interest in a small oil production company, Golden Gate Oil LLC ("Golden Gate"). This position, valued at times by Platinum Management at around $170 million, purported to represent more than 19% of PPVA's total assets at the end of 2013. In fact, it was worth a fraction of that. Golden Gate consumed more than $20 million in PPVA loans and yet barely produced any oil, suffered large operating losses and never made a single interest payment on PPVA's loans. Tellingly, when Platinum Management engaged in transactions involving Golden Gate, including buying or selling options to buy interests in the company, they were at values much lower than what it carried on its books. Indeed, it eventually purchased the remaining 52% of Golden Gate for a mere $3.2 million, and yet it was still touting an enterprise valuation of at least $170 million. Platinum Management's inflation of Golden Gate's valuation by itself led to an overstatement of PPVA's AUM by as much as 13% at the end of 2014.

5.     Platinum Management also orchestrated a fraudulent scheme in connection with its other major oil investment, Black Elk Energy Offshore Operations LLC ("Black Elk"). In part to cope with the fund's deepening liquidity crisis, Nordlicht, two of his colleagues, Levy and Small, and Black Elk CFO Shulse, schemed to divert almost $100 million – proceeds of a forthcoming asset sale – out of Black Elk to benefit preferred shares held mostly by PPVA and its affiliates. The problem was that Black Elk noteholders, some of whom were independent of Platinum Management, had priority over preferred shares, and Platinum Management and its

affiliates, which dominated Black Elk's management, could not participate in any vote among noteholders to change this priority. Thus, Nordlicht and others created a deceptive consent solicitation process and rigged the vote. They secretly transferred a large block of notes from PPVA and its affiliates to various entities advised by two other entities, B Asset Manager and B Asset Manager II (together, "BAM"), for whom Levy served as CIO. They drafted a solicitation document that falsely stated that PPVA and its affiliates only held $18 million in notes, when in fact they controlled almost $100 million. BAM affiliates then joined PPVA and its affiliated funds in casting its controlling block of notes for the consent solicitation. Once the votes were counted, and Platinum Management's fraudulent scheme prevailed, Nordlicht, Levy and Small directed Shulse to wire almost $100 million out of Black Elk for the benefit of PPVA and its affiliates.

6.     Meanwhile, in 2014-15, PPVA's liquidity crisis worsened, and Platinum Management resorted to other schemes to keep the fund afloat. For example, faced with relying on heavy short-term borrowing at annual interest rates as high as 19%, Platinum Management and PPVA CFO SanFilippo told PPVA's auditor that the loans were done to complete "investment transactions" — a false explanation provided to investors in the fund's audited financials, when they were finally released to investors months later than they were supposed to be. Platinum Management's internal documents confirmed that the real purpose for the high-interest borrowing was to ease the fund's liquidity constraints.

7.     In mid-March 2015, Nordlicht, Landesman and other senior Platinum Partners officials schemed to meet a sudden wave of over $70 million in redemptions by pressing redeeming investors to cancel those redemptions or at least defer them one quarter, and to launch an aggressive push for new investment money, all while concealing PPVA's liquidity

4

crisis. Their pitch focused on anticipated investment gains in the following month, while omitting mention of the firm's significant liquidity crisis, which would obviously scare new investors and people looking to redeem.

8.      Nordlicht also treated investor monies held in separate funds under the Platinum Partners umbrella as fungible, transferring money between funds as needed to meet liquidity demands, contrary to promises made to investors in each fund and representing an obvious conflict of interest. In particular, Platinum Management schemed with Platinum Credit to have PPCO make over $30 million in loans to PPVA in least in part to help PPVA make payments that were coming due. On one occasion, $7 million in new subscriptions to PPCO was diverted to PPVA within 24 hours to pay off an overdue short-term loan owed by PPVA. Also, certain preferred redeeming PPVA investors were allowed to transfer interests worth millions of dollars to PPCO, but no cash moved from one fund to the other. The amount was merely added to the principal owed by PPVA on its outstanding loan from PPCO, and PPCO got nothing more than a promise to pay by a fund that couldn't pay its redemptions.

9.      Along the way, Platinum Management and Nordlicht also repeatedly paid redemptions in a preferential manner, even as they continued to market redemption rules that promised investors equal treatment.

10.     Eventually, in late November 2015, Platinum Management placed a majority of PPVA's assets, all highly illiquid, in a "side pocket", from which no redemptions were possible for three years. Even then, however, few redemptions were paid from the supposedly more liquid original PPVA fund.

11.     In June 2016, after the FBI executed a search warrant on Platinum Management's premises, as well as the filing of criminal charges against a co-owner of Platinum Partners (the

umbrella entity for the Platinum companies), Nordlicht announced to investors that PPVA and PPCO would stop taking in new money and would look to monetize current investments in an orderly fashion.

12.     The PPVA fund is currently in liquidation in the Cayman Islands, while the PPCO fund and another Platinum Partners affiliated fund (the Platinum Partners Liquid Opportunity Fund ("PPLO")) have contractually retained an independent monitor. By way of this action, the Commission seeks to have a court-appointed receiver installed over the domestic PPCO and PPLO funds and their respective advisers (together, the "Receivership Entities"), in order to protect investor assets and secure a fair and orderly process by which assets are liquidated and distributions are made to investors.

## VIOLATIONS

13.     By virtue of the conduct alleged herein, Platinum Management, Platinum Credit and Nordlicht, directly or indirectly, singly or in concert, have engaged and are engaging in transactions, acts, practices and courses of business that constitute violations of Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

14.     By virtue of the conduct alleged herein, Nordlicht, in the alternative, aided and abetted Platinum Management's and Platinum Credit's violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8; and Landesman, Levy, Mann, SanFilippo and Small aided and abetted Platinum Management's violations of Section 206(4) of the Advisers Act, 15 U.S.C. §80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8 .

15.     By virtue of the conduct alleged herein, Platinum Management violated Section 206(4) of the Advisers Act, 15 U.S.C. §80b-6(4), and Rule 206(4)-2 thereunder, 17 C.F.R. § 275.206(4)-2.

16.     By virtue of the conduct alleged herein, Platinum Management, Platinum Credit Nordlicht, Landesman, Levy and SanFilippo, directly or indirectly, singly or in concert, have engaged and are engaging in transactions, acts, practices and courses of business that constitute violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), and Mann, directly or indirectly, singly or in concert, has engaged and is engaging in transactions, acts, practices and course of business that constitute violations of Securities Act Section 17(a)(1) and (3), 15 U.S.C. § 77q(a)(1) and (3).

17.     By virtue of the conduct alleged herein, Platinum Management, Platinum Credit Nordlicht, Landesman, Levy, SanFilippo and Small, directly or indirectly, singly or in concert, have engaged and are engaging in transactions, acts, practices and courses of business that constitute violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5, and Mann and Shulse, directly or indirectly, singly or in concert, have engaged and are engaging in transactions, acts, practices and courses of business that constitute violations of Exchange Act Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. §240.10b-5(a) and (c).

18.     By virtue of the conduct alleged herein, Nordlicht and Levy, in the alternative, aided and abetted Platinum Management's and Platinum Credit's violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; Landesman, Mann and SanFilippo, in the alternative, aided and abetted Platinum Management's violations of Section 17(a) of the

7

Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; Small, in the alternative, aided and abetted Platinum Management's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; and Shulse, in the alternative, aided and abetted Platinum Management, Nordlicht, Levy and Small's violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

19.     The Commission brings this action pursuant to the authority conferred upon it by Section 209 of the Advisers Act, 15 U.S.C. § 80b-9, Section 20 of the Securities Act, 15 U.S.C. § 77t, and Section 21 of the Exchange Act, 15 U.S.C. § 78u, seeking to permanently enjoin Defendants from engaging in the acts, practices and courses of business alleged herein and for such other relief as set forth below.

20.     In addition, the Commission brings an emergency action seeking: (1) a temporary restraining order and preliminary injunction against Defendant Platinum Credit enjoining it from future violations of Sections 206(1), 206(2) and 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8; Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5; (2) appointing a receiver over the Receivership Entities; (3) prohibiting the Receivership Entities from destroying or altering any documents; and (4) permitting the Commission to conduct expedited discovery.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action, and venue lies in this District, pursuant to Section 214 of the Advisers Act, 15 U.S.C. § 80b-14; Sections 20(b), 20(d) and 22(a)

of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d) and 77v(a) and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

22.     Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the transactions, acts, practices, or courses of business alleged herein, certain of which occurred in this District.

23.     For example, various investors and portfolio managers were located in Brooklyn, New York, and communications in furtherance of the fraudulent schemes and other violations alleged herein were sent to them through the means or instruments of communication in interstate commerce.

## DEFENDANTS

24.     **Platinum Management** is an investment adviser registered with the Commission since September 2, 2011. It is a Delaware limited liability company headquartered in New York, New York, and is the adviser to various funds, including PPVA. Platinum Management's March 30, 2016 Form ADV ("ADV") reported that it had approximately $1 billion in assets under management ("AUM").

25.     **Platinum Credit,** a Delaware limited partnership headquartered in New York, New York, is a relying adviser of Platinum Management, *i.e.*, it is included within Platinum Management's umbrella adviser registration with the Commission. Platinum Credit is the adviser to the PPCO. Platinum Management's March 30, 2016 ADV reported that Platinum Credit had approximately $590 million in AUM in PPCO. .

26.     **Nordlicht,** 48, resides in New Rochelle, New York. He is chairman of Platinum Partners, the umbrella organization for the various funds, co-chief investment officer or CIO of

9

Platinum Management and Platinum Credit, and CIO of Platinum Liquid Opportunity Management (NY) LLC ("Platinum Liquid"), a relying adviser of Platinum Management. He also owns, directly and indirectly, between a 20% and 33% beneficial interest in Platinum Management, Platinum Credit and Platinum Liquid, and he, his relatives and/or related trusts are also investors in certain of the funds managed by the above-named advisers. Nordlicht also was a member of the managing member of Platinum Partners Black Elk Opportunities Fund LLC ("PPBE"). From 1998-99, he held Series 7 and Series 63 licenses and was registered with FINRA.

27.     **Levy**, 41, resides in New York, New York. He is an owner and co-CIO of Platinum Management and Platinum Credit. He previously served as a PPVA portfolio manager from 2006 to approximately the end of 2013, including with respect to PPVA's investment in Black Elk. He also was chairman and CIO and general partner of the managing member of PPBE. At the end of 2013, Levy purported to leave Platinum Partners, and he became the CIO and 10% owner of B Asset Manager LP and B Asset Manager II LP (together, "BAM"), the CIO, CFO, and 49.99% owner of Beechwood Re Ltd., and the CIO and 49.99% of Beechwood Bermuda Ltd. (the latter two, together, "Beechwood").

28.     **Small**, 45, resides in New York, New York. From 2007 to at least 2014, he was a managing director and portfolio manager at PPVA, and a portfolio manager of, among other things, Black Elk. He also was a managing director and portfolio manager of PPBE. From July 2009 to at least 2014, he served as a Platinum Management-appointed member of Black Elk's board of managers.

29.     **Landesman**, 55, lives in New Rochelle, New York. He was managing general partner of PPVA and PPLO until approximately April 2015, and formerly held a percentage of

Platinum Management's ownership. Thereafter, he continued to have substantial responsibility for investor communications for PPVA. He also supervised PPVA's Chief Marketing Officer.

30.     **Mann**, 24, resides in Brooklyn, New York. At times pertinent to this Complaint, he worked in the investor relations department of Platinum Management.

31.     **SanFilippo**, 38, resides in Freehold, New Jersey. At times pertinent to this Complaint, he was the CFO of PPVA. He is licensed as a CPA in New York.

32.     **Shulse**, 46, resides in Houston, Texas. He was the CFO of Black Elk from approximately January to September 2014, and the CEO thereafter until early 2015. His Texas CPA license expired in 2014 and was suspended thereafter due to Shulse's failure to complete his mandatory continuing professional education, or CPE.

### RELATED ENTITIES

33.     **PPVA** is a Cayman Islands exempted limited partnership managed directly by Platinum Management. PPVA has the following feeder funds: Platinum Partners Value Arbitrage (International) LTD; Platinum Partners Value Arbitrage Fund (USA) L.P.; and, Platinum Partners Value Arbitrage Intermediate Fund LTD. The PPVA feeder funds were offered only to qualified purchasers, as that term is defined in the Investment Company Act of 1940 (the "Company Act"). PPVA was marketed as a multi-strategy fund that includes long/short fundamental equity trading; asset-based financing in energy, mining, and other industries; energy-related and Asia-based arbitrage opportunities; and event-driven investing in corporations.

34.     **PPCO** is a Delaware limited partnership managed by Platinum Credit. It has the following feeder funds: Platinum Partners Credit Opportunities Fund (TE) LLC; Platinum Partners Credit Opportunities Fund International (A) LTD.; Platinum Partners Credit

11

Opportunities Fund International LTD.; Platinum Partners Credit Opportunities Fund LLC; and,

Platinum Partners Credit Opportunity Fund (BL) LLC.  The PPCO feeder funds were offered

only to qualified purchasers, as that term is defined in the Company Act.  PPCO was marketed as

a single-strategy fund that invests in asset-based loans in areas such as natural resources, energy

litigation, life insurance settlements, and receivables.

  35. **Platinum Liquid** is a Delaware limited liability company that serves as the

investment manager to Platinum Partners Liquid Opportunity Fund (USA) L.P. ("PPLO USA");

Platinum Partners Liquid Opportunity Fund (International) LTD,; Platinum Partners Liquid

Opportunity Intermediate Fund L.P. and Platinum Partners Liquid Opportunity Master Fund L.P.

(the "PPLO Master Fund") (such funds, together, "PPLO").  It is a relying adviser of Platinum

Management.  Platinum Management's March 30, 2016 ADV reported that Platinum Liquid had

approximately $27 million in AUM in PPLO.  At times pertinent to this Complaint, Nordlicht

was the CIO for Platinum Liquid and was "responsible for oversight of all trading, asset

allocation and risk management on behalf of the Platinum-managed funds."  At times pertinent

to this Complaint, Nordlicht was the majority owner of Platinum Liquid.  Landesman became

President of Platinum Liquid in April 2010 and became the managing member of Platinum

Liquid effective January 1, 2011.

  36. **B Asset Manager LP and B Asset Manager II LP** (together, "BAM"),

headquartered in New York, are operationally integrated unregistered investment advisers that

manage assets primarily obtained by their controlled affiliates through reinsurance contracts with

domestic insurance companies and under investment management agreements made directly with

domestic insurance companies.  Nordlicht, Levy, and two other close associates collectively

owned 68.9% of BAM through at least August 2016.  BAM claims to have approximately $2 billion in AUM and is an affiliate of the Beechwood reinsurance entities.

37.      **PPBE** is a special purpose vehicle through which other Platinum funds and individual investors obtained interests in Black Elk Class E preferred shares.

## FACTS

### Background

38.      Platinum Partners had two principal funds – PPVA, created in 2003, and PPCO, formed in 2005.  PPVA, the flagship, was billed as a multi-strategy hedge fund, ranging from long/short equity fundamental strategies and arbitrage to asset-based finance.  Meanwhile, a primary investment strategy of PPCO was "to originate a variety of high yield, fixed income instruments."

39.      PPVA was billed as a liquid fund.  Its domestic and foreign feeder fund PPMs, consistent with their respective limited partnership agreement ("LPA") and governing articles, set out a fixed, orderly redemption process for all investors:  quarterly redemptions, upon 60 or 90 days advance notice (depending on the version of the PPM), with the fund "intend[ing] to pay" to the investor at least 90% of the amount requested within 30 days, with the remaining 10% potentially held back for completion of the fund's audit.  Nothing elsewhere in the PPMs or their respective formative documents granted broad discretion to pay some redemption requests but not others, particularly those submitted in the same cycle.

40.      Platinum Management's Due Diligence Questionnaires for PPVA ("DDQs") confirmed the fund's liquidity.  From September 2013 through September 2015, they stated, in part,

> How long does it take to exit the most liquid positions in the portfolio?
> The Fund's most liquid positions could, under normal market conditions, typically be liquidated in less than a week, including assets in the Energy and Power Arbitrage,

13

Long/Short Fundamental Equity, Event Driven, Quantitative and Asia Based Arbitrage strategies.

The listed liquid strategies represented more than half of the portfolio during that same period, according to monthly "tear sheets" sent to investors, as well as marketing presentations provided principally to prospective investors. For example, a May 2016 presentation stated the fund was targeting "42% risk allocation to short term trading and relative value strategies, 26% to event driven strategies and 32% to asset based finance strategies."

41.     Fund documents also carefully delineated the separation between the finances of the PPVA and PPCO funds. For example, the  March 2015 PPCO and April 2015 PPVA PPMs stated, as a risk factor, that they permitted loans to or from affiliated funds, but only in narrow circumstances: "in the event that an affiliate fund, such as one of the Platinum-managed funds, requires additional funds on a short-term basis in order to make an investment, the Master Fund may loan such affiliate fund any amounts to facilitate such investment"; likewise, "in the event the Master Fund requires additional funds on a short-term basis in order to make an investment, the Managing Member, the Loan Portfolio Manager or their Affiliates and/or an affiliate fund, such as one of the Platinum-managed funds, may loan the Master Fund any amounts to facilitate such investment" (quoting PPCO Onshore March 2015 PPM; emphasis added.).

42.     On the surface, PPVA and PPCO were highly successful funds. As of March 2016, Platinum Management reported that PPVA had almost $1.1 billion in AUM, and PPCO had almost $600 million in AUM. Also, PPVA reported a virtually unbroken string of strong and steady reported performance, with its NAV going up each year from 2003 to 2015, for an average annual return of 17%, with typically small gains reported for 85% of the months throughout this period.

14

43.     Beneath the surface, however, lurked serious problems, which defendants kept from investors for years.  In fact, from at least 2012, PPVA faced recurring liquidity crises.  There was a growing liquidity mismatch, as the fund became increasingly concentrated in illiquid investments, including equity and debt positions in start-up companies, many of which were not publicly traded.  And yet, many investors could and did demand their money back every quarter.  Although the liquidity crisis extended for years, Platinum Management did not – for whatever reason – sell enough of its illiquid portfolio to overcome this crisis.  Instead, it took cash out of more liquid strategies, thus skewing the balance of the portfolio toward greater illiquidity even while the liquidity pressures remained.

44.     For example, in a November 6, 2012 email entitled "Current Redemptions Nov 5, 2012," a Platinum Partners employee advised Nordlicht that there were "$27 million total," apparently referring to outstanding redemption requests.  Nordlicht forwarded this email to Landesman and stated:  "If we don't exceed this in subs [new subscriptions] from dec 1 and jan 1 we are probably going to have to put black elk [one of the fund's illiquid investments] in side pocket. I also need to pay back [a loan from an individual] and an additional 4 million oct 31 and nov 30 so we are talking 40" – apparently indicating they needed to get $40 million in new subscriptions to cover pending redemption requests and other obligations.  Landesman responded by saying he would try his best, and that he thought "…we could sweep the table here, so far, think Jan. 1st is a possibility for some, if not all."  Nordlicht replied that "it's just very daunting.  It seems like we make some progress and then reds [redemptions] are relentless almost. It's tough to get ahead in subs [subscriptions] if u have to replace 150-200 a year…."  Landesman replied: "Didn't take it as complaining, it is my job. Redemptions very daunting."

45.     That said, illiquid positions, most of them categorized for accounting purposes as "Level 3" assets, which represented almost 80% of fund assets at the end of 2014, had one virtue for Platinum Management:  since they were not publicly traded and there were no other readily available market prices, they were valued by Platinum Management itself, "determined in such manner as may be selected from time to time by the Investment Manager in its discretion."

46.     To be sure, the PPVA PPMs limited this discretion by requiring that the result represent "fair value." Platinum Management reassured investors by noting in its DDQs that its valuations were verified by an internal valuation committee. And the DDQs, tear sheets, and marketing presentations touted that Platinum Management used the services of an independent valuation agent. In reality, however, Nordlicht often instructed his staff to adjust the values of various positions up or down, with the staff left to flesh out the rationales for those adjustments.

47.     Platinum Management's external auditor in early 2015 reported to it that "a material weakness exists in the Master Fund's investment valuation process related to its Level 3 investments." Platinum Management did not disclose to its investors this important information. The auditor also identified a "very material" misstatement that required a large markdown of the valuation of one large, illiquid position, triggering a restatement of the fund's year-end 2013 AUM.

48.     Platinum Management terminated that auditor. Still, the replacement auditor included in its 2014 opinion, which it did not issue until September 2015, an "emphasis-of-matter" stating that management's estimated values for investments representing over $800 million rested on unobservable inputs, and that the amounts that might be realized in the near-term could differ materially from management's valuations.

16

49.     Platinum's substantial control over the valuations of its illiquid positions helped ensure that fund performance, which was largely composed of unrealized gains, remained steady. This was essential, because shortfalls in performance could be expected to trigger more redemptions, and so deepen the liquidity crisis.

### Overvaluation of Golden Gate Oil LLC Investment

50.     A principal example of PPVA's growth in AUM through unrealized gains is Platinum Management's manipulation of the valuation of its disastrous investment in Golden Gate, a start-up oil production company it helped create in 2012.  In 2013 through 2014, PPVA's reported AUM of approximately $900 million to $1 billion rested heavily on the valuation of this single investment.  Whereas Platinum Management valued Golden Gate at approximately $78 million at the end of 2012 (when PPVA's equity interest in Golden Gate was 48% of the company, or $37 million), the value rose sharply to $173 million at the end of 2013 (when PPVA owned or had the option to buy a 100% interest).

51.     At the end of 2013, the Golden Gate equity and loan constituted approximately 19% of PPVA's AUM, the fund's largest position.  At the end of 2014, even after the price of oil had plummeted 60%, from $100 to $40 per barrel, PPVA valued its equity in Golden Gate at $140 million, less than 20% below its 2013 year-end valuation.  It also continuously valued at par its loans to Golden Gate, which reached $18 million in principal by the end of 2013, even though Golden Gate never made a single interest payment to PPVA.

52.     Throughout this period, Nordlicht was principally responsible for setting the valuation of Golden Gate for PPVA.  Golden Gate was vastly overvalued, for multiple reasons.

53.     First, PPVA sharply increased its valuation of Golden Gate while in fact the company's performance was falling far below initial projections, with minuscule oil production

and heavy operating losses.  Golden Gate's first stage involved the drilling of seven wells, but it encountered large drilling cost overruns, consuming $18 million borrowed from PPVA by the end of 2013, as well as delays in obtaining needed permits.  Moreover, the wells produced mostly water and many were shut in (*i.e.*, not producing).  The only consistently-producing well provided revenue representing less than 10% of initial projections.  As a result, far from generating the expected millions in cash flow to pay for future drilling, Golden Gate generated $6 million in net losses in 2013.

54.     Second, several transactions with third parties concerning the sale of some or all of Golden Gate's assets were for a mere fraction of the valuation that PPVA carried on its books for the same assets.

55.     For example, in October 2013, PPVA granted its partner an option to buy one of the two main Golden Gate oil fields for a mere $6.2 million, barely one-tenth of the value touted by PPVA for the same fields.

56.     At the same time, the partners granted each other an option to buy the other party's share for $60 million, effectively meaning that the whole company was worth roughly $120 million (rather than $173 million).

57.     One month later, though, Black Elk (another PPVA investment) reported in a public filing that it had obtained an option to buy the <u>whole</u> company for $60 million.  This posed a problem for Platinum Management; Months later, a PPVA portfolio manager for Golden Gate told Nordlicht and Levy that a potential third party lender had brought up Black Elk's filing, saying "the issue is that it publicly discloses the value of the option and therefore pegs GGO [Golden Gate]'s value to $60M.  This is ultimately a marketing issue that could be dealt with but something we should all be aware of."

18

58.     Then, in August and September of 2014, PPVA in fact bought out its partner's 52% interest in Golden Gate not for $60 million, or $30 million, but a mere $3.2 million, with an additional $5.9 million contingent on achievement of production levels that Golden Gate had not come close to achieving.  These actual option and sales prices belie Platinum Management's far higher valuations, including an enterprise valuation of at least $170 million it touted as of September 30, 2014.  Third, even internally Platinum Management personnel frequently acknowledged Golden Gate was worth much less than claimed.  In early 2012, Nordlicht initially scoffed at his portfolio manager's optimistic projections: "I cringe at the 1 billion PV-10 number [a measure of the present value of the oil reserves] as it doesn't mean anything . . . . when u have billion pv10 on fields that are worth 15 [$15 million] in sale now, it doesn't really mean much . . . ."  Likewise, in late 2012, one of Platinum's project managers for Golden Gate wrote to Nordlicht that once Golden Gate, as a first step, had about seven wells producing at its two fields, the value would rise to $45 million.  Nonetheless, at the end of 2013, when the drilling program had fallen far short even of that goal and Golden Gate was deeply in the red, Platinum Management increased PPVA's valuation of its interest to $173 million.

59.     Tellingly, in early 2014, Nordlicht did not grant discretionary compensation to the portfolio managers responsible for Golden Gate based on the valuation that was on PPVA's books.

60.     Fourth, Platinum Management took steps to mislead third parties who evaluated Golden Gate's reserves and the value of PPVA's interest in the company.  Those third parties were largely at Platinum Management's mercy, for they relied upon Platinum Management and Golden Gate for virtually all of the inputs used in their calculations.  For example, Platinum Management retained an independent valuation expert to buttress its own ultimate valuations, but

19

the valuation expert's quarterly reports repeatedly contained multiple false statements, obtained from Platinum Management, overstating the number of producing wells and the volume of oil production.

61.     When Platinum Management considered having Black Elk buy PPVA's interest in Golden Gate, an independent engineering firm chosen by Black Elk made preliminary estimates that valued Golden Gate's reserves at about 10% of the estimates made by the engineering firm retained by Golden Gate.  In particular, Black Elk's engineering firm found that most of the reserves should be characterized as merely "probable" rather than as "proven" – a critical difference since classifying reserves as proven rather than probable would have a positive effect on PPVA's interest in Golden Gate.  Nordlicht ordered that those lower estimates be ignored.

62.     Although Golden Gate's chosen engineering firm was willing to characterize more reserves as proven, that firm ultimately determined that it could no longer produce reserve reports for Golden Gate based on the company's pattern of making unrealistic projections of future well completions and production.

63.     Overall, Platinum Management and Nordlicht's words and conduct, including the exceedingly small consideration paid to obtain a larger equity stake in Golden Gate, and the decision to hold on to the Golden Gate asset in the throes of deep liquidity crises, reflect that Nordlicht understood that the valuations he was continuing to use for PPVA's balance sheet did not accurately reflect the lesser realizable value reflected by Platinum Management's negative experiences in attempting to develop profitable wells.

64.     Platinum Management's and Nordlicht's recklessly or knowingly inflated valuation of PPVA's interest in Golden Gate was material to the fund's overall valuation.  For example, the $3.2 million PPVA paid for the remaining 52% interest in Golden Gate in

September 2014 implied an enterprise value of about $6.2 million for the whole company. Meanwhile, as of December 31, 2014, PPVA valued Golden Gate at $140 million. Deducting the difference of $134 million from the fund's overall $872 million in "investments in securities" as of the end of 2014 would reduce that line item on its balance sheet by 16%. Likewise, the $134 million represented approximately 13% of PPVA's overall AUM of $1.04 billion as of the end of 2014.

65.    By failing to adjust Golden Gate's valuation to match reality, Nordlicht and Platinum Management inflated the management and incentive fees they received based on that inflated valuation.

66.    Meanwhile, Platinum Management responded to investor skepticism about Golden Gate by misleading at least one investor who raised repeated concerns about PPVA's energy positions and their valuation. On March 28, 2014, investor relations official Mann provided this investor with a report about Golden Gate and Black Elk "that we have just created for investors who would like to know more about the two positions." In fact, however, the report was replete with misstatements exaggerating Golden Gate's performance. It included charts, not labeled as either actual or projected, showing Golden Gate's first quarter revenues as $4.6 million. In fact, information readily available to Platinum showed that Golden Gate's revenue for the first quarter (then almost entirely concluded) was less than 5% of the reported figure: $229,000.

67.    Moreover, focusing just on revenues was misleading, because due to high operating costs Golden Gate had a net operating loss of $100,000 for Q1 2014. The same report reported Q1 2014 production as 508 barrels per day, when in fact net production for the quarter was less than 30 barrels per day. The report also vastly overstated probable reserves, pegging

them at 16 million barrels, when the most recent engineering reserve report then available showed only 6 million barrels of probable reserves. The report also said that "Overall PPVA has lent less than $18 million to GGO." In fact, as of December 31, 2013, the amount lent was $18.4 million, and after further lending in January and February of 2014 the total outstanding stood at $21.8 million.

68.     These misstatements built upon Mann's statement to the same investor two days earlier, after speaking with Nordlicht, that Nordlicht had changed his mind about combining Golden Gate with Black Elk "since Golden Gate has been doing very well since then" – at a time when the project was in fact losing money and producing almost no oil.

### 2014: Growing Liquidity Crises and the Ensuing Black Elk Fraud

69.     By 2014, PPVA's liquidity crisis had worsened. SanFilippo sent Nordlicht and Landesman an email on February 5, 2014, attaching a chart entitled "December 31 Redemption Summary" that highlighted approximately $14 million in redemptions and other monies still owing to investors based on their December 31 redemption requests. Indeed, under the PPMs, payment was required within 30 days and so this amount was overdue. The same chart indicated that other, apparently preferred, investors, had been paid over $22,325,000 in connection with the same quarterly redemption period.

70.     Likewise, in a board meeting of the Directors of PPVA International held on March 12, 2014, in which Nordlicht and Landesman participated, Platinum Management acknowledged that the fund had experienced a greater number of redemptions than net capital contributions during 2013. Platinum Management also represented to the Board that 40% of the fund could be liquidated in 30 days, but it also represented that it was focusing on making the portfolio more liquid.

22

71.     Despite these promises, when an investor emailed Landesman on April 29, 2014 asking when the wires would go out for the April 1 redemptions, payments for which were due no later than the next day, Landesman could not answer and instead forwarded the email to SanFilippo, asking: "What can I tell Jacques?"

72.     Later on April 29, 2014, Nordlicht sent an email to San Filippo stating: "Start paying down reds [redemptions] as u can. Between Blake and ppbe (additional 10 million), shd have decent short term infusion. Hopefully some may 1 subs [subscriptions] show up as well. Have a few more outflows to discuss but this is obviously the priority." As indicated in Nordlicht's stated hope about subscriptions showing up, PPVA was heavily dependent on the infusion of new money from both subscriptions and other sources to meet its ongoing redemption obligations and lacked sufficient liquid assets in its portfolios to meet its redemption obligations.

73.     A June 3, 2014 email from a Platinum employee to Nordlicht and others entitled "Cash Sheet" listed cash on hand of $96,000; "Pending Inflows" totaling $20,000,000; "Pending Outflows" totaling $16,750,000 and Redemptions of $500,000 for May and $9,500,000 for June, which resulted in a "Projected Cash" of negative $6,154,000. Nordlicht forwarded this email to another employee instructing him to: "Take June reds off the list," suggesting that they were unable to meet the pending June redemptions of $9,500,000 due to cash flow problems.

74.     On June 16, 2014, Nordlicht emailed Landesman that the firm was in "code red" due to its inability to match redemptions with quarterly inflows of investor funds. Nordlicht stated:

> It can't go on like this or practically we will need to wind down. This is not a rhetoric thing, it's just not possible to manage net outflows of this magnitude. I think we can overcome this but this is code red, we can't go on with the status quo. ... We can't pay out 25 million in reds per quarter and have 5 come in...."

23

Landesman responded: "We are pushing hard, illiquidity a bigger hurdle than energy

concentration…Need monetization/liquidity events in the fund…" Nordlicht replied: "….We

just need to short term go crazy, get everyone focused, and long term try to come up with

marketing pitches where we can raise even when we are illiquid."

75.     In early 2014, these same liquidity problems caused Nordlicht to focus on Black

Elk, PPVA's other large, illiquid energy investment.

76.     Black Elk operated oil wells in the Gulf of Mexico, and PPVA was its principal

lender. Platinum Management officials once considered the Black Elk position one of the

strongest in PPVA's portfolio. At the end of 2012, Platinum Management's valuation of Black

Elk represented 24% of PPVA's total assets. However, Black Elk's ambitious expansion plans

ran into problems after a deadly 2012 explosion on an offshore rig prompted numerous official

investigations. By 2014 its economic performance was mixed and it was struggling to pay its

bills.

77.     Meanwhile, as of early 2014, PPVA owned the vast majority of Black Elk's

preferred shares, and a large portion of Black Elk's $150 million face value of outstanding senior

secured notes. PPVA also had the power to control Black Elk's management, as admitted by

Black Elk in its Form 10-K, as PPVA owned about 85% of the outstanding voting membership

interests and had the authority to appoint and remove all Black Elk key personnel and determine

management policies.[1]

---

[1] "As of December 31, 2013, Platinum beneficially owned approximately 85% of our
outstanding voting membership interests and approximately 66% of our total outstanding
membership interests. As a result, and for as long as Platinum holds a membership interest in us,
Platinum has the ability to remove and appoint key personnel, including all of our managers, and
to determine and control our company and management policies, our financing arrangements, the
payment of dividends or other distributions, and the outcome of certain company transactions or
other matters submitted to our members for approval, including potential mergers or acquisitions,

78.     Moreover, PPVA aggressively exercised this power, through Nordlicht, as well as through Levy and Small who were also PPVA portfolio managers for Black Elk.  They did so by appointing a majority of Black Elk's Board of Managers, appointing Shulse as CFO, repeatedly forcing the CEO to rescind his firing of that CFO and otherwise usurping the CEO's authority, making prolonged, almost weekly visits to Black Elk's Houston office, and controlling which of Black Elk's vendors were paid (if at all) and when.  As the CEO later testified in Black Elk's bankruptcy proceeding, "Platinum was calling all of the financial shots.  I would say as of February [2014], they were in complete control of, you know, essentially almost every daily activity and most certainly stayed on top on every penny in and every penny out."

79.     Nordlicht decided to use this control over Black Elk not to try to turn around the company's business, but to plunder its assets for the benefit of PPVA and its affiliates, by getting repayment of most or all of approximately $110 million in Black Elk preferred shares held by those entities.  A key reason was to stave off PPVA's liquidity crisis.  Nordlicht acknowledged the liquidity crisis in vivid terms in an email to Small on March 17, 2014:

> This is also a week I need to figure out how to restructure and raise money to pay back 110 million of preferred which if unsuccessful, wd be the end of the fund. This 'liquidity' crunch was caused by our mismanagement –yours David and I – of the black elk position so I will multitask and also address your concerns but forgive me if I am a little distracted. I have been up until 3 am for the last two weeks working through this issue.

80.     In 2014, Black Elk agreed to sell much of its prime assets to Renaissance Offshore, LLC.  Platinum Management, Nordlicht, Levy and Small schemed to divert the proceeds from that sale to redeem preferred shares, most of which were held by PPVA and affiliated funds.  However, the Black Elk note indenture required that such proceeds be paid first

---

asset sales and other significant corporate transactions.  As a controlling member, Platinum could make decisions that may conflict with noteholders' interests."

to the noteholders, and many of the notes were held by non-Platinum parties. So the Platinum

parties thus devised a scheme to amend the note indenture to authorize that proceeds of the

Renaissance sale be paid to holders of Black Elk Class E preferred shareholders, mostly PPVA,

PPCO and two other affiliated funds.

81.    The problem for Platinum was that a majority vote of noteholders was required to

amend the indenture. Platinum controlled a majority of the notes, but it could not vote. As the

consent solicitation later recited, "Notes owned by the Company or by any person directly or

indirectly controlling or controlled by or under direct or indirect common control with the

Company shall be disregarded for purposes of determining the majority." Moreover,

independent noteholders would have no reason to vote for such an amendment, as it would divert

the proceeds of the sale of key Black Elk assets to parties junior to themselves.

82.    Therefore, Platinum personnel devised a scheme to obtain the necessary consents

in a manner that deceived independent noteholders. Specifically, Nordlicht, Small and Levy

worked to transfer the Black Elk notes held by PPVA to parties he and Small called "friendlies."

83.    In a March 11, 2014 email, Nordlicht wrote to Shulse, Levy, Small and another

individual, that "We are likely to have friendlies buy the bonds as of tomorrow."

84.    Two days later, Shulse sought to benefit from his support for this effort, asking

for "a substantial bonus, 1% of the amount of preferred's actually paid back to Platinum." He

added, "Platinum getting its money out of Black Elk is a good thing for Platinum and it should

be a good thing for me as well."

85.    At one point, the plan was to quietly get pro-Platinum parties representing a

majority of the notes to sign consents, without consulting independent noteholders. However,

the note indenture trustee resisted, insisting on a formal consent solicitation process. As Shulse

explained in an email to Nordlicht, Small and Levy: "they don't trust our consents are valid because we have received a default notice in the past 60 days and we have the behind the scenes process with various dates on our consents."

86.     Nordlicht's response to the idea of an open consent solicitation was a vehement no.

87.     Shulse, showing a complete understanding of and support for Platinum's scheme to control a majority of the notes, supported the solicitation: "the quickest way is to do the formal solicitation . . . get our 51% in order . . . vote it through the DTC/BNY agents and end it." He added, "why are we afraid of an open solicitation? Probably going to avoid a lawsuit and if we have the bonds we say we do, the process ends as soon as we get over the number?"

88.     On May 12, 2014, Shulse sent an email to Levy, Small, and Nordlicht suggesting they slip an announcement regarding the amendment to the indenture "in with the 10Q filing so it has a chance to get lost and not seem like such a big deal."

89.     Nordlicht, Levy and Small eventually decided to pursue a formal consent solicitation, albeit a rigged one. Crucial to this effort was the transfer of a large number of notes from PPVA and its affiliates to BAM and its Beechwood affiliates. BAM was closely affiliated with Platinum Management through majority ownership by Nordlicht and other owners of Platinum Management, and through Nordlicht's influence over the entity thanks to the installation of Levy as CIO and many other Platinum officials in key positions at BAM. Indeed, in early 2014 Nordlicht told a third party that he planned to leave Platinum for BAM as of January 1, 2015.

90.     All told, prior to the consent solicitation, PPVA transferred over $37 million in Black Elk notes to BAM and two related entities, BBIL SHIP and BBIL ULICO 2014 Trust, at

prices Nordlicht designated.

91.    Numerous emails reflect Nordlicht's involvement:  In a May 13, 2014 email,
Nordlicht instructed that "Beechwood is buying 8 million black elk from PPVA. What is the best
way to cross? Can we do it today please."   Similarly, on June 23, 2014, he emailed: "I want to
move/sell 10 million of black elk bonds to bbil the nomura account. Please take care of it."
After confirming that BBIL was buying the bonds from PPVA, Nordlicht emailed instructions on
July 1, 2014, to sell $7 million in Black Elk bonds from PPVA to BBIL SHIP at a price of 99.

92.    Levy's position as BAM's CIO (along with the fact that many other Platinum
Partners officials were also BAM officials) assured Nordlicht that the BAM-related entities
would support the scheme.  By July 3, the Platinum Partners-related funds and BAM-related
entities held almost $100 million out of the $150 million in Black Elk notes, as reflected on a list
shared by Nordlicht, Levy and Small.

93.    Meanwhile, Nordlicht, Small, Shulse and Levy participated in the drafting of a
document to be circulated to all noteholders, which contained two closely related parts.  The first
was a tender offer, which offered to buy back notes at par.  The second part was a solicitation to
consent to note indenture amendments, most notably including that the proceeds of the
Renaissance sale would, after payment of any tendered notes, be payable to holders of preferred
shares, who were disclosed to be mostly Platinum Partners-related entities.

94.    During the drafting process, on July 3, Small circulated to Black Elk counsel a
disingenuous deceptive hypothetical question about whether $5 million in notes owned by an
affiliate had to be excluded from voting – in fact, PPVA and its affiliates held more than $98
million in notes.  Still, counsel confirmed that even Small's hypothetical $5 million in affiliate-
held notes would have to be disregarded in the vote, and Small forwarded this finding to

Nordlicht and Levy.

95.     Despite their knowing this key principle, the final consent solicitation contained

this false representation:

> As of the date hereof, there are $150 million aggregate principal amount of Notes issued
> and outstanding under the Indenture. <u>Platinum Partners Value Arbitrage Fund, L.P. and
> its affiliates,</u> which own approximately 85% of our outstanding voting membership
> interests, <u>own approximately $18,321,000 principal amount of the outstanding Notes.
> Otherwise, neither we, nor any person directly or indirectly controlled by or under direct
> or indirect common control with us, nor, to our knowledge, any person directly or
> indirectly controlling us, hold any Notes.</u>  (Emphasis added.)

The $18 million figure was a vast understatement, as it failed to disclose the $72 million in other

notes held by PPVA affiliates and BAM-related related entities.  Knowing the consent

solicitation contained this falsehood, and that the vote was rigged, Small signed the Black Elk

Board of Managers' authorization for Black Elk to conduct the consent solicitation, and to

implement it should it be approved.

96.     Also, while formally the solicitation preserved the priority of tendering

noteholders, in reality the offer discouraged tenders by its unattractive terms.  Because the notes

were callable months later at par, tendering meant foregoing months of interest for no gain.

97.     However, not tendering would be a mistake if the consent solicitation were

approved.  In the end, $11 million in notes were tendered by independent noteholders.

98.     Platinum caused all of the notes held by its PPVA and its undisclosed affiliates,

including PPCO and PPLO, and the  Beechwood entities to vote in favor of the consent

solicitation <u>but</u> without tendering.  Levy was copied on the document by which Beechwood

entities cast their votes in that manner, against their own interests as noteholders but in favor of

the interests of preferred shares held by PPVA and affiliated funds.

99.     Small signed the consent of Black Elk's board of managers which falsely recited that "the Company has received sufficient consents" to amend the indenture. On August 14, 2014, Black Elk falsely claimed in a press release that "holders of $110,565,000 principal amount of the Notes, or 73.71% of the Notes, had validly consented to the Consent Solicitation." (Emphasis added.) On August 21, Black Elk issued a Form 8-K announcing that it had received "the requisite consents" of noteholders' to, among other things, apply the proceeds from the recently-concluded Renaissance sale to retire the tendered notes and use the remaining proceeds to repurchase preferred equity issued by Black Elk.

100.    On August 18, Small, from his Platinum email address, but purporting to speak for the Black Elk board of managers, directed Shulse to wire $70 million in partial payment of Class E preferred shareholders. Levy meanwhile sent Shulse specific wire instructions for sending to PPVA and other designated parties most of the proceeds from Black Elk's sale of assets to Renaissance. This included three other Platinum Partners funds, and one third party to which Platinum had sold preferred shares and was subject to a put repurchase obligation. The $20 million of Black Elk sale proceeds sent to that party extinguished that obligation. After Nordlicht pressed Shulse to "send these wires out already," Shulse complied with the directions.

101.    All told, from August 18 to 21, 2014, Black Elk wired approximately $98 million in Renaissance sale proceeds for the benefit of PPVA and its affiliated funds, including PPCO and PPLO. One other such fund, PPBE, set up specifically to invest in Black Elk notes, distributed its share of those proceeds to its investors. Among those investors were Levy and Small, who received $256,678 and $102,671, respectively, thus benefiting directly from the Black Elk fraud.

102.    PPVA investors received various communications from Platinum Management under Nordlicht's direction, such as financial statements, marketing materials and monthly reports that reported fund performance based, in part, on the Black Elk fraudulent note scheme. However, they omitted the material fact that the proceeds paid to PPVA on account of its Black Elk Class E preferred shares were derived based on the above-referenced fraudulent conduct.

**Late 2014: Misleading Investors about PPVA's**
**Borrowing to Cope with Liquidity Constraints**

103.    Obtaining the Black Elk proceeds by itself was not enough to stanch PPVA's liquidity problems. Accordingly, starting at least in July 2014, the fund began incurring short-term loans, a principal purpose of which to ease liquidity constraints, including paying redemptions.

104.    On July 1, PPVA borrowed $10 million from a group of insiders for six months, at a 19% annual interest rate. ("July 2014 Loan"). This wasn't enough, and in September, PPVA borrowed another $50 million, at 16% interest. The vehicles were two notes by PPVA in favor of over 40 lender-participants investors, again including many insiders. The notes had a three-year term, but in fact each participating lender could elect to get back its principal after six months. These notes were marketed and referred to internally as the "PPNE Loan," *i.e.*, Platinum Partners Northstar Energy, creating the impression that the funds were to be used to invest in Northstar, a recent addition to PPVA's energy portfolio which was in the process of acquiring the remaining assets of Black Elk.

105.    All told, PPVA borrowed $95 million from various parties during 2014 at 16-19% annual interest, including the July 2014 Loan and the PPNE Loan, and as of the end of 2014 more than $40 million in overall loan principal remained outstanding. PPVA also paid over $3

million in interest on these loans, draining value from the fund and further squeezing its capacity to pay redemptions.

106.    In late 2014, Platinum Management continued to market PPVA to prospective investors and to make reports to existing investors.  However, it misled prospective and existing investors by not revealing that PPVA was engaged in heavy short-term borrowing.

107.    Still, the issue of disclosure was forced upon Platinum Management toward the end of the year.  PPVA's auditor was still working on its audit of the fund's 2013 financial statements – the same audit that would conclude with a markdown of one of PPVA's large illiquid positions and a finding that Platinum Management's valuation process represented a material weakness.  In preparing the section on subsequent events, the auditor asked about loans incurred by the funds.  When the July 2014 Loan and PPNE Loan were produced, the auditor inquired as to their purpose.  PPVA CFO SanFilippo misled the auditor, as well as investors who received the resulting audited financial statements, about the purpose of those loans, in order to conceal PPVA's pressing liquidity needs.

108.    All internal Platinum Management documents addressing auditor questions and draft disclosures said that these loans were incurred for liquidity needs.  When Levy explained the PPNE Loan internally to SanFilippo, he first wrote its purpose was "liquidity to complete a transaction," but he changed this a minute later to "Ppne is a general obligation of PPVA taken for liquidity."  SanFilippo ignored this change and used the more benign first version, telling the auditor it was for "liquidity to complete a specific transaction."

109.    Even worse, PPVA's later submission to the auditor of a financial statement disclosure about the loans – sent by an assistant and copying SanFilippo – eliminated any reference to liquidity.  The initial draft, not sent to the auditor, listed the two loans separately and

32

in each case said the loan "dealt with liquidity restraints." The version sent to the auditor, however, which appeared in the final financial statement notes, combined the loans into a single disclosure, saying that PPVA "entered into multiple financial transactions . . . in order to complete multiple investment transactions."

110.    In this manner, SanFilippo helped to misstate the purpose of these sizable short-term, high-interest loans and conceal the fund's significant liquidity constraints – which would have been a major red flag for PPVA investors.

111.    In addition, PPVA's 2013 audited financials were not released until February 11, 2015, 287 days following the April 30, 2014 due date. This prolonged delay caused Platinum Management to violate the custody rule promulgated under the Advisers Act (the "Custody Rule"). Under the Custody Rule, Platinum Management was required to either engage an independent public accountant to conduct a surprise examination once per year, or to circulate audited financial statements to investors within 120 days of the end of its fiscal year. Platinum Management did neither for the fiscal years 2013, 2014 and 2015.

### 2015: PPVA's Liquidity Crisis Deepens, as does the Misleading of Investors

112.    Even after having unlawfully extracted nearly $100 million out of its Black Elk holding, and having borrowed heavily at high interest rates, PPVA's liquidity troubles continued, as current investors sought to redeem investments and Platinum Management scrambled for new investor money to replace the amounts being withdrawn.

113.    In addition to trying to raise new money to keep their fund going, Platinum Management and Nordlicht embarked on a concerted effort to persuade people not to go through with their redemption requests.

114.    Multiple people at Platinum Management participated in that effort, including
Landesman, who had substantial responsibility for investor communications for PPVA, and
Mann, who worked in Platinum Management's investor relations department.

115.    For example, in a January 23, 2015 email chain discussing an upcoming
redemption request for the end of the first quarter, a Platinum employee told Landesman that he
had just gotten a $19 million full redemption request from an investor.  Landesman replied that
he would "try to avert, directly tied into lack of November statements."

116.    As of January 30, 2015, a PPVA spreadsheet reflected that Landesman himself
had made a $6,000,000 redemption request in the prior quarter (12/31/2014), and was waiting to
get paid.

117.    On March 3, 2015, Nordlicht forwarded an investor's contact information to
Landesman, saying, "I don't trust myself, I feel I came off really defensive with Leon.  I think u
give us best possibility to try and keep him."  Nordlicht provided positive talking points,
including "tremendous optionality that cd produce some lumpy positive monthly returns in any
one month," but did not mention any disclosures regarding liquidity problems or their difficulties
in meeting redemption obligations.  Landesman replied, "I'll handle it."

118.    By mid-March 2015, Nordlicht, Landesman and other senior Platinum Partners
officials schemed to meet a sudden wave of over $70 million in redemptions by pressing
redeeming investors to cancel those redemptions or at least defer them one quarter, and to launch
an aggressive push for new investment money, all while concealing PPVA's liquidity
crisis.  Their pitch focused on anticipated investment gains in the following month, while
omitting the firm's significant liquidity crisis, which would obviously scare new investors and
people looking to redeem.

119.    The plan to mislead investors is illustrated by an email exchange that same month in which Nordlicht and another employee, copying Landesman, were crafting a response to an investor who had made a redemption request. The draft response stated: "By the way, we have significant interest on the subscription side for April which we expect to be our best month since the fund was founded. Therefore, we are limiting net inflows to 5% of the fund in April. On the off chance you decided to recant or defer your withdrawal to June 30, please let us know by April 1st so that we can process the subscriptions in a timely manner. Regards…"

120.    Given the fund's financial straits, capping new investments does not appear to have been a sound management strategy. Instead, it appears to have been a stock marketing ploy to make the fund appear more desirable. This is particularly so because subscriptions effective on January 1, February 1 and March 1, 2015 totaled only approximately $14 million, making the possibility of reaching 5% on April 1 (let alone having to implement the cap) remote.

121.    Landesman himself called investors in an attempt to obtain deferrals of March 31, 2015 redemptions. At the time of those calls, he was aware that there wasn't even enough cash to finish paying the December 31, 2014, redemptions that had been made, including by having been on emails in which a Platinum employee pressed Nordlicht with respect to an overdue redemption and Nordlicht eventually replied: "Working on it." After speaking with Landesman, one investor canceled half its redemption, telling Landesman that it was based on "your message of the April rebalancing of PPVA."

122.    On March 31, 2015, Landesman hosted Platinum Partners' quarterly investor conference call. In introducing the call, Landesman provided a materially misleading explanation for why the call had been moved up to March 31 – an odd date for a quarterly conference call as the quarter-end performance data, usually the main purpose for such calls,

was still unavailable. Landesman told investors that the call had been moved up because Passover fell in early April. However, as Landesman knew, the real reason for the early conference call was that Platinum Management had decided to meet the liquidity crisis by spreading word of their expected April performance gain early enough to induce deferrals of redemptions and new subscriptions by early April, when they still could count as effective as of March 31.

123.    During the same quarterly investor call, Nordlicht falsely claimed "we have not really gone out and tried to market aggressively based on the month that we're having," touted their expected April gain, and omitted any mention of PPVA's liquidity crisis. Finally, Nordlicht repeated the marketing ploy that net subscriptions would be capped at 5% of the fund.

124.    On April 2, 2015, Nordlicht emailed others at Platinum Partners asking if any new "subs" [subscriptions] cleared today, instructing that "[n]ext uses of capital for ppva" should be to pay back individuals who had lent money to the fund, including insiders such as Landesman. For Landesman, the promised payment was $1 million. When he learned that he would be one of the persons getting repaid when new money came in, Landesman replied, "Back at ya."

125.    Five days later, on April 7, 2015, Nordlicht and Landesman learned of another investor who, despite another employee's efforts to reach the investor to try to change his mind, was redeeming his group's PPVA investment. Later that day, Landesman sent the investor an email saying he was sorry that the investor was "still redeeming," and adding that he hoped that they would one day be worthy of "your reinvestment." Landesman forwarded this email to Nordlicht with the words "Hail Mary time."

126.    Meanwhile, PPVA's monthly marketing materials for April 2015 continued to represent that there was no lockup and withdrawals were "Quarterly, 60 day notice required,"

without disclosing the fund's struggles paying redemptions and the resulting efforts to dissuade investors from redeeming.

127.    Despite the various Platinum Defendants' efforts to reduce the amount of redemptions that would be effective March 31, 2015 and payable April 30, 2015, most of PPVA's redemptions that became effective on March 31, 2015 were not paid on April 30 as required, nor were they paid as a group at any one time. Rather, they were paid selectively, from April through July.

128.    In late May, an investor who was still waiting to receive payment of his redemption pointedly asked: "To address our concerns, I ask that you be fully transparent with respect to timing of the redemption, including why PPVA does not simply sell some liquid securities to fund the redemption." Nordlicht responded: "There are good reasons we do not liquidate trading positions but that is another story and doesn't excuse what happened. It was really Murphy's law in terms of a few closings getting postponed or dragged out at the same time. In any event, I am hopeful for tomorrow." Nordlicht's response omitted material information, such as that the fund had been having trouble paying redemptions for more than one quarter, and that one of its large portfolio company holdings was overvalued.

129.    As the end of the next quarter approached in June, Platinum once again worked to execute on its continued scheme to stave off redemptions. Almost $50 million in June 30, 2015 redemptions came due by July 31. But payments were made at various times from late-August until mid-October, with some redeeming investors not being paid at all.

130.    Landesman persuaded several investors to postpone their redemptions to September 2015, without disclosing PPVA's liquidity crisis. Indeed, he assured one investor,

who expressed hope for a 12% annual return for 2015 and 15% for 2016-19, "all of that is doable," without mentioning that in fact PPVA was essentially out of cash.

131.     On July 1, 2015, PPVA started the day with $1,010,000 and had scheduled outflows totaling $991,000, leaving a net of $20,000. The scheduled outflows did not include any redemption obligations.

132.     PPVA's financial condition at the time was so perilous that Platinum Management principals made loans to allow PPVA to meet certain of its financial obligations. For example, as of July 24, 2015, the PPVA master fund bank account was overdrawn $1.5 million. That day, a Platinum Management principal wired $1.65 million into the Platinum Management bank account, and that $1.65 million was transferred that same day into the PPVA master fund account. From there, the money was used for various PPVA obligations, including $50,000 that was transferred to the PPVA (USA) account to fund payments to two investors.

133.     In other words, in July 2015, Platinum Management was resorting to obtaining short-term loans from its principals even to selectively fund $50,000 worth of redemption obligations while other redemption requests remained unpaid.

134.     Consistent with prior months' marketing materials, PPVA's July 2015 marketing materials made no mention of any liquidity or redemption issues and instead represented that there was no lockup and that withdrawals were "Quarterly, 60 days' notice required."

135.     Even as unpaid redeeming investors pressed for explanations, Platinum employees held back on revealing the whole truth. For example, in mid-August 2015, one investor who was still waiting for payment on his June 30, 2015, redemption asked in an email received by Landesman and Mann whether any outstanding redemptions have been paid. He

received a misleading response from another Platinum employee, on which both Landesman and Mann were copied: "We endeavor to treat all investors equally. We are open to providing priority to investors who show severe hardship, but very much prefer to make simultaneous payments to all investors at the same time." By the time of that response, however, twelve redemptions for June 30 had been paid out, at least in part.

136.    Throughout this period, Mann was aware of PPVA's liquidity problems because he prepared internal reports on, among other things, dates and amounts of redemptions and subscriptions, and was also aware of investor complaints about late redemptions and pointed questions about PPVA's liquidity. Despite that knowledge, he continued to communicate with investors about processing new redemptions and deferrals without disclosing the full picture of the fund's troubles.

137.    Mann also followed Platinum Management's practices of selective redemptions, pressing Nordlicht to provide payment to an investor on hardship grounds while ignoring emails of another investor who inquired about the status of his own pending redemption request.

### PPVA Borrows from PPCO, Violating the Funds' Rules Made Known to Investors

138.    As PPVA's liquidity crisis deepened, Platinum Management turned to yet another source for desperately needed cash: PPCO. The PPMs of both PPVA and PPCO prohibited the lending or borrowing of funds from one to the other for any purposes other than to facilitate an investment. Starting in October 2014, however, the two funds ignored this restriction, and PPCO frequently extended large loans at least in part to help ease PPVA's cash crisis. Nordlicht readily executed this scheme, since he was the co-CIO of both funds and essentially controlled their affairs, treating their funds as a single "stew."

139.    In October 2014, PPVA borrowed $10 million from PPCO at 16% interest. This principal was paid back by the end of 2014. In 2015 the two funds entered into a $25 million revolving credit arrangement. The note evidencing this was dated as of January 1, 2015, and on or about that date PPVA borrowed another $18 million. The outstanding principal declined and then rose again, so that by late August, it exceeded $12 million.

140.    From August 1 to August 20, 2015, alone, a net $3.35 million flowed from PPCO to PPVA.

141.    Toward the end of August 2015, however, Nordlicht briefly reversed course. From August 21 to August 31, 2015, with PPCO facing its own unpaid redemption requests, PPVA transferred $2.275 million from its master fund account to PPCO (and PPCO transferred back only $15,000). During that same period, PPCO paid outstanding June 30, 2015 redemptions totaling approximately $3.7 million. At the same time that PPVA was helping PPCO pay its outstanding redemptions, PPVA as of the end of September 1 had at least fourteen overdue redemptions of its own totaling at least $10 million. It was not until mid-October that Platinum Management completed paying those fourteen redemptions.

142.    Nordlicht then reversed course again. From September 9 through 30, PPVA's ability to pay redemptions was aided by $3.7 million in new funding from PPCO to PPVA.

143.    Still, the September quarter brought continued redemption strains. Of the approximately 57 redemptions that became effective on September 30, 2015, most have never been paid, although 17 investors did receive preferential payments for some or all of their redemptions, in one form or another.

144.   On September 30, 2015, PPVA's principal bank accounts were again nearly empty and the fund faced approximately $20 million in new net redemptions and repayment of a short-term loan of $7.2 million.

145.   That same day, two related foreign funds subscribed to PPCO by wiring $6.5 million and $1.2 million, respectively, into a PPCO account.

146.   The next day, October 1, 2015, those subscribers' funds were transferred to a PPCO Master Fund account at the same bank.  From there, $7.3 million of the new PPCO investors' money was wired to the PPVA Master Fund bank account at a different bank.  PPVA used that money to repay its outstanding loan.

147.   Thus, within 24 hours of investing $7 million in PPCO, these investors' monies had, without their knowledge or consent, been diverted to a separate fund, PPVA, to pay off a short-term loan.

148.   The $7 million was then added to the outstanding principal owed by PPCO to PPVA on its revolving loan.  This "loan" contradicted representations made in the PPMs of both funds because PPVA was borrowing, and PPCO was lending, money to handle a short-term cash crunch rather than for the permitted purposes of making investments.

149.   Meanwhile, PPVA's monthly marketing materials for September 2015 again provided no information on liquidity problems, and repeated that there was no lockup provision and that withdrawals were "Quarterly, 60 days' notice required."

150.   On September 16, 2015, PPVA finally provided investors with audited financials for the 2014 audit year, 139 days following the April 30, 2014 due date.  This prolonged delay once again violated Platinum Management's obligations under the Custody Rule.  Even worse, although the audited financials disclosed that PPVA had borrowed approximately $95 million

41

during 2014, they repeated the misleading statement from the prior year's audit that the purpose of those loans was to complete "investment transactions."

### Investors Transfer Interests from PPVA to PPCO, But PPCO Gets No Cash

151.    In October and November 2015, Platinum Management, Platinum Credit and Nordlicht also misused PPCO to help PPVA by engaging in preferential, cashless redemptions of some PPVA investors and cashless transfers of those investors' interests into PPCO.

152.    In an attempt to redeem certain PPVA investors without having to pay out cash, Platinum Management caused them to execute PPCO subscription agreements, together, in most cases, with detailed wire instructions to Platinum Management's fund administrator authorizing that the proceeds of their PPVA redemptions be wired to a designated PPCO bank account. One other investor did not submit wire instructions, but nonetheless gave the direction to "sell/redeem" $500,000 from PPVA and "invest the redemption proceeds" into PPCO.

153.    In fact, however, the signed wire instructions that had been provided to the fund administrator were not followed: no transfers of funds ever occurred. Instead, the amounts – totaling over $3 million – were simply added to the balance of PPVA's outstanding revolving line of credit owed to PPCO.

154.    Such cashless redemptions harmed, and were a breach of fiduciary duty to, both PPCO and PPVA. This new PPCO "loan" to PPVA clearly was not a loan for purposes of investment, as narrowly permitted by PPCO's fund documents, and thus contradicted representations in PPCO's PPMs. And PPCO received no cash for these new subscriptions, merely a promise to pay by an affiliated fund that lacked sufficient funds to meet its own redemption obligations. This left PPCO investors exposed to the risk presented by PPVA's illiquidity.

155.    PPVA, too, was harmed, as it was forced to incur the obligation to pay high interest merely to facilitate redemptions from its own fund. Remaining PPVA investors were also harmed by what in effect were preferential redemptions, which allowed certain redeeming investors to escape from PPVA to the relatively healthier PPCO. Nonetheless, Platinum Management, Platinum Credit, Nordlicht and others ignored the blatant conflict of interest between PPCO and PPVA. Further, Nordlicht as co-CIO of the advisers to both PPVA and PPCO, caused PPCO and PPVA to act in a way that was potentially contrary to each of their own interests.

156.    These were not the first cashless transfers from PPVA to PPCO. As early as October 2014, an investor wired instructions to redeem $15 million from PPVA and "use the proceeds of the redemption to subscribe" to PPCO "for the same amount of $15,000,000" effective December 31, 2014. Later, this was changed to a cashless transfer, which Platinum officials first thought to add to the PPNE Loan, and then decided to use as the basis for what became the new $25 million revolving note by PPVA to PPCO. The effect was the same: PPVA was shed of a $15 million investment interest and PPCO gained a $15 million investment interest for no cash, and just a promise to pay by PPVA.

157.    In this earlier case, the failure to deal with the obvious conflict of interest between the two funds was blatant. PPCO's CFO wrote that "since the borrower is PPVA no need for risk and valuation to sign off as the CIO is obviously comfortable with the risk. David Levy can just approve the deal sheet and memo."

### Late 2015 and 2016 – the Peaking of the Liquidity Crisis, New Misleading Communications with Investors and New Diversions of Funds

158.    By the late fall of 2015, Platinum Management decided to address PPVA's liquidity problems by placing certain assets in a "side-pocket" that would prevent them from

being used as a basis for calculating the amount of redemptions an investor would be entitled to until the assert was sold.  Still investors continued to be misled, and funds improperly diverted, even after this change occurred.

159.    Nordlicht issued a letter dated November 23, 2015 stating that PPVA USA, via its investment in the PPVA Master Fund, "still holds substantial investments in the remaining illiquid assets which require additional time before the Master Fund can realize the value of those investments.  Accordingly, the Investment Manager has a plan to segregate certain illiquid assets (and related liabilities) from the remainder of the assets in the portfolio (the 'Special Investments') in the interest of protecting investors and maximizing returns. …The Special Investments structure protects the Fund investors from being left holding a disproportionately high percentage of illiquid assets when redemptions are made by some investors."  Nordlicht asked for the investors' consent to this "Special Investments" modification of the fund.

160.    In a conference call in late November 2015 explaining this shift, Nordlicht stated that the existing fund "should quickly become very very liquid" and "I expect it to have ample liquidity," and "liquidity-wise, we're getting things back to normal and we expect to run it with ample liquidity . . . ."  In the same investor call, Nordlicht also minimized the significance of the redemptions crisis PPVA was facing, saying, "this was not a redemption-driven type of move that we've made, and in fact we've had less redemptions than you would expect in a fund of our size.  This was really a situation where it got to a point where we just had too many private equity positions.  I don't feel comfortable paying out in cash at this time."

161.    This was misleading, given that the fund was cash-strapped and had substantial past-due redemptions, a fact he omitted.

162.    Moreover, contrary to Nordlicht's promise that the fund "should quickly become very very liquid" after illiquid assets were moved to the side-pocket, most investors were not paid redemptions even out of the existing fund.  With a few selective exceptions, cash redemption payments ceased from late 2015 forward.

163.    Meanwhile, on November 11, 2015, an investor who was waiting to receive payment on his September 2015 redemption of approximately $394,000 sent an email to Mann asking when his redemption would be paid.  Mann replied: "[w]e hope to send it to you soon." However, during that same month another Platinum employee told the investor that Platinum could not return his investment because of liquidity issues, since liquidating their liquid holdings in order to pay him would leave remaining investors with too high a portion of the illiquid investments.  Mann subsequently ignored a January 12, 2016, email from the investor asking when his redemption would be paid.  To date, the investor has not received any portion of his PPVA investment back.

164.    In mid-January 2016, one unpaid PPVA and PPCO investor emailed Platinum complaining:  "I have asked already about a dozen times about money due to me from PPVA. …you have not paid me money that is due for 75 days. Every time I ask I am told a few more days. … Also PPNE [note interest payment] is supposed to pay at the start of the month and we are now at Jan 15 with no money. This was supposedly guaranteed by the fund."  In a reply email from a Platinum Management employee, the investor was told that the PPNE interest payments would be made the following week and that they would have an answer for him on Monday when the overdue September 30 redemption would be paid.

165.    The investor responded in part: "Nothing makes investors more jittery than not paying in a timely fashion. I told you that in my opinion holding up the PPCO payment in light

of the changes that you wanted to implement at PPVA was a big mistake. If in fact PPCO has nothing to do with PPVA than (sic) why was the PPCO delayed for 2 months."

166.    The investor's email reflects Platinum Management's and Platinum Credit's failure to disclose the extensive intermingling of funds between the two funds to deal with both funds' liquidity problems.

167.    In May 2016, with liquidity problems still not solved, Platinum Management, Platinum Credit, Nordlicht and Levy used BAM to essentially steal investor money to obtain cash needed for PPVA expenses.

168.    Among its many transactions BAM made with Platinum Partners affiliates, was a $25 million participation interest in a term secured loan to a wholly-owned PPCO portfolio company named Credit Strategies LLC.  The loan requires that Credit Strategies in effect apply proceeds either to its own debt obligations or to general corporate purposes.

169.    In May, a Platinum portfolio manager (copying Nordlicht and Levy) emailed a request for $1.5 million in funding under the note for purposes of "working capital."  The request was signed by Levy, as co-CIO for Credit Strategies.  On May 11, BAM approved the funding instructed its bank to wire the money to Credit Strategies' bank account.

170.    However, the money was not used by Credit Strategies for working capital as required, but was diverted to a separate fund, PPVA.

171.    First, Credit Strategies wired approximately $1.5 million to the parent PPCO fund's account.  From there, PPCO wired the money to its investment manager, Platinum Credit. Platinum Credit, in turn, wired approximately the same amount to Platinum Management.

172.    Platinum Management then wired the money to a PPVA bank account that at the time was overdrawn by about $1.54 million because of payments the funds that had been made to prime brokers.

173.    Furthermore, in June 2016, with PPVA's liquidity crisis peaking, SanFilippo helped Nordlicht break Platinum Management's oft-repeated promise to investors that overdue redemptions would be paid once several illiquid positions were monetized.  As an example of this promise, Mann told one investor in May 2016 that "we anticipate paying/wiring the whole 12/31 redemption class their funds (minus 10% audit holdback) together sometime at the end of June or beginning of July (or maybe earlier).  This is based on our current liquidity and the anticipated sale of two companies."

174.    Meanwhile, Nordlicht helped to close a transaction involving one portfolio company.  As a result, on June 9, 2016, PPVA received $37 million in proceeds.  But one of those funds were paid that month to investors.  Instead, $11 million of these proceeds were invested in a different private company – the same type of illiquid investment that had gotten PPVA into a liquidity crisis in the first place.  And, among other uses of the funds, Nordlicht emailed SanFilippo and directed him to make various payments totaling approximately $900,000 to a handful of parties, mostly insiders.  By the end of the month, there was $31,000 left in the PPVA Master Fund account.  This use of the proceeds contradicted the repeated promises by Platinum Management that such major monetizing events would fund large-scale redemption payments.

**PPVA and PPCO Cease Taking on New Investors**

175.    In June 2016, the FBI executed a search warrant at Platinum Management's offices, and the U.S. Attorney's Office for the Southern District of New York filed criminal charges against one of Platinum Partners' co-owner, in connection with a bribery scheme in

which he is alleged to have paid kickbacks to a New York City Correction Officer's Union official to obtain the union's retirement fund investments in PPVA during the time it was experiencing its liquidity crisis.

176.    In the wake of those events, Nordlicht announced to investors that the PPVA fund would stop taking in new money and fund investments would gradually be monetized. .

177.    On July 18, 2016, following consultations between Commission staff and counsel for Platinum Partners and its affiliates, the PPVA, PPCO, and PPLO funds retained Guidepost Solutions LLC ("Guidepost") as an "Independent Oversight Advisor," giving the firm access to information and employees and advance notice of major transactions concerning all of Platinum Partners' funds.

178.    On July 20, 2016, Platinum circulated to investors Guidepost's letter announcing its appointment "to assist the Managers with the development and implementation of a plan for the orderly liquidation of the Funds under management."

179.    On July 28, 2016, a petition was filed in the Grand Court of the Cayman Islands, commencing an involuntary liquidation proceeding and seeking the appointment of Matthew Wright ("Wright") and Christopher Kennedy ("Kennedy") of RHSW (Cayman Limited) as Joint Official Liquidators for the PPVA International feeder fund.

180.    On August 25, 2016, the Cayman Court appointed Wright and Kennedy as joint provisional liquidators of the PPVA master fund. An involuntary liquidation proceeding was commenced against PPVA in the Cayman Islands, where the PPVA master fund and international feeder fund are incorporated. Those PPVA funds are now under the supervision of a court-appointed liquidator. On October 19, 2016, the Cayman liquidator commenced an

ancillary bankruptcy proceeding in the United States, pursuant to Chapter 15 of the United States Bankruptcy Code.

181.     The PPCO and PPLO funds remained under the informal monitoring of Guidepost.

182.     On October 26, 2016, the Litigation Trustee for Black Elk, a Debtor in Bankruptcy, commenced an Adversary Proceeding against PPVA, PPCO, and PPLO, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, based on claims arising from the fraudulent consent scheme alleged above.  On the same day, the Bankruptcy Court issued a TRO imposing certain restrictions on PPCO and PPLO's assets.  A hearing for a related application for injunctive relief has been set for January 12, 2017.

183.     In November 2016, in connection with the Black Elk trustee's request for preliminary relief in its adversary proceeding, the testimony of various individuals was taken.

184.     On November 29, 2016, Levy was deposed by the Trustee and asserted his Fifth Amendment right against self-incrimination, refusing to answer any questions concerning the Black Elk note transactions and any other Platinum matters.

185.     On November 30, 2016, Nordlicht was deposed by the Trustee and asserted his Fifth Amendment right against self-incrimination, refusing to answer any questions regarding the Black Elk note transactions and any other Platinum matters.

186.     On November 30, 2016, PPCO's auditor advised PPCO that it had suspended work on all outstanding engagements and that PPCO should retain a new accounting firm to replace it.

49

## FIRST CLAIM FOR RELIEF
### (Against Platinum Management, Platinum Credit and Nordlicht)
### Violations of Sections 206(1) and 206(2) of the Advisers Act
### and Rule 206(4)-8 thereunder

187.    The Commission realleges and incorporates paragraphs 1 to 186 by reference as if fully set forth herein.

188.    From at least 2012 through the present, Defendants Platinum Management, Platinum Credit and Nordlicht, investment advisers, directly or indirectly, singly or in concert, by the use of the means and instruments of transportation or communication in interstate commerce, and of the mails, employed and are employing devices, schemes and artifices to defraud investors, and have engaged and are engaging in transactions, practices and courses of business which operate as fraud and deceit upon these investors.

189.    By engaging in the conduct described above, Defendants Platinum Management, Platinum Credit and Nordlicht have violated, are violating and, unless restrained and enjoined, will continue to violate Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. 80b-6(1) and 80b-6(2).

## SECOND CLAIM FOR RELIEF
### (Against Nordlicht)
### Aiding and Abetting Violations of Section 206(1) and 206(2) of the Advisers Act

190.    The Commission realleges and incorporates paragraphs 1 to 189 by reference as if fully set forth herein.

191.    From at least 2012 through the present, by engaging in the conduct described above, and pursuant to Section 209(f) of the Advisers Act, 15 U.S.C. § 80b-9(f), Defendant Nordlicht, in the alternative, singly or in concert, directly or indirectly, knowingly or recklessly aided, abetted, counseled, commended, induced or procured Defendant Platinum Management's

and Platinum Credit's violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. 80b-6(1) and 80b-6(2).

192.    Unless restrained and enjoined, Defendant Nordlicht will again aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. 80b-6(1) and 80b-6(2).

### THIRD CLAIM FOR RELIEF
**(Against Platinum Management, Platinum Credit and Nordlicht)**
**Violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder**

193.    The Commission realleges and incorporates paragraphs 1 to 192 by reference as if fully set forth herein.

194.    From at least 2012 through the present, Platinum Management, Platinum Credit and Nordlicht also served as investment advisers to a pooled investment vehicle, and (a) made untrue statements of material fact or omitted to state a material fact, necessary to make the statements made, in the light of circumstances under which they were made, not misleading, to an investor in the pooled investment vehicle; and (b) engaged in an act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle.

195.    By engaging in the foregoing conduct, Defendants Platinum Management, Platinum Credit and Nordlicht have violated, are violating and, unless restrained and enjoined, will continue to violate 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

### FOURTH CLAIM FOR RELIEF
**(Against Levy, Small, Landesman, Mann, SanFilippo and Nordlicht)**
**Aiding and Abetting Violations of Section 206(4)**
**of the Advisers Act and Rule 206(4)-8 Thereunder**

196.    The Commission realleges and incorporates paragraphs 1 to 195 by reference as if fully set forth herein.

197.     From at least 2012 through the present, by engaging in the conduct described

above, and pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)], Defendants

Levy, Small, Landesman, Mann, SanFilippo, and Nordlicht in the alternative, singly or in

concert, directly or indirectly, knowingly or recklessly aided, abetted, counseled, commended,

induced or procured Defendant Platinum Management's violations of Section 206(4) of the

Advisers Act and Rule 206(4)-8 thereunder and Defendant Nordlicht, in the alternative, singly or

in concert, directly or indirectly, knowingly or recklessly aided, abetted, counseled, commended,

induced or procured Defendant Platinum Credit's Management's violations of Sections 206(4) of

the Advisers Act, 15 U.S.C. § 80b-6(4),  and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-

8.

198.     Unless restrained and enjoined, Defendants Levy, Small and Nordlicht will again

aid and abet violations of Sections 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule

206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8.

### FIFTH CLAIM FOR RELIEF
**(Against Platinum Management)**
**Violation of Section 206(4) of the Advisers Act and Rule 206(4)-2 Thereunder**

199.     The Commission realleges and incorporates paragraphs 1 to 198 by reference as if

fully set forth herein.

200.     By engaging in the conduct described above, Platinum Management willfully

violated Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), which prohibits a registered

investment adviser from engaging in fraudulent, deceptive or manipulative conduct, and Rule

206(4)-2 thereunder, 17 C.F.R. § 275.206(4)-2, which requires an adviser to take certain

enumerated steps to safeguard client assets over which it has custody.

201.    By reason of the foregoing, Platinum Management violated, is violating and, unless restrained and enjoined, will continue to violate Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-2 thereunder, 17 C.F.R. § 275.206(4)-2.

### SIXTH CLAIM FOR RELIEF
**(Against Platinum Management, Platinum Credit, Nordlicht, Levy, Landesman and SanFilippo)**
**Violations of Section 17(a) of the Securities Act**

202.    The Commission realleges and incorporates paragraphs 1 to 201 by reference as if fully set forth herein.

203.    Interests in PPVA and PPCO are securities within the meaning of Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

204.    By engaging in the conduct described above, Defendants Platinum Management, Platinum Credit, Nordlicht, Levy, Landesman and SanFilippo, directly or indirectly, singly or in concert, in the offer or sale of securities, knowingly, recklessly or negligently,  by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, (a) have employed, are employing, or are about to employ, devices, schemes, or artifices to defraud; (b) have made untrue statements of material fact, or have omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) have engaged, are engaging, or are about to engage in transactions, practices, or courses of business which operate, operated, or would operate as a fraud or deceit upon the purchasers of securities.

205.    By reason of the foregoing, Defendants Platinum Management, Platinum Credit, Nordlicht, Levy, Landesman and SanFilippo have violated, are violating, and unless restrained and enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## SEVENTH CLAIM FOR RELIEF
### (Against Mann)
#### Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act

206.    The Commission realleges and incorporates paragraphs 1 through 205 by reference as if fully set forth herein.

207.    Shares of PPVA and PPCO are securities within the meaning of Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

208.    By engaging in the conduct described above, Defendant Mann, directly or indirectly, singly or in concert, in the offer or sale of securities, knowingly, recklessly or negligently,  by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, (a) has employed, are employing, or are about to employ, devices, schemes, or artifices to defraud; and/or (b) has engaged, are engaging, or are about to engage in transactions, practices, or courses of business which operate, operated, or would operate as a fraud or deceit upon the purchasers of securities.

209.    By reason of the foregoing, Defendant Mann has violated, is violating, and unless restrained and enjoined will again violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1)  and 15 U.S.C. § 77q(a)(3).

## EIGHTH CLAIM FOR RELIEF
### (Against Nordlicht and Levy ,Landesman, Mann and SanFilippo)
#### Aiding and Abetting Violations of Section 17(a) of the Securities Act

210.    The Commission realleges and incorporates paragraphs 1 through 209 by reference as if fully set forth herein.

211.    By engaging in the conduct described above, and pursuant to Section 15(b) of the Securities Act, 15 U.S.C. § 77o(b), Defendants Nordlicht, Levy, Landesman, Mann and

SanFilippo, in the alternative, singly or in concert, directly or indirectly, aided and abetted, and are therefore also liable for Defendant Platinum Management's, and Defendants Nordlicht and Levy, in the alternative, singly or in concert, directly or indirectly, aided and abetted, and are therefore also liable for Platinum Credit's, primary violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], because they knowingly or recklessly provided substantial assistance to Defendants Platinum Management's, and Defendants Nordlicht and Levy knowingly and recklessly provided substantial assistance to Platinum Credit's, violations of the Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

212.    Unless restrained and enjoined, Defendants Nordlicht, Levy, Landesman, Mann and SanFilippo will again aid and abet violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a) .

### NINTH CLAIM FOR RELIEF
**(Against Platinum Management, Platinum Credit, Nordlicht, Levy, Small, Landesman and SanFilippo)**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

213.    The Commission realleges and incorporates paragraphs 1 through 212 by reference as if fully set forth herein.

214.    By engaging in the conduct described above, Defendants Platinum Management, Platinum Credit, Nordlicht, Levy, Small, Landesman and SanFilippo directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce or by the use of the mails, in connection with the purchase or sale of securities, knowingly or recklessly: a) employed, are employing or are about to employ devices, schemes and artifices to defraud; b) have obtained, are obtaining or are about to obtain money and property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading; and/or c) have engaged, are

engaging or are about to engage in transactions, practices or courses of business which have

operated, operate or will operate as a fraud and deceit upon investors.

215.    By engaging in the foregoing conduct, Defendants Platinum Management,

Platinum Credit, Nordlicht, Levy, Small, Landesman, and SanFilippo have violated, are

violating, and unless restrained and enjoined will again violate Section 10(b) of the Exchange

Act, 15 U.S.C. §§78j(b), and Rule 10b-5 thereunder, 17 C.F.R. §240.10b-5.

<div align="center">

**TENTH CLAIM FOR RELIEF**
**(Against Mann and Shulse)**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

</div>

216.    The Commission realleges and incorporates paragraphs 1 through 215 by

reference as if fully set forth herein.

217.    By engaging in the conduct described above, Defendants Mann and Shulse,

directly or indirectly, singly or in concert, by use of the means or instruments of transportation or

communication in, or the means or instrumentalities of, interstate commerce or by the use of the

mails, in connection with the purchase or sale of securities, knowingly or recklessly: a)

employed, are employing or are about to employ devices, schemes and artifices to defraud;

and/or b) have engaged, are engaging or are about to engage in transactions, practices or courses

of business which have operated, operate or will operate as a fraud and deceit upon investors.

218.    By engaging in the foregoing conduct, Defendants Mann and Shulse have

violated, are violating, and unless restrained and enjoined will again violate Section 10(b) of the

Exchange Act, 15 U.S.C. §§78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R.

§240.10b-5(a) and 17 C.F.R. §240.10b-5(c).

## ELEVENTH CLAIM OR RELIEF
### (Against Small , Landesman, Mann, SanFilippo and Shulse)
### Aiding and Abetting Violations of Section 10(b)
### of the Exchange Act and Rule 10(b)-5 Thereunder

219. The Commission realleges and incorporates paragraphs 1 through 218 by reference as if fully set forth herein.

220. By engaging in the conduct described above, and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Defendants Small, Landesman, Mann, SanFilippo and Shulse, in the alternative, singly or in concert, directly or indirectly, aided and abetted, and are therefore also liable for Defendant Platinum Management's primary violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 thereunder 17 C.F.R. § 240.10b-5, because they each knowingly or recklessly provided substantial assistance to Defendant Platinum Management's violations of Section 10b of the Exchange Act, 15 U.S.C. § 78j(b),  and Rule 10(b)-5 thereunder, 17 C.F.R. § 240.10b-5.

221. Unless restrained and enjoined, Defendants Small Landesman, Mann, SanFilippo and Shulse will again aid and abet violations of Section 10b of the Exchange Act and Rule 10(b)-5 thereunder, 17 C.F.R. § 240.10b-5.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

### I.

A Final Judgment finding that the Defendants violated the securities laws and rules promulgated thereunder as alleged herein.

### II.

An Order temporarily, and preliminarily through a final judgment, restraining and enjoining Platinum Credit,  its agents, servants, employees and attorneys and all persons in

active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, and each of them, from directly or indirectly committing, or aiding and abetting or controlling, future violations of Sections 206(1), 206(2), 206(4) of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8, thereunder; Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and Section 10(b) of the Exchange Act 15 U.S.C. § 78j(b), Rule 10(b)-5 thereunder, 17 C.F.R. § 240.10b-5.

## III.

An order temporarily, and preliminarily through a final judgment, appointing a Receiver over the Receivership Entities.

## IV.

An Order permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from directly or indirectly committing, or aiding and abetting or controlling, future violations of Sections 206(1), 206(2), 206(4) of the Advisers Act,15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-2 [17C.F.R. § 275.206(4)-2] and Rule 206(4)-8 thereunder, 17 C.F.R. § 275.206(4)-8]; Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a); and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5 thereunder 17 C.F.R. § 240.10b-5.

## V.

A Final Judgment ordering all Defendants, except Shulse, to disgorge, on a joint and several basis, all ill-gotten gains and unjust enrichment, plus prejudgment interest thereon.

## VI.

A Final Judgment ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e).

## VII.

An Order temporarily, and preliminarily through a final judgment, appointing a receiver over the Receivership Entities.

## VIII.

An Order temporarily, and preliminarily through a final judgment, freezing the assets of X and Y, including their bank and brokerage accounts pending a final judgment, pursuant to the Court's equitable power and Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5).

## IX.

An Order granting expedited discovery.

## X.

An Order temporarily, and preliminarily through a final judgment, restraining and enjoining Defendants and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing, or otherwise interfering with the access of the Commission to relevant documents, books and records.

## XI.

Granting such other and further relief as this Court deems just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY DEMAND

Pursuant to Rule 39 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated:  December 19, 2016
       New York, New York

Respectfully submitted,

By: _____

     Andrew M. Calamari
     Sanjay Wadhwa
     Adam Grace
     Kevin P. McGrath
     Neal Jacobson
     Jess Velona
     Danielle Sallah
     Attorneys for the Plaintiff
     SECURITIES AND EXCHANGE
      COMMISSION
     New York Regional Office
     Brookfield Place
     200 Vesey Street, Suite 400
     New York, NY 10281-1022
     (212) 336-0180 (Velona)

EXHIBIT 22



STERLING VALUATION GROUP, INC.

February 21, 2013

Mr. Joseph SanFilippo
Platinum Management (NY) LLC
152 West 57th Street, 4th Floor
New York, New York 10019

Dear Mr. SanFilippo:

At your request, we have analyzed certain financial information regarding assets held by Platinum Partners Value Arbitrage Fund LP, and/or its affiliates (the "Fund"), as set forth herein, and submit this letter on our findings.

The purpose of this analysis is to express an opinion (the "Opinion") on the fair value, as of December 31, 2012, of the Fund's interest in the investments (the "Investments") described herein. We understand that the Fund intends to use our Opinion solely for internal management planning and management's determination of net asset value, profit and loss calculations, and financial reporting, and that the Fund may provide an informational copy of the Opinion in its entirety to shareholders, and prospective shareholders, of the Fund.

The term "fair value," as used herein, is defined as the amounts at which the Fund's interests in the Investments would change hands between a willing buyer and a willing seller (that are not affiliated with one another), each having reasonable knowledge of all relevant facts, neither being under any compulsion to act.

Nothing contained herein is intended to be construed or relied on by any person as a legal opinion as to any matter, including without limitation relating to the underlying borrower, the enforceability of the underlying transaction, or the perfection of any security interest. In connection with this Opinion, we have made such reviews, analyses, and inquiries as we have deemed necessary and appropriate under the circumstances. No opinion or representation as to matters relating to the perfection of any security interest is hereby given, and no independent examination of any public records in connection therewith has been made.

In connection with this Opinion, we have relied solely on such information as described in Appendices I through XXX attached hereto and incorporated herein by this reference. We have not independently verified and have assumed the accuracy and completeness of the information supplied to us by the Fund with respect to the borrowers, issuers or Investments described herein, and the Fund, and do not assume any responsibility with respect to it. We have not made any physical inspection, or independent appraisal, of any of the common stock, equity, properties, or assets of the borrowers, issuers, or the Fund.

Mr. Joseph SanFilippo
Platinum Management (NY) LLC
February 21, 2013                                                                               Page 2

For the purposes of this analysis, we have assumed that the Fund acquired its interest in each Investment described herein on such Investment's issuance date and/or thereafter in good faith arms length transactions.

This Opinion is based on the Fund's representation and warranty made as of the date of this Opinion that: (i) except as otherwise set forth herein, the Fund is not aware of any material adverse change in the financial condition or business operations of the obligors underlying the Investments; (ii) except as otherwise set forth herein, to the Fund's knowledge and belief there has been no material default or material Event of Default under the terms of the Investments; and (iii) except as otherwise set forth herein, the Fund has not received any oral or written notification under the documents evidencing the Investments indicating any circumstances that may become a material default or material Event of Default under the Investments.

All valuation methodologies that estimate the worth of secured loans, unsecured loans, convertible securities and equity securities are predicated on numerous assumptions pertaining to prospective economic conditions. Our opinion is necessarily based on business, economic, market, and other conditions as they exist, and can be evaluated by us as of December 31, 2012. Unanticipated events and circumstances may occur and actual results may vary from those assumed. The variations may be material.

Based upon the investigation, premises, provisos, and analyses outlined above, and subject to the attached "Limiting Factors and Other Assumptions," it is our opinion that, as of December 31, 2012 the fair value of the Fund's interest in the loans, is reasonably stated in the amounts as set forth in Exhibit A.

In accordance with recognized professional ethics, our fees for this service are not contingent upon the opinion expressed herein, and neither Sterling Valuation Group, Inc., nor any of its employees have a present or intended financial interest in the borrowers or issuers of the investments described herein.

STERLING VALUATION GROUP, INC.

*Sterling Valuation Group, Inc.*

Attachment

## LIMITING FACTORS AND OTHER ASSUMPTIONS

The professional fee for this engagement is not contingent upon the opinion of value set forth in the attached written opinion ("Opinion") prepared by Sterling Valuation Group, Inc. ("Sterling").

The Opinion is based on business, general economic, market and other conditions that reasonably could be evaluated by Sterling as of the valuation date. Subsequent events that could affect the conclusions set forth in the Opinion include adverse changes in industry performance or market conditions and changes to the business, financial condition and results of operations of the borrowers or issuers, as the case may be, of the investments described herein. Sterling is under no obligation to update, revise or reaffirm the Opinion.

The Opinion is intended solely for the information of the person or persons to whom it is addressed, solely for the purpose stated, and may not be relied upon by any other person or for any other purpose without Sterling's prior written consent. The conclusions set forth in the Opinion are based on methods and techniques that Sterling considers appropriate under the circumstances, and represent the opinion of Sterling based upon information furnished by the Fund and its advisors and other publicly available sources. Sterling has relied upon the Fund's representations that the information provided by it, or on its behalf, is accurate and complete in all material requests.

Notwithstanding the foregoing, the opinions set forth in the Opinion are not intended by Sterling, and should not be construed, to be investment advice in any manner whatsoever. Furthermore, no opinion, counsel or interpretation is intended in matters that require legal, accounting, tax or other appropriate professional advice. It is assumed that such opinions, counsel or interpretations have been or will be obtained from the appropriate professional sources.

Except to the extent specifically disclosed in writing to Sterling, the Opinion also assumes that the borrowers or issuers of the investments described herein, as the case may be, have no material contingent assets or liabilities, no unusual obligations or substantial commitments other than those incurred in the ordinary course of business, and no pending or threatened litigation that would have a material effect on such borrowers or issuers.

| Investment | 12/31/2012 Sterling Low Value | 12/31/2012 Sterling High Value |
|---|---|---|
| 1 ARS | 2,741,197 | 2,741,197 |
| 2 Grey K Enviornmental Offshore Fund - Investment in Fund I and II | 13,619,992 | 13,619,992 |
| 3 Bear Stearns High-Grade Stuctured Credit Structured Credit Strategy Note | 22,255,687 | 22,255,687 |
| 4 China Cablecom | 1,098,757 | 3,645,613 |
| 5 Minque Limited (Formerly Norther Star Mining) | 9,500,522 | 9,500,522 |
| 6 Angiolight | 2,450,000 | 2,950,000 |
| 7 Implant Sciences Corp | 38,228,231 | 43,650,289 |
| 8 China Horizon | 49,680,977 | 49,680,977 |
| 9 Navidea | 120,761,743 | 120,761,743 |
| 10 Vistagen Therapeutics, Inc. | 8,587,283 | 8,587,283 |
| 11 ALS Life Solutions LLC/Absolute Life Solutions | - | 1,394,450 |
| 12 Echo Therapeutics, Inc | 15,062,960 | 16,051,177 |
| 13 Ferrous Resources | 1,666,667 | 2,500,000 |
| 14 Black Elk | 208,916,097 | 286,979,999 |
| 15 Desert Hawk | 5,868,053 | 5,868,053 |
| 16 Glacial | 29,828,728 | 33,921,377 |
| 17 Colorep | 16,607,792 | 16,607,792 |
| 18 Carbon Portfolio (ACT / CERs) | 15,974,999 | 19,585,680 |
| 19 First Lux (BTEL/BTEL 2 Repo) | 26,092,420 | 26,092,420 |
| 20 PT Minarak (ETLY Repo) | 3,596,217 | 3,596,217 |
| 21 First Lux BKK (ETLY-ENRG-UNSP) | 1,683,114 | 1,683,114 |
| 22 First Lux (VIVA) | 4,143,190 | 4,143,190 |
| 23 Advance Energy Global Ltd (RMBA REPO) | 3,019,980 | 3,019,980 |
| 24 Viper Motorcycle Company | 5,876,731 | 6,090,001 |
| 25 Golden Gate Oil LLC | 35,468,160 | 41,228,160 |
| 26 Zadara | 2,370,000 | 2,370,000 |
| 27 Healthcare Corporation of America | 1,024,000 | 1,024,000 |
| 28 Excalibur | 8,129,795 | 8,129,795 |
| 29 FluroPharma | 1,026,981 | 1,173,692 |
| 30 Tanzanian Royalty | 3,186,365 | 3,729,947 |
| Total $ | 658,466,638 | 762,582,347 |

**Appendix XXV – Golden Gate Oil LLC**

Golden Gate Oil LLC (the "Company"), owns a string of oil fields on a 2,000 acre plot in the Santa Maria Valley in south central California. From the 1950s to the 1980s, Unocal Corporation had large operations throughout the property. Since that time, the fields have been left dormant and are not producing oil, although there are large proven reserves in place.

The Company and the Fund, through Precious Capital LLC, entered into a Note Purchase Agreement dated as of April 10, 2012 (the "Note Purchase Agreement"), pursuant to which the Company issued to the Fund a Senior Secured Promissory Note dated April 10, 2012, in the face amount of $25,000,000 (the "Note"). The Note evidences advances under the Note Purchase Agreement (each, a "Funding"). Pursuant to the Note Purchase Agreement, Fundings will be made in the Fund's sole discretion from time to time prior to April 10, 2014. Each Funding must be in a minimum amount of $500,000 and integral multiples of $100,000 in excess thereof. The aggregate amount of Fundings may not exceed $25,000,000. The stated maturity date of the Note is April 10, 2015 (the "Maturity Date"). Interest accrues at a rate of 24.996 percent per annum and is payable as follows: (a) interest at the rate of 15 percent per annum is due on the first business day of each month and on the Maturity Date ("Current Interest"); and (b) interest at the rate of 9.996 percent per annum ("Deferred Interest") is payable on the Maturity Date. After an event of default, the interest rate will increase to 22 percent per annum. Interest is computed on the basis of a 360-day year of twelve 30-day months. Interest will not accrue on Deferred Interest unless Deferred Interest is not paid on the Maturity Date.

Principal may be voluntarily prepaid in whole or in part upon ten business days' notice to the Fund. Prepayment in full may be required upon a change of control or an equity sale with proceeds in excess of $5 million. Proceeds of collateral may be required to prepay the Note unless such proceeds are used to acquire substitute assets within 180 days. Repaid principal may not be reborrowed.

Available funds are to be applied in priority order as follows: first, from proceeds of hydrocarbon sales, to pay all royalties and costs of hydrocarbon production, up to 21 percent of such proceeds; second, to the Fund to pay fees, costs, and expenses and to the Company to pay expenses and working capital requirements; third, to pay accrued interest on the outstanding principal balance of the Note; and fourth, to pay principal of the Note in specified amounts depending on the ratio of available funds to the Note balance, and finally, to the Company. Accordingly, Current Interest on the Note will accrue and not be paid until cash flows of the Company are sufficient to pay the first two steps of the waterfall. We understand from the Fund that Current Interest is expected to be paid beginning in the second quarter of 2013.

As security for the Company's obligations, the Company granted to the Fund a security interest in all of the Company's assets, including all deposit, security and commodity accounts of the Company. In addition, Amiel David and Richard Lee have each provided a validity guaranty to the Fund.

We understand that, on April 10, 2012, the Fund made the initial advance under the Note (the "Initial Funding") in the amount of $6,500,000. Under the Note Purchase Agreement, the proceeds of the Initial Funding were to be used by the Company to pay a dividend to AmRich to enable AmRich to (i) acquire drilling rigs, (ii) meet certain payments obligation under leases related to Oil and Gas Properties, (iii) acquire casings, pipeline tubing and other drilling equipment necessary for drilling initial well and for surface facilities and improvements, (iv) repay certain indebtedness of AmRich, (v) pay certain brokers' fees, and (vi) pay certain other fees and expenses associated with the transaction. The proceeds of Fundings after the Initial Funding are to be used solely for general corporate purposes of the Company and, among other things, are expressly not to be used to purchase interests in oil and gas properties if the amount used for such purpose would exceed 10 percent of the aggregate amount of the

respective Funding. We understand that, during the third quarter of 2012, the Fund made additional Fundings under the Note Purchase Agreement aggregating $2,500,000.

The Note Purchase Agreement and Note are each governed by the laws of the State of New York.

We understand that the Company also issued 480 membership units in the Company ("Membership Units") to the Fund, representing 48 percent of the outstanding Membership Units. Pursuant to the Note Purchase Agreement, the Company is not permitted to declare or pay any dividends or make any distributions to holders of Membership Units, nor to redeem or otherwise retire or acquire for value any Membership Units. Also pursuant to the Note Purchase Agreement, the Company is generally required to allow the Fund the opportunity to provide any additional indebtedness that the Company enters into. If the Company and the Fund do not agree on the terms of any such financing and the Company obtains financing from an unrelated third party on terms more favorable to the third party than the terms offered by the Fund, the Fund will be entitled to purchase the financing from the third party. If the terms offered by the third party or the same as or less favorable than the terms offered by the Fund, the Company may consummate the financing with the third party.

As of December 31, 2012, the Fund held an interest in the Note of $12,893,000, comprising principal of $12,000,000 and accrued Current Interest of $893,000, and 480 Membership Units in the Company.

<u>Analysis</u>

Documents reviewed:

1. Note Purchase Agreement dated as of April 10, 2012;

2. Senior Secured Promissory Note dated as of April 10, 2012;

3. Security Agreement dated April 10, 2012;

4. Appraisal Report as of April 30, 2012 on Certain Properties owned by AmRich Energy, prepared by DeGolyer and MacNaughton;

5. Valuation prepared by the Fund as of December 31, 2012; and

6. Certain information in the public domain from independent sources, without undertaking an exhaustive search or review of such information or independently verifying the accuracy or completeness thereof.

In valuing the Fund's interest in the Note and in the Membership Units in the Company at December 31, 2012, we discussed with certain employees of the Fund the material financial and economic criteria used by the Fund to value its investment. The Company owns a string of undeveloped oil fields on a 2,000 acre plot in south central California. We understand that the Company used the initial funding supplied by the Note to drill five oil wells, which are the most economical and shallowest of the potential wells.

According to the third-party reserve report prepared by DeGolyer and MacNaughton, and independent consulting firm focused on the petroleum industry, the properties owned by the Company have 16,399 Mbbl of net proved undeveloped reserves and 12,795 Mbbl of net probable undeveloped

reserves[1]. DeGoyler and MacNaughton determined the PV10 value as of April 30, 2012 of the proved undeveloped reserves to be $913,688,000 and the PV10 of net probable undeveloped reserves to be $670,333,000[2].

In determining the value of the Fund's interest in the Note at December 31, 2012, we have taken into consideration that the Note is secured by all of the Company's assets, including all deposit, security and commodity accounts of the Company. We considered that the Company is an early stage enterprise, and that it intends to request financing incrementally, initially to develop 7 wells on the shallowest part of the property, at a depth of less than 1,000 meters, which we understand has occurred, as further described below, and, subsequently, an additional 3 wells and supporting production infrastructure. We understand from the Fund that, as of December 31, 2012, the Company has drilled a total of seven wells and that the average output from each of these wells is estimated at around 60 barrels per day. We further understand that the Company received water injection permits for the wells in the fourth quarter of 2012.

The Fund received a collateral coverage update report from American Energy Advisors, Inc., dated November 1, 2012 in regard to the AmRich Santa Maria Valley Asset Area. American Energy Advisors, Inc. concluded that the market value for new wells on production plus proven undeveloped ("PUD") reserves is $50,785,000. This valuation only takes into account two wells drilled on the Santa Maria Valley Field and four wells drilled on the Casmalia Field and does not take into consideration the two new, larger wells on the Santa Maria Valley field, which are expected to commence production in August 2013 as a result of the successful completion of the permitting process.

At December 31, 2012, based on a total of 8 wells expected to be in production during 2013 the Fund estimated a valuation of $55,235,261[3] before ascribing any further value to the PUD reserves. Following the success of the permitting process and the anticipated production of the two new wells, the Fund also performed a market analysis and developed a valuation based on a run-rate annual pre-tax cash flow of $12,000,000. The Fund performed a market analysis of 34 publicly-traded comparable companies at December 31, 2012, and used the average enterprise value/EBITDA multiple of 11.3 times to capitalize the estimated pre-tax cash flow of $12,000,000  resulting in an enterprise value of $135,600,000 at December 31, 2012. The Fund averaged the two foregoing valuations resulting in an enterprise value of $95,417,630 and subtracted debt of $12,893,000 (representing the Note at 100 percent of par plus accrued interest), resulting in an equity value of $82,524,630, which the Fund further adjusted to $78,000,000 and determined a value for the Fund's 48 percent interest in the Membership Units of $37,440,000 at December 31, 2012.

---

[1] The proved and probable reserves presented in the report were prepared in accordance with the Petroleum Resources Management System approved in March 2007 by the society of Petroleum Engineers, the World Petroleum Council, the American Association of Petroleum Geologists, and the Society of Petroleum Evaluation Engineers. Therefore, the reserves in the report do not meet the requirements of the SEC.

[2] To determine the PV10 values, oil prices ranging from $107 per barrel in May 2012 through $92.13 per barrel in 2016 were used, with the 2016 price held constant for the remaining life of each property thereafter.

[3] The Fund analyzed the forecast operating cash flow from the 10 wells from May 2013 to December 2013, using an average oil price per barrel of $96.00, and present valued the net income (after geological and geophysical, land and other fees) using a 25 percent discount rate, resulting in total cash flow of $7,235,260 over the 7-month period or a run-rate of $12,000,000 per year. The Fund then estimated a terminal value of $48,000,000 (for 2014 onwards), which when added to the present value of forecast 2013 cash flows of $7,235,260 results in a valuation of $55,235,261 at December 31, 2012.

In our independent analysis, we considered that all reserve estimates involve uncertainty, depending on the amount of reliable geologic and engineering data available and the interpretation of those data. Proven reserves are those reserves claimed to have a reasonable certainty of being recoverable under existing economic and political conditions, with existing technology, and PUD reserves require additional capital investment, such as drilling new wells, to bring the oil to the surface. Based on the foregoing and taking into account the value indications in the aforementioned DeGolyer and MacNaughton reserve report and the American Energy Advisors, Inc. collateral report, the Company has been successful in its initial drilling efforts. We further considered that during the fourth quarter of 2012, the Company was able to obtain injection and production permits on its Tog-Adams and Bognuda leases. Prior to obtaining such permits, the Company was unable to process the water by-product that occurs during the drilling process. With the ability to process and inject water on both sites, the Company can put two additional wells into production during 2013. These two additional wells will be the largest wells on the Santa Maria Valley Field, each producing 400 barrels of oil per day. For purposes of our analysis we estimated the incremental cash flow of these two additional wells at approximately $1,000,000 per month[4] in the aggregate and assumed 36 to 48 months of cash flows[5] resulting in a valuation of $36,000,000 to $48,000,000 to which we added the collateral value of $50,785,000 developed by American Energy Advisors, Inc. as of November 1, 2012, resulting in a total enterprise value ranging from $86,785,000 to $98,785,000. We subtracted debt of $12,893,000 resulting in a range of equity values of $$73,892,000 to $85,892,000 and a range of values for the Fund's 48 percent interest in the Membership Units of $35,468,160 to $41,228,160 at December 31, 2012.

Based on the foregoing, , at December 31, 2012, we valued the Fund's interest in the Note at 100 percent of par plus accrued interest in the aggregate amount of $12,893,000 and the Fund's 48 percent interest in the Membership Units in the range of $35,468,160 to $41,228,160 at December 31, 2012.

---

[4] Average net income before geological and geophysical, land and other fees estimated at $726,000 per field for the period August to December 2013.
[5] For purposes of our valuation, we estimated the value of the two additional wells using valuation techniques typically applied by market participants to value Overriding Royalty Interests on oil and gas revenues from oil and gas leases. Valuation techniques include applying multiples to estimated monthly run-rate cash flows and based on our experience in valuing Overriding Royalty Interests these multiples most frequently range from 36 to 48 times.

EXHIBIT 23

**To:**    Harvey Werblowsky[HWerblowsky@platinumlp.com]
**Cc:**    Mark Nordlicht[mnordlicht@platinumlp.com]; Joseph SanFilippo[JSanFilippo@platinumlp.com]; Uri Landesman[ULandesman@platinumlp.com]; Andrew Kaplan[AKaplan@platinumlp.com]; Gilad Kalter[gkalter@platinumlp.com]; David Levy[dlevy@platinumlp.com]; Daniel Mandelbaum[DMandelbaum@platinumlp.com]
**From:**    Naftali Manela
**Sent:**    Thur 1/22/2015 10:27:49 PM
**Subject:**    Re: Investor Letter Draft

Updated as per Harvey's comments.

I'll let the marketing guys decide best way to communicate this to november PPVA shareholders.


Dear PPVA Investors,

We are pleased to announce that the December performance estimate for PPVA net of all fees and expenses is +1.70%.

At this time I would like to give a brief explanation as to reason for the delay in providing November month end statements.

While in the process of completing our 2013 audit, which we hope to have finalized and distributed over the next few weeks, we have determined that there will need to be an adjustment to the 2013 year end balances.

We are making all investors at December 31, 2013 whole by reversing a portion of portfolio manager fees earned through 2013, but as a result, we need to recalculate the returns for each month of 2014 prior to finalizing November's return. We don't expect a material change in the overall YTD 2014 returns although the returns for some of the individual months will vary.

As a result, the November statements may not be finalized until early February 2015. December statements should follow shortly thereafter. We will keep you updated on the status of the audit and the month end statements as additional information becomes available.

Our apologies for any inconvenience this has caused you. If you have any questions, feel free to contact us.

Best,

Mark


On Jan 22, 2015, at 5:13 PM, Harvey Werblowsky <HWerblowsky@platinumlp.com> wrote:


I think it should also include something about keeping them updated

Sent from my iPad

On Jan 22, 2015, at 5:11 PM, "Naftali Manela <nmanela@platinumlp.com> wrote:


In the interest of time, I have prepared the following redraft. Please comment.

Again, reminder to only send this out to investors who are supposed to receive November statements.

Dear PPVA Investors,

We are pleased to announce that the December performance estimate for PPVA net of all fees and expenses is +1.70%.

At this time I would like to give a brief explanation as to reason for the delay in providing November month end statements.

While in the process of completing our 2013 audit, which we hope to have finalized and distributed over the next few weeks, we have determined that there will need to be an adjustment to the 2013 year end balances.

We are making all investors at December 31, 2013 whole by reversing a portion of portfolio manager fees earned through 2013, but as a result, we need to recalculate the returns for each month of 2014 prior to finalizing November's return. We don't expect a material change in the overall YTD 2014 returns although the returns for some of the individual months will vary.

As a result, the November statements may not be finalized until early February 2015. December statements should follow shortly thereafter.

Our apologies for any inconvenience this has caused you. If you have any questions, feel free to contact us.

Best,

Mark


On Jan 22, 2015, at 1:49 PM, Mark Nordlicht mnordlicht@platinumlp.com wrote:

Ok, who is rewriting this then? Andrew?

**From:** Joseph SanFilippo
**Sent:** Thursday, January 22, 2015 1:49 PM
**To:** Mark Nordlicht; Uri Landesman; Andrew Kaplan; Naftali Manela
**Cc:** Gilad Kalter; David Levy; Daniel Mandelbaum
**Subject:** RE: RE:

I would say that we don't expect a material change in the YTD returns.

**From:** Mark Nordlicht
**Sent:** Thursday, January 22, 2015 1:19 PM
**To:** Uri Landesman; Andrew Kaplan; Naftali Manela
**Cc:** Gilad Kalter; David Levy; Joseph SanFilippo; Daniel Mandelbaum
**Subject:** RE: RE:

I would think u would.
In other words
The ytd 2014 returns will be unaffected by any restatements although monthly p and l will see some variance.

**From:** Uri Landesman
**Sent:** Thursday, January 22, 2015 1:17 PM
**To:** Mark Nordlicht; Andrew Kaplan; Naftali Manela
**Cc:** Gilad Kalter; David Levy; Joseph SanFilippo; Daniel Mandelbaum

**Subject:** RE: RE:

> Do you want to mention that 2014 returns will be unaffected by the monthly restatements?

**From:** Mark Nordlicht
**Sent:** Thursday, January 22, 2015 1:15 PM
**To:** Andrew Kaplan; Naftali Manela
**Cc:** Gilad Kalter; David Levy; Joseph SanFilippo; Daniel Mandelbaum; Uri Landesman
**Subject:** RE: RE:

> I defer to marketing as to who shd answer questions. This is how I wd format letter though.
>
> Dear PPVA Investors,
>
> December performance estimate for PPVA net off all fees and expenses is +1.70%.
>
> I would like to give brief explanation as to reason for the delay in providing November month end statements.
>
> While in the process of completing our 2013 audit, which we hope to have finalized and distributed over the next few weeks, we have determined that there will need to be an adjustment to the 2013 year end balances.
>
> We are making all investors at December 31, 2013 whole by reversing a portion of portfolio manager fees earned through 2013, but as a result, we need to recalculate the returns for each month of 2014 prior to finalizing November's return.
>
> As a result, the November statements may not be finalized until early February 2015. December statements should follow shortly thereafter.
>
> Our apologies for any inconvenience this has caused you. If you have any questions feel free to contact me at (212) 582-2222.
>
> Best,
>
> Mark

**From:** Andrew Kaplan
**Sent:** Thursday, January 22, 2015 8:32 AM
**To:** Mark Nordlicht; Naftali Manela
**Cc:** Gilad Kalter; David Levy; Joseph SanFilippo; Daniel Mandelbaum; Uri Landesman
**Subject:** RE: RE:

> I have redrafted with Mark and Naftali's comment. Version below, but a few suggestions:
>
> 1.  Paragraph 3: "We are making all investors at December 31" – "at" seems off.
> 2.  I would not suggest they call Mark directly. While yes, the buck stops here with Mark, I do not think it is a good use of his time to field all these potential questions, and if he does not speak to each caller, it would appear disingenuous. I would suggest replacing "me" with "us" in the final paragraph.
>
> Latest draft:
>
> Dear PPVA Investors,
>
> I am pleased to let you know that the December performance estimate for PPVA is up +1.70%, and I would also like to explain the reason for the delay in providing November month end statements.

While in the process of completing our 2013 audit, which we hope to have finalized and distributed over the next few weeks, we have determined that there will need to be an adjustment to the 2013 year end balances.

We are making all investors at December 31, 2013 whole by reversing a portion of portfolio manager fees earned through 2013, but as a result, we need to recalculate the returns for each month of 2014 prior to finalizing November's return.

As a result, the November statements may not be finalized until early February 2015. December statements should follow shortly thereafter.

Our apologies for any inconvenience this has caused you. If you have any questions feel free to contact me at (212) 582-2222.

Best,

Mark

---

**From:** Mark Nordlicht
**Sent:** Thursday, January 22, 2015 4:01 AM
**To:** Naftali Manela; Andrew Kaplan
**Cc:** Gilad Kalter; David Levy; Joseph SanFilippo; Daniel Mandelbaum; Uri Landesman
**Subject:** RE: RE:

Need to say early February and we better get it all done by then. Send it out with Dec estimate of return. Lead with Dec return first.

---

**From:** Naftali Manela
**Sent:** Wednesday, January 21, 2015 8:08 PM
**To:** Andrew Kaplan
**Cc:** Gilad Kalter; Mark Nordlicht; David Levy; Joseph SanFilippo; Daniel Mandelbaum; Uri Landesman
**Subject:** Re: RE:

I would suggest the following version.

Dear PPVA Investors,

I would like to explain the reason for the delay in providing November month end statements.

While in the process of completing our 2013 audit, which we hope to have finalized and distributed over the next few weeks, we have determined that there will need to be an adjustment to the 2013 year end balances.

We are making all investors at December 31, 2013 whole by reversing a portion of portfolio manager fees earned through 2013. But as a result, we need to recalculate the returns for each month of 2014 prior to finalizing November's return.

As a result, the November statements may not be finalized until sometime in February 2015. December statements should follow shortly thereafter.

Our apologies for any inconvenience this has caused you. If you have any questions feel feel free to contact me at (212) 582-2222.

Best,

Mark

On Jan 21, 2015, at 7:16 PM, Naftali Manela namela@platinumlp.com wrote:

I would say by end of January for november statements and December statements shortly thereafter.

Also I would adjust the second sentence to read as follows: As part of finalizing our 2013 audit which we hope to distribute over the next few weeks, we have determined that there will be...

On Jan 21, 2015, at 7:12 PM, Andrew Kaplan <AKaplan@platinumlp.com wrote:

Please update me on any developments over the past month that should be included/updated, and I can reword a new draft.

Earlier DRAFT of PPVA Delayed NAV letter below - incorporated with Naftali's original edits, some updates, and New Year's salutations removed:

Dear PPVA Investors,

I would like to explain the reason for the delay in providing November NAV and statements. Upon finalizing our 2013 audit for which all numbers have been agreed upon, and we hope to distribute over the next few weeks, we have determined that there will be a restatement, and therefore we cannot finalize the November NAV until such a readjustment is finalized.

No investor will experience any loss due the 2013 restatement. The loss will be borne entirely by trader/portfolio manager fees earned through 2013. As a result we need to recalculate the returns for each month of 2014 prior to finalizing November's return.

Again, there will be no net loss to any investor, but the

November statements may not be finalized until (removing - early to mid-) January 2015.  December statements should follow thereafter, as normally scheduled, by the end of January. (??? New timing ???)

Our apologies for any inconvenience thus may have caused you.  We have taken concrete steps to build procedures to ensure that this will not happen again.

Best,

Mark

-----Original Message-----
From: Naftali Manela
Sent: Wednesday, January 21, 2015 5:26 PM
To: Gilad Kalter
Cc: Mark Nordlicht; Andrew Kaplan; David Levy; Joseph SanFilippo; Daniel Mandelbaum
Subject: Re:


Please redraft. Let's get something out.

> On Jan 21, 2015, at 3:55 PM, Gilad Kalter
> <gkalter@platinumlp.com wrote:
>
> The draft kaplan sent last night is outdated.
>
>
> On Jan 21, 2015, at 3:48 PM,
> Mark Nordlicht
> <mnordlicht@platinumlp.com
> wrote:
>
> Gentlemen- we are getting too
> many questions on November
> final statement. I think letter has to
> go out. Can we get it out pleasE?
>
> Sent from my iPad

EXHIBIT 24



### STERLING VALUATION GROUP, INC.

April 30, 2014

Mr. Joseph SanFilippo
Platinum Management (NY) LLC
152 West 57 Street, 4 Floor
New York, New York 10019

Dear Mr. SanFilippo:

At your request, we have analyzed certain financial information regarding assets held by Platinum Partners Value Arbitrage Fund LP, and/or its affiliates (the "Fund"), as set forth herein, and submit this letter on our findings.

The purpose of this analysis is to express an opinion (the "Opinion") on the fair value, as of December 31, 2013, of the Fund's interest in the investments (the "Investments") described herein. We understand that the Fund intends to use our Opinion solely for internal management planning and management's determination of net asset value, profit and loss calculations, and financial reporting, and that the Fund may provide an informational copy of the Opinion in its entirety to shareholders, and prospective shareholders, of the Fund.

The term "fair value," as used herein, is defined as the amounts at which the Fund's interests in the Investments would change hands between a willing buyer and a willing seller (that are not affiliated with one another), each having reasonable knowledge of all relevant facts, neither being under any compulsion to act.

Nothing contained herein is intended to be construed or relied on by any person as a legal opinion as to any matter, including without limitation relating to the underlying borrower, the enforceability of the underlying transaction, or the perfection of any security interest. In connection with this Opinion, we have made such reviews, analyses, and inquiries as we have deemed necessary and appropriate under the circumstances. No opinion or representation as to matters relating to the perfection of any security interest is hereby given, and no independent examination of any public records in connection therewith has been made.

In connection with this Opinion, we have relied solely on such information as described in Appendices I through XXVIII attached hereto and incorporated herein by this reference. We have not independently verified and have assumed the accuracy and completeness of the information supplied to us by the Fund with respect to the borrowers, issuers or Investments described herein, and the Fund, and do not assume any responsibility with respect to it. We have not made any physical inspection, or independent appraisal, of any of the common stock, equity, properties, or assets of the borrowers, issuers, or the Fund.

Mr. Joseph SanFilippo
Platinum Management (NY) LLC
April 30, 2014                                                                                  Page 2

    For the purposes of this analysis, we have assumed that the Fund acquired its interest in each Investment described herein on such Investment's issuance date and/or thereafter in good faith arms length transactions.

    This Opinion is based on the Fund's representation and warranty made as of the date of this Opinion that: (i) except as otherwise set forth herein, the Fund is not aware of any material adverse change in the financial condition or business operations of the obligors underlying the Investments; (ii) except as otherwise set forth herein, to the Fund's knowledge and belief there has been no material default or material Event of Default under the terms of the Investments; and (iii) except as otherwise set forth herein, the Fund has not received any oral or written notification under the documents evidencing the Investments indicating any circumstances that may become a material default or material Event of Default under the Investments.

    All valuation methodologies that estimate the worth of secured loans, unsecured loans, convertible securities and equity securities are predicated on numerous assumptions pertaining to prospective economic conditions. Our opinion is necessarily based on business, economic, market, and other conditions as they exist, and can be evaluated by us as of December 31, 2013. Unanticipated events and circumstances may occur and actual results may vary from those assumed. The variations may be material.

    Based upon the investigation, premises, provisos, and analyses outlined above, and subject to the attached "Limiting Factors and Other Assumptions," it is our opinion that, as of December 31, 2013 the fair value of the Fund's interest in the loans, is reasonably stated in the amounts as set forth in Exhibit A.

    In accordance with recognized professional ethics, our fees for this service are not contingent upon the opinion expressed herein, and neither Sterling Valuation Group, Inc., nor any of its employees have a present or intended financial interest in the borrowers or issuers of the investments described herein.

STERLING VALUATION GROUP, INC.

*Sterling Valuation Group, Inc.*

Attachment

## LIMITING FACTORS AND OTHER ASSUMPTIONS

The professional fee for this engagement is not contingent upon the opinion of value set forth in the attached written opinion ("Opinion") prepared by Sterling Valuation Group, Inc. ("Sterling").

The Opinion is based on business, general economic, market and other conditions that reasonably could be evaluated by Sterling as of the valuation date. Subsequent events that could affect the conclusions set forth in the Opinion include adverse changes in industry performance or market conditions and changes to the business, financial condition and results of operations of the borrowers or issuers, as the case may be, of the investments described herein. Sterling is under no obligation to update, revise or reaffirm the Opinion.

The Opinion is intended solely for the information of the person or persons to whom it is addressed, solely for the purpose stated, and may not be relied upon by any other person or for any other purpose without Sterling's prior written consent. The conclusions set forth in the Opinion are based on methods and techniques that Sterling considers appropriate under the circumstances, and represent the opinion of Sterling based upon information furnished by the Fund and its advisors and other publicly available sources. Sterling has relied upon the Fund's representations that the information provided by it, or on its behalf, is accurate and complete in all material requests.

Notwithstanding the foregoing, the opinions set forth in the Opinion are not intended by Sterling, and should not be construed, to be investment advice in any manner whatsoever. Furthermore, no opinion, counsel or interpretation is intended in matters that require legal, accounting, tax or other appropriate professional advice. It is assumed that such opinions, counsel or interpretations have been or will be obtained from the appropriate professional sources.

Except to the extent specifically disclosed in writing to Sterling, the Opinion also assumes that the borrowers or issuers of the investments described herein, as the case may be, have no material contingent assets or liabilities, no unusual obligations or substantial commitments other than those incurred in the ordinary course of business, and no pending or threatened litigation that would have a material effect on such borrowers or issuers.

Platinum
EXHIBIT A
As of December 31, 2013

| Investment | 12/31/2013 Sterling Low Value | 12/31/2013 Sterling High Value |
|---|---|---|
| 1 ARS | 1,500,000 | 1,500,000 |
| 2 Grey K Enviornmental Offshore Fund - Investment in Fund I and II | 8,245,243 | 8,245,243 |
| 3 China Cablecom | 681,605 | 2,112,580 |
| 4 Minque Limited | 6,586,300 | 6,586,300 |
| 5 Angiolight | 3,605,000 | 3,605,000 |
| 6 Implant Sciences Corp | 50,126,501 | 60,047,373 |
| 7 China Horizon | 66,181,440 | 66,181,440 |
| 8 Navidea | 73,092,326 | 73,092,326 |
| 9 Vistagen Therapeutics, Inc. | 7,443,499 | 10,200,447 |
| 10 Urigen | 7,000,000 | 7,000,000 |
| 11 ALS Life Solutions LLC / Augmented Reality | 41,189,840 | 44,127,084 |
| 12 Echo Therapeutics, Inc | 8,119,807 | 9,592,018 |
| 13 Ferrous Resources | 1,166,667 | 1,500,000 |
| 14 Black Elk | 186,146,281 | 195,041,136 |
| 15 Glacial | 19,697,800 | 25,293,440 |
| 16 Desert Hawk | 22,128,397 | 26,025,000 |
| 17 Colorep (Airdye/Saviva FS I LLP) | 1,250,000 | 4,162,500 |
| 18 Viper Motorcycle Company | 5,000,000 | 5,000,000 |
| 19 Golden Gate Oil LLC | 175,009,679 | 197,532,266 |
| 20 Zadara | 7,601,741 | 8,459,951 |
| 21 Excalibur | 4,369,500 | 4,855,800 |
| 22 FluroPharma | 3,987,490 | 4,785,987 |
| 23 Car Charging Group, Inc | 9,112,902 | 9,980,311 |
| 24 Range Resources | 6,057,691 | 6,057,691 |
| 25 Alcyone Resources | 1,783,400 | 1,914,666 |
| 26 Carbon Portfolio (ACT/CERs) | 26,907,237 | 31,970,234 |
| 27 Advanced Energy | 11,471,109 | 11,657,866 |
| 28 Blumont | 3,000,000 | 3,000,000 |
| Total: | 758,461,455 | 850,562,201 |

Appendix XIX – Golden Gate Oil LLC

Golden Gate Oil LLC (the "Company"), owns a string of oil fields on a 2,000 acre plot in the Santa Maria Valley in south central California. From the 1950s to the 1980s, Unocal Corporation had large operations throughout the property. Since that time, the fields have been left dormant and are not producing oil, although there are large proven reserves in place.

The Company and the Fund, through Precious Capital LLC, entered into a Note Purchase Agreement dated as of April 10, 2012 (the "Note Purchase Agreement"), pursuant to which the Company issued to the Fund a Senior Secured Promissory Note dated April 10, 2012, in the face amount of $25,000,000 (the "Note"). The Note evidences advances under the Note Purchase Agreement (each, a "Funding"). Pursuant to the Note Purchase Agreement, Fundings will be made in the Fund's sole discretion from time to time prior to April 10, 2014. Each Funding must be in a minimum amount of $500,000 and integral multiples of $100,000 in excess thereof. The aggregate amount of Fundings may not exceed $25,000,000. The stated maturity date of the Note is April 10, 2015 (the "Maturity Date"). Interest accrues at a rate of 24.996 percent per annum and is payable as follows: (a) interest at the rate of 15 percent per annum is due on the first business day of each month and on the Maturity Date ("Current Interest"); and (b) interest at the rate of 9.996 percent per annum ("Deferred Interest") is payable on the Maturity Date. After an event of default, the Current Interest rate will increase to 22 percent per annum. Interest is computed on the basis of a 360-day year of twelve 30-day months. Interest will not accrue on Deferred Interest unless Deferred Interest is not paid on the Maturity Date.

Principal may be voluntarily prepaid in whole or in part upon ten business days' notice to the Fund. Prepayment in full may be required upon a change of control or an equity sale with proceeds in excess of $5 million. Proceeds of collateral may be required to prepay the Note unless such proceeds are used to acquire substitute assets within 180 days. Repaid principal may not be reborrowed.

Available funds are to be applied in priority order as follows: first, from proceeds of hydrocarbon sales, to pay all royalties and costs of hydrocarbon production, up to 21 percent of such proceeds; second, to the Fund to pay fees, costs, and expenses and to the Company to pay expenses and working capital requirements; third, to pay accrued interest on the outstanding principal balance of the Note; and fourth, to pay principal of the Note in specified amounts depending on the ratio of available funds to the Note balance, and finally, to the Company. Accordingly, Current Interest on the Note will accrue and not be paid until cash flows of the Company are sufficient to pay the first two steps of the waterfall. We understand from the Fund that Current Interest had been expected to be paid beginning in the second quarter of 2013, but we understand that, as of December 31, 2013, Current Interest continues to accrue and has not been paid.

As security for the Company's obligations, the Company granted to the Fund a security interest in all of the Company's assets, including all deposit, security and commodity accounts of the Company. In addition, Amiel David and Richard Lee have each provided a validity guaranty to the Fund.

We understand that, on April 10, 2012, the Fund made the initial advance under the Note (the "Initial Funding") in the amount of $6,500,000. Under the Note Purchase Agreement, the proceeds of the Initial Funding were to be used by the Company to pay a dividend to AmRich to enable AmRich to (i) acquire drilling rigs, (ii) meet certain payments obligation under leases related to Oil and Gas Properties, (iii) acquire casings, pipeline tubing and other drilling equipment necessary for drilling initial well and for surface facilities and improvements, (iv) repay certain indebtedness of AmRich, (v) pay certain brokers' fees, and (vi) pay certain other fees and expenses associated with the transaction. The proceeds of Fundings after the Initial Funding are to be used solely for general corporate purposes of the Company and, among other things, are expressly not to be used to purchase interests in oil and gas

properties if the amount used for such purpose would exceed 10 percent of the aggregate amount of the respective Funding. We understand that, since the original Funding in April 2012, the Fund has made additional Fundings under the Note Purchase Agreement, so that, as of December 31, 2013, $16,356,000 principal amount is outstanding under the Note.

The Note Purchase Agreement and Note are each governed by the laws of the State of New York.

We understand that the Company also issued 480 membership units in the Company ("Membership Units") to the Fund, representing 48 percent of the outstanding Membership Units. Pursuant to the Note Purchase Agreement, the Company is not permitted to declare or pay any dividends or make any distributions to holders of Membership Units, nor to redeem or otherwise retire or acquire for value any Membership Units. Also pursuant to the Note Purchase Agreement, the Company is generally required to allow the Fund the opportunity to provide any additional indebtedness that the Company enters into. If the Company and the Fund do not agree on the terms of any such financing and the Company obtains financing from an unrelated third party on terms more favorable to the third party than the terms offered by the Fund, the Fund will be entitled to purchase the financing from the third party. If the terms offered by the third party are the same as or less favorable than the terms offered by the Fund, the Company may consummate the financing with the third party.

Pursuant to the First Amendment to the Amended and Restated Operating Agreement, dated as of October 29, 2013 (the "First Amendment"), the Fund may call all Membership Units held by other members or Amrich may put its Membership Units to the Fund, in each case at a defined purchase price (the "Purchase Price") provided that certain milestones are met during a specified milestone period. The milestone period is the period of time after October 29, 2013 and prior to the date that is 45 days after the completion of the second production well drilled on drilling pad 16A in the Santa Maria Valley. The milestone to be met is the drilling and completion of two production wells and one injection well in the Santa Maria Valley field, and the equipping of such wells for production, together with the construction of non-permanent production facilities. The target production of each production well is also specified in milestone description in the First Amendment. The Purchase Price is, generally, $60 million, taking into account the Note and any Fundings under the Note after October 29, 2013, with the Purchase Price to be paid (i) upon the closing date of the call or put, 70 percent of the Purchase Price, and (ii) within 36 months of the closing date of the call or put, provided that the Company has secured specified permits and based on the Company's gross monthly sales, up to 30 percent of the Purchase Price. Should Amrich elect to put its Membership Units to the Fund, then all other members will be obligated to do so as well. The First Amendment provides that, if the call or put is exercised and the Company or its assets are sold to a third party purchaser within 60 days after the exercise, then the selling members will be compensated according to their former pro rata interests to the extent that the sale price is in excess of the Purchase Price.

In addition, the First Amendment provides that, prior to the exercise of any put or call, Amrich may purchase 100 percent of the Company's interest in oil and gas properties located in the Casmalia Field, for a purchase price of $6.2 million.

As of December 31, 2013, the Fund held an interest in the Note of $24,392,489, comprising principal of $18,437,500 and accrued Current Interest of $5,954,989, and 480 Membership Units in the Company, as well as an option to purchase all outstanding Membership Units in the Company.

<u>Analysis</u>

Documents reviewed:

1. Note Purchase Agreement dated as of April 10, 2012;

2. Senior Secured Promissory Note dated as of April 10, 2012;

3. Security Agreement dated April 10, 2012;

4. First Amendment to Amended and Restated Operating Agreement, dated as of October 29, 2013;

5. Appraisal Report as of April 30, 2012 on Certain Properties owned by AmRich Energy, prepared by DeGolyer and MacNaughton;

6. Appraisal Report as of May 1, 2013 on Certain Properties owned by Golden Gate Oil LLC prepared by DeGolyer and MacNaughton;

7. Valuation prepared by the Fund as of December 31, 2013; and

8. Certain information in the public domain from independent sources, without undertaking an exhaustive search or review of such information or independently verifying the accuracy or completeness thereof.

In valuing the Fund's interest in the Note and in the Membership Units in the Company at December 31, 2013, we discussed with certain employees of the Fund the material financial and economic criteria used by the Fund to value its investment. The Company owns a string of undeveloped oil fields on a 2,000 acre plot in south central California. We understand that the Company used the initial funding supplied by the Fund under the Note to drill five oil wells, which are the most economical and shallowest of the potential wells. We further understand from the Fund that, at December 31, 2013, the two wells drilled in the Santa Maria Valley field are producing, that three of the four wells in the Casmalia Field are producing, and that the fourth well in the Casmalia Field began production in July 2013. We also understand from the Fund that the Company's development plan for the Santa Maria Valley has been revised, and is now based on drilling directional wells from pads, rather than vertical wells, to minimize surface disturbances. We understand that, during the fourth quarter of 2012, the Company was able to obtain injection and production permits on its Tog-Adams and Bognuda leases. Prior to obtaining such permits, the Company had not been authorized to process the water by-product that occurs during the drilling process. With the authorization to process and inject water on both sites, the Company was able to put two additional wells into production during 2013. The additional wells are the largest wells on the Santa Maria Valley Field, each expected to produce 400 barrels of oil per day. We understand that in December 2013, the Company commenced its horizontal drilling program with the spudding of a disposal well.

The Fund received a collateral coverage update report from American Energy Advisors, Inc., dated November 1, 2012 in regard to the AmRich Santa Maria Valley Asset Area. American Energy Advisors, Inc. concluded that the market value for new wells on production plus proven undeveloped ("PUD") reserves is $50,785,000. This valuation only takes into account the two wells drilled on the Santa Maria Valley Field and the four wells drilled on the Casmalia Field and does not take into consideration the two new, larger wells on the Santa Maria Valley field, which have been successfully permitted.

According to the third-party reserve report dated May 1, 2013 prepared by DeGolyer and MacNaughton, an independent consulting firm focused on the petroleum industry, the properties owned by the Company have 16,164 Mbbl of net proved reserves and 4,977 Mbbl of net probable undeveloped reserves[1]. DeGoyler and MacNaughton determined the PV10 value[2] as of May 1, 2014 of the proved reserves to be $614,644,000, comprising $16,204,000 in developed producing reserves, $1,873,000 in developed nonproducing reserves, and $596,567,000 in proved undeveloped reserves, and the PV10 of net probable undeveloped reserves to be $169,377,000[3]

In determining the value of the Fund's interest in the Note at December 31, 2013, we have taken into consideration that the Note is secured by all of the Company's assets, including all deposit, security and commodity accounts of the Company. We considered that the Company is an early stage enterprise, and that it intends to request financing incrementally, initially to develop 7 wells on the shallowest part of the property, at a depth of less than 1,000 meters, which we understand has occurred, as further described below, and, subsequently, an additional 3 wells and supporting production infrastructure. We understand from the Fund that, as of December 31, 2013, the Company has drilled a total of eight wells and that the average output from each of these wells is estimated at around 60 barrels per day.

To value its investment in the Company at December 31, 2013, the Fund performed an analysis of seventeen comparable companies[4] and, based on this analysis, applied a range of Enterprise Value/PV-10 of reserves multiples to an adjusted PV-10 value of reserves of the Company of $558,100,000, resulting in a range of enterprise values of $196,544,000 to $245,680,000. The adjusted PV-10 value was calculated as the DeGoyler and MacNaughton PV-10 value of $614,644,000 less the PV-10 value attributable to the Casmalia Field of $56,543,898, assuming that the Company's interest in the Casmalia Field would be sold to Amrich under the terms stated in the First Amendment. The multiples applied by the Fund were at discounts of 50 to 60 percent from the first quartile of the Enterprise Value/PV-10 multiples of the seventeen comparable companies of 0.88. From the range of enterprise values, the Fund deducted debt of approximately $24,400,000, added cash of $200,000, deducted the cost of the put option[5], estimated to be approximately $16,456,000, resulting in a range of equity values of $155,907,000 to $205,043,000. At December 31, 2013, the Fund valued its 100 percent equity position at $173,139,777, within this range.

At December 31, 2013, taking into consideration the range of aforementioned range of enterprise values, the Fund valued its interest in the Note Receivable at 100 percent of par plus accrued interest in the amount of $24,392,489.

---

[1] The proved and probable reserves presented in the report were prepared in accordance with the Petroleum Resources Management System approved in March 2007 by the society of Petroleum Engineers, the World Petroleum Council, the American Association of Petroleum Geologists, and the Society of Petroleum Evaluation Engineers. Therefore, the reserves in the report do not meet the requirements of the SEC.

[2] Present value of estimated future oil and gas revenues, net of estimated direct expenses, discounted at an annual discount rate of 10 percent.

[3] To determine the PV10 values, an oil price of $96.08 per barrel in 2013 through 2032 was used.

[4] The comparable companies analyzed by the Fund were Clayton Williams Energy Inc., Concho Resources, Inc., Emerald Oil, Inc., Evolution Petroleum Corp., Halcón Resources Corp., Linn Energy, Matador Resources Company, Midstates Petroleum Company, Newfield Exploration Company, Oasis Petroleum Inc., Penn Virginia Corporation, Quicksilver Resources, Inc., Resolute Energy Corp., Sanchez Energy Corp., Swift Energy Company, Warren Resources, Inc., and ZaZa Energy Corporation.

[5] The Fund determined the net cost of the exercise of the options under the First Amendment to be approximately $16,455,866, payable to withdrawing Members. Exercise of the options would give the Fund a 100 percent interest in the Membership Units

In our independent analysis, we considered that all reserve estimates involve uncertainty, depending on the amount of reliable geologic and engineering data available and the interpretation of those data. Proven reserves are those reserves claimed to have a reasonable certainty of being recoverable under existing economic and political conditions, with existing technology, and PUD reserves require additional capital investment, such as drilling new wells, to bring the oil to the surface.

In assessing the collateral coverage of the Note, we used a risk-adjusted approach to determine a range of enterprise values of the Company applying a range of discount rates to the projected net revenues by determined by DeGolyer and MacNaughton in the May 2013 appraisal report. In developing the appropriate discount rates for each category of reserves we took into account comparable analyses performed by market participants based on information in our possession. Using the same inputs as used in the aforementioned reserve report, taking into consideration the relatively low risk of the producing reserves, we used a discount rate of 20 percent to present value the projected net revenues of the PDP reserves, resulting in a risk-adjusted present value of $12,620,854. To take into account the uncertainty regarding the timing of the drilling of additional wells under the new development plan and the greater uncertainty of the revenues from the proved developed non-producing (PDNP) reserves and the proved undeveloped (PUD) reserves, we applied a range of higher discount rates to determine the present values of these reserves. We discounted the projected net revenues of the PDNP reserves at 25 percent resulting in a risk-adjusted present value of $1,230,367 to which we applied a further 25 percent discount resulting in a value for the PDNP reserves of to $922,775. We discounted the projected net revenues of the PUD reserves at 30 percent, resulting in a risk-adjusted present value of $275,302,945 to which we applied a further 30 percent discount resulting in a value for the PUD reserves of $192,712,062. The resulting adjusted values of the proved developed producing reserves, the proved developed non-producing reserves and the proved undeveloped reserves in the aggregate, based on the May 2013 reserve report, is $206,255,690 and we made no further adjustments at December 31, 2013, taking into account the limited development of the reserves over the 7-month period since the report was prepared. From this range of values we subtracted debt of $24,382,500 and the option cost of $16,456,000, and added cash of $200,000. We made a further adjustment by deducting the estimated value of the risked reserves (based on the foregoing analysis) attributable to the Casmalia Field of $15,000,000, resulting in an equity value of $150,617,190 at December 31, 2013.

Based on the foregoing, taking into account the Fund's analysis at December 31, 2013, we valued the Fund's interest in the Note at 100 percent of par plus accrued interest in the aggregate amount of $24,392,489 and the Fund's 100 percent interest in the Membership Units in the range of $150,617,190 to $173,139,777 at December 31, 2013.

# EXHIBIT 25

11/20/2018                                    2013.09.30-10Q

10-Q 1 a20130930-10q.htm 10-Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

---

## FORM 10-Q

---

(Mark One)

☒  **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2013**

or

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

**Commission File Number: 333-174226**

---

# BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC
### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **Texas** | **38-3769404** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **11451 Katy Freeway, Suite 500** | |
| **Houston, Texas** | **77079** |
| (Address of principal executive offices) | (Zip Code) |

**(281) 598-8600**
Registrant's telephone number, including area code

---

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☐   No ☒

(Explanatory Note: The registrant is a voluntary filer and is not subject to the filing requirements of the Securities Exchange Act of 1934. However, during the preceding 12 months, the registrant has filed all reports that it would have been required to file by Section 13 or 15(d) of the Securities Exchange Act of 1934 if the registrant was subject to the filing requirements of the Securities Exchange Act of 1934.)

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer       ☐                                    Accelerated filer       ☐

11/20/2018                                    2013.09.30-10Q

Non-accelerated filer        ☒  (Do not check if a smaller reporting company)        Smaller reporting company        ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of November 12, 2013, there were 1,361,300 Class A Units, 114,277,308.5 Class B Units, 12,031,250 Class C Units and 104,988,929 Class E Units issued and outstanding.

**BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC**
**QUARTERLY REPORT ON FORM 10-Q**
**FOR THE QUARTER ENDED SEPTEMBER 30, 2013**

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **Part I. Financial Information** | | |
| Item 1. | Financial Statements | |
| | Consolidated Balance Sheets as of September 30, 2013 and December 31, 2012 | 1 |
| | Consolidated Statements of Operations for the Three and Nine Months Ended September 30, 2013 and 2012 | 2 |
| | Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2013 and 2012 | 3 |
| | Notes to Consolidated Financial Statements | 4 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 20 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | 37 |
| Item 4. | Controls and Procedures | 40 |
| **Part II. Other Information** | | |
| Item 1. | Legal Proceedings | 41 |
| Item 1A. | Risk Factors | 42 |
| Item 5. | Other Information | 43 |
| Item 6. | Exhibits | 44 |
| **Signatures** | | 46 |
| **Exhibit Index** | | 47 |

(i)

# PART I—FINANCIAL INFORMATION

Item 1. Financial Statements

## BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC AND SUBSIDIARIES
## CONSOLIDATED BALANCE SHEETS
### (in thousands)

| | September 30, 2013 | December 31, 2012 |
|---|---|---|
| | (Unaudited) | |
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 6,686 | $ 1,383 |
| Restricted cash | 694 | — |
| Accounts receivable, net of allowance for doubtful accounts of $817 at September 30, 2013 and $509 at December 31, 2012 | 60,361 | 46,553 |
| Accounts receivable - insurance recovery | 254 | 3,100 |
| Due from affiliates | 273 | 347 |
| Prepaid expenses and other current assets | 11,092 | 27,972 |
| Current portion of escrow for abandonment costs | 4,323 | — |
| Derivative assets | — | 2,408 |
| TOTAL CURRENT ASSETS | 83,683 | 81,763 |
| OIL AND GAS PROPERTIES, successful efforts method of accounting, net of accumulated depreciation, depletion, amortization and impairment of $265,893 and $191,326 at September 30, 2013 and December 31, 2012, respectively | 234,918 | 260,012 |
| OTHER PROPERTY AND EQUIPMENT, net of accumulated depreciation of $4,792 and $1,717 at September 30, 2013 and December 31, 2012, respectively | 5,334 | 1,968 |
| **OTHER ASSETS** | | |
| Debt issue costs, net | 1,889 | 3,230 |
| Asset retirement obligation escrow receivable | 20,348 | 20,348 |
| Escrow for abandonment costs, net of current portion | 234,334 | 215,263 |
| Other assets | 7,068 | 7,880 |
| TOTAL OTHER ASSETS | 263,639 | 246,721 |
| TOTAL ASSETS | $ 587,574 | $ 590,464 |
| **LIABILITIES AND MEMBERS' DEFICIT** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable and accrued expenses | $ 193,419 | $ 108,736 |
| Derivative liabilities | 7,523 | — |
| Asset retirement obligations | 32,124 | 41,572 |
| Current portion of debt and notes payable | 243 | 3,552 |
| TOTAL CURRENT LIABILITIES | 233,309 | 153,860 |
| **LONG-TERM LIABILITIES** | | |
| Gas imbalance payable | 2,147 | 2,521 |
| Dividends payable | — | 12,408 |
| Derivative liabilities | 1,149 | 5,091 |
| Asset retirement obligations, net of current portion | 270,762 | 303,933 |
| Debt, net of current portion, net of unamortized discount of $686 and $882 at September 30, 2013 and December 31, 2012, respectively | 184,367 | 201,118 |
| TOTAL LONG-TERM LIABILITIES | 458,425 | 525,071 |
| TOTAL LIABILITIES | 691,734 | 678,931 |

| | | | |
|---|---|---:|---:|
| CLASS E AND CLASS D PREFERRED UNITS | | 104,989 | 30,000 |
| COMMITMENTS AND CONTINGENCIES | | | |
| MEMBERS' DEFICIT | | (209,149) | (118,467) |
| TOTAL LIABILITIES AND MEMBERS' DEFICIT | $ | 587,574 | $ 590,464 |

*The accompanying notes are an integral part of these consolidated financial statements.*

1

**BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(Unaudited)**
**(in thousands)**

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| REVENUES: | | | | |
| Oil sales | $  50,479 | $  50,721 | $  136,415 | $  165,441 |
| Natural gas sales | 12,600 | 13,289 | 40,046 | 36,754 |
| Plant product sales | 1,457 | 2,876 | 5,831 | 11,079 |
| Realized (loss) gain on derivative financial instruments | (2,725) | 3,284 | (2,573) | 11,189 |
| Unrealized (loss) gain on derivative financial instruments | (5,143) | (16,129) | (5,989) | 7,375 |
| Other revenues | 7,089 | 3,084 | 16,389 | 8,062 |
| TOTAL REVENUES | 63,757 | 57,125 | 190,119 | 239,900 |
| OPERATING EXPENSES: | | | | |
| Lease operating | 50,995 | 43,840 | 141,168 | 131,055 |
| Production taxes | 173 | 192 | 489 | 744 |
| Workover | 1,028 | 4,395 | 7,312 | 10,485 |
| Exploration | — | 311 | — | 1,249 |
| Depreciation, depletion and amortization | 10,027 | 12,302 | 32,727 | 36,546 |
| Impairment of oil and gas properties | 402 | 3,681 | 55,779 | 6,992 |
| General and administrative | 9,621 | 8,301 | 28,250 | 20,668 |
| Gain on involuntary conversion of asset | (7,194) | — | (17,827) | — |
| Accretion of asset retirement obligations | 4,458 | 9,256 | 19,551 | 27,228 |
| Loss (gain) on sale of assets | 424 | — | (35,367) | 120 |
| Other operating expenses | 2,704 | — | 5,117 | — |
| TOTAL OPERATING EXPENSES | 72,638 | 82,278 | 237,199 | 235,087 |
| (LOSS) INCOME FROM OPERATIONS | (8,881) | (25,153) | (47,080) | 4,813 |
| OTHER INCOME (EXPENSE): | | | | |
| Interest income | 30 | 11 | 81 | 305 |
| Miscellaneous expense | (2,674) | (919) | (7,620) | (2,408) |
| Interest expense | (6,890) | (6,514) | (19,526) | (19,422) |
| TOTAL OTHER EXPENSE, NET | (9,534) | (7,422) | (27,065) | (21,525) |
| NET LOSS | (18,415) | (32,575) | (74,145) | (16,712) |
| LESS: PREFERRED UNIT DIVIDENDS | 4,755 | 2,232 | 12,581 | 5,976 |
| NET LOSS ATTRIBUTABLE TO COMMON UNIT HOLDERS | $  (23,170) | $  (34,807) | $  (86,726) | $  (22,688) |

*The accompanying notes are an integral part of these consolidated financial statements.*

2

## BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF CASH FLOWS
#### (Unaudited)
#### (in thousands)

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2013 | 2012 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net loss | $ (74,145) | $ (16,712) |
| *Adjustments to reconcile net loss to net cash provided by operating activities:* | | |
| Depreciation, depletion, and amortization | 32,727 | 36,546 |
| Impairment of oil and gas properties | 55,779 | 6,992 |
| Accretion of asset retirement obligations | 19,551 | 27,228 |
| Amortization of debt issue costs | 4,595 | 3,455 |
| Accretion of debt discount | 195 | 171 |
| Unrealized loss (gain) on derivative financial instruments | 5,989 | (7,375) |
| (Gain) loss on sale of assets | (35,367) | 120 |
| Provision on doubtful accounts | 308 | — |
| Gain on involuntary conversion of assets | (17,827) | — |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | (13,086) | 10,514 |
| Due from affiliates, net | 74 | (1) |
| Prepaid expenses and other assets | 16,440 | (6,920) |
| Other assets | 464 | — |
| Accounts payable and accrued liabilities | 74,560 | 2,737 |
| Gas imbalance | (16) | 896 |
| Settlement of asset retirement obligations | (41,512) | (13,623) |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | 28,729 | 44,028 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Additions to oil and gas properties | (112,719) | (18,153) |
| Acquisition of oil and gas properties | (3,250) | (3,454) |
| Sale of oil and gas properties | 65,741 | (120) |
| Additions to property and equipment | (683) | (252) |
| Cash assumed in consolidation of Freedom Well Services, LLC | 473 | |
| Proceeds received from insurance recovery | 23,837 | — |
| Deposits | (9) | (272) |
| Restricted cash | (694) | — |
| Escrow payments, net | (23,394) | (38,878) |
| NET CASH USED IN INVESTING ACTIVITIES | (50,698) | (61,129) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Proceeds on short term notes | 348 | 17,644 |
| Payments on short term notes | (3,827) | (12,940) |
| Borrowing on bank debt | 23,168 | 145,000 |
| Payments on bank debt | (40,168) | (112,500) |
| Debt issuance costs | (2,249) | (3,022) |
| Contributions from members | 50,000 | — |
| Distributions to members | — | (16,694) |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | 27,272 | 17,488 |

11/20/2018                                     2013.09.30-10Q

| | | | | |
|---|---|---|---|---|
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | | 5,303 | | 387 |
| CASH AND CASH EQUIVALENTS - BEGINNING OF PERIOD | | 1,383 | | 17,260 |
| CASH AND CASH EQUIVALENTS - END OF PERIOD | $ | 6,686 | $ | 17,647 |
| SUPPLEMENTAL CASH FLOW INFORMATION: | | | | |
| Cash paid for interest | $ | 11,773 | $ | 12,603 |
| NONCASH INVESTING AND FINANCING ACTIVITIES: | | | | |
| Asset retirement obligations relieved due to sale of properties | $ | (22,999) | $ | — |
| Increase in asset retirement due to revaluation | $ | 2,341 | $ | — |
| Paid-in-kind dividends on preferred equity and accrued distributions to members | $ | 12,581 | $ | 5,976 |

*The accompanying notes are an integral part of these consolidated financial statements.*

3

### BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC AND SUBSIDIARIES
#### Notes to Consolidated Financial Statements
#### (Unaudited)

#### NOTE 1—BASIS OF PRESENTATION

*Nature of Operations*: Black Elk Energy Offshore Operations, LLC and our wholly-owned subsidiaries (collectively, "Black Elk", "BEEOO", "we", "our" or "us") is a Houston-based oil and natural gas company engaged in the exploration, development, production and exploitation of oil and natural gas properties. We were formed on November 20, 2007 for the purpose of acquiring oil and natural gas producing properties within the Outer Continental Shelf of the United States in the Gulf of Mexico.

*Basis of Presentation:* The accompanying unaudited consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial information. Accordingly, they do not include all of the information and footnotes required by GAAP for complete financial statements. In the opinion of management, all adjustments of a normal and recurring nature considered necessary for a fair presentation of our interim and prior period results have been included in the accompanying consolidated financial statements. The results of operations for the interim period are not necessarily indicative of the results that will be realized for any other interim period or for the entire fiscal year. For further information, refer to the consolidated financial statements and notes thereto included in our Annual Report on Form 10-K for the year ended December 31, 2012 (the "2012 Form 10-K").

*Reclassifications*: Certain reclassifications have been made to conform 2012 balances to our 2013 presentation. Such reclassifications had no effect on net loss or cash flow.

*Principles of Consolidation*: The consolidated financial statements include the accounts of Black Elk Energy Offshore Operations, LLC and our wholly-owned subsidiaries, Black Elk Energy Land Operations, LLC and Black Elk Energy Finance Corp. Effective January 1, 2013, in accordance with accounting guidelines for consolidation of variable interest entities, we consolidated Freedom Well Services, LLC ("FWS"), as we determined that we are the primary beneficiary of FWS and will have the power to direct the activities of FWS. All material intercompany accounts and transactions have been eliminated in consolidation.

*Use of Estimates in Preparation of Financial Statements*: The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the balance sheet date and the amounts of revenues and expenses recognized during the reporting period. We analyze our estimates based on historical experience, current factors and various other assumptions that we believe to be reasonable under the circumstances. However, actual results could differ from such estimates.

*Recent Accounting Pronouncements:* In December 2011, the FASB issued accounting guidance which increases disclosures about offsetting assets and liabilities. New disclosures are required to enable users of financial statements to understand significant quantitative differences in balance sheets prepared under GAAP and International Financial Reporting Standards ("IFRS") related to the offsetting of financial instruments. The existing GAAP guidance allowing balance sheet offsetting, including industry-specific guidance, remains unchanged. The guidance is effective for annual and interim reporting periods beginning on or after January 1, 2013. The disclosures should be applied retrospectively for all prior periods presented. The adoption of this amendment did not have a material impact on our consolidated financial statements.

#### NOTE 2—LIQUIDITY RISKS AND UNCERTAINTIES

As shown in the accompanying consolidated financial statements, we had a net working capital deficit of approximately $(149.6) million at September 30, 2013. The combination of restricted credit availability, lower production since the fourth quarter of 2012, our drilling program, settlement of our plugging and abandonment ("P&A") liabilities and additional collateral requirements related to the surety bonds that secure our P&A obligations led to significant reductions in our working capital in the fourth quarter of 2012 and the first nine months of 2013. To increase liquidity, we stretched accounts payable, aggressively pursued accounts receivable and sold assets. We continue to optimize our production portfolio and recommenced our drilling program in the fourth quarter of 2012, which is substantially complete for 2013. We have completed six operated wells and two non-operated wells in 2013. We expect to drill or complete two non-operated wells during the fourth quarter of 2013. To fund our drilling programs and operations, we expect to continue to raise additional capital over the next several years. To improve our access to funding, on August 30, 2013, we consented to the assignment by Capital One Bank, N.A. and the other lenders of all of their rights and obligations under our Credit Agreement, dated as of December 24, 2010 (the "Credit Facility"), to White Elk LLC, as Administrative Agent and Lender, and Resource Value Group LLC, as Lender. Resource Value Group LLC is affiliated with our majority owner, Platinum Partners Value Arbitrage Fund L.P. Also, we are evaluating additional potential asset sales of core and non-core assets to optimize our portfolio and normalize the age of our accounts payable. On March 26, 2013, we sold four producing fields to Renaissance Offshore, LLC ("Renaissance") for approximately $52.5 million subject to

2013.09.30-10Q

4

normal adjustments. A portion of the proceeds from the sale were used to reduce the amount borrowed under the Credit Facility by $36 million and the remainder was used for general corporate purposes. Cash collateral securing surety bonds of approximately $9.0 million related to the sold properties were released and received in the third quarter of 2013. The remainder of the cash collateral securing surety bonds for the sold properties was used to increase the collateral with the surety companies relating to bonds that had previously been issued to satisfy the bonding and security requirements of the Bureau of Ocean Energy Management ("BOEM"). We sold an additional interest in one field to Renaissance on July 31, 2013 for $10.5 million subject to normal adjustments.

Our primary use of capital has been for the acquisition, development and exploitation of oil and natural gas properties, settlement of our P&A as well as providing collateral to secure our P&A obligations. As we plug and abandon certain fields and meet the various criteria related to the corresponding escrow accounts, we expect to release funds from the escrow accounts. Also, our letters of credit with Capital One are backed entirely by cash. We use letters of credit to back a portion of our surety bonds for P&A obligations.

On August 30, 2013, we entered into a Limited Waiver and Eleventh Amendment to our Credit Facility to (1) obtain waivers related to our financial covenants for the third and fourth quarters of 2013, (2) extend the maturity date under the credit facility to January 1, 2015, (3) increase the Applicable Margin under the Credit Facility by one percent (for a total increase of two percent when combined with the one percent increase pursuant to the Eighth Amendment), (4) maintain the borrowing base at $25 million, subject to the right of Resource Value Group LLC to require the Administrative Agent to increase the borrowing base up to a maximum of $50 million, and (5) waive our right and the right of the Lenders to request or obtain a borrowing base redetermination prior to the first scheduled redetermination date in 2014. The borrowing base under the Credit Facility was increased to $35 million on September 30, 2013 and as of that date we had $35 million outstanding. Subsequently, the borrowing base was increased to $47 million on October 15, 2013. As of November 14, 2013, we had $45 million drawn on the Credit Facility.

As of September 30, 2013, we were in compliance with all covenants under the Indenture. We believe anticipated capital expenditures in 2013 will exceed the amount provided for in a covenant regarding maximum capital expenditures. However, the Indenture also provides that we may use proceeds from the sale of assets for capital expenditures that we believe is not limited by the previously referenced capital expenditure covenant. In the event our interpretation of the Indenture is not upheld or if our cash proceeds from the sale of assets are not sufficient to reduce our capital expenditures to a level that makes us compliant with the maximum capital expenditure covenant, we have an option under the Indenture to redeem the 13.75% Senior Secured Notes due 2015 (the "Notes"), beginning December 1, 2013, at a redemption price of 106.875% of par plus accrued interest and may seek to redeem the Notes; however, there can be no assurance that we will have sufficient funds to do so. We also have the option to solicit a waiver from the holders of the Notes. In these circumstances, absent a waiver and following notice to us of the default and lapse of the 30-day grace period as provided in the Indenture, the Indenture trustee or the holders of at least 25% in aggregate principal amount of the Notes would have the right to declare all the Notes to be due and payable immediately. A default under the Indenture covenant could also result in a cross-default under our credit facility.

We are currently evaluating new sources of liquidity including, but not limited to, accessing the debt capital markets and potential asset sales of non-core and core properties to optimize our portfolio. The accompanying financial statements do not include any adjustments related to the recoverability and classification of recorded assets or the amount and classifications of liabilities that might result from the uncertainty associated with our ability to meet our obligations as they come due. For additional information, please see "Risk Factors" under Item 1A of this Form 10-Q.

Our capital budget may be adjusted in the future as business conditions warrant and the ultimate amount of capital we expend may fluctuate materially based on market conditions and the success of our drilling program as the year progresses. The amount, timing and allocation of capital expenditures are largely discretionary and within our control. If oil and natural gas prices decline or costs increase significantly, we could defer a significant portion of our budgeted capital expenditures until later periods to prioritize capital projects that we believe have the highest expected returns and potential to generate near-term cash flows. We routinely monitor and adjust our capital expenditures in response to changes in prices, availability of financing, drilling and acquisition costs, industry conditions, the timing of regulatory approvals, the availability of rigs, success or lack of success in drilling activities, contractual obligations, internally generated cash flows and other factors both within and outside our control. Our planned operations for the remainder of 2013 reflect our expectations for production based on actual production history and new production expected to be brought online, the continuation of commodity prices near current levels and the higher cost of servicing our additional financing and other obligations.

Our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our wells, the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, our ability to monetize our properties and future production through asset sales and financial derivatives, and a number of other factors, some of which are beyond our control. Our inability to increase near-term production levels and generate sufficient liquidity through the actions noted above could result in our inability to meet our obligations as they come due which would have a

5

material adverse effect on our financial position, results of operation and cash flows. In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through other financing sources; however, there is no assurance that we will be able to do so in the future if required to meet any short-term liquidity needs.

Our estimates of proved oil and natural gas reserves and the estimated future net revenues from such reserves are based upon various assumptions, including assumptions relating to oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes and availability of funds. The estimation process requires significant assumptions in the evaluation of available geological, geophysical, engineering and economic data for each reservoir. Therefore, these estimates are inherently imprecise and the quality and reliability of this data can vary. Estimates of our oil and natural gas reserves and the costs and timing associated with developing these reserves are subject to change, and may differ materially from our actual results. A substantial portion of our total proved reserves are undeveloped and recognition of such reserves requires us to expect that capital will be available to fund their development. The size of our operations and our capital expenditures budget limit the number of properties that we can develop in any given year and we intend to continue to develop these reserves, but there is no assurance we will be successful. Development of these reserves may not yield the expected results, or the development may be delayed or the costs may exceed our estimates, any of which may materially affect our financial position, results of operations, cash flows, the quantity of proved reserves that we report, and our ability to meet the requirements of our financing obligations.

Our current production is concentrated in the Gulf of Mexico, which is characterized by production declines more rapid than those of conventional onshore properties. As a result, we are particularly vulnerable to a near-term severe impact resulting from unanticipated complications in the development of, or production from, any single material well or infrastructure installation, including lack of sufficient capital, delays in receiving necessary drilling and operating permits, increased regulation, reduced access to equipment and services, mechanical or operational failures, and severe weather. Any unanticipated significant disruption to, or decline in, our current production levels or prolonged negative changes in commodity prices or operating cost levels could have a material adverse effect on our financial position, results of operations, cash flows, the quantity of proved reserves that we report, and our ability to meet our commitments as they come due.

Oil and natural gas development and production in the Gulf of Mexico are regulated by the BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE") of the Department of the Interior ("DOI"). We cannot predict future changes in laws and regulations governing oil and gas operations in the Gulf of Mexico. New regulations issued since the Deepwater Horizon incident in 2010 have changed the way we conduct our business and increased our costs of developing and commissioning new assets. Should there be additional significant future regulations or additional statutory limitations, they could require further changes in the way we conduct our business, further increase our costs of doing business or ultimately prohibit us from drilling for or producing hydrocarbons in the Gulf of Mexico.

As an oil and gas company, our revenue, profitability, cash flows, proved reserves and future rate of growth are substantially dependent on prevailing prices for oil and natural gas. Historically, the energy markets have been very volatile, and we expect such price volatility to continue. Any extended decline in oil or gas prices could have a material adverse effect on our financial position, results of operations, cash flows, the quantities of oil and gas reserves that we can economically produce, and may restrict our ability to obtain additional financing or to meet the contractual requirements of our debt and other obligations.

## NOTE 3—OIL AND GAS PROPERTIES

The following table reflects capitalized costs related to our oil and gas properties:

|  | September 30, 2013 | | December 31, 2012 |
|---|---|---|---|
|  | *(Unaudited)* | | |
|  | (In thousands) | | |
| Proved properties | $ | 500,811 | $ | 451,338 |
| Accumulated depreciation, depletion, amortization and impairment | | (265,893) | | (191,326) |
| Oil and gas properties, net | $ | 234,918 | $ | 260,012 |

6

The following table describes the changes to our asset retirement obligations (unaudited):

| | (in thousands) |
|---|---:|
| Balance at December 31, 2012 | $ 345,505 |
| Revaluation of liability | 2,341 |
| Liabilities relieved due to sale of properties | (22,999) |
| Liabilities settled | (41,512) |
| Accretion expense | 19,551 |
| Balance at September 30, 2013 | $ 302,886 |
| Less: current portion | (32,124) |
| Total Long-Term Asset Retirement Obligations | $ 270,762 |

## NOTE 4—ACQUISITIONS AND DIVESTITURES

On March 26, 2013, we completed the sale of four fields to Renaissance for approximately $52.5 million subject to normal adjustments. Funds were used to reduce the amount borrowed under the Credit Facility by $36 million and for general corporate purposes. We sold an additional interest in one field to Renaissance on July 31, 2013 for $10.5 million subject to normal adjustments. Funds were used for general corporate purposes.

## NOTE 5—DERIVATIVE INSTRUMENTS

We enter into hedging transactions with major financial institutions to reduce exposure to fluctuations in the price of oil and natural gas. We use financially settled crude oil and natural gas swaps. With a swap, the counterparty is required to make a payment to us if the settlement price for a settlement period is below the hedged price for the transaction, and we are required to make a payment to the counterparty if the settlement price for any settlement period is above the hedged price for the transaction. We elected not to designate any of our derivative contracts as qualifying hedges for financial reporting purposes, therefore all of the derivative instruments are categorized as standalone derivatives and are being marked-to-market with "Unrealized (loss) gain on derivative financial instruments" recorded in the consolidated statements of operations.

7

11/20/2018                                     2013.09.30-10Q

At September 30, 2013, we had the following contracts outstanding (Asset (Liability) and Fair Value Gain (Loss) (unaudited)):

| Period | Crude Oil | | | | Natural Gas | | | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Monthly Volume (Bbls) | Contract Price ($/Bbl) | Asset (Liability) | Fair Value Gain (Loss) | Monthly Volume (MMBtu) | Contract Price ($/MMBtu) | Asset (Liability) | Fair Value Gain (Loss) | Asset (Liability) | Fair Value Gain (Loss) |
| Swaps: | | | (in thousands) | | | | (in thousands) | | (in thousands) | |
| 10/13 - 10/13 | 27,750 | $ 96.90 | $ (140) | $ (140) | 104,000 | $ 4.60 | $ 114 | $ 114 | $ (26) | $ (26) |
| 11/13 - 11/13 | 26,800 | 96.90 | (121) | (121) | 104,000 | 4.60 | $ 106 | 106 | (15) | (15) |
| 12/13 - 12/13 | 27,750 | 96.90 | (101) | (101) | 104,000 | 4.60 | 88 | 88 | (13) | (13) |
| 1/14 - 2/14 | 19,000 | 96.90 | (84) | (84) | 82,000 | 4.60 | 120 | 120 | 36 | 36 |
| 10/13 - 10/13 | 3,259 | 100.80 | (4) | (4) | 91,166 | 4.94 | 132 | 132 | 128 | 128 |
| 11/13 - 11/13 | — | — | ---- | — | 64,926 | 4.94 | 88 | 88 | 88 | 88 |
| 12/13 - 12/13 | 10,042 | 100.80 | 1 | 1 | 119,462 | 4.94 | 141 | 141 | 142 | 142 |
| 1/14 - 5/14 | 10,083 | 100.80 | 139 | 139 | 129,960 | 4.94 | 694 | 694 | 833 | 833 |
| 6/14 - 6/14 | — | — | — | — | 129,960 | 4.94 | 133 | 133 | 133 | 133 |
| 10/13 - 12/13 | 19,750 | 85.90 | (905) | (905) | 47,000 | 5.00 | 196 | 196 | (709) | (709) |
| 1/14 - 12/14 | 15,000 | 65.00 | (4,947) | (4,947) | — | — | — | — | (4,947) | (4,947) |
| 10/13 - 10/13 | 28,006 | 88.80 | (368) | (368) | 34,551 | 4.09 | 20 | 20 | (348) | (348) |
| 11/13 - 11/13 | 31,605 | 88.80 | (395) | (395) | 28,939 | 4.09 | 15 | 15 | (380) | (380) |
| 12/13 - 12/13 | 38,743 | 88.80 | (448) | (448) | 37,906 | 4.09 | 13 | 13 | (435) | (435) |
| 1/14 - 1/14 | 4,723 | 88.80 | (49) | (49) | 43,347 | 4.09 | 11 | 11 | (38) | (38) |
| 2/14 - 2/14 | 13,313 | 88.80 | (126) | (126) | 32,636 | 4.09 | 8 | 8 | (118) | (118) |
| 3/14 - 3/14 | 8,413 | 88.80 | (71) | (71) | 46,764 | 4.09 | 12 | 12 | (59) | (59) |
| 4/14 - 4/14 | 12,473 | 88.80 | (95) | (95) | 41,253 | 4.09 | 13 | 13 | (82) | (82) |
| 5/14 - 5/14 | 11,793 | 88.80 | (79) | (79) | 40,391 | 4.09 | 11 | 11 | (68) | (68) |
| 6/14 - 6/14 | 15,546 | 88.80 | (92) | (92) | 20,112 | 4.09 | 5 | 5 | (87) | (87) |
| 7/14 - 7/14 | 11,845 | 88.80 | (62) | (62) | 39,283 | 4.09 | 9 | 9 | (53) | (53) |
| 8/14 - 8/14 | 13,165 | 88.80 | (61) | (61) | 34,246 | 4.09 | 7 | 7 | (54) | (54) |
| 9/14 - 9/14 | 16,235 | 88.80 | (66) | (66) | 29,753 | 4.09 | 6 | 6 | (60) | (60) |
| 10/14 - 10/14 | 15,605 | 88.80 | (55) | (55) | 28,635 | 4.09 | 5 | 5 | (50) | (50) |
| 11/14 - 11/14 | 18,525 | 88.80 | (57) | (57) | 27,081 | 4.09 | 3 | 3 | (54) | (54) |
| 12/14 - 12/14 | 22,526 | 88.80 | (56) | (56) | 34,114 | 4.09 | (1) | (1) | (57) | (57) |
| 10/13 - 10/13 | 4,000 | 87.85 | (56) | (56) | — | — | — | — | (56) | (56) |
| 11/13 - 11/13 | 250 | 87.85 | (3) | (3) | — | — | — | — | (3) | (3) |
| 12/13 - 12/13 | 2,500 | 87.85 | (31) | (31) | — | — | — | — | (31) | (31) |
| 1/14 - 1/14 | 46,000 | 87.85 | (523) | (523) | — | — | — | — | (523) | (523) |
| 2/14 - 2/14 | 25,000 | 87.85 | (259) | (259) | — | — | — | — | (259) | (259) |
| 3/14 - 3/14 | 56,000 | 87.85 | (524) | (524) | — | — | — | — | (524) | (524) |
| 4/14 - 4/14 | 45,000 | 87.85 | (382) | (382) | ---- | — | — | ---- | (382) | (382) |
| 5/14 - 5/14 | 46,000 | 87.85 | (349) | (349) | — | — | — | — | (349) | (349) |
| 6/14 - 6/14 | 48,000 | 87.85 | (326) | (326) | 40,391 | 4.19 | 14 | 14 | (312) | (312) |
| 7/14 - 7/14 | 36,000 | 87.85 | (219) | (219) | 20,112 | 4.19 | 6 | 6 | (213) | (213) |
| 8/14 - 8/14 | 34,000 | 87.85 | (186) | (186) | 39,283 | 4.19 | 11 | 11 | (175) | (175) |
| 9/14 - 9/14 | 26,000 | 87.85 | (128) | (128) | 34,246 | 4.19 | 10 | 10 | (118) | (118) |

11/20/2018                                         2013.09.30-10Q

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/14 - 10/14 | 27,000 | 87.85 | (118) | (118) | 29,753 | 4.19 | 8 | 8 | (110) | (110) |
| 11/14 - 11/14 | 20,000 | 87.85 | (78) | (78) | 28,635 | 4.19 | 6 | 6 | (72) | (72) |
| 12/14 - 12/14 | 31,000 | 87.85 | (101) | (101) | 27,081 | 4.19 | 2 | 2 | (99) | (99) |
| 1/15 - 1/15 | — | — | — | — | 34,114 | 4.19 | — | — | — | — |
| 2/15 - 2/15 | — | — | — | — | 27,838 | 4.19 | — | — | — | — |
| 3/15 - 3/15 | — | — | — | — | 24,461 | 4.19 | 1 | 1 | 1 | 1 |
| 1/15 - 1/15 | — | — | — | — | 27,838 | 4.09 | (3) | (3) | (3) | (3) |
| 2/15 - 2/15 | — | — | — | — | 24,461 | 4.09 | (2) | (2) | (2) | (2) |
| 3/15 - 3/15 | — | — | — | — | 26,443 | 4.09 | (1) | (1) | (1) | (1) |
| 10/13 - 10/13 | 67,513 | 108.44 | 181 | 181 | — | — | — | — | 181 | 181 |
| 11/13 - 11/13 | 64,159 | 108.44 | 184 | 184 | — | — | — | — | 184 | 184 |
| 12/13 - 12/13 | 45,392 | 108.44 | 162 | 162 | — | — | — | — | 162 | 162 |
| 1/14 - 1/14 | 46,006 | 100.72 | (142) | (142) | — | — | — | — | (142) | (142) |
| 2/14 - 2/14 | 39,159 | 100.72 | (88) | (88) | — | — | — | — | (88) | (88) |
| 3/14 - 3/14 | 36,822 | 100.72 | (55) | (55) | — | — | — | — | (55) | (55) |
| 4/14 - 4/14 | 34,069 | 100.72 | (25) | (25) | — | — | — | — | (25) | (25) |
| 5/14 - 5/14 | 35,200 | 100.72 | 1 | 1 | — | — | — | — | 1 | 1 |
| 6/14 - 6/14 | 31,668 | 100.72 | 23 | 23 | — | — | — | — | 23 | 23 |
| 7/14 - 7/14 | 48,509 | 100.72 | 64 | 64 | — | — | — | — | 64 | 64 |
| 8/14 - 8/14 | 46,473 | 100.72 | 87 | 87 | — | — | — | — | 87 | 87 |
| 9/14 - 9/14 | 45,830 | 100.72 | 110 | 110 | — | — | — | — | 110 | 110 |
| 10/14 - 10/14 | 44,282 | 100.72 | 125 | 125 | — | — | — | — | 125 | 125 |
| 11/14 - 11/14 | 40,874 | 100.72 | 130 | 130 | — | — | — | — | 130 | 130 |
| 12/14 - 12/14 | 26,424 | 100.72 | 95 | 95 | — | — | — | — | 95 | 95 |
| | | | $ (10,673) | $ (10,673) | | | $ 2,001 | $ 2,001 | $ (8,672) | $ (8,672) |

8

The fair values of derivative instruments in our consolidated balance sheets were as follows (in thousands) (unaudited):

| Derivatives Not Designated as Hedging Instruments under Accounting Guidance | Asset Derivatives | | Liability Derivatives | | Asset (Liability) Derivatives Total | |
|---|---|---|---|---|---|---|
| | Balance Sheet Location | Fair Value at September 30, 2013 | Balance Sheet Location | Fair Value at September 30, 2013 | Balance Sheet Location | Fair Value at September 30, 2013 |
| Commodity Contracts | Derivative financial instruments | | Derivative financial instruments | | Derivative financial instruments | |
| | Current | $ 2,934 | Current | $ (10,457) | Current | $ (7,523) |
| | Non-current | 376 | Non-current | (1,525) | Non-current | (1,149) |
| **Total derivative instruments** | | $ 3,310 | | $ (11,982) | | $ (8,672) |

| Derivatives Not Designated as Hedging Instruments under Accounting Guidance | Asset Derivatives | | Liability Derivatives | | Asset (Liability) Derivatives Total | |
|---|---|---|---|---|---|---|
| | Balance Sheet Location | Fair Value at December 31, 2012 | Balance Sheet Location | Fair Value at December 31, 2012 | Balance Sheet Location | Fair Value at December 31, 2012 |
| Commodity Contracts | Derivative financial instruments | | Derivative financial instruments | | Derivative financial instruments | |
| | Current | $ 6,808 | Current | $ (4,400) | Current | $ 2,408 |
| | Non-current | 1,235 | Non-current | (6,326) | Non-current | (5,091) |
| **Total derivative instruments** | | $ 8,043 | | $ (10,726) | | $ (2,683) |

We have a netting agreement with our financial institution that permits net settlement of gross commodity derivative assets against gross commodity derivative liabilities, and we routinely exercise our contractual right to offset realized gains against realized losses when settling with our derivative counterparty.

The effect of derivate instruments on our consolidated statements of operations was as follows (in thousands) (unaudited):

| Derivatives Not Designated as Hedging Instruments under Accounting Guidance | Statements of Operations Location | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | | 2013 | 2012 | 2013 | 2012 |
| Commodity Contracts | Realized (loss) gain on derivative financial instruments | $ (2,725) | $ 3,284 | $ (2,573) | $ 11,189 |
| Commodity Contracts | Unrealized (loss) gain on derivative financial instruments | (5,143) | (16,129) | (5,989) | 7,375 |
| **Total derivative instruments** | | $ (7,868) | $ (12,845) | $ (8,562) | $ 18,564 |

## NOTE 6—FAIR VALUE MEASUREMENTS

Accounting guidance for fair value measurements clarifies the definition of fair value, prescribes methods for measuring fair value, establishes a fair value hierarchy based on the inputs used to measure fair value, and expands disclosures about fair value measurements. The three-tier fair value hierarchy, which prioritizes the inputs used in the valuation methodologies, is:

- *Level 1*—Valuations based on quoted prices for identical assets and liabilities in active markets.

- *Level 2*—Valuations based on observable inputs other than quoted prices included in Level 1, such as quoted prices for similar assets and liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, or other inputs that are observable or can be corroborated by observable market data.

- *Level 3*—Valuations based on unobservable inputs reflecting our own assumptions, consistent with reasonably available assumptions made by other market participants. These valuations require significant judgment.

As required by accounting guidance for fair value measurements, financial assets and liabilities are classified based on the lowest level of input that is significant to the fair value measurement. Our assessment of the significance of a particular

9

input to the fair value measurement requires judgment and may affect the valuation of the fair value of assets and liabilities and their placement within the fair value hierarchy levels.

The following tables present information about our assets and liabilities measured at fair value on a recurring basis as of September 30, 2013 and December 31, 2012 and indicate the fair value hierarchy of the valuation techniques utilized by us to determine such fair value (in thousands) (unaudited):

|  | Fair Value as of September 30, 2013 | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets** | | | | |
| Oil and Natural Gas Derivatives | $ 3,310 | $ — | $ 3,310 | $ — |
| | $ 3,310 | $ — | $ 3,310 | $ — |
| **Liabilities** | | | | |
| Oil and Natural Gas Derivatives | $ (11,982) | $ — | $ (11,982) | $ — |
| | $ (11,982) | $ — | $ (11,982) | $ — |

Fair Value Measurements at September 30, 2013 Using Fair Value Hierarchy

|  | Fair Value as of December 31, 2012 | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets** | | | | |
| Oil and Natural Gas Derivatives | $ 8,043 | $ — | $ 8,043 | $ — |
| | $ 8,043 | $ — | $ 8,043 | $ — |
| **Liabilities** | | | | |
| Oil and Natural Gas Derivatives | $ (10,726) | $ — | $ (10,726) | $ — |
| | $ (10,726) | $ — | $ (10,726) | $ — |

Fair Value Measurements at December 31, 2012 Using Fair Value Hierarchy

At September 30, 2013 and December 31, 2012, management estimates that the derivative contracts had a fair value of $(8.7) million and $(2.7) million, respectively. We estimated the fair value of derivative instruments using internally-developed models that use as their basis readily observable market parameters.

The determination of the fair values above incorporates various factors required under accounting guidance for fair value measurements. These factors include not only the impact of our nonperformance risk but also the credit standing of the counterparties involved in our derivative contracts.

As of September 30, 2013, the estimated fair value of cash and cash equivalents, accounts receivable, other current assets, accounts payable and other current liabilities approximated their carrying value due to their short-term nature. The estimated fair value of our debt was primarily based on quoted market prices as well as prices for similar debt based on recent market transactions. The fair value of debt at September 30, 2013 was $182.7 million.

*Fair Value on a Non-Recurring Basis*

Oil and gas properties with a carrying value of $290.7 million were written down to their fair value of $234.9 million, resulting in an impairment charge of $0.4 million and $55.8 million for the three and nine months ended September 30, 2013, respectively, which is recognized under "Impairments of oil and gas properties" in the consolidated statements of operations. As of September 30, 2012, oil and gas properties with a carrying value of $224.4 million were written down to their fair value of $217.4 million, resulting in an impairment charge of $3.7 million and $7.0 million for the three and nine months ended September 30, 2012, respectively. The impairment analysis is based on the estimated discounted future cash flows for those properties. Significant Level 3 assumptions used in the calculation of estimated discounted cash flows included our estimate of future oil and gas prices, production costs, development expenditures, estimated quantities and timing of production of proved reserves, appropriate risk-adjusted discount rates, and other relevant data.

The revaluation to asset retirement obligations resulted from revised estimations. Fair values for the asset retirement obligations are categorized as Level 3. Such estimations are based on present value techniques which utilize company-specific information for

such inputs as cost and timing of plugging and abandonment of wells and facilities. We recorded $2.3 million in additions to asset retirement obligations measured at fair value during the nine months ended September 30, 2013.

10

## NOTE 7—DEBT AND NOTES PAYABLE

Our debt and notes payable are summarized as follows:

| | September 30, 2013 | | December 31, 2012 |
|---|---|---|---|
| | (in thousands) | | |
| | (unaudited) | | |
| Senior Secured Revolving Credit Facility | $ | 35,000 | $ | 52,000 |
| 13.75% Senior Secured Notes, net of discount | | 149,314 | 149,118 |
| AFCO Credit Corporation-insurance note payable | | — | 3,552 |
| Other debt | | 296 | — |
| Total debt | | 184,610 | 204,670 |
| Less: current portion | | (243) | (3,552) |
| Total long-term debt | $ | 184,367 | $ | 201,118 |

*Senior Secured Revolving Credit Facility*

On December 24, 2010, we entered into a Credit Facility comprised of a senior secured revolving credit facility of up to $35 million and a $75 million secured letter of credit facility to be used exclusively for the issuance of letters of credit in support of our future P&A liabilities relating to our oil and natural gas properties (the "Letter of Credit Facility"). The Credit Facility bears interest based on the borrowing base usage, at the applicable London Interbank Offered Rate, plus applicable margins ranging from 4.75% to 5.5%, or an alternate base rate based on the federal funds effective rate plus applicable margins ranging from 3.25% to 4.00%. The applicable margin is computed based on the borrowing based utilization percentage in effect from time to time. On August 30, 2013, we consented to the assignment by Capital One Bank, N.A. and the other lenders of all of their rights and obligations under the Credit Facility to White Elk LLC, as Administrative Agent and Lender, and Resource Value Group LLC, as Lender. Resource Value Group LLC is affiliated with our majority owner, Platinum Partners Value Arbitrage Fund L.P.

We have entered into various amendments to the Credit Facility and the Letter of Credit Facility. These amendments have, among other things, (1) changed our amount available for borrowing under the Credit Facility from $35 million to a current borrowing base of $47 million, (2) adjusted the commitments under the Letter of Credit Facility to a current level of approximately $66.6 million, (3) increased the applicable margin with respect to each ABR loan or Eurodollar loan outstanding by a total of 2%, (4) amended certain provisions governing our swap agreements, (5) updated the fees on the letters of credit to 2% on a go-forward basis, (6) updated the "change in control" definition, (7) amended the definition of debt included in the calculation of the covenants, (8) changed the maturity date from December 24, 2013 to January 1, 2015 on the Credit Facility and to June 22, 2014 on the Letter of Credit Facility, (9) added affirmative covenants to be furnished on a weekly basis including updated cash flow projections, updated accounts payable and accounts receivable schedules, and daily production reports for the week, (10) added an affirmative covenant that we would receive certain specified capital contributions from Platinum Partners Black Elk Opportunities Fund LLC ("PPBE") or entities designated by PPBE during the first quarter of 2013, (11) revised the definition of "Event of Default" to include non-compliance with new affirmative covenants and (12) restricted returns of capital to our unit holders or distributions of our property to our equity interest holders.

On August 30, 2013, we entered into a Limited Waiver and Eleventh Amendment to our Credit Facility (the "Eleventh Amendment") to (1) obtain waivers related to our financial covenants for the third and fourth quarters of 2013, (2) extend the maturity date under the credit facility to January 1, 2015, (3) increase the Applicable Margin under the Credit Facility by one percent (for a total increase of two percent when combined with the one percent increase pursuant to the Eighth Amendment), (4) maintain the borrowing base at $25 million, subject to the right of Resource Value Group LLC to require the Administrative Agent to increase the borrowing base up to a maximum of $50 million and (5) waive our right and the right of the Lenders to request or obtain a borrowing base redetermination prior to the first scheduled redetermination date in 2014. The borrowing base under the Credit Facility was increased to $35 million on September 30, 2013 and as of that date we had $35 million outstanding. Subsequently, the borrowing base was increased to $47 million on October 15, 2013. As of November 14, 2013, we had $45 million drawn on the Credit Facility.

As of September 30, 2013, letters of credit in the aggregate amount of $96.6 million were outstanding under the Letter of Credit Facility. We had $35.0 million in borrowings under the Credit Facility. As of November 14, 2013, we had $2.0 million available for additional borrowings under the Credit Facility.

A commitment fee of 0.5% per annum is computed based on the unused borrowing base and paid quarterly. For each of the three and nine months ended September 30, 2013, we recognized $4,125 in commitment fees, which have been included in

11

"Interest expense" on the consolidated statements of operations. A letter of credit fee is computed based on the same applicable margin used to determine the interest rate to Eurodollar loans times the stated face amount of each letter of credit.

The Credit Facility is secured by mortgages on at least 80% of the total value of our proved oil and gas reserves. The borrowing base is re-determined semi-annually on or around April 1st and October 1st of each year.

The Credit Facility requires us and our subsidiaries to maintain certain financial covenants. Specifically, we may not permit, in each case as calculated as of the end of each fiscal quarter, our total leverage ratio to be more than 2.5 to 1.0, our interest coverage ratio to be less than 3.0 to 1.0, or our payables restriction covenant, which does not allow accounts payable greater than 90 days old to exceed $6.0 million in the aggregate, excluding certain vendors (in each case as defined in our revolving Credit Facility). In addition, we and our subsidiaries are subject to various covenants, including, but not limited to, restrictions on our and our subsidiaries' ability to merge and consolidate with other companies, incur indebtedness, grant liens or security interests on assets subject to their security interests, pay dividends, make acquisitions, loans, advances or investments, sell or otherwise transfer assets, enter into transactions with affiliates or change our line of business. As of September 30, 2013, we were not in compliance with the total leverage ratio covenant, the hedging requirement covenant and the interest coverage ratio covenant. Our total leverage ratio was calculated to be 6.0 to 1.0, which was higher than the required maximum of 2.5 to 1.0. Our hedging requirement of our notional volumes exceeded 60% for the months of October and November 2013 by 21% and 13%, respectively, of the reasonably anticipated total volume of projected production from proved, developed, and producing oil and gas properties. Our interest coverage ratio covenant was calculated to be 1.2 to 1.0, which was lower than the minimum 3.0 to 1.0. Our payables restriction covenant was calculated to be $27.2 million which was higher than the maximum of $6.0 million. We received a limited waiver relating to such covenants in the Eleventh Amendment for only the fiscal quarters ended September 30, 2013 and December 31, 2013 as well as a limited waiver and amendment on our Letter of Credit Facility in the Limited Waiver, Tenth Amendment to Letter of Credit Facility Agreement (the "Waiver and Tenth Amendment") for the fiscal quarter ended September 30, 2013.

*13.75% Senior Secured Notes*

On November 23, 2010, we issued $150 million face value of 13.75% Notes discounted at 99.109%. The net proceeds were used to repay all of the outstanding indebtedness under our prior revolving credit facility, to fund BOEM collateral requirements, and to prefund our escrow accounts. We pay interest on the Notes semi-annually in arrears, on June 1 and December 1 of each year, which commenced on June 1, 2011. The Notes will mature on December 1, 2015, at which time all principal then outstanding will be due. As of September 30, 2013, the recorded value of the Notes was $149.3 million, which includes the unamortized discount of $0.7 million. We incurred underwriting and debt issue costs of $7.2 million, which have been capitalized and are being amortized over the life of the Notes.

The Notes are secured by a security interest in our and the guarantors' assets (excluding the W&T Escrow Accounts (as defined below)) to the extent they constitute collateral under our existing unused Credit Facility and derivative contract obligations. The liens securing the Notes will be subordinated and junior to any first lien indebtedness, including our derivative contracts obligations and Credit Facility.

We have the right to redeem the Notes under various circumstances. If we experience a change of control, the holders of the Notes may require us to repurchase the Notes at 101% of the principal amount thereof, plus accrued unpaid interest. We also have an optional redemption in which we may redeem up to 35% of the aggregate principal amount of the Notes at a price equal to 110.0% of the principal amount, plus accrued interest and unpaid interest to the date of redemption, with the net cash proceeds of certain equity offerings until December 1, 2013. From December 1, 2013 until December 1, 2014, we may redeem some or all of the Notes at an initial redemption price equal to par value plus one-half the coupon which equals 106.875% plus accrued and unpaid interest to the date of the redemption. On or after December 1, 2014, we may redeem some or all of the Notes at a redemption price equal to par plus accrued and unpaid interest to the date of redemption.

On May 23, 2011, we commenced a Consent Solicitation that resulted in our entry into the First Supplemental Indenture. We paid a consent solicitation fee of $4.5 million. The First Supplemental Indenture amended the Indenture, among other things, to: (1) increase the amount of capital expenditures permitted to be made by us on an annual basis, (2) enable us to obtain financial support from our majority equity holder by way of a $30 million investment in Sponsor Preferred Stock, which can be repaid over time, and (3) obligate us to make an offer to repurchase the Notes semi-annually at an offer price equal to 103% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest to the extent we meet certain defined financial tests and as permitted by our credit facilities.

The Notes require us to maintain certain financial covenants. Specifically, we may not permit our SEC PV-10 to consolidated leverage to be less than 1.4 to 1.0 as of the last day of each fiscal year. In addition, we and our subsidiaries are subject to various covenants, including restricted payments, incurrence of indebtedness and issuance of preferred stock, liens, dividends and other payments, merger, consolidation or sale of assets, transactions with affiliates, designation of restricted and

2013.09.30-10Q

12

unrestricted subsidiaries, and a maximum limit for capital expenditures. Our limitation on capital expenditures was amended in conjunction with the Consent Solicitation on May 31, 2011 to 30% of consolidated earnings before interest expense, income taxes, DD&A, impairment of oil and gas properties, and exploration expense for any year thereafter. As of September 30, 2013, we were in compliance with all covenants under the Indenture. We believe anticipated capital expenditures in 2013 will exceed the amount provided for in a covenant regarding maximum capital expenditures. However, the Indenture also provides that we may use proceeds from the sale of assets for capital expenditures that we believe is not limited by the previously referenced capital expenditure covenant. In the event our interpretation of the Indenture is not upheld or if our cash proceeds from the sale of assets are not sufficient to reduce our capital expenditures to a level that makes us compliant with the maximum capital expenditure covenant, we have the option under the Indenture to redeem the Notes, beginning December 1, 2013, at a redemption price of 106.875% of par plus accrued interest and may seek to redeem the Notes; however, there can be no assurance that we will have sufficient funds to do so. We also have the option to solicit a waiver from the holders of the Notes. In these circumstances, absent a waiver and following referenced notice to us of the default and lapse of the 30-day grace period as provided in the Indenture, the Indenture trustee or the holders of at least 25% in aggregate principal amount of the Notes would have the right to declare all the Notes to be due and payable immediately. A default under the Indenture covenant could also result in a cross-default under our credit facility.

The amounts of required principal payments based on our outstanding debt amounts as of September 30, 2013, were as follows:

| Period Ending September 30, | | (in thousands) |
|---|---|---|
| 2014 | $ | 243 |
| 2015 | | 35,030 |
| 2016 | | 150,023 |
| | | 185,296 |
| Unamortized discount on 13.75% Senior Secured Notes | | (686) |
| Total debt | $ | 184,610 |

## NOTE 8–PREFERRED UNITS AND MEMBERS' DEFICIT

In the first quarter of 2013, we entered into contribution agreements with PPVA (Equity) and Platinum Partners Black Elk Opportunities Fund LLC ("PPBE") or entities designated by PPBE (together, the "Platinum Group") pursuant to which we have issued 50.0 million additional Class E Preferred Units (the "Class E Units") and 3.8 million additional Class B Units to the Platinum Group for an aggregate offering price of $50.0 million. The Class E Units are recorded under "Preferred Units" and the Class B Units are included in "Members Deficit" in the consolidated balance sheets. In addition, we also agreed to issue an additional 43 million Class E Units in exchange for $30.0 million of outstanding Class D Preferred Units and $13.0 million of paid-in-kind dividends. The Class D Preferred Units were recorded under "Preferred Units" in the consolidated balance sheets. The Class E Units will receive a preferred return of 20% per annum, which will increase from and after March 25, 2014 to 36% per annum (such date as determined by our Fifth Amendment to Second Amended and Restated Limited Liability Operating Agreement). For the nine months ended September 30, 2013, we issued an additional amount of Class E Units of approximately 12.0 million as paid-in-kind dividends to the holders of Class E Units.

On February 12, 2013, we entered into an agreement with Platinum under which we agreed to issue Class B Units to Platinum in exchange for financial consulting services, including (1) analysis and assessment of our business and financial condition and compliance with financial covenants in our Credit Facility, (2) discussion with us and senior bank lenders regarding capital contributions and divestitures of non-core assets, and (3) coordination with our attorneys, accountants, and other professionals. On February 12, 2013, we issued 1,131,458.5 Class B Units to PPVA Black Elk (Equity) LLC, an affiliate of Platinum, pursuant to such agreement.

On February 12, 2013, we entered into the Fourth Amendment to the Second Amended and Restated Limited Liability Operating Agreement of the Company (the "Fourth Amendment"). The Fourth Amendment amended the Company's operating agreement to effectuate a 10,000 to 1 unit split for each of the Class A Units, Class B Units and Class C Units.

## NOTE 9—COMMITMENTS AND CONTINGENCIES

### General

Due to the nature of our business, some contamination of the real estate property owned or leased by us is possible. Environmental site assessment of the property would be necessary to adequately determine remediation costs, if any. Management does not consider the amounts that would result from any environmental site assessments to be significant to the

13

consolidated financial position or results of our operations. Accordingly, no provision for potential remediation costs is reflected in the accompanying consolidated financial statements.

We are subject to claims and lawsuits that arise primarily in the ordinary course of business. It is the opinion of management that the disposition or ultimate resolution of such claims and lawsuits will not have a material adverse effect on our consolidated financial position or results of operations.

For each of the following proceedings, we are currently evaluating the plaintiff's claims and determining appropriate courses of response with the aid of outside legal counsel and insurance defense counsel. These proceedings are at a preliminary stage; accordingly, we currently cannot assess the probability of losses, or reasonably estimate a range of any potential losses related to the proceedings. Some or all of the costs of defense and liability (if any) may be covered under our Commercial General Liability insurance policy. We intend to vigorously defend ourselves in these proceedings. We are currently in the early stages of litigation for each proceeding and are therefore unable to determine whether these proceedings would have a material adverse effect on our financial position, results of operations or cash flows.

### West Delta 32

On November 16, 2012, an explosion and fire occurred on our West Delta 32-E platform (the "West Delta 32 Incident"). The investigation in regards to the West Delta 32 Incident has been concluded by BSEE. On November 4, 2013, BSEE issued its investigation report (the "BSEE Panel Report 2013-002") on the West Delta 32 Incident. The report recommends that contractors Wood Group Production Service Network, Grand Isle Shipyard, and Compass Engineering Consultants, as well as Black Elk Energy be issued the following types of Incidents of Non-Compliance: G-110, G-112, G-116, G-303, G-310, G-311, G-312 and E-100. The report also recommends that contractor Wood Group Production Service Network and Black Elk Energy be issued the additional following types of Incidents of Non-Compliance: G-309 and G-317. The report states that BSEE will issue Incidents of Non-Compliance based upon evidence contained in the report and/or other relevant evidence. No Incidents of Non-Compliance have been issued yet, and Black Elk Energy has and will continue to fully cooperate with BSEE. Black Elk Energy will be carefully reviewing the BSEE Panel Report 2013-002 over the coming weeks.

At BSEE's direction, we engaged an independent third-party auditor to audit our SEMS program. BSEE participated in the audit and after reviewing the results, it issued a letter to BEEOO stating that "BEEOO's SEMS meets the intent of SEMS regulations and policies, provided that the Corrective Action Plan ("CAP") is implemented in accordance with BEEOO's SEMS Audit Report. We are currently providing regular updates on our CAP progress.

In August 2013, ABSG Consulting ("ABSG"), a third party investigator, concluded that on the day of the West Delta 32 Incident contractors were welding a flange on open piping leading to an oil tank that contained flammable vapors. The piping had not been isolated and made safe for welding activities as required by Black Elk Energy safe work practices. The ABSG report further found that flammable vapors in the piping ignited, and within seconds reached the three oil tanks. The welding work was performed under contract by Grand Isle Shipyard. At the time of the incident, the platform production was shut in and no oil was flowing to or through the platform.

On October 15, 2013, the Department of Justice, U.S. Attorney's Office issued a subpoena pertaining to all physical evidence collected and maintained by BEEOO and ABSG Consulting as part of the investigation of the West Delta Incident.

As of November 12, 2013, several civil lawsuits have been filed as a result of the West Delta 32 Incident. The courts held a status conference ordering procedural matters to be filed on the court's docket. All civil cases filed both in Texas and Louisiana as a result of the West Delta 32 Incident are being defended by insurance defense counsel. We believe we have strong defenses and cross-claims and intend to defend ourselves vigorously.

On January 8, 2013, five investors in Black Elk Energy, LLC ("BEE") filed a purported derivative action on behalf of BEE in the 164th Judicial District of Harris County, Texas against our President and CEO, John Hoffman; our majority unit holder, PPVA Black Elk (Equity) LLC; several entities affiliated with PPVA Black Elk (Equity) LLC; and Iron Island Technologies, Inc. The lawsuit originally alleged that the defendants improperly diluted BEE's percentage ownership in our company and that the defendants' alleged gross mismanagement harmed BEE by allegedly causing a credit rating downgrade and a prospective buyer to reduce an alleged offer price for our company. The plaintiffs seek an unspecified amount of damages on behalf of BEE in connection with these claims. On July 26, 2013, in response to a motion to dismiss by PPVA Black Elk (Equity) LLC and its affiliated entities, the court dismissed all claims against all defendants. The claims were dismissed with prejudice to re-filing in Texas.

In the previously reported investor plaintiff civil matter, the same plaintiffs filed a Temporary Restraining Order and Preliminary Injunction in the Supreme Court of the State of New York, County of New York, restraining BEEOO from dispersing any proceeds from the sale of 43 oil and gas offshore fields being marketed at an oil and gas clearing house until

2013.09.30-10Q

14

27.01% of the sale proceeds are placed in an escrow account during the pendency of the litigation. The Judge dismissed the Temporary Restraining Order and set a hearing for the Motion for the Injunction. The court heard oral arguments on the preliminary injunction motion on October 31, 2013 and reserved decision; a ruling is expected later this month. The Company intends to file a motion to dismiss the complaint in its entirety for failure to state a cause of action and based on documentary evidence that refutes the claims.

On April 29, 2013, Grand Isle Shipyards, Inc. ("GIS") sued BEEOO, Enviro Tech Systems, LLC, Wood Group USA, Inc., and Compass Engineering & Consultants, LLC in the United States District Court for the Eastern District of Louisiana for damages it alleged incurred in connection with the West Delta 32 Incident. GIS specifically sought damages for loss of property and equipment, expenses in the form of indemnity and medical benefits paid to or on behalf of its employees, and for unpaid invoices in connection with the work it performed at West Delta 32. Upon motion by BEEOO, however, the court dismissed GIS' lawsuit and ordered GIS and BEEOO to first attempt to resolve their claims through mediation, and if that is unsuccessful, then through binding arbitration, pursuant to and in accordance with the MSA. The mediation is scheduled on November 12, 2013. If that is unsuccessful, then the arbitration process will proceed.

### Operating Leases

We lease office space and certain equipment under non-cancelable operating lease agreements that expire on various dates through 2020.

During 2012, we entered into two drilling unit contracts. One of the contracts was amended in June 2013 and was extended an additional 180 days to begin in January 2014. The second contract was for the duration of one drill well and was extended to include one additional drill well, which has now been completed. Additionally, we purchased leasehold in South Texas and drilled and completed one well in the third quarter of 2013.

Approximate future minimum lease payments for operating leases at September 30, 2013 were as follows:

| Period Ending September 30, | | (in thousands) |
|---|---|---|
| 2014 | $ | 31,860 |
| 2015 | | 2,201 |
| 2016 | | 2,029 |
| 2017 | | 1,740 |
| 2018 | | 1,577 |
| Thereafter | | 3,476 |
| | $ | 42,883 |

### Escrow Accounts

Pursuant to the purchase agreement from W&T Offshore, Inc. (the "W&T Acquisition"), we are required to fund two escrow accounts (the "W&T Escrow Accounts"), relating to the operating and non-operating properties that were acquired in maximum aggregate amount of $63.8 million ($32.6 million operated and $31.2 million non-operated) for future P&A costs that may be incurred on such properties. As of November 2010, we fully funded the operating escrow account in the amount of $32.6 million and the payment schedule for the Non-Operated Properties Escrow Account was amended and commenced on December 2011. As of September 30, 2013, we have funded $16.4 million into the non-operating escrow account, leaving $14.8 million to be funded through May 1, 2017.

The obligations under the W&T Escrow Accounts are fully guaranteed by an affiliate of Platinum. W&T Offshore Inc. ("W&T") has a first lien on the entirety of the W&T Escrow Accounts, and BP Corporation North America Inc. and Platinum are pari passu second lien holders. Once P&A obligations with respect to the interest in properties acquired from the W&T Acquisition have been fully satisfied, the lien on the W&T Escrow Accounts will be automatically extinguished. W&T also has a second priority lien with respect to the interest in properties acquired from the W&T Acquisition (with Platinum and BNP Paribas sharing a first priority lien), which lien will be released once the W&T Escrow Accounts have been fully funded. On December 19, 2012, we entered into a Third Amendment to Purchase and Sale Agreement (the "Third Amendment") with W&T. Pursuant to the Third Amendment, we caused performance bonds (the "ARGO Bonds") in an aggregate amount of $32.6 million to be issued by Argonaut Insurance Company to W&T to guaranty our performance of certain plugging and abandonment obligations. Upon receipt of the ARGO Bonds, W&T (i) released its rights to any money held in an escrow account established to secure our performance of certain plugging and abandonment obligations with respect to the Operated Properties Escrow Account, (ii) released the security interest and deposit account control agreement formerly securing its rights in the Operated Properties Escrow Account and (iii) authorized the escrow agent to release such funds from the Operated Properties Escrow Account to or at our direction. In addition, we and W&T agreed that until the funding of an escrow account

2013.09.30-10Q

15

established to our performance of certain plugging and abandonment obligations with respect to certain non-operated properties is complete, we may not obtain reductions of the ARGO Bonds under any circumstances without W&T's consent.

Pursuant to the purchase agreement for the Maritech Acquisition, we are required to fund an escrow account (the "Maritech Escrow Account"), relating to the properties that were acquired, of $13.1 million to be used for future P&A costs that may be incurred on such properties. As of September 30, 2013, we have funded $11.3 million, leaving $1.8 million to be funded through February 2014.

In regards to the Merit Acquisition, we are required to establish an escrow account to secure the performance of our P&A obligations and other indemnity obligations with respect to P&A and/or decommissioning of the acquired wells and facilities. We paid $33 million in surety bonds at closing and are required to, over time, deposit in the escrow account an amount equal to $60 million, which is to be paid in 30 equal monthly installments payable on the first day of each month commencing on June 1, 2011. As of September 30, 2013, we have funded $56.0 million, leaving $4.0 million to be funded through November 2013.

## NOTE 10—GAIN ON INVOLUNTARY CONVERSION

### High Island 443 A-2

On September 27, 2012, an incident occurred on our High Island 443 A-2 ST well which required the closing of the blind/shear rams to properly shut in and maintain control of the well due to several days of unsuccessful attempts to repair a small hydrocarbon leak on a conductor riser. Additional surface diagnostics found the inner casing strings to be most likely compromised. On October 12, 2012, BSEE advised us to plug and abandon the well. We have well control insurance and pursued reimbursement for this incident. Additionally, once the High Island 443 A-2 ST well was plugged, we started operations to sidetrack the High Island 443 A-5 well on the same platform. The costs associated with the High Island 443 A-5 drilling are also insurance recoverable.

The claim was approved and paid by insurance underwriters. We recorded a receivable of $3.1 million for reimbursement, after a deductible of $0.5 million, under our insurance policy at December 31, 2012 and received the funds during the first quarter of 2013. As of September 30, 2013, we recorded a receivable of $0.3 million for additional reimbursement and received these final funds in October 2013. The claim has been finalized. We received a total of approximately $24.1 million, net of the deductible, in cash for the claim during 2013.

## NOTE 11—RELATED PARTY TRANSACTIONS

We pay for certain operating and general and administration expenses on behalf of Black Elk Energy, LLC. At both September 30, 2013 and December 31, 2012, we had receivables from Black Elk Energy, LLC in the amount of $23,430.

On August 30, 2013, we consented to the assignment by Capital One Bank, N.A. and the other lenders of all of their rights and obligations under our Credit Facility to White Elk LLC, as Administrative Agent and Lender, and Resource Value Group LLC, as Lender. Resource Value Group LLC is affiliated with Platinum. As part of this transaction, we paid a required $0.3 million purchase fee on behalf of Platinum pursuant to the Loan Purchase Agreement.

During 2011, we entered into a contribution agreement with Platinum. We also entered into additional contributions with (PPVA (Equity)) and the Platinum Group in 2013. See Note 8.

On May 28, 2013, FWS entered into an equipment lease agreement with Pea and Eigh Company, LLC ("Pea and Eigh"), a related party of Platinum. The lease began on July 1, 2013 and is payable in monthly installments of approximately $35,000, maturing on December 31, 2013, with an option to purchase the equipment for $1.5 million. As of September 30, 2013, we have not purchased all of the equipment. We currently have restricted cash of $0.6 million for the additional equipment to be purchased as well as advances due to Pea and Eigh, which is included in "Accounts payable and accrued expenses".

In October 2010, Freedom Logistics LLC ("Freedom") was formed by Platinum, our majority equity holder, and Freedom HHC Management, LLC, the members of which are Messrs. John Hoffman (our President and Chief Executive Officer) and David Cantu (a former employee), for the purpose of holding certain aircraft equipment, including two helicopters. On October 8, 2010, we guaranteed the loan that Freedom used to purchase two helicopters in the aggregate principal amount of $3.2 million. The loan was paid off in December 2012 in connection with the sale of Freedom. Before the sale, Freedom provided us with aircraft services, which were prepaid on a monthly basis. As of December 31, 2012, we had a receivable of $0.3 million from Freedom. The receivable was paid on February 26, 2013.

16

## NOTE 12—SUBSEQUENT EVENTS

*Option to Purchase Golden Gate Oil.* On November 14, 2013, we entered into a Purchase Option Agreement with the owners of Golden Gate Oil LLC pursuant to which we have the option to purchase 100% of the equity of Golden Gate for an aggregate purchase price equal to $60 million plus the amount of any advances made to Golden Gate by its members after October 29, 2013 plus the principal, interest and fees outstanding under certain debt of Golden Gate. Golden Gate and its principal owner are affiliated with Platinum.

The Golden Gate Oil Project is located in the Santa Maria Oil Basin, Santa Barbara, California. The Project is an in-fill horizontal opportunity, targeting the highly fractured Monterrey Shale oil reservoir.

*Letter of Credit Facility Amendment.* On November 14, 2013, we entered into the Waiver and Tenth Amendment on our Letter of Credit Facility to (1) obtain waivers related to our financial covenants for the third quarter of 2013, (2) cap the outstanding principal balance under the Letter of Credit Facility at approximately $66.6 million, (3) no longer issue or renew existing Letters of Credit and (4) remove the financial covenant requirements and the restriction of asset sales.

17

### CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Quarterly Report on Form 10-Q (this "Form 10-Q") contains forward-looking statements that are subject to a number of risks and uncertainties, many of which are beyond our control. All statements, other than statements of historical fact included in this Form 10-Q, regarding our strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects, plans and objectives of management are forward-looking statements. When used in this Form 10-Q, the words "could," "believe," "anticipate," "intend," "estimate," "expect," "may," "continue," "predict," "potential," "project" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. Forward-looking statements may include statements that relate to, among other things, our:

- Financial data, including production, costs, revenues and operating income;
- Future financial and operating performance and results;
- Business strategy and budgets;
- Market prices;
- Expected plugging and abandonment obligations and other expected asset retirement obligations;
- Technology;
- Financial strategy;
- Amount, nature and timing of capital expenditures;
- Drilling of wells and the anticipated results thereof;
- Oil and natural gas reserves;
- Timing and amount of future production of oil and natural gas;
- Competition and government regulations;
- Operating costs and other expenses;
- Cash flow and anticipated liquidity;
- Prospect development;
- Property acquisitions and sales; and
- Plans, forecasts, objectives, expectations and intentions.

These forward-looking statements are based on our current expectations and assumptions about future events and their potential effect on us. While management believes that these forward-looking statements are reasonable as and when made, there can be no assurance that future developments affecting us will be those that we anticipate. All comments concerning our expectations for future revenues and operating results are based on our forecasts for our existing operations and do not include the potential impact of any future acquisition. Our forward-looking statements involve significant risks and uncertainties (some of which are beyond our control) and assumptions that could cause actual results to differ materially from our historical experience and our present expectations or projections. Known material factors that could cause our actual results to differ from those in the forward-looking statements are described in "Item 1A. Risk Factors" in this Form 10-Q and our 2012 Form 10-K.

These factors include risks summarized below:

- Low and/or declining prices for oil and natural gas;
- Oil and natural gas price volatility;
- Risks associated with drilling, including completion risks, cost overruns and the drilling of non-economic wells or dry holes;
- Ability to raise additional capital to fund future capital expenditures;
- Ability to post additional collateral as required by surety companies;
- Cash flow and liquidity;
- Ability to find, acquire, market, develop and produce new oil and natural gas properties;
- Uncertainties in the estimation of proved reserves and in the projection of future rates of production and timing of development expenditures;

2013.09.30-10Q

18

- Geological concentration of our reserves;
- Discovery, acquisition, development and replacement of oil and natural gas reserves;
- Operating hazards attendant to the oil and natural gas business;
- Down hole drilling and completion risks that are generally not recoverable from third parties or insurance;
- Potential mechanical failure or underperformance of significant wells or pipeline mishaps;
- Potential increases in plugging and abandonment and other asset retirement costs as a result of new regulations;
- Weather conditions;
- Availability and cost of material and equipment;
- Delays in anticipated drilling start-up dates;
- Actions or inactions of third-party operators of our properties;
- Ability to find and retain skilled personnel;
- Strength and financial resources of competitors;
- Potential defects in title to our properties;
- Federal and state regulatory developments and approvals, including the adoption of new regulatory requirements;
- Losses possible from current litigation matters as a result of the explosion and fire on the West Delta 32-E Platform and other future litigation;
- Environmental risks;
- Changes in interest rates;
- Developments in oil and natural gas-producing countries;
- Events similar to those of September 11, 2001, Hurricanes Katrina, Rita, Gustav and Ike and the Deepwater Horizon explosion;
- Possible referral to the Bureau of Ocean Energy Management to revoke our status as an operator on all of our existing facilities pursuant to a letter received from BSEE on November 21, 2012; and
- Worldwide political and economic conditions.

Readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date of this Form 10-Q. We undertake no responsibility to publicly release the results of any revisions of our forward-looking statements after the date they are made.

Should one or more of the risks or uncertainties described in "Item 1A. Risk Factors" in this Form 10-Q and our 2012 Form 10-K occur, or should underlying assumptions prove incorrect, our actual results and plans could differ materially from those expressed in any forward-looking statement.

All forward-looking statements, express or implied, included in this Form 10-Q are expressly qualified in their entirety by this cautionary statement. This cautionary statement should also be considered in connection with any subsequent written or oral forward-looking statements that we or persons acting on our behalf may issue.

**Except as required by law, we undertake no obligations to update, revise or release any revisions to any forward-looking statements to reflect events or circumstances occurring after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict all of these factors. Further, we cannot assess the impact of each such factor on our business or the extent to which any factors, or combination of factors, may cause actual results to be materially different from those contained in any forward-looking statement.**

19

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis should be read in conjunction with the consolidated financial statements and related notes included elsewhere in this Form 10-Q. The following discussion and analysis contains forward-looking statements that reflect our future plans, estimates, beliefs and expected performance. The forward-looking statements are dependent upon events, risks and uncertainties that may be outside our control. Our actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, the volatility of oil and natural gas prices, production timing and volumes, estimates of proved reserves, operating costs and capital expenditures, economic and competitive conditions, regulatory changes and other uncertainties, as well as those factors discussed in this Form 10-Q, particularly in "Item 1A. Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements," all of which are difficult to predict. As a result of these risks, uncertainties and assumptions, the forward-looking events discussed may not occur.*

## Overview

We are an oil and gas company engaged in the acquisition, exploitation, development and production of oil and natural gas properties. We seek to acquire and exploit properties with proved developed reserves, proved developed non-producing reserves and proved undeveloped reserves. Our strategy is to acquire and economically maximize properties that are currently producing or have the potential to produce given additional attention and capital resources. We are engaged in a continual effort to monitor and reduce operating expenses by finding opportunities to safely increase efficiencies related to staffing, transportation and operational procedures. Moreover, our ability to accurately estimate and manage plugging and abandonment costs associated with potential acquisitions increases the likelihood of achieving our target returns on investment. Our management team has extensive engineering, geological, geophysical, technical and operational expertise in successfully developing and operating properties in both our current and planned areas of operation. As of September 30, 2013, we held an aggregate net interest in approximately 490,370 gross (239,190 net) acres under lease and had an interest in 1,059 gross wells, 268 of which are producing.

We have financed our acquisitions to date through a combination of cash flows provided by operating activities, borrowings under lines of credit and the Notes, and capital contributions from our members. Our use of capital for acquisitions, exploitation and development allows us to direct our capital resources to what we believe to be the most attractive opportunities as market conditions evolve. We have historically acquired properties that we believe will meet or exceed our rate of return criteria. For acquisitions of properties with additional development, exploitation and exploration potential, we have focused on acquiring properties that we expect to operate so that we can control the timing and implementation of capital spending. In some instances, we have acquired non-operated property interests at what we believe to be attractive rates of return either because they provided a foothold in a new area of interest or complemented our existing operations. We intend to continue to acquire both operated and non-operated properties to the extent we believe they meet our return objectives. In addition, our willingness to acquire non-operated properties in new areas provides us with geophysical and geologic data that may lead to further acquisitions in the same area, whether on an operated or non-operated basis.

Black Elk Energy Offshore Operations, LLC and Black Elk Energy Land Operations, LLC were formed on November 20, 2007 as operating subsidiaries of Black Elk Energy, LLC. Black Elk Energy, LLC subsequently assigned its interests in Black Elk Energy Land Operations, LLC to Black Elk Energy Offshore Operations, LLC. Black Elk Energy Offshore Operations, LLC currently has three wholly owned domestic subsidiaries: (i) Black Elk Energy Land Operations, LLC, which is a guarantor under our Indenture, (ii) Black Elk Energy Finance Corp., which is the co-issuer of the Notes and (iii) Freedom Well Services, LLC. Neither Black Elk Energy Land Operations, LLC nor Black Elk Energy Finance Corp has any material assets or operations. Black Elk Energy, LLC owns a minority interest in Black Elk Energy Offshore Operations, LLC.

We seek to acquire assets in our areas of focus from oil and gas companies that have determined that such assets are noncore and desire to remove them from their producing property portfolio or have made strategic decisions to deemphasize their offshore operations. Prior to an acquisition, we perform stringent structural engineering tests to determine whether the reservoirs possess potential upside. Each opportunity is presented, catalogued and graded by our management and risked appropriately for the overall impact to our Company.

We have historically grown our business through third-party acquisitions, including the acquisition of our first field, South Timbalier 8, in 2008, which was followed by an additional field acquisition, West Cameron 66, the W&T Acquisition in 2009, the Chroma and Nippon Acquisitions in 2010 and the Maritech and Merit Acquisitions in 2011.

Our revenue, profitability and future growth rate depend significantly on factors beyond our control, such as economic, political and regulatory developments, and environmental hazards, as well as competition from other sources of energy. Oil and natural gas prices historically have been volatile and may fluctuate widely in the future. Sustained periods of low prices for oil

20

or natural gas could materially and adversely affect our financial position, our results of operations, the quantities of oil and natural gas reserves that we can economically produce and our access to capital. Prices for oil and natural gas can fluctuate widely in response to relatively minor changes in the global and regional supply of and demand for oil and natural gas, market uncertainty, economic conditions and a variety of additional factors. Since our inception, commodity prices have experienced significant fluctuations.

From time to time, we use derivative financial instruments to economically hedge a portion of our commodity price risk to mitigate the impact of price volatility on our business. Our average prices that reflect both the before and after effects of our realized commodity hedging transactions for the three and nine months ended September 30, 2013 and 2012 are shown in the table below.

| | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | | 2012 | | 2013 | | 2012 | |
| **Oil:** | | | | | | | | |
| Average price before effects of hedges ($/Bbl)[1] | $ | 110.41 | $ | 102.92 | $ | 108.24 | $ | 107.93 |
| Average price after effects of hedges ($/Bbl) | | 102.01 | | 103.06 | | 103.41 | | 105.99 |
| Average price differentials[2] | | 4.59 | | 10.76 | | 10.07 | | 11.81 |
| **Gas:** | | | | | | | | |
| Average price before effects of hedges ($/Mcf)[1] | $ | 3.74 | $ | 3.06 | $ | 3.85 | $ | 2.63 |
| Average price after effects of hedges ($/Mcf) | | 4.07 | | 3.80 | | 4.18 | | 3.64 |
| Average price differentials[2] | | 0.19 | | 0.18 | | 0.16 | | 0.09 |

(1) Realized oil and natural gas prices do not include the effect of realized derivative contract settlements.
(2) Price differential compares realized oil and natural gas prices, without giving effect to realized derivative contract settlements, to West Texas Intermediate crude index prices and Henry Hub natural gas prices, respectively.

Oil and natural gas prices remain unstable and we expect them to remain volatile in the future. Factors affecting the price of oil include worldwide economic conditions, geopolitical activities, worldwide supply disruptions, weather conditions, actions taken by the Organization of Petroleum Exporting Countries and the value of the U.S. dollar in international currency markets. Factors affecting the price of natural gas include North American weather conditions, industrial and consumer demand for natural gas, storage levels of natural gas and the availability and accessibility of natural gas deposits in North America.

In order to mitigate the impact of changes in oil and natural gas prices on our cash flows, we are a party to hedging and other price protection contracts, and we intend to continue entering into such transactions in the future to reduce the effect of oil and natural gas price volatility on our cash flows. Currently, our risk management program is designed to hedge a significant portion of our production to assure adequate cash flow to meet our obligations. If the global economic instability continues, commodity prices may be depressed for an extended period of time, which could alter our development plans and adversely affect our growth strategy and our ability to access additional funding in the capital markets.

The primary factors affecting our production levels are capital availability, the success of our drilling program and our portfolio of well work projects. In addition, we face the challenge of natural production declines. As initial reservoir pressures are depleted, production from a given well decreases. We attempt to overcome this natural decline primarily through drilling our existing undeveloped reserves and enhancing our current asset base. Our future growth will depend on our ability to continue to add reserves in excess of production and to bring back to production or increase production on wellbores that are currently not productive or not being optimized. Our ability to add reserves through drilling and well work projects is dependent on our capital resources and can be limited by many factors, including our ability to timely obtain drilling permits and regulatory approvals. Any delays in drilling, completing or connecting our new wells to gathering lines will negatively affect our production, which will have an adverse effect on our revenues and, as a result, cash flow from operations.

We focus our efforts on increasing oil and natural gas reserves and production while controlling costs at a level that is appropriate for long-term operations. Our future cash flows from operations are dependent upon our ability to manage our overall cost structure.

**Recent Events**

*Potential Sale of Class B Units*

On September 16, 2013, we entered into a Subscription Agreement with Asiasons Capital Limited ("Asiasons") for the sale of 9,960,159 of our Class B Units for an aggregate purchase price of approximately US$50 million (based on a fixed price for Asiasons ordinary shares of 1.1948 Singapore Dollars and a fixed exchange rate of one U.S. Dollar to 1.27 Singapore

11/20/2018                                    2013.09.30-10Q

21

Dollars). The Subscription Agreement provides that Asiasons will pay for the Class B Units by issuing 53,146,970 ordinary shares in Asiasons to us and will also issue an aggregate of 3,482,386 ordinary shares to Jett Capital Advisors LLC as a broker's fee in connection with the transaction. The ordinary shares of Asiasons are listed on the Singapore Exchange Securities Trading Limited (SGX Symbol: 5ET).

The issuance of the Class B Units and the closing of the transaction are subject to customary closing conditions, including satisfactory completion by us and by Asiasons of financial, legal and operational due diligence on the other party, board approvals, accuracy of representations and warranties, and listing approval of the ordinary shares on the Singapore Exchange.

We have been informed that the Singapore Exchange has notified Asiasons that it does not have sufficient authority to issue the ordinary shares to us as contemplated by the Subscription Agreement. The Subscription Agreement has not been terminated, but the proposed sale of Class B Units on the terms set forth in the Subscription Agreement is unlikely to occur. We are engaged in discussions with Asiasons to determine whether the parties can reach agreement on the terms of a new investment.

*Safety and Environmental Management Systems ("SEMS") Audit*

On January 17, 2013, we commenced a Bureau of Safety and Environmental Enforcement ("BSEE") directed Independent Third Party SEMS Audit. The audit was conducted by M&H Energy Services ("M&H") in three phases: documentation, implementation and offshore facilities. During the offshore phase, 19 platforms were audited for SEMS compliance. BSEE participated as observers in portions of each phase.

Phase I started with a request from M&H to provide SEMS Program Manual and all documents incorporated by reference. These documents were reviewed for compliance with the requirements of 30 CFR Part 250 Subpart S and API RP 75 (incorporated by reference). Phase 2 kicked off on February 13, 2013 with a review of preliminary findings from Phase 1 and an analysis of SEMS records and documentation to determine how effectively the SEMS was implemented. The Phase 3 Offshore Audit started on March 4, 2013 and covered 19 platforms across our Gulf of Mexico asset areas (East, Central, and West). The final audit phase was completed on March 13, 2013. The Audit Closeout Meeting occurred on March 25, 2013 on schedule with the plan submitted to BSEE. We submitted the Final Audit Report to BSEE on April 10, 2013. The Corrective Action Plan ("CAP") was submitted to BSEE on April 11, 2013. We received a letter from BSEE on April 24, 2013 stating that the review was complete and that our SEMS meets the intent of the regulations and policies provided that the CAP is implemented in accordance with the SEMS Audit Report. On September 27, 2013 Black Elk advised BSEE that our SEMS CAP was complete.

*Performance Improvement Plan ("PIP")*

On November 21, 2012, BSEE sent us a letter requiring us to take certain actions and to improve our performance. The letter made reference to, among other things, the explosion and fire that occurred on our West Delta 32-E platform on November 16, 2012, (the "November 16, 2012 Incident"). BSEE stated in the letter that if we did not improve our performance, we would be subject to additional enforcement action up to and including possible referral to the Bureau of Ocean Energy Management ("BOEM") to revoke our status as an operator on all of our existing facilities. We have undertaken the actions BSEE required of us in the November 21 letter and have been regularly reporting our progress on those required improvements to BSEE. We have submitted a PIP to BSEE that identifies corrective action items to improve safety performance in offshore operations. The primary components of the PIP address:

- Independent Third-Party SEMS Audit
- Enhanced oversight of work on our operated platforms
- Hazard Recognition
- Compliance
- Reduction of Incidents of Non-Conformance (INCs)
- Stop Work Authority

In a meeting held at the BSEE Regional Office on October 30, 2013, BEEOO shared with BSEE representatives that implementation of corrective actions (18 elements and 58 tasks) associated with the PIP has been 100% completed. Other essential work control processes such as our Project Execution Plans and Contractor Bridging Agreements have been improved to provide better guidelines and procedures for hazard assessment and work controls. Training in Hazard Recognition, National Pollutant Discharge Elimination System ("NPDES"), Job Safety Analysis ("JSA") and Stop Work Authority ("SWA") will be ongoing and has been incorporated into our training matrix.

22

Based on the receipt of requested work and operation permits along with our interactions with BSEE and our corrective actions discussed above, we believe that we have improved our safety and compliance performance.

*High Island 443 A-2*

On September 27, 2012, an incident occurred on our High Island 443 A-2 ST well which required the closing of the blind/shear rams to properly shut in and maintain control of the well due to several days of unsuccessful attempts to repair a small hydrocarbon leak on a conductor riser. Additional surface diagnostics found the inner casing strings to be most likely compromised. On October 12, 2012, the BSEE advised us to plug and abandon the well. We have well control insurance and pursued reimbursement for this incident and the claim was approved. Additionally, once the High Island 443 A-2 ST well was plugged, we started operations to sidetrack the High Island 443 A-5 well on the same platform. The costs associated with the High Island 443 A-5 drill are also insurance recoverable. We recorded a receivable of $3.1 million for reimbursement, after a deductible of $0.5 million, under our insurance policy at December 31, 2012 and received the funds during the first quarter of 2013. As of September 30, 2013, we recorded a receivable of $0.3 million for reimbursement and received these funds in October 2013. The claim has been finalized. We received a total of approximately $24.1 million, net of the deductible, in cash for the claim.

*Capital Contributions*

In the first quarter of 2013, we entered into contribution agreements with PPVA (Equity) and Platinum Partners Black Elk Opportunities Fund LLC ("PPBE") or entities designated by PPBE (together, the "Platinum Group") pursuant to which we have issued 50 million additional Class E Units and 3.8 million additional Class B Units to the Platinum Group for an aggregate offering price of $50.0 million. In addition, we also agreed to issue an additional 43 million Class E Units in exchange for $30.0 million of outstanding Class D Preferred Units and $13.0 million of paid-in-kind dividends. The Class E Units will receive a preferred return of 20% per annum, which will increase from and after March 25, 2014 to 36% per annum (such date as determined by our Fifth Amendment to Second Amended and Restated Limited Liability Operating Agreement). For the nine months ended September 30, 2013, we issued an additional amount of Class E Units of approximately 12.0 million as paid-in-kind dividends to the holders of Class E Units.

*Operating Agreement Amendment*

On April 9, 2013, we entered into the Fifth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC (the "Fifth Amendment") to (1) revise and confirm the order and manner of distributions to our members and (2) permit the issuance of Class E Units in an aggregate amount not to exceed $95.0 million and the issuance of Class B Units in connection with such Class E Units in an aggregate amount not to exceed 3,800,000 units before giving effect to any capitalized Class E preferred return, for cash or property capital contributions.

On May 3, 2013, we entered into the Sixth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC (the "Sixth Amendment") to (1) establish the payment of the Class E Preferred Return to be paid in kind at the end of each calendar quarter to holders of record on that date unless we, with the consent of the Platinum Manager, elect to pay the Class E Preferred Return in cash and (2) establish New Mountain Finance Holdings, LLC as a Class E Member and, in the event that we do not file required reports with the U.S. Securities and Exchange Commission, provide them with rights as an Observer to the Board (as such term is defined by the Sixth Amendment). Additionally, pursuant to the Sixth Amendment, for so long as any Class E Preferred Units are outstanding, we cannot, without the written consent of the Class E Members, issue any equity instruments, including any additional classes of preferred units, that have rights, privileges or priorities that are equal or superior to the rights, privileges, or priorities of the existing Class E Preferred Units.

*Letter of Credit Facility Amendment and Credit Facility Amendments*

On August 15, 2013, we entered into a Limited Waiver, Ninth Amendment to Letter of Credit Facility Agreement to (1) obtain waivers related to certain covenants in the Letter of Credit Facility for the fiscal quarter ended June 30, 2013, (2) reduce the commitments and cap the outstanding principal balance under the Letter of Credit Facility at approximately $105.7 million and (3) reduce the maximum principal amount available under the Third Amended and Restated Note dated November 8, 2012 from $200.0 million to approximately $105.7 million.

On August 30, 2013, we consented to the assignment by Capital One Bank, N.A. and the other lenders of all of their rights and obligations under our Credit Facility to White Elk LLC, as Administrative Agent and Lender, and Resource Value Group LLC, as Lender. Resource Value Group LLC is affiliated with Platinum.

On August 30, 2013, we entered into a Limited Waiver and Eleventh Amendment to our Credit Facility to (1) obtain waivers related to our financial covenants for the third and fourth quarters of 2013, (2) extend the maturity date under the Credit Facility to January 1, 2015, (3) increase the Applicable Margin under the Credit Facility by one percent (for a total

increase of two percent when combined with the one percent increase pursuant to the Eighth Amendment), (4) maintain the borrowing base at $25 million, subject to the right of Resource Value Group LLC to require the Administrative Agent to increase the borrowing base up to a maximum of $50 million, and (5) waive our right and the right of the Lenders to request or obtain a borrowing base redetermination prior to the first scheduled redetermination date in 2014. The borrowing base under the Credit Facility was increased to $35 million on September 30, 2013 and as of that date we had $35 million outstanding. Subsequently, the borrowing base was increased to $47 million on October 15, 2013. As of November 14, 2013, we had $45 million drawn on the Credit Facility.

On November 14, 2013, we entered into the Waiver and Tenth Amendment on our Letter of Credit Facility to (1) obtain waivers related to our financial covenants for the third quarter of 2013, (2) cap the outstanding principal balance under the Letter of Credit Facility at approximately $66.6 million, (3) no longer issue or renew existing Letters of Credit and (4) remove the financial covenant requirements and the restriction of asset sales.

*Drilling Update*

We successfully completed seven wells and had one drilling rig on a non-operated property as of September 30, 2013. All of the completed wells encountered pay equal to or above our expectations. Our rig activity during the remainder of 2013 will be dependent on oil and gas prices. Accordingly, our rig count may increase or decrease.

Liquidity Risks and Uncertainties

As shown in the accompanying consolidated financial statements, we had a net working capital deficit of approximately $(149.6) million at September 30, 2013. The combination of restricted credit availability, lower production since the fourth quarter of 2012, our drilling program, settlement of our plugging and abandonment ("P&A") liabilities and additional collateral requirements related to the surety bonds that secure our P&A obligations led to significant reductions in our working capital in the fourth quarter of 2012 and the first nine months of 2013. To increase liquidity, we stretched accounts payable, aggressively pursued accounts receivable and sold assets. We continue to optimize our production portfolio and recommenced our drilling program in the fourth quarter of 2012, which is substantially complete for 2013. We have completed six operated wells and two non-operated wells in 2013. We expect to drill or complete two non-operated wells during the fourth quarter of 2013. To fund our drilling programs and operations, we expect to continue to raise additional capital over the next several years. To improve our access to funding, on August 30, 2013, we consented to the assignment by Capital One Bank, N.A. and the other lenders of all of their rights and obligations under our Credit Agreement, dated as of December 24, 2010 (the "Credit Facility"), to White Elk LLC, as Administrative Agent and Lender, and Resource Value Group LLC, as Lender. Resource Value Group LLC is affiliated with our majority owner, Platinum Partners Value Arbitrage Fund L.P. Also, we are evaluating additional potential asset sales of core and non-core assets to optimize our portfolio and normalize the age of our accounts payable. On March 26, 2013, we sold four producing fields to Renaissance Offshore, LLC for approximately $52.5 million subject to normal adjustments. A portion of the proceeds from the sale were used to reduce the amount borrowed under the Credit Facility by $36 million and the remainder has been and will be used for general corporate purposes. Cash collateral securing surety bonds of approximately $9.0 million related to the sold properties were released and received in the third quarter of 2013. The remainder of the cash collateral securing surety bonds for the sold properties was used to increase the collateral with the surety companies relating to bonds that had previously been issued to satisfy the bonding and security requirements of the BOEM. We sold an additional interest in one field to Renaissance on July 31, 2013 for $10.5 million subject to normal adjustments.

Our primary use of capital has been for the acquisition, development and exploitation of oil and natural gas properties, settlement of our P&A as well as providing collateral to secure our P&A obligations. As we plug and abandon certain fields and meet the various criteria related to the corresponding escrow accounts, we expect to release funds from the escrow accounts. Also, our letters of credit with Capital One are backed entirely by cash. We use letters of credit to back a portion of our surety bonds for P&A obligations.

On August 30, 2013, we entered into a Limited Waiver and Eleventh Amendment to our Credit Facility to (1) obtain waivers related to our financial covenants for the third and fourth quarters of 2013, (2) extend the maturity date under the credit facility to January 1, 2015, (3) increase the Applicable Margin under the Credit Facility by one percent (for a total increase of two percent when combined with the one percent increase pursuant to the Eighth Amendment), (4) maintain the borrowing base at $25 million, subject to the right of Resource Value Group LLC to require the Administrative Agent to increase the borrowing base up to a maximum of $50 million, and (5) waive our right and the right of the Lenders to request or obtain a borrowing base redetermination prior to the first scheduled redetermination date in 2014. The borrowing base under the Credit Facility was increased to $35 million on September 30, 2013 and as of that date we had $35 million outstanding. Subsequently, the borrowing base was increased to $47 million on October 15, 2013. As of November 14, 2013, we had $45 million drawn on the Credit Facility.

24

As of September 30, 2013, we were in compliance with all covenants under the Indenture. We believe anticipated capital expenditures in 2013 will exceed the amount provided for in a covenant regarding maximum capital expenditures. However, the Indenture also provides that we may use proceeds from the sale of assets for capital expenditures that we believe is not limited by the previously referenced capital expenditure covenant. In the event our interpretation of the Indenture is not upheld or if our cash proceeds from the sale of assets are not sufficient to reduce our capital expenditures to a level that makes us compliant with the maximum capital expenditure covenant, we have the option under the Indenture to redeem the Notes, beginning December 1, 2013, at a redemption price of 106.875% of par plus accrued interest and may seek to redeem the Notes; however, there can be no assurance that we will have sufficient funds to do so. We also have the option to solicit a waiver from the holders of the Notes. In these circumstances, absent a waiver and following notice to us of the default and lapse of the 30-day grace period as provided in the Indenture, the Indenture trustee or the holders of at least 25% in aggregate principal amount of the Notes would have the right to declare all the Notes to be due and payable immediately. A default under the Indenture covenant could also result in a cross-default under our credit facility.

We are currently evaluating new sources of liquidity including, but not limited to, accessing the debt capital markets and potential asset sales of non-core and core properties to optimize our portfolio. The accompanying financial statements do not include any adjustments related to the recoverability and classification of recorded assets or the amount and classifications of liabilities that might result from the uncertainty associated with our ability to meet our obligations as they come due. For additional information, please see "Risk Factors" under Item 1A of this Form 10-Q.

Our capital budget may be adjusted in the future as business conditions warrant and the ultimate amount of capital we expend may fluctuate materially based on market conditions and the success of our drilling program as the year progresses. The amount, timing and allocation of capital expenditures are largely discretionary and within our control. If oil and natural gas prices decline or costs increase significantly, we could defer a significant portion of our budgeted capital expenditures until later periods to prioritize capital projects that we believe have the highest expected returns and potential to generate near-term cash flows. We routinely monitor and adjust our capital expenditures in response to changes in prices, availability of financing, drilling and acquisition costs, industry conditions, the timing of regulatory approvals, the availability of rigs, success or lack of success in drilling activities, contractual obligations, internally generated cash flows and other factors both within and outside our control. Our planned operations for the remainder of 2013 reflect our expectations for production based on actual production history and new production expected to be brought online, the continuation of commodity prices near current levels and the higher cost of servicing our additional financing and other obligations.

Our cash flow projections are highly dependent upon numerous assumptions including the timing and rates of production from our wells, the sales prices we realize for our oil and natural gas, the cost to develop and produce our reserves, our ability to monetize our properties and future production through asset sales and financial derivatives, and a number of other factors, some of which are beyond our control. Our inability to increase near-term production levels and generate sufficient liquidity through the actions noted above could result in our inability to meet our obligations as they come due which would have a material adverse effect on our financial position, results of operation and cash flows. In the event we do not achieve the projected production and cash flow increases, we will attempt to fund any short-term liquidity needs through other financing sources; however, there is no assurance that we will be able to do so in the future if required to meet any short-term liquidity needs.

Our estimates of proved oil and natural gas reserves and the estimated future net revenues from such reserves are based upon various assumptions, including assumptions relating to oil and natural gas prices, drilling and operating expenses, capital expenditures, taxes and availability of funds. The estimation process requires significant assumptions in the evaluation of available geological, geophysical, engineering and economic data for each reservoir. Therefore, these estimates are inherently imprecise and the quality and reliability of this data can vary. Estimates of our oil and natural gas reserves and the costs and timing associated with developing these reserves are subject to change, and may differ materially from our actual results. A substantial portion of our total proved reserves are undeveloped and recognition of such reserves requires us to expect that capital will be available to fund their development. The size of our operations and our capital expenditures budget limit the number of properties that we can develop in any given year and we intend to continue to develop these reserves, but there is no assurance we will be successful. Development of these reserves may not yield the expected results, or the development may be delayed or the costs may exceed our estimates, any of which may materially affect our financial position, results of operations, cash flows, the quantity of proved reserves that we report, and our ability to meet the requirements of our financing obligations.

Our current production is concentrated in the Gulf of Mexico, which is characterized by production declines more rapid than those of conventional onshore properties. As a result, we are particularly vulnerable to a near-term severe impact resulting from unanticipated complications in the development of, or production from, any single material well or infrastructure installation, including lack of sufficient capital, delays in receiving necessary drilling and operating permits, increased regulation, reduced access to equipment and services, mechanical or operational failures, and severe weather. Any unanticipated significant disruption to, or decline in, our current production levels or prolonged negative changes in commodity

2013.09.30-10Q

25

prices or operating cost levels could have a material adverse effect on our financial position, results of operations, cash flows, the quantity of proved reserves that we report, and our ability to meet our commitments as they come due.

Oil and natural gas development and production in the Gulf of Mexico are regulated by the BOEM and BSEE of the DOI. We cannot predict future changes in laws and regulations governing oil and gas operations in the Gulf of Mexico. New regulations issued since the Deepwater Horizon incident in 2010 have changed the way we conduct our business and increased our costs of developing and commissioning new assets. Should there be additional significant future regulations or additional statutory limitations, they could require further changes in the way we conduct our business, further increase our costs of doing business or ultimately prohibit us from drilling for or producing hydrocarbons in the Gulf of Mexico.

As an oil and gas company, our revenue, profitability, cash flows, proved reserves and future rate of growth are substantially dependent on prevailing prices for oil and natural gas. Historically, the energy markets have been very volatile, and we expect such price volatility to continue. Any extended decline in oil or gas prices could have a material adverse effect on our financial position, results of operations, cash flows, the quantities of oil and gas reserves that we can economically produce, and may restrict our ability to obtain additional financing or to meet the contractual requirements of our debt and other obligations.

<div align="center">26</div>

### How We Evaluate Our Operations

We use a variety of financial and operational measures to assess our overall performance. Among these measures are (1) volumes of oil and natural gas produced, (2) oil and natural gas prices realized, (3) per unit operating and administrative costs and (4) Adjusted EBITDA (as defined in the following table).

The following table contains certain financial and operational data for each of the three and nine months ended September 30, 2013 and 2012:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| **Average daily sales:** | | | | |
| Oil (Bopd) | 4,969 | 5,357 | 4,617 | 5,595 |
| Natural gas (Mcfpd) | 36,595 | 47,177 | 38,149 | 51,075 |
| Plant products (Galpd) | 16,484 | 34,206 | 24,397 | 38,900 |
| Oil equivalents (Boepd) | 11,461 | 14,034 | 11,556 | 15,033 |
| **Average realized prices[1]:** | | | | |
| Oil ($/Bbl) | $ 102.01 | $ 103.06 | $ 103.41 | $ 105.99 |
| Natural gas ($/Mcf) | 4.07 | 3.80 | 4.18 | 3.64 |
| Plant products ($/Gallon) | 0.96 | 0.91 | 0.88 | 1.04 |
| Oil equivalents ($/Boe) | 58.62 | 54.35 | 56.97 | 54.49 |
| **Costs and Expenses:** | | | | |
| Lease operating expense ($/Boe) | 48.36 | 33.95 | 44.75 | 31.82 |
| Production tax expense ($/Boe) | 0.16 | 0.15 | 0.15 | 0.18 |
| General and administrative expense ($/Boe) | 9.12 | 6.43 | 8.95 | 5.02 |
| Net loss (in thousands) | (18,415) | (32,575) | (74,145) | (16,712) |
| Adjusted EBITDA[2] (in thousands) | 9,126 | 17,233 | 25,722 | 70,943 |

(1)  Average realized prices presented give effect to our hedging.

(2)  Adjusted EBITDA is defined as net loss before interest expense, net, surety and letter of credit fees, West Delta 32 costs, unrealized loss (gain) on derivative instruments, accretion of asset retirement obligations, depreciation, depletion, and amortization, impairment of oil and gas properties, gain on involuntary conversion of assets and loss (gain) on sale of assets. Adjusted EBITDA is not a measure of net loss or cash flows as determined by GAAP, and should not be considered as an alternative to net loss, operating loss or any other performance measures derived in accordance with GAAP or as an alternative to cash flows from operating activities as a measure of our liquidity. We present Adjusted EBITDA because it is frequently used by securities analysts, investors and other interested parties in the evaluation of high-yield issuers, many of whom present Adjusted EBITDA when reporting their results. Adjusted EBITDA has limitations as an analytical tool, and you should not consider it in isolation, or as a substitute for analysis of our operating results or cash flows as reported under GAAP. Because of these limitations, Adjusted EBITDA should not be considered as a measure of discretionary cash available to us to invest in the growth of our business. Our presentation of Adjusted EBITDA should not be construed as an inference that our future results will be unaffected by unusual or nonrecurring items. A reconciliation table is provided below to illustrate how we derive Adjusted EBITDA.

27

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2013 | 2012 | 2013 | 2012 |
|  | (in thousands) | | | |
| Net loss | $ (18,415) | $ (32,575) | $ (74,145) | $ (16,712) |
| Adjusted EBITDA | $ 9,126 | $ 17,233 | $ 25,722 | $ 70,943 |
| Reconciliation of Net loss to Adjusted EBITDA |  |  |  |  |
| Net loss | $ (18,415) | $ (32,575) | $ (74,145) | $ (16,712) |
| Interest expense, net | 6,813 | 6,601 | 19,293 | 19,435 |
| Surety and letter of credit fees | 2,458 | 1,839 | 7,017 | 4,709 |
| West Delta 32 costs | 4,702 | — | 12,397 | — |
| Unrealized loss (gain) on derivative instruments | 5,143 | 16,129 | 5,989 | (7,375) |
| Accretion of asset retirement obligations | 4,458 | 9,256 | 19,551 | 27,228 |
| Depreciation, depletion and amortization | 10,027 | 12,302 | 32,727 | 36,546 |
| Impairment of oil and gas properties | 402 | 3,681 | 55,779 | 6,992 |
| Gain on involuntary conversion of assets | (7,194) | — | (17,827) | — |
| Provision for doubtful accounts | 308 | — | 308 | — |
| Loss (gain) on sale of assets | 424 | — | (35,367) | 120 |
| Adjusted EBITDA | $ 9,126 | $ 17,233 | $ 25,722 | $ 70,943 |

28

The following table sets forth certain information with respect to oil and gas operations for the three and nine months ended September 30, 2013 and 2012:

| | Three Months Ended September 30, 2012 | | | | Nine Months Ended September 30, 2012 | | | |
|---|---|---|---|---|---|---|---|---|
| | 2013 | 2012 | Change | % Change | 2013 | 2012 | Change | % Change |
| PRODUCTION: | | | | | | | | |
| Oil (MBbl) | 457 | 493 | (36) | (7)% | 1,260 | 1,533 | (273) | (18)% |
| Natural gas (MMcf) | 3,367 | 4,340 | (973) | (22)% | 10,415 | 13,995 | (3,580) | (26)% |
| Plant products (MGal) | 1,517 | 3,147 | (1,630) | (52)% | 6,660 | 10,659 | (3,999) | (38)% |
| Total (MBoe) | 1,054 | 1,291 | (237) | (18)% | 3,155 | 4,119 | (964) | (23)% |
| REVENUES: | | | | | | | | |
| Oil sales | $ 50,479 | $ 50,721 | $ (242) | — % | $ 136,415 | $ 165,441 | $ (29,026) | (18)% |
| Natural gas sales | 12,600 | 13,289 | (689) | (5)% | 40,046 | 36,754 | 3,292 | 9 % |
| Plant product sales and other revenue | 1,457 | 2,876 | (1,419) | (49)% | 5,831 | 11,079 | (5,248) | (47)% |
| Realized (loss) gain on derivative financial instruments | (2,725) | 3,284 | (6,009) | (183)% | (2,573) | 11,189 | (13,762) | (123)% |
| Unrealized (loss) gain on derivative financial instruments | (5,143) | (16,129) | 10,986 | (68)% | (5,989) | 7,375 | (13,364) | (181)% |
| Other revenues | 7,089 | 3,084 | 4,005 | 130 % | 16,389 | 8,062 | 8,327 | 103 % |
| TOTAL REVENUES | 63,757 | 57,125 | 6,632 | 12 % | 190,119 | 239,900 | (49,781) | (21)% |
| OPERATING EXPENSES: | | | | | | | | |
| Lease operating | 50,995 | 43,840 | 7,155 | 16 % | 141,168 | 131,055 | 10,113 | 8 % |
| Production taxes | 173 | 192 | (19) | (10)% | 489 | 744 | (255) | (34)% |
| Workover | 1,028 | 4,395 | (3,367) | (77)% | 7,312 | 10,485 | (3,173) | (30)% |
| Exploration | — | 311 | (311) | (100)% | — | 1,249 | (1,249) | (100)% |
| Depreciation, depletion and amortization | 10,027 | 12,302 | (2,275) | (18)% | 32,727 | 36,546 | (3,819) | (10)% |
| Impairment of oil and gas properties | 402 | 3,681 | (3,279) | (89)% | 55,779 | 6,992 | 48,787 | 698 % |
| General and administrative | 9,621 | 8,301 | 1,320 | 16 % | 28,250 | 20,668 | 7,582 | 37 % |
| Gain on involuntary conversion of asset | (7,194) | — | (7,194) | 100% | (17,827) | — | (17,827) | 100% |
| Accretion of asset retirement obligations | 4,458 | 9,256 | (4,798) | (52)% | 19,551 | 27,228 | (7,677) | (28)% |
| Loss (gain) on sale of assets | 424 | — | 424 | 100% | (35,367) | 120 | (35,487) | (29,573)% |
| Other operating expenses | 2,704 | — | 2,704 | 100% | 5,117 | — | 5,117 | 100% |
| TOTAL OPERATING EXPENSES | 72,638 | 82,278 | (9,640) | (12)% | 237,199 | 235,087 | 2,112 | 1 % |
| (LOSS) INCOME FROM OPERATIONS | (8,881) | (25,153) | 16,272 | (65)% | (47,080) | 4,813 | (51,893) | (1,078)% |
| OTHER INCOME (EXPENSE): | | | | | | | | |
| Interest income | 30 | 11 | 19 | 173 % | 81 | 305 | (224) | (73)% |
| Miscellaneous expense | (2,674) | (919) | (1,755) | 191 % | (7,620) | (2,408) | (5,212) | 216 % |
| Interest expense | (6,890) | (6,514) | (376) | 6 % | (19,526) | (19,422) | (104) | 1 % |
| TOTAL OTHER EXPENSE, NET | (9,534) | (7,422) | (2,112) | 28 % | (27,065) | (21,525) | (5,540) | 26 % |
| NET LOSS (INCOME) | $ (18,415) | $ (32,575) | $ 14,160 | (43)% | $ (74,145) | $ (16,712) | $ (57,433) | 344 % |

*Production*

**Oil and natural gas production.** Total oil, natural gas and plant product production of 1,054 MBoe and 3,155 MBoe decreased 237 MBoe, or 18%, and 964 MBoe, or 23%, respectively, during the three and nine months ended September 30, 2013 compared to the same periods in 2012 as a result of downtime in the fields requiring hot work, which was delayed due to the BSEE requirements for approval after the West Delta 32 incident, pipeline repairs, and the asset field sales to Renaissance on March 26, 2013 and July 31,

2013. The year-to-date variance was also a result of a longer winter weather season. Production volumes were 45% oil and natural gas liquids ("NGLs") and 55% natural gas in the nine months ended September 30, 2013.

*Revenues*

*Total revenues.* Total revenues for the three and nine months ended September 30, 2013 of $63.8 million and $190.1 million increased $6.6 million, or 12%, and decreased $49.8 million, or 21%, respectively, over the comparable periods in 2012.

Revenues, excluding the realized and unrealized revenues from commodity hedge contracts, increased $1.7 million, or 2%, and decreased $22.7 million, or 10%, respectively, for the three and nine months ended September 30, 2013 compared to

29

the same periods in 2012. The increase for the quarter was related to our consolidation of Freedom Well Services, LLC in 2013 and higher oil, gas and plant product prices partially offset by lower oil, gas, and plant product production. The year-to-date decrease was primarily a result of lower oil, gas and plant product production and lower plant product prices partially offset by higher oil and gas prices and the consolidation of Freedom Well Services, LLC.

We entered into certain oil and natural gas commodity derivative contracts in 2013 and 2012. We realized (losses) gains on these derivative contracts in the amounts of $(2.7) million and $(2.6) million for the three and nine months ended September 30, 2013, respectively, and $3.3 million and $11.2 million for the three and nine months ended September 30, 2012, respectively. We recognized unrealized gains (losses) of $(5.1) million and $(6.0) million for the three and nine months ended September 30, 2013, respectively, and $(16.1) million and $7.4 million in the same periods of 2012.

Excluding hedges, we realized average oil prices of $110.41 per barrel and $108.24 per barrel and gas prices of $3.74 per Mcf and $3.85 per Mcf for the three and nine months ended September 30, 2013, respectively. For the same periods in 2012, excluding hedges, we realized average oil prices of $102.92 per barrel and $107.93 per barrel and gas prices of $3.06 per Mcf and $2.63 per Mcf, respectively. We expect commodity prices to remain volatile in the future.

*Operating Expenses*

*Lease operating costs.* Our lease operating costs for the three and nine months ended September 30, 2013 were $51.0 million, or $48.36 per Boe, and $141.2 million, or $44.75 per Boe. For the three and nine months ended September 30, 2012, our lease operating costs were $43.8 million, or $33.95 per Boe, and $131.1 million, or $31.82 per Boe, respectively. Lease operating expenses increased by $7.2 million and $10.1 million for the three and nine months ended September 30, 2013, respectively, compared to the same periods in 2012, primarily as a result of the West Delta 32 Incident. The increase in cost per Boe during 2013 was primarily attributable to decreased production.

For the three and nine months ended September 30, 2013, non-recurring expenses relating to the West Delta 32 Incident included repair and incident investigation costs of $4.4 million and $11.0 million, respectively. In 2013, we remediated a significant number of Incidents of Noncompliance ("INCs") and expect the amount of non-recurring expenses incurred in the future to be less.

*Workover costs.* Our workover costs for the three and nine months ended September 30, 2013 were $1.0 million and $7.3 million, a decrease of $3.4 million compared to the third quarter of 2012 and a decrease of $3.2 million compared to the first nine months in 2012. For the nine months ended September 30, 2013, Ship Shoal 198, South Timbalier 203, South Marsh 23 and Vermilion 119 were the primary workover expense projects.

*Exploration.* Our exploration expenses for the three and nine months ended September 30, 2012 were $0.3 million and $1.2 million, respectively. There were no exploration costs for the same period in 2013. Exploration costs for 2012 included expenses to drill a non-operated well, South Pelto 13, which was unsuccessful.

*Depreciation, depletion, amortization and impairment.* DD&A expense was $10.0 million, or $9.51 per Boe, and $32.7 million, or $10.37 per Boe, for the three and nine months ended September 30, 2013, respectively. For the three and nine months ended September 30, 2012, DD&A was $12.3 million, or $9.53 per Boe, and $36.5 million, or $8.87 per Boe. The decrease in DD&A for the three and nine months ended September 30, 2013 was a result of lower production and reduced asset basis as a result of the impairments recorded in 2013 and 2012. Depletion is recorded based on units of production and DD&A expense includes depletion of future asset retirement obligations. We recorded a $0.4 million and $55.8 million impairment for the three and nine months ended September 30, 2013 and a $3.7 million and $7.0 million impairment for the same periods in 2012, respectively. The impairments recorded during the three months ended September 30, 2013 resulted primarily from additional costs for High Island 443 and South Timbalier 8 as a well was determined to be uneconomic. These impairments were partially offset by the partial reduction of a liability and impairment associated with Garden Banks 602 as we elected to non-consent on a deep water well. The Garden Banks 602 impairment was initially recorded in the first quarter of 2013. Additionally, for the nine months ended September 30, 2013, we recorded impairments related to (1) South Padre 833 field as the operator will plug and abandon the field and (2) additional costs for High Island 443 in which a significant portion of the costs associated with the drilling of this well are recoverable under our insurance policies and the impairment will be partially offset by the "Gain on Involuntary Conversion of Assets" discussed below.

*General and administrative expenses.* G&A expense was $9.6 million, or $9.12 per Boe, and $28.3 million, or $8.95 per Boe, for the three and nine months ended September 30, 2013 and $8.3 million, or $6.43 per Boe, and $20.7 million, or $5.02 per Boe, for the same periods in 2012. The increase in G&A expense for the three and nine months ended September 30, 2013 was due to an increase in staff, primarily in our drilling and safety groups, and related administrative costs, in addition to higher legal fees relating to the West Delta 32 incident of $0.3 million and $1.4 million, respectively, severance costs, consultant expenses and costs related to our consolidation of Freedom Well Services, LLC. The increases in G&A expense were partially

2013.09.30-10Q

30

offset by recording the 2013 surety fees in the amounts of $1.5 million and $4.3 million to "Miscellaneous expense" for the three and nine months ended September 30, 2013, respectively. Additionally, the three months ended September 30, 2013 was also lower compared to the same prior year period due to a decrease in bonus expense.

*Gain on involuntary conversion of asset.* On September 27, 2012, an incident occurred on our High Island 443 A-2 ST well which required the closing of the blind/shear rams to properly shut in and maintain control of the well due to several days of unsuccessful attempts to repair a small hydrocarbon leak on a conductor riser. Additional surface diagnostics found the inner casing strings to be most likely compromised. On October 12, 2012, the BSEE advised us to plug and abandon the well. We have well control insurance and pursued reimbursement for this incident and the claim was approved. Additionally, once the High Island 443 A-2 ST well was plugged, we started operations to sidetrack the High Island 443 A-5 well on the same platform. The costs associated with the High Island 443 A-5 drill are also insurance recoverable. We recorded a gain of $(7.2) million and $(17.8) million as of the three and nine months ended September 30, 2013, respectively, The claim has been finalized. We received a total of approximately $24.1 million, net of the deductible, in cash for the claim during 2013.

*Accretion expense.* We recognized accretion expense of $4.5 million and $19.6 million for the three and nine months ended September 30, 2013, respectively, compared to $9.3 million and $27.2 million for the three and nine months ended September 30, 2012, respectively. The decrease in accretion expense in 2013 was primarily attributable to P&A activity that was performed in 2012 and 2013 and the extended life of the remaining assets, partially offset by increased liability, in the fourth quarter of 2012.

*Loss (gain) on sale of assets.* Loss (gain) on sale of assets of $0.4 million and $(35.4) million for the three and nine months ended September 30, 2013, respectively, was primarily related to the sale of four fields to Renaissance for approximately $52.5 million subject to normal purchase price adjustments on March 26, 2013 and the sale of an additional interest in one field to Renaissance on July 31, 2013 for $10.5 million.

*Other operating expenses.* Other operating expenses of $2.7 million and $5.1 million for the three and nine months ended September 30, 2013, respectively, were related to our consolidation of Freedom Well Services, LLC. There were no other operating expenses for the same periods in 2012.

*Miscellaneous expense.* Miscellaneous expense of $2.7 million and $7.6 million for the three and nine months ended September 30, 2013, respectively, compared to $0.9 million and $2.4 million for the three and nine months ended September 30, 2012, respectively, was primarily due to the surety fee reclassification of $1.5 million and $4.3 million for the three and nine months ended September 30, 2013, respectively, as mentioned above under "General and administrative expenses".

## Liquidity and Capital Resources

Our primary sources of liquidity to date have been capital contributions from our members, proceeds from the offering of our senior notes, which closed in November 2010, borrowings under our lines of credit, cash flows from operations and asset sales. Additionally, once the High Island 443 A-2 ST well was plugged, we started operations to sidetrack the High Island 443 A-5 well on the same platform. The costs associated with the High Island 443 A-5 drill were also insurance recoverable. We received a total of $24.1 million, net of the deductible, in cash for the claim. Our primary use of capital has been for the acquisition, development and exploitation of oil and natural gas properties and settlement of our P&A liabilities as well as providing collateral to secure our P&A obligations. To improve our access to funding, on August 30, 2013, we consented to the assignment by Capital One Bank, N.A. and the other lenders of all of their rights and obligations under our Credit Facility to a new lender group.

Our future success in growing proved reserves and production will be highly dependent on our ability to access outside sources of capital. If we are unable to enter into a new revolving credit facility, obtain additional contributions or loans from Platinum, sell additional core or non core properties, or otherwise access new sources of liquidity, our cash flows from operations and other sources of funds may not be sufficient to satisfy our working capital requirements, contractual obligations and expected capital expenditures.

*Senior Secured Revolving Credit Facility*

On December 24, 2010, we entered into a Credit Facility comprised of a senior secured revolving credit facility of up to $35 million and a $75 million secured letter of credit facility to be used exclusively for the issuance of letters of credit in support of our future P&A liabilities relating to our oil and natural gas properties (the "Letter of Credit Facility"). The Credit Facility bears interest based on the borrowing base usage, at the applicable London Interbank Offered Rate, plus applicable margins ranging from 4.75% to 5.5%, or an alternate base rate based on the federal funds effective rate plus applicable margins ranging from 3.25% to 4.00%. The applicable margin is computed based on the borrowing based utilization percentage in effect

31

from time to time. The borrowing base under our Credit Facility is subject to redetermination on a semi-annual basis, effective April 1 and October 1, and up to one additional time during any six month period, as may be requested by either us or the administrative agent, acting at the direction of the majority of the lenders. The borrowing base will be determined by the administrative agent in its sole discretion and consistent with its normal oil and gas lending criteria in existence at that particular time. Our obligations under the Credit Facility are guaranteed by our existing subsidiaries and are secured on a first-priority basis by all of our and our subsidiaries' assets, in the case of the Credit Facility, and by cash collateral, in the case of the Letter of Credit Facility. The Credit Facility matures on January 1, 2015 and June 22, 2014 on the Letter of Credit Facility. The Credit Facility is subject to certain customary fees and expenses of the lenders and administrative agent thereunder.

On August 30, 2013, we consented to the assignment by Capital One Bank, N.A. and the other lenders of all of their rights and obligations under the Credit Facility to White Elk LLC, as Administrative Agent and Lender, and Resource Value Group LLC, as Lender. Resource Value Group LLC is affiliated with our majority owner, Platinum Partners Value Arbitrage Fund L.P.

We have entered into various amendments to the Credit Facility and the Letter of Credit Facility. These amendments have, among other things, (1) changed our amount available for borrowing under the Credit Facility from $35 million to a current borrowing base of $47 million, (2) adjusted the commitments under the Letter of Credit Facility to a current level of approximately $66.6 million, (3) increased the applicable margin with respect to each ABR loan or Eurodollar loan outstanding by a total of 2%, (4) amended certain provisions governing our swap agreements, (5) updated the fees on the letters of credit to 2% on a go-forward basis, (6) updated the "change in control" definition, (7) amended the definition of debt included in the calculation of the covenants, (8) changed the maturity date from December 24, 2013 to January 1, 2015 on the Credit Facility and to June 22, 2014 on the Letter of Credit Facility, (9) added affirmative covenants to be furnished on a weekly basis including updated cash flow projections, updated accounts payable and accounts receivable schedules, and daily production reports for the week, (10) added an affirmative covenant that we would receive certain specified capital contributions from Platinum Partners Black Elk Opportunities Fund LLC ("PPBE") or entities designated by PPBE during the first quarter of 2013, (11) revised the definition of "Event of Default" to include non-compliance with new affirmative covenants and (12) restricted returns of capital to our unit holders or distributions of our property to our equity interest holders.

On August 30, 2013, we entered into a Limited Waiver and Eleventh Amendment to our Credit Facility to (1) obtain waivers related to our financial covenants for the third and fourth quarters of 2013, (2) extend the maturity date under the credit facility to January 1, 2015, (3) increase the Applicable Margin under the Credit Facility by one percent (for a total increase of two percent when combined with the one percent increase pursuant to the Eighth Amendment), (4) maintain the borrowing base at $25 million, subject to the right of Resource Value Group LLC to require the Administrative Agent to increase the borrowing base up to a maximum of $50 million, and (5) waive our right and the right of the Lenders to request or obtain a borrowing base redetermination prior to the first scheduled redetermination date in 2014. The borrowing base under the Credit Facility was increased to $35 million on September 30, 2013 and as of that date we had $35 million outstanding. Subsequently, the borrowing base was increased to $47 million on October 15, 2013. As of November 14, 2013, we had $45 million drawn on the Credit Facility.

As of September 30, 2013, letters of credit in the aggregate amount of $96.6 million were outstanding under the Letter of Credit Facility. We had $35.0 million in borrowings under the Credit Facility. As of November 14, 2013, we had $2.0 million available for additional borrowings under the Credit Facility.

A commitment fee of 0.5% per annum is computed based on the unused borrowing base and paid quarterly. For the nine months ended September 30, 2013, we recognized $4,125 in commitment fees, which have been included in "Interest expense" on the consolidated statements of operations. A letter of credit fee is computed based on the same applicable margin used to determine the interest rate to Eurodollar loans times the stated face amount of each letter of credit.

The Credit Facility is secured by mortgages on at least 80% of the total value of our proved oil and gas reserves. The borrowing base is re-determined semi-annually on or around April 1ˢᵗ and October 1ˢᵗ of each year.

The Credit Facility requires us and our subsidiaries to maintain certain financial covenants. Specifically, we may not permit, in each case as calculated as of the end of each fiscal quarter, our total leverage ratio to be more than 2.5 to 1.0, our interest coverage ratio to be less than 3.0 to 1.0, or our payables restriction covenant, which does not allow accounts payable greater than 90 days old to exceed $6.0 million in the aggregate, excluding certain vendors (in each case as defined in our revolving Credit Facility). In addition, we and our subsidiaries are subject to various covenants, including, but not limited to, restrictions on our and our subsidiaries' ability to merge and consolidate with other companies, incur indebtedness, grant liens or security interests on assets subject to their security interests, pay dividends, make acquisitions, loans, advances or investments, sell or otherwise transfer assets, enter into transactions with affiliates or change our line of business. As of September 30, 2013, we were not in compliance with the total leverage ratio covenant, the hedging requirement and the interest coverage ratio covenant. Our total leverage ratio was calculated to be 6.0 to 1.0, which was higher than the required maximum of 2.5 to 1.0. Our hedging requirement of our notional volumes exceeded 60% for the months of October and November 2013

32

by 21% and 13%, respectively, of the reasonably anticipated total volume of projected production from proved, developed, and producing oil and gas properties. Our interest coverage ratio covenant was calculated to be 1.2 to 1.0, which was lower than the minimum 3.0 to 1.0. Our payables restriction covenant was calculated at $27.2 million which was higher than the maximum of $6.0 million. We received a limited waiver relating to such covenants in the Eleventh Amendment for the fiscal quarters ended September 30, 2013 and December 31, 2013 as well as a limited waiver on our Letter of Credit Facility in the Waiver and Tenth Amendment for the fiscal quarter ended September 30, 2013.

The Credit Facility provides that, upon the occurrence of certain events of default, our obligations thereunder may be accelerated and the lending commitments terminated. Such events of default include payment defaults to the lenders, material inaccuracies of representations and warranties, covenant defaults, cross defaults to other material indebtedness, including the notes, voluntary and involuntary bankruptcy proceedings, material money judgments, certain change of control events and other customary events of default.

For a further discussion of our Credit Facility, please see "Notes to Consolidated Financial Statements—Note 7—Debt and Notes Payable" in this Form 10-Q.

### 13.75% Senior Secured Notes

On November 23, 2010, we issued $150 million in aggregate principal amount of the Notes discounted at 99.109%. The net proceeds were used to repay all of the outstanding indebtedness under our lines of credit, to fund BOEM collateral requirements and to prefund our P&A escrow accounts. We pay interest on the Notes semi-annually, on June 1st and December 1st of each year, in arrears, commencing June 1, 2011. The Notes mature on December 1, 2015.

The Notes are secured by a security interest in the issuers' and the guarantors' assets (excluding the escrow accounts set up for the future P&A obligations of the properties acquired in the W&T Acquisition). The liens securing the Notes are subordinated and junior to any first lien indebtedness, including our derivative contracts obligation and Credit Facility.

We have the right or the obligation to redeem the Notes under various conditions. If we experience a change of control, the holders of the Notes may require us to repurchase the Notes at 101% of the principal amount thereof, plus accrued unpaid interest. We also have an optional redemption in which we may redeem up to 35% of the aggregate principal amount of the Notes at a price equal to 110.0% of the principal amount, plus accrued and unpaid interest to the date of redemption, with the net cash proceeds of certain equity offerings until December 1, 2013. From December 1, 2013 until December 1, 2014, we may redeem some or all of the Notes at an initial redemption price equal to par value plus one-half the coupon which equals 106.875% plus accrued and unpaid interest to the date of the redemption. On or after December 1, 2014, we may redeem some or all of the Notes at a redemption price equal to par plus accrued and unpaid interest to the date of redemption.

On May 31, 2011, we amended the Indenture, among other things, to: (1) increase the amount of capital expenditures permitted to be made by us on an annual basis, (2) enable us to obtain financial support from our majority equity holder by way of a $30 million investment in Class D Units that can be repaid over time and (3) obligate us to make an offer to repurchase the Notes semiannually at an offer price equal to 103% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest to the extent it meets certain defined financial tests and as permitted by our credit facilities.

As of September 30, 2013, we were in compliance with all covenants under the Indenture. We believe anticipated capital expenditures in 2013 will exceed the amount provided for in a covenant regarding maximum capital expenditures. However, the Indenture also provides that we may use proceeds from the sale of assets for capital expenditures that we believe is not limited by the previously referenced capital expenditure covenant. In the event our interpretation of the Indenture is not upheld or if our cash proceeds from the sale of assets are not sufficient to reduce our capital expenditures to a level that makes us compliant with the maximum capital expenditure covenant, we have the option under the Indenture to redeem the Notes, beginning December 1, 2013, at a redemption price of 106.875% of par plus accrued interest and may seek to redeem the Notes; however, there can be no assurance that we will have sufficient funds to do so. We also have the option to solicit a waiver from the holders of the Notes. In these circumstances, absent a waiver and following notice to us of the default and lapse of the 30-day grace period as provided in the Indenture, the Indenture trustee or the holders of at least 25% in aggregate principal amount of the Notes would have the right to declare all the Notes to be due and payable immediately. A default under the Indenture covenant could also result in a cross-default under our credit facility.

### Member Contributions

In the first quarter of 2013, we entered into contribution agreements with PPVA (Equity) and Platinum Partners Black Elk Opportunities Fund LLC ("PPBE") or entities designated by PPBE (together, the "Platinum Group") pursuant to which we have issued 50 million additional Class E Units and 3.8 million additional Class B Units to the Platinum Group for an aggregate offering price of $50.0 million. In addition, we also agreed to issue an additional 43 million Class E Units in exchange for

2013.09.30-10Q

33

$30.0 million of outstanding Class D Preferred Units and $13.0 million of paid-in-kind dividends. The Class E Units will receive a preferred return of 20% per annum, which will increase from and after March 25, 2014 to 36% per annum (such date as determined by our Fifth Amendment to Second Amended and Restated Limited Liability Operating Agreement). For the nine months ended September 30, 2013, we issued an additional amount of Class E Units of approximately 12.0 million as paid-in-kind dividends to the holders of Class E Units.

On February 12, 2013, we entered into an agreement with Platinum under which we agreed to issue Class B Units to Platinum in exchange for financial consulting services, including (1) analysis and assessment of our business and financial condition and compliance with financial covenants in our credit facility, (2) discussion with us and senior bank lenders regarding capital contributions and divestitures of non-core assets, and (3) coordination with our attorneys, accountants, and other professionals. On February 12, 2013, we issued 1,131,458.5 Class B Units to PPVA Black Elk (Equity) LLC, an affiliate of Platinum, pursuant to such agreement.

*Capital Expenditures*

We expect total capital expenditures to be approximately $99.5 million for 2013 (excluding expenditures directly related to any acquisitions or costs to be reimbursed by insurance). Approximately $89.6 million (excluding expenditures directly related to any acquisitions or costs reimbursed by insurance) was expended in the first nine months of 2013 for various projects including recompletions and drilling, and the remaining $9.9 million will be used for drilling and development during the remainder of the year.

To date, our 2013 capital budget has been funded from cash flow from operations, capital contributions, asset sales and insurance reimbursements for P&A costs on the High Island 443 A-2 well (before a deductible of $0.5 million).

We expect that our commodity derivative positions will help us stabilize a portion of our expected cash flows from operations despite potential declines in the price of oil and natural gas. We actively review acquisition opportunities on an ongoing basis. Our ability to make significant additional acquisitions for cash would require us to obtain additional equity or debt financing, which we may not be able to obtain on terms acceptable to us or at all.

*Cash Flows*

The table below discloses the net cash provided by (used in) operating activities, investing activities, and financing activities for the six months ended September 30, 2013 and 2012:

|  | Nine Months Ended September 30, | |
|  | 2013 | 2012 |
| --- | --- | --- |
| Net cash provided by operating activities | $    28,729 | $    44,028 |
| Net cash used in investing activities | (50,698) | (61,129) |
| Net cash provided by financing activities | 27,272 | 17,488 |
| Net increase (decrease) in cash and equivalents | $      5,303 | $         387 |

*Cash flows provided by operating activities.* Cash provided by operating activities totaled $28.7 million during the nine months ended September 30, 2013 compared to $44.0 million during the nine months ended September 30, 2012. Significant components of net cash provided by operating activities during the nine months ended September 30, 2013 included $36.9 million of changes in operating assets and liabilities and $66.0 million of non-cash items, primarily DD&A expense, impairment and accretion of asset retirement obligations partially offset by the net loss, gain on sale of assets and gain on involuntary conversion of assets.

Our operating cash flows are sensitive to a number of variables, the most significant of which is the volatility of oil and natural gas prices. Regional and worldwide economic activity, weather, infrastructure capacity to reach markets and other variable factors significantly impact the prices of these commodities. These factors are beyond our control and are difficult to predict. For additional information on the impact of changing prices on our financial position, see "Item 3. Quantitative and Qualitative Disclosures About Market Risk" below.

*Cash flows used in investing activities.* Cash used in investing activities was $50.7 million in the nine months ended September 30, 2013 was primarily attributable to $112.7 million in oil and gas property additions associated with the capital drilling program during the period and the $23.4 million funding of the future P&A obligations through escrow partially offset by the sale proceeds of $65.7 million related to the asset sales to Renaissance Offshore, LLC and $23.8 million in proceeds

34

received from insurance recovery for HI443. Cash used in investing activities in the comparable period of 2012 totaling $61.1 million was attributable to $18.2 million in oil and gas property additions and the $38.9 million funding of the future P&A obligations through escrow.

*Cash flows provided by (used in) financing activities.* Cash flows provided by financing activities of $27.3 million in the nine months ended September 30, 2013 were attributable to $50.0 million in contributions from the Platinum Group and PPVA Equity and $23.2 million of borrowings under the Credit Facility partially offset by $40.2 million of payments on the Credit Facility and $3.8 million in payments on short-term notes. Cash flows provided by financing activities of $17.5 million ended September 30, 2012 were attributable to $145.0 million of borrowings on the Credit Facility and $17.6 million borrowings on short term notes partially offset by $112.5 million of payments on the Credit Facility, $12.9 million in payments on short-term notes, $16.7 million of tax distributions to members and $3.0 million of debt issue costs.

### Asset Retirement Obligations

As many as four times per year, we review and, to the extent necessary, revise our asset retirement obligation estimates. As of September 30, 2013, we had a decrease in our asset retirement obligations primarily as a result of the asset sales to Renaissance Offshore, LLC and in P&A work performed in 2013 partially offset by a revaluation of the liability and accretion expense. For the three and nine months ended September 30, 2013, we recognized $4.5 million and $19.6 million in accretion expense, respectively.

At September 30, 2013 and December 31, 2012, we recorded total asset retirement obligations of $302.9 million and $345.5 million, respectively, and have funded approximately $238.7 million and $215.3 million, respectively, in collateral to secure our P&A obligations, inclusive of performance bonds. As of September 30, 2013 and December 31, 2012, we also have a guaranteed escrow amount of $20.3 million for certain fields which will be refunded to us once we have completed our P&A obligations on the entire field. The escrow is guaranteed by TETRA Technologies, Inc.

### Contractual Obligations

We have various contractual obligations in the normal course of our operations and financing activities. The following schedule summarizes our contractual obligations and other contractual commitments at September 30, 2013:

| | | | Payments Due by Period | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Total | | Less than 1 Year | | 1 - 3 Years | | 3 -5 Years | After 5 Years |
| | | | | | (in thousands) | | | |
| Contractual Obligations | | | | | | | | |
| Total debt and notes payable | $ | 185,296 | $ | 243 | $ | 185,053 | $ — | $ — |
| Interest on debt and notes payable | | 47,882 | | 23,170 | | 24,712 | — | — |
| Operating leases (1) | | 42,883 | | 31,860 | | 4,230 | 3,317 | 3,476 |
| Total contractual obligations | | 276,061 | | 55,273 | | 213,995 | 3,317 | 3,476 |
| Other Obligations | | | | | | | | |
| Asset retirement obligations (2) | | 302,886 | | 32,124 | | 95,011 | 87,387 | 88,364 |
| Total obligations (3) | $ | 578,947 | $ | 87,397 | $ | 309,006 | $ 90,704 | $ 91,840 |

(1)   Consists of rig commitments and office space leases for our Texas and Louisiana offices and services provided in the office.
(2)   Asset retirement obligations will be partially funded via the escrow. The obligations reflected above are discounted.
(3)   Does not include Class D and Class E Cumulative Convertible Participating Preferred Units as they are contingently redeemable at the holders' option.

### Off-Balance Sheet Arrangements

We do not currently have any off-balance sheet arrangements.

### Oil and Gas Hedging

As part of our risk management program, we hedge a portion of our anticipated oil and natural gas production to reduce our exposure to fluctuations in oil and natural gas prices. Reducing our exposure to price volatility helps ensure that we have adequate funds available for our capital programs and more price sensitive drilling programs. Our decision on the quantity and price at which we choose to hedge our future production is based in part on our view of current and future market conditions.

11/20/2018                                        2013.09.30-10Q

35

While the use of these hedging arrangements limits the downside risk of adverse price movements, their use also may limit future revenues from favorable price movements. In addition, the use of hedging transactions may involve basis risk. The use of hedging transactions also involves the risk that the counterparties will be unable to meet the financial terms of such transactions.

At September 30, 2013, commodity derivative instruments were in place covering approximately 75% of our projected oil sales volumes and 24% of our projected natural gas volumes through 2013.

Please see "Notes to Consolidated Financial Statements—Note 5—Derivative Instruments" in this Form 10-Q for additional discussion regarding the accounting applicable to our hedging program.

## Critical Accounting Policies

"Management's Discussion and Analysis of Financial Condition" is based upon our consolidated financial statements, which have been prepared in conformity with GAAP. The preparation of these statements requires that we make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses. We base these estimates on historical experience and on assumptions that we consider reasonable under the circumstances; however, reported results could differ from the current estimates under different assumptions and/or conditions. We have disclosed the areas requiring the use of management's estimates in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our 2012 Form 10-K.

## Inflation and Changes in Prices

Our revenues, the value of our assets, and our ability to obtain bank financing or additional capital on attractive terms have been and will continue to be affected by changes in commodity prices and the costs to produce our reserves. Commodity prices are subject to significant fluctuations that are beyond our ability to control or predict. During the three and nine months ended September 30, 2013, we received an average of $110.41 and $108.24 per barrel of oil and $3.74 and $3.85 per Mcf of natural gas, respectively, before consideration of commodity derivative contracts, compared to $102.92 and $107.93 per barrel of oil and $3.06 and $2.63 per Mcf of natural gas, respectively, in the three and nine months ended September 30, 2012. Although certain of our costs are affected by general inflation, inflation does not normally have a significant effect on our business.

36

### Item 3. Quantitative and Qualitative Disclosures About Market Risk

We are exposed to a variety of market risks including commodity price risk, credit risk and interest rate risk. We address these risks through a program of risk management, which may include the use of derivative instruments.

The following quantitative and qualitative information is provided about financial instruments to which we are a party, and from which we may incur future gains or losses from changes in market interest rates or commodity prices and losses from extension of credit.

Hypothetical changes in interest rates and commodity prices chosen for the following estimated sensitivity analysis are considered to be reasonably possible near-term changes generally based on consideration of past fluctuations for each risk category. However, since it is not possible to accurately predict future changes in interest rates and commodity prices, these hypothetical changes may not necessarily be an indicator of probable future fluctuations.

*Commodity Price Risk*

Our primary market risk exposure is in the pricing applicable to our oil and natural gas production. Realized pricing is primarily driven by the prevailing worldwide price for oil and spot market prices applicable to our U.S. natural gas production. Pricing for oil and natural gas production has been volatile and unpredictable for several years, and we expect this volatility to continue in the future. The prices we receive for production depend on many factors outside of our control, including volatility in the differences between product prices at sales points and the applicable index price. Based on our annualized production for the nine months ended September 30, 2013, our annual revenue would increase or decrease by approximately $16.8 million for each $10.00 per barrel change in oil prices and $13.9 million for each $1.00 per MMBtu change in natural gas prices without giving effect to any hedging. Based on our total annual production for the year ended December 31, 2012, our revenues would have increased or decreased by approximately $19.8 million for each $10.00 per barrel change in oil prices and $17.9 million for each $1.00 per MMBtu change in natural gas prices without giving effect to any hedging.

To partially reduce price risk caused by these market fluctuations, we hedge a significant portion of our anticipated oil and natural gas production as part of our risk management program. Reducing our exposure to price volatility helps ensure that we have adequate funds available for our capital programs and more price sensitive drilling programs. Our decision on the quantity and price at which we choose to hedge our production is based in part on our view of current and future market conditions. While hedging limits the downside risk of adverse price movements, it also may limit future revenues from favorable price movements. The use of hedging transactions also involves the risk that counterparties, which generally are financial institutions, will be unable to meet the financial terms of such transactions.

At September 30, 2013, the fair value of our commodity derivatives were included in our consolidated balance sheets for approximately $7.5 million as current liabilities and $1.1 million as long-term liabilities. At December 31, 2012, the fair value of our commodity derivatives was approximately $2.4 million and $5.1 million, which were recorded as current assets and long-term liabilities, respectively. For the three and nine months ended September 30, 2013, we realized net decreases in oil and natural gas revenues related to hedging transactions of approximately $(2.7) million and $(2.6) million, respectively, and increases for the same periods in 2012 of $3.3 million and $11.2 million, respectively.

37

As of September 30, 2013, we maintained the following commodity derivative contracts:

| Remaining Contract Term: Oil | Contract Type | Notional Volume in Bbls/Month | NYMEX Strike Price |
|---|---|---|---|
| December 2013 - December 2013 | Swap | 27,750 | $ 96.90 |
| October 2013 - October 2013 | Swap | 27,750 | $ 96.90 |
| November 2013 - November 2013 | Swap | 26,800 | $ 96.90 |
| October 2013 - December 2013 | Swap | 19,750 | $ 85.90 |
| January 2014 - February 2014 | Swap | 19,000 | $ 96.90 |
| January 2014 - December 2014 | Swap | 15,000 | $ 65.00 |
| January 2014 - May 2014 | Swap | 10,083 | $ 100.80 |
| December 2013 - December 2013 | Swap | 10,042 | $ 100.80 |
| October 2013 - October 2013 | Swap | 3,259 | $ 100.80 |
| October 2013 - October 2013 | Swap | 28,006 | $ 88.80 |
| November 2013 - November 2013 | Swap | 31,605 | $ 88.80 |
| December 2013 - December 2013 | Swap | 38,743 | $ 88.80 |
| January 2014 - January 2014 | Swap | 4,723 | $ 88.80 |
| February 2014 - February 2014 | Swap | 13,313 | $ 88.80 |
| March 2014 - March 2014 | Swap | 8,413 | $ 88.80 |
| April 2014 - April 2014 | Swap | 12,473 | $ 88.80 |
| May 2014 - May 2014 | Swap | 11,793 | $ 88.80 |
| June 2014 - June 2014 | Swap | 15,546 | $ 88.80 |
| July 2014 - July 2014 | Swap | 11,845 | $ 88.80 |
| August 2014 - August 2014 | Swap | 13,165 | $ 88.80 |
| September 2014 - September 2014 | Swap | 16,235 | $ 88.80 |
| October 2014 - October 2014 | Swap | 15,605 | $ 88.80 |
| November 2014 - November 2014 | Swap | 18,525 | $ 88.80 |
| December 2014 - December 2014 | Swap | 22,526 | $ 88.80 |
| October 2013 - October 2013 | Swap | 4,000 | $ 87.85 |
| November 2013 - November 2013 | Swap | 250 | $ 87.85 |
| December 2013 - December 2013 | Swap | 2,500 | $ 87.85 |
| January 2014 - January 2014 | Swap | 46,000 | $ 87.85 |
| February 2014 - February 2014 | Swap | 25,000 | $ 87.85 |
| March 2014 - March 2014 | Swap | 56,000 | $ 87.85 |
| April 2014 - April 2014 | Swap | 45,000 | $ 87.85 |
| May 2014 - May 2014 | Swap | 46,000 | $ 87.85 |
| June 2014 - June 2014 | Swap | 48,000 | $ 87.85 |
| July 2014 - July 2014 | Swap | 36,000 | $ 87.85 |
| August 2014 - August 2014 | Swap | 34,000 | $ 87.85 |
| September 2014 - September 2014 | Swap | 26,000 | $ 87.85 |
| October 2014 - October 2014 | Swap | 27,000 | $ 87.85 |
| November 2014 - November 2014 | Swap | 20,000 | $ 87.85 |
| December 2014 - December 2014 | Swap | 31,000 | $ 87.85 |
| October 2013 - October 2013 | Swap | 67,513 | $ 108.44 |
| November 2013 - November 2013 | Swap | 64,159 | $ 108.44 |
| December 2013 - December 2013 | Swap | 45,392 | $ 108.44 |
| January 2014 - January 2014 | Swap | 46,006 | $ 100.72 |
| February 2014 - February 2014 | Swap | 39,159 | $ 100.72 |

11/20/2018                                        2013.09.30-10Q

| | | | | |
|---|---|---|---|---|
| March 2014 - March 2014 | Swap | 36,822 | $ | 100.72 |
| April 2014 - April 2014 | Swap | 34,069 | $ | 100.72 |
| May 2014 - May 2014 | Swap | 35,200 | $ | 100.72 |
| June 2014 - June 2014 | Swap | 31,668 | $ | 100.72 |
| July 2014 - July 2014 | Swap | 48,509 | $ | 100.72 |
| August 2014 - August 2014 | Swap | 46,473 | $ | 100.72 |
| September 2014 - September 2014 | Swap | 45,830 | $ | 100.72 |
| October 2014 - October 2014 | Swap | 44,282 | $ | 100.72 |
| November 2014 - November 2014 | Swap | 40,874 | $ | 100.72 |
| December 2014 - December 2014 | Swap | 26,424 | $ | 100.72 |

38

| Remaining Contract Term: Natural Gas | Contract Type | Notational Volume in MMBtus/Month | NYMEX Strike Price |
|---|---|---|---|
| January 2014 - June 2014 | Swap | 129,960 | $ 4.94 |
| December 2013 - December 2013 | Swap | 119,462 | $ 4.94 |
| October 2013 - December 2013 | Swap | 104,000 | $ 4.60 |
| October 2013 - October 2013 | Swap | 91,166 | $ 4.94 |
| January 2014 - February 2014 | Swap | 82,000 | $ 4.60 |
| November 2013 - November 2013 | Swap | 64,926 | $ 4.94 |
| October 2013 - December 2013 | Swap | 47,000 | $ 5.00 |
| October 2013 - October 2013 | Swap | 34,551 | $ 4.09 |
| November 2013 - November 2013 | Swap | 28,939 | $ 4.09 |
| December 2013 - December 2013 | Swap | 37,906 | $ 4.09 |
| January 2014 - January 2014 | Swap | 43,347 | $ 4.09 |
| February 2014 - February 2014 | Swap | 32,636 | $ 4.09 |
| March 2014 - March 2014 | Swap | 46,764 | $ 4.09 |
| April 2014 - April 2014 | Swap | 41,253 | $ 4.09 |
| May 2014 - May 2014 | Swap | 40,391 | $ 4.09 |
| June 2014 - June 2014 | Swap | 20,112 | $ 4.09 |
| July 2014 - July 2014 | Swap | 39,283 | $ 4.09 |
| August 2014 - August 2014 | Swap | 34,246 | $ 4.09 |
| September 2014 - September 2014 | Swap | 29,753 | $ 4.09 |
| October 2014 - October 2014 | Swap | 28,635 | $ 4.09 |
| November 2014 - November 2014 | Swap | 27,081 | $ 4.09 |
| December 2014 - December 2014 | Swap | 34,114 | $ 4.09 |
| January 2015 - January 2015 | Swap | 27,838 | $ 4.09 |
| February 2015 - February 2015 | Swap | 24,461 | $ 4.09 |
| March 2015 - March 2015 | Swap | 26,443 | $ 4.09 |
| June 2014 - June 2014 | Swap | 40,391 | $ 4.19 |
| July 2014 - July 2014 | Swap | 20,112 | $ 4.19 |
| August 2014 - August 2014 | Swap | 39,283 | $ 4.19 |
| September 2014 - September 2014 | Swap | 34,246 | $ 4.19 |
| October 2014 - October 2014 | Swap | 29,753 | $ 4.19 |
| November 2014 - November 2014 | Swap | 28,635 | $ 4.19 |
| December 2014 - December 2014 | Swap | 27,081 | $ 4.19 |
| January 2015 - January 2015 | Swap | 34,114 | $ 4.19 |
| February 2015 - February 2015 | Swap | 27,838 | $ 4.19 |
| March 2015 - March 2015 | Swap | 24,461 | $ 4.19 |

For a further discussion of our hedging activities, please see "Notes to Consolidated Financial Statements—Note 5—Derivative Instruments" in this Form 10-Q.

*Credit Risk*

We monitor our risk of loss associated with non-performance by counterparties of their contractual obligations. Our principal exposure to credit risk is through joint interest receivables, which totaled $17.4 million at September 30, 2013 and $17.8 million at December 31, 2012. Joint interest receivables arise from billing entities who own partial interests in the wells we operate. These entities participate in our wells primarily based on their ownership in leases on which we have an interest. We also have exposure to credit risk from the sale of our oil and natural gas production that we market to energy marketing companies and refineries, the receivables totaled $39.1 million at September 30, 2013 and $27.2 million at December 31, 2012. We also have credit risk associated

with our financially settled crude oil and natural gas swaps. As of September 30, 2013, all of our swaps were with BP Energy Company as the counterparty.

In order to minimize our exposure to credit risk, we request prepayment of costs where it is allowed by contract or state law. For such prepayments, a liability is recorded and subsequently reduced as the associated work is performed. We also have the right to place a lien on our co-owners interest in the well to redirect production proceeds in order to secure payment or, if necessary, foreclose on the interest. In addition, we monitor our exposure to counterparties on oil and natural gas sales primarily by reviewing credit ratings, financial statements and payment history. We extend credit terms based on our evaluation of each

39

counterparty's credit worthiness. We historically have not required our counterparties to provide collateral to support oil and natural gas sales receivables owed to us.

*Interest Rate Risk*

Our primary exposure to interest rate risk results from outstanding borrowings under our Credit Facility, which bears interest based on the borrowing base usage, at the applicable London Interbank Offered Rate, plus applicable margins ranging from 4.75% to 5.5%, or an alternate base rate based on the federal funds effective rate plus applicable margins ranging from 3.25% to 4.00%. The applicable margin is computed based on the grid when the borrowing based utilization percentage is at its highest level. Based on the $35.0 million outstanding under the Credit Facility as of September 30, 2013, an increase of 100 basis points in the underlying interest rate would have had a $0.4 million impact on our annual interest expense. However, there is no guarantee that we will not borrow additional amounts under the Credit Facility in the future, and, in the event we borrow amounts and interest rates significantly increase, the interest that we would be required to pay would be more significant. We do not believe our variable interest rate exposure warrants entry into interest rate hedges and, therefore, we have not hedged our interest rate exposure. However, to reduce our exposure to changes in interest rates for our borrowings under the Credit Facility, we may in the future enter into interest rate risk management arrangements for a portion of our outstanding debt to alter our interest rate exposure.

## Item 4. Controls and Procedures

*Evaluation of Disclosure Controls and Procedures.* Under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, we have performed an evaluation of the design, operation and effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and 15d-15(e) of the Exchange Act) at September 30, 2013. Based on that evaluation, our principal executive officer and principal financial officer concluded that such disclosure controls and procedures were not effective. See "Material Weakness" below.

*Material Weakness.* In connection with the preparation of our consolidated financial statements for the year ended December 31, 2012, we identified control deficiencies that constituted a material weakness in the design and operation of our internal control over financial reporting. The following material weakness was present at December 31, 2012 and September 30, 2013:

- *Financial Close Process:* Controls over our financial accounting and reporting processes were deficient in accounting for non-routine and non-systematic transactions. These deficiencies resulted from the difficulty in the following:
- The updated asset portion of the revised estimate of our asset retirement obligations were not included in the impairment computation of Net Book Value.

*Remediation.* To remediate this material weakness, during 2013, management has and will continue executing the remediation program that began during early 2013, which includes assessing the adequacy of processes and procedures underlying the specific areas discussed above, expanding and strengthening our controls surrounding the accounting for non-routine and non-systematic transactions and strengthening our policies, procedures and controls surrounding accrued expenses ensuring cooperation and coordination with departments outside of the accounting department.

*Changes in Internal Control Over Financial Reporting.* Other than the measures described above under "Remediation" and the appointment of our Chief Financial Officer, Bruce Koch, on April 16, 2013, there has not been any change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended September 30, 2013 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

40

# PART II. OTHER INFORMATION

**Item 1. Legal Proceedings**

*West Delta 32 Block Platform Incident.* On November 16, 2012, an explosion and fire occurred on our West Delta 32-E platform, located in the Gulf of Mexico approximately 17 miles southeast of Grand Isle, Louisiana ("West Delta 32 Incident"). At the time of the explosion, production on the platform had been shut in while crews of independent contractors performed maintenance and construction on the platform.

*Regulatory Investigation and Audit.* On November 4, 2013, BSEE issued its investigative report (the "BSEE Panel Report 2013-002") on the West Delta 32 Incident. The report recommends that contractors Wood Group Production Service Network, Grand Isle Shipyard, and Compass Engineering Consultants, as well as Black Elk Energy be issued the following types of Incidents of Non-Compliance: G-110, G-112, G-116, G-303, G-310, G-311, G-312, and E-100. The report also recommends that contractor Wood Group Production Service Network and Black Elk Energy be issued the additional following types of Incidents of Non-Compliance: G-309 and G-317. The report states that if BSEE will issue Incidents of Non-Compliance based upon evidence contained in the report and/or other relevant evidence. No Incidents of Non-Compliance have been issued yet, and Black Elk Energy has and will continue to fully cooperate with BSEE. Black Elk Energy will be carefully reviewing the BSEE Panel Report 2013-002 over the coming weeks.

The United States Chemical Safety and Hazard investigation board has also made inquiry of us regarding the incident but indicated that they will not open an investigation. On October 15, 2013, the Department of Justice, U.S. Attorney's Office issued a subpoena pertaining to all physical evidence collected and maintained by Black Elk Energy and ABS Consulting as part the investigation of the WD-32 platform incident. We are fully cooperating with all government agencies.

On November 21, 2012, BSEE sent us a letter requiring us to take certain actions and to improve our performance. The letter made reference to, among other things, the explosion and fire that occurred on our West Delta 32-E platform on November 16, 2012. BSEE stated in the letter that if we did not improve our performance, we would be subject to additional enforcement action up to and including possible referral to the Bureau of Ocean Energy Management to revoke our status as an operator on all of our existing facilities. We have undertaken the actions BSEE required of us in the November 21 letter and have been regularly reporting our progress on those required improvements to BSEE. We have submitted a PIP to BSEE that identifies corrective action items to improve safety performance in offshore operations. The primary components of the PIP address:

- Independent Third-Party SEMS Audit
- Enhanced oversight of work on our operated platforms
- Hazard Recognition
- Compliance
- Reduction of Incidents of Non-Conformance (INCs)
- Stop Work Authority

In a meeting held at the BSEE Regional Office on October 30, 2013, BEEOO shared with BSEE representatives that implementation of corrective actions (18 elements and 58 tasks) associated with the Performance Improvement Plan ("PIP") has been 100% completed. Other essential work control processes such as our Project Execution Plans and Contractor Bridging Agreements have been improved to provide better guidelines and procedures for hazard assessment and work controls. Training in Hazard Recognition, National Pollutant Discharge Elimination System ("NPDES"), Job Safety Analysis ("JSA") and Stop Work Authority ("SWA") will be ongoing and has been incorporated into our training matrix.

Based on the receipt of requested work and operation permits along with our interactions with BSEE and our corrective actions discussed above, we believe that we have improved our safety and compliance performance.

*Civil Litigation.* As of November 12, 2013, several civil lawsuits have been filed as a result of the West Delta 32 Incident. The courts held a status conference ordering procedural matters to be filed on the court's docket. All civil cases filed both in Texas and Louisiana as a result of the West Delta 32 Incident are being defended by insurance defense counsel. We believe we have strong defenses and cross-claims and intend to defend ourselves vigorously.

On January 8, 2013, five investors in Black Elk Energy, LLC ("BEE") filed a purported derivative action on behalf of BEE in the 164th Judicial District of Harris County, Texas against our President and CEO, John Hoffman; our majority unit holder, PPVA Black Elk (Equity) LLC; several entities affiliated with PPVA Black Elk (Equity) LLC; and Iron Island Technologies, Inc. The lawsuit originally alleged that the defendants improperly diluted BEE's percentage ownership in our

41

company and that the defendants' alleged gross mismanagement harmed BEE by allegedly causing a credit rating downgrade and a prospective buyer to reduce an alleged offer price for our company. The plaintiffs seek an unspecified amount of damages on behalf of BEE in connection with these claims. On July 26, 2013, in response to a motion to dismiss by PPVA Black Elk (Equity) LLC and its affiliated entities, the court dismissed all claims against all defendants. The claims were dismissed with prejudice to re-filing in Texas.

In the previously reported investor plaintiff civil matter, the same plaintiffs filed a Temporary Restraining Order and Preliminary Injunction in the Supreme Court of the State of New York, County of New York, restraining BEEOO from dispersing any proceeds from the sale of 43 oil and gas offshore fields being marketed at an oil and gas clearing house until 27.01% of the sale proceeds are placed in an escrow account during the pendency of the litigation. The Judge dismissed the Temporary Restraining Order and set a hearing for the Motion for the Injunction. The court heard oral arguments on the preliminary injunction motion on October 31, 2013 and reserved decision; a ruling is expected later this month. The Company intends to file a motion to dismiss the complaint in its entirety for failure to state a cause of action and based on documentary evidence that refutes the claims.

On April 29, 2013, Grand Isle Shipyards, Inc. ("GIS") sued BEEOO, Enviro Tech Systems, LLC, Wood Group USA, Inc., and Compass Engineering & Consultants, LLC in the United States District Court for the Eastern District of Louisiana for damages it alleged incurred in connection with the West Delta 32 Incident. GIS specifically sought damages for loss of property and equipment, expenses in the form of indemnity and medical benefits paid to or on behalf of its employees, and for unpaid invoices in connection with the work it performed at West Delta 32. Upon motion by BEEOO, however, the court dismissed GIS' lawsuit and ordered GIS and BEEOO to first attempt to resolve their claims through mediation, and if that is unsuccessful, then through binding arbitration, pursuant to and in accordance with the MSA. The mediation is scheduled on November 12, 2013. If that is unsuccessful, then the arbitration process will proceed.

*Other Regulatory Items.* We are party to various other litigation matters arising in the ordinary course of business. We do not believe the outcome of these disputes or legal actions will have a material adverse effect on our financial statements.

## Item 1A. Risk Factors

We are subject to certain risks and hazards due to the nature of the business activities we conduct. For a discussion of these risks, see "Risk Factors" in our 2012 Form 10-K. The risks described in the 2012 Form 10-K could materially and adversely affect our business, financial condition, cash flows, and results of operations. Except as set forth below, there have been no material changes to the risks described in the 2012 Form 10-K. We may experience additional risks and uncertainties not currently known to us, or, as a result of developments occurring in the future, conditions that we currently deem to be immaterial may also materially and adversely affect our business, financial condition, cash flows and results of operations.

*We may be required to post additional collateral in order to satisfy the collateral requirements related to the surety bonds that secure our P&A obligations.*

We are currently subject to the bonding or security requirements of BOEM for various obligations, including P&A obligations, for certain federal leases in the Gulf of Mexico. Failure to post the requisite bonds or otherwise satisfy BOEM's security requirements could have a severe adverse effect on our ability to operate in the Gulf of Mexico. Because we are not exempt from the BOEM's bonding requirements, we engage a number of surety companies to post the requisite bonds. Pursuant to the terms of our agreements with these surety companies, we are required to post collateral or post collateral on demand, the amount of which can be increased at the surety companies' discretion with 30 days' notice. If these surety companies increase the amount of required collateral, our available liquidity could be adversely affected, which could cause us to modify our 2013 capital expenditure budget. We cannot assure you that we will be able to satisfy any additional collateral requirements. If we fail to do so, we may be in default under our agreements with the surety companies, which in turn could cause a cross-default under our Credit Facility and Indenture. Additionally, should we default under any of our agreements with the surety companies, and should any surety company begin exercising its remedies under these agreements, our operations in the Gulf of Mexico could be severely adversely affected.

42

## Item 5. Other Information

As of September 30, 2013, we were not in compliance with the financial covenants set forth in Section 9.01(a), (b) and (c) of the Letter of Credit Agreement dated December 24, 2010 (as amended by that First Amendment dated May 31, 2011 and that Second Amendment dated December 30, 2011, and as further amended, restated, supplemented or modified from time to time, the "Letter of Credit Agreement") as our payables restriction covenant was calculated to be $27.2 million which was higher than our maximum of $6 million, our total leverage ratio was calculated to be 6.0 to 1.0 which was higher than the required 2.5 to 1.0 and our interest coverage ratio was calculated to be 1.2 to 1.0 which was lower than the required 3.0 to 1.0. We received a waiver for the period for the fiscal quarter ended September 30, 2013. The Letter of Credit Agreement also (1) capped the outstanding principal balance under the Letter of Credit Facility at approximately $66.6 million, (2) removed the obligation to issue or renew existing Letters of Credit and (3) removed the financial covenant requirements and the restriction of asset sales.

The foregoing description of the Letter of Credit Agreement, is qualified in its entirety by the full text of such agreement which is filed as Exhibit 10.11 to this Quarterly Report on Form 10-Q and incorporated by reference herein.

43

## Item 6. Exhibits

The exhibits marked with the asterisk symbol (*) are filed (or furnished in the case of Exhibits 32.1 and 32.2) with this Form 10-Q.

| Exhibit Number | Description |
|---|---|
| 3.1 | Certificate of Formation of Black Elk Energy Offshore Operations, LLC, dated as of November 20, 2007 (incorporated by reference to Exhibit 3.1 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011 (SEC File No. 333-174226)). |
| 3.2 | Certificate of Amendment of Black Elk Energy Offshore Operations, LLC, dated as of January 29, 2008 (incorporated by reference to Exhibit 3.2 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011 (SEC File No. 333-174226)). |
| 3.3 | Second Amended and Restated Limited Liability Company Operating Agreement of Black Elk Energy Offshore Operations, LLC, dated as of July 13, 2009 (incorporated by reference to Exhibit 3.4 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011 (SEC File No. 333-174226)). |
| 3.4 | First Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC, dated August 19, 2010 (incorporated by reference to Exhibit 3.5 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011 (SEC File No. 333-174226)). |
| 3.5 | Second Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of May 31, 2011 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on June 3, 2011). |
| 3.6 | Third Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of January 25, 2013 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on January 31, 2013). |
| 3.7 | Fourth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of February 12, 2013 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on February 19, 2013). |
| 3.8 | Fifth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of April 9, 2013 (incorporated by reference to Exhibit 3.10 to the Form 8-K filed with the Securities and Exchange Commission on April 15, 2013). |
| 3.9 | Sixth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of May 3, 2013 (incorporated by reference to Exhibit 3.1 to the Form 10-K filed with the Securities and Exchange Commission on May 9, 2013). |
| 10.1 | Purchase and Sale Agreement by and between Black Elk Offshore Operations, LLC and Renaissance Offshore, LLC, effective as of July 31, 2013 (incorporated by reference to Exhibit 10.1 to the Form 8-K filed with the Securities and Exchange Commission on August 6, 2013). |
| 10.2 | Tenth Amendment to Credit Agreement, effective as of July 31, 2013, by and among the Company, the Guarantors party thereto, Capital One, N.A., as Administrative Agent for the Lenders signatory thereto, and the Lenders signatory thereto (incorporated by reference to Exhibit 10.2 to the Form 8-K filed with the Securities and Exchange Commission on August 6, 2013). |
| 10.3 | Letter Loan Purchase Agreement, dated as of July 31, 2013, by and among the Company, PPVA Black Elk Equity LLC, Capital One, N.A., as Administrative Agent for the Lenders signatory thereto, and the Lenders signatory thereto (incorporated by reference to Exhibit 10.3 to the Form 8-K filed with the Securities and Exchange Commission on August 6, 2013). |
| 10.4 | Guaranty, dated as of July 31, 2013, by Platinum Partners Value Arbitrage Fund L.P., Platinum Montaur Life Sciences, LLC, Meserole Group LLC, PPVA Black Elk Investors LLC and DMRJ Group LLC in favor of Capital One, N.A., as Administrative Agent for the benefit of the Lenders to that certain Credit Agreement dated December 24, 2010, as |

2013.09.30-10Q

amended (incorporated by reference to Exhibit 10.4 to the Form 8-K filed with the Securities and Exchange Commission on August 6, 2013).

10.5     Limited Waiver and Ninth Amendment to Letter of Credit Facility Agreement and Amendment to Note, effective as of August 15, 2013, by and among the Company, the Guarantors party thereto, the Lenders party thereto and Capital One, N.A., as Administrative Agent for the Lenders (incorporated by reference to Exhibit 10.1 to the Form 8-K filed with the Securities and Exchange Commission on August 21, 2013).

44

| Exhibit Number | Description |
|---|---|
| 10.6 | Loan Purchase and Sale Agreement, dated as of August 30, 2013, by and among Capital One Bank, N.A., as Administrative Agent for the Lenders signatory thereto, and the Lenders signatory thereto, and White Elk LLC, as new Administrative Agent and Lender, and Resource Value Group LLC, as new Lender (incorporated by reference to Exhibit 10.1 to the Form 8-K filed with the Securities and Exchange Commission on September 6, 2013). |
| 10.7 | Omnibus Assignment and Assumption of Loans, Loan Documents and Related Liens and Security Interests and Appointment of Agent, dated as of August 30, 2013, by and among, Capital One, N.A., in its capacity as Administrative Agent for the Lenders, Issuing Bank and Collateral Agent and Mortgagee for the Secured Parties and First Lien Agent, Second Lien Agent and Facility Swap Agent under the Intercreditor Agreements, the Lenders signatory thereto, White Elk LLC, Resource Value Group LLC, on behalf of one or more beneficial holders of the Loans, and Black Elk Energy Offshore Operations, LLC (incorporated by reference to Exhibit 10.2 to the Form 8-K filed with the Securities and Exchange Commission on September 6, 2013). |
| 10.8 | Limited Waiver and Eleventh Amendment to Credit Agreement, effective as of August 30, 2013, by and among Black Elk Energy Offshore Operations, LLC, the Guarantors party thereto, White Elk LLC, as Administrative Agent for the Lenders signatory thereto, and the Lenders signatory thereto (incorporated by reference to Exhibit 10.3 to the Form 8-K filed with the Securities and Exchange Commission on September 6, 2013). |
| 10.9 | Subscription Agreement, dated as of September 16, 2013, by and between Black Elk Energy Offshore Operations, LLC and Asiasons Capital Limited (incorporated by reference to Exhibit 10.1 to the Form 8-K filed with the Securities and Exchange Commission on September 20, 2013). |
| 10.10 | Supplemental Agreement, dated as of September 26, 2013, by and between Black Elk Energy Offshore Operations, LLC and Asiasons Capital Limited (incorporated by reference to Exhibit 10.1 to the Form 8-K filed with the Securities and Exchange Commission on October 3, 2013). |
| *10.11 | Limited Waiver, Tenth Amendment to Letter of Credit Facility Agreement, effective as of November 14, 2013, by and among the Company, the Guarantors party thereto, the Lenders party thereto and Capital One, N.A., as Administrative Agent for the Lenders. |
| *31.1 | Certification (pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act) by Principal Executive Officer. |
| *31.2 | Certification (pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act) by Principal Financial Officer. |
| *32.1 | Section 1350 Certification (pursuant to Sarbanes-Oxley Section 906) by Principal Executive Officer and Principal Financial Officer. |
| 101.INS§ | XBRL Instance Document |
| 101.SCH§ | XBRL Taxonomy Extension Schema Document |
| 101.CAL§ | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.LAB§ | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE§ | XBRL Taxonomy Extension Presentation Linkbase Document |
| 101.DEF§ | XBRL Taxonomy Extension Definition Linkbase Document |

\*      Filed herewith.

§      Furnished with this Form 10-Q. In accordance with Rule 406T of Regulation S-T, the information in these exhibits shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to liability under that section, and shall not be incorporated by reference into any registration statement or other document filed under the Securities Act of 1933, as amended, except as expressly set forth by specific reference in such filing.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC**
(Registrant)

Date:    November 14, 2013                    By:    /s/ Bruce Koch

                                                     Bruce Koch
                                                     *Vice President and Chief Financial Officer*
                                                     (Duly Authorized Officer and Principal Financial Officer)

46

# EXHIBIT INDEX

The exhibits marked with the asterisk symbol (*) are filed (or furnished in the case of Exhibits 32.1 and 32.2) with this Form 10-Q.

| Exhibit Number | Description |
|---|---|
| 3.1 | Certificate of Formation of Black Elk Energy Offshore Operations, LLC, dated as of November 20, 2007 (incorporated by reference to Exhibit 3.1 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011 (SEC File No. 333-174226)). |
| 3.2 | Certificate of Amendment of Black Elk Energy Offshore Operations, LLC, dated as of January 29, 2008 (incorporated by reference to Exhibit 3.2 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011 (SEC File No. 333-174226)). |
| 3.3 | Second Amended and Restated Limited Liability Company Operating Agreement of Black Elk Energy Offshore Operations, LLC, dated as of July 13, 2009 (incorporated by reference to Exhibit 3.4 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011 (SEC File No. 333-174226)). |
| 3.4 | First Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC, dated August 19, 2010 (incorporated by reference to Exhibit 3.5 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011 (SEC File No. 333-174226)). |
| 3.5 | Second Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of May 31, 2011 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on June 3, 2011). |
| 3.6 | Third Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of January 25, 2013 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on January 31, 2013). |
| 3.7 | Fourth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of February 12, 2013 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on February 19, 2013). |
| 3.8 | Fifth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of April 9, 2013 (incorporated by reference to Exhibit 3.10 to the Form 8-K filed with the Securities and Exchange Commission on April 15, 2013). |
| 3.9 | Sixth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of May 3, 2013 (incorporated by reference to Exhibit 3.1 to the Form 10-K filed with the Securities and Exchange Commission on May 9, 2013). |
| 10.1 | Purchase and Sale Agreement by and between Black Elk Offshore Operations, LLC and Renaissance Offshore, LLC, effective as of July 31, 2013 (incorporated by reference to Exhibit 10.1 to the Form 8-K filed with the Securities and Exchange Commission on August 6, 2013). |
| 10.2 | Tenth Amendment to Credit Agreement, effective as of July 31, 2013, by and among the Company, the Guarantors party thereto, Capital One, N.A., as Administrative Agent for the Lenders signatory thereto, and the Lenders signatory thereto (incorporated by reference to Exhibit 10.2 to the Form 8-K filed with the Securities and Exchange Commission on August 6, 2013). |
| 10.3 | Letter Loan Purchase Agreement, dated as of July 31, 2013, by and among the Company, PPVA Black Elk Equity LLC, Capital One, N.A., as Administrative Agent for the Lenders signatory thereto, and the Lenders signatory thereto (incorporated by reference to Exhibit 10.3 to the Form 8-K filed with the Securities and Exchange Commission on August 6, 2013). |

47

| 10.4 | Guaranty, dated as of July 31, 2013, by Platinum Partners Value Arbitrage Fund L.P., Platinum Montaur Life Sciences, LLC, Meserole Group LLC, PPVA Black Elk Investors LLC and DMRJ Group LLC in favor of Capital One, N.A., as Administrative Agent for the benefit of the Lenders to that certain Credit Agreement dated December 24, 2010, as amended (incorporated by reference to Exhibit 10.4 to the Form 8-K filed with the Securities and Exchange Commission on August 6, 2013). |
|---|---|
| 10.5 | Limited Waiver and Ninth Amendment to Letter of Credit Facility Agreement and Amendment to Note, effective as of August 15, 2013, by and among the Company, the Guarantors party thereto, the Lenders party thereto and Capital One, N.A., as Administrative Agent for the Lenders (incorporated by reference to Exhibit 10.1 to the Form 8-K filed with the Securities and Exchange Commission on August 21, 2013). |
| 10.6 | Loan Purchase and Sale Agreement, dated as of August 30, 2013, by and among Capital One Bank, N.A., as Administrative Agent for the Lenders signatory thereto, and the Lenders signatory thereto, and White Elk LLC, as new Administrative Agent and Lender, and Resource Value Group LLC, as new Lender (incorporated by reference to Exhibit 10.1 to the Form 8-K filed with the Securities and Exchange Commission on September 6, 2013). |
| 10.7 | Omnibus Assignment and Assumption of Loans, Loan Documents and Related Liens and Security Interests and Appointment of Agent, dated as of August 30, 2013, by and among, Capital One, N.A., in its capacity as Administrative Agent for the Lenders, Issuing Bank and Collateral Agent and Mortgagee for the Secured Parties and First Lien Agent, Second Lien Agent and Facility Swap Agent under the Intercreditor Agreements, the Lenders signatory thereto, White Elk LLC, Resource Value Group LLC, on behalf of one or more beneficial holders of the Loans, and Black Elk Energy Offshore Operations, LLC (incorporated by reference to Exhibit 10.2 to the Form 8-K filed with the Securities and Exchange Commission on September 6, 2013). |
| 10.8 | Limited Waiver and Eleventh Amendment to Credit Agreement, effective as of August 30, 2013, by and among Black Elk Energy Offshore Operations, LLC, the Guarantors party thereto, White Elk LLC, as Administrative Agent for the Lenders signatory thereto, and the Lenders signatory thereto (incorporated by reference to Exhibit 10.3 to the Form 8-K filed with the Securities and Exchange Commission on September 6, 2013). |
| 10.9 | Subscription Agreement, dated as of September 16, 2013, by and between Black Elk Energy Offshore Operations, LLC and Asiasons Capital Limited (incorporated by reference to Exhibit 10.1 to the Form 8-K filed with the Securities and Exchange Commission on September 20, 2013). |
| 10.10 | Supplemental Agreement, dated as of September 26, 2013, by and between Black Elk Energy Offshore Operations, LLC and Asiasons Capital Limited (incorporated by reference to Exhibit 10.1 to the Form 8-K filed with the Securities and Exchange Commission on October 3, 2013). |
| *10.11 | Limited Waiver, Tenth Amendment to Letter of Credit Facility Agreement, effective as of November 14, 2013, by and among the Company, the Guarantors party thereto, the Lenders party thereto and Capital One, N.A., as Administrative Agent for the Lenders. |
| *31.1 | Certification (pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act) by Principal Executive Officer. |
| *31.2 | Certification (pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act) by Principal Financial Officer. |
| *32.1 | Section 1350 Certification (pursuant to Sarbanes-Oxley Section 906) by Principal Executive Officer and Principal Financial Officer. |
| 101.INS§ | XBRL Instance Document |
| 101.SCH§ | XBRL Taxonomy Extension Schema Document |
| 101.CAL§ | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.LAB§ | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE§ | XBRL Taxonomy Extension Presentation Linkbase Document |
| 101.DEF§ | XBRL Taxonomy Extension Definition Linkbase Document |
| * | Filed herewith. |

2013.09.30-10Q

§          Furnished with this Form 10-Q. In accordance with Rule 406T of Regulation S-T, the information in these exhibits shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to liability under that section, and shall not be incorporated by reference into any registration statement or other document filed under the Securities Act of 1933, as amended, except as expressly set forth by specific reference in such filing.

<div align="center">48</div>

EXHIBIT 26

**To:**      David Steinberg[DSteinberg@platinumlp.com]
**Cc:**      Mark Nordlicht[mnordlicht@platinumlp.com]; David Levy[dlevy@platinumlp.com]; Daniel Saks[DSaks@platinumlp.com]
**From:**    Ari Hirt
**Sent:**    Fri 5/23/2014 5:01:37 PM
**Subject:** FW: Golden Globe Follow-Up-- Houlihan Lokey

David,
I've been working with Houlihan Lokey (a midsize investment bank) on possibly funding our American Petrol transaction.  See the information request they have regarding Michigan.  I definitely need your help to answer the first question as I am not in that loop.  Regarding the other questions should i just send them access to our Newco Dataroom?  Btw, one issue they brought up which must deal with is regarding the Black Elk SEC disclosure about the GGO Option -- the issue is that it publicly discloses the value of the option and therefore pegs GGO's value to $60M.  This is ultimately a marketing issue that could be dealt with but something we should all be aware of.
Best,
Ari

---

**From:** Crowley III, Daniel F.
**Sent:** Friday, May 23, 2014 8:32 AM
**To:** Ari Hirt
**Cc:** Hanson, JP
**Subject:** Golden Globe Follow-Up

Ari,
It was great to meet you yesterday. Thank you for the time and insight on the California and Colorado assets -- the conversation was very helpful and informative. As discussed, we've compiled a brief follow-up list of questions and info requests regarding the Michigan assets. We believe this information will enable us to finalize our thoughts on whether and how we may be able to assist you.

1. Overview of acquisition process, especially with respect to exclusivity, targeted timing of close, status of purchase-sale agreement, conditions precedent, etc.
2. Any presentations or information memoranda related to the assets, especially with respect to the development plan / outlook (e.g., materials used in the sale process)
3. Brock Engineering reserves report, as well as the buyer reserves report if one has been performed at this time
4. If available, an XLS operating model(s) of the pro forma consolidated business or of each asset base on an individual basis; if not available, historical and projected financials on each of the asset bases
5. More generally, access to the data site that is being established for the Michigan assets

In addition, we would very much appreciate the opportunity to speak with Stephen about the California reserves.

Thanks,
Dan

**Daniel F. Crowley III**
Vice President

EXHIBIT 27

**To:**      Ari Hirt[ahirt@platinumlp.com]
**Cc:**      Jed Latkin[JLatkin@platinumlp.com]
**From:**    Mark Nordlicht
**Sent:**    Tue 4/3/2012 7:44:50 PM
**Subject:** Re: AmRich deal overview

Obviously i am a sucker for upside but i do quibble with 2 items in your investment rationale. 1- i cringe at the 1 bill 10 number as it doesnt mean anything. Our pv 10 in black elk of 1 billion is a number u can work off of but when u billion pv 10 on fields that are worth 15 in sale now, it doesnt really mean much...but hopefully what we are saying exists.

2- i feel like team is supbar in that it's an experienced team at the top that has never been successful to this magni even close. It doesnt mean we are not a do, i just want to make sure we dont get high on our own supply as uri wd

Sent from my iPad

On Apr 3, 2012, at 9:00 PM, "Ari Hirt" <ahirt@platinumlp.com>wrote:

Mark -- below is our overview of the new oil deal. I will forward you the same for Proteus Energy within the hour.

AMRICH -- the new Oil Deal

They have accumulated leases in the Santa Maria Oil Fairway of Central California.
D&M has given a resource report representing a PV10 of $1billion-- based on the fields'
Proven Undeveloped reserves -- All resource and engineering work has also been reviewed and
confirmed by a 3rd Party from Gustavson Associates who we hired.
The Borrower is pledging the Leases to a new entity called Golden Gate of which we will own
48%.

Deal Terms:
25% interest
48% equity interest in the Golden Gate LLC
Term: 3 years...but based on cashflow we expect all Principal to be paid back within 2
years.

$25 million total line to disbursed in several tranches -- an initial $6.5 million funding
to drill 5 total wells in the Casmalia field
Next tranche: $10 million, approx 3-5 months after initial tranche. Conditional on SPECIFIC
milestones agreed to by us and our 3rd Party engineer from Gustavson Associates.
Follow on tranches: Up to $8.5M, approx a year from now...also conditional on SPECIFIC
milestones (listed below).

Investment Rationale:
  1) Robust proven reserves with a PV10 north of $1 Billion
  2) Proven area with lots of active wells that are currently producing
  3) Lender has done all the leg work gathering hundreds of leases to combine this into one
     large entity making up over 7700 acres of land and comprising three large oil fields
  4) Proven operational team with extensive local knowledge and experience
  4) Relatively shallow wells with results within 60 days of initial drill
  5) Fast payback as the cashflows ramp rapidly within the first six months

Advance Milestones:
  1) We will not fund the second tranche until after the four production wells and one
     disposal well have been drilled AND - we have full performance testing on the four
     main wells and we have gauged the full flow rate and depth, saturation and pay zone
     perforation is completed - however once these milestones are hit it is imperative
     that we do the second funding so that we can start work on the large SMV field.
  2) Further fundings (for the NW Casmalia field and further work on SMV) will not proceed
     until the 5 wells in the SMV have been drilled and the wells are producing an average
     of 40brls a day for fifteen consecutive days as monitored and shown by production
     tests over eight hour periods.

Cashflows:
    1) We expect to see the following cash-flow schedule by end of June:

| MONTH | Jun-12 | Jul-12 | Aug-12 | Sep-12 | Oct-12 | Nov-12 | Dec-12 | Jan-13 | Feb-13 | Mar-13 | Apr-13 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| NET REVENUE, M$ | 255 | 229 | 700 | 1,247 | 1,781 | 1,591 | 1,471 | 1,341 | 1,098 | 1,117 | 1,444 |
| G&A Total | 79 | 101 | 101 | 101 | 110 | 110 | 110 | 110 | 110 | 111 | 110 |
| NET INCOME, M$ | 176 | 128 | 599 | 1,146 | 1,670 | 1,481 | 1,361 | 1,230 | 988 | 1,006 | 1,334 |

As you can see the cashflows really pick up and this should put us in a good position to be completely repaid within two years on the principal.

Equity Upside:
    1) A comparable field producing 3,000brls a month just received an $800 million offer
       from a mini-major
    2) Our proven and probable are much larger than this contiguous field and should generate
       an offer of similar magnitude

EXHIBIT 28

**To:**    Mark Nordlicht[mnordlicht@platinumlp.com]
**Cc:**    Jed Latkin[JLatkin@platinumlp.com]
**From:**    Ari Hirt
**Sent:**    Fri 11/23/2012 7:27:26 PM
**Subject:**    RE:

when you say the "last report" I assume you mean the report(s) we had going into the deal. We had two reports -- 1) the D&M report showing an overall PV10 value based only on PUDS reserves for all the acerage in the range of $800M - $1200M.  We also had a report from Steve Lieberman, our engineer/local market specialist who sells oil projects in California, giving a Market Value sale # before any drilling of $22M.

Our next reserve report(s), in February, will be at a stage where we have drilled and are producing 4 Casmalia wells (which is set for middle of Dec) and 2 Santa Maria Wells -- based on this progress we expect to see a similar value on the D&M report but this time with PDPs. We also will be asking D&M to give us a PV10 value just based on the acreage immediately in proximity to our PDPs.  Based on these PDPs we should have an easy market value of $45M. (remember, this is based on a point in time where we are essentially only 2/3 through the first phase of our development strategy).  Value of the overall project will start climbing much faster when we complete our next 3 SMV wells and reach the $1.2 - $1.5M revenue a month number because at this point we will have enough cash flow to start drilling more wells based on cash flow so that we could start proving the development trajectory assumed in the D&M reports.

---

**From:** Mark Nordlicht
**Sent:** Friday, November 23, 2012 2:09 PM
**To:** Ari Hirt
**Subject:**

Ari- What do we expect new reserve report at golden gate to say?? How have we enhanced value from last report and what did last report show again????

# EXHIBIT 29

**To:**      Scott Taylor[staylor@beechwoodcapitalgroup.com]
**Cc:**       mfeuer@beechwoodcapitalgroup.com[mfeuer@beechwoodcapitalgroup.com]; David Levy[dlevy@platinumlp.com]; Kerry
Propper[kpropper@chardancm.com]
**From:**   Jack Liu
**Sent:**    Thur 2/28/2013 8:49:35 PM
**Subject:** RE: NDA
4739_001.pdf

Scott,

Please find the attached counter-signed NDA.

Jack

**From:** Scott Taylor [mailto:staylor@beechwoodcapitalgroup.com]
**Sent:** Thursday, February 28, 2013 2:24 PM
**To:** Jack Liu
**Cc:** mfeuer@beechwoodcapitalgroup.com; dlevy@platinumlp.com; Kerry Propper
**Subject:** Re: NDA

On Thu, Feb 28, 2013 at 12:58 PM, Jack Liu jliu@chardancm.com wrote:
Scott and Mark,

I apologize for the inconvenience. The earlier version of AlphaRe Beechwood NDA had the wrong address for AlphaRe. I have fixed
it in the attached version. Could you please sign it again? Thanks.

Jack Y. Liu, CFA
Senior Vice President, Chardan Capital Markets
1600, 17 State Street, New York , NY 10036
646-465-9042(o) 646-465-9039(f) 919-357-8796 (c)
jliu@chardancm.com

**From:** Scott Taylor [mailto:staylor@beechwoodcapitalgroup.com]
**Sent:** Wednesday, February 27, 2013 11:08 AM
**To:** Kerry Propper
**Cc:** mfeuer@beechwoodcapitalgroup.com; dlevy@platinumlp.com; Jack Liu
**Subject:** Re: NDA

Signed NDA attached.

On Tue, Feb 26, 2013 at 6:40 PM, Kerry Propper kpropper@chardancm.com wrote:
Scott and Mark,

I think you will recognize the form of NDA. Although I have not received final comments to this NDA from Alpha Re, please review
and if acceptable sign. I will attempt to get it counter-signed tomorrow.

Kerry

**From:** Scott Taylor [mailto:staylor@beechwoodcapitalgroup.com]
**Sent:** Tuesday, February 26, 2013 2:02 PM
**To:** Kerry Propper
**Cc:** mfeuer@beechwoodcapitalgroup.com; dlevy@platinumlp.com
**Subject:** Re: NDA

On Tue, Feb 26, 2013 at 1:49 PM, Kerry Propper<kpropper@chardancm.com>wrote:
Please send back your NDA in word and I will attempt to use your format.

**From:** Scott Taylor [mailto:staylor@beechwoodcapitalgroup.com]
**Sent:** Tuesday, February 26, 2013 11:32 AM
**To:** Kerry Propper
**Cc:** mfeuer@beechwoodcapitalgroup.com; dlevy@platinumlp.com
**Subject:** NDA

Kerry -

Attached is a mutual NDA (signed already by me) that we can execute with Alpha Re.

We have a Segregated Portfolio Company in the Cayman Islands, regulated by CIMA.  It is licensed to reinsurer Commercial P&C lines, and has done most of its work in the Workers' Compensation line.  We have not engaged life transactions through this entity, nor do we plan to.

Kind regards,
Scott

February 28, 2013

## CONFIDENTIALITY and NON-DISCLOSURE AGREEMENT

THIS AGREEMENT is entered into and made effective as of the date written above (the "Effective Date"), by and between Beechwood Capital Group, LLC (the "Receiving Party") and Alpha Re Limited (the "Disclosing Party"). This Agreement provides for the protection from unauthorized disclosure or use of Confidential Information (as defined below) that may be furnished by the Disclosing Party to the Receiving Party and that may be used by the Receiving Party solely for the purpose of evaluating or engaging in a business relationship between the Disclosing Party and the Receiving Party.

1. "Confidential Information" means non-public information relating to the business of the Disclosing Party and/or its subsidiaries and affiliates that the Disclosing Party designates as being confidential or proprietary or which, under the circumstances surrounding disclosure, ought to be treated as confidential. "Confidential Information" includes, without limitation, ideas, concepts, designs, specifications, drawings, tracings, models, samples, data, software, computer programs, computer files, marketing plans and strategies, business strategies, customer names, mailing lists, prices, rates, costs, information received from others that the Disclosing Party is obligated to treat as confidential, and other technical, financial or business information. Confidential Information may be furnished in any tangible or intangible form, including written or printed documents, visual demonstrations or inspections, computer disks, or tapes, other electronic media and oral communications.

The Receiving Party's obligations hereunder will not apply, or will cease to apply, to that Confidential Information which the Receiving Party can establish (i) is or hereafter becomes generally known or available to the public or interested persons through no breach of this Agreement by the Receiving Party; (ii) is rightfully known to the Receiving Party without restriction on disclosure at the time of its receipt from the Disclosing Party; (iii) is rightfully furnished to the Receiving Party by a third party without breach of an obligation of confidentiality; (iv) is independently developed by the Receiving Party without use of or reference to the Confidential Information; (v) is required to be disclosed pursuant to the order of a court, administrative agency or other governmental body (provided that the Receiving Party shall give the Disclosing Party reasonable notice prior to such disclosure and shall comply with any applicable protective order or equivalent); or (vi) is approved for release by written authorization of the Disclosing Party.

2. Obligations of Receiving Party. The Receiving Party will protect Confidential Information by using at least the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized disclosure of such Confidential Information as the Receiving Party uses to protect its own confidential or proprietary information. The Receiving Party will neither disclose

nor copy Confidential Information except as necessary for its employees with a need to know, provided that any such employee shall have agreed in writing, as a condition to his or her employment or in order to obtain Confidential Information, to be bound by non-disclosure and non-use obligations substantially similar to this Agreement. Any copies which are made will be identified as belonging to the Disclosing Party and shall be reproduced with the Disclosing Party's proprietary rights notices in the same manner in which such notices appear in the original copy provided by the Disclosing Party. The Receiving Party will not disassemble, decompile or reverse engineer any prototypes, software or other tangible objects which embody Confidential Information. The Receiving Party will not use the Confidential Information for any purpose except to evaluate or engage in a business relationship with the Disclosing Party ("Permitted Use"). The Receiving Party will not disclose Confidential Information to any third party without the prior written consent of the Disclosing Party.

3. Ownership of Confidential Information. All Confidential Information shall remain the property of the Disclosing Party. By disclosing information to the Receiving Party, the Disclosing Party does not grant any express or implied right to the Receiving Party to or under any of the Disclosing Party's patents, copyrights, trademarks or trade secret information. The Receiving Party will return all originals, copies, reproductions and summaries of Confidential Information immediately upon the Disclosing Party's request or, at the Disclosing Party's option, destroy the same, and will deliver to the Disclosing Party, upon its request, a certificate of a duly authorized officer certifying as to the foregoing.

4. Remedies. The Receiving Party acknowledges that money damages would not be a sufficient remedy for any breach of this Agreement, and the Disclosing Party will be entitled to specific performance and injunctive relief as remedies for any such breach. Such remedies will not be deemed to be the exclusive remedies for a breach of this Agreement but will be in addition to all other remedies available at law or equity to the Disclosing Party. In the event that the Disclosing Party resorts to any action to enforce the provisions of this Agreement, the Disclosing Party shall be entitled to recover the costs of such action so incurred, including,

without limitation, reasonable attorney's fees, at trial and all appellate levels.

5. <u>No Warranty.</u> THE DISCLOSING PARTY MAKES NO REPRESENTATION, WARRANTY, ASSURANCE, GUARANTY OR INDUCEMENT WHATSOEVER TO THE RECEIVING PARTY WITH RESPECT TO THE QUALITY OF THE INFORMATION FURNISHED BY THE DISCLOSING PARTY, NON-INFRINGEMENT OF ANY RIGHTS OF THIRD PARTIES, OR ANY OTHER MATTER OF ANY NATURE WHATSOEVER. THE DISCLOSING PARTY ACCEPTS NO RESPONSIBILITY FOR ANY EXPENSES, LOSSES OR ACTIONS INCURRED OR UNDERTAKEN BY THE RECEIVING PARTY AS A RESULT OF RECEIPT OF ANY INFORMATION FROM THE DISCLOSING PARTY. This Agreement does not require the Disclosing Party to furnish any information to the Receiving Party. It is further understood that neither party has any obligation under or by virtue of this Agreement to enter into any type of business relationship with the other party.

6. <u>Term.</u> This Agreement shall terminate three (3) years from the Effective Date.

7. <u>Audit.</u> The Receiving Party, upon reasonable notice, shall permit Disclosing Party, at its own expense, to audit, as it relates to this Agreement, the records of the Receiving Party to enable Disclosing Party to evaluate Receiving Party's compliance with this Agreement. Such audit shall be conducted during Receiving Party's normal business hours.

8. <u>General.</u> This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior or contemporaneous agreements or understandings, written or oral, concerning the subject matter hereof. This Agreement may be amended, modified or revoked only by a written instrument executed by all parties hereto. Failure to enforce any provision of this Agreement shall not constitute a waiver of any term hereof, and no waiver of any other provision(s) or of the same provision on another occasion. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

9. <u>Notices.</u> Any notice or communication from one party to the other party concerning the terms of this Agreement shall be in writing and shall be sent by certified mail, return receipt requested and postage prepaid, or by national commercial overnight courier, such as Federal Express, UPS, or Airborne Express, to the address specified below. Notices sent by certified mail shall be deemed received on the third business day after mailing; notices sent by commercial overnight

courier shall be deemed received according to the records of the courier.

| To: | Beechwood Capital Group |
|---|---|
| | 1186 Broadway |
| | Hewlett, NY 11557, USA |
| | (516) 295-4000 |
| | Attn: General Counsel |

| To: | Alpha Re Limited |
|---|---|
| | c/o Aon Insurance Managers |
| | (Cayman) Ltd. |
| | 94 Solaris Avenue, Second |
| | Floor, Camana Bay, Cayman |
| | Islands |
| | Attn: Gregory Tolaram |

10. <u>Governing Law.</u> This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed within the State of New York. Each party consents to personal jurisdiction in any action brought in any court, federal or state, of competent jurisdiction within the State of New York. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or enforceable, the remaining provisions shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have duly
executed this Agreement as of the Effective Date.

Alpha Re Limited

By: _____

Name: _____ Gregory Tolaram _____

Title: _____ COO_____


BEECHWOOD CAPITAL GROUP, LLC



By _____
Name: __Scott Taylor_____

Title: ___Manager_____

Page 3 of 3

# EXHIBIT 30

**To:** David Steinberg[david.s@grid4x.com]
**From:** Murray Huberfeld
**Sent:** Thur 3/28/2013 9:38:22 PM
**Subject:** Re: wires update

So just missing Marcos to get to 2.255.000
Sent via BlackBerry by AT&T

---

**From:** David Steinberg <david.s@grid4x.com>
**Date:** Thu, 28 Mar 2013 17:36:53 -0400
**To:** murray huberfeld<huberfeld@gmail.com>
**Cc:** ezra beren<ezraberen@gmail.com>
**Subject:** wires update

wire update

| | | | | | | |
|---|---|---|---|---|---|---|
| 17/03/13 | 671 העברה מחו"ל | 19/03 | 100,000.00 | 108,014.53 | 010005/66108 | AARON M PARNES |
| 21/03/13 | 671 העברה מחו"ל | 25/03 | 99,992.50 | 197,792.50 | 010012/66108 | THE R Z H FDN |
| 21/03/13 | 671 העברה מחו"ל | 22/03 | 100,000.00 | 297,792.50 | 010014/66108 | SHABSE J FUCHS |
| 21/03/13 | 671 העברה מחו"ל | 22/03 | 100,000.00 | 397,792.50 | 010015/66108 | JD BEREN LLC |
| 21/03/13 | 671 העברה מחו"ל | 22/03 | 50,000.00 | 447,792.50 | 010021/66108 | W EAST 21 ASSO |
| 21/03/13 | 671 העברה מחו"ל | 22/03 | 99,992.17 | 547,784.67 | 010022/66108 | TIFERES INVEST |
| 21/03/13 | 671 העברה מחו"ל | 22/03 | 99,992.17 | 647,776.84 | 010024/66108 | BERNARD FUCHS |
| 21/03/13 | 671 העברה מחו"ל | 22/03 | 100,000.00 | 747,776.84 | 010025/66108 | SR CAPITAL, L |
| 21/03/13 | 671 העברה מחו"ל | 22/03 | 99,980.00 | 847,756.84 | 010026/66108 | DAVID I LEVY |
| 21/03/13 | 671 העברה מחו"ל | 22/03 | 99,980.00 | 947,736.84 | 010027/66108 | MEADOWS CAPITA |
| 21/03/13 | 671 העברה מחו"ל | 22/03 | 99,995.00 | 1,047,731.84 | 010028/66108 | RICHARD P STAD |
| 21/03/13 | 671 העברה מחו"ל | 21/03 | 99,992.50 | 1,147,724.34 | 010029/66108 | SOLOMON WERDIG |
| 21/03/13 | 671 העברה מחו"ל | 25/03 | 49,980.00 | 1,197,704.34 | 010031/66108 | ELBOGEN, CHAYA |
| 24/03/13 | 671 העברה מחו"ל | 27/03 | 50,000.00 | 1,247,704.34 | 010010/66108 | CHESED CONGREG |
| 24/03/13 | 671 העברה מחו"ל | 27/03 | 100,000.00 | 1,347,704.34 | 010012/66108 | JUDITH D GOLDB |
| 24/03/13 | 671 העברה מחו"ל | 27/03 | 105,000.00 | 1,452,704.34 | 010015/66108 | OLIVE TREE HOL |
| 24/03/13 | 671 העברה מחו"ל | 27/03 | 199,970.00 | 1,652,674.34 | 010019/66108 | LRFI LLC |
| 25/03/13 | 671 העברה מחו"ל | 28/03 | 50,000.00 | 1,702,674.34 | 010026/66108 | JONATHAN J LEI |
| 28/03/13 | 671 העברה מחו"ל | 29/03 | 49,992.17 | 1,749,666.51 | 010022/66108 | BEECHWOOD CAPI |