EXHIBIT 31

**To:**       David Levy[dlevy@platinumlp.com]
**From:**     Scott Taylor
**Sent:**     Wed 4/17/2013 5:04:53 PM
**Subject:**  Couple things
Beechwood Re Overview_Draft.docx

Hope you are well, and we are looking forward to tomorrow at 11am.

First, I am attaching a quick overview that I drafted and have shared with our intended captive managers and tax folks to give a general plan on what we are doing.

Second, would it be possible to grab a small conference room starting at 9ish for myself and a colleague to meet prior to the 11am meeting.  He's coming up from Philly and I want to accomplish a couple things on another front prior to the meeting.

Let me know.

FYI - Moishe will be calling you a little later to chat for a few in advance of tomorrow's meeting with Fred Marro, etc.

Thanks
Scott

## "BEECHWOOD RE" OVERVIEW AND THOUGHTS

### A. BUSINESS OVERVIEW

BEECHWOOD RE is being formed with the intent to provide reinsurance capacity for U.S. domiciled life insurers that are interested in ceding risk to an offshore entity. The target classes of business are originally set to be U.S.-based disability policies, long-term care policies and potentially select types of annuity contracts. The profile of BEECHWOOD RE's target classes are those with high – but predictable – frequency, very low severity, and long pay-out periods. The capital partners behind BEECHWOOD RE have committed up to $50 Million of surplus capital to fund $300 - $400 Million of original reinsurance premium capacity.

 In terms of management of the insurance operations, we are planning on running the entity very lean from a W2 employee perspective, however invest appropriately with best-in-class vendor relationships to provide most critical functions. Mark Feuer, Scott Taylor, and potentially other junior resources shall compose the core management team of the insurance operations, bringing a decade of commercial insurance experience to the entity. Both Mark Feuer and Scott Taylor have been involved in the creation and management of a Cayman Islands based Segregated Portfolio Company which will provide experience relative to the operation of insurance assets on the island.

### B. REINSURANCE VEHICLE

It appears that the Cayman Islands and the Cayman Monetary Authority is the most advantageous domicile BEECHWOOD RE from a capitalization, regulatory, and tax perspective. CIMA is very familiar with similar structures, which adds to the benefits of the domicile.

I believe that BEECHWOOD RE should aim to be licensed as a Class B3 insurer, however we are open to the best possible legal structure to support our business plan.

### C. UNDERWRITING PROCESS AND RESOURCES

BEECHWOOD RE aims to participate in reinsurance transactions of closed block business subject to the classes and underwriting profile described above. Optimally, the transactions will be 100% quota share participation in closed block business, however we are open to other structures….including potential ongoing treaty arrangements when appropriate.

The underwriting process for BEECHWOOD RE is going to involve a full understanding of the submission and underlying block of business attributes prior to actuarial analysis. That process

will be led by Scott Taylor and the management team.  From there, our intention is to have an independent third-party actuary perform an analysis on each deal.  Our BEECHWOOD RE chief actuary will then do their own analysis and render an opinion on the third-party effort.

The management team will then engage in pricing discussions with the ceding insurer, including surplus needs, ceding commissions, and total funding.  The ultimate goal of BEECHWOOD RE is to select and reinsure deals that have limited underwriting risk on an overall basis, and the lowest possible cost of capital (e.g.,  less than ~5.5%)

### a.  Resources

**HEAD ACTUARY**

BEECHWOOD RE needs to identify and retain a qualified and respected life actuary, with specific experience in the disability and long term care arena.  This role is critical in assisting management in determining pricing and terms for deal structures, in addition to coordinating annual overall reserve assessments for the BEECHWOOD RE portfolio.

**THIRD-PARTY ACTUARIAL RESOURCES**

Given the variations and complexities in properly understanding the different life insurance reinsurance transactions, BEECHWOOD RE seeks a small panel of actuarial resources that can be used to do independent actuarial analyses on a deal by deal basis. For instance, if we can find an actuary who is particularly skilled at understanding the evolving long term care insurance market and development patterns, we require that resource different than the actuary needed to analyze a standard disability deal.

### D.  REGULATORY, LEGAL, AND COMPLIANCE

BEECHWOOD RE intends to maintain a best-in-class management of regulatory, compliance, and legal issues.   From the original structuring of the reinsurance vehicle, to ongoing relations with the Monetary Authority and ceding insures, BEECHWOOD RE will invest necessary funds to maintain good standing with all parties.

BEECHWOOD RE requires a senior resource to manage this function.  If possible we would like to discuss retaining Fred Marro and Westmont Associates in this regard.

We also require a licensed captive manager in the Cayman Islands.  While familiar with several through our previous commercial insurance operations, we are open to suggestions.  It is critical that our regulatory and compliance resources are comfortable with the manager, and that will take priority in the ultimate selection of such.

**E.  INVESTMENT MANAGEMENT**

BEECHWOOD RE will enlist best-in-class investment managers with the intention of profitably managing the balance sheet of the reinsurer.  To the extent that ceding insurers require credit for insurance and have the assets placed in trust, we will ensure that the investment managers are subject to the investment restrictions per the trust agreement.  The management team has experience with managing balance sheet assets subject to the provisions of a NY State 114a Trust**.**  It is our understanding that each ceding insurer will have their own specific requirements for trust language, and be subject to different State rules regarding credit for reinsurance. BEECHWOOD RE is confident that it can be successful in managing assets profitably while subject to any reasonable set of particular rules.

# EXHIBIT 32

**To:** Crystal O'Sullivan[cosullivan@beechwoodcapitalgroup.com]
**From:** David Levy
**Sent:** Fri 5/17/2013 1:08:49 AM
**Subject:** Re: Beechwood Re Open Items

Crystal what do I need to do for a personal financial statement?

Sent from my iPhone

On May 15, 2013, at 1:39 PM, "Crystal O'Sullivan"<cosullivan@beechwoodcapitalgroup.com> wrote:

Good Afternoon David,

I was just following up with you regarding the open items for Beechwood Re.  As of now, the items missing are:

- Original reference letter from Allen Herman
- Original certified copy of driver's license
- Personal Financial Statement
- Original signed Personal Questionnaire (pg. 4 of the PQ you filled out)

I spoke with Scott, he said he would bring and have you sign the PQ sheet when he sees you on Tuesday. other items I have received the originals of.

If you have any questions, please let me know, otherwise have a good holiday.

Warm regards,
Crystal

--

Crystal O'Sullivan
Direct Phone: (516) 331-5221
Fax Number: (516) 345-9740

**To:**      Chaya Barber[cbarber@platinumlp.com]
**From:**    David Levy
**Sent:**    Wed 5/1/2013 2:12:54 PM
**Subject:** FW: Cayman Captive
Personal Questionnaire.doc
Guidance note - References.doc
Sample Affidavit.doc


**From:** Crystal O'Sullivan [mailto:cosullivan@spinnetworks.com]
**Sent:** Tuesday, April 30, 2013 3:00 PM
**To:** David Levy
**Subject:** Cayman Captive


Good Afternoon David,


Scott forwarded me your contact information so I can send along the items that we need filled out for Beechwood
Re. You will need the following:
  • Personal Questionnaire to be filled out
  • 3 reference letters (2 personal, 1 financial - there is a guideline that I attached so you know what to include
    them)
  • Notarized Affidavit of No Convictions
  • Certified copy of passport picture or driver's license (if the passport or driver's license do not have your up
    private address, you will need to include a copy of a recent utility bill)

I will be more then happy to help you in any way I can.  For example, if you have an up to date resume with your
employment history for the past 10 years, I can start to populate your questionnaire.  Please let me know if you ha
questions.

Warm regards,
Crystal


Crystal O'Sullivan
Provider Relations Specialist
Work Phone: 516.331.5210 ext 221
Fax Number: 516.345.9740
Specialty Provider Imaging Network

**To:**      David Levy[dlevy@platinumlp.com]
**From:**    Crystal O'Sullivan
**Sent:**    Wed 5/1/2013 5:11:44 PM
**Subject:** Cayman Captive
David Levy - Character Reference no. 1.docx
David Levy - Character Reference no. 2.docx
David Levy - Bank Reference Letter.docx

Good Afternoon David,

Mark asked for me to provide some character reference letters for your use. I've attached 2 to this email (please a
you see fit - I left the items that would need to be changed in bold). I've also attached the bank reference letter. It'
basic letter stating you have been and still are in good standing with whichever financial institution you use (must b
then 2 years.)

Please let me know if you have any questions regarding the attachments.

Crystal
**Crystal O'Sullivan**
**Provider Relations Specialist**
**Work Phone: 516.331.5210 ext 221**
**Fax Number: 516.345.9740**
Specialty Provider Imaging Network


---------- Forwarded message ----------
From: **Crystal O'Sullivan** <cosullivan@spinnetworks.com>
Date: Tue, Apr 30, 2013 at 3:00 PM
Subject: Cayman Captive
To: dlevy@platinumlp.com


Good Afternoon David,

Scott forwarded me your contact information so I can send along the items that we need filled out for Beechwood F
will need the following:

- Personal Questionnaire to be filled out
- 3 reference letters (2 personal, 1 financial - there is a guideline that I attached so you know what to include
  them)
- Notarized Affidavit of No Convictions
- Certified copy of passport picture or driver's license (if the passport or driver's license do not have your up
  private address, you will need to include a copy of a recent utility bill)

I will be more then happy to help you in any way I can. For example, if you have an up to date resume with your
employment history for the past 10 years, I can start to populate your questionnaire. Please let me know if you ha
questions.

Warm regards,
Crystal


Crystal O'Sullivan
Provider Relations Specialist
Work Phone 516.331.5210 ext 221
Fax Number 516.345.9740

Specialty Provider Imaging Network

**To:**      David Levy[dlevy@platinumlp.com]
**From:**    Crystal O'Sullivan
**Sent:**    Wed 5/15/2013 5:39:12 PM
**Subject:** Beechwood Re Open Items

Good Afternoon David,

I was just following up with you regarding the open items for Beechwood Re.  As of now, the items missing are:

- Original reference letter from Allen Herman
- Original certified copy of driver's license
- Personal Financial Statement
- Original signed Personal Questionnaire (pg. 4 of the PQ you filled out)


I spoke with Scott, he said he would bring and have you sign the PQ sheet when he sees you on Tuesday.  All otl have received the originals of.

If you have any questions, please let me know, otherwise have a good holiday.

Warm regards,
Crystal


--

Crystal O'Sullivan
Direct Phone: (516) 331-5221
Fax Number: (516) 345-9740

**To:**      David Levy[dlevy@platinumlp.com]
**From:**    Crystal O'Sullivan
**Sent:**    Fri 5/17/2013 2:11:29 PM
**Subject:** Re: Beechwood Re Open Items
PFS Scott Taylor.pdf

David,

For the PFS, you will need a listing of your assets, a listing of your liabilities and then a networth statement.

I've attached Scott's so you can see the simple format they want.

Also, this too needs to be notarized.

Thanks!


On Thu, May 16, 2013 at 9:08 PM, David Levy dlevy@platinumlp.com wrote:

   Crystal what do I need to do for a personal financial statement?

Sent from my iPhone

On May 15, 2013, at 1:39 PM, "Crystal O'Sullivan" bosullivan@beechwoodcapitalgroup.com wrote:


      Good Afternoon David,

      I was just following up with you regarding the open items for Beechwood Re. As of now, the items missing are:

         • Original reference letter from Allen Herman
         • Original certified copy of driver's license
         • Personal Financial Statement
         • Original signed Personal Questionnaire (pg. 4 of the PQ you filled out)


      I spoke with Scott, he said he would bring and have you sign the PQ sheet when he sees you on Tuesday. All other items I have received the originals of.

      If you have any questions, please let me know, otherwise have a good holiday.

      Warm regards,
      Crystal


      --

      Crystal O'Sullivan
      Direct Phone (516) 331-5221
      Fax Number (516) 345-9740


THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED
RECIPIENT(S) AND MAY CONTAIN CONFIDENTIAL AND
PRIVILEGED INFORMATION.

ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE OR
DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE

```
INTENDED RECIPIENT, PLEASE CONTACT THE SENDER
BY REPLY E-MAIL AND DESTROY ALL COPIES
OF THE ORIGINAL E-MAIL.
```

--
Crystal O'Sullivan
Direct Phone: (516) 331-5221
Fax Number: (516) 345-9740

EXHIBIT 33

**To:**       Mark Nordlicht[mnordlicht@platinumlp.com]
**From:**     David Levy
**Sent:**     Thur 5/30/2013 11:08:47 PM
**Subject:**  Term-Sheet Beechwood
Term-Sheet Beechwood.docx

See attached ts for beechwood

CONFIDENTIAL

DRAFT – May 30, 2013

*THIS TERM SHEET IS A NON-BINDING EXPRESSION OF INTENT, DOES NOT CONSTITUTE A COMMITMENT NOR DOES IT CREATE ANY OBLIGATION OR DUTY BY THE INVESTOR TO MAKE, CONSIDER OR NEGOTIATE ANY INVESTMENT OR EXTENSION OF CREDIT. THESE PROPOSED TERMS AND CONDITIONS ARE PROVIDED FOR DISCUSSION PURPOSES ONLY AND DO NOT CONSTITUTE AN OFFER, AGREEMENT OR COMMITMENT BY LENDER TO ENTER INTO ANY PROPOSED TRANSACTION PURPORTED TO BE EVIDENCED HEREBY.  THE ACTUAL TERMS AND CONDITIONS UPON WHICH THE INVESTOR MIGHT ENTER INTO AN ARRANGEMENT ARE SUBJECT TO ALL NECESSARY INTERNAL INVESTOR APPROVALS, EXECUTION AND DELIVERY OF DOCUMENTATION SATISFACTORY TO THE INVESTOR AND SUCH OTHER TERMS AND CONDITIONS AS ARE DETERMINED BY THE INVESTOR AND ITS COUNSEL.*

- <u>Company</u>  Beechwood Re a [_____] Corporation (the "Borrower").

- <u>Investor</u>  _____, an entity controlled by David Levy (the "Lender").

- <u>Company Structure</u>:
  (i)  Mark Feuer and Scott Taylor to provide insurance background and expertise
  (ii)  David Levy to provide investment expertise
  (iii)  All Reinsurance transactions to be approved unanimously
  (iv)  Upon the approval by the Investor of Reinsurance Transaction totaling over $100,000,000 in value Mark Feuer and Scott Taylor shall be paid an annual combined salary totaling $750,000.
  (v)  David Levy shall have the right to invest all proceeds of Reinsurance Transactions at his sole discretion.
  (vi)  There shall be a 7 member BoD. Management shall each serve directors

- <u>Management</u>  The Company shall be managed by Mark Feuer (33.34% equity), Scott Taylor (16.67% equity), and David Levy (49.99% equity).

- <u>Transaction</u>:  The Borrower is in the business of Reinsurance and has a need for se capital on its balance sheet.

- <u>Preferred Investment</u>  Investment shall mean an amount of up to One Hundred Million ($100,000,000) dollars, in cash or other assets to be mutually agreed the parties, made by or on behalf of Lender, to be drawn at the sole discretion of the Lender, and subject to the terms of the definitive documentation.

- <u>Redemption</u>:
  (i)  Prior to the Borrower entering into a Reinsurance transaction t Lender may at its sole discretion exchange the assets
  (ii)  Upon the completion of a Reinsurance Transaction the Preferr Investment shall be redeemable at the Companies discreti

- <u>Interest Rate</u>:
  (i)  8% per annum on all cash
  (ii)  ( % ) per annum on all other assets

1

CONFIDENTIAL
DRAFT – May 30, 2013

- <u>Reinsurance Transaction</u>:     The investor shall have the right to approve any Reinsurance trans the Company enters into until the Investment is repaid in full.

- <u>Limit on Distributions</u>     No distributions or loans to Management shall be made prior to the Company redeeming the entire balance of the Preferred Investment

- <u>Governing Law</u>     All documents shall be governed by the laws of the State of New York such other jurisdiction as the Investor and Company shall agree upon in which the loan transaction contemplated hereby is fully lawful), and parties shall agree that New York (or such other jurisdiction) shall be t exclusive venue for any action brought under the facility. The Compan shall nominate an agent for service of process in New York (or such o jurisdiction). Company shall provide an opinion of New York counsel counsel licensed in such other jurisdiction), acceptable in form and substance to Investor, as to the legality of Companies business, and a the enforceability of the documents evidencing the Investment includi without limitation, compliance with any applicable civil and criminal us statutes and to such other matters as Lender may require.

- <u>Expenses</u>:     All costs and expenses incurred by Investor in connection with the proposed Facility shall be paid by Company, upon the completion of t transaction.

This Term Sheet does not contain all of the terms and conditions of any financing arrangement proposed between the parties hereto, which shall be set forth in definitive documentation. Furthermore, this Term Sheet reflects one alternative financing facility being considered by Investor and therefore does not supersede any other term sheet being reviewed by Investor and Company. As a result, this Term Sheet is not, and shall not be deemed to constitute, a commitment or an offer by any party to consummate the transactions contemplated hereby, all of which shall be subject to ordinary approvals, definitive documentation, negotiation and the satisfaction or waiver of all conditions set forth therein.

EXHIBIT 34

**To:**      David Levy[dlevy@platinumlp.com]
**From:**    Crystal O'Sullivan
**Sent:**    Fri 5/31/2013 8:06:54 PM
**Subject:** Invoice
Beechwood Re Invoice.docx

David,

Please find attached invoice.  Please let me know if you need anything else.

Crystal

--
Crystal O'Sullivan
Direct Phone: (516) 331-5221
Fax Number: (516) 345-9740

# INVOICE

Date: 5/31/2013
Invoice # 134
Expiration Date: 5/31/2014

Beechwood Re
1186 Broadway
Hewlett, NY 11557
(516) 734-6000
Fax (516) 345-9740
cosullivan@beechwoodcapital
group.com

To

David Levy
Platinum Partners
152 W 57th St
New York, NY 10019
(212) 582-2222

| Service Charge Description | Unit Price | Line Total |
|---|---|---|
| Filing, Licensing, Legal, & Administrative Services | $25,000 | $25,000 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

| | |
|---|---|
| Subtotal | $25,000.00 |
| Sales Tax | $0.00 |
| Total | $25,000.00 |

Quotation prepared by: Crystal O Sullivan_____

This is a quotation on the goods named, subject to the conditions noted below: (Describe any conditions pertaining to these prices and any additional terms of the agreement. You may want to include contingencies that will affect the quotation.)

To accept this quotation, sign here and return: _____



EXHIBIT 35

**To:**       David Levy[dlevy@platinumlp.com]
**From:**     Scott Taylor
**Sent:**     Tue 6/4/2013 7:23:27 PM
**Subject:**  when you have a set of sample investment guidelines, please send them

I am creating our Beechwood Re "document"

EXHIBIT 36

**To:**       Mark Nordlicht[mnordlicht@platinumlp.com]
**From:**     Scott Taylor
**Sent:**     Wed 6/12/2013 8:05:57 PM
**Subject:**  Re: Beechwood Re Presentation

Mark -

We were given assurances yesterday that we will be fully licensed by the end of the month.  Our hearing is set for
and we will get formal notification a few days after.  On the deal side, I do not want to set expectations, etc. but the
lot of opportunities on the horizon:

1. $250MM fixed annuity deal with Farmers New World Life
2. $520MM structured annuity deal with Farmers New World Life
3. $200MM mixed life product deal with Hartford
4. $170MM fixed annuity deal with Forrester life
5. SANLAM (south african bank) open flow fixed annuity deal
6. $60MM-$100MM long-term disability deal with consortium of Blue Cross/Blue Shield entities

My guess is that we will get the first of these to fund during the summer and perhaps a couple more in the fall.  The
with this marketplace is that things move SLOWLY even when pushed.  So we are being as aggressive as possible
the pipeline and working on deals...pushing all in hopes of getting one quickly.

Let us know if you have any questions.

Regards
Scott


On Wed, Jun 12, 2013 at 3:12 PM, Mark Nordlicht mnordlicht@platinumlp.com wrote:

   How are we doing on potential deals? What do u think timing could be?


   **From:** Scott Taylor [mailto:staylor@beechwoodcapitalgroup.com]
   **Sent:** Wednesday, June 12, 2013 3:09 PM
   **To:** David Levy; Mark Nordlicht
   **Subject:** Beechwood Re Presentation


David -

I know you are working on putting together the investment document (that you spoke with Mark about) this week, a
   basis for conversations with some of the FA players, who understand the transactions to be largely a financial de
   than something more complicated.

I have attached for you our general management and strategy document for Beechwood Re both as reference, and
   template for the other document.

Thanks
Scott


THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED
RECIPIENT(S) AND MAY CONTAIN CONFIDENTIAL AND

PRIVILEGED INFORMATION.

ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE OR
DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE
INTENDED RECIPIENT, PLEASE CONTACT THE SENDER
BY REPLY E-MAIL AND DESTROY ALL COPIES
OF THE ORIGINAL E-MAIL.

EXHIBIT 37

**To:**      David Levy[dlevy@platinumlp.com]
**From:**    Scott Taylor
**Sent:**    Sun 6/16/2013 2:10:24 PM
**Subject:** document
Beechwood Re Investments Doc_ June2013.pptx

take a look

# Beechwood Re

Investment Strategy & Guidelines
Discussion Document

June 2013

Copyright 2013



# Beechwood Re Investment Management Strategy is Based on Producing Superior Returns Through Credit-Based Strategies

Introduction
Risk Management
 Strategies
Transparency
Compliance
Biographies
Conclusion

- Beechwood Re was formed to provide offshore reinsurance capacity to Life, Accident and Health insurance companies seeking improved capital efficiency through reallocations of surplus

- We observed a growing need for reinsurance underwriting expertise and capacity for middle market-sized deals in fixed and indexed annuity, long-term disability, and long-term care lines, and formed the reinsurer in direct response to these requirements

- In order to drive success, Beechwood Re's Chief Investment Officer seeks to employ a multi-strategy, multi-manager credit-focused approach that seeks superior risk-adjusted returns irrespective of any broader market direction.

- Beechwood Re emphasizes qualitative, quantitative, operational, and structural risk management and utilizes best of class third party administration, audit, and valuation services.

- Beechwood Re will seek out best in class third party managers as well as invest a portion of its assets directly , planning to allocate capital across multiple distinct investment strategies that span various asset classes, geographies and liquidity profiles



# Overview of Reinsurance Transaction Benefits and Asset Management Structures

**Cedant Transaction Benefits**

- The proposed reinsurance solution mitigates the negative rating factors

  - **Reduced Interest Rate Exposure** – Reliance on interst0sensitive annuity business would be reduced

  - **Reduce Disintermediation Risk** – Eliminates exposure to annuities with no surrender protection

  - **Improve Capital Ratios** – Capital currently assigned to the annuity block would be freed up for alternate use

**Modified Coinsurance Structure**

- Cedant establishes a modified coinsurance account ("Mod-Co Account"). The Mod-Co Account and assets maintained therein will be owned by the Cedant

- Quota share of assets (up to 100%) with a combined statutory book value equal to the ceded reserves will be maintained in the Mod-Co Account

- Beechwood Re will establish an Escrow Account for the benefit of cedant and maintain assets equal to an Escrow Balance ("EB"). EB will be the greater of (1) 7% of the ceded reserves, or (2) the IMR

- Beechwood Re's asset managers are hired by Cedant to manage assets in the Mod-Co account in accordance with mutually agreed to investment guidelines



# The Basis of Beechwood Re's Investment Strategy is Superior Risk Management Capabilities

- Strong risk management is the key to monitoring our investments with third party managers.
- The Chief Investment Officer believes that risk must be addressed on several levels with multiple tools.

Introduction
Risk Management t
Strategies
Transparency
Compliance
Biographies
Conclusion



PAGE 4

# The Basis of Beechwood Re's Investment Strategy is Superior Risk Management Capabilities – (cont.)

Introduction

Risk Management

Strategies

Transparency

Compliance

Biographies

Conclusion

Risk management is fundamental to any transactions Beechwood Re manages on its own. The Chief Investment Officer believes that risk must be addressed on several levels:

**Investment Risks**

- *Detailed analysis* of underlying forms of collateral
- *Diversification* of loan portfolio among various strategies and industries
- Focus on appropriate *deal controls*, including: lockboxes/controlled bank account agreements; internal/external verifications; etc.
- Active monitoring and *due diligence* (real-time/daily/weekly/ monthly; as applicable)

**Legal and Structural Risks**

- Assistance from corporate counsel in structuring investments
- Careful management of exposure through the use of LLC structures

**Operational Risks**

- Secure third party controls, independent valuation, compliance program



5

# Beechwood Re Investment Management Overview

Introduction
Risk Management
**Strategies**
Transparency
Compliance

Biographies
Conclusion

**Strategy Mix:** Beechwood Re's expertise is in a broad array of diversified, credit-based strategies which allow for strong risk-adjusted returns uncorrelated to any broader market activity. 90%+ of the investments will be in NAIC 1 & 2 asset classes.

**Risk Management:** Risk management is the primary focus of the investments team. We plan to utilize multiple third-party risk systems and a focus on capital preservation in managing strategies.

**Opportunism:** Entrepreneurial culture and willingness to source "outside the box" investments that pass .

**Industry Network:** Extensive network of contacts provides unique opportunities and first mover advantages.

**Experience:** Eight year track record of Beechwood Re's CIO, with an additional 120 years of collective credit-based investing in the broader team.

BEECHWOOD
CAPITAL GROUP

# The Majority of the Asset Allocation is Focused on Credit Based Investments with U.S. Corporations

Introduction
Risk Management
**Strategies**
Transparency
Compliance
Biographies
Conclusion

| Asset Class | Allocation % |
|---|---|
| Equity Interests – U.S. | 15% |
| Equity Interest – Other | 5% |
| Secured Asset-Based Collateralized Loans – General (Obligations of US Institutions) | 15% |
| Secured Asset-Based Collateralized Loans – Healthcare | 10% |
| Secured Asset-Based Collateralized Loans – Mining | 10% |
| Secured Asset-Based Collateralized Loans – Energy | 10% |
| Secured Asset-Based Collateralized Loans – Receivables | 5% |
| Commodities | 5% |
| Corporate Bonds - Other | 10% |
| Direct Loans to U.S. Corporations | 10% |
| Other | 10% |



BEECHWOOD
CAPITAL GROUP

# Beechwood Re Will Utilize Best-In-Class Third-Party Asset Managers in Addition to Investing on a Proprietary Basis

Introduction
Risk Management
**Strategies**
Transparency
Compliance
Biographies
Conclusion

- Beechwood Re will invest a portion of its assets with third-party managers and has developed a strict criteria for selecting managers;

  - Fund size: $500MM - $2B
  - Uncorrelated returns
  - Long track record of success
  - Strong risk management
  - Best in class compliance
  - Portfolio diversification
  - Transparency

- Beechwood Re will also invest a portion of its assets in proprietary sourced transactions ;

  - Specialized *skills* to property structure and negotiate a transaction including

    - Added layers of *due diligence* and legal review
    - Extensive niche industry *experience*
    - Advanced *monitoring* capabilities
    - Sophisticated *controls* to minimize fraud risk



# A Culture of Transparency Is Critical in Maintaining a Healthy Relationship with Cedants and Trustees

Introduction
Risk Management
Strategies
Transparency
Compliance
Biographies
Conclusion

An integral part of our mission is to remain accountable to our cedants who entrust us with their capital.

- **Commitment to providing portfolio insight**
  - Monthly performance, capital allocation, performance contribution and risk metrics provided to cedants and trustees
  - Annual audit by a top tier accounting firm with significant industry experience
  - Open-door policy for any cedant seeking direct conversations with the investment manager regarding all aspects of portfolio
  - In-depth Due Diligence and investment policies available upon request

- **Independent valuation and reporting**
  - Sterling Valuation Group evaluates all valuations on a quarterly basis
  - Formal policies outlining all fair valuation practices and methods
  - We will seek out third-party managers with
    - Deep internal team of experienced professionals with accounting and operations backgrounds
    - Compliance with Rule 13F and 13D reporting requirements



BEECHWOOD
CAPITAL GROUP

# Beechwood Re Holds Third-Party Investment Managers to Strict Compliance and Ethics Standards

Introduction
Risk Management
Strategies
Transparency
Compliance
Biographies
Conclusion

**We are committed to the highest legal and ethical standards in the industry and have sought out third party managers who;**

- Registered Investment Advisor with U.S. Securities and Exchange Commission

- Code of Ethics

- Compliance Policies and Procedures

- Full-time in-house Chief Compliance Officer

- Strict adherence to federal securities law and SRO regulations

- Annual Compliance Meetings

- Employee Personal Account restrictions and monitoring

- Real time compliance trade surveillance

- Annual Certification of Compliance by all employees, officers and directors

- Anti-Money Laundering procedures and controls

- Outside Business Activity Pre-Approval process



BEECHWOOD
CAPITAL GROUP

11

# KEY MEMBERS OF MANAGEMENT TEAM

Copyright 2013



# DAVID LEVY

Introduction

Risk Management

Strategies

Transparency

Compliance

**Biographies**

Conclusion

- Mr. Levy has spent his career as an investment specialist and portfolio manager

- Most recently, Mr. Levy served as Deputy Chief Investment Officer at Platinum Partners Value Arbitrage Fund, L.P. He has directly managed over $250 million in capital and oversees over $1 billion in total investments. The focus of Mr. Levy's investments is in asset-based lending in a variety of industries, and utilizing credit based strategies to generate returns with less risk than traditional strategies.

- Prior to working at Platinum Funds, Mr. Levy worked at lighthouse Capital Partners where he actively managed investments for institutional investors. Mr. Levy's prior experience also includes internships in the New York City mayor's office for Mayor Bloomberg and with the Chief Counsel for Senator Orrin Hatch.

- He serves as a member of the International Crisis Group's Advisory Council

  - Mr. Levy holds a Bachelor of Science in Finance from Yeshiva University in New York, NY.

Copyright 2013



# MARK FEUER

Introduction
Risk Management
Strategies
Transparency
Compliance
**Biographies**
Conclusion

- Mr. Feuer has 20 years of experience in the financial services and insurance sectors

- Most recently, he was an owner in a Managing General Underwriter and reinsurance operation focused in the property and casualty market – specifically worker's compensation insurance for the healthcare industry

- Prior to that, Mr. Feuer was Chief Executive Officer of Marsh's U.S. operations, controlling a $2.5B+ revenue P&L and thousands of employees.  Mr. Feuer was also a senior leader within Merrill Lynch's Private Client Business, rising to be the Chief Operating Officer for the Americas, with responsibility for the trust company, retirement division, private bank, and other operations

- Mr. Feuer serves on several Boards of Directors, including many non-profit institutions in the New York area

- Mr. Feuer holds a *Juris Doctor* from New York Law School and an LLM in Taxation from New York University School of Law

Copyright 2013



13

# SCOTT TAYLOR

Introduction
Risk Management
Strategies
Transparency
Compliance
**Biographies**
Conclusion

- Mr. Taylor has spent his career in financial services and the insurance sectors

- Most recently, he led the underwriting team and reinsurance contracts for a property and casualty program manager and reinsurance operation. In this role he played the lead role in carrier relations, focused on both primary underwriting and reinsurance operations.

- Previously, Mr. Taylor led the Small Commercial business segment within Marsh & McLennan, responsible for the P&L and over $1B of P&C premiums. His roles prior to MMC included being the chief Operating Officer of the Merrill Lynch Private Banking and Investments division.

- Mr. Taylor began his career at McKinsey & Company in New York, providing management consulting services in the insurance industry, including extensive experience in the life insurance arena

- Mr. Taylor holds an A.B. with honors in Economics from Harvard University.

Copyright 2013



BEECHWOOD
CAPITAL GROUP

# Summary

Introduction
Risk Management
**Strategies**
Transparency
Compliance
**Conclusion**

- **Credit-focused investment strategy which focuses on capital preservation**

- **Uncorrelated results to both broader markets**

- **Superior risk-adjusted returns**

- **Proven record of outperformance in various market environments**

- **Strong culture of risk management and transparency**

- **Broad diversification through use of third party managers**

- **Proprietary self sourced transactions**

- **Best in class third party vendors**



EXHIBIT 38

**To:**       David Levy[dlevy@platinumlp.com]
**From:**     David Ottensoser
**Sent:**     Thur 6/20/2013 5:24:45 PM
**Subject:**  FW: New matter

Beechwood Re Investment LLC (or something like that)?


-----Original Message-----
From: Auerbach, Andrew [mailto:aeauerbach@BryanCave.com]
Sent: Thursday, June 20, 2013 1:14 PM
To: David Ottensoser
Subject: New matter

David,

In order to open the new matter, I will need the name of the Newco.  Please let me know when you and David have decided on a name.

Thanks,
Andy

Andrew E. Auerbach
Bryan Cave LLP
1290 Avenue of the Americas
New York, New York 10104
(212) 541-1232 - direct
(212) 904-0535 - fax
aeauerbach@bryancave.com

_____

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.
bcllp2013

EXHIBIT 39



Andrew E. Auerbach
Partner
Direct: (212) 541-1232
Fax: (212) 904-0535
acauerbach@bryancave.com

Bryan Cave LLP
1290 Avenue of the Americas
New York, NY 10104-3300
Tel (212) 541-2000
Fax (212) 541-4630
www.bryancave.com

June 25, 2013

**CONFIDENTIAL**

David Levy
Beechwood Re Investment LLC
c/o Platinum Partners
Carnegie Hall Tower
152 West 57th Street, 4th Floor
New York, NY 10019

Re:      Engagement of Bryan Cave LLP

Dear David:

We are pleased that you have chosen to engage Bryan Cave LLP to provide legal services in connection with the formation of Beechwood Re Investment LLC and other related services in connection with investments to be made by the entity. Consistent with our normal practice and as required by 22 NYCRR Part 1215, this letter and the attached Statement of Engagement Terms and Billing Practices (New York) (the "Statement") set forth the terms of our engagement. The Statement is provided to our clients so that we can establish a mutual understanding regarding our engagement.

We cannot guarantee any particular legal result, but we assure you that we will work vigorously and efficiently. The quality of our work is paramount, and while we do not sacrifice quality to economy, we do recognize the need for cost effective representation. The selection of lawyers and legal assistants who will render services to you will be made by us as the lawyers having overall supervisory responsibility for your matter, taking into consideration the nature of the matter, the office in which most of those services are likely to be rendered, the degree of legal experience, knowledge and specialization required in order to achieve your objective, the availability of lawyers and legal assistants to work on your matter and their hourly billing rates. If at any time you have questions, concerns or criticisms, please contact either of us at once.

We take into account many factors in billing for services rendered. The principal factor is usually our time costs billed at our hourly rates for the attorneys and legal assistants who do the work. Our hourly rates for attorneys and other members of the professional staff are based on years of experience, specialization in training and

**Bryan Cave Offices**
Atlanta
Charlotte
Chicago
Dallas
Hamburg
Hong Kong
Irvine
Jefferson City
Kansas City
London
Los Angeles
Milan
New York
Paris
Phoenix
San Francisco
Shanghai
St. Louis
Washington, DC

**Bryan Cave International Trade**
*A TRADE CONSULTING SUBSIDIARY
OF NON-LAWYER PROFESSIONALS*
www.bryancavetrade.com
Bangkok
Beijing
Jakarta
Kuala Lumpur
Manila
Shanghai
Singapore
Tokyo

**Bryan Cave Strategies**
*A GOVERNMENT RELATIONS AND
POLITICAL AFFAIRS SUBSIDIARY*
www.bryancavestrategies.com
Washington, DC
St. Louis

NY02DOCS\1738998.1\NY\N000059

Beechwood Re Investment LLC                                              **Bryan Cave LLP**
June 25, 2013
Page 2

practice, level of professional attainment and other factors relative to the engagement.  Currently our hourly rates for attorneys and legal assistants range from $215 to $950.  Our time charges are usually in minimum units of one tenth (1/10) of an hour.  Hourly billing rates are reconsidered periodically with changes effective as of the first of the month adopted, usually January 1, and are subject to change without notice.

Our billing statements are normally rendered on a monthly basis and are due and payable upon receipt. We endeavor to include expenses and other charges in the statement for the month in which they are incurred. On occasion, however, accounting for certain expenses and charges (i.e., late-posted items or international charges), may be delayed, in which case late-posted items will be billed on the next regular statement.

Our representation is conditioned upon receipt of the signed copy of this letter from you confirming your understanding and approval of these terms of our engagement.

Our attorney-client relationship is one of mutual trust and confidence. We do our best to see to it that our clients are satisfied not only with our services but also with the fees charged for those services. Whenever you have any questions or comments regarding our services or fees, you should contact either of us or any other attorney in the Firm with whom you are working. We also encourage you to inquire about any matter relating to our fee arrangements or monthly statements that are in any way unclear.

2

Beechwood Re Investment LLC                                    **Bryan Cave LLP**
June 25, 2013
Page 3

We appreciate the confidence you have placed in us and look forward to working with you. If this letter and the Statement correctly set forth our mutual understanding, please sign and date the enclosed copy of this letter and return it to us with the attached Statement.

Very truly yours,

*A. E. Auerbach*

Andrew E. Auerbach


THESE TERMS, INCLUDING THE ATTACHED **STATEMENT OF ENGAGEMENT TERMS AND BILLING PRACTICES,** ARE APPROVED.

DATED: June ___, 2013


Beechwood Re Investment LLC


By:_____
Name: _____
Title: _____

**Bryan Cave LLP**

# STATEMENT OF ENGAGEMENT TERMS
# AND BILLING PRACTICES

(New York)

Rates are determined for our lawyers and legal assistants on the basis of seniority, experience or area of practice, the geographic location of the office, and factors relative to the engagement.   Hourly billing rates are reconsidered periodically with changes effective as of the first of the month adopted, usually January 1, and are subject to change without notice. The current rates for our professionals likely to be involved in rendering services in connection with this matter are as follows:  Mark Weakley/$495, Laurel Durham/$425 and Andrew Auerbach/$620.  This list may change from time-to-time.

Deposits.  As a matter of Firm policy and in light of the expected work involved in this representation, we request that Beechwood Re Investment LLC  make a payment of **$0**, to be applied against our fees, expenses and other charges.

Any deposits that we receive from you will be placed in one of our client trust accounts on your behalf and are refundable to the extent not subject to disbursement.  Under certain circumstances, one of those accounts allows interest earned to be credited to the client. New York law requires that the interest earned in the other trust account, which must be used for all deposits which are too small in amount or will be held for too short a time to generate enough interest to justify placing the funds in a separate account, be contributed to a New York state fund to provide civil legal service programs for indigent persons and programs for the administration of justice.  If you have questions with regard to the account into which your deposit(s) are placed, please feel free to contact us.

Deposits are received with the understanding that we are expressly authorized to withdraw from the trust account the sums necessary to pay for services as they are performed and expenses as they are incurred. You will be notified in writing of the amounts applied or withdrawn, and you will also be provided with a statement explaining the services rendered and costs incurred. If the charges for services and costs exceed the balance on deposit, the statement will show the excess due and payable. We may also request additional deposits to cover further services and costs, if circumstances warrant. When our services are completed, you will receive a final invoice. Any remaining balance after payment of our final invoice will be returned to you.

Representation in Other Matters. We are a large law firm and we represent many other companies and individuals. To avoid any misunderstanding in connection with our current (and any future) engagement for you, we confirm that we have not been asked to act as counsel for any subsidiary, parent, affiliate or other member of your corporate group by acting as counsel to you. Any such relationship, if undertaken by us with any group member, must be separately entered into.

It is possible that some of our present or future clients will have disputes with you during the time that we are representing you.  Therefore, as a condition to our undertaking this engagement, you have agreed that our Firm may continue to represent or may undertake in the future to represent other existing or new clients in any matter on a position, other than a matter in which we represent you with respect to that position, that is adverse to you or in which your interests may be adversely affected.  We agree, however, that your prospective consent to conflicting representation contained in the preceding sentence shall not apply in any instance where as the result of our representation of you we have obtained sensitive, proprietary or other confidential information of a non-public nature that, if known to any such other client of ours, could be used in any such other matter by such client to your disadvantage.

Estimates.  Before undertaking a particular assignment, we will, if requested, provide you with a fee estimate to the extent possible. Estimates are not possible for some matters, however, and cannot be relied on in many others because the ultimate scope of our work will not be clear at the outset. When a fee estimate is given, it is only an estimate; it is not a maximum or minimum fee quotation. The actual fee may be more or less than the quoted estimate.

Litigation and Dispute Resolution Matters.  The outcome, cost and the course of most litigation matters cannot be predicted.  Should you ever have questions or concerns, we encourage you to contact us. Your timely and full cooperation and assistance will play a critical role in our efforts. You always retain the right to determine whether a compromise should be pursued and accepted, or, alternatively, whether the matter should be pursued to an adjudication

**Bryan Cave LLP**

on the merits at trial and thereafter to an appeal. While we cannot assure you that there will not be an adverse outcome, our efforts always are directed toward obtaining the most satisfactory resolution of this matter for you that is possible.

Termination of Engagement.  You may terminate our engagement with or without cause at any time on written notice to us. Termination of our services will not affect your responsibility to pay for legal services rendered and all expenses and other charges incurred up to the date when we receive notice of termination, and for any further work required of us in order to facilitate an orderly turnover of matters in process at the time of termination.

We may terminate our engagement for any of the reasons permitted under the New York Code of Professional Responsibility, including your deliberate disregard to pay fees, insistence upon conduct contrary to our judgment and advice, insistence upon presenting a claim or defense that is not warranted under existing law and cannot be supported by good faith argument, or any other conduct that renders it unreasonably difficult for us to carry out employment effectively or presents conflicts with our professional responsibilities.  If required, we will request a stipulation executed by you allowing us to withdraw as your attorney in any judicial, arbitration or similar proceedings, and you agree to sign such stipulation. We may also apply for a court order approving our withdrawal from representing you, and you agree in advance to our withdrawal.

Our attorney-client relationship will also terminate when a matter for which our Firm was hired has been completed, whether or not our bill to you for services has been rendered or paid. Upon termination of our relationship, neither you nor the Firm has a duty to accept new engagements or to continue representation in any matters unless mutually agreed in writing.

Future Representation.  In the event our engagement necessitates that we prepare an agreement which provides for ongoing rights and obligations on your part, a dispute concerning the interpretation or enforceability of that agreement may subsequently arise after our engagement has been terminated. In the absence of our express written agreement, you may not assume that the Firm will continue to be free to represent you in a future dispute concerning such agreement.

Retention of Files.  Generally, we keep each client's legal files for ten years after we close the file. After ten years, we destroy those files unless the client tells us otherwise. If you want us to keep your files for a longer period of time, or you seek the original or copies of documents in your files, please tell us.

Arbitration of Disputes.  In the event that a dispute arises between us relating to our fees, you may have the right to arbitration of the dispute pursuant to Part 137 of the Rules of the Chief Administrator of the Courts. Upon your request, a copy of those Rules will be provided to you.

In the event that a dispute arises between us concerning the services we have provided to you, whether claims for legal malpractice, breach of fiduciary duty, breach of contract, or any other claim based upon alleged attorney misconduct, or a fee dispute to which Part 137 does not apply, then that dispute will be settled by arbitration before an arbitral forum other than that prescribed by Part 137. Such an arbitration shall be heard in the City of New York by a panel of three arbitrators, all of whom must be attorneys practicing in that City, with one arbitrator to be selected by each party and the third to be chosen by the two arbitrators or the parties to the arbitration. The arbitrators may establish such rules for the conduct of the arbitration as they may choose, except that those rules shall be consistent with the procedural rules of the American Arbitration Association for commercial arbitrations; the arbitrators shall have the power to award all relief available in a court of law; and the arbitration proceedings shall be private and confidential and shall not be disclosed to the public by either the arbitrators or the parties to the arbitration. The award of the arbitrators must be by a majority vote and shall be final and binding, not subject to challenge by either party in any court of law. The arbitrators shall determine which party shall pay for the arbitrators' fees and the costs of the proceedings, but in any event each party shall bear its own costs of legal representation, if any, in the proceeding. Although you can consult another lawyer with respect to this provision, we believe that it is desirable because, although both parties give up the right to a jury trial, to full discovery, and to appellate review, arbitration generally is a quicker and less expensive method of dispute resolution and the privacy of the process can be assured.

Charges.  Our statements to our clients are normally rendered on a monthly basis, and ordinarily include certain charges other than fees for legal services. These charges may include third-party expenses (such as filing fees, court reporters and travel) and internal expenses. Clients may be asked to pay larger third-party invoices directly. Other third-party expenses

2

Bryan Cave LLP

will be added to our bills with no markup. The Firm has elected to charge for certain support activities on the basis of each client's individual use instead of covering them in its hourly rates for fee earners. The internal charges will be billed in the following way:

Mail:  Clients are charged the actual cost of regular and express mail and bulk mailings, as well as air express couriers.

Messengers:  Clients are charged the actual costs of outside messenger service. In some instances, Firm personnel may be used in lieu of an outside messenger service to reduce delivery time. In those cases, delivery charges are competitive with those of the outside messenger.

Overtime:  Staff overtime is charged only when required by the time constraints of the specific project.

Photocopying and Binding:  The Firm charges $.20 per page for regular copies, $.75 per page for color copies. Copying by outside vendors when required by size or time constraints of the specific project is charged at actual cost.  The Firm charges $5.00 for each binding (velo, spiral, fastback, etc.) job. Documents are scanned at $.20 per page.

Computerized Support Services including Word-Processing:  Clients are billed for computerized support services, including word-processing services, at the rate of $.50 per minute for composing and editing.

Computer Research:  The Firm uses Lexis/Nexis and Westlaw computer-assisted research. The Firm contracts for these services in bulk and for several years in advance. The Firm bills clients at the vendor's regular rates to third parties without discount.

Facsimile:  Clients are charged $1.00 per page plus the telephone expense for outgoing faxes. There is no charge for incoming faxes.

Long-Distance Telephone Calls:  To ensure availability and quality of transmission of voice and data, the Firm contracts with long distance carriers for these services in bulk and for several years in advance.  Long distance calls are billed at direct dial rates to third parties without discount.

Billing Contact.  You have agreed that our bills should be sent to your attention and that they will be reviewed and processed for payment promptly.  You have further agreed that we may contact you to confirm receipt of our invoices as well as to query the status of their payment.

Applicable Law.  Even though our Firm has offices and transacts business in numerous locations, our attorney-client relationship will be governed by New York law, including the New York Code of Professional Conduct.

3

EXHIBIT 40

**To:**       David Levy[dlevy@platinumlp.com]; David Ottensoser[DOttensoser@platinumlp.com]
**From:**     Durham, Laurel
**Sent:**     Wed 7/3/2013 6:34:14 PM
**Subject:**  Beechwood Reinvestment - Revised LLC Agreement and Subscription Documents
RED - Beechwood Reinvestment - LLC Agreement (DE) - Beechwood Reinvestment - LLC Agreement (DE)-v1.DOC
Beechwood Reinvestment - LLC Agreement (DE)-v2.DOC
Beechwood Reinvestment, LLC - Subscription Documents (DE)-v1.DOC

David and David,

Attached for your review are the following documents:

1. Clean and redline of the LLC Agreement for Beechwood Reinvestment, LLC, which I revised pursuant to our call on Monday.  Will there be a minimum amount for the initial closing?  I have left the "Initial Closing" amount in the definitions section blank at this time.
2. Clean version of the subscription documents in which I added the Newco name.

There are some blanks in the documents, particularly the address for Beechwood and wire instruction information for investors in the subscription documents.

Thanks and please let me know if you have any questions or comments.
Best regards,
Laurel

**Laurel A. Durham**
Bryan Cave LLP
1700 Lincoln St., Suite 4100
Denver, Colorado 80203-4541
(303) 866-0685 (Direct – Denver)
(303) 417-8533 (Direct – Boulder)
(303) 866-0200 (Fax)
laurel.durham@bryancave.com
www.bryancave.com

---

This electronic message is from a law firm. It may contain confidential or privileged information. If you received this transmission in error, please reply to the sender to advise of the error and delete this transmission and any attachments.

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.
bcllp2013

**BC Draft**
**6̶7̶/2̶1̶3̶/2013**

**THE LIMITED LIABILITY COMPANY INTERESTS IN THE COMPANY REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT (AS MODIFIED, AMENDED AND SUPPLEMENTED) AMONG THE MEMBERS AND MANAGER SIGNATORY HERETO, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR QUALIFIED UNDER ANY STATE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS THEREFROM. THESE LIMITED LIABILITY COMPANY INTERESTS MAY NOT BE OFFERED, ASSIGNED, PLEDGED, SOLD OR OTHERWISE DISPOSED OF ABSENT AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT AND QUALIFICATION UNDER SUCH STATE SECURITIES LAWS, UNLESS EXEMPTIONS FROM SUCH REGISTRATION AND QUALIFICATION REQUIREMENTS ARE AVAILABLE. THE COMPANY HAS THE RIGHT TO REQUIRE ANY POTENTIAL TRANSFEROR OF A LIMITED LIABILITY COMPANY INTEREST IN THE COMPANY TO DELIVER AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY PRIOR TO ANY TRANSFER TO THE EFFECT THAT AN EXEMPTION FROM REGISTRATION AND QUALIFICATION IS AVAILABLE FOR SUCH TRANSFER. ADDITIONAL SUBSTANTIAL RESTRICTIONS ON TRANSFER OF THESE LIMITED LIABILITY COMPANY INTERESTS ARE SET FORTH IN THIS AGREEMENT.**

LIMITED LIABILITY COMPANY AGREEMENT

FOR

[NEWCO] BEECHWOOD REINVESTMENT, LLC

Dated as of June July ___, 2013

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS................................................................................................. 1

ARTICLE II THE LIMITED LIABILITY COMPANY........................................................6
    2.1    Formation..............................................................................................................6
    2.2    Name.....................................................................................................................6
    2.3    Term......................................................................................................................6
    2.4    Registered Office and Agent; Principal Place of Business....................................6
    2.5    Purpose................................................................................................................. 6

ARTICLE III CAPITAL CONTRIBUTIONS.......................................................................7
    3.1    Capital Contributions By Members.......................................................................7
    3.2    Admission of Additional Members....................................................................... 7
    3.3    No Third Party Right to Enforce..........................................................................7~~7~~8
    3.4    Return of Contributions.......................................................................................7~~7~~8

ARTICLE IV REPRESENTATIONS, WARRANTIES AND COVENANTS.......................8
    4.1    General Representations and Warranties................................................................8
    4.2    Conflict and Tax Representations..........................................................................8
    4.3    Survival................................................................................................................8~~8~~9

ARTICLE V COMPANY MANAGEMENT...........................................................................9
    5.1    Manager.................................................................................................................9
    5.2    Management Authority..........................................................................................9
    5.3    Major Decisions..................................................................................................10
    5.4    Duties..................................................................................................................11
    5.5    Payment of Expenses..........................................................................................11
    5.6    Initial Manager as Member.................................................................................11
    5.7    Removal and Replacement..................................................................................11
    5.8    Resignation.........................................................................................................11
    5.9    Vacancies............................................................................................................11
    5.10   Reliance by Third Parties...............................................................................~~11~~12
    5.11   Other Business Opportunities; Affiliate Transactions; Conflicts........................ 12
    5.12   Standard of Care; Indemnification...................................................................... 12

ARTICLE VI MEMBERS..................................................................................~~14~~15
    6.1    No Control by the Members; Rights of the Members......................................~~14~~15
    6.2    Limited Liability.................................................................................................15
    6.3    Quorum and Voting.............................................................................................15
    6.4    Action by Written Consent..................................................................................15
    6.5    Meetings..............................................................................................................15
    6.6    No State-Law Partnership....................................................................................16
    6.7    Tax Matters.........................................................................................................16

i

**ARTICLE VII DISTRIBUTIONS TO THE MEMBERS**......................................................**16**
    7.1    Discretionary Distribution to Pay Tax................................................ 16
    7.2    Ordinary Distributions.......................................................... ~~16~~17
    7.3    Liquidity Event and Liquidation Proceeds.................................. 17
    7.4    Distributions in Kind and of Non-Cash Assets............................ 17

**ARTICLE VIII ALLOCATION OF PROFITS AND LOSSES**................................**~~17~~18**
    8.1    In General.................................................................... ~~17~~18
    8.2    Regulatory Allocations and Other Allocation Rules................... 19
    8.3    Other Allocation Rules...................................................... ~~20~~21

**ARTICLE IX ALLOCATION OF TAXABLE INCOME AND TAX LOSSES**................ **21**
    9.1    Allocation of Taxable Income and Tax Losses............................. 21
    9.2    Allocation of Section 704(c) Items......................................... 21
    9.3    Integration with Section 754 Election...................................... 21
    9.4    Allocation of Tax Credits.................................................... ~~21~~22

**ARTICLE X ACCOUNTING AND REPORTING**.........................................**~~21~~22**
    10.1    Books......................................................................... ~~21~~22
    10.2    Capital Accounts............................................................. 22
    10.3    Valuation of Securities and Other Assets Owned by the Company......... 22
    10.4    Transfers During Year....................................................... ~~23~~24
    10.5    Reports....................................................................... ~~23~~24
    10.6    Section 754 Election......................................................... 24
    10.7    Inspection of Documents..................................................... 24

**ARTICLE XI TRANSFER OF MEMBER'S INTEREST**.................................**~~24~~25**
    11.1    Restrictions on Transfers and Liens....................................... ~~24~~25
    11.2    Permitted Transfers......................................................... ~~24~~25
    11.3    Substitution of a Member.................................................... 25
    11.4    Conditions to Substitution.................................................. 26
    11.5    Admission as a Member....................................................... 26

**ARTICLE XII WITHDRAWAL, DISSOLUTION AND TERMINATION**.................**26**
    12.1    Withdrawal.................................................................... 26
    12.2    Dissolution................................................................... ~~26~~27
    12.3    Liquidation................................................................... ~~26~~27
    12.4    Articles of Dissolution...................................................... ~~27~~28

**ARTICLE XIII NOTICES**............................................................**~~27~~28**
    13.1    Method of Notices........................................................... ~~27~~28
    13.2    Computation of Time......................................................... 28

**ARTICLE XIV GENERAL PROVISIONS**.............................................**~~28~~29**
    14.1    Amendment..................................................................... ~~28~~29
    14.2    Governing Law; Venue........................................................ ~~28~~29
    14.3    Waiver........................................................................ 29
    14.4    Power of Attorney............................................................ 29

ii

14.5     Confidentiality..................................................................................................... 30
14.7     Applicable Law..................................................................................................3031
14.8     Entire Agreement................................................................................................3031
14.9     Counterparts.......................................................................................................3031
14.10   Additional Documents........................................................................................3031
14.11   No Third Party Beneficiaries..............................................................................3031
14.12   Counsel to the Company......................................................................................3031

iii

**LIMITED LIABILITY COMPANY AGREEMENT**
**FOR**
**[NEWCO]BEECHWOOD REINVESTMENT, LLC**

This Limited Liability Company Agreement (this "Agreement"), dated as of ~~June~~July ___, 2013 (the "Effective Date"), for ~~[Newco]~~Beechwood Reinvestment, LLC, a Delaware limited liability company (the "Company"), is among the Manager and Members (as defined below) signatory hereto.

In consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

**Article I**
**DEFINITIONS**

In addition to the terms defined elsewhere in this Agreement, the following terms shall have the indicated meaning:

"Accredited Investor" has the meaning assigned to such term under Rule 501 of Regulation D, promulgated under the Securities Act.

"Act" means the Delaware Limited Liability Company Act, as amended from time to time.

"Adjusted Capital Account Deficit" means, with respect to any Member, a deficit balance in such Member's Capital Account as of the end of the fiscal year after giving effect to the following adjustments:  (a) credit to such Capital Account the additions, if any, permitted by Treasury Regulations §§ 1.704-1(b)(2)(ii)(*c*) (referring to obligations to restore a capital account deficit), 1.704-2(g)(1) (referring "partnership minimum gain") and 1.704-2(i)(5) (referring to "partner nonrecourse debt minimum gain"), and (b) debit to such Capital Account the items described in §§ 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*) of the Treasury Regulations.  This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulation § 1.704-1(b)(2)(ii)(*d*).

"Adjusted Properties" is defined in Section 9.2.

"Affiliate" means with respect to a Person, (a) any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, (b) any spouse, ascendant or descendant of any such Person or any Person described in clause (a) of this definition, and (c) any trust, family partnership or other entity established primarily for the benefit of such Person or any Person described in clauses (a) or (b) of this definition.  As used in this definition, the word "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" is defined in the introductory paragraph.

1

"Available Cash" means Distributable Assets that are in the form of cash or cash equivalents.

"Business" is defined in Section 2.5.

"Business Day" means each day that is not a Saturday or Sunday when the New York Stock Exchange is open for business.

"Capital Account" is defined in Section 10.2(a).

"Capital Contribution" means for any Member at the particular time in question the aggregate of the dollar amounts of any cash, cash equivalents and Non-Cash Assets contributed by such Member to the capital of the Company.

"Carrying Value." The initial "Carrying Value" of property contributed to the Company, including Non-Cash Assets, by a Member means the value of such property at the time of contribution as determined by the Manager. The initial Carrying Value of any other property shall be the adjusted basis of such property for federal income tax purposes at the time it is acquired by the Company. The initial Carrying Value of a property shall be reduced (but not below zero) by all subsequent depreciation, cost recovery, depletion and amortization deductions with respect to such property as taken into account in determining Profit and Loss. The Carrying Value of any property shall be adjusted from time to time in accordance with Section 10.2(b) and Treasury Regulation § 1.704-1(b)(2)(iv)(*m*), and to reflect changes, additions or other adjustments to the Carrying Value for dispositions, acquisitions or improvements of Company properties, as deemed appropriate by the Manager.

"Certificate of Formation" is defined in Section 2.1.

"Code" means the Internal Revenue Code of 1986, as amended from time to time. Any reference herein to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of future Law.

"Company" is defined in the introductory paragraph.

"Company Counsel" is defined in Section 14.12.

"Company Expenses" means all expenses and costs incurred in conducting the Company's business, including, without limitation the following: (i) accounting, legal and other professional services; (ii) costs and expensed incurred in connection with the Company's investment in the Operating Company (including related due diligence expenses) and the monitoring, management, restructuring, sale or other disposition of such investment; (iii) costs of any litigation or investigation involving Company activities; (iv) costs of any litigation or investigation involving Company activities; (v) Organizational Expenses; and (vi) costs and expenses for terminating, dissolving and winding up the Company.

"Company Interest" means any Membership Interest, and any other rights in the Company, including, without limitation, any economic rights as an assignee, transferee or successor of any Member.

"Confidential Information" means information concerning the properties, operations, business, trade secrets, technical know-how and other non-public information and data of or relating to the Company and the Manager (including the contents of this Agreement and its Exhibits), its properties, any technical information with respect to any project of the Company.

"Distributable Assets" means, at a particular time, the cash, cash equivalents and Non-Cash Assets held by the Company [(including, without limitation, distributions received from the Operating Company)], less such cash reserves as the Manager reasonably determines are necessary to pay on a timely basis Company costs and expenses, including Company Expenses, taxes, and other obligations of the Company, taking into account the anticipated revenues of the Company.

"Effective Date" is defined in the introductory paragraph.

"GAAP" means generally accepted accounting principles in the United States in accordance with the hierarchy set forth in Financial Accounting Standards Board Accounting Standards Codification.

"Indemnified Person" is defined in Section 5.12(b).

"Initial Closing" means the date on which the first Member is admitted to the Company which shall occur when the subscriptions for Membership Interests is at least $[__,000,000].

"Law" or "Laws" means all applicable federal, state, tribal and local laws (statutory or common), rules, ordinances, regulations, grants, concessions, franchises, licenses, orders, directives, judgments, decrees, restrictions and other similar requirements, whether legislative, municipal, administrative or judicial in nature.

"Lien" means any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, charge, deposit arrangement, preference, priority, security interest, option, right of first refusal or other transfer restriction or encumbrance of any kind (including preferential purchase rights, conditional sales agreements or other title retention agreements, and the filing of or agreement to give any financing statement under the Uniform Commercial Code or comparable Law of any jurisdiction to evidence any of the foregoing).

"Major Decision" is defined in Section 5.3.

"Major Decision Threshold" means $[100,000].100,000.

"Manager" is defined in Section 5.1.

"Member" means, at the time of determination, a Person holding Company Interests, that is or should be designated as a Member of the Company and a Person admitted as a substituted Member pursuant to Section 11.3.

"Membership Interest" means, with respect to any Member, (a) that Member's status as a Member, (b) that Member's Capital Account and share of the Profits, Losses and other items of income, gain, loss, deduction and credits of, and the right to receive distributions (liquidating or

3

otherwise) from, the Company under the terms of this Agreement, (c) all other rights, benefits, and privileges enjoyed by, and obligations of, such Member (under the Act or this Agreement) in its capacity as a Member, including that Member's rights to vote, consent and approve those matters described in this Agreement, and (d) all obligations, duties and liabilities imposed on that Member under the Act or this Agreement in its capacity as a Member.

"Misconduct" means any of the following:  (a) the conviction of, or plea of nolo contendere by any member of the Manager with respect to (i) a material violation of material federal or state securities Laws, (ii) a felony under any criminal statute, or (iii) a violation of any other criminal statute involving intentional fraud, misappropriation or embezzlement, or (b) the Manager has been determined by a court of first impression having competent jurisdiction to have knowingly and willfully breached its material obligations under this Agreement or, subject to Section 5.4, its fiduciary obligations to the Company, including for intentional fraud, willful misconduct or gross negligence.

"Non-Cash Assets" means Securities and any other in-kind property held by the Company other than cash or cash-equivalents.  The value of Non-Cash Assets shall be determined as of the date of the initial Capital Contributions of Non-Cash Assets by a Member and, thereafter, shall be revalued every 12 months in accordance with the procedures described in this Agreement.  Non-Cash Assets shall not include any dividends or distributions made to a Member by the issuer of Securities and the Member shall be entitled to retain any dividends or distributions made to the Member by such issuer.

"Operating Company" means ~~Beachwood~~Beechwood Reinsurance LLC, a limited liability company formed under the laws of the Cayman Islands, British West Indies.

"Organizational Expenses" means the expenses incurred in the organization of the Company and the offering of the Membership Interests.

"Percentage Interests" means, with respect to each Member, the percentage of the outstanding Membership Interests held by such Member set forth opposite such Member's name on Exhibit A, as such Percentage Interest may be modified from time to time pursuant to this Agreement.

"Person" means a natural person, corporation, joint venture, partnership, limited liability partnership, limited partnership, limited liability limited partnership, limited liability company, trust, estate, business trust, association, governmental authority or any other entity.

"Preferred Distribution" means an amount, determined for each Member, equal to (i) eight percent (8%) of such Member's Capital Contributions that consist of cash and cash equivalents and (ii) five percent (5%) of such Member's Capital Contributions of Non-Cash Assets (based on the most recent valuation completed with respect to such Non-Cash Assets).

"Prime Rate" means a rate per annum equal to the *lesser of* (a) an annual rate of interest which equals the floating commercial loan rate as published in the Wall Street Journal from time to time as the "Prime Rate," adjusted in each case as of the banking day in which a change in the Prime Rate occurs, as reported in the Wall Street Journal; *provided, however,* that if such rate is no longer published in the Wall Street Journal, then it shall mean an annual rate of interest which

4

equals the floating commercial loan rate of Citibank N.A., or its successors and assigns, announced from time to time as its "base rate," adjusted in each case as of the banking day in which a change in the base rate occurs, and (b) the maximum rate permitted by applicable Law.

"Profit" or "Loss" means the income or loss of the Company as determined under the capital accounting rules of Treasury Regulation § 1.704-1(b)(2)(iv) for purposes of adjusting the Capital Accounts of Members including, without limitation, the provisions of paragraphs 1.704-1(b)(2)(iv)(g) and 1.704-1(b)(4) of those regulations relating to the computation of items of income, gain, deduction and loss.

"Regulatory Allocations" is defined in Section 8.2(h).

"Relative" means, in relation to a natural person, any spouse, brother, sister, aunt, uncle, ascendant or descendant of such natural person.

"Required Interest of Members" means Members holding, individually or in the aggregate, at least [66%] of the Membership Interests.

"Rules" is defined in Section 14.12.

"Securities" or "Security" means (1) securities and other financial instruments and rights and options relating thereto of United States of America ("U.S.") and non-U.S. entities, now existing or hereinafter created, including without limitation equities, debt instruments, shares of stock funds, American Deposit Receipts, shares; (2) partnership, limited liability or similar beneficial interests in private entities, (3) private investments in public entities (PIPEs); (4) bonds, notes, bills, debt, debt instruments and debentures; (5) currencies; (6) interest rate, commodity, equity and other derivative products and instruments of any kind, including, without limitation (a) futures contracts (and options thereon), (b) swap contracts, options, and forward rate agreements, (c) spot and forward currency transactions and (d) agreements relating to or securing such transactions; (7) loans, accounts and notes receivable and payable held by trade or other creditors; (8) trade acceptances; (9) contract and other claims; (10) executory contracts; (11) participations; (12) mutual funds, exchange-traded funds and other stock funds; (13) money market funds; (14) obligations of the U.S. or any state thereof, foreign governments and instrumentalities of any of them; (15) commercial paper; (16) certificates of deposit; (17) banker's acceptances; (18) trust receipts; and (19) other obligations and instruments or evidences of indebtedness of whatever kind or nature; in each case, of any Person, corporation, government or other entity whatsoever, or such other instruments identified by the Manager.

"Securities Act" means the Securities Act of 1933, as amended from time to time.  Any reference herein to a specific section or sections of the Securities Act shall be deemed to include a reference to any corresponding provision of future Law.

"Transfer" or "Transferred" means, with respect to any asset, including a Membership Interest or any portion thereof, including any right to receive distributions from the Company or any other economic interest in the Company, a sale, pledge assignment, transfer, conveyance, gift, exchange or other disposition of such asset, whether such disposition be voluntary, involuntary or by merger, exchange, consolidation or other operation of Law, including the following:  (a) in the case of an asset owned by a natural person, a transfer of such asset upon the

death of its owner, whether by will, intestate succession or otherwise, (b) in the case of an asset owned by a Person which is not a natural person, a distribution of such asset, including in connection with the dissolution, liquidation, winding up or termination of such Person (other than a liquidation under a deemed termination solely for tax purposes), and (c) a disposition in connection with, or in lieu of, a foreclosure of a Lien; *provided, however,* a Transfer shall not include the creation of a Lien.

"Treasury Regulations" means regulations issued by the Department of Treasury under the Code.  Any reference herein to a specific section or sections of the Treasury Regulations shall be deemed to include a reference to any corresponding provision of future regulations under the Code.

"Unpaid Preferred Distribution" means an amount, determined for each Member, equal to the Member's Preferred Distribution reduced by the aggregate amount distributed to the Member pursuant to Sections 7.1, 7.2 and 7.3 through the date of determination.

**Article II**
**THE LIMITED LIABILITY COMPANY**

**Formation**.  The Company was formed pursuant to the Certificate of Formation, filed by the Manager with the Secretary of State of the State of Delaware on ~~June~~July ___, 2013 (as amended, modified and supplemented, the "Certificate of Formation").  The Manager shall execute such further documents (including amendments to the Certificate of Formation) and take such further action as shall be appropriate or necessary to comply with the requirements of Law for the formation, qualification or operation of a limited liability company in all other states and counties where the Company may conduct its business.  To the fullest extent permitted by the Act, this Agreement shall control as to any conflict between this Agreement and the Act or as to any matter provided for in this Agreement that is also provided for in the Act.

**Name**.  The name of the Company shall be ~~[Newco]~~ Beechwood Reinvestment, LLC, unless otherwise determined by the Manager.

**Term**.  The Company shall have perpetual existence; *provided*, that the Company shall be dissolved upon the occurrence of an event set forth in Section 12.2.

**Registered Office and Agent; Principal Place of Business**.  The location of the registered office of the Company and the Company's registered agent shall be at such address as set forth in the Certificate of Formation, unless otherwise determined by the Manager.  The location of the principal place of business of the Company shall be at such location as the Manager may from time to time select.

**Purpose**.  The business of the Company shall be to (a) invest in the Operating Company, and engage in any and all activities related or incidental thereto (including incurring debt to finance such activities), and (b) do all things necessary or appropriate in connection with the foregoing (collectively, the "Business").  The Business may be conducted directly by the Company or indirectly through another corporation, limited liability company, partnership (general or limited), joint venture or other entity or arrangement.

**Article III**
**CAPITAL CONTRIBUTIONS**

**Capital Contributions By Members**.

(a)     The Members shall make Capital Contributions of cash in U.S. Dollars, cash equivalents and Non-Cash Assets to the Company, payable by wire transfer.  The initial Capital Contribution amounts, including the value of any Non-Cash Assets, of each Member shall be set forth in the books and records of the Company.

(b)     Subject to applicable securities laws, each Member shall have the first right to purchase such Member's pro rata share (based on such Member's Percentage Interests) of any new Membership Interests to be issued by the Company.  If any Member does not purchase its full pro rata share, then any remaining Members shall have the right to purchase the remaining share pro rata.  Each Member shall have 20 days from the date of receiving a notice from the Manager of such proposed sale to agree to purchase its pro rata share of the new Membership Interests for the price and upon the terms and conditions specified in the notice by giving written notice to the Company and stating therein the amount of Membership Interests to be purchased.

(c)     (b) The Manager shall not be authorized to call (and the Members shall not be obligated to make) any additional Capital Contributions following the Members' initial Capital Contributions except for Capital Contributions that Members may elect to make as provided in Section 3.1(c).

(d)     (c) Except as specifically provided under this Agreement, no Member shall have any obligation to contribute capital to the Company, including without limitation with respect to any deficit Capital Account balance.

3.2     **Admission of Additional Members.**

(a)     Subject to Article XII and Section 3.2(b) below, no additional Person may be admitted as a Member to the Company (i) without the prior written consent of the Manager and (ii) without executing and delivering to the Company and the Manager the documents described in Section 11.3(a).

(b)     For the period commencing on the date of the Initial Closing and ending on the first to occur of (i) the Company's receipt of total Capital Contributions equal to $100,000,000 (or such greater amount as the Manager shall accept in its discretion); or (ii) **[90th]** day thereafter, the Manager may admit persons as additional Members (or allow existing Members to increase their Capital Contributions) without the consent of any of the existing Members.  Following the admission of any such subsequently admitted Members pursuant to this Section 3.2(b), such Members shall be deemed for all purposes of this Agreement except for voting rights and other matters, expressly set forth herein, which shall not commence until such Member's admission in accordance with this Agreement to have been an initial Member, admitted as of the date of this Agreement (unless expressly provided to the contrary herein). Upon the admission of any additional Members to the Company (or increase in the Capital

7

Contributions of a Member) pursuant to this Section 3.2(b), the assets of the Company shall not be revalued except in the discretion of the Manager.

**No Third Party Right to Enforce**.  No Person other than a Member shall have the right to enforce any obligation of a Member to contribute capital hereunder and specifically no lender or other third party shall have any such rights.

**Return of Contributions**.  No Member shall be entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.  No unpaid Capital Contribution shall constitute a liability of the Company, the Manager or any Member.  A Member is not required to contribute or to lend cash or property to the Company to enable the Company to return any Member's Capital Contributions.  The provisions of this Section 3.4 shall not limit a Member's rights under Article XII.

**Article IV**
**REPRESENTATIONS, WARRANTIES AND COVENANTS**

**General Representations and Warranties**.  Each Member represents and warrants to the Manager, the other Members and the Company as follows:

(a)     If it is an entity, it is the type of legal entity specified in its Subscription Documents, duly organized and in good standing under the Laws of the jurisdiction of its organization and is qualified to do business and is in good standing in those jurisdictions where necessary to carry out the purposes of this Agreement;

(b)     If it is an entity, the execution, delivery and performance by it of this Agreement and all transactions contemplated herein are within its entity powers and have been duly authorized by all necessary entity actions;

(c)     This Agreement constitutes its valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium and similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity; and

(d)     The execution, delivery and performance by it of this Agreement will not conflict with, result in a breach of or constitute a default under any of the terms, conditions or provisions of (i) any applicable Law, (ii) if it is an entity, its governing documents, or (iii) any agreement or arrangement to which it or any of its Affiliates is a party or which is binding upon it or any of its Affiliates or any of its or their assets.

**Conflict and Tax Representations**.  Each Member represents and warrants to the Manager, the other Members and the Company as follows:

(a)     Such Member has been advised that (i) a conflict of interest exists among the Members' individual interests, (ii) this Agreement has tax consequences and (iii) it should seek independent counsel in connection with the execution of this Agreement;

8

(b)     Such Member has had the opportunity to seek independent counsel, including independent tax advice, prior to the execution of this Agreement, and such Member is not relying to any extent on any representation of any kind to it regarding tax consequences of this Agreement; and

(c)     This Agreement and the language used in this Agreement are the product of all parties' efforts and each party hereby irrevocably waives the benefit of any rule of contract construction which disfavors the drafter of an agreement.

**Survival**.  The representations and warranties set forth in this Article IV shall survive the execution and delivery of this Agreement and any documents of Transfer provided under this Agreement.

### Article V
### COMPANY MANAGEMENT

**Manager**.  The Company shall be managed by one manager (the "<u>Manager</u>"). The initial Manager shall be David Levy.  The Manager shall have the power and authority to conduct the business of the Company and is hereby expressly authorized on behalf of the Company to make all decisions with respect to the Company's business and to take all actions necessary to carry out such decisions, except as such discretion, powers and rights are expressly limited or denied in this Agreement.

**Management Authority**.  The Manager shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Company and shall have, in addition to those powers and rights expressly granted in this Agreement, all the powers and rights of a Manager of a limited liability company organized under the Act, except as such discretion, powers and rights are expressly limited or denied in this Agreement.  Without limiting the generality of the foregoing, and except as provided in Section 5.3, in connection with managing and controlling the business and affairs of the Company, the Manager shall have the sole authority and absolute discretion, on behalf of the Company and without limitation:

(a)     To originate and structure the investment of Company assets in the Operating Company;

(b)     To monitor and evaluate the Company's investment in the Operating Company and provide ongoing management and operations support services to the Operating Company;

(c)     To exercise the voting rights under any and all Securities of the Operating Company owned by the Company;

(d)     To arrange for the sale, pledge, or other Transfer of all or any part of the Securities of the Operating Company held by the Company (including determining the timing and manner of such sale), or the approval by the Company of any merger or consolidation of the Operating Company or the sale of all or substantially all of the Operating Company's assets on such terms and at such times as it shall determine to be in the best interests of the Company and its Members;

9

(e)       To cause the Company to borrow money from Members or to guarantee loans or other extensions of credit (i) to support an obligation made to the Operating Company, or (ii) to provide bridge financing to the Operating Company;

(f)       To admit additional Members or to issue additional equity interests (or rights to acquire equity interests) in the Company to existing Members, to additional Members or to other persons or entities, but only to the extent consistent with Section 3.2 and Article XI;

(g)       To hire, employ, retain or otherwise secure attorneys, accountants, consultants and other independent contractors or other personnel necessary or appropriate to carry out the purposes of the Company upon such terms as the Manager may determine;

(h)       To sue and be sued, and complain and defend, in the name of and on behalf of the Company, and to settle, adjust, submit to arbitration and compromise all actions, suits, accounts, reckonings, claims and demands whatsoever now or hereafter pending between the Company and any other party (other than a Member);

(i)       To pay all Company Expenses;

(j)       To make or revoke such elections as it deems appropriate under the tax Laws of the United States, the several states and other relevant jurisdictions as to the treatment of items of Company income, expenses, gain, loss, deduction and credit, including without limitation to make or revoke the election referred to in Section 754 of the Code; and

(k)       Subject to the provisions of Section 5.3, to take all other actions, to enter into all other agreements and transactions with any other parties and to execute all other documents and instruments of any kind, which the Manager may deem necessary or appropriate in carrying out the purposes of the Company.

5.3     **Major Decisions**.  No Manager, Member, officer, employee, agent or representative of the Company shall have any authority to bind or take any action on behalf of the Company with respect to any Major Decision unless such Major Decision has been approved by a Required Interest of Members.  Each of the following matters shall constitute a "Major Decision":(a)       any merger, reorganization, consolidation, dissolution or similar restructuring of the Company;

(b)       the sale, lease or other disposition of all or substantially all of assets of the Company other than the sale of inventory in the ordinary course of business;

(c)        entering into a new line of business or expanding the current Business of the Company outside the scope of the Business of the Company as conducted in the ordinary course consistent with past practice;

(d)       any amendment to this Agreement;

(e)       the dissolution of the Company pursuant to Section 12.2(a);

10

(f)    the providing of any guaranty (or other obligations that, in economic effect, are substantially equivalent to a guaranty) of any amount owed by or any obligation of any person;

(g)    the settlement of any claim against the Company for a settlement in excess of the Major Decision Threshold;

(h)    the incurrence of any indebtedness or the creation of any Lien on any property or assets of the Company in excess of the Major Decision Threshold;

(i)    the redemption of any outstanding Membership Interests;

(j)    any transaction or other undertaking between the Company, a Member or an Affiliate of any of them pursuant to Section 5.11; and

(k)    making any other decision or taking any action with respect to the Company that specifically requires the approval of all of the Members pursuant to this Agreement.

**Duties**.  The Manager and each officer of the Company shall carry out his duties in good faith.  The Manager shall devote such time to the business and affairs of the Company as he may determine, in his reasonable discretion, is necessary for the efficient carrying on of the Company's business.  The Manager's and officers' duties and liabilities are restricted by the provisions of this Agreement to the extent that any such provisions restrict the duties and liabilities of the Manager and officers otherwise existing at law or in equity.

**Payment of Expenses**.  The Company shall pay (or reimburse the Manager for) all Company Expenses (including Company Expenses incurred directly by the Manager and any others acting for or on behalf of the Company).

**Initial Manager as Member**.  The Manager, in addition to his rights and obligations as the Manager, may invest in the Company as a Member or acquire Membership Interests previously purchased by other Members and, in that event, shall acquire and hold the same rights and obligations as such other Members with respect to those Membership Interests. The Manager does not need to be a Member.

**Removal and Replacement**.  In the case of the occurrence of Misconduct with respect to the Manager, a Required Interest of Members may elect to remove the Manager and elect a successor Manager (excluding for this purpose a removed Manager if he is also a Member), subject to such successor Manager's compliance with Section Article XI effective upon such removal by providing not less than 60 days' prior written notice to the Manager.

5.8    **Resignation**.  The Manager may resign at any time by giving written notice to the Members.  Unless otherwise specified in the notice, the resignation shall take effect upon receipt thereof by the Members, and the acceptance of the resignation shall not be necessary to make it **Vacancies**

11

. In the case of the death of a Manager, the Members agree to designate and elect one of the following persons as the successor Manager, subject to such successor Manager's compliance with Section Article XI effective upon such removal by providing not less than 60 days' prior written notice to the Manager: [_____].  If a Person that is both a Manager and a Member is removed or resigns as a Manager, such Person shall continue to be a Member in the Company notwithstanding such Person's removal as the Manager.

          **Reliance by Third Parties**.  No third party dealing with the Company shall be required to ascertain whether the Manager or any Company officer is acting in accordance with the provisions of this Agreement.  All third parties may rely on a document executed by a majority of the Manager or by any Company officer as binding on the Company.  The foregoing provisions shall not apply to third parties who are Affiliates or family members of any such Person executing any such document.  If the Manager or any officer acts without authority, it shall be liable to the Members for any damages arising out of its unauthorized actions.

          **Other Business Opportunities; Affiliate Transactions; Conflicts**.

          (a)     Each Member acknowledges that the Manager, the other Members and their respective Affiliates are or may be active in other business activities and shall, subject to the restrictions under Section 5.3, be free to independently engage, invest or participate for their own account in, and receive the full benefits from, any business or activity, without consulting with the Company or the Members and without offering any right to participate therein to the Company or any other Member.

          (b)     [The Manager and its affiliates shall offer to the Company the first right to participate in investments in the Operating Company that are made available to the Company.]

          (c)     Except as set forth in clause (b) above, no Member shall be required to make any investment opportunity available to the Company.

          (d)     The Manager may, on behalf of the Company, enter into contracts, agreements, undertakings and transactions with Members, or with Persons, firms or corporations having business, financial or other relationships with Members, provided that such transactions with such Persons and entities are on terms no less favorable to the Company than are generally available to unrelated third parties in comparable transactions.

          (e)     The Manager and Members, and their respective Affiliates, shall be entitled to earn and retain any fees, salaries, commissions and options customarily paid or granted to directors, employees or independent contractors of the Operating Company.

          **Standard of Care; Indemnification.**

          (a)     It is understood that the business of the Company involves a high degree of investment and other risk.  The Manager and any Company officer shall not have any liability to the Company or any Member for errors in judgment or for acts or omissions made in good faith and reasonably believed to be in the best interest of the Company, except in the case of a Manager, by reason of its intentional fraud, willful misfeasance or gross negligence; provided, however, that the Manager must repay to the Company any amounts paid to them in excess of

12

those to which it is entitled under the terms of this Agreement.  The Manager shall not be liable to the Company or any Member for any tax, or penalty or interest related thereto, imposed upon the Company or any Member so long as the Manager has acted in good faith and in a manner reasonably believed to be consistent with this Agreement and in the best interest of the Company.

(b)     To the fullest extent permitted by law, the Manager, Company officers and the respective agents, officers, directors, employees and Affiliates of any of the foregoing to the extent applicable (the "Indemnified Persons" or an "Indemnified Person") shall, in accordance with this Section 5.12, be indemnified and held harmless by the Company from and against (i) all losses, claims, damages, liabilities, expenses, and other amounts arising from any claims (including reasonable legal expenses), demands, actions, suits or proceedings (civil, criminal, administrative or investigative), in which they may be involved, as a party or otherwise, by reason of their management of the affairs of the Company, or rendering of advice or consultation with respect thereto, or which relate to the Company, its properties, business or affairs including acting as a director of the Operating Company (but only after first exhausting the indemnification provided to such Indemnified Person by the Operating Company and then only to the extent that full indemnification is not provided by the Operating Company, and in such event the Company shall be subrogated to the right of indemnity from the Operating Company), whether or not they continue to be such at the time any such liability or expense is paid or incurred if such Indemnified Person acted in good faith and in a manner such Indemnified Person reasonably believed to be in, or not opposed to, the best interests of the Company, and, with respect to any criminal proceeding, had no reasonable cause to believe the conduct of such Indemnified Person was unlawful; and (ii) any threatened, pending, or completed action by or in the right of the Company to procure a judgment in its favor by reason of the fact that such Indemnified Person is or was an agent of the Company, against expenses actually or reasonably incurred by such Indemnified Person in connection with the defense or settlement of such action, if such Indemnified Person acted in good faith and in a manner such Indemnified Person reasonably believed to be in, or not opposed to, the best interests of the Company except that indemnification shall be made in respect of any claim, issue or matter as to which such Indemnified Person shall have been adjudged to be liable for misconduct in the performance of the Indemnified Person's duty to the Company only to the extent that the court in which such action or suit was brought, or another court of appropriate jurisdiction, determines upon application that, despite the adjudication of liability, but in view of all circumstances of the case, such Indemnified Person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

(c)     No Indemnified Person shall be entitled to indemnification hereunder for any conduct arising from the intentional fraud, gross negligence or willful misconduct of such Indemnified Person.

(d)     Expenses (including attorneys' fees) incurred by an Indemnified Person in a civil or criminal action, suit or proceeding shall be paid by the Company (or, following dissolution of the Company, the Members) in advance of the final disposition of such action, suit or proceeding, in each case within 30 days after bills or invoices for such expenses are submitted to the Company by the Indemnified Person; provided that such expenses will not be so advanced in connection with an action, suit or proceeding brought against the Indemnified Persons by a

13

Required Interest of Members; and provided further that the Indemnified Person to be advanced such expenses shall agree in writing that, if it is later determined that such Indemnified Person was not entitled to indemnification with respect to such action, suit or proceeding by reason of Section 5.12(c), then such Indemnified Person shall reimburse the Company (or, following dissolution of the Company, the Members) for such advances within ten (10) Business Days following the final disposition of the action, suit or proceeding with respect to which such advance is being requested, with interest at the Prime Rate, determined as of the date of such advance.  Expenses incurred by an Indemnified Person in any such action, suit or proceeding shall be presumed reasonable unless and until such presumption is rebutted by clear and convincing evidence.

(e)     The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that the Indemnified Person did not act in good faith and in a manner which the Indemnified Person reasonably believed to be in, or not opposed to, the best interests of the Company or that the Indemnified Person had reasonable cause to believe that the Indemnified Person's conduct was unlawful.

(f)     The indemnification provided by this Section 5.12 shall not be deemed to be exclusive of any other rights to which the Indemnified Person may be entitled under any agreement, or as a matter of law, or otherwise, both as to action in an Indemnified Person's official capacity and to action in another capacity, and shall continue as to an Indemnified Person who has ceased to have an official capacity for acts or omissions during such official capacity or otherwise when acting at the request of the Manager and shall inure to the benefit of the heirs, successors and administrators of such Indemnified Persons.

(g)     To the extent that the Indemnified Person has been successful on the merits or otherwise in defense of any proceedings referred to herein, or in defense of any claim, issue or matter therein, the Indemnified Person shall be indemnified by the Company against expenses actually and reasonably incurred by the Indemnified Person in connection therewith and not already advanced to the Indemnified Person pursuant to Section 5.12.

(h)     The Manager shall have power to purchase and maintain insurance on behalf of the Manager and the Indemnified Persons at the expense of the Company, against any liability asserted against or incurred by them in any such capacity or arising out of the Manager's status as such, whether or not the Company would have the power to indemnify the Indemnified Persons against such liability under the provisions of this Agreement.

(i)     The Manager may rely upon and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(j)     The Manager may consult with counsel, accountants and other experts reasonably selected by it, and any opinion of an independent counsel, accountant or expert retained and supervised by the Manager with reasonable care, shall be full and complete

14

protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such opinion.

(k)      No Indemnified Person may satisfy any right of indemnity or reimbursement granted in this Section 5.12 or to which it may be otherwise entitled except out of the assets of the Company, and no Member shall be personally liable with respect to any such claim for indemnity or reimbursement.

## Article VI
## MEMBERS

**No Control by the Members; Rights of the Members**.  Except as is specifically permitted by this Agreement and as is specifically required by the Act, the Members, in such capacity, shall not take part in the control or management of the affairs of the Company, and a Member, in such capacity, shall not have any authority to act for or on behalf of the Company.

**Limited Liability**.  The liability of each Member shall be limited as provided by the Act.  No Member other than the Manager shall take part in the control, management, direction or operation of the affairs of the Company, unless otherwise expressly provided in this Agreement, or specifically required under the Act, or shall have any power to bind the Company in their capacity as Members.

**Quorum and Voting**.  Except as otherwise stated below, a Required Interest of Members, represented in person or by proxy, shall be necessary to constitute a quorum at meetings of the Members.  One or more Members may participate in a meeting of the Members by means of conference telephone or similar communication equipment by which all persons participating in the meeting can hear each other at the same time, and such participation shall constitute presence in person at the meeting.  If a quorum is present, the affirmative vote of a Required Interest of Members for matters put to a vote of the Members, in each case present at the meeting or represented by proxy shall be the act of the Members unless a greater number is required by the Act or this Agreement.  In the absence of a quorum, those present may adjourn the meeting for any period, but in no event shall such period exceed 60 days.

**Action by Written Consent**.  Any vote or other action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by a written consent describing the action taken signed by a Required Interest of Members unless this Agreement requires the approval of a greater number for such action to be taken, in which case such written consent must be signed by the requisite number required to approve such action. Action taken under this Section 6.4 shall be effective when the required number of Members whose consent is required for such action have signed the consent, unless the consent specifies a different effective date.  Any Member that did not execute any such consent shall be provided with reasonably prompt written notice of any such action so taken; *provided*, that the failure to provide such notice shall not invalidate such action.

**Meetings**.

(a)      Meetings of the Members for any purpose or purposes may be called only by the Manager.  The Manager may designate the place for any meeting.

15

(b)     Written notice stating the place, day and hour of the meeting, and the purpose or purposes for which the meeting is called, shall be delivered pursuant to Section 13.1, by or at the direction of the Manager, to each Member of record entitled to vote at such Meeting. Meetings of the Members may be called upon not less than 5 calendar days' written notice.

(c)     At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by his duly authorized attorney-in-fact.  Such proxy shall be filed with the Manager before or at the time of the meeting.  No proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy.

(d)     At each meeting of the Members, the Members may, but shall not be required to, elect a chairman for that particular meeting by the vote of a Required Interest of Members represented at the meeting.  The chairman shall preside over and conduct the meeting and shall appoint someone in attendance to make accurate minutes of the meeting.  Following each meeting, the minutes of the meeting shall be sent to each Member.

(e)     No Member shall be entitled to compensation for attendance at Member meetings or for time spent in its or his capacity as a Member.

**No State-Law Partnership**.  The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.  Except as otherwise required by the Act or other applicable Law, and expressly this Agreement, no Member shall have any fiduciary duty to any other Member.

**Tax Matters**.

(a)     David Levy is hereby designated as the initial "tax matters partner" as such term is defined in section 6231(a)(7) of the Code.  The appointment of any successor tax matters partner shall be approved by the Members.  Subject to the provisions hereof, the tax matters partner is authorized and required to represent the Company in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  Notwithstanding the foregoing, the tax matters partner shall promptly notify all Members of the commencement of any audit, investigation or other proceeding concerning the tax treatment of Company tax items and shall keep all Members adequately informed of such proceedings.

(b)     The tax matters partner and the Manager shall make or cause to be made all available elections as required by the Code and the Treasury Regulations to cause the Company to be classified as a partnership for federal income tax purposes.

### Article VII
### DISTRIBUTIONS TO THE MEMBERS

**Discretionary Distribution to Pay Tax**.  On or before the date upon which the Members are required to make each payment of their federal estimated income taxes, prior to

making any distributions under Section 7.2, the Company may in the sole discretion of the Manager (but shall not be required to) make distributions out of Available Cash to each Member for purposes of covering the amount of such estimated income taxes.  The amount of any distributions to a Member pursuant to this Section 7.1 shall be treated as an advance against and shall be applied to reduce distributions that such Member would otherwise be entitled to receive under this Agreement.

**Ordinary Distributions**.  Distributable Assets will be distributed as follows:

(a)     First, one hundred percent (100%) to the Members (and among them in proportion to their relative Unpaid Preferred Distribution amounts) until such time as the Unpaid Preferred Distribution of each Member is reduced to zero; and

(b)     Second, one hundred percent (100%) to the Members (and among them in accordance with their respective Percentage Interests).

7.3     **Liquidity Event and Liquidation Proceeds.  Subject to Section 12.3, and except as otherwise specifically provided in this Agreement, Distributable Assets with respect to distributions the Company receives upon the sale, merger or other acquisition of the Operating Company (or the Company's interests therein), together with any other Company assets available for distribution in connection with the sale, exchange or other disposition of all or substantially all of the assets of the Company or on the liquidation of the Company, will be distributed as follows:**

(a)     First, one hundred percent (100%) to the Members (and among them in proportion to their relative Unpaid Preferred Distribution amounts) until such time as the Unpaid Preferred Distribution of each Member is reduced to zero; and

(b)     Second, one hundred percent (100%) to the Members (and among them in accordance with their respective Percentage Interests).

**Distributions in Kind and of Non-Cash Assets**.  During the existence of the Company, no Member shall be entitled to receive as distributions from the Company any Company asset other than cash except as otherwise set forth herein with respect to Non-Cash Assets.  If the Manager distributes a Non-Cash Asset, then the Manager shall distribute such Non-Cash Asset directly to the Member who contributed such Non-Cash Asset to the Company and such Non-Cash Asset shall not be distributed to other Members.  The Manager may, in its sole discretion, distribute Distributable Assets in kind in the priority set forth in Section 7.2; *provided* that for purposes of this Section 7.4, a distribution of a Distributable Asset, including an undivided interest in a Distributable Asset, to a Member shall be treated as if the asset had been sold for its fair value, any gain or loss (determined with respect to its Carrying Value) had been allocated pursuant to the applicable provisions of Article VIII, and an amount equal to the fair market value of such asset or undivided interest had been distributed under the applicable provisions of this Article VII.  Each class of Securities that is distributed shall be distributed to the Members in proportion to the relative amounts the Members are entitled to receive with respect to the distribution being made, except to the extent that a disproportionate distribution of Securities is necessary in order to avoid distributing fractional shares.  For purposes of the

preceding sentence, each lot of stock or other Securities having a separately identifiable tax basis or holding period will be treated as a separate class of Securities.  In-kind distributions of assets in connection with the dissolution and winding-up of the Company shall be governed by Article XII.

### Article VIII
### ALLOCATION OF PROFITS AND LOSSES

**In General**.

(a)     This Article provides for the allocation among the Members of Profit and Loss for purposes of crediting and debiting the Capital Accounts of the Members.  Article IX provides for the allocation among the Members of taxable income and tax losses.

(b)     Subject to Section 8.1(c), and except as provided in Sections 8.2 and 8.3, all Profits and Losses shall be allocated among the Members as follows:

(i)     Profits.  Except as provided in Section 8.1(b)(iii), Profits shall be allocated:

(A)     First, to the extent any Member has a deficit Capital Account balance, to such Members in proportion to such deficit balances until the deficit Capital Account balance of each member has been eliminated; and

(B)     Thereafter, to the Members (and among them in proportion to their respective Percentage Interests).

(ii)     Losses.  Except as provided in Section 8.1(b)(iii), Losses shall be allocated:

(A)     First, to the Members, and proportionately among them in proportion to their respective Percentage Interests, until the Capital Account balance of each Member equals zero; and

(B)     Thereafter, to the Members (and among them in proportion to their respective Percentage Interests).

(iii)     Sale or Liquidation.  Upon the sale, exchange or other disposition of all or substantially all of the assets of the Company (including, without limitation, on the sale, merger or other acquisition of the Operating Company or the Company's interests therein) or the liquidation of the Company, Profits and Losses (or, as necessary, individual items of Profit and Loss) shall be allocated as follows:

(A)     First, to the extent any Member has a deficit Capital Account balance, Profits shall be allocated to such Members, (and among them in proportion to the relative amounts of such deficit Capital Account balances) until the deficit Capital Account balance of each Member has been eliminated;

18

(B)     Second, to the Members (and among them in proportion to the relative aggregate amounts allocable to them under this Section 8.1(b)(iii)(B)) to the extent necessary to cause each Member's Capital Account balance to equal such Member's Unpaid Preferred Distribution;

(C)     Thereafter, to the Members (and among them in proportion to their respective Percentage Interests).

(iv)     Interpretation.  For the avoidance of doubt, upon the sale, exchange or other disposition of all or substantially all of the assets of the Company or the liquidation of the Company, the allocations in Section 8.1(b)(iii) are intended to cause the Capital Account balance of each Member, after giving effect to such allocations, to equal the amount distributable to the Member at that time under Section 7.2, and shall be applied in accordance with that intent.

(c)     Allocations under Section 8.1(b) shall be made after making and adjusting the Members' Capital Accounts for all distributions made under Article VII through the date with respect to which the allocations are being made.

**Regulatory Allocations and Other Allocation Rules**.  Notwithstanding Sections 8.1 and 8.3:

(a)     Loss Limitation.  The Losses allocated pursuant to Section 8.1 shall not exceed the maximum amount of Losses that can be so allocated without causing such Member to have an Adjusted Capital Account Deficit at the end of any fiscal year.  In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 8.1, the limitation set forth in this Section 8.2(a) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(*d*) of the Treasury Regulations.  All Losses in excess of the limitations set forth in this Section 8.2(a) shall be allocated to the Members in accordance with their respective Percentage Interests.  This Section 8.2(a) shall be interpreted consistently with the loss limitation provisions of Treasury Regulations § 1.704-1(b)(2)(ii)(*d*).

(b)     Minimum Gain Chargeback.  Except as otherwise provided in Treasury Regulations § 1.704-2(f), if there is a net decrease in partnership minimum gain (as defined in Treasury Regulations §§ 1.704-2(b)(2) and 1.704-2(d)(1)) during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount and in the manner required by Treasury Regulations §§ 1.704-2(f) and 1.704-2(j)(2).  This Section 8.2(b) shall be interpreted consistently with the "minimum gain" provisions of Treasury Regulations § 1.704-2 related to nonrecourse liabilities (as defined in Treasury Regulations § 1.704-2(b)(3)).

(c)     Member Minimum Gain Chargeback.  Except as otherwise provided in Treasury Regulation § 1.704-2(i)(4), if there is a net decrease in partner nonrecourse debt minimum gain (as defined in Treasury Regulations §§ 1.704-2(i)(2) and 1.704-2(i)(3)) attributable to partner nonrecourse debt (as defined in Treasury Regulations § 1.704-2(b)(4)) during any fiscal year, each Member who has a share of the partner nonrecourse debt minimum

HROBOU\115491.1115491.2

gain attributable to such Member's partner nonrecourse debt, determined in accordance with Treasury Regulations § 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount and in the manner required by Treasury Regulations §§ 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 8.2(c) shall be interpreted consistently with the "minimum gain" provisions of Treasury Regulations § 1.704-2 related to partner nonrecourse liabilities (as defined in Treasury Regulations § 1.704-2(b)(4)).

(d)   Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations §§ 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) or 1.704-1(b)(2)(ii)(*d*)(*6*), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit, if any, of such Member as quickly as possible.  This Section 8.2(d) shall be interpreted consistently with the "qualified income offset" provisions of Treasury Regulations § 1.704-1(b)(2)(ii)(*d*).

(e)   Nonrecourse Deductions.  Any non-recourse deduction (as defined in Treasury Regulations § 1.704-2(b)(1)) for any fiscal year shall be allocated to the Members in proportion to their respective Percentage Interests.

(f)   Member Nonrecourse Deductions.  Any partner nonrecourse deductions (as defined in Treasury Regulations §§ 1.704-2(i)(1) and 1.704-2(i)(2)) for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the partner nonrecourse debt (as defined in Treasury Regulations § 1.704-2(b)(4)) to which such Member nonrecourse deductions are attributable in accordance with Treasury Regulations § 1.704-2(i)(1).

(g)   Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset is required pursuant to Code Section 732(d), Code Section 734(b) or Code Section 743(b), the Capital Accounts of the Members shall be adjusted pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(*m*).

(h)   Curative Allocations.  The allocations under Sections 8.2(a) through 8.2(f) (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Article VIII.  Therefore, notwithstanding any other provision this Article VIII (other than the Regulatory Allocations), the Company shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 8.1.  In exercising its discretion under this Section 8.2(h), the Manager shall take into account future Regulatory Allocations under Sections 8.2(a) through 8.2(f) that are likely to offset other Regulatory Allocations previously made.

20

**Other Allocation Rules**.

(a)    Profits, Losses, and any other items allocable to any period shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Regulations thereunder.

(b)    Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations § 1.752 3(a)(3), the Members' interests in Profits shall be their respective Percentage Interests.

(c)    To the extent permitted by Treasury Regulations § 1.704-2(h)(3), the Company shall treat distributions of Available Cash as having been made from the proceeds of a nonrecourse liability (as defined in Treasury Regulations § 1.704-2(b)(3)) or a partner nonrecourse debt (as defined in Treasury Regulations § 1.704-2(b)(4)) only to the extent that such distributions would not cause or increase an Adjusted Capital Account Deficit for any Member.

## Article IX
## ALLOCATION OF TAXABLE INCOME AND TAX LOSSES

**Allocation of Taxable Income and Tax Losses**.  Except as provided in Sections 9.2 and 9.3, each item of income, gain, loss and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such item is allocated for book purposes under Article VIII.

**Allocation of Section 704(c) Items**.  The Members recognize that with respect to property contributed to the Company by a Member and with respect to property revalued in accordance with Treasury Regulations § 1.704-1(b)(2)(iv)(*f*) (referred to as "Adjusted Properties") there will be a difference between the agreed values or Carrying Values, as the case may be, of such property at the time of contribution or revaluation, as the case may be, and the adjusted tax basis of such property at that time.  All items of tax depreciation, cost recovery, depletion, amortization and gain or loss with respect to such contributed properties and Adjusted Properties shall be allocated among the Members to take into account the book-tax disparities with respect to such properties in accordance with the provisions of Sections 704(b) and 704(c) of the Code and Treasury Regulations § 1.704-3(b)(1).  Any gain or loss attributable to a contributed property or an Adjusted Property (exclusive of gain or loss allocated to eliminate such book-tax disparities under the immediately preceding sentence) shall be allocated in the same manner as such gain or loss would be allocated for book purposes under Article VIII.

**Integration with Section 754 Election**.  All items of income, gain, loss, deduction and credits recognized by the Company for federal income tax purposes and allocated to the Members in accordance with the provisions hereof and all basis allocations to the Members shall be determined without regard to any election under Section 754 of the Code that may be made by the Company; *provided, however*, such allocations, once made, shall be adjusted as necessary or appropriate to take into account the adjustments permitted by Sections 734 and 743 of the Code.

**Allocation of Tax Credits**

21

. The tax credits, if any, with respect to the Company's property or operations shall be allocated among the Members in accordance with Treasury Regulations § 1.704-1(b)(4)(ii).

## Article X
## ACCOUNTING AND REPORTING

**Books**.  The Manager shall cause the Company to maintain complete and accurate books of account of the Company's affairs at the principal office of the Company.  The Company's books shall be kept in accordance with GAAP, consistently applied, and on an accrual basis method of accounting.  Subject to the requirements of applicable Law, the fiscal year of the Company shall end on December 31 of each year.

**Capital Accounts**.

(a)     The Manager shall cause the Company to maintain a separate capital account for each Member and such other Member accounts as may be necessary or desirable to comply with the requirements of applicable Law ("Capital Accounts").  Each Member's Capital Account shall be maintained in accordance with the provisions of Treasury Regulations § 1.704-1(b)(2)(iv).  With respect to the Manager, to the extent such Member holds Membership Interests in its capacity as a Member, the Manager shall maintain a Capital Account with respect to the Manager's Membership Interest(s) separate from the Capital Account attributable to the Membership Interests of the Manager in that capacity;

(b)     Consistent with and as permitted in the provisions of Treasury Regulations § 1.704-1(b)(2)(iv)(*f*), the Capital Accounts of all Members and the Carrying Values of all Company properties may (as determined by the Manager) be adjusted upwards or downwards to reflect any unrealized gain or unrealized loss with respect to such Company property (as if such unrealized gain or unrealized loss had been recognized upon an actual sale of such property for the amount of its fair market value immediately prior to the event giving rise to revaluation under this Section 10.2(b), and had been allocated among the Members pursuant to Article VIII).  In determining such unrealized gain or unrealized loss, the fair market value of Company properties as of the date of determination shall be determined by the Manager.

(c)     A transferee of a Company Interest shall succeed to the Capital Account attributable to the Company Interest Transferred, except that if the Transfer causes a termination of the Company under Section 708(b)(1)(B) of the Code, Treasury Regulations § 1.708-1(b) shall apply.

**Valuation of Securities and Other Assets Owned by the Company**.

(a)     Subject to the specific standards set forth below, the valuation of Securities and other assets and liabilities under this Agreement shall be at fair market value, as determined by the Manager in its discretion.  In determining the value of the interest of any Member or in any accounting between the Members, no value shall be placed on the goodwill or the name of the Company.

(b)     The value of the Company's assets shall be determined in accordance with GAAP and in conformity with the provisions of the Accounting Standards Codification, Topic

22

820, *Fair Value Management*, in such manner as the Manager may deem fair and reasonable.  In calculating the value of assets, the Manager may use particular pricing services, brokers, market makers or other intermediaries as the Manager shall determine.  The assets and investments of the Company shall be valued by the Manager in accordance with the foregoing and the following guidelines, and all such values are final and conclusive as to all Members:

        (i)     If the asset being valued is an interest in another partnership or other entity in which the Company has invested, the value of such interest shall be the value attributed to such interest under the terms of the instruments governing said partnership or entity as reported by its administrators or officers, as of such date as shall be determined to be appropriate by the Manager.

        (ii)     Listed Securities, including derivatives, will be valued at their last sales price on the date of determination, or, if no sales occurred on such date, at the mean between the "bid" and "asked" prices at the close of trading on such date on such exchange.

        (iii)     Securities not traded on a national securities exchange, but traded over the counter shall be valued at the "bid" prices for long positions and "asked" prices for short positions on the date as of which the value is being determined except that those Securities quoted on the National Market System shall be valued at the last price as reported by NASDAQ, or if such prices are not reported by NASDAQ, as reported by the Pink OTC Markets Inc. or successor entity; provided that the valuation of options not traded on a national securities exchange may be determined from any reliable source selected by the Manager.

        (iv)     The value of illiquid or impaired Securities will (in conformity with the provisions of the Accounting Standards Codification, Topic 820, *Fair Value Measurement*) be at a value believed to be the price at which the Security would be sold in an orderly transaction in a principal market.

        (v)     Over-the-counter option and swap transactions entered into with a counterparty shall be valued in accordance with the option's or the swap's terms by the counterparty in good faith in a commercially reasonable manner.

        (vi)     Short term money market instruments and bank deposits shall be valued at cost plus accrued interest to date.

        (vii)     All other Securities and assets of the Company will be assigned a fair value as the Manager may reasonably determine in consultation with such industry professionals and other third parties as the Manager deems appropriate in its discretion.  In addition, the Manager reserves the right to adjust the valuations of any Security to reflect discounts for illiquidity, restrictions upon marketability, differences between the market value and the basis of the assets for federal income tax purposes or other factors affecting the value of assets or influencing the reality of a sale occurring at quoted prices.

        (viii)     If on the date as of which any valuation is being made, the exchange or market herein designated for the valuation of any given assets is not open for business, the valuation of such assets shall be determined as of the last preceding date on which such exchange or market was open for business.

**Transfers During Year**

23

. In order to avoid an interim closing of the Company's books, the allocation of Profits and Losses under Article VIII between a Member who Transfers part or all of its Company Interest during the Company's accounting year and his transferee, or to a Member whose percentage interests in Profits and Losses varies during the course of the Company's accounting year, may be determined pursuant to any method chosen by the Manager; *provided, however*, that any Profit or Loss attributable to extraordinary items related to the sale of Company property shall be allocated to the owner of the interest in the Company at the time the Profit or Loss attributable to the extraordinary item was realized.

**Reports**. The Manager shall cause the Company to deliver to the Members the following financial statements and reports at the times indicated below:

(a)     The Manager provide each Member annual review of the Company's investment or other asset held by the Company and unaudited financial statements for the Company prepared in accordance with GAAP.  Such review will also include a discussion by the Manager regarding the activities of the Company and the Operating Company and their respective operating and financial results.

(b)     The Manager shall send to each Person who was a Member in the Company at any time during the fiscal year then ended reviewed annual financial statements for the Company (including a statement of each Member's Capital Account at the end of such fiscal year), and annual tax information necessary for completion of individual tax returns, including Forms K-1.

(c)     The financial reports, tax returns and forms described in Sections 10.5(a) and 10.5(b) are dependent upon information to be provided to the Manager by the third parties. Therefore, notwithstanding the foregoing time periods, the Manager may furnish such reports, tax returns and forms to the Members after the expiration of such time periods, but as soon as reasonably practical, following receipt of all financial and other information necessary or desirable to prepare such documents.

**Section 754 Election**.  The Manager may, in its sole discretion, determine whether the Company shall make the election provided for under Section 754 of the Code.  Any such election shall be at the sole cost and expense of the Company.

**Inspection of Documents**.  Each Member shall have the right to inspect, review, make copies of, and audit all agreements, documents, records and reports relating to the business of the Company prepared by or on behalf of the Company in connection with the performance of its duties hereunder, in each case at such Member's expense during reasonable business hours and with at least five Business Days prior written notice to the Manager.

**Article XI**
**TRANSFER OF MEMBER'S INTEREST**

**Restrictions on Transfers and Liens**.  No Member shall Transfer or create a Lien on all or any portion of its Membership Interest except as permitted by this Article XI.  Any attempted Transfer of, or creation of a Lien on, any portion of a Membership Interest not in accordance with the terms of this Article XI shall be null and void and of no legal effect.
**Permitted Transfers**.

24

Any Transfers and Liens permitted under this Section 11.2 shall be subject to the other provisions of this Article XI.  The following Transfers and Liens shall be permitted.

(a)      To the extent not otherwise permitted by clauses (b), (c) or (d) below, a Member may Transfer all or any portion of its Membership Interest only in the sole and absolute discretion, and with the written approval, of the Manager;

(b)      A Member may Transfer all or any portion of its Membership Interest to any other Member;

(c)      A Member may Transfer all or any portion of its Membership Interest to an Affiliate of such Member without the consent of the Manager or any other Member *provided* that such Affiliate is an Accredited Investor; and

(d)      A Member who is a natural person may Transfer all or a portion of his or her Membership Interest for the benefit of one or more Relatives (e.g., Transfers to family trusts or family partnerships, limited partnerships, limited liability companies, or limited liability limited partnerships).

### Substitution of a Member.

(a)      No transferee (by voluntary or involuntary conveyance, foreclosure, dissolution of marriage, operation of law or otherwise) of all or any portion of a Company Interest shall become a substituted Member without the consent of the Manager, which consent may be withheld in the sole discretion of the Manager.  A transferee of a Company Interest who receives the requisite consent to become a Member shall succeed to all of the rights and interest of its transferor in the Company as well as the voting and other rights of a Member if such rights were not held by the transferor.  A transferee of a Member who does not receive the requisite consent to become a Member shall not have any right to vote, shall be entitled only to the distributions to which its transferor otherwise would have been entitled and shall have no other right to participate in the management of the business and affairs of the Company or to become a Member.

(b)      If a Member shall be dissolved, merged or consolidated, its successor in interest shall have the same obligations and rights to profits or other compensation that such Member would have had if it had not been dissolved, merged or consolidated, except that the representative or successor shall not become a substituted Member without the consent of the Manager, which consent may be withheld in the sole discretion of the Manager.  Such a successor in interest who receives the requisite consent to become a Member shall succeed to all of the rights and interests of its predecessor as well as the voting and other rights of a Member if such rights were not held by the predecessor.  A successor in interest who does not receive the requisite consent to become a Member shall not have any right to vote, shall be entitled only to the distributions to which its predecessor otherwise would have been entitled and shall have no right to participate in the management of the business and affairs of the Company or to become a Member.

(c)      No Transfer of any Company Interest otherwise permitted under this Agreement shall be effective for any purpose whatsoever until the transferee shall have assumed

the transferor's obligations to the extent of the Company Interest that is Transferred, and shall have agreed to be bound by all the terms and conditions hereof, by written instrument, duly acknowledged, in form and substance reasonably satisfactory to the Manager.  Without limiting the foregoing, any transferee that has not become a substituted Member shall nonetheless be bound by the provisions of this Article XI with respect to any subsequent Transfer.  Upon admission of the transferee as a substituted Member, the transferor shall have no further obligations under this Agreement with respect to that portion of its Company Interest that is Transferred to the transferee; *provided, however,* no Member or former Member shall be released, either in whole or in part, from any liability of such Member to the Company pursuant to this Agreement or otherwise which has accrued through the date of such Transfer (whether as the result of a voluntary or involuntary Transfer) of all or part of such Member's Company Interest unless the Manager agrees to any such release.

**Conditions to Substitution**.  As conditions to its admission as a Member (a) any assignee, transferee or successor of a Member shall execute and deliver such instruments, in form and substance satisfactory to the Manager, as the Manager shall deem necessary, and (b) such assignee, transferee or successor shall pay all reasonable expenses in connection with its admission as a substituted Member.

**Admission as a Member**.  No Person shall be admitted to the Company as a Member unless either (a) the Membership Interest or part thereof acquired by such Person has been registered under the Securities Act, and any applicable state securities Laws or (b) the Manager has received a favorable opinion of the transferor's legal counsel or of other legal counsel acceptable to the Manager to the effect that the Transfer of the Membership Interest to such Person is exempt from registration under those Laws.  The Manager, however, may waive the requirements of this Section 11.5.

## Article XII
## WITHDRAWAL, DISSOLUTION AND TERMINATION

**Withdrawal**.  No Member shall have any right to voluntarily resign from the Company.  When a transferee of all or any portion of a Membership Interest becomes a substituted Member pursuant to Section 11.3, the transferring Member shall cease to be a Member with respect to the portion of the Membership Interest so Transferred.

**Dissolution**.  The Company shall be dissolved upon the occurrence of any of the following:

(a)     The written determination of the Manager;

(b)     The sale of all or substantially all of the assets of the Company; or

(c)     The sale, acquisition or dissolution and final liquidation of the Operating Company.

**Liquidation**.  Upon dissolution of the Company, the Manager shall appoint in writing one or more liquidators (who may be Members or the Manager) who shall have full authority to wind up the affairs of the Company and to make a final distribution as provided

26

HROBOU\115491.1115491.2

herein.  The liquidator shall continue to operate the Company properties with all of the power and authority of the Manager.  The steps to be accomplished by the liquidator are as follows:

(a)     As promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made by the Company's independent accountants of the Company's assets, liabilities and operations through the last day of the month in which the dissolution occurs or the final liquidation is completed, as appropriate, including in such accounting the Profit or Loss resulting from the actual or deemed sale or distribution of the Company's properties, as provided in Section 10.2(b).

(b)     The liquidator shall pay all of the debts and liabilities of the Company or otherwise make adequate provision therefor (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine).  The liquidator shall then, by payment of cash or property (at the election of the liquidator, and, in the case of property, valued as of the date of termination of the Company at its fair market value by an appraiser selected by the liquidator), distribute all remaining amounts to the Members in accordance with their respective Capital Account Balances.  For purposes of this Article XII, a distribution of an asset or an undivided interest in an asset in-kind to a Member shall be considered a distribution of an amount equal to the fair market value of such asset or undivided interest.  Each Member shall have the right to designate another Person to receive any property that otherwise would be distributed in kind to that Member pursuant to this Section 12.3.

(c)     Any real property distributed to the Members shall be conveyed by special warranty deed and shall be subject to the operating agreements and all Liens, contracts and commitments then in effect with respect to such property, which shall be assumed by the Members receiving such real property.

(d)     Except as expressly provided herein, the liquidator shall comply with any applicable requirements of the Act and all other applicable Laws pertaining to the winding up of the affairs of the Company and the final distribution of its assets.  Liquidation of the Company shall be completed within the time limits imposed by Treasury Regulations § 1.704-1(b)(2)(ii) and (g).

(e)     The distribution of cash or property to the Members in accordance with the provisions of this Section 12.3 shall satisfy each Member's rights with respect to the Member's respective Capital Contributions and interests in the profits of the Company, and shall constitute a complete distribution to the Members of their respective interests in the Company and all Company property.  Notwithstanding any other provision of this Agreement, no Member shall have any obligation to contribute to the Company, pay to any other Member or pay to any other Person any deficit balance in such Member's Capital Account.

**Articles of Dissolution**.  Upon the completion of the distribution of the Company's assets as provided in this Article XII, the Company shall be terminated and the Person acting as liquidator shall file a articles of dissolution and shall take such other actions as may be necessary to terminate the Company.

**Article XIII**
**NOTICES**

**Method of Notices**.  All notices required or permitted by this Agreement shall be in writing and shall be hand delivered, sent by registered or certified mail or by nationally recognized overnight courier, or by facsimile or other electronic transmission (including electronic mail).  Any such notice or communication shall be deemed to have been delivered and received (a) in the case of personal delivery, on the date of such delivery, (b) in the case of registered or certified mail, on the third Business Day following that on which the piece of mail containing such communication is posted, (c) in the case of a nationally recognized overnight courier in circumstances under which such courier guarantees next Business Day delivery, on the next Business Day after the date sent, and (d) in the case of facsimile or electronic transmission (including electronic mail), on the date sent if such date is a Business Day or on the next Business Day if the date sent is not a Business Day.  Any such communication shall be sent to the Members at their respective addresses set forth in their Subscription Documents, and to the Company and Manager at the following:

[Newco]Beechwood Reinvestment, LLC
[_____]
[_____]
Attn:  Manager
Email:  [_____]
Facsimile:  [_____]

Any Member or Manager may give notice from time to time changing its respective address for that purpose.

**Computation of Time**.  In computing any period of time under this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

**Article XIV**
**GENERAL PROVISIONS**

**Amendment**.  This Agreement may not be amended except by an instrument in writing signed by the Manager that has been approved by a Required Interest of Members in accordance with this Agreement unless otherwise expressly provided in this Agreement. Notwithstanding the above, any amendment that has a material adverse effect on the Capital Account of any Member, imposes on a Member an obligation to make additional Capital Contributions or adversely affects a Member's rights under this Agreement shall not be effective against such Member without the prior written consent of such Member (such consent may not be unreasonably withheld); *provided*, *however*, that the admittance of new Members or the dilution of the Percentage Interests or other rights of Members occasioned by the increase in Membership Interests in accordance with the terms of this Agreement or the admittance of such

28

new Members shall not constitute an adverse effect on a Member for purposes of this Section 14.1.

**Governing Law; Venue**.  This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Delaware residents made and to be performed entirely within Delaware.  Any action, proceeding or dispute arising hereunder, or concerning the subject matter of this Agreement must be commenced, prosecuted and adjudicated in the state or federal courts located in New York City, New York.  Each Member irrevocably consents to personal jurisdiction in New York City, New York, and irrevocably waives any objection such person may have based on personal jurisdiction, improper venue or inconvenient forum.

**Waiver**.  Except as otherwise provided herein, rights hereunder may not be waived except by an instrument in writing signed by the party sought to be charged with the waiver.

**Power of Attorney**.

(a)     Each Member, by becoming a party to and agreeing to be bound by this Agreement, irrevocably constitutes and appoints, with full power of substitution, the Manager its true and lawful attorney-in-fact with full power and authority, in its name, place and stead to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Agreement, including but not limited to:

(i)     all certificates and other instruments (including counterparts of this Agreement and the Certificate of Formation), and any amendments thereto, which the Manager deems necessary to form, qualify or continue the Company as a limited liability company (or another entity in which the Members will have limited liability comparable to that provided by the Act on the Effective Date) in any jurisdiction in which the Company may conduct business,

(ii)     any other instrument or document which may be required to be filed by the Company under the Laws of any state or other jurisdiction or which the Manager deem advisable to file to qualify the Company to do business therein or to comply with applicable Law;

(iii)     any instrument or document, including amendments to this Agreement and the Certificate of Formation, which may be required to effect the continuation of the Company, the admission of any Member, or the dissolution and termination of the Company; *provided* that such continuation, admission or dissolution and termination are in accordance with the terms of this Agreement; and

(iv)     all elections that may be made by the Company or the Members in respect of the Company under the Code.

(b)     The appointment by each Member of the Manager as its attorney-in-fact is irrevocable and shall be deemed to be a power coupled with an interest, in recognition of the fact that each of the Members under this Agreement will be relying upon the power of the Manager

29

to act as contemplated by this Agreement in any filing and other action by the Manager on behalf of the Company, and shall survive and not be affected by the subsequent bankruptcy, insolvency or dissolution of any Member hereby giving such power and the Transfer or assignment of all or any part of the Membership Interest of such Member; *provided, however*, that in the event of the Transfer by a Member of all or any part of its Membership Interest, the foregoing power of attorney of the transferor shall survive such Transfer only until such time, if any, as the transferee shall have been admitted to the Company as a Member and all required documents and instruments shall have been duly executed to effect such substitution.  Notwithstanding anything to the contrary contained in this Section 14.4, the power of attorney granted pursuant to this Section 14.4 does not empower the Manager to exercise such power to take any action that is not otherwise permitted under this Agreement, or that requires the consent of any Member unless such consent has been given by such Member.

**Confidentiality**.  Each Member will keep confidential and not use, reveal, provide or transfer to any third party any Confidential Information it obtains or has obtained concerning the Company, except (a) to the extent that disclosure to a third party is required by applicable Law; (b) information which, at the time of disclosure, is generally available to the public (other than as a result of a breach of this Agreement or any other confidentiality agreement to which such Person is a party or of which it has actual knowledge), as evidenced by generally available documents or publications; (c) information that was in its possession prior to disclosure (as evidenced by appropriate written materials) and was not acquired directly or indirectly from the Company; (d) to the extent disclosure is necessary or advisable, to its or the Company's employees, consultants or advisors for the purpose of carrying out their duties hereunder; (e) to banks or other financial institutions or agencies or any independent accountants or legal counsel or investment advisors employed by the Manager, the Company or any Member, to the extent disclosure is necessary or advisable to obtain financing; (f) to the extent necessary, disclosure to third parties to enforce this Agreement, or (g) to a Member or Manager or to their respective Affiliates; *provided, however*, that in each case of disclosure pursuant to (d), (e) or (g), the Persons to whom disclosure is made agree to be bound by this confidentiality provision. The obligation of each Member and Manager not to disclose Confidential Information except as provided herein shall not be affected by the termination of this Agreement or the replacement of the Manager or any Member.

**Applicable Law**.  This Agreement shall be construed in accordance with and governed by the Laws of the State of Delaware, excluding its conflicts of laws rules.

**Entire Agreement**.  This Agreement embodies the entire understanding and agreement among the parties concerning the Company and supersedes any and all prior negotiations, understandings or agreements in regard thereto.

**Counterparts**.  This instrument may be executed and delivered (including by facsimile with written confirmation of receipt (or other electronic transmission)) in any number of counterparts each of which shall be considered an original.

**Additional Documents**.  The Members hereto covenant and agree to execute such additional documents and to perform additional acts as are or may become necessary or convenient to carry out the purposes of this Agreement.

HROBOU\115491.1115491.2

     **No Third Party Beneficiaries**.  This Agreement is for the sole benefit of the Members, and no other Person is intended to be a beneficiary of this Agreement or shall have any rights hereunder.

     **Counsel to the Company**.  Counsel to the Company may also be counsel to the Manager.  The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the New York Rules of Professional Conduct or similar rules in any other jurisdiction  ("Rules").  The Company has initially selected Bryan Cave LLP ("Company Counsel") as legal counsel to the Company.  Each Member acknowledges that Company Counsel does not represent any Member in its capacity as a Member in the absence of a clear and explicit written agreement to such effect between the Member and Company Counsel (and then only to such extent as set forth in the such agreement), and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member.  In the event any dispute or controversy arises between any Member and the Company, or between any Member or the Company, on the one hand, and the Manager or any Affiliate of the Manager that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent such Manager or the Company (and in the case where the dispute is between any Member, on the one hand, and both the Manager and the Company, on the other hand, Company Counsel may represent both the Company and the Manager) in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.  Each Member further acknowledges that, whether or not Company Counsel has in the past represented or is currently representing such Member with respect to other matters, Company Counsel has not represented the interests of any Member in the preparation and negotiation of this Agreement.  Notwithstanding the provisions of Section 14.8 (Entire Agreement), this Section 14.12 shall be treated as a supplement to, and not a substitution or replacement for, any other waiver, consent or agreement provided to the Company Counsel by any Person.

**[Signatures page follows.]**

HROBOU\115491.1115491.2

**MANAGER:**

_____

David Levy

**MEMBERS:**

All those Members who have executed a
Subscription Agreement and Special Power of
Attorney, originals of which are on file with the
Company

**BC Draft**
**7/3/2013**

**THE LIMITED LIABILITY COMPANY INTERESTS IN THE COMPANY REPRESENTED BY THIS LIMITED LIABILITY COMPANY AGREEMENT (AS MODIFIED, AMENDED AND SUPPLEMENTED) AMONG THE MEMBERS AND MANAGER SIGNATORY HERETO, HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR QUALIFIED UNDER ANY STATE SECURITIES LAWS IN RELIANCE UPON EXEMPTIONS THEREFROM.   THESE LIMITED LIABILITY COMPANY INTERESTS MAY NOT BE OFFERED, ASSIGNED, PLEDGED, SOLD OR OTHERWISE DISPOSED OF ABSENT AN EFFECTIVE REGISTRATION UNDER THE SECURITIES ACT AND QUALIFICATION UNDER SUCH STATE SECURITIES LAWS, UNLESS EXEMPTIONS FROM SUCH REGISTRATION AND QUALIFICATION REQUIREMENTS ARE AVAILABLE.  THE COMPANY HAS THE RIGHT TO REQUIRE ANY POTENTIAL TRANSFEROR OF A LIMITED LIABILITY COMPANY INTEREST IN THE COMPANY TO DELIVER AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY PRIOR TO ANY TRANSFER TO THE EFFECT THAT AN EXEMPTION FROM REGISTRATION AND QUALIFICATION IS AVAILABLE FOR SUCH TRANSFER.  ADDITIONAL SUBSTANTIAL RESTRICTIONS ON TRANSFER OF THESE LIMITED LIABILITY COMPANY INTERESTS ARE SET FORTH IN THIS AGREEMENT.**

LIMITED LIABILITY COMPANY AGREEMENT

FOR

BEECHWOOD REINVESTMENT,  LLC

Dated as of July ___, 2013

**TABLE OF CONTENTS**

Page

**ARTICLE I DEFINITIONS**..................................................................................................... 1

**ARTICLE II THE LIMITED LIABILITY COMPANY**.................................................... 6
    2.1    Formation..........................................................................................................6
    2.2    Name.................................................................................................................6
    2.3    Term.................................................................................................................6
    2.4    Registered Office and Agent; Principal Place of Business.................................6
    2.5    Purpose............................................................................................................ 6

**ARTICLE III CAPITAL CONTRIBUTIONS**.................................................................... 7
    3.1    Capital Contributions By Members....................................................................7
    3.2    Admission of Additional Members..................................................................... 7
    3.3    No Third Party Right to Enforce........................................................................ 8
    3.4    Return of Contributions.................................................................................... 8

**ARTICLE IV REPRESENTATIONS, WARRANTIES AND COVENANTS**...................... 8
    4.1    General Representations and Warranties............................................................8
    4.2    Conflict and Tax Representations.......................................................................8
    4.3    Survival............................................................................................................9

**ARTICLE V COMPANY MANAGEMENT**........................................................................ 9
    5.1    Manager............................................................................................................ 9
    5.2    Management Authority....................................................................................... 9
    5.3    Major Decisions..............................................................................................10
    5.4    Duties............................................................................................................. 11
    5.5    Payment of Expenses...................................................................................... 11
    5.6    Initial Manager as Member.............................................................................. 11
    5.7    Removal and Replacement............................................................................... 11
    5.8    Resignation..................................................................................................... 11
    5.9    Vacancies....................................................................................................... 11
    5.10   Reliance by Third Parties................................................................................ 12
    5.11   Other Business Opportunities; Affiliate Transactions; Conflicts........................ 12
    5.12   Standard of Care; Indemnification................................................................... 12

**ARTICLE VI MEMBERS**................................................................................................ 15
    6.1    No Control by the Members; Rights of the Members......................................... 15
    6.2    Limited Liability............................................................................................. 15
    6.3    Quorum and Voting......................................................................................... 15
    6.4    Action by Written Consent............................................................................... 15
    6.5    Meetings......................................................................................................... 15
    6.6    No State-Law Partnership................................................................................ 16
    6.7    Tax Matters.................................................................................................... 16

i

**ARTICLE VII DISTRIBUTIONS TO THE MEMBERS**......................................................**16**
    7.1    Discretionary Distribution to Pay Tax.......................................................16
    7.2    Ordinary Distributions..............................................................................17
    7.3    Liquidity Event and Liquidation Proceeds................................................17
    7.4    Distributions in Kind and of Non-Cash Assets.........................................17

**ARTICLE VIII ALLOCATION OF PROFITS AND LOSSES**......................................**18**
    8.1    In General.................................................................................................18
    8.2    Regulatory Allocations and Other Allocation Rules.................................19
    8.3    Other Allocation Rules.............................................................................21

**ARTICLE IX ALLOCATION OF TAXABLE INCOME AND TAX LOSSES**...................**21**
    9.1    Allocation of Taxable Income and Tax Losses.........................................21
    9.2    Allocation of Section 704(c) Items..........................................................21
    9.3    Integration with Section 754 Election.......................................................21
    9.4    Allocation of Tax Credits..........................................................................22

**ARTICLE X ACCOUNTING AND REPORTING**........................................................**22**
    10.1   Books........................................................................................................22
    10.2   Capital Accounts.......................................................................................22
    10.3   Valuation of Securities and Other Assets Owned by the Company...........22
    10.4   Transfers During Year...............................................................................24
    10.5   Reports......................................................................................................24
    10.6   Section 754 Election..................................................................................24
    10.7   Inspection of Documents...........................................................................24

**ARTICLE XI TRANSFER OF MEMBER'S INTEREST**..............................................**25**
    11.1   Restrictions on Transfers and Liens..........................................................25
    11.2   Permitted Transfers...................................................................................25
    11.3   Substitution of a Member..........................................................................25
    11.4   Conditions to Substitution.........................................................................26
    11.5   Admission as a Member............................................................................26

**ARTICLE XII WITHDRAWAL, DISSOLUTION AND TERMINATION**.......................**26**
    12.1   Withdrawal................................................................................................26
    12.2   Dissolution................................................................................................27
    12.3   Liquidation................................................................................................27
    12.4   Articles of Dissolution..............................................................................28

**ARTICLE XIII NOTICES**..........................................................................................**28**
    13.1   Method of Notices....................................................................................28
    13.2   Computation of Time.................................................................................28

**ARTICLE XIV GENERAL PROVISIONS**...................................................................**29**
    14.1   Amendment...............................................................................................29
    14.2   Governing Law; Venue.............................................................................29
    14.3   Waiver.......................................................................................................29
    14.4   Power of Attorney.....................................................................................29

ii

14.5     Confidentiality........................................................................................... 30
14.7     Applicable Law...........................................................................................31
14.8     Entire Agreement........................................................................................31
14.9     Counterparts................................................................................................31
14.10    Additional Documents................................................................................ 31
14.11    No Third Party Beneficiaries......................................................................31
14.12    Counsel to the Company.............................................................................31

iii

**LIMITED LIABILITY COMPANY AGREEMENT**
**FOR**
**BEECHWOOD REINVESTMENT,  LLC**

This Limited Liability Company Agreement (this "Agreement"), dated as of July ___, 2013 (the "Effective Date"), for Beechwood Reinvestment, LLC, a Delaware limited liability company (the "Company"), is among the Manager and Members (as defined below) signatory hereto.

In consideration of the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Members agree as follows:

**Article I**
**DEFINITIONS**

In addition to the terms defined elsewhere in this Agreement, the following terms shall have the indicated meaning:

"Accredited Investor" has the meaning assigned to such term under Rule 501 of Regulation D, promulgated under the Securities Act.

"Act" means the Delaware Limited Liability Company Act, as amended from time to time.

"Adjusted Capital Account Deficit" means, with respect to any Member, a deficit balance in such Member's Capital Account as of the end of the fiscal year after giving effect to the following adjustments:  (a) credit to such Capital Account the additions, if any, permitted by Treasury Regulations §§ 1.704-1(b)(2)(ii)(*c*) (referring to obligations to restore a capital account deficit), 1.704-2(g)(1) (referring "partnership minimum gain") and 1.704-2(i)(5) (referring to "partner nonrecourse debt minimum gain"), and (b) debit to such Capital Account the items described in §§ 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*) of the Treasury Regulations.  This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulation § 1.704-1(b)(2)(ii)(*d*).

"Adjusted Properties" is defined in Section 9.2.

"Affiliate" means with respect to a Person, (a) any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, (b) any spouse, ascendant or descendant of any such Person or any Person described in clause (a) of this definition, and (c) any trust, family partnership or other entity established primarily for the benefit of such Person or any Person described in clauses (a) or (b) of this definition.  As used in this definition, the word "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract or otherwise.

"Agreement" is defined in the introductory paragraph.

1

"<u>Available Cash</u>" means Distributable Assets that are in the form of cash or cash equivalents.

"<u>Business</u>" is defined in Section 2.5.

"<u>Business Day</u>" means each day that is not a Saturday or Sunday when the New York Stock Exchange is open for business.

"<u>Capital Account</u>" is defined in Section 10.2(a).

"<u>Capital Contribution</u>" means for any Member at the particular time in question the aggregate of the dollar amounts of any cash, cash equivalents and Non-Cash Assets contributed by such Member to the capital of the Company.

"<u>Carrying Value</u>."  The initial "Carrying Value" of property contributed to the Company, including Non-Cash Assets, by a Member means the value of such property at the time of contribution as determined by the Manager.  The initial Carrying Value of any other property shall be the adjusted basis of such property for federal income tax purposes at the time it is acquired by the Company.  The initial Carrying Value of a property shall be reduced (but not below zero) by all subsequent depreciation, cost recovery, depletion and amortization deductions with respect to such property as taken into account in determining Profit and Loss.  The Carrying Value of any property shall be adjusted from time to time in accordance with Section 10.2(b) and Treasury Regulation § 1.704-1(b)(2)(iv)(*m*), and to reflect changes, additions or other adjustments to the Carrying Value for dispositions, acquisitions or improvements of Company properties, as deemed appropriate by the Manager.

"<u>Certificate of Formation</u>" is defined in Section 2.1.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time.  Any reference herein to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of future Law.

"<u>Company</u>" is defined in the introductory paragraph.

"<u>Company Counsel</u>" is defined in Section 14.12.

"<u>Company Expenses</u>" means all expenses and costs incurred in conducting the Company's business, including, without limitation the following: (i) accounting, legal and other professional services; (ii) costs and expensed incurred in connection with the Company's investment in the Operating Company (including related due diligence expenses) and the monitoring, management, restructuring, sale or other disposition of such investment; (iii) costs of any litigation or investigation involving Company activities; (iv) costs of any litigation or investigation involving Company activities; (v) Organizational Expenses; and (vi) costs and expenses for terminating, dissolving and winding up the Company.

"<u>Company Interest</u>" means any Membership Interest, and any other rights in the Company, including, without limitation, any economic rights as an assignee, transferee or successor of any Member.

"Confidential Information" means information concerning the properties, operations, business, trade secrets, technical know-how and other non-public information and data of or relating to the Company and the Manager (including the contents of this Agreement and its Exhibits), its properties, any technical information with respect to any project of the Company.

"Distributable Assets" means, at a particular time, the cash, cash equivalents and Non-Cash Assets held by the Company [(including, without limitation, distributions received from the Operating Company)], less such cash reserves as the Manager reasonably determines are necessary to pay on a timely basis Company costs and expenses, including Company Expenses, taxes, and other obligations of the Company, taking into account the anticipated revenues of the Company.

"Effective Date" is defined in the introductory paragraph.

"GAAP" means generally accepted accounting principles in the United States in accordance with the hierarchy set forth in Financial Accounting Standards Board Accounting Standards Codification.

"Indemnified Person" is defined in Section 5.12(b).

"Initial Closing" means the date on which the first Member is admitted to the Company which shall occur when the subscriptions for Membership Interests is at least $[__,000,000].

"Law" or "Laws" means all applicable federal, state, tribal and local laws (statutory or common), rules, ordinances, regulations, grants, concessions, franchises, licenses, orders, directives, judgments, decrees, restrictions and other similar requirements, whether legislative, municipal, administrative or judicial in nature.

"Lien" means any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, charge, deposit arrangement, preference, priority, security interest, option, right of first refusal or other transfer restriction or encumbrance of any kind (including preferential purchase rights, conditional sales agreements or other title retention agreements, and the filing of or agreement to give any financing statement under the Uniform Commercial Code or comparable Law of any jurisdiction to evidence any of the foregoing).

"Major Decision" is defined in Section 5.3.

"Major Decision Threshold" means $100,000.

"Manager" is defined in Section 5.1.

"Member" means, at the time of determination, a Person holding Company Interests, that is or should be designated as a Member of the Company and a Person admitted as a substituted Member pursuant to Section 11.3.

"Membership Interest" means, with respect to any Member, (a) that Member's status as a Member, (b) that Member's Capital Account and share of the Profits, Losses and other items of income, gain, loss, deduction and credits of, and the right to receive distributions (liquidating or

3

otherwise) from, the Company under the terms of this Agreement, (c) all other rights, benefits, and privileges enjoyed by, and obligations of, such Member (under the Act or this Agreement) in its capacity as a Member, including that Member's rights to vote, consent and approve those matters described in this Agreement, and (d) all obligations, duties and liabilities imposed on that Member under the Act or this Agreement in its capacity as a Member.

"Misconduct" means any of the following:  (a) the conviction of, or plea of nolo contendere by any member of the Manager with respect to (i) a material violation of material federal or state securities Laws, (ii) a felony under any criminal statute, or (iii) a violation of any other criminal statute involving intentional fraud, misappropriation or embezzlement, or (b) the Manager has been determined by a court of first impression having competent jurisdiction to have knowingly and willfully breached its material obligations under this Agreement or, subject to Section 5.4, its fiduciary obligations to the Company, including for intentional fraud, willful misconduct or gross negligence.

"Non-Cash Assets" means Securities and any other in-kind property held by the Company other than cash or cash-equivalents.  The value of Non-Cash Assets shall be determined as of the date of the initial Capital Contributions of Non-Cash Assets by a Member and, thereafter, shall be revalued every 12 months in accordance with the procedures described in this Agreement.  Non-Cash Assets shall not include any dividends or distributions made to a Member by the issuer of Securities and the Member shall be entitled to retain any dividends or distributions made to the Member by such issuer.

"Operating Company" means Beechwood Reinsurance LLC, a limited liability company formed under the laws of the Cayman Islands, British West Indies.

"Organizational Expenses" means the expenses incurred in the organization of the Company and the offering of the Membership Interests.

"Percentage Interests" means, with respect to each Member, the percentage of the outstanding Membership Interests held by such Member set forth opposite such Member's name on Exhibit A, as such Percentage Interest may be modified from time to time pursuant to this Agreement.

"Person" means a natural person, corporation, joint venture, partnership, limited liability partnership, limited partnership, limited liability limited partnership, limited liability company, trust, estate, business trust, association, governmental authority or any other entity.

"Preferred Distribution" means an amount, determined for each Member, equal to (i) eight percent (8%) of such Member's Capital Contributions that consist of cash and cash equivalents and (ii) five percent (5%) of such Member's Capital Contributions of Non-Cash Assets (based on the most recent valuation completed with respect to such Non-Cash Assets).

"Prime Rate" means a rate per annum equal to the *lesser of* (a) an annual rate of interest which equals the floating commercial loan rate as published in the Wall Street Journal from time to time as the "Prime Rate," adjusted in each case as of the banking day in which a change in the Prime Rate occurs, as reported in the Wall Street Journal; *provided, however,* that if such rate is no longer published in the Wall Street Journal, then it shall mean an annual rate of interest which

4

equals the floating commercial loan rate of Citibank N.A., or its successors and assigns, announced from time to time as its "base rate," adjusted in each case as of the banking day in which a change in the base rate occurs, and (b) the maximum rate permitted by applicable Law.

"Profit" or "Loss" means the income or loss of the Company as determined under the capital accounting rules of Treasury Regulation § 1.704-1(b)(2)(iv) for purposes of adjusting the Capital Accounts of Members including, without limitation, the provisions of paragraphs 1.704-1(b)(2)(iv)(*g*) and 1.704-1(b)(4) of those regulations relating to the computation of items of income, gain, deduction and loss.

"Regulatory Allocations" is defined in Section 8.2(h).

"Relative" means, in relation to a natural person, any spouse, brother, sister, aunt, uncle, ascendant or descendant of such natural person.

"Required Interest of Members" means Members holding, individually or in the aggregate, at least 66% of the Membership Interests.

"Rules" is defined in Section 14.12.

"Securities" or "Security" means (1) securities and other financial instruments and rights and options relating thereto of United States of America ("U.S.") and non-U.S. entities, now existing or hereinafter created, including without limitation equities, debt instruments, shares of stock funds, American Deposit Receipts, shares; (2) partnership, limited liability or similar beneficial interests in private entities, (3) private investments in public entities (PIPEs); (4) bonds, notes, bills, debt, debt instruments and debentures; (5) currencies; (6) interest rate, commodity, equity and other derivative products and instruments of any kind, including, without limitation (a) futures contracts (and options thereon), (b) swap contracts, options, and forward rate agreements, (c) spot and forward currency transactions and (d) agreements relating to or securing such transactions; (7) loans, accounts and notes receivable and payable held by trade or other creditors; (8) trade acceptances; (9) contract and other claims; (10) executory contracts; (11) participations; (12) mutual funds, exchange-traded funds and other stock funds; (13) money market funds; (14) obligations of the U.S. or any state thereof, foreign governments and instrumentalities of any of them; (15) commercial paper; (16) certificates of deposit; (17) banker's acceptances; (18) trust receipts; and (19) other obligations and instruments or evidences of indebtedness of whatever kind of nature; in each case, of any Person, corporation, government or other entity whatsoever, or such other instruments identified by the Manager.

"Securities Act" means the Securities Act of 1933, as amended from time to time.  Any reference herein to a specific section or sections of the Securities Act shall be deemed to include a reference to any corresponding provision of future Law.

"Transfer" or "Transferred" means, with respect to any asset, including a Membership Interest or any portion thereof, including any right to receive distributions from the Company or any other economic interest in the Company, a sale, pledge assignment, transfer, conveyance, gift, exchange or other disposition of such asset, whether such disposition be voluntary, involuntary or by merger, exchange, consolidation or other operation of Law, including the following:  (a) in the case of an asset owned by a natural person, a transfer of such asset upon the

5

death of its owner, whether by will, intestate succession or otherwise, (b) in the case of an asset owned by a Person which is not a natural person, a distribution of such asset, including in connection with the dissolution, liquidation, winding up or termination of such Person (other than a liquidation under a deemed termination solely for tax purposes), and (c) a disposition in connection with, or in lieu of, a foreclosure of a Lien; *provided, however,* a Transfer shall not include the creation of a Lien.

"Treasury Regulations" means regulations issued by the Department of Treasury under the Code.  Any reference herein to a specific section or sections of the Treasury Regulations shall be deemed to include a reference to any corresponding provision of future regulations under the Code.

"Unpaid Preferred Distribution" means an amount, determined for each Member, equal to the Member's Preferred Distribution reduced by the aggregate amount distributed to the Member pursuant to Sections 7.1, 7.2 and 7.3 through the date of determination.

### Article II
### THE LIMITED LIABILITY COMPANY

**Formation**.  The Company was formed pursuant to the Certificate of Formation, filed by the Manager with the Secretary of State of the State of Delaware on July ___, 2013 (as amended, modified and supplemented, the "Certificate of Formation").  The Manager shall execute such further documents (including amendments to the Certificate of Formation) and take such further action as shall be appropriate or necessary to comply with the requirements of Law for the formation, qualification or operation of a limited liability company in all other states and counties where the Company may conduct its business.  To the fullest extent permitted by the Act, this Agreement shall control as to any conflict between this Agreement and the Act or as to any matter provided for in this Agreement that is also provided for in the Act.

**Name**.  The name of the Company shall be  Beechwood Reinvestment, LLC, unless otherwise determined by the Manager.

**Term**.  The Company shall have perpetual existence; *provided*, that the Company shall be dissolved upon the occurrence of an event set forth in Section 12.2.

**Registered Office and Agent; Principal Place of Business**.  The location of the registered office of the Company and the Company's registered agent shall be at such address as set forth in the Certificate of Formation, unless otherwise determined by the Manager.  The location of the principal place of business of the Company shall be at such location as the Manager may from time to time select.

**Purpose**.  The business of the Company shall be to (a) invest in the Operating Company, and engage in any and all activities related or incidental thereto (including incurring debt to finance such activities), and (b) do all things necessary or appropriate in connection with the foregoing (collectively, the "Business").  The Business may be conducted directly by the Company or indirectly through another corporation, limited liability company, partnership (general or limited), joint venture or other entity or arrangement.

6

Article III
**CAPITAL CONTRIBUTIONS**

**Capital Contributions By Members**.

(a)     The Members shall make Capital Contributions of cash in U.S. Dollars, cash equivalents and Non-Cash Assets to the Company, payable by wire transfer.  The initial Capital Contribution amounts, including the value of any Non-Cash Assets, of each Member shall be set forth in the books and records of the Company.

(b)     Subject to applicable securities laws, each Member shall have the first right to purchase such Member's pro rata share (based on such Member's Percentage Interests) of any new Membership Interests to be issued by the Company.  If any Member does not purchase its full pro rata share, then any remaining Members shall have the right to purchase the remaining share pro rata.  Each Member shall have 20 days from the date of receiving a notice from the Manager of such proposed sale to agree to purchase its pro rata share of the new Membership Interests for the price and upon the terms and conditions specified in the notice by giving written notice to the Company and stating therein the amount of Membership Interests to be purchased.

(c)     The Manager shall not be authorized to call (and the Members shall not be obligated to make) any additional Capital Contributions following the Members' initial Capital Contributions except for Capital Contributions that Members may elect to make as provided in Section 3.1(c).

(d)     Except as specifically provided under this Agreement, no Member shall have any obligation to contribute capital to the Company, including without limitation with respect to any deficit Capital Account balance.

3.2     **Admission of Additional Members.**

(a)     Subject to Article XII and Section 3.2(b) below, no additional Person may be admitted as a Member to the Company (i) without the prior written consent of the Manager and (ii) without executing and delivering to the Company and the Manager the documents described in Section 11.3(a).

(b)     For the period commencing on the date of the Initial Closing and ending on the first to occur of (i) the Company's receipt of total Capital Contributions equal to $100,000,000 (or such greater amount as the Manager shall accept in its discretion); or (ii) 90th day thereafter, the Manager may admit persons as additional Members (or allow existing Members to increase their Capital Contributions) without the consent of any of the existing Members.  Following the admission of any such subsequently admitted Members pursuant to this Section 3.2(b), such Members shall be deemed for all purposes of this Agreement except for voting rights and other matters, expressly set forth herein, which shall not commence until such Member's admission in accordance with this Agreement to have been an initial Member, admitted as of the date of this Agreement (unless expressly provided to the contrary herein).  Upon the admission of any additional Members to the Company (or increase in the Capital

7

Contributions of a Member) pursuant to this Section 3.2(b), the assets of the Company shall not be revalued except in the discretion of the Manager.

**No Third Party Right to Enforce**.  No Person other than a Member shall have the right to enforce any obligation of a Member to contribute capital hereunder and specifically no lender or other third party shall have any such rights.

**Return of Contributions**.  No Member shall be entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its Capital Account or its Capital Contributions.  No unpaid Capital Contribution shall constitute a liability of the Company, the Manager or any Member.  A Member is not required to contribute or to lend cash or property to the Company to enable the Company to return any Member's Capital Contributions.  The provisions of this Section 3.4 shall not limit a Member's rights under Article XII.

Article IV
**REPRESENTATIONS, WARRANTIES AND COVENANTS**

**General Representations and Warranties**.  Each Member represents and warrants to the Manager, the other Members and the Company as follows:

(a)     If it is an entity, it is the type of legal entity specified in its Subscription Documents, duly organized and in good standing under the Laws of the jurisdiction of its organization and is qualified to do business and is in good standing in those jurisdictions where necessary to carry out the purposes of this Agreement;

(b)     If it is an entity, the execution, delivery and performance by it of this Agreement and all transactions contemplated herein are within its entity powers and have been duly authorized by all necessary entity actions;

(c)     This Agreement constitutes its valid and binding obligation, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium and similar Laws affecting the enforcement of creditors' rights generally and by general principles of equity; and

(d)     The execution, delivery and performance by it of this Agreement will not conflict with, result in a breach of or constitute a default under any of the terms, conditions or provisions of (i) any applicable Law, (ii) if it is an entity, its governing documents, or (iii) any agreement or arrangement to which it or any of its Affiliates is a party or which is binding upon it or any of its Affiliates or any of its or their assets.

**Conflict and Tax Representations**.  Each Member represents and warrants to the Manager, the other Members and the Company as follows:

(a)     Such Member has been advised that (i) a conflict of interest exists among the Members' individual interests, (ii) this Agreement has tax consequences and (iii) it should seek independent counsel in connection with the execution of this Agreement;

8

(b)     Such Member has had the opportunity to seek independent counsel, including independent tax advice, prior to the execution of this Agreement, and such Member is not relying to any extent on any representation of any kind to it regarding tax consequences of this Agreement; and

(c)     This Agreement and the language used in this Agreement are the product of all parties' efforts and each party hereby irrevocably waives the benefit of any rule of contract construction which disfavors the drafter of an agreement.

**Survival**.  The representations and warranties set forth in this Article IV shall survive the execution and delivery of this Agreement and any documents of Transfer provided under this Agreement.

Article V
**COMPANY MANAGEMENT**

**Manager**.  The Company shall be managed by one manager (the "Manager"). The initial Manager shall be David Levy.  The Manager shall have the power and authority to conduct the business of the Company and is hereby expressly authorized on behalf of the Company to make all decisions with respect to the Company's business and to take all actions necessary to carry out such decisions, except as such discretion, powers and rights are expressly limited or denied in this Agreement.

**Management Authority**.  The Manager shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Company and shall have, in addition to those powers and rights expressly granted in this Agreement, all the powers and rights of a Manager of a limited liability company organized under the Act, except as such discretion, powers and rights are expressly limited or denied in this Agreement.  Without limiting the generality of the foregoing, and except as provided in Section 5.3, in connection with managing and controlling the business and affairs of the Company, the Manager shall have the sole authority and absolute discretion, on behalf of the Company and without limitation:

(a)     To originate and structure the investment of Company assets in the Operating Company;

(b)     To monitor and evaluate the Company's investment in the Operating Company and provide ongoing management and operations support services to the Operating Company;

(c)     To exercise the voting rights under any and all Securities of the Operating Company owned by the Company;

(d)     To arrange for the sale, pledge, or other Transfer of all or any part of the Securities of the Operating Company held by the Company (including determining the timing and manner of such sale), or the approval by the Company of any merger or consolidation of the Operating Company or the sale of all or substantially all of the Operating Company's assets on such terms and at such times as it shall determine to be in the best interests of the Company and its Members;

9

(e)     To cause the Company to borrow money from Members or to guarantee loans or other extensions of credit (i) to support an obligation made to the Operating Company, or (ii) to provide bridge financing to the Operating Company;

(f)     To admit additional Members or to issue additional equity interests (or rights to acquire equity interests) in the Company to existing Members, to additional Members or to other persons or entities, but only to the extent consistent with Section 3.2 and Article XI;

(g)     To hire, employ, retain or otherwise secure attorneys, accountants, consultants and other independent contractors or other personnel necessary or appropriate to carry out the purposes of the Company upon such terms as the Manager may determine;

(h)     To sue and be sued, and complain and defend, in the name of and on behalf of the Company, and to settle, adjust, submit to arbitration and compromise all actions, suits, accounts, reckonings, claims and demands whatsoever now or hereafter pending between the Company and any other party (other than a Member);

(i)     To pay all Company Expenses;

(j)     To make or revoke such elections as it deems appropriate under the tax Laws of the United States, the several states and other relevant jurisdictions as to the treatment of items of Company income, expenses, gain, loss, deduction and credit, including without limitation to make or revoke the election referred to in Section 754 of the Code; and

(k)     Subject to the provisions of Section 5.3, to take all other actions, to enter into all other agreements and transactions with any other parties and to execute all other documents and instruments of any kind, which the Manager may deem necessary or appropriate in carrying out the purposes of the Company.

5.3     **Major Decisions**.  No Manager, Member, officer, employee, agent or representative of the Company shall have any authority to bind or take any action on behalf of the Company with respect to any Major Decision unless such Major Decision has been approved by a Required Interest of Members.  Each of the following matters shall constitute a "Major Decision":(a)     any merger, reorganization, consolidation, dissolution or similar restructuring of the Company;

(b)     the sale, lease or other disposition of all or substantially all of assets of the Company other than the sale of inventory in the ordinary course of business;

(c)      entering into a new line of business or expanding the current Business of the Company outside the scope of the Business of the Company as conducted in the ordinary course consistent with past practice;

(d)     any amendment to this Agreement;

(e)     the dissolution of the Company pursuant to Section 12.2(a);

10

(f)     the providing of any guaranty (or other obligations that, in economic effect, are substantially equivalent to a guaranty) of any amount owed by or any obligation of any person;

(g)     the settlement of any claim against the Company for a settlement in excess of the Major Decision Threshold;

(h)     the incurrence of any indebtedness or the creation of any Lien on any property or assets of the Company in excess of the Major Decision Threshold;

(i)     the redemption of any outstanding Membership Interests;

(j)     any transaction or other undertaking between the Company, a Member or an Affiliate of any of them pursuant to Section 5.11; and

(k)     making any other decision or taking any action with respect to the Company that specifically requires the approval of all of the Members pursuant to this Agreement.

**Duties**.  The Manager and each officer of the Company shall carry out his duties in good faith.  The Manager shall devote such time to the business and affairs of the Company as he may determine, in his reasonable discretion, is necessary for the efficient carrying on of the Company's business.  The Manager's and officers' duties and liabilities are restricted by the provisions of this Agreement to the extent that any such provisions restrict the duties and liabilities of the Manager and officers otherwise existing at law or in equity.

**Payment of Expenses**.  The Company shall pay (or reimburse the Manager for) all Company Expenses (including Company Expenses incurred directly by the Manager and any others acting for or on behalf of the Company).

**Initial Manager as Member**.  The Manager, in addition to his rights and obligations as the Manager, may invest in the Company as a Member or acquire Membership Interests previously purchased by other Members and, in that event, shall acquire and hold the same rights and obligations as such other Members with respect to those Membership Interests. The Manager does not need to be a Member.

**Removal and Replacement**.  In the case of the occurrence of Misconduct with respect to the Manager, a Required Interest of Members may elect to remove the Manager and elect a successor Manager (excluding for this purpose a removed Manager if he is also a Member), subject to such successor Manager's compliance with Section Article XI effective upon such removal by providing not less than 60 days' prior written notice to the Manager.

5.8     **Resignation**.  The Manager may resign at any time by giving written notice to the Members.  Unless otherwise specified in the notice, the resignation shall take effect upon receipt thereof by the Members, and the acceptance of the resignation shall not be necessary to make it **Vacancies**

11

. In the case of the death of a Manager, the Members agree to designate and elect one of the following persons as the successor Manager, subject to such successor Manager's compliance with Section Article XI effective upon such removal by providing not less than 60 days' prior written notice to the Manager: [_____].  If a Person that is both a Manager and a Member is removed or resigns as a Manager, such Person shall continue to be a Member in the Company notwithstanding such Person's removal as the Manager.

**Reliance by Third Parties**.  No third party dealing with the Company shall be required to ascertain whether the Manager or any Company officer is acting in accordance with the provisions of this Agreement.  All third parties may rely on a document executed by a majority of the Manager or by any Company officer as binding on the Company.  The foregoing provisions shall not apply to third parties who are Affiliates or family members of any such Person executing any such document.  If the Manager or any officer acts without authority, it shall be liable to the Members for any damages arising out of its unauthorized actions.

**Other Business Opportunities; Affiliate Transactions; Conflicts**.

(a)     Each Member acknowledges that the Manager, the other Members and their respective Affiliates are or may be active in other business activities and shall, subject to the restrictions under Section 5.3, be free to independently engage, invest or participate for their own account in, and receive the full benefits from, any business or activity, without consulting with the Company or the Members and without offering any right to participate therein to the Company or any other Member.

(b)     The Manager and its affiliates shall offer to the Company the first right to participate in investments in the Operating Company that are made available to the Company.

(c)     Except as set forth in clause (b) above, no Member shall be required to make any investment opportunity available to the Company.

(d)     The Manager may, on behalf of the Company, enter into contracts, agreements, undertakings and transactions with Members, or with Persons, firms or corporations having business, financial or other relationships with Members, provided that such transactions with such Persons and entities are on terms no less favorable to the Company than are generally available to unrelated third parties in comparable transactions.

(e)     The Manager and Members, and their respective Affiliates, shall be entitled to earn and retain any fees, salaries, commissions and options customarily paid or granted to directors, employees or independent contractors of the Operating Company.

**Standard of Care; Indemnification.**

(a)     It is understood that the business of the Company involves a high degree of investment and other risk.  The Manager and any Company officer shall not have any liability to the Company or any Member for errors in judgment or for acts or omissions made in good faith and reasonably believed to be in the best interest of the Company, except in the case of a Manager, by reason of its intentional fraud, willful misfeasance or gross negligence; provided, however, that the Manager must repay to the Company any amounts paid to them in excess of

those to which it is entitled under the terms of this Agreement.  The Manager shall not be liable to the Company or any Member for any tax, or penalty or interest related thereto, imposed upon the Company or any Member so long as the Manager has acted in good faith and in a manner reasonably believed to be consistent with this Agreement and in the best interest of the Company.

        (b)     To the fullest extent permitted by law, the Manager, Company officers and the respective agents, officers, directors, employees and Affiliates of any of the foregoing to the extent applicable (the "Indemnified Persons" or an "Indemnified Person") shall, in accordance with this Section 5.12, be indemnified and held harmless by the Company from and against (i) all losses, claims, damages, liabilities, expenses, and other amounts arising from any claims (including reasonable legal expenses), demands, actions, suits or proceedings (civil, criminal, administrative or investigative), in which they may be involved, as a party or otherwise, by reason of their management of the affairs of the Company, or rendering of advice or consultation with respect thereto, or which relate to the Company, its properties, business or affairs including acting as a director of the Operating Company (but only after first exhausting the indemnification provided to such Indemnified Person by the Operating Company and then only to the extent that full indemnification is not provided by the Operating Company, and in such event the Company shall be subrogated to the right of indemnity from the Operating Company), whether or not they continue to be such at the time any such liability or expense is paid or incurred if such Indemnified Person acted in good faith and in a manner such Indemnified Person reasonably believed to be in, or not opposed to, the best interests of the Company, and, with respect to any criminal proceeding, had no reasonable cause to believe the conduct of such Indemnified Person was unlawful; and (ii) any threatened, pending, or completed action by or in the right of the Company to procure a judgment in its favor by reason of the fact that such Indemnified Person is or was an agent of the Company, against expenses actually or reasonably incurred by such Indemnified Person in connection with the defense or settlement of such action, if such Indemnified Person acted in good faith and in a manner such Indemnified Person reasonably believed to be in, or not opposed to, the best interests of the Company except that indemnification shall be made in respect of any claim, issue or matter as to which such Indemnified Person shall have been adjudged to be liable for misconduct in the performance of the Indemnified Person's duty to the Company only to the extent that the court in which such action or suit was brought, or another court of appropriate jurisdiction, determines upon application that, despite the adjudication of liability, but in view of all circumstances of the case, such Indemnified Person is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

        (c)     No Indemnified Person shall be entitled to indemnification hereunder for any conduct arising from the intentional fraud, gross negligence or willful misconduct of such Indemnified Person.

        (d)     Expenses (including attorneys' fees) incurred by an Indemnified Person in a civil or criminal action, suit or proceeding shall be paid by the Company (or, following dissolution of the Company, the Members) in advance of the final disposition of such action, suit or proceeding, in each case within 30 days after bills or invoices for such expenses are submitted to the Company by the Indemnified Person; provided that such expenses will not be so advanced in connection with an action, suit or proceeding brought against the Indemnified Persons by a

13

Required Interest of Members; and provided further that the Indemnified Person to be advanced such expenses shall agree in writing that, if it is later determined that such Indemnified Person was not entitled to indemnification with respect to such action, suit or proceeding by reason of Section 5.12(c), then such Indemnified Person shall reimburse the Company (or, following dissolution of the Company, the Members) for such advances within ten (10) Business Days following the final disposition of the action, suit or proceeding with respect to which such advance is being requested, with interest at the Prime Rate, determined as of the date of such advance.  Expenses incurred by an Indemnified Person in any such action, suit or proceeding shall be presumed reasonable unless and until such presumption is rebutted by clear and convincing evidence.

       (e)     The termination of a proceeding by judgment, order, settlement, conviction or upon a plea of nolo contendere, or its equivalent, shall not, of itself, create a presumption that the Indemnified Person did not act in good faith and in a manner which the Indemnified Person reasonably believed to be in, or not opposed to, the best interests of the Company or that the Indemnified Person had reasonable cause to believe that the Indemnified Person's conduct was unlawful.

       (f)     The indemnification provided by this Section 5.12 shall not be deemed to be exclusive of any other rights to which the Indemnified Person may be entitled under any agreement, or as a matter of law, or otherwise, both as to action in an Indemnified Person's official capacity and to action in another capacity, and shall continue as to an Indemnified Person who has ceased to have an official capacity for acts or omissions during such official capacity or otherwise when acting at the request of the Manager and shall inure to the benefit of the heirs, successors and administrators of such Indemnified Persons.

       (g)     To the extent that the Indemnified Person has been successful on the merits or otherwise in defense of any proceedings referred to herein, or in defense of any claim, issue or matter therein, the Indemnified Person shall be indemnified by the Company against expenses actually and reasonably incurred by the Indemnified Person in connection therewith and not already advanced to the Indemnified Person pursuant to Section 5.12.

       (h)     The Manager shall have power to purchase and maintain insurance on behalf of the Manager and the Indemnified Persons at the expense of the Company, against any liability asserted against or incurred by them in any such capacity or arising out of the Manager's status as such, whether or not the Company would have the power to indemnify the Indemnified Persons against such liability under the provisions of this Agreement.

       (i)     The Manager may rely upon and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, bond, debenture, or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

       (j)     The Manager may consult with counsel, accountants and other experts reasonably selected by it, and any opinion of an independent counsel, accountant or expert retained and supervised by the Manager with reasonable care, shall be full and complete

14

protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such opinion.

(k)      No Indemnified Person may satisfy any right of indemnity or reimbursement granted in this Section 5.12 or to which it may be otherwise entitled except out of the assets of the Company, and no Member shall be personally liable with respect to any such claim for indemnity or reimbursement.

Article VI
**MEMBERS**

**No Control by the Members; Rights of the Members**.  Except as is specifically permitted by this Agreement and as is specifically required by the Act, the Members, in such capacity, shall not take part in the control or management of the affairs of the Company, and a Member, in such capacity, shall not have any authority to act for or on behalf of the Company.

**Limited Liability**.  The liability of each Member shall be limited as provided by the Act.  No Member other than the Manager shall take part in the control, management, direction or operation of the affairs of the Company, unless otherwise expressly provided in this Agreement, or specifically required under the Act, or shall have any power to bind the Company in their capacity as Members.

**Quorum and Voting**.  Except as otherwise stated below, a Required Interest of Members, represented in person or by proxy, shall be necessary to constitute a quorum at meetings of the Members.  One or more Members may participate in a meeting of the Members by means of conference telephone or similar communication equipment by which all persons participating in the meeting can hear each other at the same time, and such participation shall constitute presence in person at the meeting.  If a quorum is present, the affirmative vote of a Required Interest of Members for matters put to a vote of the Members, in each case present at the meeting or represented by proxy shall be the act of the Members unless a greater number is required by the Act or this Agreement.  In the absence of a quorum, those present may adjourn the meeting for any period, but in no event shall such period exceed 60 days.

**Action by Written Consent**.  Any vote or other action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by a written consent describing the action taken signed by a Required Interest of Members unless this Agreement requires the approval of a greater number for such action to be taken, in which case such written consent must be signed by the requisite number required to approve such action.  Action taken under this Section 6.4 shall be effective when the required number of Members whose consent is required for such action have signed the consent, unless the consent specifies a different effective date.  Any Member that did not execute any such consent shall be provided with reasonably prompt written notice of any such action so taken; *provided*, that the failure to provide such notice shall not invalidate such action.

**Meetings**.

(a)      Meetings of the Members for any purpose or purposes may be called only by the Manager.  The Manager may designate the place for any meeting.

15

(b)     Written notice stating the place, day and hour of the meeting, and the purpose or purposes for which the meeting is called, shall be delivered pursuant to Section 13.1, by or at the direction of the Manager, to each Member of record entitled to vote at such Meeting. Meetings of the Members may be called upon not less than 5 calendar days' written notice.

(c)     At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by his duly authorized attorney-in-fact.  Such proxy shall be filed with the Manager before or at the time of the meeting.  No proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy.

(d)     At each meeting of the Members, the Members may, but shall not be required to, elect a chairman for that particular meeting by the vote of a Required Interest of Members represented at the meeting.  The chairman shall preside over and conduct the meeting and shall appoint someone in attendance to make accurate minutes of the meeting.  Following each meeting, the minutes of the meeting shall be sent to each Member.

(e)     No Member shall be entitled to compensation for attendance at Member meetings or for time spent in its or his capacity as a Member.

**No State-Law Partnership**.  The Members intend that the Company not be a partnership (including a limited partnership) or joint venture, and that no Member or Manager be a partner or joint venturer of any other Member or Manager, for any purposes other than federal and state tax purposes, and this Agreement may not be construed to suggest otherwise.  Except as otherwise required by the Act or other applicable Law, and expressly this Agreement, no Member shall have any fiduciary duty to any other Member.

**Tax Matters**.

(a)     David Levy is hereby designated as the initial "tax matters partner" as such term is defined in section 6231(a)(7) of the Code.  The appointment of any successor tax matters partner shall be approved by the Members.  Subject to the provisions hereof, the tax matters partner is authorized and required to represent the Company in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  Notwithstanding the foregoing, the tax matters partner shall promptly notify all Members of the commencement of any audit, investigation or other proceeding concerning the tax treatment of Company tax items and shall keep all Members adequately informed of such proceedings.

(b)     The tax matters partner and the Manager shall make or cause to be made all available elections as required by the Code and the Treasury Regulations to cause the Company to be classified as a partnership for federal income tax purposes.

Article VII
**DISTRIBUTIONS TO THE MEMBERS**

**Discretionary Distribution to Pay Tax**.  On or before the date upon which the Members are required to make each payment of their federal estimated income taxes, prior to

16

making any distributions under Section 7.2, the Company may in the sole discretion of the Manager (but shall not be required to) make distributions out of Available Cash to each Member for purposes of covering the amount of such estimated income taxes.  The amount of any distributions to a Member pursuant to this Section 7.1 shall be treated as an advance against and shall be applied to reduce distributions that such Member would otherwise be entitled to receive under this Agreement.

**Ordinary Distributions**.  Distributable Assets will be distributed as follows:

(a)     First, one hundred percent (100%) to the Members (and among them in proportion to their relative Unpaid Preferred Distribution amounts) until such time as the Unpaid Preferred Distribution of each Member is reduced to zero; and

(b)     Second, one hundred percent (100%) to the Members (and among them in accordance with their respective Percentage Interests).

7.3     **Liquidity Event and Liquidation Proceeds**.  Subject to Section 12.3, and except as otherwise specifically provided in this Agreement, Distributable Assets with respect to distributions the Company receives upon the sale, merger or other acquisition of the Operating Company (or the Company's interests therein), together with any other Company assets available for distribution in connection with the sale, exchange or other disposition of all or substantially all of the assets of the Company or on the liquidation of the Company, will be distributed as follows:

(a)     First, one hundred percent (100%) to the Members (and among them in proportion to their relative Unpaid Preferred Distribution amounts) until such time as the Unpaid Preferred Distribution of each Member is reduced to zero; and

(b)     Second, one hundred percent (100%) to the Members (and among them in accordance with their respective Percentage Interests).

**Distributions in Kind and of Non-Cash Assets**.  During the existence of the Company, no Member shall be entitled to receive as distributions from the Company any Company asset other than cash except as otherwise set forth herein with respect to Non-Cash Assets.  If the Manager distributes a Non-Cash Asset, then the Manager shall distribute such Non-Cash Asset directly to the Member who contributed such Non-Cash Asset to the Company and such Non-Cash Asset shall not be distributed to other Members.  The Manager may, in its sole discretion, distribute Distributable Assets in kind in the priority set forth in Section 7.2; *provided* that for purposes of this Section 7.4, a distribution of a Distributable Asset, including an undivided interest in a Distributable Asset, to a Member shall be treated as if the asset had been sold for its fair value, any gain or loss (determined with respect to its Carrying Value) had been allocated pursuant to the applicable provisions of Article VIII, and an amount equal to the fair market value of such asset or undivided interest had been distributed under the applicable provisions of this Article VII.  Each class of Securities that is distributed shall be distributed to the Members in proportion to the relative amounts the Members are entitled to receive with respect to the distribution being made, except to the extent that a disproportionate distribution of Securities is necessary in order to avoid distributing fractional shares.  For purposes of the

17

preceding sentence, each lot of stock or other Securities having a separately identifiable tax basis or holding period will be treated as a separate class of Securities.  In-kind distributions of assets in connection with the dissolution and winding-up of the Company shall be governed by Article XII.

## Article VIII
## ALLOCATION OF PROFITS AND LOSSES

**In General**.

(a)     This Article provides for the allocation among the Members of Profit and Loss for purposes of crediting and debiting the Capital Accounts of the Members.  Article IX provides for the allocation among the Members of taxable income and tax losses.

(b)     Subject to Section 8.1(c), and except as provided in Sections 8.2 and 8.3, all Profits and Losses shall be allocated among the Members as follows:

(i)     Profits.  Except as provided in Section 8.1(b)(iii), Profits shall be allocated:

(A)     First, to the extent any Member has a deficit Capital Account balance, to such Members in proportion to such deficit balances until the deficit Capital Account balance of each member has been eliminated; and

(B)     Thereafter, to the Members (and among them in proportion to their respective Percentage Interests).

(ii)     Losses.  Except as provided in Section 8.1(b)(iii), Losses shall be allocated:

(A)     First, to the Members, and proportionately among them in proportion to their respective Percentage Interests, until the Capital Account balance of each Member equals zero; and

(B)     Thereafter, to the Members (and among them in proportion to their respective Percentage Interests).

(iii)     Sale or Liquidation.  Upon the sale, exchange or other disposition of all or substantially all of the assets of the Company (including, without limitation, on the sale, merger or other acquisition of the Operating Company or the Company's interests therein) or the liquidation of the Company, Profits and Losses (or, as necessary, individual items of Profit and Loss) shall be allocated as follows:

(A)     First, to the extent any Member has a deficit Capital Account balance, Profits shall be allocated to such Members, (and among them in proportion to the relative amounts of such deficit Capital Account balances) until the deficit Capital Account balance of each Member has been eliminated;

18

(B)     Second, to the Members (and among them in proportion to the relative aggregate amounts allocable to them under this Section 8.1(b)(iii)(B)) to the extent necessary to cause each Member's Capital Account balance to equal such Member's Unpaid Preferred Distribution;

(C)     Thereafter, to the Members (and among them in proportion to their respective Percentage Interests).

(iv)     <u>Interpretation</u>.  For the avoidance of doubt, upon the sale, exchange or other disposition of all or substantially all of the assets of the Company or the liquidation of the Company, the allocations in Section 8.1(b)(iii) are intended to cause the Capital Account balance of each Member, after giving effect to such allocations, to equal the amount distributable to the Member at that time under Section 7.2, and shall be applied in accordance with that intent.

(c)     Allocations under Section 8.1(b) shall be made after making and adjusting the Members' Capital Accounts for all distributions made under Article VII through the date with respect to which the allocations are being made.

**Regulatory Allocations and Other Allocation Rules**.  Notwithstanding Sections 8.1 and 8.3:

(a)     <u>Loss Limitation</u>.  The Losses allocated pursuant to Section 8.1 shall not exceed the maximum amount of Losses that can be so allocated without causing such Member to have an Adjusted Capital Account Deficit at the end of any fiscal year.  In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 8.1, the limitation set forth in this Section 8.2(a) shall be applied on a Member by Member basis so as to allocate the maximum permissible Losses to each Member under Section 1.704-1(b)(2)(ii)(*d*) of the Treasury Regulations.  All Losses in excess of the limitations set forth in this Section 8.2(a) shall be allocated to the Members in accordance with their respective Percentage Interests.  This Section 8.2(a) shall be interpreted consistently with the loss limitation provisions of Treasury Regulations § 1.704-1(b)(2)(ii)(*d*).

(b)     <u>Minimum Gain Chargeback</u>.  Except as otherwise provided in Treasury Regulations § 1.704-2(f), if there is a net decrease in partnership minimum gain (as defined in Treasury Regulations §§ 1.704-2(b)(2) and 1.704-2(d)(1)) during any fiscal year, each Member shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount and in the manner required by Treasury Regulations §§ 1.704-2(f) and 1.704-2(j)(2).  This Section 8.2(b) shall be interpreted consistently with the "minimum gain" provisions of Treasury Regulations § 1.704-2 related to nonrecourse liabilities (as defined in Treasury Regulations § 1.704-2(b)(3)).

(c)     <u>Member Minimum Gain Chargeback</u>.  Except as otherwise provided in Treasury Regulation § 1.704-2(i)(4), if there is a net decrease in partner nonrecourse debt minimum gain (as defined in Treasury Regulations §§ 1.704-2(i)(2) and 1.704-2(i)(3)) attributable to partner nonrecourse debt (as defined in Treasury Regulations § 1.704-2(b)(4)) during any fiscal year, each Member who has a share of the partner nonrecourse debt minimum

19

gain attributable to such Member's partner nonrecourse debt, determined in accordance with Treasury Regulations § 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such fiscal year (and, if necessary, subsequent fiscal years) in an amount and in the manner required by Treasury Regulations §§ 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 8.2(c) shall be interpreted consistently with the "minimum gain" provisions of Treasury Regulations § 1.704-2 related to partner nonrecourse liabilities (as defined in Treasury Regulations § 1.704-2(b)(4)).

(d)    Qualified Income Offset.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulations §§ 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) or 1.704-1(b)(2)(ii)(*d*)(*6*), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit, if any, of such Member as quickly as possible.  This Section 8.2(d) shall be interpreted consistently with the "qualified income offset" provisions of Treasury Regulations § 1.704-1(b)(2)(ii)(*d*).

(e)    Nonrecourse Deductions.  Any non-recourse deduction (as defined in Treasury Regulations § 1.704-2(b)(1)) for any fiscal year shall be allocated to the Members in proportion to their respective Percentage Interests.

(f)    Member Nonrecourse Deductions.  Any partner nonrecourse deductions (as defined in Treasury Regulations §§ 1.704-2(i)(1) and 1.704-2(i)(2)) for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the partner nonrecourse debt (as defined in Treasury Regulations § 1.704-2(b)(4)) to which such Member nonrecourse deductions are attributable in accordance with Treasury Regulations § 1.704-2(i)(1).

(g)    Section 754 Adjustments.  To the extent an adjustment to the adjusted tax basis of any Company asset is required pursuant to Code Section 732(d), Code Section 734(b) or Code Section 743(b), the Capital Accounts of the Members shall be adjusted pursuant to Treasury Regulations § 1.704-1(b)(2)(iv)(*m*).

(h)    Curative Allocations.  The allocations under Sections 8.2(a) through 8.2(f) (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Article VIII.  Therefore, notwithstanding any other provision this Article VIII (other than the Regulatory Allocations), the Company shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of this Agreement and all Company items were allocated pursuant to Section 8.1.  In exercising its discretion under this Section 8.2(h), the Manager shall take into account future Regulatory Allocations under Sections 8.2(a) through 8.2(f) that are likely to offset other Regulatory Allocations previously made.

HROBOU\115491.2

**Other Allocation Rules**.

(a)     Profits, Losses, and any other items allocable to any period shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Regulations thereunder.

(b)     Solely for purposes of determining a Member's proportionate share of the "excess nonrecourse liabilities" of the Company within the meaning of Treasury Regulations § 1.752 3(a)(3), the Members' interests in Profits shall be their respective Percentage Interests.

(c)     To the extent permitted by Treasury Regulations § 1.704-2(h)(3), the Company shall treat distributions of Available Cash as having been made from the proceeds of a nonrecourse liability (as defined in Treasury Regulations § 1.704-2(b)(3)) or a partner nonrecourse debt (as defined in Treasury Regulations § 1.704-2(b)(4)) only to the extent that such distributions would not cause or increase an Adjusted Capital Account Deficit for any Member.

## Article IX
## ALLOCATION OF TAXABLE INCOME AND TAX LOSSES

**Allocation of Taxable Income and Tax Losses**.  Except as provided in Sections 9.2 and 9.3, each item of income, gain, loss and deduction of the Company for federal income tax purposes shall be allocated among the Members in the same manner as such item is allocated for book purposes under Article VIII.

**Allocation of Section 704(c) Items**.  The Members recognize that with respect to property contributed to the Company by a Member and with respect to property revalued in accordance with Treasury Regulations § 1.704-1(b)(2)(iv)(*f*) (referred to as "Adjusted Properties"), there will be a difference between the agreed values or Carrying Values, as the case may be, of such property at the time of contribution or revaluation, as the case may be, and the adjusted tax basis of such property at that time.  All items of tax depreciation, cost recovery, depletion, amortization and gain or loss with respect to such contributed properties and Adjusted Properties shall be allocated among the Members to take into account the book-tax disparities with respect to such properties in accordance with the provisions of Sections 704(b) and 704(c) of the Code and Treasury Regulations § 1.704-3(b)(1).  Any gain or loss attributable to a contributed property or an Adjusted Property (exclusive of gain or loss allocated to eliminate such book-tax disparities under the immediately preceding sentence) shall be allocated in the same manner as such gain or loss would be allocated for book purposes under Article VIII.

**Integration with Section 754 Election**.  All items of income, gain, loss, deduction and credits recognized by the Company for federal income tax purposes and allocated to the Members in accordance with the provisions hereof and all basis allocations to the Members shall be determined without regard to any election under Section 754 of the Code that may be made by the Company; *provided, however*, such allocations, once made, shall be adjusted as necessary or appropriate to take into account the adjustments permitted by Sections 734 and 743 of the Code.

**Allocation of Tax Credits**

. The tax credits, if any, with respect to the Company's property or operations shall be allocated among the Members in accordance with Treasury Regulations § 1.704-1(b)(4)(ii).

Article X
## ACCOUNTING AND REPORTING

**Books**.  The Manager shall cause the Company to maintain complete and accurate books of account of the Company's affairs at the principal office of the Company.  The Company's books shall be kept in accordance with GAAP, consistently applied, and on an accrual basis method of accounting.  Subject to the requirements of applicable Law, the fiscal year of the Company shall end on December 31 of each year.

**Capital Accounts**.

(a)     The Manager shall cause the Company to maintain a separate capital account for each Member and such other Member accounts as may be necessary or desirable to comply with the requirements of applicable Law ("Capital Accounts").  Each Member's Capital Account shall be maintained in accordance with the provisions of Treasury Regulations § 1.704-1(b)(2)(iv).  With respect to the Manager, to the extent such Member holds Membership Interests in its capacity as a Member, the Manager shall maintain a Capital Account with respect to the Manager's Membership Interest(s) separate from the Capital Account attributable to the Membership Interests of the Manager in that capacity;

(b)     Consistent with and as permitted in the provisions of Treasury Regulations § 1.704-1(b)(2)(iv)(*f*), the Capital Accounts of all Members and the Carrying Values of all Company properties may (as determined by the Manager) be adjusted upwards or downwards to reflect any unrealized gain or unrealized loss with respect to such Company property (as if such unrealized gain or unrealized loss had been recognized upon an actual sale of such property for the amount of its fair market value immediately prior to the event giving rise to revaluation under this Section 10.2(b), and had been allocated among the Members pursuant to Article VIII).  In determining such unrealized gain or unrealized loss, the fair market value of Company properties as of the date of determination shall be determined by the Manager.

(c)     A transferee of a Company Interest shall succeed to the Capital Account attributable to the Company Interest Transferred, except that if the Transfer causes a termination of the Company under Section 708(b)(1)(B) of the Code, Treasury Regulations § 1.708-1(b) shall apply.

**Valuation of Securities and Other Assets Owned by the Company**.

(a)     Subject to the specific standards set forth below, the valuation of Securities and other assets and liabilities under this Agreement shall be at fair market value, as determined by the Manager in its discretion.  In determining the value of the interest of any Member or in any accounting between the Members, no value shall be placed on the goodwill or the name of the Company.

(b)     The value of the Company's assets shall be determined in accordance with GAAP and in conformity with the provisions of the Accounting Standards Codification, Topic

22

820, *Fair Value Management*, in such manner as the Manager may deem fair and reasonable.  In calculating the value of assets, the Manager may use particular pricing services, brokers, market makers or other intermediaries as the Manager shall determine.  The assets and investments of the Company shall be valued by the Manager in accordance with the foregoing and the following guidelines, and all such values are final and conclusive as to all Members:

(i)    If the asset being valued is an interest in another partnership or other entity in which the Company has invested, the value of such interest shall be the value attributed to such interest under the terms of the instruments governing said partnership or entity as reported by its administrators or officers, as of such date as shall be determined to be appropriate by the Manager.

(ii)    Listed Securities, including derivatives, will be valued at their last sales price on the date of determination, or, if no sales occurred on such date, at the mean between the "bid" and "asked" prices at the close of trading on such date on such exchange.

(iii)    Securities not traded on a national securities exchange, but traded over the counter shall be valued at the "bid" prices for long positions and "asked" prices for short positions on the date as of which the value is being determined except that those Securities quoted on the National Market System shall be valued at the last price as reported by NASDAQ, or if such prices are not reported by NASDAQ, as reported by the Pink OTC Markets Inc. or successor entity; provided that the valuation of options not traded on a national securities exchange may be determined from any reliable source selected by the Manager.

(iv)    The value of illiquid or impaired Securities will (in conformity with the provisions of the Accounting Standards Codification, Topic 820, *Fair Value Measurement*) be at a value believed to be the price at which the Security would be sold in an orderly transaction in a principal market.

(v)    Over-the-counter option and swap transactions entered into with a counterparty shall be valued in accordance with the option's or the swap's terms by the counterparty in good faith in a commercially reasonable manner.

(vi)    Short term money market instruments and bank deposits shall be valued at cost plus accrued interest to date.

(vii)    All other Securities and assets of the Company will be assigned a fair value as the Manager may reasonably determine in consultation with such industry professionals and other third parties as the Manager deems appropriate in its discretion.  In addition, the Manager reserves the right to adjust the valuations of any Security to reflect discounts for illiquidity, restrictions upon marketability, differences between the market value and the basis of the assets for federal income tax purposes or other factors affecting the value of assets or influencing the reality of a sale occurring at quoted prices.

(viii)    If on the date as of which any valuation is being made, the exchange or market herein designated for the valuation of any given assets is not open for business, the valuation of such assets shall be determined as of the last preceding date on which such exchange or market was open for business.

**Transfers During Year**

23

.  In order to avoid an interim closing of the Company's books, the allocation of Profits and Losses under Article VIII between a Member who Transfers part or all of its Company Interest during the Company's accounting year and his transferee, or to a Member whose percentage interests in Profits and Losses varies during the course of the Company's accounting year, may be determined pursuant to any method chosen by the Manager; *provided, however*, that any Profit or Loss attributable to extraordinary items related to the sale of Company property shall be allocated to the owner of the interest in the Company at the time the Profit or Loss attributable to the extraordinary item was realized.

**Reports**.  The Manager shall cause the Company to deliver to the Members the following financial statements and reports at the times indicated below:

(a)     The Manager provide each Member annual review of the Company's investment or other asset held by the Company and unaudited financial statements for the Company prepared in accordance with GAAP.  Such review will also include a discussion by the Manager regarding the activities of the Company and the Operating Company and their respective operating and financial results.

(b)     The Manager shall send to each Person who was a Member in the Company at any time during the fiscal year then ended reviewed annual financial statements for the Company (including a statement of each Member's Capital Account at the end of such fiscal year), and annual tax information necessary for completion of individual tax returns, including Forms K-1.

(c)     The financial reports, tax returns and forms described in Sections 10.5(a) and 10.5(b) are dependent upon information to be provided to the Manager by the third parties. Therefore, notwithstanding the foregoing time periods, the Manager may furnish such reports, tax returns and forms to the Members after the expiration of such time periods, but as soon as reasonably practical, following receipt of all financial and other information necessary or desirable to prepare such documents.

**Section 754 Election**.  The Manager may, in its sole discretion, determine whether the Company shall make the election provided for under Section 754 of the Code.  Any such election shall be at the sole cost and expense of the Company.

**Inspection of Documents**.  Each Member shall have the right to inspect, review, make copies of, and audit all agreements, documents, records and reports relating to the business of the Company prepared by or on behalf of the Company in connection with the performance of its duties hereunder, in each case at such Member's expense during reasonable business hours and with at least five Business Days prior written notice to the Manager.

Article XI
**TRANSFER OF MEMBER'S INTEREST**

**Restrictions on Transfers and Liens**.  No Member shall Transfer or create a Lien on all or any portion of its Membership Interest except as permitted by this Article XI.  Any attempted Transfer of, or creation of a Lien on, any portion of a Membership Interest not in accordance with the terms of this Article XI shall be null and void and of no legal effect.
**Permitted Transfers**.

24

Any Transfers and Liens permitted under this Section 11.2 shall be subject to the other provisions of this Article XI.  The following Transfers and Liens shall be permitted.

(a)	To the extent not otherwise permitted by clauses (b), (c) or (d) below, a Member may Transfer all or any portion of its Membership Interest only in the sole and absolute discretion, and with the written approval, of the Manager;

(b)	A Member may Transfer all or any portion of its Membership Interest to any other Member;

(c)	A Member may Transfer all or any portion of its Membership Interest to an Affiliate of such Member without the consent of the Manager or any other Member *provided* that such Affiliate is an Accredited Investor; and

(d)	A Member who is a natural person may Transfer all or a portion of his or her Membership Interest for the benefit of one or more Relatives (e.g., Transfers to family trusts or family partnerships, limited partnerships, limited liability companies, or limited liability limited partnerships).

### Substitution of a Member.

(a)	No transferee (by voluntary or involuntary conveyance, foreclosure, dissolution of marriage, operation of law or otherwise) of all or any portion of a Company Interest shall become a substituted Member without the consent of the Manager, which consent may be withheld in the sole discretion of the Manager.  A transferee of a Company Interest who receives the requisite consent to become a Member shall succeed to all of the rights and interest of its transferor in the Company as well as the voting and other rights of a Member if such rights were not held by the transferor.  A transferee of a Member who does not receive the requisite consent to become a Member shall not have any right to vote, shall be entitled only to the distributions to which its transferor otherwise would have been entitled and shall have no other right to participate in the management of the business and affairs of the Company or to become a Member.

(b)	If a Member shall be dissolved, merged or consolidated, its successor in interest shall have the same obligations and rights to profits or other compensation that such Member would have had if it had not been dissolved, merged or consolidated, except that the representative or successor shall not become a substituted Member without the consent of the Manager, which consent may be withheld in the sole discretion of the Manager.  Such a successor in interest who receives the requisite consent to become a Member shall succeed to all of the rights and interests of its predecessor as well as the voting and other rights of a Member if such rights were not held by the predecessor.  A successor in interest who does not receive the requisite consent to become a Member shall not have any right to vote, shall be entitled only to the distributions to which its predecessor otherwise would have been entitled and shall have no right to participate in the management of the business and affairs of the Company or to become a Member.

(c)	No Transfer of any Company Interest otherwise permitted under this Agreement shall be effective for any purpose whatsoever until the transferee shall have assumed

the transferor's obligations to the extent of the Company Interest that is Transferred, and shall have agreed to be bound by all the terms and conditions hereof, by written instrument, duly acknowledged, in form and substance reasonably satisfactory to the Manager.  Without limiting the foregoing, any transferee that has not become a substituted Member shall nonetheless be bound by the provisions of this Article XI with respect to any subsequent Transfer.  Upon admission of the transferee as a substituted Member, the transferor shall have no further obligations under this Agreement with respect to that portion of its Company Interest that is Transferred to the transferee; *provided, however,* no Member or former Member shall be released, either in whole or in part, from any liability of such Member to the Company pursuant to this Agreement or otherwise which has accrued through the date of such Transfer (whether as the result of a voluntary or involuntary Transfer) of all or part of such Member's Company Interest unless the Manager agrees to any such release.

<u>**Conditions to Substitution**</u>.  As conditions to its admission as a Member (a) any assignee, transferee or successor of a Member shall execute and deliver such instruments, in form and substance satisfactory to the Manager, as the Manager shall deem necessary, and (b) such assignee, transferee or successor shall pay all reasonable expenses in connection with its admission as a substituted Member.

<u>**Admission as a Member**</u>.  No Person shall be admitted to the Company as a Member unless either (a) the Membership Interest or part thereof acquired by such Person has been registered under the Securities Act, and any applicable state securities Laws or (b) the Manager has received a favorable opinion of the transferor's legal counsel or of other legal counsel acceptable to the Manager to the effect that the Transfer of the Membership Interest to such Person is exempt from registration under those Laws.  The Manager, however, may waive the requirements of this Section 11.5.

**Article XII**
**WITHDRAWAL, DISSOLUTION AND TERMINATION**

<u>**Withdrawal**</u>.  No Member shall have any right to voluntarily resign from the Company.  When a transferee of all or any portion of a Membership Interest becomes a substituted Member pursuant to Section 11.3, the transferring Member shall cease to be a Member with respect to the portion of the Membership Interest so Transferred.

<u>**Dissolution**</u>.  The Company shall be dissolved upon the occurrence of any of the following:

(a)     The written determination of the Manager;

(b)     The sale of all or substantially all of the assets of the Company; or

(c)     The sale, acquisition or dissolution and final liquidation of the Operating Company.

<u>**Liquidation**</u>.  Upon dissolution of the Company, the Manager shall appoint in writing one or more liquidators (who may be Members or the Manager) who shall have full authority to wind up the affairs of the Company and to make a final distribution as provided

26

herein.  The liquidator shall continue to operate the Company properties with all of the power and authority of the Manager.  The steps to be accomplished by the liquidator are as follows:

(a)  As promptly as possible after dissolution and again after final liquidation, the liquidator shall cause a proper accounting to be made by the Company's independent accountants of the Company's assets, liabilities and operations through the last day of the month in which the dissolution occurs or the final liquidation is completed, as appropriate, including in such accounting the Profit or Loss resulting from the actual or deemed sale or distribution of the Company's properties, as provided in Section 10.2(b).

(b)  The liquidator shall pay all of the debts and liabilities of the Company or otherwise make adequate provision therefor (including, without limitation, the establishment of a cash escrow fund for contingent liabilities in such amount and for such term as the liquidator may reasonably determine).  The liquidator shall then, by payment of cash or property (at the election of the liquidator, and, in the case of property, valued as of the date of termination of the Company at its fair market value by an appraiser selected by the liquidator), distribute all remaining amounts to the Members in accordance with their respective Capital Account Balances.  For purposes of this Article XII, a distribution of an asset or an undivided interest in an asset in-kind to a Member shall be considered a distribution of an amount equal to the fair market value of such asset or undivided interest.  Each Member shall have the right to designate another Person to receive any property that otherwise would be distributed in kind to that Member pursuant to this Section 12.3.

(c)  Any real property distributed to the Members shall be conveyed by special warranty deed and shall be subject to the operating agreements and all Liens, contracts and commitments then in effect with respect to such property, which shall be assumed by the Members receiving such real property.

(d)  Except as expressly provided herein, the liquidator shall comply with any applicable requirements of the Act and all other applicable Laws pertaining to the winding up of the affairs of the Company and the final distribution of its assets.  Liquidation of the Company shall be completed within the time limits imposed by Treasury Regulations § 1.704-1(b)(2)(ii) and (g).

(e)  The distribution of cash or property to the Members in accordance with the provisions of this Section 12.3 shall satisfy each Member's rights with respect to the Member's respective Capital Contributions and interests in the profits of the Company, and shall constitute a complete distribution to the Members of their respective interests in the Company and all Company property.  Notwithstanding any other provision of this Agreement, no Member shall have any obligation to contribute to the Company, pay to any other Member or pay to any other Person any deficit balance in such Member's Capital Account.

**Articles of Dissolution**.  Upon the completion of the distribution of the Company's assets as provided in this Article XII, the Company shall be terminated and the Person acting as liquidator shall file a articles of dissolution and shall take such other actions as may be necessary to terminate the Company.

Article XIII
**NOTICES**

**Method of Notices**.  All notices required or permitted by this Agreement shall be in writing and shall be hand delivered, sent by registered or certified mail or by nationally recognized overnight courier, or by facsimile or other electronic transmission (including electronic mail).  Any such notice or communication shall be deemed to have been delivered and received (a) in the case of personal delivery, on the date of such delivery, (b) in the case of registered or certified mail, on the third Business Day following that on which the piece of mail containing such communication is posted, (c) in the case of a nationally recognized overnight courier in circumstances under which such courier guarantees next Business Day delivery, on the next Business Day after the date sent, and (d) in the case of facsimile or electronic transmission (including electronic mail), on the date sent if such date is a Business Day or on the next Business Day if the date sent is not a Business Day.  Any such communication shall be sent to the Members at their respective addresses set forth in their Subscription Documents, and to the Company and Manager at the following:

Beechwood Reinvestment, LLC
[_____]
[_____]
Attn:  Manager
Email:  [_____]
Facsimile:  [_____]

Any Member or Manager may give notice from time to time changing its respective address for that purpose.

**Computation of Time**.  In computing any period of time under this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday or legal holiday.

Article XIV
**GENERAL PROVISIONS**

**Amendment**.  This Agreement may not be amended except by an instrument in writing signed by the Manager that has been approved by a Required Interest of Members in accordance with this Agreement unless otherwise expressly provided in this Agreement. Notwithstanding the above, any amendment that has a material adverse effect on the Capital Account of any Member, imposes on a Member an obligation to make additional Capital Contributions or adversely affects a Member's rights under this Agreement shall not be effective against such Member without the prior written consent of such Member (such consent may not be unreasonably withheld); *provided*, *however*, that the admittance of new Members or the dilution of the Percentage Interests or other rights of Members occasioned by the increase in Membership Interests in accordance with the terms of this Agreement or the admittance of such

28

new Members shall not constitute an adverse effect on a Member for purposes of this Section 14.1.

**Governing Law; Venue**.  This Agreement shall be governed by and construed under the laws of the State of Delaware as applied to agreements among Delaware residents made and to be performed entirely within Delaware.  Any action, proceeding or dispute arising hereunder, or concerning the subject matter of this Agreement must be commenced, prosecuted and adjudicated in the state or federal courts located in New York City, New York.  Each Member irrevocably consents to personal jurisdiction in New York City, New York, and irrevocably waives any objection such person may have based on personal jurisdiction, improper venue or inconvenient forum.

**Waiver**.  Except as otherwise provided herein, rights hereunder may not be waived except by an instrument in writing signed by the party sought to be charged with the waiver.

**Power of Attorney**.

(a)      Each Member, by becoming a party to and agreeing to be bound by this Agreement, irrevocably constitutes and appoints, with full power of substitution, the Manager its true and lawful attorney-in-fact with full power and authority, in its name, place and stead to execute, certify, acknowledge, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Agreement, including but not limited to:

(i)      all certificates and other instruments (including counterparts of this Agreement and the Certificate of Formation), and any amendments thereto, which the Manager deems necessary to form, qualify or continue the Company as a limited liability company (or another entity in which the Members will have limited liability comparable to that provided by the Act on the Effective Date) in any jurisdiction in which the Company may conduct business,

(ii)      any other instrument or document which may be required to be filed by the Company under the Laws of any state or other jurisdiction or which the Manager deem advisable to file to qualify the Company to do business therein or to comply with applicable Law;

(iii)      any instrument or document, including amendments to this Agreement and the Certificate of Formation, which may be required to effect the continuation of the Company, the admission of any Member, or the dissolution and termination of the Company; *provided* that such continuation, admission or dissolution and termination are in accordance with the terms of this Agreement; and

(iv)      all elections that may be made by the Company or the Members in respect of the Company under the Code.

(b)      The appointment by each Member of the Manager as its attorney-in-fact is irrevocable and shall be deemed to be a power coupled with an interest, in recognition of the fact that each of the Members under this Agreement will be relying upon the power of the Manager

29

to act as contemplated by this Agreement in any filing and other action by the Manager on behalf of the Company, and shall survive and not be affected by the subsequent bankruptcy, insolvency or dissolution of any Member hereby giving such power and the Transfer or assignment of all or any part of the Membership Interest of such Member; *provided, however*, that in the event of the Transfer by a Member of all or any part of its Membership Interest, the foregoing power of attorney of the transferor shall survive such Transfer only until such time, if any, as the transferee shall have been admitted to the Company as a Member and all required documents and instruments shall have been duly executed to effect such substitution.  Notwithstanding anything to the contrary contained in this Section 14.4, the power of attorney granted pursuant to this Section 14.4 does not empower the Manager to exercise such power to take any action that is not otherwise permitted under this Agreement, or that requires the consent of any Member unless such consent has been given by such Member.

      <u>**Confidentiality**</u>.  Each Member will keep confidential and not use, reveal, provide or transfer to any third party any Confidential Information it obtains or has obtained concerning the Company, except (a) to the extent that disclosure to a third party is required by applicable Law; (b) information which, at the time of disclosure, is generally available to the public (other than as a result of a breach of this Agreement or any other confidentiality agreement to which such Person is a party or of which it has actual knowledge), as evidenced by generally available documents or publications; (c) information that was in its possession prior to disclosure (as evidenced by appropriate written materials) and was not acquired directly or indirectly from the Company; (d) to the extent disclosure is necessary or advisable, to its or the Company's employees, consultants or advisors for the purpose of carrying out their duties hereunder; (e) to banks or other financial institutions or agencies or any independent accountants or legal counsel or investment advisors employed by the Manager, the Company or any Member, to the extent disclosure is necessary or advisable to obtain financing; (f) to the extent necessary, disclosure to third parties to enforce this Agreement, or (g) to a Member or Manager or to their respective Affiliates; *provided, however*, that in each case of disclosure pursuant to (d), (e) or (g), the Persons to whom disclosure is made agree to be bound by this confidentiality provision. The obligation of each Member and Manager not to disclose Confidential Information except as provided herein shall not be affected by the termination of this Agreement or the replacement of the Manager or any Member.

      <u>**Applicable Law**</u>.  This Agreement shall be construed in accordance with and governed by the Laws of the State of Delaware, excluding its conflicts of laws rules.

      <u>**Entire Agreement**</u>.  This Agreement embodies the entire understanding and agreement among the parties concerning the Company and supersedes any and all prior negotiations, understandings or agreements in regard thereto.

      <u>**Counterparts**</u>.  This instrument may be executed and delivered (including by facsimile with written confirmation of receipt (or other electronic transmission)) in any number of counterparts each of which shall be considered an original.

      <u>**Additional Documents**</u>.  The Members hereto covenant and agree to execute such additional documents and to perform additional acts as are or may become necessary or convenient to carry out the purposes of this Agreement.

HROBOU\115491.2

**No Third Party Beneficiaries**.  This Agreement is for the sole benefit of the Members, and no other Person is intended to be a beneficiary of this Agreement or shall have any rights hereunder.

**Counsel to the Company**.  Counsel to the Company may also be counsel to the Manager.  The Manager may execute on behalf of the Company and the Members any consent to the representation of the Company that counsel may request pursuant to the New York Rules of Professional Conduct or similar rules in any other jurisdiction  ("Rules").  The Company has initially selected Bryan Cave LLP ("Company Counsel") as legal counsel to the Company.  Each Member acknowledges that Company Counsel does not represent any Member in its capacity as a Member in the absence of a clear and explicit written agreement to such effect between the Member and Company Counsel (and then only to such extent as set forth in the such agreement), and that in the absence of any such agreement Company Counsel shall owe no duties directly to a Member.  In the event any dispute or controversy arises between any Member and the Company, or between any Member or the Company, on the one hand, and the Manager or any Affiliate of the Manager that Company Counsel represents, on the other hand, then each Member agrees that Company Counsel may represent such Manager or the Company (and in the case where the dispute is between any Member, on the one hand, and both the Manager and the Company, on the other hand, Company Counsel may represent both the Company and the Manager) in any such dispute or controversy to the extent permitted by the Rules, and each Member hereby consents to such representation.  Each Member further acknowledges that, whether or not Company Counsel has in the past represented or is currently representing such Member with respect to other matters, Company Counsel has not represented the interests of any Member in the preparation and negotiation of this Agreement.  Notwithstanding the provisions of Section 14.8 (Entire Agreement), this Section 14.12 shall be treated as a supplement to, and not a substitution or replacement for, any other waiver, consent or agreement provided to the Company Counsel by any Person.

**[Signatures page follows.]**

31

**MANAGER:**

_____
David Levy

**MEMBERS:**

All those Members who have executed a
Subscription Agreement and Special Power of
Attorney, originals of which are on file with the
Company

32

**BC Draft**
**7/3/2013**

# BEECHWOOD REINVESTMENT, LLC

# SUBSCRIPTION DOCUMENTS

**The Membership Interests referred to in the attached Subscription Agreement have not been registered under the Securities Act of 1933, as amended, (the "Securities Act") and may not be sold, transferred, assigned or hypothecated without the consent of the Manager and unless there is an effective registration statement under the Securities Act covering such securities or the Manager receives an opinion of counsel for the holder reasonably satisfactory to the Manager stating that such sale, transfer, assignment or hypothecation is exempt from the registration and prospectus delivery requirements of the Securities Act.**

**A Subscriber should be prepared to bear the economic risk of an investment in the Company for an indefinite period of time because the Membership Interests have not been registered under the Securities Act or the laws of any other jurisdiction, and, therefore, cannot be sold unless they are subsequently registered or an exemption from registration is available.  There is no obligation of the Company to register the Membership Interests under the Securities Act or the laws of any other jurisdiction.  Transfer of the Membership Interests is also restricted by the terms of the LLC Agreement relating thereto.**

## SUBSCRIPTION INSTRUCTIONS

Prospective investors in Beechwood Reinvestment, LLC, a Delaware limited liability company (the "Company"), must complete and deliver these Subscription Documents as instructed below.

**1.**   *Review Company Documents:*

You should read carefully the Limited Liability Company Agreement of the Company (the "LLC Agreement").

**2.**   *Completion of the Documents:*

a.   **Subscriber:**   The word "Subscriber" is the person for whose account the Membership interests in the Company (the "Membership Interests") are being purchased.   Another person with investment authority may execute the Subscription Documents on behalf of Subscriber, but should indicate the capacity in which he or she is doing so and the name of the Subscriber.

b.   **Subscription Agreement and Investor Qualification Questionnaire:** Complete all requested information in the attached Subscription Agreement and Investor Qualification Questionnaire and date and sign the appropriate signature pages. By executing the Subscription Agreement, the Subscriber adopts the LLC Agreement and authorizes the Manager to execute the LLC Agreement on behalf of Subscriber.

c.   **IRS Form W-9:** Complete and sign IRS Form W-9 to certify your tax identification number attached as Exhibit A.

If you are investing through multiple entities, please make additional copies of these documents as necessary, ensuring that all documents are completed for each entity investing in the Company.

**3.**   *Delivering Subscription Documents and Authorization:*

One completed and signed copy of the Subscription Agreement and Investor Qualification Questionnaire, together with any required evidence of authorization, should be delivered to [counsel for] the Company via overnight courier as follows:

[_____]
Attention: [_____]
Facsimile: [_____]
Email: [_____]

i

**4.** *Making Capital Contributions:*

Capital Contributions will be due upon the Manager informing you of his acceptance of your signed Subscription Documents.  Your Capital Contribution shall be made by wire transfer as follows:

Wire Routing Transit Number: [_____]

Bank Name: [_____]

City, State: [_____]

Account Number: [_____]

Title of Account:  [_____]

Capital Contributions will be held by the Company pending the Company's investment in Beachwood Reinsurance LLC, and shall be promptly returned to you, without interest, if such investment does not close on or before [_____], 2013.

**5.** *Additional Required Documents:*

The Manager reserves the right to request any additional documentation necessary to verify your identity.  Please be aware that your failure to provide such documentation may delay your acceptance by the Manager or cause your subscription request to be rejected entirely.

**6.** *Additional Information:*

Questions about the Subscription Documents and procedures should be directed to David Levy at [_____].  If your subscription is accepted, the Manager will countersign your Subscription Agreement to confirm your admission to the Company and will send you a copy of the fully-executed signature page.

HROBOU\115504.1

---

### Beechwood Reinvestment, LLC
#### SUBSCRIPTION AGREEMENT

---

Beechwood Reinvestment, LLC
[_____]
[_____]

Dear Sir and Madam:

Beechwood Reinvestment, LLC, a Delaware limited liability company (the "Company"), has been formed pursuant to the Delaware Limited Liability Company Act and will be operated in accordance with its Limited Liability Company Agreement (as amended from time to time, the "LLC Agreement"). The Company was formed for the purpose of making an equity investment in Beachwood Reinsurance LLC, a limited liability company formed under the laws of the Cayman Islands, British West Indies. The Manager of the Company is David Levy (the "Manager"). Capitalized terms used herein but not otherwise defined herein shall have the meanings given to them in the LLC Agreement. The initial closing of the offering (the "Initial Closing") is expected to occur on _____, 2013 for any amount of subscriptions. At each Closing, investors will be required to tender all of their total Capital Contributions subscribed for at such Closing. Following the Initial Closing, the Manager may accept additional subscriptions in accordance with the LLC Agreement.

1.      **Subscription.**  Subject to the terms and conditions hereof, the undersigned ("Subscriber") hereby tenders a subscription for a Capital Contribution in the amount set forth on the signature page hereto (the "Subscription") for Membership Interests in the Company (the "Membership Interests"). The Subscription shall be due and payable by wired funds upon the Manager's acceptance of this Subscription Agreement.

2.      **Acceptance of Agreement; Obligations Under LLC Agreement.**  It is understood and agreed that this Agreement is made subject to the following terms and conditions:

(a)      The Manager shall have the right to accept or reject Subscriber's Subscription in the Manager's sole and absolute discretion, and this Subscription Agreement and the Subscription shall be deemed to be accepted by the Manager only when Subscriber has been admitted into the Company as a Member.

(b)      If this Subscription Agreement and the Subscription are accepted by the Manager and the conditions set forth in Section 3 below are satisfied, the Manager will execute as attorney-in-fact for Subscriber and the remainder of the Members, a LLC Agreement substantially in the form delivered to Subscriber.

1

(c)      Subscriber agrees to be bound by all the terms and provisions of the LLC Agreement and to perform all obligations therein imposed upon a Member with respect to Subscriber's Membership Interests.

(d)      Subscriber understands that Subscriber's Membership Interests will not be evidenced by a certificate subject to Article 8 of the Uniform Commercial Code.

**3.      Closing; Conditions to Closing.**

(a)      <u>Time and Place of Closing</u>.  The closing of the sale and purchase of the Membership Interests and admission as a Member to the Company (the "<u>Closing</u>") shall take place at such place and on such date as shall be selected by the Manager.

(b)      <u>Undersigned's Conditions to Closing</u>.  Subscriber's obligations hereunder are subject to the following conditions: (i) the representations and warranties of the Manager contained in this Agreement shall be true and correct at the Closing; (ii) the Manager shall have performed and complied with all agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing; and (iii) Subscriber has received and had the opportunity to review any changes made to the LLC Agreement following the original delivery of such documents to Subscriber.

(c)      <u>Company's Conditions to Closing</u>.  The Company's obligations hereunder are subject to the following:  (i) Subscriber's representations and warranties contained in this Agreement shall be true and correct at the Closing; and (ii) all proceedings in connection with the transactions contemplated hereby and all documents and instruments incident to such transactions shall be satisfactory in substance and form to the Company and the Company shall have received all such counterpart originals or certified or other copies of such documents as the Company may reasonably request.

(d)      <u>Authorizations</u>.  Upon acceptance of this Agreement and the Subscription by the Manager, and the admission of Subscriber to the Company as a Member, Subscriber authorizes the Manager to (i) execute the LLC Agreement on behalf of Subscriber and Subscriber agrees to be bound by and comply with the terms of the LLC Agreement and (ii) enter the undersigned's name on its records as holder of the Membership Interests.  The Membership Interests to be created on account of this Agreement shall be registered only in the name of Subscriber.

**4.      Representations and Warranties by the Manager.**  The Company represents, warrants and agrees as follows:

(a)      <u>Organization and Standing of the Company</u>.  The Company is duly and validly organized and validly existing as a limited liability company under the laws of Delaware, and has all requisite power and authority under the LLC Agreement and such laws to conduct its business as described in the LLC Agreement.

(b)      <u>Compliance with Other Instruments</u>. The Company is not in violation of any term of the LLC Agreement nor is it in material violation of any term or any other mortgage,

HROBOU\115504.1

indenture, contract, agreement, instrument, judgment, decree, order, statute, rule or regulation which is applicable or to which it is bound.

(c)  <u>Governmental and Regulatory Approval</u>.  Neither the execution and delivery of the Subscription Agreements or the LLC Agreement, nor the offer, issuance or sale of the Membership Interests, requires any consent, approval or authorization from, or filing, registration or qualification with, any federal, state or local governmental or regulatory authority in the United States (including, without limitation, registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>")) on the part of the Company, except for compliance by the Company with Regulation D promulgated under the Securities Act ("<u>Regulation D</u>"), and the requirements of any application state securities laws, all of which filings required to be made prior to the Closing have been or will have been made.

**5.  Representations and Warranties.**  In consideration of the sale of the Membership Interests, Subscriber hereby represents and warrants to the Company that:

(a)  Subscriber is an Accredited Investor as defined in Regulation D.

(b)  The Membership Interests subscribed for are being acquired by Subscriber for investment purposes only, for Subscriber's own account and not with the view to any resale or distribution thereof, and Subscriber is not participating, directly or indirectly, in an underwriting of such Membership Interests, and will not take, or cause to be taken, any action that would cause Subscriber to be deemed an "underwriter" of such Membership Interests as defined in Section 2(11) of the Securities Act.

(c)  Subscriber acknowledges that Subscriber has been offered an opportunity to ask questions of, and receive answers from, the Manager concurrently with this offering, concerning the Company and its proposed investments, and that the Manager has fully complied with any request for such information.

(d)  Subscriber has been furnished any documents that may have been made available upon request, has carefully read such documents, understands and has evaluated the risks of a purchase of the Membership Interests.

(e)  Subscriber has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of an investment in the Membership Interests, is able to bear such risks, and has obtained, in Subscriber's judgment, sufficient information from the Manager to evaluate the merits and risks of an investment in the Membership Interests.  Subscriber has determined that the Membership Interests are a suitable investment for Subscriber.

(f)  Subscriber has reviewed Subscriber's financial condition and commitments, alone and together with Subscriber's advisers (if any).  Based on such review, Subscriber is satisfied Subscriber has adequate means of providing for his, her or its financial needs and possible contingencies, and those of Subscriber's dependents, and that Subscriber does not have any need for liquidity of the funds being utilized in the purchase of the Membership Interests.  Subscriber has assets or sources of income which, taken together, are more than

3

sufficient so that Subscriber could bear the risk of loss of his, her or its entire investment in the Company.

(g)     Any information Subscriber has furnished to the Manager with respect to Subscriber's financial position and business experience, including the Investor Qualification Questionnaire delivered to the Manager, is correct and complete as of the date of this Subscription Agreement and if there should be any material change in such information prior to Subscriber's admission to the Company as a Member, Subscriber will immediately furnish such revised or corrected information in writing to the Company (through its Manager).

(h)     If Subscriber is signing this Subscription Agreement on behalf of an entity, Subscriber is authorized and otherwise duly qualified to make an investment decision for such entity to invest in the Membership Interests.

(i)     Subscriber hereby reconfirms as representations and warranties, as though fully set forth herein, each of Subscriber's statements and answers set forth in the Investor Qualification Questionnaire Subscriber delivered to the Manager.

(j)     The execution, delivery and performance by Subscriber of this Subscription Agreement are within Subscriber's powers and will not constitute or result in a breach or default under or conflict with any order, ruling or regulation of any court or other tribunal or of any governmental commission or agency, or any agreement or other undertaking, to which Subscriber is a party or by which Subscriber is bound, and, if Subscriber is not an individual, will not violate any provisions of the incorporation papers, bylaws, indenture of trust or partnership agreement, as may be applicable, of Subscriber.  Subscriber's signature on this Subscription Agreement is genuine, and the signatory, if Subscriber is an individual, has legal competence and capacity to execute the same, and this Subscription Agreement constitutes a legal, valid and binding obligation of Subscriber, enforceable in accordance with its terms.

(k)     In making Subscriber's decision to invest in the Membership Interests, Subscriber has relied solely upon independent investigations made by Subscriber.  Subscriber is not relying on the Company or the Manager with respect to tax and other economic considerations involved in acquiring the Membership Interests.

(l)     Subscriber understands that the Company will not register as an investment company under the Investment Company Act, by reason of the provisions of Section 3(c)(1) and Section 3(c)(7) thereof.

(m)     No representations or warranties have been made to Subscriber by the Company or the Manager, or any officer, employee, agent or affiliate of any of them.

(n)     Subscriber acknowledges and agrees that the written disclosures made in the LLC Agreement and these Subscription Documents shall be controlling over any oral statements.

**6.     Restrictions on Transferability.**  Subscriber realizes that the Company has not and does not intend to file periodic reports with the Securities and Exchange Commission pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as

4

amended.   Subscriber also understands that the Company has not agreed to register the Membership Interests for distribution in accordance with the provisions of the Securities Act or any applicable state securities laws, and that the Company has not agreed to comply with any exemption under the Securities Act or any such laws for the resale of the Membership Interests. Hence, Subscriber understands that by virtue of the provisions of certain rules relating to "restricted securities" promulgated under the Securities Act, the Membership Interests which Subscriber has subscribed for hereby must be held indefinitely, unless and until subsequently registered under the Securities Act and/or applicable state securities laws or unless an exemption from registration is available, in which case Subscriber may still be limited with respect to the extent to which such Membership Interests may be transferred.   As a consequence, Subscriber understands that Subscriber must bear the economic risks of the investment in the Membership Interests for an indefinite period of time.

      **7.**   **Subscriber Awareness.**   Subscriber acknowledges, represents, agrees and is aware that:

      (a)   No federal or state agency has passed upon the Membership Interests or made any findings or determination as to the fairness of this investment.

      (b)   The representations, warranties, agreements and acknowledgments Subscriber makes herein are made with the intent that they be relied upon by the Company and the Manager in determining Subscriber's suitability as an investor, and shall survive Subscriber's admission as a Member of the Company.   In addition, Subscriber undertakes to notify the Company immediately of any change in any representation, warranty or other information set forth herein relating to Subscriber.

      (c)   No representation or warranties have been made to Subscriber by the Company, the Manager, or any managing director, officer, employee, agent or affiliate of any of them.

      **8.**   **Indemnities.**   Subscriber agrees to indemnify and hold harmless the Company and the Manager, and each other person, if any, who controls or is controlled by any of them, within the meaning of Section 15 of the Securities Act, against any and all loss, liability, claim, damage and expense whatsoever (including, but not limited to, any and all expenses whatsoever reasonably incurred in investigating, preparing or defending against any litigation commenced or threatened or any claim whatsoever) arising out of or based upon any false representation or warranty or breach or failure by Subscriber to comply with any covenant or agreement made by Subscriber, in this Subscription Agreement or in any other document furnished by Subscriber to any of the foregoing in connection with this transaction.   Subscriber hereby acknowledges that where any subscription agreement, transfer request or other document ("<u>Document</u>") is sent to the Manager by way of facsimile the fact that a transmission report produced by the originator of such transmission discloses that the transmission was sent will not be sufficient proof of receipt by the Manager.   The Manager will not be liable for any loss arising as a result of acting or failing to act on the basis of any Document sent by facsimile.   Subscriber agrees to indemnify the Manager from and against any and all actions, losses, costs, charges, expenses and demands of any kind which may at any time hereafter be incurred by the Manager in consequence of accepting and acting upon or failing to act upon any Document sent by facsimile.

5

**9.** **Power of Attorney.**

(a)     By executing this Subscription Agreement, Subscriber is hereby granting a special power of attorney, making, constituting and appointing the Manager as Subscriber's attorney-in-fact, with power and authority to act in Subscriber's name and on Subscriber's behalf to execute, acknowledge and swear to the execution, acknowledgment and filing of the following documents:

(i)     the LLC Agreement, substantially in the form provided to Subscriber, with such changes as are not materially adverse to Subscriber;

(ii)     any other instrument or document which may be required to be filed by the Company under the laws of any state or by any governmental agency, or which the Manager deems advisable to file; and

(iii)     any instrument or document which may be required to effect the continuation of the Company, the admission of an additional or substituted Member, or the dissolution and termination of the Company (provided such continuation, admission or dissolution and termination are in accordance with the terms of the LLC Agreement), or to reflect any reductions in amount of contributions of Members.

(b)     The special power of attorney being granted hereby by each Member:

(i)     is a special power of attorney coupled with an interest, is irrevocable, and shall survive the death or legal incapacity of Subscriber;

(ii)     may be exercised by the Manager signing individually for each Member or for all of the Members executing any particular instrument; and

(iii)     shall survive an assignment by Subscriber of its Membership Interests in the Company except that, where the assignee of the Membership Interests owned by a Member has been approved by the Manager for admission to the Company as a substituted Member, the special power of attorney shall survive such assignment for the sole purpose of enabling the Manager to execute, acknowledge and file any instrument or document necessary to effect such substitution.

(c)     In the event of any conflict between the LLC Agreement and any document filed pursuant to this power of attorney, the LLC Agreement shall control.

The exercise of this power of attorney shall be subject to the Manager's responsibility to obtain the approval of the Members on such matters as required by the LLC Agreement or by applicable law.

**10.** **Survival of Agreements, Representations and Warranties.**  All agreements, representations and warranties contained herein or made in writing by or on behalf of the Company in connection with the transactions contemplated by this Agreement shall survive the execution and delivery of this Agreement, any investigation at any time made by Subscriber or

on Subscriber's behalf, and the sale and purchase of the Membership Interests in the Company and payment therefor.

**11.    Revocability.**  Subscriber understands and agrees that Subscriber may not cancel, terminate, or revoke this Subscription Agreement.

**12.    Notice.**  Any notices or other communications in connection herewith shall be sufficiently given if sent by registered or certified mail, postage prepaid, and (a) if to the Company, at the address at the head of this Subscription Agreement, and (b) if to Subscriber, at the address set forth below, or (c) at such other address as either Subscriber or the Company shall designate to the other by notice in writing.

**13.    Successors and Assigns.**  This Subscription Agreement shall be binding upon and shall inure to the benefit of the parties hereto and to the successors and assigns of the Company and to the personal and legal representatives, heirs, guardians, successors, and permitted assignees of Subscriber.

**14.    Modification.**  Neither this Subscription Agreement nor any provision hereof shall be modified, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, change, discharge or termination is sought.

**15.    Entire Agreement.**  This Subscription Agreement, the Investor Qualification Questionnaire and other agreements or documents referred to herein or in the LLC Agreement contain the entire agreement of the parties.  There are no representations, warranties, covenants or other agreements except as stated or referred to herein and in such other agreements or documents.

**16.    Beneficial Ownership.**  If Subscriber is acting as trustee, agent, representative or nominee for a subscriber ("Beneficial Owner"), Subscriber understands and acknowledges that the representations, warranties and agreements made herein are made by Subscriber (a) with respect to Subscriber, and (b) with respect to the Beneficial Owner of Subscriber subscribed for hereby.  Subscriber further represents and warrants that he or she has all requisite power and authority from said Beneficial Owner to execute and perform the obligations under this Subscription Agreement.  Subscriber also agrees to indemnify the Company, the Manager, and each of their officers and agents for any and all costs, fees and expenses (including legal fees and disbursements) in connection with any damages resulting from Subscriber or the Beneficial Owner's misrepresentation or misstatement contained herein, or the assertion of Subscriber's lack of proper authorization from the Beneficial Owner of Subscriber subscribed for hereby to enter into this Subscription Agreement or perform the obligations hereof.

**17.    Assignability.**  This Subscription Agreement is not transferable or assignable by Subscriber.

**18.    No Waiver.**  Failure of the Company to exercise any right or remedy under this Subscription Agreement or any other agreement between the Company and Subscriber, or otherwise, or delay by the Company in exercising such right or remedy, will not operate as a waiver thereof.

**19.    Applicable Law.**  This Subscription Agreement shall be governed by and construed in accordance with the laws of the state of Delaware and, to the extent it involves any United States statute, in accordance with the laws of the United States.

**20.    Primary Place Residence or Domicile.**  Subscriber has received and accepted the offer to purchase the Membership Interests in the state of Subscriber's residence or domicile as set forth below its signature to this Agreement.  Such address is the address where Subscriber is a resident and a domiciliary and not a temporary or transient resident.

**21.    Withholding.**  The Company is required to withhold a certain portion of the taxable income and gain, if any, allocated or distributed to Subscriber unless Subscriber provides documentation confirming that such undersigned is not subject to withholding, or is subject to a reduced rate of withholding.  Each undersigned is urged to consult with a tax advisor concerning the application of the United States withholding rules to such undersigned.

*[Signature page follows.]*

HROBOU\115504.1

**For Investors that are Individuals:**

Very truly yours,                                          **Capital Contribution:**

_____          $_____
**[Print Investor Name]**

By: _____

Primary State of Residence: _____

Date: _____

**SUBSCRIPTION ACCEPTED:**

Beechwood Reinvestment, LLC
a Delaware limited liability company

By:_____
    Manager

Date:_____

[SIGNATURE PAGE TO SUBSCRIPTION AGREEMENT AND SPECIAL POWER OF ATTORNEY]

**For Investors that are Entities:**

Very truly yours,                                          **Capital Contribution:**

_____          $_____
**[Print Investor Name]**

By:_____

Title:_____

State of Organization: _____

Primary State of Operations: _____

Date: _____

**SUBSCRIPTION ACCEPTED:**

Beechwood Reinvestment, LLC
a Delaware limited liability company

By:_____
     Manager

Date:_____

[SIGNATURE PAGE TO SUBSCRIPTION AGREEMENT AND SPECIAL POWER OF ATTORNEY]

HROBOU\115504.1

---

### Beechwood Reinvestment, LLC
#### INVESTORS QUALIFICATION QUESTIONNAIRE

---

Information furnished in this questionnaire will be kept strictly confidential, except that the Manager may present the information to such regulatory bodies or other parties as may be appropriate to establish the availability of exemptions from certain securities law registration requirements or the compliance of the Company and this offering with applicable securities laws.

**A.      General Information**

1.      Full Name of Subscriber:          _____

2.      Address for Notices:          _____
                                          _____

3.      Telephone Number:          _____

4.      Facsimile Number:          _____

5.      Address of Main Office:          _____
        (if different from above)          _____

6.      Address of Registered Office:          _____
        (if different from above)          _____

7.      Social Security No./IRS Taxpayer ID: _____

8.      Date of Birth:          _____

9.      E-mail Address:          _____

**B.      Subscriber Contact Information**

*Primary Contact:*

10.     Name:          _____

11.     Address:          _____
        (if different from above)          _____

12.     Telephone Number:          _____

13.     Facsimile Number:          _____

14.     E-mail:          _____

HROBOU\115504.1

***Custodian (if any):***

15.    Name:                            _____

16.    Address:                        _____
       (if different from above)       _____

17.    Telephone Number.               _____

18.    Facsimile Number:               _____

19.    E-mail:                         _____

**C.    Investment Experience**

Approximate number of years Subscriber (or Custodian) has been investing:  _____ years

| *Please check frequency of Subscriber's (or Custodian's) investments in:* | Often | Occasionally | Seldom | Never |
|---|:---:|:---:|:---:|:---:|
| Marketable securities (stocks, bonds, debentures, options) | ☐ | ☐ | ☐ | ☐ |
| Speculative or venture capital investments | ☐ | ☐ | ☐ | ☐ |
| Other private investment funds | ☐ | ☐ | ☐ | ☐ |

**OTHER EXPERIENCE OF SUBSCRIBER**

Other positions/background related to       _____
financial, business, accounting, economics, _____
taxation or investment matters that         _____
demonstrate investment sophistication       _____

2

**D.**     **Accredited Investor Status**

Subscriber represents and warrants that Subscriber is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "Securities Act"), and has checked the box or boxes below which are next to the category or categories under which Subscriber qualifies as an accredited investor:

☐   (a)          A bank as defined in Section 3(a)(2) of the Securities Act or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act, whether acting in its individual or fiduciary capacity.

☐   (b)          An insurance company as defined in Section 2(13) of the Securities Act.

☐   (c)          A broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934.

☐   (d)          An investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act").

☐   (e)          A business development company as defined in Section 2(a)(48) of the Investment Company Act.

☐   (f)          A small business investment company licensed by the Small Business Administration under Section 301(e) or (d) of the Small Business Investment Act of 1958.

☐   (g)          A private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "Advisers Act").

☐   (h)          A corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring Interests, with total assets in excess of $5 million.

☐   (i)          A trust with total assets in excess of $5 million not formed for the specific purpose of acquiring Interests, whose purchase is directed by a sophisticated person with such knowledge and experience in financial and business matters as described in Rule 506(b)(2)(ii) of Regulation D under the Securities Act as to be capable of evaluating the merits and risks of an investment in the Membership Interests.

☐   (j)          An individual with annual income in excess of $200,000 U.S. dollars or joint income with a spouse in excess of $300,000 in each of the two most recent years, and a reasonable expectation of reaching the same income level in the current year.

☐   (k)          An individual with net worth, or joint net worth with his or her spouse, in excess of $1,000,000 (excluding the value of the individual's primary residence).

☐ (l)     An entity in which all of the equity owners are accredited investors as determined under any of the paragraphs (a) through (k) above.  **If this box is checked, please provide the following information**:

| Name of<br>Each Equity Owner | Identify Which of<br>Paragraphs (a) - (k)<br>Above Apply |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

(Attach additional sheet(s) if necessary.)

☐ (m)     A trust for estate planning purposes that is revocable by its grantor(s) and each grantor is an accredited investor under either paragraphs (j) or (k) above ($300,000 joint or $200,000 individual income on $1,000,000 net worth).

**E.**     **Supplemental Data for Entities**

20.    If Subscriber is an entity, furnish the following supplemental data:

Legal form of entity (check one):

☐ Partnership

☐ Corporation

☐ Limited Liability Company

☐ Trust

☐ Other  (Specify): _____

Jurisdiction of organization:_____

Date of formation:_____

Number of Shareholders, Partners or Members (if applicable):_____

Paragraph number(s) in the governing instrument(s) or governing law that authorize(s) Subscriber to make an investment in the Company: _____

Authorized signatories for the investment account (lease provide specimen signatures for each):

4

_____

_____

21.   Was Subscriber organized for the specific purpose of acquiring Membership Interests?

☐   Yes          ☐   No

22.   Are shareholders, partners or other holders of equity or beneficial interests in Subscriber able to decide individually whether to participate, or the extent of their participation, in Subscriber's investment in the Company (i.e., can shareholders, partners or other holders of equity or beneficial interests in Subscriber determine whether their capital will form part of the capital invested by Subscriber in the Company)?

☐   Yes          ☐   No

23.   (a)      Please indicate whether or not Subscriber is, or is acting on behalf of:  (i) an employee benefit plan within the meaning of Section 3(3) of ERISA; (ii) a "plan" described in Section 4975 of the Code (including Individual Retirement Plans and Keogh Plans); or (iii) an entity which is deemed to hold the plan assets of any of the foregoing pursuant to 29 C.F.R. § 2510.3-101 (each a "benefit plan investor").

☐   Yes          ☐   No

(b)      Is Subscriber subject to Title I of ERISA?

☐   Yes          ☐   No

24.   Does Subscriber (or any affiliate) have discretionary authority or control, or provide investment advice for a fee (direct or indirect), with respect to the assets of the Company?  For purposes of this question (i) an "affiliate" of a person includes any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with the person and (ii) "control," with respect to a person other than an individual, means the power to influence the management or policies of such person.

☐   Yes          ☐   No

25.   Does the amount of Subscriber's subscription for Membership Interests in the Company exceed 40% of the total assets of Subscriber?

☐   Yes          ☐   No

26.   Would Subscriber be an "investment company" but for reliance on an exclusion from the definition of "investment company" in Section 3(c)(1) or Section 3(c)(7) under the Investment Company Act?

☐   Yes          ☐   No

5

27.  (a)  Is Subscriber a grantor trust, a partnership or an S-Corporation for U.S. federal income tax purposes?

☐   Yes   ☐   No

(b)  If the question above was answered "Yes," please indicate whether or not:

(i)  more than 50% of the value of the ownership interest of any beneficial owner in Subscriber is (or may at any time during the term of the Company be) attributable to Subscriber's (direct or indirect) interest in the Company; or

☐   Yes   ☐   No

(ii)  it is a principal purpose of Subscriber's participation in the Company to permit the Company to satisfy the 100 partner limitation contained in U.S. Treasury Regulation Section 1.7704-1(h)(3).

☐   Yes   ☐   No

28.  On what dates does Subscriber's tax year end?_____

**F.  U.S. Person Status**

Subscriber certifies that it is a "U.S. Person" as defined in Regulation S adopted under the 1933 Act.  Subscriber is such a "U.S. Person" under Regulation S if it is (1) a partnership or corporation organized or incorporated under the laws of the U.S.; (2) an estate of which any executor or administrator is a U.S. Person; (3) a trust of which any trustee is a U.S. Person; (4) an agency or branch of a non-U.S. entity located in the U.S.; (5) a partnership or corporation organized under the laws of any non-U.S. jurisdiction but formed by a U.S. Person principally for the purpose of investing in securities not registered under the 1933 Act (unless organized and incorporated, and owned, by accredited investors as defined in Rule 501 under the 1933 Act who are not natural persons, estates or trusts); (6) a non-discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary for a U.S. Person; or (7) a discretionary or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated or (if an individual) resident in the U.S.  For this purpose, "U.S." includes U.S. territories and possessions, and "U.S. Person" includes a natural person resident in the U.S., including a resident alien.

**G.  Persons Authorized to Act for Subscriber**

In addition to the persons authorized by the power of attorney contained in Section 9 of the Subscription Agreement, Subscriber certifies that the persons named below are authorized to act individually on behalf of this account unless otherwise noted.  Please provide name, specimen signatures and titles in the form that such person would sign documents on behalf of this account, and telephone numbers.  Please state any circumstances under which more than one signature is required to take action with respect to this account.  Such persons are the only persons so authorized until further written notice to the Company signed by one or more of such

6

persons together with (in the case of entities) appropriate documentation establishing the authority of the person seeking to action on behalf of Subscriber.

**Signatory #1:**                                         **Signatory #2:**

_____                    _____
Signature                                                 Signature

_____                    _____
Name (and title, if applicable)                    Name (and title, if applicable)

_____                    _____
Telephone number                                      Telephone number

**Signatory #1:**                                         **Signatory #2:**
_____                    _____
Signature                                                 Signature

_____                    _____
Name (and title, if applicable)                    Name (and title, if applicable)

_____                    _____
Telephone number                                      Telephone number

*[Signature Page Follows.]*

7

_____
**(Print or Type Name of Subscriber)**


`

By:_____
(Signature)


Name:_____
(Print or Type Name of Signatory)


Title:_____
(Print or Type Title of Signatory)


Dated:_____

SIGNATURE PAGE TO INVESTOR QUALIFICATION QUESTIONNAIRE

8

**EXHIBIT A**

**FORM W-9**
**(WITH INSTRUCTIONS)**

HROBOU\115504.1