EXHIBIT 41



**Unaudited Balance Sheet September 1, 2013**

### <u>ASSETS</u>

| | |
|---|---|
| Cash and Cash Equivalents | $10,387,230 |
| Limited Partnership Interests in Investment Fund "A" | $39,550,950 |
| Limited Partnership Interests in Investment Fund "B" | $27,130,392 |
| Private Shares in Company Publically Traded Company | $37,733,013 |
| ***TOTAL ASSETS*** | ***$114,801,585*** |

### <u>LIABILITIES</u>

| | |
|---|---|
| None | $   - |
| ***TOTAL LIABILITIES*** | ***$   -*** |

### <u>NET EQUITY</u>

| | |
|---|---|
| ***NET EQUITY*** | ***$114,851,585*** |

EXHIBIT 42

**To:**    Ari Hirt[ahirt@platinumlp.com]
**Cc:**    Joseph SanFilippo[JSanFilippo@platinumlp.com]
**From:**    Mark Nordlicht
**Sent:**    Mon 2/3/2014 5:50:58 PM
**Subject:**    Re: Funding Request

He is allowed to give excuse after excuse on drilling but complains incessantly on funding.

Sent from my iPad

On Feb 3, 2014, at 11:48 AM, "Ari Hirt" <ahirt@platinumlp.com> wrote:

> Mark,
> Below are the funding needs spelled out. These are all real needs. We need to fund at least 900K before you get there
> Wednesday, and probably as soon as today. These are all needs that we pushed off from last week. if we don't we
> probably will lose Dennis as well as the rig and most of the other service companies.
> Additionally, I would recommend us getting on the phone with Dennis as soon as this afternoon to discuss what has
> been going on with the drilling.
> Please advise.
> --Ari

> **From:** Barry Furlong [mailto:controller@goldengateoil.com]
> **Sent:** Monday, February 03, 2014 12:43 PM
> **To:** Ari Hirt
> **Cc:** Dennis Corkran
> **Subject:** RE: Funding Request

>> Ari,
>> Today we need $400k for A/P, and deposits (wires) already made to reimburse the account.
>>
>> Today we need $100k for Scientific Drilling deposit (wire transfer)
>>
>> Today we need $400k for Nabors Drilling deposit for well 20L
>>
>> This week we need $376k for A/P
>>
>> W/E 2/14/14  we need $122k
>>
>> Total  $1,398 k
>>
>> Barry

> **From:** Ari Hirt [mailto:ahirt@platinumlp.com]
> **Sent:** Monday, February 03, 2014 9:12 AM
> **To:** Dennis Corkran; Barry Furlong
> **Subject:** RE: Funding Request

>> So Barry, pls advise ASAP what the request should be today, tomorrow and beginning next week

> **From:** Dennis Corkran [mailto:d.corkran@goldengateoil.com]
> **Sent:** Monday, February 03, 2014 12:09 PM
> **To:** Ari Hirt; Barry Furlong
> **Subject:** RE: Funding Request
> **Importance:** High

>> I was referring to the $100k deposit with Scientific Drilling that needs to be wired to Scientific this morning if we hope
>> to be able to replace GeoGuidance before they run their tools in the hole.  Once GeoGuidance's tools are in the hole it
>> will cost us another round trip and rig up time (approx. 14 hours total lost…$$35k?) to change them out…so I will not

change them out with Scientific unless we can do it from the beginning of the redrill of the sidetrack.  The tools need to be mobilized this afternoon to get them here in time to do that.  So, if we can't wire transfer to Scientific this morning it will cost us to change them out later or live with them for the rest of this well.

I'll let Barry address the rest of the funding request.

**Dennis Corkran**
Dennis Corkran, CEO
Golden Gate Oil, LLC
D.Corkran@GoldenGateOil.com
805-623-8009 (direct); 805-623-8013 (main); 805-332-3379 (fax)
512-773-3409 (cell)
2370 Skyway Drive, Suite 101
Santa Maria, California 93455
<image001.jpg>

---

**From:** Ari Hirt [mailto:ahirt@platinumlp.com]
**Sent:** Monday, February 03, 2014 9:02 AM
**To:** Dennis Corkran; Barry Furlong
**Subject:** RE: Funding Request

What exact amount is urgent for as early as this morning? My understanding from my visit was that $487K related to payables due next week and that the $400K deposit to Nabors was due for tomorrow.  Based on the AP worksheet from last week I had requested earlier today that $740K be advanced today.  Does this make sense?

---

**From:** Dennis Corkran [mailto:d.corkran@goldengateoil.com]
**Sent:** Monday, February 03, 2014 11:57 AM
**To:** Barry Furlong; Ari Hirt
**Subject:** RE: Funding Request

Barry,

Since you didn't mention it in the text of this email I assume you already talked to Ari about this and conveyed the urgency of trying to get the wire transfer this morning.

**Dennis Corkran**
Dennis Corkran, CEO
Golden Gate Oil, LLC
D.Corkran@GoldenGateOil.com
805-623-8009 (direct); 805-623-8013 (main); 805-332-3379 (fax)
512-773-3409 (cell)
2370 Skyway Drive, Suite 101
Santa Maria, California 93455
<image002.jpg>

---

**From:** Barry Furlong
**Sent:** Monday, February 03, 2014 8:55 AM
**To:** Ari Hirt (ahirt@platinumlp.com)
**Cc:** Dennis Corkran
**Subject:** Funding Request

Ari,
I have an additional $100k deposit requirement for Scientific Drilling.  This company is going to replace GeoGuidance (directional drilling company) who is not performing .

This $100k is added to my AP Worksheet which now brings my request up to **$1,306,596.**
There are some other added items all highlighted in YELLOW.

| TOTAL A/P AGING | 997,928.28 | 401,504.46 | 487,580.96 | 108,842.86 | 997,98 |
|---|---|---|---|---|---|
| | | ---------- | ---------- | ---------- | ---------- |

| | | | |
|---|---|---|---|
| | Pay Now - Jan 27 | (367,749.74) | |
| Prior Funding Advanced | Amount from AP Recon 1/17 | 229,207.59 | Other pending cash Requi **Drilling AFE 2013-013 V** |
| Unused Advance | | | |
| | **Available Cash 1/27/14** | 236,792.41 | Incurred Costs not yet invoiced |
| | Pay by February 15, 2014 | (487,580.96) | **Drilling AFE 2013-011 W** |
| | | | Incurred Costs not yet invoiced |
| | **Est. Royalty Checks** | 27,857.57 | |
| | **Actual Royalty Checks Written** | (21,863.16) | **Drilling AFE 2013-014 W** |
| | | | Baker Hughes Deposit |
| | **Checks written not on A/P** | (21,535.93) | |
| | Checks written 1/21-1/23 | | |
| | Baker Hughes cementing 16-19L | (51,775.23) CK# 2578 | OPEX for Feb 2014 |
| | Baker Hughes cementing 16-19L | (53,812.90) CK# 2579 | G&A Feb 2014 |
| ITEMS NOT INCLUDED | Payroll 1/31/14 | (83,503.45) Paid 1/31/14 | |
| ON ABOVE AP RECON | | | |
| " | JB Dewar Diesel | (71,849.84) CK# 2580 | |
| | JD Rush - 7 5/8" drill pipe | (75,783.00) | |
| " | Schlumberger - Deposit - wire | (65,000.00) Wired 1/31/14 | |
| " | Scientific Drilling - Deposit | (100,000.00) | |

| | | | |
|---|---|---|---|
| | Cash Requirements | (906,596.64) | |
| | **Loan/Advance Request** | | |
| | | (906,596.64) | Advance Request $XXX,000 |
| **Nabors** | **Loan/Advance Request** | (400,000.00) | |
| | **TOTAL CASH REQUIREMENTS INCLUDING NABORS** | **(1,306,596.64)** | Advance Request $XXX,000 |

Barry Furlong
Controller
Golden Gate Oil LLC
Controller@goldengateoil.com
Office: 805.623.8013  Direct: 805.623.8012
FAX:  805.332.3379
2370 Skyway Dr.  Suite 101
Santa Maria, CA 93455
<image002.jpg>

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN

CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE

OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE

CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN

CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE

OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE

CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

EXHIBIT 43

## NOTE SALE AGREEMENT

This NOTE SALE AGREEMENT (this "*Agreement*") is made as of February 26, 2014 by and among PRECIOUS CAPITAL LLC, a Delaware limited liability company ("*Seller*"), the entities set forth on Schedule A hereto (each, an "*Buyer*" and collectively the "*Buyers*"), BAM ADMINISTRATIVE SERVICES, LLC ("*BAM*") and PLATINUM PARTNERS VALUE ARBITRAGE FUND LP ("*Platinum*"). All capitalized terms used in this Agreement and not otherwise defined herein will have the respective meanings set forth in the Note Purchase Agreement as hereinafter defined.

### W I T N E S S E T H :

**WHEREAS**, Seller and Golden Gate Oil LLC, a Delaware limited liability company (the "*Company*"), entered into that certain Note Purchase Agreement dated as of April 10, 2012, as amended by that certain First Omnibus Amendment to Note Purchase Agreement and Senior Secured Promissory Note, dated as of October 29, 2013 (as further amended, restated, supplemented or otherwise modified from time to time, the "*Purchase Agreement*"), pursuant to which the Company issued a senior secured promissory note (as amended and restated, the "*Note*") to Seller;

**WHEREAS**, Seller desires to sell, transfer and assign to Buyers all of Seller's right, title and interest in and to an aggregate of $21,805,500 of principal amount of the Note and $6,584,830 of interest, including deferred interest (collectively, the "*Seller's Note*"); and

**WHEREAS**, Buyers desires to purchase from the Seller the Seller's Note and to become Investors under the Purchase Agreement and the other Transaction Documents, upon the other terms and conditions hereinafter set forth;

**NOW, THEREFORE**, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Purchase and Sale of Seller's Note.  In consideration of the purchase price to be paid by Buyers set forth in Section 2 hereof, and subject to Seller's receipt of the purchase price, Seller hereby sells, assigns, transfers, conveys and delivers to Buyers, and Buyers hereby purchase from Seller all of the right, title, and interest of the Seller in and to the Seller's Note, in the amounts set forth on Schedule A hereto.  Seller has not assigned and delegated to Buyers and Buyers have not assumed or accepted Seller's obligation to make Fundings pursuant to the Purchase Agreement.

2.      Purchase Price.  The aggregate purchase price to be paid by Buyers for the Note shall be $28,390,330  (the "*Purchase Price*"), and shall be paid in full at the Closing (as hereinafter defined) as set forth on Schedule A hereto.  Seller agrees that if after the Closing it receives any payment in connection with any Transaction Document or representing the proceeds of any portion of the Collateral with respect to the Seller's Note it shall promptly pay the same to Buyers in pro rata in accordance with the Investment Percentage set forth on Schedule A hereto.

130355.00100/7342092v.3

3.    Closing.   The closing of the purchases and sales of the Seller's Note (the "*Closing*") shall take place at the offices of Blank Rome LLP at 405 Lexington Avenue, New York, New York 10174 at 10:00 a.m. on the date and year first above written, or at such other time, date and place as the parties may agree.

4.    Representations, Warranties and Covenants of Seller.   Seller hereby represents, warrants and covenants to Buyers as follows:

       a.   Power and Authority.   Seller has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

       b.   Title.   Seller has good and marketable title to the Seller's Note, free and clear of all liens, claims or encumbrances of any kind or nature (collectively, "*Liens*") (other than Liens sin favor of Investor pursuant to the Transaction Documents ("*Investor Liens*")).   Upon the consummation of the transactions contemplated by this Agreement, the Buyers will acquire good and valid title to the Seller's Note, free and clear of all Liens (other than the Investor Liens).

       c.   Authorization; Binding Obligation Seller has taken all requisite action to make valid and enforceable against Seller in accordance with its terms all of the obligations of Seller set forth in this Agreement.   This Agreement has been duly executed and delivered by Seller and constitutes the legal, valid and binding obligation of Seller, enforceable in accordance with its terms, except as may be limited by principles of equity or by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally.

       d.   No Consent. No consent, approval or authorization of any person or entity or governmental authority of any kind is required in connection with the execution and delivery by Seller of this Agreement or the consummation of the transactions contemplated by this Agreement.

       e.   Brokers and Finders.   No agent, broker, investment banker, financial advisor or other firm or person is or will be entitled to any broker's or finder's fee or any other commission or similar fee in connection with any of the transactions contemplated by this Agreement.

       f.   Outstanding Amount.   As of the date of this Agreement, the amount of the Seller's Note is equal to the full outstanding amount due under the Note, including all principal, interest, including accrued interest, and penalties.

       g.   Counterclaims. Seller has not received notice, and has no knowledge of any offsets, counterclaims or other defenses available to the Company with respect to the Note.

2

h.   Amendment. Seller has not amended or consented to any amendment to the Note, and Seller has no knowledge of and has not received notice of any amendment to the Note.

i.   Event of Default. No event of default or event which, with the passage of time or the giving of notice or both, would become an event of default has occurred and is continuing under the Note.

j.   Pledge. Seller has not pledged, assigned or terminated, in whole or in part, any of its right, title and interest in, to or under the Note other than the assignment to Buyers hereunder.

5.   Representations, Warranties and Covenants of Buyers. Each Buyer severally but not jointly hereby represents, warrants and covenants to Seller as follows:

a.   Power and Authority. Buyer has all power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby.

b.   Authorization; Binding Obligation. Buyer has taken all requisite action to make valid and enforceable against Buyer in accordance with its terms all of the obligations of Buyer set forth in this Agreement. This Agreement has been duly executed and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer, enforceable in accordance with its terms, except as may be limited by principles of equity or by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally.

c.   No Consent. No consent, approval or authorization of any person or entity or governmental authority of any kind is required in connection with the execution and delivery by Buyer of this Agreement or the consummation of the transactions contemplated by this Agreement.

d.   Brokers and Finders.   No agent, broker, investment banker, financial advisor or other firm or person is or will be entitled to any broker's or finder's fee or any other commission or similar fee in connection with any of the transactions contemplated by this Agreement.

e.   Independent Evaluation.   Buyer has received and conducted its own evaluation of the Transaction Documents and such other documents and information (including financial statements and financial information) as it deemed appropriate to make its own credit analysis and decision to enter into this Agreement and has made its decision to become an Investor under the Transaction Documents for all purposes independently and without reliance upon Seller, and will continue to do so.

3

6.   <u>Closing Deliveries – Seller</u>.  At the Closing, Seller shall deliver to BAM on behalf of the Buyers the original Note, accompanied by a duly executed instruments of transfer.

7.   <u>Closing Deliveries – Buyers</u>.  At the Closing, Buyers shall deliver to Seller the Purchase Price be a wire transfer of immediately available funds in accordance with the written payment instructions furnished by Seller to BAM on behalf of the Buyers prior to the Closing

8.   <u>Put</u>.

    a.  Upon delivery by BAM on behalf of the Buyers of a Put Notice (as defined below) to Platinum the Buyers hereby agrees to sell, assign and convey to Platinum and Platinum hereby agrees to purchase and accept from such Buyer, all of such Buyer's right, title and interest in and to the Seller's Note.   If an Event of Default under Section 2.1(a) of the Note has occurred and is continuing, BAM on behalf of the Buyers may (but shall not be obligated to) deliver to Platinum a written notice electing to have each Buyers and Platinum consummate the Put (the "***Put Notice***").  Such Put Notice shall include a reference to a closing date for the Put (such date being referred to as the "***Proposed Closing Date***").   In addition, such Put Notice shall include a calculation of the Purchase Price.  The delivery by BAM on behalf of the Buyers to Platinum of a Put Notice shall irrevocably obligate and commit the parties hereto to consummate the Put no later than the Proposed Closing Date, subject to the terms and conditions of this Agreement. "***Purchase Price***" means the amount equal to the outstanding principal amount of the Buyer's Note plus all accrued and unpaid interest thereon.  Notwithstanding the foregoing, BAM may not deliver a Put Notice in the event the Event of Default under Section 2.1(a) has been cured as a result of payments under the Guaranty in Section 9 hereof.

    b.  As consideration for the Put, Buyers shall pay to Platinum in accordance with their Investment Percentage a payment equal to 50% of the amount paid by the Company to the Buyers pursuant to Section 1.2(a)(ii)(1) of the Note (which shall not exceed 3% per annum) at such time as such amounts are paid to the Buyers.

9.   Guaranty

    a.  <u>Agreement to Guaranty</u>.  Platinum hereby, unconditionally and irrevocably, and with full recourse, guarantees and agrees to be a surety to Buyers (and its successors, indorsees, transferees and assigns), for the prompt and complete payment and performance when due (whether at the stated maturity, by acceleration or otherwise) by the Company of the obligations owed by the Seller to Buyers under the terms of the Note (other than principal payments) (the "***Guaranteed Obligations***").   The guarantee and surety agreement provided for under this Section 9 is a guarantee of, and agreement of surety with respect to, payment and performance and not merely of collection, and

4

Platinum hereby agrees to be a primary obligor with respect to the Guaranteed Obligations.

b. <u>Guarantor Waivers</u>. Platinum hereby waives all notices with respect to its obligations and liabilities under this Section 9, including without limitation, notices of (a) acceptance of the guaranty and surety agreement provided for hereunder, (b) the existence or incurring from time to time of any Guaranteed Obligations, (c) nonpayment of any of the Guaranteed Obligations, (d) the existence of any Event of Default, the making of demand, or the taking of any action by BAM under this Agreement or any Transaction Document, and (e) demand and default hereunder. Platinum further acknowledges that it (a) has examined or had the opportunity to examine this Agreement and the Transaction Documents and (b) waives any defense which may exist with respect to its obligations and liabilities under this Section 9 resulting from its failure to receive or examine at any time this Agreement or any Transaction Document or any amendments, modifications or supplements thereto or restatements thereof or replacements therefor. Platinum acknowledges that in entering into the provisions of this Section 9 and the agreements provided for herein, it is not relying upon any statement, representation, warranty or opinion of any kind from BAM or any Buyer as to the present or future financial condition, performance, assets, liabilities or prospects of the Company or as to any other matter.

c. <u>Guarantor Consents; Unconditional Nature of Guaranty</u>. In connection with its liabilities and obligations under this Section 9, Platinum hereby consents and agrees that BAM may at any time or from time to time in their respective discretion (i) extend or change the time of payment, and/or the manner, place or terms of payment of any or all Guaranteed Obligations, (ii) amend, supplement, restate or replace this Agreement or any Transaction Documents, (iii) renew or extend any financing now or hereafter reflected by this Agreement and the Transaction Documents, or the maturity thereof, or increase (without limit of any kind) or decrease the advances and extensions of credit to Company under this Agreement and the Transaction Documents, (iv) settle, compromise or grant releases for liabilities of Company and/or any other Person or Persons liable with Platinum for any of the Guaranteed Obligations (for purposes of this Section 9, any such other Person, an "obligor"), and (v) exchange, compromise, release or surrender, or subordinate or release any Lien on, any property (including any collections therefrom or proceeds thereof), including any portion of the Collateral, of Company or any other obligor, which in any such case now or hereafter secures any of the Guaranteed Obligations, or apply against the Guaranteed Obligations any and all payments and/or proceeds of any such property received by Buyers or BAM at any time in any order as BAM may determine in accordance with this Agreement and the Transaction Documents; all of the foregoing in such manner and upon such terms as BAM may see fit and, in the context of Platinum's obligations and liabilities under this Section 9, without notice to or further consent from Platinum, who hereby agrees to be and shall

5

remain bound under the provisions of this Section 9 notwithstanding any such action(s).

d.  The liability of Platinum under this Section 9 is absolute, primary, unlimited and unconditional and shall not be reduced, impaired or affected in any way by reason of (i) any failure by BAM to obtain, retain, perfect (or maintain perfection of) or preserve, or the lack of prior enforcement of, any rights against Company, Platinum or any other obligor or in any property (specifically including the Collateral) of any of them, (ii) the invalidity or unenforceability or voidability of any Guaranteed Obligations or any rights in any property (specifically including the Collateral) pledged by any Person or Persons to secure the Guaranteed Obligations, (iii) any delay by BAM in making demand upon Company, Platinum or any other obligor, or any delay by BAM in enforcing, or any failure to enforce, any rights against the Company, Platinum or any other obligor or in any property (specifically including the Collateral) pledged by any Person or Persons to secure the Obligations, even if such rights are thereby lost, (iv) any failure, neglect or omission on the part of BAM to obtain or perfect any Lien upon, protect, exercise rights against, or realize on, any property of the Company, Platinum or any other obligor, (v) the existence or nonexistence of any defenses which may be available to the Company, Platinum or any other obligor with respect to the Guaranteed Obligations (other than the defense of payment), (vi) the granting by BAM of any waiver or forbearance at any time and for any period with respect to any payment or performance of the Guaranteed Obligations by Company and/or Platinum or with respect to any Event(s) of Default, (vii) any failure to proceed against Company, Platinum or any other obligor, any property (specifically including the Collateral) pledged by any Person or Persons to secure the Obligations, in a commercially reasonable manner, (viii) the commencement of any bankruptcy, reorganization, liquidation, dissolution or receivership proceeding or case filed by or against the Company, Platinum or any other obligor or (ix) any other fact, event, condition or omission which may give rise to a guarantor or suretyship defense in favor of Platinum. Platinum promises and undertakes to make all payments in respect of its obligations and liabilities under this Section 9 free and clear of any deduction, offset, defense, claim or counterclaim of any kind.

e.  <u>Rights with Respect to Guaranty Cumulative</u>. Without limiting any other provision of this Agreement, Platinum hereby agrees that: (a) the rights and remedies of Buyers under and with respect to this Section 9 are cumulative and not alternative, and BAM may proceed in any order from time to time against Company, Platinum or any other obligor and their respective assets, (b) BAM shall have no obligation to proceed at any time or in any manner against, or exhaust any or all of *its rights against*, the *Company* or any other obligor and their respective assets prior to proceeding against Platinum and/or any of its assets under the provisions of this Section 9, and (c) BAM may proceed against Platinum or its assets under the provisions of this Section 9 in any order and in any manner as BAM may elect in its sole discretion.

6

    f.   <u>Subordination of Rights of Subrogation and Contribution</u>. Any and all rights of any nature of Platinum to subrogation, reimbursement, contribution or indemnity, and any right of Platinum to recourse to any assets or property of, or payment from, Company or any other obligor, to the extent of any of such foregoing rights shall arise out of the performance by Platinum of its obligations and liabilities under this Section 9 shall be unconditionally subordinated to all of Buyers rights under this Agreement and the Transaction Documents and Platinum shall not at any time exercise any of such rights unless and until all of the Obligations have been paid in full.  Any payments received by Platinum with respect to any of the rights of Platinum described herein prior to such time as all of the Obligations have been paid in full shall be held by Platinum pursuant to an express trust for the benefit of Buyers created hereby and segregated from and not commingled with any other assets or property Platinum and shall be promptly, but in any event not later than three (3) Business Days after receipt thereof, remitted by Platinum to BAM on behalf of the Buyers.

    g.   <u>Continuing Nature of Guaranty</u>. The provisions of this Section 9 and the guarantee and surety agreements provided for herein shall constitute a continuing guaranty and suretyship obligation as to Platinum with respect to all Guaranteed Obligations from time to time arising or incurred, and shall continue in effect, and BAM may continue to act in reliance hereon, until all of the Obligations have been paid in full, and until such time, Platinum shall not have any right to terminate or revoke the provisions of this Section 9 and the guarantee and surety agreements provided for herein.

    h.   <u>Guaranty Valid to Maximum Extent</u>. To the extent that any Applicable Law (including any Applicable Laws relating the fraudulent conveyances or transfers of the insolvency of debtors) would otherwise render the obligations of Platinum under this Section 9 invalid or unenforceable as exceeding such maximum amount of such obligations allowable under such Applicable Law, Platinum shall nevertheless remain liable under this Section 9, provided, however, that in such a case, Platinum's obligations under this Section 9 shall be limited to the maximum amount which does not result in such invalidity or unenforceability.  Notwithstanding the foregoing, Platinum obligations hereunder shall be presumptively valid and enforceable to their fullest extent in accordance with the terms of this Section 9, as if this Section 9(h) were not a part of this Section 9.

    10.   <u>Modification</u>.  This Agreement, together with any and all documents executed concurrently herewith or referred to herein, contains the entire understanding among the parties and supersedes any and all prior agreements among them, and no modification, alteration or change in the terms hereof shall be effective unless same shall be in writing and signed by all of the parties hereto.

7

11.    Survival of Representations and Warranties.  All representations, warranties, covenants and agreements set forth in this Agreement will survive the execution and delivery of this Agreement and the closing and the consummation of the transactions contemplated by this Agreement.

12.    Assignment.  No party hereto may assign its rights or obligations under this Agreement without the consent of the other parties hereto.

13.    Further Assurances.  The parties hereto each agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to implement the transactions contemplated by this Agreement.

14.    Severability.  In the event that any one or more of the provisions contained herein, or the application thereof in any circumstances, is held invalid, illegal or unenforceable in any respect for any reason, the parties shall negotiate in good faith with a view to the substitution therefor of a suitable and equitable solution in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid provision, provided, however, that the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein shall not be in any way impaired thereby, it being intended that all of the rights and privileges of the parties hereto shall be enforceable to the fullest extent permitted by law.

15.    Notices.  All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in each case to the most recent address for such party on the books and records of the Company (or to such other address as a party may designate by notice to the other parties).

16.    Governing Law.  This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York, without giving effect to principles of conflict of laws.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement shall be brought against each of the parties in the courts of the State of New York and each of the parties consents to the sole jurisdiction of such courts (and the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

17.    Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument.

[SIGNATURE PAGES FOLLOW]

8

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SELLER:                    PRECIOUS CAPITAL LLC

By: _____
Name: Joseph SanFil. PPO
Title: CFO

BUYERS:                   BRE BCLIC PRIMARY

By:_____
Name:_____
Title:_____

BRE BCLIC SUB

By:_____
Name:_____
Title:_____

BRE WNIC 2013 LTC PRIMARY

By:_____
Name:_____
Title:_____

BRE WNIC 2013 LTC SUB

By:_____
Name:_____
Title:_____

9

SCHEDULE A

| | Principal Amount | Accrued Interest | Purchase Price | Investment Percentage |
|---|---|---|---|---|
| **BRE BCLIC PRIMARY** | $7,385,523 | $2,230,282 | $9,615,805 | 33.87% |
| **BRE BCLIC SUB** | $361,971 | $109,308 | $471,279 | 1.66% |
| **BRE WNIC 2013 LTC PRIMARY** | $13,401,660 | $4,047,036 | $17,448,697 | 61.46% |
| **BRE WNIC 2013 LTC SUB** | $656,346 | $198,203 | $854,549 | 3.01% |

130355.00100/7342092v.3

EXHIBIT 44

EX-10.1 4 ex10-1.htm NOTE PURCHASE AGREEMENT - PEDEVCO

**Exhibit 10.1**

**NOTE PURCHASE AGREEMENT**

**Dated as of March 7, 2014**

**by and between**

**PEDEVCO CORP.**

**and**

**THE INVESTORS PARTY HERETO**

**and**

**BAM ADMINISTRATIVE SERVICES LLC**

ex10-1.htm

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I  PURCHASE AND SALE OF NOTES | | 1 |
| Section 1.1 | Purchase and Sale of Notes. | 1 |
| Section 1.2 | Closing. | 2 |
| | | |
| ARTICLE II  REPRESENTATIONS AND WARRANTIES | | 3 |
| Section 2.1 | Representations and Warranties of the Company. | 3 |
| Section 2.2 | Representations and Warranties of each Investor. | 15 |
| | | |
| ARTICLE III  COVENANTS | | 17 |
| Section 3.1 | Securities Compliance. | 17 |
| Section 3.2 | Registration and Listing. | 17 |
| Section 3.3 | Compliance with Laws. | 17 |
| Section 3.4 | Keeping of Records and Books of Account. | 17 |
| Section 3.5 | Reporting Requirements. | 18 |
| Section 3.6 | Other Agreements. | 22 |
| Section 3.7 | Use of Proceeds. | 22 |
| Section 3.8 | Reporting Status. | 23 |
| Section 3.9 | Payment of Revenues. | 23 |
| Section 3.10 | Amendments. | 23 |
| Section 3.11 | Distributions. | 24 |
| Section 3.12 | Prohibition on Liens. | 24 |
| Section 3.13 | Prohibition on Indebtedness. | 24 |
| Section 3.14 | Compliance with Transaction Documents. | 25 |
| Section 3.15 | Transactions with Affiliates. | 25 |
| Section 3.16 | No Merger or Sale of Assets; No Formation of Subsidiaries. | 26 |
| Section 3.17 | Payment of Taxes, Etc. | 27 |
| Section 3.18 | Corporate Existence. | 27 |
| Section 3.19 | Maintenance of Assets. | 27 |
| Section 3.20 | No Investments. | 27 |
| Section 3.21 | Acquisition of Assets. | 28 |
| Section 3.22 | Inspection. | 28 |
| Section 3.23 | Material Contracts. | 28 |
| Section 3.24 | Insurance. | 29 |
| Section 3.25 | Production Report and Lease Operating Statements. | 30 |
| Section 3.26 | Operation and Maintenance of Properties. | 30 |
| Section 3.27 | Title Information. | 31 |
| Section 3.28 | Gas Imbalances, Take-or-Pay or Other Prepayments. | 31 |
| Section 3.29 | Company Contribution. | 31 |
| Section 3.29 | Capital Expenditure Plan. | 31 |
| Section 3.30 | Post-Closing Covenants. | 32 |
| | | |
| ARTICLE IV  CONDITIONS | | 33 |
| Section 4.1 | Conditions Precedent to the Obligation of the Company to Close and to Sell the Notes at the Closing. | 33 |

-i-

TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| Section 4.2 | Conditions Precedent to the Obligation of the Investors to Close at the Closing. | 34 |
| Section 4.3 | Conditions Precedent to the Obligation of the Investors to Make Each Funding. | 38 |
|  |  |  |
| ARTICLE V  CERTIFICATE LEGEND | | 39 |
| Section 5.1 | Legend. | 39 |
|  |  |  |
| ARTICLE VI  INDEMNIFICATION | | 39 |
| Section 6.1 | General Indemnity. | 39 |
| Section 6.2 | Indemnification Procedure. | 39 |
|  |  |  |
| ARTICLE VII  REGARDING AGENT | | 40 |
| Section 7.1 | Appointment. | 40 |
| Section 7.2 | Nature of Duties. | 41 |
| Section 7.3 | Lack of Reliance on Agent: Resignation. | 41 |
| Section 7.4 | Certain Rights of the Agent. | 42 |
| Section 7.5 | Reliance. | 42 |
| Section 7.6 | Notice of Default. | 43 |
| Section 7.7 | Indemnification. | 43 |
| Section 7.8 | The Company's Undertaking to Agent. | 43 |
| Section 7.9 | No Reliance on the Agent's Obligor Identification Program. | 43 |
| Section 7.10 | Other Agreements. | 44 |
|  |  |  |
| ARTICLE VIII  MISCELLANEOUS | | 44 |
| Section 8.1 | Fees and Expenses. | 44 |
| Section 8.2 | Specific Performance; Consent to Jurisdiction; Venue. | 44 |
| Section 8.3 | Entire Agreement; Amendment. | 45 |
| Section 8.4 | Notices. | 45 |
| Section 8.5 | Waivers. | 46 |
| Section 8.6 | Headings. | 46 |
| Section 8.7 | Successors and Assigns. | 47 |
| Section 8.8 | No Third Party Beneficiaries. | 47 |
| Section 8.9 | Governing Law. | 47 |
| Section 8.10 | Survival. | 47 |
| Section 8.11 | Publicity. | 47 |
| Section 8.12 | Counterparts. | 48 |
| Section 8.13 | Severability. | 48 |
| Section 8.14 | Further Assurances. | 48 |

-ii-

EXHIBITS

| Exhibit 1.1A | - | Form of Notes |
| Exhibit 1.1B | - | Form of Advance Request |

SCHEDULES

| Schedule 2.1(b) | - | Consents |
| Schedule 2.1(c)(i) | - | Authorized Capital Stock |
| Schedule 2.1(c)(ii) | - | Preemptive or Other Rights |
| Schedule 2.1(c)(iii) | - | Contracts for Additional Shares |
| Schedule 2.1(c)(iv) | - | Registration and Anti-Dilution Rights |
| Schedule 2.1(g) | - | Subsidiaries |
| Schedule 2.1(h) | - | Bank Accounts |
| Schedule 2.1(i) | - | Material Adverse Effect |
| Schedule 2.1(j) | - | Undisclosed Liabilities |
| Schedule 2.1(l) | - | Indebtedness |
| Schedule 2.1(m) | - | Oil and Gas Properties |
| Schedule 2.1(n) | - | Litigation |
| Schedule 2.1(w) | - | Collective Bargaining and Employment Agreements |
| Schedule 2.1(y) | - | Certain Developments |
| Schedule 2.1(bb) | - | Equity and Convertible Debt Issuances |
| Schedule 2.1(cc) | - | Brokers |
| Schedule 3.12 | - | Permitted Liens |

-iii-

### NOTE PURCHASE AGREEMENT

This NOTE PURCHASE AGREEMENT, dated as of March 7, 2014 (this "<u>Agreement</u>"), is by and between PEDEVCO CORP, a Texas corporation (the "<u>Company</u>"), each of the entities party to this Agreement as investors (collectively, the "<u>Investors</u>" and each, individually, an "<u>Investor</u>") and BAM ADMINISTRATIVE SERVICES LLC, as agent for the Investors (the "<u>Agent</u>"). Capitalized terms used below and not otherwise defined have the meanings given to such terms in the Transaction Documents (as defined in Section 2.1(b) below) unless the context would require otherwise.

The parties hereto agree as follows:

### ARTICLE I

### PURCHASE AND SALE OF NOTES

Section 1.1          <u>Purchase and Sale of Notes.</u>

(a)          On the Closing Date (as defined in Section 1.2, upon satisfaction of the terms and conditions set forth in ARTICLE IV, the Company shall issue to each Investor a promissory note, substantially in the form of <u>Exhibit 1.1A</u> hereto (each a "<u>Note</u>" and, collectively, the "<u>Notes</u>"), each such Note shall evidence the advances made by the Investors to the Company pursuant to this Agreement.

(b)          On the Closing Date, upon satisfaction of the terms and conditions set forth in ARTICLE IV and in reliance on the representations and warranties of the Company set forth herein and in the other Transaction Documents (as defined in Section 2.1(b)), each Investor shall advance to the Company an amount not to exceed its Pro Rata Share of the result of (i)$34,500,000, less (ii) the sum of (1) the amount of the original issue discount set forth below, (2) an underwriting fee in the amount of $3,450,000 and (3) the amount of fees and expenses of the Investor the Company is obligated to pay pursuant to Section 8.1 (the "<u>Initial Funding</u>"); <u>provided</u> that such Investor shall not be obligated to make an advance in excess of the amount set forth opposite the term "Term Commitment" under such Investor's signature on the signature pages to this Agreement (such amount, the "<u>Term Commitment</u>"). The issuance and sale of the Notes is referred to herein as the "<u>Closing</u>". The Notes shall be issued on an original issue discount basis, reflecting an unconditional non-refundable original issue discount in the amount of $1,725,000 for the period commencing with the Closing through the scheduled Maturity Date, as set forth in the Notes. For purposes of this Agreement, "<u>Pro Rata Share</u>" shall mean, with respect to each Investor, a fraction, expressed as a percentage, the numerator of which is the Term Commitment of such Investor and the denominator of which is the Term Commitment of all of the Investors.

(c)        Subject to the terms and conditions set forth in ARTICLE IV and in reliance on the representations and warranties of the Company set forth herein and in the other Transaction Documents, RJ Credit LLC ("RJC") shall, from time to time prior to March 6, 2017 (the "Maturity Date"), advance to the Company such additional amounts requested by the Company (each such advance, a "Subsequent Funding"; the Initial Funding and the Subsequent Fundings, collectively, the "Fundings" and each, individually, a "Funding"), provided that (i) the Company may not request a Subsequent Funding more than one time in any calendar month, (ii) RJC shall have received a written request from the Company at least fifteen (15) Business Days prior to the requested date of such advance in the form of Exhibit 1.1B attached hereto (the "Advance Request"); (iii) no Event of Default (as defined in the Notes) or event that with the passage of time or the giving of notice, or both, would become an Event of Default (a "Default") shall have occurred and be continuing or would result therefrom; (iv) the Company shall have deposited into a segregated account of the Company (the "Capex Account") the Company Contribution (as defined below) in an amount equal to the amount of such Subsequent Funding and (v) the Company shall have provided to RJC, and RJC shall be satisfied with, in its reasonable discretion, a notice of capital call issued to the Company or a Subsidiary to fund the Company's or such Subsidiary's obligation pursuant to an approved authorization for expenditure ("AFE") issued for a well(s) to be drilled and completed on any property located in Comanche, Harper, Barber and Kiowa Counties, Kansas (the "Mississippian Property") or properties acquired in connection with the Continental Acquisition (as defined in Section 3.7(a)) (the Mississippian Property and the properties acquired in connection with the Continental Acquisition, the "Conveyed Properties"), which such AFE shall be set forth in the most recently delivered Capital Expenditure Plan.  RJC is permitted to deduct and retain from each Subsequent Funding made to the Company the sum of (1) original issue discount in an amount equal to five percent (5%) of the requested Subsequent Funding, (2) a fee in an amount equal to ten percent (10%) of the requested Subsequent Funding and (3) the amount of fees and expenses of RJC the Company is obligated to pay pursuant to Section 8.1.  Each Subsequent Funding shall be in a minimum amount of $500,000 and integral multiples of $100,000 in excess thereof.  The aggregate amount of Subsequent Fundings made by RJC under this Agreement shall not exceed $15,500,000 (the "Maximum Amount") and any Subsequent Funding repaid may not be reborrowed.  The net proceeds of each Subsequent Funding shall be immediately deposited into the Capex Account.  The Company shall not withdraw or transfer any funds from the Capex Account other than for the purposes described in Section 3.7(b).  In the event the Company drills a dry hole, the Company may not use any additional proceeds of Subsequent Fundings regardless of whether such proceeds are in the Capex Account or the Operating Account, without the consent of RJC.  For purposes of this Agreement, "Business Day" shall mean any day banking transactions can be conducted in New York City, New York and does not include any day which is a federal or state holiday in such location.

(d)        The aggregate outstanding principal amount of the Notes and all accrued and unpaid interest thereon shall be due and payable on the earlier of the Maturity Date and the date on which such principal amount is accelerated after the occurrence of an Event of Default pursuant to the terms of the Notes, provided that the Company shall not pay, and RJC shall not accept, any payment on account of the Note issued by the Company to RJC until the Company has paid in full all amounts outstanding under the Notes issued to the other Investors.

Section 1.2            Closing.

The Closing under this Agreement shall take place immediately upon the execution of this Agreement by the parties hereto and the satisfaction of the conditions contained in Section 4.2 and Section 4.3 or on such other date as may be agreed upon in writing by the parties hereto (the "Closing Date").  The Closing shall take place at the offices of RJC, 152 West 57th Street, 4th Floor, New York, NY 10:00 a.m., New York time, or at some other time and location as may be agreed upon by the parties hereto.

-2-

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES

Section 2.1          Representations and Warranties of the Company.

The Company hereby represents and warrants to the Investors and the Agent, as of the date hereof and the date of the Closing hereunder, as follows:

(a)          Organization, Good Standing and Power.  The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Texas and has the requisite corporate power to own, lease and operate its properties and assets and to conduct its business as it is now being conducted.  The Company does not have any direct or indirect Subsidiaries (as defined in Section 2.1(g)) or own securities of any kind in any other entity except as set forth on Schedule 2.1(g) hereto.  The Company and each such Subsidiary is duly qualified as a foreign corporation or limited liability company to do business and is in good standing in every other jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary except for any jurisdiction(s) (alone or in the aggregate) in which the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.  For the purposes of this Agreement, "Material Adverse Effect" means a material adverse effect on (i) the business, operations, properties, prospects or financial condition of the Company and its Subsidiaries (taken together as a whole), (ii) the ability of the Company or its Subsidiaries to perform any of its obligations under this Agreement or any of the other Transaction Documents (as defined in Section 2.1(b)), (iii) the Collateral, or the Agent's Liens (on behalf of itself and the Investors) on the Collateral or the priority of such Liens, or (iv) the rights of or benefits available to the Agent or the Investors under this Agreement or any of the other Transaction Documents.

(b)          Authorization; Enforcement.  The Company and the Subsidiaries (as applicable) have the requisite corporate or limited liability company power and authority to enter into and perform this Agreement, the Notes, the Security Agreement dated as of the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement") by and among the Company, the Subsidiaries and the Agent, those certain leasehold and fee mortgages or deeds of trust dated as of the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, collectively, the "Mortgages") by and between the Company, the trustee (if applicable) and the Agent, the Officer's Certificate to be delivered by the Company, dated as of the Closing Date (the "Officer's Certificate"), the Patent Security Agreement dated as of the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Patent Security Agreement") by and between the Company and the Agent, the Continental Interest Conveyance Agreement (as defined in Section 4.2(s)), the Mississippian Interest Conveyance Agreement (as defined in Section 4.2(s)), the Asia Sixth Interest Conveyance Agreement (as defined in Section 4.2(s)), and the guaranty dated as of the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Guaranty"; this Agreement, the Notes, the Security Agreement, the Mortgages, the Patent Security Agreement, the Continental Interest Conveyance Agreement, the Mississippian Interest Conveyance Agreement, the Asia Sixth Interest Conveyance Agreement and the Guaranty, collectively, the "Transaction Documents") to be delivered by each of the Subsidiaries to the Agent, and to issue and sell the Notes in accordance with the terms hereof.  The execution, delivery and performance of the Transaction Documents by the Company and the Subsidiaries and the consummation of the transactions contemplated thereby have been duly and validly authorized by all necessary corporate or limited liability company action, and no further consent or authorization of the Company, its Board of Directors, manager, stockholders or any other third party is required, except as set forth on Schedule 2.1(b) hereto.  When executed and delivered by the Company and the Subsidiaries, each of the Transaction Documents shall constitute a valid and binding obligation of the Company and the Subsidiaries enforceable against the Company and the Subsidiaries in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, moratorium, liquidation, conservatorship, receivership or similar laws relating to, or affecting generally the enforcement of, creditor's rights and remedies or by other equitable principles of general application.

-3-

(c) Capitalization.  The authorized capital stock and the issued and outstanding shares of capital stock of the Company as of the Closing Date is set forth on Schedule 2.1(c)(i) hereto.  All of the outstanding shares of the common stock, $0.001 par value per share of the Company ("Common Stock") and any other outstanding security of the Company have been duly and validly authorized.  Except as set forth on Schedule 2.1(c)(ii) hereto, no shares of Common Stock or any other security of the Company are entitled to preemptive rights or registration rights and there are no outstanding options, warrants, scrip, rights to subscribe to, call or commitments of any character whatsoever relating to, or securities or rights convertible into, any shares of capital stock of the Company.  Furthermore, except as set forth on Schedule 2.1(c)(iii) hereto, there are no contracts, commitments, understandings, or arrangements by which the Company is or may become bound to issue additional shares of the capital stock of the Company or options, securities or rights convertible into shares of capital stock of the Company.  Except as set forth on Schedule 2.1(c)(iv) hereto, the Company is not a party to or bound by any agreement or understanding granting registration or anti-dilution rights to any person with respect to any of its equity or debt securities. The Company is not a party to, and it has no knowledge of, any agreement or understanding restricting the voting or transfer of any shares of the capital stock of the Company.

(d) Issuance of Securities.  The Notes have been duly authorized by all necessary corporate action and, when paid for or issued in accordance with the terms hereof, the Notes shall be validly issued and outstanding, free and clear of all liens, encumbrances and rights of refusal of any kind.

<div align="center">-4-</div>

(e)        No Conflicts.  The execution, delivery and performance of the Transaction Documents by the Company and the Subsidiaries, the performance by the Company of its obligations under the Notes and the consummation by the Company and the Subsidiaries of the transactions contemplated hereby and thereby, and the issuance of the Notes as contemplated hereby, do not and will not (i) violate or conflict with any provision of the Company's Certificate of Formation (the "Certificate of Formation") or Bylaws (the "Bylaws"), each as amended to date, or any Subsidiary's comparable charter documents, (ii) conflict with, or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, mortgage, deed of trust, indenture, note, bond, license, lease agreement, instrument or obligation to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries' respective properties or assets are bound, (iii) result in a violation of any federal, state, local or foreign statute, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries are bound or affected, or (iv) except as set forth in the Transaction Documents, create or impose a lien, mortgage, security interest, charge or encumbrance of any nature on any property or asset of the Company or its Subsidiaries under any agreement or any commitment to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or by which any of their respective properties or assets are bound, except, in all cases, for such conflicts, defaults, terminations, amendments, acceleration, cancellations and violations as would not, individually or in the aggregate, have a Material Adverse Effect (other than violations pursuant to clauses (i) or (iii) (with respect to federal and state securities laws)).  Except as set forth in Schedule 2.1(b), neither the Company nor any of its Subsidiaries is required under federal, state, foreign or local law, rule or regulation to obtain any consent, authorization or order of, or make any filing or registration with, any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, in order for it to execute, deliver or perform any of its obligations under the Transaction Documents or issue and sell the Notes in accordance with the terms hereof (other than any filings, consents and approvals that may be required to be made by the Company under applicable state and federal securities laws, rules or regulations (which if required, shall be filed on a timely basis) and filings to perfect liens or security interests granted to the Agent pursuant to the Transaction Documents).  The business of the Company and its Subsidiaries is not being conducted in violation of any laws, ordinances or regulations of any governmental entity, except for such violations that would not reasonably be expected to have a Material Adverse Effect.

(f)        Commission Documents, Financial Statements.  The Common Stock of the Company is registered pursuant to Section 12(b) or 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and the Company has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the Securities and Exchange Commission (the "Commission") pursuant to the reporting requirements of the Exchange Act since July 27, 2012 (other than in connection with the Current Report on Form 8-K/A filed with the Commission on October 9, 2012, which was due within four business days of July 27, 2012) (all of the foregoing including filings incorporated by reference therein and amendments thereto being referred to herein as the "Commission Documents").  Each Commission Document complied in all material respects with the requirements of the Exchange Act and the rules and regulations of the Commission promulgated thereunder and other federal, state and local laws, rules and regulations applicable to such documents, and the Commission Documents did not, as of their respective filing dates, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  As of their respective dates, the financial statements of the Company included in the Commission Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the Commission or other applicable rules and regulations with respect thereto.  Such financial statements have been prepared in accordance with generally accepted accounting principles ("GAAP") applied on a consistent basis during the periods involved (except (i) as may be otherwise indicated in such financial statements or the notes thereto or (ii) in the case of unaudited interim statements, to the extent they may not include footnotes or may be condensed or summary statements), and fairly present in all material respects the financial position of the Company and its Subsidiaries as of the dates thereof and the results of operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments).

-5-

(g)      Subsidiaries.  Schedule 2.1(g) hereto sets forth each Subsidiary of the Company, showing the jurisdiction of its incorporation or organization and showing the percentage of each person's ownership of the outstanding stock or other interests of such Subsidiary.  For the purposes of this Agreement, "Subsidiary" shall mean any corporation or other entity of which at least 50% of the securities or other ownership interest having ordinary voting power (absolutely or contingently) for the election of directors or other persons performing similar functions are at the time owned directly or indirectly by the Company and/or any of its Subsidiaries; provided that for purposes of this Agreement, Pacific Energy Development MSL, LLC ("PED MSL") shall be deemed to be a Subsidiary of the Company.  All of the outstanding shares of capital stock of each Subsidiary have been duly authorized and validly issued, and are fully paid and nonassessable.  There are no outstanding preemptive, conversion or other rights, options, warrants or agreements granted or issued by or binding upon any Subsidiary for the purchase or acquisition of any shares of capital stock of any Subsidiary or any other securities convertible into, exchangeable for or evidencing the rights to subscribe for any shares of such capital stock.  Neither the Company nor any Subsidiary is subject to any obligation (contingent or otherwise) to repurchase or otherwise acquire or retire any shares of the capital stock of any Subsidiary or any convertible securities, rights, warrants or options of the type described in the preceding sentence except as set forth on Schedule 2.1(g) hereto.  Neither the Company nor any Subsidiary is party to, nor has any knowledge of, any agreement restricting the voting or transfer of any shares of the capital stock of any Subsidiary.  Each subsidiary is duly organized, validly existing and in good standing under the laws of the jurisdictions set forth on Schedule 2.1(g) and has the requisite corporate or other power to own, lease and operate its properties and assets and to conduct its business as it is now being conducted.

(h)      Bank Accounts.  Schedule 2.1(h) sets forth a complete and accurate list  of deposit accounts (the "Bank Accounts") owned by the Company, each Subsidiary and Condor Energy Technology LLC ("Condor").

<div align="center">-6-</div>

(i) No Material Adverse Change. Except as set forth on Schedule 2.1(i) hereto, since September 30, 2013, neither the Company nor its Subsidiaries have experienced or suffered any Material Adverse Effect.

(j) No Undisclosed Liabilities. Except as set forth on Schedule 2.1(j) hereto, since September 30, 2013, neither the Company nor any of its Subsidiaries has incurred any liabilities, obligations, claims or losses (whether liquidated or unliquidated, secured or unsecured, absolute, accrued, contingent or otherwise) other than those incurred in the ordinary course of the Company's or its Subsidiaries respective businesses or which, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect.

(k) No Undisclosed Events or Circumstances. Since September 30, 2013, no event or circumstance has occurred or exists with respect to the Company or its Subsidiaries or their respective businesses, properties, prospects, operations or financial condition, which, under applicable law, rule or regulation, requires public disclosure or announcement by the Company but which has not been so publicly announced or disclosed.

(l) Indebtedness. Schedule 2.1(l) hereto sets forth as of the date hereof all outstanding secured and unsecured Indebtedness of the Company or any Subsidiary, or for which the Company or any Subsidiary has commitments. For the purposes of this Agreement, "Indebtedness" shall mean, with respect to any Person, (a) all obligations for borrowed money, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other obligations in respect of letters of credit, bankers acceptances, current swap agreements, interest rate hedging agreements (including, without limitation, interest rate and commodity hedging agreements), or other financial products, (c) all capital lease obligations, (d) all obligations or liabilities secured by a lien or encumbrance on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all obligations for the deferred purchase price of assets, together with trade debt and other accounts payable that exceed $50,000 in the aggregate in any fiscal year, (f) all synthetic leases, (g) all obligations with respect to redeemable stock and redemption or repurchase obligations under any capital stock or other equity securities issued by such Person, (h) all reimbursement obligations and other liabilities of such Person with respect to surety bonds (whether bid, performance or otherwise), letters of credit, banker's acceptances, drafts or similar documents or instruments issued for such Person's account, (i) indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer to the extent such Person is liable therefore as a result of such Person's ownership interest in such entity, except to the extent that the terms of such indebtedness expressly provide that such Person is not liable therefore or such Person has no liability therefore as a matter of law, (j) trade debt and other account payables which remain unpaid more than sixty (60) days past the invoice date, and (k) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted or sold with recourse) any of the foregoing obligations of any other Person; provided, however, Indebtedness shall not include (I) usual and customary trade debt and other accounts payable incurred in the ordinary course of business less than sixty (60) days past the invoice date and (II) endorsements for collection or deposit in the ordinary course of business. Neither the Company nor any Subsidiary is in default with respect to any Indebtedness. "Person" means any individual, sole proprietorship, joint venture, partnership, corporation, limited liability company, association, joint-stock company, unincorporated organization, cooperative, trust, estate, governmental entity or any other entity of any kind or nature whatsoever.

(m)      <u>Title to Assets</u>.  Each of the Company and the Subsidiaries has good, valid, and marketable title to all of its real and personal property reflected in the Commission Documents and as set forth on <u>Schedule 2.1(m)</u>, free and clear of any mortgages, pledges, charges, liens, security interests or other encumbrances, except for: (i) the Permitted Encumbrances; (ii) burdens recorded before the Closing Date in the real property records of the county in which the assets set forth in the Commission Documents or on <u>Schedule 2.1(m)</u> are located, other than any such burdens that arise by, from, through, under or as a result of any act by the Company, any Subsidiary or any Affiliate of the Company or any Subsidiary; and (iii) those which individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Any leases of the Company and each of its Subsidiaries are valid and subsisting and in full force and effect.  Pursuant to, and upon execution and delivery of, the Security Agreement and the filing of financing statements and Mortgages in the appropriate jurisdictions, the Company and its Subsidiaries shall have granted to the Agent a perfected, first priority security interest in substantially all of the Company's and each of its Subsidiaries' Oil and Gas Properties with respect to which a security interest may be perfected by the filing of such financing statements and Mortgages, which shall be a first priority security interest on all of such assets except for the Permitted Encumbrances and burdens recorded before the Closing Date in the real property records of the county in which the assets set forth in the Commission Documents or on <u>Schedule 2.1(m)</u> are located, other than any such burdens that arise by, from, through, under or as a result of any act by the Company, any Subsidiary or any Affiliate of the Company or any Subsidiary. With respect to the Oil and Gas Properties listed on <u>Schedule 2.1(m)</u>, "good, valid and marketable title" means such title that will enable the title holder to receive from each of such Oil and Gas Properties at least the "Net Revenue Interest" for the wells identified on Schedule 2.1(m) associated with each of such Oil and Gas Properties, without reduction, suspension, or termination throughout the productive life of the wells, except for any reduction, suspension, or termination: (i) caused by orders of the appropriate regulatory agency having jurisdiction over an Oil and Gas Properties that are promulgated after the Closing Date and that concern pooling, unitization, communitization, or spacing matters affecting an Oil and Gas Properties; or (ii) otherwise set out in <u>Schedule 2.1(m)</u>.  "Good, valid and marketable title" also means title that will obligate the title holder to bear no greater  "Working Interest" than the Working Interest for each of the wells identified on <u>Schedule 2.1(m)</u>  as being associated with each of such Oil and Gas Properties, without increase throughout the productive life of the wells, except for any increase: (i) that also results in the Net Revenue Interest associated with the well being proportionately increased; (ii) caused by contribution requirements provided for under provisions similar to those contained in Article VI of the A.A.P.L. Form 610-1989 Model Form Operating Agreement; (iii) caused by orders of the appropriate regulatory agency having jurisdiction over an Oil and Gas Properties that are promulgated after the Closing Date and that concern pooling, unitization, communitization, or spacing matters affecting any Oil and Gas Properties; or (iv) otherwise set forth in <u>Schedule 2.1(m)</u>.

-8-

(n)        Actions Pending.  There is no action, suit, claim, investigation, arbitration, alternate dispute resolution proceeding or other proceeding pending or, to the knowledge of the Company, threatened against the Company or any Subsidiary which questions the validity of this Agreement or any of the other Transaction Documents or any of the transactions contemplated hereby or thereby or any action taken or to be taken pursuant hereto or thereto.  Except as set forth on Schedule 2.1(n) hereto, there is no action, suit, claim, investigation, arbitration, alternate dispute resolution proceeding or other proceeding pending or, to the knowledge of the Company, threatened against or involving the Company, any Subsidiary or any of their respective properties or assets, which individually or in the aggregate, would reasonably be expected, if adversely determined, to have a Material Adverse Effect.  There are no outstanding orders, judgments, injunctions, awards or decrees of any court, arbitrator or governmental or regulatory body against the Company or any Subsidiary or any officers or directors of the Company or Subsidiary in their capacities as such, which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(o)        Compliance with Law.  The business of the Company and the Subsidiaries has been and is presently being conducted in accordance with all applicable federal, state and local governmental laws, rules, regulations and ordinances, except such that, individually or in the aggregate, the noncompliance therewith could not reasonably be expected to have a Material Adverse Effect.  The Company and each of its Subsidiaries have all franchises, permits, licenses, consents and other governmental or regulatory authorizations and approvals necessary for the conduct of its business as now being conducted by it unless the failure to possess such franchises, permits, licenses, consents and other governmental or regulatory authorizations and approvals, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(p)        Taxes.  Since July 27, 2012, the date of the closing of the Company's Agreement and Plan of Reorganization between the Company, Blast Acquisition Corp., a wholly-owned Nevada subsidiary of the Company, and Pacific Energy Development Corp., a privately-held Nevada corporation, (i) the Company and each of the Subsidiaries has accurately prepared and filed (or validly extended) all federal, state and other tax returns required by law to be filed by it, has paid or made provisions for the payment of all taxes shown to be due and all additional assessments, and adequate provisions have been and are reflected in the financial statements of the Company and the Subsidiaries for all current taxes and other charges to which the Company or any Subsidiary is subject and which are not currently due and payable; and (ii) none of the federal income tax returns of the Company or any Subsidiary have been audited by the Internal Revenue Service.   The Company has no knowledge of any additional assessments, adjustments or contingent tax liability (whether federal or state) of any nature whatsoever, whether pending or threatened against the Company or any Subsidiary for any period, nor of any basis for any such assessment, adjustment or contingency.

-9-

(q)      Disclosure.  To the Company's knowledge, neither this Agreement nor the Schedules hereto nor any other documents, certificates or instruments furnished to any Investor or the Agent by or on behalf of the Company or any Subsidiary in connection with the transactions contemplated by this Agreement, taken together as a whole, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made herein or therein, in the light of the circumstances under which they were made herein or therein, not misleading.

(r)      Environmental Compliance.  Except as would not reasonably be expected to have a Material Adverse Effect, the Company and each of its Subsidiaries have obtained all approvals, authorizations, certificates, consents, licenses, orders and permits or other similar authorizations of all governmental authorities, or from any other person, that are required under any Environmental Laws.  "Environmental Laws" shall mean all applicable laws relating to the protection of the environment including, without limitation, all requirements pertaining to reporting, licensing, permitting, controlling, investigating or remediating emissions, discharges, releases or threatened releases of hazardous substances, chemical substances, pollutants, contaminants or toxic substances, materials or wastes, whether solid, liquid or gaseous in nature, into the air, surface water, groundwater or land, or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of hazardous substances, chemical substances, pollutants, contaminants or toxic substances, material or wastes, whether solid, liquid or gaseous in nature.  Except as would not reasonably be expected to have a Material Adverse Effect, the Company has all necessary governmental approvals required under all Environmental Laws as necessary for the Company's business or the business of any of its Subsidiaries.  The Company and each of its Subsidiaries are also in material compliance with all other limitations, restrictions, conditions, standards, requirements, schedules and timetables required or imposed under all Environmental Laws.  Except for such instances as would not individually or in the aggregate have a Material Adverse Effect, Company has not received written notice of any past or present events, conditions, circumstances, incidents, actions or omissions relating to or in any way affecting the Company or its Subsidiaries that violate or may violate any Environmental Law after the Closing Date or that may give rise to any environmental liability, or otherwise form the basis of any claim, action, demand, suit, proceeding, hearing, study or investigation (i) under any Environmental Law, or (ii) based on or related to the manufacture, processing, distribution, use, treatment, storage (including without limitation underground storage tanks), disposal, transport or handling, or the emission, discharge, release or threatened release of any hazardous substance.

-10-

(s)　　　Books and Records; Internal Accounting Controls.  The records and documents of the Company and its Subsidiaries accurately reflect in all material respects the information relating to the business of the Company and its Subsidiaries, the location and collection of their assets, and the nature of all transactions giving rise to the obligations or accounts receivable of the Company or any Subsidiary. The Company is in material compliance with all provisions of the Sarbanes-Oxley Act of 2002 and the Dodd Frank Act which are applicable to it as of the Closing Date. The Company and its Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP or International Financial Reporting Standards ("IFRS"), as applicable, and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization, and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. The Company has established disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and designed such disclosure controls and procedures to ensure that information required to be disclosed by the Company in the reports it files or submits under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms. The Company's certifying officers have evaluated the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by the Company's most recently filed periodic report under the Exchange Act (such date, the "Evaluation Date").  The Company presented in its most recently filed periodic report under the Exchange Act the conclusions of the certifying officers about the effectiveness of the disclosure controls and procedures based on their evaluations as of the Evaluation Date, the Investors and the Agent acknowledging that such conclusions reported in the Company's Quarterly Report on Form 10-Q for the quarterly period ended September 30, 2013 were that the Company's disclosure controls and procedures were not effective because of the material weakness in internal control over financial reporting, as more specifically described in such Quarterly Report.  Since the Evaluation Date, there have been no changes in the Company's internal control over financial reporting (as such term is defined in the Exchange Act) that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

(t)　　　Material Agreements.  Except as would not reasonably be expected to have a Material Adverse Effect, the Company and each of its Subsidiaries have performed all obligations required to be performed by them to date under any written or oral contract, instrument, agreement, commitment, obligation, plan or arrangement, filed or required to be filed with the Commission or any other material contract, material instrument, material agreement, material commitment, material obligation, material plan or material arrangement to which the Company or any Subsidiary is a party or by which the Company's or any Subsidiary's properties or assets are bound (the "Material Agreements").  Neither the Company nor any of its Subsidiaries has received any notice of default under any Material Agreement, which has not been waived or cured.  Neither the Company nor any of its Subsidiaries is currently in default under any Material Agreement now in effect.

(u)　　　Transactions with Affiliates.  There are no loans, leases, agreements, contracts, royalty agreements, management contracts or arrangements or other continuing transactions between (a) the Company, any Subsidiary or any of their respective customers or suppliers on the one hand, and (b) on the other hand, any officer, employee, consultant or director of the Company, or any of its Subsidiaries, or any person owning at least 5% of the outstanding capital stock of the Company or any Subsidiary or any member of the immediate family of such officer, employee, consultant, director or stockholder or any corporation or other entity controlled by such officer, employee, consultant, director or stockholder, or a member of the immediate family of such officer, employee, consultant, director or stockholder which, in each case, is required to be disclosed in the Commission Documents or in the Company's most recently filed definitive proxy statement on Schedule 14A, that is not so disclosed in the Commission Documents or in such proxy statement.

-11-

(v)        Securities Act of 1933.  The Company has complied and will comply with all applicable federal and state securities laws in connection with the offer, issuance and sale of the Notes hereunder.  Neither the Company nor anyone acting on its behalf, directly or indirectly, has or will sell, offer to sell or solicit offers to buy the Notes or similar securities to, or solicit offers with respect thereto from, or enter into any negotiations relating thereto with, any person, or has taken or will take any action so as to bring the issuance and sale of the Notes under the registration provisions of the Securities Act and applicable state securities laws, and neither the Company nor any of its affiliates, nor any person acting on its or their behalf, has engaged in any form of general solicitation or general advertising (within the meaning of Regulation D under the Securities Act) in connection with the offer or sale of the Notes.  The Company is not, and has not been for a period of more than 12 months prior to the date of the issuance of the Notes, an issuer identified in Rule 144(i)(l) under the Securities Act.   Neither the Company, nor any of its directors, officers or controlling persons, has taken or will, in violation of applicable law, take, any action designed to or that might reasonably be expected to cause or result in, or which has constituted, stabilization or manipulation of the price of the Common Stock to facilitate the sale or resale of the securities issued or issuable in connection with the transactions contemplated hereunder.

(w)        Employees.  Neither the Company nor any Subsidiary has any collective bargaining arrangements or agreements covering any of its employees, except as set forth on Schedule 2.1(w) hereto.  Except as set forth on Schedule 2.1(w) hereto, neither the Company nor any Subsidiary has any employment contract, agreement regarding proprietary information, non-competition agreement, non-solicitation agreement, confidentiality agreement, or any other similar contract or restrictive covenant, relating to the right of any officer, employee or consultant to be employed or engaged by the Company or such Subsidiary required to be disclosed in the Commission Documents that is not so disclosed.  No officer, consultant or key employee of the Company or any Subsidiary whose termination, either individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect, has terminated or, to the knowledge of the Company, has any present intention of terminating his or her employment or engagement with the Company or any Subsidiary.

(x)        Intellectual Property.  The Company and each of the Subsidiaries owns, or possesses the rights to use, all patents (and any patentable improvements thereof), trademarks, service marks, trade names, domain names, copyrights and websites (or copyrightable derivative works thereof), and intellectual property rights relating thereto (to any of the foregoing list, whether or not registered), licenses and authorizations which are necessary for the conduct of its business as now conducted without infringement or any conflict with the rights of others.

-12-

(y)        <u>Absence of Certain Developments</u>.  Except as set forth on <u>Schedule 2.1(y)</u> hereto, since September 30, 2013, neither the Company nor any Subsidiary has:

(i)        issued any stock, bonds or other corporate securities or any right, options or warrants with respect thereto;

(ii)        borrowed any amount in excess of $50,000 or incurred or become subject to any other liabilities in excess of $50,000 (absolute or contingent) except current liabilities incurred in the ordinary course of business which are comparable in nature and amount to the current liabilities incurred in the ordinary course of business during the comparable portion of its prior fiscal year, as adjusted to reflect the current nature and volume of the business of the Company and its Subsidiaries;

(iii)        discharged or satisfied any lien or encumbrance in excess of $50,000 or paid any obligation or liability (absolute or contingent) in excess of $50,000, other than current liabilities paid in the ordinary course of business;

(iv)        declared or made any payment or distribution of cash or other property to stockholders with respect to its stock, or purchased or redeemed, or made any agreements so to purchase or redeem, any shares of its capital stock, in each case in excess of $25,000 individually or $50,000 in the aggregate;

(v)        sold, assigned or transferred any other tangible assets, or canceled any debts or claims, in each case in excess of $50,000, except in the ordinary course of business;

(vi)        sold, assigned or transferred any patent rights, trademarks, trade names, copyrights, trade secrets or other intangible assets or intellectual property rights in excess of $50,000, or disclosed any proprietary confidential information to any person except to customers in the ordinary course of business or pursuant to nondisclosure agreements;

(vii)        suffered any material losses or waived any rights of material value, whether or not in the ordinary course of business, or suffered the loss of any material amount of prospective business;

(viii)        made any changes in employee compensation except in the ordinary course of business and consistent with past practices;

(ix)        made capital expenditures or commitments therefor that aggregate in excess of $50,000;

(x)        entered into any material transaction, whether or not in the ordinary course of business;

(xi)        made charitable contributions or pledges in excess of $5,000;

(xii)        suffered any material damage, destruction or casualty loss, whether or not covered by insurance;

-13-

(xiii)        experienced any material problems with labor or management in connection with the terms and conditions of their employment; or

(xiv)        entered into an agreement, written or otherwise, to take any of the foregoing actions.

(z)        <u>Public Utility Holding Company Act and Investment Company Act Status</u>.  The Company is not a "holding company" or a "public utility company" as such terms are defined in the Public Utility Holding Company Act of 1935, as amended.  The Company is not, and as a result of and immediately upon either Closing will not be, an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

(aa)        <u>ERISA</u>.  No liability to the Pension Benefit Guaranty Corporation has been incurred with respect to any Plan by the Company or any of its Subsidiaries which is or would be materially adverse to the Company and its Subsidiaries.  The execution and delivery of this Agreement and the issuance and sale of the Notes will not involve any transaction which is subject to the prohibitions of Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>") or in connection with which a tax could be imposed pursuant to Section 4975 of the Internal Revenue Code of 1986, as amended.  As used in this Section 2.1(aa), the term "Plan" shall mean an "employee pension benefit plan" (as defined in Section 3 of ERISA) which is or has been established and maintained, or to which contributions are or have been made, by the Company or any Subsidiary or by any trade or business, whether or not incorporated, which, together with the Company or any Subsidiary, is under common control, as described in Section 414(b) or (c) of the Code.

(bb)        <u>No Integrated Offering</u>.  Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales of any security or solicited any offers to buy any security under circumstances that would cause the offering of the Notes pursuant to this Agreement to be integrated with prior offerings by the Company for purposes of the Securities Act which would prevent the Company from selling the Notes pursuant to Regulation D and Rule 506 thereof under the Securities Act, or any applicable exchange-related stockholder approval provisions, nor will the Company or any of its affiliates or subsidiaries take any action or steps that would cause the offering of the Notes to be integrated with other offerings.  The Company does not have any registration statement pending before the Commission or currently under the Commission's review and, except as set forth on <u>Schedule 2.1(bb)</u>, since September 30, 2013 the Company has not offered or sold any of its equity securities or debt securities convertible into shares of Common Stock.

(cc)        <u>Broker's Fees</u>.  Except to the extent set forth on <u>Schedule 2.1(cc)</u> hereto, neither the Company nor any Subsidiary has any obligation to any Person in respect of any finder's, broker's, investment banking or other similar fee in connection with any of the transactions contemplated under the Transaction Documents.

-14-

(dd)        Foreign Asset Control Regulations, etc.  Neither the purchase of the Notes by the Investors nor any use of the proceeds thereof will violate the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto.  None of the Company or the Subsidiaries (i) is a Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti-Terrorism Order or (ii) engages in any dealings or transactions with any such Person.  The Company and the Subsidiaries are in compliance, in all material respects, with the USA Patriot Act.  No proceeds of the purchase of the Notes by the Investors will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended, assuming in all cases that such Act applies to the Company or the Subsidiaries.

Section 2.2        Representations and Warranties of each Investor.

(a)        Each Investor hereby represents and warrants to the Company as of the date hereof and as of the date of the Closing that such Investor is purchasing the Note issued to such Investor solely for its own account and not with a view to or for sale in connection with distribution.  Such Investor does not have a present intention to sell such Note, nor a present arrangement (whether or not legally binding) or intention to effect any distribution of such Note to or through any Person; provided, however, that by making the representations herein, such Investor does not agree to hold such Note for any minimum or other specific term and reserves the right to dispose of such Note at any time in accordance with Federal and state securities laws applicable to such disposition. Such Investor further represents and warrants to the Company as of the date hereof and as of the date of the Closing that (i) such Investor has such knowledge and experience in financial and business matters that such Investor is capable of evaluating the merits and risks of the proposed investment in such Note; (ii) such Investor understands that such Note may not be sold, transferred or otherwise disposed of by it without registration under the Securities Act and any applicable state securities laws, or an exemption therefrom, and that in the absence of an effective registration statement covering such securities or an available exemption from registration, such Investor may be required to hold such securities indefinitely; and (iii) such Investor is an "accredited investor" within the meaning of Regulation D promulgated under the Securities Act.

<center>-15-</center>

---

(b)        Each of the Agent and each Investor agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (i) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (ii) to the extent requested by any regulatory authority having or asserting jurisdiction; (iii) to the extent required by law or by any subpoena or similar legal process; (iv) to any other party to this Agreement; (v) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (vi) subject to an agreement containing provisions substantially the same as those of this Section 2.2(b), to any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement; (vii) with the consent of the Company or any of its Subsidiaries; or (viii) to the extent such Information (1) becomes publicly available other than as a result of a breach of this Section 2.2(b) or (2) becomes available to the Agent or such Investor, as applicable, on a non-confidential basis from a source other than the Company of any of its Subsidiaries, which source is not known to the Agent or such Investor, as applicable, to be in breach of confidentiality with respect to such Information.  For the purposes of this Section 2.2(b), "Information" means all information received directly or indirectly from the Company of any Subsidiary relating to the Company or any Subsidiary, any Affiliate thereof, or the business of any of the foregoing, other than any such information that is available to the Agent or such Investor, as applicable, on a non-confidential basis prior to disclosure by the Company of any Subsidiary or any Affiliate of any thereof (unless the source is known to the Agent or such Investor, as applicable, to be in breach of confidentiality with respect to such Information); provided that, in the case of information received from the Company or any Subsidiary, any Affiliate thereof after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 2.2(b) shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

**EACH OF THE AGENT AND EACH INVESTOR ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 2.2(B) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE COMPANY OR ANY OF ITS SUBSIDIARIES, AND EACH OF THEIR AFFILIATES OR THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL, STATE AND OTHER APPLICABLE SECURITIES LAWS.**

**ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY THE COMPANY, THE AGENT OR ANY INVESTOR PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE COMPANY OR ANY OF ITS SUBSIDIARIES OR THEIR RESPECTIVE SECURITIES.  ACCORDINGLY, EACH OF THE AND EACH INVESTOR REPRESENTS TO THE COMPANY THAT IT HAS IDENTIFIED TO THE COMPANY A CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL, STATE AND OTHER APPLICABLE SECURITIES LAWS.**

-16-

## ARTICLE III

## COVENANTS

The Company covenants with the Agent and the Investors as follows, which covenants are for the benefit of the Agent and the Investors and their respective successors and assigns.  Unless otherwise set forth in the covenants in this ARTICLE III, such covenants shall survive the Closing hereunder until the Notes and all other obligations under the Transaction Documents are paid in full, at which time they shall automatically terminate.

Section 3.1          <u>Securities Compliance</u>.

The Company shall notify the Commission in accordance with its rules and regulations, of the transactions contemplated by any of the Transaction Documents and shall take all other necessary action and proceedings as may be required and permitted by applicable law, rule and regulation, for the legal and valid issuance of the Notes to the Investors or subsequent holders.

Section 3.2          <u>Registration and Listing</u>.

The Company shall cause its Common Stock to continue to be registered under Sections 12(b) or 12(g) of the Exchange Act, to comply in all respects with its reporting and filing obligations under the Exchange Act and to not take any action or file any document (whether or not permitted by the Securities Act or the rules promulgated thereunder) to terminate or suspend such registration or to terminate or suspend its reporting and filing obligations under the Exchange Act or Securities Act.  The Company will take all action necessary to continue the listing or trading of its Common Stock on the New York Stock Exchange, the NYSE Alternext Exchange, the NYSE MKT, the Nasdaq Capital Markets, the Nasdaq Global Markets, or the Nasdaq Global Select Market, the OTCQB or the OTC Bulletin Board.  Upon the request of the Agent or any Investor, the Company shall deliver to the Agent and the Investors a written certification of a duly authorized officer as to whether it has complied with such requirements.

Section 3.3          <u>Compliance with Laws</u>.

The Company shall comply, and cause each Subsidiary to comply, with all applicable laws, rules, regulations and orders of any governmental authority, including without limitation, all securities law, rules and regulations and timely make all filings required by any such laws, rules and regulations, except for such noncompliance or failures that individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect.

Section 3.4          <u>Keeping of Records and Books of Account</u>.

The Company shall keep and cause each Subsidiary to keep adequate records and books of account, in which complete entries will be made in accordance with GAAP or IFRS, as applicable, consistently applied, reflecting all financial transactions of the Company and its Subsidiaries, and in which, for each fiscal year, all proper reserves for depreciation, depletion, obsolescence, amortization, taxes, bad debts and other purposes in connection with its business shall be made.  Upon request of the Agent or any Investor, the Company shall, and shall cause each of its Subsidiaries to, make available to the Agent or such Investor, as applicable, any and all books and records or any other information reasonably requested by the Agent or such Investor, as applicable, relating to the financial condition to the Company and each of its Subsidiaries.

-17-

Section 3.5                     <u>Reporting Requirements</u>.

The Company shall furnish the following to the Agent and the Investors until payment in full in cash of all amounts due under any Transaction Document and the termination of this Agreement and the other Transaction Documents (the Agent and the Investors acknowledge that the requirement to furnish copies of documents filed publicly with the Securities and Exchange Commission on the EDGAR database ("<u>EDGAR Documents</u>") shall be satisfied by the delivery of electronic mail notices of such filings or automatic alerts through EDGAR, and the Company shall not be required (unless otherwise requested in writing by the Agent or any Investor) to provide the Agent or the Investors any further notice or physical copies of any EDGAR Documents):

(a)         <u>Commission Documents</u>

(1)          Within 45 days following the end of each of the Company's fiscal quarters (provided that if the Company timely files a Form 12b-25, the Company shall have an additional five days following the end of the Company's fiscal quarter), Quarterly Reports on Form 10-Q;

(2)          Within 90 days following the end of each of the Company's fiscal years (provided that if the Company timely files a Form 12b-25, the Company shall have an additional fifteen days following the end of the Company's fiscal year), Annual Reports on Form 10-K;

(3)          Current Reports filed with the Commission on Form 8-K as soon as practical after the document is or would have been required to be filed with the Commission;

(4)          Copies of any other filings filed or required to be filed with the Commission as soon as practical after the document is or would have been required to be filed with the Commission;

(5)          Copies of all notices, information and proxy statements in connection with any meetings that are, in each case, provided to holders of shares of Common Stock, contemporaneously with the delivery of such notices or information to such holders of Common Stock; and

(6)          Within five (5) Business Days of the Agent's or any Investor's request, copies of any other reports, information or filings reasonably requested by the Agent or such Investor from time to time.

-18-

(b)      Budget

(i)      By no later than thirty (30) days before the end of each calendar year, the Company shall deliver (or cause to be delivered) to the Agent and the Investors an Annual Budget for the following calendar year, which Annual Budget shall (A) reflect monthly general and administrative expenditures, plugging expenses, and other budgeted items and be in a form and substance satisfactory to the Agent and the Investors and the Company in their reasonable discretion,  "Annual Budget" means the annual operating budget (including budgeted statements on both a monthly and full year basis of income and sources and uses of cash) for the Company and each of its Subsidiaries.

(ii)      By no later than five (5) days before the end of each calendar quarter end, the Company shall deliver (or cause to be delivered to the Agent and the Investors (A) a Quarterly Budget for the following quarter, which Quarterly Budget shall (1) reflect the quarter's general and administrative expenditures, plugging expenses, and other budgeted items and otherwise be in a form and substance mutually agreeable to each of the Agent, the Investors and the Company and readily producible and available through the Company's then-existing accounting systems, software and processes; and (B) a comparison of the Quarterly Budget previously delivered to the Agent and the Investors in respect of the immediately prior quarter and the actual expenditures of the Company for such quarter, together with an explanation of any material variances.  "Quarterly Budget" means the operating budget (including budgeted statements on a quarterly basis of income and sources and uses of cash) for the Company and each of its Subsidiaries.  "Budgets" means, collectively, the Annual Budgets and the Quarterly Budgets.

(iii)      By no later than thirty (30) days before the end of each calendar year, the Company shall deliver (or cause to be delivered) to the Agent and the Investors a drilling plan and capital expenditure budget for the drilling of exploratory and development wells by the Company and the Subsidiaries on the Oil and Gas Properties that are part of the Collateral (the "Assigned Properties") for the period commencing on January 1 of the next succeeding calendar year and ending on December 31 of such next succeeding calendar year months detailing the manner in which the Company anticipates using the net proceeds of Subsequent Fundings and Company Contributions, which shall be in a form and substance mutually agreeable to each of the Agent, the Investors and the Company (any such budget for any period of time, the "Capital Expenditure Plan").

(c)      Reserve Reports.  The Company shall, at its sole expense, (i) cause an engineering reserve report relating to the Oil and Gas Properties to be prepared by a licensed engineer (which may be an internally-generated report) for the first six (6) months of a calendar year and delivered to the Agent and the Investors on the fifteenth calendar day of August of each year (or, if such fifteenth day is not a Business Day, on the immediately following Business Day), beginning on August 15, 2014, and (ii) retain either Ryder Scott Petroleum Consultants, Netherland, Sewell & Associates, Inc. or DeGolyer and MacNaughton (each of the foregoing, an "Approved Consultant") to prepare an engineering reserve report relating to the Oil and Gas Properties each calendar year and deliver such report to the Agent and the Investors on the fifteenth calendar day of March of each year (or, if such first calendar day is not a Business Day, on the immediately following Business Day), beginning on March 15, 2015.  Any such engineering reserve report shall be referred to herein as a "Reserve Report".  Each Reserve Report will evaluate the projected recoverable reserves attributable to the Company's and each of its Subsidiaries' working interests and net revenue interests in the Oil and Gas Properties.  The Reserve Report will separately report on PDP Reserves, PDNP Reserves and PUD Reserves in accordance with the requirements of Rule 4-10 of Regulation S-X of the Securities and Exchange Commission.

-19-

(d)      <u>Tax Returns</u>.  Within twenty (20) days after filing thereof, a copy of the annual federal tax return (and any amended return) and any state, monthly or annual, tax filings (and any amendment thereto) of the Company or any of its Subsidiaries certified by the chief financial officer or chief executive officer of the Company or such Subsidiary to be accurate and complete in all material respects.

(e)      <u>Government Notices</u>.  Promptly after receipt, copies of all notices, requests, subpoenas, inquiries or other writings received from any governmental agency concerning the violation or alleged violation of any Environmental Laws, the storage, use or disposal of any Hazardous Material, the violation or alleged violation of the Fair Labor Standards Act or the payment or non-payment of any taxes including any tax audit, in each case, with respect to the Company or any of its Subsidiaries.

(f)      <u>Notification of Events of Default, etc.</u>  By the end of the fourth (4th) Business Day following the day any officer of the Company or any of its Subsidiaries obtains knowledge of any of the following events or conditions, a written notice, including a certificate signed by the chief executive officer or president of the Company or such Subsidiary, specifying the nature and period of existence of such condition or event and what action the Company or such Subsidiary, as applicable, has taken, is taking, and proposes to take, with respect thereto:

(i)      any condition, circumstance or event that constitutes an Event of Default or a Default;

(ii)      any default or breach by the Company or any of its Subsidiaries of the performance, observance or fulfillment of any of the obligations, duties, covenants or conditions contained in any contractual obligation of the Company or any of its Subsidiaries, or the occurrence of any condition or event that would allow the other party to any such contractual obligations to terminate or cancel such contract, or the receipt by the Company or any of its Subsidiaries of any notice from any such counterparty under any such contractual obligation claiming that any such default or material condition or event has occurred, in any such case with respect to any contract of the Company or any of its Subsidiaries the termination or cancellation of which, or non-renewal of which on substantially similar terms, could reasonably be expected to have a Material Adverse Effect;

(iii)      any condition, circumstance or event which has had or could reasonably be expected to have a Material Adverse Effect; or

-20-

(iv)        the resignation or termination of the chief financial officer or the controller of the Company or any of its Subsidiaries (or any officer(s) or employee(s) of the Company or any of its Subsidiaries performing the duties and functions commonly performed by a chief financial officer and a controller) or the head(s) of operations and sales of the Company or any of its Subsidiaries, or if any such person shall leave his or her office for whatever reason or ceases to exercise the rights and duties of such office; provided, that, in addition to giving written notice as provided for above, the Company shall also provide notice to the Agent and the Investors via e-mail and telephone to one of the managing partners of the Agent of such occurrence by the end of the fourth (4th) Business Day following the day any officer of the Company obtains knowledge of any such event described in this clause (iv) unless the Company has previously publicly disclosed or concurrently discloses such resignation/termination in the EDGAR Documents and such disclosure is electronically provided to the Agent and the Investors or the Agent and the Investors receive an electronic alert through EDGAR of the same.

(g)        Trade Names.  At least ten (10) Business Days advance written notice of any new trade name or fictitious business name.

(h)        Locations.  At least ten (10) Business Days advance written notice of any change in the Company's or any of its Subsidiaries' addresses or of any new location for their respective books and records or where any assets of the Company or any of its Subsidiaries on which a Lien in favor of the Agent has been or purports to be created and/or granted pursuant to any Transaction Documents (the "Collateral") (including any such new Collateral location operated by a third party (and specifically including any public warehouse, any consignment location, any locations where any of the Collateral is to be held for processing and any other bailee location at which any of the Collateral is to be located)).  With respect to any such new location (which in any event shall be within the continental United States assuming that such Collateral was located in the continental United States at the time it became Collateral), the Company shall, and shall cause each of its Subsidiaries to, execute such documents and take such actions as the Agent or any Investor deems necessary or desirable to perfect and protect the security interests of the Agent in the Collateral prior to the transfer or removal of any Collateral to such new location.

(i)        Accounts.  The Company will cause (i) the Agent and the Investors to be provided with the ability to monitor and access the Bank Accounts of the Company, each Subsidiary and Condor online and in real time, and (ii) copies of all bank statements with respect to all accounts of every kind to be provided to the Agent contemporaneously with their being provided to the Company, any Subsidiary or Condor.  The Company shall not and shall not permit any of its Subsidiaries to open or own any deposit accounts other than as set forth on Schedule 2.1(h), unless (x) such accounts are approved by the Agent in writing, which approval shall not be unreasonably delayed, conditioned or withheld, (y) the Company has complied with clauses (i) and (ii) of this Section 3.5(i) with respect to such accounts and (z) such accounts are part of the Collateral.

(j)        Certified Public Accountants.  Within four (4) Business Days of the resignation or termination of the Company's current certified public accountants, or any certified public accountants hereafter engaged by the Company, notify the Agent and the Investors in writing of such occurrence and the reason(s) therefor, unless the Company has previously publicly disclosed or concurrently discloses such resignation/termination in the EDGAR Documents and such disclosure is electronically provided to the Agent and the Investors or the Agent and the Investors receive an electronic alert through EDGAR of the same.

-21-

(k)        Litigation.  Within four (4) Business Days after the Company obtains knowledge of (i) the institution of any action, suit, proceeding, governmental investigation or arbitration against or affecting the Company or any of its Subsidiaries or any property of the Company or any of its Subsidiaries not previously disclosed by the Company to the Agent and the Investors in writing and in an amount in excess of $50,000 or (2) any material development in any action, suit, proceeding, governmental investigation or arbitration at any time pending against or affecting the Company or any of its Subsidiaries or any property of the Company or any of its Subsidiaries that could reasonably be expected to have a Material Adverse Effect, the Company will give written notice thereof to the Agent and the Investors and provide such other information as may be reasonably available to the Company or any of its Subsidiaries to enable the Agent and the Investors and its counsel to evaluate such matter.

(l)        Milestone Reports.  With reasonable promptness, copies of all data, including well logs, drilling records, completion reports, test results and field notes, with respect to the Oil and Gas Properties, and daily reports from the field that describe the drilling and completion operations.

(m)        Revenue Statements.  Within four (4) Business Days after the Company's receipt thereof, revenue statements from the sale of Hydrocarbons for each calendar month.

(n)        Asia Sixth.  Within four (4) Business Days after the Company's receipt or delivery thereof, copies of all notices, requests, subpoenas, inquiries or other writings received or delivered in connection with that certain Shares Subscription Agreement dated September 11, 2013 by and between The Sixth Energy Limited, Asia Sixth Energy Resources Limited and Pacific Energy Development Corp., a Nevada corporation ("PEDCO").

(o)        Other Notices.  Within four (4) Business Days after the Company's receipt or delivery thereof, copies of all notices, requests, subpoenas, inquiries or other writings received or delivered with respect to any of the Collateral to the extent such notices, requests, subpoenas, inquiries or other writings could reasonably be deemed to be material to the ownership or economics of the Company and its Subsidiaries, taken as a whole, or the Oil and Gas Properties.

Section 3.6                Other Agreements.

The Company shall not, and shall not permit its Subsidiaries to, enter into any agreement in which the terms of such agreement would restrict or impair the right or ability to perform of the Company or any of its Subsidiaries to perform if their specific obligation, under any Transaction Document.  Notwithstanding the above and the other terms and conditions of this Agreement, the Agent and the Investors agree and acknowledge that the Company shall have the right to (a) sell all or any portion of the Mississippian Property in accordance with the terms of this Agreement, and/or (b) farm in a third party into all or any portion of the Mississippian Property, and/or (c) otherwise transfer or divest all or any portion of the Mississippian Property in accordance with the terms of this Agreement.

Section 3.7                Use of Proceeds.

(a)        The net proceeds from the Initial Funding shall be used by the Company as follows:  (i) $27,300,000 (together with $2,700,000, representing the net cash proceeds received from the sale by White Hawk Petroleum LLC ("White Hawk") of approximately 1,331 net acres in the Eagle Ford located in McMullen County, Texas to Millennial PDP Fund IV, LP) to purchase assets located in Weld and Morgan Counties, Colorado, from Continental Resources, Inc. (the "Continental Acquisition"), and (ii) to pay fees and expenses incurred in connection with the transactions contemplated by this Agreement, the Continental Acquisition, and the other Transaction Documents.

-22-

(b)       The net proceeds of each Subsequent Funding shall be used by the Company to pay the Company's or a Subsidiary's, as applicable, pro rata share, based on the Company's or such Subsidiary's working interest in an Oil and Gas Properties or the related well, of drilling and completion costs, and related title, landman, permitting, legal and accounting expenses, for projects with respect to the Conveyed Properties.

(c)       In no event shall the proceeds of any Funding be used to redeem any Common Stock or securities convertible, exercisable or exchangeable into Common Stock, to settle any outstanding litigation or towards the payment of selling general and administrative expenses.  Notwithstanding the foregoing, to the extent the Company receives any purchase price adjustments pursuant to the provisions of the Continental Acquisition purchase documentation which has the effect of reducing the purchase price payment due from the Company upon the closing of the Continental Acquisition (including, but not limited to, a downward adjustment to the amount of cash due at closing to reflect any performance deposits paid by the Company), then the Company may use the net proceeds after the Company's payment of the purchase price due at closing of the Continental Acquisition that remain from the Initial Funding allocated to the payment of the Continental Acquisition purchase price for any corporate purpose.

Section 3.8       Reporting Status.

The Company shall timely file all reports required to be filed with the Commission pursuant to the Exchange Act, and the Company shall not terminate its status as an issuer required to file reports under the Exchange Act even if the Exchange Act or the rules and regulations thereunder would permit such termination.  The Company shall promptly disclose on Form 8-K the occurrence of any Material Adverse Effect or any event that could reasonably be expected to cause a Material Adverse Effect, assuming such disclosure is otherwise required by Form 8-K.

Section 3.9       Payment of Revenues.

The Company shall, not later than fourteen (14) days after the Closing, direct the operators party to the operating agreements for the Oil and Gas Properties acquired in connection with the Continental Acquisition to pay to an account with respect to which the Agent has a perfected security interest and control all amounts due to the Company or any Subsidiary under such operating agreements.

Section 3.10       Amendments.

The Company shall not, and shall not permit any of its Subsidiaries to, amend or waive any provision of its Certificate of Formation or Bylaws or other organizational documents in any way that would adversely affect exercise or other rights of the holder of the Notes.

-23-

Section 3.11          Distributions.

The Company agrees that it shall not, and shall not permit any Subsidiary to, (i) declare or pay any cash dividends or make any distributions (by reduction of capital or otherwise) to any holder(s) of Common Stock or other equity security of the Company or any Subsidiary (or security convertible into or exercisable for Common Stock) or set aside or otherwise deposit or invest any sums for such purpose; provided, however, that any Subsidiary may declare and pay such dividends or make such distributions to such holder(s) so long as an Event of Default or a Default has not occurred and in not continuing, or (ii) redeem, retire, defease, purchase or otherwise acquire for value, directly or indirectly, any Common Stock or other equity security of the Company or any Subsidiary or set aside or otherwise deposit or invest any sums for such purpose.

Section 3.12          Prohibition on Liens.

The Company shall not, and shall not permit its Subsidiaries to, enter into, create, incur, assume, suffer or permit to exist any lien, security interest, mortgage, pledge, charge, claim or other encumbrance of any kind (collectively, "Liens") on or with respect to any of its assets, now owned or hereafter acquired or any interest therein or any income or profits therefrom, or file or permit the filing of, or permit to remain in effect any financing statement or other similar notice of any Lien with respect to such assets, other than Permitted Encumbrances. "Permitted Encumbrances" means the individual and collective reference to the following: (a) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves (in the good faith judgment of the management of the Company) have been established in accordance with GAAP or IFRS, as applicable; (b) Liens imposed by law which were incurred in the ordinary course of the Company's business, such as carriers', warehousemen's and mechanics' Liens, statutory landlords' Liens, and other similar Liens arising in the ordinary course of the Company's business, and which (x) do not individually or in the aggregate materially detract from the value of such property or assets or materially impair the use thereof in the operation of the business of the Company and its consolidated Subsidiaries or (y) are being contested in good faith by appropriate proceedings, which proceedings have the effect of preventing for the foreseeable future the forfeiture or sale of the property or asset subject to such Lien; (c) the Liens set forth in Schedule 3.12 hereto in effect on the date hereof; (d) the Liens of the Agent set forth in the Transactions Documents; and (e) Liens that are subordinate to the Liens of the Agent pursuant to a subordination agreement and on terms and conditions, in each case satisfactory to the Agent in its sole discretion; provided that Liens described in the foregoing clauses (a) and (b) that are recorded in the real property records of the county in which the Oil and Gas Properties are located before the Closing Date shall not be Permitted Encumbrances to the extent such Liens arise by, from, through, under or as a result of any act by the Company, any Subsidiary or any Affiliate of the Company or any Subsidiary.

Section 3.13          Prohibition on Indebtedness.

The Company shall not, and shall not permit any Subsidiary to, enter into, create, incur, assume, suffer, become or be liable for in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse or otherwise become responsible for (directly or indirectly), any Indebtedness, performance, obligations or dividends of any other Person, other than (i) Indebtedness existing on the date hereof and disclosed in Schedule 2.1(l) to this Agreement, (ii) Indebtedness in favor of the Agent and the Investors and (iii) Indebtedness that is subordinate to the obligations of the Company to the Investors under the Notes and the other Transaction Documents pursuant to a subordination agreement in form and substance reasonably acceptable to the Agent and the Investors.

-24-

Section 3.14          <u>Compliance with Transaction Documents</u>.

The Company shall, and shall cause its Subsidiaries to, comply with their respective obligations under the Notes and the other Transaction Documents.

Section 3.15          <u>Transactions with Affiliates</u>.

The Company shall not, and shall not permit its Subsidiaries to, directly or indirectly, (i) purchase, acquire or lease any property from, or sell, transfer or lease any property to any officer, director, agent, employee or any Affiliate of the Company or any Subsidiary, or (ii) make any payments of management, consulting or other fees for management or similar services, or of any Indebtedness owing to any officer, director, agent, employee, or other Affiliate of Company or any Subsidiary, including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director, agent or such employee or, to the knowledge of the Company, any entity in which any officer, director, agent or any such employee has a substantial interest or is an officer, director, trustee or partner, other than (i) for payment of reasonable salary for services actually rendered, as approved by the Board of Directors of the Company as fair and reasonable in all respects to the Company or the applicable Subsidiary and upon terms no less favorable to the Company or such Subsidiary that the Company or such Subsidiary would obtain in a comparable arm's length transaction with an unaffiliated person, (ii) reimbursement for expenses incurred on behalf of the Company in the ordinary course of and pursuant to the reasonable requirements of the business or any Subsidiary, and (iii) the repayment of amounts due or owing by PEDCO to MIE Jurassic Energy Corporation ("<u>MIEJE</u>") pursuant to that certain promissory note, dated November 1, 2012, as amended and restated to date, in accordance with its terms but only to the extent permitted by that certain Subordination and Intercreditor Agreement dated as of the date hereof among the PEDCO, MIEJE and the Agent, or the conversion of such promissory note into shares of common stock of the Company.  "<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  "<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. For the purposes of this definition, and without limiting the generality of the foregoing, any Person that owns directly or indirectly 10% or more of the equity interests having ordinary voting power for the election of the directors or other governing body of a Person (other than as a limited partner of such other Person) will be deemed to "control" such other Person. "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

-25-

Section 3.16                    No Merger or Sale of Assets; No Formation of Subsidiaries.

The Company shall not, and shall not permit any Subsidiary to, directly or indirectly, (i) merge into or with or consolidate with any other Person (other than into the Company or a Subsidiary of the Company) or permit any other Person (other than the Company or a Subsidiary of the Company) to merge into or with or consolidate with it, provided that if any such consolidation or merger involves the Company, then the Company must be the survivor of such consolidation or merger; (ii) sell, issue, assign, lease, license, transfer, abandon, farm-out or otherwise dispose of any or all of its assets (other than inventory in the ordinary course of business), except as provided below; (iii) in any way or manner alter its organizational structure or effect a change of entity (except as expressly permitted in this Agreement); (iv) form or create any subsidiary or become a partner in any partnership or joint venture, or make any acquisition of any interest in any Person or acquire substantially all of the assets of any Person, unless (x) in the case of the formation or creation of any subsidiary or becoming a partner in any partnership or joint venture, (1) any such subsidiary, partnership or joint venture becomes a party to the Transaction Documents as guarantor and the assets of such subsidiary, partnership or joint venture are pledged to the Agent as Collateral, except, in the case of any partnership or joint venture, to the extent the related partnership agreement or similar organizational documents specifically prohibit such partnership or joint venture from becoming a party to the Transaction Documents and causing its assets to become Collateral, and (2) the equity interests issued by such subsidiary, partnership or joint venture and owned by the Company of such Subsidiary are pledged to the Agent as Collateral or (y) in the case of any acquisition of assets of any Person, such assets are pledged to the Agent as Collateral; (v) wind up, liquidate or, subject to the proviso in Section 3.19 below, dissolve or (vi) agree to do any of the foregoing. Notwithstanding the foregoing, the Company may transfer, sell, assign or farm-out, its working interest in all or any portion of the Mississippian Property, in an arm's length, commercially and economically reasonable bona fide transaction (a "Bona Fide Transaction"), without the Agent's or any Investor's consent, provided that (1) such Bona Fide Transaction is approved by the Board of Directors of the Company, (2) such Bona Fide Transaction does not materially negatively affect the Maker's ability to timely pay the principal and interest on the Notes or otherwise have a Material Adverse Effect, (3) the Agent maintains the security interest provided by the Security Agreement in the consideration received by the Maker or PED MSL or any of their respective Affiliates in connection with such Bona Fide Transaction and (4) RJ Resources Corp., a Delaware corporation ("RJ Resources") receives a pro rata portion, based on the RJ RESOURCES' working interest in the Mississippian Property, of any consideration received by the Company or PED MSL or any of their respective Affiliates in connection with such Bona Fide Transaction (whether in cash or in kind). Upon the sale, assignment or transfer of all or any portion of the Mississippian Property in a Bona Fide Transaction, neither the Agent nor any Investor shall not retain any interest, rights, Lien or security interest in the Mississippian Property. For the sake of clarity, the Agent and the Investors shall approve, ratify or consent to any Bona Fide Transaction agreed to by the Company's Board of Directors. In the event and on each occasion that any proceeds are received by or on behalf of the Company or any Affiliate of the Company in respect of any Bona Fide Transaction, the Company shall, immediately after such proceeds (after payment of any proceeds due to the Investors or any Affiliate of the Investors in connection with such Bona Fide Transaction) are received by the Company or any such Affiliate, prepay the Notes in an aggregate amount equal to 100% of such proceeds to the extent of the then outstanding principal and interest thereon. If the Company delivers to the Agent and the Investors a certificate of the chief financial officer, principal accounting officer, treasurer or controller of the Company to the effect that the Company or any Subsidiary of the Company intends to apply such proceeds (or a portion thereof specified in such certificate) within 360 days after receipt of such proceeds to acquire Oil and Gas Properties, fund a portion of the Capital Expenditure Plan or acquire equipment or other tangible assets to be used in the business of the Company or such Subsidiary, and certifying that no Default or Event of Default has occurred and is continuing, then such proceeds specified in such certificate shall not be required to be immediately applied to the prepayment of the Notes upon receipt thereof, provided that if all or any portion of such proceeds is not so reinvested within such 360-day period, such unused portion shall be applied on the last day of such period as a mandatory prepayment to the extent of the then outstanding principal of the Notes and interest thereon; provided, further, that all property purchased with such proceeds shall be made subject to a Lien in favor of the Agent.

-26-

Section 3.17          Payment of Taxes, Etc.

The Company shall, and shall cause each of its Subsidiaries to, promptly pay and discharge, or cause to be paid and discharged, when due and payable, all lawful taxes, assessments and governmental charges or levies imposed upon the income, profits, property or business of the Company and the Subsidiaries; provided, however, that any such tax, assessment, charge or levy need not be paid if the validity thereof shall currently be contested in good faith by appropriate proceedings and if the Company or such Subsidiaries shall have set aside on its books adequate reserves with respect thereto, and provided, further, that the Company and such Subsidiaries will pay all such taxes, assessments, charges or levies forthwith upon the commencement of proceedings to foreclose any lien which may have attached as security therefor.

Section 3.18          Corporate Existence.

The Company shall, and shall cause each of its Subsidiaries to, maintain in full force and effect its corporate existence, rights and franchises and all licenses and other rights to use property owned or possessed by it and reasonably deemed to be necessary to the conduct of its business; provided, however, that the Company may dissolve or cause one or more of its Subsidiaries to merge or consolidate with the Company or any of its other Subsidiaries, provided that if any such consolidation or merger involves the Company, then the Company must be the survivor of such consolidation or merger.

Section 3.19          Maintenance of Assets.

The Company shall, and shall cause its Subsidiaries to, keep its properties in good repair, working order and condition, reasonable wear and tear excepted, and from time to time make all necessary and proper repairs, renewals, replacements, additions and improvements thereto.

Section 3.20          No Investments.

The Company shall not, and shall not permit any Subsidiary to, make or suffer to exist any Investments or commitments therefor, other than (a) Investments made in the ordinary course of business, (b) Investments existing on the Closing Date by the Company in the Subsidiaries, (c) Investment made exclusively from the proceeds of an equity investment into the Company, (d) Investments made pursuant to the Company's outstanding obligations in connection with the pending acquisition of shares of Asia Sixth pursuant to that certain Shares Subscription Agreement dated September 11, 2013 between Asia Sixth, The Sixth Energy Limited and PEDCO and (e) loans made by PEDCO to Condor, provided that (i) simultaneously with the making of such loan by PEDCO, MIE Jurassic Energy Corporation ("MIEJE") also makes a loan to Condor in such amount as will result in PEDCO's loan to Condor representing twenty percent (20%) of the aggregate amount loaned to Condor by PEDCO and MIEJE and (ii) the loans made to Condor by PEDCO and MIEJE are *par passu* in right of payment. "Investment" means, with respect to any Person, (i) all investments (by capital contribution or otherwise) in any other Person, (ii) any extension of credit, loan or advance, or (iii) any purchase or repurchase of stock or other ownership interest, Indebtedness or all or a substantial part of the assets or property of any Person, bonds, notes, debentures or other securities, or otherwise, and whether existing on the date of this Agreement or thereafter made, but such term shall not include (x) the cash surrender value of life insurance policies on the lives of officers or employees, (y) amounts due from customers for services or products delivered or sold in the ordinary course of business, (z) or payments required to be made pursuant to operating agreements with respect to Oil and Gas Properties to fund drilling and completion costs with respect to operated and non-operated wells, or lease extensions, option exercises or acquisitions pursuant to corresponding AFE's received by the Company or any Subsidiary.

-27-

Section 3.21          Acquisition of Assets.

In the event the Company or any Subsidiary acquires any assets or other properties, without limiting or impairing the limitations set forth in Section 3.20 above, such assets or properties shall constitute a part of the Collateral (as defined in the Security Agreement) and the Company shall take all action necessary to perfect the Agent's security interest in such assets or properties; provided that the Agent may waive or forego any Collateral requirement hereunder if the costs that would be incurred in fulfilling such requirement (including taking into account tax consequences and applicable law) are excessive in relation to the benefits afforded thereby, as determined by the Agent in its sole discretion.

Section 3.22          Inspection.

The Company, upon reasonable written notice (which in no event shall be less than 48 hours), shall permit the Agent and any Investor and their respective duly authorized representatives or agents to visit any of the Company's properties and inspect any of its assets or books and records, to examine and make copies of its books and records and to discuss its affairs, finances, technology and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as the Agent or such Investor may designate.

Section 3.23          Material Contracts.

The Company shall, and shall cause each of its Subsidiaries to, comply with and perform all obligations required to be performed by them to date under any Material Agreement, other than those which, individually or in the aggregate, are not reasonably likely to have a Material Adverse Effect.

-28-

Section 3.24          <u>Insurance</u>.

The Company shall, and will cause each Subsidiary to:

(a)          have (i) all insurance policies sufficient for the compliance by each of them with all material governmental requirements and all Material Agreements and (ii) insurance coverage in at least amounts and against such risk (including, without limitation, public liability) that are usually insured against by companies similarly situated and engaged in the same or a similar business for the assets and operations of the Company and the Subsidiaries.  The Company shall deliver (or cause to be delivered) copies of all such policies to the Agent and the Investors with an endorsement naming the Agent as a lender loss payee (under a satisfactory lender loss payable endorsement) or additional insured, as appropriate.  Each policy of insurance or endorsement shall contain a clause requiring the insurer to give not less than 30 days prior written notice to the Agent in the event of cancellation of the policy for any reason whatsoever; and

(b)          give to the Agent and the Investors prompt notice of any loss of the Company or any Subsidiary exceeding $25,000 covered by such insurance.  So long as no Event of Default (as defined in the Notes) has occurred and is continuing, the Company or such Subsidiary shall have the exclusive right to adjust any losses payable under any such insurance policies which are less than $25,000.  Following the occurrence and during the continuation of an Event of Default, the Agent shall have the right to adjust any losses payable under any such insurance policies, without any liability to the Company and the Subsidiaries whatsoever in respect of such adjustments except for the liability of the Agent for its gross negligence or willful misconduct.  Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies) or as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid over to the Agent, for the benefit of the Investors, to be applied at the option of the Investors either to the prepayment (or held as cash collateral for) of the amounts outstanding under the Notes or to be disbursed to Company or such Subsidiary under staged payment terms satisfactory to the Investors for application to the cost of repairs, replacements, or restorations; <u>provided</u>, <u>however</u>, that, with respect to any such monies in an aggregate amount during any 12 consecutive month period not in excess of $50,000, so long as (i) no Event of Default shall have occurred and be continuing, (ii) the Company or the Subsidiary shall have given the Agent and the Investors prior written notice of the Company's or such Subsidiary's intention to apply such monies to the costs of repairs, replacement, or restoration of the property which is the subject of the loss, destruction, or taking by condemnation, (iii) the monies are held in a cash collateral account in which the Agent has a perfected first-priority security interest, and (iv) the Company or the Subsidiaries complete such repairs, replacements, or restoration within 180 days after the initial receipt of such monies, the Company and the Subsidiaries shall have the option to apply such monies to the costs of repairs, replacement, or restoration of the property which is the subject of the loss, destruction, or taking by condemnation unless and to the extent that such applicable period shall have expired without such repairs, replacements, or restoration being made, in which case, any amounts remaining in the cash collateral account shall be paid to the Agent and applied (or held as collateral) as set forth above.

-29-

Section 3.25                    <u>Production Report and Lease Operating Statements</u>.

Within 40 days after the end of each production month (unless for gas, then within 60 days after the end of each production month), (i) a report setting forth, for each calendar month during the then current fiscal year to date, the volume of production and sales attributable to production (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Company's and each Subsidiary's Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto and incurred for each such calendar month, and internet access to the Company, real time reports of sales of production, if then available, and (ii) a statement from each operator setting forth the volumes of hydrocarbons sold, the price received and the Company's or such Subsidiary's share of the proceeds of such sale.  For non-operated assets, production reports will be forwarded within two (2) Business Days of receipt from the operator.

Section 3.26                    <u>Operation and Maintenance of Properties</u>.

The Company, at its own expense, shall, and shall cause each Subsidiary to:

(1)       operate its Oil and Gas Properties and other material properties or, in the case of non-operated properties, use its reasonable efforts to, cause such Oil and Gas Properties and other material properties to be operated in a careful and efficient manner, as would an ordinarily prudent operator under the same or similar circumstances, in accordance with the practices of the industry and in compliance with all applicable contracts and agreements and in compliance with all governmental requirements, including, without limitation, applicable pro ration requirements and Environmental Laws, and all applicable laws, rules and regulations of every other governmental authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom and the plugging of wells and such other obligations as contemplated by any of the Transaction Documents, except, in each case, where the failure to comply could not reasonably be expected to have a Material Adverse Effect;

(2)       keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its material Oil and Gas Properties and other material properties, including, without limitation, all equipment, machinery and facilities;

(3)       promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and indebtedness accruing under the leases of whatever type or kind or other agreements affecting or pertaining to its Oil and Gas Properties and will take all other commercially reasonable actions necessary to keep unimpaired its and their rights with respect thereto and prevent any forfeiture thereof or default thereunder, including the expenditure of funds, unless: (i) the Company's management has approved or ratifies such forfeiture or default; (ii) the actions required to be taken are out of the reasonable control of the Company (to include, without limitation, requiring a third party to file a Petition for Formal Probate of Will and Formal Appointment of Personal Representative); or (iii) the forfeiture thereof or default could not reasonably be expected to have a Material Adverse Effect;

-30-

(4)        promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with industry standards, the obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties and other material properties; and

(5)        to the extent none of the Company or the Subsidiaries is the operator of any property, the Company shall use reasonable efforts to require the operator to comply with this Section 3.26.

Section 3.27          Title Information.

Upon request of the Agent or any Investor (at its sole discretion), the Company will deliver or caused to be delivered title information in form and substance acceptable to the Agent or such Investor covering Oil and Gas Properties, now owned or hereafter acquired; provided that with respect to the Oil and Gas Properties acquired in connection with the Continental Acquisition, the Company shall only be obligated to deliver or cause to be delivered such information available and in the possession of the Company or any Subsidiary.

Section 3.28          Gas Imbalances, Take-or-Pay or Other Prepayments.

The Company shall not, and shall not permit any Subsidiary to, allow gas imbalances, take-or-pay or other prepayments with respect to the operated Oil and Gas Properties of the Company or any Subsidiary that would require the Company or such Subsidiary to deliver Hydrocarbons at some future time without then or thereafter receiving full payment therefor to exceed one half billion cubic feet of gas in the aggregate.  This Section 3.27 shall not apply to the Company's non-operated assets or to oil and gas properties located in Aktobe oblast of the Republic of Kazakhstan (the "Kazakhstan Asset").

Section 3.29          Company Contribution.

On or prior to the date that the Company delivers an Advance Request to RJC pursuant to Section 1.1(c), the Company shall have deposited into the Capex Account from a source other than an Investor an amount of funds equal to the amount of the requested Subsequent Funding described in such Advance Request (the "Company Contribution").  Notwithstanding the foregoing, any proceeds the Company receives from the transfer, sale, assignment or farm-out of the Mississippian Properties may not be used to fund the Company Contribution.

Section 3.29          Capital Expenditure Plan.

(a)        The Company shall not, and shall not permit its Subsidiaries to, make expenditures with the proceeds of any Subsequent Funding or any Company Contribution except in compliance with Section 3.7(b) and in accordance with the Capital Expenditure Plan.  By no later than ten (10) days after the end of each month, the Company shall deliver to RJC a comparison of the Capital Expenditure Plan and the actual expenditures of the Company for such month, together with an explanation of any material variances.  The Company may, with the prior written consent of RJC (such consent not to be unreasonably withheld), update the Capital Expenditure Plan in order to facilitate necessary and desired changes due to factors such as timing of permits, availability of rigs, leaseholder issues, land preparation, non-operated project AFE's received, and other events or occurrences related to the Assigned Properties.

-31-

(b)        Expenditures set forth in the Capital Expenditure Plan shall be funded as follows:

(i)        For projects within the Conveyed Properties:

(1)        *first*, from the net proceeds received by the Company from the transfer, sale, assignment or farm-out of the Mississippian Properties, if any; and

(2)        *second*, from the Company Contribution and the proceeds of a Subsequent Funding made by RJC as provided in Section 3.7(b).

(ii)        For projects outside the Conveyed Properties from the working capital of the Company.

Section 3.30              Post-Closing Covenants.

The Company shall deliver or caused to be delivered to the Agent each document enumerated below, in form and substance satisfactory to the Agent, by the earlier of (i) the date specified below opposite such document and (ii) the date on which the Company or its applicable Subsidiary receives the comparable document with respect to its interest in the affected Oil and Gas Properties, provided that, the Agent may, in its reasonable discretion, agree to extend the date on which any such document is required to be delivered:

| **Document** | **Date of Delivery** |
| --- | --- |
| (a)        appropriate documents to be signed by RJ Resources pursuant to which RJ Resources shall become a party to all joint operating agreements related to the Oil and Gas Properties subject to the Continental Interest Conveyance Agreement | Not later than April 4, 2014 |
| (b)        consent of the Colorado State Land Board with respect to the transfer to Red Hawk Petroleum, LLC ("Red Hawk") and RJ Resources of the Oil and Gas Properties subject to the Continental Interest Conveyance Agreement with respect to which the State of Colorado is the lessor | Not later than July 7, 2014 |
| (c)        consent of the Board of the County Commissioners of the County of Weld with respect to the transfer to Red Hawk and RJ Resources of the Oil and Gas Properties subject to the Continental Interest Conveyance Agreement with respect to which the Weld County is the lessor | Not later than July 7, 2014 |
| (d)        consent of the Marguerite Freeman Revocable Trust with respect to the transfer to Red Hawk and RJ Resources of the Oil and Gas Properties subject to the Continental Interest Conveyance Agreement with respect to which the Marguerite Freeman Revocable Trust is the lessor | Not later than May 4, 2014 |

-32-

ex10-1.htm

## ARTICLE IV

## CONDITIONS

          Section 4.1          Conditions Precedent to the Obligation of the Company to Close and to Sell the Notes at the Closing.

The obligation hereunder of the Company to close and issue and sell the Notes to the Investors at the Closing is subject to the satisfaction or waiver, at or before the Closing of the conditions set forth below.  These conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion.

          (a)          No Injunction.  No statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any court or governmental authority of competent jurisdiction which prohibits the consummation of any of the transactions contemplated by this Agreement.

          (b)          Delivery of Initial Funding.  The Investors shall have advanced the Initial Funding as payment for the purchase price of the Notes on the date of the Closing.

          (c)          Delivery of Transaction Documents.  The Transaction Documents to which the Agent and each Investor is a party shall have been duly executed and delivered by the Agent and such Investor to the Company.

          (d)          Accuracy of Representations and Warranties.  Each of the representations and warranties of each Investor in this Agreement and the other Transaction Documents shall be true and correct in all material respects as of the date of the Closing, except for representations and warranties that speak as of a particular date, which shall be true and correct in all material respects as of such date.

          (e)          No Proceedings or Litigation.  No action, suit or proceeding before any arbitrator or any governmental authority shall have been commenced, and no investigation by any governmental authority shall have been threatened, against the Agent or any Investor seeking to restrain, prevent or change the transactions contemplated by this Agreement, or seeking damages in connection with such transactions.

-33-

Section 4.2                    <u>Conditions Precedent to the Obligation of the Investors to Close at the Closing</u>.

The obligation hereunder of the Investors to consummate the transactions contemplated by this Agreement, including the obligation hereunder of the Investors to make the Initial Funding, is subject to the satisfaction or waiver in the Investors' sole discretion, on or before the Closing Date, of each of the conditions set forth below.

(a)          <u>Notes and Transaction Documents</u>.  The Company shall have delivered to each Investor a Note, and the Company and the Subsidiaries shall have duly executed and delivered the other Transaction Documents to the Agent and the Investors, and the Agent and the Investors shall have received such title information as the Agent or any Investor may require, satisfactory to the Agent and the Investors, setting forth the status of title to the Company's interest in any Oil and Gas Properties owned by Company or any Subsidiary which is subject to the Liens existing or to exist under the terms of the Security Agreement or the Mortgages.  For the purposes of this Agreement, "<u>Oil and Gas Properties</u>" means (a) all rights, titles, interests and estates now or hereafter acquired directly or indirectly through ownership in other entities or otherwise in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature (the "<u>Hydrocarbon Interests</u>"); (b) any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including, without limitation, cash, securities, accounts and contract rights (the "<u>Properties</u>") now or hereafter pooled or unitized with Hydrocarbon Interests; (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any governmental authority) which may affect all or any portion of the Hydrocarbon Interests; (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of oil, gas, casing head gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom ("<u>Hydrocarbons</u>") from or attributable to such Hydrocarbon Interests; (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; (f) all tenements, hereditaments, appurtenances and Properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all Properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereinafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property and including any and all oil wells, gas wells, injection wells, disposal wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

-34-

(b)        <u>Deposit Account Control Agreement.</u>  The Agent shall have received Deposit Account Control Agreements for each deposit account of the Company and the Subsidiaries, including without limitation, deposit accounts owned by White Hawk, the Operations Account, which shall be in form and substance satisfactory to the Agent in its sole discretion.  The Company shall not be required to provide Deposit Account Control Agreements for deposit accounts of Condor.

(c)        <u>Secretary's Certificate</u>.  The Company, Red Hawk, PED MSL, PEDCO and White Hawk Petroleum, LLC shall have delivered to the Agent and the Investors secretary's certificates, dated as of the Closing, as to (i) the resolutions approving the transactions contemplated hereby and by the Transaction Documents, (ii) the respective organizational documents of the Company, Red Hawk Petroleum, LLC, PED MSL, PEDCO and White Hawk Petroleum, LLC, each as in effect at the Closing, and (iii) the authority and incumbency of the officers of the Company, Red Hawk, PED MSL, PEDCO and White Hawk Petroleum, LLC executing the Transaction Documents and any other documents required to be executed or delivered in connection therewith.

(d)        <u>Good Standing Certificates, etc.</u>  The Agent and the Investors shall have received certificates of the appropriate governmental agencies with respect to the existence, qualification and good standing of the Company, Red Hawk, PED MSL and PEDCO.

(e)        <u>Officer's Certificate</u>.  The Company shall have delivered to the Agent and the Investors a certificate signed by an executive officer on behalf of the Company, dated as of the date of the Closing, confirming the accuracy of the Company's representations and warranties as of such date and no Default or Event of Default has occurred or will occur on the Closing Date after giving effect to the transactions contemplated by the Transaction Documents.

(f)        <u>Due Diligence</u>.  The Company shall have permitted the Agent and each Investor to make such inspections as the Agent or such Investor deems reasonably appropriate and the Agent or such Investor, as applicable, is satisfied, in its reasonable discretion, with the results thereof.  Such audits and inspections by the Agent or such Investor shall not affect any of the representations and warranties made by the Company in this Agreement and shall not, under any circumstances constitute a waiver of the Agent's or such Investor's indemnification rights under ARTICLE VI hereof, or otherwise relieve the Company of any liability thereunder.

(g)        <u>Searches</u>.  The Agent and the Investors shall have received UCC, tax, judgment and litigation searches against the Company and the Subsidiaries in those offices and jurisdictions as the Agent or any Investor shall reasonably request which shall show that no financing statement, liens, or assignments or other filings have been filed or remain in effect against the Company, the Subsidiaries or any Collateral except for Permitted Encumbrances and financing statements, assignments or other filings with respect to which the secured party or existing lender (i) has delivered to the Agent termination statements or other documentation evidencing the termination of its Liens and security interests in the Collateral, or (ii) has agreed in writing to release or terminate its Lien and security interest in the Collateral upon receipt of proceeds of the Initial Funding on the Closing Date.

-35-

(h)        UCC Financing Statements; Mortgages.  On or prior to the date of the Closing, the Company and the Subsidiaries shall have filed (or authorized the filing of) all UCC and similar financing statements and all Mortgages, each in form and substance satisfactory to the Agent and the Investors, at the appropriate offices to create a valid and perfected first priority security interest in the Collateral (as defined in the Security Agreement) and in the Oil and Gas Properties.

(i)        Consents.  Except as set forth on Schedule 2.1(b) hereto, the Company shall have obtained all consents, approvals, or waivers from all governmental authorities, third parties and Company security holders necessary (i) for the execution, delivery and performance of this Agreement and the Transaction Documents and the transactions contemplated hereby and thereby and (ii) to not trigger any preemptive rights, rights of first refusal, put or call rights or obligations, anti-dilution rights or similar rights that any holder of the Company's securities may have with respect to the execution, delivery and performance of this Agreement and each of the Transaction Documents and all transactions contemplated hereby and thereby, all without material cost or other adverse consequences to the Company.

(j)        Insurance.  The Agent and the Investors shall have received a certificate of insurance coverage for Company and the Subsidiaries (or other evidence of insurance coverage acceptable to the Agent and the Investors) showing that Company and the Subsidiaries are carrying insurance in accordance with Section 3.23 hereof.

(k)        Operating Agreements.  The Agent and the Investors shall have received copies of the operating agreements for the Oil and Gas Properties which are part of the Collateral (as defined in the Security Agreement) and, with respect to each operating agreement, other than any operating agreement for the Oil and Gas Properties acquired in connection with the Continental Acquisition, the operator party thereto shall agree to pay to an account with respect to which the Agent has a perfected security interest and control all amounts due to the Company or any Subsidiary under such operating agreement.

(l)        Environmental Condition.  The Agent and the Investors shall have received all reports and notices concerning the environmental condition of the Oil and Gas Properties available to Company and shall be satisfied with the environmental condition thereof.

(m)        Opinion of Counsel.  The Agent and the Investors shall have received an opinion of counsel to the Company, dated the date of the Closing, reasonably acceptable to counsel to the Agent and the Investors.

-36-

(n)        Capital Expenditure Plan.  The Company shall deliver to RJC a Capital Expenditure Plan for the period commencing on February 1, 2014 and ending on December 31, 2014.

(o)        Subordination Agreements.  The Agent and the Investors shall have received subordination agreements dated as of the Closing Date from the holders of the Indebtedness set forth on Schedule 2.1(l) hereto, in form and substance satisfactory to the Agent and the Investors.

(p)        MIE Note.  The Agent and the Investors shall have received a subordination agreement and acknowledgment from MIE Holdings Corporation relating to its outstanding Secured Subordinated Promissory Note owed by the Company to MIE Holdings Corporation, in form and substance satisfactory to the Agent and the Investors in their sole discretion.

(q)        Continental Acquisition.  The conditions to closing the Continental Acquisition shall have been satisfied, other than the payment of the purchase price in connection therewith, and the Company shall have deposited into its operating account an amount equal to $2,700,000, representing the net cash proceeds received from the sale by White Hawk of approximately 1,331 net acres in the Eagle Ford located in McMullen County, Texas to Millennial PDP Fund IV, LP, to be applied to pay a portion of the purchase price of $30,000,000 for the Continental Acquisition.

(r)        Proved PV-10.  The Agent and the Investors shall have received, to its sole satisfaction, verification of the Company's proved PV-10 (including a breakdown of PDP, PNP and PUDs) from an Approved Consultant.

(s)        Conveyance Agreements.  The Company or a Subsidiary and RJ RESOURCES shall have entered into, and consummated the transactions contemplated by, agreements with respect to the sale, assignment and conveyance by the Company or such Subsidiary to such affiliate of fifty percent (50%) of (i) the working interest acquired by the Company or such Subsidiary in connection with the Continental Acquisition (the "Continental Interest Conveyance Agreement"), (ii) limited liability company interests of PED MSL (the "Mississippian Interest Conveyance Agreement") and (iii) the benefits, whether in the form of the shares of Asia Sixth, the return of the initial subscription price paid by PEDCO or proceeds received by PEDCO from the exercise of rights, acquired pursuant to that certain Shares Subscription Agreement dated September 11, 2013 between Asia Sixth, The Sixth Energy Limited and PEDCO (the "Asia Sixth Interest Conveyance Agreement").

(t)        Condor Notes.  PEDCO shall have loaned to Condor such funds as required pursuant to outstanding unpaid cash calls, so that after giving effect to such loan(s), PEDCO's loan to Condor represents approximately 20% of the aggregate amount of loans made by MIEJE and PEDCO to Condor.

-37-

(u)        Condor Operating Agreement.  The Agent and the Investors shall have received a copy of an executed amendment to the Condor operating agreement between Condor, PEDCO and MIEJE that permits (i) PEDCO to pledge to the Agent the Units issued by Condor to PEDCO and (ii) RJC or any Person designated by RJC to become a Member of Condor if RJC exercised its remedies to foreclose on such pledge after the occurrence of an Event of Default.

Section 4.3        Conditions Precedent to the Obligation of the Investors to Make Each Funding.

The obligation hereunder of the Investors to make each Funding contemplated by this Agreement is subject to the satisfaction or waiver in the Investors' sole discretion, at or before such Funding, of each of the conditions set forth below.

(a)        Accuracy of Representations and Warranties.  Each of the representations and warranties of the Company and the Subsidiaries in this Agreement and the other Transaction Documents shall be true and correct in all material respects as of the date of the Closing, except for representations and warranties that speak as of a particular date, which shall be true and correct in all material respects as of such date.

(b)        Event of Default.  No Default or Event of Default shall have occurred and be continuing.

(c)        Performance.  The Company and each Subsidiary shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Agreement and the other Transaction Documents to be performed, satisfied or complied with by the Company and each Subsidiary at or prior to the date of the Closing.

(d)        No Suspension, Etc.  At any time prior to any Funding, a banking moratorium shall have not been declared either by the United States or New York State authorities, nor shall there have occurred any material outbreak or escalation of hostilities or other national or international calamity or crisis of such magnitude in its effect on, or any material adverse change in any financial market which, in each case, in the judgment of the Investors, makes it impracticable or inadvisable to make such Funding.

(e)        No Injunction.  No statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by any court or governmental authority of competent jurisdiction which prohibits the consummation of any of the transactions contemplated by this Agreement.

(f)        No Proceedings or Litigation.  No action, suit or proceeding before any arbitrator or any governmental authority shall have been commenced, and no investigation by any governmental authority shall have been threatened, against the Company or any Subsidiary, or any of the officers, directors or affiliates of the Company or any Subsidiary seeking to restrain, prevent or change the transactions contemplated by this Agreement, or seeking damages in connection with such transactions.

(g)        Material Adverse Effect.  No Material Adverse Effect shall have occurred since September 30, 2013.

-38-

(h)         Payment of the Investors' Expenses.  The Company shall have paid the fees and expenses described in Section 8.1 of this Agreement.

## ARTICLE V

## CERTIFICATE LEGEND

Section 5.1         Legend.

Each certificate representing a Note shall be stamped or otherwise imprinted with a legend substantially in the following form (in addition to any legend required by applicable state securities or "blue sky" laws):

THE SECURITIES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR UNLESS PEDEVCO CORP. SHALL HAVE RECEIVED AN OPINION OF COUNSEL THAT REGISTRATION OF SUCH SECURITIES UNDER THE SECURITIES ACT AND UNDER THE PROVISIONS OF APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

## ARTICLE VI

## INDEMNIFICATION

Section 6.1         General Indemnity.

The Company agrees to indemnify and hold harmless the Agent and each Investor (and their respective directors, officers, members, partners, affiliates, agents, successors and assigns) from and against any and all losses, liabilities, deficiencies, costs, damages and expenses (including, without limitation, reasonable attorneys' fees, charges and disbursements) incurred by the Agent or an Investors as a result of any inaccuracy in or breach of the representations, warranties or covenants made by the Company herein.

Section 6.2         Indemnification Procedure.

Any party entitled to indemnification under this ARTICLE VI (an "indemnified party") will give written notice to the indemnifying party of any matter giving rise to a claim for indemnification; provided that the failure of any party entitled to indemnification hereunder to give notice as provided herein shall not relieve the indemnifying party of its obligations under this ARTICLE VI except to the extent that the indemnifying party is actually prejudiced by such failure to give notice.  In case any such action, proceeding or claim is brought against an indemnified party in respect of which indemnification is sought hereunder, the indemnifying party shall be entitled to participate in and, unless in the reasonable judgment of the indemnifying party a conflict of interest between it and the indemnified party exists with respect to such action, proceeding or claim, to assume the defense thereof with counsel reasonably satisfactory to the indemnified party.  In the event that the indemnifying party advises an indemnified party that it will contest such a claim for indemnification hereunder, or fails, within thirty (30) days of receipt of any indemnification notice to notify, in writing, such person of its election to defend, settle or compromise, at its sole cost and expense, any action, proceeding or claim (or discontinues its defense at any time after it commences such defense), then the indemnified party may, at its option, defend, settle or otherwise compromise or pay such action or claim.  In any event, unless and until the indemnifying party elects in writing to assume and does so assume the defense of any such claim, proceeding or action, the indemnified party's costs and expenses arising out of the defense, settlement or compromise of any such action, claim or proceeding shall be losses subject to indemnification hereunder.  The indemnifying party shall cooperate fully with the indemnifying party in connection with any negotiation or defense of any such action or claim by the indemnifying party and shall furnish to the indemnifying party all information reasonably available to the indemnified party which relates to such action or claim.  The indemnifying party shall keep the indemnified party fully apprised at all times as to the status of the defense or any settlement negotiations with respect thereto.  If the indemnifying party elects to defend any such action or claim, then the indemnified party shall be entitled to participate in such defense with counsel of its choice at its sole cost and expense.  The indemnifying party shall not be liable for any settlement of any action, claim or proceeding effected without its prior written consent.  Notwithstanding anything in this ARTICLE VI to the contrary, the indemnifying party shall not, without the indemnified party's prior written consent, settle or compromise any claim or consent to entry of any judgment in respect thereof which imposes any future obligation on the indemnified party or which does not include, as an unconditional term thereof, the giving by the claimant or the plaintiff to the indemnified party of a release from all liability in respect of such claim.  The indemnification obligations to defend the indemnified party required by this ARTICLE VI shall be made by periodic payments of the amount thereof during the course of investigation or defense, as and when bills are received or expense, loss, damage or liability is incurred, so long as the indemnified party shall refund such moneys if it is ultimately determined by a court of competent jurisdiction that such party was not entitled to indemnification.  The indemnity agreements contained herein shall be in addition

to (a) any cause of action or similar rights of the indemnified party against the indemnifying party or others, and (b) any liabilities the indemnifying party may be subject to pursuant to the law.

-39-

## ARTICLE VII

## REGARDING AGENT

Section 7.1 <u>Appointment</u>.

Each Investor hereby designates BAM Administrative Services LLC to act as the Agent for such Investor under this Agreement and the Transaction Documents. Each Investor hereby irrevocably authorizes the Agent to take such action on its behalf under the provisions of this Agreement and the Transaction Documents and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto and the Agent shall hold all Collateral, payments of principal and interest, fees, charges and collections received pursuant to this Agreement, for the ratable benefit of Investors. The Agent may perform any of its duties hereunder by or through its agents or employees. As to any matters not expressly provided for by this Agreement the Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Investors, and such instructions shall be binding; <u>provided</u>, <u>however</u>, that the Agent shall not be required to take any action which exposes the Agent to liability or which is contrary to this Agreement or the Transaction Documents or Applicable Law unless the Agent is furnished with an indemnification reasonably satisfactory to the Agent with respect thereto.

-40-

10/26/2018                                                          ex10-1.htm

Section 7.2          Nature of Duties.

The Agent shall have no duties or responsibilities except those expressly set forth in this Agreement and the Transaction Documents.  Neither the Agent nor any of its officers, directors, employees or agents shall be (a) liable for any action taken or omitted by them as such hereunder or in connection herewith, unless caused by their gross (not mere) negligence or willful misconduct, or (b) responsible in any manner for any recitals, statements, representations or warranties made by the Company or any Subsidiary (collectively, the "Loan Parties" and each, individually, a "Loan Party") or any officer thereof contained in this Agreement, or in any of the Transaction Documents or in any certificate, report, statement or other document referred to or provided for in, or received by the Agent under or in connection with, this Agreement or any of the Transaction Documents or for the value, validity, effectiveness, genuineness, due execution, enforceability or sufficiency of this Agreement, or any of the Transaction Documents or for any failure of a Loan Party to perform its obligations hereunder.  The Agent shall not be under any obligation to any Investor to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any of the Transaction Documents, or to inspect the properties, books or records of a Loan Party.  The duties of the Agent with respect to the Term Loan to Borrower shall be mechanical and administrative in nature; the Agent shall not have by reason of this Agreement a fiduciary relationship in respect of any Investor; and nothing in this Agreement, expressed or implied, is intended to or shall be so construed as to impose upon the Agent any obligations in respect of this Agreement except as expressly set forth herein.

Section 7.3          Lack of Reliance on Agent; Resignation.

(a)          Independently and without reliance upon the Agent or any other Investor, each Investor has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Term Loan hereunder and the taking or not taking of any action in connection herewith, and (ii) its own appraisal of the creditworthiness of the Loan Parties.  The Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Investor with any credit or other information with respect thereto, whether coming into its possession before making of any Funding or at any time or times thereafter except as shall be provided by the Loan Parties pursuant to the terms hereof.  The Agent shall not be responsible to any Investor for any recitals, statements, information, representations or warranties herein or in any agreement, document, certificate or a statement delivered in connection with or for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency of this Agreement or any Transaction Document, or of the financial condition of the Loan Parties, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement, the Transaction Documents or the financial condition of the Loan Parties, or the existence of any Event of Default or any Default.

-41-

(b)        The Agent may resign on sixty (60) days' written notice to each of Investors and Borrower and upon such resignation, the Investors will promptly designate a successor Agent reasonably satisfactory to Borrower (provided that no such approval by Borrower shall be required (i) in any case where the successor Agent is one of Investors or (ii) after the occurrence and during the continuance of any Event of Default).  Any such successor Agent shall succeed to the rights, powers and duties of the Agent, and shall in particular succeed to all of the Agent's right, title and interest in and to all of the Liens in the Collateral securing the obligations created hereunder or any Transaction Document, and the term "the Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as the Agent shall be terminated, without any other or further act or deed on the part of such former Agent.  However, notwithstanding the foregoing, if at the time of the effectiveness of the new Agent's appointment, any further actions need to be taken in order to provide for the legally binding and valid transfer of any Liens in the Collateral from former Agent to new Agent and/or for the perfection of any Liens in the Collateral as held by new Agent or it is otherwise not then possible for new Agent to become the holder of a fully valid, enforceable and perfected Lien as to any of the Collateral, former Agent shall continue to hold such Liens solely as agent for perfection of such Liens on behalf of new Agent until such time as new Agent can obtain a fully valid, enforceable and perfected Lien on all Collateral, provided that the Agent shall not be required to or have any liability or responsibility to take any further actions after such date as such agent for perfection to continue the perfection of any such Liens (other than to forego from taking any affirmative action to release any such Liens).  After any the Agent's resignation as the Agent, the provisions of this ARTICLE VII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Agent under this Agreement (and in the event resigning Agent continues to hold any Liens pursuant to the provisions of the immediately preceding sentence, the provisions of this ARTICLE VII shall inure to its benefit a to any actions taken or omitted to be taken by it in connection with such Liens).

Section 7.4                    Certain Rights of the Agent.

If the Agent shall request instructions from the Investors with respect to any act or action (including failure to act) in connection with this Agreement or any Transaction Document, the Agent shall be entitled to refrain from such act or taking such action unless and until the Agent shall have received instructions from the Investors; and the Agent shall not incur liability to any Person by reason of so refraining.  Without limiting the foregoing, the Investors shall not have any right of action whatsoever against the Agent as a result of its acting or refraining from acting hereunder in accordance with the instructions of the Investors.

Section 7.5                    Reliance.

The Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, order or other document or telephone message reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper person or entity, and, with respect to all legal matters pertaining to this Agreement and the Transaction Documents and its duties hereunder, upon advice of counsel selected by it.  The Agent may employ agents and attorneys-in-fact and shall not be liable for the default or misconduct of any such agents or attorneys-in-fact selected by the Agent with reasonable care.

-42-

---

Section 7.6          Notice of Default.

The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder or under the Transaction Documents, unless the Agent has received notice from an Investor or the Company referring to this Agreement or the Transaction Documents, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Agent receives such a notice, the Agent shall give notice thereof to the Investors. The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Investors; provided that, unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of Investors.

Section 7.7          Indemnification.

To the extent the Agent is not reimbursed and indemnified by a Loan Party, each Investor will reimburse and indemnify the Agent (based on the outstanding principal amount of the Fundings due to such Investor and the aggregate outstanding principal amount of the Fundings due to all the Investors), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Agent in performing its duties hereunder, or in any way relating to or arising out of this Agreement or any Transaction Document; provided that, Investors shall not be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross (not mere) negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment).

Section 7.8          The Company's Undertaking to Agent.

Without prejudice to their respective obligations to Investors under the other provisions of this Agreement, the Company hereby undertakes with the Agent to pay to the Agent from time to time on demand all amounts from time to time due and payable by it for the account of the Agent or the Investors or any of them pursuant to this Agreement to the extent not already paid. Any payment made pursuant to any such demand shall pro tanto satisfy the Company's obligations to make payments for the account of the Investors or the relevant one or more of them pursuant to this Agreement.

Section 7.9          No Reliance on the Agent's Obligor Identification Program.

Each Investor acknowledges and agrees that neither such Investor, nor any of its Affiliates, participants or assignees, may rely on the Agent to carry out such Investor's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the USA PATRIOT Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP Regulations"), or any other Anti-Terrorism Law, including any programs involving any of the following items relating to or in connection with the Loan Parties, their Affiliates or their agents, this Agreement, the Transaction Documents or the transactions hereunder or contemplated hereby: (a) any identity verification procedures, (b) any record-keeping, (c) comparisons with government lists, (d) customer notices or (e) other procedures required under the CIP Regulations or such other laws.

-43-

Section 7.10                    Other Agreements.

Each of Investors agrees that it shall not, without the express consent of the Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of the Agent, set off against the amount outstanding under this Agreement and the Transaction Documents, any amounts owing by such Investor to a Loan Party or any deposit accounts of a Loan Party now or hereafter maintained with such Investor. Anything in this Agreement to the contrary notwithstanding, each of Investors further agrees that it shall not, unless specifically requested to do so by the Agent, take any action to protect or enforce its rights arising out of this Agreement or the Transaction Documents, it being the intent of Investors that any such action to protect or enforce rights under this Agreement and the Transaction Documents shall be taken in concert and at the direction or with the consent of the Agent or Investors.

### ARTICLE VIII

### MISCELLANEOUS

Section 8.1                    Fees and Expenses.

The Company shall pay the costs, fees and expenses of the Agent and the Investors incurred in connection with the transactions contemplated by the Transaction Documents, including reasonable diligence and legal fees and expenses and the costs, fees and expenses associated with title information, recordation or perfection of the Collateral (as defined in the Security Agreement) up to a maximum of $200,000. The Agent and the Investor confirms and acknowledges that prior to the date of this Agreement the Company has paid $50,000 to be applied to such legal fees and expenses. In addition, the Company shall pay all reasonable fees and expenses incurred by the Agent and the Investors in connection with the administration and enforcement of this Agreement or any of the other Transaction Documents, including, without limitation, all reasonable attorneys' fees and expenses.

Section 8.2                    Specific Performance; Consent to Jurisdiction; Venue.

(a)          The Company, the Agent and the Investors acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement or the other Transaction Documents were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent or cure breaches of the provisions of this Agreement or the other Transaction Documents and to enforce specifically the terms and provisions hereof or thereof, this being in addition to any other remedy to which any of them may be entitled by law or equity.

-44-

(b)        The parties agree that venue for any dispute arising under this Agreement will lie exclusively in the state or federal courts located in New York County, New York, and the parties irrevocably waive any right to raise *forum non conveniens* or any other argument that New York is not the proper venue.  The parties irrevocably consent to personal jurisdiction in the state and federal courts of the state of New York.  The Company, the Agent and the Investors consent to process being served in any such suit, action or proceeding by mailing a copy thereof to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof.  Nothing in this Section 7.2 shall affect or limit any right to serve process in any other manner permitted by law.  The parties hereby waive all rights to a trial by jury.

       Section 8.3                    Entire Agreement; Amendment.

This Agreement and the Transaction Documents contain the entire understanding and agreement of the parties with respect to the matters covered hereby and, except as specifically set forth herein or in the other Transaction Documents, neither the Company nor the Agent or the Investors make any representation, warranty, covenant or undertaking with respect to such matters, and they supersede all prior understandings and agreements with respect to said subject matter, all of which are merged herein.  No provision of this Agreement may be waived or amended other than by a written instrument signed by the Company, the Agent and the Investors.  Any amendment or waiver effected in accordance with this Section 8.3 shall be binding upon the Investors (and their respective successors and assigns) and the Company.

       Section 8.4                    Notices.

Any notice, demand, request, waiver or other communication required or permitted to be given hereunder shall be in writing and shall be effective (a) upon hand delivery by telecopy or facsimile at the address or number designated below (if delivered on a Business Day during normal business hours where such notice is to be received), or the first Business Day following such delivery (if delivered other than on a Business Day during normal business hours where such notice is to be received) or (b) on the second Business Day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur.  The addresses for such communications shall be:

<p style="text-align:center">-45-</p>

| | |
|---|---|
| If to the Company: | PEDEVCO CORP.<br>4125 Blackhawk Plaza Circle, Suite 201<br>Danville, California  94506<br>Tel:  (855) 733-3826<br>Fax:  (925) 403-0703<br>Attention:  General Counsel and Chief Financial Officer |
| with copies to: | The Loev Law Firm, PC<br>6300 West Loop South; Suite 280<br>Bellaire, Texas 77401<br>Tel:  (713) 524-4110<br>Fax:  (713) 524-4122<br>Attention:  David M. Loev |
| If to the Agent: | BAM Administrative Services LLC<br>1370 Avenue of the Americas, 32nd Floor<br>New York, New York 10019<br>Tel:  (212) 260-5050<br>Fax:  (212) 260-5051<br>Attention:  David Levy |
| with copies to: | RJ Credit LLC<br>152 West 57th Street, 4th Floor<br>New York, NY 10019<br>Tel:  (212) 582-2222<br>Fax:  (212) 582-2424<br>Attention:  David Steinberg |
| and: | Blank Rome LLP<br>405 Lexington Avenue<br>New York, New York  10174<br>Tel:  (212) 885-5431<br>Fax:  (917) 332-3065<br>Attention:  Eliezer M. Helfgott, Esq. |
| If to an Investor: | To the address set forth on the signatures page to this Agreement |

Any party hereto may from time to time change its address for notices by giving written notice of such changed address to the other party hereto.

Section 8.5                                        <u>Waivers</u>.

No waiver by either party of any default with respect to any provision, condition or requirement of this Agreement shall be deemed to be a continuing waiver in the future or a waiver of any other provision, condition or requirement hereof, nor shall any delay or omission of any party to exercise any right hereunder in any manner impair the exercise of any such right accruing to it thereafter.

Section 8.6                                        <u>Headings</u>.

The article, section and subsection headings in this Agreement are for convenience only and shall not constitute a part of this Agreement for any other purpose and shall not be deemed to limit or affect any of the provisions hereof.

-46-

Section 8.7                                    <u>Successors and Assigns</u>.

     This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns.  After the Closing, the assignment by a party to this Agreement of any rights hereunder shall not affect the obligations of such party under this Agreement.  Any Investor may assign the Note issued to such Investor and its rights under this Agreement and the other Transaction Documents and any other rights hereto and thereto without the consent of the Company, <u>provided</u> such assignment is not required to be registered under the Securities Act or under applicable state securities laws and such Investor provides the Company prompt written notice of such assignment, <u>provided</u> that the failure to provide such notice shall not affect such assignment.  Neither the Company nor any Subsidiary may assign its rights and obligations under any Transaction Document without the prior written consent of the Agent and the Investors, which consent may be withheld by the Agent and the Investors in their sole discretion.

Section 8.8                                    <u>No Third Party Beneficiaries</u>.

     This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

Section 8.9                                    <u>Governing Law</u>.

     This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to any of the conflicts of law principles which would result in the application of the substantive law of another jurisdiction.  This Agreement shall not be interpreted or construed with any presumption against the party causing this Agreement to be drafted.

Section 8.10                                    <u>Survival</u>.

     The representations, and warranties of the Company, the Agent and the Investors shall survive the execution and delivery hereof and the Closing; the agreements and covenants set forth in ARTICLE I, ARTICLE III, ARTICLE V, ARTICLE VI and ARTICLE VII of this Agreement shall survive the execution and delivery hereof and Closing hereunder.

Section 8.11                                    <u>Publicity</u>.

     The Company agrees that it will not disclose, and will not include in any public announcement, the names of the Agent or any Investor without the consent of the Agent or such Investor, which consent shall not be unreasonably withheld or delayed, or unless and until such disclosure is required by law, rule or applicable regulation and then only to the extent of such requirement, provided that the Agent and the Investors acknowledge that the Company is required to file a Form 8-K following the Closing and that the Form 8-K rules require the disclosure of the names of the Agent and the Investors in such Form 8-K.

-47-

Section 8.12                          <u>Counterparts</u>.

This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and shall become effective when counterparts have been signed by each party and delivered to the other parties hereto, it being understood that all parties need not sign the same counterpart.

Section 8.13                          <u>Severability</u>.

The provisions of this Agreement are severable and, in the event that any court of competent jurisdiction shall determine that any one or more of the provisions or part of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision or part of a provision of this Agreement and this Agreement shall be reformed and construed as if such invalid or illegal or unenforceable provision, or part of such provision, had never been contained herein, so that such provisions would be valid, legal and enforceable to the maximum extent possible.

Section 8.14                          <u>Further Assurances</u>.

From and after the date of this Agreement, upon the request of the Agent or any Investor, the Company shall execute and deliver such instruments, documents and other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement and the other Transaction Documents.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

-48-

ex10-1.htm

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**PEDEVCO CORP.**

By: */s/ Frank C. Ingriselli*
   Name: Frank C. Ingriselli
   Title: President and CEO

S-1

**BAM ADMINISTRATIVE SERVICES LLC**

By:      */s/ David Levy*
         Name: David Levy
         Title:

S-2

**BRE BCLIC PRIMARY**
**Wilmington Trust, National Association, not in its individual**
**capacity, but solely as Trustee**

By:     /s/ David B. Young
          Name: David B. Young
          Title: Vice President

Term Commitment:   $11,800,000

Address for Notices:

BRe BCLIC Primary
1370 Avenue of the Americas, 32nd Floor
New York, New York 10019
Tel:  (212) 260-5050
Fax:  (212) 260-5051
Attention:  David Levy

With copies to:

Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
Tel:  (212) 885-5431
Fax:  (917) 332-3065
Attention:  Eliezer M. Helfgott, Esq.

S-3

**BRE BCLIC SUB**
**Wilmington Trust, National Association, not in its individual**
**capacity, but solely as Trustee**


By:      /s/ David B. Young
          Name: David B. Young
          Title: Vice President

Term Commitment:  $423,530

Address for Notices:

BRe BCLIC Sub
1370 Avenue of the Americas, 32nd Floor
New York, New York 10019
Tel:  (212) 260-5050
Fax:  (212) 260-5051
Attention:  David Levy

With copies to:

Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
Tel:  (212) 885-5431
Fax:  (917) 332-3065
Attention:  Eliezer M. Helfgott, Esq.

S-4

**BRE WNIC 2013 LTC PRIMARY**

By:    /s/ David B. Young
       Name: David B. Young
       Title: Vice President

Term Commitment:  $17,522,941

Address for Notices:

BRe WNIC 2013 LTC Primary
1370 Avenue of the Americas, 32nd Floor
New York, New York 10019
Tel:  (212) 260-5050
Fax:  (212) 260-5051
Attention:  David Levy

With copies to:

Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
Tel:  (212) 885-5431
Fax:  (917) 332-3065
Attention:  Eliezer M. Helfgott, Esq.

S-5

**BRE WNIC 2013 LTC SUB**

By:   /s/ David B. Young
       Name: David B. Young
       Title: Vice President

Term Commitment: $803,529

Address for Notices:

BRe WNIC 2013 LTC Sub Trust
1370 Avenue of the Americas, 32nd Floor
New York, New York 10019
Tel:  (212) 260-5050
Fax:  (212) 260-5051
Attention:  David Levy

With copies to:

Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
Tel:  (212) 885-5431
Fax:  (917) 332-3065
Attention:  Eliezer M. Helfgott, Esq.

S-6

**RJ CREDIT LLC**

By:     /s/ David Steinberg
          David Steinberg
          Authorized Signatory

Term Commitment:  $3,950,000

Address for Notices:

RJ Credit LLC
152 West 57th Street, 4th Floor
New York, NY 10019
Tel:  (212) 582-2222
Fax:  (212) 582-2424
Attention:  David Steinberg

With copies to:

Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
Tel:  (212) 885-5431
Fax:  (917) 332-3065
Attention:  Eliezer M. Helfgott, Esq.

S-7

EXHIBIT 45

7/21/2016                                  Exhibit 10.7 - Intercreditor Agreement (M0629775.DOC;1)

EX-10.7 8 imsc140326_ex10z7.htm EXHIBIT 10.7

Exhibit 10.7

# INTERCREDITOR AGREEMENT

INTERCREDITOR AGREEMENT (this "Agreement") dated as of March 19, 2014, by and between the First Lien Agent (such term, and each other term used but not defined in this preamble or in the recitals to this Agreement, having the meaning assigned thereto in Section 1), for itself and on behalf of the other First Lien Creditors, and the Second Lien Creditor, and acknowledged and agreed by the Borrowers and the other Obligors.

RECITALS:

WHEREAS, Implant Sciences Corporation, a Massachusetts corporation (together with its successors and assigns, including any receiver, trustee or debtor-in-possession, the "Borrower"), the Investors (as defined therein) (together with their successors and assigns (other than the Second Lien Creditor as a purchaser under Section 5), including any successor pursuant to any initial or subsequent Refinancing of a First Lien Purchase Agreement, the "First Lien Investors") and the First Lien Agent are, simultaneously with the execution and delivery of this Agreement, entering into a Note Purchase Agreement dated as of the date hereof (as amended or otherwise modified from time to time, the "Initial First Lien Purchase Agreement"), pursuant to which the First Lien Investors have made loans to the Borrower evidenced by Senior Secured Promissory Notes dated the date hereof (as amended or otherwise modified from time to time, the "First Lien Notes");

WHEREAS, in connection with the Initial First Lien Purchase Agreement, C Acquisition Corp., a Delaware corporation ("C Acquisition"), Accurel Systems International Corporation, a California corporation ("Accurel"), and IMX Acquisition Corp., a Delaware corporation ("IMX;" each of the Borrower, C Acquisition, Accurel and IMX, together with their successors and assigns, including any receiver, trustee or debtor-in-possession, a "Credit Party" and collectively, the "Credit Parties"), are, simultaneously with the execution and delivery of this Agreement, executing and delivery a Guaranty dated as of the date hereof (as amended or otherwise modified from time to time, the "Initial First Lien Guaranty") in favor of the First Lien Agent, pursuant to which the Credit Parties (other than the Borrower) will guaranty the Borrower's obligations to the First Lien Investors and the First Lien Agent under the Initial First Lien Purchase Agreement and the First Lien Notes;

WHEREAS, the Borrower, the other Credit Parties and the First Lien Agent are, simultaneously with the execution and delivery of this Agreement, entering into a Security Agreement dated as of the date hereof (as amended or otherwise modified from time to time, the "Initial First Lien Security Agreement"), pursuant to which the Borrower and the other Credit Parties will grant to the First Lien Agent, for the benefit of the First Lien Creditors, a Lien on substantially all of their assets, all as more particularly described in the Initial First Lien Security Agreement;

WHEREAS, the Borrowers, the other Credit Parties and DMRJ Group LLC (together with its successors and assigns, including any successor pursuant to any initial or subsequent Refinancing of a Second Lien Credit Agreement, the "Second Lien Creditor"), entered into a Credit Agreement dated as of September 4, 2009 (as amended through the date hereof and as further amended or otherwise modified from time to time, the "Initial Second

Lien Credit Agreement"), pursuant to which the Second Lien Creditor made and may make certain loans to the Borrower which are evidenced by the Amended and Restated Promissory Note, dated as of September 29, 2011 issued by the Borrower to the Second Lien Creditor as amended or otherwise modified from time to time, the "Second Lien Note");

WHEREAS, in connection with the Initial Second Lien Credit Agreement, the Credit Parties (other than the Borrower) executed and delivered a Guaranty dated as of September 4, 2009 (as amended or otherwise modified from time to time, the "Initial Second Lien Guaranty") in favor of the Second Lien Creditor, pursuant to which the Credit Parties (other than the Borrower) guaranteed the Borrower's obligations to the Second Lien Creditor under the Initial Second Lien Credit Agreement and the Second Lien Note;

WHEREAS, the Borrower, the other Credit Parties and the Second Lien Creditor Agent entered into a Security Agreement dated as of September 4, 2009 (as amended or otherwise modified from time to time, the "Initial Second Lien Security Agreement"), pursuant to which the Borrower and the other Credit Parties granted to the Second Lien Creditor a Lien on substantially all of their assets, all as more particularly described in the Initial Second Lien Security Agreement;

WHEREAS, the Second Lien Creditor, and the First Lien Agent, on behalf of the First Lien Creditors, wish to set forth their agreement as to certain of their respective rights and obligations with respect to the assets of the Borrowers and the other Credit Parties and their understanding relative to their respective positions in certain assets of the Borrowers and the other Credit Parties; and

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto agree as follows:

Section 1.    Definitions.

1.1    General Terms.   As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and the plural forms of the terms defined:

"Affiliate": with respect to any Person, each officer, director, general partner or joint-venturer of such Person and any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" means the possession of either (a) the power to vote, or the beneficial ownership of, 10% or more of the Voting Stock of such Person or (b) the power to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agreement": as defined in the preamble hereof.

"Assignment": as defined in Section 5.1.

"Bankruptcy Code": the Federal Bankruptcy Reform Act of 1978 (11 U.S.C. §101, et seq.).

2

"Bankruptcy Law": the Bankruptcy Code and any other federal, state, provincial or foreign bankruptcy, winding up, reorganization, insolvency, receivership or similar law affecting creditors' rights or any other law pursuant to which proceedings may be commenced seeking or imposing any stay, reorganization, arrangement, composition or readjustment of obligations or indebtedness.

"Borrower": as defined in the recitals hereof.

"Business Day": any day of the year that is not a Saturday, a Sunday or a day on which banks are required or authorized to close in New York City.

"Collateral": all property and interests in property and proceeds thereof now owned or hereafter acquired by any Obligor in or upon which a Lien (including any Liens granted in an Insolvency Proceeding) is granted or required or purported to be granted by such Obligor in favor of any Secured Creditor as security for all or any part of the Obligations whether or not such Lien is valid, perfected or enforceable.

"Credit Party": as defined in the recitals hereof.

"Defaulting Creditor": as defined in Section 5.6(c).

"DIP Financing": the obtaining of credit or incurring debt secured by Liens on all or any portion of the Collateral pursuant to section 364 of the Bankruptcy Code or any other analogous Bankruptcy Law.

"DIP Liens": as defined in Section 6.2.

"Discharge of First Lien Obligations": (a) actual payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of an Insolvency Proceeding, whether or not such interest would be allowed or allowable in such proceeding) on all outstanding Indebtedness (as defined in the First Lien Purchase Agreement) included in the First Lien Obligations, (b) actual payment or, in the case of contingent obligations, cash collateralization in full in cash of all other First Lien Obligations (including indemnification obligations in respect of known contingencies and fees, costs or charges accruing on or after the commencement of an Insolvency Proceeding, whether or not such fees, costs or charges would be allowed or allowable in the proceeding) that are due and payable or otherwise accrued and owing at or prior to the time the amounts referenced in clause (a) above  are paid (other than contingent indemnification Obligations for which no claim or demand for payment, whether oral or written, has been made at such time) , (c) termination or expiration of all commitments to extend credit that would be First Lien Obligations and (d) no Person has any further right to obtain any loans or other extensions of credit under the documents relating to such First Lien Obligations.

"Discharge of Second Lien Obligations": (a) actual payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of an Insolvency Proceeding, whether or not such interest would be allowed or allowable in such proceeding) on all outstanding Indebtedness included in the Second Lien Obligations, (b) actual payment in full in cash of all other Second Lien Obligations (including indemnification

3

obligations in respect of known contingencies and fees, costs or charges accruing on or after the commencement of an Insolvency Proceeding, whether or not such fees, costs or charges would be allowed or allowable in the proceeding) that are due and payable or otherwise accrued and owing at or prior to the time such principal and interest are paid (other than contingent indemnification Obligations for which no claim or demand for payment, whether oral or written, has been made at such time), (c) termination or expiration of all commitments to extend credit that would be Second Lien Obligations, and (d) no Person has any further right to obtain any loans or other extensions of credit under the documents relating to such Second Lien Obligations.

"Disposition": any sale, lease, exchange, transfer or other disposition, and "Dispose" and "Disposed of" shall have correlative meanings.

"Distribution": with respect to any indebtedness or obligation, (a) any payment or distribution by any Person of cash, securities or other property, by setoff or otherwise, on account of such indebtedness or obligation or (b) any redemption, purchase or other acquisition of such indebtedness or obligation by any Person.

"Documents": the First Lien Documents and the Second Lien Documents, or any of them.

"Dollars" or "$" shall mean the lawful currency of the United States of America.

"Enforcement Action": (a) to take any action to foreclose, execute, arrest, levy, or collect on, take possession or control (by set off or otherwise) of, sell or otherwise realize upon (judicially or non-judicially), or lease, license, or otherwise dispose of (whether publicly or privately), any Collateral, or otherwise exercise or enforce remedial rights with respect to any Collateral under the First Lien Documents or the Second Lien Documents (including by way of set-off, recoupment, notification of a public or private sale or other disposition pursuant to the UCC or other applicable law, notification to account debtors, notification to depositary banks under deposit account control agreements, securities intermediaries under securities accounts or commodities intermediaries under commodities accounts, or exercise of rights under landlord consents, bailee waivers or similar agreements, if applicable, but excluding the execution and delivery of documentation solely to obtain control (as defined in Section 3.3(a)) over deposit accounts or securities accounts to the extent permitted by Section 3.3), (b) to, or to enter into (or, if the First Lien Agent consents thereto after the occurrence and during the continuation of an Event of Default, any Obligor enters into) any agreement in order to have a third party to, solicit bids to effect the liquidation or disposition of Collateral or to engage or retain sales brokers, marketing agents, investment bankers, accountants, appraisers, auctioneers, or other third Persons for the purposes of marketing, promoting, or selling any Collateral, (c) to receive a transfer of any Collateral (other than a payment in respect of Obligations initiated by a Borrower while no Event of Default is continuing) in satisfaction of Indebtedness or any other Obligation secured thereby or make a credit bid for the purpose of doing so (whether or not in an Insolvency Proceeding), (d) to notify account debtors to make payments to any Secured Creditor or its agents, (e) to otherwise enforce or take any action to enforce a Lien or to exercise another right or remedy, as a secured creditor or an unsecured creditor, pertaining to the Collateral at law, in equity, or pursuant to the First Lien Documents or Second Lien Documents (including

4

exercising voting rights in respect of equity or debt interests comprising any of the Collateral), (f) to effect the Disposition of any Collateral by any Obligor after the occurrence and during the continuation of an Event of Default, (g) to take any other remedial actions as a Secured Creditor against any Collateral, (h) to commence any legal proceedings or actions against or with respect to any Obligor or any of such Obligor's assets for the purpose of effecting or facilitating any of the actions described in clauses (a) through (g) above, or (i) to commence any Insolvency Proceeding against any Obligor.

"Event of Default": each "Event of Default" or similar term, as such term is defined in any First Lien Document or any Second Lien Document.

"Exigent Circumstances": circumstances that the First Lien Agent reasonably believes render necessary or appropriate an Enforcement Action to prevent or mitigate the destruction of, physical harm to, impairment of or decrease in value of any Collateral or the rights and interests of the First Lien Creditors therein (including without limitation any loss of priority of the Liens of the First Lien Creditors and any impairment of rights arising from any movement of any item of Collateral).

"Final Order": an order of the bankruptcy court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been filed or sought, such order of the bankruptcy court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or from which certiorari, reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided that the possibility that a motion under Rule 59 or Rule 60 of the U.S. Federal Rules of Civil Procedure or any analogous rule under the U.S. Federal Rules of Bankruptcy Procedure or other applicable rules of civil procedure in the relevant jurisdiction, may be filed with respect to such order shall not cause such order not to be a Final Order.

"First Lien Agent": BAM Administrative Services LLC in its capacity as agent for the First Lien Creditors under the First Lien Documents, and its successors and assigns in such capacity (including any New First Lien Agent that is deemed to be the First Lien Agent pursuant to Section 4.5).

"First Lien Collateral Documents": the Initial First Lien Security Agreement, and any other documents or instruments granting or purporting to grant a Lien on real or personal property to secure a First Lien Obligation or granting rights or remedies with respect to such Liens.

"First Lien Creditors": the First Lien Agent, the First Lien Investors and the other Persons from time to time holding First Lien Obligations.

"First Lien Documents": the First Lien Purchase Agreement, all Transaction Documents (as such term is defined in the First Lien Purchase Agreement) and all other agreements, instruments and other documents at any time executed or delivered by any Obligor

5

or any other Person with, to or in favor of the First Lien Agent or any other First Lien Creditor in connection therewith or related thereto, including such documents evidencing initial and subsequent Refinancings of the First Lien Obligations, in each case, as the same may be amended, amended and restated, supplemented, modified, replaced, substituted or renewed from time to time.

"First Lien Investors": as defined in the recitals hereto.

"First Lien Loans": any loans or advances outstanding under the First Lien Documents.

"First Lien Obligations": all Obligations of the Obligors under the First Lien Purchase Agreement and the other First Lien Documents, including the guaranties under the First Lien Documents or any other agreement or instrument granting or providing for the perfection of a Lien securing any of the foregoing.  Notwithstanding any other provision hereof, the term "First Lien Obligations" will include accrued interest, fees, costs, and other charges incurred under the First Lien Purchase Agreement and the other First Lien Documents, whether incurred before or after the commencement of an Insolvency Proceeding, and whether or not allowed or allowable in an Insolvency Proceeding. To the extent that any payment with respect to the First Lien Obligations (whether by or on behalf of any Obligor, as proceeds of security, enforcement of any right of set-off, or otherwise) is declared to be fraudulent or preferential in any respect, set aside, avoided, or required to be paid to a debtor in possession, trustee, receiver, or similar Person, then the obligation or part thereof originally intended to be satisfied will be deemed to be reinstated and outstanding as if such payment had not occurred.

"First Lien Purchase Agreement":  (a) the Initial First Lien Purchase Agreement and (b) each loan or credit agreement evidencing any replacement, substitution, renewal, or initial or subsequent Refinancing of the Obligations under the Initial First Lien Purchase Agreement, in each case, as the same may be amended, amended and restated, supplemented, modified, replaced, substituted or renewed from time to time or Refinanced in accordance with the terms of this Agreement.

"Governmental Authority": any nation, sovereign or government, any state or other political subdivision thereof, any agency, authority or instrumentality thereof and any entity or authority exercising executive, legislative, taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory body, arbitrator, public sector entity, supra-national entity (including the European Union and the European Central Bank) and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Indemnified First Lien Person": as defined in Section 5.1.

"Initial First Lien Purchase Agreement": as defined in the recitals hereto.

"Initial Second Lien Credit Agreement": as defined in the recitals hereto.

"Insolvency Proceeding": as to any Obligor or Collateral, any of the following:  (a) any case, action or proceeding before any court or other Governmental Authority or pursuant

6

to any Bankruptcy Law relating to bankruptcy, reorganization, arrangement, insolvency, liquidation, receivership, dissolution, winding-up or relief of debtors or enforcement of a mortgage in respect of a vessel, or (b) any general assignment for the benefit of creditors, composition, marshaling of assets for creditors, or other, similar arrangement in respect of its creditors generally or any substantial portion of its creditors; in each case in (a) and (b) above, undertaken under the law of any jurisdiction, including the Bankruptcy Code.

"Junior Adequate Protection Liens": as defined in Section 6.3(b).

"Lien": any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or otherwise), security interest or other security arrangement and any other preference, priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a capital lease and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Maximum First Lien Principal Amount": the sum of (a) $16,500,000, plus (b) amounts in respect of interest, fees, costs and premium (if any), in each case above accruing in respect of or attributable to, but only accruing in respect of or attributable to, the aggregate principal amount of the First Lien Obligations at any one time not to exceed the amount referred to in clause (a) above, in each case that have been paid in-kind or capitalized.

"New First Lien Agent": as defined in Section 4.5(a).

"New First Lien Documents": as defined in Section 4.5(a).

"New First Lien Obligations": as defined in Section 4.5(a).

"New Second Lien Agent": as defined in Section 4.5(b).

"New Second Lien Documents": as defined in Section 4.5(b).

"New Second Lien Obligations": as defined in Section 4.5(b).

"Obligations": with respect to any Obligor, all amounts, obligations, liabilities, covenants and duties of every type and description owing by such Obligor to any Secured Creditor arising out of, under, or in connection with, any agreement, whether direct or indirect (regardless of whether acquired by assignment), absolute or contingent, due or to become due, whether liquidated or not, now existing or hereafter arising and however acquired, and whether or not evidenced by any instrument or for the payment of money (including all interest, fees, and charges whether or not accruing after the filing of any Insolvency Proceeding with respect to any Obligations, whether or not a claim for such post-filing or post-petition interest, fees, and charges is allowed or allowable in any such proceeding), including all other fees, expenses (including fees, charges and disbursement of counsel), interest, commissions, charges, costs, disbursements, indemnities and reimbursement of amounts paid and other sums chargeable to such Obligor under any agreement.

7

"Obligor": each Borrower, each Credit Party and each other Person that is liable on or in respect of the First Lien Obligations or Second Lien Obligations or that has granted or purported to grant a Lien on any assets as Collateral to secure the First Lien Obligations or Second Lien Obligations, together with such Person's successors and assigns, including a receiver, trustee or debtor-in-possession on behalf of such Person.

"Party": a party to this Agreement (other than the Obligors).

"Permitted Second Lien Disposition" shall mean a Disposition (excluding any collection of any Collateral consisting of an obligation) of any Collateral in connection with an Enforcement Action by the Second Lien Creditor after the expiration of the Standstill Period and subject to the terms of Section 3.1 of this Agreement, which Disposition is commercially reasonable in all respects and undertaken on an arm's length basis with parties that are not Affiliates of any of the Second Lien Creditor.

"Person": an individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture, other entity or Governmental Authority.

"Pledged Collateral": any Collateral in the possession or control (as defined in Section 3.3) of the First Lien Agent or the Second Lien Creditor.

"Proceeds": (a) all "proceeds," as defined in Article 9 of the UCC, of the Collateral, and (b) whatever is recovered when any Collateral is sold, exchanged, collected or  Disposed of, whether voluntarily or involuntarily, including any additional or replacement Collateral provided during any Insolvency Proceeding and any payment or property received in an Insolvency Proceeding on account of, or from, Collateral, an interest in Collateral or the value of any Collateral.

"Purchase Date": as defined in Section 5.2.

"Purchase Event": as defined in Section 5.1.

"Purchase Notice": as defined in Section 5.2.

"Purchase Obligations": as defined in Section 5.1.

"Purchase Price": as defined in Section 5.3.

"Recovery": as defined in Section 6.8.

"Refinance": in respect of any First Lien Obligations or Second Lien Obligations or the commitments related thereto, to refinance, replace, refund, or repay, or to issue other Obligations or commitments in exchange or replacement for such Obligations or commitments relating thereto (whether or not fully utilized) in whole or in part, whether with the same or different lenders, agents, or arrangers. "Refinanced" and "Refinancing" have correlative meanings.

8

"Release Documents": termination statements, releases, and other documents reasonably necessary or advisable to release, release of record, or evidence the release of a Lien or of a guaranty obligation in connection with the disposition of Stock of an Obligor.

"Requisite Second Lien Creditor": Second Lien Creditor holding more than 50% of the outstanding principal balance of the Second Lien Loans.

"Second Lien Collateral Documents": the "Collateral Documents" as defined in the Second Lien Credit Agreement, and any other documents or instruments granting or purporting to grant a Lien on real or personal property to secure a Second Lien Obligation or granting rights or remedies with respect to such Liens.

"Second Lien Credit Agreement": (a) the Initial Second Lien Credit Agreement and (b) each loan or credit agreement evidencing any replacement, substitution, renewal, or initial or subsequent Refinancing of the Obligations under the Second Lien Credit Agreement, in each case as the same may be amended, amended and restated, supplemented, modified, replaced, substituted or renewed from time to time or Refinanced in accordance with the terms of this Agreement.

"Second Lien Creditor": as defined in the recitals hereto.

"Second Lien Default": any "Event of Default" or similar term, as such term is defined under the Second Lien Documents.

"Second Lien Default Notice": with respect to any Second Lien Default, a written notice from the Second Lien Creditor to the First Lien Agent, with a copy to the Obligors, stating that such notice is a "Second Lien Default Notice," indicating that such Second Lien Default has occurred, and describing such Second Lien Default in reasonable detail.

"Second Lien Documents": the Second Lien Credit Agreement, all Transaction Documents (as such term is defined in the Second Lien Credit Agreement) and all other agreements, instruments and other documents at any time executed or delivered by any Obligor or any other Person with, to or in favor of the Second Lien Creditor in connection therewith or related thereto, including such documents evidencing successive Refinancings of the Second Lien Obligations, in each case, as the same may be amended, amended and restated, supplemented, modified, replaced, substituted or renewed from time to time.

"Second Lien Loans": the loans or advances outstanding under the Second Lien Documents.

"Second Lien Obligations": all Obligations of the Obligors under (a) the Second Lien Credit Agreement and the other Second Lien Documents, (b) the guaranties under the Second Lien Documents, or (c) any other agreement or instrument granting or providing for the perfection of a Lien securing any of the foregoing. Notwithstanding any other provision hereof, the term "Second Lien Obligations" will include accrued interest, fees, costs, and other charges incurred under the Second Lien Credit Agreement and the other Second Lien Documents, whether incurred before or after the commencement of an Insolvency Proceeding, and whether or not allowed or allowable in an Insolvency Proceeding. To the extent that any payment with

9

7/21/2016                    Exhibit 10.7 - Intercreditor Agreement  (M0629775.DOC;1)

respect to the Second Lien Obligations (whether by or on behalf of any Obligor, as proceeds of security, enforcement of any right of set-off or recoupment, or otherwise) is declared to be fraudulent or preferential in any respect, set aside, avoided, or required to be paid to a debtor in possession, trustee, receiver, or similar Person, then the obligation or part thereof originally intended to be satisfied will be deemed to be reinstated and outstanding as if such payment had not occurred.

"Secured Creditors": the First Lien Creditors and the Second Lien Creditor, or any of them.

"Senior Adequate Protection Liens": as defined in Section 6.2.

"Standstill Period": the period commencing on the date of a Second Lien Default and ending upon the date which is the earlier of (a) 120 days after the First Lien Agent has received a Second Lien Default Notice with respect to such Second Lien Default and (b) the date on which the Discharge of First Lien Obligations shall have occurred; provided that in the event that as of any day during such 120 days, no Second Lien Default is continuing, then the Standstill Period shall be deemed not to have commenced.

"Stock": all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"UCC": the Uniform Commercial Code of any applicable jurisdiction and, if the applicable jurisdiction shall not have any Uniform Commercial Code, the Uniform Commercial Code as in effect in the State of New York.

"Voting Stock": Stock of any Person having ordinary power to vote in the election of members of the board of directors, managers, trustees or other controlling Persons of such Person (irrespective of whether, at the time, Stock of any other class or classes of such entity shall have or might have voting power by reason of the occurrence of any contingency).

1.2    Certain Matters of Construction.  Unless otherwise stated or the context clearly requires otherwise: (a) references to the First Lien Agent will refer to the First Lien Agent acting on behalf of itself and on behalf of all of the other First Lien Creditors; (b) definitions of terms apply equally to the singular and plural forms; pronouns will include the corresponding masculine, feminine, and neuter forms; (c) "will" and "shall" have the same meaning; (d) in computing periods from a specified date to a later specified date, (i) the words "from" and "commencing on" (and the like) mean "from and including," (ii) the words "to," "until" and "ending on" (and the like) mean "to but excluding" and (iii) the word "through" means "to and including"; (e) except as otherwise provided in this Agreement, any action permitted under this Agreement may be taken at any time and from time to time; (f) all indications of time of day mean New York City time; (g) "including" means "including, but not limited to"; (h) "A or B" means "A or B or both"; (i) references to a statute refer to the statute and all regulations promulgated under or implementing the statute as in effect at the relevant time, references to a specific provision of a statute or regulation include successor provisions; (j) references to a

10

section of the Bankruptcy Code also refer to any similar provision of other Bankruptcy Law; (k) references to an agreement (including this Agreement) refer to the agreement as the same may be amended, supplemented or modified at the relevant time; (l) references to a Governmental Authority include any successor Governmental Authority; (m) section references refer to sections of this Agreement, references to numbered sections refer to all included sections (for example, a reference to Section 6 also refers to Sections 6.1, 6.1(a), etc.), and references to a section or article in an agreement, statute, or regulation include successor and renumbered sections and articles of that or any successor agreement, statute, or regulation; (n) references to a Person include the Person's permitted successors and assigns; (o) "herein," "hereof," "hereunder," and words of similar import refer to this Agreement in its entirety and not to any particular provision; and (p) "asset" and "property" have the same meaning and refer to both real and personal, tangible and intangible assets and property, including cash, securities, accounts, and general intangibles, wherever located.

Section 2.      Security Interests; Priorities.

2.1      Priorities.  Each Secured Creditor hereby acknowledges that other Secured Creditors have been granted Liens upon the Collateral to secure their respective Obligations.  A Lien on Collateral securing or purporting to secure any First Lien Obligation will at all times be senior and prior in all respects to a Lien on such Collateral securing or purporting to secure any Second Lien Obligation, and a Lien on Collateral securing or purporting to secure any Second Lien Obligation will at all times be junior and subordinate in all respects to a Lien on such Collateral securing or purporting to secure any First Lien Obligation.

2.2      No Alteration of Priority.  Except as otherwise expressly provided herein, the priority of the Liens securing the First Lien Obligations, and the rights and obligations of the Parties under this Agreement, will remain in full force and effect irrespective of  (a) how a Lien was acquired (whether by grant, possession, statute, operation of law, subrogation, judgment or otherwise), (b) the time, manner, or order of the grant, attachment, filing, recordation, or perfection of a Lien, (c) any conflicting provision of the UCC or other applicable law, (d) any defect or deficiencies in, or non-perfection (including any failure to perfect or lapse in perfection), setting aside, recharacterization, or avoidance of, any Lien or a First Lien Document or a Second Lien Document, (e) the modification, subordination or recharacterization of a First Lien Obligation or a Second Lien Obligation, (f) the modification of a First Lien Document or the modification of a Second Lien Document, (g) the voluntary (to the extent not prohibited by the First Lien Documents or the Second Lien Documents) or involuntary subordination of a Lien on Collateral securing a First Lien Obligation to a Lien securing another obligation of an Obligor or other Person, (h) the exchange of a security interest in any Collateral for a security interest in other Collateral, (i) the commencement of an Insolvency Proceeding, or (j) any other circumstance whatsoever, including a circumstance that might be a defense available to, or a discharge of, an Obligor in respect of a First Lien Obligation or a Second Lien Obligation or holder of such Obligation and notwithstanding any conflicting terms or conditions which may be contained in any of the Documents.

2.3      Perfection; Contesting Liens.  Except as provided in Section 3.3 as between the First Lien Creditors and Second Lien Creditor, (a) the First Lien Agent will be solely responsible for perfecting and maintaining the perfection of its Liens on the First Lien Collateral, and (b) the

11

Second Lien Creditor will be solely responsible for perfecting and maintaining the perfection of its Liens on the Second Lien Collateral.  This Agreement is intended solely to govern the respective Lien priorities as between the First Lien Creditors and the Second Lien Creditor and does not impose on the First Lien Creditors or the Second Lien Creditor any obligations in respect of the disposition of Proceeds of foreclosure on any Collateral that would conflict with a prior perfected claim in favor of another Person, an order or decree of a court or other Governmental Authority, or applicable law.  The First Lien Agent and the First Lien Creditors will have no liability to the Second Lien Creditor for (and the Second Lien Creditor hereby waives any claim arising from) any action or inaction by a First Lien Creditor with respect to any First Lien Document, First Lien Obligations or Collateral, including (1) the maintenance, preservation, or collection of the First Lien Obligations or any Collateral, and (2) the foreclosure upon, or the sale, liquidation, maintenance, preservation, or other disposition of, any Collateral, including any such action or inaction that results in a default or event of default under the Second Lien Documents.  The First Lien Agent will not have by reason of this Agreement or any other document a fiduciary relationship with any First Lien Creditor or the Second Lien Creditor, and the Second Lien Creditor will not have by reason of this Agreement or any other document a fiduciary relationship with any First Lien Creditor. The parties recognize that the interests of the First Lien Agent and the Second Lien Creditor may differ, and the First Lien Agent may act in its own interest or in the interest of the First Lien Creditors without taking into account the interests of the Second Lien Creditor.  The First Lien Agent will not contest, or support any Person in contesting, directly or indirectly, in any proceeding (including an Insolvency Proceeding) the validity, enforceability, perfection, characterization or priority of any Lien securing or purportedly securing a Second Lien Obligation.  The Second Lien Creditor will not contest, or support any Person in contesting, directly or indirectly, in any proceeding (including an Insolvency Proceeding) the validity, enforceability, perfection, characterization or priority of any Lien securing or purportedly securing a First Lien Obligation.  Nothing in this Agreement shall be construed to (x) prevent or impair the rights of any Secured Creditor to enforce this Agreement, or (y) waive any default or event of default under the Second Lien Transaction Documents resulting from the incurrence of First Lien Loans under the First Lien Transaction Documents with a principal amount in excess of the Maximum First Lien Principal Amount.

2.4       Payment Over; Application of Proceeds of Collateral.   Until the Discharge of First Lien Obligations, whether or not an Insolvency Proceeding has commenced and without regard to whether the First Lien Creditors have exhausted all of their remedies against the Obligors under the First Lien Documents or otherwise, any Collateral, Distributions in respect thereof or Proceeds thereof received by the Second Lien Creditor, including any such Collateral constituting Proceeds, or any payment or Distribution, that may be received by the Second Lien Creditor (a) in connection with the exercise of any right or remedy (including any right of set-off or recoupment) with respect to the Collateral, (b) in connection with any insurance policy claim or any condemnation award (or deed in lieu of condemnation) in respect of the Collateral, (c) from the collection or other Disposition of, or realization on, the Collateral in any Enforcement Action or (except as provided in Section 6.10) pursuant to any Insolvency Proceeding or (d) in violation of this Agreement, shall be segregated and held in trust and promptly paid over to the First Lien Agent, for the benefit of the First Lien Creditors, in the same form as received, with any necessary endorsements.  The First Lien Agent is authorized to make such necessary endorsements as agent for the Second Lien Creditor.  This authorization is coupled with an interest and is irrevocable until the Discharge of First Lien Obligations. All Collateral and all

12

Proceeds thereof received after the Discharge of First Lien Obligations shall be segregated and held in trust for and forthwith paid over, in the kind or funds and currency received, to the Second Lien Creditor for application to the Second Lien Obligations (unless otherwise required by law or court order) and, after the Discharge of Second Lien Obligations, to whomever may be lawfully entitled thereto.

2.5     Release of Collateral Upon Enforcement Action or Permitted Sale or Disposition.  If the First Lien Agent releases a Lien on all or any portion of the Collateral in connection with:  (a) an Enforcement Action, (b) a sale in the ordinary course pursuant to Section 363 of the Bankruptcy Code or other Bankruptcy Law, the entry of an order of the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code or any other analogous Bankruptcy Law, or in connection with the confirmation of a plan of reorganization or arrangement in any Insolvency Proceeding, or (c) a Disposition of any Collateral other than pursuant to an Enforcement Action (whether or not there is an Event of Default under the First Lien Documents), then any Lien of the Second Lien Creditor on such Collateral will be, except as otherwise provided below, automatically and simultaneously released to the same extent, and the Second Lien Creditor will be deemed to have consented under the Second Lien Documents to such transaction free and clear of the Second Lien Creditor's security interest (it being understood that the Second Lien Creditor shall still, subject to the terms of this Agreement, have a security interest with respect to the Proceeds of such Collateral except to the extent applied to First Lien Obligations) and to have waived the provisions of the Second Lien Documents to the extent necessary to permit such transaction and will promptly execute and deliver to the First Lien Agent such Release Documents as the First Lien Agent requests to effectively release or confirm the release of such Lien of the Second Lien Creditor and take such further actions as the First Lien Agent shall reasonably require in order to release or terminate the Second Lien Creditor's Liens on such Collateral (or release any applicable Obligor, including any Obligor that is an issuer of the equity that is the subject of such transaction and any subsidiary thereof); provided that such release will not occur without the consent of the Second Lien Creditor for (x) an Enforcement Action, as to any Collateral the net cash Proceeds of the Disposition of which will not be applied to permanently repay (or otherwise reduce in the case of a "credit bid") the First Lien Obligations or any DIP Financing, (y) a Disposition (other than a Disposition described in (a) or (b) above), if the Disposition is prohibited by a provision of the Second Lien Credit Agreement other than solely as the result of the existence of a default or event of default under the Second Lien Documents or (z) a release in connection with any matter described in clause (b) above, if pursuant to court order, (i) the Liens of the Second Lien Creditor would not attach to the net Proceeds of the Disposition with the same priority and validity as the Liens held by the Second Lien Creditor on such Collateral, with the Liens remaining subject to the terms of this Agreement, or (ii) the net Proceeds of a Disposition of Collateral received by First Lien Agent in excess of those necessary to achieve the Discharge of First Lien Obligations would not be distributed in accordance with the UCC and applicable law.

2.6     Power of Attorney.  The Second Lien Creditor hereby appoints the First Lien Agent and any officer or agent of the First Lien Agent, with full power of substitution, as its true and lawful attorney-in-fact with full power and authority in the place and stead of the Second Lien Creditor or in the First Lien Agent's own name, in the First Lien Agent's discretion to take any action and to execute any and all documents and instruments that may be reasonable and appropriate for the purpose of carrying out the terms of Section 2.5, including any endorsements

13

or other instruments of transfer or release; provided, that the First Lien Agent shall not be permitted to provide any consent described in the proviso to Section 2.5 which is required of the Second Lien Creditor. This appointment is coupled with an interest and is irrevocable until the Discharge of First Lien Obligations or such time as this Agreement is terminated in accordance with its terms. No Person to whom this power of attorney is presented, as authority for the First Lien Agent (or any officer or agent of the First Lien Agent) to take any action or actions contemplated hereby, shall be required to inquire into or seek confirmation from the Second Lien Creditor as to the authority of the First Lien Agent (or any such officer or agent) to take any action described herein, or as to the existence of or fulfillment of any condition to this power of attorney, which is intended to grant to the First Lien Agent (or any officer or agent of the First Lien Agent) the authority to take and perform the actions contemplated herein.

2.7     Waiver.  Each of the Secured Creditors (a) waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations under the Documents and notice of or proof of reliance by the Secured Creditors upon this Agreement and protest, demand for payment or notice except to the extent otherwise specified herein and (b) acknowledges and agrees that the other Secured Creditors have relied upon the Lien priority and other provisions hereof in entering into the Documents and in making funds available to the Borrower thereunder.

2.8     Notice of Interest In Collateral.  This Agreement is intended, in part, to constitute an authenticated notification of a claim by each Secured Creditor to the other Secured Creditors of an interest in the Collateral in accordance with the provisions of Sections 9-611 and 9-621 of the UCC.

2.9     New Liens.   So long as the Discharge of First Lien Obligations shall not have occurred, the parties hereto agree that no additional Liens shall be granted or permitted on any asset of any Borrower or any other Obligor to secure any Second Lien Obligation unless, subject to the terms of this Agreement, immediately after giving effect to such grant or concurrently therewith, a senior and prior Lien shall be granted on such asset to secure the First Lien Obligations.  So long as the Discharge of Second Lien Obligations shall not have occurred, the parties hereto agree that no additional Liens shall be granted or permitted on any asset of any Borrower or any other Obligor to secure any First Lien Obligation unless, subject to the terms of this Agreement, immediately after giving effect to such grant or concurrently therewith, a junior and subordinated Lien shall be granted on such asset to secure the Second Lien Obligations.  To the extent that the foregoing provisions of this Section are not complied with for any reason, without limiting any other rights and remedies available to the First Lien Agent or the First Lien Creditors, the Second Lien Creditor agrees that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.9 shall be subject to the terms of this Agreement, including the turnover provisions of Section 2.4.

2.10     Similar Liens and Agreements.  The Parties intend that the Collateral securing all or any portion of the First Lien Obligations and the Collateral securing the Second Lien Obligations be identical.  Accordingly, subject to the other provisions of this Agreement, the Parties will use commercially reasonable efforts to cooperate:

(a)     to determine, upon the reasonable written request of the First Lien Agent or the Second Lien Creditor, the specific assets included in the Collateral securing their

14

respective Obligations, the steps taken to perfect the Liens thereon and the identity of the Obligors;

(b)    to make the forms, documents, and agreements creating or evidencing the Liens of the Secured Creditors in the Collateral materially the same, other than with respect to the relative priority of the Liens created or evidenced thereunder, the identity of the Secured Creditors benefitted thereby and other matters contemplated by this Agreement; and

(c)    to provide that any Lien obtained by any Secured Creditor in respect of any judgment obtained in respect of any Obligations shall be subject in all respects to the terms of this Agreement.

Section 3.    <u>Enforcement of Security</u>.

3.1    <u>Exercise of Remedies against Collateral</u>.

(a)    Subject to subsection (b) below, until the Discharge of First Lien Obligations, the First Lien Creditors will have the exclusive right to (1) commence and maintain Enforcement Actions (including the rights to set-off or "credit bid" their debt), (2) subject to <u>Section 2.5</u>, make determinations regarding the release or disposition of, or restrictions with respect to, the Collateral, and (3) otherwise enforce the rights and remedies of a secured creditor under the UCC and other applicable law and the Bankruptcy Laws of any applicable jurisdiction in such order and in such manner as the First Lien Creditors may determine in their sole discretion without consulting with or obtaining the consent of the Second Lien Creditor and regardless of whether any such exercise is adverse to the interests of the Second Lien Creditor, except as otherwise required pursuant to the UCC and other applicable law, subject to the relative priorities described in <u>Section 2.1</u>. In conducting any public or private sale under the UCC, 10 days' notice shall be deemed to be commercially reasonable notice. The First Lien Agent and the other First Lien Creditors may take Enforcement Actions pursuant to the provisions of the First Lien Documents and applicable law, all in such manner as they may determine in the exercise of their sole discretion. Such Enforcement Actions may include the rights of an agent appointed by them to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under the Bankruptcy Laws of any applicable jurisdiction. Except as provided in this <u>Section 3.1</u> and <u>Section 3.2</u> below, notwithstanding any rights or remedies available to a Second Lien Creditor under any of the Second Lien Documents, applicable law or otherwise, a Second Lien Creditor shall not take any Enforcement Action. Until the Discharge of First Lien Obligations, each Second Lien Creditor (1) shall not take any action that would hinder any exercise of remedies or the taking of any Enforcement Action under the First Lien Documents, and (2) waives any right it may have as a junior lien creditor or otherwise to object to the manner in which the First Lien Agent or the First Lien Creditors may seek to take any Enforcement Action (including any right to object to a First Lien Creditor accepting any Collateral in full or partial satisfaction of First Lien Obligations under Section 9-620 of the UCC or any applicable law in Canada), regardless of whether any action or omission by or on behalf of the First Lien Agent and the First Lien Creditors is adverse to the interest of the Second Lien Creditor.

15

(b)     Notwithstanding the preceding Section 3.1(a), Second Lien Creditor may commence and may continue an Enforcement Action with respect to a Second Lien Default only if: (1) the Standstill Period with respect thereto shall have elapsed; (2) the First Lien Agent is not then pursuing with commercially reasonable diligence an Enforcement Action with respect to all or a material portion of the Collateral (which would include the notification of account debtors to make payments to the First Lien Agent or its agents and exercising dominion over any cash or security accounts of any Obligor) or attempting with commercially reasonable diligence to vacate any stay or prohibition against such exercise; (3) any acceleration of the Second Lien Obligations has not been rescinded; and (4) the applicable Obligor is not then a debtor in an Insolvency Proceeding.

3.2     Permitted Actions.  Notwithstanding Section 3.1(a), a Second Lien Creditor may (a) file a proof of claim or statement of interest, vote on a plan of reorganization (including a vote to accept or reject a plan of partial or complete liquidation, reorganization, arrangement, composition, or extension), and make other filings, arguments, and motions, with respect to the Second Lien Obligations and the Collateral in any Insolvency Proceeding commenced by or against any Obligor; (b) take action to create, perfect, preserve, or protect (but not enforce) its Lien on the Collateral, so long as such actions are not adverse to the priority status in accordance with this Agreement of Liens on the Collateral securing the First Lien Obligations or the First Lien Creditors' rights to exercise remedies or otherwise not in accordance with this Agreement; (c) file necessary pleadings in opposition to a claim objecting to or otherwise seeking the disallowance of a Second Lien Obligation or a Lien securing the Second Lien Obligation; (d) join (but not exercise any control over) a judicial foreclosure or Lien enforcement proceeding with respect to the Collateral initiated by the First Lien Agent, to the extent that such action could not reasonably be expected to interfere materially with the Enforcement Action, but the Second Lien Creditor may not receive any Proceeds thereof unless expressly permitted herein; (e) bid for or purchase Collateral at any public, private, or judicial foreclosure upon such Collateral initiated by any First Lien Creditor, or any sale of Collateral during an Insolvency Proceeding; provided that such bid may not include a "credit bid" in respect of any Second Lien Obligations unless the net cash Proceeds of such bid are otherwise sufficient to cause the Discharge of First Lien Obligations and are applied to cause the Discharge of the First Lien Obligations, in each case, at the closing of such bid; (f) accelerate any Second Lien Obligations in accordance with the provisions of the Second Lien Documents; and (g) seek adequate protection during an Insolvency Proceeding to the extent expressly permitted by Section 6, in the case of each of clauses (a) through (g) in a manner not inconsistent with the other terms of this Agreement.   Except as expressly provided for herein, (1) no provision hereof shall be construed to prohibit the payment by a Borrower of regularly scheduled principal, interest and other amounts owed in respect of the Second Lien Obligations so long as the receipt thereof is not the direct or indirect result of any Enforcement Action, and (2) unless and until the Discharge of the First Lien Obligations shall have occurred, the sole right of the Second Lien Creditor with respect to the Collateral is to hold a lien on the Collateral pursuant to the Second Lien Collateral Documents for the period and to the extent granted therein and to receive a share of the Proceeds thereof, if any, after the Discharge of the First Lien Obligations shall have occurred.

3.3     Collateral In Possession.

16

(a) If the First Lien Agent has any Pledged Collateral in its possession or control, then, subject to Section 2.1 and this Section 3.3, the First Lien Agent will possess or control such Pledged Collateral as bailee or agent for perfection for the benefit of the Second Lien Creditor as secured party, so as to satisfy the requirements of sections 8-106(d)(3), 8-301(a)(2), 9-313(c) and 9-314(a) of the UCC.  The First Lien Agent will have no obligation to any First Lien Creditor or Second Lien Creditor to ensure that any Pledged Collateral is genuine or owned by any of the Obligors or to preserve rights or benefits of any Person except as expressly set forth in this Section 3.3.  In this Section 3.3, "control" has the meaning given that term in sections 8-106 and 9-314 of the UCC.

(b) The duties or responsibilities of the First Lien Agent under this Section 3.3 will be limited solely to possessing or controlling the applicable Pledged Collateral as bailee or agent for perfection in accordance with this Section 3.3 and delivering such Pledged Collateral upon a Discharge of First Lien Obligations, as provided in subsection (e) below.  The First Lien Agent makes no representation or warranty as to whether the provisions of this Section 3.3 are sufficient to perfect the security interest in any Collateral in which the First Lien Agent has such possession or control.

(c) If the Second Lien Creditor has any Pledged Collateral in its possession or control, then, subject to Section 2.1 and this Section 3.3, the Second Lien Creditor will promptly notify the First Lien Agent of its possession or control of such Pledged Collateral and if requested by the First Lien Agent, deliver or transfer such Pledged Collateral in its possession or control, together with any necessary endorsements (which endorsements will be without recourse and without any representation or warranty), to the First Lien Agent in such manner as the First Lien Agent shall reasonably direct.  Until such delivery or transfer is complete, the Second Lien Creditor shall possess or control such Pledged Collateral as bailee or agent for perfection for the benefit of the First Lien Agent as secured party, so as to satisfy the requirements of sections 8-106(d)(3), 8-301(a)(2), 9-313(c) and 9-314(a) of the UCC. The Second Lien Creditor will have no obligation to any First Lien Creditor to ensure that any Pledged Collateral is genuine or owned by any of the Obligors or to preserve rights or benefits of any Person except as expressly set forth in this Section 3.3.  The First Lien Agent hereby waives and releases the Second Lien Creditor from all claims and liabilities arising out of the Second Lien Creditor's role under this Section 3.3(c) as bailee or agent with respect to any Pledged Collateral. The Second Lien Creditor makes no representation or warranty as to whether the provisions of this Section 3.3(c) are sufficient to perfect the security interest in any Collateral in which the Second Lien Creditor has such possession or control.

(d) The duties or responsibilities of the Second Lien Creditor under this Section 3.3 will be limited solely to possessing or controlling the Pledged Collateral as bailee or agent for perfection in accordance with this Section 3.3 and delivering the Pledged Collateral to the First Lien Agent promptly upon the request by the First Lien Agent therefor.  The Second Lien Creditor makes no representation or warranty as to whether the provision of this Section 3.3 are sufficient to perfect the security interest in any Collateral in which the Second Lien Creditor has such possession or control.

(e) Upon the Discharge of First Lien Obligations, First Lien Agent will promptly deliver or transfer (subject to the terms of any control agreement) control of any

17

Pledged Collateral in its possession or control, together with any necessary endorsements (which endorsements will be without recourse and without any representation or warranty), *first,* to the Second Lien Creditor if any Second Lien Obligations remain outstanding, and *second*, to the applicable Obligor or Obligors or, in the case of clauses *first* and *second*, as a court of competent jurisdiction may otherwise direct.

3.4    Waiver of Marshalling and Similar Rights.  Until the Discharge of First Lien Obligations, the Second Lien Creditor, to the fullest extent permitted by applicable law, waives as to the First Lien Agent and each other First Lien Creditor any requirement regarding, and agrees not to demand, request, plead or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law.

3.5    Insurance and Condemnation Awards.  Until the Discharge of First Lien Obligations, and subject to the rights of the Obligors under the First Lien Documents, the First Lien Agent will have the exclusive right to adjust settlement for any losses covered by an insurance policy covering the Collateral, and to approve an award granted in a condemnation or similar proceeding (or a deed in lieu of condemnation) affecting the Collateral, and all proceeds of such policy, award, or deed will be applied in accordance with Section 2.4 and thereafter, if no Second Lien Obligations are outstanding, to the payment to the owner of the subject property, such other Person as may be entitled thereto, or as a court of competent jurisdiction may otherwise direct.

Section 4.    Covenants

4.1    Amendments to First Lien Documents.

(a)    The First Lien Creditors may at any time and from time to time and without consent of or notice to the Second Lien Creditor, without incurring any liability to the Second Lien Creditor and without impairing or releasing any rights or obligations hereunder or otherwise, amend, restate, supplement, modify, substitute, renew or replace any or all of the First Lien Documents; provided that without the consent of the Second Lien Creditor, the First Lien Creditors shall not amend, restate, supplement, modify, substitute, renew or (except as provided in Section 6.2) Refinance any or all of the First Lien Documents to (a) directly increase the interest rate margins on the First Lien Obligations to an amount greater than 300 basis points per annum on a weighted average basis above the applicable interest rate margins on the First Lien Obligations in effect on the date hereof (excluding, without limitation, fluctuations in underlying rate indices and imposition of a default rate of 2% per annum), (b) extend the final maturity date of the First Lien Obligations, (c) restrict the amendment of the Second Lien Documents except as set forth in Section 4.2, (d) increase the principal portion of the First Lien Obligations in excess of the Maximum First Lien Principal Amount, (e) modify a mandatory prepayment provision relating to the sale of Vessels in a manner that allows amounts that would otherwise be required to be used to prepay First Lien Obligations to be retained by the Obligors to an amount greater than permitted under the Second Lien Documents, or (f) modify a covenant that directly restricts one or more Obligors from making payments under the Second Lien Documents that would otherwise be permitted under the First Lien Documents as in effect on the date hereof.

18

(b)    Notwithstanding any provision contained in the Second Lien Documents to the contrary, the Obligors, the First Lien Agent and the other First Lien Creditors may at any time and from time to time without the consent of or notice to the Second Lien Creditor and without violating any Second Lien Document or creating any Second Lien Default, amend the payment waterfall provisions contained in the First Lien Documents, create or add new tranches of First Lien Obligations, and/or reallocate all or a portion of the First Lien Obligations to the principal amount of one or more newly created loan tranches or facilities (which new tranches or facilities shall constitute "First Lien Obligations" hereunder, subject to the proviso below), each of which (and/or the Liens securing same) may be contractually senior, junior or pari passu to the then existing or thereafter arising First Lien Obligations (and/or the Liens securing same) and contain such terms and provisions to be determined and agreed among the Obligors (or any one or more of them), First Lien Agent, and relevant First Lien Creditors; provided, however, that any such amendments, creations, additions, reallocations and modifications shall be subject to the limitations set forth in Section 4.1(a).

4.2    Amendments to Second Lien Documents.  Until the Discharge of First Lien Obligations has occurred, and notwithstanding anything to the contrary contained in the Second Lien Documents, the Second Lien Creditor shall not, without the prior written consent of the First Lien Agent, amend, restate, supplement, modify, substitute, renew or Refinance any or all of the Second Lien Documents to (a) directly or indirectly increase the applicable interest rates in respect of the Second Lien Obligations (excluding, without limitation, fluctuations in underlying rate indices and imposition of a default rate of 2% per annum) by more than 300 basis points per annum, (b) shorten the maturity or weighted average life to maturity of the Second Lien Obligations, require that any payment on the Second Lien Obligations be made earlier than the date originally scheduled for such payment or that any commitment expire any earlier than the date originally scheduled therefor, or add or make more restrictive any mandatory prepayment, redemption, repurchase, sinking fund or similar requirement, provided that the prior written consent of the First Lien Agent shall not be required with respect to any modification which shortens the maturity of the Second Lien Obligations upon the effectiveness of any change made to shorten the maturity of the First Lien Obligations by an equivalent period, (c) add or modify in a manner adverse to any Obligor or any First Lien Creditor any covenant, agreement or event of default under the Second Lien Documents (except to the extent necessary to conform to changes made to the First Lien Documents, excluding changes related to the first priority status of the First Lien Obligations), (d) restrict the amendment of the First Lien Documents except as set forth in Section 4.1 or (e) increase the principal amount of the Second Lien Obligations (other than, subject to clause (a) above, as a result of interest thereon having been paid in-kind or capitalized).

4.3    Amendments to Collateral Documents.  If a First Lien Creditor and an Obligor modify a First Lien Collateral Document, the modification will apply automatically to any comparable provision of a Second Lien Collateral Document, without the consent of the Second Lien Creditor and without any action by Second Lien Creditor or any Obligor; provided that no such modification will (a) remove or release the Lien of the Second Lien Creditor on the Collateral, except to the extent that (1) the release is permitted hereunder and (2) there is a corresponding release of the Lien of the First Lien Creditors on the Collateral, (b) impose duties on the Second Lien Creditor without its consent, (c) permit other Liens on the Collateral not permitted under the terms of the Second Lien Documents other than as provided in Section 6, or

19

(d) by its terms be adverse to the interest of the Second Lien Creditor to a greater extent than the First Lien Creditors (other than by virtue of their relative priorities and rights and obligations hereunder).

4.4     Prepayments.  Without the prior written consent of the First Lien Agent, no Second Lien Creditor will take, demand or receive from any Obligor any prepayment of principal (whether optional, voluntary, mandatory or otherwise or by redemption, defeasance or other payment or distribution) with respect to any Second Lien Obligations, except for mandatory prepayments in respect of Dispositions of assets, the issuance or incurrence of Indebtedness, the issuance of Stock or receipt of capital contributions and the existence of excess cash flow, in each case only to the extent expressly permitted by the terms of the First Lien Documents.

4.5     Effect of Refinancing.

(a)     If the Discharge of First Lien Obligations is being effected through a Refinancing; provided that (1) the First Lien Agent gives a notice of such Refinancing to the Second Lien Creditor at least 5 Business Days prior to such Refinancing (except as otherwise provided in Section 6.2) and (2) the credit agreement and the other documents evidencing such new First Lien Obligations (the "New First Lien Documents") do not effect an amendment, supplement or other modification of the terms of the First Lien Obligations in a manner that is prohibited by Section 4.1, then (A) such Discharge of First Lien Obligations shall be deemed not to have occurred for all purposes of this Agreement, (B) the indebtedness under such Refinancing and all other obligations under the credit documents evidencing such indebtedness (the "New First Lien Obligations") shall be treated as First Lien Obligations for all purposes of this Agreement, (C) the New First Lien Documents shall be treated as the First Lien Documents and (D) the agent under the New First Lien Documents (the "New First Lien Agent") shall be deemed to be the First Lien Agent for all purposes of this Agreement.  Upon receipt of a notice of Refinancing under the preceding sentence, which notice shall include the identity of the New First Lien Agent, the Second Lien Creditor shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as the New First Lien Agent may reasonably request in order to provide to the New First Lien Agent and the holders of the New First Lien Obligations the rights and powers set forth herein; provided, that the failure of the Second Lien Creditor to enter into such documents and agreements shall not affect the rights of the party that consummates the Refinancing to rely on and enforce the terms of this Agreement.

(b)     If the Discharge of Second Lien Obligations is being effected through a Refinancing; provided that (1) the Second Lien Creditor gives a notice of such Refinancing to the First Lien Agent at least 5 Business Days prior to such Refinancing and (2) the credit agreement and the other documents evidencing such New Second Lien Obligations (the "New Second Lien Documents") do not effect an amendment, supplement or other modification of the terms of the Second Lien Obligations in a manner that is prohibited by Section 4.2, then (A) such Discharge of Second Lien Obligations shall be deemed not to have occurred for all purposes of this Agreement, (B) the indebtedness under such Refinancing and all other obligations under the credit documents evidencing such indebtedness (the "New Second Lien Obligations") shall be treated as Second Lien Obligations for all purposes of this Agreement, (C) the New Second Lien

20

Documents shall be treated as the Second Lien Documents and (D) any agent under the New Second Lien Documents (the "New Second Lien Agent") shall be deemed to be the Second Lien Creditor for all purposes of this Agreement. Upon receipt of a notice of Refinancing under the preceding sentence, which notice shall include the identity of the New Second Lien Agent, the First Lien Agent shall promptly enter into such documents and agreements (including amendments or supplements to this Agreement) as the New Second Lien Agent may reasonably request in order to provide to the New Second Lien Agent the rights and powers set forth herein; provided, that the failure of the First Lien Agent to enter into such documents and agreements shall not affect the rights of the party that consummates the Refinancing to rely on and enforce the terms of this Agreement.

(c)     By their acknowledgement hereto, Obligors agree to cause the agreement, document or instrument pursuant to which any New First Lien Agent or any New Second Lien Agent is appointed to provide that the New First Lien Agent or New Second Lien Agent, as applicable, agrees to be bound by the terms of this Agreement.

Section 5.      <u>Second Lien Creditor' Purchase Option</u>.

5.1     <u>Purchase Option</u>.  If there is (a) an acceleration of the First Lien Obligations in accordance with the First Lien Purchase Agreement or the First Lien Notes, (b) an Event of Default arising from the failure of a Borrower to make any payment in respect of principal, interest or fees (other than administrative agency or collateral agency fees) under the First Lien Purchase Agreement or the First Lien Notes that is not waived by the First Lien Creditors, within 45 days of its occurrence, or (c) the commencement of an Insolvency Proceeding (each a "Purchase Event"), then Second Lien Creditor may within 15 Business Days of notice from the First Lien Agent pursuant to clause (a) or (b) above or within 15 Business Days of the first Purchase Event to occur under clause (c) above (as the case may be, the "Purchase Deadline"), and not afterwards, purchase all, but not less than all, of the First Lien Obligations (the "Purchase Obligations") for the Purchase Price. Notwithstanding anything in the First Lien Documents to the contrary, no consent of any Obligor to such purchase shall be required. Such purchase will (1) include all principal of, and all accrued and unpaid interest, fees, and expenses in respect of, all First Lien Obligations, and all other First Lien Obligations, outstanding at the time of purchase, (2) be made pursuant to an "Assignment*" (as such term is defined in the First Lien Purchase Agreement, but including only those representations and warranties of the Assignor thereunder as are specified in <u>Section 5.6</u>), whereby the Second Lien Creditor will assume all f Obligations of the First Lien Creditors under the First Lien Documents, and (3) otherwise be subject to the terms and conditions of this <u>Section 5</u>. Each First Lien Creditor will retain all rights to indemnification provided in the relevant First Lien Documents for all claims and other amounts relating to facts and circumstances relating to such First Lien Creditor's holdings of the First Lien Obligations (except to the extent such claims and other amounts were included in the Purchase Price). No amendment, modification or waiver following any purchase under this <u>Section 5</u> of any indemnification provisions under the First Lien Documents shall be effective as to any First Lien Creditor or any Affiliate or officer, director, employee or other related indemnified person of such First Lien Creditor ("Indemnified First Lien Person") without the prior written consent of such Indemnified First Lien Person, and such indemnification provisions shall continue in full force and effect for the benefit of the Indemnified First Lien Persons whether or not any First Lien Documents otherwise remain in

21

effect. Notwithstanding the occurrence of a Purchase Event, the delivery of a Purchase Notice or the existence or operation of the terms in this <u>Section 5</u>, the First Lien Creditors may take or refrain from taking any Enforcement Action at any time; <u>provided</u>, that following the delivery of a Purchase Notice, the First Lien Creditors may only take an Enforcement Action to the extent set forth in <u>Section 5.2(b)</u>.

5.2     <u>Purchase Notice</u>.

(a)     The Second Lien Creditor will deliver a written notice (the "Purchase Notice") to the First Lien Agent no later than three Business Days before the Purchase Deadline that (1) is signed by the Second Lien Creditor, (2) states that it is a Purchase Notice under this <u>Section 5</u>, (3) states that the Second Lien Creditor is irrevocably electing to purchase, in accordance with this <u>Section 5</u>, all of the Purchase Obligations, and (4) designates a purchase date (the "Purchase Date") on which the purchase will occur, that is not later than the Purchase Deadline. A Purchase Notice will be ineffective if it is received by the First Lien Agent after the occurrence giving rise to the Purchase Event is waived, cured, or otherwise ceases to exist.

(b)  Upon the First Lien Agent's receipt of an effective Purchase Notice conforming to this <u>Section 5.2</u>, the Second Lien Creditor will be irrevocably obligated to purchase, and the First Lien Creditors will be irrevocably obligated to sell, the First Lien Obligations in accordance with and subject to this <u>Section 5</u>.  If so instructed by the Second Lien Creditor in the Purchase Notice, the First Lien Creditors shall not complete any Enforcement Action (other than (1) the exercise of control over any Obligor's deposit or securities accounts, (2) the collection of proceeds of accounts and payment intangibles, and (3) Enforcement Actions taken under Exigent Circumstances), as long as the purchase and sale of the First Lien Obligations provided for in this <u>Section 5</u> shall have closed, and the First Lien Creditors shall have received payment in full of the First Lien Obligations as provided for in <u>Section 5.3</u>, in each case by the date designated as the Purchase Date in the Purchase Notice.

5.3     <u>Purchase Price</u>.  The purchase price ("Purchase Price") for the Purchase Obligations will equal the sum of (a) the principal amount of all loans, advances, or similar extensions of credit included in the Purchase Obligations, and all accrued and unpaid fees  and interest thereon through the Purchase Date, (b) all accrued and unpaid fees, expenses, indemnities, and other amounts owed to the First Lien Creditors under the First Lien Documents on the Purchase Date, and (c) amounts according to the good faith estimate of the First Lien Agent of contingent obligations in respect of claims which are known to the First Lien Agent or First Lien Creditors and which are reasonably expected by the First Lien Agent to require the making of a payment under the First Lien Documents.

5.4     <u>Purchase Closing</u>.  On the Purchase Date, the Second Lien Creditor will (a) execute and deliver the Assignment, (b) pay the Purchase Price to First Lien Agent by wire transfer of immediately available funds, and (c) execute and deliver to the First Lien Agent a waiver and release of, and covenant not to sue in respect of, all claims arising out of this Agreement, the relationship between the First Lien Creditors and the Second Lien Creditor in connection with First Lien Documents and the Second Lien Documents, and the transactions contemplated hereby as a result of exercising the purchase option contemplated by this <u>Section 5</u>.

22

5.5      Actions After Purchase Closing.  Promptly after the closing of the purchase of all Purchase Obligations, the First Lien Agent will distribute the Purchase Price to the First Lien Creditors in accordance with the terms of the First Lien Documents. The First Lien Agent shall promptly turn over all possessory collateral to the Second Lien Creditor.  After the closing of the purchase of all Purchase Obligations, the Second Lien Creditor may request that First Lien Agent immediately resign as administrative agent and, if applicable, collateral agent under the First Lien Transaction Documents, and First Lien Agent will immediately resign if so requested.  Upon such resignation, a new administrative agent and, if applicable, a new collateral agent will be elected or appointed in accordance with the First Lien Transaction Documents.

5.6      No Recourse or Warranties; Defaulting Creditors.

(a)      The First Lien Creditors will be entitled to rely on the statements, representations, and warranties in the Purchase Notice without investigation, even if the First Lien Creditors are notified that any such statement, representation, or warranty is not or may not be true.

(b)  The purchase and sale of the Purchase Obligations under this Section 5 will be without recourse and without any representation or warranty whatsoever by the First Lien Creditors, except that the First Lien Creditors shall represent and warrant that on the Purchase Date, immediately before giving effect to the purchase, (i) the First Lien Creditors own the Purchase Obligations free and clear of all Liens, (ii) the principal of and accrued and unpaid interest on the First Lien Obligations, and the fees and expenses thereof, are as stated in the assignment agreement and (iii) each First Lien Creditor has the full right and power to assign its First Lien Obligations and such assignment has been duly authorized by all necessary corporate action by such First Lien Creditor.

The obligations of the First Lien Creditors to sell their respective Purchase Obligations under this Section 5 are several and not joint and several. If a First Lien Creditor breaches its obligation to sell its Purchase Obligations under this Section 5 (a "Defaulting Creditor"), no other First Lien Creditor will be obligated to purchase the Defaulting Creditor's Purchase Obligations for resale to the holders of the Second Lien Obligations.  A First Lien Creditor that complies with this Section 5 will not be in default of this Agreement or otherwise be deemed liable for any action or inaction of any Defaulting Creditor, provided that nothing in this subsection (c) will affect the Second Lien Creditor's obligation to purchase all of the Purchase Obligations.

(d)  Each Obligor hereby consents to any assignment effected to the Second Lien Creditor pursuant to this Section 5.

Section 6.      Bankruptcy Matters.

6.1      Bankruptcy.  This Agreement shall be applicable both before and after the filing of any petition by or against any Obligor under the Bankruptcy Code or the commencement of any other Insolvency Proceeding and all converted or succeeding cases in respect thereof.  The relative rights of the First Lien Creditors and the Second Lien Creditor in respect of any Collateral or Proceeds thereof shall continue after the filing of such petition or commencement of

7/21/2016                    Exhibit 10.7 - Intercreditor Agreement (M0629775.DOC;1)

such proceeding on the same basis as prior to the date of such filing or commencement of such proceeding.  All references in this Agreement to any Obligor will include such Person as a debtor-in-possession and any receiver, trustee, trustee in bankruptcy, liquidator or other estate representative for such Person in an Insolvency Proceeding.  This Agreement is a "subordination agreement" under section 510(a) of the Bankruptcy Code and shall be enforceable in any Insolvency Proceeding.

6.2      Post-Petition Financing.  Until the Discharge of First Lien Obligations, if an Insolvency Proceeding has commenced, no Second Lien Creditor may, directly or indirectly, contest, protest, or object to, and each Second Lien Creditor will be deemed to have consented to, and hereby consents in advance to, (1) any use, sale, or lease of "cash collateral" (as defined in section 363(a) of the Bankruptcy Code), and (2) any Borrower or any other Obligor obtaining DIP Financing if the First Lien Agent consents to such use, sale, or lease, or DIP Financing; provided that (A) in the case of a DIP Financing, the Second Lien Creditor is not required as a condition to such DIP Financing to release its Lien on the Collateral as the same may exist at the time of such DIP Financing, (B) the Second Lien Creditor, may seek adequate protection as permitted by Section 6.3, (C) the Second Lien Creditor may object to the amount of any DIP Financing if, after taking into account the principal amount of such DIP Financing (after giving effect to any Refinancing or "roll-up" of First Lien Obligations) on any date, the sum of the then outstanding principal amount of any First Lien Obligations and the then outstanding principal amount of any DIP Financing (including the unfunded commitments under such DIP Financing) would exceed the Maximum First Lien Principal Amount, and (D) in the case of a DIP Financing, the Liens securing such DIP Financing are pari passu with, or superior in priority to, the then outstanding First Lien Obligations and the Liens securing such First Lien Obligations, respectively.  The Second Lien Creditor further agree that: (i) adequate notice to the Second Lien Creditor for such DIP Financing or use of cash collateral shall be deemed to have been given to the Second Lien Creditor if the Second Lien Creditor receives notice in advance of the hearing to approve such DIP Financing or use of cash collateral on an interim basis and at least 5 Business Days in advance of the hearing to approve such DIP Financing or use of cash collateral on a final basis, (ii) such DIP Financing (and any First Lien Obligations) may be secured by Liens on all or a part of the assets of the Obligors that shall be superior in priority to the Liens on the assets of the Obligors held by any other Person, (iii) the Second Lien Creditor consent to, and will, subordinate (and will be deemed hereunder to have subordinated) their Liens (A) to the Liens securing such DIP Financing (the "DIP Liens") on the same terms (but on a basis junior to the Liens of the First Lien Creditors) as the Liens of the First Lien Creditors are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (B) to any "replacement Liens" or Liens on additional collateral granted to the First Lien Creditors as adequate protection of their interests in the Collateral (the "Senior Adequate Protection Liens") and (C) to any professional fee or other "carve-out" agreed to by the First Lien Agent or the other First Lien Creditors and (iv) any customary "carve-out" or other similar administrative priority expense or claim consented to in writing by the First Lien Agent (or granted pursuant to any order in any Insolvency Proceeding as to which the First Lien Agent did not object), including, without limitation, break up fees and expense reimbursement in connection with an auction of any assets of any Obligor to be paid prior to or contemporaneously with the Discharge of First Lien Obligations, will be deemed for purposes of Section 6.2 to be a use of cash collateral or will otherwise be deemed consented to by the Second Lien Creditor.  No Second Lien Creditor may, directly or indirectly, provide or propose, or support any other Person in

24

file:///C:/Users/iadler/AppData/Local/Microsoft/Windows/Temporary%20Internet%20Files/Content.Outlook/YCRWIJJF/Intercreditor.htm                    25/38

providing or proposing, DIP Financing to an Obligor; provided, that (x) if no First Lien Creditor or Affiliate of a First Lien Creditor offers to provide DIP Financing to the extent permitted under Section 6.2 on or before the date of the hearing to approve DIP Financing, then a Second Lien Creditor may seek to provide DIP Financing to such extent, so long as (i) no such DIP Financing secured by Liens equal or senior in priority to the Liens securing any First Lien Obligations shall include a "roll-up" of any Second Lien Obligations, (ii) the First Lien Agent shall not be required as a condition to such DIP Financing to release its Lien on the Collateral as the same may exist at the time of such DIP Financing, (iii) any such DIP Financing shall provide adequate protection acceptable to the First Lien Agent or as otherwise determined in an Insolvency Proceeding, and (iv) such DIP Financing shall otherwise be extended in accordance with the terms of this Agreement, and (y) First Lien Creditors may object to any such proposed DIP Financing.

6.3     Adequate Protection

(a) The Second Lien Creditor will not contest, protest, or object to (1) any request by a First Lien Creditor for "adequate protection" under any Bankruptcy Law, (2) an objection by a First Lien Creditor to a motion, relief, action, or proceeding based on a First Lien Creditor claiming a lack of adequate protection, or (3) any request by the First Lien Agent for relief from any stay or other relief based upon a lack of adequate protection.

(b) Notwithstanding the preceding Section 6.2, in an Insolvency Proceeding: (1)  except as permitted in this Section 6.3, the Second Lien Creditor may not seek or request adequate protection or relief from the automatic stay imposed by section 362 of the Bankruptcy Code or any other applicable Bankruptcy Law, (2) if a First Lien Creditor is granted Senior Adequate Protection Liens, then the Second Lien Creditor may seek or request adequate protection in the form of a Lien on the Collateral subject to the Senior Adequate Protection Liens (the "Junior Adequate Protection Liens"), which Junior Adequate Protection Liens will be subordinated to (A) the Liens securing the First Lien Obligations on the same basis as the other Liens securing the Second Lien Obligations are subordinated to the Liens securing First Lien Obligations under this Agreement, (B) to the DIP Liens on the same terms (but on a basis junior to the Liens of the First Lien Creditors) as the Liens of the First Lien Creditors are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), and (C) any professional fee or other "carve-out" or other similar administrative priority expense or claim, including, without limitation, break up fees and expense reimbursement in connection with an auction of any assets of any Obligor to be paid prior to or contemporaneously with the Discharge of First Lien Obligations, agreed to by the First Lien Agent or the other First Lien Creditors; provided that any failure of the Second Lien Creditor to obtain such Junior Adequate Protection Liens shall not impair or otherwise affect the agreements, undertakings and consents of the Second Lien Creditor hereunder; and (3) if a First Lien Creditor is granted adequate protection in the form of a claim under section 507(b) of the Bankruptcy Code or analogous claim under the provisions of any other applicable Bankruptcy Law, then the Second Lien Creditor may seek or request adequate protection in the form of a subordinate claim under section 507(b) of the Bankruptcy Code or other provision.  Any claim by the Second Lien Creditor under section 507(b) of the Bankruptcy Code will be subordinate in right of payment to any claim of the First Lien Creditors (and the lenders under any DIP Financing) under section 507(b) of the Bankruptcy Code and any payment thereof will be deemed to be Proceeds of Collateral and the Second Lien Creditor hereby waives its rights under section 1129(a)(9) of the

25

Bankruptcy Code and consent and agree that such section 507(b) claims may be paid under a plan of reorganization in any form having a value on the effective date of such plan equal to the allowed amount of such claims.  The foregoing sentence will apply mutatis mutandis to any analogous claims of the First Lien Creditors and the Second Lien Creditor, respectively, under the provisions of any other applicable Bankruptcy Law. Except as expressly set forth above, the Second Lien Creditor shall not seek or request adequate protection in any Insolvency Proceeding, and the First Lien Creditors may oppose any adequate protection proposed to be made by any Obligor to the Second Lien Creditor.  Furthermore, in the event that the Second Lien Creditor actually receives any payment of (or through) adequate protection in any Insolvency Proceeding (including any payment in respect of a claim granted under Section 5.07(b) of the Bankruptcy Code), the same shall be segregated and held in trust and promptly paid over to the First Lien Agent, for the benefit of the First Lien Creditors, in the same form as received, with any necessary endorsements, and the Second Lien Creditor hereby authorizes the First Lien Agent to make any such endorsements as agent for the Second Lien Creditor (which authorization, being coupled with an interest, is irrevocable) to be held or applied by the First Lien Agent in accordance with the terms of the First Lien Documents until the Discharge of First Lien Obligations shall have occurred before any of the same may be retained by the Second Lien Creditor.  The Second Lien Creditor irrevocably authorizes, empowers and directs any debtor, debtor in possession, receiver, trustee, liquidator, custodian, conservator or other Person having authority to pay or otherwise deliver all such payments to the First Lien Agent.

6.4      Sale of Collateral; Waivers.  Notwithstanding anything to the contrary contained herein, the Second Lien Creditor will not contest, protest, or object, and will be deemed to have consented pursuant to section 363(f) of the Bankruptcy Code (or any other analogous Bankruptcy Law), to a Disposition of Collateral, or the process or procedures for obtaining bids for and effecting a Disposition of Collateral (including the right of the First Lien Creditors to credit bid and the retention by the Obligors of professionals in connection with any potential Disposition), or any motion or order in connection with any such Disposition, process or procedures, under section 363 of the Bankruptcy Code (or any other provision of the Bankruptcy Code or applicable Bankruptcy Law), if the First Lien Agent consents to such Disposition, such process or procedures or such motion or order; provided that (a) either (i) pursuant to court order, the Liens of the Second Lien Creditor attach to the net Proceeds of the Disposition with the same priority and validity as the Liens held by the Second Lien Creditor on such Collateral, and the Liens remain subject to the terms of this Agreement, or (ii) the net Proceeds of a Disposition of Collateral received by First Lien Agent in excess of those necessary to achieve the Discharge of First Lien Obligations are distributed in accordance with the UCC and applicable law, and (b) the net cash Proceeds of any Disposition under Section 363(b) of the Bankruptcy Code (or any other provision of the Bankruptcy Code or applicable Bankruptcy Law), net of any reasonable and customary "carve-outs", break up fees, expense reimbursement and administrative claims, are permanently applied to the DIP Financing or to the First Lien Obligations or are set aside for any reasonable and customary wind-down, liquidation or similar costs in an amount not to exceed $500,000 in the aggregate for all such Dispositions.  Notwithstanding the foregoing, the Second Lien Creditor may raise any objections to any such Disposition that could be raised by any creditor of the Obligors whose claims were not secured by any Liens on such Collateral, provided such objections are not inconsistent with any other term or provision of this Agreement and are not based on the status of the Second Lien Creditor as secured creditor (without limiting the foregoing, the Second Lien Creditor may not raise any objections based on rights afforded by

26

Sections 363(e) and (f) of the Bankruptcy Code to secured creditors (or by any comparable provision of any Bankruptcy Law)) with respect to the Liens granted to the Second Lien Creditor.

6.5     <u>No Waiver</u>.  Nothing in this <u>Section 6</u> limits a First Lien Creditor from objecting in an Insolvency Proceeding or otherwise to any action taken by the Second Lien Creditor, including the Second Lien Creditor's seeking adequate protection (other than adequate protection for the Second Lien Creditor expressly contemplated by <u>Section 6.3</u>), proposing a DIP Financing unless permitted by <u>Section 6.2</u> or asserting any of its rights and remedies under the Second Lien Documents or otherwise.

6.6     <u>Relief From the Automatic Stay</u>.  Until the Discharge of First Lien Obligations, the Second Lien Creditor may not seek relief from the automatic stay or any other stay in an Insolvency Proceeding in respect of the Collateral without the First Lien Agent's prior written consent or oppose any request by the First Lien Agent for relief from such stay.

6.7     <u>Waiver</u>.  The Second Lien Creditor waives (a) any claim it may now or hereafter have arising out of the First Lien Creditors' election in any proceeding instituted under Chapter 11 of the Bankruptcy Code of the application of Section 1111(b)(2) of the Bankruptcy Code, out of any cash collateral or financing arrangement or out of any grant of security interest in the Collateral in any Insolvency Proceeding, (b) any right to assert or enforce any claim under section 506(c) or 552 of the Bankruptcy Code as against First Lien Creditors or any of the Collateral to the extent securing the First Lien Obligations, or (c) any claim they may have, pursuant to any other applicable Bankruptcy Law, which is analogous to any claim described in (a) or (b).

6.8     <u>Avoidance Issues; Reinstatement</u>.  If a First Lien Creditor or the Second Lien Creditor receives payment or property on account of a First Lien Obligation or Second Lien Obligation, and the payment is subsequently invalidated, avoided, declared to be fraudulent, reviewable or preferential, set aside, or otherwise required to be transferred to a trustee, receiver, or an Obligor or an the estate of an Obligor (a "Recovery"), then, to the extent of the Recovery, the First Lien Obligations or Second Lien Obligations intended to have been satisfied by the payment will be reinstated as First Lien Obligations or Second Lien Obligations, as applicable, on the date of the Recovery, and no Discharge of First Lien Obligations or Discharge of Second Lien Obligations, as applicable, will be deemed to have occurred for all purposes hereunder. If this Agreement is terminated prior to a Recovery, this Agreement will be reinstated in full force and effect, and such prior termination will not diminish, release, discharge, impair, or otherwise affect the obligations of the Secured Creditors from the date of reinstatement. Upon any such reinstatement of First Lien Obligations, the Second Lien Creditor will deliver to First Lien Agent any Collateral or Proceeds thereof received between the date of Discharge of First Lien Obligations and the Recovery.  The Second Lien Creditor may not benefit from a Recovery, and any distribution made to the Second Lien Creditor as a result of a Recovery will be paid over to the First Lien Agent for application to the First Lien Obligations in accordance with this Agreement.

6.9     <u>Certain Voting Rights</u>.  The Second Lien Creditor shall not, without the consent of the First Lien Agent, directly or indirectly propose, support or vote in favor of any a plan of

<div align="center">27</div>

reorganization or arrangement or similar dispositive restructuring plan in connection with an Insolvency Proceeding that provides for treatment of the First Lien Creditors, the First Lien Obligations, the Second Lien Creditor or the Second Lien Obligations in a manner, or that is otherwise, inconsistent with this Agreement.

6.10    <u>Reorganization Securities</u>.  Nothing in this Agreement prohibits or limits the right of the Second Lien Creditor to receive and retain(a) any debt or equity securities that are issued by a reorganized debtor pursuant to a plan of reorganization or similar dispositive restructuring plan in connection with an Insolvency Proceeding, <u>provided</u> that any debt or equity securities received prior to the Discharge of First Lien Obligations by the Second Lien Creditor on account of a Second Lien Obligation that constitutes a distribution from or on account of the Collateral, an interest in Collateral or the value of Collateral, whether such distribution is made in respect of a "secured claim" within the meaning of section 506(b) of the Bankruptcy Code  or (except as provided below) otherwise, will be paid over or otherwise transferred to the First Lien Agent for application in accordance with this Agreement, unless such distribution is made under a plan that is consented to by the affirmative vote of all classes composed of the secured claims of the First Lien Creditors (and such classes do not include the claims of any creditors other than First Lien Creditors), or (b) any Distribution received by the Second Lien Creditor pursuant to a plan of reorganization or arrangement or similar dispositive restructuring plan in connection with an Insolvency Proceeding in respect of any claim classified under such plan as an unsecured claim in accordance with section 506(a)(1) of the Bankruptcy Code (or analogous Bankruptcy Law).

6.11    <u>Post-Petition Interest</u>.

(a) The Second Lien Creditor shall not oppose or seek to challenge any claim by the First Lien Agent or any other First Lien Creditor for allowance in any Insolvency Proceeding of First Lien Obligations consisting of post-petition interest, fees or expenses, or the payment of any such amount during the pendency of such proceedings, to the extent of the value of the Lien on the Collateral of the First Lien Creditors, without regard to the existence of the Lien of the Second Lien Creditor.

(b) Neither the First Lien Agent nor any other First Lien Creditor shall oppose or seek to challenge any claim by the Second Lien Creditor for allowance in any Insolvency Proceeding of Second Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien on the Collateral of the Second Lien Creditor (after taking into account the Lien of the First Lien Creditors on the Collateral and the extent of the First Lien Obligations, including any post-petition interest, fees or expenses included in such First Lien Obligations).

6.12    <u>Separate Grants of Security and Separate Classification</u>.  The Second Lien Creditor acknowledges and agrees that (a) the grants of Liens pursuant to the First Lien Documents and the Second Lien Documents constitute two separate and distinct grants of Liens and (b) because of their differing rights in the Collateral, the Second Lien Obligations are fundamentally different from the First Lien Obligations and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency Proceeding.  The Second Lien Creditor shall not seek in any Insolvency Proceeding to be treated as part of the same class of creditors as the First Lien Creditors and shall not oppose any pleading or motion by the First

<div align="center">28</div>

7/21/2016                          Exhibit 10.7 - Intercreditor Agreement  (M0629775.DOC;1)

Lien Creditors for the First Lien Creditors and the Second Lien Creditor to be treated as separate classes of creditors.  Notwithstanding the foregoing, if it is held that the First Lien Obligations and the Second Lien Obligation constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the Second Lien Creditor hereby acknowledge and agree that all distributions shall be made as if there were separate classes of senior and junior secured claims against the Obligors in respect of the Collateral, with the effect being that, to the extent that the aggregate value of the Collateral exceeds the amount of the First Lien Obligations incurred and accrued before the commencement of any Insolvency Proceeding, the First Lien Creditors shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, and fees, costs and charges incurred subsequent to the commencement of the applicable Insolvency Proceeding before any distribution is made in respect of any of the claims held by the Second Lien Creditor.  The Second Lien Creditor hereby agree to turn over to the First Lien Creditors amounts otherwise received or receivable by them to the extent necessary to effectuate the intent of the preceding sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Lien Creditor.

6.13   Rights as Unsecured Lenders.  In any Insolvency Proceeding, the Second Lien Creditor may exercise any rights and remedies that could be exercised by an unsecured creditor in accordance with the terms of the Second Lien Documents and applicable law, in each case in a manner not inconsistent with the terms of this Agreement.

Section 7.          Representations and Warranties.

7.1   Representations and Warranties of Each Party.  Each party hereto represents and warrants to the other parties hereto as follows:

(a)  Such party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and has all requisite power and authority to execute and deliver this Agreement and perform its obligations hereunder.

(b)  This Agreement has been duly executed and delivered by such party and constitutes a legal, valid and binding obligation of such party, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

(c)  The execution, delivery and performance by such party of this Agreement (i) do not require any consent or approval of, registration or filing with or any other action by any governmental authority and (ii) will not violate any provision of law, statute, rule or regulation, or of the certificate or articles of incorporation or other constitutive documents or by-laws of such party or any order of any governmental authority or any provision of any material indenture, material agreement or other material instrument binding upon such party.

29

      7.2      <u>Representations and Warranties of First Lien Agent</u>

.  The First Lien Agent represents and warrants to the Second Lien Creditor that it has been authorized by the First Lien Investors to enter into this Agreement.

Section 8.      <u>Miscellaneous</u>.

      8.1      <u>Termination</u>.  Subject to <u>Section 4.5</u>, this Agreement shall terminate and be of no further force and effect upon the first to occur of (a) the Discharge of First Lien Obligations or (b) the Discharge of Second Lien Obligations.

      8.2      <u>Successors and Assigns; No Third Party Beneficiaries</u>.

(a) This Agreement shall be binding upon each Secured Creditor and its respective successors and assigns and shall inure to the benefit of each Secured Creditor and its respective successors, participants and assigns. However, no provision of this Agreement shall inure to the benefit of any other Person, including a trustee, debtor-in-possession, creditor trust or other representative of an estate or creditor of any Borrower, or other Obligor, including where such estate or creditor representative is the beneficiary of a Lien on Collateral by virtue of the avoidance of such Lien in an Insolvency Proceeding.  If the First Lien Agent resigns or is replaced pursuant to the First Lien Purchase Agreement, its successor will be a party to this Agreement with all the rights, and subject to all the obligations, of this Agreement. Notwithstanding any other provision of this Agreement, this Agreement may not be assigned to any Person except as expressly contemplated herein.

(b) Each Secured Creditor reserves the right to grant participations in, or otherwise sell, assign, transfer or negotiate all or any part of, or any interest in, their respective Obligations.  No Secured Creditor shall be obligated to give any notices to or otherwise in any manner deal directly with any participant in the Obligations and no participant shall be entitled to any rights or benefits under this Agreement, except through the Secured Creditor with which it is a participant.

(c) In connection with any participation or other transfer or assignment, a Secured Creditor shall disclose to such participant or other transferee or assignee the existence and terms and conditions of this Agreement and require that such participant or other transferee or assignee agree in writing to be bound by the terms of this Agreement.   The Second Lien Creditor agrees that the Second Lien Credit Agreement and each Second Lien Collateral Document will include the following legend (or language to a similar effect approved by the First Lien Agent):

"Notwithstanding anything herein to the contrary, the lien and security interest granted to the Second Lien Creditor pursuant to or in connection with this Agreement, the terms of [any Security Document] [this Agreement], and the exercise of any right or remedy by the Second Lien Creditor [t]hereunder are subject to the provisions of the Intercreditor Agreement dated as of March __, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among BAM Administrative Services

30

LLC, as the First Lien Agent, and DMRJ Group LLC, as Second Lien Creditor.  In the event of any conflict between the terms of the Intercreditor Agreement and this agreement [or any Security Document], the terms of the Intercreditor Agreement shall control."

8.3     Notices.  All notices and other communications provided for hereunder shall be in writing and shall be mailed, sent by overnight courier, telecopied or delivered, as follows:

(a) if to the First Lien Agent, to it at the following address:

BAM Administrative Services LLC
1370 Avenue of the Americas, 32nd Floor
New York, New York  10019
Attention:  David Levy
Telephone:  (212) 260-5050
Telecopier:  (212) 260-5051

(b) if to the Second Lien Creditor, to it at the following address:

DMRJ Group, LLC
c/o Platinum Partners Value Arbitrage Fund , L.P.
152 West 57th Street, 4th Floor
New York, New York  10019
Attention:  Daniel I. Small
Telephone:  (212) 582-0500
Telecopier:  (212) 582-2424

with a copy to:

Blank Rome LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Attention:  Eliezer M. Helfgott
Telephone:  (212) 885-5431
Telecopier:  (917) 332-3065

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 7.3.  All such notices and other communications shall be effective (1) if sent by registered mail, return receipt requested, when received, (2) if sent by facsimile, when transmitted and a confirmation is received, provided that the same is on a Business Day and, if not, on the next Business Day or (3) if delivered by messenger or overnight courier, upon delivery, provided that the same is on a Business Day and, if not, on the next Business Day.

31

8.4     Counterparts.  This Agreement may be executed by the parties hereto in several counterparts, and each such counterpart shall be deemed to be an original and all of which shall constitute together but one and the same agreement.

8.5     GOVERNING LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

8.6     CONSENT TO JURISDICTION AND VENUE.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT SHALL BE BROUGHT EXCLUSIVELY IN THE COURTS OF THE STATE OF NEW YORK LOCATED IN THE CITY OF NEW YORK, BOROUGH OF MANHATTAN, OR OF THE UNITED STATES OF AMERICA FOR THE SOUTHERN DISTRICT OF NEW YORK AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE FIRST LIEN AGENT ON BEHALF OF THE FIRST LIEN CREDITORS AND THE SECOND LIEN CREDITOR HEREBY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF FORUM NON CONVENIENS, THAT ANY OF THEM MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY SUCH ACTION OR PROCEEDING IN SUCH JURISDICTIONS.

8.7     MUTUAL WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO, OR DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREIN OR RELATED THERETO (WHETHER FOUNDED IN CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, AS APPLICABLE, BY THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.7.

8.8     Amendments.  No amendment or waiver of any provision of this Agreement, and no consent to any departure by any Person from the terms hereof, shall in any event be effective unless it is in writing and signed by the Second Lien Creditor and the First Lien Agent, with the consent required under the First Lien Purchase Agreement.  In no event shall the consent of any Obligor be required in connection with any amendment or other modification of this Agreement.

8.9     No Waiver.  No failure or delay on the part of any Secured Creditor in exercising any power or right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.

32

8.10    <u>Severability</u>.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provisions in any other jurisdiction.

8.11    <u>Further Assurances</u>.  Each party hereto agrees to cooperate fully with each other party hereto to effectuate the intent and provisions of this Agreement and, from time to time, to take such further action and to execute and deliver such additional documents and instruments (in recordable form, if requested) as the First Lien Agent or Second Lien Creditor may reasonably request to effectuate the terms of and the Lien priorities contemplated by this Agreement.

8.12    <u>Headings</u>.  The section headings contained in this Agreement are and shall be without meaning or content whatsoever and are not part of this Agreement.

8.13    <u>Credit Analysis</u>.  The Secured Creditors shall each be responsible for keeping themselves informed of (a) the financial condition of the Obligors and all other endorsers, obligors or guarantors of the  Obligations and (b) all other circumstances bearing upon the risk of nonpayment of the Obligations, and have made and shall continue to make, independently and without reliance upon each other, their own credit analysis and decision in entering into the First Lien Documents and Second Lien Documents to which they are parties and taking or not taking any action thereunder.  No Secured Creditor shall have any duty to advise any other Secured Creditor of information known to it regarding such condition or any such other circumstances, and no disclosure of any such information shall create any obligation to provide any further information or be deemed to constitute or require any representation or warranty from the disclosing Secured Party regarding that or any other information.  No Secured Creditor assumes any liability to any other Secured Creditor or to any other Person with respect to:  (i) the financial or other condition of Obligors and all other endorsers, obligors or guarantors of the  Obligations, (ii) the enforceability, validity, value or collectability of the Obligations, any Collateral therefor or any guarantee or security which may have been granted in connection with any of the Obligations,  (iii) any Obligor's title or right to transfer any Collateral or security or (iv) any other circumstance that might bear on the risk of nonpayment of any Obligations.

8.14    <u>Waiver of Claims</u>.  To the maximum extent permitted by law, each party hereto waives any claim it might have against any Secured Creditor with respect to, or arising out of, any action or failure to act or any error of judgment or negligence, mistake or oversight whatsoever on the part of any other party hereto or their respective directors, officers, employees or agents with respect to any exercise of rights or remedies under the Documents or any transaction relating to the Collateral in accordance with this Agreement.  None of the Secured Creditors, nor any of their respective directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon any of the Collateral or for any delay in doing so or, except as specifically provided in this Agreement, shall be under any obligation to Dispose of any Collateral upon the request of any Obligor or any Secured Creditor or any other Person or to take any other action whatsoever with regard to the Collateral or any part thereof.

8.15    <u>Conflicts</u>.  In the event of any conflict between the provisions of this Agreement and the provisions of the Documents, the provisions of this Agreement shall govern.

8.16    <u>Specific Performance</u>.  Each of the First Lien Agent and the Second Lien Creditor may demand specific performance of this Agreement and, on behalf of itself and the respective other Secured Creditors, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense that might be asserted to bar the remedy of specific performance in any action which may be brought by the respective Secured Creditors.  The rights and remedies provided in this Agreement will be cumulative and not exclusive of other rights or remedies provided by law.

8.17    <u>Indirect Action</u>.   Unless otherwise expressly stated, if a Party may not take an action under this Agreement, then it may not take that action indirectly, or take any action assisting or supporting any other Person in taking that action directly or indirectly. "Taking an action indirectly" means taking an action that is not expressly prohibited for the Party but is intended to have substantially the same effects as the prohibited action.

8.18    <u>Provisions Solely to Define Relative Rights</u>.   The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the Secured Creditors.  None of the Obligors or any other creditor thereof shall have any rights hereunder, and none of the Obligors may rely on the terms hereof.  Nothing in this Agreement is intended to or shall impair the obligations of Obligors, which are absolute and unconditional, to pay the First Lien Obligations and the Second Lien Obligations as and when the same shall become due and payable in accordance with their respective, or to affect the relative rights of the lenders of any Obligor, other than the relative rights between the First Lien Agent and the First Lien Creditors, on the one hand, and the Second Lien Creditor, on the other.

8.19    <u>Subrogation</u>.  If a Second Lien Creditor pays or distributes cash, property, or other assets to a First Lien Creditor under this Agreement, the Second Lien Creditor will be subrogated to the rights of the First Lien Creditor with respect to the value of the payment or distribution, <u>provided</u> that the Second Lien Creditor waives all rights of subrogation arising hereunder or otherwise in respect of any such payment or distribution until the Discharge of First Lien Obligations.  Such payment or distribution will not reduce the Second Lien Obligations.

8.20    <u>Entire Agreement</u>.  This Agreement and the Documents embody the entire agreement of the Obligors, the First Lien Agent, the First Lien Creditors and the Second Lien Creditor with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings relating to the subject matter hereof and thereof and any draft agreements, negotiations or discussions involving any Obligor and any of the First Lien Agent, the First Lien Creditors and the Second Lien Creditor relating to the subject matter hereof.

8.21    <u>Survival</u>.   All covenants, agreements, representations and warranties made by any party in this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency Proceeding.  The Second Lien Creditor hereby waives any and all rights the Second Lien Creditor may now or hereafter have under applicable law to revoke this Agreement or any of the provisions of this Agreement.

34

8.22   <u>Intercompany Indebtedness</u>.   By their execution thereof, each of the Obligors hereby covenants and agrees that all Indebtedness owing by any Obligor to any other Obligor is hereby expressly subordinated, to the extent and in the manner immediately hereinafter set forth, in right of payment to the prior payment in full in cash of all First Lien Obligations and all Second Lien Obligations.  For all purposes hereof, a payment or distribution on account of such intercompany Indebtedness may consist of cash, property or securities, by set-off or otherwise, and a payment or distribution on account of such intercompany Indebtedness shall include, without limitation, any redemption, purchase or other acquisition of such intercompany Indebtedness.  The subordination provisions herein set forth are made for the benefit of the holders of the First Lien Obligations and the Second Lien Obligations, and such holders may proceed to enforce such provisions.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

35

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

FIRST LIEN AGENT:

BAM ADMINISTRATIVE SERVICES LLC, as First Lien Agent


By:  /s/ David Levy
        Name:
        Title:


SECOND LIEN CREDITOR:

DMRJ GROUP LLC, as Second Lien Creditor


By:  /s/ Daniel Small
        Name: Daniel Small
        Title: Managing Director

Each of the undersigned hereby acknowledges and agrees to the foregoing terms and provisions.

CREDIT PARTIES:

IMPLANT SCIENCES CORPORATION

By:  /s/ Glenn D. Bolduc
     Name: Glenn D. Bolduc
     Title: President and Chief Executive Officer

C ACQUISITION CORP.

By:  /s/ Glenn D. Bolduc
     Name: Glenn D. Bolduc
     Title: President

ACCUREL SYSTEMS INTERNATIONAL CORPORATION

By:  /s/ Glenn D. Bolduc
     Name: Glenn D. Bolduc
     Title: President

IMX ACQUISITION CORP.

By:  /s/ Glenn D. Bolduc
     Name: Glenn D. Bolduc
     Title: President

EXHIBIT 46

Indenture, dated as of November 23, 2010

EX-4.1 8 dex41.htm INDENTURE, DATED AS OF NOVEMBER 23, 2010

**Exhibit 4.1**

*Execution Copy*

BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC

and

BLACK ELK ENERGY FINANCE CORP.,

as Issuers,

AND EACH OF THE GUARANTORS PARTY HERETO

———————

INDENTURE

Dated as of November 23, 2010

———————

13.75% SENIOR SECURED NOTES DUE 2015

———————

The Bank of New York Mellon Trust Company, N.A.,

as Trustee and Collateral Agent

———————

CROSS-REFERENCE TABLE*

| Trust Indenture Act Section | Indenture Section |
|---|---|
| 310(a)(1) | 7.10 |
| (a)(2) | 7.10 |
| (a)(3) | N.A. |
| (a)(4) | N.A. |
| (a)(5) | 7.10 |
| (b) | 7.10 |
| (c) | N.A. |
| 311(a) | 7.11 |
| (b) | 7.11 |
| (c) | N.A. |
| 312(a) | 2.05 |
| (b) | 13.03 |
| (c) | 13.03 |
| 313(a) | 7.06 |
| (b)(2) | 7.06; 7.07 |
| (c) | 7.06; 2.02 |
| (d) | 7.06 |
| 314(a) | 4.03; 13.02; 13.05 |
| (c)(1) | 13.04 |
| (c)(2) | 13.04 |
| (c)(3) | N.A. |
| (e) | 13.05 |
| (f) | N.A. |
| 315(a) | 7.01 |
| (b) | 7.05; 13.02 |
| (c) | 7.01 |
| (d) | 7.01 |
| (e) | 6.11 |
| 316(a) (last sentence) | 2.09 |
| (a)(1)(A) | 6.05 |

Indenture, dated as of November 23, 2010

| | |
|---|---|
| (a)(1)(B) | 6.04 |
| (a)(2) | N.A. |
| (b) | 6.07 |
| (c) | 2.12 |
| 317(a)(1) | 6.08 |
| (a)(2) | 6.09 |
| (b) | 2.04 |
| 318(a) | 13.01 |
| (b) | N.A. |
| (c) | 13.01 |

N.A. means not applicable.

\* This Cross-Reference Table is not part of the Indenture.

<div style="text-align:center">TABLE OF CONTENTS</div>

*Page*

ARTICLE 1
DEFINITIONS AND INCORPORATION
BY REFERENCE

| | | |
|---|---|---|
| Section 1.01 | Definitions | 1 |
| Section 1.02 | Other Definitions | 30 |
| Section 1.03 | Incorporation by Reference of Trust Indenture Act | 31 |
| Section 1.04 | Rules of Construction | 31 |

ARTICLE 2
THE NOTES

| | | |
|---|---|---|
| Section 2.01 | Form and Dating | 32 |
| Section 2.02 | Execution and Authentication | 33 |
| Section 2.03 | Registrar and Paying Agent | 33 |
| Section 2.04 | Paying Agent to Hold Money in Trust | 34 |
| Section 2.05 | Holder Lists | 34 |
| Section 2.06 | Transfer and Exchange | 34 |
| Section 2.07 | Replacement Notes | 44 |
| Section 2.08 | Outstanding Notes | 45 |
| Section 2.09 | Treasury Notes | 45 |
| Section 2.10 | Temporary Notes | 45 |
| Section 2.11 | Cancellation | 46 |
| Section 2.12 | Defaulted Interest | 46 |
| Section 2.13 | CUSIP Numbers | 46 |

ARTICLE 3
REDEMPTION AND PREPAYMENT

| | | |
|---|---|---|
| Section 3.01 | Notices to Trustee | 46 |
| Section 3.02 | Selection of Notes to Be Redeemed or Purchased | 47 |
| Section 3.03 | Notice of Redemption | 47 |
| Section 3.04 | Effect of Notice of Redemption | 48 |
| Section 3.05 | Deposit of Redemption or Purchase Price | 48 |
| Section 3.06 | Notes Redeemed or Purchased in Part | 48 |
| Section 3.07 | Optional Redemption | 49 |
| Section 3.08 | Mandatory Redemption; Open Market Purchases | 49 |
| Section 3.09 | Offer to Purchase by Application of Excess Proceeds | 50 |

ARTICLE 4
COVENANTS

| | | |
|---|---|---|
| Section 4.01 | Payment of Notes | 51 |
| Section 4.02 | Maintenance of Office or Agency | 52 |
| Section 4.03 | Reports | 52 |
| Section 4.04 | Compliance Certificate | 54 |
| Section 4.05 | Taxes; Stay, Extension and Usury Laws | 55 |

Indenture, dated as of November 23, 2010

| | | |
|---|---|---|
| Section 4.06 | Excess Cash Flow Offer | 55 |
| Section 4.07 | Restricted Payments | 57 |
| Section 4.08 | Dividend and Other Payment Restrictions Affecting Subsidiaries | 59 |
| Section 4.09 | Incurrence of Indebtedness and Issuance of Preferred Stock | 61 |

*Page*

| | | |
|---|---|---|
| Section 4.10 | Asset Sales | 63 |
| Section 4.11 | Transactions with Affiliates | 65 |
| Section 4.12 | Liens | 66 |
| Section 4.13 | Business Activities | 67 |
| Section 4.14 | Corporate Existence | 67 |
| Section 4.15 | Offer to Repurchase at the Option of Holders | 67 |
| Section 4.16 | Additional Guarantees | 69 |
| Section 4.17 | Designation of Restricted and Unrestricted Subsidiaries | 69 |
| Section 4.18 | Impairment of Security Interest | 70 |
| Section 4.19 | Post-Closing | 70 |
| Section 4.20 | Further Assurances | 70 |
| Section 4.21 | Maximum Capital Expenditures | 70 |
| Section 4.22 | PV-10 | 70 |

ARTICLE 5
SUCCESSORS

| | | |
|---|---|---|
| Section 5.01 | Merger, Consolidation, or Sale of Assets | 71 |
| Section 5.02 | Successor Substituted | 72 |

ARTICLE 6
DEFAULTS AND REMEDIES

| | | |
|---|---|---|
| Section 6.01 | Events of Default and Remedies | 72 |
| Section 6.02 | Acceleration | 73 |
| Section 6.03 | Other Remedies | 74 |
| Section 6.04 | Waiver of Past Defaults | 74 |
| Section 6.05 | Control by Majority | 74 |
| Section 6.06 | Limitation on Suits | 74 |
| Section 6.07 | Rights of Holders of Notes to Receive Payment | 75 |
| Section 6.08 | Collection Suit by Trustee | 75 |
| Section 6.09 | Trustee May File Proofs of Claim | 75 |
| Section 6.10 | Priorities | 76 |
| Section 6.11 | Undertaking for Costs | 76 |

ARTICLE 7
TRUSTEE

| | | |
|---|---|---|
| Section 7.01 | Duties of Trustee | 76 |
| Section 7.02 | Rights of Trustee | 77 |
| Section 7.03 | Individual Rights of Trustee | 79 |
| Section 7.04 | Trustee's Disclaimer | 79 |
| Section 7.05 | Notice of Defaults | 79 |
| Section 7.06 | Reports by Trustee to Holders of the Notes | 79 |
| Section 7.07 | Compensation and Indemnity | 79 |
| Section 7.08 | Replacement of Trustee | 80 |
| Section 7.09 | Successor Trustee by Merger, etc. | 81 |
| Section 7.10 | Eligibility; Disqualification | 81 |
| Section 7.11 | Preferential Collection of Claims Against Issuers | 81 |

ARTICLE 8
LEGAL DEFEASANCE AND COVENANT DEFEASANCE

| | | |
|---|---|---|
| Section 8.01 | Option to Effect Legal Defeasance and Covenant Defeasance | 82 |
| Section 8.02 | Legal Defeasance and Discharge | 82 |

ii

Indenture, dated as of November 23, 2010

| | | Page |
|---|---|---|
| Section 8.03 | Covenant Defeasance | 82 |
| Section 8.04 | Conditions to Legal or Covenant Defeasance | 83 |
| Section 8.05 | Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions | 84 |
| Section 8.06 | Repayment to Company | 84 |
| Section 8.07 | Reinstatement | 85 |

ARTICLE 9
AMENDMENT, SUPPLEMENT AND WAIVER

| | | |
|---|---|---|
| Section 9.01 | Without Consent of Holders of Notes | 85 |
| Section 9.02 | With Consent of Holders of Notes | 86 |
| Section 9.03 | Compliance with Trust Indenture Act | 87 |
| Section 9.04 | Revocation and Effect of Consents | 87 |
| Section 9.05 | Notation on or Exchange of Notes | 88 |
| Section 9.06 | Trustee to Sign Amendments, etc. | 88 |

ARTICLE 10
COLLATERAL AND SECURITY

| | | |
|---|---|---|
| Section 10.01 | Grant of Security Interest | 88 |
| Section 10.02 | Recording and Opinions | 89 |
| Section 10.03 | Release of Collateral | 89 |
| Section 10.04 | [Reserved] | 90 |
| Section 10.05 | Authorization of Actions to Be Taken by the Trustee Under the Collateral Agreements | 90 |
| Section 10.06 | Authorization of Receipt of Funds by the Trustee Under the Collateral Agreements | 91 |
| Section 10.07 | Termination of Security Interest | 91 |
| Section 10.08 | Trustee's Duties with Respect to Collateral | 91 |

ARTICLE 11
GUARANTEES

| | | |
|---|---|---|
| Section 11.01 | Guarantee | 91 |
| Section 11.02 | Execution and Delivery of Notation of Guarantee | 92 |
| Section 11.03 | [Reserved] | 92 |
| Section 11.04 | Limitation of Liability of Certain Guarantors | 92 |
| Section 11.05 | Unconditional Guaranty | 93 |
| Section 11.06 | No Release Based on Actions of the Second Lien Secured Parties | 93 |
| Section 11.07 | Waivers | 94 |
| Section 11.08 | Continuing Guaranty; Reinstatement | 96 |
| Section 11.09 | Subordination; Subrogation; Contribution | 96 |
| Section 11.10 | Guarantors May Consolidate, etc., on Certain Terms | 98 |
| Section 11.11 | Releases | 99 |

ARTICLE 12
SATISFACTION AND DISCHARGE

| | | |
|---|---|---|
| Section 12.01 | Satisfaction and Discharge | 99 |
| Section 12.02 | Application of Trust Money | 100 |

ARTICLE 13
MISCELLANEOUS

| | | |
|---|---|---|
| Section 13.01 | Trust Indenture Act Controls | 101 |

iii

| | | Page |
|---|---|---|
| Section 13.02 | Notices | 101 |
| Section 13.03 | Communication by Holders of Notes with Other Holders of Notes | 102 |
| Section 13.04 | Certificate and Opinion as to Conditions Precedent | 102 |
| Section 13.05 | Statements Required in Certificate or Opinion | 103 |
| Section 13.06 | Rules by Trustee and Agents | 103 |
| Section 13.07 | No Personal Liability of Directors, Officers, Employees and Stockholders | 103 |
| Section 13.08 | Governing Law; WAIVER OF JURY TRIAL | 103 |

Indenture, dated as of November 23, 2010

Section 13.09 No Adverse Interpretation of Other Agreements                    103
Section 13.10 Successors                                                       104
Section 13.11 Severability                                                     104
Section 13.12 Counterpart Originals                                            104
Section 13.13 Table of Contents, Headings, etc.                                104

EXHIBITS

Exhibit A   FORM OF NOTE
Exhibit B   FORM OF CERTIFICATE OF TRANSFER
Exhibit C   FORM OF CERTIFICATE OF EXCHANGE
Exhibit D   FORM OF CERTIFICATE OF ACQUIRING INSTITUTIONAL ACCREDITED INVESTOR
Exhibit E   FORM OF NOTATION OF GUARANTY
Exhibit F   FORM OF SUPPLEMENTAL INDENTURE

iv

THIS INDENTURE dated as of November 23, 2010 is among Black Elk Energy Offshore Operations, LLC, a Texas limited liability company (the "Company"), Black Elk Energy Finance Corp., a Texas corporation (the "Issuer" and together with the Company, the "Issuers"), the Guarantors (as defined herein), and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent.

The Issuers, the Guarantors, the Trustee and Collateral Agent agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders (as defined herein) of the Issuers' 13.75% Senior Secured Notes due 2015 (the "Notes"):

ARTICLE 1
DEFINITIONS AND INCORPORATION
BY REFERENCE

Section 1.01 *Definitions*.

"*144A Global Note*" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the Private Placement Legend and deposited with or on behalf of, and registered in the name of, the Depositary or its nominee that will be issued in a denomination equal to the outstanding principal amount of the Notes sold in reliance on Rule 144A.

"*ACNTA*" (Adjusted Consolidated Net Tangible Assets) means (without duplication), as of the date of determination:

(1) the sum of:

(a) discounted future net revenue from proved crude oil and natural gas reserves of the Company and its Restricted Subsidiaries calculated in accordance with SEC guidelines before any state or federal income taxes, as estimated in a reserve report prepared as of the Company as of the end of the Company's most recently completed fiscal year (which, in the case of the fiscal year ended December 31, 2009 will be deemed to be the reserve report prepared as of August 31, 2010), as increased by, as of the date of determination, the discounted future net revenue from:

(i) estimated proved crude oil and natural gas reserves of the Company and its Restricted Subsidiaries attributable to acquisitions consummated since the date of such year-end reserve report, and

(ii) estimated crude oil and natural gas reserves of the Company and its Restricted Subsidiaries attributable to extensions, discoveries and other additions and upward determinations of estimates of proved crude oil and natural gas reserves (including previously estimated development costs incurred during the period and the accretion of discount since the prior year-end) due to exploration, development or exploitation, production or other activities which reserves were not reflected in such year-end reserve report,

in each case calculated in accordance with SEC guidelines (utilizing the prices utilized in such year-end reserve report), and decreased, as of the date of determination, the discounted future net revenue attributable to

1

(iii) estimated proved crude oil and natural gas reserves of the Company and its Restricted Subsidiaries reflected in such year-end reserve report produced or disposed of since the date of such year-end reserve report, and

(iv) reductions in the estimated proved crude oil and natural gas reserves of the Company and its Restricted Subsidiaries reflected in such year-end reserve report since the date of such year-end reserve report attributable to downward determinations of estimates of proved crude oil and natural gas reserves due to exploration, development or exploitation, production or other activities conducted or otherwise occurring since the date of such year-end reserve report,

Indenture, dated as of November 23, 2010

in each case calculated in accordance with SEC guidelines (utilizing the prices utilized in such year-end reserve report);

(b) the capitalized costs that are attributable to crude oil and natural gas properties of the Company and its Restricted Sub to which no proved crude oil and natural gas reserves are attributed, based on the Company's books and records as of a date than the date of the Company's latest annual or quarterly financial statements;

(c) the Net Working Capital on a date no earlier than the date of the Company's latest annual or quarterly financial stateme

(d) the greater of (I) the net book value on a date no earlier than the date of the Company's latest annual or quarterl statements and (II) the appraised value, as estimated by independent appraisers, of other tangible assets of the Compa Restricted Subsidiaries as of a date no earlier than the date of the Company's latest audited financial statements;

(2) minus, to the extent not otherwise taken into account in the immediately preceding clause (1), the sum of:

(a) minority interests;

(b) any net gas balancing liabilities of the Company and its Restricted Subsidiaries reflected in the Company's latest financial statements;

(c) the discounted future net revenue, calculated in accordance with SEC guidelines (utilizing the same prices utilize Company's year-end reserve report), attributable to reserves subject to participation interests, overriding royalty interests interests of third parties, pursuant to participation, partnership, vendor financing or other agreements then in effect, or which ot are required to be delivered to third parties;

(d) the discounted future net revenue, calculated in accordance with SEC guidelines (utilizing the same prices utilize Company's year-end reserve report), attributable to reserves that are required to be delivered to third parties to fully sa obligations of the Company and its Restricted Subsidiaries with respect to Volumetric Production Payments on the schedules : with respect thereto; and

(e) the discounted future net revenue, calculated in accordance with SEC guidelines, attributable to reserves subject to Denominated Production Payments that,

2

based on the estimates of production included in determining the discounted future net revenue specified in the immediately p clause (1)(a) (utilizing the same prices utilized in the Company's year-end reserve report), would be necessary to satisfy : obligations of the Company and its Restricted Subsidiaries with respect to Dollar-Denominated Production Payments on the s specified with respect thereto.

"*Acquired Debt*" means, with respect to any specified Person:

(1) Indebtedness of any other Person existing at the time such other Person was merged with or into or became a Subsic specified Person, whether or not such Indebtedness is incurred in connection with, or in contemplation of, such other Person mergin into, or becoming a Subsidiary of, such specified Person; and

(2) Indebtedness secured by a Lien encumbering any asset acquired by such specified Person.

"*Additional Assets*" means:

(1) any assets used or useful in the Oil and Gas Business;

(2) the Capital Stock of a Person that becomes a Restricted Subsidiary as a result of the acquisition of such Capital S Company or another Restricted Subsidiary; or

(3) Capital Stock constituting a minority in any Person that at such time is a Restricted Subsidiary;

*provided, however* that any such Restricted Subsidiary described in clause (2) or (3) is primarily engaged in the Oil and Gas Business.

"*Additional Interest*" means all additional interest then owing pursuant to a Registration Rights Agreement.

"*Additional Notes*" means additional Notes (other than the Initial Notes) issued under this Indenture in accordance with Sections 2 4.09 hereof, as part of the same series as the Initial Notes.

"*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or common control with such specified Person. For purposes of this definition, "*control*," as used with respect to any Person, means the possess directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the own voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person will be deeme be control. For purposes of this definition, the terms "*controlling*," "*controlled by*" and "*under common control with*" have correlative meanings.

"*Agent*" means each of the First Lien Collateral Agent and the Collateral Agent.

Indenture, dated as of November 23, 2010

"*Applicable Premium*" means, as calculated by the Company, with respect to any Note on any redemption date, the greater of:

(1) 1.0% of the principal amount of the Note; and

3

(2) the excess of: (a) the present value at the redemption date of (i) the redemption price of the Note at December 1, 2013 regard to accrued and unpaid interest) (such redemption price being set forth in the table appearing in Section 3.07(a) hereof) p required interest payments due on the Note through December 1, 2013 (excluding accrued but unpaid interest to the applicable re date), computed using a discount rate equal to the Treasury Rate as of such redemption date plus 50 basis points, over (b) the amount of such Note.

"*Applicable Procedures*" means, with respect to any transfer or exchange of or for beneficial interests in any Global Note, the rul procedures of the Depositary, Euroclear and Clearstream that apply to such transfer or exchange.

"*Asset Sale*" means:

(1) the sale, lease, conveyance or other disposition of any properties or assets (including by way of a Production Payment or leaseback transaction); *provided* that the sale, lease, conveyance or other disposition of all or substantially all of the properties or assets Company and its Restricted Subsidiaries taken as a whole will be governed by Sections 4.15 and/or 5.01 hereof and not by the pro Section 4.10 hereof; and

(2) the issuance of Equity Interests in any of the Company's Restricted Subsidiaries or the sale of Equity Interests in an Restricted Subsidiaries.

Notwithstanding the preceding, the following items will not be deemed to be Asset Sales:

(1) any single transaction or series of related transactions that involves properties or assets having a fair market value of less million;

(2) a transfer of assets between or among any of the Company and its Restricted Subsidiaries;

(3) an issuance or sale of Equity Interests by a Restricted Subsidiary to the Company or to another Restricted Subsidiary;

(4) the sale, lease or other disposition of hydrocarbons, equipment, inventory, accounts receivable or other properties or a ordinary course of business, including, without limitation, any abandonment, farm-in, farm-out, lease or sublease of any oil a properties or the forfeiture or other disposition of such properties pursuant to standard form operating agreements, in each ca ordinary course of business in a manner customary in the Oil and Gas Business;

(5) the sale or other disposition of cash or Cash Equivalents;

(6) a Restricted Payment that is permitted by Section 4.07 hereof or a Permitted Investment;

(7) any trade or exchange by the Company or any Restricted Subsidiary of oil and gas properties or other properties or assets f gas properties or other properties or assets owned or held by another Person; *provided* that the fair market value of the properties or asset traded or exchanged by the Company or such Restricted Subsidiary (together with any cash) is reasonably equivalent to the fair ma of the properties or assets (together with any cash) to be received by the Company or such Restricted Subsidiary; *provided further* that any net cash received must be applied in accordance with the provisions of Section 4.10 hereof;

4

(8) the creation or perfection of a Lien (but not the sale or other disposition of the properties or assets subject to such accordance with the limitations set forth in Section 4.12 hereof; and

(9) surrender or waiver of contract rights or the settlement, release or surrender of contract, tort or other claims of any kind.

"*Attributable Debt*" in respect of a sale and leaseback transaction means, at the time of determination, the present value of the oblig the lessee for net rental payments during the remaining term of the lease included in such sale and leaseback transaction including any which such lease has been extended or may, at the option of the lessor, be extended. Such present value shall be calculated using a c equal to the rate of interest implicit in such transaction, determined in accordance with GAAP.

"*Bankruptcy Law*" means Title 11, U.S. Code or any similar federal or state law for the relief of debtors.

"*Beneficial Owner*" has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in cal the beneficial ownership of any particular "person" (as that term is used in Section 13(d)(3) of the Exchange Act), such "person" will be de have beneficial ownership of all securities that such "person" has the right to acquire by conversion or exercise of other securities, whe right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition. The terms "*Beneficially Owns*" and

Indenture, dated as of November 23, 2010

"*Beneficially Owned*" have correlative meanings.

"*Board of Directors*" means:

(1) with respect to a corporation, the board of directors of the corporation;

(2) with respect to a partnership, the board of directors of the general partner of the partnership;

(3) with respect to any other Person, the board or committee of such Person serving a similar function.

"*Board Resolution*" means a copy of a resolution certified by the Secretary or an Assistant Secretary of the applicable Person to ha duly adopted by the Board of Directors of such Person and to be in full force and effect on the date of such certification, and delivere Trustee.

"*Business Day*" means each day that is not a Saturday, Sunday or other day on which banking institutions in New York, New Yo authorized or required by law to close. If a payment date is not a Business Day at a place of payment, payment may be made at that p next succeeding day that is a Business Day, and no interest shall accrue on such payment for the intervening period.

"*Capital Lease Obligation*" means, at the time any determination is to be made, the amount of the liability in respect of a capital lea would at that time be required to be capitalized on a balance sheet prepared in accordance with GAAP, and the Stated Maturity thereof date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be prepaid b without payment of a penalty.

"*Capital Stock*" means:

(1) in the case of a corporation, corporate stock;

(2) in the case of an association or business entity, any and all shares, interests, participations, rights or other equivalents designated) of corporate stock;

(3) in the case of a partnership or limited liability company, partnership or membership interests (whether general or limited); an

(4) any other interest or participation that confers on a Person the right to receive a share of the profits and losses of, or distrib assets of, the issuing Person;

but excluding from all of the foregoing any debt securities convertible into Capital Stock, whether or not such debt securities include any participation with Capital Stock.

"*Cash Equivalents*" means:

(1) United States dollars;

(2) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumental United States government (*provided* that the full faith and credit of the United States is pledged in support of those securities) ha maturities of not more than six months from the date of acquisition;

(3) certificates of deposit and eurodollar time deposits with maturities of six months or less from the date of acquisition, ba acceptances with maturities not exceeding six months and overnight bank deposits, in each case, with any lender party to the Se Agreement or with any domestic commercial bank having capital and surplus in excess of $500.0 million and a Thomson Bank Watc of "B" or better;

(4) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clause (3) above entered into with any financial institution meeting the qualifications specified in clause (3) above;

(5) commercial paper having the highest rating obtainable from Moody's Investors Service, Inc. or Standard & Poor's Ratings S and in each case maturing within six months after the date of acquisition; and

(6) money market funds at least 95% of the assets of which constitute Cash Equivalents of the kinds described in clauses (1 (5) of this definition.

"*Change of Control*" means the occurrence of any of the following:

(1) the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in series of related transactions, of all or substantially all of the properties or assets (including Capital Stock) of the Compa Subsidiaries taken as a whole to any "person" (as that term is used in Section 13(d)(3) of the Exchange Act) other than one or more Holders;

Indenture, dated as of November 23, 2010

(2) the adoption of a plan relating to the liquidation or dissolution of the Company;

(3) the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is the "person" or "group" (as that term is used in Section 13(d)(3) of the Exchange Act), other than one or more Permitted Holders, becom Beneficial Owner, directly or indirectly, of more than 50% of the Voting Stock of the Company, measured by voting power rather number of shares, units or the like,, other than, with respect to a merger or consolidation, a transaction in which the Voting Stoc Company outstanding immediately prior to such transaction is converted into or exchanged for Voting Stock for Capital Stock in a corporation of the surviving or transferee Person (or any parent thereof) constituting a majority of the outstanding shares, units or the like, of such Stock of such surviving or transferee Person (or any parent thereof) immediately after giving effect to such transaction;

(4) the first day on which a majority of the members of the Board of Directors of the Company are not Continuing Directors; or

(5) the first day on which John Hoffman, the chief executive officer of the Company as of the Issue Date, is no longer a manage Company for any reason other than (i) John Hoffman's death or his "Disability" as defined in his employment agreement with the Co as in effect on the Issue Date or (ii) his termination for "cause" pursuant to the terms of such employment agreement as in effect on Date.

Notwithstanding the preceding, a conversion (whether by merger, statutory conversion or otherwise) of the Company from a limited company to a corporation, or an exchange of all of the outstanding memberships interests in the Company for Capital Stock in a corpora not constitute a Change of Control, so long as following such merger, conversion or exchange the "persons" (as that term is Section 13(d)(3) of the Exchange Act) who Beneficially Owned the Voting Stock of the Company immediately prior to such transaction c to Beneficially Own in the aggregate sufficient Voting Stock of such successor corporation to elect a majority of its directors.

"*Clearstream*" means Clearstream Banking, S.A.

"*Collateral*" means collateral as such term is defined in the Security Agreements, and any other property, whether now owned or h acquired, upon which a Lien securing the Obligations under this Indenture, the Collateral Agreements, the Notes or the Guarantees is g purported to be granted under any Collateral Agreement; *provided, however*, that "Collateral" shall not include any Excluded Collateral.

"*Collateral Agent*" means the Trustee acting in its capacity as the collateral agent for the Second Lien Secured Parties until a su replaces it in accordance with the provisions provided herein and thereafter means any such successor.

"*Collateral Agreements*" means, collectively, the Intercreditor Agreement, the Security Agreements, the Mortgage and each pledge, se agreement or other collateral agreement, deposit account control agreement, securities account control agreement or other document or creating Liens in favor of the Collateral Agent as required herein, in each case, as the same may be in force from time to time.

7

"*Commission*" or "*SEC*" means the Securities and Exchange Commission.

"*Consolidated Coverage Ratio*" means as of any date of determination, the ratio of (x) the aggregate amount of Consolidated EBITDA the Company for the period of the most recent four full consecutive fiscal quarters ending prior to the date of such determination fo financial statements are in existence to (y) Consolidated Interest Expense for such four fiscal quarters; *provided, however,* that:

(1) if the Company or any Restricted Subsidiary:

(a) has incurred any Indebtedness since the beginning of such period that remains outstanding on such date of determina the transaction giving rise to the need to calculate the Consolidated Coverage Ratio is an incurrence of Indebtedness, Con EBITDAX and Consolidated Interest Expense for such period will be calculated after giving effect on a *pro forma* basis to the incurrence of such Indebtedness and the use of proceeds thereof as if such Indebtedness had been incurred on the first day of su and such proceeds had been applied as of such date (except that in making such computation, the amount of Indebtedne revolving Credit Facility outstanding on the date of such calculation will be deemed to be (i) the average daily balanc Indebtedness during such four fiscal quarters or such shorter period for which such facility was outstanding or (ii) if such rev Credit Facility Indebtedness was incurred after the end of such four fiscal quarters, the average daily balance of such Inde during the period from the date of incurrence of such revolving Credit Facility Indebtedness to the date of such calculation, in ea *provided* that such average daily balance shall take into account any repayment of Indebtedness under such revolving Credit F provided in clause (b)); or

(b) has repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of the period, inclu the proceeds of such new Indebtedness, that is no longer outstanding on such date of determination or if the transaction givi the need to calculate the Consolidated Coverage Ratio involves a discharge of Indebtedness (in each case other than Ind incurred under any revolving Credit Facility unless such Indebtedness has been permanently repaid and the related com terminated), Consolidated EBITDAX and Consolidated Interest Expense for such period will be calculated after giving effect on a *pro forma* basis to such discharge of such Indebtedness as if such discharge had occurred on the first day of such period;

Indenture, dated as of November 23, 2010

(2) if, since the beginning of such period, the Company or any Restricted Subsidiary has made any Asset Sale or if the t
giving rise to the need to calculate the Consolidated Coverage Ratio is such an Asset Sale, the Consolidated EBITDAX for such pe
be reduced by an amount equal to the Consolidated EBITDAX (if positive) directly attributable to the assets which are the subject
Asset Sale for such period or increased by an amount equal to the Consolidated EBITDAX (if negative) directly attributable thereto
period and Consolidated Interest Expense for such period shall be reduced by an amount equal to the Consolidated Interest Expen
attributable to any Indebtedness of the Company or any Restricted Subsidiary repaid, repurchased, defeased or otherwise discha
respect to the Company and its continuing Restricted Subsidiaries in connection with or with the proceeds from such Asset Sale
period (or, if the Capital Stock of any Restricted Subsidiary is sold or otherwise disposed of, the Consolidated Interest Expense
period directly attributable to the Indebtedness of such Restricted Subsidiary to the extent the Company and its continuing R
Subsidiaries are no longer liable for such Indebtedness after such sale);

8

(3) if, since the beginning of such period, the Company or any Restricted Subsidiary (by merger or otherwise) has made any In
in any Restricted Subsidiary (or any Person which becomes a Restricted Subsidiary or is merged with or into the Company or a R
Subsidiary) or an acquisition (or will have received a contribution) of assets, including any acquisition or contribution of assets occu
connection with a transaction causing a calculation to be made as provided herein, which constitutes all or substantially all of a
division, operating unit, segment, business, group of related assets or line of business, Consolidated EBITDAX and Consolidated
Expense for such period will be calculated after giving *pro forma* effect thereto (including the incurrence of any Indebtedness) as if su
investment or acquisition or contribution had occurred on the first day of such period; and

(4) if, since the beginning of such period, any Person (that subsequently became a Restricted Subsidiary or was merged with o
Company or any Restricted Subsidiary since the beginning of such period) made any Asset Sale or any Investment or acquisition of a
would have required an adjustment pursuant to clause (2) or (3) above if made by the Company or a Restricted Subsidiary du
period, Consolidated EBITDAX and Consolidated Interest Expense for such period will be calculated after giving *pro forma* effect thereto as
if such Asset Sale or Investment or acquisition of assets had occurred on the first day of such period.

For purposes of this definition, whenever *pro forma* effect is to be given to any calculation under this definition, the *pro forma* calculations
will be determined in good faith by a responsible financial or accounting officer of the Company; *provided*, that such officer may in his or her
discretion include any reasonably identifiable and factually supportable *pro forma* changes to Consolidated EBITDAX, including any *pro forma*
expenses and cost reductions, that have occurred or in the judgment of such officer are reasonably expected to occur within 12 months
of the applicable transaction to the extent that such expense or cost reduction or any other operating improvements could then be reflecte
in *pro forma* financial statements prepared in accordance with Regulation S-X under the Securities Act or any other regulation or polic
SEC. If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest expense on such Indebtedness will
calculated as if the average rate in effect from the beginning of such period to the date of determination had been the applicable rate for
period (taking into account any interest rate Hedging Obligation applicable to such Indebtedness, but if the remaining term of such inte
Hedging Obligation is less than 12 months, then such interest rate Hedging Obligation shall only be taken into account for that portio
period equal to the remaining term thereof). If any Indebtedness that is being given *pro forma* effect bears an interest rate at the option of the
Company, the interest rate shall be calculated by applying such optional rate chosen by the Company. Interest on Indebtedness that may
be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate, or other rate, shall
to have been based upon the rate actually chosen, or, if none, then based upon such optional rate chosen as the Company may designate

"*Consolidated EBITDAX*" for any period means, without duplication, the Consolidated Net Income for such period, plus the follow
without duplication and to the extent deducted (and not added back) in calculating such Consolidated Net Income:

(1) Consolidated Interest Expense;

(2) Consolidated Income Tax Expense;

(3) consolidated depletion and depreciation expense of the Company and its Restricted Subsidiaries;

9

(4) consolidated amortization expense or impairment charges of the Company and its Restricted Subsidiaries recorded in co
with the application of Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 350, Intangibles-Go
and Other (formerly Statement of Financial Accounting Standard No. 142, "Goodwill and Other Intangibles" and Statement of Fi
Accounting Standard No. 144, "Accounting for the Impairment or Disposal of Long Lived Assets");

(5) accretion of asset retirement obligations and other non-cash charges of the Company and its Restricted Subsidiaries (excl
such non-cash charge to the extent it represents an accrual of or reserve for cash charges in any future period or amortization of
cash expense that was paid in a prior period not included in the calculation);

(6) so long as the Company uses successful efforts or a similar method of accounting for its oil and gas properties, cons
exploration expense of the Company and its Restricted Subsidiaries; and

Indenture, dated as of November 23, 2010

if applicable for such period; and less, to the extent included in calculating such Consolidated Net Income and in excess of any costs or attributable thereto that were deducted (and not added back) in calculating such Consolidated Net Income, the sum of (x) the amount o revenues that are amortized during such period and are attributable to reserves that are subject to Volumetric Production Payments, (y recorded in accordance with GAAP as repayments of principal and interest pursuant to Dollar-Denominated Production Payments and non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item th Consolidated EBITDAX in any prior period).

Notwithstanding the preceding sentence, clauses (2) through (6) relating to amounts of a Restricted Subsidiary that is not a Guarant added to Consolidated Net Income to compute Consolidated EBITDAX of the Company only to the extent (and in the same proportion) tha income (loss) of such Restricted Subsidiary was included in calculating the Consolidated Net Income of the Company and, to the amounts set forth in clauses (2) through (6) are in excess of those necessary to offset a net loss of such Restricted Subsidiary or if such Subsidiary has net income for such period included in Consolidated Net Income, only if a corresponding amount would be permitted at th determination to be dividended or distributed to the Company by such Restricted Subsidiary without prior approval (that has not been o pursuant to the terms of its charter and all agreements, instruments, judgments, decrees, orders, statutes, rules and governmental applicable to that Restricted Subsidiary or the holders of its Capital Stock.

"*Consolidated Income Tax Expense*" means, with respect to any period, the provision for federal, state, local and foreign taxes (inclu state franchise taxes) based on income of the Company and its Restrict Subsidiaries for such period as determined in accordance with (for any period in which the Company is a partnership or limited liability company) the Tax Amount for such period.

"*Consolidated Interest Expense*" means, for any period, the total consolidated interest expense of the Company and its Rest Subsidiaries, determined on a consolidated basis in accordance with GAAP, plus, to the extent not included in such interest expense a duplication:

(1) interest expense for such period attributable to Capital Lease Obligations and the interest component of any deferred obligations;

(2) amortization of debt discount and debt issuance cost; *provided* that any amortization of bond premium will be credited to reduc Consolidated Interest Expense unless, pursuant to GAAP, such amortization of bond premium has otherwise reduced Consolidated Expense);

10

(3) non-cash interest expense;

(4) commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing

(5) the interest expense on Indebtedness of another Person that is guaranteed by the Company or one of its Restricted Subs secured by a lien on assets of the Company or one of its Restricted Subsidiaries, to the extent such guarantee becomes payable becomes subject to foreclosure;

(6) costs associated with interest rate Hedging Obligations (including amortization of fees); *provided, however* that if such interest rate Hedging Obligations result in net benefits rather than costs, such benefits shall be credited to reduce Consolidated Interest Expen pursuant to GAAP, such net benefits are otherwise reflected in Consolidated Net Income;

(7) the consolidated interest expense of the Company and its Restricted Subsidiaries that was capitalized during such period; an

(8) all dividends paid or payable in cash, Cash Equivalents or Indebtedness or dividends accrued during such period on a Disqualified Stock of the Company or on preferred stock of its Restricted Subsidiaries payable to a party other than the Compa wholly-owned Subsidiary;

minus, to the extent included above, write-off of deferred financing costs (and interest) attributable to Dollar-Denominated Production Pay

"*Consolidated Leverage*" means, as of the date of determination, the Company's long term debt reported on the Company's consolidated balance sheet as of the last day of the previous fiscal year prepared in accordance with GAAP minus the Company's cash equivalents on such date.

"*Consolidated Net Income*" means, for any period, the aggregate net income (loss) of the Company and its consolidated Subsi determined in accordance with GAAP and before any reduction in respect of preferred stock dividends of such Person, less (for any p Company is a partnership or limited liability company) the Tax Amount for such period; *provided, however* that there will not be included (to the extent otherwise included therein) in such Consolidated Net Income:

(1) any net income (loss) of any Person (other than the Company) if such Person is not a Restricted Subsidiary, except that:

(a) subject to the limitations contained in clauses (3) and (4) below, the Company's equity in the net income of any such for such period will be included in such Consolidated Net Income up to the aggregate amount of cash actually distributed Person during such period to the Company or a Restricted Subsidiary as a dividend or other distribution (subject, in the c

Indenture, dated as of November 23, 2010

dividend or other distribution to a Restricted Subsidiary, to the limitations contained in clause (2) below); and

11

(b) the Company's equity in a net loss of any such Person for such period will be included in determining such Consolida Income to the extent such loss has been funded with cash from the Company or a Restricted Subsidiary during such period;

(2) any net income (but not loss) of any Restricted Subsidiary if such Subsidiary is subject to restrictions, directly or indirectly, payment of dividends or the making of distributions by such Restricted Subsidiary, directly or indirectly, to the Company, except that:

(a) subject to the limitations contained in clauses (3), (4) and (5) below, the Company's equity in the net income of Restricted Subsidiary for such period will be included in such Consolidated Net Income up to the aggregate amount of cash th have been distributed by such Restricted Subsidiary during such period to the Company or another Restricted Subsidiary as a or other distribution (subject, in the case of a dividend or other distribution paid to another Restricted Subsidiary, to the lim contained in this clause); and

(b) the Company's equity in a net loss of any such Restricted Subsidiary for such period will be included in determinin Consolidated Net Income;

(3) any gain (loss) realized upon the sale or other disposition of any property, plant or equipment of the Company or its cons Subsidiaries which is not sold or otherwise disposed of in the ordinary course of business and any gain (loss) realized upon the sal disposition of any Capital Stock of any Person;

(4) any extraordinary or nonrecurring gains or losses or nonrecurring other income or expenses, together with any related prov taxes (and, without duplication, any Permitted Tax Distributions) on such gains or losses or other income or expenses and all related expenses;

(5) the cumulative effect of a change in accounting principles;

(6) any asset impairment write-downs on oil and gas properties under GAAP or SEC guidelines;

(7) any unrealized non-cash gains or losses or charges in respect of Hedging Obligations (including those resulting from the ap of Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) 815);

(8) income or loss attributable to discontinued operations (including, without limitation, operations disposed of during such whether or not such operations were classified as discontinued);

(9) all deferred financing costs written off, and premiums paid, in connection with any early extinguishment of Indebtedness;

(10) any depreciation, depletion and amortization expense in excess of capital expenditures; and

(11) any non-cash compensation charge arising from any grant of stock, stock options or other equity based awards; *provided* that the proceeds resulting from any such grant will be excluded from Section 4.07(a)(3)(b) hereof.

12

"*Continuing Directors*" means, as of any date of determination, any member of the Board of Directors of the Company, as applicable, v

(1) was a member of such Board of Directors on the date hereof; or

(2) was nominated for election or elected to such Board of Directors with the approval of a majority of the Continuing Director were members of such Board of Directors at the time of such nomination or election.

"*Corporate Trust Office of the Trustee*" will be at the address of the Trustee specified in Section 13.02 hereof or such other addre which the Trustee may give notice to the Issuers.

"*Credit Facilities*" means one or more first-priority secured debt facilities (including, without limitation, the Senior Credit Agreeme commercial paper facilities or capital markets financings, in each case with banks or other institutional lenders or institutional investors p for revolving credit loans, term loans, receivables financing (including through the sale of receivables to such lenders or to special purpos formed to borrow from (or sell receivables to) such lenders against such receivables), letters of credit or capital markets financings, in eac amended, restated, modified, renewed, refunded, replaced or refinanced (including by means of sales of debt securities) in whole or in time to time.

"*Custodian*" means the Trustee, as custodian with respect to the Notes in global form, or any successor entity thereto.

"*Debt Documents*" means, collectively, the First Lien Debt Documents and the Second Lien Debt Documents.

"*Default*" means any event that is, or with the passage of time or the giving of notice or both would be, an Event of Default.

"*Definitive Note*" means a certificated Note registered in the name of the Holder thereof and issued in accordance with Section 2.01

Indenture, dated as of November 23, 2010

hereof, substantially in the form of Exhibit A hereto except that such Note shall not bear the Global Note Legend and shall not have the
of Exchanges of Interests in the Global Note" attached thereto.

"*Depositary*" means, with respect to the Notes issuable or issued in whole or in part in global form, the Person specified in Sect
hereof as the Depositary with respect to the Notes, and any and all successors thereto appointed as Depositary hereunder and having b
pursuant to the applicable provision of this Indenture.

"*Disqualified Stock*" means any Capital Stock that, by its terms (or by the terms of any security into which it is convertible, or for whicl
exchangeable, in each case at the option of the Holder of the Capital Stock), or upon the happening of any event, matures or is m
redeemable, pursuant to a sinking fund obligation or otherwise, or redeemable at the option of the Holder of the Capital Stock, in whole o
on or prior to the date that is 91 days after the date on which the Notes mature. Notwithstanding the preceding sentence, any Capit
would constitute Disqualified Stock solely because the Holders of the Capital Stock have the right to require the Company to repurchase o
such Capital Stock upon the occurrence of a change of control or an asset sale will not constitute Disqualified Stock if the terms of suc
Stock provide that the Company may not repurchase or redeem any such Capital Stock pursuant to such provisions unless such rep
redemption complies with Section 4.07 hereof.

13

"*Dollar-Denominated Production Payment*" means production payment obligations recorded as liabilities in accordance with GA.
together with all undertakings and obligations in connection therewith.

"*Domestic Subsidiary*" means any Restricted Subsidiary of the Company that was formed under the laws of the United States or any
the United States or the District of Columbia or that guarantees or otherwise provides direct credit support for any Indebtedness of the Cor

"*Equity Interests*" means Capital Stock and all warrants, options or other rights to acquire Capital Stock (but excluding any debt secur
is convertible into, or exchangeable for, Capital Stock).

"*Equity Offering*" means any public or private sale of Capital Stock (other than Disqualified Stock) made for cash on a primary basis
Company after the date hereof.

"*Euroclear*" means Euroclear Bank, S.A./N.V., as operator of the Euroclear system.

"*Excess Cash Flow*" means, with respect to the Company and its Restricted Subsidiaries for any period, Consolidated EBITDAX; n
Consolidated Interest Expense; minus, Tax Amount; minus, aggregate capital expenditures (including all cash payments in respect of ac
of the Capital Stock, property or long-term assets of any other Person); minus, changes in Net Working Capital; minus, net cash cont
deposits, payments or charges (including contributions, deposits, payments or charges in respect of performance, surety and similar bond
respect to letters of credit in support thereof) in respect of the Company's plugging and abandonment obligations arising from, or related t
and Gas Business; minus, the aggregate payment, repayment, redemption, defeasance or other retirement for value by the Comp
Indebtedness.

"*Excess Cash Flow Offer Amount*" means, with respect to any period (A) 50% of Excess Cash Flow for such period minus (B) $5.0 milli

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Exchange Notes*" means the Notes (including any Additional Notes) issued in an Exchange Offer pursuant to Section 2.06(f) hereof.

"*Exchange Offer*" has the meaning set forth for such term in the initial Registration Rights Agreement.

"*Exchange Offer Registration Statement*" has the meaning set forth in the Registration Rights Agreement.

"*Excluded Collateral*" means:

(1) any Capital Stock of any Foreign Subsidiary in excess of 66% of the Capital Stock of such Foreign Subsidiary or any prop
assets of any Foreign Subsidiary;

(2) any permit or license or any contractual obligation entered into by either Issuer or any Guarantor (A) that prohibits or requ
consent of any Person other than the Company or any of its Affiliates as a condition to the creation by such Issuer or Guarantor of
any right, title or interest in such permit, license or contractual agreement or any Capital Stock or equivalent related thereto or (l
extent that any requirement of law applicable thereto prohibits the creation of a Lien thereon, but only, with respect to the prohit
(A) and (B), to the extent, and for as long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed inefl
the Uniform Commercial Code or any other requirement of law;

14

Indenture, dated as of November 23, 2010

    (3) fixed or capital assets owned by either Issuer or any Guarantor that are subject to a purchase money Lien or a capital contractual obligation pursuant to which such Lien is granted (or in the document providing for such capital lease) prohibits or requ consent of any Person other than the Company or any of its Affiliates as a condition to the creation of any other Lien on such equipm

    (4) any Capital Stock of any Subsidiary of the Company to the extent (and only to the extent) that in the reasonable judgme Company, if such Capital Stock were not excluded from the Collateral then Rule 3-16 or Rule 3-10 of Regulation S-X under the Se Act would require the filing of separate financial statements of such Subsidiary with the SEC (or any other governmental age connection with a registration of the Notes under the Securities Act;

    (5) Collateral that has been released in accordance with the Intercreditor Agreement or this Indenture;

    (6) the W&T Escrow Accounts; and

    (7) other property or assets owned by either Issuer or any Guarantor that are not subject to Liens securing any First Lien Obliga

    *"Existing Indebtedness"* means the aggregate principal amount of Indebtedness of the Company and its Restricted Subsidiaries in e on the date hereof, until such amounts are repaid.

    The term *"fair market value"* means, with respect to any asset or property, the sale value that would be obtained in an arm's-leng market transaction between an informed and willing seller under no compulsion to sell and an informed and willing buyer under no comp buy. Except as otherwise provided herein, the fair market value of an asset or property in excess of $10.0 million shall be determin independent accounting, appraisal or investment banking firm of recognized standing, and any lesser fair market value may be determi officer of the Company acting in good faith.

    *"First Lien Agreement"* means (i) the Senior Credit Agreement and any other agreement evidencing First Lien Obligations and (ii) any credit agreement, loan agreement, note agreement, promissory note, indenture or other agreement or instrument evidencing or governin of any indebtedness or other financial accommodation that (x) has been incurred to extend, replace, refinance or refund in whole o indebtedness and other obligations outstanding under the Senior Credit Agreement or any other agreement or instrument referred to in (ii) and (y) is consistent with the provisions set forth under Article 9 hereof.

    *"First Lien Collateral Agent"* means the collateral agent for the First Lien Secured Parties named in any First Lien Debt Document a successor or replacement collateral agent designated as such by the holders of First Lien Obligations.

    *"First Lien Debt Document"* means, collectively, all agreements, instruments and other documents evidencing, governing or providin Lien for the benefit of any First Lien Obligations.

15

    *"First Lien Obligations"* means, collectively, (i) all principal of and interest and premium (if any) on all loans made pursuant to a First Agreement and any other Indebtedness incurred pursuant to a Credit Facility to the extent that such Indebtedness is secured equall with the other First Lien Obligations by the Liens on the Collateral, (ii) all reimbursement obligations (if any) and interest thereon with res any letter of credit or similar instruments issued pursuant to a First Lien Agreement, (iii) all Hedging Obligations of the Company or any Gu and (iv) all fees, expenses and other amounts payable from time to time pursuant to the First Lien Debt Documents.

    *"First Lien Secured Parties"* means the holders of the First Lien Obligations and the First Lien Collateral Agent.

    *"First Priority Lien"* means any Permitted Lien securing First Lien Obligations.

    *"Foreign Subsidiary"* means any Restricted Subsidiary of the Company that is not a Domestic Subsidiary.

    The term *"freely tradable"* means a Transfer Restricted Security shall be deemed to be "freely tradable" at any time of determinatio such time of determination (i) it may be sold to the public pursuant to Rule 144A under the Securities Act by a person that is not an "affili defined in Rule 144 under the Securities Act) of the Company without regard to any of the conditions specified therein (other than the period requirement in paragraph (d) of Rule 144 so long as such holding period requirement is satisfied at such time of determination) does not bear any restrictive legends relating to the Securities Act.

    *"GAAP"* means generally accepted accounting principles in the United States, which are in effect from time to time.

    *"Global Note Legend"* means the legend set forth in Section 2.06(g)(2) hereof, which is required to be placed on all Global Notes herein.

    *"Global Notes"* means, individually and collectively, each of the Restricted Global Notes and the Unrestricted Global Notes deposited on behalf of and registered in the name of the Depository or its nominee, substantially in the form of Exhibit A hereto and that bears th Note Legend and that has the "Schedule of Exchanges of Interests in the Global Note" attached thereto, issued in accordance with Sec 2.06(b)(3), 2.06(b)(4), 2.06(d)(2) or 2.06(f) hereof.

Indenture, dated as of November 23, 2010

"*Government Securities*" means direct obligations of, or obligations guaranteed by, the United States of America, and the payment f the United States pledges its full faith and credit.

"*Governmental Authority*" means the government of the United States of America or any other nation, or of any political subdivision the whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising ex legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national such as the European Union or the European Central Bank).

The term "*guarantee*" or "*guaranty*" means a guarantee other than by endorsement of negotiable instruments for collection in the ore course of business, direct or indirect, in any manner including, without limitation, by way of a pledge of assets or through letters of c reimbursement agreements in respect thereof, of all or any part of any Indebtedness. When used as a verb, "*guarantee*" or "*guaranty*" as applicable, has a correlative meaning.

"*Guarantee*" means any guarantee by a Guarantor of the Issuers' payment Obligations as provided herein and on the Notes.

16

"*Guarantors*" means each Restricted Subsidiary of the Company that executes this Indenture as an initial Guarantor or that be Guarantor in accordance with the provisions herein, and their respective successors and assigns.

"*Guaranteed Obligations*" means, collectively,

(1) the prompt and full payment of the principal of, premium and Additional Interest, if any, and interest on, the Notes whe whether at stated maturity, by acceleration, redemption or otherwise, and the prompt and full payment of the interest on the overdue of and interest on the Notes, if any, if lawful, and all other Obligations of the Issuers to the Holders or the Trustee under the In Documents, including all amounts that constitute part of the Guaranteed Obligations and would be owed by the Issuers but for the they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving the Issue

(2) in case of any extension of time of payment or renewal of any Notes or any of such other Guaranteed Obligations, the pro full payment when due or performed in accordance with the terms of the extension or renewal, whether at stated maturity, by accel otherwise.

"*Hedging Obligations*" means, with respect to any specified Person, the obligations of such Person incurred in the normal course of b and not for speculative purposes under:

(1) interest rate swap agreements, interest rate cap agreements and interest rate collar agreements entered into with on financial institutions and designed to protect the Person or any of its Restricted Subsidiaries entering into the agreement against flu in interest rates with respect to Indebtedness incurred and not for purposes of speculation;

(2) foreign exchange contracts and currency protection agreements entered into with one or more financial institutions and des protect the Person or any of its Restricted Subsidiaries entering into the agreement against fluctuations in currency exchanges respect to Indebtedness incurred and not for purposes of speculation;

(3) any commodity futures contract, commodity option or other similar agreement or arrangement designed to protect fluctuations in the price of oil, natural gas or other commodities used, produced, processed or sold by that Person or any of its R Subsidiaries at the time; and

(4) other agreements or arrangements designed to protect such Person or any of its Restricted Subsidiaries against fluctu interest rates, commodity prices or currency exchange rates.

"*Holder*" means a Person in whose name a Note is registered.

"*IAI Global Note*" means a Global Note substantially in the form of Exhibit A hereto bearing the Global Note Legend and the P Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee that will be iss denomination equal to the outstanding principal amount of the Notes sold to Institutional Accredited Investors

17

"*Indebtedness*" means, with respect to any specified Person (excluding accrued expenses and trade payables), without duplication,

(1) all obligations of such Person, whether or not contingent, in respect of:

(a) the principal of and premium, if any, in respect of outstanding (A) Indebtedness of such Person for money borrow (B) Indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such F responsible or liable;

(b) all Capital Lease Obligations of such Person and all Attributable Debt in respect of sale and leaseback transactions

Indenture, dated as of November 23, 2010

into by such Person;

(c) the deferred purchase price of property, which purchase price is due more than six months after the date of taking de title to such property, including all obligations of such Person for the deferred purchase price of property under any title re agreement, but excluding accrued expenses and trade accounts payable arising in the ordinary course of business; and

(d) the reimbursement obligation of any obligor for the principal amount of any letter of credit, banker's acceptance or s transaction (excluding obligations with respect to letters of credit securing obligations (other than obligations described in (a) through (c) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are n upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the tenth Business Day following receipt Person of a demand for reimbursement following payment on the letter of credit);

(2) all net obligations in respect of Hedging Obligations except to the extent such net obligations are otherwise included definition;

(3) all liabilities of others of the kind described in the preceding clause (1) or (2) that such Person has Guaranteed or that are c its legal liability;

(4) with respect to any Production Payment, any warranties or guaranties of production or payment by such Person with respec Production Payment but excluding other contractual obligations of such Person with respect to such Production Payment;

(5) Indebtedness (as otherwise defined in this definition) of another Person secured by a Lien on any asset of such Person, w not such Indebtedness is assumed by such Person, the amount of such obligations being deemed to be the lesser of

(a) the full amount of such obligations so secured, and

(b) the fair market value of such asset as determined in good faith by such specified Person;

(6) Disqualified Stock of such Person or a Restricted Subsidiary in an amount equal to the greater of the maximum ma redemption or repurchase price (not including, in either case, any redemption or repurchase premium) or the liquidation preference th

(7) the aggregate preference in respect of amounts payable on the issued and outstanding preferred stock of any of the C Restricted Subsidiaries that are not Guarantors in the event of any voluntary or involuntary liquidation, dissolution or winding up

18

(excluding any such preference attributable to such preferred stock that is owned by such Person or any of its Restricted Sub *provided* that if such Person is the Company, such exclusion shall be for such preference attributable to such preferred stock that is o the Company or any of its Restricted Subsidiaries); and

(8) any and all deferrals, renewals, extensions, refinancings and refundings (whether direct or indirect) of, or amend modifications or supplements to, any liability of the kind described in any of the preceding clauses (1), (2), (3), (4), (5), (6), (7) or this (8), whether or not between or among the same parties.

if and to the extent any of the preceding items (other than letters of credit and Hedging Obligations) would appear as a liability upon a bala of the specified Person prepared in accordance with GAAP. In addition, the term "Indebtedness" includes all Indebtedness of others sec Lien on any asset of the specified Person (whether or not such Indebtedness is assumed by the specified Person) and, to the extent no included, the Guarantee by the specified Person of any Indebtedness of any other Person. Subject to clause (4) of the preceding Production Payments shall not be deemed to be Indebtedness.

"*Indenture*" means this Indenture, as amended or supplemented from time to time.

"*Indenture Document*" means, collectively, this Indenture, the applicable Registration Rights Agreement, the Notes, the Guarantees Collateral Agreements.

"*Intercreditor Agreement*" means the Second Lien Intercreditor Agreement that is entered into as of the date hereof by and a Trustee, the First Lien Collateral Agent and the Issuers, as the same may be amended, supplemented, restated or modified from time to ti

"*Indirect Participant*" means a Person who holds a beneficial interest in a Global Note through a Participant.

"*Initial Notes*" means the first $150,000,000 aggregate principal amount of Notes issued hereunder on the date hereof, and any Not upon registration of transfer thereof or in exchange therefor.

"*Insolvency Proceeding*" means any proceeding in respect of bankruptcy, insolvency, winding up, receivership, dissolution or assignme the benefit of creditors, in each of the foregoing events whether under the Bankruptcy Law or any similar federal, state or foreign ban insolvency, reorganization, receivership or similar law.

"*Institutional Accredited Investor*" means an institution that is an "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7 Regulation D under the Securities Act, as amended.

Indenture, dated as of November 23, 2010

"*Investments*" means, with respect to any Person, all direct or indirect investments by such Person in other Persons (including Affilia the forms of loans (including guarantees or other obligations), advances or capital contributions (excluding commission, travel and advances to officers and employees made in the ordinary course of business), purchases or other acquisitions for consideration of Ind Equity Interests or other securities, together with all items that are or would be classified as investments on a balance sheet prepared in a with GAAP. If the Company or any Restricted Subsidiary of the Company sells or otherwise disposes of any Equity Interests of any o indirect Restricted Subsidiary of the Company such that, after giving effect to any such sale or disposition, such Person is no longer a I Subsidiary of the Company, the Company will be deemed to have made

19

an Investment on the date of any such sale or disposition in an amount equal to the fair market value of the Equity Interests of suc Subsidiary not sold or disposed of in an amount determined as provided in Section 4.07(d) hereof. The acquisition by the Comp Subsidiary of the Company of a Person that holds an Investment in a third Person will not be deemed to be an Investment by the Compa Subsidiary in such third Person unless such Investment in such third Person was contemplated by the Company or such Subsidia incidental to the acquisition of such Person.

"*Issue Date*" means November 23, 2010.

"*Legal Holiday*" means a Saturday, a Sunday or a day on which banking institutions in the City of New York or at a place of payme authorized by law, regulation or executive order to remain closed. If a payment date is a Legal Holiday at a place of payment, paym made at that place on the next succeeding day that is not a Legal Holiday, and no interest shall accrue on such payment for the intervenin

"*Letter of Transmittal*" means the letter of transmittal to be prepared by the Issuers and sent to all Holders of the Notes for use Holders in connection with an Exchange Offer.

"*Lien*" means, with respect to any asset, any mortgage, lien, pledge, charge, security interest or encumbrance of any kind in respe asset, whether or not filed, recorded or otherwise perfected under applicable law, including any conditional sale or other title retention ag any lease in the nature thereof, any option or other agreement to sell or give a security interest in and any filing of or agreement to financing statement under the Uniform Commercial Code (or equivalent statutes) of any jurisdiction other than a precautionary financing s not intended as a security agreement.

"*Mortgage*" means that certain Deed of Trust, Mortgage, Assignment, Security Agreement, Fixture Filing and Financing Statem entered into on or prior to the date set forth in Section 4.19 hereof by and among the trustee thereunder, the Collateral Agent and the Co the same may be amended, supplemented, restated or modified from time to time.

"*Net Proceeds*" means the aggregate cash proceeds received by the Company or any of its Restricted Subsidiaries in respect of a Sale (including, without limitation, any cash received upon the sale or other disposition of any non-cash consideration received in any As net of, without duplication:

(1) the direct costs relating to such Asset Sale, including, without limitation, legal, accounting and investment banking fe commissions, title and recording tax expenses, and any relocation expenses incurred as a result of the Asset Sale;

(2) taxes paid or payable as a result of the Asset Sale (including Permitted Tax Distributions), in each case, after taking into acc available tax credits or deductions and any tax sharing arrangements;

(3) amounts required to be applied to the repayment of Indebtedness secured by a Lien on the properties or assets that were of such Asset Sale;

(4) all payments made on any Hedging Obligation or other Indebtedness which is secured by any assets subject to such Asse accordance with the terms of any Permitted Lien upon such assets, or which must by its terms, or in order to obtain a necessary c such Asset Sale, or by applicable law be repaid out of the proceeds from such Asset Sale; and

20

(5) any reserve for adjustment in respect of the sale price of such properties or assets established in accordance with GAAP.

"*Net Working Capital*" means:

(1) all current assets of the Company and its Restricted Subsidiaries, minus

(2) all current liabilities of the Company and its Restricted Subsidiaries, except current liabilities included in Indebtedness;

in each case, on a consolidated basis and determined in accordance with GAAP.

"*Non-Recourse Debt*" means Indebtedness:

Indenture, dated as of November 23, 2010

(1) as to which neither the Company nor any of its Restricted Subsidiaries (a) provides credit support of any kind (inclu undertaking, agreement or instrument that would constitute Indebtedness), (b) is directly or indirectly liable as a guarantor or otl (c) is the lender;

(2) no default with respect to which (including any rights that the holders of the Indebtedness may have to take enforcemer against an Unrestricted Subsidiary) would permit upon notice, lapse of time or both any holder of any other Indebtedness (other Notes) of the Company or any of its Restricted Subsidiaries to declare a default on such other Indebtedness or cause the paym Indebtedness to be accelerated or payable prior to its Stated Maturity; and

(3) as to which the lenders have been notified in writing that they will not have any recourse to the stock or assets of the Con any of its Restricted Subsidiaries.

"*Non-U.S. Person*" means a Person who is not a U.S. Person.

"*Notes*" has the meaning assigned to it in the preamble herein. The Initial Notes and the Additional Notes shall be treated as a single all purposes herein, and unless the context otherwise requires, all references to the Notes shall include the Initial Notes and any Additiona

"*Obligations*" means any principal, premium, if any, interest (including interest accruing on or after the filing of any petition in bankrupt for reorganization, whether or not a claim for post-filing interest is allowed in such proceeding), penalties, fees, charges, ex indemnifications, reimbursement obligations, damages, guarantees, and other liabilities or amounts payable under the documentation gov Indebtedness or in respect thereto.

"*Officer*" means, with respect to any Person, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Op Officer, the Chief Financial Officer, the Treasurer, any Assistant Treasurer, the Controller, the Secretary or any Vice-President of such Per

"*Officers' Certificate*" means a certificate signed on behalf of the Issuers by one Officer of each Issuer (regardless of whether the certi being delivered to the Trustee by the Issuers or the Company), each of whom must be the principal executive officer, the principal financi or the principal accounting officer of such Issuer, that meets the requirements of Section 13.05 hereof.

21

"*Oil and Gas Business*" means:

(1) the acquisition, exploration, development, operation and disposition of interests in oil, natural gas and other hydrocarbon pro

(2) the gathering, marketing, treating, processing (but not refining), storage, selling and transporting of any production fi interests, including any hedging activities related thereto; and

(3) any activity necessary, appropriate, incidental or reasonably related to the activities described above.

"*Opinion of Counsel*" means an opinion from legal counsel who is reasonably acceptable to the Trustee, that meets the requiren Section 13.05 hereof. The counsel may be an employee of or counsel to the Company or any Subsidiary of the Company.

"*Participant*" means, with respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, E or Clearstream, respectively (and, with respect to DTC, shall include Euroclear and Clearstream).

"*Participating Broker-Dealer*" has the meaning set forth in the Registration Rights Agreement.

"*Permitted Business Investment*" means Investments made in the ordinary course of, and of a nature that is or shall have become cus in, the Oil and Gas Business, including through agreements, transactions, interests or arrangements that permit one to share risk or cos with regulatory requirements regarding local ownership or satisfy other objectives customarily achieved through the conduct of the Oil Business jointly with third parties, including without limitation:

(1) direct or indirect ownership of crude oil, natural gas, other related hydrocarbon and mineral properties or any interest th gathering, transportation, processing, storage or related systems; and

(2) the entry into operating agreements, joint ventures, processing agreements, working interests, royalty interests, mineral leas in agreements, farm-out agreements, development agreements, production sharing agreements, area of mutual interest agreement for the sale, transportation or exchange of crude oil and natural gas and related hydrocarbons and minerals, unitization agreement arrangements, joint bidding agreements, service contracts, partnership agreements (whether general or limited), or other similar or c agreements, transactions, properties, interests or arrangements and Investments and expenditures in connection therewith or pursu in each case made or entered into in the ordinary course of the Oil and Gas Business, excluding, however, Investments in corpora publicly-traded limited partnerships.

"*Permitted Holders*" means any Beneficial Owner of Capital Stock of the Company on the Issue Date.

"*Permitted Investment*" means:

Indenture, dated as of November 23, 2010

(1) any Investment in the Company or in a Restricted Subsidiary of the Company;

(2) any Investment in Cash Equivalents;

22

(3) any Investment by the Company or any Restricted Subsidiary of the Company in a Person, if as a result of such Investment:

(a) such Person becomes a Restricted Subsidiary of the Company; or

(b) such Person is merged, consolidated or amalgamated with or into, or transfers or conveys substantially all of its prop assets to, or is liquidated into, the Company or a Restricted Subsidiary of the Company;

(4) any Investment made as a result of the receipt of non-cash consideration from an Asset Sale that was made pursuant compliance with Section 4.10 hereof;

(5) any Investment in any Person solely in exchange for the issuance of Equity Interests (other than Disqualified Stock Company;

(6) any Investments received in compromise of obligations of trade creditors or customers that were incurred in the ordinary c business, including pursuant to any plan of reorganization or similar arrangement upon the bankruptcy or insolvency of any trade cr customer;

(7) Hedging Obligations permitted to be incurred under Section 4.09;

(8) Permitted Business Investments;

(9) any repurchases of Notes permitted herein, including open market purchases of the Notes; and

(10) other Investments in any Person having an aggregate fair market value (measured on the date each such Investment was without giving effect to subsequent changes in value), when taken together with all other Investments made pursuant to this clause are at the time outstanding, not to exceed $5.0 million.

"*Permitted Liens*" means:

(1) Liens on any property or assets securing Indebtedness and other obligations under Credit Facilities permitted herein;

(2) Liens in favor of the Company or the Guarantors;

(3) Liens on any property or assets of a Person existing at the time such Person is merged with or into or consolidate Company or any Restricted Subsidiary of the Company, *provided* that such Liens were in existence prior to the contemplation of such mer or consolidation and do not extend to any property or assets other than those of the Person merged into or consolidated with the Co the Restricted Subsidiary;

(4) Liens on any property or assets existing at the time of acquisition thereof by the Company or any Restricted Subsidiar Company *provided* that such Liens were not incurred in connection with the contemplation of such acquisition;

23

(5) Liens to secure the performance of statutory obligations, surety or appeal bonds, performance bonds or other obligations nature incurred in the ordinary course of business;

(6) Liens existing on the Issue Date;

(7) Liens arising from Uniform Commercial Code financing statement filings regarding operating leases entered into by the Co and its Restricted Subsidiaries in the ordinary course of business;

(8) Liens securing Permitted Refinancing Indebtedness incurred to refinance Indebtedness that was previously so secured, *provided that* any such Lien is limited to all or part of the same property or assets (plus improvements, replacements, accessions, proceeds or di distributions in respect thereof) that secured (or, under the written arrangements under which the original Lien arose, could Indebtedness being refinanced or is in respect of property that is the security for a Permitted Lien hereunder;

(9) Liens securing Hedging Obligations of the Company or any of its Restricted Subsidiaries;

(10) Liens securing Indebtedness incurred in connection with the acquisition by the Company or any Restricted Subsidiary c used in the Oil and Gas Business (including the office buildings and other real property used by the Company or such Restricted S in conducting its operations) *provided* that (i) such Liens attach only to the assets acquired with the proceeds of such Indebtedness; (i Indebtedness is not in excess of the purchase price of such fixed assets; and (iii) such Indebtedness is permitted to be inc Section 4.10;

(11) any Lien incurred in the ordinary course of business incidental to the conduct of the business of the Company or the Subsidiaries or the ownership of their property (including (a) easements, rights of way and similar encumbrances, (b) rights or title o

Indenture, dated as of November 23, 2010

under leases (other than Capital Lease Obligations), (c) rights of collecting banks having rights of setoff, revocation, refund or c
with respect to money or instruments of the Company or the Restricted Subsidiaries on deposit with or in the possession of suc
(d) Liens imposed by law, including Liens under workers' compensation or similar legislation and mechanics', carriers', warehouse
materialmen's, suppliers' and vendors' Liens, and (e) Liens incurred to secure performance of obligations with respect to stat
regulatory requirements, performance or return-of-money bonds, surety bonds or other obligations of a like nature and incurred in a
consistent with industry practice;

(12) Liens for taxes, assessments and governmental charges not yet due or the validity of which are being contested in g
appropriate proceedings, promptly instituted and diligently conducted, and for which adequate reserves have been established to
required by GAAP as in effect at such time;

(13) Liens created for the benefit of (or to secure) Second Lien Obligations in respect of the Initial Notes in an aggregate p
amount not to exceed $150.0 million; and

(14) Liens incurred with respect to obligations that do not exceed $2.0 million at any one time outstanding.

24

"*Permitted Refinancing Indebtedness*" means any Indebtedness of the Company or any of its Restricted Subsidiaries issued in exchan
or the net proceeds of which are used to extend, refinance, renew, replace, defease or refund other Indebtedness of the Company o
Restricted Subsidiaries (other than intercompany Indebtedness); *provided* that:

(1) the principal amount (or accreted value, if applicable) of such Permitted Refinancing Indebtedness does not exceed the
amount (or accreted value, if applicable) of the Indebtedness being extended, refinanced, renewed, replaced, defeased or refur
accrued interest on the Indebtedness and the amount of all expenses and premiums incurred in connection therewith);

(2) such Permitted Refinancing Indebtedness has a final maturity date no earlier than the final maturity date of, and has a W
Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being extended, refi
renewed, replaced, defeased or refunded;

(3) if the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded is subordinated in right of paym
Notes or the Guarantees, such Permitted Refinancing Indebtedness is subordinated in right of payment to the Notes or the Gua
terms at least as favorable to the Holders of Notes as those contained in the documentation governing the Indebtedness being
refinanced, renewed, replaced, defeased or refunded; and

(4) such Indebtedness is not incurred by a Restricted Subsidiary of the Company if the Company is the obligor on the Indel
being extended, refinanced, renewed, replaced, defeased or refunded; *provided, however,* that a Restricted Subsidiary that is also a Guaranto
may guarantee Permitted Refinancing Indebtedness incurred by the Company, whether or not such Restricted Subsidiary was a
guarantor of the Indebtedness being extended, refinanced, renewed, replaced, defeased or refunded.

"*Permitted Tax Distribution*" means (i) for any calendar year or portion thereof of the Company during which it is a pass-through enti
U.S. federal income tax purposes, payments and distributions to the members of the Company on each estimated payment date as well as
applicable due date to enable the members of the Company (or, if any of them are themselves a pass-through entity for U.S. federa
purposes, their shareholders, members or partners) to make payments of U.S. federal and state income taxes (including estimates th
result of the operations of the Company and its Subsidiaries during the current and any previous calendar year, not to exceed an amou
the amount of each such member's (or, in the case of a pass-through entity, its shareholders', members' or partners') U.S. federal and sta
tax liability resulting solely from the pass-through tax treatment of such member's interest in the Company and as calculated pursua
operating agreement of the Company as in effect on the Issue Date and as it may be amended from time to time thereafter in a manner
adverse to the Holders of the Notes and (ii) payments and distributions to Black Elk Management LLC sufficient to permit its me
discharge their 2010 United States federal income tax liabilities in respect of the receipt by Black Elk Management LLC of Class B Units p
to Paragraph 24 of the First Amended and Restated Operating Agreement of the Company and the receipt by Black Elk Management LL
amounts described in this clause (ii); *provided, however,* that all payments and distributions pursuant to this clause (ii) shall not exceed S
million in the aggregate.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organi
limited liability company or government or other entity.

25

"*PPVA*" means Platinum Partners Value Arbitrage Fund L.P.

"*Private Placement Legend*" means the legend set forth in Section 2.06(g)(1) hereof to be placed on all Notes issued hereunder excep
otherwise permitted herein.

"*Production Payments*" means, collectively, Dollar-Denominated Production Payments and Volumetric Production Payments.

Indenture, dated as of November 23, 2010

"*QIB*" means a "qualified institutional buyer" as defined in Rule 144A.

"*Registration Rights Agreement*" means (i) the Registration Rights Agreement, dated as of November 23, 2010, among the Issuers, the Guarantor and the other parties named on the signature pages thereof, as such agreement may be amended, modified or supplemented time and (ii) with respect to any Additional Notes, one or more registration rights agreements among the Issuers, the Guarantors and parties thereto, as such agreement(s) may be amended, modified or supplemented from time to time, relating to rights given by the Issuers purchasers of Additional Notes to register such Additional Notes under the Securities Act

"*Regulation S*" means Regulation S promulgated under the Securities Act.

"*Regulation S Global Note*" means a Regulation S Temporary Global Note or Regulation S Permanent Global Note, as appropriate.

"*Regulation S Permanent Global Note*" means a permanent Global Note in the form of Exhibit A hereto bearing the Global Note Legend the Private Placement Legend and deposited with or on behalf of and registered in the name of the Depositary or its nominee, is denomination equal to the outstanding principal amount of the Regulation S Temporary Global Note upon expiration of the Restricted Peri

"*Regulation S Temporary Global Note*" means a temporary Global Note in the form of Exhibit A hereto deposited with or on behalf of registered in the name of the Depositary or its nominee, issued in a denomination equal to the outstanding principal amount of the Note sold in reliance on Rule 903 of Regulation S.

"*Responsible Officer*" when used with respect to the Trustee, means any officer within the corporate trust department of the Tr including any vice president, assistant vice president, assistant secretary, assistant treasurer, trust officer or any other officer of th customarily performing functions similar to those performed by any of the above designated officers and also means, with respect to a corporate trust matter, any other officer to whom such matter is referred because of his knowledge of and familiarity with the particular sub who shall have direct responsibility for the administration of this Indenture.

"*Restricted Definitive Note*" means a Definitive Note bearing the Private Placement Legend.

"*Restricted Global Note*" means a Global Note bearing the Private Placement Legend.

"*Restricted Investment*" means an Investment other than a Permitted Investment.

"*Restricted Period*" means the 40-day distribution compliance period as defined in Regulation S.

26

"Restricted Subsidiary" of a Person means any Subsidiary of the referent Person that is not an Unrestricted Subsidiary.

"*Rule 144*" means Rule 144 promulgated under the Securities Act.

"*Rule 144A*" means Rule 144A promulgated under the Securities Act.

"*Rule 903*" means Rule 903 promulgated under the Securities Act.

"*Rule 904*" means Rule 904 promulgated under the Securities Act.

"*Sarbanes-Oxley Act of 2002*" means the Public Company Accounting Reform and Investor Protection Act and the rules and reg promulgated thereunder.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Second Lien Debt Document*" means, collectively, the Indenture Documents and corresponding documents relating to other Secon Obligations.

"*Second Lien Obligation*" means collectively, (i) all principal of and interest and premium (if any) on all Notes and (ii) all fees, expe and other amounts payable from time to time as provided herein and in related documents.

"*Second Lien Secured Creditor*" means the holders of the Second Lien Obligations.

"*Second Lien Secured Parties*" means the Holders of the Second Lien Obligations, the Trustee, any agent for any Second Lien Oblig and the Collateral Agent.

"*SEC PV-10*" means the estimated future gross revenue to be generated from the production of proved reserves, net of estimated and future development and abandonment costs, using prices and costs in effect at the determination date, before income taxes, and wit effect to non-property-related expenses, discounted to a present value using an annual discount rate of 10% in accordance with the gu

Indenture, dated as of November 23, 2010

the Commission. Such amount shall be determined by either Netherland, Sewell & Associates, Inc., Ryder Scott Company, L.P., or De MacNaughton.

"*Secured Parties*" means, collectively, the First Lien Secured Parties and the Second Lien Secured Parties.

"*Security Agreement*" means that certain Security Agreement entered into as of the date hereof by and among the Issuers and the Guarantor as "Grantors" and the Trustee and the Collateral Agent, as the same may be amended, supplemented, restated or modified from time.

"*Senior Credit Agreement*" means the Amended and Restated Credit Agreement by and among the Company, the guarantors party thereto lenders party thereto, and PPVA Black Elk (Cayman) Ltd., as agent, dated as of July 13, 2009, including any related notes, guarantees, documents, instruments and agreements executed in connection therewith, and in each case as amended, restated, modified, renewed replaced or refinanced from time to time, including with different lenders or in differing amounts of Indebtedness to the extent permitted he

"*Senior Debt*" means all Indebtedness of the Company or any of its Restricted Subsidiaries permitted to be incurred under the terms including the Notes, unless the instrument under which such Indebtedness is incurred expressly provides that it is subordinated in right of to the Notes or any Guarantee, and all Obligations with respect to the foregoing.

27

"*Shelf Registration Statement*" means the Shelf Registration Statement as defined in the Registration Rights Agreement.

"*Stated Maturity*" means, with respect to any installment of interest or principal on any series of Indebtedness, the date on which the p of interest or principal was scheduled to be paid in the original documentation governing such Indebtedness, and will not include any co obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

The term "*subordinated*" means, with respect to Indebtedness, Indebtedness that is expressly subordinated in right of payment. Un Indebtedness shall not be deemed subordinated to secured Indebtedness solely because of such security. For purposes of Section Indebtedness of the Company or a Guarantor shall not be deemed subordinated due to the operation of Article 10 hereof or the Agreements.

"*Subsidiary*" means, with respect to any specified Person:

(1) any corporation, association or other business entity of which more than 50% of the total voting power of Voting Stock time owned or controlled, directly or through another Subsidiary, by that Person or one or more of the other Subsidiaries of that Per combination thereof); and

(2) any partnership (a) the sole general partner or the managing general partner of which is such Person or a Subsidiary of su or (b) the only general partners of which are that Person or one or more Subsidiaries of that Person (or any combination thereof).

"*Tax Amount*" means, for any period, the combined federal, state and local income taxes, including estimated taxes, that would be pa the Company if it were a Texas corporation filing separate tax returns with respect to its Taxable Income for such period; *provided* that in determining the Tax Amount, the effect thereon of any net operating loss carry-forwards or other carry-forwards or tax attributes, alternative minimum tax carry-forwards, that would have arisen if the Company were a Texas corporation shall be taken into account; *provided*, *further*, that, if there is an adjustment in the amount of the Taxable Income for any period, an appropriate positive or negative adjustment made in the Tax Amount, and if the Tax Amount is negative, then the Tax Amount for succeeding periods shall be reduced to take into such negative amount until such negative amount is reduced to zero. Notwithstanding anything to the contrary, Tax Amount shall not inclu resulting from the Company's reorganization as, or change in the status to, a corporation for tax purposes.

"*Taxable Income*" means, for any period, the taxable income or loss of the Company for such period for U.S. federal income tax purpo

"*TIA*" means the Trust Indenture Act of 1939, as amended (15 U.S.C. §§ 77aaa-77bbbb).

"*Treasury Rate*" means, with respect to the Notes as of any redemption date, the yield to maturity at the time of computation of United Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (51 become publicly available at least two Business Days prior to the redemption date (or, if such Statistical Release is no longer publis publicly available source or similar market data)) most nearly equal to the period

28

from the redemption date to December 1, 2013; *provided*, *however* that if the period from the redemption date to December 1, 2013 is not equa the constant maturity of a United States Treasury security for which a weekly average yield is given, the Treasury Rate shall be obtained interpolation (calculated to the nearest one-twelfth of a year) from the weekly average yields of United States Treasury securities for wh yields are given, except that if the period from the redemption date to December 1, 2013 is less than one year, the weekly average yield o

Indenture, dated as of November 23, 2010

traded United States Treasury securities adjusted to a constant maturity of one year shall be used.

"*Trustee*" means The Bank of New York Mellon Trust Company, N.A. until a successor replaces it in accordance with the appl provisions herein and thereafter means the successor serving hereunder.

"*Unrestricted Definitive Note*" means a Definitive Note that does not bear and is not required to bear the Private Placement Legend.

"*Unrestricted Global Note*" means a Global Note that does not bear and is not required to bear the Private Placement Legend.

"*Unrestricted Subsidiary*" means any Subsidiary of the Company that is designated by the Board of Directors as an Unrestricted Sub pursuant to a resolution of the Board of Directors, but only to the extent that such Subsidiary:

(1) has no Indebtedness other than Non-Recourse Debt;

(2) is not party to any agreement, contract, arrangement or understanding with the Company or any Restricted Subsidia Company unless the terms of any such agreement, contract, arrangement or understanding are no less favorable to the Compa Restricted Subsidiary than those that might be obtained at the time from Persons who are not Affiliates of the Company;

(3) is a Person with respect to which neither the Company nor any of its Restricted Subsidiaries has any direct or indirect (a) to subscribe for additional Equity Interests or (b) to maintain or preserve such Person's financial condition or to cause such achieve any specified levels of operating results; and

(4) does not guarantee or otherwise directly or indirectly provide credit support for any Indebtedness of the Company or an Restricted Subsidiaries.

Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the Trustee by filing with the Tru Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with the pre conditions and was permitted by Section 4.07 hereof. If, at any time, any Unrestricted Subsidiary would fail to meet the preceding require an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes of this Indenture and any Indebtedne Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Company as of such date and any Lien of such Subsidia deemed to be incurred as of such date and, if such Indebtedness is not permitted to be incurred pursuant to Section 4.09 hereof, or such permitted to be incurred as of such date pursuant to Section 4.12 hereof, then in either case, the Company will be in default of such cover

"*U.S. Person*" means a U.S. Person as defined in Rule 902(k) promulgated under the Securities Act.

29

"*Volumetric Production Payment*" means production payment obligations recorded as deferred revenue in accordance with GAAP, to with all related undertakings and obligations.

"*Voting Stock*" of any Person as of any date means the Capital Stock of such Person that is at the time entitled (without regard occurrence of any contingency) to vote in the election of the Board of Directors of such Person.

"*Weighted Average Life to Maturity*" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:

(1) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial mat other required payments of principal, including payment at final maturity, in respect of the Indebtedness, by (b) the number c (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by

(2) the then outstanding principal amount of such Indebtedness.

"*W&T*" means W&T Offshore, Inc., a Texas corporation.

"*W&T Escrow Accounts*" means the escrow accounts established pursuant to the terms of the W&T Purchase and Sale Agreement an to a first priority Lien in favor of W&T in accordance with the terms of the W&T Purchase and Sale Agreement.

"*W&T Properties*" means those certain properties of the Company purchased from W&T pursuant to the W&T Purchase an Agreement.

"*W&T Purchase and Sale Agreement*" means that certain Agreement for Purchase and Sale dated effective August 1, 2009, by and be W&T, as "Seller" and the Company, as "Buyer."

Section 1.02 *Other Definitions*.

| Term | Defined in Section |
|---|---|
| "*Affiliate Transaction*" | 4.11 |

Indenture, dated as of November 23, 2010

| Term | Defined in Section |
|---|---|
| "Asset Sale Offer" | 3.09 |
| "Authentication Order" | 2.02 |
| "Change of Control Offer" | 4.15 |
| "Change of Control Payment" | 4.15 |
| "Change of Control Purchase Date" | 4.15 |
| "Covenant Defeasance" | 8.03 |
| "DTC" | 2.03 |
| "Event of Default" | 6.01 |
| "Excess Cash Flow Offer" | 4.06 |
| "Excess Cash Flow Offer Payment" | 4.06 |
| "Excess Cash Flow Offer Purchase Date" | 4.06 |
| "Excess Proceeds" | 4.10 |
| "Incur" | 4.09 |
| "Legal Defeasance" | 8.02 |
| "Net Worth" | 11.09 |

| Term | Defined in Section |
|---|---|
| "Offer Amount" | 3.09 |
| "Offer Period" | 3.09 |
| "Paying Agent" | 2.03 |
| "Payment Default" | 6.01 |
| "Permitted Debt" | 4.09 |
| "Post-Petition Interest" | 11.09 |
| "Purchase Date" | 3.09 |
| "Registrar" | 2.03 |
| "Restricted Payments" | 4.07 |
| "Restricted Payments Basket" | 4.07 |
| "Subordinated Obligations" | 11.09 |

Section 1.03 *Incorporation by Reference of Trust Indenture Act.*

(a) Whenever this Indenture refers to a provision of the TIA, the provision is incorporated by reference in and made a part of this Inde

(b) The following TIA terms have the following meanings in this Indenture:

(1) "indenture securities" means the Notes and the Guarantees;

(2) "indenture security holder" means a Holder of a Note;

(3) "indenture to be qualified" means this Indenture;

(4) "indenture trustee" or "institutional trustee" means the Trustee; and

(5) "obligor" on the Notes and the Guarantees means the Issuers and the Guarantors, respectively, and any successor obligo Notes and the Guarantees, respectively.

(c) All other terms used herein that are defined by the TIA, defined by TIA reference to another statute or defined by SEC rule under have the meanings so assigned to them.

Section 1.04 *Rules of Construction.*

Unless the context otherwise requires:

(1) a term has the meaning assigned to it;

(2) an accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(3) "or" is not exclusive;

(4) words in the singular include the plural, and in the plural include the singular;

(5) "will" shall be interpreted to express a command;

http://www.sec.gov/Archives/edgar/data/1518908/000119312511139871/dex41.htm[11/7/2012 12:29:58 PM]

Indenture, dated as of November 23, 2010

(6) provisions apply to successive events and transactions; and

(7) references to sections of or rules under the Securities Act or the Exchange Act will be deemed to include substitute, replac successor sections or rules adopted by the SEC from time to time.

ARTICLE 2
THE NOTES

Section 2.01 *Form and Dating*.

(a) *General*. The Notes and the Trustee's certificate of authentication will be substantially in the form of Exhibit A hereto *provided* that the form of the Exchange Notes shall include such variations as are permitted or required by the applicable Registration Rights Agree evidenced by the Issuers' execution of such Exchange Notes). The Notes may be issued in definitive or global forms hereunder. The N have notations, legends or endorsements required by law, stock exchange rule or usage. Each Note will be dated the date of its authenti Notes shall be in denominations of $2,000 and integral multiples of $1,000 in excess thereof. Notwithstanding any provision herein or in th any *pro rata* redemptions or repurchases of the Notes by the Issuers as provided herein shall be made in a manner that preserves the denominations of the Notes.

The terms and provisions contained in the Notes will constitute, and are hereby expressly made, a part of this Indenture and the Is Guarantors and the Trustee, by their execution and delivery of this Indenture, expressly agree to such terms and provisions and to thereby. However, to the extent any provision of any Note conflicts with the express provisions herein, the provisions of this Indenture sha and be controlling.

(b) *Global and Definitive Notes*. Notes issued in global form will be substantially in the form of Exhibit A hereto (including the Global N Legend thereon and the "Schedule of Exchanges of Interests in the Global Note" attached thereto). Notes issued in definitive form substantially in the form of Exhibit A hereto (but without the Global Note Legend thereon and without the "Schedule of Exchanges of Inte the Global Note" attached thereto). Each Global Note will represent such of the outstanding Notes as will be specified therein and e provide that it represents the aggregate principal amount of outstanding Notes from time to time endorsed thereon and that the aggregat amount of outstanding Notes represented thereby may from time to time be reduced or increased, as appropriate, to reflect exch redemptions. Any endorsement of a Global Note to reflect the amount of any increase or decrease in the aggregate principal amount of o Notes represented thereby will be made by the Trustee or the Custodian, at the direction of the Trustee, in accordance with instructions gi Holder thereof as required by Section 2.06 hereof.

(c) *Temporary Global Notes*. Notes offered and sold in reliance on Regulation S will be issued initially in the form of the Regulatic Temporary Global Note, which will be deposited on behalf of the purchasers of the Notes represented thereby with the Trustee, as custod Depositary, and registered in the name of the Depositary or the nominee of the Depositary for the accounts of designated agents holding of Euroclear or Clearstream, duly executed by the Issuers and authenticated by the Trustee as hereinafter provided. The Restricted Per terminated upon the receipt by the Trustee of written notice thereof from the Company.

Following the termination of the Restricted Period, beneficial interests in the Regulation S Temporary Global Note will be exchan beneficial interests in the Regulation S Permanent Global Note pursuant to the Applicable Procedures. Simultaneously with the authent the Regulation S

32

Permanent Global Note, the Trustee will cancel the Regulation S Temporary Global Note. The aggregate principal amount of the Reg Temporary Global Note and the Regulation S Permanent Global Note may from time to time be increased or decreased by adjustment: the records of the Trustee and the Depositary or its nominee, as the case may be, in connection with transfers of interest as hereinafter pr

(d) *Euroclear and Clearstream Procedures Applicable*. The provisions of the "Operating Procedures of the Euroclear System" and "Ter and Conditions Governing Use of Euroclear" and the "General Terms and Conditions of Clearstream Banking" and "Customer Handb Clearstream will be applicable to transfers of beneficial interests in the Regulation S Temporary Global Note and the Regulation S Pe Global Note that are held by Participants through Euroclear or Clearstream.

Section 2.02 *Execution and Authentication*.

(a) At least one Officer of each of the Issuers must sign the Notes for the Issuers by manual or facsimile signature.

(b) If an Officer of either of the Issuers whose signature is on a Note no longer holds that office at the time a Note is authenticated, will nevertheless be valid.

(c) A Note will not be valid until authenticated by the manual signature of the Trustee. The signature will be conclusive evidenc Note has been authenticated under this Indenture.

Indenture, dated as of November 23, 2010

(d) The Trustee shall authenticate and deliver: (i) on the date hereof, an aggregate principal amount of $150.0 million of Notes, Additional Notes in accordance with Section 4.09 hereof and (iii) Exchange Notes for issue only in an Exchange Offer pursuant to a Reg Rights Agreement, for a like principal amount of Notes, in each case upon receipt of a written order of the Issuers signed by two Officers Issuer (an *Authentication Order*). Such Authentication Order shall specify the amount of the Notes to be authenticated and the date on wh original issue of the Notes is to be authenticated. The aggregate principal amount of Notes outstanding at any time may not exceed the principal amount of Notes authorized for issuance by the Issuers pursuant to one or more Authentication Orders, except as provided in Se hereof.

(e) The Trustee may appoint an authenticating agent acceptable to the Issuers to authenticate Notes. An authenticating agent may a Notes whenever the Trustee may do so. Each reference made herein to authentication by the Trustee includes authentication by such authenticating agent has the same rights as an Agent to deal with Holders or an Affiliate of the Issuers.

Section 2.03 *Registrar and Paying Agent*.

(a) The Issuers will maintain an office or agency in the Borough of Manhattan, the City of New York, where Notes (i) may be presen registration of transfer or for exchange (*Registrar*) and (ii) may be surrendered or presented for payment (*Paying Agent*). The Registrar wil keep a register of the Notes and of their transfer and exchange. The Issuers may appoint one or more co-registrars and one or more paying agents. The term "Registrar" includes any co-registrar and the term "Paying Agent" includes any additional paying agent. The Issu change any Paying Agent or Registrar without notice to any Holder. The Issuers will notify the Trustee in writing of the name and addres Agent not a party hereof. If the Issuers fail to appoint or maintain another entity as Registrar or Paying Agent, the Trustee shall act as s Company or any of its domestic Subsidiaries may act as Paying Agent or Registrar.

(b) The Issuers initially appoint The Depository Trust Company ("*DTC*") to act as Depositary with respect to the Global Notes.

(c) The Issuers initially appoint the Trustee to act as the Registrar and Paying Agent and to act as Custodian with respect to the Glob

Section 2.04 *Paying Agent to Hold Money in Trust*.

The Issuers will require each Paying Agent other than the Trustee to agree in writing that the Paying Agent will hold in trust for the of Holders or the Trustee all money held by the Paying Agent for the payment of principal, premium or Additional Interest, if any, or interes Notes, and will notify the Trustee of any default by the Issuers in making any such payment. While any such default continues, the Tru require a Paying Agent to pay all money held by it to the Trustee. The Issuers at any time may require a Paying Agent to pay all money to the Trustee. Upon payment over to the Trustee, the Paying Agent (if other than one of the Issuers) will have no further liability for the m the Company or a Subsidiary acts as Paying Agent, it will segregate and hold in a separate trust fund for the benefit of the Holders all mo by it as Paying Agent. Upon any bankruptcy or reorganization proceedings relating to the Company, the Trustee will serve as Paying Age Notes.

Section 2.05 *Holder Lists*.

The Trustee will preserve in as current a form as is reasonably practicable the most recent list available to it of the names and addre Holders and shall otherwise comply with TIA § 312(a). If the Trustee is not the Registrar, the Issuers will furnish to the Trustee at l Business Days before each regular record date and at such other times as the Trustee may request in writing, a list in such form and as as the Trustee may reasonably require of the names and addresses of the Holders of Notes and the Issuers shall otherwise con § 312(a).

Section 2.06 *Transfer and Exchange*.

(a) *Transfer and Exchange of Global Notes*. A Global Note may not be transferred except as a whole by the Depositary to a nominee Depositary, by a nominee of the Depositary to the Depositary or to another nominee of the Depositary, or by the Depositary or any such n a successor Depositary or a nominee of such successor Depositary. All Global Notes will be exchanged by the Issuers for Definitive Notes

(1) the Issuers deliver to the Trustee notice from the Depositary that it is unwilling or unable to continue to act as Depositary o is no longer a clearing agency registered under the Exchange Act and, in either case, a successor Depositary is not appointed by the within 120 days after the date of such notice from the Depositary;

(2) the Issuers in their sole discretion (but subject to DTC's rules) determine that the Global Notes (in whole but not in part) sh exchanged for Definitive Notes and deliver a written notice to such effect to the Trustee; *provided, that* in no event shall the Regulation S Temporary Global Note be exchanged by the Issuers for Definitive Notes prior to (A) the expiration of the Restricted Period and receipt by the Registrar of any certificates required pursuant to Rule 903(b)(3)(ii)(B) under the Securities Act; or

(3) upon the request of the Depositary after there has occurred and is continuing a Default or Event of Default with respect to the

Indenture, dated as of November 23, 2010

34

Upon the occurrence of any of the preceding events, Definitive Notes shall be issued in such names as the Depositary shall in
Trustee. Global Notes also may be exchanged or replaced, in whole or in part, as provided in Sections 2.07 and 2.10 hereof. Ev
authenticated and delivered in exchange for, or in lieu of, a Global Note or any portion thereof, pursuant to this Section 2.06 or Section
2.10 hereof, shall be authenticated and delivered in the form of, and shall be, a Global Note. A Global Note may not be exchanged
Note other than as provided in this Section 2.06(a), however, beneficial interests in a Global Note may be transferred and exchanged as
in Section 2.06(b), (c) or (f) hereof.

(b) *Transfer and Exchange of Beneficial Interests in the Global Notes*. The transfer and exchange of beneficial interests in the Global Not
will be effected through the Depositary, in accordance with the provisions herein and the Applicable Procedures. Beneficial interest
Restricted Global Notes will be subject to restrictions on transfer set forth herein to those set forth herein to the extent required by the Secu
Transfers of beneficial interests in the Global Notes also will require compliance with either subparagraph (1) or (2) below, as applicable
as one or more of the other following subparagraphs, as applicable:

(1) *Transfer of Beneficial Interests in the Same Global Note*. Beneficial interests in any Restricted Global Note may be transferred
Persons who take delivery thereof in the form of a beneficial interest in the same Restricted Global Note in accordance with the
restrictions set forth in the Private Placement Legend; *provided, however*, that prior to the expiration of the Restricted Period, transfers
beneficial interests in the Regulation S Temporary Global Note may not be made to a U.S. Person or for the account or benefi
Person. Beneficial interests in any Unrestricted Global Note may be transferred to Persons who take delivery thereof in the fo
beneficial interest in an Unrestricted Global Note. No written orders or instructions shall be required to be delivered to the Registrar
the transfers described in this Section 2.06(b)(1) hereof.

(2) *All Other Transfers and Exchanges of Beneficial Interests in Global Notes*. In connection with all transfers and exchanges o
beneficial interests that are not subject to Section 2.06(b)(1) above, the transferor of such beneficial interest must deliver to the
either:

(A) both:

(i) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Appli
Procedures directing the Depositary to credit or cause to be credited a beneficial interest in another Global Note in an
equal to the beneficial interest to be transferred or exchanged; and

(ii) instructions given in accordance with the Applicable Procedures containing information regarding the Partic
account to be credited with such increase; or

(B) both:

(i) a written order from a Participant or an Indirect Participant given to the Depositary in accordance with the Appli
Procedures directing the Depositary to cause to be issued a Definitive Note in an amount equal to the beneficial intere
transferred or exchanged; and

35

(ii) instructions given by the Depositary to the Registrar containing information regarding the Person in whose nam
Definitive Note shall be registered to effect the transfer or exchange referred to in subparagraph (1) above;

*provided* that in no event shall Definitive Notes be issued upon the transfer or exchange of beneficial interests in the Regul
Temporary Global Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Registrar of any certi
required pursuant to Rule 903 under the Securities Act.

Upon consummation of an Exchange Offer by the Issuers in accordance with Section 2.06(f) hereof, the requirements of this Section 2
shall be deemed to have been satisfied upon receipt by the Registrar of the instructions contained in the Letter of Transmittal deliver
Holder of such beneficial interests in the Restricted Global Notes. Upon satisfaction of all of the requirements for transfer or exchange of b
interests in Global Notes contained herein and the Notes or otherwise applicable under the Securities Act, the Trustee shall adjust the
amount of the relevant Global Note(s) pursuant to Section 2.06(h) hereof.

(3) *Transfer of Beneficial Interests to Another Restricted Global Note*. A beneficial interest in any Restricted Global Note may be
transferred to a Person who takes delivery thereof in the form of a beneficial interest in another Restricted Global Note if th
complies with the requirements of Section 2.06(b)(2) above and the Registrar receives the following:

(A) if the transferee will take delivery in the form of a beneficial interest in the 144A Global Note, then the transferor
deliver a certificate in the form of Exhibit B hereto, including the certifications in item (1) thereof;

(B) if the transferee will take delivery in the form of a beneficial interest in the Regulation S Temporary Global Note o
Regulation S Permanent Global Note, then the transferor must deliver a certificate in the form of Exhibit B hereto, includi
certifications in item (2) thereof; and

Indenture, dated as of November 23, 2010

(C) if the transferee will take delivery in the form of a beneficial interest in the IAI Global Note, then the transferor must de a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by (3) thereof, if applicable.

(4) *Transfer and Exchange of Beneficial Interests in a Restricted Global Note for Beneficial Interests in an Unrestricted Globa* A beneficial interest in any Restricted Global Note may be exchanged by any Holder thereof for a beneficial interest in an Unre Global Note or transferred to a Person who takes delivery thereof in the form of a beneficial interest in an Unrestricted Global No exchange or transfer complies with the requirements of Section 2.06(b)(2) above and:

(A) such exchange or transfer is effected pursuant to an Exchange Offer in accordance with the applicable Registratio Agreement and Section 2.06(f) hereof, the Holder of the beneficial interest to be transferred, in the case of an exchang transferee, in the case of a transfer, certifies in the applicable Letter of Transmittal that it is not (i) a Participating Broker-Deale Person participating in the distribution of the Exchange Notes or (iii) a Person who is an affiliate (as defined in Rule 144) of the I

36

(B) such transfer is effected pursuant to a Shelf Registration Statement in accordance with the applicable Registration Agreement;

(C) such transfer is effected by a Participating Broker-Dealer pursuant to an Exchange Offer Registration Staten accordance with the applicable Registration Rights Agreement; or

(D) the Registrar receives the following:

(i) if the Holder of such beneficial interest in a Restricted Global Note proposes to exchange such beneficial intere beneficial interest in an Unrestricted Global Note, a certificate from such Holder in the form of Exhibit C hereto, includin certifications in item (1)(a) thereof; or

(ii) if the Holder of such beneficial interest in a Restricted Global Note proposes to transfer such beneficial intere Person who shall take delivery thereof in the form of a beneficial interest in an Unrestricted Global Note, a certificate from Holder in the form of Exhibit B hereto, including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests or if the Applicable Procedures so re Opinion of Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance Securities Act and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required to maintain compliance with the Securities Act.

If any such transfer is effected pursuant to subparagraph (B) or (D) above at a time when an Unrestricted Global Note has no issued, the Issuers shall issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee shall a one or more Unrestricted Global Notes in an aggregate principal amount equal to the aggregate principal amount of beneficial interests t pursuant to subparagraph (B) or (D) above.

Beneficial interests in an Unrestricted Global Note cannot be exchanged for, or transferred to Persons who take delivery thereof in of, a beneficial interest in a Restricted Global Note.

(c) *Transfer or Exchange of Beneficial Interests for Definitive Notes.*

Beneficial interests in a Global Note shall not be exchangeable for Definitive Notes except in accordance with Section 2.06(a) unless otherwise agreed by the Issuers.

(d) *Transfer and Exchange of Definitive Notes for Beneficial Interests.*

(1) *Restricted Definitive Notes to Beneficial Interests in Restricted Global Notes.* If any Holder of a Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Restricted Global Note or to transfer such Restricted Definitive Notes to a Per takes delivery thereof in the form of a beneficial interest in a Restricted Global Note, then, upon receipt by the Registrar of the documentation:

37

(A) if the Holder of such Restricted Definitive Note proposes to exchange such Note for a beneficial interest in a Res Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (2)(b) thereof;

(B) if such Restricted Definitive Note is being transferred to a QIB in accordance with Rule 144A, a certificate to the effe forth in Exhibit B hereto, including the certifications in item (1) thereof;

(C) if such Restricted Definitive Note is being transferred to a Non-U.S. Person in an offshore transaction in accordance Rule 903 or Rule 904, a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (2) thereof;

Indenture, dated as of November 23, 2010

(D) if such Restricted Definitive Note is being transferred pursuant to an exemption from the registration requiremen Securities Act in accordance with Rule 144, a certificate to the effect set forth in Exhibit B hereto, including the certifications in (3)(a) thereof;

(E) if such Restricted Definitive Note is being transferred to an Institutional Accredited Investor in reliance on an exemption the registration requirements of the Securities Act other than those listed in subparagraphs (B) through (D) above, a certifica effect set forth in Exhibit B hereto, including the certifications, certificates and Opinion of Counsel required by item (3) there applicable;

(F) if such Restricted Definitive Note is being transferred to the Company or any of its Subsidiaries, a certificate to the eff forth in Exhibit B hereto, including the certifications in item (3)(b) thereof; or

(G) if such Restricted Definitive Note is being transferred pursuant to an effective registration statement under the Securiti a certificate to the effect set forth in Exhibit B hereto, including the certifications in item (3)(c) thereof,

the Trustee will cancel the Restricted Definitive Note, increase or cause to be increased the aggregate principal amount of, in th clause (A) above, the appropriate Restricted Global Note, in the case of clause (B) above, the 144A Global Note, in the case (C) above, the Regulation S Global Note, and in all other cases, the IAI Global Note.

(2) *Restricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes.* A Holder of a Restricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Restricted Definitive Note to a Person w delivery thereof in the form of a beneficial interest in an Unrestricted Global Note only if:

(A) such exchange or transfer is effected pursuant to an Exchange Offer in accordance with the applicable Registration Agreement and Section 2.06(f) hereof and the Holder, in the case of an exchange, or the transferee, in the case of a transfer, the applicable Letter of Transmittal that it is not (i) a Participating Broker-Dealer, (ii) a Person participating in the distribution Exchange Notes or (iii) a Person who is an affiliate (as defined in Rule 144) of the Company;

(B) such transfer is effected pursuant to a Shelf Registration Statement in accordance with the applicable Registration Agreement;

38

(C) such transfer is effected by a Participating Broker-Dealer pursuant to an Exchange Offer Registration Stater accordance with the applicable Registration Rights Agreement; or

(D) the Registrar receives the following:

(i) if the Holder of such Definitive Notes proposes to exchange such Notes for a beneficial interest in the Unres Global Note, a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(c) there

(ii) if the Holder of such Definitive Notes proposes to transfer such Notes to a Person who shall take delivery ther the form of a beneficial interest in the Unrestricted Global Note, a certificate from such Holder in the form of Exhibit B he including the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests or if the Applicable Procedures so require, an Counsel in form reasonably acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Secu and that the restrictions on transfer contained herein and in the Private Placement Legend are no longer required in order to compliance with the Securities Act.

Upon satisfaction of the conditions of any of the subparagraphs in this Section 2.06(d)(2), the Trustee will cancel the Definitive and increase or cause to be increased the aggregate principal amount of the Unrestricted Global Note.

(3) *Unrestricted Definitive Notes to Beneficial Interests in Unrestricted Global Notes.* A Holder of an Unrestricted Definitive Note may exchange such Note for a beneficial interest in an Unrestricted Global Note or transfer such Definitive Notes to a Person who takes thereof in the form of a beneficial interest in an Unrestricted Global Note at any time. Upon receipt of a request for such an exch transfer, the Trustee will cancel the applicable Unrestricted Definitive Note and increase or cause to be increased the aggregate amount of one of the Unrestricted Global Notes.

If any such exchange or transfer from a Definitive Note to a beneficial interest is effected pursuant to subparagraphs (2)(B), ( (3) above at a time when an Unrestricted Global Note has not yet been issued, the Company will issue and, upon receipt of an Auth Order in accordance with Section 2.02 hereof, the Trustee will authenticate one or more Unrestricted Global Notes in an aggregate amount equal to the principal amount of Definitive Notes so transferred.

(e) *Transfer and Exchange of Definitive Notes for Definitive Notes.* Upon request by a Holder of Definitive Notes and such Holder' compliance with the provisions of this Section 2.06(e), the Registrar will register the transfer or exchange of Definitive Notes. Pri registration of transfer or exchange, the requesting Holder must present or surrender to the Registrar the Definitive Notes duly end accompanied by a written instruction of transfer in form satisfactory to the Registrar duly executed by such Holder or by its attorne authorized in writing. In addition, the requesting Holder must provide any additional certifications, documents and information, as app

Indenture, dated as of November 23, 2010

required pursuant to the following provisions of this Section 2.06(e).

39

(1) *Restricted Definitive Notes to Restricted Definitive Notes.* Any Restricted Definitive Note may be transferred to and registered the name of Persons who take delivery thereof in the form of a Restricted Definitive Note if the Registrar receives the following:

(A) if the transfer will be made pursuant to Rule 144A, then the transferor must deliver a certificate in the form of Exh hereto, including the certifications in item (1) thereof;

(B) if the transfer will be made pursuant to Rule 903 or Rule 904, then the transferor must deliver a certificate in the f Exhibit B hereto, including the certifications in item (2) thereof; and

(C) if the transfer will be made pursuant to any other exemption from the registration requirements of the Securities Act, t transferor must deliver a certificate in the form of Exhibit B hereto, including the certifications, certificates and Opinion of Co required by item (3) thereof, if applicable.

(2) *Restricted Definitive Notes to Unrestricted Definitive Notes.* Any Restricted Definitive Note may be exchanged by the Holde thereof for an Unrestricted Definitive Note or transferred to a Person or Persons who take delivery thereof in the form of an Unre Definitive Note if:

(A) such exchange or transfer is effected pursuant to an Exchange Offer in accordance with the applicable Registratio Agreement and the Holder, in the case of an exchange, or the transferee, in the case of a transfer, certifies in the applicable Transmittal that it is not (i) a Participating Broker-Dealer, (ii) a Person participating in the distribution of the Exchange Notes or Person who is an affiliate (as defined in Rule 144) of the Company;

(B) any such transfer is effected pursuant to a Shelf Registration Statement in accordance with the applicable Registratio Agreement;

(C) any such transfer is effected by a Participating Broker-Dealer pursuant to an Exchange Offer Registration State accordance with the applicable Registration Rights Agreement; or

(D) the Registrar receives the following:

(i) if the Holder of such Restricted Definitive Notes proposes to exchange such Notes for an Unrestricted Definitive a certificate from such Holder in the form of Exhibit C hereto, including the certifications in item (1)(d) thereof; or

(ii) if the Holder of such Restricted Definitive Notes proposes to transfer such Notes to a Person who shall take d thereof in the form of an Unrestricted Definitive Note, a certificate from such Holder in the form of Exhibit B hereto, inclu the certifications in item (4) thereof;

and, in each such case set forth in this subparagraph (D), if the Registrar so requests, an Opinion of Counsel in form re acceptable to the Registrar to the effect that such exchange or transfer is in compliance with the Securities Act and that the re on transfer contained herein and in the Private Placement Legend are no longer required in order to maintain compliance Securities Act.

40

(3) *Unrestricted Definitive Notes to Unrestricted Definitive Notes.* A Holder of Unrestricted Definitive Notes may transfer such Note to a Person who takes delivery thereof in the form of an Unrestricted Definitive Note. Upon receipt of a request to register such a trans Registrar shall register the Unrestricted Definitive Notes pursuant to the instructions from the Holder thereof.

(f) *Exchange Offer.* Upon the occurrence of an Exchange Offer in accordance with the applicable Registration Rights Agreement, the will issue and, upon receipt of an Authentication Order in accordance with Section 2.02 hereof, the Trustee will authenticate:

(1) one or more Unrestricted Global Notes in an aggregate principal amount equal to the principal amount of the beneficial inte the Restricted Global Notes accepted for exchange in the Exchange Offer by Persons that certify in the applicable Letters of Transr (A) they are not Participating Broker-Dealers, (B) they are not participating in a distribution of the Exchange Notes and (C) they affiliates (as defined in Rule 144) of the Company; and

(2) Unrestricted Definitive Notes in an aggregate principal amount equal to the principal amount of the Restricted Definitive accepted for exchange in the Exchange Offer by Persons that certify in the applicable Letters of Transmittal that (A) th Participating Broker-Dealers, (B) they are not participating in a distribution of the Exchange Notes and (C) they are not affiliates (as in Rule 144) of the Company.

Concurrently with the issuance of such Notes, the Trustee will cause the aggregate principal amount of the applicable Restricted Glol to be reduced accordingly, and the Issuers will execute and the Trustee will authenticate and deliver to the Persons designated by the Definitive Notes so accepted Unrestricted Definitive Notes in the designated principal amount.

Indenture, dated as of November 23, 2010

(g) *Legends.*The following legends will appear on the face of all Global Notes and Definitive Notes issued hereunder unless spec stated otherwise in the applicable provisions hereof.

(1) *Private Placement Legend*

(A) Except as permitted by subparagraph (B) below, each Global Note and each Definitive Note (and all Notes iss exchange therefor or substitution thereof) shall bear the legend in substantially the following form:

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE *SECURITIES ACT*), OR ANY STATE OR OTHER SECURITIES LAWS. NEITHER THIS SECURITY NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE REOFFERED, SOLD, ASSIGNED, TRANSFERRED, PLEDGED, ENCUMBERED OR OTHERWISE DISPOSED OF IN TH ABSENCE OF SUCH REGISTRATION OR UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, REGISTRATIO

THE HOLDER OF THIS SECURITY, BY ITS ACCEPTANCE HEREOF, (1) REPRESENTS THAT (A) IT IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), (B) IT IS A NON-U.S. PERSON AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION WITHIN THE MEANING OF REGULATION S UNDER THE

41

SECURITIES ACT, OR (C) IT IS AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (A)(1), (2), (3) OR (7) OF RULE 501 UNDER THE SECURITIES ACT AND (2) AGREES TO OFFER, SELL OR OTHERWISE TRANSF SUCH SECURITY, PRIOR TO THE DATE (THE *RESALE RESTRICTION TERMINATION DATE*) WHICH IS ONE YEAR AFTER THE LATER OF THE ORIGINAL ISSUE DATE HEREOF AND THE LAST DATE ON WHICH AN ISSUER OR ANY AFFILIATE OF AN ISSUER WAS THE OWNER OF THIS SECURITY (OR ANY PREDECESSOR OF SUCH SECURITY) ONLY (A) TO AN ISSUER OR AN SUBSIDIARY THEREOF, (B) FOR SO LONG AS THE SECURITIES ARE ELIGIBLE FOR RESALE PURSUANT TO RULE 144A, TO PERSON IT REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT, THAT PURCHASES FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER TO WHICH NOTICE IS GIVEN THAT THE TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, (C) PURSUANT TO OFFERS AND SALES TO NON-U.S. PERSONS THAT OCCUR OUTSIDE THE UNITED STATES WITHIN THE MEANING O REGULATION S UNDER THE SECURITIES ACT, (D) TO AN INSTITUTIONAL "ACCREDITED INVESTOR" WITHIN THE MEANING OF SUBPARAGRAPH (A)(1),(2), (3) OR (7) OF RULE 501 UNDER THE SECURITIES ACT THAT IS ACQUIRING THE SECURITY FO ITS OWN ACCOUNT, OR FOR THE ACCOUNT OF SUCH AN INSTITUTIONAL ACCREDITED INVESTOR, FOR INVESTMENT PURPOSES AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, ANY DISTRIBUTION IN VIOLATION OF THE SECURITIES ACT, (E) PURSUANT TO A REGISTRATION STATEMENT WHICH HAS BEEN DECLARED EFFECTIVE UNDEI THE SECURITIES ACT, OR (F) PURSUANT TO ANOTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUBJECT TO THE ISSUERS' AND THE TRUSTEE'S, OR REGISTRAR'S, AS APPLICABLE, RIGHT PRIO TO ANY SUCH OFFER, SALE OR TRANSFER PURSUANT TO CLAUSE (C), (D) OR (F) TO REQUIRE THE DELIVERY OF A OPINION OF COUNSEL, CERTIFICATION AND/OR OTHER INFORMATION SATISFACTORY TO EACH OF THEM, AND IN EACH OF THE FOREGOING CASES, A CERTIFICATE OF TRANSFER IN THE FORM APPEARING ON THE OTHER SIDE OF THIS SECURITY COMPLETED AND DELIVERED BY THE TRANSFEROR TO THE TRUSTEE OR REGISTRAR. THIS LEGEND WILL BE REMOVEI UPON THE REQUEST OF THE HOLDER AFTER THE RESALE RESTRICTION TERMINATION DATE."

(B) Notwithstanding the foregoing, any Global Note or Definitive Note issued pursuant to subparagraphs (b)(4), (c)(3), (d)(2), (d)(3), (e)(2), (e)(3) or (f) of this Section 2.06 (and all Notes issued in exchange therefor or substitution thereof) will not b Private Placement Legend.

(2) *Global Note Legend.*Each Global Note will bear a legend in substantially the following form:

"THIS GLOBAL NOTE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE INDENTURE GOVERNING THIS NOTE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THE TRUSTEE MAY MAKE SUCH NOTATIONS HEREON AS MAY BE REQUIRED PURSUANT TO SECTION 2.06 OF THE INDENTURE, (2) THIS GLOBAL NOTE MAY BE EXCHANGED IN WHOLE B NOT IN PART PURSUANT TO SECTION 2.06(a) OF THE INDENTURE, (3) THIS GLOBAL NOTE MAY BE DELIVERED TO THE TRUSTEE FOR CANCELLATION PURSUANT TO SECTION 2.11 OF THE INDENTURE AND (4) THIS GLOBAL NOTE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY WITH THE PRIOR WRITTEN CONSENT OF THE COMPANY.

42

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR NOTES IN DEFINITIVE FORM, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THI DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCI NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY (55 WATER STREET, NEW YORI

Indenture, dated as of November 23, 2010

NEW YORK) ("*DTC*"), TO THE COMPANY OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AN
ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED B'
AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY
BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FC
VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE
CO., HAS AN INTEREST HEREIN."

(3) *Regulation S Temporary Global Note Legend.* The Regulation S Temporary Global Note will bear a legend in substantially t
following form:

"THE RIGHTS ATTACHING TO THIS REGULATION S TEMPORARY GLOBAL NOTE, AND THE CONDITIONS AND PROCEDURES
GOVERNING ITS EXCHANGE FOR A REGULATION S PERMANENT GLOBAL NOTE OR CERTIFICATED NOTES, ARE AS
SPECIFIED IN THE INDENTURE (AS DEFINED HEREIN)."

(4) *Additional Legends.* Definitive Notes issued to Affiliates of the Company may bear additional legends to reflect further restric
on transfer.

(h) *Cancellation and/or Adjustment of Global Notes.* At such time as all beneficial interests in a particular Global Note have been exchan
for Definitive Notes or a particular Global Note has been redeemed, repurchased or canceled in whole and not in part, each such Global
be returned to or retained and canceled by the Trustee in accordance with Section 2.11 hereof. At any time prior to such cancellati
beneficial interest in a Global Note is exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial int
another Global Note or for Definitive Notes, the principal amount of Notes represented by such Global Note will be reduced accordingly
endorsement will be made on such Global Note by the Trustee or by the Depositary at the direction of the Trustee to reflect such reducti
the beneficial interest is being exchanged for or transferred to a Person who will take delivery thereof in the form of a beneficial interest in
Global Note, such other Global Note will be increased accordingly and an endorsement will be made on such Global Note by the Trustee
Depositary at the direction of the Trustee to reflect such increase.

(i) *General Provisions Relating to Transfers and Exchanges.*

(1) To permit registrations of transfers and exchanges, the Issuers will execute and the Trustee will authenticate Global N
Definitive Notes upon receipt of an Authentication Order in accordance with Section 2.02 hereof or at the Registrar's request.

(2) No service charge will be made to a Holder of a beneficial interest in a Global Note or to a Holder of a Definitive No
any registration of transfer or exchange, but the Issuers may require payment of a sum sufficient to cover any transfer ta
governmental charge payable in connection therewith (other than any such transfer taxes or similar governmental charge paya
exchange or transfer pursuant to Sections 2.10, 3.06, 3.09, 4.10, 4.15 and 9.05 hereof).

43

(3) All Global Notes and Definitive Notes issued upon any registration of transfer or exchange of Global Notes or Definitive Note
be the valid obligations of the Issuers, evidencing the same debt, and entitled to the same benefits hereunder, as the Globa
Definitive Notes surrendered upon such registration of transfer or exchange.

(4) Neither the Registrar nor the Issuers will be required:

(A) to issue, to register the transfer of or to exchange any Notes during a period beginning at the opening of busine
before the day of mailing a notice of redemption pursuant to Section 3.03 hereof;

(B) to register the transfer of or to exchange any Note selected for redemption in whole or in part, except the unredeemed
of any Note being redeemed in part; or

(C) to register the transfer of or to exchange a Note between a record date and the next succeeding interest payment date

(5) Prior to due presentment for the registration of a transfer of any Note, the Trustee, any Agent and the Issuers may deem an
Person in whose name any Note is registered as the absolute owner of such Note for the purpose of receiving payment of princip
interest on such Notes and for all other purposes, and none of the Trustee, any Agent or the Issuers shall be affected by notice to th
As long as DTC (or its nominee) is the registered holder of any Notes, DTC shall be deemed the Holder of such Notes for all such pu

(6) The Trustee will authenticate Global Notes and Definitive Notes in accordance with the provisions of Section 2.02 hereof.

(7) All certifications, certificates and Opinions of Counsel required to be submitted to the Registrar pursuant to this Section
effect a registration of transfer or exchange may be submitted by facsimile.

(j) The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer in
herein or under applicable law with respect to any transfer of any interest in any Note (including any transfers between or among Partic
beneficial owners of interests in any Global Note) other than to require delivery of such certificates and other documentation or evide
expressly required by, and to do so if and when expressly required by the terms hereof, and to examine the same to determine
compliance as to form with the express requirements hereof.

Indenture, dated as of November 23, 2010

Section 2.07 *Replacement Notes.*

(a) If any mutilated Note is surrendered to the Trustee or the Issuers and the Trustee receives evidence of the destruction, loss or tl Note, the Issuers will issue and the Trustee, upon receipt of an Authentication Order, will authenticate a replacement Note if the Issuers Trustee's requirements are met. If required by the Trustee or the Issuers, an indemnity bond must be supplied by the Holder that is suffici judgment of the Trustee and the Issuers to protect the Issuers, the Trustee, any Agent and any authenticating agent from any loss that a may suffer if a Note is replaced. The Issuers may charge for its expenses in replacing a Note.

<center>44</center>

(b) Every replacement Note is an additional obligation of the Issuers and will be entitled to all of the benefits hereof equa proportionately with all other Notes duly issued hereunder.

Section 2.08 *Outstanding Notes.*

(a) The Notes outstanding at any time are all the Notes authenticated by the Trustee except for those canceled by it, those delivere cancellation, those reductions in the interest in a Global Note effected by the Trustee in accordance with the provisions hereof, and those in this Section 2.08 as not outstanding. Except as set forth in Section 2.09 hereof, a Note does not cease to be outstanding because the an Affiliate of the Company holds the Note.

(b) If a Note is replaced pursuant to Section 2.07 hereof, it ceases to be outstanding unless the Trustee receives proof satisfactory to replaced Note is held by a bona fide purchaser; however, Notes held by the Issuers or a Subsidiary of the Company shall not be dee outstanding for purposes of Section 3.07(b) hereof.

(c) If the principal amount of any Note is considered paid pursuant to Section 4.01 hereof, it ceases to be outstanding and interest or to accrue.

(d) If the Paying Agent (other than the Company, a Subsidiary or an Affiliate of any thereof) holds, by 10:00 a.m., Eastern Tim redemption date or other maturity date, money sufficient to pay Notes payable on that date, then on and after that date such Notes will b to be no longer outstanding and will cease to accrue interest.

Section 2.09 *Treasury Notes.*

In determining whether the Holders of the required principal amount of Notes have concurred in any direction, waiver or consen Section 9.02 hereof or otherwise, Notes owned by the Permitted Holders, the Issuers or any Guarantor, or by any Person directly or controlling or controlled by or under direct or indirect common control with the Permitted Holders, the Issuers or any Guarantor, will be con as though not outstanding, except that for the purposes of determining whether the Trustee will be protected in relying on any such waiver or consent, only Notes that a Responsible Officer of the Trustee knows are so owned will be so disregarded.

Section 2.10 *Temporary Notes.*

(a) Until certificates representing Notes are ready for delivery, the Issuers may prepare and execute and the Trustee, upon rec Authentication Order, will authenticate temporary Notes. Temporary Notes will be substantially in the form of certificated Notes but ma variations that the Issuers consider appropriate for temporary Notes and as may be reasonably acceptable to the Trustee. Without un delay, the Issuers will prepare and the Trustee will authenticate definitive Notes in exchange for temporary Notes.

(b) The Issuers shall cause definitive Notes to be prepared and authenticated without unreasonable delay. After the preparat definitive Notes, the temporary Notes shall be exchanged for definitive Notes upon surrender of the temporary Notes at the office or ager Issuers, without charge to the Holder. Upon surrender for cancellation of one or more temporary Notes, the Issuers shall execute and t shall authenticate and deliver in exchange therefore a like principal amount of definitive Notes of authorized denominations. Until so exc Holders of temporary Notes will be entitled to all of the benefits of this Indenture.

<center>45</center>

Section 2.11 *Cancellation.*

The Issuers at any time may deliver Notes to the Trustee for cancellation. The Registrar and Paying Agent will forward to the Tru Notes surrendered to them for registration of transfer, exchange or payment. The Trustee and no one else will cancel all Notes surren registration of transfer, exchange, payment, replacement or cancellation and will dispose of canceled Notes (subject to the record requirement of the Exchange Act and the Trustee). Certification of the cancellation of all canceled Notes will be delivered to the Issue written request. The Issuers may not issue new Notes to replace Notes that have been paid or that have been delivered to the T cancellation. To the extent that any Notes are held in the form of Global Notes and less than all of such Global Notes are to be canc reduction of the principal amount of any such Global Note and the Registrar's notation of such cancellation on its books and records

Indenture, dated as of November 23, 2010

deemed to satisfy any cancellation requirement; *provided,* that certification of such cancellation shall be delivered to the Issuers upon w request.

Section 2.12 *Defaulted Interest.*

If the Issuers default in a payment of interest on the Notes, they will pay the defaulted interest in any lawful manner plus, to the exten interest payable on the defaulted interest, to the Persons who are Holders on a subsequent special record date, in each case at the rate the Notes and in Section 4.01 hereof. The Issuers will notify the Trustee in writing of the amount of defaulted interest proposed to be paic Note and the date of the proposed payment. The Issuers will fix or cause to be fixed each such special record date and payment date, but no such special record date may be less than 10 days prior to the related payment date for such defaulted interest. At least 15 days special record date, the Issuers (or, upon the written request of the Issuers, the Trustee in the name and at the expense of the Issuers) cause to be mailed to Holders a notice that states the special record date, the related payment date and the amount of such interest to be

Section 2.13 *CUSIP Numbers.*

The Issuers in issuing the Notes may use CUSIP, ISIN or other such numbers (if then generally in use), and, if so, the Trustee CUSIP, ISIN or other such numbers in notices of redemption as a convenience to Holders; *provided* that any such notice may state that no representation is made as to the correctness of such numbers either as printed on the Notes or as contained in any notice of a redempt reliance may be placed only on the other identification numbers printed on the Notes, and any such redemption shall not be affected by a in or omission of such numbers. The Issuers shall promptly notify the Trustee in writing of any change in the CUSIP, ISIN or other number

ARTICLE 3
REDEMPTION AND PREPAYMENT

Section 3.01 *Notices to Trustee.*

If the Issuers elect to redeem Notes pursuant to the optional redemption provisions of Section 3.07 hereof, they must furnish to the T least ten days (unless a shorter period is agreeable to the Trustee) before the giving of a notice of such redemption pursuant to Section 3 an Officers' Certificate setting forth the information required to be included in such notice by clauses (1)-(4) and (8) of Section 3.03(b) principal amount of Notes to be redeemed and stating that all conditions precedent to the giving of such notice have been satisfied.

46

Section 3.02 *Selection of Notes to Be Redeemed or Purchased.*

(a) If less than all of the Notes are to be redeemed at any time, the Issuers will select Notes for redemption as follows:

(1) if the relevant Notes are listed on any national securities exchange, in compliance with the requirements of the principal securities exchange on which the Notes are listed; or

(2) if the relevant Notes are not listed on any national securities exchange, on a *pro rata* basis and in any event in accordance with Applicable Procedures of the Depository to the extent the Notes are Global Notes.

(b) No Notes of $2,000 or less can be redeemed in part.

(c) If any Note is to be redeemed in part only, the notice of redemption that relates to that Note will state the portion of the principal of that Note that is to be redeemed. A new Note in principal amount equal to the unredeemed portion of the original Note will be issue name of the Holder of Notes upon cancellation of the original Note. Notes called for redemption become due on the date fixed for redemp and after the redemption date, interest ceases to accrue on Notes or portions of them called for redemption.

Section 3.03 *Notice of Redemption.*

(a) Subject to the provisions of Section 3.09 hereof, at least 30 days but not more than 60 days before a redemption date, the Issuer or cause to be mailed, by first class mail, a notice of redemption to each Holder whose Notes are to be redeemed at its registered addr that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasa Notes or a satisfaction and discharge of this Indenture pursuant to Article 8 or 12 hereof.

(b) The notice will identify the Notes to be redeemed and will state:

(1) the CUSIP number;

(2) the redemption date;

(3) the redemption price;

(4) if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the re date upon surrender of such Note, a new Note or Notes in principal amount equal to the unredeemed portion will be issued upon ca

Indenture, dated as of November 23, 2010

of the original Note;

    (5) the name and address of the Paying Agent;

    (6) that Notes called for redemption must be surrendered to the Paying Agent to collect the redemption price;

<div align="center">47</div>

    (7) that, unless the Issuers default in making such redemption payment, interest on Notes called for redemption ceases to accr after the redemption date;

    (8) the paragraph of the Notes and/or Section herein pursuant to which the Notes called for redemption are being redeemed; an

    (9) that no representation is made as to the correctness or accuracy of the CUSIP number, if any, listed in such notice or print Notes.

    (c) At the Issuers' request, the Trustee will give the notice of redemption in the Issuers' names and at their expense; *provided, however,* that the Issuers have delivered to the Trustee, contemporaneously with the Officers' Certificate referred to in Section 3.01 hereof, a written req the Trustee give such notice.

Section 3.04 *Effect of Notice of Redemption.*

    Once notice of redemption is mailed in accordance with Section 3.03 hereof, Notes called for redemption become irrevocab payable on the redemption date at the redemption price. A notice of redemption may not be conditional, except that any redemption pu Section 3.07(b) may, at the Issuers' discretion, be conditioned upon completion of the related Equity Offering.

Section 3.05 *Deposit of Redemption or Purchase Price.*

    (a) No later than 10:00 a.m. Eastern Time on the redemption or purchase date, the Issuers will deposit with the Trustee or with th Agent money sufficient to pay the redemption or purchase price of and accrued interest and Additional Interest, if any, on all Notes to be r or purchased on that date. The Trustee or the Paying Agent will promptly return to the Issuers any money deposited with the Trustee or t Agent by the Issuers in excess of the amounts necessary to pay the redemption or purchase price of, and accrued interest and Additiona any, on, all Notes to be redeemed or purchased.

    (b) If the Issuers comply with the provisions of the preceding paragraph, on and after the redemption or purchase date, interest will accrue on the Notes or the portions of Notes called for redemption or purchase. If a Note is redeemed or purchased on or after an inter date but on or prior to the related interest payment date, then any accrued and unpaid interest shall be paid to the Person in whose name was registered at the close of business on such record date. If any Note called for redemption or surrendered for purchase is not so surrender for redemption or purchase because of the failure of the Issuers to comply with the preceding paragraph, interest shall be p unpaid principal, from the redemption or purchase date until such principal is paid, and to the extent lawful on any interest not paid on suc principal, in each case at the rate provided in the Notes and in Section 4.01 hereof.

Section 3.06 *Notes Redeemed or Purchased in Part.*

    Upon surrender of a Note that is redeemed or purchased in part, the Issuers will issue and, upon receipt of an Authentication O Trustee will authenticate for the Holder at the expense of the Issuers a new Note equal in principal amount to the unredeemed or un portion of the Note surrendered.

<div align="center">48</div>

Section 3.07 *Optional Redemption.*

    (a) On or after December 1, 2013, the Issuers may redeem all or a part of the Notes at any time or from time to time upon not less th more than 60 days' prior notice, at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued a interest and Additional Interest, if any, on the Notes to the applicable redemption date (subject to the right of Holders of record on t record date to receive interest due on an interest payment date that is on or prior to the redemption date), if redeemed during the 12-mo beginning on December 1 of the years set forth below:

| Year | Percentage |
|------|------------|
| 2013 | 106.875% |
| 2014 | 100.000% |

    (b) At any time on or prior to December 1, 2013, the Issuers may on any one or more occasions redeem up to 35% of the aggregate amount of the Notes issued hereunder, upon not less than 30 nor more than 60 days' prior notice, at a redemption price of 110.0% of the amount, plus accrued and unpaid interest and Additional Interest, if any, on the Notes to the redemption date (subject to the right o

Indenture, dated as of November 23, 2010

record on the relevant record date to receive interest due on an interest payment date that is on or prior to the redemption date), with proceeds of one or more Equity Offerings by the Company, *provided* that:

(1) at least 65% of the aggregate principal amount of Notes issued hereunder (including Additional Notes) remains outs immediately after the occurrence of such redemption (excluding Notes held by the Company and its Subsidiaries); and

(2) the redemption occurs within 90 days of the date of the closing of such Equity Offering.

(c) At any time prior to December 1, 2013, the Notes may be redeemed in whole or in part at the option of the Issuers upon not les nor more than 60 days' prior notice at a redemption price equal to 100% of the principal amount thereof plus the Applicable Premium a accrued and unpaid interest and Additional Interest, if any, to, the date of redemption (subject to the right of Holders of record on the record date to receive interest due on an interest payment date that is on or prior to the redemption date).

(d) Any redemption pursuant to this Section 3.07 shall be made pursuant to the provisions of Sections 3.01 through 3.06 hereof.

(e) Except pursuant to the preceding paragraphs (a), (b) and (c), the Notes will not be redeemable at the Issuers' option prior to t maturity.

Section 3.08 *Mandatory Redemption; Open Market Purchases.*

Except as set forth under Sections 4.06, 4.10 and 4.15 hereof, the Issuers are not required to make mandatory redemption or si payments with respect to the Notes or to repurchase the Notes at the option of the Holders. The Company and its Subsidiaries may acq by means other than a redemption or required repurchase, whether by tender offer, open market purchases, negotiated transactions or o accordance with applicable securities laws, so long as such acquisition does not otherwise violate the terms hereof.

49

Section 3.09 *Offer to Purchase by Application of Excess Proceeds.*

(a) In the event that, pursuant to Section 4.10 hereof, the Company is required to commence an offer to all Holders to purchase "*Asset Sale Offer*"), it will follow the procedures specified below.

(b) The Asset Sale Offer shall be made to all Holders and all holders of other Indebtedness that is *pari passu* with the Notes containing provisions similar to those set forth herein with respect to offers to purchase or redeem with the proceeds of sales of assets. The Asset will remain open for a period of at least 20 Business Days following its commencement and not more than 30 Business Days, except to t that a longer period is required by applicable law (the "*Offer Period*"). No later than three Business Days after the termination of the Offer Per (the "*Purchase Date*"), the Company will apply all Excess Proceeds (the "*Offer Amount*") to the purchase of Notes and such other *pari passu* Indebtedness (on a *pro rata* basis, if applicable) or, if less than the Offer Amount has been tendered, all Notes and other Indebtedness tende response to the Asset Sale Offer.

(c) If the Purchase Date is on or after an interest record date and on or before the related interest payment date, any accrued a interest and Additional Interest, if any, will be paid to the Person in whose name a Note is registered at the close of business on such re and no further interest will be payable on such interest payment date to Holders who tender Notes pursuant to the Asset Sale Offer.

(d) Upon the commencement of an Asset Sale Offer, the Company will send, by first class mail, a notice to the Trustee and ea Holders. The notice will contain all instructions and materials necessary to enable such Holders to tender Notes pursuant to the Asset S The notice, which will govern the terms of the Asset Sale Offer, will state:

(1) the CUSIP number;

(2) that the Asset Sale Offer is being made pursuant to this Section 3.09 and Section 4.10 hereof and the length of time the A Offer will remain open;

(3) the Offer Amount, the purchase price and the Purchase Date;

(4) that any Note not tendered or accepted for payment will continue to accrue interest;

(5) that, unless the Issuers default in making such payment, any Note accepted for payment pursuant to the Asset Sale Offer to accrue interest after the Purchase Date;

(6) that Holders electing to have a Note purchased pursuant to an Asset Sale Offer may elect to have Notes purchased denominations of $2,000 and integral multiples of $1,000 in excess thereof;

(7) that Holders electing to have Notes purchased pursuant to any Asset Sale Offer will be required to surrender the Note, form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the C depositary, if appointed by the Company, or a paying agent at the address specified in the notice at least three days before the Purch

50

Indenture, dated as of November 23, 2010

(8) that Holders will be entitled to withdraw their election if the Company, the depositary or the paying agent, as the case r receives, not later than the expiration of the Offer Period, a telegram, telex, facsimile transmission or letter setting forth the nam Holder, the principal amount of the Note the Holder delivered for purchase and a statement that such Holder is withdrawing his ele have such Note purchased;

(9) that, if the aggregate principal amount of Notes and other *pari passu* Indebtedness surrendered by Holders thereof exceeds the O Amount, the Company will select the Notes and other *pari passu* Indebtedness to be purchased on a *pro rata* basis based on the principal amount of Notes and such other *pari passu* Indebtedness surrendered (with such adjustments as may be deemed appropriate by the Co so that only Notes in denominations of $2,000 and integral multiples of $1,000 in excess thereof, will be purchased); and

(10) that Holders whose Notes were purchased only in part will be issued new Notes equal in principal amount to the unpu portion of the Notes surrendered (or transferred by book-entry transfer).

(e) On or before the Purchase Date, the Company will, to the extent lawful, accept for payment, on a *pro rata* basis to the extent necessary, the Offer Amount of Notes or portions thereof tendered pursuant to the Asset Sale Offer, or if less than the Offer Amount has been ten Notes tendered, and will deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certifica that such Notes or portions thereof were accepted for payment by the Company in accordance with the terms of this Section 3.09. The the depositary or the paying agent, as the case may be, will promptly (but in any case not later than five days after the Purchase deliver to each tendering Holder an amount equal to the purchase price of the Notes tendered by such Holder and accepted by the Co purchase, and the Issuers will promptly issue a new Note, and the Trustee, upon written request from the Issuers, will authenticate a deliver (or cause to be transferred by book entry) such new Note to such Holder, in a principal amount equal to any unpurchased port Note surrendered. Any Note not so accepted shall be promptly mailed or delivered by the Issuers to the Holder thereof. The Issuers wil announce the results of the Asset Sale Offer on the Purchase Date.

(f) Other than as specifically provided in this Section 3.09, any purchase pursuant to this Section 3.09 shall be made pursua provisions of Sections 3.01 through 3.06 hereof applicable to purchases of Notes.

ARTICLE 4
COVENANTS

Section 4.01 *Payment of Notes.*

(a) The Issuers will pay or cause to be paid the principal of, premium, if any, and interest and Additional Interest, if any, on the Note dates and in the manner provided in the Notes. Principal, premium, if any, and interest and Additional Interest, if any will be considered the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds as of 10:00 a.m. Eastern Time on the due da deposited by the Issuers in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and in due. The Issuers will pay all Additional Interest, if any, in the same manner on the dates and in the amounts set forth in the applicable Re Rights Agreement.

51

(b) The Issuers will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue principa rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; they will pay interest (includ petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Interest (without regar applicable grace period) at the same rate to the extent lawful.

Section 4.02 *Maintenance of Office or Agency.*

(a) The Issuers will maintain in the Borough of Manhattan, the City of New York, an office or agency (which may be an office of the T or an Affiliate of the Trustee or Registrar) where Notes may be presented or surrendered for payment, registration of transfer or for excha Issuers hereby designate the corporate trust office of the Trustee located at 101 Barclay Street, New York, NY 10286, Attn: Corpor Administration, as one such office or agency in the Borough of Manhattan of the Issuers in accordance with Section 2.03 hereof. The Iss give prompt written notice to the Trustee of any change in the location of such office or agency. Notices and demands in respect of the N this Indenture shall also be served upon the Trustee or the Collateral Agent at the Corporate Trust Office at the address set forth in Sec hereof. If at any time the Issuers fail to maintain any such required office or agency or fail to furnish the Trustee with the address there presentations, surrenders, notices and demands may be made or served at the Corporate Trust Office of the Trustee.

(b) The Issuers may also from time to time designate one or more offices or agencies where the Notes may be presented or s for any or all such purposes and may from time to time rescind such designation, *provided, however*, that no such designation or rescission will in any manner relieve the Issuers of their obligation to maintain an office or agency in the Borough of Manhattan, the City of New Yor purposes. The Issuers will give prompt written notice to the Trustee of any such designation or rescission and of any change in the locat such other office or agency.

Indenture, dated as of November 23, 2010

Section 4.03 *Reports.*

(a) Whether or not required by the rules and regulations of the SEC, so long as any Notes are outstanding, the Company will furn. Holders of Notes and the Trustee (by making them available on its Web site as described below), within the time periods specified in the rules and regulations:

(1) all quarterly and annual reports that would be required to be filed with the SEC on Forms 10-Q and 10-K if the Compan required to file such reports; and

(2) all current reports that would be required to be filed with the SEC on Form 8-K if the Company were required to file such rep

(b) All such reports will be prepared in all material respects in accordance with all of the rules and regulations applicable to su Each annual report on Form 10-K will include a report on the Company's consolidated financial statements by the Company's c independent accountants. In addition, following the consummation of the Exchange Offer contemplated by the initial Registration Agreement, the Company will file a copy of each of the reports referred to in clauses (1) and (2) above with the SEC for public availability the time periods specified in the rules and regulations applicable to such reports (unless the SEC will not accept such a filing) and v reports on its Web site within those time periods.

(c) If, at any time after consummation of the Exchange Offer contemplated by the initial Registration Rights Agreement, the Compa longer subject to the periodic reporting requirements of the Exchange Act for any reason, the Company will nevertheless continue filing th specified in

52

the preceding paragraphs of this Section 4.03 with the SEC within the time periods specified above unless the SEC will not accept suc The Company will not take any action for the purpose of causing the SEC not to accept any such filings. If, notwithstanding the foregoing, will not accept the Company's filings for any reason, the Company will post the reports referred to in the preceding paragraphs on its ' within the time periods that would apply if the Company were required to file those reports with the SEC.

(d) If the Company has designated any of its Subsidiaries as Unrestricted Subsidiaries, then the quarterly and annual financial inf required by the preceding paragraphs will include a reasonably detailed presentation, either on the face of the financial statements footnotes thereto, and in Management's Discussion and Analysis of Financial Condition and Results of Operations, of the financial cond results of operations of the Issuers and their Restricted Subsidiaries separate from the financial condition and results of opera Unrestricted Subsidiaries of the Company.

(e) In addition, the Issuers and the Guarantors agree that, for so long as any Notes remain outstanding, if at any time they are not r file with the SEC the reports required by the preceding paragraphs, they will furnish to the Holders of Notes and to securities ana prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act.

(f) In addition, the Company will arrange and participate in quarterly conference calls to discuss its results of operations with Holde Notes, no later than 10 Business Days following the date on which each of the quarterly and annual reports are made available as provic The Company will provide to the Holders of the Notes dial-in conference call information substantially concurrently with the posting o reports on its Web site. Access to any such reports on the Company's Web site and to such quarterly conference calls may be password *provided* that the Company makes reasonable efforts to notify the Holders of the Notes of the password and other information required t such reports on its Web site and such quarterly conference calls.

(g) The Company will post the reports specified in this Section 4.03 on its Web site no later than the date the Company is required to those reports to the Trustee and the Holders of the Notes and maintain such posting so long as any Notes remain outstanding; *provided, however* that such Web site may be password-protected so long as the Company makes reasonable efforts to notify the Trustee and the Holders o of postings to the Web site (including through the information dissemination procedures of the Depositary for the Notes) and to provide the and the Holders of the Notes with access to such Web site.

(h) Notwithstanding the foregoing, prior to the earlier of (i) 180 days after the Issue Date or (ii) the filing of an Exchange Offer Regis Statement or a Shelf Registration Statement, as applicable, in each case as provided in the initial Registration Rights Agreement, the Con not be required to provide the following:

(1) *Sarbanes-Oxley.* No certifications or attestations concerning the financial statements or disclosure controls and procedu internal controls that would otherwise be required pursuant to the Sarbanes-Oxley Act of 2002 will be required (*provided, further, however* that nothing contained in the terms herein shall otherwise require the Company to comply with the terms of the Sarbanes-Oxley Act at any time when it would not otherwise be subject to such statute);

53

Indenture, dated as of November 23, 2010

(2) *Financial Statements of Acquired Entities.* The financial statements required of acquired businesses will be limited to the fin statements (in whatever form) that the Company receives in connection with the acquisition, and whether or not audited;

(3) *Financial Statements of Unconsolidated Entities.* No financial statements of unconsolidated entities will be required;

(4) *Segment Reporting.* The Company will not be required to prepare its financial statements in accordance with SFAS No. 131;

(5) *Mezzanine Securities.* The Company will not be required to comply with SFAS No. 150 in respect of any period prior to the hereof;

(6) *Supplemental Schedules.* The schedules identified in Section 5-04 of Regulation S-X will not be required;

(7) *Item 403 of Regulation S-K.* The Company may limit the information disclosed in such reports in respect of Item 403 of Regula S-K under the Securities Act to identifying, in each case utilizing a reference date permitted under Item 403, (A) the aggregate vo economic ownership interests in the Company and, if applicable, the top-level holding company of the Company of each Person (i any "group" as that term is used in Section 13(d)(3) under the Exchange Act) who is known to the Company to be the Beneficial O more than 5% of any class of the Company's Capital Stock, (B) the aggregate voting and economic ownership interests in the t holding company of the Issuers beneficially owned by directors and officers of the Company as a group and (C) the information req be disclosed under Item 403(c); and

(8) *Exhibits.* No exhibits pursuant to Item 601 of Regulation S-K under the Securities Act (other than in respect of material agree governing Indebtedness) will be required.

(i) In the event that any direct or indirect parent company of the Company guarantees the Notes at the time of or following an initia offering of such parent company, the Company may satisfy its obligations in this Section 4.03 with respect to financial information relatin Company by furnishing financial information relating to such parent company, *provided, however* that the same is accompanied by consolidatin information that explains in reasonable detail the differences between the information relating to such parent company and any of its Sub on the one hand, and the information relating to the Company and its Subsidiaries, on a standalone basis, on the other hand.

(j) Delivery of any reports to the Trustee pursuant to this Section 4.03 is for informational purposes only, and the Trustee's receipt shall not constitute constructive notice of any information contained therein or determinable from information contained therein, includ Issuers' compliance with any of their covenants hereunder (as to which the Trustee is entitled to rely exclusively on Officers' Certificates).

Section 4.04 *Compliance Certificate.*

(a) The Issuers and each Guarantor shall deliver to the Trustee, within 90 days after the end of each fiscal year, an Officers' Certifica that a review of the activities of the Company and its Subsidiaries during the preceding fiscal year has been made under the supervis signing Officers with a view to determining whether the Issuers have kept, observed, performed and fulfilled their

54

obligations herein, and further stating, as to each such Officer signing such certificate, that to the best of his or her knowledge the I kept, observed, performed and fulfilled each and every covenant herein; and are not in default in the performance or observance of terms, provisions and conditions herein (or, if a Default or Event of Default has occurred, describing all such Defaults or Events of De which he or she may have knowledge and what action the Issuers are taking or propose to take with respect thereto) and that to the be her knowledge no event has occurred and remains in existence by reason of which payments on account of the principal of or interest, if a Notes are prohibited or if such event has occurred, a description of the event and what action the Issuers are taking or propose to take w thereto.

(b) So long as any of the Notes are outstanding, the Company will deliver to the Trustee, forthwith upon any Officer of the becoming aware of any Default or Event of Default, an Officers' Certificate specifying such Default or Event of Default and what act Company is taking or proposes to take with respect thereto.

Section 4.05 *Taxes; Stay, Extension and Usury Laws.*

(a) The Company will pay, and will cause each of its Subsidiaries to pay, prior to delinquency, all material taxes, assessm governmental levies except such as are contested in good faith and by appropriate proceedings or where the failure to effect such pay adverse in any material respect to the Holders of the Notes.

(b) The Issuers and each of the Guarantors covenant (to the extent that they may lawfully do so) that they will not at any time ins plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay, extension or usury law wherever enacted, now time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Issuers and each of the Guarantors (to that they may lawfully do so) hereby expressly waive all benefit or advantage of any such law, and covenant that they will not, by reso such law, hinder, delay or impede the execution of any power herein granted to the Trustee, but will suffer and permit the execution of ev power as though no such law has been enacted.

Indenture, dated as of November 23, 2010

Section 4.06 *Excess Cash Flow Offer.*

(a) Within 90 days after the end of each full fiscal year following the Issue Date for which the Excess Cash Flow Offer Amount excee
million, to the extent permitted by its Credit Facilities the Company will offer to purchase Notes (the *Excess Cash Flow Offer*) at an offer price
equal to 100% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest and Additional Interest, if any, t
of purchase (the *Excess Cash Flow Offer Payment*) and such offer price will be payable in cash with 50% of the Company's Excess Ca
from the prior fiscal year. If the aggregate principal amount of Notes tendered into such Excess Cash Flow Offer exceeds the Excess C
Offer Amount, the Trustee will select the Notes to be purchased on a *pro rata* basis, by lot or by such other method as the Trustee deems fair a
appropriate.

(b) Within 90 days following the end of each such full fiscal year, the Company will mail a notice to each holder and the Trustee off
repurchase Notes as of the date specified in the notice (the *Excess Cash Flow Offer Purchase Date*), which date will be no earlier than 30 days
and no later than 60 days from the date such notice is mailed. Such notice shall state:

(1) that the Excess Cash Flow Offer is being made pursuant to this Section 4.06;

55

(2) the purchase price and the Excess Cash Flow Offer Purchase Date;

(3) that any Note not tendered will continue to accrue interest;

(4) that, unless the Company defaults in the payment of the Excess Cash Flow Offer Payment, all Notes accepted for payment
to the Excess Cash Flow Offer will cease to accrue interest after the Excess Cash Flow Offer Purchase Date;

(5) that Holders electing to have any Notes purchased pursuant to an Excess Cash Flow Offer will be required to surrender th
with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the
agent appointed by the Company at the address specified in the notice prior to the close of business on the third Business Day pre
Excess Cash Flow Offer Purchase Date;

(6) that Holders will be entitled to withdraw their election if the paying agent receives, not later than the close of business
second Business Day preceding the Excess Cash Flow Offer Purchase Date, a telegram, telex, facsimile transmission or letter settin
name of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is withdrawing his ele
have the Notes purchased; and

(7) that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpu
portion of the Notes surrendered, which unpurchased portion must be equal to $2,000 in principal amount or integral multiples of $
excess thereof.

(c) The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and r
thereunder to the extent those laws and regulations are applicable in connection with each repurchase of Notes pursuant to an Excess
Offer. To the extent that the provisions of any securities laws or regulations conflict with the Excess Cash Flow provisions of the ind
Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under t
Sale provisions of the indenture by virtue of such conflict.

(d) On or before the Excess Cash Flow Offer Purchase Date, the Company will, to the extent lawful accept for payment all Notes or
of Notes properly tendered pursuant to Excess Cash Flow Offer. Promptly after such acceptance, on the Excess Cash Flow Offer Purchas
Company will:

(1) deposit with the paying agent an amount equal to the Excess Cash Flow Offer Payment in respect of all Notes or portions
properly tendered; and

(2) deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate sta
aggregate principal amount of Notes or portions of Notes being purchased by the Company.

(e) On the Excess Cash Flow Offer Purchase Date, the paying agent will mail to each holder of Notes properly tendered the Exc
Flow Offer Payment for such Notes (or, if all the Notes are then in global form, make such payment through the facilities of the Deposita
the Trustee will promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal a
any unpurchased portion of the Notes surrendered, if any, *provided* that each new Note will be in a principal amount of $2,000 or an integr
multiple of $1,000.

56

(f) The Company will publicly announce the results of the Excess Cash Flow Offer as soon as practicable after the Excess Cash Fl
Purchase Date.

Indenture, dated as of November 23, 2010

Section 4.07 *Restricted Payments.*

(a) The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly:

(1) declare or pay any dividend or make any other payment or distribution on account of the Company's or any of its Restricted Subsidiaries' Equity Interests (including, without limitation, any payment in connection with any merger or consolidation involving the Company or any of its Restricted Subsidiaries) or to the direct or indirect holders of the Company's or any of its Restricted Subsidiaries' Equity Interests in their capacity as such (other than dividends or distributions payable in Equity Interests (other than Disqualified Stock) of the Company or payable to the Company or a Restricted Subsidiary of the Company);

(2) purchase, redeem or otherwise acquire or retire for value (including, without limitation, in connection with any merger or consolidation involving the Company) any Equity Interests of the Company or any direct or indirect parent of the Company;

(3) make any payment on or with respect to, or purchase, redeem, defease or otherwise acquire or retire for value, any Indebtedness of either Issuer or any Guarantor that is subordinated to the Notes or the Guarantees, except a payment of interest or principal at or within one year of the Stated Maturity thereof; or

(4) make any Restricted Investment (all such payments and other actions set forth in these clauses (1) through (4) above being collectively referred to as *Restricted Payments*),

unless, at the time of and after giving effect to such Restricted Payment:

(1) no Default or Event of Default has occurred and is continuing or would occur as a consequence of such Restricted Payment;

(2) the Company would, at the time of such Restricted Payment and after giving *pro forma* effect thereto as if such Restricted Payment had been made at the beginning of the applicable four-quarter period, have been permitted to incur at least $1.00 of additional Indebtedness pursuant to the Consolidated Coverage Ratio test set forth in Section 4.09(a) hereof, and

(3) such Restricted Payment, together with the aggregate amount of all other Restricted Payments made by the Company and its Restricted Subsidiaries after the date hereof (excluding Restricted Payments permitted by clauses (2) through (9) of the next succeeding paragraph), is less than the sum, without duplication, of the *Restricted Payments Basket*:

(a) 50% of the Consolidated Net Income of the Company for the period (taken as one accounting period) from the beginning of the first full fiscal quarter of the Company commencing immediately before the Issue Date to the end of the Company's most recently ended fiscal quarter for which internal financial statements are available at the time of such Restricted Payment (or, if such Consolidated Net Income for such period is a deficit, less 100% of such deficit), plus

57

(b) 100% of the aggregate net cash proceeds received by the Company (including the fair market value of any Additional Assets (measured as of the date of the definitive agreement with respect to such Additional Assets) to the extent acquired in consideration of Equity Interests of the Company (other than Disqualified Stock)) since the Issue Date as a contribution to its common equity capital or from the issue or sale of Equity Interests of the Company (other than Disqualified Stock) or from the issue or sale of convertible or exchangeable Disqualified Stock or convertible or exchangeable debt securities of the Company that have been converted into or exchanged for such Equity Interests (other than Equity Interests (or Disqualified Stock or debt securities) sold to a Subsidiary of the Company), plus

(c) [reserved],

(d) to the extent that any Restricted Investment that was made after the Issue Date is sold for cash or otherwise liquidated or repaid for cash, the lesser of (i) the cash return of capital with respect to such Restricted Investment (less the cost of disposition, if any) and (ii) the initial amount of such Restricted Investment, plus

(e) to the extent that any Unrestricted Subsidiary of the Company is redesignated as a Restricted Subsidiary after the Issue Date, the lesser of (i) the fair market value of the Company's Investment in such Subsidiary as of the date of such redesignation or (ii) such fair market value as of the date on which such Subsidiary was originally designated as an Unrestricted Subsidiary.

(b) So long as no Default or Event of Default has occurred and is continuing or would be caused thereby (except in the case of Restricted Payments pursuant to clause (8) below), the preceding provisions will not prohibit:

(1) the payment of any dividend or other distribution within 60 days after the date of declaration of the dividend or other distribution, if at the date of declaration such dividend or other distribution payment would have complied with the provisions hereof;

(2) the purchase, redemption, defeasance or other acquisition or retirement for value of any Indebtedness of either Issuer or any Guarantor that is subordinated to the Notes or the Guarantees or of any Equity Interests of the Company in exchange for, or out of the net cash proceeds of the substantially concurrent sale (other than to a Subsidiary of the Company) of, Equity Interests of the Company (other than Disqualified Stock) *provided,* that the amount of any such net cash proceeds that are utilized for any such purchase, redemption, defeasance, or other acquisition or retirement for value will be excluded from clause (3)(b) of the preceding paragraph;

(3) the purchase, redemption, defeasance or other acquisition or retirement for value of subordinated Indebtedness of either

Indenture, dated as of November 23, 2010

any Guarantor with the net cash proceeds from an incurrence of, or in exchange for, Permitted Refinancing Indebtedness;

(4) [reserved];

(5) [reserved];

58

(6) so long as no Default has occurred and is continuing, upon the occurrence of a Change of Control or an Asset Sale and days after the completion of the offer to repurchase the Notes under Section 4.10 or 4.15 hereof (including the purchase of tendered), any purchase, redemption, defeasance or other acquisition or retirement for value of any Indebtedness of either Issu Guarantor that is subordinated to the Notes or the Guarantees and that is required under the terms thereof as a result of such Control or Asset Sale at a purchase or redemption price not to exceed 101% of the outstanding principal amount thereof, plus acc unpaid interest thereon, if any; *provided* that, in the notice to Holders relating to a Change of Control or Asset Sale hereunder, the Com shall describe this clause (6);

(7) [reserved];

(8) so long as the Company is treated for U.S. federal tax purposes as a disregarded entity or partnership, Permitted Tax Dist and

(9) other Restricted Payments in an aggregate amount since the Issue Date not to exceed $2.0 million.

(c) The amount of all Restricted Payments (other than cash) will be the fair market value on the date of the Restricted Payment of th or securities proposed to be transferred or issued by the Company or such Restricted Subsidiary, as the case may be, pursuant to the Payment. The fair market value of any assets or securities that are required to be valued by this Section 4.07 will be determined by the Directors, whose determination shall be evidenced by a Board Resolution. The Board of Directors' determination must be based upon an o appraisal issued by an accounting, appraisal or investment banking firm of national standing if the fair market value exceeds $15.0 m later than the date of making any Restricted Payment that would have the effect of reducing the Restricted Payments Basket unde paragraph of this Section 4.07, the Company will deliver to the Trustee an Officers' Certificate stating that such Restricted Payment is p and setting forth the basis upon which the calculations required by this Section 4.07 were computed, together with a copy of any fairness o appraisal required herein. For purposes of determining compliance with this Section 4.07, in the event that a Restricted Payment meets t of more than one of the categories of Restricted Payments described in the preceding clauses (1)-(9), the Company will be permitted to c later classify or reclassify in whole or in part in its sole discretion) such Restricted Payment in any manner that complies with this Section 4

Section 4.08  *Dividend and Other Payment Restrictions Affecting Subsidiaries.*

(a) The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create or permit to exist or be effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(1) pay dividends or make any other distributions on its Capital Stock to the Company or any of its Restricted Subsidiaries, or Indebtedness or other obligations owed to the Company or any of its Restricted Subsidiaries;

(2) make loans or advances to the Company or any of its Restricted Subsidiaries; or

(3) transfer any of its properties or assets to the Company or any of its Restricted Subsidiaries.

59

(b) The restrictions in this Section 4.08(a) will not apply to encumbrances or restrictions existing under or by reason of:

(1) agreements governing Existing Indebtedness and the Senior Credit Agreement as in effect on the date hereof and any ame modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of those agreements; *provided* that the amendments, modifications, restatements, renewals, increases, supplements, refundings, replacement or refinancings are not more restrictive, taken as a whole, with respect to such dividend, distribution and other payment restrictions than those contained agreements on the date hereof;

(2) this Indenture, the Notes and the Guarantees;

(3) applicable law, rule, regulation or order;

(4) any instrument governing Indebtedness or Capital Stock of a Person acquired by the Company or any of its Restricted Sub as in effect at the time of such acquisition (except to the extent such Indebtedness or Capital Stock was incurred or issued in conne such acquisition), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, othe Person, or the property or assets of the Person, so acquired, and any amendments, modifications, restatements, renewals supplements, refundings, replacements or refinancings of those instruments; *provided* that the amendments, modifications, restatemen renewals, increases, supplements, refundings, replacement or refinancings are not materially more restrictive, taken as a whole, wi to such dividend, distribution and other payment restrictions than those contained in those instruments; *provided that*, in the case of

Indenture, dated as of November 23, 2010

Indebtedness, such Indebtedness was permitted by the terms hereof to be incurred;

(5) customary non-assignment provisions in contracts and leases entered into in the ordinary course of business and consi past practices;

(6) purchase money obligations for property acquired in the ordinary course of business and Capital Lease Obligations that restrictions on that property of the nature described in clause (3) of the preceding paragraph;

(7) any agreement for the sale or other disposition of a Restricted Subsidiary of the Company that restricts distributions Restricted Subsidiary pending its sale or other disposition;

(8) Permitted Refinancing Indebtedness; *provided* that the restrictions contained in the agreements governing such Permi Refinancing Indebtedness are not materially more restrictive, taken as a whole, than those contained in the agreements gove Indebtedness being refinanced;

(9) agreements governing other Indebtedness of the Company and one or more Restricted Subsidiaries permitted; *provided that* the restrictions in the agreements governing such Indebtedness are not materially more restrictive, taken as a whole, than those herein;

(10) Liens securing Indebtedness otherwise permitted to be incurred under Section 4.12 hereof that limit the right of the d dispose of the assets subject to such Liens;

60

(11) provisions with respect to the disposition or distribution of assets or property in joint venture agreements, asset sale agre stock sale agreements, agreements respecting Permitted Business Investments and other similar agreements entered into in th course of business; and

(12) restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary c business.

Section 4.09 *Incurrence of Indebtedness and Issuance of Preferred Stock.*

(a) The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, issue, as guarantee or otherwise become directly or indirectly liable, contingently or otherwise, with respect to (collectively, "*incur*") any Indebtedness (including Acquired Debt) and neither the Issuers nor any Guarantor will issue any Disqualified Stock, and the Company will not permit a Restricted Subsidiaries to issue any shares of preferred stock; *provided, however* that the Issuers and any Guarantor may incur Indebtedne (including Acquired Debt) or issue Disqualified Stock, if the Consolidated Coverage Ratio for the Company's most recently ended four fu quarters for which internal financial statements are available immediately preceding the date on which such additional Indebtedness is in such Disqualified Stock is issued would have been at least 2.5 to 1.0, determined on a *pro forma* basis (including a *pro forma* application of the net proceeds therefrom), as if the additional Indebtedness had been incurred or Disqualified Stock had been issued, as the case may be, at th of such four-quarter period.

(b) The provisions of Section 4.09(a) hereof will not prohibit the incurrence of any of the following items of Indebtedness (collec "*Permitted Debt*"):

(1) the incurrence by the Issuers or any Guarantor of Indebtedness under one or more Credit Facilities in an aggregate principa at any one time outstanding under this clause (1) (with letters of credit being deemed to have a principal amount equal to the m potential liability of the Company and its Restricted Subsidiaries thereunder) not to exceed an amount equal to the greater of ( million (minus the amount of any permanent payment and commitment reductions) and (b) 10% of ACNTA as of the date of such incu

(2) the incurrence by the Company or any of its Restricted Subsidiaries of the Existing Indebtedness;

(3) the incurrence by the Issuers and the Guarantors of Indebtedness represented by the Initial Notes and the Guarantees ther Exchange Notes and the related Guarantees issued pursuant to a Registration Rights Agreement;

(4) the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness represented by Capital Lease Ob mortgage financings or purchase money obligations, in each case, incurred for the purpose of financing all or any part of the purch or cost of construction or improvement of property, plant or equipment used in the business of the Company or such Restricted Subs an aggregate principal amount, including all Permitted Refinancing Indebtedness incurred to refund, refinance or replace any Inde incurred pursuant to this clause (4), not to exceed $4.0 million at any time outstanding;

(5) the incurrence by the Company or any of its Restricted Subsidiaries of Permitted Refinancing Indebtedness in exchange fo net proceeds of which are used to extend, refinance, renew, replace, defease or refund Indebtedness (other than intercompany Ind that was permitted to be incurred herein under Section 4.09(a) or Section 4.09(b)(2), (3), (4) or (11);

61

Indenture, dated as of November 23, 2010

(6) the incurrence by the Company or any of its Restricted Subsidiaries of intercompany Indebtedness between or among th
and any of its Restricted Subsidiaries *provided, however* that:

(a) if one of the Issuers is the obligor on such Indebtedness and a Guarantor is not the obligee, such Indebtedne
expressly subordinated to the prior payment in full in cash of all Obligations with respect to the Notes, or if a Guarantor is the
on such Indebtedness and neither of the Issuers nor another Guarantor is the obligee, such Indebtedness must be expressly su
to the prior payment in full in cash of all Obligations with respect to the Guarantee of such Guarantor; and

(b) (i) any subsequent issuance or transfer of Equity Interests that results in any such Indebtedness being held by a Per
than the Company or a Restricted Subsidiary of the Company and (ii) any sale or other transfer of any such Indebtedness to
that is neither the Company nor a Restricted Subsidiary of the Company will be deemed, in each case, to constitute an incu
such Indebtedness by the Company or such Restricted Subsidiary, as the case may be, that was not permitted by this clause (6

(7) the incurrence by the Company or any of its Restricted Subsidiaries of Hedging Obligations;

(8) the guarantee by either Issuer or any of the Guarantors of Indebtedness of an Issuer or any Guarantor that was permi
incurred under this Section 4.09;

(9) the incurrence by the Company or any of its Restricted Subsidiaries of obligations relating to net gas balancing positions a
the ordinary course of business and consistent with past practice;

(10) the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness in respect of bid, performance, su
similar bonds issued for the account of the Company and any of its Restricted Subsidiaries in the ordinary course of business, i
guarantees and obligations of the Company and any of its Restricted Subsidiaries with respect to letters of credit supporting such ob
(in each other than an obligation for money borrowed);

(11) Indebtedness of a Restricted Subsidiary incurred and outstanding on the date on which such Restricted Subsidiary was ac
or merged into, the Company or any Restricted Subsidiary (other than Indebtedness incurred (a) to provide all or any portion o
utilized to consummate the transaction or series of related transactions pursuant to which such Restricted Subsidiary became a
Subsidiary or was otherwise acquired by the Company or (b) otherwise in connection with, or in contemplation of, such acqu
*provided, however* that at the time such Restricted Subsidiary is acquired by the Company, the Company would have been able
$1.00 of additional Indebtedness under Section 4.09(a) hereof after giving effect to the incurrence of such Indebtedness pursuant to t
(11);

(12) the incurrence by the Company or any of its Restricted Subsidiaries of Indebtedness arising from agreements of the Con
any of its Restricted Subsidiaries providing for indemnification, adjustment of purchase price or similar obligations, in each case, inc
assumed in connection with the disposition of any business, assets or Capital Stock of a Subsidiary, *provided* that the maximum aggregate
liability in respect of all such Indebtedness shall at no time exceed the gross proceeds actually received by the Company and its F
Subsidiaries in connection with such disposition; and

(13) the incurrence by the Company or any of its Restricted Subsidiaries of additional Indebtedness in an aggregate principal a
any time outstanding, not to exceed $2.0 million.

(c) For purposes of determining compliance with this Section 4.09, in the event that an item of Indebtedness (including Acquired Deb
the criteria of more than one of the categories of Permitted Debt described in clauses (1) through (13) above, or is entitled to be incurred
to Section 4.09(a) hereof, the Company will be permitted to classify (or later classify or reclassify in whole or in part in its sole discretio
item of Indebtedness in any manner that complies with this Section 4.09.

(d) The amount of Indebtedness issued at a price that is less than the principal amount thereof will be equal to the amount of the li
respect thereof determined in accordance with GAAP. Indebtedness of any Person existing at the time such Person becomes a Restricted
shall be deemed to have been incurred by the Company and the Restricted Subsidiary at the time such Person becomes a Restricted Sub
accrual of interest, the accretion or amortization of original issue discount, the payment of interest on any Indebtedness in the form of a
Indebtedness with the same terms, and the payment of dividends or other distributions on Disqualified Stock in the form of additional sha
or the like of the same class of Disqualified Stock will not be deemed to be an incurrence of Indebtedness or an issuance of Disqualified S
purposes of this Section 4.09, *provided,* in each such case, that the amount thereof is included for purposes of determining the Consol
Coverage Ratio of the Company.

Section 4.10 *Asset Sales.*

(a) The Company will not, and will not permit any of its Restricted Subsidiaries to, consummate an Asset Sale unless:

(1) the Company (or the Restricted Subsidiary, as the case may be) receives consideration at the time of the Asset Sale at lea
the fair market value (measured as of the date of the definitive agreement with respect to such Asset Sale) of the assets or Equity
issued or sold or otherwise disposed of; and

Indenture, dated as of November 23, 2010

(2) at least 75% of the consideration received by the Company or such Restricted Subsidiary from all Asset Sales since the
in the aggregate, is in the form of cash or Additional Assets (the fair market value of which shall be measured as of the date of the c
agreement with respect to such Additional Assets).

For purposes of this provision, each of the following will be deemed to be cash:

(A) any liabilities, as shown on the Company's or such Restricted Subsidiary's most recent consolidated balance shee
Company or any Restricted Subsidiary (other than contingent liabilities and liabilities that are by their terms expressly subordir
the Notes or any Guarantee) that are assumed by the transferee of any such assets pursuant to a customary novation agre
releases the Company or such Restricted Subsidiary from further liability; and

63

(B) any securities, notes or other obligations received by the Company or any such Restricted Subsidiary from such transf
are converted within 90 days by the Company or such Restricted Subsidiary into cash, to the extent of the cash receive
conversion.

(b) Within 360 days after the receipt of any Net Proceeds from an Asset Sale, the Company or any such Restricted Subsidiary
those Net Proceeds at its option to any combination of the following:

(1) to repay or repurchase Indebtedness and other Obligations under a Credit Facility, any other First Lien Obligations that, if
the Indebtedness so repaid is revolving credit Indebtedness, to correspondingly reduce commitments with respect thereto) and Ind
and other Obligations arising under or pursuant to the Notes;

(2) to acquire all or substantially all of the properties or assets of one or more other Persons primarily engaged in the Oil a
Business, and, for this purpose, a division or line of business of a Person shall be treated as a separate Person so long as such pr
assets are acquired by the Company or a Restricted Subsidiary;

(3) to acquire a majority of the Voting Stock of one or more other Persons primarily engaged in the Oil and Gas Business.
giving effect to any such acquisition of Voting Stock, such Person is or becomes a Restricted Subsidiary; and

(4) to make one or more capital expenditures or to acquire other long-term assets that are not classified as current assets un
and that are used in the Oil and Gas Business.

(c) Pending the final application of any Net Proceeds, the Company or any such Restricted Subsidiary may temporarily reduce r
credit borrowings or otherwise invest the Net Proceeds in any manner that is not prohibited by this Indenture.

(d) Any Net Proceeds from Asset Sales that are not applied or invested as provided in the preceding paragraph will constitute *Excess
Proceeds*. On the 361st day after the Asset Sale (or, at the Company's option, any earlier date), if the aggregate amount of Excess Proc
exceeds $5.0 million, the Company will make an Asset Sale Offer to all Holders of Notes, and all holders of other Indebtedness that is *pari passu*
with the Notes containing provisions similar to those set forth herein with respect to offers to purchase or redeem with the proceeds o
assets, to purchase the maximum principal amount of Notes and such other *pari passu* Indebtedness that may be purchased out of the Exce
Proceeds. The offer price in any Asset Sale Offer will be equal to 100% of principal amount plus accrued and unpaid interest and A
Interest, if any, to the date of settlement, subject to the right of Holders of record on the relevant record date to receive interest due on a
payment date that is on or prior to the date of settlement, and will be payable in cash. If any Excess Proceeds remain after consumma
Asset Sale Offer, the Company or any of its Restricted Subsidiaries may use those Excess Proceeds for any purpose not otherwise pre
this Indenture. If the aggregate principal amount of Notes and other *pari passu* Indebtedness tendered into such Asset Sale Offer exceeds
amount of Excess Proceeds, the Trustee will select the Notes and such other *pari passu* Indebtedness to be purchased on a *pro rata* basis. Upon
completion of each Asset Sale Offer, the amount of Excess Proceeds will be reset at zero.

64

(e) The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and reg
thereunder to the extent those laws and regulations are applicable in connection with each repurchase of Notes pursuant to an Asset Sal
the extent that the provisions of any securities laws or regulations conflict with Section 3.09 hereof or this Section 4.10, the Company will
with the applicable securities laws and regulations and will not be deemed to have breached its obligations under Section 3.09 here
Section 4.10 by virtue of such conflict.

(f) In the case of clauses (2) through (4) of the preceding paragraph (b), the Company (or the applicable Restricted Subsidiary,
may be) will be deemed to have complied with its obligations under the preceding paragraphs if it enters into a binding commitment to
such assets or Voting Stock or make such capital expenditure prior to 360 days after the receipt of the applicable *Net Proceeds*; that such
binding commitment will be subject only to customary conditions and such acquisition or expenditure is completed within 180 days follow
expiration of the aforementioned 360-day period. If the acquisition or expenditure contemplated by such binding commitment is not consu
on or before such 180th day, and the Company (or the applicable Restricted Subsidiary, as the case may be) has not applied the a

Indenture, dated as of November 23, 2010

Proceeds for another purpose permitted by the preceding paragraph (b) on or before such 180th day, such commitment shall be deemed been a permitted application of Net Proceeds.

Section 4.11 *Transactions with Affiliates.*

(a) The Company will not, and will not permit any of its Restricted Subsidiaries to, make any payment to, or sell, lease, transfer or ot dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate of the Company (each an *Affiliate Transaction*), unless:

(1) the Affiliate Transaction is on terms that are no less favorable to the Company or the relevant Restricted Subsidiary than th would have been obtained in a comparable transaction by the Company or such Restricted Subsidiary with an unrelated Person; and

(2) the Company delivers to the Trustee:

(a) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in of $5.0 million, a resolution of the Board of Directors set forth in an Officers' Certificate certifying that such Affiliate Transaction complies with this covenant and that such Affiliate Transaction(s) has been approved by a majority of the members of the E Directors;

(b) with respect to any Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in of $15.0 million, the Company delivers to the Trustee a written opinion that such Affiliate Transaction(s) is fair, from a financial of view, to the Company and its Restricted Subsidiaries, taken as a whole, or that such Affiliate Transaction(s) is not less favo the Company and its Restricted Subsidiaries than could reasonably be expected to be obtained at the time in an arm transaction with a person who is not an Affiliate, in either such case issued by an independent accounting, appraisal or inv banking firm of recognized standing;

65

(3) so long as PPVA is an Affiliate of the Company, with respect to any Affiliate Transaction or series of related Affiliate Transac between the Company and any of its Restricted Subsidiaries, on the one hand, and PPVA or any of its Affiliates (other than the Com any of its Restricted Affiliates), on the other, the chief executive officer of the Company delivers to the Trustee an Officers' Cer certifying that such Affiliate Transaction(s) complies with this Section 4.11 and that such Affiliate Transaction(s) has been appr majority of the members of the Board of Directors; and

(4) so long as PPVA is an Affiliate of the Company, with respect to any Affiliate Transaction or series of related Affiliate Transac between John Hoffman or any of his Affiliates (other than the Company or any of its Restricted Subsidiaries), on the one hand, Company or any of its Restricted Subsidiaries, on the other, PPVA delivers to the Trustee a certificate certifying that such A Transaction(s) complies with this Section 4.11 and that such Affiliate Transaction(s) has been approved by a majority of the membe Board of Directors.

(b) The following items will not be deemed to be Affiliate Transactions and, therefore, will not be subject to the provisio Section 4.11(a) hereof:

(1) any employment or severance agreement or other employee or director compensation agreement, arrangement or pla amendment thereto, entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(2) transactions between or among any of the Company and its Restricted Subsidiaries;

(3) transactions with a Person (other than an Unrestricted Subsidiary of the Company) that is an Affiliate of the Company because the Company owns an Equity Interest in such Person;

(4) the payment of reasonable directors' fees, the payments of other reasonable benefits and the provision of officers' and d indemnification and insurance to the extent permitted by law to persons who are officers and directors of the Company and its R Subsidiaries, in each case in the ordinary course of business and approved by the Board of Directors;

(5) sales of Equity Interests (other than Disqualified Stock) to Affiliates of the Company, or contributions to the capital of the Com by its Affiliates;

(6) transactions pursuant to any agreement in effect on the Issue Date, as such agreement may be amended, modified or sup from time to time *provided* that any such amendment, modification or supplement will not be materially adverse to the Company Restricted Subsidiaries compared to the terms of such agreement in effect on the Issue Date; and

(7) Permitted Investments or Restricted Payments that are permitted under Section 4.07 hereof.

Section 4.12 *Liens.*

The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or suffer t any Lien securing Indebtedness of any kind on any asset now owned or hereafter acquired, except Permitted Liens.

Indenture, dated as of November 23, 2010

Section 4.13 *Business Activities.*

(a) The Company will not, and will not permit any of its Restricted Subsidiaries to, engage in any business other than the Oil a Business, except to such extent as would not be material to the Company and its Restricted Subsidiaries taken as a whole.

(b) The Co-Issuer may not engage in any business not related directly or indirectly to obtaining money or arranging financing Company or its Restricted Subsidiaries.

Section 4.14 *Corporate Existence.*

Subject to Article 5 hereof, the Company shall do or cause to be done all things necessary to preserve and keep in full force and effe

(1) its limited liability company existence, and the corporate, partnership or other existence of each of its Subsidiaries, in acc with the respective organizational documents (as the same may be amended from time to time) of the Company or any such Subsidi

(2) the rights (charter and statutory), licenses and franchises of the Company and its Subsidiaries;

*provided, however,* that the Company shall not be required to preserve any such right, license or franchise, or the corporate, partnership existence of any of its Subsidiaries, if the Company shall determine that the preservation thereof is no longer desirable in the condu business of the Company and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Ho Notes.

Section 4.15 *Offer to Repurchase at the Option of Holders.*

Upon the occurrence of a Change of Control, the Company will make an offer (a *Change of Control Offer*) to each Holder to repurchase all or any part (equal to $2,000 or an integral multiple of $1,000) of that Holder's Notes at a purchase price in cash equal to 101% of the a principal amount of Notes repurchased plus accrued and unpaid interest and Additional Interest, if any, on the Notes repurchased to t settlement (the *Change of Control Purchase Date* ) subject to the right of Holders of record on the relevant record date to receive interest du an interest payment date that is on or prior to the Change of Control Purchase Date (the *Change of Control Payment* ). Within 30 days following any Change of Control, the Company will mail a notice to each Holder and the Trustee describing the transaction or transactions that con Change of Control and stating:

(1) that the Change of Control Offer is being made pursuant to this Section 4.15 and that all Notes tendered will be acce payment;

(2) the purchase price and the Change of Control Purchase Date, which shall be no earlier than 30 days and no later than 60 the date such notice is mailed;

(3) that any Note not tendered will continue to accrue interest;

(4) that, unless the Company defaults in the payment of the Change of Control Payment, all Notes accepted for payment pursu Change of Control Offer will cease to accrue interest after the Change of Control Purchase Date;

(5) that Holders electing to have any Notes purchased pursuant to a Change of Control Offer will be required to surrender th with the form entitled "Option of Holder to Elect Purchase" attached to the Notes completed, or transfer by book-entry transfer, to the agent at the address specified in the notice prior to the close of business on the third Business Day preceding the Change of Contro Date;

(6) that Holders will be entitled to withdraw their election if the paying agent receives, not later than the close of business second Business Day preceding the Change of Control Purchase Date, a telegram, telex, facsimile transmission or letter setting forth of the Holder, the principal amount of Notes delivered for purchase, and a statement that such Holder is withdrawing his election to Notes purchased; and

(7) that Holders whose Notes are being purchased only in part will be issued new Notes equal in principal amount to the unpu portion of the Notes surrendered, which unpurchased portion must be equal to $2,000 in principal amount or integral multiples of $ excess thereof.

The Company will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and reg thereunder to the extent those laws and regulations are applicable in connection with the repurchase of the Notes as a result of a Change To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Section 4.15, the Company will with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this Section 4.15 by virtu compliance.

Indenture, dated as of November 23, 2010

(b) On or before the Change of Control Purchase Date, the Company will, to the extent lawful, accept for payment all Notes or po Notes properly tendered pursuant to the Change of Control Offer. Promptly after such acceptance, on the Change of Control Purcha Company will:

(1) deposit with the paying agent an amount equal to the Change of Control Payment in respect of all Notes or portions c properly tendered; and

(2) deliver or cause to be delivered to the Trustee the Notes properly accepted together with an Officers' Certificate sta aggregate principal amount of Notes or portions of Notes being purchased by the Company.

(c) On the Change of Control Purchase Date, the paying agent will mail to each Holder of Notes properly tendered the Change Payment for such Notes (or, if all the Notes are then in global form, make such payment through the facilities of DTC), and the Trus promptly authenticate and mail (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to any unp portion of the Notes surrendered, if a *provided* that each new Note will be in a principal amount of $2,000 or an integral multiple of $1,000 excess thereof. The Company will publicly announce the results of the Change of Control Offer as soon as practicable after the Change c Purchase Date.

(d) The provisions described above that require the Company to make a Change of Control Offer following a Change of Control applicable whether or not any other provisions herein are applicable.

(e) The Company will not be required to make a Change of Control Offer upon a Change of Control if a third party makes the c Control Offer in the manner, at the times and otherwise in compliance with the requirements set forth herein applicable to a Change Offer made by the Company and purchases all Notes properly tendered and not withdrawn under the Change of Control Offer.

68

(f) A Change of Control Offer may be made in advance of a Change of Control, and conditioned upon the occurrence of the Ch Control, if a definitive agreement is in place for the Change of Control at the time of making the Change of Control Offer.

Section 4.16 *Additional Guarantees*.

If any Restricted Subsidiary of the Company that is not already a Guarantor guarantees any other Indebtedness of the Company und Facility, then that Restricted Subsidiary will become a Guarantor by executing a supplemental indenture in substantially the form of E hereto and delivering it to the Trustee within 20 Business Days of the date on which it guaranteed Indebtedness of the Company un Facility; *provided, however,* that the foregoing shall not apply to Subsidiaries of the Company that have properly been designated as Unre Subsidiaries in accordance with this Indenture for so long as they continue to constitute Unrestricted Subsidiaries. Any such guarante subject to the release provisions set forth in Article 11.

Section 4.17 *Designation of Restricted and Unrestricted Subsidiaries.*

(a) The Board of Directors of the Company may designate any Restricted Subsidiary of the Company to be an Unrestricted Subsidia designation would not cause a Default. If a Restricted Subsidiary of the Company is designated as an Unrestricted Subsidiary, the aggr market value of all outstanding Investments owned by the Company and its Restricted Subsidiaries in the Subsidiary properly designate deemed to be an Investment made as of the time of the designation and will reduce the amount of the Restricted Payments Basket or Permitted Investments, as determined by the Company. That designation will only be permitted if the Investment would be permitted at t and if the Subsidiary so designated otherwise meets the definition of an Unrestricted Subsidiary.

(b) Any designation of a Subsidiary of the Company as an Unrestricted Subsidiary will be evidenced to the Trustee by filing with the the Board Resolution giving effect to such designation and an Officers' Certificate certifying that such designation complied with the pr conditions and was permitted under Section 4.07 hereof. If, at any time, any Unrestricted Subsidiary would fail to meet the preceding requ as an Unrestricted Subsidiary, it will thereafter cease to be an Unrestricted Subsidiary for purposes hereof, and any Indebtednes Subsidiary will be deemed to be incurred by a Restricted Subsidiary of the Company as of such date under Section 4.09 hereof, and a such Subsidiary will be deemed to be incurred as of such date under Section 4.12 hereof, and, if such Indebtedness is not permitted to b under Section 4.09, or such Lien is not permitted to be incurred under Section 4.12 hereof, then, in either case, the Company will be in c such covenant.

(c) The Board of Directors of the Company may at any time designate any Unrestricted Subsidiary to be a Restricted Subsidia Company *provided* that such designation will be deemed to be an incurrence of Indebtedness by a Restricted Subsidiary of the Compan outstanding Indebtedness of such Unrestricted Subsidiary and the creation, incurrence, assumption or otherwise causing to exist any Li Unrestricted Subsidiary and such designation will only be permitted if (1) such Indebtedness is permitted pursuant to Section 4.09 calculated on a *pro forma* basis as if such designation had occurred at the beginning of the four-quarter reference period, (2) such Lien is pe pursuant to Section 4.12 hereof and (3) no Default or Event of Default would be in existence following such designation.

Indenture, dated as of November 23, 2010

69

Section 4.18 *Impairment of Security Interest.*

Neither the Company nor any Restricted Subsidiary will take or omit to take any action which would adversely affect or impair material respect the Liens in favor of the Collateral Agent with respect to the Collateral, except as otherwise permitted or required by the C Agreements or herein. Neither the Company nor any Restricted Subsidiary will enter into any agreement that requires the proceeds rece any sale of Collateral to be applied to repay, redeem, defease or otherwise acquire or retire any Indebtedness of any Person, other than Debt Documents or as permitted herein and by the Collateral Agreements (including the Intercreditor Agreement).

Section 4.19 *Post-Closing.*

The Issuers and the Guarantors will use their respective commercially reasonable efforts to perfect on the date hereof the I Collateral for the benefit of the Holders of the Notes that are created on the date hereof and to create valid Second Priority Liens wit thereto, but, to the extent any such Liens are not perfected by such date, the Issuers and the Guarantors will do or cause to be do: things that may be required, including obtaining any required consents from third parties, to have all Liens on the Collateral duly crea enforceable and perfected, in each case solely to the extent required by the Collateral Agreements, promptly following the date hereof, I event prior to the date that is 60 calendar days thereafter.

Section 4.20 *Further Assurances.*

The Issuers and the Guarantors shall execute any and all further documents, financing statements, agreements and instruments, : further action that may be required under applicable law, or that the Collateral Agent may reasonably request, in order to grant, preserv and perfect the validity and priority of the Liens created or intended to be created by the Collateral Agreements on the Collateral. In additi time to time, the Company will reasonably promptly secure the Obligations provided herein and the Collateral Agreements by pledging or or causing to be pledged or created, perfected Liens with respect to the Collateral. The Company shall deliver or cause to be delive Collateral Agent all such instruments and documents as the Collateral Agent shall reasonably request to evidence compliance Section 4.20.

Section 4.21 *Maximum Capital Expenditures.*

The Company and its Restricted Subsidiaries will not allow their aggregate capital expenditures to exceed (i) $30 million for the fis ending December 31, 2011 and (ii) 25% of Consolidated EBITDAX for any fiscal year thereafter; provided that, the difference be Company's and its Restricted Subsidiaries' permitted capital expenditures for any fiscal year and their actual capital expenditures for su year, if positive, shall be available for use for capital expenditures in the subsequent fiscal year without regard to the preceding restric Company shall certify its compliance with this Section 4.21 in the Officers' Certificate delivered to the Trustee in accordance with Section hereof following the completion of each fiscal year.

Section 4.22 *PV-10.*

The Company and its Restricted Subsidiaries will not allow the ratio of their SEC PV-10 to Consolidated Leverage to be less than 1 as of the last day of each fiscal year and shall certify their compliance with this Section 4.22 in the Officers' Certificate delivered to the Tr accordance with Section 4.04(a) hereof following the completion of each fiscal year.

70

ARTICLE 5
SUCCESSORS

Section 5.01 *Merger, Consolidation, or Sale of Assets.*

(a) Neither of the Issuers may, directly or indirectly: (1) consolidate or merge with or into another Person (whether or not such Issu surviving Person); or (2) sell, assign, transfer, lease, convey or otherwise dispose of all or substantially all of its properties or assets, in on related transactions, to another Person, unless:

(1) either (a) such Issuer is the surviving Person or (b) the Person formed by or surviving any such consolidation or merger than such Issuer) or to which such sale, assignment, transfer, lease, conveyance or other disposition has been made is a corporat partnership or limited liability company organized or existing under the laws of the United States, any state of the United States or the of Columbia *provided* that the Co-Issuer may not consolidate or merge with or into another Person other than a corporation for so the Company is not a corporation;

(2) the Person formed by or surviving any such consolidation or merger (if other than such Issuer) or the Person to which assignment, transfer, lease, conveyance or other disposition has been made assumes all the obligations of such Issuer under the N

Indenture, dated as of November 23, 2010

applicable Registration Rights Agreement pursuant to agreements reasonably satisfactory to the Trustee;

(3) immediately after such transaction no Default or Event of Default exists;

(4) except with respect to a transaction solely between the Company and a Guarantor or a transaction involving only the Co-Is not the Company, the Company or the Person formed by or surviving any such consolidation or merger (if other than the Compan which such sale, assignment, transfer, lease, conveyance or other disposition has been made will, on the date of such transaction a *pro forma* effect thereto and any related financing transactions as if the same had occurred at the beginning of the applicable fou period, be permitted to incur at least \$1.00 of additional Indebtedness pursuant to the Fixed Charge Coverage Ratio test se Section 4.09(a) hereof; and

(5) such Issuer shall have delivered to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating th consolidation, merger or disposition and such supplemental indenture (if any) comply with this Indenture.

(b) In addition, the Company will not, directly or indirectly, lease all or substantially all of the properties and assets of it and its Res Subsidiaries taken as a whole, in one or more related transactions, to any other Person.

(c) This Section 5.01 will not apply to:

(1) a merger of either Issuer with an Affiliate solely for the purpose of reincorporating or reorganizing such Issuer in a jurisdiction; or

(2) any consolidation or merger, or any sale, assignment, transfer, conveyance, lease or other disposition of assets between or Company and its Restricted Subsidiaries.

71

Section 5.02 *Successor Substituted.*

Upon any consolidation or merger, or any sale, assignment, transfer, lease, conveyance or other disposition of all or substantiall properties or assets of the Company in a transaction that is subject to, and that complies with the provisions of Section 5.01 hereof, the Person formed by such consolidation or into or with which the Company is merged or to which such sale, assignment, transfer, lease, co or other disposition is made shall succeed to, and be substituted for (so that from and after the date of such consolidation, merger, sale, a transfer, lease, conveyance or other disposition, the provisions hereof referring to the "Company" shall refer instead to the successor P not to the Company), and may exercise every right and power of the Company provided herein with the same effect as if such successor l been named as the Company herein; *provided, however,* that the predecessor Company shall not be relieved from the obligation to pay principal of and interest on the Notes except in the case of a sale of all of the Company's assets in a transaction that is subject to, and tha with the provisions of, Section 5.01 hereof.

ARTICLE 6
DEFAULTS AND REMEDIES

Section 6.01 *Events of Default and Remedies.*

Each of the following is an *Event of Default:*

(1) default for 30 days in the payment when due of interest or Additional Interest, if any, on the Notes;

(2) default in payment when due of the principal of, or premium, if any, on the Notes;

(3) failure by the Company to comply with the provisions of Sections 4.06, 4.10, 4.15 or 5.01 hereof;

(4) failure by the Company or any of its Restricted Subsidiaries, as applicable, to comply for 30 days after receipt of written noti the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes with the provisions described under Sections 4 4.12, 4.08, 4.11, 4.16, and 4.13 hereof;

(5) failure by the Company for 30 days after notice from the Trustee or the Holders of at least 25% in aggregate principal amou Notes outstanding to comply with any of the other agreements provided herein (or 60 days with respect to the covenant in Sec hereof);

(6) default under any mortgage, indenture or instrument under which there may be issued or by which there may be se evidenced any Indebtedness for money borrowed by the Company or any of its Restricted Subsidiaries (or the payment of which is gu by the Company or any of its Restricted Subsidiaries), whether such Indebtedness or guarantee now exists, or is created after the Iss that default:

(a) is caused by a failure to pay principal of, or interest or premium, if any, on such Indebtedness prior to the expiration grace period provided in such Indebtedness on the date of such default (a *Payment Default*); or

72

Indenture, dated as of November 23, 2010

(b) results in the acceleration of such Indebtedness prior to its Stated Maturity,

and, in each case, the principal amount of any such Indebtedness, together with the principal amount of any other such Indebtedr which there has been a Payment Default and the maturity of which has been so accelerated, aggregates $15.0 million or mo Payment Default is not cured or such acceleration rescinded within 15 days;

(7) failure by the Company or any of its Restricted Subsidiaries to pay final judgments aggregating in excess of $15.0 million judgments are not paid, discharged or stayed (including a stay pending appeal) for a period of 60 days after the date of such final (or, if later, the date when payment is due pursuant to such judgment);

(8) except as permitted herein, any Guarantee shall be held in any judicial proceeding to be unenforceable or invalid or shall o any reason to be in full force and effect or any Guarantor, or any Person acting on behalf of any Guarantor, shall deny or disa obligations under its Guarantee;

(9) the Company or any Restricted Subsidiary, pursuant to or within the meaning of any Bankruptcy Law: commences a volunta consents to the entry of an order for relief against it in an involuntary case, consents to the appointment of a custodian of it or substantially all of its assets or makes a general assignment for the benefit of its creditors;

(10) a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that: is for relief against the Compan Restricted Subsidiary, as debtor in an involuntary case, appoints a custodian of the Company or any Restricted Subsidiary, or a cus all or substantially all of the assets of the Company or any Restricted Subsidiary, or orders the liquidation of the Company or any R Subsidiary, and the order or decree remains unstayed and in effect for 60 days; or

(11) (x) any Collateral Agreement at any time for any reason shall cease to be in full force and effect in all material respects, e provided in the Collateral Agreements or herein; (y) any Collateral Agreement ceases to give the Collateral Agent the Liens, rights and privileges purported to be created thereby with respect to any Collateral having a fair market value in excess of $1.0 million, su and prior to the rights of all third persons other than the holders of Permitted Liens and subject to no other Liens except as expressly by the applicable Collateral Agreement or herein; or (z) the Company or any of the Guarantors, directly or indirectly, contest in any the effectiveness, validity, binding nature or enforceability of any Collateral Agreement.

Section 6.02 *Acceleration.*

(a) In the case of an Event of Default described in clause (9) or (10) of Section 6.01 hereof with respect to the Company or any R Subsidiary, all outstanding Notes will become due and payable immediately without further action or notice. If any other Event of Defaul and is continuing, the Trustee or the Holders of at least 25% in principal amount of the then outstanding Notes may declare all the Notes and payable immediately.

(b) The Holders of a majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on b all of the Holders, rescind an acceleration and its consequences, if the rescission would not conflict with any judgment or decree and if al Events of Default (except nonpayment of principal, interest or premium or Additional Interest, if any, that has become due solely becau acceleration) have been cured or waived.

73

(c) In the case of any Event of Default occurring by reason of any willful action or inaction taken or not taken by or on behalf of the Co with the intention of avoiding payment of the premium that the Company would have had to pay if the Company then had elected to re Notes prior to stated maturity (other than with the net cash proceeds of an Equity Offering), an equivalent premium will also become immediately due and payable to the extent permitted by law upon the acceleration of the Notes.

Section 6.03 *Other Remedies.*

(a) If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, p and Additional Interest, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or herein.

(b) The Trustee may maintain a proceeding even if it does not possess any of the Notes or does not produce any of them in the proc delay or omission by the Trustee or any Holder of a Note in exercising any right or remedy accruing upon an Event of Default shall not in right or remedy or constitute a waiver of or acquiescence in the Event of Default. All remedies are cumulative to the extent permitted by la

Section 6.04 *Waiver of Past Defaults.*

The Holders of a majority in aggregate principal amount of the Notes then outstanding by notice to the Trustee may on behalf of the of all of the Notes waive any past Default or Event of Default and its consequences as provided herein except a continuing Default Default in the payment of principal of, or interest, premium or Additional Interest, if any, on, the Notes or in respect of a covenant that ca amended without the consent of each Holder.

Indenture, dated as of November 23, 2010

Section 6.05 *Control by Majority.*

(a) Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of co any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it. However, the Tru refuse to follow any direction that conflicts with law or this Indenture that the Trustee determines may be unduly prejudicial to the rights Holders of Notes or that may involve the Trustee in personal liability.

(b) Subject to this Section 6.05 and Section 6.06 hereof, Holders of a majority in principal amount of the then outstanding Notes ma the Trustee in its exercise of any trust or power. The Trustee may withhold notice of any continuing Default or Event of Default from Ho the Notes if it determines that withholding notice is in their interest, except a Default or Event of Default relating to the payment of principa interest, premium or Additional Interest, if any, on, the Notes.

Section 6.06 *Limitation on Suits.*

Subject to the provisions herein relating to the duties of the Trustee in case an Event of Default occurs and is continuing, the Truste under no obligation to exercise any of the rights or powers provided herein at the request or direction of any Holders of Notes unless suc have offered the Trustee reasonable indemnity or security against any loss, liability or expense. Except to enforce the right to receive p principal, interest, premium or Additional Interest, if any, when due, no Holder of a Note may pursue any remedy with respect to this Inde the Notes unless:

(1) such Holder has previously given the Trustee notice that an Event of Default is continuing;

74

(2) Holders of at least 25% in aggregate principal amount of the then outstanding Notes have requested the Trustee to p remedy;

(3) such Holders have offered the Trustee reasonable security or indemnity against any loss, liability or expense;

(4) the Trustee has not complied with such request within 60 days after the receipt of the request and the offer of security or in and

(5) Holders of a majority in aggregate principal amount of the then outstanding Notes have not given the Trustee a d inconsistent with such request within such 60-day period.

Section 6.07 *Rights of Holders of Notes to Receive Payment.*

Notwithstanding any other provision herein, the right of any Holder of a Note to receive payment of principal, premium and Add Interest, if any, and interest on the Note, on or after the respective due dates expressed in the Note (including in connection with a purchase), or to bring suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected v consent of such Holder *provided,* that a Holder shall not have the right to institute any such suit for the enforcement of payment if and to the that the institution or prosecution thereof or the entry of judgment therein would, under applicable law, result in the surrender, impairment or loss of the Lien of this Indenture upon any property subject to such Lien.

Section 6.08 *Collection Suit by Trustee.*

If an Event of Default specified in Section 6.01(1) or (2) hereof occurs and is continuing, the Trustee is authorized to recover judgme own name and as Trustee of an express trust against the Issuers for the whole amount of principal of, premium and Additional Interest, i interest remaining unpaid on, the Notes and interest on overdue principal and, to the extent lawful, interest and such further amount a sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and ad Trustee, its agents and counsel.

Section 6.09 *Trustee May File Proofs of Claim.*

The Trustee is authorized to file such proofs of claim and other papers or documents as may be necessary or advisable in order t claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its counsel) and the Holders of the Notes allowed in any judicial proceedings relative to the Issuers (or any other obligor upon the Not creditors or their property and shall be entitled and empowered to collect, receive and distribute any money or other property payable or d on any such claims, and any custodian in any such judicial proceeding is hereby authorized by each Holder to make such payments to th and in the event that the Trustee shall consent to the making of such payments directly to the Holders, to pay to the Trustee any amount d the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel, and any other amounts d pursuant to

75

Indenture, dated as of November 23, 2010

Section 7.07 hereof. To the extent that the payment of any such compensation, expenses, disbursements and advances of the Trustee
counsel, and any other amounts due the Trustee pursuant to Section 7.07 hereof out of the estate in any such proceeding, shall be de
reason, payment of the same shall be secured by a Lien on, and shall be paid out of, any and all distributions, dividends, money, s
other properties that the Holders may be entitled to receive in such proceeding whether in liquidation or under any plan of reorgani
arrangement or otherwise. Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adop
of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder, or to a
the Trustee to vote in respect of the claim of any Holder in any such proceeding.

Section 6.10 *Priorities.*

    If the Trustee collects any money pursuant to this Article 6, it shall pay out the money in the following order:

        *First*: to the Trustee and Collateral Agent and their agents and attorneys for amounts due pursuant to Section 7.07 hereof, i
    payment of all compensation, expenses and liabilities incurred, and all advances made, by the Trustee or Collateral Agent and the
    expenses of collection;

        *Second* to Holders of Notes for amounts due and unpaid on the Notes for principal, premium and Additional Interest, if an
    interest, ratably, without preference or priority of any kind, according to the amounts due and payable on the Notes for principal, p
    and Additional Interest, if any, and interest, respectively; and

        *Third*: to the Issuers or to such party as a court of competent jurisdiction shall direct.

    The Trustee may fix a record date and payment date for any payment to Holders of Notes pursuant to this Section 6.10.

Section 6.11 *Undertaking for Costs.*

    In any suit for the enforcement of any right or remedy provided herein or in any suit against the Trustee for any action taken or omit
as a Trustee, a court in its discretion may require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit
court in its discretion may assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due
the merits and good faith of the claims or defenses made by the party litigant. This Section 6.11 does not apply to a suit by the Trustee,
Holder of a Note pursuant to Section 6.07 hereof, or a suit by Holders of more than 10% in aggregate principal amount of the then (
Notes.

ARTICLE 7
TRUSTEE

Section 7.01 *Duties of Trustee.*

    (a) If an Event of Default has occurred and is continuing, the Trustee will exercise such of the rights and powers vested in it by this In
and use the same degree of care and skill in its exercise, as a prudent person would exercise or use under the circumstances in the con
person's own affairs.

76

___

    (b) Except during the continuance of an Event of Default:

        (1) the duties of the Trustee will be determined solely by the express provisions hereof and the Trustee need perform only tho
    that are specifically set forth herein and no others, and no implied covenants or obligations shall be read into this Indenture ag
    Trustee; and

        (2) in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctn
    opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements hereof; but in
    of any such certificates or opinions by which any provision hereof are specifically required to be furnished to the Trustee, the Trustee
    under a duty to examine the same to determine whether or not they conform to the requirements hereof (but need not confirm or in
    the accuracy of mathematical calculations or other facts stated therein).

    (c) The Trustee may not be relieved from liabilities for its own negligent action, its own negligent failure to act, or its own v
misconduct, except that:

        (1) this paragraph does not limit the effect of Section 7.01(b) hereof;

        (2) the Trustee will not be liable for any error of judgment made in good faith by a Responsible Officer, unless it is prove
    Trustee was negligent in ascertaining the pertinent facts; and

        (3) the Trustee will not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction re
    by it pursuant to Section 6.05 hereof.

Indenture, dated as of November 23, 2010

(d) Whether or not therein expressly so provided, every provision hereof that in any way relates to the Trustee is subject to para (b), and (c) of this Section 7.01 hereof.

(e) No provision herein will require the Trustee to expend or risk its own funds or incur any liability. The Trustee will be under no obli to exercise any of its rights and powers hereunder at the request of any Holders, unless such Holder has offered to the Trustee indemnity satisfactory to it against any loss, liability or expense.

(f) The Trustee will not be liable for interest on any money received by it except as the Trustee may agree in writing with the Issuers held in trust by the Trustee need not be segregated from other funds except to the extent required by law.

Section 7.02 *Rights of Trustee*.

(a) The Trustee may conclusively rely upon any document believed by it to be genuine and to have been signed or presented by t Person. The Trustee need not investigate any fact or matter stated in the document, but the Trustee, in its discretion, may make such furt or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigatio be entitled to examine the books, records and premises of the Issuers, personally or by agent or attorney at the sole cost of the Issuer incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(b) Before the Trustee acts or refrains from acting, it may require an Officers' Certificate or an Opinion of Counsel or both. The Trus not be liable for any action it takes or omits to take in good faith in reliance on such Officers' Certificate or Opinion of Counsel. The Trust consult with counsel and the written advice of such counsel or any Opinion of Counsel will be full and complete authorization and protecti liability in respect of any action taken, suffered or omitted by it hereunder in good faith and in reliance thereon.

(c) The Trustee may act through its attorneys and agents and will not be responsible for the misconduct or negligence of any agent with due care.

(d) The Trustee will not be liable for any action it takes or omits to take in good faith that it believes to be authorized or within the ri powers conferred upon it by this Indenture.

(e) Unless otherwise specifically provided herein, any demand, request, direction or notice from the Issuers will be sufficient if evide an Officers' Certificate.

(f) The Trustee will be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or dire any of the Holders unless such Holders have offered to the Trustee reasonable indemnity or security against the losses, liabilities and ex might be incurred by it in compliance with such request or direction.

(g) The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and reasonably believed b authorized or within the discretion or rights or powers conferred upon it by this Indenture.

(h) In no event shall the Trustee be responsible or liable for special, indirect, or consequential loss or damage of any kind (including, but not limited to, loss of profit) irrespective of whether the Trustee has been advised of the likelihood of such loss or dam regardless of the form of action.

(i) The Trustee shall not be deemed to have notice of any Default or Event of Default unless a Responsible Officer of the Trustee h knowledge thereof or unless written notice of any event which is in fact such a Default is received by the Trustee at the Corporate Trust the Trustee, and such notice references the Notes and this Indenture.

(j) The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indem are extended to, and shall be enforceable by, the Trustee and by the Collateral Agent in each of its capacities hereunder and under the Agreements, and each agent, custodian and other Person employed to act hereunder.

(k) In no event shall the Trustee be responsible or liable for any failure or delay in the performance of its obligations hereunder arisi or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of u communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

(l) The Trustee may request that the Issuers deliver a certificate setting forth the names of individuals and/or titles of officers autho such time to take specified actions as provided herein.

http://www.sec.gov/Archives/edgar/data/1518908/000119312511139871/dex41.htm[11/7/2012 12:29:58 PM]

Indenture, dated as of November 23, 2010

Section 7.03 *Individual Rights of Trustee*.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer Affiliate of the Issuers with the same rights it would have if it were not Trustee. However, in the event that the Trustee acquires any co interest it must eliminate such conflict within 90 days, apply to the SEC for permission to continue as Trustee (if this Indenture has been under the TIA) or resign. Any Registrar or Paying Agent may do the same with like rights and duties. The Trustee is also subject to Sect and 7.11 hereof.

Section 7.04 *Trustee's Disclaimer*.

The Trustee will not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it be accountable for the Issuers' use of the proceeds from the Notes or any money paid to the Issuers or upon the Issuers' direction provision herein, it will not be responsible for the use or application of any money received by any Paying Agent other than the Trustee, a not be responsible for any statement or recital herein or any statement in the Notes or any other document in connection with the sale of or pursuant to this Indenture other than its certificate of authentication.

Section 7.05 *Notice of Defaults*.

If a Default or Event of Default occurs and is continuing and if it is known to the Trustee, the Trustee will mail to Holders of Notes a of the Default or Event of Default within 90 days after it is known to the Trustee. Except in the case of a Default or Event of Default in pay principal, interest, premium or Additional Interest, if any, the Trustee may withhold the notice if and so long as a committee of its Re Officers in good faith determines that withholding the notice is in the interests of the Holders of the Notes.

Section 7.06 *Reports by Trustee to Holders of the Notes*.

(a) Within 60 days after each May 15 beginning with the May 15 following the date hereof, and for so long as Notes remain outstanding Trustee will mail to the Holders of the Notes a brief report dated as of such reporting date that complies with TIA § 313(a) (but if no described in TIA § 313(a) has occurred within the twelve months preceding the reporting date, no report need be transmitted). The will comply with TIA § 313(b)(2). The Trustee will also transmit by mail all reports as required by TIA § 313(c).

(b) A copy of each report at the time of its mailing to the Holders of Notes will be mailed by the Trustee to the Issuers and filed Trustee with the SEC and each stock exchange on which the Notes are listed in accordance with TIA § 313(d). The Issuers will promptly r Trustee when the Notes are listed on any stock exchange.

Section 7.07 *Compensation and Indemnity*.

(a) The Issuers will pay to the Trustee and Collateral Agent from time to time reasonable compensation for its acceptance of this I and services hereunder. The Trustee's compensation will not be limited by any law on compensation of a trustee of an express trust. T will reimburse each of the Trustee and Collateral Agent promptly upon request for all reasonable disbursements, advances and expenses made by it in addition to the compensation for its services. Such expenses will include the reasonable compensation, disbursements an of the Trustee's agents and counsel.

<div align="center">79</div>

(b) The Issuers and the Guarantors, jointly and severally, will indemnify the Trustee and the Collateral Agent against any and al liabilities or expenses incurred by either of them arising out of or in connection with the acceptance or administration of its duties provided including the costs and expenses of enforcing this Indenture against the Issuers and the Guarantors (including this Section 7.07) and defe against any claim (whether asserted by the Issuers, the Guarantors, any Holder or any other Person) or liability in connection with the e performance of any of its powers or duties hereunder, except to the extent any such loss, liability or expense may be attributable to its n or bad faith. Each of the Trustee and Collateral Agent will notify the Issuers promptly of any claim for which it may seek indemnity. Failure Trustee or Collateral Agent to so notify the Issuers will not relieve the Issuers or any of the Guarantors of their obligations hereunder. Th or such Guarantor will defend the claim and the Trustee and Collateral Agent will cooperate in the defense. The Trustee and Collateral A have separate counsel and the Issuers will pay the reasonable fees and expenses of such counsel. Neither the Issuers nor any Guarantor any settlement made without its consent, which consent will not be unreasonably withheld.

(c) The obligations of the Issuers and the Guarantors under this Section 7.07 will survive the satisfaction and discharge of this Indentu

(d) To secure the Issuers' and the Guarantors' payment obligations in this Section 7.07, the Trustee and Collateral Agent will h prior to the Notes on all money or property held or collected by the Trustee, except that held in trust to pay principal and interest on Notes. Such Lien will survive the satisfaction and discharge of this Indenture.

(e) When the Trustee incurs expenses or renders services after an Event of Default specified in Section 6.01(9) or (10) hereof o expenses and the compensation for the services (including the fees and expenses of its agents and counsel) are intended to constitute

Indenture, dated as of November 23, 2010

Indenture, dated as of November 23, 2010

LEGAL DEFEASANCE AND COVENANT DEFEASANCE

Section 8.01 *Option to Effect Legal Defeasance and Covenant Defeasance.*

The Issuers may at any time, at the option of the Board of Directors of the Company evidenced by a resolution set forth in an Officers' Certificate, elect to have either Sections 8.02 or 8.03 hereof be applied to all outstanding Notes upon compliance with the conditions set forth below in this Article 8.

Section 8.02 *Legal Defeasance and Discharge.*

(a) Upon the Issuers' exercise pursuant to Section 8.01 hereof of the option applicable to this Section 8.02, the Issuers and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be deemed to have been discharged from their obligations with respect to all outstanding Notes (including the Guarantees) on the date the conditions set forth below are satisfied (hereinafter, "*Legal Defeasance*"). For this purpose, Legal Defeasance means that the Issuers and the Guarantors will be deemed to have paid and discharged the entire Indebtedness represented by the outstanding Notes (including the Guarantees), which will thereafter be deemed to be "outstanding" for the purposes of Section 8.05 hereof and the other Sections herein referred to in clauses (1) and (2) below, and to have satisfied all their other obligations under such Notes, the Guarantees and this Indenture (and the Trustee, on demand of and at the expense of the Issuers, will execute proper instruments acknowledging the same), except for the following provisions which will survive until otherwise terminated or discharged hereunder:

(1) the rights of Holders of outstanding Notes to receive payments in respect of the principal of, and interest, premium or Additional Interest, if any, on such Notes when such payments are due from the trust referred to below;

(2) the Issuers' obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payment and money for security payments held in trust;

(3) the rights, powers, trusts, duties and immunities of the Trustee, and the Issuers' obligations in connection therewith; and

(4) this Article 8.

(b) Subject to compliance with this Article 8, the Issuers may exercise their option under this Section 8.02 notwithstanding the prior exercise of their option pursuant to Section 8.03 hereof.

Section 8.03 *Covenant Defeasance.*

Upon the Issuers' exercise pursuant to Section 8.01 hereof of the option applicable to this Section 8.03, the Issuers and each of the Guarantors will, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, be released from each of their obligations contained in Sections 4.03, 4.04(b), 4.06, 4.07, 4.08, 4.09, 4.10, 4.11, 4.12, 4.13, 4.15, 4.16, 4.17, 4.18, 4.19, 4.20, 4.21 or 4.22 hereof and clause (4) of Section 5.01 hereof with respect to the outstanding Notes on and after the date the conditions set forth in Section 8.04 hereof are satisfied (hereinafter, "*Covenant Defeasance*"), and the Notes will thereafter be deemed not "outstanding" for the purposes of any direction, waiver, consent or declaration or act of Holders (and the consequences of any thereof) in connection with such Sections or clause, but will continue to be deemed "outstanding" for all other purposes hereunder (it being understood that such

82

Notes will not be deemed outstanding for accounting purposes if GAAP so permits). For this purpose, Covenant Defeasance means that, with respect to the outstanding Notes and Guarantees, the Issuers and the Guarantors may omit to comply with and will have no liability in respect of any term, condition or limitation set forth in any such Sections or clause, whether directly or indirectly, by reason of any reference elsewhere herein to any such Sections or clause or by reason of any reference in any such Sections or clause to any other provision herein or in any other document and such omission to comply will not constitute a Default or an Event of Default pursuant to Section 6.01 hereof, but, except as specified above, the remainder of this Indenture and such Notes and Guarantees will be unaffected thereby. In addition, upon the Issuers' exercise pursuant to Section 8.01 hereof of the option applicable to this Section 8.03, subject to the satisfaction of the conditions set forth in Section 8.04 hereof, Sections 6.01(3) through 6.01(8) and 6.01(11) hereof will not constitute Events of Default.

Section 8.04 *Conditions to Legal or Covenant Defeasance.*

In order to exercise either Legal Defeasance or Covenant Defeasance under either Section 8.02 or 8.03 hereof:

(1) the Company or any Guarantor must irrevocably deposit with the Trustee, in trust, for the benefit of the Holders of the Notes, cash in U.S. dollars, non-callable Government Securities or a combination of cash in U.S. dollars and non-callable Government Securities, in amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of, interest, premium and Additional Interest, if any, on the outstanding Notes on the date of fixed maturity or on the applicable redemption date, as the case may be, and the Company must specify whether the Notes are being defeased to the date of fixed maturity or to a particular redemption date;

(2) in the case of an election pursuant to Section 8.02 hereof, the Company has delivered to the Trustee an Opinion

Indenture, dated as of November 23, 2010

reasonably acceptable to the Trustee confirming that:

(A) the Company has received from, or there has been published by, the Internal Revenue Service a ruling; or

(B) since the date hereof, there has been a change in the applicable federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel will confirm that, the Holders of the outstanding Notes recognize income, gain or loss for federal income tax purposes as a result of such Legal Defeasance and will be subject to federal i on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not oc

(3) in the case of an election pursuant to Section 8.03 hereof, the Company has delivered to the Trustee an Opinion reasonably acceptable to the Trustee confirming that the Holders of the outstanding Notes will not recognize income, gain or loss fo income tax purposes as a result of such Covenant Defeasance and will be subject to federal income tax on the same amounts manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

83

(4) no Default or Event of Default has occurred and is continuing on the date of such deposit (other than a Default or Event of resulting from the borrowing of funds to be applied to such deposit);

(5) such Legal Defeasance or Covenant Defeasance will not result in a breach or violation of, or constitute a default under, any agreement or instrument (other than this Indenture) to which either Issuer or any of the Guarantors is a party or by which either Issu of the Guarantors is bound;

(6) the Company must deliver to the Trustee an Officers' Certificate stating that the deposit was not made by the Compar intent of preferring the Holders of Notes over the other creditors of the Company with the intent of defeating, hindering, dela defrauding creditors of the Company or others; and

(7) the Company must deliver to the Trustee an Officers' Certificate and an Opinion of Counsel, each stating that all con precedent relating to the Legal Defeasance or the Covenant Defeasance have been complied with.

Section 8.05 *Deposited Money and Government Securities to be Held in Trust; Other Miscellaneous Provisions.*

(a) Subject to Section 8.06 hereof, all money and non-callable Government Securities (including the proceeds thereof) deposited Trustee (or other qualifying trustee, collectively for purposes of this Section 8.05, the "Trustee") pursuant to Section 8.04 hereof in respect of the outstanding Notes will be held in trust and applied by the Trustee, in accordance with the provisions of such Notes and this Indentu payment, either directly or through any Paying Agent (including the Company acting as Paying Agent) as the Trustee may determin Holders of such Notes of all sums due and to become due thereon in respect of principal, premium and Additional Interest, if any, and int such money need not be segregated from other funds except to the extent required by law.

(b) The Issuers will pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the ca callable Government Securities deposited pursuant to Section 8.04 hereof or the principal and interest received in respect thereof ot such tax, fee or other charge which by law is for the account of the Holders of the outstanding Notes.

(c) Notwithstanding anything in this Article 8 to the contrary, the Trustee will deliver or pay to the Issuers from time to time upon the r of the Issuers any money or non-callable Government Securities held by it as provided in Section 8.04 hereof which, in the opinion of a n recognized firm of independent public accountants expressed in a written certification thereof delivered to the Trustee (which may be the delivered pursuant to Section 8.04(1) hereof), are in excess of the amount thereof that would then be required to be deposited to equivalent Legal Defeasance or Covenant Defeasance.

Section 8.06 *Repayment to Company.*

Any money deposited with the Trustee or any Paying Agent, or then held by the Issuers, in trust for the payment of the principal of, p or Additional Interest, if any, or interest on, any Note and remaining unclaimed for two years after such principal, premium or Additional I if any, or interest has become due and payable shall be paid to the Issuers on their request or (if then held by the Issuers) will be discha such trust; and the Holder of such Note will thereafter be permitted to look only to the Issuers for payment thereof, and all liability of the or such Paying Agent with respect to

84

such trust money, and all liability of the Issuers as trustee thereof, will thereupon cease; *provided, however*, that the Trustee or such Paying Agent, before being required to make any such repayment, may at the expense of the Issuers cause to be published once in *The New York Time* and *The Wall Street Journal* (national edition), notice that such money remains unclaimed and that, after a date specified therein, which will not be le 30 days from the date of such notification or publication, any unclaimed balance of such money then remaining will be repaid to the Issuers

Section 8.07 *Reinstatement.*

Indenture, dated as of November 23, 2010

If the Trustee or Paying Agent is unable to apply any U.S. dollars or non-callable Government Securities in accordance with Section 8.03 hereof, as the case may be, by reason of any order or judgment of any court or Governmental Authority enjoining, restraining or prohibiting such application, then the Issuers' and the Guarantors' obligations under this Indenture and the Notes and the Guarantees revived and reinstated as though no deposit had occurred pursuant to Section 8.02 or 8.03 hereof until such time as the Trustee or Paying permitted to apply all such money in accordance with Section 8.02 or 8.03 hereof, as the case may be; *provided, however*, that, if the Issuers make any payment of principal of, premium or Additional Interest, if any, or interest on, any Note following the reinstatement of their obligation Issuers will be subrogated to the rights of the Holders of such Notes to receive such payment from the money held by the Trustee or Paying

ARTICLE 9
AMENDMENT, SUPPLEMENT AND WAIVER

Section 9.01. *Without Consent of Holders of Notes.*

(a) Notwithstanding Section 9.02 hereof, the Issuers, the Guarantors and the Trustee may amend or supplement the Indenture without the consent of any Holder of Notes:

(1) to cure any ambiguity, defect or inconsistency;

(2) to provide for uncertificated Notes in addition to or in place of certificated Notes;

(3) to provide for the assumption of an Issuer's or a Guarantor's obligations to the Holders of the Notes and Guarantees by a s to such Issuer or Guarantor pursuant to Article 5 or Article 11 hereof;

(4) to make any change that would provide any additional rights or benefits to the Holders of the Notes or that does not adverse the legal rights hereunder of any Holder; *provided* that any change to conform this Indenture to the preliminary offering circular dat October 26, 2010, as amended and supplemented by the supplement thereto dated November 15, 2010 and as further supplemented by the pricing supplement term sheet dated November 22, 2010 relating to the offering of the Initial Notes will not be to adversely affect the legal rights of any Holder herein;

(5) to secure the Notes or the Guarantees pursuant to Article 10 hereof or otherwise;

(6) to provide for the issuance of Additional Notes in accordance with Section 2.02 hereof;

(7) to add any additional Guarantor or to evidence the release of any Guarantor from its Guarantee, in each case as provided in the Intercreditor Agreement;

85

(8) to comply with requirements of the Commission in order to effect or maintain the qualification of this Indenture under the TIA

(9) to evidence or provide for the acceptance of appointment herein of a successor Trustee.

(b) Upon the request of the Issuers accompanied by a resolution of their Boards of Directors authorizing the execution of any such an supplemental indenture, and upon receipt by the Trustee of the documents described in Sections 7.02 and 9.06 hereof, the Trustee will jo Issuers and the Guarantors in the execution of any amended or supplemental indenture authorized or permitted by the terms herein and to further appropriate agreements and stipulations that may be therein contained, but the Trustee will not be obligated to enter into such an supplemental indenture that affects its own rights, duties or immunities herein or otherwise.

(c) In addition to the foregoing, Holders of the Notes, by the acceptance thereof, shall be deemed to agree that the Collateral Agreem be amended without the consent of any Holder or Notes in circumstances set forth in the Intercreditor Agreement.

Section 9.02. *With Consent of Holders of Notes.*

(a) Except as provided below in this Section 9.02, the Indenture Documents may be amended or supplemented with the co Holders of a majority in aggregate principal amount of the Notes affected thereby then outstanding (including, without limitation, consents o in connection with a purchase of, or tender offer or exchange offer for, Notes), and any existing Default or Event of Default or complian any provision of the Indenture Documents may be waived with the consent of the Holders of a majority in aggregate principal amount of outstanding Notes (including, without limitation, consents obtained in connection with a tender offer or exchange offer for, Notes).

(b) Upon the request of the Issuers accompanied by a resolution of their Boards of Directors authorizing the execution of any such an supplemental indenture, and upon the filing with the Trustee of evidence satisfactory to the Trustee of the consent of the Holders of aforesaid, and upon receipt by the Trustee of the documents described in Sections 7.02 and 9.06 hereof, the Trustee will join with the Is the Guarantors in the execution of such amended or supplemental indenture unless such amended or supplemental indenture directly Trustee's own rights, duties or immunities herein or otherwise, in which case the Trustee may in its discretion, but will not be obligated into such amended or supplemental indenture.

Indenture, dated as of November 23, 2010

(c) It is not necessary for the consent of the Holders of the Notes under this Section 9.02 to approve the particular form of an amendment, supplement or waiver, but it is sufficient if such consent approves the substance thereof.

(d) After an amendment, supplement or waiver under this Section 9.02 becomes effective, the Issuers will mail to the Holders of affected thereby a notice briefly describing the amendment, supplement or waiver. Any failure of the Issuers to mail such notice, or an therein, will not, however, in any way impair or affect the validity of any such amended or supplemental indenture or waiver. Subject to S 6.04 and 6.07 hereof, the Holders of a majority in aggregate principal amount of the Notes then outstanding voting as a single class compliance in a particular instance by the Issuers with any provision of the Indenture Documents. However, without the consent of e affected thereby, an amendment, supplement or waiver under this Section 9.02 may not (with respect to any Notes held by a non-c Holder):

(1) reduce the principal amount of Notes whose Holders must consent to an amendment, supplement or waiver;

86

(2) reduce the principal of or change the fixed maturity of any Note or alter or waive any of the provisions with respect redemption of the Notes (except with respect to Sections 3.09, 4.06, 4.10 and 4.15 hereof);

(3) reduce the rate of or change the time for payment of interest, including default interest, on any Note;

(4) waive a Default or Event of Default in the payment of principal of, or premium or Additional Interest, if any, or interest Notes (except a rescission of acceleration of the Notes by the Holders of a majority in principal amount of the Notes and a waive payment default that resulted from such acceleration);

(5) make any Note payable in currency other than that stated in the Notes;

(6) make any change in the provisions herein relating to waivers of past Defaults or the rights of Holders of Notes to receive pa of principal of, or interest or premium or Additional Interest, if any, on, the Notes (other than as permitted by clause (7) below);

(7) waive a redemption payment with respect to any Note (other than a payment required by Section 3.09, 4.06, 4.10 or 4.15 he

(8) release any Guarantor from any of its obligations under its Guarantee or this Indenture, except in accordance with the term and the Intercreditor Agreement; or

(9) make any change in the preceding amendment, supplement and waiver provisions.

(e) Without the consent of the Holders of at least 70% in aggregate principal amount of the Notes then outstanding (including, limitation, consents obtained in connection with a purchase of, or tender offer or exchange offer for, Notes), an amendment, supplement may not (i) release all or a material portion of the Collateral from the Liens created pursuant to the Collateral Agreements or (ii) subordi Liens created pursuant to the Collateral Agreements, except, in each case, in accordance with the Indenture and the Collateral Agreemen

Section 9.03 *Compliance with Trust Indenture Act.*

Every amendment or supplement to this Indenture or the Notes will be set forth in an amended or supplemental indenture that comp the TIA as then in effect.

Section 9.04 *Revocation and Effect of Consents.*

Until an amendment, supplement or waiver becomes effective, a consent to it by a Holder of a Note is a continuing consent by the Ho Note and every subsequent Holder of a Note or portion of a Note that evidences the same debt as the consenting Holder's Note, even if the consent is not made on any Note. However, any such Holder of a Note or subsequent Holder of a Note may revoke the consent as to the Trustee receives written notice of revocation before the date the amendment, supplement or waiver becomes effective. An am supplement or waiver becomes effective in accordance with its terms and thereafter binds every Holder.

87

Section 9.05 *Notation on or Exchange of Notes.*

The Trustee may place an appropriate notation about an amendment, supplement or waiver on any Note thereafter authenticated. T in exchange for all Notes, may issue and the Trustee shall, upon receipt of an Authentication Order, authenticate new Notes tha amendment, supplement or waiver.

Failure to make the appropriate notation or issue a new Note will not affect the validity and effect of such amendment, supplement or

Section 9.06 *Trustee to Sign Amendments, etc.*

The Trustee will sign any amended or supplemental indenture authorized pursuant to this Article 9 if the amendment or supplement

Indenture, dated as of November 23, 2010

adversely affect the rights, duties, liabilities or immunities of the Trustee. The Issuers may not sign an amended or supplemental indent Boards of Directors of the Issuers approve it. In executing any amended or supplemental indenture, the Trustee will be entitled to re (subject to Section 7.01 hereof) will be fully protected in relying upon, in addition to the documents required by Section 13.04 hereof, an O Certificate and an Opinion of Counsel stating that the execution of such amended or supplemental indenture is authorized or permitted her

ARTICLE 10
COLLATERAL AND SECURITY

Section 10.01 *Grant of Security Interest.*

The due and punctual payment of the principal of and interest and Additional Interest, if any, on the Notes when and as the same sh and payable, whether on an interest payment date, at maturity, by acceleration, repurchase, redemption or otherwise, and interest o principal of and interest and Additional Interest (to the extent permitted by law), if any, on the Notes (including, but not limited to, all i accrued or accruing (or which would, absent commencement of an Insolvency Proceeding (and the effect of provisions such as Section 5 the Bankruptcy Law), accrue) after commencement of an Insolvency Proceeding, whether or not the claim for such interest is allowed as such Insolvency Proceeding), and performance of all other obligations of the Issuers and the Guarantors to the Holders or the Trustee under the Notes, according to the terms hereunder or thereunder, shall be secured by all property and assets of the Issuers and the Gua from time to time are subject to Liens securing First Lien Obligations, other than the Excluded Collateral, including as provided in the Co Agreements which the Issuers and the Guarantors have entered into simultaneously with the execution of this Indenture, in each case su Intercreditor Agreement. Each Holder, by its acceptance of Notes, consents and agrees to the terms of the Intercreditor Agreement Collateral Agreements (including, without limitation, the provisions providing for foreclosure and release of Collateral) as the same ma effect or may be amended, waived, supplemented or modified from time to time in accordance with its terms and authorizes and di Collateral Agent to enter into the Intercreditor Agreement and the other Collateral Agreements and to perform its obligations and exercise thereunder in accordance therewith. The Issuers will deliver to the Trustee copies of all documents delivered to the Collateral Agent pu the Collateral Agreements, and will do or cause to be done all such acts and things as may be necessary or proper, or as may be requ provisions of the Collateral Agreements, to assure and confirm to the Trustee and the Collateral Agent the security interest in the contemplated hereby, by the Collateral Agreements or any part thereof, as from time to time constituted, so as to render the same availa security and benefit of this Indenture and of the Notes secured hereby, according to the intent and

88

purposes herein expressed. The Collateral Agent may open and maintain one or more accounts to hold the Collateral and the Collateral A from time to time, it being understood that such accounts shall not in any way expand or otherwise affect the Collateral Agent's duties u Collateral Agreements. The Trustee and the Collateral Agent are hereby authorized to enter into the Collateral Agreements, inclu Intercreditor Agreement.

Section 10.02 *Recording and Opinions.*

(a) The Issuers will furnish to the Collateral Agent and the Trustee on or within one month of December 1 in each year beginni December 1, 2011, an Opinion of Counsel either:

(1) (A) stating that, in the opinion of such counsel, action has been taken with respect to the recording, registering, filing, re-rec re-registering and re-filing of all supplemental indentures, mortgages, financing statements, mortgage reinscriptions, continuation st or other instruments of further assurance as is necessary to maintain the Lien of the Collateral Agreements and reciting with re security interests in the Collateral the details of such action or referring to prior Opinions of Counsel in which such details are (B) stating that, in the opinion of such counsel, based on relevant laws as in effect on the date of such Opinion of Counsel, all mortgage reinscriptions, financing statements and continuation statements have been filed that are necessary as of such date and succeeding 12 months to fully preserve and protect, to the extent such protection and preservation are possible by filing, the rig Holders of Notes and the Collateral Agent and the Trustee hereunder and under the Collateral Agreements with respect to the interests in the Collateral;

(2) stating that, in the opinion of such counsel, no such action is necessary to maintain such Lien and assignment.

(b) The Issuers will otherwise comply with the provisions of TIA §314(b).

Section 10.03 *Release of Collateral.*

(a) Subject to subsections (b), (c) and (d) of this Section 10.03, Collateral may be released from the Lien and security interest crea Collateral Agreements in accordance with the provisions of the Collateral Agreements and under the following circumstances:

(1) if any Subsidiary that is a Guarantor is released from its Guarantee pursuant to the terms hereof, that Subsidiary's assets w released from the Liens securing the Notes;

(2) pursuant to Section 9.02 hereof, with the consent of Holders of at least 70% in aggregate principal amount of the outstanding

Indenture, dated as of November 23, 2010

(3) if required in accordance with the terms of the Intercreditor Agreement;

(4) if such Collateral becomes Excluded Collateral;

(5) if the First Priority Lien on such Collateral is released, other than a release following a discharge of First Lien Obligations;

(6) if the Issuers exercise their Legal Defeasance option or Covenant Defeasance option pursuant to Sections 8.01, 8.02 and 8.

89

(7) upon satisfaction and discharge of the Indenture or payment in full of the principal of, and premium and accrued and unpaid on, the Notes and all other Obligations that are then due and payable pursuant to Section 12.01 hereof.

(b) In addition, upon the request of the Issuers pursuant to an Officers' Certificate certifying that all conditions precedent hereunder ha met and stating whether or not such release is in connection with a sale or disposition of assets and (at the sole cost and expense of the Collateral Agent will release Collateral that is sold, conveyed or disposed of in compliance with the provisions hereof; *provided*, that if such sale, conveyance or disposition constitutes an Asset Sale, such Asset Sale complies with the requirements of Section 4.10 hereof. Upon rece Officers' Certificate the Collateral Agent shall execute, deliver or acknowledge any instruments of termination, satisfaction or release rea requested of it to evidence the release of any Collateral permitted to be released pursuant to this Indenture or the Collateral Agreements.

(c) The Issuers shall determine the applicability of TIA Section 314(d) to any such release, and if the Issuers determine that Section not applicable they shall include a statement to this effect in the Officers' Certificate to be provided under clause (d). Any certificate or required by TIA § 314(d) may be made by an Officer of either of the Issuers except in cases where TIA § 314(d) requires that such cert opinion be made by an independent Person, which Person will be an independent engineer, appraiser or other expert selected or appro Issuers in the exercise of reasonable care. If the Issuers determine that Section 314(d) of the TIA is not applicable to the release of Colla the Issuers need not deliver the documents that would otherwise be required under Section 3.14(d); *provided*, *however*, that in no event is this intended to derogate the right of the Trustee and Collateral Agent to request and obtain an Opinion of Counsel and Officers' Certificate sta all conditions precedent in the Indenture Documents to such release have been complied with whenever the Trustee and/or Collatera asked to execute or acknowledge a release of Collateral.

(d) Notwithstanding anything to the contrary contained herein, at any time the Trustee or Collateral Agent is requested to acknow execute a release of Collateral, the Trustee and/or the Collateral Agent shall be entitled to receive an Opinion of Counsel and Officers' C that all conditions precedent in the Indenture Documents to such release have been complied with. The Trustee may, to the extent Sections 7.01 and 7.02 hereof, accept as conclusive evidence of compliance with the foregoing provisions the appropriate statements co such documents and such Opinion of Counsel.

Section 10.04 *[Reserved]*

Section 10.05 *Authorization of Actions to Be Taken by the Trustee Under the Collateral Agreements.*

(a) Subject to the provisions of Sections 7.01 and 7.02 hereof, the Trustee may, in its sole discretion and without the consent of the H Notes, direct, on behalf of the Holders of Notes, the Collateral Agent to, take all actions it deems necessary or appropriate in order to:

(1) enforce any of the terms of the Collateral Agreements; and

(2) collect and receive any and all amounts payable in respect of the Obligations of the Issuers hereunder.

(b) The Trustee will have power to institute and maintain such suits and proceedings as it may deem expedient to prevent any impa the Collateral by any acts that may be unlawful or in violation of the Collateral Agreements or this Indenture, and such suits and proceedin Trustee

90

may deem expedient to preserve or protect its interests and the interests of the Holders of Notes in the Collateral (including power to ins maintain suits or proceedings to restrain the enforcement of or compliance with any legislative or other governmental enactment, rule or o may be unconstitutional or otherwise invalid if the enforcement of, or compliance with, such enactment, rule or order would impair th interest hereunder or be prejudicial to the interests of the Holders of Notes or of the Trustee).

Section 10.06 *Authorization of Receipt of Funds by the Trustee Under the Collateral Agreements.*

The Trustee is authorized to receive any funds for the benefit of the Holders of Notes distributed under the Collateral Agreeme make further distributions of such funds to the Holders of Notes according to the provisions hereof.

Section 10.07 *Termination of Security Interest.*

Upon the payment in full of all Obligations of the Issuers herein and under the Notes, or upon Legal Defeasance, the Trustee

Indenture, dated as of November 23, 2010

request of the Issuers, deliver a certificate to the Collateral Agent stating that such Obligations have been paid in full, and instruct the Collateral Agent to release the Liens pursuant to this Indenture and the Collateral Agreements.

Section 10.08 *Trustee's Duties with Respect to Collateral*

(a) Beyond the exercise of reasonable care in the custody thereof, the Trustee shall have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Trustee shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Trustee shall be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Trustee in good faith.

(b) The Trustee shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence, bad faith or willful misconduct on the part of the Trustee, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of the Issuers to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Trustee shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of the Collateral Agency Agreement or the Security Documents by the Issuers, the Guarantors, the Secured Parties or the Collateral Agent.

ARTICLE 11
GUARANTEES

Section 11.01 *Guarantee*.

(a) The Guarantors, jointly and severally, fully, irrevocably, absolutely and unconditionally guarantee to each of the Holders of Notes and the Trustee the prompt and complete payment and performance when due, irrespective of the validity and enforceability of the Indenture, the Notes or the obligations of the Issuers thereunder, no matter how the same shall become due, of all Guaranteed Obligations.

91

(b) If the Issuers shall for any reason fail to pay any Guaranteed Obligation, as and when such Guaranteed Obligation shall become due and payable, whether at its stated maturity, as a result of the exercise of any power to accelerate, or otherwise, the Guarantors will, upon demand by the Trustee, pay such Guaranteed Obligation in full to the Trustee for the benefit of the Holders of Notes and the Trustee to which such Guaranteed Obligation is owed. If the Issuers shall for any reason fail to perform promptly any Guaranteed Obligation that is not for the payment of money, the Guarantors will, upon demand by the Trustee, cause such Guaranteed Obligation to be performed or, if specified by the Trustee, provide sufficient funds, in such amount and manner as the Trustee shall in good faith determine, for the prompt, full and faithful performance of such Guaranteed Obligation by the Trustee or such other Person as the Trustee shall designate. Without limiting the generality of the foregoing, the Guarantors will pay all amounts that constitute part of the Guaranteed Obligations that would be owing but for the fact that they are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding.

Section 11.02 *Execution and Delivery of Notation of Guarantee*.

(a) To evidence its Guarantee set forth in Section 11.01 hereof, each Guarantor hereby agrees that a notation of such Guarantee substantially in the form attached as Exhibit E hereto will be endorsed by an Officer of such Guarantor, by manual or facsimile signature, on each Note authenticated and delivered by the Trustee and that this Indenture will be executed on behalf of such Guarantor by one of its Officers.

(b) Each Guarantor hereby agrees that its Guarantee set forth in Section 11.01 hereof will remain in full force and effect notwithstanding any failure to endorse on each Note a notation of such Guarantee.

(c) If an Officer whose signature is on this Indenture or on the Guarantee no longer holds that office at the time the Trustee authenticates the Note on which a Guarantee is endorsed, the Guarantee will be valid nevertheless.

(d) The delivery of any Note by the Trustee, after the authentication thereof hereunder, will constitute due delivery of the Guarantee set forth in this Indenture on behalf of the Guarantors.

(e) In the event that the Company or any of its Restricted Subsidiaries creates or acquires any Domestic Subsidiary after the date hereof, if required by Section 4.16 hereof, the Company will cause such Domestic Subsidiary to comply to the extent applicable with the provisions of Section 4.16 hereof, this Article 11.

Section 11.03 *[Reserved]*

Indenture, dated as of November 23, 2010

Section 11.04 *Limitation of Liability of Certain Guarantors.*

(a) Notwithstanding any other provision of this Article 11, each Guarantor confirms that it is the intention of each such Guaranto Guarantee of such Guarantor not constitute a fraudulent transfer or conveyance for purposes of Bankruptcy Law, the Uniform Conveyance Act, the Uniform Fraudulent Transfer Act or any similar federal or state law to the extent applicable to any Guarantee. To e the foregoing intention, the Trustee, the Holders and the Guarantors hereby

92

irrevocably agree that the obligations of such Guarantor will be limited to the maximum amount that will, after giving effect to such n amount and all other contingent and fixed liabilities of such Guarantor that are relevant under such laws, and after giving effect to any co from, rights to receive contribution from or payments made by or on behalf of any other Guarantor in respect of the obligations of su Guarantor under this Article 11, result in the obligations of such Guarantor under its Guarantee not constituting a fraudulent transfer or con

(b) Notwithstanding any other provision of this Article 11, with respect to any Guarantor guaranteed hereby and the liability o Guarantor for all obligations under this Article 11 and any Indenture Document to which it is a party, liability shall be limited to the m liability that can be incurred by such Guarantor without rendering this Guarantee subject to avoidance under Section 548 of the Unite Bankruptcy Code or any comparable provisions of any applicable state or federal law.

Section 11.05 *Unconditional Guaranty.*

(a) Each Guarantor will pay the Guaranteed Obligations strictly in accordance with the terms of the Indenture Documents to th permitted by law regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any such term or any righ Second Lien Secured Party with respect thereto.

(b) This is a guarantee of payment and not of collection. The obligations of each Guarantor under or in respect of this Article 11 a Indenture Document to which such Guarantor is a party are independent of the Guaranteed Obligations or any other obligation of the Issu other Guarantor under or in respect of the Indenture Documents, and a separate action or actions may be brought and prosecuted a Guarantor to enforce this Guarantee, irrespective of whether any action is brought against the Issuers or any other Guarantor or whether or any other Guarantor is joined in any such action or actions.

(c) The obligations of each Guarantor under this Article 11 and each Indenture Document to which such Guarantor is a party shall n maximum extent permitted by law, be affected by:

(1) any voluntary or involuntary liquidation, dissolution, sale of all or substantially all assets, marshalling of assets or liab receivership, conservatorship, assignment for the benefit of creditors, insolvency, bankruptcy, reorganization, arrangement, or compo the Company, the Co-Issuer or any other Guarantor;

(2) any other proceeding involving the Issuers or any other Guarantor or any asset of the Company, the Co-Issuer or a Guarantor under any law for the protection of debtors; or

(3) any discharge, impairment, modification, release, or limitation of the liability of, or stay of actions or lien enforcement proc against, the Company, the Co-Issuer or any other Guarantor, any property of the Company, the Co-Issuer or any other Guarantor, or in bankruptcy of the Company, the Co-Issuer or any other Guarantor in the course of or resulting from any such proceeding.

Section 11.06 *No Release Based on Actions of the Second Lien Secured Parties*

No action that the Collateral Agent or any other Second Lien Secured Party may take or omit to take in connection with any In Document, any Guaranteed Obligation (or any other indebtedness owing by the Issuers to any Second Lien Secured Party), or a security, and no

93

course of dealing between any Second Lien Secured Party and the Issuers, any Guarantor or any other Person, shall release or Guarantor's Guaranteed Obligations, liabilities, agreements or duties hereunder, affect this Guarantee or any Indenture Document Guarantor is a party, or afford any Guarantor any recourse against any Second Lien Secured Party, regardless of whether any such action may increase any risk to or liability of any Second Lien Secured Party, the Issuers or any Guarantor or increase any risk to or dimi safeguard of any collateral security.

Section 11.07 *Waivers.*

The liability of each Guarantor under this Article 11 and each Indenture Document to which such Guarantor is a party shall be irre absolute and unconditional irrespective of, and each Guarantor irrevocably waives, for purposes of this Article 11 and each Indenture Doc which such Guarantor is a party, any defense that it may now have or hereafter acquire relating to any or all of the following (and eacl

Indenture, dated as of November 23, 2010

acknowledges that it will receive substantial direct and indirect benefits from the financing arrangements contemplated by the In Documents and that the waivers set forth below and otherwise in this Article 11 are knowingly made in contemplation of such benefits) case to the maximum extent permitted by law:

(1) Any lack of validity or enforceability of any Indenture Document, any agreement or instrument relating thereto, any defense by reason of any disability or other defense of any other Person or the cessation from any cause whatsoever of the liability of a Person.

(2) Any change in the time, manner or place of payment of, or in any other term of, any Guaranteed Obligation or any other Ob of either of the Issuers or any Guarantor in respect of the Indenture Documents, or any other amendment or waiver of or any c departure from any Indenture Document, including any increase in the Guaranteed Obligations resulting from the extension of a credit to either of the Issuers or any Guarantor or any of its Subsidiaries or otherwise.

(3) Any taking, exchange, release or non-perfection of any collateral security, or any taking, release or amendment or waiv consent to departure from any other guarantee of any Guaranteed Obligation.

(4) Any manner of application of collateral security, or proceeds thereof, to any Guaranteed Obligation, or any manner of sale disposition of any collateral security securing any Guaranteed Obligation or any other obligation of either of the Issuers or any G under the Indenture Documents or any other asset of either of the Issuers or any Guarantor or any of its Subsidiaries, and any other to marshal assets.

(5) Any right to require any Second Lien Secured Party to proceed against any other Person, to exhaust any collateral securi Guaranteed Obligations, to have any other Person joined with any Guarantor in any suit arising out of the Guaranteed Obligatio Article 11 or to pursue any other remedy in any Second Lien Secured Party's power.

(6) Any change or restructuring of the corporate structure or termination of the existence of either of the Issuers or any Guaranto of its Subsidiaries.

(7) Any failure of any Second Lien Secured Party to disclose to the Issuers or any Guarantor any information relating to the b condition (financial or otherwise), operations, performance, properties or prospects of either of the Issuers or any Guarantor now or known to such Second Lien Secured Party (each Guarantor waiving any duty on the part of the Second Lien Secured Parties to dis information).

94

(8) Any failure of any other Person to execute or deliver any notation of guarantee, any supplement hereto or any other gu agreement.

(9) Any release or reduction of the liability of any Guarantor or other guarantor or surety with respect to the Guaranteed Obliga any other compromise or settlement of the Guaranteed Obligations.

(10) Promptness, diligence, notice of acceptance, presentment, demand for performance, notice of non-performance, acceleration, protest or dishonor and, to the extent permitted by law, any other notice with respect to any Guaranteed Obligation Article 11, including notice of acceptance of this Article 11, as amended.

(11) Any requirement that any Second Lien Secured Party create or perfect any Lien or protect or insure any property subject th

(12) Any right to revoke the provisions of this Article 11.

(13) Any election of remedies by any Second Lien Secured Party that in any manner impairs, reduces, releases or otherwise affects any collateral security or any subrogation, reimbursement, exoneration, contribution or indemnification right of any Guarantor right of any Guarantor to proceed against either of the Issuers or any Guarantor, any other guarantor, any other Person or any security.

(14) Any right of set-off or counterclaim against or in respect of the Guaranteed Obligations of any Guarantor hereunder.

(15) Any neglect, failure or refusal to take any action:

(a) for the collection or enforcement of any Guaranteed Obligation,

(b) to realize on any collateral security,

(c) to enforce any Indenture Document,

(d) to file or enforce a claim in any proceeding described in Section 11.05(c) hereof,

(e) in connection with the administration of any Indenture Document or

(f) otherwise concerning the Guaranteed Obligations or the Indenture Documents, or any delay in taking any such action.

(16) The fact that any Guarantor may have incurred directly any Guaranteed Obligation or is otherwise primarily liable therefor.

(17) Any duty of any Second Lien Secured Party to disclose to any Guarantor any matter, fact or thing relating to the bu condition (financial or otherwise), operations, performance, properties or prospects of either of the Issuers or any Guarantor or a

Indenture, dated as of November 23, 2010

Subsidiaries now or hereafter known by such Second Lien Secured Party.

95

(18) Any defense to the recovery by any Second Lien Secured Party against any Guarantor of any deficiency after a non-jud and any defense or benefit that may be afforded by applicable law (and in that connection each Guarantor acknowledges that the Agent may, without notice to or demand upon such Guarantor and without affecting the liability of such Guarantor under this Arti foreclose under any mortgage by non-judicial sale).

(19) Any statute of limitations applicable to the Guaranteed Obligations.

(20) To the extent permitted by law, any other circumstance or any existence of or reliance on any representation by any Sec Secured Party, except for indefeasible payment in full in cash and performance in full of each Guaranteed Obligation, that might o constitute a defense available to, or a discharge of, any Guarantor or either of the Issuers or any other guarantor or surety.

Section 11.08 *Continuing Guaranty; Reinstatement.*

(a) The Guarantee set forth in this Article 11 is a continuing guaranty and shall remain in full force and effect until the indefeasible p in full in cash of the Guaranteed Obligations and all other amounts payable hereunder, unless released in accordance with this Article 11.

(b) This Article 11 and each Indenture Document to which any Guarantor is a party shall continue to be effective or be reinstated, as may be, if at any time any payment of any Guaranteed Obligation is rescinded or must otherwise be returned by any Second Lien Secure a result of the insolvency, bankruptcy or reorganization of either of the Issuers or any Guarantor or otherwise, all as though such paymen been made, and each Guarantor jointly and severally will pay such amount to the applicable Second Lien Secured Party on demand. Any subrogation that is made as contemplated in Section 11.02(b) hereof prior to any such payment shall (regardless of the terms of such tr automatically voided upon the making of any such payment or payments, and all rights so transferred shall thereupon automatically revert vested in the Second Lien Secured Parties.

Section 11.09 *Subordination; Subrogation; Contribution*

(a) Subordination Each Guarantor subordinates all debts, liabilities and other Obligations owed to such Guarantor by either of the Iss any other Guarantor (the *Subordinated Obligation* ) to the Guaranteed Obligations as follows:

(1) Except during the continuance of a Default (including the commencement and continuation of any proceeding under any Bar Law relating to either of the Issuers or any other Guarantor), any Guarantor may receive regularly scheduled payments from eith Issuers or any other Guarantor on account of the Subordinated Obligations. After the occurrence and during the continuance of an (including the commencement and continuation of any proceeding under any Bankruptcy Law relating to either of the Issuers Guarantor), unless the Collateral Agent, subject to the provisions of the Intercreditor Agreement, otherwise agrees, no Guaran demand, accept or take any action to collect any payment on account of any Subordinated Obligation.

(2) In any proceeding under any Bankruptcy Law relating to the Company or any Guarantor, the Second Lien Secured Parties entitled to receive payment in full in cash of all Guaranteed Obligations (including all interest and expenses accruing after the comme of a proceeding under any Bankruptcy Law, whether or not constituting an allowed claim in such proceeding (the *Post-Petition Interest* )) before any Guarantor receives payment of any Subordinated Obligation.

96

(3) After the occurrence and during the continuance of any Default (including the commencement and continuation of any pro under any Bankruptcy Law relating to either of the Issuers or any Guarantor), each Guarantor shall, if the Collateral Agent, sul provisions of the Intercreditor Agreement, so requests, collect, enforce and receive payments on account of the Subordinated Oblig Collateral Agent for the Second Lien Secured Parties and deliver such payments to the Collateral Agent on account of the Gu Obligations (including all Post-Petition Interest), together with any necessary endorsements or other instruments of transfer, but reducing or affecting in any manner the liability of such Guarantor under the other provisions of this Article 11.

(b) Limited Right of Subrogation

(1) Until all Guaranteed Obligations have been indefeasibly paid in full in cash and otherwise performed in full, and all oblig under each Indenture Document to which any Guarantor is a party have been paid and performed in full, no Guarantor shall have an subrogation, reimbursement, indemnity, exoneration, contribution or any other claim against either of the Issuers or any other G any collateral security in connection with the Guarantee provided in this Article 11. Until such time, each Guarantor waives any enforce any remedy that such Guarantor may have against the Issuers and any right to participate in any collateral security.

(2) If any amount shall be paid to any Guarantor on account of any subrogation or other right, any such other remedy, or any c security at any time when all of the Guaranteed Obligations and all other expenses guaranteed pursuant hereto shall not have full, such amount shall be held in trust for the benefit of the Second Lien Secured Parties, shall be segregated from the other fund

Indenture, dated as of November 23, 2010

Guarantor and, subject to the provisions of the Intercreditor Agreement, shall forthwith be paid over to the Trustee to be held by t for the benefit of the Second Lien Secured Parties as collateral security for, or then or at any time thereafter applied in whole or in pa Trustee against, any Guaranteed Obligation, whether matured or unmatured, in such order as the Trustee shall elect.

(3) If any Guarantor shall have paid off any Guaranteed Obligation and if all of the Guaranteed Obligations shall have been inde paid in full in cash, the Trustee will, at the Guarantors' expense and reasonable request, execute and deliver to such applicable (without recourse, representation or warranty) appropriate documents necessary to evidence the transfer, without representation or by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by the Guarantor, *provided that*:

(a) such transfer shall be subject to Section 11.08(b) hereof, and

(b) without the consent of the Collateral Agent (which the Collateral Agent may withhold in its discretion) no Guarantor have the right to be subrogated to any claim or right against either of the Issuers or any other Guarantor that has become own Second Lien Secured Party, whose ownership has otherwise changed in the course of enforcement of the Indenture Documen the Collateral Agent otherwise has released or wishes to release from its Guaranteed Obligations.

97

(c) <u>Right of Contribution</u>. After all Guaranteed Obligations have been indefeasibly paid in full in cash and otherwise performed in ful all obligations under each Indenture Document to which any Guarantor is a party have been paid and performed in full, the Guarantors made payments in respect of the Guaranteed Obligations shall be entitled to contribution from the other Guarantors, to the end payments upon the Guaranteed Obligations shall be shared among all such Guarantors in proportion to their respective *Net Worth*, the contribution obligations of each such Guarantor shall be limited to the maximum amount that it can pay at such time without rend contribution obligations voidable under applicable law relating to fraudulent conveyances or fraudulent transfers. *Net Worth* means, at any time and for any Guarantor:

(1) the fair value of such Guarantor's assets (other than such right of contribution), minus

(2) the fair value of such Guarantor's liabilities (other than its liabilities under its guaranty of the Guaranteed Obligations).

Section 11.10 *Guarantors May Consolidate, etc., on Certain Terms*.

(a) Except as otherwise provided in Section 11.11 hereof, no Guarantor may sell or otherwise dispose of all or substantially all of its a or consolidate with or merge with or into (whether or not such Guarantor is the surviving Person) another Person, other than the Issuers Guarantor, unless:

(1) immediately after giving effect to such transaction, no Default or Event of Default exists; and

(2) either:

(A) subject to Section 11.11 hereof, the Person acquiring the properties or assets in any such sale or disposition or th formed by or surviving any such consolidation or merger (if other than the Guarantor) unconditionally assumes all the oblig that Guarantor herein and the Guarantee, pursuant to a supplemental indenture substantially in the form as specified herein; or

(B) such sale or other disposition complies with Section 4.10 hereof.

(b) In case of any such consolidation, merger, sale or conveyance and upon the assumption by the successor Person, by sup indenture, executed and delivered to the Trustee and satisfactory in form to the Trustee, of the Guarantee endorsed upon the Notes and punctual performance of all of the covenants and conditions contained herein to be performed by the Guarantor, such successor Person w to and be substituted for the Guarantor with the same effect as if it had been named herein as a Guarantor. Such successor Person the cause to be signed any or all of the notations of the Guarantees to be endorsed upon all of the Notes issuable hereunder which theretofo have been signed by the Issuers and delivered to the Trustee. All the Guarantees so issued will in all respects have the same legal rank under this Indenture as the Guarantees theretofore and thereafter issued in accordance with the terms of this Indenture as thoug Guarantees had been issued at the date of the execution hereof.

(c) Except as set forth in Articles 4 and 5 hereof, and notwithstanding clauses (a)(2)(A) and (a)(2)(B) above, nothing contained her any of the Notes will prevent any consolidation or merger of a Guarantor with or into the Issuers or another Guarantor, or will prevent an conveyance of the property of a Guarantor as an entirety or substantially as an entirety to either of the Issuers or another Guarantor.

98

Section 11.11 *Releases*.

(a) The Guarantee of a Guarantor will be released:

(1) in connection with any sale or other disposition of all or substantially all of the properties or assets of that Guarantor (inclu way of merger or consolidation) to a Person that is not (either before or after giving effect to such transaction) the Company or a Su

Indenture, dated as of November 23, 2010

of the Company, if the sale or other disposition is not prohibited by Section 4.10 hereof;

(2) in connection with any sale or other disposition of Capital Stock of that Guarantor to a Person that is not (either before giving effect to such transaction) the Company or a Subsidiary of the Company, if after such sale or disposition such Guarantor is no Restricted Subsidiary and the sale or other disposition is not prohibited by Section 4.10 hereof;

(3) if the Company designates any Restricted Subsidiary that is a Guarantor as an Unrestricted Subsidiary in accorda Section 4.17 hereof;

(4) upon Legal Defeasance or Covenant Defeasance in accordance with Article 8 hereof or satisfaction and discharge of this I in accordance with Article 11 hereof;

(5) if such Guarantor ceases to guarantee Indebtedness of the Company under a Credit Facility; or

(6) as provided in the Intercreditor Agreement.

(b) Any Guarantor not released from its obligations under its Guarantee as provided in this Section 11.11 hereof will remain liable full amount of principal of and interest and premium and Additional Interest, if any, on the Notes and for the other obligations of any Gu under this Indenture as provided in this Article 11.

(c) Upon delivery by the Issuers to the Trustee of an Officers' Certificate and an Opinion of Counsel to the effect that such sale disposition was made by the Issuers in accordance with the provisions hereof, including without limitation Section 4.10 hereof, the Tru execute any documents reasonably required in order to evidence the release of any Guarantor from its obligations under its Guarantee.

ARTICLE 12
SATISFACTION AND DISCHARGE

Section 12.01 *Satisfaction and Discharge.*

(a) This Indenture will be discharged and will cease to be of further effect as to all Notes issued hereunder, when:

(1) either:

(a) all Notes that have been authenticated, except lost, stolen or destroyed Notes that have been replaced or paid and whose payment money has theretofore been deposited in trust and thereafter repaid to the Issuers, have been delivered to t for cancellation; or

99

(b) all Notes that have not been delivered to the Trustee for cancellation have become due and payable or will become payable within one year by reason of the mailing of a notice of redemption or otherwise and the Company or any Gua irrevocably deposited or caused to be deposited with the Trustee as trust funds in trust solely for the benefit of the Holders U.S. dollars, non-callable Government Securities, or a combination of cash in U.S. dollars and non-callable Government Secu amounts as will be sufficient, without consideration of any reinvestment of interest, to pay and discharge the entire Indebtedne Notes not delivered to the Trustee for cancellation for principal, interest, premium and Additional Interest, if any, and accrued to the date of fixed maturity or redemption;

(2) no Default or Event of Default has occurred and is continuing on the date of the deposit or will occur as a result of the dep the deposit will not result in a breach or violation of, or constitute a default under, any material agreement or instrument (other t Indenture) to which either Issuer or any of Guarantors is a party or by which either Issuer or any Guarantor is bound;

(3) the Company or any Guarantor has paid or caused to be paid all sums payable by the Issuers and the Guarantors hereunde

(4) the Company has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money to payment of the Notes at fixed maturity or on the redemption date, as the case may be; and

(5) the Company has delivered an Officers' Certificate and an Opinion of Counsel to the Trustee stating that all conditions prece satisfaction and discharge have been satisfied.

(b) Notwithstanding the satisfaction and discharge of this Indenture, if money has been deposited with the Trustee pursuant to s (b) of clause (1) of this Section 12.01 hereof, the provisions of Sections 12.02 and 8.06 hereof will survive. In addition, nothing Section 12.01 hereof will be deemed to discharge those provisions of Section 7.07 hereof, that, by their terms, survive the satisfa discharge of this Indenture.

Section 12.02 *Application of Trust Money.*

(a) Subject to the provisions of Section 8.06 hereof, all money deposited with the Trustee pursuant to Section 12.01 hereof shall b trust and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment, either directly or through Agent (including the Company acting as its own Paying Agent) as the Trustee may determine, to the Persons entitled thereto, of the p

Indenture, dated as of November 23, 2010

premium and Additional Interest, if any) and interest for whose payment such money has been deposited with the Trustee; but such money need not be segregated from other funds except to the extent required by law.

(b) If the Trustee or Paying Agent is unable to apply any money or Government Securities in accordance with Section 12.01 hereof by reason of any legal proceeding or by reason of any order or judgment of any court or Governmental Authority enjoining, restraining or otherwise prohibiting such

100

application, the Issuers' and any Guarantor's obligations herein and under the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 12.01 hereof; *provided*, that if the Issuers have made any payment of principal of, premium or Additional Interest, if any, or interest on, any Notes because of the reinstatement of their obligations, the Issuers shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or Government Securities held by the Trustee or Paying Agent.

ARTICLE 13
MISCELLANEOUS

Section 13.01 *Trust Indenture Act Controls*.

If any provision hereof limits, qualifies or conflicts with the duties imposed by TIA §318(c), the imposed duties will control.

Section 13.02 *Notices*.

(a) Any notice or communication by the Issuers, any Guarantor or the Trustee to the others is duly given if in writing in English and delivered in Person or by first class mail (registered or certified, return receipt requested), facsimile transmission or overnight air courier guaranteeing next day delivery, to the other's address:

If to the Issuers and/or any Guarantor:

Black Elk Energy Offshore Operations, LLC
11451 Katy Freeway, Suite 500
Houston, TX 77079
Facsimile No.: (281) 598-8601
Attention: James Hagemeier

With a copy to (which such copy shall not constitute notice):

Vinson & Elkins LLP
First City Tower
1001 Fannin Street, Suite 2500
Houston, TX 77002
Facsimile No.: (713) 615-5531
Attention: T. Mark Kelly

If to the Trustee:

The Bank of New York Mellon Trust Company, N.A.
601 Travis Street, 16ᵗʰ Floor
Houston, TX 77002
Facsimile No.: (713) 483-6954
Attention: Corporate Trust Administration

(b) The Issuers, any Guarantor or the Trustee, by notice to the others, may designate additional or different addresses for subsequent notices or communications.

101

(c) All notices and communications (other than those sent to Holders) will be deemed to have been duly given: at the time delivered by hand, if personally delivered; five Business Days after being deposited in the mail, postage prepaid, if mailed; when receipt acknowledged, if transmitted by facsimile; and the next Business Day after timely delivery to the courier, if sent by overnight air courier guaranteeing next day delivery.

(d) Any notice or communication to a Holder will be mailed by first class mail, certified or registered, return receipt requested, or by overnight air courier guaranteeing next day delivery to its address shown on the register kept by the Registrar. Any notice or communication will also be so mailed to any Person described in TIA § 313(c), to the extent required by the TIA. Failure to mail a notice or communication to a Holder or any defect in it will not affect its sufficiency with respect to other Holders.

Indenture, dated as of November 23, 2010

(e) If a notice or communication is mailed in the manner provided above within the time prescribed, it is duly given, whether or addressee receives it.

(f) If the Issuers mail a notice or communication to Holders, they will mail a copy to the Trustee and each Agent at the same time.

(g) The Trustee agrees to accept and act upon instructions or directions pursuant to this Indenture sent by unsecured e-mail, transmission or other similar unsecured electronic methods (including pdf files). If the party elects to give the Trustee e-mail or fa instructions (or instructions by a similar electronic method) and the Trustee in its discretion elects to act upon such instructions, the T understanding of such instructions shall be deemed controlling. The Trustee shall not be liable for any losses, costs or expenses arising indirectly from the Trustee's reliance upon and compliance with such instructions notwithstanding such instructions conflict or are inco with a subsequent written instruction. The party providing electronic instructions agrees to assume all risks arising out of the use of such e methods to submit instructions and directions to the Trustee, including without limitation the risk of the Trustee acting on unauth instructions, and the risk or interception and misuse by third parties.

Section 13.03 *Communication by Holders of Notes with Other Holders of Notes.*

Holders may communicate pursuant to TIA § 312(b) with other Holders with respect to their rights under this Indenture or the Not Company, the Trustee, the Registrar and anyone else shall have the protection of TIA § 312(c).

Section 13.04 *Certificate and Opinion as to Conditions Precedent.*

Upon any request or application by the Issuers to the Trustee to take any action under this Indenture, the Issuers shall furnish to the T

(1) an Officers' Certificate in form and substance reasonably satisfactory to the Trustee (which must include the statements se Section 13.05 hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this I relating to the proposed action have been satisfied; and

(2) an Opinion of Counsel in form and substance reasonably satisfactory to the Trustee (which must include the statements se Section 13.05 hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied.

102

Section 13.05 *Statements Required in Certificate or Opinion.*

Each certificate or opinion with respect to compliance with a condition or covenant provided for herein (other than a certificate pr pursuant to TIA § 314(a)(4)) must comply with the provisions of TIA § 314(e) and must include:

(1) a statement that the Person making such certificate or opinion has read such covenant or condition;

(2) a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions con such certificate or opinion are based;

(3) a statement that, in the opinion of such Person, he or she has made such examination or investigation as is necessary to e or her to express an informed opinion as to whether or not such covenant or condition has been satisfied; and

(4) a statement as to whether or not, in the opinion of such Person, such condition or covenant has been satisfied.

Section 13.06 *Rules by Trustee and Agents.*

The Trustee may make reasonable rules for action by or at a meeting of Holders. The Registrar or Paying Agent may make reason and set reasonable requirements for its functions.

Section 13.07 *No Personal Liability of Directors, Officers, Employees and Stockholders.*

No past, present or future director, officer, employee, incorporator or stockholder or other owner of Capital Stock of an Issue Guarantor, as such, will have any liability for any obligations of such Issuer or any Guarantor under the Notes, this Indenture, the Guarant any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder of Notes by accepting a Note waives an all such liability. The waiver and release are part of the consideration for issuance of the Notes.

Section 13.08 *Governing Law; WAIVER OF JURY TRIAL.*

THIS INDENTURE, THE NOTES AND THE GUARANTEES WILL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

EACH ISSUER, EACH GUARANTOR AND THE TRUSTEE HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS INDENTURE, THE NOTES OR THE TRANSACTION CONTEMPLATED HEREBY.

Indenture, dated as of November 23, 2010

Section 13.09 *No Adverse Interpretation of Other Agreements.*

This Indenture may not be used to interpret any other indenture, loan or debt agreement of the Company or its Subsidiaries or of Person. Any such indenture, loan or debt agreement may not be used to interpret this Indenture.

103

Section 13.10 *Successors.*

All agreements of each of the Issuers contained herein and in the Notes will bind its successors, except as provided in Section 5.0 All agreements of the Trustee contained herein will bind its successors. All agreements of each Guarantor contained herein will bind its su except as otherwise provided in Section 11.10 hereof.

Section 13.11 *Severability.*

In case any provision herein or in the Notes is invalid, illegal or unenforceable, the validity, legality and enforceability of the rem provisions will not in any way be affected or impaired thereby.

Section 13.12 *Counterpart Originals.*

The parties may sign any number of copies of this Indenture, and each party hereto may sign any number of separate copies of this Each signed copy shall be an original, but all of them together represent the same agreement. The exchange of copies of this Inden signature pages by facsimile or PDF transmission shall constitute effective execution and delivery of this Indenture as to the parties hereto be used in lieu of the original Indenture for all purposes. Signatures of the parties hereto transmitted by facsimile or PDF shall be deen their original signatures for all purposes.

Section 13.13 *Table of Contents, Headings, etc.*

The Table of Contents, Cross-Reference Table and Headings of the Articles and Sections of this Indenture have been ins convenience of reference only, are not to be considered a part of this Indenture and will in no way modify or restrict any of the terms or pr hereof.

[Signatures on following page]

104

## SIGNATURES

IN WITNESS WHEREOF, the parties hereto have caused this Indenture to be executed as of the date first written above.

Black Elk Energy Offshore Operations, LLC, as an Issuer

By: /s/ James Hagemeir
    James Hagemeier
    Vice President

Black Elk Energy Finance Corp., as Co-Issuer

By: /s/ James Hagemeir
    James Hagemeier
    Vice President

Black Elk Energy Land Operations, LLC, as Guarantor

By: /s/ James Hagemeir
    James Hagemeier
    Vice President

The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent

Indenture, dated as of November 23, 2010

By: /s/ Kash Asghar
_____
Kash Asghar
Senior Associate

SIGNATURE PAGE TO
INDENTURE

EXHIBIT A

*[Insert the Global Note Legend, if applicable pursuant to the provisions of the Indenture]*

*[Insert the Private Placement Legend, if applicable pursuant to the provisions of the Indenture]*

[Face of Note]

CUSIP/ISIN_____

13.75% Senior Secured Notes due 2015

No. _____                                                                                            $_____

Black Elk Energy Offshore Operations, LLC

and

Black Elk Energy Finance Corp.

promise to pay to_____ or registered assigns, the principal sum of _____ DOLLARS [or such greater or lesser amount as may be indicated on the Schedule of Exchanges of Interests in the Global Note attached hereto]* on December 1, 2015.

Interest Payment Dates: June 1 and December 1, commencing June 1, 2011.

Record Dates: May 15 and November 15

Dated:_____, 20___

Black Elk Energy Offshore Operations, LLC

By:_____
  Name:
  Title:

Black Elk Energy Finance Corp.

By:_____
  Name:
  Title:

This is one of the Notes referred to in the within-mentioned Indenture:

The Bank of New York Mellon Trust Company, N.A., as Trustee

By: _____
        **Authorized Signatory**

* This language should be included only if the Note is issued in global form.

A-1

[Back of Note]
13.75% Senior Secured Notes due 2015

Indenture, dated as of November 23, 2010

Capitalized terms used herein have the meanings assigned to them in the Indenture referred to below unless otherwise indicated.

(1) *INTEREST*. Black Elk Energy Offshore Operations, LLC, a Texas limited liability company, and Black Elk Energy Finance Corp., a corporation (together, the *Issuers*), promise to pay interest on the principal amount of this Note at 13.75% per annum from _____, 20__ until maturity and shall pay the Additional Interest, if any, payable pursuant to Section 4 of the Registration Rights Agreement referred to The Issuers will pay interest and Additional Interest, if any, semi-annually in arrears on June 1 and December 1 of each year, or if any su not a Business Day, on the next succeeding Business Day (each an *Interest Payment Date*). Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of issuance; *provided* that if there is no existing Default in the payment of interest, and if this Note is authenticated between a record date referred to on the face hereof and the next succeed Payment Date, interest shall accrue from such next succeeding Interest Payment Date; *provided, further* that the first Interest Payment Date shall be June 1, 2011. The Issuers will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law) on overdue pri the rate equal to 1% per annum in excess of the then applicable interest rate on the Notes to the extent lawful; they will pay interes post-petition interest in any proceeding under any Bankruptcy Law) on overdue installments of interest and Additional Interest (without r any applicable grace period) at the same rate to the extent lawful.

(2) *METHOD OF PAYMENT*. The Issuers will pay interest on the Notes (except defaulted interest) and Additional Interest to the Person are registered Holders of Notes at the close of business on the May 15 or November 15 next preceding the Interest Payment Date, Notes are cancelled after such record date and on or before such Interest Payment Date, except as provided in Section 2.12 of the Inde respect to defaulted interest. Holders must surrender Notes to the Paying Agent to collect payments of principal and premium, if any, toge accrued and unpaid interest and Additional Interest, if any, due at maturity. The Notes will be payable as to principal, premium, if any, inte Additional Interest, if any, at the office or agency of the Issuers maintained for such purpose within the Borough of Manhattan, the City a of New York, or, at the option of the Issuers, payment of interest and Additional Interest may be made by check mailed to the Hold addresses set forth in the register of Holders; *provided* that payment by wire transfer of immediately available funds will be required wi respect to any amounts due on all Global Notes and all other Notes the Holders of which shall have provided wire transfer instructio Issuers or the Paying Agent. Such payment shall be in such coin or currency of the United States of America as at the time of payn tender for payment of public and private debts. Principal, premium, if any, and interest and Additional Interest, if any will be considered the date due if the Paying Agent, if other than the Company or a Subsidiary thereof, holds as of 10:00 a.m. Eastern Time on the due da deposited by the Issuers in immediately available funds and designated for and sufficient to pay all principal, premium, if any, and in due. The Issuers will pay all Additional Interest, if any, in the same manner as other interest due on the Notes, on the dates and in the ar forth in the Registration Rights Agreement.

(3) *PAYING AGENT AND REGISTRAR*. Initially, The Bank of New York Mellon Trust Company, N.A., the Trustee under the Indenture, will as Paying Agent and Registrar. The Issuers may change any Paying Agent or Registrar without notice to any Holder. The Company or Domestic Subsidiaries may act in any such capacity.

A-2

(4) *INDENTURE*. The Issuers issued the Notes under an Indenture dated as of November 23, 2010 (the *Indenture*) among the Issuers, the Guarantors and the Trustee and Collateral Agent. The terms of the Notes include those stated in the Indenture and those made part of th by reference to the TIA. The Notes are subject to all such terms, and Holders are referred to the Indenture and such Act for a stateme terms. To the extent any provision of this Note conflicts with the express provisions of the Indenture, the provisions of the Indenture shal and be controlling. The Notes are secured obligations of the Issuers as provided in the Indenture and the Collateral Agreements. The Inde not limit the aggregate principal amount of Notes that may be issued thereunder.

(5) *OPTIONAL REDEMPTION*

(a) Except as set forth in subparagraphs (b) and (c) of this Paragraph 5, the Issuers will not have the option to redeem the N December 1, 2013. On or after December 1, 2013, the Issuers may redeem all or a part of the Notes upon not less than 30 nor more tha prior notice, at the redemption prices (expressed as percentages of principal amount) set forth below plus accrued and unpaid in Additional Interest, if any, on the Notes redeemed to the applicable redemption date, if redeemed during the 12-month period begi December 1 of the years set forth below, subject to the rights of Holders on the relevant record date to receive interest on the releva Payment Date:

| Year | Percentage |
|------|-----------|
| 2013 | 106.875% |
| 2014 | 100.000% |

(b) Notwithstanding the provisions of subparagraph (a) of this Paragraph 5, at any time on or prior to December 1, 2013, the Issuer any one or more occasions redeem up to 35% of the aggregate principal amount of the Notes issued under the Indenture at a redempt 110.0% of the principal amount, plus accrued and unpaid interest and Additional Interest, if any, on the Notes to the redemption date (s the right of Holders of record on the relevant record date to receive interest due on an Interest Payment Date that is on or prior to the re date), with the net cash proceeds of one or more Equity Offerings by the Company; *provided* that: (i) at least 65% of the aggregate principa

Indenture, dated as of November 23, 2010

amount of Notes issued under the Indenture (including Additional Notes) remains outstanding immediately after the occurrence of such (excluding Notes held by the Company and its Subsidiaries); and (ii) the redemption occurs within 90 days of the date of the closing of suc Offering.

(c) At any time prior to December 1, 2013, the Notes may be redeemed in whole or in part at the option of the Issuers upon not les nor more than 60 days' prior notice at a redemption price equal to 100% of the principal amount thereof plus the Applicable Premium a accrued and unpaid interest and Additional Interest, if any, to the date of redemption (subject to the right of Holders of record on the record date to receive interest due on an Interest Payment Date that is on or prior to the redemption date).

Unless the Issuers default in the payment of the redemption price, interest will cease to accrue on the Notes or portions thereof redemption on the applicable redemption date.

(6) *MANDATORY REDEMPTION*.

The Issuers are not required to make mandatory redemption or sinking fund payments with respect to the Notes. The Issuers n time and from time to time purchase the Notes in the open market or otherwise if such purchase complies with the then applicable agre the Issuers, including the Indenture.

A-3

(7) *REPURCHASE AT THE OPTION OF HOLDER*.

(a) Upon the occurrence of a Change of Control, the Company will make an offer to each Holder to repurchase all or any part ( $2,000 or an integral multiple of $1,000 in excess thereof) of that Holder's Notes at a purchase price in cash equal to 101% of the a principal amount of Notes repurchased plus accrued and unpaid interest and Additional Interest, if any, on the Notes repurchased to t settlement (the "*Change of Control Purchase Date*") subject to the rights of Holders on the relevant record date to receive interest due o relevant Interest Payment Date. Within 30 days following any Change of Control, the Issuers will mail a notice to each Holder and t describing the transaction or transactions that constitute the Change of Control and offering to repurchase Notes as of the Change Purchase Date specified in the notice, which date will be no earlier than 30 days and no later than 60 days from the date such noti pursuant to the procedures required by the Indenture and described in such notice.

(b) If the Company or a Restricted Subsidiary of the Company consummates any Asset Sale, on the 361st day after the Asset Sale Company's option, any earlier date), if the aggregate amount of Excess Proceeds then exceeds $5.0 million, the Company will make an Offer to all Holders of Notes, and all holders of other Indebtedness that is *pari passu* with the Notes containing provisions similar to those set fort in the Indenture with respect to offers to purchase or redeem with the proceeds of sales of assets, to purchase the maximum principal Notes and such other *pari passu* Indebtedness that may be purchased out of the Excess Proceeds. The offer price in any Asset Sale Offer equal to 100% of principal amount plus accrued and unpaid interest and Additional Interest, if any, to the date of settlement, subject to th Holders of record on the relevant record date to receive interest due on an Interest Payment Date that is on or prior to the date of settle will be payable in cash. If any Excess Proceeds remain after consummation of an Asset Sale Offer, the Company may use those Exces for any purpose not otherwise prohibited by the Indenture. If the aggregate principal amount of Notes and other *pari passu* Indebtedness tendered into such Asset Sale Offer exceeds the amount of Excess Proceeds, the Trustee will select the Notes and *such other* Indebtedness to be purchased on a *pro rata* basis. Upon completion of each Asset Sale Offer, the amount of Excess Proceeds will be reset at zero.

(c) Within 90 days after the end of each full fiscal year following the Issue Date for which the Excess Cash Flow Offer Amount excee million, to the extent permitted by its Credit Facilities the Company will offer to purchase Notes (the "*Excess Cash Flow Offer*") as prescribed in Section 4.06 of the Indenture, at an offer price equal to 100% of the aggregate principal amount of Notes repurchased plus accrued a interest and Additional Interest, if any, to the date of purchase, and will be payable in cash with 50% of the Company's Excess Cash Flow prior fiscal year. If the aggregate principal amount of Notes tendered into such Excess Cash Flow Offer exceeds the Excess Cash F Amount, the Trustee will select the Notes to be purchased on a *pro rata* basis, by lot or by such other method as the Trustee deems fair a appropriate.

(8) *NOTICE OF REDEMPTION*. Notice of redemption will be mailed at least 30 days but not more than 60 days before a redemption dat Issuers will mail or cause to be mailed, by first class mail, a notice of redemption to each Holder whose Notes are to be redeemed at its address, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connect defeasance of the Notes or a satisfaction and discharge of the Indenture. Notes in denominations larger than $2,000 may be redeemed only in whole multiples of $1,000, unless all of the Notes held by a Holder are to be redeemed.

A-4

(9) *DENOMINATIONS, TRANSFER, EXCHANGE*. The Notes are in registered form without coupons in denominations of $2,000 and inte multiples of $1,000. The transfer of Notes may be registered and Notes may be exchanged as provided in the Indenture. The Registr Trustee may require a Holder, among other things, to furnish appropriate endorsements and transfer documents and the Issuers ma

Indenture, dated as of November 23, 2010

Holder to pay any taxes and fees required by law or permitted by the Indenture. The Issuers need not exchange or register the transfe
or portion of a Note selected for redemption, except for the unredeemed portion of any Note being redeemed in part. Also, the Issu
exchange or register the transfer of any Notes for a period of 15 days before the mailing of a notice of redemption or during the period b
record date and the corresponding Interest Payment Date.

(10) *PERSONS DEEMED OWNERS.* The registered Holder of a Note may be treated as its owner for all purposes.

(11) *AMENDMENT, SUPPLEMENT AND WAIVER.* The Indenture, the Notes, the Guarantees and the other Indenture Documents may be an
or supplemented as specified in the Indenture. In determining whether the Holders of the required principal amount of Notes have consen
such amendment, supplement or waiver, Notes owned by the Permitted Holders, the Issuers or any Guarantor, or by any Person
indirectly controlling or controlled by or under direct or indirect common control with the Permitted Holders, the Issuers or any Guarantor,
considered as though not outstanding, except that for the purposes of determining whether the Trustee will be protected in relying on
consent or waiver, only Notes that a Responsible Officer of the Trustee knows are so owned will be so disregarded.

(12) *DEFAULTS AND REMEDIES.* Events of Default are specified in the Indenture. In the case of an Event of Default arising from ce
events of bankruptcy, insolvency or reorganization, with respect to the Company or any Restricted Subsidiary, all outstanding Notes will
due and payable immediately without further action or notice. If any other Event of Default occurs and is continuing, the Trustee or the Ho
at least 25% in aggregate principal amount of the then outstanding Notes may declare all the Notes to be due and payable immediatel
may not enforce the Indenture or the Notes except as provided in the Indenture. Subject to certain limitations, Holders of a majority in a
principal amount of the then outstanding Notes may direct the Trustee in its exercise of any trust or power. The Trustee may withhold noti
continuing Default or Event of Default from Holders of the Notes if it determines that withholding notice is in their interest, except a Def
Event of Default relating to the payment of principal of, or interest, premium or Additional Interest, if any, on the Notes. The Holder
majority in aggregate principal amount of the then outstanding Notes by written notice to the Trustee may, on behalf of all of the Holders
an acceleration and its consequences, if the rescission would not conflict with any judgment or decree and if all existing Events of Defaul
nonpayment of principal, interest or premium or Additional Interest, if any, that has become due solely because of the acceleration) h
cured or waived.

(13) *TRUSTEE DEALINGS WITH COMPANY.* The Trustee, in its individual or any other capacity, may make loans to, accept deposits from
perform services for the Company or its Affiliates, and may otherwise deal with the Company or its Affiliates, as if it were not the Trustee.

(14) *NO RECOURSE AGAINST OTHERS.* A director, officer, employee, incorporator or stockholder or other owner of Capital Stock of an Is
or any of the Guarantors, as such, will not have any liability for any obligations of such Issuer or the Guarantors under the Notes, the Gua
the Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each Holder by accepting a No
and releases all such liability. The waiver and release are part of the consideration for the issuance of the Notes.

A-5

(15) *AUTHENTICATION.* This Note will not be valid until authenticated by the manual signature of the Trustee or an authenticating agent

(16) *ABBREVIATIONS.* Customary abbreviations may be used in the name of a Holder or an assignee, such as: TEN COM (= ter
common), TEN ENT (= tenants by the entireties), JT TEN (= joint tenants with right of survivorship and not as tenants in common),
Custodian), and U/G/M/A (= Uniform Gifts to Minors Act).

(17) *ADDITIONAL RIGHTS OF HOLDERS OF RESTRICTED GLOBAL NOTES AND RESTRICTED DEFINITIVE NOTES.* In addition to the rights
provided to Holders of Notes under the Indenture, Holders of Restricted Global Notes and Restricted Definitive Notes will have all the ri
forth in the Registration Rights Agreement dated as of November 23, 2010, among the Issuers, the Guarantors and the other parties na
signature pages thereof or, in the case of Additional Notes, Holders of Restricted Global Notes and Restricted Definitive Notes will have t
set forth in one or more registration rights agreements, if any, among the Issuers, the Guarantors and the other parties thereto, rela
given by the Issuers and the Guarantors to the purchasers of any Additional Notes (collectively, the *"Registration Rights Agreement"*)

(18) *CUSIP NUMBERS.* Pursuant to a recommendation promulgated by the Committee on Uniform Security Identification Procedure
Issuers have caused CUSIP numbers to be printed on the Notes, and the Trustee may use CUSIP numbers in notices of redem
convenience to Holders. No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained ir
of redemption, and reliance may be placed only on the other identification numbers placed thereon.

(19) *GOVERNING LAW.* THE LAWS OF THE STATE OF NEW YORK WILL GOVERN AND BE USED TO CONSTRUE THE
INDENTURE, THIS NOTE AND THE GUARANTEES.

The Issuers will furnish to any Holder upon written request and without charge a copy of the Indenture and/or the Registrat
Agreement. Requests may be made to:

Black Elk Energy Offshore Operations, LLC
11451 Katy Freeway, Suite 500

Indenture, dated as of November 23, 2010

Houston, TX 77079
Facsimile No.: (281) 598-8601
Attention: James Hagemeier

A-6

ASSIGNMENT FORM

To assign this Note, fill in the form below:

(I) or (we) assign and transfer this Note to: _____

(Insert assignee's legal name)

(Insert assignee's soc. sec. or tax I.D. no.)

(Print or type assignee's name, address and zip code)

and irrevocably appoint_____ to transfer this Note
on the books of the Issuers. The agent may substitute another to act for him.

Date:_____

Your Signature: _____
(Sign exactly as your name appears on the face of th
Note)

Signature Guarantee:_____

A-7

OPTION OF HOLDER TO ELECT PURCHASE

If you want to elect to have this Note purchased by the Issuers pursuant to Section 4.06, 4.10 or 4.15 of the Indenture, check the a[
box below:

☐ Section 4.06      ☐ Section 4.10      ☐ Section 4.15

If you want to elect to have only part of the Note purchased by the Issuers pursuant to Section 4.06, 4.10 or 4.15 of the Indenture,
amount you elect to have purchased:

$_____

Date:_____

Your Signature: _____
(Sign exactly as your name appears on the face of th
Note)

Tax Identification No.: _____

Signature Guarantee:_____

A-8

SCHEDULE OF EXCHANGES OF INTERESTS IN THE GLOBAL NOTE *

Indenture, dated as of November 23, 2010

The following exchanges of a part of this Global Note for an interest in another Global Note or for a Definitive Note, or exchanges of another Global Note or Definitive Note for an interest in this Global Note, have been made:

| Date of Exchange | Amount of decrease in Principal Amount of this Global Note | Amount of increase in Principal Amount of this Global Note | Principal Amount of this Global Note following such decrease (or increase) | Signature of authorized officer of Trustee or Custodian |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

\* *This schedule should be included only if the Note is issued in global form*

A-9

EXHIBIT B

FORM OF CERTIFICATE OF TRANSFER

Black Elk Energy Offshore Operations, LLC
11451 Katy Freeway, Suite 500
Houston, TX 77079

[*Registrar address block*]

Re: 13.75% Senior Secured Notes due 2015

Reference is hereby made to the Indenture, dated as of November 23, 2010 (the "*Indenture*"), among Black Elk Energy Offshore Operations, LLC, a Texas limited liability company (the "*Company*"), Black Elk Energy Finance Corp., a Texas corporation (the "*Issuer*" and together with the Company, the "*Issuers*"), the Guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

_____, (the "*Transferor*") owns and proposes to transfer the Note[s] or interest in such Note[s] specified in Annex A hereto, in the principal amount of $_____ in such Note[s] or interests (the "*Transfer*"), to _____ (the "*Transferee*"), as further specified in Annex A hereto. In connection with the Transfer, the Transferor hereby certifies that:

[CHECK ALL THAT APPLY]

1. ☐ **Check if Transferee will take delivery of a beneficial interest in the 144A Global Note or a Restricted Definitive Note pursuant to Rule 144A.** The Transfer is being effected pursuant to and in accordance with Rule 144A under the Securities Act of 1933, as amended (the "*Securities Act*"), and, accordingly, the Transferor hereby further certifies that the beneficial interest or Definitive Note is being transferred to a Person that the Transferor reasonably believes is purchasing the beneficial interest or Definitive Note for its own account, or for one or more accounts with respect to which such Person exercises sole investment discretion, and such Person and each such account is a "qualified institutional buyer" within the meaning of Rule 144A in a transaction meeting the requirements of Rule 144A, and such Transfer is in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the 144A Global Note and/or the Restricted Definitive Note and in the Indenture and the Securities Act.

2. ☐ **Check if Transferee will take delivery of a beneficial interest in [the Regulation S Temporary Global Note,] the Regulation S [Permanent] Global Note or a Restricted Definitive Note pursuant to Regulation S.** The Transfer is being effected pursuant to and in accordance with Rule 903 or Rule 904 under the Securities Act and, accordingly, the Transferor hereby further certifies that (i) the Transfer is being made to a Person outside the United States and (x) at the time the buy order was originated, the Transferee was outside the United States or such Transferor and any Person acting on its behalf reasonably believed and believes that the Transferee was outside the United States, (y) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither such Transferor nor any Person acting on its behalf knows that the transaction was prearranged with a buyer in the United States, (ii) no directed selling efforts have been made in contravention of the requirements of Rule 903(b) or Rule 904(b) of Regulation S under the Securities Act, (iii) the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act and (iv) if the proposed transfer is being made prior to the expiration of the applicable holding period with respect to

Indenture, dated as of November 23, 2010

B-1

restricted securities set forth in Rule 144 under the Securities Act, as amended, the transfer is not being made to a U.S. Person or for the benefit of a U.S. Person. Upon consummation of the proposed transfer in accordance with the terms of the Indenture, the transferred interest or Definitive Note will be subject to the restrictions on Transfer enumerated in the Private Placement Legend printed on the Reg Permanent Global Note [, the Regulation S Temporary Global Note] and/or the Restricted Definitive Note and in the Indenture and the S Act.

3. ☐ **Check and complete if Transferee will take delivery of a beneficial interest in the IAI Global Note or a Restricted Definitive Note pursuant to any provision of the Securities Act other than Rule 144A or Regulation S**. The Transfer is being effected in compliance with the transfer restrictions applicable to beneficial interests in Restricted Global Notes and Restricted Definitive Notes and pursuant to and in ac with the Securities Act and any applicable blue sky securities laws of any state of the United States, and accordingly the Transferor hereby certifies that (check one):

(a) ☐ such Transfer is being effected pursuant to and in accordance with Rule 144 under the Securities Act;

or

(b) ☐ such Transfer is being effected to the Company or a subsidiary thereof;

or

(c) ☐ such Transfer is being effected pursuant to an effective registration statement under the Securities Act and in compliance prospectus delivery requirements of the Securities Act;

or

(d) ☐ such Transfer is being effected to an Institutional Accredited Investor and pursuant to an exemption from the regis requirements of the Securities Act other than Rule 144A, Rule 144, Rule 903 or Rule 904, and the Transferor hereby further certifie has not engaged in any general solicitation within the meaning of Regulation D under the Securities Act and the Transfer complies transfer restrictions applicable to beneficial interests in a Restricted Global Note or Restricted Definitive Notes and the requiremen exemption claimed, which certification is supported by (1) a certificate executed by the Transferee in the form of Exhibit D to the In and (2) if such Transfer is in respect of a principal amount of Notes at the time of transfer of less than $250,000, an Opinion provided by the Transferor or the Transferee (a copy of which the Transferor has attached to this certification), to the effect that such is in compliance with the Securities Act. Upon consummation of the proposed transfer in accordance with the terms of the Inden transferred beneficial interest or Definitive Note will be subject to the restrictions on transfer enumerated in the Private Placeme printed on the IAI Global Note and/or the Restricted Definitive Notes and in the Indenture and the Securities Act.

4. ☐ **Check if Transferee will take delivery of a beneficial interest in an Unrestricted Global Note or of an Unrestricted Definitive Note**.

(a) ☐ **Check if Transfer is pursuant to Rule 144**. (i) The Transfer is being effected pursuant to and in accordance with Rule 144 under Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky securities laws of an the

B-2

United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the tra beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Private Placement Legend p the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(b) ☐ **Check if Transfer is Pursuant to Regulation S**. (i) The Transfer is being effected pursuant to and in accordance with Rule 903 Rule 904 under the Securities Act and in compliance with the transfer restrictions contained in the Indenture and any applicable blue sky laws of any state of the United States and (ii) the restrictions on transfer contained in the Indenture and the Private Placement Lege required in order to maintain compliance with the Securities Act. Upon consummation of the proposed Transfer in accordance with the ter Indenture, the transferred beneficial interest or Definitive Note will no longer be subject to the restrictions on transfer enumerated in the Placement Legend printed on the Restricted Global Notes, on Restricted Definitive Notes and in the Indenture.

(c) ☐ **Check if Transfer is Pursuant to Other Exemption**. (i) The Transfer is being effected pursuant to and in compliance with exemption from the registration requirements of the Securities Act other than Rule 144, Rule 903 or Rule 904 and in compliance with the restrictions contained in the Indenture and any applicable blue sky securities laws of any State of the United States and (ii) the restr transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Secu Upon consummation of the proposed Transfer in accordance with the terms of the Indenture, the transferred beneficial interest or Defini

Indenture, dated as of November 23, 2010

will not be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Global Notes or Definitive Notes and in the Indenture.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuers.

<div style="text-align: right;">

[Insert Name of Transferor]

By: _____
    Name:
    Title:

</div>

Dated: _____

<div style="text-align: center;">B-3</div>

---

<div style="text-align: center;">ANNEX A TO CERTIFICATE OF TRANSFER</div>

1. The Transferor owns and proposes to transfer the following:

<div style="text-align: center;">[CHECK ONE OF (a) OR (b)]</div>

(a) ☐ a beneficial interest in the:

    (i) ☐ 144A Global Note (CUSIP 09203Y AA9), or

    (ii) ☐ Regulation S Global Note (CUSIP U0918C AA9), or

    (iii) ☐ IAI Global Note (CUSIP 09203Y AB7); or

(b) ☐ a Restricted Definitive Note.

2. After the Transfer the Transferee will hold:

<div style="text-align: center;">[CHECK ONE]</div>

(a) ☐ a beneficial interest in the:

    (i) ☐ 144A Global Note (CUSIP 09203Y AA9), or

    (ii) ☐ Regulation S Global Note (CUSIP U0918C AA9), or

    (iii) ☐ IAI Global Note (CUSIP 09203Y AB7); or

    (iv) ☐ Unrestricted Global Note (CUSIP 09203Y AC5); or

(b) ☐ a Restricted Definitive Note; or

(c) ☐ an Unrestricted Definitive Note,

in accordance with the terms of the Indenture.

<div style="text-align: center;">B-4</div>

---

<div style="text-align: right;">EXHIBIT C</div>

<div style="text-align: center;">FORM OF CERTIFICATE OF EXCHANGE</div>

Black Elk Energy Offshore Operations, LLC
11451 Katy Freeway, Suite 500
Houston, TX 77079

[Registrar address block]

    Re: 13.75% Senior Secured Notes due 2015 (CUSIP _____)

    Reference is hereby made to the Indenture, dated as of November 23, 2010 (the "Indenture"), among Black Elk Energy Offshore Operations, LLC, a Texas limited liability company (the "Company"), Black Elk Energy Finance Corp., a Texas corporation (the "Co-Issuer" and together with the Company, the "Issuers"), the Guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

Indenture, dated as of November 23, 2010

_____, (the "*Owner*") owns and proposes to exchange the Note[s] or interest in such Note[s] specified herein, in the principal amount of $_____ in such Note[s] or interests (the "*Exchange*"). In connection with the Exchange, the Owner hereby certifies that:

1. **Exchange of Restricted Definitive Notes or Beneficial Interests in a Restricted Global Note for Unrestricted Definitive Notes or Beneficial Interests in an Unrestricted Global Note**

(a) ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to beneficial interest in an Unrestricted Global Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a beneficial interest in an Unrestricted Global Note in an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Global Notes and pursuant to and in accordance with the Securities Act of 1933, as amended (the "*Securities Act*"), (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest in an Unrestricted Global Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(b) ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Unrestricted Definitive Note**. In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

(c) ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in an Unrestricted Global Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for a beneficial interest in an Unrestricted Global Note, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the beneficial interest is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

C-1

(d) ☐ **Check if Exchange is from Restricted Definitive Note to Unrestricted Definitive Note**. In connection with the Owner's Exchange of a Restricted Definitive Note for an Unrestricted Definitive Note, the Owner hereby certifies (i) the Unrestricted Definitive Note is being acquired for the Owner's own account without transfer, (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to Restricted Definitive Notes and pursuant to and in accordance with the Securities Act, (iii) the restrictions on transfer contained in the Indenture and the Private Placement Legend are not required in order to maintain compliance with the Securities Act and (iv) the Unrestricted Definitive Note is being acquired in compliance with any applicable blue sky securities laws of any state of the United States.

2. **Exchange of Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes for Restricted Definitive Notes or Beneficial Interests in Restricted Global Notes**

(a) ☐ **Check if Exchange is from beneficial interest in a Restricted Global Note to Restricted Definitive Note.** In connection with the Exchange of the Owner's beneficial interest in a Restricted Global Note for a Restricted Definitive Note with an equal principal amount, the Owner hereby certifies that the Restricted Definitive Note is being acquired for the Owner's own account without transfer. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the Restricted Definitive Note issued will continue to be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the Restricted Definitive Note and in the Indenture and the Securities Act.

(b) ☐ **Check if Exchange is from Restricted Definitive Note to beneficial interest in a Restricted Global Note**. In connection with the Exchange of the Owner's Restricted Definitive Note for a beneficial interest in the [CHECK ONE] ☐ 144A Global Note ☐ Regulation S Global Note, ☐ IAI Global Note with an equal principal amount, the Owner hereby certifies (i) the beneficial interest is being acquired for the Owner's own account without transfer and (ii) such Exchange has been effected in compliance with the transfer restrictions applicable to the Restricted Global Notes and pursuant to and in accordance with the Securities Act, and in compliance with any applicable blue sky securities laws of any state of the United States. Upon consummation of the proposed Exchange in accordance with the terms of the Indenture, the beneficial interest issued will be subject to the restrictions on transfer enumerated in the Private Placement Legend printed on the relevant Restricted Global Note in the Indenture and the Securities Act.

This certificate and the statements contained herein are made for your benefit and the benefit of the Issuers.

_____
[Insert Name of Transferor]

By: _____
Name:

Indenture, dated as of November 23, 2010

Title: _____

Dated:_____

C-2

---

EXHIBIT D

FORM OF CERTIFICATE FROM
ACQUIRING INSTITUTIONAL ACCREDITED INVESTOR

Black Elk Energy Offshore Operations, LLC
11451 Katy Freeway, Suite 500
Houston, TX 77079

[*Registrar address block*]

Re: 13.75% Senior Secured Notes due 2015

Reference is hereby made to the Indenture, dated as of November 23, 2010 (the "*Indenture*"), among Black Elk Energy Offshore Operations, LLC, a Texas limited liability company (the "*Company*"), Black Elk Energy Finance Corp., a Texas corporation (the "*Co-Issuer*" and together with the Company, the "*Issuers*"), the Guarantors party thereto and The Bank of New York Mellon Trust Company, N.A., as Trustee. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

In connection with our proposed purchase <u>of $</u> aggregate principal amount of:

    (a) ☐ a beneficial interest in a Global Note, or

    (b) ☐ a Definitive Note,

we confirm that:

1. we are an Institutional "Accredited Investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act of 19 amended (the "*Securities Act*");

2. any purchase of Notes by us will be for our own account or the account of one or more other Institutional Accredited Investo which we exercise sole investment discretion;

3. either (1) we are not, and will not transfer the Notes to, an entity holding "plan assets," within the meaning of 29 C.F.R. 2510.3-any "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Security Act of 1974, as am ("*ERISA*") or any "plan" within the meaning of Section 4975 of the Internal Revenue Code of 1986, as amended (the "*Code*"), or (2) our purchase and holding of the Notes will not result in a non-exempt prohibited transaction under ERISA or Section 4975 of the C any substantially similar applicable law);

4. we have such knowledge and experience in financial and business matters that we are capable of evaluating the merits ar purchasing the Notes, and we and any accounts for which we are acting are able to bear the economic risks of an entire loss their investment in the Notes;

5. we are not acquiring the Notes with a view to any distribution thereof in a transaction that would violate the Securities Ac securities laws of any state of the U.S. or any other applicable jurisdiction; *provided* that the disposition of our property and the property of any accounts for which we are acting as fiduciary shall remain at all times within our and their control;

D-1

---

6. we have received a copy of the Offering Circular and acknowledge that we have had access to such financial and other informa have been afforded the opportunity to ask such questions of representatives of the Issuers and receive answers thereto, a necessary to verify the information contained in the Offering Circular; and

7. we acknowledge that the Notes have not been registered under the Securities Act and that the Notes may not be offered or s the U.S. or to, or for the benefit of, U.S. persons except as set forth below.

You and the Issuers are entitled to rely upon this letter and are irrevocably authorized to produce this letter or a copy hereof to any i party in any administrative or legal proceedings or official inquiry with respect to the matters covered hereby.

_____
[Insert Name of Accredited Investor]

Indenture, dated as of November 23, 2010

<div style="text-align:right;">
By: _____<br>
Name:<br>
Title:
</div>

Dated: _____

<div style="text-align:center;">D-2</div>

---

<div style="text-align:right;">EXHIBIT E</div>

<div style="text-align:center;">FORM OF NOTATION OF GUARANTEE</div>

For value received, each Guarantor (which term includes any successor Person under the Indenture (as defined below)) agrees, su provisions in the Indenture dated as of November 23, 2010 (the "*Indenture*") among Black Elk Energy Offshore Operations, LLC, a Texas limite liability company, Black Elk Energy Finance Corp., a Texas corporation, the Guarantors party thereto and The Bank of New York Mello Company, N.A., as trustee (in such capacity, the "*Trustee*") and as collateral agent: (a) that the undersigned, jointly and severally with the Guarantors, fully, irrevocably, absolutely, and unconditionally guarantees to each Holder of Notes and the Trustee the prompt and c payment and performance when due, and no matter how the same shall become due, of all Guaranteed Obligations subject to any f forth therein; (b) that each reference in the Indenture to a "Guarantor" shall also mean and be a reference to the undersigned; (c obligations of the Guarantors to the Holders of Notes and to the Trustee pursuant to the Indenture are expressly set forth in Article Indenture, and reference is hereby made to the Indenture for the precise terms of the Guarantee; (d) to be bound by such provi (e) authorizes and directs the Trustee, on behalf of such Holder, to take such action as may be necessary or appropriate to effec provisions.

NEW YORK LAW TO GOVERN. THE INTERNAL LAW OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS NOTATION OF GUARANTEE.

Capitalized terms used but not defined herein have the meanings given to them in the Indenture.

<div style="text-align:center;">[NAME OF GUARANTOR(S)]</div>

<div style="text-align:right;">
By: _____<br>
Name:<br>
Title:
</div>

<div style="text-align:center;">E-1</div>

---

<div style="text-align:right;">EXHIBIT F</div>

<div style="text-align:center;">
[FORM OF SUPPLEMENTAL INDENTURE<br>
TO BE DELIVERED BY SUBSEQUENT GUARANTORS]
</div>

THIS SUPPLEMENTAL INDENTURE (this "*Supplemental Indenture*"), dated as of _____, 20__, is among _____ (the "*Guaranteeing Subsidiary*"), a subsidiary of Black Elk Energy Offshore Operations, LLC (or its permitted successor), a Delaware limited lia company (the "*Company*"), the Company, Black Elk Energy Finance Corp., a Delaware corporation (the "*Issuer*" and, together with the Company, the "*Issuers*"), the other Guarantors (as defined in the Indenture referred to herein) and The Bank of New York Mellon Trust Con N.A., as trustee under the Indenture referred to below (the "*Trustee*").

<div style="text-align:center;">W I T N E S S E T H</div>

WHEREAS, the Issuers have heretofore executed and delivered to the Trustee an indenture (the "*Indenture*"), dated as of November 23, 2010 providing for the issuance of 13.75% Senior Secured Notes due 2015 (the "*Notes*");

WHEREAS, the Indenture provides that under certain circumstances the Guaranteeing Subsidiary shall execute and deliver to the supplemental indenture pursuant to which the Guaranteeing Subsidiary shall unconditionally guarantee all of the Issuers' Obligations u Notes and the Indenture on the terms and conditions set forth herein (the "*Guarantee*"); and

WHEREAS, pursuant to Section 9.01 of the Indenture, the Trustee is authorized to execute and deliver this Supplemental Indenture.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is acknowledged, the Issuers, the Guaranteeing Subsidiary, the existing Guarantors and the Trustee mutually covenant and agree for the ratable benefit of the Holders of the Notes as follows:

Indenture, dated as of November 23, 2010

1. CAPITALIZED TERMS. Capitalized terms used herein without definition shall have the meanings assigned to them in the Indenture

2. AGREEMENT TO GUARANTEE. The Guaranteeing Subsidiary hereby agrees to provide an unconditional Guarantee on the term subject to the conditions set forth in the Indenture including but not limited to Article 11 thereof.

4. NO RECOURSE AGAINST OTHERS. No past, present or future director, officer, employee, incorporator, stockholder or agent o Guaranteeing Subsidiary, as such, shall have any liability for any obligations of the Guaranteeing Subsidiary under the Notes, its Gu Indenture or this Supplemental Indenture or for any claim based on, in respect of, or by reason of, such obligations or their creation. Each the Notes by accepting a Note waives and releases all such liability. The waiver and release are part of the consideration for issuance of t

5. NEW YORK LAW TO GOVERN. THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN AND BE USED TO CONSTRUE THIS SUPPLEMENTAL INDENTURE.

6. COUNTERPARTS The parties may sign any number of copies of this Supplemental Indenture. Each signed copy shall be an original of them together represent the same agreement.

<div align="center">F-1</div>

7. EFFECT OF HEADINGS. The Section headings herein are for convenience only and shall not affect the construction hereof.

8. THE TRUSTEE The Trustee shall not be responsible in any manner whatsoever for or in respect of the validity or sufficiency Supplemental Indenture or for or in respect of the recitals contained herein, all of which recitals are made solely by the Guaranteeing S and the Issuers.

<div align="center">F-2</div>

IN WITNESS WHEREOF, the parties hereto have caused this Supplemental Indenture to be duly executed and attested, all as of the above written.

Dated: _____, 20__

[GUARANTEEING SUBSIDIARY]

By: _____
    Name:
    Title:

BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC

By: _____
    Name:
    Title:

BLACK ELK ENERGY FINANCE CORP.

By: _____
    Name:
    Title:

[EXISTING GUARANTORS]

By: _____
    Name:
    Title:

THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., as Trustee

By: _____
    Authorized Signatory

<div align="center">F-3</div>

Indenture, dated as of November 23, 2010

EXHIBIT 47

10/26/2018                                                2013.12.31-10K

10-K 1 a20131231-10k.htm 10-K
Table of Contents

Index to Financial Statements

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

**(Mark one)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the fiscal year ended December 31, 2013

### or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the transition period from           to

### Commission file no. 333-174226

# BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC
### (Exact name of registrant as specified in its charter)

| Texas | 38-3769404 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **11451 Katy Freeway, Suite 500** | |
| **Houston, Texas** | **77079** |
| (Address of principal executive offices) | (Zip Code) |

### (281) 598-8600
### (Registrant's telephone number, including area code)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   ☐ Yes   ☒ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   ☒ Yes   ☐ No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   ☒ Yes   ☐ No

(Explanatory Note: The registrant is a voluntary filer and is not subject to the filing requirements of the Securities Exchange Act of 1934. However, during the preceding 12 months, the registrant has filed all reports that it would have been required to file by Section 13 or 15(d) of the Securities Exchange Act of 1934 if the registrant was subject to the filing requirements of the Securities Exchange Act of 1934.)

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   ☒ Yes   ☐ No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).  ☐ Yes   ☒ No

As of June 29, 2012, the registrant's membership interests are currently not listed on an exchange and, therefore, the aggregate market value of the registrant's membership interests held by non-affiliates on such date cannot be reasonably determined.

As of March 31, 2014, there were 1,361,300 Class A Units, 114,277,308.5 Class B Units, 12,031,250 Class C Units and 109,743,693 Class E Units issued and outstanding.

---

**DOCUMENTS INCORPORATED BY REFERENCE:**
Exhibits incorporated by reference are referred to under Part IV of this annual report.

Table of Contents

Index to Financial Statements

**BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC'S**
**ANNUAL REPORT ON FORM 10-K**
**FOR THE YEAR ENDED DECEMBER 31, 2013**

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| Cautionary Note Regarding Forward-Looking Statements | ii |
| PART I | |
| Item 1. Business | 1 |
| Item 1A. Risk Factors | 17 |
| Item 1B. Unresolved Staff Comments | 34 |
| Item 2. Properties | 34 |
| Item 3. Legal Proceedings | 34 |
| Item 4. Mine Safety Disclosures | 36 |
| PART II | |
| Item 5. Related Stockholder Matters and Issuer Purchases of Equity Securities | 37 |
| Item 6. Selected Financial Data | 37 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations | 39 |
| Item 7A. Quantitative and Qualitative Disclosures About Market Risk | 62 |
| Item 8. Financial Statements and Supplementary Data | 64 |
| Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 93 |
| Item 9A. Controls and Procedures | 93 |
| Item 9B. Other Information | 94 |
| PART III | |
| Item 10. Directors, Executive Officers and Corporate Governance | 96 |
| Item 11. Executive Compensation | 97 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 103 |
| Item 13. Certain Relationships and Related Transactions and Director Independence | 105 |
| Item 14. Principal Accountant Fees and Services | 107 |
| PART IV | |
| Item 15. Exhibits and Financial Statement Schedules | 108 |
| EXHIBIT INDEX | |

i

10/26/2018                                      2013.12.31-10K

Table of Contents

Index to Financial Statements

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K (this "Form 10-K") contains forward-looking statements that are subject to a number of risks and uncertainties, many of which are beyond our control. All statements, other than statements of historical fact included in this Form 10-K, regarding our strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects, plans and objectives of management are forward-looking statements. When used in this Form 10-K, the words "could," "believe," "anticipate," "intend," "estimate," "expect," "may," "continue," "predict," "potential," "project" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. Forward-looking statements may include statements that relate to, among other things, our:

- Financial data, including production, costs, revenues and operating income;
- Future financial and operating performance and results;
- Business strategy and budgets;
- Market prices;
- Expected plugging and abandonment obligations and other expected asset retirement obligations;
- Technology;
- Financial strategy;
- Amount, nature and timing of capital expenditures;
- Drilling of wells and the anticipated results thereof;
- Oil and natural gas reserves;
- Timing and amount of future production of oil and natural gas;
- Competition and government regulations;
- Operating costs and other expenses;
- Cash flow and anticipated liquidity;
- Prospect development;
- Property acquisitions and sales; and
- Plans, forecasts, objectives, expectations and intentions.

These forward-looking statements are based on our current expectations and assumptions about future events and their potential effect on us. While management believes that these forward-looking statements are reasonable as and when made, there can be no assurance that future developments affecting us will be those that we anticipate. All comments concerning our expectations for future revenues and operating results are based on our forecasts for our existing operations and do not include the potential impact of any future acquisitions. Our forward-looking statements involve significant risks and uncertainties (some of which are beyond our control) and assumptions that could cause actual results to differ materially from our historical experience and our present expectations or projections. Known material factors that could cause our actual results to differ from those in the forward-looking statements are those described in "Item 1A. Risk Factors."

Readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date of this Form 10-K. We undertake no responsibility to publicly release the results of any revisions of our forward-looking statements after the date they are made.

Should one or more of the risks or uncertainties described in this Form 10-K occur, or should underlying assumptions prove incorrect, our actual results and plans could differ materially from those expressed in any forward-looking statement.

All forward-looking statements, expressed or implied, included in this Form 10-K are expressly qualified in their entirety by this cautionary statement. This cautionary statement should also be considered in connection with any subsequent written or oral forward-looking statements that we or persons acting on our behalf may issue.

**Except as required by law, we undertake no obligations to update, revise or release any revisions to any forward-looking statements to reflect events or circumstances occurring after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict all of these factors. Further, we cannot assess the impact of each such factor on our business or the extent to which any factors, or combination of factors, may cause actual results to be materially different from those contained in any forward-looking statement.**

Table of Contents

Index to Financial Statements

While many rules and regulations have been promulgated and are already in effect, other rules and regulations, including the proposed margin rules, remain to be finalized or effectuated; therefore, the impact of those rules and regulations on us is uncertain at this time. The Dodd-Frank Act, and the rules promulgated thereunder, could (1) significantly increase the cost of derivative contracts (including from swap recordkeeping and reporting,or decrease the liquidity, of energy-related derivatives we use to hedge against commodity price fluctuations (including through requirements to post collateral, which could adversely affect our available liquidity), (2) materially alter the terms of derivative contracts, (3) reduce the availability of derivatives to protect against risks we encounter, and (4) increase our exposure to less creditworthy counterparties. If we reduce our use of derivatives as a result of the Dodd-Frank Act and applicable rules and regulations, our cash flow may become more volatile and less predictable, which could adversely affect our ability to plan for and fund capital expenditures.

Finally, the Dodd-Frank Act was intended, in part, to reduce the volatility of oil, natural gas liquids and natural gas prices, which some legislators attributed to speculative trading in derivatives and commodity instruments related to oil, natural gas liquids and natural gas. Our revenues could therefore be adversely affected if a consequence of the Dodd-Frank Act and regulations is to lower commodity prices. Any of these consequences could have a material adverse effect on us, our financial condition and our results of operations.

***Climate change legislation or regulations restricting emissions of GHGs could result in increased operating costs and reduced demand for the oil and natural gas that we produce.***

In December 2009, the EPA published its findings that emissions of carbon dioxide, methane and other GHGs present an endangerment to public health and the environment because emissions of such gases are, according to EPA, contributing to warming of the earth's atmosphere and other climatic changes. These findings by the EPA allow the agency to proceed with the adoption and implementation of regulations that would restrict emissions of GHGs under existing provisions of the Clean Air Act. Accordingly, the EPA has adopted rules under the Clean Air Act requiring a reduction in emissions of GHGs from motor vehicles and requiring certain construction and operating permit reviews for GHGs from certain stationary sources. In addition, the EPA has adopted rules requiring the monitoring and reporting of GHG emissions from specified GHG emission sources in the United States including, among others, certain onshore and offshore oil and natural gas production facilities on an annual basis.

In addition, from time to time, Congress has considered legislation and almost one-half of the states have already taken legal measures to reduce emissions of GHGs, primarily through the planned development of GHG emission inventories and/or regional GHG cap and trade programs. The adoption of legislation or regulatory programs to reduce emissions of GHGs could require us to incur increased operating costs, such as costs to purchase and operate emissions control systems, to acquire emissions allowances or comply with new regulatory or reporting requirements. Any such legislation or regulatory programs could also increase the cost of consuming, and thereby reduce demand for, the oil and natural gas we produced. Consequently, legislation and regulatory programs to reduce emissions of GHGs could have an adverse effect on our business, financial condition and results of operations. Finally, it should be noted that some scientists have concluded that increasing concentrations of GHGs in the Earth's atmosphere may produce climate changes that have significant physical effects, such as increased frequency and severity of storms, droughts, and floods and other climatic events. If any such effects were to occur, they could have an adverse effect on our financial condition and results of operations.

**Risks Related to Our Relationship with Platinum**

***Platinum owns approximately 85% of our outstanding voting membership interests, giving it influence and control in corporate transactions and other matters, which may conflict with noteholders' interests.***

As of December 31,2013, Platinum beneficially owned approximately 85% of our outstanding voting membership interests and approximately 66% of our total outstanding membership interests. As a result, and for as long as Platinum holds a membership interest in us, Platinum has the ability to remove and appoint key personnel, including all of our managers, and to determine and control our company and management policies, our financing arrangements, the payment of dividends or other distributions, and the outcome of certain company transactions or other matters submitted to our members for approval, including potential mergers or acquisitions, asset sales and other significant corporate transactions. As a controlling member, Platinum could make decisions that may conflict with noteholders' interests.

Pursuant to our Second Amended and Restated Limited Liability Company Operating Agreement (as amended and in effect as of the date hereof), if we propose to obtain additional financing through the issuance of equity or certain debt securities, Platinum is entitled to a right of first offer to provide such financing. Platinum and the other members also have, pursuant to that agreement, the right of first refusal with respect to any proposed transfer of our equity interests.

33

EXHIBIT 48

**To:**      Daniel Small[dsmall@platinumlp.com]
**From:**   David Levy
**Sent:**    Tue 7/15/2014 6:29:44 PM
**Subject:**  FW: RE:

---

**From:** David Levy
**Sent:** Sunday, July 13, 2014 7:06 PM
**To:** John Hoffman
**Cc:** Mark Nordlicht
**Subject:** Re: RE:

As we discussed please pull back the letter on Jeff. IBM flexible tonight or tomorrow am to speak to you regarding art.

Sent from my iPhone
On Jul 13, 2014, at 6:40 PM, "John Hoffman" <jhoffman@blackelkenergy.com> wrote:

> Please let's talk about a time to talk to Art.
>
> Also I need an email please from you telling me to reverse / over-ride my decision on firing Jeff. Then I will honor your demand.
>
> Talk in the morning.
>
> Best

John
> On Jul 11, 2014, at 4:47 PM, "David Levy" <dlevy@beechwood.com> wrote:

>> Sounds good.  please call when you can. Thanks

>> **From:** John Hoffman [mailto:jhoffman@blackelkenergy.com]
>> **Sent:** Friday, July 11, 2014 5:46 PM
>> **To:** David Levy
>> **Subject:** RE:

>> Got him to back off and talk to you on Monday….. being reasonable.

>> **From:** David Levy [mailto:dlevy@beechwood.com]
>> **Sent:** Friday, July 11, 2014 4:45 PM
>> **To:** John Hoffman
>> **Subject:** RE:

>> We said we would speak about art 1st what's happening with him please be careful as he has threatened litigation against the company

>> **From:** John Hoffman [mailto:jhoffman@blackelkenergy.com]
>> **Sent:** Friday, July 11, 2014 5:36 PM
>> **To:** David Levy
>> **Subject:** Re:

>> As soon as done with Art will call

John
> On Jul 11, 2014, at 4:32 PM, "David Levy" <dlevy@beechwood.com> wrote:

>> John did you have a chance to put the numbers together for me. I would like to see them before anything goes out to anyone as we discussed. Just tried you please call when you can

Beechwood | **David Levy**
1370 Avenue of the Americas, 32nd Floor, New York, NY 10019

tel: (646) 356-1616 | fax: (212) 260-5051 | cell: (516) 319-1555

DLevy@beechwood.com

CONFIDENTIALITY NOTE: The information contained in this email message may
be legally privileged and confidential information intended only for the use of the
individual or entity to whom it is addressed. If the reader of this message is not the
intended recipient, you are hereby notified that any dissemination, distribution or
copy of this message is strictly prohibited. If you have received this email in error,
please immediately delete the message. Thank you.

CONFIDENTIALITY NOTE: The information contained in this email message may be legally
privileged and confidential information intended only for the use of the individual or entity to
whom it is addressed. If the reader of this message is not the intended recipient, you are hereby
notified that any dissemination, distribution or copy of this message is strictly prohibited. If you
have received this email in error, please immediately delete the message. Thank you.

CONFIDENTIALITY NOTE: The information contained in this email message may be legally
privileged and confidential information intended only for the use of the individual or entity to
whom it is addressed. If the reader of this message is not the intended recipient, you are hereby
notified that any dissemination, distribution or copy of this message is strictly prohibited. If you
have received this email in error, please immediately delete the message. Thank you.

CONFIDENTIALITY NOTE: The information contained in this email message may be legally privileged and
confidential information intended only for the use of the individual or entity to whom it is addressed. If the reader of this
message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this message
is strictly prohibited. If you have received this email in error, please immediately delete the message. Thank you.

**To:** David Levy[dlevy@platinumlp.com]
**Cc:** Daniel Small[dsmall@platinumlp.com]
**From:** Mark Nordlicht
**Sent:** Mon 8/18/2014 1:59:45 PM
**Subject:** FW: notes to david regarding equity deal

I do want to treat Jeff well and recognize renassaince transaction. At same time, I want to transition him out of Freedom petroleum/black elk as soon as possible and get him back at freedom wells. He can also be special utility person we can use in all kinds of restructuring business. I don't see him at black elk though and obviously I don't appreciate him saying our equity isn't worth anything. It goes without saying that anyone who says that cannot remain in leadership capacity , not that he had right temperament or expertise to do it anyhow. Lets make that clear as part of the package.

---

**From:** Jeffrey Shulse [mailto:jshulse314@outlook.com]
**Sent:** Monday, August 18, 2014 6:12 AM
**To:** Daniel Small; David Levy; Mark Nordlicht
**Subject:** RE: notes to david regarding equity deal

I don't mean to keep bugging everyone, but it has been another month and a lot has been accomplished ... As I said in my July 22nd note and previous notes before that, my intention is not to make a crazy ask, but rather looking for an acknowledgement that closing Renaissance and paying preferred is the big liquidity event at Black Elk for quite sometime.   It definitely means the common equity is worth zero, so while I am interested in equity incentive going forward, I don't think that alone is the only incentive that is fair given where we are at.

I had the benefit of everyone at Platinum, but there was no chance John, Art and Joe were going to get you the result at Renaissance that I did, and there was little chance anyone other than me was going to step into this mess, put up with the enormous pile of crap john and his team dealt out, get fired several times, and still work long hours to make everything happen.

Given the significant payments made in the past to John and James for closing public debt ( which I'm guessing was really sourced by Platinum), given the significant payments given to Joe Matthews to close terrible deals, and given the likely departure payments to John and Art and others who are responsible for this mess, I am just looking for something fair and consistent with the significant value I have brought from increased Renaissance proceeds over Talos, the $2 million in debt reduction from Wood Group and Hercules (with more coming), the P&A deal with Merit, bond collateral restructuring, Fieldwood transaction, etc.

I would respectfully ask that we make this a priority this week so I know where I stand

---

From: jshulse314@outlook.com
To: dsmall@platinumlp.com
Subject: notes to david regarding equity deal
Date: Tue, 22 Jul 2014 16:52:25 +0000

Dan,

Attached is two of the emails I sent to David over the past 6 months ... I cant find the one from January when I started ... My intention is not to make some crazy ask ... I am flexible with how we structure this, my only requirement is that I am aligned with Platinum and it seems to me that has to include something around the debt as well as the equity.

I will say that some of this is all sort of happening all at once which might come off as a big ask, but I can say I have been consistent from the beginning and it is just timing.  A couple of percentage points around debt and a reasonable equity percentage seems to me to be reasonable given the amount of work, the difficult environment, the risk of getting all this accomplished, etc.  I don't think I am asking for double digit ownership and I certainly would like to think I deserve as much to fix it as the people who screwed it up are getting.

David assured me when I took this position that we are all going to make a lot of money and with this Renaissance deal

it seems to me that this is the liquidity event remaining for Black Elk and certainly for Platinum around the preferreds ... I am going to work as hard as I can to see that there is value to the equity but I hope you agree it is highly highly speculative ... this is the bite at the apple in the coming months so just looking for something fair.

Look forward to your thoughts

Sent from Windows Mail

EXHIBIT 49

**To:**       Saurabh Shah[SShah@platinumlp.com]; 'Momborquette, David'[David.Momborquette@srz.com]
**From:**   David Ottensoser
**Sent:**    Tue 3/3/2015 10:29:35 PM
**Subject:** FW: U1247575 Platinum Partners Liquid Opportunity Master Fund

---

**From:** David Ottensoser
**Sent:** Tuesday, March 03, 2015 5:28 PM
**To:** 'Randy Katzenstein'
**Cc:** Alice Rooney
**Subject:** RE: U1247575 Platinum Partners Liquid Opportunity Master Fund

Randy –

We wanted to reply to the February 17, 2015 inquiry that you forwarded to us from Interactive Brokers regarding a December 15, 2014 trade in certain high yield bonds issued by Black Elk. Based on our review of the circumstances underlying the trade, our understanding is that the sale was made from an account belonging to the wife of David Steinberg, an employee of Platinum Partners. We understand that Mr. Steinberg had trading authority over that account. Mr. Steinberg bought Black Elk high yield bonds for Platinum Partners Liquid Opportunity Master Fund LP on December 15, 2014. Mr. Steinberg had trading authority over the fund account. Platinum Partners was in the market at various times during that month to purchase Black Elk high yield bonds.

We understand how this trade could raise questions and therefore are in the process of reviewing and revising our internal policies and procedures.

We also appreciate your getting an extension of the reply deadline on our behalf from Interactive Brokers.

David Ottensoser
Chief Compliance Officer

---

**From:** Randy Katzenstein [mailto:randy@obexgroup.com]
**Sent:** Tuesday, February 17, 2015 5:33 PM
**To:** David Ottensoser
**Cc:** Alice Rooney
**Subject:** FW: U1247575 Platinum Partners Liquid Opportunity Master Fund

Hi David:

OBEX has been asked by our clearing firm, Interactive Brokers, to send PPLO the attached message regarding some trading PPLO did in December and obtain a written response to the inquiry.  I spoke with Mark Misch, the compliance analyst who explained why this is on their radar.  It appears that when PPLO bought 10 Black Elk bonds, I believe by David Steinberg, Interactive Brokers tracked the other side of the trade originating from the same IP address.  Please note, PPLO has an account at IB which was introduced by OBEX Securities.  The buy was entered directly to Interactive by PPLO.  The transaction in question did not get handled by OBEX.  The other account, Rachel Steinberg who sold the bonds, was not opened by OBEX and is not under OBEX's purview.

As stated in the attachment, Interactive is looking for the details of the trades to review the circumstance.

Please offer an explanation for Interactive Brokers and forward to my attention.

Best regards,


Randy Katzenstein
President & CEO
OBEX Group LLC

Tel:   914-833-1800
Fax:   914-833-8903
randy@obexgroup.com



**From:** Ellen Winston-Repp [mailto:ewinston@interactivebrokers.com]
**Sent:** Tuesday, February 17, 2015 12:04 PM
**To:** Alice M. Rooney
**Cc:** Randy Katzenstein
**Subject:** U1247575 Platinum Partners Liquid Opportunity Master Fund

Hi Alice,

IB's Compliance dept has asked me to contact OBEX Securities regarding one of its clients, U1247575 Platinum Partners Liquid Opportunity Master Fund account, which has recently appeared on one of IB's surveillance reports.

I am sending you this email because a written notice needs to be sent your client which I have attached.

Regards, Ellen
_____
Ellen Winston-Repp | Institutional Sales
**Interactive Brokers LLC**   | 8 Greenwich Office Park, Greenwich, CT 06831
(203) 618-8002 (O) 203-273-5872 (M)

EXHIBIT 50

**To:**      Nicholas Marzella (nmarzella@platinumlp.com)[nmarzella@platinumlp.com]
**Cc:**      Israel Wallach (iwallach@beechwoodreinsurance.com)[iwallach@beechwoodreinsurance.com]; David Shirreffs
(dshirreffs@beechwoodreinsurance.com)[dshirreffs@beechwoodreinsurance.com]
**From:**    Mark Nordlicht
**Sent:**    Mon 6/23/2014 5:13:41 PM

I want to move/sell  10 million of black elk bonds to bbil the nomura account. Please take care of it today.

**To:**     David Steinberg <DSteinberg@platinumlp.com>[DSteinberg@platinumlp.com]; Nicholas Marzella
<nmarzella@platinumlp.com>[nmarzella@platinumlp.com]
**Cc:**     Wallach Israel <iwallach@beechwoodreinsurance.com>[iwallach@beechwoodreinsurance.com]
**From:**   Mark Nordlicht <mnordlicht@platinumlp.com>
**Sent:**   Tue 5/13/2014 6:02:11 PM

David, nick- beechwood is buying 8 million black elk from PPVA. What is best
way to cross? Can we do it today please?

Sent from my iPad

**To:**    Nicholas Marzella <nmarzella@platinumlp.com>[nmarzella@platinumlp.com]
**Cc:**    Israel Wallach (iwallach@beechwoodreinsurance.com)
<iwallach@beechwoodreinsurance.com>[iwallach@beechwoodreinsurance.com]
**From:**  Mark Nordlicht <mnordlicht@platinumlp.com>
**Sent:**  Tue 7/1/2014 7:38:26 PM

How much black elk bonds still at nomura ppva? 7 million? Trade them over to bbil ship please. Thx