EXHIBIT 51

## UNANIMOUS WRITTEN CONSENT OF THE MANAGERS OF
## BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC

### July 14, 2014

Pursuant to the provisions of Sections 6.201 and 101.359 of the Texas Business Organizations Code and the Second Amended and Restated Limited Liability Company Operating Agreement dated as of July 13, 2009, as amended on August 19, 2010, May 31, 2011, January 25, 2013, February 12, 2013, April 9, 2013, and May 3, 2013, of Black Elk Energy Offshore Operations, LLC, a Texas limited liability company (the "*Company*"), the undersigned persons, being all of the Managers of the Company, expressly including the Platinum Manager, sign this instrument, or a counterpart hereof, to evidence their consent to the Resolutions set forth below, with the same force and effect as if such Resolutions were adopted by the required vote at a duly called meeting of the Managers.

**WHEREAS**, the Company, Black Elk Energy Finance Corp. ("*BEEFC*"), Black Elk Energy Land Operations, LLC (the "*Guarantor*") and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent (the "*Trustee*"), are parties to that certain Indenture, dated as of November 23, 2010, as supplemented by the First Supplemental Indenture dated as of May 31, 2011 (the "*Indenture*"), pursuant to which the Issuers have issued $150,000,000 in aggregate principal amount of 13.75% Senior Secured Notes due 2015 (the "*Notes*");

**WHEREAS**, the Company has entered into a Purchase and Sale Agreement with Renaissance Offshore, LLC for the sale of selected oil and gas properties (the "*Renaissance Sale*");

**WHEREAS**, it has been proposed that the Company authorize (i) the use of the net proceeds of the Renaissance Sale to conduct a full or partial offer to purchase (the "*Offer*") for cash outstanding Notes of the Company at a purchase price equal to $1,000 per $1,000 principal amount of the Notes and (ii) a solicitation of consents (the "*Solicitation*") to the adoption of certain amendments to the Indenture, pursuant to the Offer to Purchase and Consent Solicitation Statement (the "*Statement*"), in substantially the form provided to the Managers;

**WHEREAS**, it has been proposed that, upon receipt of sufficient consents pursuant to the Statement, the Company execute and deliver a Second Supplemental Indenture to the Indenture among the Company, BEEFC and the Guarantor (the "*Supplemental Indenture*"), in substantially the form provided to the Managers;

**WHEREAS**, the Supplemental Indenture will modify and amend the Indenture to, among other things, enable the Company to use the net proceeds of the Renaissance Sale to consummate the Offer and to use any remaining proceeds from the Renaissance Sale to purchase preferred equity issued by the Company;

**NOW, THEREFORE, BE IT RESOLVED**, that the form, terms and provisions of the Supplemental Indenture be, and hereby are, in all respects authorized and approved, in substantially the form provided to the Managers;

**RESOLVED FURTHER**, that the Offer and the Solicitation are hereby authorized and approved, and that any officer of the Company (each an "***Authorized Officer***" and collectively, the "***Authorized Officers***") be, and hereby is, authorized and directed, in the name and on behalf of the Company, to cause the Company to conduct the Offer and the Solicitation and to fix and determine the specific terms relating to the Offer and the Solicitation, such determination to be conclusively evidenced by the delivery on behalf of the Company of the Tender Documents (as defined below);

**RESOLVED FURTHER**, that each Authorized Officer is hereby authorized, in the name and on behalf of the Company, to prepare and distribute, as required by applicable law, the Statement, a Letter of Transmittal and Consent to Tender and to Give Consent, and related documents, for the Notes (collectively, the "***Tender Documents***") in order to effect the Offer and the Solicitation in such form as such Authorized Officer or Authorized Officers shall approve;

**RESOLVED FURTHER**, that each Authorized Officer is hereby authorized, in the name and on behalf of the Company, to enter into, negotiate, execute, deliver and perform the Company's obligations under, a tabulation agent agreement (the "***Tabulation Agent Agreement***") with The Bank of New York Mellon Trust Company, N.A., or such other entity as the Authorized Officer or Authorized Officers determine, pursuant to which such entity will serve as tabulation agent in connection with the Offer and Solicitation, in such form as the Authorized Officer or Authorized Officers, executing the same on behalf of the Company, shall approve, such approval to be conclusively evidenced by the execution on behalf of the Company of the Tabulation Agent Agreement;

**RESOLVED FURTHER**, that each Authorized Officer is hereby authorized, in the name and on behalf of the Company, to enter into, negotiate, execute, deliver and perform the Company's obligations under, a depositary agreement (the "***Depositary Agreement***") with The Bank of New York Mellon Trust Company, N.A., or such other entity as the Authorized Officer or Authorized Officers determine, pursuant to which such entity will serve as depositary in connection with the Offer and Solicitation, in such form as the Authorized Officer or Authorized Officers, executing the same on behalf of the Company, shall approve, such approval to be conclusively evidenced by the execution on behalf of the Company of the Depositary Agreement;

**RESOLVED FURTHER**, that each Authorized Officer is hereby authorized, in the name and on behalf of the Company, upon the receipt of sufficient consents pursuant to the Statement, to execute, deliver and perform the Company's obligations under, the Supplemental Indenture in substantially the form described in the Statement provided to the Managers, in such form as such Authorized Officer or Authorized Officers, executing the same on behalf of the Company, shall approve, such approval to be conclusively evidence by the execution on behalf of the Company of the Supplemental Indenture and any certificates, instruments, documents, reports, statements and other ancillary documents as may be required or contemplated with respect thereto by the Indenture or the Supplemental Indenture; and

**RESOLVED FURTHER**, that each Authorized Officer is hereby individually authorized, empowered, and directed for and on behalf of the Company, without the necessity for joinder of any other person, to take all actions and pay all such fees and costs, and to execute and

deliver such other documents and agreements which, in his or her sole discretion, are reasonably necessary and proper to comply with, and effect the Supplemental Indenture, the Offer and the Solicitation and the related documents (including, without limitation, the Tender Documents, the Tabulation Agent Agreement, and the Depositary Agreement) or the transactions contemplated thereby, and to take such other action or actions (including, without limitation, to accept payment and to incur or pay or cause to be paid all consideration payable to the holders of the Notes and all other fees and expenses in connection with the transactions contemplated by the foregoing resolutions on behalf of the Company) as the Company shall deem necessary, appropriate, or advisable to carry out the intent and purpose of the foregoing resolutions.

**IN WITNESS WHEREOF**, the undersigned Managers expressly evidence their consents as of the date first written above. These Resolutions may be executed in one or more counterparts. Each counterpart shall be an original. All counterparts together shall constitute but one and the same instrument, binding upon all of the Managers, notwithstanding that all the Managers may not have executed the same counterpart.

John G. Hoffman, Manager

Daniel Small, Manager

## UNANIMOUS WRITTEN CONSENT OF THE MANAGERS OF
## BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC

July 14, 2014

Pursuant to the provisions of Sections 6.201 and 101.359 of the Texas Business Organizations Code and the Second Amended and Restated Limited Liability Company Operating Agreement dated as of July 13, 2009, as amended on August 19, 2010, May 31, 2011, January 25, 2013, February 12, 2013, April 9, 2013, and May 3, 2013, of Black Elk Energy Offshore Operations, LLC, a Texas limited liability company (the "*Company*"), the undersigned persons, being all of the Managers of the Company, expressly including the Platinum Manager, sign this instrument, or a counterpart hereof, to evidence their consent to the Resolutions set forth below, with the same force and effect as if such Resolutions were adopted by the required vote at a duly called meeting of the Managers.

**WHEREAS**, the Company, Black Elk Energy Finance Corp. ("*BEEFC*"), Black Elk Energy Land Operations, LLC (the "*Guarantor*") and The Bank of New York Mellon Trust Company, N.A., as Trustee and Collateral Agent (the "*Trustee*"), are parties to that certain Indenture, dated as of November 23, 2010, as supplemented by the First Supplemental Indenture dated as of May 31, 2011 (the "*Indenture*"), pursuant to which the Issuers have issued $150,000,000 in aggregate principal amount of 13.75% Senior Secured Notes due 2015 (the "*Notes*");

**WHEREAS**, the Company has entered into a Purchase and Sale Agreement with Renaissance Offshore, LLC for the sale of selected oil and gas properties (the "*Renaissance Sale*");

**WHEREAS**, it has been proposed that the Company authorize (i) the use of the net proceeds of the Renaissance Sale to conduct a full or partial offer to purchase (the "*Offer*") for cash outstanding Notes of the Company at a purchase price equal to $1,000 per $1,000 principal amount of the Notes and (ii) a solicitation of consents (the "*Solicitation*") to the adoption of certain amendments to the Indenture, pursuant to the Offer to Purchase and Consent Solicitation Statement (the "*Statement*"), in substantially the form provided to the Managers;

**WHEREAS**, it has been proposed that, upon receipt of sufficient consents pursuant to the Statement, the Company execute and deliver a Second Supplemental Indenture to the Indenture among the Company, BEEFC and the Guarantor (the "*Supplemental Indenture*"), in substantially the form provided to the Managers;

**WHEREAS**, the Supplemental Indenture will modify and amend the Indenture to, among other things, enable the Company to use the net proceeds of the Renaissance Sale to consummate the Offer and to use any remaining proceeds from the Renaissance Sale to purchase preferred equity issued by the Company;

**NOW, THEREFORE, BE IT RESOLVED**, that the form, terms and provisions of the Supplemental Indenture be, and hereby are, in all respects authorized and approved, in substantially the form provided to the Managers;

**RESOLVED FURTHER**, that the Offer and the Solicitation are hereby authorized and approved, and that any officer of the Company (each an "*Authorized Officer*" and collectively, the "*Authorized Officers*") be, and hereby is, authorized and directed, in the name and on behalf of the Company, to cause the Company to conduct the Offer and the Solicitation and to fix and determine the specific terms relating to the Offer and the Solicitation, such determination to be conclusively evidenced by the delivery on behalf of the Company of the Tender Documents (as defined below);

**RESOLVED FURTHER**, that each Authorized Officer is hereby authorized, in the name and on behalf of the Company, to prepare and distribute, as required by applicable law, the Statement, a Letter of Transmittal and Consent to Tender and to Give Consent, and related documents, for the Notes (collectively, the "*Tender Documents*") in order to effect the Offer and the Solicitation in such form as such Authorized Officer or Authorized Officers shall approve;

**RESOLVED FURTHER**, that each Authorized Officer is hereby authorized, in the name and on behalf of the Company, to enter into, negotiate, execute, deliver and perform the Company's obligations under, a tabulation agent agreement (the "*Tabulation Agent Agreement*") with The Bank of New York Mellon Trust Company, N.A., or such other entity as the Authorized Officer or Authorized Officers determine, pursuant to which such entity will serve as tabulation agent in connection with the Offer and Solicitation, in such form as the Authorized Officer or Authorized Officers, executing the same on behalf of the Company, shall approve, such approval to be conclusively evidenced by the execution on behalf of the Company of the Tabulation Agent Agreement;

**RESOLVED FURTHER**, that each Authorized Officer is hereby authorized, in the name and on behalf of the Company, to enter into, negotiate, execute, deliver and perform the Company's obligations under, a depositary agreement (the "*Depositary Agreement*") with The Bank of New York Mellon Trust Company, N.A., or such other entity as the Authorized Officer or Authorized Officers determine, pursuant to which such entity will serve as depositary in connection with the Offer and Solicitation, in such form as the Authorized Officer or Authorized Officers, executing the same on behalf of the Company, shall approve, such approval to be conclusively evidenced by the execution on behalf of the Company of the Depositary Agreement;

**RESOLVED FURTHER**, that each Authorized Officer is hereby authorized, in the name and on behalf of the Company, upon the receipt of sufficient consents pursuant to the Statement, to execute, deliver and perform the Company's obligations under, the Supplemental Indenture in substantially the form described in the Statement provided to the Managers, in such form as such Authorized Officer or Authorized Officers, executing the same on behalf of the Company, shall approve, such approval to be conclusively evidence by the execution on behalf of the Company of the Supplemental Indenture and any certificates, instruments, documents, reports, statements and other ancillary documents as may be required or contemplated with respect thereto by the Indenture or the Supplemental Indenture; and

**RESOLVED FURTHER**, that each Authorized Officer is hereby individually authorized, empowered, and directed for and on behalf of the Company, without the necessity for joinder of any other person, to take all actions and pay all such fees and costs, and to execute and

deliver such other documents and agreements which, in his or her sole discretion, are reasonably necessary and proper to comply with, and effect the Supplemental Indenture, the Offer and the Solicitation and the related documents (including, without limitation, the Tender Documents, the Tabulation Agent Agreement, and the Depositary Agreement) or the transactions contemplated thereby, and to take such other action or actions (including, without limitation, to accept payment and to incur or pay or cause to be paid all consideration payable to the holders of the Notes and all other fees and expenses in connection with the transactions contemplated by the foregoing resolutions on behalf of the Company) as the Company shall deem necessary, appropriate, or advisable to carry out the intent and purpose of the foregoing resolutions.

**IN WITNESS WHEREOF**, the undersigned Managers expressly evidence their consents as of the date first written above.  These Resolutions may be executed in one or more counterparts.  Each counterpart shall be an original.  All counterparts together shall constitute but one and the same instrument, binding upon all of the Managers, notwithstanding that all the Managers may not have executed the same counterpart.

---

John G. Hoffman, Manager

---

Daniel Small, Manager

603716045.2

# EXHIBIT 52

10/26/2018                                          8kRenSaleExecSupplIndent

8-K 1 a8krensaleexecsupplindent.htm 8-K

# UNITED STATES

## SECURITIES AND EXCHANGE COMMISSION

### Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT

#### Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): August 15, 2014**

# BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC

(Exact name of registrant as specified in its charter)

| **Texas** | **333-174226** | **38-3769404** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

**11451 Katy Freeway, Suite 500**

**Houston, Texas 77079**

(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: **(281) 598-8600**

**Not Applicable**

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐     Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐     Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐     Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

---

**Item 1.01 and 3.03        Entry into a Material Definitive Agreement; Material Modification to Rights of Security Holders**

*Entry into Second Supplemental Indenture*

On August 19, as a result of the receipt by Black Elk Energy Offshore Operations, LLC (the "Company" or "we") of the requisite consents in connection with the tender offer (the "Offer") and consent solicitation (the "Consent Solicitation") of the Company's outstanding $150,000,000 aggregate principal amount of 13.75% senior secured notes due 2015 (the "Notes") prior to 5:00 p.m. Eastern Time on August 13, 2014 (the "Expiration Time") and the satisfaction or waiver of the conditions to effectiveness specified in the Company's Offer to Purchase and Consent Solicitation Statement dated July 16, 2014, the Company, Black Elk Energy Finance Corp., the guarantor and the trustee under the Indenture governing the Notes dated as of November 23, 2010, as supplemented by the First Supplemental Indenture dated as of May 31, 2011 (the "Indenture") entered into a Second Supplemental Indenture (the "Supplemental Indenture") in order to effect the proposed amendments to the Indenture effective as of August 19, 2014 (the "Effective Time"). At the Effective Time, the Supplemental Indenture will be binding on all holders of the Notes, including those who did not deliver a consent or who validly revoked their consent before the Expiration Time.

Among other things, the Supplemental Indenture will (i) allow the Company to apply the net proceeds from the Renaissance Sale (as defined below) to consummate the Offer and to use any remaining proceeds from the Renaissance Sale to purchase preferred equity issued by the Company; (ii) permit the incurrence of indebtedness arising from the performance of the Company's plugging and abandonment obligations and liens on the Company's oil and gas properties to secure such indebtedness; and (iii) remove the covenant prohibiting the Company and its Restricted Subsidiaries (as defined in the Indenture) from incurring aggregate capital expenditures in excess of 30% of Consolidated EBITDAX (as defined in the Indenture) in any fiscal year.

The description of the Supplemental Indenture in this Form 8-K is a summary and is qualified in its entirety by the terms of the Supplemental Indenture. A copy of the Supplemental Indenture is attached hereto as Exhibit 4.1 and incorporated herein by reference.

**Item 2.01        Completion of Acquisition or Disposition of Assets**

*Sale of Assets*

On August 15, 2014, the Company completed the previously announced sale to Renaissance Offshore, LLC ("Renaissance") of seven operated and two non-operated assets in the offshore Gulf of Mexico (the "Renaissance Sale"). After customary purchase price adjustments, the Company received $149.2 million in net proceeds from the Renaissance Sale. The assets sold in the Renaissance Sale represent a significant amount of the Company's cash flow, proved reserves and production.

**Item 7.01                Other Events**

On August 21, 2014, the Company issued a press release announcing (i) the closing of the Renaissance Sale, (ii) the acceptance of the Notes in connection with its previously announced Offer and Consent Solicitation and (iii) the execution of the Supplemental Indenture. A copy of this press release is attached hereto as Exhibit 99.1 and is incorporated herein by reference.

The information in this Item 7.01, including the attached Exhibit 99.1, is being "furnished" pursuant to General Instruction B.2 of Form 8-K and shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section, and is not incorporated by reference into any Company filing, whether made before or after the date hereof, regardless of any general incorporation language in such filing.

**Item 9.01**               **Financial Statements and Exhibits**

    (d)  Exhibits

| Exhibit | Description |
|---|---|
| 4.1* | Second Supplemental Indenture, dated as of August 19, 2014, by and among Black Elk Energy Offshore Operations, LLC and Black Elk Energy Finance Corp. as issuers, Black Elk Energy Land Operations, LLC as guarantor, and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent. |
| 99.1* | Press Release issued by Black Elk Energy Offshore Operations, LLC, dated August 21, 2014. |

    *   Included herewith.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: August 21, 2014

**BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC**

Black Elk Energy, LLC, its sole member

By:   /s/ John Hoffman
       John Hoffman
       President and Chief Executive Officer

## EXHIBIT INDEX

| **Exhibit** | **Description** |
| --- | --- |
| 4.1* | Second Supplemental Indenture, dated as of August 19, 2014, by and among Black Elk Energy Offshore Operations, LLC and Black Elk Energy Finance Corp. as issuers, Black Elk Energy Land Operations, LLC as guarantor, and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent. |
| 99.1* | Press Release issued by Black Elk Energy Offshore Operations, LLC, dated August 21, 2014. |

\*     Included herewith.

EXHIBIT 53

**To:**       Jeff Shulse (jeffs@blackelkenergy.com) <jeffs@blackelkenergy.com>[jeffs@blackelkenergy.com]
**Cc:**       Samuel Salfati <ssalfati@platinumlp.com>[ssalfati@platinumlp.com]
**From:**     Daniel Small <dsmall@platinumlp.com>
**Sent:**     Mon 8/18/2014 8:43:16 PM
**Subject:**  Wires

Jeff, on behalf of Sam Salfati and myself constituting a majority of the board of managers you are hereby authorized to wire $70MM in partial payment of Preferred E units. Regards, Dan

EXHIBIT 54

 **STERLING** NATIONAL BANK

```
                                        Date   8/29/14          Page    1
                                        Account Number   Acct Ending ██
                                        Enclosures                     16
```


```
PLATINUM PARTNERS VALUE ARBITRAGE FUND
L.P.                                      Your Relationship Manager is:
C/O PLATINUM PARTNERS                            Janet Liz
152 W 57TH ST FL 4                              (212)935-1324
NEW YORK NY 10019-3310                            jliz
                                                 snb.com
                                                  And
                                             Louis Cenname
                                              (212)935-3847
                                               lcenname
                                                snb.com
```

```
                           CHECKING ACCOUNT

              Account Title: PLATINUM PARTNERS VALUE ARBITRAGE FUND
                            L.P.
                            C/O PLATINUM PARTNERS
```

```
CHECKING                             Number of Enclosures            16
Account Number      Acct Ending ██   Statement Dates   8/01/14 thru  9/01/14
Previous Balance         3,528,143.00   Days in the statement period       32
    42 Deposits/Credits 99,139,757.20   Average Ledger          6,244,178.34
   118 Checks/Debits    90,527,722.66   Average Collected       6,243,571.34
Service Charge           1,500.00

New Balance             12,140,177.54

Total Service Charge Reversals    2,090.13

*********************************************************************
```

```
Activity in Date Order                Checks/      Deposits/
Date        Description                Debits        Credits     Daily Balance
 8/01 Trsf from NEWEL CHK                          1,500,000.00   5,028,143.00
          Confirmation number   801140168
 8/01 Trsf from PPVA USA SSC                         750,000.00   5,778,143.00
          Confirmation number   801140101
 8/01 Trsf from PPVA INTERMEDIATE                    280,000.00   6,058,143.00
          aug subs
          Confirmation number   801140112
 8/01 Trsf from NEWEL CHK                            235,252.79   6,293,395.79
          Confirmation number   801140147
 8/01 Trsf from PPVA INTERMEDIATE                    112,000.00   6,405,395.79
          next gen aug 1 sub
          Confirmation number   801140162
 8/01 Trsf from PPVA USA SSC                          80,289.47   6,485,685.26
```



**STERLING**
NATIONAL BANK

```
Date  8/29/14        Page    2
Account Number   Acct Ending ▆▆
Enclosures                    16
```

```
PLATINUM PARTNERS VALUE ARBITRAGE FUND
L.P.
C/O PLATINUM PARTNERS
152 W 57TH ST FL 4
NEW YORK NY 10019-3310
```

CHECKING                    Acct Ending ▆▆  (Continued)

Activity in Date Order

| Date | Description | Checks/Debits | Deposits/Credits | Daily Balance |
|---|---|---|---|---|
| | Confirmation number   801140149 | | | |
| 8/01 | Trsf from PMLS CHK | | 27,716.25 | 6,513,401.51 |
| | Confirmation number   801140148 | | | |
| 8/01 | IT: PLATINUM PARTNERS VALUE AR | | 1,000,000.00 | 7,513,401.51 |
| 8/01 | OT: MACQUARIE BANK LIMITED | 370,000.00 | | 7,143,401.51 |
| | PLATINUM PARTNERS VALUE ARBITR | | | |
| 8/01 | OT: CANTOR FITZGERALD EUROPE | 75,000.00 | | 7,068,401.51 |
| | IBAN: ▆▆▆▆▆▆▆ | | | |
| 8/01 | OT: ARNOLD & PORTER LLP | 52,557.79 | | 7,015,843.72 |
| 8/01 | Transf to RJ CREDIT LLC | 1,817,656.36 | | 5,198,187.36 |
| | advance req | | | |
| | Confirmation number   801140003 | | | |
| 8/01 | Transf to PPVA USA SSC | 1,500,000.00 | | 3,698,187.36 |
| | 630 red | | | |
| | Confirmation number   801140163 | | | |
| 8/01 | Transf to DMRJ CHK | 350,000.00 | | 3,348,187.36 |
| | advance req | | | |
| | Confirmation number   801140160 | | | |
| 8/01 | Transf to PPVA INTERMEDIATE | 100,000.00 | | 3,248,187.36 |
| | sff foundation 630 | | | |
| | Confirmation number   801140164 | | | |
| 8/01 | Transf to PMLS CHK | 33,658.78 | | 3,214,528.58 |
| | Confirmation number   801140169 | | | |
| 8/01 | Transf to PPVA EQUITY | 21,979.58 | | 3,192,549.00 |
| | Confirmation number   801140086 | | | |
| 8/04 | Trsf from NEWEL CHK | | 500,000.00 | 3,692,549.00 |
| | Confirmation number   804140289 | | | |
| 8/04 | Trsf from RJ CREDIT LLC | | 51,020.83 | 3,743,569.83 |
| | Confirmation number   804140241 | | | |
| 8/04 | OT: NOMURA INTERNATIONAL PLC | 500,000.00 | | 3,243,569.83 |
| 8/04 | Transf to PPVA INTERMEDIATE | 1,418,642.91 | | 1,824,926.92 |
| | 630 reds b | | | |
| | Confirmation number   804140247 | | | |
| 8/04 | Transf to PPVA USA SSC | 915,654.15 | | 909,272.77 |
| | 630 reds b | | | |
| | Confirmation number   804140245 | | | |
| 8/04 | Transf to PPVA INTERMEDIATE | 150,000.00 | | 759,272.77 |
| | MF Withdrawal | | | |





```
Date  8/29/14        Page    3
Account Number    Acct Ending
Enclosures                      16
```

PLATINUM PARTNERS VALUE ARBITRAGE FUND
L.P.
C/O PLATINUM PARTNERS
152 W 57TH ST FL 4
NEW YORK NY 10019-3310

CHECKING                    Acct Ending ▓▓▓  (Continued)

Activity in Date Order                  Checks/      Deposits/
Date      Description                   Debits       Credits      Daily Balance

| Date | Description | Checks/Debits | Deposits/Credits | Daily Balance |
|---|---|---|---|---|
| | Confirmation number  804140266 | | | |
| 8/04 | Transf to PPVA FUND USA | 75,000.00 | | 684,272.77 |
| | MF Withdrawal | | | |
| | Confirmation number  804140264 | | | |
| 8/04 | Transf to PRECIOUS CAP CHK | 15,000.00 | | 669,272.77 |
| | august | | | |
| | Confirmation number  804140292 | | | |
| 8/04 | Transf to NEWEL CHK | 12,500.00 | | 656,772.77 |
| | august | | | |
| | Confirmation number  804140291 | | | |
| 8/04 | Transf to WESTMINSTER CAPITAL | 12,500.00 | | 644,272.77 |
| | august | | | |
| | Confirmation number  804140293 | | | |
| 8/04 | Transf to DMRJ CHK | 677.99 | | 643,594.78 |
| | Confirmation number  804140268 | | | |
| 8/04 | Transf to DMRJ CHK | 677.79 | | 642,916.99 |
| | Confirmation number  804140270 | | | |
| 8/05 | IT: PLATINUM PARTNERS VALUE AR | | 400,000.00 | 1,042,916.99 |
| 8/05 | OT: NOMURA INTERNATIONAL PLC | 485,000.00 | | 557,916.99 |
| 8/05 | OT: CANTOR FITZGERALD EUROPE | 405,000.00 | | 152,916.99 |
| | IBAN: ▓▓▓▓▓▓▓▓▓▓ | | | |
| 8/05 | OT: BERNARD HUTMAN | 15,000.00 | | 137,916.99 |
| 8/05 | OT: MICHAEL HUTMAN | 15,000.00 | | 122,916.99 |
| 8/05 | OT: SURYA FINANCIAL SYSTEMS IN | 12,800.00 | | 110,116.99 |
| | PPVA | | | |
| 8/05 | OT: IRA BURSTEIN | 10,000.00 | | 100,116.99 |
| 8/05 | OT: NAGINLAL MODI NUTAN KUMAR | 9,000.00 | | 91,116.99 |
| | SWIFT CODE: ▓▓▓▓▓▓ | | | |
| 8/05 | OT: SUNG HO SUH | 5,250.00 | | 85,866.99 |
| 8/06 | Trsf from PPVA INTERMEDIATE | | 32,000.00 | 117,866.99 |
| | next gen perl aug 1 | | | |
| | Confirmation number  806140105 | | | |
| 8/06 | IT: PLATINUM PARTNERS VALUE AR | | 1,700,000.00 | 1,817,866.99 |
| 8/06 | IT: 152 WEST 57TH ST | | 1,100,000.00 | 2,917,866.99 |
| | REF: 0000034248450Q1 | | | |
| 8/06 | DEPOSIT | | 19,424.04 | 2,937,291.03 |
| 8/06 | IT: PLATINUM PARTNERS VALUE AR | | 696.75 | 2,937,987.78 |
| 8/06 | OT: NOMURA INTERNATIONAL PLC | 355,000.00 | | 2,582,987.78 |
| | FOR FURTHER CREDIT TO:      CPB | | | |

 **STERLING** NATIONAL BANK

```
Date   8/29/14          Page      4
Account Number    Acct Ending  ▓
Enclosures                            16
```


PLATINUM PARTNERS VALUE ARBITRAGE FUND
L.P.
C/O PLATINUM PARTNERS
152 W 57TH ST FL 4
NEW YORK NY 10019-3310

CHECKING                    Acct Ending ▓    (Continued)

Activity in Date Order                      Checks/      Deposits/
Date       Description                      Debits       Credits        Daily Balance

| Date | Description | Checks/Debits | Deposits/Credits | Daily Balance |
|------|-------------|--------------:|-----------------:|--------------:|
| 8/06 | Transf to PPVA USA SSC | 950,000.00 | | 1,632,987.78 |
|      | june 30 subs | | | |
|      | Confirmation number  806140125 | | | |
| 8/06 | Transf to PPVA INTERMEDIATE | 800,000.00 | | 832,987.78 |
|      | huang min chung | | | |
|      | Confirmation number  806140061 | | | |
| 8/06 | Transf to PPVA INTERMEDIATE | 606,618.75 | | 226,369.03 |
|      | june 30 reds | | | |
|      | Confirmation number  806140126 | | | |
| 8/06 | Transf to PPVA EQUITY | 1,580.74 | | 224,788.29 |
|      | Confirmation number  806140065 | | | |
| 8/06 | TRF FR PLATINUM PARTNERS VALUE | 8,500.00 | | 216,288.29 |
|      | #0148 TO LAFITTE ENERGY#1077 | | | |
| 8/07 | Trsf from PPVA INTERMEDIATE | | 5,000,000.00 | 5,216,288.29 |
|      | coba aug sub | | | |
|      | Confirmation number  807140109 | | | |
| 8/07 | IT: PLATINUM PARTNERS VALUE AR | | 1,100,000.00 | 6,316,288.29 |
| 8/07 | TRANSFER FROM ACCT ▓ | | 480,000.00 | 6,796,288.29 |
|      | 4 TO ACCT # ▓ | | | |
| 8/07 | OT: FCBA TRUST | 79,150.00 | | 6,717,138.29 |
| 8/07 | OT: EAST HOLDINGS LLC | 18,996.00 | | 6,698,142.29 |
| 8/07 | OT: AARON ELBOGEN IRREVOCABLE | 15,830.00 | | 6,682,312.29 |
| 8/07 | OT: ELBOGEN FAMILY CHARITABLE | 15,830.00 | | 6,666,482.29 |
| 8/07 | OT: MARTIN STERN | 4,749.00 | | 6,661,733.29 |
| 8/07 | Transf to PPVA INTERMEDIATE | 2,676,475.55 | | 3,985,257.74 |
|      | june 30 redemptions | | | |
|      | Confirmation number  807140111 | | | |
| 8/07 | Transf to PPVA USA SSC | 1,900,000.00 | | 2,085,257.74 |
|      | june 30 redemptions | | | |
|      | Confirmation number  807140110 | | | |
| 8/07 | Transf to DMRJ CHK | 350,000.00 | | 1,735,257.74 |
|      | Confirmation number  807140136 | | | |
| 8/07 | Transf to VIPER HIGH PERFORM | 250,000.00 | | 1,485,257.74 |
|      | Confirmation number  807140113 | | | |
| 8/07 | Transf to WESTMINSTER CAPITAL | 50,000.00 | | 1,435,257.74 |
|      | cover margin call | | | |
|      | Confirmation number  807140102 | | | |
| 8/07 | Transf to PPVA USA SSC | .01 | | 1,435,257.73 |
|      | feiger | | | |


**STERLING**
NATIONAL BANK

Date   8/29/14       Page    5
Account Number    Acct Ending 
Enclosures                         16

PLATINUM PARTNERS VALUE ARBITRAGE FUND
L.P.
C/O PLATINUM PARTNERS
152 W 57TH ST FL 4
NEW YORK NY 10019-3310

CHECKING                          Acct Ending ▇▇ (Continued)

Activity in Date Order                    Checks/      Deposits/
Date        Description                   Debits       Credits      Daily Balance
            Confirmation number   807140008
   8/08 Trsf from NEWEL CHK                            198,928.56    1,634,186.29
            Confirmation number   808140115
   8/08 TRANASFER FROM ACCT ▇▇▇            1,200,000.00    2,834,186.29
            TO ACCT # ▇▇▇▇▇
   8/08 OT: NOMURA INTERNATIONAL PLC     590,000.00                 2,244,186.29
   8/08 OT: CREDIT SUISSE SECURITIES U   400,000.00                 1,844,186.29
            PLATINUM PARNERS VALUE ARBITRA
   8/08 OT: MACQUARIE BANK LIMITED       390,000.00                 1,454,186.29
            PLATINUM PARTNERS VALUE ARBITR
   8/08 OT: INFINITAS CAPITAL, LLC        81,655.99                 1,372,530.30
            TRADER FEE
   8/08 Transf to PPVA FUND USA           75,000.00                 1,297,530.30
            MF withdrawal
            Confirmation number   808140186
   8/08 Transf to PPVA INTERMEDIATE       75,000.00                 1,222,530.30
            MF withdrawal
            Confirmation number   808140190
   8/08 TRF FR PPVA MASTER TO PPLO       474,010.97                   748,519.33
            MASTER (INDO PARTICIPATION)
   8/08 TRF FR PPVA MASTER TO PPLO       326,495.00                   422,024.33
            MASTER (PPVA BE GUARANTEE)
   8/08 TRF FR PPVA MSTER TO PPLO MSTR    40,718.91                   381,305.42
            (BAL.OF GREY K PURCHASE PRICE)
   8/11 Trsf from PPVA INTERMEDIATE                    189,138.39      570,443.81
            ppbe 8/1 transfers
            Confirmation number   811140213
   8/11 IT: PLATINUM PARTNERS VALUE AR                 650,000.00    1,220,443.81
   8/11 IT: 152 WEST 57TH ST                           400,000.00    1,620,443.81
            REF: 0000034381675Q1
   8/11 TRF FR PPVA US SS&C #0527 TO                    15,261.80    1,635,705.61
            PPVA CHK ▇▇▇ PER REQ.
   8/11 OT: DAVID LEINSDORF, ATTORNEY      6,884.34                 1,628,821.27
   8/11 OT: LAND TITLE GUARANTEE COMPA     1,828.00                 1,626,993.27
            ATTN:  GAYLENE
   8/11 Transf to PRECIOUS CAP CHK       550,332.23                 1,076,661.04
            Confirmation number   811140208
   8/11 CHECK            1698             40,158.12                 1,036,502.92
   8/11 CHECK            1694              2,581.98                 1,033,920.94



**STERLING**
NATIONAL BANK

Date  8/29/14          Page      6
Account Number    Acct Ending 
Enclosures                              16

PLATINUM PARTNERS VALUE ARBITRAGE FUND
L.P.
C/O PLATINUM PARTNERS
152 W 57TH ST FL 4
NEW YORK NY 10019-3310

CHECKING                    Acct Ending ▋    (Continued)

Activity in Date Order                Checks/      Deposits/
Date       Description                Debits       Credits      Daily Balance

| Date | Description | Checks/Debits | Deposits/Credits | Daily Balance |
|---|---|---|---|---|
| 8/11 | CHECK           1697 | 161.14 | | 1,033,759.80 |
| 8/12 | IT: 152 WEST 57TH ST | | 550,000.00 | 1,583,759.80 |
| | REF: 0000034422806Q1 | | | |
| 8/12 | OT: CREDIT SUISSE SECURITIES U | 250,000.00 | | 1,333,759.80 |
| | PLATINUM PARNERS VALUE ARBITRA | | | |
| 8/12 | Transf to PRECIOUS CAP CHK | 30,000.00 | | 1,303,759.80 |
| | Confirmation number   812140107 | | | |
| 8/12 | Transf to NEWEL CHK | 653.92 | | 1,303,105.88 |
| | Confirmation number   812140026 | | | |
| 8/12 | CHECK           1690 | 1,051.73 | | 1,302,054.15 |
| 8/12 | CHECK           1696 | 350.58 | | 1,301,703.57 |
| 8/13 | OT: NOMURA INTERNATIONAL PLC | 270,000.00 | | 1,031,703.57 |
| 8/13 | OT: CURTIS MALLET PREVOST COLT | 69,688.38 | | 962,015.19 |
| 8/14 | IT: 152 WEST 57TH ST | | 650,000.00 | 1,612,015.19 |
| | REF: 0000034504384Q1 | | | |
| 8/14 | OT: CREDIT SUISSE SECURITIES U | 540,000.00 | | 1,072,015.19 |
| | PLATINUM PARNERS VALUE ARBITRA | | | |
| 8/14 | OT: CANTOR FITZGERALD EUROP | 150,000.00 | | 922,015.19 |
| | IBAN: ▋ | | | |
| 8/15 | Trsf from PPVA INTERMEDIATE | | 76,000.00 | 998,015.19 |
| | edelstein ira | | | |
| | Confirmation number   815140149 | | | |
| 8/15 | IT: 152 WEST 57TH ST | | 550,000.00 | 1,548,015.19 |
| | REF: 0000034541443Q1 | | | |
| 8/15 | REVERSAL OF SERVICE CHARGE EAA | | 2,090.13 | 1,550,105.32 |
| 8/15 | OT: CREDIT SUISSE SECURITIES U | 200,000.00 | | 1,350,105.32 |
| | PLATINUM PARNERS VALUE ARBITRA | | | |
| 8/15 | Account Analysis Charge | 1,500.00 | | 1,348,605.32 |
| 8/15 | Transf to DMRJ CHK | 350,000.00 | | 998,605.32 |
| | implant | | | |
| | Confirmation number   815140148 | | | |
| 8/15 | Transf to NEWCO LLC | 2,540.53 | | 996,064.79 |
| | Confirmation number   815140071 | | | |
| 8/15 | Transf to PRECIOUS CAP CHK | 2,423.43 | | 993,641.36 |
| | Confirmation number   814140158 | | | |
| 8/15 | CHECK           1699 | 27,500.00 | | 966,141.36 |
| 8/15 | SERVICE CHARGE EAA | 2,090.13 | | 964,051.23 |
| 8/18 | Trsf from PPVA INTERMEDIATE | | 600.00 | 964,651.23 |

 **STERLING**
NATIONAL BANK

```
Date  8/29/14          Page    7
Account Number    Acct Ending  ██
Enclosures                          16
```


PLATINUM PARTNERS VALUE ARBITRAGE FUND
L.P.
C/O PLATINUM PARTNERS
152 W 57TH ST FL 4
NEW YORK NY 10019-3310

CHECKING                    Acct Ending ██    (Continued)

Activity in Date Order                  Checks/     Deposits/
Date      Description                   Debits      Credits      Daily Balance
          Confirmation number  818140137
    8/18 OT: CREDIT SUISSE SECURITIES U  200,000.00                 764,651.23
          PLATINUM PARNERS VALUE ARBITRA
    8/18 Transf to PPVA INTERMEDIATE     200,000.00                 564,651.23
          MF withdrawal
          Confirmation number  818140133
    8/18 Transf to PPVA FUND USA         100,000.00                 464,651.23
          MF Withdrawal
          Confirmation number  818140135
    8/18 Transf to WESTMINSTER CAPITAL    17,250.00                 447,401.23
          ga global markets invoice
          Confirmation number  818140148
    8/19 Trsf from PPVA EQUITY                       20,000,000.00  20,447,401.23
          Confirmation number  819140080
    8/19 Trsf from PPVA EQUITY                       12,563,819.73  33,011,220.96
          Confirmation number  819140081
    8/19 IT: BLACK ELK ENERGY OFFSHORE              15,332,672.97  48,343,893.93
            REF: 16304793
    8/19 OT: PT SINARMAS SEKURITAS         47,094.81                48,296,799.12
            REF 2622FAVIII2014
    8/19 OT: MICHAEL HUTMAN                23,124.79                48,273,674.33
            MARCH 2014 EXP
    8/19 Transf to MAXIMILIAN INVESTORS     9,918.18                48,263,756.15
            range london trip r levy
          Confirmation number  819140102
    8/19 CHECK            1702           161,725.89                48,102,030.26
    8/19 CHECK            1703            12,973.54                48,089,056.72
    8/19 CHECK            1706             6,180.31                48,082,876.41
    8/19 CHECK            1707             3,919.50                48,078,956.91
    8/19 CHECK            1705             2,315.15                48,076,641.76
    8/19 CHECK            1709             1,264.00                48,075,377.76
    8/19 CHECK            1704               871.00                48,074,506.76
    8/19 CHECK            1695               618.94                48,073,887.82
    8/20 IT: PLATINUM PARTNERS VALUE AR                      1.90  48,073,889.72
    8/20 OT: PLATINUM PARTNERS BLACK EL 20,381,030.09                27,692,859.63
            BOND PURCHASE AMORTIZED COST
    8/20 OT: PLATINUM PARTNERS BLACK EL 19,783,677.08                 7,909,182.55
            BOND PURCHASED AT AMORTIZED CO
```



**STERLING**
NATIONAL BANK

```
Date   8/29/14         Page    8
Account Number     Acct Ending
```

```
Enclosures                      16
```

PLATINUM PARTNERS VALUE ARBITRAGE FUND
L.P.
C/O PLATINUM PARTNERS
152 W 57TH ST FL 4
NEW YORK NY 10019-3310

CHECKING                    Acct Ending ▇▇▇  (Continued)

Activity in Date Order                  Checks/      Deposits/
Date       Description                  Debits       Credits       Daily Balance

| Date | Description | Checks/Debits | Deposits/Credits | Daily Balance |
|---|---|---|---|---|
| 8/20 | OT: CREDIT SUISSE SECURITIES U | 1,000,000.00 | | 6,909,182.55 |
| | PLATINUM PARNERS VALUE ARBITRA | | | |
| 8/20 | OT: PLATINUM PARTNERS BLACK EL | 193,578.85 | | 6,715,603.70 |
| | PURCHASED INTEREST Q3 | | | |
| 8/20 | OT: PLATINUM PARTNERS BLACK EL | 122,168.50 | | 6,593,435.20 |
| | PURCHASED INTEREST Q3 | | | |
| 8/20 | OT: PLATINUM PARTNERS BLACK EL | 101,475.00 | | 6,491,960.20 |
| | PPVA GUARANTEE Q3 | | | |
| 8/20 | OT: PLATINUM PARTNERS BLACK EL | 62,350.00 | | 6,429,610.20 |
| | PPVA GUARANTEE Q3 | | | |
| 8/20 | Transf to DMRJ CHK | 300,000.00 | | 6,129,610.20 |
| | Confirmation number   820140094 | | | |
| 8/21 | Trsf from NEWEL CHK | | 1,900,000.00 | 8,029,610.20 |
| | Confirmation number   821140061 | | | |
| 8/21 | Trsf from PPVA INTERMEDIATE | | 50,000.00 | 8,079,610.20 |
| | Confirmation number   821140031 | | | |
| 8/21 | IT: PLATINUM PARTNERS BLACK EL | | 15,301,688.91 | 23,381,299.11 |
| | REF: MT14233001385 | | | |
| 8/21 | IT: 152 WEST 57TH ST | | 1,000,000.00 | 24,381,299.11 |
| | REF: 0000034699119Q1 | | | |
| 8/21 | OT: CREDIT SUISSE SECURITIES U | 1,200,000.00 | | 23,181,299.11 |
| | PLATINUM PARNERS VALUE ARBITRA | | | |
| 8/21 | Transf to VIPER HIGH PERFORM | 2,540.53 | | 23,178,758.58 |
| | Confirmation number   821140062 | | | |
| 8/21 | transferr from acct ▇▇▇▇▇▇ | 7,814,096.89 | | 15,364,661.69 |
| | to acct # ▇▇▇▇▇▇ | | | |
| 8/22 | IT: PLATINUM PARTNERS BLACK EL | | 2,085,418.67 | 17,450,080.36 |
| | REF: MT14233001375 | | | |
| 8/22 | OT: CREDIT SUISSE SECURITIES U | 500,000.00 | | 16,950,080.36 |
| | PLATINUM PARNERS VALUE ARBITRA | | | |
| 8/22 | OT: BILZIN SUMBERG BAENA PRICE | 96,225.83 | | 16,853,854.53 |
| | CLIENT NAME:   PLATINUM PARTNRE | | | |
| 8/22 | Transf to PRECIOUS CAP CHK | 2,212,000.00 | | 14,641,854.53 |
| | amrich energy | | | |
| | Confirmation number   822140001 | | | |
| 8/22 | Transf to RJ CREDIT LLC | 1,672,256.00 | | 12,969,598.53 |
| | drilling facility pedevco | | | |
| | Confirmation number   822140079 | | | |





Date  8/29/14        Page    9
Account Number   Acct Ending
Enclosures                    16

PLATINUM PARTNERS VALUE ARBITRAGE FUND
L.P.
C/O PLATINUM PARTNERS
152 W 57TH ST FL 4
NEW YORK NY 10019-3310

CHECKING                    Acct Ending          (Continued)

Activity in Date Order                Checks/      Deposits/
Date      Description                 Debits        Credits     Daily Balance
8/22  Transf to PRECIOUS CAP CHK    600,000.00                  12,369,598.53
          american energy advisors
          Confirmation number   822140002
8/22  Transf to PPVA INTERMEDIATE   200,000.00                  12,169,598.53
          PLAT MGMT MF Payment
          Confirmation number   822140147
8/22  Transf to PPVA FUND USA       100,000.00                  12,069,598.53
          PLAT MGMT MF
          Confirmation number   822140145
8/26  Trsf from NEWEL CHK                          55,736.01    12,125,334.54
          correction of prev transfer
          Confirmation number   826140015
8/26  Transf to NEWEL CHK            56,299.00                  12,069,035.54
          Confirmation number   826140013
8/27  OT: SKYEAST INTERNATIONAL LIMI 7,360,060.00               4,708,975.54
          CHIPS NO
8/27  OT: MACQUARIE BANK LIMITED    4,120,000.00                 588,975.54
          PLATINUM PARTNERS VALUE ARBITR
8/27  OT: MCDERMOTT WILL AND EMORY L 3,571.58                    585,403.96
          CLIENT NO:   084993
8/27  Transf to PRECIOUS CAP CHK      9,955.00                   575,448.96
          brown armstrong goldengate
          Confirmation number   827140118
8/27  TRANSFER FROM ACCT             50,000.00                   525,448.96
          TO ACCT #
8/27  CHECK           1710            2,077.38                   523,371.58
8/27  CHECK           1700            1,638.79                   521,732.79
8/28  TRANSFER FROM ACCT        ue  367,000.00                   154,732.79
          TO ACCT
8/29  IT: PLATINUM PARTNERS VALUE AR            12,000,000.00   12,154,732.79
8/29  OT: AURORA ENERGY SOLUTIONS    14,555.25                  12,140,177.54

******************************************************************************

                    --- CHECKS IN NUMBER ORDER ---
Date      Check No            Amount    Date    Check No               Amount
8/15                        2,090.13    8/11    1694*               2,581.98
8/12      1690*             1,051.73    8/19    1695                  618.94
* Denotes missing check numbers



STERLING
NATIONAL BANK

Date   8/29/14        Page    10
Account Number   Acct Ending ████
Enclosures                      16

PLATINUM PARTNERS VALUE ARBITRAGE FUND
L.P.
C/O PLATINUM PARTNERS
152 W 57TH ST FL 4
NEW YORK NY 10019-3310

CHECKING                     Acct Ending ████   (Continued)

--- CHECKS IN NUMBER ORDER ---

| Date | Check No | Amount | Date | Check No | Amount |
|------|----------|--------|------|----------|--------|
| 8/12 | 1696  | 350.58 | 8/19 | 1704  | 871.00 |
| 8/11 | 1697  | 161.14 | 8/19 | 1705  | 2,315.15 |
| 8/11 | 1698  | 40,158.12 | 8/19 | 1706  | 6,180.31 |
| 8/15 | 1699  | 27,500.00 | 8/19 | 1707  | 3,919.50 |
| 8/27 | 1700  | 1,638.79 | 8/19 | 1709* | 1,264.00 |
| 8/19 | 1702* | 161,725.89 | 8/27 | 1710  | 2,077.38 |
| 8/19 | 1703  | 12,973.54 |      |          |        |

* Denotes missing check numbers

* * *  E N D   O F   S T A T E M E N T   * * *







#1706   Posted 20140819   $6,180.31

#1707   Posted 20140819   $3,919.50

#1709   Posted 20140819   $1,264.00

#1710   Posted 20140827   $2,077.38

EXHIBIT 55

 **Capital**One**Bank**

# MANAGE YOUR CASH
CASH MANAGEMENT ┃ CHECKING ┃ MONEY MARKET ┃ CDs ┃ LOANS

PLATINUM PARTNERS BLACK ELK
OPPORTUNITIES FUND INTERNATIONAL LTD
152 W 57TH ST 54TH FL
NEW YORK NY 10019

Speak to a dedicated business solutions expert
at 1-888-755-2172 — a one-stop number for
both your business and personal needs.

## ACCOUNT SUMMARY FOR PERIOD AUGUST 01, 2014 - AUGUST 29, 2014

**Business Checking**        **PLATINUM PARTNERS BLACK ELK**

| | | | |
|---|---|---|---|
| Previous Balance 07/31/14 | $189,778.39 | Number of Days in Cycle | 29 |
| 3 Deposits/Credits | $36,179,002.83 | Minimum Balance This Cycle | $40.00 |
| 20 Checks/Debits | ($36,138,805.59) | Average Collected Balance | $802,687.75 |
| Service Charges | $0.00 | | |
| Ending Balance 08/29/14 | $229,975.63 | | |

## ACCOUNT DETAIL FOR PERIOD AUGUST 01, 2014 - AUGUST 29, 2014

**PLATINUM PARTNERS BLACK**

**Business Checking**        **ELK**

| Date | Description | Deposits/Credits | Withdrawals/Debits | Resulting Balance |
|---|---|---|---|---|
| 08/07 | Wire transfer withdrawal PPVA FUND INTERN ATIONAL LT 080714 140807161702H400 | | $189,738.39 | $40.00 |
| 08/20 | Wire transfer deposit PLATINUM PARTNER S BLACK EL 082014 140820163352F100 | $12,464,358.08 | | $12,464,398.08 |
| 08/21 | Wire transfer deposit PLATINUM PARTNER S BLACK EL 082114 140821114025F100 | $15,630,097.75 | | $28,094,495.83 |
| 08/21 | Wire transfer deposit PLATINUM PARTNER S BLACK EL 082114 140821130721F100 | $8,084,547.00 | | $36,179,042.83 |
| 08/21 | Wire transfer withdrawal Cong Bnei Ranzhe v 082114 140821121735H400 | | $332.80 | $36,178,710.03 |
| 08/21 | Wire transfer withdrawal Ohel Chai 082114 140821121732H400 | | $4,359.69 | $36,174,350.34 |
| 08/21 | International Wire Transfer Dr INTERNATIONAL INTERNATL 082114 USD50480753-00 Shloimi Wagschel | | $7,523.35 | $36,166,826.99 |
| 08/21 | Wire transfer withdrawal Interlink I Char itable Tru 082114 140821121744H400 | | $13,338.41 | $36,153,488.58 |

Thank you for banking with us    **PAGE 1 OF 2**

Branch bank products and services offered by Capital One, N.A.,
Capital One Bank is a trade name of Capital One, N.A.
and does not refer to a separately insured institution,
Member FDIC, © 2014 Capital One, All rights reserved.

 MEMBER **FDIC** 

## ACCOUNT DETAIL   CONTINUED FOR PERIOD   AUGUST 01, 2014-   AUGUST 29, 2014

| Date | Description | Deposits/Credits | Withdrawals/Debits | Resulting Balance |
|---|---|---|---|---|
| 08/21 | Wire transfer withdrawal Natnl Society fo r Hebrew D 082114 140821121747H400 | | $16,640.04 | $36,136,848.54 |
| 08/21 | International Wire Transfer Dr INTERNATIONAL    INTERNATL 082114 USD50480751-00     Dresden Investments LTD. | | $19,968.04 | $36,116,880.50 |
| 08/21 | Wire transfer withdrawal Interlink III Ch aritable T 082114 140821121741H400 | | $20,007.62 | $36,096,872.88 |
| 08/21 | Wire transfer withdrawal Marcos & Adela K atz 082114 140821121722H400 | | $66,560.14 | $36,030,312.74 |
| 08/21 | International Wire Transfer Dr INTERNATIONAL    INTERNATL 082114 USD50480745-00     Golda Wilk | | $66,595.84 | $35,963,716.90 |
| 08/21 | Wire transfer withdrawal RBC New York 082114 140821121728H400 | | $102,667.68 | $35,861,049.22 |
| 08/21 | International Wire Transfer Dr INTERNATIONAL    INTERNATL 082114 USD50480747-00     Eva Guttman | | $102,667.68 | $35,758,381.54 |
| 08/21 | International Wire Transfer Dr INTERNATIONAL    INTERNATL 082114 USD50480748-00    Huang Lai Tsu Hsia | | $513,338.41 | $35,245,043.13 |
| 08/21 | Wire transfer withdrawal PLATINUM PARTNER S CREDIT O 082114 140821110303H400 | | $1,009,872.51 | $34,235,170.62 |
| 08/21 | Wire transfer withdrawal Huberfeld Family  Foundatio 082114 140821121725H400 | | $1,026,676.83 | $33,208,493.79 |
| 08/21 | International Wire Transfer Dr INTERNATIONAL    INTERNATL 082114 USD50480754-00     Mind, Body and Soul Co. L | | $1,026,676.83 | $32,181,816.96 |
| 08/21 | Wire transfer withdrawal Platinum Prtrs V alue Arbit 082114 140821145232H400 | | $15,301,688.91 | $16,880,128.05 |
| 08/21 | International Wire Transfer Dr INTERNATIONAL    INTERNATL 082114 USD50480749-00    Two Sons Corp. | | $15,400,152.42 | $1,479,975.63 |
| 08/28 | Wire transfer withdrawal Interlink I Char itable Tru 082814 140828140430H400 | | $500,000.00 | $979,975.63 |
| 08/28 | Wire transfer withdrawal Interlink III Ch aritable T 082814 140828140433H400 | | $750,000.00 | $229,975.63 |
| **Total** | | $36,179,002.83 | $36,138,805.59 | |

PSI: 0 / SHC: 0 / LOB :S

EXHIBIT 56

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| BLACK ELK ENERGY OFFSHORE | § | CASE NO. 15-34287 (MI) |
| OPERATIONS, LLC | § | |
| | § | |
| DEBTOR. | § | CHAPTER 11 |
| | § | |
| RICHARD SCHMIDT, LITIGATION TRUSTEE, | § | |
| | § | |
| PLAINTIFF, | § | |
| | § | |
| VS. | § | |
| | § | ADVERSARY NO. _____ |
| PLATINUM PARTNERS VALUE ARBITRAGE | § | |
| FUND LP, PLATINUM PARTNERS CREDIT | § | |
| OPPORTUNITIES MASTER FUND LP, PLATINUM | § | |
| PARTNERS LIQUID OPPORTUNITIES MASTER | § | |
| FUND LP, AND PPVA BLACK ELK (EQUITY) | § | |
| LLC, | § | |
| | § | |
| | § | |
| DEFENDANTS. | § | |
| | § | |

**ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Richard Schmidt ("Trustee"), the Trustee of the Black Elk Litigation Trust ("Trust") files

this Original Complaint against Platinum Partners Value Arbitrage Fund LP ("PPVAF"),

Platinum Partners Credit Opportunities Master Fund LP ("PPCOMF"), Platinum Partners Liquid

Opportunities Master Fund LP ("PPLOMF"), and PPVA Black Elk (Equity) LLC ("PPVA BE"),

collectively "Platinum."

# I.
## INTRODUCTORY DESCRIPTION OF THE CASE

1.      The Trustee brings this adversary proceeding seeking to avoid and recover fraudulent transfers made by Black Elk Energy Offshore Operations, LLC ("Black Elk"), at the direction of Platinum, within two years before the date of the filing of Black Elk's involuntary bankruptcy petition.

2.      In 2009, Platinum invested in Black Elk, and that investment initially appeared very successful.  In 2011, the Wall Street Journal reported that, aided in part by the ban on drilling in the Gulf of Mexico after the BP Macondo explosion and oil spill, Platinum's Black Elk investment strategy "was Platinum's most successful last year, having contributed a significant portion of its high-teens return."

3.      On November 16, 2012, though, an explosion and fire occurred on an offshore Black Elk platform, and three workers died.  Because of that explosion and also deteriorating investment and market conditions, Black Elk's business began to suffer and decline.

4.      By early 2014, Black Elk was effectively insolvent – it was regularly pushing creditors' payments off to more than a year past their due dates because it simply did not have sufficient cash to pay its current liabilities.  Also by early 2014, Platinum dominated and controlled Black Elk -- being its majority and by far largest investor, controlling its credit facility, controlling the majority of the Senior Secured Notes and also junior Series E preferred equity, and appointing and controlling the Black Elk Board of Managers and Black Elk's chief Financial Officer ("CFO").  In early 2014, Platinum faced the prospect of losing more than $100 million in the impending demise of Black Elk.  To ameliorate that loss, Platinum devised several schemes to divert money to itself.

2

594382 11

5.      Platinum's principal scheme involved selling off Black Elk's prime assets to Renaissance Offshore, LLC, and diverting the proceeds from that sale to Platinum by redeeming its junior Series E preferred equity instead of the Senior Secured Notes, including those held by Platinum, which were entitled to first call on the proceeds from the asset sale (the "Renaissance Sale").

6.      Platinum undertook this scheme so that Platinum could divert the Renaissance Sale money to itself to pay off its Series E preferred equity, thereby benefitting itself to the same extent as it would by paying off Senior Secured Notes - cash is cash - while at the same time maintaining its secured creditor position as a Holder of Senior Secured Notes at the head of the line to receive any assets from Black Elk's estate in the foreseeable bankruptcy.

7.      Thus, as Black Elk negotiated the sale of its prime assets to Renaissance, Platinum implemented a scheme to fraudulently claim that a majority of unaffiliated and disinterested Holders of the 13.75% Senior Secured Notes voted to allow Platinum the ability to transfer the proceeds of the Renaissance Sale to Platinum by redeeming the Series E preferred equity ahead of the Notes.

8.      The lynchpin in Platinum's fraudulent transfer scheme was to make it appear that a majority vote of unaffiliated and disinterested Senior Secured Note Holders consented to amend the Indenture.  Recognizing that it would be difficult to persuade truly unaffiliated and disinterested Secured Senior Note Holders to renounce their rights, Platinum had to find a way to fix the vote.

9.      The Indenture voting math is not complicated.  In 2010, Black Elk issued $150 million face value of the 13.75% Senior Secured Notes.  In order to permit the transfer of the Renaissance Sale proceeds to Platinum for the Series E preferred equity, rather than to the

Senior Secured Note Holders or to be used for trade payables or acquisitions necessary to maintain Black Elk as a going concern, Platinum had to minimize the number of tenders and secure approval of an amendment to the Indenture.  To secure that amendment, a majority of the unaffiliated and disinterested Holders of the Senior Secured Notes had to approve Platinum's proposal by consenting to the proposal.

10.    Specifically, as set forth in the Offer to Purchase and Consent Solicitation Statement: "Pursuant to Section 316(a) of the Trust Indenture Act of 1939, Notes owned by the Company or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company shall be disregarded for purposes of determining the majority."  (Ex. 1 at 18-19)[1]  Because Platinum controlled Black Elk, this statement meant that the sum of all Notes held by Platinum, Platinum-affiliated entities and entities controlled by Platinum were to be subtracted from the $150 million Notes entitled to vote.  Of the remainder, a majority had to consent.

11.    Since it was obvious that few truly unaffiliated and disinterested Senior Secured Note Holders would consent to the provision, Platinum had to find a way to ensure that a majority of the apparently unaffiliated and disinterested voters would consent to a proposal that was so contrary to their financial interest.  The most obvious way to secure that consent was to use a Trojan horse "friendly" consenter:  secure the votes of a company or companies holding a substantial number of Notes that looked independent, but were in fact controlled by Platinum. That simple device was what Platinum used.

12.    The "friendly" consenters were a group of Beechwood entities, whose investment decisions were made and controlled by Platinum through Platinum's significant ownership

---

[1] The exhibits are not attached to this Complaint, but instead attached to the concurrently filed Declaration of Craig Smyser.

594382 11

interests, by assigning a number of Platinum employees to Beechwood, and by installing a Platinum executive, David Levy, as the Chief Investment Officer ("CIO") of B Asset Manager, the investment arm of these Beechwood entities.  Levy remained an employee of Platinum while at Beechwood, or at least continued to use his Platinum email address while directing Beechwood, Platinum and Black Elk affairs in 2014, including involving himself constantly in the process that led to the fraudulent transfer of the Renaissance Sale proceeds to Platinum. After Levy was placed by Platinum at Beechwood, Levy directed the Beechwood entities in early 2014 to obtain at least $37 million of the Black Elk Senior Secured Notes.

13.     Platinum, through Levy, caused the Beechwood entities to vote to consent their Notes in favor of the Platinum proposal. Shortly after engineering Beechwood's purchase of the Senior Secured Notes and voting those Notes in favor of the Platinum scheme, Levy left his CIO position at Beechwood, and returned full time to Platinum.

14.     The manipulation of the Indenture vote and the subsequent fraudulent transfer of $98 million – virtually the entire remaining cash balance from Black Elk's Renaissance Sale – to Platinum all occurred less than two years before Black Elk filed for bankruptcy.

15.     In addition to the Renaissance Sale fraud, Platinum also made fraudulent transfers with respect to a Platinum-controlled credit facility company, White Elk, and also both appropriated a corporate opportunity and then later improperly transferred assets with respect to a company called Northstar Offshore Group, LLC ("Northstar") and later still improperly transferred assets to TKN Petroleum Offshore, LLC ("TKN Offshore").

16.     Platinum's scheming was known to some Black Elk executives from at least February 2014, but the schemes still succeeded.  Black Elk Chief Executive Officer ("CEO")

594382 11

John Hoffman sent an email to Black Elk's General Counsel and one of its outside law firms on June 26, 2014 that described the schemes and predicted the result:

> I apologize for this note out of the blue but I need your guidance. Platinum (PPVA) is planning to create many new companies and place the acquisitions [including Northstar] that Black Elk recently technically worked up, bid and won into those new entities. Many if not all of existing equity holders would be left in the cold with no equity in the new companies. Further, they plan to isolate Black Elk, pay themselves back ([Series E] preferred equity) ahead of so called friendly bond holders [the Beechwood entities] and lay off most people. I believe that the ultimate plan is to bankrupt the company.

(Ex. 2)   Black Elk's CEO was right on all counts – Platinum appropriated the Northstar opportunity, did repay the Platinum Series E preferred equity rather than use the proceeds for trade payables or acquisitions, and even paid itself in front of the "friendly" voting Beechwood companies. Platinum also later engaged in a fraudulent conveyance of Black Elk assets to Platinum-related TKN Offshore. Black Elk's CEO was also correct in his June 26, 2014 prognostication -  once the Renaissance Sale proceeds went to Platinum for Platinum's Series E preferred equity, laying off employees and bankruptcy was not only inevitable, but also has occurred.

## II.
## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C.  § 157(b)(2)(A), (B), (C), (H) and (O). Venue is proper in this Court pursuant to 28 U. S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are §§ 105, 502, 510, 544, 548 and 550 of the Bankruptcy Code. In accordance with Local Rule 7008-1, the Trustee consents to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

594382 11

## III.
## PARTIES

18.     Trustee, Richard Schmidt, is the duly appointed Litigation Trustee in the above-captioned chapter 11 bankruptcy proceeding of In re Black Elk Energy Offshore Operations, LLC, Bankruptcy Case no. 15-34287 ("Bankruptcy Case"), and has standing and authority to bring this action pursuant to his appointment as Litigation Trustee under the Plan [Docket Nos. 1092 and 1204].

19.     Defendant, Platinum Partners Value Arbitrage Fund LP, a Delaware limited partnership, has appeared in the above-referenced Bankruptcy Case and may be served through its counsel of record, Baker Botts L.L.P., Omar J. Alaniz and James R. Prince, 2001 Ross Avenue, Suite 600, Dallas, Texas 75201-2980 and Danny David, One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002-4995.  Defendant may also be served by serving its registered agent for service of process, Vcorp Services, LLC, at 1013 Centre Road, Suite 403-B, Wilmington, Delaware 19805.

20.     Defendant, Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, has appeared in the above-referenced Bankruptcy Case and may be served through its counsel of record, Baker Botts L.L.P., Omar J. Alaniz and James R. Prince, 2001 Ross Avenue, Suite 600, Dallas, Texas 75201-2980 and Danny David, One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002-4995.  Defendant may also be served by serving its registered agent for service of process, Vcorp Services, LLC, at 1013 Centre Road, Suite 403-B, Wilmington, Delaware 19805.

21.     Defendant, Platinum Partners Liquid Opportunities Master Fund LP, a Delaware limited partnership, has appeared in the above-referenced Bankruptcy Case and may be served through its counsel of record, Baker Botts L.L.P., Omar J. Alaniz and James R. Prince,

7

2001 Ross Avenue, Suite 600, Dallas, Texas 75201-2980 and Danny David, One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002-4995.  Defendant may also be served by serving its registered agent for service of process, Vcorp Services, LLC, at 1013 Centre Road, Suite 403-B, Wilmington, Delaware 19805.

22.     Defendant, PPVA Black Elk (Equity) LLC, a Delaware limited liability company, has appeared in the above referenced Bankruptcy Case and may be served through its counsel of record, Baker Botts L.L.P., Omar J. Alaniz and James R. Prince, 2001 Ross Avenue, Suite 600, Dallas, Texas 75201-2980 and Danny David, One Shell Plaza, 910 Louisiana Street, Houston, Texas 77002-4995.  Defendant may also be served by serving its registered agent for service of process, Vcorp Services, LLC, at 1013 Centre Road, Suite 403-B, Wilmington, Delaware 19805.

<div align="center">

**IV.**
**BACKGROUND**

</div>

**A.     Procedural Background**

23.     On August 11, 2015 (the "Petition Date"), three petitioning creditors' filed an involuntary bankruptcy petition against Black Elk under chapter 7 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"), commencing an involuntary bankruptcy case.

24.     On August 31, 2015, Black Elk filed its Consent to the Order for Relief and filed its Motion to Convert the Involuntary Chapter 7 Case to a Voluntary Chapter 11 Case.  On September 1, 2015, the Bankruptcy Court entered the Order for Relief and entered an order granting Black Elk's Motion to Convert.

25.     The Black Elk initially operated its business as a debtor-in-possession pursuant to sections 1107 and 1008 of the Bankruptcy Code.

<div align="center">8</div>

594382 11

26.     On June 20, 2016, Black Elk filed its Third Amended Plan of Liquidation of Black Elk Energy Offshore Operations, LLC under Chapter 11 of the Bankruptcy Code (the "Plan") [Docket No. 1092].

27.     On July 14, 2016, the Bankruptcy Court entered an Order Confirming Third Amended Plan of Liquidation of Black Elk Energy Offshore Operations, LLC under Chapter 11 of the Bankruptcy Code [Docket No. 1204].

28.     Pursuant to the Plan, Richard Schmidt, Trustee herein, was appointed and approved to serve as the Litigation Trustee, with full authority to bring the above-captioned action.

**B.      Black Elk's History**

29.     Formed in November 2007 as a limited liability company, Black Elk was an oil and gas company headquartered in Houston with substantially all its producing assets located offshore in United States federal and Louisiana and Texas state waters in the Gulf of Mexico. (Ex. 3, at 1)  Black Elk acquired, exploited, and developed properties that other oil and gas companies had desired to remove from their producing property portfolios.  (*Id.*)  John Hoffman ("Hoffman") was a Black Elk founder and the company's CEO, and Anna Marizza Piche ("Piche") was the company's General Counsel.  Both were at Black Elk until August 2014.

30.     From 2008 to 2011, Black Elk employed an acquisition strategy to expand its holdings and further develop its business.  (*Id.*, at 1-2)

31.     To finance its operations, on November 23, 2010, Black Elk issued $150 million of debt to the Senior Secured Noteholders, and simultaneously entered into, among other documents, a Security Agreement (the "Security Agreement") in favor of The Bank of New York Mellon Trust Company, N.A. ("BNY") as Trustee and Collateral Agent for the 13.75% Senior Secured Notes.  (Ex. 1, at 5; Ex. 92)  Pursuant to the Security Agreement, the Senior

Secured Noteholders were granted a first priority lien on substantially all of Black Elk's assets. (Ex. 1, at 54; Ex. 92)

32.     By December 31, 2013, Black Elk had approximately 457,065 gross (223,852 net) acres under lease in the Gulf of Mexico, 935 gross (444 net) wells and 58 production platforms. (Ex. 3, at 1)

33.     For 2014, Black Elk stated it intended to increase its reserves product and cash flow through several strategies.  (*Id*., at 2)  One strategy was to "continue to pursue strategic acquisitions."  (*Id*. at 2)  Black Elk would seek to acquire properties "currently producing or have the potential to produce with additional attention and capital" to "extend the economic life of fields."  (*Id*.)  The importance of this acquisition strategy could not be underestimated, as Black Elk told the SEC, because:  "If we are unable to replace reserves through drilling or acquisitions, our level of production and cash flows will be adversely affected."  (*Id*., at 22)

34.     Production and drilling on platforms in the Gulf of Mexico depended on the service of many independent contractors willing to work under those conditions.  In its 2013 10-K, Black Elk acknowledge its dependence on its contractors:  **"We are dependent on contractors and sub-contractors for our daily operational and service needs on individual fields and platforms.  If these parties fail to satisfy their obligations to us or if we are unable to maintain these relationships, our revenue, profitability and growth prospects could be adversely affected."**  (Ex. 3, at 25, emphasis in original)  Yet, despite this reliance on contractors, Black Elk said that "to increase liquidity, we stretched accounts payable."  (*Id*., at 26)  That meant Black Elk was not paying the contractors in a timely fashion for the work – "the daily operational service needs" – that were the lifeblood of its operations.  Thus, stretching accounts receivable threatened its core business, a fact Black Elk acknowledged: "our inability

10

to pay trade creditors in a timely manner could impair our ability to develop and operate our properties." (*Id.*, at 26)

35.   Black Elk was effectively insolvent by early 2014 – some trade creditors were paid, if at all, more than a year past their due dates because Black Elk did not have sufficient cash to pay its liabilities. (Ex. 100)

**C.   Platinum's History**

36.   Platinum Partners, LP is "a Manhattan hedge fund," that was founded in part by Murray Huberfeld, who is currently under criminal indictment.   (Ex. 72, at ¶ 8d; Ex. 73) Platinum Management (NY) LLC ("Platinum Mgmt") and Platinum Liquid Opportunity Management (NY) LLC are hedge fund sponsors.  They provide services to pooled investment vehicles. According to the Platinum Partners website, they launch and manage hedge funds for their clients, including the funds at issue in this case.  (Ex. 72, at ¶ 11)  They have listed Murray Huberfeld ("Huberfeld") as Partner, Mark Nordlicht ("Nordlicht") as a Managing Member and/or Chief Investment Officer, Uri Landesman ("Landesman") as President, and Daniel Small ("Small") as Managing Director.  (Exs. 27, 68 at 12, and 69)

37.   Platinum Mgmt is the manager for PPVAF, the core Platinum hedge fund, which was founded in 2003 by Nordlicht, with investors that also included Huberfeld.  (Ex. 68, at 12; Ex. 72, at ¶¶ 8, 11)  Nordlicht has been the Chief Investment Officer ("CIO") and the person primarily directing Platinum's day-to-day operations, as demonstrated by his signing, as "controlling person," a joint filing with the SEC on behalf of Platinum Mgmt, PPVAF, PPLOMF, and other Platinum-affiliated entities.  (*Id.*, at 12-13)

38.   A number of other Platinum executives have played key roles in the Platinum companies, like Black Elk, in which Platinum has invested, and then dominated and controlled. In addition to Nordlicht, Platinum's primary actors relevant to this case are: (a) David Levy

("Levy"), Huberfeld's nephew, a Managing Director and Portfolio Manager at Platinum, whom Platinum placed as CIO of the "friendly" Beechwood entities, and as the President of B Asset Manager, which was both the Administrative Agent for Black Elk's credit facility and also the investment arm of the Beechwood entities; (b) Daniel Small ("Small"), a Managing Director at Platinum Mgmt and Portfolio Manager at Platinum, an executive at Beechwood, and also placed by Platinum on the Black Elk Board of Managers; (c) Samuel Salfati ("Salfati"), who was an executive of Platinum that was placed on the Black Elk Board of Managers to secure a majority vote regarding the Renaissance Sale and the distribution of the proceeds to improperly repurchase Series E preferred equity. Platinum also worked through Black Elk's Chief Financial Officer, (d) Jeff Shulse ("Shulse"), whom Platinum placed at Black Elk in January 2014, and also through (e) Steven Fuerst ("Fuerst"), whom Platinum placed at Black Elk and who became Black Elk's General Counsel in August 2014.

## V.
## PLATINUM'S PLUNDER OF BLACK ELK

**A.   Platinum's Dominion and Control through Black Elk's Credit Facility; Transfers to Platinum Cayman and White Elk**

39.   On December 24, 2010, Black Elk entered into a $200 million, two-part credit facility with Capital One as the administrative agent (the "Credit Facility"). The Credit Facility consisted of a senior secured revolving loan (the "Revolving Credit Facility") and a secured letter of credit facility (the "Letter of Credit Facility").

40.   On August 30, 2013 Black Elk consented to Capital One (and its syndicated lenders) assigning the Revolving Credit Facility to a lending syndicate with White Elk LLC as lender and administrative agent and a company called Resource Value Group ("RVG") as lender through a Loan Purchase and Sale Agreement. White Elk and RVG are Platinum-related entities created just days before the assignment for the purpose of assuming control over Black Elk's

594382 11

Credit Facility.  At the time of the loan assignment, Black Elk had drawn about $60 million from its revolving line of credit with Capital One.  Since the date of the loan assignment, there is no record of Black Elk receiving any additional sums from the newly created lending syndicate.

41.     RVG was formed just 16 days before the loan assignment, on August 14, 2013, and is identified as an affiliate of Platinum in Black Elk SEC filings.  Further, a September 2013 Put Agreement entered into between RVG and PPVAF was signed by Managing Director, Daniel Small, on behalf of both Platinum and RVG.  (Ex. 65)  Through Lender Joinder Agreements, RVG assigned its right to payment under the loan purchase agreement to various parties.

42.     White Elk was formed just 3 days before the loan assignment, on August 27, 2013.  On at least one occasion, Black Elk transferred funds directly to a Platinum entity after identifying the recipient of funds in its accounting records as White Elk.  The details of that transfer are provided below:



(Ex. 66)

43.     Significantly, White Elk received numerous wire transfers from Black Elk at the specific instruction of Platinum, and without regard to priority or basis for such transfers.  A log of transfers to White Elk from Black Elk's Operating Account in the two years prior to the Petition Date is provided below:

594382 11



(*Id.*)

44.    In connection with its credit facility interest, and as detailed above, White Elk received at least eleven (11) million dollars directly from Black Elk.

45.    The loan purchase agreement, lender joinder agreements and other documentation were designed to create the impression that the foregoing entities were simply assigned Capital One's rights (i.e., repayment of principal and interest) related to funds received by Black Elk under the original revolving line of credit.   On information and belief, ultimately, however, Black Elk paid the foregoing entities sums in excess of what was owed under the terms of the Revolving Credit Facility at the time of its assignment to a Platinum affiliate.

      **B.**    **Platinum's Dominion and Control through Platinum's Equity Position; the Renaissance Sale and Transfers to Benefit Platinum**

46.    **Platinum's domination and control of Black Elk's equity position.**  In the first quarter of 2013, Black Elk entered into contribution agreements with PPVA BE and Platinum Partners Black Elk Opportunities Fund LLC ("PPBE") or entities designated by PPBE (together, the "Platinum Group") pursuant to which Black Elk issued 50 million additional Series E

preferred equity units and 3.8 million additional Class B Units to the Platinum Group for an aggregate offering price of $50 million.  (Ex. 3, at 43)  In addition, Black Elk also agreed to issue an additional 43 million Series E preferred equity units in exchange for $30 million of outstanding Series D preferred equity units and $13 million of paid-in-kind dividends.  (*Id.*)

47.   On February 12, 2013, Black Elk entered into an agreement with Platinum under which Black Elk agreed to issue Class B Units to Platinum in exchange for financial consulting services.  (*Id.*, at 56)  Consequently, Black Elk issued 1,131,458.5 Class B Units to PPVA BE, an affiliate of Platinum, pursuant to such agreement.  (*Id.*)

48.   As of December 31, 2013, Platinum owned approximately 85% of Black Elk's outstanding voting membership interests and approximately 66% of Black Elk's total outstanding membership interests, giving it significant influence and control in corporate transactions and other matters.  (Ex. 3, at 33)  As a result of its majority ownership interest in Black Elk, Platinum had the ability to and did exercise its rights to remove and appoint key personnel, including all Managers, and to determine and control the company, management policies, financing arrangements, the payment of dividends or other distributions, and the outcome of certain company transactions or other matters submitted to members for approval, including potential mergers or acquisitions, asset sales and other significant corporate transactions.  (*Id.*)  Corporate documents, including Black Elk's Operating Agreement, which refers to the role of a "Platinum Manager," and e-mail communications referenced herein reveal overwhelming evidence of Black Elk management conferring with, and seeking approvals from Platinum for day-to-day business decisions, as well as any significant or extraordinary transactions.  (Ex. 98, at 18-19)

49.     Prior to the Petition Date, Platinum had the ability to appoint members of the Black Elk's Board of Managers, who in turn, had the power to appoint and remove Black Elk's Officers.  (Ex. 3, at 33)  Through this influence, Platinum has dominated Black Elk, exerting control over the Black Elk's day-to-day operations.  In fact, Black Elk's former Chief Executive Officer and several other Black Elk employees have stated that Platinum actively participated in and directed the affairs and operations of the Black Elk.  (Ex. 4, at 17; Ex. 53)  Platinum's control over Black Elk includes, among other indicia of domination, Platinum having directed Black Elk to engage in specific business transactions, causing Black Elk to terminate existing business relationships in favor of entities related to or affiliated with Platinum, and controlling which of Black Elk's vendors were paid (if at all) and when.  Platinum used this domination of Black Elk inequitably and to the detriment of Black Elk and Black Elk's creditors by, among other actions, preventing Black Elk from paying is legitimate debts while diverting assets to the benefit of Platinum and its affiliates and insiders.

50.     Platinum consolidated and further exerted its control over Black Elk, and stepped up the implementation of its schemes to plunder Black Elk, when it appointed Jeff Shulse as Black Elk's CFO in January 2014.  As described by Black Elk's founder and former CEO Hoffman, "Mr. Nordlicht and Mr. Small came into my office and made a very hard sell to put Jeff Shulse into the CFO position."[2]  (Ex. 4, at 21)  As Hoffman further testified, "Jeff [Shulse] was not a team player and he was clearly there working for Platinum."  (*Id.*, at 110)  Beginning in January 2014, "it was almost weekly we would either see Small, Levy or Nordlicht in the [Black Elk] office."  (*Id.*, at 74)  Hoffman has further testified that "Platinum was calling all of

---

[2] A new CFO was needed at Black Elk because, as Black Elk's CEO told Nordlicht, Small and Levy in a January 7, 2014 email responding to a Nordlicht email about strategies and a message "to hold off [Black Elk's] bondholders":  "FYI – Bruce has stopped coming in.  He doesn't want to be CFO with all the stuff going on."  (Ex. 67)

the financial shots.  I would say as of February [2014], they were in complete control of, you know, essentially almost every daily activity and most certainly stayed on top of every penny in and every penny out."  (*Id.*, at 17)  Also according to Hoffman, Platinum had the ultimate decision-making authority on whether Black Elk would enter into an acquisition or buy any properties.  (*Id.*, at 48)

51.     Shulse clearly worked for the benefit of Platinum, and not Black Elk.   On March 7, 2014, a couple of months after Platinum installed Shulse as Black Elk's CFO, Shulse sent an email to David Levy regarding "███████████████████████"  (Ex. 5)  In this email, Shulse stated that Levy, on behalf of Platinum, was "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████."  (*Id.*)  Shulse went on to say that "████████████████████████████████████████████████████████████████████████████████████████████████████████████"  (*Id.*)

52.     By July 22, 2014, when Shulse still had not finalized his equity deal with Platinum, he sent Daniel Small an email pledging that "████████████████████████████████████████████████████████████"  (Ex. 5)  Shulse went on to remind Small that "██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"  (*Id.*, emphasis added)

53.     This July 2014 email also attached the undated text of an earlier email from Shulse to Levy, where Shulse reaffirmed that "███████████████████████████████████████████████████████"  (Ex. 5)  Shulse restarted the discussion of his equity interest by first stating that "█████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████"

(*Id.*)  After concluding his lengthy list of proposed terms, Shulse reminded Platinum that "███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████" (*Id.*)  Shulse concluded this email with the following:  "███████

███████████████████████████████████████████████

███████████████████████████████" (*Id.*)

54.      As Shulse and the other Platinum plants at Black Elk knew by July 2014, Black

Elk "did not have enough income to pay all of the bills that were outstanding" (Ex. 4, at 91;

Ex. 100), and thus was unable to pay its debts as they became due.  (Ex. 6, Note 2—Going

Concern Consideration)  Black Elk did not have the funds or liquidity to pay its mounting trade

debt, which is believed to have been in the $80 to $90 million range.[3]  (*Id.*; Ex.  4, at 81-82, 91)

Black Elk was financially stressed to the point where the only short-term alternative to filing a

bankruptcy was to sell substantially all of its assets.

55.      **The Renaissance Sale.**  On or about July 10, 2014, Black Elk entered into a

Purchase Sale Agreement with Renaissance Offshore, LLC (the "Renaissance Sale") that would

---

[3] Fuerst, as the person brought in by Platinum in 2013 "to be the center point person for the
vendors to call…." (Ex. 4, at 84), and also later as General Counsel, was well aware of Black
Elk's financial condition and inability to continue if the proceeds of the Renaissance sale went to
pay off Series E Platinum preferred debt.

transfer certain assets to Renaissance in exchange for $170 million, subject to certain closing adjustments.[4]  (Ex. 7, Section 2.1)  The Renaissance Sale represented "a significant amount of [Black Elk's] cash flow, proved reserves, and production."  (Ex. 6, at 6, Note 5—Acquisitions and Divestitures)  The Renaissance Sale closed on August 15, 2014, at which time about $125 million in proceeds was transferred to Black Elk.  (*Id*., at 6; Ex. 8)

56.     Rather than use these Renaissance Sale proceeds to pay Black Elk's substantial debts, the Senior Secured Notes or trade payables, Platinum used the proceeds to retire Black Elk's Series E preferred equity units, which not only provided no real value to Black Elk, but also cemented Black Elk's insolvency and avoided the proper order of priority.  (Ex 6, Note 9, Members' Deficit)

57.     Because of its ownership and control of Black Elk, Platinum, through an improper Offer to Purchase and Consent Solicitation, purported to amend the Indenture to allow the vast majority of the Renaissance proceeds to be used to retire the Series E preferred equity and to purchase only a small number of the Senior Secured Notes.  (Ex. 6, at 10, Note 8—Debt and Notes Payable, at 11, Note 9—Members' Deficit)

58.     **The Offer to Purchase and Consent Solicitation Scheme.**  The Offer to Purchase and Consent Solicitation required a majority of the non-Platinum-affiliated Secured Senior Note holders to consent.  Platinum, through primarily Nordlicht, Small, and Levy, caused the following representation to appear in the Offer to Purchase and Consent Solicitation Statement:  "As of the date hereof [July 16, 2014], there are $150 million aggregate principal amount of Notes issued and outstanding under the Indenture.  Platinum Partners Value Arbitrage

---

[4] Although Black Elk was the party on the Renaissance PSA, Platinum was representing in an E&P Ventures PowerPoint that "██████████████████████████████████████████." (Ex. 70, at 5)

Fund L.P. and its affiliates, which own approximately 85% of our outstanding voting membership interests,[5] own approximately $18,321,000 principal amount of outstanding Notes. Otherwise, neither we, nor any person directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, held any Notes."  (Ex. 1, at 5)  This last sentence was false, and designed to cover up Platinum's scheme to fix the consent vote.

59.     Platinum's actual purpose was (1) to avoid having a large number of Notes tendered, but (2) to allow Platinum to receive the benefit of approximately $98 million from retiring Series E preferred equity in disregard of the proper priority order of distribution. (Ex. 92)  By avoiding tender of any significant amount of Senior Secured Notes, Platinum maximized the amount of cash available for retiring the Series E preferred equity, while also maintaining the priority position of Platinum's own Senior Secured Notes.

60.     The first purpose of discouraging a large number of tenders was achieved primarily by the unpalatable terms of the Offer to Purchase and Consent Solicitation, which provided no redemption premium on tendered Notes.  Platinum accomplished the first part of its goal, as only 11,433,000 of the 150,000,000 Notes, or 7.62%, were tendered.  (Ex. 39)  Platinum tendered none of its own Notes.

61.     Platinum achieved the second part of its goal, allowing an improper priority redemption of its Series E preferred equity, through a scheme to fix the vote.  In the months leading up to the Offer to Purchase and Consent Solicitation, Platinum orchestrated the scheme explained by Nordlicht in a February 4, 2014 email to Black Elk's CEO Hoffman and CFO

---

[5] As of June 2014, Platinum was the majority holder of Series E preferred equity.  Schedules obtained from Black Elk's auditors indicate Platinum held more than 80 million Series E preferred equity compared to the roughly 20 million held by other parties.  (Ex. 9; Ex. 10, Attachment B)

Shulse, and Platinum's Small, Levy, and David Ottensoser: "the move is going to be to inform bondholders we have sales lined up but we are going to use the proceeds for working capital and for drilling. That will lead to friendlies getting control of bonds at decent prices. Once friendlies have control of bonds, we can then execute with flexibility according to what we would like to do." (Ex. 71)

62.   Nordlicht further updated Black Elk's CEO Hoffman and General Counsel Piche, in a February 6, 2014 email: "FYI – I am close to buying 20 million bonds from MSD. It will at that point be easy task to buy additional 25 million if bondholders don't behave and we can change covenants at any time by flipping our bonds to friendlies . . . ." (Ex. 11)

63.   By March 3, 2014, Platinum's Nordlicht informed Levy, Shulse, Hoffman, and Piche that "We have friendly buying 20 million" (Ex. 12) and further assured this same group by email that Platinum would soon have "50 percent in friendly hands,"[6] in which case the vote would be "academic." (*Id.*)  Hoffman also was informed by Platinum on "a number of occasions[,] don't worry about the bond vote, you know. We [Platinum] have control of the vote." (Ex. 4, at 94)  Hoffman specifically identified Platinum, Shulse and Fuerst as the people "aligned about the [Renaissance] money going to buy the Series E." (*Id.*, at 100)  This scheme, of course, was not revealed to the Senior Secured Note holders that were unaffiliated with Platinum.[7]

_____

[6] Having a majority also was perceived as beneficial to Platinum because Nordlicht believed that "50 percent can override them" if "25% of the bondholders[ ] call a default." (Ex. 13)

[7] In fact, Shulse and Platinum were telling the marketplace exactly the opposite. In a July 17, 2014 email, JAB Energy confirmed its conversation with Shulse that "BEE will use the proceeds to pay down current bond holders, pay down payables, and return some preferred equity to Platinum." The email said that "[p]er our conversation, BEE intends to make current all of the AOS payables app $2.8 million, make a large payment to JAB of between $4 and $6 million and return to the executed payment plan between BEE and JAB for outstanding balance." (Ex. 14) Shulse and Platinum were falsely claiming that bondholders would be paid first, then payables

64.     Platinum, at the primary direction of Nordlicht, Levy, and Small,[8] obtained alleged approval of the indenture amendments in part through an improper Platinum "disclaimer of beneficial interest" in $43,293,000 of Notes that were in fact beneficially owned by Platinum affiliates.  (Ex. 15; Ex. 10, Attachments C and E)

65.     Platinum also achieved the improper consent approval in part through implementation of the scheme to have "friendly" Notes bought and held by the affiliated but undisclosed Beechwood entities voted in favor of consent.  Platinum, Nordlicht, Levy and Small were the primary architects that implemented this scheme.  As revealed in a September 17, 2016 *Wall Street Journal* article, Beechwood was owned in substantial part by Platinum and its affiliates – Platinum (through Nordlicht and Murray Huberfeld) controlled over 35% of Beechwood, and Levy (and his family trusts) controlled another 5%.  (Ex. 17, ¶ 68; Ex. 74) Platinum, including Nordlicht and Levy, formed Beechwood with two other people acting as front men for the purpose of entering into reinsurance agreements in which they would be able to control and use trust assets to benefit Platinum and themselves.  Platinum exercised dominance and control of Beechwood.

66.     In order to implement the scheme to have "friendlies" purchase and vote the Notes as directed by Platinum, Platinum installed Levy as the Chief Investment Officer and

---

would be paid second, and finally some preferred equity to Platinum would be paid third.  The actual intent was to make sure that Platinum got paid for its Series E preferred equity while maintaining its Note priority position.

[8] By examples, the Second Supplemental Indenture required and had the signatures of Hoffman as CEO and a Manager, Fuerst as the Secretary and General Counsel, and Small and Salfati as Managers.  Shulse, as CFO, made the false representation in the Officers' Certificate that "The undersigned confirm that, excluding any Notes held by the Permitted Holders, the Issuers, or any Guarantor, or by an Person directly or indirectly controlling or controlled by or under direct or indirect common control with the Permitted Holders, the Issuers, or any Guarantor, the holders of a majority in the aggregate of principal amount of the Notes outstanding have consented to the Second Supplemental Indenture."  (Ex. 16)

President at B Asset Manager, the investment arm of the Beechwood entities.  At the same time, Levy continued to work for and on behalf of Platinum with respect to Black Elk.[9]  Levy, on behalf of Platinum, began making the investment decisions for Beechwood.  (Ex. 17, ¶ 86; Ex. 74)

       67.     As Chief Investment Officer and President of B Asset Manager, Levy caused the "friendly" Beechwood entities Beechwood Bermuda International Ltd., BBIL ULICO 2014, Bre WNIC 2013 LTC Primary, Bre WNIC 2013 LTC Sub, and Bre BCLIC to obtain approximately $37 million worth of Notes, and then vote them as directed by Platinum and in support of Platinum's scheme.[10]  (Ex. 17, ¶¶ 93-95; Ex. 21, at PPVA-10468 (Schedule 1, listing number of Notes held by Beechwood entities); Ex. 22 (Bond Spreadsheet); and Ex. 28 (BNY Mellon Chart))  As Reuters has reported, "Beechwood spokesman David Goldin confirmed that Levy was responsible for Beechwood's purchase of Black Elk bonds and for voting them in Platinum's favor, along with the approval of the covenant changes."  (Ex. 29)[11]  As set forth in another

---

[9] Levy, for example, on behalf of Platinum, but while at B Asset Manager / Beechwood and using his dlevy@beechwood.com email, addressed the internal senior management disputes at Black Elk among Black Elk Officers Shulse, Hoffman, and Art Garza on July 13, 2014, 3 days before the Black Elk 8-K announcing the Offer to Purchase and Consent Solicitation.  (Ex. 18) Upon information and belief, Beechwood also has had a number of other Platinum plants over the pertinent time period, including Will Slota, at Chief Operating Officer, Paul Poteat, as Chief Technology Officer, David Ottensoser, as  General Counsel, Daniel Small, as Senior Secured Collateralized Loans Project Manager, David Leff, as United States Fixed Income Project Manager, Rick Hogdon, as Chief Underwriting Officer, Daniel Saks, as B Asset Manager's Chief Investment Officer (after Levy resigned and returned full-time to Platinum), and Naftali Manela and Eli Rakower, who provided consulting services to Beechwood.  (Ex. 17, ¶¶ 104, 64, 17; Ex. 74)

[10] Also in February 2014, with David Levy acting as President of B Asset Manager, the Beechwood entities entered into a Loan Purchase and Sale Agreement, as well as ancillary agreements, related to Black Elk's Credit Facility.  (Ex. 23; Ex. 24, Omnibus Assignment; Ex. 25, Note; Ex. 26, Note)

[11] Platinum's effective control of the Beechwood Notes also is illustrated in the email communications among Platinum executives on May 16, 2014 regarding Platinum lending out and getting back Black Elk Notes from B Asset Manager.  (Ex. 30)

complaint recently filed against Levy, among others, in the Southern District of New York:  "In short, Beechwood, in the person of Levy, voted Beechwood-purchased bonds [and did not tender their Notes], including the Trust's bonds, against the interests of the Trust and Beechwood, and in favor of subordinating them to Platinum's interests, even though the vote meant that the Trusts' bonds would be exposed to greater risk of loss, because all the value of Black Elk's assets was paid to Platinum."  (Ex. 17, ¶ 95)

68.     In addition to the improper rigging of the vote through "disclaiming" affiliates and obtaining "friendly" votes, Platinum also obtained any truly non-affiliated consent by misstatements of fact, including (a) not disclosing the amount of Notes disclaimed by Platinum, (b) the relationships between the consenting parties and Platinum, and (c) Platinum's intentions to cause Black Elk to repurchase all of Platinum's Series E preferred equity, and the effect that such repurchase would have on the ability of Black Elk to continue as a going concern.

69.     Black Elk's founder and then-CEO Hoffman was sufficiently troubled by Platinum's undisclosed plan to repay itself ahead of Black Elk's lenders and creditors that he emailed Black Elk's General Counsel Piche and outside counsel on June 26, 2014, stating in part his understanding that "they [Platinum] plan to isolate Black Elk, pay themselves back ([Series E] preferred equity) ahead of so called friendly bond holders and lay off most people."  (Ex. 2)

70.     Hoffman also issued a memorandum on July 9, 2014 revoking all Black Elk's employees' authority with respect to all contracts and monetary matters.  (Ex 31; Ex. 4, at 134)  Hoffman's memorandum, which stated that his approval and signature was required for, among other things, all wires, checks or other transfers of Black Elk's property, was apparently his attempt to prevent Platinum from carrying out its plan to recover its equity investment at the expense of Black Elk's lenders and creditors.  (Ex. 31; Ex. 32)

594382 11

71.     Also on July 9, after sending out his memorandum, Hoffman had an email exchange with Nordlicht in which Hoffman recognized that Black Elk was now being run by Platinum through Shulse and protested that "███████████████████████████████ ███████."  (Ex. 32)  Hoffman went on to say that "████████████████████████████████ █████████████████████████████████" and that "███████████████████████████ ███████████████████████████████████"[12]  (*Id.*)  Hoffman recognized that "███████████████████████████████████████████████████ █████████████████████████████████████."  (*Id.*)  Hoffman feared that Platinum's interest was in "shutting down Black Elk and taking all the money out."  (Ex. 4, at 76)

72.     Hoffman, as CEO, also had directed the termination of Shulse, the CFO.  On July 13, Levy, emailing Hoffman from his Beechwood address, directed:  "As we discussed please pull back the letter [of termination] on Jeff [Shulse]."  (Ex. 33)  Hoffman forwarded this email to Piche, Black Elk's General Counsel, stating:  "See note from Platinum usurping my decision to fire the CFO."  (*Id.*)  Shulse continued to work on Platinum's behalf at Black Elk.

73.     The purported July 14, 2014 Written Unanimous Consent of the Managers of Black Elk regarding the Renaissance Sale and the Offer to Purchase and Consent Solicitation contains the signature of Platinum's Small, but not Hoffman.  (Ex. 75)

74.     As noted above, at the time of the Renaissance Sale, Platinum exercised control over Black Elk.  Platinum now held the vast majority of the common stock in Black Elk, as well

---

[12] These sentiments are consistent with Hoffman's statement in a June 27 email to Nordlicht that "[t]he current direction runs counter to my instincts.  I have fiduciary duties and no longer feel that I have the capacity to exercise those duties."  In that same email, Hoffman said that "I am apprehensive about the uses of the Renaissance proceeds as I feel it will put Black Elk at risk of defaulting on creditors and ruin my reputation."  (Ex. 34)

as a significant portion of Black Elk's 13.75% Senior Secured Notes, Senior Secured Revolving Credit (through its common ownership of White Elk and RVG) and Series E preferred equity units.  (Ex. 6, at 11-12, Note 9, at 20, Capital Contributions; Ex. 35 ("PPVA is directing our current strategic business activities . . . ."))

75.     On July 16, 2014, Black Elk filed a Form 8-K with the Securities and Exchange Commission (the "SEC') announcing that it had made a tender offer to, and solicited consent from, holders of its 13.75% Senior Secured Notes that, among other things, allowed noteholders to tender their notes and sought to change certain covenants that would enable Black Elk to retire Series E preferred equity ahead of the Notes.  (Ex. 36)

76.     Platinum dominated and controlled the Renaissance Sale closing, as well as the Offer to Purchase and Consent Solicitation.  On August 12, 2014, Daniel Small, on behalf of Platinum, emailed David Levy at dlevy@beechwood.com to ask whether he has "signed the releases for the [Renaissance] sale?"  (Ex. 37)  Levy responded one minute later from his iPad, "No what do I need to do !"  At 10:49 pm, Small then instructed Levy:  "David, sign the attached document and forward it to Russell Diamond for counter-signature and copy Jeff [Shulse at Black Elk]."  (*Id.*)  Small then further instructed Shulse:  "Jeff, concurrent with David sending to Russell send Russell the NSAI reserve report excluding the properties sold to Renaissance so he can calculate the hedges that need to be unwind [sic]."  (*Id.*)  The next day, August 13, 2014, Levy, as President of B Asset Manager LP, executed and provided consent for the Renaissance Sale.  (Ex. 38)

77.     On August 14, 2014, Black Elk, under the influence of Platinum, issued a press release falsely claiming that "holders of $110,565,000 principal amount of the Notes, or 73.71% of the Notes, had validly consented to the Consent Solicitation and not revoked such consent."

594382 11

(Ex. 39; Ex. 28)   Any questions were to be directed to Fuerst. These alleged results were achieved only by improperly including all of the Platinum controlled, but "deemed not affiliated" and "friendly" votes.[13]

78.     On August 15, 2014, Black Elk issued a Form 8-K announcing that it had received consent from holders of its 13.75% Senior Secured Notes to, among other things, apply the proceeds from the Renaissance Sale to retire the tendered 13.75% Senior Secured Notes and to utilize the remaining proceeds to re-purchase preferred equity issued by Black Elk.  (Ex. 40)  The consent was memorialized in a Second Supplemental Indenture.  (Ex. 6, at 11; Ex. 16)  In addition to the Platinum actors, Hoffman, as Black Elk CEO, as well as Piche and Fuerst, as Black Elk Secretary and General Counsel, were instrumental in facilitating the creation of the Second Supplemental Indenture.  (Ex. 6; Ex. 16)  Again, it was only by improperly including the votes of the affiliated Platinum-controlled, but "disclaimed" or "friendly" entities, that consent allegedly was obtained.

79.     Beginning on August 15, 2014, Black Elk received the following wire transfers relating to the Renaissance Sale:

---

[13] This representation also directly contradicts the method of tabulating results set forth in the Offer to Purchase and Consent Solicitation (Ex. 1, at 2 ("Requisite Consents"), 18-19) and as stated in Black Elk's press release of July 16, 2014:  "If Consents from the holders of at least a majority in principal amount of the outstanding Notes (disregarding any Notes held by affiliates of the Company) have been validly received…."  (Ex. 36, at Ex. 99.1, at 1-2)

594382 11



| | Account No. | | | |
|------|------------|------------------|-------------------------------------------------|-----------------|
| Date | Amegy Bank | Wire Description | | Amount |
| 8/15/2014 | | RENAISSANCE OFFSHORE, LLC;REF M 1306804969 | | $ 99,999,999.99 |
| 8/15/2014 | | RENAISSANCE OFFSHORE, LLC;REF M 1306804970 | | $ 19,240,898.44 |
| 8/15/2014 | | PETROLEUM STRATEGIES, INC.;OBI 1306804015 | | $ 5,713,164.64 |
| 8/22/2014 | | RENAISSANCE OFFSHORE, LLC;REF M 1306604221 | | $ 1,059,810.55 |
| | | Total | | $126,013,873.49 |

(Ex. 41)

80.     On August 18, 2014, three days after the first three Renaissance wire transfers to Black Elk, Shulse again followed up with Platinum regarding his reward.  In an email to Nordlicht, Small and Levy, Shulse said that "███████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████████████████████████████████████,14 (Ex. 42)   Shulse  again  reminded  Platinum  that  "██████████████████████ ████████████"  (Id.)  That same day, in an email to Levy and Small, Nordlicht said that "███████ ██████████████████████████████████████████"  (Id.)

81.     Platinum circumvented Hoffman's authority as President and CEO of Black Elk by directing Shulse, based upon the approval of the Platinum-affiliated managers and the alleged

---

[14] The August 18-21, 2014 wire transfers for the Series E preferred equity no doubt worsened Black Elk's insolvency.  However, Black Elk was insolvent months earlier.  By example, Shulse, in a May 20, 2014 email, stated that "█████████████████████████████████████████ ██████████████████████████████████████████████████████████████████████"  (Ex. 43)

unanimity of the Black Elk Board of Managers, to make the subject transfers without Hoffman's approval or signature.  As noted above, Shulse and Platinum were in that same time frame negotiating Shulse's financial remuneration.  (Ex. 44, at 35-39; Ex. 45)  On information and belief, Platinum agreed to pay Shulse bonuses in the total amount of $550,000, in large part for his involvement and assistance in the Renaissance Sale.  (Ex. 44, at 35-36; Ex. 46, at 10)  Notably, Hoffman had fired Shulse on three occasions in part because Hoffman believed that Shulse was acting in Platinum's best interest at the expense of Black Elk.  (Ex. 4 at 67-69, 134-137)  Each time, Platinum reinstated Shulse.  Immediately following the Renaissance Sale, Platinum appointed Shulse as Black Elk's CEO, after reaching a deal with Hoffman to resign as Black Elk's President and CEO.  (*Id.*; Ex. 47, at 3)

82.  __Platinum Wire Transfers the Renaissance Proceeds to Its Improper Benefit.__

E-mail communications on August 18, 2014 by and between Nordlicht, Shulse, Small, Salfati and Levy demonstrate the mechanics of the final implementation of the plan to improperly transfer nearly $98 million from Black Elk for the benefit of Platinum.  That day, Shulse emailed Nordlicht, with the subject line, "Wire is NOT approved," explaining that Shulse understood that Nordlicht was "talking to John [Hoffman] at 4:00, [but] the wire transfer deadline is 3:30 ... if you want New Mountain paid today, you are going to have to make a decision soon.  I am happy to hit send if the board tells me to, if not it will likely be tomorrow if John approves at 4:00."[15] (Ex. 48)

83.  Five minute later on August 18, 2014, Nordlicht sent an email to Shulse, copying Small, Salfati and Levy, in which Nordlicht represented that "the board is in agreement to send new mountain wire and 50 million to ppbe.  ZThe [sic] balance of the preferred I am going to get

---

[15] The import of the New Mountain transfer is explained further, *infra* at ¶ 87.

you john email so u have unanimous consent on top of his verbal agreement that he has already given me … but send these wires out already!!!!!"  (Ex. 48)  At approximately the same time, Daniel Small also emailed Shulse, copying Salfati:  "Jeff, on behalf of Sam Salfati and myself constituting a majority of the board of managers you are hereby authorized to wire $70 million in partial payment of the Preferred E units, Regards, Dan."  (Ex. 49)  Based on Nordlicht's emphatic, five exclamation point email, and Small's confirmatory email, Shulse then authorized and requested the release of the wires "per Mark's [Nordlicht's] direction."  (Ex. 48)

84.     On August 18, David Levy, from his Platinum email address, also sent Shulse, at his personal email address, the PPCOMF wire transfer instructions.  On August 20, Shulse then forwarded on these instructions with the direction to Black Elk employees that "[t]he board has also requested and approved the payment of $24,600,584.31 of Series E preferred to Platinum Partners Credit Opportunities Master Fund LP … wire instructions below ... needs to go today."  (Ex. 50)

85.     Between August 18 and 21, 2014, Black Elk remitted the following wire transfers, pursuant to the instruction of Platinum, and particularly the involvement and direction of Nordlicht, Levy, Small, Salfati, and Shulse, and without the intervention and prevention of the transfers by Hoffman, Piche or Fuerst:

594382 11

| | Account No. | | |
|---|---|---|---|
| Date | Amegy Bank | Wire Description | Amount |
| 8/18/2014 | | PPVA Black Elk Equity LLC 1307003426 | $ 32,563,819.73 |
| 8/18/2014 | | New Mountain Finance Corp 1307003422 | $ 20,462,777.78 |
| 8/18/2014 | | Platinum Partners Value Arbitrage  1307003428 | $ 15,332,672.97 |
| 8/19/2014 | | The Bank of New York Mellon 1306701696 | $ 11,773,608.13 |
| 8/20/2014 | | Platinum Partners Credit Opportunity 1306102280 | $ 24,600,584.31 |
| 8/21/2014 | | Platinum Partners Liquid Opportunity 1306101216 | $  5,000,000.00 |
| | | Total | $109,733,462.92 |

(Ex. 76)

86.     These remittances, except for the Bank of New York Mellon for the tendered Notes, all benefitted Platinum.  The benefit of the transfers to the named Platinum entities is obvious.

87.     The New Mountain transfer also benefitted Platinum because Platinum was able to avoid buying back the New Mountain Series E preferred equity under a put agreement. Platinum and New Mountain Finance Holdings, LLC entered into a Securities Purchase and Put Agreement in May 2013 in which New Mountain Finance Holdings, LLC paid $20 million for Series E preferred equity, with the right to have Platinum repurchase the Series E preferred equity on a dollar-dollar basis, plus any accrued, uncapitalized, and unpaid Series E preferred return, plus interest.  (Ex. 20, at 2)  New Mountain Finance Holdings, LLC entered into this Agreement based in part upon the fact that Platinum controlled Black Elk:  the agreement recites that "Platinum, along with one or more of its affiliates, beneficially owns a majority of Black Elk Energy's outstanding voting interests and a majority of Black Elk Energy's outstanding membership interests."  (Ex. 20, at 1)  New Mountain Finance Holdings, LLC then assigned the

agreement to New Mountain Finance Corp. by second amendment dated May 23, 2014.  (Ex. 87)
A third amendment further extended the put agreement to July 16, 2014.  (Ex. 78)  A fourth
amendment extended the time to August 15, 2014.  (Ex. 79)  Platinum was in default of the
fourth amendment when Black Elk transferred the wire on August 18.

88.     These remittances improperly enriched Platinum by approximately $98 million.[16]
On August 19, 2014, Black Elk, under Hoffman's signature, instructed Bank of New York
Mellon to extinguish $11,433,000 of notes tendered.  (Ex. 52)

89.     Although Platinum improperly benefitted by almost $100 million,[17] the effect on
Black Elk was equally stark but devastating.  As Black Elk's founder and CEO Hoffman has
testified, "As soon as the 96 [sic] million went to New York [to benefit Platinum], we [Black
Elk] were bankrupted."  (Ex. 4, at 130)  When asked whether Black Elk was insolvent after the
wire transfers to Platinum, Hoffman unequivocally responded "Absolutely" and "No question."[18]
(*Id.*)

---

[16] Liskow & Lewis withdrew as counsel for Black Elk on or around July 21, 2014 in part because
of the "several calls from [Black Elk] employees raising questions about the use of proceeds
from [Renaissance] asset sales."  (Ex. 51)  Liskow & Lewis stated that "[t]hese recent
developments and conflicts made us uncomfortable with continuing to advise [Black Elk] and
therefore led us to conclude that we needed to withdraw from any further  representation of the
company, other than to continue assisting in the imminent closing of the Renaissance Offshore,
LLC sale (the "Renaissance Transaction") if [Black Elk] so desires."  Liskow & Lewis made
clear that "we do not and have not advised [Black Elk] how the proceeds from the Renaissance
Transaction or any other sale transaction are to, or were to, be applied…."  (Ex. 51)

[17] The impropriety of Platinum's actions is forcefully stated in the resignation letter of one of
Black Elk's executives, who concluded his resignation letter with the following: "For these
reasons, I resign my position as Facilities Manager as I cannot legally and morally continue
forward knowing I will be taking part of fraudulent activities."  (Ex. 53)

[18] In October 2014, as things worsened at Black Elk, Shulse sent an email to Nordlicht, Small,
and Levy describing the risks and likely adverse results from pending litigation.  (Ex. 80)  Levy
first chastised Shulse for not including Fuerst, saying "I'm sure you meant to add Steve to this
and note it is a privileged communication part of litigation."  To that, Nordlicht responded "All
the more reason to pay back preferred and get the positive fields sold."  (*Id.*)  Shulse, incredulous
that Nordlicht just described the Series E preferred equity scheme, emails Small:  "He really just

90.     The impropriety of the Series E wire transfers after the Renaissance Sale also was later discussed by and between Platinum's David Levy and Zach Weiner, and Platinum's third CEO at Black Elk, Jed Latkin, in a July 2015 email.  (Ex. 89)  Latkin informed Levy and Weiner that BDO wanted "a full breakdown of where every dollar went from the renaissance transaction including a breakdown of the payouts to platinum and its related entities," also "wanted to state in the notes that they believe this transaction violated the indenture and was a preferential payment," and that "they would indicate in the filing that there was control and manipulation by the parent ownership company."  (*Id.*)

### C.     Platinum's Misappropriation of Black Elk's Northstar Offshore Transaction

91.     In May 2014, Black Elk entered into negotiations to purchase certain of Northstar Offshore Group 1, LLC' s ("Northstar Offshore") oil and gas properties in the Gulf of Mexico. (Ex. 54)  The parties contemplated a purchase price of $100 million and entering into a Purchase and Sale Agreement by July 1, 2014.  (*Id.*)  As a part of the parties' agreement, Northstar agreed to negotiate exclusively with Black Elk from May 27, 2014 through July 1, 2014, recognizing that Black Elk was going to expend significant corporate resources conducting its due diligence on the subject properties.  (*Id.*)

92.     According to Black Elk's founder and CEO Hoffman, Black Elk invested substantial man-hours and significant resources conducting its due diligence on the Northstar properties.  (Ex. 4, at 23-24)  Hoffman estimated that Black Elk spent "millions" on due diligence matters, including but not limited to, field visits, legal fees, technical resource time, use of software and title work.  (*Id.*)  Hoffman, who was intimately involved in the negotiation, due

---

put that in writing? … With all due respect, some things should just stay in his head."  (*Id.*) Platinum understood that after it misappropriated the Renaissance Sale proceeds, Black Elk was a dead company walking.

594382 11

diligence and purchase of the Northstar properties, stated that at the eleventh hour, Platinum or a Platinum affiliate was substituted in for Black Elk on the draft Purchase and Sale Agreement, and Northstar ultimately sold the properties to a Platinum entity.[19]   (Ex. 4, at 16-17)   Hoffman and Piche considered, but did not pursue, legal or other action against Platinum to prevent its usurpation of the opportunity.   (Ex. 55)

93.      Shortly thereafter, members of Black Elk's management team, including Hoffman, contacted counsel who had drafted the Northstar PSA to alert them to the fact that Platinum had usurped Black Elk's corporate opportunity without compensating Black Elk for the monies and manpower it had expended on due diligence.   (*Id.*, at 17-19)   Upon hearing that Black Elk's personnel were used to develop prospects for Platinum, with no benefit or value flowing to Black Elk, Liskow & Lewis, who was counsel for Black Elk, resigned from its representation of Black Elk in the Northstar transaction.[20]   (Ex. 51)

---

[19] On June 5, 2014, Levy, as CIO of B Asset Manager for Beechwood, provided Black Elk an intention letter to fund Black Elk's acquisition of Northstar.  (Ex. 56)  On June 27, 2014, Levy sent a letter to Black Elk withdrawing its prior interest in financing the Northstar transaction, stating:   "To reiterate, due to the current financial situation of Black Elk, BAM [B Asset Manager] is no longer interested in further exploring financing Black Elk in connection with those potential acquisitions referenced in the Interest Letters and each such Interest Letter has been withdrawn as a result of further review of Black Elk."  (Ex. 57)  Of course, Levy always had been aware of Black Elk's financial condition, given his prior and concurrent role with Platinum and oversight of Black Elk.  Also on June 27, Shulse sent a "Renaissance Update" email to Platinum and Levy, while he was at Beechwood, that the Renaissance transaction had hit a snag because Renaissance was "getting advice from V&E regarding [a possible Black Elk] bankruptcy."  (Ex. 58)

[20] In its email dated July 21, 2014, Liskow & Lewis stated that they believed that "the use of [Black Elk] personnel to develop [Northstar] prospects, including drafting and negotiating purchase and sale agreements for such entities, …, if true, raised questions of the appropriate use of company assets, possible usurpation of corporate opportunities and other potential legal and equitable claims."  (Ex. 51)

**D.**     **Platinum Takes the Remainder of Black Elk's Assets for Northstar Offshore.**

94.     After wrongfully purchasing Northstar Offshore, Platinum caused Black Elk to sell the remainder of its assets to Platinum through a PSA with Northstar Offshore in early 2015. (Ex. 59)  Nordlicht, Small, Levy, Salfati, and Shulse all were involved in the planning and implementation of this transaction, as set forth in part by Small's December 19, 2014 email (Ex. 60) describing the planned execution of the transaction.  The Black Elk Notes for Northstar preferred equity exchange portion of this scheme was succinctly stated in Small's January 28, 2015 email to other Platinum executives, including Levy:  "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"  (Ex. 61; Ex. 62)

95.     By this time, Shulse had been appointed CEO of Black Elk.  (Ex. 47)  In pertinent part, Black Elk was selling certain of its remaining oil and gas properties to Northstar in exchange for Northstar assuming $70 million of the Senior Secured Notes issued by Black Elk and owned by Platinum and its affiliates.  (Ex. 59)

96.     According to Shulse, he signed, but did not date, the PSA between Black Elk and Northstar because he was not comfortable with closing the transaction over concerns he had that the transaction would be a fraudulent transfer.  (Ex. 44, at 185-86)  Shulse indicated that he signed the Northstar PSA at Platinum's repeated requests, in effect "we did this fake closing" for Platinum's benefit.  (*Id*., at 181, 185-86)

97.     Ultimately, on March 31, 2015, Shulse sent a letter to Northstar's CEO notifying Northstar that it was to remove his signature from all documents related to the proposed sale of assets from Black Elk to Northstar because "I have been advised by counsel that the Transaction

35

would qualify as **Fraudulent Transfer** under the Uniform Fraudulent Transfer Act ("UFTA"), as adopted by the State of Texas."  (Ex. 63 (emphasis in original))  Thus, Black Elk's then CEO revoked his approval and authority for Black Elk to enter into the PSA with Northstar.  (*Id.*)

98.     Even though Shulse had revoked his approval of the Northstar transaction, Platinum purportedly closed the transaction and attempted to convey the subject properties to Northstar for its own benefit.  (Ex. 59)

**E.     Platinum Fakes Another Black Elk Closing and Assignment to TKN Offshore.**

99.     Shortly after the Northstar Offshore transaction, Shulse decided that he was going to leave Black Elk and start his own company.  (Ex. 44, at 182-83, 190-98)  As a part of his exit strategy, Shulse wanted to purchase certain of the few remaining properties from Black Elk and Black Elk's interest in Freedom Well Services, LLC.  (*Id.*)

100.    For the planned purchase, Shulse formed two companies, both of which he wholly owned, namely TKN Petroleum Holdings, LLC ("TKN") and Medius Energy, LLC ("Medius"). (*Id.*)  Platinum negotiated the proposed sale on behalf of Black Elk and Shulse negotiated on behalf of TKN and Medius.  (*Id.*)  Platinum negotiated this transaction through its surrogate, John Boylan, whom Platinum approved appointing as Acting CEO and alleged Independent Director of Black Elk, with the participation of Platinum and Shulse, and the drafting and legal advice of Fuerst.[21]  (Ex. 81)  According to Shulse, the parties never reached an agreement on the proposed sale of assets to TKN and Medius, even though Boylan and Shulse signed a PSA

---

[21] Boylan began discussing helping Platinum and Shulse with their "wind down(?)" of Black Elk as early June 30, 2014.  (Exs. 82-84)

(Ex. 88) related to the proposed sale.  (Ex 44, at 181-183, 190-194, 196-197)  There also are Black Elk Board Minutes dated February 6, 2015 allegedly approving the transaction.[22]  (Ex. 81)

101.    Shulse ultimately resigned and left Black Elk having never reached an agreement to purchase certain Black Elk properties and Freedom Well Services.   (Ex. 44, at 196)  Notwithstanding the fact that TKN and Medius' sole owner and principal never consummated the deal, Platinum purportedly closed the sale and conveyed the assets to another, Platinum TKN.  (Ex. 64)

102.    In an effort to conceal the fraudulent closing, upon information and belief, Platinum then formed a new entity, TKN Petroleum Offshore, LLC ("TKN Offshore"), to purchase the properties allegedly sold to TKN.  Platinum drafted, signed and executed a phony Purchase and Sale Agreement between TKN and TKN Offshore.  (Ex. 64)  The fraudulent PSA was signed by Platinum's Salfati on behalf of TKN.  (*Id.*)  Salfati, however, was not an officer, director, employee, agent or representative of TKN.  (Ex. 44, at 200-01)  Salfati had no authority to sign any agreement on behalf of TKN; Shulse was the only person authorized to enter into such an agreement on behalf of TKN and he claims that knew nothing about the fraudulent TKN/TKN Offshore PSA.  (*Id.*)

103.    After the fraudulent sale to TKN Offshore, Platinum started the process of transferring the Black Elk properties to TKN Offshore, leaving Black Elk with the few assets it had at the beginning of Black Elk's Bankruptcy Case.

---

[22] Although the Board Minutes state that Boylan presented an analysis of the transaction for the Board to review before approval, four days later on February 10, Fuerst sent an email with the subject line "Bd Meeting" to Small, copying Shulse, Salfati, and Levy, stating that "I haven't seen any analysis (Boylan's Medius Report) for the Northstar deal."  (Ex. 85)  On March 12, 2015, Boylan followed up with Shulse regarding his invoice and also asked to get a "Certificate of D&O Insurance, which includes John Boylan."  (Ex. 86)

594382 11

## VI.
## CLAIMS FOR RELIEF

**COUNT I - FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(A)(1)(A)**

104.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

105.    Pursuant to § 548(a)(1)(A) of the Bankruptcy Code, a trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

106.    As set forth above, immediately following the Renaissance Sale and within the two-year period prior to the Petition Date, Platinum directed and caused Black Elk to wire $97,959,854.79 of the sale proceeds to and for the benefit of Platinum to repurchase Series E preferred equity.

107.    There are creditors of Black Elk who have allowable claims against Black Elk which claims were in existence at the time of the transfers.  The subject transfers were made by Black Elk at Platinum's direction with actual intent to hinder, delay, or defraud its then existing and future creditors.

108.    As set forth above, Black Elk's fraudulent intent in this instance is evidenced as (i) the transfers were made to insiders of Black Elk; (ii) the transfers were concealed or effectuated via fraud; (iii) the transfers were substantially all of Black Elk's productive assets (or the proceeds thereof); (iv) Black Elk removed or concealed assets; (v) the value of the consideration received by Black Elk was not reasonably equivalent to value of the transfers; (vi) Black Elk was insolvent or became insolvent shortly after the transfers were made; (vii) the

38

594382 11

transfers occurred shortly before or shortly after Black Elk incurred substantial debt; (viii) Black Elk transferred essential assets (or the proceeds thereof) to a lienor who transferred the assets to an insider; and (ix) Black Elk engaged in a pattern of sharp dealing prior to bankruptcy.

109.    Accordingly, Trustee requests that the Court avoid the subject transfers as actual fraudulent transfers under section § 548(a)(1)(A).

### COUNT II - FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(A)(1)(B)

110.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

111.    Pursuant to § 548(a)(1)(B) of the Bankruptcy Code, a trustee may avoid any transfer of an interest of the debtor in property that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such transfer and was insolvent on the date that such transfer was made or became insolvent as a result of such transfer.

112.    As set forth above, immediately following the Renaissance Sale and within the two-year period prior to the Petition Date, Platinum directed and caused Black Elk to wire $97,959,854.79 of the sale proceeds to Defendants to repurchase the Series E shares held by Defendants.  Because the subject transfers were used to retire the Series E preferred shares, Black Elk received less than a reasonably equivalent value in exchange for the transfers.

113.    Further, both before and after the Renaissance Sale, Black Elk was insolvent and unable to pay its debts as they became due.

114.    Accordingly, the Trustee requests that the Court avoid the subject transfers as actual fraudulent transfers under section § 548(a)(1)(B).

### COUNT III - VIOLATIONS OF THE TEXAS UNIFORM FRAUDULENT TRANSFER ACT

115.    The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

116.    The Texas Uniform Fraudulent Transfer Act ("TUFTA"), codified as chapter 24 of the Texas Business and Commerce Code, permits the recovery of the value of any transfers made with "actual intent to hinder, delay, or defraud any creditor of the debtor" as well as those made "without receiving a reasonably equivalent value in exchange for the transfer or obligation." Tex. Bus. & Com. Code Ann. § 24.005.  Transfers made within four years of the Petition Date may be avoided.  *Id.* at § 24.006.  TUFTA defines transfers fraudulent as to present or future creditors as:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> >
> > (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> >
> > > (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > >
> > > (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Com. Code Ann. § 24.005.

117.    Section 544(b) of the Bankruptcy Code allows the trustee to avoid a transfer of Black Elk's interest in property that is voidable under applicable law—in this case, TUFTA. Section 550 of the Bankruptcy Code allows the Trustee to recover the property transferred or the value of the property transferred in violation of sections 544 and 548.

118.    As it relates to the Renaissance Sale and the Series E wire transfers, these transfers to the Platinum insiders and their affiliates were fraudulent as to Black Elk's present and future creditors and in violation of TUFTA, as set forth above.

119.    Further, Tex. Bus. & Com. Code Ann. § 24.006 defines transfers fraudulent as to present creditors as:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
>
> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Tex. Bus. & Com. Code Ann. § 24.006.

120.    The $97,959,854.79 in wire transfers to Platinum insiders and their affiliates are likewise in violation of § 24.006 of TUFTA.

121.    Platinum Partners Value Arbitrage Fund LP, Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Liquid Opportunities Master Fund, LP, and PPVA Black Elk Equity LLC, are liable as the recipient transferees of these funds or the persons for whose benefit the transfers were made.  These transfers were intentional and initiated by the Platinum defendants, as they controlled Black Elk's Board of Managers and caused Black Elk to make the transfers.

122.    Accordingly, the Trustee respectfully requests that the Court avoid the subject transfers as actual and/or constructive fraudulent transfers under section 544(b) and applicable Texas state law, and recover the value of the transferred property pursuant to section 550 of the Bankruptcy Code.

594382 11

**COUNT IV - RECOVERY OF AVOIDED TRANSFERS PURSUANT TO 11 U.S.C. § 550**

123.  The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

124.  Section 550 of the Bankruptcy Code allows the trustee to recover, for the benefit of the estate, the property or the value of the property transferred and avoided under sections 544 and 548 from the initial transferee of such transfer or the entity for whose benefit such transfer was made.

125.  Here, as set forth above, the Trustee is entitled to avoid, under sections 544 and 548, transfers of $97,959,854.79.

126.  Platinum Partners Value Arbitrage Fund LP, Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Liquid Opportunities Master Fund, LP, and PPVA Black Elk Equity LLC are the initial transferees or persons for whose benefit the transfers were made.

127.  Thus, pursuant to section 550 of the Bankruptcy Code, the Trustee is entitled to recover the amounts transferred.

**COUNT V - ALTER EGO**

128.  The Trustee incorporates all preceding paragraphs as if fully re-alleged herein.

129.  Platinum exercised its control over Black Elk to such a degree that Black Elk operated as nothing more than Platinum's tool or business conduit.  Evidence of such domination includes, among other indicia of domination, Platinum having directed Black Elk to engage in specific business transactions, causing Black Elk to terminate existing business relationships in favor of entities related to or affiliated with Platinum, and controlling which of Black Elk's vendors were paid and when.  Upon information and belief, Platinum's control was so pervasive that Black Elk's management was virtually unable to make even the most basic business decisions without first obtaining direction and approval from Platinum's personnel.

42

594382 11

130.    Platinum used this domination of Black Elk inequitably and to the detriment of Black Elk and Black Elk's creditors by, among other actions, preventing Black Elk from paying is legitimate debts while diverting assets to the benefit of Platinum and its affiliates and insiders.

131.    Further, Platinum used its control to cause Black Elk to defraud its creditors by, inter alia, entering into contracts or otherwise incurring obligations that Black Elk could not or would not perform and falsely represented to creditors that certain funds were or would be available to satisfy Black Elk's obligations.

132.    For example, at the direction of Platinum, Black Elk falsely represented to its creditors that certain bond collateral would be made available to satisfy Black Elk's obligations even though Platinum had already directed Black Elk to divert such funds to Platinum's benefit.

133.    At the time that these misrepresentations were made, both Black Elk and Platinum knew or should have known that such representations were false; Platinum directed Black Elk to make such false representations with the intent that Black Elk's creditors and contract counter-parties rely and act upon such misrepresentations.  Upon information and belief, as a result of such fraudulent activity, Black Elk incurred tens of millions of dollars in debt and substantial non-monetary obligations that Black Elk was unable or unwilling to perform.

134.    Pursuant to Texas law, Platinum may be deemed liable for such fraudulently incurred obligations.

## COUNT VI - CLAIM OBJECTION

135.    Platinum filed the following proofs of claim against Black Elk in the above-referenced bankruptcy case:

| Platinum Defendant | Claim Number | Claim Amount |
|---|---|---|
| PPVAF | 224; 242 | $22,620,000 in principal $1,555,262.50 in interest |

| PPVA BE | 231 | unknown |
| PPLOMF | 240 | $10,668,000 in principal $733,425 in interest |
| PPCOMF | 241 | $29,582,000 |

136.    Platinum are entities from which property, in the form of the transfers detailed herein, is recoverable under sections 548 and 550 of the Bankruptcy Code.  Platinum has not returned the transfers to the Trustee.  Accordingly, any and all claims of Platinum against Black Elk's estate must be disallowed until such time as Platinum pays to the Trustee an amount equal to the aggregate amount of the Transfers, plus interest thereon and costs.

### COUNT VII - EQUITABLE SUBORDINATION

137.    Section 510(c) of the Bankruptcy Code provides that a bankruptcy court may, "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim, or all or part of an allowed interest to all or part of another allowed interest...." 11 U.S.C. § 510(c)(1).  Equitable subordination pursuant to § 510(c) is appropriate when (i) a claimant has engaged in some type of inequitable conduct; and (ii) such misconduct has resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

138.    As set forth above, Platinum undertook a scheme allowing Platinum to divert the Renaissance Sale proceeds to itself to pay off its Series E preferred equity before bankruptcy, thereby benefiting itself to the same extent as it would by paying off Senior Secured Notes while at the same time maintaining its secured creditor position as a Holder of Senior Secured Notes at the head of the line to receive any assets from Black Elk's estate in the foreseeable bankruptcy.

139.    By further examples, Platinum made fraudulent transfers with respect to a Platinum-controlled credit facility company, White Elk, and also both appropriated a corporate

44

opportunity and then later improperly transferred assets with respect to a company called Northstar and later still improperly transferred assets to TKN Offshore.

140.    Through its dominion and control over Black Elk, Platinum caused Black Elk to engage in a pattern of conduct designed to harass, delay, and defraud Black Elk's creditors.  In particular, to increase liquidity Platinum caused Black Elk to "stretch" accounts payable – delaying the paying of trade indebtedness in order to facilitate Platinum's plunder set forth in this Complaint.

141.    As a result of these acts and others, the Trustee seeks to equitably subordinate all of Platinum's claims against Black Elk pursuant to 11 U.S.C. § 510(c).  Platinum's acts constituted inequitable conduct and misconduct by Platinum, which caused harm and injured Black Elk and Black Elk's creditors and conferred an unfair advantage to Platinum.  Equitable subordination of all of the Platinum's claims will prevent the occurrence of injustice or unfairness in the administration of Black Elk's bankruptcy estate and is not inconsistent with the provisions of the Bankruptcy Code.

## VII.
## PRAYER

142.    For these reasons, the Trustee asks for judgment against Platinum for the following:

    (a)    actual damages;

    (b)    exemplary damages;

    (c)    prejudgment and post-judgment interest on all amounts recovered in this adversary proceeding;

    (0    reasonable attorney fees;

    (g)    court costs;

    (h)    injunctive relief as set forth in the concurrently filed TRO/PI Application; and

(i)      all other legal and equitable relief to which the Trustee is entitled.

Dated October 26, 2016.

Respectfully submitted,

By: _/s/  Craig Smyser_____
    SMYSER KAPLAN & VESELKA, L.L.P.
    Craig Smyser
    Attorney-in-Charge
    Texas Bar No. 18777575
    Fed. Bar No. 848
    csmyser@skv.com
    700 Louisiana, Suite 2300
    Houston, Texas 77002
    713-221-2300
    713-221-2320 (fax)

Of Counsel:

SMYSER KAPLAN & VESELKA, L.L.P.
Jeff Potts
Texas Bar No. 00784781
Fed. Bar No. 16504
Justin Waggoner
Texas Bar No. 24003122
Fed. Bar No. 23098
700 Louisiana, Suite 2300
Houston, Texas 77002
713-221-2300
713-221-2320 (fax)
jpotts@skv.com
jwaggoner@skv.com

OKIN ADAMS LLP
Matthew Okin
Texas Bar No. 00784695
Fed. Bar No. 15204
David Curry, Jr.
Texas Bar No. 24065107
Fed. Bar No. 975482
1113 Vine St., Suite 201
Houston, Texas 77002
713-228-4100
888-865-2118
mokin@okinadams.com
dcurry@okinadams.com

**ATTORNEYS FOR TRUSTEE**

594382 11

EXHIBIT 57

10-Q 1 a201409-30x10q.htm 10-Q

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 10-Q

(Mark One)

☒   **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2014

or

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: 333-174226

# BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Texas | 38-3769404 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| 3100 South Gessner Road, Suite 215 Houston, Texas | 77063 |
| (Address of principal executive offices) | (Zip Code) |

(832) 379-2300
Registrant's telephone number, including area code

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☐   No ☒

(Explanatory Note: The registrant is a voluntary filer and is not subject to the filing requirements of the Securities Exchange Act of 1934. However, during the preceding 12 months, the registrant has filed all reports that it would have been required to file by Section 13 or 15(d) of the Securities Exchange Act of 1934 if the registrant was subject to the filing requirements of the Securities Exchange Act of 1934.)

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |

Non-accelerated filer          ☒ *(Do not check if a smaller reporting company)*          Smaller reporting company          ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

As of November 19, 2014, there were 1,361,300 Class A Units, 114,277,308.5 Class B Units, 12,031,250 Class C Units and 7,935,670 Class B Units issued and outstanding.

**BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC**
**QUARTERLY REPORT ON FORM 10-Q**
**FOR THE QUARTER ENDED September 30, 2014**

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| **Part I. Financial Information** | | | |
| Item 1. | Financial Statements | | |
| | Consolidated Balance Sheet (unaudited) as of September 30, 2014 and December 31, 2013 | | 1 |
| | Consolidated Statement of Operations (unaudited) for the Three and Nine Months Ended September 30, 2014 and 2013 | | 2 |
| | Consolidated Statements of Cash Flows for the Nine Months Ended September 30, 2014 and 2013 | | 3 |
| | Notes to Consolidated Financial Statements (unaudited) | | 4 |
| Item 2. | Management's Discussion and Analysis of Financial Condition and Results of Operations | | 18 |
| Item 3. | Quantitative and Qualitative Disclosures About Market Risk | | 32 |
| Item 4. | Controls and Procedures | | 33 |
| **Part II. Other Information** | | | |
| Item 1. | Legal Proceedings | | 36 |
| Item 1A. | Risk Factors | | 38 |
| Item 6. | Exhibits | | 39 |
| **Signatures** | | | 41 |
| **Exhibit Index** | | | 42 |

(i)

# PART I—FINANCIAL INFORMATION

Item 1. Financial Statements

## BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC AND SUBSIDIARIES
### CONSOLIDATED BALANCE SHEETS
#### (unaudited)
#### (in thousands)

| | | September 30, 2014 | | December 31, 2013 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| CURRENT ASSETS: | | | | |
| Cash and cash equivalents | $ | 5,467 | $ | 6,227 |
| Restricted cash | | 675 | | 775 |
| Accounts receivable, net of allowance for doubtful accounts of $826 and $811 at September 30, 2014 and December 31, 2013, respectively | | 29,452 | | 61,747 |
| Due from affiliates | | 273 | | 273 |
| Prepaid expenses and other current assets | | 6,811 | | 7,109 |
| Current portion of escrow for abandonment costs | | 25,872 | | 21,976 |
| Derivative assets | | 270 | | 1,370 |
| TOTAL CURRENT ASSETS | | 68,820 | | 99,477 |
| OIL AND GAS PROPERTIES, successful efforts method of accounting, net of accumulated depreciation, depletion, amortization and impairment of $217,526 and $293,973 at September 30, 2014 and December 31, 2013, respectively | | 43,200 | | 196,136 |
| OTHER PROPERTY AND EQUIPMENT, net of accumulated depreciation of $6,112 and $5,350 at September 30, 2014 and December 31, 2013, respectively | | 2,962 | | 4,862 |
| OTHER ASSETS | | | | |
| Debt issue costs, net | | 557 | | 1,488 |
| Asset retirement obligation escrow receivable | | 20,348 | | 20,348 |
| Escrow for abandonment costs, net of current portion | | 196,262 | | 235,473 |
| Other assets | | 7,548 | | 7,830 |
| TOTAL OTHER ASSETS | | 224,715 | | 265,139 |
| TOTAL ASSETS | $ | 339,697 | $ | 565,614 |
| **LIABILITIES AND MEMBERS' DEFICIT** | | | | |
| CURRENT LIABILITIES: | | | | |
| Accounts payable and accrued expenses | $ | 96,366 | $ | 155,880 |
| Derivative liabilities | | 1,179 | | 9,828 |
| Asset retirement obligations | | 32,839 | | 43,109 |
| Current portion of debt and notes payable | | 340 | | 257 |
| TOTAL CURRENT LIABILITIES | | 130,724 | | 209,074 |
| LONG-TERM LIABILITIES | | | | |
| Gas imbalance payable | | 727 | | 1,888 |
| Derivative liabilities | | — | | 31 |
| Asset retirement obligations, net of current portion | | 162,661 | | 233,623 |
| Debt, net of current portion, net of unamortized discount of $398 and $617 at September 30, 2014 and December 31, 2013, respectively | | 138,192 | | 183,929 |
| TOTAL LONG-TERM LIABILITIES | | 301,580 | | 419,471 |
| TOTAL LIABILITIES | | 432,304 | | 628,545 |
| CLASS E PREFERRED UNITS | | 7,936 | | 109,744 |

10/26/2018                                    2014.09-30-10Q

COMMITMENTS AND CONTINGENCIES

| | | | | |
|---|---|---|---|---|
| MEMBERS' DEFICIT | | (100,543) | | (172,675) |
| TOTAL LIABILITIES AND MEMBERS' DEFICIT | $ | 339,697 | $ | 565,614 |

*The accompanying notes are an integral part of these consolidated financial statements.*

1

# BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF OPERATIONS
### (Unaudited)
### (In thousands)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2014 | 2013 | 2014 | 2013 |
| REVENUES: | | | | |
| Oil sales | $ 7,811 | $ 50,479 | $ 70,692 | $ 136,415 |
| Natural gas sales | 4,718 | 12,600 | 26,192 | 40,046 |
| Plant product sales | (101) | 1,457 | 3,032 | 5,831 |
| Gain (loss) on derivative financial instruments | 4,883 | (7,868) | (3,593) | (8,562) |
| Other revenues | 2,441 | 7,089 | 15,830 | 16,389 |
| TOTAL REVENUES | 19,752 | 63,757 | 112,153 | 190,119 |
| OPERATING EXPENSES: | | | | |
| Lease operating | 12,744 | 51,168 | 66,753 | 141,657 |
| Workover | 1,431 | 1,028 | 2,050 | 7,312 |
| Depreciation, depletion and amortization | 2,537 | 10,027 | 24,476 | 32,727 |
| Impairment of oil and gas properties | 11,395 | 402 | 14,469 | 55,779 |
| General and administrative | 8,901 | 9,621 | 21,630 | 28,250 |
| Gain on involuntary conversion of asset | — | (7,194) | — | (17,827) |
| Accretion of asset retirement obligations | 551 | 4,458 | 3,536 | 19,551 |
| (Gain) loss on sale of assets | (98,526) | 424 | (133,077) | (35,367) |
| Other operating expenses | 1,062 | 2,704 | 6,413 | 5,117 |
| TOTAL OPERATING EXPENSES | (59,905) | 72,638 | 6,250 | 237,199 |
| INCOME (LOSS) FROM OPERATIONS | 79,657 | (8,881) | 105,903 | (47,080) |
| OTHER INCOME (EXPENSE): | | | | |
| Interest income | 10 | 30 | 45 | 81 |
| Miscellaneous expense | (1,312) | (2,674) | (5,778) | (7,620) |
| Interest expense | (5,459) | (6,890) | (17,733) | (19,526) |
| TOTAL OTHER EXPENSE, NET | (6,761) | (9,534) | (23,466) | (27,065) |
| NET INCOME (LOSS) | 72,896 | (18,415) | 82,437 | (74,145) |
| LESS: PREFERRED UNIT DIVIDENDS | $ 2,033 | $ 4,755 | $ 10,233 | $ 12,581 |
| NET INCOME (LOSS) ATTRIBUTABLE TO COMMON UNIT HOLDERS | $ 70,863 | $ (23,170) | $ 72,204 | $ (86,726) |

*The accompanying notes are an integral part of these consolidated financial statements.*

2

**BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC AND SUBSIDIARIES**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(Unaudited)
(in thousands)

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2014 | 2013 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net income (loss) | $   82,437 | $   (74,145) |
| *Adjustments to reconcile net income (loss) to net cash (used in) provided by operating activities:* | | |
| Depreciation, depletion, and amortization | 24,476 | 32,727 |
| Impairment of oil and gas properties | 14,469 | 55,779 |
| Accretion of asset retirement obligations | 3,536 | 19,551 |
| Amortization of debt issue costs | 4,520 | 4,595 |
| Accretion of debt discount | 219 | 195 |
| Loss on derivative financial instruments | 3,593 | 8,562 |
| Settlement of derivative financial instruments | (11,174) | (2,573) |
| Gain on sale of assets | (133,077) | (35,367) |
| Provision on doubtful accounts | 16 | 308 |
| Gain on involuntary conversion of assets | — | (17,827) |
| Changes in operating assets and liabilities: | | |
| Accounts receivable | 31,370 | (13,086) |
| Escrow receivable, short term | (29,525) | — |
| Due from affiliates, net | — | 74 |
| Prepaid expenses and other assets | (3,290) | 16,440 |
| Other assets | 310 | 464 |
| Accounts payable and accrued liabilities | (36,290) | 74,560 |
| Gas imbalance | (1,198) | (16) |
| Settlement of asset retirement obligations | (17,717) | (41,512) |
| NET CASH (USED IN) PROVIDED BY OPERATING ACTIVITIES | (67,325) | 28,729 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Additions to oil and gas properties | (11,150) | (112,719) |
| Acquisition of oil and gas properties | — | (3,250) |
| Sale of oil and gas properties | 170,698 | 65,741 |
| Additions to property and equipment | (10) | (683) |
| Cash assumed in consolidation of Freedom Well Services, LLC | — | 473 |
| Proceeds received from insurance recovery | — | 23,837 |
| Deposits | — | (9) |
| Restricted cash | 100 | (694) |
| Escrow payments, net | 5,817 | (23,394) |
| Escrow released | 59,024 | — |
| NET CASH PROVIDED BY (USED IN) INVESTING ACTIVITIES | 224,479 | (50,698) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Proceeds on short term notes | 2,818 | 348 |
| Payments on short term notes | (2,758) | (3,827) |
| Borrowing on bank debt | — | 23,168 |
| Payments on bank debt | (45,933) | (40,168) |
| Debt issuance costs | — | (2,249) |

| | | | |
|---|---|---|---|
| Contributions from members | | — | 50,000 |
| Distributions to members | | (112,041) | — |
| NET CASH (USED IN) PROVIDED BY FINANCING ACTIVITIES | | (157,914) | 27,272 |
| NET (DECREASE) INCREASE IN CASH AND CASH EQUIVALENTS | | (760) | 5,303 |
| CASH AND CASH EQUIVALENTS - BEGINNING OF PERIOD | | 6,227 | 1,383 |
| CASH AND CASH EQUIVALENTS - END OF PERIOD | $ | 5,467 | $ 6,686 |
| SUPPLEMENTAL CASH FLOW INFORMATION: | | | |
| Cash paid for interest | $ | 10,983 | $ 11,773 |
| NONCASH INVESTING AND FINANCING ACTIVITIES: | | | |
| Asset retirement obligations relieved due to sale of properties | $ | (67,051) | $ (22,999) |
| Increase in asset retirement due to revaluation | $ | — | $ 2,341 |
| Paid-in-kind dividends on preferred equity and accrued distributions to members | $ | 10,233 | $ 12,581 |

*The accompanying notes are an integral part of these consolidated financial statements.*

3

BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC AND SUBSIDIARIES
Notes to Consolidated Financial Statements
(Unaudited)

NOTE 1—BASIS OF PRESENTATION

*Nature of Operations*: Black Elk Energy Offshore Operations, LLC and our wholly-owned subsidiaries (collectively, "Black Elk", "BEEOO", "we", "our" or "us") is a Houston-based oil and natural gas company engaged in the exploration, development, production and exploitation of oil and natural gas properties. We were formed on November 20, 2007 for the purpose of acquiring oil and natural gas producing properties within the Outer Continental Shelf of the United States in the Gulf of Mexico.

*Basis of Presentation*: The accompanying unaudited consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") for interim financial information. Accordingly, they do not include all of the information and footnotes required by GAAP for complete financial statements. In the opinion of management, all adjustments of a normal and recurring nature considered necessary for a fair presentation of our interim and prior period results have been included in the accompanying consolidated financial statements. The results of operations for the interim period are not necessarily indicative of the results that will be realized for any other interim period or for the entire fiscal year. For further information, refer to the consolidated financial statements and notes thereto included in our Annual Report on Form 10-K for the year ended December 31, 2013 (the "2013 Form 10-K").

*Reclassifications*: Certain reclassifications have been made to conform 2013 balances to our 2014 presentation. Such reclassifications had no effect on net income (loss) or cash flow.

*Principles of Consolidation*: The consolidated financial statements include the accounts of Black Elk Energy Offshore Operations, LLC and our wholly-owned subsidiaries, Black Elk Energy Land Operations, LLC and Black Elk Energy Finance Corp. Effective January 1, 2013, in accordance with accounting guidelines for consolidation of variable interest entities, we consolidated Freedom Well Services, LLC ("FWS"), as we determined that we are the primary beneficiary of FWS and will have the power to direct the activities of FWS. All material inter-company accounts and transactions have been eliminated in consolidation.

*Use of Estimates in Preparation of Financial Statements*: The preparation of consolidated financial statements in conformity with GAAP requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the balance sheet date and the amounts of revenues and expenses recognized during the reporting period. We analyze our estimates based on historical experience, current factors and various other assumptions that we believe to be reasonable under the circumstances. However, actual results could differ from such estimates.

*Recent Accounting Pronouncements*: In April 2014, the Financial Accounting Standards Board issued Accounting Standards Update ("ASU") 2014-08, "Reporting Discontinued Operations and Disclosures of Disposals of Components of an Entity." ASU 2014-08 narrows the definition of "discontinued operations" to dispositions that represent a strategic shift that has or will have a significant impact on the entity's operations and financial results. The ASU requires additional disclosures regarding assets and liabilities *held for sale*, and income and losses, including gain or loss on sale, and cash flows from discontinued operations. In addition, the ASU requires disclosures for disposals of individually significant components of the business which do not qualify as discontinued operations, including general information about the disposition and disclosure of the pretax profit or loss from the component for the period of disposal and all comparable historic periods presented. ASU 2014-08 is effective for all fiscal years beginning after December 15, 2014, and can be adopted early for certain asset dispositions and reclassifications of assets from "held and used" to "held for sale." We are evaluating the impact this standard will have on our consolidated financial statements and related disclosures.

In May 2014, the FASB issued Accounting Standards Update 2014-09, *Revenue from Contracts with Customers* (Topic 606). The update provides guidance concerning the recognition and measurement of revenue from contracts with customers. Its objective is to increase the usefulness of information in the financial statements regarding the nature, timing and uncertainty of revenues. The update is effective for the Company beginning in calendar year 2017. We are evaluating the impact this standard will have on our consolidated financial statements and related disclosures.

In August 2014, the FASB issued Accounting Standards Update No. 2014-15, *Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern* ("ASU 2014-15"). ASU 2014-15 requires management to assess an entity's ability to continue as a going concern, and to provide related footnote disclosures in certain circumstances. The standard is effective for annual financial statement starting period ending December 15, 2016, with early adoption permitted. We are currently evaluating the provisions of ASU 2014-15 and assessing the impact, if any, it may have on our consolidated financial position, results of operations or cash flows.

4

## NOTE 2 - GOING CONCERN CONSIDERATION

The consolidated financial statements have been prepared assuming the Company will continue as a going concern. As of September 30, 2014, the Company had a net working capital deficit of approximately $61.9 million and a members' deficit of approximately $100.5 million. The net working capital deficit at September 30, 2014 is primarily the result of the Company's accounts payable and accrued expenses of $96.3 million. Additionally, the Company's 13.75% Senior Secured Notes will mature in December 2015 (see "Note 8 - Debt and Notes Payable" for further discussion). We cannot assure that the Company will generate sufficient cash flow from operations to service the remaining Notes. These conditions raise substantial doubt about the Company's ability to continue as a going concern.

Our primary cash flow for the first nine months of 2014 was from divestiture of assets (see "Note 5 - Acquisitions and Divestitures" for further discussion). The combination of restricted credit availability, lower production since the fourth quarter of 2013, settlement of our plugging and abandonment ("P&A") liabilities and additional collateral requirements related to our surety bonds that secure our P&A obligations led to significant cash reductions in the fourth quarter of 2013 and the first nine months of 2014. To increase liquidity, we continue to manage accounts payable, aggressively pursue accounts receivable and seek opportunities to sell non-core assets.

Our primary use of capital has been for collateral to secure our P&A obligations. As we plug and abandon certain fields and meet the various criteria related to the corresponding escrow accounts, we expect to release funds from the escrow accounts. On August 15, 2014, the Company closed the sale of seven operated and one non-operated assets to Renaissance Offshore, LLC (the "Renaissance Sale"). The net proceeds of the Renaissance Sale were used primarily to fund our purchase of the Notes validly tendered and not withdrawn pursuant to the tender offer on July 16, 2014 and to re-purchase Series E preferred units.

The Company may continue to liquidate additional oil and natural gas properties to meet its liquidity needs; however, there is no certainty that this would generate the cash necessary to meet our obligation. Additionally, this could affect the Company's long-term strategic plan and require the Company to liquidate certain oil and gas properties at an amount less than would normally be achieved if sold in the ordinary course of business (see "Note 3 - Liquidity, Risks and Uncertainties" for further discussion).

The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty. Please refer to Item 1A. Risk Factors for detail discussions of our risk factors.

## NOTE 3— LIQUIDITY, RISKS AND UNCERTAINTIES

The Company currently faces significant challenges with our cash flow and our need to pay for operating expenses, including our debt service obligations. The Company's cash position raises substantial doubt about the Company's ability to continue as a going concern. We will need to seek additional working capital through the sale of equity or assets and potentially refinance our debt in an effort to improve our liquidity position.

We routinely monitor and adjust our capital expenditures in response to changes in prices, availability of financing, drilling and acquisition costs, industry conditions, the timing of regulatory approvals, the availability of rigs, success or lack of success in drilling activities, contractual obligations, internally generated cash flows and other factors both within and outside our control.

Virtually all of our current production is concentrated in the Gulf of Mexico, which is characterized by production declines more rapid than those of conventional onshore properties. As a result, we are particularly vulnerable to a near-term severe impact resulting from unanticipated complications in the development of, or production from, any single material well or infrastructure installation, including lack of sufficient capital, delays in receiving necessary drilling and operating permits, increased regulation, reduced access to equipment and services, mechanical or operational failures, and severe weather. Any unanticipated significant disruption to, or decline in, our current production levels or prolonged negative changes in commodity prices or operating cost levels could have a material adverse effect on our financial position, results of operations, cash flows, the quantity of proved reserves that we report, and our ability to meet our commitments as they come due.

As an oil and gas company, our revenue, profitability, cash flows, proved reserves and future rate of growth are substantially dependent on prevailing prices for oil and natural gas. Historically, the energy markets have been very volatile, and we expect such price volatility to continue. Any extended decline in oil or gas prices could have a material adverse effect on our financial position, results of operations, cash flows, the quantities of oil and gas reserves that we can economically

5

produce, and may restrict our ability to obtain additional financing or to meet the contractual requirements of our debt and other obligations.

## NOTE 4—OIL AND GAS PROPERTIES

The following table reflects capitalized costs related to our oil and gas properties:

|  | September 30, 2014 | | December 31, 2013 | |
|---|---|---|---|---|
|  | *(Unaudited)* | | | |
|  | (in thousands) | | | |
| Proved properties | $ | 260,726 | $ | 490,109 |
| Accumulated depreciation, depletion, amortization and impairment |  | (217,526) |  | (293,973) |
| Oil and gas properties, net | $ | 43,200 | $ | 196,136 |

The following table describes the changes to our asset retirement obligations (unaudited):

|  | | (in thousands) |
|---|---|---|
| Balance at December 31, 2013 | $ | 276,732 |
| Liabilities settled |  | (17,717) |
| Liabilities relieved due to sale of properties |  | (67,051) |
| Accretion expense |  | 3,536 |
| Balance at September 30, 2014 |  | 195,500 |
| Less: current portion |  | (32,839) |
| Total Long-Term Asset Retirement Obligations | $ | 162,661 |

## NOTE 5—ACQUISITIONS AND DIVESTITURES

On August 15, 2014, the Company closed the sale of seven operated and one non-operated assets to Renaissance Offshore, LLC (the "Renaissance Sale"). After customary purchase price adjustments, the Company received $125.1 million in net proceeds from the Renaissance Sale. The assets sold in the Renaissance Sale represent a significant amount of the Company's cash flow, proved reserves and production. Reflected in our September 30, 2014 consolidated financial statements is a preliminary gain of $98.5 million related to the Renaissance sale. The net proceeds of the Renaissance Sale was used primarily to fund our purchase of the Notes validly tendered and not withdrawn pursuant to the tender offer on August 13, 2014 and to re-purchase Series E preferred units.

On March 13, 2014 , the Company entered into a Purchase and Sale Agreement (the "PSA") with a wholly owned subsidiary of Fieldwood Energy LLC ("Fieldwood"). Pursuant to the PSA, Fieldwood acquired all of the Company's interest in one operated and 15 non-operated fields in the offshore Gulf of Mexico, for $50 million, prior to normal purchase price adjustments (the "Sale"). The Sale closed on March 17, 2014. Reflected in our September 30, 2014 consolidated financial statements is a preliminary gain of $34.5 million related to Fieldwood.

On March 26, 2013, we completed the sale of four fields to Renaissance Offshore, LLC for approximately $52.5 million prior to normal purchase price adjustments. The proceeds were used to reduce the amount borrowed under the Credit Facility. Reflected in our September 30, 2013 consolidated financial statements is a gain of $35.8 million.

6

## NOTE 6—DERIVATIVE INSTRUMENTS

We enter into hedging transactions with major financial institutions to reduce exposure to fluctuations in the price of oil and natural gas. We use financially settled crude oil and natural gas swaps. With a swap, the counterparty is required to make a payment to us if the settlement price for a settlement period is below the hedged price for the transaction, and we are required to make a payment to the counter-party if the settlement price for any settlement period is above the hedged price for the transaction. We elected not to designate any of our derivative contracts as qualifying hedges for financial reporting purposes, therefore all of the derivative instruments are categorized as standalone derivatives and are being marked-to-market with "Unrealized (loss) gain on derivative financial instruments" recorded in the consolidated statements of operations.

At September 30, 2014, we had the following contracts outstanding (Asset (Liability) and Fair Value Gain (Loss) (unaudited)):

| Period | Crude Oil | | | | Natural Gas | | | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Monthly Volume (Bbls) | Contract Price ($/Bbl) | Asset (Liability) | Fair Value Gain (Loss) | Monthly Volume (MMBtu) | Contract Price ($/MMBtu) | Asset (Liability) | Fair Value Gain (Loss) | Asset (Liability) | Fair Value Gain (Loss) |
| Swaps: | | | (In thousands) | | | | (In thousands) | | (In thousands) | |
| 10/14 - 12/14 | 15,000 | 65.00 | $ (1,122) | $ (1,122) | — | — | $ — | $ — | $ (1,122) | $ (1,122) |
| 10/14 - 10/14 | 5,525 | 87.75 | (17) | (17) | 28,635 | 4.09 | 3 | 3 | (14) | (14) |
| 11/14 - 11/14 | 5,525 | 87.75 | (13) | (13) | 27,081 | 4.09 | (1) | (1) | (14) | (14) |
| 12/14 - 12/14 | 5,525 | 87.75 | (10) | (10) | 34,114 | 4.09 | (3) | (3) | (13) | (13) |
| 1/15 - 1/15 | — | — | — | — | 27,838 | 4.09 | (4) | (4) | (4) | (4) |
| 2/15 - 2/15 | — | — | — | — | 24,461 | 4.09 | (4) | (4) | (4) | (4) |
| 3/15 - 3/15 | — | — | — | — | 26,443 | 4.09 | (2) | (2) | (2) | (2) |
| 10/14 -10/14 | — | — | — | — | 29,753 | 4.19 | 6 | 6 | 6 | 6 |
| 11/14 - 11/14 | — | — | — | — | 28,635 | 4.19 | 2 | 2 | 2 | 2 |
| 12/14 -12/14 | — | — | — | — | 27,081 | 4.19 | — | — | — | — |
| 1/15 - 1/15 | — | — | — | — | 34,114 | 4.19 | (2) | (2) | (2) | (2) |
| 2/15 - 2/15 | — | — | — | — | 27,838 | 4.19 | (1) | (1) | (1) | (1) |
| 3/15 - 3/15 | — | — | — | — | 24,461 | 4.19 | 1 | 1 | 1 | 1 |
| 10/14 -10/14 | — | — | — | — | 192,799 | 4.47 | 94 | 94 | 94 | 94 |
| 11/14 - 11/14 | — | — | — | — | 186,296 | 4.47 | 64 | 64 | 64 | 64 |
| 12/14 - 12/14 | — | — | — | — | 189,992 | 4.47 | 52 | 52 | 52 | 52 |
| 1/15 - 1/15 | — | — | — | — | 58,684 | 4.47 | 12 | 12 | 12 | 12 |
| 2/15 - 2/15 | — | — | — | — | 68,337 | 4.47 | 15 | 15 | 15 | 15 |
| 3/15 - 3/15 | — | — | — | — | 69,732 | 4.47 | 21 | 21 | 21 | 21 |
| | | | $ (1,162) | $ (1,162) | | | $ 253 | $ 253 | $ (909) | $ (909) |

7

The fair values of derivative instruments in our consolidated balance sheets were as follows (in thousands) (unaudited):

| Derivatives Not Designated as Hedging Instruments under Accounting Guidance | Asset Derivatives | | Liability Derivatives | | Asset (Liability) Derivatives Total | |
|---|---|---|---|---|---|---|
| | Balance Sheet Location | Fair Value at September 30, 2014 | Balance Sheet Location | Fair Value at September 30, 2014 | Balance Sheet Location | Fair Value at September 30, 2014 |
| Commodity Contracts | Derivative financial instruments | | Derivative financial instruments | | Derivative financial instruments | |
| | Current | $ 270 | Current | $ (1,179) | Current | $ (909) |
| | Non-current | — | Non-current | — | Non-current | — |
| Total derivative instruments | | $ 270 | | $ (1,179) | | $ (909) |

| Derivatives Not Designated as Hedging Instruments under Accounting Guidance | Asset Derivatives | | Liability Derivatives | | Asset (Liability) Derivatives Total | |
|---|---|---|---|---|---|---|
| | Balance Sheet Location | Fair Value at December 31, 2013 | Balance Sheet Location | Fair Value at December 31, 2013 | Balance Sheet Location | Fair Value at December 31, 2013 |
| Commodity Contracts | Derivative financial instruments | | Derivative financial instruments | | Derivative financial instruments | |
| | Current | $ 1,370 | Current | $ (9,828) | Current | $ (8,458) |
| | Non-current | — | Non-current | (31) | Non-current | (31) |
| Total derivative instruments | | $ 1,370 | | $ (9,859) | | $ (8,489) |

We have a netting agreement with our financial institution that permits net settlement of gross commodity derivative assets against gross commodity derivative liabilities, and we routinely exercise our contractual right to offset realized gains against realized losses when settling with our derivative counter-party.

The effect of derivate instruments on our consolidated statements of operations was as follows (in thousands) (unaudited):

| Derivatives Not Designated as Hedging Instruments under Accounting Guidance | Statements of Operations Location | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | | 2014 | 2013 | 2014 | 2013 |
| Realized Commodity Contracts | Gain (loss) on derivative financial instruments | $ (2,316) | $ (2,725) | $ (11,174) | $ (2,573) |
| Unrealized Commodity Contracts | Gain (loss) on derivative financial instruments | 7,199 | (5,143) | 7,581 | (5,989) |
| Total derivative instruments | | $ 4,883 | $ (7,868) | $ (3,593) | $ (8,562) |

## NOTE 7—FAIR VALUE MEASUREMENTS

Accounting guidance for fair value measurements clarifies the definition of fair value, prescribes methods for measuring fair value, establishes a fair value hierarchy based on the inputs used to measure fair value, and expands disclosures about fair value measurements. The three-tier fair value hierarchy, which prioritizes the inputs used in the valuation methodologies, is:

- Level 1—Valuations based on quoted prices for identical assets and liabilities in active markets.

- Level 2—Valuations based on observable inputs other than quoted prices included in Level 1, such as quoted prices for similar assets and liabilities in active markets, quoted prices for identical or similar assets and liabilities in markets that are not active, or other inputs that are observable or can be corroborated by observable market data.

- Level 3—Valuations based on unobservable inputs reflecting our own assumptions, consistent with reasonably available assumptions made by other market participants. These valuations require significant judgment.

8

As required by accounting guidance for fair value measurements, financial assets and liabilities are classified based on the lowest level of input that is significant to the fair value measurement. Our assessment of the significance of a particular input to the fair value measurement requires judgment and may affect the valuation of the fair value of assets and liabilities and their placement within the fair value hierarchy levels.

The following tables present information about our assets and liabilities measured at fair value on a recurring basis as of September 30, 2014 and December 31, 2013 and indicate the fair value hierarchy of the valuation techniques utilized by us to determine such fair value (in thousands) (unaudited):

| | Fair Value as of September 30, 2014 | | Fair Value Measurements at September 30, 2014 Using Fair Value Hierarchy | | | | | |
| | | | Level 1 | | Level 2 | | Level 3 | |
| **Assets** | | | | | | | | |
| Oil and Natural Gas Derivatives | $ | 270 | $ | — | $ | 270 | $ | — |
| | $ | 270 | $ | — | $ | 270 | $ | — |
| **Liabilities** | | | | | | | | |
| Oil and Natural Gas Derivatives | $ | (1,179) | $ | — | $ | (1,179) | $ | — |
| | $ | (1,179) | $ | — | $ | (1,179) | $ | — |

| | Fair Value as of December 31, 2013 | | Fair Value Measurements at December 31, 2013 Using Fair Value Hierarchy | | | | | |
| | | | Level 1 | | Level 2 | | Level 3 | |
| **Assets** | | | | | | | | |
| Oil and Natural Gas Derivatives | $ | 1,370 | $ | — | $ | 1,370 | $ | — |
| | $ | 1,370 | $ | — | $ | 1,370 | $ | — |
| **Liabilities** | | | | | | | | |
| Oil and Natural Gas Derivatives | $ | (9,859) | $ | — | $ | (9,859) | $ | — |
| | $ | (9,859) | $ | — | $ | (9,859) | $ | — |

We estimated the fair value of derivative instruments using internally-developed models that use as their basis readily observable market parameters.

The determination of the fair values above incorporates various factors required under accounting guidance for fair value measurements. These factors include not only the impact of our nonperformance risk but also the credit standing of the counter-parties involved in our derivative contracts.

As of September 30, 2014, the estimated fair value of cash and cash equivalents, accounts receivable, other current assets, accounts payable and other current liabilities approximated their carrying value due to their short-term nature. The estimated fair value of our debt was primarily based on quoted market prices as well as prices for similar debt based on recent market transactions. The fair value of debt at September 30, 2014 was $121.5 million.

*Fair Value on a Non-Recurring Basis*

Oil and gas properties with a carrying value of $57.7 million were written down to their fair value of $43.2 million, resulting in an impairment charge of $11.4 million and $14.5 million for the three and nine months ended September 30, 2014, which is recognized under " Impairment of oil and gas properties" in the consolidated statements of operations. As of September 30, 2013, oil and gas properties with a carrying value of $290.7 million were written down to their fair value of $234.9 million, resulting in an impairment charge of $0.4 million and $55.8 million for the three and nine months ended September 30, 2013, respectively. The impairment analysis is based on the estimated discounted future cash flows for those properties. Significant Level 3 assumptions used in the calculation of estimated discounted cash flows included our estimate of future oil and gas prices, production costs, development expenditures, estimated quantities and timing of production of proved reserves, appropriate risk-adjusted discount rates, and other relevant data.

## NOTE 8—DEBT AND NOTES PAYABLE

Our debt and notes payable are summarized as follows:

| | September 30, 2014 | | December 31, 2013 |
|---|---|---|---|
| | (In thousands) | | |
| | (unaudited) | | |
| Senior Secured Revolving Credit Facility | $ | — | $ 34,500 |
| 13.75% Senior Secured Notes, net of discount | | 138,169 | 149,383 |
| Other debt | | 363 | 303 |
| Total debt | | 138,532 | 184,186 |
| Less: current portion | | (340) | (257) |
| Total long-term debt | $ | 138,192 | $ 183,929 |

*Senior Secured Revolving Credit Facility*

Our Credit Facility was paid in full on March 17, 2014. As of September 30, 2014, we had zero borrowings outstanding in letters of credit issued under the Credit Facility. Our letters of credit were paid in full and terminated on June 8, 2014.

*13.75% Senior Secured Notes*

On November 23, 2010, we issued $150 million face value of 13.75% Notes discounted at 99.109% (the "Notes"). The net proceeds were used to repay all of the outstanding indebtedness under our prior revolving Credit Facility, to fund BOEM collateral requirements, and to prefund our escrow accounts. We pay interest on the Notes semi-annually in arrears, on June 1 and December 1 of each year, which commenced on June 1, 2011. The Notes will mature on December 1, 2015, at which time all principal then outstanding will be due. As of September 30, 2014, the recorded value of the Notes was $138.2 million, which includes the unamortized discount of $0.4 million. We incurred underwriting and debt issue costs of $7.2 million, which have been capitalized and are being amortized over the life of the Notes.

The Notes are secured by a security interest in our and the guarantors' assets (excluding the W&T Escrow Accounts (as defined below)).

We have the right to redeem the Notes under various circumstances. If we experience a change of control, the holders of the Notes may require us to repurchase the Notes at 101% of the principal amount thereof, plus accrued unpaid interest. We also have an optional redemption in which we may redeem up to 35% of the aggregate principal amount of the Notes at a price equal to 110% of the principal amount, plus accrued interest and unpaid interest to the date of redemption, with the net cash proceeds of certain equity offerings until December 1, 2013. From December 1, 2013 until December 1, 2014, we may redeem some or all of the Notes at an initial redemption price equal to par value plus one-half the coupon which equals 106.875% plus accrued and unpaid interest to the date of the redemption. On or after December 1, 2014, we may redeem some or all of the Notes at a redemption price equal to par plus accrued and unpaid interest to the date of redemption.

On May 23, 2011, we commenced a Consent Solicitation that resulted in our entry into the First Supplemental Indenture. We paid a consent solicitation fee of $4.5 million. The First Supplemental Indenture amended the Indenture, among other things, to: (1) increase the amount of capital expenditures permitted to be made by us on an annual basis, (2) enable us to obtain financial support from our majority equity holder by way of a $30 million investment in Sponsor Preferred Stock, which can be repaid over time, and (3) obligate us to make an offer to repurchase the Notes semi-annually at an offer price equal to 103% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest to the extent we meet certain defined financial tests and as permitted by our credit facilities.

On July 16, 2014, each of Black Elk Energy Offshore Operations, LLC and Black Elk Energy Finance Corp. announced that it has commenced a cash tender offer to purchase its outstanding $150,000,000 aggregate principal amount of 13.75% senior secured notes due 2015. The Offer and the Consent Solicitation were being made in connection with our proposed disposition of certain assets pursuant to a Purchase and Sale Agreement between the Company and Renaissance Offshore, LLC, dated July 10, 2014. The offer expired on August 13, 2014. As of the expiration of the offer, $11,333,000 principal amount of the Notes validly tendered and not withdrawn, and holders of $110,565,000 principal amount of the Notes, or 73.71% of the Notes, validly consented to the Consent Solicitation and not revoked such consent.

2014.09-30-10Q

10

On August 15, 2014, we announced the closing of the Renaissance sale of seven operated and one non-operated assets. Based on the consents received and the conditions to effectiveness, including the Renaissance Sale, having been satisfied or waived in connection with the announced tender offer and consent solicitation, the guarantor and the trustee under the indenture governing the Notes entered into a Second Supplemental Indenture in order to effect the proposed amendments to the indenture governing the Notes effective as of August 19, 2014. At the effective time, the Second Supplemental Indenture was binding on all holders of Notes, including those who did not deliver a consent. All Notes validly tendered and not withdrawn by 5 P.M ET on August 13, 2014 were accepted for payment and the Company promptly paid for such Notes, using Renaissance proceeds, in accordance with the terms of the Company's Offer to Purchase and Consent Solicitation Statement dated July 16, 2014, and in the related Letter of Transmittal and Consent to Tender and to Give Consent.

The Notes require us to maintain certain financial covenants. Specifically, we may not permit our SEC PV-10 to consolidated leverage to be less than 1.4 to 1.0 as of the last day of each fiscal year. In addition, we and our subsidiaries (excluding FWS) are subject to various covenants, including restricted payments, incurrence of indebtedness and issuance of preferred stock, liens, dividends and other payments, merger, consolidation or sale of assets, transactions with affiliates, designation of restricted and unrestricted subsidiaries, and a maximum limit for capital expenditures. Amended in conjunction with the Consent Solicitation on May 31, 2011 (the "Indenture"), our limitation on capital expenditures of a maximum limit of $60 million for the fiscal year ending December 31, 2012 and 30% of consolidated earnings before interest expense, income taxes, DD&A and impairment, and exploration expense for any year thereafter. This covenant limiting capital expenditures was removed in the Supplemental Indenture described below.

On August 19, 2014, as supplemented by the First Supplemental Indenture, entered into a Second Supplemental Indenture (the "Supplemental Indenture") in order to effect the proposed amendments to the Indenture effective as of August 19, 2014 (the "Effective Time"). At the Effective Time, the Supplemental Indenture will be binding on all holders of the Notes, including those who did not deliver a consent or who validly revoked their consent before the Expiration Time.

Among other things, the Supplemental Indenture (i) allowed the Company to apply the net proceeds from the Renaissance Sale to consummate the Offer and to use any remaining proceeds from the Renaissance Sale to purchase preferred equity issued by the Company; (ii) permitted the incurrence of indebtedness arising from the performance of the Company's plugging and abandonment obligations and liens on the Company's oil and gas properties to secure such indebtedness; and (iii) removed the covenant prohibiting the Company and its Restricted Subsidiaries (as defined in the Indenture) from incurring aggregate capital expenditures in excess of 30% of Consolidated EBITDAX (as defined in the Indenture) in any fiscal year.

The amounts of required principal payments based on our outstanding debt amounts as of September 30, 2014, were as follows:

| Period Ending September 30, | | (In thousands) |
|---|---|---|
| 2015 | $ | 340 |
| 2016 | | 138,590 |
| | $ | 138,930 |
| Unamortized discount on 13.75% Senior Secured Notes | | (398) |
| Total debt | $ | 138,532 |

## NOTE 9– MEMBERS' DEFICIT

The Member Agreement (the "Agreement") has four (Class A, B, C, and E) classes of members. Net income (loss) is allocated to the members in accordance with the terms set forth in the Agreement. The Agreement allows for preferred returns to certain members after internal rate of return and return of investment hurdles are met.

In the first quarter of 2013, we entered into contribution agreements with PPVA (Equity) and Platinum Partners Black Elk Opportunities Fund LLC ("PPBE") or entities designated by PPBE (together, the "Platinum Group") pursuant to which we have issued 50.0 million additional Class E Preferred Units (the "Class E Units") and 3.8 million additional Class B Units to the Platinum Group for an aggregate offering price of $50.0 million. The Class E Units are recorded under "Preferred Units" and the Class B Units are included in "Members' Deficit" in the consolidated balance sheets. In addition, we also agreed to issue an additional 43 million Class E Units in exchange for $30.0 million of outstanding Class D Preferred Units and $13.0 million of paid-in-kind dividends. The Class D Preferred Units were recorded under "Preferred Units" in the consolidated balance sheets. The Class E Units had a preferred return of 20% per annum, which was set to increase to 36% on March 25, 2014. On March 24, 2014, AQR Diversified Arbitrage Fund exercised its right, and we complied, requiring us and PPVA to repurchase all of its Class E Preferred Units for $14.0 million. We obtained waivers to the Class E Preferred Units waiving the incremental

2014.09-30-10Q

11

preferred return. As a result of the waivers obtained, we issued Class E Units of approximately $10.2 million as paid-in-kind dividends for the nine months ended September 30, 2014.

In August 2014, we re-purchased $96 million of our Series B Preferred units using proceeds of the Renaissance Sale reflected in our Consolidated Statement of Cash Flows. As of September 30, 2014, we have $7.9 million Series B Preferred units outstanding.

On February 12, 2013, we entered into an agreement with Platinum under which we agreed to issue Class B Units to Platinum in exchange for financial consulting services, including (1) analysis and assessment of our business and financial condition and compliance with financial covenants in our Credit Facility, (2) discussion with us and senior bank lenders regarding capital contributions and divestitures of non-core assets, and (3) coordination with our attorneys, accountants, and other professionals. On February 12, 2013, we issued 1,131,458.5 Class B Units to PPVA Black Elk (Equity) LLC, an affiliate of Platinum, pursuant to such agreement.

On February 12, 2013, we entered into the Fourth Amendment to the Second Amended and Restated Limited Liability Operating Agreement of the Company (the "Fourth Amendment"). The Fourth Amendment amended the Company's operating agreement to effectuate a 10,000 to 1 unit split for each of the Class A Units, Class B Units and Class C Units.

## NOTE 10—COMMITMENTS AND CONTINGENCIES

*General*

Due to the nature of our business, some contamination of the real estate property owned or leased by us is possible. Environmental site assessment of the property would be necessary to adequately determine remediation costs, if any. Management does not consider the amounts that would result from any environmental site assessments to be significant to the consolidated financial position or results of our operations. Accordingly, no provision for potential remediation costs is reflected in the accompanying consolidated financial statements. We are subject to claims and lawsuits that arise primarily in the ordinary course of business. It is the opinion of management that the disposition or ultimate resolution of such claims and lawsuits will not have a material adverse effect on our consolidated financial position or results of operations.

*West Delta 32*

We continue to go through the discovery phases of the civil litigation of the personal injury lawsuits filed as a result of the November 16, 2012, explosion and fire which occurred on our West Delta 32-E platform, located in the Gulf of Mexico approximately 17 miles southeast of Grand Isle, Louisiana. Several civil lawsuits have been filed as a result of the West Delta 32 Incident. The lawsuits that were filed in Texas have been transferred to the United States District Court for the Eastern District of Louisiana, and all cases have been consolidated for discovery purposes in that Court. The first plaintiff's case will be tried in either December of 2014 or January of 2015. All civil cases filed as a result of the West Delta 32 Incident are being defended by insurance defense counsel. We believe we have strong defenses and cross-claims and intend to defend ourselves.

*Thomas Andrus, et al*

As previously reported, six investors in Black Elk Energy, LLC ("BEE") filed a purported derivative complaint on behalf of BEE in the Supreme Court of the State of New York, County of New York, against the Company, John Hoffman, Iron Island Technologies Inc., and various entities and individuals associated with the Company's majority unit owner (the "Platinum Defendants"). The lawsuit seeks unspecified damages allegedly arising from (1) the dilution of BEE's ownership interest in the Company through various financing transactions with the Platinum Defendants and the issuance of membership units under management and employee incentive programs; and (2) the alleged mismanagement of the Company in connection with certain alleged safety violations and the West Delta 32 Incident. We believe there are strong defenses to the claims asserted in the lawsuit, and the Company intends to defend the case vigorously.

On or about September 24, 2013, Plaintiffs filed a motion for a preliminary injunction to restrain a portion of the proceeds of the Company's proposed sale of certain oil fields in the Gulf of Mexico. The Court denied the motion on November 15, 2013. On or about November 20, 2013, we filed a motion to dismiss the complaint in its entirety, inter alia, on the grounds that (i) the claims fail to state a cause of action; (ii) the claims are refuted by documentary evidence; (iii) plaintiffs, who are not members of the Company, lack standing to assert a claim for mismanagement of the Company; and (iv) certain claims are barred by the statute of limitations.

Oral arguments were heard on July 24, 2014. At that time, the judge has asked for additional briefing on the Conflicts of Law issue. We had a conference call with the Court on Friday, September 5, 2014 to set a schedule for the supplemental

12

briefs the Court has requested. Our revised brief was due and submitted on or about September 10, 2014. Oral arguments on the motions to dismiss were heard on November 6, 2014 and we are awaiting the judge's ruling.

### Grand Isle Shipyard ("GIS") Matters

On April 29, 2013, Grand Isle Shipyards, Inc. ("GIS") sued BEEOO, Enviro Tech Systems, LLC, Wood Group USA, Inc., and Compass Engineering & Consultants, LLC in the United States District Court for the Eastern District of Louisiana for damages it alleged incurred in connection with the West Delta 32 Incident. GIS specifically sought damages for loss of property and equipment, expenses in the form of indemnity and medical benefits paid to or on behalf of its employees, and for unpaid invoices in connection with the work it performed at West Delta 32. Upon motion by BEEOO, however, the court dismissed GIS' lawsuit and ordered GIS and BEEOO to first attempt to resolve their claims through mediation which took place on November 12, 2013. Since the mediation was unsuccessful, the Parties have now agreed to enter into binding Arbitration pursuant to and in accordance with the MSA.

Invoice Arbitration - On October 8, 2014, Black Elk submitted to the Arbitrator its initial briefing on all affirmative claims and defenses. This briefing was drafted and submitted pursuant to an order from the Arbitrator. GIS ignored this order to some degree and submitted Motions for summary Judgment on that date instead. GIS asked for summary judgment on all of its claims and confusingly argued that Black Elk is not entitled to summary judgment on its affirmative claims (Black Elk obviously has not sought summary judgment on its affirmative claims). On October 17, 2014, the parties participated in a telephonic hearing with the Arbitrator regarding the briefing and preexisting motions. The Arbitrator (1) granted Black Elk the right to conduct an audit pursuant to the MSA between the parties, (2) granted Black Elk limited discovery concerning the use of D&R workers on Black Elk platforms, and (3) stated that he would not be granting any dispositive motions in the case (i.e. GIS' Motions for Summary Judgment).

The arbitration, currently scheduled for December 1, 2014, has been delayed until the new year. This was a necessary step as both parties will need to take depositions and aggregate discovery before an arbitration can take place.

Platform Arbitration - The arbitration case for damages to the West Delta 32 Platform is scheduled for hearing before a three-arbitrator panel on May 12, 2015. The arbitration proceeding initiated by Black Elk against Compass Engineering & Consultants, LLC for damages arising from the explosion of the WD-32 Platform has been abated pending resolution of Compass' separate lawsuit filed in the United States District for the Western District of Louisiana seeking a declaration that it was not subjected to arbitration. We are currently in the process of drafting discovery to GIS concerning D&R Resources, LLC's employees' rates, duties, and training. We will continue to defend ourselves vigorously.

### Vistar Oil Texas, LLC Joint Venture

On April 16, 2014, Vistar Oil Texas LLC ("Vistar") filed a petition against Black Elk in Harris County District Court. This suit alleges that Black Elk breached an Acquisition and Participation Agreement and a Joint Operating Agreement between the parties, primarily by failing to provide Vistar with the funds required to bring several wells into operation in Wilson County, Texas. Vistar alleges damages of approximately $6,500,000, certain lease acquisition costs and promissory note payments required to cover liens placed on the wells. Vistar further alleges that Black Elk is in breach by refusing to provide approximately $10,350,000 to Vistar to acquire additional property. This case is in discovery. We believe we have strong potential defenses and have submitted counterclaims, and intend to defend ourselves vigorously.

### Arthur Garza III

On August 31, 2014, Arthur Garza, former Chief Technical Officer of Black Elk Energy Offshore Operations, LLC, filed suit against Black Elk Energy Offshore Operations for payment of severance under his employment agreement. This case is in discovery. We believe we have strong potential defenses and intend to defend ourselves vigorously.

### Operating Leases

We lease office space and certain equipment under non-cancellable operating lease agreements that expire on various dates through 2020.

Approximate future minimum lease payments for operating leases at September 30, 2014 were as follows:

2014.09-30-10Q

13

| Period Ending September 30, | (In thousands) |
| --- | --- |
| 2015 | $ 4,056 |
| 2016 | 2,072 |
| 2017 | 1,784 |
| 2018 | 1,655 |
| 2019 | 1,590 |
| Thereafter | 1,941 |
| | $ 13,098 |

*Escrow Accounts*

Pursuant to the purchase agreement from W&T Offshore, Inc. (the "W&T Acquisition"), we are required to fund two escrow accounts (the "W&T Escrow Accounts"), relating to the operating and non-operating properties that were acquired in maximum aggregate amount of $63.8 million ($32.6 million operated and $31.2 million non-operated) for future P&A costs that may be incurred on such properties. As of November 2010, we fully funded the operating escrow account in the amount of $32.6 million and the payment schedule for the Non-Operated Properties Escrow Account was amended and commenced on December 2011. As of September 30, 2014, we have funded $20.5 million into the non-operating escrow account, leaving $10.7 million to be funded through May 1, 2017.

The obligations under the W&T Escrow Accounts are fully guaranteed by an affiliate of Platinum. W&T Offshore Inc. ("W&T") has a first lien on the entirety of the W&T Escrow Accounts, and BP Corporation North America Inc. and Platinum are pari passu second lien holders. Once P&A obligations with respect to the interest in properties acquired from the W&T Acquisition have been fully satisfied, the lien on the W&T Escrow Accounts will be automatically extinguished. W&T also has a second priority lien with respect to the interest in properties acquired from the W&T Acquisition (with Platinum and BNP Paribas sharing a first priority lien), which lien will be released once the W&T Escrow Accounts have been fully funded.

On December 19, 2012, we entered into a Third Amendment to Purchase and Sale Agreement (the "Third Amendment") with W&T. Pursuant to the Third Amendment, we caused performance bonds (the "ARGO Bonds") in an aggregate amount of $32.6 million to be issued by Argonaut Insurance Company to W&T to guaranty our performance of certain plugging and abandonment obligations. Upon receipt of the ARGO Bonds, W&T (i) released its rights to any money held in an escrow account established to secure our performance of certain plugging and abandonment obligations with respect to the Operated Properties Escrow Account, (ii) released the security interest and deposit account control agreement formerly securing its rights in the Operated Properties Escrow Account and (iii) authorized the escrow agent to release such funds from the Operated Properties Escrow Account to or at our direction. In addition, we and W&T agreed that until the funding of an escrow account established to our performance of certain plugging and abandonment obligations with respect to certain non-operated properties is complete, we may not obtain reductions of the ARGO Bonds under any circumstances without W&T's consent. As of September 30, 2014, we no longer use ARGO Bonds as these are now backed by cash collateral.

Pursuant to the purchase agreement for the Maritech acquisition, we are required to fund an escrow account (the "Maritech Escrow Account"), relating to the properties that were acquired, of $13.1 million to be used for future P&A costs that may be incurred on such properties. This escrow obligation was fully funded in February 2014.

In regards to the Merit acquisition, we are required to establish an escrow account to secure the performance of our P&A obligations and other indemnity obligations with respect to P&A and/or decommissioning of the acquired wells and facilities. We paid $33 million in surety bonds at closing and are required to, over time, deposit in the escrow account an amount equal to $60 million, which is to be paid in 30 equal monthly installments payable on the first day of each month commencing on June 1, 2011. This escrow obligation was fully funded in November 2013.

## NOTE 11—RELATED PARTY TRANSACTIONS

We pay for certain operating and general and administration expenses on behalf of Black Elk Energy, LLC. At both September 30, 2014 and December 31, 2013, we had receivables from Black Elk Energy, LLC in the amount of $273,430.

On August 30, 2013, we consented to the assignment by Capital One Bank, N.A. and the other lenders of all of their rights and obligations under our Credit Facility to White Elk LLC, as Administrative Agent and Lender, and Resource Value Group LLC, as Lender. Resource Value Group LLC is affiliated with Platinum. As part of this transaction, we paid a required $0.3 million purchase fee on behalf of Platinum pursuant to the Loan Purchase Agreement.

2014.09-30-10Q

14

During 2011, we entered into a contribution agreement with Platinum. We also entered into additional contributions with (PPVA (Equity)) and the Platinum Group in 2013. Please see "Notes to Consolidated Financial Statements - Note 9 - Members' Deficit" in this Form 10-Q for additional discussion regarding members' contributions.

On May 28, 2013, FWS entered into an equipment lease agreement with Pea and Eigh Company, LLC ("Pea and Eigh"), a related party of Platinum. The lease began on July 1, 2013 and is payable in monthly installments of approximately $35,000, maturing on December 31, 2013, with an option to purchase the equipment for $1.5 million. As of September 30, 2014, we have not purchased all of the equipment. We currently have restricted cash of $0.6 million for the additional equipment to be purchased as well as advances due to Pea and Eigh, which is included in "Accounts payable and accrued expenses".

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Quarterly Report on Form 10-Q (this "Form 10-Q") contains forward-looking statements that are subject to a number of risks and uncertainties, many of which are beyond our control. All statements, other than statements of historical fact included in this Form 10-Q, regarding our strategy, future operations, financial position, estimated revenues and losses, projected costs, prospects, plans and objectives of management are forward-looking statements. When used in this Form 10-Q, the words "could," "believe," "anticipate," "intend," "estimate," "expect," "may," "continue," "predict," "potential," "project" and similar expressions are intended to identify forward-looking statements, although not all forward-looking statements contain such identifying words. Forward-looking statements may include statements that relate to, among other things, our:

- Financial data, including production, costs, revenues and operating income;
- Future financial and operating performance and results;
- Business strategy and budgets;
- Market prices;
- Expected plugging and abandonment obligations and other expected asset retirement obligations;
- Technology;
- Financial strategy;
- Amount, nature and timing of capital expenditures;
- Drilling of wells and the anticipated results thereof;
- Oil and natural gas reserves;
- Timing and amount of future production of oil and natural gas;
- Competition and government regulations;
- Operating costs and other expenses;
- Cash flow and anticipated liquidity;
- Prospect development;
- Property acquisitions and sales; and
- Plans, forecasts, objectives, expectations and intentions.

These forward-looking statements are based on our current expectations and assumptions about future events and their potential effect on us. While management believes that these forward-looking statements are reasonable as and when made, there can be no assurance that future developments affecting us will be those that we anticipate. All comments concerning our expectations for future revenues and operating results are based on our forecasts for our existing operations and do not include the potential impact of any future acquisition. Our forward-looking statements involve significant risks and uncertainties (some of which are beyond our control) and assumptions that could cause actual results to differ materially from our historical experience and our present expectations or projections. Known material factors that could cause our actual results to differ from those in the forward-looking statements are described in "Item 1A. Risk Factors" in this Form 10-Q and our 2013 Form 10-K.

These factors include risks summarized below:

- Low and/or declining prices for oil and natural gas;
- Oil and natural gas price volatility;

15

- Risks associated with drilling, including completion risks, cost overruns and the drilling of non-economic wells or dry holes;

- Ability to raise additional capital to fund future capital expenditures;

- Ability to post additional collateral as required by surety companies;

- Cash flow and liquidity;

- Ability to find, acquire, market, develop and produce new oil and natural gas properties;

- Uncertainties in the estimation of proved reserves and in the projection of future rates of production and timing of development expenditures;

- Geological concentration of our reserves;

- Discovery, acquisition, development and replacement of oil and natural gas reserves;

- Operating hazards attendant to the oil and natural gas business;

- Down hole drilling and completion risks that are generally not recoverable from third parties or insurance;

- Potential mechanical failure or underperformance of significant wells or pipeline mishaps;

- Potential increases in plugging and abandonment and other asset retirement costs as a result of new regulations;

- Weather conditions;

- Availability and cost of material and equipment;

- Delays in anticipated drilling start-up dates;

- Actions or inactions of third-party operators of our properties;

- Ability to find and retain skilled personnel;

- Strength and financial resources of competitors;

- Potential defects in title to our properties;

- Federal and state regulatory developments and approvals, including the adoption of new regulatory requirements;

- Losses possible from current litigation matters as a result of the explosion and fire on the West Delta 32-E Platform and other future litigation;

- Environmental risks;

- Changes in interest rates;

- Developments in oil and natural gas-producing countries;

- Events similar to those of September 11, 2001, Hurricanes Katrina, Rita, Gustav and Ike and the Deepwater Horizon explosion; and

- Worldwide political and economic conditions.

Readers are cautioned not to place undue reliance on forward-looking statements, which speak only as of the date of this Form 10-Q. We undertake no responsibility to publicly release the results of any revisions of our forward-looking statements after the date they are made.

Should one or more of the risks or uncertainties described in "Item 1A. Risk Factors" in this Form 10-Q and our 2013 Form 10-K occur, or should underlying assumptions prove incorrect, our actual results and plans could differ materially from those expressed in any forward-looking statement.

All forward-looking statements, express or implied, included in this Form 10-Q are expressly qualified in their entirety by this cautionary statement. This cautionary statement should also be considered in connection with any subsequent written or oral forward-looking statements that we or persons acting on our behalf may issue.

Except as required by law, we undertake no obligations to update, revise or release any revisions to any forward-looking statements to reflect events or circumstances occurring after the date on which such statement is made or to reflect the occurrence of unanticipated events. New factors emerge from time to time, and it is not possible for us to predict all of these factors. Further, we cannot assess the impact of each such factor on our business or the extent to

which any factors, or combination of factors, may cause actual results to be materially different from those contained in any forward-looking statement.

17

Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations

*The following discussion and analysis should be read in conjunction with the consolidated financial statements and related notes included elsewhere in this Form 10-Q. The following discussion and analysis contains forward-looking statements that reflect our future plans, estimates, beliefs and expected performance. The forward-looking statements are dependent upon events, risks and uncertainties that may be outside our control. Our actual results could differ materially from those discussed in these forward-looking statements. Factors that could cause or contribute to such differences include, but are not limited to, the volatility of oil and natural gas prices, production timing and volumes, estimates of proved reserves, operating costs and capital expenditures, economic and competitive conditions, regulatory changes and other uncertainties, as well as those factors discussed in this Form 10-Q, particularly in "Item 1A. Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements," all of which are difficult to predict. As a result of these risks, uncertainties and assumptions, the forward-looking events discussed may not occur.*

Overview

We are an oil and gas company engaged in the acquisition, exploitation, development and production of oil and natural gas properties. Our strategy is to acquire and economically maximize properties that are currently producing or have the potential to produce given additional attention and capital resources. We are engaged in a continual effort to monitor and reduce operating expenses by finding opportunities to safely increase efficiencies related to staffing, transportation and operational procedures. Moreover, our ability to accurately estimate and manage plugging and abandonment costs associated with potential acquisitions increases the likelihood of achieving our target returns on investment. Our management team has extensive engineering, geological, geophysical, technical and operational expertise in successfully developing and operating properties in both our current and planned areas of operation. As of September 30, 2014, we held an aggregate net interest in approximately 273,916 gross (146,403 net) acres under lease and had an interest in 547 gross wells, 68 of which are producing.

We have financed our acquisitions to date through a combination of cash flows provided by operating activities, borrowings under lines of credit and the Notes, and capital contributions from our members. We have historically acquired properties that we believe will meet or exceed our rate of return criteria. With our recent downsized operation, we have divested majority of our operated assets. We are expecting to revisit our strategy in the fourth quarter of 2014.

Black Elk Energy Offshore Operations, LLC and Black Elk Energy Land Operations, LLC were formed on November 20, 2007 as operating subsidiaries of Black Elk Energy, LLC. Black Elk Energy, LLC subsequently assigned its interests in Black Elk Energy Land Operations, LLC to Black Elk Energy Offshore Operations, LLC. Black Elk Energy Offshore Operations, LLC currently has three wholly owned domestic subsidiaries: (i) Black Elk Energy Land Operations, LLC, which is a guarantor under our Indenture, (ii) Black Elk Energy Finance Corp., which is the co-issuer of the Notes and (iii) Freedom Well Services, LLC. Neither Black Elk Energy Land Operations, LLC nor Black Elk Energy Finance Corp has any material assets or operations. Black Elk Energy, LLC owns a minority interest in Black Elk Energy Offshore Operations, LLC.

Prior to an acquisition, we perform stringent structural engineering tests to determine whether the reservoirs possess potential upside. Each opportunity is presented, catalogued and graded by our management and risked appropriately for the overall impact to our Company.

Our revenue, profitability and future growth rate depend significantly on factors beyond our control, such as economic, political and regulatory developments, and environmental hazards, as well as competition from other sources of energy. Oil and natural gas prices historically have been volatile and may fluctuate widely in the future. Sustained periods of low prices for oil or natural gas could materially and adversely affect our financial position, our results of operations, the quantities of oil and natural gas reserves that we can economically produce and our access to capital. Prices for oil and natural gas can fluctuate widely in response to relatively minor changes in the global and regional supply of and demand for oil and natural gas, market uncertainty, economic conditions and a variety of additional factors. Since our inception, commodity prices have experienced significant fluctuations.

18

From time to time, we use derivative financial instruments to economically hedge a portion of our commodity price risk to mitigate the impact of price volatility on our business. Our average prices that reflect both the before and after effects of our realized commodity hedging transactions for the three and nine months ended September 30, 2014 and 2013 are shown in the table below.

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2014 | 2013 | 2014 | 2013 |
| Oil: | | | | |
| Average price before effects of hedges ($/Bbl)[1] | $   99.72 | $   110.41 | $   102.51 | $   108.24 |
| Average price after effects of hedges ($/Bbl) | 65.71 | 102.01 | 86.88 | 103.41 |
| Average price differentials[2] | 2.12 | 4.59 | 2.74 | 10.07 |
| Gas: | | | | |
| Average price before effects of hedges ($/Mcf)[1] | $   4.16 | $   3.74 | $   4.86 | $   3.85 |
| Average price after effects of hedges ($/Mcf) | 4.47 | 4.07 | 4.79 | 4.18 |
| Average price differentials[2] | 0.23 | 0.19 | 0.29 | 0.16 |

(1) Realized oil and natural gas prices do not include the effect of realized derivative contract settlements.

(2) Price differential compares realized oil and natural gas prices, without giving effect to realized derivative contract settlements, to West Texas Intermediate crude index prices and Henry Hub natural gas prices, respectively.

Oil and natural gas prices remain unstable and we expect them to remain volatile in the future. Factors affecting the price of oil include worldwide economic conditions, geopolitical activities, worldwide supply disruptions, weather conditions, actions taken by the Organization of Petroleum Exporting Countries and the value of the U.S. dollar in international currency markets. Factors affecting the price of natural gas include North American weather conditions, industrial and consumer demand for natural gas, storage levels of natural gas and the availability and accessibility of natural gas deposits in North America.

In order to mitigate the impact of changes in oil and natural gas prices on our cash flows, we are a party to hedging and other price protection contracts, and we intend to continue entering into such transactions in the future to reduce the effect of oil and natural gas price volatility on our cash flows. Currently, our risk management program is designed to hedge a significant portion of our production to assure adequate cash flow to meet our obligations. If the global economic instability continues, commodity prices may be depressed for an extended period of time, which could alter our development plans and adversely affect our growth strategy and our ability to access additional funding in the capital markets.

The primary factors affecting our production levels are capital availability and our portfolio of well work projects. In addition, we face the challenge of natural production declines. As initial reservoir pressures are depleted, production from a given well decreases. We attempt to overcome this natural decline primarily through drilling our existing undeveloped reserves and enhancing our current asset base. Our future growth will depend on our ability to continue to add reserves in excess of production and to bring back to production or increase production on well-bores that are currently not productive or not being optimized. Our ability to add reserves through drilling and well work projects is dependent on our capital resources and can be limited by many factors, including our ability to timely obtain drilling permits and regulatory approvals. Any delays in drilling, completing or connecting our new wells to gathering lines will negatively affect our production, which will have an adverse effect on our revenues and, as a result, cash flow from operations.

We focus our efforts on increasing oil and natural gas reserves and production while controlling costs at a level that is appropriate for long-term operations. Our future cash flows from operations are dependent upon our ability to manage our overall cost structure.

Recent Events

*Performance Improvement Plan ("PIP")*

On November 21, 2012, BSEE sent us a letter requiring us to take certain actions and to improve our performance. The letter made reference to, among other things, the explosion and fire that occurred on our West Delta 32-E platform on November 16, 2012, (the "November 16, 2012 Incident"). BSEE stated in the letter that if we did not improve our performance, we would be subject to additional enforcement action up to and including possible referral to the Bureau of Ocean Energy Management ("BOEM") to revoke

our status as an operator on all of our existing facilities. We have undertaken the actions BSEE required of us in the November 21 letter and have been regularly reporting our progress on those required improvements to BSEE. We have submitted a PIP to BSEE that identifies corrective action items to improve safety performance in offshore operations. The primary components of the PIP address:

19

- Independent Third-Party SEMS Audit
- Enhanced oversight of work on our operated platforms
- Hazard Recognition
- Compliance
- Reduction of Incidents of Non-Conformance (INCs)
- Stop Work Authority

In a meeting held at the BSEE Regional Office on October 30, 2013, BEEOO shared with BSEE representatives that implementation of corrective actions (18 elements and 58 tasks) associated with the PIP has been 100% completed. Other essential work control processes such as our Project Execution Plans and Contractor Bridging Agreements have been improved to provide better guidelines and procedures for hazard assessment and work controls. Training in Hazard Recognition, National Pollutant Discharge Elimination System ("NPDES"), Job Safety Analysis ("JSA") and Stop Work Authority ("SWA") will be ongoing and has been incorporated into our training matrix.

On May 22, 2014, we received a letter from BSEE expressing that BEOO completed all the items and elements described in our Performance Improvement Plan. The last remaining task list item is to notify the Lake Charles District upon completion of the Vermilion Block 369 A platform blasting and painting operations. On June 5, 2014, BEEOO notified BSEE Lake Charles District of the completion of the last remaining item on the Performance Improvement Plan, i.e. Vermilion Block 369 platform blasting and painting operations, on June 4, 2014. As of September 30, 2014, we are no longer on the PIP. BSEE recognizes that BEOO has made safety enhancements and implemented changes to our oversight processes on our operated platforms. We plan to continue with cultivating a safety environment in an effort to mitigate risks in all operations as required by statute and regulation. Additionally, BSEE will continue to regularly inspect our facilities and conduct compliance follow-up inspections to confirm correction of noncompliance issued since the beginning of 2014.

*Capital Contributions*

In the first quarter of 2013, we entered into contribution agreements with PPVA (Equity) and Platinum Partners Black Elk Opportunities Fund LLC ("PPBE") or entities designated by PPBE (together, the "Platinum Group") pursuant to which we have issued 50 million additional Class E Units and 3.8 million additional Class B Units to the Platinum Group for an aggregate offering price of $50.0 million. In addition, we also agreed to issue an additional 43 million Class E Units in exchange for $30.0 million of outstanding Class D Preferred Units and $13.0 million of paid-in-kind dividends. The Class E Units had a preferred return of 20% per annum, which was set to increase to 36% on March 25, 2014 (such date as determined by our Fifth Amendment to Second Amended and Restated Limited Liability Operating Agreement). On March 24, 2014 AQR Diversified Arbitrage Fund exercised its right, and we complied, requiring us and PPVA to repurchase all of its Class E Preferred Units for $14.0 million. We obtained waivers to the Class E Preferred Units waiving the incremental preferred return. As a result of the waivers obtained, we issued an additional amount of Class E Units of approximately $10.2 million as paid-in-kind dividends during the period ended September 30, 2014.

In August 2014, we re-purchased $96 million of our Series E Preferred units using proceeds of the Renaissance Sale. As of September 30, 2014, we have $7.9 million Series E Preferred units outstanding.

*Operating Agreement Amendment*

On April 9, 2013, we entered into the Fifth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC (the "Fifth Amendment") to (1) revise and confirm the order and manner of distributions to our members and (2) permit the issuance of Class E Units in an aggregate amount not to exceed $95.0 million and the issuance of Class B Units in connection with such Class E Units in an aggregate amount not to exceed 3,800,000 units before giving effect to any capitalized Class E preferred return, for cash or property capital contributions.

On May 3, 2013, we entered into the Sixth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC (the "Sixth Amendment") to (1) establish the payment of the Class E Preferred Return to be paid in kind at the end of each calendar quarter to holders of record on that date unless we, with the consent of the Platinum Manager, elect to pay the Class E Preferred Return in cash and (2) establish New Mountain Finance Holdings, LLC as a Class E Member and, in the event that we do not file required reports with the U.S. Securities and Exchange Commission, provide them with rights as an Observer to the Board (as such term is defined by the Sixth Amendment). Additionally, pursuant to the Sixth Amendment, for so long as any Class E Preferred Units are outstanding, we cannot, without the written consent of the

20

10/26/2018                                        2014.09-30-10Q

Class E Members, issue any equity instruments, including any additional classes of preferred units, that have rights, privileges or priorities that are equal or superior to the rights, privileges, or priorities of the existing Class E Preferred Units.

*Letter of Credit Facility Waivers And Amendments*

On August 15, 2013, we entered into a Limited Waiver, Ninth Amendment to Letter of Credit Facility Agreement to (1) obtain waivers related to certain covenants in the Letter of Credit Facility for the fiscal quarter ended June 30, 2013, (2) reduce the commitments and cap the outstanding principal balance under the Letter of Credit Facility at approximately $105.7 million and (3) reduce the maximum principal amount available under the Third Amended and Restated Note dated November 8, 2012 from $200.0 million to approximately $105.7 million.

On November 14, 2013, we entered into the Waiver and Tenth Amendment on our Letter of Credit Facility to (1) obtain waivers related to our financial covenants for the third quarter of 2013, (2) cap the outstanding principal balance under the Letter of Credit Facility at approximately $66.6 million, (3) no longer issue or renew existing Letters of Credit and (4) remove the financial covenant requirements and the restriction of asset sales.

As of September 30, 2014, we had zero borrowings outstanding in letters of credit issued under this Credit Facility. Our letters of credit have been paid in full and terminated on June 8, 2014.

*Revolving Credit Facility Waivers and Amendments*

On March 17, 2014, our credit facility was paid in full.

**Liquidity, Risks and Uncertainties**

As shown in the accompanying consolidated financial statements, we had a net working capital deficit of approximately $61.9 million at September 30, 2014. The Company's cash position raises substantial doubt about the Company's ability to continue as a going concern. This going concern risk is due to the losses from operations, net capital deficiency, volatile prices, uncertain regulatory environment, and inclement weather. We will need to seek additional working capital through the sale of equity or assets and potentially refinance our Notes in an effort to improve our liquidity position.

In 2014 we have decided to defer a significant portion of our identified capital expenditures until later periods to prioritize capital projects that we believe have the highest expected returns and potential to generate near-term cash flows. We will monitor and adjust our future capital expenditures to respond to changes in prices, availability of financing, industry conditions, and contractual obligations.

In 2013, we realized approximately $131.8 million in sales proceeds (subject to customary closing adjustments) which we used to reduce our credit facility and fund our 2013 capital expenditures. We no longer have our Credit Facility as it was paid in full on March 17, 2014.

In 2014, our primary use of capital has been for providing collateral to secure our P&A obligations and re-purchase Series E Preferred Units. As we plug and abandon certain fields and meet the various criteria related to the corresponding escrow accounts, we expect to release funds from the escrow accounts. Our letters of credit with Capital One that were backed entirely by cash were paid in full on June 8, 2014. We used these letters of credit to back our surety bonds for P&A obligations. We terminated the 100% cash-backed letters of credit and increased our collateral with the surety agencies in the second quarter of 2014 for P&A obligations.

On July 10, 2014, we entered into a Purchase and Sale Agreement with Renaissance Offshore, LLC. Pursuant to the Purchase and Sale Agreement, Renaissance will acquire our interests, subject to certain exclusions, in nine fields, seven operated and two non-operated, in the offshore Gulf of Mexico (the "Renaissance Sale"). On August 15, 2014, we closed the sale to Renaissance Offshore, LLC of seven operated and one non-operated assets in the offshore Gulf of Mexico. After customary purchase price adjustments, the Company received $125.1 million in net proceeds from the Renaissance Sale. The assets sold in the Renaissance Sale represent a significant amount of the Company's cash flow, proved reserves and production.

On July 16, 2014, we commenced a cash tender offer to purchase all of the Notes on the terms and subject to the conditions set forth in an Offer to Purchase and Consent Solicitation Statement dated July 16, 2014. In conjunction with the tender offer, and on the terms and subject to the conditions set forth in the offer documents, we solicited consents of holders of the Notes to modify certain of the restrictive covenants contained in the indenture governing the Notes. The Offer and the Consent Solicitation were made solely by means of the offer documents, which were made available to the holders of Notes.

2014.09-30-10Q

21

As of the expiration of the Offer at 5:00 p.m. EST on August 13, 2014, $11,333,000 principal amount of the Notes had validly tendered and not withdrawn, and holders of $110,565,000 principal amount of the Notes, or 73.71% of the Notes, had validly consented to the Consent Solicitation and not revoked such consent. Based on the consents received and the conditions to effectiveness, including the Renaissance Sale, having been satisfied or waived in connection with the tender offer and Consent Solicitation with respect to the Company's outstanding $150,000,000 aggregate principal amount of 13.75% senior secured notes due 2015 (the "Notes"), the Company, Black Elk Energy Finance Corp., the guarantor and the trustee under the indenture governing the Notes entered into a Second Supplemental Indenture in order to effect the proposed amendments to the indenture governing the Notes effective as of August 19, 2014 (the "Effective Time"). At the Effective Time, the Second Supplemental Indenture was binding on all holders of Notes, including those who did not deliver a consent.

All Notes validly tendered and not withdrawn at or before 5:00 p.m. Eastern Time on August 13, 2014 were accepted for payment and the Company had promptly paid for such Notes, using the Renaissance Sale proceeds, in accordance with the terms of the Company's Offer to Purchase and Consent Solicitation Statement dated July 16, 2014, and in the related Letter of Transmittal and Consent to Tender and to Give Consent.

Virtually all of our current production is concentrated in the Gulf of Mexico, which is characterized by production declines more rapid than those of conventional onshore properties. As a result, we are particularly vulnerable to a near-term severe impact resulting from unanticipated complications in the development of, or production from, any single material well or infrastructure installation, including lack of sufficient capital, delays in receiving necessary drilling and operating permits, increased regulation, reduced access to equipment and services, mechanical or operational failures, and severe weather. Any unanticipated significant disruption to, or decline in, our current production levels or prolonged negative changes in commodity prices or operating cost levels could have a material adverse effect on our financial position, results of operations, cash flows, the quantity of proved reserves that we report, and our ability to meet our commitments as they come due.

As an oil and gas company, our revenue, profitability, cash flows, proved reserves and future rate of growth are substantially dependent on prevailing prices for oil and natural gas. Historically, the energy markets have been very volatile, and we expect such price volatility to continue. Any extended decline in oil or gas prices could have a material adverse effect on our financial position, results of operations, cash flows, the quantities of oil and gas reserves that we can economically produce, and may restrict our ability to obtain additional financing or to meet the contractual requirements of our debt and other obligations.

22

## How We Evaluate Our Operations

We use a variety of financial and operational measures to assess our overall performance. Among these measures are (1) volumes of oil and natural gas produced, (2) oil and natural gas prices realized, (3) per unit operating and administrative costs and (4) Adjusted EBITDA (as defined in the following table).

The following table contains certain financial and operational data for each of the three and nine months ended September 30, 2014 and 2013:

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Average daily sales[1]: | | | | |
| Oil (Bopd) | 851 | 4,969 | 2,526 | 4,617 |
| Natural gas (Mcfpd) | 12,315 | 36,595 | 19,739 | 38,149 |
| Plant products (Galpd) | (148) | 16,484 | 12,321 | 24,397 |
| Oil equivalents (Boepd) | 2,900 | 11,461 | 6,109 | 11,556 |
| Average realized prices[1][2]: | | | | |
| Oil ($/Bbl) | $ 65.71 | $ 102.01 | $ 86.88 | $ 103.41 |
| Natural gas ($/Mcf) | 4.47 | 4.07 | 4.79 | 4.18 |
| Plant products ($/Gallon) | 7.43 | 0.96 | 0.90 | 0.88 |
| Oil equivalents ($/Boe) | 37.89 | 58.62 | 53.21 | 56.97 |
| Costs and Expenses: | | | | |
| Lease operating expense ($/Boe) | $ 47.76 | $ 48.55 | $ 40.02 | $ 44.90 |
| General and administrative expense ($/Boe) | 33.36 | 9.12 | 12.97 | 8.95 |
| Net income (loss) (in thousands) | 72,896 | (18,415) | 82,437 | (74,145) |
| Adjusted EBITDA[2] (in thousands) | (11,548) | 9,126 | 6,956 | 25,722 |

(1) Average daily sales and average realized prices comprise of actuals and accruals. During the nine months ended September 30, 2014, we identified a non-cash adjustment that impacted our average daily sales calculations that originated in prior periods. Because the adjustment was immaterial to any prior periods in which they arose, the correction was recorded in the current period.

(2) Average realized prices presented give effect to our hedging.

(3) Adjusted EBITDA is defined as net (loss) income before interest expense, net, surety and letter of credit fees, West Delta 32 costs, unrealized loss (gain) on derivative instruments, accretion of asset retirement obligations, depreciation, depletion, and amortization, impairment of oil and gas properties, gain on involuntary conversion of assets and loss (gain) on sale of assets. Adjusted EBITDA is not a measure of net loss or cash flows as determined by GAAP, and should not be considered as an alternative to net loss, operating loss or any other performance measures derived in accordance with GAAP or as an alternative to cash flows from operating activities as a measure of our liquidity. We present Adjusted EBITDA because it is frequently used by securities analysts, investors and other interested parties in the evaluation of high-yield issuers, many of whom present Adjusted EBITDA when reporting their results. Adjusted EBITDA has limitations as an analytical tool, and you should not consider it in isolation, or as a substitute for analysis of our operating results or cash flows as reported under GAAP. Because of these limitations, Adjusted EBITDA should not be considered as a measure of discretionary cash available to us to invest in the growth of our business. Our presentation of Adjusted EBITDA should not be construed as an inference that our future results will be unaffected by unusual or nonrecurring items. A reconciliation table is provided below to illustrate how we derive Adjusted EBITDA.

23

|  | Three Months Ended September 30, | | | | Nine Months Ended September 30, | | | |
|---|---|---|---|---|---|---|---|---|
|  | 2014 | | 2013 | | 2014 | | 2013 | |
|  | (In thousands) | | | | | | | |
| Net income (loss) | $ | 72,896 | $ | (18,415) | $ | 82,437 | $ | (74,145) |
| Adjusted EBITDA | $ | (11,548) | $ | 9,126 | $ | 6,956 | $ | 25,722 |
| Reconciliation of Net (loss) income to Adjusted EBITDA | | | | | | | | |
| Net income (loss) | $ | 72,896 | $ | (18,415) | $ | 82,437 | $ | (74,145) |
| Interest expense, net | | 5,417 | | 6,813 | | 17,568 | | 19,293 |
| Surety and letter of credit fees | | 1,200 | | 2,458 | | 4,685 | | 7,017 |
| West Delta 32 costs | | 181 | | 4,702 | | 427 | | 12,397 |
| Unrealized (gain) loss on derivative instruments | | (7,199) | | 5,143 | | (7,581) | | 5,989 |
| Accretion of asset retirement obligations | | 551 | | 4,458 | | 3,536 | | 19,551 |
| Depreciation, depletion and amortization | | 2,537 | | 10,027 | | 24,476 | | 32,727 |
| Impairment of oil and gas properties | | 11,395 | | 402 | | 14,469 | | 55,779 |
| Gain on involuntary conversion of assets | | — | | (7,194) | | — | | (17,827) |
| Provision for doubtful accounts | | — | | 308 | | 16 | | 308 |
| (Gain) loss on sale of assets | | (98,526) | | 424 | | (133,077) | | (35,367) |
| Adjusted EBITDA | $ | (11,548) | $ | 9,126 | $ | 6,956 | $ | 25,722 |

The following table sets forth certain information with respect to oil and gas operations for the three and nine months ended September 30, 2014 and 2013:

|  | Three Months Ended September 30, | | | | Nine Months Ended September 30, 2013 | | | |
|---|---|---|---|---|---|---|---|---|
|  | 2014 | 2013 | Change | % Change | 2014 | 2013 | Change | % Change |
| PRODUCTION: | | | | | | | | |
| Oil (MBbl) | 78 | 457 | (379) | (83)% | 690 | 1,260 | (570) | (45)% |
| Natural gas (MMcf) | 1,133 | 3,367 | (2,234) | (66)% | 5,389 | 10,415 | (5,026) | (48)% |
| Plant products (MGal) | (14) | 1,517 | (1,531) | (101)% | 3,364 | 6,660 | (3,296) | (49)% |
| Total (MBoe) | 267 | 1,054 | (787) | (75)% | 1,668 | 3,155 | (1,487) | (47)% |
| REVENUES: | | | | | | | | |
| Oil sales | $ 7,811 | $ 50,479 | $ (42,668) | (85)% | $ 70,692 | $ 136,415 | $ (65,723) | (48)% |
| Natural gas sales | 4,718 | 12,600 | (7,882) | (63)% | 26,192 | 40,046 | (13,854) | (35)% |
| Plant product sales and other revenue | (101) | 1,457 | (1,558) | (107)% | 3,032 | 5,831 | (2,799) | (48)% |
| Gain (loss) on derivative financial instruments | 4,883 | (7,868) | 12,751 | 162 % | (3,593) | (8,562) | 4,969 | 58 % |
| Other revenues | 2,441 | 7,089 | (4,648) | (66)% | 15,830 | 16,389 | (559) | (3)% |
| TOTAL REVENUES | 19,752 | 63,757 | (44,005) | (69)% | 112,153 | 190,119 | (77,966) | (41)% |
| OPERATING EXPENSES: | | | | | | | | |
| Lease operating | 12,744 | 51,168 | (38,424) | (75)% | 66,753 | 141,657 | (74,904) | (53)% |
| Workover | 1,431 | 1,028 | 403 | 39 % | 2,050 | 7,312 | (5,262) | (72)% |
| Depreciation, depletion and amortization | 2,537 | 10,027 | (7,490) | (75)% | 24,476 | 32,727 | (8,251) | (25)% |
| Impairment of oil and gas properties | 11,395 | 402 | 10,993 | 2,735 % | 14,469 | 55,779 | (41,310) | (74)% |
| General and administrative | 8,901 | 9,621 | (720) | (7)% | 21,630 | 28,250 | (6,620) | (23)% |
| Gain on involuntary conversion of asset | — | (7,194) | 7,194 | 100 % | — | (17,827) | 17,827 | 100 % |
| Accretion of asset retirement obligations | 551 | 4,458 | (3,907) | (88)% | 3,536 | 19,551 | (16,015) | (82)% |
| (Gain) loss on sale of assets | (98,526) | 424 | (98,950) | (23,337)% | (133,077) | (35,367) | (97,710) | (276)% |
| Other operating expenses | 1,062— | 2,704— | (1,642) | (61)% | 6,413— | 5,117— | 1,296— | 25 % |

10/26/2018            2014.09-30-10Q

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| TOTAL OPERATING EXPENSES | (59,905) | 72,638 | (132,543) | (182)% | 6,250 | 237,199 | (230,949) | (97)% |
| INCOME (LOSS) FROM OPERATIONS | 79,657 | (8,881) | 88,538 | (997)% | 105,903 | (47,080) | 152,983 | (325)% |
| OTHER INCOME (EXPENSE): | | | | | | | | |
| Interest (expense) income | 10 | 30 | (20) | (67)% | 45 | 81 | (36) | (44)% |
| Miscellaneous income (expense) | (1,312) | (2,674) | 1,362 | 51 % | (5,778) | (7,620) | 1,842 | 24 % |
| Interest expense | (5,459) | (6,890) | 1,431 | 21 % | (17,733) | (19,526) | 1,793 | 9 % |
| TOTAL OTHER EXPENSE, NET | (6,761) | (9,534) | 2,773 | 29 % | (23,466) | (27,065) | 3,599 | 13 % |
| NET INCOME (LOSS) | $ 72,896 | $ (18,415) | $ 91,311 | 496 % | $ 82,437 | $ (74,145) | $ 156,582 | 211 % |

24

## Production

*Oil and natural gas production.* Total oil, natural gas and plant product production of 267 MBoe decreased 787 MBoe, or 75%, and 1,668 MBoe decreased 1,487 MBoe, or 47%, during the three and nine months ended September 30, 2014 compared to the same periods in 2013 as a result of asset sales, pipeline repairs, and natural decline. Additionally, average daily sales and average realized prices comprise of actuals and accruals. During the nine months ended September 30, 2014, we identified a non-cash adjustment that impacted our average daily sales calculations that originated in prior periods. Because the adjustment was immaterial to any prior periods in which they arose, the correction was recorded in the current period.

## Revenues

*Total revenues.* Total revenues for the three and nine months ended September 30, 2014 of $19.8 million and $112.2 million decreased $44.0 million, or 69%, and $78.0 million, or 41%, respectively, over the comparable periods in 2013.

Revenues, excluding the realized and unrealized revenues from commodity hedge contracts, decreased $56.8 million, or 79%, and $82.9 million, or 42%, for the three and nine months ended September 30, 2014, respectively, compared to the same periods in 2013. The decrease was primarily due to the impact of recent divestitures of properties and various gas pipeline shut-ins. Additionally, average daily sales and average realized prices comprise of actuals and accruals. During the nine months ended September 30, 2014, we identified a non-cash adjustment that impacted our average daily sales calculations that originated in prior periods. Because the adjustment was immaterial to any prior periods in which they arose, the correction was recorded in the current period.

We entered into certain oil and natural gas commodity derivative contracts in 2014 and 2013. We realized losses on these derivative contracts in the amounts of $2.3 million and $11.2 million for the three and nine months ended September 30, 2014, respectively, and $2.7 million and $2.6 million for the three and nine months ended September 30, 2013, respectively. We recognized unrealized gains of $7.2 million and $7.6 million for the three and nine months ended September 30, 2014, respectively, and losses of $5.1 million and $6.0 million in the same periods of 2013.

Excluding hedges, we realized average oil prices of $99.72 per barrel and $102.51 per barrel and gas prices of $4.16 per Mcf and $4.86 per Mcf for the three and nine months ended September 30, 2014, respectively. For the same periods in 2013, excluding hedges, we realized average oil prices of $110.41 per barrel and $108.24 per barrel and gas prices of $3.74 per Mcf and $3.85 per Mcf for the three and nine months ended September 30, 2013, respectively. Oil prices were lower on a quarter and year-to-date basis that were partially offset by slightly higher gas prices compared to 2013. We expect commodity prices to remain volatile in the future.

## Operating Expenses

*Lease operating costs.* Our lease operating costs for the three and nine months ended September 30, 2014 were $12.7 million, or $47.76 per Boe, and $66.8 million, or $40.02 per Boe. For the three and nine months ended September 30, 2013, our lease operating costs were $51.2 million, or $48.55 per Boe, and $141.7 million, or $44.90 per Boe, respectively. Lease operating expenses decreased by $38.4 million and $74.9 million for the three and nine months ended September 30, 2014, respectively, compared to the same periods in 2013, primarily as a result of the 2013 Renaissance transaction and the 2014 Fieldwood and Renaissance transactions. The increase in cost per Boe during 2014 was primarily attributable to decreased production and operating expenses that are fixed in the short-term.

*Workover costs.* Our workover costs for the three and nine months ended September 30, 2014 were $1.4 million and $2.1 million, an increase of $0.4 million and a decrease $5.3 million compared to the third quarter and nine months of 2013, respectively. For the nine months ended September 30, 2014, South Pelto 20, Garden Banks 82/128, Garden Banks 602, South Timbalier 8, and South Pelto 13 were the primary workover expense projects.

*Depreciation, depletion, amortization and impairment.* DD&A expense was $2.5 million, or $9.51 per Boe, and $24.5 million, or $14.68 per Boe, for the three and nine months ended September 30, 2014, respectively. For the three and nine months ended September 30, 2013, DD&A was $10 million, or $9.51 per Boe and $32.7 million, or $10.37 per Boe, respectively. The decrease in DD&A for the three and nine months ended September 30, 2014 was a result of asset sales, lower production and reduced asset basis as a result of the impairments recorded in 2014 and 2013. Depletion is recorded based on units of production and DD&A expense includes depletion of future asset retirement obligations. We recorded $11.4 million and $14.5 million impairment for the three and nine months ended September 30, 2014 and $0.4 million and $55.8 million in the same periods in 2013, respectively.

*General and administrative expenses.* G&A expense was $8.9 million, or $33.36 per Boe, and $21.6 million, or $12.97 per Boe, for the three and nine months ended September 30, 2014, respectively, and $9.6 million, or $9.12 per Boe, and $28.3

25

million, or $8.95 per Boe, for the same periods in 2013. The decrease in G&A expense for the three and nine months ended September 30, 2014 was primarily the result of headcount reductions, and restructuring overhead and insurance contracts that was partially offset by higher severance expenses. Excluding the severance expenses recorded in the third quarter of 2014 of $1.8 million, our G&A expenses for the three and nine months September 30, 2014 were $7.1 million, or $26.61 per Boe, and $19.8 million, or $11.89 per Boe, respectively. G&A expense for the nine month ended September 30, 2013 reflects a reclassification of surety fees from G&A expenses to miscellaneous expense.

*Accretion expense.* We recognized accretion expense of $0.6 million and $3.5 million for the three and nine months ended September 30, 2014, respectively, compared to $4.5 million and $19.6 million for the three and nine months ended September 30, 2013. The decrease in accretion expense is a result of P&A activity incurred during 2013 and the nine months ended September 30, 2014, decreased asset retirement liability due to the sale of properties during 2013 and the Fieldwood and Renaissance transactions in 2014, and a revision to the discount rate used to calculate accretion. As the Company had fully funded our operating escrow accounts, we have prospectively adjusted the accretion rate to be reflective.

*Gain on sale of assets.* We recognized a gain on the sale of assets of $98.5 million and $133.1 million for the three and nine months ended September 30, 2014 related to the Apache settlement and the sale to Fieldwood and Renaissance. Fieldwood acquired all of the Company's interest in one operated and 15 non-operated fields for $50 million, subject to normal purchase price adjustments that was closed on March 17, 2014. On August 15, 2014, we closed a sale with Renaissance of seven operated and one non-operated assets for $125.1 million, after normal purchase price adjustments.

*Other operating expenses.* Other operating expenses of $1.1 million and $6.4 million for the three and nine months ended September 30, 2014, compared to $2.7 million and $5.1 million for the three and nine months ended September 30, 2013. The decrease in other operating expenses is due to FWS experiencing less P&A projects, and therefore less operating expenses, in third quarter 2014. For the nine months ended September 30, 2014, an increase in other operating expenses was primarily due to the nine months impact on the operating lease that became effective effective July 2013.

*Miscellaneous expense.* Miscellaneous expense is $1.3 million and $5.8 million for the three and nine months ended September 30, 2014, compared to $2.7 million and $7.6 million for the three and nine months ended September 30, 2013, respectively. Miscellaneous expense for the three and nine months ended September 30, 2013 reflects reclassification of surety fees from G&A expense to miscellaneous expense. Miscellaneous expense for the three and nine months ended September 30, 2014 reflects a decrease in surety and escrow fees and a settlement loss of $0.8 million incurred in the first quarter of 2013. The settlement loss of $0.8 million related to final settlement on outstanding accounts payable and accounts receivable between Black Elk Energy and Fieldwood, Apache and W&T Offshore.


Liquidity and Capital Resources

    The Company currently faces challenges with our current cash flow and need to pay our operating expenses, including our debt service obligations. The Company's cash position raises substantial doubt about the Company's ability to continue as a going concern. We will need to seek additional working capital through the sale of equity or assets and potentially refinance our Notes in an effort to improve our liquidity.

    In 2014 we have decided to defer a significant portion of our identified capital expenditures until later periods to prioritize capital projects that we believe have the highest expected returns and potential to generate near-term cash flows. We will monitor and adjust our future capital expenditures to respond to changes in prices, availability of financing, industry conditions, and contractual obligations.

    As of September 30, 2014, our primary use of capital has been for Series E payment as well as providing collateral to secure our P&A obligations. As we abandon certain fields and meet the various criteria related to the corresponding escrow accounts, we expect to release funds from the escrow accounts. Furthermore, we no longer use letters of credit to back our surety bonds for P&A obligations. Our surety bonds are now backed by the surety agencies.

*Senior Secured Revolving Credit Facility*

    On December 24, 2010, we entered into a Credit Facility comprised of a senior secured revolving credit facility of up to $35 million and a $75 million secured letter of credit facility to be used exclusively for the issuance of letters of credit in support of our future P&A liabilities relating to our oil and natural gas properties (the "Letter of Credit Facility"). The Credit Facility bears interest based on the borrowing base usage, at the applicable London Interbank Offered Rate, plus applicable margins ranging from 4.75% to 5.5%, or an alternate base rate based on the federal funds effective rate plus applicable margins

2014.09-30-10Q

26

ranging from 3.25% to 4.00%. The applicable margin is computed based on the borrowing based utilization percentage in effect from time to time. The borrowing base under our Credit Facility is subject to redetermination on a semi-annual basis, effective April 1 and October 1, and up to one additional time during any six month period, as may be requested by either us or the administrative agent, acting at the direction of the majority of the lenders. The borrowing base will be determined by the administrative agent in its sole discretion and consistent with its normal oil and gas lending criteria in existence at that particular time. Our obligations under the Credit Facility were guaranteed by our existing subsidiaries and are secured on a first-priority basis by all of our and our subsidiaries' assets, in the case of the Credit Facility, and by cash collateral, in the case of the Letter of Credit Facility. On March 17, 2014 the Credit Facility was paid in full.

We have entered into various amendments to the Letter of Credit Facility. These amendments have, among other things, (1) adjusted the commitments under the Letter of Credit Facility to approximately $66.6 million, (2) updated the fees on the letters of credit to 2% on a go-forward basis, (3) changed the maturity date from June 22, 2014 on the Letter of Credit Facility. These letters of credit were paid in full and closed as of June 8, 2014.

A letter of credit fee is computed based on the same applicable margin used to determine the interest rate to Eurodollar loans times the stated face amount of each letter of credit.

For a further discussion of our Credit Facility, please see "Notes to Consolidated Financial Statements—Note 8—Debt and Notes Payable" in this Form 10-Q.

*13.75% Senior Secured Notes*

On November 23, 2010, we issued $150 million in aggregate principal amount of the Notes discounted at 99.109%. The net proceeds were used to repay all of the outstanding indebtedness under our lines of credit, to fund BOEM collateral requirements and to prefund our P&A escrow accounts. We pay interest on the Notes semi-annually, on June 1st and December 1st of each year, in arrears, commencing June 1, 2011. The Notes mature on December 1, 2015.

The Notes are secured by a security interest in the issuers' and the guarantors' assets (excluding the escrow accounts set up for the future P&A obligations of the properties acquired in the W&T acquisition). The liens securing the Notes are subordinated and junior to any first lien indebtedness, including our derivative contracts obligation and Credit Facility.

We have the right or the obligation to redeem the Notes under various conditions. If we experience a change of control, the holders of the Notes may require us to repurchase the Notes at 101% of the principal amount thereof, plus accrued unpaid interest. We also have an optional redemption in which we may redeem up to 35% of the aggregate principal amount of the Notes at a price equal to 110.0% of the principal amount, plus accrued and unpaid interest to the date of redemption, with the net cash proceeds of certain equity offerings until December 1, 2013. From December 1, 2013 until December 1, 2014, we may redeem some or all of the Notes at an initial redemption price equal to par value plus one-half the coupon which equals 106.875% plus accrued and unpaid interest to the date of the redemption. On or after December 1, 2014, we may redeem some or all of the Notes at a redemption price equal to par plus accrued and unpaid interest to the date of redemption.

On May 31, 2011, we amended the Indenture, among other things, to: (1) increase the amount of capital expenditures permitted to be made by us on an annual basis, (2) enable us to obtain financial support from our majority equity holder by way of a $30 million investment in Class D Units that can be repaid over time and (3) obligate us to make an offer to repurchase the Notes semiannually at an offer price equal to 103% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest to the extent it meets certain defined financial tests and as permitted by our credit facilities.

On August 19, 2014, as a result of the receipt of the requisite consents in connection with the tender offer and consent solicitation of the Company's outstanding $150,000,000 aggregate principal amount of 13.75% senior secured notes due 2015 (the "Notes") prior to 5:00 p.m. Eastern Time on August 13, 2014 (the "Expiration Time") and the satisfaction or waiver of the conditions to effectiveness specified in the Company's Offer to Purchase and Consent Solicitation Statement dated July 16, 2014, the Company, Black Elk Energy Finance Corp., the guarantor and the trustee under the Indenture governing the Notes dated as of November 23, 2010, as supplemented by the First Supplemental Indenture dated as of May 31, 2011 (the "Indenture") entered into a Second Supplemental Indenture (the "Supplemental Indenture") in order to effect the proposed amendments to the Indenture effective as of August 19, 2014 (the "Effective Time"). At the Effective Time, the Supplemental Indenture will be binding on all holders of the Notes, including those who did not deliver a consent or who validly revoked their consent before the Expiration Time.

As of September 30, 2014, the recorded value of the Notes was $138.2 million, which includes the unamortized discount of $0.4 million.

*Renaissance Sale*

On July 10, 2014, we entered into a Purchase and Sale Agreement with Renaissance Offshore, LLC. Pursuant to the Purchase and Sale Agreement, Renaissance will acquire our interests, subject to certain exclusions, in nine fields, seven operated and two non-operated, in the offshore Gulf of Mexico(the "Renaissance Sale"). On August 15, 2014, the Company closed the sale of seven operated and one non-operated assets to Renaissance Offshore, LLC. After customary purchase price adjustments, the Company received $125.1 million in net proceeds from the Renaissance Sale. The net proceeds of the Renaissance Sale was used primarily to fund our purchase of the Notes validly tendered and not withdrawn pursuant to the tender offer on August 13, 2014 and to re-purchase Series E preferred units.

*Tender Offer and Consent Solicitation*

On July 16, 2014, we commenced a cash tender offer to purchase all of the Notes on the terms and subject to the conditions set forth in an Offer to Purchase and Consent Solicitation Statement dated July 16, 2014. In conjunction with the tender offer, and on the terms and subject to the conditions set forth in the offer documents, we solicited consents of holders of the Notes to modify certain of the restrictive covenants contained in the indenture governing the Notes. The Offer and the Consent Solicitation were made solely by means of the offer documents, which were made available to the holders of Notes.

The Offer and the Consent Solicitation were made in connection with our proposed disposition of certain assets pursuant to the Renaissance Sale. The net proceeds of the Renaissance Sale was used primarily to fund our purchase of the Notes validly tendered and not withdrawn pursuant to the tender offer on August 13, 2014 and to re-purchase Series E preferred units.

Our obligation to accept for purchase and to pay for Notes validly tendered and not withdrawn pursuant to the tender offer was subject to the satisfaction or waiver, in our discretion, of certain conditions, including, among others, our receipt of consents from the holders of at least a majority in principal amount of the outstanding Notes to the proposed amendments and our receipt of aggregate proceeds in the Renaissance Sale of at least $100 million.

Consents from the holders of at least a majority in principal amount of the outstanding Notes were validly received prior to the expiration time and the conditions to effectiveness were satisfied or waived. A Second Supplemental Indenture was entered in order to effect the proposed amendments to the indenture governing the Notes effective as of August 19, 2014. All Notes validly tendered and not withdrawn at or before 5:00 p.m. Eastern Time on August 13, 2014 were accepted for payment and the Company promptly paid for such Notes in accordance with the terms of the Company's Offer to Purchase and Consent Solicitation Statement dated July 16, 2014, and in the related Letter of Transmittal and Consent to Tender and to Give Consent. Among other things, the Second Supplemental Indenture:

· allowed us to apply the net proceeds from the Renaissance Sale to consummate the tender offer and to use any remaining proceeds from the Renaissance Sale to purchase our preferred equity; and

· permitted the incurrence of indebtedness arising from the performance of our plugging and abandonment obligations and liens on our oil and gas properties to secure such indebtedness

·
· removed the covenant prohibiting the Company and its Restricted Subsidiaries from incurring aggregate capital expenditures in excess of 30% of Consolidated EBITDAX in any fiscal year.

*Member Contributions*

In the first quarter of 2013, we entered into contribution agreements with PPVA (Equity) and Platinum Partners Black Elk Opportunities Fund LLC ("PPBE") or entities designated by PPBE (together, the "Platinum Group") pursuant to which we have issued 50 million additional Class E Units and 3.8 million additional Class B Units to the Platinum Group for an aggregate offering price of $50.0 million. In addition, we also agreed to issue an additional 43 million Class E Units in exchange for $30.0 million of outstanding Class D Preferred Units and $13.0 million of paid-in-kind dividends. The Class E Units had a preferred return of 20% per annum, which was set to increase on March 25, 2014 to 36% per annum (such date as determined by our Fifth Amendment to Second Amended and Restated Limited Liability Operating Agreement). On March 24, 2014 AQR Diversified Arbitrage Fund exercised its right, and we complied, requiring us and PPVA to repurchase all of its Class E Preferred Units for $14.0 million. We obtained waivers to the Class E Preferred Units waiving the incremental preferred return. As a result of the waivers obtained, we issued an additional amount of Class E Units of approximately $10.2 million as paid-in-kind dividends as of September 30, 2014.

28

On February 12, 2013, we entered into an agreement with Platinum under which we agreed to issue Class B Units to Platinum in exchange for financial consulting services, including (1) analysis and assessment of our business and financial condition and compliance with financial covenants in our credit facility, (2) discussion with us and senior bank lenders regarding capital contributions and divestitures of non-core assets, and (3) coordination with our attorneys, accountants, and other professionals. On February 12, 2013, we issued 1,131,458.5 Class B Units to PPVA Black Elk (Equity) LLC, an affiliate of Platinum, pursuant to such agreement.

*Stock Split.* On February 12, 2013, we entered into the Fourth Amendment to the Second Amended and Restated Limited Liability Operating Agreement of the Company (the "Fourth Amendment"). The Fourth Amendment amended the Company's operating agreement to effectuate a 10,000 to 1 unit split for each of the Class A Units, Class B Units and Class C Units.

*Operating Agreement Amendment.* In April 2013, we entered into the Fifth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC (the "Fifth Amendment") to (1) revise and confirm the order and manner of distributions to our members and (2) permit the issuance of Class E Units in an aggregate amount not to exceed $95.0 million and the issuance of Class B Units in connection with such Class E Units in an aggregate amount not to exceed 3,800,000 units before giving effect to any capitalized Class E preferred return, for cash or property capital contributions.

Historically, we used our commodity derivative positions to help us stabilize a portion of our expected cash flows from operations despite potential declines in the price of oil and natural gas. We are currently assessing our commodity derivative positions to determine whether or not to enter into additional oil and gas hedging. Please see "—Oil and Natural Gas Hedging" and "—Quantitative and Qualitative Disclosures About Market Risk."

We actively review acquisition opportunities on an ongoing basis. Our ability to make significant additional acquisitions for cash would require us to obtain additional equity or debt financing, which we may not be able to obtain on terms acceptable to us or at all.

*Cash Flows*

The table below discloses the net cash provided by (used in) operating activities, investing activities, and financing activities for the nine months ended September 30, 2014 and 2013:

|  | Nine Months Ended September 30, | |
|---|---|---|
|  | 2014 | 2013 |
| Net cash (used in) provided by operating activities | $ (67,325) | $ 28,729 |
| Net cash provided by (used in) investing activities | 224,479 | (50,698) |
| Net cash (used in) provided by financing activities | (157,914) | 27,272 |
| Net (decrease) increase in cash and equivalents | $ (760) | $ 5,303 |

*Cash flows (used in) provided by operating activities.* Cash used in operating activities totaled $(67.3) million during the nine months ended September 30, 2014 compared to $28.7 million provided by operating activities during the nine months ended September 30, 2013. Significant components of net cash (used in) operating activities during the nine months ended September 30, 2014 included $(56.3) million of changes in operating assets and liabilities and $(93.4) million of non-cash items, primarily DD&A expense, impairment and accretion of asset retirement obligations partially offset by the net gain on sale of assets. Cash provided by operating activities in the comparable period of 2013 were attributed to changes in operating assets and liabilities and non-cash items, primarily DD&A expense, impairment and accretion of asset retirement obligations partially offset by the net loss, gain on sale of assets and gain on involuntary conversion of assets.

Our operating cash flows are sensitive to a number of variables, the most significant of which is the volatility of oil and natural gas prices. Regional and worldwide economic activity, weather, infrastructure changes to reach markets and other variable factors significantly impact the prices of these commodities. These factors are beyond our control and are difficult to predict. For additional information on the impact of changing prices on our financial position, see "Item 3. Quantitative and Qualitative Disclosures About Market Risk" below.

*Cash flows provided by (used in) investing activities.* Cash provided by investing activities was $224.5 million in the nine months ended September 30, 2014 was primarily attributable to the sale to Fieldwood Energy, LLC and Renaissance Offshore Operations, LLC partially offset by additions to the oil and gas properties during the period and the funding of the future P&A obligations through escrow. Cash used in investing activities in the comparable period of 2013 were attributed to

29

oil and gas property additions associated with the capital drilling program during the period and the funding of the future P&A obligations through escrow partially offset by the sale proceeds of the sale of four fields to Renaissance Offshore and proceeds received from insurance recovery for HI 443.

*Cash flows (used in) provided by financing activities.* Cash flows used in financing activities of $(157.9) million in the nine months ended September 30, 2014 were attributable to $11.4 million of payments on the $150 million bond, $34.5 million of payments on the Credit Facility and $112.0 million distribution to members. Cash flows provided by financing activities of $27.3 million in the nine months ended September 30, 2013 were attributable to contributions from Platinum Group and PPVA and borrowings under the Credit Facility partially offset by payments on the Credit Facility and short-term notes.

### Asset Retirement Obligations

As many as four times per year, we review and, to the extent necessary, revise our asset retirement obligation estimates. As of September 30, 2014, we had a decrease of $81.2 million in our asset retirement obligations primarily as a result of the asset sales to Fieldwood Energy, LLC and Renaissance Offshore Operations, LLC, settlements of asset retirement obligations, and recognized $3.5 million in accretion expense. For the three and nine months ended September 30, 2013, we decreased our assets retirement obligations primarily as a result of the asset sale to Renaissance Offshore, LLC and in P&A work performed in 2013.

At September 30, 2014 and December 31, 2013, we have total asset retirement obligations of $195.5 million and $276.7 million, respectively, and have funded approximately $196.3 million and $235.4 million in our long-term escrows and $25.9 million and $22.0 million in our short-term escrows, respectively, in collateral to secure our P&A obligations, inclusive of performance bonds. As of September 30, 2014 and December 31, 2013, we also have a guaranteed escrow amount of $20.3 million for certain fields which will be refunded to us once we have completed our P&A obligations on the entire field. The escrow is guaranteed by TETRA Technologies, Inc.

### Contractual Obligations

We have various contractual obligations in the normal course of our operations and financing activities. The following schedule summarizes our contractual obligations and other contractual commitments at September 30, 2014:

| | | | Payments Due by Period | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total | | Less than 1 Year | | 1 - 3 Years | | 3 -5 Years | | After 5 Years |
| | | | | | (in thousands) | | | | |
| Contractual Obligations | | | | | | | | | |
| Total debt and notes payable | $ | 138,930 | $ | 340 | $ | 138,590 | $ | — | $ | — |
| Interest on debt and notes payable | | 28,847 | | 19,321 | | 9,526 | | — | | — |
| Operating leases (1) | | 13,098 | | 4,056 | | 3,856 | | 3,245 | | 1,941 |
| Total contractual obligations | | 180,875 | | 23,717 | | 151,972 | | 3,245 | | 1,941 |
| Other Obligations | | | | | | | | | |
| Asset retirement obligations (2) | | 195,500 | | 32,839 | | 104,805 | | 10,793 | | 47,063 |
| Total obligations (3) | $ | 376,375 | $ | 56,556 | $ | 256,777 | $ | 14,038 | $ | 49,004 |

(1) Consists of office space leases for our Texas and Louisiana offices and services provided in the office.
(2) Asset retirement obligations will be partially funded via the escrow. The obligations reflected above are discounted.
(3) Does not include Class E Cumulative Convertible Participating Preferred Units as they are contingently redeemable at the holders' option.

### Off-Balance Sheet Arrangements

We do not currently have any off-balance sheet arrangements.

### Oil and Gas Hedging

As part of our risk management program, we hedge a portion of our anticipated oil and natural gas production to reduce our exposure to fluctuations in oil and natural gas prices. Reducing our exposure to price volatility helps ensure that we have

30

adequate funds available for our capital programs and more price sensitive drilling programs. Our decision on the quantity and price at which we choose to hedge our future production is based in part on our view of current and future market conditions.

While the use of these hedging arrangements limits the downside risk of adverse price movements, their use also may limit future revenues from favorable price movements. In addition, the use of hedging transactions may involve basis risk. The use of hedging transactions also involves the risk that the counter-parties will be unable to meet the financial terms of such transactions.

Please see "Notes to Consolidated Financial Statements—Note 6—Derivative Instruments" in this Form 10-Q for additional discussion regarding the accounting applicable to our hedging program.

### Critical Accounting Policies

"Management's Discussion and Analysis of Financial Condition" is based upon our consolidated financial statements, which have been prepared in conformity with GAAP. The preparation of these statements requires that we make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses. We base these estimates on historical experience and on assumptions that we consider reasonable under the circumstances; however, reported results could differ from the current estimates under different assumptions and/or conditions. We have disclosed the areas requiring the use of management's estimates in "Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations" included in our 2013 Form 10-K.

### Inflation and Changes in Prices

Our revenues, the value of our assets, and our ability to obtain bank financing or additional capital on attractive terms have been and will continue to be affected by changes in commodity prices and the costs to produce our reserves. Commodity prices are subject to significant fluctuations that are beyond our ability to control or predict. During the three and nine months ended September 30, 2014, we received an average of $99.72 and $102.51 per barrel of oil and $4.16 and $4.86 per Mcf of natural gas, respectively, before consideration of commodity derivative contracts, compared to $110.41 and $108.24 per barrel of oil and $3.74 and $3.85 per Mcf of natural gas, in the three and nine months ended September 30, 2013, respectively. Although certain of our costs are affected by general inflation, inflation does not normally have a significant effect on our business.

31

### Item 3. Quantitative and Qualitative Disclosures About Market Risk

We are exposed to a variety of market risks including commodity price risk, credit risk and interest rate risk. We address these risks through a program of risk management, which may include the use of derivative instruments.

The following quantitative and qualitative information is provided about financial instruments to which we are a party, and from which we may incur future gains or losses from changes in market interest rates or commodity prices and losses from extension of credit.

Hypothetical changes in interest rates and commodity prices chosen for the following estimated sensitivity analysis are considered to be reasonably possible near-term changes generally based on consideration of past fluctuations for each risk category. However, since it is not possible to accurately predict future changes in interest rates and commodity prices, these hypothetical changes may not necessarily be an indicator of probable future fluctuations.

*Commodity Price Risk*

Our primary market risk exposure is in the pricing applicable to our oil and natural gas production. Realized pricing is primarily driven by the prevailing worldwide price for oil and spot market prices applicable to our U.S. natural gas production. Pricing for oil and natural gas production has been volatile and unpredictable for several years, and we expect this volatility to continue in the future. The prices we receive for production depend on many factors outside of our control, including volatility in the differences between product prices at sales points and the applicable index price. Based on our annualized production for the nine months ended September 30, 2014, our annual revenue would increase or decrease by approximately $9.2 million for each $10.00 per barrel change in oil prices and $7.2 million for each $1.00 per MMBtu change in natural gas prices without giving effect to any hedging. Based on our production for the nine month ended September 30, 2013, our revenues would have increased or decreased by approximately $16.8 million for each $10.00 per barrel change in oil prices and $13.9 million for each $1.00 per MMBtu change in natural gas prices without giving effect to any hedging.

To partially reduce price risk caused by these market fluctuations, we hedge a significant portion of our anticipated oil and natural gas production as part of our risk management program. Reducing our exposure to price volatility helps ensure that we have adequate funds available for our capital programs and more price sensitive drilling programs. Our decision on the quantity and price at which we choose to hedge our production is based in part on our view of current and future market conditions. While hedging limits the downside risk of adverse price movements, it also may limit future revenues from favorable price movements. The use of hedging transactions also involves the risk that counterparties, which generally are financial institutions, will be unable to meet the financial terms of such transactions.

At September 30, 2014, the fair value of our commodity derivatives included in our consolidated balance sheets represent a net current liability of $0.9 million. At December 31, 2013, the fair value of our commodity derivatives was approximately $8.5 million and $0.3 million, which were recorded as current liabilities and long-term liabilities, respectively. For the three and nine months ended September 30, 2014, we realized net decrease in oil and natural gas revenues related to hedging transactions of approximately $4.9 million and $3.6 million, and decreases for the same periods in 2013 of $2.7 and $2.6 million, respectively.

32

10/26/2018                                    2014.09-30-10Q

As of September 30, 2014, we maintained the following commodity derivative contracts:

| Remaining Contract Term: Oil | Contract Type | Notational Volume in Bbls/Month | | NYMEX Strike Price |
|---|---|---|---|---|
| October 2014 - October 2014 | Swap | 5,525 | $ | 87.75 |
| November 2014 - November 2014 | Swap | 5,525 | | 87.75 |
| December 2014 - December 2014 | Swap | 5,525 | | 87.75 |
| October 2014 - December 2014 | Swap | 15,000 | | 65.00 |

| Remaining Contract Term: Natural Gas | Contract Type | Notational Volume in MMBtus/Month | | NYMEX Strike Price |
|---|---|---|---|---|
| October 2014 - October 2014 | Swap | 28,635 | $ | 4.09 |
| November 2014 - November 2014 | Swap | 27,081 | | 4.09 |
| December 2014 - December 2014 | Swap | 34,114 | | 4.09 |
| January 2015 - January 2015 | Swap | 27,838 | | 4.09 |
| February 2015 - February 2015 | Swap | 24,461 | | 4.09 |
| March 2015 - March 2015 | Swap | 26,443 | | 4.09 |
| October 2014 - October 2014 | Swap | 29,753 | | 4.19 |
| November 2014 - November 2014 | Swap | 28,635 | | 4.19 |
| December 2014 - December 2014 | Swap | 27,081 | | 4.19 |
| January 2015 - January 2015 | Swap | 34,114 | | 4.19 |
| February 2015 - February 2015 | Swap | 27,838 | | 4.19 |
| March 2015 - March 2015 | Swap | 24,461 | | 4.19 |
| October 2014 - October 2014 | Swap | 192,799 | | 4.47 |
| November 2014 - November 2014 | Swap | 186,296 | | 4.47 |
| December 2014 - December 2014 | Swap | 189,992 | | 4.47 |
| January 2015 - January 2015 | Swap | 58,684 | | 4.47 |
| February 2015 - February 2015 | Swap | 68,337 | | 4.47 |
| March 2015 - March 2015 | Swap | 69,732 | | 4.47 |

For a further discussion of our hedging activities, please see "Notes to Consolidated Financial Statements—Note 6—Derivative Instruments" in this Form 10-Q.

*Credit Risk*

We monitor our risk of loss associated with non-performance by counter-parties of their contractual obligations. Our principal exposure to credit risk is through joint interest receivables, which totaled $17.2 million at September 30, 2014 and $17.0 million at December 31, 2013. Joint interest receivables arise from billing entities who own partial interests in the wells we operate. These entities participate in our wells primarily based on their ownership in leases on which we have an interest. We also have exposure to credit risk from the sale of our oil and natural gas production that we market to energy marketing companies and refineries, the receivables totaled $9.8 million at September 30, 2014 and $35.2 million at December 31, 2013. We also have credit risk associated with our financially settled crude oil and natural gas swaps. As of September 30, 2014, all of our swaps were with BP Energy Company as the counter-party.

In order to minimize our exposure to credit risk, we request prepayment of costs where it is allowed by contract or state law. For such prepayments, a liability is recorded and subsequently reduced as the associated work is performed. We also have the right to place a lien on our co-owners interest in the well to redirect production proceeds in order to secure payment or, if necessary, foreclose on the interest. In addition, we monitor our exposure to counter-parties on oil and natural gas sales primarily by reviewing credit ratings, financial statements and payment history. We extend credit terms based on our evaluation of each counterparty's credit worthiness. We historically have not required our counter-parties to provide collateral to support oil and natural gas sales receivables owed to us.

Item 4. Controls and Procedures

The Company maintains disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time

33

periods specified in the rules and forms of the U.S. Securities and Exchange Commission, and to ensure that the information required to be disclosed by us in reports that we file under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer / Chief Financial Officer, to allow timely decisions regarding required disclosure.

As required by Rule 15d-15(b) under the Exchange Act, management annually reviews our accounting policies and practices, and as a result of such review, identified it had an ineffective financial reporting process and inconsistent review of certain routine accrual calculations and journal entries. As a result of these material weaknesses (as further discussed below), our Chief Executive Officer / Chief Financial Officer have concluded that our disclosure controls and procedures as of June 30, 2014 were not effective at a reasonable level of assurance, based on the evaluation of these controls and procedures required by Rules 13a-15(b) and 15d-15(b) of the Exchange Act. Notwithstanding the material weaknesses further discussed below, our Chief Executive Officer / Chief Financial Officer believe that the financial statements included in this report fairly present in all material respects (and in accordance with U.S. generally accepted accounting principles) our financial condition, results of operations and cash flows for the periods presented.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as that term is defined by Exchange Act Rules 13a-15(f) and 15d-15(f). Our internal control over financial reporting is designed under the supervision of our Chief Executive Officer / Chief Financial Officer in order to provide reasonable assurance regarding the reliability of our financial reporting and the preparation of our financial statements for external purposes in accordance with U.S. generally accepted accounting principles. Our control environment is the foundation for our system of internal control over financial reporting and is an integral part of the changes within the organization and internal reporting.

We carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer/Chief Financial Officer, of the effectiveness of our internal controls over financial reporting pursuant to Rule 13a-15(c) under the Securities Exchange Act as of the end of the period covered by this 2013 Form 10-K. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. In addition, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

Management evaluated the effectiveness of our internal control over financial reporting as of September 30, 2014. In making this evaluation, management used the criteria established in *1992 Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). In connection with such evaluation, our management identified material weaknesses in our control environment based on the criteria established in the *1992 Internal Control-Integrated Framework* issued by the COSO. A material weakness is a control deficiency, or a combination of control deficiencies, that results in more than a remote likelihood that a material misstatement of our annual or interim financial statements will not be prevented or detected.

The material weaknesses identified were related to our continued lack of sufficient control over financial accounting and reporting processes, specifically our inconsistent review of certain routine accrual calculations and journal entries, whereas in prior year, the matter related to accounting for non-routine and non-systematic transactions. Significant turnover and reduction in force in late 2013 and early 2014 caused the above-mentioned control deficiencies and resulted in the recording of certain adjustments prior to the issuance of our consolidated financial statements included in the 2013 Form 10-K. Because of these material weaknesses, management has concluded that the Company did not maintain effective internal control over financial reporting as of September 30, 2014.

*Changes in Internal Control Over Financial Reporting.*

As a result of the material weaknesses identified during the period covered by this Form 10-Q, management has implemented and will continue to implement changes to our internal controls that are both organizational and process-focused in an effort to improve the control environment, including as it relates to our application of accounting principles regarding our financial reporting process and review and approval of certain routine transactions. The changes to our control environment through the date of this Form 10-Q include, among others:

- Re-evaluation of key processes that support our financial reporting function;
- Changes in certain process owners due to turnover and reduction in force.

34

2014.09-30-10Q

We will continue our efforts to improve our control environment and to focus on improving our processes and systems to help ensure that our financial reporting, operational and business requirements are met in a timely manner going forward.

Due to the downsize of operation in third quarter 2014, we continue to re-evaluate our key processes that support our financial function. Our Chief Executive Officer / Chief Financial Officer will continue to seek for opportunities to mitigate our risks.

35

2014.09-30-10Q

# PART II. OTHER INFORMATION

Item 1. Legal Proceedings

*West Delta 32 Block Platform Incident.* On November 16, 2012, an explosion and fire occurred on our West Delta 32-E platform, located in the Gulf of Mexico approximately 17 miles southeast of Grand Isle, Louisiana ("West Delta 32 Incident"). At the time of the explosion, production on the platform had been shut in while crews of independent contractors performed maintenance and construction on the platform.

On November 4, 2013, BSEE issued its investigative report (the "BSEE Panel Report 2013-002") on the West Delta 32 Incident. The report recommends that contractors Wood Group Production Service Network, Grand Isle Shipyard, and Compass Engineering Consultants, as well as Black Elk Energy be issued the following types of Incidents of Non-Compliance: G-110, G-112, G-116, G-303, G-310, G-311, G-312, and E-100. The report also recommends that contractor Wood Group Production Service Network and Black Elk Energy be issued the additional following types of Incidents of Non-Compliance: G-309 and G-317. The report states that BSEE will issue Incidents of Non-Compliance based upon evidence contained in the report and/or other relevant evidence. No Incidents of Non-Compliance have been issued yet, and Black Elk Energy has and will continue to fully cooperate with BSEE. Black Elk Energy will be carefully reviewing the BSEE Panel Report 2013-002 over the coming weeks.

On October 15, 2013, the Department of Justice, U.S. Attorney's Office issued a subpoena pertaining to all physical evidence collected and maintained by Black Elk Energy and ABS Consulting as part the investigation of the WD-32 platform incident. Further, on March 25, 2014, a second subpoena was issued by the U.S. Attorney's Office requesting records and documents for specific time periods still part of their investigation of the WD-32 incident. We are fully cooperating with all government agencies.

On November 21, 2012, BSEE sent us a letter requiring us to take certain actions and to improve our performance. The letter made reference to, among other things, the explosion and fire that occurred on our West Delta 32-E platform on November 16, 2012. BSEE stated in the letter that if we did not improve our performance, we would be subject to additional enforcement action up to and including possible referral to the Bureau of Ocean Energy Management to revoke our status as an operator on all of our existing facilities. We have undertaken the actions BSEE required of us in the November 21 letter and have been regularly reporting our progress on those required improvements to BSEE.

In a meeting held at the BSEE Regional Office on October 30, 2013, BEEOO shared with BSEE representatives that implementation of corrective actions (18 elements and 58 tasks) associated with the Performance Improvement Plan ("PIP") has been 100% completed. Other essential work control processes such as our Project Execution Plans and Contractor Bridging Agreements have been improved to provide better guidelines and procedures for hazard assessment and work controls. Training in Hazard Recognition, National Pollutant Discharge Elimination System ("NPDES"), Job Safety Analysis ("JSA") and Stop Work Authority ("SWA") will be ongoing and has been incorporated into our training matrix.

Based on the receipt of requested work and operation permits along with our interactions with BSEE and our corrective actions discussed above, we believe that we have improved our safety and compliance performance.

*Civil Litigation.*

West Delta 32 As of August 14, 2014, several civil lawsuits have been filed as a result of the West Delta 32 Incident. The lawsuits that were filed in Texas have been transferred to the United States District Court for the Eastern District of Louisiana, and all cases have been consolidated for discovery purposes in that Court. The first plaintiff's case will be tried in either December of 2014 or January of 2015. All civil cases filed as a result of the West Delta 32 Incident are being defended by insurance defense counsel. We believe we have strong defenses and cross-claims and intend to defend ourselves vigorously.

Thomas Andrus, et al As previously reported, six investors in Black Elk Energy, LLC ("BEE") filed a purported derivative complaint on behalf of BEE in the Supreme Court of the State of New York, County of New York, against the Company, John Hoffman, Iron Island Technologies Inc., and various entities and individuals associated with the Company's majority unit owner (the "Platinum Defendants"). The lawsuit seeks unspecified damages allegedly arising from (1) the dilution of BEE's ownership interest in the Company through various financing transactions with the Platinum Defendants and the issuance of membership units under management and employee incentive programs; and (2) the alleged mismanagement of the Company in connection with certain alleged safety violations and the West Delta 32 Incident. We believe there are strong defenses to the claims asserted in the lawsuit, and the Company intends to defend the case vigorously.

36

10/26/2018

2014.09-30-10Q

On or about September 24, 2013, Plaintiffs filed a motion for a preliminary injunction to restrain a portion of the proceeds of the Company's proposed sale of certain oil fields in the Gulf of Mexico. The Court denied the motion on November 15, 2013. On or about November 20, 2013, we filed a motion to dismiss the complaint in its entirety, inter alia, on the grounds that (i) the claims fail to state a cause of action; (ii) the claims are refuted by documentary evidence; (iii) plaintiffs, who are not members of the Company, lack standing to assert a claim for mismanagement of the Company; and (iv) certain claims are barred by the statute of limitations. The Court denied the motion on November 15, 2013. On or about November 20, 2013, we filed a motion to dismiss the complaint in its entirety, inter alia, on the grounds that (i) the claims fail to state a cause of action; (ii) the claims are refuted by documentary evidence; (iii) plaintiffs, who are not members of the Company, lack standing to assert a claim for mismanagement of the Company; and (iv) certain claims are barred by the statute of limitations.

We had Oral Arguments in the Andrus matter on July 24, 2014. At that time, the judge has asked for additional briefing on the Conflicts of Law issue. We had a conference call with the Court on Friday, September 5, 2014 to set a schedule for the supplemental briefs the Court has requested. Our revised brief was due and submitted on or about September 10, 2014. Oral arguments on the motions to dismiss are scheduled for November 5, 2014.

Grand Isle Shipyard ("GIS") Matters  On April 29, 2013, Grand Isle Shipyards, Inc. ("GIS") sued BEEOO, Enviro Tech Systems, LLC, Wood Group USA, Inc., and Compass Engineering & Consultants, LLC in the United States District Court for the Eastern District of Louisiana for damages it alleged incurred in connection with the West Delta 32 Incident. GIS specifically sought damages for loss of property and equipment, expenses in the form of indemnity and medical benefits paid to or on behalf of its employees, and for unpaid invoices in connection with the work it performed at West Delta 32. Upon motion by BEEOO, however, the court dismissed GIS' lawsuit and ordered GIS and BEEOO to first attempt to resolve their claims through mediation which took place on November 12, 2013. Since the mediation was unsuccessful, the Parties have now agreed to enter into binding Arbitration pursuant to and in accordance with the MSA.

*Invoice Arbitration* - On October 8, 2014, Black Elk submitted to the Arbitrator its initial briefing on all affirmative claims and defenses. This briefing was drafted and submitted pursuant to an order from the Arbitrator. GIS ignored this order to some degree and submitted Motions for summary judgment on that date instead. GIS asked for summary judgment on all of its claims and confusingly argued that Black Elk is not entitled to summary judgment on its affirmative claims (Black Elk obviously has not sought summary judgment on its affirmative claims). On October 17, 2014, the parties participated in a telephonic hearing with the Arbitrator regarding the briefing and preexisting motions. The Arbitrator (1) granted Black Elk the right to conduct an audit pursuant to the MSA between the parties, (2) granted Black Elk limited discovery concerning the use of D&R platforms, and (3) stated that he would not be granting any dispositive motions in the case (i.e. GIS' Motions for Summary Judgment).

The arbitration, currently scheduled for December 1, 2014, has been delayed until the new year. This was a necessary step as both parties will need to take depositions and aggregate discovery before an arbitration can take place.

*Platform Arbitration* - The arbitration case for damages to the West Delta 32 Platform is scheduled for hearing before a three-arbitrator panel on May 12, 2015. The arbitration proceeding initiated by Black Elk against Compass Engineering & Consultants, LLC for damages arising from the explosion of the WD-32 Platform has been abated pending resolution of Compass' separate lawsuit filed in the United States District for the Western District of Louisiana seeking a declaration that it was not subjected to arbitration. We are currently in the process of drafting discovery to GIS concerning D&R Resources, LLC's employees' rates, duties, and training. We will continue to defend ourselves vigorously.

Vistar Oil Texas, LLC Joint Venture  On April 16, 2014, Vistar Oil Texas LLC ("Vistar") filed a petition against Black Elk in Harris County District Court. This suit alleges that Black Elk breached an Acquisition and Participation Agreement and a Joint Operating Agreement between the parties, primarily by failing to provide Vistar with the funds required to bring several wells into operation in Wilson County, Texas. Vistar alleges damages of approximately $6,500,000, certain lease acquisition costs and promissory note payments required to cover liens placed on the wells. Vistar further alleges that Black Elk is in breach by refusing to provide approximately $10,350,000 to Vistar to acquire additional property. This case is in discovery. We believe we have strong potential defenses and have submitted counterclaims, and intend to defend ourselves vigorously.

Arthur Garza III  On August 31, 2014, Arthur Garza, former Chief Technical Officer of Black Elk Energy Offshore Operations, LLC, filed suit against Black Elk Energy Offshore Operations for payment of severance under his Employment Agreement. This case is in discovery. We believe we have strong potential defenses and intend to defend ourselves vigorously.

*Other Regulatory Items.* We are party to various other litigation matters arising in the ordinary course of business. We do not believe the outcome of these disputes or legal actions will have a material adverse effect on our financial statements.

37

## Item 1A. Risk Factors

We are subject to certain risks and hazards due to the nature of the business activities we conduct. For a discussion of these risks, see "Risk Factors" in our 2013 Form 10-K and the risk factor set forth below. The risks described in the 2013 Form 10-K and below could materially and adversely affect our business, financial condition, cash flows, and results of operations. Except as set forth below, there have been no material changes to the risks described in the 2013 Form 10-K. We may experience additional risks and uncertainties not currently known to us, or, as a result of developments occurring in the future, conditions that we currently deem to be immaterial may also materially and adversely affect our business, financial condition, cash flows and results of operations.

*We may not be able to generate sufficient cash flow to meet our debt service obligations.*

Our ability to make payments on the Notes and to fund planned capital expenditures will depend on our ability to generate cash in the future. We cannot assure you that our business will generate sufficient cash flow from operations to service the remaining Notes, or that future borrowings will be available to us in an amount sufficient to enable us to make payments on such Notes or to fund our other capital needs. If our business does not generate sufficient cash flow from operations to service the Notes, we may be required to:

- refinance all or a portion of the Notes;
- obtain additional financing;
- sell some of our assets or operations; reduce or delay capital expenditures, research and development efforts and acquisitions; or
- revise or delay our strategic plans.

However, we cannot assure you that we would be able to implement alternative financing plans, if necessary, on commercially reasonable terms or at all, or that implementing any such alternative financing plans would allow us to meet our payment obligations under the Notes. Our inability to generate sufficient cash flow to satisfy our payment obligations under the Notes or to obtain alternative financings, could materially and adversely affect our business, financial condition, results of operations and prospects.

If we default on the remaining Notes, holders of the Notes will be secured only to the extent of the value of the assets underlying their security interest. To prevent foreclosure, we may be motivated to commence voluntary bankruptcy proceedings or holders of Notes or various other interested persons may be motivated to institute bankruptcy proceedings against us. The commencement of such bankruptcy proceedings would expose the holders to additional risks, including additional restrictions on exercising rights against collateral. To the extent that the claims of the holders exceed the value of the assets securing the Notes and other liabilities, those claims will rank equally with the claims of the holders of any outstanding senior unsecured indebtedness. As a result, if the value of the assets pledged as security for the Notes and other liabilities is less than the value of the claims of the holders and other liabilities, those claims may not be satisfied in full before the claims of our unsecured creditors are paid.

*We have doubt on our ability to continue as a going concern.*

The Company has a going concern risk. As discussed in Note 2 to the financial statements, the Company has suffered recurring losses from operations and has a net capital deficiency that raise substantial doubt about its ability to continue as a going concern. As of September 30, 2014, there have been no notices of foreclosures on the Company's assets. We are currently evaluating our consolidated financial position, results of operations and cash flows. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

38

10/26/2018 .2014.09-30-10Q

## Item 6. Exhibits

The exhibits marked with the asterisk symbol (*) are filed (or furnished in the case of Exhibits 31.1 and 32.1) with this Form 10-Q.

| Exhibit Number | Description |
| --- | --- |
| 3.1 | Certificate of Formation of Black Elk Energy Offshore Operations, LLC, dated as of November 20, 2007 (incorporated by reference to Exhibit 3.1 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011, File No. 333-174226). |
| 3.2 | Certificate of Amendment of Black Elk Energy Offshore Operations, LLC, dated as of January 29, 2008 (incorporated by reference to Exhibit 3.2 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011, File No. 333-174226). |
| 3.3 | Second Amended and Restated Limited Liability Company Operating Agreement of Black Elk Energy Offshore Operations, LLC, dated as of July 13, 2009 (incorporated by reference to Exhibit 3.4 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011, File No. 333-174226). |
| 3.4 | First Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC, dated August 19, 2010 (incorporated by reference to Exhibit 3.5 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011, File No. 333-174226). |
| 3.5 | Second Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of May 31, 2011 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on June 3, 2011, File No. 333-174226). |
| 3.6 | Third Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of January 25, 2013 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on January 31, 2013, File No. 333-174226). |
| 3.7 | Fourth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of February 12, 2013 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on February 19, 2013, File No. 333-174226). |
| 3.8 | Fifth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of April 9, 2013 (incorporated by reference to Exhibit 3.10 to the Form 10-K filed with the Securities and Exchange Commission on April 15, 2013, File No. 333-174226). |
| 3.9 | Sixth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of May 3, 2013 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on May 9, 2013, File No. 333-174226). |
| 4.1 | Second Supplemental Indenture, dated as of August 19, 2014, by and among Black Elk Energy Offshore Operations, LLC and Black Elk Energy Finance Corp. as issuers, Black Elk Energy Land Operations, LLC as guarantor, and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent (incorporated by reference from Exhibit 4.1 of the Current Report on Form 8-K filed on August 21, 2014). |
| 10.1 | Purchase and Sale Agreement by and between Black Elk Energy Offshore Operations, LLC and Renaissance Offshore, LLC, dated July 10, 2014 (incorporated by reference from Exhibit 10.1 of the Current Report on Form 8-K filed on July 16, 2014). |

39

| Exhibit Number | Description |
|---|---|
| *31.1 | Certification (pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act) by Principal Executive Officer / Principal Financial Officer. |
| *32.1 | Section 1350 Certification (pursuant to Sarbanes-Oxley Section 906) by Principal Executive Officer and Principal Financial Officer. |
| 101.INS§ | XBRL Instance Document |
| 101.SCH§ | XBRL Taxonomy Extension Schema Document |
| 101.CAL§ | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.LAB§ | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE§ | XBRL Taxonomy Extension Presentation Linkbase Document |
| 101.DEF§ | XBRL Taxonomy Extension Definition Linkbase Document |

\*     Filed herewith.

§     Furnished with this Form 10-Q. In accordance with Rule 406T of Regulation S-T, the information in these exhibits shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to liability under that section, and shall not be incorporated by reference into any registration statement or other document filed under the Securities Act of 1933, as amended, except as expressly set forth by specific reference in such filing.

40

10/26/2018                                          2014.09-30-10Q

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

BLACK ELK ENERGY OFFSHORE OPERATIONS, LLC
(Registrant)

Date:   November 19, 2014            By:  /s/ Jeffrey Shulse

Jeffrey Shulse

*Chief Executive Officer / Chief Financial Officer*
(Duly Authorized Officer and Principal Financial Officer)

41

## EXHIBIT INDEX

The exhibits marked with the asterisk symbol (*) are filed (or furnished in the case of Exhibits 31.1 and 32.1) with this Form 10-Q.

| Exhibit Number | Description |
|---|---|
| 3.1 | Certificate of Formation of Black Elk Energy Offshore Operations, LLC, dated as of November 20, 2007 (incorporated by reference to Exhibit 3.1 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011, File No. 333-174226). |
| 3.2 | Certificate of Amendment of Black Elk Energy Offshore Operations, LLC, dated as of January 29, 2008 (incorporated by reference to Exhibit 3.2 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011, File No. 333-174226). |
| 3.3 | Second Amended and Restated Limited Liability Company Operating Agreement of Black Elk Energy Offshore Operations, LLC, dated as of July 13, 2009 (incorporated by reference to Exhibit 3.4 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011, File No. 333-174226). |
| 3.4 | First Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC, dated August 19, 2010 (incorporated by reference to Exhibit 3.5 to the Registration Statement on Form S-4 filed with the Securities and Exchange Commission on May 16, 2011, File No. 333-174226). |
| 3.5 | Second Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of May 31, 2011 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on June 3, 2011, File No. 333-174226). |
| 3.6 | Third Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of January 25, 2013 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on January 31, 2013, File No. 333-174226). |
| 3.7 | Fourth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of February 12, 2013 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on February 19, 2013, File No. 333-174226). |
| 3.8 | Fifth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of April 9, 2013 (incorporated by reference to Exhibit 3.10 to the Form 10-K filed with the Securities and Exchange Commission on April 15, 2013, File No. 333-174226). |
| 3.9 | Sixth Amendment to Second Amended and Restated Operating Agreement of Black Elk Energy Offshore Operations, LLC dated as of May 3, 2013 (incorporated by reference to Exhibit 3.1 to the Form 8-K filed with the Securities and Exchange Commission on May 9, 2013, File No. 333-174226). |
| 4.1 | Second Supplemental Indenture, dated as of August 19, 2014, by and among Black Elk Energy Offshore Operations, LLC and Black Elk Energy Finance Corp. as issuers, Black Elk Energy Land Operations, LLC as guarantor, and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent (incorporated by reference from Exhibit 4.1 of the Current Report on Form 8-K filed on August 21, 2014). |
| 10.1 | Purchase and Sale Agreement by and between Black Elk Energy Offshore Operations, LLC and Renaissance Offshore, LLC, dated July 10, 2014 (incorporated by reference from Exhibit 10.1 of the Current Report on Form 8-K filed on July 16, 2014). |

|  | Certification (pursuant to Rule 13a-14(a) or Rule 15d-14(a) of the Exchange Act) by Principal Executive Officer / Principal Financial Officer. |
|---|---|
| *31.1 | |
| *32.1 | Section 1350 Certification (pursuant to Sarbanes-Oxley Section 906) by Principal Executive Officer / Principal Financial Officer. |
| 101.INS§ | XBRL Instance Document |
| 101.SCH§ | XBRL Taxonomy Extension Schema Document |
| 101.CAL§ | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.LAB§ | XBRL Taxonomy Extension Label Linkbase Document |
| 101.PRE§ | XBRL Taxonomy Extension Presentation Linkbase Document |
| 101.DEF§ | XBRL Taxonomy Extension Definition Linkbase Document |
| * | Filed herewith. |
| § | Furnished with this Form 10-Q. In accordance with Rule 406T of Regulation S-T, the information in these exhibits shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to liability under that section, and shall not be incorporated by reference into any registration statement or other document filed under the Securities Act of 1933, as amended, except as expressly set forth by specific reference in such filing. |

43

EXHIBIT 58

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS.  THIS NOTE MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT AS TO THIS NOTE UNDER SAID ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR (B) AN EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS.

THIS NOTE IS REGISTERED WITH THE AGENT PURSUANT TO SECTION 9.4(B) OF THE PURCHASE AGREEMENT (AS DEFINED BELOW).  TRANSFER OF ALL OR ANY PORTION OF THIS NOTE IS PERMITTED SUBJECT TO THE PROVISIONS SET FORTH IN SUCH SECTION 9.4(B) WHICH REQUIRE, AMONG OTHER THINGS, THAT NO TRANSFER IS EFFECTIVE UNTIL THE TRANSFEREE IS REFLECTED AS SUCH ON THE REGISTRY MAINTAINED WITH THE AGENT PURSUANT TO SUCH SECTION 9.4(B).

## UNSECURED TERM NOTE

FOR VALUE RECEIVED, MONTSANT PARTNERS LLC, a Delaware limited liability company (the "Company") hereby promises to pay to SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, a Pennsylvania domiciled life insurance company (the "Holder") or its registered assigns or successors in interest, the sum of Thirty Five Million Five Hundred Thousand Dollars and 00/100 ($35,500,000.00), together with any accrued and unpaid interest hereon, on January 30, 2017 (the "Maturity Date"), if not sooner accelerated or other sooner indefeasibly paid in full.

Capitalized terms used herein without definition shall have the meanings ascribed to such terms in that certain Note Purchase Agreement dated as of the date hereof (as amended, restated, modified and/or supplemented from time to time, the "Purchase Agreement") among the Company, the Holder, each other Investor from time to time party thereto (together with Holder, the "Investors" and each, an "Investor") and BAM Administrative Services LLC, as agent for the Investors (the "Agent" together with the Investors, collectively, the "Creditor Parties").

The following terms shall apply to this Unsecured Term Note (this "Note"):

## ARTICLE I
## CONTRACT RATE AND AMORTIZATION

1.1     Contract Rate.  Subject to Sections 2.2 and 3.9, interest payable on the outstanding principal amount of this Note (the "**Principal Amount**") shall accrue at a rate per annum equal to twelve percent (12.0%) (the "**Contract Rate**").  All interest shall be (i) calculated on the basis of a 360 day year of twelve (12) thirty-day months and (ii) payable monthly, in arrears, commencing on February 2, 2015, on the first business day of each consecutive calendar month thereafter through and including the Maturity Date, and on the Maturity Date, whether by acceleration or otherwise.

1.2     Contract Rate Payments.  The Contract Rate shall be calculated on the last business day of each calendar month hereafter until the applicable Maturity Date and shall be subject to adjustment as set forth herein.

1.3     Principal Payments.  Any outstanding Principal Amount together with any accrued and unpaid interest and any and all other unpaid amounts which are then owing by the Company to the Holder under this Note, the Purchase Agreement and/or any other Related Agreement shall be due and payable in full on the Maturity Date.

1.4     Optional Prepayment.  The Company may prepay this Note at any time prior to the Maturity Date without penalty or premium by paying to the Holder a sum of money equal to the Principal Amount outstanding at such time together with all accrued but unpaid interest thereon and any and all other sums due, accrued or payable to the Holder arising under this Note, the Purchase Agreement or any other Related Agreement outstanding on the date of such prepayment.

## ARTICLE II
## EVENTS OF DEFAULT

2.1     Events of Default.  The occurrence of any of the following events set forth in this Section 2.1 shall constitute an event of default ("Event of Default") hereunder:

(a)     Failure to Pay.  The Company fails to pay when due any installment of principal, interest or other fees hereon in accordance herewith, or the Company fails to pay any of the other Obligations (under and as defined in the Security Agreement) when due, and, in any such case, such failure shall continue for a period of ten (10) days following the date upon which any such payment was due;

(b)     Breach of Covenant.  The Company or any of its Subsidiaries breaches any covenant or any other term or condition of this Note in any material respect and such breach, if subject to cure, continues for a period of twenty (20) days after the occurrence thereof.

(c)     Breach of Representations and Warranties.  Any representation, warranty or statement made or furnished by the Company or any of its Subsidiaries in this Note, the Purchase Agreement or any other Related Agreement shall at any time be false or misleading in any material respect on the date as of which made or deemed made.

(d)     Default Under Other Agreements.  The occurrence of any default (or similar term) in the observance or performance of any other agreement or condition relating to any indebtedness or contingent obligation of the Company or any of its Subsidiaries (including, without limitation, the Subordinated Debt (as defined below)) beyond the period of grace (if any), the effect of which default is to cause, or permit the holder or holders of such indebtedness or beneficiary or beneficiaries of such contingent obligation to cause, such indebtedness to become due prior to its stated maturity or such contingent obligation to become payable;

(e)    Material Adverse Effect.  Any change or the occurrence of any event which could reasonably be expected to have a Material Adverse Effect;

(f)    Bankruptcy.  The Company or any of its Subsidiaries shall (i) apply for, consent to or suffer to exist the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under the federal bankruptcy laws (as now or hereafter in effect), (iv) be adjudicated a bankrupt or insolvent, (v) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vi) acquiesce to, without challenge within ten (10) days of the filing thereof, or failure to have dismissed, within thirty (30) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (vii) take any action for the purpose of effecting any of the foregoing;

(g)    Judgments.  Attachments or levies in excess of $50,000 in the aggregate are made upon the Company or any of its Subsidiary's assets or a judgment is rendered against the Company's property involving a liability of more than $50,000 which shall not have been vacated, discharged, stayed or bonded within thirty (30) days from the entry thereof;

(h)    Insolvency.  The Company or any of its Subsidiaries shall admit in writing its inability, or be generally unable, to pay its debts as they become due or cease operations of its present business;

(i)    Change of Control.  A Change of Control (as defined below) shall occur with respect to the Company, unless Holder shall have expressly consented to such Change of Control in writing.  A "Change of Control" shall mean any event or circumstance as a result of which (i) any "Person" or "group" (as such terms are defined in Sections 13(d) and 14(d) of the Exchange Act, as in effect on the date hereof), other than the Holder, is or becomes the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act), directly or indirectly, of 50% or more on a fully diluted basis of the then outstanding voting equity interest of the Company (other than a "Person" or "group" that beneficially owns 50% or more of such outstanding voting equity interests of the Company on the date hereof), (ii) the Board of Directors of the Company shall cease to consist of a majority of the Company's board of directors on the date hereof or (iii) the Company or any of its Subsidiaries merges or consolidates with, or sells all or substantially all of its assets to, any other person or entity;

(j)    Indictment; Proceedings.  The indictment or threatened indictment of the Company or any of its Subsidiaries or any executive officer of the Company or any of its Subsidiaries under any criminal statute, or commencement or threatened commencement of criminal or civil proceeding against the Company or any of its Subsidiaries or any executive officer of the Company or any of its Subsidiaries pursuant to which statute or proceeding penalties or remedies sought or available include forfeiture of any of the property of the Company or any of its Subsidiaries;

(k)    The Purchase Agreement and Related Agreements.  (i) An Event of Default shall occur under and as defined in the Purchase Agreement or any other Related Agreement, (ii) the Company or any of its Subsidiaries shall breach any term or provision of the

Purchase Agreement or any other Related Agreement in any material respect and such breach, if capable of cure, continues unremedied for a period of twenty (20) days after the occurrence thereof, (iii) the Company or any of its Subsidiaries attempts to terminate, challenges the validity of, or its liability under, the Purchase Agreement or any Related Agreement, (iv) any proceeding shall be brought to challenge the validity, binding effect of the Purchase Agreement or any Related Agreement or (v) the Purchase Agreement or any Related Agreement ceases to be a valid, binding and enforceable obligation of the Company or any of its Subsidiaries (to the extent such persons or entities are a party thereto);

(l)     Failure to Deliver Replacement Note.  The Company's failure to issue and deliver a replacement Note to the Holder within twenty (20) days of the Holder's written request therefor; provided, that such request is accompanied by (a) the Note to be replaced or (b) an affidavit of the Holder evidencing the loss or destruction of the Note;

(m)     Subordinated Debt.  The Company or any of its Subsidiaries shall take or participate in any action which would be prohibited under the provisions of any subordination agreement governing any indebtedness owing by the Company which has been subordinated in right of payment to the obligations hereunder ("Subordinated Debt") or make any payment on the Subordinated Debt to a person or entity that was not entitled to receive such payments under the provisions of any subordination agreement governing such Subordinated Debt;

(n)     Minimum Collateral Maintenance. At any time on and after the Collateral Deposit Date, the aggregate fair market value of all Collateral in which the Agent holds a first lien perfected security interest, as reasonably determined by Agent from time to time, shall equal less than 150% of the aggregate amount of the outstanding Obligations at such time;

(o)     Debt Rating of SVO4 or higher.  Following a best efforts application by Holder to have the obligations arising under this Note receive an SVO rating, such obligations shall fail to receive an SVO4 or higher rating on or prior to November 1, 2015 and the obligations under this Note shall remain outstanding as of December 15, 2015; or

(p)     Post-Closing Requirements.  The Post-Closing Requirements shall not have each been satisfied (or waived by the Agent) on or prior to February 20, 2015, as determined by Agent in its sole discretion.

2.2     Default Interest.  Following the occurrence and during the continuance of an Event of Default, the Company shall pay additional interest on the outstanding principal balance of this Note in an amount equal to eleven percent (11.0%) per annum ("Default Interest Rate"), and all outstanding obligations under this Note, the Purchase Agreement and each other Related Agreement, including unpaid interest, shall continue to accrue interest at such additional interest rate from the date of such Event of Default until the date such Event of Default is cured or waived.

2.3     Remedies.  Upon the occurrence and during the continuation of any Event of Default, in addition to any other remedies set forth herein or permitted under applicable law,

4

the unpaid Principal Amount of this Note, any accrued and unpaid interest and all other amounts payable hereunder shall be immediately due and payable without presentment, demand, protest or further notice of any kind.  Holder shall have all rights and may exercise any remedies available to it hereunder or under law, successively or concurrently.

### ARTICLE III
### MISCELLANEOUS

3.1     Cumulative Remedies.  The remedies under this Note shall be cumulative.

3.2     Failure or Indulgence Not Waiver.  No failure or delay on the part of the Holder hereof in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.  All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

3.3     Notices.  Any notice herein required or permitted to be given shall be given in writing in accordance with the terms of the Purchase Agreement.

3.4     Amendment Provision.  The term "Note" and all references thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented, and any successor instrument as such successor instrument may be amended or supplemented.

3.5     Assignability.  This Note shall be binding upon the Company and its successors and assigns, and shall inure to the benefit of the Holder and its successors and assigns, and may be assigned by the Holder in accordance with the requirements of the Purchase Agreement.  The Company may not assign any of its obligations under this Note without the prior written consent of the Holder, any such purported assignment without such consent being null and void.

3.6     Cost of Collection.  In case of the occurrence of an Event of Default under this Note, the Company shall pay the Holder the Holder's reasonable costs of collection, including reasonable attorneys' fees.

3.7     Governing Law, Jurisdiction and Waiver of Jury Trial.

(a)     THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

(b)     THE COMPANY HEREBY CONSENTS AND AGREES THAT THE STATE AND/OR FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE COMPANY, ON THE ONE HAND, AND THE HOLDER AND/OR ANY OTHER CREDITOR PARTY, ON THE OTHER HAND, PERTAINING TO THIS NOTE OR ANY OF THE OTHER RELATED

AGREEMENTS OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS NOTE OR ANY OF THE RELATED AGREEMENTS; PROVIDED, THAT THE COMPANY ACKNOWLEDGES THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF THE COUNTY OF NEW YORK, STATE OF NEW YORK; AND FURTHER PROVIDED, THAT NOTHING IN THIS NOTE SHALL BE DEEMED OR OPERATE TO PRECLUDE THE HOLDER AND/OR ANY OTHER CREDITOR PARTY FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE OBLIGATIONS (AS DEFINED IN THE SECURITY AGREEMENT), TO REALIZE ON THE COLLATERAL (AS DEFINED IN THE SECURITY AGREEMENT) OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE HOLDER AND/OR ANY OTHER CREDITOR PARTY.  THE COMPANY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND THE COMPANY HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. THE COMPANY HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO THE COMPANY AT THE ADDRESS SET FORTH IN THE PURCHASE AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF THE COMPANY'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

(c)  THE COMPANY DESIRES THAT ITS DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS.  THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND/OR OF ARBITRATION, THE COMPANY HERETO WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE BETWEEN THE HOLDER AND/OR ANY OTHER CREDITOR PARTY, ON THE ONE HAND, AND THE COMPANY, ON THE OTHER HAND, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS NOTE, ANY OTHER RELATED AGREEMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO.

3.8  Severability.  In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

3.9  Maximum Payments.  Nothing contained herein shall be deemed to establish or require the payment of a rate of interest or other charges in excess of the maximum permitted by applicable law.  In the event that the rate of interest required to be paid or other charges hereunder exceed the maximum rate permitted by such law, any payments in excess of

such maximum rate shall be credited against amounts owed by the Company to the Holder and thus refunded to the Company.

        3.10   Reserved.

        3.11   Construction; Counterparts.  Each party acknowledges that its legal counsel participated in the preparation of this Note and, therefore, stipulates that the rule of construction that ambiguities are to be resolved against the drafting party shall not be applied in the interpretation of this Note to favor any party against the other.  This Note may be executed by the parties hereto in one or more counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one and the same instrument.  Any signature delivered by a party by facsimile or electronic transmission shall be deemed to be an original signature hereto.

        3.12   Registered Obligation.  This Note shall be registered (and such registration shall thereafter be maintained) as set forth in Section 9.4(b) of the Purchase Agreement. Notwithstanding any document, instrument or agreement relating to this Note to the contrary, transfer of this Note (or the right to any payments of principal or stated interest thereunder) may only be effected by (i) surrender of this Note and either the reissuance by the Company of this Note to the new holder or the issuance by the Company of a new instrument to the new holder or (ii) registration of such holder as an assignee in accordance with Section 9.4(b) of the Purchase Agreement.

[Balance of page intentionally left blank; signature page follows]

**IN WITNESS WHEREOF**, the Company has caused this Secured Term Note to be signed in its name effective as of this 30<sup>th</sup> day of January, 2015.

MONTSANT PARTNERS LLC

By: _____
Name: _____
Title: _____

WITNESS:

_____

EXHIBIT 59

PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT (this "Agreement") is entered into as of May 13, 2015 by and between MONTSANT PARTNERS LLC, a Delaware limited liability company ("Pledgor") and BAM ADMINISTRATIVE SERVICES LLC, a Delaware limited liability company, as agent for the Investors identified in the Note Purchase Agreement referred to below ("Agent" and, together with the Investors, the "Creditor Parties" and each, a "Creditor Party").

RECITALS

WHEREAS, pursuant to that certain Note Purchase Agreement, dated as of January 30, 2015 (as amended, modified, restated or supplemented from time to time, the "Purchase Agreement"), by and among Pledgor, the Investors named therein and from time to time party thereto (the "Investors"), and Agent, as agent for the Investors, the Investors purchased from Pledgor the Notes described in the Purchase Agreement; and

WHEREAS, Pledgor agreed in the Purchase Agreement to pledge to the Agent, for the ratable benefit of the Investors, collateral acceptable in all respects to the Agent to secure the Obligations.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.      Defined Terms.  All capitalized terms used herein which are not defined shall have the meanings given to them in the Purchase Agreement.

2.      Pledge and Grant of Security Interest.  To secure the prompt payment and performance in full when due of the Obligations, Pledgor hereby pledges and assigns to Agent for the benefit of the Investors, and grants to Agent for the benefit of the Investors, a security interest in any and all right, title and interest of Pledgor in and to the following, whether now owned or existing or owned, acquired, or arising hereafter (collectively, the "Collateral"):

(a)      The promissory notes identified on Schedule A annexed hereto and expressly made a part hereof together with all of Pledgor's rights title and interest in and to all documents, instruments and agreements entered into in connection with the transactions contemplated by such promissory notes and all attendant liens, rights, claims, title assignments and interests (including security interests) pertaining to or arising therefrom (the "Note Collateral");

(b)      the shares of stock set forth on Schedule B annexed hereto and expressly made a part hereof (the "Stock Collateral"), the certificates representing the Pledged Stock and all dividends, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Stock;

(c)      all common stock, or securities convertible into such common stock, of a publicly traded corporation or similar business entity from time to time identified by Pledgor to

Agent as collateral security for the Obligations, provided that such common stock or securities (i) are traded on a recognized market and (ii) has a readily ascertainable market value (or such value may be calculated with reference to any other publicly traded security convertible into such common stock) (the "Additional Collateral" and, together with the Stock Collateral, the "Pledged Stock"), the certificates representing the Additional Collateral and all dividends, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Additional Collateral;

(d)     all dividends, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of Pledged Stock;

(e)     all options and rights, whether as an addition to, in substitution of or in exchange for any shares of any Pledged Stock and all dividends, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all such options and rights; and

(f)     all Proceeds (as defined in Section 9-102(a)(64) of the UCC), of any and all of the foregoing.

All terms used in this Agreement with respect to the Collateral which are not defined herein or in the Purchase Agreement shall have the meanings set forth in the UCC.  For purposes hereof, the term "UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection or priority of, or remedies with respect to, Agent's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions of this Agreement relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions; provided further that to the extent that the UCC is used to define any term herein and such term is defined differently in different Articles or Divisions of the UCC, the definition of such term contained in Article or Division 9 of the UCC shall govern.

3.     Security for Obligations.  The security interest created hereby in the Collateral constitutes continuing collateral security for the Obligations.

4.     Procedures.  All certificates representing or evidencing the Pledged Stock shall be delivered to and held by COR Clearing LLC ("Securities Intermediary") on behalf of Agent pursuant to that certain Control Agreement dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "Control Agreement") among the Pledgor, Agent and Securities Intermediary.  The Pledgor hereby authorizes each issuer of the Pledged Stock (each, an "Issuer") upon demand by the Agent to deliver any certificates, instruments or other distributions issued in connection with the Collateral directly to the Agent, in each case to be held by the Agent subject to the terms hereof, provided that Agent shall not make such demand if an Event of Default (as defined below) does not exist.  With respect to Collateral which is in the form of an Uncertificated Security (as defined in Section 8-102(a)(18)

of the UCC) credited on the books of a Clearing Corporation (as defined in Section 8-102(a)(5) of the UCC) or Securities Intermediary (as defined in Section 8-102(14) of the UCC) (including The Depository Trust Company), the Pledgor shall promptly notify the Agent thereof and shall promptly take (x) all actions required (i) to comply with the applicable rules of such Clearing Corporation or Securities Intermediary and (ii) to perfect the security interest of the Agent under applicable law (including, in any event, under Sections 9-314(a) and (c), 9-106 and 8-106(d) of the UCC) and (y) such other actions as the Agent deems necessary or desirable to effect the foregoing.  Upon the occurrence and during the continuance of an Event of Default (as defined below), the Agent shall have the right, during such time in its discretion and without notice to the Pledgor, to transfer to or to register in the name of the Agent or any of its nominees any or all of the Pledged Stock and any other Collateral.  In addition, the Agent shall have the right at such time to exchange certificates or instruments representing or evidencing Pledged Stock for certificates or instruments of smaller or larger denominations.   With respect to the Note Collateral, Assignor hereby specifically authorizes and directs the maker of the Note Collateral upon notice to such maker by Agent to make all payments due under or arising in connection with the Note Collateral directly to Agent and hereby irrevocably authorizes and empowers Agent (a) to ask, demand, receive, receipt and give acquittance for any and all amounts which may be or become due or payable, or remain unpaid at any time and times to Pledgor by the maker under and in connection with the Note Collateral, (b) to endorse any checks, drafts or other orders for the payment of money payable to Pledgor in payment thereof, and (c) in Agent's discretion to file any claims or take any action or institute any proceeding, either in its own name or in the name of Pledgor or otherwise, which Agent may deem necessary or advisable to effectuate the foregoing, provided, however, that Agent shall not give any such notice to any maker if an Event of Default does not exist.  It is expressly understood and agreed, however, that Agent shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or take any other action to collect or enforce the payment of any amounts which may have been assigned to Agent or to which Agent may be entitled hereunder at any time or times.  In the event Pledgor declines to exercise any rights in respect of any Note Collateral, Agent shall have the right to enforce any and all such rights of Pledgor.

5.     Representations and Warranties of the Pledgor.   The Pledgor represents and warrants to the Creditor Parties (which representations and warranties shall be deemed to continue to be made until all of the Obligations have been paid in full and each Related Agreement and each agreement and instrument entered into in connection therewith has been terminated) that:

(a)     the execution, delivery and performance by the Pledgor of this Agreement and the pledge of the Collateral hereunder do not and will not result in any violation of any material agreement, indenture, instrument, license, judgment, decree, order, law, statute, ordinance or other governmental rule or regulation applicable to the Pledgor;

(b)     this Agreement constitutes the legal, valid, and binding obligation of the Pledgor enforceable against the Pledgor in accordance with its terms, except (i) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other

equitable remedies, and (iii) insofar as indemnification and contribution provisions may be limited by applicable law;

(c)     Pledgor has not received written notice that any shares of Pledged Stock were not duly authorized or validly issued or were not fully paid and nonassessable;

(d)     no consent or approval of any person, corporation, governmental body, regulatory authority or other entity, is or will be necessary for (i) the execution, delivery and performance of this Agreement, except for such consents and approvals that have been obtained and are in full force and effect, (ii) the exercise by the Agent of any rights with respect to the Collateral or (iii) the pledge and assignment of, and the grant of a security interest in, the Collateral hereunder;

(e)     there are no pending or, to the best of Pledgor's knowledge, threatened actions or proceedings before any court, judicial body, administrative agency or arbitrator which may materially adversely affect the Collateral;

(f)     the Pledgor has the requisite power and authority to enter into this Agreement and to pledge and assign the Collateral to the Agent in accordance with the terms of this Agreement;

(g)     the Pledgor owns each item of the Collateral and, except for the pledge and security interest granted to Agent hereunder, the Collateral shall be, immediately following the closing of the transactions contemplated by the Related Agreements, free and clear of any other security interest, mortgage, pledge, claim, lien, charge, hypothecation, assignment, offset or encumbrance whatsoever (collectively, "Liens");

(d)     Pledgor has not received written notice that there are any restrictions on the transfer of the Pledged Stock contained in the certificate of incorporation or by laws (or equivalent organizational documents) of any Issuer or otherwise which have not otherwise been waived by the necessary parties;

(h)     Pledgor has not received written notice that any of the Note Collateral or the Pledged Stock has been issued or transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such issuance or transfer may be subject;

(i)     this Agreement is effective to grant to Agent, for the benefit of the Investors, a valid security interest in all right, title and interest of the Pledgor in the Collateral;

(j)     upon the effectiveness of the Control Agreement, "control" (as defined in Section 8-106 of the UCC) has been obtained by the Agent over all of Collateral consisting of Securities and Securities Entitlements with respect to which such "control" may be obtained pursuant to Section 8-106 of the UCC; and

(k)     the Required Collateral Certificate (as hereafter defined) delivered by Pledgor to the Agent on the date hereof is true and correct as of the date hereof.

6.      Covenants.  The Pledgor covenants that, until the Obligations shall be satisfied in full and the Purchase Agreement and each Related Agreement are terminated:

(a)      The Pledgor will not sell, assign, transfer, convey or otherwise dispose of its rights in or to the Collateral or any interest therein; nor will the Pledgor create, incur or permit to exist any Lien whatsoever with respect to any of the Collateral or the proceeds thereof other than that created hereby.  Notwithstanding the foregoing, the Pledgor shall be permitted to sell, assign, transfer, convey or otherwise dispose of any Collateral if (i) immediately after giving effect thereto, the sum of (1) fifty percent (50%) of the sum of (x) the outstanding principal amount of the promissory notes representing the Note Collateral plus (y) the market value of the Pledged Stock, based on the average of the last sale price of the Pledged Stock during the five (5) consecutive trading days immediately preceding the date of such sale, assignment, transfer, conveyance or disposition plus (2) one hundred percent (100%) of the cash and free credit balances in the account maintained by the Pledgor with the Securities Intermediary and subject to the Control Agreement equals or exceeds the outstanding principal amount of the Notes (the "Required Collateral Coverage") and (ii) the Pledgor delivers to Agent a certificate of an authorized officer certifying that no Event of Default exists and compliance with the Required Collateral Coverage (each, a "Required Collateral Certificate").

(b)      The Pledgor will, at its expense, defend Agent's right, title and security interest in and to the Collateral against the claims of any other party.

(c)      The Pledgor shall at any time, and from time to time, upon the written request of Agent, execute and deliver such further documents and do such further acts and things as Agent may reasonably request in order to effectuate the purposes of this Agreement including, but without limitation, delivering to Agent, upon the occurrence of an Event of Default, irrevocable proxies in respect of the Collateral in form satisfactory to Agent.  Until receipt thereof, upon an Event of Default that has occurred and is continuing, this Agreement shall constitute Pledgor's proxy to Agent or its nominee to vote all shares of Collateral then registered in each Pledgor's name.

(d)      The Pledgor will not consent to or approve (each, a "Vote") the issuance of (i) any additional shares of any class of capital stock or other equity interests of any Issuer or (ii) any securities convertible, either voluntarily by the holder thereof or automatically upon the occurrence or nonoccurrence of any event or condition, into, or any securities exchangeable for, any such shares, unless, in each such case, immediately prior to and immediately following any such Vote, the Pledgor shall be in compliance with the Required Collateral Coverage.

(d)      Without first obtaining the written consent of Agent, Pledgor shall not (i) amend or modify any Note Collateral or (ii) agree to or suffer any amendment, extension, renewal, release, acceptance, forbearance, modification or waiver with respect to any rights arising under any such Note Collateral.

7.      Voting Rights and Dividends.  In addition to the Agent's rights and remedies set forth in Section 8, in case an Event of Default shall have occurred and be continuing, the Agent shall (i) be entitled to vote the Collateral, (ii) be entitled to give consents, waivers and ratifications in respect of the Collateral (the Pledgor hereby irrevocably constituting and

appointing the Agent, with full power of substitution, the proxy and attorney-in-fact of the Pledgor for such purposes) and (iii) be entitled to collect and receive for its own use cash dividends paid on the Collateral.  The Pledgor shall not be permitted to exercise or refrain from exercising any voting rights or other powers if, in the reasonable judgment of the Agent, such action would have a material adverse effect on the value of the Collateral or any part thereof; and, underlined provided, further, that the Pledgor shall give at least five (5) days' written notice of the manner in which the Pledgor intends to exercise, or the reasons for refraining from exercising, any voting rights or other powers other than with respect to any election of directors and voting with respect to any incidental matters.  Following the occurrence of an Event of Default, all dividends and all other distributions in respect of any of the Collateral, shall be delivered to the Agent to hold as Collateral and shall, if received by the Pledgor, be received in trust for the benefit of the Agent, be segregated from the other property or funds of any other Person, and be forthwith delivered to the Agent as Collateral in the same form as so received (with any necessary endorsement).

8.    Event of Default.  An "Event of Default" under this Agreement shall occur upon the happening of any of the following events:

(a)    An "Event of Default" under any Related Agreement shall have occurred and be continuing beyond any applicable cure period; or

(b)    Any portion of the Collateral is subjected to a levy of execution, attachment, distraint or other judicial process or any portion of the Collateral is the subject of a claim (other than by the Agent) of a Lien or other right or interest in or to the Collateral and such levy or claim shall not be cured, disputed or stayed within a period of fifteen (15) business days after the occurrence thereof.

9.    Remedies.  In case an Event of Default shall have occurred and is continuing, the Agent may:

(a)    Transfer any or all of the Collateral into its name, or into the name of its nominee or nominees;

(b)    Exercise all rights with respect to the Collateral including, without limitation, all rights of conversion, exchange, subscription or any other rights, privileges or options pertaining to any Collateral as if it were the absolute owner thereof, including, but without limitation, the right to exchange, at its discretion, any or all of the Collateral upon the merger, consolidation, reorganization, recapitalization or other readjustment of any Issuer thereof, or upon the exercise by such Issuer of any right, privilege or option pertaining to any of the Collateral, and, in connection therewith, to deposit and deliver any and all of the Collateral with any committee, depository, transfer agent, registrar or other designated agent upon such terms and conditions as it may determine, all without liability except to account for property actually received by it; and

(c)    Subject to any requirement of applicable law, sell, assign and deliver the whole or, from time to time, any part of the Collateral at the time held by the Agent, at any private sale or at public auction, with or without demand, advertisement or notice of the time or

place of sale or adjournment thereof or otherwise (all of which are hereby waived, except such notice as is required by applicable law and cannot be waived), for cash or credit or for other property for immediate or future delivery, and for such price or prices and on such terms as the Agent in its sole discretion may determine, or as may be required by applicable law.

The Pledgor hereby waives and releases any and all right or equity of redemption, whether before or after sale hereunder. At any such sale, unless prohibited by applicable law, the Agent may bid for and purchase the whole or any part of the Collateral so sold free from any such right or equity of redemption. All moneys received by the Agent hereunder, whether upon sale of the Collateral or any part thereof or otherwise, shall be held by the Agent and applied by it as provided in Section 11. No failure or delay on the part of the Agent in exercising any rights hereunder shall operate as a waiver of any such rights nor shall any single or partial exercise of any such rights preclude any other or future exercise thereof or the exercise of any other rights hereunder. The Agent shall have no duty as to the collection or protection of the Collateral or any income thereon nor any duty as to preservation of any rights pertaining thereto, except to apply the funds in accordance with the requirements of Section 11. The Agent may exercise its rights with respect to property held hereunder without resort to other security for or sources of reimbursement for the Obligations. In addition to the foregoing, Agent shall have all of the rights, remedies and privileges of a secured party under the UCC regardless of the jurisdiction in which enforcement hereof is sought.

10.    Private Sale. The Pledgor recognizes that the Agent may be unable to effect (or to do so only after delay which would adversely affect the value that might be realized from the Collateral) a public sale of all or part of the Collateral by reason of certain prohibitions contained in the Securities Act, and may be compelled to resort to one or more private sales to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such Collateral for their own account, for investment and not with a view to the distribution or resale thereof. The Pledgor agrees that any such private sale may be at prices and on terms less favorable to the seller than if sold at public sales and that a private sale shall not be deemed to have been made in manner that is not commercially reasonable solely because such sale was a private sale. The Pledgor agrees that the Agent has no obligation to delay sale of any Collateral for the period of time necessary to permit any Issuer to register the Collateral for public sale under the Securities Act.

11.    Proceeds of Sale. The proceeds of any collection, recovery, receipt, appropriation, realization or sale of the Collateral shall be applied by the Agent as follows:

(a)    First, to the payment of all costs, reasonable expenses and charges of the Agent and to the reimbursement of the Agent for the prior payment of such costs, reasonable expenses and charges incurred in connection with the care and safekeeping of the Collateral (including, without limitation, the reasonable expenses of any sale or any other disposition of any of the Collateral), attorneys' fees and reasonable expenses, court costs, any other fees or expenses incurred or expenditures or advances made by Agent in the protection, enforcement or exercise of its rights, powers or remedies hereunder;

(b)    Second, to the payment of the Obligations, in whole or in part, in such order as the Agent may elect, whether or not such Obligations are then due;

(c)     Third, to such persons, firms, corporations or other entities as required by applicable law including, without limitation, Section 9-615(a)(3) of the UCC; and

(d)     Fourth, to the extent of any surplus to the Pledgor or as a court of competent jurisdiction may direct.

In the event that the proceeds of any collection, recovery, receipt, appropriation, realization or sale are insufficient to satisfy the Obligations, the Pledgor shall be liable for the deficiency plus the costs and fees of any attorneys employed by Agent to collect such deficiency.

12.     <u>Waiver of Marshaling</u>.  The Pledgor hereby waives any right to compel any marshaling of any of the Collateral.

13.     <u>No Waiver</u>.  Any and all of the Agent's rights with respect to the Liens granted under this Agreement shall continue unimpaired, and Pledgor shall be and remain obligated in accordance with the terms hereof, notwithstanding (a) the bankruptcy, insolvency or reorganization of the Pledgor, (b) the release or substitution of any item of the Collateral at any time, or of any rights or interests therein, or (c) any delay, extension of time, renewal, compromise or other indulgence granted by the Agent in reference to any of the Obligations. The Pledgor hereby waives all notice of any such delay, extension, release, substitution, renewal, compromise or other indulgence, and hereby consents to be bound hereby as fully and effectively as if the Pledgor had expressly agreed thereto in advance.  No delay or extension of time by the Agent in exercising any power of sale, option or other right or remedy hereunder, and no failure by the Agent to give notice or make demand, shall constitute a waiver thereof, or limit, impair or prejudice the Agent's right to take any action against the Pledgor or to exercise any other power of sale, option or any other right or remedy.

14.     <u>Expenses</u>.  The Collateral shall secure, and the Pledgor shall pay to Agent on demand, from time to time, all reasonable costs and expenses, (including but not limited to, reasonable attorneys' fees and costs, taxes, and all transfer, recording, filing and other charges) of, or incidental to, the custody, care, transfer, administration of the Collateral or any other collateral, or in any way relating to the enforcement, protection or preservation of the rights or remedies of the Agent under this Agreement or with respect to any of the Obligations.

15.     <u>The Agent Appointed Attorney-In-Fact and Performance by the Agent</u>.  Upon the occurrence of an Event of Default, the Pledgor hereby irrevocably constitutes and appoints the Agent as the Pledgor's true and lawful attorney-in-fact, with full power of substitution, to execute, acknowledge and deliver any instruments and to do in the Pledgor's name, place and stead, all such acts, things and deeds for and on behalf of and in the name of the Pledgor, which the Pledgor could or might do or which the Agent may deem necessary, desirable or convenient to accomplish the purposes of this Agreement, including, without limitation, to execute such instruments of assignment or transfer or orders and to register, convey or otherwise transfer title to the Collateral into the Agent's name.  The Pledgor declares this power of attorney to be coupled with an interest and irrevocable.  If the Pledgor fails to perform any agreement herein contained, the Agent may itself perform or cause performance thereof, and any costs and expenses of the Agent incurred in connection therewith shall be paid by the Pledgor as provided in Section 14.

16.     Waivers.  The parties hereto desires that their disputes be resolved by a judge applying such applicable laws.  Therefore, to achieve the best combination of the benefits of the judicial system and of arbitration, the parties hereto waive all rights to trial by jury in any action, suit, or proceeding brought to resolve any dispute, whether arising in contract, tort, or otherwise between any Creditor Party and/or Pledgor arising out of, connected with, related or incidental to the relationship established between then in connection with this Agreement, any other document or the transactions related hereto or thereto.

17.     Recapture.  Notwithstanding anything to the contrary in this Agreement, if any Creditor Party receives any payment or payments on account of the Obligations, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver, or any other party under the United States Bankruptcy Code, as amended, or any other federal or state bankruptcy, reorganization, moratorium or insolvency law relating to or affecting the enforcement of creditors' rights generally, common law or equitable doctrine, then to the extent of any sum not finally retained by such Creditor Party, the Pledgor's obligations to such Creditor Party shall be reinstated and this Agreement shall remain in full force and effect (or be reinstated) until payment shall have been made to Agent on behalf of such Creditor Party, which payment shall be due on demand.

18.     Captions.  All captions in this Agreement are included herein for convenience of reference only and shall not constitute part of this Agreement for any other purpose.

19.     Miscellaneous.

(a)     This Agreement constitutes the entire and final agreement among the parties with respect to the subject matter hereof and may not be changed, terminated or otherwise varied except by a writing duly executed by the parties hereto.

(b)     No waiver of any term or condition of this Agreement, whether by delay, omission or otherwise, shall be effective unless in writing and signed by the party sought to be charged, and then such waiver shall be effective only in the specific instance and for the purpose for which given.

(c)     In the event that any provision of this Agreement or the application thereof to the Pledgor or any circumstance in any jurisdiction governing this Agreement shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable provision to parties, jurisdictions, or circumstances other than to whom or to which it is held invalid or unenforceable shall not be affected thereby, nor shall same affect the validity or enforceability of any other provision of this Agreement.

(d)     This Agreement shall be binding upon the Pledgor, and the Pledgor's successors and assigns, and shall inure to the benefit of the Agent and its successors and assigns.

(e)     Any notice or other communication required or permitted pursuant to this Agreement shall be given in accordance with the Note.

(f)     THIS AGREEMENT AND THE OTHER DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

(g)     EACH OF THE PLEDGOR AND AGENT HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE PLEDGOR, ON THE ONE HAND, AND THE AGENT, ON THE OTHER HAND, PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER RELATED AGREEMENTS OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OF THE OTHER RELATED AGREEMENTS, PROVIDED, THAT EACH OF THE PLEDGOR AND AGENT ACKNOWLEDGES THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF THE COUNTY OF NEW YORK, STATE OF NEW YORK; AND FURTHER PROVIDED, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE INDEBTEDNESS, TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE INDEBTEDNESS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE AGENT.  EACH OF THE PLEDGOR AND AGENT EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH OF THE PLEDGOR AND AGENT HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS.  EACH OF THE PLEDGOR AND AGENT HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO THE PLEDGOR OR AGENT, AS APPLICABLE, AT THE ADDRESS SET FORTH IN THE NOTE AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF THE PLEDGOR'S OR AGENT'S, AS APPLICABLE, ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

(h)     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one and the same agreement.  Any signature delivered by a party by facsimile or electronic transmission shall be deemed an original signature hereto.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first written above.

MONTSANT PARTNERS LLC

By: _____
Name:
Title:

BAM ADMINISTRATIVE SERVICES LLC, as Agent

By: _____
Name: **Daniel Saks**
Title:   **Authorized Signatory**

*SIGNATURE PAGE TO PLEDGE AGREEMENT*

SCHEDULE A to the Pledge Agreement

Promissory Notes

     1.     Senior Secured Convertible Promissory Note dated December 10, 2008 in the original principal amount of $5,600,000 made by Implant Sciences corporation ("Implant") in favor of DMRJ Group, LLC.