# EXHIBIT 61

## NOTE AND EQUITY PLEDGE AGREEMENT

THIS NOTE AND EQUITY PLEDGE AGREEMENT (this "Agreement") is entered into as of September __, 2014 by and among PRINCIPAL GROWTH STRATEGIES LLC, a Delaware limited liability company, located at 152 w. 57th Street, 4th Floor, New York, New York ("PGS"), PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER FUND LP, a Delaware limited partnership, located at 152 w. 57th Street, 54th Floor, New York, New York ("PPCO"), and AGERA HOLDINGS, LLC, a Delaware limited liability company ("Holdings" and together with PGS, PPCO, and each other individual and/or entity that becomes a pledger hereunder pursuant to Section 24 hereof, the "Pledgors" and each, a "Pledgor") and BAM ADMINISTRATIVE SERVICES LLC, a Delaware limited liability company, as agent for the Investors identified below ("Agent" and, together with the Investors (as defined below), the "Secured Creditors" and each, a "Secured Creditor").

### RECITALS

WHEREAS, Northstar GOM Holdings Group LLC, a Delaware limited liability company (the "Northstar Issuer"), Northstar Offshore Group, LLC, a Delaware limited liability company ("Northstar Offshore"), and other guarantors from time to time party thereto, are parties to that certain Indenture, dated as of the date hereof (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Indenture"), pursuant to which the Issuer has issued $80,000,000 of its 12% second priority senior secured notes due 2019 (the "Initial Notes") and may issue an unlimited amount of additional notes (the "Additional Notes" and, together with the Initial Notes, the "Notes");

WHEREAS, PPCO holds either a direct or indirect equity interest in Northstar Issuer and Northstar Offshore and shall benefit from the issuance and sale of the Notes;

WHEREAS, PPCO also holds either a direct or indirect equity interest in each of PGS, Holdings and Agera Energy LLC, a Delaware limited liability company ("Energy");

WHEREAS, pursuant to the Indenture, each of BRe WNIC 2013 LTC Primary and Senior Health Insurance Company of Pennsylvania (collectively, the "Investors", and each, an "Investor") acquired certain of the Notes issued under said Indenture, and may from time to time acquire additional Notes (collectively, the "Purchased Notes"); and

WHEREAS, in order to induce the Investors to provide or continue to provide such the financial accommodations as described in the Purchased Notes, the Pledgors have each agreed to pledge and grant a security interest in the collateral described herein to Agent, for the benefit of the Secured Creditors, on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration the receipt of which is hereby acknowledged, the parties agree as follows.

1.  Definitions. Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Purchase Agreement.

2.  Pledge and Grant of Security Interest. To secure the prompt payment and performance in full when due, whether by lapse of time or otherwise, of the Obligations (as

defined in Section 3 hereof), each Pledgor hereby pledges and assigns to Agent for the benefit of the Secured Creditors, and grants to Agent for the benefit of the Secured Creditors, a first priority security interest in any and all right, title and interest of such Pledgor in and to the following, whether now owned or existing or owned, acquired, or arising hereafter (collectively, the "Collateral"):

       (a)    Equity Interests.  The outstanding stock and/or membership interests set forth on Schedule 1 attached hereto together with the certificates (or other agreements or instruments), if any, representing such stock and/or membership interests, and all options and other rights, contractual or otherwise, with respect thereto (collectively, together with the shares of stock and membership interests and/or proceeds described in Sections 2(b) and 2(c) below, the "Equity Interests"), including, but not limited to, the following:

       (i)    all shares, interests, units or securities representing a dividend on any of the Equity Interests, or representing a distribution or return of capital upon or in respect of the Equity Interests, or resulting from a stock split, revision, reclassification or other exchange therefor, and any subscriptions, warrants, rights or options issued to the holder of, or otherwise in respect of, the Equity Interests; and

       (ii)    without affecting the obligations of any Pledgor under any provision prohibiting such action hereunder or under any Document, in the event of any consolidation or merger involving the issuer of any Equity Interests and in which such issuer is not the surviving entity, all shares of each class of the stock of the successor entity formed by or resulting from such consolidation or merger.

       (b)    Additional Interests.  100% (or, if less, the full amount owned by each Pledgor) of each class of the issued and outstanding stock and/or membership interests owned by such Pledgor of each issuer identified on Schedule 1 attached hereto (the "Issuers" and each, an "Issuer") and each Subsidiary of the Issuer, including, without limitation, the certificates, if any, representing such stock and/or membership interests.

       (c)    PGS Notes.  That certain amended and restated secured convertible promissory note issued by Energy to PGS in the principal amount of $600,071.23, and convertible into the common membership interests of Holdings, dated June 11, 2014, as amended, modified or supplemented from time to time (the "Convertible PGS Note") and each other promissory note and instrument that may from time to time be issued by Energy and/or Holding to PGS (collectilvey with the Convertible PGS Note, the "Pledged Notes").

       (d)    Proceeds.  All proceeds and products of the foregoing, however and whenever acquired and in whatever form.

Without limiting the generality of the foregoing, it is hereby specifically understood and agreed that each Pledgor may from time to time hereafter deliver additional shares of stock and/or membership interests, as applicable, to Agent for the benefit of the Secured Creditors as collateral security for the Obligations.  Upon delivery to Agent, such additional shares of stock and/or membership interests shall be deemed to be part of the Collateral and shall be subject to

2

the terms of this Agreement whether or not Schedule 1 is amended to refer to such additional shares or membership interests.

3.    Security for Obligations.  The security interest created hereby in the Collateral of each Pledgor constitutes continuing collateral security for all of the following (the "Obligations"): (a) all obligations of Northstar Issuer and/or Northstar Offshore to the Secured Creditors under the Purchased Notes and (b) all other obligations and liabilities of Northstar Issuer and/or Northstar Offshore to the Secured Creditors whether now existing or hereafter arising, direct or indirect, liquidated or unliquidated, absolute or contingent, due or not due and whether under, pursuant to or evidenced by a note, agreement, guaranty, instrument or otherwise (in each case, irrespective of the genuineness, validity, regularity or enforceability of such Obligations, or of any instrument evidencing any of the Obligations or of any collateral therefor or of the existence or extent of such collateral, and irrespective of the allowability, allowance or disallowance of any or all of such in any case commenced by or against either of Northstar Issuer or Northstar Offshore under Title 11, United States Code, including, without limitation, obligations of Northstar Issuer and/or Northstar Offshore for post-petition interest, fees, costs and charges that would have accrued or been added to the Obligations but for the commencement of such case).

4.    Delivery of the Collateral.  Each Pledgor hereby agrees that:

(a)    Delivery of Certificates.  Each Pledgor shall deliver to Agent (i) simultaneously with or prior to execution and delivery of this Agreement, all certificates representing the Equity Interests and (ii) promptly upon the receipt thereof by or on behalf of each Pledgor, all other certificates and instruments constituting the Collateral. Prior to delivery to Agent, all such certificates and instruments constituting the Collateral shall be held in trust by each Pledgor for the benefit of Secured Creditors pursuant hereto. All such certificates shall be delivered in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment in blank, substantially in the form provided in Schedule 2 attached hereto.

(b)    Delivery of Pledged Notes.  All instruments representing or evidencing the Pledged Notes shall be delivered to and held by or on behalf of Agent pursuant hereto and shall be accompanied by duly executed instruments of transfer or assignments in blank, all in form and substance satisfactory to Agent. PGS hereby shall upon demand by Agent to deliver any certificates, instruments or other distributions issued in connection with the Pledged Notes directly to Agent, in each case to be held by Agent, subject to the terms hereof. Upon the occurrence and during the continuance of an Event of Default (as defined below), Agent shall have the right, during such time in its discretion and without notice to PGS, to transfer to or to register in the name of Agent or any of its nominees any or all of the Pledged Notes. In addition, Agent shall have the right at such time to exchange instruments representing or evidencing Pledged Notes for instruments of smaller or larger denominations.

(c)    Additional Securities.  If any Pledgor shall receive by virtue of its being or having been the owner of any Collateral, any (i) stock certificate, membership certificate or other certificate representing stock or a membership interest, including without limitation, any certificate representing a dividend or distribution in connection with any increase or reduction of capital, reclassification, merger, consolidation, sale of assets,

3

combination of shares or membership or equity interests, stock splits, spin-off or split-off, promissory notes or other instrument; (ii) option or right, whether as an addition to, substitution for, or an exchange for, any Collateral or otherwise; (iii) dividends payable in securities; or (iv) distributions of securities in connection with a partial or total liquidation, dissolution or reduction of capital, capital surplus or paid-in surplus, then such Pledgor shall receive such certificate, instrument, option, right or distribution in trust for the benefit of the Secured Creditors, shall segregate it from such Pledgor's other property and shall deliver it forthwith to Agent in the exact form received together with any necessary endorsement and/or appropriate stock power or membership interest power, as applicable, duly executed in blank, substantially in the form provided in Schedule 2, to be held by Agent as Collateral and as further collateral security for the Obligations.

(d)    <u>Financing Statements</u>. Each Pledgor authorizes Agent to file such UCC (as defined herein) or other applicable financing statements as may be reasonably requested by Agent in order to perfect and protect the security interest created hereby in the Collateral.

5.    <u>Representations and Warranties</u>. Each Pledgor hereby represents and warrants to the Secured Creditors, that so long as any of the Obligations remain outstanding or any Document is in effect:

(a)    <u>Authorization of the Equity Interests</u>. The Equity Interests are duly authorized and validly issued, are fully paid and nonassessable and are not subject to the preemptive rights of any Person. All other shares of stock or membership interests constituting Collateral will be duly authorized and validly issued, fully paid and nonassessable and not subject to the preemptive rights of any Person.

(b)    <u>Title</u>. Each Pledgor has good and indefeasible title to the Collateral and will at all times be the legal and beneficial owner of such Collateral free and clear of any Lien, other than Permitted Encumbrances. Except with respect to Permitted Encumbrances, there exists no "adverse claim" within the meaning of Section 8-102 of the Uniform Commercial Code as in effect in the State of New York (the "<u>UCC</u>") with respect to the Equity Interests.

(c)    <u>Exercising of Rights</u>. To the best of each Pledgor's knowledge, the exercise by Agent of its rights and remedies hereunder will not violate any law or governmental regulation or any material contractual restriction binding on or affecting any Pledgor or any of its property.

(d)    <u>Pledgors' Authority</u>. No authorization, approval or action by, and no notice or filing with any governmental authority or with the issuer of any Equity Interests is required either (i) for the pledges made by Pledgors or for the granting of the security interests by Pledgors pursuant to this Agreement or (ii) to the best of each Pledgor's knowledge, for the exercise by Agent of its rights and remedies hereunder (except as may be required by laws affecting the offering and sale of securities).

(e)    <u>Security Interest</u>. This Agreement creates a valid security interest in favor of Agent, for the benefit of the Secured Creditors, in the Collateral. The taking

possession by Agent of the certificates, if any, representing the Equity Interests and all other certificates and instruments constituting Collateral and/or the execution and delivery of a Control Agreement (as defined in Section 6(d) below) with regard to such uncertificated Equity Interests consisting of membership interests will perfect Agent's security interest, for the benefit of the Secured Creditors, in the Equity Interests and, when properly perfected by filing or registration, in all other Collateral represented by such Equity Interests, other Collateral and instruments securing the Obligations.  Except as set forth in this Section 5(e), no action is necessary to perfect or otherwise protect such security interest.

6.      Covenants.  Each Pledgor hereby covenants, that so long as any of the Obligations remain outstanding or any Document is in effect, each Pledgor, shall:

(a)      No Transfer.  No Pledgor will sell, assign, transfer, convey, or otherwise dispose of its rights in or to the Collateral or any interest therein; nor will any Pledgor create, incur or permit to exist any Lien whatsoever with respect to any of the Collateral or the proceeds thereof other than that created hereby or otherwise granted for the benefit of Agent and/or affiliates of the Secured Parties.

(b)      Books and Records.  Mark its books and records (and shall cause each issuer of the Equity Interests of such Pledgor to mark its books and records) to reflect the security interest granted to Agent, for the benefit of the Secured Creditors, pursuant to this Agreement.

(c)      Defense of Title.  Warrant and defend title to and ownership of the Collateral at its own expense against the claims and demands of all other parties claiming an interest therein, keep the Collateral free from all Liens (other than Permitted Encumbrances), and not sell, exchange, transfer, assign, lease or otherwise dispose of the Collateral or any interest therein nor create, incur or permit to exist any Lien whatsoever with respect to any of the Collateral or the proceeds thereof other than that created hereby (other than Permitted Encumbrances).

(d)      Additional Equity Interests.  Not consent to or approve the issuance of (i) any additional shares of any class of capital stock or other equity interests of any issuer of such Equity Interests; or (ii) any securities convertible either voluntarily by the holder thereof or automatically upon the occurrence or nonoccurrence of any event or condition into, or any securities exchangeable for, any such shares, unless, in either case, such shares are pledged as Collateral pursuant to this Agreement.

(e)      Further Assurances.  Promptly execute and deliver at its expense all further instruments and documents and take all further action that may be reasonably necessary and desirable or that Agent may reasonably request in order to (i) perfect and protect the security interest created hereby in the Collateral (including without limitation any and all action necessary to satisfy Agent that Agent, for the benefit of the Secured Creditors, has obtained a first priority perfected Security Interest in any stock and/or membership interests; (ii) enable Agent, as agent for the Investors, to exercise and enforce its rights and remedies hereunder in respect of the Collateral; and (iii) otherwise effect the purposes of this Agreement, including, without limitation and if requested by Agent, (A) delivering to Agent irrevocable proxies in respect of the Collateral, which

irrevocable proxies will be strictly and only for the purpose of allowing Agent to perfect and protect the security interest granted or purported to be granted hereby or to enable Agent, as agent for the Investors, to exercise and enforce its rights and remedies hereunder with respect to the Collateral and/or (B) executing and delivering, and causing the issuer of such Equity Interests to execute and deliver, a limited liability company control agreement ("Control Agreement") substantially in the form of Schedule 3 hereto and each Pledgor shall cause each such issuer to acknowledge in writing its receipt and acceptance thereof. Such Control Agreement shall instruct such issuer to follow instructions from Agent without such Pledgor's consultation or consent.

(f)     Amendments. Not make or consent to any amendment or other modification or waiver with respect to any of the Collateral or enter into any agreement or allow to exist any restriction with respect to any of the Collateral other than pursuant hereto, including, without limitation, any amendment that would (i) impair the Collateral or adversely affect in any respect the rights, privileges, benefits and security interests provided to or intended to be provided to Agent, for the benefit of the Secured Creditors, under this Agreement or (ii) that in any way adversely affects the perfection of the security interests of Agent, for the benefit of the Secured Creditors, in the Collateral, including, without limitation, any amendment electing to no longer treat any membership interest as a security under Section 8-103 of the UCC, or any election to turn any previously certificated membership interest into an uncertificated membership interest.

(g)     Compliance with Securities Laws. File all reports and other information now or hereafter required to be filed by such Pledgor with the United States Securities and Exchange Commission and any other state, federal or foreign agency in connection with the ownership of the Collateral.

7.     Advances by Secured Creditors. Upon the occurrence and during the continuance of an Event of Default (as defined below), Agent may, at its sole option and in its sole discretion, perform the covenants and agreements of the Pledgors set forth herein, and in so doing, may expend such sums as Agent may reasonably deem advisable in the performance thereof, including, without limitation, the payment of any insurance premiums, the payment of any taxes, a payment to obtain a release of a Lien or potential Lien, expenditures made in defending against any adverse claim and all other expenditures which the Secured Creditors may make for the protection of the Collateral or which it may be compelled to make by operation of law. All such sums and amounts so expended shall be repayable by the applicable Pledgor(s) promptly upon timely notice thereof and demand therefor, shall constitute additional Obligations and shall bear interest from the date said amounts are expended at the applicable Contract Rate for the Notes. No such performance of any covenant or agreement by the Secured Creditors on behalf of any Pledgor, and no such advance or expenditure therefor, shall relieve any Pledgor of any default under the terms of this Agreement. The Secured Creditors may make any payment hereby authorized in accordance with any bill, statement or estimate procured from the appropriate public office or holder of the claim to be discharged without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax assessment, sale, forfeiture, tax lien, title or claim except to the extent such payment is being contested in good faith by a Pledgor in appropriate proceedings and against which adequate reserves are being maintained in accordance with GAAP.

8.     Events of Default.  Each of the following shall constitute an event of default ("Event of Default") hereunder:

(a)     An "Event of Default" under the Indenture or any agreement or note related to the Indenture shall have occurred and be continuing beyond any applicable cure period;

(b)     Any Pledgor shall default in the performance of any of its obligations under any agreement between any Pledgor and Agent and/or any other Secured Creditor, including, without limitation, this Agreement, and such default shall not be cured during any applicable cure period;

(c)     Any representation or warranty of any Pledgor made herein or in any agreement, statement or certificate given in writing pursuant hereto or thereto or in connection herewith or therewith shall be false or misleading in any material respect;

(d)     Any portion of the Collateral is subjected to a levy of execution, attachment, distraint or other judicial process or any portion of the Collateral is the subject of a claim (other than by a Secured Creditor) of a Lien or other right or interest in or to the Collateral and such levy or claim shall not be cured, disputed or stayed within a period of fifteen (15) business days after the occurrence thereof; or

(e)     Any Pledgor shall (i) apply for, consent to, or suffer to exist the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or other fiduciary of itself or of all or a substantial part of its property, (ii) make a general assignment for the benefit of creditors, (iii) commence a voluntary case under any state or federal bankruptcy laws (as now or hereafter in effect), (iv) be adjudicated a bankrupt or insolvent, (v) file a petition seeking to take advantage of any other law providing for the relief of debtors, (vi) acquiesce to, or fail to have dismissed, within thirty (30) days, any petition filed against it in any involuntary case under such bankruptcy laws, or (vii) take any action for the purpose of effecting any of the foregoing.

9.     Remedies.

(a)     General Remedies.  Upon the occurrence of an Event of Default and during the continuation thereof, Agent shall have, in respect of the Collateral, in addition to the rights and remedies provided herein or by law, the rights and remedies of a secured party under the UCC or any other applicable law.

(b)     Transfer and Sale of Collateral.  Upon the occurrence of an Event of Default and during the continuation thereof, without limiting the generality of this Section and without notice, Agent may, in its sole discretion for the benefit of the Secured Creditors, sell or otherwise dispose of or realize upon the Collateral, or any part thereof, in one or more parcels, at public or private sale, at any exchange or broker's board or elsewhere, at such price or prices and on such other terms as Agent may deem commercially reasonable, for cash, credit or for future delivery or otherwise in accordance with applicable law.  To the extent permitted by law, Agent may in such event, bid for the purchase of such securities.  Each Pledgor agrees that, to the extent notice of sale shall be required by law and has not been waived by such Pledgor, any requirement of reasonable notice shall be met if notice, specifying the place of any public

7

sale or the time after which any private sale is to be made, is personally served on or mailed, postage prepaid, to such Pledgor, in accordance with the notice provisions of Purchase Agreement at least ten (10) days before the time of such sale. Agent shall not be obligated to make any sale of the Collateral regardless of notice of sale having been given. Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(c)    Private Sale. Upon the occurrence of an Event of Default and during the continuation thereof, each Pledgor recognizes that Agent may deem it impracticable to effect a public sale of all or any part of the Equity Interests or any of the securities constituting the Collateral and that Agent may, therefore, determine to make one or more private sales of any such securities to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such securities for their own account, for investment and not with a view to the distribution or resale thereof. Each Pledgor acknowledges that any such private sale may be at prices and on terms less favorable to the seller than the prices and other terms which might have been obtained at a public sale and, notwithstanding the foregoing, agrees that such private sale shall be deemed to have been made in a commercially reasonable manner and that Agent shall have no obligation to delay sale of any such securities for the period of time necessary to permit the issuer of such securities to register such securities for public sale under the Securities Act of 1933, as amended. Each Pledgor further acknowledges and agrees that any offer to sell such securities which has been made privately in the manner described above shall be deemed to involve a "public sale" under the UCC, notwithstanding that such sale may not constitute a "public offering" under the Securities Act of 1933, as amended, and Agent may, in such event, bid for the purchase of such securities.

(d)    Retention of Collateral. In addition to the rights and remedies hereunder, upon the occurrence and during the continuance of an Event of Default, Agent may, after providing the notices required by Section 9-620 of the UCC or otherwise complying with the requirements of applicable law of the relevant jurisdiction, retain all or any portion of the Collateral in satisfaction of the Obligations. Unless and until Agent shall have provided such notices, however, Agent shall not be deemed to have retained the Collateral in satisfaction of any Obligations for any reason.

(e)    Deficiency. In the event that the proceeds of any sale, collection or realization are insufficient to pay all amounts to which Agent, for the benefit of the Secured Creditors, is legally entitled, Pledgors shall be, jointly and severally, liable for the deficiency, together with interest thereon, together with the costs of collection and the reasonable fees of any attorneys employed by Agent to collect such deficiency. Any surplus remaining after the full payment and satisfaction of the Secured Obligations shall be returned to the appropriate party in accordance with Section 9-615 of the UCC.

10.    Rights of Agent.

(a)    Power of Attorney. In addition to other powers of attorney contained herein, each Pledgor hereby designates and appoints Agent, and each of its designees or agents as attorney-in-fact of each such Pledgor, irrevocably and with power of

substitution, with authority to take any or all of the following actions upon the occurrence and during the continuance of an Event of Default:

  (i) to demand, collect, settle, compromise, adjust and give discharges and releases concerning the Collateral, all as Agent may reasonably determine;

  (ii) to commence and prosecute any actions at any court for the purposes of collecting any of the Collateral and enforcing any other right in respect thereof;

  (iii) to defend, settle or compromise any action brought and, in connection therewith, give such discharge or release as Agent may deem reasonably appropriate;

  (iv) to pay or discharge taxes, liens, security interests, or other encumbrances levied or placed on or threatened against the Collateral;

  (v) to direct any parties liable for any payment under any of the Collateral to make payment of any and all monies due and to become due thereunder directly to Agent or as Agent shall direct;

  (vi) to receive payment of and receipt for any and all monies, claims, and other amounts due and to become due at any time in respect of or arising out of any Collateral;

  (vii) to sign and endorse any drafts, assignments, proxies, stock powers, verifications, notices and other documents relating to the Collateral;

  (viii) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as Agent may deem reasonably appropriate;

  (ix) to execute and deliver all assignments, conveyances, statements, financing statements, renewal financing statements, pledge agreements, affidavits, notices and other agreements, instruments and documents that Agent may determine necessary in order to perfect and maintain the security interests and liens granted in this Agreement and in  order to fully consummate all of the transactions contemplated herein and therein;

  (x) to exchange any of the Collateral or other property upon any merger, consolidation, reorganization, recapitalization or other readjustment of the issuer thereof and, in connection therewith, deposit any of the Collateral with any committee, depository, transfer agent, registrar or other designated agency upon such terms as Agent may determine;

  (xi) to vote for a shareholder, partner or member resolution, or to sign an instrument in writing, sanctioning the transfer of any or all of the Equity Interests into the name of Agent, for the benefit of the Secured Creditors, or into the name of any transferee to whom the Equity Interests or any part thereof may be sold pursuant to Section 9 hereof; and

(xii)    to do and perform all such other acts and things as Agent may reasonably deem to be necessary, proper or convenient in connection with the Collateral.

This power of attorney is a power coupled with an interest and shall be irrevocable until such time as all of the Obligations have been indefeasibly paid in full.  Agent shall be under no duty to exercise or withhold the exercise of any of the rights, powers, privileges and options expressly or implicitly granted to Agent, for the benefit of the Secured Creditors, in this Agreement, and shall not be liable for any failure to do so or any delay in doing so.  Agent shall not be liable for any act or omission or for any error of judgment or any mistake of fact or law in its individual capacity or its capacity as attorney-in-fact except acts or omissions resulting from its gross negligence or willful misconduct.  This power of attorney is conferred on Agent solely to protect, preserve and realize upon its security interest in Collateral.

(b)    Performance by Agent of any Pledgor's Obligations.  If any Pledgor fails to perform any agreement or obligation contained herein, Agent itself may perform, or cause performance of, such agreement or obligation, and the expenses of Agent incurred in connection therewith shall be payable by the applicable Pledgor pursuant to Section 7 hereof.

(c)    Assignment by Agent.  Subject to the Indenture and the Purchased Notes, any Investor may from time to time assign the Obligations and any portion thereof and/or the Collateral and any portion thereof, and the assignee shall be entitled to all of the rights and remedies of such Investor under this Agreement in relation thereto.

(d)    Agent's Duty of Care.  Other than the exercise of reasonable care to assure the safe custody of the Collateral while being held by Agent hereunder, Agent shall have no duty or liability to preserve rights pertaining thereto, it being understood and agreed that each Pledgor, as applicable, shall be responsible for preservation of all rights in the Collateral, and Agent shall be relieved of all responsibility for the Collateral upon surrendering it or tendering the surrender of it to the applicable Pledgor.  Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equal to that which Agent accords its own property, which shall be no less than the treatment employed by a reasonable and prudent person in the industry, it being understood that Agent shall not have responsibility for (i) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not Agent has or is deemed to have knowledge of such matters; or (ii) taking any necessary steps to preserve rights against any parties with respect to any Collateral.

(e)    Voting Rights in Respect of the Collateral.

(i)    So long as no Event of Default shall have occurred and be continuing, to the extent permitted by law, each Pledgor may exercise any and all voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement; and

(ii)    Upon the occurrence and during the continuance of an Event of Default, all rights of each Pledgor to exercise the voting and other consensual rights which they would otherwise be entitled to exercise pursuant to clause (i) of this subsection (e) shall cease and all such rights shall thereupon become vested in Agent, as Agent for the Investors, which shall then have the sole right to exercise such voting and other consensual rights.

(f)    Dividend and Distribution Rights in Respect of the Collateral.

(i)    So long as no Event of Default shall have occurred and be continuing or no other Document prohibits the making or receiving of any dividends and other distributions and subject to Section 4(b) hereof, each Pledgor may receive and retain any and all dividends and other distributions (other than dividends and other distributions constituting Collateral which are addressed hereinabove) or interest paid in respect of the Collateral to the extent otherwise permitted.

(ii)    Upon the occurrence and during the continuance of an Event of Default:

(A)    all rights of each Pledgor to receive the dividends, other distributions and interest payments which it would otherwise be authorized to receive and retain pursuant to paragraph (i) of this subsection shall cease and all such rights shall thereupon be vested in Agent, as agent for the Investors, which shall then have the sole right to receive and hold such dividends, other distributions and interest payments as Collateral; and

(B)    all dividends and interest payments which are received by any Pledgor contrary to the provisions of paragraph (A) of this clause shall be received in trust for the benefit of Agent, as agent for the Investors, shall be segregated from other property or funds of such Pledgor and shall be forthwith paid over to Agent as Collateral in the exact form received, to be held by Agent as Collateral and as further collateral security for the Obligations.

(g)    Release of Collateral.  Agent may release any of the Collateral from this Agreement or may substitute any of the Collateral for other Collateral without altering, varying or diminishing in any way the force, effect, lien, pledge or security interest of this Agreement as to any Collateral not expressly released or substituted, and this Agreement shall continue as a first priority lien on all Collateral not expressly released or substituted.

11.    Application of Proceeds.  Upon the occurrence of and during the continuance of an Event of Default, any payments in respect of the Obligations and any proceeds of any Collateral, when received by Agent in cash or its equivalent, will be applied as follows:  first, to all reasonable costs and expenses of the Secured Creditors (including without limitation reasonable attorneys' fees and expenses) incurred in connection with the implementation and/or enforcement of this Agreement and/or the Indenture, the Purchased Notes or any other agreement related thereto; second, to the principal amount of the Obligations; third, to such of the

Obligations consisting of accrued but unpaid interest and fees; <u>fourth</u>, to all other amounts payable with respect to the Obligations; and <u>fifth</u>, to the payment of the surplus, if any, to whoever may be lawfully entitled to receive such surplus. Each Pledgor shall remain jointly and severally liable to the Secured Creditors for any deficiency.

12.    <u>Costs of Counsel</u>. If at any time hereafter, whether upon the occurrence of an Event of Default or not, Agent employs counsel to prepare or consider amendments, waivers or consents with respect to this Agreement, or to take action or make a response in or with respect to any legal or arbitral proceeding relating to this Agreement or relating to the Collateral, or to protect the Collateral or exercise any rights or remedies under this Agreement or with respect to the Collateral, then each Pledgor agrees to promptly pay upon demand any and all such reasonable documented costs and expenses incurred by Agent, all of which costs and expenses shall constitute Obligations hereunder.

13.    <u>Subordination</u>. With respect to all Collateral pledged as security for those liabilities from time to time arising under and pursuant to that certain Note Purchase Agreement, dated as of June 18, 2014 (as amended, modified, restated or supplemented from time to time, the "<u>Purchase Agreement</u>"), by and among Energy, the investors named therein and from time to time party thereto (collectively, the "<u>Agera Investors</u>"), and Agent, as agent for the Agera Investors, the Related Agreements (as defined in the Purchase Agreement") and all other documents, instruments and agreements executed in connection therewith (together with the Purchase Agreement and the Related Agreements, the "<u>Agera Documents</u>") (the "<u>Common Collateral</u>"), each Secured Creditor hereby subordinates all claims and security interests it may have against, or with respect to, any Common Collateral, to the security interests granted in the Common Collateral to Agent for the benefit of the Agera Investors. Use of proceeds of Common Collateral in the payment of the Obligations shall be postponed and subordinated in right of payment and priority to the payment in full of all liabilities to the Agera Investors arising under the Agera Documents.

14.    <u>Continuing Agreement</u>.

(a)    This Agreement shall be a continuing agreement in every respect and shall remain in full force and effect until such time as all Obligations have been indefeasibly paid in full. Upon such payment and termination, this Agreement shall be automatically terminated, the security interest in the Collateral shall be deemed released, and Agent shall, promptly (i) at the expense of the applicable Pledgor, forthwith release all of its liens and security interests hereunder and shall execute and deliver all UCC termination statements and/or other documents reasonably requested by such Pledgor evidencing such termination and (ii) return, or cause to be returned, all certificates representing the Equity Interests to the Pledgors. Notwithstanding the foregoing, all releases and indemnities provided hereunder shall survive termination of this Agreement.

(b)    This Agreement shall continue to be effective or be automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Obligations is rescinded or must otherwise be restored or returned by Agent as a preference, fraudulent conveyance or otherwise under any bankruptcy, insolvency or similar law, all as though such payment had not been made; <u>provided</u> that in the event payment of all or any part of the Obligations is rescinded or must be restored or returned, all reasonable costs and expenses (including without limitation any reasonable legal fees

and disbursements) incurred by Agent in defending and enforcing such reinstatement shall be deemed to be included as a part of the Obligations.

15.     Amendments; Waivers; Modifications.  This Agreement and the provisions hereof may not be amended, waived, modified, changed, discharged or terminated except in writing by all parties hereto; provided, that, to the extent that additional investors that are also represented by Agent shall from time to time purchase Notes, the Agent shall have the sole and exclusive right to supplement the definition of Investor as set forth herein to add such additional purchasers as beneficial parties of the Pledgors' grant of security as described herein.

16.     Successors in Interest.  This Agreement shall create a continuing security interest in the Collateral and shall be binding upon each Pledgor, its successors and assigns and shall inure, together with the rights and remedies of Agent hereunder, to the benefit of Agent, for the benefit of the Secured Creditors, and their respective successors and permitted assigns; provided, however, that no Pledgor may assign its rights or delegate its duties hereunder without the prior written consent of Agent.  To the fullest extent permitted by law, each Pledgor hereby releases Agent, as agent for the Secured Creditors, and the Secured Creditors, and their successors and permitted assigns, from any liability for any act or omission relating to this Agreement or the Collateral, except for any liability arising from the gross negligence or willful misconduct of Agent, or its officers, employees or agents.

17.     Notices.  All notices required or permitted to be given under this Agreement shall be in conformance with the terms of the Purchase Agreement and notice to PGS shall be as follows:

Principal Growth Strategies LLC
152 W. 57th Street
4th Floor
New York, New York 10019
Email: [_____]

Platinum Partners Credit Opportunities Master Fund LP
152 W. 57th Street
54th Floor
New York, New York 10019
Email: [_____]

Agera Holdings, LLC
555 Pleasantville Road, Suite 107
Briarcliff Manor, New York 10510
Attn: Michael Nordlicht
Email: michael.nordlicht@ageraenergy.com

18.     Counterparts.  This Agreement may be executed in any number of counterparts, each of which where so executed and delivered shall be an original, but all of which shall constitute one and the same instrument.  It shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.  Any signature delivered by facsimile or electronic transmission shall be deemed to be an original signature hereto.

19.     Headings.  The headings of the sections and subsections hereof are provided for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

20.     Governing Law; Consent to Jurisdiction and Service of Process; Waiver of Jury Trial.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.  THE PROVISIONS OF THE PURCHASE AGREEMENT RELATING TO CONSENT TO JURISDICTION AND WAIVER OF JURY TRIAL ARE HEREBY INCORPORATED BY REFERENCE HEREIN, MUTATIS MUTANDIS.

21.     Severability.  If any provision of this Agreement is determined to be illegal, invalid or unenforceable, such provision shall be fully severable and the remaining provisions shall remain in full force and effect and shall be construed without giving effect to the illegal, invalid or unenforceable provisions.

22.     Entirety.  This Agreement, the Indenture and the other documents related to the Indenture represent the entire agreement of the parties hereto and thereto, and supersede all prior agreements and understandings, oral or written, if any, including any commitment letters or correspondence relating to the  Indenture or the transactions contemplated herein and therein.

23.     Survival.  All representations and warranties of each Pledgor hereunder shall survive the execution and delivery of this Agreement.

24.     Other Security.  To the extent that any of the Obligations are now or hereafter secured by property other than the Collateral (including, without limitation, real and other personal property owned by any Pledgor), or by a guarantee, endorsement or property of any other Person, then Agent shall have the right to proceed against such other property, guarantee or endorsement upon the occurrence and during the continuance of any Event of Default, and Agent has the right, in its sole discretion, to determine which rights, security, liens, security interests or remedies Agent shall at any time pursue, relinquish, subordinate, modify or take with respect thereto, without in any way modifying or affecting any of them or any of Agent's rights or the Obligations under this Agreement.

25.     Joinder.  It is understood and agreed that any person or entity that desires to become a Pledgor hereunder, or is required to execute a counterpart of this Pledge Agreement after the date hereof, shall become a Pledgor hereunder by (x) executing a Joinder Agreement in form and substance satisfactory to the Agent, (y) delivering supplements to such exhibits and annexes to this Agreement as the Agent shall reasonably request and (z) taking all actions as specified in this Pledge Agreement as would have been taken by such Pledgor had it been an original party to this Pledge Agreement, in each case with all documents required above to be delivered to the Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Agent.

**[Remainder of page intentionally left blank]**

Each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

PRINCIPAL GROWTH STRATEGIES LLC

By:_____.
Name:
Title:

PLATINUM PARTNERS CREDIT
OPPORTUNITIES MASTER FUND LP

By:_____
Name:
Title:

AGERA HOLDINGS, LLC,
By: Agera Management Corp., its manager

By: _____
Name: Michael Nordlicht
Title: Authorized Signatory

AGREED AND ACKNOWLEDGED:

BAM ADMINISTRATIVE SERVICES LLC,
as Agent

By:_____
    Name: David Levy
    Title: Authorized Signatory

Each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

PRINCIPAL GROWTH STRATEGIES LLC

By:_____
Name:
Title:

PLATINUM PARTNERS CREDIT
OPPORTUNITIES MASTER FUND LP

By:_____
Name:
Title:

AGERA HOLDINGS, LLC,
By: Agera Management Corp., its manager

By:_____
Name: Michael Nordlicht
Title: Authorized Signatory

AGREED AND ACKNOWLEDGED:

BAM ADMINISTRATIVE SERVICES LLC,
as Agent

By:_____
Name: David Levy
Title: Authorized Signatory

## SCHEDULE 1

| Pledgor | Issuer | Type | Number of Shares/ Interests | Certificate Number | Percentage Ownership of Type Listed |
|---|---|---|---|---|---|
| Principal Growth Strategies LLC | Agera Holdings, LLC | Preferred Membership Interests | 17 | N/A | 40.48% |
| Platinum Partners Credit Opportunities Master Fund LP | Agera Holdings, LLC | Preferred Membership Interests | 25 | N/A | 59.52% |
| Agera Holdings, LLC | Agera Energy, LLC | Common Membership Interests | 1,000 | N/A | 100% |

## SCHEDULE 2

### [Irrevocable Stock Power] [Membership Interest Power]

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers to

the following [shares of stock/membership interest] of _____, a _____:

<u>No. of [Shares] [Units]</u>                                    <u>Certificate No.</u>

and irrevocably appoints _____ its agent and attorney-in-fact to transfer all or any part of such [stock/membership interests] and to take all necessary and appropriate action to effect any such transfer. The agent and attorney-in-fact may substitute and appoint one or more persons to act for him. The effectiveness of a transfer pursuant to this stock power shall be subject to any and all transfer restrictions referenced on the face of the certificates evidencing such interest or in the [certificate of incorporation/articles of organization] or [bylaws/operating agreement] of the subject [corporation/limited liability company], to the extent they may from time to time exist.

_____

a _____

By: _____
Name:
Title:

17

## SCHEDULE 3

### FORM OF CONTROL ACKNOWLEDGMENT

Reference is hereby made to that certain Equity Pledge Agreement, dated as of [_____  __, 20__], (as amended, modified and/or supplemented from time to time, the "Pledge Agreement"), between [PLEDGOR] (the "Pledgor"), certain other pledgers party thereto from time to time and BAM Administrative Services LLC, as agent for the Secured Creditors (as defined therein) (the "Agent") wherein the Pledgor has pledged and granted a security interest in all of its interests in [ISSUER], a, [_____] limited liability company (the "Issuer"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Pledge Agreement.

The Issuer is hereby instructed by the Pledgor that all of the Pledgor's right, title and interest in and to all of the Pledgor's rights in connection with any membership interests in the Issuer now and hereafter owned by the Pledgor are subject to a pledge and security interest in favor of the Agent, for the ratable benefit of the Secured Creditors (as defined in the Pledge Agreement). The Pledgor hereby instructs the Issuer to act upon any instruction delivered to it by the Agent with respect to the Collateral without seeking further instruction from the Pledgor, and, by its execution hereof, the Issuer hereby agrees to do so.

The Issuer, by its written acknowledgment and acceptance hereof, hereby acknowledges receipt of a copy of the Pledge Agreement and agrees promptly to note on its books the security interests granted under the Pledge Agreement. The Issuer also waives any rights or requirements at any time hereafter to receive a copy of the Pledge Agreement in connection with the registration of any Collateral in the name of the Agent or its designee or the exercise of voting rights by the Agent or its designee.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the Pledgor has caused this Control Acknowledgment to be duly signed and delivered by its officer duly authorized as of this _____ day of [_____, 20__].

[PLEDGOR]

By: _____
Name:
Title:


Acknowledged and accepted this

_____ day of [_____, 20__].

[ISSUER]

By: _____
Name:
Title:

19

# EXHIBIT 62



STERLING VALUATION GROUP, INC.

June 11, 2015

Mr. Joseph SanFilippo
Platinum Management (NY) LLC
250 West 55th Street, 14th Floor
New York, New York 10019

Dear Mr. SanFilippo:

At your request, we have analyzed certain financial information regarding assets held by Platinum Partners Value Arbitrage Fund LP, and/or its affiliates (the "Fund"), as set forth herein, and submit this letter on our findings.

The purpose of this analysis is to express an opinion (the "Opinion") on the fair value, as of December 31, 2014, of the Fund's interest in the investments (the "Investments") described herein. We understand that the Fund intends to use our Opinion solely for internal management planning and management's determination of net asset value, profit and loss calculations, and financial reporting, and that the Fund may provide an informational copy of the Opinion in its entirety to shareholders, and prospective shareholders, of the Fund.

The term "fair value," as used herein, is defined as the amounts at which the Fund's interests in the Investments would change hands between a willing buyer and a willing seller (that are not affiliated with one another), each having reasonable knowledge of all relevant facts, neither being under any compulsion to act.

Nothing contained herein is intended to be construed or relied on by any person as a legal opinion as to any matter, including without limitation relating to the underlying borrower, the enforceability of the underlying transaction, or the perfection of any security interest. In connection with this Opinion, we have made such reviews, analyses, and inquiries as we have deemed necessary and appropriate under the circumstances. No opinion or representation as to matters relating to the perfection of any security interest is hereby given, and no independent examination of any public records in connection therewith has been made.

In connection with this Opinion, we have relied solely on such information as described in Appendices I through XXXI attached hereto and incorporated herein by this reference. We have not independently verified and have assumed the accuracy and completeness of the information supplied to us by the Fund with respect to the borrowers, issuers or Investments described herein, and the Fund, and do not assume any responsibility with respect to it. We have not made any physical inspection, or independent appraisal, of any of the common stock, equity, properties, or assets of the borrowers, issuers, or the Fund.

Mr. Joseph SanFilippo
Platinum Management (NY) LLC
June 11, 2015                                                                                              Page 2

     For the purposes of this analysis, we have assumed that the Fund acquired its interest in each Investment described herein on such Investment's issuance date and/or thereafter in good faith arms length transactions.

     This Opinion is based on the Fund's representation and warranty made as of the date of this Opinion that: (i) except as otherwise set forth herein, the Fund is not aware of any material adverse change in the financial condition or business operations of the obligors underlying the Investments; (ii) except as otherwise set forth herein, to the Fund's knowledge and belief there has been no material default or material Event of Default under the terms of the Investments; and (iii) except as otherwise set forth herein, the Fund has not received any oral or written notification under the documents evidencing the Investments indicating any circumstances that may become a material default or material Event of Default under the Investments.

     All valuation methodologies that estimate the worth of secured loans, unsecured loans, convertible securities and equity securities are predicated on numerous assumptions pertaining to prospective economic conditions. Our opinion is necessarily based on business, economic, market, and other conditions as they exist, and can be evaluated by us as of December 31, 2014. Unanticipated events and circumstances may occur and actual results may vary from those assumed. The variations may be material.

     Based upon the investigation, premises, provisos, and analyses outlined above, and subject to the attached "Limiting Factors and Other Assumptions," it is our opinion that, as of December 31, 2014 the fair value of the Fund's interest in the loans, is reasonably stated in the amounts as set forth in Exhibit A.

     In accordance with recognized professional ethics, our fees for this service are not contingent upon the opinion expressed herein, and neither Sterling Valuation Group, Inc., nor any of its employees have a present or intended financial interest in the borrowers or issuers of the investments described herein.

STERLING VALUATION GROUP, INC.

*Sterling Valuation Group, Inc.*

Attachment

### LIMITING FACTORS AND OTHER ASSUMPTIONS

The professional fee for this engagement is not contingent upon the opinion of value set forth in the attached written opinion ("Opinion") prepared by Sterling Valuation Group, Inc. ("Sterling").

The Opinion is based on business, general economic, market and other conditions that reasonably could be evaluated by Sterling as of the valuation date.  Subsequent events that could affect the conclusions set forth in the Opinion include adverse changes in industry performance or market conditions and changes to the business, financial condition and results of operations of the borrowers or issuers, as the case may be, of the investments described herein.  Sterling is under no obligation to update, revise or reaffirm the Opinion.

The Opinion is intended solely for the information of the person or persons to whom it is addressed, solely for the purpose stated, and may not be relied upon by any other person or for any other purpose without Sterling's prior written consent.  The conclusions set forth in the Opinion are based on methods and techniques that Sterling considers appropriate under the circumstances, and represent the opinion of Sterling based upon information furnished by the Fund and its advisors and other publicly available sources.  Sterling has relied upon the Fund's representations that the information provided by it, or on its behalf, is accurate and complete in all material requests.

Notwithstanding the foregoing, the opinions set forth in the Opinion are not intended by Sterling, and should not be construed, to be investment advice in any manner whatsoever.  Furthermore, no opinion, counsel or interpretation is intended in matters that require legal, accounting, tax or other appropriate professional advice.  It is assumed that such opinions, counsel or interpretations have been or will be obtained from the appropriate professional sources.

Except to the extent specifically disclosed in writing to Sterling, the Opinion also assumes that the borrowers or issuers of the investments described herein, as the case may be, have no material contingent assets or liabilities, no unusual obligations or substantial commitments other than those incurred in the ordinary course of business, and no pending or threatened litigation that would have a material effect on such borrowers or issuers.

**Platinum**
**EXHIBIT A**
**As of December 31, 2014**

| | | 12/31/2014 Sterling Low Value | 12/31/2014 Sterling High Value |
|---|---|---|---|
| I | Grey K | 5,638,452 | 5,638,452 |
| II | Minque | 4,911,133 | 5,674,348 |
| III | Implant Sciences | 51,011,326 | 60,870,726 |
| IV | China Horizon Equity | 62,101,221 | 62,101,221 |
| | China Horizon Debt | 4,539,032 | 4,539,032 |
| V | Urigen Equity | 58,270,947 | 72,000,000 |
| | Urigen Debt | 2,000,000 | 2,000,000 |
| VI | Ferrous Resources | 671,667 | 1,166,667 |
| VII | Agera Energy LLC | 33,835,461 | 42,932,359 |
| VIII | Desert Hawk Equity | 13,834,636 | 19,062,285 |
| | Desert Hawk Debt | 15,164,989 | 15,164,989 |
| IX | Airdye LLC | 11,360,000 | 11,360,000 |
| | Saviva I FS LP | 16,336,664 | 18,277,616 |
| X | Viper Motorcycle Company | 5,698,000 | 5,698,000 |
| | Viper Real Estate Inc | 2,696,437 | 2,696,437 |
| XI | Zadara | 8,446,378 | 8,446,378 |
| XII | Alcyone (PPLO) | 1,820,963 | 2,081,101 |
| XIII | Blumont | 13,224,000 | 13,224,000 |
| XIV | Pedevco | 5,324,030 | 5,324,030 |
| | Golden Globe Oil Debt (Formerly RJ Resources) | 6,082,086 | 6,082,086 |
| | Golden Globe Oil Equity (Formerly RJ Resources) | 28,500,000 | 35,000,000 |
| XV | Advance Energy Repo 3 (SUGI) | 9,320,709 | 9,489,590 |
| XVI | Sky East Interenational Repo 1 (LCGP) | 4,448,505 | 4,596,551 |
| | Sky East Interenational Repo 2 (TMPI) | 8,815,447 | 9,026,628 |
| | Sky East Interenational Repo 3 (PLAS) | 7,224,679 | 7,468,799 |
| XVII | Newrick Holdings Ltd (MYRX) | 10,492,509 | 10,805,392 |
| XVIII | Carbon Portfolio | 30,653,717 | 35,165,007 |
| XIX | Liongold | 11,044,889 | 11,044,889 |
| XX | Wexford (PPLO) | 1,674,500 | 1,674,500 |
| XXI | Suchman LLC and Over Everything LLC | 17,665,000 | 17,665,000 |
| XXII | Parot Tavot, LLC | 2,250,643 | 2,250,643 |
| | Copper Rider, LLC | 2,446,922 | 2,446,922 |
| XXIII | CNC | 2,007,000 | 2,007,000 |
| XXIV | Bang Holdings (PPLO) | 1,144,786 | 1,439,429 |
| XXV | **PPVA Oil and Gas**[1] | | |
| | Black Elk Preferred Equity | 8,031,969 | 8,031,969 |
| | Black Elk Note Receivable (Accrued Interest) | 1,758,997 | 1,758,997 |
| | Golden Gate Oil Debt | 10,570,776 | 10,570,776 |
| | Northstar GOM Holdings 12% Note Receivable (Formerly Lafitte) | 9,905,363 | 9,905,363 |
| | Northstar GOM Holdings 12% Senior Notes | 5,090,333 | 5,090,333 |
| | PPVA Oil and Gas Common Equity | 239,419,923 | 293,040,404 |
| | Northstar (PPLO) | 6,894,643 | 6,894,643 |
| XXVI | Navidea | 53,962,589 | 55,792,589 |
| XXVII | Vistagen | 7,219,533 | 8,353,098 |
| XXVIII | Infinity Augmented Reality | 28,573 | 1,546,755 |
| XXIX | Echo Therapeutics | 4,131,905 | 4,377,478 |
| XXX | Fluropharma | 2,240,937 | 2,416,156 |
| XXXI | Car Charging Group Inc | 2,783,195 | 3,260,314 |
| | Total | 812,695,464 | 925,458,952 |

[1] PPVA Oil and Gas Common Equity  includes Northstar, Golden Gate Oil and
Black Elk

# EXHIBIT 63



**Alvarez & Marsal Valuation Services, LLC**
600 Madison Avenue, 8th Floor
New York, NY 10022
Phone: +1 212 759 4433
Fax: +1 212 759 5532

June 26, 2015

<span style="color:red">**Private and Confidential**</span>

Daniel Mandelbaum
Chief Financial Officer
Platinum Partners, LP
250 West 57th Street, 14th Floor
New York, NY 10019

**RE:  Valuation Advisory Services for Certain Investments Held by Funds Managed by Platinum Partners, LP as of March 31, 2015**

Dear Mr. Mandelbaum,

Per the engagement letter ("Engagement Letter") by and between Platinum Partners, LP, including its subsidiaries and affiliates and their respective successors and assigns (jointly and severally, "Platinum"), dated April 16, 2015, Alvarez & Marsal Valuation Services, LLC ("A&M") has been engaged by Platinum to provide valuation consulting services for certain investments (the "Investments") held in certain portfolio companies (the "Portfolio Companies") as of March 31, 2015 (the "Valuation Date").

As defined in our Engagement Letter, our services included the execution of certain limited procedures (the "Limited Procedures") and the preparation of this letter report (the "Report"), which is intended to provide the management of Platinum ("Management") with information that A&M understands will be relied upon for financial reporting purposes only.  Platinum understands that Management is solely and ultimately responsible for determining the Fair Value of its investments in good faith.

We relied, without further independent verification, on the accuracy and completeness of all publicly available information and information (including but not limited to the prospective financial information) that is furnished by or on behalf of Platinum and other sources reasonably deemed appropriate by A&M regarding each Portfolio Company or Investment.  We are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein. We did not engage in any independent assessment of any prospective financial information.

Per our Engagement Letter, A&M assumes that all information provided (i) reflects accurately a description of the business and the nature of each underlying asset, the results of operations and financial condition, without additional verification and (ii) that all information made available to A&M was complete and correct in all material respects and did not contain any untrue statements of material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements were made.

Platinum has requested an estimated range of Fair Value for the following Investments in the following Portfolio Companies, as of the Valuation Date:

* Minque– Common equity
* Xcell Energy and Coal – Notes receivable
* Abdala Gold – Notes receivable
* LC Energy – Preferred equity / common equity
* American Patriot Group – Notes receivable
* Cleveland Mining Company – Convertible note / secured note / common equity / options
* Cokal – Bridge loan / warrants
* Arabella Exploration – Notes receivable / warrants



* Blumont Group – Notes receivable
* Daybreak Oil & Gas – Notes receivable / net working interests / warrants
* Proteus – Notes receivable / common equity
* Greentown Oil & Gas – Notes receivable / common equity
* Santa Maria Energy – Common equity
* NorthStar Energy – Preferred equity
* Nordaq Energy – Common equity / warrants
* Greehy & Company – Notes receivable / common equity (participating interest)
* Buffalo Lake Advanced Biofuels – Common equity (membership interest)
* NJ Ethanol – Preferred equity / common equity
* Alcor Energy – Notes receivable / common equity (membership interest)
* Agera – Preferred equity / membership interest
* Khorrami Pollarf Abir – Notes receivable
* Activision – Notes receivable
* Milberg – Profit share
* Accutane – Notes / Profit share
* Stanford International Bank – Profit share
* Katrina Barge Case – Notes receivable / Profit share
* TARS – Notes receivable
* ALS Capital Ventures – Common equity
* Marquis Healthcare Technologies – Notes receivable / common equity
* Over Everything – Notes receivable / common equity (membership units)
* Bellicose – Notes receivable

Platinum acknowledges that this Report and any advice (written or oral) provided by A&M to Platinum in connection with the Engagement Letter is intended solely for the benefit and use of Platinum in considering the matters to which the related Engagement Letter relates. Platinum agrees that neither the Report nor any such advice shall be used for any other purpose or disclosed or made available to third parties (other than Platinum's auditor, administrator, tax and legal advisors) and other professional advisors, provided that any such other professional advisors first execute A&M's standard non-reliance letter, or otherwise reproduced, disseminated, quoted or referred to at any time in any manner without A&M's prior written approval, except as required by law or regulation of any relevant jurisdiction. In addition, A&M will not provide consent to be a named expert in any filings, including, without limitation, any filings with the U.S. Securities and Exchange Commission under the Securities Act of 1933 or the Securities Exchange Act of 1934, as amended. The report is not being rendered by A&M as an agent or as a fiduciary of Platinum or any of its constituents and A&M shall not have any liability or obligation with respect to its services hereunder to such constituents or to any other person, firm or public or private entity.

Notwithstanding the foregoing, (i) Platinum shall not refer to A&M either directly by name or indirectly as an independent valuation service provider (or by any other indirect reference or description), or to the services, whether in any public filing or other document, without our prior written consent, which A&M may at its discretion grant, withhold, or grant subject to conditions; and (ii) in addition to the foregoing prohibitions and requirements with respect to all third parties, submission of A&M's Report or any portion thereof to, or responding to any comment letter issued by, the Securities and Exchange Commission or its staff, or any written or verbal references to A&M, A&M's Report or to the services in such a response is subject to Platinum providing A&M with prior written notice, and allowing A&M to provide input as to the content of such response. In no event, regardless of whether consent or pre-approval has been provided, shall A&M assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

A&M's Report is as of the Valuation Date. A&M cannot be held responsible for changes in the market conditions that could have a material impact on the values reported therein subsequent to the Valuation Date. It is further stated that the terms of A&M's engagement do not provide for reporting on events and transactions which occurred subsequent to the Valuation Date. Because A&M's services are limited in nature and scope, they cannot be relied upon to discover all documents and other information or provide all analyses that may be of importance in this matter. For example, any procedures A&M performed



cannot be relied upon to give assurance that any defalcations or fraudulent transfers that might have taken place will be discovered.

Platinum understands that A&M is not undertaking to provide any legal, regulatory, accounting, insurance, tax or similar professional advice, and that A&M's Report will not be used for guidance in such matters. It is also assumed that businesses or/and assets analyzed will not operate in violation of any applicable government regulations, codes, ordinances or statutes. It is assumed that all necessary licenses and agreements remain in full force and effect in order to continue the operations of each company supporting the values of the Investments.

This engagement was conducted in accordance with our Engagement Letter and through discussions with Platinum. The sufficiency of the Limited Procedures is solely the responsibility of those parties specified in this Report. Consequently, A&M makes no representation regarding the sufficiency of the Limited Procedures either for the purposes for which this Report has been requested or for any other purpose.

**Summary of Conclusions**

Utilizing the approaches and procedures outlined in the following sections and in the attached Appendix, and under the guidelines of ASC 820, we estimate the Fair Value range of each of the Investments as of the Valuation Date to be as follows:

| Security Issuer | Investment | Concluded Fair Value Range ($000s) |
|---|---|---|
| Minque | Common Equity | $3,000 - $4,300 |
| Xcell Energy and Coal | Notes Receivable | $6,000 - $7,400 |
| Abdala Gold | Notes Receivable | $18,000 - $19,234 |
| LC Energy | Common Equity | $7,400 - $13,200 |
| | Preferred Equity | $9,529 |
| American Patriot Group | Notes Receivable | $3,700 - $5,000 |
| Cleveland Mining Company | Convertible Note | $6,800 - $7,000 |
| | Secured Note | $3,000 - $3,100 |
| | Common Equity | $16,000 - $22,000 |
| | Options | $0 - $50 |
| Cokal | Bridge Loan | $9,360 - $9,440 |
| | Warrants | $800 - $1,000 |
| Arabella Exploration | Notes Receivable | $11,820 - $11,990 |
| | Warrants | $700 - $900 |
| Blumont Group | Notes Receivable | $11,100 - $11,200 |
| Daybreak Oil & Gas | Notes Receivable | $12,900 - $13,200 |
| | Net Working Interests | $2,400 - $3,200 |
| | Warrants | $70 - $95 |
| Proteus | Notes Receivable | $0 |
| | Common Equity | $2,600 - $3,000 |
| Greentown Oil & Gas | Notes Receivable | $4,960 - $5,070 |
| | Notes Receivable | $2,600 - $2,640 |
| | Common Equity | $900 - $1,200 |
| Santa Maria Energy | Common Equity | $1,200 - $3,000 |
| NorthStar Energy | Preferred Equity | $26,200 - $28,300 |
| Nordaq Energy | Common Equity | $2,000 - $2,300 |
| | Warrants | $400 - $550 |
| Greehy & Company | Notes Receivable | $3,500 - $3,600 |
| | Common Equity | $0 |
| Buffalo Lake Advanced Biofuels | Common Equity | $45,000 - $54,000 |
| NJ Ethanol | Common Equity | $1,000 - $1,600 |
| | Preferred Equity | $1,660 |

ALVAREZ & MARSAL   3



| Security Issuer | Investment | Concluded Fair Value Range ($000s) |
|---|---|---|
| Alcor Energy | Notes Receivable | $5,500 - $5,640 |
| | Common Equity | $9,800 - $14,600 |
| Agera | Preferred Equity | $4,338 - $4,338 |
| | Membership Interest | $34,300 - $44,100 |
| Khorrami Pollarf Abir | Notes Receivable | $5,176 |
| Activision | Notes Receivable | $5,250 - $5,350 |
| Milberg | Profit Share | $6,100 – $6,700 |
| Accutane | Notes & Profit Share | $6,000 - $6,300 |
| Stanford International Bank | Profit Share | $10,800 - $11,200 |
| Katrina Barge Case | Notes Receivable | $7,500 - 11,200 |
| | Profit Share | |
| TARS | Notes Receivable | $7,900 - $11,700 |
| ALS Capital Ventures | Common Equity | $88,100 - $96,200 |
| Marquis Healthcare Technologies | Notes Receivable | $2,420 - $2,460 |
| | Common Equity | $8,400 - $15,700 |
| Over Everything | Notes Receivable | $4,160 - $4,270 |
| | Common Equity | $5,100 - $7,800 |
| Bellicose | Notes Receivable | $10,600 - $10,890 |

We appreciate the continued opportunity to work with you on this engagement.  Please contact me at (212) 763-1615 and mmcmahon@alvarezandmarsal.com, or Peter Wollmeringer at (212) 763-1636 and pwollmeringer@alvarezandmarsal.com if we can be of further assistance.

Yours sincerely,

*Alvarez & Marsal Valuation Services LLC*

Alvarez & Marsal Valuation Services, LLC
By:   Mark McMahon
        Managing Director

# EXHIBIT 64

| Instrument | Strategy | Portfolio % | Accrued Interest | Total | Preferred Equity & Debt | Common Equity & Convertible Debt/PE | Peak Level | Debt sold to Benchmead | Debt sold to New Mountain | Total PE and QGPE | Total E and QGPE | Total Exposure Including Debt sold to Third Parties |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Golden Gate DT LLC | Asset Based Finance Energy | 6.4% | 2,232,951.23 | 139,562,176.34 | 117,562,371.98 | 122,025,798.40 | 3 | | 40,055,124.58 | 122,025,598.40 | 217,789,313.18 | 217,790,513.18 |
| Northstar GOM Holdings | Asset Based Finance General | 21.3% | 5,492,738.68 | 206,383,860.36 | 92,215,453.68 | 114,060,406.68 | 3 | 30,000,000.00 | 30,000,000.00 | 114,060,406.68 | 154,215,453.68 | 296,383,860.36 |
| Virgin Pulse and China Horizon | Event Driven | 6.6% | | 66,074,245.00 | 66,074,245.00 | 6,054,838.70 | 2 | | 61,019,452.30 | 61,019,452.30 | | |
| Aspire Energy LLC | Event Driven | 4.3% | | 60,000,502.02 | 60,000,502.02 | 6,765,322.82 | 3 | | 53,975,029.70 | 53,975,029.70 | | |
| Kadmon Sciences Corp | Asset Based Finance General | 8.8% | 4,111,234.85 | 86,888,053.74 | | 86,877,545.07 | 3 | 20,000,000.00 | 30,000,000.00 | 34,193,514.64 | 34,193,514.64 | 102,869,650.71 |
| Perforce | Asset Based Finance Energy | 3.7% | | 36,243,211.12 | | 36,243,211.12 | 3 | | 15,151,987.02 | 15,151,987.02 | 21,097,168.10 | 36,243,155.12 |
| Novolex Biopharmaceutica | Event Driven | 2.0% | | 19,826,469.47 | | 19,826,469.47 | 3 | | | 13,346,471.87 | 13,346,471.87 | |
| Vringo Therapeutics Inc | Event Driven | 1.9% | | 18,943,464.80 | | 18,943,464.80 | 3 | | | 18,896,469.80 | 18,896,469.80 | |
| Carbon Credits | Energy Related Arbitrage | 3.7% | | 36,994,542.81 | | 36,994,542.81 | 3 | | | | | |
| Seventh International Limited | Asia Based Arbitrage | 2.2% | | 21,157,815.94 | | 21,167,815.94 | 3 | | | 21,167,815.94 | 21,167,815.94 | |
| Dakota Plains Holdings | Asset Based Finance General | 2.5% | | 23,878,732.02 | | 23,878,732.02 | 3 | | | 23,878,732.02 | 23,873,712.02 | 32,873,712.02 |
| Scena Pit Op | Asset Based Finance General | 2.4% | | 21,955,406.80 | | 21,955,406.80 | 3 | | 9,000,000.00 | 9,000,000.00 | | |
| Direct Investing, LLC | Event Driven | 2.2% | 289,154.84 | 22,273,739.78 | | 22,273,739.78 | 3 | | 14,683,444.62 | 14,683,444.62 | | |
| Black Elk Energy Offshore | Asset Based Finance Energy | 2.2% | | 21,448,800.00 | 21,448,800.00 | | 3 | | 21,448,800.00 | 21,448,800.00 | | 21,448,800.00 |
| Blackbird Group Ltd | Asia Based Arbitrage | 2.6% | 4,644,591.21 | 25,060,788.21 | 25,060,788.21 | | 3 | | | | | |
| Advance Energy Global | Asia Based Arbitrage | 1.2% | 11,787,884.67 | 11,787,884.67 | 11,787,884.67 | | 3 | | | | | |
| Amityi LLC | Asset Based Finance General | 0.9% | 881,597.20 | 8,918,937.20 | 883,937.20 | | 3 | | | | | |
| Nuverra Holdings Ltd | Asia Based Arbitrage | 1.4% | | 13,921,527.72 | 13,921,527.72 | | 3 | | | 13,921,527.72 | 13,921,527.72 | |
| Zeally | Event Driven | 0.6% | | 6,092,672.00 | | 6,092,672.00 | 3 | | | 6,092,672.00 | 6,092,672.00 | |
| Citie Therapeutics Inc | Event Driven | 0.8% | | 7,615,915.14 | | 7,615,915.14 | 2 | 1,000,000.00 | | 6,605,835.14 | 6,605,835.14 | |
| Milagro Limited (formerly Mariner Star) | Asset Based Finance Mining | 0.5% | | 4,912,174.52 | | 4,912,174.52 | 3 | | | 4,912,174.52 | 4,912,174.52 | |
| LiveGold | Asia Based Arbitrage | 8.1% | | 78,251,693.78 | | 78,251,693.78 | 3 | | | 78,251,693.78 | 78,251,693.78 | |
| Viper Metals/pine Company | Asset Based Finance General | 0.5% | | 724,860.52 | | 724,860.52 | 3 | 724,860.52 | | | | |
| UREYE EVERGREEN COAL LUND | Asset Based Finance General | 0.1% | | 1,355,187.00 | | 1,355,187.00 | 3 | | | | | |
| Banyan Claros Receivable | Asset Based Finance General | 0.0% | | | | | 3 | | | | | |
| Viper Fast Trade, Inc | Event Driven | 0.2% | 2,234,136.99 | 2,234,136.99 | | 2,234,136.99 | 3 | | | 2,234,136.99 | 2,234,136.99 | |
| John Johnson / Claros Receivable | Asset Based Finance General | 0.2% | 2,000,000.00 | 2,000,000.00 | 2,000,000.00 | | 3 | | | | | |
| Car Charging Group Inc | Event Driven | 0.4% | 3,975,902.50 | 3,975,902.50 | | 3,975,902.50 | 2 | | | 3,975,902.50 | 3,975,902.50 | |
| Infinity Augmented Reality | Event Driven | 0.5% | 4,768,381.33 | 4,768,381.33 | | 4,768,381.33 | 2 | | | 4,768,381.77 | 4,768,381.77 | |
| Copper Rabit LLC | Event Driven | 0.2% | 1,617,548.10 | 1,617,548.10 | 1,617,548.10 | | 3 | | | | | |
| Fluoxetherms | Event Driven | 0.1% | 978,732.34 | 978,732.34 | | 978,732.34 | 3 | | | 978,732.34 | 978,732.34 | |
| Slice Corportant LTD | Event Driven | 0.1% | 1,442,621.76 | 1,442,621.76 | | 1,442,621.76 | 3 | | | 1,442,621.76 | 1,442,621.76 | |
| Farol Travel LLC | Asset Based Finance General | 0.1% | 1,431,683.10 | 1,431,683.10 | 1,431,683.10 | | 3 | | | | | |
| TAG Premium Holdings | Asset Based Finance General | 0.1% | 1,000,000.00 | 1,000,000.00 | 1,000,000.00 | | 3 | | 1,000,000.00 | | | 1,000,000.00 |
| OKC Development Ltd | Event Driven | 0.0% | 345,460.00 | 345,460.00 | 345,460.00 | | 3 | | | | | |
| Chibium Executive Pharma | Asset Based Finance General | 0.1% | 750,000.00 | 750,000.00 | 750,000.00 | | 3 | | | | | |
| Data Analytic Corp | Event Driven | 0.0% | 380,360.80 | 380,360.80 | 380,360.80 | | 2 | | | | | |
| Freedom Food Wing | Asset Based Finance Mining | 0.0% | 25,000.00 | 25,000.00 | | 25,000.00 | 3 | | | 25,000.00 | 25,000.00 | |
| Analog LLC | Asset Based Finance Mining | 0.0% | 56,506.54 | 56,506.54 | | 56,506.54 | 3 | | | 56,506.54 | 56,506.54 | |
| QUANTRX BIOMEDICAL CORP | Event Driven | 0.0% | 178,061.32 | 178,061.32 | | 178,061.32 | 3 | | | 178,061.32 | 178,061.32 | |
| Immunix Therapeutics | Event Driven | 0.0% | 50,000.00 | 50,000.00 | 50,000.00 | | 3 | | | | | |
| | Grand Total | | 947,616,599.10 | | 968,891,938.71 | 268,519,513.82 | | | 460,534,880.20 | | | |
| | | | September 1st NAV | 804,680,060.48 | | | | | | | | |
|  | | | | 21,226,339.61 | | | | | | | | |

| Strategy | Portfolio % | Value |
|---|---|---|
| Asia Based Arbitrage | 18.7% | 150,169,283.33 |
| Asset Based Finance Energy | 50.3% | 404,644,291.86 |
| Asset Based Finance General | 14.7% | 117,926,737.45 |
| Asset Based Finance Mining | 3.5% | 28,457,796.98 |
| Energy Related Arbitrage | 4.9% | 39,350,089.85 |
| Event Driven | 28.4% | 228,345,739.27 |
| Long/Short Fundamental | 0.0% | - |
| Opportunistic Macro | 0.0% | - |
| | | 968,893,938.73 |

| | | |
|---|---|---|
| Sept 1st AUM | | 804,680,960.48 |



| Investment | Maturity | Accrued Interest | Notes |
|---|---|---|---|
| Agera Energy LLC | | | |
| PedevCo | | 188,000.00 | Will be added to principal of the note |
| Blumont Group Ltd. | 3/16/2016 | 4,664,391.21 | Due at the maturity on the note |
| China Horizon | 11/30/2015 | | Interest will be capitalized as of 6/30 |
| Desert Hawk Gold Corp. | 8/31/2015 | - | $500K Due 8/31/2015 |
| Desert Hawk Gold Corp. | 11/30/2016 | | |
| Golden Gate Oil LLC | 10/1/2015 | 2,267,950.23 | Accruing regular and deferred interest |
| Implant Sciences Corp | 3/31/2017 | | Outstanding interest marked at 15% discount |
| Implant Sciences Corp | 3/31/2017 | | Interest Capitalized |
| Implant Sciences Corp | 3/31/2017 | | Interest Capitalized |
| Navidea Biopharmaceutica | 6/30/2016 | 100,000.00 | Will be paid with Principal |

# EXHIBIT 65



**Alvarez & Marsal Valuation Services, LLC**
600 Madison Avenue, 8th Floor
New York, NY 10022
Phone: +1 212 759 4433
Fax: +1 212 759 5532

June 9, 2016

**Private and Confidential**

Joseph SanFilippo
Chief Financial Officer
Platinum Partners, LP
250 West 55th Street, 14th Floor
New York, NY 10019

**RE: Valuation Advisory Services for Certain Investments Held by Funds Managed by Platinum
Partners Value Arbitrage Fund, LP as of March 31, 2016**

Dear Mr. SanFilippo,

Per the engagement letter ("Engagement Letter") by and between Platinum Partners, LP, including its
subsidiaries and affiliates and their respective successors and assigns (jointly and severally, "Platinum"),
dated April 16, 2015, Alvarez & Marsal Valuation Services, LLC ("A&M") has been engaged by Platinum
to provide valuation consulting services for certain investments (the "Investments") in portfolio companies
(the "Portfolio Companies") held in Platinum Partners Value Arbitrage Master Fund, LP ("PPVA") as of
March 31, 2016 (the "Valuation Date").

As defined in our Engagement Letter, our services included the execution of certain limited procedures
(the "Limited Procedures") and the preparation of this letter report (the "Report"), which is intended to
provide the management of Platinum ("Management") with information that A&M understands will be
relied upon for financial reporting purposes only.  Platinum understands that Management is solely and
ultimately responsible for determining the Fair Value of its investments in good faith.

We relied, without further independent verification, on the accuracy and completeness of all publicly
available information and information (including but not limited to the prospective financial information)
that is furnished by or on behalf of Platinum and other sources reasonably deemed appropriate by A&M
regarding each Portfolio Company or Investment.   We are not responsible for the accuracy or
completeness of such information and shall not be responsible for any inaccuracies or omissions therein.
We did not engage in any independent assessment of any prospective financial information.

Per our Engagement Letter, A&M assumes that all information provided (i) reflects accurately a
description of the business and the nature of each underlying asset, the results of operations and
financial condition, without additional verification and (ii) that all information made available to A&M was
complete and correct in all material respects and did not contain any untrue statements of material fact or
omit to state a material fact necessary in order to make the statements therein not misleading in light of
the circumstances under which such statements were made.

Platinum has requested an estimated range of Fair Value for the following Investments in the following
Portfolio Companies owned by PPVA, as of the Valuation Date:

- PPVA Oil & Gas (incl. NorthStar Offshore Group & Golden Gate Oil) – Senior secured promissory
  note / Preferred equity units/ Delayed draw term note / Second Priority Senior Secured Notes /
  Common equity
- Pedevco – Senior secured notes receivable / Subordinate notes receivable / Common equity /
  Senior and Junior warrants / Caspian Energy common equity & options
- China Horizon Holdings – Convertible note / Promissory notes / Demand promissory note / Series
  B&C preferred equity / Common equity
- Sky East International - Repurchase agreements
- Newrick Holdings – Repurchase agreement



- Carbon offtake contracts
- Urigen Pharmaceuticals – Convertible notes /  Preferred equity / Warrants
- Viper High Performance – Notes receivable / Common equity
- Viper Real Estate – Real property
- AirDye / Saviva – Senior promissory note / Common equity
- Echo Therapeutics – Secured convertible note / Promissory bridge note / Convertible preferred Series E&F equity / Common equity / Warrants
- Navidea Biopharmaceuticals – Series A convertible preferred shares / Common shares / Equity swaps / Warrants
- FluoroPharma Medical – Convertible preferred Series B / Common stock / Warrants
- Vistagen Therapeutics – Series A, B & C convertible preferred stock / Common stock
- Car Charging Group – Common equity
- Infinity Augmented Reality – Preferred A&B / Common equity / Options
- Implant Sciences – Senior secured promissory notes / Line of credit / First, Second and Third senior secured convertible promissory notes / Common shares
- Zadara Storage – Series A preferred shares / Ordinary A-1 and A-2 shares
- Liongold Corp – Common equity / Put option
- Parot Tovot / Copper Rider – Loans (in Default)
- Blumont – Notes receivable
- Agera Energy – Membership interest
- Over Everything – Notes receivable / Common Equity
- Minque – Common equity
- Desert Hawk Gold – Equity ownership

Platinum acknowledges that this Report and any advice (written or oral) provided by A&M to Platinum in connection with the Engagement Letter is intended solely for the benefit and use of Platinum in considering the matters to which the related Engagement Letter relates.  Platinum agrees that neither the Report nor any such advice shall be used for any other purpose or disclosed or made available to third parties (other than Platinum's auditor, administrator, tax and legal advisors) and other professional advisors, provided that any such other professional advisors first execute A&M's standard non-reliance letter, or otherwise reproduced, disseminated, quoted or referred to at any time in any manner without A&M's prior written approval, except as required by law or regulation of any relevant jurisdiction.  In addition, A&M will not provide consent to be a named expert in any filings, including, without limitation, any filings with the U.S. Securities and Exchange Commission under the Securities Act of 1933 or the Securities Exchange Act of 1934, as amended.  The report is not being rendered by A&M as an agent or as a fiduciary of Platinum or any of its constituents and A&M shall not have any liability or obligation with respect to its services hereunder to such constituents or to any other person, firm or public or private entity.

Notwithstanding the foregoing, (i) Platinum shall not refer to A&M either directly by name or indirectly as an independent valuation service provider (or by any other indirect reference or description), or to the services, whether in any public filing or other document, without our prior written consent, which A&M may at its discretion grant, withhold, or grant subject to conditions; and (ii) in addition to the foregoing prohibitions and requirements with respect to all third parties, submission of A&M's Report or any portion thereof to, or responding to any comment letter issued by, the Securities and Exchange Commission or its staff, or any written or verbal references to A&M, A&M's Report or to the services in such a response is subject to Platinum providing A&M with prior written notice, and allowing A&M to provide input as to the content of such response.  In no event, regardless of whether consent or pre-approval has been provided, shall A&M assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

A&M's Report is as of the Valuation Date.  A&M cannot be held responsible for changes in the market conditions that could have a material impact on the values reported therein subsequent to the Valuation Date.  It is further stated that the terms of A&M's engagement do not provide for reporting on events and transactions which occurred subsequent to the Valuation Date.  Because A&M's services are limited in nature and scope, they cannot be relied upon to discover all documents and other information or provide all analyses that may be of importance in this matter.  For example, any procedures A&M performed



cannot be relied upon to give assurance that any defalcations or fraudulent transfers that might have taken place will be discovered.

Platinum understands that A&M is not undertaking to provide any legal, regulatory, accounting, insurance, tax or similar professional advice, and that A&M's Report will not be used for guidance in such matters. It is also assumed that businesses or/or assets analyzed will not operate in violation of any applicable government regulations, codes, ordinances or statutes. It is assumed that all necessary licenses and agreements remain in full force and effect in order to continue the operations of each company supporting the values of the Investments.

This engagement was conducted in accordance with our Engagement Letter and through discussions with Platinum. The sufficiency of the Limited Procedures is solely the responsibility of those parties specified in this Report. Consequently, A&M makes no representation regarding the sufficiency of the Limited Procedures either for the purposes for which this Report has been requested or for any other purpose.

**Summary of Conclusions**

Utilizing the approaches and procedures outlined in the following sections and in the attached Appendix, and under the guidelines of ASC 820, we estimate the Fair Value range of each of the Investments as of the Valuation Date to be as follows:

| Issuer | Investment | Concluded Fair Value Range (000s) |
|---|---|---|
| PPVA Oil & Gas / NorthStar Offshore Group/ Golden Gate Oil | Common equity | $202,500 - $243,100 |
| | Senior secured promissory note | $16,732 - $17,117 |
| | Preferred equity units | $60,831 |
| | Delayed Draw Term Loan / Second Priority Senior Secured Notes | $22,304 - $22,511 |
| Pedevco | Senior secured notes receivable / Subordinate notes receivable / Common equity / Senior and Junior Warrants / Caspian Energy common equity & options | $27,923 - $28,140 |
| China Horizon Holdings | Convertible note / Promissory notes / Demand promissory note / Series B&C preferred equity / Common equity | $51,675 - $81,152 |
| Sky East International - Repurchase Agreements | PT Eureka Prima Jakarta | $4,280 - $4,291 |
| | PT Sigmagold International Perkasa | $8,439 - $8,445 |
| | PT Polaris Investema | $7,526 - $7,593 |
| | Advance Energy - Repurchase agreement | $11,310 - $11,369 |
| Newrick Holdings | Repurchase agreement | $13,283 - $13,310 |
| Carbon offtake contracts | Carbon offtake contracts | $35,478 - $342,805 |
| Urigen Pharmaceuticals | Convertible notes / Preferred equity / Warrants | $75,450 - $91,182 |
| Viper High Performance | Notes receivable / Common equity | $878 - $1,228 |
| Viper Real Estate Inc. | Real property | $2,734 |
| Airdye / Saviva | Senior promissory note / Common equity | $24,491 - $27,227 |
| Echo Therapeutics | Secured Convertible Note / Promissory bridge note / Convertible preferred Series E&F equity / Common equity / Warrants | $6,150 - $6,920 |
| Navidea Biopharmaceuticals | Series A convertible preferred shares / Common shares / Equity swaps / Warrants | $30,300 - $31,600 |
| FluoroPharma Medical | Convertible preferred Series B / Common stock / Warrants | $3,436 - $3,457 |



| Issuer | Investment | Concluded Fair Value Range (000s) |
|---|---|---|
| Vistagen Therapeutics | Series A, B & C convertible preferred stock / Common stock | $39,600 - $43,000 |
| Car Charging Group, Inc. | Common equity | $2,700 |
| Infinity Augmented Reality | Preferred A&B / Common equity / Options | $4,639 - $5,345 |
| Implant Sciences | Senior secured promissory note / Line of credit / First, Second and Third senior secured convertible promissory notes / Common shares | $86,480 |
| Zadara Storage | Series A preferred shares / Ordinary A-1 & A-2 shares | $6,300 - $8,800 |
| Liongold | Common equity / Put option | $6,852 - $8,077 |
| Parot Tavot / Copper Rider | Loans (in Default) | $654 - $785 |
| Blumont Group | Notes receivable | $15,444 |
| Agera Energy | Membership interest | $117,800 - $148,100 |
| Over Everything | Notes receivable / Common equity | $19,110 - $27,380 |
| Minque | Common equity | $4,200 - $6,500 |
| Desert Hawk Gold | Equity ownership | $23,084 - $31,841 |

We appreciate the continued opportunity to work with you on this engagement.  Please contact me at (212) 763-1615 and mmcmahon@alvarezandmarsal.com, or Shankar Mulchandani at (212) 763-9759 and smulchandani@alvarezandmarsal.com if we can be of further assistance.

Yours sincerely,

*Alvarez & Marsal Valuation Services LLC*

Alvarez & Marsal Valuation Services, LLC
By:   Mark McMahon
        Managing Director

**Platinum Partners, LP - Platinum Partners Value Arbitrage Fund, LP**
**Valuation of Equity Investments in Agera Energy LLC**
**Investment Overview and Summary of Valuation Methodology & Conclusions**

Schedule 1

Valuation Date: March 31, 2016

US$ in 000s

# Agera Energy LLC

## Business Description & Investment Thesis [1]

Agera Energy LLC ("Agera" or the "Company") is an energy company providing solutions for businesses and residents. The Company's solutions include natural gas and electricity supply, demand management, utility audits and small business funding. Agera is a licensed supplier in over 20 states and 50 different utilities.

Platinum owns 55.0% of Principal Growth Strategies ("PGS") which holds a convertible note issued by Agera Energy. The convertible note, issued in May 2014, can be converted into 95.0% of the outstanding securities of the Company at the sole discretion of PGS.  During the third quarter of 2015, Agera Energy repurchased the preferred units owned by Platinum.

### Summary of Investments Reviewed [1][3][4][5]

| | Percentage Owned | Terms |
|---|---|---|
| Membership Interest [2] | 52.25% | NA |

## Current Business Commentary

### Business

New management has thus far successfully implemented many changes to the company and cost structure. The Company was also able to stop the churning of customers and is now building the customer base which is greater than 200 thousand. The Company continues to eliminate legacy costs (i.e. bad debt) and to achieve regulatory approval in all operating states. In the first quarter of 2015, the Company announced the acquisition of Energy Me, an energy retailer supplying electricity to commercial and residential customers, for a purchase price of $5.5 million.

### Financials

The Company had revenue of $352.5 million and EBITDA of $11.0 million in fiscal year 2013; however Agera Energy experienced customer churn as it went through the bankruptcy process in 2014. Management forecasted a recovery in EBITDA for 2015 to $13.4 million and expects significant growth in revenue and EBITDA in 2016 and 2017. Future growth will be driven primarily by expansion of the customer base and the acquisition of Energy Me which is expected to add incremental revenue of approximately $104.0 million and incremental EBITDA of $4.1 million in 2015.

Based on December 31, 2015 financials, Agera achieved FY 2015 revenues of $301.4 million and EBITDA of $20.2 million. The EBITDA is significantly higher than the projected FY 2015 EBITDA of $13.4. Management is projecting about 100% revenue growth and about 75% EBITDA growth in FY 2016.

### Valuation Methodology

The enterprise value of the Company was estimated using the income approach and market approach. We performed a discounted cash flow analysis using the Company's forecasts to derive the future debt-free cash flows of the business. The cash flows were discounted to present value using a discount rate derived from the comparable publicly traded companies. We also considered the market approach, applying valuation multiples (one year forward revenue and EBITDA multiples) of comparable publicly-traded companies to the Company's projected financial parameters to estimated enterprise value.

Net debt was subtracted from enterprise value to derive the implied aggregate equity to which Platinum's 52.25% membership interest was applied, which reflects an effective controlling interest in the Company.

## Equity Value Summary

| | | Low | High |
|---|---|---|---|
| Enterprise Value | $ | 251,000 | 309,000 |
| Add: Cash and Cash Equivalents | | 11,083 | 11,083 |
| Less: Debt | | 36,550 | 36,550 |
| Aggregate Equity Value | | 225,533 | 283,533 |
| Implied Enterprise Value Multiples | | | |
| 2016 EBITDA | | 7.1 x | 8.8 x |

## Summary of Valuation Methodology

| | Method A | %Wt | Method B | %Wt |
|---|---|---|---|---|
| | Market Approach | 50.0% | Income Approach | 50.0% |
| 52.25% Membership Interest | | | | |

## Summary of Fair Value by Investment

| | Low | High |
|---|---|---|
| 52.25% Membership Interest | $117,860 | $148,100 |

**Footnotes:**
(1) Source: Platinum Valuation Memo.
(2) PGS holds a convertible note in Agera Energy that can be converted at its sole discretion into 95.0% of the outstanding capital securities of the company. Platinum holds a 55.0% interest in PGS, resulting in an effective membership interest in the Company of 52.25%.
(3) Source: Agera Energy et al - proforma combined Nov. 2015 01.12.16.
(4) Source: Agera Business internal projections 1.27.2016
(5) Source: Agera Energy et al - proforma combined Dec 2015 - 03.02.16

**Platinum Partners, LP – Platinum Partners Value Arbitrage Fund, LP**
Schedule 2
Valuation of Equity Investments in Agera Energy LLC
Valuation Summary
Valuation Date: March 31, 2016
US$ in 000s

|  | Weighting | Estimated Range of Enterprise Value | |
|---|---|---|---|
| **Market Approach:** |  |  |  |
| Guideline Public Company Method - Control (1) | 50.0% | $ 255,000 | $ 303,000 |
| **Income Approach:** |  |  |  |
| Discounted Cash Flow Method - Control (2) | 50.0% | 246,000 | 314,000 |
| Indicated Enterprise Value Range - Rounded | | $ 251,000 | $ 309,000 |
| Implied 2016 EBITDA Multiple (3) | | 7.1 x | 8.8 x |
| Add: Cash (4) | | 11,083 | 11,083 |
| Less: Debt (4) | | 36,550 | 36,550 |
| Implied Aggregate Equity Value | | $ 225,533 | $ 283,533 |
| **Common Equity Value** | | $ 225,533 | $ 283,533 |
| PPVA 52.25% Membership Interest (rounded) (5) | | 117,800 | 148,100 |

*Footnotes:*
*(1) See Comparable Company Valuation Analysis, Schedule 3.*
*(2) See Business Enterprise Valuation: Income Approach - Discounted Debt-Free Cash Flow ("DCF") Method, Schedule 5.*
*(3) Projected 2016 EBITDA, per Company forecast.*
*(4) Cash and debt balances as of March 31, 2016 based on data provided by Management.*
*(5) A discount for illiquidity is not applied to Platinum's common equity value due to effective control of the Company.*

**Platinum Partners, LP - Platinum Partners Value Arbitrage Fund, LP**
**Valuation of Equity Investments in Agera Energy LLC**
**Comparable Company Valuation Analysis**
**US$ in 000s**

Schedule 3
Valuation Date: March 31, 2016

| Valuation Multiples | Weighting | Selected Multiple Range | | Agera Energy LLC Financial Statistic (1) | Enterprise Value Range (2) | | Less: Interest-Bearing Debt | Equity Value Range | |
|---|---|---|---|---|---|---|---|---|---|
| **1 Year Forward:** | | | | | | | | | |
| Enterprise Value / Revenue (3) | 33.3% | 0.35 x | 0.45 x | $ 607,343 | $ 212,570 | $ 273,304 | $ 36,550 | $ 176,020 | $ 236,754 |
| Enterprise Value / EBITDA (3) | 66.7% | 7.00 x | 8.00 x | 35,198 | 246,386 | 281,584 | 36,550 | 209,836 | 245,034 |
| **Weighted Indicated Fair Value Range - Minority, Marketable** | | | | | | | | $ 198,564 | $ 242,274 |
| Add: Control Premium (4) | | | | | | | 10.0% | 19,856 | 24,227 |
| **Weighted Adjusted Fair Value of Equity - Control, Marketable Basis** | | | | | | | | $ 218,420 | $ 266,501 |
| Add: Interest-Bearing Debt | | | | | | | | 36,550 | 36,550 |
| **Weighted Adjusted Fair Value of Enterprise Value - Control (Rounded)** | | | | | | | | $ 255,000 | $ 303,000 |

*Footnotes:*
(1) Projected financial parameters per Company forecast file.
(2) Valuation Multiple x Financial Statistic.
(3) Selected revenue and EBITDA multiple range based on the low indication from the comparable public companies.
(4) As Platinum has effective control of the Company, a control premium is applied based on research and analysis by Alvarez & Marsal.

**Platinum Partners, LP - Platinum Partners Value Arbitrage Fund, LP**
Valuation of Equity Investments in Agera Energy LLC
Comparable Company Multiples
US$ in 000s, except per share

Schedule 4
Valuation Date: March 31, 2016

| | High | 75th Percentile | 25th Percentile | Low | Mean | Median | Just Energy Group Inc. | Superior Plus Corp. | Spark Energy, Inc. |
|---|---|---|---|---|---|---|---|---|---|
| Company Name: | | | | | | | | | |
| Ticker Symbol: | | | | | | | TSX:JE | TSX:SPB | SPKE |
| Fiscal Year End (FYE): | | | | | | | Mar 31, '15 | Dec 31, '15 | Dec 31, '15 |
| Trailing Twelve Months (TTM): | | | | | | | Dec 31, '15 | Dec 31, '15 | Dec 31, '15 |
| **Valuation Multiples:** | | | | | | | | | |
| *Enterprise Value / Revenue* | | | | | | | | | |
| FYE+2 Consensus | 0.77 x | 0.66 x | 0.46 x | 0.39 x | 0.57 x | 0.54 x | 0.39 x | 0.54 x | 0.77 x |
| FYE+1 Consensus | 0.82 x | 0.70 x | 0.49 x | 0.40 x | 0.60 x | 0.58 x | 0.40 x | 0.58 x | 0.82 x |
| TTM | 0.90 x | 0.79 x | 0.55 x | 0.44 x | 0.67 x | 0.67 x | 0.44 x | 0.67 x | 0.90 x |
| *Enterprise Value / EBITDA* | | | | | | | | | |
| FYE+2 Consensus | 7.8 x | 7.2 x | 5.8 x | 5.1 x | 6.5 x | 6.5 x | 7.8 x | 5.1 x | 6.5 x |
| FYE+1 Consensus | 8.5 x | 7.8 x | 6.8 x | 6.5 x | 7.4 x | 7.1 x | 8.5 x | 6.5 x | 7.1 x |
| TTM | 9.3 x | 9.3 x | 8.9 x | 8.6 x | 9.0 x | 9.2 x | 9.2 x | 9.3 x | 8.6 x |

*Footnotes:*
(1) Historical and forecast consensus financial statements for the selected guideline public companies provided by Capital IQ.

**Platinum Partners, LP – Platinum Partners Value Arbitrage Fund, LP**
**Valuation of Equity Investments in Agera Energy LLC**
**Business Enterprise Valuation: Income Approach - Discounted Debt-Free Cash Flow ("DCF") Method**
**US$ in 000s**

**Schedule 5**
**Valuation Date: March 31, 2016**

| | Company Forecast (1) | | | Extended Forecast (2) | | | Terminal |
|---|---|---|---|---|---|---|---|
| | Dec 31, '16 | Dec 31, '17 | Dec 31, '18 | Dec 31, '19 | Dec 31, '20 | Dec 31, '21 | |
| Net Revenue | $ 607,343 | $ 819,846 | $ 1,115,782 | $ 1,338,938 | $ 1,472,832 | $ 1,546,474 | $ 1,585,136 |
| % Revenue Growth Rate | 100.5% | 35.0% | 36.1% | 20.0% | 10.0% | 5.0% | 2.5% |
| Total Expenses | 572,145 | 764,381 | 1,034,887 | 1,241,864 | 1,366,051 | 1,434,353 | 1,470,212 |
| EBITDA | $ 35,198 | $ 55,465 | $ 80,895 | $ 97,074 | $ 106,781 | $ 112,120 | $ 114,923 |
| EBITDA Margin | 5.8% | 6.8% | 7.3% | 7.3% | 7.3% | 7.3% | 7.3% |
| Depreciation & Amortization | 115 | 115 | 115 | 115 | 115 | 115 | 115 |
| Earnings Before Interest & Taxes (EBIT) | $ 35,083 | $ 55,350 | $ 80,780 | $ 96,959 | $ 106,667 | $ 112,006 | $ 114,809 |
| EBIT Margin | 5.8% | 6.8% | 7.2% | 7.2% | 7.2% | 7.2% | 7.2% |
| Blended Income Taxes | (12,279) | (19,373) | (28,273) | (33,936) | (37,333) | (39,202) | (40,183) |
| Blended Income Tax Rate | 35.0% | 35.0% | 35.0% | 35.0% | 35.0% | 35.0% | 35.0% |
| Debt-Free Net Income | $ 22,804 | $ 35,978 | $ 52,507 | $ 63,024 | $ 69,333 | $ 72,804 | $ 74,626 |
| Cash Flow Adjustments: | | | | | | | |
| Depreciation & Amortization | 115 | 115 | 115 | 115 | 115 | 115 | 115 |
| Capital Expenditures | (115) | (115) | (115) | (115) | (115) | (115) | (115) |
| Net Change in Non-Cash Working Capital | (21,416) | (14,875) | (20,716) | (15,621) | (9,373) | (5,155) | (2,706) |
| Debt-Free Cash Flow | $ 1,388 | $ 21,102 | $ 31,792 | $ 47,403 | $ 59,961 | $ 67,649 | $ 71,919 |
| Partial Period Factor | 0.75 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | |
| Discount Period | 0.38 | 1.25 | 2.25 | 3.25 | 4.25 | 5.25 | |
| Present Value Factor  20.0% | 0.9336 | 0.7957 | 0.6631 | 0.5526 | 0.4605 | 0.3837 | |
| Present Value of Debt-Free Cash Flows | $ 976 | $ 16,791 | $ 21,081 | $ 26,193 | $ 27,611 | $ 25,959 | |

Terminal Growth Rate    2.5%

| | | |
|---|---|---|
| Sum of the Present Value of Discrete Year Cash Flows | 118,611 | Residual Value at Terminal Year   $ 410,968 |
| Present Value of Terminal Cash Flow | 157,701 | Present Value Factor   0.3837 |
| **Indicated Enterprise Value from Operations (Rounded)** | **$ 276,000** | **Present Value of Terminal Cash Flow   $ 157,701** |

**Enterprise Value from Operations Sensitivity Test**

| | | WACC | | |
|---|---|---|---|---|
| Growth | | 18.5% | 20.0% | 21.5% |
| | 2.0% | $ 303,000 | $ 272,000 | $ 246,000 |
| | 2.5% | $ 308,000 | $ 276,000 | $ 250,000 |
| | 3.0% | $ 314,000 | $ 281,000 | $ 253,000 |

| Implied Enterprise Value from Operations Multiples: | |
|---|---|
| FYE 2016 Revenue Multiple | 0.5 x |
| FYE 2016 EBITDA Multiple | 7.8 x |
| FYE 2017 Revenue Multiple | 0.3 x |
| FYE 2017 EBITDA Multiple | 5.0 x |

*Footnotes:*
*(1) Projected revenue and cash flows per company guidance*
*(2) Company projections extended based on guidance from Platinum assuming EBITDA margin and working capital as a percent of revenue (7.3%) stabilize at 2018 levels.*

**Platinum Partners, LP - Platinum Partners Value Arbitrage Fund, LP**
Valuation of Equity Investments in Agera Energy LLC
Beta, Capital Asset Pricing Model ("CAPM") & Weighted Average Cost of Capital ("WACC") Analyses
US$ in 000s, except per share amounts

**Schedule 6**
**Valuation Date: March 31, 2016**

| Selected Public Guideline Companies (1) | Total Debt | Total Preferred Equity | Month End Stock Price | Total Shares Outstanding | Market Value of Common Equity | Total Capital | Book Value of Debt to Equity | Book Value of Debt to Capital (Wd) | Effective Income Tax Rate | 5 Year Monthly Equity Raw Beta | 5 Year Monthly Asset Raw Beta (Ba) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Just Energy Group Inc. | $ 500,923 | $ — | $ 6.11 | 147,072 | $ 898,446 | $ 1,399,368 | 55.6% | 35.8% | 35.0% | 1.56 | 1.15 |
| Superior Plus Corp. | 612,045 | — | 6.99 | 141,093 | 985,999 | 1,598,044 | 62.1% | 38.3% | 2.9% | 1.15 | 0.72 |
| Spark Energy, Inc. | 48,737 | — | 17.81 | 14,869 | 264,810 | 313,547 | 18.4% | 15.5% | 35.0% | NA | NA |
| High | | | | | | | 62.1% | 38.3% | 35.0% | 1.56 | 1.15 |
| Low | | | | | | | 18.4% | 15.5% | 2.9% | 1.15 | 0.72 |
| Mean | | | | | | | 45.4% | 29.9% | 24.3% | 1.35 | 0.94 |
| Median | | | | | | | 55.8% | 35.6% | 35.0% | 1.35 | 0.94 |
| Selected as Most Comparable to Subject Company | | | | | | | 55.8% | 35.6% | 35.0% | | 0.94 |

**Source:**
Risk-free rate of return (20-year Treasury Bond yield) as of March 31, 2016 as published in Federal Reserve Statistical Release, H.15.

**Cost of Equity Calculation:**

| | | Source: |
|---|---|---|
| Risk-Free Rate (Rf) | 2.2% | |
| Plus Equity Premiums: | | |
| Equity Risk Premium (Rm-Rf) | 6.0% | The expected return of the market in excess of the risk-free rate (2) |
| Relevered Equity Beta (Be) | 1.27 | Be = Ba x [ 1 + (Wd / We) x ( 1 - T )] |
| Industry - Adjusted Equity Risk Premium | 7.6% | Be x (Rm - Rf) |
| Size Premium (SP) | 5.6% | 2016 Valuation Handbook - Cost of Capital, Wiley, 10th decile |
| Additional Risk Premium (ARP) | 13.0% | Additional risk premium based on risks to achieving forecasts. |
| Cost of Equity (Re) Discount Rate (rounded) | 28.5% | Re = Rf + Be (Rm - Rf) + SP + ARP + CRP |

**Cost of Debt Calculation:**

| | | Source: |
|---|---|---|
| Pre-Tax Weighted Cost of Debt | 8.0% | Barclays Capital US Aggregate High Yield Electric Utility Index yield as of March 31, 2016 |
| Estimated Tax Rate | 35.0% | Effective combined State and Federal income tax rate (Federal + [(1 - Federal) x State]) |
| After-Tax Cost of Debt (Rd) | 5.2% | Rd = Rd x (1 - T) |

**Weighted Average Cost Of Capital Calculation:**

| | | |
|---|---|---|
| Debt % of Capital | 35.8% | Wd |
| Cost of Debt | 5.2% | Rd |
| Weighted Cost of Debt | 1.9% | Wd x Rd |
| Equity % of Capital | 64.2% | We |
| Cost of Equity | 28.5% | Re |
| Weighted Cost of Equity | 18.3% | We x Re |
| Weighted Average Cost of Capital (rounded) | 20.0% | |

*Footnotes:*
(1) Source: Capital IQ.
(2) The estimated Equity Risk Premium (ERP) of 6.0 percent is based on studies by NYU professor Aswath Damodaran, London Business School professors Elroy Dimson, Paul Marsh, and Mike Staunton, and the 2015 Valuation Handbook.

EXHIBIT 66

ENTERED
08/02/2017

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **NORTHSTAR OFFSHORE** | § | **Case No. 16-34028** |
| **GROUP, LLC,** | § | **Chapter 11** |
| | § | |
| **DEBTOR.** | § | |

**ORDER (I) APPROVING THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF
CLAIMS, LIENS, INTERESTS AND ENCUMBRANCES; (II) APPROVING
THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

Upon consideration of Northstar Offshore Group, LLC's (the "Debtor") motion (the "Motion")[1] [ECF No. 437] seeking entry of an order authorizing and approving, among other things, the sale (the "Sale") of substantially all of the Debtor's assets (the "Assets") free and clear of Liens and Claims pursuant to that certain Asset Purchase Agreement dated as of August 1, 2017 (the "Purchase Agreement"), attached hereto as Exhibit A, by and between the Debtor and Northstar Offshore Ventures LLC (the "Buyer"), and the assumption and assignment of the executory contracts and unexpired leases identified in Schedule 1.4(a) to the Purchase Agreement (the "Assumed and Assigned Contracts"); and this Court (the "Court" or the "Bankruptcy Court") having determined that the relief requested in the Motion is in the best interests of the Debtor, its estate, its creditors, and other parties in interest; and after due deliberation thereon, and good and sufficient cause appearing therefor, including[2] for the reasons stated on the record at the hearing seeking approval of the Sale (the "Sale Hearing"):

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the Purchase Agreement or the Bidding Procedures Order (defined below), as applicable.

[2]    The words "include," "includes" or "including" when used in this Order shall be deemed to be followed by the words "without limitation," whether or not they are in fact followed by those words or words of like import.

4829-2101-0251.v5

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

    A.    The Court has jurisdiction to consider the Motion and to grant the relief requested therein pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue in this Court is proper under 28 U.S.C. § 1408 and 1409.

    B.    The legal predicates for the relief requested in the Motion are §§ 105, 106, 363 and 365 of the Bankruptcy Code.  Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004, 6006 and 9014.

    C.    In accordance with the provisions of the *Order (A) Approving Sale and Bidding Procedures in Connection With Sale of Assets of the Debtor, (B) Approving Form and Manner of Notice, (C) Scheduling Auction and Sale Hearing, (D) Authorizing Procedures Governing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (E) Granting Related Relief* [ECF No. 504] (as subsequently amended, including, without limitation, amendments relating to, among other things, the Bidding Procedures' deadlines set forth in ECF No. 650, collectively, the "Bidding Procedures Order"), and as evidenced by the certificate of service previously filed with this Court, the Debtor served the Sale Notice, together with a copy of the Bidding Procedures Order and the Bidding Procedures, on (i) all entities contacted by Parkman Whaling, LLC, the Debtor's investment banker, or known by the Debtor to have expressed an interest in entering into a transaction involving the Assets within the last eighteen (18) months; (ii) all state and local taxing authorities or recording offices which have a reasonably known interest in the relief requested; (iii) all of the Debtor's insurers; (iv) all non-debtor parties to the Debtor's contracts or leases (executory or otherwise) as identified by the Debtor; (v) all parties who are known or reasonably believed, after reasonable inquiry, to have

---

[3]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law. *See* Fed. R. Bankr. P. 7052.

asserted any Lien, encumbrance, Claim, or other interest in any of the Assets; (vi) upon all parties set forth in the Debtor's master service list and creditor matrix maintained in these cases; and (viii) all holders of Preferential Purchase Rights.  Based upon the certificates of service [ECF Nos. 443, 521, 532, 554, 590, 620], and the evidence presented as the Sale Hearing: (1) proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures Order, the Bidding Procedures, the Sale Hearing, the Sale and the transactions contemplated thereby, including without limitation, the assumption and assignment of the Assigned Contracts to the Buyer, has been provided in accordance with the Bid Procedures Order, sections 102(1), 105(a), 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6004, 6006, 9006, 9007, and 9014; (2) such notice was good and sufficient, appropriate under the particular circumstances and reasonably calculated to reach and apprise all known and unknown holders of liens, claims and encumbrances and (3) no other or further notice of the Motion, the Sale Hearing, the Sale, the assumption and assignment of the Assumed Contracts or the related Cure Amounts is or shall be required.  In addition, the Sale Notice was posted on the Debtor's case information website for the Chapter 11 Case, https://cases.primeclerk.com/northstar.  Further, a reasonable opportunity to object to and to be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 6004(a).

D.      The Assets sought to be transferred and/or assigned by the Debtor to the Buyer pursuant to the Purchase Agreement are property of the Debtor's estate and title thereto is vested in the Debtor's estate.  For the sake of clarity, such Assets do not include any claims held by the Debtor against third parties, including avoidance actions under chapter 5 of the Bankruptcy Code and applicable non-bankruptcy law, subject to the limitations contained in paragraph 10 below regarding the ability of the Debtor, its estate and any successor to the rights of the Debtor or the

3

estate to prosecute or assert claims against third parties.  To resolve an informal objection raised by the Official Committee of Unsecured Creditors (the "Committee"), such Assets also do not include any claims and causes of action including, without limitation, claims and causes of action under directors and officers' insurance policies and any rights or proceeds of insurance in connection therewith (the "D&O Claims"), each of which constitute an Excluded Asset under this Order, notwithstanding anything to the contrary in the Purchase Agreement, subject again to the limitation contained in paragraph 10 below.

      E.    The Bidding Procedures were substantively and procedurally fair to all parties and all potential bidders, and afforded notice and a full, fair and reasonable opportunity for any person to make a higher or otherwise better offer to purchase the Assets.

      F.    The Debtor and the Buyer negotiated, proposed, and entered into the Purchase Agreement without collusion or fraud, in good faith, and from arm's-length bargaining positions. The Buyer is, therefore, purchasing the Assets in good faith and is a good faith Buyer within the meaning of § 363(m) of the Bankruptcy Code.  The Buyer is not an "insider" or "affiliate" of the Debtor as those terms are defined in §§ 101(31) and 101(2) of the Bankruptcy Code.  Neither the Debtor nor the Buyer has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under § 363(n) of the Bankruptcy Code.  The Buyer proceeded in good faith in connection with all aspects of the Sale.  The Buyer (i) recognized that the Debtor was free to deal with any other party interested in acquiring the Assets, (ii) complied with the Bidding Procedures Order and Bidding Procedures in all respects and (iii) willingly subjected the bid to the competitive Bidding Procedures approved in the Bidding Procedures Order.  All payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Sale have been disclosed, neither the Buyer or the Debtor has

violated section 363(n) of the Bankruptcy Code by any action or inaction, and no common identity of directors or controlling stockholders exists between and among the Buyer on the one hand, and the Debtor, on the other.  Accordingly, the Buyer is entitled to all of the protections afforded under § 363(m) of the Bankruptcy Code, including in the event this Order or any portion thereof is reversed or modified on appeal, and otherwise has proceeded in good faith in all respects in connection with this Chapter 11 Case and the Sale.

      G.    The Debtor and its professionals marketed the Assets and conducted the marketing and sale process in compliance with the Bidding Procedures and the Bidding Procedures Order.  Based upon the record of these proceedings, creditors and other parties in interest and prospective purchasers were afforded a reasonable and fair opportunity to bid and make a higher or otherwise better offer to purchase the Assets.  The Debtor received Qualified Bids from Arena Limited DIP I, LLC ("Arena") and Acadia Energy Holdings, LLC ("Acadia") in addition to the Buyer's Qualified Bid (as set forth in the Purchase Agreement).  The bids submitted by Arena and Acadia, however, were not superior to the Buyer's bid, and after engaging in discussions with the Debtor regarding whether either party intended to amend its respective bid to compete with the Buyer's bid, Arena and Acadia informed the Debtor that neither intended to amend their respective bids and both consented to the cancellation of the Auction. Therefore, in accordance with the Bidding Procedures, the Debtor determined that (i) the Buyer's Qualified Bid constituted the highest and best offer for the Assets and selected the Buyer's Qualified Bid (as set forth in the Purchase Agreement) as the Successful Bid, (ii) there was no need for the Auction to occur, and (iii) canceled the Auction to preserve estate assets. Accordingly, to inform interested parties of the foregoing, the Debtor filed its *Notice of Cancellation of Auction* on July 23, 2017 [ECF No. 703].  A copy of the Purchase Agreement

was attached to the Notice of Cancellation as Exhibit A.  The Debtor's determination that the Purchase Agreement constitutes the highest and best offer for the Assets and the Debtor's selection of the Purchase Agreement as the Successful Bid constitute a valid and sound exercise of the Debtor's business judgment.

H.      The total consideration provided by the Buyer pursuant to the Purchase Agreement (i) is fair and adequate, (ii) is the highest or otherwise best offer for the Assets, (iii) is in the best interests of the Debtor, its creditors, its estate and other parties in interest; (iv) will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative, and (v) constitutes reasonably equivalent value and fair consideration under the Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, the Bankruptcy Code and any other applicable laws.   The Debtor's determination that the Purchase Agreement constitutes the highest and best offer for the Assets and the Debtor's selection of the Purchase Agreement as the Successful Bid constitute a valid and sound exercise of the Debtor's business judgment.   Neither the Debtor nor the Buyer engaged in any conduct that would cause or permit the Purchase Agreement or the consummation of the Sale to be avoided, or costs or damages to be imposed, under § 363(n) of the Bankruptcy Code, any other law of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  The Purchase Agreement was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying or defrauding creditors of the Debtor under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Debtor nor the Buyer has entered into the Purchase Agreement or is consummating the Sale with any fraudulent or otherwise improper purpose.  Other than the

6

Buyer, no person, entity or group of persons or entities has offered to purchase the Assets for an amount that would provide greater economic value to the Debtor and its estate. The Court's approval of the Motion as set forth herein, the Sale, and the Purchase Agreement is in the best interests of the Debtor, its estate and creditors and all other parties in interest.

I.       The Debtor and its professionals conducted the sale process in compliance with the Bidding Procedures Order, and afforded potential purchasers a full, fair and reasonable opportunity to make a higher or otherwise better offer for the Assets than the offer reflected in the Purchase Agreement.

1.       Based on the evidence presented at the Sale Hearing, the Court made findings of fact and conclusions of law that the Sale qualifies as a sale of all or substantially all of the Debtor's assets, and as a consequence, the Debtor is permitted to sell free and clear of any preferential rights held by Fieldwood Energy LLC, Fieldwood Energy Offshore, LLC, and their affiliates (collectively, "Fieldwood"). The Court's oral findings are incorporated into this Order.

J.       Based on the evidence presented at the Sale Hearing, the Buyer is willing, authorized, capable, and qualified—financially, operationally, legally, and otherwise—to perform all obligations under the Purchase Agreement, including to procure replacement performance bonds and assume all Assumed Liabilities with respect to the Assets to be sold pursuant to the Purchase Agreement. Specifically, the Court concludes that the Buyer (i) has sufficient capital to operate the Assets; (ii) upon the Closing, will have personnel qualified to continue operation of the Assets without disruption; (iii) has corporate authority to purchase the Assets; (iv) upon the Closing, will have or after Closing, consistent with the Purchase Agreement, is likely to have, all necessary governmental authority to operate the Assets, including sufficient bonding for the Assets to satisfy all governmental requirements. No

7

consents or approvals of the Debtor, other than those expressly provided for in the Purchase Agreement or this Order, are required for the Debtor to consummate the Sale.

K.     Upon the Closing, except as included in the Assumed Liabilities, the Buyer shall not, and shall not be deemed to: (i) be the successor of or successor employer[4] to the Debtor, and shall instead be, and be deemed to be, a new independent entity from the Debtor and employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws, (ii) have, *de facto* or otherwise, merged or consolidated with or into the Debtor, (iii) be a mere continuation or substantial continuation of the Debtor or the enterprise(s) of the Debtor, or (iv) be liable for any acts or omissions of the Debtor in the conduct of its business or arising under or related to the Assets other than as set forth in the Purchase Agreement.  Without limiting the generality of the foregoing, and except as otherwise provided in the Purchase Agreement, the parties intend that the Buyer shall not be liable for any liability (other than Assumed Liabilities) against the Debtor, or any of its predecessors or Affiliates, and the Buyer shall have no successor or vicarious liability of any kind or character whatsoever, whether known or unknown as of the Effective Time, whether now existing or hereafter arising, whether asserted or unasserted, or whether fixed or contingent, with respect to the Debtor's business, the Assets or any liabilities of the Debtor arising prior to the Effective Time.  The Buyer would not have purchased the Assets but for the foregoing protections against potential Claims based upon "successor liability" theories.

L.     All parties in interest have been provided the ability and the opportunity to assert Claims against the Debtor.

---

[4]     As described in COBRA (defined below) and in any other applicable law or regulation.

M.    Each and every provision of the Assigned Contracts or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any Assigned Contract has been satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.  In accordance with the provisions of the Bidding Procedures Order, and as evidenced by the certificate of service previously filed with this Court, the Debtor served the following: (i) *Notice of (I) Request for Authority to Assume and Assign Certain Executory Contracts and Unexpired Leases, and (II) Proposed Cure Amounts* [ECF No. 544]; (ii) *First Supplemental Notice of (I) Request for Authority to Assume and Assign Certain Executory Contracts and Unexpired Leases, and (II) Proposed Cure Amounts* [ECF No. 591]; (iii) *Second Supplemental Notice of (I) Request for Authority to Assume and Assign Certain Executory Contracts and Unexpired Leases, and (II) Proposed Cure Amounts* [ECF No. 649]; and (iv) *Notice of (I) Request for Authority to Assume and Assign Certain Executory Contracts and Unexpired Leases, and (II) Proposed Cure Amounts* [ECF No. 725], on the Contract Counterparties identified therein that identified, to the extent applicable, (i) the Assumed and Assigned Contract(s) with such Contract Counterparties; (ii) the name and address of such Contract Counterparties; (iii) the proposed effective date of the assignment (subject to the right of the Debtor and the Buyer to withdraw the request for assumption and assignment of the Assumed and Assigned Contract(s) prior to the Closing); (iv) the Cure Amount, if any, under the Assumed and Assigned Contract(s); and (v) the deadlines by which such Contract Counterparties must file an objection to the proposed assumption and assignment of the Assumed and Assigned Contract(s).  The notice given by the Debtor of the assumption and assignment of the Assumed and Assigned Contracts and the associated Cure Amounts constitutes good and sufficient notice and no further notice is required in connection

9

therewith.  Upon the assignment and sale to the Buyer, the Assigned Contracts shall be deemed valid and binding, in full force and effect in accordance with their terms, subject to the provisions of this Order, and shall be assigned and transferred to the Buyer, notwithstanding any provision in the Assigned Contracts prohibiting or otherwise restricting assignment or transfer, and the Debtor, its estate or any of their predecessors, successors or assigns, shall have no further liability or obligation under the Assigned Contracts.

N.   The assumption and assignment of the Assumed and Assigned Contracts is integral to the Purchase Agreement and is in the best interests of the Debtor, its estate, its creditors, and other parties in interest, and represents the Debtor's reasonable exercise of sound and prudent business judgment.  The Buyer has demonstrated adequate assurance of future performance of all Assigned Contracts within the meaning of section 365 of the Bankruptcy Code by the Buyer or any of its affiliates or designees to which an Assigned Contract is assumed and assigned by the Debtor.  The Assigned Contracts being assigned to the Buyer are an integral part of the Sale of the Assets and, accordingly, their assumption and assignment are reasonable and an enhancement to the value of the Debtor's estate.  Evidence adduced at the Sale Hearing demonstrates adequate assurance of future performance by the Buyer with respect to the Assumed and Assigned Contracts pursuant to § 365(f)(2)(B) of the Bankruptcy Code.  The Buyer shall be responsible for satisfying the Cure Amounts.

O.   The Buyer would not have entered into the Purchase Agreement and would not consummate the Sale if the Sale to the Buyer were not free and clear of all claims, lien, interests and encumbrances (other than Assumed Liabilities), including Claims and Liens as defined in the Purchase Agreement, pursuant to § 363(f) of the Bankruptcy Code or if the Buyer would, or in the future could, be liable for any of such claims, liens, interests and encumbrances.  Unless

10

expressly included in the Purchase Agreement, the Buyer shall not be responsible for any claims, liens, interests and encumbrances, including in respect of the following: (i) any labor or employment agreements; (ii) any mortgages, deeds of trust or security interests; (iii) any health or welfare, compensation or other employee benefit plans, agreements, practices or programs; (iv) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related Claim, including, without limitation, Claims that might otherwise arise under or pursuant to (a) Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and section 4980B of the Internal Revenue Code and of any similar state law (collectively, "COBRA") (except as otherwise specifically provided in the Purchase Agreement), (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or Claims relating to any employment with the Debtor or any of its predecessors; (v) any liabilities arising, at any time prior to the Effective Time, under any Environmental Laws with respect to any assets owned or operated by the Debtor or any predecessor of the Debtor; (vi) any bulk sales or similar law; (vii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (viii) any Excluded Liabilities.

11

P.      The Debtor is the sole and lawful owner of the Assets, or otherwise has a valid, enforceable property interest in such, and title thereto is vested in the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code.

Q.      The consummation of the Sale to the Buyer and the assumption and assignment of the Assumed and Assigned Contracts is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, §§ 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale.  In particular, the Debtor may sell the Assets free and clear of all Liens and Claims (except for Assumed Liabilities and Permitted Encumbrances) of any kind or nature whatsoever because, in each case, one or more of the standards set forth in §§ 363(f)(l)-(5) of the Bankruptcy Code have been satisfied.  Any party with an interest in the Assets who did not object, or who withdrew its objection, to the Sale or the Motion is deemed to have consented pursuant to § 363(f)(2) of the Bankruptcy Code.  Any party with a Lien, Claim, or other interest in the Assets who did object falls within one or more of the other subsections of § 363(f) of the Bankruptcy Code and is adequately protected by having its Lien, Claim, or other interest, if any, either (i) remain against the Assets (in the case of Senior Statutory Liens) or (ii) attach to the net cash proceeds of the Sale ultimately attributable to the Assets against or in which such Liens or other interests are asserted with the same validity, enforceability, priority, and force and effect as they had against the Assets or their proceeds as of the Voluntary Petition Date.

R.      Accordingly, subject to section 363(f) of the Bankruptcy Code, and except as otherwise provided in the Purchase Agreement or this Order, the transfer of each of the Assets to the Buyer will be, as of the Closing Date, a legal, valid, and effective transfer of the Assets,

12

which transfer vests or will vest the Buyer with all right, title, and interest of the Debtor to the Assets free and clear of, among other things, (i) all Claims, Liens, interests and encumbrances (other than Assumed Liabilities and Permitted Encumbrances), (ii) all debts arising under, relating to, or in connection with any act of the Debtor or Claims, liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of the Debtor's Chapter 11 Case, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, rights with respect to Claims and Liens (x) that purport to give to any party a right of setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, consent right, Preferential Purchase Rights, other purchase or repurchase right or option, or termination of, the Debtor's or the Buyer's interests in the Assets, or any similar rights, or (y) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including, without limitation, any restriction on use, voting, transfer, receipt of income or other exercise of any attributes of ownership), relating to, accruing or arising any time prior to or on the Closing Date, with the exception of Assumed Liabilities and Permitted Encumbrances.

S.      There is no better available alternative for the Assets than the Sale to the Buyer. The Sale contemplated by the Purchase Agreement is in the best interests of the Debtor, its estate and creditors, and all other parties in interest.

T.      Subject to the entry of this Order, the Debtor: (i) has full power and authority to execute the Purchase Agreement and all other documents contemplated thereby; (ii) has all of the power and authority necessary to consummate the  transactions contemplated by the Purchase Agreement; and (iii) has taken all corporate action necessary to authorize and approve the

Purchase Agreement and the Sale, and all other actions required to be performed by the Debtor to consummate the transactions contemplated in the Purchase Agreement.  No consents or approvals, other than those expressly provided for in the Purchase Agreement or this Order, are required for the Debtor to consummate the Sale.

U.     The Debtor served the Sale Notice, together with a copy of the Bidding Procedures Order and the Bidding Procedures, on each and all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any Lien, encumbrance, Claim, Preference Right, Transfer Requirement, or other interest in any of the Assets.

V.     Good and sufficient reasons for approval of the Purchase Agreement and the Sale have been articulated by the Debtor.  The Debtor has demonstrated a good, sufficient and sound business purpose for the Sale outside: (a) the ordinary course of business, pursuant to § 363(b) of the Bankruptcy Code; and (b) a plan of reorganization, because, among other things, the immediate consummation of the Sale is necessary and appropriate to maximize the value of the Debtor's estate.  To maximize the value of the Assets and preserve the viability of the operations to which the Assets relate, it is essential that the Sale occur within the time constraints set forth in the Purchase Agreement.  Time is of the essence in consummating the Sale.

W.     Because the entry into and consummation of the Purchase Agreement constitutes the exercise by the Debtor of sound business judgment, the Debtor, its respective members, officers, directors, employees, advisors, professionals or agents, shall have or incur no liability to the estate or any holder of a Claim or equity interest for any act or omission in connection with, related to, or arising out of the negotiations of the Purchase Agreement or the consummation of the transactions contemplated thereunder, other than liability arising out of or relating to any act

14

or omission that constitutes a breach of the Purchase Agreement, willful misconduct, fraud or gross negligence, in each case as determined by the Bankruptcy Court.

X.     The Sale does not constitute a *sub rosa* chapter 11 plan.  The Sale neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a plan for the Debtor.

Y.     An injunction against creditors and third parties pursuing Claims against, and liens, interests and encumbrances on, the Assets is necessary to induce the Buyer to close the Sale, and the issuance of such injunctive relief is therefore necessary to avoid irreparable injury to the Debtor's estate and will benefit the Debtor's creditors.

Z.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

2.     The relief requested in the Motion is GRANTED and the Sale and Purchase Agreement are approved, all as set forth in this Order.  All objections to the Motion, to the Bidding Procedures, and/or otherwise to the Sale are overruled on the merits, with prejudice, to the extent they have not been withdrawn, waived or otherwise resolved.

3.     Pursuant to §§ 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, the Debtor is authorized to sell and transfer all of the Debtor's right, title and interest in and to the Assets to the Buyer in accordance with the Purchase Agreement (including any ancillary documents) on the Closing Date and such sale and transfer shall (a) constitute a legal, valid, binding, and effective transfer of the Assets, (b) upon the Debtor's receipt of the Purchase Price,

vest the Buyer with all right, title and interest of the Debtor to the Assets, free and clear of all Liens, Claims, Preference Rights, Transfer Requirements, and other interests in and on the Assets pursuant to § 363(f) of the Bankruptcy Code (other than the liens created by the Buyer, the Permitted Encumbrances and the Assumed Liabilities), and (c) constitute transfers for reasonably equivalent value and fair consideration under the Bankruptcy Code and the laws of the state in which Debtor is incorporated and any other applicable non-bankruptcy laws.

4.      Each of the Debtor and the Buyer are hereby authorized and directed to take any and all actions necessary or appropriate to:  (i) close and consummate the Sale in accordance with the Motion, the Purchase Agreement and this Order; (ii) assume and assign to the Buyer the Assumed and Assigned Contracts; and (iii) perform, consummate, implement and close fully the Purchase Agreement together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement.  The Debtor and each other party to the Purchase Agreement and any and all documents executed in connection therewith (collectively, the "Sale Documents") are hereby authorized and directed to perform each of their covenants and undertakings as provided in the Sale Documents prior to or after the Closing Date without further order of the Court.  The Buyer and the Debtor shall have no obligation to close the Sale except as is contemplated and provided for in the Purchase Agreement.

5.      Except as otherwise provided in the Purchase Agreement, all Persons (including, without limitation, customers, vendors, lessors, warehousemen, mechanics, repairmen, repair facility operators, storage facility operators, bailees, consignees, and other parties in possession of any of the Assets at any time) holding liens, Claims, Preference Rights, or Transfer Requirements of any kind or nature whatsoever against the Debtor or the Assets shall be and

hereby are forever barred, estopped, and permanently enjoined from asserting, prosecuting, commencing, continuing, or otherwise pursuing in any manner any action, Claim, or other proceeding of any kind, directly or indirectly, against the Buyer, any Affiliates of the Buyer (as they existed immediately prior to the Closing), or the Assets, including any action, Claim, or other proceeding seeking to prevent or interfere with the consummation of the Sale, with the retrieval by the Buyer or the delivery to the Buyer of possession of the Assets, or with any access to or any use, benefit, or enjoyment of the Assets by the Buyer, except with respect to Assumed Liabilities and the Permitted Encumbrances.  All Persons that are in possession of any of the Assets on the Closing Date are directed to surrender possession of such Assets to the Buyer or its assignee on the Closing Date (or as soon as possible after demand is made by the Buyer following the Closing Date).  Following the Closing Date, no holder of a Lien, Claim or other interest in or against the Debtor or the Assets shall interfere with the Buyer's rights and title to, and operation of, or use and enjoyment of, the Assets based on or related to any such Lien, Claim, or other interest, except with respect to Assumed Liabilities and Permitted Encumbrances.  Notwithstanding anything contained in this Order or the Purchase Agreement to the contrary, holders of alleged Senior Statutory Liens in the Assets are authorized to file and prosecute in the Bankruptcy Court all actions necessary to obtain a final determination of the validity, priority and extent of any alleged Senior Statutory Lien on the Assets.

6.      Upon the Closing: (a) the Debtor is hereby authorized and directed to consummate, and shall be deemed for all purposes to have consummated, the sale, transfer and assignment of all of the Debtor's rights, title and interest in the Assets to the Buyer free and clear of all Liens, Claims and liabilities, other than the Assumed Liabilities; and (b) except as expressly provided in the Purchase Agreement, all Liens, Claims and liabilities (other than the

Assumed Liabilities and the Permitted Encumbrances) shall not be enforceable against the Buyer or the Assets. Unless expressly included in the Assumed Liabilities or as otherwise expressly provided in this Order, the Buyer shall not be responsible for any Claims, Liens, interests and encumbrances, including in respect of the following: (i) any labor or employment agreements; (ii) any mortgages, deeds of trust or security interests; (iii) any pension, health or welfare, compensation or other employee benefit plans, agreements, practices or programs, including, without limitation, any pension plan of the Debtor or any multiemployer plan to which the Debtor has at any time contributed to or had any liability or potential liability; (iv) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related Claim, including, without limitation, Claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (g) the Americans with Disabilities Act of 1990, (h) COBRA, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, or (k) any other state or federal benefits or Claims relating to any employment with the Debtor or any of its predecessors; (v) liabilities arising, at any time prior to the Effective Time, under any Environmental Laws with respect to any assets owned or operated by the Debtor or any predecessor of the Debtor; (vi) any bulk sales or similar law; (vii) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (viii) any Excluded Liabilities.  A certified copy of this Order may be filed with the appropriate clerk and/or recorder to cancel or extinguish any such Lien, Claim, interest or encumbrance of record, and each appropriate clerk and/or recorder is hereby ordered to accept a certified copy of this

18

Order as evidence of the cancellation or extinguishment of any such Lien, Claim, interest or encumbrance.

7.      The transfer to the Buyer of the Debtor's rights, title and interest in the Assets pursuant to the Purchase Agreement shall be, and hereby is deemed to be, a legal, valid and effective transfer of the Debtor's rights, title and interest in the Assets, and vests in or will vest in the Buyer all rights, title and interest of the Debtor in the Assets, free and clear of all Claims, Liens, interests and encumbrances of any kind or nature whatsoever (other than the Assumed Liabilities and Permitted Encumbrances), with any such Claims, Liens, interests and encumbrances attaching to the proceeds of the Sale in the same validity, extent and priority as immediately prior to the Sale, subject to the provisions of the Purchase Agreement, and any rights, Claims and defenses of the Debtor and other parties in interest.

8.      None of the Buyer or its affiliates, successors, assigns, equity holders, employees or professionals shall have or incur any liability to, or be subject to any action by the Debtor or its estate, predecessors, successors or assigns, arising out of the negotiation, investigation, preparation, execution, delivery of the Purchase Agreement and the entry into and consummation of the Sale, except as expressly provided in the Purchase Agreement and this Order.

9.      If the Debtor, its estate, the Committee, any liquidating or litigation trust established for claims of the Debtor, its estate or creditors, or any of the foregoing's successors or assigns, including any subsequently appointed chapter 11 or chapter 7 trustee, recovers funds on account of the D&O Claims, regardless of the source of such funds, then the first $150,000.00 of recoveries to the Estate received from or in respect of the D&O Claims, net of any reasonable costs and expenses incurred, including, without limitation, any deductibles paid or payable thereunder, in prosecuting such D&O Claims on or after the date of this Order, shall be paid to

the Buyer as repayment for amounts paid under section 2.1 of the Purchase Agreement; <u>provided</u> <u>however</u>, that no contingent or partial contingent fee arrangement for the prosecution of D&O Claims will be entered into without first consulting with the Buyer.

      10.      Notwithstanding anything to the contrary in the Motion, the Purchase Agreement or this Order, none of the Debtor, its estate, the Committee, any liquidating or litigation trust established for claims of the Debtor, its estate or creditors, or any of the foregoing's successors or assigns or others acting on their behalf or for their benefit, including any subsequently appointed chapter 11 or chapter 7 trustee shall sue, and each of the forgoing shall be barred from suing and shall be deemed to have entered into a covenant not to sue any persons or third parties that (a) are Seller Indemnified Persons under section 8.3 of the Purchase Agreement, solely to the extent such claims would give rise to Losses (as defined in the Purchase Agreement) identified in, and subject to indemnification under, section 8.3 of the Purchase Agreement and (b) are identified by the Buyer within thirty (30) days after the Closing as persons or third parties against whom or which an action under section 547 or 549 of the Bankruptcy Code shall not be pursued based on the Buyer's good faith determination that such person or third party is one with whom or which Buyer reasonably anticipates it will continue to do business after the Closing; <u>provided</u>, <u>however</u>, that such list shall be filed no later than thirty (30) days following the Closing, and the Committee shall promptly, but in no event later than five (5) days following the filing, inform the Buyer that it objects to any such parties as not complying with this paragraph, and in the event the parties are unable to reach agreement, the parties shall present the issues to the Court.  Notwithstanding the foregoing, and for the avoidance of doubt, nothing in this Order approves or provides for the transfer or release of any claim or cause of action against an insider or former insider of the Debtor that arose on or prior to December 2, 2016.

11.     Except as expressly provided in the Purchase Agreement or this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons, holding Claims, Liens, interests or encumbrances of any kind or nature whatsoever against or in the Debtor or the Debtor's interests in the Assets (whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of this Chapter 11 Case, whether imposed by agreement, understanding, law, equity or otherwise), including, without limitation, the non-debtor party or parties to each Assumed and Assigned Contract, arising under or out of, in connection with, or in any way relating to, the Assets or the transfer of the Debtor's interests in the Assets to the Buyer, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing such Claims, Liens, interests and encumbrances against the Buyer or its affiliates, successors, assigns, equity holders, employees or professionals, the Assets, or the Debtor's interest in such Assets.  Following the Closing, no holder of a Claim, Lien, interest or encumbrance against the Debtor shall interfere with the Buyer's title to, operation of, or use and enjoyment of the Assets based on or related to any such Claim, Lien, interest or encumbrance, and except as otherwise provided in the Purchase Agreement or this Order, all such Claims, Liens, interests or encumbrances, if any, shall transfer and attach to the proceeds from the Sale in the order of their priority, with the same priority, validity, force and effect which they have against such Assets as of the Closing, subject to the Debtor's estate's or the Debtor's rights, Claims and defenses with respect thereto.  All persons are hereby enjoined from taking action that would interfere with or adversely affect the ability of the Debtor to transfer the Assets

in accordance with the terms of the Purchase Agreement and this Order. Nothing in this Order precludes the bringing of a lawsuit against the Buyer or its assigns with respect to Assumed Liabilities, including Assumed M&M Lien Claims in the validity, priority, and extent as determined by the Bankruptcy Court, or an obligation that is an assumed obligation under an Assumed and Assigned Contract or that first arises under an Assumed and Assigned Contract after the Closing of the Sale.

12.     The Purchase Agreement has been entered into with the Buyer in good faith and the Buyer is a good faith purchaser of the Assets as that term is used in § 363(m) of the Bankruptcy Code. The Buyer is entitled to all of the protections afforded by § 363(m) of the Bankruptcy Code.

13.     The Buyer has not colluded or entered into any agreements with any other bidders, potential bidders or any other parties interested in the Assets and there was no agreement among potential bidders that controlled the price paid for the Assets; therefore, neither the Debtor nor any successor in interest to the Debtor's estate shall be entitled to bring an action against the Buyer, and the Sale may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

14.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Sale. Except for Parkman Whaling, LLC, no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment is due to any person in connection with the Purchase Agreement, the other transaction documents or the transactions contemplated hereby or thereby for which the Buyer is or will become liable.

15.     The consideration provided by the Buyer for the Assets under the Purchase Agreement shall be deemed for all purposes to constitute reasonably equivalent value and fair

consideration under the Bankruptcy Code and any other applicable law, and the Sale may not be avoided, or costs or damages imposed or awarded, under § 363(n) or any other provision of the Bankruptcy Code, the Uniform Voidable Transfer Act, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act or any other similar federal or state laws.

16.    Obligations of the Debtor relating to Taxes, whether arising under Law, the Purchase Agreement or otherwise, shall be fulfilled by the party responsible for such obligations under the Purchase Agreement.

17.    At the Closing of the Sale, proceeds from the Sale shall be paid to the DIP Agent in an amount to indefeasibly pay in full and completely satisfy the DIP Obligations (as defined in the motion seeking approval of the DIP at ECF No. 105). To the extent the DIP Agent incurs any fees or expenses that are not paid at Closing, and that would otherwise be payable pursuant to the Final DIP Order, the DIP Agent shall submit a final invoice pursuant to the procedures set forth in the Final DIP Order for payment of the DIP Agent's fees and expenses.

18.    The provisions of this Order are non-severable and mutually dependent.

19.    Upon the Closing, except with respect to Assumed Liabilities and Permitted Encumbrances, the Buyer shall not and shall not be deemed to: (i) be the successor of or successor employer to the Debtor (under COBRA, any applicable regulations thereunder, or any other applicable law), and shall instead be, and be deemed to be, a new employer with respect to any and all federal or state unemployment laws, including any unemployment compensation or tax laws, or any other similar federal or state laws; (ii) have, de facto or otherwise, merged or consolidated with or into the Debtor; (iii) be a mere continuation or substantial continuation of the Debtor or the enterprise(s) of the Debtor; or (iv) be liable for any acts or omissions of Debtor in the conduct of the Debtor's business or arising under or related to the Assets other than as set

forth in the Purchase Agreement.  Without limiting the generality of the foregoing, and except as otherwise provided in the Purchase Agreement and in this Order, the parties intend and the Court hereby orders that the Buyer shall not be liable for any liability (other than Assumed Liabilities) against the Debtor, or any of its predecessors or Affiliates, and the Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Debtor's business, the Assets or any liabilities of, or Claims against, the Debtor arising prior to the Closing Date.

20.    This Order is and shall be: (a) effective as a determination that, other than Assumed Liabilities and Permitted Encumbrances, all Claims, Liens, interests and encumbrances of any kind or nature whatsoever existing as to the Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected; and (b) binding upon and shall authorize all entities, including, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies or units, governmental departments or units, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to the Assets conveyed to the Buyer.

21.    Except with respect to Assumed Liabilities and Permitted Encumbrances, if any person or entity which has filed statements or other documents or agreements evidencing Liens, interests or encumbrances on, or Claims in, the Assets shall not have delivered to the Debtor before the Closing, in proper form for filing and executed by the appropriate parties, termination

24

statements, instruments of satisfaction, releases of Liens and easements, and any other documents necessary for the purpose of documenting the release of all Claims, Liens, interests or encumbrances which the person or entity has or may assert with respect to the Assets, the Debtor and the Buyer are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Assets. Notwithstanding the foregoing, a certified copy of this Order may be filed with the appropriate clerk or recorded with the recorder of any state, county, or local authority and that shall be sufficient to cancel or extinguish any of the Liens and Claims of record except the Assumed Liabilities and Permitted Encumbrances.

22.     Except with respect to Assumed Liabilities and Permitted Encumbrances, all other Liens or other interests in or on the Assets attach to the net cash proceeds of the Sale ultimately attributable to the Assets against or in which such Liens or other interests are asserted, subject to the terms of such Liens or other interests, with the same validity, enforceability, priority, and force and effect as they had against the Assets or their proceeds as of the Voluntary Petition Date, or as provided in the Final DIP Order, subject to any rights, Claims and defenses the Debtor or any other parties may possess with respect thereto.

23.     Buyer shall pay the full, negotiated, or adjudicated amount of each Senior Statutory Lien on the Assets by the later of (i) the Closing Date, (ii) within fifteen (15) days of agreement between Buyer and the holder of a Senior Statutory Lien or (iii) fifteen (15) days following the entry of a final non-appealable order of the Bankruptcy Court adjudicating the validity, priority, and extent of such Senior Statutory Lien.

24.     Notwithstanding anything contained in this Order or the Purchase Agreement to the contrary, the Allocated Value of the Assets shall have no preclusive effect in any proceeding

25

to determine whether a lien is a Senior Statutory Lien. All rights to make such arguments and determinations in any subsequent proceedings are reserved to each holder of a Senior Statutory Lien, the Buyer and the Debtor and its successors.

25.     Nothing in this Order shall be interpreted to modify or otherwise affect the prepetition priorities among Senior Statutory Liens of the Debtor, and nothing in this Order or the Final DIP Order, including the granting of the First Lien Adequate Protection Liens and Second Lien Adequate Protection Liens in the Final DIP Order, shall be deemed to have modified or otherwise affected such prepetition priorities, all of which are hereby expressly preserved.

26.     Nothing in this Order shall affect or otherwise impair common law or contractual setoff or recoupment rights that Fieldwood, Houston Energy L.P., HE&D Offshore, L.P., M21K, LLC, Energy XXI, GOM, LLC, Energy XXI Pipeline II, LLC, and EPL Oil & Gas, Inc. may possess, as of the Effective Time.

27.     The Debtor is hereby authorized and directed to take any and all actions necessary to consummate the transactions contemplated by the Purchase Agreement (including any ancillary documents) and this Order.

28.     The terms of this Order shall be binding on and inure to the benefit of the Debtor, the Buyer, all creditors and all other parties in interest, and any successors of such parties including, but not limited to, any trustee or examiner with expanded powers appointed in this Chapter 11 Case or upon the conversion of this Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code.

29.     Pursuant to §§ 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, the Debtor's assumption and assignment to the Buyer, and the

Buyer's assumption on the terms set forth in the Purchase Agreement, of the Assumed and Assigned Contracts is hereby approved, and the requirements of §§ 365(b)(1) and 365(f) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

30.    The Debtor is hereby authorized and directed in accordance with §§ 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign to the Buyer, effective upon the Closing Date, the Assumed and Assigned Contracts, and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed and Assigned Contracts.  The Debtor (in consultation with the Buyer) may choose to exclude any of the contracts or leases from the list of the Assumed and Assigned Contracts contained on Exhibit B hereto prior to the Closing Date, in which case such contracts or leases shall not constitute Assumed and Assigned Contracts and shall not be assumed by the Debtor.

31.    The Assumed and Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such contract that prohibits, restricts, or conditions such assignment or transfer pursuant to § 365(f) of the Bankruptcy Code.   There shall be no accelerations, assignment fees, increases or any other fees charged to the Buyer or the Debtor as a result of the assumption and assignment of the Assumed and Assigned Contracts.

32.    Within fifteen (15) days of the Closing, the Buyer shall pay or satisfy the Cure Amounts for the Assumed and Assigned Contacts, and upon making such payment all defaults or other obligations of the Debtor under the Assumed and Assigned Contracts arising or accruing prior to the Closing Date (without giving effect to any acceleration clauses or any default provisions of the kind specified in § 365(b)(2) of the Bankruptcy Code), whether monetary or non-monetary, shall be deemed cured pursuant to § 365 of the Bankruptcy Code.

33.     All counterparties to the Assumed and Assigned Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, and shall not charge the Debtor or the Buyer for any instruments, applications, consents or other documents which may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale.

34.     Debtor and Buyer acknowledge that Debtor currently serves as the operator for some, but not all, of the Assets to be conveyed pursuant to this Order.  The following provisions in this paragraph apply only to the Assets for which Debtor currently serves as the operator (the "Operated Assets").  Notwithstanding anything to the contrary in the provisions of an Assigned Contract or any other operating agreement, participation agreement or other agreement which affects the Operated Assets, parties who own an oil and gas interest, including, without limitation, the owner of any working interest, operating rights interest or record title interest in any of the Operated Assets, the Buyer is hereby appointed as the contractual and regulatory operator of record for each and all of the Operated Assets.  Buyer shall promptly prepare and file all forms and instruments required by contract or law or which are necessary to effect the designation of itself as operator of the Operated Assets.  Further, the owners of any working interest, operating rights interest or record title interest in any of the Operated Assets are hereby ordered to fully execute and promptly deliver to Buyer, all forms, designations, instruments and documents required by the Bureau of Ocean Energy Management ("BOEM") or the Bureau of Safety and Environmental Enforcement ("BSEE") or any other governmental authority for the recognition and/or change of designation of operatorship, as well as for any other documentation required for the recognition and/or change of operatorship required by law or contract, including,

but not limited to, all required Designation of Operator forms (Form BOEM-1123) and Oil Spill Financial Responsibility (OSFR) forms for Offshore Facilities (Form OSFR-1017).

35.     The following provisions in this paragraph are applicable only to the administration of such Assets for which Debtor serves as operator, in relation to terminated leases (the "Terminated Lease Obligations").  Notwithstanding anything to the contrary in the provisions of an Assigned Contract or any other operating agreement, participation agreement or other agreement which affects the Terminated Lease Obligations, parties who own an oil and gas interest, including, without limitation, the owner of any working interest, operating rights interest or record title interest in any of the Terminated Lease Obligations, the Buyer is hereby appointed as the contractual and regulatory operator of record for each and all of the Terminated Lease Obligations.  Buyer shall promptly prepare and file all forms and instruments required by contract or law or which are necessary to effect the designation of itself as operator of the Terminated Lease Obligations.  Further, owners of any working interest, operating rights interest or record title interest in any of the Terminated Lease Obligations are hereby ordered to fully execute and promptly deliver to Buyer all forms, designations, instruments and documents required by the BOEM or BSEE or any other governmental authority for the recognition and/or change of designation of operatorship, as well as for any other documentation required for the recognition and/or change of operatorship required by law or contract, including, but not limited to, all required Designation of Operator forms (Form BOEM-1123) and Oil Spill Financial Responsibility (OSFR) forms for Offshore Facilities (Form OSFR-1017).

36.     Forms to be submitted to BOEM and BSEE by the Buyer (as the Debtor's successor for purposes of permitting only) are declared to be forms correctly submitted on behalf of, and with the full authorization of, the Buyer and Debtor, including all documents reasonably

29

required to formally transfer operator status to the Buyer, except for any reasonable restrictions set forth in this Order.

37.     Nothing in this Order or the Purchase Agreement releases, nullifies, precludes, or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner or operator of property after the date of entry of this Order.  Nothing in this Order or the Purchase Agreement authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law; provided that, to the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Assets on account of the filing or pendency of this Chapter 11 Case.  Nothing in this Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order.

38.     Each and every federal, state and governmental agency or department, and any other person or entity, is hereby authorized to accept any and all documents and instruments in connection with or necessary to consummate the Sale contemplated by the Purchase Agreement.

39.     Notwithstanding anything to the contrary in this Order or any Sale Documents any assumption, assignment and/or transfer of any interests in federal oil and gas leases, rights-of-way or rights-of-use-and-easement (collectively, the "Federal Leases") will be ineffective absent the consent of the governmental unit as provided for in applicable non-bankruptcy laws and regulations including, without limitation, 30 C.F.R. Part 556.  In order to obtain the consent of the governmental unit to any assumption, assignment and/or transfer, any and all existing

defaults under the applicable Federal Leases must be cured or the prospective assignee and/or transferee must provide adequate assurance that the defaults will be cured.  Nothing in this Order or the Sale Documents shall be interpreted to set cure amounts for Federal Leases or to require the governmental unit to novate or otherwise consent to the assignment and/or transfer of any interests in the Federal Leases.

40.     Notwithstanding any other provision in this Order or in the Sale Documents, the United States will retain, and have, the right to audit and/or perform any compliance review and, if appropriate, collect from the Debtor or its successors and assigns including the Buyer, any additional monies that were owed by the Debtor prior to the assumption and assignment of the Federal Leases without those rights being adversely affected by these bankruptcy proceedings. The Debtor, the Buyer, and their successors and assigns will each individually retain all defenses and/or rights, other than defenses and/or rights arising from the bankruptcy, to challenge any such determination.  The audit and/or compliance review period shall remain open for the full statute of limitations period established by the Federal Oil and Gas Royalty Simplification and Fairness Act of 1996 (30 U.S.C. §§ 1701, *et seq.*).  Notwithstanding anything to the contrary in this Order or in the Sale Documents, nothing shall affect the United States' rights to offset or recoup any amounts due under, or relating to, the Federal Leases.

41.     Notwithstanding anything to the contrary in this Order, the Purchase Agreement or any related transaction document, nothing shall affect, waive, or limit: (i) the decommissioning obligations and financial assurance obligations set forth in The Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*, and its implementing regulations found in, among other places, 30 C.F.R. Part 250 Subpart Q and 30 C.F.R. Part 556, any other regulatory obligations for qualification, or otherwise, as determined by The Department of the

31

Interior ("Interior"), that must be met by the Debtor and/or the Buyer on the Federal Leases going forward or Interior's enforcement thereof; or (ii) Interior's regulatory authority under applicable laws and regulations to grant, direct or deny any applicable suspensions of production or suspensions of operations. To the extent that anything in this Order or any Sale Documents conflicts with paragraphs 39 through 41, the terms of paragraphs 39 through 41 shall supersede and control.

42.     Notwithstanding anything to the contrary stated in this Order, the Purchase Agreement, the *Debtor's Notice of (I) Request for Authority to Assume Certain Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts* [ECF No. 544], *First Supplemental Notice of (I) Request For Authority To Assume And Assign Certain Executory Contracts And Unexpired Leases, And (II) Proposed Cure Amounts* [ECF No. 591], *Second Supplemental Notice of (I) Request For Authority To Assume And Assign Certain Executory Contracts And Unexpired Leases, And (II) Proposed Cure Amounts* [ECF No. 649], *Notice of (I) Request for Authority to Assume and Assign Executory Contracts and Unexpired Leases and (II) Proposed Cure Amounts* [ECF No. 725], or otherwise, the Debtor, Houston Energy, L.P. and HE&D Offshore, L.P. (the "Houston Energy Entities"), and  M21K, LLC, Energy XXI GOM, LLC, Energy XXI Pipeline II, LLC and EPL Oil & Gas, Inc. (the "Energy XXI Entities"), shall negotiate and attempt to arrive at a mutual agreement regarding the Cure Amounts to be paid, respectively, to the Houston Energy Entities and the Energy XXI Entities in connection with the Debtor's assumption and assignment to Buyer of executory contracts with one or more of the Houston Energy Entities and one or more of the Energy XXI Entities. In the event that the Debtor and the Houston Energy Entities and/or the Energy XXI Entities are not able to reach a mutually acceptable agreement regarding the Cure Amounts within 30 days of the date of this

Order, any unresolved Cure Amount issue, at the request of the Debtor, the Houston Energy Entities or the Energy XXI Entities, as the case may be, shall be set for hearing for determination by the Court.

43.     Any Cure amounts owed to Helis Oil & Gas Company, LLC ("Helis") under the operating agreements relating to WC 21, WC 44 and WC 57 shall be paid and satisfied through Helis's recoupment and/or offset rights under this Court's Order dated April 18, 2017 [ECF No. 449] (the "Helis Recoupment Order") to the extent that joint interest billings equal or exceed working interest payments owed to Helis thereunder.  If working interest payments exceed joint interest billings, any overage shall be paid to Helis.  The Helis Recoupment Order shall be and remain binding on the Buyer, who shall be and remain subject to its terms and conditions.  The currently known Cure amount due Helis under its operating agreement relating to Ship Shoal 252 is zero; however, in the event and to the extent that the Debtor has not paid, and is determined to owe, the operator payments on any joint interest billings and Helis should be called upon to fund its *pro-rata* interest of any such amounts owed and not paid by the Debtor, any such amounts shall be paid to Helis as Cure.

44.     Assumption of HI A571 OA and Resolution of HI A571 Cure Objection:  With respect to the assumption of the Operating Agreement dated February 13, 1974 (the "HI A571 Operating Agreement") for High Island A-571 (OCS Lease No. G02391) ("HI A571"):

> a. Debtor shall assume OCS Lease No. G02391 and assign it to Buyer.  Buyer commits to promptly provide such financial security as may be required by law and such cure and adequate assurance as may be required by BOEM and BSEE to bring the lease into compliance.  Furthermore, Buyer shall provide McMoRan Oil & Gas, LLC ("McMoRan") with prompt notice concerning its supplemental

bonding and other financial assurance it may provide to BOEM and BSEE related to HI A571.

b. Debtor shall assume the HI A571 Operating Agreement and assign its rights to Buyer and the HI A571 Operating Agreement shall remain in full force and effect.

c. McMoRan and Debtor shall be entitled to setoff both pre- and post-petition outstanding joint interest billings from the share of production Debtor has withheld from McMoRan and following this setoff, McMoRan shall pay to Debtor the sum of $484,644.89 (the "Net JIB Settlement"), within 14 days of the entry of this Order.  McMoRan and Debtor shall setoff and/or pay to each other as necessary such further amounts as may become due by the time of the closing of the sale to Buyer.  Payment of the Net JIB Settlement shall fully satisfy all obligations, costs, expenses, and joint interest bills through June 30, 2017, owed by McMoRan under the HI A571 Operating Agreement.

d. Debtor, and upon closing of the Sale, Buyer shall resume providing McMoRan its production in kind.  McMoRan shall resume payment of joint interest billings in the ordinary course of business and all rights under the HI A571 Operating Agreement are reserved and unimpaired by this Order.

e.  Cure of HI A571 Operating Agreement Lien Defaults:  Conditioned upon payment by McMoRan of the Net JIB Settlement, Buyer shall indemnify, defend, protect, and hold harmless McMoRan against and from any and all damages, losses, liabilities, obligations, penalties, claims, sums paid in settlement of claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements, fines, liens, encumbrances, and expenses of any kind or any nature that may be

34

imposed upon, incurred by, or asserted or awarded against McMoRan that arise directly or indirectly out of any statutory liens against McMoRan or its interest and related to HI A571 for services provided before before the Effective Time. This indemnity shall include attorneys' fees and costs, the market value of any production or other property seized, levied, or otherwise attached by any parties asserting statutory liens.   This indemnity obligation shall be a condition of assumption of the HI A571 Operating Agreement and shall be secured by the first priority security rights provided by the HI A571 Operating Agreement.  For the avoidance of doubt, McMoRan shall not be billed for any share of any payment to any party asserting a statutory lien on HI A571 for services provided prior to the Effective Date.

45.    Notwithstanding anything contained in this Order or the Purchase Agreement to the contrary, including paragraphs 22 and 23 of this Order, the following stipulations and agreements shall apply to Archrock Partners Operating LLC and Archrock Services LP (collectively, "Archrock"):

a. Debtor shall pay Archrock out of the sale proceeds all unpaid postpetition charges due Archrock through July 31, 2017 in the amount of $304,517.70 within ten (10) business days after Debtor's receipt of  proceeds of the Sale in full satisfaction of Archrock's liens in the sale proceeds and its administrative claims existing as of July 31, 2017.  Archrock shall retain its liens in the proceeds of the sale in the same manner, in the same order of priority, and with the same validity, force and effect they now have as against the applicable Assets until all amounts required by this paragraph are fully paid to Archrock.

35

b. Buyer shall pay Archrock Partners Operating LLC ninety percent (90%) of the lawful amounts due through December 2, 2016 relating to South Marsh Island 41A, High Island 571A, West Cameron 269 and Eugene Island 184 (collectively, the "Archrock Locations") within five (5) business days after the Closing Date in full satisfaction of Archrock's Senior Statutory Liens in the Archrock Locations. Archrock and the Debtor agree that the amount due for such period on the Archrock Locations is $340,815.51 and the required ninety percent (90%) payment is $306,733.95. Buyer shall also pay Archrock Partners Operating LLC all contractual charges accruing on or after August 1, 2017 on the Archrock Locations in the ordinary course of business including a payment of $67,726.16 for the August 2017 compression charges on the Archrock Locations within five (5) business days after the Closing Date.

c. Upon receipt of the amounts due under this agreement and Order, Archrock shall execute and deliver releases of all of its liens in the Archrock Locations to counsel for the Buyer, Patrick Potter, Pillsbury Winthrop Shaw Pittman LLP, within twenty (20) days of Archrock receiving good funds.

46.     The Debtor and Buyer agree that the issues as to cure of the HI A 442 Operating Agreement with Rosetta Resources Offshore, LLC are severed from this ruling and that the parties shall work to reach a consensual resolution of their disputes. If such disputes cannot be consensually resolved on or before September 27, 2017, the matter shall be heard by this Court at the status conference scheduled on that date at 9:00 a.m. (Central Time).

47.     Notwithstanding anything to the contrary in this Order, the Purchase Agreement, other Sale filings, or in any financing arrangements made in conjunction with the Sale

(collectively, and for purposes of this paragraph, the "Order and Sale Documents"), the Order and Sale Documents do not impair or otherwise impact any party's rights in (i) any bonds posted by Argonaut Insurance Company ("Argonaut") on which Debtor is the principal ("Argonaut P&A Bonds"), specifically including, but not limited to, Bond Nos. SUR0030280, SUR0030276 and SUR0030279 issued by Argonaut, as surety, to JX Nippon Oil Exploration (U.S.A.) Limited ("Nippon"), as obligee (collectively, the "Nippon P&A Bonds"), (ii) any collateral held by Argonaut in relation to the Argonaut P&A Bonds ("Argonaut Collateral"), (iii) and all documentation directly associated therewith. It is the intent of this paragraph that no party's rights as to Argonaut P&A Bonds, including the Nippon P&A Bonds, and the Argonaut Collateral are increased or diminished pursuant to this Order, and all parties' other rights in relation thereto are specifically preserved. Provided, if and when any collateral is released by Argonaut or is thereafter released by FNBCT as a consequence of a release of liability under any letter of credit, the rights in any such released collateral will be governed by the Purchase Agreement. The foregoing provisions shall be read consistent with the Court's findings on the matter on August 2, 2017 at the Sale Hearing. If necessary, a status conference shall be held on September 27, 2017 to address the resolution of pending disputes between Argonaut and FNBCT, with Argonaut's jurisdictional arguments fully reserved.

48.     Notwithstanding anything to the contrary in this Order or in the Purchase Agreement, the attachments thereto, or otherwise, after Closing, the Buyer is obligated to have Lexon replace the existing Lexon bonds numbers: 1138469, 1118851, 1118854, 1118855, 1138472, 1138470, and 1138467 with new bonds from Lexon in favor of the existing obligees with the Buyer as Principal. Lexon in its sole discretion can waive the need for the issuance of the new bond for Lexon bond 1138467.

49.   To the extent that this Order is inconsistent with the Purchase Agreement or any prior order or pleading with respect to the Motion in this Chapter 11 Case, the terms of this Order shall govern.

50.   Except as agreed by the parties to the Purchase Agreement in writing, this Order shall not be modified by any chapter 11 plan of the Debtor confirmed in this Chapter 11 Case.

51.   This Order and the Purchase Agreement shall be binding in all respects upon all creditors and interest holders of the Debtor, all non-debtor parties to the Assumed and Assigned Contracts, all successors and assigns of the Debtor and its affiliates and subsidiaries, and any trustees, examiners, "responsible persons" or other fiduciaries appointed in the Chapter 11 Case or upon a conversion of the Debtor's case under chapter 7 of the Bankruptcy Code, including a chapter 7 trustee, and the Purchase Agreement shall not be subject to rejection or avoidance under any circumstances.  If any order under § 1112 of the Bankruptcy Code is entered, such order shall provide (in accordance with §§ 105 and 349 of the Bankruptcy Code) that this Order and the rights granted to the Buyer hereunder shall remain effective and, notwithstanding such dismissal, shall remain binding on the Debtor, all of its creditors and parties in interest.

52.   The failure specifically to include or make reference to any particular provisions of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Purchase Agreement is authorized and approved in its entirety.

53.   Neither the Buyer nor the Debtor shall have an obligation to close the Sale until all conditions precedent in the Purchase Agreement to close the Sale have been met, satisfied, or waived in accordance with the terms of the Purchase Agreement.

38

54.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Purchase Agreement, all amendments thereto, and any waivers and consents thereunder, and each ancillary document executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to the Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale, including, but not limited to, retaining  jurisdiction to (a) compel delivery of the Assets to the Buyer, (b) interpret, implement, and enforce the provisions of this Order, (c) protect the Buyer against any Lien, Claims, or interests in or against the Debtor or the Assets of any kind or nature whatsoever except as to Senior Statutory Liens that constitute Assumed Liabilities, and (d) enter any orders under §§ 105, 363 or 365 of the Bankruptcy Code with respect to the Assumed and Assigned Contracts; provided, however, that in the event the Court abstains from exercising or declines to exercise jurisdiction or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

55.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding any provision in the Bankruptcy Rules to the contrary, including but not limited to Bankruptcy Rule 6004(h) and 6006(d), the Court expressly finds there is no reason for any material delay in the implementation of this Order and, accordingly, unless otherwise ordered by the Court: (i) the terms of this Order shall be immediately effective and enforceable upon the termination of the stays set forth in this paragraph; (ii) this Order is stayed until 10:00 a.m. on August 3, 2017; and (iii) if a motion for stay pending appeal is filed on or before 10:00 a.m. on August 3, 2017, (x) this Court will conduct a hearing on any such motion at 2:00 p.m. on August

Case 1:18-cv-10936-UA   Document 1-8   Filed 11/21/18   Page 86 of 100

Case 16-34028   Document 792   Filed in TXSB on 08/02/17   Page 40 of 41

3, 2017; and (y) this Order is further stayed until the conclusion of the 2:00 p.m. hearing.   Upon

the termination of the stay(s), (i) the Debtor is not subject to any other stay of this Order or in the

implementation, enforcement or realization of the relief granted in this Order unless so stayed by

further Court order; and (ii) the Debtor shall take any action and perform any act authorized

under this Order.

Dated: Houston, Texas
      August 2, 2017

                                      _____
                              THE HONORABLE MARVIN ISGUR
                              UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

Purchase Agreement

4829-2101-0251.v5

EXHIBIT 67

ASSIGNMENT AGREEMENT

This Assignment Agreement (this "<u>Agreement</u>") is made effective as of May 4 , 2015 (the "<u>Effective Date</u>") by and between DMRJ Group LLC (the "<u>Assignor</u>") and Montsant Partners LLC (the "<u>Assignee</u>"). All capitalized terms used in this Agreement and not otherwise defined herein will have the respective meanings set forth in the Purchase Agreement as hereinafter defined.

RECITALS:

WHEREAS, Implant Sciences Corporation, a Massachusetts corporation ("<u>Company</u>") and the Assignor are parties to that certain Note and Warrant Purchase Agreement, dated as of December 10, 2008 (as amended to the date hereof and as further amended, restated, supplemented or otherwise modified from time to time, the "<u>Purchase Agreement</u>");

WHEREAS, Assignor desires to assign to Assignee all of Assignor's rights, title and interest in and to that Senior Secured Convertible Promissory Note dated December 10, 2008 in the original principal amount of $5,600,000 made by Company in favor of Assignor (the "<u>Assigned Note</u>");

WHEREAS, the Assigned Note is one of various promissory notes issued by the Company and purchased by Assignor under the Purchase Agreement (such promissory notes, other than the Assigned Note, the "<u>Other Notes</u>");

WHEREAS, in connection with the assignment hereunder of the Assigned Note by Assignor to Assignee, Assignor shall also assign to Assignee a pro-rata share (to the extent of Assignor's interest in the Assigned Note) in and to all of Assignor's (a) right, title and interest in and to the Purchase Agreement, the Transactional Documents (other than the Other Notes and the Warrants), the Collateral and all attendant liens, rights, assignments and interests (including security interests) pertaining to or arising therefrom and (b) obligations and other duties as an Investor under the Transaction Documents (other than the Other Notes and the Warrants) and the Collateral, as more specifically set forth herein (collectively with the Assigned Note, the "<u>Assigned Interest</u>"); and

WHEREAS, Assignee desires to become an Investor under the Purchase Agreement and the other Transaction Documents (other than the Other Notes and the Warrants) and to accept such assignment and delegation from Assignor.

NOW, THEREFORE, in consideration of the premises and the agreements, provisions, and covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor and Assignee agree as follows:

1.    ASSIGNMENT, DELEGATION, AND ACCEPTANCE

1.1    <u>Assignment</u>. As of the Effective Date, Assignor hereby transfers and assigns to Assignee, without recourse and without representations or warranties of any kind (except as set forth in <u>Section 3.2</u>), all of Assignor's right, title, and interest in and to the

Assigned Interests.  Assignor agrees that if after the Effective Date it receives payment in respect of the Assigned Note and/or any other payment or amount relating to the Assigned Interests (including without limitation any proceeds of any portion of the Collateral), it shall hold the same in trust for Assignee and promptly (but in any event within two (2) Business Days following Assignor's receipt thereof) remit such amount directly to Assignee in immediately available funds.

       1.2    <u>Delegation</u>.  As of the Effective Date, Assignor hereby irrevocably assigns and delegates to Assignee, to the extent of Assignee's pro-rata share thereof, Assignor's duties and obligations pursuant to the Transaction Documents (other than the Other Notes and the Warrants), but only to the extent relating to the Assigned Note.

       1.3    <u>Acceptance by Assignee</u>.  As of the Effective Date, (i) Assignee irrevocably assumes and accepts the assignment and delegation provided from in Sections 1.1 and 1.2 hereof and agrees to be an Investor under the Transaction Documents (other than in respect of the Other Notes and the Warrants) and to be bound by the terms and conditions thereof and (ii) Assignor agrees, to the extent provided herein, to relinquish its rights with respect to the Assigned Interests.

       1.4    <u>Agency</u>.  Each of Assignor and Assignee hereby appoints Assignor as its collateral agent under the Purchase Agreement and the other Transaction Documents (other than the Warrants).  In such capacity, Assignor shall hold, maintain and enforce Assignor's and Assignee's rights in, to and against the Collateral and otherwise deal with the Collateral for the ratable benefit of Assignor and Assignee.  Company hereby acknowledges that all security interests granted under any and all security agreements heretofore and hereafter entered into in connection with the transactions contemplated by the Purchase Agreement shall be deemed security interests granted to Assignor as collateral agent for the ratable benefit of each of Assignor and Assignee.

       1.4    <u>Effective Date</u>.  This Agreement shall become effective on and as of the Effective Date upon the execution and delivery of this Agreement by the parties hereto.  Notwithstanding anything to the contrary in this Agreement, Assignor shall have no obligation to pay to Assignee any payment received prior to the Effective Date on account, directly or indirectly, of the Assigned Note.

2.    REPRESENTATIONS, WARRANTIES AND COVENANTS

       2.1    <u>Assignee's Representations and Warranties</u>.  Assignee hereby represents, warrants, and covenants the following to Assignor:

       (a)    Assignee has full power and authority and has taken all action necessary to execute and deliver this Agreement and to fulfill the obligations hereunder and to consummate the transactions contemplated hereby.

       (b)    Assignee is familiar with transactions of the kind and scope reflected in the Transaction Documents and in this Agreement.

2

(c)     Assignee has received and conducted its own evaluation of the Transaction Documents and such other documents and information (including financial statements and financial information) as it deemed appropriate to make its own credit analysis and decision to enter into this Agreement and has made its decision to become an Investor for all purposes independently and without reliance upon Assignor, and will continue to do so.

(d)     As of the Effective Date, Assignee is entitled to receive payments of principal and interest in respect of the Assigned Note without deduction for or on account of any taxes imposed by the United States of America or any political subdivision thereof.

2.2     <u>Assignor's Representations and Warranties</u>.  Assignor hereby represents, warrants and covenants the following to Assignee:

(a)     Assignor has full power and authority and has taken all action necessary to execute and deliver this Agreement and to fulfill the obligations hereunder and to consummate the transactions contemplated hereby.

(b)     Assignor is the legal and beneficial owner of the Assigned Interests, free and clear of any adverse claim, lien, encumbrance, security interest, restriction on transfer, purchase option, call or similar right of a third party.

(c)     Assignor makes no representation or warranty and assumes no responsibility with respect to (A) the truth, correctness and validity of any of the statements, warranties or representations made by Company or any other person in the Purchase Agreement, any Transaction Document or any other instrument or document furnished pursuant thereto or in connection therewith, or (B) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Purchase Agreement, the other Transaction Documents or any Collateral or any other instrument or document furnished pursuant thereto or in connection therewith or (C) the financial condition of Company or any other person, or the performance or observance by Company or any other person of any of their respective obligations under the Purchase Agreement, any other Transaction Document, or any other instrument or document furnished pursuant thereto or in connection therewith.

3.     AMENDMENTS AND WAIVERS

No amendment, modification, termination, or waiver of any provision of this Agreement will be effective without the written concurrence of Assignor and Assignee.

4.     SEVERABILITY

Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law.  In the event any provision of this Agreement is or is held to be invalid, illegal, or unenforceable under applicable law, such provision will be ineffective only to the extent of such invalidity, illegality, or unenforceability, without invalidating the remainder of such provision or the remaining provisions of the Agreement.  In addition, in the event any provision of or obligation under this Agreement is or is held to be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, and

3

enforceability of the remaining provisions or obligations in any other jurisdictions will not in any way be affected or impaired thereby.

5.  SECTION TITLES

Section and subsection titles in this Agreement are included for convenience of reference only, do not constitute a part of this Agreement for any other purpose, and have no substantive effect.

6.  SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

7.  APPLICABLE LAW

THIS AGREEMENT WILL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE.

8.  COUNTERPARTS

This Agreement and any amendments, waivers, consents, or supplements may be executed in any number of counterparts and by different parties hereto in separate counterparts (including by facsimile or other electronic transmission of executed signature pages hereto), each of which, when so executed and delivered, will be deemed an original and all of which shall together constitute one and the same instrument.

**[Signature page follows]**

4

IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

ASSIGNOR:                         **DMRJ GROUP LLC**

By: _____
Name: _____
Title: _____

ASSIGNEE:                         **MONTSANT PARTNERS LLC**

By: _____
Name: _____
Title: _____

ACKNOWLEDGED AND AGREED TO:

**IMPLANT SCIENCES CORPORATION, the Company**

By: _____
Name: Roger P. Deschenes
Title: Chief Financial Officer

**ACCRUEL SYSTEMS INTERNATIONAL CORPORATION, a Guarantor**

By: _____
Name: Roger P. Deschenes
Title: Vice President

**IMX ACQUISITION CORP., a Guarantor**

By: _____
Name: Roger P. Deschenes
Title: Vice President

*[SIGNATURE PAGE TO IMPLANT ASSIGNMENT AGREEMENT]*

130355.01600/7493399v.1

**C ACQUISITION CORP., a Guarantor**

By: _____

Name: Roger P. Deschenes
Title: Vice President

EXHIBIT 68

**To:**    David Levy[dlevy@platinumlp.com]; Mark Nordlicht[mnordlicht@platinumlp.com]; Joseph
SanFilippo[JSanFilippo@platinumlp.com]; Naftali Manela[nmanela@platinumlp.com]; Nicholas Marzella[nmarzella@platinumlp.com];
Kerry Propper[KPropper@platinumlp.com]
**Cc:**    Michael Kimelman[mkimelman@platinumlp.com]
**From:**    Michael Kimelman
**Sent:**    Wed 1/13/2016 10:53:56 PM
**Subject:**    01.13.2016 PPVA/PPLO Cash

| **PPVA Checking Activity 01/13/2016** | **Activity** | |
|---|---|---|
| (wire (out): PPVA to CS | $ | (590,000.00) |
| (wire (out):  PPVA to Macquarie | $ | (430,000.00) |
| (wire (out):  PPVA to GS | $ | (420,000.00) |
| (wire (out):  PPVA to EDF Man | $ | (90,000.00) |
| (wire (out):  PPVA to Insurance Funding Corp (D and O Insurance) | $ | (49,448.31) |
| (wire (out):   PPVA to PMNY | $ | (284,000.00) |
| (wire (out): PPVA to PPLO | $ | (10,000.00) |
| wire in to:  PPVA from PPCO | $ | 1,500,000.00 |
| wire in to:  PPVA from GS | $ | 330,000.00 |
| Net total | $ | (43,448.31) |
| Current Balance | $ | 16,700.00 |
| PMNY Current Balance | $ | 4,689.00 |

| **PPLO Checking Activity 01/13/2016** | **Activity** | |
|---|---|---|
| Wire in:  PPLO from PPVA | $ | 10,000.00 |
| (Wire Out):  PPLO to CS | $ | (13,000.00) |
| Net total | $ | (3,000.00) |
| Current Balance | $ | 4,669.00 |

EXHIBIT 69

January 13, 2016

I, Mark Nordlicht, agree on this day, to the following on behalf of myself, Platinum Partners Value Arbitrage Fund L.P. ("**PPVA**"), Platinum Partners Credit Opportunities Master Fund LP ("PPCO") and each of their affiliates (collectively, "**Platinum**"):

To the extent not otherwise in violation of applicable law, upon the sale of the assets and/or equity (collectively, the "**Sale**") of Implant Sciences Inc. and/or any of its subsidiaries (collectively, the "**Company**"), the proceeds of such Sale that inure, directly or indirectly, to the benefit of Platinum, shall immediately upon consummation of such Sale be applied and remitted to B Asset Manager, LP ("**BAMLP**"), in such amount necessary to purchase and/or repay in full all indebtedness owing by Golden Gate Oil Inc. to BAMLP and each of its investment advisory clients at such time (collectively, "**BAM**"); provided, that, nothing herein shall modify the obligations of the Company herein to first repay all indebtedness owing by the Company to BAM with proceeds of a Sale (the "**Implant Repayment**").

I further agree to take or cause to be taken all additional actions deemed by BAM to be reasonably necessary in furtherance of the foregoing, as well as to create a perfected security interest in the obligations described above to the extent requested by BAM.

Agreed and Acknowledged to by:

_____

Mark Nordlicht

Witnessed by:

_____

Mark Feuer

EXHIBIT 70

10/25/2018                  NAVB Historical Stock Quotes - Navidea Biopharmaceuticals Inc. Historical Stock Quotes - MarketWatch



Sponsored Links

1. **Data Analysis Tools**

2. **Top 10 Penny Stocks**

3. **High-dividend ETFs**

4. **Top Stocks to Buy**

5. **Best Stock to Buy Right Now**

6. **Stock Trading For Beginners**