EXHIBIT 71

10/25/2018                    NAVB Historical Stock Quotes - Navidea Biopharmaceuticals Inc. Historical Stock Quotes - MarketWatch



# EXHIBIT 72

**EXECUTION COPY**

## MASTER GUARANTY AGREEMENT

New York, New York                                                 March 21, 2016

FOR VALUE RECEIVED, and in consideration of (a) note purchases from, loans made or to be made, credit otherwise extended or to be extended by (i) the Montsant Investors (as defined below) to or for the account of Montsant Partners LLC, a Delaware limited liability company ("Montsant") and (ii) the GGO Secured Parties (as defined below) to or for the account of Golden Gate Oil LLC, a Delaware limited liability company ("GGO"), (b) the direct or indirect benefit received by Platinum Partners Value Arbitrage Fund L.P., an exempted limited partnership under the laws of the Cayman Islands ("PPVA" and together with Montsant and GGO, the "Companies" and each a "Company") in respect of the restructuring of Montsant's and GGO's respective obligations to the Creditor Parties (as defined below), and (c) note purchases from, loans made or to be made, credit otherwise extended or to be extended by BBIL ULICO 2014 ("BBIL") to or for the account of Montsant, from time to time and at any time and for other good and valuable consideration and to induce the Creditor Parties (as defined below), in their discretion, to purchase such notes, make such loans or other extensions of credit and to make or grant such renewals, extensions, releases of collateral or relinquishments of legal rights as the Creditor Parties (as defined below) may deem advisable, each of the undersigned (and each of them if more than one, the liability under this Guaranty being joint and several) (jointly and severally referred to as "Guarantors" or "the undersigned") unconditionally guarantees to the Creditor Parties (as defined below), their successors, endorsees and assigns the prompt payment when due (whether by acceleration or otherwise) of all present and future obligations and liabilities of any and all kinds of the Companies to the Creditor Parties (as defined below) and of all instruments of any nature evidencing or relating to any such obligations and liabilities upon which the Companies or one or more parties and the Companies are or may become liable to the Creditor Parties (as defined below), whether incurred by any Company as maker, endorser, drawer, acceptor, guarantors, accommodation party or otherwise, and whether due or to become due, secured or unsecured, absolute or contingent, joint or several, and however or whenever acquired by the Creditor Parties (as defined below), in each case specifically and exclusively relating to (i) the Obligations under and as defined in that certain Note Purchase Agreement, dated as of January 30, 2015, among BAM Administrative Services LLC, as agent (the "Agent" or "BAM") for the investors from time to time party thereto (the "Montsant Investors") and Montsant (as the same may be amended, restated, modified and/or supplemented from time to time, the "Montsant NPA"), (ii) the Secured Obligations under and as defined in that certain Security Agreement, dated as of April 10, 2012, between GGO and the Agent (as successor agent to Precious Capital LLC ("Precious")), as agent for the secured parties (the "GGO Secured Parties" and together with the Investors, the Agent and BBIL, each a "Creditor Party" and collectively, the "Creditor Parties") from time to time party thereto (as the same may be amended, restated, modified and/or supplemented from time to time, the "GGO Security Agreement"), (iii) the obligations and liabilities arising under that certain Seller Note, dated on or about March 31, 2016, in the original principal amount of $6,137,215.50 made by Montsant in favor of BBIL (the "Seller Note" and together with the GGO Security Agreement, the Montsant NPA, and all other documents, instruments and agreements entered into in connection with the transactions contemplated hereby and thereby, the "Documents") and (iv) the obligations of PPVA as more fully described in Section 1 hereto (the "PPVA Obligations"), or any documents,

instruments or agreements referred to therein, whether now existing or hereafter arising, direct or indirect, liquidated or unliquidated, absolute or contingent, due or not due and whether under, pursuant to or evidenced by a note, agreement, guaranty, instrument or otherwise (all of which are herein collectively referred to as the "Obligations"), and irrespective of the genuineness, validity, regularity or enforceability of such Obligations, or of any instrument evidencing any of the Obligations or of any collateral therefor or of the existence or extent of such collateral, and irrespective of the allowability, allowance or disallowance of any or all of the Obligations in any case commenced by or against any Company under Title 11, United States Code, including, without limitation, obligations or indebtedness of any such Company for post-petition interest, fees, costs and charges that would have accrued or been added to the Obligations but for the commencement of such case. Terms not otherwise defined herein shall have the meaning assigned such terms in the Documents, as applicable. In furtherance of the foregoing, the undersigned hereby agree as follows:

1.  PPVA Obligations. Immediately following PPVA's receipt of any payments, proceeds, distributions and/or other amounts arising in any manner whatsoever from any right, title and/or interest, PPVA may have in and to Implant Sciences Corporation (the "Proceeds"), PPVA shall immediately following such receipt remit such Proceeds in immediately available funds as follows:

(a)  First, PPVA shall make or cause to be made a payment to BAM in an amount equal to Twenty-Million Dollars ($20,000,000.00) to prepay the principal amount owed by GGO to the Investors, as such term defined in that certain Note Purchase Agreement, (as same may be amended, restated, modified and or supplemented from time to time), dated as of April 10, 2012, by and between GGO and BAM (as successor agent to Precious); and

(b)  Second, PPVA shall make or cause to be made a payment of any remaining Proceeds to pay in full all outstanding obligations and liabilities under that certain Note Purchase Agreement, dated as of March 19, 2014, by and between Implant Sciences Corporation, each of the investors party thereto, and the Agent.

2.  No Impairment. The Creditor Parties may at any time and from time to time, either before or after the maturity thereof, without notice to or further consent of the undersigned, extend the time of payment of, exchange or surrender any collateral for, renew or extend any of the Obligations or increase or decrease the interest rate thereon, or any other agreement with the Companies or with any other party to or person liable on any of the Obligations, or interested therein, for the extension, renewal, payment, compromise, discharge or release thereof, in whole or in part, or for any modification of the terms thereof or of any agreement between any Creditor Party and the Companies or any such other party or person, or make any election of rights the Creditor Parties may deem desirable under the United States Bankruptcy Code, as amended, or any other federal or state bankruptcy, reorganization, moratorium or insolvency law relating to or affecting the enforcement of creditors' rights generally (any of the foregoing, an "Insolvency Law") without in any way impairing or affecting this Guaranty. This Guaranty shall be effective regardless of the subsequent incorporation, merger or consolidation of any Company, or any change in the composition,

nature, personnel or location of any Company and shall extend to any successor entity to any Company, including a debtor in possession or the like under any Insolvency Law.

3.   <u>Guaranty Absolute</u>.   Subject to Section 6(c) hereof, each of the undersigned jointly and severally guarantees that the Obligations will be paid strictly in accordance with the terms of the Documents and/or any other document, instrument or agreement creating or evidencing the Obligations, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Companies with respect thereto.   Guarantors hereby knowingly accept the full range of risk encompassed within a contract of "continuing guaranty" which risk includes the possibility that the Companies will contract additional indebtedness, obligations and liabilities for which Guarantors may be liable hereunder after any such Company's financial condition or ability to pay its lawful debts when they fall due has deteriorated, whether or not any such Company has properly authorized incurring such additional indebtedness, obligations and liabilities.   The undersigned acknowledge that (i) no oral representations, including any representations to extend credit or provide other financial accommodations to any Company, have been made by any Creditor Party to induce the undersigned to enter into this Guaranty and (ii) any extension of credit to any Company shall be governed solely by the provisions of the Documents.   The liability of each of the undersigned under this Guaranty shall be absolute and unconditional, in accordance with its terms, and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstance or occurrence whatsoever, including, without limitation: (a) any waiver, indulgence, renewal, extension, amendment or modification of or addition, consent or supplement to or deletion from or any other action or inaction under or in respect of the Documents or any other instruments or agreements relating to the Obligations or any assignment or transfer of any thereof, (b) any lack of validity or enforceability of any Document or other documents, instruments or agreements relating to the Obligations or any assignment or transfer of any thereof, (c) any furnishing of any additional security to the Creditor Parties or their assignees or any acceptance thereof or any release of any security by the Creditor Parties or their assignees, (d) any limitation on any party's liability or obligation under the Documents or any other documents, instruments or agreements relating to the Obligations or any assignment or transfer of any thereof or any invalidity or unenforceability, in whole or in part, of any such document, instrument or agreement or any term thereof, (e) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to the Companies, or any action taken with respect to this Guaranty by any trustee or receiver, or by any court, in any such proceeding, whether or not the undersigned shall have notice or knowledge of any of the foregoing, (f) any exchange, release or nonperfection of any collateral, or any release, or amendment or waiver of or consent to departure from any guaranty or security, for all or any of the Obligations or (g) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the undersigned.   Any amounts due from the undersigned to the Creditor Parties shall bear interest until such amounts are paid in full at the highest rate then applicable to the Obligations.   Obligations include post-petition interest whether or not allowed or allowable.

4.   <u>Waivers</u>.

(a)     This Guaranty is a guaranty of payment and not of collection.  The Creditor Parties shall be under no obligation to institute suit, exercise rights or remedies or take any other action against the Companies or any other person or entity liable with respect to any of the Obligations or resort to any collateral security held by it to secure any of the Obligations as a condition precedent to the undersigned being obligated to perform as agreed herein and each of the Guarantors hereby waives any and all rights which it may have by statute or otherwise which would require the Creditor Parties to do any of the foregoing.  Each of the Guarantors further consents and agrees that the Creditor Parties shall be under no obligation to marshal any assets in favor of Guarantors, or against or in payment of any or all of the Obligations.  The undersigned hereby waives all suretyship defenses and any rights to interpose any defense, counterclaim or offset of any nature and description which the undersigned may have or which may exist between and among any Creditor Party, the Companies and/or the undersigned with respect to the undersigned's obligations under this Guaranty, or which any Company may assert on the underlying debt, including but not limited to failure of consideration, breach of warranty, fraud, payment (other than cash payment in full of the Obligations), statute of frauds, bankruptcy, infancy, statute of limitations, accord and satisfaction, and usury.

(b)     Each of the undersigned further waives (i) notice of the acceptance of this Guaranty, of the making of any such loans or extensions of credit, and of all notices and demands of any kind to which the undersigned may be entitled, including, without limitation, notice of adverse change in any Company's financial condition or of any other fact which might materially increase the risk of the undersigned and (ii) presentment to or demand of payment from anyone whomsoever liable upon any of the Obligations, protest, notices of presentment, non-payment or protest and notice of any sale of collateral security or any default of any sort.

(c)     Notwithstanding any payment or payments made by the undersigned hereunder, or any setoff or application of funds of the undersigned by any Creditor Party, the undersigned shall not be entitled to be subrogated to any of the rights of such Creditor Party against the Companies or against any collateral or guarantee or right of offset held by such Creditor Party for the payment of the Obligations, nor shall the undersigned seek or be entitled to seek any contribution or reimbursement from the Companies in respect of payments made by the undersigned hereunder, until all amounts owing to the Creditor Parties by the Companies on account of the Obligations are indefeasibly paid in full and the Creditor Parties' obligation to extend credit pursuant to the Documents has been irrevocably terminated.  If, notwithstanding the foregoing, any amount shall be paid to the undersigned on account of such subrogation rights at any time when all of the Obligations shall not have been paid in full and the Creditor Parties' obligations to extend credit pursuant to the Documents shall not have been terminated, such amount shall be held by the undersigned in trust for the Creditor Parties, segregated from other funds of the undersigned, and shall forthwith upon, and in any event within two (2) business days of, receipt by the undersigned, be turned over to the Agent in the exact form received by the undersigned (duly endorsed by the undersigned to the Agent, if required), to be applied against the Obligations, whether matured or unmatured, in such order as the Agent may determine, subject to the provisions of the Documents.  Any and all present and future debts, obligations and liabilities of the Companies to any of the undersigned

are hereby waived and postponed in favor of, and subordinated to the full payment and performance of, all present and future debts and Obligations of the Companies to the Creditor Parties.

5.     <u>Security</u>.  All sums at any time to the credit of the undersigned and any property of the undersigned in any Creditor Party's possession or in the possession of any bank, financial institution or other entity that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Creditor Party (each such entity, an "<u>Affiliate</u>") shall be deemed held by such Creditor Party or such Affiliate, as the case may be, as security for any and all of the undersigned's obligations and liabilities to the Creditor Parties and to any Affiliate of the Creditor Parties, no matter how or when arising and whether under this or any other instrument, agreement or otherwise.

6.     <u>Representations and Warranties</u>.  Each of the undersigned hereby jointly and severally represents and warrants (all of which representations and warranties shall survive until all Obligations are indefeasibly satisfied in full and the Documents have been irrevocably terminated), that:

(a)     <u>Corporate Status</u>.  It is a corporation, partnership or limited liability company, as the case may be, duly formed, validly existing and in good standing under the laws of its jurisdiction of formation indicated on the signature page hereof and has full power, authority and legal right to own its property and assets and to transact the business in which it is engaged.

(b)     <u>Authority and Execution</u>.  It has full power, authority and legal right to execute and deliver, and to perform its obligations under, this Guaranty and has taken all necessary corporate, partnership or limited liability company, as the case may be, action to authorize the execution, delivery and performance of this Guaranty.

(c)     <u>Legal, Valid and Binding Character</u>.  This Guaranty constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting the enforcement of creditor's rights and general principles of equity that restrict the availability of equitable or legal remedies.

(d)     <u>Violations</u>.  The execution, delivery and performance of this Guaranty will not violate any requirement of law applicable to it or any contract, agreement or instrument to which it is a party or by which it or any of its property is bound or result in the creation or imposition of any mortgage, lien or other encumbrance other than in favor of the Agent, for the ratable benefit of the Creditor Parties, on any of its property or assets pursuant to the provisions of any of the foregoing, which, in any of the foregoing cases, could reasonably be expected to have, either individually or in the aggregate, a material adverse effect on the business, assets, liabilities, condition (financial or otherwise), properties, operations or prospects of any Company and its Subsidiaries, taken individually and as a whole (a "<u>Material Adverse Effect</u>").

(e)     <u>Consents or Approvals</u>.   No consent of any other person or entity (including, without limitation, any creditor of the undersigned) and no consent, license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required in connection with the execution, delivery, performance, validity or enforceability of this Guaranty by it, except to the extent that the failure to obtain any of the foregoing could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(f)     <u>Litigation</u>.   No litigation, arbitration, investigation or administrative proceeding of or before any court, arbitrator or governmental authority, bureau or agency is currently pending or, to the best of its knowledge, threatened (i) with respect to this Guaranty or any of the transactions contemplated by this Guaranty or (ii) against or affecting it, or any of its property or assets, which, in each of the foregoing cases, if adversely determined, could reasonably be expected to have a Material Adverse Effect.

(g)     <u>Financial Benefit</u>.   It has derived or expects to derive a financial or other advantage from each and every loan, advance or extension of credit made under the Documents or other Obligation incurred by the Companies to the Creditor Parties.

(h)     <u>Solvency</u>.   As of the date of this Guaranty, (a) the fair saleable value of its assets exceeds its liabilities and (b) it is meeting its current liabilities as they mature.

7.     <u>Acceleration</u>.

(a)     If any breach of any covenant or condition or other event of default shall occur and be continuing under any agreement made by any Company or any of the undersigned to any Creditor Party, or any Company or any of the undersigned should at any time become insolvent, or make a general assignment, or if a proceeding in or under any Insolvency Law shall be filed or commenced by, or in respect of, any of  the undersigned, or if a notice of any lien, levy, or assessment is filed of record with respect to any assets of any of the undersigned by the United States of America or any department, agency, or instrumentality thereof, or if any taxes or debts owing at any time or times hereafter to any one of them becomes a lien or encumbrance upon any assets of the undersigned in any Creditor Party's possession, or otherwise, any and all Obligations shall for purposes hereof, at the Creditor Parties' option, be deemed due and payable without notice notwithstanding that any such Obligation is not then due and payable by any Company.

(b)     Each of the undersigned will promptly notify the Agent of any default by such undersigned in its respective performance or observance of any term or condition of any agreement to which the undersigned is a party if the effect of such default is to cause, or permit the holder of any obligation under such agreement to cause, such obligation to become due prior to its stated maturity and, if such an event occurs, the Creditor Parties shall have the right to accelerate such undersigned's obligations hereunder.

8.     <u>Payments from Guarantors</u>.   The Creditor Parties, in their sole and absolute discretion, with or without notice to the undersigned, may apply on account of the Obligations

any payment from the undersigned or any other guarantors, or amounts realized from any security for the Obligations, or may deposit any and all such amounts realized in a non-interest bearing cash collateral deposit account to be maintained as security for the Obligations.

9.   Costs.   The undersigned shall pay on demand, all costs, fees and expenses (including expenses for legal services of every kind) relating or incidental to the enforcement or protection of the rights of the Creditor Parties hereunder or under any of the Obligations.

10.   No Termination.   This is a continuing irrevocable guaranty and shall remain in full force and effect and be binding upon the undersigned, and each of the undersigned's successors and assigns, until all of the Obligations have been indefeasibly paid in full and the Creditor Parties' obligations to extend credit pursuant to the Documents has been irrevocably terminated.  If any of the present or future Obligations are guarantied by persons, partnerships, corporations or other entities in addition to the undersigned, the death, release or discharge in whole or in part or the bankruptcy, merger, consolidation, incorporation, liquidation or dissolution of one or more of them shall not discharge or affect the liabilities of any undersigned under this Guaranty.

11.   Recapture.   Anything in this Guaranty to the contrary notwithstanding, if any Creditor Party receives any payment or payments on account of the liabilities guaranteed hereby, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver, or any other party under any Insolvency Law, common law or equitable doctrine, then to the extent of any sum not finally retained by the Creditor Parties, the undersigned's obligations to the Creditor Parties shall be reinstated and this Guaranty shall remain in full force and effect (or be reinstated) until payment shall have been made to the Creditor Parties, which payment shall be due on demand.

12.   Books and Records.   The books and records of the Agent showing the account between each of the Creditor Parties and the Companies shall be admissible in evidence in any action or proceeding, shall be binding upon the undersigned for the purpose of establishing the items therein set forth and shall constitute prima facie proof thereof.

13.   No Waiver.  No failure on the part of any Creditor Party to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by any Creditor Party of any right, remedy or power hereunder preclude any other or future exercise of any other legal right, remedy or power.  Each and every right, remedy and power hereby granted to the Creditor Parties or allowed it by law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by the Creditor Parties at any time and from time to time.

14.   WAIVER OF JURY TRIAL.   EACH OF THE UNDERSIGNED DESIRES THAT ITS DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS.  THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH OF THE UNDERSIGNED HERETO WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN

CONTRACT, TORT, OR OTHERWISE BETWEEN ANY CREDITOR PARTY, AND/OR ANY OF THE UNDERSIGNED ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS GUARANTY, ANY DOCUMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO.

15. <u>GOVERNING LAW; JURISDICTION</u>.   THIS GUARANTY CANNOT BE CHANGED OR TERMINATED ORALLY, AND SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS.   EACH OF THE UNDERSIGNED HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN ANY OF THE UNDERSIGNED, ON THE ONE HAND, AND ANY CREDITOR PARTY, ON THE OTHER HAND, PERTAINING TO THIS GUARANTY OR ANY OF THE DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS GUARANTY OR ANY OF THE DOCUMENTS; <u>PROVIDED</u>, THAT EACH OF THE UNDERSIGNED ACKNOWLEDGES THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF THE COUNTY OF NEW YORK, STATE OF NEW YORK; AND <u>FURTHER PROVIDED</u>, THAT NOTHING IN THIS GUARANTY SHALL BE DEEMED OR OPERATE TO PRECLUDE THE CREDITOR PARTIES FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE OBLIGATIONS, TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF ANY CREDITOR PARTY.   EACH OF THE UNDERSIGNED EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH UNDERSIGNED HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR <u>FORUM NON CONVENIENS</u>.   EACH OF THE UNDERSIGNED HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH UNDERSIGNED IN ACCORDANCE WITH SECTION 19 AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF SUCH UNDERSIGNED'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

16. <u>Understanding With Respect to Waivers and Consents</u>.  Each Guarantor warrants and agrees that each of the waivers and consents set forth in this Guaranty is made voluntarily and unconditionally after consultation with outside legal counsel and with full knowledge of its significance and consequences, with the understanding that events giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which such Guarantor otherwise may have against a Company, any Creditor Party or any other person or entity or against any collateral.  If, notwithstanding the intent of the parties that the terms of this

Guaranty shall control in any and all circumstances, any such waivers or consents are determined to be unenforceable under applicable law, such waivers and consents shall be effective to the maximum extent permitted by law.

17.  Severability.  To the extent permitted by applicable law, any provision of this Guaranty which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

18.  Amendments, Waivers.  No amendment or waiver of any provision of this Guaranty nor consent to any departure by the undersigned therefrom shall in any event be effective unless the same shall be in writing executed by each of the undersigned directly affected by such amendment and/or waiver and the Agent.

19.  Notice.  All notices, requests and demands to or upon the undersigned, shall be in writing and shall be deemed to have been duly given or made (a) when delivered, if by hand, (b) three (3) days after being sent, postage prepaid, if by registered or certified mail, (c) when confirmed electronically, if by facsimile, or (d) when delivered, if by a recognized overnight delivery service in each event, to the numbers and/or address set forth beneath the signature of the undersigned.

20.  Successors.  Each Creditor Party may, from time to time, without notice to the undersigned, sell, assign, transfer or otherwise dispose of all or any part of the Obligations and/or rights under this Guaranty.  Without limiting the generality of the foregoing, each Creditor Party may assign, or grant participations to, one or more banks, financial institutions or other entities all or any part of any of the Obligations.  In each such event, the Creditor Parties, their Affiliates and each and every immediate and successive purchaser, assignee, transferee or holder of all or any part of the Obligations shall have the right to enforce this Guaranty, by legal action or otherwise, for its own benefit as fully as if such purchaser, assignee, transferee or holder were herein by name specifically given such right.  The Creditor Parties shall have an unimpaired right to enforce this Guaranty for its benefit with respect to that portion of the Obligations which the Creditor Parties have not disposed of, sold, assigned, or otherwise transferred.

21.  Joinder.  It is understood and agreed that any person or entity that desires to become a Guarantor hereunder, or is required to execute a counterpart of this Guaranty after the date hereof pursuant to the requirements of any Document, shall become a Guarantor hereunder by (x) executing a joinder agreement in form and substance satisfactory to the Agent, (y) delivering supplements to such exhibits and annexes to such Documents as the Agent shall reasonably request and/or as may be required by such joinder agreement and (z) taking all actions as specified in this Guaranty as would have been taken by such Guarantor had it been an original party to this Guaranty, in each case with all documents required above to be delivered to the Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Agent.

22.   Release.  Nothing except indefeasible payment in full of the Obligations shall release any of the undersigned from liability under this Guaranty.

23.   Remedies Not Exclusive.  The remedies conferred upon the Creditor Parties in this Guaranty are intended to be in addition to, and not in limitation of any other remedy or remedies available to the Creditor Parties.

24.   Limitation of Obligations under this Guaranty.  Each Guarantor and each Creditor Party (by its acceptance of the benefits of this Guaranty) hereby confirms that it is its intention that this Guaranty not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act of any similar Federal or state law. To effectuate the foregoing intention, each Guarantor and each Creditor Party (by its acceptance of the benefits of this Guaranty) hereby irrevocably agrees that the Obligations guaranteed by such Guarantor shall be limited to such amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of such Guarantor that are relevant under such laws and after giving effect to any rights to contribution pursuant to any agreement providing for an equitable contribution among such Guarantor and the other Guarantors (including this Guaranty), result in the Obligations of such Guarantor under this Guaranty in respect of such maximum amount not constituting a fraudulent transfer or conveyance.

25.   Limited Recourse Against PPVA.  Notwithstanding anything to the contrary contained herein, the Creditor Parties' recourse hereunder solely with respect to PPVA shall be limited to enforcement of Agent's rights against PPVA under the Collateral Assignment, dated as of the date hereof (as the same may be amended, modified and/or supplemented from time to time, the "China Horizon Collateral Assignment"), made by PPVA in favor of the Agent, in respect of the Notes and the Convertible Implant Note (as such terms are defined in the China Horizon Collateral Assignment) and the Collateral Assignment, dated as of the date hereof (as the same may be amended, modified and/or supplemented from time to time, the "Carbon Credits Collateral Assignment"), made by PPVA in favor of the Agent, in respect of the Carbon Credit Portfolio Agreements (as such term is defined in the Carbon Credits Collateral Assignment).

26.   Limited Recourse Against Montsant.  Notwithstanding anything to the contrary contained herein, following payment in full in cash of all the Obligations owing by Montsant in respect of the Note (as such term is defined in the Montsant NPA) and the Seller Note, the Creditor Parties' recourse hereunder solely with respect to Montsant shall be limited to the Agent's rights against the Specified Collateral (as hereinafter defined) pledged by Montsant under the Pledge Agreement, dated as of May 13, 2015, by and between Montsant and the Agent (as the same may be amended, restated, modified and/or supplemented from time to time, the "Pledge Agreement") and the Control Agreement, dated as of July 6, 2015, among the Agent, Montsant and COR Clearing LLC (as the same may be amended, restated, modified and/or supplemented from time to time).  For purposes hereof, the term "Specified Collateral" shall have the meaning set forth in the Pledge Agreement.

**[REMAINDER OF THIS PAGE IS BLANK.
SIGNATURE PAGE IMMEDIATELY FOLLOWS]**

IN WITNESS WHEREOF, this Guaranty has been executed by the undersigned as of the date and year here above written.

**GUARANTORS**

**MONTSANT PARTNERS LLC**

By:_____

    Name:
    Title:

Address for Notices:
Montsant Partners LLC
c/o Platinum Management (NY)
250 West 55th Street, 14th Floor
New York, New York 10019
Attn: David Steinberg
Tel: (212) 582-2222
Facsimile: (212) 582-2424

**GOLDEN GATE OIL LLC**

By:_____

    Name:
    Title:

Address for Notices:
Golden Gate Oil LLC
c/o Platinum Management (NY)
250 West 55th Street, 14th Floor
New York, New York 10019
Attn: David Steinberg
Tel: (212) 582-2222
Facsimile: (212) 582-2424

**PLATINUM PARTNERS VALUE**
**ARBITRAGE FUND L.P.**

By: _____

    Name:
    Title:

Address for Notices:
Platinum Partners Value Arbitrage Fund L.P.
c/o Platinum Management (NY)
250 West 55th Street, 14th Floor
New York, New York 10019
Attn: David Steinberg
Tel: (212) 582-2222
Facsimile: (212) 582-2424


**INDIVIDUAL GUARANTOR**

_____

MARK A. NORDLICHT

Address for Notices:
Mark A. Nordlicht
c/o Platinum Management (NY)
250 West 55th Street, 14th Floor
New York, New York 10019
Attn: David Steinberg
Tel: (212) 582-2222
Facsimile: (212) 582-2424

**AGREED AND ACKNOWLEDGED:**

BAM ADMINISTRATIVE SERVICES LLC,
as Agent

By:_____
    Name:  Dhruv Narain
    Title:  Authorized Signatory

Address for Notices:
1370 Avenue of the Americas
32nd Floor
New York, NY 10019
Attn:  Dhruv Narain
Tel:  (646) 356-1650
Email:  dnarain@bassetmanager.com

EXHIBIT 73

EXECUTION COPY

COLLATERAL ASSIGNMENT

COLLATERAL ASSIGNMENT made as of March 21, 2016 (as amended, restated or otherwise modified from time to time, this "Collateral Assignment") by PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P., an exempted limited partnership under the laws of the Cayman Islands (the "Assignor"), to BAM ADMINISTRATIVE SERVICES LLC, a Delaware limited liability company, as agent for the Creditor Parties (as defined below) (in such capacity, "Assignee").

FOR VALUE RECEIVED, and as collateral security for all debts, liabilities and obligations (including, without limitation, performance obligations) of the Assignor, Montsant Partners LLC, a Delaware limited liability company ("Montsant"), and Golden Gate Oil LLC, a Delaware limited liability company ("GGO"), to the Creditor Parties (as defined below) pursuant to the terms of that certain Master Guaranty Agreement, dated as of March 21, 2016 (as amended, restated or otherwise modified from time to time), by and among Assignor, Montsant, GGO, and Assignee, Assignor hereby assigns, transfers and sets over unto and grants to Assignee, for the ratable benefit of the Creditor Parties (and their successors and assigns), a security interest in the following, whether now owned, acquired or hereafter arising (the "Collateral"):

(a)   all of Assignor's right, title and interest to (but not its obligations under) that certain Demand Promissory Note in the original principal amount of $2,499,788.00, dated July 1, 2015 (as amended, restated, or otherwise modified from time to time, the "China Horizon Demand Note") issued by China Horizon Investments Group ("China Horizon") to Assignor, together with all of Assignor's right, title and interest in and to all documents, instruments and agreements entered into in connection with the transactions contemplated thereby and all attendant liens, rights, claims, title, assignments and interests (including security interests) pertaining to or arising therefrom,

(b)   all of Assignor's right, title and interest to (but not its obligations under) that certain Promissory Note in the original principal amount of $2,265,084.00, dated July 1, 2015 (as amended, restated, or modified from time to time, the "China Horizon Promissory Note" and together with the China Horizon Demand Note, each a "Note" and collectively the "Notes") issued by China Horizon to Assignor, together with all of Assignor's right, title and interest in and to all documents, instruments and agreements entered into in connection with the transactions contemplated thereby and all attendant liens, rights, claims, title, assignments and interests (including security interests) pertaining to or arising therefrom; and

(c)   all indemnity rights and all moneys and claims for moneys due and/or to become due to Assignor under or in respect of each item of Collateral.

For purposes hereof, the term "Creditor Parties" means (a) Assignee, (b) the investors from time to time party to that certain Note Purchase Agreement, dated as of January 30, 2015 (the "Montsant Investors"), among Assignee, Montsant and the Montsant Investors (as the same may be amended, restated, modified and/or supplemented from time to time), (c) the investors from time to time party to that certain Note Purchase Agreement, dated as of April 10, 2012 (the

"GGO Investors"), among Assignee (as successor to Precious Capital LLC), GGO and the GGO Investors (as the same may be amended, restated, modified and/or supplemented from time to time) and (d) BBIL ULICO 2014 ("BBIL") (as the holder of that certain Promissory Note dated as of March 28, 2016 in the original principal amount of $6,137,215.50 made by Montsant in favor of BBIL (as the same may be amended, restated, modified and/or supplemented from time to time).

Assignor hereby (i) irrevocably authorizes and directs China Horizon, and its respective successors and assigns, to make all payments and distributions due to Assignor under or arising under any item of Collateral directly to Assignee and (ii) irrevocably authorizes and empowers Assignee (a) to ask, demand, receive, receipt and give acquittance for any and all amounts which may be or become due or payable, or remain unpaid at any time and times to Assignor by China Horizon under and pursuant to any item of Collateral, (b) to endorse any checks, drafts or other orders for the payment of money payable to Assignor in payment thereof, and (c) in Assignee's discretion to file any claims or take any action or institute any proceeding, either in its own name or in the name of Assignor or otherwise, which Assignee may deem necessary or advisable to effectuate the foregoing. It is expressly understood and agreed, however, that Assignee shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or take any other action to collect or enforce the payment of any amounts which may have been assigned to Assignee or to which Assignee may be entitled hereunder at any time or times.

China Horizon is hereby authorized to recognize Assignee's claims to rights under each item of Collateral without investigating any reason for any action taken by Assignee or the validity of the amount or the obligations or existence of any default, or the application to be made by Assignee of any of the amounts to be paid to Assignee. Checks for all or any part of the sums payable under this Collateral Assignment shall be drawn to the sole and exclusive order of Assignee.

Assignor shall on the date hereof deliver the original Notes to Assignee, together with endorsements in favor of Assignee, each in form and substance satisfactory to Assignee. At any time and from time to time, upon the written request of Assignee, Assignor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as Assignee may reasonably deem desirable (a) to obtain the full benefits of this Collateral Assignment, (b) to protect, preserve and maintain Assignee's rights in any Collateral, and/or (c) to enable Assignee to exercise all or any of the rights and powers herein granted.

In the event any Assignor declines to exercise any rights in respect of any item of Collateral, Assignee shall have the right to enforce any and all such rights of Assignor directly against China Horizon, as applicable.

This shall be a continuing agreement and the rights and benefits of Assignor in and to the Collateral are in addition to and not in substitution for any other security held by Assignee and shall not operate as a merger of any simple contract debt or suspend the fulfillment of or affect the right, remedies and powers of Assignee in respect of the said rights and benefits or any

collateral of Assignor held by Assignee.  Without limiting the generality of any of the foregoing, all claims present or future of Assignor against any person liable upon or for payment in respect of any Collateral are hereby assigned to Assignee.

The security interests created hereby are intended to attach and take effect forthwith upon the execution of this Collateral Assignment by Assignor, and Assignor acknowledges that value has been given and that Assignor has rights in and to the Collateral.

This Collateral Assignment shall be governed by and construed in accordance with the laws of the State of New York.

This Collateral Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, Assignor has duly executed this Collateral Assignment as of the day and year first above written.

**ASSIGNOR**

PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P.

By: _____
    Name:
    Title:

**ASSIGNEE**

BAM ADMINISTRATIVE SERVICES LLC

By:_____
    Name:  Dhruv Narain
    Title:  Authorized Signatory

EXHIBIT 74

TURNOVER AGREEMENT

TURNOVER AGREEMENT made as of March 21, 2016 (as amended, restated or otherwise modified from time to time, this "Turnover Agreement") by PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P., an exempted limited partnership under the laws of the Cayman Islands (the "Assignor"), to BAM ADMINISTRATIVE SERVICES LLC, a Delaware limited liability company, as agent for the Creditor Parties (as defined below) (in such capacity, "Assignee").

FOR VALUE RECEIVED, and as security for all debts, liabilities and obligations of China Horizon Investments Group Limited ("China Horizon") to the Assignee and the Creditor Parties, Assignor hereby assigns, transfers and agrees to turn over to and grants to Assignee, for the ratable benefit of the Creditor Parties (and their successors and assigns), a security interest in the following, whether now owned, acquired or hereafter arising (the "Specified Property"):

(a)     all of Assignor's right, title and interest to (but not its obligations under) proceeds, moneys and claims for moneys due and/or to become due from all debt instruments from time to time issued by China Horizon to Assignor through and including the date hereof, together with all of Assignor's right, title and interest in and to all documents, instruments and agreements entered into in connection with the transactions contemplated thereby and all attendant liens, rights, claims, title, assignments and interests (including security interests) pertaining to or arising therefrom,

(b)     all of Assignor's right, title and interest to (but not its obligations in respect of) proceeds, moneys and claims for moneys due and/or to become due from all equity interests from time to time owned and/or held by Assignor in China Horizon on or prior to the date hereof, together with all of Assignor's right, title and interest in and to all documents, instruments and agreements entered into in connection with the transactions contemplated thereby and all attendant liens, rights, claims, title, assignments and interests (including security interests) pertaining to or arising therefrom; and

(c)     all proceeds, moneys and claims for moneys due and/or to become due to Assignor under or in respect of each item of Specified Property.

For purposes hereof, the term "Creditor Parties" means any and all investors, lenders and note purchasers with respect to which China Horizon is indebted and with respect to which BAM acts as administrative and/or collateral agent.

Subject to the Platinum Turnover Limitation (as defined below), Assignor hereby (i) irrevocably agrees to turn over to Assignee all payments, distributions, sales proceeds and other amounts payable from time to time to Assignor in connection with Assignor's rights in any and each item of Specified Property, (ii) irrevocably authorizes and directs China Horizon, and its respective successors and assigns, to turn over to Assignee all payments, distributions, sales proceeds and other amounts payable from time to time to Assignor in connection with Assignor's rights in any and each item of Specified Property and (iii) irrevocably authorizes and empowers Assignee (a) to ask, demand, receive, receipt and give acquittance for any and all amounts which may be or become due or payable, or remain unpaid at any time and times to Assignor by China Horizon under and pursuant to any item of Specified Property, (b) to endorse any checks, drafts or

other orders for the payment of money payable to Assignor in payment thereof, and (c) in Assignee's discretion to file any claims or take any action or institute any proceeding, either in its own name or in the name of Assignor or otherwise, which Assignee may deem necessary or advisable to effectuate the foregoing.  It is expressly understood and agreed, however, that Assignee shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or take any other action to collect or enforce the payment of any amounts which may have been assigned to Assignee or to which Assignee may be entitled hereunder at any time or times.  The Platinum Turnover Limitation shall mean an amount up to but not exceeding $5,500,000; provided, that, in the event that (i) all of the Creditor Parties' existing indebtedness in China Horizon is converted or exchanged for equity in China Horizon and (ii) China Horizon requests after such conversion or exchange, additional capital investments from the Creditor Parties, to the extent that such Creditor Parties elect not to fund all or a portion of such requested additional capital investments, the Turnover Limitation shall be reduced by an amount equal to the product of (I) the dilutive effect of the aggregate capital investments actually raised by China Horizon from all investors on the Creditor Parties equity in China Horizon (as represented by a percentage change) multiplied by (II) $5,500,000.  Notwithstanding the foregoing, Assignor's turnover obligations hereunder shall terminate when all indebtedness owing by China Horizon to the Creditor Parties has been paid in full, which such indebtedness as of the date hereof equals $8,500,000.  The aggregate proceeds of Specified Property actually received in immediately available funds by Assignor from Assignee hereunder shall be referred to as the "Turnover Amount."

On and after the date upon which the Creditor Parties shall have received the sum of (x) $8,500,000 plus (y) that amount of all other investments (whether in the form of debt or equity) made by the Creditor Parties to China Horizon from Assignor pursuant to this Agreement and/or China Horizon, Assignee shall thereafter turnover to Assignor, but only to the extent of the Turnover Amount, all amounts received by Assignee in respect of (i) all debt instruments from time to time owned and/or held by Assignee in China Horizon, (ii) all equity interests from time to time owned and/or held by Assignee in China Horizon and (iii) all proceeds, moneys and claims for moneys due and/or to become due to Assignee in respect of the foregoing.

China Horizon is hereby authorized to recognize Assignee's claims to rights under each item of Specified Property without investigating any reason for any action taken by Assignee or the validity of the amount or the obligations or existence of any default, or the application to be made by Assignee of any of the amounts to be paid to Assignee.  Checks for all or any part of the sums payable under this Turnover Agreement shall be drawn to the sole and exclusive order of Assignee.

At any time and from time to time, upon the written request of Assignee, Assignor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as Assignee may reasonably deem desirable (a) to obtain the full benefits of this Turnover Agreement, (b) to protect, preserve and maintain Assignee's rights in any Specified Property, and/or (c) to enable Assignee to exercise all or any of the rights and powers herein granted.

In the event any Assignor declines to exercise any rights in respect of any item of Specified Property, Assignee shall have the right to enforce any and all such rights of Assignor directly against China Horizon, as applicable.

This shall be a continuing agreement and the rights and benefits of Assignor in and to the Specified Property are in addition to and not in substitution for any other security held by Assignee and shall not operate as a merger of any simple contract debt or suspend the fulfillment of or affect the right, remedies and powers of Assignee in respect of the said rights and benefits or any Specified Property of Assignor held by Assignee.  Without limiting the generality of any of the foregoing, all claims present or future of Assignor against any person liable upon or for payment in respect of any Specified Property are hereby assigned to Assignee.

Assignor acknowledges that value has been given and that Assignor has rights in and to the Specified Property.

This Turnover Agreement shall be governed by and construed in accordance with the laws of the State of New York.

This Turnover Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, Assignor has duly executed this Turnover Agreement as of the day and year first above written.

**ASSIGNOR**

PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P.

By:_____
    Name:
    Title:

**ASSIGNEE**

BAM ADMINISTRATIVE SERVICES LLC

By:_____
    Name:  Dhruv Narain
    Title:  Authorized Signatory

EXHIBIT 75

EXECUTION COPY

COLLATERAL ASSIGNMENT

COLLATERAL ASSIGNMENT made as of March 21, 2016 (as amended, restated or otherwise modified from time to time, this "Collateral Assignment") by PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P., an exempted limited partnership under the laws of the Cayman Islands (the "Assignor"), to BAM ADMINISTRATIVE SERVICES LLC, a Delaware limited liability company, as agent for the Creditor Parties (as defined below) (in such capacity, "Assignee").

FOR VALUE RECEIVED, and as collateral security for all debts, liabilities and obligations (including, without limitation, performance obligations) of the Assignor, Montsant Partners LLC, a Delaware limited liability company ("Montsant"), and Golden Gate Oil LLC, a Delaware limited liability company ("GGO"), to the Creditor Parties (as defined below) pursuant to the terms of that certain Master Guaranty Agreement, dated as of March 21, 2016 (as amended, restated or otherwise modified from time to time, the "Master Guaranty")), by and among Assignor, Montsant, GGO, and Assignee, Assignor hereby assigns, transfers and sets over unto and grants to Assignee, for the ratable benefit of the Creditor Parties (and their successors and assigns), a security interest in the following, whether now owned, acquired or hereafter arising (the "Collateral"):

(a)        all of Assignor's right, title and interest in and to (but not its obligations under) the agreements identified on Schedule 1 hereto (collectively, the "Carbon Credit Portfolio Agreements"), including any and all right, title and interest in and to all carbon credits, emission reductions and related assets heretofore and hereafter received by Assignor under or in respect of any of the Carbon Credit Portfolio Agreements; and

(b)        all indemnity rights and all moneys and claims for moneys due and/or to become due to Assignor under or in respect of each item of Collateral.

For purposes hereof, the term "Creditor Parties" means (a) Assignor, (b) the investors from time to time party to that certain Note Purchase Agreement, dated as of January 30, 2015 (the "Montsant Investors"), among Assignee, Montsant and the Montsant Investors (as the same may be amended, restated, modified and/or supplemented from time to time, the "Montsant Purchase Agreement"), (c) the investors from time to time party to that certain Note Purchase Agreement, dated as of April 10, 2012 (the "GGO Investors"), among Assignee (as successor to Precious Capital LLC), GGO and the GGO Investors (as the same may be amended, restated, modified and/or supplemented from time to time) and (d) BBIL ULICO 2014 ("BBIL") (as the holder of that certain Promissory Note dated as of March 28, 2016 in the original principal amount of $6,137,215.50 made by Montsant in favor of BBIL (as the same may be amended, restated, modified and/or supplemented from time to time).

Assignor hereby (i) irrevocably authorizes and directs each entity listed on Schedule 2 hereto (each a "Carbon Credit Entity"), and its respective successors and assigns, to make all payments and distributions due to Assignor under or arising under any item of Collateral directly to Assignee and (ii) irrevocably authorizes and empowers Assignee (a) to ask, demand, receive, receipt and give acquittance for any and all amounts which may be or become due or payable, or

remain unpaid at any time and times to Assignor by any Carbon Credit Entity under and pursuant to any item of Collateral, (b) to endorse any checks, drafts or other orders for the payment of money payable to Assignor in payment thereof, and (c) in Assignee's discretion to file any claims or take any action or institute any proceeding, either in its own name or in the name of Assignor or otherwise, which Assignee may deem necessary or advisable to effectuate the foregoing.  It is expressly understood and agreed, however, that Assignee shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or take any other action to collect or enforce the payment of any amounts which may have been assigned to Assignee or to which Assignee may be entitled hereunder at any time or times.

Each Carbon Credit Entity is hereby authorized to recognize Assignee's claims to rights under each item of Collateral without investigating any reason for any action taken by Assignee or the validity of the amount or the obligations or existence of any default, or the application to be made by Assignee of any of the amounts to be paid to Assignee.  Checks for all or any part of the sums payable under this Collateral Assignment shall be drawn to the sole and exclusive order of Assignee.

At any time and from time to time, upon the written request of Assignee, Assignor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as Assignee may reasonably deem desirable (a) to obtain the full benefits of this Collateral Assignment, (b) to protect, preserve and maintain Assignee's rights in any Collateral, and/or (c) to enable Assignee to exercise all or any of the rights and powers herein granted.

In the event the Assignor shall at any time receive a certificate or instrument evidencing any carbon credits, emission reductions and/or related assets constituting Collateral,  Assignor shall receive such certificate or instrument, as the case may be, for the benefit of Assignee, shall segregate it from Assignor's other property and shall deliver it forthwith to Assignee in the exact form received together with any necessary endorsement to be held by Assignee as Collateral as further collateral security hereunder.  In the event any carbon credits, emission reductions and/or related assets constituting collateral are held in a form other than a certificate or instrument, Assignor shall take all such action as Assignor shall deem necessary in order to perfect Assignor's security interest in such Collateral.

Without limiting the foregoing, Assignor shall take all such further action that may be necessary in order to (i) perfect and protect the security interest created hereby in this Collateral Assignment (including any and all action necessary to satisfy Assignee that Assignee has obtained a first priority perfected security interest in all Collateral); (ii) enable Assignee to exercise and enforce its rights and remedies hereunder in respect of the Collateral; and (iii) otherwise effect the purposes of this Collateral Assignment.

In the event any Assignor declines to exercise any rights in respect of any item of Collateral, Assignee shall have the right to enforce any and all such rights of Assignor directly against the Carbon Credit Entities, as applicable.

This shall be a continuing agreement and the rights and benefits of Assignor in and to the Collateral are in addition to and not in substitution for any other security held by Assignee and shall not operate as a merger of any simple contract debt or suspend the fulfillment of or affect the right, remedies and powers of Assignee in respect of the said rights and benefits or any collateral of Assignor held by Assignee.  Without limiting the generality of any of the foregoing, all claims present or future of Assignor against any person liable upon or for payment in respect of any Collateral are hereby assigned to Assignee.

The security interests created hereby are intended to attach and take effect forthwith upon the execution of this Collateral Assignment by Assignor, and Assignor acknowledges that value has been given and that Assignor has rights in and to the Collateral.

Upon the full satisfaction by Montsant of its Obligations (as defined in the Montsant Purchase Agreement) Assignee shall permit Assignor to sell, assign, transfer, convey or otherwise dispose of the Collateral so long as, prior to the satisfaction of the obligations of the Assignor under the Master Guarantee and at the time of any such sale, assignment, transfer, conveyance or disposition, the sum of the fair market value, as provided by a reputable third party appraiser reasonably satisfactory to the Agent, of the Collateral equals or exceeds Seven Million Five Hundred Thousand Dollars ($7,500,000.00).

This Collateral Assignment shall be governed by and construed in accordance with the laws of the State of New York.

This Collateral Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

### [REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Assignor has duly executed this Collateral Assignment as of the day and year first above written.

**ASSIGNOR**

PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P.

By: _____
    Name:
    Title:

**ASSIGNEE**

BAM ADMINISTRATIVE SERVICES LLC

By:_____
    Name:  Dhruv Narain
    Title:  Authorized Signatory

**SCHEDULE 1**

<u>Carbon Credit Portfolio Agreements</u>

**SCHEDULE 2**

<u>Carbon Credit Entities</u>

**EXECUTION COPY**

COLLATERAL ASSIGNMENT

COLLATERAL ASSIGNMENT made as of March 21, 2016 (as amended, restated or otherwise modified from time to time, this "Collateral Assignment") by PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P., an exempted limited partnership under the laws of the Cayman Islands (the "Assignor"), to BAM ADMINISTRATIVE SERVICES LLC, a Delaware limited liability company, as agent for the Creditor Parties (as defined below) (in such capacity, "Assignee").

FOR VALUE RECEIVED, and as collateral security for all debts, liabilities and obligations (including, without limitation, performance obligations) of the Assignor, Montsant Partners LLC, a Delaware limited liability company ("Montsant"), and Golden Gate Oil LLC, a Delaware limited liability company ("GGO"), to the Creditor Parties (as defined below) pursuant to the terms of that certain Master Guaranty Agreement, dated as of March 21, 2016 (as amended, restated or otherwise modified from time to time), by and among Assignor, Montsant, GGO, and Assignee, Assignor hereby assigns, transfers and sets over unto and grants to Assignee, for the ratable benefit of the Creditor Parties (and their successors and assigns), a security interest in the following, whether now owned, acquired or hereafter arising (the "Collateral"):

(a)    all of Assignor's right, title and interest to (but not its obligations under) that certain Demand Promissory Note in the original principal amount of $2,499,788.00, dated July 1, 2015 (as amended, restated, or otherwise modified from time to time, the "China Horizon Demand Note") issued by China Horizon Investments Group ("China Horizon") to Assignor, together with all of Assignor's right, title and interest in and to all documents, instruments and agreements entered into in connection with the transactions contemplated thereby and all attendant liens, rights, claims, title, assignments and interests (including security interests) pertaining to or arising therefrom,

(b)    all of Assignor's right, title and interest to (but not its obligations under) that certain Promissory Note in the original principal amount of $2,265,084.00, dated July 1, 2015 (as amended, restated, or modified from time to time, the "China Horizon Promissory Note" and together with the China Horizon Demand Note, each a "Note" and collectively the "Notes") issued by China Horizon to Assignor, together with all of Assignor's right, title and interest in and to all documents, instruments and agreements entered into in connection with the transactions contemplated thereby and all attendant liens, rights, claims, title, assignments and interests (including security interests) pertaining to or arising therefrom; and

(c)    all indemnity rights and all moneys and claims for moneys due and/or to become due to Assignor under or in respect of each item of Collateral.

For purposes hereof, the term "Creditor Parties" means (a) Assignee, (b) the investors from time to time party to that certain Note Purchase Agreement, dated as of January 30, 2015 (the "Montsant Investors"), among Assignee, Montsant and the Montsant Investors (as the same may be amended, restated, modified and/or supplemented from time to time), (c) the investors from time to time party to that certain Note Purchase Agreement, dated as of April 10, 2012 (the

"GGO Investors"), among Assignee (as successor to Precious Capital LLC), GGO and the GGO Investors (as the same may be amended, restated, modified and/or supplemented from time to time) and (d) BBIL ULICO 2014 ("BBIL") (as the holder of that certain Promissory Note dated as of March 28, 2016 in the original principal amount of $6,137,215.50 made by Montsant in favor of BBIL (as the same may be amended, restated, modified and/or supplemented from time to time).

Assignor hereby (i) irrevocably authorizes and directs China Horizon, and its respective successors and assigns, to make all payments and distributions due to Assignor under or arising under any item of Collateral directly to Assignee and (ii) irrevocably authorizes and empowers Assignee (a) to ask, demand, receive, receipt and give acquittance for any and all amounts which may be or become due or payable, or remain unpaid at any time and times to Assignor by China Horizon under and pursuant to any item of Collateral, (b) to endorse any checks, drafts or other orders for the payment of money payable to Assignor in payment thereof, and (c) in Assignee's discretion to file any claims or take any action or institute any proceeding, either in its own name or in the name of Assignor or otherwise, which Assignee may deem necessary or advisable to effectuate the foregoing.  It is expressly understood and agreed, however, that Assignee shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or take any other action to collect or enforce the payment of any amounts which may have been assigned to Assignee or to which Assignee may be entitled hereunder at any time or times.

China Horizon is hereby authorized to recognize Assignee's claims to rights under each item of Collateral without investigating any reason for any action taken by Assignee or the validity of the amount or the obligations or existence of any default, or the application to be made by Assignee of any of the amounts to be paid to Assignee.  Checks for all or any part of the sums payable under this Collateral Assignment shall be drawn to the sole and exclusive order of Assignee.

Assignor shall on the date hereof deliver the original Notes to Assignee, together with endorsements in favor of Assignee, each in form and substance satisfactory to Assignee. At any time and from time to time, upon the written request of Assignee, Assignor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as Assignee may reasonably deem desirable (a) to obtain the full benefits of this Collateral Assignment, (b) to protect, preserve and maintain Assignee's rights in any Collateral, and/or (c) to enable Assignee to exercise all or any of the rights and powers herein granted.

In the event any Assignor declines to exercise any rights in respect of any item of Collateral, Assignee shall have the right to enforce any and all such rights of Assignor directly against China Horizon, as applicable.

This shall be a continuing agreement and the rights and benefits of Assignor in and to the Collateral are in addition to and not in substitution for any other security held by Assignee and shall not operate as a merger of any simple contract debt or suspend the fulfillment of or affect the right, remedies and powers of Assignee in respect of the said rights and benefits or any

collateral of Assignor held by Assignee.  Without limiting the generality of any of the foregoing, all claims present or future of Assignor against any person liable upon or for payment in respect of any Collateral are hereby assigned to Assignee.

The security interests created hereby are intended to attach and take effect forthwith upon the execution of this Collateral Assignment by Assignor, and Assignor acknowledges that value has been given and that Assignor has rights in and to the Collateral.

This Collateral Assignment shall be governed by and construed in accordance with the laws of the State of New York.

This Collateral Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, Assignor has duly executed this Collateral Assignment as of the day and year first above written.

**ASSIGNOR**

PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P.

By:_____
    Name:
    Title:

**ASSIGNEE**

BAM ADMINISTRATIVE SERVICES LLC

By:_____
    Name: Dhruv Narain
    Title: Authorized Signatory

## TURNOVER AGREEMENT

TURNOVER AGREEMENT made as of March 21, 2016 (as amended, restated or otherwise modified from time to time, this "Turnover Agreement") by PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P., an exempted limited partnership under the laws of the Cayman Islands (the "Assignor"), to BAM ADMINISTRATIVE SERVICES LLC, a Delaware limited liability company, as agent for the Creditor Parties (as defined below) (in such capacity, "Assignee").

FOR VALUE RECEIVED, and as security for all debts, liabilities and obligations of China Horizon Investments Group Limited ("China Horizon") to the Assignee and the Creditor Parties, Assignor hereby assigns, transfers and agrees to turn over to and grants to Assignee, for the ratable benefit of the Creditor Parties (and their successors and assigns), a security interest in the following, whether now owned, acquired or hereafter arising (the "Specified Property"):

(a)     all of Assignor's right, title and interest to (but not its obligations under) proceeds, moneys and claims for moneys due and/or to become due from all debt instruments from time to time issued by China Horizon to Assignor through and including the date hereof, together with all of Assignor's right, title and interest in and to all documents, instruments and agreements entered into in connection with the transactions contemplated thereby and all attendant liens, rights, claims, title, assignments and interests (including security interests) pertaining to or arising therefrom,

(b)     all of Assignor's right, title and interest to (but not its obligations in respect of) proceeds, moneys and claims for moneys due and/or to become due from all equity interests from time to time owned and/or held by Assignor in China Horizon on or prior to the date hereof, together with all of Assignor's right, title and interest in and to all documents, instruments and agreements entered into in connection with the transactions contemplated thereby and all attendant liens, rights, claims, title, assignments and interests (including security interests) pertaining to or arising therefrom; and

(c)     all proceeds, moneys and claims for moneys due and/or to become due to Assignor under or in respect of each item of Specified Property.

For purposes hereof, the term "Creditor Parties" means any and all investors, lenders and note purchasers with respect to which China Horizon is indebted and with respect to which BAM acts as administrative and/or collateral agent.

Subject to the Platinum Turnover Limitation (as defined below), Assignor hereby (i) irrevocably agrees to turn over to Assignee all payments, distributions, sales proceeds and other amounts payable from time to time to Assignor in connection with Assignor's rights in any and each item of Specified Property, (ii) irrevocably authorizes and directs China Horizon, and its respective successors and assigns, to turn over to Assignee all payments, distributions, sales proceeds and other amounts payable from time to time to Assignor in connection with Assignor's rights in any and each item of Specified Property and (iii) irrevocably authorizes and empowers Assignee (a) to ask, demand, receive, receipt and give acquittance for any and all amounts which may be or become due or payable, or remain unpaid at any time and times to Assignor by China Horizon under and pursuant to any item of Specified Property, (b) to endorse any checks, drafts or

other orders for the payment of money payable to Assignor in payment thereof, and (c) in Assignee's discretion to file any claims or take any action or institute any proceeding, either in its own name or in the name of Assignor or otherwise, which Assignee may deem necessary or advisable to effectuate the foregoing. It is expressly understood and agreed, however, that Assignee shall not be required or obligated in any manner to make any demand or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim or take any other action to collect or enforce the payment of any amounts which may have been assigned to Assignee or to which Assignee may be entitled hereunder at any time or times. The Platinum Turnover Limitation shall mean an amount up to but not exceeding $5,500,000; provided, that, in the event that (i) all of the Creditor Parties' existing indebtedness in China Horizon is converted or exchanged for equity in China Horizon and (ii) China Horizon requests after such conversion or exchange, additional capital investments from the Creditor Parties, to the extent that such Creditor Parties elect not to fund all or a portion of such requested additional capital investments, the Turnover Limitation shall be reduced by an amount equal to the product of (I) the dilutive effect of the aggregate capital investments actually raised by China Horizon from all investors on the Creditor Parties equity in China Horizon (as represented by a percentage change) multiplied by (II) $5,500,000. Notwithstanding the foregoing, Assignor's turnover obligations hereunder shall terminate when all indebtedness owing by China Horizon to the Creditor Parties has been paid in full, which such indebtedness as of the date hereof equals $8,500,000. The aggregate proceeds of Specified Property actually received in immediately available funds by Assignor from Assignee hereunder shall be referred to as the "Turnover Amount."

On and after the date upon which the Creditor Parties shall have received the sum of (x) $8,500,000 plus (y) that amount of all other investments (whether in the form of debt or equity) made by the Creditor Parties to China Horizon from Assignor pursuant to this Agreement and/or China Horizon, Assignee shall thereafter turnover to Assignor, but only to the extent of the Turnover Amount, all amounts received by Assignee in respect of (i) all debt instruments from time to time owned and/or held by Assignee in China Horizon, (ii) all equity interests from time to time owned and/or held by Assignee in China Horizon and (iii) all proceeds, moneys and claims for moneys due and/or to become due to Assignee in respect of the foregoing.

China Horizon is hereby authorized to recognize Assignee's claims to rights under each item of Specified Property without investigating any reason for any action taken by Assignee or the validity of the amount or the obligations or existence of any default, or the application to be made by Assignee of any of the amounts to be paid to Assignee. Checks for all or any part of the sums payable under this Turnover Agreement shall be drawn to the sole and exclusive order of Assignee.

At any time and from time to time, upon the written request of Assignee, Assignor shall promptly and duly execute and deliver any and all such further instruments and documents and take such further action as Assignee may reasonably deem desirable (a) to obtain the full benefits of this Turnover Agreement, (b) to protect, preserve and maintain Assignee's rights in any Specified Property, and/or (c) to enable Assignee to exercise all or any of the rights and powers herein granted.

In the event any Assignor declines to exercise any rights in respect of any item of Specified Property, Assignee shall have the right to enforce any and all such rights of Assignor directly against China Horizon, as applicable.

This shall be a continuing agreement and the rights and benefits of Assignor in and to the Specified Property are in addition to and not in substitution for any other security held by Assignee and shall not operate as a merger of any simple contract debt or suspend the fulfillment of or affect the right, remedies and powers of Assignee in respect of the said rights and benefits or any Specified Property of Assignor held by Assignee.  Without limiting the generality of any of the foregoing, all claims present or future of Assignor against any person liable upon or for payment in respect of any Specified Property are hereby assigned to Assignee.

Assignor acknowledges that value has been given and that Assignor has rights in and to the Specified Property.

This Turnover Agreement shall be governed by and construed in accordance with the laws of the State of New York.

This Turnover Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, Assignor has duly executed this Turnover Agreement as of the day and year first above written.

**ASSIGNOR**

PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P.

By:_____

    Name:

    Title:

**ASSIGNEE**

BAM ADMINISTRATIVE SERVICES LLC

By:_____
    Name:  Dhruv Narain
    Title:  Authorized Signatory

EXHIBIT 76

**To:** mnordlicht@platinumlp.com[mnordlicht@platinumlp.com]
**Cc:** dlevy@platinumlp.com[dlevy@platinumlp.com]
**From:** mkatzmx@gmail.com
**Sent:** Sun 3/13/2016 9:55:07 PM
**Subject:** Re: Agera

Of course. Had in mind the range you mentioned, which should be in line with an above industry average fw lookin multiple.

On Mar 13, 2016, at 17:34, Mark Nordlicht mnordlicht@platinumlp.com wrote:

> We can debate the merits of your analysis, i agree with the majority of it... But before we spend time on it, we need an insider buying at acceptable price.

Sent from my iPhone

On Mar 13, 2016, at 10:10 PM, Michael Katz mkatzmx@gmail.com wrote:

> Mark,
>
> After thinking about this for a few days I would like to share some thoughts on Agera and a potential sale to an insider. Believe this merits serious consideration now, some notes below on why.
>
> **Energy retail markets:**
>
> This is probably the best growth environment in over a decade because of the ample head room (spark spread) in many markets. It is a good reason to continue growing creating more value, however, this is exactly the type of thinking that got several retailers in deep trouble in the past. Probably before the end of the year utilities will finish re-setting prices eroding margins and triggering higher attrition rates. Before prices start increasing significantly there will be a "trough" of another re-set period with utilities which can take several quarters to correct, so topline revenue will not begin increasing until then. This period of time will be the least attractive for an exit (~2017) since top line will remain stagnant, margins will compress, growth will slow, and attrition will increase. We have seen this story before, it is rather predictable. For these reasons forward looking multiples are likely to be highest now.
>
> **Alternate exit strategies**
>
> *IPO*: Let's assume that yield does not go out of fashion and that an MLP-like exit in TMX is doable in the short to medium term even while other energy related mlps are being battered. The following factors should be considered,
>
> *Liquidity*: a much higher multiple IPO will not generate a full liquidity event, cash remaining

strapped for some time; cash that could be put into much higher multiple opportunities (see conclusions below) now.

*Management grooming*: We've discussed the need for a CEO. The market will see through a figurehead choice and to find a real guy who can successfully work with Kevin is going to take time (pp time), and be slow and painful to implement. A strategic sale now will bypass this problem, freeing up future bandwidth. It will also free up Kevin to take on other projects

<u>Strategic buyer</u>: In the next 24-36 months the following challenges will exist with any other credible potential buyer:

1. *Strategic buyers are wiser than in times past*: Unlike the potential insider, major sophisticated buyers have stopped trading books on RCEs but now look for and value acquisitions on the actual profitability of the book and assign much less weight to cosmetic MWh volume throughput. Gone are the days where sticky RCEs with any margin could trade at a multiple of top line revenue. Assuming that size and valuation will be linear is no longer a true. As mentioned above forward looking ebitda numbers are likely to be best now

2. *Challenging capital markets*: from the roughly 12 or so players who may be interested in the book many are battling management shakeups (NRG), bloated debt (cetrica), and past M&A activity that they are still trying to digest (Exelon). In the medium term I can't see the capital markets be kind to the sector, especially with issuance of new debt under reasonable terms or major cash acquisitions. Not saying it will not be possible but believe we will be facing headwinds as opposed to today's tailwinds.

The bottom line is that even if you don't agree with any or much of the above, surely you can agree that even in the best case scenario the amount of money potentially left on the table with a sale of Agera today (let's say 2-3X more than the current valuation) is significantly lower than any potential upside in heavily re-investing the proceeds from the sale of Agera into the Oil&Gas sector (+5-10x). This sector represents the greatest opportunity in a generation, a smart play can return the entire fund(s) several times over. Having insider knowledge and expertise in the oil & gas sector increases the handicap for success.

To summarize, a sale today to the strategic would:

- Bypass market headwinds that are around the corner

- Have a clean and full liquidity event now, bypassing complexities of a future exit with either an IPO, or with an unhealthy sector that will struggle to purchase an asset of that size

- Capitalize on an insider's willingness to purchase now

- Solve together with the sale of Implants our liquidity problem

- Create an amazing marketing story now that can help us push (alongside the reforms we've discussed) in building the AUM asp

- Free up cash to re-invest in the oil & gas sector which is a much higher multiple potential upside opportunity today than the energy retail sector

Perhaps the above merits some hard-data quantitative analysis?

Thoughts?

--
Michael

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

EXHIBIT 77

**From:**    Mark Nordlicht
**Sent:**    Mon 3/21/2016 4:38:06 PM

It has been a long run but we are nearing the end of the placement of our management share class and are also very close to disposing of Implant. Those two alone will over the next few months get us very close to our long term goals but to be healthy, we really need marketing team to deliver on attracting new investors so we can now take advantage of opportunities which are plentiful to us after having been playing defense for so long. IT IS TIME TO START PLAYING OFFENSE. I hope each and every person in marketing group can work collaboratively, brainstorm and take initiatives to bring in significant new capital into the firm.
We have some great products to sell. They are unique and despite all the stress of last 9 months, we should remind ourselves we are offering unique, non correlated products that investors really cant find elsewhere.  I want to thank entire marketing group for their patience thus far and for all the hand holding that will be required over the next few months as we await implant proceeds. I also want to take this opportunity to introduce Michael Katz who is long term investor in Fund as an LP and now part of the family with an  interest in the GP. Michael is very interested in rebranding our image, improving our infrastructure,  and helping craft marketing strategies going forward. Please take the time to meet him if you haven't already and share ideas as to how we can make the firm better.

PPVA- Now new and improved, back to the strategy mix that produced 17 percent annualized over a 13 year track record. We obviously left strong positions in vehicle that would travel with the track record and after taking in 100 m of 3 yr locked money, we are now poised to deliver very healthy risk adjusted returns. There are no funds I know oiut there with our track record. Yes, side pocket is challenge but keep in mind, all the investments in side pocket came from gains, are well positioned to bring more gains going forward, and were acquired for little to no value. Going forward, we have great mix of liquid strategies along with equity optionality.  One possible initiative we shd pursue is white label program.
White Label Program- Allow partners to be in asset management business with 13 year track record. Allow them to charge 1 and 10, we give them discounted fees. Net result is 2.5 /25 fund whereby numbers still work. Or we can discount fees even more but let's get money in right now. That needs to be our priority.
We should put a power point together and also get involved in set up for our white label partners.
1- Israel- MN
2- Ukranian Bank conglomerate- EB/MN
3- China- Australian permanent residency program, family offices, others - Chinese Group


Need major push for ppco. We need to be doing 15-20 million a month, pay out reds , close and launch ppco 2.
1- Abdala. 550 million in free cashflow 1250 gold
2- Agera growth
3- Life settlement opportunistic
4- Coal roll up
5- Steady yielding strategies with proven track record.
Based on embedded gains , good chance of 25% plus returns from end of 16 through end of 18

PPCO 2-

We have great sales pitch here. We are only investing in strategies whereby we can sell off the loan quickly if it becomes compromised. For example, in retail energy finance we will have agreement from other Escos, whether it be Agera or competitiot to buy the loan if it becomes compromised as they will want to own the customer base of the amount of our debt.  We are targeting low volatility 10 percent net returns to investor and this is right up our alley.

Energy- Stay tuned but our strategy of using debt to create private equity upside is primed for energy space right now. We are actively looking at opportunities. Let me know if anyone has interest.


Regards, Mark

EXHIBIT 78

**THIS CONVERTIBLE PROMISSORY NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. NO SALE OR DISPOSITION MAY BE EFFECTED EXCEPT IN COMPLIANCE WITH RULE 144 UNDER SUCH ACT OR AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL FOR LENDER, SATISFACTORY TO BORROWER, THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE ACT OR RECEIPT OF A NO-ACTION LETTER FROM THE SECURITIES AND EXCHANGE COMMISSION.**

**AGERA HOLDINGS LLC**

**SECOND AMENDED AND RESTATED
SECURED CONVERTIBLE PROMISSORY NOTE**

**$600,071.23**                                                    **June 9, 2016
New York, New York**

**For Value Received,** Agera Holdings LLC, a Delaware limited liability company, located at 669 Crown Street, Brooklyn, NY 11213 (**"Borrower"**), hereby unconditionally promises to pay to the order of Principal Growth Strategies LLC, a Delaware limited liability company, located at 152 W. 57th Street, 4th Floor, New York, New York (**"Lender"**), in lawful money of the United States of America and in immediately available funds, the principal sum of $600,071.23 together with accrued and unpaid interest thereon, each due and payable on the dates and in the manner set forth below. This amended and restated secured convertible promissory note (the **"Note"**) amends, restates and supersedes in its entirety that certain Amended and Restated Secured Convertible Promissory Note dated June 11, 2014 originally issued by Agera Energy LLC ("Agera") in favor of Lender in connection with that certain Note Purchase Agreement, dated as of May 18, 2014, by and between Agera and Lender.

The principal balance of the Note shall bear simple interest at an annual rate equal to 1.00%. Interest shall be calculated on the basis of a 365 day year for the actual number of days elapsed. Interest shall commence with the date hereof and shall continue on the outstanding principal balance hereof until paid in full or converted.

The Note is executed and delivered in connection with that certain Amended and Restated Note Purchase Agreement, dated as of June 9, 2016, by and between Borrower and Lender (the **"Purchase Agreement"**).

1.    **Repayment and Conversion.**

(a)    **Payment Demand; Prepayment.** Unless the Note has been converted in accordance with the terms of this Section 1, at any time on or after the date hereof, Lender, at its sole discretion, may demand payment of the entire outstanding principal balance of the Note and all accrued and unpaid interest thereon (the **"Payment Demand"**). Borrower may not prepay all or any portion of the outstanding principal balance of this Note or any accrued and unpaid interest thereon at any time prior to June 9, 2026, and thereafter may pay such amounts without penalty

only upon 90 days' prior written notice to Lender. Any prepayment made under this Section 1(a) is subject to the rights of Lender set forth in Section 1(b) below.

(b)  **Optional Conversion.** Subject to the requirements set forth in Section 1(c), at any time, Lender, in its sole discretion, may, upon five days' written notice to Borrower, require Borrower to convert the outstanding principal balance of the Note and all accrued and unpaid interest thereon automatically and without any further action by Lender into the number of units of limited liability company interests (the *"Units"*) of Borrower, equal to 95.01% of the outstanding capital securities of Borrower (the **"Conversion Securities"**).

(c)  **Regulatory Requirements.** Notwithstanding the foregoing, the effectiveness of any conversion pursuant to this Section 1 shall be subject to and conditioned upon (i) all applicable federal and state laws, rules, regulations, policies and procedures (including without limitation, laws, rules, regulations, policies and procedures of the Federal Energy Regulatory Commission, any state public utility commission or public service commission or other regulatory commission having jurisdiction over Borrower or any of its subsidiaries, a regional transmission organization or independent system operator in which territory Borrower or any of its subsidiaries provides services, the North American Electric Reliability Corporation or any of its regional reliability organizations and any independent market monitor for any of the jurisdictions in which Borrower or its subsidiaries provides services) and (ii) obtaining all approvals required under such applicable federal and state laws, rules, regulations policies and procedures. Upon such conversion, Lender shall use its commercially reasonable efforts to comply with such laws, rules, regulations, policies and procedures and to provide Borrower with executed regulatory affirmations and/or disclosures as Borrower may require to comply with regulations.

2.  **Mechanics of Conversion.** In the event of conversion pursuant to Section 1, the Note shall be converted automatically without any further action by Lender and whether or not the Note is surrendered to Borrower or its transfer agent; *provided, however,* that Borrower shall not be obligated to issue certificates evidencing the Conversion Securities issuable upon such conversion unless the Note is either delivered to Borrower or its transfer agent as provided below, or Lender notifies Borrower or its transfer agent in writing that the Note has been lost, stolen or destroyed and executes an agreement satisfactory to Borrower to indemnify Borrower from any loss incurred by it in connection with the Note. Upon the occurrence of such conversion, Lender shall surrender the Note at the office of Borrower or any transfer agent for the Conversion Securities. Thereupon, there shall be issued and delivered to Lender, at such office and in its name as shown on the surrendered Note, a certificate for the number of Units of Conversion Securities into which the Note was convertible on the date on which such conversion occurred.

3.  **Fractional Units.** No fractional Units shall be issued upon the conversion of the Note. All Units issuable upon conversion of the outstanding amount of the Note shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional Unit. If, after the aforementioned aggregation, the conversion would result in the issuance of a fraction of a Unit of Conversion Securities, Borrower shall, in lieu of issuing any fractional Unit, pay Lender who is otherwise entitled to such fraction a sum in cash equal to the fair market value of such fraction on the date of conversion (as determined in good faith by the Manager of Borrower).

**4.  Security Interest.** This Note is secured pursuant to a Security Agreement by and between Borrower and Lender dated concurrently herewith (as the same may be amended, restated or otherwise modified from time to time, the ***"Security Agreement").*** Borrower and Lender acknowledge and agree that all references in the Security Agreement to the "Note" shall refer to this Note and that the term "Obligations" contained in the Security Agreement shall include all obligations arising under this Note. Borrower shall not, directly or indirectly, grant any security interests to any other party that are equal to or senior in priority to the security interest granted to Lender to secure Borrower's obligations under the Note while the Note is outstanding except (a) in connection with a loan, line of credit or similar lending agreement (a ***"Loan")*** to Borrower by a bank or other financial institution (a ***"Financial Institution"),*** or (b) as may be granted in equipment leasing transactions of Borrower. Lender agrees to subordinate the Note (and to enter into a subordination agreement in the form acceptable to a Financial Institution evidencing the same) with respect to a Loan from a Financial Institution.

**5.  Payments.** All payments of principal and interest shall be in lawful money of the United States of America and shall be payable at the address set forth in the opening paragraph of the Note unless another place of payment shall be specified in writing by Lender. Payment on the Note shall be applied first to accrued interest, and thereafter to the outstanding principal balance hereof. If any payments on the Note become due on a Saturday, Sunday, or a public holiday under the laws of the state of New York, such payment shall be made on the next succeeding business day and such extension of time shall be included in computing interest in connection with such payment.

**6.  Default.** Each of the following events shall be an ***"Event of Default"*** hereunder:

(a)  Borrower fails to pay timely any of the principal amount, accrued interest or other amounts due under this Note within ten days of receipt of a Payment Demand;

(b)  Borrower does any of the following: (i) merge or consolidate with any person, (ii) dissolve, (iii) wind up its affairs, or (iv) sell, assign, lease, or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to any person, except in the case of clause (i) or (iv), where such person is or becomes a Borrower hereunder as of the date of such transaction and such further assurances with respect to any such transaction satisfactory to Lender are delivered on or before the effective date of such transaction;

(c)  Borrower files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing;

(d)  An involuntary petition is filed against Borrower under any bankruptcy statute now or hereafter in effect, and such petition is not dismissed or discharged within 60 days, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of Borrower; and

(e)     Borrower breaches any representation, warranty or covenant under the Note, the Purchase Agreement or the Security Agreement.

**7.      Remedies.** Upon the occurrence and during the continuance of any Event of Default, the outstanding principal balance of the Note and all accrued and unpaid interest thereon shall, all at the option of Lender, upon notice to Borrower, except that no such election by Lender and notice to Borrower shall be required in the case of an Event of Default of the type specified in Sections 6(b)(ii) or (iii) or 6(c), automatically be immediately due, payable and collectible by Lender pursuant to applicable law.

**8.      Cumulative Remedies.** Lender's rights and remedies under the Note shall be cumulative. The Lender shall have all other rights and remedies not inconsistent herewith as provided under the Uniform Commercial Code, by law or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default shall be deemed a continuing waiver.

**9.      Creditor's Rights.** Borrower waives presentment and demand for payment, notice of dishonor, protest and notice of protest of the Note. Borrower hereby acknowledges that Lender shall be entitled to recover, and the undersigned agrees to pay when incurred, all reasonable costs and expenses of collection of the Note, including without limitation, reasonable attorneys' fees. The right to plead any and all statutes of limitations as a defense to any demands hereunder is hereby waived to the full extent permitted by law. Borrower and Lender consent irrevocably to personal jurisdiction in the state and federal courts having jurisdiction over New York City, New York for the resolution of any disputes arising hereunder or relating hereto.

**10.     Usury.** In no event shall the interest rate or rates payable under the Note, plus any other amounts paid in connection herewith and therewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. Borrower and Lender, in executing and delivering the Note and the Purchase Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; *provided, however,* that, anything contained herein to the contrary notwithstanding, if such rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then *ipso facto,* as of the date of the Note, Borrower is and shall be liable only for the payment of such maximum as allowed by law, and payment received from Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of any remaining obligations to the extent of such excess.

**11.     Governing Law.** THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES THAT WOULD REQUIRE THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

**12.     Waiver with respect to Damages. BORROWER ACKNOWLEDGES THAT LENDER DOES NOT HAVE ANY FIDUCIARY RELATIONSHIP WITH, OR FIDUCIARY DUTY TO, BORROWER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENT CONTEMPLATED HEREBY AND THE RELATIONSHIP BETWEEN LENDER, ON THE ONE HAND, AND BORROWER, ON THE OTHER HAND, IN CONNECTION HEREWITH IS SOLELY THAT OF CREDITOR AND DEBTOR.  TO THE**

**EXTENT PERMITTED BY APPLICABLE LAW, BORROWER SHALL NOT ASSERT, AND BORROWER HEREBY WAIVES, ANY CLAIMS AGAINST LENDER ON ANY THEORY OF LIABILITY, FOR SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES (AS OPPOSED TO DIRECT OR ACTUAL DAMAGES) ARISING OUT OF, IN CONNECTION WITH, OR AS A RESULT OF, THIS NOTE, ANY AGREEMENT OR INSTRUMENT CONTEMPLATED.**

**13.   SERVICE OF PROCESS; SUBMISSION TO JURISDICTION.   EACH OF THE PARTIES HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE STATE COURTS OF THE STATE OF NEW YORK IN NEW YORK COUNTY AND TO THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, FOR THE PURPOSES OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF OR BASED UPON THIS NOTE AND THE SUBJECT MATTER HEREOF.   TO THE EXTENT PERMITTED BY APPLICABLE LAW, BORROWER (A) HEREBY WAIVES, AND AGREES NOT TO ASSERT, BY WAY OF MOTION, AS A DEFENSE, OR OTHERWISE, IN ANY SUCH SUIT, ACTION OR OTHER PROCEEDING BROUGHT IN THE ABOVE-NAMED COURTS, ANY CLAIM THAT IT IS NOT SUBJECT PERSONALLY TO THE JURISDICTION OF SUCH COURTS, THAT ITS PROPERTY IS EXEMPT OR IMMUNE FROM ATTACHMENT OR EXECUTION, THAT THE SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM, THAT THE VENUE OF THE SUIT, ACTION OR PROCEEDING IS IMPROPER OR THAT THIS AGREEMENT, THE SUBJECT MATTER HEREOF MAY NOT BE ENFORCED IN OR BY SUCH COURT, (B) HEREBY WAIVES THE RIGHT TO REMOVE ANY SUCH ACTION, SUIT OR PROCEEDING INSTITUTED BY LENDER IN STATE COURT TO FEDERAL COURT, AND (C) HEREBY WAIVES THE RIGHT TO ASSERT IN ANY SUCH ACTION, SUIT OR PROCEEDING ANY OFFSETS OR COUNTERCLAIMS EXCEPT COUNTERCLAIMS THAT ARE COMPULSORY OR OTHERWISE ARISE FROM THE SAME SUBJECT MATTER.   EACH OF THE PARTIES HEREBY CONSENTS TO SERVICE OF PROCESS BY MAIL AT THE ADDRESS TO WHICH NOTICES ARE TO BE GIVEN TO IT PURSUANT TO SECTION 17 HEREOF.**

**14.   Amendment and Waiver.** Any provision of the Note may be amended or waived in a writing signed by both Borrower and Lender. No failure or delay on the part of the Lender to exercise any right, remedy, power or privilege under this Note shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**15.   Successors and Assigns.** The provisions of the Note shall inure to the benefit of and be binding on any successor to Borrower or Lender, as applicable. Lender may transfer its rights and obligations under the Note at any time in whole or in part without the consent of Borrower. Borrower may only transfer its rights and obligations under the Note in whole or in part with the prior written consent of Lender.

**16.   Transfers.** The Note may be transferred only upon its surrender to Borrower for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to Borrower. Thereupon, the Note shall be reissued to, and registered in the name of, the transferee, or a new Note for like principal amount and interest shall be issued to, and registered in the name of, the transferee. Interest and principal shall be paid solely to the

registered holder of the Note. Such payment shall constitute full discharge of Borrower's obligation to pay such interest and principal.

      **17.**    **Notice.** Notice permitted or required to be given hereunder shall be deemed sufficient if given in writing by electronic mail, facsimile, reputable overnight delivery service or by registered or certified mail, postage prepaid, return receipt requested, addressed to the respective addresses of the parties set forth in the introductory paragraph or at such other address as the respective parties may designate by like notice from time to time. Notices so given shall be deemed effective upon the earlier of (i) receipt by the party to which notice is given; (ii) on the fifth business day following the date such notice was deposited in the mail; or (iii) on the second business day following the date such notice was delivered to a reputable overnight delivery service.

*[Signature page follows]*

In Witness Whereof, this Note is executed as of the date first above written.

**BORROWER:**

**AGERA HOLDINGS LLC**

By: _____

Name: Steven C Laker

Title: Vice President

[Signature page to Secured Convertible Promissory Note of Agera Holdings LLC]

AGREED TO AND ACCEPTED BY:

PRINCIPAL GROWTH STRATEGIES
LLC

By: _____

Name: David Steinberg

Title: Authed Sylator

[Signature page to Secured Convertible Promissory Note of Agera Holdings LLC]

EXHIBIT 79

**To:**     Lawrence.Delevingne@thomsonreuters.com[Lawrence.Delevingne@thomsonreuters.com]
**From:**   Mark Nordlicht
**Sent:**    Mon 3/21/2016 2:35:25 AM
**Subject:**  RE:  On BACKGROUND

Please acknowledge that you received everything, I ended up being much more comprehensive than I set out to be!!

Still on background...yikes some of these phrases I can't believe came out of my mouth!!! I will start on background and then I will indicate as to some quotes I can go on the record on.  On background now-  In terms of "cheating" on liquidity, what I meant was given that we run a fund solely devoted to asset backed lending in addition to PPVA, oftentimes the investments we see that have better risk adjusted characteristics will be ones in which we tolerate illiquidity. It is thus a "challenge " to lay off of them in order to maintain the balance allowing us to operate within the hedge fund structure. But the cause of our current illiquidity is what some would call a high class problem. The entire side pocket was successful positions that we either invested very little into or even ones in which we already took millions of dollars out but still own a sizeable equity stake (this is the case in much of our energy holdings). Overall though, we are running 1.35 billion and have returned 2.6 billion to investors in cash over the years so I think we have shown ourselves to "turn over" the money and manage liquidity fairly well. In PPVA, on average our strategy of utilizing debt as an entry point to create private equity upside has been successful and on average, the debt portion of our investments are less than a year in duration. It's when we end up with private equity upside "for free" or for little value that we have historically run into liquidity issues. On one hand, this is the price of producing the superior risk adjusted returns we have achieved. But on the other hand, we are taking the steps outlined previously to insure we can also avoid side pocketing in future. This includes lengthening liquidity terms and potentially setting aside equity kickers that we may thing will take a while to monetize earlier before they have appreciated in value (something easier said than done as hard to predict).  But in general, being more vigilant about not straying from the 50% targeted liquid trading strategies is the key and we will be monitoring that very closely going forward.

I am frankly a little surprised at the suggestion that we push the envelope from an "ethical perspective" as that is actually not something that I have really been accused of previously. Anyone who knows me  I really believe would think that is really the opposite of how we conduct business. I have certainly been accused of aggressively pursuing risk adjusted returns to the fullest extent of the law and that may be true. That is where my comment of our extensive legal due  diligence for new strategies comes in. But there is a real distinction of being aggressive from a legal perspective and being aggressive from ethical perspective. You have aggregated our worst investments for the most part and I just don't see an inkling of "ethical " issue. Certainly being defrauded (Kuber, Banyon to some extent)  isn't ethical issue. Lending money to company like Glacial that ended up having some legal issues as a company is not unethical.  Investing in cash call can hardly be considered as pushing an "ethical" envelope. In terms of Black Elk, fighting with other creditors in a bankruptcy isn't ethical issue. I think you kind of have to have sharp elbows when you are a fiduciary for others. I guess closest thing you can point to is BDL but even there, we were certainly told that the annuitants would be given a split of the brokers commission which seemed to be a win win actually. This was a heavily scrutinized transaction and so it's clear we were not involved in signing people up.  I really do take offense as to charges of ethical impropriety as there is just no evidence of it even amongst the  most sordid investments you can dig up. Remmber over 13 years, we have thousands of investments, you are talking about a handful here. If you are even going to insinuate any ethical issues-and I know you have asked the investors about this too- please tell me one instance of an ethics issue other than some supposed person who is close to me who is not going on record and made this statement!!!!! I think fairness would require this.

In terms of Huberfeld and Bodner, my original seed investors, it is definitely true that it has been helpful in terms of institutional outreach that they are no longer involved or have any ownership in management company. I guess it is also not untrue that I have "distanced" myself when I give it some thought.  But I would not have separated from them had they not generously agreed to so as not to hold back me or Platinum. In general, I do really live my life by judging people as to how they interact with me and not solely by what a google search might uncover or past issues they may have. It is certainly a factor and issues to consider but I try to dig deeper and really get to know people I am doing business with. I have had people with sterling reputations who have been awful to do business with and some with colorful pasts who have been of the utmost integrity. If you are going to mention Cassidy, please let me know as I will defend him as he is one person who has proven himself to me from integrity perspective and that is why I recommended him for non fiduciary sales role at Agera.  In terms of our asset backed lending product, it's certainly not surprising that one can stitch together a "guilt by association" type of story as in the high interest world fraud is the number one risk and it attracts some unsavory characters. But on the whole, the overwhelming majority of people we have lent money to and transacted with have been people of integrity.

We are expecting some major news involving one of our portfolio companies over next couple of weeks and one that is major monetization event for us that should solve any lingering liquidity issues as well. It involves non material non public information so please treat the information sensitively. I will give you information as it becomes "hard" but I can tell you the company is Implant

Sciences where we have a hybrid debt/equity position. I will get you more info as it becomes available over next couple of days as well as give you some color as to the background of how we got involved but I am exhausted at the moment (hence probably giving you more info than I should across the board!!).

Some quotes I am comfortable with to go on record with are below:

"our core strategies have proven to have institutional appeal..that doesn't mean it's going to be attractive to everybody…. But we've always done well with institutional investors that go the extra step to really dig deep from a diligence perspective into how we invest . We are gratified that we have been able to reward them for that. "

"we are very aggressive to produce risk adjusted returns"

"It is definitely an attractive time to be deploying our strategy of utilizing  debt as an entry point to secure private equity upside in energy right now. "

---

**From:** Mark Nordlicht
**Sent:** Sunday, March 20, 2016 2:55 AM
**To:** 'Lawrence.Delevingne@thomsonreuters.com'
**Subject:** On BACKGROUND

On Background-
I am 47 (unless your article drags on to July which wd be fine with me)
I do drive myself back and forth from work other than the occasional UBER.
I live in Westchester.
I am proudly Jewish. We have broad investor base including some Jews and  many Gentiles.
Agera- Agera was set up to start a multi level marketing ESCO similar to Crius (formerly Viridian) which I had been a co founder and personal passive investor in. We normally wouldn't  start a  company from scratch as it doesn't match our risk mandate but the relatively small amount of capital necessary and the success of Crius whereby we merged Viridian with another company and took it public as Crius in Canada gave me the confidence to do so. When acquisitions opportunities arose outside of mlm, we shifted gears. We have already recouped all initial money paid for Glacial. Any value we have is in additional to the 53 million. Our cost basis is zero at this point. Agera has made additional accretive acquisitions. In terms of Glacial I don't recall exact amount of money lent but it was in the tens of millions. We recouped all our capital and reaped double digit interest rates. We did not profit from the equity kicker other than to be in advantageous position when the assets came up for bid in bankruptcy.
Cashcall, again I don't recall exact amount but it was in the tens of millions. I should point out by the way that Cashcall and Paul were previously financed by Morgan , Deutsche and Citi so notion that these loans were somehow predatory is a hard case to make. We don't anticipate any more lines at this time as traditional banks have reentered the space (capital one I think) and the risk adjusted opportunity is not as attractive. The investment has met or expectations as all our principal and interest was repaid.
Kuber- I would love to say we recouped substantial all capital on this one (as we did in Rothstein fraud)  but that's not the case. In our 13 + year history this is the one I would have most liked to have back. I feel our diligence was compromised by confidentiality related to Hipaa laws whereby we did not subject the receivables to same level of scrutiny of other transactions. We should have just walked away though. It's frustrating as we have avoided many other frauds over the years that have felled others- notably the Petters fraud which took down Gottex- given our rigorous legal and business due diligence procedures. Total losses were in 20-30 million range.
Black Elk
We took place of a fund that was winding down at the time and the initial terms was a 13 million dollar loan against production which was accompanied by a 50% equity stake. We later grew the line to 60 million and a 75% equity stake. We were repaid  the 60 million plus I believe around  20-40 million in dividends and were left with the equity stake in addition.
New Mountain reference is false. Whatever debt we had at that point we still had to pay back. Paying preferred had no effect on that.
PPBE had a wide range of investors. Average size was probably 2 million so may have been as much as 50 investors.
To my knowledge David Levy did not have any personal holding Of BEE Fund.
The vote really was never at issue. There was in fact a preferred investor who also held the bonds that didn't vote. It is more of a clerical issue of tracking down people to get their paperwork. Whether or not Platinum votes counted (I think somewhat unclear), there was always going to be enough votes. Again, oil was 100, bond holders could have gotten paid out par plus accrued if they wanted to. The expectation was certainly that the money (other than 30 million approximately to pay down payables) was all going to pay back debt and preferred. What was surprising was how many bondholders stayed in which resulted in more pref getting paid out.

We are not going to comment on routine SEC exams (we have completed multiple ones over the years).
I will review below quotes and see if there's anything I feel comfortable going on record with. Get back to you tomorrow. Regards

**From:** Lawrence.Delevingne@thomsonreuters.com [mailto:Lawrence.Delevingne@thomsonreuters.com]
**Sent:** Sunday, March 20, 2016 1:52 AM
**To:** Mark Nordlicht
**Subject:** RE: Follow up questions/quotes

I haven't gotten anything back on this – please resend.

**From:** Mark Nordlicht [mailto:mnordlicht@platinumlp.com]
**Sent:** Saturday, March 19, 2016 7:51 PM
**To:** Delevingne, Lawrence (Reuters News)
**Subject:** RE: Follow up questions/quotes

I did answer a bunch of the below , didn't i? I can't find it for some reason. I believe I was up to Kuber? Do you have what I sent you? regards

**From:** Mark Nordlicht
**Sent:** Tuesday, March 8, 2016 2:38 PM
**To:** 'Lawrence.Delevingne@thomsonreuters.com'
**Subject:** RE: Follow up questions/quotes

I missed it for some reason, will take a look.

**From:** Lawrence.Delevingne@thomsonreuters.com [mailto:Lawrence.Delevingne@thomsonreuters.com]
**Sent:** Tuesday, March 8, 2016 2:11 PM
**To:** Mark Nordlicht
**Subject:** Fwd: Follow up questions/quotes

I wanted to make sure you received this?


Begin forwarded message:

**From:** "Delevingne, Lawrence (Reuters News)" <Lawrence.Delevingne@thomsonreuters.com>
**Date:** March 1, 2016 at 5:23:38 PM EST
**To:** Mark Nordlicht <mnordlicht@platinumlp.com>
**Subject: Follow up questions/quotes**

Hi Mark,

I wanted to follow up on some points, including items in my fact-checking email that haven't been explicitly covered yet, and quotes from our in-person conversation to potentially use on the record. If there's anything else in the fact-check email or otherwise you take issue with, please let me know.

**Additional fact-checks/requests for comment:**

Personal background:
    --you are 48 years old
    --you live in New Rochelle with your wife and children. You drive yourself to work and back each day.
    --You have deep roots in the New York-area Jewish community, the source of some PP's major investors.
On Agera/Glacial:
    --you said it is not correct that Agera was set up to buy assets of glacial – how did it work then?
    --PP paid $53 million for Glacial's assets out of bankruptcy and Agera Energy has since quintupled in value to about $275 million.
    --For Glacial, when was the first Platinum investment in Glacial made? You had said 2010 before but wanted to make sure it wasn't earlier.
    --How much was lent to Glacial overall?

--PP's eventual equity stake was essentially a wash as it was acquired for free and didn't gain in value given the bankruptcy

On CashCall:

    --How much was lent to Cashcall overall? Are there any more Cashcall funds planned?

    --Has the investment met PP's financial expectations?

On Kuber:

    --What was total amount invested by PP and what was the total amount recovered? If it's like Banyon, want to show assets all or substantially recovered

On Black Elk:

    --How and when did $60M in loans turn into a controlling equity stake?

    --Has PP put in any additional money or made any loans since? If so, how much?

    --Is it fair to say the value of PP's stake in BEE increased from $60M to as much as $186M in mid 2014? Is that apples to apples? Want to show early success of investment.

    --PP essentially controlled Black Elk in recent years and selected its management following John Hoffman's departure as CEO.

On BEE tender/consent solicitation offer in 2014:

    --Didn't Platinum benefit from having Black Elk preferred equity holders getting paid because it didn't have to pay New Mountain?

    --PPBE fund investors included the Huberfeld Family Foundation and Ace Foundation (Aaron Elbogen). Any others?

    --Wasn't Platinum and its affiliate funds not allowed to vote its bonds on the consent solicitation and tender offer because it was the majority owner of BEE?

    --Did David Levy have a personal holding in BEE bonds upon leaving for Beechwood, or just reestablished the position with Beechwood's money while an employee there? Both?

SEC exam:

    --is there comment on the recent SEC examination of Platinum? Is it ongoing? I understand the difference between this more routine exam and an investigation from the Enforcement division.

**I would like to make the below quotes on the record from our in person conversation:**

--Re institutional investors:

"there's a lot of pressure to be more open to strategies that can deliver steady returns"

" "there are some institutional investors who never want to be in a headline, no matter what. They don't want to hear explanations, they don't want to hear stories"

"we are definitely not for everybody"

--Re strategy:

"we are very aggressive to produce risk adjusted returns"

"at the end of the day, we're gonna be aggressive. We have a fiduciary responsibility to preserve capital, to put up risk adjusted returns and to produce differentiated returns"

"we check everything thing out very, very carefully" from a legal perspective

--Re PPVA liquidity:

"is a challenge"

"I think we have taken corrective actions…we are tracking it much more carefully" re new PPVA liquidity terms (6 month notice period for redemptions), new share class with locked up capital.

"this definitely was a little bit of a storm but overall I do believe in the product" of PPVA mix of liquid/illiquid.

--Re energy PE positions become big in recent years before side-pocket:

"I definitely cheated..we've put in controls in place to really watch over me to make sure I don't cheat again and to make sure we are doing a better job of matching the liquidity terms versus what we are looking to do."

--Re energy asset-based lending opp:

"it's definitely an attractive time to be doing our strategy in energy right now" re assets at this price level – very attractive.

That's it for now.

Thanks,

Lawrence

Lawrence Delevingne
Reporter | Reuters
+1 646.223.5362 | @ldelevingne
lawrence.delevingne@tr.com

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN

CONFIDENTIAL AND PRIVILEGED INFORMATION. ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE

OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE

CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

EXHIBIT 80

TO BE FILED UNDER SEAL