# EXHIBIT 81

**To:**      mkatzmx@gmail.com[mkatzmx@gmail.com]
**From:**    Mark Nordlicht
**Sent:**    Sun 3/27/2016 11:03:52 AM
**Subject:** Re: Trip

Not sure on victor yet, waiting to hear his schedule. Dont want to appear too desperate and with new plan im really not. I have additinal 13.5 follow on coming in this week/ early next as well. The 10 is kickstarting everything though, cd reslly use it asap. Thought it was coming last monday already.
Our focus now is going to be to get the right deal on agera. I guess best is you do paperwork with your grandfather in new york in person. I didnt think it was that complicated, thk God we really got everything we needed from murray and david. David and bernie meeting was added bonus, hopefully we get to see him before he leaves but it's really  just feel good thing anyhow. At this point i got to like the idea of two days with david anyhow just to really focus on action points on all the positions .

Sent from my iPhone

> On Mar 27, 2016, at 1:28 PM, Michael Katz <mkatzmx@gmail.com> wrote:
>
> Departure time seems to be a moving target, Europe stop may not happen.  I'd like to come and participate in the meetings, also very excited and have much to discuss, but finishing paperwork is the priority. I'm waiting to hear back on his firm plans in a couple of hours so can plan accordingly. Agree that setting up a war chest other considerations and there seem to be other potential sources of optionality in the book to offset any loss in upside. A plan to clean up the balance sheet is also a priority; weighing the benefits of more high cost debt vs the added burden should be carefully considered. I'm excited to lead the effort on organization, there is much to do. We can discuss work on several fronts, org, hr, rebranding, and pr. A few immediate improvements should make big differences though we should prioritize and make sure whatever we do is foundational as opposed to cosmetic and will take root in the organization. You still plan on meeting Victor this week?
>
>> On Mar 27, 2016, at 05:23, Mark Nordlicht <mnordlicht@platinumlp.com> wrote:
>>
>> He is not leaving until Monday 12 the earliest, leaving house 10:30 is plan currently (acc to yehudah who is there on inside). I think he is stopping in Europe too. I think David and Bernie shd come as I need to discuss entire plan with them which includes potentially selling agera besides implant and setting up debt facility besides  so we have war chest. In this scenario we would really clean everything up, I am very excited. I think I wd then steer Victor to helping us launch ppco 2 and use his infusion for that which will have added benefit of knocking him down on mgmt. percentage ask for me. In short, if they take afternoon flight, we can have feel good meeting at 9 am before your grandfather leaves and I can meet for two intense days with Bernie and David. You either come or wait for your grandfather in NY  but then we cd have meeting next week or week after in NY all of us regardless which will really be forward looking on execution of rebranding/marketing plan, shoring up operations etc. I will be laser like focused on the investment side (which we shd discuss as well, need to set up recruiting plan there that will add diversification and strength to team)  on rebuilding team I want and adding a few pieces to really set us up to power ahead as well. But I need to nail down what we do now. I was reluctant on agera at first but I have idea how to replace that upside in the fund and the liquidity is just too transformative for us to ignore. I also recognize your point on the right time in "cycle" to exit and it appear we might get statisfactory type of bid from a beechwood led consortium.  I am really looking at you as major asset in acting in principal capacity to get us really organized on all fronts to succeed (I think that is area of strength for you)  as that is area that frankly both David and I are weak at and are too busy needing to focus on bringing home existing investments.
>>
>> -----Original Message-----
>> From: Michael Katz [mailto:mkatzmx@gmail.com]
>> Sent: Sunday, March 27, 2016 12:02 PM
>> To: Mark Nordlicht
>> Subject: Re: Trip
>>
>> Just spoke to him. as it happens, the pilots were there when I called. He is coming to ny.
>>
>>> On Mar 26, 2016, at 20:36, Mark Nordlicht <mnordlicht@platinumlp.com> wrote:
>>>
>>> Ok. Obviously i defer to u on this one. Just my two cents but i am worried about him flying all over the place. Even on a private plane, it takes a lot out of you. I was actually relieved when he didnt go to dubai. My father is 7 years younger but i am insisting they stay every place at least a month when they fly and preferably more. But im sure he is stubborn and wont listen to you unfortunately!!!
>>>
>>> Sent from my iPhone
>>>
>>>> On Mar 27, 2016, at 3:31 AM, Michael Katz <mkatzmx@gmail.com> wrote:
>>>>
>>>> Let's postpone 12h as there's a chance he will leave and need David here if he does. If he doesn't, would like to go there, conclude paperwork and we can all meet.
>>>>
>>>>> On Mar 26, 2016, at 20:25, Mark Nordlicht <mnordlicht@platinumlp.com> wrote:
>>>>>

>>>>> David told me. Ok. Its 3:30 am here ... Its really also for me to meet with david and bernie ... And was hoping for you as well. Dahlia not letting me leave for two weeks ( dont ask), have some important  decisions to make, want to really get moving forward.
>>>>> Sent from my iPhone
>>>>>
>>>>> On Mar 27, 2016, at 3:18 AM, Michael Katz <mkatzmx@gmail.com> wrote:
>>>>>
>>>>> He's coming to NY, message from Liliana, so he asked me not to go tonight. I'll speak to him in a few hours.
>>>>>
>>>>>> On Mar 26, 2016, at 12:48, Mark Nordlicht <mnordlicht@platinumlp.com> wrote:
>>>>>>
>>>>>> All we really need is Sunday and it'll give us all chance to work
>>>>>> together. Regards
>>>>>>
>>>>>> Sent from my iPad
>>>>>>
>>>>>>> On Mar 26, 2016, at 1:59 AM, Michael Katz <mkatzmx@gmail.com> wrote:
>>>>>>>
>>>>>>> Good call on Implats today!
>>>>>>> As I told David and Bernie, nice gesture but may be off on timing. I'd like to get this signed first, and he may leave for Switzerland on Monday. Anyway we can work from there, much to do.
>>>>>>
>>>>>>
>>>>>>
>>>>>>
>>>>>> THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND
>>>>>> MAY CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY
>>>>>> UNAUTHORIZED REVIEW, USE, DISCLOSURE OR DISTRIBUTION IS
>>>>>> PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE CONTACT THE SENDER BY REPLY E-MAIL AND
DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.
>>>>>
>>>>>
>>>>>
>>>>>
>>>>> THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY
>>>>> CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED
>>>>> REVIEW, USE, DISCLOSURE OR DISTRIBUTION IS PROHIBITED. IF YOU ARE
>>>>> NOT THE INTENDED RECIPIENT, PLEASE CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF
THE ORIGINAL E-MAIL.
>>>
>>>
>>>
>>> THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY
>>> CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED
>>> REVIEW, USE, DISCLOSURE OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT
>>> THE INTENDED RECIPIENT, PLEASE CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE
ORIGINAL E-MAIL.
>>
>>
>>
>>
>> THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
>> CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
>> OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
>> CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

# EXHIBIT 82

**To:**      mnordlicht@platinumlp.com[mnordlicht@platinumlp.com]
**From:**    aron.turen@gmail.com
**Sent:**    Wed 5/11/2016 12:31:13 AM
**Subject:** Re: Esco

Hmmm.
Any others for sale?
Please let me know if it falls through.. Hopefully it won't

On May 10, 2016 8:30 PM, "Mark Nordlicht" <mnordlicht@platinumlp.com> wrote:

  Under contract

Sent from my iPhone

On May 11, 2016, at 3:29 AM, Aron Turen <aron.turen@gmail.com> wrote:


        Hi,
Is agera for sale?

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

# EXHIBIT 83

EXECUTION VERSION

**AMENDED AND RESTATED**

**LIMITED LIABILITY COMPANY AGREEMENT**

among

**AGH PARENT LLC**

and

**THE MEMBERS NAMED HEREIN**

dated as of

June 9, 2016

**TABLE OF CONTENTS**

**ARTICLE I** DEFINITIONS ...................................................................................................1

Section 1.01 Definitions.                                                          1

Section 1.02 Interpretation.                                                       15

**ARTICLE II** ORGANIZATION ...........................................................................................15

Section 2.01 Formation.                                                           15

Section 2.02 Name.                                                               16

Section 2.03 Principal Office.                                                     16

Section 2.04 Registered Office; Registered Agent.                                   16

Section 2.05 Purpose; Powers.                                                     16

Section 2.06 Term.                                                               16

Section 2.07 No State-Law Partnership.                                            16

**ARTICLE III** UNITS .........................................................................................................17

Section 3.01 Units Generally.                                                      17

Section 3.02 Authorization and Issuance of Preferred Units.                         17

Section 3.03 Authorization and Issuance of Common Units.                          17

Section 3.04 Incentive Units.                                                      17

Section 3.05 Other Issuances.                                                      19

Section 3.06 Certification of Units.                                                19

**ARTICLE IV** MEMBERS ....................................................................................................20

Section 4.01 Admission of New Members.                                            20

Section 4.02 Representations and Warranties of Members.                            20

Section 4.03 No Personal Liability.                                                21

Section 4.04 No Withdrawal.                                                       21

Section 4.05 Death.                                                              22

Section 4.06 Voting.                                                             22

Section 4.07 Meetings.                                                           22

Section 4.08 Quorum.                                                             23

Section 4.09 Action Without Meeting.                                              23

Section 4.10 Power of Members.                                                   23

i

Section 4.11 No Interest in Company Property.                                    23

**ARTICLE V** CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ........................23

Section 5.01 Initial Capital Contributions.                                     23

Section 5.02 Additional Capital Contributions.                                  24

Section 5.03 Maintenance of Capital Accounts.                                   24

Section 5.04 Succession Upon Transfer.                                          25

Section 5.05 Negative Capital Accounts.                                         25

Section 5.06 No Withdrawal.                                                     25

Section 5.07 Treatment of Loans From Members.                                   25

Section 5.08 Modifications.                                                     25

**ARTICLE VI** ALLOCATIONS ........................................................................25

Section 6.01 Allocation of Net Income and Net Loss.                             25

Section 6.02 Regulatory and Special Allocations.                                26

Section 6.03 Tax Allocations.                                                   28

Section 6.04 Allocations in Respect of Transferred Units.                       28

Section 6.05 Curative Allocations.                                              29

**ARTICLE VII** DISTRIBUTIONS ...................................................................29

Section 7.01 General.                                                           29

Section 7.02 Priority of Distributions.                                         29

Section 7.03 Limitations on Incentive Units.                                    30

Section 7.04 Tax Advances.                                                      31

Section 7.05 Tax Withholding; Withholding Advances.                             32

Section 7.06 Distributions in Kind.                                             34

Section 7.07 Cancellation of Certain Preferred Units.                           34

**ARTICLE VIII** MANAGEMENT ...................................................................34

Section 8.01 The Manager.                                                       34

Section 8.02 Officers.                                                          35

Section 8.03 No Personal Liability.                                             35

**ARTICLE IX** TRANSFERS AND PRE-EMPTIVE RIGHTS .......................................35

Section 9.01 General Restrictions on Transfer.                                  35

DB1/ 87817619.15

Section 9.02 Permitted Transfers. 36

Section 9.03 Drag-along Rights. 36

Section 9.04 Purchase Right. 37

Section 9.05 Class A Preferred Unit Redemption. 39

Section 9.06 Class C Preferred Unit Redemption. 40

Section 9.07 Tag-Along Right. 40

Section 9.08 Pre-Emptive Rights. 44

Section 9.09 Rights with Respect to Blockers. 44

**ARTICLE X** COVENANTS .................................................44

Section 10.01 Confidentiality. 44

Section 10.02 Registration Rights. 44

**ARTICLE XI** ACCOUNTING; TAX MATTERS .........................................46

Section 11.01 Inspection Rights; Information Rights. 46

Section 11.02 Tax Matters Member. 46

Section 11.03 Tax Returns. 48

Section 11.04 Company Funds. 48

**ARTICLE XII** DISSOLUTION AND LIQUIDATION ...................................48

Section 12.01 Events of Dissolution. 48

Section 12.02 Effectiveness of Dissolution. 49

Section 12.03 Liquidation. 49

Section 12.04 Cancellation of Certificate. 50

Section 12.05 Survival of Rights, Duties and Obligations. 50

Section 12.06 Recourse for Claims. 50

**ARTICLE XIII** EXCULPATION AND INDEMNIFICATION ....................................50

Section 13.01 Exculpation of Covered Persons. 50

Section 13.02 Liabilities of Covered Persons. 51

Section 13.03 Indemnification. 51

Section 13.04 Survival. 53

**ARTICLE XIV** MISCELLANEOUS ................................................................54

Section 14.01 Expenses. 54

DB1/ 87817619.15

Section 14.02 Further Assurances.                                       54

Section 14.03 Notices.                                                  54

Section 14.04 Headings.                                                 55

Section 14.05 Severability.                                             55

Section 14.06 Entire Agreement.                                         55

Section 14.07 Successors and Assigns.                                   55

Section 14.08 No Third-party Beneficiaries.                             55

Section 14.09 Amendment.                                                55

Section 14.10 Waiver.                                                   56

Section 14.11 Governing Law.                                            56

Section 14.12 Submission to Jurisdiction.                              56

Section 14.13 Waiver of Jury Trial.                                     57

Section 14.14 Equitable Remedies.                                       57

Section 14.15 Remedies Cumulative.                                      57

Section 14.16 Counterparts.                                             57

Section 14.17 Initial Public Offering.                                  57

iv

**AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT**

This Amended and Restated Limited Liability Company Agreement of AGH Parent LLC, a Delaware limited liability company (the "**Company**"), is entered into as of June 9, 2016 by and among the Company, the Initial Members executing this Agreement as of the date hereof and each other Person who after the date hereof becomes a Member of the Company and becomes a party to this Agreement by executing a Joinder Agreement. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in **Section 1.01** of this Agreement.

## RECITALS

**WHEREAS**, the Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation with the Secretary of State of the State of Delaware on May 31, 2016 (the "**Certificate of Formation**");

**WHEREAS**, the Members wish to amend and restate in its entirety that certain Limited Liability Company Agreement of the Company, dated as of June 3, 2016, in order to set forth their binding agreement as to the affairs of the Company, the conduct of its business and certain rights with respect to the relationship among the parties hereto; and

**WHEREAS**, the Members wish to enter into this Agreement to provide for, among other things, the management of the business and affairs of the Company, the allocation and distribution of profits and losses, and the respective rights and obligations of the Members and the Company to and among each other.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### DEFINITIONS

Section 1.01   **Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings set forth in this **Section 1.01**:

"**Acceptance Notice**" has the meaning set forth in Section 9.08(c).

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)      crediting to such Capital Account any amount which such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1) and 1.704-2(i); and

(b)      debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) and (*6*).

"**Adjusted Taxable Income**" of a Member for a Fiscal Year (or portion thereof) with respect to Units held by such Member means the federal taxable income allocated by the Company to the Member with respect to such Units (as adjusted by any final determination in connection with any tax audit or other proceeding) for such Fiscal Year (or portion thereof); *provided*, that such taxable income shall be computed (i) minus any excess taxable loss or excess taxable credits of the Company for any prior period allocable to such Member with respect to such Units that were not previously taken into account for purposes of determining such Member's Adjusted Taxable Income in a prior Fiscal Year to the extent such loss or credit would be available under the Code to offset income of the Member (or, as appropriate, the direct or indirect members of the Member) determined as if the income, loss, and credits from the Company were the only income, loss, and credits of the Member (or, as appropriate, the direct or indirect members of the Member) in such Fiscal Year and all prior Fiscal Years, and (ii) without taking into account the application of Code Section 704(c) and any special basis adjustment with respect to such Member resulting from an election by the Company under Code Section 754.

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, or is a Family Member of such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.  For the avoidance of any doubt, any Person for whom B Asset Manager, LP, a Delaware limited partnership, or its Affiliates, serves as investment or asset manager, shall be deemed to be an "Affiliate" of the Beechwood Members.

"**Agreement**" means this Amended and Restated Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"**Applicable Law**" means all applicable provisions of (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Award Agreements**" has the meaning set forth in **Section 3.04(c)**.

"**Bankruptcy**" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent

2

jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

"**Beechwood Members**" means BRe WNIC 2013 LTC Primary, BBLN-Agera Corp., BBIL ULICO 2014, BHLN-Agera Corp., BOLN-Agera Corp and Beechwood Re Investments LLC.

"**Blocker Equityholder**" means any Person holding equity securities of a Blocker.

"**Blocker**" means any Beechwood Member, or Transferee thereof, that is treated as a corporation for tax purposes.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided*, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Manager in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)     the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)     immediately prior to the Distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such Distribution;

(c)     the Book Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values, as determined by the Manager, as of the following times:

(i)     the acquisition of an additional Membership Interest in the Company by a new or existing Member in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii)     the Distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company;

(iii)     the grant to a Service Provider of any Incentive Units, or the issuance by the Company of a noncompensatory option; and

3

(iv)    the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(*g*);

*provided*, that adjustments pursuant to clauses (i), (ii) and (iii) above need not be made if the Manager reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d)    the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*); *provided*, that Book Values shall not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)    if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required to close.

"**Capital Account**" has the meaning set forth in **Section 5.03**.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property contributed to the Company by such Member; *provided*, however, no Member shall be deemed to have made any Capital Contribution to the Company with respect to the issuance to such Member of an Incentive Unit, the vesting of an Incentive Unit or a Code Section 83(b) election made by such Member with respect to an Incentive Unit.

"**Cause**," with respect to any particular Service Provider, has the meaning set forth in any Award Agreement, employment agreement or other written contract of engagement entered into between the Company or any Company Subsidiary and such Service Provider; *provided*, however, if none, then "Cause" means any of the following:

(a)    such Service Provider's fraud, embezzlement or other material dishonesty or breach of fiduciary duty against the Company or any of the Company Subsidiaries as determined by the Manager;

(b)    any conviction of, or the entering of a plea of guilty or *nolo contendere* to, a crime or the commission of an act that involves moral turpitude as determined by the Manager, or any willful or material violation by such Service Provider of any federal, state or foreign securities laws;

4

(c)     any conviction of any other criminal act or act of material dishonesty, disloyalty or misconduct by such Service Provider as determined by the Manager;

(d)     the use (including being under the influence) or possession of illegal drugs by such Service Provider on the premises of the Company or any of the Company Subsidiaries or while performing any duties or responsibilities with the Company or any of the Company Subsidiaries; or

(e)     the material breach by such Service Provider of any covenant undertaken in **Article X** herein, any Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the Company Subsidiaries, or the material violation by such Service Provider of any material policy of the Company or any Company Subsidiary; which breach or violation, if capable of cure, has continued unremedied for more than thirty (30) days after the Company or Company Subsidiary has provided written notice thereof.

"**Certificate of Formation**" has the meaning set forth in the Recitals.

"**Change of Control**" means: (a) the sale of all or substantially all of the consolidated assets of the Company and the Company Subsidiaries to a Third Party Purchaser or (b) a transaction resulting in no less than a majority of the Units on a Fully Diluted Basis being held by a Third Party Purchaser.

"**Class A Preferred Capital Value**" means $35,000,000.

"**Class A Preferred Return**" means, with respect to the Class A Preferred Units, an amount equal to a compounded annual rate of return of six percent (6%) on the Class A Preferred Unreturned Capital Value with respect to such Class A Preferred Units, calculated from the date on which the related Capital Contribution is made.

"**Class A Preferred Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class A Preferred Units" in this Agreement.

"**Class A Preferred Unreturned Capital Value**" means, for any Class A Preferred Unit at any time, the amount of the Class A Preferred Capital Value for such Class A Preferred Unit, reduced by the aggregate amount of all Distributions made by the Company in respect of such Class A Preferred Unit pursuant to **Section 7.02(b)** prior to such time.

"**Class B Preferred Units**" means the Class B-1 Preferred Units and the Class B-2 Preferred Units.

"**Class B-1 Preferred Capital Value**" means $22,000,000.

"**Class B-1 Preferred Return**" means, with respect to the Class B Preferred Units, an amount equal to a compounded annual rate of return of six percent (6%) on the Class B Preferred

5

Unreturned Capital Value with respect to such Class B Preferred Units, calculated from the date on which the related Capital Contribution is made.

"**Class B-1 Preferred Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class B Preferred Units" in this Agreement.

"**Class B-1 Preferred Unreturned Capital Value**" means, for any Class B Preferred Unit at any time, the amount of the Class B Preferred Capital Value for such Class B Preferred Unit, reduced by the aggregate amount of all Distributions made by the Company in respect of such Class B Preferred Unit pursuant to **Section 7.02(d)** prior to such time.

"**Class B-2 Preferred Capital Value**" means $2,000,000.

"**Class B-2 Preferred Return**" means, with respect to the Class B-2 Preferred Units, an amount equal to a compounded annual rate of return of six percent (6%) on the Class B-2 Preferred Unreturned Capital Value with respect to such Class B-2 Preferred Units, calculated from the date on which the related Capital Contribution is made.

"**Class B-2 Preferred Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class B-2 Preferred Units" in this Agreement.

"**Class B-2 Preferred Unreturned Capital Value**" means, for any Class B-2 Preferred Unit at any time, the amount of the Class B-2 Preferred Capital Value for such Class B-2 Preferred Unit, reduced by the aggregate amount of all Distributions made by the Company in respect of such Class B-2 Preferred Unit pursuant to **Section 7.02(f)** prior to such time.

"**Class C Preferred Capital Value**" means $59,040,000.

"**Class C Preferred Return**" means, with respect to the Class C Preferred Units, an amount equal to a compounded annual rate of return of eight percent (8%) on the Class C Preferred Unreturned Capital Value with respect to such Class C Preferred Units, calculated from the date on which the related Capital Contribution is made. For purposes of the calculation of the Class C Preferred Return, the reduction in the Class C Preferred Unreturned Capital Value pursuant to Section 7.5(d) of the Purchase Agreement shall be deemed to occur on the date of the contribution, such that there would be no preferred return *ab initio* with respect to such reduced Class C Preferred Unreturned Capital Value.

"**Class C Preferred Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Class C Preferred Units" in this Agreement.

"**Class C Preferred Unreturned Capital Value**" means, for any Class C Preferred Unit at any time, the amount of the Class C Preferred Capital Value for such Class C Preferred Unit,

6

reduced by (x) the aggregate amount of all Distributions made by the Company in respect of such Class C Preferred Unit pursuant to **Section 7.02(h)** prior to such time and (y) reductions pursuant to Section 7.5(d) of the Purchase Agreement.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Common Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common Units" in this Agreement.

"**Company**" has the meaning set forth in the Preamble.

"**Company Class A Redemption**" has the meaning set forth in **Section 9.05(a)(i)**.

"**Company Class A Redemption Notice**" has the meaning set forth in **Section 9.05(b)**.

"**Company Class C Redemption Notice**" has the meaning set forth in **Section 9.06(b)**.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Section 1.704-2(b)(2) of the Treasury Regulations, substituting the term "Company" for the term "partnership" as the context requires.

"**Company Subsidiary**" means a Subsidiary of the Company.

"**Confidential Information**" has the meaning set forth in **Section 10.01(a)**.

"**Covered Person**" has the meaning set forth in **Section 13.01(a)**.

"**Covered Transaction**" has the meaning set forth in **Section 9.09**.

"**Delaware Act**" means the Delaware Limited Liability Company Act, Title 6, Chapter 18, §§ 18-101, *et seq*, and any successor statute, as it may be amended from time to time.

"**Dissolution Event**" has the meaning set forth in **Section 12.01**.

"**Distributable Cash**" means, as of any date, the excess of (a) the cash, cash equivalent items, marketable securities and money market investments held by the Company over (b) the sum of the amount of such items as the Manager reasonably determines to be necessary for (i) the payment of the Company's then due or accrued expenses, liabilities and other obligations and (ii) the establishment of appropriate reserves for expenses, liabilities and obligations.

"**Distribution**" means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided*, that none of the following shall be a Distribution: (a) any redemption or purchase by the Company or any Member of any Units or Unit Equivalents; (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as a Service Provider or

7

Manager for the Company or a Company Subsidiary. "**Distribute**" when used as a verb and "**Distributable**" when used as an adjective shall each have a correlative meaning.

"**Drag-along Member**" has the meaning set forth in **Section 9.03(a)**.

"**Drag-along Notice**" has the meaning set forth in **Section 9.03(b)**.

"**Drag-along Sale**" has the meaning set forth in **Section 9.03(a)**.

"**Dragging Member**" has the meaning set forth in **Section 9.03(a)**.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Estimated Tax Amount**" of a Member for a Fiscal Year means the Member's Tax Amount for such Fiscal Year as estimated in good faith from time to time by the Manager.  In making such estimate, the Manager shall take into account amounts shown on Internal Revenue Service Form 1065 filed by the Company and similar state or local forms filed by the Company for the preceding taxable year and such other adjustments as in the reasonable business judgment of the Manager are necessary or appropriate to reflect the estimated operations of the Company for the Fiscal Year.

"**Excess Amount**" has the meaning set forth in **Section 7.04(b)**.

"**Excess Net Losses**" has the meaning set forth in **Section 6.02(i)**.

"**Exercise Period**" has the meaning set forth in **Section 9.08(c)**.

"**Exercising Member**" means each Pre-emptive Member exercising its rights to purchase its Pre-emptive Pro Rata Portion of the New Securities in full.

"**Fair Market Value**" of any asset as of any date means (a) the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Manager based on such factors as the Manager, in the exercise of its reasonable business judgment, considers relevant and (b) for purposes of **Section 9.04** only, if the Service Provider disagrees with the Manager's determination of Fair Market Value, the purchase price of the Incentive Units of such date as determined in good faith by an independent investment banking, accounting or valuation firm (paid one-half by the Company and one-half by the Service Provider) chosen by the Manager that is reasonably acceptable to the Service Provider.

"**Family Members**" has the meaning set forth in **Section 9.02(a)**.

"**Fiscal Year**" means the calendar year, unless otherwise determined by the Manager.

"**Forfeiture Allocations**" has the meaning set forth in **Section 6.02(h)**.

8

"**Fully Diluted Basis**" means, as of any date of determination, (a) with respect to all the Units, all issued and outstanding Units of the Company and all Units issuable upon the exercise of any outstanding Unit Equivalents as of such date, whether or not such Unit Equivalent is at the time exercisable, or (b) with respect to any specified type, class or series of Units, all issued and outstanding Units designated as such type, class or series and all such designated Units issuable upon the exercise of any outstanding Unit Equivalents as of such date, whether or not such Unit Equivalent is at the time exercisable.

"**GAAP**" means United States generally accepted accounting principles consistently applied from period to period and throughout any period.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Imputed Underpayment Amount**" has the meaning set forth in **Section 7.05(d)**.

"**Incentive Plan**" has the meaning set forth in **Section 3.04(c)**.

"**Incentive Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Incentive Units" in this Agreement and includes both Restricted Incentive Units and Unrestricted Incentive Units.

"**Initial Member**" has the meaning set forth in the definition of the term Member.

"**Initial Public Offering**" has the meaning set forth in **Section 14.17(a)**.

"**IPO Entity**" has the meaning set forth in **Section 14.17(a)**.

"**Issuance Notice**" has the meaning set forth in **Section 9.08(b)**.

"**Joinder Agreement**" means the joinder agreement in form and substance attached hereto as Exhibit A.

"**Liquidator**" has the meaning set forth in **Section 12.03(a)**.

"**Losses**" has the meaning set forth in **Section 13.03(a)**.

"**Manager**" has the meaning set forth in **Section 8.01(b)**.

"**Member**" means (a) each Person who has executed this Agreement or a counterpart thereof (each, an "**Initial Member**"); and (b) and each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Delaware Act, in each case so long as such Person is shown on the Company's books and records as the owner of one or more Units. The Members shall constitute the "members" (as that term is defined in the Delaware Act) of the Company.

9

"**Member Class A Redemption**" has the meaning set forth in **Section 9.05(a)(ii)**.

"**Member Class A Redemption Notice**" has the meaning set forth in **Section 9.05(c)**.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Members Schedule**" has the meaning set forth in **Section 3.01**.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (based on the type and class of Unit or Units held by such Member), as applicable, (a) to a Distributive share of Net Income, Net Losses and other items of income, gain, loss and deduction of the Company; (b) to a Distributive share of the assets of the Company; (c) to vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement; and (d) to any and all other benefits to which such Member may be entitled as provided in this Agreement or the Delaware Act.

"**Misallocated Item**" has the meaning set forth in **Section 6.05**.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(a)     any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)     any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(*i*) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)     any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by

reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d)      any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*);

(e)      if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f)      to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*m*), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"**New Interests**" has the meaning set forth in **Section 3.05**.

"**New Partnership Audit Rules**" shall mean, as enacted pursuant to the Bipartisan Budget Act of 2015, Sections 6221 through 6241 of the Code, including any amendments thereto or other Code provisions with respect to the same subject matter as Sections 6221 through 6241 of the Code, and any regulations promulgated or proposed under any such Sections and any administrative guidance with respect thereto.

"**New Securities**" means Units or Unit Equivalents; *provided*, that the term "New Securities" shall not include any Units or Unit Equivalents issued by the Company in connection with: (A) a grant to any existing or prospective Service Providers other than any Service Provider who is an affiliate of the Manager; (B) any acquisition by the Company or any Company Subsidiary of any equity interests, assets, properties or business of any Person other than from an affiliate of the Manager; (C) any transaction or series of related transactions involving a Change of Control; (D) any Public Offering; (E) any subdivision of Units (by a split of Units or otherwise), payment of Distributions or any similar recapitalization; (F) any issuance of Units or Unit Equivalents to lenders or other institutional investors (excluding the Members) in any arm's length transaction in which such lenders or investors provide debt financing to the Company or any Company Subsidiary; or (G) a joint venture, strategic alliance or other commercial relationship with any Person (including Persons that are customers, suppliers and strategic partners of the Company or any Company Subsidiary but not including any affiliate of the Manager) relating to the operation of the Company's or any Company Subsidiary's business and not for the primary purpose of raising equity capital.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

11

"**Officers**" has the meaning set forth in **Section 8.02**. "**Permitted Transfer**" means a Transfer of Common Units carried out pursuant to **Section 9.02**.

"**Permitted Transferee**" means a recipient of a Permitted Transfer.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**PGS**" means Principal Growth Strategies LLC, a Delaware limited liability company, and any Transferee thereof.

"**PGS Redemption Notice**" has the meaning set forth in **Section 9.06(c)**.

"**PGS Value**" means investments held by the Company in Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, Platinum Partners Value Arbitrage Fund L.P., an exempted limited partnership under the laws of the Cayman Islands, their respective shareholders or any of their respective Affiliates, with an approximate aggregate value equal to $35,400,000 of all amounts payable thereunder (including principal and interest), including equity in Yellow River (Cayman) Ltd. The value attributable to PGS Value in connection with Section 9.06 shall be (x) with respect to debt instruments, face value (including principal and interest) and (y) with respect to limited partnership interests, the capital account value as carried on the books of the applicable partnership.

"**Pre-emptive Member**" means the holders of Class A Preferred Units.

"**Pre-emptive Pro Rata Portion**" means a pro rata portion determined by dividing (i) the Class A Preferred Unreturned Capital Value of the applicable Member by (ii) the Preferred Unreturned Capital Value.

"**Preferred Units**" means the Class A Preferred Units, the Class B Preferred Units and the Class C Preferred Units.

"**Preferred Unreturned Capital Value**" means, as of the date of determination, the sum of the Class A Preferred Unreturned Capital Value, Class B-1 Preferred Unreturned Capital Value, Class B-2 Preferred Unreturned Capital Value and Class C Preferred Unreturned Capital Value.

"**Profits Interest**" has the meaning set forth in **Section 3.04(f)**.

"**Profits Interest Hurdle**" means an amount set forth in each Award Agreement reflecting the P Series Liquidation Value (or a multiple thereof) of the relevant P Series Incentive Units at the time the Units are issued as determined by the Manager.

"**Prospective Purchaser**" has the meaning set forth in **Section 9.08(b).**

"**P Series**" has the meaning set forth in **Section 3.04(b)**.

"**P Series Liquidation Value**" means, as of the date of determination and with respect to the relevant new P Series Incentive Units to be issued, the aggregate amount that would be Distributed to the Members pursuant to **Section 7.02**, if, immediately prior to the issuance of the relevant new P Series Incentive Units, the Company sold all of its assets for Fair Market Value and immediately liquidated, the Company's debts and liabilities were satisfied and the proceeds of the liquidation were Distributed pursuant to **Section 12.03(c)**.

"**Public Offering**" means any underwritten public offering pursuant to a registration statement filed in accordance with the Securities Act.

"**Purchase Agreement**" means that certain Purchase Agreement dated as of the date hereof, 2016 by and between the Company and PGS.

"**Purchase Notice**" has the meaning set forth in **Section 9.04(b)(i)**.

"**Purchased Units**" has the meaning set forth in **Section 9.04(b)(i)**.

"**Qualified Public Offering**" means the sale, in a firm commitment underwritten public offering led by a nationally recognized underwriting firm pursuant to an effective registration statement under the Securities Act, of Units (or common stock of the Company or an IPO Entity) having an aggregate offering value (net of underwriters' discounts and selling commissions) of at least $75,00000, following which at least 20% of the total Units (or common stock of the Company or an IPO Entity) on a Fully Diluted Basis shall have been sold to the public and shall be listed on any national securities exchange or quoted on the NASDAQ Stock Market System.

"**Qualifying Incentive Units**" has the meaning set forth in **Section 7.03**.

"**Quarterly Estimated Tax Amount**" of a Member for any calendar quarter of a Fiscal Year means the excess, if any of (a) the product of (i) a quarter (¼) in the case of the first calendar quarter of the Fiscal Year, half (½) in the case of the second calendar quarter of the Fiscal Year, three-quarters (¾) in the case of the third calendar quarter of the Fiscal Year, and one (1) in the case of the fourth calendar quarter of the Fiscal Year and (ii) the Member's Estimated Tax Amount for such Fiscal Year over (b) all Distributions previously made during such Fiscal Year to such Member.

"**Regulatory Allocations**" has the meaning set forth in **Section 6.02(g)**.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Restricted Incentive Units**" has the meaning set forth in **Section 3.04(d)(i)**.

"**Securities Act**" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which shall be in effect at the time.

"**Service Providers**" has the meaning set forth in **Section 3.04(a)**.

"**Shortfall Amount**" has the meaning set forth in **Section 7.04(b)**.

13

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests are owned, directly or indirectly, by the first Person.

"**Tax Advance**" has the meaning set forth in **Section 7.04(a)**.

"**Tax Amount**" of a Member for a Fiscal Year means the product of (a) the Tax Rate for such Fiscal Year and (b) the Adjusted Taxable Income of the Member for such Fiscal Year with respect to its Units.

"**Tax Matters Member**" means the "tax matters partner" (within the meaning of Section 6231(a)(7) of the Code as in effect prior to the enactment of the Bipartisan Budget Act of 2015) for periods prior to the effectiveness with respect to the LLC of the New Partnership Audit Rules and thereafter the "partnership representative"  as such term is defined in Section 6223(a) of the Code.

"**Tax Rate**" means the highest marginal blended federal, state and local tax rate applicable to ordinary income, qualified dividend income or capital gains, as appropriate, for such period applicable to any of the Members (or its direct or indirect owners), taking into account for federal income tax purposes, the deductibility of state and local taxes and any applicable limitations on such deductions, and taking into account any tax imposed by Section 1301 or 1411 of the Code, which rate shall be determined by the Manager; *provided*, *however*, the same Tax Rate (as determined by the Manager) shall be applied with respect to each Member.

"**Taxing Authority**" has the meaning set forth in **Section 7.05(b)**.

"**Third Party Purchaser**" means any Person who, immediately prior to the contemplated transaction, (a) does not directly or indirectly own or have the right to acquire any outstanding Preferred Units or Common Units (or applicable Unit Equivalents), (b) is not a Permitted Transferee of any Person who directly or indirectly owns or has the right to acquire any Preferred Units or Common Units (or applicable Unit Equivalents) or (c) is not an Affiliate of the Company or of any Member, Manager or Officer.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units or Unit Equivalents owned by a Person. "**Transfer**" when used as a noun shall have a correlative meaning. "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Unallocated Item**" has the meaning set forth in **Section 6.05**.

"**Unit**" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including but not limited to the Preferred Units, the Common Units and any other units hereinafter issued by the Company; *provided*, that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the Membership Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"**Unit Equivalents**" means any security or obligation that is by its terms, directly or indirectly, convertible into, or exchangeable or exercisable for Units, and any option, warrant or other right to subscribe for, purchase or acquire Units.

"**Unrestricted Incentive Units**" has the meaning set forth in **Section 3.04(d)(ii)**.

"**Voting Members**" has the meaning set forth in **Section 4.07(b)**.

"**Voting Units**" has the meaning set forth in **Section 4.07(a)**.

"**Withholding Advances**" has the meaning set forth in **Section 7.05(b)**.

**Section 1.02   Interpretation.** For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. The definitions given for any defined terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Unless the context otherwise requires, references herein: (x) to Articles, Sections, and Exhibits mean the Articles and Sections of, and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**ARTICLE II**
**ORGANIZATION**

**Section 2.01   Formation.**

(a)      The Company was formed on May 31, 2016, pursuant to the provisions of the Delaware Act, upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware.

(b)      This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Delaware Act) of the Company. The rights, powers, duties, obligations

DB1/ 87817619.15

and liabilities of the Members shall be determined pursuant to the Delaware Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement shall, to the extent permitted by the Delaware Act, control.

**Section 2.02   Name.** The name of the Company is "AGH Parent LLC" or such other name or names as the Manager may from time to time designate; *provided*, that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."   The Manager shall give prompt notice to each of the Members of any change to the name of the Company.

**Section 2.03   Principal Office.** The principal office of the Company shall be at such place as may from time to time be determined by the Manager.

**Section 2.04   Registered Office; Registered Agent.**

(a)      The registered office of the Company shall be the office of the initial registered agent named in the Certificate of Formation or such other office (which need not be a place of business of the Company) as the Manager may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

(b)      The registered agent for service of process on the Company in the State of Delaware shall be the initial registered agent named in the Certificate of Formation or such other Person or Persons as the Manager may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

**Section 2.05   Purpose; Powers.**

(a)      The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Delaware Act and to engage in any and all activities necessary or incidental thereto.

(b)      The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

**Section 2.06   Term.** The term of the Company commenced on the date the Certificate of Formation was filed with the Secretary of State of the State of Delaware and shall continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

**Section 2.07   No State-Law Partnership.** The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes.  The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment.  The Members intend that the Company shall not be a partnership (including, without limitation, a limited partnership) or joint venture,

and that no Member, Manager or Officer of the Company shall be a partner or joint venturer of any other Member, Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this **Section 2.07**.

<div align="center">

**ARTICLE III**

**UNITS**

</div>

**Section 3.01   Units Generally.** The Membership Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series.  Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series.  The Manager shall maintain a schedule of all Members, their respective mailing addresses and the amount and series of Units held by them (the "**Members Schedule**"), and shall update the Members Schedule upon the issuance or Transfer of any Units to any new or existing Member in accordance with this Agreement and as may be required pursuant to Section 7.5(c) of the Purchase Agreement.  The Members Schedule shall be kept confidential but shall be available for review at the Company to all Members upon written request by any such Member.

**Section 3.02   Authorization and Issuance of Preferred Units.**   The Company is hereby authorized to issue a class of Units designated as Preferred Units.  As of the date hereof, there are four (4) classes of Preferred Units: Class A Preferred Units, Class B-1 Preferred Units, Class B-2 Preferred Units and Class C Preferred Units.  As of the date hereof, 350,000 Class A Preferred Units are issued and outstanding, 220,000 Class B-1 Preferred Units are issued and outstanding, 3,438 Class B-2 Preferred Units, and 590,400 Class C Preferred Units are issued and outstanding.

**Section 3.03   Authorization and Issuance of Common Units.**  The Company is hereby authorized to issue a class of Units designated as Common Units.  As of the date hereof, 5,730 Common Units are issued and outstanding.

**Section 3.04   Incentive Units.**

(a)     Subject to **Section 3.03** and upon the terms and conditions set forth in any applicable Award Agreements or employment agreements approved by the Manager, the Company may issue Incentive Units up to 10% of the total number of issued and outstanding Units on a Fully Diluted Basis to any Manager, Officer, employee, consultant, independent contractor, advisor or other service provider of the Company or any Company Subsidiary (collectively, "**Service Providers**", and each a "**Service Provider**").

(b)     Subject to **Section 3.03** and upon the terms and conditions set forth in any applicable Award Agreements or employment agreements approved by the Manager, the Company may issue a profits interest series of Incentive Units to any Service Provider (each a "**P Series**" Incentive Units, to be consecutively designated as "Series P-1," "Series P-2," etc.).

(c)     The Manager is hereby authorized and directed to adopt a written plan pursuant to which P Series Incentive Units may be granted, each of which shall be granted in compliance

<div align="center">17</div>

with Rule 701 of the Securities Act or another applicable exemption (such plan as in effect from time to time, the "**Incentive Plan**").  In connection with the adoption of the Incentive Plan and issuance of Incentive Units, the Manager is hereby authorized to negotiate and enter into award agreements with any Service Provider to whom it grants Incentive Units (such agreements, "**Award Agreements**").  Each Award Agreement shall include such terms, conditions, rights and obligations as may be determined by the Manager, in its sole discretion, consistent with the terms herein.  As of the date hereof, 12,062 Incentive Units are issued and outstanding.

(d)     The Manager shall establish such vesting criteria for the Incentive Units as it determines in its discretion and shall include such vesting criteria in the Incentive Plan and/or the applicable Award Agreement for any grant of Incentive Units.  As used in this Agreement:

(i)     any Incentive Units that have not vested pursuant to the terms of the Incentive Plan and any associated Award Agreement are referred to as "**Restricted Incentive Units**"; and

(ii)     any Incentive Units that have vested pursuant to the terms of the Incentive Plan and any associated Award Agreement are referred to as "**Unrestricted Incentive Units.**"

(e)     Immediately prior to each issuance of each P Series Incentive Unit following the initial issuance described in the second sentence of **Section 3.04(c)**, the Manager shall determine in good faith the P Series Liquidation Value.  In each Award Agreement that the Company enters into with a Service Provider for the issuance of each new P Series Incentive Units, the Manager shall include an appropriate Profits Interest Hurdle for such Incentive Units on the basis of the P Series Liquidation Value (or a multiple thereof) immediately prior to the issuance of such Incentive Units as determined by the Manager.

(f)     The Company and each Member hereby acknowledge and agree that all P Series Incentive Units constitute a "profits interest" in the Company within the meaning of Rev. Proc. 93-27 (a "**Profits Interest**"), and that any and all P Series Incentive Units received by any Service Provider are received in exchange for the provision of services to or for the benefit of the Company or Company Subsidiary in a Service Provider capacity or in anticipation of becoming a Service Provider. The Company and any Member which receives P Series Incentive Units hereby agree to comply with the provisions of Rev. Proc. 2001-43, and neither the Company nor any Member who receives any P Series Incentive Units shall perform any act or take any position inconsistent with the application of Rev. Proc. 2001-43 or any future Internal Revenue Service guidance or other Governmental Authority that supplements or supersedes the foregoing Revenue Procedures.

(g)     Incentive Units granted to a Service Provider shall receive the following tax treatment:

(i)     each Member that receives Incentive Units must make a timely and effective election under Code Section 83(b) with respect to such Incentive Units received by such Member and shall promptly provide a copy of any such election which is made to the Company.  Except as otherwise determined by the Manager, both the Company and all Members shall (A) treat such Incentive Units as outstanding for tax purposes, (B) treat such Member as a

18

partner for tax purposes with respect to such Incentive Units and (C) file all tax returns and reports consistently with the foregoing.  Neither the Company nor any of its Members shall deduct any amount (as wages, compensation or otherwise) with respect to the receipt of such P Series Incentive Units (whether or not vested) for federal income tax purposes; and

(ii)    in accordance with the finally promulgated successor rules to Proposed Treasury Regulations Section 1.83-3(l) and IRS Notice 2005-43, each Member, by executing this Agreement, authorizes and directs the Company to elect a safe harbor under which the fair market value of any P Series Incentive Units issued after the effective date of such Proposed Treasury Regulations (or other guidance) will be treated as equal to the liquidation value (within the meaning of the Proposed Treasury Regulations or successor rules) of the P Series Incentive Units as of the date of issuance of such P Series Incentive Units. In the event that the Company makes a safe harbor election as described in the preceding sentence, each Member hereby agrees to comply with all safe harbor requirements with respect to Transfers of Units while the safe harbor election remains effective.

(h)    For the avoidance of any doubt, all Incentive Units, including Unrestricted Incentive Units, shall be subject to **Section 9.03.**

**Section 3.05   Other Issuances.**  In addition to Preferred Units, Common Units and Incentive Units, the Company is hereby authorized, to authorize and issue or sell to any Person any of the following (collectively, "**New Interests**"): (i) any new type, class or series of Units not otherwise described in this Agreement, which Units may be designated as classes or series of the Preferred Units, Common Units or Incentive Units but having different rights; and (ii) Unit Equivalents. The Manager is hereby authorized, subject to **Section 14.09,** to amend this Agreement to reflect such issuance and to fix the relative privileges, preference, duties, liabilities, obligations and rights of any such New Interests, including the number of such New Interests to be issued, the preference (with respect to Distributions, in liquidation or otherwise) over any other Units and any contributions required in connection therewith.

**Section 3.06   Certification of Units.**

(a)    The Manager in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Member.

(b)    In the event that the Manager shall issue certificates representing Units in accordance with **Section 3.06(a)**, then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED  EXCEPT (A) PURSUANT TO A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION THEREUNDER.

## ARTICLE IV
### MEMBERS

**Section 4.01   Admission of New Members.**

(a)     New Members may be admitted by the Manager from time to time (i) in connection with an issuance of Units by the Company, and (ii) in connection with a Transfer of Units, subject to compliance with the provisions of **Article IX**, and in either case, following compliance with the provisions of **Section 4.01(b)**.

(b)     In order for any Person not already a Member of the Company to be admitted as a Member, whether pursuant to an issuance or Transfer of Units, such Person shall have executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement.  Upon the amendment of the Members Schedule by the Manager and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units, such Person shall be admitted as a Member and deemed listed as such on the books and records of the Company and thereupon shall be issued his, her or its Units.  The Manager shall also adjust the Capital Accounts of the Members as necessary in accordance with **Section 5.03**.

**Section 4.02   Representations and Warranties of Members.** By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members, whether admitted as of the date hereof or pursuant to **Section 4.01**, represents and warrants to the Company and acknowledges that:

(a)     The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with;

(b)     Such Member is an "accredited investor" within the meaning of Rule 501 promulgated under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and agrees that it will not take any action that would have an adverse effect on the availability of the exemption from registration provided by Rule 501 promulgated under the Securities Act with respect to the offer and sale of the Units;

(c)     Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof;

DB1/ 87817619.15

(d)     The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Company Subsidiaries that may have been made or given by any other Member or by any agent or employee of any other Member;

(e)     Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto;

(f)     Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(g)     The execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound;

(h)     This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by Bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity); and

(i)     Neither the issuance of any Units to any Member nor any provision contained herein will entitle the Member to remain in the employment of the Company or any Company Subsidiary or affect the right of the Company or any Company Subsidiary to terminate the Member's employment at any time for any reason, other than as otherwise provided in such Member's employment agreement or other similar agreement with the Company or Company Subsidiary, if applicable.

None of the foregoing shall replace, diminish or otherwise adversely affect any Member's representations and warranties made by it in the Purchase Agreement or any Award Agreement, as applicable.

**Section 4.03   No Personal Liability.** Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company or of any Company Subsidiaries or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

**Section 4.04   No Withdrawal.** A Member shall not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in § 18-304 of the Delaware Act.  So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void.  As soon

DB1/ 87817619.15

as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

Section 4.05   **Death.** The death of any Member shall not cause the dissolution of the Company.  In such event the Company and its business shall be continued by the remaining Member or Members and the Units owned by the deceased Member shall automatically be Transferred to such Member's heirs; *provided*, that within a reasonable time after such Transfer, the applicable heirs shall sign a written undertaking substantially in the form of the Joinder Agreement.

Section 4.06   **Voting.** Except as otherwise provided by this Agreement (including **Section 14.09**) or as otherwise required by the Delaware Act or Applicable Law, on all matters on which all the Members are entitled to vote:

(a)     each holder of a Class B Preferred Unit and Common Unit shall be entitled to one vote per each Class B Preferred Unit and each Common Unit of which such Member is the record owner and shall vote together as a single class; and

(b)     the holders of Preferred Units (other than Class B Preferred Units) and Incentive Units shall not be entitled to vote.

Section 4.07   **Meetings.**

(a)     **Voting Units.** As used herein, the term "**Voting Units**" shall mean the Common Units and the Class B Preferred Units.

(b)     **Calling the Meeting.** Meetings of the Members may be called by the Manager. Only Members who hold the relevant Voting Units ("**Voting Members**") shall have the right to attend meetings of the Members.

(c)     **Notice.** Written notice stating the place, date and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purposes for which the meeting is called, shall be delivered not fewer than one (1) day and not more than thirty (30) days before the date of the meeting to each Voting Member, by or at the direction of the Manager or the Member(s) calling the meeting, as the case may be. The Voting Members may hold meetings at the Company's principal office or at such other place as the Manager or the Member(s) calling the meeting may designate in the notice for such meeting.

(d)     **Participation.** Any Voting Member may participate in a meeting of the Voting Members by means of conference telephone or other communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting.

(e)     **Vote by Proxy.** On any matter that is to be voted on by Voting Members, a Voting Member may vote in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.  Every proxy shall be revocable in the discretion of the Voting Member executing it unless otherwise provided

in such proxy; *provided*, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.

(f)     **Conduct of Business.** The business to be conducted at such meeting need not be limited to the purpose described in the notice.  Attendance of a Member at any meeting shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

**Section 4.08   Quorum.** A quorum of any meeting of the Voting Members shall require the presence of the Members holding a majority of the Voting Units held by all Voting Members. Subject to **Section 4.09**, no action at any meeting may be taken by the Members unless the appropriate quorum is present.  Subject to **Section 4.09**, no action may be taken by the Members at any meeting at which a quorum is present without the affirmative vote of Members holding a majority of the Voting Units held by all Voting Members.

**Section 4.09   Action Without Meeting.** Notwithstanding the provisions of **Section 4.08**, any matter that is to be voted on, consented to or approved by Voting Members may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than a majority of the Voting Units held by all Voting Members. A record shall be maintained by the Manager of each such action taken by written consent of a Member or Members.

**Section 4.10   Power of Members.** The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Delaware Act.  Except as otherwise specifically provided by this Agreement or required by the Delaware Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

**Section 4.11   No Interest in Company Property.** No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

# ARTICLE V
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 5.01   Initial Capital Accounts.** Contemporaneously with the execution of this Agreement, each Member shall have an initial Capital Account, be credited with an initial Capital Contribution and shall own the number, type, series and class of Units, in each case, in the amounts set forth opposite such Initial Member's name on the Members Schedule as in effect on the date hereof.

**Section 5.02   Additional Capital Contributions.**

(a)      No Member shall be required to make any additional Capital Contributions to the Company.  Any future Capital Contributions made by any Member shall only be made with the consent of the Manager.

(b)      No Member shall be required to lend any funds to the Company and no Member shall have any personal liability for the payment or repayment of any Capital Contribution by or to any other Member.

**Section 5.03   Maintenance of Capital Accounts.** The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this **Section 5.03**.  Each Capital Account shall be established and maintained in accordance with the following provisions:

(a)      Each Member's Capital Account shall be increased by the amount of:

(i)      such Member's Capital Contributions, including such Member's initial Capital Contribution;

(ii)      any Net Income or other item of income or gain allocated to such Member pursuant to **Article VI**; and

(iii)      any liabilities of the Company that are assumed by such Member or secured by any property Distributed to such Member.

(b)      Each Member's Capital Account shall be decreased by:

(i)      the cash amount or Book Value of any property Distributed to such Member pursuant to **Article VII** and **Section 12.03(c)**;

(ii)      the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to **Article VI**; and

(iii)      the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations.  In the event the Manager shall determine that it is prudent to modify or adjust the manner in which the Capital Accounts, or any debits or credits thereto (including debits or credits relating to liabilities which are secured by contributed or distributed property or which are assumed by the Company or any Members), are computed in order to comply with such Treasury Regulations, the Manager may make such modification or adjustment, provided such modification or adjustment does not affect the amounts distributable to any Member pursuant to this Agreement.

24

**Section 5.04   Succession Upon Transfer.** In the event that any Units are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units and, subject to **Section 6.04**, shall receive allocations and Distributions pursuant to **Article VI**, **Article VII** and **Article XII** in respect of such Units.

**Section 5.05   Negative Capital Accounts.** In the event that any Member shall have a deficit balance in his, her or its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

**Section 5.06   No Withdrawal.** No Member shall be entitled to withdraw any part of his, her or its Capital Account or to receive any Distribution from the Company, except as provided in this Agreement.  No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any Distributions to any Members, in liquidation or otherwise.

**Section 5.07   Treatment of Loans From Members.** Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in **Section 5.03(a)(iii)**, if applicable.

**Section 5.08   Modifications.** The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Section 1.704-1(b) of the Treasury Regulations and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Manager determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Manager may authorize such modifications.

### ARTICLE VI
#### ALLOCATIONS

**Section 6.01   Allocation of Net Income and Net Loss.** For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary and provided herein, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in **Section 6.02**, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (i) the Distributions that would be made to such Member pursuant to **Section 12.03(c)** if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), and the net assets of the Company were

25

Distributed, in accordance with **Section 12.03(c)**, to the Members immediately after making such allocations, minus (ii) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets. Notwithstanding the foregoing, upon a liquidation of the Company pursuant to **Section 12.03**, the Company shall, to the extent necessary, allocate individual items of income, gain, loss or deduction of the Company among the Members such that the Capital Account balance of each Member is as nearly as possible, on a proportionate basis, equal to the amounts provided for in the first sentence of this **Section 6.01**.  Notwithstanding any other provision of this Agreement, the Manager may make such allocations of Net Income or Net Loss (or items thereof) as it deems reasonably necessary to give economic effect to the provisions of this Agreement, taking into such facts and circumstances as it deems reasonably necessary for this purpose.

　　　　**Section 6.02   Regulatory and Special Allocations.** Notwithstanding the provisions of **Section 6.01**:

　　　　(a)　　　If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g)(1).  The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This **Section 6.02(a)** is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted and applied in a manner consistently therewith.

　　　　(b)　　　Member Nonrecourse Deductions shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain.  Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This **Section 6.02(b)** is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

　　　　(c)　　　In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) or (*6*) that causes an Adjusted Capital Account Deficit, Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or Distributions to the extent required by the Treasury Regulations as quickly as possible.  This **Section 6.02(c)** is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

(d)     In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of the amount such Member is obligated to restore pursuant to the penultimate sentences of Treasury Regulations Sections 1.704-2(*g*)(*1*) and 1.704-2(*i*)(*5*), each such Member shall be specially allocated items of Company income and gain in the amount of such excess to the extent required by the Treasury Regulations as quickly as possible, *provided,* that an allocation pursuant to this **Section 6.02(d)** shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article VI have been made as if **Section 6.02(c)** and this **Section 6.02(d)** were not in the Agreement.

(e)     Nonrecourse Deductions for any Fiscal Year shall be allocated among the Members in the same proportions as are the other Net Losses of the Company for such year.

(f)     Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

(g)     The allocations set forth in paragraphs (a) through (f) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704.  Notwithstanding any other provisions of this **Article VI** (other than the Regulatory Allocations), the Regulatory Allocations shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

(h)     The Company and the Members acknowledge that allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(*c*) ("**Forfeiture Allocations**") result from the allocations of Net Income and Net Loss provided for in this Agreement. For the avoidance of doubt, the Company is entitled to make Forfeiture Allocations and, once required by applicable final or temporary guidance, allocations of Net Income and Net Loss will be made in accordance with Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(*c*) or any successor provision or guidance.

(i)     Net Losses allocated pursuant to **Section 6.01** shall not exceed the maximum amount of Net Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year.  In the event some but not all of Members would otherwise have Adjusted Capital Account Deficits as a consequence of an allocation of Net Losses pursuant to **Section 6.01**, the limitation set forth in this **Section 6.02(i)** shall be applied on a Member by Member basis and Net Losses not allocable to any Member as a result of such limitation shall be allocated (a) first, to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the maximum permissible Net Losses to each Member under Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations (until the Capital Account balances of all Members shall be reduced to zero), and (b) thereafter in the same manner as Nonrecourse Deductions.  If and to the extent Net Losses are allocated pursuant to this **Section 6.02(i)** rather than **Section 6.01**, then, notwithstanding **Section 6.01** above, subsequent allocations of Net Profits shall be made first to the Members who received excess

27

allocations of Net Losses pursuant to this **Section 6.02(i)** in excess of what they would have otherwise received pursuant to **Section 6.01** ("**Excess Net Losses**"), in proportion to those Excess Net Losses, until all such Excess Net Losses have been offset with allocations of Net Profits pursuant to this sentence.  Any remaining allocations of Net Profits shall be made in accordance with **Section 6.01**.

Section 6.03   Tax Allocations.

(a)     Subject to **Section 6.03(b)** through **Section 6.03(e)**, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b)     Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and Treasury Regulations Section 1.704-3, so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)     If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(*f*) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d)     Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)     The Company shall make allocations pursuant to this Section 6.03 in accordance with such method or methods as may be adopted for the Company by the Tax Matters Member pursuant to Code Section 704(c).

(f)     Allocations pursuant to this **Section 6.03** are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, Distributions or other items pursuant to any provisions of this Agreement.

Section 6.04   **Allocations in Respect of Transferred Units.** In the event of a Transfer of Units during any Fiscal Year made in compliance with the provisions of **Article IX**, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using the interim closing of the books method in accordance with applicable Treasury Regulations.

28

**Section 6.05   Curative Allocations.** In the event that the Tax Matters Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is not specified in this **Article VI** (an "**Unallocated Item**"), or that the allocation of any item of Company income, gain, loss or deduction hereunder is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)) (a "**Misallocated Item**"), then the Manager may allocate such Unallocated Items, or reallocate such Misallocated Items, to reflect such economic interests; *provided*, that no such allocation will be made without the prior consent of each Member that would be adversely and disproportionately affected thereby; and *provided, further*, that no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

## ARTICLE VII
### DISTRIBUTIONS

**Section 7.01   General.**

(a)      Subject to **Section 7.01(b)**, **Section 7.02** and **Section 7.04**, the Manager shall have sole discretion regarding the amounts and timing of Distributions to Members, including to decide to forego payment of Distributions in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company (which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including, but not limited to, present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies).

(b)      Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Members if such Distribution would violate § 18-607 of the Delaware Act or other Applicable Law.

**Section 7.02   Priority of Distributions.** Subject to any payments to be made under **Section 9.05** or **Section 9.06**, after making all Distributions required for a given Fiscal Year under **Section 7.04** and subject to the priority of Distributions pursuant to **Section 12.03(c)**, if applicable, all Distributions determined to be made by the Company pursuant to **Section 7.01** shall be made in the following manner:

(a)      *first*, to the Members holding Class A Preferred Units pro rata in proportion to their holdings of Class A Preferred Units, until each such Member has received its Class A Preferred Return under this **Section 7.02(a)** (after giving effect to **Section 7.04(d)**));

(b)      *second*, to the Members holding Class A Preferred Units pro rata in proportion to their holdings of Class A Preferred Units, until each such Member has received its Class A Preferred Unreturned Capital Value under this **Section 7.02(b)**;

29

(c)      *third*, to the Members holding Class B-1 Preferred Units pro rata in proportion to their holdings of Class B-1 Preferred Units, until each such Member has received its Class B-1 Preferred Return under this **Section 7.02(c)** (after giving effect to **Section 7.04(d)**)**;**

(d)      *fourth*, to the Members holding Class B-1 Preferred Units pro rata in proportion to their holdings of Class B-1 Preferred Units, until each such Member has received its Class B-1 Preferred Unreturned Capital Value under this **Section 7.02(d)**;

(e)      *fifth*, to the Members holding Class B-2 Preferred Units pro rata in proportion to their holdings of Class B-2 Preferred Units, until each such Member has received its Class B-2 Preferred Return under this **Section 7.02(e)** (after giving effect to **Section 7.04(d)**);

(f)      *sixth*, to the Members holding Class B-2 Preferred Units pro rata in proportion to their holdings of Class B-2 Preferred Units, until each such Member has received its Class B-2 Preferred Unreturned Capital Value under this **Section 7.02(f)**;

(g)      *seventh*, to the Members holding Class C Preferred Units pro rata in proportion to their holdings of Class C Preferred Units, until each such Member has received its Class C Preferred Return under this **Section 7.02(g)** (after giving effect to **Section 7.04(d)**);

(h)      *eighth*, to the Members holding Class C Preferred Units pro rata in proportion to their holdings of Class C Preferred Units, until each such Member has received its Class C Preferred Unreturned Capital Value under this **Section 7.02(f)**;

(i)      *ninth,* any remaining amounts to all Members holding Class B Preferred Units, Common Units and Incentive Units (subject to the limitations on Incentive Units set forth in **Section 7.03**) pro rata in proportion to the aggregate number of such Units outstanding treated as one class of Units.

Notwithstanding the foregoing, any holder of a Class B-1 Preferred Unit can give written notice to the Company not to receive Distributions that they otherwise would be entitled to pursuant to clause (c) and/or (d) of this **Section 7.02** until such time as such holder notifies the Company in writing that it wishes to commence again receiving Distributions pursuant to clause (c) and/or (d) of this **Section 7.02**.  Upon the recommencement of such Distributions, such holder shall receive Distributions in priority to any other Distributions pursuant to this **Section 7.02**, until such time that it receives an amount equal to the forgone Distributions.

**Section 7.03   Limitations on Incentive Units.** It is the intention of the parties to this Agreement that Distributions to any Service Provider with respect to P Series Incentive Units be limited to the extent necessary so that the related Membership Interest constitutes a Profits Interest.  In furtherance of the foregoing, and notwithstanding anything to the contrary in this Agreement, the Manager shall, if necessary, limit any Distributions to any Service Provider with respect to P Series Incentive Units so that such Distributions in respect of such Units do not exceed the available profits in respect of such Service Provider's related Profits Interest.  Available profits shall include the aggregate amount of profit and unrealized appreciation in all of the assets of the Company between the date of issuance of such P Series Incentive Units and the date of such Distribution, it being understood that such unrealized appreciation shall be determined on the basis of the Profits Interest Hurdle applicable to such P Series Incentive Unit.

DB1/ 87817619.15

In the event that a Service Provider's Distributions and allocations with respect to P Series Incentive Units are reduced pursuant to the preceding sentence, an amount equal to such excess Distributions shall be treated as instead apportioned to the holders of Preferred Units, Common Units and P Series Incentive Units that have met their Profits Interest Hurdle (such P Series Incentive Units, "**Qualifying Incentive Units**"), pro rata in proportion to their aggregate holdings of Preferred Units, Common Units and Qualifying Incentive Units treated as one class of Units.  In addition, any amount otherwise distributable with respect to a Restricted Incentive Unit pursuant to **Section 7.02** shall be distributed by the Company pursuant to **Section 7.02** and, upon such Restricted Incentive Unit becoming an Unrestricted Incentive Unit, such Unrestricted Incentive Unit shall receive an amount that would have been received but for this sentence pursuant to the next Distribution pursuant to **Section 7.02**, prior to, and in priority to, any other Distributions pursuant **Section 7.02** (other than other distributions with respect to Unrestricted Incentive Units pursuant to this sentence which will be allocated among holders of Unrestricted Incentive Units in accordance with the amount to be distributed to each such holder pursuant to this sentence).

    **Section 7.04 Tax Advances.**

    (a) Subject to any restrictions in any of the Company's and/or any Company Subsidiary's then applicable debt-financing arrangements to retain any other amounts necessary to satisfy the Company's and/or the Company Subsidiaries' obligations and subject to the Company having sufficient Distributable Cash at least five (5) days before each date prescribed by the Code for a calendar-year corporation to pay quarterly installments of estimated tax, the Company shall Distribute cash to each Member in proportion to and to the extent of such Member's Quarterly Estimated Tax Amount for the applicable calendar quarter (each such Distribution, a "**Tax Advance**").

    (b) If, at any time after the final Quarterly Estimated Tax Amount has been Distributed pursuant to **Section 7.04(a)** with respect to any Fiscal Year, the aggregate amount of Tax Advances to any Member with respect to such Fiscal Year are less than such Member's Tax Amount for such Fiscal Year (a "**Shortfall Amount**"), the Company shall Distribute cash in proportion to and to the extent of each Member's Shortfall Amount.  The Company shall Distribute Shortfall Amounts with respect to a Fiscal Year before the 75th day of the next succeeding Fiscal Year; *provided*, that if the Company has made Distributions during such Fiscal Year other than pursuant to this **Section 7.04**, the Manager shall apply such Distributions to reduce any Shortfall Amount.

    (c) If the aggregate Tax Advances made to any Member pursuant to this **Section 7.04** for any Fiscal Year exceed such Member's Tax Amount (an "**Excess Amount**"), such Excess Amount shall reduce subsequent Tax Advances that would be made to such Member pursuant to this **Section 7.04**.

    (d) Any Distributions made pursuant to this **Section 7.04** with respect to Adjusted Taxable Income on account of amounts distributable pursuant to **Sections 7.02(a), (c), (e)** or **(g)** shall be treated for purposes of this Agreement as advances on Distributions pursuant to such Sections (and such Sections only) and shall reduce, dollar-for-dollar, the amount otherwise Distributable to such Member pursuant to such Sections.

(e)    Notwithstanding anything to the contrary herein, no Tax Advance will be required to be made with respect to items arising with respect to any Covered Transaction, although any unpaid Tax Advance with respect to any taxable period, or portion thereof, ending before a Covered Transaction shall continue to be required to be paid prior to any Distributions being made under **Section 7.02**.

   **Section 7.05    Tax Withholding; Withholding Advances.**

   (a)    **Tax Withholding.** If requested by the Manager, each Member shall, if able to do so, deliver to the Manager:

      (i)    an affidavit in form satisfactory to the Manager that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other Applicable Law;

      (ii)    any certificate that the Manager may reasonably request with respect to any such laws; and/or

      (iii)    any other form or instrument reasonably requested by the Manager relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Manager the affidavit described in **Section 7.05(a)(i)**, the Manager may withhold amounts from such Member in accordance with **Section 7.05(b)**.

   (b)    **Withholding Advances.** The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Member) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any Distribution or allocation by the Company of income or gain to such Member and to withhold the same from Distributions to such Member. In the event that the distributions or proceeds to the Company or any Company Subsidiary are reduced on account of taxes withheld at the source or any taxes are otherwise required to be paid by the Company and such taxes are imposed on or with respect to one or more, but not all of the Members in the Company, the amount of the reduction shall be borne by the relevant Members and treated as if it were paid by the Company as a Withholding Advance with respect to such Members. Taxes imposed on the Company where the rate of tax varies depending on characteristics of the Members shall be treated as taxes imposed on or with respect to the Members for purposes of the preceding sentence. Any funds withheld from a Distribution by reason of this **Section 7.05(b)** shall nonetheless be deemed Distributed to the Member in question for all purposes under this Agreement and, at the option of the Manager, shall be charged against the Member's Capital Account.

   (c)    **Repayment of Withholding Advances.** Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a Distribution to that Member shall, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in the *Wall Street Journal* on the date of payment plus two percent (2.0%) per annum:

(i)      be promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Manager shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii)      with the consent of the Manager, be repaid by reducing the amount of the next succeeding Distribution or Distributions to be made to such Member (which reduction amount shall be deemed to have been Distributed to the Member, but which shall not further reduce the Member's Capital Account if the Manager shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d)      **Imputed Underpayment**.  Any "imputed underpayment" within the meaning of Code Section 6225 paid (or payable) by the Company as a result of an adjustment with respect to any Company item, including any interest or penalties with respect to any such adjustment (collectively, an "**Imputed Underpayment Amount**"), shall be treated as if it were paid by the Company as a Withholding Advance with respect to the appropriate Members.  The Manager shall reasonably determine the portion of an Imputed Underpayment Amount attributable to each Member or former Member.   The portion of the Imputed Underpayment Amount that the Manager attribute to a Member shall be treated as a Withholding Advance with respect to such Member.  The portion of the Imputed Underpayment Amount that the Manager attributes to a former Member shall be treated as a Withholding Advance with respect to both such former Member and such former Member's transferee(s) or assignee(s), as applicable, and the Manager may in its discretion exercise the Company's rights pursuant to this Section in respect of either or both of the former Member and its transferee or assignee.  Imputed Underpayment Amounts treated as a Withholding Advance also shall include any imputed underpayment within the meaning of Code Section 6225 paid (or payable) by any entity treated as a partnership for U.S. federal income tax purposes in which the Company holds (or has held) a  direct or indirect interest other than through entities treated as corporations for U.S. federal income tax purposes to the extent that the Company bears the economic burden of such amounts, whether by law or agreement.

(e)      **Indemnification.** Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the Company's failure to deduct and withhold tax on amounts Distributable or allocable to such Member.  The provisions of this **Section 7.05(e)** and the obligations of a Member pursuant to **Section 7.05(e)** shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units.  The Company may pursue and enforce all rights and remedies it may have against each Member under this **Section 7.05(e)**, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(f)    **Overwithholding.** Neither the Company nor the Manager shall be liable for any excess taxes withheld in respect of any Distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

### Section 7.06    Distributions in Kind.

(a)    The Manager is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company; *provided*, that Tax Advances shall only be made in cash. In any non-cash Distribution, the securities or property so Distributed will be Distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be Distributed among the Members pursuant to **Section 7.02**.

(b)    Any Distribution of securities shall be subject to such conditions and restrictions as the Manager determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Manager may require that the Members execute and deliver such documents as the Manager may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the Distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

### Section 7.07    Cancellation of Certain Preferred Units.

(a)    At such time as the Class A Preferred Unreturned Capital Value is equal to zero, the Class A Preferred Units shall automatically, and with no further action by any Member, the Company or the Manager, be deemed cancelled.

(b)    At such time as the Class C Preferred Unreturned Capital Value is equal to zero, the Class C Preferred Units shall automatically, and with no further action by any Member, the Company or the Manager, be deemed cancelled.

(c)    A certain number of Class C Preferred Units shall automatically, and with no further action by the Member, the Company or the Manager, be deemed cancelled in accordance with and pursuant to Section 7.05(c) of the Purchase Agreement.

### ARTICLE VIII
#### MANAGEMENT

### Section 8.01    The Manager.

(a)    The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Manager, and the Manager shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement; *provided*, *however*, that the Company shall not engage in transactions with an

34

Affiliate of a holder of Class B Preferred Units other than on arms-length terms without the prior written consent of the holders of a majority of the Class A Preferred Units (other than the those Class A Preferred Units held by Senior Health Insurance Company of Pennsylvania), the holders of a majority of Class C Preferred Units, and Senior Health Insurance Company of Pennsylvania (as long as it holds Class A Preferred Units).   Notwithstanding the foregoing proviso, all Members hereby consent to entering into a consulting services agreement in substantially the form attached hereto as Exhibit B.  In addition, without the prior written consent of the holders of a majority of the Class A Preferred Units, the Company shall not:

         (i)     effect a dissolution, liquidation or winding up of the Company, or make any filing for or in connection with a proceeding in bankruptcy (or the out-of-court contractual equivalent thereof);

         (ii)    issue or obligate itself to issue any New Securities unless the same ranks junior to the Class A Preferred Units with respect to Distributions; or

         (iii)   purchase or redeem Class B Preferred Units.

    (b)    The Manager shall be the "manager" of the Company as provided in the Delaware Act.  The Manager, in the performance of its duties as such, shall not owe to the Company or the Members any fiduciary duties.  The "**Manager**" shall initially be BAM Management Services, LLC, who shall hold such office until it resigns or is removed by a vote of the holders of a majority of the Voting Units, and its successor has been designated by a vote of the holders of a majority of the Voting Units.  The Manager may resign at any time by delivering its resignation to the Company, which resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event.

    **Section 8.02   Officers.**  The Manager may appoint individuals as officers of the Company (the "**Officers**") as it deems necessary or desirable to carry on the business of the Company and the Manager may delegate to such Officers such power and authority as the Manager deems advisable.  No Officer need be a Member.  Any individual may hold two (2) or more offices of the Company.  Each Officer shall hold office until his or her successor is designated by the Manager or until his or her earlier death, resignation or removal.  Any Officer may resign at any time upon written notice to the Manager.  Any Officer may be removed by the Manager with or without cause at any time.  A vacancy in any office occurring because of death, resignation, removal or otherwise, may, but need not, be filled by the Manager.

    **Section 8.03   No Personal Liability.** Except as otherwise provided in the Delaware Act, by Applicable Law or expressly in this Agreement, neither the Manager nor any Officer will be obligated personally for any debt, obligation or liability of the Company or of any Company Subsidiaries, whether arising in contract, tort or otherwise, solely by reason of being an Officer or the Manager.

<div align="center">

**ARTICLE IX**
**TRANSFERS AND PRE-EMPTIVE RIGHTS**

</div>

    **Section 9.01   General Restrictions on Transfer.**

(a)     Each Member acknowledges and agrees that, until the consummation of a Qualified Public Offering, such Member (or any Permitted Transferee of such Member) shall not, without the consent of the Manager (which consent shall not be unreasonably withheld), Transfer any Units or Unit Equivalents except as permitted pursuant to **Section 9.02** or in accordance with the procedures described in **Section 9.02** through **Section 9.07**, as applicable.

(b)     Any Transfer or attempted Transfer of any Units or Unit Equivalents in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the owner of such Units or Unit Equivalents for all purposes of this Agreement.

**Section 9.02   Permitted Transfers.** The provisions of **Section 9.01(a)**, **Section 9.03** (with respect to the Dragging Member only) and **Section 9.07** shall not apply to any of the following Transfers by any Member of any of its Units or Unit Equivalents:

(a)     With respect to any Member, to (i) an Affiliate of such Member; (ii) a trust under which the distribution of Units may be made only to such Member and/or any such Member's spouse, parent, siblings, descendants (including adoptive relationships and stepchildren) and the spouses of each such natural persons (collectively, "**Family Members**"), *provided*, that the trustee of any such trust is at all times the Member or a trustee reasonably acceptable to the Manager; (iii) a charitable remainder trust, the income from which will be paid to such Member during his or her life, *provided*, that the trustee of any such trust is at all times the Member or a successor trustee acceptable to the Manager, (iv) a corporation, partnership or limited liability company, the stockholders, partners or members of which are only such Member and/or Family Members of such Member, *provided*, that the Member or a successor acceptable to the Manager at all times controls any such corporation, partnership or limited liability company, or (v) by will or by the laws of intestate succession, to such Member's executors, administrators, testamentary trustees, legatees or beneficiaries; *provided*, that any Member who Transfers Units shall remain bound by the provisions of **Section 10.01**;

(b)     Pursuant to a Public Offering; or

(c)     With respect to PGS, to Starfish Capital, Inc.

Any Imputed Underpayment Amount that is properly allocable to an assignor of an interest, as reasonably determined by the Manager, shall be treated as a Withholding Payment with respect to the applicable assignee in accordance with **Section 7.05**.  Furthermore, as a condition to any assignment, each assignor shall be required to agree (i) to continue to comply with the provisions of **Section 11.02(a)** notwithstanding such assignment and (ii) to indemnify and hold harmless the Company and the Manager from and against any and all liability with respect to the assignee's Withholding Payments resulting from Imputed Underpayment Amounts attributable to the assignor to the extent that the assignee fails to do so.

**Section 9.03   Drag-along Rights.**

(a)     **Participation.** At any time prior to the consummation of a Qualified Public Offering, if the holders of at least a majority of the Class B Preferred Units (for the purposes of this **Section 9.03**, the "**Dragging Member**") propose to consummate, in one transaction or a series of related transactions, a Change of Control (a "**Drag-along Sale**"), the Dragging Member may, after delivering the Drag-along Notice in accordance with **Section 9.03(b)**, require that each other Member (each, a "**Drag-along Member**") participate in such sale (including, if necessary, by converting their Unit Equivalents into the Units to be sold in the Drag-along Sale) in accordance with **Section 9.03(b)**.  The Distribution of the aggregate consideration of such transaction shall be made in accordance with **Section 12.03(c)**.

(b)     **Procedures.** The Dragging Member shall exercise its rights pursuant to this **Section 9.03** by delivering a written notice (the "**Drag-along Notice**") to the Company and each Drag-along Member no later than five (5) Business Days prior to the anticipated closing date of such Drag-along Sale.  The Drag-along Notice shall make reference to the Dragging Member's rights and obligations hereunder and shall describe in reasonable detail the person or entity to whom such Units are proposed to be sold, the number of each class or series of Units to be sold by the Dragging Member, the proposed amount of consideration for the Drag-along Sale and the other material terms and conditions of the Drag-along Sale.  Each Drag-along Member shall execute the purchase agreement, if applicable, and make or provide the same representations, warranties, covenants, indemnities and agreements as the Dragging Member makes or provides in connection with the Drag-along Sale; *provided*, that each Drag-along Member shall only be obligated to make individual representations and warranties with respect to its title to and ownership of the applicable Units, authorization, execution and delivery of relevant documents, enforceability of such documents against the Drag-along Member, and other matters relating to such Drag-along Member and any Drag-along Member's liability relating to representations, warranties and covenants (and related indemnities) and other indemnification obligations related to the Company in connection with such Drag-along Sale, shall be several and pro rata and shall not be more than the consideration actually received by such Drag-along Member in such Sale. Each Drag-along Member shall pay its pro-rata share of any costs of the transaction that are not otherwise paid by the Company, and costs incurred by any Drag-along Member on such Drag-along Member's own behalf are not treated as costs of the transaction.  Each Drag-along Member who is required to participate in a Drag-along Sale must, with respect to any such Drag-along Sale: (i) subject to the foregoing provisions of this **Section 9.03**, cooperate fully with the transaction and take all steps reasonably requested by the Dragging Member to effect the transaction,  including, without limitation, entering into agreements and delivering certificates and instruments, in each case, consistent with the agreements being entered into and the certificates being delivered by the Dragging Member (*provided*, that no Drag-along Member shall have any obligation to agree to any restrictive covenant in connection with any such sale); (ii) consent to and vote in favor of the transaction; and (iii) not exercise any applicable dissenter's, appraisal or like rights with respect to the transaction.

Section 9.04   Purchase Right.

(a)     **Purchase Right.**

(i)     Following the termination of employment or other engagement of any Service Provider with the Company or any Company Subsidiary for any reason, the Company

37

may, within the later of 180 days after the Company becomes aware of any breach by such terminated Service Provider of any covenant in **Article X** herein or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the Company Subsidiaries, but shall not be obligated to, elect to purchase any and all Incentive Units owned by such Service Provider at the following purchase price: (x) in the event of a termination other than a termination for Cause, if such Service Provider has not, prior to the time of any purchase, breached any covenant in **Article X** herein or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the Company Subsidiaries, at a purchase price equal to Fair Market Value; (y) in the event of a termination other than a termination for Cause, if such Service Provider breaches, prior to the time of any purchase, any covenant in **Article X** herein or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the Company Subsidiaries, at a purchase price equal to zero; or (z) in the event of a termination for Cause, at a purchase price equal to zero.

(ii)     Following the termination of employment or other engagement of any Service Provider with the Company or any Company Subsidiary for any reason, if any such Service Provider later provides any services for any competitor of the Company (whether as an employee, contractor, consultant, director, officer or otherwise), the Company may, at any time, elect to purchase any and all Incentive Units (including Incentive Units not previously purchased) owned by such Service Provider at a purchase price equal to Fair Market Value.

(b)     **Procedures.**

(i)     If the Company desires to exercise its right to purchase Units granted to a Service Provider pursuant to this **Section 9.04**, the Company shall deliver to the Service Provider, as applicable, a written notice (the "**Purchase Notice**") within the aforementioned time period set forth in **Section 9.04(a)** specifying the number of Units to be purchased by the Company (the "**Purchased Units**") and the purchase price therefor in accordance with **Section 9.04(a)**.

(ii)     Such Service Provider shall, at the closing of any purchase consummated pursuant to this **Section 9.04**, represent and warrant to the Company that:

(A)     such Service Provider has full right, title and interest in and to the Purchased Units;

(B)     such Service Provider has all the necessary power and authority and has taken all necessary action to sell such Purchased Units as contemplated by this **Section 9.04**; and

(C)     the Purchased Units are free and clear of any and all liens other than those arising as a result of or under the terms of this Agreement.

38

(iii)    Subject to **Section 9.04(b)(iv)**, the closing of any sale of Purchased Units pursuant to this **Section 9.04** shall take place no later than thirty (30) days following receipt by the Service Provider of the Purchase Notice. Subject to **Section 9.04(b)(iv)**, the purchase price for the Purchased Units shall be paid on the fifth (5) Business Day following expiration of all covenants with an expiration date which are applicable to such Service Provider in **Article X** herein or under any effective Award Agreement, employment agreement or any written non-disclosure, non-competition, or non-solicitation covenant or agreement with the Company or any of the Company Subsidiaries.

(iv)    To the extent that the payment of the purchase price for the Purchased Units at the time of such closing in **Section 9.04(b)(iii)** is not permitted by any credit facility or similar arrangement of the Company or any of its Affiliates or Subsidiaries, the Company may pay such purchase price in installments, with simple interest accruing on the unpaid amount of such purchase price at 3% per annum, over a period of up to five (5) years after such closing.

(c)    **Cooperation.** The Service Provider shall take all actions as may be reasonably necessary to consummate the sale contemplated by this **Section 9.04**, including, without limitation, entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

(d)    **Closing.** At the closing of any sale and purchase pursuant to this **Section 9.04**, the Service Provider, as applicable, shall deliver to the Company a certificate or certificates representing the Incentive Units to be sold (if any), accompanied by evidence of transfer and payment of all necessary transfer taxes.

### Section 9.05   Class A Preferred Unit Redemption.

(a)    Subject to the terms and conditions set forth in this **Section 9.05**, at any time after the fifteenth (15) year anniversary of this Agreement:

(i)    the Company shall have the right to redeem all, or any portion, of the Class A Preferred Units held by any holder of Class A Preferred Units for a per Unit redemption price equal (A) to the sum of the Class A Preferred Unreturned Capital Value plus the any unpaid Class A Preferred Return calculated as of date of redemption, divided by (B) the number of outstanding Class A Preferred Units, payable in cash (a "**Company Class A Redemption**"); and

(ii)    each holder of Class A Preferred Units shall have the right to elect to cause the Company to redeem all, or any portion, of the Class A Preferred Units held by such Member for a per Unit redemption price equal to (A) the sum of the Class A Preferred Unreturned Capital Value plus the any unpaid Class A Preferred Return calculated as of date of redemption, which sum is divided by (B) the number of outstanding Class A Preferred Units, payable in cash (a "**Member Class A Redemption**").

(b)    In the event that the Company wishes to exercise its redemption rights set forth in **Section 9.05(a)(i)**, the Company shall provide written notice (a "**Company Class A Redemption Notice**") of such election to the applicable holder of Class A Preferred Units. The Company Class A Redemption Notice shall specify the effective date of the redemption;

DB1/ 87817619.15

*provided* that, unless consented to by such holder in writing, the effective date of the redemption shall be no earlier than thirty (30) days and no later than ninety (90) days after the delivery of the Company Class A Redemption Notice.

(c)      In the event that a holder of Class A Preferred Units wishes to excise its redemption rights set forth in Section **9.05(a)(ii)**, such holder of Class A Preferred Units shall provide written notice of such election (a "**Member Class A Redemption Notice**") to the Company.  A Member Class A Redemption Notice shall specify the effective date of the redemption; *provided* that, unless consented to by the Company in writing, the effective date of the redemption shall be no earlier than thirty (30) days and no later than ninety (90) days after the delivery of a Member Class A Redemption Notice.

(d)      If on the date of any redemption, the Act or other Applicable Law, credit facility or similar arrangement of the Company or any of its Affiliates or Subsidiaries prevents the Company from redeeming, or the Company does not have sufficient assets to redeem, in each case, all Class A Preferred Units required hereunder to be redeemed on such date, (i) the Company shall redeem the maximum number of Class A Preferred Units that it may redeem consistent with, as applicable, the Act, other Applicable Law or as the Company's assets permit, and shall redeem the remaining Class A Preferred Units (in one or a series of transactions), as soon as it may lawfully do so under the Act, other Applicable Law and/or as soon as the Company has sufficient assets, as applicable, (ii) any such partial redemptions shall be among the Members holding Class A Preferred Units based on the Preferred Percentage of such Members, and (iii) the holders of the Class A Preferred Units being redeemed shall continue to be considered to be the holder of such Class A Preferred Units and shall have all rights (including the right to receive the Preferred Return) associated with such Class A Preferred Units (regardless of whether such holder continues to have satisfied any threshold ownership requirements as a result of partial redemptions as long as such holder satisfied such rights at the time the redemption was exercised) until such time as such Class A Preferred Units are redeemed in full.

**Section 9.06   Class C Preferred Unit Redemption.**

(a)      Subject to the terms and conditions set forth in this **Section 9.06**, the Company shall have the right at any time to redeem all, or any portion, of the outstanding Class C Preferred Units held by any holder of Class C Preferred Units for a per Unit redemption price equal to (A) the sum of the Class C Preferred Unreturned Capital Value plus the any unpaid Class C Preferred Return calculated as of date of redemption, which sum is divided by (B) the number of outstanding Class C Preferred Units, payable:

(i)      with respect to the Class C Preferred Units held by PGS, in the case of a redemption of Class C Units pursuant to a Class C Redemption Notice delivered by the Company on or prior to October 31, 2016, in the form of PGS Value, with the remainder to be paid in cash; or

(ii)      in all other cases, in cash.

(b)      In the event that the Company wishes to exercise its redemption rights set forth in **Section 9.06(a)**, the Company shall provide written notice (a "**Class C Redemption**

**Notice**") of such election to the applicable holder of Class C Preferred Units.  The Class C Redemption Notice shall specify the effective date of the redemption.  The effective date of the redemption shall be no later than ninety (90) days after the delivery of a Class C Redemption Notice.

(c)     Subject to the terms and conditions set forth in this **Section 9.06**, PGS may send a written notice to the Company on October 31, 2016, requesting that the Company redeem a certain number of Class C Preferred Units held by PGS with a value equal to, and in exchange for as consideration, the PGS Value (the "**PGS Redemption Notice**").  If, upon receipt of a duly delivered PGS Redemption Notice, the Company determines in good faith that such redemption in exchange for PGS Value complies with Applicable Laws and does not conflict with or violate any restrictions or limitations on such use or Transfer of PGS Value, the Company shall use commercially reasonable efforts to effect such redemption no later than ninety (90) days after the delivery of the PGS Redemption Notice.

(d)     If on the date of any redemption, the Act or other Applicable Law, credit facility or similar arrangement of the Company or any of its Affiliates or Subsidiaries prevents the Company from redeeming, or the Company does not have sufficient assets to redeem, in each case, all Class C Preferred Units required hereunder to be redeemed on such date, (i) the Company shall redeem the maximum number of Class C Preferred Units that it may redeem consistent with, as applicable, the Act, other Applicable Law or as the Company's assets permit, and shall redeem the remaining Class C Preferred Units (in one or a series of transactions), as soon as it may lawfully do so under the Act, other Applicable Law and/or as soon as the Company has sufficient assets, as applicable, (ii) any such partial redemptions shall be among the Members holding Class C Preferred Units based on the Preferred Percentage of such Members, and (iii) the holders of the Class C Preferred Units being redeemed shall continue to be considered to be the holder of such Class C Preferred Units and shall have all rights (including the right to receive the Preferred Return) associated with such Class C Preferred Units (regardless of whether such holder continues to have satisfied any threshold ownership requirements as a result of partial redemptions as long as such holder satisfied such rights at the time the redemption was exercised) until such time as such Class C Preferred Units are redeemed in full.

**Section 9.07   Tag-along Right.**

(a)     If at any time prior to a Qualified Public Offering, a holder of Class B Preferred Units proposes to Transfer any portion of such holders' Class B Preferred Units other than in connection with **Section 9.02** and does not elect to exercise the drag-along right in accordance with **Section 9.03** (if applicable), then such holder of Class B Preferred Units shall send written notice to Beechwood Re Investments LLC which shall state (i) that such holder of Class B Preferred Units desires to make such a Transfer, (ii) the identity of the proposed transferee and the number of Units proposed to be sold or otherwise transferred, (iii) the proposed purchase price per Unit to be paid and the other terms and conditions of such Transfer, and (iv) the projected closing date of such Transfer.

(b)     For a period of ten (10) days after the giving of the notice pursuant to clause (a) above, the Beechwood Re Investments LLC shall have the right to sell to the proposed transferee

in such Transfer at a price and upon the same terms and conditions as the holder of Class B Preferred Units a percentage of the total number of Units proposed to be Transferred to such proposed transferee equal to the percentage obtained by dividing (x) the number of Common Units then held by Beechwood Re Investments LLC by (y) the sum of the total number of Class B Preferred Units then outstanding, the total number of Common Units then Outstanding and the total number of Incentive Units then outstanding.

(c)    The rights of Beechwood Re Investments LLC under **Section 9.07(b)** shall be exercisable by delivering written notice thereof, prior to the expiration of the 10-day period referred to in clause (b) above, to the applicable holder of Class B Preferred Units with a copy to the Company.  The failure of any Beechwood Re Investments LLC to respond within such period to the holder of Class B Preferred Units shall be deemed to be a waiver of Beechwood Re Investments LLC rights under this **Section 9.07** with respect to that Transfer, so long as such Transfer takes place within a period of one hundred and twenty (120) days following the expiration of the 10-day period.

**Section 9.08   Pre-emptive Right.**

(a)    **Issuance of New Securities.** The Company hereby grants to each Pre-emptive Member **t**he right to purchase New Securities that the Company may from time to time propose to issue or sell to any party between the date hereof and the consummation of a Qualified Public Offering.

(b)    **Additional Issuance Notices.** The Company shall give written notice (an "**Issuance Notice**") of any proposed issuance or sale described in **Section 9.08(a)** to the Pre-emptive Members promptly following the date on which any such issuance or sale is approved. The Issuance Notice shall, if applicable, be accompanied by a written offer from, or summary of terms submitted to, any prospective purchaser seeking to purchase New Securities (a "**Prospective Purchaser**") and shall set forth the material terms and conditions of the proposed issuance or sale, including:

(i)    the number and description of the New Securities proposed to be issued;

(ii)    the proposed issuance date, which shall be at least fifteen (15) days from the date of the Issuance Notice;

(iii)    the proposed purchase price per unit of the New Securities; and

(iv)    if the consideration to be paid by the Prospective Purchaser includes non-cash consideration, the Manager's good-faith determination of the Fair Market Value thereof.

(c)    **Exercise of Pre-emptive Rights.** Each Pre-emptive Member shall for a period of ten (10) days following the receipt of an Issuance Notice (the "**Exercise Period**") have the right to elect irrevocably to purchase all or any portion of its Pre-emptive Pro Rata Portion of any New Securities, as applicable, at the respective purchase prices set forth in the Issuance Notice by delivering a written notice to the Company (an "**Acceptance Notice**") specifying the number of New Securities it desires to purchase.  The delivery of an Acceptance Notice by a Pre-emptive

Member shall be a binding and irrevocable offer by such Member to purchase the New Securities described therein.  The failure of a Pre-emptive Member to deliver an Acceptance Notice by the end of the Exercise Period shall constitute a waiver of its rights under this **Section 9.08** with respect to the purchase of such New Securities, but shall not affect its rights with respect to any future issuances or sales of New Securities.

(d)  **Sales to the Prospective Purchaser.**  Following the expiration of the Exercise Period, the Company shall be free to complete the proposed issuance or sale of New Securities described in the Issuance Notice with respect to which Pre-emptive Members declined to exercise the pre-emptive right set forth in this **Section 9.08** on terms no less favorable to the Company than those set forth in the Issuance Notice (except that the amount of New Securities to be issued or sold by the Company may be reduced); *provided*, that: (i) such issuance or sale is closed within sixty (60) days after the expiration of the Exercise Period(subject to the extension of such sixty(60) day period for a reasonable time not to exceed thirty (30) days to the extent reasonably necessary to obtain any third-party approvals); and (ii) for the avoidance of doubt, the price at which the New Securities are sold to the Prospective Purchaser is at least equal to or higher than the purchase price described in the Issuance Notice.  In the event the Company has not sold such New Securities within such time period, the Company shall not thereafter issue or sell any New Securities without first again complying with the procedures set forth in this **Section 9.08**.

(e)  **Closing of the Issuance.** The closing of any purchase by any Pre-emptive Member shall be consummated concurrently with the consummation of the issuance or sale described in the Issuance Notice. Upon the issuance or sale of any New Securities in accordance with this **Section 9.08**, the Company shall deliver the New Securities free and clear of any liens (other than those arising hereunder and those attributable to the actions of the purchasers thereof), and the Company shall so represent and warrant to the purchasers thereof, and further represent and warrant to such purchasers that such New Securities shall be, upon issuance thereof to the Exercising Members and after payment therefor, duly authorized, validly issued, fully paid and non-assessable. The Company, in the discretion of the Manager pursuant to **Section 3.06(a)**, may deliver to each Exercising Member certificates evidencing the New Securities.  Each Exercising Member shall deliver to the Company the purchase price for the New Securities purchased by it by certified or bank check or wire transfer of immediately available funds.  Each party to the purchase and sale of New Securities shall take all such other actions as may be reasonably necessary to consummate the purchase and sale including, without limitation, entering into such additional agreements as may be necessary or appropriate.

(f)  **Timing of Pre-Emptive Right.** The Pre-emptive Members hereby acknowledge and agree that the Company, due to timing constraints, confidentiality considerations, or other reasons, may request that one or more third party purchasers acquire securities in advance of complying with the requirements of this **Section 9.08**, and each Pre-emptive Member consents to such issuance; *provided* that, as promptly as practicable thereafter, but in no event later than thirty (30) days following such acquisition, the Company complies with the requirements of this **Section 9.08** with respect thereto.  Failure by a Pre-emptive Member to exercise such Pre-emptive Member's option to purchase New Securities with respect to any offering, sale and issuance shall not effect such Pre-emptive Member's option to purchase New Securities in any subsequent offering, sale and purchase.

43

**Section 9.09  Rights with Respect to Blockers.**   Notwithstanding anything in this Agreement to contrary, in addition to any other rights in connection with (a) a Dissolution Event, (b) an Initial Public Offering or (c) any other sale, transfer, exchange, redemption, contribution, merger, consolidation, disposition or similar transaction involving Membership Interests or assets of the Company or a Company  Subsidiary (each of the transactions described in clauses (a) through (c), a "**Covered Transaction**"), the Company and the Members shall negotiate such transaction so as to include a right on the part of the Blocker Equityholders to dispose of their securities in the Blockers in the Covered Transaction on terms and conditions not less favorable to the Blocker Equityholders than the terms of the Covered Transaction that would have applied to the Blockers' disposition of their Units or a sale of assets by the Company followed by a distribution of proceeds to the Members, as applicable, for a price equal to the amount that the Blockers would otherwise have received in the Covered Transaction.   For the avoidance of doubt, this Section is intended to provide the Blocker Equityholders with any benefits the Blockers would have received (ratably reduced only by the net reduction in tax benefits deliverable by all Members in the aggregate as a result of the transfer of securities of the Blocker) under any so-called "tax receivables agreement" in connection with any public offering if the Blocker Equityholders had participated themselves in such transaction with respect to its interest in the Company.   Any Covered Transaction that is an Initial Public Offering will be structured as a tax-free transaction under Code Section 351 or 368, as applicable.

## ARTICLE X
### COVENANTS

**Section 10.01 Confidentiality.**

(a)    Each Member acknowledges that during the term of this Agreement, such Member will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company and the Company Subsidiaries that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Member acknowledges that: (i) the Company and the Company Subsidiaries have invested, and continue to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company and the Company Subsidiaries with a competitive advantage over others in the marketplace; and (iii) the Company and the Company Subsidiaries would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing their investment in the Company or performing their duties as a Manager, Officer, employee, consultant or other service provider of the Company and/or the Company Subsidiaries) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, either during their association or

44

employment with the Company and/or the Company Subsidiaries or thereafter, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

(b)      Nothing contained in **Section 10.01(a)** shall prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to other Members; (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this **Section 10.01** as if a Member; or (vii) to any potential Permitted Transferee in connection with a proposed Transfer of Units from such Member, as long as such Transferee agrees to be bound by the provisions of this **Section 10.01** as if a Member or (viii) with respect to any Member that is an Affiliate of a private equity fund, to its Affiliates' current and potential investors in the ordinary course of their private equity business; *provided*, that in the case of clause (i), (ii) or (iii), such Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available; and *provided, further*, that in the case of clause (viii) the Manager shall be entitled to review any such disclosure relating to the Company prior to its publication and the Manager's comments with respect to any such disclosure that would be competitively harmful to the Company shall be considered in good faith by the disclosing party.

(c)      The restrictions of **Section 10.01(a)** shall not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or becomes available to a Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Member and any of its Representatives in compliance with this Agreement; (iii) is or has been independently developed or conceived by such Member without use of Confidential Information; or (iv) becomes available to the receiving Member or any of its Representatives on a non-confidential basis from a source other than the Company, any other Member or any of their respective Representatives; *provided*, that such source is not known by the recipient of the Confidential Information to be bound by a confidentiality agreement with the disclosing Member or any of its Representatives.

**Section 10.02 Registration Rights**.  In anticipation of an Initial Public Offering, the Manager, the holders of a majority of the Class A Preferred Units (other than those Class A Preferred Units held by Senior Heath Insurance Company of Pennsylvania), the holders of a majority of the Class B Preferred Units or the holders of a majority of the Class C Preferred Units, or Senior Heath Insurance Company of Pennsylvania (as long as it holds Class A Preferred Units), may require the Company to enter into a customary "Registration Rights Agreement" with the Members, which agreement shall set forth the rights and obligations of the Members in connection with an Initial Public Offering or any other public offering, facilitate the

45

consummation of the Initial Public Offering in an orderly and efficient manner and contain customary piggyback registration rights for the holders of Preferred Units and Common Units (including cutback provisions).

## ARTICLE XI
### ACCOUNTING; TAX MATTERS

**Section 11.01 Inspection Rights; Information Rights.**

    (a)    The Company shall furnish to each Member the following reports:

        (A)    <u>Annual Financial Statements</u>.  As soon as practicable, but in any event within ninety (90) business days after the end of each fiscal year of the Company, a consolidated balance sheet of the Company and its Subsidiaries, if any, as of the end of such fiscal year and the related consolidated statements of income, stockholders' equity and cash flows for the fiscal year then ended, prepared in accordance with GAAP, together with an audit thereof by a firm of independent public accountants of nationally recognized standing selected by the Manager; and

        (B)    <u>Quarterly Financial Statements</u>.  As soon as practicable, but in any event within thirty (30) business days after the end of each fiscal quarter of the Company, a consolidated balance sheet of the Company and its Subsidiaries, if any, and the related consolidated statements of income, stockholders' equity and cash flows for the fiscal quarter then ended, unaudited but prepared in accordance with GAAP and certified by the chief financial officer of the Company, such consolidated balance sheet to be as of the end of such quarter and such consolidated statements of income, stockholders' equity and cash flows to be for such quarter and for the period from the beginning of the fiscal year to the end of such quarter, in each case with comparative statements for the prior fiscal year.

**Section 11.02 Tax Matters.**

    (a)    **Appointment.** The Members hereby appoint BBLN-Agera Corp. as the "**Tax Matters Member**" who shall serve as the "tax matters partner" (as such term is defined in Section 6231 of the Code) for the Company.

    (b)    **Procedural Compliance**.  Each Member hereby agrees (i) to take such actions as may be required to effect the designation of BBLN-Agera Corp. as the Tax Matters Member, (ii) to cooperate to provide any information or take such other actions as may be reasonably requested by the Tax Matters Member in order to determine whether any Imputed Underpayment Amount may be modified pursuant to Code Section 6225(c),  and (iii) to, upon the request of the

46

Tax Matters Member, file any amended U.S. federal income tax return and pay any tax due in connection with such tax return in accordance with Code Section 6225(c)(2).  A Member's obligation to comply with this Section shall survive the transfer, assignment or liquidation of such Member's interest in the Company.

(c)     **Tax Examinations and Audits.** (i) the Tax Matters Member is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith; (ii) each Member agrees to cooperate with the Tax Matters Member and to do or refrain from doing any or all things reasonably requested by the Tax Matters Member with respect to the conduct of examinations by Taxing Authorities and any resulting proceedings; and (iii) each Member agrees that any action taken by the Tax Matters Member in connection with audits of the Company shall be binding upon such Members and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company.

(d)     **Income Tax Elections.** The Tax Matters Member shall have discretion to make any income tax election it deems advisable on behalf of the Company. All determinations as to tax elections and accounting principles shall be made by the Tax Matters Member.

(e)     **Tax Returns and Tax Deficiencies.** Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. The Tax Matters Member shall have discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in **Section 7.05(d)**.

(f)     **Resignation.** The Tax Matters Member may resign at any time. If BBLN-Agera Corp. resigns as the Tax Maters Member, the holders of a majority of the Voting Units shall appoint a new Tax Matters Member.

(g)     **New Partnership Audit Rules**.  As and to the extent required by the New Partnership Audit Rules, the Tax Matters Member shall be the "partnership representative" (as defined in Section 6223(a) of the Code). Unless otherwise determined by the Manager, the Company shall not elect to apply the New Partnership Audit Rules prior to the effective date described in Section 6241(g)(1) of the Code.  The Manager, in its discretion, shall determine (A) whether or not the Company should make the election under Section 6221(b) of the Code with respect to determinations of adjustments at the Company level and (B) if the election described in clause (A) is not made or is not available, to the extent applicable, whether or not the Company should make the election under Section 6226(a) of the Code with respect to the alternative to payment of imputed underpayment by the Company and, in each such case if such election is made, the Company, the Manager and the partnership representative, as applicable, shall take any other action such as filings, disclosures and notifications necessary to effectuate such election.   Notwithstanding the foregoing, the Manager, the Company and the partnership

47

representative are each authorized, in its discretion, to make any available election related to Sections 6221 through 6241 of the Code and take any action it deems necessary or appropriate to comply with the requirements of the Code and conduct the Company's affairs under Sections 6221 through 6241 of the Code.  Each Member shall cooperate with the Company in order to make any election or to otherwise comply with the Partnership Audit Rules, including providing necessary information, documents and forms.

**Section 11.03 Tax Returns.**  At the expense of the Company, the Manager (or any Officer that it may designate pursuant to **Section 8.02**) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company and the Company Subsidiaries own property or do business. As soon as reasonably possible after the end of each Fiscal Year, and no later than May 31 of the next Fiscal Year with respect to such Fiscal Year, the Manager or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.  Upon request of the Majority Member, the Company will provide tax data in electronic form as reasonably requested by May 31.  For each Fiscal Year, the Company will provide each Person who was a Member at any time during such Fiscal Year with an estimate of the taxable income and state apportionments allocable to such Person on a periodic basis during such Fiscal Year, including (x) by the end of May of such Fiscal Year an estimate of taxable income and state apportionments as of that date, and (y) by the end of October of such year an estimate of taxable income and state apportionments as of that date.  The Company will use a "more-likely-than-not" standard when taking tax positions.

**Section 11.04 Company Funds.**  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Manager, in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Manager. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Manager may designate.

### ARTICLE XII
### DISSOLUTION AND LIQUIDATION

**Section 12.01 Events of Dissolution.**  The Company shall be dissolved and is affairs wound up only upon the occurrence of any of the following events (each, a "**Dissolution Event**"):

(a)     The determination of the Manager to dissolve the Company;

(b)     An election to dissolve the Company made by holders of a majority of the Voting Units;

DB1/ 87817619.15

(c)      The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(d)      The entry of a decree of judicial dissolution under § 18-802 of the Delaware Act.

**Section 12.02 Effectiveness of Dissolution.** Dissolution of the Company shall be effective on the day on which the event described in **Section 12.01** occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in **Section 12.03** and the Certificate of Formation shall have been cancelled as provided in **Section 12.04**.

**Section 12.03 Liquidation.** If the Company is dissolved pursuant to **Section 12.01**, the Company shall be liquidated and its business and affairs wound up in accordance with the Delaware Act and the following provisions:

(a)      **Liquidator.** The Manager, or, if the Manager is unable to do so, a Person selected by the holders of a majority of the Voting Units, shall act as liquidator to wind up the Company (the "**Liquidator**"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)      **Accounting.** As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c)      **Distribution of Proceeds.** The Liquidator shall liquidate the assets of the Company and Distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)      *first*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)      *second*, to the establishment of and additions to reserves that are determined by the Manager in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)      *third*, to the Members in the same manner as Distributions are made under **Section 7.02**.

(d)      **Discretion of Liquidator.** Notwithstanding the provisions of **Section 12.03(c)** that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in **Section 12.03(c)**, if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion,

Distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of **Section 12.03(c)**, undivided interests in such Company assets as the Liquidator deems not suitable for liquidation.   Any such Distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such Distribution, any property to be Distributed will be valued at its Fair Market Value.

**Section 12.04 Cancellation of Certificate.** Upon completion of the Distribution of the assets of the Company as provided in **Section 12.03(c)** hereof, the Company shall be terminated and the Liquidator shall cause the cancellation of the Certificate of Formation in the State of Delaware and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and shall take such other actions as may be necessary to terminate the Company.

**Section 12.05 Survival of Rights, Duties and Obligations.** Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination.  For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to **Section 13.03**.

**Section 12.06 Recourse for Claims.** Each Member shall look solely to the assets of the Company for all Distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Manager, the Liquidator or any other Member.

## ARTICLE XIII
### EXCULPATION AND INDEMNIFICATION

**Section 13.01 Exculpation of Covered Persons.**

(a)     **Covered Persons.** As used herein, the term "**Covered Person**" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates, and (iii) the Manager and each Officer, employee, agent or representative of the Company.

(b)     **Standard of Care.** No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c)     **Good Faith Reliance.** A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to

50

the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups: (i) one or more Officers or employees of the Company; (ii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iii) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in § 18-406 of the Delaware Act.

**Section 13.02  Liabilities of Covered Persons.**

(a)     This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

**Section 13.03  Indemnification.**

(a)     **Indemnification.** To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)     Any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii)     The fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any Company Subsidiary;

51

*provided*, that (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct; *provided, further*, that, unless the Manager otherwise determines, no Person shall be entitled to indemnification hereunder with respect to a proceeding initiated by such Person or with respect to a proceeding between such Person on the one hand and any of the Company or its Subsidiaries on the other.

(b)     **Reimbursement.** The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this **Section 13.03**; *provided*, that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this **Section 13.03**, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c)     **Entitlement to Indemnity.** The indemnification provided by this **Section 13.03** shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise.  The provisions of this **Section 13.03** shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this **Section 13.03** and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d)     **Insurance.** To the extent available on commercially reasonable terms, the Company may purchase and maintain, at its expense as determined by the Manager, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Manager may determine; *provided*, that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses. The Company hereby acknowledges that the Covered Persons may have certain rights to indemnification, advancement of expenses and/or insurance provided by a Member, or its Affiliates (excluding the Company and its Subsidiaries). The Company hereby agrees, on behalf of itself and its Subsidiaries, (i) that it is an indemnitor of first resort (i.e., its obligations to each

52

of the Covered Persons are primary and any obligation of a Member or its Affiliates to advance expenses or to provide indemnification for the same expenses or liabilities incurred by or on behalf of any of the Covered Persons is secondary); (ii) that it shall be required to advance the full amount of expenses incurred by or on behalf of each of the Covered Persons and shall be liable for the full amount of all Losses to the extent legally permitted and as required by the terms of this Agreement (or, to the extent applicable, the Delaware Act), without regard to any rights such Covered Persons may have against a Member or its Affiliates (including under director and officer insurance policies); and (iii) that it irrevocably waives, relinquishes and releases each Member and its Affiliates from any and all claims for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by a Member or its Affiliates on behalf of a Covered Persons with respect to any claim for which a Covered Person has sought indemnification from the Company or any Subsidiary of the Company shall affect the foregoing, and each Member shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of a Covered Person against the Company or any Subsidiary of the Company. The Company and each of the Covered Persons agree that each Member, and its Affiliates are express third-party beneficiaries of the terms of this **Section 13.03(d)**.

(e) **Funding of Indemnification Obligation.** Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this **Section 13.03** shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f) **Savings Clause.** If this **Section 13.03** or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this **Section 13.03** to the fullest extent permitted by any applicable portion of this **Section 13.03** that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g) **Amendment.** The provisions of this **Section 13.03** shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this **Section 13.03** is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.  No amendment, modification or repeal of this **Section 13.03** that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 13.04 Survival.** The provisions of this **Article XIII** shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XIV
### MISCELLANEOUS

**Section 14.01 Expenses.** Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section 14.02 Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 14.03 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 14.03**):

| If to the Company: | AGH Parent LLC |
| | c/0 B Asset Manager |
| | 1370 Avenue of the Americas |
| | 32nd Floor |
| | New York, NY 10019 |
| | Attention: Dhruv Narain |
| | Facsimile: 212.260.5051 |
| | E-Mail: dnarain@bassetmanager.com |
| | |
| with a copy to: | Morgan, Lewis & Bockius LLP |
| | 101 Park Avenue |
| | New York, NY  10178 |
| | Attention: Steven A. Navarro, Esq. |
| | Facsimile: 212.309.6001 |
| | E-mail: steven.navarro@morganlewis.com |

If to any Member, to such Member's respective mailing address as set forth on the Members Schedule.

54

**Section 14.04 Headings.** The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision of this Agreement.

**Section 14.05 Severability.** If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 14.06 Entire Agreement.**

(a)    This Agreement, together with the Certificate of Formation, the Incentive Plan, each Award Agreement, the Purchase Agreement and all related Exhibits and Schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

(b)    In the event of an inconsistency or conflict between the provisions of this Agreement and any provision of the Incentive Plan or an applicable Award Agreement with respect to the subject matter of the Incentive Plan or Award Agreement, the Manager shall resolve such conflict in its sole discretion.

**Section 14.07 Successors and Assigns.** Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

**Section 14.08 No Third-party Beneficiaries.** Except as provided in **Article XIII**, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 14.09 Amendment.**

(a)    No provision of this Agreement may be amended or modified except by a writing executed by the Manager; *provided,* that no amendment or modification that would materially and adversely affect holders of one class or series of Membership Interests without similarly and proportionately affecting holders of other classes or series of Membership Interests, shall be made without the prior written consent of holders of at least a majority of the Membership Interests of such class; for the avoidance of doubt, no such consent shall be required with respect

to amendments or modifications made solely to establish the terms of Incentive Units or new securities of the Company.

(b)     Any amendment in accordance with **Section 14.09(a)** shall be binding upon each Member and the Company.

(c)     Without limiting the generality of the foregoing, and for the avoidance of any doubt, the Manager may amend this Agreement without the consent of any Member (i) to reflect changes validly made in the Members and corresponding changes in the terms and provisions of this Agreement necessary to reflect or conform with any such change in the Members; (ii) to reflect changes permitted in accordance with this Agreement in the Capital Accounts or the Membership Interests of the Members; or (iii) to clarify any ambiguities herein or to appropriately adjust any mechanics or procedures set forth herein so long as the rights of the Members are not prejudiced (in more than an insignificant manner) thereby.

(d)     Anything in the foregoing provisions of this **Section 14.09** to the contrary notwithstanding, this Agreement may be amended from time to time in each and every manner deemed necessary or appropriate by the Manager to comply with the then existing requirements of the Code and the Treasury Regulations affecting the Company or any other provision of applicable law or regulation.

**Section 14.10 Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 14.11 Governing Law.** All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

**Section 14.12 Submission to Jurisdiction.** The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such

courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth in **Section 14.03** shall be effective service of process for any suit, action or other proceeding brought in any such court.

Section 14.13  **Waiver of Jury Trial.** Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

Section 14.14  **Equitable Remedies.** Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Section 14.15  **Remedies Cumulative.** The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in **Section 13.02** to the contrary.

Section 14.16  **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of Electronic Transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

Section 14.17  **Initial Public Offering.**

(a)      **Initial Public Offering.** If at any time the Manager desires to cause (i) a Transfer of all or a substantial portion of (x) the assets of the Company or (y) the Units to a newly organized corporation or other business entity (an "**IPO Entity**"); (ii) a merger or consolidation of the Company into or with a IPO Entity as provided under § 18-209 of the Delaware Act or otherwise; or (iii) another restructuring of all or substantially all the assets or Units of the Company into an IPO Entity, including by way of the conversion of the Company into a Delaware corporation as provided under § 18-216 of the Delaware Act (any such corporation also herein referred to as an "**IPO Entity**"), in any such case in anticipation of or otherwise in connection with an Initial Public Offering of securities of an IPO Entity or its Affiliate (an "**Initial Public Offering**"), each Member shall take such steps to effect such Transfer, merger,

57

consolidation, conversion or other restructuring as may be reasonably requested by the Manager, including, without limitation, executing and delivering all agreements, instruments and documents as may be reasonably required and Transferring or tendering such Member's Units to an IPO Entity in exchange for consideration for shares of capital stock or other equity interests of the IPO Entity, determined in accordance with the valuation procedures set forth in **Section 14.17(b)**.

(b) **Fair Market Value.** In connection with a transaction described in **Section 14.17(a)**, the Manager shall, in good faith but subject to the following sentence, determine the Fair Market Value of the assets and/or Transferred Units to, merged with or converted into shares of the IPO Entity, the aggregate Fair Market Value of the IPO Entity and the number of shares of capital stock or other equity interests to be issued to each Member in exchange for consideration therefore.  In determining Fair Market Value, (i) the offering price of the Initial Public Offering shall be used by the Manager to determine the Fair Market Value of the capital stock or other equity interests of the IPO Entity and (ii) the Fair Market Value of the Units shall be based upon a hypothetical orderly liquidation of the Company utilizing generally accepted valuation methodologies, including the assumption that the assets of the Company are a "going concern" at the time of such determination and shall not include any discounts for lack of marketability, minority ownership or otherwise. In addition, any Units (including Incentive Units) to be converted into or redeemed or exchanged for shares of the IPO Entity shall receive shares with substantially equivalent economic, governance, priority and other rights and privileges as in effect immediately prior to such transaction (disregarding the tax treatment of such transaction).

(c) **Appointment of Proxy.** Each Member hereby makes, constitutes and appoints the Company, with full power of substitution and resubstitution, its true and lawful attorney, for it and in its name, place and stead and for its use and benefit, to act as its proxy in respect of any vote or approval of Members required to give effect to this **Section 14.17**, including any vote or approval required under § 18-209 or § 18-216 of the Delaware Act. The proxy granted pursuant to this **Section 14.17(c)** is a special proxy coupled with an interest and is irrevocable.

(d) **Lock-up Agreement.** Each Member hereby agrees that in connection with an Initial Public Offering, and upon the request of the managing underwriter in such offering, such Member shall not, without the prior written consent of such managing underwriter, during the period commencing three days prior to the effective date of such registration and until the date specified by such managing underwriter (such period not to exceed 180 days in the case of an Initial Public Offering, and such lock-up period subject to automatic expiration in the event the Initial Public Offering has not been consummated by a date to be reasonably agreed upon between the Company and the managing underwriting), (i) offer, pledge, sell, contract to sell, grant any option or contract to purchase, purchase any option or contract to sell, hedge the beneficial ownership of or otherwise dispose of, directly or indirectly, any Units or Unit Equivalents (including any equity securities of the IPO Entity) (whether such Units or Unit Equivalents or any such securities are then owned by the Member or are thereafter acquired), or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Units or Unit Equivalents (including equity securities of the IPO Entity) or such other securities, in cash or otherwise. The

58

foregoing provisions of this **Section 14.17(d)** shall not apply to sales of securities to be included in such Initial Public Offering or other offering if otherwise permitted. Each Member agrees to execute and deliver such other agreements as may be reasonably requested by the Company or the managing underwriter which are consistent with the foregoing or which are necessary to give further effect thereto. The forgoing provisions of this **Section 14.17(d)** shall apply only to the Company's Initial Public Offering, shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall only be applicable to the Members if all executive officers, directors and greater than 5% stockholders of the Company enter into similar agreements.

[SIGNATURE PAGE FOLLOWS]

DB1/ 87817619.15

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**The Company:**

**AGH Parent LLC**

By: _____
Name:  Dhruv Narain
Title:  Authorized Signatory

[Signature Page to Amended and Restated Limited Liability Company Agreement of AGH Parent LLC]

The Members:

**SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA**

By: _____

Name: BRIAN C. WEGNER

Title: PRESIDENT & CEO

[Signature Page to Amended and Restated Limited Liability Company Agreement of AGH Parent LLC]

**BRE WNIC 2013 LTC PRIMARY**

Wilmington Trust, National Association
not in its individual capacity
but solely as Trustee

By: _____
Name:
Title:

David B. Young
Vice President

[Signature Page to Amended and Restated Limited Liability Company Agreement of AGH Parent LLC]

**BBLN-AGERA CORP.**

By: _____

Name:  Dhruv Narain

Title:  President

[Signature Page to Amended and Restated Limited Liability Company Agreement of AGH Parent LLC]

**BBIL ULICO 2014**

Wilmington Trust, National Association
not in its individual capacity
but solely as Trustee

By: _____
Name:
Title:
David B. Young
Vice President

**BHLN-AGERA CORP.**

By: _____
Name:  Dhruv Narain
Title:  President

[Signature Page to Amended and Restated Limited Liability Company Agreement of AGH Parent LLC]

**BOLN-AGERA CORP.**

By: _____

Name:  Dhruv Narain

Title:  President

**STARFISH HOLDINGS GROUP, INC.**

By: _____

Name: Kevin Cassidy

Title: President

PRINCIPAL GROWTH STRATEGIES,
LLC

By: _____
Name: David Slansky
Title: Authorized Signatory

**BEECHWOOD RE INVESTMENTS LLC**

By: _____
Name:  Samuel Adler
Title:  Authorized Signatory

[Signature Page to Amended and Restated Limited Liability Company Agreement of AGH Parent LLC]

## Members Schedule

| Members | Class A Preferred Units | Class B-1 Preferred Units | Class B-2 Preferred Units | Class C Preferred Units | Preferred Class A Unreturned Capital Value | Preferred Class B-1 Unreturned Capital Value | Preferred Class B-2 Unreturned Capital Value | Preferred Class C Unreturned Capital Value | Common Units | Incentive Units | Total Units |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Senior Health Insurance Company of Pennsylvania | 350,000 | | | | $35,000,000 | | | | | | 350,000 |
| BRe WNIC 2013 LTC Primary | | 31,178.89 | | | | $3,117,889.24 | | | | | 31,178.89 |
| BBLN-Agera Corp. | | 50,600 | | | | $5,060,000 | | | | | 50,600 |
| BBIL ULICO 2014 | | 75,900 | | | | $7,590,000 | | | | | 75,900 |
| BHLN-Agera Corp. | | 50,600 | | | | $5,060,000 | | | | | 50,600 |
| BOLN-Agera Corp. | | 11,721.11 | | | | $1,172,110.76 | | | | | 11,721.11 |
| Starfish Holdings Group, Inc. | | | | | | | | | | 12,062 | 12,062 |
| Principal Growth Strategies, LLC | | | 3,438 | 590,400 | | | $2,000,000 | $59,040,000 | | | 593,838 |
| Beechwood Re Investments LLC | | | | | | | | | 5,730 | | 5,730 |
| **Total** | **350,000** | **220,000** | **3,438** | **590,400** | **$35,000,000** | **$22,000,000** | **$2,000,000** | **$59,040,000** | **5,730** | **12,062** | **1,181,630** |

**Exhibit A**

*FORM OF JOINDER AGREEMENT*

**JOINDER AGREEMENT**

Reference is hereby made to the Amended and Restated Limited Liability Company Agreement, dated June 9, 2016, as amended from time to time (the "**LLC Agreement**"), among [*EXISTING MEMBERS*] and AGH Parent LLC, a company organized under the laws of Delaware (the "**Company**"). Pursuant to and in accordance with Section 4.01(b) of the LLC Agreement, the undersigned hereby acknowledges that it has received and reviewed a complete copy of the LLC Agreement and agrees that upon execution of this Joinder, such Person shall become a party to the LLC Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto [, and shall hold the status of [*MEMBERSHIP CLASS*]].

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the LLC Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of [DATE].

[NEW MEMBER]

By_____

Name:

Title:

**Exhibit B**

*FORM OF AGREEMENT FOR CONSULTING SERVICES*

*Execution Version*

## AGREEMENT FOR CONSULTING SERVICES

THIS AGREEMENT is made effective as of June 9, 2016 (the "**Effective Date**"), by and between BAM Management Services LLC, a Delaware limited liability company ("**Management**"), and AGH Parent LLC, a Delaware limited liability company (the "**Company**," and together with the Company's direct or indirect subsidiaries, the "**Companies**").

WHEREAS, Management, by and through its officers, employees, agents and affiliates has developed in connection with the conduct of its business and affairs various areas of expertise in the fields of finance, accounting, marketing, and strategic planning and corporate consulting;

WHEREAS, the Company has, pursuant to that certain Purchase Agreement by and between the Company and Principal Growth Strategies LLC ("**PGS**"), dated as of the date hereof (the "**Purchase Agreement**"), purchased that certain Amended and Restated Secured Convertible Promissory Note issued on May 16, 2014, as amended and restated on June 11, 2014, as further amended on July 3, 2014, and as further amended as of the date of the Purchase Agreement by that certain amendment dated as of the date of the Purchase Agreement (the "**Closing Note Amendment**"), in the principal amount of $600,071.23 (Six Hundred Thousand Seventy-One Dollars and Twenty Three Cents), executed by Agera Energy LLC ("**Agera Energy**") as acknowledged by Agera Holdings LLC, payable to the order of PGS as specified therein (as so amended as aforesaid, the "**Note**"); and

WHEREAS, the Companies desire to avail themselves of the expertise of Management in those areas hereinabove enumerated and in which Management is acknowledged to have expertise.

NOW, THEREFORE, the parties do hereby agree as follows:

1.  <u>Appointment; Term</u>. The Company hereby appoints Management for a period of ten (10) years from the Effective Date (the "**Term**") to render strategic planning and consulting services to the Companies during the Term as herein contemplated. Management's role in this regard shall be strictly limited to that of a consultant. Nothing in this Agreement shall confer or be deemed to confer any corporate or managerial authority over any of the business affairs of the Companies.

2.  <u>Services</u>. During the Term, Management shall render to the Companies, by and through such of its officers, employees, agents and affiliates as Management, in its sole discretion, shall designate from time to time, strategic planning and corporate consulting services (the "**Services**"). Upon completion of the Term, upon mutual agreement between Management and the Company, Management shall render to the Companies the Services for an additional period of mutual determination. Said Services shall consist of advice concerning finance, marketing, strategic planning, and such other corporate consulting services as shall be requested from time to time by Company. Company acknowledge and agrees that the Services to be provided by Management hereunder do not encompass services that would be required in connection with (i) (a) a sale, merger, joint venture formation or other business combination or recapitalization in connection with which an unaffiliated third party acquires an equity interest in

any of the Companies, directly or indirectly or (b) any acquisition by any of the Companies of the capital stock or assets (other than assets acquired by the Companies in the ordinary course of business), (whether by purchase, merger, joint venture formation or other business combination, or otherwise), of any unaffiliated third party, (ii) a sale, lease or conveyance of all or a portion of the assets of any of the Companies, (iii) (A) any offering by the Companies of capital  or (B) any issuance of debt financing or indebtedness or the refinancing of any indebtedness of any of the Companies, or (iv) any declaration of an extraordinary dividend by any of the Companies. Further, notwithstanding anything to the contrary contained herein, Management shall perform no services of a type or nature that would require Management to be registered or regulated under any applicable law in the United States relating to the regulation of broker/dealer or investment advisory services.

3.      Fees.  In consideration of Management's performance of the above-described Services, the Company agrees to pay to Management, in cash, a services fee at the rate of one million ($1,000,000) dollars per annum payable in advance in quarterly installments commencing on the Effective Date of two hundred fifty thousand ($250,000) dollars for the duration of the Term (the "**Fee**"). It is recognized that, subject to the terms of this Agreement, the Company is committed to pay the full amount payable hereunder, and the Fee, once paid, is non-refundable. The Fee shall then after be due on the first day of each calendar quarter thereafter, or such other time as mutually agreed; provided, however that any payments otherwise due prior to the conversion or sale of the Note shall neither be earned nor accrue, but rather shall become an executory contractual obligation, the earning and payment of all of which contractual obligations in the aggregate shall be entirely contingent upon the conversion of the Note where upon all amounts otherwise due hereunder shall be earned and paid.  In the event of (i) the termination of this Agreement prior to the end of the Term, (ii) a change of control of the Company or (iii) a direct or indirect change of control of Agera Energy, all Fees then due that have not previously been paid, shall be accelerated and become immediately due and payable to Management.

4.      Subsidiaries.  The Company shall cause and take all action needed such that any direct or indirect subsidiary of the Company agrees to the terms hereof by duly executing and delivering a guaranty in the form attached hereto as **Exhibit A**.

5.      Reimbursements.  Within 15 calendar days of delivery of Management's invoice, Company shall reimburse Management for its reasonable actual out-of-pocket expenses incurred in connection with the performance of services pursuant to this Agreement.

6.      Default.  In the event that Company fails to pay any part of the Fee as set forth in Paragraph 3 above when and as due, and Company does not cure such failure prior to the 5th day of the month following the month in which such payment is due, then Company shall be in default under this Agreement and Management shall be entitled to receive payment in full of the unpaid portion of the Fee upon making written demand upon Company for such payment. Upon delivery of such written demand, Management shall be excused from rendering any further services pursuant to this Agreement. The aforesaid right and privilege of Management to withhold services is intended to be in addition to any and all other remedies available because of Company's default, including Management's right to payment of all fees set forth herein. Further, in the event of a default by Company, Company agree to reimburse Management for any and all costs and expenses incurred by Management, including, without limitation, reasonable

2

counsel fees and expenses, in connection with such default and any litigation or other proceedings instituted for the collection of payments due hereunder.

7.    Permissible Activities. Nothing herein shall in any way preclude Management from engaging in any business activities or from performing services for its own account or for the account of others, in addition to performing the Services hereunder. Except as may otherwise be agreed in writing after the date hereof: (a) each member of the Management Group (as defined in Section 8) shall have the right to, and shall have no duty (contractual or otherwise) not to, directly or indirectly: (i) engage in the same or similar business activities or lines of business as the Companies or any of their affiliates, or advise, manage, supervise or monitor any company or business, including any and all existing and future portfolio companies of any affiliate of Management, whether or not such company or business competes with the business of the Companies, and (ii) do business with any client or customer of the Companies or any of their affiliates; and (b) no member of the Management Group shall be liable to the Companies or any of their affiliates for breach of any duty (contractual or otherwise) by reason of any such activities or of such person's participation therein.

8.    Liability; Indemnification.

(a)    Neither Management, any of its affiliates, nor any of their respective partners, directors, officers, members, employees or agents (collectively, the "**Management Group**") shall be liable to the Companies or any of their affiliates for any loss, liability, damage or expense (including attorney's fees and expenses) (collectively, a "**Loss**") arising out of or in connection with the performance of services contemplated by this Agreement, unless such Loss shall be proven to result directly from the gross negligence or bad faith on the part of such member of the Management Group. Management makes no representations or warranties, express or implied, in respect of the services provided by any member of the Management Group. In no event will any member of the Management Group be liable (x) for any indirect, special, incidental or consequential damages, including lost profits or savings, whether or not such damages are foreseeable or (y) in respect of any Losses relating to any third party claims (whether based in contract, tort or otherwise) other than for the Losses relating to the services which may be provided by Management hereunder.

(b)    Company shall indemnify and hold harmless Management and its directors, officers, employees, agents and controlling persons (each being an "**Indemnified Party**") from and against any and all losses, claims, damages and liabilities, joint or several, to which such Indemnified Party may become subject under any applicable federal or state law, or otherwise, relating to or arising out of the strategic planning and consulting services contemplated by, this Agreement. Company shall reimburse any Indemnified Party for all costs and expenses (including reasonable counsel fees and expenses) incurred in connection with the investigation of, preparation for or defense of any pending or threatened claim or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party. Company shall not be liable under the foregoing indemnification provision to the extent that any loss, claim, damage, liability or expense is found in a final judgment by a court of competent jurisdiction to have resulted primarily from the bad faith or gross negligence of Management.

9.      Amendments. No amendment or waiver of any provision of this Agreement, or consent to any departure by either party from any such provision, shall in any event be effective unless the same shall be in writing and signed by the parties to this Agreement and then such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

10.     Notices. Any and all notices hereunder shall, in the absence of receipted hand delivery, be deemed duly given when mailed, if the same shall be sent by registered or certified mail, return receipt requested, and the mailing date shall be deemed the date from which all time periods pertaining to a date of notice shall run. Notices shall be addressed to the parties at the following addresses:

    If to Management, to:

        c/o B Asset Manager
        1370 Avenue of the Americas
        32nd Floor
        New York, NY 10019
        Attention:  Dhruv Narain

    If to Company, to:

        c/o B Asset Manager
        1370 Avenue of the Americas
        32nd Floor
        New York, NY 10019
        Attention:  Dhruv Narain

11.     Entire Agreement. This Agreement shall constitute the entire agreement between the parties with respect to the subject matter hereof, and shall supersede all previous oral and written (and all contemporaneous oral) negotiations, commitments, agreements and understandings relating hereto.

12.     Assignment. This Agreement shall be assignable by either party hereto provided that the non-assigning party consents in writing to such assignment.

13.     Applicable Law. This Agreement shall be construed and enforced in accordance with the laws of Delaware (without regard to the conflicts of laws provisions thereof or of any other jurisdiction) and shall inure to the benefit of, and be binding upon, Management and Company and their respective successors and assigns.

14.     No Continuing Waiver. The waiver by any party of any breach of this Agreement shall not operate or be construed to be a waiver of any subsequent breach.

15.     Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument.

4

*Remainder of Page Intentionally Left Blank*

DB1/ 87897518.2

## EXHIBIT A

## FORM OF SUBSIDIARY GUARANTY

THIS GUARANTY, dated as of [_____ ___, _____], is executed and delivered pursuant to that certain Agreement for Consulting Services (the "**Consulting Agreement**"), dated as of June 9, 2016 (the "**Effective Date**"), by and between AGH Parent LLC, a Delaware limited liability company (the "**Company**") and BAM Management Services LLC a Delaware limited liability company ("**Management**").  Capitalized terms not otherwise defined in this Guaranty have the meanings ascribed to them in the Consulting Agreement.

In consideration of Management's execution and delivery of the Consulting Agreement and its agreement to perform the transactions contemplated hereby, and as a material inducement to such execution, delivery and performance, each of the undersigned hereby (a) guarantees (jointly and severally with any other guarantors under the Consulting Agreement) any payments owed by the Company to the Consultant pursuant to this Agreement and (b) acknowledges and concurs in each and all of the terms and conditions of the Consulting Agreement, including (without limitation) each such term that defines, limits or otherwise circumscribes the relationship between the parties thereto and the scope of any party's responsibility or authority thereunder.  The undersigned agrees that no formal change, amendment, modification or waiver of any terms or condition hereof or the Consulting Agreement, no extension in whole or in part of the time for the performance by Management of any of its obligations hereunder or under the Consulting Agreement, and no settlement, compromise, release, surrender, modification or impairment of, or exercise or failure to exercise any claim, right or remedy of any kind or nature in connection herewith or the Consulting Agreement, shall affect, impair or discharge, in whole or in part, the liability of the undersigned for the full, prompt and unconditional performance of the obligations of the Company under the Consulting Agreement.  The obligations of the undersigned hereunder are absolute and unconditional, irrespective of any circumstance which might otherwise constitute a legal or equitable discharge of a surety or guarantor.  The liability of the undersigned shall be direct and not conditional or contingent on the pursuit of remedies against the Company.  Management may at its option proceed in the first instance against the undersigned to collect any amount owed hereunder without first proceeding against the Company.  The guarantee of the undersigned shall be a continuing guarantee, and the above consent and waiver of the undersigned shall remain in full force and effect until the obligations of the Company hereunder are discharged and paid in full.  The undersigned agrees to pay all costs, fees and expenses (including reasonable attorneys' fees and all disbursements) incurred by Management in collecting or enforcing the undersigned's obligations hereunder.

[NAME OF SUBSIDIARY]


By:_____
Name:
Title:

**JOINDER AGREEMENT**

Reference is hereby made to the Amended and Restated Limited Liability Company Agreement, dated June 9, 2016, as amended from time to time (the "**LLC Agreement**"), among the Initial Members and AGH Parent LLC, a company organized under the laws of Delaware (the "**Company**"). Pursuant to and in accordance with Section 4.01(b) of the LLC Agreement, the undersigned hereby acknowledges that it has received and reviewed a complete copy of the LLC Agreement and agrees that upon execution of this Joinder, such Person shall become a party to the LLC Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the LLC Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, and shall hold the status of a holder of Class B-2 Preferred Units and Class C Preferred Units.

Capitalized terms used herein without definition shall have the meanings ascribed thereto in the LLC Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of June 9, 2016.

Starfish Capital, Inc.

By _____

Name: Kevin Cassidy

Title: President

**AGH Parent LLC**
**Amended and Restated Members Schedule**
**to the Amended and Restated Limited Liability Company Agreement of AGH Parent LLC**
**(June 9, 2016)**

| Members | Class A Preferred Units | Class B-1 Preferred Units | Class B-2 Preferred Units | Class C Preferred Units | Preferred Class A Unreturned Capital Value | Preferred Class B-1 Unreturned Capital Value | Preferred Class B-2 Unreturned Capital Value | Preferred Class C Unreturned Capital Value | Common Units | Incentive Units | Total Units |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Senior Health Insurance Company of Pennsylvania | 350,000 | | | | $35,000,000 | | | | | | 350,000 |
| BRe WNIC 2013 LTC Primary | | 31,178.89 | | | | $3,117,889.24 | | | | | 31,178.89 |
| BBLN-Agera Corp. | | 50,600 | | | | $5,060,000 | | | | | 50,600 |
| BBIL ULICO 2014 | | 75,900 | | | | $7,590,000 | | | | | 75,900 |
| BHLN-Agera Corp. | | 50,600 | | | | $5,060,000 | | | | | 50,600 |
| BOLN-Agera Corp. | | 11,721.11 | | | | $1,172,110.76 | | | | | 11,721.11 |
| Starfish Holdings Group, Inc. | | | | | | | | | | 12,062 | 12,062 |
| Starfish Capital, Inc. | | | 3,438 | 45,520 | | | $2,000,000 | $4,552,000 | | | 48,958 |
| Principal Growth Strategies, LLC | | | | 544,880 | | | | $54,488,000 | | | 544,880 |
| Beechwood Re Investments LLC | | | | | | | | | 5,730 | | 5,730 |
| **Total** | **350,000** | **220,000** | **3,438** | **590,400** | **$35,000,000** | **$22,000,000** | **$2,000,000** | **$59,040,000** | **5,730** | **12,062** | **1,181,630** |

EXHIBIT 84

EXECUTION VERSION

## PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "**Agreement**") is dated as of June 9, 2016, by and between AGH Parent LLC, a Delaware limited liability company (the "**Buyer**"), and Principal Growth Strategies LLC, a Delaware limited liability company (the "**Seller**").

WHEREAS, the Seller has agreed to sell, and the Buyer has agreed to purchase, that certain Amended and Restated Secured Convertible Promissory Note issued on May 16, 2014, as amended and restated on June 11, 2014, as further amended on July 3, 2014, and as further amended as of the date of this Agreement by that certain amendment dated as of the date of this Agreement (the "**Closing Note Amendment**"), in the principal amount of $600,071.23 (Six Hundred Thousand Seventy-One Dollars and Twenty Three Cents), executed by Agera Energy LLC ("**Agera Energy**"), as acknowledged by Agera Holdings LLC ("**Holdings**" and together with Agera Energy and each Subsidiary of Holdings and Agera Energy, collectively, the "**Company Parties**"), payable to the order of the Seller as specified therein (as so amended as aforesaid, the "**Note**"), and all rights, titles and interests of the Seller existing and to exist in connection with or as security for the payment of the indebtedness evidenced by the Note, including, without limitation, all rights, titles and interests arising under or evidenced by (a) the Note; (b) that certain Secured Note Purchase  Agreement, dated as of May 16, 2014, by and between Agera Energy and the Seller (as amended, modified or supplemented from time to time, including pursuant to that certain amendment dated as of the date of this Agreement (the "**Closing Note Purchase Agreement Amendment**"), the "**Purchase Agreement**"); and (c) that certain Security Agreement, dated as of May 16, 2014 by Agera Energy for the benefit of the Seller (as amended, modified or supplemented from time to time, including pursuant to that certain amendment dated as of the date of this Agreement (the "**Closing Security Agreement Amendment**"), (the "**Security Agreement**" and, together with the Note, the Purchase Agreement and all other documents, instruments, amendments and agreements entered into in connection with the transactions contemplated thereby, collectively, the "**Loan Documents**"); and

WHEREAS, all capitalized terms used in this Agreement shall have the meanings ascribed to such terms in Section 8.

NOW, THEREFORE, in consideration of the mutual promises and agreements set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **PURCHASE AND SALE.**

   1.1 **Purchase of Loan Documents.**  Subject to the terms and conditions set forth in this Agreement, at the Closing, the Seller hereby sells, transfers, assigns and delivers to the Buyer, and the Buyer hereby purchases and accepts from the Seller, all of the Seller's right, title and interest in, to and under the Loan Documents, free and clear of any Lien (other than Permitted Liens).

   1.2 **Excluded Assets and Liabilities.**  For the avoidance of doubt, the sale, assignment, transfer and conveyance of the Loan Documents hereunder does not include the sale, assignment, transfer, conveyance or assumption of any assets, Liabilities or obligations of the Seller of any nature whatsoever other than the Loan Documents.

2. **CLOSING**

   2.1 <u>Time and Place</u>.  The consummation of the sale by the Seller to the Buyer of the Loan Documents (the "**Closing**") will take place on the date of this Agreement at the offices of Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, NY 10178-0060, or remotely via the exchange of

2

documents and signature pages (consistent with <u>Section 9.3</u>).  The Closing will be on the date of this Agreement, which is sometimes referred to herein as the "**Closing Date**," and the Closing shall be effective as of 11:59 p.m. on the Closing Date.

        2.2    <u>Seller Deliveries at Closing</u>.  At the Closing, in addition to any other instruments or documents referred to herein, the Seller shall execute and deliver to the Buyer such bills of sale, certificates of title and other instruments of assignment or transfer with respect to the Loan Documents as the Buyer may reasonably request and as may be necessary to vest in the Buyer good and marketable title to all of the Loan Documents, free and clear of any Lien (other than Permitted Liens), including:

       (a)     an Assignment of Secured Convertible Promissory Note in the form of <u>Exhibit A</u> (the "**Assignment**");

       (b)     an Amendment to that certain Master Service Agreement by and among Agera Management Corp., Agera Energy LLC, Aequitas Energy Inc., and energy.me llc d/b/a energy.me in the form of <u>Exhibit B</u> (the "**MSA Amendment**");

       (c)     Amendment to Employment Agreement of Kevin Cassidy, dated June 9, 2016;

       (d)     Amendment to Employment Agreement of Michael Nordlicht, dated June 9, 2016;

       (e)     Amendment to Employment Agreement of Steven Laker, dated June 9, 2016;

       (f)     Independent Contractor/Contractor Agreement between Agera Energy LLC & Starfish Capital, Inc., dated June 9, 2016;

       (g)     Profits Interest Award Agreement Non-Solicitation and Non-Compete Agreement between Kevin Cassidy and Agera Parent LLC, dated as of June 9, 2016;

       (h)     the Closing Note Amendment;

       (i)     the Closing Note Purchase Agreement Amendment;

       (j)     the Closing Security Agreement Amendment;

       (k)     the Buyer LLC Agreement;

       (l)     IRS Form W-9 claiming a complete exemption from back-up withholding, and a properly prepared and executed certificate of non-foreign status under Treas. Reg. §1.1445-2(b)(2); each in form reasonably satisfactory to Buyer;

       (m)     <u>Secretary's Certificate</u>.  The Seller shall have delivered to the Buyer a Secretary's certificate, dated as of the Closing Date and signed by its Secretary or Assistant Secretary, certifying as to its incumbent officers, Charter Documents and resolutions of the managers/members of the Seller approving the Transactions;

       (n)     <u>Good Standing Certificates</u>.  The Seller shall have delivered to the Buyer a Certificate of Good Standing of the Seller and each of the Company Parties issued by the Secretaries of State of the respective jurisdictions of organizations of each such entity, dated within five (5) Business Days of the Closing Date; and

3

2.3     Buyer Deliveries at Closing. At the Closing, the Buyer shall execute and deliver to Seller:

(a)     the Assignment; and

(b)     the Buyer LLC Agreement.

2.4     Payment of Purchase Price.  The aggregate consideration to be paid at the Closing for the purchase and sale of all of the Seller's right, title and interest in, to and under the Loan Documents, will be $170,000,000.00 (the "**Purchase Price**") to be paid as follows:

(a)     The Buyer will pay the following amounts in cash by wire transfer, an amount equal to $65,293,540.00 (Sixty-Five Million Two Hundred Ninety Three Thousand Five Hundred Forty Dollars) to the Seller (with an amount of $25,000,000.00 (Twenty-Five Million Dollars) to be paid to at the direction of the Seller to certain payees); and

(b)     The Buyer will assign the debt and equity instruments listed on Schedule 1 to the Seller with a value of $43,666,460.00 (Forty-Three Million Six Hundred Sixty-Six Thousand Four Hundred Sixty Dollars);

(c)     The Buyer will issue to the Seller 3,438 Class B-2 Units with an original value equal to $2,000,000.00 (Two Million Dollars); and

(d)     The Buyer will issue to the Seller 590,400 Class C Units with an original value equal to $59,040,000.00 (Fifty-Nine Million Forty Thousand Dollars).

2.5     Withholding.  Notwithstanding anything in this Agreement to the contrary, the Buyer and the Seller shall be entitled to deduct and withhold from the consideration otherwise payable to any Person pursuant to this Agreement any amount as may be required to be deducted and withheld with respect to the making of such payment under the Code, or any other provision of Tax Law.  To the extent that amounts are so withheld or deducted by the Buyer or the Seller, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such Person in respect of which such deduction and withholding was made by the Buyer or the Seller, as the case may be.  To the extent that amounts required to be withheld or deducted from payment by the Buyer to or for the account of any Person, were not so withheld or deducted by the Buyer or Holdings, such Person shall indemnify and hold harmless the Buyer and Holdings from such amount so required to be withheld (including any interest and penalties thereon, and, in the case of a payment deemed to be compensation subject to withholding, the employer's portion of any Taxes associated with such payment).

**3.     REPRESENTATIONS AND WARRANTIES OF THE SELLER REGARDING THE COMPANY PARTIES**

The Seller represents and warrants to the Buyer as follows:

3.1     Organization; Capitalization; Ownership.

(a)     Organization.  Each Company Party is duly formed, validly existing and in good standing under the laws of the state in which each such Company Party was formed or incorporated and has all requisite limited liability company power and authority and all necessary government approvals to own, lease and operate its properties and to carry on the Business as now being conducted by the Company Parties and as currently proposed to be conducted by the Company Parties.

4

Each Company Party is duly qualified or licensed, and is in good standing, in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of the Business makes such qualification or licensing necessary, except where the failure to so qualify has not had or could not reasonably be expected to have a Material Adverse Effect.  All jurisdictions in which the Company Parties are qualified to do business are set forth in <u>Section 3.1</u> of the Disclosure Schedules.

(b)     <u>Capitalization</u>.  <u>Section 3.1(b)</u> of the Disclosure Schedules sets forth (i) the total number of authorized units or other equity interests of such Company Party, (ii) the number of such units or other equity interests issued and outstanding, and (iii) the record and beneficial owner of all the issued and outstanding units or other equity interests of each Company Party.  All of the outstanding units or other equity interests of the Company Parties are duly authorized, validly issued and fully paid.

(c)     <u>Ownership</u>.  Except as set forth in <u>Section 3.1(c)</u> of the Disclosure Schedules, (i) there are no outstanding securities convertible into or exchangeable for units or other equity interests in the Company Parties, (ii) there are no outstanding or authorized options, preferred units, restricted units, warrants, calls, rights (preemptive or otherwise), subscriptions, rights of first refusal or first offer, or other rights of any character obligating any Company Party to issue, transfer or sell or cause to be issued, transferred or sold any units or other equity interests, (iii) no units or other equity interests of the Company Parties are reserved for issuance, (iv) there are no Contracts affecting or relating to the voting, issuance, purchase, redemption, registration, repurchase or transfer of any units or other equity interests of the Company Parties, or securities or obligations of any kind convertible into any units of or other equity interests of the Company Parties, and (v) none of the outstanding units or other equity interests of the Company Parties were issued in violation of any federal or state securities laws or other applicable law.

(d)     <u>Other Equity Interests, etc</u>. The Company Parties do not own, directly or indirectly, any shares of capital stock or other equity interest (or any other interest convertible into, or exchangeable for, an equity interest) in any Person and has not made any loans or advances to any Person.

(e)     <u>Conversion Interests</u>.  The Note is convertible into 95.01% of the outstanding equity interests of Holdings.  Except as set forth in <u>Section 3.1(e)</u> of the Disclosure Schedules, no consent, approval, exemption or authorization of, or registration, qualification or filing with, any Person, including any Governmental Authority, is required for the conversion by the Buyer of the Note (the "<u>Conversion</u>").

3.2     <u>Charter Documents</u>.  The Seller has delivered to the Buyer a true and correct copy of each Company Party's Charter Documents.  None of the Company Parties is in default under or in violation of any provision of its Charter Documents.

3.3     <u>No Conflicts; Required Filings and Consents</u>.  Except as set forth in <u>Section 3.3</u> of the Disclosure Schedules, the consummation of the Transactions and any Conversion will not conflict with, or result in any material violation of, or material default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any right or obligation or loss of any benefit or creation of any Lien (other than Permitted Liens) on, any of the Loan Documents, Material Contracts, assets or rights of the Company under (i) any provision of any of the Company Parties' Charter Documents, (ii) any Material Contract to which any Company Party is a party, (iii) any Permit, judgment, order or decree applicable to any Company Party, or any of their respective properties or assets, or (iv) any Law applicable to any Company Party or any of their respective properties or assets.

3.4     <u>Financial Statements</u>.  <u>Section 3.4</u> of the Disclosure Schedules includes a true, correct and complete copy of the Company Parties' consolidated (a) audited financial statements

5

consisting of the consolidated balance sheet of the Company Parties as at December 31, 2015 and the related statements of consolidated operations and cash flows for the year then ended including the related notes (the "Annual Financial Statements"), and (b) unaudited financial statements of the Company Parties consisting of the consolidated balance sheet of the Company Parties as at March 31, 2016 and the related consolidated statements of income for the three months then ended (the "Interim Financial Statements" and together with the Annual Financial Statements, the "Financial Statements").  The Financial Statements have been prepared in accordance with GAAP, are true, correct and complete in all material respects, and fairly present and describe the consolidated  financial condition and operating results of the Company Parties as of the dates, and for the periods, indicated therein.  The consolidated  balance sheet of the Company Parties as of December 31, 2015 is referred to herein as the "12/31/15 Balance Sheet" and the date thereof as the "Balance Sheet Date."

        3.5    Absence of Undisclosed Liabilities.  Since the Balance Sheet Date none of the Company Parties has any Liabilities that are of the type that would be set forth on a balance sheet of such Company Party that has been prepared in accordance with the methodologies used to prepare the 12/31/15 Balance Sheet, other than (a) those which are adequately reflected or reserved against in the 12/31/15 Balance Sheet, (b) those which have been incurred in the Ordinary Course of Business since the Balance Sheet Date, (c) those incurred in connection with the execution and delivery of this Agreement, or (d) Liabilities disclosed in Section 3.5 of the Disclosure Schedules.

        3.6    Absence of Certain Changes.  Except as set forth in Section 3.6 of the Disclosure Schedules, since the Balance Sheet Date, the Company Parties have carried on the Business only in the Ordinary Course of Business, and, without limiting the generality of the foregoing, there has not been:

        (a)    any change in the assets, Liabilities, sales, income or business of the Company Parties in their relationships with suppliers, customers or lessors, other than changes which were both in the Ordinary Course of Business and have not been, either in any case or in the aggregate, materially adverse to the Business;

        (b)    any acquisition, disposition, lease, assignment or other transfer by the Company Parties (including transfers to or from the equity holders of the Company Parties) of any material asset or material property (including the Company Parties' Intellectual Property) other than in the Ordinary Course of Business;

        (c)    any Material Adverse Effect or any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting, either in any case or in the aggregate, the property of the Company Parties or the Business;

        (d)    any declaration, setting aside or payment of any dividend or any other distributions (whether in cash or in kind) with respect to the Company Parties' equity interests;

        (e)    any issuance of any notes, bonds or other debt securities, any equity securities or any securities convertible or exercisable into, directly or indirectly, any of the equity securities of the Company Parties, or any direct or indirect redemption, purchase or other acquisition of any equity securities of the Company Parties;

        (f)    any increase in the compensation, pension or other benefits payable or to become payable by any Company Party to any of their respective directors, managers, officers, employees, sales representatives or consultants, or any bonus payments or arrangements made by any such Company Party to or with any of them (other than pursuant to the terms of any existing written agreement or plan of which the Buyer has been supplied complete and correct copies, and other than

6

normal merit increases to employees made in the Ordinary Course of Business), granted or promised any increase in any employee benefit plan or arrangement, amended or terminated any existing employee benefit plan or arrangement (other than an amendment required by Law), or adopted any new employee benefit plan or arrangement;

(g)        any forgiveness or cancellation of any material Debt or material claim by any Company Party or any waiver of any right of material value other than compromises of accounts receivable in the Ordinary Course of Business;

(h)        any capital expenditures in the aggregate in excess of $100,000;

(i)        any change or authorization of any change in any Company Party's Charter Documents;

(j)        any entry by the Company Parties into any Material Contract or amendment or termination of the applicable Company Party's rights thereunder, or any transaction other than in the Ordinary Course of Business;

(k)        any acquisition of any other business or Person (or any significant portion or division thereof), whether by merger, consolidation or reorganization or by purchase of its assets or stock, or any acquisition of any other material assets;

(l)        any Lien (other than Permitted Liens) on any of the assets, tangible or intangible, of the Company Parties;

(m)        any material change in the Company Parties' business practices, including, without limitation, any change in accounting methods or practices or collection, credit, pricing or payment policies of the Company Parties;

(n)        any loan or advance to, or guarantees for the benefit of, any Persons (other than advances to employees for travel and business expenses incurred in the Ordinary Course of Business that do not exceed $50,000 in the aggregate);

(o)        any discharge or satisfaction by the Company Parties of any Lien, or payment by the Company Parties of any material Liability (fixed or contingent) other than (A) current Liabilities included in the 12/31/15 Balance Sheet, and (B) current Liabilities incurred since the Balance Sheet Date in the Ordinary Course of Business; or

(p)        any commitment or agreement, in writing or otherwise, to any of the foregoing, except as expressly contemplated by this Agreement.

3.7        Litigation. Except as disclosed in Section 3.7 of the Disclosure Schedules, there is no private or governmental Action pending before any Governmental Authority, or, to the Seller's Knowledge, threatened, against or affecting the Company Parties, or any of the Company Parties' properties or assets or officers, managers, directors or employees (in their capacities as such). There is no judgment, decree or order against the Company Parties or, to the Seller's Knowledge, any of the Company Parties' managers, directors, officers or employees (in their capacities as such), that could prevent, enjoin, or materially alter or delay any of the Transactions.

7

3.8     Licenses and Permits; Regulation.

(a)     The Company Parties are in possession of, and have made proper and timely application for renewal for, as applicable, all licenses, permits, approvals, consents, registrations, authorizations, easements, variances, and exceptions, necessary for the Company Parties to own, lease and operate their properties or to carry on the Business as it is now being conducted by the Company Parties or currently planned to be conducted by the Company Parties (collectively, the "Authorizations"), a list of which has been set forth by the Seller in Section 3.8(a) of the Disclosure Schedules, and no suspension or cancellation of any Authorization is pending or, to the Seller's Knowledge, threatened.  No Company Party is in conflict with, or in material default or material violation of, any Authorization.

(b)     The Company Parties have not operated the Business prior to receiving any required Authorizations from any applicable Governmental Authority.  All such Authorizations are in full force and effect on the date of this Agreement.  The Seller and the Company Parties have identified and made available for examination by the Buyer all information relating to regulation of the Business, including the Company Parties' Authorizations.  All regulatory information and documents are kept by the Company Parties at the principal place of business at 555 Pleasantville Rd. S-107, Briarcliff Manor, NY 10510.

3.9     Title to Property; Use of Assets.

(a)     Section 3.9(a) of the Disclosure Schedules sets forth a true, correct and complete list of the Leased Real Property leased by the Company Parties, the name of the lessor, the date of the lease and each amendment thereto (collectively, the "Leases").  The Company Parties have delivered or made available to the Buyer true, correct and complete copies of each Lease.  The Company Parties have valid leasehold or sublease interests in all Leased Real Property, free and clear of any Lien (other than Permitted Liens), and there is not under any such Leases any existing default or event of default (or event which with notice or lapse of time, or both, would constitute a default) by the applicable Company Party, or, to the Seller's Knowledge, any other party thereto.  Following the Closing, after giving effect to the consummation of the Transactions no Company Party, nor to the Seller's Knowledge, any other party to any Lease, will be in breach or default under any Lease, and, to the Seller's Knowledge, no event has occurred which, with notice or lapse of time, would constitute such a breach or default or permit termination, modification or acceleration under the Lease.

(b)     Section 3.9(b) of the Disclosure Schedules sets forth a true, correct and complete list of all Owned Real Property held by the Company Parties.  The Company Parties have good and marketable title to all Owned Real Property, free and clear of any Lien (other than Permitted Liens).  To the Seller's Knowledge, all water, sewer, gas, electric, telephone and drainage facilities, and all other utilities required by any Law or by the use and operation of the Owned Real Property in the conduct of the business are operable and are adequate to service the Owned Real Property in the operation of the business as currently conducted.

(c)     Section 3.9(c) of the Disclosure Schedules sets forth a true, correct and complete list of all personal property of the Company Parties with a replacement cost or value of at least $20,000 owned or leased by the Company Parties, and such personal property is, taken as a whole, in good operating condition (except for ordinary wear and tear).

(d)     The Company Parties, and the operation of the Business by the Company Parties, do not use or otherwise receive the benefit of any assets, whether tangible or intangible, that are not validly owned, validly licensed or validly leased by the Company Parties.

8

3.10     Intellectual Property.

(a)     Section 3.10(a) of the Disclosure Schedules lists (i) all of the Company Parties' issued patents and patent applications and all registered and unregistered trademarks, trade names and service marks, registered and unregistered copyrights, maskworks, and domain names, including the jurisdictions in which each such Intellectual Property right has been issued or registered or in which any application for such issuance and registration has been filed, (ii) all licenses, sublicenses and other agreements to which any Company Party is a party and pursuant to which any third party is authorized by a Company Party to use any Intellectual Property owned by a Company Party, and (iii) all licenses, sublicenses and other agreements to which a Company Party is a party and pursuant to which a Company Party is authorized to use any third party Intellectual Property (other than "off the shelf" commercially available software with an aggregate annual cost of less than $50,000) which are incorporated in, are or form a part of any Product and that is material to the Business (collectively, "Third Party Intellectual Property Rights").  The Intellectual Property listed in Section 3.10(a) of the Disclosure Schedules constitutes all Intellectual Property necessary in all material respects to conduct the Business as currently conducted by the Company Parties and as proposed to be conducted by the Company Parties.  Except as set forth in Section 3.10(a) of the Disclosure Schedules, (A) the Company Parties are the sole and exclusive owners of the Intellectual Property used by the Company Parties to conduct the Business, and (B) the Intellectual Property licensed to the Company Parties by a third party (other than "off the shelf" software) is the subject of a written license or other agreements; in the case of the foregoing clauses (A) and (B), free and clear of all Liens.

(b)     To the Seller's Knowledge, there is no unauthorized use, disclosure, infringement or misappropriation by any third party of any Intellectual Property rights owned by the Company Parties or any Third Party Intellectual Property Rights of any third party to the extent licensed by or through the Company Parties, including by any employee or former employee of the Company Parties.  No Company Party has entered into any agreement to indemnify any other Person against any charge of infringement of any Intellectual Property.

(c)     The Company Parties are not, and will not be as a result of the performance of the Company Parties' obligations under this Agreement, in breach of any license, sublicense or other agreement relating to the Intellectual Property owned by the Company Parties or Third Party Intellectual Property Rights.

(d)     All issued patents, registered trademarks, registered service marks and registered copyrights held by the Company Parties are valid and existing, and there is no assertion or claim challenging the validity of any such registered Intellectual Property, or material unregistered Intellectual Property of the Company Parties.  No Company Party has received any written notice of any suit, action or proceeding which involves a claim of infringement of any patents, trademarks, service marks, copyrights or violation of any trade secret or other proprietary right of any third party, and there are no pending or, to the Seller's Knowledge, threatened, claims of infringement with respect to the Company Parties' use of any such patents, trademarks, service marks, copyrights or violation of any trade secret or other proprietary right of any third party, nor has any Company Party received any cease-and-desist or invitations to license letters with respect to the Intellectual Property of any third party.  The conduct of the Business as currently conducted by the Company Parties or the use by the Company Parties of any Intellectual Property in connection therewith does not infringe any Intellectual Property of any third party.  No third party is challenging the ownership by the Company Parties of, or the validity or effectiveness of, any of the Intellectual Property of the Company Parties.  The Company Parties have not brought any action, suit or proceeding for infringement of Intellectual Property or breach of any license or agreement involving Intellectual Property against any third party.  There are no pending, or, to the Seller's Knowledge, threatened, interference, re-examinations, oppositions or nullities involving any

9

patents, patent rights or applications therefor of the Company Parties, except such as may have been commenced by the Company Parties.  There is no material breach or violation by the Company Parties, or, to the Seller's Knowledge, threatened or actual loss of rights under, any license agreement to which any Company Party is a party.

(e)      Section 3.10(e) of the Disclosure Schedules lists the only employees, consultants and/or independent contractors of the Company Parties who have contributed to the development of the Company Parties' Intellectual Property. All employees, consultants and/or independent contractors who have developed or contributed to the development of the Company Parties' Intellectual Property have executed a valid assignment to the Company Parties' of any intellectual property rights which such employees, consultants and/or independent contractors may have in such Intellectual Property

3.11    Compliance With Laws.  Except as set forth in Section 3.11 of the Disclosure Schedules, the Company Parties have complied in all material respects with, is not in violation of, and has not received in the past five (5) years any notices of violation with respect to, any Laws applicable to the Company Parties or with respect to the ownership or operation of the Business or by which any property or asset of any Company Party is bound.

3.12    Absence of Certain Payments.  No Company Party has (nor has any of its directors, managers, officers, agents, or employees nor any other Person, acting on behalf of any Company Party) directly or indirectly (a) used any of such Company Party's funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity, (b) made any unlawful payment to foreign or domestic government officials or employees, or to the officers or employees of a company owned or controlled in whole or in part by a foreign or domestic government (e.g., "state owned enterprise"), or to foreign or domestic political parties or campaigns from such Company Party's funds, (c) violated any provision of the U.S. Foreign Corrupt Practices Act of 1977 or any comparable U.S. or foreign Law, (d) established or maintained any unlawful or unrecorded fund of such Company Party's monies or other assets, or (e) offered or made any bribe, rebate, payoff, influence payment, kickback, or anything of value, or other unlawful payment, to any Person, private or public, whether in money, property, or services, to obtain favorable treatment in securing business or to obtain special concessions for such Company Party, or to pay for favorable treatment for business secured or for special concessions already obtained for such Company Party.

3.13    Taxes.

(a)      Filing of Tax Returns and Payment of Taxes.  Except as set forth in Section 3.13(a) of the Disclosure Schedules, each of the Company Parties has timely filed all Tax Returns required to have been filed by it, and all such Tax Returns have been prepared in material compliance with all applicable laws and regulations.  All Taxes, assessments, fees and other governmental charges upon the Company Parties or any of their respective properties, assets, revenues, income and franchises with respect to any full or partial Tax period ending on or before the Closing Date have been paid, other than those not yet due or currently payable without penalty or interest.  The Seller has delivered to the Buyer true, correct and complete copies of all income Tax Returns filed by the Company Parties for all applicable taxable periods ended after December 31, 2009.

(b)      Deficiencies and Refund Claims.  Except as set forth in Section 3.13(b) of the Disclosure Schedules, no deficiency or adjustment in respect of Taxes has been proposed, asserted or assessed in writing by any Taxing Authority against the Company Parties.  No written claim for assessment or collection of Taxes which previously has been asserted relating in whole or in part to any Company Party remains unpaid.

10

(c)      Liens.  There are no Liens for Taxes (other than current Taxes not yet due and payable) on any of the properties or assets of the Company Parties.

(d)      Extensions of the Time for Filing Tax Returns.  No Company Party has requested or been granted an extension of the time for filing any non-income Tax Return that has not yet been filed.

(e)      Pending Proceedings.  Except as set forth in Section 3.13(e) of the Disclosure Schedules, there is no action, suit, Taxing Authority proceeding, or audit with respect to any Tax now in progress, pending or, to the Seller's Knowledge, threatened in writing, against or with respect to the Company Parties.

(f)      No Failures to File Tax Returns.  No claim has ever been made in writing by a Taxing Authority in a jurisdiction where the Company Parties do not pay Tax or file Tax Returns that any Company Party is or may be subject to Taxes assessed by such jurisdiction.

(g)      Membership in Affiliated Groups, Liability for Taxes of Other Persons, Etc.  No Company Party has ever been a member of any affiliated group of corporations (as defined in Section 1504(a) of the Code) or filed or been included in a combined, consolidated, or unitary Tax Return, other than any affiliated group the parent of which is any of the Company Parties.  No Company Party is a party to or bound by any Tax sharing or Tax allocation agreement (other than agreements entered into in the Ordinary Course of Business, the principal purpose of which is unrelated to Taxes).  Except for any Liability for the Taxes of the Company Parties, no Company Party is presently liable, nor does any Company Party have any potential liability, for the Taxes of another person (i) under Treasury Regulations Section 1.1502-6 (or comparable provision of state, local or foreign law), (ii) as transferee or successor, or (iii) by contract or indemnity or otherwise (other than agreements entered into in the Ordinary Course of Business, the principal purpose of which is unrelated to Taxes).

(h)      Withholding Taxes.  The Company Parties have timely withheld and timely paid all Taxes which are required to have been withheld and paid by them in connection with amounts paid or owing to any employee, independent contractor, creditor or other person, and have timely collected and Taxes imposed on its sales, including any Taxes with respect to the furnishing of energy.

(i)      Tax Status.  At all times since their formation, the Company Parties were properly characterized as either "partnerships" or "disregarded entities" for U.S. federal income Tax purposes and state and local Tax purposes, other than Aequitas Energy, Inc., which has been characterized as a "corporation."  Note of the properties of any Company Party is subject to the "anti-churning rules" of Section 197(f)(9) of the Code.  Each Company Party that is characterized as a partnership for U.S. federal income Tax purposes has in place a valid election under Section 754 of the Code.

3.14    Employee Benefit Plans.

(a)      Identification of Plans.  Except for the arrangements set forth in Section 3.14(a) of the Disclosure Schedules, the Company Parties do not now maintain or contribute to, and do not have any outstanding liability to or in respect of or obligation under, any plan, program, policy or arrangement providing pension, profit-sharing, deferred compensation, bonus or incentive compensation, stock option or equity-based compensation, severance, group or individual health, dental, medical, life insurance, survivor, or other similar benefits, whether formal or informal, written or oral, for the benefit of any director, officer, consultant or employee, whether active or terminated.  Neither the Company Parties nor any other Person treated as a single employer with the Company Parties (any such Person, an

11

"ERISA Affiliate") under Section 414 of the Code or Section 4001(b) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") sponsors, maintains or contributes to or has ever sponsored, maintained or contributed to any Employee Benefit Plan within the meaning of Section 3(3) of ERISA that is subject to Title IV of ERISA or Section 412 of the Code.  Each of the arrangements set forth in Section 3.14(a) of the Disclosure Schedules is herein referred to as an "Employee Benefit Plan," except that any such arrangement which is a multi-employer plan within the meaning of Section 4001 of ERISA (a "Multi-Employer Plan") shall be treated as an Employee Benefit Plan only for purposes of Sections 3.14(g)(ii), (vi) and (vii).

(b)      Delivery of Documents.  The Seller has delivered or made available to the Buyer true, correct and complete copies of each material Employee Benefit Plan, and with respect to each such Plan (or if such Plan is not written, an accurate description of the material terms thereof) true, correct and complete copies of (a) any associated trust, custodial, insurance or service agreements, (b) any annual report, actuarial report, or disclosure materials (including specifically any summary plan descriptions) submitted to any governmental agency or distributed to participants or beneficiaries thereunder in the current or any of the three (3) preceding calendar years, (c) the most recently received IRS determination or opinion letters and any governmental advisory opinions, rulings, compliance statements, closing agreements, or similar materials specific to such Plan, and pending requests relating to any of the foregoing, (d) any written policies or procedures used in the administration of such Plan, (e) all material written agreements and contracts relating to each Employee Benefit Plan, including fidelity or ERISA bonds, administrative service agreements, group annuity contracts and group insurance contracts, (f) all communications material to any Employee or Employees relating to any Employee Benefit Plan and any proposed Employee Benefit Plan, in each case relating to any amendments, terminations, establishments, increases or decreases in benefits, acceleration of payments or vesting schedules or other events that would result in any material liability to the Company Parties that are not reflected in the current summary plan description and plan document, (g) all material forms and notices relating to the provision of post-employment continuation of health coverage, and (h) all policies pertaining to fiduciary liability insurance covering the fiduciaries of each Employee Benefit Plan.

(c)      Compliance with Terms and Law.  Each Employee Benefit Plan is and has heretofore been maintained and operated in all material respects in compliance with the terms of such Plan and with the requirements prescribed (whether as a matter of substantive Law or as necessary to secure favorable Tax treatment) by any and all statutes, governmental or court orders, or governmental rules or regulations in effect from time to time, including, but not limited to, ERISA and the Code, and applicable to such Plan.  Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Code (a "Qualified Plan") is expressly identified as such in Section 3.14(c) of the Disclosure Schedules and has received a favorable determination letter from the IRS (or, where there is no determination letter but the Qualified Plan is based upon a master and prototype or volume submitter form, the sponsor of such form has received a current advisory opinion as to the form upon which the Seller is entitled rely under applicable IRS procedures) and to the Seller's Knowledge, nothing has occurred as to each which has resulted or would reasonably be expected to result in the revocation of such qualification or which requires or would reasonably be expected to require action under the compliance resolution programs of the IRS to preserve such qualification.

(d)      Each plan, program, arrangement or agreement that constitutes in any part a nonqualified deferred compensation plan within the meaning of Section 409A of the Code is identified as such in Section 3.14(d) of the Disclosure Schedules.  Since December 31, 2004 and through December 31, 2008, each plan, program, arrangement or agreement identified or required to be identified in Section 3.14(d) of the Disclosure Schedules has been operated and maintained in accordance with a good faith, reasonable interpretation of Section 409A of the Code and its purpose with respect to amounts deferred (within the meaning of Section 409A of the Code) after December 31, 2004.  By December 31,

12

2008, each plan, program, arrangement or agreement identified or required to be identified in Section 3.14(d) of the Disclosure Schedules was amended to the extent necessary or appropriate to comply with Section 409A of the Code and the final regulations promulgated thereunder. From and after January 1, 2009, each plan, program, arrangement or agreement identified or required to be identified in Schedule 3.14(d) has been operated and maintained in accordance with Section 409A of the Code and applicable guidance thereunder, including the final regulations promulgated with respect thereto.

(e)       No event has occurred and, to the Seller's Knowledge, no condition exists with respect to the Employee Benefit Plans or any other employee benefit matter that would subject the Company Parties, either directly or indirectly by reason of their affiliation with any other member of their controlled group, to any material Tax, fine, lien, penalty or other liability imposed by applicable Laws.

(f)       Except as set forth in Section 3.14(f) of the Disclosure Schedules or as required by applicable Law, neither the execution and delivery of this Agreement, shareholder approval of this Agreement nor the consummation of the transactions contemplated hereby (either alone or in combination with another event pursuant to a so-called "double-trigger" or similar provision) will or would reasonably be expected to (a) entitle any Company employee to severance pay, unemployment compensation, bonus payment or any other payment or benefit, (b) result in the acceleration or creation of any rights of any Company employee to payments or benefits or increases in any payments or benefits or any loan forgiveness or give rise to any additional service credits under any Employee Benefit Plan, (c) directly or indirectly cause the Company or any of its Subsidiaries to transfer or set aside any assets to fund any benefits under any Employee Benefit Plan, (d) limit or restrict the right to amend, terminate or transfer the assets of any Employee Benefit Plan on or following the Closing Date or (e) result in any payment, right or benefit that would, individually or in combination with any other such payment, right, or benefit, constitute an "excess parachute payment" (as such term is defined in Section 280G(b)(1) of the Code) to any Company employee.

(g)       Absence of Certain Events and Arrangements.

(i)       there is no pending or threatened legal Action, other than routine claims for benefits, concerning any Employee Benefit Plan and, to the Seller's Knowledge, there is no basis for any such legal action, proceeding or investigation;

(ii)       no Liability (contingent or otherwise) to the Pension Benefit Guaranty Corporation ("PBGC") or any Multi-Employer Plan has been incurred by the Company Parties or any ERISA Affiliate (other than insurance premiums satisfied in due course);

(iii)       no reportable event within the meaning of Section 4043 of ERISA, or event or condition which presents a material risk of termination by the PBGC, has occurred with respect to any Employee Benefit Plan, or any retirement plan of an ERISA Affiliate, which is subject to Title IV of ERISA; and

(iv)       no Employee Benefit Plan provides welfare benefits subsequent to termination of employment to employees or their beneficiaries except to the extent required by applicable state insurance laws and Title I, Subtitle B, Part 6 of ERISA;

(h)       Effect of Transactions. Except as set forth in Section 3.14(h) of the Disclosure Schedules, the consummation of the Transactions will not, by itself or in combination with any other event (regardless of whether that other event has or will occur), result in any payment (whether of severance pay or otherwise) becoming due from or under any Employee Benefit Plan to any current or

13

former director, officer, consultant or employee of the Company Parties or result in the vesting, acceleration of payment or increases in the amount of any benefit payable to or in respect of any such current or former director, officer, consultant or employee.

(i)        <u>Multi-Employer Plans</u>.  No Employee Benefit Plan is a Multi-Employer Plan and none of the Company Parties nor any ERISA Affiliate has in the past contributed to any Multi-Employer Plan.

(j)        None of the Company Parties has any stated plan, intention or commitment to establish any new Employee Benefit Plan, to modify or terminate any Employee Benefit Plan (except to the extent required by Law or to conform any such Employee Benefit Plan to the requirements of any applicable Law, in each case as previously disclosed to Buyer in writing, or as required by this Agreement), or to enter into any Employee Benefit Plan.

(k)        (a) No claim, legal proceeding, arbitration or other action is pending, or, to the Seller's Knowledge, has been threatened relating to or otherwise in connection with any Employee Benefit Plan, the assets thereof, or fiduciaries or parties-in-interest, as defined under ERISA, (b) to the Seller's Knowledge, no facts or circumstances exist that could reasonably be expected to give rise to any such claim, legal proceeding, arbitration or other action, (c) no administrative investigation, audit or other administrative proceeding by any Governmental Authority is pending, in progress, or, to the Seller's Knowledge, threatened and (d) no Employee Benefit Plan and no party in interest with respect thereto has engaged in a "prohibited transaction," which could subject the Company Parties or any ERISA Affiliate directly or indirectly to liability under Section 4975 of the Code or Sections 409 or 502(i) of ERISA.

(l)        None of the Employee Benefit Plans provide, nor does the Company Parties or any member of their controlled group maintain or contribute to any plan that provides, post-employment medical, health, life or welfare insurance benefits or coverage to any employee of the Company Parties, their spouse or dependents, except as may be required by applicable Law.

(m)        Each individual who is classified as an independent contractor has been properly classified for purposes of participation and benefit accrual under each Employee Benefit Plan.

(n)        With respect to any Employee Benefit Plan that is an employee welfare benefit plan (within the meaning of Section 3(1) of ERISA), (i) each such plan for which contributions are claimed as deductions under any provision of the Code is in material compliance with all applicable requirements pertaining to such deduction, (ii) with respect to any welfare benefit fund (within the meaning of Section 419 of the Code) to the Seller's Knowledge there is no disqualified benefit (within the meaning of Section 4976(b) of the Code) that would result in the imposition of a Tax under Section 4976(a) of the Code, (iii) any Employee Benefit Plan that is a group health plan (within the meaning of Section 4980B(g)(2) of the Code) complies with all of the applicable requirements of Section 4980B of the Code, ERISA, Title XXII of the Public Health Service Act, the applicable provisions of the Social Security Act, the Health Insurance Portability and Accountability Act of 1996, and other applicable Laws, and (iv) no welfare benefit plan provides health or other benefits after an employee's or former employee's retirement or other termination of employment except as required by Section 4980B of the Code.  Each of the Employee Benefit Plans is in compliance with the Patient Protection and Affordable Care Act and its companion bill, the Health Care and Education Reconciliation Act of 2010, to the extent applicable.

14

3.15    Employee Matters.

(a)    The Company Parties, in their capacity as an employer or joint employer, are in compliance with all Laws in respect of employment and employment practices, including, without limitation, with respect to the classification of employees for purposes of federal, state and local Law, terms and conditions of employment, wages and hours and nondiscrimination in employment, and is not engaged in any unfair labor practice and has never been engaged in any unfair labor practice or accused of engaging in an unfair labor practice.  There is no Action pending, and within the last five (5) years there has not been any Action, with respect to employment or labor matters (including allegations of employment discrimination, retaliation and unfair labor practices), or, to the Seller's Knowledge, threatened, against the Company Parties alleging unlawful discrimination in employment practices before any Governmental Authority, and there is no charge of or proceeding with regard to any unfair labor practice against the Company Parties pending before the National Labor Relations Board.  There is no labor strike, dispute, slow-down or work stoppage actually pending or, to the Seller's Knowledge, threatened, against or involving the Company Parties, nor do the Seller or the Company Parties know of any reasonable basis for any such activity.  No Person has petitioned within the last five (5) years, and no Person is now petitioning, for union representation of any of the employees of the Company Parties.  No grievance or Action arising out of or under any collective bargaining agreement is pending against the Seller and no claim therefor has been asserted.  None of the employees of the Company Parties is covered by any collective bargaining agreement and have never been a party to or bound by any collective bargaining agreement, and no collective bargaining agreement is currently being negotiated by the Company Parties.  The Company Parties have not experienced any work stoppage during the last five (5) years.  None of the Company Parties, in their capacity as an employer or joint employer, is delinquent to, or has failed to pay, any of its employees, consultants or contractors for any wages (including overtime, meal breaks or waiting time penalties), salaries, commissions, accrued and unused vacation, on-call payments, equal pay, or collective bargaining payments to which they would be entitled under applicable Law, if any, bonuses, benefits, advantage in kind, profit sharing, stock options or other compensation for any services performed by them or amounts required to be reimbursed or damages or interest paid to such individuals.  None of the Company Parties is liable for any payment to any trust or other fund or to any Governmental Authority, with respect to unemployment compensation benefits, social security or other benefits or obligations for employees (other than routine payments to be made in the normal course of business and consistent with past practice).  The Company Parties have paid all outstanding liabilities, fees, expenses and obligations relating to the employees, former employees, consultants, independent contractors, directors, officers and any other Person who provides or has provided services to the Company Parties.  None of the Company Parties have any liability, including under any Employee Benefit Plan, arising out of the treatment of any service provider as a consultant or independent contractor and not as an employee.

(b)    Section 3.15(b) of the Disclosure Schedules sets forth a true and complete list and summary of (i) all officers and directors of the Company Parties, and (ii) all employees of the Company Parties, including each such employee's job title, remuneration (including, but not limited to, wages, salary, commissions, normal bonus, profit sharing, deferred compensation or other compensation) and duration of employment.  Section 3.15(b) of the Disclosure Schedules also contains a complete and accurate list of all of the independent contractors, consultants, temporary employees, leased employees or other servants or agents employed or used as of the date of this Agreement with respect to the operation of the Business and classified by the Company Parties as other than employees or compensated other than through wages paid by the Company Parties through the Company Parties' payroll department and reported on a form W-4 ("Contingent Workers"), showing for each Contingent Worker such individual's role in the business, fee or compensation arrangements and other contractual terms with the Seller.  Except as set forth in Section 3.15(b) of the Disclosure Schedules, no Person listed

15

thereon has received or been promised, orally or in writing, any bonus or increase in compensation and there has been no "general increase" in the compensation or rate of compensation payable to any employees of the Seller since the Balance Sheet Date. Except as set forth in Section 3.15(b) of the Disclosure Schedules, no Person listed thereon is a party to any Contracts with the Company Parties other than standard agreements with the Company Parties entered into in such Persons' capacities as employees or Contingent Workers. To the extent that the Company Parties contract with any Contingent Workers, the Company Parties have properly classified and treated them in all material respects in accordance with applicable Laws and for purposes of all employee benefit plans and perquisites.

(c)     None of the Company Parties is a government contractor or subcontractor.

(d)     There has not been a "mass layoff" or "plant closing" (as defined by the Worker Adjustment and Retraining Notification Act of 1988 and any similar state, local or foreign law) with respect to the Company Parties at any time within the twelve months preceding the date of this Agreement and none of the Company Parties has implemented any plant or office closing, transfer of employees or layoff of employees that (without regard to any actions that might be taken by Buyer after the Closing) is or could reasonably be expected to be in violation of any applicable WARN or similar Laws

(e)     Each Employment Agreement is set forth on Section 3.15(e) of the Disclosure Schedules and a copy of each Employment Agreement and any amendment thereto has been delivered to Buyer. Except as set forth in Section 3.15(e) of the Disclosure Schedules, the employment of each of the current employees is terminable at will, and none of the Company Parties has any obligation to provide any particular form or period of notice prior to terminating the employment of any of its current employees. None of the Company Parties has, and to the Seller's Knowledge, no other Person has, (i) entered into any agreement that obligates or purports to obligate Buyer or any of Buyer's Affiliates to make an offer of employment to any employee, consultant or contractor of the Company or (ii) promised or otherwise provided any assurances (contingent or other) to any employee, consultant or contractor of the Company Parties of any terms or conditions of employment with Buyer or any of Buyer's Affiliates following the Closing. The Seller has delivered to Buyer accurate and complete copies of all employee manuals and handbooks, employment policy statements, employment customs and practices, internal regulations, collective bargaining or labor agreements and Employment Agreements with respect to employees, all of which complied at all relevant times with applicable Law in all material respects.

(f)     All Persons who perform services in the United States for the Company Parties are either United States citizens or are legally entitled to work in the United States under the Immigration Reform and Control Act of 1986, as amended, and any other United States immigration laws relating to the employment of non-United States citizens applicable in the state in which the employees are employed. All individuals who perform services outside of the United States for the Company Parties are legally entitled to work in the country in which the individuals perform services. The Company Parties have not and does not employ any minors.

(g)     The Company Parties are compliant in all material respects with data privacy Laws regarding the retention, recording, use and transfer of personal and sensitive data, whether cross border or to third parties, have completed all adequate agreements and filings or notifications with all applicable Governmental Authorities or otherwise, and have in all material respects informed the employees or candidates for employment, and kept the data secure and confidential at all times, and the Transactions will not result in Buyer or the Company Parties to be in breach of such data privacy Laws.

16

(h)      Except as set forth in Section 3.15(h) of the Disclosure Schedules, there are no Actions filed, pending or, to the Seller's Knowledge, threatened (or for which the Company Parties received any written notice of) before any arbitrator, the Equal Employment Opportunity Commission, the Department of Labor, or any similar state agencies, or any other Governmental Authority concerning any matter relating to the labor and employment practices of the Company Parties or any employee, former employee, consultant or independent contractor of the Company Parties including with respect to matters involving discrimination or harassment, wage and hour, vacation or paid time off, the WARN Act, collective bargaining, civil rights, fair employment practices, the proper classification of employees, consultants or independent contractors, immigration, pay equity, safety and health, workers' compensation and the collection and payment of employment related Taxes, or the keeping of records in relation to the foregoing.

3.16     Material Contracts.

(a)      Except as set forth in Section 3.16(a) of the Disclosure Schedules, the Company Parties are not party to or bound by any Contracts, whether written or oral,  involving the following (such contracts, agreements and arrangements as are required to be set forth in Section 3.16(a) of the Disclosure Schedules being referred to herein collectively as the "Material Contracts"):

(i)      Other than in the Ordinary Course of Business, Contracts for the (A) future purchase, exchange or sale of natural gas, (B) future purchase, exchange, transmission or sale of electric power in any form, including energy, capacity or any ancillary services, and (C) future transportation of natural gas;

(ii)     Other than Contracts of the nature covered by Section 3.16(a)(i), Contracts for the (A) purchase or sale of any asset or that grant a right or option to purchase or sell any asset, other than in each case Contracts relating to assets with a nominal value of less than $50,000 individually or $100,000 in the aggregate, and (B) provision or receipt of any services or that grant a right or option to provide or receive any services, other than in each case Contracts relating to services with a nominal value of less than $50,000 individually or $100,000 in the aggregate;

(iii)    any interconnection, transportation, storage, capacity release, or market participant Contracts;

(iv)     Partnership, joint venture or limited liability company agreements;

(v)      any offset, countertrade, distributor, sales, advertising, agency or manufacturer's representative Contract or group purchasing Contract;

(vi)     any Contract (including proposals) for the purchase or lease of machinery, equipment, motor vehicles, office furniture, fixtures, materials, supplies, or other personal property or services involving the payment by the Seller of more than $50,000 over the remaining life of the Contract from the date of this Agreement;

(vii)    any Contract that expires or may be renewed at the option of any Person other than the Seller so as to expire more than one year after the date of this Agreement;

(viii)   any trust indenture, mortgage, promissory note, loan agreement or other Contract for the borrowing of money, any currency exchange, commodities or other hedging arrangement or any leasing transaction of the type required to be capitalized in accordance with GAAP,

17

consistently applied;

(ix)     any Contract for capital expenditures in excess of $50,000 in the aggregate;

(x)     any non-competition, non-solicitation, assignment of inventions or similar agreement between any Company Party and any employee of, or consultant to, any Company Party;

(xi)     any Contract or guarantee, support, indemnification, assumption or endorsement of, or any similar commitment with respect to, the Liabilities (whether accrued, absolute, contingent or otherwise) of any other Person;

(xii)     any guarantee of any obligation or any letter of credit, bond or other indemnity (excluding endorsements of instruments for collection in the Ordinary Course of Business);

(xiii)     any Contract for the sale or lease of any of its assets, excluding sales of services in the Ordinary Course of Business, or entered into other than in the Ordinary Course of Business;

(xiv)     any Contract (including proposals) for the performance of services by any Company Party;

(xv)     Any management or advisory Contract;

(xvi)     Contracts relating to the supply or storage of water to any Company Party or any Company Party's entitlement to water;

(xvii)     any Contract that (A) limits any Company Party's freedom to compete in any line of business or in any geographic area, (B) contains a "Most Favored Nation" or other similar provision, or (C) is a requirements Contract;

(xviii)    any Contract disclosed pursuant to <u>Section 3.22</u> (*Restrictions on Business Activities*);

(xix)     any license, development or other agreement relating to any of the Company Parties' Intellectual Property or relating to Intellectual Property which any Company Party has licensed from or to any other Person, or authorized for use by any other Person, or been authorized by any other Person for use by the Seller, other than "off the shelf" software;

(xx)     any Contract pursuant to which any Company Party has agreed to indemnify or hold harmless any other Person or which imposes any non-competition or exclusive dealing obligations of any Company Party;

(xxi)     any Employment, consulting, or other Contract providing for severance payments or other additional rights or benefits (whether or not optional) in the event of the sale or other change in control of any Company Party;

(xxii)     any Contract with any current employee or consultant of the Company Party or with any Person in which any Company Party has an interest;

18

(xxiii) any research or co-development agreements relating to any of the Intellectual Property owned by any Company Party; or

(xxiv) any Tax sharing or Tax allocation agreement.

(b)      Each Material Contract is a legal, valid and binding agreement, and no Company Party is in material default under, or in material breach of, any Material Contract, and, to the Seller's Knowledge, no other party thereto is in material default under, or in material breach of, any Material Contract; neither the Seller nor any Company Party is in receipt of any claim of default under any such Material Contract; and neither the Seller nor any Company Party anticipates any termination or change to, or receipt of a proposal with respect to, any Material Contract as a result of the Transactions.

3.17    Environmental Matters.

(a)      (i)      Each Company Party holds and has held all required Environmental Permits; (ii) each such Environmental Permit is identified in Section 3.17(a) of the Disclosure Schedules; and (iii) each such Environmental Permit will remain valid and effective after the Closing without any notice to or consent of any Governmental Authority;

(b)      Each Company Party is and has been in compliance with, and has no Liability under, any and all applicable or required (i) Environmental Permits, and (ii) Environmental Laws;

(c)      There are no past, pending or threatened Environmental Claims against any Company Party, and no Company Party is aware of any facts or circumstances which could reasonably be expected to form the basis for any Environmental Claim against any Company Party;

(d)      No Releases of Hazardous Materials have occurred and no Person has been exposed to any Hazardous Materials at, from, in, to, on or under any Sites and no Hazardous Materials are present in, on, about or migrating to or from any Site that could give rise to an Environmental Claim against any Company Party;

(e)      No Company Party, any predecessors of any Company Party, or any Person previously owned by any Company Party, has transported or arranged for the treatment, storage, handling, disposal, or transportation of any Hazardous Material to any off-Site location which has or could result in an Environmental Claim against any Company Party;

(f)      There are no (i) polychlorinated biphenyl containing equipment, (ii) underground storage tanks, or (iii) asbestos containing material at any owned, leased, operated or occupied real property;

(g)      There are no Phase I or Phase II environmental assessments, environmental investigations, studies, audits, tests, reviews or other analyses conducted by, on behalf of, or which are in the possession of, the Seller or any Company Party (or any of their respective advisors or representatives) with respect to any Site which have not been delivered to the Buyer prior to execution of this Agreement;

(h)      Neither the execution of this Agreement nor the consummation of the transaction contemplated by this Agreement will require any notification to or consent of any Governmental Authority or the undertaking of any investigations or remedial actions pursuant to Environmental Laws; and

DB1/ 87728904.11

19

(i)     No Company Party has entered into or is subject to any judgment, Action or other similar requirement of or agreement with any Governmental Authority under any Environmental Laws.

(j)     No Company Party   has, either expressly or by operation of law, assumed responsibility for or agreed to indemnify or hold harmless any Person for any liability or obligation, arising under or relating to Environmental Laws, including, but not limited to, any obligation for investigation, corrective or remedial action.

3.18    Insurance.  Section 3.18 of the Disclosure Schedules lists all policies of fire, liability, workmen's compensation, life, property and casualty and other insurance owned or held by the Company Parties with respect to the Business or with respect to which any Company Party is a beneficiary thereunder.  Such policies of insurance are maintained with financially sound and reputable insurance companies, funds or underwriters and are of the kinds and cover such risks and are in such amounts and with such deductibles and exclusions as are consistent with prudent business practice (collectively, the "Insurance Policies").  All such Insurance Policies are in full force and effect.  All premiums dues on such Insurance Policies have been paid.  No Company Party is in default with respect to its obligations under any of such Insurance Policies, and has not received any notification of cancellation of any such insurance policies.

3.19    Suppliers and Customers.  Section 3.19 of the Disclosure Schedules sets forth (a) the five (5) largest suppliers of the Company Parties (the "Material Suppliers"), each based on the dollar amount of expenditures for the 2015 fiscal year, (b) the twenty-five (25) largest customers of the Seller (the "Material Customers"), each based on the dollar amount of purchases for the 2015 fiscal year, and (c) the amount of consideration paid to or from such Material Supplier or Material Customer.  No Material Supplier or Material Customer has cancelled or otherwise terminated, or threatened to cancel or otherwise terminate, its relationship with any Company Party, or has during the last twelve (12) months decreased materially, or threatened to decrease or limit materially, its services, supplies or materials for use by the Company Parties, except for normal cyclical changes related to customers' businesses.  The Seller has no Knowledge that any such Material Supplier or Material Customer intends to cancel or otherwise substantially modify its relationship with any Company Party or to decrease materially or limit its services, supplies or materials to the Company Parties, and to the Seller's  Knowledge, the consummation of the Transactions will not adversely affect the relationship of the Buyer with any such Material Supplier or Material Customer.

3.20    Interested Party Transactions.  Neither the Seller, nor any of its respective Affiliates, (a) is indebted to the Company Parties, nor are the Company Parties indebted to any such Person (except for amounts due as normal salaries and bonuses and in reimbursement of ordinary expenses), (b) owns, directly or indirectly, any interest in (excepting not more than 1% stock holdings for investment purposes in securities of publicly held and traded companies) or is an officer, director, manager, employee or consultant of any Person which is a competitor, lessor, lessee, customer or supplier of the Company Parties, (c) owns, directly or indirectly (other than as an equity holder of the Company Parties), in whole or in part, any tangible or intangible property which any Company Party is using or the use of which is necessary for the Business, or (d) has any cause of action or other claim whatsoever against, or owes any amount to, the Company Parties, except for claims in the Ordinary Course of Business, such as for accrued vacation pay, accrued benefits under Employee Benefit Plans and similar matters and agreements.

3.21    Certain Agreements Affected by the Transactions.  Except as set forth in Section 3.21 of the Disclosure Schedules, neither the execution and delivery of this Agreement nor the consummation of the Transactions and any Conversion will (a) result in the Company Parties paying or

20

becoming obligated to pay any payment (including, without limitation, severance, unemployment compensation, golden parachute, bonus or otherwise) to any director or employee of any Company Party, (b) materially increase any benefits otherwise payable by the Company Parties, or (c) result in the acceleration of the time of payment or vesting of any such benefits.

3.22    Restrictions on Business Activities.  Except as set forth in Section 3.22 of the Disclosure Schedules, there is no Contract or Action binding upon the Company Parties which has or could reasonably be expected to have the effect of prohibiting or impairing any current or future activity of the Company Parties or the overall conduct of the Business by the Company Parties as currently conducted or as proposed to be conducted.

3.23    Books and Records.  The Books and Records, all of which have been made available to the Buyer, are complete and correct in all material respects and have been maintained in accordance with sound business practices.

3.24    Complete Copies of Materials.  The Seller has delivered or made available to the Buyer and its representatives true and complete copies of each document specifically identified on the Disclosure Schedules.

3.25    Brokers.  Neither the Seller, nor has any of its Affiliates, has dealt with, retained, utilized or been represented by, nor is any fee or commission due to, any broker, agent, finder or intermediary in connection with the negotiation or consummation of the Transactions.

3.26    Disclosure.  No representation or warranty by the Seller in this Agreement or in any exhibit or schedule to this Agreement, or in any written statement, certificate or other document to be delivered to the Buyer at the Closing pursuant hereto or in connection with the Transactions, contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements contained therein not misleading.  There is no material fact of which the Seller is actually aware and has not disclosed to the Buyer in writing which materially adversely affects, or that the Seller can now reasonably foresee, in its good faith reasonable determination, will materially adversely affect, the financial condition or operations of the Company Parties or the Business.

**4.       REPRESENTATIONS AND WARRANTIES OF THE SELLER**

The Seller represents and warrants to the Buyer as follows:

4.1    Organization.  The Seller is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

4.2    Authority and Enforceability.  The Seller has all requisite power and full legal right to enter into the Transaction Documents, and to perform all of such Seller's agreements and obligations thereunder in accordance with their respective terms.  Each of the Transaction Documents has been duly authorized by all necessary limited liability company action of the Seller.  The Seller has delivered to the Buyer certified copies of the resolutions duly adopted by the managing member of the Seller authorizing and approving the Transactions and the Transaction Documents (the "Transaction Approvals").  The Transaction Approvals constitute all necessary limited liability company action for the authorization, execution and delivery of the Transaction Documents by the Seller and the performance by the Seller of the Transactions, and such approvals have not been revoked, rescinded or amended.

21

4.3     No Conflicts; Required Filings and Consents.

(a)     Except as set forth in Section 4.3(a) of the Disclosure Schedules, the execution and delivery of the Transaction Documents by the Seller, and the consummation of the Transactions, will not conflict with, or result in any material violation of, or material default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any right or obligation or loss of any benefit or creation of any Lien (other than Permitted Liens) on any of the Loan Documents under (i) any provision of the Seller's Charter Documents, (ii) any Material Contract to which the Seller is a party, (iii) any Permit, judgment, order or decree applicable to the Seller, or any of its respective properties or assets, or (iv) any Law applicable to the Seller or any of its properties or assets.

(b)     Except as set forth in Section 4.3(b) of the Disclosure Schedules, no consent, approval, exemption or authorization of, or registration, qualification or filing with, any Governmental Authority is required for the execution and delivery by the Seller of the Transaction Documents to which it is a party or for the consummation by the Seller of the Transactions.

(c)     Title.  As of the date hereof, the Seller owns the Loan Documents and all rights, titles, and interests arising thereunder, free and clear of all Liens.

(d)     Brokers.  The Seller has not dealt with, retained, utilized or been represented by, nor is any fee or commission due to, any broker, agent, finder or other intermediary in connection with the negotiation or consummation of the Transactions.

**5.     REPRESENTATIONS AND WARRANTIES OF THE BUYER**

The Buyer hereby represents and warrants to the Seller as follows:

5.1     Organization.  The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has the requisite limited liability power and authority and all necessary material government approval to own, lease and operate its properties and to carry on its business as it is now being conducted.

5.2     Authority and Enforceability. The Buyer has all requisite power and full legal right to enter into the Transaction Documents and to perform all of the Buyer's agreements and obligations thereunder in accordance with their respective terms.  Each of the Transaction Documents has been duly and validly executed and delivered by the Buyer and, assuming the due authorization, execution and delivery by the Seller, constitutes the legal, valid and binding obligation of the Buyer enforceable against the Buyer in accordance with its terms, except as the enforceability thereof may be limited by any applicable bankruptcy, reorganization, insolvency or other Laws affecting creditors' rights generally or by general principles of equity.

5.3     No Conflict; Required Filings and Consents.

(a)     The execution and delivery of the Transaction Documents by the Buyer does not, and the consummation of the Transactions will not, conflict with, or result in any violation of, or default under (with or without notice or lapse of time, or both), or give rise to a right of termination, cancellation or acceleration of any right or obligation or loss of any benefit or creation of any Lien on any asset of the Buyer, under (i) any provision of the Buyer's organizational documents, each as amended to date, (ii) any agreement or instrument to which the Buyer is a party or to which any of its properties or

22

assets is bound, (iii) any Permit, judgment, order or decree applicable to the Buyer or any of its properties or assets, or (iv) Law applicable to the Buyer or any of its properties or assets.

(b)      No consent, approval or authorization of, or registration, qualification or filing with, any Governmental Authority is required for the execution and delivery by the Buyer of the Transaction Documents or for the consummation by the Buyer of the Transactions.

5.4      <u>Brokers</u>.  The Buyer has not dealt with, retained, utilized or been represented by, nor is any fee or commission due to, any broker, agent, finder or other intermediary in connection with the negotiation or consummation of the Transactions.

**6.      CERTAIN COVENANTS**

6.1      <u>Covenants regarding Confidentiality, Non-Competition, and Non-Solicitation</u>.  As an inducement for the Buyer to enter into this Agreement and to consummate the Transactions, the Seller agrees as follows:

(a)      <u>Confidential Information</u>.  The Seller shall, and shall cause its Affiliates and representatives to, hold, in confidence any and all information, whether written or oral, concerning the Business and the Company Parties and the Buyer, except to the extent that the Seller can show that such information (i) is generally available and known to the public through no fault of the Seller, any of the Seller's Affiliates or representatives, or (ii) is lawfully acquired by such Seller's Affiliates or representatives from and after the Closing Date from sources that are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation (all of the foregoing, "<u>Business Confidential Information</u>").  If the Seller's Affiliates or representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, the Seller, on behalf of such Affiliate or representative, shall promptly notify the Buyer in writing and shall disclose only that portion of such information which such Seller Affiliate or representative is advised by such Affiliates or representative's legal counsel in writing is legally required to be disclosed; <u>provided</u>, that such Seller Affiliate or representative shall use commercially reasonable efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.  Notwithstanding anything contained in this Agreement to the contrary, each Seller Affiliate or representative may disclose Business Confidential Information to its respective legal, accounting and Tax advisors in connection with enforcing its respective rights under this Agreement and the other Transaction Documents.

(b)      <u>Non-Competition; Non-Interference</u>.  The Seller shall not, and shall not permit any of its Affiliates (including any successor thereof), to, directly or indirectly:

(i)      for a period commencing on the Closing Date and ending on the date that is the earlier of (A) 9 months after the redemption of the Class C Units (as provided for in the Buyer LLC Agreement) and (B) the first anniversary of the Closing Date (the "<u>Non-Compete Period</u>"), own a controlling interest in (whether through the ownership of equity, the possession of contractual rights, or otherwise), manage, operate or participate in the management or operation, or provide any financing with controlling or other management rights to, any Person that engages in the Business, as currently conducted by the Company Parties or proposed to be conducted by the Company Parties, anywhere in the world as of the Closing Date;

(ii)      for a period commencing on the Closing Date and ending on the date that is the third anniversary of the Closing Date (the "<u>Non-Interference Period</u>"), permit intentionally interfere in any material respect with the business relationships (whether formed prior to or after the Closing Date) of the Company Parties, including, without limitation, any of their customers or

23

suppliers;

(iii)     for the Non-Interference Period, (A) take any action that is designed or intended to have the effect of discouraging any lessor, licensor, customer or supplier, from having a business relationship or potential business relationship with the Company Parties, or from maintaining business relationships or entering into a new business relationship with the Company Parties, and the Seller will refer all inquiries relating to the Business or the Company Parties to the Buyer; or (B) interfere with, or attempt to interfere with, the employment of, or relationships with, any employees of the Company Parties, or, directly or indirectly, solicit, hire or attempt to induce any of them to leave the employ of, or terminate such party's relationship with, the Company Parties; provided, that the foregoing shall not prohibit the Seller from hiring a Person who responds to general media advertisements not specifically directed at the officers, employees, representatives or agents of the Company Parties, or their respective Affiliates.

(c)     The Seller acknowledges and agrees that the covenants set forth in this Section 6.1 are necessary to protect the Company Parties and the Business following the Closing. The Seller further acknowledges and agrees that the Buyer's willingness to enter into this Agreement is conditioned and dependent upon the Seller's promises to be bound by this Section 6.1 and the covenants set forth herein.  The Seller acknowledges and agrees that any breach or threatened breach of the restrictive covenants contained in this Section 6.1 would cause irreparable injury to the Company Parties and/or the Buyer and that the remedy at Law for any such breach or threatened breach would be inadequate, and, accordingly, the Seller agrees and consents that, in addition to any other available remedy to the Company Parties and/or the Buyer, temporary and permanent injunctive relief may be granted in any action which may be brought by the Company Parties and/or the Buyer to enforce such restrictive covenants without necessity of proof that any other remedy at Law is inadequate.

(d)     The Seller acknowledges and agrees that all of the restrictions, covenants and agreements in this Section 6.1 are appropriate, reasonable and valid (including with respect to geographic scope and duration) and fully necessary for the protection of the legitimate interests of the Company Parties and the Buyer.  If any provision contained in this Section 6.1 shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Section 6.1, but this Section 6.1 shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.  It is the intention of the parties that if any of the restrictions or covenants contained herein is held to cover a geographic area or to be for a length of time which is not permitted by applicable Law, or in any way construed to be too broad or to any extent invalid, such provision shall not be construed to be null, void and of no effect, but to the extent such provision would be valid or enforceable under applicable Law, a court of competent jurisdiction shall construe and interpret or reform this Section 6.1 to provide for a covenant having the maximum enforceable geographic area, time period and other provisions (not greater than those contained herein) as shall be valid and enforceable under such applicable Law.  The Seller acknowledges and agrees that the Restricted Period shall be automatically extended by the length of any period during which the Seller is in breach of the terms of this Section 6.1.

6.2     Transfer Taxes.  All transfer, documentary, sales, use, stamp, registration and other such Taxes and fees incurred in connection with this Agreement will be paid by the Seller when due.  The Seller, at its expense, will file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees, and, if required by applicable Law, the other parties hereto will join in the execution of any such Tax Returns and other documentation.  The Buyer and the Seller further agree, upon request, to use their commercially reasonable efforts to obtain any certificate or other document from any Governmental Authority or any

24

other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed with respect to the Transactions.

6.3     Tax Matters Cooperation.  The parties hereto shall cooperate fully, as and to the extent reasonably requested by any other party hereto, in connection with the filing of Tax Returns, and any audit, litigation or other proceeding with respect to Taxes. Such cooperation shall include the retention for six (6) years following the Closing Date and (upon such other party's reasonable request) the provision of records and information which are reasonably relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Each party hereto shall provide to the others, within ten (10) Business Days of the receipt thereof, any Tax related communications and notices it receives which may impact such other party's Liability with respect to Taxes or filing responsibilities.

**7.**     INDEMNIFICATION

7.1     Indemnification by the Buyer.  Subject to the limitations set forth in this Section 7, the Buyer hereby agrees to indemnify, defend and hold harmless the Seller and its Affiliates, and their respective directors, managers, officers, employees, representatives and agents, from and against any and all Damages related to or arising out of or in connection with:

(a)     any inaccuracy or breach of any representation or warranty made by the Buyer in the Transaction Documents (including any schedules thereto); and

(b)     any breach by the Buyer of, or default in the performance by the Buyer of, any covenant, agreement, obligation or undertaking made by the Buyer in the Transaction Documents (including any schedules thereto).

7.2     Indemnification by the Seller.  Subject to the limitations set forth in this Section 7, the Seller hereby agrees to indemnify, defend and hold harmless the Buyer and its Affiliates, and their respective directors, managers, officers, employees, representatives and agents, from and against any and all Damages related to or arising out of or in connection with:

(a)     any inaccuracy or breach of any representation or warranty made by the Seller in the Transaction Documents (including the Disclosure Schedules and any other schedules thereto);

(b)     any breach by the Seller of, or default in the performance by the Seller of, any covenant, agreement, obligation or undertaking made by the Seller in the Transaction Documents (including the Disclosure Schedules and any schedules thereto);

(c)     any Pre-Closing Taxes imposed on any Company Party, and any Taxes imposed on Seller; and

(d)     any inaccuracy or breach of the representation and warranty under Section 3.14(d), related to compliance with Section 409A of the Code; and any issues relating to the classification of Contingent Workers under Section 3.15(b); the offer of coverage or any other requirements under the Patient Protection and Affordable Care Act; and any inaccuracy or breach of the representation and warranty under Section 3.10(e). This Section 7.2(d) will not be subject to the limitations under Section 7.5.

7.3     Third-Party Claims.

25

(a)     In the event that any party hereto (an "Indemnified Party") desires to make a claim against another party hereto (an "Indemnifying Party," which term includes all Indemnifying Parties if more than one), in connection with any third-party Action any time instituted against or made upon the Indemnified Party for which the Indemnified Party may seek indemnification hereunder (a "Third-Party Claim"), the Indemnified Party will promptly notify the Indemnifying Party of such Third-Party Claim and of the Indemnified Party's claim of indemnification with respect thereto; provided, that failure to promptly give such notice will not relieve the Indemnifying Party of its indemnification obligations under this Section 7.3, except to the extent, if any, that the Indemnifying Party has actually been prejudiced thereby.

(b)     The Indemnifying Party will have the right to assume the defense of the Third-Party Claim with counsel of its choice reasonably satisfactory to the Indemnified Party by written notice to the Indemnified Party within fifteen (15) days after the Indemnifying Party has received notice of the Third-Party Claim; provided, that the Indemnifying Party must conduct the defense of the Third-Party Claim actively and diligently thereafter in order to preserve its rights in this regard; and, provided further, that the Indemnified Party may retain separate co-counsel at its sole cost and expense and participate in the defense of the Third-Party Claim.  Notwithstanding the foregoing, the Indemnifying Party will not have the right to assume the defense of the Third-Party Claim if such Third Party Claim (i) seeks non-monetary relief, (ii) involves criminal or quasi-criminal allegations, (iii) is one in which an Indemnifying Party and the Indemnified Party are jointly named in the complaint or (iv) could reasonably be expected to materially adversely affect the Taxes of the Indemnified Party for a taxable period (or portion thereof) beginning after the Closing Date.  If the Indemnifying Party (A) fails to assume the defense of the Third-Party Claim in accordance with this Section 7.3(b), (B) is unable to assume such defense on account of the restrictions set forth in the immediately preceding sentence, or (C) after assuming such defense, fails to conduct the defense of the Third-Party Claim actively and diligently, the Indemnified Party, with counsel of its choice may conduct the defense of such Third-Party Claim, with the costs and expenses thereof to be borne as provided in Sections 7.3(c) or 7.3(d), as applicable.

(c)     With respect to any Third-Party Claim the defense of which is being conducted by the Indemnifying Party pursuant to the provisions of Section 7.3(b), the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior consent of the Indemnified Party (which will not be unreasonably withheld or delayed) unless the judgment or proposed settlement (i) includes an unconditional release of all liability of each Indemnified Party with respect to such Third-Party Claim, (ii) involves only the payment of money damages by the Indemnifying Party and does not impose an injunction or other equitable relief upon the Indemnified Party, and (iii) does not involve an admission of any liability or wrongdoing on the part of the Indemnified Party.  With respect to any Third-Party Claim the defense of which is being conducted by the Indemnified Party pursuant to the provisions of Section 7.3(b), the Indemnified Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third-Party Claim without the prior written consent of the Indemnifying Party (which will not be unreasonably withheld or delayed).  In the event of any settlement of any Third-Party Claim by (A) the Indemnifying Party with or without the prior consent of the Indemnified Party in accordance with the applicable provisions hereinabove set forth in this Section 7.3(c), or (B) the Indemnified Party with the prior consent of the Indemnifying Party as hereinabove set forth in this Section 7.3(c), all of the costs and expenses incurred in connection with any such Third-Party Claim and the settlement thereof (including the costs and expenses of counsel for the Indemnified Party) shall be Damages of the Indemnified Party and borne by the Indemnifying Party, subject in all events to the applicable limitations set forth in Section 7.

7.4     Purchase Price Adjustments.  The parties agree that to the greatest extent possible the payment of any indemnity hereunder shall be treated as an adjustment to the Purchase Price for Tax purposes.

26

7.5     Limitations of Liability and Order of Recourse.

(a)     Deductible.  No Indemnifying Party will be required to indemnify any Indemnified Party hereunder with respect to any breaches of such party's representations or warranties hereunder until such time as the aggregate amount of Damages resulting therefrom for which the applicable Indemnified Party(ies) are otherwise entitled to indemnification pursuant to this Agreement, exceeds $1,700,000.00 (One Million Seven Hundred Thousand) (the "Indemnification Deductible"), after which the applicable Indemnifying Party(ies) shall be obligated to indemnify the applicable Indemnified Party(ies) for the full amount of all Damages incurred by such Indemnified Party(ies) in excess of such Indemnification Deductible, subject to the limitations in this Section 7.5.  Notwithstanding anything to the contrary in this Section 7.5, the Indemnification Deductible shall not apply to any Damages arising out of or in connection with (i) fraud,   (ii) the breach of the representations set forth in Sections 3.1 (*Organization; Capitalization; Ownership*), 3.2 (*Charter Documents*), 3.3 (*No conflicts; Required Filings and Consents*), and 3.13 (*Taxes*), or (iii) the matters set forth in Section 7.2(d).

(b)     Maximum Liability.  The parties specifically agree that notwithstanding any provision of this Agreement to the contrary, the indemnification provided for in Section 7.2 is subject to the following limitations:

(i)     The maximum aggregate liability of the Seller under Section 7.2(a) shall in no event exceed an amount equal to $49,000,000 (Forty Nine Million Dollars);

(ii)     Notwithstanding anything to the contrary in this Section 7.5, the maximum aggregate liability set forth in this Section 7.5(b) shall not apply to any Damages arising out of or in connection with fraud on the part of the Seller.

(c)     Survival.   All representations and warranties of the parties in this Agreement shall survive the Closing and shall expire on, and no Indemnifying Party will be liable for any Damages resulting from any breach thereof unless a written claim for indemnification is given by the Indemnified Party to the Indemnifying Party with respect thereto prior to, December 8, 2017.

(d)     Order of Recourse.   The Buyer's right to indemnification or reimbursement pursuant to this Article 7, on account of any indemnifiable Damages, will be satisfied (i) first to the extent available, by a cancellation in the Class C Preferred Units held by the Seller, and, (ii) to the extent not satisfied by clause (i), such excess Damages will be satisfied by the Seller.  For each dollar of indemnification payment in clause (i), the Class C Preferred Unreturned Capital with respect to such Class C Preferred Units shall be reduced by one dollar, and for each $100, one Class C Preferred Unit held by such Seller shall be cancelled.  The parties to this Agreement agree that such reduction shall be reflected in the Members Schedule to the Buyer LLC Agreement.

7.6     Survival of Representations and Warranties.  The representations and warranties of the parties hereto contained in this Agreement or otherwise made in writing in connection with the Transactions (in each case except as affected by the Transactions) shall be deemed material and, notwithstanding any investigation by the Buyer, shall be deemed to have been relied on by the Buyer and shall survive the Closing and the consummation of the Transactions in accordance with the provisions of Section 7.5(b). Each representation and warranty made by the Seller or the Buyer in this Agreement shall expire on the last day, if any, that claims for breaches of such representation or warranty may be made pursuant to Section 7.5, except that any such representation or warranty that has been made the subject of a claim prior to such expiration date shall survive with respect to such claim until the final resolution of such claim pursuant to this Section 7.

27

7.7     Effect of Investigation. The representations, warranties and covenants of an Indemnifying Party, and an Indemnified Party's right to indemnification with respect thereto, shall not be affected or deemed waived by reason of the fact that such Indemnified Party or any of its Representatives actually knew that any such representation or warranty is, was or might be inaccurate.

7.8     Exclusive Remedy. From and after the Closing, the indemnification provided pursuant to this Section 7 shall be the sole and exclusive remedy for any Damages resulting from or arising out of any breach or claim in connection with this Agreement, the other Transaction Documents, the Disclosure Schedules or any certificate delivered in connection with this Agreement, regardless of the cause of action; provided, that, the indemnification rights provided pursuant to this Section 7 are independent of, and, in addition to, such rights and remedies as the parties may have in equity to seek specific performance or other equitable remedies in the case of any breach of any covenant set forth in Section 6.1.

8.     DEFINITIONS

As used herein the following terms not otherwise defined have the following respective meanings:

"12/31/15 Balance Sheet" shall have the meaning given such term in Section 3.4.

"Action" means any claim, grievance, complaint, charge, action, cause of action, demand, lawsuit, arbitration, inquiry, investigation, audit, notice of violation, proceeding, litigation, injunction, order, decree, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at Law or in equity.

"Affiliate" shall mean any Person directly or indirectly controlling, controlled by or under direct or indirect common control with, the Seller (or other specified Person) and shall include (a) any Person who is a director or beneficial holder of at least 10% of any class of the then outstanding capital stock (or other shares of beneficial interest) of the Seller (or other specified Person) and (b) any Person of which the Seller (or other specified Person) or an Affiliate of the kind listed in clause (a) above of the Seller (or other specified Person) shall, directly or indirectly, either beneficially own at least 10% of any class of the then outstanding capital stock (or other shares of beneficial interest) or constitute at least a 10% equity participant.

"Agreement" shall have the meaning given such term in the preamble.

"Annual Financial Statements" shall have the meaning given such term in Section 3.4.

"Assignment" shall have the meaning given such term in Section 2.2(a).

"Authorizations" shall have the meaning given such term in Section 3.8.

"Balance Sheet Date" shall have the meaning given such term in Section 3.4.

"Books and Records" means all records (whether in written or other form) of any kind (whether held by the Company Parties or by others on its behalf) owned and in the possession or control of the Seller or Company Parties, including purchase and sales records, customer lists and records, customer prospect lists and records, distributor lists and records, referral sources, marketing materials, research and development materials, operating guides and manuals, creative materials, Intellectual Property materials, studies, cost and pricing information, supplier lists and records, business plans, specifications, personnel

28

and labor relations records, accounting and financial records, maintenance records, operating and management manuals, computer systems and software documentation, disks, tapes and other computer storage media and the information stored thereon, blank forms, blank checks and other blank instruments, and studies and reports, plans, specifications and designs of equipment and records (whether in written or oral form).

"Business" shall mean the provision of energy products, including physical electricity and natural gas to business and residential consumers, purchasing electricity and natural gas from wholesale providers and distributing such commodities to consumers.

"Business Confidential Information" shall have the meaning given such term in Section 6.1(a)(i).

"Business Day" shall mean any day except Saturday, Sunday or any day on which banks are generally not open for business in the State of New York.

"Buyer" shall have the meaning given such term in the preamble.

"Buyer LLC Agreement" means the amended and restated limited liability company agreement of Buyer, dated as of June 9, 2016, as the same may be amended or modified from time to time.

"CERCLA" shall have the meaning given such term in Section 3.17(a).

"Charter Documents" shall mean, with respect to any Person which is an entity, the certificate of incorporation, bylaws, limited liability company operating agreement, partnership agreement, or other equivalent organizational or constituent documents, each as then amended and in effect.

"Class B-2 Units" shall have the meaning given such term in the Buyer LLC Agreement.

"Class C Units" shall have the meaning given such term in the Buyer LLC Agreement.

"Closing" shall have the meaning given such term in Section 2.1.

"Closing Date" shall have the meaning given such term in Section 2.1.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Contingent Workers" shall have the meaning given such term in Section 3.15(b).

"Contract" means any contract, purchase order, agreement, mortgage, indenture, lease, license, insurance policy or other agreement, instrument or binding commitment, whether oral or written.

"Conversion" shall have the meaning given such term in Section 3.1(e).

"Damages" shall mean all damages, losses, Liabilities, deficiencies, Actions, judgments, interest, awards, penalties, costs, and expenses of whatever kind, including court costs and the reasonable fees and expenses of legal counsel, that are incurred as a result of any claims, demands, actions, causes of action, suits, litigations, arbitrations or liabilities; provided, that in no event shall Damages include any punitive, consequential, special or exemplary damages.

29

"Debt" shall mean as to any Person at any time, without duplication: (i) all indebtedness, liabilities and obligations of such Person for borrowed money, including from the Seller; (ii) all indebtedness, Liabilities and obligations of such Person evidenced by bonds, notes, debentures or other similar instruments; (iii) all indebtedness, liabilities and obligations of such Person to pay the deferred purchase price of property or services, contingent or otherwise; (iv) all Liabilities under leases of such Person that would be required to be recorded as capital leases under GAAP; (v) all indebtedness of others guaranteed by such Person (including guarantees in the form of an agreement to repurchase or reimburse); (vi) all reimbursement obligations of such Person (whether contingent or otherwise) in respect of letters of credit, bankers' acceptances, surety or other bonds and similar instruments; (vii) any amounts owed to any Person under any noncompetition, severance or similar arrangement; (viii) any change-of-control or similar payment or increased cost that is triggered in whole or in part by the Transactions; (ix) any Liability of a Person under deferred compensation plans, phantom stock plans, severance or bonus plans, or similar arrangements made payable in whole or in part as a result of the Transactions; (x) any off-balance sheet financing of a Person (but excluding all leases recorded for accounting purposes by the applicable Person as an operating lease); and (xi) any accrued and unpaid interest on, and any prepayment premiums, penalties or similar contractual charges in respect of, any of the foregoing obligations computed as though payment is being made in respect thereof on the Closing Date.

"Disclosure Schedule," or "Disclosure Schedules" mean the Disclosure Schedule attached hereto, dated as of the date of this Agreement, delivered by the Seller to the Buyer concurrently with the execution and delivery of this Agreement.

"Employee Benefit Plan" shall have the meaning given such term in Section 3.14(a).

"Environmental Claim" means any and all administrative or judicial actions, suits, orders, claims, liens, notices, notices of violations, investigations, complaints, requests for information, proceedings, or other communication, whether criminal or civil, pursuant to or relating to any applicable Environmental Law.

"Environmental Laws" shall mean any and all federal, state, local, provincial and foreign, civil and criminal laws, statutes, ordinances, orders, common law, codes, rules, regulations, Environmental Permits, policies, guidance documents, judgments, decrees, injunctions, or agreements with any Governmental Authority, relating to the protection of health and the environment, worker health and safety, and/or governing the handling, use, generation, treatment, storage, transportation, disposal, manufacture, registration, distribution, formulation, packaging, labeling, or Release of or exposure to Hazardous Substances.

"Environmental Permit" means any federal, state, local, provincial, or foreign permits, licenses, approvals, consents or authorizations required or issued by any Governmental Authority under or in connection with any Environmental Law, including without limitation, any and all orders, consent orders or binding agreements issued by or entered into with a Governmental Authority under any applicable Environmental Law.

"ERISA" shall have the meaning given such term in Section 3.14(a).

"ERISA Affiliate" shall have the meaning given such term in Section 3.14(a).

"Exchange Act" shall mean the Securities and Exchange Act of 1934, as amended.

30

"Family Member" shall mean, as applied to any individual, any parent, spouse, child, spouse of a child, brother or sister of the individual, and each trust created for the benefit of one or more of such Persons, and each custodian of property of one or more such Persons.

"FERC" means the Federal Energy Regulatory Commission.

"Financial Statements" shall have the meaning given such term in Section 3.4.

"FPA" means the Federal Power Act, as amended, including the implementing regulations adopted by FERC thereunder.

"GAAP" shall mean United States generally accepted accounting principles, consistently applied throughout the periods involved.

"Governmental Authority" shall mean any nation, sovereign or government or political subdivision, whether federal, regional, state, province, local or foreign, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any such nation, sovereign, government or political subdivision, and any private certification agencies or entities.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Hazardous Substances" shall mean petroleum, petroleum hydrocarbons or petroleum products, petroleum by-products, radioactive materials, asbestos or asbestos-containing materials, gasoline, diesel fuel, pesticides, radon, urea formaldehyde, mold, lead or lead-containing materials, polychlorinated biphenyls; and any other chemicals, materials, substances or wastes in any amount or concentration which are regulated under or for which liability can be imposed under any Environmental Law.

"Indemnified Party" shall have the meaning given such term in Section 7.3(a).

"Indemnifying Party" shall have the meaning given such term in Section 7.3(a).

"Insurance Policies" shall have the meaning given such term in Section 3.18.

"Intellectual Property" shall mean intellectual property or proprietary rights of any description, including, without limitation, (i) rights in any patent, patent application (including, without limitation, any continuation, continuation-in-part and divisional filings), copyright, industrial design, URL, domain name, social media address, trademark, service mark, logo, slogan, trade dress, corporate name or trade name, (ii) related registrations and applications for registration, (iii) trade secrets, moral rights or publicity rights, (iv) inventions, discoveries, or improvements, modifications, know-how, techniques, methodologies, writings, works of authorship, design or data, whether or not patented, patentable, copyrightable or reduced to practice, including, but not limited to, any inventions, discoveries, improvements, modifications, know-how, techniques, methodologies, writings, works of authorship, designs or data embodied or disclosed in any:  (1) computer source codes (human readable format) and object codes (machine readable format); (2) specifications; (3) manufacturing, assembly, test, installation, service and inspection instructions and procedures; (4) engineering, programming, service and maintenance notes and logs; (5) technical, operating and service and maintenance manuals and data; (6) hardware reference manuals; and (7) user documentation, help files or training materials, and (v) goodwill, franchises, consents, approvals, and claims of infringement and misappropriation against third parties related to any of the foregoing.

31

"Interim Financial Statements" shall have the meaning given such term in Section 3.4.

"IRS" shall mean the United States Internal Revenue Service.

"Knowledge" or "knowledge" means, with respect to the Seller, the actual knowledge of the Seller or the knowledge the Seller should have known after reasonable investigation and due inquiry thereby.

"Law" means with respect to any Governmental Authority, any constitutional provision, law, statute, code, rule, regulation, ordinance, treaty, order, decree, writ, judgment, decision, certificate, holding, determination, injunction, permit, directive, requirement or rule of law (including common law) of such Governmental Authority along with the interpretation and administration thereof by any Governmental Authority charged with the interpretation or administration thereof, including the Securities Act, the Exchange Act, or rules or regulations promulgated by the Securities and Exchange Commission or any of the foregoing or of related to FERC, the FPA or PUHCA. Unless the context clearly requires otherwise, the term "Law" shall include each of the foregoing (and each provision thereof) as in effect at the time in question, including any amendments, supplements, replacements or other modifications thereto or thereof, and whether or not in effect as of the date of this Agreement.

"Leases" shall have the meaning given such term in Section 3.9(b).

"Leased Real Property" means the real property leased, subleased or licensed by the Seller as tenant, subtenant, licensee or other similar party, together with, to the extent leased, licensed or owned by the Seller, all buildings and other structures, facilities or leasehold improvements, currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property and other assets of every kind, nature and description of the Seller located at or attached or appurtenant thereto and all easements, licenses, rights, options, privileges and appurtenances relating to any of the foregoing.

"Liability" means any liability, Debt, obligation, deficiency, Tax, penalty, assessment, fine, claim, cause of action or other loss, fee, cost or expense of any kind or nature whatsoever, whether asserted or unasserted, absolute or contingent, known or unknown, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due and regardless of when asserted.

"Lien" means with respect to any asset, any mortgage, lien, license, pledge, charge, security interest, claim, title retention agreement, restriction or encumbrance of any kind in respect of such asset.

"Material Adverse Effect" means any event, change, circumstance, condition, state of facts, development or effect that has had or would reasonably be expected to have a materially adverse effect on the financial condition, properties, assets, Liabilities, business, operations or results of operations of the Company Parties taken as a whole, or may prevent or materially delay consummation of the Transactions or otherwise prevent the Seller from performing its obligations under any Transaction Document to which it is a party; provided, however, that neither of the following shall be deemed to be a Material Adverse Effect: (i) any adverse change in the price of electricity or gas, and (ii) changes in general economic conditions.

"Material Contracts" shall have the meaning given such term in Section 3.16(a).

"Material Customers" shall have the meaning given such term in Section 3.19.

32

"Material Suppliers" shall have the meaning given such term in Section 3.19.

"Multi-Employer Plan" shall have the meaning given such term in Section 3.14(a).

"Ordinary Course of Business" means any action taken by a Person if such action is consistent in nature, scope and magnitude with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person.

"Owned Real Property" means the real property owned by the Company Parties.

"PBGC" shall have the meaning given such term in Section 3.14(d)(ii).

"Permitted Liens" means any Lien for Taxes or other governmental charges, assessments or levies that are not yet due and payable.

"Person" shall mean a corporation, an association, a partnership (general or limited), a limited liability company, an organization, a business, an individual, a government or political subdivision thereof or a Governmental Authority.

"Pre-Closing Tax" means any Tax for any taxable period or portion thereof ending on the Closing Date.  If a taxable period begins prior to the Closing Date and ends after the Closing Date, then the portion of the taxable period that ends on the Closing Date shall constitute a Pre-Closing Tax.  In the case of Taxes arising in a taxable period of a Company Party that includes, but does not end on, the Closing Date, except as provided in the next sentence, the allocation of such Taxes to the portion of such taxable period that ends on the Closing Date shall be made on the basis of an interim closing of the books as of the end of the Closing Date.  In the case of any Taxes based on capitalization, debt or shares of stock authorized, issued or outstanding, or any real property, personal property or similar ad valorem Taxes that are payable for a taxable period that includes, but does not end on, the Closing Date, the portion of such Tax which relates to the portion of such taxable period ending on the Closing Date shall be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on (and including) the Closing Date and the denominator of which is the number of days in the entire taxable period.  However, any such Taxes attributable to any property that was owned by a Company Party at some point prior to the Closing Date, but is not owned as of the Closing Date, shall be allocated entirely to portion of such taxable period ending on the Closing Date.

"PUHCA" means the Public Utility Holding Company Act of 2005, including the implementing regulations adopted by FERC thereunder.

"Purchase Price" shall have the meaning given such term in Section 2.1.

"Qualified Plan" shall have the meaning given such term in Section 3.14(c).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, migrating, leaching, dumping, or disposing of a Hazardous Substance.

"Restricted Period" shall have the meaning given such term in Section 6.1(b).

"SARA" shall have the meaning given such term in Section 3.17(a).

33

"Securities Act" shall mean the Securities Act of 1933, as amended.

"Seller" shall have the meaning given such term in the preamble.

"Site" means any real properties currently or previously owned, leased, occupied or operated by: (i) any Company Party; (ii) any predecessors of any Company Party; or (iii) any entities previously owned by any Company Party, in each case, including all soil, subsoil, surface waters and groundwater thereat.

"Subsidiary" or "Subsidiaries" means with respect to a specified Person, any other Person of which (i) a majority of the voting power of the voting equity securities or equity interests is owned, directly or indirectly, by such specified Person or (ii) the general partner, manager or other entity governing such other Person is controlled by such specified Person.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means any United States federal, state or local, or non-United States, income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, transfer, registration, value added, excise, export, natural resources, energy, severance, stamp, withholding, occupational, premium, windfall profit, environmental tax, customs, duties, real property, personal property, capital stock, capital gains, net worth, escheat, unclaimed property, intangibles, social security, pension insurance contributions, unemployment, disability, payroll, license, employee or other tax or similar levy in the nature of a tax, of any kind whatsoever, including any interest, penalties, or additions to tax in respect of the foregoing

"Tax Return" means any return, declaration, report, claim for refund, information return, or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment, or collection of any Tax or the administration of any Laws, regulations, or administrative requirements relating to any Tax.

"Taxing Authority" means any Governmental Authority having any responsibility for (i) the determination, assessment or collection or payment of any Tax, or (ii) the administration, implementation or enforcement of or compliance with any law, rule or regulation relating to any Tax.

"Third Party Claim" shall have the meaning given such term in Section 7.3(a).

"Third Party Intellectual Property Rights" shall have the meaning given such term in Section 4.11(b).

"Transaction Approvals" shall have the meaning given such term in Section 4.2.

"Transaction Documents" shall mean this Agreement and the Assignment.

"Transactions" means the purchase and sale of the Loan Documents and the other transactions contemplated by this Agreement and the other Transaction Documents.

**9.**   GENERAL

9.1   Consent to Jurisdiction.

(a)   Each of the parties hereto hereby irrevocably submits to the non-exclusive jurisdiction of any federal or state court located within the Borough of Manhattan in the City and State of New York over any dispute arising out of or relating to this Agreement or any of the Transaction

34

Documents or any of the transactions contemplated by this Agreement and the other Transaction Documents or thereby and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action proceeding related thereto may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by Law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the parties hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by the delivery of a copy thereof in accordance with the provisions of Section 8.3.

(c)     EACH OF THE PARTIES HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (i) ARISING UNDER THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, OR (ii) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY TRANSACTION DOCUMENT OR ANY OF THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. EACH OF THE PARTIES TO THIS AGREEMENT HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION WILL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OF A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

9.2     Expenses.  Each of the Buyer, on the one hand, and the Seller, on the other hand, will pay all of their respective own fees, costs and expenses incurred in connection with negotiation of this Agreement and the Transactions, including, without limitation, any legal, accounting, banking, appraisal, consulting or other professional or brokerage or finder's fees payable in connection therewith.

9.3     Notices.  All notices, demands and other communications hereunder shall be in writing or by written telecommunication, and shall be deemed to have been duly given if delivered personally or if mailed by certified mail, return receipt requested, postage prepaid, or if sent by overnight courier, or sent by written telecommunication, as follows:

If to the Seller as follows:

c/o Platinum Partners
250 West 55th Street
14th Floor
New York, NY 10019
Fax 212-582-2424
Attention: Suzanne Horowitz, Chief Legal Officer
Email: shorowitz@platinumlp.com

If to the Buyer, to:

c/o B Asset Manager

35

1370 Avenue of the Americas
32nd Floor
New York, NY 10019
Attention: Dhruv Narain
Fax: (212) 260-5051
E-Mail: dnarain@bassetmanager.com

with a copy* to:

Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
Attention: Steven A. Navarro, Esq.
Fax: (212) 309-6001
E-mail: steven.navarro@morganlewis.com

*Which copy will not constitute notice to the Seller or the Buyer as the case may be, and will be sent at the same time and by the same means as the corresponding notice is sent to the Seller or the Buyer, as the case may be.

Any such notice shall be effective (a) if delivered personally, when received, (b) if sent by overnight courier, when receipted for, (c) if mailed, five (5) days after being mailed as described above, and (d) if sent by written telecommunication, when dispatched.

9.4    Entire Agreement.  This Agreement and the other schedules referred to herein, together with the other Transaction Documents, contain the entire agreement and understanding of the parties hereto and supersede all prior agreements and understandings relating to the subject matter hereof, and shall not be amended except by a written agreement hereafter signed by the parties hereto.

9.5    Governing Law.  The validity and construction of this Agreement shall be governed and construed and enforced in accordance with the internal Laws (and not the choice-of-law rules) of the State of Delaware.

9.6    Interpretation.  The headings of sections and subsections are for reference only and shall not limit or control the meaning thereof.  All references in this Agreement to "dollars" or "$" mean United States dollars.  The words "include," "includes" and "including" when used in this Agreement shall be deemed to be followed by the phrase "without limitation."  The words "list" and "listed" when used in this Agreement shall be deemed to include, true, complete and correct lists, as the case may be.  References in this Agreement to any gender include references to all genders, and, unless the context otherwise requires, references to the singular include references to the plural and vice versa. The words "hereof," "herein," and "hereunder" and word of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

9.7    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns.  Neither this Agreement nor the obligations of any party hereunder shall be assignable or transferable by such party without the prior written consent of any other party hereto; provided, that nothing contained in this Section 9.7 shall prevent the Buyer, without the consent of the Seller, (a) from transferring or assigning this Agreement or any of its rights or obligations hereunder to an Affiliate of the Buyer, or a Person which is acquiring all or substantially of the assets of the Buyer, or (b) from assigning all or part of its rights or

36

obligations hereunder by way of collateral assignment to any bank or financing institution providing financing for the acquisition contemplated hereby, but no such transfer or assignment made pursuant to clauses (a) or (b) shall relieve the Buyer of its obligation under this Agreement.

9.8     Severability.  In the event that any provision of this Agreement is held to be invalid, void, illegal, or unenforceable by any court of competent jurisdiction, the same shall be deemed to be severable from the remainder of this Agreement and shall in no way affect, impair, or invalidate any other provision contained herein; provided, that if any that if any provision of this Agreement is deemed or held invalid, void, illegal, or unenforceable, such provision shall be replaced with a provision as similar as possible in such a manner as to be effective, valid and enforceable.

9.9     Further Assurances.  The parties hereto agree to take such reasonable steps and execute such other and further documents as may be necessary or appropriate to cause the terms and conditions contained in the Transaction Documents to be carried into effect.

9.10    No Implied Rights or Remedies.  Except as otherwise expressly provided herein, nothing herein expressed or implied is intended or shall be construed to confer upon or to give any Person, other than the Seller and the Buyer and their respective successors and permitted assigns or shareholders, if any, any rights or remedies under or by reason of this Agreement.

9.11    Delivery By Facsimile; Counterparts.  This Agreement may be executed and delivered in person, by facsimile, .pdf, .tiff, or other electronic means intended to preserve the original graphic and pictorial appearance of a document, and in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement, binding on all of the parties hereto.

9.12    Public Statements or Releases.  Unless otherwise required by applicable Law (after consulting with legal counsel), no party to this Agreement will make, issue or release any public announcement, statement or acknowledgment of the existence of, or reveal the status of, this Agreement or the Transactions, without first obtaining the written consent of the other party.  Notwithstanding the foregoing, nothing contained in this Section 9.12 shall prevent a party hereto from making such disclosures as such party may consider necessary, after consulting with its counsel, to satisfy such party's legal obligations (and in such case, such party will, to the extent consistent with timely compliance with such requirement, consult with the other parties prior to making the required release, announcement or statement).  In the event the terms of this Agreement and the Transactions must, in the reasonable discretion of the Buyer's counsel, be disclosed in connection with legal obligations or proceedings, including applicable requirements of any stock exchange or applicable Law, then (a) the Buyer shall notify the Seller within a reasonable period of time prior to such disclosure being made, and (b) the Buyer shall take all commercially reasonable actions permitted under applicable Law to ensure that such information is maintained confidential to the maximum extent possible.

9.13    Specific Performance.  The parties hereto agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions hereof in any court of the United States or any state having jurisdiction, this being in addition to any other rights or remedies to which they are entitled at Law or in equity.

[Remainder of page intentionally left blank.]

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have caused this Agreement to be duly executed and delivered as a sealed instrument as of the date first above written.

BUYER:

AGH PARENT LLC

By: _____
Name:  Dhruv Narain
Title:   Authorized Signatory

SELLER:

PRINCIPAL GROWTH STRATEGIES LLC

By: _____
Name: _____
Title: _____

[SIGNATURE PAGE TO PURCHASE AGREEMENT]

IN WITNESS WHEREOF, and intending to be legally bound hereby, the parties hereto have caused this Agreement to be duly executed and delivered as a sealed instrument as of the date first above written.

BUYER:

AGH PARENT LLC

By: _____
Name:_____
Title:_____

SELLER:

PRINCIPAL GROWTH STRATEGIES LLC

By: _____
Name: _____
Title: _____

[SIGNATURE PAGE TO PURCHASE AGREEMENT]

SCHEDULE 1

| Transferor Name and Address | Description of Assigned Asset | FMV of Assigned Asset as of Effective Date | Requires Consent /Notification | FMV of Assigned Asset transferred to PGS |
|---|---|---|---|---|
| AGH Parent LLC | $6,749,714.94 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04, as subsequently assigned to AGH Parent LLC. | $6,749,714.94 | No | $6,749,714.94 |
| AGH Parent LLC | $2,309,462 of principal indebtedness outstanding and $107,310.90 of accrued and unpaid interest under that certain Amended and Restated Convertible Promissory Note, dated as of May 28, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to Senior Health Insurance Company of Pennsylvania in the stated principal amount of $2,309,462, as subsequently assigned to AGH Parent LLC. | $2,416,772.90 | Notification will be given to debtor | $2,416,772.90 |
| AGH Parent LLC | $355,301.87 of principal indebtedness outstanding and $12,849.28 of accrued and unpaid interest under that certain Promissory Note, dated as of September 21, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $355,301.87, as subsequently assigned to AGH Parent LLC. | $368,151.15 | Notification will be given to debtor | $368,151.15 |
| AGH Parent LLC | $355,301.87 of principal indebtedness outstanding and $17,229.70 of accrued and unpaid interest under that certain Promissory Note, dated as of December | $372,531.57 | Notification will be given to | $372,531.57 |

SCHEDULE 1

| | | | |
|---|---|---|---|
| | 7, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $355,301.87, as subsequently assigned to AGH Parent LLC. | | debtor | |
| AGH Parent LLC | $571,929.18 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04, as subsequently assigned to AGH Parent LLC. | $571,929.18 | No | $571,929.18 |
| AGH Parent LLC | $3,438,544.94 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the BRe WNIC 2013 LTC Primary in the stated principal amount of $14,989,677.78, as subsequently assigned to AGH Parent LLC. | $3,438,544.94 | No | $3,438,544.94 |
| AGH Parent LLC | $3,352,355.32 of principal indebtedness outstanding under that certain Amended and Restated Secured Promissory Note, dated as of May 12, 2016, issued by Pedevco Corp., a Texas corporation, to BRe WNIC 2013 LTC Primary in the stated principal amount of $13,065,703.98, as subsequently assigned to AGH Parent LLC. | $3,352,355.32 | Notification will be given to debtor | $3,352,355.32 |
| AGH Parent LLC | $3,117,889.24 of principal indebtedness outstanding under that certain Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to BRe WNIC 2013 LTC Primary in the stated principal amount of $14,989,677.78, as | $3,117,889.24 | Notification will be given to debtor | $3,117,889.24 |

SCHEDULE 1

| | | | | |
|---|---|---|---|---|
| | subsequently assigned to AGH Parent LLC. | | | $12,901,696.77 |
| AGH Parent LLC | $12,901,696.77 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04, as subsequently assigned to AGH Parent LLC. | $12,901,696.77 | Notification will be given to debtor | |
| AGH Parent LLC | $4,190,538 of principal indebtedness outstanding and $194,716.50 of accrued and unpaid interest under that certain Amended and Restated Convertible Note, dated as of May 28, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $4,190,538, as subsequently assigned to AGH Parent LLC. | $4,385,254.50 | Notification will be given to debtor | $4,385,254.50 |
| AGH Parent LLC | $644,698.13 of principal indebtedness outstanding and $23,315.11 of accrued and unpaid interest under that certain Promissory Note, dated as of September 21, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $644,698.13, as subsequently assigned to AGH Parent LLC. | $668,013.24 | Notification will be given to debtor | $668,013.24 |
| AGH Parent LLC | $644,698.13 of principal indebtedness outstanding and $31,263.44 of accrued and unpaid interest under that certain Promissory Note, dated as of December 7, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $644,698.13, as subsequently assigned to AGH Parent LLC. | $675,961.57 | Notification will be given to debtor | $675,961.57 |
| AGH Parent LLC | $4,647,644.68 of principal indebtedness (the "**Assigned WNIC-PEDCO** | $4,647,644.68 | Notification | $4,647,644.68 |

SCHEDULE 1

| | will be given to debtor | |
|---|---|---|
| **Debt**") outstanding under that certain Amended and Restated Secured Promissory Note, dated as of May 12, 2016, issued by Pedevco Corp., a Texas corporation, to BRe WNIC 2013 LTC Primary in the stated principal amount of $13,065,703.98, as subsequently assigned to AGH Parent LLC. | | |
| **Total** | | $43,666,460.00 |

EXHIBIT 85

FINAL

## FLOW OF FUNDS MEMORANDUM

The following sets forth the fund transfers required at the Closing in connection with the transactions contemplated by that certain Purchase Agreement, dated as of June 9, 2016 (as such agreement may be amended or modified, the "Purchase Agreement"), by and between AGH Parent LLC, a Delaware limited liability company ("AGH Parent"), and Principal Growth Strategies LLC, a Delaware limited liability company (the "Seller"). All capitalized terms used but not otherwise defined herein will have the meanings assigned to such terms in the Purchase Agreement.

**Order of Events on June 9, 2016 (all actions are deemed to take place simultaneously):**

1. Beechwood entities contribute: (i) $22,000,000 in assets to AGH Parent pursuant to Contribution Agreement in exchange for 220,000 Class B-1 Preferred Units; and (ii) $36,960,000.00 in assets to AGH Parent pursuant to Note Purchase Agreement/Contribution Agreement in exchange for B-1 Debt in the principal amount of $36,960,000.00, all as set forth on Schedule 1. Beechwood entities become parties to AGH Parent LLC Agreement.

2. SHIP enters into Subscription Agreement and Note Purchase Agreement and related debt documents to purchase 350,000 Class A Preferred Units for $35,000,000 and B-1 Debt in the principal amount of $15,000,000. SHIP wires an aggregate of $50,000,000 to AGH Parent. SHIP becomes party to AGH Parent LLC Agreement.

3. AGH Parent sells 5,730 Common Units to Beechwood Re Investments LLC for $100 pursuant to a Subscription Agreement. Beechwood Re Investments becomes party to AGH Parent LLC Agreement.

4. AGH Parent and Seller enter into Purchase Agreement to purchase the Note for an aggregate purchase price of $170,000,000 (the "**Purchase Price**").

5. Purchase Price Allocation:

   a. AGH Parent wires **$25,000,000.00** to Beechwood entities at the direction of Seller pursuant to Funds Direction Letter, as set forth in the funds flow below; Beechwood entities assign the Note to PGS;

   b. AGH Parent wires **$40,293,540.00** at the direction of Seller pursuant to the Funds Direction Letter, as set forth in the funds flow below;

   c. AGH Parent assigns debt and equity instruments to Seller with a value of **$43,666,460**, as set forth on Schedule 1 to the Purchase Agreement;

   d. AGH Parent issues **3,438 Class B-2 Units** to Seller; and

   e. AGH Parent issues **590,400 Class C Units** to the Seller.

| | **Funds Flow** | | **Amount** |
|---|---|---|---|
| **(1)** | Beechwood entities (listed below) wire an aggregate $10,093,540.00 to AGH Parent pursuant to steps 1(i) ($1,382,110.76) and 1(ii) ($8,711,429.24) above, as set forth on <u>Schedule 1</u> attached hereto. | | **$10,093,540.00** |
| | SHIP - BAM | 331,690.00 | |
| | BBIL SHIP | 30,000.00 | |
| | Bre BCLIC Sub | 500,000.00 | |
| | Bre WNIC 2013 LTC Primary | 601,850.00 | |
| | Bre WNIC 2013 LTC Sub | 700,000.00 | |
| | BBIL ULICO 2014 | 90,000.00 | |
| | BBIHL-SEG | 60,000.00 | |
| | BBLN-Agera (BBIL Custody) | 4,060,000.00 | |
| | BBLN-Agera (BBIL SHIP) | 60,000.00 | |
| | Old Mutual (Bermuda) Ltd. | 3,660,000.00 | |
| | **Wire Instructions:** | | |
| | Bank Name: | Signature Bank | |
| | FRB / ABA Routing Number: | ██████████ | |
| | Account Number: | | |
| | Beneficiary Name: | AGH Parent LLC | |
| | Reference: | c/o AGH Parent LLC 1370 Avenue of the Americas 32nd Floor New York, NY 10019 | |
| **(2)** | SHIP wires an aggregate of $50,000,000 to AGH Parent pursuant to step 2 above. | | **$ 50,000,000.00** |
| | **Wire Instructions:** | | |
| | Bank Name: | Signature Bank | |
| | FRB / ABA Routing Number: | ██████████ | |
| | Account Number: | | |
| | Beneficiary Name: | AGH Parent LLC | |
| | Reference: | c/o AGH Parent LLC 1370 Avenue of the Americas 32nd Floor New York, NY 10019 | |
| **(3)** | Net cash flow from AGH Parent to BAM Administrative Services on behalf of its clients. | | **$ 19,800,000.00** |
| | **Wire Instructions:** | | |
| | Bank Name: | Signature Bank | |
| | FRB / ABA Routing Number: | ██████████ | |
| | Account Number: | | |
| | Beneficiary Name: | BAM Administrative Services LLC | |
| | Reference: | c/o BAM Administrative Services LLC 1370 Avenue of the Americas 32nd Floor New York, NY 10019 | |

| | Funds Flow | | Amount |
|---|---|---|---|
| **(4)** | AGH Parent to send an aggregate amount of $40,293,540.00 by wires on behalf of and at the direction of Seller pursuant to the Direction Letter as follows: | | **$40,293,540.00** |
| **(4)(a)** | **Yellow River** | | **$933,540.00** |
| | **Wire Instructions:** | | |
| | Bank Name: | JPMorgan Chase Bank | |
| | Bank Address: | 60 East 42nd Street, New York, NY 10165 | |
| | Name: | Yellow River Management LLC Chase Bank, USA | |
| | Beneficiary name: | Yellow River Management LLC | |
| | Beneficiary address: | 335 Madison Ave, 27th Floor, New York, NY 10017 | |
| | ABA/Routing Number: | ███████ | |
| | Account Number: | ███████ | |
| | SWIFT code: | ███████ | |
| | Reference: | Principal Growth Strategies, LLC | |
| **(4)(b)** | **ALS** | | **$1,500,000.00** |
| | **Wire Instructions:** | | |
| | Bank Name: | Signature Bank | |
| | FRB / ABA Routing Number: | ███████ | |
| | Beneficiary name: | BAM Administrative Services LLC | |
| | Account Number: | ███████ | |
| | Reference: | c/o BAM Administrative Services LLC 1370 Avenue of the Americas 32nd Floor New York, NY 10019 | |
| **(4)(c)** | **Seller** | | **$37,860,000.00** |
| | **Wire Instructions:** | | |
| | Bank Name: | Sterling National Bank | |
| | Address: | 650 Fifth Avenue, New York, NY 10022 | |
| | FRB / ABA Routing Number: | ███████ | |
| | Account Number: | ███████ | |
| | Account Name/Beneficiary: | Principal Growth Strategies, LLC | |
| | Reference: | Agera | |

\* \* \* \* \*

Schedule 1

Contribution of $22,000,000 in assets to AGH Parent pursuant
to Contribution Agreement in exchange for 220,000 Class B-1 Preferred Units

| Transferor Name and Address | Description of Contributed Asset | FMV of Contributed Asset as of Effective Date | Requires Consent /Notification | No. of Class B-1 Preferred Units Issued by the Company to the Transferor |
|---|---|---|---|---|
| BRe WNIC 2013 LTC Primary | $3,117,889.24 of principal indebtedness (the "**Assigned WNIC-PPCO Debt**") outstanding under that certain Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to BRe WNIC 2013 LTC Primary in the stated principal amount of $14,989,677.78. | $3,117,889.24 | Notification will be given to debtor | 31,178.8924 |
| BBLN-Agera Corp. | 50% of the right title and interest of BBLN-Agera Corp. under that certain Amended and Restated Assignment of Note and Liens, entered into as of May 12, 2016 by and among Principal Growth Strategies LLC, BBIL ULICO 2014, Beechwood Bermuda Investment Holdings Ltd., linked to its Segregated Accounts, Beechwood Bermuda International Ltd. and BBLN-Agera Corp. (as amended and restated, further amended, modified or supplemented from time to time, the "**Repo Agreement**"); provided, that, it is agreed and acknowledged that BBLN-Agera Corp. hereby agrees to waive, without duplication, $60,000 of the "Repurchase Price" (as defined in the Repo Agreement). | $5,000,000 | No | 50,000.00 |
| BBLN-Agera Corp. | Cash | $60,000 | N/A | 600.00 |
| BBIL ULICO 2014 | 100% of the right title and interest of BBIL ULICO 2014 under the Repo Agreement; provided, that, it is agreed and acknowledged that BBIL ULICO 2014 hereby agrees to waive $90,000 of the "Repurchase Price" (as defined | $7,500,000 | No | 75,000.00 |

DB1/ 87947029.1

Schedule 1

| Transferor Name and Address | Description of Contributed Asset | FMV of Contributed Asset as of Effective Date | Requires Consent /Notification | No. of Class B-1 Preferred Units Issued by the Company to the Transferor |
|---|---|---|---|---|
| | in the Repo Agreement). | | | |
| BBIL ULICO 2014 | Cash | $90,000 | N/A | 900.00 |
| BHLN-Agera Corp. | 100% of the right title and interest of BHLN-Agera Corp. under the Repo Agreement; provided, that, it is agreed and acknowledged that BHLN-Agera Corp. hereby agrees to waive $60,000 of the "Repurchase Price" (as defined in the Repo Agreement). | $5,000,000 | No | 50,000.00 |
| BHLN-Agera Corp. | Cash | $60,000 | No | 600.00 |
| BOLN-Agera Corp. | Cash | $1,172,110.76 | N/A | 11,721.1076 |
| TOTAL | | $22,000,000 | | 220,000 |

DB1/ 87947029.1

Schedule 1

$36,960,000 in assets to AGH Parent pursuant to
Note Purchase Agreement/Contribution Agreement in exchange for B-1 Debt

| Transferor Name and Address | Description of Contributed Asset | FMV of Contributed Asset as of Effective Date | Requires Consent /Notification | Principal Debt to be issued by AGH Parent LLC |
|---|---|---|---|---|
| Senior Health Insurance Company of Pennsylvania (in respect of its SHIP-BAM Account) | Cash | $331,690 | N/A | $331,690 |
| Senior Health Insurance Company of Pennsylvania (in respect of its SHIP-BAM Account) | $12,901,696.77 of principal indebtedness (the "**Assigned SHIP-PPCO Debt**") outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04. | $12,901,696.77 | Notification will be given to debtor | $608,310 |
| BOLN-Agera Corp. | BOLN-Agera Corp. holds a participation interest in $12,293,386.77 of such Assigned SHIP-PPCO Debt (the "**SHIP-PPCO Participation**") and hereby releases its claim to the SHIP-PPCO Participation (such that the Assigned SHIP-PPCO Debt shall be transferred hereunder free and clear of any obligations arising under the SHIP-PPCO Participation) in exchange for the issuance by AGH Parent LLC to BOLN-Agera Corp. of $12,293,386.77 of principal indebtedness pursuant to the terms of that certain Note Purchase Agreement, dated as of June ___, 2016, by and between the investors from time to time party thereto (the "**Investors**"), BAM Administrative Services LLC, as agent for the Investors, and AGH. | N/A | N/A | $12,293,386.77 |
| | 49.7% of the right title and interest of BBLN-Agera Corp. under that | $4,970,000 | No | $4,970,000 |

Schedule 1

| | | | | |
|---|---|---|---|---|
| BBLN-Agera Corp. | certain Amended and Restated Assignment of Note and Liens, entered into as of May 12, 2016 by and among PGS, BBIL ULICO 2014, Beechwood Bermuda Investment Holdings Ltd., linked to its Segregated Accounts, Beechwood Bermuda International Ltd. and BBLN-Agera Corp. (as further amended and restated, amended, modified or supplemented from time to time, the "**Repo Agreement**"); *provided, that*, it is agreed and acknowledged that BBLN-Agera Corp. hereby agrees to waive, without duplication, $90,000 of the "Repurchase Price" (as defined in the Repo Agreement). | | | |
| BBLN-Agera Corp. | Cash | $4,090,000 | N/A | $4,090,000 |
| BRe BCLIC Sub | Cash | $500,000 | N/A | $500,000 |
| BRe WNIC 2013 LTC Primary | Cash | $601,850 | N/A | $601,850 |
| BRe WNIC 2013 LTC Sub | Cash | $700,000 | N/A | $700,000 |
| BOLN-Agera Corp. | Cash | $2,487,889.24 | N/A | $2,487,889.24 |
| BRe WNIC 2013 LTC Primary | $4,190,538 of principal indebtedness outstanding and $194,716.50 of accrued and unpaid interest under that certain Amended and Restated Convertible Note, dated as of May 28, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $4,190,538. | $4,385,254.50 | Notification will be given to debtor | $4,385,254.50 |

Schedule 1

| | | | |
|---|---|---|---|
| BRe WNIC 2013 LTC Primary | $644,698.13 of principal indebtedness outstanding and $23,315.11 of accrued and unpaid interest under that certain Promissory Note, dated as of September 21, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $644,698.13. | $668,013.24 | Notification will be given to debtor | $668,013.24 |
| BRe WNIC 2013 LTC Primary | $644,698.13 of principal indebtedness outstanding and $31,263.44 of accrued and unpaid interest under that certain Promissory Note, dated as of December 7, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $644,698.13. | $675,961.57 | Notification will be given to debtor | $675,961.57 |
| BRe WNIC 2013 LTC Primary | $4,647,644.68 of principal indebtedness (the "**Assigned WNIC-PEDCO Debt**") outstanding under that certain Amended and Restated Secured Promissory Note, dated as of May 12, 2016, issued by Pedevco Corp., a Texas corporation, to BRe WNIC 2013 LTC Primary in the stated principal amount of $13,065,703.98. | $4,647,644.68 | Notification will be given to debtor | $2,899,051.68 |
| BOLN-Agera Corp. | BOLN-Agera Corp. holds a participation interest in $1,748,593 of such Assigned WNIC-PEDCO Debt (the "**WNIC-PEDCO Participation**") and hereby releases its claim to the WNIC-PEDCO Participation (such that the Assigned WNIC-PEDCO Participation shall be transferred hereunder free and clear of any obligations arising under the WNIC-PEDCO Participation) in exchange for the issuance by AGH Parent LLC to BOLN-Agera Corp. of $1,748,593 of principal indebtedness pursuant to the terms of that certain Note Purchase | N/A | N/A | $1,748,593 |

Schedule 1

Agreement, dated as of June ___, 2016, by and between the Investors, BAM Administrative Services LLC, as agent for the Investors, and AGH Parent LLC.

| | | | |
|---|---|---|---|
| | $36,960,000 | | $36,960,000 |
| TOTAL | | | |

DB1/ 87947029.1

PRINCIPLE GROWTH STRATEGIES LLC
C/O PLATINUM PARTNERS
250 WEST 55TH STREET
14TH FLOOR
NEW YORK, NY 10019

June 9, 2016

AGH Parent LLC
c/o B Asset Manager
1370 Avenue of the Americas
32nd Floor
New York, NY 10019

Each of the Parties listed
on the attached Schedule 1.

Re:      Funding Direction Letter

Pursuant to the terms of that certain Purchase Agreement (the "*Purchase Agreement*"), dated as of the date hereof, by and between Principal Growth Strategies LLC, a Delaware limited liability company ("*PGS*"), and AGH Parent LLC, a Delaware limited liability company ("*AGH Parent*"), PGS has agreed to issue and sell to AGH that certain Amended and Restated Secured Convertible Promissory Note issued on May 16, 2014, as amended and restated on June 11, 2014, as further amended on July 3, 2014, and as further amended and restated as of the date of this Agreement by that certain Second Amended and Restated Secured Convertible Promissory Note dated as of the date of this Agreement (as so amended and restated, the "*Second A&R Note*"), in the principal amount of $600,071.23, executed by Agera Holdings LLC, payable to the order of PGS as specified therein, and all rights, titles and interests of PGS existing and to exist in connection with or as security for the payment of the indebtedness evidenced by the Second A&R Note, including, without limitation, all rights, titles and interests arising under or evidenced by (a) the Note; (b) that certain Secured Note Purchase Agreement, dated as of May 16, 2014, by and between Agera Energy LLC ("*Agera Energy*") and PGS (as amended, modified or supplemented from time to time, including pursuant to that certain amendment dated as of the date of the Purchase Agreement) (the "*Note Purchase Agreement*"); and (c) that certain Security Agreement, dated as of May 16, 2014 by Agera Energy for the benefit of PGS (as amended, modified or supplemented from time to time, including pursuant to that certain amendment dated as of the date of the Purchase Agreement) (the "*Security Agreement*" and, together with the Second A&R Note, the Note Purchase Agreement and all other documents, instruments, amendments and agreements entered into in connection with the transactions contemplated thereby, collectively, the "*Loan Documents*").  All capitalized terms used herein without definition which are defined in the Purchase Agreement shall have the same meanings herein as therein.

Pursuant to the Purchase Agreement, the Purchase Price of $170,000,000 is comprised of cash, Class B-1 Units, Class C Units, Common Units and the relinquishment of certain debt and/or equity investments as set forth on Schedule 1.  For administrative convenience, PGS hereby requests, authorizes and directs AGH Parent to pay and deliver, as applicable, portions of such cash, Class B-1 Units, Class C Units, and Common Units directly to the parties, or to their designees, as applicable, the respective amounts listed on Schedule 2 attached hereto.

*[The remainder of this page is intentionally left blank.*
*Signature page on the following page.]*

DB1/ 87858638.5

Very truly yours,

Principal Growth Strategies LLC

By_____

Name:   David Steinberg

Title:   Authorized Signatory

[Signature Page to Funding Direction Letter]

Schedule 1

SCHEDULE 1

| Transferor Name and Address | Description of Assigned Asset | FMV of Assigned Asset as of Effective Date | Requires Consent /Notification | FMV of Assigned Asset transferred to PGS |
|---|---|---|---|---|
| AGH Parent LLC | $6,749,714.94 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04, as subsequently assigned to AGH Parent LLC. | $6,749,714.94 | No | $6,749,714.94 |
| AGH Parent LLC | $2,309,462 of principal indebtedness outstanding and $107,310.90 of accrued and unpaid interest under that certain Amended and Restated Convertible Promissory Note, dated as of May 28, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to Senior Health Insurance Company of Pennsylvania in the stated principal amount of $2,309,462, as subsequently assigned to AGH Parent LLC. | $2,416,772.90 | Notification will be given to debtor | $2,416,772.90 |
| AGH Parent LLC | $355,301.87 of principal indebtedness outstanding and $12,849.28 of accrued and unpaid interest under that certain Promissory Note, dated as of September 21, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $355,301.87, as subsequently assigned to AGH Parent LLC. | $368,151.15 | Notification will be given to debtor | $368,151.15 |
| AGH Parent LLC | $355,301.87 of principal indebtedness outstanding and $17,229.70 of accrued and unpaid interest under that certain Promissory Note, dated as of December | $372,531.57 | Notification will be given to | $372,531.57 |

SCHEDULE 1

| | | | |
|---|---|---|---|
| | 7, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $355,301.87, as subsequently assigned to AGH Parent LLC. | | debtor |
| AGH Parent LLC | $571,929.18 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04, as subsequently assigned to AGH Parent LLC. | $571,929.18 | No | $571,929.18 |
| AGH Parent LLC | $3,438,544.94 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the BRe WNIC 2013 LTC Primary in the stated principal amount of $14,989,677.78, as subsequently assigned to AGH Parent LLC. | $3,438,544.94 | No | $3,438,544.94 |
| AGH Parent LLC | $3,352,355.32 of principal indebtedness outstanding under that certain Amended and Restated Secured Promissory Note, dated as of May 12, 2016, issued by Pedevco Corp., a Texas corporation, to BRe WNIC 2013 LTC Primary in the stated principal amount of $13,065,703.98, as subsequently assigned to AGH Parent LLC. | $3,352,355.32 | Notification will be given to debtor | $3,352,355.32 |
| AGH Parent LLC | $3,117,889.24 of principal indebtedness outstanding under that certain Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to BRe WNIC 2013 LTC Primary in the stated principal amount of $14,989,677.78, as | $3,117,889.24 | Notification will be given to debtor | $3,117,889.24 |

SCHEDULE 1

| | | | | |
|---|---|---|---|---|
| | subsequently assigned to AGH Parent LLC. | | | |
| AGH Parent LLC | $12,901,696.77 of principal indebtedness outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by Platinum Partners Credit Opportunities Master Fund LP, a Delaware limited partnership, to the Senior Health Insurance Company of Pennsylvania in the stated principal amount of $42,963,949.04, as subsequently assigned to AGH Parent LLC. | $12,901,696.77 | Notification will be given to debtor | $12,901,696.77 |
| AGH Parent LLC | $4,190,538 of principal indebtedness outstanding and $194,716.50 of accrued and unpaid interest under that certain Amended and Restated Convertible Note, dated as of May 28, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $4,190,538, as subsequently assigned to AGH Parent LLC. | $4,385,254.50 | Notification will be given to debtor | $4,385,254.50 |
| AGH Parent LLC | $644,698.13 of principal indebtedness outstanding and $23,315.11 of accrued and unpaid interest under that certain Promissory Note, dated as of September 21, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $644,698.13, as subsequently assigned to AGH Parent LLC. | $668,013.24 | Notification will be given to debtor | $668,013.24 |
| AGH Parent LLC | $644,698.13 of principal indebtedness outstanding and $31,263.44 of accrued and unpaid interest under that certain Promissory Note, dated as of December 7, 2015, issued by China Horizon Investments Group Limited, a Cayman Islands company, to BRe WNIC 2013 LTC Primary in the stated principal amount of $644,698.13, as subsequently assigned to AGH Parent LLC. | $675,961.57 | Notification will be given to debtor | $675,961.57 |
| AGH Parent LLC | $4,647,644.68 of principal indebtedness (the "**Assigned WNIC-PEDCO** | $4,647,644.68 | Notification | $4,647,644.68 |

SCHEDULE 1

| | will be given to debtor | |
|---|---|---|
| **Debt**") outstanding under that certain Amended and Restated Secured Promissory Note, dated as of May 12, 2016, issued by Pedevco Corp., a Texas corporation, to BRe WNIC 2013 LTC Primary in the stated principal amount of $13,065,703.98, as subsequently assigned to AGH Parent LLC. | | |
| **Total** | | $43,666,460.00 |

Schedule 2

| Name | Wiring Instructions | Amounts |
|---|---|---|
| c/o BAM Administrative Services LLC  for benefit of:<br><br>1.  BBIL ULICO 2014 - 30% - ($7,500,000)<br>2.  Beechwood Bermuda Investment Holdings Ltd., for the benefit of its segregated accounts - 20% - ($5,000,000)<br>3.  Beechwood Bermuda International Limited - 10% - ($2,500,000)<br>4.  BBLN-Agera Corp. - 40% - ($10,000,000) | Bank Name:<br>Signature Bank<br>FRB / ABA Routing Number:<br><br>Account Number:<br><br>Reference:<br>c/o BAM Administrative Services LLC<br>1370 Avenue of the Americas<br>32nd Floor<br>New York, NY 10019<br><br>(Or as further directed by BAM pursuant to funds flow memo) | **$25,000,000.00** |
| Principal Growth Strategies LLC | Bank Name: Sterling National Bank<br>Address: 650 Fifth Avenue, New York, NY 10022<br>FRB / ABA Routing Number:<br><br>Account Number:<br>Reference:  Agera<br><br>(Or as further directed by PGS pursuant to funds flow memo) | **$40,293,540.00**<br><br>**590,400 Class C Units** with an aggregate original value equal to $59,040,000.00.<br><br>**3,438 Class B-1 Units** with an aggregate original value equal to $2,000,000.<br><br>Relinquishment of debt and/or equity by AGH Parent as set forth on Schedule 1 with an aggregate value equal to $43,666,460.00. |

EXHIBIT 86

**To:**       Dhruv Narain[dnarain@bassetmanager.com]
**From:**    David Steinberg
**Sent:**    Fri 4/1/2016 10:05:22 AM
**Subject:**  RE: Morning Availability
2016.04.01-Agera - Assignment of Notes and Liens.v1 - ds comments.doc

Dhruv, I'm sorry but I feel like I'm being  totally being taken advantage of and this is not in good faith.

Separately I have the following comments on the terms – also reflected in the attached mark up.

1.   Restricted cash is always part of the EV calculations across every single industry. Rational is simple – if you wind down the company the equity gets to keep the cash that was once restricted.
2.   You are paying for 95% of the company we will need to deal with Kevin. For PGS, this is a full sale upon which we need to take care of Kevin and his team, that was our deal with him. He got to this great ending and we need to pay him.
3.    We have always discussed that the $80mm will be allocated in a TBD nature mutually satisfactory to both parties, not "as selected by such Purchasers in their sole discretion." These are sensitive issues and I cannot accept demands which we believe will hurt Platinum's business. We have been having constructive conversations about this but we have agreed that they are far from final as they are complicated and sensitive.
4.   I just don't have a full understanding of the ramifications of a turnover vs a standard call option for 5% struck at $25.5mm (5% of $510mm). I think they are the same and future financings will have the same dilutive effects but why make it so complicated?
5.    I would like to propose that we keep the option period until June 30 (not July 30) and add a strict no shop clause for Platinum during the option period. This way you can be assured that if everything is moving ahead ok we will extend the option. But just to leave it out there for 4 months is a very long time.

**From:** Dhruv Narain [mailto:dnarain@bassetmanager.com]
**Sent:** Friday, April 01, 2016 5:39 AM
**To:** David Steinberg
**Subject:** Re: Morning Availability

As much of a surprise to me as to you.  Will do everything I can.
On Apr 1, 2016, at 4:32 AM, David Steinberg <DSteinberg@platinumlp.com> wrote:

Really??? So realistically we don't get the money till 2pm.

_____

On Apr 1, 2016, at 4:26 AM, Dhruv Narain <dnarain@bassetmanager.com> wrote:

I will see you at 7 AM.

We can have Chris make any changes as soon as he gets in, sign and fund.

Begin forwarded message:

**From:** "Christian R. Thomas" <cthomas@beechwood.com>
**Date:** March 31, 2016 at 11:20:16 PM EDT
**To:** Dhruv Narain <dnarain@bassetmanager.com>
**Subject: Morning Availability**

Dhruv,
I leave my house at 7:30 to drop my kids off at school and arrive at the office around 9:30.  I'll be

available via cell on and off until I get to the office.
Best,
Christian

&lt;image001.jpg&gt;

B Asset Manager | **Christian R. Thomas, Esq.** | General Counsel
1370 Avenue of the Americas, 32nd Floor, New York, NY 10019
dir: (646) 356-1623 | cell: (201) 566-6957 | fax: (212) 260-5051

cthomas@beechwood.com

This message is intended only for the use of the person to whom it is addressed and may contain information that is privileged, confidential, and/or attorney work product. If the recipient of this e-mail is not the addressee, you are hereby notified that any review, reliance, dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient please contact the sender immediately and delete all copies.

CONFIDENTIALITY NOTE: The information contained in this email message may be legally privileged and confidential information intended only for the use of the individual or entity to whom it is addressed. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this message is strictly prohibited. If you have received this email in error, please immediately delete the message. Thank you.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN

CONFIDENTIAL AND PRIVILEGED INFORMATION ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE

OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE

CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

EXHIBIT 87

## PURCHASE AGREEMENT

This **PURCHASE AGREEMENT**, dated as of June 9, 2016 (this "Agreement"), is by and between Principal Growth Strategies, LLC (the "Company"), a Delaware limited liability company and Starfish Capital, Inc., a New York corporation ("Seller").  Capitalized terms and certain other terms used in this Agreement and not otherwise defined have the meanings set forth in Exhibit A.

## BACKGROUND

Seller currently holds an eight percent (8%) membership interest of the Company in accordance with the terms of the Operating Agreement.  The Company desires to purchase, and Seller desires to sell, transfer and assign to the Company, all of such Membership Interests (collectively, "Seller's Membership Interests"), upon the terms and subject to the conditions set forth in this Agreement.

## AGREEMENT

**NOW, THEREFORE**, in consideration of the foregoing and the respective representations, warranties, covenants and agreements of the parties contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF MEMBERSHIP INTERESTS;
## PURCHASE PRICE

**1.1.**    **Purchase and Sale of Membership Interests.**

Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Closing (as defined in Section 2.1 hereof), Seller hereby sells, conveys, transfers, assigns, and delivers to the Company, and the Company hereby purchases from Seller, the Seller's Membership Interests, free and clear of all Encumbrances.

**1.2.**    **Purchase Price.**

The purchase price for the Seller's Membership Interests shall be at a purchase price of $13,552,000 (the "Purchase Price").

**1.3.**    **Payments by the Company.**

At the Closing, the Company shall purchase from the Seller the Seller's Membership Interests and will pay the Purchase Price as follows:

(i)    $7,000,000 in cash or by wire transfer of immediately available funds, to an account designated by the Seller as set forth on Schedule I attached hereto;

1

(ii)    $2,000,000 of Class B-2 Preferred Interests in AGH Parent; and

(iii)    $4,552,000 of Class C Preferred Interests in AGH Parent.

## ARTICLE II
## CLOSING

**2.1.**    <u>Closing</u>.

The initial closing of the transactions contemplated herein (the "<u>Closing</u>") shall be held at 10:00 a.m. New York time at the offices of Seller's counsel, Herrick Feinstein, LLP, 2 Park Avenue, New York, New York  10016 on the date hereof (the "<u>Closing Date</u>").  For tax and accounting purposes, the Closing shall be effective as of 12:01 a.m. New York City time on the Closing Date.  Upon the Closing, Seller shall be deemed to have relinquished all of its rights and privileges with respect to the Company and its subsidiaries, including, without limitation, any and all rights under the Operating Agreement or applicable law as a member of the Company, including any right to seek indemnification from the Company and shall be released from all obligations as a member of the Company.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller hereby represents and warrants to the Company as follows:

**3.1.**    <u>Organization of the Seller</u>.

The Seller has been duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was formed, with the full power and authority to conduct its business as presently being conducted and to enter into this Agreement.

**3.2.**    <u>Authorization</u>.

The Seller has all requisite power and authority, and has taken all action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder.  This Agreement has been duly executed and delivered by the Seller and, assuming the due authorization, execution and delivery of this Agreement by the Company, is a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as may be limited by the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

**3.3.**    <u>No Conflict or Violation; Consents and Approvals</u>.

(a)    Neither the execution, delivery or performance by the Seller of this Agreement nor the consummation of the transactions contemplated hereby, will (i) violate or conflict with any provision of the certificate of formation, operating agreement, bylaws or similar organizational documents of Seller, (ii) violate, conflict with, or result in or constitute a

breach or default under (with the giving of notice or passage of time, or both), or result in the termination of, or accelerate the performance required by, or result in a right of termination, or acceleration under, any of the terms, conditions or provisions of any contract to which Seller is a party or by which its assets are bound, or (iii) violate any Law or Governmental Order applicable to Seller.

        (b)    No consent, approval or authorization of or from, notice to or declaration, filing or registration with any domestic or foreign Governmental Authority, lender or any other person is required to be made or obtained by Seller in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, except where failure to obtain such consent, approval or authorization or to make such notice, declaration, filing or registration would not reasonably be expected to have a material adverse effect on Seller or to materially adversely affect the ability of Seller to carry out their obligations hereunder or consummate the transactions contemplated hereby.

### 3.4.   Title to Seller's Membership Interests.

Seller is the legal and beneficial owner of Seller's Membership Interests, free and clear of all Encumbrances and such Seller's Membership Interests represent all membership interests of the Company legally or beneficially owned by Seller.

### 3.5.   No Encumbrances.

The Seller's Membership Interests are free and clear of all Encumbrances, of any nature whatsoever, whether or not perfected, and are free and clear of any restrictions regarding transfer, other than those contained in the LLC Agreement, which restrictions have been waived by the Company with respect to the transactions contemplated by this Agreement.

### 3.6.   No Brokers or Finders.

Seller has not engaged or made any agreement with any broker, finder or similar agent or any person or firm which will result in the obligation of the Company to pay any finder's fee, brokerage fees or commission or similar payment in connection with the transactions contemplated hereby.

### 3.7.   No Litigation.

There is no claim, action, suit, proceeding or government investigation pending or, to the knowledge of Seller, threatened against Seller by or before any court or Governmental Authority that individually or in the aggregate would, or would reasonably be expected to, impede to the ability of the Company to complete the Closing.

### 3.8.   No Restrictive Agreements.

Seller is not a party to any contract or subject to any other legal restriction, which prevents either Seller from entering into, performing and complying with this Agreement, nor is Seller party to any contract or obligation granting to any person or entity any absolute or contingent rights in or to the Seller's Membership Interests.

3.9.   **No Other Agreements.**

Seller has not granted to any person, any options, warrants, rights, or other instruments or agreements giving any person the right to acquire the Seller's Membership Interests, nor are there any commitments to issue or execute any such options, warrants, rights, instruments or agreements.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

The Company hereby represents and warrants to Seller as follows:

4.1.   **Organization of the Company.**

The Company is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction in which it was formed, with the full power and authority to conduct its business as presently being conducted and to enter into this Agreement.

4.2.   **Authorization.**

The Company has all requisite power and authority, and has taken all action necessary, to execute and deliver this Agreement, to consummate the transactions contemplated hereby and to perform its obligations hereunder.  This Agreement has been duly executed and delivered by the Company and, assuming the due authorization, execution and delivery of this Agreement by Seller, is a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as may be limited by the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar Laws relating to or affecting creditors' rights generally and general equitable principles (whether considered in a proceeding in equity or at law).

4.3.   **No Conflict or Violation; Consents and Approvals.**

(a)      Neither the execution, delivery or performance by the Company of this Agreement nor the consummation of the transactions contemplated hereby, will (i) violate or conflict with any provision of the certificate of formation, operating agreement or similar organizational documents of the Company, (ii) violate, conflict with, or result in or constitute a breach or default under (with the giving of notice or passage of time, or both), or result in the termination of, or accelerate the performance required by, or result in a right of termination, or acceleration under, any of the terms, conditions or provisions of any contract to which the Company is a party or by which its assets are bound, or (iii) violate any Law or Governmental Order applicable to the Company.

(b)      No consent, approval or authorization of or from, notice to or declaration, filing or registration with any domestic or foreign Governmental Authority or any other person is required to be made or obtained by the Company in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, except where failure to obtain such consent, approval or authorization or to make such notice, declaration, filing or registration would not reasonably be expected to have a material adverse

effect on the Company or to materially adversely affect the ability of the Company to carry out their obligations hereunder or consummate the transactions contemplated hereby.

### 4.4.   No Brokers or Finders.

The Company has not engaged or made any agreement with any broker, finder or similar agent or any person or firm which will result in the obligation of the Seller to pay any finder's fee, brokerage fees or commission or similar payment in connection with the transactions contemplated hereby.

### 4.5.   No Litigation.

There is no claim, action, suit, proceeding or government investigation pending or, to the knowledge of the Company, threatened against the Company by or before any court or Governmental Authority that individually or in the aggregate would, or would reasonably be expected to, impede to the ability of the Company to complete any Closing.

### ARTICLE V
### COVENANTS OF THE PARTIES

The parties agree as follows with respect to the period following the execution of this Agreement and the Closing:

### 5.1.   AGH Parent Agreement.   Seller agrees to be bound by the terms of the AGH Parent Agreement and to execute such documents as may be reasonably requested by AGH Parent to evidence such agreement.

### 5.2.   Further Assurances.   Upon the terms and subject to the conditions contained herein, the parties agree, from and after the Closing, (i) to use their reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, (ii) to execute any documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the transactions contemplated hereunder, and (iii) to cooperate with each other in connection with the foregoing.

### ARTICLE VI
### INDEMNIFICATION

### 6.1.   Reliance on Representations, Etc.

Each party hereto shall be entitled to rely upon the representations and warranties of the other party set forth in this Agreement and such representations and warranties shall survive the Closing. The right of any person to indemnification, reimbursement or other remedy based upon breaches of representations, warranties, covenants and agreements contained in this Agreement shall not be affected by any investigation conducted by any person, or any knowledge of any person acquired at any time (whether before or after the execution and delivery of this Agreement or Closing Date), with respect to the accuracy of, or compliance with, any such

representation, warranty, covenant or agreement. Each of the covenants and agreements made in this Agreement shall survive the Closing until they are fully performed or terminate in accordance with their respective terms.

6.2.    **Indemnification.**

(a)    From and after the Closing, Seller shall indemnify, defend and hold harmless the Company, its affiliates and each of their respective members, managers, directors, officers, employees, agents, successors and permitted assigns, their affiliates and subsidiaries (collectively, the "Company Indemnified Parties"), from and against any and all Losses incurred in connection with, arising out of, resulting from or incident to: (i) any breach of any representation or warranty made by Seller in or pursuant to this Agreement; and (ii) any breach of any covenant or agreement made by Seller in or pursuant to this Agreement;.

(b)    From and after the Closing, the Company shall indemnify, defend and hold harmless Seller, its affiliates and each of their respective members, managers, directors, officers, employees, agents, successors and permitted assigns their affiliates and subsidiaries (collectively, the "Seller Indemnified Parties"), from and against any and all Losses incurred in connection with, arising out of, resulting from or incident to: (i) any breach of any representation or warranty made by the Company in or pursuant to this Agreement; and (ii) any breach of any covenant or agreement made by the Company in or pursuant to this Agreement.

## ARTICLE VII
## MISCELLANEOUS

7.1.    **Assignment; Binding Effect.**

No party shall assign its rights or delegate its obligations hereunder without the prior written consent of the other party or parties, and any attempted assignment or delegation in contravention of this sentence shall be null and void *ab initio*. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, heirs, executors, administrators and permitted assigns, and no other person shall have any right, benefit or obligation under this Agreement as a third party beneficiary or otherwise.

7.2.    **No Third-Party Rights.**

Except as expressly set forth herein, nothing in this Agreement shall be construed to give any person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement. Except as expressly set forth herein, this Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

7.3.    **Notices.**

All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given (a) when received if personally delivered; (b) when transmitted if transmitted by telecopy, electronic or digital transmission; (c) the day after it is sent, if sent for next day delivery to a domestic

HF 10852393v.1                                            6

address by recognized overnight delivery service; and (d) upon receipt, if sent by certified or registered mail, return receipt requested.  In each case any such notice, request, demand or other communication shall be sent to:

    If to the Company, to:

        Principal Growth Strategies LLC
        c/o Platinum Partners
        250 West 55th Street, 14th Floor
        New York, NY  10019
        Attn: Mark Nordlicht

    If to Seller, to:

        Starfish Capital, Inc.
        72 North State Road, #502
        Briarcliff Manor, New York 10510
        Attn: Kevin Cassidy

    with a copy to:

        Herrick, Feinstein LLP
        2 Park Avenue
        New York, NY  10016
        Attn: Therese Doherty, Esq.

or to such other place and with such other copies as either party may designate as to itself by written notice to the others.

    7.4.    <u>Governing Law</u>.

    THIS AGREEMENT SHALL BE CONSTRUED, INTERPRETED AND THE RIGHTS OF THE PARTIES DETERMINED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK; (INCLUDING SECTIONS 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW BUT WITHOUT REFERENCE TO ALL OTHER CHOICE OF LAW PROVISIONS OF NEW YORK LAW).

    7.5.    <u>Waiver of Jury Trial</u>.

    Each of the parties hereby waives to the fullest extent permitted by applicable Law any right it may have to a trial by jury with respect to any litigation directly or indirectly arising out of, under or in connection with this Agreement or the transactions contemplated by this Agreement.  Each of the parties hereby (a) certifies that no representative, agent or attorney of the other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it has been induced to enter into this Agreement and the transactions contemplated by this Agreement, as applicable, by, among other things, the mutual waivers and certifications in this Section 7.5.

### 7.6.  Entire Agreement; Amendments and Waivers.

This Agreement (together with all exhibits, schedules, and attachments hereto), constitutes the entire agreement among the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the parties hereto. No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

### 7.7.  Counterparts.

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument, binding upon the parties hereto.

### 7.8.  Expenses.

Each of the Company and Seller shall pay all of its own and its affiliates' out-of-pocket expenses incurred in connection with the transactions contemplated hereby and in connection with any subsequent amendment or waiver thereof, including without limitation all fees and disbursements of any outside accounting, legal, insurance, real estate, environmental, geological, or other professionals engaged by such party or its affiliates in connection with such transactions.

### 7.9.  Severability.

In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.

### 7.10.  Titles; Gender.

The titles, captions or headings of the Articles and Sections herein, and the use of a particular gender, are for convenience of reference only and are not intended to be a part of or to affect or restrict the meaning or interpretation of this Agreement.

### 7.11.  Exhibits.

The Exhibits referred to in this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth in their entirety herein.

### 7.12.  Cumulative Remedies.

All rights and remedies of either party hereto are cumulative of each other and of every

MP 10862393v.1

other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

### 7.13. Specific Performance.

Each of the Company and Seller acknowledges and agrees that the other party would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that any breach of this Agreement by the other party could not be adequately compensated in all cases by monetary damages alone. Accordingly, in addition to any other right or remedy to which Seller or the Company may be entitled under this Agreement, it shall be entitled to enforce any provision of this Agreement by seeking a decree of specific performance and to temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

### 7.14. No Admissions.

The release and covenants in this Agreement do not constitute an admission by the parties to this Agreement.

### 7.15. Service of Process, Consent to Jurisdiction.

(a)     Each of the parties hereto irrevocably consents to the service of any process, pleading, notices or other papers by the mailing of copies thereof by registered or certified mail, or by nationally recognized overnight courier, postage or delivery charges prepaid, to such party at such party's address set forth herein, or by any other method provided or permitted under New York law.

(b)     Each party hereto irrevocably and unconditionally (i) agrees that any suit, action or other legal proceeding arising out of this Agreement may be brought in any New York state court or federal court sitting in the Borough of Manhattan, New York; (ii) consents to the exclusive jurisdiction of any such court in any such suit, action or proceeding; and (iii) waives any objection to the laying of venue of any such suit, action or proceeding in any such court.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

COMPANY:

PRINCIPAL GROWTH STRARTEGIES LLC

By:_____

Name:_____

Title:_____

SELLER:

STARFISH CAPITAL, INC.

By:_____

Name: Kevin Cassidy

Title:   President

HF 10862392v.1

<u>**Schedule I**</u>

Wire Instructions

<u>Seller Wire Instructions</u>:

Wire Instructions:

Bank Name:   JPMorgan Chase Bank, N.A.

New York, New York 10017


FRB / ABA Routing Number: ███████

Account Number: ████████

SWIFT No. ██████

Account  Name:      Lawrence R. Gelber

Attorney-at-Law Master Trust Account

## EXHIBIT A

## DEFINITIONS

As used in this Agreement, the terms below shall have the following meanings. Any of such terms, unless the context otherwise requires, may be used in the singular or plural, depending upon the reference.

"AGH Parent" means AGH Parent LLC, a Delaware limited liability company.

"AGH Parent Agreement" means the Amended and Restated Limited Liability Company Agreement of AGH Parent, dated as of June 9, 2016, as amended from time to time.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the City of New York.

"Claim" means any claim, demand, demand letter, administrative, regulatory or judicial action, suit, petition, appeals lien, notice of non-compliance or violation, investigation, proceeding, consent order, consent agreement, cause of action, chose in action, right of recovery or right of set-off of whatever kind or description against any person.

"Company" has the meaning set forth in the Introduction to this Agreement.

"control" (including its correlative meanings "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of securities or partnership or other interests, by contract or otherwise.

"Encumbrance" means any mortgage, deed of trust, hypothecation, rights of others, claim, encumbrance, burden, reservation, title defect, title retention agreement, conditional sale arrangement, lease, sublease, license, occupancy agreement, restrictive covenant, condition, encroachment, voting trust agreement, interest option, right of first offer, negotiation or refusal, proxy, or other similar restriction, limitation, lien, pledge, charge, easement or other security interest.

"Governmental Authority" means any court, tribunal, judicial or arbitral body, government (federal, state, provincial, local, foreign, or multinational) or other regulatory, administrative or governmental agency or authority.

"Governmental Order" means any judgment, decision, decree, injunction, ruling, stipulation, determination, award, writ or order of or entered by or with any Governmental Authority that is binding on any person or its property under applicable Law.

"Law" or "Laws" means any federal, national, supranational, state, provincial, local or similar law, statute, ordinance, regulation, rule, court decision, code, requirement or rule of law (including common law).

"Liabilities" means any direct or indirect liability, indebtedness, obligation, commitment,

expense, claim, deficiency, guaranty or endorsement of or by any person of any type, whether absolute or contingent, matured or unmatured, liquidated or unliquidated, accrued or unaccrued, known or unknown, whenever arising, including all costs and expenses relating thereto, and including without limitation those liabilities, Indebtedness and obligations arising under any Law, Action, threatened Action, Governmental Order or any award of any arbitrator of any kind, and those arising under any Contract.

"Operating Agreement" means the  Operating Agreement of the Company dated December 4, 2014, as amended.

"Losses" means, in respect of the indemnification obligations of any party pursuant to this Agreement, any and all costs, losses, Liabilities, obligations, damages (including consequential damages, lost profits, special or incidental damages, multiple damages, exemplary damages and other penalty damages) and other reasonable out-of-pocket expenses, including, without limitation, interest, penalties, reasonable attorneys' fees and all amounts paid in investigation, defense or settlement of Actions relating to Losses.

"Membership Interests" has the meaning set forth in the Operating Agreement.

"Seller" has the meaning set forth in the Introduction to this Agreement.

"Seller's Membership Interests" has the meaning set forth in the "Background" section of this Agreement.

EXHIBIT 88

**AGH Parent LLC**
**c/o BAM Management Services LLC**
**1370 Avenue of the Americas, 32nd Floor**
**New York, New York  10019**

October 28, 2016

Principal Growth Strategies LLC
c/o Platinum Partners
250 West 55th Street, 14th Floor
New York, New York  10019
Attn:  Suzanne Horowitz, Chief Legal Officer

Re:  Notice of AGH Parent LLC ("**AGH Parent**") Redemption of Class C Preferred Units held by Principal Growth Strategies LLC ("**PGS**")

Dear Ms. Horowitz:

Pursuant to Section 9.06 of the AGH Parent Amended and Restated Limited Liability Company Agreement entered into as of June 9, 2016 ("**LLC Agreement**"), we write to notify you that AGH Parent will exercise its redemption rights set forth in Section 9.06(a)(i) of the LLC Agreement with respect to the portion of Class C Preferred Units held by PGS that may be redeemed with the full amount of PGS Value ("**Redemption**").  The effective date of the Redemption will be the earlier of January 26, 2017 and the Business Day immediately preceding the date of a Change of Control or a Dissolution Event ("**Effective Date**").  On the Effective Date, AGH Parent will pay PGS a redemption price for the Class C Preferred Units held by PGS in the form of PGS Value.  Any capitalized term used but not defined herein shall have the meaning specified in the LLC Agreement.

Sincerely,

AGH Parent LLC
By: BAM Management Services LLC, its manager

By: _____
Name: Dhruv Narain
Title: Authorized Signatory

cc:    Mark Nordlicht
       David Steinberg
       Bart Schwartz
       Matthew Wright
       Chris Kennedy
       Barbra Parlin, Esq.

EXHIBIT 89

**AGH Parent LLC**
**c/o BAM Management Services LLC**
**1370 Avenue of the Americas, 32nd Floor**
**New York, New York 10019**

January 26, 2017

Principal Growth Strategies LLC
c/o Platinum Partners
1325 Avenue of the Americas
Suite 2717
New York, New York 10019
Attn: Suzanne Horowitz, Chief Legal Officer

      Re:    AGH Parent LLC's Partial Redemption of Class C Preferred Units Held by
               Principal Growth Strategies LLC

Dear Ms. Horowitz,

      We refer to that certain Amended and Restated Limited Liability Company Agreement among AGH Parent LLC ("**AGH Parent**"), Principal Growth Strategies LLC ("**PGS**") and the Members named therein dated as of June 9, 2016 (the "**LLC Agreement**"). Any capitalized term used but not defined herein shall have the meaning specified in the LLC Agreement.

      Pursuant to Section 9.06 of the LLC Agreement, AGH Parent elected, by delivery to PGS of a Class C Redemption Notice dated October 28, 2016 (the "**AGH Parent Redemption Notice**"), to exercise its redemption rights as set forth in Section 9.06(a)(i) of the LLC Agreement to redeem, effective as of January 26, 2017, the portion of the Class C Preferred Units held by PGS that may be redeemed on such date in consideration for the full amount of the PGS Value ($35,400,000.00) as provided therein.

      Accordingly, enclosed with this letter is an Assignment (the "**Assignment**"), duly executed on behalf of AGH Parent, transferring to PGS all of AGH Parent's interest in the assets set forth in Schedule A to such Assignment, which together have aggregate value, as determined in accordance with the LLC Agreement, equal to the PGS Value.

      AGH Parent is simultaneously updating its records to reflect the redemption of 336,928.93 Class C Preferred Units held by PGS, as well as the satisfaction as relates to PGS of $1,707,107.00 in accretive Class C Preferred Return related to the redeemed units, in each case, effective as of the date hereof.

67606107v2

Sincerely,

AGH Parent LLC

By: BAM Management Services LLC, its manager

By: _____

Name: Dhruv Narain
Title:   Authorized Signatory

Cc:   Mark Nordlicht (mnordlicht@platinumlp.com)
      David Steinberg (DSteinberg@platinumlp.com)
      Bart Schwartz (BSchwartz@guidepostsolutions.com)
      Robert Rittereiser (rittereiser@guidepostsolutions.com)
      Matthew Wright (MWright@RHSWCaribbean.com)
      Chris Kennedy (CKennedy@RHSWCaribbean.com)
      Barbra Parlin, Esq. (Barbra.Parlin@hklaw.com)
      Warren Gluck, Esq. (Warren.Gluck@hklaw.com)
      Alan Levine, Esq. (alevine@cooley.com)
      Celia Barenholtz, Esq. (cbarenholtz@cooley.com)

67606107v2

**Schedule A**

| Identification of PGS Value Asset | Ascribed PGS Value Pursuant to LLC Agreement |
|---|---|
| -$1,436,721.13 of principal indebtedness and $19,715.07 of accrued and unpaid interest and fees outstanding under that certain Promissory Note, issued to BBIL ULICO 2014 by **Montsant Partners LLC** in the principal amount of $6,137,215.50 on or about March 31, 2016 and subsequently assigned in relevant part to Beechwood Omnia Ltd. effective as of January 26, 2017, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | **$1,456,436.20** |
| -$4,567,599.71 of principal indebtedness and $24,741.17 of accrued and unpaid interest and fees outstanding under that certain Fifth Amended and Restated Senior Secured Promissory Note, reissued to BRe WNIC 2013 LTC Primary by **Golden Gate Oil LLC** in the principal amount of $20,405,749.26 on or about March 21, 2016 and subsequently assigned in relevant part to Beechwood Omnia Ltd. effective as of November 1, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | **$4,592,340.88** |
| -$2,720,431.68 of principal indebtedness and $14,735.67 of accrued and unpaid interest and fees outstanding in the participation interests held by Beechwood Omnia Ltd. in that certain Fifth Amended and Restated Senior Secured Promissory Note, reissued to the Senior Health Insurance Company of Pennsylvania by **Golden Gate Oil LLC** in the principal amount of $11,249,414.40 on or about March 21, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | **$2,735,167.35** |
| -$6,734,192.89 of principal indebtedness and $36,476.88 of accrued and unpaid interest and fees outstanding under that certain Fifth Amended and Restated Senior Secured Promissory Note, reissued to BRe WNIC 2013 LTC Primary by **Golden Gate Oil LLC** in the principal amount of $20,405,749.26 on or about March 21, 2016 and subsequently assigned in relevant part to Beechwood Bermuda International Ltd. (for its BBILCustody (ULICO) Account) Ltd. effective as of November 1, 2016, as further assigned in relevant part by Beechwood Bermuda International Ltd. (for its BBILCustody (ULICO) Account) to Beechwood OMNIA Ltd. effective as of January 26, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | **$6,770,669.77** |
| -$941,438.32 of principal indebtedness and $10,199.06 of accrued and unpaid interest and fees outstanding under that certain Amended and Restated Secured Term Note, reissued to BRe WNIC 2013 LTC Primary by **Pedevco Corp.** in the principal amount of $13,065,703.98 on or about May 12, 2016 and subsequently assigned in relevant part by BRe WNIC 2013 LTC Primary to Beechwood OMNIA Limited effective as of November 1, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | **$951,637.37** |
| -$95,064.88 of principal indebtedness and $1,029.88 of accrued and unpaid interest and fees outstanding under that certain Amended and Restated Secured Term Note, reissued to BRe WNIC 2013 LTC Sub by **Pedevco Corp.** in the principal amount of $856,992.17 on or about May | **$96,094.76** |

67606107v2

| | |
|---|---|
| 12, 2016 and subsequently assigned in relevant part by BRe WNIC 2013 LTC Sub to Beechwood OMNIA Limited effective as of November 1, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | |
| -$50,110.30 of principal indebtedness and $542.87 of accrued and unpaid interest and fees outstanding under that certain Amended and Restated Secured Term Note, reissued to BRe BCLIC Sub by **Pedevco Corp.** in the principal amount of $451,709.79 on or about May 12, 2016 and subsequently assigned in relevant part by BRe BCLIC Sub to Beechwood OMNIA Limited effective as of November 1, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; and | $50,653.17 |
| -$1,396,059.50 of principal indebtedness and $15,124.19 of accrued and unpaid interest and fees outstanding in the participation interests held by Beechwood Omnia Ltd. in that certain Amended and Restated Secured Term Note, reissued to the Senior Health Insurance Company of Pennsylvania by **Pedevco Corp.** in the principal amount of $12,585,118.75 on or about May 12, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017. | $1,411,183.69 |
| -$5,359,751.87 of principal indebtedness and $73,547.93 of accrued and unpaid interest and fees outstanding under that certain Promissory Note, issued to BBIL ULICO 2014 by **Montsant Partners LLC** in the principal amount of $6,137,215.50 on or about March 31, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | $5,433,299.80 |
| -$1,255,736.22 of principal indebtedness and $13,603.63 of accrued and unpaid interest and fees outstanding under that certain Amended and Restated Secured Term Note, reissued to BRe WNIC 2013 LTC Primary by **Pedevco Corp.** in the principal amount of $13,065,703.98 on or about May 12, 2016 and subsequently assigned in relevant part by BRe WNIC 2013 LTC Primary to Beechwood Bermuda International Limited (for credit to its ULICO custody account) effective as of November 1, 2016, as further assigned by Beechwood Bermuda International Limited to BBIL ULICO 2014, effective as of November 30, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; | $1,269,339.85 |
| -$115,685.39 of principal indebtedness and $1,253.24 of accrued and unpaid interest and fees outstanding under that certain Amended and Restated Secured Term Note, reissued to BRe WNIC 2013 LTC Sub by **Pedevco Corp.** in the principal amount of $856,992.17 on or about May 12, 2016 and subsequently assigned in relevant part by BRe WNIC 2013 LTC Sub to Beechwood Bermuda International Limited (for credit to its ULICO custody account) effective as of November 1, 2016, as further assigned by Beechwood Bermuda International Limited to BBIL ULICO 2014, effective as of November 30, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; and | $116,938.63 |
| -$60,980.86 of principal indebtedness and $660.62 of accrued and unpaid interest and fees outstanding under that certain Amended and Restated Secured Term Note, reissued to BRe BCLIC Sub by **Pedevco Corp.** in the principal amount of $451,709.79 on or about May 12, 2016 and subsequently assigned in relevant part by BRe BCLIC Sub to Beechwood Bermuda International Limited (for credit to its ULICO custody account) effective as of November 1, 2016, as further assigned by Beechwood Bermuda International Limited to BBIL ULICO 2014, | $61,641.48 |

4

| | |
|---|---|
| effective as of November 30, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017; and<br><br>-$1,698,900.53 of principal indebtedness and $18,404.51 of accrued and unpaid interest and fees outstanding in the participation interests held by BBIL ULICO 2014 in that certain Amended and Restated Secured Term Note, reissued to the Senior Health Insurance Company of Pennsylvania by **Pedevco Corp.** in the principal amount of $12,585,118.75 on or about May 12, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017. | **$1,717,305.04** |
| -$8,619,020.00 of principal indebtedness and $118,272.01 of accrued and unpaid interest and fees outstanding in the participation interests held by Beechwood Bermuda International Limited (for credit to its ULICO custody account) in that certain Second Amended and Restated Secured Term Note, issued to Senior Health Insurance Company of Pennsylvania by **Montsant Partners LLC** in the principal amount of $36,774,055.56 on or about March 21, 2016, then as subsequently assigned in relevant part to Assignor effective as of January 26, 2017. | $8,737,292.01 |
| **TOTAL** | **$35,400,000** |

5

EXHIBIT 90

**PROMISSORY NOTE**

Maximum Principal Amount: US$36,000,000          New York, New York
                                                   As of May 11, 2015

        FOR VALUE RECEIVED, the undersigned, PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P., a Cayman Islands limited partnership with its chief executive office located at 250 West 55th Street, 14th Floor, New York, New York 10019 (the "Borrower"), hereby unconditionally promises to pay to the order of each lender as set forth in Schedule A (together with its successors and assigns, each a "Lender"), to such account of a Lender, as such Lender may designate, the principal amount corresponding to such Lender set forth in Schedule A (each a "Principal Amount") or so much thereof as may be outstanding from time to time, together with all accrued and unpaid interest with respect to such Lender thereon.

        The Borrower hereby agrees, for the benefit of each Lender, as follows:

        1.     Interest on the Principal Amount corresponding to each Lender as set forth in Schedule A shall be due and owing to the applicable Lender on the first Business Day of each month commencing with October 1, 2014 and on the Maturity Date (as defined below), at a rate equal to one and three hundred thirty-three thousandths percent (1.333%) per month, provided the Principal Amount with respect to each Lender required to be repaid by the Borrower to the applicable Lender under this Promissory Note (as amended, restated, modified and/or supplemented from time to time, this "Note"; the total amount owing to all Lenders hereunder, the "Loan") shall be paid to the applicable Lender in full by the Borrower on or before May 11, 2018 (the "Maturity Date"). Interest on the principal amount of the Loan shall be calculated on the basis of the actual number of days elapsed in a given calendar month and an assumed 360-day year. After 18 months from the issue date the Borrower may at any time, at its option and upon not less than one (1) Business Day's prior written notice to the Lenders, prepay the outstanding principal of the Loan (the "Prepayment Amount"), in whole at any time or in part from time to time. Each such Prepayment Amount to be accompanied by the payment of accrued interest at a rate equal to one and three hundred thirty-three thousandths percent (1.333%) on any outstanding principal amount of the Loan as of the date of such prepayment. Any such Prepayment Amount paid by the Borrower to the Lenders shall be distributed to the Lenders (and the lender under the substantially similar $14,000,000 note entered into as of the date hereof (the "Other Note")) *pro rata* in proportion the outstanding principal amount of the Loan attributable to such Lenders and lender at the time of such prepayment. 6 months from the date a lender's monies are received, and, with respect to each Lender, at a Lender's option, with 30 days prior written notice, the outstanding portion of such Lender's Principal Amount as of the end of the calendar month of the date of such election shall be due and owing to such Lender on the last day of such month, without penalty.

        2.     As collateral security for all indebtedness, obligations and other liabilities of the Borrower to the Lenders now or hereafter arising evidenced by this Note, the Borrower hereby transfers, grants and pledges a continuing perfected security interest in all of the Borrower's right, title and interest in and to the assets held by the Borrower on the date hereof, all options and other rights, contractual or otherwise, in respect thereof and all distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such assets, and all proceeds of any and all of the foregoing (collectively, the "Collateral"). Such security interest shall be subordinated to the first priority security interest provided by the Borrower pursuant to that certain Note dated July 1, 2014 and shall be pari passu with the Other Note. The Borrower shall, from time to time, (i) immediately take all actions as may be reasonably requested by the Lenders to perfect the security interest of the Lenders in the Collateral, including, without limitation, signing and filing of UCC-1 Financing Statements, and (ii)

immediately take all actions as may be reasonably requested from time to time by the Lenders so that control of such Collateral is obtained and at all times held by the Lenders, subject to the existing security interest. All of the foregoing shall be at the sole cost and expense of the Borrower.

3.      If this Note or any payment hereunder becomes due on a day which is not a Business Day (as defined below), the due date of this Note or payment shall be extended to the next succeeding Business Day, and such extension of time shall he included in computing interest and fees in connection with such payment. As used herein, "Business Day" shall mean any day other than a Saturday, Sunday or day which shall be in the State of New York a legal holiday or day on which banking institutions are required or authorized to close.

4.      All payments shall be made by Borrower to the Lenders at 250 West 55th Street, 14th Floor, New York, New York 10019 or such other place as the Lenders may from time to time specify in writing in lawful currency of the United States of America in immediately available funds, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments.

5.      This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or the Lenders, except by an agreement in writing signed by the Lenders and the Borrower.

6.      Whenever used, the singular number shall include the plural, the plural number shall include the singular, and the words "Lender" and "Borrower" shall include their respective permitted successors, assigns, heirs, executors and administrators.

7.      Notwithstanding the above, from time to time, without affecting the obligation of Borrower or the successors or assigns of Borrower to pay the outstanding principal balance of this Note and observe the covenants of Borrower contained herein, without giving notice to or obtaining the consent of Borrower, the successors or assigns of Borrower or guarantors, and without liability on the part of the Lenders, each Lender may, with respect to such Lender's Principal Amount, at such Lender's option, decrease the maximum amount of the Note, extend the time for payment of said outstanding principal balance or any part thereof, reduce the payments thereon, release anyone liable on any of said outstanding principal balance, accept a renewal of this Note, modify the terms and time of payment of said outstanding principal balance, join in any extension or subordination agreement, release any security given herefor, take or release other or additional security, and agree in writing with Borrower to modify the rate of interest or period of amortization of this Note or change the amount of the monthly installments payable hereunder.

8.      Borrower and all others who may become liable for all or any part of this indebtedness hereunder do hereby severally waive presentment and demand for payment, notice of dishonor, protest, notice of protest, notice of nonpayment, notice of intent to accelerate the maturity hereof and of acceleration. No release of any security for the indebtedness hereunder or any person liable for payment of the indebtedness hereunder, no extension of time for payment of this note or any installment hereof, and no alteration, amendment or waiver of any provision hereof made by agreement between or among the Lender(s) and any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower for the payment of all or any part of the indebtedness hereunder.

9.      Borrower represents that Borrower has full power, authority and legal right to execute, deliver and perform its obligations pursuant to this Note and that this Note constitutes a valid and binding obligation of Borrower.

10.     This Note was negotiated in the State of New York, the Loan was made by the Lenders and accepted by Borrower in the State of New York, and the proceeds of the Note delivered pursuant hereto were disbursed from the State of New York.

**11.     THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED, ENFORCED, AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE OR GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICTS OF LAW PRINCIPLES THEREOF.**

**12.     THE BORROWER AND THE LENDERS CONSENT AND AGREE THAT THE STATE OR FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES INVOLVING BORROWER OR THE LENDERS PERTAINING TO THIS NOTE, PROVIDED, THAT BORROWER AND THE LENDERS ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF THE COUNTY OF NEW YORK, STATE OF NEW YORK. BORROWER ASSENTS AND SUBMITS TO PERSONAL JURISDICTION OF ANY SUCH COURT IN ANY ACTION OR PROCEEDING INVOLVING BORROWER OR THE LENDERS PERTAINING TO THIS NOTE. BORROWER HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT, AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH ABOVE AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF BORROWER'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAIL, PROPER POSTAGE PREPAID.**

**13.     TO THE FULLEST EXTENT ALLOWED BY LAWS OF THE STATE OF NEW YORK, THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY, IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS NOTE AND FOR ANY COUNTERCLAIM THEREIN.**

14.     The remedies under this Note shall he cumulative to, and not exclusive of, any rights or remedies otherwise available. A Lender shall not, by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder and no waiver by a Lender of its rights or remedies hereunder shall be valid against such Lender unless in writing, signed by such Lender, and then only to the extent therein set forth. The waiver by a Lender of any right or remedy hereunder upon any one occasion shall not be construed as a bar to any right or remedy which it would otherwise have had on any future occasion.

15.     The liability of the undersigned shall be absolute and unconditional and without regard to the liability of any other party hereto.

16.     Borrower and the Lenders intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits a Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law).  If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under this Note, then it is Borrower's and the Lenders' express intent that all excess amounts theretofore collected by a Lender shall be credited against the unpaid principal balance of the Loan with respect to such Lender's Principal Amount (or, if the Loan has been or would thereby be paid in full, refunded to Borrower), and the provisions hereof immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the

recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to a Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the maximum lawful rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

17.     Each Lender shall have the right to assign, in whole or in part, its interest in this Note and all of its rights hereunder, and all of the provisions herein shall continue to apply to the Loan. Each Lender shall have the right to participate its interest in the Loan with other parties. Each Lender shall provide prompt notice to Borrower of any assignment, in whole or in part, of this Note with respect to its Principal Amount.  The term "Holder" as used herein shall mean each Lender and shall also include any transferee of this Note whose name has been recorded by the Borrower in the Note Register (as defined below). Each transferee of this Note acknowledges that this Note has not been registered under the Securities Act of 1933, as amended, (the "Securities Act") and may be transferred only pursuant to an effective registration under the Securities Act or pursuant to an applicable exemption from the registration requirements of the Securities Act. The Borrower shall maintain a register (the "Note Register") in its principal offices for the purpose of registering this Note and any transfer or partial transfer thereof, which register shall reflect and identify, at all times, the ownership of record of any interest in this Note. Upon the issuance of this Note, the Borrower shall record the name and address of each Lender in the Note Register as a Holder. Upon surrender for registration of transfer or exchange of this Note at the principal offices of the Borrower, the Borrower shall, at its expense, execute and deliver one or more new notes of like tenor and of a like aggregate Principal Amount with respect to a Lender, registered in the name of the Holder or a transferee or transferees. Every note surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by written instrument of transfer duly executed by the Holder of such note or such holder's attorney duly authorized in writing. It shall be a condition precedent to any transfer or partial transfer of the record ownership of an interest in this Note that the Borrower register such transfer or partial transfer in the Note Register and otherwise comply in all respects with the provisions of this Paragraph 17, and the Borrower's failure to do so shall render any such transfer or partial transfer void *ab initio.*

18.     All understandings, representations and agreements heretofore had with respect to this Note are merged into this Note, which alone fully and completely expresses the agreement of Borrower and the Lenders. None of the Lenders or any other party have made any representation, warranty, or statement to Borrower in order to induce Borrower to execute this Note, and any and all claims for fraud in the inducement are expressly waived.

19.     Borrower hereby waives the right to assert a claim or counterclaim against each Lender for injunctive relief arising out of or relating to this Note, including, without limitation, any claim or counterclaim against a Lender relating to the exercise of their rights and remedies arising out of or relating to this Note. Borrower hereby acknowledges that any claim or counterclaim against a Lender arising out of or relating to this Note can be adequately remedied by an action at law for money damages.

20.     In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

21.     Each party acknowledges that its legal counsel participated in the preparation of this Note and, therefore, stipulates that the rule of construction that ambiguities are to be resolved against the drafting party shall not be applied in the interpretation of this Note to favor any party against the other.

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered as of the day first above written.

PLATINUM PARTNERS VALUE ARBITRAGE
FUND, L.P., a Cayman Islands limited partnership

By: _____

Name: Mark Nordlicht
Title: CIO