EXHIBIT 91

## PROMISSORY NOTE

Maximum Principal Amount: US$ 150,000,000

New York, New York
As of August 12, 2015

FOR VALUE RECEIVED, the undersigned, PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P., a Cayman Islands limited partnership with its chief executive office located at 250 West 55th Street, 14th Floor, New York, New York 10019 (the "Borrower"), hereby unconditionally promises to pay to the order of each lender (together with its successors and assigns, each a "Lender"), to such account of a Lender, as such Lender may designate, the principal amount corresponding to such Lender (each a "Principal Amount") or so much thereof as may be outstanding from time to time, together with all accrued and unpaid interest with respect to such Lender thereon.

The Borrower hereby agrees, for the benefit of each Lender, as follows:

1.      Interest on the Principal Amount corresponding to each Lender shall be due and owing to the applicable Lender on the first Business Day of each month commencing with September 1, 2015 and on the Maturity Date (as defined below), at a rate equal to one percent (1.0%) per month, provided the Principal Amount with respect to each Lender required to be repaid by the Borrower to the applicable Lender under this Promissory Note (as amended, restated, modified and/or supplemented from time to time, this "Note"; the total amount owing to all Lenders hereunder, the "Loan") shall be paid to the applicable Lender in full by the Borrower 12 months from the date that such Lender's payment is received ( the "Maturity Date"). Interest on the principal amount of the Loan shall be calculated on the basis of the actual number of days elapsed in a given calendar month and an assumed 360-day year. After 6 months from the date hereof, the Borrower may at any time, at its option and upon not less than thirty (30) days' prior written notice from the last day of the calendar month that the request is made (such written notice may not be made prior to 6 months from the date hereof) to the Lenders, prepay the outstanding principal of the Loan (the "Prepayment Amount"), in whole at any time or in part from time to time.  Each such Prepayment Amount to be accompanied by the payment of accrued interest at a rate equal to one percent (1.0%) on any outstanding principal of the Loan as of the date of such prepayment. Any such Prepayment Amount paid by the Borrower to the Lenders shall be distributed to the Lenders *pro rata* in proportion to the outstanding principal amount of the Loan attributable to such Lenders and lender at the time of such prepayment.  After 6 months from the date hereof, and, with respect to each Lender, at a Lender's option, and upon not less than thirty (30) days' prior written notice from the last day of the calendar month that the request is made (such written notice may not be made prior to 6 months from the date hereof), the outstanding portion of such Lender's Principal Amount (the "Call Amount") as of the end of the calendar month of the date of such election shall be due and owing to such Lender on the date set forth on the written notice, without penalty.  Each such Call Amount to be accompanied by the payment of accrued interest at a rate equal to one percent (1.0%) on any outstanding principal amount of the Loan as of the date of payment of such Call Amount.

2.      As collateral security for all indebtedness, obligations and other liabilities of the Borrower to the Lenders now or hereafter arising evidenced by this Note, the Borrower hereby transfers, grants and pledges a continuing perfected security interest in all of the Borrower's right, title and interest in and to the assets held by the Borrower on the date hereof, all options and other rights, contractual or otherwise, in respect thereof and all distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such assets, and all proceeds of any and all of the foregoing (collectively, the "Collateral").  Such security interest shall be subordinated to the first priority security interest provided by the Borrower pursuant to those certain Notes dated June 17,

DOC ID - 21921472.8

2015 and July 15, 2015 (and its predecessor Notes). The Borrower shall, from time to time, (i) immediately take all actions as may be reasonably requested by the Lenders to perfect the security interest of the Lenders in the Collateral, including, without limitation, signing and filing of UCC-1 Financing Statements, and (ii) immediately take all actions as may be reasonably requested from time to time by the Lenders so that control of such Collateral is obtained and at all times held by the Lenders, subject to the existing security interest. All of the foregoing shall be at the sole cost and expense of the Borrower.

3.      If this Note or any payment hereunder becomes due on a day which is not a Business Day (as defined below), the due date of this Note or payment shall be extended to the next succeeding Business Day, and such extension of time shall he included in computing interest and fees in connection with such payment. As used herein, "Business Day" shall mean any day other than a Saturday, Sunday or day which shall be in the State of New York a legal holiday or day on which banking institutions are required or authorized to close.

4.      All payments shall be made by Borrower to the Lenders at 250 West 55th Street, 14th Floor, New York, New York 10019 or such other place as the Lenders may from time to time specify in writing in lawful currency of the United States of America in immediately available funds, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments.

5.      This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or the Lenders, except by an agreement in writing signed by the Lenders and the Borrower.

6.      Whenever used, the singular number shall include the plural, the plural number shall include the singular, and the words "Lender" and "Borrower" shall include their respective permitted successors, assigns, heirs, executors and administrators.

7.      Notwithstanding the above, from time to time, without affecting the obligation of Borrower or the successors or assigns of Borrower to pay the outstanding principal balance of this Note and observe the covenants of Borrower contained herein, without giving notice to or obtaining the consent of Borrower, the successors or assigns of Borrower or guarantors, and without liability on the part of the Lenders, each Lender may, with respect to such Lender's Principal Amount, at such Lender's option, decrease the maximum amount of the Note, extend the time for payment of said outstanding principal balance or any part thereof, reduce the payments thereon, release anyone liable on any of said outstanding principal balance, accept a renewal of this Note, modify the terms and time of payment of said outstanding principal balance, join in any extension or subordination agreement, release any security given herefor, take or release other or additional security, and agree in writing with Borrower to modify the rate of interest or period of amortization of this Note or change the amount of the monthly installments payable hereunder.

8.      Borrower and all others who may become liable for all or any part of this indebtedness hereunder do hereby severally waive presentment and demand for payment, notice of dishonor, protest, notice of protest, notice of nonpayment, notice of intent to accelerate the maturity hereof and of acceleration. No release of any security for the indebtedness hereunder or any person liable for payment of the indebtedness hereunder, no extension of time for payment of this note or any installment hereof, and no alteration, amendment or waiver of any provision hereof made by agreement between or among the Lender(s) and any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower for the payment of all or any part of the indebtedness hereunder.

9.      Borrower represents that Borrower has full power, authority and legal right to execute, deliver and perform its obligations pursuant to this Note and that this Note constitutes a valid and binding obligation of Borrower.

DOC ID - 21921472.8

10.     This Note was negotiated in the State of New York, the Loan was made by the Lenders and accepted by Borrower in the State of New York, and the proceeds of the Note delivered pursuant hereto were disbursed from the State of New York.

11.     **THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED, ENFORCED, AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE OR GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICTS OF LAW PRINCIPLES THEREOF.**

12.     **THE BORROWER AND THE LENDERS CONSENT AND AGREE THAT THE STATE OR FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES INVOLVING BORROWER OR THE LENDERS PERTAINING TO THIS NOTE, PROVIDED, THAT BORROWER AND THE LENDERS ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF THE COUNTY OF NEW YORK, STATE OF NEW YORK. BORROWER ASSENTS AND SUBMITS TO PERSONAL JURISDICTION OF ANY SUCH COURT IN ANY ACTION OR PROCEEDING INVOLVING BORROWER OR THE LENDERS PERTAINING TO THIS NOTE. BORROWER HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT, AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH ABOVE AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF BORROWER'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAIL, PROPER POSTAGE PREPAID.**

13.     **TO THE FULLEST EXTENT ALLOWED BY LAWS OF THE STATE OF NEW YORK, THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY, IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS NOTE AND FOR ANY COUNTERCLAIM THEREIN.**

14.     The remedies under this Note shall he cumulative to, and not exclusive of, any rights or remedies otherwise available. A Lender shall not, by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder and no waiver by a Lender of its rights or remedies hereunder shall be valid against such Lender unless in writing, signed by such Lender, and then only to the extent therein set forth. The waiver by a Lender of any right or remedy hereunder upon any one occasion shall not be construed as a bar to any right or remedy which it would otherwise have had on any future occasion.

15.     The liability of the undersigned shall be absolute and unconditional and without regard to the liability of any other party hereto.

16.     Borrower and the Lenders intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits a Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law). If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under this Note, then it is Borrower's and the Lenders' express intent that all excess amounts theretofore collected by a Lender shall be credited against the unpaid principal balance of the Loan with respect to such Lender's Principal Amount (or, if the Loan has been or would thereby be paid in full, refunded to Borrower), and the provisions hereof immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the

recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to a Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the maximum lawful rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

17.     Each Lender shall have the right to assign, in whole or in part, its interest in this Note and all of its rights hereunder, and all of the provisions herein shall continue to apply to the Loan. Each Lender shall have the right to participate its interest in the Loan with other parties. Each Lender shall provide prompt notice to Borrower of any assignment, in whole or in part, of this Note with respect to its Principal Amount. The term "Holder" as used herein shall mean each Lender and shall also include any transferee of this Note whose name has been recorded by the Borrower in the Note Register (as defined below). Each transferee of this Note acknowledges that this Note has not been registered under the Securities Act of 1933, as amended, (the "Securities Act"), and may be transferred only pursuant to an effective registration under the Securities Act or pursuant to an applicable exemption from the registration requirements of the Securities Act. The Borrower shall maintain a register (the "Note Register") in its principal offices for the purpose of registering this Note and any transfer or partial transfer thereof, which register shall reflect and identify, at all times, the ownership of record of any interest in this Note. Upon the issuance of this Note, the Borrower shall record the name and address of each Lender in the Note Register as a Holder. Upon surrender for registration of transfer or exchange of this Note at the principal offices of the Borrower, the Borrower shall, at its expense, execute and deliver one or more new notes of like tenor and of a like aggregate Principal Amount with respect to a Lender, registered in the name of the Holder or a transferee or transferees. Every note surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by written instrument of transfer duly executed by the Holder of such note or such holder's attorney duly authorized in writing. It shall be a condition precedent to any transfer or partial transfer of the record ownership of an interest in this Note that the Borrower register such transfer or partial transfer in the Note Register and otherwise comply in all respects with the provisions of this Paragraph 17, and the Borrower's failure to do so shall render any such transfer or partial transfer void *ab initio.*

18.     All understandings, representations and agreements heretofore had with respect to this Note are merged into this Note, which alone fully and completely expresses the agreement of Borrower and the Lenders. None of the Lenders or any other party have made any representation, warranty, or statement to Borrower in order to induce Borrower to execute this Note, and any and all claims for fraud in the inducement are expressly waived.

19.     Borrower hereby waives the right to assert a claim or counterclaim against each Lender for injunctive relief arising out of or relating to this Note, including, without limitation, any claim or counterclaim against a Lender relating to the exercise of their rights and remedies arising out of or relating to this Note. Borrower hereby acknowledges that any claim or counterclaim against a Lender arising out of or relating to this Note can be adequately remedied by an action at law for money damages.

20.     In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

21.     Each party acknowledges that its legal counsel participated in the preparation of this Note and, therefore, stipulates that the rule of construction that ambiguities are to be resolved against the drafting party shall not be applied in the interpretation of this Note to favor any party against the other.

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered as of the day first above written.

Platinum Partners Value Arbitrage
Fund L.P., a Cayman Islands limited partnership

By: _____
        Name: Mark Nordlicht
        Title: CIO

EXHIBIT 92

# PROMISSORY NOTE

Maximum Principal Amount: US$14,000,000.00

New York, New York
As of September 18, 2014

FOR VALUE RECEIVED, the undersigned, PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P., a Cayman Islands limited partnership with its chief executive office located at 152 West 57th Street, 4th Floor, New York, New York 10019 (the "Borrower"), hereby unconditionally promises to pay to Twosons (together with its successors and assigns, the "Lender"), to such account of the Lender, as the Lender may designate, the principal amount equal to $14,000,000.00 (the "Principal Amount") or so much thereof as may be outstanding from time to time, together with all accrued and unpaid interest to the Lender thereon.

The Borrower hereby agrees, for the benefit of the Lender, as follows:

1.        Interest on the Principal Amount shall be due and owing to the Lender on the first Business Day of each month commencing with October 1, 2014 and on the Maturity Date (as defined below), at a rate equal to one and three hundred thirty-three thousandths percent (1.333%) per month, provided the Principal Amount required to be repaid by the Borrower to the Lender under this Promissory Note (as amended, restated, modified and/or supplemented from time to time, this "Note"; the total amount owing to the Lender hereunder, the "Loan") shall be paid to the Lender in full by the Borrower on or before September 30, 2017 (the "Maturity Date"). Interest on the Principal Amount shall be calculated on the basis of the actual number of days elapsed in a given calendar month and an assumed 360-day year. After 18 months from the issue date the Borrower may at any time, at its option and upon not less than one (1) Business Day's prior written notice to the Lender, prepay the outstanding principal of the Loan (the "Prepayment Amount"), in whole at any time or in part from time to time. Each such Prepayment Amount to be accompanied by the payment of accrued interest at a rate equal to one and three hundred thirty-three thousandths percent (1.333%) on any outstanding principal amount of the Loan as of the date of such prepayment. Any such Prepayment Amount paid by the Borrower to the Lender shall be distributed to the Lender and the lenders under the substantially similar $36,000,000 note entered into as of the date hereof (the "Other Note") *pro rata* in proportion the outstanding principal amount of the loans attributable to the Lender and such lenders at the time of such prepayment. After March 31, 2015 and, at the Lender's option, with 30 days prior written notice, the outstanding portion of the Lender's Principal Amount as of the end of the calendar month of the date of such election shall be due and owing to the Lender on the last day of such month, without penalty.

2.        As collateral security for all indebtedness, obligations and other liabilities of the Borrower to the Lender now or hereafter arising evidenced by this Note, the Borrower hereby transfers, grants and pledges a continuing perfected security interest in all of the Borrower's right, title and interest in and to the assets held by the Borrower on the date hereof, all options and other rights, contractual or otherwise, in respect thereof and all distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such assets, and all proceeds of any and all of the foregoing (collectively, the "Collateral"). Such security interest shall be subordinated to the first priority security interest



provided by the Borrower pursuant to that certain Note dated July 1, 2014 and shall be pari passu with the Other Note. The Borrower shall, from time to time, (i) immediately take all actions as may be reasonably requested by the Lender to perfect the security interest of the Lender in the Collateral, including, without limitation, signing and filing of UCC-1 Financing Statements, and (ii) immediately take all actions as may be reasonably requested from time to time by the Lender so that control of such Collateral is obtained and at all times held by the Lender, subject to the existing security interest. All of the foregoing shall be at the sole cost and expense of the Borrower.

3.       If this Note or any payment hereunder becomes due on a day which is not a Business Day (as defined below), the due date of this Note or payment shall be extended to the next succeeding Business Day, and such extension of time shall he included in computing interest and fees in connection with such payment. As used herein, "Business Day" shall mean any day other than a Saturday, Sunday or day which shall be in the State of New York a legal holiday or day on which banking institutions are required or authorized to close.

4.       All payments shall be made by Borrower to the Lender at 152 West 57th Street, 4th Floor, New York, New York 10019 or such other place as the Lender may from time to time specify in writing in lawful currency of the United States of America in immediately available funds, without counterclaim or setoff and free and clear of, and without any deduction or withholding for, any taxes or other payments.

5.       This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or the Lender, except by an agreement in writing signed by the Lender and the Borrower.

6.       Whenever used, the singular number shall include the plural, the plural number shall include the singular, and the words "Lender" and "Borrower" shall include their respective permitted successors, assigns, heirs, executors and administrators.

7.       Notwithstanding the above, from time to time, without affecting the obligation of Borrower or the successors or assigns of Borrower to pay the outstanding principal balance of this Note and observe the covenants of Borrower contained herein, without giving notice to or obtaining the consent of Borrower, the successors or assigns of Borrower or guarantors, and without liability on the part of the Lender, the Lender may, with respect to the Lender's Principal Amount, at the Lender's option, decrease the maximum amount of the Note, extend the time for payment of said outstanding principal balance or any part thereof, reduce the payments thereon, release anyone liable on any of said outstanding principal balance, accept a renewal of this Note, modify the terms and time of payment of said outstanding principal balance, join in any extension or subordination agreement, release any security given herefor, take or release other or additional security, and agree in writing with Borrower to modify the rate of interest or period of amortization of this Note or change the amount of the monthly installments payable hereunder.

8.       Borrower and all others who may become liable for all or any part of this indebtedness hereunder do hereby severally waive presentment and demand for payment, notice of dishonor, protest, notice of protest, notice of nonpayment, notice of intent to accelerate the maturity hereof and of acceleration. No release of any security for the indebtedness hereunder or any person liable for payment of the indebtedness hereunder, no extension of time for payment of this note or



any installment hereof, and no alteration, amendment or waiver of any provision hereof made by agreement between or among the Lender(s) and any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower for the payment of all or any part of the indebtedness hereunder.

9.   Borrower represents that Borrower has full power, authority and legal right to execute, deliver and perform its obligations pursuant to this Note and that this Note constitutes a valid and binding obligation of Borrower.

10.   This Note was negotiated in the State of New York, the Loan was made by the Lender and accepted by Borrower in the State of New York, and the proceeds of the Note delivered pursuant hereto were disbursed from the State of New York.

**11.   THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED, ENFORCED, AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE OR GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICTS OF LAW PRINCIPLES THEREOF.**

**12.   THE BORROWER AND THE LENDER CONSENT AND AGREE THAT THE STATE OR FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES INVOLVING BORROWER OR THE LENDER PERTAINING TO THIS NOTE, PROVIDED, THAT BORROWER AND THE LENDER ACKNOWLEDGE THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF THE COUNTY OF NEW YORK, STATE OF NEW YORK. BORROWER ASSENTS AND SUBMITS TO PERSONAL JURISDICTION OF ANY SUCH COURT IN ANY ACTION OR PROCEEDING INVOLVING BORROWER OR THE LENDER PERTAINING TO THIS NOTE. BORROWER HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT, AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH ABOVE AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF BORROWER'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAIL, PROPER POSTAGE PREPAID.**

**13.   TO THE FULLEST EXTENT ALLOWED BY LAWS OF THE STATE OF NEW YORK, THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY, IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS NOTE AND FOR ANY COUNTERCLAIM THEREIN.**

14.   The remedies under this Note shall he cumulative to, and not exclusive of, any rights or remedies otherwise available. The Lender shall not, by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder and no waiver by the Lender of its rights or remedies hereunder shall be valid against the Lender unless in writing,

signed by the Lender, and then only to the extent therein set forth. The waiver by the Lender of any right or remedy hereunder upon any one occasion shall not be construed as a bar to any right or remedy which it would otherwise have had on any future occasion.

15.     The liability of the undersigned shall be absolute and unconditional and without regard to the liability of any other party hereto.

16.     Borrower and the Lender intend at all times to comply with applicable state law or applicable United States federal law (to the extent that it permits the Lender to contract for, charge, take, reserve or receive a greater amount of interest than under state law). If the applicable law (state or federal) is ever judicially interpreted so as to render usurious any amount called for under this Note, then it is Borrower's and the Lender's express intent that all excess amounts theretofore collected by the Lender shall be credited against the unpaid principal balance of the Loan with respect to the Principal Amount (or, if the Loan has been or would thereby be paid in full, refunded to Borrower), and the provisions hereof immediately be deemed reformed and the amounts thereafter collectible thereunder reduced, without the necessity of the execution of any new document, so as to comply with applicable law, but so as to permit the recovery of the fullest amount otherwise called for thereunder. All sums paid or agreed to be paid to the Lender for the use, forbearance or detention of the Loan shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the maximum lawful rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

17.     The Lender shall have the right to assign, in whole or in part, its interest in this Note and all of its rights hereunder, and all of the provisions herein shall continue to apply to the Loan. The Lender shall have the right to participate its interest in the Loan with other parties. The Lender shall provide prompt notice to Borrower of any assignment, in whole or in part, of this Note with respect to its Principal Amount. The term "Holder" as used herein shall mean the Lender and shall also include any transferee of this Note whose name has been recorded in the Note Register (as defined below). Each transferee of this Note acknowledges that this Note has not been registered under the Securities Act of 1933, as amended, (the "Securities Act"), and may be transferred only pursuant to an effective registration under the Securities Act or pursuant to an applicable exemption from the registration requirements of the Securities Act. The Borrower shall maintain a register (the "Note Register") in its principal offices for the purpose of registering this Note and any transfer or partial transfer thereof, which register shall reflect and identify, at all times, the ownership of record of any interest in this Note. Upon the issuance of this Note, the Borrower shall record the name and address of the Lender in the Note Register as a Holder. Upon surrender for registration of transfer or exchange of this Note at the principal offices of the Borrower, the Borrower shall, at its expense, execute and deliver one or more new notes of like tenor and of a like aggregate Principal Amount with respect to the Lender, registered in the name of the Holder or a transferee or transferees. Every note surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by written instrument of transfer duly executed by the Holder of such note or such holder's attorney duly authorized in writing. It shall be a condition precedent to any transfer or partial transfer of the record ownership of an interest in this Note that the Borrower register such transfer or partial transfer in the Note Register and otherwise



comply in all respects with the provisions of this Paragraph 17, and the Borrower's failure to do so shall render any such transfer or partial transfer void *ab initio*.

18.     All understandings, representations and agreements heretofore had with respect to this Note are merged into this Note, which alone fully and completely expresses the agreement of Borrower and the Lender. None of the Lender or any other party have made any representation, warranty, or statement to Borrower in order to induce Borrower to execute this Note, and any and all claims for fraud in the inducement are expressly waived.

19.     Borrower hereby waives the right to assert a claim or counterclaim against the Lender for injunctive relief arising out of or relating to this Note, including, without limitation, any claim or counterclaim against the Lender relating to the exercise of their rights and remedies arising out of or relating to this Note. Borrower hereby acknowledges that any claim or counterclaim against the Lender arising out of or relating to this Note can be adequately remedied by an action at law for money damages.

20.     In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

21.     Each party acknowledges that its legal counsel participated in the preparation of this Note and, therefore, stipulates that the rule of construction that ambiguities are to be resolved against the drafting party shall not be applied in the interpretation of this Note to favor any party against the other.

IN WITNESS WHEREOF, Borrower has caused this Note to be executed and delivered as of the day first above written.

PLATINUM PARTNERS VALUE
ARBITRAGE FUND, L.P., a Cayman Islands
limited partnership

By:   _____

Name:   Mark Nordlicht
Title:    CIO

**Acknowledged and Agreed:**

TWOSONS

By: _____
Name:   PATRICK BELAICH
Title:   DIRECTOR

# EXHIBIT 93

**To:**    gdonnenfeld@platinumlp.com[gdonnenfeld@platinumlp.com]; seth@thecollective.com[seth@thecollective.com]
**Cc:**    dlevy@platinumlp.com[dlevy@platinumlp.com]; DSteinberg@platinumlp.com[DSteinberg@platinumlp.com]
**From:**    Mark Nordlicht
**Sent:**    Mon 7/4/2016 2:35:42 PM

Once u have court protection, everything gets stayed by filing chapter 15. New mountain wd be unsecured in larger group if they dont get security now. Finding out whether that security cd grt challenged even if we gave it to them. Bottom line though, there is little need for hearing. We are filing voluntary tuesday and shd agree to some sort of judgment. Talk later

Sent from my iPhone

# EXHIBIT 94

<u>Forbearance and Security Agreement</u>

This Forbearance and Security Agreement (this "<u>Agreement</u>") is made and entered into as of this 5 day of July, 2016 by and among Platinum Partners Value Arbitrage Fund, L.P. ("<u>PPVA</u>"), Epocs Real Estate Partnership, Ltd. ("<u>Epocs</u>"), West Loop South LLC ("<u>West Loop</u>"), and DMRJ Group, LLC ("<u>DMRJ</u>").

WHEREAS, pursuant to that certain Promissory Note dated as of August 12, 2015 (the "<u>August 12 2015 Note</u>"), (a) Epocs made loans to PPVA totaling the principal sum of Two Million Five Hundred Twenty Thousand Three Hundred Eighty Six Dollars and Eighty Four Cents ($2,520,386.84); and (b) West Loop made loans to PPVA totaling the principal sum of Two Million Five Hundred Sixty Nine Thousand Seven Hundred Sixteen Dollars and Eighty Four Cents ($2,569,716.84);

WHEREAS, pursuant to that certain Inventory Purchase and Sale Agreement dated as of October 13, 2015 (as amended, the "<u>Purchase and Sale Agreement</u>"), PPVA guaranteed payments to West Loop now totaling the principal sum of Two Million Sixty Five Thousand Seven Hundred Seventy Three Dollars and Forty Eight Cents ($2,065,773.48);

WHEREAS, Epocs and West Loop (together, the "<u>Creditors</u>") are affiliated entities;

WHEREAS, in accordance with the schedule set forth at <u>Exhibit A</u> hereto, sums due and owing by PPVA to the Creditors under the August 12 2015 Note and the Purchase and Sale Agreement (assuming no further payments), inclusive of principal, interest and other applicable fees (collectively, the "<u>Obligations</u>"), are projected to total Seven Million Six Hundred Ninety Eight Thousand Seven Hundred Forty Five Dollars and Seventy Four Cents ($7,698,745.74) as of October 31, 2016;

WHEREAS, PPVA and DMRJ are affiliated entities with a common interest in amicable resolution of disputes between the Creditors and PPVA;

WHEREAS, PPVA, Epocs, West Loop and DMRJ (collectively, the "<u>parties</u>") enter into this Agreement for purposes of causing the Creditors to forbear from exercising rights or remedies with respect to the Obligations until October 31, 2016 in exchange for (a) a guarantee from DMRJ and (b) a first-priority security interest in any and all of DMRJ's rights and remedies under that certain Senior Secured Convertible Promissory Note dated September 5, 2012 with face amount of Twelve Million Dollars ($12,000,000), a copy of which is attached hereto as <u>Exhibit B</u> with its associated security agreement (together, the "<u>Secured Note</u>").

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  The Creditors shall forbrear from all enforcement actions against PPVA to enforce their rights under the Obligations prior to October 31, 2016; provided, however, this provision shall be of no further force or effect if and when PPVA should file for, or otherwise be subject to, any bankruptcy or other form of insolvency proceeding.

2.  DMRJ hereby guarantees that it shall be jointly and severally liable for repayment of the Obligations to the Creditors but, for such purpose, DMRJ's liability shall be limited to DMRJ's rights and remedies (including without limitation proceeds) under the Secured Note.  Without limiting the foregoing, for purposes of securing the Obligations, DMRJ hereby grants to the Creditors a first-priority security interest in and to all of DMRJ's rights and remedies under the Secured Note, including without limitation in and to all payments and proceeds from the maker (Implant Sciences Corporation) thereunder.  The Creditors shall have the right to make applicable UCC filings with respect to the foregoing, and PPVA and DMRJ shall cooperate with respect thereto, including without limitation by delivering to the Creditors the original signed version of the Secured Note as necessary to perfect such security interest.

3.  Notwithstanding anything to the contrary herein, Implant Sciences Corporation and DMRJ at any time shall have the right to divide the Secured Note into more than one note of lower denominations which add up to principal amounts of Twelve Million Dollars ($12,000,000) in the aggregate (and except for the divided denominations, with all terms and conditions otherwise identical to those of the Secured Note), with one such divided note to be at principal amount of Four Million Six Hundred Ten Thousand Twenty Seven Dollars and Thirty Nine Cents ($4,610,027.39) (the "Replacement Secured Note").  For avoidance of doubt, the principal amount of any such Replacement Secured Note was intended to be calculated in a manner such that sums due thereunder shall total Seven Million Six Hundred Ninety Eight Thousand Seven Hundred Forty Five Dollars and Seventy Four Cents ($7,698,745.74) as of October 31, 2016.  At any time DMRJ shall request, the Creditors shall return the original signed version of the Secured Note to DMRJ and DMRJ shall simultaneously provide the Creditors with the original signed version of the Replacement Secured Note in its stead.  At such point in time, all references in Section 2 above to the "Secured Note" shall be deemed to refer to the "Replacement Secured Note".  For avoidance of doubt, the Creditors at all times shall be entitled to a first-priority security interest and this paragraph merely provides for a mechanism by which PPVA and DMRJ may replace the relevant collateral with collateral with lower principal value but nonetheless sufficient to cover payment of the Obligations in full.

4.  Notwithstanding anything to the contrary contained herein, (a) the Creditors' rights under the Secured Note under no circumstances shall include any right to exercise any form of conversion rights thereunder, or to benefit from any convertibility in the notes whatsoever; and (b) DMRJ shall have the right to amend (i) the maturity date of the Secured Note so as to extend it to a date no later than October 31, 2016 and/or (ii) any aspect of the Secured Note to the extent relating to conversion rights. Creditors shall cooperate in any and all respects as required to facilitate any such amendment(s), including without limitation by substituting any form of note then held in Creditors possession to effectuate such amendment.

5.  The rights and remedies granted to the Creditors hereunder are cumulative and, except to the extent expressly provided by paragraph 1 above, nothing herein constitutes a waiver of rights or

remedies by the Creditors and nothing herein releases any person or entity from any obligation owed to the Creditors.

6. This Agreement may be executed in counterparts, and/or with originals exchanged by electronic means.

7. The terms and conditions of this Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and shall not be amended absent a writing signed by all parties.

{signature page(s) follow}

3

IN WITNESS WHEREOF, the parties hereto by their signatures below enter into this Agreement as of the date first set forth above.

PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P.

By: _____

EPOCS REAL ESTATE PARTNERSHIP, LTD.

By: _____

WEST LOOP SOUTH LLC

By: _____

DMRJ GROUP, LLC

By: _____

4

| PLATINUM DEBT DUE SCOPE ENTITIES | | | | |
|---|---|---|---|---|
| As of 07/04/16 | | | | |
| | EPOCS | WLS | TC OPS | TOTAL |
| Original Amt | 2,520,386.84 | 2,669,716.84 | 2,065,773.48 | 7,255,877.16 |
| Repayments | | (100,000.00) | 0 | (100,000.00) |
| Current Principle | 2,520,386.84 | 2,569,716.84 | 2,065,773.48 | 7,155,877.16 |
| Interest | 0 | 0 | 116,316.82 | 116,316.82 |
| Fee | 0 | 0 | 61,973.20 | 61,973.20 |
| Total current amt due | 2,520,386.84 | 2,569,716.84 | 2,244,063.50 | 7,334,167.18 |
| Accrued | | | | |
| Interest thru: | 5/31/2016 | 5/31/2016 | 6/6/2016 | |
| | | | | |
| Interest Rate | 12.00% | 12.00% | 12.00% | per annun |
| Anticipated Pay Date | 10/31/2016 | 10/31/2016 | 10/31/2016 | |
| # of Days | 153 | 153 | 147 | |
| Acc'd Interest | 126,778.91 | 129,260.28 | 108,539.37 | 364,578.56 |
| | | | | |
| Total with acc'd interest | 2,647,165.75 | 2,698,977.12 | 2,352,602.87 | 7,698,745.74 |
| | | | | |
| | | | | |
| NOTES: | | | | |
| *** Assumes no monthly interest payments on the EPOCS and WLS | | | | |
| notes after payment for May accrued interest. | | | | |

EXHIBIT 95

Master Agreement for Unification of Zapata and Gerszberg Businesses

This Master Agreement for Unification of Zapata and Gerszberg Businesses (this "Agreement") is made and entered into as of this 3rd day of June, 2016 (the "Effective Date") by and among Seth Gerszberg, an individual residing at 229 Chestnut Street, Englewood, NJ 07631, USA ("Seth"), Spectrum30, LLC ("Spectrum30"), a US limited liability company, whose registered office is at 229 Chestnut Street, Englewood, NJ 07631, USA; and Franky Zapata, a French individual residing at 39 Avenue Saint-Roch, 13740 Le Rove, France ("Franky"):

WHEREAS, Seth and Raymond Li ("Ray") are the sole owners of JLIP, LLC, a limited liability company formed under the laws of Delaware, USA ("JLIP");

WHEREAS, JLIP owns the patents and patent applications listed on Exhibit A hereto (such patent rights, together with any and all associated trade secrets, R&D, know-how and other forms of intellectual property now or at any time later owned by JLIP, the "JLIP IP");

WHEREAS, Franky is the sole owner of Zapata Holding, a French SARL whose registered offices are located at 39 Avenue Saint-Roch, 13740 Le Rove, France, registered under the number 790 082 275 at the RCS of Aix-en-Provence ("Zapata Holding");

WHEREAS, Zapata Holding is the sole owner of all shares of each of (a) Personal Water Craft Product, a French SARL whose registered offices are located at 39 Avenue Saint-Roch, 13740 Le Rove, France, registered under the number 502 833 833 at the RCS of Aix-en-Provence, France ("PWC"), (b) Zapata Production, a French SARL whose registered offices are located at 39 Avenue Saint-Roch, 13740 Le Rove, France, registered under the number 802 702 324 at the RCS of Aix-en-Provence ("Zapata Production") and (c) ESH France, a French SARL whose registered offices are located at 39 Avenue Saint-Roch, 13740 Le Rove, France, registered under the number 801 857 038 at the RCS of Aix-en-Provence ("ESH France");

WHEREAS, Zapata Holding and PWC own intellectual property rights, including without limitation the trademarks, patents and patent applications listed on Exhibit B hereto (such and any and all other intellectual property rights, whether or not scheduled on Exhibit B as the parties acknowledge that Exhibit B does not include a complete list of same, and including without limitation all patents, patent applications such patent and trademark rights, together with any and all associated trade secrets, R&D, know-how and other forms of intellectual property now or at any time later owned by Zapata Holding and/or PWC, the "Zapata IP");

WHEREAS, on and subject to the terms and conditions herein, Seth, Spectrum30 and Franky desire to form a new business together, comprised of one or more intellectual property holding companies which, among other things, will own all the JLIP IP (subject to terms and conditions herein concerning Ray) and the Zapata IP, and one or more operating companies which, among other things, will design, manufacture, distribute, sell and/or promote products using the JLIP IP (subject to terms and conditions herein concerning Ray) and/or the Zapata IP on a global basis;

1/21

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seth and Franky (the "parties") agree as follows:

1. **The Parties' Intent:** the parties intend for the execution of this Agreement to constitute consummation of a binding, irrevocable transaction establishing a joint venture having the governance and economic structure set forth herein (the "Venture"). Although Additional actions and documentation may be needed to further memorialize the Venture, the parties agree to complete in good faith the obligations and actions as set forth herein and to finalize such documentation as soon as possible, and the lack of any such additional documentation shall in no way minimize, marginalize, or void the Venture established herein.

   1.1. To the parties' knowledge, this transaction is entirely lawful and does not require any government approval regarding dual-purpose legislation. Notwithstanding their belief, the parties shall not engage in anything illegal or contrary to the extent allowed by the laws of France, and if the Venture triggers or requires any governmental compliance, then the Parties shall endeavor to comply, and if such compliance is not attainable, then the Venture shall be restructured in a fashion that preserves the parties' economic and authoritative positions in a fashion that is narrowed as minimally as possible to remove the Venture from the scope of any prohibitive regulations so that the Venture can proceed as intended. The parties agree to fully cooperate with one another and use best efforts to ensure that any and all applicable legal, governmental and/or regulatory requirements are satisfied so as to render the transactions herein as lawful.

2. **Obligations of the Parties**

1   If the condition precedent hereafter mentioned is not satisfied before the 10th of June, 2016, the Agreement will be considered as void (with retroactivity) except the provisions mentioned in Articles 10, 11 and 12 and except if waived by Franky: Spectrum30 shall deposit Ten Million euros (€10,000,000) ("Spectrum30 Deposit") with Zapata Holding bank account and the sum shall be received by Zapata Holding by the 10th of June, 2016 at the latest. The Spectrum30 Deposit shall be satisfied by a deposit converted from U.S. dollars to euros made at a currency exchange rate of 1.11 USD:1 Euro;

2.2 The following obligations shall be satisfied during the Term of this Agreement, except if waived by Franky:

   2.2.1 Seth (at his and/or Spectrum30's own expense) shall attempt to settle all third-party lawsuits naming JLIP as a defendant;

   2.2.2 The capitalization table attached in Exhibit C hereto of Spectrum30 shall be the same and remain unchanged;

2/21

2.2.3    Since the Effective Date, Seth shall have conducted his business, and shall have caused JLIP to conduct its business, in the ordinary course consistent with past practice and no material adverse change shall have occurred with respect to this business; Seth and JLIP shall not have transferred or assigned directly or indirectly and by any means any of JLIP IP without Franky's prior written consent;

2.2.4    The shares of all entities presently owned by Seth or any of his entities, to the extent such entities shall continue as subsidiaries of the Joint Holding Company, shall be free and clear of all liens and/or security interests; and

2.2.5    On or before the 10th of June, 2016, Spectrum30 shall fund into an attorney trust account of Spectrum30's choosing a sum equal to $15 Million U.S. Dollars less the amount of the Spectrum30 Deposit (the "Spectrum30 Trust Funds"). The Spectrum30 Trust Funds shall be subject to further disbursement if, as, when and where Spectrum30 may direct for use in connection with settlement payments to Ray, settlement payments to plaintiffs asserting claims against JLIP, repayment to lenders that sourced funds used by JLIP and/or Jetlev, LLC and/or otherwise as Spectrum30 may direct. For avoidance of doubt, neither Franky nor the Joint Holding Company, nor any business owned or controlled by Franky shall have any ownership interest in, and/or control over, the Spectrum30 Trust Funds.

2.3  The following obligations shall be satisfied during the Term of this Agreement, except if waived by Spectrum30:

2.3.1    The Zapata IP shall be free and clear of all liens and/or security interests;

2.3.2    Franky (at his own expense) shall attempt to settle all third-party lawsuits naming Zapata Holding or any of its subsidiaries as a defendant.

2.3.3    Since the Effective Date, Franky shall have conducted his businesses, and shall have caused Zapata Holding and its subsidiaries to conduct their respective businesses, in the ordinary course consistent with past practice and no material adverse change shall have occurred with respect to these businesses; Franky, Zapata Holding and its subsidiaries shall not have transferred or assigned directly or indirectly and by any means any of Zapata IP without Spectrum30's prior written consent; and

2.3.4    The shares of all entities presently owned by Franky or any of his entities, to the extent such entities shall continue as subsidiaries of the Joint Holding Company, shall be free and clear of all liens and/or security interests.

3/21

**3   Venture Entities and Additional Documentation**

3.1  *Establishment of Joint Holding Company:*

3.1.1   Franky shall form (or cause to be formed) a new French holding company ("Joint Holding Company") which shall be headquartered in France.

3.1.2   The parties shall sign a shareholders' agreement substantially similar to that attached as Exhibit D hereto as of the date of the Purchase;

3.1.3   Seth, Spectrum30 and Franky undertake to (i) act in good faith and to avoid any act of any kind which will be in contradiction with the economy, spirit and terms and conditions of this Agreement, (ii) not engage in any negotiations with any potential partner inconsistent with the terms and conditions hereof, and promptly advise the other of any third-parties who may approach either side to engage in any form of such inconsistent negotiation; and *(iii) negotiate and sign all the legal documentation usually required to implement the terms* and conditions of this Agreement and the other related documents and that will include standard provisions for this kind of transactions, including standard representations and warranties, including but not limited to a shareholders agreement according to the provisions mentioned in Article 3.1.2, in addition to the specific provisions included in this Agreement;

3.1.4   Franky, Spectrum30 and Seth shall take all necessary steps to agree on the number of shares of the Joint Holding Company, subject of the Purchase (as defined in Article 4.2.1) and to value the Zapata Holding's and Seth/Spectrum30's contributions in kind referred to in Article 3, in a way which shall allow the following distribution of the Joint Holding Company's capital and equity (post Purchase and contributions): (a) sixty percent (60%) held by Franky or a company controlled or owned by Franky and (b) forty percent (40%) held by Spectrum30;

3.1.5   Franky, Spectrum30  and Seth shall take all necessary steps to agree on the corporate structure of the group controlled by the Joint Holding Company, including to agree on the identity and purpose of its wholly-owned subsidiaries, it being understood that the Joint Holding Company will own one or more intellectual property holding companies (the "IPCOs") which shall own all of the intellectual property rights (including but without limitation the JLIP IP subject to terms and conditions herein concerning Ray, the Zapata IP and the Propulsion IP) and one or more operating companies (the "OPCOs") which shall operate global businesses using such intellectual property rights.  By way of example only, the IPCOs and/or OPCOs may divide their assets and/or structure their activities between water and air technologies;

4/21

3.1.6   Franky shall cause Zapata Holding (or its subsidiaries) to hold EUR 1,500,000 of cash (with Franky entitled to distribute to himself all the results prior to the Purchase and to make a loan of the amount above). The value of the EUR 1,500,000 of cash left by Franky in such companies as of the Purchase plus the cost basis of any inventory (to the extent viable and sellable) left by Franky in such companies as of the Purchase shall be deemed a loan by Franky (the "Franky Loan"). Notwithstanding the foregoing, the principal amount of the Franky Loan shall not exceed EUR 3,000,000 as of the Purchase;

3.1.7   The parties shall share information and materials concerning their respective businesses subject to unification hereunder, including without limitation as it relates to assets, liabilities, operations, finance, sales and marketing data. Immediately upon funding the Spectrum30 Deposit, Franky will share all patents and pending patent applications with Seth.

3.1.8   Seth shall use commercially reasonable efforts to acquire (or cause an entity controlled by Seth to acquire) all of Ray's right, title and interest in and to Ray's equity in JLIP such that Seth (or an entity controlled by Seth) shall be the sole owner of JLIP and that the JLIP IP to be transferred as soon as possible in the Joint Holding Company;

3.1.9   Seth shall use commercially reasonable efforts to have caused Jetlev, LLC to have entered into an "Assignment for Benefit of Creditor" or other form of dissolution proceeding, with Ray's consent as soon as possible.

4   **Venture Equity Structure and Contributions**

4.1   Franky shall cause Zapata Holding to contribute in kind to the Joint Holding Company all of Zapata Holdings' assets and shares held in its existing companies (including without limitation in PWC, Zapata Production and ESH France) except the shares,  by assets, interests and debts detained in Franzap ("Franzap") a French real estate company with registered offices located in AVENUE DE SAINT-ROCH QUARTIER LE DOUARD 13740 LE ROVE registered under the number 480 155 340 at the RCS of Aix-en-Provence, for the value determined pursuant to Article 3.1.4 hereof. Franky represents that Franzap does not own any assets that are in any way related to the JLIP IP, Zapata IP, Propulsion IP, or the businesses affiliated with any such IP, except the real estate, object of some leases to the abovementioned companies. Notwithstanding the foregoing, any such affiliated real estate leases shall be at fair market value, and otherwise arm's length, and have a reasonable term. If the business needs change and/or a more economical alternative is available, then any and all leases with Franzap shall be terminable without penalty upon a maximum of three-months (3) notice. Franzap does not have and shall not place any lien, encumbrance, charge, or claim on any asset, inventory, or property of the Joint Holding Company or any subsidiaries thereof.

4.2   Seth and Spectrum30 shall:

    4.2.1   cause Spectrum30 to purchase a certain amount of Zapata Holding's shares in the Joint Holding Company for a global net purchase price of Eight Million Euros (EUR 8,000,000) for the amount of shares in accordance with Article 3.1.4 (the *"Purchase"*) to be paid from the Spectrum30 Deposit as from the constitution of the Joint Holding Company. The shares will be transferred at the time of the Purchase. The parties agree that the aforementioned purchase price is and conclusively shall be deemed a function of the following purchase price allocation: Seven Million Five Hundred Thousand Euros (EUR 7,500,000) is allocated towards activities relating to water-based propulsion technology; and Five Hundred Thousand Euros (EUR 500,000) is allocated towards air-based propulsion technology.

    4.2.2   subject to Seth having acquired (or caused an entity controlled by Seth to acquire) all of Ray's right, title and interest in and to Ray's equity in JLIP such that Seth (or an entity controlled by Seth) shall be the sole owner of JLIP, Seth shall contribute in kind as soon as possible to the Joint Holding Company all the JLIP IP for the value determined pursuant to Article 3.1.4 hereof and transfer its shares to Spectrum30.

    4.2.3   grant a loan of two million euros (EUR 2,000,000) to the Joint Holding Company (the "Seth Loan"), at the same terms and conditions as the Franky Loan, to be paid from the Spectrum30 Deposit as from the constitution of the Joint Holding Company, with repayment of the Seth Loan to be subordinated to the repayment of the Franky Loan (i.e., the Seth Loan shall not be repaid unless and until the Franky Loan has been repaid).  Notwithstanding anything to the contrary in this Agreement, Seth shall not receive any repayment on the Seth Loan unless and until Seth has contributed in kind to the Joint Holding Company all the JLIP IP.

4.3   Franky, Spectrum30 and Seth shall execute or cause the companies they respectively manage to execute all the documents and agreements reflecting the transactions provided for herein and make all payments required herein. These agreements include, but are not limited to, the license agreements providing for licenses that the OPCOs shall receive from the IPCOs so as to conduct global operations using the technologies and intellectual property rights owned by the IPCOs. Such intercompany licenses shall contain reasonable royalty-rates and other terms designed to protect the underlying intellectual property rights.

4.4   If and upon Seth acquiring (or has caused an entity controlled by Seth to have acquired) all of Ray's right, title and interest in and to Ray's equity in JLIP such that Seth (or an entity controlled by Seth) to be the sole owner of JLIP, then Seth shall cause JLIP to assign to Joint Holding Company or one of its subsidiaries all of the JLIP IP, free and clear of all liens and/or security interests (except for the Ray Li Security Interest, as defined below) with respect to the contribution of the share capital in the group of the Joint Holding Company mentioned in article 3.1.4.

## 5   Venture Covenants

5.1   Each of Franky and Seth shall dedicate the majority of their working time to the Joint Holding Company and its subsidiaries (remuneration to be discussed in good faith). Neither Seth nor Franky shall directly or indirectly compete with Joint Holding Company and/or its subsidiaries as from the Effective Date.

5.2   Franky shall be primarily responsible for day-to-day activities and operations of the Joint Holding Company (and any of its subsidiaries) in the areas of R&D, production, manufacturing and strategic evolution.   Seth shall be primarily responsible for day-to-day activities and operations of the Joint Holding Company (and any of its subsidiaries) in the areas of business development, sales, intellectual property protection, legal and finance.

5.3   Notwithstanding the foregoing, non-material decisions of the Joint Holding Company (and any of its subsidiaries) shall be made by good-faith consultation between Franky and Seth but with Franky to have sole decision-making authority in the event of a disagreement (including as it relates to areas for which Seth is primarily responsible on a day-to-day basis); provided, however, that any and all material decisions of the Joint Holding Company (and any of its subsidiaries) listed in Exhibit E hereto shall require unanimity between Franky and Seth. It being understood that in case of disagreement preventing to manage the company, the dispute shall be resolved according to Article 12.

5.4   Each owner shall be transparent and permit the other access to the companies' books and records and promptly respond to and comply with any reasonable requests for information and/or materials regarding the company's finances and/or other operations, provided that the Spectrum30 Deposit has been effectively received by Zapata Holding.

5.5   The parties hereby consent to issuance of the following two life insurance policies and shall use good-faith efforts to secure same as soon as possible: (a) a term policy (10 years if possible) on Franky's life with Spectrum30 as the sole beneficiary, with coverage of Fifteen Million U.S. Dollars ($15,000,000), and the premiums for such policy shall be payable by Spectrum30; and (b) a term policy (10 years if possible) on Franky's life with the Joint Holding Company as the sole beneficiary, with coverage of Fifteen Million U.S. Dollars ($15,000,000), and the premiums for such policy shall be payable by the Joint Holding Company.

5.6   The profits made by the Joint Holding Company shall be directly or indirectly shared between the parties in proportion to their holding in the company, that is, 60% for Franky (or the company controlled by Franky) and 40% for Spectrum30.

7/21

5.7   Franky, Spectrum30, and Seth undertake that all the future "Propulsion IP", as defined as the know-how, intellectual property, technology and r&d in any way relating to propulsion and including without limitation any and all such intellectual property rights relating to Jetlev, Flyboard, Flyboard Air, jetpack and/or hoverboard technology (and evolutions thereof) shall be owned solely by the Joint Holding Company and its subsidiaries (and most likely the IPCOs), including without limitation any and all such know-how, intellectual property, technology and r&d designed, invented and/or otherwise developed by or on behalf of Seth, Franky and any business in which either has any form of interest.

5.8   From and after any time that the Joint Holding Company and its subsidiaries shall have acquired the JLIP IP,  the Joint Holding Company and its subsidiaries shall be jointly and severally liable for paying to Ray a royalty (the "Ray Li Royalty") equal to five percent (5%) of net sales of water-propelled backpacks (for such purposes net sales means gross sales less only returns, chargebacks, taxes, shipping and insurance), but only to the extent such sales (a) are made in territories covered by Australian Patent No. 2005226960, Canadian Patent No. 2,560,921, European Patent No. EP 1 732 806 or U.S. Patent Nos. 7,258,301, 7,735,772, and 7,900,867; and (b) are made during the life(s) of such patents. From and after any time that the Joint Holding Company and its subsidiaries shall have acquired the JLIP IP, the Ray Li Royalty shall be payable on sales by Joint Holding Company and/or any of its affiliates (and/or unaffiliated licensees to the extent they pay royalties to Joint Holding Company and/or any of its affiliates). From and after any time that the Joint Holding Company and its subsidiaries shall have acquired the JLIP IP, to secure Ray's entitlement to the Ray Li Royalty, the Joint Holding Company and its subsidiaries shall grant to Ray a first-priority security interest in and to the following collateral: the JLIP IP and any license agreements covering the JLIP IP, including any and all proceeds therefrom (the "Ray Li Security Interest").

5.9   The Franky Loan shall be reimbursed as soon as the Joint Holding Company and/or its subsidiaries will be financially able to repay Franky and before the Seth Loan. Subject to the satisfaction of the requirements of Article 4.2.3, the Seth Loan shall be reimbursed as soon as the Joint Holding Company and/or its subsidiaries will be financially able to repay Seth and after the reimbursement of the Franky Loan.  For avoidance of doubt, the amount to be repaid under the Franky Loan and/or Seth Loan may be subject to downward adjustment based upon the indemnification mechanisms expressly provided for herein.

5.10 If, as of the Purchase, Seth had not yet acquired (and had not yet caused an entity controlled by Seth to have acquired) all of Ray's right, title and interest in and to Ray's equity in JLIP such that Seth (or an entity controlled by Seth) was then the sole owner of JLIP, then Seth shall continue to use commercially reasonable efforts to acquire (or cause an entity controlled by Seth to acquire) all of Ray's right, title and interest in and to Ray's equity in JLIP.  If Seth shall have acquired (or have caused an entity controlled by Seth to have acquired) all of Ray's right, title and interest in and to Ray's equity in JLIP such that Seth (or an entity controlled by Seth) is then the sole owner of JLIP then, at such time, Seth shall cause JLIP to assign to Joint Holding Company or one of its subsidiaries all of the JLIP IP, free and clear of all liens and/or security interests (except for the Ray Li Security Interest, as defined below) with respect to the contribution of the capital of the group mentioned in Article 3.1.4.

5.11 Neither party nor any of party's businesses, including the Joint Holding Company and/or any of its subsidiaries, shall commercialize or sell any products which may constitute violation of law or jeopardize the validity of this Agreement based upon potential "dual products" and no such products shall be sold prior to a determination of the lawfulness of same by the applicable French regulatory authority.

6   Representations and warranties

6.1  Franky represents and warrants to Seth and Spectrum30 that:

6.1.1   The IPCOs shall own all forms of intellectual property to the extent now or at any time hereinafter owned or developed by Franky and/or any company in which Franky has any form of interest, including without limitation, all of the Zapata IP, all IP in any way related to water and/or air propulsion technologies and/or flying technologies and all associated and/or related technologies, and any and all Propulsion IP owned by Franky and/or any of his businesses (including without limitation Zapata Holding and PWC);

6.1.2   All the intellectual property referred to in Article 6.1.1 shall be centralized in the IPCOs free and clear of liens and encumbrances;

6.1.3   The IPCOs additionally shall own and control, on an exclusive basis, all rights of endorsement, sponsorship, celebrity and publicity in and to the name, image and likeness of Franky;

6.1.4   The OPCOs shall own all of PWC and any and all operating assets of any of Franky's other existing businesses, including Zapata Production and ESH France, except the real estate company named Franzap owned by Franky and its assets and any interest or debts related to this company as such real estate company does not fall within the scope of this transaction.

9/21

6.1.5    This Master Agreement does not infringe any other agreement past or present, or any by-law applicable to it, by which he is bound.

6.2   Seth and Spectrum30 represents and warrants to Franky that on and as of the Effective Date:

6.2.1    To the extent the JLIP IP then forms part of the venture, (i) the IPCOs shall fully own any and all intellectual property in any way related to water and/or air propulsion technologies and/or flying technologies and all associated and/or related technologies to the extent now or at any time hereinafter owned or developed by Seth and/or any company in which Seth has any form of interest, and for avoidance of doubt (ii) that such intellectual property owned by the IPCOs shall include without limitation all of the JLIP IP and any Propulsion IP owned by Seth and/or any of his businesses (including without limitation JLIP); and

6.2.2    To the extent the JLIP IP then forms part of the venture, all the intellectual property referred to in Article 6.2.1 shall be assigned and centralized in the IPCOs free and clear of liens and encumbrances (except for the Ray Li Security Interest);

6.2.3    Seth and/or Spectrum30 shall not permit JLIP to commence any legal proceeding against Joint Holding Company and/or any of its subsidiaries for infringement of JLIP's intellectual property rights and will use all his powers and voting rights to do so; and

6.2.4    This Master Agreement does not infringe any other agreement past or present, or any by-law applicable to it, by which they are bound (and/or their subsidiaries or affiliates), including without limitation as relating to any agreement with JLIP or Ray.

7    Severability: The nullity of one or more of these articles shall not result in the nullity of this Agreement. In this case, the parties undertake to use their best efforts to remedy the cause of such nullity so that, except where impossible, the agreement remain in full force and effect without disruption.

8    Indemnification and specific performance

8.1   Each party shall defend, indemnify and hold the other party harmless from and against any and all liability, loss, expense (including without limitation reasonable attorneys' fees), and claims for injury or damages arising out of the performance of this Agreement, including but not limited to, in case of any breach of any of his covenants or inaccuracy of his representation or warranty.

10/21

8.2   The parties admit that the non-fulfillment of their commitments under this Agreement cannot be sufficiently sanctioned by damages. Accordingly, the parties expressly agree that they will seek specific performance as a priority rather than the termination or cancellation of this Agreement. For that purpose, the parties waive the implementation of the provisions of Article 1142 of the French civil code and accept that the injured party by a nonperformance of this Agreement could require, by way of legal action, the enforcement of the non-performed obligation, without prejudice of the damages which it could rely on pursuant to Article 8.1 hereof. In addition, for each promise of sale or purchase provided in this Agreement, the obliged party admits that his promise is irrevocable and cannot be withdrawn, even before the beneficiary of the said promise has lifted his option.

8.3   Seth and Spectrum30 shall defend, indemnify and hold harmless Franky, the Joint Holding Company and its subsidiaries from and against any and all claims, losses, liabilities and/or damages, including without limitation reasonable attorneys' fees, arising from (a) any third-party claim based on any act or omission of Seth, JLIP, LLC and/or Jetlev, LLC occurring prior to the Purchase; and/or (b) any claim that sales of products by Joint Holding Company and/or any of its subsidiaries in the United States infringes or violates the patents owned by JLIP. As a form of security for Seth's obligations under this paragraph, any obligations owed by Seth under this paragraph may be funded by way of reducing the amount then owed under the Seth Loan on a dollar-for-dollar or euro-for-euro basis.

8.4   Franky shall defend, indemnify and hold harmless Seth, the Joint Holding Company and its subsidiaries from and against any and all claims, losses, liabilities and/or damages, including without limitation reasonable attorneys' fees, arising from any third-party (except, Raymond Li, Seth, JLIP and Jetlev and/or any company in which one of them detains any kind of equity and/or interest) claim based on any act or omission of Franky, Zapata Holding and/or PWC occurring prior to the Purchase. As a form of security for Franky's obligations under this paragraph, any obligations owed by Seth under this paragraph may be funded by way of reducing the amount then owed under the Franky Loan on a dollar-for-dollar or euro-for-euro basis.

8.5   The failure to exercise, partially or totally, by either of the parties, of one or more rights under the provisions of this Agreement cannot be considered as a waiver of such rights for the future or of any other right hereunder.

9     Term: This agreement shall remain in full force and effect as of the Effective Date and for a fifteen (15) year period thereafter.

10   **Confidentiality:** Each party expressly forbids itself to disclose the content and the actions of this Agreement to any third party, without the prior and written consent of the other parties. In addition, each party commits to consider as strictly confidential and not to disclose, use, sell or transfer to a third party, directly or indirectly, any document and information which he could acquire or have access to within this Agreement and/or from his relation with, or from his role in the Joint Holding Company and/or, as the case may be, its subsidiaries, and especially, the activity, the technology, the products, the clients, the strategy, the development, the commercial agreements or partnerships or the financial situation of PWC Product and/or Zapata Holding.

It is agreed that this confidentiality clause is waived when:

- it is required by the applicable law or rules;

- it only relates to disclosures made to a director, a manager, an officer, an employee or a professional counsel of a party, but only for the execution by such party of his commitments and obligations or the exercise of his rights resulting from this Agreement and if the abovementioned director, manager, officer, employee or professional counsel is also committed to respect the confidentiality of these information, which this party guarantees.

Will not be considered as confidential the information:

- which, at the time of disclosure, are generally publically known, already published or in the public domain because of third parties and without breaching the confidentiality commitment hereunder;

- available through other sources without breaching the confidentiality commitment hereunder.

Notwithstanding anything to the contrary herein, each party hereto may share information with any of its tax advisors, legal advisors, representatives and/or business consultants subject to an agreement by such others to maintain confidential information as confidential.

11   **Notices:** Any notice or other communication required or permitted to be given hereunder shall be delivered in person, transmitted by email (with a confirmation copy to be sent by registered mail) or sent by international courier service or by registered mail addressed as follows:

(i) If to Franky:
Franky Zapata – 39 Avenue Saint-Roch, 13740 Le Rove, France
Email address: frankyzapata@hotmail.com
With a copy by email to:
Olivier Nett – oliviernett@novapartners.fr

(ii) If to Seth or Spectrum30:
Seth Gerszberg – 229 Chestnut Street, Englewood, NJ 07631, USA
Email address: seth@thecollective.com

12/21

11  **Notices:** *Any notice or other communication required or permitted to be given hereunder shall be* delivered in person, transmitted by email (with a confirmation copy to be sent by registered mail) or sent by international courier service or by registered mail addressed as follows:

(i) If to Franky:
Franky Zapata – 39 Avenue Saint-Roch, 13740 Le Rove, France
Email address: frankyzapata@hotmail.com
With a copy by email to:
Olivier Nett – oliviernett@novapartners.fr

(ii) If to Seth or Spectrum30:
Seth Gerszberg – 229 Chestnut Street, Englewood, NJ 07631, USA
Email address: seth@thecollective.com
With a copy by email to:
Gregg Donnenfeld – gregg@thecollective.com
And to:
Olivier Savelli – osavelli@alternativelaw.eu

Any party may at any time change his address for service from time to time by giving notice to the other party in accordance with this Article 11.

12  **Arbitration:** *Any dispute arising out of or in connection with this agreement shall be referred to and* finally resolved by arbitration under the LCIA Rules, which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three, one of them designated by Franky, the other by Seth and the third by the two others arbitrators; the seat, or legal place, of arbitration shall be London, England. The language to be used in the arbitral proceedings shall be English, and the parties expressly direct any arbitrator to give the utmost deference and respect to the Parties' intent as reflected in Article 1 of this Agreement.

Seth Gerszberg,
signing for himself individually
and for Spectrum30

Franky Zapata
signing for himself individually
and for Zapata Holding

13/21

With a copy by email to:
Gregg Donnenfeld – gregg@thecollective.com
And to:
Olivier Savelli – osavelli@alternativelaw.eu

Any party may at any time change his address for service from time to time by giving notice to the other party in accordance with this Article 11.

12  **Arbitration:** Any dispute arising out of or in connection with this agreement shall be referred to and finally resolved by arbitration under the LCIA Rules, which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three, one of them designated by Franky, the other by Seth and the third by the two others arbitrators; the seat, or legal place, of arbitration shall be London, England. The language to be used in the arbitral proceedings shall be English, and the parties expressly direct any arbitrator to give the utmost deference and respect to the Parties' intent as reflected in Article 1 of this Agreement.

_____
Seth Gerszberg,
signing for himself individually
and for Spectrum30


_____
Franky Zapata
signing for himself individually
and for Zapata Holding

13/21

Exhibit A: JLIP Patents

1.  Australian Patent No. 2005226960; entitled "Personal Propulsion Device," Accepted Journal Date of January 21, 2010;

2.  Canadian Patent No. 2,560,921; entitled "Personal Propulsion Device," Issued on October 27, 2009;

3.  European Patent No. EP 1 732 806, entitled "Personal Propulsion Device," granted on October 28, 2015;

4.  U.S. Patent No. 7,258,301; entitled "Personal Propulsion Device," issued on August 21 , 2007;

5.  U.S. Patent No. 7,735,772; entitled "Personal Propulsion Device," Issued on June 15, 2010;

6.  U.S. Patent No. 7,900,867; entitled "Personal Propulsion Device," issued on March 08, 2011;

7.  U.S. Patent No. 9,205,905; entitled "Waterproof Rotary Contact Assembly," issued on December 8, 2015;

8.  U.S. Design Patent No. D714,086, entitled "Backrest," issued on September 30, 2014;

9.  U.S. Design Patent No. D716,065, entitled "Platform," issued on October 28, 2014;

10. U.S. Pat. App. Ser. No. 14/210,102, entitled "Personal Propulsion Devices with Improved Balance," filed on March 13, 2014;

11. U.S. Pat. App. Ser. No. 14/312,892, entitled "Propulsion Devices with Improved Controls," filed on June 24, 2014;

12. U.S. Pat. App. Ser. No. 14/520,431, entitled "Control Systems for Personal Propulsion Devices," filed on October 22, 2014; and

13. PCT App. Ser. No. PCT/US14/26763, entitled "Personal Propulsion Devices with Improved Balance," filed on March 13, 2014.

14/21

Exhibit B:  Zapata IP

All patent applications and patents and/or other intellectual property rights scheduled and/or otherwise identified on the exhibit to that certain email sent by Olivier Nett to Nicholas Lewis on May 17, 2016.

**PORTEFEUILLE BREVETS AU 17 MAI 2016**

Exhibit C: capitalization table of Spectrum30

Emily Holton, 100% owner of Spectrum 30

Exhibit D : Shareholder Agreement

19/21

# SHAREHOLDERS' AGREEMENT

[...]

## BETWEEN

Zapata Holding

*Zapata Holding*

## AND

Spectrum30

Dated [...] 2016

## TABLE OF CONTENTS

Article 1 – Definitions ..................................................................................................... 4

SECTION I – MANAGEMENT OF THE COMPANY .................................................................. 6

Article 2 – Executive Appointment ................................................................................. 6

SECTION II – SHARE CAPITAL OF THE COMPANY .............................................................. 6

Article 3 – Pre-emptive right........................................................................................... 6

    3.1.    Principle................................................................................................. 6

    3.2.    Procedure ............................................................................................. 6

Article 4 – Anti-dilution right........................................................................................... 7

Article 5 – Financing ...................................................................................................... 8

SECTION III – UNDERTAKINGS ....................................................................................... 8

Article 6 – Non-competition............................................................................................ 8

Article 7 – Intellectual property...................................................................................... 9

SECTION IV – MISCELLANEOUS ..................................................................................... 9

Article 8 – Entire agreement .......................................................................................... 9

Article 9 – Severability ................................................................................................... 9

Article 10 – Notices........................................................................................................ 9

Article 11 – Confidentiality ........................................................................................... 10

    11.1    Scope ................................................................................................. 10

    11.2    Undertakings...................................................................................... 11

Article 13 – Agent ........................................................................................................ 12

Article 14 – Duration .................................................................................................... 12

Article 15 – Arbitration ................................................................................................. 13

ANNEX ....................................................................................................................... 14

2

BETWEEN:

- Zapata Holding, a French company *(société à responsabilité limitée)* with a share capital of € 651,000, whose registered office is at 39 Avenue Saint Roch, 13740 Le Rove, registered with the Trade and Companies Registry of Aix en Provence (France) under number 790 082 275, represented by its Chairman, Mr. Franky Zapata, duly authorized for the purposes hereof,

hereinafter referred to as "Zapata Holding"
of the first part,

AND:

- Spectrum30, LLC, a US limited liability company, with a share capital of € [...], whose registered office is at [229 Chestnut St...], , represented by its Manager, Mr. Seth Gerszberg, duly authorized for the purposes hereof,

hereinafter referred to as "Spectrum30"
of the second part,

Zapata Holding and Spectrum 30
being hereinafter referred to collectively as the "**Parties**"
and individually as a or the "**Party**",

IN THE PRESENCE OF:

Mr. Seth Gerszberg, a US citizen, born on [...] and residing at 229 Chestnut Street, Englewood, NJ 07631, USA,

- Franky Zapata, a French individual born on 27, September 1978 and residing at 39 Avenue Saint-Roch, 13740 Le Rove, France ("Franky"):

- [...], a French company *(société à responsabilité limitée)* with a share capital of € [...], whose registered office is at 39 Avenue Saint Roch, 13740 Le Rove, registered with the Trade and Companies Registry of Aix en Provence (France) under number [...], represented by its Chairman, Mr. Franky Zapata, duly authorized for the purposes hereof,

hereinafter referred to as the "**Company**",

the Parties and the Company
being hereinafter referred to collectively as the "**Signatories**"
and individually as a or the "**Signatory**".

WHEREAS:

[to be completed]

3

NOW THEREFORE THE PARTIES HEREBY AGREE AS FOLLOWS:

## ARTICLE 1 – DEFINITIONS

For the purposes of this shareholders' agreement, the terms listed below, when written with a capital letter, shall have the following meanings:

| | |
|---|---|
| Activity: | any lawful activity of the Company, including without limitation, research and development, production and commercialisation of any device related to propulsion, flyvboard, flyboard air and flying object; |
| Agent: | the agent appointed by the Parties, |
| Agreement: | this shareholders' agreement, as amended or supplemented from time to time by way of amendment; |
| Change of Control | the change of the control which has the meaning set forth in article L. 233-3 of the French Commercial Code; |
| Company | [___], a French company ([___]) with a share capital of € [___], whose registered office is at [___], registered with the Trade and Companies Registry of [___] (France) under number [___]; |
| Fully Diluted Capital: | capital of the Company consisting of the Shares forming its capital and the Shares that may result from the exercise of any securities giving access to its capital, and of any options or subscription rights or allocation of shares; |
| […] Group: | the group of companies constituted by the Company and its direct and indirect subsidiaries as well as any existing or future subsidiaries of these companies; |
| Master Agreement: | that certain Master Agreement for Unification of Zapata and Gerszberg Businesses being entered into by and among Seth Gerszberg, an individual residing at 229 Chestnut Street, Englewood, NJ 07631, USA and Franky Zapata, a French individual residing at 39 Avenue Saint-Roch, 13740 Le Rove, France; |
| Party: | any natural person or legal entity having signed or adhered to this Agreement as a Party; |
| Security: | any ordinary or preferred Share which is or will be issued by the Company in representation of its share capital as well as any securities giving access to its capital and any subscription or attribution right related to these Securities; |
| Share: | any ordinary or preferred share issued or that will be issued by the Company in representation of its capital; |
| Third Party: | any natural person or legal entity, which is not a Party to this Agreement; |

4

Transfer (to):            to complete a Transfer;

Transfer:                 any transaction resulting in a transfer of ownership (*propriété, nue-propriété ou usufruit*) of Securities, for any reason whatsoever (including but not limited to sales, exchanges, gratuities, partial contributions of assets, mergers or any combination of these methods of transfer of ownership).

### SECTION I – MANAGEMENT OF THE COMPANY

### ARTICLE 2 – EXECUTIVE APPOINTMENT

The Parties undertake to use their powers and voting right in the Company in order to appoint Mr. Franky Zapata or any company controlled by him as Président of the Company.

### SECTION II – SHARE CAPITAL OF THE COMPANY

### ARTICLE 3 – PRE-EMPTIVE RIGHT

3.1.    Principle

Each Party (hereinafter referred to as a "**Transferor**") undertakes, should it contemplate to Transfer (hereinafter referred to as the "**Proposed Transfer**") all or part of its Securities (hereinafter referred to as the "**Transferred Security(ies)**") to another Party or to a Third Party (hereinafter referred to as the "**Transferee**"), to offer to all the other Parties (hereinafter referred to as the "**Beneficiaries**") to acquire the Transferred Securities under the same terms and conditions (in particular but not limited to at the same price) as those set forth in the Proposed Transfer.

3.2.    Procedure

- Notification of the Proposed Transfer

The Transferor undertakes to notify to the Beneficiaries the Proposed Transfer:

- the number, nature and category of the Transferred Securities,

- the identity of the Transferee (name, forename and residence for natural person and corporate name, form, registered office for legal entities – the same for the person who detains the ultimate control of the legal entities) and, as the case may be, the identity of the person holding more than fifty per cent (50%) of the share capital of the Transferee,

- the price or value per Transferred Security, for each category of Transferred Security,

- the terms and conditions applicable to the Proposed Transfer, including but not limited to those applicable to the payment of the price.

Any incomplete notification shall be deemed null and void.

Such notification shall include a duly certified copy of the Transferee undertaking to acquire the Transferred Securities, under the sole condition precedent of the waiving of the pre-emptive right set out in this Article 3.

- Exercise of the pre-emptive right

Each Beneficiary shall be entitled to exercise the pre-emptive right through the notification to the Transferor and to the Agent of his/her intent to acquire whole or part of the Transferred Securities, within ninety (90) days of the notification of the Proposed Transfer (hereinafter referred to as the "**Exercise Period**").

If the combined purchase offers of the Beneficiaries concern, in total, a number of Securities of the Transferor which exceeds the number of the Transferred Securities, the Beneficiaries may agree on the allocation of the Transferred Securities between them. If no notification of such agreement is provided to the Transferor and to the Agent before the expiry of the Exercise Period, the Securities shall be shared out between the Beneficiaries within the limit of their respective requests and in proportion to the ratio of the Shares respectively held by each of them to the total number of the Shares held by the Beneficiaries. Any remaining Securities shall be transferred to the Beneficiaries having first notified its intent to exercise their pre-emptive right or, in case of a draw, having requested the largest number of Transferred Shares, within the limits of their respective requests.

If the combined purchase offers of the Beneficiaries concern, in total, a number of Securities of the Transferor equal to the number of Transferred Securities, the Transferor shall, within ten (10) days of the expiry date of the Exercise Period, sign all the documents necessary to complete the corresponding Transfer and to register this Transfer, subject to the payment of the Transfer price.

Should the Transferor fail to comply with this procedure, the Beneficiaries shall be entitled to request any lawyer to escrow the Transfer price. In such case, the mere remittance to the Company of (i) a copy of the Agreement, (ii) a receipt from the escrow and (iii) a confirmation from the Agent of the exercise of the pre-emptive right shall be deemed a duly executed transfer order and shall cause the Company to register the corresponding Transfer. The Company recognises it and accept this process.

- *Non-exercise of the pre-emptive right*

Upon expiry of the Exercise Period, should the Transferor have not received any pre-emptive notification from one or several Beneficiaries or should the Beneficiaries have exercised their pre-emptive right on a number of Securities inferior to the number of Transferred Securities, the Transferor shall be entitled to complete the Proposed Transfer. In this case, the Transfer *contemplated in the Proposed Transfer shall be completed within fifteen (15)* days of the expiry date of the Exercise Period, failing which the Transferor shall implement again the aforementioned procedure.

### Article 4 – ANTI-DILUTION RIGHT

Upon issuance of any new Securities, whether reserved or not, or upon exercise of any securities giving access to the share capital issued by the Company, the Parties shall be entitled to maintain their participation at their original level.

Consequently, each Party undertakes to use its powers and voting rights in the Company:

- to enable each Party to maintain its participation at its original level and under the same conditions (in particular with regards to the price) as those offered to any other new holder of Securities by maintaining its preferential subscription right, and

- to enable each Party, in the event of an issuance of Securities with waiving of the preferential subscription right, to subscribe to the relevant issuance or to any complementary issuance that would be reserved to such Party within thirty (30) days of the relevant issuance, and this, under the same conditions (in particular with regards to the price) as those applicable to the new Securities that would be issued.

7

Each Party expressly acknowledges and accepts that its participation in the Fully Diluted Capital shall be reduced if such Party decides not to exercise the rights set out in this Article 4.

### ARTICLE 5 – FINANCING

Each Party undertakes that all and any financing needs for the Company (and/or any of its subsidiaries), shall (i) be exclusively covered by loans, which includes corporate loans, and (ii) not be covered by any equity transaction. Any loan provided by a Party to the Company (or any subsidiary thereof) shall bear an interest rate of fifteen percent (15%) per year, and any such loan shall otherwise be subject to any other repayment terms mutually agreed upon by the Company and the lending Party.

### SECTION III – UNDERTAKINGS

### ARTICLE 6 – NON-COMPETITION

For the time periods during which (a) Zapata Holding or Spectrum30 directly or indirectly hold Securities, and for a period of twenty-four (24) months from the date on which the Parties will cease to hold such Securities, or (b) Franky Zapata remains President or has another managerial role in the Company, then and for a period of twenty-four (24) months from the date on which Zapata ceases to have a managerial role in the Company, then the Parties, Franky Zapata, and Seth Gerszberg:

(i)     shall not take any interest, in any respect whatsoever, whether directly or indirectly, in particular through any company or family member, in any respect whatsoever, occupying in particular a position of employee, manager, member of the supervisory board, member of the executive board, manager, general manager, deputy general manager, director, employee, counsel or other, whether remunerated or not, in any company having an activity identical, related or similar to the Activity (hereinafter referred to as a "*Competitor*") ;

(ii)    shall not hold, in any respect whatsoever, whether directly or indirectly, in particular through any company or family member, a participation in the capital of a Competitor, without prejudice to the right to hold a participation inferior to one per cent (1%) in the share capital of a company whose shares are listed on a regulated market or organized multilateral system for exclusive patrimonial purposes;

(iii)   shall not contact, in any respect whatsoever, whether directly or indirectly, in particular through any company or family member, any employee and/or legal representative of the [...] Group, with the view to offering him/her an employment agreement and/or any other position, such as legal representative;

(iv)    shall not solicit within the framework of an activity identical, related or similar to the Activity, in any respect whatsoever, whether directly or indirectly, in particular through any company or family member, any client and/or provider with which the [...] Group will have established commercial relationship, or that will have been prospected by the [...] Group;

(v)     shall not build, grant for lease and, more generally, take any interest in any respect whatsoever, whether directly or indirectly, in particular through any company or family member, in any industrial building in which any activity identical, related or similar to the Activity would be performed.

8

If the Parties, Franky Zapata, or Seth Gerszberg does not comply with the undertakings set out by this Article 6, the respective offending party or individual shall indemnify the Company and/or the shareholder for the suffered loss, it being specified that said indemnification shall not be inferior to € 1,000,000.

### ARTICLE 7 – INTELLECTUAL PROPERTY

The Parties recognize that the value of intellectual property related to the Activity are valuable to the Company (and its subsidiaries), and so the Parties shall exercise all commercially reasonable efforts to protect such intellectual property.

## SECTION IV – MISCELLANEOUS

### ARTICLE 8 – ENTIRE AGREEMENT

The Signatories hereby agree upon that the Agreement constitutes their entire agreement in respect of its purpose and replaces, supersedes and prevails over all other prior agreements or documents relating in any way to the subject matter hereof (except the Master Agreement). For avoidance of doubt, the Parties voting rights, powers, and authority regarding certain decisions related to the Company are governed as set forth in the Master Agreement.

### ARTICLE 9 – SEVERABILITY

In the event that any of the provisions hereof is held to be null or void in any way whatsoever and for any reason whatsoever, this nullity shall not affect the validity of the other provisions of the Agreement and the Signatories undertake to use their best efforts to remedy the cause of such nullity so that, except where impossible, the Agreement remain in full force and effect without disruption.

The Signatories agree that the provisions set forth in the preamble and the Annex hereof shall form an integral part of the Agreement.

### ARTICLE 10 – NOTICES

All notices requested or authorized under the Agreement shall be executed in writing and shall be validly executed if either delivered in person or sent by registered letter, return receipt requested, or sent by fax or by e-mail confirmed by a letter delivered in person or by registered

letter, return receipt requested, to the registered office or to the residence of the concerned Signatory, such as mentioned in the recitals of the Agreement.

Any change in address for purposes hereof shall be notified by the concerned Signatory to the other Signatories and to the Agent as provided above.

Notices and other communications delivered in person shall be effective on the delivery date, as confirmed by an acknowledgment of receipt from the recipient.

Notices sent by e-mail or fax shall be deemed effective as of the date thereof, provided that they are confirmed on the same day by letter delivered in person or by registered letter, return receipt requested.

Any notice or other communication required or permitted to be given hereunder shall be delivered in person, transmitted by email (with a confirmation copy to be sent by registered mail) or sent by international courier service or by registered mail addressed as follows:

(i) If to Zapata Holding:
Franky Zapata – 39 Avenue Saint-Roch, 13740 Le Rove, France
Email address: frankyzapata@hotmail.com
With a copy by email to:
Olivier Nett – oliviernett@novapartners.fr

(ii) If to Spectrum30:
Seth Gerszberg – 229 Chestnut Street, Englewood, NJ 07631, USA
Email address: seth@thecollective.com
With a copy by email to:
Gregg Donnenfeld – gregg@thecollective.com
And to:
Olivier Savelli – osavelli@alternativelaw.eu

### ARTICLE 11 – CONFIDENTIALITY

11.1    Scope

Each Signatory undertakes to consider and to treat as confidential the following information:

-   the existence and content of this Agreement,

-   any information and documents collected during the negotiation of this Agreement, for the purposes of its signing and during its execution.

However, the Signatories hereby agree that the following information shall not be deemed confidential:

-   any information which be or become publicly known through no wrongful act of a Third Party or of the Signatory having disclosed the information, and

-   it is available through other sources without breach of this confidentiality undertaking.

## 11.2  Undertakings

As long as he/she is bound by this Agreement, and for a period of twenty-four (24) months from the termination date of the Agreement, each Signatory undertakes not to disclose, cede, transfer, to anyone, and by any means whatsoever, any information deemed confidential. For the same period, each Signatory undertakes not to use the information for any purpose whatsoever.

Each Signatory shall however be entitled to disclose and use information deemed confidential, if necessary, in the following cases:

- within the framework of his/her position as employee or representative of […] Group, and generally, within the framework of his/her activity in the Group,
- if required by law, legal decision or an administrative authority,
- if required for the exercise of his/her rights before a court or an administrative authority,
- if required for the execution of this Agreement,
- if required for the Transfer of his/her Securities under this Agreement,
- in case of prior written consent of all other Signatories.

Each Signatory undertakes to be liable for all consequences, whether direct or indirect, of any nature whatsoever, likely to result, for the companies of the […] Group and/or any other Signatory, from the disclosure of information deemed confidential, excluding those that will be disclosed in the aforementioned cases, if necessary.

### Article 12 – Adhesion

No Party shall execute any Transfer of one or several Securities to any Third Party, and no Third Party shall subscribe to any issuance of any new Securities by the Company without the Third Party's adhesion to the Agreement at the latest upon the completion of the Transfer or the subscription to the new Securities issued by the Company.

For the implementation of this Article, the Parties grant to the Agent an irrevocable power of attorney to make such Third Party become a party hereto.

Accordingly, the mere execution by the Agent of a copy of the Agreement also executed by the above-mentioned Third Party shall be deemed executed by the Parties. Said Third Party shall thus become a Party for the purposes of the Agreement and the Agreement shall benefit to and bind the said Third Party.

The Agent is also granted with all powers to amend the Agreement in order to include the Third Party's name and all the Parties shall be bound by such amendments.

A copy of the amended Agreement shall then be notified to each of the Parties by the Agent.

Should the relevant Party fail to comply with its undertaking to ensure that the Third Party becomes a party hereto as set forth above, the Parties grant a joint and irrevocable power of attorney to the Agent to refuse to register the information pertaining to the Transfer.

In the event of a Transfer of Securities to a Third Party, the latter shall belong to the group of the transferor.

11

ARTICLE 13 – AGENT

In order to guarantee the exercise of the rights which the Parties mutually grant to each other and to give full effect to the Agreement, the Parties agree to appoint, jointly and irrevocably, the Company as their common agent in charge of administrating the Agreement (hereinafter referred to as the "*Agent*").

As administrator of the Agreement, especially empowered by the Parties:

- the Agent shall ensure that the shareholders' accounts opened by the Company mention that the Securities held by the Parties are subject to Transfer restrictions pursuant to the Agreement;

- the Agent shall verify the conformity of such transfer orders to the undertakings subscribed in the Agreement;

- the Agent shall register a transfer order only after ensuring that the procedures provided for in the Agreement have been satisfied and that the Transfer may be completed;

This power of attorney applies to all the Securities held by the Parties.

The Agent shall be entitled to terminate his/her mission at any time, provided that he/she notifies such a termination at least six (6) months in advance. Upon expiry of this notice period, if no Agent has been appointed, the most diligent Party will be entitled to request the court having jurisdiction to appoint a new Agent.

ARTICLE 14 – DURATION

The Agreement is entered into for a period of fifteen (15) years from its signing date. Upon expiry of this first period of fifteen (15) years, the Agreement shall be automatically renewed for successive period of five (5) years. On each renewal, any Party may terminate its participation to the Agreement, by notifying such decision to the other Parties at least six (6) months in advance. The Agreement shall remain effective between all other Signatories.

In addition, the Agreement will terminate, with regards to a specific Party, on the date when such Party shall cease to hold any Security. Notwithstanding the foregoing, such Party shall not be relieved from any liabilities or obligations whatsoever in respect of matters, undertakings or conditions which shall not have been done, observed or performed by that Party prior to such termination. The Agreement shall remain in force between all other Signatories.

However, the expiry of the Agreement shall not affect the validity of any right or obligation of any Party of which duration exceeds the duration of this Agreement, such as, in particular, all undertakings of which starting date and term are set forth in this Agreement independently from the term of this Agreement and/or result from the execution or non-execution of the Agreement before its expiry.
Notwithstanding the foregoing, the Agreement shall automatically terminate upon the admission of Securities on a regulated stock market.

### ARTICLE 15 – ARBITRATION

Any dispute arising out of or in connection with this agreement shall be referred to and finally resolved by arbitration under the LCIA Rules, which Rules are deemed to be incorporated by reference into this clause. The number of arbitrators shall be three; the seat, or legal place, of arbitration shall be London, England. The language to be used in the arbitral proceedings shall be English

*Executed in [...] originals,*
*on [...] 2016,*

.

**For Zapata Holding**
Mr Franky Zapata

**For Spectrum30**
Mr Seth Gerszberg

Mr Seth Gerszberg

Franky Zapata

13

ANNEX

Exhibit E: Material Decisions

1. Adoption and/or modifications of budgets

2. Any material change in the scope or nature of the company's business activities

3. Any contract or transaction which imposes obligations on the business (a) exceeding One Hundred Seventy-Five Thousand (175,000) Euros; and/or (b) lasting more than three (3) months

4. Any expenditure outside of an agreed upon budget

5. Any transaction outside the ordinary course of business

6. Any business dealing with an affiliated person or entity

7. Commencement or settlement of any litigation or other legal proceeding

8. Appointment or termination of outside professionals (e.g., lawyers, accountants)

9. Granting any security interests, liens or other encumbrances on any assets of the company

10. Granting any corporate guarantees

11. Entering into any loan, licensing or endorsement agreement

12. Approval of business plans

13. Admission of any person as a new equity owner of the company in a manner that dilutes another person's equity in the company

14. Decisions regarding amounts and timing of distributions and/or reserves

15. Entry into material transactions, including asset sales, mergers, reorganizations or other similar transactions

16. Any agreement, any transfer, any pledge and/or any operation, transaction of any kind relating to the intellectual property owned by Joint Holding Company and/or any of its subsidiaries.

17. Adoption of trademarks

20/21

18. Tax decisions that impact taxes on the other

19. Appointment of any "Agent" that may be referenced in the Shareholders' Agreement

20. Any other decisions that have the potential of adversely impacting one owner over another

EXHIBIT 96

**SPECTRUM 30, LLC**
**229 Chestnut Street**
**Englewood, NJ 07631**

June 9, 2016

Huron Capital, LLC
250 West 55th Street
14th Floor
New York, New York 10019

RE:     Spectrum 30, LLC Funds Flow

To Whom it May Concern:

These instructions are given to you pursuant to that certain Secured Note (the "**Note**") issued by Spectrum 30, LLC (the "**Company**") to Huron Capital, LLC (the "**Lender**") in the face amount of $15,000,000.00 on the date hereof pursuant to the terms of Note, dated as of the date hereof, by and between the Company and the Lender.  Subject to the terms set forth below, the Company hereby instructs the Lender to disburse funds on the Company's behalf as follows:

1.  Eleven Million One Hundred Thousand U.S. Dollars (USD $11,100,000) to the account identified on Exhibit A hereto; and

2.  Three Million Nine Hundred Thousand U.S. Dollars (USD $3,900,000) to the following account:

> Provident Bank
> 100 Wood Avenue South
> Iselin, NJ 08830

> Routing # ▮▮▮▮▮▮

> Credit: Sherman Wells Sylvester & Stamelman
> Attorney Trust Core Account

> Acct.  No. ▮▮▮▮▮▮

> credit to sub-account of:  ▮▮▮▮ (Spectrum)

Thank you.

Very truly yours,
SPECTRUM 30, LLC

By: _____
Name:  Seth Gerszberg
Title:   Manager

Exhibit A

●●●○○ Orange F   3G          20:45          ✈ ⏰ ✳ 38 % ■▬

🔒 was.martinmaurel.com

que
rin Maurel

| Relevé d'identité bancaire | | | |
|---|---|---|---|
| Cadre réservé au destinataire du RIB | | | |
| *Intitulé du Compte* | | | |
| SARL ZAPATA HOLDING | | | |
| **Banque MARTIN MAUREL**<br>**Agence Grignan**<br>**43 Rue Grignan**<br>**13006 Marseille** | | | |
| Banque | Guichet | Compte | Clef Rib |
| ██████ | ███████ | ████████ | 71 |
| IBAN: | ████████████████████████ | | |
| BIC: | ████████████ | | |