UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN TROTT and CHRISTOPHER SMITH, as Joint Official Liquidators and Foreign Representatives of PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in Official Liquidation), *et ano.*,<br><br>Plaintiffs,<br><br>- against -<br><br>PLATINUM MANAGEMENT (NY) LLC, *et al.*,<br><br>Defendants. | Civil Action No. 1:18-cv-10936-JSR<br><br>**MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY CURTIS, MALLET-PREVOST, COLT & MOSLE LLP** |

In support of their Motion to Disqualify Curtis, Mallet-Prevost, Colt & Mosle LLP ("**Curtis Mallet**"), Martin Trott and Christopher Smith, as Joint Official Liquidators and Foreign Representatives of Platinum Partners Value Arbitrate Fund, L.P. (in Official Liquidation) ("**JOLs**") and Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) ("**PPVA**" and, collectively with the JOLs, the "**Plaintiffs**"), respectfully state as follows:

I.    SUMMARY AND INTRODUCTION

Plaintiffs' detailed Complaint seeks to recover hundreds of millions of dollars looted from PPVA by multiple Defendants. During the multi-year period in which this looting occurred, Curtis Mallet represented PPVA as well as many of the looters and, whether wittingly or unwittingly, provided much assistance to the looters. One of the key looters assisted by Curtis Mallet, and the defendant on whose behalf Curtis Mallet has entered an appearance in this litigation, is David Bodner.

Curtis Mallet previously represented PPVA regarding many of the same matters that are now directly at issue in the Complaint. Moreover, one or more Curtis Mallet lawyers will plainly

be witnesses adverse to the defense in this litigation, and Curtis Mallet is seeking to represent Mr. Bodner with a number of the same lawyers who previously represented PPVA. Curtis Mallet must therefore be disqualified from the representation of Mr. Bodner, both under the former client conflicts rule and the attorney-witness rule.

## II. FACTUAL BACKGROUND

### A. Curtis Mallet's Continuous Representation of PPVA

From 2009 until the commencement of PPVA's Cayman Liquidation, Curtis Mallet continuously represented PPVA in matters on behalf of PPVA and its affiliates, including litigation and investigations conducted by the United States Government and the Securities and Exchange Commission ("**SEC**"), and with the law firm Dechert LLP ("**Dechert**"), the plan to liquidate PPVA to effectuate the final portions of the Second Scheme – in other words, many of the exact same allegations set forth in the Complaint. Attached as Exhibit 1 to the December 26, 2018 Declaration of Martin Trott ("**Trott Decl.**") is an internal spreadsheet maintained by Platinum executives evidencing the continuous work performed by Curtis Mallet on behalf of the Platinum Partners enterprise. In total, Curtis Mallet billed approximately $15,000,000.00 in fees and expenses to Platinum-related entities and individuals for legal services, with at least $9,379,277.43 of this amount attributable to legal work performed for PPVA by Curtis Mallet from April 2009 through August 2016. Although PPVA was not the only Curtis Mallet client, it was certainly the primary entity whose interests were to be served by the firm's other PPVA-related clients, including but not limited to Platinum Management.[1]

---

[1] On multiple occasions, Platinum Management employees, including Defendant SanFilippo, allocated payment of Curtis Mallet invoices to reflect work performed for PPVA, even where the client on the engagement letter was not in fact PPVA. On December 29, 2011, through a technical representation of Platinum Management and its principals, Defendant SanFilippo estimated that, of a $1.6 million payment to Curtis Mallet, 73% of the payment (roughly $1.7 million) could be attributed to work performed for PPVA. See Trott Decl. at Exhibit 2. In 2014, Platinum Management allocated 65% of a nearly $200,000

A cursory review of Curtis Mallet engagement letters in the possession of the JOLs[2] shows that at a minimum, Curtis Mallet represented PPVA, affiliated and predecessor funds such as Platinum Partners Credit Opportunities Master Fund LP and Level 3 Capital Funds, investment managers for Platinum funds such as Defendant Platinum Management (NY) LLC, and Platinum executives such as David Bodner. *See* Curtis Mallet Engagement Letters, Trott Decl. at Exhibit 4. Curtis Mallet attorneys Gabriel Hertzberg and Elliot Lauer spearheaded the firm's Platinum representation, with substantial assistance provided by Curtis Mallet attorney Jacques Semmelman.

In 2012, Curtis Mallet began representing PPVA in conjunction with "responding to the inquiry by the United States Securities and Exchange Commission into matters involving variable annuities." Trott Decl., Exhibit 4 at p. 11. However, Curtis Mallet could more aptly be characterized as the "core" law firm for PPVA in relation to its serious investigations, litigation, and the Beechwood scheme. Curtis Mallet's longtime representation of PPVA and others directly covered multiple matters described in the Complaint including: (1) the rigged vote that precipitated the sale of Black Elk assets to Renaissance and permitted the misdirection of the sale proceeds to certain Defendants at the expense of senior bondholders (Complaint at ¶¶ 286-346); (2) the clandestine ownership of Beechwood by (proposed client) Bodner, as well as Huberfeld, Levy, and Nordlicht which allowed them and other Beechwood Defendants to enrich themselves at the expense of PPVA by providing Platinum Management with "third-party" transaction partners

---

payment to Curtis Mallet as resulting from work performed on behalf of PPVA. Trott Decl. at Exhibit 3. Platinum Management paid these invoices through an account in the name of PPVA.

[2] For the sake of completeness, we note that as of this date, Plaintiffs do not know the full extent of Curtis Mallet's representations. Plaintiffs have asked Curtis Mallet to identify all such matters and to provide all related engagement letters and billings, but Curtis Mallet has yet to do so. Thus, there may be additional substantially related representations beyond what is identified herein.

#62469505_v4

(Complaint at ¶¶ 191-258); and (3) the purported sale of Beechwood stock to insiders on or about August 2016, a few months after the 2016 PPVA "restructuring" to further the Second Scheme and avoid obvious liability in connection therewith, and Agera Transactions whereby Beechwood had siphoned off PPVA's remaining valuable assets and saddled it with uncollectable and valueless debt (Complaint at ¶¶ 380-486).  In other words, Curtis Mallet represented PPVA and others in the preparation of responses to government investigators concerning some of the same subjects addressed in the Complaint.  As explained below, this situation gives rise to both conflict of interest and attorney-witness rule issues.

Throughout 2014, for example, Curtis Mallet prepared responses to the SEC on behalf of PPVA as well as others that included these issues.  One such response, provided via a September 4, 2014 email from Joshua Kramer-Eisenbud to Messrs. Hertzberg and Lauer, described at length the ownership of the Beechwood Entities and the role of Platinum Defendants at Beechwood.  The same response was drafted to inform the SEC that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." Trott Decl., Exhibit 5.  An understanding of the "investments" by B Asset Manager and other Beechwood Entities orchestrated by Platinum Management will likely be critical to Plaintiffs' claims concerning the First Scheme Transactions that inflated PPVA's net asset value and enriched the Platinum and Beechwood Defendants by increasing fees payable to B Asset Manager and Platinum Management at the expense of PPVA.

Curtis Mallet represented the Platinum Partners enterprise in connection with an investigation into the entirety of the Platinum business by the United States Attorney for the Eastern District of New York (the "**2016 E.D.N.Y. Investigation**").  Through this representation,

#62469505_v4

Hertzberg and Lauer became aware of the specific allegations brought against numerous Defendants, including Mr. Bodner, with respect to many of the allegations set forth in the Complaint. For instance, after calls with an Assistant United States Attorney, on March 3, 2016, Hertzberg asked Platinum Management's in-house counsel, copying in Lauer, for help in



Trott Decl., Exhibit 6. This email illustrates the breadth and scope of Curtis Mallet's representation of the Platinum Partners enterprise, including but not limited to PPVA.

#62469505_v4

This email thread also includes an email from Sylvi Sareva, a Curtis Mallet associate,



*Id.* (emphasis added).³  As such, it is clear that PPVA (Platinum) was, through 2006, just prior to the Cayman Liquidation, considered by Curtis Mallet to be Curtis Mallet's primary client.

In addition, on June 15, 2016, Hertzberg sent an email to Lauer and Platinum's co-counsel at Dechert LLP ("**Dechert**") recounting a conversation Mr. Hertzberg had with Sean Haran ("**Mr. Haran**"), an attorney that represented Naftali Manela in connection with the 2016 E.D.N.Y. Investigation.  Trott Decl., Exhibit 7.  In this email, Hertzberg stated that

---

³  This disagreement alone will require Plaintiffs to call Curtis Mallet attorneys as a fact witnesses.

#62469505_v4



As the ever-increasing government investigations in connection with PPVA continued throughout the first half of 2016, PPVA retained Dechert to provide assistance to Curtis Mallet and coordinate the Cayman liquidation of PPVA to effectuate the Second Scheme. Curtis Mallet worked in concert with Dechert in preparing responses to government investigators, including the SEC and the U.S. Attorneys' office for the Eastern District of New York. ▮▮▮

▮▮▮

With respect to Curtis Mallet's representation of PPVA, Plaintiffs also note the following:

- Plaintiffs have not found any indication that Curtis Mallet ever orally discussed conflicts with, or sought oral or written consent from, anyone who was not personally conflicted. *Cf.* N.Y. Rules of Prof. Conduct, Rule 1.13(d).

#62469505_v4

- At all times when Curtis Mallet represented Mr. Bodner as well as PPVA, Mr. Bodner owed fiduciary duties to PPVA, and the converse would not have been true.[4]

**B.    Curtis Mallet Represents Multiple Defendants in the Beechwood Sale**

After the acts comprising the Second Scheme were reaching their conclusion and the Defendants were preparing for the Cayman Liquidation (*see* Complaint at ¶¶ 119-137), Curtis Mallet was retained by Defendants Bodner, Huberfeld, Nordlicht, Levy and the Beechwood Trusts "in the sale of stock in Beechwood Re Holdings, Inc. and certain affiliated companies, collectively, ("**Beechwood**")." See Trott Decl., Exhibit 4 at p. 15.  At that time, Beechwood Re Holdings held all of the common stock of Beechwood Re and Beechwood Re Investments LLC, via Beechwood Series A-Series I LLC (which were beneficially owned and controlled by Levy, Huberfeld, Bodner and Nordlicht and their families), owned the preferred stock in Beechwood Re.  (*See* Complaint at ¶¶ 191-245).

The sale referred to in the Beechwood sale engagement letter included a loan for the purchase by Taylor-Lau Family 2016ACQ Trust, a trust controlled by Defendant Scott Taylor, of Class A and B common shares of Beechwood Bermuda, pursuant to an Uncertificated Securities Control Agreement, dated August 5, 2016, between the Taylor-Lau Family 2016ACQ Trust, Mark Nordlicht and Beechwood Bermuda (the "**Control Agreement**").  Trott Decl., Exhibit 9.  Messrs. Lauer and Hertzberg are listed in the Control Agreement as the party to be noticed on behalf of Mark Nordlicht.  Trott Decl., Exhibit 9 at p. 4.

On August 19, 2016, an invoice was issued by Curtis Mallet to Mr. Bodner at his attention for services rendered in the "Beechwood Stock Sale" (the "**Beechwood Invoice**").  Trott Decl., Exhibit 10.  The Beechwood Invoices also include entries for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[4] Plaintiffs do not know whether or to what extent Curtis Mallet may at times have represented PPVA in matters in which Mr. Bodner was not also a firm client or *vice versa*.

██████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

Plaintiffs do not contend that Curtis Mallet represented PPVA in this transaction, which was plainly detrimental to PPVA—a belated attempt by Bodner, Huberfeld, Levy and Nordlicht to distance themselves (on paper) from Beechwood after the Second Scheme was executed. What Plaintiffs contend here, for attorney-witness rule purposes, is that Curtis Mallet attorneys will have key testimony to give on issues relating to this transaction and other critical Beechwood transactions as well as Mr. Bodner's ownership, control, and management of Platinum.

### III.  LEGAL ARGUMENT

Disqualification is warranted "where an attorney's conduct 'poses a significant risk of trial taint.'" *Decker v. Nagel Rice LLC*, 716 F.Supp.2d 228, 231 (S.D.N.Y. 2010), *quoting Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981). "A motion to disqualify an attorney is committed to the discretion of the Court." *Prout v. Vladeck*, 316 F. Supp. 3d 784, 809 (S.D.N.Y.), reconsideration denied, 319 F. Supp. 3d 741 (S.D.N.Y. 2018). While it is true that motions to disqualify are sometimes brought for tactical purposes, it is still true that "in the disqualification situation, any doubt is to be resolved in favor of disqualification." *Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir.1975) (citation omitted).

An attorney who represents a current client adverse to a former client can be subject to disqualification based on the lawyer's duties of confidentiality and/or loyalty to the former client. Disqualification can also be based on attorney-witness conflicts. Both are present here.

**A.  Curtis Mallet's Prior Representation of PPVA Requires Disqualification**

As this Court has held:

A disqualification motion should be granted if (1) the moving party is a former client of its opponent's counsel; (2) there is a "substantial relationship" between the subject matter of the counsel's prior representation of the moving party and the

9

issues in the present lawsuit; and (3) counsel is likely to have had access to relevant privileged information during his prior representation.

*Panebianco v. First Unum Life Ins. Co.*, No. 04 CIV. 9331 (JSR), 2005 WL 975835, at *2 (S.D.N.Y. Apr. 27, 2005).

Regarding the first prong, PPVA plainly is a long-time former client of Curtis Mallet. This element is satisfied.

Regarding the second prong, "[a] substantial relationship exists where facts pertinent to the problems underlying the prior representation are relevant to the subsequent representation." *U.S. v. Prevezon Holdings Ltd.*, 839 F.3d 227, 239 (2d Cir. 2016) (internal quotation omitted); *see also* Geoffrey C. Hazard, Jr., W. William Hodes & Peter R. Jarvis, *The Law of Lawyering* §14.07 (4th Edition, 2018-2 Supp. 2014) ("modern cases focus on the factual contours of both the former and the current transactions or matters and ask whether the affected lawyer reasonably could have learned confidential information in the first representation *that would be of significance in the second*."); *U.S. Football League v. Nat'l Football League*, 605 F. Supp. 1448, 1459 (S.D.N.Y. 1985) ("the presence of a common factual question meant that the substantial relationship test was satisfied"); *Giambrone v. Meritplan Ins. Co.*, 117 F. Supp. 3d 259, 272 (E.D.N.Y. 2015) ("The inquiry does not turn on whether the legal claims or underlying theories are similar, but rather whether the successive representations share common material factual issues.") Given that the test turns on an overlap of one or more factual issues, "[t]he more wide-ranging the allegations of the complaint, the more likely it is that background legal work will be relevant to the instant litigation."). *U.S. Football League*, 605 F. Supp. at 1460. Given the multiple and extensive overlaps between the work performed by Curtis Mallet for PPVA and the allegations in the Complaint—including as to Mr. Bodner and his roles at Platinum and Beechwood—it would be frivolous to assert that no substantial relationship exists.

Regarding the third prong, once a substantial relationship is demonstrated, and especially where, as here, at least some of the same lawyers purposefully involved in the Bodner representation were extensively involved in the PPVA representation, the moving party need not show that confidences were passed to counsel. Instead, there is an irrebuttable presumption that confidences were shared. *Prevezon*, 839 F.3d at 240. *See also Piven v. Harwood Feffer LLP*, No. 14 Civ. 6601 (LAK), 2015 WL 1268002, at *1 (S.D.N.Y. Mar. 11, 2015); *TufAmerica, Inc. v. Codigo Music LLC*, 11 Civ.1434 (ALC)(DCF), 2013 WL 1903867 at *2 (S.D.N.Y. May 7, 2013).

Although there is an exception to the substantial relationship test under *Allegaert v. Perot*, 565 F.2d 246, 251 (2d Cir.1977) which sometimes allows a law firm that previously represented more than one client to stop representing one client while continuing to represent another when their interests become adverse, that exception has been construed narrowly and is inapplicable.

As noted, *inter alia*, in *Burda Media, Inc. v. Blumenberg*, 97 Civ. 7167(RWS), 1999 WL 1021104 at*4 (S.D.N.Y. Nov. 8, 1999), both the District Court and Circuit Court in *Allegaert* had expressly assumed "that the parties were both aware of their mutual relationship and of the potential conflicts that relationship entailed." In the footnote to this last sentence, the *Burda Media* court noted that the District Court in *Allegaert* had stated that it would be "patently frivolous" to assert that any of the parties were not aware of the potential for conflicts at the time (citing to 434 F.Supp. at 799 n.13) and that the Second Circuit had observed that the parties were "as sophisticated, perhaps, as the American corporate community can be." (citing to 565 F.2d at 251 n.7). In point of fact, the *Burda Media* court then went on to discuss *Felix v. Balkin*, 98 Civ. 4491-93, 95, 97, 98 (AKH), 1999 WL 311483 (S.D.N.Y. May 7, 1999) as follows:

> In *Felix*, the court found that an attorney's failure to identify potential conflicts in a common representation and to properly advise the complaining client, other than mentioning that he did not 'see' any conflict in the concurrent representation, constituted a failure to discharge his professional obligations. 1999 WL 311483 at

11

>  *9.  Disqualification was found necessary, notwithstanding the applicability of the rule set forth in *Allegaert*.

*See also* NYC Bar Eth. Op. 1999-7 ("The decision in *Allegaert* was based on the understanding by the joint clients that the law firm would continue to represent the primary client if a dispute arose."). No one—and certainly not Curtis Mallet—told PPVA or any non-conflicted agents of PPVA about the risks that PPVA plainly confronted through sharing counsel with individual and entities who could and did loot it.

Alternatively, and given that Mr. Bodner owed fiduciary duties to PPVA rather than the other way around, it would be inappropriate for that reason as well to allow Curtis Mallet to describe him as the primary client and PPVA as the secondary client within the meaning of *Allegaert*. As stated in *Rosman v. Shapiro*, 653 F. Supp. 1441 (S.D.N.Y. 1987):

> A client reasonably expects that an attorney will remain loyal to his interests in matters on which that attorney previously represented him. That expectation is worthy of protection in this Court. Indeed, the well-settled ethical principle is that "[w]hen the interest of clients diverge and become antagonistic, their lawyer must be absolutely impartial between them, which ... usually means that he may represent none of them." *See Drinker*, Legal Ethics 112 (1953). To hold otherwise would undermine the loyalty and trust upon which the attorney-client relationship is based.

*Id.* at 1446 (internal citations and footnote omitted). This is all the more so when one of Curtis Mallet's clients (Mr. Bodner) owed fiduciary rather than just arms-length obligations to another (PPVA).

Curtis Mallet must therefore be disqualified on conflict of interest grounds.

**B.     The Attorney-Witness Rule Also Requires Disqualification**

Even at this very early stage of the proceedings, the conclusion seems inescapable that one or more Curtis Mallet attorneys will be core witnesses—particularly where, as here, a number of the Defendants may assert the Fifth Amendment right against self-incrimination.

"[A]n attorney may be disqualified from representing a client in an action when such attorney is a necessary witness who has 'knowledge of the facts and [has] participate[d] in some of the events giving rise to [the lawsuit]' and who, if allowed to participate as both an advocate and a witness, 'would jeopardize [the court's] interest in ensuring that the trial is conduct fairly and in conformity with prevailing ethical rules.'" *Prout v. Vladeck*, 316 F. Supp. 3d 784, 809 (S.D.N.Y.), *reconsideration denied*, 319 F. Supp. 3d 741 (S.D.N.Y. 2018) *quoting United States v. Napoli*, No. 10-CR-150, 2010 WL 1687669, at *4 (E.D.N.Y. 2010). In deciding such motions, courts look to current and past New York ethical rules and standards as well as the ABA Model Rules of Professional Conduct. *See Sea Trade Mar. Corp. v. Coutsodontis*, No. 09 CIV.488 BSJ HBP, 2011 WL 3251500, at *7-8 (S.D.N.Y. July 25, 2011).[5]

Disqualification of an individual attorney is appropriate if that attorney's testimony will be substantially helpful *or* prejudicial to the client. *Lamborn v. Dittmer*, 873 F.2d 522, 531 (2d Cir. 1989) (where attorney's testimony could be significantly useful to client, "he should be disqualified regardless of whether he will actually be called."). By contrast, testimony that would

---

[5] New York Rule of Professional Conduct 3.7 states, in part:

> (a) A lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact unless:
> (1) the testimony relates solely to an uncontested issue;
> (2) the testimony relates solely to the nature and value of legal services rendered in the matter;
> (3) disqualification of the lawyer would work substantial hardship on the client;
> (4) the testimony will relate solely to a matter of formality, and there is no reason to believe that substantial evidence will be offered in opposition to the testimony; or
> (5) the testimony is authorized by the tribunal.
> (b) A lawyer may not act as advocate before a tribunal in a matter if:
> (1) another lawyer in the lawyer's firm is likely to be called as a witness on a significant issue other than on behalf of the client, and it is apparent that the testimony may be prejudicial to the client . . . .

13

likely be materially prejudicial to the client can warrant firm-wide disqualification. *Id*. In such circumstances:

> The movant . . . bears the burden of demonstrating specifically how and as to what issues in the case the prejudice may occur and that the likelihood of prejudice occurring [to the witness-advocate's client] is substantial. "Prejudice" in this context means testimony that is sufficiently adverse to the factual assertions or account of events offered on behalf of the client, such that the bar or the client might have an interest in the lawyer's independence in discrediting that testimony.

*Murray v. Metro. Life Ins. Co.*, 583 F.3d 173, 178 (2d Cir. 2009) (internal quotations and citations omitted); *see also Gleason v. Zocco*, 941 F. Supp. 32, 35 (S.D.N.Y. 1996) (lawyer's "extensive personal involvement in every aspect of the underlying controversies that led to this lawsuit require his disqualification, both because of the likelihood that he will be a necessary witness and because of the real and present danger that his personal interests will infringe on his professional representation in ways deleterious to his client").

Plaintiffs understand that pretrial discovery is yet to be had in this case and that the unexpected not infrequently happens in discovery. Nonetheless, it presently seems clear enough, at least to Plaintiffs, that there will have to be trial testimony from one or more Curtis Mallet lawyers and that at least some of that testimony will of necessity be harmful to Mr. Bodner. If the Court is inclined at this time to conclude that Plaintiffs' attorney-witness motion is premature, the Court should at a minimum require Curtis Mallet to explain how it expects to comply with its discovery obligations without bogging discovery down in subsequent conflict of interest and attorney-witness issues.

## IV.    CONCLUSION

For the foregoing reasons and for those included in the Motion to Dismiss, Curtis Mallet must be disqualified from representing David Bodner.

14

**Dated: December 26, 2018**
  **New York, New York**

                    Respectfully submitted,

                    Martin Trott and Christopher Smith, as Joint
                    Official Liquidators, and Platinum Partners Value
                    Arbitrage Fund L.P.,

                    By: /s/ Warren E. Gluck
                          Warren E. Gluck, Esq.

                    Warren E. Gluck, Esq.
                    Peter R. Jarvis, Esq. (*pro hac vice forthcoming*)
                    Trisha M. Rich, Esq. (*pro hac vice forthcoming*)
                    HOLLAND & KNIGHT LLP
                    31 West 52nd Street
                    New York, New York 10019
                    Telephone: 212-513-3200
                    Facsimile: 212-385-9010
                    Email: warren.gluck@hklaw.com
                            peter.jarvis@hklaw.com
                            trisha.rich@hklaw.com

                    *Attorneys for Plaintiffs Martin Trott and Christopher Smith, as Joint Official Liquidators and Foreign Representatives of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation), and for Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation)*