Warren E. Gluck, Esq.
Barbra R. Parlin, Esq.
Mitchell J. Geller, Esq.
John Brownlee, Esq. (*pro hac vice forthcoming*)
Timothy D. Belevetz, Esq. (*pro hac vice forthcoming*)
Richard A. Bixter Jr., Esq. (*pro hac vice forthcoming*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone:  212-513-3200
Facsimile:  212-385-9010
Email: warren.gluck@hklaw.com
        barbra.parlin@hklaw.com
        mitchell.geller@hklaw.com
        john.brownlee@hklaw.com
        timothy.belevetz@hklaw.com
        richard.bixter@hklaw.com


*Attorneys for Plaintiffs Martin Trott and Christopher Smith,
as Joint Official Liquidators and Foreign Representatives of
Platinum Partners Value Arbitrage Fund L.P. (in Official
Liquidation), and for Platinum Partners Value Arbitrage Fund
L.P. (in Official Liquidation)*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTIN TROTT and CHRISTOPHER SMITH, as Joint Official Liquidators and Foreign Representatives of PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in OFFICIAL LIQUIDATION) and PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (in OFFICIAL LIQUIDATION) <br><br> Plaintiffs, <br><br> - against - <br><br> PLATINUM MANAGEMENT (NY) LLC, MARK NORDLICHT, DAVID LEVY, ESTATE of URI LANDESMAN, MURRAY HUBERFELD, DAVID BODNER, DAVID STEINBERG, DANIEL SMALL, | Case No. 18-CIV-10936 (JSR) <br><br> **FIRST AMENDED COMPLAINT** <br><br> **JURY TRIAL REQUESTED** |

JOSEPH SANFILIPPO, DAVID OTTENSOSER,
BERNARD FUCHS, MICHAEL NORDLICHT, MICHAEL
KATZ, KEVIN CASSIDY, SETH GERSZBERG, EZRA
BEREN, NAFTALI MANELA, DANIEL SAKS, MOSHE
M. FEUER a/k/a MARK FEUER, SCOTT TAYLOR,
DHRUV NARAIN, PLATINUM PARTNERS BLACK ELK
OPPORTUNITIES FUND LLC, PLATINUM PARTNERS
BLACK ELK OPPORTUNITIES FUND
INTERNATIONAL LTD., MORRIS FUCHS, LEON
MEYERS, MN CONSULTING NY LLC, ESTATE of
JULES NORDLICHT, BARBARA NORDLICHT, ESTATE
OF SOLOMON ENGLANDER, ESTATE OF GERTRUDE
ENGLANDER, ROCKWELL FULTON CAPITAL, L.P.,
DITMAS PARK CAPITAL, L.P., PLATINUM FI GROUP
LLC, FCBA TRUST, AARON PARNES, SARAH
PARNES, SHMUEL FUCHS FOUNDATION, SOLOMON
WERDIGER, OLIVE TREE HOLDINGS LLC, HUANG
LAI TSU HSIA, HUBERFELD FAMILY FOUNDATION,
MIND, BODY & SOUL CO., LIMITED, TWOSONS
CORPORATION, GRD ESTATES LTD., MEADOWS
CAPITAL LLC, ABRAHAM C. GROSSMAN, DAVID
GICHTIN, ORA GICHTIN, GOLDA WILK, THE ESTATE
OF MARCOS KATZ, ADELA KATZ, BEECHWOOD
CAPITAL GROUP, LLC, B ASSET MANAGER LP, B
ASSET MANAGER II LP, BEECHWOOD RE
INVESTMENTS, LLC, BEECHWOOD RE HOLDINGS,
INC., BEECHWOOD RE LTD., BEECHWOOD
BERMUDA INTERNATIONAL LTD., BAM
ADMINISTRATIVE SERVICES LLC, ILLUMIN
CAPITAL MANAGEMENT LP, BRE BCLIC PRIMARY,
BRE BCLIC SUB, BRE WNIC 2013 LTC PRIMARY, BRE
WNIC 2013 LTC SUB, BBIL ULICO 2014 TRUST, BBLN-
PEDCO CORP., BHLN-PEDCO CORP., BEECHWOOD
TRUST NO. 1, BEECHWOOD TRUST NO. 2,
BEECHWOOD TRUST NO. 3, BEECHWOOD TRUST
NO. 4, BEECHWOOD TRUST NO. 5, BEECHWOOD
TRUST NO. 6, BEECHWOOD TRUST NO. 7,
BEECHWOOD TRUST NO. 8, BEECHWOOD TRUST
NO. 9, BEECHWOOD TRUST NO. 10, BEECHWOOD
TRUST NO. 11, BEECHWOOD TRUST NO. 12,
BEECHWOOD TRUST NO. 13, BEECHWOOD TRUST
NO. 14, BEECHWOOD TRUST NO. 15, BEECHWOOD
TRUST NO. 16, BEECHWOOD TRUST NO. 17,
BEECHWOOD TRUST NO. 18, BEECHWOOD TRUST
NO. 19, BEECHWOOD TRUST NO. 20, BEECHWOOD
RE INVESTMENTS, LLC SERIES A, BEECHWOOD RE

INVESTMENTS, LLC SERIES B, BEECHWOOD RE
INVESTMENTS, LLC SERIES C, BEECHWOOD RE
INVESTMENTS, LLC SERIES D, BEECHWOOD RE
INVESTMENTS, LLC SERIES E, BEECHWOOD RE
INVESTMENTS, LLC SERIES F, BEECHWOOD RE
INVESTMENTS, LLC SERIES G, BEECHWOOD RE
INVESTMENTS, LLC SERIES H, BEECHWOOD RE
INVESTMENTS, LLC SERIES I and JOHN DOES 1-100,

Defendants.

# TABLE OF CONTENTS

**Page**

DESCRIPTION OF THE CASE ............................................................................1

PARTIES RELEVANT TO THE JOLS' CLAIMS...........................................16

JURISDICTION AND VENUE ........................................................................46

FACTUAL BACKGROUND .............................................................................47

    A.    THE PPVA INVESTMENT STRUCTURE ...........................................47

    B.    PLATINUM MANAGEMENT AS GENERAL PARTNER.....................49

    C.    PLATINUM DEFENDANTS' VALUATION AND RISK ASSESSMENT PROCESS AND REPRESENTATIONS CONCERNING INVESTMENTS AND NAV............................53

    D.    THE COLLAPSE AND LIQUIDATION OF PPVA ...........................56

    E.    CONCENTRATION IN ILLIQUID INVESTMENTS .........................63

    F.    MISREPRESENTATION OF PPVA'S NAV IN THE WAKE OF THE BLACK ELK EXPLOSION .........................................................64

    G.    MISREPRESENTATION OF VALUE FOR GOLDEN GATE OIL......................66

    H.    CREATION OF BEECHWOOD .........................................................69

    I.    STRUCTURE AND OWNERSHIP OF BEECHWOOD........................73

    J.    BEECHWOOD AND THE FIRST SCHEME ......................................76

        1.    Golden Gate Oil .............................................................78

        2.    PEDEVCO .......................................................................80

        3.    Implant Sciences ............................................................81

    K.    BLACK ELK SCHEME......................................................................82

    L.    CREATION OF MONTSANT AND REPURCHASE OF BLACK ELK BONDS ...................96

    M.    NORTHSTAR .....................................................................................98

    N.    THE SECOND SCHEME ..................................................................101

        1.    Use of Montsant to Hide Beechwood Encumbrance of PPVA Assets ..............................................................102

        2.    Nordlicht Side Letter .....................................................104

        3.    March 2016 "Restructuring" of PPVA/PPCO/Beechwood Transactions ...............................................106

    O.    THE AGERA TRANSACTIONS ......................................................111

        1.    Agera Energy ................................................................112

        2.    The Agera Energy Valuation ........................................114

        3.    The Agera Sale Process ................................................114

i

   4. The Agera Sale ....................................................................116

   5. The Redemption of the Class C Portion of the Note
    Purchase Price ....................................................................119

 P. THE SECURITY LOCKUP ........................................................121

   1. PPNE Notes .......................................................................122

   2. Kismetia .............................................................................124

   3. Twosons .............................................................................125

   4. Seth Gerszberg and West Loop/Epocs ................................130

CLAIMS FOR RELIEF .........................................................................136

 FIRST COUNT: BREACH OF FIDUCIARY DUTY (DUTY OF CARE AND GOOD FAITH)
  AGAINST THE PLATINUM DEFENDANTS ...............................136

 SECOND COUNT: BREACH OF FIDUCIARY DUTY (DUTY OF LOYALTY/SELF-
  DEALING) AGAINST THE PLATINUM DEFENDANTS ................137

 THIRD COUNT: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES AGAINST
  THE INDIVIDUAL PLATINUM DEFENDANTS ...........................138

 FOURTH COUNT: FRAUD AGAINST THE PLATINUM DEFENDANTS ...................140

 FIFTH COUNT: CONSTRUCTIVE FRAUD AGAINST THE PLATINUM DEFENDANTS ...............144

 SIXTH COUNT: AIDING AND ABETTING FRAUD AGAINST THE INDIVIDUAL
  PLATINUM DEFENDANTS .....................................................148

 SEVENTH COUNT: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES AGAINST
  THE BEECHWOOD DEFENDANTS ...........................................149

 EIGHTH COUNT: AIDING AND ABETTING FRAUD AGAINST THE BEECHWOOD
  DEFENDANTS .....................................................................151

 NINTH COUNT: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES AGAINST
  THE BEOF FUNDS AND THE PREFERRED INVESTORS OF THE BEOF FUNDS ..........153

 TENTH COUNT: AIDING AND ABETTING FRAUD AGAINST THE BEOF FUNDS AND
  THE PREFERRED INVESTORS OF THE BEOF FUNDS ................155

 ELEVENTH COUNT: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
  AGAINST MICHAEL KATZ ....................................................157

 TWELFTH COUNT: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES AGAINST
  KEVIN CASSIDY AND MICHAEL NORDLICHT ..........................158

 THIRTEENTH COUNT: AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES
  AGAINST SETH GERSZBERG ................................................160

 FOURTEENTH COUNT: IN THE ALTERNATIVE, UNJUST ENRICHMENT AGAINST THE
  BEECHWOOD DEFENDANTS, KEVIN CASSIDY AND SETH GERSZBERG .................162

 FIFTEENTH COUNT: IN THE ALTERNATIVE, UNJUST ENRICHMENT AGAINST THE
  BEOF FUNDS AND THE PREFERRED INVESTORS OF THE BEOF FUNDS ................163

SIXTEENTH COUNT: CIVIL CONSPIRACY AGAINST THE PLATINUM DEFENDANTS AND THE BEECHWOOD DEFENDANTS ....................................................164

SEVENTEENTH COUNT: VIOLATION OF CIVIL RICO AGAINST THE PLATINUM DEFENDANTS AND THE BEECHWOOD DEFENDANTS ..............................................165

EIGHTEENTH COUNT: (FOR RELIEF ONLY) ALTER EGO AGAINST THE BEECHWOOD ENTITIES IN RESPECT OF COUNTS ONE, TWO, FOUR AND FIVE ............................171

NINETEENTH COUNT: (FOR RELIEF ONLY) ALTER EGO AGAINST THE BEOF FUNDS IN RESPECT OF COUNTS ONE, TWO, FOUR AND FIVE ...............................173

TWENTIETH COUNT: DECLARATORY JUDGMENT THE NORDLICHT SIDE LETTER IS VOID AND UNENFORCEABLE AS CONTRARY TO PUBLIC POLICY ..........................174

TWENTY-FIRST COUNT: DECLARATORY JUDGMENT THAT THE MASTER GUARANTY IS VOID AND UNENFORCEABLE AS AGAINST PUBLIC POLICY ...............................175

INDEX OF EXHIBITS ...............................................................................182

## DESCRIPTION OF THE CASE

1.       This case arises in connection with one of the most spectacular hedge fund collapses in recent memory –whereby a fund with a purported net asset value ("**NAV**") of nearly $1 billion turns out to not only be insolvent but to have liabilities, or a ***negative*** NAV, in the range of $400 to $800 million.

2.       Martin Trott and Christopher Smith are the Court-appointed Joint Official Liquidators and Foreign Representatives (the "**JOLs**") of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) ("**PPVA**" and collectively with the JOLs, "**Plaintiffs**"), with authority pursuant to Orders of the Grand Court of the Cayman Islands and the United States Bankruptcy Court of the Southern District of New York to liquidate the assets of PPVA and bring litigation on its behalf

3.       The defendants in this case are an interrelated and overlapping group of persons and entities, including the **Platinum Defendants** (Mark Nordlicht, David Bodner, Murray Huberfeld, Uri Landesman, David Levy, Bernard Fuchs, Naftali Manela, David Ottensoser, Joseph SanFilippo, and Daniel Small, Ezra Beren and Platinum Management (NY) LLC); the **Beechwood Defendants** (Mark Nordlicht, David Bodner, Murray Huberfeld, David Levy, Mark Feuer, Scott Taylor, Naftali Manela, David Ottensoser, Daniel Saks, Ezra Beren, Dhruv Narain, Illumin Capital Management LP, and the Beechwood Entities (as defined below), and certain other culpable and entities and individuals, including the **BEOF Funds** and the **Preferred Investors of the BEOF Funds** (both as defined below), **Michael Joseph Nordlicht**, **Kevin Cassidy**, **Seth Gerszberg**, and **Michael Katz** (collectively, "**Defendants**") – several of whom have been indicted and/or sued for their role in connection with certain of the acts discussed below –  who used their positions of trust, access and authority to either enrich themselves and certain friends and family at the expense of PPVA.

4.     The harm to PPVA resulted from actions constituting conspiracy, fraud, deceit, asset dissipation and breaches of fiduciary obligations.   Defendants are among those who committed these tortious acts or directly aided and abetted this conduct.

5.     Defendants "papered" their acts and transactions to make them appear legitimate when those acts and transactions actually were permeated by fraud, deceit and breach of trust.

6.     As a result, Defendants are liable to PPVA in an amount to be proved at trial for the harms caused by the nine-figure schemes.

7.     In large part, this case arises out of the relationship between and among PPVA, its general partner Platinum Management (NY) LLC ("**Platinum Management**"), Platinum Management's "Beechwood" alter ego, and the individuals who owned, operated and managed Platinum Management and Beechwood -- Nordlicht, Landesman, Huberfeld, Bodner, Fuchs, Levy, Steinberg, Small, SanFilippo, Ottensoser, Manela, Saks, and Beren.

8.     Beechwood, a business comprised of reinsurance companies, investment management entities, investment trusts and related entities (collectively, "**Beechwood**"), was founded, owned and managed by the very persons who founded, owned and managed Platinum Management – and originally was operated out of Platinum Management's offices.

9.     From 2013 until 2015, the Platinum Defendants and Beechwood Defendants caused PPVA (and/or its subsidiaries) to engage in a series of non-commercial transactions with the Beechwood Entities (defined below) designed to:

(i)     falsely inflate the net value ascribed to PPVA's assets, thereby enabling Platinum Management to collect unearned partnership shares/fees;

(ii)    prioritize the interests of the Beechwood Entities over the interests of PPVA, by, *inter alia*, consistently subordinating PPVA's prior rights in common collateral to those of the Beechwood Entities, and granting the Beechwood Entities put rights against PPVA; and

      (iii)     enable Platinum Management insiders, friends and designated investors/creditors to take the proceeds from the sale of the assets of PPVA's largest investment, Black Elk, in contravention of the prior rights of PPVA and Black Elk's other creditors, while leaving the Black Elk investment worthless to PPVA, and PPVA liable for tens of millions of dollars of fraudulent conveyance and other claims (the "**Black Elk Scheme**");

This set of acts and transactions is referred to herein as the "**First Scheme**."

10.     By late 2015, with PPVA's collapse imminent and faced with a serious investigation of the Black Elk Scheme, the Platinum Defendants – with material assistance from the other Defendants – further breached their duties to PPVA by conspiring to transfer or encumber all or nearly all of PPVA's remaining assets for the benefit of the Beechwood Defendants, select insiders, and Platinum Partners Credit Opportunities Master Fund L.P. ("**PPCO**"), another Platinum Management operated fund.  This set of acts and transactions is referred to herein as the "**Second Scheme**."

11.     The significant wrongful acts and transactions within the Second Scheme, addressed in detail below, include the following:

      (i)     a one page document dated January 13, 2016, signed by Mark Nordlicht on and witnessed by Mark Feuer, which requires PPVA and any of its subsidiaries and affiliates holding the valuable proceeds from the sale of Implant Sciences Corporation ("**IMSC**") to use such proceeds to pay approximately $37 million of uncollectable debt owed to Beechwood by Golden Gate Oil, LLC, for no benefit to PPVA (the "**Nordlicht Side Letter**");

      (ii)     a March 2016 "restructuring" by which tens of millions of dollars were stripped from PPVA and assets were encumbered by Platinum Management for the benefit of PPCO and Beechwood;

      (iii)     a March 2016 "Master Guaranty Agreement" and related documents[1] between and among PPVA, certain of its subsidiaries, and Beechwood, among others, by which Beechwood was granted liens on available PPVA

---

[1] In addition to the Master Guaranty, the Platinum Defendants caused PPVA to execute that certain China Horizon Collateral Assignment dated March 21, 2016, that certain Turnover Agreement dated March 21, 2016, and that certain Carbon Credits Portfolio Assignment dated March 21,2016 (collectively, the "**March Beechwood Assignments**").

assets to further collateralize otherwise uncollectable debt owed to Beechwood (the "**Master Guaranty**");

(iv)      the series of transactions, documents and promissory notes that the Platinum Defendants, together with Defendant Seth Gerszberg, caused PPVA to enter into with select redeeming investors and certain creditors of PPVA, by which those investors and creditors preferentially were granted security interests and liens on all assets of PPVA (and in some cases subsidiary assets) to collateralize tens of millions of dollars of equity redemption claims or otherwise unsecured debt for no additional consideration (the "**Security Lockup**"); and

(v)      the June 9, 2016 transfer of one of PPVA's last valuable assets, a majority interest in Agera Energy (defined below), worth between $200-$300 million, to Beechwood and Senior Health Insurance Company of Pennsylvania ("**SHIP**"), for little to no consideration. The Agera Energy transactions was the culmination of the Second Scheme and a self-described "insider transaction" conceived of by defendant Michael Katz, the Platinum Defendants and the Beechwood Defendants (the "**Agera Transactions**") to strip PPVA of its largest asset and acquire the value of the same while dissipating the purported proceeds.

12.      The persons responsible for sourcing, overseeing, managing and valuing PPVA's investments and assets, assessing and determining appropriate levels of risk, operating PPVA's business and in whom PPVA reposed confidence and trust for these purposes included, inter alia:

(i) **Mark Nordlicht ("Nordlicht")**, who was the co-chief investment officer of PPVA and managing member of Platinum Management, which in turn was the General Partner of PPVA. Nordlicht was chairman of the valuation committee and risk committee, had ultimate oversight of all trading, asset allocation, and risk management activities, was the managing member/manager of substantially all of the subsidiaries through which PPVA's investments were held, was responsible for sourcing investment opportunities, marketing to investors, overseeing the operation and management of PPVA (and Platinum Management's) business, hiring personnel, meeting with outside counsel, developing business strategy. Nordlicht is a founder and member of Platinum Management and was a

4

direct beneficiary of all of the inflated distributions, fees and other payments made to it by PPVA;

(ii) **Uri Landesman ("Landesman")**, who until spring 2015 held the title President of Platinum Management. Together with Nordlicht, he served as co-chief investment officer of PPVA, responsible for all trading, asset allocation and risk management on behalf of PPVA, and was a member of both the valuation and risk committees. Landesman was a member of Platinum Management, so was a direct beneficiary of all of the inflated distributions, fees and other payments made to it by PPVA even after he resigned in 2015. He remained involved in developing strategy for managing PPVA's liquidity issues and seeking out new investors even after his resignation in 2015;

(iii) **Murray Huberfeld ("Huberfeld")**, who, together with Nordlicht and David Bodner, founded and is an owner of Platinum Management. Huberfeld also is a founder and was at all relevant times an owner of the Beechwood Entities. Among other things, Huberfeld was involved with sourcing investment opportunities, meeting with and marketing to important investors and developing business and investment strategy for PPVA. He also was involved in the management and operation of PPVA and of Platinum Management, taking part in meetings with attorneys, interviewing new personnel, and meeting with investment partners. As an owner, Huberfeld was a direct beneficiary of all of the inflated distributions, fees and other payments made to Platinum Management by PPVA;

(iv) **David Bodner ("Bodner")**, is another founder and owner of Platinum Management. Bodner also is a founder and was at all relevant times an owner of the Beechwood Entities. Like Huberfeld, Bodner was involved with sourcing investment

opportunities, meeting with and marketing to important investors and developing investment strategies for PPVA and its investments, including, for example, its investment in China Horizon/Yellow River. He also was involved in the management and operation of PPVA and of Platinum Management, taking part in meetings with attorneys, interviewing new personnel, and meeting with investment partners. As an owner, Bodner was a direct beneficiary of all of the inflated distributions, fees and other payments made to Platinum Management by PPVA;

(v) **Bernard Fuchs** was a principal of Platinum Management who benefited from the inflated distributions, fees and other amounts paid by PPVA. Bernard Fuchs was involved with meeting with and marketing to new investors, efforts to retain existing investors, sourcing and managing investments and developing business strategy for PPVA. He was involved in planning significant investments and transactions including with respect to Black Elk and the Agera Transactions. He also was involved in the management and operation of PPVA and of Platinum Management, taking part in meetings with attorneys, meeting with potential investment partners and negotiating personnel matters. During the period leading up to the Cayman Liquidation, Bernard Fuchs was tasked with communicating with investors seeking information as to the status of their unfulfilled redemption requests. He provided false and misleading information to investors about the status of PPVA's financial situation and solvency;

(vi) **David Levy ("Levy")** was a portfolio manager and beginning in 2015, co-chief investment officer of PPVA. He had direct responsibility for overseeing and managing many of PPVA's most significant investments, including, *inter alia*, Black Elk, Implant Sciences, China Broadband, China Cablecomm, China Networks, and Desert Hawk, and

was paid based on the increase in value of those investments, whether realized or unrealized, as well as the profits of the Platinum affiliated management companies, including Platinum Management.  As such, he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA.  He was a member of the risk and valuation committees responsible for valuing PPVA's assets and assessing risk related thereto, and was appointed as an operating officer/manager of certain subsidiaries through which PPVA's investments were held, such as DMRJ.  During 2013-2014, he also was employed as the Chief Investment Officer of BAM (defined below), even when BAM ostensibly was on the opposite side of a transaction from PPVA;

(vi) **David Steinberg ("Steinberg")**, was at various times a portfolio manager, investment advisor and co-chief risk advisor for PPVA, and was at all relevant times a member of the valuation committee that had overall responsibility for valuing PPVA's assets.  In his capacity as a member of the risk committee and co-chief risk advisor, Steinberg was responsible for assessing the risk associated with PPVA's investments, a significant issue in determining value.  Steinberg had direct responsibility for overseeing and managing PPVA's investments in PEDEVCO, Navidea Biopharmaceuticals, Inc., Vistagen Therapeutics, Inc., Urigen Pharmaceuticals, Inc., and Echo Therapeutics, Inc., among other credits, was the official responsible for reviewing and negotiating the agreements and other documents relating to the March 2016 restructuring and the Agera Transactions, and was appointed as an officer/manager/authorized signatory of certain PPVA subsidiaries such as Principal Growth Strategies LLC (the entity through which PPVA held its interest in the Agera Note) and Montsant Partners LLC, as well as companies

in which PPVA invested such as PEDEVCO.  During the relevant period, Steinberg was paid a base salary as well as incentive compensation that was directly tied to the increase in the value of the investments he managed, whether realized or unrealized.  As such, he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA.  Beginning in 2014, Steinberg, together with Ezra Beren, also was a co-investment advisor to BAM (defined below), the Beechwood entities' investment advisor, for which he was paid based on the performance of the investments he managed;

(vii) **Daniel Small ("Small")**, was the managing director and portfolio manager charged with originating, managing and overseeing many of PPVA's investments, including its investments in Black Elk, Implant Sciences, China Cablecomm, Desert Hawk and Northstar until his employment was terminated in or about July 2015.  Small was responsible for identifying potential investment opportunities, performing due diligence on potential investments, designing and implementing the structure of investments, negotiating the terms of investments and monitoring and monetizing investment decisions. Small was paid a base salary plus bonus compensation that was directly tied to the increase in the value of the investments he managed, whether realized or unrealized.  As such, he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA;

(viii) **Joseph SanFilippo ("SanFilippo")**, chief financial officer for PPVA and a member of the valuation and risk committees who also was an officer of certain

subsidiaries through which PPVA held its investments.  In his capacity as a member of the valuation and risk committees and as chief financial officer, he was, among others, responsible for determining the value of and risk associated with PPVA's investments. SanFilippo also was responsible for communicating with the third parties who routinely performed valuation, accounting and administrative services on behalf of PPVA, including calculating and reporting PPVA's NAV on a monthly basis and providing valuation reports each quarter.  SanFilippo received a salary as well as bonus compensation, so he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA;

(ix) **David Ottensoser ("Ottensoser")**, general counsel, chief compliance officer and a member of the risk committee.  Ottensoser participated in drafting, reviewing and/or commenting on the contracts and other documents that bound PPVA to the improper transactions comprising the First and Second Schemes and without which the First and Second Scheme could not have occurred.  As a member of the risk committee, he was responsible for assessing the risk associated with PPVA's investments, a significant issue in determining value.  At the same time, Ottensoser provided legal services to BAM/the Beechwood Entities, even when those parties ostensibly were on opposite sides of a transaction from PPVA.  Ottensoser received a salary as well as bonus compensation, so he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA;

(x) **Naftali Manela ("Manela")**, was chief operating officer, a member of the valuation committee and an officer of certain subsidiaries through which PPVA held its investments, such as DMRJ.  Manela was responsible for all aspects of the administration of PPVA's business.  Manela also worked closely with senior management including Nordlicht, Bodner, Huberfeld, Levy, Fuchs, and the portfolio managers such as Small and Steinberg in structuring transactions and investments on behalf of PPVA.  At the same time, Manela worked for BAM/the Beechwood Entities, performing similar services, even when those parties ostensibly were on opposite sides of a transaction from PPVA.  Manela received a salary as well as bonus compensation, so he directly benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA;

(xi) **Daniel Saks ("Saks")**, was, until about 2014, a portfolio/investment manager with oversight and control over numerous PPVA investments.  In particular, by the end of 2013, Saks became responsible for overseeing and managing PPVA's bio/pharma investments in companies including Advaxis Inc., Angiolight, Inc., Echo Therapeutics Inc., FluoroPharma, Navidea Biopharmaceuticals Inc., NewCardio Inc., Urigen Pharmaceuticals Inc., and Vistagen Therapeutics Inc., and previously was involved with overseeing the investment in Golden Gate Oil.  During 2014, Saks began working for the Beechwood Entities, eventually serving as  Chief Investment Officer and then President of B Asset Manager LP during and after 2015; and

(xii) **Ezra Beren ("Beren")**, who until the end of 2015 was an investment manager with responsibility for overseeing and managing PPVA's subsidiary RJ Credit and its various investments (e.g., PEDEVCO), among other investments, as well as a required

10

member of the valuation committee that had responsibility for valuing all of PPVA's assets and investments and was paid a salary plus incentive compensation based on the increased value of the investments he managed, whether realized or unrealized. In 2014, Beren also entered into an investment management agreement with BAM, for which he was paid based on the performance of the investments he managed, so he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants and from the inflated distributions, fees and other payments made to Platinum Management by PPVA. Beren worked for BAM/the Beechwood Entities even when those parties ostensibly were on opposite sides of a transaction from PPVA. As of January 1, 2016, he worked at BAM full time.

13. The Platinum and Beechwood Defendants scrambled to close the Agera Transactions on June 9, 2016, the day after defendant Murray Huberfeld, a co-founder and principal of Platinum Management, was arrested in connection with the misappropriation of PPVA funds to bribe a pension official in exchange for investing in PPVA. A true and correct copy of the Superseding Information in *United States v. Murray Huberfeld*, Case No. 16-CR-467 (AKH), filed in connection with Huberfeld's guilty plea for defrauding PPVA, is attached hereto as **Exhibit 1.**

14. After Murray Huberfeld's arrest, the Federal Bureau of Investigation executed a search warrant on Platinum Management's offices in connection with multiple government investigations.

15. By June 14, 2016, Nordlicht announced that reporting as to PPVA's NAV would be suspended and PPVA would be liquidated.

16.     PPVA was placed into provisional liquidation under the supervision of the Grand Court of the Cayman Islands on August 23, 2016 (the "**Cayman Liquidation**").  At that time, Platinum Management and its executives were still publicly claiming that PPVA had a NAV of nearly $1 billion.

17.     In reality, as of the date the Cayman Liquidation was commenced, the First and Second Schemes had left PPVA potentially liable for as much as $400-$800 million in creditor claims and virtually no valuable assets other than litigation claims and defenses.

18.     PPVA at one time, held valuable assets.

19.     But from at least 2012 until the commencement of PPVA's Cayman Liquidation, the Platinum Defendants failed to abide by the balanced investment strategies set forth in PPVA's governing documents, which were designed to maintain PPVA's liquidity and financial condition.

20.     Rather, the Platinum Defendants caused PPVA's investment portfolio to be increasingly more concentrated in illiquid investments, including equity and debt positions in start-up companies, many of which were not publicly traded.

21.     By the end of 2012, the Platinum Defendants caused PPVA's investments to become concentrated such that 40% of its reported NAV was represented by investments in **just two** oil and gas operations:  Black Elk Energy Offshore Operations, LLC ("**Black Elk**"), a Gulf of Mexico oil platform operator, and Golden Gate Oil, LLC ("**Golden Gate**"), a California-based onshore oil operation.

22.     Golden Gate was a highly speculative investment that the Platinum Defendants realized was a failure at an early stage, as Golden Gate barely produced any oil, suffered large operating losses and never made a single interest payment on loans originated by PPVA.  Despite

this, Platinum Management falsely reported a five-fold increase in the value of PPVA's Golden Gate Oil investment during fiscal year 2013.

23.     Black Elk was a Houston, Texas based publicly reporting company that mostly operated offshore platforms located in the Gulf of Mexico.  In November 2012, an explosion occurred on Black Elk's West Delta 32 platforms, resulting in the death of Black Elk employees and prompting numerous investigations (the "**Black Elk Explosion**").  Following the Black Elk Explosion, Black Elk's financial results, liquidity and business operations deteriorated significantly.

24.     Given the impact that the Black Elk and Golden Gate Oil business losses would have had on PPVA's NAV if reported accurately, PPVA should have been liquidated in 2013.  Indeed, forty percent of PPVA's total portfolio was worth far less than reported.

25.     The Platinum Defendants refused to admit a loss or realize a write-down in value, declaring instead that PPVA's NAV actually *increased* during this period, in order to enrich themselves with unearned partnership shares and/or fees.

26.     The Platinum Defendants' concentration of PPVA's investments in illiquid assets meant that the Platinum Defendants had significant discretion over their valuation, since there was no ready market for such investments.  The lack of a ready market also meant that many of these investments could not be quickly or easily liquidated to meet the Platinum Defendants' need for cash to pay themselves, operate Platinum Management, and continue to hide the losses at PPVA.

27.     To resolve this difficulty, the Platinum Defendants and the Beechwood Defendants, among others, conceived of and executed the First Scheme.

28.     In 2013, Nordlicht, Huberfeld, Bodner (collectively the co-founders of Platinum Management), together with Levy, Scott Taylor ("**Taylor**"), and Moshe "Mark" Feuer ("**Feuer**")

created Beechwood and, between March 2013 and late 2015, these individuals used their positions of trust, authority and control over PPVA to cause PPVA and the Beechwood Entities to engage in the fraudulent, non-commercial transactions that comprise the First Scheme.

29.     During the period from 2012 through 2015, the Platinum Defendants reported that PPVA "experienced" annualized returns of between a maximum of 11.6% and a minimum of 7.15%, and reported that the **_net value_** of its assets under management for PPVA had increased steadily from $688 million until they reached $789 million as of October 1, 2015, awarding themselves partnership distributions, fees and other compensation based on these results.

30.     By late 2015, the liabilities resulting from the non-commercial transactions to which the Platinum and Beechwood Defendants had caused PPVA to become a party, coupled with ongoing losses at PPVA's most significant investments, made it clear that PPVA could not continue to exist for much longer.  At that time, Defendants conceived and executed the Second Scheme to encumber or strip the last valuable assets away from PPVA to benefit themselves and particularly Beechwood, PPCO, and certain insiders of the Platinum Defendants.

31.     As a result of Defendants' actions, hundreds of millions of dollars were diverted from PPVA, PPVA's remaining assets lost value or were purportedly encumbered, and tort and contract claims crystalized against PPVA – all under circumstances where master funds like PPVA are supposed to hold zero or minimal debt.

32.     By the time the Cayman Liquidation was commenced, most of PPVA's remaining investments (i) had little to no net value; (ii) required so much investment and were at such an early stage they effectively had no value to PPVA in liquidation; and/or (iii) were valuable but subject to significant creditor liens and/or claims.

33.     Thus, rather than the positive NAV that potentially could have been salvaged in 2013, Defendants ensured a 2016 liquidation outcome with NAV of zero and hundreds of millions of dollars of creditor claims that PPVA could not pay.

34.     Platinum Management, in its capacity as PPVA's general manager, and its principals/managers/advisors/owners, Nordlicht, Huberfeld, Bodner, Landesman, Bernard Fuchs, Levy, Steinberg, Beren, Manela, Ottensoser, SanFilippo, and Small (collectively, the "**Platinum Defendants**") were obligated to manage and operate PPVA in good faith, in accordance with the terms of the partnership agreement, other operating documents, marketing materials, and the representations, statements and promises made to PPVA.  Unless otherwise noted, all references herein to the Platinum Defendants means that each of the persons named as such were involved in the act, omission, misstatement, or breach at issue, *provided however* that references to the Platinum Defendants for the time period after July 2015 do not include Small and provided further that references to the Platinum Defendants for the period after January 2016 do not include Beren.

35.     The Platinum Defendants breached this duty, and were materially assisted in this breach by, among others: (i) Nordlicht, Huberfeld, Bodner, Levy, Beren, Manela, Ottensoser (each to the extent they were acting on behalf of the Beechwood Entities), Daniel Saks ("**Saks**"), Taylor, Feuer, Dhruv Narain ("**Narain**") and Illumin Capital Management LP ("**Illumin**") (collectively, together with the Beechwood Entities, the "**Beechwood Defendants**"); (ii) the BEOF Funds (defined below); (iii) the Preferred Investors of the BEOF Funds (defined below); (iv) Kevin Cassidy; (v) Michael Katz; (vi) Michael Nordlicht; and (vii) Seth Gerszberg (collectively, the

persons identified in subparagraphs (i)–(vii) together with the Platinum Defendants, "**Defendants**").[2]

36.     Unless otherwise noted, all references herein to the Beechwood Defendants means that each of the persons named as such were involved in the act, omission, misstatement, or breach at issue, *provided however* that references to the Beechwood Defendants for the time period before January 2016 do not include Narain or Illumin.

## PARTIES RELEVANT TO THE JOLS' CLAIMS

37.     Plaintiffs Martin Trott and Christopher Smith are the duly appointed Joint Official Liquidators and Foreign Representatives of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation).

38.     Plaintiff Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation) is an exempted limited partnership marketed as a multi-strategy investment fund and registered under the Exempted Limited Partnership Law, 2014, of the Cayman Islands.

39.     Platinum Management is a Platinum Defendant and a Delaware limited liability company with its principal place of business in New York, New York.  Platinum Management is the general partner of PPVA.

40.     Defendant Mark Nordlicht is a Platinum Defendant as well as a Beechwood Defendant.  Nordlicht is a resident of New Rochelle, New York.

41.     Together with Huberfeld and Bodner, Nordlicht founded Platinum Management and the Platinum affiliated group of funds that includes, inter alia, PPVA, PPCO, PPLO, the BEOF Funds, and controlled and orchestrated the creation of Beechwood.

---

[2] Unless otherwise stated to the contrary, references herein to the Platinum Defendants and/or the Beechwood Defendants refer to a certain Defendant to the extent he was employed or otherwise affiliated with Platinum Management or Beechwood, respectively, at the given time.

42.     Nordlicht was the managing member of Platinum Management and, together with Landesman (at all relevant times until about first quarter 2015) then Levy (at all relevant times from and after 2015), the co-chief investment officer of PPVA.

43.     Nordlicht directly or indirectly holds ownership interests in Platinum Management, and thus personally benefitted from the inflated fees and other payments made by PPVA to Platinum Management as a result of the First and Second Scheme.

44.     Nordlicht was a member of the risk committee, and in that capacity was responsible for assessing the risks associated with PPVA's investments, which is a significant factor in determining the value of such investments.

45.     Nordlicht also was a member of the valuation committee.  In that capacity, he was responsible for assessing the actual value of PPVA's investments and reporting such values so that PPVA's NAV could be accurately determined and any fees and other charges accurately calculated.

46.     Nordlicht also was an owner and controlling person for Beechwood, operating the business of Beechwood both directly and via intermediaries, including Defendants David Levy, Naftali Manela, Daniel Saks, Dhruv Narain, Taylor and Feuer

47.     Indeed, from and after the period when Beechwood commenced occupying office space separate from Platinum Management through the end of 2014, Nordlicht even maintained an office within Beechwood's offices.

48.     Nordlicht was involved in every aspect of the First and Second Schemes, including, inter alia, (i) by using his position as a member of the valuation committee to falsely inflate the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing

17

PPVA to pay excessive fees and other amounts to the Platinum Defendants; (ii) orchestrating the

Black Elk Scheme; (iii) orchestrating the series of transactions among PPVA and the Beechwood

Entities designed to mask the inflation of PPVA's NAV and the overpayment of fees and other

amounts to the Platinum Defendants, (iv) orchestrating the series of transactions among PPVA,

Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable

assets; and (v) using his position to cause PPVA to engage in the transactions referred to herein as

the Security Lock-Up.

49.     Defendant David Levy is a Platinum Defendant as well as a Beechwood Defendant.

Levy is a resident of New York, New York and defendant Huberfeld's nephew.

50.     From and after 2015, Levy served as co-chief investment officer of PPVA alongside

Nordlicht.  Levy also was a portfolio manager with responsibility for overseeing and managing

several of PPVA's most significant investments, including, as noted above, Implant Sciences and

Black Elk.  He also was appointed as an officer/manager of certain of the PPVA subsidiaries,

including DMRJ, in which PPVA held its investments.

51.     As a portfolio manager, Levy received a salary as well as a bonus based on the

realized and/or unrealized increase in the performance of the PPVA investments that he managed.

As co-chief investment officer, Levy received, among other things, a percentage of the profits of

Platinum Management.  As such, he personally benefitted from the inflated valuations, and

excessive fees and other payments made by PPVA to Platinum Management as a result of the First

and Second Scheme.

52.     Levy was a member of the valuation committee.  In that capacity, he was

responsible for assessing the actual value of PPVA's investments and reporting such values so that

PPVA's NAV could be accurately determined and any fees and other charges accurately calculated.

53.     Beginning in 2013, Levy was instrumental in the creation of Beechwood and served as chief investment officer of BAM I (defined below), the Beechwood asset management entity until the end of 2014.   Beechwood marketed Levy to potential clients as a member of its management team and specifically highlighted Levy's eight years of experience with Platinum Management as a key to Beechwood's future success.   In late 2014/early 2015, in the wake of the Black Elk Scheme, Levy returned to work at Platinum Management.   Levy remained an owner of Beechwood after his return to Platinum Management.

54.     Levy was involved in every aspect of the First and Second Schemes, including, inter alia, (i) by using his position as a member of the valuation committee to falsely inflate the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive fees and other amounts to the Platinum Defendants; (ii) orchestrating the Black Elk Scheme; (iii) orchestrating the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of fees and other amounts to the Platinum Defendants, (iv) orchestrating the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) using his position to cause PPVA to engage in the transactions referred to herein as the Security Lock-Up.

55.     Defendant the Estate of Uri Landesman ("**Landesman Estate**") is a Platinum Defendant.   Landesman was a resident of New Rochelle, New York until his death on September 14, 2018.

56.     At all relevant times until about April 2015, Landesman served as the President of Platinum Management, a Director of the Feeder Funds (defined below) and co-Chief Investment Officer of PPVA.

57.     Until April 2015, Landesman shared responsibility with Nordlicht for all trading, asset allocation and risk management on behalf of PPVA.

58.     Landesman was a member of the risk committee, and in that capacity was responsible for assessing the risks associated with PPVA's investments, which was a significant factor in determining value.

59.     Landesman also was a member of the valuation committee.  In that capacity, he was responsible for assessing the actual value of PPVA's investments and reporting such values so that PPVA's NAV could be accurately determined and any fees and other charges accurately calculated.

60.     Landesman was involved with sourcing investment opportunities, meeting with and marketing to important investors and developing investment and business strategy for PPVA and its investments.

61.     Landesman directly or indirectly holds ownership interests in Platinum Management, and thus personally benefitted from the inflated valuations and excessive fees and other payments made by PPVA to Platinum Management as a result of the First and Second Schemes.

62.     Landesman was granted distributions and/or a salary in respect of his interest in Platinum Management after his resignation, and thus he continued to be enriched by the inflated fees and other payments made by PPVA to Platinum Management as a result of the First and Second Scheme after April 2015.

20

63.     In connection with the First Scheme, Landesman was responsible for marketing PPVA on behalf of Platinum Management, and making representations concerning PPVA's NAV and the status of its various investments, such as Black Elk.  Despite his direct knowledge of PPVA's liquidity issues and the Platinum Defendants' misrepresentation of PPVA's NAV, Landesman routinely misrepresented PPVA's financial condition.

64.     Even after Landesman resigned, he continued to be involved with PPVA investor relations on behalf of Platinum Management.

65.     During 2015 and 2016, Landesman was involved in discussions with Nordlicht, Bodner, Huberfeld, Levy, Fuchs and other Platinum Defendants concerning the status of PPVA, its true financial situations and liquidity issues.

66.     Landesman materially misstated PPVA's financial condition and omitted information concerning the true status of its financial condition to PPVA and various third parties during 2015 and 2016.  As a result, the other Platinum Defendants were able to complete the transactions comprising the Second Scheme, to PPVA's detriment.

67.     Defendant Murray Huberfeld is a Platinum Defendant as well as a Beechwood Defendant.  He resides in Lawrence, New York.

68.     Huberfeld is a co-founder of Platinum Management and PPVA together with Nordlicht and Bodner.

69.     At all relevant times, Huberfeld directly or indirectly held ownership interests in Platinum Management, and thus personally benefitted from the inflated fees and other payments made by PPVA to Platinum Management as a result of the First and Second Schemes.

70.     Until his indictment on June 8, 2016, Huberfeld continued to make management decisions that directly impacted PPVA.

71.     On or about May 25, 2018, Huberfeld pled guilty to federal charges of conspiracy to commit wire fraud, in connection with a bribe Huberfeld offered to Norman Seabrook, the former President of the Correction Officer's Benevolent Association of New York ("**COBA**"), in exchange for COBA's investment of $20 million with PPVA and other Platinum-affiliated funds.

72.     In 2013, Huberfeld was instrumental in the creation of Beechwood and helped solicit the initial investment funds for use by Beechwood. At all relevant times, Huberfeld was a direct or indirect owner of Beechwood.

73.     Huberfeld was involved in every aspect of the First and Second Schemes, including, inter alia, (i) using his position as a senior Platinum Management executive to participate in the false inflation of the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive fees and other amounts to the Platinum Defendants; (ii) orchestrating the Black Elk Scheme; (iii) orchestrating the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of fees and other amounts to the Platinum Defendants, (iv) orchestrating the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) using his position to cause PPVA to engage in the transactions referred to herein as the Security Lock-Up.

74.     Defendant David Bodner is a Platinum Defendant as well as a Beechwood Defendant.  Bodner is a resident of Monsey, New York.

75.     Along with Huberfeld and Nordlicht, Bodner is a co-founder of Platinum Management and PPVA who helped solicit the initial investment funds for PPVA from his contacts in the New York Jewish community.

76. At all relevant times, Bodner directly or indirectly held ownership interests in Platinum Management, and thus personally benefitted from the inflated fees and other payments made by PPVA to Platinum Management as a result of the First and Second Schemes.

77. Bodner was instrumental in the creation of Beechwood.  At all relevant times, Bodner directly or indirectly held ownership interests in Beechwood.

78. Bodner was involved in every aspect of the First and Second Schemes, including, inter alia, (i) by using his position as a senior Platinum Management executive to participate in the false inflation of the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive fees and other amounts to the Platinum Defendants; (ii) orchestrating the Black Elk Scheme; (iii) orchestrating the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of fees and other amounts to the Platinum Defendants, (iv) orchestrating the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) using his position to cause PPVA to engage in the transactions referred to herein as the Security Lock-Up.

79. In February 1990, Huberfeld and Bodner were arrested for sending imposters to take their Series 7 brokerage licensing exams.  They eventually pled guilty to misdemeanors and were sentenced to two years of probation and paid substantial fines to the SEC.

80. Thereafter, in 1998, Huberfeld and Bodner settled civil allegations that they sold more than 513,000 shares of restricted stock in an investment company.  Huberfeld and Broad Capital, the fund Bodner and Huberfeld were managing at that time, made large restitution claims to the SEC in connection with these acts.

81. Huberfeld and Bodner's checkered pasts are matters of public record. Published articles concerning Platinum Management routinely mentioned their arrests, guilty pleas and SEC fines.

82. Neither Huberfeld nor Bodner had an official title at Platinum Management. Instead, Bodner and Huberfeld generally conducted business at Platinum Management via a shared secretary, through whom the substantial majority of emails to and from Bodner and Huberfeld were exchanged. The secretary would, in turn, either print out copies of the relevant emails and attachments to show to Bodner and Huberfeld or forward the emails to Bodner and/or Huberfeld at their personal email addresses. Attached as **Exhibit 2** are true and correct copy of a February 11, 2016 email from Bernard Fuchs to the secretary for Huberfeld and Bodner, directing the secretary to provide the email to Bodner.

83. Among other things, both Bodner and Huberfeld were involved with sourcing investment opportunities, meeting with and marketing to important investors, dealing with issues concerning liquidity and redemptions, and developing business and investment strategy for PPVA.

84. At all relevant times, Bodner and Huberfeld also were involved in the management and operation of PPVA and of Platinum Management, taking part in meetings with attorneys, interviewing new personnel, and meeting with investors. Although they did not have official titles, Bodner and Huberfeld's approval was required for all significant business, investment and personnel decisions.

85. At all relevant times Nordlicht, Bodner and Huberfeld were the concealed owners and co-lead managers of the Beechwood Entities. They wielded this power and control via intermediaries, including the outward facing Beechwood Managers, Taylor, Feuer and Narain. Their approval was required for all significant decisions including all investment decisions.

86.     On information and belief, both Bodner and Huberfeld also participated in improperly inflating the values of PPVA's assets in order to improperly increase PPVA's NAV, thereby causing PPVA to pay excessive distributions, fees and other payments to the Platinum Defendants.

87.     Defendant David Steinberg is a Platinum Defendant and a resident of Clifton, New Jersey.  Steinberg joined Platinum Management in May 2009, and at all relevant times served as portfolio manager for various PPVA investment positions.

88.     Steinberg also held the position of co-chief risk officer for Platinum Management and PPVA, with responsibility for assessing the risk of PPVA's investments.

89.     Steinberg was involved in every aspect of the First and Second Schemes, including, inter alia, (i) by using his position as a member of the valuation committee to participate in the false inflation of the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive distributions, fees and other amounts to the Platinum Defendants; (ii) helping to orchestrate the Black Elk Scheme; (iii) helping to orchestrate the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of distributions, fees and other amounts to the Platinum Defendants, (iv) helping to orchestrate the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) assisting in the consummation of the transactions referred to herein as the Security Lock-Up.

90.     Steinberg was involved with and responsible for negotiating and executing numerous transactions involving PPVA that are part of both the First Scheme and Second

Schemes, including but not limited to the Black Elk Scheme, the January 2015 Montsant loan, the PEDEVCO transaction, the March 2016 Restructuring and the Agera Transactions.

91.     Due to his active management of various PPVA investment positions and his positions as a member of the valuation and risk committees and co-chief risk officer, Steinberg had direct knowledge of the Platinum Defendants' inflation of the value of PPVA's assets and the misrepresentation of PPVA's NAV.

92.     Steinberg also was involved in the creation of Beechwood and even worked for Beechwood at the same time as he was supposed to be working on behalf of PPVA.

93.     Steinberg was a direct participant in the Black Elk Scheme, using an account maintained in the name of his wife to purchase Black Elk bonds for the purpose of voting in favor of the consent required to amend the Indenture, then subsequently reselling such bonds to an affiliated fund, PPLO, after the scheme concluded.

94.     Steinberg was a responsible person or officer or fiduciary for various PPVA subsidiaries involved in the transactions comprising the First and Second Schemes, including Montsant and PGS.  Steinberg executed the original Montsant transaction documents, the Agera Sale documents on behalf of PGS, was instrumental in negotiating the terms of significant components of the Second Scheme including the March 2016 PPVA restructuring, the Agera Transactions (as defined below), and the Security Lockup, which stripped PPVA of millions of dollars' worth of assets.

95.     Defendant Daniel Small is a Platinum Defendant and a resident of New York, New York.  Small was an employee of Platinum Management from 2007 until July 2015, and served as Platinum Management's Managing Director.

96.     Together with Levy, Small served as portfolio manager for, *inter alia*, PPVA's investments in Black Elk, Implant Sciences, China Cablecomm, and China Horizon until he left Platinum Management in July 2015.  Small's compensation as portfolio manager was based in part on increases to the value of the assets he managed, so he profited from the inflated values ascribed to those assets.

97.     Small had direct knowledge of the Black Elk Explosion and the effect it had on the value of PPVA's investment in Black Elk and PPVA's overall NAV, the subsequent financial issues faced by Black Elk during 2013 and 2014.  He was an architect of and helped carry out the Black Elk Scheme and the transactions by which the remaining Black Elk assets were acquired to create Northstar.  Both of these transactions have been challenged as fraudulent transfers by the Black Elk Trustee, resulting in tens of millions of potential liabilities to PPVA.

98.     Joseph SanFilippo is a Platinum Defendant and a resident of Freehold, New Jersey.  At all relevant times, SanFilippo served as Chief Financial Officer of Platinum Management and PPVA.

99.     At all relevant times, SanFilippo was a member of both the valuation committee and the risk committee.  As such, SanFilippo was responsible for assessing the value of PPVA's assets and determining the risk associated therewith.

100.    In his capacity as chief financial officer and member of the valuation and risk committees, SanFilippo played an instrumental part in the systematic overvaluation of PPVA's assets by the Platinum Defendants and the resulting inflation of PPVA's NAV.

101.    SanFilippo was responsible for, *inter alia*, the creation of false financial disclosure documents for PPVA.

102.    SanFilippo also had responsibility for communicating with PPVA's auditors, third party valuation providers, and fund administrators and did so on a routine basis.

103.    On information and belief, SanFilippo also was involved in preparing the documents and information necessary to complete the March 2016 Restructuring and particularly the transfer of assets to PPCO.

104.    SanFilippo was involved in every aspect of the First and Second Schemes, including, inter alia, (i) by using his position as a member of the valuation and risk committees to participate in the false inflation of the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive distributions, fees and other amounts to the Platinum Defendants; (ii) helping to orchestrate the Black Elk Scheme; (iii) helping to orchestrate the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of distributions, fees and other amounts to the Platinum Defendants, (iv) helping to orchestrate the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) assisting in the consummation of the transactions referred to herein as the Security Lock-Up.

105.    David Ottensoser is a Platinum Defendant as well as a Beechwood Defendant.  He is a resident of Woodmere, New York.  At all relevant times, Ottensoser served as general counsel and Chief Compliance Officer for Platinum Management and PPVA.

106.    Ottensoser was one of the in house counsel responsible for documenting the transactions that comprised the First and Second Schemes and was actively involved in closing those transactions.

107. Ottensoser also was involved in creating Beechwood and worked as general counsel for Beechwood during its initial stages, providing legal services to Beechwood and PPVA even when both parties ostensibly were on opposite sides of a transaction.

108. In his capacity as general counsel of Platinum Management, PPVA and Beechwood, Ottensoser was aware of the conflicts between those entities and arising out of the transactions comprising the First and Second Schemes, and that PPVA's interests were being subordinated to those of Beechwood, the Preferred Investors of the BEOF Funds, PPCO and/or the counterparts in connection with the Security Lock Up.

109. As a member of the risk committee, Ottensoser was responsible for assessing the risk associate with PPVA's assets and investments, a significant issue in determining the value thereof.

110. Ottensoser was involved in every aspect of the First and Second Schemes, including, inter alia, (i) by using his position as a member of the risk committee to participate in the false inflation of the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive distributions, fees and other amounts to the Platinum Defendants; (ii) helping to orchestrate the Black Elk Scheme; (iii) helping to orchestrate the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of distributions, fees and other amounts to the Platinum Defendants, (iv) helping to orchestrate the series of transactions among PPVA, Beechwood and/or affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) assisting in the consummation of the transactions referred to herein as the Security Lock-Up.

111.    Bernard Fuchs, a/k/a Berish Fuchs, is a Platinum Defendant as well as a Preferred Investor of the BEOF Funds (defined below).   Bernard Fuchs is a resident of Lawrence, New York.

112.    Bernard Fuchs is the direct or indirect holder of ownership interests in Platinum Management.  As such, he personally benefitted from the inflated distributions, fees and other payments made by PPVA to Platinum Management as a result of the First and Second Schemes.

113.    Bernard Fuchs did not have an official title, but nevertheless had day to day involvement in the management and operations of Platinum Management and PPVA.

114.    Among other things, Bernard Fuchs was involved with meeting with and marketing to important investors, dealing with issues concerning liquidity and redemptions, and developing business and investment strategy for PPVA.

115.    Bernard Fuchs took part in meetings with attorneys, investors and investment partners related to the operation and management of PPVA and the transactions comprising the First and Second Schemes.  He also was aware of and participated in the planning, marketing and execution of various aspects of the transactions comprising the First and Second Schemes, such as marketing to the Preferred Investors of the BEOF Funds in connection with the Black Elk Scheme and assisting in the planning of the Agera Transactions.

116.    During late 2015 and the first quarter of 2016, Bernard Fuchs engaged in numerous discussions with investors seeking information concerning the status of PPVA, their investments and requests for redemption, often exchanging emails with Nordlicht, Bodner Huberfeld, Levy and/or  Landesman concerning the best response to those investor inquiries and/or forwarding on such inquiries.

117.    During his exchanges with investors, Bernard Fuchs misrepresented the financial status of PPVA and failed to provide information concerning PPVA's actual financial status, even encouraging investors to invest additional funds at a time when PPVA was unable to pay redemptions and potentially insolvent.

118.    In one email exchange during the last week of February 2016, Bernard Fuchs even berated an investor who suggested that it would be forced to send a letter to the SEC seeking an investigation as to why investors had not been paid for long outstanding redemption requests if those redemption requests were not honored, claiming that the letter had done damage to Platinum Management's business.  *See* Exhibit 2.

119.    On information and belief, Bernard Fuchs' misrepresentations and omissions delayed and or dissuaded investors from taking steps to contact authorities, which enabled the other Defendants to complete the various transactions comprising the March 2016 Restructuring, the Agera Transactions and the Security Lock-Up, to the detriment of PPVA.

120.    Defendant Ezra Beren is a Platinum Defendant as well as a Beechwood Defendant. He is a resident of New York, New York.  Beren is the son-in-law of Murray Huberfeld.

121.    From March 2007 until December 2015, Beren served as Vice President of Platinum Management.  In January 2016, Beren was hired by BAM (defined below) as a credit analyst.

122.    Due to his management role with Platinum Management and Beechwood, Beren was involved in the acts that comprise the First and Second Schemes, including the misrepresentation of PPVA's NAV, the creation of Beechwood and the series of transactions between Beechwood Entities and PPVA that are included in the Second Scheme.

123.     Beren was a portfolio manager for various PPVA investments and in that capacity participated in meetings of the valuation committee.  As such, he personally benefitted from the inflated asset values assigned to PPVA's assets by the Platinum Defendants, and from the inflated distributions, fees and other payments made to Platinum Management by PPVA.

124.     Beren also was engaged as a portfolio manager for BAM beginning in 2014, at the same time as he was working as a portfolio manager for PPVA.

125.     Defendant Naftali Manela is a Platinum Defendant as well as a Beechwood Defendant.  He is a resident of Brooklyn, New York.

126.     Manela worked interchangeably at Platinum Management and Beechwood, assisting the Defendants in orchestrating the First and Second Schemes, including the Black Elk Scheme and the Agera Transactions.

127.     Manela was a member of the valuation committee, and in that capacity was responsible for assessing the value of PPVA's assets.

128.     Manela was involved in every aspect of the First and Second Schemes, including, inter alia, (i) by using his position as a member of the valuation committee to participate in the false inflation of the value of PPVA's assets, particularly during the period from 2012 through 2016, in order to report information that resulted in PPVA's NAV being inflated and overstated during that period, causing PPVA to pay excessive distributions, fees and other amounts to the Platinum Defendants; (ii) helping to orchestrate the Black Elk Scheme; (iii) helping to orchestrate the series of transactions among PPVA and the Beechwood Entities designed to mask the inflation of PPVA's NAV and the overpayment of distributions, fees and other amounts to the Platinum Defendants, (iv) helping to orchestrate the series of transactions among PPVA, Beechwood and/or

affiliated entities in order to encumber or strip PPVA's remaining valuable assets; and (v) assisting in the consummation of certain of the transactions referred to herein as the Security Lock-Up.

129.     Michael Joseph Nordlicht is a Defendant and the nephew of Mark Nordlicht. Michael Nordlicht resides in West Hempstead, New York. In or about 2014, Mark Nordlicht installed Michael Nordlicht as in-house counsel for Agera Energy, LLC ("**Agera Energy**"), an energy reseller managed by Platinum Management as a joint investment by PPVA and PPCO. Prior to the Agera Transactions discussed below, Michael Nordlicht held a 95.01% indirect equity interest in Agera Energy.

130.     Michael Nordlicht participated in and helped facilitate the closing of the Agera Transactions, to the detriment of PPVA.

131.     Michael Katz ("**Katz**") is a Defendant and a resident of New York, New York.

132.     Katz is the grandson of Marcos Katz, a significant investor in PPVA.

133.     In 2015, Marcos Katz sought to redeem his investment in PPVA but there was not sufficient funds to honor this request.  Instead, Nordlicht, Huberfeld, Bodner and Fuchs offered Marcos Katz the opportunity to exchange his investment in PPVA for an interest in Platinum Management and certain other consideration.  As part of the proposed deal, Marcos Katz was offered the opportunity to appoint a representative to oversee his interests.

134.     Although a term sheet was prepared, final documents between and among Marcos Katz and the other members of Platinum Management apparently were never finalized.  Despite this, Michael Katz, Marcos Katz's grandson, began taking an active role at Platinum Management beginning in or about January 2016.

135.    Michael Katz knew Nordlicht, Levy, Huberfeld, Bodner and Fuchs before he began representing his grandfather's interests in 2016.  In fact, Katz and Levy previously had invested in an energy company that was merged into Agera in 2014, during the startup phase of that business.

136.    By March 2016, Katz began formally advising Platinum Management in connection with the Second Scheme, and, in particular, the Agera Transactions.  In March 2016, Katz conspired with Nordlicht, Levy and other Platinum Defendants to develop the plan to transfer PPVA's interest in Agera Energy to an "insider." Katz had knowledge of certain Second Scheme Transactions and exerted control over PPVA and its subsidiaries in connection with such Second Scheme Transactions.

137.    Kevin Cassidy ("**Cassidy**") is a Defendant and a resident of Briarcliff Manor, New York.

138.    In 2007, Optionable Inc., a fund co-founded by Cassidy and affiliated with Nordlicht, collapsed after Cassidy was arrested for deliberately misstating the value of Optionable, Inc.'s natural gas derivatives.  Cassidy, who had served two prior stints in prison, was sentenced to be incarcerated for 30 months.

139.    When Cassidy was released from prison in 2014, Nordlicht, Bodner and Huberfeld installed him as the *managing director* of Agera Energy.

140.    Starfish Capital, Inc. ("**Starfish**"), an entity created and controlled by Cassidy, was made a party to the Agera Transactions as a means of paying Cassidy millions of dollars out of the proceeds thereof for no apparent consideration.

141.    Cassidy had knowledge of certain Second Scheme Transactions and exerted control over PPVA and its subsidiaries in connection with such Second Scheme Transactions.

142.    Seth Gerszberg ("**Gerszberg**") is a Defendant and a resident of Englewood, New Jersey.  Beginning at the latest by about January 2016, Gerszberg served as an advisor to Platinum Management in connection with various PPVA investment positions and negotiations with PPVA's creditors.  Gerszberg orchestrated and executed certain of the transactions and transfers that comprise the Second Scheme, particularly the purported encumbrance of the debt position in Implant Sciences Corporation as well as the outflow of substantially all of PPVA's cash on hand immediately following the Agera Transactions. Gerszberg had knowledge of certain Second Scheme Transactions and exerted control over PPVA and its subsidiaries in connection with such Second Scheme Transactions.

143.    Defendant Platinum Partners Black Elk Opportunities Fund LLC ("**BEOF I**") is a Delaware limited liability company with its principal place of business in New York.  BEOF I is not a subsidiary of PPVA, but rather an investment vehicle for the Platinum Defendants and their preferred investors and creditors.  The Platinum Defendants used BEOF I to provide themselves and select insiders with the proceeds of the Renaissance Sale (defined below) to the detriment of PPVA.

144.    Defendant Platinum Partners Black Elk Opportunities Fund International Ltd. ("**BEOF II**" and together with BEOF I, the "**BEOF Funds**") is a limited company domiciled in the Cayman Islands with its principal place of business in New York.  BEOF II is not a subsidiary of PPVA, but rather an investment vehicle for the Platinum Defendants and their preferred investors and creditors.  The Platinum Defendants used BEOF II to provide themselves and select insiders with a majority of the proceeds of the Renaissance Sale to the detriment of PPVA.

145.    Defendants "**The Preferred Investors of the BEOF Funds**" are various individuals and entities, and their successors-in-interest and transferees (to be discovered), that

were direct or indirect investors in the BEOF Funds and received proceeds from the Renaissance Sale (defined below).  The Preferred Investors of the BEOF Funds were aware of the actions of the Platinum and Beechwood Defendants in furtherance of the Black Elk Scheme, as well as Beechwood's representations that it was unaffiliated with Platinum Management.

146.    The Preferred Investors of the BEOF Funds include the following persons and entities: (i) Morris Fuchs; (ii) Leon Meyers; (iii) Small; (iv) Levy; (v) MN Consulting NY LLC; (vi) Estate of Jules Nordlicht; (vii) Barbara Nordlicht; (viii) Estate of Solomon Englander; (ix) Estate of Gertrude Englander; (x) Rockwell Fulton Capital; (xi) Ditmas Park Capital, LP; (xii) Platinum FI Group LLC; (xiii) FCBA Trust; (xiv) Aaron Parnes; (xv) Sarah Parnes; (xvi) Shmuel Fuchs Foundation; (xvii) Solomon Werdiger; (xviii) Olive Tree Holdings LLC; (xix) Huang Lai Tsu Hsia; (xx) Huberfeld Family Foundation; (xxi) Mind, Body & Soul Co., Limited; (xxii) Twosons Corporation; (xxiii) GRD Estates Ltd.; (xxiv) Meadows Capital LLC; (xxv) Abraham C. Grossman; (xxvi) David Gichtin; (xxvii) Ora Gichtin; (xxviii) Golda Wilk; (xxix) Estate of Marcos Katz; (xxx) Adela Katz; and (xxxi) John Does 1-100.

147.    The Preferred Investors of the BEOF Funds are comprised of Platinum Defendants such as Levy and Small, as well as persons and entities who are friends and family of or otherwise personally or professionally connected to one or more of the Platinum Defendants.

148.    For example, Preferred Investors of the BEOF Funds Barbara Nordlicht and, before his death on or about August 3, 2018, Jules Nordlicht, are the parents of defendant Mark Nordlicht and grandparents of defendant Michael Joseph Nordlicht.

149.    Preferred Investors of the BEOF Funds Gertrude and Solomon Englander, both of whom have since passed away, were long term investors in funds managed by the Platinum Defendants.

36

150.    Preferred Investor of the BEOF Funds the Huberfeld Family Foundation is set up for the benefit of the family of defendant Murray Huberfeld.  The Huberfeld Family Foundation itself also appears to have had transactions/connections with certain of the other Preferred Investors of the BEOF Funds during the same time period, such as Aaron Elbogen.

151.    Preferred Investor of the BEOF Funds Morris Fuchs is the brother of defendant Bernard Fuchs and was a long term investor in various funds managed by the Platinum Defendants.

152.    Preferred Investor of the BEOF Funds the Shmuel Fuchs Foundation is set up for the benefit of the family of defendants Bernard Fuchs and Morris Fuchs.

153.    Preferred Investor of the BEOF Funds Leon Meyers is a long term investor in various funds managed by the Platinum Defendants who was a personal friend of both Nordlicht and Levy.

154.    On information and belief, Leon Meyers often had lunch and/or dinner with Levy or Nordlicht, and spent time with both men and their families away from the office during holidays and on weekends.

155.    Preferred Investor of the BEOF Funds MN Consulting NY LLC is an investment vehicle owned by Mark Friedman and Neil Einhorn, who are investors in a chain of nursing homes. On information and belief, Einhorn and Friedman both have known Huberfeld for many years. Einhorn is active in and a significant contributor to at least one charity in which Huberfeld serves as vice president.

156.    Preferred Investor of the BEOF Funds Solomon Werdiger is another close friend of Huberfeld.  On information and belief, Solomon Werdiger is active in and a significant contributor to one or more charities in which Huberfeld serves as vice president. He also was long term investor in various funds managed by the Platinum Defendants.

157.    On information and belief, Preferred Investor of the BEOF Funds Huang Lai Tsu Hsia is a personal client of defendant Bernard Fuchs.

158.    On information and belief, Preferred Investor of the BEOF Funds Olive Tree Holdings was a longtime client of Murray Huberfeld.  Huberfeld referred to Olive Tree as one of "my people" and its managing member, Avi Schron, routinely attended lunches with Huberfeld and Bodner and also is active in a religious/political group in which Huberfeld is active.

159.    On information and belief, Preferred Investor of the BEOF Funds FCBA Trust is a trust set up by Aaron and Chaya Elbogen, who are longtime friends of Bodner and Huberfeld as well as Manela.  The Elbogens and their various entities are long term investors in various funds managed by the Platinum Defendants.

160.    Notably, the SEC previously has charged Aaron Elbogen with aiding and abetting another fraudulent scheme.  In that case, the SEC alleged that Elbogen and others employed by Datek Securities and Securities Corp. manipulated NASDAQ's small order execution system during the period from 1993 through 2001.  Elbogen was chief executive officer of Datek, which was a day trading firm that subsequently sold its day trading business to Heartland, a registered broker dealer owned in part by Aaron Elbogen.  Elbogen and the other parties charged in the scheme settled the charges in 2003 and paid an aggregate of $70 million in fines and penalties, including $1.4 million by Elbogen personally.  Elbogen also agreed to an order barring him from associating with any broker or dealer, which remains in effect today.

161.    It should be noted that during 2014, the very same time that the Preferred Investors of the BEOF Funds received the proceeds of the Black Elk Renaissance Sale as a result of the Black Elk Scheme, Preferred Investor of the BEOF Funds the Huberfeld Family Foundation, Inc., a purported charitable foundation set up by defendant Huberfeld and his family, maintained two

separate loans, each in the amount of $1.5 million, to another trust apparently related to Aaron Elbogen (the Aaron Elbogen Irrevocable Trust). The two loans purportedly each bore interest at the astounding rate of 700%. A true and correct copy of the 2014 Tax Return for the Huberfeld Family Foundation is attached as **Exhibit 3**.

162. On information and belief, Preferred Investor of the BEOF Funds Platinum FI Group LLC, is a longtime client, and its principal, Mark (Moshe) Leben, is a close friend, of Huberfeld.

163. On information and belief, Preferred Investor of the BEOF Funds GRD Estates Ltd. is a longtime client of Huberfeld, and its principal, Gordon Diamond, is Huberfeld's close personal friend.

164. Preferred Investor of the BEOF Funds Meadows Capital LLC is an investment firm located in New Jersey and managed by Robert Cohn. Mr. Cohen was an acquaintance of Mr. Huberfeld, and held several meetings with Huberfeld and Bodner leading up to the Renaissance Sale.

165. Preferred Investor of the BEOF Funds Abraham C. Grossman is a long-term investor with Murray Huberfeld and Mark Nordlicht various funds, including the BEOF Funds and PPVA.

166. On information and belief, Preferred Investor of the BEOF Funds Golda Wilk is an investment manager located in Belgium. Ms. Wilk is one of the largest investors in the BEOF Funds, receiving a distribution of more than $4 Million in connection with the Renaissance Sale.

167. The late Marcos Katz, along with his wife, Adela Katz, are Preferred Investors of the BEOF Funds. Marcos Katz was a significant investor of the BEOF Funds, PPVA and other

funds managed by Nordlicht, Huberfeld and Bodner.  In March 2016, Marcos Katz was permitted to appoint Michael Katz at Platinum Management to directly oversee his investment with PPVA.

168.    Preferred Investor of the BEOF Funds Ora Gichtin is the sister of Mark Nordlicht. Along with her husband, David Gichtin, Ms. Gichtin was provided an interest in the BEOF Funds at the direction of Mark Nordlicht.

169.    On information and belief, Preferred Investor of the BEOF Funds Mind Body & Soul Co. Ltd. was a client of Huberfeld.  Mind Body & Soul Co. Ltd. was represented by its agent Ezra Erani, a close friend of Huberfeld, who arranged for Mind Body & Soul Co. Ltd. to invest in the BEOF Funds among other Platinum related investments.  Ezra Erani was invited to attend the celebrations following Huberfeld's daughter's wedding.

170.    On information and belief, Preferred Investor of the BEOF Funds Aaron Parnes and his wife Sarah also are clients of Murray Huberfeld and were referred to by him as among "his people."  They were long terms investors in various funds managed by the Platinum Defendants.

171.    On information and belief, Preferred Investor of the BEOF Funds Rockwell Fulton Capital, L.P. and Ditmas Park Capital L.P., both of which have common ownership, were clients of Nordlicht.

172.    Defendant Twosons Corporation ("**Twosons**") purports to be a foreign corporation authorized to do business in New York.  As a Preferred Investor of the BEOF Funds, Twosons received $15.4 million of proceeds from the Black Elk Renaissance Sale (defined below). Twosons and its principals the Harari family were good friends and clients of Huberfeld.

173.    Defendant Daniel Saks is a Beechwood Defendant and a resident of Teaneck, New Jersey.  Until 2014, Saks worked as a portfolio manager at Platinum Management.

174. During 2014, Saks began working at BAM, although he was still also working for PPVA/Platinum Management.

175. In late 2014, Daniel Saks replaced Levy as chief investment officer for BAM subsequent to Levy's return to Platinum Management, and later served as its President.

176. Saks routinely received and was involved in commenting on the third party valuation reports sent to BAM that included inflated valuations of the Beechwood transactions with PPVA.

177. Saks was instrumental to Beechwood's involvement in the First Scheme and Second Scheme discussed below, and acted as signatory on behalf of various Beechwood Entities in connection with several of the transactions among Beechwood Entities and PPVA. For example, Saks was involved in orchestrating the January 2015 Montsant transaction and executed the transaction documents on behalf of BAM. Saks similarly was involved in negotiating amendments to the Golden Gate Oil transaction documents.

178. Defendant Moshe M. Feuer is a Beechwood Defendant and a resident of Lawrence, New York. Feuer, Levy and Taylor were the original public face of Beechwood and, together with Nordlicht, Bodner and Huberfeld, founded the company. Feuer remained with Beechwood at all relevant times.

179. At all relevant times, Feuer (through trusts) owned common stock in various Beechwood Entities and had managerial authority over the Beechwood Entities. Feuer also acted as signatory for Beechwood as to certain transactions comprising the Second Scheme, such as the Nordlicht Side Letter.

180. Before establishing Beechwood, Feuer was the CEO of Marsh USA Inc. and had pre-existing relationships with Nordlicht, Huberfeld and certain other Platinum Defendants. Feuer

had long known the senior executives at Platinum Management, who were active in the same social community on New York's Long Island.  Feuer and Huberfeld served on the board of a charity together, and Feuer's sister went to the same school as Nordlicht.

181.   Feuer had knowledge of certain First Scheme Transactions and Second Scheme Transactions, and exerted control over PPVA and its subsidiaries in connection therewith.

182.   For example, Feuer was the person who witnessed Nordlicht's execution of the Nordlicht Side Letter.

183.   Defendant Scott Taylor is a Beechwood Defendant and a resident of New York, New York.  Taylor, Feuer and Levy founded Beechwood together with Nordlicht, Bodner and Huberfeld.  Taylor, Feuer and Levy were the original public face of Beechwood, and Taylor remained with Beechwood at all relevant times.

184.   At all relevant times, Taylor (through trusts) owned common stock in Beechwood and had managerial authority over the Beechwood Entities.

185.   Prior to forming Beechwood, Taylor had been an executive of Marsh & McLennan and COO for Merrill Lynch Wealth Management's Private Banking and Investments Group.

186.   Taylor had knowledge of certain First Scheme Transactions and Second Scheme Transactions, and exerted control over PPVA and its subsidiaries in connection therewith.

187.   Taylor, together with Levy, helped prepare the marketing documents by which various reinsurance clients were induced to invest funds with the Beechwood Reinsurance Companies, and which did not disclose the connections between the Beechwood entities and Platinum Management.

188.   On information and belief, Taylor and Feuer were involved in orchestrating the various transactions comprising the First and Second Schemes.

42

189.    Defendant Dhruv Narain is a Beechwood Defendant and a resident of Purchase, New York.

190.    Narain became a senior executive at BAM (defined below) and the Beechwood Entities (defined below) no later than January 2016, and was instrumental in the execution of certain transactions comprising the Second Scheme, including the March 2016 PPVA Restructuring (including execution of the Master Guaranty), the 2016 Montsant Transaction, matters involving PEDEVCO during 2016, and the Agera Transactions.

191.    Narain was one of the primary persons who orchestrated the terms of the March 2016 Transaction and the Agera Transactions, and exerted control over PPVA and its subsidiaries in connection therewith.

192.    Narain was aware of the true value of Agera, having obtained third party valuation reports about that company.

193.    Narain worked with Nordlicht, Levy, Steinberg, Ottensoser, Fuchs, Bodner, Huberfeld, Katz, Cassidy, Michael Nordlicht, Platinum Management and the Beechwood Defendants to transfer ownership and control of Agera to the Beechwood Entities, which were controlled and owned, at least in part, by Nordlicht, Bodner, Huberfeld and Levy.

194.    Defendant Beechwood Capital Group, LLC ("**Beechwood Capital**") is a Beechwood Entity and a New York limited liability company with its principal place of business in Lawrence, New York, at the same address as Feuer's principal residence.

195.    Defendant B Asset Manager LP ("**BAM I**") is a Beechwood Entity and a Delaware limited partnership, which had its principal place of business in New York, New York at all relevant times.   BAM I served as an investment advisor for Beechwood and its various investments.

43

196.     Defendant B Asset Manager II LP ("**BAM II**" and, collectively with BAM I, "**BAM**") is a Beechwood Entity and a Delaware limited partnership, which had its principal place of business in New York, New York at all relevant times.  BAM II served as an investment advisor for Beechwood and its various investments.  Nordlicht, Bodner, Huberfeld and Levy owned nearly 70% of the partnership interests in BAM.

197.     Defendant Beechwood Re Investments, LLC ("**Beechwood Investments**") is a Beechwood Entity and a Delaware limited liability company, which had its principal place of business in New York, New York at all relevant times.  Beechwood Investments was used as a vehicle by Nordlicht, Bodner and Huberfeld to purchase all the preferred shares in the Beechwood Reinsurance Companies.  The managing member of Beechwood Investments was N Management, LLC, a Nordlicht-controlled entity, and the other members of Beechwood Investments were entities owned or controlled by Nordlicht, Bodner, Levy or Huberfeld through various Beechwood Trusts.

198.     Defendant Beechwood Re Holdings, Inc. ("**Beechwood Holdings**") is a Delaware corporation and a Beechwood Entity.  Beechwood Holdings holds all the common stock of Beechwood Re Ltd.

199.     Defendant Beechwood Re Ltd. ("**Beechwood Cayman**") is a Beechwood Entity and a reinsurance company domiciled in the Cayman Islands, which had its principal place of business in New York, New York at all relevant times.  Nearly 70% of the common stock of Beechwood Re was held by various Beechwood Trusts created by Nordlicht, Bodner, Huberfeld and Levy.  Beechwood Investments, an entity owned and controlled by Nordlicht, Bodner Huberfeld and Levy through trusts, owned all preferred shares of Beechwood Re.

200.    Defendant Beechwood Bermuda International Ltd. ("**Beechwood Bermuda**" and, collectively with Beechwood Cayman, the "**Beechwood Reinsurance Companies**") is a Beechwood Entity and a reinsurance company domiciled in Bermuda which had its principal place of business in New York, New York at all relevant times.

201.    Defendant BAM Administrative Services LLC ("**BAM Administrative**") is a Beechwood Entity and a Delaware limited liability company which had its principal place of business in New York, New York at all relevant times.   BAM Administrative served as agent for the Beechwood Insurance Trusts and acts as agent and signatory on behalf of the Beechwood Reinsurance Companies in connection with certain transactions within the First and Second Schemes.

202.    Defendants BBLN-PEDCO Corp. and BHLN-PEDCO Corp. are special purpose vehicles (collectively, the "**Beechwood SPVs**") and Beechwood Entities that, at all relevant times, were managed by BAM Administrative and administered in New York, New York.

203.    Defendants BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub and BBIL ULICO 2014 Trust (collectively, the "**Beechwood Insurance Trusts**") are insurance trusts and Beechwood Entities that, at all relevant times, were managed by BAM Administrative and administered in New York, New York.

204.    Defendants Beechwood Trust Nos. 1 through 20 (each a "**Beechwood Trust**") are Beechwood Entities created in connection with transactions that occurred in New York, New York. The Beechwood Trusts were owned and controlled by Nordlicht, Bodner, Huberfeld and Levy through their families.   The Beechwood Trusts owned approximately 70 percent of the common stock of Beechwood Cayman.

205.    Each of the Beechwood Trusts is an alter ego of its respective direct or indirect owner, having been dominated and controlled by Nordlicht, Bodner, Huberfeld and Levy for the purpose of concealing their ownership and control of the Beechwood Entities.

206.    Defendants Beechwood Re Investments, LLC Series A through Beechwood Re Investments, LLC Series I (each a "**Beechwood Series**", and together with Beechwood Capital, Beechwood Holdings, BAM, Beechwood Investments, Beechwood Cayman, BAM Administrative, Beechwood Bermuda, the Beechwood Insurance Trusts, the Beechwood SPVs and the Beechwood Trusts, the "**Beechwood Entities**") are Beechwood Entities and Delaware limited liability companies which had their principal place of business in New York, New York at all relevant times.

207.    The Beechwood Series were owned and controlled by Nordlicht, Bodner, Huberfeld and Levy through their families.  The Beechwood Series owned all of the membership interests in Beechwood Investments, which owned all of the preferred stock in Beechwood Re.

208.    Each of the Beechwood Series is an alter ego of its respective direct or indirect owner, having been dominated and controlled by Nordlicht, Bodner, Huberfeld and Levy for the purpose of concealing their ownership and control of the Beechwood Entities.

209.    Defendant Illumin Capital Management LP is a Beechwood Defendant and a Delaware limited partnership, which had its principal place of business in New York, New York at all relevant times.  On information and belief, Illumin is owned and control by Dhruv Narain, who joined Beechwood in January 2016.  Illumin acted as an investment advisor to Beechwood during the course of the Second Scheme.

## <u>JURISDICTION AND VENUE</u>

210.    This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1334 and 1367.

46

211.    Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1391 and 1409.

212.    This court has personal jurisdiction over each of the Defendants because they: (i) are a citizen otherwise domiciled in the United States; (ii) are authorized to do business in the United States; (iii) have transacted business in the United States, including the State of New York, with respect to certain of the agreements and other matters at issue in this case and have consented to the jurisdiction of the state and federal courts in New York, New York to resolve any disputes arising out of such agreements; or (iv) have committed tortious acts within the United States, including within the State of New York.

**FACTUAL BACKGROUND**

**A.    The PPVA Investment Structure**

213.    PPVA was formed in 2003.  It was marketed as a multi-strategy hedge fund.

214.    At the time its insolvency proceeding was commenced, PPVA was operating pursuant to a Second Amended and Restated Limited Partnership Agreement, dated July 1, 2008, registered with the Cayman Islands Registrar of Exempted Limited Partnerships (the "**PPVA Partnership Agreement**").  A true and correct copy of the PPVA Partnership Agreement is attached hereto as **Exhibit 4.**

215.    The PPVA Partnership Agreement provides that Platinum Management is the general partner and certain Feeder Funds (defined below) are the limited partners of PPVA.

216.    Platinum Partners Value Arbitrage Fund (USA) L.P. (the "**Onshore Feeder Fund**") is a limited partner under the PPVA Partnership Agreement, with investors within the United States serving as limited partners of the Onshore Feeder Fund.

217.    Platinum Partners Value Arbitrage Fund (International) Limited (in official liquidation) (the "**Offshore Feeder Fund**") served as the vehicle to attract offshore investors and served as a limited partner of PPVA until June 22, 2010, when the Offshore Feeder Fund ceased

to be a limited partner of PPVA and Platinum Partners Value Arbitrage Intermediate Fund Ltd. (in official liquidation) (the "**Intermediate Offshore Feeder Fund**" and, collectively with the Offshore Feeder Fund and the Onshore Feeder Fund, the "**Feeder Funds**") took its place as a limited partner of PPVA.

218.    The Feeder Funds and PPVA form a master/feeder investment fund structure typical of Cayman Islands-based funds whereby:

- offshore and U.S. tax-exempt investors invested in the Offshore Feeder Fund, which in turn invested in the Intermediate Offshore Feeder Fund, which in turn invested in PPVA;

- onshore investors invested in the Onshore Feeder Fund, which in turn invested in PPVA;

- the investment activities of the Offshore Feeder Fund, the Onshore Feeder Fund and PPVA were managed by Platinum Management in its separate capacity as a General Partner of PPVA and as investment manager, appointed pursuant to the terms of the Investment Management Agreement (defined below);

- PPVA was marketed to these investors as a multi-strategy hedge fund that sought to achieve significant returns while attempting to minimize downside risk; and

- PPVA's operations were managed by Platinum Management from its offices in New York, New York.

219.    From February 22, 2006 until June 15, 2016, two employees of DMS Offshore Investment Services, David Bree and Don Seymour (the "**DMS Directors**") served as directors for the Offshore Feeder Fund and Intermediate Offshore Feeder Fund (together, the "**Offshore Funds**"), which were limited partners under the PPVA Limited Partnership Agreement.

220.    Landesman served as a director for the Offshore Feeder Fund and Intermediate Offshore Feeder Fund until April 15, 2015, at which time he was replaced by Nordlicht.

221.    The DMS Directors regularly attended and participated in board meetings for the Offshore Funds, which were limited partners of PPVA, at which (i) the financial condition of

PPVA was discussed; and (ii) representatives of Platinum Management confirmed that it was abiding by all applicable requirements set forth in the governing documents of PPVA and the Feeder Funds, including the Private Placement Memoranda (collectively, the "**PPMs**") and applicable law.

222.    The approval of the DMS Directors was required for certain transactions entered into and disclosures made by PPVA.

223.    The DMS Directors notified the Platinum Defendants of their resignation as directors of the Offshore Funds, effective as of June 15, 2016.

**B.      Platinum Management as General Partner**

224.    Platinum Management is a Delaware limited liability company organized on or about August 22, 2001.  A true and correct copy of the January 1, 2011 Second Amended and Restated Operating Agreement for Platinum Management is attached hereto as **Exhibit 5.**

225.    In addition to being the general partner of PPVA at all relevant times, Platinum Management managed several other funds, including PPCO and Platinum Partners Liquid Opportunities Fund L.P. ("**PPLO**").

226.    The founders and, at certain times, owners of Platinum Management included Nordlicht, Huberfeld and Bodner and various trusts and entities for which they held a direct or indirect beneficial interest.

227.    Landesman and Fuchs were also managers of and holders of membership interests in Platinum Management.

228.    Upon information and belief, Levy held membership interests in Platinum Management.

229.    Platinum Management and the individual Platinum Defendants operated out of various locations in New York, New York.  From 2012 until the date of the Indictment (defined

below), the office of Platinum Management and the Platinum Defendants was located at 250 West 55th Street, 14th Floor, New York, NY 10019.

230.    Section 2.02 of the PPVA Partnership Agreement provides that "the management of the Partnership shall be vested exclusively in the General Partner" *i.e.*, Platinum Management.

231.    According to Section 1.06 of the PPVA Partnership Agreement, the "Purposes of the Partnership" are "realizing capital appreciation by investing and trading in U.S. and non-U.S. Securities . . . and to engage in all activities and transactions as the General Partner [Platinum Management] may deem necessary or advisable in connection therewith, including, without limitation:"

> (i) to invest on margin, to engage in short sales and option writing, to enter into repurchase agreements and reverse repurchase agreements or to engage in such other investment techniques as the General Partner believes to be appropriate;

> (ii) to purchase, hold, sell, exchange, transfer and otherwise acquire and dispose of and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Securities and other property, funds or rights held or owned by the Partnership including, without limitation, such property, funds or rights which constitute non-traditional investment instruments;

> (iii) to allocate and invest discrete segments of the Partnership's assets to entities managed by others ("Portfolio Entities") and, pursuant to agreements granting trading authority over the segments of the Partnership's assets, to investment managers selected by the General Partner ("Managed Accounts"); provided, that the General Partner shall be responsible for monitoring the trading activities of the Partnership, the Portfolio Entities and the Managed Accounts;

> (iv) to borrow or raise moneys, and to issue, accept, endorse and execute promissory notes and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of such or other obligations of the Partnership by hypothecation or pledge of all or part of the property of the Partnership, whether at the time owned or thereafter acquired;

> (v) to engage personnel, including Affiliates (as defined in Section 2.05) of the General Partner, whether part-time or full-time, and do such other acts as the General Partner may deem necessary or advisable in connection with the maintenance and administration of the Partnership; and

(vi) to engage attorneys, independent accountants, consultants, investment managers, investment advisors, traders or such other persons as the General Partner may deem necessary or advisable.

232.    As General Partner, Platinum Management was responsible for allocating Net Capital Appreciation and Net Capital Depreciation to the accounts of all partners, and for calculating PPVA's NAV.  *See* PPVA Partnership Agreement at Sections 3.05, 3.06.

233.    Although the PPVA Partnership Agreement made Platinum Management responsible for calculating PPVA's NAV, it provided criteria as to how NAV must be calculated:

(i) *Listed Securities*.  Freely marketable Securities listed or admitted to trading on any U.S. or non-U.S. stock exchange or the U.S. NASDAQ National Market System or comparable non-U.S. market system ("NMS") shall be valued (A) at the last reported sale price of the Security on the primary stock exchange or the NMS, as the case may be, on the date of determination, or in case there shall have been no sale of such security on such date, then (B) at the mean between representative "bid" and "asked" prices for such security on such exchange or the NMS at the close of business on the date of determination, or if no such "bid" and "asked" prices are reported on such date, then (C) at the last reported sale or mean between representative "bid and "asked" price within the five-day period preceding such date; or, if neither such last sale price nor "bid" and "asked" prices are reported during such period, then (D) at such price as the General Partner deems to be fair market value.

(ii) *Unlisted Securities*. Freely marketable Securities traded over-the-counter or on another dealer market shall be valued (A) at the "last sale" price as reported by the National Association of Securities Dealers Automated Quotation System ("NASDAQ") or other primary U.S. or non-U.S. quotation system as of the date of determination or, if no such price is reported for such date, then (B) at the mean between representative "bid" and "asked" prices at the close of business on the date of determination, as reported in NASDAQ or such other system (or, if not so reported, then as reported by a recognized quotation service); or, if no such price is reported on such date, then (C) at the "last sale" or mean between representative "bid" and "asked" prices so reported within the five-day period preceding such date; or, if neither such "last sale" price nor such "bid" and "asked" prices are reported during such period, then (D) at such price as the General Partner deems to be fair market value.

(iii) *Restricted Securities*. All Securities which are not freely marketable by reason of legal restrictions ("Restricted Securities"), if readily and immediately convertible into or exercisable for freely marketable Securities, shall be valued on the basis applicable to such underlying Securities, reduced by the applicable conversion or exercise price, as the case may be, and all other Restricted Securities will be valued at their fair value, on the basis of the last representative sale price of similarly restricted Securities, or if no such sale price is available, then at such price as the General Partner deems to be fair value.

(iv) *Short Positions*. Securities held short by the Partnership will be valued as respectively provided in (i), (ii) or (iii) hereof, as applicable. The value of Securities held short by the Partnership shall be treated as a liability of the Partnership and, together with the amount of any margin or other loans on account thereof, shall be subtracted from the Partnership's assets in determining net assets of the Partnership.

(v) *Options*. Options for the purchase or sale of Securities will be valued as respectively provided in (i), (ii), (iii) or (iv) hereof, as applicable, except that options listed on an exchange will in any event be valued at the mean between the representative "bid" and "asked" prices at the close of business on the date of determination. Premiums from the sale of options written by the Partnership shall be included in the assets of the Partnership and the market value of such options shall be included as a liability of the Partnership.

(vi) *Dividends*. Dividends declared but not yet received, and rights in respect of Securities which are quoted ex-dividend or ex-rights, shall be included at the fair value thereof, less any applicable taxes thereon, as determined by the General Partner, which may, but need not, be the fair market value so determined on the day the particular Securities are first quoted ex-dividend or ex-rights.

(vii) *Commodity Interests*. Positions in commodities, commodity futures contracts, options on such futures contracts or other interests in commodities traded on an exchange, through a clearing firm or a bank or other financial institution shall be valued at their most recent settlement price, or closing market quotation, as appropriate, on the applicable exchange or with such firm or institution on the applicable determination date. If such contract cannot be liquidated, due to the operation of daily limits or otherwise, as of such determination date, the liquidating value on the first subsequent day on which the contract would be liquidated may be used or such other value as the General Partner may deem fair and reasonable.

(viii) *Cash Items*. Short-term money market instruments and bank deposits shall be valued at cost (together with accrued and unpaid interest) or market, depending on the type of investment, as the General Partner shall deem appropriate.

(ix) *Assets Allocated to Portfolio Managers*. All assets of the Partnership that are allocated to an independent portfolio manager (through a Portfolio Entity or Managed Account) for management shall be valued by the portfolio manager at their market value.

(x) *Other Assets*. The value of any other assets of the Partnership (or the value of the assets mentioned in this subsection (a) in situations not covered thereby, or in the event of any other happening determined by the General Partner in its discretion to make another method of valuation advisable) shall be their fair value, determined in such manner as may be selected from time to time by the General Partner in its discretion. All values assigned to assets by the General Partner pursuant to this Article III shall be final and conclusive as to all of the Partners.

*See* PPVA Partnership Agreement at Section 3.06.

234.     PPVA was required to reimburse Platinum Management for any expenses it incurred on its behalf in its capacity as General Manager, including overhead/salaries.  *See* PPVA Partnership Agreement at Section 2.09.

235.     The partners of PPVA, including Platinum Management, also were entitled to distributions from their capital accounts as determined by the General Partner, Platinum Management.  *See* PPVA Partnership Agreement at Article 4.

236.     Platinum Management, PPVA and the Feeder Funds also were parties to that certain investment management agreement initially dated as of March 9, 2007 (as at any time amended and restated, the "**Investment Management Agreement**").  In addition to any fees and capital amounts due to it as General Partner, Platinum Management charged PPVA certain management and incentive fees in its capacity as investment manager, calculated using as their base the NAV of the realized and unrealized value of PPVA's assets.  *Id*.

237.     Between January 1, 2013 and August 23, 2016, PPVA paid the Platinum Defendants, either directly or indirectly, distributions and/or fees totaling at least $95,112,245.00, based on the Platinum Defendants' calculation of PPVA's purported net asset value.

**C.     Platinum Defendants' Valuation and Risk Assessment Process
         and Representations Concerning Investments and NAV**

238.     At all relevant times, Platinum Management maintained a valuation committee and a risk committee to assess the value of and risk associated with PPVA's investments.

239.     The members of the valuation and risk committees shifted over time as personnel changes occurred.

240.     Nordlicht and SanFilippo were members of the valuation committee throughout the relevant period.  Landesman was a member of the valuation committee until he resigned as President of Platinum Management in April 2015.  Levy, Steinberg and Manela also were

members of the valuation committee.

241.    Nordlicht and Ottensoser were members of the risk committee. Landesman was a member of the risk committee until he resigned as President of Platinum Management in April 2015. Steinberg was a member of the risk committee and later became co-chief risk officer.

242.    The portfolio managers, such as Small, Beren, Levy and Steinberg also contributed to valuation and risk determinations.

243.    On information and belief, Huberfeld, Bodner and Fuchs also had input into determinations as to the value of and risk associated with PPVA's investments.

244.    In addition to the valuation and risk committees, which met periodically, SanFilippo, Nordlicht and other Platinum Management staff routinely communicated valuation information to PPVA's external fund administrator, SS&C Technologies, Inc., which, in turn would use that information to perform the calculations necessary to prepare PPVA's monthly NAV statements.

245.    During the period from 2012 through 2015, the Platinum Defendants reported to PPVA that it had annualized returns of 11.58% (2012) to 8.76% (2015), with the lowest annualized return during that time period being 7.11% for FY 2013. *See* Platinum Management's March 2016 Tear Sheet for PPVA, a true and correct copy of which is attached as **Exhibit 6**.

246.    PPVA further reported to PPVA that PPVA had a return of 2.6% for the first three months of 2016, and a cumulative return since PPVA's inception of 687.40%. *Id.*

247.    The Platinum Defendants represented to PPVA that the value of PPVA's assets under management had increased steadily from $688 million on January 1, 2012 to $789 million as of October 1, 2015. *See* September 2015 Due Diligence Questionnaire ("**DDQ**"), a true and correct copy of which is attached as **Exhibit 7**.

248.    The Platinum Defendants paid themselves distributions, fees and other compensation based on these reported financial results.

249.    The Platinum Defendants were required to manage PPVA as a liquid fund.

250.    The PPMs for the Feeder Funds, consistent with their respective limited partnership agreements and governing articles, set out a fixed, orderly redemption process for all investors:  quarterly redemptions, upon 60 or 90 days' advance notice (depending on the version of the PPM), with the fund "intend[ing] to pay" to the investor at least 90% of the amount requested within 30 days, with the remaining 10% potentially held back for completion of the fund's audit.  A true and correct copy of a November 2012 PPM for the Offshore Feeder Fund is attached hereto as **Exhibit 8**.

251.    The Platinum Defendants represented to PPVA that PPVA's investments would be and were allocated across a variety of different investment strategies, including short-term relative value, event-driven, and asset-based finance.  *See* September 2015 Due Diligence Questionnaire.

252.    A December 2015 Presentation created by the Platinum Defendants stated that the Platinum Defendants would cause PPVA to target "30% risk allocation to short term trading and relative value strategies, 30% to event driven strategies and 40% to asset based finance strategies."  A true and correct copy of the December 2015 Presentation is attached hereto as **Exhibit 9**.

253.    The September 2015 DDQ stated, in part:

How long does it take to exit the most liquid positions in the portfolio?

The Fund's most liquid positions could, under normal market conditions, typically be liquidated in less than a week, including assets in the Energy and Power Arbitrage, Long/Short Fundamental Equity, Event Driven, Quantitative and Asia Based Arbitrage strategies.

*See* September 2015 DDQ at p. 17.

254.     According to the Platinum Defendants' representations, investments in the listed liquid investment strategies represented as much as 61% of PPVA's portfolio.  *See* March 2016 Tear Sheet at p. 2.

255.     As the general partner and/or the persons or entities who exercised day-to-day management over PPVA, its subsidiaries and its assets, the Platinum Defendants had fiduciary duties of due care and loyalty to PPVA and were obligated to manage and operate PPVA in good faith, in accordance with its operating documents.  Those fiduciary duties included investing PPVA's assets in accordance with PPVA's investment parameters, assessing the net value of its assets at their market or fair value (depending on the asset), maintaining adequate liquidity, not acting in their own interests to the detriment of the interests of PPVA, not paying themselves unearned fees and stripping or causing liens to be placed on PPVA assets for the benefit of themselves, the Beechwood Defendants, PPCO and other "friends and family."

256.     Instead, the Platinum Defendants reneged on their obligations and breached their duties of due care and loyalty to PPVA, and acted in bad faith and with blatant disregard for the terms of PPVA's operating documents.

257.     The Beechwood Defendants, together with Defendants Katz, Gerszberg, Cassidy, the BEOF Funds and the Preferred Investors of the BEOF Funds, among others, materially and knowingly aided and abetted the Platinum Defendants' breach of their fiduciary duties to PPVA.

D.     **The Collapse and Liquidation of PPVA**

258.     By December 2015, cash redemption payments to PPVA's investors had ceased, with the notable exception of select redemption payments to insiders of Platinum Management and the Defendants.

56

259.    During the first six months of 2016, PPVA's financial condition continued to worsen.   PPVA was unable to comply with its ongoing obligations to its investments, which caused the value of those investments to deteriorate significantly.   It also faced numerous demands and lawsuits from creditors.

260.    For example, on January 8, 2016, Levy received an email from the operator of Desert Hawk Gold Corp. ("**Desert Hawk**") – a gold mining operation and a company in which a PPVA subsidiary had invested – claiming that Desert Hawk was "an absolute living hell … It is not possible to run … without proper capitalization."   A true and correct copy of the January 8, 2016 Desert Hawk email is attached hereto as **Exhibit 10**.

261.    On February 18, 2016, a Desert Hawk representative emailed Levy that the company could not complete its audit because of insufficient funding.   A true and correct copy of the February 18, 2016 Desert Hawk email is attached hereto as **Exhibit 11.**

262.    Likewise, PPVA repeatedly failed to meet its lending obligations to Urigen Pharmaceuticals, Inc. ("**Urigen**"), a pharmaceutical startup in which it had invested.

263.    In a series of emails from March 29-April 1, 2016, the president of Urigen informed Nordlicht and Levy that, as a result of PPVA's failure to provide the agreed-upon financing, Urigen had missed payroll and monthly overhead and had failed to pay creditors.   True and correct copies of the Urigen emails are attached hereto as **Exhibit 12.**

264.    Similarly, on June 15-22, 2016, a Platinum Management representative exchanged a series of email with a representative of Golden Gate Oil (an investment marketed at various times as worth more than $100 million according to the Platinum Defendants), whereby Golden Gate Oil complained that, due to PPVA's inability to fund working capital, Golden Gate Oil was unable to meet payroll expenses for the second month in a row.   True and correct copies of the

Golden Gate Oil emails are attached hereto as **Exhibit 13.**

265.    PPVA's financial distress was exacerbated by the events of June 2016, which culminated in the commencement of the Cayman Liquidation.

266.    On June 8, 2016, the United States Attorney's Office for the Southern District of New York filed criminal charges against Huberfeld in connection with a bribery scheme by which Huberfeld used PPVA funds to pay kickbacks to a New York City Correction Officer's Union official (the "**Huberfeld Arrest**").

267.    On June 14, 2016, Nordlicht announced on an investor call that Platinum Management had decided that PPVA would stop taking in new investors and all PPVA investments would be unwound and liquidated.  Attached hereto as **Exhibit 14** is a true and correct copy of Nordlicht's June 30, 2016 letter to investors, confirming the suspension of NAV reporting for PPVA and the Feeder Funds.

268.    Following Nordlicht's announcement that PPVA would be liquidated, PPVA's brokerage firms began to declare events of default, made margin calls, demanded additional collateral, and sought the immediate unwinding of their relationships with PPVA.

269.    On or about June 22, 2016, the Federal Bureau of Investigation executed a search warrant at Platinum Management's offices in connection with a broad, multi-agency federal investigation of PPVA's business practices (the "**Search Warrant**").

270.    On July 8, 2016, when PPVA was facing margin calls by its securities transaction counterparties, PPVA had less than $100 cash on hand.  Attached as **Exhibit 15** is a true and copy

of an email from Mark Nordlicht containing Platinum Management's July 8, 2016 cash report for PPVA.

271. On July 28, 2016, Parris Investment Limited, an investor in the Offshore Funds, filed an involuntary petition against the Offshore Feeder Fund in the Grand Court of the Cayman Islands (the "**Grand Court**"), seeking commencement of an involuntary liquidation proceeding and appointment of the JOLs' predecessors as joint official liquidators for the Offshore Feeder Fund.

272. On August 23, 2016, the Grand Court entered a winding up order, commencing the liquidation of the Offshore Feeder Fund and appointing Christopher Kennedy and Matthew Wright as joint official liquidators.

273. On August 23, 2016, Platinum Management, as general partner of PPVA, filed a voluntary petition seeking the liquidation of PPVA and the appointment of Christopher Kennedy and Matthew Wright as joint provisional liquidators (the "**Cayman Petition**"). A true and correct copy of the Cayman Petition is attached hereto as **Exhibit 16.**

274. Accompanying the Cayman Petition was the August 23, 2016 Second Affidavit of Mark Nordlicht (the "**Nordlicht Affidavit**"). A true and correct copy of the Nordlicht Affidavit is attached hereto as **Exhibit 17.**

275. In the Nordlicht Affidavit, Nordlicht states that the value of PPVA's assets as of August 23, 2016 is approximately $1.1 billion, provided that PPVA was able to wind down its operations in the ordinary course of business pursuant to a proposed restructuring plan. *See* Nordlicht Affidavit at ¶ 33.

276. On August 25, 2016, the Grand Court entered an order (the "**August 25, 2016 Order**") directing the provisional liquidation of PPVA and appointing Matthew Wright and

Christopher Kennedy as its joint provisional liquidators (the "**Cayman Liquidation**").  A true and correct copy of the August 25, 2016 Order is attached hereto as **Exhibit 18.**

277.    After their appointment as liquidators for PPVA, Messrs. Wright and Kennedy began learning that Nordlicht's assertions as to the value of PPVA's assets were false and that there would be insufficient funds coming in from PPVA's investments to fund the restructuring plan proposed in the Nordlicht Affidavit.

278.    Messrs. Wright and Kennedy also learned that significant claims would be made against PPVA in connection with the Black Elk Scheme and the acts of the Platinum Defendants and Beechwood Defendants, but did not have full access to PPVA's documents and records, so as to learn the extent of the schemes, until the Spring of 2018.

279.    On October 26, 2016, the litigation trustee for the Black Elk bankruptcy estate (the "Black Elk Trustee") filed an adversary complaint against, among others, PPVA, seeking recovery of more than $90 million in fraudulent transfers in connection with the Black Elk Scheme and other relief, in a case styled, *Schmidt v. Platinum Partners Value Arbitrage Fund LP et al.*, Adv. No. 16-03237, pending in the United States Bankruptcy Court for the Southern District of Texas (the "**Black Elk Adversary Complaint**").

280.    On October 18, 2016, the predecessors of the JOLs filed petitions and accompanying Declarations of Christopher Kennedy (respectively, the "**Chapter 15 Petitions**" and "**Kennedy Chapter 15 Declarations**") seeking recognition of the Cayman liquidations of PPVA and the Offshore Feeder Fund as foreign main proceedings and the JOLs as foreign representatives and certain other relief under chapter 15 of the Bankruptcy Code (the "**Chapter 15 Bankruptcy**") in the United States Bankruptcy Court for the Southern District of New York, jointly administered as Case No. 16-12925 (the "**Chapter 15 Court**").

281.    On October 27, 2016, the Grand Court entered an order directing that PPVA's Cayman Liquidation be converted to an official liquidation and, after determining that PPVA and the Offshore Feeder Fund should not share the same liquidators, appointing Messrs. Wright and Kennedy as Interim Joint Official Liquidators until a final hearing in December 2016 (the "**October 27, 2016 Order**").  A true and correct copy of the October 27, 2016 Order is attached hereto as **Exhibit 19**.

282.    On November 23, 2016, the Chapter 15 Court entered an order recognizing the Cayman Liquidation and Messrs. Kennedy and Wright as a foreign main proceeding, and as foreign representatives, respectively, pursuant to 11 U.S.C. 1501 *et seq.* (the "**Chapter 15 Recognition Order**").  A true and correct copy of the Chapter 15 Recognition Order is attached hereto as **Exhibit 20**.

283.    On December 16, 2016, the Grand Court entered an order appointing Messrs. Wright and Kennedy as Joint Official Liquidators of PPVA the (the "**December 16, 2016 Order**").  A true and correct copy of the December 16, 2016 Order is attached hereto as **Exhibit 21**.  In connection with their appointment as Joint Official Liquidators, Messrs. Wright and Kennedy resigned as liquidators of the Offshore Feeder Fund.

284.    Martin Trott and Christopher Smith are the current Joint Official Liquidators of PPVA.  Attached hereto as **Exhibit 22** are true and correct copies of Orders entered by the Grand Court reflecting: (i) the September 29, 2017 appointment of Martin Trott and corresponding release of Matthew Wright as a Joint Official Liquidator; and (ii) the July 6, 2018 appointment

of Christopher Smith and corresponding release of Christopher Kennedy as a Joint Official Liquidator.

285.    On December 19, 2016, a Grand Jury for the Eastern District of New York returned a criminal indictment, pending as Case No. 16-cr-00640, against, among others, Nordlicht, Levy, Landesman and Small, stating charges including Securities Fraud, Investment Advisor Fraud and Wire Fraud (the "**Indictment**").

286.    On December 19, 2016, the Securities and Exchange Commission filed a parallel civil action against, among others, Nordlicht, Levy, Small, Landesman and Platinum Management (the "**SEC Action**"), in the United States District Court for the Eastern District of New York as Case No. 16-cv-06848, alleging civil damages for violations of, among other things, the Investment Advisors Act of 1940, 15 U.S.C.§ 80b-1 *et seq.*, the Securities Act of 1933, 15 U.S.C. § 77a *et seq*. and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*.  A true and correct copy of the December 19, 2016 civil complaint filed by the Securities and Exchange Commission is attached hereto as **Exhibit 23**.

287.    Since their appointment, the JOLs have continued their investigation into the assets and liabilities of PPVA, and have been engaged in the process of liquidating PPVA's assets.

288.    Among other things, as of the date of this complaint, the JOLs have realized $73,719,174 in connection with the liquidation of PPVA and its subsidiaries, and estimate that the gross, total realization in connection with PPVA's assets will be between $75,719,174 and $88,294,174, less encumbrances, claims, fees and litigation claims to the recovery – at the subsidiary level – and not including any amounts recovered as a result of litigation against third parties commenced by the JOLs.

289.   The aggregate amount of proofs of debt filed in the Cayman Liquidation is $1,156,949,339, with at least $132,000,000 of such debt being on account of purported secured creditors.

290.   The aggregate amount of proofs of debt filed in the Cayman Liquidation by parties affiliated with Beechwood is $79,146,350.64.

291.   On November 20, 2018, the Grand Court entered an Order permitting the JOLs to file this complaint against the Defendants ("**Sanction Order**").

### E.   Concentration in Illiquid Investments

292.   By about the end of 2012, the Platinum Defendants' statements to PPVA concerning the amount of and purported growth in PPVA's NAV, as well as their claims regarding the allocation of PPVA's investments and the liquidity thereof were false.

293.   Notwithstanding the representations made to PPVA, the Platinum Defendants had concentrated PPVA's investments in certain highly illiquid investments, including equity and debt positions in start-up companies, many of which were not publicly traded.

294.   As of December 31, 2012, approximately 37-43% of PPVA's reported NAV consisted of its investments in Black Elk and Golden Gate Oil.  A true and correct copy of selected portions of the 2012 4th Quarter Valuation Report commissioned by Platinum Defendants and prepared by Sterling Valuation Group, Inc. is attached hereto as **Exhibit 24.**

295.   Under the terms of the PPVA Partnership Agreement, the value of assets of the partnership for which a valuation method was not prescribed or where the Platinum Management believed other methods were advisable, was to be their "fair value" as determined in Platinum Management's discretion.  *See* PPVA Partnership Agreement at Section 3.06(x).

296.    PPVA's PPMs required that the Platinum Defendants exercise their discretion in determining net asset value so that the results represent "fair value."  *See* November 2012 PPM for the Offshore Feeder Fund.

297.    The Platinum Defendants stated in its DDQs that valuations of PPVA's assets were verified and finalized by an internal valuation committee.  *See* September 2015 DDQ, at p. 26.

298.    The Platinum Defendants, however, routinely engaged in the practice of adjusting NAV subsequent to valuation committee meetings, in order to continue the illusion of a steadily increasing NAV, in order to award themselves fees.  For example, attached as **Exhibit 25** is a true and correct copy of a January 21-22, 2015 email exchange among Platinum Management employees discussing Nordlicht's readjustment of NAV subsequent to a valuation committee meeting.

## F.    **Misrepresentation of PPVA's NAV in the Wake of the Black Elk Explosion**

299.    As of the fourth quarter of 2012, PPVA's investment in Black Elk was its single biggest position.

300.    As noted above, the Black Elk Explosion occurred in November 2012.  The Black Elk Explosion caused the deaths of Black Elk employees and a serious devaluation in PPVA's investment in Black Elk.

301.    In the wake of the Black Elk Explosion, Black Elk faced increasing liquidity problems throughout 2013.

302.    Nevertheless, the Platinum Defendants actually increased their valuation of PPVA's investment in Black Elk during this same period.

303.    At the time of the Black Elk Explosion, approximately 40% of PPVA's total portfolio was worth significantly less than reported to PPVA by the Platinum Defendants, and

the remaining "assets" were speculative and early-stage investments that would have required significant capital unavailable to PPVA for any hope of profitability.

304.    Instead of winding down in the face of these events, the Defendants conceived and executed the First Scheme and then the Second Scheme to award fees to Platinum Defendants and eventually to strip PPVA of its remaining valuable assets.

305.    Keeping a substantial majority of PPVA's assets concentrated in illiquid positions, most of them categorized for accounting purposes as "Level 3" assets[3] that were not publicly traded and for which there were no readily available market prices, enabled the Platinum Defendants to retain control over how those assets would be valued for purposes of determining PPVA's NAV.

306.    The Platinum Defendants' control over the valuation of PPVA's illiquid positions in turn enabled them to ensure that PPVA's performance, which was largely composed of unrealized gains, steadily increased, thereby ensuring that there would always be distributions and fees due to Platinum Management and its members, Nordlicht, Bodner, Huberfeld, Landesman, Fuchs and Levy, and bonuses due and payable to the individuals, such as David Levy, Dan Small, David Steinberg, Ezra Beren and others whose compensation was directly tied to such increases.

307.    The lack of liquidity in PPVA's investments as well as the misrepresented NAV created problems when investors sought to redeem their investments on the short timeline provided for in the PPMs and the applicable limited partnership agreements, and when the Platinum Defendants sought to pay themselves.

---

[3] Level 3 assets are assets whose fair value cannot be determined by using observable inputs or measures, such as market prices or models.  Level 3 assets are typically very illiquid, and fair values can only be calculated using estimates or risk-adjusted value ranges.

308.    Despite the financial reports and the PPMs representing PPVA as a liquid fund, the Platinum Defendants routinely relied upon funds invested by new investors in order to pay redemptions, as a significant amount of PPVA's assets were concentrated in illiquid "Level 3" assets that were grossly overvalued by the Platinum Defendants and did not provide PPVA with a source of liquidity.

### G.    Misrepresentation of Value for Golden Gate Oil

309.    An example of the Platinum Defendants misrepresenting the value of PPVA's assets concerns PPVA's debt and equity position in Golden Gate Oil.

310.    At the end of 2012, PPVA held 48% of the equity in Golden Gate via a wholly owned subsidiary, Precious Capital LLC ("**Precious Capital**").  *See* Exhibit 24 at pp. 143-146.

311.    Precious Capital also had extended a working capital loan to Golden Gate that was secured by all of Golden Gate's assets (the "**Golden Gate Oil Loan**").  At the end of 2012, the principal and interest outstanding on the Golden Gate Oil Loan totaled $12,893,000.  *See id.*

312.    At the end of 2012, the Platinum Defendants valued PPVA's 48% equity investment in Golden Gate Oil at $37 million, which implied a total value for the company of approximately $78 million, and valued the Golden Gate Oil Loan at par.  *Id*.

313.    One year later, the Platinum Defendants reported that the value of PPVA's 48% investment in Golden Gate Oil had risen sharply, to as much as $173 million.  The Platinum Defendants once again valued the Golden Gate Oil Loan, which by then had grown to $24,392,489, at par.  True and correct copies of selected portions of Sterling Valuation's 4th Quarter 2013 Valuation Report are attached hereto as **Exhibit 26**.

314.    The Golden Gate Oil equity interests and Golden Gate Oil Loan constituted approximately 19% of PPVA's reported NAV as of the end of 2013, and other than Black Elk was one of PPVA's largest investments.

315. The value ascribed to PPVA's investment in Golden Gate Oil by the Platinum Defendants, including the value of the Golden Gate Oil Loan, was significantly inflated.

316. Golden Gate's first stage of operations involved the drilling of seven wells (the "**Golden Gate Oil Wells**"), but it encountered large drilling cost overruns, as well as delays in obtaining needed permits.

317. As a result, Golden Gate Oil had utilized the $18 million borrowed from PPVA by the end of 2013.

318. More problematic than the delays and cost overruns was the fact that the Golden Gate Oil Wells that eventually were completed produced mostly water and many were shut in (*i.e.,* not producing).

319. During 2013, the revenue realized from the only consistently-producing Golden Gate Oil Well was less than 10% of initial projections.

320. As a result, far from generating the millions in present cash flow that had been expected to pay for future drilling, Golden Gate Oil suffered $6 million in *net losses* in 2013.

321. The Platinum Defendants did not disclose any of this information in its valuation reports when valuing PPVA's investment in Golden Gate Oil.

322. In November 2013, Black Elk reported in a public filing that it had obtained an option to purchase all membership interests in Golden Gate Oil for $60 million.  True and correct copies of the relevant pages from the Form 10-Q filed with the Securities and Exchange Commission by Black Elk are attached hereto as **Exhibit 27**.

323. This disclosure demonstrated that the value the Platinum Defendants placed on Golden Gate Oil was inflated.

324.     On May 23, 2014, Ari Hirt, a Platinum Management portfolio manager for Golden Gate Oil, told Nordlicht, Levy, Saks and Steinberg that a potential third-party lender had brought up Black Elk's SEC filing, saying "the issue is that it publicly discloses the value of the option and therefore pegs GGO [Golden Gate Oil]'s value to $60M.  This is ultimately a marketing issue that could be dealt with but something we should all be aware of."  A true and correct copy of this May 23, 2014 email is attached hereto as **Exhibit 28**.

325.     Internal emails indicate that Nordlicht and the other Platinum Defendants were well aware that the values ascribed to Golden Gate Oil were inflated as early as 2012.

326.     For example, in early 2012, Nordlicht scoffed at his portfolio manager's optimistic projections concerning Golden Gate Oil's performance: "I cringe at the 1 billion PV-10 number [a measure of the present value of the oil reserves] as it doesn't mean anything . . . . when u have billion pv 10 on fields that are worth 15 [$15 million] in sale now, it doesn't really mean much..." A true and correct copy of this April 3, 2012 Nordlicht email is attached hereto as **Exhibit 29.**

327.     Likewise, in late 2012, one of Platinum Management's project managers for Golden Gate Oil wrote to Nordlicht that once Golden Gate Oil, as a first step, had the first seven Golden Gate Oil Wells producing at its two fields, the value of Golden Gate Oil would rise to $45 million.  A true and correct copy of this email is attached hereto as **Exhibit 30.**

328.     Yet, at the end of 2013, when Golden Gate Oil's drilling program had fallen far short even of that goal and Golden Gate Oil was deeply in debt, the Platinum Defendants increased their valuation of PPVA's equity interest in Golden Gate Oil to $173 million.

329.     The Platinum Defendants also continuously valued the Golden Gate Oil Loan at par, even though it appears that Golden Gate Oil never made a single interest payment to the holder of the debt during the entire period the Golden Gate Loan was outstanding.

## H.     Creation of Beechwood

330.     In order to justify charging PPVA for increasing partnership distributions and other fees, the Platinum Defendants had to keep up the pretense that PPVA's NAV was steadily increasing.

331.     As a corollary, the Platinum Defendants had to keep pace with ongoing requests for investor redemptions, or risk disclosure of the liquidity issues and true NAV of PPVA.

332.     The Platinum Defendants had caused PPVA's assets to be invested in illiquid investments, however, which made this difficult.

333.     Nordlicht, Huberfeld, Levy and Bodner, together with Feuer and Taylor, developed a scheme to create Beechwood as a way to generate capital in a new business venture that they could use for their personal benefit to, among other things, allocate to themselves an ever increasing share of PPVA assets.

334.     The majority ownership in and ultimate control of Beechwood was in fact held by Nordlicht, Huberfeld, Bodner and Levy, while Taylor and Feuer maintained ostensible and nominal management authority, with Levy.

335.     The Platinum Defendants established Beechwood while working out of Platinum Management's offices.  The effort was coordinated by Nordlicht, Levy, Huberfeld, Taylor, Feuer and Bodner.

336.     Beechwood's investment professionals were simply a revolving door of Platinum Management personnel, including Levy, Saks, Manela, Ottensoser, Beren, and others.

337.     The Platinum Defendants and individual Beechwood Defendants used a portion of the funds entrusted to the Beechwood Entities to enrich themselves, as the Beechwood Entities provided Platinum Management with transaction partners that could be used to justify the First Scheme and PPVA's inflated NAV, while ultimately causing significant harm to PPVA.

69

338. The Beechwood Entities were conceived of and functioned as the alter ego of Platinum Management for this wrongful purpose.

339. David Bodner himself confirmed that Platinum Management and the Beechwood Entities are alter egos and that the connections between the entities were hidden from third parties in order to serve the purposes of the Platinum and Beechwood Defendants.

340. In a July 29, 2015 email that Bodner apparently asked his secretary to type and send to his personal email and which was sent two years after the framework for Beechwood was first conceived, Bodner expressed concern that a Beechwood client not discover that the funds it had entrusted to Beechwood for investment actually were invested in illiquid investments at PPVA, which did not fit the client's investment parameters.

341. In the same email, Bodner stated that he did not want the client to find out that the Beechwood Defendants "weren't exactly honest" about the fact that Beechwood and Platinum Management "really were integrated."

342. If this information came out, Bodner cautioned that the client might seek to pull all of its money out, which could result in Beechwood having to dissolve. A true and correct copy of this July 29, 2015 email is attached hereto as **Exhibit 31**.

343. The scheme began in about February 2013, when Bodner, Huberfeld, Nordlicht and Levy commenced working with Taylor and Feuer to create the Beechwood Entities.

344. By February 28, 2013, Levy and Nordlicht were advising Beechwood Capital and designating Taylor as Beechwood Capital's manager.

345. On February 26-28, 2013, writing from "beechwoodcapitalgroup.com" email domains, Taylor and Feuer, copying Levy at his Platinum Management email address, discussed the execution of an NDA between Beechwood Capital and Alpha Re Limited, another reinsurance

company.  A true and correct copy of this February 26-28, 2013 email exchange is attached hereto as **Exhibit 32**.

346.    On March 28, 2013, Steinberg sent an email to Huberfeld forwarding a list of wire transfers.[4]  Included among them is a transfer by Platinum Management of $1,749,666.51 to Beechwood Capital, evidencing Platinum Management's initial investment in Beechwood and corresponding control thereof.  A true and correct copy of this email is attached hereto as **Exhibit 33.**

347.    On or around April 17, 2013, Taylor drafted a memorandum intended to provide Beechwood's captive managers with an overview of Beechwood's corporate structure (the "**Beechwood Overview Memorandum**").  A true and correct copy of a cover email from Taylor to Levy, attaching the Beechwood Overview Memorandum, is attached hereto as **Exhibit 34**.

348.    On or about May 15, 2013, Levy executed initial due diligence documents for Beechwood Cayman as required by the Cayman Islands Monetary Authority.  True and correct copies of April-May 2013 correspondence between Levy and Crystal O'Sullivan concerning the Beechwood questionnaire are attached hereto as **Exhibit 35**.

349.    On or about May 30, 2013, Levy emailed Nordlicht a draft term sheet for Beechwood Cayman.  A true and correct copy of this email together with the draft term sheet is attached hereto as **Exhibit 36**.

350.    On or about May 31, 2013, Crystal O'Sullivan sent Levy an invoice for $25,000 for filing, licensing, legal, and administrative services in connection with the creation of the Beechwood Reinsurance Companies, so that Platinum Management could pay such fees on behalf of Beechwood.  A true and correct copy of the cover email from Crystal O'Sullivan, together

---

[4] The list also appears to reflect investments connected to certain of the Preferred Investors of the BEOF Funds.

with the invoice, is attached hereto as **Exhibit 37**.

351.    On June 4, 2013, Taylor emailed Levy under the subject "when you have a set of sample investment guidelines, please send them."  The text of the email states "I am creating our Beechwood Re [Beechwood Cayman] 'document.'"  A true and correct copy of this June 4, 2013 email is attached hereto as **Exhibit 38**.

352.    On June 12, 2013, Taylor emailed Nordlicht, seeking Nordlicht's approval in regard to several potential "deal" opportunities for the Beechwood Reinsurance Companies.  A true and correct copy of this June 12, 2013 email correspondence between Taylor and Nordlicht is attached hereto as **Exhibit 39**.

353.    Also on June 12, 2013, Taylor sent Levy a general management and strategy document to assist Levy in drafting an unspecified "investment document."  *See id.*

354.    On June 16, 2013, Taylor emailed Levy a PowerPoint Presentation that he prepared entitled "Beechwood Re Investment Strategy & Guidelines Discussion Document" (the "**Beechwood Re Presentation**").  A true and correct copy of the June 16, 2013 cover email from Taylor to Levy, together with the attached Beechwood Re Presentation, is attached hereto as **Exhibit 40**.

355.    The Beechwood Re Presentation identifies Levy as a key member of the management team, and touts his 8 years of experience with Platinum Management as a strategy for Beechwood's future success.  *See id.* at 12.  The presentation did not, however, indicate that Levy would continue to work at Platinum Management while working at Beechwood.

356.    Platinum Management engaged the law firm of Bryan Cave LLP ("**Bryan Cave**") as outside counsel to assist in the creation of the Beechwood Entities.  True and correct copies of emails dated June 20, 2013, between Andrew E. Auerbach of Bryan Cave, Levy and David

Ottensoser, discussing the opening of a new matter for creation of "Beechwood Re Investment LLC," are attached hereto as **Exhibit 41**.  A true and correct copy of the Bryan Cave engagement letter, directed to "David Levy at Beechwood Re, c/o Platinum Partners," is attached hereto as **Exhibit 42**.

357.    By July 3, 2013, Bryan Cave prepared the initial corporate documents, including an LLC agreement for Beechwood Reinvestment LLC and subscription documents for investment in the membership interests in that entity.

358.    These documents were sent to the Platinum Defendants and used by them to grant Nordlicht, Bodner, Huberfeld and Levy majority ownership and control over Beechwood.  A true and correct copy of an email from Laurel A. Durham of Bryan Cave to Levy and Ottensoser, attaching a draft of the Beechwood Reinvestment LLC Operating Agreement and subscription documents is attached hereto as **Exhibit 43**.

## I.    **Structure and Ownership of Beechwood**

359.    As a result of the foregoing actions by the Platinum Defendants acting in concert with the Beechwood Defendants, by February 26, 2014, the Beechwood Reinsurance Companies were established and had received significant funds for investment from insurance investors, including SHIP.

360.    The common stock of Beechwood Cayman was held by Beechwood Holdings.

361.    Beechwood Holdings' equity, and the share capital of Beechwood Bermuda, was in turn owned by Feuer, Taylor, Levy, Nordlicht, Bodner and Huberfeld.

362.    Nordlicht, Bodner and Huberfeld together owned nearly **70%** of the common stock in Beechwood Holdings and Beechwood Bermuda, and held their shares through Beechwood Trusts No. 1-19, in which each of their children were the beneficiaries.

363.    Levy held his common stock in Beechwood Holdings and Beechwood Bermuda as the beneficiary of Beechwood Trust No. 20.

364.    The Platinum Defendants and Beechwood Defendants also created BAM to manage and invest the assets obtained through reinsurance agreements with the Beechwood Reinsurance Companies.

365.    Nordlicht, Bodner, Huberfeld and Levy owned a controlling interest in BAM.

366.    To attract reinsurance business and also satisfy the requirements of regulators, Beechwood required a source of capital.

367.    In the materials used to market the Beechwood Reinsurance Companies, the Beechwood Defendants indicated that they were capitalized with cash provided by Feuer, Taylor, Levy and certain investors.

368.    For example, Levy, Feuer and Taylor created and showed potential clients an "Unaudited Balance Sheet September 1, 2013," which stated that the Beechwood Reinsurance Companies held assets totaling $114,801,585, including over $37 million in shares issued by a publicly traded company and over $10 million in "cash and cash equivalents," but no liabilities. A true and correct copy of the September 1, 2013 Balance Sheet is attached hereto as **Exhibit 44**.

369.    Nordlicht, Huberfeld, Bodner, Levy, Feuer and Taylor caused the creation of another Delaware limited liability company, Beechwood Investments.

370.    The managing member of Beechwood Investments was N Management LLC, an entity controlled by Nordlicht.

371.    The other nine members of Beechwood Investments were denominated as Beechwood Re Investments, LLC Series A through Beechwood Re Investments, LLC Series I.

372.    On information and belief, each Beechwood Series, in turn, was beneficially owned by Nordlicht, Bodner, Huberfeld, Levy and their families.

373.    From the time they were formed and at all relevant times thereafter, Feuer was Chief Executive Officer and Taylor was President of the Beechwood Reinsurance Companies.

374.    Levy served as BAM's Chief Financial Officer and Chief Investment Officer until the end of 2014, when he was replaced by Saks, another Platinum Management executive.

375.    Narain became a senior executive of BAM no later than January 2016.   On information and belief, Narain held ownership interests and/or control in certain of the Beechwood Entities.

376.    At all relevant times, the management teams of the Beechwood Entities served and worked at the sole discretion of Beechwood's ultimate beneficial owners – Nordlicht, Bodner, Huberfeld and Levy -- and functioned as the alter ego of Platinum Management to PPVA's detriment.

377.    The management team of the Beechwood Entities largely was comprised of personnel employed by or otherwise connected to Platinum Management.

378.    For example, the Beechwood team included, from time to time, the following persons: (i) Levy, as "Chief Investment Officer"; (ii) Will Slota, as "Chief Operations Officer"; (iii) Paul Poteat, as "Chief Technology Officer"; (iv) David Ottensoser, as "General Counsel"; and (v) Daniel Small, as the "Senior Secured Collateralized Loans PM."

379.    Although each of the foregoing persons had titles at Beechwood, they also were full-time officers or employees of Platinum Management.

380.    During the following two years, additional Platinum Management employees also worked at Beechwood or otherwise directed the activities of the Beechwood Entities.

381.     Stewart Kim, a former Platinum Management employee, was hired by Feuer and Taylor as the Beechwood Reinsurance Companies' Chief Risk Officer.

382.     Beren, Huberfeld's son-in-law, was hired by Feuer and Taylor in January 2016 to be a portfolio manager at Beechwood after serving in a similar capacity at Platinum Management from 2011 through 2015.

383.     After Levy left Beechwood to return to Platinum Management full time, Feuer and Taylor hired Saks to replace Levy as CIO and president of BAM

384.     Manela and Eli Rakower, both employees of Platinum Management, provided extensive and regular consulting services to the Beechwood Entities while also employed by Platinum Management.

385.     BAM and the other Beechwood Entities operated out of Platinum Management's office space until at least the end of February 2014.

386.     Even after separate office space was set up, Nordlicht maintained an office at Beechwood through at least 2014, and Huberfeld took over Nordlicht's office at Beechwood when Nordlicht moved out.

## J.     Beechwood and the First Scheme

387.     Immediately after the Beechwood Entities gained access to the first reinsurance trust assets, the Platinum Defendants and the individual Beechwood Defendants caused PPVA to enter into numerous non-commercial transactions with the Beechwood Entities and, in some cases, to co-invest with the Beechwood Entities in third-party companies.

388.     The prices at which assets/loans were bought and sold were used to support the Platinum Defendants' valuations of the relevant equity, debt or investment.

389.     These were not real market transactions in which prices are established as a result of arm's-length negotiations.

76

390.    To the contrary, the transactions between and among the Beechwood Entities and their clients, on the one hand, and PPVA and its subsidiaries/affiliates on the other, were insider transactions, orchestrated by the Platinum Defendants and the Beechwood Defendants, including the Platinum Management executives that owned the Beechwood Entities, which transactions harmed PPVA.

391.    The prices and the terms of these transactions were set without regard to the actual value of the underlying asset or the likelihood that principal or interest on a loan ever would be repaid, but rather to further the goal to enrich the Platinum Defendants and Beechwood by increasing the fees payable to Platinum Management and BAM (the "**First Scheme Transactions**")

392.    In some cases the First Scheme Transactions were used to justify ever-increasing valuations of the underlying assets as reported by Platinum Management.

393.    In other cases, the First Scheme Transactions were used to mask the performance failures at the underlying operating companies.

394.    In all cases, the First Scheme Transactions were used as a basis to pay the Platinum Defendants unearned partnership shares and/or fees.

395.    Platinum Defendants used First Scheme Transactions in which significant loans were extended/purchased or investments made by a "third party," *i.e.*, the Beechwood Entities, as evidence of the validity of the Platinum Defendants' "estimate" as to the true enterprise value of the underlying company.

396.    These were insider transactions, however.  Also, in most cases, any investment or loan made by the Beechwood Entities was backed by a guarantee from or a put right back to PPVA, and thus was not a valid basis upon which to assess the merits of the underlying business.

77

397.     In other cases, PPVA's prior rights in collateral were made subordinate to the rights of the Beechwood Entities.

398.     The Platinum and Beechwood Defendants damaged PPVA because they favored the rights of the Beechwood Entities – which were owned by Nordlicht, Huberfeld, Levy, Bodner, Feuer and Taylor – over those of PPVA, by causing PPVA to grant guarantees and put rights in favor of the Beechwood Entities, and to subordinate its rights in collateral in favor of the Beechwood Entities.

399.     These inflated valuations enabled the Platinum Defendants to report to PPVA a steady rise in the NAV of the assets they managed, which in turn enabled the Platinum Defendants to pay themselves excessive partnership shares, investment management and performance fees, to the detriment of PPVA.

### 1.     Golden Gate Oil

400.     An example of a First Scheme Transaction used to artificially inflate the reported value of PPVA's investments is the sale of Precious Capital's interest in the Golden Gate Oil Loan to the Beechwood Entities.

401.     Given Golden Gate Oil's ongoing operational issues, steep losses and the serious questions concerning the true value of its business, it would be difficult to find an arm's length lender willing to purchase its debt, and certainly not for anything close to par.

402.     On February 3, 2014, Nordlicht sent an email to Platinum Management executives complaining about Golden Gate Oil's lack of performance and increased need for financing.  A true and correct copy of Nordlicht's February 3, 2014 email is attached hereto as **Exhibit 45.**

403.     On February 26, 2014, the Platinum Defendants and Beechwood Defendants caused BAM I, acting as agent for certain Beechwood reinsurance trusts, to purchase the Golden Gate Oil Loan from Precious Capital.

78

404.    As of February 26, 2014, the total amount of principal and interest outstanding on the Golden Gate Oil Loan was in excess of $28 million.

405.    The Platinum Defendants and Beechwood Defendants caused BAM Administrative, on behalf of its clients, to buy the Golden Gate Oil Loan at par.  A copy of the February 26, 2014 Note Purchase Agreement by and among Precious Capital and BAM Administrative (the "**GGO Note Purchase Agreement**") is attached hereto as **Exhibit 46.**

406.    This transaction provided the Platinum Defendants with a basis upon which to justify their valuation of that investment as reported to PPVA.

407.    However, the GGO Note Purchase Agreement contained a hidden failsafe for the benefit of Beechwood.

408.    The GGO Note Purchase Agreement specifically provided that BAM I could put the Golden Gate Oil Loan it had purchased to PPVA and that PPVA would guarantee payment of that debt in full (the "**GGO Put Option and Guaranty**").  *See* GGO Note Purchase Agreement at ¶ 8.

409.    The Platinum Defendants and Beechwood Defendants used BAM I's purchase of the Golden Gate Oil Loan as a way to justify their then-current valuation of PPVA's investment in Golden Gate Oil, which had inexplicably risen from $37 million to $173 million during 2013, and to justify their management fees, but nevertheless left PPVA liable to pay the Beechwood Entities in the event that the underlying operating company failed to repay the Golden Gate Loan, which all parties knew would likely occur.

410.    The GGO Put Option and Guaranty protected Beechwood's investment in Golden Gate Oil at the expense of PPVA.

2.     **PEDEVCO**

411.    During the following months, the Platinum Defendants and Beechwood Defendants caused PPVA and the Beechwood Entities to engage in a series of additional transactions whereby PPVA was required to subordinate, willfully and improperly, its interests to those of Beechwood.

412.    By such transactions, the Platinum Defendants breached their fiduciary duties to PPVA, and such breaches were aided and abetted by the Beechwood Defendants.

413.    Although the Platinum Defendants directed PPVA and its subsidiaries to enter into certain multi-party agreements with certain Beechwood Entities as co-lenders, the Platinum Defendants did not ensure that the interests of PPVA were protected.

414.    Instead, the Platinum Defendants, with the assistance of the Beechwood Defendants, acted to protect the interests of the Beechwood Entities at the expense and to the detriment of the interests of PPVA.

415.    For example, on March 7, 2014, Platinum Defendants, and Beechwood Defendants caused a subsidiary of PPVA – RJ Credit LLC ("**RJ Credit**") – as well as certain Beechwood Entities to purchase certain senior secured notes (the "**PEDEVCO Notes**") issued by PEDEVCO Corp. ("**PEDEVCO**"), a publicly traded oil and gas company based in Texas.  A true and correct copy of the Note Purchase Agreement by which RJ Credit obtained its interest in PEDEVCO is attached hereto as **Exhibit 47**.

416.    Under the terms of the PEDEVCO Notes, RJ Credit was the only lender obligated to make continuing loans to PEDEVCO, such that the Platinum Defendants and Beechwood Defendants favored the interests of the Beechwood Entities and its clients over PPVA with this transaction.

417.    The PEDEVCO Notes held by PPVA's subsidiary were also subordinated in priority to those held by the Beechwood Entities and its clients such that no interest could be paid

on the PEDEVCO Notes held by RJ Credit unless and until all interest due to Beechwood's clients was paid in full.

418.    In addition, no principal could be paid on the PEDEVCO Notes held by RJ Credit until all principal on the PEDEVCO Notes held by the Beechwood investors was paid in full.

419.    In May 2016, the PEDEVCO Notes were restructured due to the falling price of oil and other operational issues that had caused a significant revenue shortfall at the company, as a result of which PEDEVCO was unable to pay interest on the notes and its other liabilities.

420.    Beechwood Defendant Dhruv Narain caused certain affiliates of the Beechwood Entities to make a further investment in PEDEVCO.  The monies invested by these affiliates of the Beechwood Entities in May 2016 were made senior in priority to the monies invested by certain Beechwood Entities in March 2014, however, further subordinating the PEDEVCO Notes held by RJ Credit.

421.    Despite the fact that they were aware that the PEDEVCO Notes held by RJ Credit were now subordinated to two layers of financing and that, by spring 2016, PEDEVCO was unable to pay interest on its secured debt and that PEDEVCO's ability to pay the note and other liabilities was in significant doubt, the Platinum Defendants nevertheless claimed that the net asset value of PPVA indirect interests in PEDEVCO still were worth approximately $28 million.

422.    The Beechwood Defendants had direct knowledge of this misrepresented valuation and participated in misleading PPVA as to the value of this asset.

**3.    Implant Sciences**

423.    Also in March 2014, the Platinum Defendants and Beechwood Defendants caused BAM Administrative, on behalf of its clients, to refinance $20 million of the revolving loan issued by PPVA's subsidiary, DMRJ Group, LLC ("**DMRJ**"), to Implant Sciences Corporation ("**IMSC**").

424.    The revolving loan and certain existing term loans also held by DMRJ were secured by liens on and security interests in all of the assets of IMSC and its affiliates.

425.    The Platinum Defendants could have arranged for IMSC to issue a new term note to Beechwood that would be *pari passu* with the existing IMSC debt held by DMRJ, as had been done previously when IMSC revolver debt was refinanced.

426.    Instead the Platinum Defendants and Beechwood Defendants caused DMRJ to subordinate all of its liens on IMSC's assets, including the lien securing DMRJ's revolving loan to IMSC – even though that lien secured future loans to that company – to the liens securing repayment of BAM Administrative' s term loan.  The intercreditor agreement between DMRJ and BAM Administrative also ceded to BAM I significant rights in the event of an IMSC bankruptcy, even though DMRJ held much larger loans to that company.  A true and correct copy of the March 2014 Intercreditor Agreement by and between BAM Administrative and DMRJ is attached hereto as **Exhibit 48**.

## K.    **Black Elk Scheme**

427.    The Platinum Defendants also conspired with the Beechwood Defendants, as well as the BEOF Funds and the Preferred Investors of the BEOF Funds, to help the Platinum Defendants and the Preferred Investors of the BEOF Funds cash out their investment in a rapidly deteriorating Black Elk ahead of the interests of PPVA.  The Platinum Defendants returned the favor by causing PPVA to cash out the Beechwood Entities, leaving PPVA holding the bag.

428.    As noted above, Black Elk was an oil and gas company headquartered in Houston, Texas.  Most of its producing assets were located offshore in the Gulf of Mexico.

429.    In 2009, the Platinum Defendants caused PPVA to acquire ownership of a majority of Black Elk's common equity in connection with a loan made to the company.  The original loan

was repaid in December 2010, with a portion of the proceeds realized by Black Elk through the private placement of $150 million in 13.75% Senior Secured Notes.

430.    In August 2011, Black Elk completed an exchange offer by which the original Black Elk 13.75% Senior Secured Notes were exchanged for new notes with substantially the same terms, except that the new notes were publicly listed and did not contain trading restrictions (the "**13.75% Senior Secured Notes**").

431.    PPVA and/or its subsidiaries held a significant portion of the 13.75% Senior Secured Notes, while the remainder were publicly held.

432.    The indenture governing the 13.75% Senior Secured Notes (the "**Indenture**") did not permit Black Elk to use the proceeds of an asset sale to make a dividend to or otherwise redeem its preferred equity.  A true and correct copy of the Indenture is attached hereto as **Exhibit 49**.

433.    The Black Elk Explosion occurred in November 2012.

434.    The Platinum Defendants represented that, as of the end of 2012, PPVA's investment in Black Elk's common and preferred equity was worth between $208 to 286 million. *See* Exhibit 24.

435.    PPVA's investment in Black Elk constituted approximately 35% of PPVA's total reported net asset value at the end of 2012 and was by far the largest position held by PPVA.

436.    The Black Elk Explosion was followed by a series of investigations and litigation and a significant deterioration in Black Elk's financial condition and liquidity that worsened throughout 2013.

437.    During the first quarter of 2013, the Platinum Defendants caused PPVA, via its subsidiary PPVA Black Elk (Equity) LLC, to buy $10 million of Series E preferred equity units and additional class B equity units, and to exchange class D preferred units that PPVA already

held for more Series E preferred equity from Black Elk.   The agreements between Black Elk (Equity) LLC and Black Elk were signed by David Levy.

438.   In addition, the Platinum Defendants set up the BEOF Funds.  The BEOF Funds were not PPVA subsidiaries.

439.   Rather the BEOF Funds were a standalone mechanism by which Platinum Management personnel, their family and friends, and certain preferred investors were offered the opportunity to invest in Black Elk "outside of the regular funds." *See, e.g.,* February 1, 2013 Email from Murray Huberfeld to Fabrice Harari of Twosons describing opportunity to invest in BEOF Funds, a true and correct copy of which is attached as **Exhibit 50**.

440.   The key persons managing the BEOF Funds included Mark Nordlicht, Uri Landesman, Naftali Manela, David Levy and Daniel Small.   In addition, Nordlicht, Fuchs, Huberfeld, Landesman and Bodner were heavily involved in marketing the investment to potential investors and were aware of and involved in the planning of all aspects of the transactions between and among the BEOF Funds and PPVA.

441.   Twosons was one of the "important client[s] and good friend[s]" to which Murray Huberfeld pitched an investment in Black Elk via the BEOF Funds during the first quarter of 2013. A true and correct copy of a February 7, 2013 email from Huberfeld to Fabrice Harari, copying David Levy, is attached hereto as **Exhibit 51.** Others included Jules and Barbara Nordlicht, Mark Nordlicht's parents, and the Huberfeld Family Foundation, an investment vehicle related to Murray Huberfeld.

442.   Collectively, the Preferred Investors of the BEOF Funds purchased an aggregate of $40 million of the Series E preferred equity pursuant to contribution agreements executed between Black Elk and BEOF I during the first quarter of 2013.

443.    Daniel Small and David Levy each signed one or more contribution agreements between BEOF I and Black Elk on behalf of BEOF I.

444.    The first round of BEOF Fund investment in Black Elk occurred during the first quarter of 2013, before the full extent of Black Elk's financial difficulties arising out of the Black Elk Explosion was fully known.

445.    Nevertheless, the onerous terms of the series E preferred clearly indicate that Black Elk was having difficulty obtaining financing even as early as the beginning of 2013.

446.    Pursuant to the Third Amendment to the Second Amended and Restated Operating Agreement of Black Elk, which is dated January 25, 2013 and which set the terms of the series E preferred equity, Black Elk was obligated to pay 20% interest per annum on that security through March 24, 2014, with such interest to be capitalized each quarter and added to the balance to the extent not distributed, plus additional class B shares.  If the total principal and interest due with respect to the series E preferred equity was not repaid by March 24, 2014, interest would increase to *36% per annum*.

447.    During 2013, Black Elk accrued significant unsecured liabilities in addition to its secured obligations, because it was not paying its trade creditors on a timely basis.  As a result, Black Elk may even have been insolvent by the end of 2013.

448.    The facts concerning Black Elk's deteriorating financial condition, were reported clearly and in detail by Black Elk in its public filings.

449.    In addition, during 2013 the rating agencies downgraded Black Elk, first in June and then in September 2013. On June 7, 2013, Moody's downgraded Black Elk because of "the significant deterioration in [Black Elk's] liquidity position since the third quarter of 2012." On September 17, 2013, Reuters published an article titled "S&P cuts Black Elk Energy Offshore

rating to 'CCC+',"" reporting a downgrade in both Black Elk's credit rating and Note rating. That article stated: "The outlook is negative" and explained its rationale that "[t]he rating on Black Elk reflects our view of its 'vulnerable' business risk and 'highly-leveraged' financial risk, incorporating the company's small reserve and production base, high operating costs, and acquisitive growth strategy."

450.    Black Elk's second quarter 2013 10-Q, issued on August 14, 2013, discussed at length the legal effects of the Black Elk explosion and again showed that total liabilities exceeded total assets, accounts payable and accrued expenses growing to $160.1 million, a members deficit of $186.0 million, and acknowledged "restricted credit availability." Black Elk also reported that it was evaluating other credit sources, including Platinum.

451.    Black Elk reported in its public filings that, as of December 31, 2013, entities affiliated with Platinum Management beneficially owned approximately 85% of its outstanding voting membership interests and approximately 66% of total outstanding membership interests.  A true and correct copy of relevant pages from Black Elk's 10-K for FY 2013 is attached hereto as **Exhibit 52**.

452.    As a result, Black Elk stated that "for as long as [the Platinum entities] hold a membership interest in us, Platinum has the ability to remove and appoint key personnel, including all of our managers, and to determine and control our company and management policies, our financing arrangements, the payment of dividends or other distributions, and the outcome of certain company transactions or other matters submitted to our members for approval, including potential mergers or acquisitions, asset sales and other significant corporate transactions.  As a controlling member, Platinum could make decisions that may conflict with noteholders' interests." *Id*.

453.    The Platinum Defendants aggressively exercised this power, through Nordlicht, as well as through Levy and Small who were the portfolio managers for Black Elk.  However, the other individual Platinum Defendants, including Bodner, Huberfeld, Landesman, Manela, SanFilippo, Ottensoser, Steinberg, Beren and Fuchs were aware of and participated in the actions and transactions with respect to Black Elk and the Black Elk Scheme as set forth below.

454.    Nordlicht, Levy and Small exercised this power by, *inter alia*, appointing a majority of Black Elk's Board of Managers, appointing Jeffrey Shulse ("**Shulse**") as CFO of Black Elk, repeatedly forcing the Black Elk CEO to rescind his firing of Shulse as CFO and otherwise usurping the CEO's authority.  True and correct copies of a collection of these communications are attached hereto as **Exhibit 53.**

455.    In early 2014, at the direction of the Platinum Defendants, Black Elk entered into negotiations to sell a significant portion of its prime assets (the "**Renaissance Sale**") to Renaissance Offshore, LLC ("**Renaissance**").

456.    The Indenture required that unless the proceeds of such a sale were to be used to purchase replacement assets, Black Elk was required to use the sale proceeds to repay the holders of the 13.75% Senior Secured Notes, a significant portion of which were held by PPVA or its subsidiaries.

457.    In addition to the 13.75% Senior Secured Notes that were held by PPVA and its affiliates, a significant number of such Notes were then held by public bondholders.

458.    By 2014, Black Elk had tens of millions of unsecured debt in addition to the amounts it owed with respect to the 13.75% Senior Secured Notes.

459.    If the proceeds of the Renaissance Sale were to be distributed to the bondholders, it was unlikely that there would be any recovery for holders of Black Elk's preferred and equity

interests, a substantial portion of which were held by the Preferred Investors of the BEOF Funds such as Twosons, Jules and Barbara Nordlicht, the Huberfeld Family Foundation and other friends and family of the Platinum Defendants.

460.    On information and belief, at least certain of the investors in the BEOF Funds raised concerns as to the status of their investment by the beginning of 2014.

461.    As a result, Platinum Management's statements concerning the value of PPVA's investment in Black Elk's equity would be exposed as a lie, and the Preferred Investors of the BEOF Funds would lose their investment.

462.    The Platinum Defendants and Beechwood Defendants developed the Black Elk Scheme to divert the proceeds from the Renaissance Sale to redeem the series E preferred shares in Black Elk for the benefit of the Preferred Investors of the BEOF Funds and to hide Platinum Management's false valuations of the Black Elk equity.

463.    An amendment to the Indenture governing the 13.75% Senior Secured Notes was needed to allow Black Elk to use the proceeds of the Renaissance Sale to redeem its series E preferred shares and accomplish their goal.

464.    The Indenture required a majority vote of the holders of the 13.75% Senior Secured Notes to amend the Indenture.

465.    While Platinum Management and affiliates controlled a significant portion of the 13.75% Senior Secured Notes by that time, they could not vote in favor of an amendment to the Indenture, because the consent solicitation (the "**Consent Solicitation**") specifically provided that "Notes owned by [Black Elk] or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with [Black Elk] shall be disregarded for purposes of determining the majority."

466.    Therefore, the Platinum Defendants, led by Nordlicht, Levy and Small, needed to obtain the necessary consents in a manner that deceived independent noteholders.

467.    To that end, Nordlicht, Landesman, Small, Levy and the other managers of the BEOF Funds, working with Huberfeld and Platinum Defendants, caused PPVA to transfer a portion of the 13.75% Senior Secured Notes it held to the BEOF Funds, partly in exchange for series E preferred equity held by the BEOF Funds.

468.    The debt for equity swaps were made subsequent to a March 2014 offering by the BEOF Funds, by which investors were offered the opportunity to roll over their existing investment in the BEOF Funds and/or invest additional capital, which purportedly would be used to purchase 13.75% Senior Secured Notes from PPVA or its affiliates, the open market or from Black Elk in the event it issued additional Notes (none were issued).

469.    The Preferred Investors of the Preferred Funds each agreed to participate in the March 2014 offering, either by rolling over their existing investment in the BEOF Funds (and thus in Black Elk) and/or by investing additional capital.  For example, Twosons invested $10 million in connection with the March 2014 offering.

470.    Given Black Elk's precarious financial condition, the Preferred Investors of the BEOF Funds clearly were aware of and agreed to participate in the March 2014 offering in order to aid Nordlicht, Levy, Small, Landesman, Manela and the other Platinum Defendants and the Beechwood Defendants in their scheme to ensure that those Preferred Investors would not lose their investment in Black Elk, with actual knowledge that Beechwood was affiliated with the Platinum Defendants.

471.    The true purpose of the swaps was to create the appearance that independent entities, *i.e.*, the BEOF Funds, were the owners of the 13.75% Senior Secured Notes,

notwithstanding that the same people, including Nordlicht, Levy, Small, Landesman, Manela, Huberfeld, Bodner and SanFilippo, were managing both PPVA and the BEOF Funds.

472.     Platinum Management thereafter caused PPVA to sell approximately $24.5 million worth of the 13.75% Senior Secured Notes to Beechwood Entities managed by BAM at prices solely designated by Nordlicht.

473.     Levy and the other Beechwood Defendants also caused certain Beechwood Entities to purchase 13.75% Senior Secured Notes on the "open market," and through allegedly independent noteholders, including but not limited to the wife of Steinberg.  A true and correct copy of an email dated March 3, 2015 from Platinum Management Chief Compliance Officer David Ottensoser confirming that Steinberg's wife purchased certain of the 13.75% Senior Secured Notes is attached hereto as **Exhibit 54.**

474.     Numerous emails reflect the involvement of Nordlicht, Levy, Small, and other Platinum Defendants and Beechwood Defendants in this scheme.  For example, in a May 13, 2014 email, Nordlicht instructed that "Beechwood is buying 8 million black elk from PPVA. What is the best way to cross? Can we do it today please."

475.     Similarly, on June 23, 2014, Nordlicht emailed: "I want to move/sell 10 million of black elk bonds to bbil the nomura account.  Please take care of it."

476.     After confirming that "BBIL" (a Beechwood reinsurance trust) was buying 13.75% Senior Secured Notes from PPVA, Nordlicht emailed instructions on July 1, 2014, to sell $7 million in 13.75% Senior Secured Notes from PPVA to a Beechwood reinsurance trust.  True and correct copies of these emails are attached hereto as **Exhibit 55.**

477.     Levy's position as CIO for BAM (along with the fact that many other Platinum Management employees also worked at Beechwood) assured Nordlicht that the Beechwood

Entities would support the scheme by purchasing the required amount of 13.75% Senior Secured Notes and supporting amendment of the Black Elk Note Indenture.

478.    Similarly, the BEOF Funds supported the amendment to the Black Elk Notes Indenture.

479.    By July 2014, Platinum Management, Beechwood and their affiliates managed or controlled approximately 66% of the 13.75% Senior Secured Notes.

480.    The Beechwood Defendants worked with their own counsel and with counsel for Black Elk to draft the Consent Solicitation to be circulated to the holders of the 13.75% Senior Secured Notes, which contained two closely related parts.

481.    The first part was a tender offer, which included an offer by Black Elk to buy back the 13.75% Senior Secured Notes at par.

482.    The second part was a request that noteholders consent to certain amendments to the Indenture.  The most notable proposed amendment provided that, after payment of any tendered 13.75% Senior Secured Notes, the proceeds of the Renaissance Sale could be used to redeem Black Elk preferred shares.

483.    The final Consent Solicitation contained this false representation:

> As of the date hereof, there are $150 million aggregate principal amount of Notes issued and outstanding under the Indenture.  Platinum Partners Value Arbitrage Fund, L.P. and its affiliates, which own approximately 85% of our outstanding voting membership interests, own approximately $18,321,000 principal amount of the outstanding Notes.
>
> Otherwise, neither we, nor any person directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, hold any Notes.  (Emphasis added.)

484.    The $18 million figure was a vast understatement, as it failed to disclose the $72 million in 13.75% Senior Secured Notes held by other funds managed by the Platinum Defendants and the Beechwood Defendants.

485.    The Platinum Defendants and Beechwood Defendants were aware that the Consent Solicitation contained this falsehood, that the vote was rigged, and the result would be a massive loss to PPVA to the benefit of the BEOF Funds and their equity interests.

486.    Despite this, Small signed as a manager and directed the CEO to sign the Black Elk Board of Managers' authorization for Black Elk to conduct the Consent Solicitation, and to implement the solicitation should the requisite number of consents be obtained.  A true and correct copy of this authorization is attached hereto as **Exhibit 56.**

487.    The Platinum Defendants and Beechwood Defendants caused all of the 13.75% Senior Secured Notes held by the other funds managed by the individual Platinum Defendants (including the BEOF Funds) and the Beechwood Entities to vote in favor of the Consent Solicitation.

488.    On August 21, 2014, Black Elk issued a Form 8-K announcing that it had received "the requisite consents" of noteholders to, among other things, apply the proceeds from the recently-concluded Renaissance Sale to retire the tendered notes and use the remaining proceeds to repurchase preferred equity issued by Black Elk.  A true and correct copy of the August 21, 2014 Black Elk 8-K, exhibits excluded, is attached hereto as **Exhibit 57.**

489.    On August 18, 2014, Small sent an email from his Platinum Management email address that purported to speak for the Black Elk Board of Managers directing Shulse to wire $70 million in partial payment of series E preferred shareholders.  Levy also sent Shulse specific wire instructions for sending the designated parties most of the proceeds from the Renaissance Sale. After Nordlicht emailed Shulse to "send these wires out already," Shulse complied with the directions and caused the wire transfers to be sent out.  A true and correct copy of the August 18, 2014 email is attached hereto as **Exhibit 58**.

490.     Between August 18 and 21, 2014, Black Elk wired approximately $98 million in Renaissance Sale proceeds to holders of its series E preferred equity.

491.     Included in this amount was approximately $47 million that was transferred to a Sterling Bank Account in the name of PPVA (the "**Sterling Bank Deposit**").  A true and correct copy of PPVA's Sterling Bank account statement for the month of August 2014 is attached hereto as **Exhibit 59**.

492.     In the days following the Sterling Bank Deposit, the Platinum Defendants caused PPVA to transfer approximately $36 million of the Sterling Bank Deposit to bank accounts in the name of the BEOF Funds at North Fork Bank.  A true and correct copy of wire records evidencing wire transfers from PPVA's Sterling Bank account to the BEOF Funds' bank account is attached hereto as **Exhibit 60**.

493.     On information and belief, the BEOF Funds subsequently distributed the amounts they received to the Preferred Investors of the BEOF Funds.  The following is a list detailing the date[s] and amount of the distributions to each of the Preferred Investors of the BEOF Funds, along with their investment positions at critical points:

| | Investment | | Final Capital Distribution | Date |
|---|---|---|---|---|
| | As of 31 December 13 | As at 1 August 14 | | |
| **Platinum Partners Black Elk Opporunities Fund LLC** | | | | |
| Jules Nordlicht | $ 7,000,000 | $ 7,000,000 | $ 7,187,005 | 21-Aug-14 |
| Jules and Barbara Nordlicht Foundation Inc | $ 500,000 | $ 500,000 | $ 513,357 | 21-Aug-14 |
| Morris Fuchs | $ 3,000,000 | $ 2,000,000 | $ 2,053,430 | 21-Aug-14 |
| Shmuel Fuchs Foundation Inc | $ 1,500,000 | $ 1,000,000 | $ 1,026,715 | 21-Aug-14 |
| David Levy | $ 250,000 | $ 250,000 | $ 256,679 | 21-Aug-14 |
| Dan Small | $ 100,000 | $ 100,000 | $ 102,672 | 21-Aug-14 |
| Leon Meyers | $ 3,250,000 | $ 3,250,000 | $ 3,433,002 | 21-Aug-14 |
| GRD Estates Ltd | $ 2,000,000 | $ 1,898,000 | $ 1,948,705 | 21-Aug-14 |
| Olive Tree Holdings LLC | $ 500,000 | $ 500,000 | $ 513,357 | 21-Aug-14 |
| Solomon and Gertrude Englander | $ 500,000 | $ 500,000 | $ 513,357 | 21-Aug-14 |
| Platinum F.I Group LLC | $ 750,000 | $ 750,000 | $ 770,036 | 21-Aug-14 |
| Aaron Parnes | $ 1,000,000 | $ 1,000,000 | $ 1,026,715 | 21-Aug-14 |
| Sol Werdiger | $ 1,000,000 | $ 2,000,000 | $ 2,053,430 | 21-Aug-14 |
| Rockwell Fulton Capital, L.P. | $ 550,000 | $ 550,000 | $ 564,693 | 21-Aug-14 |
| Ditmas Park Capital L.P. | $ 500,000 | $ 500,000 | $ 616,029 | 21-Aug-14 |
| FCBA Trust | $ 1,500,000 | $ 1,000,000 | $ 1,026,715 | 21-Aug-14 |
| MN Consulting NY LLC | $ - | $ 250,000 | $ 256,679 | 21-Aug-14 |
| Meadows Capital LLC | $ 500,000 | $ 500,000 | $ 508,329 | 21-Aug-14 |
| Abraham C. Grossman | $ 250,000 | $ 500,000 | $ 508,329 | August-14 |
| David and Ora Gichtin | $ 500,000 | $ 500,000 | $ 508,329 | 21-Aug-14 |
| **Platinum Partners Black Elk Opporunities Fund Internaitonal LLC** | | | | |
| Huberfeld Family Foundation | $ 1,000,000 | $ 1,000,000 | $ 1,026,677 | 21-Aug-14 |
| Twosons Corp. | $ - | $ 15,000,000 | $ 15,400,152 | 21-Aug-14 |
| Mind, Body and Soul Co. LTD | $ - | $ 1,000,000 | $ 1,026,677 | 21-Aug-14 |
| Huang Lai Tsu Hsia | $ - | $ 500,000 | $ 513,338 | 21-Aug-14 |
| Golda Wilk | $ 300,000 | $ 4,002,145 | $ 4,068,741 | 21-Aug-14 |
| Marcos and Adela Katz | $ 4,000,000 | $ 4,000,000 | $ 4,066,560 | 21-Aug-14 |

494.     An involuntary bankruptcy petition was filed against Black Elk in August 2015 in the United States Bankruptcy Court for the Southern District of Texas, which subsequently was converted to a voluntary chapter 11 case in September 2015 (the "**Black Elk Bankruptcy**").

495.     At the time of the Black Elk Bankruptcy, PPVA held approximately $22 Million of 13.75% Senior Secured Notes, which remained unpaid.

496.     During the Black Elk Bankruptcy, the creditors' committee commenced an investigation of the events surrounding the 13.75% Senior Secured Notes Consent Solicitation.

497.     The investigation of the Black Elk Scheme, orchestrated by the Platinum Defendants and Beechwood Defendants, resulted in the commencement of litigation against PPVA by the Black Elk post-confirmation litigation trustee in which the trustee has asserted millions of dollars of claims against PPVA.  Among other things, the trustee sought to avoid and recover all

transfers to PPVA and to equitably subordinate PPVA's claims in connection with its 13.75% Senior Secured Notes.

498.   The Black Elk Scheme also forms one of the primary bases for the Criminal Action and the SEC Action, which had the effect of further devaluing PPVA's assets.  A true and correct copy of the Black Elk Adversary Complaint against, among others, PPVA, is attached hereto as **Exhibit 61**.

499.   The Platinum Defendants, under Nordlicht's direction, generated certain reports to PPVA regarding PPVA's performance, such as financial statements that reported fund performance based, in part, on the outcome of the Black Elk Scheme.

500.   These reports omitted the material fact that the proceeds initially paid to PPVA on account of its Black Elk Class E preferred shares were based on the above-referenced conduct and for the benefit of the BEOF Funds and **not** PPVA.

501.   If the Platinum and Beechwood Defendants had not engaged in the Black Elk Scheme, the proceeds of the Renaissance Sale likely would have been used to pay off the Black Elk 13.75% Senior Secured Notes in full, a portion of which would have gone to PPVA in respect of the Notes it held, including the Notes it sold to the Beechwood Entities.

502.   Instead, as a result of the actions of the Platinum and Beechwood Defendants, the Black Elk Scheme enabled the Preferred Investors of the BEOF Funds to recoup their equity investment ahead of the higher priority bonds held by PPVA, render those bonds and re-acquired bonds worthless, and enabled the Platinum Defendants to pay themselves inflated distributions and/or fees, while leaving PPVA vulnerable to millions of dollars of claims by the Black Elk Litigation Trustee.

**L.**  **Creation of Montsant and Repurchase of Black Elk Bonds**

503.    In connection with the Black Elk Scheme, the Platinum Defendants and Beechwood Defendants caused the Beechwood Entities to purchase approximately $25 million worth of 13.75% Senior Secured Notes from PPVA and its subsidiaries.

504.    In addition, Platinum Defendants and Beechwood Defendants caused the Beechwood Entities to purchase additional 13.75% Senior Secured Notes on the open market, such that the total amount of 13.75% Senior Secured Notes ultimately held by the Beechwood Entities was approximately $37 million.

505.    Once the Platinum Defendants diverted the proceeds from the Renaissance Sale to themselves and their friends and family at the BEOF Funds, the 13.75% Senior Secured Notes held by the Beechwood Entities for purposes of the Black Elk Scheme were worth significantly less than they had been before the Renaissance Sale.

506.    Moreover, the Platinum Defendants and Beechwood Defendants were aware that and acknowledged that any recovery Beechwood received with respect to the 13.75% Senior Secured Notes would be subject to a claim for equitable subordination once the Black Elk Scheme was inevitably disclosed in connection with Black Elk's bankruptcy.

507.    Black Elk's quarterly report for the third quarter of 2014 indicates that, after the Black Elk bond solicitation described above was completed and the proceeds of the Renaissance Sale distributed to the holders of Black Elk series E preferred and the few non-consenting bondholders, Black Elk was left with $138 million of outstanding bonds, approximately $100 million of accounts payable as well as significant other liabilities, but limited assets or sources of revenue with which to pay such liabilities.  A true and correct copy of the Black Elk 2014 Third Quarter 10-Q Report is attached hereto as **Exhibit 62.**

508.   Due to these public reports and their own inside knowledge of Black Elk, the Platinum Defendants and Beechwood Defendants were well aware that Black Elk would be unable to meet its obligations under the 13.75% Senior Secured Notes.

509.   Despite this, on or about January 31, 2015, the Platinum Defendants and Beechwood Defendants caused a subsidiary of PPVA, Montsant Partners LLC ("**Montsant**"), to purchase all of the 13.75% Senior Secured Notes held by the Beechwood Entities at 93.5% of par, and to pay interest on the Golden Gate Oil Loan.

510.   To finance these transactions, Platinum Defendants and Beechwood Defendants caused Montsant to "borrow" $35.5 million at 12% interest from SHIP, a Beechwood client, via a loan administered by Beechwood (the "**2015 Montsant Loan**").

511.   Although the 2015 Montsant Loan initially was made on an unsecured basis, the transaction documents required that collateral be posted to secure the loan post-closing.  A true and correct copy of the promissory note evidencing the 2015 Montsant Loan is attached hereto as **Exhibit 63**.

512.   David Steinberg, listed as an "authorized signatory" executed the transaction documents related to the 2015 Montsant Loan on behalf of Montsant.  Steinberg also negotiated the terms of the 2015 Montsant Loan in his capacity as a fiduciary of this wholly owned PPVA subsidiary.

513.   Thereafter, Platinum Management transferred equity securities and notes belonging to PPVA and DMRJ to an account pledged as collateral to secure amounts due under the 2015 Montsant Loan (the "**Montsant Collateral Account**"), under transactions and circumstances that are the subject of continuing investigation.  A true and correct copy of the May 13, 2015 Pledge Agreement by and between Montsant and BAM Administrative, as agent (the "**Montsant Pledge**

**Agreement**") is attached hereto as __Exhibit 64.__

514.    SanFilippo, Steinberg, and Levy, among other Platinum Defendants, were involved with and responsible for transferring the PPVA and DMRJ assets and securities to the Collateral Account.

515.    As a result, the Platinum Defendants caused PPVA assets to be pledged to secure a debt to benefit Beechwood, the Platinum Defendants' new business venture, which debt was only incurred in order to repay Beechwood for its corrupt participation in the Black Elk Scheme for the BEOF Funds' benefit and to PPVA's detriment.  Additional details related to this transaction are set forth below.

**M.**    __Northstar__

516.    In May 2014, Platinum Defendants and Beechwood Defendants entered into negotiations to invest in certain oil and gas properties located in the Gulf of Mexico and owned by a predecessor to Northstar Offshore Group, LLC ("**Northstar**").

517.    Northstar's initial acquisition of assets in 2014 was financed in part by the issuance of $80 million of notes (the "**Northstar Notes**"), of which $50 million subsequently were purchased by Beechwood Entities.  The initial Northstar acquisition was completed in Fall 2014. True and correct copies of the Northstar Notes issued to Beechwood Entities are attached hereto as __Exhibit 65.__

518.    The Northstar Notes were supposed to be fully secured by all of the assets of Northstar.

519.    The Platinum Defendants and Beechwood Defendants nevertheless took additional steps to protect the interests of Beechwood over those of PPVA by granting certain Beechwood Entities a lien on PPVA's interests in Agera Energy, one of PPVA's most significant assets, as additional collateral to secure repayment of the Northstar Notes (the "**Agera Security**

**Agreement**").  A true and correct copy of the Agera Security Agreement is attached hereto as **Exhibit 66.**

520.    In or around Spring 2015, the Platinum Defendants caused Northstar to purchase certain remaining assets of Black Elk, with the consideration for such purchase being the assumption by Northstar of the obligation to pay approximately $65 million worth of Black Elk 13.75% Senior Secured Notes held by PPVA and funds affiliated with Platinum Management, which the Platinum Defendants subsequently caused to be converted to equity in the parent company of Northstar[5].

521.    The Platinum Defendants represented to investors that PPVA's equity interests in its oil and gas investments (including Northstar, Black Elk and Golden Gate Oil) were worth approximately $240 million as of the end of 2014.

522.    By the first quarter of 2015, the Platinum Defendants claimed that PPVA's interests in the preferred equity of Northstar's parent separately were worth an additional $26-28 million. True and correct copies of the selected portions of PPVA's 4th Quarter 2014 and 1st Quarter 2015 Valuations are attached hereto as **Exhibit 67** and **Exhibit 68** respectively.

523.    By June 2016, the Platinum Defendants valued PPVA's equity interests in Northstar as approximately $200 million, or 21.3% of PPVA's NAV.  A true and correct copy of the June 30, 2016 Indicative NAV Report shared with PPVA's investors is attached hereto as **Exhibit 69**.

524.    The Platinum Defendants consistently valued PPVA's approximately $8 million of unsecured loans to Northstar at par.

---

[5] Even after this transaction, PPVA still held a portion of Black Elk 13.75% Senior Secured Notes.

525.    By June 30, 2016, the Platinum Defendants and Beechwood Defendants had caused PPVA to engage in a series of transactions with the Beechwood Entities and PPCO that resulted in PPVA holding $22 million worth of the Northstar Notes, which it reported as being secured by a second priority interest in all of Northstar's assets and also valued at par.

526.    Throughout the first six months of 2016, the equity, preferred equity and debt investment in Northstar was the largest portion of PPVA's reported net asset value. A true and correct copy of portions of PPVA 1st Quarter 2016 Valuation is attached hereto as **Exhibit 70**.

527.    The Platinum Defendants' valuation of Northstar was inflated, false and omitted material information.

528.    For example, the Platinum Defendants' claim that PPVA's interest in $22 million of Northstar Notes was secured by liens on all of Northstar's assets was materially false.

529.    No mortgages or financing statements were filed on behalf of the holders of the Northstar Notes with respect to the properties acquired from Black Elk.

530.    At all relevant times, Platinum Defendants controlled P Administrative Services LLC, the entity serving as trustee for the Northstar Notes, but failed to ensure that the necessary filings to perfect the security interests and liens of holders of the Northstar Notes were ever made.

531.    By 2016, Northstar was experiencing significant challenges managing operations and expenses due to the reduction in revenue resulting from falling oil prices.

532.    As a result, Northstar had accumulated millions of dollars in unpaid trade payables and accrued and unpaid interest on the Northstar Notes, with Platinum Management largely financing Northstar's day-to-day operations by allowing it to draw on unsecured credit lines from PPVA and PPCO.

533.     Moreover, the Northstar transactions detailed above, which were engineered by the Platinum Defendants, were the subject of claims for breach of fiduciary duty, usurpation of a corporate opportunity and other allegations against PPVA and potential fraudulent conveyance claims against Northstar by the Black Elk Trustee.  *See* Black Elk Adversary Complaint, Exhibit 61.

534.     A Platinum Management employee served on the Northstar board of directors and thus the Platinum Defendants were well aware of Northstar's financial condition.

535.     On August 12, 2016, certain of Northstar's creditors filed an involuntary chapter 7 bankruptcy petition against the company.  Northstar subsequently moved to convert the case to a case under chapter 11 of the Bankruptcy Code, and an order for relief was entered on December 2, 2016.

536.     Northstar's assets eventually were sold pursuant to a transaction effected under 11 U.S.C. § 363 for $13,250,000 in cash, a $19 million working capital facility in order to pay assumed liabilities, replacement of certain plugging & abandonment bonds and up to $150,000 to fund a post-confirmation litigation trust  (the "**Northstar Sale**").  A true and correct copy of the Order of the United States Bankruptcy Court for the Southern District of Texas approving the Northstar Sale, exhibit excluded, is attached hereto as **Exhibit 71**.

537.     Holders of the Northstar Notes and Northstar's preferred and common equity, including PPVA and its subsidiaries, received no recovery from the proceeds of the Northstar Sale.

**N.**     **The Second Scheme**

538.     Despite the actions of the Defendants set forth above, by mid-2015 PPVA still held assets worth approximately $300 million, a significant portion of which was comprised of PPVA's investment positions in IMSC and Agera Energy (the "**Remaining PPVA Assets**").

539.    Beginning in late 2015, the Defendants conspired to commence the Second Scheme, engaging in an intentional scheme to transfer or encumber nearly all of the Remaining PPVA Assets to or for the benefit of the Platinum Defendants, the Beechwood Defendants, PPCO and select insiders of the Platinum Defendants, and to the detriment of PPVA.

540.    Throughout the course of the Second Scheme, the Platinum Defendants deliberately granted the Beechwood Entities, PPCO and other insiders/friends/preferred investors liens on PPVA's investments at the subsidiary level, and the Platinum Defendants would consistently report PPVA's NAV without taking into account the encumbrances provided to these insider parties, thereby inflating the total amount of fees and other compensation due to them.  *See* Exhibit 70.

541.    The Second Scheme was executed successfully by the Defendants, such that by the time the Cayman Liquidation of PPVA had commenced, PPVA had hundreds of millions in liabilities and minimal assets.

542.    Certain of the transactions comprising the Second Scheme ("**Second Scheme Transactions**") are set forth below.

### 1.    Use of Montsant to Hide Beechwood Encumbrance of PPVA Assets

543.    As noted above, the Platinum Defendants used Montsant to provide subsidiary level liens on certain of the Remaining PPVA Assets to or for the benefit of the Beechwood Defendants by way of the Montsant Collateral Account.

544.    At the direction of the Platinum Defendants and Beechwood Defendants, Montsant was a party to a series of transactions whereby Beechwood was granted liens on certain of the Remaining PPVA Assets that held actual value.

545.    Notably, Beechwood was not granted liens on PPVA's oil and gas investments, which the Platinum Defendants and Beechwood Defendants knew had little or no value.

546.    Instead, interests in oil and gas companies such as Golden Gate Oil and PEDEVCO were used as illusory consideration to offload assets and security interests to Beechwood during the course of the Second Scheme.

547.    As noted above, the Beechwood Entities held liens against PPVA's assets via the Montsant Collateral Account.

548.    The Platinum Defendants transferred assets held by PPVA into the Montsant Collateral Account at will and generally with no consideration.

549.    Although the assets within the Montsant Collateral Account were still included in calculations of PPVA's NAV as though they held value to PPVA, the assets were wholly encumbered, at the subsidiary level, for the benefit of Beechwood and its clients in connection with the First and Second Schemes.

550.    The existence of these subsidiary level encumbrances were not incorporated in the PPVA NAV calculations by SanFilippo, Manela or the other Platinum Defendants.

551.    The assets that the Platinum Defendants caused PPVA and its subsidiaries to transfer into the Montsant Collateral Account included equity securities in Navidea Biopharmaceuticals, Inc. ("**Navidea**") and equity securities and debt instruments issued by Vistagen Therapeutics, Inc. ("**Vistagen**").

552.    The Navidea and Vistagen shares transferred into the Montsant Collateral Account were previously directly held by PPVA and/or another of its subsidiaries.

553.    Similarly, on May 4, 2015, DMRJ and Montsant entered into an agreement (the "**Montsant Assignment Agreement**") by which DMRJ assigned to Montsant its rights, title, and interest in that certain December 2008 Term Note issued by IMSC with an original principal

amount of $5.6 million (the "**December 2008 Note**"). A true and correct copy of the Montsant Assignment Agreement is attached hereto as __Exhibit 72.__

554. The Platinum Defendants and Beechwood Defendants thereafter caused Montsant to deposit the December 2008 Note into the Montsant Collateral Account, as part of the collateral securing Montsant's obligations under the 2015 Montsant Loan.

555. Steinberg executed the 2015 Montsant Loan agreement as an "authorized signatory" on behalf of Montsant.

### 2. __Nordlicht Side Letter__

556. In January 2016, the Platinum Defendants and Beechwood Defendants faced a crisis at Beechwood.

557. The Beechwood Entities were saddled with the approximately $37 million due and owing under the Golden Gate Oil Loan, with, as they were aware, no prospect for Golden Gate Oil to repay this debt. They also had purchased shares of Navidea stock from Montsant on or about October 25, 2015 at the then market price of $6,137.215.50, but by January the value of the stock had dropped significantly.

558. Until January 2016, the Platinum Defendants caused PPVA to pay the interest on the Golden Gate Oil loan to Beechwood. At that time, however, PPVA no longer was able to do so because it was facing margin calls of more than $1.5 million and had only $16,700.00 in available cash. A true and correct copy of PPVA's January 13, 2016 cash report is attached hereto as __Exhibit 73.__

559. On information and belief, at the same time, the Beechwood Entities were facing questions from regulators due to the significant drop in the share price of the Navidea stock they had purchased from PPVA only a few months before.

560.     To help his Beechwood interests, but to the detriment of PPVA, on or about January 13, 2016, Nordlicht apparently executed the Nordlicht Side Letter.

561.     The Nordlicht Side Letter states that it is made on behalf of Nordlicht, PPVA, PPCO "and each of their affiliates" and provides:

> To the extent not otherwise in violation of applicable law, *upon the sale of the assets and/or equity (collectively, the "Sale") of Implant Sciences, Inc. and/or any of its subsidiaries (collectively, the "Company"), the proceeds of such Sale that inure, directly or indirectly, to the benefit of Platinum, shall immediately upon consummation of such Sale be applied and remitted to B Asset Manager, LP ("BAMLP"), in such amount necessary to purchase and/or repay in full all indebtedness owing by Golden Gate Oil Inc. to BAMLP and each of its investment advisory clients at such time (collectively, "BAM")*; <u>provided</u>, <u>that</u>, nothing herein shall modify the obligations of the Company herein to first repay all indebtedness owing by the Company to BAM with proceeds of a Sale ("Implant Repayment").

A true and correct copy of the Nordlicht Side Letter is attached hereto as **<u>Exhibit 74.</u>**

562.     The Nordlicht Side Letter further states that Nordlicht agrees "to take or cause to be taken all additional actions deemed by BAM to be reasonably necessary in furtherance of the foregoing, as well as to create a perfected security interest in the obligations described above to the extent requested by BAM." *Id.*

563.     The Nordlicht Side Letter is purportedly signed by Beechwood Defendant Mark Feuer as a witness.

564.     Neither PPVA nor any of its subsidiaries received any consideration whatsoever for the Nordlicht Side Letter.

565.     At the time of execution of the Nordlicht Side Letter, IMSC was being marketed for sale.

566.     By executing the Nordlicht Side Letter, Nordlicht purported to grant the Beechwood Entities an interest in the proceeds of a separate investment held by another PPVA

subsidiary, that otherwise would not have been available to them to pay off the Golden Gate Oil Loan, to the detriment of PPVA.

567.    At the time the Nordlicht Side Letter was executed, approximately $37 million was due and owing under the Golden Gate Oil Loan.

568.    The Nordlicht Side Letter benefits the Beechwood Entities, owned by Nordlicht, Huberfeld, Bodner, Levy, Feuer and Taylor, at the expense of PPVA.

569.    The executed Nordlicht Side Letter was circulated among the executives and lawyers employed by Platinum Management, including Ottensoser and Manela.  Despite this, the Nordlicht Side Letter was not considered when determining the value of the PPVA assets to which it ostensibly applied, thereby inflating the value of those assets.

570.    The existence of the Nordlicht Side Letter also was not disclosed in the Nordlicht Affidavit or any of the supporting documents submitted in connection with the Cayman Liquidation.

571.    BAM subsequently has asserted a claim that the Nordlicht Side Letter was a valid and binding encumbrance upon the proceeds of PPVA's subsidiary DMRJ's interest in IMSC, and has asserted a claim to recover up to the full amount of the Golden Gate Oil debt out of the proceeds that DMRJ received from IMSC pursuant to the terms of the Nordlicht Side Letter.

### 3.    March 2016 "Restructuring" of PPVA/PPCO/Beechwood Transactions

572.    A few weeks later, in March 2016, Platinum Defendants and Beechwood Defendants orchestrated a series of transactions in connection with a "restructuring" of  all of the transactions previously entered into between and among PPVA, PPCO and the Beechwood Entities, whereby all the benefits flowed directly to certain Beechwood Entities and PPCO, and thus to the individual Platinum and Beechwood Defendants who owned and managed those entities and were entitled to charge them for partnership shares and fees, to the detriment of PPVA.

573.    For example, on March 21, 2016, Montsant and BAM entered into a series of agreements (the "**2016 Montsant Transactions**") by which the 2015 Montsant Loan was amended and restated, and Montsant purportedly borrowed an additional $6,137,215.50 from BAM client and Beechwood Entity BBIL ULICO 2014 to fund Montsant's purported re-purchase of certain Navidea shares.

574.    The 2016 Montsant Transactions reversed the October 25, 2015 sale by which Montsant had sold equity securities in Navidea from the Montsant Collateral Account to certain Beechwood Entities for $6,137.215.50.  The October 2015 sale was made for the then market price of $1.95 per share.  Attached as **<u>Exhibit 75</u>** is the stock ticker price reflecting the October 26, 2015 share price for Navidea on the open market.

575.    The actual closing price for Navidea stock as of March 21, 2016 was approximately <u>$1 per share</u>.  True and correct copies of stock ticker reports evidencing the March 21, 2016 share price for Navidea are attached hereto as **<u>Exhibit 76.</u>**

576.    Nevertheless, pursuant to the 2016 Montsant Transactions, Montsant re-purchased the Navidea shares from the Beechwood Entities at $1.95 per share.

577.    Nothing in the original October 25, 2015 transaction documents granted the Beechwood Entities the right to put the Navidea stock back to PPVA at the October 2015 sale price.

578.    Rather than purchase the Navidea stock at the market price, the Platinum Defendants and Beechwood Defendants conspired for Montsant to purchase the Navidea shares at **<u>double the market price</u>**, in order to boost the Beechwood Entities' secured claim against Montsant and PPVA and further enrich the Beechwood Entities at PPVA's expense.

579. The assets in the Montsant Collateral Account, including the December 2008 Note and the Navidea shares that were re-purchased by Montsant pursuant to the 2016 Montsant Transactions, were pledged for the repayment of both the original amounts owing to SHIP under the 2015 Montsant Loan as well as the additional amounts purportedly borrowed from BBIL ULICO 2014 by Montsant in March 2016.

580. Also on March 21, 2016, Precious Capital, BAM Administrative, Golden Gate Oil and certain Beechwood Entities entered into the Sixth Omnibus Amendment to the Golden Gate Oil Loan (the "**Sixth Omnibus Amendment**"), by which notes evidencing the Golden Gate Oil Loan were reissued in the following amounts (the "**GGO Notes**"):

- Fifth Amended and Restated Senior Secured Promissory Note, dated March 21, 2016, in the initial principal amount of $11,249,414.40, originally issued to SHIP;

- Fifth Amended & Restated Senior Secured Promissory Note, dated March 21, 2016, in the initial principal amount of $551,147.03, originally issued to BRe BCLIC Sub;

- Fifth Amended and Restated Senior Secured Promissory Note, dated March 21, 2016, in the initial principal amount of $20,405,749.26, originally issued to BRe WNIC 2013 LTC Primary; and

- Fifth Amended and Restated Senior Secured Promissory Note, dated March 21, 2016, in the initial principal amount of $999,370.23, originally issued to BRe WNIC 2013 LTC Sub.

581. Also on or about March 21, 2016, Montsant, PPVA, Golden Gate Oil and BAM Administrative entered into the Master Guaranty, by which, inter alia, Montsant agreed to guaranty amounts owed to various Beechwood Entities and SHIP by Golden Gate Oil, to the extent of the assets contained in the Montsant Collateral Account.  A true and correct copy of the Master Guaranty is attached hereto as **Exhibit 77.**

582. The Master Guaranty further purported to provide BAM Administrative, as agent for certain Beechwood Entities and SHIP, with a non-recourse guaranty from PPVA of amounts owed by Golden Gate Oil and amounts owed by Montsant.

583.    The guaranty was limited to certain amounts to be received by PPVA from the anticipated future sale of IMSC.  As stated in the Master Guaranty:

> Immediately following PPVA's receipt of any payments, proceeds, distributions and/or other amounts arising in any manner whatsoever from any right, title and/or interest, PPVA may have in and to Implant Sciences Corporation (the "Proceeds"), PPVA shall immediately following such receipt remit such Proceeds in immediately available funds as follows:
>
> (a) First, PPVA shall make or cause to be made a payment to  BAM [BAM Administrative] in an amount equal to Twenty-Million Dollars ($20,000,000.00) to prepay the principal amount owed by GGO to the Investors, as such term defined in that certain Note Purchase Agreement, (as same may be amended, restated, modified and or supplemented from time to time), dated as of April 10, 2012, by and between GGO and BAM (as successor agent to Precious); and
>
> (b) Second, PPVA shall make or cause to be made a payment of any remaining Proceeds to pay in full all outstanding obligations and liabilities under that certain Note Purchase Agreement, dated as of March 19, 2014, by and between Implant Sciences Corporation, each of the investors party thereto, and the Agent [BAM Administrative].

Master Guaranty at ¶ 1

584.    The Master Guaranty was further secured by collateral assignments from PPVA to Beechwood Entities of: (i) amounts owed under certain promissory notes issued by China Horizon Investment Group ("**China Horizon**") to PPVA, in the original principal amount of $4,764,872; and (ii) carbon credits, emission reductions and related assets due and payable to PPVA under certain carbon credit portfolio agreements.  True and correct copies of the Collateral Assignment and Turnover Agreement assigning PPVA's interests in the China Horizon promissory note to BAM Administrative are attached as **Exhibit 78** and **Exhibit 79**, respectively.  A true and correct copy of the Collateral Assignment of carbon credits from PPVA to BAM Administrative is attached as **Exhibit 80**.

585.     Also on March 21, 2016, the Montsant Pledge Agreement in favor of BAM was amended to provide that the Montsant Collateral Account would secure all of Montsant's obligations under the March 2016 Guaranty and the 2016 Montsant Transactions.

586.     The Master Guaranty in no way benefitted PPVA.

587.     Rather, the Master Guaranty benefited Beechwood by providing it with additional collateral to secure the non-performing Golden Gate Oil Loan, comprised of a significant portion of PPVA's remaining valuable assets.

588.     In connection with the Master Guaranty, several of the transactions entered into during the prior two years among PPVA and its subsidiaries and Beechwood were effectively reversed for Beechwood's benefit and to PPVA's detriment via a $70 million "loan" to PPCO, by which certain Platinum positions were transferred from certain Beechwood reinsurance trusts to PPCO, which was thought to be solvent (unlike PPVA), and then, in a classic insider and undervalue transaction, valuable assets of PPVA, then worth in excess of $20-$80 Million, were transferred to PPCO without valuable consideration.

589.     On March 22, 2016, various documents were executed among various Beechwood Entities and PPCO, by which PPCO became indebted to these Beechwood Entities in the original principal amount of $70,000,000 (the "**PPCO Indebtedness**").

590.     Thereafter, the Platinum Defendants caused PPCO to transfer approximately $20 million in <u>uncollectable</u> Northstar debt to PPVA at par, in exchange for certain known "good and collectable" assets of PPVA, including PPVA's equity and debt interests in certain investments, such as Navidea, Urigen, and Airdye Solutions, LLC, among others.

591.    The Platinum Defendants and PPCO were aware that the Northstar notes had no value, while the assets transferred to PPCO were believed to have significant value at the time they were transferred to PPCO.  In fact, the Navidea note ultimately was paid at par.

592.    The net effect of this March 2016 "restructuring" was to prop up Beechwood and PPCO to PPVA's substantial detriment, under circumstances where Beechwood and PPCO were chosen as the "good funds" to continue onward, while PPVA was left heading towards liquidation with the Platinum Defendants' insiders largely paid out for their actual investments.

593.    The transaction documents evidencing the March restructuring were signed by Mark Nordlicht on behalf of PPVA, Montsant and Golden Gate Oil.  Notably, David Steinberg is listed as the notice party in the documents.

594.    The terms of and specific steps by which the various transactions comprising the March 2016 restructuring were accomplished were developed, coordinated and accomplished by Nordlicht, Huberfeld, Bodner, Levy, Bernard Fuchs, Steinberg, SanFilippo and Ottensoser, working together with Narain, Taylor, and Feuer.

**O.    The Agera Transactions**

595.    As early as March 2016, the Platinum Defendants and Beechwood Defendants had conspired to transfer the rest of the Remaining PPVA Assets by way of a series of "insider" transactions in order to clear out the uncollectable debt obligations owed to Beechwood by companies such as Golden Gate Oil and PEDEVCO, leaving PPVA with little to nothing in exchange for the transactions.

596.    The scheme was initiated by Defendant Katz, who, by email on March 13, 2016, suggested to Mark Nordlicht a "potential sale to an insider" as a "solution" in order to keep PPVA's

interest in Agera with the Platinum Defendants' friends and family.  Attached as **Exhibit 81** is a true and correct copy of the March 13, 2016 email from Katz to Nordlicht.

597.    Katz is an advisor to Platinum Management and the grandson of Platinum investor Marcos Katz.

598.    In March 2016, Nordlicht introduced Katz as an advisor to Platinum Management to oversee the final stages of the Second Scheme.  A true and correct copy of Nordlicht's March 21, 2016 email introducing Katz to certain Platinum Management employees is attached hereto as **Exhibit 82.**

### 1.    **Agera Energy**

599.    Agera Energy is a Delaware limited liability company and a leading energy reseller to the consumer and business markets.

600.    Agera Energy maintains a principal place of business in Briarcliff Manor, New York.

601.    Agera Energy was formed through the combination of Agera Energy LLC, an entity formed at the direction of the Platinum Defendants, and the assets of Glacial Energy Holdings LLC, which were purchased pursuant to a June 17, 2014 sale order entered by the United States Bankruptcy Court for the District of Delaware pursuant to Section 363 of the Bankruptcy Code (the "**Glacial Energy Purchase**").

602.    PPVA and PPCO owned a controlling interest in Agera Energy through a jointly-owned subsidiary, Principal Growth Strategies, LLC ("**PGS**").  Before June 8, 2016, PPVA held 55% of the membership interests in PGS, and PPCO held 45% of the PGS membership interests.

603.    At all relevant times before the Agera Sale, PGS was the holder of a May 19, 2014 promissory note convertible into approximately 95% of the equity in Agera Energy (the "**Agera**

**Note**").  A true and correct copy of the Second Amended and Restated Agera Note is attached hereto as **Exhibit 83.**

604.   Shortly after the Glacial Energy Purchase, at the direction of Nordlicht, Kevin Cassidy was hired by Agera Energy as a senior executive.

605.   Cassidy, who had served two prior stints in prison, was arrested a third time in 2007 for deliberately misstating the value of natural gas derivatives held by one of Nordlicht's previous funds, Optionable Inc., which had collapsed amid scandal in 2007.

606.   Nordlicht or other persons employed by Platinum Management caused Cassidy to be hired as a senior executive by Agera Energy upon Cassidy's release from prison, despite the fact that he had no prior experience in the energy sector.

607.   Despite Cassidy's multiple convictions, Nordlicht vouched for Cassidy's integrity when questioned by a reporter.  A true and correct copy of a March 21, 2016 email from Nordlicht to a reporter for Thomson Reuters, attached as **Exhibit 84.**

608.   Agera Energy is a wholly owned subsidiary of Agera Holdings, LLC, a Delaware limited liability company ("**Agera Holdings**").

609.   Agera Holdings' sole business is to act as a holding company and control the business of its wholly owned subsidiaries. Those subsidiaries are Agera Energy, Utility Recovery LLC and Agera Solutions LLC.

610.   Immediately prior to the Agera Sale, Agera Holdings was owned 95.01% by Michael Joseph Nordlicht and 4.99% by MF Energy Holdings, LLC ("**MF Holdings**").  Feuer held all of the membership interests in MF Holdings.

611.   Michael Joseph Nordlicht is Nordlicht's nephew.

612.    According to his LinkedIn profile, he graduated from Georgetown University Law Center in 2012 and then he worked a few months as a law clerk for the Public Defender's office in Baltimore, Maryland.  He also was an associate attorney for about eight months at the Maryland Attorney General's office in the Department of Public Safety and Correctional Services.

613.    In or about late 2013, Nordlicht installed his nephew as the general counsel of Agera Energy, despite the fact that he appears to have had no prior experience in private practice or in the energy sector.

614.    Michael Nordlicht did not pay anything for the equity he held in Agera Holdings.

**2.    The Agera Energy Valuation**

615.    Based on its December 31, 2015 financial statements, Agera Energy achieved FYE 2015 revenues of $301.4 million and EBITDA of $20.2 million.

616.    Agera Energy's value as of March 31, 2016 was estimated to be between $225,533,000 and $283,553,000.  *See* PPVA 1st Quarter 2016 Valuation, Exhibit 70 at p. 128. This valuation report was issued on the same day as the Agera Sale.

617.    In a July 15, 2016 investment memorandum sent to BAM, Narain stated that due to Agera Energy's profitable financial performance, the true valuation of Agera Energy was closer to the high end of available estimates.  A true and correct copy of this investment memorandum from Narain to BAM is attached as **Exhibit 85.**

**3.    The Agera Sale Process**

618.    By March 27, 2016, Nordlicht, Bodner, Huberfeld, Levy, Bernard Fuchs and Katz began planning an insider sale of Agera to a "[B]eechwood led consortium."  A true and correct copy of this email is attached hereto as **Exhibit 86**.

619.    Between May 1, 2016 and June 9, 2016, the specific terms by which the Agera Sale was effected were put in place by Steinberg, Ottensoser, Taylor and Narain, all operating with the

knowledge of and in conjunction with the other Platinum Defendants, Katz, the Beechwood Defendants, SHIP, Cassidy and Michael Nordlicht.  Steinberg and Michael Nordlicht, together with help from Cassidy, also worked together to create the schedules and back up for the deal documents.

620.     Steinberg also worked directly with Cassidy and his counsel to create the mechanism by which 8% of the Agera purchase price was paid to an entity set up by Cassidy to avoid having taxes withheld from such payment.

621.     Platinum Management portfolio managers typically were compensated with a bonus calculated as a percentage of the profits earned on the PPVA investments they managed. Between 2014 and June 2016, Platinum Management had alleged in responses to SEC inquiries that Cassidy was not employed as a portfolio manager at Platinum Management.  Cassidy also did not have a written contract with Platinum Management, PPVA or PGS that would entitle him to any payment in connection with the sale of the Agera Note.

622.     On information and belief, during the period between 2014 and June 2016, Cassidy was paid a salary of $135,000 per year and Starfish was paid approximately $2.5 million by Agera in connection with Cassidy's work at Agera.

623.     Steinberg, Ottensoser, Michael Nordlicht, Narain and Cassidy, worked together to prepare the documents by which the various parts of the Agera transaction were accomplished.

624.     Michael Nordlicht and Kevin Cassidy actively participated in the negotiation and closing of the Agera Transactions, with actual knowledge of the deflated sale price and that Beechwood would be paid substantial fees from the closing.

625.    The insider transaction was intended to be substantially below fair value and was the product of the insider relationship between Beechwood and Platinum Management.   The transaction was executed, performed, overseen and then managed by Narain and Illumin.

626.    The Platinum Defendants did not attempt to market the Agera Note and actively dissuaded potential buyers from inquiring into the purchase of the Agera Note.

627.    For example, on May 11, 2016, in response to an inquiry by a non-investor potential purchaser, Nordlicht stated that PPVA's interest in Agera Energy was off the market.   A true and correct copy of this May 11, 2016 email is attached hereto as **Exhibit 87.**

628.    The Platinum Defendants also did not obtain a fairness opinion in connection with the Agera Sale.

629.    IMSC, PPVA's other remaining investment of significant value, was being marketed for sale at the same time as the Platinum Defendants and Beechwood Defendants were "negotiating" the Agera Sale.

630.    By contrast to their actions in connection with the sale of the Agera Note, the Platinum Defendants arranged for IMSC to hire an investment banker to openly market IMSC for sale and took all necessary due diligence actions customary for the legitimate sale of an operating company.

### 4.    The Agera Sale

631.    On June 9, 2016, the day after the arrest of Huberfeld, the Platinum Defendants, working in concert with the Beechwood Defendants and SHIP, caused PGS to transfer its interest in the Agera Note to AGH Parent LLC ("**AGH Parent**") – an entity not affiliated with PPVA, but at that time controlled directly by the Platinum Defendants and Beechwood Defendants, and for the benefit of SHIP (the "**Agera Sale**").

116

632.     SHIP, with full knowledge of the insider nature of the Agera Sale and the detriment it caused to PPVA, contributed approximately $50 million for the closing of the Agera Sale to benefit and enrich itself, working in tandem with Beechwood to the detriment of PPVA, just weeks before SHIP would publicly distance themselves from Beechwood for fraud, and while, upon information and belief, litigation was anticipated.

633.     On June 9, 2016, AGH Parent amended its Limited Liability Company Agreement (the "**AGH Parent Amended Operating Agreement**") and entered into a series of related transactions, resulting in AGH Parent admitting SHIP and certain Beechwood Entities as new members of AGH Parent.  A true and correct copy of the AGH Parent Amended Operating Agreement is attached hereto as **Exhibit 88.**

634.     Narain executed the AGH Parent Amended Operating Agreement on behalf of both AGH Parent and certain Beechwood Entities.  Only the AGH entities were advised by outside counsel in connection with the Agera Transactions, which was hurriedly closed the day after Huberfeld's arrest.

635.     Simultaneous with the execution of the AGH Parent Amended Operating Agreement, PGS and AGH Parent entered into the Purchase Agreement (the "**Agera Purchase Agreement**"), by which PGS sold the Agera Note to AGH Parent.  A true and correct copy of the Agera Purchase Agreement is attached hereto as **Exhibit 89.**

636.     Steinberg executed the documents as the "responsible person" and fiduciary of PPVA's subsidiary, PGS, the seller of the Agera Note.

637.     Even though the Platinum Defendants and Beechwood Defendants had evidence and believed that the market value for the Agera Note was between $225-285 million, the stated purchase price for the Agera Note was only $170 million (the "**Note Purchase Price**").

638.   The Note Purchase Price also was significantly below the $213,256,350-$269,356,350 million valuation of the Agera Note that Platinum Management had commissioned in March 31, 2016, just two months prior to the transaction, which valuation was delivered to SanFilippo on behalf of Platinum Management on the same day the Agera Sale closed.  *See* PPVA 2016 First Quarter Valuation at Exhibit 70.  Copies of that report, in both draft and final form, were circulated among the Platinum Defendants.

639.   Even then, at least **two-thirds** of the Note Purchase Price was paid in the form of uncollectable, valueless debt instruments that were transferred at par value, as well as membership interests in AGH Parent that were subject to redemption at the sole discretion of the Beechwood Defendants and Beechwood Entities in exchange for worthless debt and equity interests.

640.   Altogether, approximately $115 million of the purported $170 million Note Purchase Price was paid or payable in a combination of Beechwood "debt forgiveness" and worthless debt and equity assignments, which assignments benefited the Defendants, and in no way benefitted PPVA.

641.   A significant portion of the $43,666,460 of the Note Purchase Price attributed to debt transfers was comprised of highly distressed debt, including debt owed by China Horizon and under the PEDEVCO Notes, which were transferred to AGH Parent by certain Beechwood Entities and SHIP at the direction of Narain and Illumin, and which had little or no actual value.

642.   Documents drafted by the Platinum Defendants in connection with the Agera Transactions evidence that only $55 million of the Note Purchase Price was paid in cash to PGS, with approximately $10 million still remaining unaccounted for.  True and correct copies of these closing documents are attached hereto as **Exhibit 90**.

643.     In connection with the Agera Sale, all of the equity and voting interests in Agera Holdings were transferred from Michael Nordlicht and MF Holdings to AGH Parent.

644.     As noted above, Cassidy was not an employee of Platinum Management, PPVA or PGS.  Nevertheless, Nordlicht, Steinberg, Narain and Ottensoser conspired with Cassidy to pay Cassidy 8% of the **gross** proceeds from the sale of Agera.

645.     To effect the payment, Steinberg, Cassidy and his counsel prepared an amendment to the PGS operating agreement that granted Starfish, Cassidy's alter ego, 8% of the membership interests in PGS on the day before the Agera Sale closed.  The grant was made for no consideration.

646.     Thereafter, on June 9, 2016 (concurrent with the Agera Sale and Huberfeld's arrest), PGS entered into a Purchase Agreement with Starfish by which PGS purported to "repurchase" Starfish's membership interests in PGS for $13,552,000 (the "**Starfish Purchase Agreement**"), consisting of: (i) $7,000,000 in cash; (ii) $2,000,000 of Class B-2 Preferred Interests in AGH Parent; and (iii) $4,552,000 in Class C Preferred Interests in AGH Parent., Cassidy's Class C Preferred Interests were not subject to redemption in exchange for "PGS Value." A true and correct copy of the Starfish Purchase Agreement is attached hereto as **Exhibit 91.**

647.     The payoff to Cassidy was structured as a grant and repurchase of membership interests in PGS by Starfish so that Cassidy could avoid the payment of any withholding taxes with respect to the transfer.

648.     Immediately after the Agera Sale, the Platinum Defendants transferred substantially all of the remaining cash proceeds of the Agera Sale to insiders of Platinum Management, including $15 million for the benefit of Seth Gerszberg, as discussed below.

**5.      The Redemption of the Class C Portion of the Note Purchase Price**

649.     Approximately $59 million of the Note Purchase Price was paid to PGS via Class C Units in AGH Parent.  In fact, these units had little or no value.

650.    The Amended AGH Parent Operating Agreement provided that $35.4 million of the Class C Portion was subject to being redeemed in exchange for $35.4 million (the "**PGS Value**") of debt or partnership interests held by Beechwood Entities or SHIP.

651.    On October 28, 2016, the Beechwood Defendants caused AGH Parent to deliver a letter to PGS (the "**AGH Redemption Notice**"), indicating its intent to exercise the redemption rights set forth in Section 9.06(a)(i) of the Amended AGH Parent Operating Agreement "with respect to the portion of Class C Preferred Units held by PGS that may be redeemed with the full amount of PGS Value."  A true and correct copy of the AGH Redemption Notice is attached hereto as **Exhibit 92.**

652.    Thereafter, on January 26, 2017, the Beechwood Defendants and Illumin caused AGH Parent to deliver a letter to PGS enclosing an Assignment (the "**PGS Assignment**"), executed by AGH Parent, transferring to PGS all of AGH Parent's interest in the debt obligations set forth on Schedule A thereto.  A true and correct copy of the PGS Assignment is attached hereto as **Exhibit 93.**

653.    Together, the investments listed on Schedule A of the PGS Assignment have a face value equal to the PGS Value ($35.4 million).

654.    However, the investments listed in the PGS Assignment consist of distressed debt obligations transferred to AGH Parent by various Beechwood Entities and SHIP at the direction of the Beechwood Defendants and Illumin.

655.    The distressed debt obligations listed in the PGS Assignment include: (i) $14.1 million owed by Golden Gate Oil under the GGO Notes (ii) $5.7 million owed by PEDEVCO under the PEDEVCO Notes; and (iii) $15.6 owed by Montsant under the 2015 Montsant Loan.

656.     As a result of the purported AGH Redemption Notice and purported PGS Assignment, AGH Parent redeemed 336,928.93 Class C Preferred Units held by PGS and recorded satisfaction relative to PGS of $1,707,107 in accretive Class C Preferred Return related to such redeemed units, leaving PGS with approximately 207,970 Class C Preferred Units.

657.     In or about December 2016, six months after the Agera Sale, the Beechwood Defendants, led by Narain and Illumin, which had taken over management of the Beechwood Entities from BAM beginning in 2017, were marketing and negotiating the sale of AGH Parent to a third party investor for approximately $315 million in cash.

658.     On information and belief, the Beechwood Defendants thereafter sold their interests in Agera to an affiliate of Eli Global (the "**Eli Global Proceeds**").

659.     AGH Parent continues to hold the Agera Note, and Eli Global has acquired Beechwood's interests in AGH Parent.

660.     The Agera Transactions were the culmination of the Second Scheme and, standing alone, resulted in the dissipation of as much as $150 million of value to the Beechwood Entities, at a time when PPVA was known to be insolvent.  The loss of PPVA's interest in Agera has caused substantial consequential damages in an amount to be determined at trial.

661.     PGS has not received any further distributions in respect of its Class C membership interests in AGH Parent.

**P.     The Security Lockup**

662.     As PPVA's financial condition worsened throughout 2015 and 2016, the Platinum Defendants, orchestrated increasingly brazen transactions between PPVA and its subsidiaries and insiders in order to maintain control of such assets in the eventual liquidation of PPVA.

663.     At the same time, they conspired with certain friends, family and preferred investors to cash out, prioritize and secure their investments to the significant detriment of PPVA.

664.     To that end, in addition to the security interests and liens granted to the Beechwood Entities, the Platinum Defendants caused PPVA and its subsidiaries to enter into a series of agreements and transactions for the purposed of providing certain insiders and preferred investors and creditors with security interests in and liens on PPVA's Remaining Assets.

665.     These security interests and liens were designed to provide those insiders and preferred investors and creditors a priority debt position, to the detriment of other similarly situated creditors and investors.

### 1.     PPNE Notes

666.     Beginning in or about September 2014, the Platinum Defendants caused PPVA to issue a promissory note with a maximum principal amount of $36 million and an interest rate of 1.333% per month, and which subsequently was reissued in or about May 2015 (the "**16% PPNE Note**").

667.     The 16% PPNE Note is not payable to a particular person, but rather "to the order of each Lender."

668.     The 16% PPNE Note is signed by Nordlicht, as "CIO of PPVA."  A true and correct copy of a certain version of the 16% PPNE Note is attached as **Exhibit 94.**

669.     Thereafter, on or about August 12, 2015, the Platinum Defendants caused PPVA to execute a promissory note with a maximum principal amount of $150 million and an interest rate of 1% per month (the "**12% PPNE Note**" and together with the 16% PPNE Note, the "**PPNE Notes**").

670.     Like the 16% PPNE Note, the 12% PPNE Note is payable "to the order of each Lender" rather than to a particular person.  The August 2015 PPNE Note also is signed by

Nordlicht, as "CIO of PPVA."  A true and correct copy of the August 2015 PPNE Note is attached as **Exhibit 95.**

671.    Paragraph 2 of each of the PPNE Notes provides that the following collateral would secure PPVA's obligations under the PPNE Notes:

> As collateral security for all indebtedness, obligations and other liabilities of [PPVA] to [the PPNE Lenders] now or hereafter arising evidenced by this [PPNE Notes], [PPVA] hereby transfers, grants and pledges a continuing perfected security interest in all of [PPVA's] right, title and interest in and to the assets held by [PPVA] on the date hereof, all options and other rights, contractual or otherwise, in respect thereof and all distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such assets, and all proceeds of any and all of the foregoing (collectively, the "**Collateral**").

PPNE Notes at ¶ 2.

672.    The PPNE Notes do not identify the Lenders on the face of the document, nor did Platinum Management regularly annex an attachment listing the parties that are Lenders.

673.    Instead, from time to time, the Platinum Defendants caused PPVA to enter into side agreements with certain preferred insiders.  Under the terms of those agreements, the insider would be permitted to exchange its investment interest or its unsecured debt for ostensibly secured debt as a PPNE "lender."

674.    Certain of the Preferred Investors of the BEOF Funds were granted an interest in the PPNE Notes.

675.    Platinum Management did not disclose the existence or terms of, or amounts due under the PPNE Notes.

676.    Platinum Management also did not include the amount due under the PPNE Notes in calculating the net value of PPVA's assets.

2.    **Kismetia**

677.    Offshore Feeder Fund investor Kismetia Ltd. ("**Kismetia**") likewise was given preferential treatment by the Platinum Defendants.

678.    In or about June 30, 2015, Kismetia sought to redeem its investment in the Offshore Feeder Fund.

679.    At that time, PPVA was under severe liquidity constraints.  Although Platinum Management directed a partial payment of the amounts due to Kismetia, it did not cause the full payment of the amount owed to Kismetia in respect of Kismetia's redemption request.

680.    On or about March 16, 2016, the Platinum Defendants caused PPVA to issue a promissory note dated as of that date but effective as of December 31, 2015 (the "**Kismetia Note**") to Kismetia for the balance of the redemption payment due to it.

681.    Like the PPNE Notes, paragraph 2 of the Kismetia Note provides that the following collateral would secure PPVA's obligations under the Kismetia Note:

> As collateral security for all indebtedness, obligations and other liabilities of [PPVA] to [Kismetia] now or hereafter arising evidenced by this [Kismetia Note], [PPVA] hereby transfers, grants and pledges a continuing perfected security interest in all of [PPVA's] right, title and interest in and to the assets held by [PPVA] on the date hereof (including without limitation all assets now or in the future held in the Special Investments also known the "Side Pocket" whereby the Platinum Partners Value Arbitrage Fund L.P. may invest part of its assets in investments that the General Partner believes are illiquid, lacking a readily assessable market value or should be held until the resolution of a special event or circumstances) all options and other rights, contractual or otherwise, in respect thereof and all distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such assets, and all proceeds of any and all of the foregoing.  (collectively, the "**Collateral**").  In addition, [PPVA] shall pledge [Kismetia's] redeemed equity interest in the [Offshore Fund] to Kismetia as additional security for [PPVA's] obligations under this Note and shall deliver any certificates reflecting such redeemed interest to [Kismetia] to secure such pledge.

Kismetia Note at ¶ 2.

682.    The Kismetia Note was amended on June 14, 2016, six days after the Huberfeld Arrest and the same day Nordlicht announced that PPVA would stop taking redemption requests and its assets would be liquidated.

683.    Among other changes, the amendment provides that $484,338.36 in accrued interest was due by August 31, 2016, that all principal and interest would be due as of August 31, 2016 or potentially earlier dates, and that if all amounts were not paid in full, interest would triple, from 1% per month to 3% per month.

684.    As a result of the Kismetia Note, as amended, Kismetia exchanged worthless interests in the Offshore Feeder Fund and a worthless redemption claim for a claim secured by all the assets of PPVA that purports to accrue interest at *3% per month* or *36% per year*, to the detriment of PPVA.

### 3.    Twosons

685.    Defendant Twosons Corporation ("**Twosons**") is a Panamanian corporation authorized to do business in New York.  Twosons was an investor in the BEOF Funds (defined below) that received $15.4 million of proceeds from the Black Elk Renaissance Sale (defined above).  Nordlicht subsequently executed a promissory note dated September 18, 2014 on behalf of PPVA as borrower in the original maximum principal amount of $14 million dollars for the benefit of Twosons that accrued interest at a rate of 1.333% per month (the "**Twosons Note**").  A true and correct copy of the Twosons Note is attached hereto as **Exhibit 96**.

686.    Twosons is owned principally and managed by members of the Harari family and their agents/employees, including, inter alia, Fabrice Harari, Raphael Harari, and Benjamin Uzan.

687.    The Hararis are a family from France and Geneva, Switzerland with an estimated net worth of 400 - 500 million Swiss francs (about $400 - $500 million USD).

688.    The Hararis made a fortune in France from a pharmaceutical company called

Negma Laboratories, which they owned for 35 years and sold in 2007 for a reported $250 million.

689.    The Hararis also own Steba Biotech, which they created in 1996 to begin developing a new prostate cancer drug called Tookad.  Tookad reached Phase II trials in 2008, and completed its Phase III trials in 2016.  Mexico approved the use of Tookad for early-stage prostate cancer in 2016, and the European Medicines Agency approved Tookad in November 2017.

690.    Steba Biotech is a private company.    The Hararis financed Steba Biotech themselves, investing hundreds of millions of dollars into that company.

691.    There are significant business and personal connections between the Harari family and certain of the Platinum Defendants.  Raphael Harari and Twosons invested in PPCO as early as 2011.

692.    In a February 7, 2013 email to Fabrice Harari regarding David Levy's cell phone number on which David Levy is copied, Murray Huberfeld writes "David -- I had a call today with fabrice. Harari regarding black elk.  Told him to reach out to u next week with any questions or concerns Please respond to him and give him any information he requires.  **Fabrice is an important client as well as a close friend.** I told him that u will be in London on Feb 12 in case he or someone from his team will be there as well Thx Murray." *See* Exhibit 51 (emphasis supplied).

693.    The Hararis'/Twosons' involvement with Black Elk had begun the week before when, on February 1, 2013, Murray Huberfeld emailed Fabrice Harari to offer him the opportunity to participate in a "one off deal" for Black Elk and provided a short description of the terms of the deal, including an initial interest rate of 16% net to investor, paid quarterly, which would increase to 36% if not paid on time, plus equity grants depending on the total amount invested.  The term of the investment was 14 months.

694.     As noted, the original Twosons investment was in PPCO, which provided a return of 9.5%.  By February 18, 2013, Twosons' principals were looking to redeem that investment in favor of something "more aggressive," such as the returns provided in connection with an investment in Black Elk that Murray Huberfeld had described the week before to Fabrice Harari.

695.     On information and belief, the Hararis' self-financing of Steba Biotech may explain in part the Twosons / Hararis' involvement with the Platinum Defendants and their efforts to lock in unusually high rates of return in 2013 and 2014, which was about seven years after the Hararis' initial investment in Steba Biotech, and two years before Steba Biotech received approvals for Tookad from Mexico and the European Union.

696.     Twosons eventually purchased $10 million of Black Elk series E preferred in 2013 from a PPVA subsidiary.  Under the terms of a side letter executed by Nordlicht in connection with the purchase, PPVA was obligated to repurchase the series E preferred that Twosons had bought at Twosons' request.  The side letter also required the payment of cash interest to Twosons even though other holders of the series E preferred would receive payment in kind "PIK" interest.

697.     Thereafter, in 2014, Twosons and its principals knowingly acted to further aid and abet Nordlicht, Huberfeld, Levy, Small, Bodner, Manela, Landesman and the other Platinum Defendants to maintain the pretense that PPVA was a liquid fund with high net asset values thereby justifying the excessive fees charged.

698.     In return, the Platinum Defendants agreed to continue to provide Twosons and its principals the Hararis with special rights, privileges and rates of return not available to other investors and lenders.

699.     For example, in connection with Twosons' agreement to roll over their existing investment in the BEOF Funds in spring 2014 and invest an additional $10 million, Nordlicht

executed a "side letter" dated April 1, 2014 on behalf of PPVA, BEOF II and certain related parties (the "**Side Letter**").  A true and correct copy of the Side Letter is attached hereto as **Exhibit 97.**

700.    The Side Letter provided that Twosons would receive its quarterly 20% dividends in cash, even though the BEOF Funds documents permitted such dividends to be paid in kind and all other investors received their payments in kind.

701.    Likewise, the Side Letter provided that Twosons could put their shares back to BEOF II at par, irrespective of certain events that would permit that fund to decline to redeem other investors' shares.

702.    Nordlicht, Landesman, Levy, Manela, Small, Fuchs and the other Platinum Defendants also caused the BEOF Funds to repurchase Twosons' series E preferred equity on or about April 1, 2014 at par.

703.    Within days after the Black Elk Renaissance Sale closed and the proceeds thereof purportedly were used to redeem the series E preferred equity,[6] Nordlicht, Small, Levy, Manela, Fuchs, Huberfeld, Landesman worked together to cause PPVA to transfer approximately $36 Million of those proceeds to bank accounts in the name of the BEOF Funds at North Fork Bank, which in turn were distributed to the Preferred Investors of the BEOF Funds, among others.

704.    On August 21, 2014, Twosons received $15,400,152.42 of those proceeds in respect of its remaining position as a Preferred Investor of the BEOF Funds.  *See* Exhibit 60.

705.    Within weeks after Twosons cashed out its investment via the Black Elk Scheme, Twosons once again agreed to aid and abet Huberfeld, Nordlicht, and the other Platinum Defendants and maintain the ongoing fraud regarding PPVA's inflated net asset value and

---

[6] It should be noted that, although the funds purportedly were supposed to redeem the series E preferred equity, corporate formalities were not fully observed in making such payments, nor were the series E preferred equity redeemed pro rata.  Rather, the Platinum Defendants directed how and to whom the proceeds of the Renaissance Sale should be paid out.

liquidity, by loaning them $14 million of those proceeds to use in their operation, which was structured as secured "loan" to PPVA.

706.    Once again, Nordlicht rewarded Twosons and its principals for helping to maintain the Platinum Defendants' fraud concerning the true status of PPVA's asset values, liquidity and business by binding PPVA to a transaction that provided Twosons with special protections and incentives not generally available to other investors and not disclosed when calculating PPVA's NAV.

707.    Among other things, the Twosons Note required PPVA to pay Twosons interest on the loan at the exorbitant rate of 1.33% per month or 16% per year, and also purported to grant Twosons a security interest in and lien on all of "[PPVA's] right, title and interest in and to the assets held by [PPVA] on the date hereof, all options and other rights, contractual or otherwise, in respect thereof and all distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such assets, and all proceeds of any and all of the foregoing" as collateral to secure the repayment of the loan.

708.    Nordlicht signed and executed the Twosons Note in his capacity as Chief Investment Officer of PPVA on or about September 18, 2014, approximately one month after the proceeds of the Black Elk Scheme were disbursed.

709.    The original principal amount of the Twosons Note was $14 million.

710.    Between October 2014 and June 2016, the Platinum Defendants caused PPVA to pay Twosons monthly interest totaling $2.15 million.

711.    In addition, PPVA repaid $8 million in principal to Twosons during that period.

712.    The Platinum Defendants caused PPVA to pay Twosons its monthly interest every

month through June 2016, even when Platinum Management caused PPVA not to fund payments necessary to preserve the value of its investments, pay redemption payments to investors or pay other creditors.

713.    Nordlicht, SanFilippo, Steinberg and the other members of the valuation committee did not include the amount due to Twosons in communicating to SS&C information required to calculate the net value of PPVA's assets.

714.    Platinum Management also did not include the amount due to Twosons in communicating to SS&C information required to calculate the fees payable to Platinum Management or in determining the amounts payable to the individual Platinum Defendants.

### 4.    Seth Gerszberg and West Loop/Epocs

715.    For certain preferred investors and creditors, the Platinum Defendants provided even greater illicit protection by purporting to grant security interests and liens at the subsidiary level, while at the same time failing to include these subsidiary encumbrances when calculating PPVA's NAV.

716.    A prime example of a subsidiary level security interest was that provided to Beechwood and SHIP is with respect to the Montsant Collateral Account.

717.    Another example is the series of transactions and collateral grants engaged in by Nordlicht and the other Platinum Defendants for the benefit of Nordlicht's close friend, Seth Gerszberg and Gerszberg's relatives, to the detriment of PPVA.

718.    In or about 2009, Defendant Seth Gerszberg began to form a collection of entities to operate his apparel wholesale and retail businesses ("**The Collective**") and utilize an exclusive license of the Mark Ecko apparel brands, a company he co-founded in 1993.

719.    On September 8, 2014, Atlantic Growth Capital, LLC ("**Atlantic Growth**"), a PPVA subsidiary, entered into a loan agreement with certain entities comprising The Collective,

in order to provide The Collective with a $30 million line of credit for The Collective's working capital needs (the "**Collective Loan**") and loaned it funds thereunder.

720.    In connection with its apparel operations, The Collective also entered into a series of sub-licensing and supply agreements with West Loop, South, LLC ("**West Loop**") a company owned and managed by Steven and Alan Finkelman (together, the "**Finkelmans**"), who were cousins of Gerszberg.

721.    The Finkelmans and Gerszberg had a longstanding business relationship due to the Finkelmans' position in the apparel importing industry and The Collective's retail and wholesale operations.

722.    By the summer of 2015, The Collective was unable to make payments to PPVA or Atlantic Growth under the Collective Loan.

723.    By the summer of 2015, The Collective also was in debt to West Loop for an amount of more than $2.4 million, and West Loop refused to ship additional apparel to The Collective unless Gerszberg found a way to pay West Loop for the outstanding debt.

724.    Faced with a failing business and the prospect of no apparel for the critical holiday season, Gerszberg approached Nordlicht for financial assistance.

725.    The Platinum Defendants failed to take steps to protect PPVA's interests by declaring a default on the loans owed to PPVA by Seth Gerszberg and his companies and seeking to foreclose on the collateral securing such loans.

726.    Instead, in August 2015, the Platinum Defendants caused PPVA to enter into a series of transactions with West Loop and Epocs Real Estate Partnership Ltd. ("**Epocs**" and together, "**West Loop/Epocs**") over the coming months that would solely benefit West Loop/Epocs, Gerszberg and The Collective, to the detriment of PPVA.

727.   These transactions included: (i) PPVA assuming approximately $2.5 million of debt owed by The Collective to West Loop and granting West Loop a corresponding interest in the 12% PPNE Note; (ii) PPVA incurring a sham "loan" obligation to Epocs of approximately $2.5 million, where the loan proceeds were in fact provided to The Collective and providing Epocs with a corresponding interest in the 12% PPNE Note; and (iii) PPVA guarantying an apparel buyback obligation of approximately $2.5 million owed by The Collective to West Loop (collectively, the "**Purported Underlying West Loop/Epocs Obligations**").

728.   Instead of foreclosing on the non-performing Collective Loan and the guarantees by its shareholders, *i.e.* Gerszberg and his wife, the Platinum Defendants caused PPVA to enter into the Purported Underlying West Loop/Epocs Obligations although they knew The Collective had no ability to pay its debts to West Loop, as The Collective had been running at a substantial loss for months, its retail locations were in disrepair, and the Mark Ecko trademark license held by The Collective and West Loop was set to expire in September 2015.

729.   At the direction of the Platinum Defendants and Gerszberg, West Loop and Epocs were purportedly granted an interest as "lenders" under the 12% PPNE Note in the principal amount of approximately $5 million, even though they never provided any loan funds to PPVA or any company affiliated with PPVA.

730.   Once The Collective was unable to pay the Purported Underlying West Loop/Epocs Obligations, the Platinum Defendants made no effort to enforce PPVA's rights and collect from Gerszberg or The Collective on the Underlying West Loop/Epocs Obligations or the Collective Loan.

731.   To compound these breaches, on or around January 1, 2016, Nordlicht began to consult with Gerszberg with respect to business decisions concerning PPVA.

732.    From January 1, 2016, until commencement of the Cayman Liquidation, Gerszberg advised the Platinum Defendants with respect to PPVA's investments and provided substantial assistance in the formulation and execution of the Second Scheme.

733.    At this time, Gerszberg was provided with information concerning PPVA's financial condition, its ongoing liquidity issues and the misrepresentation of its NAV by the Platinum Defendants.

734.    Gerszberg also substantially assisted the Platinum Defendants with certain of the transactions comprising the Security Lockup.

735.    On July 4, 2016, Nordlicht informed Gerszberg that PPVA would be commencing the Cayman Liquidation and the Chapter 15 Bankruptcy, leaving creditors of PPVA, such as West Loop/Epocs, with claims in PPVA's insolvency proceedings.   A true and correct copy of Nordlicht's July 4, 2016 email to Gerszberg is attached hereto as **Exhibit 98.**

736.    On July 6, 2016, as Gerszberg demanded and the Platinum Defendants agreed, a Forbearance and Security Agreement, dated July 5, 2016, was entered into among PPVA, DMRJ, West Loop and Epocs (the "**Forbearance and Security Agreement**").   A true and correct copy of the Forbearance and Security Agreement is attached hereto as **Exhibit 99**.

737.    The Forbearance and Security Agreement purports to provide West Loop/Epocs with a security interest in DMRJ's rights to certain proceeds from the sale of IMSC, specifically from one of the IMSC Notes owned by DMRJ.

738.    With direct knowledge of PPVA's imminent liquidation, Gerszberg, as agent or representative of West Loop/Epocs, drafted the Forbearance and Security Agreement for the sole benefit of West Loop/Epocs, and to the detriment of PPVA, knowing the alleged forbearance was wholly illusory.

133

739.    The Forbearance and Security Agreement orchestrated by Gerszberg and the Platinum Defendants sought to encumber PPVA's assets at the subsidiary level for the benefit of Gerszberg's family members, at a time when Platinum Management already had engaged counsel to prepare the filings in connection with PPVA's liquidation and the commencement of an insolvency proceeding was a certainty.

740.    In addition, the Platinum Defendants conspired with Gerszberg to effectuate the transfer of $15 million from the Agera proceeds to a Gerszberg-controlled entity for no consideration.

741.    On or about June 3, 2016, Gerszberg and Franky Zapata ("**Zapata**") entered into that certain Master Agreement for the Unification of Zapata and Gerszberg Businesses (the "**Zapata Master Agreement**").  A true and correct copy of the Zapata Master Agreement is attached hereto as **Exhibit 100.**

742.    Zapata is the principal of the French company Zapata Industries SAS ("**Zapata Industries**") and the inventor of a water-based flyboard device.

743.    The Zapata Master Agreement provides for the rights and duties of Gerszberg, Zapata and their affiliates upon the occurrence of a proposed merger between Zapata Industries and IMSC (the "**Proposed Zapata/IMSC Merger**").

744.    As a condition of the Zapata Master Agreement becoming effective, Gerszberg-controlled entity Spectrum30, LLC ("**Spectrum30**") was required to deposit €10,000,000 into Zapata's bank accounts by June 10, 2016.

745.    On June 9, 2016, day the Agera Transaction closed, the Platinum Defendants caused PPVA subsidiary Huron Capital LLC ("**Huron**") to transfer $15 million from the Agera proceeds to or on behalf of Gerszberg and Spectrum30 (the "**Spectrum30 Loan**").  Of that amount,

a total of $11 million was wired directly to Zapata.  A true and correct copy of documents evidencing that $15 million of the Agera proceeds were used for the "Zapata" transaction and that $11 million was wired directly to Zapata are attached hereto as **Exhibit 101.**

746.    PPVA had no obligation under the Zapata Master Agreement to provide funds to Gerszberg, Spectrum30, or Zapata in connection with the Proposed Zapata/IMSC Merger, and received no valuable consideration in return.

747.    The Platinum Defendants and Gerszberg caused PPVA to transfer a substantial portion of the limited cash PPVA received from the Agera Sale to Gerszberg and Zapata, to the detriment of PPVA.

748.    Thereafter, the Platinum Defendants and Gerszberg took steps in an attempt to protect Gerszberg and Spectrum from any claim in connection with the Spectrum30 Loan, regardless of whether or not the Proposed Zapata/IMSC Merger occurred.

749.    On August 23, 2016, the same day PPVA filed its winding up petition in the Grand Court of the Cayman Islands, the Platinum Defendants and Gerszberg caused the promissory note evidencing the Spectrum30 Loan to be amended (the "**Amended Spectrum30 Note**").

750.    The Amended Spectrum30 Note provides that if the Proposed Zapata/IMSC Merger occurs, Spectrum30 is released from any and all obligations in connections with the Spectrum30 Loan.

751.    The Amended Spectrum30 Note provides that if the Proposed Zapata/IMSC Merger *does not* occur, any amount owed to Huron under the Spectrum Loan is offset by claims of The Collective against Atlantic Growth and "the Finkelman Debt."

## CLAIMS FOR RELIEF

### First Count: Breach of Fiduciary Duty
### (Duty of Care and Good Faith) Against the Platinum Defendants

752.    The Plaintiffs repeat and re-allege paragraphs 1-751 as if fully set forth herein.

753.    The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties to PPVA.

754.    The Platinum Defendants were obligated and bound to act in a responsible and lawful manner, in good faith, so as not to cause injury to PPVA.

755.    The Platinum Defendants were obligated to exercise due care and diligence to preserve, invest, value, manage, operate, and administer PPVA, its subsidiaries, its property and its assets.

756.    The Platinum Defendants also owed PPVA duties of full and candid disclosure of all material facts relevant to PPVA, to deal fairly and honestly with PPVA, and not to omit any material facts.

757.    The Platinum Defendants were obligated to ensure that they did not engage in any fraudulent, unsafe, unlawful or unsound investment, operational, administrative or management practices.

758.    In engaging in the First and Second Schemes described herein, including: (i) the systematic misrepresentation and overvaluation of PPVA's NAV for the purpose of paying the Platinum Defendants unearned fees (First Scheme); (ii) the Black Elk Scheme, Black Elk bond devaluation, and the significant creditor claims that resulted therefrom (First Scheme); and (iii) the transfer or encumbrance of nearly all of PPVA's Remaining Assets for the sole benefit of

Beechwood, PPCO and other select insiders and to the detriment of PPVA (Second Scheme), the Platinum Defendants repeatedly breached their fiduciary obligation of due care to PPVA.

759.    As set forth in the SEC Action, the Platinum Defendants managed PPVA in an unlawful manner and failed to manage PPVA in good faith.

760.    As a direct and proximate result of the Platinum Defendants' breaches of their fiduciary duties, PPVA was injured and suffered damages.

761.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

762.    In addition, because the Platinum Defendants acted knowingly, intentionally, purposefully, maliciously, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

**Second Count: Breach of Fiduciary Duty
(Duty of Loyalty/Self-Dealing) Against the Platinum Defendants**

763.    The Plaintiffs repeat and re-allege paragraphs 1-762 as if fully set forth herein.

764.    The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed PPVA fiduciary duties of loyalty and good faith.

765.    The Platinum Defendants were duty bound to act in a responsible and lawful manner, in good faith, so as not to cause injury to PPVA.

766.    In engaging in the First and Second Schemes described herein, including: (i) intentionally engaging in certain acts for the purpose of artificially inflating PPVA's NAV, in order to generate unearned fees, bonuses, salaries, and other payments to enrich themselves at the expense of PPVA (First Scheme); (ii) intentionally engaging in the Black Elk Scheme, to enable

the Preferred Investors of the BEOF Funds to take the proceeds from the Black Elk Renaissance Sale in contravention of the prior rights of PPVA, leaving PPVA with significant losses and claims (First Scheme); and (iii) the transfer or encumbrance of nearly all of PPVA's Remaining Assets for the sole benefit of Beechwood, PPCO and other select insiders and to the detriment of PPVA (Second Scheme), the Platinum Defendants breached their duties of loyalty and good faith to PPVA.

767.    For these reasons and others set forth herein, the Platinum Defendants engaged in a consistent pattern of self-dealing and breaches of their duty of loyalty throughout the course of the First and Second Schemes.

768.    As a direct and proximate result of the Platinum Defendants' self-dealing and breaches of their duty of loyalty to PPVA, PPVA was injured and suffered damages.

769.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

770.    In addition, because the Platinum Defendants acted knowingly, intentionally, purposefully, maliciously, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Third Count: Aiding and Abetting Breach of Fiduciary Duties against the Individual Platinum Defendants

771.    The Plaintiffs repeat and re-allege Paragraphs 1-770 as if fully set forth herein.

772.    Platinum Management, the General Partner of PPVA, owed fiduciary duties of due care, loyalty and good faith to PPVA.

773.    As set forth above, Platinum Management breached its fiduciary duties to PPVA by its actions in connection with the First and Second Schemes.

774. Platinum Defendants Nordlicht, Huberfeld, Bodner, Landesman, Bernard Fuchs, Levy, Steinberg, Beren, Manela, Ottensoser, SanFilippo, and Small (collectively, the "**Individual Platinum Defendants**") used their positions as owners, executives and managers of Platinum Management to cause Platinum Management to breach its fiduciary duties to PPVA.

775. In addition, the Individual Platinum Defendants substantially assisted, aided and abetted, and participated in Platinum Management's breaches of its fiduciary obligations in connection with the First and Second Schemes by, *inter alia*, (i) orchestrating transactions among PPVA and various insiders designed to support the inflated NAV ascribed to PPVA's assets by the Platinum Defendants, so as to enable Platinum Management to charge PPVA for unearned fees and expenses; (ii) causing PPVA and its subsidiaries to engage in transactions to benefit the Platinum Defendants, BEOF Funds and the Beechwood Defendants to the detriment of PPVA; (iii) participating in the Black Elk Scheme; and (iv) engaging in transactions which purposefully transferred or encumbered the assets of PPVA and its subsidiaries, designed to benefit the Beechwood Defendants and other insiders to the detriment of PPVA.

776. The Individual Platinum Defendants had actual knowledge that Platinum Management was breaching its fiduciary obligations to PPVA by engaging in the actions and transactions comprising the First and Second Schemes.

777. As a direct and proximate result of the Individual Platinum Defendants' actions and substantial participation, PPVA was damaged.

778. The actions of the Individual Platinum Defendants caused the harm on which the primarily liability of breach of fiduciary duties is predicated.

779. By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

780. In addition, because the Individual Platinum Defendants acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Fourth Count: Fraud against the Platinum Defendants

781. The Plaintiffs repeat and re-allege paragraphs 1-780 as if fully set forth herein.

782. As detailed herein, the Platinum Defendants intentionally engaged in the First and Second Schemes by communicating material representations to PPVA in various forms and by omitting to state material facts.

783. These material representations occurred by way of the Platinum Defendants making, and causing to be made, written and oral representations concerning the financial condition of PPVA and the acts in furtherance of the Platinum Defendants' administration and management of PPVA's assets and investments.

784. These material representations included statements concerning the nature and characteristics of the investments of PPVA, the method of valuation of PPVA assets, including NAV, and the management and other fees earned by Platinum Defendants and subsequently paid by or charged to PPVA.

785. At all relevant times, the Platinum Defendants knew that such representations were material to PPVA.

786. At all relevant times, the Platinum Defendants knew that their omissions and the representations they individually or collectively made, caused to be made, or knew were being made with their consent, were false when made.

140

787.    At all relevant times, the Platinum Defendants misrepresented to PPVA that PPVA's NAV was steadily increasing, despite PPVA's assets being increasingly concentrated in speculative and unproven start-up companies, many of which were not publicly traded and for which there were no readily available market prices.

788.    The Platinum Defendants represented to PPVA that asset valuations for PPVA's investment positions would be initially set by an internal valuation committee.  Such initial valuations, however, were arbitrarily adjusted by Nordlicht, with the consent of the other Platinum Defendants, in order to increase NAV and increase management fees paid to the Platinum Defendants.

789.    The Platinum Defendants caused PPVA and its subsidiaries to engage with the Beechwood Entities and the Beechwood Defendants in insider investments, loans and other transactions including, among others, Golden Gate Oil, PEDEVCO, Black Elk, Northstar, Montsant/Navidea and Implant Sciences, at non-market prices,  at terms unconnected to the actual value of the transaction, and with improper guaranty and put arrangements, by which the Platinum Defendants misrepresented the risk of loss to PPVA and placed the interests of the Beechwood Entities ahead of PPVA's interests.

790.    The Platinum Defendants intentionally did not include the liabilities  arising from the guaranties and put agreements that they caused PPVA to grant to the Beechwood Entities when they calculated the PPVA NAV and determined the amount of partnership share, fees and expenses owed to them by PPVA even though those guaranties placed PPVA at significant risk of loss.

791.    At all times after the Black Elk Explosion, the Platinum Defendants falsely inflated PPVA's total net investment in Black Elk even though they well knew that Black Elk was

experiencing significant deterioration in performance and had accrued significant unsecured liabilities and secured obligations.

792.    The Platinum Defendants schemed to, and did, divert from PPVA and misappropriate to themselves and the Preferred Investors of the BEOF Funds proceeds from the Renaissance Sale, by engaging in the Black Elk Scheme, which resulted in significant claims against PPVA.

793.    The Platinum Defendants falsely reported and inflated the valuation of Northstar, based in part on the false claim that PPVA's claims against Northstar were secured by liens on all of Northstar's assets even though they well knew mortgages and financing statements had not been filed with respect to any of the leases and other assets that Northstar purchased from Black Elk, the company was struggling to pay its obligations, and Platinum Management was causing PPVA and PPCO to fund  Northstar's operations.

794.    The Platinum Defendants falsely inflated the NAV of PPVA's assets, in order to generate for themselves tens of millions of dollars in fraudulent fees and payments – to which they were not entitled – all to the detriment of PPVA.

795.    The Platinum Defendants knowingly and intentionally made numerous false representations of material fact and omitted to state material facts to PPVA concerning the Platinum Defendants' intent to manage and administer PPVA, its subsidiaries and its assets in compliance with the terms of PPVA's governing documents, including but not limited to the PPVA Partnership Agreement.

796.    The Platinum Defendants also knowingly and intentionally defrauded PPVA by causing it to engage in transactions with and involving the Beechwood Entities that were designed to benefit the Beechwood Entities to the detriment of PPVA.

797.    The Platinum Defendants caused PPVA and its subsidiaries to engage with the Beechwood Defendants, PPCO and other insiders in insider investments, loans and other transactions at non-market prices and terms unconnected to the actual value of the transaction, such as the Nordlicht Side Letter, the Master Guaranty, creation of the Montsant Collateral Account and the Agera Transactions, without disclosing the purpose of these transactions to encumber or transfer PPVA's assets for the benefit of insiders.

798.    The Platinum Defendants intentionally withheld from PPVA the nature of the Second Scheme Transactions, purposefully omitting the encumbrances that the Platinum Defendants had granted upon PPVA's assets for the benefit of insiders and the significant loss to PPVA that resulted from the Second Scheme Transactions.

799.    PPVA justifiably relied on the foregoing false representations, omissions and fraudulent actions of the Platinum Defendants.

800.    PPVA has been damaged as a proximate result of each of the Platinum Defendants' fraudulent misrepresentations, omissions and actions to defraud PPVA during the First and Second Schemes in at least the following ways: (i) PPVA paid the Platinum Defendants tens of millions of dollars in unearned distributions and/or fees, expenses, bonuses and other payments; (ii) PPVA incurred tens of millions of dollars in creditor claims arising out of the Black Elk Scheme; (iii) the Preferred Investors of the BEOF Funds improperly received priority payments ahead of PPVA and its subsidiaries due to the Black Elk Scheme; and (iv) PPVA and its subsidiaries were made parties to numerous non-commercial transactions with the Beechwood Entities, PPCO and other Platinum Management insiders that subordinated PPVA's interests and depressed or encumbered the value of PPVA's assets.

801. By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

802. In addition, because the Platinum Defendants acted knowingly, intentionally, purposefully, maliciously, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Fifth Count: Constructive Fraud against the Platinum Defendants

803. The Plaintiffs repeat and re-allege paragraphs 1-802 as if fully set forth herein.

804. The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties of due care, loyalty and good faith to PPVA.

805. As detailed herein, the Platinum Defendants intentionally engaged in the First and Second Schemes by communicating material representations to PPVA in various forms and by omitting to state material facts.

806. These material representations occurred by way of the Platinum Defendants making, and causing to be made, written and oral representations concerning the financial condition of PPVA and the acts in furtherance of the Platinum Defendants' administration and management of PPVA's assets.

807. These material representations included statements concerning the nature and characteristics of the investments of PPVA, the method of valuation of PPVA assets, including NAV, and the management and other fees earned by Platinum Defendants and subsequently paid by or charged to PPVA.

808. At all relevant times, the Platinum Defendants knew that such representations were material to PPVA.

809.    At all relevant times, the Platinum Defendants knew that their omissions and the representations they individually or collectively made, caused to be made, or knew were being made with their consent, were false when made.

810.    At all relevant times, the Platinum Defendants misrepresented to PPVA that PPVA's NAV was steadily increasing, despite PPVA's assets being increasingly concentrated in speculative and unproven start-up companies, many of which were not publicly traded and for which there were no readily available market prices.

811.    The Platinum Defendants represented to PPVA that asset valuations for PPVA's investment positions would be initially set by an internal valuation committee.  Such initial valuations, however, were arbitrarily adjusted by Nordlicht, with the consent of the other Platinum Defendants, in order to increase NAV and increase management fees paid to the Platinum Defendants.

812.    The Platinum Defendants caused PPVA and its subsidiaries to engage with the Beechwood Entities and the Beechwood Defendants in insider investments, loans and other transactions including, among others, Golden Gate Oil, PEDEVCO, Black Elk, Northstar, Montsant/Navidea and Implant Sciences, at non-market prices,  at terms unconnected to the actual value of the transaction, and with improper guaranty and put arrangements, by which the Platinum Defendants misrepresented the risk of loss to PPVA and placed the interests of the Beechwood Entities ahead of PPVA's interests.

813.    The Platinum Defendants intentionally did not include the liabilities  arising from the guaranties and put agreements that they caused PPVA to grant to the Beechwood Entities when they calculated the PPVA NAV and determined the amount of partnership share, fees and expenses owed to them by PPVA even though those guaranties placed PPVA at significant risk of loss.

814.     At all times after the Black Elk Explosion, the Platinum Defendants falsely inflated PPVA's total net investment in Black Elk even though they well knew that Black Elk was experiencing significant deterioration in performance and had accrued significant unsecured liabilities and secured obligations.

815.     The Platinum Defendants schemed to, and did, divert from PPVA and misappropriate to themselves and the Preferred Investors of the BEOF Funds proceeds from the Renaissance Sale, by engaging in the Black Elk Scheme, which resulted in significant claims against PPVA.

816.     The Platinum Defendants falsely reported and inflated the valuation of Northstar, based in part on the false claim that PPVA's claims against Northstar were secured by liens on all of Northstar's assets even though they well knew mortgages and financing statements had not been filed with respect to any of the leases and other assets that Northstar purchased from Black Elk, the company was struggling to pay its obligations, and Platinum Management was causing PPVA and PPCO to fund  Northstar's operations.

817.     The Platinum Defendants falsely inflated the NAV of PPVA's assets, in order to generate for themselves tens of millions of dollars in fraudulent fees and payments – to which they were not entitled – all to the detriment of PPVA.

818.     The Platinum Defendants knowingly and intentionally made numerous false representations of material fact and omitted to state material facts to PPVA concerning the Platinum Defendants' intent to manage and administer PPVA, its subsidiaries and its assets in compliance with the terms of PPVA's governing documents, including but not limited to the PPVA Partnership Agreement.

819.    The Platinum Defendants also knowingly and intentionally defrauded PPVA by causing it to engage in transactions with and involving the Beechwood Entities that were designed to benefit the Beechwood Entities to the detriment of PPVA.

820.    The Platinum Defendants caused PPVA and its subsidiaries to engage with the Beechwood Defendants, PPCO and other insiders in insider investments, loans and other transactions at non-market prices and terms unconnected to the actual value of the transaction, such as the Nordlicht Side Letter, the Master Guaranty, creation of the Montsant Collateral Account and the Agera Transactions, without disclosing the purpose of these transactions to encumber or transfer PPVA's assets for the benefit of insiders.

821.    The Platinum Defendants intentionally withheld from PPVA the nature of the Second Scheme Transactions, purposefully omitting the encumbrances that the Platinum Defendants had granted upon PPVA's assets for the benefit of insiders and the significant loss to PPVA that resulted from the Second Scheme Transactions.

822.    PPVA reposed trust and confidence in the Platinum Defendants, based on the Platinum Defendants' assurances that they would invest PPVA's assets prudently and in PPVA's best interest, in accordance with all relevant investment guidelines.

823.    Because of the nature of the fiduciary relationship, PPVA justifiably relied upon the Platinum Defendants' misrepresentations and omissions or concealments to its detriment, by permitting the Platinum Defendants to continue management of PPVA's assets and by paying the Platinum Defendants unearned fees and bonuses based off of the Platinum Defendants' misrepresentations and omissions.

824.    PPVA has been damaged as a proximate result of each of the Platinum Defendants' fraudulent misrepresentations, omissions and actions to defraud PPVA during the First and Second

Schemes in at least the following ways: (i) PPVA paid the Platinum Defendants tens of millions of dollars in unearned distributions and/or fees, expenses, bonuses and other payments; (ii) PPVA incurred tens of millions of dollars in creditor claims arising out of the Black Elk Scheme; (iii) the Preferred Investors of the BEOF Funds improperly received priority payments ahead of PPVA and its subsidiaries due to the Black Elk Scheme; and (iv) PPVA and its subsidiaries were made parties to numerous non-commercial transactions with the Beechwood Entities, PPCO and other Platinum Management insiders that subordinated PPVA's interests and depressed or encumbered the value of PPVA's assets.

825.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

826.    In addition, because the Platinum Defendants acted knowingly, intentionally, purposefully, maliciously, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

**Sixth Count:  Aiding and Abetting Fraud against the Individual Platinum Defendants**

827.    The Plaintiffs repeat and re-allege paragraphs 1-826 as if fully set forth herein.

828.    As set forth above, Platinum Management defrauded PPVA in connection with the actions comprising the First and Second Schemes.

829.    The Individual Platinum Defendants substantially assisted and participated in Platinum Management's material misrepresentations, omissions and actions to defraud PPVA in connection with the First and Second Schemes by, *inter alia*, (i) engaging in transactions with the Beechwood Defendants and other insiders designed to support the inflated net asset values ascribed to PPVA's assets by Platinum Management, so as to enable Platinum Management to cause PPVA to pay it unearned distributions, fees, expenses and other payments; (ii) engaging in transactions

to benefit the Platinum Defendants, Beechwood Defendants and other insiders to the detriment of PPVA; and (iii) participating in the Black Elk Scheme, including, among other things, the amendment of the Black Elk Indenture; and (iv) engaging in transactions which purposefully transferred or encumbered the assets of PPVA and its subsidiaries, designed to benefit the Platinum Defendants, Beechwood Defendants, the BEOF Funds and the Preferred Investors of the BEOF Funds, PPCO and other insiders to the detriment of PPVA.

830.    The Individual Platinum Defendants had actual knowledge that Platinum Management was defrauding PPVA by engaging in the acts and transactions and making the material misrepresentations and omissions comprising the First and Second Schemes.

831.    As a direct and proximate result of the Individual Platinum Defendants' actions and substantial participation, PPVA was damaged.

832.    The actions of the Individual Platinum Defendants caused the harm on which the primary liability of fraud is predicated.

833.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

834.    In addition, because the Individual Platinum Defendants acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Seventh Count: Aiding and Abetting Breach of Fiduciary Duties against the Beechwood Defendants

835.    The Plaintiffs repeat and re-allege paragraphs 1-834 as if fully set forth herein.

836. The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties of due care, loyalty and good faith to PPVA.

837. As set forth above, the Platinum Defendants breached their fiduciary duties to PPVA by their actions in connection with the First and Second Schemes as detailed above.

838. At all relevant times, Nordlicht, Levy, Huberfeld and Bodner, together with Feuer and Taylor, created, owned, managed, controlled and operated the Beechwood Entities.

839. Beechwood and Platinum Management initially shared offices and several senior staff members of the Beechwood Entities were current or seconded employees of Platinum Management, including Levy, who was named as BAM's initial CIO and was marketed as part of the Beechwood Entities' senior executive team.

840. The Beechwood Defendants and Platinum Defendants communicated with one another regularly by email and in person regarding the statements and transactions comprising the First and Second Schemes.

841. The Beechwood Defendants substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the First and Second Schemes by, *inter alia*, (i) engaging in transactions with PPVA designed to support the inflated NAV ascribed to PPVA's assets by the Platinum Defendants, so as to enable the Platinum Defendants to charge and pay themselves unearned fees and expenses; (ii) engaging in transactions to benefit the Platinum Defendants, BEOF Funds and the Beechwood Defendants to the detriment of PPVA; (iii) participating in the Black Elk Scheme; and (iv) engaging in transactions which purposefully transferred or encumbered the assets of PPVA and its subsidiaries, designed to benefit the Beechwood Defendants and other insiders to the detriment of PPVA.

842. The Beechwood Defendants had actual knowledge that the Platinum Defendants were breaching their fiduciary obligations to PPVA by engaging in the actions and transactions comprising the First and Second Schemes.

843. As a direct and proximate result of the Beechwood Defendants' actions and substantial participation, PPVA was damaged.

844. The actions of the Beechwood Defendants caused the harm on which the primarily liability of breach of fiduciary duties is predicated.

845. By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

846. In addition, because the Beechwood Defendants acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

## Eighth Count: Aiding and Abetting Fraud
### against the Beechwood Defendants

847. The Plaintiffs repeat and re-allege paragraphs 1-846 as if fully set forth herein.

848. As set forth above, the Platinum Defendants defrauded PPVA in connection with the actions comprising the First and Second Schemes.

849. At all relevant times, Nordlicht, Levy, Huberfeld and Bodner, together with Feuer and Taylor, created, owned, managed, controlled and operated the Beechwood Entities.

850. The Beechwood Entities and Platinum Management initially shared offices and several senior staff members of the Beechwood Entities were current or seconded employees of Platinum Management, including Levy, who was named as BAM's initial CIO and was marketed as part of the Beechwood Entities' senior executive team.

851.    The Beechwood Defendants and Platinum Defendants communicated with one another regularly by email and in person regarding the statements and transactions comprising the First and Second Schemes.

852.    The Beechwood Defendants substantially assisted and participated in the Platinum Defendants' material misrepresentations, omissions and actions to defraud PPVA in connection with the First and Second Schemes by, *inter alia*, (i) engaging in transactions with PPVA designed to support the inflated net asset values ascribed to PPVA's assets by the Platinum Defendants, so as to enable the Platinum Defendants to charge and pay themselves unearned fees and expenses; (ii) engaging in transactions to benefit the Platinum Defendants, Beechwood Defendants and other insiders to the detriment of PPVA; and (iii) participating in the Black Elk Scheme, including, among other things, the amendment of the Black Elk Indenture; and (iv) engaging in transactions which purposefully transferred or encumbered the assets of PPVA and its subsidiaries, designed to benefit the Beechwood Defendants and other insiders to the detriment of PPVA.

853.    As a result, the Beechwood Defendants had actual knowledge that the Platinum Defendants were defrauding PPVA by engaging in the acts and transactions and making the material misrepresentations and omissions comprising the First and Second Schemes.

854.    As a direct and proximate result of the Beechwood Defendants' actions and substantial participation, PPVA was damaged.

855.    The actions of the Beechwood Defendants caused the harm on which the primary liability of fraud is predicated.

856.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

857.    In addition, because the Beechwood Defendants acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Ninth Count: Aiding and Abetting Breach of Fiduciary Duties against the BEOF Funds and the Preferred Investors of the BEOF Funds

858.    The Plaintiffs repeat and re-allege paragraphs 1-857 as if fully set forth herein.

859.    The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties of due care, loyalty and good faith to PPVA.

860.    As set forth above, the Platinum Defendants breached their fiduciary duties to PPVA by their actions in connection with the Black Elk Scheme.

861.    As described herein, the Platinum Defendants orchestrated the Black Elk Scheme so as to divert the proceeds of the Renaissance Sale for the benefit of themselves, the BEOF Funds and the Preferred Investors of BEOF, resulting in significant losses to and claims against PPVA.

862.    Both BEOF Funds were formed, managed and marketed by the Platinum Defendants, including Nordlicht, Landesman, Levy, Manela, Huberfeld, Bodner, Fuchs, Small, Steinberg, SanFilippo, Beren and other persons employed Platinum Management.

863.    Both BEOF Funds share overlapping investors with the funds managed by Platinum Management by way of the Preferred Investors of the BEOF Funds.

864.    Both BEOF Funds were formed in the offices of Platinum Management and operated until their conclusion by Platinum Management from the same offices.

865.    That being said, the Preferred Investors of the BEOF Funds made a conscious choice to participate in the Platinum Defendants' actions with respect to Black Elk and eventually the Black Elk Scheme.  In spring 2014, each of the Preferred Investors of the BEOF Funds agreed

to exchange their existing investments in the BEOF Funds for new investments and in some cases to invest additional funds, which agreements substantially assisted the Platinum Defendants in making it possible to effect the Black Elk Scheme.

866.    The spring 2014 agreements by the Preferred Investors of the BEOF Funds to exchange their existing investments in the BEOF Funds for new investments and/or to invest additional funds were made notwithstanding the fact that by Spring 2014, Black Elk's public filings indicated that it likely was insolvent.

867.    Both BEOF Funds and the Preferred Investors of the BEOF Funds substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the Black Elk Scheme by, *inter alia*, (i) participating in the Black Elk Scheme; and (ii) engaging in transactions to benefit the Platinum Defendants, the BEOF Funds and the Preferred Investors of the BEOF Funds to the detriment of PPVA.

868.    The BEOF Funds and the Preferred Investors of the BEOF Funds had actual knowledge that the Platinum Defendants were breaching their fiduciary obligations to PPVA by engaging in the acts and transactions comprising the Black Elk Scheme.

869.    As a direct and proximate result of the actions and substantial participation of both BEOF Funds and the Preferred Investors of the BEOF Funds, PPVA was damaged.

870.    The actions of the BEOF Funds and the Preferred Investors of the BEOF Funds caused the harm on which the primarily liability of breach of fiduciary duties is predicated.

871.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

872.     In addition, because the BEOF Funds and the Preferred Investors of the BEOF Funds acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Tenth Count: Aiding and Abetting Fraud against
### the BEOF Funds and the Preferred Investors of the BEOF Funds

873.     The Plaintiffs repeat and re-allege paragraphs 1-872 as if fully set forth herein.

874.     As set forth above, the Platinum Defendants defrauded PPVA in connection with the actions comprising the Black Elk Scheme.

875.     As described herein, the Platinum Defendants orchestrated the Black Elk Scheme so as to divert the proceeds of the Renaissance Sale for the benefit of themselves, the BEOF Funds and the Preferred Investors of the BEOF Funds, resulting in significant losses and claims against PPVA.

876.     Both BEOF Funds were formed, managed and marketed by the Platinum Defendants, including Nordlicht, Landesman, Levy, Manela, Huberfeld, Bodner, Fuchs, Small, Steinberg, SanFilippo, Beren and other persons employed Platinum Management.

877.     Both BEOF Funds share overlapping investors with the funds managed by Platinum Management by way of the Preferred Investors of the BEOF Funds.

878.     Both BEOF Funds were formed in the offices of Platinum Management and operated until their conclusion by Platinum Management from the same offices.

879.     That being said, the Preferred Investors of the BEOF Funds made a conscious choice to participate in the Platinum Defendants actions with respect to Black Elk and eventually the Black Elk Scheme.  In spring 2014, each of the Preferred Investors of the BEOF Funds agreed to exchange their existing investments in the BEOF Funds for new investments and in some cases

to invest additional funds, which agreements substantially assisted the Platinum Defendants in making it possible to effect the Black Elk Scheme.

880.    The spring 2014 agreements by the Preferred Investors of the BEOF Funds to exchange their existing investments in the BEOF Funds for new investments and/or to invest additional funds were made notwithstanding the fact that by Spring 2014, Black Elk's public filings indicated that it likely was insolvent.

881.    The BEOF Funds and the Preferred Investors of BEOF Funds substantially assisted and participated in the Platinum Defendants' material misrepresentations, omissions and actions to defraud PPVA in connection with the Black Elk Scheme by, *inter alia*, (i) engaging in transactions with PPVA designed to support the inflated NAV ascribed to PPVA's investment in Black Elk by the Platinum Defendants, so as to enable the Platinum Defendants to charge and pay themselves unearned fees and expenses; (ii) engaging in transactions to benefit the Platinum Defendants, the BEOF Funds and the Preferred Investors of BEOF Funds to the detriment of PPVA; and (iii) participating in the Black Elk Scheme.

882.    The BEOF Funds and the Preferred Investors of the BEOF Funds had actual knowledge that the Platinum Defendants were defrauding PPVA by engaging in the acts and transactions and making the material misrepresentations and omissions comprising the Black Elk Scheme.

883.    As a direct and proximate result of the actions and substantial participation of the BEOF Funds and the Preferred Investors of the BEOF Funds, PPVA was damaged.

884.    The actions of the BEOF Funds and the Preferred Investors of the BEOF Funds caused the harm on which the primary liability of fraud is predicated.

885.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

886.    In addition, because the BEOF Funds and the Preferred Investors of the BEOF Funds acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

**Eleventh Count:  Aiding and Abetting Breach of
Fiduciary Duties against Michael Katz**

887.    The Plaintiffs repeat and re-allege paragraphs 1-886 as if fully set forth herein.

888.    The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties of due care, loyalty and good faith to PPVA.

889.    As set forth above, the Platinum Defendants breached their fiduciary duties to PPVA by, among other things, causing PPVA and its subsidiaries to enter into the Agera Transactions.

890.    Beginning at least in March 2016, Katz served as an advisor to Platinum Management, and assisted in orchestrating the scheme whereby the Platinum Defendants caused PPVA's interest in Agera Energy to be transferred to an "insider" to the detriment of PPVA, which was thereafter effectuated by way of the June 2016 Agera Transactions.

891.    The Platinum Defendants communicated with Katz regularly by email and in person regarding the Agera Transactions.

892.    Katz substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the Agera Transactions by, *inter alia*,

orchestrating the Agera Transactions in order to transfer PPVA's interest in Agera Energy to the Beechwood Defendants at a significant loss to PPVA.

893.    Katz had actual knowledge that the Platinum Defendants were breaching their fiduciary obligations to PPVA by engaging in the Agera Transactions.

894.    As a direct and proximate result of Katz's actions and substantial participation, PPVA was damaged.

895.    The actions of Katz caused the harm on which the primary liability of breach of fiduciary duty is predicated.

896.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

897.    In addition, because Michael Katz acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Twelfth Count:  Aiding and Abetting Breach of
### Fiduciary Duties against Kevin Cassidy and Michael Nordlicht

898.    The Plaintiffs repeat and re-allege paragraphs 1-897 as if fully set forth herein.

899.    The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties of due care, loyalty and good faith to PPVA.

900.    As set forth above, the Platinum Defendants breached their fiduciary duties to PPVA by, among other things, causing PPVA and its subsidiaries to enter into the Agera Transactions.

901.    When Cassidy was released from prison in 2014, Nordlicht, Bodner and Huberfeld installed him as the managing director of Agera Energy.

902.    Also in 2014, Michael Nordlicht was installed by Mark Nordlicht, his uncle, as in-house counsel for Agera Energy

903.    Cassidy and Starfish, an entity dominated and controlled by Cassidy, were parties to the Agera Transactions, and received millions of dollars in Agera Sale proceeds in exchange for nothing.

904.    Michael Nordlicht willfully consented to and actively participated in the Agera Transactions and the transfer of his voting and equity interests in Agera Holdings to AGH Parent.

905.    The Platinum Defendants communicated with Cassidy and Michael Nordlicht regularly by email and in person regarding the Agera Transactions, as both Cassidy and Michael Nordlicht were deeply involved in the negotiation of the Agera Transactions.

906.    Cassidy substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the Agera Transactions by, *inter alia*, (i) orchestrating the Agera Transactions in order to transfer PPVA's interest in Agera Energy to the Beechwood Defendants; and (ii) receiving $13,552,000 in cash and interests in AGH Parent from the corrupt Agera Transactions by way of his entity, Starfish.

907.    Michael Nordlicht substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the Agera Transactions by, *inter alia*, (i) orchestrating the Agera Transactions in order to transfer PPVA's interest in Agera Energy to the Beechwood Defendants; and (ii) consenting to the transfer of his voting and equity interests in Agera Energy's parent company to AGH Parent.

908.     Cassidy and Michael Nordlicht had actual knowledge that the Platinum Defendants were breaching their fiduciary obligations to PPVA by engaging in the Agera Transactions.

909.     As a direct and proximate result of Cassidy and Michael Nordlicht's actions and substantial participation, PPVA was damaged.

910.     The actions of Cassidy and Michael Nordlicht caused the harm on which the primary liability of breaches of fiduciary duty is predicated.

911.     By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

912.     In addition, because Cassidy and Michael Nordlicht acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Thirteenth Count:  Aiding and Abetting Breach of Fiduciary Duties against Seth Gerszberg

913.     The Plaintiffs repeat and re-allege paragraphs 1-912 as if fully set forth herein.

914.     The Platinum Defendants, who are comprised of the General Partner of PPVA and the individuals who oversaw the management, operation, valuation and administration of PPVA and its subsidiaries, owed fiduciary duties of due care, loyalty and good faith to PPVA.

915.     As set forth above, the Platinum Defendants breached their fiduciary duties to PPVA by, among other things, causing PPVA and its subsidiaries to enter into the certain transactions constituting the Security Lockup.

916.     On January 1, 2016, Nordlicht brought on Gerszberg as an informal advisor to Platinum Management.

917. From January 1, 2016 until commencement of the Cayman Liquidation, Gerszberg advised the Platinum Defendants and provided substantial assistance in the formulation and execution of the Second Scheme.

918. The Platinum Defendants communicated with Gerszberg regularly by email and in person regarding the Second Scheme.

919. Gerszberg substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the Second Scheme by, *inter alia*, (i) causing PPVA to allegedly incur significant liabilities due to the Purported Underlying West Loop/Epocs Obligations; (ii) negotiating certain Second Scheme Transactions on behalf of the Platinum Defendants; (iii) negotiating and drafting the Forbearance and Security Agreement on behalf of West Loop/Epocs; and (iv) directing the transfer of $15 million in Agera Sale proceeds to himself (via Spectrum30) and Franky Zapata, all of which actions were a detriment to PPVA and its subsidiaries.

920. Gerszberg had actual knowledge that the Platinum Defendants were breaching their fiduciary obligations to PPVA by engaging in the Second Scheme.

921. As a direct and proximate result of Gerszberg's actions and substantial participation, PPVA was damaged.

922. The actions of Gerszberg caused the harm on which the primary liability of breaches of fiduciary duty is predicated.

923. By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

924.    In addition, because Gerszberg acted willingly, grossly, recklessly and wantonly negligent, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

**Fourteenth Count:  In the Alternative, Unjust Enrichment**
**against the Beechwood Defendants, Kevin Cassidy and Seth Gerszberg**

925.    The Plaintiffs repeat and re-allege paragraphs 1-924 as if fully set forth herein.

926.    In connection with the Second Scheme and as described herein, the Platinum Defendants intentionally engaged in certain acts for the purpose of transferring or encumbering PPVA's assets for the sole benefit of insiders of the Platinum Defendants, including the Beechwood Defendants, Kevin Cassidy and Seth Gerszberg.

927.    The Platinum Defendants orchestrated the Second Scheme for the intentional purpose of diverting the remaining assets of PPVA and its subsidiaries to insiders such as the Beechwood Defendants, Cassidy and Gerszberg.

928.    In connection with the Second Scheme and as described herein, the Platinum Defendants did not seek fair market terms in connection with the Second Scheme Transactions, and instead set transaction terms that knowingly caused significant damage to PPVA and would unjustly benefit insiders such as the Beechwood Defendants, Cassidy and Gerszberg.

929.    Platinum Management caused PPVA and its subsidiaries to have a direct relationship with the Beechwood Defendants, Cassidy and Gerszberg.

930.    The Beechwood Defendants would be unjustly enriched at the expense of PPVA if they were permitted to receive full benefit from the Second Scheme Transactions and related transfers.

931.    PPVA would suffer an unjust detriment if the Beechwood Defendants were permitted to receive the full benefits of the Second Scheme Transactions.

932. Permitting the Beechwood Defendants, Cassidy and Gerszberg to receive full benefit of the Second Scheme Transactions at the expense of PPVA would be against equity and good conscience.

933. By reason of the foregoing, and pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2), the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

934. In addition, because the Beechwood Defendants, Cassidy and Gerszberg acted knowingly, intentionally, purposefully, maliciously, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Fifteenth Count:  In the Alternative, Unjust Enrichment against the BEOF Funds and the Preferred Investors of the BEOF Funds

935. The Plaintiffs repeat and re-allege paragraphs 1-934 as if fully set forth herein.

936. In connection with the Black Elk Scheme and as described herein, the Platinum Defendants intentionally engaged in certain acts that resulted in the improper conveyance and transfer of $36 million to the BEOF Funds and the Preferred Investors of the BEOF Funds to the detriment of PPVA and its subsidiaries.

937. The Platinum Defendants orchestrated the Black Elk Scheme in part to divert the proceeds of the Renaissance Sale away from PPVA for the benefit of the BEOF Funds and the Preferred Investors of the BEOF Funds.

938. Platinum Management caused PPVA and its subsidiaries to have a direct relationship with the BEOF Funds and the Preferred Investors of the BEOF Funds.

939. The BEOF Funds and the Preferred Investors of the BEOF Funds would be unjustly enriched at the expense of PPVA if they were permitted to receive and retain the proceeds they received from the Black Elk Scheme.

163

940.    PPVA would suffer an unjust detriment if the BEOF Funds and the Preferred Investors of the BEOF Funds are permitted to receive the full benefits of the Black Elk Scheme and the transfers related thereto.

941.    Permitting the BEOF Funds and the Preferred Investors of the BEOF Funds to retain the full benefit of the Black Elk Scheme and the transfers related thereto at the expense of PPVA would be against equity and good conscience.

942.    By reason of the foregoing, and pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2) the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

943.    In addition, because the BEOF Funds and the Preferred Investors of the BEOF Funds acted knowingly, intentionally, purposefully, maliciously, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Sixteenth Count: Civil Conspiracy against the Platinum Defendants and the Beechwood Defendants

944.    The Plaintiffs repeat and re-allege paragraphs 1-943 as if fully set forth herein.

945.    As set forth herein, Defendants, acting in concert and as a conspiracy, engaged in various tortious conduct against PPVA in connection with the First and Second Schemes, including breach of fiduciary duties, fraud, constructive fraud and/or aiding and abetting of the same.

946.    At all relevant times, each Defendant was a knowing and intentional participant in the conspiracy and agreed to pursue its aims, namely, to transfer or encumber PPVA's assets for the benefit of the Defendants.

947.    Defendants were closely related entities or individuals, with close corporate relationships and common control, that entered into various agreements among themselves and conspired to intentionally damage PPVA.

948.    Each Defendant committed one or more overt acts in furtherance of the conspiracy, including, but not limited to:  (i) engaging in transactions designed to support the inflated NAV ascribed to PPVA's assets by the Platinum Defendants, so as to enable the Platinum Defendants to charge and pay themselves unearned fees and expenses; (ii) engaging in transactions to benefit the Platinum Defendants, Preferred Investors of the BEOF Funds and the Beechwood Defendants to the detriment of PPVA; (iii) participating in the Black Elk Scheme; and (iv) engaging in transactions which purposefully transferred or encumbered the assets of PPVA and its subsidiaries, designed to benefit the Beechwood Defendants and other insiders to the detriment of PPVA.

949.    PPVA has been injured as a proximate result of the wrongful acts committed by Defendants in furtherance of the conspiracy, as set forth in this Amended Complaint.

950.    By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial of this action, together with interest at the statutory rate.

951.    In addition, because Defendants acted willingly, grossly, recklessly and wantonly negligent, and without regard for PPVA's rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### Seventeenth Count:  Violation of Civil RICO against the
### Platinum Defendants and the Beechwood Defendants

952.    The Plaintiffs repeat and re-allege paragraphs 1-951 as if fully set forth herein.

953.    The RICO scheme has common participants and a common victim. Each of the Platinum Defendants and Beechwood Defendants violated RICO, and PPVA was injured as a result.

954.    Each of the Platinum Defendants and Beechwood Defendants is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. Section 1961(3).

955.    Each of the Platinum Defendants and Beechwood Defendants violated 18 U.S.C. § 1962(c) by means of the acts described in the preceding paragraphs and as further described below.

956.    Each of the Platinum Defendants and Beechwood Defendants, whether as an owner or employee of, or otherwise associated with, the Beechwood Entities, conducted the affairs of each of the Beechwood Entities through illegal acts as they individually and collectively directly or indirectly participated in managing, directing or operating each separate entity of the Beechwood Entities.

957.    The Enterprise.    The Platinum Defendants, Beechwood Defendants, and Beechwood Entities form an association-in-fact for the common and continuing purpose described herein and constitute an "enterprise," under 18 U.S.C. Section 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. Each one was an ongoing association with a shared purpose and relationships among the individual Platinum Defendants and Beechwood Defendants associated with the enterprise, and each entity of association endured with sufficient longevity so as to permit, encourage and support the individual associates in their efforts and actions in pursuing and advancing the purpose(s) of the enterprise. There may be other members of the enterprise who are unknown at this time.

166

958.    <u>Pattern of Racketeering Activity</u>.   The Platinum Defendants and Beechwood Defendants, each of whom is a person associated with, or employed by the enterprise, did knowingly, willfully, and unlawfully conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. Sections 1961(1), 1961(5), and 1962(c).   The racketeering activity was made possible by the Platinum Defendants and Beechwood Defendants' regular and repeated use of the facilities and services of the enterprise.   The Platinum Defendants and Beechwood Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

959.    Predicate acts of racketeering are acts that are indictable under provisions of the United States Code enumerated in 18 U.S.C. Section 1961(1)(B), as more specifically alleged below.   The Platinum Defendants and Beechwood Defendants each committed at least two such acts or else aided and abetting such acts.

960.    The acts of racketeering were not isolated.   Rather, the acts of the Platinum Defendants and Beechwood Defendants were related in that they had the same or similar purpose and result, participants, victims, and method of commission.   Further, the acts of racketeering have been continuous.   There was repeated conduct during a period of time beginning in approximately February 2014 and continuing through June 2016.

961.    <u>Predicate Acts: Use of Mails and Wires to Defraud in Violation of 18 U.S.C. Sections 1341 and 1343</u>.   Each of the Platinum Defendants and Beechwood Defendants, through the association-in-fact enterprise, engaged in two or more acts constituting indictable offenses under 18 U.S.C. Sections 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud PPVA, and to obtain money and property from PPVA, through false pretenses, representations, and promises.   To execute their scheme or artifice, the Platinum Defendants and

Beechwood Defendants caused delivery of various documents and things by the U.S. mails or by private or commercial interstate carriers, or received such therefrom and transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce various writings, signs, and signals. The acts of the Platinum Defendants and Beechwood Defendants were done with knowledge that the use of the mails or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance the scheme or artifice.

962.    The predicate acts of racketeering include: (i) an email, dated March 11, 2014, to further the Black Elk Scheme to secure the votes to amend the Indenture through the fraudulent use of Beechwood as an unauthorized proxy; (ii) emails dated May 13, 2014, June 23, 2014, and July 1, 2014, furthering the fraudulent scheme to cause PPVA to sell loan interests to Beechwood Entities at artificial and inflated prices; (iii) email communication containing false representations in the final Consent Solicitation published prior to amended of the Indenture; (iv) email communications to the Indenture Trustee consenting to the Indenture amendment; (v) an email, dated August 18, 2014, directing wire of tens of millions of dollars in funds to designated parties from proceeds of the Renaissance Sale; (vi) email communications concerning Platinum Defendants and Beechwood Defendants' causing Montsant, a PPVA subsidiary, to purchase remaining 13.75% Senior Secured Noted Beechwood Entities held at 93.5% of par; (vii) email communications from April through June 2016 concerning the sale by PGS, of which PPVA held a 55% interest, of PGS's only asset, the Agera Note, to an insider for a fraction of its fair market value; and (viii) the Nordlicht Side Letter, dated January 14, 2016, purportedly providing the proceeds owed to DMRJ from sale of IMSC to repay debts of Golden Gate Oil owed to Beechwood

Entities.   Each of these communications by or on behalf of the Platinum Defendants and Beechwood Defendants constitutes a distinct and separate offense.

963.   The aforementioned predicate acts of racketeering activity involve distinct and independent criminal acts.  They were neither isolated nor sporadic event but rather involve regular and repeated violations of law to accomplish the Platinum Defendants' and Beechwood Defendants' desired ends in the course of the business of the association-in-fact enterprise.  These acts were related to one another and to the objects of the fraudulent schemes and of obtaining money and property through the First and Second Schemes, and the Platinum Defendants and Beechwood Defendants have perpetrated and engaged in the predicate acts to further their fraudulent schemes and obtain money and property.  The predicate acts of racketeering activity have in common: (i) objectives (to divert PPVA's funds and assets for their own personal and financial benefit); (ii) participants (Platinum Defendants and Beechwood Defendants); (iii) victims (PPVA and its investors and creditors); (iv) methods of executing the schemes to defraud and to obtain money and property (using false and fraudulent representations regarding liquidity and fair market values of PPVA's assets to induce investment and regarding the independence of the Platinum Defendants and Beechwood Defendants and co-schemers); and (v) installing PPVA insiders to manage the Beechwood Entities in violation of their fiduciary duties and in furthering the First and Second Schemes.

964.   The Platinum Defendants and Beechwood Defendants' predicate acts of racketeering were conducted in furtherance of the schemes to defraud and to obtain money and property and were continuous since February 2014 until June 2016.  The predicate acts of racketeering continue formed an integral part of the enterprises' *modus operandi*.

965.    Accordingly, the Platinum Defendants and Beechwood Defendants have engaged in a pattern of racketeering activity, pursuant to 18 U.S.C. Section 1961(5).

966.    At all relevant times, each enterprise engaged in, and its activities affected, interstate commerce.

967.    Each of the Platinum Defendants and Beechwood Defendants has therefore violated 18 U.S.C. Section 1962(c) by conducting or participating in the conduct of the enterprises' affairs through a pattern of racketeering activity.

968.    PPVA has been injured in its business and property as a proximate result of each of the Platinum Defendants and Beechwood Defendants' violations of 18 U.S.C. Section 1962(c), in at least the following ways: (i) defrauding PPVA through the falsely inflated net asset value of the assets of PPVA; (ii) the Black Elk Scheme, which resulted in claims of more than $100 million against PPVA and the diversion of the Renaissance Sale proceeds away from PPVA; and (iii) the transactions comprising the Second Scheme, where PPVA's assets of approximately $300 million were offloaded to Beechwood Entities or insiders of Platinum Defendants and Beechwood Defendants, to the detriment of PPVA.

969.    All of these facts, in addition to others stated above, make it clear that Platinum Management and its executives dominated and controlled the Beechwood Entities in furtherance of the First and Second Schemes.  Accordingly, the Beechwood Entities are liable for all amounts owed by Platinum Management to PPVA in connection with the First and Second Schemes.

**Eighteenth Count: (For Relief Only) Alter Ego against the
Beechwood Entities in respect of Counts One, Two, Four and Five**

970.     The Plaintiffs repeat and re-allege paragraphs 1-969 as if fully set forth herein.

971.     This count is pleaded as additional allegations for relief against the Beechwood Entities as alter egos of Platinum Management in respect of Counts One, Two, Four and Five and not as a separate cause of action.

972.     The Beechwood Entities were formed and conceived as the alter-ego of Platinum Management for the purpose of inflicting harm upon PPVA.

973.     The Beechwood Entities and Platinum Management have overlapping ownership, in particular, Nordlicht, Huberfeld, Levy and Bodner.

974.     The Beechwood Entities and Platinum Management have overlapping management, founders and officers, including Huberfeld, Nordlicht, Bodner, Levy, Ottensoser, Small, Saks, Manela, Beren and the other persons listed herein.

975.     The Beechwood Entities were founded in and initially operated from the offices of Platinum Management.

976.     The Beechwood Entities were capitalized by the Platinum Defendants with assets controlled by Platinum Management.  The Beechwood Entities and Platinum Management were inadequately capitalized relative to their business and investment risks at all relevant times.

977.     The Beechwood Entities were financed and created by Platinum Management and assets controlled by Platinum Management were used to finance the Beechwood Entities.

978.     The individual Platinum Defendants and Beechwood Defendants, including Levy and Manela, used email addresses at both Beechwood and Platinum Management interchangeably in furtherance of their efforts in connection with the First and Second Schemes.

979.     As set forth in detail herein, Platinum Management and the Beechwood Entities used the property of PPVA in furtherance of a fraud, in order to siphon fees off of inflated NAVs.  The Beechwood Entities and Platinum Management caused PPVA and Beechwood to make joint investments, often to the detriment of PPVA and its creditors and investors.  Beechwood and Platinum Management entered into informal and unreported loan agreements and terms, put-back agreements, and guarantees including the GGO Put Option and Guaranty, cross collateralization of assets, and the Nordlicht Side Letter, all of which were not reported to PPVA.

980.     The ultimate decision making for both Platinum Management and the Beechwood Entities rested with the same controlling minds: Nordlicht, Huberfeld, Levy and Bodner.

981.     Platinum Management often caused PPVA to commit acts which benefited the Beechwood Entities at PPVA's expense, including but not limited to the Black Elk Scheme, the Nordlicht Side Letter, the Master Guaranty, the PEDEVCO subordination, and the Agera Transactions.

982.     By virtue of the Master Guaranty and the Agera Transactions, PPVA assets were transferred to the ownership and control of the Beechwood Defendants and Beechwood Entities without formal marketing or other market-based controls, by way of corrupt and wrongful insider transactions.

983.     Beechwood and Platinum Management engaged in a corrupt enterprise to pursue fraudulent, wrongful, and illicit purposes, which directly harmed PPVA.  This enterprise and plan is summarized herein as the First Scheme and the Second Scheme, wherein Platinum Management formed and created the Beechwood Entities for the corrupt and wrongful purposes of inflating PPVA's asset values and taking fees based upon these values, engaging in the Black Elk Scheme

for the benefit of the BEOF Funds and to the detriment of PPVA, and then forming and executing the Second Scheme for the purpose of dissipating PPVA's remaining valuable assets to Beechwood, most notably its interests in IMSC and Agera Energy.

984.    By reason of the foregoing, the Beechwood Entities are alter egos of Platinum Management and are liable to the same extent as Platinum Management in connection with the Plaintiffs' Counts One, Two, Four and Five.

**Nineteenth Count: (For Relief Only) Alter Ego against the
BEOF Funds in respect of Counts One, Two, Four and Five**

985.    The Plaintiffs repeat and re-allege paragraphs 1-984 as if fully set forth herein.

986.    This count is pleaded as additional allegations for relief against the BEOF Funds as alter egos of Platinum Management in respect of Counts One, Two, Four and Five and not as a separate cause of action.

987.    Platinum Management formed the BEOF Funds for the corrupt and wrongful purpose of siphoning nearly $100 million in funds out of Black Elk in connection with the Renaissance Sale, all the while allowing PPVA and its subsidiaries to face the consequences in the form of substantial creditor claims and the total devaluation of the Black Elk bonds that would be repurchased by PPVA via Montsant.

988.    Both BEOF Funds were formed by the same persons and counsel that formed Platinum Management.

989.    Both BEOF Funds have overlapping ownership, management and control with Platinum Management, and were formed by a corrupt group of the Platinum Defendants for the purpose of covering their Black Elk investment losses in the wake of the Black Elk Explosion.

990.    Platinum Management directed the capitalization of both BEOF Funds.

991.    Both BEOF Funds share overlapping investors with the funds managed by Platinum Management.

992.    Both BEOF Funds were formed in the offices of Platinum Management and operated until their conclusion by Platinum Management from the same offices.

993.    Both BEOF Funds were named similar to other funds managed by Platinum Management, which other funds shared overlapping investments in Black Elk.

994.    Ultimate decision making for both Platinum Management and the BEOF Funds rested in the same controlling minds: Nordlicht, Huberfeld, Small, Levy and Bodner.

995.    Both BEOF Funds were formed and conceived to execute a fraud that harmed PPVA and benefited both BEOF Funds, to wit – the diversion of the Renaissance Sale proceeds.

996.    By reason of the foregoing, the BEOF Funds are alter egos of Platinum Management and are liable to the same extent as Platinum Management in connection with Plaintiffs' Counts One, Two, Four and Five.

## Twentieth Count:  Declaratory Judgment
## The Nordlicht Side Letter Is Void and Unenforceable as Contrary to Public Policy

997.    The Plaintiffs repeat and re-allege paragraphs 1-996 as if fully set forth herein.

998.    On or about January 14, 2016, Nordlicht executed the Nordlicht Side Letter purportedly on behalf of himself, PPVA, PPCO "and each of their affiliates."

999.    The Nordlicht Side Letter is purportedly signed by Feuer as a witness.

1000.   Neither PPVA nor any of its subsidiaries received any consideration whatsoever in return for executing the Nordlicht Side Letter.

1001.   The intended and direct result of the Nordlicht Side Letter was to provide the Beechwood Entities with a right to obtain payment of the Golden Gate Oil Loan, which at that time totaled approximately $37 million, from the proceeds of the sale of IMSC and the repayment

174

of IMSC's loan obligations to DMRJ and Montsant, irrespective of whether such amounts were held by PPVA or one of its affiliates.

1002.   The Nordlicht Side Letter constituted a furtherance of the corrupt and fraudulent First and Second Schemes, whereby the Platinum Defendants and Beechwood Defendants siphoned off hundreds of millions of dollars in assets from PPVA for their own benefit.

1003.   As the Nordlicht Side Letter is permeated with fraud and in violation of applicable law, the dictates of public policy and justice warrant a finding that the Nordlicht Side Letter is void and unenforceable.

1004.   By reason of the foregoing, the Plaintiffs are entitled to a judgment declaring that the Nordlicht Side Letter cannot be enforced by any of the Beechwood Defendants in any capacity, as the Nordlicht Side Letter is void and unenforceable as against public policy.

### Twenty-First Count: Declaratory Judgment that the Master Guaranty Is Void and Unenforceable as against Public Policy

1005.   The Plaintiffs repeat and re-allege paragraphs 1-1004 as if fully set forth herein.

1006.   On or about March 21, 2016, Montsant, PPVA, Golden Gate Oil and BAM Administrative entered into the "Master Guaranty", by which, *inter alia*, (i) Montsant agreed to guaranty amounts owed to various Beechwood Entities and SHIP by Golden Gate Oil, to the extent of the assets contained in the Montsant Collateral Account; and (ii) BAM Administrative, as agent for certain Beechwood Entities and SHIP, was provided with a non-recourse guaranty from PPVA of amounts owed by Golden Gate Oil and amounts owed by Montsant.

1007.   The Master Guaranty amounted to a significant encumbrance of the remaining assets of PPVA which solely benefited the interests of the Beechwood Defendants.

1008.   The intended result of the Master Guaranty was to provide the Beechwood Entities holding the Golden Gate Oil debt with a claim to IMSC proceeds, the Montsant Collateral Account, and various other PPVA assets.

1009.   As a result of the Master Guaranty, the Platinum Defendants and Beechwood Defendants were able to continue their misrepresentation as to the value of the Golden Gate Oil investment, as the anticipated sale proceeds from IMSC and the assets in the Montsant Collateral Account could be used to pay the Golden Gate Oil Loan in full.

1010.   The Master Guaranty constituted a furtherance of the corrupt First and Second Schemes, whereby the Platinum Defendants and Beechwood Defendants siphoned off hundreds of millions of dollars in assets from PPVA for their own benefit.

1011.   As the Master Guaranty is permeated with fraud and in violation of applicable law, the dictates of public policy and justice warrant a finding that the Master Guaranty is void and unenforceable.

1012.   By reason of the foregoing, the Plaintiffs are entitled to a judgment declaring that the Master Guaranty cannot be enforced by the Beechwood Entities in any capacity, as the Master Guaranty is void and unenforceable as against public policy.

WHEREFORE, the Plaintiffs pray that this Court enter judgment against Defendants as follows:

a)       on the Plaintiffs' first count, awarding compensatory damages against the Platinum Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Platinum Defendants in an amount to be determined at trial;

b)      on the Plaintiffs' second count, awarding compensatory damages against the Platinum Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Platinum Defendants in an amount to be determined at trial;

c)      on the Plaintiffs' third count, awarding compensatory damages against the Individual Platinum Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Individual Platinum Defendants in an amount to be determined at trial;

d)      on the Plaintiffs' fourth count, awarding compensatory damages against the Platinum Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Platinum Defendants in an amount to be determined at trial;

e)      on the Plaintiffs' fifth count, awarding compensatory damages against the Platinum Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Platinum Defendants in an amount to be determined at trial;

f)      on the Plaintiffs' sixth count, awarding compensatory damages against the Individual Platinum Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Individual Platinum Defendants in an amount to be determined at trial;

g)      on the Plaintiffs' seventh count, awarding compensatory damages against the Beechwood Defendants in an amount to be determined at trial plus interest at

the statutory rate, plus punitive damages against the Beechwood Defendants in an amount to be determined at trial;

h)      on the Plaintiffs' eight count, awarding compensatory damages against the Beechwood Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Beechwood Defendants in an amount to be determined at trial;

i)      on the Plaintiffs' ninth count, awarding compensatory damages against the BEOF Funds and the Preferred Investors of the BEOF Funds in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the BEOF Funds and the Preferred Investors of the BEOF Funds in an amount to be determined at trial;

j)      on the Plaintiffs' tenth count, awarding compensatory damages against the BEOF Funds and the Preferred Investors of the BEOF Funds in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the BEOF Funds and the Preferred Investors of the BEOF Funds in an amount to be determined at trial;

k)      on the Plaintiffs' eleventh count, awarding compensatory damages against Michael Katz in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against Michael Katz in an amount to be determined at trial;

l)      on the Plaintiffs' twelfth count, awarding compensatory damages against Kevin Cassidy and Michael Nordlicht in an amount to be determined at trial plus

interest at the statutory rate, plus punitive damages against Kevin Cassidy and Michael Nordlicht in an amount to be determined at trial;

m)      on the Plaintiffs' thirteenth count, awarding compensatory damages against Seth Gerszberg in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against Seth Gerszberg in an amount to be determined at trial;

n)      on the Plaintiffs' fourteenth count, compensatory damages against the Beechwood Defendants, Seth Gerszberg and Kevin Cassidy in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Beechwood Defendants, Seth Gerszberg and Kevin Cassidy in an amount to be determined at trial;

o)      on the Plaintiffs' fifteenth count, compensatory damages against the BEOF Funds and the Preferred Investors of the BEOF Funds in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against BEOF Funds and the Preferred Investors of the BEOF Funds in an amount to be determined at trial;

p)      on the Plaintiffs' sixteenth count, compensatory damages against the Platinum Defendants and Beechwood Defendants in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Platinum Defendants and Beechwood Defendants in an amount to be determined at trial;

q)      on the Plaintiffs' seventeenth count, treble damages against the Platinum and Beechwood Defendants in an amount to be determined at trial plus interest at the statutory rate;

r)      on the Plaintiffs' eighteenth count, awarding compensatory damages against the Beechwood Entities as the alter ego of Platinum Management in respect of counts one, two, four and five, in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the Beechwood Entities in an amount to be determined at trial, to the same extent that the Platinum Defendants are liable on the Plaintiffs' first, second, fourth and fifth counts;

s)      on the Plaintiffs' nineteenth count, awarding compensatory damages against the BEOF Funds as the alter ego of Platinum Management in respect of counts one, two, four and five, in an amount to be determined at trial plus interest at the statutory rate, plus punitive damages against the BEOF Funds in an amount to be determined at trial, to the same extent that the Platinum Defendants are liable on the Plaintiffs' first, second, fourth and fifth counts;

t)      on the Plaintiffs' twentieth count, a judgment declaring that the Nordlicht Side Letter cannot be enforced by the Beechwood Entities in any capacity as the Nordlicht Side Letter is void and unenforceable as against public policy; and

u)      on the Plaintiffs' twenty-first count, a judgment declaring that the Master Guaranty cannot be enforced by the Beechwood Entities in any capacity as the Master Guaranty is void and unenforceable as against public policy.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.


Dated: January 23, 2019
New York, New York

HOLLAND & KNIGHT LLP

By: _____
        Warren E. Gluck, Esq.

Warren E. Gluck, Esq.
Barbra R. Parlin, Esq.
Mitchell J. Geller, Esq.
John Brownlee, Esq. (*pro hac vice forthcoming*)
Timothy D. Belevetz, Esq. (*pro hac vice forthcoming*)
Richard A. Bixter Jr., Esq. (*pro hac vice forthcoming*)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, New York 10019
Telephone: 212-513-3200
Facsimile:  212-385-9010
Email: warren.gluck@hklaw.com
           barbra.parlin@hklaw.com
           mitchell.geller@hklaw.com
           john.brownlee@hklaw.com
           timothy.belevetz@hklaw.com
           richard.bixter@hklaw.com


*Attorneys for Plaintiffs Martin Trott and Christopher Smith, as Joint Official Liquidators and Foreign Representatives of Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation), and for Platinum Partners Value Arbitrage Fund L.P. (in Official Liquidation)*

181

## INDEX OF EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1 | Huberfeld Information & Guilty Plea |
| 2 | February 12, 2016 email from Fuchs to Bodner RE investor objection |
| 3 | Huberfeld Family Foundation 2014 Tax Return |
| 4 | PPVA Second Amended & Restated Limited Partnership Agreement |
| 5 | Platinum Management Second Amended & Restated Operating Agreement |
| 6 | March 2016 PPVA Tearsheet |
| 7 | September 2015 PPVA Due Diligence Questionnaire |
| 8 | November 2012 PPM for Offshore Feeder Fund |
| 9 | December 2015 PPVA Marketing Presentation |
| 10 | January 8, 2016 Desert Hawk Email to Levy |
| 11 | February 18, 2016 Desert Hark Email to Levy |
| 12 | March 29-April 1, 2016 Urigen Email RE Missed Payroll |
| 13 | June 15-22, 2016 GGO Email RE Missed Payroll |
| 14 | June 30, 2016 Letter to PPVA Investors RE Suspension of NAV Reporting |
| 15 | July 8, 2016 Email Showing PPVA with Less than $100 |
| 16 | August 23, 2016 Voluntary Petition for PPVA Liquidation |
| 17 | August 23, 2016 Second Affidavit of Nordlicht for PPVA Liquidation |
| 18 | August 25, 2016 Cayman Order Appointing Joint Provisional Liquidators |
| 19 | October 27, 2016 Cayman Order Converting to Official Liquidation |
| 20 | November 22, 2016 Chapter 15 Recognition Order |
| 21 | December 16, 2016 Final Cayman Order Appointing JOLs |
| 22 | September 29, 2017 Order Appointing Trott & July 6, 2018 Order Appointing Smith |
| 23 | December 19, 2016 SEC Complaint |
| 24 | PPVA Sterling Valuation as of December 31, 2012 |
| 25 | January 22, 2015 Email Showing Adjustment of NAV |
| 26 | PPVA Sterling Valuation as of December 31, 2013 |
| 27 | Black Elk 2013 Q4 10-Q |
| 28 | May 23, 2014 Email RE Black Elk Disclosure of GGO Value |
| 29 | April 3, 2012 Email RE Optimistic Performance of GGO |
| 30 | November 23, 2012 Email RE GGO Value Rising to $45M |
| 31 | July 30, 2015 Email Re Concerns with Beechwood |
| 32 | February 28, 2013 Email Discussing Beechwood NDA |
| 33 | March 28, 2013 Email Concerning Platinum Management's Initial Investment in Beechwood |
| 34 | Beechwood Overview Memo |
| 35 | April-May 2013 Emails between Levy and Crystal O'Sullivan |
| 36 | Beechwood Term Sheet |

37          O'Sullivan Invoice
38          June 4, 2013 Email Sample Investment Guidelines for Beechwood
39          June 12, 2013 Email RE Deal Opportunities for Beechwood
40          June 16, 2013 Beechwood Re Presentation
41          June 20, 2013 Email RE Bryan Cave Opening New Matter for Beechwood
42          Bryan Cave Engagement Letter
43          July 3, 2013 Bryan Cave Email RE Draft Beechwood Documents
44          Unaudited Balance Sheet September 1, 2013
45          February 3, 2014 Email RE GGO Needing Funding
46          GGO Note Purchase Agreement
47          March 7, 2014 PEDEVCO Note Purchase Agreement
48          March 19, 2014 Intercreditor Agreement
49          Black Elk Indenture
50          February 4, 2013 Huberfeld Email Re BEOF Deal
51          February 20, 2013 Huberfeld Email with Harari
52          Black Elk 2013 10-K
53          July 2014 Emails RE Rescinding Firing of Shulse
54          March 3, 2014 Email RE Steinberg's Wife and Black Elk
55          July 1, 2014 Emails RE Selling $7M Interest in Senior Secured Notes
56          Small Authorization for Consent Solicitation
57          Black Elk August 21, 2014 8-K
58          August 18, 2014 Email RE Wiring $70M from Black Elk
59          August 2014 Sterling Bank Statement
60          August 2014 Wire Transfers from PPVA to Black Elk
61          Black Elk Adversary Complaint
62          Black Elk 2014 Q3 10-Q
63          2015 Montsant Loan Promissory Note
64          May 13, 2015 Montsant Pledge Agreement
65          Northstar Notes
66          Northstar/Agera Security Agreement
67          PPVA 2014 Q4 Valuation
68          PPVA 2015 Q1 Valuation
69          June 30, 2016 Indicative NAV Report
70          PPVA 2016 Q1 Valuation
71          Northstar Sale Order
72          May 4, 2015 Montsant Assignment Agreement
73          January 13, 2016 Cash Report
74          Nordlicht Side Letter
75          Stock ticker price of Navidea on October 26, 2015
76          Stock ticker price of Navidea on March 21, 2016
77          Master Guaranty

| | |
|---|---|
| 78 | China Horizon Collateral Assignment |
| 79 | China Horizon Turnover Agreement |
| 80 | Carbon Credits Collateral Assignment |
| 81 | March 13, 2016 Email from Nordlicht to Katz RE Agera Sale to Insider |
| 82 | March 21, 2016 Email from Nordlicht to PM Employees Introducing Katz |
| 83 | Amended and Restated Agera Note |
| 84 | March 21, 2016 Email from Nordlicht to Reuters Reporter RE Cassidy |
| 85 | July 15, 2016 Narain Investment Memorandum |
| 86 | March 27, 2016 Email from Nordlicht to Katz RE Sale of Agera to Beechwood Led "consortium" |
| 87 | May 11, 2016 Email from Nordlicht RE Agera Off Market |
| 88 | AGH Parent Amended Operating Agreement |
| 89 | Agera Note Purchase Agreement |
| 90 | Agera Closing Documents:  Flow of Funds Memorandum and Funding Direction Letter |
| 91 | Starfish Purchase Agreement |
| 92 | AGH Parent Redemption Notice |
| 93 | AGH Parent to PGS Assignment |
| 94 | May 11, 2015 PPNE Note |
| 95 | August 12, 2015 PPNE Note |
| 96 | Twosons Note |
| 97 | Twosons Side Letter |
| 98 | July 4, 2016 Email from Nordlicht to Gerszberg  RE PPVA liquidation |
| 99 | Forbearance and Security Agreement |
| 100 | Zapata and Gerszberg Master Agreement for Unification of Businesses |
| 101 | Spectrum30 Flow of Funds Letter |