## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **MARTIN TROTT AND CHRISTOPHER SMITH, AS JOL,**<br><br>**PLAINTIFF,**<br><br>**VS.**<br><br>**PLATINUM MANAGEMENT (NY) LL, et al.**<br><br>**DEFENDANTS.** | **DOCKET NO.:  1:18-cv-10936-JSR; 18 Civ. 10936 (JSR)** |

---

### BRIEF OF SETH GERSZBERG IN SUPPORT OF HIS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

---

**Brief Submitted by:**
**Seth Gerszberg**
**229 Chestnut Street**
**Englewood, New Jersey 07631**
*Pro Se*

Seth Gerszberg ("Gerszberg") respectfully submits this brief in support of its motion to dismiss all claims against it in the Joint Official Liquidators ("JOL") Second Amended Complaint ("SAC") for failure to state a claim under Federal rule of Civil Procedure 12(b)(6). Gerszberg herein joins with the motions to dismiss filed contemporaneously herewith with regards to the SAC, on the same or similar grounds of the other defendants.

## PRELIMINARY STATEMENT

The SAC fails to present a coherent narrative to support the JOLs' guilt by association approach to litigation. In addition, the SAC fails to make any particularized allegations of fact against Gerszberg, resulting in a mixed set of conclusory claims. When taken together,  these conclusory claims do not form a cogent story, and at times are self-contradicting.

The SAC pleads two counts against Gerszberg: (1) aiding and abetting breach of fiduciary duty (Count Thirteen); and (2) unjust enrichment (Count Fourteen). Nowhere in the over 200 pages, 1,000 paragraphs, or 101 exhibits is there to be found the requisite "who", "what", "where", "when", or "why" of Gerszberg's allegedly culpable conduct, let alone in a manner sufficient to meet the heightened pleading requirements to allege fraud related causes of action of the Federal Rules of Procedure. After weeding through the muck of vague and conclusory allegations, the JOLs' are alleging that Gerszberg aided and abetted the Platinum Defendants' breaches of their fiduciary obligations to PPVA in relation to four scenarios: (1) it is alleged Gerszberg caused PPVA to incur liabilities due to the "Purported Underlying West Loop/Epocs Obligations"; (2) it is alleged Gerszberg negotiated "certain Second Scheme Tranactions" on behalf of the Platinum Defendants; (3) it is alleged Gerszberg negotiated and drafting the Forbearance and Security Agreement on behalf of West Loop/Epocs; and (4) it is alleged that Gerszberg directed the transfer of $15 million in Agera Sale proceeds to himself (via

Spectrum30) and Franky Zapata . Essentially, the JOLs claim these deals were done for the sole benefit of Gerszberg and his associates for no consideration at all. However, conveniently, and in an effort to circumvent any opposition in the motion to dismiss stage, the JOLs fail to attach the agreements that relate to these deals – the agreements which unequivocally detail said consideration. [1]

None of these propositions, independently or in combination, support the causes of action asserted against Gerszberg. Notably, the JOLs are in a position to plead Facts with the detail required by Rule 9(b) because they have had thousands of documents from Gerszberg and others. As such, the Court should dismiss the SAC against Gerszberg with prejudice.

---

[1] In fact, one of the more egregious pleading tactics the JOL's employ is the manner in which they selectively attach exhibits to support their claims. Of the 101 exhibits attached to the

## FACTUAL BACKGROUND

### A.  BACKGROUND GENERALLY

Gerszberg is a 25-year veteran of the apparel industry, with a proven track history of success in the business building one of the largest youth culture street-wear brands in the world, with sales exceeding billions of dollars. See generally SAC ¶729.

At the time Gerszberg was first introduced to PPVA and Mark Nordlicht ("Nordlicht"), at the end of 2013, Gerszberg owned an operated a collection of retail and wholesale apparel companies, to which Gerszberg had already personally invested approximately $40 million. Id. In addition, Gerszberg owned all of the United States, and a large part of the global intellectual property for hydro-flight, into which he personally invested $6 million.[2]  It was this company that ultimately partnered with Franky Zapata, and the company Zapata Industries SAS ("Zapata"), a hydra-propulsion technology company, which possessed technology for a water-based fly-board device. SAC ¶¶752-53.

### B.  ORIGINS OF THE WESTLOOP EPOCS OBLIGATIONS

On or around September 8, 2014, Atlantic Growth Capital, LLC ("Atlantic Growth"), a PPVA subsidiary, entered into a loan agreement with certain entities comprising Over Everything,[3] in order to provide The Collective with $40 million in a combination of working capital and acquisition funding (the "Collective Loan"). SAC ¶729-30. While referenced in the SAC, this agreement is not attached to the pleading, and is attached hereto to the Affidavit of Seth Gerszberg ("Gerszberg Aff."), as Exhibit A, the September 8, 2014 Loan and Security

---

[2] Hydro-flight is a term used for flying people in the air with the use of downward water pressure from a pump system such as a jet ski.

[3]  Over Everything was the umbrella company for a collection of companies including The Collective, TC OPS, 3 Tac and Suchman are all owned by Gerszberg and d/b/a/ The Collective. See Gerszberg Aff., at Exhibit A.

Agreement, at page 2. **In exchange for the loan, PPVA retained an ownership interest of 50% of the Collective. Id.**

Subsequently, however, Atlantic (which is owned by PPVA) was only able to fund $15 million of the monies that was promised to the Collective in said agreement/loan (Gerszberg Aff., at Exhibit A), which forced the Collective into a precarious position where it was caused to be unable to fund the working capital to purchase the inventory for its stores in Q4 of 2014 through 2015. SAC ¶¶733-35. Even the $15 million that was provided, was not given on time. Nor was the Collective able to acquire companies to grow and scale. See generally SAC ¶¶731-37. Ultimately, this lack of funding caused the Collective to sustain significant losses (and which led to Gerszberg to wind down his company, at the end of 2015). Id.

Accordingly, in an email dated August 10, 2015, Nordlicht suggests to Gerszberg that Steve Finkelman and Allen Finkelman (the "Finkelmans"), who operate and control the entities Westloop and Epocs, proffer the money that was promised to the Collective, so that the Collective could purchase said apparel to fill its stores and orders ("Westloop/Epocs Obligations"). See Gerszberg Aff., at Exhibit B; see also SAC ¶¶731-37. In exchange for this loan, PPVA would pay the Finkelmans $5 million via notes from PPNE. SAC ¶737.

Thereafter, the Finkelmans' Westloop/Epocs Obligations were not paid by PPVA pursuant to the notes (to date, they have not been paid back). In fact, the SAC acknowledges that even as of July of 2016, the repayment of the Finkelman debt was being negotiated. SAC ¶¶737, 747. Accordingly, it was Gerszberg's personal and *Fiduciary obligation via the Collective* to ensure the repayment of this Finkelman debt.

### C. **GERSZBERG/ZAPATA DEAL**

The only other global IP holder of hydro-flight was a group of companies created by a French inventor named Franky Zapata ("Franky"). SAC ¶¶753-53. Gerszberg and Franky had discussed different structures for merging the IP with the Zapata operating business. Id. In April, 2016, Franky evolved the company to include jet propulsion to fly with air and not just water, and which had enormous potential for military application. Id.

On or around April of 2016, Gerzberg entered into a deal with Franky, wherein Gerszberg would convey all of his Intellectual Property, in addition to approximately 8 million euro of payment to Franky and €2 million euro in working capital loan to the Company. Franky would in turn convey all of his intellectual property for water and air flight technology, and his operating company, which had earned over $2 million in the prior year, plus a €3 million euro working capital loan to the company. Id.; see also Exhibit 100 attached to the SAC. Ultimately, the combined company would be owned 40% to Gerszberg and 60% to Franky.

### D. **IMSC/ZAPATA MERGER**

Implant Sciences Corporation ("IMSC") was a publically traded company that sold explosive trace detention technology to airports globally. See SAC ¶¶12, 50, 436-38. PPVA and/or PPVA subsidiaries, had options and warrants that when exercised would provide PPVA with the majority stake in IMSC, in addition to the interest in the loans it provided to IMSC. Id.

On or around the first half of 2016, IMSC was looking for options to reduce its debt to PPVA and to grow by, among other options, selling its current technology, which they would use the proceeds of such sale, in turn, for repayment of the PPVA debt and excess cash projected at approximately $40 million in proceeds to purchase a new compelling technology/company.

In May of 2016, managers of PPVA introduced Gerszberg to the President of IMSC, Robert Liscousk. See Gerszberg Aff., at Exhibit C, an email dated May 12, 2016 from Robert Liscouski to David Levy regarding the potential acquisition of Zapata.  PPVA viewed a reverse merger of IMSC as creating the highest potential financial outcome for the IMSC business.

At that time, Gerszberg was concerned in entering into an agreement with PPVA and/or companies with significant PPVA investments. In the wind down of the Collective, Gerszberg was personally exposed for approximately $7 million in personal guarantees for the company, on top of the fact that the Finkelmans were still owed an additional approximately $7 million.  SAC ¶¶ 731-737. Thus, in order to motivate Gerszberg, PPVA proposed lending Gerszberg $15 million, provided that Gerszberg worked to finalize the reverse merger between Zapata and IMSC ("Zapata/IMSC Merger"), a framework for which is detailed in the June 9, 2016 agreement between the PPVA subsidiary Huron Capital, LLC ("Huron") and Spectrum30, LLC ("Spectrum30") (the "Huron Loan Document"). See Gerszberg Aff., at Exhibit D. [4]

To satisfy the concern regarding the Finkelman debt, PPVA agreed to provide notes to the Finkelmans that would ensure that they would be paid back from the IMSC/Zapata deal. Because those notes could not be conveyed at the time of the Huron loan, and as an additional negotiated security, a precondition to the Huron Loan Document included a provision that provided that Gerszberg could offset the money owed to the Finkelmans (i.e. the Westloop/Epocs obligations) prior to PPVA's repayment.[5]

---

[4]  Also, a subsequent amendment to the Huron Note was entered into by said parties, exchanging an extension of the transaction timeline for the IMSC/Zapata deal, for additional offset rights to Gerszberg.  See Gerszberg Aff., at Exhibit H.

[5]  This was contemplated at that time because Gerszberg would not enter into the deal (and accept any more money) if the Finkelmans were not assured payment of the debts owed to them.

In addition, the June 9, 2016 Huron Loan Document also states that a letter of intent was required by Gerszberg within 30 days. As such, Gerszberg had 30 days to complete all the related conditions- precedent in order to effectuate the deal, including the Forbearance and Security Agreement, entered into among PPVA, DMRJ, West Loop and Epocs (the "Forbearance and Security Agreement").   SAC ¶747. Accordingly, drafting the Forbearance and Security Agreement was not a reaction to Mark Nordlicht's July 4, 2016 email – as alleged by the Plaintiff - but was just one of the many activities necessary to be completed in 30 days under the IMSC/Zapata deal. By way of example, an email dated June 24, 2016, requests help from Andy Stamelman, Esq., in drafting a Forbearance and Security Agreement between the Finkelmans and PPVA. See Gerszberg Aff., at Exhibit E.[6] The Forebearance was requested by PPVA, so that the Finkelman's would not sue them while IMSC pursued a tranfaction with Zapata. Moreover, on July 5, 2016, Mark Nordlicht acknowledged that the threat of liquidation was just utilized as leverage for negotiations in a separate matter. See Gerszberg Aff., at Exhibit F.[7]

---

[6] Also, four days later, on June 28, 2016, Steve Finkelman is first informed that he is receiving the Security interest. See Gerszberg Aff., at Exhibit G.

[7] Gerszberg submits that any Exhibits attached hereto, that which were not included in the pleading, were in the possession of the JOLs via a related litigation with the Finkelmans, where Gerszberg was required to provide thousands of documents for.

## LEGAL ARGUMENT

I. **APPLICABLE LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 562 (2007) (citations and emphasis omitted). **A complaint will not satisfy the pleading requirements if it offers only '"labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,'" and does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"** Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citations omitted; emphasis added). Accordingly, "[w]hile the Court must take as true all well-pleaded cacts, **conclusory allegations must be disregarded.**" Pollio v. MF Global, Ltd., 608 F. Supp. 2d 564, 572 (S.D.N.Y. 2009) (citation omitted; emphasis added).

Moreover, the factual allegations must meet a "plausibility" standard. Twombly, 550 U.S. at 564. In this connection, the complaint must plead sufficient facts to "state a claim to relief that is plausible on its SACe." Iqbal, 556 U.S. at 678, quoting Twombly, 550 U.S. at 570; see also Prout v. Vladeck, 316 F. Supp. 3d 784, 797 (S.D.N.Y. 2018). "A claim has SACial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. However, where a complaint "pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Id. Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" Id. at 679.

**In addition, where, as here, the claims sound in fraud, the heightened pleading standard requires the underlying circumstances to be stated with particularity.** See Fed. R. Civ. P. 9(b) (emphasis added); see also Mazzaro de Abreu v. Bank of Am. Corp., 525 F. Supp. 2d 381, 387 (S.D.N.Y. 2007) ("Rule 9(b) provides that the circumstances of fraud must 'be alleged with particularity,' requiring 'reasonable detail as well as allegations of fact from which a strong inference of fraud reasonably may be drawn'"). **This heightened pleading requirement applies to a claim of aiding and abetting a breach of fiduciary duty that involves an alleged fraud**. See Krys v. Pigott, 749 F.3d 117, 129 (2d Cir. 2013)(emphasis added); see also Kolbeck v. LIT Am., 939 F. Supp. 240, 245 (S.D.N.Y. 1996) ("To the extent the underlying primary violations are based on fraud, the allegations of aiding and abetting liability must meet the particularity requirements of Fed. R. Civ. P. 9(b)."); Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 119 (2d Cir. 1982) ("[C]onclusory allegations that defendants aided and abetted or conspired are not enough.");  Bullmore v. Ernst & Young Cayman Is., 45 A.D.3d 461, 464 (N.Y. 1st Dep't 2007); Marino v. Grupo Mundial Tenedora, S.A., 810 F. Supp. 2d 601, 614 (S.D.N.Y. 2011)(dismissing complaint that alleged "no specific evidence" in support of aiding and abetting).[8]

Similarly, Rule 9(b)'s heightened pleading requirement applies to claims of unjust enrichment that are "based on the same predicate allegations relating to a fraudulent scheme" that form the gravamen of a complaint. See DeBlasio v. Merrill Lynch & Co., No. 07 Civ. 318 (RJS), 2009 U.S. Dist. LEXIS 64848, at *35-36, 39 (S.D.N.Y. July 27, 2009).

---

[8] To the extent that this Court does not apply the heightened pleading standard, Gerszberg submits that the SAC should be dismissed as the statute of limitations for ordinary aiding and abetting breach of fiduciary duty is applicable (3 years). Accordingly, since three years has elapsed since the date when the JOL's first allege Gerszberg aided and abetted the Platinum Defendants in their breach of fiduciary duty towards PPVA, the SAC should be dismissed.

The SAC does not allege any Facts with sufficient particularity to sustain a claim of aiding and abetting a breach of fiduciary duty, nor does it establish any claim for unjust enrichment. Therefore, the SAC must be dismissed as against Gerszberg.

II. **THE SAC FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT AGAINST GERSZBERG (COUNT FOURTEEN)**

### A. *The Subject Of This Alleged Dispute Is Governed By An Express Contract.*

The JOL's unjust enrichment claim is barred by the existence of a written contract governing the terms and conditions of the transfer of the Agera sale proceeds.

To state a claim for unjust enrichment, a complaint must allege "that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004); see also In re Optimal U.S. Litig., 813 F. Supp. 2d 383, 402 (S.D.N.Y. 2011). However, unjust enrichment is an equitable remedy resorted to only when there is no express contract between the parties. See e.g., Clark-Fitzpatrick, Inc. v. Long Island Rail Road Co., 70 N.Y.2d 382, 388 (1987) ("A 'quasi contract' only applies in the absence of an express agreement"); IDT Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132, 142 (2009)("The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned.")(citation omitted); Curtis Properties Corp. v. Greif Companies, 236 AD2d 237, 239 (1st Dep't 1997)("[A]n enforceable written contract precludes recovery in quasi contract with respect to events arising from the same subject matter. New York courts routinely dismiss unjust enrichment claims where the subject of the dispute is governed by an express contract."); see also, e.g., Palmieri v. New York Property Ins., 2011 WL 1212733 (N.Y. Sup. Ct. 2011)(dismissing unjust enrichment because express written contract

existed); <u>Scott v. Saxon Loan Svcs.</u>, 2010 WL 1529281, at *12 (E.D.N.Y. 2010) (dismissing

unjust enrichment claim in mortgage contract context); <u>Fyrdman & Co. V. Credit Suisse First

Boston Corp.</u>, 272 A.D.2D 236, 238 (1st dep't 2000); <u>M.J. Peterson Real Estate, Inc. v. Krantz</u>,

226 A.D.2D 1079, 1080 (4th dep't 1996). Here, there exists an express contract between the

parties and therefore the unjust enrichment claim against Gerszberg should be dismissed

Making matters worse, the JOLs cite to the wrong document, erroneously alleging - in

conclusory fashion - that Gerszberg "conspired" with the Platinum Defendants to effectuate the

transfer of a portion of the cash received from the Agera sale to "to a Gerszberg-controlled entity

[i.e. Zapata] for no consideration." SAC ¶¶ 751, 757-78.[9]  Specifically, the JOLs misleadingly

attach the "Zapata Master Agreement" (an agreement between Gerszberg and Franky Zapata, the

inventor of Zapata, with the structure of their internal business affairs). Moroever, while the

Zapata Master Agreement has absolutely nothing to do with the merger between IMSC and

Zapata ("IMSC/Zapata Merger") (SAC ¶¶ 751-57), the JOL's boldly assert that:

> The Zapata Master Agreement provides for the rights and duties of Gerszberg, Zapata
> and their affiliates upon the occurrence of a proposed merger between Zapata Industries
> and IMSC . . . **PPVA had no obligation under the Zapata Master Agreement to
> provide funds to Gerszberg, Spectrum30, or Zapata in connection with the
> Proposed Zapata/IMSC Merger, and received no valuable consideration in return.**

SAC ¶¶ 754-57 (emphases added). However, the document that accurately describes "the rights

and duties of Gerszberg, Zapata and their affiliates upon the occurrence of a proposed merger

between Zapata Industries and IMSC" is the Huron/Spectrum30 agreement and note.[10]  <u>See</u>

Affidavit of Seth Gerszberg ("Gerszberg Aff."), Exhibit D ("Huron/Spectrum30 agreement and

---

[9]  To be clear, Exhibit 101 attached to the SAC demonstrates that the transfer of money to
the Gerszberg operated Spectrum30 came from Herron, not Agera.

[10] This note is discussed in the SAC (SAC ¶¶ 751-57), and is specifically referenced at SAC ¶
756.  Conveniently, the JOL's avoid attaching these agreements and notes between Spectrum30
and Huron, and instead attach the wrong document (i.e. a master agreement between Franky
Zapata and Gerszberg)

note"). The Huron/Spectrum30 agreement and note contains the terms and conditions of the Agera sale. This agreement, although referenced, was not included by the JOLs.   Thus, it should be noted that the JOLs failure to include the Huron/Spectrum30 agreement and note which contains the terms and conditions of the Agera sale, despite its reference to key terms extremely pertinent this lawsuit, is absurdly misleading.

Moreover, a provision in this agreement provides for repayment at a future certain date, under certain terms and conditions.  Specifically, the agreement states that the monies are to be paid back by Gerszberg by March 31, 2019 under the First Amendment to the Huron Agreement, and December 31, 2019 under the Second Amendment. Thus, the Huron/Spectrum30 agreement and note, an express written contract, precludes Plaintiff's unjust enrichment claim as it governs the terms and conditions of the deal.

As such, the allegations in SAC ¶¶ 754-757 should be dismissed as they are not only false and unmistakably misleading, but also because of the existence of an express contract to which the terms have not yet been triggered. [11]

### B. Alternatively, the Alleged Unjust Enrichment Claim Against Gerszberg Should Be Dismissed As It Is Unclear and the SAC Fails To Include Facts To Support It.

The SAC erroneously claims that the "Platinum Defendants conspired with Gerszberg to effectuate the transfer of $15 million from the Agera proceeds to a *Gerszberg-controlled entity for no consideration.*" SAC ¶751. There are no well-pleaded Facts showing that Gerszberg received these proceeds, let alone for nothing.[12]

---

[11]  As noted, the JOL's fail to include important documents, contracts, and emails in an effort to avoid key facts that conflict with the story they are trying to tell.

**[12] To be clear, Exhibit 101 attached to the SAC shows that the $15 million alleged to be transferred for nothing did not even come from Agera, as alleged at SAC ¶751, but came from the PPVA subsidiary Huron.**

The SAC itself belies the allegation that Gerszberg received $15 million "in exchange for nothing". First, as explained above, the JOL's use a document that has absolutely no application - the "Zapata Master Agreement" – in an effort to demonstrate that PPVA allegedly received "no benefit". Specifically, the SAC alleges that the Zapata Master Agreement has no Facts related to PPVA's obligations and therefore there was no consideration for the transaction. SAC ¶751. Again, a Master Agreement is not a contract. However, the JOLs are in possession of the contract applicable to the deal, and which states the consideration, but do not attach it to the SAC. See Gerszberg Aff., Exhibit D. Specifically, via the IMSC/Zapata Merger, IMSC (a PPVA controlled entity) received in exchange for the money, the company and certain specified rights to Zapata, a valuable entity (i.e. valuable consideration) and which is referenced in the Complaint. SAC ¶¶752-754.

Moreover, the "Agera Transactions" are discussed in the pleadings (SAC ¶¶607-672), yet Gerszberg is mentioned only once: "Immediately after the Agera Sale, the Platinum Defendants transferred substantially all of the remaining cash proceeds of the Agera Sale to insiders of Platinum Management, including $15 million for the benefit of Seth Gerszberg, as discussed below." SAC ¶659.  As such, there are simply no Facts pleaded establishing that in "equity and good conscience" require that any consideration paid to Gerszberg be turned over to PPVA. See Tasini v. AOL, Inc., 851 F. Supp. 2d 734, 741 (S.D.N.Y. 2012) (dismissing unjust enrichment claim where plaintiff failed to establish that equity and good conscience required restitution because "a plaintiff must plead some expectation of compensation that was denied in order to

recover under a theory of unjust enrichment").[13] As such, this allegation is not actionable against Gerszberg and must be dismissed.

III.   **The SAC Should Be Dismissed Because There Exists A Pre-Dispute Contractual Jury Waiver**

The contract governing the transfer of the Agera proceeds (which the JOL's failed to include despite its relevance to several allegations against Gerszberg) contains a contractual jury waiver. New York Courts routinely enforce contractual jury waiver provisions agreed to by sophisticated commercial parties. See Morgan Guaranty Trust Co. of N.Y. v. Crane, 36 F. Supp. 2d 602 (S.D.N.Y. 1999); Oei v. Citibank, N.A., 957 F. Supp. 492 (S.D.N.Y. 1999).

Here, citing to the wrong document, the JOL's erroneosly allege in conclusory fashion that Gerszberg "conspired" with the Platinum Defendants to effectuate the transfer of a portion of the cash received from the Agera sale to "to a Gerszberg-controlled entity [i.e. Zapaata] for no consideration." SAC ¶¶ 751; 7757-58.[14]  In support of this, the JOL's attach the "Zapata Master

---

[13] To the extent that the Court will not look to documents outside the pleadings, despite the reference to them in the SAC, Gerszberg submits that the claims are too attenuated as pleaded and must be dismissed. An unjust enrichment claim "'requires some type of direct dealing or actual, substantive relationship'" between the plaintiff and defendant. Laydon v. Mizuho Bank, Ltd., 2014 U.S. Dist. LEXIS 46368, at *42 (S.D.N.Y. Mar. 28, 2014), quoting Reading Int'l, Inc. v. Oaktree Capital Mgmt., 317 F. Supp. 2d 301, 334 (S.D.N.Y. 2003). If the relationship is "too attenuated," the unjust enrichment claim must be dismissed. Sperry v. Crompton Corp., 8 N.Y.3d 204, 215-16 (2007); see also In re Commodity Exch. Inc., 213 F. Supp. 3d 631, 677-8 (S.D.N.Y. 2016) ("Because Plaintiffs have failed to allege that they had any relevant relationship with the Defendants or that Defendants were enriched at Plaintiffs' expense, the SAC fails to state a claim for unjust enrichment"). Here, the SAC fails to allege a single act of direct dealing between Gerszberg and PPVA, let alone any substantive relationship between them. The SAC baldly asserts "on or around January 1, 2016, Nordlicht began to consult with Gerszberg with respect to business decisions concerning PPVA". " SAC ¶ 731. However, there are no facts pleaded anywhere in the SAC from which the Court can infer any such direct relationship. It is not plausible to conclude that Gerszberg was enriched at PPVA's expense where the SAC does not plead a single direct dealing or communication with PPVA whatsoever.

[14] To be clear, Exhibit 101 attached to the SAC demonstrates that the transfer of money to the Gerszberg operated Spectrum30 came from Herron, not Agera.

Agreement" (an agreement between Gerszberg and Franky Zapata, the inventor of Zapata, with the structure of their internal business affairs). While the Zapata Master Agreement has absolutely nothing to do with the allegations in this case, the JOL's boldly assert that:

> The Zapata Master Agreement provides for the rights and duties of Gerszberg, Zapata and their affiliates upon the occurrence of a proposed merger between Zapata Industries and IMSC . . . **PPVA had no obligation under the Zapata Master Agreement to provide funds to Gerszberg, Spectrum30, or Zapata in connection with the Proposed Zapata/IMSC Merger, and received no valuable consideration in return.**

SAC ¶¶757-57 (emphases added). This claim is misleading.[15]  As noted above, the documents that more accurately describe "the rights and duties of Gerszberg, Zapata and their affiliates upon the occurrence of a proposed merger between Zapata Industries and IMSC" are the Huron/Spectrum30 agreement and note.[16]  See Gerszberg Aff., Exhibit D,  at Section 9(d)). In the Huron/Spectrum30 agreement, under the Section "Governing Law", it states:

> **Each party hereto hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Note** or the tranfactions contemplated hereby.

See Gerszberg Aff., Exhibit D.

PPVA is a sophisticated commercial party.  Allegations in this lawsuit directly arise out of and relate to this Note. Accordingly, the Court should enforce JOL's jury waiver, and dismiss Gerszberg from this matter.

---

[15]  As noted, the JOL's fail to include important documents, contracts, and emails in an effort to avoid key facts that do not go along with the fictitious story they are trying to tell.

[16] This note is discussed in the SAC (SAC ¶¶ 757-57), and is specifically referenced at SAC ¶ 756.  Conveniently, the JOL's avoid attaching these agreements and notes between Spectrum30 and Huron, and instead attach the wrong document (i.e. a master agreement between Franky Zapata and Gerszberg)

IV. **THE SAC FAILS TO STATE A CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AGAINST SETH GERSZBERG (COUNT THIRTEEN)**

A claim for aiding and abetting a breach of fiduciary duty requires (a) a breach of fiduciary obligations owed to plaintiff, (b) that the defendant knowingly induced or participated in the breach, and (c) plaintiff suffered actual damages as a proximate result. See Sharp Int'l Corp. v. State Bank & Trust Co., 403 F.3d 43, 49 (2d Cir. 2005).  Here, the claims against Gerszberg are that he allegedly "aided and abetted the Platinum Defendants' breaches of their fiduciary obligations to PPVA in connection with the Second Scheme" by:

> (i) causing PPVA to allegedly incur significant liabilities due to the Purported Underlying West Loop/Epocs Obligations; (ii) negotiating certain Second Scheme Tranfactions on behalf of the Platinum Defendants; (iii) negotiating and drafting the Forbearance and Security Agreement on behalf of West Loop/Epocs; and (iv) directing the transfer of $15 million in Agera Sale proceeds to himself (via Spectrum30) and Franky Zapata, all of which actions were a detriment to PPVA and its subsidiaries.

SAC ¶ 932.  However, the SAC fails as it does not plead the aiding and abetting claims against Gerszberg with any particularity, falling woefully short of pleading Facts to establish the existence of any one of these material elements against Gerszberg.  Specifically, after examining these four claims, together or individually, it is clear that JOL's aiding and abetting claims (Count Thirteen) should be dismissed on the grounds that the SAC fails to allege Facts showing that Gerszberg had actual knowledge of the Platinum Defendants breach of their fiduciary duty, that Gerszberg substantially assisted the breach, or that he proximately caused damages to PPVA. Moreover, there is nothing in the SAC that would allow the Court to find plausible the JOL's theory that Gerszberg knowingly SACilitated these fictitious alleged claims - that are haphazardly set forth - with any knowledge of the underlying Fraud that PPVA was allegedly

executing. Accordingly, the Court should dismiss the Aiding and Abetting claim against Gerszberg, because it is only false and/or not plead with any degree of specificity.

### A. The SAC Fails To Plead That Gerszberg Knowingly Aided And Abetted The Platinum Defendants In Breaching Their Fiduciary Duty To PPVA In General Or With Any Required Particularity

First, the SAC must plead Facts showing that defendant had actual knowledge of the primary violator's breach of duty. Sharp Int'l Corp. v. State Bank & Trust Co., 403 F.3d 43, 49 (2d Cir. 2005); Krys v. Pigott, 749 F.3d 117, 128-29 (2d Cir. 2013) (affirming dismissal of aiding and abetting breach of fiduciary duty claim because of the failure to plead Facts establishing actual knowledge of the primary fraud and breach); see also Kolbeck, 939 F. Supp. at 246; MLSMK v. JP Morgan Chase & Co., 2011 WL 2176152, at *1-2 (2d Cir. June 6, 2011) (Madoff customer failed to allege Facts showing JPMorgan's "actual knowledge" of Madoff's fraud); O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991).[17]

Actual knowledge means just that: "Ordinarily, evidence of recklessness, conscious avoidance, or willful blindness as to whether the primary actor is engaged in fraud is not sufficient to satisfy the knowledge element of [an] aiding and abetting fraud claim." In re Agape Litig., 2011 WL 1136173, at *8 (E.D.N.Y. Mar. 29, 2011)(stating that even if "hindsight" would tend to "indicate the obviousness of the fraud," plaintiff-investors had failed to show actual knowledge with the "level of specificity that New York state courts and courts in the Second Circuit have routinely required."). Likewise, "constructive knowledge" of another's wrongdoing is "legally insufficient to impose aiding and abetting liability." Kaufman v. Cohen, 307 A.D.2d 113, 125 (1st Dep't 2003); Berman v. Morgan Keegan & Co., 2011 WL 1002683, *10 (S.D.N.Y.

---

[17] As explained by the Supreme Court in the context of a claim for securities fraud, a "strong inference" of scienter is raised at the pleading stage "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).

Mar. 14, 2011)(where Plaintiff investors, in attempting to show "actual knowledge", relied on a close relationship between an executive of the broker-dealer and the customer's principals, as well as suspicious account activity, Court held that the Facts alleged did "not give rise to a strong inference" of actual knowledge dismissing aiding and abetting claims).  Moreover, as the Second Circuit has held, "conclusory statements" of "actual knowledge" are "insufficient to support an aiding-and-abetting claim under New York law." <u>Rosner v. Bank of China</u>, 349 F. App'x 637, 639 (2d Cir. 2009).

Here, the SAC makes a general assertion that Gerszberg "had actual knowledge that the Platinum Defendants were breaching their fiduciary obligations to PPVA by engaging in the Second Scheme." SAC ¶ 933.  However, the SAC is bereft of any Facts to support this wholly conclusory allegation. [18]   To the extent the JOLs expect the court to draw this inference from the allegation that "The Platinum Defendants communicated with Gerszberg regularly by email and in person regarding the Second Scheme" (SAC ¶ 931), it fails as the SAC does not plead even a single Fact identifying any such purported communication. As such, no inferences can be drawn from any such alleged communications. The scarcity of Facts in the JOLs' SAC is telling in the SACe of the JOLs' access to thousands of documents.

Looking at the individual conclusory allegations, the SAC first alleges that Gerszberg aided and abetted a breach of fiduciary duty by "(i) causing PPVA to allegedly incur significant liabilities due to the Purported Underlying West Loop/Epocs Obligations, as is noted above. SAC ¶ 932. The "Purported Underlying West Loop/Epocs Obligations" are defined as including:

---

[18]   Nor are there facts pleaded to allow the Court to draw the inference that Gerszberg had actual knowledge that the "second scheme" transactions performed were to the "detriment to PPVA and its subsidiaries" as Plaintiff alleges. SAC ¶ 932. These general allegations, do not meet the heightened pleading requirements set forth above.

 (i) PPVA assuming approximately $2.5 million of debt owed by The Collective to West Loop and granting West Loop a corresponding interest in the 12% PPNE Note; (ii) PPVA incurring a sham "loan" obligation to Epocs of approximately $2.5 million, where the loan proceeds were in fact provided to The Collective and providing Epocs with a corresponding interest in the 12% PPNE Note; and (iii) PPVA guarantying an apparel buyback obligation of approximately $2.5 million owed by The Collective to West Loop.

SAC ¶ 940.[19]  The SAC, however, fails to allege Gerszberg had actual knowledge of any alleged breach of fiduciary duty that occurred pursuant to these "Purported Underlying West Loop/Epocs Obligations" noted above. Not one paragraph is dedicated to discussing or even mentioning any alleged knowledge by Gerszberg that these Purported Underlying West Loop/Epocs Obligations were performed by PPVA in breach of a fiduciary duty.[20] That is because Gerszberg had no such knowledge.

In fact, even assuming the Facts to be true, the pleadings – after assembling them in chronological order - demonstrate it is impossible for Gerszberg to have such knowledge. According to the SAC, "in August 2015, the Platinum Defendants caused PPVA to enter into a series of tranfactions with West Loop and Epocs Real Estate Partnership Ltd." (i.e. the Purported Underlying West Loop/Epocs Obligations).  SAC ¶ 939 . Yet, the SAC also alleges (although not true) that it was beginning in January 1, 2016 that Gerszberg allegedly "advised the Platinum Defendants with respect to PPVA's investments and provided substantial assistance in the formulation and execution of the Second Scheme." SAC ¶ 743. Thus, it is a Factual impossibility

---

[19] In addition, the SAC groups the alleged (i) debt, (ii) the loan, and (iii) the guaranty together, but fails to give them any context, otherwise. The SAC does not state which entities were involved. By doing this, the Plaintiff has failed to state any facts s pertaining to these obligations such as when these purported obligations were assumed, incurred, or guaranteed. The SAC also fails to state in what context these obligations arose. Nor does the SAC state whether these were all one obligation incorporated in one contract. Without such background, the JOL has failed to assert claims that meet the heightened pleading standard.
[20] **Putting aside any allegations of knowledge, the SAC lacks facts giving any context to these obligations that even assumed to be true, could connect any wrongdoing by Gerszberg.**

for Gerszberg to have aided and abetted the second scheme  "(i) causing PPVA to allegedly incur significant liabilities due to the Purported Underlying West Loop/Epocs Obligations" , when the purported obligations were allegedly entered into several months before his alleged knowledge of the fictitious second scheme.  Accordingly, under these pleadings, it is a Factual impossibility for Gerszberg to have aided and abetted the Platinum Defendnats in breaching their fiduciary duty to PPVA by causing PPVA to allegedly incur significant liabilities due to the Purported Underlying West Loop/Epocs Obligations. As such, that claim fails.

The SAC's second allegation against Gerszberg makes the bare assertion that he allegedly "substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the Second Scheme by . . .   (ii) negotiating **certain Second Scheme Tranfactions** on behalf of the Platinum Defendants". (SAC ¶ 932) (emphasis added). Here, not only does the SAC fail to allege any knowledge on behalf of Gerszberg, but not a single specific Fact is pleaded or single exhibit identified to give any meaning as to what this allegation, and particularly what the phrase "certain Second Scheme Transactions" is referencing. Nowhere does the SAC even provide context to give this meaning. Nor does the SAC allege – besides generally – that Gerszberg had knowledge that he was breaching these "certain second scheme transactions". Accordingly, this claim fails not only because it is false and frivolously concocted, but also because it is vague and has zero Factual support.

The SAC's fourth allegation[21] against Gerszberg claims that he allegedly aided and abetted the Platinum Defendants' breaches of their fiduciary obligations in connection with the Second Scheme by . . .   (iv) directing the transfer of $15 million in Agera Sale proceeds to himself (via Spectrum30) and Franky Zapata, all of which actions were a detriment to PPVA and

---

[21] The third allegation, which occurred, chronologically, after the fourth allegation, is discussed below.

its subsidiaries." SAC ¶932. The SAC also makes the blanked assertion that Gerszberg "conspired" with the Platinum Defendants to effectuate the transfer of $15 million from the Agera proceeds  "to a Gerszberg-controlled entity for no consideration." SAC ¶751.  First, nowhere is it plead that Gerszberg had any knowledge that the money was coming from Agera. In the SAC (SAC ¶756), and the attached Exhibit 101, it is clear that the money came from PPVA subsidiary Huron Capital LLC ("Huron"), not Agera. Moreover, the "Agera Tranfactions" are discussed in great detail at SAC ¶¶607-72, yet Gerzberg is mentioned only once: "Immediately after the Agera Sale, the Platinum Defendants transferred substantially all of the remaining cash proceeds of the Agera Sale to insiders of Platinum Management, including $15 million for the benefit of Seth Gerszberg, as discussed below." SAC ¶659. This is conclusory, and no knowledge by Gerszberg is expressed, and therefore should be disregarded.

To any extent that the JOLs attempt to have the Court infer that knowledge exists from its allegations related to the "Zapata Master Agreement", the Court should disregard it is untrue and illogical. The "Zapata Master Agreement", is a contract between Gerszberg and Franky Zapata, the inventor of Zapata, and has absolutely nothing to do with the allegations here.  SAC ¶¶ 751-755. Despite this, the JOL's seemingly attach the Zapata Master Agreement so that they can make the bare assertion that PPVA had no obligations in it, and therefore there is no consideration. As the SAC states:

> The Zapata Master Agreement provides for the rights and duties of Gerszberg, Zapata and their affiliates upon the occurrence of a proposed merger between Zapata Industries and IMSC . . . **PPVA had no obligation under the Zapata Master Agreement to provide funds to Gerszberg, Spectrum30, or Zapata in connection with the Proposed Zapata/IMSC Merger, and received no valuable consideration in return.**

SAC ¶¶754-77 (emphases added). As pleaded, the JOL's have not only blatantly attach the wrong document, but they also manipulatively use it to misrepresent in the SAC that Gerszberg

that he took $15 million for no consideration.[22]  Nevertheless, no knowledge of this purported scheme is alleged and therefore it must be dismissed.

The SAC's third allegation against Gerszberg alleges that he substantially assisted and participated in the Platinum Defendants' breaches of their fiduciary obligations in connection with the Second Scheme by "(iii) negotiating and drafting the Forbearance and Security Agreement on behalf of West Loop/Epocs". SAC ¶932.[23] This claim is premised on the notion that Gerszberg allegedly had "direct knowledge of PPVA's imminent liquidation" (SAC ¶ 749), from a July 4, 2016 email Nordlicht sent (SAC  ¶746) and thus "drafted the Forbearance and Security Agreement  . . . knowing the alleged forbearance was wholly illusory" on behalf of Westloop/Epoch (SAC ¶749). The JOL's contention that Gerszberg had knowledge that that the forbearance allegedly had no value (and therefore aided and abetted a breach of fiduciary duty by drafting the agreement), is supported by neither the documents, the pleadings, nor by applicable law. There are three independently sufficient reasons why this is the case.

The JOL's sole grounds for making this claim rests on one single email from Nordlicht, which was addressed to Steinberg Gersszberg's counsel Greg Donnenfeld, and Gerszberg. SAC ¶746. With the entire claim resting on one email, the JOL's fail to give any context or Factual background about the email. They attach 101 Exhibits[24] to their 180 page SAC, but here, the JOL's chose not to provide the emails surrounding that one July 4, 2016 email. The JOL's then

---

[22] The correct document detailing "the rights and duties of Gerszberg, Zapata and their affiliates upon the occurrence of a proposed merger between Zapata Industries and IMSC" is the Huron/ Spectrum 30 agreement and note, which is discussed in the SAC (SAC ¶¶ 751-57), and is specifically referenced at SAC ¶ 756. The Huron/Spectrum30 agreement is attached to Gerszberg Aff., at <u>Exhibit D</u>.

[23] The Forbearance and Security Agreement was, in most basic terms, an agreement between PPVA and Westloop/Epochs wherein PPVA gave Westloop/Epochs priority interest in certain security in exchange for a forbearance not to commence a lawsuit collecting on debt that they were owed. SAC  ¶747.

[24] Of the 101 Exhibits, the JOL's only attach 4 in support of its allegations against Gerszberg.

use that one single email to fabricate the claim that because Gerszberg (a non-attorney) was told that PPVA may file for bankruptcy, he chose to draft a contract giving Westloop/Epochs security for their debt in exchange for an "illusory" forbearance not to sue.  This claim is improper the months of emails the JOLs are in possession of which show that the forbearance and security agreement was not a quick scheme conspired by Gerszberg, but a well drawn out agreement that was bargained for and negotiated over a long period of time.

Notably, not only are there months of emails, but that one email is contradicted by emails from Nordlicht (and Steinberg) from the very next day, July 5, 2016, wherein it is stated very clearly that the bankruptcy was not imminent. See Gerszberg Aff., at Exhibit F. However, the JOLs inadvertently (or selectively) chose not to include them. Accordingly, the security agreement/forbearance agreement was a bargained for exchange, and the forbearance not to sue had clear value.

Further, the consideration is demonstrated in the Huron/Spectrum30 agreement, attached to Gerszberg Aff., at Exhibit D. As explained above, the JOLs selectively chose not to include the document.

Last, even assuming the Facts to be true –that the July 4, 2016 email informed Gerszberg that Bankruptcy was imminent - then the worst that can be said about Gerszberg is that he took action to extricate Westloop/Epocs from peril, which was held not improper in In re Sharp Int'l Corp., 403 F.3d 43, 52 (2d Cir. 2005)("Where [a creditor] discovered that Sharp was rife with fraud"[25] the Court characterized such information an asset and asserted that such party "had a fiduciary duty to use that asset to protect its own shareholders").

---

[25] To be clear, the allegation against Gerszberg is not that he was made aware of fraud, but that he allegedly was made aware that bankruptcy was imminent.

Sharp Int'l Corp. involved a fraud perpetrated by Sharp's principals on Sharp's creditors. State Street, which was Sharp's largest creditor, realized that Sharp was engaged in fraud and demanded that Sharp repay its debt – a line of credit owed to State Street - which was accomplished through a fraud on new lenders. Id. at 51-52. Despite these Facts, the Second Circuit held that Sharp's payment to State Street was not tantamount to aiding and abetting a breach of fiduciary duty and that the complaint says no more than that State Street relied on its own wits and resources to extricate itself from peril, without warning persons it had no duty to warn.

As the foregoing demonstrates, Plaintiff has only alleged that Gerszberg, who is not alleged to owe any direct fiduciary duty to PPVA, was conducting business with PPVA.  This in no way constitutes "knowing participation" in an alleged breach of fiduciary duty by Platinum Defendants. Accordingly, the SAC's claim against Gerszbers should be dismissed.

**B.  The SAC Fails To Plead That Gerszberg Substantially Induced or Participated in Aiding and Abetting The Platinum Defendants In Breaching Their Fiduciary Duty To PPVA In General Or With Any Required Particularity**

Second, the inducement or participation prong requires Facts pleading that the defendant provided "substantial assistance" to the primary violator. Sharp, 403 F.3d at 50, citing Kaufman, 307 A.D.2d at 126.  As the Second Circuit explained, substantial assistance requires affirmative conduct, mere inaction will not suffice: Substantial assistance may only be found where the alleged aider and abettor "affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." "The mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff." Sharp, 403 F.3d at 50 (citations omitted). Again, the SAC does not meet this pleading requirement. The SAC fails to plead specific Facts that, if true, would establish that Gerszberg

provided affirmative substantial assistance to, or helped conceal, the Platinum Defendants' alleged primary breach of fiduciary duty owed to PPVA.

Lacking any Factual support is the conclusory allegation that the Forbearance and Security Agreement was "orchestrated" by Gerszber "to encumber PPVA's assets at the subsidiary level for the benefit of Gerszberg's family members, at a time when Platinum Management already had engaged counsel to prepare the filings in connection with PPVA's liquidation and the commencement of an insolvency proceeding was a certainty."[26] These statements are not supported by any Facts (let alone well-pleaded Facts), and serve only to recite the elements of the claim in an attempt to fend off a motion to dismiss, and must be disregarded by the Court. See Iqbal, 556 U.S. at 678; Pollio, 608 F. Supp. 2d at 572. The absence of Factual support is not surprising because the SAC alleges that other defendants "controlled and owned" the relevant entities, and other defendants "planned" "negotiated," "effected," "executed," "performed," "oversaw," "managed" and "marketed" the Agera Tranfaction, not Gerszberg. SAC ¶¶ 205-206, 208, 630-631, 637-642.

There are also no Facts to show that any of the four allegations made against Gerszberg was out of the ordinary course of business, false, misleading, or otherwise used to perpetuate some wrongdoing. The blanket allegation that Gerszberg substantially assisted the Platinum Defendants "(i) causing PPVA to allegedly incur significant liabilities due to the Purported Underlying West Loop/Epocs Obligations" does not meet the heightened pleading requirements. Absent are the basic foundational Facts, such as when, why, where, how. The SAC utterly fails to explain how the West Loop/Epocs Obligations could constitute substantial assistance by Gerszberg to the Platinum Defendants' breach in connection with anything. Similarly

---

[26] The JOLs glibly add phrases like "help," "negotiated," "participated," or "actively participated" without any substantiation of any such participation at all.

unexplained is that Gerszberg substantially assisted the Platinum Defendant in "(ii) negotiating certain Second Scheme Tranfactions on behalf of the Platinum Defendants" Likewise, that Gerszberg substantially assisted the Platinum Defendant by "(iv) directing the transfer of $15 million in Agera Sale proceeds to himself (via Spectrum30) and Franky Zapata" does not allege any wrongdoing other then the bare and illogical assertion that it was for no consideration, which is contradicted in the pleadings itself. In addition, its contradicted by the Huron/Spectrum30 agreement attached hereto.   Finally, the allegation that Gerszberg drafted the forbearance agreement alleges no wrongdoing on Gerszberg's part. The Fact that Nordlicht informed Gerszberg that PPVA would be commencing the Cayman Liquidation and the Chapter 15 Bankruptcy does not supply the missing link. The Zapata/IMSC deal involved the merger of Zapata into IMSC for the benefit of PPVA. As a part of that deal, PPVA was to pay off the West Loop/Epocs debt. Upon completion of the deal, PPVA owned a percentage of Zapata. The SAC does not (and cannot) establish that any alleged knowledge by Gerszberg of a liquidation constituted substantial assistance to the Platinum Defendants' alleged breach of their fiduciary duty owed to PPVA. As a matter of law, any such knowledge could not constitute an inducement of a breach of fiduciary duty or participation in such breach. See Sharp, 403 F.3d at 52 (State Street's "express written consent to the Noteholder's purchase of an additional $25 million of subordinated notes" without which "the tranfaction would not be consummated" did not constitute substantial assistance to a breach of fiduciary duty, but merely "forbearance").   In addition, there are simply no Facts alleged connecting an alleged breach by the Platinum Defendants of duties they supposedly owed to PPVA with regard to the operation of Gerszberg's businesses.

Accordingly, the SAC thus does not identify any conduct by Gerszberg that could plausibly be described as providing substantial assistance in the commission of a wrongdoing.

**C. The SAC Fails To Plead That Gerszberg Alleged Substantially Assistance or Participation in Aiding and Abetting The Platinum Defendants In Breaching Their Fiduciary Duty To PPVA Proximately Caused Damage With Any Required Particularity**

Third, the SAC must allege that a defendant's substantial assistance proximately caused the harm on which the primary liability is predicated. See Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F. Supp. 2d 349, 370-71 (S.D.N.Y. 2007). The SAC must allege more than "but-for causation," it must allege that the "injury was 'a direct or reasonably foreseeable result of the conduct.'" Id.; see also Kolbeck, 939 F. Supp. at 249. Here, the SAC fails to plead any Facts at all to establish the required causal connection between Gerszberg's alleged conduct and the alleged harm suffered by PPVA. Certainly, not to the degree necessary to meet the heightened pleading standards. The SAC makes no such allegation regarding Gerszberg because it simply is not true.

Finally, the JOLs are in a position to plead Facts with the detail required by Rule 9(b) because they have had thousands of documents from Gerszberg and others. Further, it was demonstrated how the JOLs selectively chose documents to include in an effort to support their frivolous theories, disregarding those that they knew would not only hurt their case, but irrefutably disprove it.  Thus, at the very least, the SAC should be dismissed with prejudice to put an end to the careless, malicious and frivolous claims wasting resources and time at everyones expense except the pockets with which the JOLs' attorneys continue to line.

## CONCLUSION

The Court should grant Defendant Seth Gerszberg's motion in all respects and dismiss the Second Amended Complaint, together with such other and further relief to Defendants as the Court deems just.