UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ x
In re PLATINUM-BEECHWOOD LITIGATION  :        18-cv-6658 (JSR)
------------------------------------ x
MARTIN TROTT and CHRISTOPHER SMITH,  :
as Joint Official Liquidators and    :
Foreign Representatives of PLATINUM  :
PARTNERS VALUE ARBITRAGE FUND L.P.   :        18-cv-10936 (JSR)
(in Official Liquidation), and       :
PLATINUM PARTNERS VALUE ARBITRAGE    :        OPINION AND ORDER
FUND L.P. (in Official               :        _____
Liquidation),                        :
                                     :
          Plaintiffs,                :
                                     :
          -v-                        :
                                     :
PLATINUM MANAGEMENT (NY) LLC, et     :
al.,                                 :
                                     :
          Defendants.                :
------------------------------------ x

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: 6/21/19

JED S. RAKOFF, U.S.D.J.

On November 21, 2018, plaintiffs Martin Trott and

Christopher Smith, as Joint Official Liquidators and Foreign

Representatives of Platinum Partners Value Arbitrage Fund L.P.

(in Official Liquidation) ("PPVA"), and PPVA itself filed a

multi-count complaint against Platinum Management (NY) LLC

("Platinum Management") and numerous other defendants. ECF No.

1. On December 19, 2018, this Court held an initial conference

at which it invited defendants to file an initial round of

motions to dismiss. ECF No. 64, at 18:11-18. The Court stated

that any defendant was permitted to join or file a motion in the

initial round, but that no defendant who waited would be

prejudiced from bringing a later motion as part of a second round. Id.

On January 25, 2019, plaintiffs filed their First Amended Complaint ("FAC"), ECF No. 159, and a group of defendants filed motions to dismiss as part of the initial round. On March 15, 2019, this Court issued a "bottom-line" Order disposing of those motions, ECF No. 276, and the Court subsequently issued an Opinion setting forth the reasons for its Order, ECF No. 290. On March 29, 2019, plaintiffs filed their Second Amended Complaint ("SAC"), ECF No. 285, and the following defendants moved to dismiss as part of the second round: (1) The Beechwood Parties,[1] ECF No. 373; (2) David Bodner, ECF No. 321; (3) Michael Nordlicht and Kevin Cassidy, ECF No. 323; (4) Seth Gerszberg, ECF No. 334; (5) Murray Huberfeld, ECF No. 329; (6) Huberfeld Family Foundation, Inc. ("HFF"), ECF No. 304; (7) Michael Katz,

---

[1] The Beechwood Parties include: Beechwood Capital Group, LLC ("Beechwood Capital"), B Asset Manager LP ("BAM I"), B Asset Manager II LP ("BAM II"), Beechwood Re Investments, LLC ("BRILLC"), Beechwood Re Holdings, Inc. ("BRE Holdings"), Beechwood Re (in Official Liquidation) s/h/a Beechwood Re Ltd. ("BRE"), Beechwood Bermuda International Ltd. ("BBIL"), BAM Administrative Services, LLC ("BAM Admin"), Illumin Capital Management LP ("Illumin"), BBLN-PEDCO Corp., and BHLN-PEDCO Corp. (collectively, the "Beechwood Entities"), and Mark Feuer, Scott Taylor, and Dhruv Narain (collectively, the "Beechwood Individuals").

ECF No. 308; (8) Estate of Uri Landesman, ECF No. 299; (9) PB
Investment Holdings, Ltd., as successor-in-interest to Beechwood
Bermuda Investment Holdings, Ltd. ("PBIHL"), ECF No. 378; and
(10) Daniel Saks, ECF No. 357.[2]

For the reasons below, the Court resolves defendants'
motions as follows:

- The Beechwood Parties: The SAC is dismissed in its
  entirety as to Illumin. As to all other Beechwood
  Parties, the Fourteenth Count (unjust enrichment),
  Sixteenth Count (civil conspiracy), and Seventeenth
  Count (civil RICO) are dismissed. In addition, the
  Seventh Count (aiding and abetting breach of fiduciary
  duties) and Eighth Count (aiding and abetting fraud)
  are dismissed as to BRILLC, BRE Holdings, BRE, and
  BBIL. The Beechwood Parties' motion is otherwise
  denied.

---

[2] Defendant Joseph SanFilippo belatedly joined the group of
defendants that moved to dismiss in the initial round. ECF
No. 259. Although the Court indicated that it would rule on
SanFilippo's motion in the second round, ECF No. 290, at 2 n.1,
SanFilippo is one of the defendants currently facing criminal
prosecution in the Eastern District of New York. Accordingly,
his deadline to answer — like that of the other criminal
defendants - is postponed until after trial, and the Court will
wait to rule on any motions from SanFilippo until that time.

- Bodner and Huberfeld: The Fourteenth and Seventeenth Counts are dismissed. The motions are otherwise denied.

- Nordlicht and Cassidy: The motion is denied in its entirety.

- Gerszberg: The Fourteenth Count is dismissed in part, as specified below. The motion is otherwise denied.

- HFF: The Twenty-Second Count (alter ego) is dismissed. The motion is otherwise denied.

- Katz: The motion is granted, and the SAC is dismissed in its entirety as to Katz.

- Landesman: The motion is granted, and the Seventeenth Count is dismissed.

- PBIHL: The motion is granted, and the SAC is dismissed in its entirety as to PBIHL.

- Saks: The First Count (breach of fiduciary duty), Second Count (same), Third Count (aiding and abetting breach of fiduciary duties), Fourth Count (fraud), Fifth Count (constructive fraud), Sixth Count (aiding and abetting fraud), Fourteenth Count, Sixteenth

4

Count, and Seventeenth Count are dismissed. The motion
is otherwise denied.

### Background

The background to this case is largely set forth in the
Court's Opinion on the initial round of motions to dismiss the
FAC. See ECF No. 290, at 4-21. The SAC is substantially
identical to the FAC, although it has been amended in the
following relevant respects:

- PBIHL has been added as a defendant. According to the
  SAC, PBIHL "is a Beechwood Entity organized under
  Bermuda law, with its principal place of business in
  Bermuda." SAC ¶ 214. PBIHL is the successor in
  interest to Beechwood Bermuda Investment Holdings
  Ltd., which "was a reinsurance and wealth management
  company domiciled in Bermuda that issued wealth
  management products for the Beechwood Defendants." Id.

- Saks is now named as both a Platinum Defendant and a
  Beechwood Defendant (previously he was named only as a
  Beechwood Defendant). Id. ¶ 3.

- The SAC has added as a Twenty-Second Count an alter ego claim against HFF in respect of Counts One through Six. Id. ¶¶ 1029-41.

Whereas the focus of the initial round of motions was whether plaintiffs had engaged in impermissible group pleading, defendants now move to dismiss on a range of more particularized grounds. Some arguments are common to multiple motions, such as the argument that plaintiffs' RICO claim should be dismissed, and the argument that plaintiffs' claims are barred by the doctrine of in pari delicto and the Second Circuit's decision in Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir. 1991) (the "Wagoner rule"). Other arguments are defendant-specific. This Opinion begins by addressing common arguments before moving to defendant-specific arguments.

## Analysis

The applicable standard of review and legal standards are largely set forth in the Court's Opinion on the initial round of motions to dismiss the FAC. See ECF No. 290, at 21-29. The following additional legal standards are also relevant to the instant motions:

## I.  Legal Standards

### A. The Wagoner Rule and the Doctrine of In Pari Delicto

6

"The so-called Wagoner rule stands for the well-settled proposition that a bankrupt corporation, and by extension, an entity that stands in the corporation's shoes, lacks standing to assert claims against third parties for defrauding the corporation where the third parties assisted corporate managers in committing the alleged fraud." Cobalt Multifamily Inv'rs I, LLC v. Shapiro, 857 F. Supp. 2d 419, 425 (S.D.N.Y. 2012).[3] The Wagoner rule applies not only to bankruptcy trustees, but also to liquidators and court-appointed receivers. See id.; Bullmore v. Ernst & Young Cayman Islands, 861 N.Y.S.2d 578, 586-87 (N.Y. Sup. Ct. 2008).

The doctrine of in pari delicto is similar to the Wagoner rule, but instead of functioning as a prudential rule of standing, it is an affirmative defense that "generally precludes a wrongdoer . . . from recovering from another wrongdoer." Picard v. HSBC Bank PLC, 454 B.R. 25, 29 (S.D.N.Y. 2011), amended sub nom. In re Bernard L. Madoff Inv. Sec. LLC, No. 11 Civ. 763 (JSR), 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011), aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC., 721 F.3d 54 (2d

_____

[3] Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

7

Cir. 2013), and aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC., 721 F.3d 54 (2d Cir. 2013); see Kirschner v. KPMG LLP, 938 N.E.2d 941, 950 (N.Y. 2010) ("The doctrine of in pari delicto mandates that the courts will not intercede to resolve a dispute between two wrongdoers.").

As relevant here, there are two exceptions to the Wagoner rule and in pari delicto doctrine: First, under the "insider exception," courts have held that "in pari delicto/Wagoner does not apply to the actions of fiduciaries who are insiders in the sense that they either are on the board or in management, or in some other way control the corporation." In re Refco Inc. Sec. Litig., No. 07-MD-1902 (JSR), 2010 WL 6549830, at *16 (S.D.N.Y. Dec. 6, 2010), report and recommendation adopted in part, rejected in part on other grounds sub nom. In re Refco Sec. Litig., 779 F. Supp. 2d 372 (S.D.N.Y. 2011), aff'd sub nom. Krys v. Butt, 486 F. App'x 153 (2d Cir. 2012); see Glob. Crossing Estate Representative v. Winnick, No. 04 Civ. 2558 (GEL), 2006 WL 2212776, at *15 (S.D.N.Y. Aug. 3, 2006) ("Courts have held that the Wagoner and 'in pari delicto' rules do not apply to claims against corporate insiders for breach of their fiduciary duties.").

Second, under the "adverse interest" exception, the Wagoner rule and in pari delicto doctrine will not apply where a corporate officer "totally abandoned the corporation's interests and [is] acting entirely for his own or another's purposes." Kirschner, 938 N.E.2d at 947. The exception "cannot be invoked merely because [an officer] has a conflict of interest or because he is not acting primarily for his principal." Ctr. v. Hampton Affiliates, Inc., 488 N.E.2d 828, 830 (N.Y. 1985). Instead, New York law "reserves this most narrow of exceptions for those cases – outright theft or looting or embezzlement – where the insider's misconduct benefits only himself or a third party; i.e., where the fraud is committed against a corporation rather than on its behalf." Kirschner, 938 N.E.2d at 952.

**B. The RICO Amendment**

The elements of a civil RICO claim are set forth in the Court's Opinion on the initial round of motions to dismiss the FAC. See ECF No. 290, at 28-29. Notwithstanding these elements, section 107 of the Private Securities Litigation Reform Act ("PSLRA") – also referred to as the "RICO Amendment" – provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c).

"The scope of the RICO Amendment is broad. It bars <u>any</u> claim that is actionable as fraud in the purchase or sale of securities, even in situations where a plaintiff lacks standing or is otherwise precluded from asserting a valid claim under the securities laws." <u>Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC</u>, 286 F. Supp. 3d 634, 643 (S.D.N.Y. 2017).

To be actionable as securities fraud, in turn, fraud must be "undertaken in connection with the purchase of a security." <u>MLSMK Inv. Co. v. JP Morgan Chase & Co.</u>, 651 F.3d 268, 280 (2d Cir. 2011). "Conduct that is merely incidental or tangentially related to the sale of securities will not meet the 'in connection with' requirement." <u>Leykin v. AT & T Corp.</u>, 423 F. Supp. 2d 229, 241 (S.D.N.Y. 2006), <u>aff'd</u>, 216 F. App'x 14 (2d Cir. 2007). Instead, the conduct must be "integral to the purchase and sale of the securities in question." <u>Pross v. Katz</u>, 784 F.2d 455, 459 (2d Cir. 1986). And in the context of a Ponzi scheme, "conduct undertaken to keep . . . [the] scheme alive is conduct undertaken in connection with the purchase and sale of securities." <u>MLSMK</u>, 651 F.3d at 277 n.11.

## C. Alter Ego

Under applicable New York law, "[g]enerally, . . . piercing the corporate veil requires a showing that: (1) the owners

exercised complete domination of the corporation in respect to
the transaction attacked; and (2) that such domination was used
to commit a fraud or wrong against the plaintiff which resulted
in plaintiff's injury." Morris v. New York State Dep't of
Taxation & Fin., 623 N.E.2d 1157, 1160-61 (N.Y. 1993). "While
complete domination of the corporation is the key to piercing
the corporate veil, especially when the owners use the
corporation as a mere device to further their personal rather
than the corporate business, such domination, standing alone, is
not enough; some showing of a wrongful or unjust act toward
plaintiff is required." Id. at 1161. "Typically, piercing
analysis is used to hold individuals liable for the actions of a
corporation they control. However, New York law recognizes
'reverse' piercing, which . . . seeks to hold a corporation
accountable for actions of its shareholders." Am. Fuel Corp. v.
Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997).

II.  **Common Arguments**

   **A. Whether Plaintiffs' RICO Claim Should Be Dismissed**

   The Seventeenth Count of the SAC brings a civil RICO claim
against the Platinum and Beechwood Defendants. SAC ¶¶ 968-85.
Multiple defendants move to dismiss the claim, arguing that it
is barred by the RICO Amendment because the SAC "rel[ies]

exclusively on allegations relating to transactions involving the purchase or sale of securities, including heavy reliance on the alleged Black Elk Scheme, which forms the core of the securities-fraud claims brought by the SEC and the criminal charges filed against the Platinum principals." Memorandum of Law in Support of the Beechwood Parties' Motion to Dismiss the Second Amended Complaint 14 ("BP MTD"), ECF No. 374 (citations omitted).[4] Defendants note that this Court held in the related case Senior Health Insurance Company of Pennsylvania v. Beechwood Re Ltd. et al., 18-cv-6658 (JSR) ("SHIP"), that SHIP's RICO claim was "barred by the RICO Amendment insofar as the gravamen of SHIP's mail and wire fraud claims is that Beechwood funneled SHIP's assets to Platinum," 2019 WL 1759925, at *8 (S.D.N.Y. Apr. 22, 2019), and they argue that the same conclusion is compelled here.

Plaintiffs respond that the alleged misconduct in SHIP was actionable as securities fraud – and thus barred by the RICO Amendment - because the defendants there allegedly "obtained the funds from SHIP precisely for the purpose of acquiring the

---

[4] PBIHL also moves to dismiss plaintiffs' RICO claim. As discussed below, the Court has dismissed the SAC as to PBIHL for the independent reason that PBIHL is the object of impermissible group pleading.

securities, and the fraud coincided with the securities
transactions." Plaintiffs' Memorandum of Law in Opposition to
Moving Defendants' Second Round of Motions to Dismiss 22
("Opp."), ECF No. 351; see SHIP, 2019 WL 1759925, at *7-8.
Plaintiffs explain that the Court left open in SHIP whether the
RICO Amendment applied to "allegations that defendants
misrepresented the market value of SHIP's assets in connection
with defendants' regular withdrawal of performance fees." 2019
WL 1759925, at *8. And they argue that allegations of NAV
misstatement can ground a RICO claim in the instant case
because, unlike in SHIP, defendants here are alleged to have
misrepresented PPVA's NAV for more than two years. Opp. 23.

The Court acknowledges that it left open in SHIP whether
the misstatement of asset values, and the attendant withdrawal
of unearned fees, is actionable as securities fraud. Certainly,
such conduct is less obviously "integral to the purchase and
sale of . . . securities," Pross, 784 F.2d at 459, than
misrepresentations about the existence or nature of the assets
in which a fraudster purports to invest his victim's funds, see,
e.g., S.E.C. v. Zandford, 535 U.S. 813, 822 (2002) (holding that
respondent's conduct was actionable as securities fraud where
respondent misappropriated victims' funds after representing

13

that he "would conservatively invest their assets in the stock market and that any transactions made on their behalf would be for their benefit for the safety of principal and income"). It is easy to imagine a scheme similar to the one alleged in the SAC, not involving securities at all, in which a fraudster misrepresented the value of his services in order to collect unearned fees. See, e.g., Weil v. Long Island Sav. Bank, FSB, 77 F. Supp. 2d 313, 316 (E.D.N.Y. 1999) (describing scheme in which plaintiffs "were unwittingly made to pay inflated legal fees in connection with their mortgages"). Such a scheme (assuming it satisfied the other elements of a civil RICO claim) would not be barred by the RICO Amendment.

The scheme in the instant case, however, did involve securities. Indeed, as the SAC and attached exhibits make clear, defendants are essentially alleged to have operated a Ponzi scheme in which they: used their "control over the valuation of PPVA's illiquid positions . . . to ensure that PPVA's 'performance,' which was largely composed of unrealized gains, steadily increased," SAC ¶ 320; "routinely relied upon funds invested by new investors in order to pay redemptions," id. ¶ 322; and formed Beechwood "to keep up the pretense that PPVA's NAV was steadily increasing," id. ¶ 344. The related complaint

14

in <u>SEC v. Platinum Management (NY) LLC et al.</u>, 16-cv-06848-BMC

(E.D.N.Y.) ("the SEC action") – which the SAC incorporates as

Exhibit 25 - similarly alleges that defendants fraudulently

"projected stability and confidence" to their investors,

"reporting steady, positive returns every year," ECF No. 285-2,

at 114, and that they sought to meet redemptions by "launch[ing]

an aggressive push for new investment money," that "focused on

anticipated investment gains," <u>id.</u> at 116-17.

Given these allegations, the Court cannot conclude that

misstatements of PPVA's NAV were "merely incidental or

tangentially related to the sale of securities." <u>Leykin</u>, 423 F.

Supp. 2d at 241. Instead, they were made in substantial part to

sustain defendants' Ponzi scheme. And, as the Second Circuit has

explained, "conduct undertaken to keep a securities fraud Ponzi

scheme alive is conduct undertaken in connection with the

purchase and sale of securities." <u>MLSMK</u>, 651 F.3d at 277 n.11.

Accordingly, the Court holds that the RICO Amendment bars

plaintiffs' RICO claim, even to the extent that the claim relies

on alleged misstatements of PPVA's NAV.[5]

---

[5] The Court's holding is also supported by its conclusion in
<u>Picard v. Kohn</u>, 907 F. Supp. 2d 392 (S.D.N.Y. 2012). There, the
Court held that the RICO Amendment barred claims brought against
defendants who fed money into Bernard Madoff's Ponzi scheme,

Moreover, even if the RICO Amendment did not apply, the Seventeenth Count would fail as to the Beechwood Parties and Saks because the SAC fails to charge these defendants with enough predicate acts over a sufficient period of time to state a RICO claim. See First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 182 (2d Cir. 2004) (holding that RICO claim was properly dismissed where "alleged predicate acts attributed to [defendant], which span[ned] barely seven months, d[id] not extend over a sufficiently long period of time to satisfy the requirements of closed-ended continuity"); McLaughlin v. Anderson, 962 F.2d 187, 192 (2d Cir. 1992) ("[T]he bare minimum of a RICO charge is that a defendant personally committed or aided and abetted the commission of two predicate acts."). As defendants explain in their submissions, Saks's "tenure with Platinum and Beechwood lasted less than two years," Defendant Daniel Saks' Memorandum of Law in Support of Motion to Dismiss the Second Amended Complaint 14 ("Saks MTD"), ECF No. 359, and the misrepresentation of PPVA's NAV occurred for only 22 months after Beechwood launched, Reply Memorandum of Law in Further

_____

even though these claims were grounded in part in defendants' alleged collection of "hundreds of millions of dollars in fees from their customers." Id. at 396.

16

Support of the Beechwood Parties' Motion to Dismiss the Second Amended Complaint 5 ("BP Reply"), ECF No. 396. These periods do not "satisfy the requirements of closed-ended continuity." First Capital Asset  Mgmt., 385 F.3d at 182.

### B. Whether Plaintiffs' Claims Are Barred by the **Wagoner** Rule or the Doctrine of **In Pari Delicto**

The Beechwood Parties, Nordlicht and Cassidy, HFF, Katz, Saks, and Gerszberg argue that the SAC should be dismissed (either in part or in its entirety) based on the Wagoner rule and the related doctrine of in pari delicto.[6] See BP MTD 8-13; Saks MTD 22-23; Memorandum of Law of Defendants Michael Nordlicht and Kevin Cassidy in Support of Their Motion to Dismiss the Second Amended Complaint 3 ("Nordlicht-Cassidy MTD"), ECF No. 324; Huberfeld Family Foundation, Inc.'s Memorandum of Law in Support of Its Motion to Dismiss the Second Amended Complaint 14-15 ("HFF MTD"), ECF No. 307; Memorandum of Law in Support of Defendant Michael Katz's Motion to Dismiss 6-11 ("Katz MTD"), ECF No. 309; Defendant's, Seth Gerszberg,

---

[6] PBIHL also argues that the SAC should be dismissed because of Wagoner and in pari delicto, but - as noted - the Court has dismissed the SAC as to PBIHL on group pleading grounds.

Memorandum of Law in Further Support of Motion to Dismiss 3-6

("Gerszberg Reply"), ECF No. 393.

Defendants argue that <u>Wagoner</u> and <u>in pari delicto</u> bar

plaintiffs' claims because the SAC's "central premise . . . is

that PPVA's own principals were involved in and orchestrated the

misconduct for which PPVA is now suing." BP MTD 9. Moreover,

defendants contend, neither the "insider exception" nor the

"adverse interest exception" applies. As a preliminary matter,

defendants note, the insider exception may not even apply to the

<u>in pari delicto</u> defense under New York law. Katz MTD 10-11. And

even if it can apply to that doctrine, defendants argue that it

does not apply to them because they are not insiders. <u>Id.</u> at 11.

As for the adverse interest exception, defendants argue

that the SAC fails to allege that PPVA's agents "totally

abandoned" the fund's interests. <u>Kirschner</u>, 938 N.E.2d at 947.

Instead, defendants argue, the SAC alleges that the Platinum

Defendants misstated PPVA's NAV to attract investors and keep

the fund afloat, and the related complaint in the SEC action

details the numerous ways in which the Platinum Defendants

worked to sustain the fund and ease its liquidity constraints.

BP MTD 11-12. Defendants argue that "[s]o long as the corporate

wrongdoer's fraudulent conduct enables the business to survive –

18

to attract investors and customers and raise funds for corporate purposes," the adverse interest exception does not apply. Kirschner, 938 N.E.2d at 953; cf. id. ("A fraud by top management to overstate earnings, and so facilitate stock sales or acquisitions, is not in the long-term interest of the company; but, like price-fixing, it profits the company in the first instance.").

Plaintiffs respond that neither Wagoner nor in pari delicto applies because each of the moving defendants is either an insider or the alter ego of an insider. See Opp. 4. According to plaintiffs, "[t]he insider exception is not limited to fiduciaries such as officers and directors of a corporation; it includes corporate insiders with some level of control over the company's affairs." Id. at 5. Moreover, plaintiffs argue, the moving defendants all qualify as insiders because they "used their positions of authority, influence and control to cause PPVA to engage in non-commercial transactions to inflate NAV and eventually loot PPVA." Id. at 7. Plaintiffs contend that this is particularly true of the Beechwood Entities, who are alleged to be alter egos of Platinum Management. Id.

Even if the moving defendants are not insiders, plaintiffs argue, "this case represents one of the rare 'looting and

19

embezzlement' circumstances where the adverse interest exception to in pari delicto applies." Id. at 12. Plaintiffs argue that "the consistent theme of the SAC is that, at every juncture, the Defendants favored their own interests over those of PPVA, and that the inevitable outcome of the series of non-commercial transactions comprising the First and Second Schemes was the implosion of PPVA." Id.

Beginning with the insider exception, the Court agrees with plaintiffs that the Beechwood Entities cannot claim the protections of Wagoner and in pari delicto insofar as they are found to be alter egos of Platinum Management. As this Court has explained, the rationale behind the insider exception is that "it would be absurd to allow a wrongdoing insider to rely on the imputation of his own conduct to the corporation as a defense." Refco, 2010 WL 6549830, at *15. This rationale applies with equal force to alter egos of insiders, to whom the conduct is also imputed. As noted above, New York law recognizes reverse veil piercing, such that corporations can be held liable for the actions of those who control them. See Am. Fuel Corp., 122 F.3d at 134. To the extent that they are found to be alter egos of Platinum, the Beechwood Entities cannot avoid liability on the grounds that conduct imputed to them is also imputed to PPVA.

20

By contrast, the Court concludes that the SAC fails to allege insider status as to the other moving defendants. Feuer, Taylor, Narain, Nordlicht, Cassidy, Gerszberg, Katz, and HFF[7] are not alleged to have held positions at PPVA, or to have owed fiduciary duties to PPVA. Plaintiffs go to great lengths to detail the ways in which these defendants harmed PPVA, see Opp. 8-11, but harm is insufficient to establish insider status. See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC, 987 F. Supp. 2d 311, 321 (S.D.N.Y. 2013) ("[T]he Second Circuit has read the insider exception . . . narrowly to allow only for suits . . . against a fiduciary of the debtor corporation, not against third parties who are alleged to have aided and abetted the debtor's fraud, short of control by the third party over the debtor."). And although plaintiffs allege that Saks held a position at PPVA, these allegations do not show that Saks had the level of control to qualify as an insider. As this Court has explained, "[t]he purpose of the insider exception is to hold fiduciaries responsible for their conduct as control persons,"

---

[7] HFF is differently situated from the Beechwood Entities because the SAC does not adequately allege that HFF was an alter ego of a Platinum insider, for the reasons discussed below.

id. at 322, and – as discussed at greater length below – Saks is
not adequately alleged to be a fiduciary or control person.

Insider status is not the end of the story, however, as
non-insider defendants may still be subject to liability if the
adverse interest exception applies. On this point, the Court
holds that the applicability of the adverse interest exception
must be evaluated with respect to specific instances of alleged
misconduct. And the Court agrees with plaintiffs that certain
allegations in the SAC describe the kind of "outright theft or
looting or embezzlement" to which the exception applies. See
Kirschner, 938 N.E.2d at 952. For example, the alleged diversion
of the Renaissance Sale proceeds to the Preferred Investors can
be viewed only as "fraud . . . committed against [PPVA] rather
than on its behalf." Id.; see ECF No. 290, at 11-13. The same is
true of the Nordlicht Side Letter, which allegedly obligated
PPVA – for no consideration - to apply proceeds from the sale of
one of its assets toward a debt owed to BAM. ECF No. 290, at 15-
16. In the remaining sections of this Opinion, which consider
defendant-specific arguments for dismissal, the Court will
clarify which instances of alleged misconduct fall within the
adverse interest exception.

**III.  Defendant-Specific Arguments**

## A. The Beechwood Parties

The Beechwood Parties are named in or implicated by the Seventh, Eighth, Fourteenth, Sixteenth, Seventeenth,[8] Eighteenth, Twentieth, and Twenty-First Counts of the SAC. In the initial round, Beechwood Capital, BAM II, BBLN-PEDCO Corp., and BHLN-PEDCO Corp. moved to dismiss. The Court granted the motions of Beechwood Capital, BBLN-PEDCO Corp., and BHLN-PEDCO Corp., but it denied the motion of BAM II. ECF No. 290, at 37.

The Beechwood Individuals and Illumin now move to dismiss the SAC in its entirety, and the Beechwood Entities move to dismiss all claims except the alter ego claim in the Eighteenth Count. BP MTD 1. As discussed above, the Beechwood Parties argue at length that plaintiffs' claims are barred by the Wagoner rule and the doctrine of in pari delicto, and they contend that plaintiffs' RICO claim is barred by the PSLRA. The Beechwood Parties also make several additional arguments for dismissal.

First, the Beechwood Parties argue that the Seventh and Eighth Counts – in addition to being barred by Wagoner and in pari delicto – fail to state claims for aiding and abetting. Id.

_____

[8] As discussed above, the Court holds that the Seventeenth Count is barred by the RICO Amendment. Accordingly, the claim is dismissed as to the Beechwood Parties, among others.

at 16-19. With respect to aiding and abetting breach of
fiduciary duties, defendants argue that the SAC fails to allege
substantial assistance, at least as to BRILLC, BRE Holdings,
BRE, BBIL, or Illumin. Id. at 16-18. And as for aiding and
abetting fraud, defendants contend that the SAC fails to allege
justifiable reliance by PPVA because the only PPVA officers who
could have been misled are those accused of committing the
fraud. Id. at 18-19. Relatedly, defendants argue that the
Sixteenth Count for civil conspiracy should be dismissed as
duplicative of the aiding and abetting claims. Id. at 20.

Moving to the Fourteenth Count, defendants argue that
plaintiffs' unjust enrichment claim should be dismissed for two
reasons: First, an express agreement covers "each one of the
alleged bad acts underlying the claim." Id. at 21. Second, the
SAC alleges only "a general, non-specific benefit," and
"contains no well-pled allegations concerning how the Beechwood
Individuals were supposedly 'enriched.'" Id.

The Beechwood Parties also argue that the Court should
dismiss the Twentieth and Twenty-First Counts, which seek
declaratory judgments that the Nordlicht Side Letter and the
Master Guaranty, respectively, are void and unenforceable as
against public policy. SAC ¶¶ 1013-28. As discussed in the

24

Court's Opinion on the initial round of motions to dismiss, the Nordlicht Side Letter was a document that Mark Nordlicht allegedly executed to divert funds from PPVA to the Beechwood Entities. ECF No. 290, at 15. Specifically, BAM Admin held a loan issued by Golden Gate Oil, and PPVA's subsidiary Montsant had been paying the interest on the loan. Id. When Montsant was no longer able to pay, the Side Letter bound PPVA to pay in Montsant's stead – for no consideration - by applying proceeds from the sale of Implant Sciences Corporation ("IMSC"), a company in which PPVA held a substantial interest. Id. at 15-16.

The Master Guaranty, meanwhile, obligated Montsant to guaranty amounts owed to various Beechwood Entities and SHIP by Golden Gate. SAC ¶ 593. As with the Side Letter, the Master Guaranty did not benefit PPVA, but instead "benefited Beechwood by providing it with additional collateral to secure the non-performing Golden Gate Oil Loan, comprised of a significant portion of PPVA's remaining valuable assets." Id. ¶ 599.

The Beechwood Parties argue that plaintiffs' declaratory judgment claims should be dismissed on two grounds. First, defendants argue, these claims rest on the theory that PPVA was fraudulently induced to enter into the Side Letter and the Guaranty, and plaintiffs have not adequately alleged fraudulent

inducement. BP MTD 22. Second, defendants argue that PPVA's subsidiary DMRJ is already litigating the enforceability of the Side Letter in New York state court. Id. at 23. Not only do plaintiffs' claims in this Court constitute a "second bite at the apple," defendants argue, but they are also inconsistent with the position taken by DMRJ in state court that the Master Guaranty superseded the Side Letter. Id. at 23-24.

Finally, the Beechwood Parties argue that the SAC's alter ego claim should be dismissed as to Illumin because it is entirely group pled, and they argue that the claims against Beechwood Capital, BBLN-PEDCO Corp., and BHLN-PEDCO Corp. should be dismissed because they were already dismissed in this Court's Opinion and Order on the initial round of motions. Id. at 24-25.

Taking the Beechwood Parties' last argument first, the Court agrees that it has already dismissed plaintiffs' claims against Beechwood Capital, BBLN-PEDCO Corp., and BHLN-PEDCO Corp., see ECF No. 290, at 37, and it hereby reaffirms that dismissal. The Court likewise agrees that the SAC should be dismissed as to Illumin based on impermissible group pleading. Although the SAC alleges in conclusory fashion that "Illumin is owned and controlled by Dhruv Narain" and "acted as an investment advisor to Beechwood during the course of the Second

26

Scheme," SAC ¶ 222, there are no allegations that specifically describe the nature of Narain's control or tie Illumin to any alleged misconduct. For example, the SAC alleges that "the Beechwood Defendants and Illumin caused AGH Parent to deliver a letter to PGS enclosing an Assignment" as part of the Agera Sale. Id. ¶ 663. But the document that this allegation references – attached as Exhibit 94 to the SAC – is signed by Narain on behalf of BAM Management Services LLC. ECF No. 285-7, at 223. Illumin is not mentioned.

Moving to the remaining Beechwood Parties, the Court has already explained above that the Beechwood Entities cannot claim the protections of Wagoner and in pari delicto insofar as they are found to be alter egos of Platinum Management. As for Feuer, Taylor, and Narain, the Court also holds that plaintiffs' claims are not barred by Wagoner or in pari delicto, at least at the pleading stage, because the adverse interest exception applies. Feuer, for example, is alleged to have witnessed the Nordlicht Side Letter, which saddled PPVA with financial obligations for no consideration. See SAC ¶ 11(i). And Taylor and Narain are charged with orchestrating the Agera Sale, which – as discussed below in the context of Nordlicht and Cassidy's motion – is plausibly alleged to have satisfied the exception.

27

With respect to defendants' more particularized grounds for dismissal, the Court agrees that the SAC fails to allege substantial assistance, and thus aiding and abetting, as to BRILLC, BRE Holdings, BRE, and BBIL. BRILLC (referred to in the SAC as "Beechwood Investments") is alleged only to have been "used as a vehicle by Nordlicht, Levy, Bodner and Huberfeld to purchase all the preferred shares in the Beechwood Reinsurance Companies." Id. ¶ 212. The Beechwood Reinsurance Companies, in turn, are a defined group comprising BBIL and BRE, which are referred to in the SAC as "Beechwood Bermuda" and "Beechwood Cayman," respectively. Id. ¶¶ 215-16. The SAC alleges that "the Beechwood Reinsurance Companies were established and had received significant funds for investment from insurance investors, including SHIP." Id. ¶ 373. But there are no specific allegations that describe how these entities participated in the First or Second Schemes. And finally, BRE Holdings (referred to in the SAC as "Beechwood Holdings") is alleged only to have owned all of Beechwood Cayman's common stock. Id. ¶ 213.

While these allegations are insufficient to state aiding and abetting claims as to the above entities, defendants' arguments for dismissing the claims as to the other Beechwood Parties fall short. Defendants contend that the SAC fails to

28

allege aiding and abetting as to the other Beechwood Parties
because PPVA's officers could not have justifiably relied on
their own misrepresentations. BP MTD 19. But this argument fails
to respect the distinction between a company and its officers,
and it essentially rehashes the points made above – and rejected
by this Court – in the context of the Wagoner rule and in pari
delicto. Compare BP MTD 9 ("The Wagoner rule provides that . . .
a bankruptcy trustee . . . lacks standing to assert a claim
against a third party for defrauding a corporation with the
cooperation of management on behalf of the guilty corporation."
(quotations and alteration omitted)), with id. at 19 ("[T]he
Liquidators, standing in the shoes of PPVA, cannot assert claims
against the Beechwood Parties for aiding and abetting PPVA in
deceiving itself."). Accordingly, while the Seventh and Eighth
Counts are dismissed as to BRILLC, BRE Holdings, BRE, and BBIL,
they are not dismissed as to the other Beechwood Parties.

Moving to the Sixteenth Count, the Court agrees that
plaintiffs' conspiracy claim is duplicative of their aiding and
abetting claims, and it hereby dismisses the conspiracy claim as
to all Beechwood Parties. See Loreley Fin. (Jersey) No. 3 Ltd.
v. Wells Fargo Sec., LLC, No. 12-cv-3723 (RJS), 2016 WL 5719749,
at *8 (S.D.N.Y. Sept. 29, 2016) ("In cases in which Plaintiffs'

29

aiding and abetting claims overlap with their conspiracy claims, New York courts have allowed the aiding and abetting claims to proceed, but have dismissed as duplicative the conspiracy claims."); Kew Gardens Hills Apartment Owners, Inc. v. Horing Welikson & Rosen, P.C., 828 N.Y.S.2d 98, 101 (2nd Dep't 2006) ("[T]he seventh cause of action alleging conspiracy to breach a fiduciary duty should have been dismissed . . . because it is duplicative of the aiding and abetting cause of action.").

With respect to the Fourteenth Count, plaintiffs have essentially abandoned their unjust enrichment claim, responding in their answering papers only that "the unjust enrichment claim against the Beechwood Movants, pled in the alternative, is due to Plaintiffs seeking to invalidate certain Second Scheme transactions." Opp. 36 n.9. As the Beechwood Parties note in their reply, even if plaintiffs' oblique mention of "invalidat[ing]" "transactions" refers to the Nordlicht Side Letter and the Master Guaranty, these agreements were made only with BAM I and BAM Admin. BP Reply 8-9; ECF No. 285-6, at 98 (Nordlicht Side Letter); ECF No. 285-7, at 2 (Master Guaranty). Moreover, plaintiffs fail to respond (obliquely or otherwise) to defendants' contention that the unjust enrichment claim is pled

with impermissible generality. Accordingly, the Fourteenth Count is dismissed as to all Beechwood Parties.

Finally, as to the Twentieth and Twenty-First Counts, the Court holds that plaintiffs have adequately alleged that they are entitled to declaratory relief. "[A] contract is unenforceable under New York law if the finder of fact concludes that the agreement was made with corruption and fraud contemplated as its purpose." CMF Investments, Inc. v. Palmer, No. 13-CV-475 VEC, 2014 WL 6604499, at *2 (S.D.N.Y. Nov. 21, 2014). Here, plaintiffs allege that the Nordlicht Side Letter and Master Guaranty were structured for the corrupt purpose of stripping value from PPVA. This is sufficient to state a claim.

Moreover, the fact that one of PPVA's subsidiaries, DMRJ, is seeking a similar declaratory judgment in state court does not preclude plaintiffs' claims here. See McClellan v. Carland, 217 U.S. 268, 282 (1910) ("[T]he pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . ."). Nor does DMRJ's position that the Guaranty superseded the Side Letter preclude PPVA from arguing that both are void.

Accordingly, as to the Beechwood Parties, the Court rules as follows: The SAC is dismissed in its entirety as to Illumin.

31

As to all other Beechwood Parties, the Fourteenth, Sixteenth, and Seventeenth Counts are dismissed. In addition, the Seventh and Eighth Counts are dismissed as to BRILLC, BRE Holdings, BRE, and BBIL. The Beechwood Parties' motion is otherwise denied.

## B. Bodner and Huberfeld

Bodner and Huberfeld are both Platinum Defendants and Beechwood Defendants. Accordingly, they are named in the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Fourteenth,[9] Sixteenth, and Seventeenth[10] Counts of the SAC. In the initial round of motions to dismiss, Bodner moved to dismiss the FAC on group pleading grounds, and he also moved to dismiss each count against him on more particularized grounds. ECF No. 183. Huberfeld joined Bodner's motion. ECF No. 173.

This Court largely denied Bodner's motion, holding that plaintiffs plausibly alleged that Bodner and the other Platinum Defendants: (1) were corporate insiders, such that they could be charged with Platinum's misstatements of PPVA's NAV; (2) had

---

[9] Bodner argues that the SAC impermissibly reasserts the unjust enrichment claim that the Court already dismissed. Bodner MTD 12 n.3. The Court agrees, and it again dismisses the Fourteenth Count as to Bodner and Huberfeld.

[10] As discussed above, the Court holds that the Seventeenth Count is barred by the RICO Amendment. Accordingly, the claim is dismissed as to Bodner and Huberfeld, among others.

scienter, given their motive and opportunity to commit fraud; and (3) were fiduciaries of PPVA. ECF No. 290, at 44-54. Based on these conclusions, the Court held that plaintiffs stated claims against Bodner and Huberfeld for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraud, constructive fraud, aiding and abetting fraud, civil conspiracy, and civil RICO. Id. at 54. The Court dismissed plaintiffs' unjust enrichment claim, however, because the claim was abandoned. Id. at 55.

Now before the Court is Bodner's second motion to dismiss, which Huberfeld again joins. See Memorandum of Law of Defendant David Bodner in Support of His Motion to Dismiss the Non-NAV Claims in the Second Amended Complaint ("Bodner MTD"), ECF No. 322; Defendant Murray Huberfeld's Memorandum of Law in Support of His Motion to Dismiss the Second Amended Complaint, ECF No. 330. In his motion, Bodner accepts for purposes of argument that plaintiffs have stated claims in connection with Platinum's misstatements of PPVA's NAV. Bodner MTD 1. Bodner argues, however, that the SAC also includes "allegations that a dozen or more transactions were executed with the fraudulent intent to loot or encumber the assets of PPVA." Id. at 2. Bodner contends that the SAC does not adequately tie him to these

transactions, and that any allegations regarding the transactions should be dismissed as to him. Id.

This Court considered and rejected a similar argument in the SHIP action. There, certain Beechwood Defendants argued that SHIP should be limited in the allegations it could use to support its fraud claims. See 2019 WL 1759925, at *2. The Court disagreed, holding that it would not "place SHIP's claims in a factual straitjacket at the pleading stage, and well before completion of discovery." Id. The Court cautioned, however, that if SHIP later "trie[d] to prove fraud based on misstatements or omissions that SHIP should have referenced in the SAC, then defendants c[ould] make an appropriate motion at that time." Id.

The Court sees no reason to treat Bodner's and Huberfeld's motions differently in the instant case. Given the close relationship between the alleged fraudulent transactions and the misstatements of PPVA's NAV, any attempt to segregate "NAV" from "non-NAV" claims at this stage would be artificial and premature.[11]

**C. Nordlicht and Cassidy**

---

[11] As in SHIP, however, Bodner and Huberfeld may argue later in this litigation that plaintiffs are barred from relying on conduct that should have been alleged in the SAC. As to whether such an argument will prevail, the Court expresses no opinion.

Michael Nordlicht and Kevin Cassidy are both named in the
Twelfth Count of the SAC (aiding and abetting breach of
fiduciary duty) for their role in the Agera transactions.
Cassidy is also named in the Fourteenth Count (unjust
enrichment). Previously, Nordlicht and Cassidy moved to dismiss
on group pleading grounds, and they also moved to dismiss for
failure to state a claim. ECF No. 195. The Court denied their
motion, holding that plaintiffs plausibly alleged that: (1)
Nordlicht and Cassidy knew the Platinum Defendants were
breaching their fiduciary duties to PPVA; (2) Nordlicht and
Cassidy participated in the breach; and (3) Cassidy was unjustly
enriched at the expense of PPVA through his receipt of unearned
proceeds from the Agera Sale. ECF No. 290, at 60-61.

Nordlicht and Cassidy now move to dismiss on the grounds
that plaintiffs' claims are barred by the Wagoner rule and the
doctrine of in pari delicto. Nordlicht-Cassidy MTD 1-3. As
discussed above, neither Nordlicht nor Cassidy is adequately
alleged to be an insider of PPVA. Accordingly, the disposition
of their motion turns on whether their alleged conduct falls
within the adverse interest exception.

Beginning with the unjust enrichment claim against Cassidy,
the Court concludes that the adverse interest exception applies.

35

As explained in the Court's Opinion on the initial round of motions to dismiss, plaintiffs allege that Cassidy created and controlled an entity called Starfish, and that Starfish was granted 8% of the membership interests in PPVA's subsidiary PGS the day before PGS sold its interest in a convertible note in Agera to AGH Parent. ECF No. 290, at 16-18. Plaintiffs allege, moreover, that the grant to Starfish was made without consideration to PGS. Id. at 18. This naked diversion of financial interests — like the diversion of proceeds from the Renaissance Sale to the Preferred Investors — constitutes "outright theft or looting" for purposes of the adverse interest exception. See Kirschner, 938 N.E.2d at 952.

Cassidy and Nordlicht's broader participation in the Agera Sale, however, raises more difficult questions. According to defendants, "[t]he SAC does not (and cannot truthfully) allege that the Agera Transaction constituted theft or looting or embezzlement of PPVA" because "the SAC and its annexed exhibits establish that the Agera Transaction was intended to and did create at least a short-term benefit for PPVA." Reply Memorandum of Law of Defendants Michael Nordlicht and Kevin Cassidy in Further Support of Their Motion to Dismiss the Second Amended Complaint 6 ("Nordlicht-Cassidy Reply"), ECF No. 392.

36

Specifically, defendants cite an email from Katz to Mark Nordlicht and Levy – attached as Exhibit 82 to the SAC – in which Katz describes how the sale of Agera would "[s]olve . . . our liquidity problem." ECF No. 285-7, at 33. Defendants also cite an email from Mark Nordlicht to Katz – attached as Exhibit 87 to the SAC – in which Nordlicht appears to say, of the Agera Sale, that "the liquidity is just too transformative for us to ignore." Id. at 54. Based on these exhibits, defendants argue, "the Agera Transaction was not an 'abandonment' or 'looting' of PPVA by Platinum Management, but rather an infusion of cash into PPVA at a time when it allegedly faced liquidity issues." Nordlicht-Cassidy Reply 7.

If defendants are correct – and if the Agera Sale provided PPVA with liquidity necessary to sustain the fund's operations – then the Court agrees that the adverse interest exception does not apply. See Kirschner, 938 N.E.2d at 953 ("So long as the corporate wrongdoer's fraudulent conduct enables the business to survive — to attract investors and customers and raise funds for corporate purposes — th[e] test [for applying the adverse interest exception] is not met."). The Court also agrees that the exhibits cited by defendants, although not entirely clear, raise the suggestion that PPVA may have anticipated a benefit

37

from the Agera Sale in the form of increased liquidity. This suggestion, however, is insufficient at the pleading stage to overwhelm the raft of allegations in the SAC that characterize the Agera Sale as pure pilfering.

According to the SAC, the Agera Sale was orchestrated "to clear out the uncollectable debt obligations owed to Beechwood by companies such as Golden Gate Oil and PEDEVCO, leaving PPVA with little to nothing in exchange for the transactions." SAC ¶ 607. Although the convertible note in Agera in which PPVA (through PGS) held an interest was allegedly valued between $225 and $285 million, PGS sold the note to AGH Parent for $170 million, with $115 million of that amount being "paid or payable in a combination of Beechwood 'debt forgiveness' and worthless debt and equity assignments." Id. ¶¶ 648, 651. Moreover, of the $55 million paid in cash, $10 million is still unaccounted for. Id. ¶ 653. And not long after the sale closed, the Beechwood Entities allegedly sold their interests in AGH Parent to a third party, leaving PPVA, on the whole, with as much as $150 million in losses. Id. ¶¶ 668-71.

Based on these allegations, one can plausibly infer – even taking into account Exhibits 82 and 87 – that the Agera Sale constituted "outright theft or looting" for purposes of the

38

adverse interest exception. The fact that PGS received $45 million in cash from the Agera Sale does not prove that PPVA (through PGS) received a benefit from the sale. To the contrary, it is reasonable to infer based on the pleadings that PGS could have received significantly more cash if the convertible note had been sold at a market price. To hold that any amount of cash received is a benefit, even if that cash pales in comparison to the value of the assets for which it was exchanged, would render the term "benefit" meaningless.

That said, defendants may well be able to show after discovery that PPVA received necessary liquidity from the Agera Sale. If this liquidity enabled PPVA to sustain its operations, then it may qualify as a benefit, even if the convertible note was sold below market price. And if the Agera Sale benefitted PPVA, then the adverse interest exception does not apply, and judgment for Nordlicht and Cassidy on the aiding and abetting claim is warranted.

In sum, Nordlicht and Cassidy's motion to dismiss is denied in its entirety. The unjust enrichment claim against Cassidy clearly falls within the adverse interest exception. And while the aiding and abetting claim is a closer call, the Court holds at this stage in the litigation that the claim can proceed.

39

### D. Gerszberg

Gerszberg is named in the Thirteenth and Fourteenth Counts
of the SAC, for aiding and abetting breach of fiduciary duties
and unjust enrichment, respectively. The SAC alleges that
Gerszberg ran an apparel business called the Collective, which
took out a $30 million line of credit from Atlantic Growth, a
PPVA subsidiary. SAC ¶¶ 729-30. The Collective also entered into
a series of agreements with a company called West Loop, but by
the summer of 2015, the Collective was unable to make payments
to Atlantic Growth and was in $2.4 million of debt to West Loop.
Id. ¶¶ 731-34. Gerszberg was close friends with Mark Nordlicht,
and he approached Nordlicht for help. Id. ¶ 735. Thereafter, the
Platinum Defendants declined to foreclose on their loans to
Gerszberg, and they instead caused PPVA to enter into a series
of transactions with West Loop and a company called Epocs that
"solely benefit[ted] West Loop/Epocs, Gerszberg and The
Collective, to the detriment of PPVA." Id. ¶¶ 736-37.

Specifically, the SAC alleges that PPVA assumed the
Collective's debt to West Loop and granted West Loop an interest
in a promissory note issued by PPVA (the "12% PPNE Note"). Id.
¶ 738. PPVA also incurred a "sham" loan obligation to Epocs,
pursuant to which the loan proceeds were given to the Collective

40

and Epocs was given an interest in the 12% PPNE Note. Id.
Finally, PPVA guaranteed an obligation that the Collective owed
to West Loop. Id. Together, these transactions are referred to
in the SAC as the "Purported Underlying West Loop/Epocs
Obligations." Id.

The SAC also alleges that "Gerszberg was provided with
information concerning PPVA's financial condition, its ongoing
liquidity issues and the misrepresentation of its NAV by the
Platinum Defendants." Id. ¶ 744. According to the SAC, however,
Gerszberg nevertheless drafted a "Forbearance and Security
Agreement" on behalf of West Loop and Epocs that gave these
companies a security interest in the rights that PPVA's
subsidiary DMRJ had to proceeds from the sale of IMSC. Id.
¶¶ 747-49.

Finally, the SAC alleges that Gerszberg and the Platinum
Defendants conspired to transfer $15 million from the Agera Sale
to Gerszberg and entities he controlled for no consideration.
The SAC alleges that Gerszberg and an individual named Franky
Zapata entered into an agreement – the "Zapata Master Agreement"
– that concerned "the rights and duties of Gerszberg, Zapata and
their affiliates upon the occurrence of a proposed merger
between Zapata Industries and IMSC." Id. ¶¶ 752, 754. For the

41

Zapata Master Agreement to become effective, a Gerszberg-controlled entity called Spectrum30 needed to deposit €10 million into Zapata's bank account. Id. ¶ 755. On the day the Agera transaction closed, a PPVA subsidiary called Huron transferred $15 million of the proceeds to Gerszberg and Spectrum30 (the "Spectrum30 Loan"), and $11 million was wired to Zapata. Id. ¶ 756. The SAC alleges that PPVA had no obligation under the Zapata Master Agreement to transfer these funds, and that it received nothing in return. Id. ¶ 757.

Gerszberg did not move to dismiss as part of the initial round, but he now moves to dismiss on several grounds. See Brief of Seth Gerszberg in Support of His Motion to Dismiss the Second Amended Complaint, ECF No. 334-1. First, Gerszberg argues that plaintiffs' unjust enrichment claim is barred because an express contract governs the transfer of proceeds from the Agera Sale. Id. at 11. Second, Gerszberg contends that plaintiffs' aiding and abetting claim fails because it does not adequately allege knowledge, substantial assistance, or proximate causation. Id. at 18-28. And third – as noted above – Gerszberg raises a Wagoner/in pari delicto defense. Gerszberg Reply 3-6.

As a preliminary matter, the Court holds that plaintiffs' claims against Gerszberg are not barred by Wagoner and in pari

42

delicto because the adverse interest exception applies. Through
the Purported Underlying West Loop/Epocs Obligations, the
Forbearance and Security Agreement, and the Spectrum30 Loan,
Gerszberg and his affiliates were allegedly awarded various
financial benefits at the expense of PPVA. These benefits were
awarded without consideration and unambiguously "operated at
[PPVA's] expense." Kirschner, 938 N.E.2d at 952.

Moving to the unjust enrichment claim, the Court agrees
with Gerszberg that an express contract governs the transfer of
proceeds from the Agera Sale. In support of plaintiffs'
allegation that Gerszberg was unjustly enriched by the $15
million transfer from Huron, the SAC relies on Exhibit 102 to
the SAC. See ECF No. 285-8, at 49-52. Exhibit 102, however,
references a "Note" issued by Spectrum30 to Huron, which the SAC
does not include as an exhibit. Id. This "Note," which sets the
terms of the $15 million transfer, is attached to Gerszberg's
motion (permissibly, in the Court's view, given its
incorporation by reference in Exhibit 102). See ECF No. 334,
Ex. D. The Note is signed by Gerszberg on behalf of Spectrum30,
and by Mark Nordlicht on behalf of Huron and PPVA. Id. at 14.

As this Court has explained previously, "an unjust
enrichment claim is not available where it simply duplicates, or

43

replaces, a conventional contract or tort claim." ECF No. 290, at 27 (quoting <u>Corsello v. Verizon New York, Inc.</u>, 967 N.E.2d 1177, 1185 (N.Y. 2012)). To the extent that PPVA seeks to recover the $15 million that Huron loaned to Spectrum30, the appropriate vehicle is a breach of contract action. Accordingly, the unjust enrichment claim is dismissed as to Gerszberg <u>insofar as it relates to the Spectrum30 Loan</u>.

In all other respects, however, Gerszberg's motion to dismiss plaintiffs' unjust enrichment claim is denied. After all, the Spectrum30 Loan is only one of several transactions through which plaintiffs allege that Gerszberg was unjustly enriched. And Gerszberg does not argue that these other transactions were governed by express contracts. Indeed, Gerszberg gives no explanation as to why these transactions cannot ground an unjust enrichment claim. Any argument to the contrary has thus been forfeited for purposes of the instant motion practice.

Gerszberg's motion to dismiss plaintiffs' aiding and abetting claim is also denied. The SAC plausibly alleges that Gerszberg engaged in multiple transactions that stripped PPVA of its value, and that he did so with actual knowledge of PPVA's financial difficulties and the Platinum Defendants' fiduciary

44

breaches. SAC ¶¶ 744, 749. Given the nature the transactions
with which Gerszberg is charged, the SAC's allegations of
knowledge are far from conclusory. Moreover, the SAC adequately
alleges that Gerszberg substantially assisted in the breaches
that led to his enrichment and that he proximately caused the
injuries that PPVA suffered. Indeed, it is hard to imagine how
the Purported Underlying West Loop/Epocs Obligations, the
Forbearance and Security Agreement, or the Spectrum30 Loan would
have happened without him.

Accordingly, the Fourteenth Count of the SAC is dismissed
only insofar as it relates to the Spectrum30 Loan, and
Gerszberg's motion to dismiss is otherwise denied.

**E. HFF**

HFF is a Preferred Investor of the BEOF Funds, and it is
accordingly named in the Ninth, Tenth, and Fifteenth Counts of
the SAC. In addition – as noted above – the SAC added as a
Twenty-Second Count an alter ego claim against HFF in respect of
Counts One through Six. According to the SAC, HFF "is set up for
the benefit of the family of defendant Murray Huberfeld, but in
fact was used as a repository for assets of the Platinum
Defendants and their friends and family during the course of the
First and Second Schemes, and as such is the alter ego of

45

Platinum Management and Murray Huberfeld." SAC ¶ 144. Huberfeld is alleged to be HFF's president, director, and official signatory, and the daily administration of HFF is alleged to have been handled by the Platinum Defendants and other Platinum employees. Id. ¶¶ 145-46.

Moreover, the SAC alleges that HFF "regularly entered into transactions and agreements with Platinum insiders and certain of the Defendants in this case," and that HFF "has a history of providing a range of 'loans' to affiliated investors and friends in the Platinum circle." Id. ¶¶ 148-49. For example, the SAC alleges, HFF loaned Mark Nordlicht $7.5 million through an intermediary. Id. ¶ 152. HFF also gave a $325,000 zero-interest loan to the Fuchs Family Foundation, and it loaned $1.8 million to Moshe Oratz – an individual who managed certain Platinum-affiliated funds – including $750,000 for Oratz to pay fines and restitution in connection with a criminal racketeering conviction. Id. ¶¶ 153-57. In addition, the SAC alleges, Platinum Defendants regularly invested money acquired during the course of the First and Second Schemes, and HFF loaned this money to Platinum insiders. Id. ¶¶ 159-61.

Finally, according to the SAC, HFF "provided substantial assistance to the Platinum Defendants in implementing the First

and Second Schemes," and "acted as a repository for assets illicitly gained by the Platinum Defendants by way of the First and Second Schemes." Id. ¶¶ 880-81. The SAC alleges that HFF "was formed for the corrupt and wrongful purpose of acting as a clearing house for assets acquired by Murray Huberfeld and certain other Platinum Defendants in connection with the First and Second Schemes," and that it "was one of the Preferred Investors of the BEOF Funds in connection with the siphoning of nearly $100 million in funds out of Black Elk in connection with the Renaissance Sale." Id. ¶¶ 1031-32.

HFF now moves to dismiss the SAC in its entirety. As a preliminary matter, HFF argues, plaintiffs lack standing to bring claims in connection with HFF's role as a Preferred Investor. HFF MTD 10. According to HFF, the SAC alleges that plaintiffs were injured because the proceeds of the Renaissance Sale would have been used to pay off PPVA's debt if they had not been funneled to the Preferred Investors. Id. at 12. However, HFF argues, the SAC itself alleges that "Black Elk, now in bankruptcy, has sought to avoid and recover all transfers to PPVA and to equitably subordinate PPVA's claims in connection with its secured debt." Id. (citing SAC ¶ 510). Accordingly, HFF concludes, any injury belongs to Black Elk in the first instance. Id. Moreover, HFF

notes that it has already settled its claims with Black Elk, and that any injury of PPVA's has been rendered moot. Id. at 13.

Even if plaintiffs had standing, HFF continues, the SAC would fail to state a claim. With respect to aiding and abetting, HFF contends that its "unrelated transactions with certain of the defendants or investment in the BEOF Funds does not permit the reasonable inference that the Foundation substantially assisted the Black Elk Scheme or any other scheme." Id. at 17. And as for unjust enrichment, HFF argues that "the SAC does not demonstrate that [HFF] was enriched, particularly considering its substantial lost investment in PPVA." Id. at 18. Moreover, HFF contends, "[a]bsent any allegations of dealings between [HFF and PPVA], their relationship is simply too attenuated to state a claim for unjust enrichment." Id. at 19.

Finally, with respect to plaintiffs' alter ego claim, HFF argues that the SAC fails to allege that the Platinum Defendants had complete domination over HFF, or that this domination was used to injure plaintiffs. Id. at 20. Instead, HFF contends, "the only non-conclusory facts that Plaintiffs assert are that Huberfeld was the 'president, director and official signatory' for the Foundation and that a single 'invoice for third party

48

payroll services' was directed to Platinum Management's offices."
Id. at 21 (quoting SAC ¶¶ 145-47). Moreover, HFF continues, "the
SAC does not — because it cannot — allege that the Foundation's
corporate formalities were not observed, that it was
undercapitalized, engaged in any ultra vires activity, or that
the dealings between Huberfeld or Platinum Management with the
Foundation were anything other than arms-length." Id.

HFF also contends that "the SAC does not sufficiently allege
with particularity any non-conclusory facts to support a
reasonable inference that the Foundation's corporate form was
used to achieve the fraud or breaches of fiduciary duty alleged
in Counts 1-6 of the SAC." Id. at 22. Instead, HFF explains,
"Plaintiffs only assert that during the time period of the SAC,
the Foundation, among other activity, 'entered into transactions
and agreements with Platinum insiders and certain of the
Defendants in this case,' 'provid[ed] a range of "loans" to
affiliated investors and friends in the Platinum circle,' and
that other defendants, from time to time, provided money to the
Foundation." Id. The rest of the SAC's allegations, HFF
concludes, are conclusory or false on their face. Id. at 23.

After reviewing the new allegations in the SAC and the
arguments in the parties' submissions, the Court is of the view

49

that the alter ego claim – but only the alter ego claim – should
be dismissed as to HFF. Simply put, the SAC does not plausibly
allege that HFF was "used by [Huberfeld] to accomplish his own
and not [HFF's] business," Wm. Passalacqua Builders, Inc. v.
Resnick Developers S., Inc., 933 F.2d 131, 138 (2d Cir. 1991), or
that the Platinum Defendants were "in reality carrying on [HFF's]
business in their personal capacities for purely personal . . .
ends," Walkovszky v. Carlton, 223 N.E.2d 6, 8 (N.Y. 1966). As HFF
notes, the SAC does not allege that HFF's "corporate formalities
were not observed, that it was undercapitalized," or that it
"engaged in any ultra vires activity." HFF MTD 21. And while it
is true that Huberfeld is alleged to be HFF's president,
director, and official signatory, if this were sufficient to
pierce the corporate veil little would be left of the rule that
courts must "disregard corporate form reluctantly." Gartner v.
Snyder, 607 F.2d 582, 586 (2d Cir. 1979).

     Nor is the Court's conclusion changed by the SAC's
allegations that HFF engaged in suspicious financial transactions
with Platinum-related individuals at a time when the First and
Second Schemes were ongoing. Although the loans and "investments"
described in the SAC may raise eyebrows, plaintiffs fail to
describe how these transactions contributed to either scheme.

Instead, the SAC alleges in conclusory fashion that HFF "act[ed] as a clearing house for assets acquired by Murray Huberfeld and certain other Platinum Defendants in connection with the First and Second Schemes." SAC ¶ 1031. How this clearing house was "connected" to the First and Second Schemes, or how it facilitated the schemes' operation, is left unexplained.

The Court nevertheless concludes that the SAC adequately alleges aiding and abetting and unjust enrichment in connection with HFF's role as a Preferred Investor. The Court already explained in its Opinion on the initial round of motions why plaintiffs have stated an unjust enrichment claim as to the other Preferred Investors, see ECF No. 290, at 33, and the same reasoning applies to HFF. Moreover, the grounds on which the Court dismissed the aiding and abetting claims as to the other Preferred Investors – that "plaintiffs' allegations [we]re insufficient to impute actual knowledge to any of these defendants," id. – do not apply to HFF, as HFF is charged with the knowledge of Huberfeld, and Huberfeld is alleged to have had knowledge of Platinum's fraud and fiduciary breaches. See Baker v. Latham Sparrowbush Assocs., 72 F.3d 246, 255 (2d Cir. 1995) ("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that

51

corporation."). This is true even though Huberfeld is not plausibly alleged to have "exercised complete domination" over HFF. Morris, 623 N.E.2d at 1160.

Moreover, HFF's arguments regarding standing and Wagoner/in pari delicto do not change the Court's conclusion. With respect to standing, the Court finds that the SAC plausibly alleges that PPVA was injured by the diversion of proceeds from the Renaissance Sale because the proceeds would have remained with PPVA if they had not been siphoned to the Preferred Investors. And with respect to Wagoner and in pari delicto, the Court has already indicated above that the diversion of the proceeds from the Renaissance Sale constituted the kind of "outright theft or looting" to which the adverse interest exception applies. See Kirschner, 938 N.E.2d at 952. So, while HFF (like the other Preferred Investors) is not an insider, it still can be held liable for the proceeds that it received.

**F. Katz**

Katz is named only in the Eleventh Count of the SAC, which alleges that he aided and abetted the Platinum Defendants' breach of their fiduciary duties. SAC ¶¶ 900-10. According to the SAC, Katz's grandfather, Marcos, was a major investor in PPVA. Id. ¶ 124. In 2015, Marcos sought to redeem his investment

52

in PPVA, but there was insufficient liquidity to do so. Id.
¶ 125. The Platinum Defendants instead gave Marcos an
opportunity to convert his interest in PPVA into an interest in
Platinum Management and to appoint a representative to oversee
his interests. Id. In early 2016, Michael Katz – who knew
Nordlicht, Levy, Huberfeld, Bodner and Fuchs, and who had
previously invested with Levy in an energy company that was
merged into Agera in 2014 – "began taking an active role at
Platinum Management" and representing Marcos's interests. Id.
¶¶ 126-27.

The key allegations against Katz relate to his involvement
in the Agera transactions. According to the SAC, "Katz conspired
with Nordlicht, Levy and other Platinum Defendants to develop
the plan to transfer PPVA's interest in Agera Energy to an
'insider.'" Id. ¶ 128. Specifically, the SAC alleges that Katz
"initiated" the Agera transactions in a March 13, 2016 email to
Nordlicht. Id. ¶ 608. In the email – discussed above in the
context of Nordlicht and Cassidy's motion, and attached as
Exhibit 82 to the SAC - Katz says, "I would like to share some
thoughts on Agera and a potential sale to an insider. Believe
this merits serious consideration now, some notes below on why."
ECF No. 285-7, at 32. The SAC also cites an email from Nordlicht

to Katz – also discussed above and attached as Exhibit 87 to the
SAC – in which Nordlicht says that Platinum "might get
statisfactory [sic] type of bid from a beechwood led
consortium." ECF No. 285-7, at 54. Based on these emails, the
SAC alleges that Katz was an advisor to Platinum who knew that
the Platinum Defendants were breaching their fiduciary duties by
engaging in the Agera transactions, and who substantially
assisted with those transactions. SAC ¶¶ 903-07. Plaintiffs seek
both compensatory and punitive damages from Katz. Id. ¶¶ 909-10.

Katz did not move to dismiss as part of the initial round,
but he now moves to dismiss on several grounds. First, as noted
above, Katz argues that plaintiffs' claims are barred by the
Wagoner rule and the doctrine of in pari delicto. See Katz MTD
6-11. This argument fails because of the Court's conclusion –
discussed in the context of Nordlicht and Cassidy's motion –
that the Agera Sale falls within the adverse interest exception.

Second, Katz argues that the SAC does not adequately plead
the elements of aiding and abetting breach of fiduciary duty.
Id. at 11-18. Beginning with knowledge, Katz argues that "there
are no allegations that Katz held any position at Platinum,
Beechwood, or Agera; had any personal interest in the Agera
Transactions; or actually prepared or executed any documents

54

related to the Agera Transactions." Id. at 13. Katz contrasts
himself in these respects to the defendants allegedly involved
in the Agera Sale whose motions to dismiss the Court denied in
the initial round. Moreover, Katz contends, "the SAC's failure
to properly plead actual knowledge of fraud is not surprising
given that it alleges no personal benefit to Katz, who is
described in the SAC as simply acting as a representative for
the interests of his outside-investor grandparents." Id. at 14.

Moving to substantial assistance, Katz argues that the SAC
alleges only "guilt by association," and that even if Katz
suggested that Agera be sold to a Platinum-related insider
(which Katz denies), "the SAC does not allege that Katz was
suggesting a transaction that would be unfair, offensive,
illicit, or improper to PPVA." Id. at 15-16. To the contrary,
Katz argues, his email to Nordlicht makes clear that Katz was
proposing a sale at "an above industry average" price. Id. at 16
(quoting ECF No. 285-7, at 32). Moreover, Katz argues, the SAC
does not adequately allege causation because it does not allege
that Katz was a but-for cause of the Agera Sale, and - even if
it did - Katz's email to Nordlicht "is too attenuated to
constitute proximate cause." Id. at 16-17.

The Court agrees with Katz, and it hereby dismisses the aiding and abetting claim against him. At bottom, the SAC relies on two email exchanges between Katz and Nordlicht, and these exchanges establish only that: (1) Katz proposed selling Agera to an "insider" – a term whose meaning is unclear from the context – at an "above industry average" price, ECF No. 285-7, at 32; and (2) Nordlicht told Katz that PPVA might receive a satisfactory bid from a "beechwood led consortium," id. at 54. The Court cannot reasonably infer from these exchanges that the Agera Sale "was initiated by . . . Katz," SAC ¶ 608, or that Katz "assisted in orchestrating the scheme," id. ¶ 903. At most, the Court can infer that Katz was an active investor who was aware of PPVA's plans to sell its interest in Agera, and who sought to maximize the return that PPVA received.

To hold Katz liable for aiding and abetting would require the Court to engage in the sort of "speculation" that is inappropriate even at the motion to dismiss stage. See Gmurzynska v. Hutton, 257 F. Supp. 2d 621, 631 (S.D.N.Y. 2003), aff'd, 355 F.3d 206 (2d Cir. 2004). Plaintiffs seem to recognize as much, as they spend barely a page in their opposition brief addressing Katz's arguments (and even this page largely recites

the allegations in the SAC). Accordingly, the Court holds that the SAC fails to state a claim as to Katz.

### G. Landesman

Landesman moves only to dismiss the civil RICO claim in the Seventeenth Count of the SAC. See ECF No. 299. Because, as discussed above, the Court holds that plaintiffs' RICO claim is barred by the RICO Amendment, Landesman's motion is granted.

### H. PBIHL

As noted above, the SAC added PBIHL as a defendant. PBIHL is alleged to be "a Beechwood Entity organized under Bermuda law, with its principal place of business in Bermuda." SAC ¶ 214. It is also alleged to be the successor in interest to Beechwood Bermuda Investment Holdings Ltd., which "was a reinsurance and wealth management company domiciled in Bermuda that issued wealth management products for the Beechwood Defendants." Id.

PBIHL moves to dismiss on a number of grounds. See Memorandum of Law in Support of Motion to Dismiss on Behalf of Defendant PB Investment Holdings, Ltd., ECF No. 379. As relevant here, PBIHL argues that it has been impermissibly group pled and that it should be dismissed as a defendant for the same reasons that the Court dismissed the FAC as to Beechwood Capital,

BBLNPEDCO Corp., BHLN-PEDCO Corp., and Beechwood Trust Nos. 7-14. Id. at 5-7; see ECF No. 290, at 34-37.

The Court agrees. PBIHL is named in a single paragraph of the SAC, and it is not charged with any specific wrongdoing. Although plaintiffs have attempted to add specificity by attaching new documents to their opposition brief, see ECF No. 398, the Court will not consider these, see O'Brien v. Nat'l Prop. Analysts Partners, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss."). Accordingly, PBIHL's motion to dismiss the SAC is granted.

### I. Saks

Whereas the FAC classified Saks only as a Beechwood Defendant, the SAC classifies him as both a Platinum Defendant and a Beechwood Defendant. As such, Saks is named in the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Fourteenth,[12] Sixteenth, and Seventeenth[13] Counts of the SAC. In

---

[12] Saks, like Bodner, argues that the Fourteenth Count impermissibly reasserts the unjust enrichment claim that the Court already dismissed. Saks MTD 5. The Court agrees, and it again dismisses the Fourteenth Count as to Saks.

[13] As discussed above, the Court holds that the Seventeenth Count is barred by the RICO Amendment. Accordingly, the claim is dismissed as to Saks, among others.

the initial round of motions to dismiss, Saks incorporated the group pleading arguments made by Bodner, and he argued that plaintiffs failed to attribute to him "even one instance of specific wrongful conduct or specific knowledge of wrongful conduct by others." ECF No 193, at 4.

The Court denied Saks's motion, holding that one could "reasonably infer that Saks knowingly participated in the Platinum Defendants' tortious conduct." ECF No. 290, at 56-57. Specifically, the Court explained, plaintiffs "allege[d] that Saks moved from a portfolio management position at Platinum Management to become CIO and President of BAM," and they "also allege[d] that he helped orchestrate the transaction in which Montsant paid millions of dollars for Black Elk senior secured notes of dubious value." Id. at 57. The Court held that "Saks [wa]s not prejudiced from hereafter moving to dismiss the remaining claims in the FAC on more particularized grounds," but it "reject[ed] his broad-brush argument that no wrongdoing or knowledge of wrongdoing has been attributed to him." Id.

Saks now moves to dismiss on more particularized grounds. He argues that the First and Second Counts for breach of fiduciary duties – now brought against him in his capacity as a Platinum Defendant – should be dismissed because the SAC fails

59

to allege the he owed fiduciary duties to PPVA or that he
breached those duties. Saks MTD 6-10. With respect to the owing
of duties, Saks argues that he is alleged only to have worked
for six months as a non-owner employee at Platinum. Id. at 6.
And as for breach, Saks contends that he "is not alleged to be
one of the 'narrowly defined group of highly ranked officers or
directors who participated in the preparation and dissemination
of' net asset value ('NAV') reports for PPVA's investments." Id.
at 8. Saks contrasts his role with that of Bodner, Huberfeld,
Ottensoser, Levy, and Landesman – whom this Court held were
insiders and thus chargeable with misstatements of PPVA's NAV –
and he argues that he was not "a founder or owner," or "a member
of the valuation committee, or of the risk committee." Id. at 9.

For similar reasons, Saks argues that the Fourth and Fifth
Counts for fraud and constructive fraud should be dismissed. Id.
at 10. Not only are plaintiffs unable to tie Saks to any
misstatements through the group pleading doctrine, he argues,
and not only does the constructive fraud claim fail because
plaintiffs do not adequately allege a fiduciary duty, but the
SAC also fails "to establish scienter as to Saks during his
short tenure at Platinum." Id. at 11. Saks argues that he is
alleged to be copied on one email – attached as Exhibit 30 to

60

the SAC - regarding the public disclosure of an option that Black Elk had to purchase Golden Gate Oil for $60 million. See ECF No. 285-3, at 102. This email, Saks argues, is insufficient to show that he knew Golden Gate's value was inflated. Saks MTD 12.

Next, Saks argues that the aiding and abetting claims against him (the Third, Sixth, Seventh, and Eighth Counts) should be dismissed for failure to plead knowledge or substantial assistance. Id. at 17-21. With respect to knowledge, Saks argues that "[t]he SAC, at most, alleges that Saks could have had reason to suspect that some type of wrongdoing was occurring." Id. at 18. And with respect to substantial assistance, he contends that "no action of Saks proximately caused any harm to PPVA." Id. at 19. Saks argues that the only conduct attributed to him as a Platinum Defendant is his receipt of the Golden Gate email above, which was neither the but-for nor proximate cause of any harm. Id. at 20.

Moreover, Saks contends, the only conduct attributed to him as a Beechwood Defendant is his signature of the Montsant Pledge Agreement, which "secured a previous loan, made four months earlier, that enabled Montsant to purchase Black Elk 13.75% Senior Secured Notes at 93.5% of par." Id. Saks argues that he

61

is not alleged to be involved with the previous loan, and he is
not alleged to be responsible for PPVA valuation reports that
involved assets encumbered by the pledge agreement. Id. at 20-
21. In addition, Saks contends, the pledge agreement did not
proximately cause injury to PPVA because any harm to PPVA came
through the prior purchase of the Black Elk notes and the
subsequent misstatement of asset values. Id. at 21.

       As a final point, Saks argues that the SAC fails to state a
claim for civil conspiracy because such a claim requires proof
of "intentional participation in the furtherance of a plan or
purpose" and "resulting damage or injury." Id. at 22 (quoting
Treppel v. Biovail Corp., No. 03 Civ. 3002 (PKL), 2005 WL
2086339, at *5 (S.D.N.Y. Aug. 30, 2005)). According to Saks, the
SAC "fails to plead an agreement involving Saks in even a
conclusory fashion." Id.

       The Court largely agrees with Saks, and it hereby dismisses
all claims brought against him as a Platinum Defendant. Unlike
the other Platinum Defendants, Saks is not alleged to have "held
a high level position indicating that he was an insider, with
direct involvement in day-to-day affairs." In re Alstom SA, 406
F. Supp. 2d 433, 449 (S.D.N.Y. 2005). Instead, he is alleged
only to have been a portfolio manager who was "responsible for

overseeing and managing PPVA's bio/pharma investments," which are mostly tangential to the SAC's core allegations. SAC ¶ 12(xii). These allegations are insufficient to charge him with misstatements of PPVA's NAV, and the SAC does not otherwise meet Rule 9(b)'s specificity requirement for pleading fraud or breach of fiduciary duty in connection with Saks's role at Platinum. Moreover, while plaintiffs contend in their opposition brief that Saks "was marketed as the co-CIO of Platinum Partners, along with Mark Nordlicht," Opp. 35, this allegation appears nowhere in the SAC. Accordingly, the First through Sixth Counts are hereby dismissed as to Saks.[14]

Moving to the remaining counts, brought against Saks in his capacity as a Beechwood Defendant, the Court holds that the SAC states claims for aiding and abetting.[15] As plaintiffs note, the Court already held in its Opinion on the initial round of motions to dismiss that "Saks knowingly participated in the Platinum Defendants' tortious conduct." ECF No. 290, at 56-57.

---

[14] As noted above, the Fourteenth and Seventeenth Counts are also dismissed.

[15] The Court concludes, however - as it did with the other Beechwood Defendants - that plaintiffs' conspiracy claim is duplicative of their aiding and abetting claims. The Sixteenth Count is therefore dismissed as to Saks.

The only question, then, is whether Saks's participation rose to the level of "substantial assistance." The Court concludes that it did because it is reasonable to infer that Saks substantially assisted the Platinum Defendants by signing the Montsant Pledge Agreement. Indeed, without posting collateral to secure the loan from SHIP, the Platinum Defendants might have had difficulty unwinding the Black Elk Scheme.

As a final point, Saks cannot raise a defense based on the Wagoner rule or the doctrine of in pari delicto. As discussed above, the Black Elk Scheme involved the straightforward diversion of assets from PPVA. And the Montsant Pledge Agreement was part of a series of transactions whereby a PPVA subsidiary borrowed money and encumbered its assets in order to relieve Beechwood Entities of worthless securities. These transactions qualify as "looting," and the adverse interest exception therefore applies.

In sum, Saks's motion is denied with respect to the Seventh and Eighth Counts, and it is granted in all other respects.

### Conclusion

This Opinion disposes of the second round of motions to dismiss in Trott et al. v. Platinum Management (NY) LLC et al., 18-cv-10936. The Clerk is directed to close the following

64

entries on the <u>Trott</u> docket: 299, 304, 308, 321, 323, 329, 357,
373, and 378. The Clerk is also directed to close the following
entries on the master docket, 18-cv-6658: 257, 259, 262, 276,
278, 284, 333, and 383.

      SO ORDERED.

Dated:    New York, NY
        June 21, 2019                     JED S. RAKOFF, U.S.D.J.