# EXHIBIT 601

| From: | David Levy [dlevy@platinumlp.com] |
|---|---|
| Sent: | 7/21/2014 6:27:21 PM |
| To: | Murray Huberfeld [huberfeld@gmail.com] |
| Subject: | WNIC BCLIC BBIL Holdings as of 7-18-14.xlsx |
| Attachments: | WNIC BCLIC BBIL Holdings as of 7-18-14.xlsx; ATT00001.txt |

CTRL5193708-1

**Beechwood Re Ltd.**
**July 18, 2014**
**Holdings Summary**

| Assets | | |
|---|---|---|
| Available Cash | $ | 72,735,861 |
| Public Investments | | |
| Principal | | 296,756,893 |
| Accrued Interest | | 2,581,346 ** |
| GAAP Unrealized G/L | | (12) |
| ABS Investments | | |
| Principal | | 189,254,986 |
| Accrued Interest | | 3,956,791 ** |
| Commercial Real Estate Investments | | |
| Principal | | 5,742,819 |
| Accrued Interest | | 52,281 ** |
| Limited Partnership Investments | | |
| Platinum Partners Credit Opportunities Fund LLC | | 36,610,435 ** |
| GAAP Unrealized  G/L | | 309,292 ** |
| **Total Assets** | $ | 608,000,693 |

**Balances are as of July 31, 2014

**Beechwood Bermuda International Ltd.**
**July 18, 2014**
**Holdings Summary**

| Assets | | |
|---|---|---|
| Available Cash | 43,705,893 | |
| Public Investments | | |
| Principal | 132,806,362 | |
| Accrued Interest | 956,360 | ** |
| GAAP Unrealized G/L | 2,030,046 | |
| Private Equity | | |
| Platinum Partners Value Arbitrage | 7,500,000 | |
| GAAP Unrealized G/L | 160,544 | ** |
| Senior Secured Investments | | |
| Principal | 23,952,300 | |
| Accrued Interest | 632,899 | ** |
| GAAP Unrealized G/L | - | |
| Commercial Real Estate Investments | | |
| Principal | 2,150,000 | |
| Accrued Interest | 12,900 | |
| Limited Partnership Investments | | |
| Platinum Partners Credit Opportunities Fund LLC | 18,303,122 | |
| GAAP Unrealized G/L | - | ** |
| **Total Assets** | **$   232,210,426** | |

**Beechwood Re Ltd. & Beechwood Bermuda International Ltd.**
**July 18, 2014**
**Holdings Summary - SHIP**

| | | Bre | BBIL | Total | |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| | Available Cash | 25,140,000 | 974,667 | 26,114,667 | |
| Public Investments | | | | | |
| | Principal | - | 18,832,130 | 18,832,130 | |
| | Accrued Interest | - | 382,797 | 382,797 | ** |
| | GAAP Unrealized G/L | - | 12,468 | 12,468 | |
| Senior Secured Investments | | | | | |
| | Principal | 30,000,000 | - | 30,000,000 | |
| | Accrued Interest | 350,000 | - | 350,000 | ** |
| | **Total Assets** | **$  55,490,000** | **$  20,202,062** | **$  75,692,062** | |

# EXHIBIT 602

# REDACTED

# EXHIBIT 603

# REDACTED

# EXHIBIT 604

# REDACTED

# EXHIBIT 605

# REDACTED

# EXHIBIT 606

# REDACTED

# EXHIBIT 607

# REDACTED

# EXHIBIT 608

# REDACTED

# EXHIBIT 609

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------

TALY USA HOLDINGS INC., and
SLL USA HOLDINGS, LLC

                                        Plaintiffs,

                -against-

JASON NISSEN,
NATIONAL EVENTS OF AMERICA, INC.,
NATIONAL EVENTS INTERMEDIATE LLC,
NATIONAL EVENTS HOLDINGS LLC,
NATIONAL EVENT COMPANY II LLC,
NATIONAL EVENT COMPANY III LLC,
WORLD EVENTS GROUP II LLC,
NEW WORLD EVENTS GROUP, INC., and
WINTER MUSIC FESTIVAL LLC,

                                        Defendants.
-------------------------------------------------------------------

Index No. 652865      /2017
Plaintiffs designate New York County
as the place of trial.

Date Purchased: 5/26/2017

**SUMMONS**

The basis of venue is that Plaintiffs'
principal place of business is in New
York County.

    **Jury Trial Demanded**

TO THE ABOVE NAMED DEFENDANTS:

    You are hereby summoned to answer the complaint in this action and to serve a copy of

your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on plaintiffs' attorneys within twenty (20) days after the service of this summons,

exclusive of the day of service (or within 30 days after the service is complete if this summons is

not personally delivered to you within the State of New York); and in case of your failure to

appear or answer, judgment will be taken against you by default for the relief demanded in the

complaint.

Dated: New York, New York
      May 26, 2017

                          MORRISON COHEN LLP

                          By:_____

                               Y. David Scharf
                               Christopher Milito
                               Joaquin Ezcurra
                               Thomas Gardner
                               909 Third Avenue
                               New York, New York 10022
                               (212) 735-8769
                               *Attorneys for Plaintiffs*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

TALY USA HOLDINGS INC., and                          Index No. 652 865 /2017
SLL USA HOLDINGS, LLC,

                                Plaintiffs,          **VERIFIED COMPLAINT**

-against-

JASON NISSEN,
NATIONAL EVENTS OF AMERICA, INC.,
NATIONAL EVENTS INTERMEDIATE LLC,
NATIONAL EVENTS HOLDINGS LLC,
NATIONAL EVENT COMPANY II LLC,
NATIONAL EVENT COMPANY III, LLC,
WORLD EVENTS GROUP II, LLC,
NEW WORLD EVENTS GROUP, INC., and
WINTER MUSIC FESTIVAL LLC,

                                Defendants.
-----------------------------------------------------------------X

        Plaintiffs Taly USA Holdings Inc. and SLL USA Holdings LLC as and for their

complaint against Defendants, allege as follows:

                            **SUMMARY**

        1.      This case involves a fraudulent scheme in which Defendant Jason Nissen

("Nissen"), using his controlled companies National Events of America, Inc., National Events

Intermediate LLC, National Events Holdings LLC, National Event Company II LLC, National

Event Company III, LLC, World Event Group II, LLC, New World Events Group, Inc., and

Winter Music Festival LLC (collectively, the "Defendants") devised and implemented a basic

yet audacious Ponzi scheme through which over one hundred and twenty million dollars were

channeled. The Ponzi scheme was based on Defendants' purported use of the funds solicited in

ticket reselling enterprises involving high profile sports and entertainment events including the

1

Case 1:18-cv-10936-JSR     Document 577-34     Filed 03/11/20     Page 24 of 207

Super Bowl, the NCAA College Basketball championship, the World Series, the U.S. Tennis Open, the Broadway musical *Hamilton* and the singer Adele's world tour.

2.    To execute this Ponzi swindle, Defendant National Events of America, Inc. ("NEA") solicited and received from Plaintiffs a series of event-specific investments under the false pretense that the funds would be used to purchase tickets for resale at a substantial profit. In reality, Defendants used the funds solicited to pay impossibly high returns to other investors or lenders who had made similar investments in NEA. The "returns" on the ticket sales were illusory, financed by cash infusions from new investors who were told their money would be used to purchase tickets for resale.

3.    To execute this scheme, Nissen created detailed and sophisticated forgeries showing the tickets that Defendants supposedly were purchasing and selling. Moreover, Nissen falsified bank documents to "prove" that the business was profitable. These forgeries were so sophisticated that Nissen was able to secure substantial and highly-structured investments from otherwise sophisticated third parties, such as Falcon Investments.

4.    Based on Nissen's false statements and forgeries, Plaintiffs invested over $32 million in specific events. To date, Plaintiffs have received back only half of their investment, leaving over $25 million unpaid. Defendants' available bank records show that this missing money was diverted to pay "profits" and interest to other investors and lenders, and also to Nissen himself. Those bank records show that during calendar year 2016, Defendant Nissen diverted approximately $1.025 million directly to himself via wire transfers. Because the records show millions upon millions of dollars being transferred between several of the Defendants' accounts, as well as millions of dollars in unidentified cheks and teller withdrawals, there is little question that Nissen diverted even more of Plaintiffs' funds to himself.

2

5.      The investment structure was simple on its face. Defendants were in the business of purchasing blocks of tickets to high-profile events and then selling them to individuals or other brokers at a marked-up price. Ticket reselling is a capital-intensive business and Defendants purportedly needed operating cash to purchase large quantities of tickets to expensive events. Thus, Plaintiffs and Nissen would discuss a particular event in which Plaintiffs would invest. Plaintiffs would enter into an event-specific investment contract which would set forth Plaintiffs' anticipated return, which usually was a percentage of the profits from that event, with a guaranteed "floor" return. The investment contracts were executed by NEA, with Nissen signing personal guarantees for each. Plaintiffs would then wire funds at Nissen's direction so that NEA could purchase tickets to the event specified in the written agreement.

6.      However, NEA did not use Plaintiffs' money to purchase tickets to the event specified in the written agreement, despite the fact that the agreements each recited that such purchases were the only "Permissible Use" of the funds. Instead, Defendants' bank records show that the funds were used to repay prior investors or lenders. Similarly, on the occasions when Plaintiffs were repaid their investment, Defendants used the funds taken from other investors to repay Plaintiffs – a classic Ponzi scheme.

7.      The foregoing is not mere allegation: Defendant Seidenfeld has explicitly admitted the Ponzi scheme to Plaintiffs' president, Yaron Turgeman. Seidenfeld came clean to Turgeman on the evening of May 7, 2017, when Defendant NEA ran out of funds, telling Turgeman, in sum and substance: "I lied to you about everything. I was running a Ponzi scheme and I ran out of money," and "I didn't really buy tickets with all the money you gave me. I gave it to other people."

3

8.    Sadly, Defendant Nissen has a history of running afoul of the law in the ticket-reselling arena.    As a public-school math teacher in Queens, Nissen was pulled from his classroom and assigned to a clerical position after it was discovered that he had charged his students $30 a ticket to an otherwise free concert.    Prior to that, Mr. Nissen was arrested for scalping tickets just outside the U.S. Open.    Now Mr. Nissen has upped the ante, transforming himself from a mere ticket scalper on the streets of Queens to a Ponzi schemer residing in a multi-million dollar mansion on Long Island's Gold Coast.

**PARTIES**

9.    Plaintiff Taly USA Holdings Inc. ("Taly") is a New York corporation with an office at 580 Fifth Avenue, New York, New York 10036.

10.    Plaintiff SLL USA Holdings, LLC ("SLL") is a wholly-owned subsidiary of Taly with an office at 580 Fifth Avenue, New York, New York 10036.

11.    Defendant Jason Nissen ("Nissen") is a natural person residing within the State of New York.

12.    Defendant National Events of America, Inc. ("NEA") is a New York corporation with an office at 1430 Broadway, 7th Floor, New York, New York, 10018.

13.    Nissen is the sole owner of NEA.

14.    Defendant National Events Holdings LLC ("NEH") is a Delaware limited liability company with an office at 1430 Broadway, 7th Floor, New York, New York, 10018.

15.    NEH is owned seventy-six percent (76%) by NEA and twenty-four percent (24%) by Falcon Strategic Partners IV, LP Investments.

4

16.     Defendant National Events Intermediate, LLC ("NEI") is a Delaware limited liability company with an office at 1430 Broadway, 7th Floor, New York, New York, 10018.

17.     NEI is wholly owned by NEH.

18.     Defendant National Event Company II LLC ("NECO II") is a New York limited liability company with an office at 1430 Broadway, 7th Floor, New York, New York, 10018.

19.     NECO II is wholly owned by NEI.

20.     Defendant National Event Company III LLC ("NECO III") is a New York limited liability company with an office at 1430 Broadway, 7th Floor, New York, New York, 10018.

21.     NECO III is wholly owned by NEI.

22.     Defendant World Events Group II LLC ("WEG") is a New York limited liability company with an office at 1430 Broadway, 7th Floor, New York, New York, 10018.

23.     WEG is wholly owned by NEI.

24.     Defendant Winter Music Festival LLC ("WMF") is a Delaware limited liability company.

25.     WMF is fifty-percent (50%) owned by NEI.

26.     Defendant New World Events Group, Inc. ("NWE") is a New York corporation with an office at 1430 Broadway, 7th Floor, New York, New York, 10018.

27.     Nissen is the sole owner of NWE.

28.     At all relevant times, Nissen was in control of the entity defendants.

## THE INVESTMENTS

29.     Beginning in June of 2016, Taly and SLL made a series of event-specific investments with NEA.  The total amount of these investments was $32,358,921.00.

30.     In keeping with the Ponzi scheme, Nissen arranged for NEA to repay some of these investments to Taly and SLL, but far from all.

31.     From mid-2016 through May of 2017 (when the scheme was discovered), NEA repaid Taly and SLL $16,223,617.47.

32.     However, NEA failed to repay Taly and SLL $16,135,303.53 of its capital.

33.     NEA failed to repay Taly over $9 million in guaranteed profits.

34.     Attached hereto as Exhibit A is a chart summarizing the funds paid by, and returned to Taly and SLL under the investments described hereinafter.

35.     Some of Taly and SLL's later investments with NEA were made through a combination of new money from Taly and SLL plus NEA's professed rolling-forward of amounts NEA owed to Taly or SLL under previous investments.

36.     Each of the investments was evidenced by a writing signed by Jason Nissen on behalf of NEA setting forth the particular event in which Plaintiffs were investing (the "Contracts"), the anticipated rate of return, a guaranteed base return and the anticipated repayment date.

37.     Each of the Contracts termed the investment in the particular event as the "permissible use" of the invested funds.

6

*MLB All Star Events*

38.    On June 2, 2016, Nissen, acting on behalf of NEA, signed an agreement under which Taly invested a principal amount of seven hundred and fifty thousand dollars ($750,000.00), to be repaid with a return on August 2, 2016 (the "All Star Contract").

39.    In Section 1 of the All Star Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to MLB All Star Events."

40.    Section 2 of the All Star Contract provided that NEA would repay Taly's investment plus the greater of a ten percent (10%) return or "40% of the profits generated by [NEA] from the permissible use of the Principal Amount."

41.    Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets to MLB All Star Events and for no other purpose.

42.    Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to MLB All Star Events.

43.    NEA's representation that NEA would use the money to purchase and resell tickets to MLB All Star Events was false at the time it was made and designed to induce Taly to make the investment.

44.    On June 2, 2016, Taly wired to NEA the sum of $750,000.00 to be used to purchase tickets for the MLB All Star Events.

45.    NEA did not use Taly's money to purchase tickets for MLB All Star Events.

46.    On June 3, 2016, NEA wired $40,000.00 to JSR Capital.

7

47.     Upon information and belief, JSR Capital is not engaged in the business of buying or selling tickets for MLB All Star Events.

48.     On June 5, 2016, NEA wired $50,000.00 to Stella Maksumova.

49.     Upon information and belief, Stella Maksumova is not engaged in the business of buying or selling tickets for MLB All Star Events.

50.     On June 6, 2016, NEA transferred $297,000.00 to another of its accounts.

*U.S. Open Tennis Championship Contracts*

51.     On June 16, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of six hundred thousand dollars ($600,000.00), payable on September 14, 2016 (the "US Open I Contract").

52.     In Section 1 of the US Open I Contract, NEA represented:  "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the 2016 US Open Tennis Championship."

53.     Section 2 of the US Open I Contract provided that NEA would repay Taly's principal plus the greater of a twelve percent (12%) return on its investment or "40% of the profits generated by [NEA] from the permissible use of the Principal Amount."

54.     On July 7, 2016, Nissen, acting on behalf of NEA, entered into an agreement in favor of Taly in the principal amount of nine hundred thousand dollars ($900,000.00), payable on July 21, 2016 (the "US Open II Contract").

55.     In Section 1 of the US Open II Contract, NEA represented:  "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the 2016 US Open Tennis Championship."

8

56.     Section 2 of the US Open II Contract provided that NEA would repay Taly's investment plus the greater of $75,000.00 or "40% of the profits generated by [NEA] from the permissible use of the Principal Amount."

57.     Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets for the US Open and for no other purpose.

58.     Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets for the US Open.

59.     NEA's representation that NEA would use the money to purchase and resell tickets for the US Open was false at the time it was made and designed to induce Taly to make the investment.

60.     On June 16, 2016, Taly wired to NEA the sum of $600,000.00 to be used to purchase tickets for the US Open.

61.     On July 8, 2016, Taly wired to NEA the sum of $900,000.00 to be used to purchase tickets for the US Open.

62.     NEA did not use Taly's money to purchase tickets for the US Open.

63.     On June 17, 2016, NEA transferred $304,000.00 to another of its accounts.

64.     On June 17, 2016, NEA wrote a check for $1,000,000.00 to an unidentified person or entity.

65.     On June 17, 2016, NEA wrote a $1 million check to an unknown person or entity.

66.     On July 8, 2016, NEA wired the sum of $876,000.00 to JAJ Executive Services.

Case 1:18-cv-10936-JSR    Document 577-34    Filed 03/11/20    Page 32 of 207

*Hamilton*

67.    On June 29, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of one million dollars ($1,000,000.00), payable on September 16, 2016 (the "Hamilton Contract").

68.    In Section 1 of the Hamilton Contract, NEA represented:  "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the 'Hamilton' show playing at The PrivateBank Theatre in Chicago."

69.    Section 2 of the Hamilton Contract provided that NEA would repay Taly's investment plus a twenty five percent (25%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

70.    Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets for Hamilton and for no other purpose.

71.    Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to Hamilton.

72.    NEA's representation that NEA would use the money to purchase and resell tickets to Hamilton was false at the time it was made and designed to induce Taly to make the investment.

73.    On June 29, 2016, Taly wired to NEA the sum of $1,000,000.00 to be used to purchase tickets to Hamilton.

74.    NEA did not use Taly's money to purchase tickets to Hamilton.

75.    On June 29, 2016, NEA transferred $990,000.00 to another of its accounts.

76.    On June 30, 2016, NEA wired $36,000.00 to Solomon Shimunov.

77.     Upon information and belief, Solomon Shimunov is not engaged in the business of buying or selling tickets to Hamilton.

*Adele I*

78.     On July 28, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of one million five hundred eighty four thousand dollars ($1,584,000.00), payable on October 8, 2016 (the "Adele I Contract").

79.     In Section 1 of the Adele I Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets for Adele's 2016 World Tour."

80.     Section 2 of the Adele I Contract provided that NEA would repay Taly's investment plus a twenty percent (20%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

81.     Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets for Adele's 2016 World Tour and for no other purpose.

82.     Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets for Adele's 2016 World Tour.

83.     NEA's representation that NEA would use the money to purchase and resell tickets for Adele's 2016 World Tour was false at the time it was made and designed to induce Taly to make the investment.

84.     On July 28, 2016, Taly wired to NEA the sum of $1,584,000.00 to be used to purchase tickets for Adele's 2016 World Tour.

85.     NEA did not use Taly's money to purchase tickets for Adele's 2016 World Tour.

86.     On July 29, 2016, NEA transferred $61,000.00 to another of its accounts.

87.     From July 29 through August 2, 2016, NEA wrote checks to unknown persons or entities totaling $503,000.00.

88.     On August 5, 2016, NEA wired $260,000.00 to I & I Realty Group LLC.

89.     Upon information and belief, I & I Realty Group LLC is not engaged in the business of buying or selling tickets for Adele's 2016 World Tour.

*Adele II*

90.     On August 9, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of seven hundred sixty five thousand dollars ($765,000.00), payable on November 5, 2016 (the "Adele II Contract").

91.     In Section 1 of the Adele II Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets for Adele's 2016 World Tour."

92.     Section 2 of the Adele II Contract provided that NEA would repay Taly's investment plus a twenty percent (20%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

93.     Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets for Adele's 2016 World Tour and for no other purpose.

94.     Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets for Adele's 2016 World Tour.

95.    NEA's representation that NEA would use the money to purchase and resell tickets for Adele's 2016 World Tour was false at the time it was made and designed to induce Taly to make the investment.

96.    On August 9, 2016, Taly wired to NEA the sum of $765,000.00 to be used to purchase tickets for Adele's 2016 World Tour.

97.    NEA did not use Taly's money to purchase tickets for Adele's 2016 World Tour.

98.    On August 9, 2016, NEA transferred $51,000.00 to another of its accounts.

99.    On August 9, 2016, NEA wired $500,000.00 to I & I Realty Group LLC.

100.    Upon information and belief, I & I Realty Group LLC is not engaged in the business of buying or selling tickets to Adele's 2016 World Tour.

101.    On August 9, 2016, NEA wired $500,000.00 to Solomon Shimunov.

102.    Upon information and belief, Solomon Shimunov is not engaged in the business of buying or selling tickets to Adele's 2016 World Tour.

*New York Mets*

103.    On August 31, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of one million one hundred and twenty thousand dollars ($1,120,000.00) (the "Mets I Contract").

104.    In Section 1 of the Mets I Contract, NEA represented recited: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to Mets tickets."

105.    Section 2 and Schedule A of the Mets Contract provided that NEA would repay Taly's investment plus a return on its investment pursuant to a formula based on how far the Mets advanced in the playoffs.

106.    On September 13, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of one million one hundred and twenty thousand dollars ($1,120,000.00), payable on February 28, 2017 (the "Mets II Contract").

107.    In Section 1 of the Mets II Contract, NEA represented:  "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to Mets tickets."

108.    Section 2 and Schedule A of the Mets II Contract provided that NEA would repay Taly's investment plus a return on its investment pursuant to a formula based on how far the Mets advanced in the playoffs.

109.    Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets to Mets games and for no other purpose.

110.    Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to Mets games.

111.    NEA's representations that NEA would use the money to purchase and resell tickets to Mets games were false at the time they was made and designed to induce Taly to make the investment.

112.    On August 31, 2016, Taly wired to NEA the sum of $675,000.00 to be used to purchase Mets tickets.

113.    NEA did not use Taly's money to purchase tickets to Mets games.

114.    On September 1, 2016, NEA wired $800,000.00 to I & I Realty Group LLC.

115.    Upon information and belief, I & I Realty Group LLC is not engaged in the business of buying or selling tickets to Mets games.

116.    On September 13, 2016, Taly wired to NEA the sum of $1,120,000.00 to be used to purchase Mets tickets.

117.    NEA did not use Taly's money to purchase tickets to Mets games.

118.    On September 13, 2016, NEA transferred $12,000.00 to family members of Jason Nissen.

119.    Between September 14 and 15, 2016, NEA transferred $789,000 to another of its accounts.

120.    On September 14, 2016, Jason Nissen or NEA made a $66,000 teller withdrawal.

121.    On September 15, 2016, Jason Nissen or NEA made a $500,000 teller withdrawal.

*UFC*

122.    On October 5, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of one million nine hundred and twenty-one thousand, seven hundred and fifty dollars ($1,921,750.00), payable on December 13, 2016 (the "UFC Contract").

123.    In Section 1 of the UFC Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the UFC 205 at the Madison Square Garden, New York."

124.    Section 2 of the UFC Contract provided that NEA would repay Taly's investment plus an eighteen percent (18%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

15

125. Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets to the UFC 205 at the Madison Square Garden, New York and for no other purpose.

126. Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to the UFC 205 at the Madison Square Garden, New York.

127. NEA's representation that NEA would use the money to purchase and resell tickets to the UFC 205 at the Madison Square Garden, New York was false at the time it was made and designed to induce Taly to make the investment.

128. On October 6, 2016, Taly wired to NEA the sum of $1,921,750.00 to be used to purchase tickets to the UFC 205 at the Madison Square Garden, New York.

129. NEA did not use Taly's money to purchase tickets to the UFC 205 at the Madison Square Garden, New York.

130. On October 6, 2016, NEA transferred $1,883,000.00 to other bank accounts under its control.

131. On October 6, 2016, Jason Nissen or NEA made teller withdrawals totaling $43,000.00.

*World Series Contracts*

132. On October 19, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of six hundred and thirty-four thousand dollars ($634,000.00), payable on November 19, 2016 (the "WS I Contract").

133.    In Section 1 of the WS I Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the Cleveland Indians 2016 World Series games."

134.    Section 2 of the WS I Contract provided that NEA repay Taly's investment plus a fifteen percent (15%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

135.    On October 24, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of five hundred and five thousand dollars ($505,000.00), payable on November 19, 2016 (the "WS II Contract").

136.    In Section 1 of the WS II Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to 2016 World Series games."

137.    Section 2 of the WS II Contract provided that NEA repay Taly's investment plus a fifteen percent (15%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

138.    Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets to the 2016 World Series games and for no other purpose.

139.    Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to the 2016 World Series games.

140.    NEA's representation that NEA would use the money to purchase and resell tickets to the 2016 World Series games was false at the time it was made and designed to induce Taly to make the investment.

17

141.    On October 20, 2016, Taly wired to NEA the sum of $350,000.00 to be used to purchase tickets to the 2016 World Series games.

142.    On October 21, 2016, Taly wired to NEA the sum of $200,000.00 to be used to purchase tickets to the 2016 World Series games.

143.    On October 24, 2016, Taly wired to NEA the sum of $505,000.00 to be used to purchase tickets to the 2016 World Series games.

144.    NEA did not use Taly's money to purchase tickets to the 2016 World Series games.

145.    On October 20, 2016, NEA transferred $165,000.00 to another bank account under its control.

146.    On October 25, 2016, Jason Nissen or NEA made a $300,000.00 teller withdrawal.

147.    On October 25, 2016, NEA wrote a check for $840,715.00 to an unidentified person or entity.

148.    On October 25, 2016, NEA wired $10,000.00 to Steven Bolden.

149.    Upon information and belief, Steven Bolden is not engaged in the business of buying or selling tickets to the 2016 World Series games.

*College Football*

150.    On November 28, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of two million six hundred thousand dollars ($2,600,000.00), payable on December 9, 2016 (the "College Football Contract").

151.    In Section 1 of the College Football Contract, NEA represented:   "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to College Football Playoff Games."

152.    Section 2 of the College Football Contract provided that NEA would repay Taly's investment plus a guaranteed return of two hundred thousand dollars ($200,000.00).

153.    Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets to College Football Playoff Games and for no other purpose.

154.    Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to College Football Playoff Games.

155.    NEA's representation that NEA would use the money to purchase and resell tickets to College Football Playoff Games was false at the time it was made and designed to induce Taly to make the investment.

156.    On November 28, 2016, Taly wired to NEA the sum of $1,500,000.00 to be used to purchase College Football Playoff Games tickets.

157.    On November 30, 2016, Taly wired to NEA the sum of $51,200.00 to be used to purchase College Football Playoff Games tickets.

158.    NEA did not use Taly's money to purchase tickets to College Football Playoff Games.

159.    On November 28, 2016, NEA wired $800,000.00 to 363 Howard Ave LLC.

160.    Upon information and belief, 363 Howard Ave LLC is not engaged in the business of buying or selling tickets to College Football Playoff Games.

19

161. On November 29, 2016, NEA wired $1,400,000.00 to Hutton Ventures LLC.

162. Upon information and belief, Hutton Ventures LLC is not engaged in the business of buying or selling tickets to College Football Playoff Games.

163. On November 29, 2016, NEA made a teller withdrawal of $100,000.00.

*Super Bowl Suites*

164. On November 10, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of one million eight hundred thousand dollars ($1,800,000.00), payable on December 7, 2016 (the "Super Bowl Suites Contract").

165. In Section 1 of the College Football Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase 2 suit[e]s at the Super Bowl LI game in Houston, Texas."

166. Section 2 of the Super Bowl Suites Contract provided that NEA would repay Taly's investment plus a guaranteed return of one hundred and fifty thousand dollars ($150,000.00).

167. Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets to suites at the Super Bowl and for no other purpose.

168. Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to suites at the Super Bowl.

169. NEA's representation that NEA would use the money to purchase and resell tickets to suites at the Super Bowl was false at the time it was made and designed to induce Taly to make the investment.

170.    On November 10, 2016, Taly wired to NEA the sum of $1,200,000.00 to be used to purchase suites at the Super Bowl.

171.    NEA did not use Taly's money to purchase tickets to suites at the Super Bowl.

172.    Between November 14 and November 21, 2016, NEA wrote checks to unidentified persons or entities totaling $889,000.00.

173.    Between November 14 and November 17, 2016, NEA transferred $139,000.00 to other accounts within its control.

174.    On November 21, 2016, NEA wired $200,000.00 to 363 Howard Ave LLC.

175.    Upon information and belief, 363 Howard Ave LLC is not engaged in the business of buying or selling tickets to suites at the Super Bowl.

*Super Bowl I & II*

176.    On October 20, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of three hundred and fifty thousand dollars ($350,000.00), payable on February 28, 2017 (the "Super Bowl I Contract").

177.    In Section 1 of the Super Bowl I Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the 2017 Super Bowl game."

178.    Section 2 of the Super Bowl I Contract provided that NEA would repay Taly's investment plus a twenty percent (20%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

179.    On October 26, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of eight hundred and fifty thousand dollars ($850,000.00), payable on February 23, 2017 (the "Super Bowl II Contract").

180.    In Section 1 of the Super Bowl II Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the 2017 Super Bowl game."

181.    Section 2 of the Super Bowl II Contract provided that NEA would repay Taly's investment plus a twenty percent (20%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

182.    Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets to the 2017 Super Bowl and for no other purpose.

183.    Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to the 2017 Super Bowl.

184.    NEA's representation that NEA would use the money to purchase and resell tickets to the 2017 Super Bowl was false at the time it was made and designed to induce Taly to make the investment.

185.    On October 26, 2016, Taly wired to NEA the sum of $200,000.00 to be used to purchase 2017 Super Bowl tickets.

186.    NEA did not use Taly's money to purchase tickets to the 2017 Super Bowl.

187.    On October 27, 2016, NEA wired the sum of $55,000.00 to Capital 7 Cash Funding LLC.

188.    Upon information and belief, Capital 7 Cash Funding LLC is not engaged in the business of buying or selling tickets to the 2017 Super Bowl.

22

*Super Bowl III*

189.    On November 22, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of one million nine hundred thousand dollars ($1,900,000.00), payable on February 28, 2017 (the "Super Bowl III Contract").

190.    In Section 1 of the Super Bowl III Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the 2017 Super Bowl game."

191.    Section 2 of the Super Bowl III Contract provided that NEA would repay Taly's investment plus a twenty percent (20%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

192.    Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets to the 2017 Super Bowl and for no other purpose.

193.    Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to the 2017 Super Bowl.

194.    NEA's representation that NEA would use the money to purchase and resell tickets to the 2017 Super Bowl was false at the time it was made and designed to induce Taly to make the investment.

195.    On November 22, 2016, Taly wired to NEA the sum of $1,188,721.00 to be used to purchase Super Bowl tickets.

196.    NEA did not use Taly's money to purchase tickets to the Super Bowl.

197.    On November 23, 2016, NEA transferred $96,000.00 to another of its accounts.

198.    On November 23, 2016, NEA transferred $50,000.00 to another of its accounts.

23

199. On November 28, 2016, NEA wired $800,000.00 to 363 Howard Ave LLC.

200. Upon information and belief, 363 Howard Ave LLC is not engaged in the business of buying or selling tickets to the 2017 Super Bowl.

*Super Bowl IV*

201. On December 27, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of three million two hundred thousand dollars ($3,200,000.00), payable on March 1, 2017 (the "Super Bowl IV Contract").

202. In Section 1 of the Super Bowl IV Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the 2017 Super Bowl game."

203. Section 2 of the Super Bowl IV Contract provided that NEA would repay Taly's investment plus a twenty percent (20%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

204. Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets to the 2017 Super Bowl and for no other purpose.

205. Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to the 2017 Super Bowl.

206. NEA's representation that NEA would use the money to purchase and resell tickets to the 2017 Super Bowl was false at the time it was made and designed to induce Taly to make the investment.

207. On December 27, 2016, Taly wired to NEA the sum of $3,200,000.00 to be used to purchase Super Bowl tickets.

208.  NEA did not use Taly's money to purchase tickets to the Super Bowl.

209.  On December 27 and 28, 2016, Nissen or NEA made $1,166,000.00 million in teller withdrawals.

210.  On December 27, 2016, NEA transferred $28,000.00 to another of its accounts.

211.  On December 27, 2016, NEA wired $300,000.00 to 363 Howard Ave LLC.

212.  Upon information and belief, 363 Howard Ave LLC is not engaged in the business of buying or selling tickets to the 2017 Super Bowl.

213.  On December 28, 2016, NEA wired $675,000.00 to M&J Rentals LLC.

214.  Upon information and belief, M&J Rentals LLC is not engaged in the business of buying or selling tickets to the 2017 Super Bowl.

215.  Between December 27 and December 29, 2016, NEA wrote checks to unknown persons or entities totaling $738,000.00.

*Super Bowl V*

216.  On December 29, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of one million nine hundred thousand dollars ($1,900,000.00), payable on March 1, 2017 (the "Super Bowl V Contract").

217.  In Section 1 of the Super Bowl V Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the 2017 Super Bowl game."

218.  Section 2 of the Super Bowl V Contract provided that NEA would repay Taly's investment plus a twenty percent (20%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

INDEX NO. 652865/2017
RECEIVED NYSCEF: 06/01/2017

Case 1:18-cv-10936-JSR    Document 577-34    Filed 03/11/20    Page 48 of 207

219.    Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets to the 2017 Super Bowl and for no other purpose.

220.    Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to the 2017 Super Bowl.

221.    NEA's representation that NEA would use the money to purchase and resell tickets to the 2017 Super Bowl was false at the time it was made and designed to induce Taly to make the investment.

222.    On December 29, 2016, Taly wired to NEA the sum of $1,000,000.00 to be used to purchase Super Bowl tickets.

223.    NEA did not use Taly's money to purchase tickets to the Super Bowl.

224.    On December 30, 2016, NEA transferred $383,000.00 to another of its accounts.

225.    On December 30, 2016, NEA wired $1,400,000.00 to Hutton Ventures LLC.

226.    Upon information and belief, Hutton Ventures LLC is not engaged in the business of buying or selling tickets to the 2017 Super Bowl.

*Super Bowl VI*

227.    On December 30, 2016, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of one million three hundred and fifty four thousand dollars ($1,354,000.00), payable on March 1, 2017 (the "Super Bowl VI Contract").

228.    In Section 1 of the Super Bowl VI Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the 2017 Super Bowl game."

26

229.    Section 2 of the Super Bowl VI Contract provided that NEA would repay Taly's investment plus a twenty percent (20%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

230.    Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets to the 2017 Super Bowl and for no other purpose.

231.    Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to the 2017 Super Bowl.

232.    NEA's representation that NEA would use the money to purchase and resell tickets to the 2017 Super Bowl was false at the time it was made and designed to induce Taly to make the investment.

233.    On December 30, 2016, Taly wired to NEA the sum of $1,300,000.00 to be used to purchase Super Bowl tickets.

234.    NEA did not use Taly's money to purchase tickets to the Super Bowl.

235.    On December 30, 2016, NEA transferred $383,000.00 to another of its accounts.

236.    On December 30, 2016, NEA wired $1,400,000.00 to Hutton Ventures LLC.

237.    Upon information and belief, Hutton Ventures LLC is not engaged in the business of buying or selling tickets to the 2017 Super Bowl.

*Super Bowl VII*

238.    On January 10, 2016, Nissen, acting on behalf of NEA, entered into an agreement in favor of Taly in the principal amount of two million three hundred seventy-eight thousand dollars ($2,378,000.00), payable on March 1, 2017 (the "Super Bowl VII Contract").

27

239. In Section 1 of the Super Bowl VII Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the 2017 Super Bowl game."

240. Section 2 of the Super Bowl VII Contract provided that NEA would repay Taly's investment plus a twenty percent (20%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

241. Taly would not have delivered any money to NEA but for NEA's promise that it would use the money to purchase and resell tickets to the 2017 Super Bowl and for no other purpose.

242. Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to the 2017 Super Bowl.

243. NEA's representation that NEA would use the money to purchase and resell tickets to the 2017 Super Bowl was false at the time it was made and designed to induce Taly to make the investment.

244. On January 9, 2017, Taly wired to NEA the sum of $2,278,000.00 plus $150,000.00 to be used to purchase Super Bowl tickets.

245. Upon information and belief, NEA did not use Taly's money to purchase tickets to the Super Bowl but rather used those funds to repay principal and interest to NEA's other lenders/investors.

*March Madness*

246.    On March 1, 2017, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of ten million dollars ($10,000,000.00), payable on May 1, 2017 (the "NCAA I Contract").

247.    Also on March 1, 2017, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of eight million dollars ($8,000,000.00), payable on May 15, 2017 (the "NCAA II Contract").

248.    In Section 1 of the NCAA I Contract and the NCAA II Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the Basketball March Madness NCAA Tournaments."

249.    Section 2 of the NCAA I Contract and the NCAA II Contract provided that NEA would repay Taly's investment plus an eighteen percent (18%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

250.    On March 1, 2017, Nissen, acting on behalf of NEA, signed an agreement in favor of SLL USA Holdings LLC in the principal amount of eight hundred and ten thousand dollars ($810,000.00), payable on May 15, 2017 (the "SLL NCAA Contract").

251.    In Section 1 of the SLL NCAA Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the Basketball March Madness NCAA Tournaments."

252.    Section 2 of the SLL NCAA Contract provided that NEA would repay SLL its investment plus an eighteen percent (18%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

29

253.    Taly delivered monies to NEA pursuant to the NCAA I Contract and the NCAA II Contract.

254.    SLL delivered monies to NEA pursuant to the SLL NCAA Contract.

255.    On March 13, 2017, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of one million four hundred thousand dollars ($1,400,000.00), payable on March 22, 2017 (the "NCAA III Contract").

256.    In Section 1 of the NCAA III Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the Basketball March Madness NCAA Tournament."

257.    Section 2 of the NCAA III Contract provided that NEA would repay Taly's investment plus a $150,000.00 return.

258.    Also on March 13, 2017, Nissen, acting on behalf of NEA, signed an agreement in favor of Taly in the principal amount of one million one hundred eighty thousand dollars ($1,180,000.00), payable on May 15, 2017 (the "NCAA IV Contract").

259.    In Section 1 of the NCAA IV Contract, NEA represented: "Use of Proceeds. [NEA] shall use the Principal Amount to purchase tickets to the Basketball March Madness NCAA Tournament."

260.    Section 2 of the NCAA IV Contract provided that NEA would repay Taly's investment plus an eighteen percent (18%) return on its investment or "50% of the profits generated by [NEA] from the permissible use of the Principal Amount."

30

261. Taly would not have delivered any money to NEA under any of the NCAA Contracts but for NEA's promise that it would use the money to purchase and resell tickets to the NCAA Tournament and for no other purpose.

262. Taly relied upon NEA's representation that NEA would use the money to purchase and resell tickets to the NCAA Tournament.

263. NEA's representation that NEA would use the money to purchase and resell tickets to the NCAA Tournament was false at the time it was made and designed to induce Taly to make the investment.

264. SLL would not have delivered any money to NEA under the SLL NCAA Contract but for NEA's promise that it would use the money to purchase and resell tickets to the NCAA Tournament and for no other purpose.

265. SLL relied upon NEA's representation that NEA would use the money to purchase and resell tickets to the NCAA Tournament.

266. NEA's representation that NEA would use the money to purchase and resell tickets to the NCAA Tournament was false at the time it was made and designed to induce SLL to make the investment.

267. On March 1, 2017, Taly wired to NEA the sum of $670,000.00 to be used to purchase NCAA tickets.

268. On March 3, 2017, Taly wired to NEA the sum of $140,000.00 to be used to purchase NCAA tickets.

269. On March 13, 2017, Taly wired to NEA the sum of $800,000.00 to be used to purchase NCAA tickets.

31

270.     On March 15, 2017, Taly wired to NEA the sum of $950,000.00 to be used to purchase NCAA tickets.

271.     NEA did not use Taly's money to purchase NCAA tickets.

272.     On March 15, 2017, NEA transferred $835,000.00 to another of its accounts, held under the name New World Events Group Inc. ("NWE").

273.     On March 15, 2017, NWE wired $850,000.00 to Hutton Ventures LLC.

274.     Upon information and belief, Hutton Ventures LLC is not engaged in the business of buying or selling tickets to the NCAA Championships.

275.     On March 23, 2017, NEA transferred $900,000.00 to NWE.

276.     On April 5, 2017, Taly wired NEA the sum of $1,200,000.00.

277.     On April 12, 2017, Nissen wired the sum of $1,450,000.00 to MYW Holdings LLC.

278.     Upon information and belief, MYW Holdings LLC is not engaged in the business of buying or selling event tickets.

279.     NEA has failed and refused to repay Taly and SLL's investment under the above-described Contracts in the amount of $16,135,303.53.

280.     Each and every one of the above-described Contracts contained a provision stating:

> If [NEA] shall fail to timely pay all amounts payable to Holder, then [NEA] shall, in addition to the sum provided for herein, pay to the Holder interest on the outstanding unpaid amounts under this Note at an annual rate of twenty (20%) percent.

281.     Jason Nissen executed personal guarantees for the Contracts (the "Guarantees").

282.    The Guarantees provide that each is "of payment and not of collection."

283.    The Guarantees provide that Nissen's obligations thereunder are unconditional, absolute and irrevocable.

284.    Nissen waived notice and demand in the Guarantees.

## THE PONZI SCHEME

285.    Using myriad bank accounts in the names of the defendant entities he controlled, Nissen took in hundreds of millions of dollars from investors such as Taly.

286.    Nissen promised the investors that their funds would be used to purchase tickets to specific sporting or other events.

287.    Nissen did not use some or all of the funds he collected to purchase tickets to specific sporting or other events.

288.    Instead, Nissen took the funds he collected to repay other investors their investments with high rates of return.

289.    Nissen then transferred the funds through the web of Defendants' bank accounts in an attempt to conceal the sources and destinations of the money.

290.    Upon information and belief, Defendants accepted money from and paid money to, among others:

    a.    MYW Holdings LLC;

    b.    Hutton Ventures LLC;

    c.    JSR Capital LLC;

    d.    Entrepreneur Growth Capital LLC;

    e.    Condor Alpha Asset Management LLC;

f.      Franklin Equity Associates;

g.      Luxury Development LLC;

h.      M&J Rentals LLC;

i.      Greenline Consulting Services Inc.;

j.      AP Consulting Services;

k.      363 Howard Ave LLC;

l.      Credit Cash NJ LLC;

m.      Capital 7 Cash Funding LLC;

n.      Capital 7 R.E. Funding LLC;

o.      1074 Capital LLC;

p.      LYA Group LLC;

q.      Vivid Holdings Inc.;

r.      Multi LVR LLC;

s.      I & I Realty Group;

t.      RX Plus LLC;

u.      JAJ Executive Services LLC;

v.      Delancy Group LLC;

w.      Advantage Sports;

x.      Tickets Deluxe;

y.      Got the Ticket Inc.;

z.      Imagine Management Corp.;

aa.     Bo's Entertainment Inc.;

bb.     Venue Kings;

cc.     Top Notch Entertainment;

dd.     The Bassewitz Group;

INDEX NO. 652865/2017

ee.     Karma International LLC;

ff.     The Huberfeld Family Foundation;

gg.     Murray Huberfeld;

hh.     Laura Huberfeld;

ii.     Rivie Schwebel;

jj.     The Rivie Schwebel Retirement Plan;

kk.     Andrew Levi;

ll.     Radion Y. Aminov;

mm.     David Cirinelli;

nn.     Olga Khakham;

oo.     Daniel Miremont;

pp.     Solomon Shimunov;

qq.     Ezra Beren;

rr.     Simon Posen;

ss.     Leonard Barshack;

tt.     Harley Sroka;

uu.     Nicholas J. Fuchs;

vv.     Parry Lee;

ww.     Brian Daiagi; and

xx.     Stella Maksumova.

291.     In fact, on or about June 14, 2016, Nissen gave a $1.9 million mortgage on his Long Island (82 Woodhollow Road, East Hills, New York) home to Entrepreneur Growth Capital ("Entrepreneur"), one of the entities listed above (the "Mortgage").

292.     The Mortgage recited that Entrepreneur was making a loan to NEA to be secured by the Mortgage.

293.     However, also on June 14, 2016, Nissen was the grantee under a deed transferring the mortgaged property to him and his wife for $2.16 million.

294.     To further his scheme, Nissen visited Plaintiffs' office often to discuss his business plan for various events.

295.     During his visits, Nissen would inform Plaintiffs of the tickets he would use Plaintiffs' money to purchase.

296.     Nissen showed Plaintiffs' officers schematics of the venue at which the events were to be held.

297.     Nissen highlighted for Plaintiffs' officers the particular sections of each venue in which NEA would purchase tickets.

298.     Nissen explained to Plaintiffs' officers the reasons NEA had decided to purchase tickets in particular sections for particular events.  This reason usually was because the highest margins could be made on re-selling tickets in those sections.

299.     Nissen explained that in most instances, NEA would purchase the tickets in its own name and then consign the tickets to NECO II to be re-sold, because NECO II had the distribution channels through which the tickets could be sold.

300.     Nissen showed Plaintiffs' officers doctored financial records, including bank statements and accounts receivable reports, to give Plaintiffs the false impression that their investment in NEA would be sound.

**NISSEN'S ADMISSIONS**

301.     Following the Super Bowl, Nissen approached Plaintiffs to discuss an investment in the NCAA Basketball Championships.

36

302.    At the time, NEA owed Plaintiffs $18 million on their several investments in the Super Bowl.

303.    Plaintiffs informed Nissen that they would consider investing in the NCAA Basketball Championships after they received the return of their Super Bowl investments.

304.    A few days later, Nissen informed Plaintiffs that he had rolled their $18 million Super Bowl investment into new NCAA Basketball Championships investments and had already purchased those tickets without Plaintiffs' consent.

305.    Plaintiffs were furious but believed that the money already had been used to purchase tickets to the NCAA Basketball Championships and entered into the NCAA Contracts.

306.    Nissen promised Plaintiffs that NEA would return approximately $1.35 million of their Super Bowl investments no later than May 5, 2017.

307.    NEA did not fulfill that promise.

308.    On the night of May 7, 2017, Nissen visited the home of Yaron Turgeman ("Turgeman"), Taly's principal.

309.    During Nissen's visit, he confessed to Turgeman that the Defendant companies were a Ponzi scheme, soliciting investments in order to secure funds which were used to pay sky-high interest and returns to other investors.

310.    For example, Nissen told Turgeman: "I lied to you about everything.  I was running a Ponzi scheme and I ran out of money," and "I didn't really buy tickets with all the money you gave me.  I gave it to other people."

311.    Later that evening, Nissen and Turgeman had a telephone conversation, in which Nissen re-affirmed his prior statements.

312.    On that telephone call Nissen confessed that he had faked financial documents in order to secure Taly's investment and to hide his scheme from other investors and lenders:

| | |
|---|---|
| Turgeman: | Let me understand something. The Hamilton ... The reports that you showed us in the return, it was all fake? |
| Nissen: | No. Some of it was real and some of it was fake. |
| Turgeman: | Some of it real, some of it fake. And- |
| Nissen: | The numbers are just all multiplied. It's the real numbers, but multiplied. |
| Turgeman: | Hold on. Hold on, let me understand something. The UFC was real or fake? |
| Nissen: | Half real, half fake. |
| Turgeman: | Half real, half fake. Which is the half that you- |
| Nissen: | You understand? They're inflated numbers. We really had those events and really sold the tickets and they're inflated, you know, two to three fold depending on how it was. |
| Turgeman: | Let me ask you a question. Let me ask you. Me and Guy are a little bit lost here. The last bank statements that you gave us, OK, did you, are these also forged? |
| Jason Nissen: | Some parts of them are. Couple of things, documents are deleted because didn't want you to see the money came from other people, yeah. |

313.    On that telephone call, Nissen also confessed that he had used Taly's money to pay lenders:

| | |
|---|---|
| Turgeman: | No, no. I'm saying you took from me the money and you paid them with my money. |
| Nissen: | No. No. No. I would take from you to invest in an event and some money would go to maybe some of these people. |

38

| | |
|---|---|
| Turgeman: | You came to my office. I haven't seen you in two years. You came to my office. You told me you had a good deal to be made- |
| Nissen: | I do have a good deal. |
| Turgeman: | What good deal? You're just telling me that the deal that you so called put on the table was a third or a fifth of the reality so you came knowingly that you are coming to take money from me to pay other people to defraud me. |
| Jason Nissen: | No, the first deal probably not.  But the other ones after that, yeah. |
| Jason Nissen: | No, I'm not worried about ... I wasn't worried about Falcon because all they would be getting is the 2.75 million a year. |
| Turgeman: | What do you mean 2.75 a year? |
| Jason Nissen: | They get their 687,500 a quarter. That's what they get. |
| Turgeman: | Okay. But you know that that 675 a quarter was paid from money that basically you took from me, from people, from all this bullshit- |
| Jason Nissen: | Sure, 100%. |

314.    On May 8, 2017, Nissen visited Taly's offices to discuss the scheme, further admitting the forgeries:

| | |
|---|---|
| Guy: | So let me ask you a question. The bank statement that you sent us last week, ... what, the guy from the bank helped you to forge it? |
| Jason: | No, I did that. |
| Guy: | You did that? |
| Jason: | Oh yeah, I had a [inaudible] before balanced checks, so I just changed it. |
| Guy: | You changed it? |
| Jason: | Yeah, I changed it. |
| Guy: | How did you change it? |
| Jason: | Photoshop. You ever hear of it? |

...

| | |
|---|---|
| Speaker 3: | When we invested in Super Bowl 20 some million dollars ... How much money did we really? |
| Jason: | Eight million. |
| Speaker 3: | Eight million. So all the invoices that you got us from on location were fake? |
| Jason: | No. The first two were real and the other ones we acted out were fake. We did with our location four million dollars. |

315.    Upon questioning, Nissen again admitted the Ponzi scheme, that he used money from later investors to pay returns to earlier investors and to repay loans to high-interest lenders:

| | |
|---|---|
| Guy: | So, where did all the money go, Jason? |
| Jason: | It went to pay off people that I owed money to. |
| Speaker 3: | Like the Russian guys in this, you paid them interest in wire? With a check? What did you - |
| Jason: | Checks. Cash. Lotta cash. Lotta checks. |
| Guy: | But did you take, also, cash? |
| Jason: | Oh, yeah, plenty of cash. I'd go through 10 million dollars a year in cash. |
| Effy: | So that's 38, 44, $60 million dollars of people that you owe money to? |
| Jason: | There's more. There's more. It's 70 million. |

## AS AND FOR A FIRST CAUSE OF ACTION
### (Fraud – against Defendants Nissen and NEA)

316.    Plaintiffs repeat and re-allege all of the foregoing allegations as if fully set forth herein.

317.    To induce Plaintiffs to enter into the Contracts and deliver investment money to NEA, Nissen and NEA represented to Plaintiffs that the investment money would be used to purchase tickets to the particular event specified in each Contract.

40

INDEX NO. 652865/2017

318.   To induce Plaintiffs to enter into the Contracts and deliver investment money to NEA, Nissen and NEA represented to Plaintiffs that the investment money Plaintiffs previously had delivered pursuant to prior Contracts had been used to purchase tickets to the particular event specified in each Contract.

319.   The foregoing representations were false at the time they were made and Nissen and NEA knew that they were false at the time they were made.

320.   The misrepresentations of fact were material.

321.   Nissen and NEA made the misrepresentations knowing that Plaintiffs would rely on the misrepresentations.

322.   Plaintiffs reasonably and justifiably relied on Nissen and NEA's misrepresentations and delivered over $32 million in investment money to NEA.

323.   NEA did not use Plaintiffs' investment money to purchase tickets to the events specified in the Contracts.

324.   Upon information and belief, NEA did not use Plaintiffs' investment money to purchase tickets to any events at all.

325.   By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but no less than $16,135,303.53.

### AS AND FOR A SECOND CAUSE OF ACTION
**(Unjust Enrichment – against all Defendants)**

326.   Plaintiffs repeat and re-allege all of the foregoing allegations as if fully set forth herein.

327.    At all relevant times, Nissen, via NEA, was in control of all the Defendant companies.

328.    Following NEA's receipt of Plaintiffs' investment money, Nissen caused NEA to transfer portions of that money to the other Defendant companies by means of wire transfers, checks and cash deposits.

329.    Upon information and belief, following NEA's receipt of Plaintiffs' investment money, Nissen caused NEA to make payments and transfer to third parties for the benefit of the other Defendant companies.

330.    Following NEA's receipt of Plaintiffs' investment money, Nissen caused NEA to transfer portions of that money to himself individually and to members of Nissen's family.

331.    Defendants were enriched at Plaintiffs' expense.

332.    It is against equity and good conscience to permit Defendants to retain the benefits of Plaintiffs' investment money.

333.    By reason of the foregoing, Plaintiffs have been damaged in an amount to be determined at trial, but no less than $16,135,303.53.

## AS AND FOR A THIRD CAUSE OF ACTION
**(Fraudulent Conveyance – against Defendants NEI, NEH, NECO II, NECO III, NWE, WEG & WMF)**

334.    Plaintiffs repeat and re-allege all of the foregoing allegations as if fully set forth herein.

335.    From June 2016 through May 2017, NEA made multiple transfers of money to NECO II, WEG and NWE.

42

336.    Upon information and belief, from June 2016 through May 2017, NEA made multiple transfers of money to NEH, NEI, NECO III and WMF.

337.    Because NEA was an admitted Ponzi scheme, at all relevant times NEA was insolvent as a matter of law.

338.    NEA's sole owner, Nissen, has admitted that transfers of money he caused to be made from NEA were made with an actual intent to defraud Taly, SLL and other creditors.

339.    Transfers made by NEA to NECO II, WEG and NWE were made with an actual intent to hinder, delay, or defraud either present or future creditors Taly, SLL and other creditors.

340.    Upon information and belief, transfers made by NEA to NEH, NEI, NECO III and WMF were made with an actual intent to hinder, delay, or defraud either present or future creditors Taly, SLL and other creditors.

341.    Transfers made by NEA to NECO II, WEG and NWE were made without fair consideration.

342.    Upon information and belief, transfers made by NEA to NEH, NEI, NECO III and WMF were made without fair consideration.

343.    By reason of the foregoing, Plaintiffs are entitled to a judgment setting aside any conveyances of money from NEA to NEI, NEH, NECO II, NECO III, NWE, WEG & WMF to the extent necessary to satisfy Plaintiffs' claim.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Contract – against Defendant NEA)

344.    Plaintiffs repeat and re-allege all of the foregoing allegations as if fully set forth herein.

43

345.    Each of the Contracts is a binding contract between Taly or SLL and NEA and is supported by adequate consideration.

346.    Plaintiffs adequately performed under the Contracts by providing their investment funds to NEA.

347.    Section 1 of each Contract provided the purpose for which Taly or SLL's investment funds were to be used.

348.    NEA breached the Contracts by not using Taly or SLL's investment funds for the purposes set forth in each or any of the Contracts.

349.    In Section 2 of each of the Contracts, NEA agreed that it would return Plaintiffs' principal investment.

350.    Section 2 of each of the Contracts set forth a formula by which Plaintiffs' return on investment would be calculated.

351.    The preamble of each of the Contracts included a date certain upon which NEA agreed to repay Taly and SLL's investment money plus the agreed-upon return.

352.    NEA further breached the Contracts by failing to repay Taly and SLL's investment money plus the agreed-upon return under the:

(a)    Super Bowl Suites Contract;

(b)    Super Bowl I Contract;

(c)    Super Bowl II Contract;

(d)    Super Bowl III Contract;

(e)    Super Bowl IV Contract;

44

     (f)      Super Bowl V Contract;

     (g)      Super Bowl VI Contract;

     (h)      Super Bowl VII Contract;

     (i)      NCAA I Contract;

     (j)      NCAA II Contract;

     (k)      NCAA III Contract;

     (l)      NCAA IV Contract; and

     (m)     SLL NCAA Contract.

353.     By reason of the foregoing, Taly and SLL have been damaged in an amount to be determined at trial, but believed to be in excess of $25 million, plus interest as set forth in the above-described Contracts.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (To Enforce Guarantees – against Defendant Nissen)

354.     Plaintiffs repeat and re-allege all of the foregoing allegations as if fully set forth herein.

355.     On March 1, 2017, Nissen executed a "Personal Guarantee" in favor of Plaintiff Taly (the "3/1 Guarantee").

356.     In the 3/1 Guarantee, Nissen personally and unconditionally guaranteed NEA's performance under the NCAA I Contract and the NCAA II Contract.

357.     The 3/1 Guarantee was one of payment and not of collection.

358.    On March 13, 2017, Nissen executed a "Personal Guarantee" in favor of Plaintiff Taly (the "3/13 Guarantee").

359.    In the 3/13 Guarantee, Nissen personally and unconditionally guaranteed NEA's performance under the NCAA III Contract and the NCAA IV Contract.

360.    The 3/13 Guarantee was one of payment and not of collection.

361.    NEA did not perform its obligations to repay Taly its investment and return under the:

    (a)    NCAA I Contract;

    (b)    NCAA II Contract;

    (c)    NCAA III Contract; and

    (d)    NCAA IV Contract.

362.    By reason of the foregoing, Nissen is liable to Taly in an amount to be determined at trial, but believed to be in excess of $25 million, plus interest as set forth in the above-described Contracts.

**WHEREFORE,** Plaintiffs demand judgment as follows:

    A.    On the first cause of action, in favor of Plaintiffs and against Defendants Nissen and NEA for fraud, damages in an amount to be determined at trial, but no less than $16,135,303.53;

    B.    On the second cause of action, in favor of Plaintiffs and against all Defendants for unjust enrichment, damages in an amount to be determined at trial, but no less than $16,135,303.53;

46

C.     On the third cause of action, setting aside any fraudulent conveyances made by Defendant NEA to any of Defendants NEI, NEH, NECO II, NECO III, NWE, WEG & WMF;

D.     On the fourth cause of action, in favor of Plaintiffs and against Defendant NEA for breach of contract, damages in an amount to be determined at trial, but no less than $25 million, plus interest as set forth in the above-described Contracts;

E.     On the fifth cause of action, in favor of Plaintiffs and against Defendant Nissen to enforce guarantees, damages in an amount to be determined at trial, but no less than $25 million, plus interest as set forth in the above-described Contracts;

F.     An award of Plaintiffs' costs, expenses and attorneys' fees as provided for in the Contracts; and

G.     Such other and further relief as is just and proper.

Dated: New York, NY
       May 26, 2017

MORRISON COHEN LLP


Y. David Scharf
Christopher Milito
Joaquin J. Ezcurra
Thomas B. Gardner
909 Third Avenue
New York, NY 10022
(212) 735-8600

47

Case 1:18-cv-10936-JSR    Document 577-34    Filed 03/11/20    Page 70 of 207

## VERIFICATION

STATE OF NEW YORK     )
                             ) ss.:

COUNTY OF NEW YORK   )

YARON TURGEMAN, being duly sworn, deposes and says:

I am the president of Taly USA Holdings Inc. and SLL USA Holdings LLC, the Plaintiffs

in the within action. I have read the foregoing Verified Complaint, know the contents thereof and

the same are true to my knowledge, except those matters therein which are stated to be alleged

on information and belief; and as to those matters, I believe them to be true.

Yaron Turgeman

Sworn to before me this
26 day of May 2017

Notary Public



CHRISTOPHER S. MILITO
NOTARY
NO. 02MI6200581
QUALIFIED IN
KINGS COUNTY
COMM. EXP.
01-26-2021
PUBLIC
STATE OF NEW YORK

# EXHIBIT A

## Taly USA Holdings Inc.
### Signature Bank -Checking/Savings
### Transactions Report - NECO

| Date | Debit | Credit | Balance |
|------|-------|--------|---------|
| 06/02/2016 | | 750,000.00 | 750,000.00 |
| 06/16/2016 | | 600,000.00 | 1,350,000.00 |
| 06/29/2016 | | 1,000,000.00 | 2,350,000.00 |
| 07/08/2016 | | 900,000.00 | 3,250,000.00 |
| 07/19/2016 | 30,000.00 | | 3,220,000.00 |
| 07/22/2016 | 975,000.00 | | 2,245,000.00 |
| 07/28/2016 | | 1,584,000.00 | 3,829,000.00 |
| 07/28/2016 | 30,000.00 | | 3,799,000.00 |
| 08/08/2016 | 750,000.00 | | 3,049,000.00 |
| 08/09/2016 | | 765,000.00 | 3,814,000.00 |
| 08/24/2016 | 77,586.97 | | 3,736,413.03 |
| 08/26/2016 | | 1,265,000.00 | 5,001,413.03 |
| 08/31/2016 | | 675,000.00 | 5,676,413.03 |
| 09/13/2016 | | 1,120,000.00 | 6,796,413.03 |
| 09/28/2016 | 100,000.00 | | 6,696,413.03 |
| 09/28/2016 | 250,000.00 | | 6,446,413.03 |
| 09/29/2016 | 225,000.00 | | 6,221,413.03 |
| 09/30/2016 | 25,000.00 | | 6,196,413.03 |
| 09/30/2016 | 1,072,000.00 | | 5,124,413.03 |
| 10/06/2016 | | 1,921,750.00 | 7,046,163.03 |
| 10/20/2016 | | 350,000.00 | 7,396,163.03 |
| 10/21/2016 | | 200,000.00 | 7,596,163.03 |
| 10/24/2016 | | 505,000.00 | 8,101,163.03 |
| 10/28/2016 | 156,000.00 | | 7,945,163.03 |
| 11/04/2016 | 450,000.00 | | 7,495,163.03 |
| 11/10/2016 | | 1,200,000.00 | 8,695,163.03 |
| 11/17/2016 | 400,000.00 | | 8,295,163.03 |
| 11/21/2016 | 78,400.00 | | 8,216,763.03 |
| 11/22/2016 | | 1,188,721.00 | 9,405,484.03 |
| 11/28/2016 | | 1,500,000.00 | 10,905,484.03 |
| 11/30/2016 | | 51,200.00 | 10,956,684.03 |
| 12/05/2016 | 622,188.50 | | 10,334,495.53 |
| 12/07/2016 | 764,753.00 | | 9,569,742.53 |
| 12/13/2016 | | | 9,569,742.53 |
| 12/15/2016 | 49,587.00 | | 9,520,155.53 |
| 12/15/2016 | 500,000.00 | | 9,020,155.53 |
| 12/15/2016 | 120,000.00 | | 8,900,155.53 |
| 12/21/2016 | 950,000.00 | | 7,950,155.53 |
| 12/23/2016 | 475,000.00 | | 7,475,155.53 |

1

INDEX NO. 652865/2017
RECEIVED NYSCEF: 06/01/2017

| Date | | | |
|------|------------|--------------|---------------|
| 12/27/2016 | 465,000.00 | | 7,010,155.53 |
| 12/27/2016 | 460,000.00 | | 6,550,155.53 |
| 12/27/2016 | 425,000.00 | | 6,125,155.53 |
| 12/27/2016 | | 3,200,000.00 | 9,325,155.53 |
| 12/28/2016 | 25,000.00 | | 9,300,155.53 |
| 12/29/2016 | | 1,000,000.00 | 10,300,155.53 |
| 12/30/2016 | | 1,300,000.00 | 11,600,155.53 |
| 01/06/2017 | 250,000.00 | | 11,350,155.53 |
| 01/09/2017 | 150,000.00 | | 11,200,155.53 |
| 01/09/2017 | | 2,278,000.00 | 13,478,155.53 |
| 01/11/2017 | 123,102.00 | | 13,355,053.53 |
| 01/18/2017 | | 2,242,500.00 | 15,597,553.53 |
| 01/23/2017 | | 780,000.00 | 16,377,553.53 |
| 01/24/2017 | | 785,500.00 | 17,163,053.53 |
| 01/27/2017 | | 1,437,250.00 | 18,600,303.53 |
| 03/01/2017 | | 670,000.00 | 19,270,303.53 |
| 03/03/2017 | | 140,000.00 | 19,410,303.53 |
| 03/13/2017 | | 800,000.00 | 20,210,303.53 |
| 03/15/2017 | | 950,000.00 | 21,160,303.53 |
| 03/24/2017 | 700,000.00 | | 20,460,303.53 |
| 03/31/2017 | 2,050,000.00 | | 18,410,303.53 |
| 04/05/2017 | | 1,200,000.00 | 19,610,303.53 |
| 04/06/2017 | 1,200,000.00 | | 18,410,303.53 |
| 04/11/2017 | 1,450,000.00 | | 16,960,303.53 |
| 04/28/2017 | 450,000.00 | | 16,510,303.53 |
| 05/05/2017 | 375,000.00 | | 16,135,303.53 |
| | 16,223,617.47 | 32,358,921.00 | 16,135,303.53 |

2

# EXHIBIT 610

| | |
|---|---|
| **From**: | Mark Nordlicht [mnordlicht@platinumlp.com] |
| **Sent**: | 8/2/2013 11:22:07 AM |
| **To**: | Murray Huberfeld [huberfeld@gmail.com] |
| **Subject**: | FW: PPVA AUM August 1st.xlsx |
| **Attachments**: | PPVA AUM August 1st.xlsx |

Please note subs vs reds. Need for new direction is clear.

**From:** Joseph SanFilippo
**Sent:** Thursday, August 01, 2013 5:18 PM
**To:** David Stern; Ed Ho; George Duch; Joe Mann; Mani Katari; Mark Nordlicht; Michael Kimelman; Nicholas Marzella; Stewart Kim; Uri Landesman; Will Slota; Withcliffe Berry; Zeke Dwek
**Subject:** PPVA AUM August 1st.xlsx

CTRL4623441-1

| | 1/1/2010 | 2/1/2010 | 2/28/2010 | 1-Mar Contributions | 3/1/2010 |
|---|---|---|---|---|---|
| PPVA USA | 147,728,724.14 | 156,419,601.00 | 161,757,701.60 | 900,000.00 | 162,657,701.60 |
| PPVA International | 295,560,308.00 | 299,099,208.00 | 265,149,905.62 | | 265,149,905.62 |
| | 443,289,032.14 | 455,518,809.00 | 426,907,607.22 | 900,000.00 | 427,807,607.22 |

|  | Mar P&L | Mar Withdrwals | 31-Mar | Apr Subs | Apr 1st AUM |
|---|---|---|---|---|---|
| PPVA USA | 368,220.97 | (2,328,528.46) | 160,697,394.11 | 8,594,839.92 | 169,292,234.03 |
|  |  |  |  |  | - |
| PPVA International | 427,724.19 | (13,994,322.84) | 251,583,306.97 | 21,035,955.62 | 272,619,262.59 |
|  | 795,945.16 | (16,322,851.30) | 412,280,701.08 | 29,630,795.54 | 441,911,496.62 |

| | April P&L | Apr Withdrwals | May Subs | Transfers from Legacy | Incentive Payout | May 1st AUM |
|---|---|---|---|---|---|---|
| PPVA USA | 4,333,718.88 | - | 2,050,000.00 | | (5,122,851.25) | **170,553,101.66** |
| PPVA International | 5,643,848.80 | - | | **8,769,049.43** | (1,100,754.59) | **285,931,406.23** |
| | 9,977,567.68 | - | 2,050,000.00 | 8,769,049.43 | (6,223,605.84) | 456,484,507.89 |

| | Estimated May P&L | May Withdrawals | June 1st Subs | Jun 1st AUM | June Income | June Withdrawals |
|---|---|---|---|---|---|---|
| PPVA USA | **(366,810.79)** | **(510,008.50)** | | **169,676,282.37** | **986,702.38** | **(5,515,609.42)** |
| PPVA International | **(1,082,863.90)** | **(4,876,851.87)** | **298,800.00** | **280,270,490.46** | **1,323,355.14** | **(26,157,794.75)** |
| | (1,449,674.69) | (5,386,860.37) | 298,800.00 | 449,946,772.83 | 2,310,057.52 | (31,673,404.17) |

| | July 1st Subs | GP Withdrawal | July 1st Class K Transfers | July 1st AUM | July Income | July Withdrawals |
|---|---|---|---|---|---|---|
| PPVA USA | **2,350,000.00** | **(800,000.00)** | | **166,697,375.33** | 3,775,646.00 | **(1,870,000.00)** |
| PPVA International | 8,500,000.00 | | **4,235,804.22** | **268,171,855.07** | 5,431,237.39 | |
| | 10,850,000.00 | (800,000.00) | 4,235,804.22 | 434,869,230.40 | 9,206,883.39 | (1,870,000.00) |

| | Aug Subs | Aug Transfers | Transfers From PPLO | August 1st AUM | Estimated Net Income | August 31st Withdrawals |
|---|---|---|---|---|---|---|
| PPVA USA | 1,950,000.00 | 613,150.39 | 3,540,093.00 | 174,706,264.72 | 2,398,143.00 | (1,000,000.00) |
| PPVA International | 600,000.00 | 138,367.44 | 194,078.41 | 274,535,538.31 | 2,951,801.73 | |
| | 2,550,000.00 | 751,517.83 | 3,734,171.41 | 449,241,803.03 | 5,349,944.73 | (1,000,000.00) |

| | Sept 1st Subs | PPLO Transfer | Class K Transfer | Sept 1st AUM | Sept Income | Sept Withdrawals |
|---|---|---|---|---|---|---|
| PPVA USA | 3,150,000.00 | | | 179,254,407.72 | 3,040,026.95 | (7,082,247.87) |
| PPVA International | 1,000,000.00 | 954,348.61 | 8,030,941.63 | 287,472,630.28 | 4,528,918.18 | (16,345,060.85) |
| | 4,150,000.00 | 954,348.61 | 8,030,941.63 | 466,727,038.00 | 7,568,945.13 | (23,427,308.72) |

|  | Sept 30 Balance | Oct 1st Subs | Oct 1st AUM | October Income Est | October Withdrawals | Nov Subscriptions |
|---|---|---|---|---|---|---|
| PPVA USA | 175,212,186.80 | 750,000.00 | 175,962,186.80 | 3,252,890.79 |  | 1,706,396.46 |
| PPVA International | 275,656,487.61 | 1,700,000.00 | 277,356,487.61 | 4,458,176.26 | (66,026.31) | 1,927,438.84 |
|  | 450,868,674.41 | 2,450,000.00 | 453,318,674.41 | 7,711,067.05 |  | 3,633,835.30 |

|  | Nov 1st AUM | Nov Income Est | Withdrawals | Dec Subs | Dec 1st AUM | December Est 0.0276 |
|---|---|---|---|---|---|---|
| PPVA USA | 180,921,474.05 | 3,134,423.45 | (1,000,000.00) | 2,500,000.00 | 185,555,897.50 | 6,008,233.53 |
| PPVA International | 283,676,076.40 | 3,632,529.47 | (1,000,000.00) | 40,431,071.49 | 326,739,677.36 | 9,447,236.71 |
|  | 464,597,550.45 | 6,766,952.92 |  | 42,931,071.49 | 512,295,574.86 | 15,455,470.24 |

|  | December Withdrawals | Transfers | Domestic GP Incentives | Jan Subs | Jan 1st AUM |
|---|---|---|---|---|---|
| PPVA USA | (15,580,660.52) | 7,669,907.18 | (3,361,161.80) | 6,326,000.00 | 186,618,215.89 |
| PPVA International | (31,696,217.01) | (7,669,907.18) |  | 4,100,000.00 | 300,920,789.88 |
|  | (47,276,877.53) | - | (3,361,161.80) | 10,426,000.00 | 487,539,005.77 |

| | Jan Estimate | Jan Withdrawals | Feb 1st Subs | Feb 1st AUM | Feb Income | Feb Withdrawals |
|---|---|---|---|---|---|---|
| PPVA USA | 4,916,189.34 | (5,639,359.47) | 6,667,000.00 | 192,562,045.76 | 10,580,984.74 | |
| PPVA International | 6,645,600.90 | | 3,359,739.00 | 310,926,129.78 | 14,096,438.88 | (2,240,000.00) |
| | 11,561,790.24 | (5,639,359.47) | 10,026,739.00 | 503,488,175.54 | 24,677,423.62 | (2,240,000.00) |

|  | March 1st Subs | March 1st AUM | March Income | March Withdrawals | April Subs |
|---|---|---|---|---|---|
| PPVA USA | 6,010,000.00 | 209,153,030.50 | 5,626,769.39 | (15,738,493.16) | 13,640,000.00 |
| PPVA International | 12,751,945.00 | 335,534,513.66 | 7,669,600.33 | (11,369,934.27) | 24,733,925.00 |
|  | 18,761,945.00 | 544,687,544.16 | 13,296,369.72 | (27,108,427.43) | 38,373,925.00 |

|  | April 1st | Income | Apr Withdrawals | May Subs | May 1st AUM | Income |
|---|---|---|---|---|---|---|
| PPVA USA | 212,681,306.73 | 4,705,794.55 | (3,610,000.00) | 125,000.00 | 213,902,101.28 | 3,604,935.16 |
| PPVA International | 356,568,104.72 | 7,042,220.11 | | 11,986,000.00 | 375,596,324.83 | 5,068,760.19 |
| | 569,249,411.45 | 11,748,014.66 | (3,610,000.00) | 12,111,000.00 | 589,498,426.11 | 8,673,695.35 |

|  | June 1st Subs | Jun 1st AUM | June Income | June Withdrawals | July 1st Subs |
|---|---|---|---|---|---|
| PPVA USA | 8,367,625.71 | 225,874,662.15 | 7,898,459.51 | (14,687,121.91) | 8,539,523.12 |
| PPVA International | 4,693,038.40 | 385,358,123.42 | 11,345,261.26 | (8,400,023.31) | 18,680,280.00 |
|  | 13,060,664.11 | 611,232,785.57 | 19,243,720.77 | (23,087,145.22) | 27,219,803.12 |

| | July 1st AUM | July Performance | July Withdrawals | August 1st Subs | August 1st AUM | August Performance |
|---|---|---|---|---|---|---|
| PPVA USA | 227,625,522.87 | 2,127,454.22 | (1,000,000.00) | 9,935,000.00 | 238,687,977.09 | 1,616,900.80 |
| PPVA International | 406,983,641.37 | 3,138,101.40 | | 32,771,704.15 | 442,893,446.92 | 2,531,800.44 |
| | 634,609,164.24 | 5,265,555.62 | (1,000,000.00) | 42,706,704.15 | 681,581,424.01 | 4,148,701.24 |

| | August Withdrawals | Sept 1st Contributions | Sept 1st AUM | September Performance | September Withdrawals | Oct 1st Contributions |
|---|---|---|---|---|---|---|
| PPVA USA | (2,000,000.00) | 1,544,814.46 | 239,849,692.35 | 2,854,460.63 | (8,556,588.54) | 1,318,000.00 |
| PPVA International | (500,000.00) | 1,442,617.20 | 446,367,864.56 | 3,527,958.24 | (6,021,177.04) | 1,000,000.00 |
| | (2,500,000.00) | 2,987,431.66 | 686,217,556.91 | 6,382,418.87 | (14,577,765.58) | 2,318,000.00 |

| | Transfer From PPLO | Transfer to PPLO | Oct 1st AUM | October Income | October Withdrawals | Nov 1st Subs |
|---|---|---|---|---|---|---|
| PPVA USA | | (2,250,000.00) | 233,215,564.44 | 3,695,429.22 | (400,000.00) | 4,705,000.00 |
| PPVA International | 246,380.11 | (2,250,000.00) | 442,871,025.87 | 6,356,969.88 | (375,000.00) | 1,100,000.00 |
| | 246,380.11 | (4,500,000.00) | 676,086,590.31 | 10,052,399.10 | (775,000.00) | 5,805,000.00 |

|  | Nov 1st AUM | Income | November Withdrawals | Dec 1st Subs | Dec 1st AUM |
|---|---|---|---|---|---|
| PPVA USA | 241,215,993.66 | (1,387,036.78) | (4,848,729.99) | 2,600,000.00 | 237,580,226.89 |
| PPVA International | 449,952,995.75 | (2,570,019.44) | - | 2,082,791.45 | 449,465,767.76 |
|  | 691,168,989.41 | (3,957,056.22) | (4,848,729.99) | 4,682,791.45 | 687,045,994.65 |

| | Income | 31-Dec Withdrawals | Jan 1st Subs | Re investment of Offshore GP Money | Jan 1st AUM |
|---|---|---|---|---|---|
| PPVA USA | 1,940,562.10 | (10,185,383.53) | 2,036,000.00 | 5,923,711.59 | 237,295,117.05 |
| PPVA International | 3,012,589.51 | (8,077,496.69) | 294,415.00 | | 444,694,876.13 |
| | 4,953,151.61 | (18,262,880.22) | 2,330,415.00 | 5,923,711.59 | 681,989,993.18 |

|  | Income | Jan Withdrawals | Feb 1st Subs | Feb 1st AUM | 0.79% Feb Estimate | Feb Withdrawals |
|---|---|---|---|---|---|---|
| PPVA USA | 1,196,392.37 | (300,000.00) | 4,675,000.00 | 242,866,509.42 | 2,158,140.70 | (7,200,000.00) |
| PPVA International | 1,996,766.40 | (140,000.00) | 6,202,300.00 | 452,753,942.53 | 3,672,330.63 | |
| | 3,193,158.77 | (440,000.00) | 10,877,300.00 | 695,620,451.95 | 5,830,471.33 | (7,200,000.00) |

|                     | March 1st Subs | March 1st AUM | 24,279,821.46 Mar Estimate | Mar Withdrawals | Apr Subs | Apr 1st AUM |
|---------------------|---------------|---------------|---------------------------|-----------------|----------|-------------|
| PPVA USA            | 404,035.00    | 238,228,685.12 | 9,411,001.10             | (16,573,721.70) | 400,000.00 | 231,465,964.52 |
| PPVA International  | 950,000.00    | 457,376,273.16 | 14,656,920.18            | (36,518,262.03) | 4,787,884.00 | 440,302,815.31 |
|                     | 1,354,035.00  | 695,604,958.28 | 24,067,921.28            | (53,091,983.73) | 5,187,884.00 | 671,768,779.83 |

| | Apr Estimate | Apr Withdrawals | May 1st Subs | May 1st AUM | May Estimate | May Withdrawals |
|---|---|---|---|---|---|---|
| PPVA USA | (243,426.84) | (2,100,000.00) | 16,266,319.83 | 245,388,857.51 | 1,581,358.47 | |
| PPVA International | (472,981.55) | | 5,306,000.00 | 445,135,833.76 | 1,281,435.13 | (50,000.00) |
| | (716,408.39) | (2,100,000.00) | 21,572,319.83 | 690,524,691.27 | 2,862,793.60 | (50,000.00) |

|  | June 1st Subs | June 1st AUM | June | June Redemptions | July 1st Subs |
|---|---|---|---|---|---|
| PPVA USA | 300,000.00 | 247,270,215.98 | 5,898,876.42 | ($2,396,490.30) | $1,318,000.00 |
| PPVA International | 4,750,000.00 | 451,117,268.89 | 9,310,344.13 | ($44,025,441.77) | $1,786,321.11 |
|  | 5,050,000.00 | 698,387,484.87 | 15,209,220.55 | (46,421,932.07) | 3,104,321.11 |

|  | July 1st AUM | July Income | Aug 1st Subs | Aug 1st AUM | Aug Income | Aug Withdrawals |
|---|---|---|---|---|---|---|
| PPVA USA | 252,090,602.10 | 4,938,825.86 | 400,000.00 | 257,429,427.96 | 451,911.60 | |
| PPVA International | 418,188,492.36 | 6,387,959.98 | 2,903,254.34 | 427,479,706.68 | 1,033,916.74 | (20,000.00) |
| | 670,279,094.46 | 11,326,785.84 | 3,303,254.34 | 684,909,134.64 | 1,485,828.34 | (20,000.00) |

|  | Sep Subs | Sep 1 AUM | Sep Estimate | Sep Withdrawals | Oct Subs | Oct 1st AUM |
|---|---|---|---|---|---|---|
| PPVA USA | 2,700,000.00 | 260,581,339.56 | 2,860,270.55 | (6,368,216.21) | 1,203,165.63 | 258,276,559.53 |
| PPVA International | 12,395,970.66 | 440,889,594.08 | 4,466,714.60 | (12,323,434.89) | 3,899,922.26 | 436,932,796.05 |
|  | 15,095,970.66 | 701,470,933.64 | 7,326,985.15 | (18,691,651.10) | 5,103,087.89 | 695,209,355.58 |

|  |  |  |  |
|---|---|---|---|
|  |  | -440043.53 |  |
|  |  | -694597.52 |  |
|  | 37.15% |  |  |
|  | 62.85% |  |  |

| | Oct Estimate | Withdrawals | Nov 1st Subs | Nov 1st AUM | Nov Estimate | Withdrawals |
|---|---|---|---|---|---|---|
| PPVA USA | 2,675,492.99 | | 450,000.00 | 261,402,052.52 | (750,294.94) | (100,000.00) |
| PPVA International | 3,967,524.23 | (2,000,000.00) | 1,410,981.77 | 440,311,302.05 | (962,647.07) | (2,000,000.00) |
| | 6,643,017.22 | (2,000,000.00) | 1,860,981.77 | 701,713,354.57 | (1,712,942.01) | (2,100,000.00) |

(1,119,904.00)

|  | Dec 1st Subs | Dec 1st AUM | Dec P&L | Dec 31st Withdrawals | Dec 31st AUM |
|---|---|---|---|---|---|
| PPVA USA | 363,000.00 | 260,914,757.58 | 4,426,488.53 | (18,354,227.40) | 246,987,018.71 |
| PPVA International | 2,935,268.00 | 440,283,922.98 | 6,564,820.15 | (8,110,512.83) | 438,738,230.30 |
|  | 3,298,268.00 | 701,198,680.56 | 10,991,308.68 | (26,464,740.23) | 685,725,249.01 |

|  |
|---|
| 12,572,041.00 |
| 9,082,105.00 |
| (21,654,146.00) |
| 38,565.00 |
| 6,913,294.00 |
| 6,951,859.00 |

|  | Jan 1s Subs | Jan 1st GP Redemption | Re invest Offshore Incentive | Jan 1st AUM | Jan P&L |
|---|---|---|---|---|---|
| PPVA USA | 5,140,232.84 | (1,415,812.08) | 11,581,775.99 | 262,293,215.46 | 5,722,689.99 |
| PPVA International | 1,761,902.73 | | | 440,500,133.03 | 8,494,891.50 |
| | 6,902,135.57 | (1,415,812.08) | 11,581,775.99 | 702,793,348.49 | 14,217,581.49 |

|  |
|---|
| (2,881,776.30) |
| 10,111,857.55 |

| | |
|---|---|
| 216,763,397.00 | 229,335,438.00 |
| 49,011,274.00 | 58,093,379.00 |
| (53,392,656.00) | (75,046,802.00) |
| 34,566,473.00 | 34,605,038.00 |
| (6,913,294.00) | - |
| 240,035,194.00 | 246,987,053.00 |

| | Jan Withdrawals | 31-Jan Balance | Feb Subs | Feb 1st Balance | Feb Income | Feb Withdrawals |
|---|---|---|---|---|---|---|
| PPVA USA | (973,440.00) | 267,042,465.45 | 3,000,000.00 | 270,042,465.45 | 2,660,638.80 | (20,060.96) |
| PPVA International | | 448,995,024.53 | 725,000.00 | 449,720,024.53 | 2,914,994.97 | (100,000.00) |
| | (973,440.00) | 716,037,489.98 | 3,725,000.00 | 719,762,489.98 | 5,575,633.77 | (120,060.96) |

|  | Mar 1st Subs | March 1st AUM | Mar Estimate | Mar Redemptions | 31-Mar Balance |
|---|---|---|---|---|---|
| PPVA USA | 900,000.00 | 273,583,043.29 | 4,618,629.57 | ($15,774,749.95) | 262,426,922.91 |
| PPVA International | 1,150,000.00 | 453,685,019.50 | 6,006,832.85 | (2,781,776.30) | 456,910,076.05 |
|  | 2,050,000.00 | 727,268,062.79 | 10,625,462.42 | (18,556,526.25) | 719,336,998.96 |
|  |  |  |  | (18,732,315.56) |  |
|  |  |  |  | 26,138.24 |  |
|  |  |  |  | 149,651.07 |  |

|                    | April Subs     | April 1st AUM   | April Estimate  | May Subs     | May 1st AUM     | May Income    |
|--------------------|---------------:|----------------:|----------------:|-------------:|----------------:|--------------:|
| PPVA USA           | 3,750,000.00   | 266,176,922.91  | 589,607.76      | 500,000.00   | 267,266,530.67  | 2,827,894.68  |
| PPVA International | 4,499,954.82   | 461,410,030.87  | 1,442,796.39    | 1,775,000.00 | 464,627,827.26  | 3,855,300.69  |
|                    | 8,249,954.82   | 727,586,953.78  | 2,032,404.15    | 2,275,000.00 | 731,894,357.93  | 6,683,195.37  |

|                 |                 |
|----------------:|----------------:|
| (1,170,931.95)  |                 |
|                 | (11,477,503.38) |
| (449,030.57)    |                 |
| (185,170.84)    | (11,827,503.38) |
|                 |                 |
|                 | (350,000.00)    |
|                 | 350,000.00      |

| | June Subs | June 1st AUM | June Income | June Withdrawals | 1-Jul Subs | July 1st AUM |
|---|---|---|---|---|---|---|
| PPVA USA | | 270,094,425.35 | 6,574,214.62 | (10,670,041.47) | 1,300,000.00 | 267,298,598.50 |
| PPVA International | 200,000.00 | 468,683,127.95 | 8,861,077.91 | (11,232,063.20) | 1,380,000.00 | 467,692,142.66 |
| | 200,000.00 | 738,777,553.30 | 15,435,292.53 | (21,902,104.67) | 2,680,000.00 | 734,990,741.16 |

|  | July Income | August 1st Subs | August 1st AUM | |
|---|---|---|---|---|
| PPVA USA | 3,742,180.38 | 875,015.00 | 271,915,793.87 | 36.45% |
| PPVA International | 5,238,152.00 | 1,185,000.00 | 474,115,294.66 | 63.55% |
| | 8,980,332.38 | 2,060,015.00 | 746,031,088.53 | 100.00% |

# EXHIBIT 611

# INTENTIONALLY OMITTED

# EXHIBIT 612

# REDACTED

# EXHIBIT 613

| From: | Robert Liscouski [rliscouski@implantsciences.com] |
|---|---|
| Sent: | 11/4/2015 7:59:18 PM |
| To: | David Levy [dlevy@platinumlp.com] |
| Subject: | Re: |
| Attachments: | Noble IMSC Presentation - May 2015 v 10.0[1].pdf; CCM Proposal for Implant Sciences.pdf |

Here you go -

Robert Liscouski

Implant Sciences Corp.

500 Research Drive Unit 3

Wilmington, MA 01887-4437

(978) 752-1700

Mobile: 703-407-9437

www.implantsciences.com

---

**From:** David Levy <dlevy@platinumlp.com>
**Date:** Wednesday, November 4, 2015 at 15:06
**To:** Robert Liscouski <rliscouski@implantsciences.com>
**Subject:** <no subject>

Can you please send me the original pitch books that were presented by noble and chardan on the company with the expected valuations. Need it internally please
THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

Warning, information subject to United States export control laws. The information contained within this email may be subject to Export Administration Regulations ("EAR"). This information may not be exported, release or disclosed to foreign nationals inside or outside the United States without first complying with the export authorization requirement of EAR.

This email message may contain information that is Confidential, and may also contain information that is held as a Trade Secret. This information is intended to be disclosed solely to the addressee(s). If you are the intended recipient, any information herein is to be held as Confidential pursuant to any Non-Disclosure Agreement applicable between the parties, or as a Trade Secret as applicable. If you are not the intended recipient, any disclosure, copying, distribution or use of the contents of this e-mail is prohibited. If you have received this email in error, please notify the sender by return e-mail and delete the e-mail from your computer system.



investment banking





May 2015

capital architects.  noblefcm.com

NEW YORK – NEW JERSEY – BOSTON – BOCA RATON – LOS ANGELES

CTRL7472644



NOBLE FINANCIAL                                    capital architects

## Table of Contents

- **Executive Summary**                    **3**
  - Summary
  - Observations
  - Noble Qualifications

- **Review of Alternatives**               **7**
  - Alternatives
  - Private Equity
    - Overview/ Number of Players/ Approach/ Issues
    - Sample List
  - Strategic Partner
    - Overview/ Number of Players/ Approach/ Issues
    - Sample List
  - Timing/ Process Overview
  - Draft Timeline

- **Noble Team**                           **22**

- **Summary**                              **24**





# Executive Summary



CTRL7472644



## Summary

- Noble Financial Capital Markets ("Noble") is pleased to have this opportunity to review with Implant Sciences Corporation ("IMSC" or the "Company") its thoughts and qualifications to continue to work with IMSC's management team to address and define strategic and financial opportunities that exist.

- Driven by recent events, a variety of options now exist for IMSC to explore as it evaluates the best course to fully capitalize on its market opportunity and maximize shareholder value.

- The purpose of this presentation is to identify the key factors and issues that need to be examined and that will allow IMSC to embark on the best path at the appropriate time.

- Noble believes that through the work of its banking and research teams it has the deepest knowledge of IMSC's unique position in its market. With the background its team has in the defense and Homeland Security markets, Noble is best positioned to be the trusted and objective advocate and advisor that IMSC needs as it works through its various options.





## Observations

- IMSC is in the process of a significant transformation. This is being driven by a number of factors:
    - TSA order, backlog and delivery schedule;
    - Significant ECAC orders and pipeline of activity;
    - An identified, robust new product pipeline that expands its addressable market and leads to new revenue opportunities for FY 17 and 18.

- Beginning Q1 2016 the financial results of IMSC take on a new look.
    - Revenues and cash flow ramp up significantly.
    - IMSC can demonstrate an ability to deliver superior gross margin.

- The Company's product pipeline is dependent on "D" rather than "R".
    - The required CAPEX to complete development is very manageable.

- The Company's balance sheet is not the deterrent to a transaction that it once was.
    - An appropriate model with new product pipeline will be needed to overcome existing concerns.





Noble's Defense & Homeland Security Expertise

Noble's senior bankers have significant experience:
- Executed numerous transactions of all types including merger & acquisition assignments and capital raising transactions of all types;
- Have a long history within the Defense and Homeland Security marketplace;
- Have completed either an M&A or capital raising transaction, and frequently both, for all of the companies noted below.

























# Review of Alternatives



noble financial capital markets investment banking

CTRL7472644

  


## Alternative Transaction Structures

| | **Private Equity** | **Strategic Partner** | **Combination** | **Public Equity** |
|---|---|---|---|---|
| **Resulting Transaction** | • Going Private<br>• Recapitalization | • Sale<br>• Strategic Relationship | • Equity Investment & Strategic Relationship | • Common Stock Offering |
| **Description** | • Full marketing effort with detailed memorandum<br>• Create competitive process | • Use recent industry contacts as catalyst<br>• Create competitive process | • Combining interest from private equity with interest for a strategic relationship | • Full public offering<br>• Cap structure would need to be addressed early on |
| **Process** | • Broad approach to 40-50 private equity firms<br>• Remain flexible as to complete sale or recapitalization | • Narrow approach to 10-12 strategic companies<br>• Remain flexible as to complete sale or strategic partnership | • Driven by activity with both private equity and strategic companies | • Form S-1 Registration Statement followed by full marketing effort |









CTRL7472644



# Private Equity Alternative



CTRL7472644



## Overview – Private Equity

- A private equity alternative can take the form of an outright purchase of the Company or as the key component of a recapitalization which would leave IMSC as a public company.

- The private equity market has rebounded from the financial downturn with great vigor.

  - As of year end 2014, there was an estimated $1 trillion dollars under management dedicated to private equity.
  - Acquisition multiples for leveraged private equity transactions have risen to pre downturn levels seen in 2007.
  - Part of this rise has been fueled by the continued low interest rate environment and the related, very active non-bank high yield debt markets.
  - IMSC's recent turn to operating profitability will allow for some amount of leverage to be applied to a recapitalization or complete sale, although not at levels seen for larger companies with long histories of profitability.

- The alignment of key management with the PE investment is an extremely important part of this process.

- The following page highlights five PE funds which exemplify the larger group to be approached.


CTRL7472644



## Sample List of Potential Private Equity

| Company | Location | Contact | Rational/Acquisition History |
|---|---|---|---|
| Battery Ventures | Boston, Massachusetts www.battery.com | Alex Benik | Detcon - gas detection sensors DSA Detection- design, manufacture and distribution of consumables for leading brands of explosives and narcotics trace detectors (ETD) Industrial Safety Technologies-manufacture and distribution of consumables for leading brands of explosives and narcotics trace detectors (ETD) |
| CM Equity Partners | New York, New York www.cmequity.com | Peter Schulte | A-Tek, Inc. - Provides information technology services and solutions and professional management and support services to homeland security, defense, intelligence and other agencies of the U.S. Federal government Averstar - developer of Information Technology services and products focusing on mission-critical systems for Federal, state and commercial customers |
| FP FRANCISCO PARTNERS | San Francisco, California www.franciscopartners.com | Tom Ludwig | EF Johnson - provides portable radios, mobile radio units, and radio systems to first responders in public safety and public service, the federal government, and industrial organizations. |
| Paladin Capital Group | Washington, DC www.paladincapgroup.com | Ken Pentimonti | Safeview - offers the only effective and acceptable alternative to metal detectors, pat down searches, and other means used to ensure safety in buildings |
| Riverside PARTNERS | Boston, Massachusetts www.riversidepartners.com | Jon Lemelman | ITC Global - delivers satellite communications systems and ongoing support to some of the world's largest and most successful companies in the mining, energy and maritime industries |



noble financial capital markets investment banking

CTRL7472644



# Strategic Partner Alternative



noble financial capital markets investment banking.

12

CTRL7472644



## Overview – Strategic Partner

- IMSC, driven by its unique market opportunity, differentiated technology and growing backlog has opportunities with strategic parties at an earlier stage than most companies.

- This opportunity can be in the form of a complete acquisition of the Company or a strategic investment which is part of an overall recapitalization of IMSC's balance sheet.

- A process with strategic parties can have a less predictable timeline than with financial investors given the need to balance both strategic and financial concerns on their part as well as the relative size difference between IMSC and some potential strategic suitors.

- Confidentiality is extremely important and needs to be actively managed, both in terms of the disclosure of a potential transaction to the overall market place as well as technical issues between IMSC and potential strategic suitors.

- The Company's key management needs to be properly incentivized, both prior to and after a potential transaction.

- The following page highlights six of the potential strategic partners.



noble financial capital markets investment banking

CTRL7472644



NOBLE FINANCIAL                                              capital architects

## Sample List of Potential Partners

| Company | Location | Contact | Rational/Acquisition History |
|---|---|---|---|
| analogic | Peabody, Massachusetts<br>www.analogic.com | Mike Levitz<br>CFO | • Would be good fit into its Security Technology segment<br>• Focus of recent acquisitions has been on Healthcare |
| COBHAM | Dorset, United Kingdom<br>www.cobham.com | David Ashton<br>EVP Business<br>Development | • M&A is an important part of Cobham's growth strategy<br>• Not a direct fit within their Aerospace and Security business |
| FLIR | Wilsonville, Oregon<br>www.flir.com | Shane Harrison<br>SVP Corporate<br>Development | • Recent realignment of business could add internal sponsorship<br>• IMSC would be a large acquisition by historical standards. 15 acquisitions since 2009 |
| L3 | New York, New York<br>www.l-3.com | Russell Mack<br>VP of Business Ventures | • Historically an active acquirer<br>• Fits well with existing product lines<br>• In-line opportunity |
| leidos | Reston, Virginia<br>www.leidos.com | Mark W Sopp<br>CFO | • Historically an active but not aggressive acquirer<br>• Strategic fit with Reveal acquisition<br>• Six transactions in last three years totaling $422 million |
| OSI SYSTEMS, INC. | Hawthorne, California<br>www.osi-systems.com | Alan Edrick<br>EVP and CFO<br>Ajay Mehra<br>President- Rapiscan | • Size would be a departure and prove challenging<br>• In-line opportunity<br>• Company now healthier and more ready for a strategic transaction |

14



CTRL7472644



# Timing and Process Overview



noble financial capital markets investment banking

15



Timing/Process Overview

**Key Short term Activities**
- Build Product and Technology Roadmap.
- Build quarterly financial model for next three fiscal years.
- Update "addressable market" based on new products.
  - Miniaturized handheld
  - In-line product

**Additional Data Points**
- New model will allow for updated valuation discussion.
- New model and Product and Technology Roadmap will highlight timing considerations.
- Conversations with industry participants will give insight into strategic opportunities and interest.

**Near Term Activity**
- With industry and financial data points, a joint dialogue with Platinum can be initiated to ensure buy in by all parties.



noble financial capital markets investment banking

CTRL7472644



## Process is a Key Factor in Maximizing Value for IMSC



It is critical to have a full understanding of IMSC's business and opportunities to:
- Understand the key selling points or issues
- Develop solid and defensible financial information
- Position the Company to generate buyer interest
- Mitigate / respond to any potential buyer concerns
- Articulate synergy and growth opportunities
- Underscore the underlying technology
- Address buyers' discount for uncertainty



Tailor the process to the objectives of the seller:
- Maximizing value while maintaining execution efficiency
- Outcome of the sale process is influenced by a variety of factors including  timing and confidentiality constraints, business and industry fundamentals, competitive landscape, corporate structure and depth of management
- Daily management of buyers at all levels
- Careful coordination with the Company management



Dedicated team members with strong familiarity of the Company will be actively involved in the process from start to finish
- Tight control over all elements of the process
- Proven track record of execution





NOBLE FINANCIAL                        capital architects

## Our Process Drives Value for Our Clients

- **Process.** Noble Financial has successfully used competitive strategic investor and private equity processes to increase buyers' valuation ranges and improve transaction terms. Major steps include:

  - ▸ **Understanding** Identify and strategize to address any potential concerns during initial due diligence.

  - ▸ **Valuation** Establish mutually agreed upon goals and expectations.

  - ▸ **Marketing** Manage an efficient, effective and confidential marketing effort.

  - ▸ **Marketing Documents** Develop an appropriate strategy to position IMSC in the marketing materials to maximize value.

  - ▸ **Buyer Identification** Identify the buyers most willing to pay a "strategic" multiple.

  - ▸ **Transaction Strategy and Process** Use an appropriate marketing strategy to drive value.

  - ▸ **Negotiation** Negotiate optimal acquisition terms.

  - ▸ **Due Diligence** Actively control the due diligence process to maintain momentum and quickly resolve issues that could harm the deal or cause a reduction in value. Leverage due diligence to identify issues likely to be raised in a stock purchase agreement.

  - ▸ **Closing** Remain engaged to ensure a timely close and funding.





CTRL7472644



NOBLE FINANCIAL                                                    capital architects

Dual Process

- IMSC should select a process designed to optimize expected results and where the timing is driven by company specific results.
    - This should be after consultation with and buy-in from Platinum.

- We expect there will be significant interest from both private equity and industry participants.
    - There are 40-50 private equity firms that have the resources and interest.
    - We expect the list of potential Industry players to be in the ten to twelve range. This would be expanded if we add the large system integrators (Primes).

- For both private equity and industry partners there could be interest in either an acquisition or a partial transaction.
    - The ability to structure a partnership as opposed to an acquisition may be important.
    - The ability to combine a private equity recapitalization with a strategic partnership may yield the best outcome.

- Both private equity and strategic partners are subject to long and varied timetables.

- Both private equity and strategic partners will want management to be properly incentivized.

- A dual process that addresses both private equity and strategic partners in parallel will be the most flexible and likely most effective.



CTRL7472644



NOBLE FINANCIAL    capital architects

## Draft Timeline



| Marketing Prep | Marketing | Investor Due Diligence | Management Meetings | Conf. Diligence / Negotiation | HSR & Shareholder Approval |

| Private Equity | |
|---|---|
| Date | Action |
| Thru Jul 17 | Finalize CIM, financial model, teaser, form NDA and process letter. |
| Jul 20 - Jul 31 | Begin formal marketing process: teaser distribution, NDA execution, CIM distribution subject to NDA. |
| Aug 3 - Sep 4 | Continue marketing process. Complete follow-up discussions with potential investors and debt financing providers. Finalize compilation of data room materials. |
| Aug 3 - Sep 18 | Prepare management presentation and conduct dry-runs. |
| Aug 17 - Aug 21 | Receive preliminary indicative financing terms from debt providers and communicate such terms to potential investors. |
| Sep 4 | Deadline for initial indications of interest. |
| Sep 7 - Sep 18 | Review indications of interest with management and Board. Begin drafting of Stock Purchase Agreement ("SPA"). |
| Sep 14 - Sep 18 | Distribute process letters to parties selected to proceed to second round. Schedule management presentations for selected parties. Open data room to selected parties. |
| Sep 21 - Oct 2 | On-site meetings with management, address specific diligence requests from potential investors and finalize draft SPA. |

| Strategic Partner | |
|---|---|
| Date | Action |
| Thru Jul 17 | Finalize CIM, financial model and Form NDA. |
| Jul 20 - Jul 31 | Customize approach and individual rationale. |
| Aug 3 - Sep 4 | Begin formal process. Finalize compilation of data room materials. |
| Aug 3 - Sep 18 | Prepare management presentation and conduct dry-runs. |
| Sep 7 - Sep 25 | Initial meetings with perspective partners. |
| Sep 25 | Deadline for initial indications of interest. |
| Oct 5 - Oct 23 | Follow-up meetings with interested parties. |



noble financial capital markets investment banking

20

CTRL7472644



## Draft Timeline (cont.)



| ■ Marketing Prep | ■ Marketing | ■ Investor Due Diligence | ■ Management Meetings | ■ Conf. Diligence/ Negotiation | ▒ HSR & Shareholder Approval |

### Private Equity

| Date | Action |
|---|---|
| Oct 14 | Deadline for revised indications of interest. |
| Oct 19 | Select process finalists and distribute SPA. |
| Oct 19 - Nov 13 | Follow-up diligence meetings and discussions with finalists regarding structure, financing, due diligence and additional approval required. |
| Nov 13 | Deadline for final indications of interest including comments to draft SPA. |
| Nov 16- Nov 20 | Evaluation of final indications of interest. Negotiate valuation and other terms SPA terms. Select final bidder with which to enter into exclusivity. |
| Nov 23 - Dec 18 | Exclusivity period for selected party with in-depth confirmatory due diligence (legal, business, environmental, financial/accounting, insurance, human resources), final negotiations relating to definitive purchase agreement and drafting/negotiation of ancillary transaction documentation (employment agreements, non-compete, etc.). Begin drafting Form S-4 and other shareholder approval documents (if necessary). |
| Dec 18 | Execute SPA and debt purchase agreement. File shareholder approval documents. |
| Jan 18 - Jan 22 | Hold shareholder meeting, fund and close. |

### Strategic Partner

| Date | Action |
|---|---|
| Oct 23 | Deadline for revised indications of interest. |
| Oct 26- Nov 6 | Evaluate indication of interests. |
| Nov 9 - Nov 13 | Negotiate valuation and select final participant with which to enter into exclusivity. |
| Nov 16 - Dec 11 | Exclusivity period for selected party with in-depth confirmatory due diligence (legal, business, environmental, financial/accounting, insurance, human resources), final negotiations relating to definitive purchase agreement and drafting/negotiation of ancillary transaction documentation (employment agreements, non-compete, etc.). Prepare Schedule TO and 14D-9 (or Form S-4 if necessary). |
| Dec 11 | Execute definitive purchase agreement and file shareholder disclosure documents. |
| Feb 12 or before | Hold shareholder meeting, finalize Hart Scott Rodino approval, fund and close. |



CTRL7472644



# Noble Team





NOBLE FINANCIAL                                    capital architects

## Investment Banking Team

**Nico Pronk, President and CEO**
- Mr. Pronk joined Noble in 1988 as COO, and in 1995, he became President.
- 25 years experience working with IPOs, secondary offerings, private placements and mergers and acquisitions.
- During his career he has served as Director or Advisor to numerous privately held and publicly traded companies.
- Netherlands Institute of Banking and Finance.

**Richard Giles, Managing Director**
- Mr. Giles joined Noble in 2010 as Head of the Technology, Media and Telecommunications (TMT) group.
- 25 years of investment banking experience.
- Former head of Stifel Nicolaus' Technology Group.
- Executed more than 100 M&A and capital raising transactions totaling $10+ billion.
- A.B., Harvard College; M.B.A., Harvard Business School.

**Robert Campbell, Managing Director**
- 20 years of investment banking experience
- Executed M&A and capital raising transactions totaling over $3 billion dollars in value
- Former Managing Director in the Investment Banking Department of B. Riley & Co., L.H. Friend, Weinress, Frankson & Presson and Seidler Companies
- B.S., Loyola Marymount University; M.B.A., UCLA Anderson School of Management,; frequent guest lecturer at USC Marshall School of Business

**Francisco Penafiel, Vice President**
- Executed M&A and capital raising transactions totaling over $1 billion dollars in value
- 7 years of sell side equity research experience, covering enterprise & infrastructure software, business services, media, communications and financial services
- Engineering, IT & Statistics, Escuela Superior Politecnica (Guayaquil, Ecuador); M.S. Economics, Florida Atlantic University

**Brian Harper, Associate**
- Joined Noble in 2014
- B.S., University of Florida; M.S. Accounting, Florida Atlantic University



noble financial capital markets investment banking

CTRL7472644



# Summary





## Summary

- In the short term there are two activities that will assist in better determining potential value and timing.
    - Build a realistic, detailed quarterly financial model covering the next three fiscal years.
    - Build a Product and Technology Roadmap that helps identify new market opportunities.

- Engage Platinum and jointly determine the best course of action.

- We anticipate that the resulting plan will be a dual path approach.
    - We anticipate approximately 40-50 private equity firms and 10-12 strategic partners.
    - Both groups will require active engagement of management.

- A process that is started by mid-July can produce results between December and March.
    - This allows for September and December quarterly results to validate forecasts and facilitate leverage.

- Noble believes it is uniquely qualified to represent IMSC in these activities.
    - Noble has a strong knowledge of the relevant private equity community.
    - Noble has relationships with the targeted strategic players.
    - Noble has a long history with IMSC and fully understands all the opportunities that lay in front of the Company.



# EXHIBIT 614

**REDACTED**

# EXHIBIT 615

| | |
|---|---|
| **From**: | David Levy [dlevy@platinumlp.com] |
| **Sent**: | 10/2/2015 6:32:50 AM |
| **To**: | Mark Nordlicht [mnordlicht@platinumlp.com] |
| **Subject**: | Re: |

Tsa keeps schlepping they say now first delivery in 3-6 weeks. The package should be complete in 2-3 weeks finally and will be out to market then. With bids die by mid dec. bob believes the selling was board members that owned shares who no longer are employed and cod sell post 10k coming out but he's not sure

Sent from my iPhone

> On Oct 2, 2015, at 9:25 AM, Mark Nordlicht <mnordlicht@platinumlp.com> wrote:
>
> How is implant doing? Is tsa delayed? What is the sales process like?
>
> Sent from my iPhone

# EXHIBIT 616

# INTENTIONALLY OMITTED

# EXHIBIT 617

| **From**: | Kerry Propper [KPropper@platinumlp.com] |
|---|---|
| **Sent**: | 1/5/2016 11:59:15 AM |
| **To**: | Mark Nordlicht [mnordlicht@platinumlp.com] |
| **CC**: | David Levy [dlevy@platinumlp.com] |
| **Subject**: | Re: |

Expecting bids on the 11th. They think at least 4 bids.

Kerry

Sent from my iPhone

> On Jan 5, 2016, at 6:50 AM, Mark Nordlicht <mnordlicht@platinumlp.com> wrote:
>
> Any color yet on implant process??
>
> Sent from my iPhone

CTRL7728630

# EXHIBIT 618

# INTENTIONALLY OMITTED

# EXHIBIT 619

# INTENTIONALLY OMITTED

# EXHIBIT 620

# INTENTIONALLY OMITTED

# EXHIBIT 621

# INTENTIONALLY OMITTED

# EXHIBIT 622

# EXHIBIT 75

January 13, 2016

I, Mark Nordlicht, agree on this day, to the following on behalf of myself, Platinum Partners Value Arbitrage Fund L.P. ("**PPVA**"), Platinum Partners Credit Opportunities Master Fund LP ("PPCO") and each of their affiliates (collectively, "**Platinum**"):

To the extent not otherwise in violation of applicable law, upon the sale of the assets and/or equity (collectively, the "**Sale**") of Implant Sciences Inc. and/or any of its subsidiaries (collectively, the "**Company**"), the proceeds of such Sale that inure, directly or indirectly, to the benefit of Platinum, shall immediately upon consummation of such Sale be applied and remitted to B Asset Manager, LP ("**BAMLP**"), in such amount necessary to purchase and/or repay in full all indebtedness owing by Golden Gate Oil Inc. to BAMLP and each of its investment advisory clients at such time (collectively, "**BAM**"); provided, that, nothing herein shall modify the obligations of the Company herein to first repay all indebtedness owing by the Company to BAM with proceeds of a Sale (the "**Implant Repayment**").

I further agree to take or cause to be taken all additional actions deemed by BAM to be reasonably necessary in furtherance of the foregoing, as well as to create a perfected security interest in the obligations described above to the extent requested by BAM.

Agreed and Acknowledged to by:

_____
Mark Nordlicht


Witnessed by:

_____
Mark Feuer

# EXHIBIT 623

# EXHIBIT 78

EXECUTION COPY

## MASTER GUARANTY AGREEMENT

New York, New York                                                          March 21, 2016

FOR VALUE RECEIVED, and in consideration of (a) note purchases from, loans made or to be made, credit otherwise extended or to be extended by (i) the Montsant Investors (as defined below) to or for the account of Montsant Partners LLC, a Delaware limited liability company ("Montsant") and (ii) the GGO Secured Parties (as defined below) to or for the account of Golden Gate Oil LLC, a Delaware limited liability company ("GGO"), (b) the direct or indirect benefit received by Platinum Partners Value Arbitrage Fund L.P., an exempted limited partnership under the laws of the Cayman Islands ("PPVA" and together with Montsant and GGO, the "Companies" and each a "Company") in respect of the restructuring of Montsant's and GGO's respective obligations to the Creditor Parties (as defined below), and (c) note purchases from, loans made or to be made, credit otherwise extended or to be extended by BBIL ULICO 2014 ("BBIL") to or for the account of Montsant, from time to time and at any time and for other good and valuable consideration and to induce the Creditor Parties (as defined below), in their discretion, to purchase such notes, make such loans or other extensions of credit and to make or grant such renewals, extensions, releases of collateral or relinquishments of legal rights as the Creditor Parties (as defined below) may deem advisable, each of the undersigned (and each of them if more than one, the liability under this Guaranty being joint and several) (jointly and severally referred to as "Guarantors" or "the undersigned") unconditionally guarantees to the Creditor Parties (as defined below), their successors, endorsees and assigns the prompt payment when due (whether by acceleration or otherwise) of all present and future obligations and liabilities of any and all kinds of the Companies to the Creditor Parties (as defined below) and of all instruments of any nature evidencing or relating to any such obligations and liabilities upon which the Companies or one or more parties and the Companies are or may become liable to the Creditor Parties (as defined below), whether incurred by any Company as maker, endorser, drawer, acceptor, guarantors, accommodation party or otherwise, and whether due or to become due, secured or unsecured, absolute or contingent, joint or several, and however or whenever acquired by the Creditor Parties (as defined below), in each case specifically and exclusively relating to (i) the Obligations under and as defined in that certain Note Purchase Agreement, dated as of January 30, 2015, among BAM Administrative Services LLC, as agent (the "Agent" or "BAM") for the investors from time to time party thereto (the "Montsant Investors") and Montsant (as the same may be amended, restated, modified and/or supplemented from time to time, the "Montsant NPA"), (ii) the Secured Obligations under and as defined in that certain Security Agreement, dated as of April 10, 2012, between GGO and the Agent (as successor agent to Precious Capital LLC ("Precious")), as agent for the secured parties (the "GGO Secured Parties" and together with the Investors, the Agent and BBIL, each a "Creditor Party" and collectively, the "Creditor Parties") from time to time party thereto (as the same may be amended, restated, modified and/or supplemented from time to time, the "GGO Security Agreement"), (iii) the obligations and liabilities arising under that certain Seller Note, dated on or about March 31, 2016, in the original principal amount of $6,137,215.50 made by Montsant in favor of BBIL (the "Seller Note" and together with the GGO Security Agreement, the Montsant NPA, and all other documents, instruments and agreements entered into in connection with the transactions contemplated hereby and thereby, the "Documents") and (iv) the obligations of PPVA as more fully described in Section 1 hereto (the "PPVA Obligations"), or any documents,

instruments or agreements referred to therein, whether now existing or hereafter arising, direct or indirect, liquidated or unliquidated, absolute or contingent, due or not due and whether under, pursuant to or evidenced by a note, agreement, guaranty, instrument or otherwise (all of which are herein collectively referred to as the "Obligations"), and irrespective of the genuineness, validity, regularity or enforceability of such Obligations, or of any instrument evidencing any of the Obligations or of any collateral therefor or of the existence or extent of such collateral, and irrespective of the allowability, allowance or disallowance of any or all of the Obligations in any case commenced by or against any Company under Title 11, United States Code, including, without limitation, obligations or indebtedness of any such Company for post-petition interest, fees, costs and charges that would have accrued or been added to the Obligations but for the commencement of such case.  Terms not otherwise defined herein shall have the meaning assigned such terms in the Documents, as applicable.  In furtherance of the foregoing, the undersigned hereby agree as follows:

1.    PPVA Obligations.  Immediately following PPVA's receipt of any payments, proceeds, distributions and/or other amounts arising in any manner whatsoever from any right, title and/or interest, PPVA may have in and to Implant Sciences Corporation (the "Proceeds"), PPVA shall immediately following such receipt remit such Proceeds in immediately available funds as follows:

(a)    First, PPVA shall make or cause to be made a payment to BAM in an amount equal to Twenty-Million Dollars ($20,000,000.00) to prepay the principal amount owed by GGO to the Investors, as such term defined in that certain Note Purchase Agreement, (as same may be amended, restated, modified and or supplemented from time to time), dated as of April 10, 2012, by and between GGO and BAM (as successor agent to Precious); and

(b)    Second, PPVA shall make or cause to be made a payment of any remaining Proceeds to pay in full all outstanding obligations and liabilities under that certain Note Purchase Agreement, dated as of March 19, 2014, by and between Implant Sciences Corporation, each of the investors party thereto, and the Agent.

2.    No Impairment.  The Creditor Parties may at any time and from time to time, either before or after the maturity thereof, without notice to or further consent of the undersigned, extend the time of payment of, exchange or surrender any collateral for, renew or extend any of the Obligations or increase or decrease the interest rate thereon, or any other agreement with the Companies or with any other party to or person liable on any of the Obligations, or interested therein, for the extension, renewal, payment, compromise, discharge or release thereof, in whole or in part, or for any modification of the terms thereof or of any agreement between any Creditor Party and the Companies or any such other party or person, or make any election of rights the Creditor Parties may deem desirable under the United States Bankruptcy Code, as amended, or any other federal or state bankruptcy, reorganization, moratorium or insolvency law relating to or affecting the enforcement of creditors' rights generally (any of the foregoing, an "Insolvency Law") without in any way impairing or affecting this Guaranty.  This Guaranty shall be effective regardless of the subsequent incorporation, merger or consolidation of any Company, or any change in the composition,

nature, personnel or location of any Company and shall extend to any successor entity to any Company, including a debtor in possession or the like under any Insolvency Law.

3.     Guaranty Absolute.     Subject to Section 6(c) hereof, each of the undersigned jointly and severally guarantees that the Obligations will be paid strictly in accordance with the terms of the Documents and/or any other document, instrument or agreement creating or evidencing the Obligations, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Companies with respect thereto.     Guarantors hereby knowingly accept the full range of risk encompassed within a contract of "continuing guaranty" which risk includes the possibility that the Companies will contract additional indebtedness, obligations and liabilities for which Guarantors may be liable hereunder after any such Company's financial condition or ability to pay its lawful debts when they fall due has deteriorated, whether or not any such Company has properly authorized incurring such additional indebtedness, obligations and liabilities.     The undersigned acknowledge that (i) no oral representations, including any representations to extend credit or provide other financial accommodations to any Company, have been made by any Creditor Party to induce the undersigned to enter into this Guaranty and (ii) any extension of credit to any Company shall be governed solely by the provisions of the Documents.  The liability of each of the undersigned under this Guaranty shall be absolute and unconditional, in accordance with its terms, and shall remain in full force and effect without regard to, and shall not be released, suspended, discharged, terminated or otherwise affected by, any circumstance or occurrence whatsoever, including, without limitation: (a) any waiver, indulgence, renewal, extension, amendment or modification of or addition, consent or supplement to or deletion from or any other action or inaction under or in respect of the Documents or any other instruments or agreements relating to the Obligations or any assignment or transfer of any thereof, (b) any lack of validity or enforceability of any Document or other documents, instruments or agreements relating to the Obligations or any assignment or transfer of any thereof, (c) any furnishing of any additional security to the Creditor Parties or their assignees or any acceptance thereof or any release of any security by the Creditor Parties or their assignees, (d) any limitation on any party's liability or obligation under the Documents or any other documents, instruments or agreements relating to the Obligations or any assignment or transfer of any thereof or any invalidity or unenforceability, in whole or in part, of any such document, instrument or agreement or any term thereof, (e) any bankruptcy, insolvency, reorganization, composition, adjustment, dissolution, liquidation or other like proceeding relating to the Companies, or any action taken with respect to this Guaranty by any trustee or receiver, or by any court, in any such proceeding, whether or not the undersigned shall have notice or knowledge of any of the foregoing, (f) any exchange, release or nonperfection of any collateral, or any release, or amendment or waiver of or consent to departure from any guaranty or security, for all or any of the Obligations or (g) any other circumstance which might otherwise constitute a defense available to, or a discharge of, the undersigned.  Any amounts due from the undersigned to the Creditor Parties shall bear interest until such amounts are paid in full at the highest rate then applicable to the Obligations.  Obligations include post-petition interest whether or not allowed or allowable.

4.     Waivers.

(a)     This Guaranty is a guaranty of payment and not of collection.  The Creditor Parties shall be under no obligation to institute suit, exercise rights or remedies or take any other action against the Companies or any other person or entity liable with respect to any of the Obligations or resort to any collateral security held by it to secure any of the Obligations as a condition precedent to the undersigned being obligated to perform as agreed herein and each of the Guarantors hereby waives any and all rights which it may have by statute or otherwise which would require the Creditor Parties to do any of the foregoing. Each of the Guarantors further consents and agrees that the Creditor Parties shall be under no obligation to marshal any assets in favor of Guarantors, or against or in payment of any or all of the Obligations.  The undersigned hereby waives all suretyship defenses and any rights to interpose any defense, counterclaim or offset of any nature and description which the undersigned may have or which may exist between and among any Creditor Party, the Companies and/or the undersigned with respect to the undersigned's obligations under this Guaranty, or which any Company may assert on the underlying debt, including but not limited to failure of consideration, breach of warranty, fraud, payment (other than cash payment in full of the Obligations), statute of frauds, bankruptcy, infancy, statute of limitations, accord and satisfaction, and usury.

(b)     Each of the undersigned further waives (i) notice of the acceptance of this Guaranty, of the making of any such loans or extensions of credit, and of all notices and demands of any kind to which the undersigned may be entitled, including, without limitation, notice of adverse change in any Company's financial condition or of any other fact which might materially increase the risk of the undersigned and (ii) presentment to or demand of payment from anyone whomsoever liable upon any of the Obligations, protest, notices of presentment, non-payment or protest and notice of any sale of collateral security or any default of any sort.

(c)     Notwithstanding any payment or payments made by the undersigned hereunder, or any setoff or application of funds of the undersigned by any Creditor Party, the undersigned shall not be entitled to be subrogated to any of the rights of such Creditor Party against the Companies or against any collateral or guarantee or right of offset held by such Creditor Party for the payment of the Obligations, nor shall the undersigned seek or be entitled to seek any contribution or reimbursement from the Companies in respect of payments made by the undersigned hereunder, until all amounts owing to the Creditor Parties by the Companies on account of the Obligations are indefeasibly paid in full and the Creditor Parties' obligation to extend credit pursuant to the Documents has been irrevocably terminated.  If, notwithstanding the foregoing, any amount shall be paid to the undersigned on account of such subrogation rights at any time when all of the Obligations shall not have been paid in full and the Creditor Parties' obligations to extend credit pursuant to the Documents shall not have been terminated, such amount shall be held by the undersigned in trust for the Creditor Parties, segregated from other funds of the undersigned, and shall forthwith upon, and in any event within two (2) business days of, receipt by the undersigned, be turned over to the Agent in the exact form received by the undersigned (duly endorsed by the undersigned to the Agent, if required), to be applied against the Obligations, whether matured or unmatured, in such order as the Agent may determine, subject to the provisions of the Documents.  Any and all present and future debts, obligations and liabilities of the Companies to any of the undersigned

are hereby waived and postponed in favor of, and subordinated to the full payment and performance of, all present and future debts and Obligations of the Companies to the Creditor Parties.

5. <u>Security</u>. All sums at any time to the credit of the undersigned and any property of the undersigned in any Creditor Party's possession or in the possession of any bank, financial institution or other entity that directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with, such Creditor Party (each such entity, an "<u>Affiliate</u>") shall be deemed held by such Creditor Party or such Affiliate, as the case may be, as security for any and all of the undersigned's obligations and liabilities to the Creditor Parties and to any Affiliate of the Creditor Parties, no matter how or when arising and whether under this or any other instrument, agreement or otherwise.

6. <u>Representations and Warranties</u>. Each of the undersigned hereby jointly and severally represents and warrants (all of which representations and warranties shall survive until all Obligations are indefeasibly satisfied in full and the Documents have been irrevocably terminated), that:

(a) <u>Corporate Status</u>. It is a corporation, partnership or limited liability company, as the case may be, duly formed, validly existing and in good standing under the laws of its jurisdiction of formation indicated on the signature page hereof and has full power, authority and legal right to own its property and assets and to transact the business in which it is engaged.

(b) <u>Authority and Execution</u>. It has full power, authority and legal right to execute and deliver, and to perform its obligations under, this Guaranty and has taken all necessary corporate, partnership or limited liability company, as the case may be, action to authorize the execution, delivery and performance of this Guaranty.

(c) <u>Legal, Valid and Binding Character</u>. This Guaranty constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other laws of general application affecting the enforcement of creditor's rights and general principles of equity that restrict the availability of equitable or legal remedies.

(d) <u>Violations</u>. The execution, delivery and performance of this Guaranty will not violate any requirement of law applicable to it or any contract, agreement or instrument to which it is a party or by which it or any of its property is bound or result in the creation or imposition of any mortgage, lien or other encumbrance other than in favor of the Agent, for the ratable benefit of the Creditor Parties, on any of its property or assets pursuant to the provisions of any of the foregoing, which, in any of the foregoing cases, could reasonably be expected to have, either individually or in the aggregate, a material adverse effect on the business, assets, liabilities, condition (financial or otherwise), properties, operations or prospects of any Company and its Subsidiaries, taken individually and as a whole (a "<u>Material Adverse Effect</u>").

(e)     Consents or Approvals.   No consent of any other person or entity (including, without limitation, any creditor of the undersigned) and no consent, license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required in connection with the execution, delivery, performance, validity or enforceability of this Guaranty by it, except to the extent that the failure to obtain any of the foregoing could not reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

(f)     Litigation.   No litigation, arbitration, investigation or administrative proceeding of or before any court, arbitrator or governmental authority, bureau or agency is currently pending or, to the best of its knowledge, threatened (i) with respect to this Guaranty or any of the transactions contemplated by this Guaranty or (ii) against or affecting it, or any of its property or assets, which, in each of the foregoing cases, if adversely determined, could reasonably be expected to have a Material Adverse Effect.

(g)     Financial Benefit.   It has derived or expects to derive a financial or other advantage from each and every loan, advance or extension of credit made under the Documents or other Obligation incurred by the Companies to the Creditor Parties.

(h)     Solvency.   As of the date of this Guaranty, (a) the fair saleable value of its assets exceeds its liabilities and (b) it is meeting its current liabilities as they mature.

7.     Acceleration.

(a)     If any breach of any covenant or condition or other event of default shall occur and be continuing under any agreement made by any Company or any of the undersigned to any Creditor Party, or any Company or any of the undersigned should at any time become insolvent, or make a general assignment, or if a proceeding in or under any Insolvency Law shall be filed or commenced by, or in respect of, any of the undersigned, or if a notice of any lien, levy, or assessment is filed of record with respect to any assets of any of the undersigned by the United States of America or any department, agency, or instrumentality thereof, or if any taxes or debts owing at any time or times hereafter to any one of them becomes a lien or encumbrance upon any assets of the undersigned in any Creditor Party's possession, or otherwise, any and all Obligations shall for purposes hereof, at the Creditor Parties' option, be deemed due and payable without notice notwithstanding that any such Obligation is not then due and payable by any Company.

(b)     Each of the undersigned will promptly notify the Agent of any default by such undersigned in its respective performance or observance of any term or condition of any agreement to which the undersigned is a party if the effect of such default is to cause, or permit the holder of any obligation under such agreement to cause, such obligation to become due prior to its stated maturity and, if such an event occurs, the Creditor Parties shall have the right to accelerate such undersigned's obligations hereunder.

8.     Payments from Guarantors.   The Creditor Parties, in their sole and absolute discretion, with or without notice to the undersigned, may apply on account of the Obligations

any payment from the undersigned or any other guarantors, or amounts realized from any security for the Obligations, or may deposit any and all such amounts realized in a non-interest bearing cash collateral deposit account to be maintained as security for the Obligations.

9. <u>Costs</u>. The undersigned shall pay on demand, all costs, fees and expenses (including expenses for legal services of every kind) relating or incidental to the enforcement or protection of the rights of the Creditor Parties hereunder or under any of the Obligations.

10. <u>No Termination</u>. This is a continuing irrevocable guaranty and shall remain in full force and effect and be binding upon the undersigned, and each of the undersigned's successors and assigns, until all of the Obligations have been indefeasibly paid in full and the Creditor Parties' obligations to extend credit pursuant to the Documents has been irrevocably terminated. If any of the present or future Obligations are guarantied by persons, partnerships, corporations or other entities in addition to the undersigned, the death, release or discharge in whole or in part or the bankruptcy, merger, consolidation, incorporation, liquidation or dissolution of one or more of them shall not discharge or affect the liabilities of any undersigned under this Guaranty.

11. <u>Recapture</u>. Anything in this Guaranty to the contrary notwithstanding, if any Creditor Party receives any payment or payments on account of the liabilities guaranteed hereby, which payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver, or any other party under any Insolvency Law, common law or equitable doctrine, then to the extent of any sum not finally retained by the Creditor Parties, the undersigned's obligations to the Creditor Parties shall be reinstated and this Guaranty shall remain in full force and effect (or be reinstated) until payment shall have been made to the Creditor Parties, which payment shall be due on demand.

12. <u>Books and Records</u>. The books and records of the Agent showing the account between each of the Creditor Parties and the Companies shall be admissible in evidence in any action or proceeding, shall be binding upon the undersigned for the purpose of establishing the items therein set forth and shall constitute prima facie proof thereof.

13. <u>No Waiver</u>. No failure on the part of any Creditor Party to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by any Creditor Party of any right, remedy or power hereunder preclude any other or future exercise of any other legal right, remedy or power. Each and every right, remedy and power hereby granted to the Creditor Parties or allowed it by law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by the Creditor Parties at any time and from time to time.

14. <u>WAIVER OF JURY TRIAL</u>. EACH OF THE UNDERSIGNED DESIRES THAT ITS DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH OF THE UNDERSIGNED HERETO WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER ARISING IN

CONTRACT, TORT, OR OTHERWISE BETWEEN ANY CREDITOR PARTY, AND/OR ANY OF THE UNDERSIGNED ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS GUARANTY, ANY DOCUMENT OR THE TRANSACTIONS RELATED HERETO OR THERETO.

15. GOVERNING LAW: JURISDICTION. THIS GUARANTY CANNOT BE CHANGED OR TERMINATED ORALLY, AND SHALL BE GOVERNED BY AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS. EACH OF THE UNDERSIGNED HEREBY CONSENTS AND AGREES THAT THE STATE OR FEDERAL COURTS LOCATED IN THE COUNTY OF NEW YORK, STATE OF NEW YORK SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN ANY OF THE UNDERSIGNED, ON THE ONE HAND, AND ANY CREDITOR PARTY, ON THE OTHER HAND, PERTAINING TO THIS GUARANTY OR ANY OF THE DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS GUARANTY OR ANY OF THE DOCUMENTS; PROVIDED, THAT EACH OF THE UNDERSIGNED ACKNOWLEDGES THAT ANY APPEALS FROM THOSE COURTS MAY HAVE TO BE HEARD BY A COURT LOCATED OUTSIDE OF THE COUNTY OF NEW YORK, STATE OF NEW YORK; AND FURTHER PROVIDED, THAT NOTHING IN THIS GUARANTY SHALL BE DEEMED OR OPERATE TO PRECLUDE THE CREDITOR PARTIES FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE OBLIGATIONS, TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF ANY CREDITOR PARTY. EACH OF THE UNDERSIGNED EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH UNDERSIGNED HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. EACH OF THE UNDERSIGNED HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH UNDERSIGNED IN ACCORDANCE WITH SECTION 19 AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF SUCH UNDERSIGNED'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.

16. Understanding With Respect to Waivers and Consents. Each Guarantor warrants and agrees that each of the waivers and consents set forth in this Guaranty is made voluntarily and unconditionally after consultation with outside legal counsel and with full knowledge of its significance and consequences, with the understanding that events giving rise to any defense or right waived may diminish, destroy or otherwise adversely affect rights which such Guarantor otherwise may have against a Company, any Creditor Party or any other person or entity or against any collateral. If, notwithstanding the intent of the parties that the terms of this

Guaranty shall control in any and all circumstances, any such waivers or consents are determined to be unenforceable under applicable law, such waivers and consents shall be effective to the maximum extent permitted by law.

17. <u>Severability</u>. To the extent permitted by applicable law, any provision of this Guaranty which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

18. <u>Amendments, Waivers</u>. No amendment or waiver of any provision of this Guaranty nor consent to any departure by the undersigned therefrom shall in any event be effective unless the same shall be in writing executed by each of the undersigned directly affected by such amendment and/or waiver and the Agent.

19. <u>Notice</u>. All notices, requests and demands to or upon the undersigned, shall be in writing and shall be deemed to have been duly given or made (a) when delivered, if by hand, (b) three (3) days after being sent, postage prepaid, if by registered or certified mail, (c) when confirmed electronically, if by facsimile, or (d) when delivered, if by a recognized overnight delivery service in each event, to the numbers and/or address set forth beneath the signature of the undersigned.

20. <u>Successors</u>. Each Creditor Party may, from time to time, without notice to the undersigned, sell, assign, transfer or otherwise dispose of all or any part of the Obligations and/or rights under this Guaranty. Without limiting the generality of the foregoing, each Creditor Party may assign, or grant participations to, one or more banks, financial institutions or other entities all or any part of any of the Obligations. In each such event, the Creditor Parties, their Affiliates and each and every immediate and successive purchaser, assignee, transferee or holder of all or any part of the Obligations shall have the right to enforce this Guaranty, by legal action or otherwise, for its own benefit as fully as if such purchaser, assignee, transferee or holder were herein by name specifically given such right. The Creditor Parties shall have an unimpaired right to enforce this Guaranty for its benefit with respect to that portion of the Obligations which the Creditor Parties have not disposed of, sold, assigned, or otherwise transferred.

21. <u>Joinder</u>. It is understood and agreed that any person or entity that desires to become a Guarantor hereunder, or is required to execute a counterpart of this Guaranty after the date hereof pursuant to the requirements of any Document, shall become a Guarantor hereunder by (x) executing a joinder agreement in form and substance satisfactory to the Agent, (y) delivering supplements to such exhibits and annexes to such Documents as the Agent shall reasonably request and/or as may be required by such joinder agreement and (z) taking all actions as specified in this Guaranty as would have been taken by such Guarantor had it been an original party to this Guaranty, in each case with all documents required above to be delivered to the Agent and with all documents and actions required above to be taken to the reasonable satisfaction of the Agent.

22. <u>Release</u>.  Nothing except indefeasible payment in full of the Obligations shall release any of the undersigned from liability under this Guaranty.

23. <u>Remedies Not Exclusive</u>.  The remedies conferred upon the Creditor Parties in this Guaranty are intended to be in addition to, and not in limitation of any other remedy or remedies available to the Creditor Parties.

24. <u>Limitation of Obligations under this Guaranty</u>.  Each Guarantor and each Creditor Party (by its acceptance of the benefits of this Guaranty) hereby confirms that it is its intention that this Guaranty not constitute a fraudulent transfer or conveyance for purposes of the Bankruptcy Code, the Uniform Fraudulent Conveyance Act of any similar Federal or state law. To effectuate the foregoing intention, each Guarantor and each Creditor Party (by its acceptance of the benefits of this Guaranty) hereby irrevocably agrees that the Obligations guaranteed by such Guarantor shall be limited to such amount as will, after giving effect to such maximum amount and all other (contingent or otherwise) liabilities of such Guarantor that are relevant under such laws and after giving effect to any rights to contribution pursuant to any agreement providing for an equitable contribution among such Guarantor and the other Guarantors (including this Guaranty), result in the Obligations of such Guarantor under this Guaranty in respect of such maximum amount not constituting a fraudulent transfer or conveyance.

25. <u>Limited Recourse Against PPVA</u>.  Notwithstanding anything to the contrary contained herein, the Creditor Parties' recourse hereunder solely with respect to PPVA shall be limited to enforcement of Agent's rights against PPVA under the Collateral Assignment, dated as of the date hereof (as the same may be amended, modified and/or supplemented from time to time, the "<u>China Horizon Collateral Assignment</u>"), made by PPVA in favor of the Agent, in respect of the Notes and the Convertible Implant Note (as such terms are defined in the China Horizon Collateral Assignment) and the Collateral Assignment, dated as of the date hereof (as the same may be amended, modified and/or supplemented from time to time, the "<u>Carbon Credits Collateral Assignment</u>"), made by PPVA in favor of the Agent, in respect of the Carbon Credit Portfolio Agreements (as such term is defined in the Carbon Credits Collateral Assignment).

26. <u>Limited Recourse Against Montsant</u>.  Notwithstanding anything to the contrary contained herein, following payment in full in cash of all the Obligations owing by Montsant in respect of the Note (as such term is defined in the Montsant NPA) and the Seller Note, the Creditor Parties' recourse hereunder solely with respect to Montsant shall be limited to the Agent's rights against the Specified Collateral (as hereinafter defined) pledged by Montsant under the Pledge Agreement, dated as of May 13, 2015, by and between Montsant and the Agent (as the same may be amended, restated, modified and/or supplemented from time to time, the "<u>Pledge Agreement</u>") and the Control Agreement, dated as of July 6, 2015, among the Agent, Montsant and COR Clearing LLC (as the same may be amended, restated, modified and/or supplemented from time to time).  For purposes hereof, the term "<u>Specified Collateral</u>" shall have the meaning set forth in the Pledge Agreement.

**[REMAINDER OF THIS PAGE IS BLANK.**
**SIGNATURE PAGE IMMEDIATELY FOLLOWS]**

IN WITNESS WHEREOF, this Guaranty has been executed by the undersigned as of the date and year here above written.

GUARANTORS

MONTSANT PARTNERS LLC

By: _____

    Name:
    Title:

Address for Notices:
Montsant Partners LLC
c/o Platinum Management (NY)
250 West 55th Street, 14th Floor
New York, New York 10019
Attn: David Steinberg
Tel: (212) 582-2222
Facsimile: (212) 582-2424

GOLDEN GATE OIL LLC

By: _____

    Name:
    Title:

Address for Notices:
Golden Gate Oil LLC
c/o Platinum Management (NY)
250 West 55th Street, 14th Floor
New York, New York 10019
Attn: David Steinberg
Tel: (212) 582-2222
Facsimile: (212) 582-2424

SIGNATURE PAGE TO
MASTER GUARANTY

PLATINUM PARTNERS VALUE
ARBITRAGE FUND L.P.

By:_____

    Name:
    Title:

Address for Notices:
Platinum Partners Value Arbitrage Fund L.P.
c/o Platinum Management (NY)
250 West 55th Street, 14th Floor
New York, New York 10019
Attn: David Steinberg
Tel: (212) 582-2222
Facsimile: (212) 582-2424

**INDIVIDUAL GUARANTOR**

_____
MARK A. NORDLICHT

Address for Notices:
Mark A. Nordlicht
c/o Platinum Management (NY)
250 West 55th Street, 14th Floor
New York, New York 10019
Attn: David Steinberg
Tel: (212) 582-2222
Facsimile: (212) 582-2424

**AGREED AND ACKNOWLEDGED:**

BAM ADMINISTRATIVE SERVICES LLC,
as Agent

By: _____
    Name:  Dhruv Narain
    Title:  Authorized Signatory

Address for Notices:
1370 Avenue of the Americas
32nd Floor
New York, NY 10019
Attn:  Dhruv Narain
Tel:  (646) 356-1650
Email:  dnarain@bassetmanager.com

# EXHIBIT 624

# INTENTIONALLY OMITTED

# EXHIBIT 625

# INTENTIONALLY OMITTED

# EXHIBIT 626

# INTENTIONALLY OMITTED

# EXHIBIT 627

# INTENTIONALLY OMITTED

# EXHIBIT 628

# INTENTIONALLY OMITTED

# EXHIBIT 629

Case 1:18-cv-10936-JSR Document 573-4 Filed 03/01/20 Page 185 of 207
Case 1:18-cv-10936-JSR Document 285-6 Filed 09/29/18 Page 56 of 116
10/25/2018                    NAVB Historical Stock Quotes - Navidea Biopharmaceuticals Inc. Historical Stock Quotes - MarketWatch



Log In                                           View All

October 25, 2018          11:53 PM EDT

| New York | London | Tokyo | | DOW | +401.13 | NASDAQ | +209.94 | S&P 500 | +49.47 |
| Closed | Closed | Open | | 24,984.55 | +1.63% | 7,318.34 | +2.95% | 2,705.57 | +1.86% |

Home   News Viewer   Markets   **Investing**   Personal Finance   Retirement   Economy   Real Estate   Entertainment

Watchlist   Alerts   Games

**Stocks**   Funds   ETFs   Options   Bonds   Commodities   Currencies   Crypto   Futures   FA Center   Tools   Getting Started   Premium Newsletters

# Navidea Biopharmaceuticals Inc.
NYSE AMERICAN: NAVB

Set Alerts
Market Index

Enter Symbols or Keywords [ GO ]

OVERVIEW   PROFILE   CHARTS   FINANCIALS   **HISTORICAL QUOTES**   ANALYST ESTIMATES   OPTIONS   SEC FILINGS   INSIDERS

After Hours - Quotes are delayed by 20 min      Oct 25, 2018, 9:56 p.m.

**$0.21**   -0.0001 -0.05%   Volume 10,167

| | Today's close | Day low | Day high | 52 week low | 52 week high |
|---|---|---|---|---|---|
| | **$0.22** -0.02 -10.12% | $0.22 | $0.24 | $0.13 | $0.68 |

Enter Date: 03/21/2016      Set

## Historical quote for: NAVB

Monday, March 21, 2016

| | |
|---|---|
| Closing price: | $0.97 |
| Open: | $0.94 |
| High: | $1.00 |
| Low: | $0.92 |
| Volume: | 322,522 |



Sponsored Links

**1. Data Analysis Tools**

**2. Top 10 Penny Stocks**

**3. High-dividend ETFs**

**4. Top Stocks to Buy**

**5. Best Stock to Buy Right Now**

**6. Stock Trading For Beginners**

# EXHIBIT 630

# INTENTIONALLY OMITTED

# EXHIBIT 631

| | |
|---|---|
| **From**: | Seth Gerszberg [seth@thecollective.com] |
| **Sent**: | 8/10/2015 11:29:20 PM |
| **To**: | Mark Nordlicht [mnordlicht@platinumlp.com] |
| **Subject**: | Re: Financing from scope if we can get 2m |

In Texas stuck landing in Chicago to late to get home.

Will look at what you wrote
And discuss it with my cousin.


Separately,
Not giving up on the bigger opportunity.
I figure of my odds are 5-10% worth the shot to try. Just don't look at me as a failure for for swinging


Sent from my iPhone

> On Aug 10, 2015, at 5:04 PM, Mark Nordlicht <mnordlicht@platinumlp.com> wrote:
>
> What about your cousin gets credited for 5 million investment in ppne?  It's 6 month paper , 30 days notice u get your money back 12 percent interest. We get credited for 5 million more into slam hype. He finances another 2.5 million  for holiday. He knows he is money good and getting 12 percent interest on full amount backed by 825 million in positions ( and growing with net inflows ). Hopefully we get u another couple million by mid sep. Can something like this work? We are in effect putting in another 7 in this scenario, u take care of your cousin etc.... I'm just trying to think outside the box. Best scenario is of course bring me 20 for ppne or give me idea for a 150 investor for mgmt stake 3 yr lock up. We are working on both. Slow go though. I really think by mid sep I can be back in balance but I understand that's too late for u. R u in city now?
>
> Sent from my iPad
>
>> On Aug 10, 2015, at 5:39 PM, "Seth Gerszberg" <seth@thecollective.com> wrote:
>>
>> Mark,
>>
>> When I told you we needed cash now to save holiday you said why didn't you tell me 2 weeks ago.
>>
>> I am sorry if I have not clearly enough explained that we are in big trouble.
>>
>> I am in Houston the stores are super light on product but the sales show so much opportunity.
>> If we could get inventory up and ship wholesale we would stop loosing and start making money through year end.
>>
>> We have so much opportunity of we don't screw this all up. Wholesale sales are less then half bookings but everything sells well. Retail continues to prove it can be great if fed. If this wasn't clear I would tell you and bail. At this point paying back the debt is harder then starting from scratch if we didn't see how quickly thus would pop.
>>
>> I really hope my personality of trying to stay calm hasn't hurt us.
>>
>> Here's the ask:
>>
>> Is there anyway to get a 1m this week and 1m next.
>>
>> I am sorry to push but here's what I have:
>>
>> 1) I put all my virtually all my money from the final IP sale of Ecko (30m+ in 2013 + I had put 10m in before that) back into the company.  I did this to:
>> A) Preserve my most critical industry relationships on the account and vendor side.
>> B) To do the right thing and to preserve the good name I built over 20 years.
>> C)  To preserve business elements and relationships that I needed to go forward. And relatively quickly reach profit levels worth more then my investment
>> D) to develop and acquire the raw elements necessary to launch effectively.
>>
>> 2) moshe and Shaul valued it at 15m which is fine.
>>
>> 3) we added platinum for 15m which is less fine but fine if we got the support necessary.
>>

CTRL7181651

>> 4) IMPORTANT: I took 2.5m of goods from my cousin Scope imports in oct / nov / dec of 2014. Scope has always been a resource of mine in the past for well in excess of 2.5m ie. They financed us through the bankruptcy and kept goods on order.
>> No real product flow interruption accused. We made money in 2014 from June to year end.
>>
>> 5) Platinum said I was not allowed to make any payments to Scope since January. No interest or slow service pay down plan on the 2.5m was offered.
>> As a result I couldn't ask them to execute purchases on our behalf over the last 8 months.
>> In the past I would have always asked for their help financing purchases. I have always made good on payables.
>>
>> 6) I am now burning everyone I preserved in the past and it's happening so quickly.
>>
>> 7) We are ok working real hard earning out of the debt build that was created together. I changed the strategy and didn't buy ebitda. You stalled on financial support a number of times for various reasons both reasonable and misguided.
>>
>> 8) I don't want to put pressure on you beyond what I already have.
>>
>> 9) If we don't get 1m this week and another next we are gonna be in real trouble.
>>
>> 10) over the last few months we have lost between 350-500k a week due to lost wholesale and retail sales.
>>
>> It has been ok cause I thought we would get funded by August. August funds meant we still catch holiday.
>>
>>
>> If we don't pay for goods at the port this week and next we will loose most of our holiday goods. We have already lost about 20%.
>>
>> No goods for holiday means we will loose money even at the time of year no one ever looses.
>>
>> I am over leveraged personally and I sit behind Platinum. My life savings,, carrier of filtered vendor and account relationships and most valued employees are all at risk beyond what's already lost.
>>
>> I was ok to sit behind you on losses and earn the debt and its interest back before we got to profits. I accept Abd acknowledge that I had changed the model and you have been supportive.
>>
>> I am just now at a point where everyone around me is saying I have to deliver this week or there will be no end to our future pain and losses.
>>
>> Finally,
>>
>> Emily is asking really tough questions.
>> They are totally valid and too uncomfortable to discuss as there are no answers that make sense.
>> If I don't produce something this week I / we are in real trouble.
>>
>> We are all in and have nothing left to give.
>>
>> I saw my cousin in Texas last night
>> I am visiting stores here today.
>> I am not sure but I think I can get my cousin to finance buys for us through year end if:
>> A) If you could organize 2m ( 1m this week and 1m next week )
>>
>> B) and a guarantee from platinum
>>
>> C) I could rotate his receivables and pay him down 10-20% of old each rotation added to cost of goods.
>>
>> I think he would agree to finance inventory through holiday
>>
>> I will cut more expenses and sell down what I can of karmaloop to reduce cash needs.
>>
>> Will need a some additional support to help pull pressure off mounting services providers shippers Warehouses etc who are beyond frustrated but would give us the opportunity to eliminate the question about our ability to perform.
>>
>>
>>
>>
>> Sent from my iPhone
>
>

CTRL7181651

```
>
>
> THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
> CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
> OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
> CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.
```

CTRL7181651

# EXHIBIT 632

| From: | Suzanne Horowitz [SHorowitz@platinumlp.com] |
|---|---|
| Sent: | 8/21/2015 1:41:14 PM |
| To: | Steve Finkelman [stevef@ScopeImp.com] |
| CC: | Gregg R. Donnenfeld [gregg@thecollective.com]; David Steinberg [DSteinberg@platinumlp.com]; Sharmila Makker (ECKO) [sharmilam@thecollective.com]; Seth Gerszberg [seth@thecollective.com]; William M. Kneller [bkneller@thecollective.com]; David Levy [dlevy@platinumlp.com] |
| Subject: | Re: Wire transfer confirmation |
| Attachments: | image003.gif; image006.jpg; image007.jpg; image003.gif; image003.gif; image003.gif; image003.gif |

Thank you Steve!

Best,
Suzanne

Sent from my iPhone

On Aug 21, 2015, at 9:38 AM, Steve Finkelman <stevef@ScopeImp.com<mailto:stevef@ScopeImp.com>> wrote:

<image006.jpg>

Aug 21, 2015 09:35:45 AM ET

SCOPE IMPORTS, INC.

Customer ID: SCOPE443

Detail Wire Transfer Activity Report

Operator ID: FINKS747

From 08/21/2015 Through 08/21/2015

<image007.jpg>

Wire Transfer

<image007.jpg>

Wire Transfer Activity Detail

 Debit Currency: USD

Debit Bank Name: WELLS FARGO BANK, NA

Debit Account Name: Epocs Real Estate PS Ltd

Account Number: 4159761246

_____

Debit Amount: 2,520,386.84 USD

Value Date: 08/21/2015

Template Name:
TC OPS - COLLECTIVE LLC

CEO® Tracking Number: 000004284

Execution Date: 08/21/2015

Type: Domestic

Fed/SWIFT Confirmation Number:


0821I1B7032R003361


Transaction Reference Number: 150821023273



Status: Confirmed

_____

Beneficiary Account Information:

Account Number:

588675277

Account Name:

TC Ops LLC

Account Address:

501 10th Ave, 7th Floor


New York, NY 10018


Beneficiary Bank Information:

Bank ID:

021000021

Bank Name:

CTRL7219960

JPMORGAN CHASE BANK, NA

Bank Address:

NEW YORK

NY


Form of Notification:

None




Originator to Beneficiary Information:

Per Letter Agreement to

Promissory Note dated Aug 12 2015

with Platinum Partners


Originator Information:

Name:

Epocs Real Estate Partnership Ltd

Address:

6300 West Loop South, Suite 100


Bellaire, TX 77401 US

Internal Reference:

ID / Account Number:



Intermediary Bank Information:

Data Not Provided

CTRL7219960

Audit Trail Information:

Created By: FINKS747 August 21, 2015 07:58:26 AM ET.


Last Modified By: FINKS747 August 21, 2015 07:58:26 AM ET.

Verified By: FINKS747 August 21, 2015 07:58:26 AM ET.


Verify-2 By:

Verify-3 By:


Verify-4 By:



From: Steve Finkelman
Sent: Thursday, August 20, 2015 6:13 PM
To: 'Gregg R. Donnenfeld'; Suzanne Horowitz; David Steinberg; Sharmila Makker (ECKO); Seth Gerszberg
Cc: William M. Kneller; David Levy
Subject: RE: Can I get an email link

. . and mine as well!

We will wire the funds to TC OPS LLC first thing in the a.m. and follow up with a confirmation to everyone.

Thanks,
Steve

From: Gregg R. Donnenfeld [mailto:gregg@thecollective.com]
Sent: Thursday, August 20, 2015 4:51 PM
To: Suzanne Horowitz; David Steinberg; Steve Finkelman; Sharmila Makker (ECKO); Seth Gerszberg
Cc: William M. Kneller; David Levy
Subject: RE: Can I get an email link

Attached are Seth and Emily's signatures···

Gregg Donnenfeld, Esq.
Executive Vice President & General Counsel
501 Tenth Avenue, Floor 7
(Entrance on W.38th Street)
New York, NY 10018
917-262-1193
Gregg@TheCollective.com<mailto:Gregg@TheCollective.com>

From: Suzanne Horowitz [mailto:SHorowitz@platinumlp.com]
Sent: Thursday, August 20, 2015 5:45 PM
To: David Steinberg; 'Steve Finkelman'; Sharmila Makker; Seth Gerszberg
Cc: Gregg R. Donnenfeld; William M. Kneller; David Levy
Subject: RE: Can I get an email link

Attached for signature please find the Amendment to Personal Guarantees and Associated Agreements as well as the fully executed side letter for each entity. Please return the fully executed Amendment- thank you.


Best,
Suzanne

Suzanne L. Horowitz | Chief Legal Officer | Platinum Partners
250 West 55th Street, 14th Floor, New York, NY 10019
tel: (212)271-7890 | fax: (212) 582-2424
shorowitz@platinumlp.com<mailto:shorowitz@platinumlp.com>

CTRL7219960

From: David Steinberg
Sent: Thursday, August 20, 2015 5:39 PM
To: 'Steve Finkelman'; Sharmila Makker (ECKO); Suzanne Horowitz; Seth Gerszberg
Cc: Gregg R. Donnenfeld; William M. Kneller; David Levy
Subject: RE: Can I get an email link

On the way back to you shortly.

_____

From: Steve Finkelman [mailto:stevef@ScopeImp.com]
Sent: Thursday, August 20, 2015 5:29 PM
To: David Steinberg; Sharmila Makker (ECKO); Suzanne Horowitz; Seth Gerszberg
Cc: Gregg R. Donnenfeld; William M. Kneller; David Levy
Subject: RE: Can I get an email link

Here is the revised WLS as well as the Epocs note from earlier.

Collective has provided wire instructions for TC Ops, LLC.  As soon as we get these signed docs back, we
'll get the wire going  although it may be too late for today.

Thanks,
Steve

From: David Steinberg [mailto:DSteinberg@platinumlp.com]
Sent: Thursday, August 20, 2015 4:12 PM
To: Steve Finkelman; Sharmila Makker (ECKO); Suzanne Horowitz; Seth Gerszberg
Cc: Gregg R. Donnenfeld; William M. Kneller; David Levy
Subject: RE: Can I get an email link

confirmed

_____

From: Steve Finkelman [mailto:stevef@ScopeImp.com]
Sent: Thursday, August 20, 2015 5:12 PM
To: Sharmila Makker (ECKO); Suzanne Horowitz; Seth Gerszberg
Cc: Gregg R. Donnenfeld; William M. Kneller; David Levy; David Steinberg
Subject: RE: Can I get an email link

David just called me to revise the retroactive interest on the West Loop portion of the note.

Here is what I have:

Initial principal, annualize interest, prorated for 230 days = $198,369.04, making revised note
$2,677,982.20.  David has agreed to pay $100k of this rolled in interest on or before Oct 31.  Interest
from August 19th  Aug 31 to be paid on Sep 1.  If I can get someone from Platinum to confirm, we'll
redo the West Loop Letter.

Steve

2,479,613.16

8/19/2015

Days

Annual

CTRL7219960

297,553.58

1/1/2015

230

Acc'd to 8/19

190,103.68


original

2,479,613.16

interest

190,103.68

revised

2,669,716.84


From: Sharmila Makker [mailto:sharmilam@thecollective.com]
Sent: Thursday, August 20, 2015 3:59 PM
To: Steve Finkelman; 'Suzanne Horowitz'; Seth Gerszberg
Cc: Gregg R. Donnenfeld; William M. Kneller; David Levy; David Steinberg
Subject: Re: Can I get an email link

Guys , I will loose 3 days if I don't get the wires out in the next 30 min ….

From: Steve Finkelman <stevef@scopeimp.com<mailto:stevef@scopeimp.com>>
Date: Thursday, August 20, 2015 at 4:20 PM
To: Ecko Unlimited <sharmilam@thecollective.com<mailto:sharmilam@thecollective.com>>, 'Suzanne Horowitz'
<SHorowitz@platinumlp.com<mailto:SHorowitz@platinumlp.com>>, Seth Gerszberg
<seth@thecollective.com<mailto:seth@thecollective.com>>
Cc: "Gregg R. Donnenfeld" <gregg@thecollective.com<mailto:gregg@thecollective.com>>, "William M. Kneller"
<bkneller@thecollective.com<mailto:bkneller@thecollective.com>>, David Levy
<dlevy@platinumlp.com<mailto:dlevy@platinumlp.com>>, David Steinberg
<DSteinberg@platinumlp.com<mailto:DSteinberg@platinumlp.com>>
Subject: RE: Can I get an email link

We are still waiting to get signed docs back from Platinum.  They have generously approved us funding
directly to you and I have funds ready to go.

From: Sharmila Makker [mailto:sharmilam@thecollective.com]
Sent: Thursday, August 20, 2015 3:16 PM
To: Steve Finkelman; 'Suzanne Horowitz'; Seth Gerszberg
Cc: Gregg R. Donnenfeld; William M. Kneller; David Levy; David Steinberg
Subject: Re: Can I get an email link

Would appreciate getting the funds asap so we don't loose any more days on delivering product , we can
send the wires out latest by 5 clock

From: Steve Finkelman <stevef@scopeimp.com<mailto:stevef@scopeimp.com>>
Date: Thursday, August 20, 2015 at 3:13 PM

To: 'Suzanne Horowitz' <SHorowitz@platinumlp.com<mailto:SHorowitz@platinumlp.com>>, Seth Gerszberg
<seth@thecollective.com<mailto:seth@thecollective.com>>, Ecko Unlimited
<sharmilam@thecollective.com<mailto:sharmilam@thecollective.com>>
Cc: "Gregg R. Donnenfeld" <gregg@thecollective.com<mailto:gregg@thecollective.com>>, "William M. Kneller"
<bkneller@thecollective.com<mailto:bkneller@thecollective.com>>, David Levy
<dlevy@platinumlp.com<mailto:dlevy@platinumlp.com>>, David Steinberg
<DSteinberg@platinumlp.com<mailto:DSteinberg@platinumlp.com>>
Subject: RE: Can I get an email link

Thanks very much Suzanne.

Regarding your question on Section 6, in the email chain exchange below with Mark
 "back interest at the rate of 1% per month will be paid to Scope on current o/s balance from Jan"
Section 6 is attempting to capture that.

Let me know if ok for me to sign a copy of these agreements and scan to you for your signatures.

Regards,
Steve


From: Suzanne Horowitz [mailto:SHorowitz@platinumlp.com]
Sent: Thursday, August 20, 2015 2:07 PM
To: Steve Finkelman; 'Seth Gerszberg'; Sharmila Makker (ECKO)
Cc: Gregg R. Donnenfeld; William M. Kneller; David Levy; David Steinberg
Subject: RE: Can I get an email link

Thank you Steve,

These drafts look good – other than can you please advise on the additional provision in Section 6 re:
the interest payment (in the West Loop letter).

With respect to your question on funding below, you can wire the money directly to the Collective. Thank
you.


Best regards,
Suzanne

Suzanne L. Horowitz | Chief Legal Officer | Platinum Partners
250 West 55th Street, 14th Floor, New York, NY 10019
tel: (212)271-7890 | fax: (212) 582-2424
shorowitz@platinumlp.com<mailto:shorowitz@platinumlp.com>

From: Steve Finkelman [mailto:stevef@ScopeImp.com]
Sent: Thursday, August 20, 2015 2:42 PM
To: David Steinberg; 'Seth Gerszberg'; Sharmila Makker (ECKO)
Cc: Gregg R. Donnenfeld; William M. Kneller; Suzanne Horowitz; David Levy
Subject: RE: Can I get an email link

David:

Attached are proposed revised Side Letters.  There is a lot of clear up and clean up, but don't believe
there is anything substantive we didn't agree on earlier.

We have funding ready to go.  Also need to know if ok with you guys if we fund Collective directly.

Thanks,
Steve

From: David Steinberg [mailto:DSteinberg@platinumlp.com]
Sent: Thursday, August 20, 2015 1:21 PM
To: 'Seth Gerszberg'; Sharmila Makker (ECKO); Steve Finkelman
Cc: Gregg R. Donnenfeld; William M. Kneller; Suzanne Horowitz; David Levy
Subject: RE: Can I get an email link

Steve, I believe we circualted the attached email yesterday and we need you to get back to us with any
comments/suggestions. Please REPLY ALL to this email.
Thanks, David

CTRL7219960

From: Seth Gerszberg [mailto:seth@thecollective.com]
Sent: Thursday, August 20, 2015 2:18 PM
To: Sharmila Makker; Steve Finkelman
Cc: Gregg R. Donnenfeld; David Steinberg; William M. Kneller
Subject: Re: Can I get an email link


Steve

David said they are waiting in some docs from you
Sorry it aware of specifics
Sent from my iPhone

On Aug 20, 2015, at 2:05 PM, Sharmila Makker
<sharmilam@thecollective.com<mailto:sharmilam@thecollective.com>> wrote:
Getting wires out today verses tom will make a huge diff as fty's will be able to dispatch original
documents tom for the shipments at the port verses sending on Monday ,

Hoping to get the funds in the account asap , my wires are all set up ⋯.

From: Seth Gerszberg <seth@thecollective.com<mailto:seth@thecollective.com>>
Date: Thursday, August 20, 2015 at 1:57 PM
To: "Gregg R. Donnenfeld" <gregg@thecollective.com<mailto:gregg@thecollective.com>>, David Steinberg
<DSteinberg@platinumlp.com<mailto:DSteinberg@platinumlp.com>>
Cc: Ecko Unlimited <sharmilam@thecollective.com<mailto:sharmilam@thecollective.com>>, "William M.
Kneller" <bkneller@thecollective.com<mailto:bkneller@thecollective.com>>
Subject: Fwd: Can I get an email link

Sharm david and gregg  are trying to get you relief today
Follow up with them

Thanks all

Sent from my iPhone

Begin forwarded message:
From: Steve Finkelman <stevef@ScopeImp.com<mailto:stevef@ScopeImp.com>>
Date: August 20, 2015 at 10:12:11 AM EDT
To: "'Gregg R. Donnenfeld'" <gregg@thecollective.com<mailto:gregg@thecollective.com>>
Cc: Seth Gerszberg <seth@thecollective.com<mailto:seth@thecollective.com>>, "Alan Finkelman (AOL)"
<asfinkelman@aol.com<mailto:asfinkelman@aol.com>>
Subject: RE: Can I get an email link
Gregg:

I have all the funds in place now.  Only two things pending - agreement on the documents and hopeful
approval of Platinum to wire funds directly to your account.

Here is where I am on the documents (waiting for our in-house attorney to review as well):

1.  My working assumption is the "Promissory Note" is set in stone; any modifications would go in the
"Side Letter"

2.  There should be two side letters: one for West Loop and one for Epocs.

3.  Both side letters:
a. should state the amount of the respective loan (WLS-$2,479,613.16; Epocs-$2,520,386.84)
b. Maturity Date needs to by December 31, not Jan 1.  I will propose December 28 just to give us three
business days and maturity payment by wire transfer to make sure it's posted to our accounts before year
end.
c.  Under New York law as you stated to be consistent with items 10-13 of the Promissory Note.
d.  You raised an issue regarding item 17 of the Promissory Note.  It seems to me this gives certain
rights to the Lender only (us), not the Borrower, so not clear on why we would ask to remove this.

4.  WLS side letter
a.  state the balance is assignment of receivable from Collective
b.  state the Sept 1 interest payment will cover period from Jan 1-Aug 31.

5.  Epocs side letter
a.  Hopefully state that funds can be directly forwarded to Collective.

CTRL7219960

Thanks,
Steve

-----Original Message-----
From: Gregg R. Donnenfeld [mailto:gregg@thecollective.com]
Sent: Wednesday, August 19, 2015 9:15 PM
To: Steve Finkelman
Cc: Seth Gerszberg; Alan Finkelman (AOL)
Subject: Re: Can I get an email link

Great!  Thank you.

Gregg Donnenfeld, Esq.
Executive Vice President
917-262-1193
Gregg@TheCollective.com<mailto:Gregg@TheCollective.com>

Sent from my iPhone
On Aug 19, 2015, at 10:06 PM, Steve Finkelman <stevef@ScopeImp.com<mailto:stevef@ScopeImp.com>> wrote:

I asked already.  Not sure if they will go for that (not sure why not as long as we provide a copy of the
wire transfer).  Meanwhile, I did a few gymnastics this afternoon, but believe I can have all the funds
in place tomorrow.

Thanks,
Steve

-----Original Message-----
From: Gregg R. Donnenfeld [mailto:gregg@thecollective.com]
Sent: Wednesday, August 19, 2015 8:12 PM
To: Steve Finkelman
Cc: Seth Gerszberg; Alan Finkelman (AOL)
Subject: RE: Can I get an email link

Steve - Additional comment for you to include when you revert to Platinum:  the existing documentation
provides for payment to be made to the Fund.  The side letter should override that directing that payment
be made directly to The Collective.  Thanks.

Gregg Donnenfeld, Esq.
Executive Vice President & General Counsel The Collective
501 Tenth Avenue, Floor 7 (Entrance on W. 38th Street) New York, NY 10018
Gregg@TheCollective.com<mailto:Gregg@TheCollective.com> / 917-262-1193


-----Original Message-----
From: Steve Finkelman [mailto:stevef@ScopeImp.com]
Sent: Wednesday, August 19, 2015 8:43 PM
To: Gregg R. Donnenfeld
Cc: Seth Gerszberg; Alan Finkelman (AOL)
Subject: Re: Can I get an email link

Thanks very much, Gregg.

Steve

Sent from my iPhone

On Aug 19, 2015, at 7:28 PM, Gregg R. Donnenfeld
<gregg@thecollective.com<mailto:gregg@thecollective.com>> wrote:

I'm not familiar with these types of documents governing Funds so don't know what type of language is in
or outside the norm.  But here's what jumped out to me in addition to the issues you mentioned below:


1.      They only sent you one note and side letter for Epocs... but you'll need the same for West Loop
as well.


2.      Not sure why the loan document is governed by NY law but the side letter governed by Delaware
law... it would seem that they should conform and Delaware should be changed to NY

CTRL7219960

3.      I'm not sure of the basis for Section 17 that talks about the Lender assigning the Note. I suggest you ask about this to be sure that you have adequate protections.. perhaps on such a short term note they will remove the paragraph. I don't suspect any ill-motive behind the clause; it's probably standard and fair; but I don't know so flagging it for review and further understanding.

Gregg Donnenfeld, Esq.
Executive Vice President & General Counsel The Collective
501 Tenth Avenue, Floor 7 (Entrance on W. 38th Street) New York, NY 10018
Gregg@TheCollective.com<mailto:Gregg@TheCollective.com><mailto:Gregg@TheCollective.com> / 917-262-1193

From: Steve Finkelman [mailto:stevef@ScopeImp.com]
Sent: Wednesday, August 19, 2015 7:01 PM
To: Gregg R. Donnenfeld
Cc: Seth Gerszberg; Alan Finkelman (AOL)
Subject: FW: Can I get an email link

Gregg:

Please review and let me know if you have any comments. I'll do the same this evening. I see a few things already such as the Side Letter states Maturity Date of January 1, 2016 when we agreed payment in full prior to Dec 31, 2015. Also, needs to address interest to be paid on current balance from Jan 1 (perhaps in the Side Letter as well).

Thanks,
Steve

From: Suzanne Horowitz [mailto:SHorowitz@platinumlp.com]
Sent: Wednesday, August 19, 2015 3:11 PM
To: Steve Finkelman; 'Gregg R. Donnenfeld'; Seth Gerszberg
Cc: William M. Kneller; David Levy; Naftali Manela; Daniel Mandelbaum; David Steinberg
Subject: RE: Can I get an email link

Thank you Steve for the information below.

Attached for your review please find the following documents:

*        Promissory Note dated August 12, 2015; and

*        Letter Agreement with respect to the Promissory Note.

Please sign the Letter Agreement (please fill in the address where noted) and we will return a fully executed copy to you. Thank you.


Best regards,
Suzanne

Suzanne L. Horowitz | Chief Legal Officer | Platinum Partners
250 West 55th Street, 14th Floor, New York, NY 10019
tel: (212)271-7890 | fax: (212) 582-2424
shorowitz@platinumlp.com<mailto:shorowitz@platinumlp.com><mailto:shorowitz@platinumlp.com>

From: Steve Finkelman [mailto:stevef@ScopeImp.com]
Sent: Wednesday, August 19, 2015 2:51 PM
To: David Steinberg; 'Gregg R. Donnenfeld'; Seth Gerszberg
Cc: William M. Kneller; Suzanne Horowitz; David Levy; Naftali Manela; Daniel Mandelbaum
Subject: RE: Can I get an email link

Entity for new funding ($5m less $2,479,613.16 = $2,520,386.84) will be from Epocs Real Estate Partnership, Ltd., a Texas limited partnership. There are three general partners (any of the three has legal authority to bind the partnership) – Alan, Steven and Ronnie Finkelman. The entity holding the $2,479,613.16 current debt is West Loop South, LLC, a Texas limited liability company. The same three of us are member/managers of this entity.

Two other questions:

1.   In order to speed up the funding, is it possible for Epocs to direct fund to Collective? If not, please get us the wiring instructions so we can get that set up in our system (we have Collective's wire information already!).

CTRL7219960

2.   I can get around half the funds ASAP, the balance may take a few additional days.  Is funding in two parts acceptable in the interest of speeding this up?

Thanks,
Steve

From: David Steinberg [mailto:DSteinberg@platinumlp.com]
Sent: Wednesday, August 19, 2015 1:38 PM
To: 'Gregg R. Donnenfeld'; Seth Gerszberg
Cc: William M. Kneller; Steve Finkelman; Suzanne Horowitz; David Levy; Naftali Manela; Daniel Mandelbaum
Subject: RE: Can I get an email link

Thanks.

2.   The fund interests can be divided into two entities.

3.   Yes. it should be rounded to five.




From: Gregg R. Donnenfeld [mailto:gregg@thecollective.com]
Sent: Wednesday, August 19, 2015 2:27 PM
To: Seth Gerszberg; David Steinberg
Cc: William M. Kneller; Steve Finkelman
Subject: RE: Can I get an email link

1.   The payable owing is $2,479,613.16.

2.   Steve will revert by end of day with the name(s) of the entity(ies) that will hold the fund interest... but he is asking whether or not it may be possible to divide up that fund interest into two companies rather than just 1.  Pls. advise and Steve will then give the final answer on this.


3.   Steve is also asking if he should be funding $2.5MM even or if the number needs to be $2.5MM rounded up a little bit to render the total $5MM even.

Thanks.

Gregg Donnenfeld, Esq.
Executive Vice President & General Counsel
501 Tenth Avenue, Floor 7
(Entrance on W.38th Street)
New York, NY 10018
917-262-1193
Gregg@TheCollective.com<mailto:Gregg@TheCollective.com><mailto:Gregg@TheCollective.com>

From: Seth Gerszberg
Sent: Wednesday, August 19, 2015 2:20 PM
To: David Steinberg
Cc: William M. Kneller; Gregg R. Donnenfeld; Steve Finkelman
Subject: Re: Can I get an email link

Steven, bill can you guys help us get the data

Sent from my iPhone

On Aug 19, 2015, at 2:17 PM, David Steinberg
<DSteinberg@platinumlp.com<mailto:DSteinberg@platinumlp.com><mailto:DSteinberg@platinumlp.com>> wrote:
I need the info on your cousin's payables and who's name he wants the interests in the fund.

You sent me a two word cryptic email before...



On Aug 19, 2015, at 2:13 PM, Seth Gerszberg
<seth@thecollective.com<mailto:seth@thecollective.com><mailto:seth@thecollective.com>> wrote:
David

Please push for tomorrow funding
Already loosing tons of orders and holiday receipts need to stop bleeding this week

Sent from my iPhone

Begin forwarded message:
From: Sharmila Makker
<sharmilam@thecollective.com<mailto:sharmilam@thecollective.com><mailto:sharmilam@thecollective.com>>
Date: August 18, 2015 at 11:30:21 AM EDT
To: Seth Gerszberg
<seth@thecollective.com<mailto:seth@thecollective.com><mailto:seth@thecollective.com>>, "William M.
Kneller"
<bkneller@thecollective.com<mailto:bkneller@thecollective.com><mailto:bkneller@thecollective.com>>, Emily
Holton <emily@thecollective.com<mailto:emily@thecollective.com><mailto:emily@thecollective.com>>, "Gregg
R. Donnenfeld" <gregg@thecollective.com<mailto:gregg@thecollective.com><mailto:gregg@thecollective.com>>
Subject: Re: Can I get an email link
Any chance in getting the funds this week ? I need 10 days to get the goods custom cleared and delivered
to plg after we wire the funds and the wovens em needs will only get on a vessel after we pay ....

From: Seth Gerszberg
<seth@thecollective.com<mailto:seth@thecollective.com><mailto:seth@thecollective.com>>
Date: Tuesday, August 18, 2015 at 6:51 AM
To: Ecko Unlimited
<sharmilam@thecollective.com<mailto:sharmilam@thecollective.com><mailto:sharmilam@thecollective.com>>,
"William M. Kneller"
<bkneller@thecollective.com<mailto:bkneller@thecollective.com><mailto:bkneller@thecollective.com>>, Emily
Holton <emily@thecollective.com<mailto:emily@thecollective.com><mailto:emily@thecollective.com>>, "Gregg
R. Donnenfeld" <gregg@thecollective.com<mailto:gregg@thecollective.com><mailto:gregg@thecollective.com>>
Subject: Fwd: Can I get an email link

Bill need exact west loop number

Sent from my iPhone

Begin forwarded message:
From: Steve Finkelman <stevef@ScopeImp.com<mailto:stevef@ScopeImp.com><mailto:stevef@ScopeImp.com>>
Date: August 18, 2015 at 4:32:25 AM EDT
To: Mark Nordlicht
<mnordlicht@platinumlp.com<mailto:mnordlicht@platinumlp.com><mailto:mnordlicht@platinumlp.com>>
Cc: Seth Gerszberg
<seth@thecollective.com<mailto:seth@thecollective.com><mailto:seth@thecollective.com>>, Alan Finkelman
<alan@scopeimp.com<mailto:alan@scopeimp.com><mailto:alan@scopeimp.com>>
Subject: Re: Can I get an email link
Mark:

Nice speaking with you this morning and sorry for not sending this until now.  Being in Vegas and without
a laptop makes this a bit cumbersome.

Here is where I believe we clarified a few issues.
1.  Soon after funding, back interest at the rate of 1% per month will be paid to Scope on current o/s
balance from Jan 1.  Thereafter, interest will be paid monthly on the total o/s 2.  Repayment in full
prior to Dec31.

Based on above, I think the next step is for you to draft the required documents.  For legal purposes,
the current o/s is due to West Loop South, LLC and the fresh funds will come from a different entity due
to our bank line covenants.  I am returning to Houston tomorrow night and should be able to get you the
entity name Wednesday, maybe even tomorrow if that would be helpful.  Seth and I also need to confirm the
exact amount due West Loop.

I possibly need a few days to figure out funding on our side.  I'm pretty certain half can be arranged
for Wed or Thur. pending completion of documents.

Just trying to lay out the pieces to make sure we are covering everything and very quickly.

Thanks,
Steve


Sent from my iPhone

CTRL7219960

On Aug 16, 2015, at 6:41 PM, Seth Gerszberg
<seth@thecollective.com<mailto:seth@thecollective.com><mailto:seth@thecoll
ective.com>> wrote:

Alan , Mark,

I have attached some background on platinum funds. I have also cc'd steve alan finkelmans brother.

I believe mark will be attempting to call alan this afternoon/evening

Mark, alan is in Vegas so no time is to late but try to call as soon as you can.

Offer to be discussed.

"What about your cousin gets credited for 5 million investment in ppne?  It's 6 month paper , 30 days
notice u get your money back 12 percent interest. We get credited for 5 million more into slam hype. He
finances another 2.5 million  for holiday. He knows he is money good and getting 12 percent interest on
full amount backed by 825 million in positions (and growing with net inflows)."

To recap:
The collective owes 2.5m to the finkelmans since December. That debt sits behind platinum as an unsecured
payable. The Platinums loan sit second behind Rosenthals.  Mark would put a $5M investment in as a 12%
annual interest bearing loan to the Platinum fund in the Finkelmans name. This loan would be secured by
the 825m of funds in the fund. The note would be able to be redeemed for $5M on 60 days notice from New
Years. The note is to the PPVA fund (info attached below) the PPVA fund has been around for 13 years and
has produced an average annual return of 18%.
The collective would reduce its payables to the finkelmans by $2.5M and would increase its note to
platinum to $5M.

The finkelmans would intern purchase another $2.5M of inventory on behalf of the collective.

Because the finkelmans have been exposed and because of the timing and liquidity concerns they would also
like to have their loan to PPVA further secured by a 5m convertible position in front of PPVA behind
Rosenthal in the collective.
This is simply an added security but is not the intended exit.

I am hopeful this opportunity to help us add inventory and liquidity also helps all parties favorably
resolve an otherwise unfavorable position.

Please contact each other tonight if possible:

Alan: 1 (713)-823-5153
Mark: 1 (917) 692-4600

Thanks
Seth

From: David Steinberg
<DSteinberg@platinumlp.com<mailto:DSteinberg@platinumlp.com><mailto:DSt
einberg@platinumlp.com>>
Date: August 14, 2015 at 10:52:30 AM EDT
To: 'Seth Gerszberg'
<seth@thecollective.com<mailto:seth@thecollective.com><mailto:seth@thecoll
ective.com>>, Mark Nordlicht
<mnordlicht@platinumlp.com<mailto:mnordlicht@platinumlp.com><mailto:mno
rdlicht@platinumlp.com>>
Cc: Joe Mann
<JMann@platinumlp.com<mailto:JMann@platinumlp.com><mailto:JMann@platinumlp.c
om>>
Subject: RE: Can I get an email link

Joe - can you please send Seth the latest pres's on PPVA and PPCO?
Thanks.

-----Original Message-----
From: Seth Gerszberg [mailto:seth@thecollective.com]

CTRL7219960

Sent: Thursday, August 13, 2015 4:44 PM
To: Mark Nordlicht
Cc: David Steinberg
Subject: Can I get an email link

Looking for a link to a digital version of the blue folders for ppva and Ppc.

Thank you

Sent from my iPhone


THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.


THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN

CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE

OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE

CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.


THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN

CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE

OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE

CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.


THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN

CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE

OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE

CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.


THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN

CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE

OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE

CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

THIS E-MAIL IS FOR THE SOLE USE OF THE INTENDED RECIPIENT(S) AND MAY CONTAIN
CONFIDENTIAL AND PRIVILEGED INFORMATION.ANY UNAUTHORIZED REVIEW, USE, DISCLOSURE
OR DISTRIBUTION IS PROHIBITED. IF YOU ARE NOT THE INTENDED RECIPIENT, PLEASE
CONTACT THE SENDER BY REPLY E-MAIL AND DESTROY ALL COPIES OF THE ORIGINAL E-MAIL.

CTRL7219960